IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY, THE HONORABLE DERRICK ROSE, MICHAEL MONTEZ, PENNY POPE, and SONNY JAMES, | § § § § § | |
| *Plaintiffs* | § § § | |
| vs. | § § | Civil Action No. 3:22-cv-00057 |
| GALVESTON, TEXAS; and THE HONORABLE MARK HENRY, in his capacity as Galveston County Judge | § § § § § | |
| *Defendants* | § § § § | |

**SECOND AMENDED COMPLAINT**

Plaintiffs Terry Petteway, the Honorable Derrick Rose, Michael Montez, Penny Pope, and Sonny James bring this action under the U.S. Constitution, 42 U.S.C. § 1983, and 52 U.S.C. § 10301 *et seq.* against Defendants Galveston County and the Honorable Mark Henry in his official capacity as Galveston County Judge, and allege the following:

## I.    INTRODUCTION

1.    In 2021, Galveston County (the "County") finally succeeded in adopting the discriminatory redistricting plan that the United States Department of Justice ("DOJ") prevented it from adopting in 2012.

- 1 -

2.      During the 2011 redistricting cycle, the County adopted a redistricting plan to diminish the equal opportunity for Black and Latino voters to elect candidates for the Commissioners Court. At that time, the County was subject to federal preclearance under the Voting Rights Act ("VRA").

3.      The DOJ objected to, and obtained an injunction against, the Commissioners Court plan under Section 5 of the Voting Rights Act. DOJ and the County eventually negotiated a plan for the Commissioners Court which maintained an opportunity district for Black and Latino voters in the County.

4.      The district court subsequently issued a permanent injunction which ordered the County to adopt the Commissioners Court plan negotiated with the DOJ. *Petteway v. Henry,* No. 3:11-cv-00511, Dkt. 69 at 1 (March 23, 2012).

5.      The 2020 census showed that there was substantial growth of the County's minority voting age population in the past decade.

6.      Despite this growth, the County adopted a map which would eliminate the sole minority opportunity district for the Commissioners Court—virtually the same plan that failed to pass preclearance in 2012. The 2021 Commissioners Court plan would reduce the ability of Black and Latino voters to elect their candidates of choice by intentionally dismantling a majority-minority precinct and cracking Black and Latino voters across four precincts.

7.   Plaintiffs hereby file suit challenging these redistricting changes as intentionally discriminatory and as violative of Section 2 of the VRA, as well as the Fourteenth and Fifteenth Amendments.

## II.   JURISDICTION AND VENUE

8.   This Court has jurisdiction under 28 U.S.C. §§ 1343(a) and 1357, 42 U.S.C. § 1983, and 52 U.S.C. § 10301 *et seq.* to hear this action's claims for legal and equitable relief. This Court also has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws and Constitution of the United States. This Court also has general jurisdiction to grant the declaratory and injunctive relief requested by Plaintiffs under 28 U.S.C. §§ 2201 and 2202, the Declaratory Judgment Act, and Federal Rules of Civil Procedure 57 and 65.

9.   Jurisdiction for Plaintiffs' claim for costs and attorneys' fees is based upon Federal Rule of Civil Procedure 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e).

10.   This Court has personal jurisdiction over all Defendants. Defendant Mark Henry is a Galveston County official who resides in Texas and performs official duties in Galveston, Texas. Defendant Galveston County is a political subdivision located within the Southern District of Texas.

11.   Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred or will occur in this judicial district. In addition, Defendant is a county official performing official duties in the Southern District of Texas.

### III.   PARTIES

12.     Plaintiffs Terry Petteway, the Honorable Derrick Rose, Michael Montez, Penny
        Pope, and Sonny James are citizens, registered voters, and current or former elected
        officials in Galveston County.

13.     Plaintiffs plan to vote in future elections for the Galveston County Commissioners.

14.     Plaintiff Terry Petteway is an African American resident of Galveston County who
        resides in a predominately Black and Hispanic voting tabulation district and
        formerly served as a Galveston County Constable.

15.     Under the prior Commissioners Court map, Mr. Petteway resided in Commissioner
        Precinct 3.

16.     Under the enacted plan, Mr. Petteway now resides in Commissioner Precinct 2.

17.     As a result of the adoption of that plan, Mr. Petteway will no longer have the equal
        opportunity to elect his candidate of choice for Commissioners Court.

18.     Plaintiff the Honorable Derrick Rose is an African American resident of Galveston
        County who resides in a predominately Black and Hispanic voting tabulation district
        and currently serves as a Galveston County Constable.

19.     Under the prior Commissioners Court map, Mr. Rose resided in Commissioner
        Precinct 3.

20.     Under the enacted plan, Mr. Rose resides in Commissioner Precinct 1.

21.     As a result of the adoption of that plan, Mr. Rose will no longer have the equal
        opportunity to elect his candidate of choice for Commissioners Court.

