**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| TERRY PETTEWAY, THE HONORABLE DERRICK ROSE, MICHAEL MONTEZ, SONNY JAMES and PENNY POPE, | § § § § § | |
| *Plaintiffs*, | § § | Civil Action No. 3:22-cv-57 |
| v. | § § | |
| GALVESTON, TEXAS, and HONORABLE MARK HENRY, in his official capacity as Galveston County Judge, | § § § § § | |
| *Defendants.* | § § | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| *Plaintiff*, | § § | |
| v. | § § | |
| | § § | Civil Action No. 3:22-cv-93 |
| GALVESTON, TEXAS, GALVESTON COUNTY COMMISSIONERS COURT, and HONORABLE MARK HENRY, in his official capacity as Galveston County Judge, | § § § § § § | |
| *Defendants.* | § § | |

| | | |
|---|---|---|
| Dickinson Bay Area Branch NAACP, GALVESTON BRANCH NAACP, MAINLAND BRANCH NAACP, GALVESTON LULAC COUNCIL 151, EDNA COURVILLE, JOE A. COMPIAN, and LEON PHILLIPS, | § § § § § § | Civil Action No. 3:22-cv-117 |

|  | § |
| --- | --- |
| *Plaintiffs*, | § |
|  | § |
| v. | § |
|  | § |
| GALVESTON, TEXAS, | § |
| HONORABLE MARK HENRY, in | § |
| his official capacity as Galveston | § |
| County Judge, and DWIGHT D. | § |
| SULLIVAN, in his official capacity as | § |
| Galveston County Clerk | § |
|  | § |
| *Defendants.* | § |
|  | § |

**PETTEWAY PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ......................................................................................... 1

LEGAL STANDARD .................................................................................................... 3

LEGAL ARGUMENT .................................................................................................... 4

   I.   Plaintiffs Sufficiently Plead this Court's Subject Matter Jurisdiction ................... 4

       a.  Plaintiffs' Allege Justiciable Racial Discrimination Claims ............................ 4

       b.  The Appointment of Dr. Robin Armstrong Does Not Moot Plaintiffs' Claims ...................................................................................................................... 7

   II.  Plaintiffs Sufficiently Allege that they Have Standing to Assert Claims Under the Voting Rights Act ...................................................................................................... 8

       a.  Plaintiffs' Allege Justiciable Racial Discrimination Claims ............................ 9

       b.  Plaintiffs Have Standing to Sue on Behalf of the Black and Latino Coalition  10

       c.  Plaintiff Montez Has Standing .......................................................................... 12

  III.  Plaintiffs Sufficiently Allege Intentional Racial Discrimination Under the Fourteenth and Fifteenth Amendments and the Voting Rights Act ...................... 13

       a.  The Commissioners Court Plan is Intentionally Discriminatory ..................... 15

       b.  The Fifteenth Amendment Prohibits Intentional Racial Discrimination ................................................................................................... 21

  IV.  Plaintiffs Sufficiently Allege that Commissioner Precinct 3 is Racially Gerrymandered ............................................................................................................ 22

       a.  The Commissioners Court Plan is a Racial Gerrymander ............................... 22

       b.  Plaintiffs' Racial Gerrymandering Claim Satisfies the Notice Pleading Standard ................................................................................................................ 25

CONCLUSION ............................................................................................................... 28

CERTIFICATE OF SERVICE ...................................................................................... 29

## INTRODUCTION

In their Motion to Dismiss, Defendants attempt to both recast Plaintiffs' well-pleaded factual allegations and invert the standard for a motion to dismiss. As Defendants' fail to satisfy their burden under Rule 12, their motion should be denied.

## FACTUAL BACKGROUND

This is an action under Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301, as well as the Fourteenth and Fifteenth Amendments, challenging the November 13, 2021 adoption of the Galveston County Commissioners Court map. *See* Second Amended Complaint, ECF No. 42 ("SAC"). Plaintiffs Terry Petteway, the Honorable Derrick Rose, Sonny James, Penny Pope, and Michael Montez are all Black or Latino voters and residents of Galveston County. *Id.* at ¶¶ 12-31. Defendants are Mark Henry, in his official capacity as Galveston County Judge, and Galveston County, both of whom are responsible for drawing the districts for the Galveston County Commissioners Court. *Id.* at ¶¶ 32-33.

Plaintiffs allege that Defendants engaged in intentional racial discrimination against Black and Latino voters resulting in the adoption of the discriminatory Commissioners Court map at issue. *See, e.g.*, *id.* at ¶¶ 1-7. In 2011, Defendants sought to eliminate the sole minority opportunity district on the Galveston County Commissioners Court by adopting a plan that dismantled Precinct 4 as a performing opportunity district for minority voters and converting it into a district controlled by Anglo voters. *Id.* at ¶¶ 35, 42.

As Galveston County was subject to preclearance under Section 5 of the VRA, the Department of Justice ("DOJ") had to approve the adopted map. *Id.* at ¶ 36. The DOJ

refused to preclear the plan, finding that invidious racial discrimination imbued Galveston County's redistricting process. The DOJ specifically identified the lack of meaningful public input, "the deliberate exclusion from meaningful involvement in key deliberations of the only member of the commissioners court elected from a minority ability-to-elect precinct," and the decision to adopt a retrogressive map that was "neither required nor inevitable," as factors informing its decision. *Id.* at ¶¶ 37-46. After DOJ rejected the plan, Defendants negotiated a map, the Benchmark Plan, which maintained Precinct 3 as an opportunity district. *See id.* at ¶¶ 37-46. The Benchmark Plan included Precinct 3, where Black and Latino voters form a majority of the voting age population and can elect their candidate of choice for County Commissioner. *Id.* at ¶¶ 56, 60.

After the 2020 census, Defendants planned to redistrict the precincts for the Galveston County Commissioners Court. *See* SAC ¶¶ 47, 51. The 2020 Census revealed that the Benchmark Plan was malapportioned but could be balanced through shifting one voting district while still maintaining Precinct 3 as an opportunity district. *See id.* at ¶¶ 63-64. However, as they previously tried in 2011, Defendants instead adopted a map which dismantled Precinct 3 as an opportunity district. Defendants proposed two plans, both of which deviated substantially from the Benchmark Plan. *Id.* at ¶¶ 64, 74-75. Proposed Map 2, ultimately adopted by Defendants, dismantled Precinct 3 as an opportunity district by cracking predominately Black and Latino voting districts and spreading them across all four precincts. *Id.* at ¶¶ 65-66, 75. As in 2011, this proposal dismantled Precinct 3 as an opportunity district. *Id.* at ¶¶ 35, 42, 75. These maps were released to the public merely days before the first and only public hearing regarding Defendants' proposals. *Id.* at ¶ 70;

2

Defs.' Mot. to Dismiss at 6-7, ECF No. 46 ("Mot.").

