**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| DICKINSON BAY AREA BRANCH NAACP; GALVESTON BRANCH NAACP; MAINLAND BRANCH NAACP; GALVESTON LULAC COUNCIL 151; EDNA COURVILLE; JOE A. COMPIAN; and LEON PHILLIPS, | § § § § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § § | Civil Action No. 3:22-cv-117- JVB |
| GALVESTON COUNTY; HONORABLE MARK HENRY, in his official capacity as Galveston County Judge; DWIGHT D. SULLIVAN, in his official capacity as Galveston County Clerk; | § § § § § § § | |
| *Defendants*. | § § | |
| | § | |
| TERRY PETTEWAY, DERRICK ROSE, MICHAEL MONTEZ, SONNY JAMES, and PENNY POPE, | § § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § | Civil Action No. 3:22-cv-57-JVB [Lead Consolidated Case] |
| GALVESTON COUNTY, TEXAS, and HONORABLE MARK HENRY, in his official capacity as Galveston County Judge, | § § § § § § | |
| *Defendants*. | § § § | |

|                                                                                                                                                 |     |                               |
| ----------------------------------------------------------------------------------------------------------------------------------------------- | --- | ----------------------------- |
| United States of America,                                                                                                                       | §§§ |                               |
| *Plaintiff*,                                                                                                                                    | §§  |                               |
| v.                                                                                                                                              | §§§ | Civil Action No. 3:22-cv-93-JVB |
| GALVESTON COUNTY, TEXAS; GALVESTON COUNTY COMMISSIONERS COURT; and MARK HENRY, in his capacity as Galveston County Judge,                        | §§§§§ |                             |
| *Defendants*.                                                                                                                                   | §§§ |                               |

## *NAACP* PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### I.  INTRODUCTION

Defendants' Motion to Dismiss ("MTD") is unsubstantiated in law and logic, and should be swiftly denied by the Court. *See* Doc. # 47. Defendants tacitly admit *NAACP* Plaintiffs as a whole have standing by failing to challenge at all the standing of Edna Courville, Joe A. Compian, and Leon Phillips ("Individual Plaintiffs"), or the associational standing of Plaintiffs Mainland Branch NAACP, Dickinson Bay Area Branch NAACP, and Galveston Branch NAACP (together, the "NAACP Branches"). They assert a cynical and legally irrelevant argument that the *appointment* of a new Commissioner of color in Galveston County somehow alleviates the asserted harms to Plaintiffs and their members'

right to *elect* a candidate of their choice on an equal basis. And they otherwise quibble about evidentiary issues that are inappropriate at this stage and, in any event, fail to gain purchase in light of the detailed allegations in the First Amended Complaint ("FAC"), which Defendants largely fail to acknowledge and seem to wish this Court to simply ignore. For the reasons set forth below, the MTD should be denied.

## II.    LEGAL STANDARD

A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) will only be granted "if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. In assessing whether a plaintiff has alleged a claim for relief, the court must accept "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig*., 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted).

3

### III. ARGUMENT

**A. Plaintiffs have associational and organizational standing.**

Standing is satisfied under Article III when a plaintiff shows (1) an "injury in fact," (2) the defendant's conduct caused that injury in fact, and (3) the injury in fact will likely be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An organization can establish an injury in fact through "associational standing," which is derivative of the standing of its members, or "organizational standing," which is in its own name. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).

"The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum of Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). In their MTD, Defendants assert only that the NAACP Branches and Galveston LULAC Council 151 ("LULAC," and together with the NAACP Branches "Organizational Plaintiffs") lack organizational standing, and that LULAC lacks associational standing. *See* MTD at 1 [Doc. # 47]. As Defendants challenge neither the Individual Plaintiffs' standing nor the NAACP Branches' associational standing, nor can they reasonably, it is therefore undisputed that Plaintiffs have Article III standing and this Court has subject matter jurisdiction over this action.

Moreover, as will be shown below, Defendants' challenges to the Organizational Plaintiffs' standing lack merit, as these Plaintiffs have plausibly alleged "general factual allegations of injury resulting from the defendant's conduct," which at this stage of the

litigation suffice for Article III purposes, *see Lujan*, 504 U.S. at 561, and LULAC properly alleges associational standing.

**1.   LULAC has associational standing.**

Associational standing is established when an entity shows (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  The allegations in the FAC satisfy each of these factors.

a.   LULAC's members have standing to sue in their own right.

The first prong of the associational standing test requires that at least one member of the association "would independently meet the Article III standing requirements." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587–88 (5th Cir. 2006); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("The association must allege that its members, or any one of them, are suffering immediate or threatened injury. . . .").

As set forth in the FAC, LULAC has "over 100 members" including "Black and Latino members" that "live across Galveston County in all four commissioner precincts." FAC ¶ 12. They "face the immediate injury of being cracked across all four commissioner precincts and having no representative on the Commissioners Court." These allegations (which Defendants ignored in their Motion) are sufficient to show that LULAC's members have suffered an injury in fact as a direct result of the new plan, especially in light of the

liberal reading provided at the pleading stage. *See La. State Conf. of the NAACP v. Louisiana*, 490 F. Supp. 3d 982, 1013 (M.D. La. 2020) (holding Louisiana NAACP had standing for Section 2 claims by alleging it had "members throughout the State, including members whose votes are unlawfully diluted.").

