# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | | |
|---|---|---|
| **TERRY PETTEWAY, et al.** <br><br> Plaintiffs, <br> v. <br><br> **GALVESTON COUNTY, TEXAS, et al.** <br><br> Defendants. | § § § § § § § § § § § | **Civil Action No. 3:22-CV-00057** <br> **(Consolidated)** |
| **UNITED STATES OF AMERICA,** <br><br> Plaintiffs, <br> v. <br><br> **GALVESTON COUNTY, TEXAS, et al.** <br><br> Defendants. | § § § § § § § § § § § § | **Civil Action No. 3:22-CV-00093** |
| **DICKINSON BAY AREA BRANCH NAACP, et al.** <br><br> Plaintiffs, <br> v. <br><br> **GALVESTON COUNTY, TEXAS, et al.** <br><br> Defendants. | § § § § § § § § § § § § § | **Civil Action No. 3:22-CV-00117** |

**DEFENDANTS', GALVESTON COUNTY'S AND HON. JUDGE MARK HENRY'S, REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS SECOND AMENDED COMPLAINT OF HON. MICHAEL MONTEZ, HON. TERRY PETTEWAY, HON. SONNY JAMES, HON. DERRICK ROSE, AND HON. PENNY POPE**

# INTRODUCTION

Despite Plaintiffs' adamant protestations that they have properly asserted every claim in their Second Amended Complaint ("SAC") and that sufficient factual allegations exist in their pleadings to support those claims, their claims still fail. For some claims, the SAC is woefully lacking in any factual allegation; for others, the facts that Plaintiffs pleaded point towards a different conclusion that the Court cannot reach. This Court should dismiss all of Plaintiffs' claims pursuant to Rules 12(b)(1) and 12(b)(6).

# ARGUMENT

## I. PLAINTIFFS' CLAIMS ARE FUNDAMENTALLY NON-JUSTICIABLE PARTISAN GERRYMANDERING CLAIMS.

The U.S. Supreme Court has long recognized that "[p]olitics and political considerations are inseparable from districting and apportionment." *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973). In fact, redistricting is both intended to have, and therefore inevitably does have, "substantial political consequences." *Id*. Such "political consequences" exist in Galveston County and the SAC simply seeks to unwind those inevitable political consequences rather than pointing to any racially discriminatory intent or effect in the redistricting process.

Plaintiffs allege that Black and Latino voters form a cohesive voting bloc because they generally vote for Democrats in elections. *See* SAC ¶ 124. Plaintiffs then allege that Anglo voters prevent Black and Latino voters from electing their preferred Democrats to office because "Anglo voters in Galveston County overwhelmingly"—by over 88%— "favor Republican candidates." SAC ¶¶ 126-27. But Plaintiffs do not allege any additional facts from primary elections that may make it plausible that *racial* injuries are more

1

probable than a loss for their preferred political party. Plaintiffs harp on Galveston County's partisan divide, *see* Defs.' Mot. To Dismiss at 10-13, but even a large partisan gap is irrelevant without evidence that political success eludes the minority coalition "on account of [their] race or color." 52 U.S.C. § 10301(a). The Voting Rights Act ("VRA") exists "to eliminate the negative effects of past discrimination on the electoral opportunities of minorities," not to ensure that the political candidates preferred by minority voters win every election. *Thornburg v. Gingles*, 478 U.S. 30, 65 (1986).

Although it is true, as Plaintiffs assert, that they are masters of their Complaint, they are not masters of this Court's jurisdiction. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (federal courts have an "independent obligation to determine whether subject-matter jurisdiction exists . . ."). A court need not automatically accept a plaintiff's contentions about the nature of their claims when the very facts pleaded in their complaint indicate that the case is about something other than what they claim. In *Jacobson v. Florida Secretary of State*, the Eleventh Circuit determined that the plaintiffs' characterization of their ballot-order claim was not entirely accurate; rather, their "complaint share[d] the same critical feature that led the Supreme Court to hold complaints of partisan gerrymandering nonjusticiable in *Rucho*"—both Plaintiffs' and the *Jacobson* complaints invariably rest[ed] on a threshold determination about what a 'fair' apportionment of political power looks like." 974 F.3d 1236, 1260 (11th Cir. 2020). This is not a determination that federal courts are properly equipped to make.