- 4 -

22.   Plaintiff Michael Montez is a Latino resident of Galveston County who resides in a predominantly Black and Hispanic voting tabulation district and formerly served as a Galveston County Constable.

23.   Under the prior Commissioners Court map, Plaintiff Montez resided in Commissioner Precinct 1.

24.   Under the enacted plan, Mr. Montez will reside in Commissioner Precinct 1.

25.   As a result of the adoption of that plan, Mr. Montez will lack the opportunity to elect his candidate of choice for Commissioners Court.

26.   Plaintiff Penny Pope is an African American resident of Galveston County who resides in a predominately Black and Hispanic voting tabulation district and formerly served as a Galveston County Justice of the Peace.

27.   Under the prior Commissioners Court map, Plaintiff Pope resided in Commissioner Precinct 3. Under the enacted plan, Ms. Pope will remain in Commissioner Precinct 3.

28.   Because Commissioner Precinct 3 is no longer an opportunity district, Ms. Pope will no longer have the equal opportunity to elect her candidate of choice for Commissioners Court.

29.   Plaintiff Sonny James is an African American resident of Galveston County who resides in a predominantly Black and Hispanic voting tabulation district and formerly served as a Galveston County Justice of the Peace.

30.  Under the prior Commissioners Court map, Plaintiff James resided in Commissioner Precinct 4. Under the enacted plan, Mr. James will reside in Commissioner Precinct 3.

31.  As a result of the adoption of that plan, Mr. James will not have the equal opportunity to elect his candidate of choice for Commissioners Court.

32.  Defendant Galveston County is a political subdivision of the State of Texas. Galveston County, Texas, may be served by service upon Mark Henry, County Judge at 722 1st Street, Galveston, Texas 77550.

33.  Defendant the Honorable Mark Henry is the County Judge of Galveston County. Defendant Henry is sued in his official capacity as the Chief Officer of Galveston County. Mark Henry, County Judge of Galveston may be served at 722 1st Street, Galveston, Texas 77550.

## IV.   <u>FACTS</u>

### *2011 Commissioners Court Plan*

34.  In 2011, Defendants adopted a plan for the Galveston County Commissioners Court.

35.  The plan would have diminished the opportunity for Black and Latino voters to elect candidates for Commissioners Court in two precincts, including Precinct 3, the only opportunity district and the only district represented by a minority Commissioner.

36.  At the time the map was passed, Galveston County was subject to federal preclearance under Sections 4 and 5 of the VRA, and as such had to submit the Commissioners Court plan to DOJ for approval.

37.   The DOJ objected to the plan for several reasons and concluded the County had "not met its burden of showing that the proposed plan was adopted with no discriminatory purpose." *See* Exhibit 1 ("DOJ Objection Letter") at 2.

38.   First, DOJ stated that the County failed to adopt appropriate redistricting criteria to inform its process.

39.   The DOJ "establishe[d] that there was a deliberate decision by the county to avoid being held to a procedural or substantive standard of conduct" to ensure that the County complied with its obligations under federal law and the Constitution. *Id*. at 2.

40.   Second, DOJ stated that the process for adopting the map was "characterized by the deliberate exclusion from meaningful involvement in key deliberations of the only member of the commissioners court elected from a minority ability-to-elect precinct." *Id.*

41.   DOJ noted that the lack of meaningful involvement by the community was demonstrated by the fact that the map was introduced and passed by the Commissioners Court on the same day. *Id.*

42.   Third, DOJ stated that the plan would result in retrogression in the voting strength of minority voters to elect candidates for Commissioners Court, because the plan would relocate the primarily-Anglo (white) Bolivar district into Precinct 3, thereby diluting the voting strength of Black voters in the district. *Id.* at 2-3.

43. DOJ noted that this retrogression was "neither required nor inevitable," which "heighten[ed] [its] concerns that the county has not met its burden of showing that the change was not motivated by any discriminatory purpose." *Id*. at 3.

44. DOJ negotiated with Defendants to adopt a map to which DOJ would not object.

45. On March 22, 2012, Defendants adopted the negotiated map. *See Petteway v. Henry,* No. 3:11-cv-00511, Dkt. 65 at 4 (Mar. 23, 2012).

46. The map negotiated by DOJ (hereafter "the Benchmark Plan") maintained Precinct 3 as an opportunity district and allowed Black and Latino voters an opportunity to elect their Commissioner of choice.

### *The 2020 Census*

47. The U.S. Census Bureau released the 2020 Census redistricting data on August 25, 2021.

48. The 2020 Census revealed that the total population of Galveston County increased by more than 20 percent, from 291,309 residents during the 2010 Census to 350,682 residents during the 2020 Census.

49. Between the 2010 and 2020 Census, the Black voting age population ("VAP") in the County increased by more than 15 percent.