On November 12, 2021, Defendants held the first and only public hearing on the proposed plans. SAC at ¶¶ 76, 84. The hearing was held in the middle of the day, three days before the proposed plans were released, and one day before Texas's mandated deadline for submitting county redistricting plans. *Id*. at ¶¶ 84-85; Mot. at 7. Defendants crammed the public into a room flowing out of doors on both sides of the room and threatened to remove members of the public who "made noise" during the hearing. SAC at ¶¶ 92-94. Residents spoke at length during the hearing about the racially discriminatory results that would arise if Map 2 were adopted. *Id.* at ¶ 79. As in 2011, Commissioner Holmes—the incumbent candidate of choice for Black and Latino voters—alleged at the public meeting that he was not allowed input into the 2021 redistricting process, and that no timeline for redistricting nor opportunities for public input were proposed by Defendants. *See id.* at ¶¶ 98-100. Though Commissioner Holmes presented two other maps that would have maintained Precinct 3 as an opportunity district, neither of those maps were brought to a vote at the public meeting. *Id.* at ¶¶ 101-102. Proposed Map 2 (the "Enacted Plan") was adopted at the meeting, guaranteeing that Black and Latino voters would no longer be able to elect their candidate of choice in elections for Commissioners Court for the next decade. *E.g., id.* at ¶¶ 78, 106.

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint "does not require detailed factual allegations," but it must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must accept

3

the plaintiff's well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins.*, 509 F.3d 673, 675 (5th Cir. 2007). The court's analysis must remain focused on whether the plaintiff has stated a claim upon which relief can be granted, not on the plaintiff's likelihood of success. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977). When the complaint includes factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the claim has facial plausibility. *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Relatedly, a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) will be granted only "if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

## LEGAL ARGUMENT

### I.      Plaintiffs Sufficiently Plead this Court's Subject Matter Jurisdiction.

#### a.  Plaintiffs' Allege Justiciable Racial Discrimination Claims.

Defendants seek to rewrite Plaintiffs' complaint—which states claims of racial discrimination—to contend instead that Plaintiffs *actually* assert a nonjusticiable partisan gerrymandering claim. But Plaintiffs, not Defendants, are the masters of their complaint, and the Court should reject Defendants' effort to invert this fundamental rule. Plaintiffs assert racial gerrymandering and vote dilution claims under the Fourteenth Amendment, Fifteenth Amendment, and Section 2 of the VRA. *See* SAC ¶¶ 170-84. These claims are justiciable. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2502 (2019); *Miller v. Johnson*, 515 U.S. 900 (1995); *Shaw v. Reno*, 509 U.S. 630 (1993); *see also* 52 U.S.C. § 10301, *et seq.*

4

Such claims do not "ask for a fair share of political power and influence," but rather for the "elimination of a racial classification." *Rucho*, 139 S. Ct. at 2502.

Racial gerrymandering claims under the Fourteenth and Fifteenth Amendments allege that "race was improperly used in the drawing of the boundaries of one or more" political subdivisions. *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262–63 (2015); *see also* SAC ¶¶ 174-75. Likewise, intentional vote dilution claims under Section 2 of the Voting Rights Act and the Fifteenth Amendment allege that an "election practice . . . is undertaken and maintained for a discriminatory purpose." *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020); *see, e.g.*, *Rice v. Cayetano*, 528 U.S. 495 (2000); *City of Mobile v. Bolden*, 446 U.S. 55 (1980) (plurality opinion); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Veasey v. Abbott*, 830 F.3d 216, 229 (5th Cir. 2016) (en banc), *Perez v. Abbott*, 390 F. Supp. 3d 803, 814 (W.D. Tex. 2019) (three-judge court); *see also* SAC ¶¶ 172-73, 183-84. Finally, results-based vote dilution under Section 2 alleges that, under the totality of the circumstances, an election practice has the effect of "minimiz[ing] or cancel[ing] out the voting strength of racial minorities in the voting population." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986); *see also* SAC ¶¶ 176-77.

Here, Plaintiffs allege that Defendants "finally succeeded in adopting the discriminatory redistricting plan that the [DOJ] prevented it from adopting in 2012," and that the "2021 Commissioners Court plan would reduce the ability of Black and Latino voters to elect their candidates of choice by intentionally dismantling a majority-minority precinct and cracking Black and Latino voters across four precincts." SAC ¶¶ 1, 6. The Commissioners Court chose a plan that radically alters the Commissioner precincts to

5

dismantle Precinct 3 and crack Galveston's Black and Latino voters across all four precincts. SAC ¶ 65. Plaintiffs allege this was done to intentionally dilute *minority's* voting strength. *See, e.g.*, SAC ¶¶ 55, 68. The plan, design, and choice of map were the product of intentionally discriminatory decision-making in which race predominated with no compelling interest to justify it.

Defendants do not dispute that racial gerrymandering and vote dilution claims are justiciable. *See* Mot. at 10-12. Moreover, Defendants' motion is void of any support showing that Plaintiffs are making a partisan gerrymandering claim. This is because Plaintiffs bring no such claim. Instead, Defendants attempt to repurpose Plaintiffs' factual allegations in support of their claim under Section 2 to instead describe a partisan gerrymandering claim. But Defendants only prove that Plaintiffs sufficiently alleged a Section 2 claim. Defendants contend that Plaintiffs allege partisan claims through their claims that "Blacks and Latinos are cohesive because they vote for Democrats in the general elections," Mot. at 11 (citing SAC ¶ 124), and that "Anglo voters in Galveston County overwhelmingly . . . favor Republican candidates," Mot. at 11-12 (citing SAC ¶¶ 126-127). These allegations, however, specifically support the *Gingles* preconditions necessary to support a claim of racial discrimination under Section 2 of the Voting Rights Act. *See* SAC ¶ 119. And courts in the Fifth Circuit have repeatedly held that a plaintiff need not prove the distinction between race and partisanship "at the pleading stage." *LULAC v. Abbott*, No. 121CV1006RPJESJVB, 2022 WL 1631301, at *13, 20, 26 (W.D. Tex. May 23, 2022) (three-judge court) (hereinafter *LULAC II*). Defendants offer no further argument to support their contention, proving that their argument is nothing more than a

6

nonsensical attempt to conflate partisan gerrymandering with racial discrimination. Plaintiffs have asserted justiciable racial gerrymandering and vote dilution claims.