Furthermore, Plaintiffs have identified a specific LULAC member and regular voter, Plaintiff Compian, who resided in the benchmark Precinct 3 and, as a result of the redistricting, will no longer have equal opportunity to elect his candidate of choice for Commissioners Court. FAC ¶ 17. Defendants do not challenge his standing or the standing of other similarly situated LULAC members. Compian has plausibly alleged an injury in fact, and LULAC may assert his injury (and that of his fellow LULAC members) as its own. *League of United Latin Am. Citizens v. Abbott* ("*LULAC III*"), No. 3:21-cv-259, 2022 WL 1631301, at *19 (W.D. Tex. May 23, 2022) (holding Plaintiff adequately pled standing by identifying a member).[1]

b. The interests of fair and equal representation that LULAC seeks to protect are germane to its purposes.

Allegations in the FAC demonstrate that LULAC also satisfies the second prong of associational standing. As the largest and oldest Latino organization in the United States,

---

[1] While LULAC has identified a member in the FAC, such specific identification is not required in the Fifth Circuit at the pleading stage. *See Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing.").

LULAC seeks to advance the economic condition, educational attainment, political influence, housing, health, and civil rights of Latino Americans through community-based programs operating at more than 1,000 LULAC councils nationwide, including in Galveston County. *See* FAC ¶¶ 11–12. LULAC regularly organizes voter registration events, hosts cultural events and fundraisers for educational scholarships, participates in community-wide charity events with other organizations such as the County NAACP Branches, and receives and addresses calls and complaints of racial discrimination. FAC ¶ 13.

Defendants glosses over allegations of LULAC's activities in their Motion, opting instead to hone in on a single paragraph of many describing this organizational plaintiff. *See* MTD at 13 (citing FAC ¶ 15). But these allegations demonstrate that the interests LULAC seeks to protect here – the rights of its members to equal voter power and freedom from intentional discrimination before the County Commissioners Court – are germane to its purpose in advancing the political influence and, by extension, additional status and rights of Latino Americans in Galveston County. *Cf. Hancock*, 487 Fed. App'x at 197 (holding that protecting the strength of votes and safeguarding the fairness of elections were "surely germane to the NAACP's expansive mission").

        c.   <u>Neither the claims asserted nor the relief requested require the participation of individual LULAC members in the lawsuit.</u>

The third prong to show associational standing focuses on "matters of administrative convenience and efficiency" and is implicated when the case requires calculation of

individual damages. *See United Food & Com. Workers Union Loc. 751*, 517 U.S. at 546 (citing *Hunt*, 432 U.S. at 343) ("*Hunt* held that 'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members, but indicated that such participation would be required in an action for damages to an association's members . . . ."). This is not a damages case.

By representing its members' interests, LULAC is ideally positioned here to pursue the claims asserted and obtain the purely declaratory and injunctive relief sought, and can do so without calling for its members to file individual lawsuits.  Indeed, this Court would be unnecessarily taxed and inundated should LULAC's individual members file their own lawsuits. Defendants fail in their Motion to assert otherwise. As the claims asserted do not require the participation of each individual member of LULAC, LULAC's assertion of its associational standing promotes important interests of judicial economy and efficiency. *See La. State Conf. of the NAACP*, 490 F. Supp. 3d at 1005 (holding "neither the claim nor relief sought requires the participation of any of NAACP's members in the lawsuit").

### 2.  The NAACP Branches and LULAC have organizational standing.

"'[O]rganizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Houston*, 867 F.3d at 610 (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). The injury an organization alleges "need not be substantial" or anything more than an "identifiable trifle,"

8

as the requirement is "qualitative, not quantitative in nature." *OCA-Greater Houston*, 867 F.3d at 612.  Organizational injury can be shown by alleging that an organization must divert resources from its usual activities in order to lessen the challenged action's harm to its mission.  *Havens Realty*, 455 U.S. at 379. At the pleading stage, an organization need only broadly allege such an often-minor injury. *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 788 (W.D. Tex. 2015) (citing *Havens Realty*, 455 U.S. at 379); *see, e.g.*, *OCA-Greater Houston*, 867 F.3d at 612 (because OCA was forced to spend some money and resources educating voters about the effects of a new statute, the challenged statute perceptibly impaired OCA's ability to "get out the vote"); *Scott v. Schedler*, 771 F.3d 831, 836-39 (5th Cir. 2014) (NAACP was injured where one member spent more time on voter registration drives after the state's failure to provide required voter registration forms); *see also Crawford v. Marion Cnty. Elec. Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury. . . .").

The Organizational Plaintiffs sufficiently allege specific and particularized injuries-in-fact to themselves as organizations. Each Organizational Plaintiff has a broad mission that relates to civic engagement and advocating for their members' interests. The NAACP Branches' mission is "to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate racial hatred and racial discrimination," which includes "ensur[ing] that the interests of communities of color are represented on local, state, and national legislative bodies by representatives who share the communities'

interests, values, and beliefs" as well as advocating "for fair housing, natural disaster relief, fair policing, education, and public health services."  FAC ¶¶ 4–7. To further these goals, the NAACP Branches regularly engage in efforts to register, educate, and engage people of color in the political process through "voter registration drives, voter education events, poll watcher programs, and get-out-the-vote campaigns" which predominantly serve the minority populations in Galveston County. FAC ¶¶ 5, 9. The NAACP Branches also provide other community support such as COVID vaccination clinics, housing programs, and other relief efforts during natural disasters. FAC ¶ 6. LULAC similarly aims to "advance[] the economic condition, educational attainment, political influence, housing, health and civil rights of Latino Americans through community-based programs." FAC ¶ 11. LULAC "regularly organizes voter registration events," and also hosts "cultural events and fundraisers for educational scholarships, participates in community-wide charity events with other organizations such as the County NAACP Branches, and receives and addresses calls and complaints of racial discrimination."  FAC ¶ 13.