Hence, although courts may not discount the veracity of a plaintiff's facts at the pleading stage, courts *may* look to the complaint, the alleged injury, and the relief sought

2

to determine if the complaint actually alleges that the challenged law results in an "impermissible partisan advantage," which is not a claim that federal courts are equipped to adjudicate. *Id.* Fundamentally, the SAC aims to create a safe Commission seat for Democrats and they are using the VRA and the Constitution to accomplish this allegedly politically fair result. Plaintiffs insist that they pleaded substantial allegations supporting their contention that Commissioner Holmes is the candidate of choice of minority voters, Pls.' Opp'n Br. at 7, but the allegations cited are either conclusory, non-cognizable, or irrelevant. *See* SAC ¶¶ 61-62, 80, 97, 123, and 167).[1]

Ultimately, Plaintiffs' argument is that this Court should reallocate political power in Galveston County and use the VRA to accomplish that goal. Essentially, Plaintiffs ask this Court to order a map that is "commensurate [with Plaintiffs'] level of political power and influence" within the county, which is a non-justiciable political question. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2499 (2019). This Court should therefore dismiss for lack of jurisdiction.

## II. PLAINTIFFS' VOTING RIGHTS ACT CLAIM IS EITHER MOOT OR UNRIPE.

Plaintiffs allege that Commissioner Holmes is the only commissioner that represents the interests of the Black and Latino communities. SAC ¶ 80. But, as shown above, Plaintiffs never explain why Commissioner Holmes represents those interests beyond

---

[1] Paragraphs 62 and 80 assert in a conclusory fashion that Commissioner Holmes is the candidate of choice for Black and Latino voters. Paragraphs 123 and 167 do not explain why Commissioner Holmes is the candidate of choice, other than by asserting his race. Paragraphs 61 and 97 are irrelevant to whether Commissioner Holmes is the candidate of choice for Black and Latino voters.

3

merely asserting that he is "the lone Black Commissioner" and represents a "majority-minority precinct." Pls.' Opp'n Br. at 18; *see also* SAC ¶¶ 61-62, 99, 167. Without explaining why they believe that Commissioner Holmes is the candidate of choice for the Black and Latino communities, and instead only repeatedly asserting the undisputed fact of Commissioner Holmes's race, it seems, relying only upon the facts pleaded in the SAC, that Plaintiffs believe that either Commissioner Holmes's race or his partisan affiliation is what makes him the candidate of choice of minority voters.

Plaintiffs' scant pleading on this point explains why the recent appointment of Dr. Robin Armstrong, who is also Black, to Commissioners Court Precinct 4 moots Plaintiffs' Complaint. Black and Latino residents combined account for 35.6% of the total voting-age population in Galveston County, and two of the five Commissioners Court Commissioners (or 40%) are Black. SAC ¶ 52. Minority representation on the Commission now clearly exceeds the proportion of Black and Latino residents in Galveston County. If, as seemingly alleged, a candidate's race alone makes him the candidate of choice for minority voters, then Plaintiffs' claim has been mooted; if, however, it is a candidate's partisan affiliation that matters, then Plaintiffs instead seek "a 'fair' apportionment of political power" that is not this Court's to give. *Jacobson*, 974 F.3d at 1260. Either way, Plaintiffs' vote dilution claim is non-cognizable when minority voters have greater than proportional representation on the Commission.