50. Black VAP went from 29,545 in 2010 to 35,043 in 2020.

51. The Hispanic or Latino VAP increased by more than 29 percent from 42,649 in 2010 to 60,159 in 2020.

52.    The Black and Hispanic VAP increased from a combined 33.2 percent to 35.6 percent of the total VAP between 2010 and 2020.

53.    As a result of this substantial growth in the County's minority population, the white share of the County's VAP fell from 62.8 percent in 2010 to 58.0 percent in 2020.

54.    On November 1, 2021, the Elections Division of the Texas Secretary of State issued an advisory directing all county officials in the State to submit any proposed changes to Commissioners Court or Constable and Justice of the Peace precinct maps by November 13, 2021. *See* Tex. Sec'y of State, Election Advisory No. 2021-14 (Nov. 1, 2021), available at

https://www.sos.texas.gov/elections/laws/advisory2021-14.shtml.

### *The 2021 Galveston County Redistricting Process Featured Intentional Racial Discrimination*

55.    Despite the increase in the population of Black and Latino voters, the County intentionally made radical changes to the Commissioners precincts for the purpose of *denying* Black and Latino voters the opportunity to elect their preferred candidate.

56.    The Benchmark Plan, which was used for Commissioners Court elections beginning in 2012, contains one precinct, Precinct 3, in which Black and Latino voters form a majority of the voting age population.

57.    Using 2020 Census data, the VAP of Benchmark Precinct 3 is 32 percent Black and 30.6 percent Latino.

58.   The Citizen Voting Age Population ("CVAP") is 33.3 percent Black and 25.2 percent Latino.

59.   The map below shows the benchmark Commissioners precincts with blue shading identifying the voting tabulation districts ("VTDs") with substantial minority populations greater than 30 percent of the total population.

**BENCHMARK COMMISSIONERS COURT PLAN**



60.   As a majority-minority Commissioner district on both a VAP and CVAP basis, Precinct 3 in the Benchmark Plan has long performed to provide Black and Latino voters the opportunity to elect their preferred candidate.

61.     Since 1999, the majority-minority precinct has been represented by Stephen D. Holmes, a Black man.

62.     Stephen D. Holmes is the candidate of choice of Black and Latino voters in that precinct.

63.     The 2020 Census revealed that the Benchmark Plan was malapportioned.

64.     Shifting just one VTD in the Benchmark Plan, however, would have balanced the population to be within a legally permissible deviation.

65.     Yet the 2021 enacted plan radically alters the Commissioner precincts, dismantling Precinct 3 and cracking its Black and Latino voters across all four precincts, as shown below.

**2021 ENACTED COMMISSIONERS COURT PLAN (MAP 2)**



66.     By spreading the County's Black and Latino population across all four Commissioner precincts, the County has ensured that these voters will have no opportunity to elect their preferred candidate in any precinct.

67.     This discriminatory cracking of Black and Latino voters was not accidental.

68.     The decision to crack apart the County's Black and Latino voters was the product of intentional racial discrimination.

69.     As in 2011, the County adopted no redistricting criteria to guide the drawing of precinct lines. The DOJ concluded that the County's failure to adopt criteria—a

departure from past practice—evidenced a racially discriminatory motive and an attempt to hide the true purpose of the plan.

70.    Around November 9, 2021, the County released two proposed maps to redraw the district lines for the Commissioners Court.

71.    To draw the proposed maps, the Commissioners employed the same attorneys who drew the maps previously denied preclearance by the DOJ in 2011.

72.    The first proposal, Map 1, largely maintained the same lines as the map implemented in 2011 but added the mostly Anglo Bolivar Peninsula to Commissioner Precinct 3.

73.    Under this proposal, Precinct 3 would have retained its status as a majority-minority VAP precinct.

74.    Under Map 1, Black and Latino voters would have constituted 58 percent of the precinct's VAP, a smaller majority than under the Benchmark Map.

75.    The second proposal or Map 2—the one ultimately adopted and shown above— entirely dismantled Precinct 3 as a performing majority-minority precinct.

76.    On November 12, 2021, the Commissioners Court held a public hearing regarding the two proposed plans.

77.    During that hearing, the Commissioners Court heard public testimony on the adoption of Map 2.

78.    Many residents expressed concern during the hearing that the map would significantly dilute minority communities' voting strength in the County and

eliminate any opportunity for Black and Latino voters to elect their candidate of choice.

79.   Indeed, residents spoke at length during the hearing about the racially discriminatory results that would arise if Map 2 was adopted.

80.   Residents alleged during the hearing that Map 2 was drawn to ensure the electoral defeat of Precinct 3 Commissioner Stephen Holmes, who residents described as the only commissioner who represented the interests of the Black and Latino community.

81.   The 2021 Galveston County redistricting process featured significant departures from procedural norms, similar to the 2011 redistricting process.