### b. The Appointment of Dr. Robin Armstrong Does Not Moot Plaintiffs' Claims.

The recent appointment of an additional Black Commissioner, Dr. Robin Armstrong, does not moot Plaintiffs' claims. Defendants misrepresent—or misunderstand—the harm Plaintiffs allege and the remedy sought. This appointment has no impact on Plaintiffs' claims.

In a vote dilution claim, "it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important." *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 503 (5th Cir. 1987) (citing *Gingles*, 478 U.S. at 69). Defendants have proffered no evidence that Dr. Armstrong is the candidate of choice of Black and Latino voters and simply tout his racial identity as a Black man. *See* Mot. at 14. On the other hand, Plaintiffs provide substantial factual allegations supporting Commissioner Holmes' status as the candidate of choice for Black and Latino voters since his election in 1999.[1] *See* SAC ¶¶ 61-62, 80, 97, 123, 167.

For the same reason, Defendants' contention that, with the appointment of Dr. Armstrong, "African American representation on the Commissioners Court is greater than

---

[1] Even assuming that Defendants' racial classification—casting the two Black Commissioners as candidates of choice merely because of their race—has any basis in fact, Defendants' argument that "African American representation on the Commissioners Court is greater than the proportion of Black and Latino residents in Galveston County" ignores Plaintiffs' allegation that Commissioner Holmes will likely no longer represent Precinct 3 after the 2024 elections, precisely because of Defendants' discriminatory efforts to remove him. Mot. at 14; *cf.* SAC ¶ 80.

the proportion of Black and Latino residents in Galveston County," Mot. at 13-14, is misplaced. While proportionality is a consideration as part of the totality of circumstances analysis under the VRA, it is the proportion of *minority opportunity districts* that is relevant—*i.e.*, the number of districts in which minority voters can elect their candidate of choice in relation to the number of minority voters jurisdiction-wide. *See LULAC v. Perry*, 548 U.S. 399, 426 (2006) ("Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area."). Defendants neither contend nor offer any evidence to suggest that Dr. Armstrong is the candidate of choice of Black and Latino voters in Galveston County, nor that there will be *any district* in which minority voters will be able to elect their preferred candidate under the new plan. The Court must instead accept as true Plaintiffs' factual allegations, which state a claim that is live, not moot, regardless of Dr. Armstrong's appointment.[2]

## II.     Plaintiffs Sufficiently Allege that they Have Standing to Assert Claims Under the Voting Rights Act.

Defendants contend that Plaintiff Montez lacks standing to maintain a claim under Section 2, and that without him, Plaintiffs' coalition claim falls apart. That is wrong. Plaintiff Montez does have standing to assert a Section 2 claim. Even if he did not, each of the remaining Plaintiffs would still have standing to assert the claim. Ultimately,

---

[2] Even if the appointment of Dr. Armstrong did somehow moot Plaintiffs' discriminatory results claim under the VRA (it does not), Defendants do not contend that it would have any effect on Plaintiffs' racial gerrymandering claim or intentional racial discrimination claims under the VRA, Fourteenth Amendment, or Fifteenth Amendment. Mot. at 13-14. Their conclusion that his appointment moots the entire case is therefore baseless. *See id.*

Defendants' standing argument misconstrues the nature of Plaintiffs' alleged harm and gets them nowhere.

### a. Plaintiff Montez's Standing Does Not Dispose of Plaintiffs' Voting Rights Act Claims.

The Court's jurisdiction over Plaintiffs' VRA claims does not hinge on the standing of a single plaintiff: Even if Plaintiff Montez lacked standing, as Defendants incorrectly claim, Mot. 17-19, it would not prove fatal to Plaintiffs' claims. There is no dispute that a plaintiff is an "aggrieved person" with standing to bring a claim under the VRA when the plaintiff has "personally suffered race-based dilution of his vote—an injury that is both concrete and particularized to him." *Vaughan v. Lewisville Indep. Sch. Dist.*, 475 F. Supp. 3d 589, 595 (E.D. Tex. 2020). Nor do Defendants contest that Plaintiffs Petteway, Rose, James, and Pope allege such a harm. Rather, Defendants wrongly contend that these Plaintiffs who otherwise would have established standing to bring suit under the VRA fail to do so because their claim requires proving that there is a cohesive coalition of minority voters of which they are a part. Besides misunderstanding the nature of coalition claims, *see infra,* Defendants attempt to elide the well-established rule that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Texas v. U.S.*, 809 F.3d 134, 151 (5th Cir. 2015) (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). Accordingly, if any one plaintiff has standing to bring the claims in this suit, the motion to dismiss for lack of standing should be denied.

### b. Plaintiffs Have Standing to Sue on Behalf of the Black and Latino Coalition

All Plaintiffs have standing to sue on behalf of the coalition of Black and Latino voters. Defendants' argument to the contrary misunderstands the nature of coalition claims under Section 2 of the VRA.[3]

A coalition of two or more politically cohesive minority groups may seek relief under Section 2. Applying Section 2 to protect minority coalitions is "necessary and appropriate to ensure full protection of the Fourteenth and Fifteenth Amendments rights," because voting discrimination is just as problematic when it prejudices one minority group as when it harms several. *See Bush v. Vera*, 517 U.S. 952, 992 (1996) (O'Connor, J., concurring). Accordingly, the Fifth Circuit has long recognized that racial minority groups may form a coalition to seek relief under Section 2. *See Campos v. City of Baytown,* 840 F.2d 1240, 1244 (5th Cir. 1988); *LULAC, Council No. 4386 v. Midland Indep. Sch. Dist.*, 812 F.2d 1494 (5th Cir. 1987). As here, both groups in *LULAC* suffered voting discrimination and resulting socioeconomic disparities, but even when they jointly tried to overcome these inequities, white-bloc voting in the at-large system consistently defeated their preferred candidates. *Id.* at 1496-99; *see also* SAC ¶¶ 123-24. Because the coalition