As a consequence of Defendants' actions, Organizational Plaintiffs have been and will be forced to "devote[] resources to counteract [Defendants'] allegedly unlawful practices." *Schedler*, 771 F.3d 831, 837 (5th Cir. 2014). Defendants' actions creating the 2021 Commissioners Court precinct map dilute the votes of Galveston's Black and Latino residents such that it renders the Commissioners Court nonresponsive to these communities. *See* FAC ¶¶ 10, 16. Because Defendants' actions have intentionally targeted the Organizational Plaintiffs' members' voting rights and ability to elect candidates of their

choice by dividing them among several precincts, Defendants have perceptibly impaired the Organizational Plaintiffs' ability to pursue their missions. Whereas previously these civil rights organizations could count on at least one Commissioner being elected from a majority-minority precinct and therefore sensitive to their and their members' interests, *see* FAC ¶¶ 127–35, they now no longer have any assurance that an elected Commissioner will understand the needs of the Black and Latino residents and actively assist those organizations in their missions relating to voting, public health, disaster relief, education, racial discrimination, and more. Further, Organizational Plaintiffs allege that Holmes has supported them through charitable contributions and attending their events, and that other Commissioners have not done so. FAC ¶¶ 127–28, 133. By robbing the Black and Latino communities represented by the NAACP Branches and LULAC of any meaningful chance to vote as an effective and cohesive bloc, the remaining Commissioners will have little incentive to attend Organizational Plaintiffs' functions or support them financially or otherwise. As it stands, Commissioner Holmes is the go-to source in county government for communities of color when it comes to accessing information about the government and direct constituent services. FAC ¶¶ 129–31, 134. Organizational Plaintiffs will have to help fill the gap in providing these services in his wake should the current map remain in place. Also, Commissioner Holmes has nominated and supported African American and Latino candidates for County offices and boards, FAC ¶¶ 132, and Plaintiffs will have to work harder and expend more resources to have representation in government without a responsive commissioner on the Court.

In the face of that new (and illegal) reality, Organizational Plaintiffs will have to counteract the effect of the unlawful Commissioners Court plan to "mitigate[e] its real-world impact." *La. State Conf. of the NAACP*, 490 F. Supp. 3d at 1016–17. The NAACP Branches will have to divert additional resources away from other activities and "toward education, outreach, and other activities that will promote the political equality for Black and Latino voters to counteract the diminished and diluted voting power of their member communities." FAC ¶ 9. Similarly, LULAC "will have to divert resources toward education, outreach, and other activities that will advance the economic condition, educational attainment, political influence, housing, health and civil rights of Latino residents of the County to counteract the diminished and diluted voting power of their member communities." FAC ¶ 15. Since "general factual allegations of injury resulting from the defendant's conduct may suffice," the FAC sufficiently alleges the resources diverted and harm to Organizational Plaintiffs' mission. *In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 (1996)).

Defendants do not make any arguments regarding the other two prongs of Article III standing, traceability and redressability, and it would have been futile to do so. There is no question that the harms of intentional vote dilution and racial gerrymandering are fairly traceable to Defendants' enactment and enforcement of an unlawful Commissioners Court map, and that Plaintiffs' harms will certainly be redressed by the Commissioners Court ceasing to use the enacted map and adopting a map that complies with the Voting Rights Act ("VRA") and the U.S. Constitution. *See Lujan*, 504 U.S. at 560.

12

\*      \*      \*

Defendants' arguments in the Motion do nothing more than ask this Court to ignore the particularized, specific, and concrete bases of standing alleged for the Organizational Plaintiffs. But a comprehensive look at the allegations in the FAC demonstrate that all of the plaintiffs, individual and organizational, have made out an active case or controversy between themselves and Defendants and will suffer irreparable harm if the Commissioners Court plan enacted in 2021 remains in place.

**B. This case is not mooted by the appointment of Commissioner Robin Armstrong in Precinct 4 to serve the remainder of the 2018-2022 term.**

Defendants' argument that the appointment of a second African American Commissioner moots Plaintiffs' entire case is completely divorced from the plain language of the Voting Rights Act, case law, and the realities of Plaintiffs' representational and constitutional harms. *See* MTD at 16-17.