### III. PLAINTIFF MONTEZ LACKS STANDING

The sole Latino Plaintiff, Mr. Montez, lacks standing to bring a vote dilution claim for two separate but equally sufficient reasons. First, Plaintiff Montez resided in Precinct

4

1 in both 2011 and 2021. There are no allegations that he resides now or ever has resided in Commissioner Precinct 3, which is the district Plaintiffs claim presents an "opportunity to elect" a minority-favored candidate. SAC ¶ 60; *see also* Pls. Opp'n Br. at 22 (alleging that Precinct 3 has been racially gerrymandered). There are simply no allegations that Plaintiff Montez's vote has been diluted, when, according to the facts pleaded by Plaintiffs, he has never resided within a precinct in which a minority coalition had the opportunity to elect the candidate of their choice. Defs.' Mot. to Dismiss at 17. A recent case within this Circuit makes clear that an individual claiming harm under Section 2 has standing to sue only where the individual "resides, votes, and personally suffers such injuries." A person who asserts a voting injury that is suffered in another district brings a generalized grievance, not a cognizable injury. *LULAC v. Abbott*, No. 3:21-CV-259, 2022 U.S. Dist. LEXIS 91761, at *23 (W.D May 23, 2022) (emphasis added) (hereinafter "*LULAC II*"). Hence, Plaintiff Montez's complaints about an alleged racial gerrymander of Precinct 3 hold no greater weight than abstract complaints raised by any other citizen.

Second, Plaintiff Montez lacks standing under Section 2 of the VRA. No allegations are made that he resides in even a hypothetical district where the minority population would be "sufficiently large and geographically compact" to elect its candidate of choice. *Gingles*, 478 U.S. at 50. The SAC revolves around the allegation that Precinct 3 is an opportunity-to-elect district, but according to their own pleadings Plaintiff Montez resided in Precinct 1 during both the 2011 and 2021 redistricting cycles. No allegations in the SAC indicate Montez would reside in Precinct 3 under the hypothetical map. Defs.' Mot. to Dismiss at 17; *see* Pls.' Opp'n Br. at 13 (claiming that Plaintiff Montez has standing "as a result of his

5

membership in the Black and Latino coalition" because Plaintiffs' desired remedy is "a wholesale restructuring of the Commission map"). According to Plaintiffs' logic, any Black or Latino voter residing anywhere within Galveston County would have standing to challenge the Commission map, whether or not their opportunity to elect their candidate of choice within the precinct where they reside has changed at all.

The injury Plaintiff Montez asserts "is not vote dilution or racial discrimination that directly harms [him] in [his] current district, but Defendants' failure to draw the plaintiff into a *hypothetical* opportunity district that was not drawn at all." *LULAC II*, 2022 U.S. Dist. LEXIS 91761, at *25. Although that alleged injury "goes beyond the boundaries of a single district," *Perez v. Abbott*, 267 F. Supp. 3d 750 (W.D. Tex. 2017), *rev'd in part on other grounds*, 138 S. Ct. 2305 (2018), "that fact does not eliminate the need for a plaintiff to plead *specific facts* tending to show that the defendant's failure to create a minority opportunity district *directly injured* [him]." *LULAC II*, 2022 U.S. Dist. LEXIS 91761, at *25 (emphasis added). Plaintiff Montez, by contrast, has not pleaded any facts suggesting that he "would have resided where that [hypothetical] Section 2 district should have existed" or that the hypothetical district "would have made it more likely that [Plaintiff Montez] could elect a candidate of [his] choice." *Id.* The SAC only indicates that Plaintiff Montez is concerned about the overall effect of the enacted map, not that he has been personally injured in any way sufficient for Article III standing.

The recent Western District of Texas decision in *LULAC v. Abbott* cited by Plaintiffs explains how this Section 2 standing analysis works. That court determined that certain plaintiffs who "appeared to request an alternative Section 2 district covering a similar

6

geographic area as the [district] where those plaintiffs did reside before the new maps took effect" had sufficiently demonstrated their injury. *LULAC II*, 2022 U.S. Dist. LEXIS 91761, at *25-26. This is a classic Section 2 claim: Plaintiffs alleging that changes to the district *in which they reside* have affected their ability to elect their candidate of choice. At the same time, the court correctly dismissed another plaintiff who "had alleged residence in an adjacent district" but who had failed to plead facts that allowed the court to determine "how she has been injured by the redrawing" of the adjacent district "[w]ithout resorting to speculation." *Id.* Likewise, any assessment this Court were to make about how Plaintiff Montez has been injured by the redrawing of a district in which he does not reside and never has resided would be nothing better than impermissible guesswork.