82.   Apart from the 2011 process decried by the DOJ, the County Commissioners Court has historically held multiple public redistricting hearings at different sites across the county with ample time to obtain and consider feedback from the public prior to the deadline to adopt a redistricting plan.

83.   In the past, those meetings were held in the evening to allow more members of the public to attend without missing work.

84.   Yet the November 12 hearing, held in the middle of the afternoon just three days after the proposed plans were released, was the only public meeting regarding the Commissioners Court map proposals.

85.   When residents asked for additional public meetings during the hearing, Defendant Judge Henry stated that additional meetings were not possible because the deadline

for counties to submit county maps to the Secretary of State was the following day, November 13, 2021.

86.    Judge Henry did not explain why earlier public meetings were not scheduled by the Commissioners Court, nor why the only public meeting for the proposed maps was held just one day before the deadline to submit the maps to the Secretary of State.

87.    That sole meeting was held in an annex building in League City, rather than the normal Commissioners Court room in Galveston.

88.    The building was surrounded by construction sites, and the hearing was held in a room less than half the size of the normal meeting room in Galveston.

89.    No microphones were provided for the public to provide comment, and there was no overflow room.

90.    Because of the absence of microphones, the public had difficulty hearing the County Judge and the Commissioners.

91.    At the beginning of the hearing, when members of the public (many of whom were Black and Latino) alerted Judge Henry that they could not hear him, he said "I'm going to speak at this tone that's all I can do I'm not going to scream I don't have a microphone."

92.    After the public grumbled at this response, Judge Henry raised his voice, yelling that "I will clear you out if you make noise, I will clear you out of here."

93.    He added, pointing to law enforcement, "I've got constables here!"

94. The public, crammed into the small room, flowing out of doors on both sides of the room, and lining the hallways (in the midst of a pandemic), made clear to the Commissioners Court that the proposed plan was discriminatory, including with signs to make the point clear, as shown below (on the left is the constable Judge Henry threatened to have remove the members of the public if they "ma[d]e noise").



95. Commissioner Stephen Holmes was not allowed to be involved in the process for developing the proposed maps.

96. At the November 12 hearing, Commissioner Holmes stated that the proposed maps were drawn without his input, and that he only met with the County's lawyer on a single occasion.

97. In 2011, Commissioner Holmes was also not allowed to be involved in the redistricting process and had no input in drawing the proposed map objected to by

DOJ. The DOJ's denial of preclearance for the County's 2011 redistricting plan cited in part the exclusion of Commissioner Holmes from the redistricting process.

98.  Commissioner Holmes alleged that no timeline for redistricting nor opportunities for public input were proposed by the other members of the Commissioners Court before presenting the maps.

99.  Commissioner Holmes alleged that he did not know who proposed to publicize the final proposed maps on the County website. As in 2011, here Commissioner Holmes—the only Black Commissioner—was shut out of the process.

100.  During the November 12 hearing, Commissioner Holmes provided the other members of the Commissioners Court a report showing the existence of racially polarized voting in the County.

101.  At the November 12 hearing, Commissioner Holmes also presented two additional proposed maps which would have maintained Precinct 3 as an opportunity district.

102.  No vote was held on those proposed maps.

103.  The Commissioners Court voted 3-1 to adopt Map 2 at the November 12, 2021, hearing.

104.  Commissioner Holmes was the only commissioner to vote against the map, while another commissioner was absent from the vote.

105.  No Commissioner precinct in the enacted plan is majority-minority.

106.  The new map dilutes the voting strength of Black and Hispanic voters in the County by moving Black and Hispanic voters into predominately Anglo districts,

diminishing any chance for Black and Hispanic voters to elect their candidate of choice for Commissioners Court.

107. Under the Benchmark Plan, Precinct 3 had a 32 percent Black and 30.6 percent Hispanic VAP and a 33.3 percent Black and 25.2 percent Hispanic CVAP.

108. Under the new plan, however, Precinct 3's VAP will be just 8.2 percent Black and 22.6 percent Hispanic, and its CVAP will be just 9.4 percent Black and 18.9 percent Hispanic.

109. The tables below use 2020 U.S. Census data to show the minority VAP and CVAP by racial demographic for each district under the enacted plan.

| VAP for Adopted Commissioners Court Map (Map 2) | | | | |
|---|---|---|---|---|
| Commissioner Precinct | Anglo VAP | Total Minority VAP | Hispanic VAP | Black VAP |
| 1 | 58.7% | 41.3% | 25.0% | 10.4% |
| 2 | 58.0% | 42.0% | 23.0% | 14.0% |
| 3 | 60.5% | 39.5% | 22.6% | 8.2% |
| 4 | 54.7% | 45.3% | 19.2% | 19.8% |

| CVAP for Adopted Commissioners Court Map (Map 2) | | | | |
|---|---|---|---|---|
| Commissioner Precinct | Anglo CVAP | Total Minority CVAP | Hispanic CVAP | Black CVAP |
| 1 | 65.1% | 34.9% | 21.6% | 10.8% |
| 2 | 62.4% | 37.6% | 20.6% | 14.4% |
| 3 | 63.9% | 36.1% | 18.9% | 9.4% |
| 4 | 61.7% | 38.3% | 15.3% | 18.2% |

110. The County approved this map despite knowing that alternative map proposals would maintain Commissioner Precinct 3 as a majority-minority district.