---

[3] Defendants raise a brief and misplaced objection to Plaintiffs' totality of the circumstances evidence. Mot. at 28 n.9. Regarding Plaintiffs' Section 2 claims, however, Defendants' argument primarily rests on whether Plaintiffs meet the *Gingles* preconditions, and makes no mention of the sufficiency of Plaintiffs' well-pleaded allegations that "[t]he totality of the circumstances illustrates that Black and Latino voters have less opportunity than other voters to participate in the electoral process in Galveston County." SAC ¶ 129; *see also* 52 U.S.C. § 10301(b). "Because Defendants' motion[] focus[es] [only] on the three preconditions," this Court should consider any arguments regarding the totality of the circumstances as waived. *LULAC II*, 2022 WL 1631301, at *14.

experienced the same discriminatory vote dilution injury and had "common social, economic, and political interests which converge [to] make them a cohesive political group," they could jointly pursue their claims to achieve single-member districts. *LULAC*, 812 F.2d at 1501-03; *see also* SAC ¶¶ 131-159.

Defendants misunderstand the nature of coalition claims and Plaintiffs' standing to bring these claims. The VRA defines the class of citizens who can sue as a class in which the "members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). The text demonstrates that the shared disadvantage based on "race or color" defines the protected class, not the racial or ethnic commonality of the group. Therefore, the Black plaintiffs in this case are not, as Defendants claim, alleging "harm on the Latino community by proxy." Mot. at 17. Rather, Plaintiffs are alleging their *own* harm as members of the protected class and are seeking to vindicate their *own* rights.

Likewise, Defendants wrongfully conflate the standards to assess Plaintiffs' *standing* to bring a VRA claim and the *merits* of such a claim. *See LULAC II*, 2022 WL 1631301, at *7 ("[T]he question of standing is quite separate from the question of remedy."). That is, they ask the Court to assume that Black and Latino voters do *not* form a cohesive class of voters and instead must be separately represented by race among the Plaintiff group. This is improper: the standard of political cohesion under *Gingles* "sets out a threshold evidentiary burden, not a proxy test for standing." *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 463 (E.D. Tex. 2020). Plaintiffs' allegation of a single, cohesive class of Black and Latino voters must be accepted as true, and each Plaintiff has standing

11

as a member of the coalition to put forth evidence of political cohesion at a later stage. *Id.* (recognizing that "*Gingles* is not requiring a plaintiff to assert the rights of other unnamed parties, but rather requiring a plaintiff to offer evidence establishing a minority coalition to which he or she belongs").

Plaintiffs Petteway, Rose, James, and Pope have properly alleged that they have personally suffered the concrete and particularized injury of race-based vote dilution. Each Plaintiff accordingly has standing to bring their claim under the VRA and, even if this court finds that Plaintiff Montez lacks standing, Plaintiffs' Voting Rights Act claim must be allowed to proceed.

### c. Plaintiff Montez Has Standing.

Plaintiff Montez has standing to assert claims under the Voting Rights Act. Under the VRA, "an aggrieved person" may institute a proceeding to enforce their right to vote. 52 U.S.C.A. § 10302; *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969). "Any person who meets the requirements of constitutional standing is an 'aggrieved person' and also meets statutory standing requirements under the VRA." *Vaughan*, 475 F. Supp. 3d at 594.

The U.S. District Courts of both Western and Northern Texas have held that "plaintiffs who reside in a reasonably compact area that could support an additional minority opportunity district have standing to pursue § 2 claims, even if they currently reside in an opportunity district." *Perez v. Abbott*, 267 F. Supp. 3d 750, 775 (W.D. Tex. 2017), *aff'd in part, rev'd in part*, *Abbott v. Perez*, 138 S. Ct. 2305 (2018); *Harding v. Cnty. of Dallas*, 2018 WL 1157166, at *6 (N.D. Tex. Mar. 5, 2018). Plaintiff Montez resides in Precinct 1 of the Benchmark Plan. SAC ¶¶ 22-25. As Plaintiff Montez alleges, the Enacted

12

Map relies on the packing and cracking of Black and Latino voters across all four
Commissioner precincts, including where Montez resides. *See* SAC ¶ 117. Plaintiff Montez
has standing to pursue a Section 2 claim because it is possible to create an additional
opportunity district where he resides. *Cf. LULAC II*, 2022 WL 1631301, at *11 (holding
that a plaintiff who "resides in an area where a *Gingles* district should have been drawn . .
. has plausibly alleged standing at this early stage."). The injury in a Section 2 case is
packing and/or cracking; regardless of whether a plaintiff is packed in an unnecessarily
high performing district or, as here, cracked into Anglo-dominated districts, he has an
injury for which he has standing to sue. Plaintiff Montez has standing to bring a claim
under the Voting Rights Act as a result of his membership in the Black and Latino coalition
whose rights are being abridged by the Enacted Plan and the vindication of whose rights
will require a wholesale restructuring of the Commission map.

## III.     Plaintiffs Sufficiently Allege Intentional Racial Discrimination Under the Fourteenth and Fifteenth Amendments and the Voting Rights Act.

Plaintiffs' complaint is replete with factual allegations which, taken as true, support
an inference that the Commissioners Court plan was drawn, at least in part, to disfavor
minority voters. Intentional racial discrimination violates both Section 2 of the VRA and
the Fourteenth and Fifteenth Amendments. *See, e.g.*, *Landry*, 963 F.3d at 463. To state an
intentional discrimination claim, "racial discrimination need only be one purpose, and not
even a primary purpose" of the challenged plan. *Veasey*, 830 F.3d at 230 (quoting *United
States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). "[I]ndirect circumstantial evidence,

including the normal inferences to be drawn from the foreseeability of defendant's actions may be considered." *Brown*, 561 F.3d at 433 (quotation marks omitted).

Accordingly, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). "The impact of the official action . . . provide[s] an important starting point." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). From there, Courts consider "five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose": (1) "the historical background of the decision," (2) "the specific sequence of events leading up to the decision," (3) "departures from the normal procedural sequence," (4) "substantive departures," and (5) "legislative history . . . ." *Veasey*, 830 F.3d at 231 (quotation marks omitted); *see Arlington Heights*, 429 U.S. at 267-68. Evidence of "race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will toward minorities because of their race," is not required. *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017).