As Defendants are well aware, neither the VRA nor the U.S. Constitution guarantee racially proportional political representation, and that is not what Plaintiffs seek in this suit. *But see Johnson v. De Grandy*, 512 U.S. 997, 1018–20 (1994) (rejecting the notion that proportionality provides a "safe harbor" to a Section 2 claim). Rather, Plaintiffs seek the ability to elect the candidate of their choice under Section 2 of the VRA and not to be intentionally discriminated against on the basis of race in redistricting. Specifically, Plaintiffs seek to preserve longtime communities of interest and Black and Latino voting power in the benchmark Precinct 3, which had elected Wayne Johnson then Stephen

Holmes as Commissioner for over three decades along racially polarized lines. *See* FAC ¶¶ 26–27. Commissioner Armstrong's appointment as Commissioner for the new Precinct 4 does nothing to address the cracking of longtime Black and Latino voter blocs in benchmark Precinct 3 in La Marque, Texas City, Dickinson, and Galveston Island, and it cannot redress Plaintiffs' harms. "In vote dilution cases, the 'harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district.'" *Anne Harding v. County of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018)). As Plaintiffs have alleged, the enacted Commissioners Court map carved the benchmark Precinct 3 and its Black and Latino residents primarily into the new Precincts 1, 2, and 4, diminishing Black and Latino residents' voting power. FAC ¶¶ 59–65. Accordingly, Plaintiffs seek declaratory and injunctive relief that prevents the Court from utilizing the enacted Commissioners Court maps. While the map is in use, Plaintiffs continue to suffer illegal vote dilution and thus maintain "a legally cognizable interest in the outcome" of their claims. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

Commissioner Armstrong's appointment also says nothing about whether he is, for the County's Black and Latino voters, the "representative[] of their choice." 52 U.S.C. § 10301(b). There is one simple reason why Commissioner Holmes can be considered the candidate of choice for benchmark Precinct 3's Black and Latino voters, and it is neither his race nor his political party: it is the fact that he was elected and re-elected term after term in a racially polarized voting environment. *See* FAC ¶ 92. But Plaintiffs also allege

14

why Commissioner Holmes specifically has garnered the support of Black and Latino residents of his former precinct. FAC ¶¶ 127–35 (describing Commissioner Holmes' charitable work, constituent services, and support for Black and Latino community members). To assert that Black and Latino Plaintiffs must similarly support Commissioner Armstrong merely because he is Black is an essentializing argument that has no place in the nuanced, sensitive discussions of race and racial discrimination present in every VRA and racial gerrymandering challenge.

Moreover, even taking their misguided proportionality argument at face value, Defendants cannot plausibly argue that the one-time *appointment* of a Black Commissioner somehow rises to the level of legally "mooting" the case. "Mootness occurs only when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Voluntary actions taken by Defendants, such as the appointment of Commissioner Armstrong, only moot a case when "subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal citations omitted). Here, the challenged conduct relates to the dismantling of the benchmark Precinct 3. Defendants ignore the fact that they have redrawn Precinct 3 such that Commissioner Holmes has lost his entire base of support and is unlikely to win re-election in 2024. Nor have they suggested that Commissioner

15

Armstrong will run again after his term expires in 2022, or that he has the voter support required to maintain the seat to which he was appointed. Indeed, it is telling that no Black County Commissioner has ever been elected outside the boundaries of a majority-minority Precinct 3. FAC ¶ 26. Accordingly, Defendants have not and cannot assure Plaintiffs that *any* Black (or Latino) candidates will hold *any* Commissioners Court seat past 2024.[2] Thus, even by the terms of their own outlandish—and frankly, insulting—argument, Defendants cannot demonstrate that Plaintiffs' claims are moot.

Lastly, Defendants do not explain how the appointment of Commissioner Armstrong moots Plaintiffs' intentional discrimination claims. Plaintiffs' injury resulting from being intentionally discriminated against on the basis of race is independent from the makeup of the Commissioners Court at any single point in time. Plaintiffs' ability to elect their preferred Commissioner "has been thwarted by official action that is racially discriminatory," which constitutes a distinct injury. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977). One would hope that Defendants are not suggesting that the one-time appointment of a Black Commissioner, in the midst of litigation, proves that the Commissioners Court is incapable of racial discrimination. This

---

[2] Even if Defendants' contention that Commissioner Armstrong's appointment automatically creates proportional representation (which it does not), this would still be insufficient grounds to dismiss Plaintiffs' VRA claim because "[p]roportionality is not a safe harbor." *De Grandy*, 512 U.S. at 1026; *see also LULAC*, 548 U.S. 399, 437 ("The role of proportionality is not to displace this local appraisal or to allow the State to trade off the rights of some against the rights of others. Instead, it provides some evidence of whether 'the political processes leading to nomination or election in the State or political subdivision are not equally open to participation.'").

16

would be the legal equivalent of saying, "see, I'm not racist, I have a Black friend."[3]

## C.  Plaintiffs sufficiently allege a Section 2 claim.

Defendants' entire argument regarding Section 2 of the VRA is that "Plaintiffs have not pleaded sufficient facts to make it plausible that race and not politics explains the racial divergence in voting patterns." MTD at 22. This argument attempts to circumvent circuit caselaw by improperly imposing a pleading burden on Plaintiffs that the Fifth Circuit and lower courts have squarely rejected. For example, Defendants in the contemporaneous statewide redistricting case attempted the same argument to no avail. *LULAC III*, 2022 WL 1631301, at *19 ("[Defendants say that even if minorities vote cohesively in general elections, [Plaintiff] hasn't explained why that behavior is best explained by race, not partisanship, in each of its proposed districts. . . . [A]t least at the pleading stage—it is enough for a *Gingles* plaintiff to allege that minorities vote cohesively in general elections in the proposed district. Accordingly, the Court rejects [Defendants'] position here, too.") (internal citations omitted). That being said, even if this Court theoretically contravened precedent to establish a new Section 2 pleading standard, Plaintiffs would still satisfy that standard.