Plaintiffs contend that "Plaintiff Montez has standing to pursue a Section 2 claim because it is possible to create an additional opportunity district where he resides," presumably meaning the area currently constituting Precinct 1. Pls.' Opp'n Br. at 13. Crucially however, Plaintiffs fail to cite the paragraph in the SAC where this allegation was made. In the immediately preceding sentence, Plaintiffs claim that Paragraph 117 supports the assertion that the enacted plan cracks and packs Black and Latino voters across all four precincts. But Paragraph 117 is irrelevant to this assertion. SAC ¶ 117.

Even if Plaintiffs intended to cite Paragraph 171, that paragraph also contains no allegation that Plaintiff Montez would ever reside in a hypothetical Precinct 3. Alleging that it is possible to draw a geographically compact district with a sufficiently large Black and Latino population, SAC ¶ 178, is not the same as alleging that Plaintiff Montez

7

"resides in an area where a *Gingles* district should have been drawn." *LULAC*, 2022 U.S. Dist. LEXIS 91761, at *37-39; *see also* Pls.' Opp'n Br. at 13. Because Plaintiffs failed to plausibly allege that Plaintiff Montez resides in a hypothetical majority-minority district that would also include the other Plaintiffs, Plaintiff Montez lacks standing to bring a Section 2 claim. Every fact pleaded indicates that Plaintiffs believe Precinct 3 is the only possible opportunity-to-elect district, and there are no allegations that Mr. Montez has resided or ever would reside in Precinct 3..

## IV. PLAINTIFFS FAIL TO PLEAD SUFFICIENT FACTS FOR A SECTION 2 VOTING RIGHTS ACT CLAIM.

### A. Without Plaintiff Montez, Plaintiffs Lack a Latino Plaintiff for a Coalition Claim.

Plaintiffs must plead and prove that the hypothetical district that the Commissioners Court was required to draw contains a minority population constituting a majority of the citizen voting age population within a geographically compact area. *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009); *LULAC II*, 2022 U.S. Dist. LEXIS 91761, at *46. If the minority population does not constitute an outright majority of the population in such a district, there is no Section 2 violation. *LULAC II*, 2022 U.S. Dist. LEXIS 91761, at *52-53. Here, to constitute a majority-minority district, both Black and Latino voters must be combined because neither group is sufficiently numerous to constitute a majority on its own. SAC ¶ 121 (under Benchmark Plan Precinct 3, Black or Latino Citizens alone do not constitute a majority).

Plaintiffs suggest that Black plaintiffs can claim both their own injuries under Section 2 of the VRA and the injuries of Latino voters, but this is not true; Section 2(a) of

8

the VRA expressly states that the statute only prohibits state laws that "result[] in a denial or abridgement of the right . . . to vote *on account of race or color*." 52 U.S.C. § 10301(a) (emphasis added). Even in the cases upon which Plaintiffs purport to rely, separate plaintiffs belonging to each minority group making up the alleged coalition joined together to assert their injuries. *See, e.g.*, *Campos v. Baytown*, 840 F.2d 1240 (5th Cir. 1988); *LULAC, Council No. 4386 v. Midland Indep. Sch. Dist.*, 812 F.2d 1494 (5th Cir. 1987). Injuries for standing purposes must be personal to each plaintiff, so plaintiffs representing each racial minority group allegedly affected must be represented.

Furthermore, according to Plaintiffs' calculations of CVAP by precinct, Hispanic voters outnumber Black voters in three of four precincts, so Hispanics are an integral component of any minority coalition. SAC ¶ 121. Under Plaintiffs' theory, Section 2 of the VRA compelled the Commissioners Court to draw a majority-minority precinct, and the Commissioners Court's refused to do so harmed the individual Black Plaintiffs even without the presence of a Latino plaintiff who can advance his own claim. Pls.' Opp'n Br. at 12. The plain terms of Section 2 make clear that the VRA protects against only concrete injuries that occur "on account of race," and does not permit the kind of attenuated representational standing asserted here.