*Racial Predominance in the Adoption of Commissioner Precinct Lines*

111. Race was the predominate consideration in the drawing of district lines for the Commissioner districts.

112. The County's redistricting scheme was controlled and dominated by the County's goal to crack Black and Latino voters and ensure that each precinct would have an Anglo majority.

113. This is evidenced by the County's previous attempt to pass a substantially similar plan in 2011 and their prohibition from doing so due to the DOJ's concerns of racial discrimination in districting.

114. The County has no compelling or sufficient justification for its predominant focus on cracking the minority community and cementing an Anglo majority in each precinct.

115. The County did not provide any analysis on their map to explain their districting choices.

116. Racial considerations subordinate traditional redistricting principles in the enacted Commissioners Court plan.

117. Traditional compelling governmental interests, such as compliance with the VRA and the United States Constitution, support the drawing of a majority-minority VAP district.

118. The County's unjustified choice of Map 2, a redistricting scheme substantially similar to the 2011 plan denied preclearance by the DOJ under Section 5 of the

VRA, cannot be rationally understood as anything other than an effort to separate voters into different districts based on race.

### *VRA Section 2 Factual Allegations*

119.   All three preconditions to a claim under Section 2 of the VRA, as set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986), are present in this case.

### Gingles *Preconditions*

120.   First, under the benchmark plan, minority voters accounted for 66.1 percent of District 3's VAP and 61.7 percent of its CVAP. Under the enacted plan, however, minority voters are dispersed across districts, reducing their share of District 3's VAP to 39.5 percent and its CVAP to 36.1 percent. Minority voters no longer make up a majority of any Commissioners Court district in Galveston County even though—as the benchmark plan indicates—there are sufficient minority voters to comprise a majority in a geographically compact single-member Commissioners Court district.

121.   The tables below show CVAP, using the most recent 2020 American Community Survey data, by racial demographic in each district under the Benchmark Plan and enacted plan respectively.

| CVAP for Benchmark Plan | | | | |
|---|---|---|---|---|
| Commissioner Precinct | Anglo CVAP | Total Minority CVAP | Hispanic CVAP | Black CVAP |
| 1 | 69.4% | 30.6% | 19.8% | 8.4% |
| 2 | 71.6% | 28.4% | 16.3% | 8.0% |
| 3 | 38.3% | 61.7% | 25.2% | 33.3% |
| 4 | 70.9% | 29.1% | 16.3% | 5.4% |

| CVAP for Adopted Commissioners Court Map (Map 2) | | | | |
|---|---|---|---|---|
| Commissioner Precinct | Anglo CVAP | Total Minority CVAP | Hispanic CVAP | Black CVAP |
| 1 | 65.1% | 34.9% | 21.6% | 10.8% |
| 2 | 62.4% | 37.6% | 20.6% | 14.4% |
| 3 | 63.9% | 36.1% | 18.9% | 9.4% |
| 4 | 61.7% | 38.3% | 15.3% | 18.2% |

122.  The enacted plan eliminates the majority-minority district in the Benchmark Plan and replaces it with a plan containing no majority-minority districts.

123.  Second, under the Benchmark Plan, minority voters in District 3 are politically cohesive. Indeed, minority voters, including Black and Latino voters, in District 3 have cohesively supported their candidate of choice, Commissioner Holmes, for numerous elections. They have also voted cohesively for candidates for statewide offices, with substantial majorities of Black and Latino voters supporting the same candidates for President, Senate, Governor, Lieutenant Governor, Attorney General, and other offices.

124.  Ecological inference analysis shows that Black and Latino voters in Galveston County are politically cohesive. For example, over three quarters of Galveston County Latino voters cast ballots for President Biden in 2020, Mr. O'Rourke for Senate in 2018, and Ms. Valdez for Governor in 2018. And over 98% of Black Galveston County voters supported those same candidates.

125.   Third, under the enacted plan Anglo voters will vote sufficiently as a bloc to defeat the minority-preferred candidate in the new District 3 and indeed in every district in the map.

126.   Anglo voters in Galveston County overwhelmingly favor Republican candidates.

127.   Over 88 percent of Anglo voters voted for the Republican nominee in the 2020 Presidential election, the 2018 Senate election, and the 2018 Gubernatorial election.