At the motion to dismiss stage, alleging a subset of the *Arlington Heights* factors is sufficient to state a claim of intentional discrimination. *See, e.g.*, *LULAC II*, 2022 WL 1631301, at \*26. In *LULAC II*, the court considered four plaintiff groups' intentional discrimination allegations and permitted each claim to proceed. *Id.* at \*26-27. The court deemed DOJ's claim plausible because it alleged the defendant "split precincts unevenly based on race," and redrew districts "that were deemed intentionally discriminatory in the previous redistricting cycle." *Id.* at \*13. Similarly, the first organizational plaintiff's claims

14

satisfied the motion to dismiss standard because it alleged "minority legislators were treated unfavorably" and "the legislature adopted procedures that made it difficult for non-English speaking members of the public to participate." *Id.* at \*26. The second organizational plaintiff's complaint "crosse[d] the line" because it alleged discriminatory effects coupled with procedural irregularities in the legislative process. *Id.* Finally, the third organizational plaintiff's complaint was "sufficient" based on its allegations of discriminatory acts in the prior redistricting cycle and consideration of racial effects in the challenged plan's legislative history. *Id.*

Plaintiffs' allegations here are even stronger than each of the successful claims in *LULAC II.*

### a.  The Commissioners Court Plan is Intentionally Discriminatory.

Defendants ask the Court to draw inferences in Defendants' favor, contrary to the motion to dismiss standard under which Plaintiffs' allegations plainly support an inference of intentional discrimination. Applying the *Arlington Heights* framework, Plaintiffs' allegations easily satisfy the lenient pleading standard applicable on a motion to dismiss.

*First*, the dismantling of Precinct 3 bears more heavily on minority voters than on Anglo voters. Galveston County's minority population increased from 33.2% to 35.5% of total population between 2010 and 2020. SAC ¶ 52. Nevertheless, the 2021 redistricting plan eliminates the County's only majority-minority Commissioners Court precinct, cracking minority voters across all four precincts and ensuring that—despite their increased share of the total population—they are no longer a majority in any Commissioners Court precinct. SAC ¶¶ 121-22. There can be "little question that dismantling" a performing

precinct has "a disparate impact on racial minority groups." *Texas v. United States*, 887 F. Supp. 2d 133, 163 (D.D.C. 2012), *vacated on other grounds*, 133 S. Ct. 2885 (2013). And the Commission knew that the new plan would eliminate the County's only majority-minority district. *See, e.g.*, SAC ¶¶ 78, 134. Although not dispositive, the "foreseeability" of this consequence supports "a strong inference" that the Commission intended the Plan to have "adverse effects" on minority voters. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979). Defendants do not contend otherwise. Mot. at 23-29.

*Second*, the historical background and legislative history corroborate "the normal inferences" that flow "from the foreseeability of defendant's actions." *Brown*, 561 F.3d at 433 (quoting *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1047 (5th Cir. 1984)). In 2021, Defendants adopted "materially the same" map that they proposed in 2011. SAC ¶ 72-77, 134. The County was subject to preclearance at the time, however, and DOJ refused to preclear the map because it would have caused unnecessary retrogression and was accompanied by several indicia of the Commission's "discriminatory purpose." SAC ¶¶ 34-43. DOJ ultimately obtained a permanent injunction blocking the County from implementing the plan and requiring it to adopt an alternative map that preserved Precinct 3's majority-minority population. SAC ¶¶ 2-4, 44-46. The current plan is a transparent attempt to revive the plan a three-judge panel in this District enjoined a decade ago. *See Petteway v. Henry*, 3:11-cv-00511, 2012 WL 12877651 (S.D. Tex. May 22, 2012), ECF No. 69. As in *LULAC II*, this is powerful evidence that the County remains intent on discriminating against minority voters. *LULAC II*, 2022 WL 1631301, at *13.

Despite the *LULAC II* court's explanation that redrawing lines "deemed intentionally discriminatory in the previous redistricting cycle" supports an inference of discriminatory intent, *id.*, Defendants downplay the plan's sordid history by invoking *Marbury v. Madison* to remind this Court that DOJ's intentional discrimination finding "does not bind this Court to find that the 2021 Commissioners Court map is an unconstitutional intentional vote dilution under the Fourteenth Amendment," Mot. at 25. *Marbury* is beside the point. As the Supreme Court explained long ago in *Arlington Heights*, the "historical background of the decision is" an "*evidentiary* source" that is useful "circumstantial" evidence of "discriminatory purpose." *Arlington Heights*, 429 U.S. at 266-67 (emphasis added). Thus, even a prior determination that is "not legally binding . . . does not undo the historical significance" of prior actions and is "damning[]" evidence of discrimination. *LULAC v. Abbott*, No. 121-CV-991-LY-JES-JVB, 2022 WL 1410729, at *18 (W.D. Tex. May 4, 2022) (hereinafter *LULAC I*). Plaintiffs invoke the prior finding as circumstantial evidence that, by mimicking a plan DOJ "deemed intentionally discriminatory in the previous redistricting cycle," the 2021 Commission acted, at least in part, for the purpose of disfavoring minority voters. *LULAC II*, 2022 WL 1631301, at *13. The "proximity and comparability" of the two plans are "a close match" that "weighs in favor of an inference of discriminatory intent." *LULAC I*, 2022 WL 1410729, at *18.

*Third*, the specific sequence of events preceding the dismantling of Precinct 3 suggest it was implemented with discriminatory intent. The 2021 redistricting cycle picked up where the 2011 cycle left off. The Commission hired the same lawyers, drew the same discriminatory map, and eschewed formal redistricting guidelines just as it did a decade

17

before. SAC ¶¶ 69, 71, 134. It stalled until November 9, 2021, to release map proposals, and did not hold a public meeting to solicit input on its proposals until November 13—the day before the County's deadline to adopt a map. SAC ¶¶ 70, 84-85. Throughout the process, the lone Black Commissioner, and majority-minority precinct representative, Stephen Holmes, was completely excluded. SAC ¶¶ 95-99. The Commission did not permit him to provide input on the proposed maps, allowed him to meet with the County's lawyer only once, kept him in the dark about publicizing redistricting proposals, and refused to vote on his proposed maps. SAC ¶¶ 95-102.