As held in *Teague v. Attala County, Mississippi*, 92 F.3d 283 (5th Cir. 1996), after Plaintiffs show the purely statistical *Gingles* factors alongside the totality of the

---

[3] *See* John Eligon, *The 'Some of My Best Friends Are Black' Defense*, N.Y. Times (Feb.16, 2019) (the "'some of my best friends are black' defense, which has so often been relied on by those facing accusations of racism that it has become shorthand for weak denials of bigotry.").

circumstances, Defendants may then attempt to rebut that showing by providing evidence that non-racial factors better account for the defeat of minority-preferred candidates at the polls. *Id.* at 290. The Fifth Circuit made clear that whether "factors other than race affect[] voting patterns" is an evidentiary issue, and the burden unequivocally rests on Defendants to rebut Plaintiffs' statistical evidence of racial polarization. *Id.* The Fifth Circuit noted that the plaintiffs had used "the established acceptance of regression analysis as a standard method for analyzing racially polarized voting" and required the defendants to "rebut the plaintiffs' evidence by showing that no such bias exists in the relevant voting community." *Id.* (internal citations omitted).

In their MTD, Defendants concede their burden and allude to their own error when they write, "Meeting these three [*Gingles*] pre-conditions *creates a rebuttable presumption* that the Commission precincts harm minority voters. . . . One factor that can *rebut* the [*Gingles*] preconditions is whether bloc voting is explained not on racial grounds, but on partisan grounds." MTD at 21-22 (emphasis added). Indeed, one of their primary citations explicitly describes the general outline for a burden-shifting framework:

> Consistent with *Gingles*, the Court holds that Plaintiffs have the duty, in the first instance, to demonstrate some evidence of racial bias through the factors used in the preconditions and totality of circumstances test. Upon doing so, the burden shifts to the State to demonstrate some evidence of partisan politics (or some other issue) influencing voting patterns. If the State does so, then the Court must balance the relative strength of the evidence directed to each of the totality of circumstances factors to determine whether racial bias best explains the alleged vote dilution.

*Lopez v. Abbott*, 339 F. Supp. 3d 589, 604 (S.D. Tex. 2018); *accord Rodriguez v. Harris*

18

*County*, 964 F. Supp. 2d 686, 777 (S.D. Tex. 2013) ("Once plaintiffs have offered facially plausible statistical evidence of racial polarization, the burden then shifts to defendants to offer proof that the divergent voting patterns of the Anglos and Latinos can be explained by some non-racial factor, such as partisanship.").

Even should Defendants eventually introduce some evidence that factors other than racial bias accounts for the alleged vote dilution, Plaintiffs can still counter Defendants' rebuttal evidence with further evidence as to the racial nature of their injuries. Such evidence might include evidence of polarization between Anglos and minorities within partisan primaries or other evidence of intra-partisan racial conflicts, *see, e.g.*, *Rodriguez*, 964 F. Supp. 2d at 777 (finding that polarization within political parties negated the defendants' evidence), as well as the standard totality of the circumstances factors, *Lopez*, 399 F. Supp. 3d at 610-618.[4] And, of course, the severity of the statistical polarization is

---

[4] Though "neither comprehensive nor exclusive," *Gingles*, 478 U.S. at 45, courts typically assess the totality of the circumstances through the so-called Senate Factors: 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; 2. the extent to which voting in the elections of the state or political subdivision is racially polarized; 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process; 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; 6. effects of discrimination in such areas whether political campaigns have been characterized by overt or subtle racial appeals; 7. the extent to which members of the minority group have been elected to public office in the jurisdiction; 8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; 9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *See id.* at 36-37.

itself a totality factor and has great weight in determining whether defeat in partisan elections has an inherently racial nexus. *See Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, No. 1:21-CV-5337-SCJ, 2022 WL 633312, at *55 (N.D. Ga. Feb. 28, 2022) ("The weight that should be placed on the extent of such polarization—and any link to partisanship—must necessarily be part of the totality-of-the-circumstances analysis under the second Senate Factor."). But now is not the time for such evidence weighing.

Arguendo, even if one were to set aside the precedent in *Teague* and other cases, Plaintiffs here alleged sufficient facts to provide a plausible inference that racial polarization in Galveston County is not purely explainable by non-racial partisan identity. For example, Plaintiffs allege that there have been racial breakdowns even within the political party system (FAC ¶ 116), that non-partisan local elections break down on racial lines and have been tainted by racial animus (FAC ¶¶ 103, 112, 115, 122–23), that racial appeals and other racial animosity exists in the community (FAC ¶¶ 109, 111–16, 118), that ideological issues themselves break down on inherently racial lines in the County (FAC ¶¶ 122, 126, 136–46), and that the Anglo majority of the political body in question has ignored minority constituents (FAC ¶¶ 127–35). When taken together with the very strong statistical polarization which Plaintiffs allege, there is more than enough to make it "plausible" that, under the totality of the circumstances, there is inherently racial vote dilution caused by the new Galveston County Commissioner districts. Though again, such a showing is not necessary at this juncture.

Plaintiffs' Section 2 claim is therefore adequately pled.

**D. Plaintiffs sufficiently allege intentional discrimination.**

Plaintiffs have also stated a plausible claim of intentional discrimination claim under the Fourteenth and Fifteenth Amendments to the U.S. Constitution. As an initial matter, Defendants briefly argue that there is no cause of action for intentional vote dilution under the Fifteenth Amendment. But the Supreme Court, Fifth Circuit, and the panel in the Texas statewide redistricting case recognize that an "election practice violates Section 2 and the Fourteenth and Fifteenth Amendments if it is undertaken and maintained for a discriminatory purpose." *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020); *see also Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (if "a State intentionally drew district lines in order to destroy otherwise [performing] districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments."); *LULAC II*, 2022 WL 1410729, at *9 (Supreme Court precedent "suggest[s] that both the Fourteenth and Fifteenth Amendments were relevant to the constitutionality of vote dilution") (citation omitted). Plaintiffs' intentional discrimination claim under both the Fourteenth and Fifteenth Amendments is proper.