### B. Plaintiffs Fail to Allege Sufficient Facts to Make It Plausible That Black and Latino Voters Are Sufficiently Politically Cohesive.

To demonstrate that a particular district should have been constructed with a majority-minority population, each of the *Gingles* preconditions "must be shown on a district-by-district basis." *LULAC II*, 2022 U.S. Dist. LEXIS 91761, at *47-48. Although

9

Plaintiffs did plead the demographic proportions making up each of the four Commissioners' Precincts in the enacted and Benchmark maps, *see* SAC ¶ 121, Plaintiffs failed to allege the percentage, level, or degree of cohesion between Black and Latino voters in Precinct 3, which is the alleged opportunity-to-elect district. SAC ¶ 123. They simply conclude without any supporting factual allegations that "minority voters in District 3 are politically cohesive." *Id.* This is insufficient to satisfy *Gingles* preconditions 2 and 3. *LULAC*, 2022 U.S. Dist. LEXIS 91761, at *64-65.

Plaintiffs' sole factual allegation of an alleged minority voting coalition comprised of Black and Latino voters are county-wide voting percentages from the 2018 and 2020 elections. SAC ¶ 124. According to Plaintiffs, "over three quarters of *Galveston County* Latino voters cast ballots for" statewide Democratic candidates in three elections in 2018 and 2020, while "over 98% of Black *Galveston County* voters supported those same candidates." *Id.* (emphasis added). Plaintiffs' error is clear: They cite only countywide data to prove political cohesion within a single precinct, even though "a *Gingles* plaintiff must show the second precondition for the minority population that would be included in its proposed district," not countywide. *See LULAC II*, 2022 U.S. Dist. LEXIS 91761, at *47. If Plaintiffs have access to this data, they failed to include it in their pleadings; and if they do not have access to this data, then they have asserted a Section 2 claim without first verifying that the numbers prove what they allege. Accordingly, this Court must dismiss Plaintiffs' VRA claim with prejudice.

V.   **PLAINTIFFS FAIL TO PLEAD SUFFICIENT FACTS DEMONSTRATING INTENTIONAL RACIAL DISCRIMINATION UNDER THE FOURTEENTH AND FIFTEENTH AMENDMENT AND THE VOTING RIGHTS ACT.**

Plaintiffs note that "inferences must be drawn in Plaintiffs['] favor at this stage of the proceedings," Pls.' Opp'n Br. at 20, but this belies the fact that Plaintiffs have made factual allegations that are directly contradicted by publicly available documents that are judicially noticeable. Defendants asked this Court to take judicial notice of "all 2021 public meeting notices for the Galveston County Commissioners Court," Defs.' Mot. to Dismiss at 9, and Plaintiffs did not object. Therefore, the Court can see that "all the public meetings that the Commissioners' Court held in 2021 were during normal business hours" and that the date and time of the November 12th meeting at which the map was ultimately adopted "was announced with the requisite 72-hour notice required for such meetings." *Id.* at 26-27. The 2021 redistricting process was conducted in accordance with past practice; to the extent that the redistricting timeline was in any way abbreviated, that is attributable to the delayed release of 2020 Census data and not any impermissible intent on the part of the Commissioners. *Id.* at 27-28.

Plaintiffs rely on the argument that the DOJ's 2012 refusal to preclear an earlier Commissioners Court redistricting map should also doom this version, Pls.' Opp'n Br. at 16, but this Court should not give deference to DOJ's determination that the 2012 map contained indicia of intentional discrimination. *Id.* at 26. "[T]he judiciary retains an independent obligation in adjudicating [] equal protection challenges to ensure that the State's actions are narrowly tailored to achieve a compelling interest." *Miller v. Johnson*,

11

515 U.S. 900, 922 (1995). Plaintiffs insist that *Arlington Heights* requires courts to review the historical background of a decision as an "evidentiary source" for discriminatory intent. Pls.' Opp'n Br. at 17. In fact, the relevant evidence is judicial determinations of invalidity (which do not appear in the record), not *prima facie* Section 5 letters issued before fact-finding and litigation commenced. *See LULAC v. Abbott,* No. 3:21-CV-259-DCG-JES-JVB, 2022 U.S. Dist. LEXIS 80659, at *51-52 (W.D. Tex. May 4, 2022) (hereinafter "*LULAC I*"). A DOJ letter advising the state that it has detected indicia of discrimination does not relieve the state of its independent obligation to assure itself with a strong basis in evidence that a remedy is required. *Miller*, 515 U.S. at 922.