128.   Reconstituted election results demonstrate that under the enacted plan, Anglo voters will vote sufficiently as a bloc to defeat minority preferred candidates in all four Commissioner precincts. For example, while President Biden, Congressman O'Rourke, and Ms. Valdez each carried District 3 under the benchmark plan, they would have lost all four districts under the enacted plan.

*Totality of the Circumstances*

129.   The totality of the circumstances illustrates that Black and Latino voters have less opportunity than other voters to participate in the electoral process in Galveston County in that they have less opportunity to elect their representatives of choice as Commissioners. *See* 52 U.S.C. § 10301(b).

130.   Under *Gingles*, a "functional" analysis of the factors set forth in the 1982 Senate Report guides the Court's assessment of whether the totality of the circumstances indicate minority voters have less opportunity to elect their candidates of choice. *Gingles*, 478 U.S. at 44-45. These factors include, among other things, the jurisdiction's history of discrimination, the ongoing effects of historical

discrimination, the presence of racial appeals in political campaigns, and the success of minority candidates in past elections. *Id.* Here, the weight of each factor indicates that minority voters have less opportunity to elect their preferred candidates.

*History of Discrimination*

131.  The County has a long and well-documented history of official discrimination against Black and Latino residents.

132.  The County was formerly subject to preclearance by the DOJ under Section 5 of the VRA.

133.  As is discussed at length above, as recently as 2011, the DOJ objected to a plan for Commissioners Court that would have resulted in diluting the voting strength of the Black and Latino population in Commissioner Precinct 3 by moving the largely Anglo Bolivar peninsula into the precinct.

134.  Map 1 is materially the same plan that was objected to in 2011 by the DOJ.

135.  In objecting to the Commissioners Court plan in 2011, the DOJ concluded that the County failed to demonstrate that the 2011 map was not adopted for a racially discriminatory purpose.

136.  The County also entered into a consent decree with the DOJ in 2007 for failure to provide Spanish language assistance to voters in violation of the Help America Vote Act.

137.  Galveston County Independent School District was under federal supervision for school desegregation from 1959 until 2009.

138.   Several recent incidents in Galveston County evidence the ongoing official discrimination experienced by Black and Latino residents.

139.   In August 2019, the League City Police Department referred to Black residents who allegedly committed a theft as "buffoonish" on its Facebook page.

140.   In October 2019, the Galveston Police Department had to formally change its arrest policy after releasing video footage of police officers walking a Black man attached to a rope while the officers rode horseback.

141.   The aftermath of Hurricane Ike, a devastating storm that sent 110 mile-per-hour winds and 12-to-15-foot storm surges across Galveston Island and the Bolivar Peninsula, underscored racial tensions in the County.

142.   Four of Galveston's six public housing developments were among the thousands of structures damaged across the city during Hurricane Ike.

143.   Instead of repairing the damaged public housing developments, Galveston demolished them, displacing the residents of all 569 units. This was the culmination of a decades-long campaign to remove public housing in the name of promoting tourism and economic revitalization.

144.   The demolition prompted a fierce, racially charged debate in Galveston about whether to rebuild the City's public housing.

145.   City council meetings held to debate the issue erupted in shouting matches between predominantly Anglo opponents of public housing and predominantly Black proponents of rebuilding.

- 24 -

146.    The Anglo opponents of rebuilding were "openly racist" in their opposition to public housing. Edgar Walters, *"It's our form of apartheid": How Galveston stalled public housing reconstruction in the 10 years after Ike*, Texas Tribune, (Apr. 16, 2018), https://www.texastribune.org/2018/04/16/galveston-public-affordable-housing-hurricane-ike/.

147.    The debate continued through the City's 2012 mayoral campaign, in which challenger Lewis Rosen unseated incumbent Joe Jaworski by running on an anti-public housing platform in an election he called a "referendum on public housing."

148.    Mayor Rosen's campaign website quoted him as saying, "My position on rebuilding public housing is very simple: Don't do it."

149.    Keeping Mayor Rosen's campaign promise, the Galveston City Council declined to approve new public housing until 2013, five years after Hurricane Ike.

150.    The City Council only approved new public housing then because the DOJ agreed not to revoke hundreds of millions of dollars in federal disaster relief it had distributed to Galveston on the condition that over $100 million of those dollars be spent on housing assistance.

151.    The agreement authorized building 145 low-income units dispersed across mixed income developments instead of the 569 one-for-one rebuilding the City had initially promised its disproportionately minority public housing residents.

152.    Despite this compromise, Mayor Rosen characterized the agreement as having been "forced down our throats."

153.   By 2018, $76 million of the $103 million in housing assistance grants remained unspent, the City of Galveston's Black population had declined by 15 percent, and only 59 of the original 544 displaced families had been relocated into newly built affordable housing.