The Commission's hearing on the map confirmed its objective of rushing through a discriminatory map without meaningful public feedback. In the sole meeting it held during the redistricting process, the Commission failed to provide microphones to facilitate public input and interaction between Commissioners and constituents. SAC ¶¶ 89-90. Still, members of the minority community testified that the maps were racially discriminatory, and Commissioner Holmes presented evidence on racially polarized voting in Galveston County to illustrate how the new map would affect minority voters. SAC ¶¶ 94, 100. Judge Henry greeted this input by threatening to "clear . . . out" members of the public who attempted to participate and reminding the public "I've got constables here!" to substantiate the threat. SAC ¶¶ 92-93. This sequence of events, including the evidence that "minority legislators" and their constituents "were treated unfavorably," is probative of the Commission's intent to discriminate against minority voters. *LULAC II*, 2022 WL 1631301, at *26.

Defendants do not contest most of this troubling sequence of events except to offer the conclusory assertion that "Commissioner Holmes was not prohibited from participating in the redistricting process." Mot. at 28. Defendants deem it irrelevant that the Commission excluded Commissioner Holmes from providing input on the proposed maps, participating in the map-drawing process with the County's lawyers, and publicizing map proposals because he retained "the legal authority to place redistricting on the agenda at any of the regularly scheduled meetings." Mot. at 28. However, when Commissioner Holmes exercised his legal authority to propose nondiscriminatory maps, the Commission refused to even call them for a vote. SAC ¶¶ 101-02. Defendants attempt to contradict Plaintiffs' factual assertions with respect to Commissioner Holmes underscore the veracity of Plaintiffs' factual allegations—not their insufficiency.

*Fourth*, Plaintiffs allegations of substantive and procedural departures from the ordinary redistricting process provide further evidence of discriminatory intent. Until the County began pressing for discriminatory maps in 2011, it traditionally held a series of public hearings on redistricting, scheduled early in the process, hosted in locations across the County, and timed to accommodate ordinary working schedules. SAC ¶¶ 81-83. In 2021, by contrast, the Commission held only one hearing, which it delayed until the day before the redistricting deadline, hosted in a remote and undersized location, and scheduled in the middle of the workday. SAC ¶¶ 84-88.

Here again, Defendants do not contend that Plaintiffs' allegations are insufficient to state a claim but instead dispute whether they are true. According to Defendants, there was "nothing unusual about the timing of the" Commission's redistricting hearing and the

19

meeting's midday timing was "consistent with the County Commissioners Court's normal and usual practice." Mot. at 26-27. This is at loggerheads with Plaintiffs' allegations that, for the reasons described above, the "2021 Galveston County redistricting process featured significant departures from procedural norms, similar to the 2011 redistricting process." SAC ¶ 81. That tension renders Defendants' contention futile for purposes of its motion to dismiss: "the Court must accept all" Plaintiffs' "factual allegations as true at the motion-to-dismiss stage; the time" for Defendants "to dispute their truth is at summary judgment"—not here. *LULAC II*, 2022 WL 1631301, at \*26.

After asserting that the redistricting process followed "usual practice," Defendants make an about face and seem to concede that the redistricting process was a "departure from normal practice." Mot. at 26-27. But they contend the Court should excuse these departures because "the whole world had to depart from its normal routines and past practices due to COVID-19." Mot. at 28. To be sure, as a general matter, "the COVID–19 pandemic provides an obvious alternative explanation for [a] rushed redistricting process." *LULAC II*, 2022 WL 1631301, at \*26. It seems unlikely that is true here, however, where the Commission redeployed the same procedural gambits it employed a decade ago—well before the onset of the pandemic. SAC ¶¶ 81-82. It also fails to explain the hearing's inaccessible location, inadequate space, or inconvenient timing. *See id.* at ¶¶ 84-90. And in any event, inferences must be drawn in Plaintiffs favor at this stage of the proceedings—not Defendants'.

Ultimately, Defendants' Motion greets Plaintiffs' claims of intentional racial discrimination by ignoring, disputing, or drawing their own favorable inferences from

Plaintiffs' factual allegations—not by disputing their sufficiency. They are welcome to raise these arguments again at "summary judgment," but here the Court accepts Plaintiffs' allegations as true and construes all inferences in Plaintiffs' favor. *LULAC II*, 2022 WL 1631301, at *26. Plaintiffs' complaint is more than sufficient under that standard.

### b.  The Fifteenth Amendment Prohibits Intentional Racial Discrimination.

In addition to their claims under the Fourteenth Amendment and Voting Rights Act, Plaintiffs allege an intentional racial discrimination and intentional vote dilution claim under the Fifteenth Amendment. Defendants contend, however, that "there is no cause of action for intentional vote dilution under the Fifteenth Amendment." Mot. at 23. But the Supreme Court and Fifth Circuit have both long-recognized that an "election practice violates Section 2 and the Fourteenth and Fifteenth Amendments if it is undertaken and maintained for a discriminatory purpose." *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020); *see, e.g.*, *Rice v. Cayetano*, 528 U.S. 495 (2000); *City of Mobile v. Bolden*, 446 U.S. 55 (1980) (plurality opinion); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Veasey v. Abbott*, 830 F.3d 216, 229 (5th Cir. 2016), *Perez v. Abbott*, 390 F. Supp. 3d 803, 814 (W.D. Tex. 2019) (three-judge court). Indeed, the Supreme Court has specified that if "a State intentionally drew district lines in order to destroy otherwise [performing] districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality opinion). In line with this precedent, a three-judge court in this Circuit recently applied the *Arlington Heights* factors to an intentional racial vote dilution claim under the Fifteenth Amendment. *LULAC I*, 2022 WL 1410729, at *8-9. That understanding is consistent with the Supreme Court's decision in

21

*Voinovich v. Quilter*—the ultimate authority on which Defendant's assertion rests, Mot. at 23—which denied a vote dilution claim under the Fifteenth Amendment only because the plaintiffs failed to prove the "intentional discrimination" element of the claim. 507 U.S. 146, 159 (1993). And it would flatly repudiate the text, history, and purpose of the Fifteenth Amendment to conclude that the Amendment granting minority voting rights permits intentional racial discrimination in a state's election practices.