Regarding the substance of Defendants' arguments, once again, they ignore swathes of Plaintiffs' FAC and present mere factual disagreements with Plaintiffs' allegations and the reasonable inferences therefrom. At this stage, where the Court must take Plaintiffs' well-pled factual allegations as true and view them in the light most favorable to Plaintiffs, Defendants' factual disagreements must be rejected. *See Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 726 (5th Cir. 2018).

To find discriminatory intent, courts typically look at the nonexhaustive factors set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977): (1) "historical background of the decision," (2) "specific sequence of events leading up to the challenged decision," (3) "departures from the normal procedural sequence," (4) "substantive departures" from usual decisionmaking factors, and (5) "legislative history." *Id.* at 267–68. The plaintiffs bear the burden to show that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law"; if they meet that burden, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (quoting *Hunter*, 471 U.S. at 228).

Plaintiffs have pled specific facts relevant to each *Arlington Heights* factor and therefore more than satisfied their burden to show that racial discrimination was a substantial factor behind adoption of the current Commissioners Court map. Indeed, "[i]t is sufficient for Plaintiffs to point to circumstantial evidence, such as procedural irregularities or apparent subterfuge, from which discriminatory intent can plausibly be inferred." *LULAC III*, 2022 WL 1631301, at *26 (citing *Arlington Heights*, 429 U.S. at 266–68).

As to the first *Arlington Heights* factor, the historical background of the decision, Defendants passingly acknowledge that some of Plaintiffs' allegations of racial discrimination involving political entities within the County may be probative, *see* MTD at 22–23 n.7, but do not mention at all the numerous allegations of discriminatory actions

by the County itself, *see, e.g.*, FAC ¶¶ 97–102, 104–110, 126, 133, 136–38, 142–46. And that's only part of the more than 10 pages worth of current and historical contextual evidence Plaintiffs allege. FAC ¶¶ 96–146. Furthermore, although Defendants argue that the DOJ's 2012 findings of discriminatory intent are not legally binding on this Court, those conclusions need not be legally binding to be probative of a historical background of racial discrimination. *See, e.g.*, *Veasey*, 830 F.3d at 240 (finding DOJ objections to Texas's prior decades' statewide redistricting plans constituted circumstantial evidence of discriminatory intent); *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 224 (4th Cir. 2016) (similarly considering past DOJ objection letters as relevant to discriminatory intent in redistricting). The specific sequence of events leading up to adoption of the maps in 2021 mirrored the sequence of events that led to the initial failure of preclearance in 2012: (1) "the county's failure to adopt, as it had in previous redistricting cycles, a set of criteria by which the county would be guided in the redistricting process"; (2) "deliberate exclusion from meaningful involvement in key deliberations of the only member of the commissioners court elected from a minority ability-to-elect precinct" (Precinct 3 Commissioner Holmes); and (3) the pretextual inclusion of the largely white Bolivar Peninsula in Precinct 3. FAC ¶ 38. Defendant Judge Henry and Commissioners Clark, who were on the Commissioners Court during the 2011-12 redistricting cycle, were clearly aware that those specific actions had resulted in a finding of discriminatory intent, and in 2012, the Commissioners Court obtained preclearance of and adopted a different map that maintained the benchmark Precinct 3. *See Petteway v. Henry*, 3:11-cv-00511

(S.D. Tex. Mar. 23, 2012) [Doc. # 69]. Yet they forged ahead with similar actions and map proposals this decade. As the panel in the statewide redistricting case held, the "proximity and comparability" of a map previously rejected as intentionally discriminatory, "weighs in favor of an inference of discriminatory intent." *League of United Latin Am. Citizens v. Abbott* ("*LULAC II*"), No. 1:21-CV-991-LY-JES-JVB, 2022 WL 1410729, at *18 (W.D. Tex. May 4, 2022).

Defendants were also aware of the disparate and discriminatorily dilutive impact of adopting either Map Proposal 1 or 2—but particularly Proposal 2—on Black and Latino voters. The DOJ's 2012 letter clearly describes the dilutive impact of adding the Bolivar Peninsula to Precinct 3, as the Commissioners Court proposed to do in Map Proposal 1, and the public outcry and Commissioner Holmes's own map proposals and public statements emphasized how destructive Map Proposal 2 would be to Black and Latino voting power. FAC ¶¶ 58–60, 81–84.  And the foreseeable impact of an action to dilute minority voting strength is "objective evidence that, combined with other evidence, provide ample support for finding discriminatory intent." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 728 (S.D. Tex. 2017).