      Plaintiffs' argument that Commissioner Holmes was treated unfairly in the 2021 redistricting process is also unavailing. Pls.' Opp'n Br. at 18. Like every other Commissioner, Commissioner Holmes had the legal authority to call a meeting at any time and place redistricting on the agenda. *See* Tex. Att'y Gen. Op. No. DM-228 at 3. At no point was he deprived of that legal authority—he simply chose not to exercise it. Moreover, the Commission could not, as a matter of law discuss Commissioner Holmes' proposed maps at the November 12th meeting. Pls.' Opp'n Br. at 19. Because he failed to timely produce his maps to make the agenda notice deadline and for the public to have time to review, Texas law prohibits the Commissioners Court from discussing, much less vote on, items not listed on the agenda. Tex. Gov't Code § 551.041 (requiring notice of meeting including notice of the subject of the meeting); *see id.* § 551.042 (a-b) (prohibiting discussion of items not listed on the agenda with the exception of discussion of placing the issue on the agenda for the next meeting); *see also* Ex. A (agenda for November 12, 2022

only mentions discussion of the two map proposals, and no other proposals). This is not a factual contradiction of Plaintiffs' allegations. Rather, this shows that Plaintiffs' factual allegations of illicit intent behind not responding to Commissioner Holmes's proposals fail as a matter of law.

Furthermore it is remarkable that Plaintiffs bemoan an alleged lack of "meaningful public feedback" on the enacted map at the same time that they advance this claim of illicit intent. *Id.* at 18. Additionally, no inference can be drawn from Plaintiffs' allegation that the County attorney only met with Commissioner Holmes once, SAC ¶ 96, because they fail to allege that the County attorney met with any other Commissioners Court member more than once.

Finally, the Court should note that it is not clear whether a vote dilution cause of action like Plaintiffs bring can be used to enforce the Fifteenth Amendment. The Supreme Court "has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, [it] ha[s] never held any legislative apportionment inconsistent with the Fifteenth Amendment." *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993). In the absence of any guidance as to what a Fifteenth Amendment vote dilution claim would look like or even if such claims exist, this Court should dismiss Plaintiffs' Fifteenth Amendment claim.

VI. **PLAINTIFFS FAIL TO STATE A RACIAL GERRYMANDERING CLAIM BECAUSE PLAINTIFFS' CLAIMS ARE NOT DISTRICT SPECIFIC AND THERE IS NOT A PLAINTIFF FROM EACH COMMISSIONERS COURT PRECINCT.**

The Supreme Court has soundly rejected the interpretation that racial gerrymanders involved claims "that race improperly motivated the drawing of boundary lines of the State

13

*considered as a whole.*" *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015) (emphasis added). Instead, the Supreme Court has required racial gerrymandering claims to be pursued against the specific boundaries of individual districts, and it applies district-by-district. *Id*. The Supreme Court has consistently described racial gerrymandering claims "as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*." *Id*. at 262-63 (emphasis in the original). This district-specific language is necessary in light of the harm that racial gerrymanders cause, namely, being "personally . . . subjected to [a] racial classification," *Bush v. Vera*, 517 U.S. 952, 957 (1996) (principal opinion), as well as being represented by a legislator who believes his "primary obligation is to represent only the members" of a particular racial group. *Shaw v. Reno*, 509 U.S. 630, 648 (1993) (*Shaw I*). Simply put, racial gerrymandering "directly threatens a voter who lives in the district attacked. But [does] not so keenly threaten a voter who lives elsewhere in the State. Indeed, the latter voter normally lacks standing to pursue a racial gerrymandering claim." *Ala. Legis. Black Caucus*, 575 U.S. at 263.