154.   A Gulf Coast Interfaith organizer summed up the effect of Galveston's refusal to rebuild public housing on its Black community: "They were all exported. It's our form of apartheid."

*Ongoing Effects of the History of Discrimination*

155.   Black and Latino residents still suffer from the effects of discrimination in the County.

156.   Only 8.3 percent of non-Hispanic white (hereinafter "white") residents in the County live below the poverty level, but 19.8 percent of Black residents and 19 percent of Latino residents live below the poverty level.

157.   The $85,145 median income of white County residents is 1.46 times greater than the $58,440 median income of Latino County residents and nearly 1.9 times greater than the $44,939 median income of Black County residents.

158.   White residents have an unemployment rate of just 5 percent compared to a 7 percent unemployment rate for Latino County residents and an 11 percent unemployment rate for Black County residents.

159.   Black and Latino residents of Galveston County have lower high school and college graduation rates than white residents: 86.5 percent of Black residents and 74.1

percent of Latino residents have a high school level of education or higher, compared to 94.6 percent of white residents. This disparity grows when considering higher education. Only 17.2 of Latino residents and 21.3 percent of Black residents have a bachelor's degree or higher, compared to 36.3 percent of white residents.

*Racial Appeals in Political Campaigns*

160.   Political Campaigns in the County have featured overt and subtle racial appeals.

161.   For example, in the 2020 Republican primary for Tax Assessor-Collector, challenger Jackie Peden's campaign sent a mailer attacking incumbent Cheryl Johnson saying that "Texans can thank Cheryl Johnson for having illegal immigrants vote in this November's election!" The mailer included an image of an unnamed Latino man who was a member of the MS-13 gang and an inmate in an El Salvador prison.

162.   The photo was taken from a British newspaper. The mailer is shown below:



163.   Ms. Johnson, the incumbent, said "[i]t is despicable, it is vile, and it's a lie." She added that "[w]hen I looked at this, I was offended because it makes it appear that every Hispanic male or somebody with tattoos is an illegal immigrant." John Wayne Ferguson, *Johnson: Peden ad 'racist,' 'discriminatory,' and 'a lie,'* Daily News (Feb. 22, 2020), https://www.galvnews.com/news/free/article_1f26ee77-55ca-5723-a493-28fdd78f15c5.html.

164.   In another example, during the campaign for the 2020 election for Galveston County Republican Party Chair, incumbent Yolanda Waters was revealed to have called a

Black party official a "typical Nig" for requesting funds to attend an event, which she called an "unfortunate typo."

165.   Waters rejected calls from the Governor and others to resign, and eventually lost her campaign for reelection as party chair. Patrick Svitek, *Top Texas Republicans pressure a county chair to resign over racist text*, Tex. Tribune (Dec. 8, 2019), https://www.texastribune.org/2019/12/07/texas-republicans-racist-text-resign/.

*Limited Success of Black and Latino Candidates*

166.   Black and Hispanic residents have seen little political representation in the County.

167.   In the last twenty years, Commissioner Stephen Holmes has been the only Black elected official elected to the Commissioners Court.

168.   Upon information and belief, there has only been one Hispanic or Latino resident elected to the Commissioners Court.

169.   Upon information and belief, no Hispanic or Latino candidates have been reliably elected as Justice of the Peace in the last 20 years.

## V.   CLAIMS

### Count 1

*Intentional Racial Discrimination in Violation of the Fourteenth Amendment*

170.   Plaintiffs reallege the facts set forth above.

171.   The adopted Commissioners Court plan was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of Precinct 3 as a performing majority-minority

precinct through the cracking of Black and Latino voters across four precincts in which they will have no opportunity to elect their preferred candidate because of racially polarized voting.

## Count 2

### *Intentional Racial Discrimination in Violation of the Fifteenth Amendment*

172.   Plaintiffs reallege the facts set forth above.

173.   The adopted Commissioners Court plan was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of Precinct 3 as a performing majority-minority precinct through the cracking of Black and Latino voters across four precincts in which they will have no opportunity to elect their preferred candidate because of racially polarized voting.

## Count 3

### *Racial Gerrymandering in Violation of the Fourteenth Amendment*

174.   Plaintiffs reallege the facts set forth above.

175.   Race predominated the drawing of Commissioners Court precinct lines, subordinating other redistricting criteria to race, without a compelling justification.

## Count 4

### *Discriminatory Results in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq.*

176.   Plaintiffs reallege the facts set forth above.

177.   The adopted Commissioners Court plan violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because under the totality of the circumstances, the Commissioners Court plan has the effect of denying Black and Hispanic voters an equal opportunity to participate in the political process and elect representatives of their choice by diluting their voting strength.

178.   The County's Black and Hispanic population is sufficiently large and geographically compact to allow for the creation of a single member Commissioners Court district in which Black and Latino voters would constitute a majority of the population and citizen voting age population.