## IV.    Plaintiffs Sufficiently Allege that Commissioner Precinct 3 is Racially Gerrymandered.

Like Plaintiffs' allegations of intentional racial discrimination, Plaintiffs' racial gerrymandering allegations carry their claims comfortably "across the line" at this early stage of litigation. *LULAC II*, 2022 WL 1631301, at *27 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Recognizing this, Defendants' principal response to Plaintiffs' racial gerrymandering claim is that Plaintiffs failed to identify District 3 as the gerrymandered district. Mot. at 20-21. As a fallback, they contend Plaintiff's allegations of racial gerrymandering are insufficient. Mot. at 21-22. Both arguments are meritless.

### a.  The Commissioners Court Plan is a Racial Gerrymander.

Plaintiffs' racial gerrymandering claim is closely related to their intentional racial discrimination claim. Although the claims are "analytically distinct," the central difference between the two claims at this stage is quantitative—not qualitative: "the types of evidence that would allow either claim to succeed are largely the same." *LULAC II*, 2022 WL 1631301, at *27. A Plaintiff who has "nudged their claims [of intentional discrimination] across the line" also succeeds in pleading racial gerrymandering when they allege that the

22

intentional discrimination amounted to "the predominant factor" motivating the plan. *Id.* (first quoting *Twombly*, 550 U.S. at 570; and then quoting *Miller*, 515 U.S. at 915).

As discussed in detail above, Defendants intentionally adopted the enacted plan to disfavor minority voters. *Supra*, at Part III.a. The map mimics the plan DOJ rejected as intentionally discriminatory just a decade ago, which the Commission knew would eliminate the County's only minority-opportunity district but nevertheless rushed through the redistricting process without input from the public or only minority Commissioner. *Id.* Indeed, the plan was not motivated merely in part by racial discrimination—intentional discrimination is the *only* explanation for the Commission's actions. *See, e.g.*, SAC ¶¶ 67-68, 112-14. The Commission "did not provide any analysis on their map to explain their districting choices." SAC ¶ 115. And shifting only one voting tabulation district would have remedied the prior plan's malapportionment and kept Precinct 3's majority minority population intact, yet the "enacted plan radically alters the Commissioner precincts, dismantling Precinct 3 and cracking its Black and Latino voters across all four precincts." SAC ¶¶ 63-68; *compare* SAC ¶ 59 *with* SAC ¶ 65. Racial considerations are the only explanation for the Commission dramatically reconfiguring the court-approved plan and replacing it with the discriminatory plan it tried, and failed, to adopt last cycle. Plaintiffs' claim that the Commission used race as the predominant tool driving its redistricting decisions is well-pled.

Defendants seek to skirt Plaintiffs' extensive allegations that race was the Commission's predominant redistricting criterion by claiming that Plaintiffs must allege the challenged "precinct is not compact, divides communities of interest, is not contiguous,

23

[] does not respect political subdivision lines" or is bizarrely shaped. Mot. at 21-22. That is not the law. "[A] conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017). As the Supreme Court has explained, a "plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision." *Miller*, 515 U.S. at 916. Thus, "an intentional vote dilution and a *Shaw* claim . . . are not mutually exclusive, and the [same] allegations are sufficient to support both types of claims." *Perez*, 253 F. Supp. 3d at 893 n.29. Even Defendants seem to recognize this, acknowledging that none of the allegations they claim Plaintiffs' complaint lacks is "a necessary element to a racial gerrymandering claim." Mot. at 21. Defendants' attempt to rewrite the law betrays their recognition that Plaintiffs' intentional discrimination allegations are sufficient to state a claim on both counts.

Still more, Plaintiffs' complaint *does* contain allegations of Precinct 3's "shape and demographics" on top of the allegations of "legislative purpose" already discussed. *Miller*, 515 U.S. at 916. The complaint supplies comprehensive data illustrating how the enacted plan eliminates the 61.7% CVAP majority in Precinct 3 and replaces it with a plan in which minority CVAP is less than 40% in each precinct. SAC ¶¶ 120-21; *see also* SAC ¶¶ 107-09. The complaint also depicts both the former and enacted maps, illustrating how the new plan unnecessarily and "radically alters the Commissioner precincts," and including

24

shading to highlight racial demographics in each district. SAC ¶¶ 59, 65. And to be clear, Plaintiffs do allege that intentional discrimination so thoroughly "controlled and dominated" the Commission's redistricting objectives that "[r]ace was the predominate consideration in the drawing of district lines" and "subordinate[d] traditional redistricting principles in the enacted . . . plan." SAC ¶¶ 111-12, 116. Under any rubric of racial gerrymandering, Plaintiffs' claim is well-pled.

### b. Plaintiffs' Racial Gerrymandering Claim Satisfies the Notice Pleading Standard.

A plaintiff alleging a racial gerrymandering claim may assert either that "*every* . . . district in a" jurisdiction "suffers from racial gerrymandering" or that "the boundaries of individual districts" are tainted by racial gerrymandering. *Ala. Legislative Black Caucus*, 575 U.S. at 263. In this case, Plaintiffs have alleged that racial considerations predominated in the drawing of the Enacted Plan as a whole and in the construction of Precinct 3 specifically. The Commission's consideration of race predominated both in its dismantling of benchmark Precinct 3 as a performing minority opportunity district, and in its cracking of minority voters across all four districts. *See* SAC ¶¶ 34-169. Thus, each plaintiff has standing to challenge the Enacted Plan as a racial gerrymander, and even if they did not, Plaintiffs Pope and James, who reside in Precinct 3, still would.

To start, Plaintiffs allege that "*every* . . . district in" the Enacted Plan "suffers from racial gerrymandering." *Ala. Legislative Black Caucus*, 575 U.S. at 263; *e.g.,* SAC ¶ 171. The Commissioners Court represents only four precincts. To dismantle Precinct 3 as a majority-minority precinct, Defendants had to elevate racial criteria not only in their

reconfiguring of Precinct 3, but also in their careful dispersion of minority voters across the remaining three precincts. *See* SAC ¶¶ 65, 67, 68, 112. The precision with which they did so is evident: minority CVAP now hovers between 34% and 39% in all four districts—just low enough to prevent minority voters from electing their candidate of choice in any district but just high enough to prevent minorities from approaching a majority in any one precinct. SAC ¶ 109. The plaintiffs cracked into Precincts 1 and 2 for the purpose of dismantling Precinct 3 are victims of the harm that flows from "racial classification" just as surely as are the plaintiffs residing in Precinct 3. Mot. at 20 (quoting *Ala. Legislative Black Caucus*, 575 U.S. at 263).