Defendants ignore most of Plaintiffs' allegations about the specific sequence of events leading up to the discriminatory redistricting decision, including Defendants' failure to consider Commissioner Holmes's suggestions of a redistricting map that would have balanced populations yet made minimal changes to longtime boundaries. FAC ¶¶ 82–84. The Motion also fails to address Plaintiffs' detailed allegations regarding the November

24

12, 2021 hearing, including the numerous barriers to public access and the public testimony about the racially discriminatory impact and intent of the maps, to which Defendant Judge Henry, Commissioner Apffel, and Commissioner Giusti failed to respond (factor 2). FAC ¶¶ 70–83. In the statewide redistricting case, allegations that "minority legislators were treated unfavorably" and adoption of "procedures that made it difficult for non-English speaking members of the public to participate" were sufficient to render the plaintiff's theory of discriminatory intent plausible. *LULAC III*, 2022 WL 1631301, at *26  (citing *Texas v. United States*, 887 F. Supp. 2d 133, 164 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 570 U.S. 928 (2013) (mem.)). Defendants' failure to adopt redistricting criteria and schedule public redistricting hearings was a departure from normal redistricting practices in other counties and a repeat of Defendants' discriminatory practice in 2011 (factor 3). FAC ¶¶ 46, 48.

Additionally, as to substantive departures from usual decision-making factors, Plaintiffs allege that the Commissioners Court failed to adhere to traditional redistricting principles such as preserving the cores of existing districts, preserving communities of interest, and non-discriminatory incumbent protection—although all of the Anglo incumbents remained in their own winnable precincts, Commissioner Holmes's precinct became practically unwinnable for him. FAC ¶¶ 59–61, 65, 94. Lastly, regarding the final *Arlington Heights* factor (legislative history), the exclusion of the sole non-Anglo Commissioner from the decision-making process and refusal to seriously consider his concerns is probative. *See, e.g.*, *Perez v. Abbott*, 253 F. Supp. 3d 864, 961 (W.D. Tex.

2017) (listing the "exclusion of minority member and public input despite the minority population growth" as probative of intentional discrimination). This accumulation of evidence, alongside the stark and predictable disparate effect of the new map, leads to a plausible inference of intent to discriminate against Black and Latino voters. At this stage, Plaintiffs' myriad allegations of other *Arlington Heights* factors in addition to the historical context of discrimination sufficiently rebut the presumption of legislative good faith. *Cf. Abbott v. Perez*, 138 S. Ct. 2305, 2324–25 (2018).

Defendants' counterarguments are solely factual and, at this stage, cannot "on their own render Plaintiffs' allegations implausible." *League of United Latin Am. Citizens v. Abbott* ("*LULAC I*"), No. 1:21-CV-00991-LY-JES-JVB, 2022 WL 174525, at *4 (W.D. Tex. Jan. 18, 2022) (citing *Arnold v. Williams*, 979 F.3d 262, 268 (5th Cir. 2020) (At the 12(b)(6) stage, "it is inappropriate for a district court to weigh the strength of the allegations.")). Thus, to the extent Defendants argue that holding redistricting meetings during normal business hours in a county annex building is consistent with standard practice, that factual assertion contradicts Plaintiffs' allegations and cannot be credited at this time. FAC ¶ 71. Moreover, the statewide redistricting panel has already rejected the explanation that "pandemic-related delays forced the legislature to hurry," among others, and this Court should reject Defendants' similar arguments here. *LULAC I*, 2022 WL 174525, at *4. In any event, the FAC also alleges that despite facing the exact same time constraints as Defendant Galveston County, other counties in Texas were able to hire outside counsel to provide demographic, mapping, and legal analyses; adopt timelines and

26

criteria to guide redistricting; and schedule public hearings to obtain community input. FAC ¶ 46. Finally, even if the Court could entertain Defendants' factual argument that Commissioner Holmes may have had the authority to unilaterally raise redistricting at a public Commissioners meeting, that issue is irrelevant to the fact that Commissioner Holmes was sidelined by the County's redistricting consultant and ignored by his peers when he suggested non-discriminatory map alternatives. FAC ¶¶ 49–50, 84. "[O]f course, a legislature need not break its own rules to engage in unusual procedures." *N. Carolina State Conf. of NAACP*, 831 F.3d at 227.

Defendants posit no legal arguments for why Plaintiffs' allegations are insufficient to state an Equal Protection claim at this stage or how they can satisfy their burden on a Rule 12 motion.

### E.  Plaintiffs sufficiently allege racial gerrymandering.

Defendants also ignore the plain allegations in the FAC and reasonable inferences drawn therefrom to argue that the FAC insufficiently alleges (1) which precincts are the results of racial gerrymandering and (2) that "any particular precinct line in the Enacted Plan violates traditional redistricting principles." MTD at 18–19. First, a plaintiff alleging a racial gerrymandering claim may assert either that "*every* . . . district in a" jurisdiction "suffers from racial gerrymandering" or that "the boundaries of individual jurisdictions" are tainted by racial gerrymandering. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015). The FAC clearly alleges that the entire enacted map suffers from racial gerrymandering, but also identifies how the specific boundaries are tainted. The enacted

27

Map Proposal 2 "completely altered the benchmark map" by moving "Precinct 3 to a concentrated population in the northwest of the County to cover predominantly Anglo parts of League City and Friendswood" and "divid[ing] the majority of the benchmark Precinct 3's Black and Latino residents among proposed Precincts 1, 2, and 4." FAC ¶¶ 60–61. The FAC describes the deliberate splitting of Black-majority voting precincts between Precincts 1 and 4. FAC ¶¶ 60–61. Individual Plaintiffs residing in the enacted Precincts 1, 2, and 4 and Organizational Plaintiffs' members residing in all four enacted Precincts all have standing to challenge their sorting into "different districts on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 649 (1993).