Plaintiffs also pursue their challenge against all four precincts as unconstitutional racial gerrymanders without a Plaintiff from each of the four precincts participating in this lawsuit. *See* Pls.' Opp'n Br. at 25. And, the present Plaintiffs do not make any allegations as to how the boundaries specific to Precincts 1, 2, or 4 constitute a racial gerrymander. *Id*. at 26. While Plaintiffs ostensibly pursue their challenge to the Enacted Plan as a whole, there are no statewide (or in this case countywide) claims of racial gerrymandering, only district-specific claims. Jurisdiction-wide evidence is permitted to prove violations in

14

individual districts, but nothing more. Importantly, for their jurisdiction-wide complaint, Plaintiffs lack a plaintiff in each Commissioners Court precinct. So, Plaintiffs cannot bring a racial gerrymandering claim that challenges all four precincts.

Imprecision in pleading as to which district is allegedly the unlawful racial gerrymander "is a problem." *LULAC II,* 2022 U.S. Dist. LEXIS 91761, at*81. "A racial gerrymandering claim . . . applies to the boundaries of individual districts." *Id*. Here, Plaintiffs have presented no allegations as to Precincts 1, 2 or 4.

As for Commissioners Precinct 3, even though Precinct 3 is cited several times throughout the SAC, it lacks any allegations that Precinct 3 exhibits an irregular shape or that the Commissioners established a target percentage of minority population to create the district. *Id.* at *82. Moreover, Plaintiffs have not identified a Plaintiff in every district and Organizational Plaintiffs fail to identify or name any specific members in Precinct 3. This is insufficient to state a claim. But ultimately, Plaintiffs also do not identify which Precinct is a racial gerrymander. The two allegations of splitting precincts were located in Benchmark Precinct 3. But since there is no plaintiff in Precinct 3, there is no plaintiff to challenge that Precinct 3 is an unconstitutional racial gerrymander.

Accordingly, Plaintiffs fail to state a claim of racial gerrymandering because their claims are not district specific and there is not a plaintiff from each Commissioners Court Precinct in this suit. Their claims must therefore be dismissed.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Defendants' Motion to Dismiss all of Plaintiffs' claims.

Date: July 6, 2022                                  Respectfully submitted,

                                                    */s/ Dallin B. Holt*
                                                    Dallin B. Holt
                                                    Attorney in Charge
                                                    Texas Bar No. 24099466
                                                    S.D. of Texas Bar No. 3536519
                                                    Jason B. Torchinsky*
                                                    Shawn T. Sheehy*
                                                    dholt@holtzmanvogel.com
                                                    jtorchinsky@holtzmanvogel.com
                                                    ssheehy@holtzmanvogel.com
                                                    HOLTZMAN VOGEL BARAN
                                                    TORCHINSKY &  JOSEFIAK PLLC
                                                    15405 John Marshall Hwy
                                                    Haymarket, VA 2019
                                                    P: (540) 341-8808
                                                    F: (540) 341-8809
                                                    *Pro hac vice pending*

                                                    Joseph R. Russo, Jr.
                                                    Greer, Herz & Adams, L.L.P.
                                                    State Bar No. 24002879
                                                    Federal I.D. No. 22559
                                                    Jordan S. Raschke
                                                    State Bar No 24108764
                                                    jrusso@greerherz.com
                                                    jraschke@greerherz.com
                                                    One Moody Plaza, 18th Floor
                                                    Galveston, Texas 77550
                                                    (409) 797-3200 (telephone)
                                                    (866) 456-0170 (facsimile)

                                                    Angie Olalde
                                                    Greer, Herz & Adams, L.L.P.
                                                    State Bar No. 24049015
                                                    Fed. ID No. 11084
                                                    aolalde@greerherz.com
                                                    2525 South Shore Blvd., Ste. 203
                                                    League City, Texas 77573
                                                    (409) 797-3200 (telephone)
                                                    (866) 422-4406 (facsimile)
                                                    *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2022, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Dallin B. Holt*
Counsel for Defendants