179.   Black and Latino voters in the County are politically cohesive.

180.   Anglo voters in the County, who are the majority in the County, vote sufficiently as a bloc to usually defeat the candidates of choice of Black and Latino voters in the absence of a VRA-compliant district.

181.   The totality of the circumstances demonstrates that Black and Latino voters have less opportunity than Anglo voters to participate in the political process and elect representatives of their choice.

182.   Section 2 of the Voting Rights Act, 52 U.S.C. 10301 *et seq.*, contains an implied right of action that entitles Plaintiffs to maintain this claim. *See, e.g.*, *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (Stevens, J., joined by Ginsburg, J., lead opinion); *id.* at 240 (Breyer, J., joined by O'Connor & Souter, JJ., concurring); *see also League of United Latin Am. Citizens v. Abbott*, No. EP-21-

CV-00259-DCG-JES-JVB, 2021 WL 5762035 (W.D. Tex. Dec. 3, 2021) (three-judge court) (denying "motion to dismiss for want of a private cause of action to enforce Section 2 of the Voting Rights Act"); *Veasey v. Abbott*, 13 F.4th 362 (5th Cir. 2021) (private plaintiffs enforcing Section 2 entitled to attorneys' fees). In addition, 42 U.S.C. § 1983 provides a private right of action under which Plaintiffs may enforce their Section 2 claim. *See Maine v. Thiboutot*, 448 U.S. 1 (1980).

## Count 5

### *Intentional Racial Discrimination in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq*

183.   Plaintiffs reallege the facts set forth above.

184.   The adopted Commissioners Court plan was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of Precinct 3 as a performing majority-minority precinct through the cracking of Black and Latino voters across four precincts in which they will have no opportunity to elect their preferred candidate because of racially polarized voting.

## VI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.   Issue a declaratory judgment that the 2021 adopted Galveston County Commissioners Court plan unlawfully dilutes minorities' voting rights, through

intentional racial discrimination in violation of the Fourteenth Amendment, the Fifteenth Amendment, and Section 2 of the Voting Rights Act;

2.     Issue a declaratory judgment that the adopted Galveston County Commissioners Court plan had race as the predominant consideration, with other districting criteria subordinated to race, without any sufficient justification;

3.     Issue a declaratory judgment that the adopted Galveston County Commissioners Court plan violates the discriminatory results prohibition of Section 2 of the Voting Rights Act by failing to include a district in which Black and Latino voters have an opportunity to elect their candidate of choice;

4.     Preliminarily and permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under the adopted Commissioners Court plan. Plaintiffs have no adequate remedy at law other than the judicial relief sought herein and unless Defendants are enjoined from using the adopted Commissioners Court plan, Plaintiffs will be irreparably injured by the continued violation of their constitutional and statutory rights;

5.     Set a reasonable deadline for the County to adopt a valid redistricting plan by the Court's deadline that does not dilute, cancel out, or minimize the voting strength of minority voters in Galveston County;

6.     If the County fails to adopt a valid redistricting plan by the Court's deadline, order a new County Commissioners redistricting plan that does not dilute, cancel out, or minimize the voting strength of Galveston County minority voters;

7.  Award Plaintiffs their costs and reasonable attorneys' fees pursuant to Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e);

8.  Grant an order retaining jurisdiction over this matter until the Defendants, their agents, employees, and those persons acting in concert with them have complied with all orders and mandates of this Court; and

9.  Grant such other and further relief as it deems is proper and just.

Dated this 25th day of May, 2022.

Respectfully submitted,

/s/ Chad W. Dunn

Mark P. Gaber*
Simone Leeper*
Valencia Richardson*
Orion de Nevers**
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
sleeper@campaignlegal.org
vrichardson@campaignlegal.org
odenevers@campaignlegal.org

Sonni Waknin*
Bernadette Reyes*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
sonni@uclavrp.org
bernadette@uclavrp.org

*admitted pro hac vice

Chad W. Dunn (Tex. Bar No. 24036507)
Brazil & Dunn
4407 Bee Cave Road
Building 1, Ste. 111
Austin, TX 78746
(512) 717-9822
chad@brazilanddunn.com

Neil G. Baron
Law Office of Neil G. Baron
1010 E Main Street, Ste. A
League City, TX 77573
(281) 534-2748
neil@ngbaronlaw.com

*\*\*admitted pro hac vice; licensed to practice in CA only, supervised by Mark Gaber, a member of the D.C. bar*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that all counsel of record were served a copy of the foregoing this 25th day of May 2022 via the Court's CM/ECF system.

/s/ Chad W. Dunn
Chad W. Dunn (Tex. Bar No. 24036507)
Brazil & Dunn
4407 Bee Cave Road
Building 1, Ste. 111
Austin, TX 78746
(512) 717-9822
chad@brazilanddunn.com