Defendants' reliance on *Alabama Legislative Black Caucus* and *Hays* only confirms the point. Mot. at 20-21. In *Alabama Legislative Black Caucus*, the Court held that the plaintiffs' claims must be limited to specific districts, rather than the state as a whole, because "the District Court found that racial criteria had not predominated in the drawing of some Alabama districts." 575 U.S. at 263. Thus, the entire plan did not "suffer[] from racial gerrymandering." *Id.* at 263. Here, in contrast, Plaintiffs do allege that racial criteria predominated in "*every*" district, so the Court is free to consider the map as a whole. *Id.* The same is true of *Hays*, in which the plaintiffs similarly provided evidence that race predominated in the drawing of only some—but not all—of the plan's districts. *United States v. Hays*, 515 U.S. 737, 745-46 (1995). Plaintiffs' claims here suffer no such shortcoming.

Even if Plaintiffs were limited to challenging only a single district within the plan (they are not), they would have satisfied the notice pleading standard. A three-judge court

in this Circuit recently explained that a complaint need only "refer to" the challenged districts to provide adequate "notice" of a racial gerrymandering claim. *LULAC II*, 2022 WL 1631301, at *27. Applying that lenient standard, it permitted racial gerrymandering claims to advance based only on passing references to the relevant districts. *See id.*; MALC First Am. Compl., ¶¶ 229, 231, *LULAC v. Abbott*, 3:21-cv-00259-DCG-JES-JVB, ECF No. 247 (W.D. Tex. Apr. 22, 2022). Here, however, Plaintiffs identify District 3 as the principal "*electoral district[]*," *Ala. Legislative Black Caucus*, 575 U.S. at 263, at issue on nearly every page of their complaint, *see* SAC ¶¶ 35, 42, 56, 57, 60, 65, 72, 73, 75, 80, 101, 107, 108, 110, 133, 171, 173, 184. Indeed, Plaintiffs reiterate throughout their complaint that the crux of their claims is the "intentional dismantling of *Precinct 3* as a performing majority-minority precinct through the cracking of Black and Latino voters." SAC ¶¶ 171, 173, 184 (emphasis added); *see also* SAC ¶¶ 65, 75 (variations of same). These recitations satisfy the notice pleading standard, and Plaintiffs Pope and James, as residents of Precinct 3, have standing to maintain them. [4]

---

[4] Defendants also add that Plaintiffs failed to state a claim because "they failed to plead any facts that race and not political preferences predominated the reasons for the placement of the precinct boundaries." Mot at 22-23 n.8. Putting aside this mischaracterization of Plaintiffs' allegations—which are entirely focused on race, not party—Plaintiffs need not prove the distinction at this stage in the proceedings. *See, e.g.*, *LULAC II*, 2022 WL 1631301, at *26.

## CONCLUSION

Because Plaintiffs sufficiently plead the allegations in their Second Amended

Complaint, Plaintiffs respectfully request that this Court deny Defendants' Motion to

Dismiss.[5]

Respectfully submitted this 29th day of June, 2022.


|  |  |
|---|---|
|  | */s/ Chad Dunn* |
| Mark P. Gaber* | Chad W. Dunn (Tex. Bar No. 24036507) |
| Simone Leeper* | Brazil & Dunn |
| Valencia Richardson* | 4407 Bee Cave Road |
| Orion de Nevers** | Building 1, Ste. 111 |
| Campaign Legal Center | Austin, TX 78746 |
| 1101 14th St. NW, Ste. 400 | (512) 717-9822 |
| Washington, DC 20005 | chad@brazilanddunn.com |
| (202) 736-2200 |  |
| mgaber@campaignlegal.org | Neil G. Baron |
| cjackson@campaignlegal.org | Law Office of Neil G. Baron |
| sleeper@campaignlegal.org | 1010 E Main Street, Ste. A |

---

[5] Contrary to Defendants' assertions, a dismissal with prejudice would be improper here. This is Plaintiffs' first opportunity to respond to a Motion to Dismiss. Furthermore, Defendants failed to give adequate notice of the scope of their defenses per this Court's standing order. *See* Galveston District Court Rules of Practice at 3-4. On May 11, 2022, Defendants notified Plaintiffs of their intent to file a motion to dismiss Plaintiffs' First Amended Complaint. *See* Doc. 39-1. In their notice, Defendants failed to identify several jurisdictional defenses they now make in their Motion to Dismiss, including Defendants' challenge to Plaintiffs' standing under the Voting Rights Act and to Plaintiffs' ability to bring vote dilution claims under the Fifteenth Amendment. Defendants' failure to provide adequate notice of all their defenses, per this Court's order, denies Plaintiffs a "fair opportunity to make [their] case." *See Schiller v. Physicians Res. Grp. Inc.,* 342 F.3d 563, 566-67 (5th Cir. 2003) ("In deciding whether to grant leave to amend, the district court may consider a variety of factors in exercising its discretion . . . ."); *see also Williams v. Morris*, 614 F. App'x 773, 774 (5th Cir. 2015) ("[W]hen a complaint is dismissed for lack of jurisdiction, including lack of standing, it should be without prejudice."). Thus, while Plaintiffs maintain that they sufficiently pled their claims under Rules 8 and 12, if this Court grants any part of Defendants' Motion to Dismiss it should grant Plaintiffs leave to amend their complaint.

28

vrichardson@campaignlegal.org
odenevers@campaignlegal.org

Sonni Waknin*
Bernadette Reyes*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
sonni@uclavrp.org

League City, TX 77573
(281) 534-2748
neil@ngbaronlaw.com

*admitted pro hac vice
**admitted pro hac vice; licensed to practice in CA only, supervised by Mark Gaber, a member of the D.C. bar

Counsel for Petteway Plaintiffs

## CERTICATE OF SERVICE

I HEREBY CERTIFY that on June 29, 2022, the foregoing document was filed electronically (via CM/ECF), and that all counsel of record were served by CM/ECF.

/s/ Chad Dunn
Counsel for Petteway Plaintiffs