Second, Plaintiffs have plausibly alleged their racial gerrymandering claims as to these precincts, which can only be explained by a desire to draw four majority-Anglo precincts.

> The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

*Miller v. Johnson*, 515 U.S. 900, 916 (1995). The Supreme Court does *not* require a "conflict or inconsistency between the enacted plan and traditional redistricting criteria" as "a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering." *Bethune-Hill v. Va. State Bd. of Elecs.*, 137 S. Ct. 788,

28

799 (2017). Even so, Plaintiffs plausibly allege that race predominated over traditional redistricting criteria because (1) none of the dramatic changes to the Commissioners Court precincts were necessary to address malapportionment, which could have been resolved by shifting a single voting precinct (FAC ¶¶ 65, 84); (2) Map Proposal 2 split existing political subdivisions of the cities of La Marque, Texas City, and Dickinson, and longtime voting precincts (FAC ¶¶ 60–61); and (3) Map Proposal 2 failed to respect existing communities of interest of Black and Latino voters, instead cracking them such that all four precincts became a majority Anglo (FAC ¶ 63). Furthermore, a racial gerrymander need not resemble a bug or a bird (or a salamander) for race to predominate over other traditional redistricting principles. *Miller*, 515 U.S. at 913 ("Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake . . . was a legislature's dominant and controlling rationale. . . [.]"). Even a more compactly shaped district can be obviously racially gerrymandered when its lines are "considered in conjunction with [the district's] racial and population densities." *Id.* at 917. Here, the fundamental alteration of Precinct 3's borders and the targeted division of the benchmark Precinct 3's Black and Latino populations among Precincts 1, 2, and 4—splitting city borders and communities of interest—supports a racial gerrymandering claim.

In any event, because Defendants failed to adopt any neutral redistricting criteria or publicly explain their rationale for developing Map Proposals 1 and 2 and adopting Map Proposal 2, *see* FAC ¶ 48, the only explanation inferable from the drastic division of cities

and communities of interest in the enacted map is Defendants' desire to sort Black and Latino voters on the basis of race such that Anglo voters would comprise the majority in all four Commissioners precincts. The demographics of the enacted map, found in Table 3 in the FAC, show Black and Latino CVAP levels between 34% and 39% in each precinct—resulting in a questionably consistent distribution of minority voters too small to create any majority-minority voting precinct. FAC ¶ 64.

The combination of Plaintiffs' thorough allegations of intentional vote dilution and discrimination, plus the subordination of traditional redistricting principles, state a plausible racial gerrymandering claim. *See LULAC III*, 2022 WL 1631301, at *28 (considering allegations of intentional vote dilution to support racial gerrymandering claim).

## F.  Leave to amend

None of Defendants' arguments favors granting dismissal of any of Plaintiffs' claims without leave to amend or with prejudice. This is Plaintiffs' first opportunity to respond to a Rule 12 motion, and Defendants' Motion contains arguments not previewed in the letter required by the Court's practices. *See* Doc. # 39-2. Defendants cannot establish that any further amendments would be futile on any of Plaintiffs' causes of action.

## IV. CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.

/s/ *Sarah Xiyi Chen*

30

**TEXAS CIVIL RIGHTS PROJECT**
Attorney-in-Charge
Mimi M.D. Marziani
Texas Bar No. 24091906
Hani Mirza
Texas Bar No. 24083512
Joaquin Gonzalez*
Texas Bar No. 24109935
Sarah Xiyi Chen*
California Bar No. 325327
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
mimi@texascivilrightsproject.org
hani@texascivilrightsproject.org
joaquin@texascivilrightsproject.org
schen@texascivilrightsproject.org

**SOUTHERN    COALITION    FOR
SOCIAL JUSTICE**
Hilary Harris Klein*
North Carolina Bar No. 53711
1415 W. Hwy 54, Suite 101
Durham, NC 27707
919-323-3380 (Telephone)
919-323-3942 (Facsimile)
hilaryhklein@scsj.org

**WILLKIE  FARR  &  GALLAGHER
LLP**
Richard Mancino*
New York Bar No. 1852797
Michelle Anne Polizzano*
New York Bar No. 5650668
Andrew J. Silberstein*
New York Bar No. 5877998
Molly Linda Zhu*
New York Bar No. 5909353
Kathryn Carr Garrett*

31

New York Bar No. 5923909
787 Seventh Avenue
New York, New York 10019
212-728-8000 (Telephone)
212-728-8111 (Facsimile)
rmancino@willkie.com
mpolizzano@willkie.com
asilberstein@willkie.com
mzhu@willkie.com
kgarrett@willkie.com

JoAnna Suriani*
DC Bar No. 1645212
1875 K Street, N.W.
Washington, DC 20006-1238
(202) 303-1000 (Telephone)
(202) 303-2000 (Facsimile)
jsuriani@willkie.com

**SPENCER & ASSOCIATES, PLLC**
Nickolas Spencer
Texas Bar No. 24102529
9100 Southwest Freeway, Suite 122
Houston, TX 77074
713-863-1409 (Telephone)
nas@naslegal.com

***COUNSEL FOR PLAINTIFFS***
*admitted *pro hac vice*

**CERTICATE OF SERVICE**

I HEREBY CERTIFY that on June 29, 2022, the foregoing document was filed electronically (via CM/ECF), and that all counsel of record were served by CM/ECF.

/s  *Sarah Xiyi Chen*