## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **TERRY PETTEWAY, et al.** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **Civil Action No. 3:22-CV-00057** |
| | § | **(Consolidated)** |
| **GALVESTON COUNTY, TEXAS, et al.** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **Civil Action No. 3:22-CV-00093** |
| | § | |
| **GALVESTON COUNTY, TEXAS, et al.** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| **DICKINSON BAY AREA BRANCH** | § | |
| **NAACP, et al.** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **Civil Action No. 3:22-CV-00117** |
| | § | |
| **GALVESTON COUNTY, TEXAS, et al.** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## DEFENDANTS', GALVESTON COUNTY'S, HON. JUDGE MARK HENRY'S, AND DWIGHT D. SULLIVAN'S, REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS FIRST AMENDED COMPLAINT OF DICKINSON BAY AREA BRANCH NAACP, GALVESTON BRANCH NAACP, MAINLAND BRANCH NAACP, GALVESTON LULAC COUNCIL 151, EDNA COURVILLE, JOE A. COMPIAN, AND LEON PHILLIPS

## INTRODUCTION

Far from properly asserting every claim present in their Amended Complaint, *NAACP* Plaintiffs (herein after "Plaintiffs") lack sufficient factual allegations in their pleadings to support those claims. For most of their claims, Plaintiffs' Complaint is woefully lacking in any factual allegations at all; for others, the facts that Plaintiffs have pleaded point towards a different conclusion than the one that Plaintiffs attempt to draw. This Court should dismiss all of Plaintiffs' claims pursuant to Rules 12(b)(1) and 12(b)(6).

## ARGUMENT

### I.   PLAINTIFFS LACK STANDING

Despite Plaintiffs' desperate arguments to the contrary, Organizational Plaintiffs—NAACP and LULAC—lack standing to maintain this suit.[1] Accordingly, this Court must dismiss Plaintiffs' claims for want of jurisdiction as they pertain to the Organizational Plaintiffs.

#### A.   Plaintiffs Lack Organizational Standing

By LULAC's and the NAACP's very own words, their complaints about the Enacted Plan are simply too abstract and circuitous to support standing in the present case.

First, the Organizational Plaintiffs argue they are harmed because the Enacted Plan forces them to "devote resources to counteract Defendants' allegedly unlawful practices." Opp. at 10 (cleaned up). Unfortunately for Organizational Plaintiffs, a three-judge panel of

---

[1] As will be discussed *infra*, Individual Plaintiffs also cannot maintain this suit because they fail to state a claim upon which this Court can grant relief and because they fail to hail from all Commission precincts.

1

the Western District of Texas has already rejected these arguments (from these exact Organizational Plaintiffs, no less) stating that allegations that they "will have to commit significant time and resources to combating the effects" of a disfavored district plan are insufficient to establish organizational standing. *See LULAC v. Abbott,* No. 3:21-CV-259, 2022 U.S. Dist. LEXIS 91761, *18-19 (W.D. Tex. May 23, 2022) (three-judge court) (hereinafter "LULAC II"). This is not a specific factual allegation that this Court can credit. *See id.* *19. Moreover, Organizational Plaintiffs rely on abstract assertions that the Enacted Plan will force them to "counteract the effect of the [Enacted Plan] to 'mitigate[e] its real-world impact'" by diverting resources for "education, outreach, and other activities" such as "promot[ing] the political equality for Black and Latino voters" and "advance[ing] the economic condition, educational attainment, political influence, housing, health and civil rights of Latino residents . . ." Opp. at 12. These activities are clearly already part of the mission, purpose, and operation of Organizational Plaintiffs' organizations. *See* FAC at ¶¶ 3-16. Additionally, Organizational Plaintiffs seem to argue that pursuing this suit, which they themselves initiated, is itself a harm imposed by the Enacted Plan sufficient to support standing. *See* Opp. at 10-13.

In *LULAC II*, the court rejected assertions nearly identical to those assertions on which the Organizational Plaintiffs double down in their Opposition Brief 2022 U.S. Dist. LEXIS 91761, at *17-19. In that case, the court held that allegations of harm, including that a redistricting plan "frustrates and impedes" an organization's "core mission," are too abstract to support standing. *Id*. at *17 (citing *NAACP v. City of Kyle*, 626 F.3d 233, 238-39 (5th Cir. 2010)). Here, the Organizational Plaintiffs' assertions of harm are simply too

abstract, and they repeatedly have failed to provide *specific* explanation of how the Enacted Plan causes these harms. *Id.* at *18.

Organizational Plaintiffs must allege how the Enacted Plan "significantly and perceptibly impaired" their actual activities, "not just their abstract interests in civic participation, voting rights and the like." *Id.*[2] Organizational Plaintiffs never state with specificity where they are "forced" to divert resources from and exactly what activities they must curtail as a direct result. Instead, they allege that they will be spending money on programs that they spend money on anyway. This is not a diversion of resources away from the Organizational Plaintiffs' missions; rather, it *is* the use of resources directly in pursuit of their mission. Accordingly, there is no injury-in-fact sufficient to support Organizational Standing.

Organizational Plaintiffs also fail when they argue that they have organizational standing to challenge the Enacted Plan because it deprives their members of

---

[2] *And See OCA-Greater Houston v. Texas*, 867 F.3d 604, 611 (5th Cir. 2017) (discussing how plaintiffs' failure to differentiate alleged harm from routine activities, failure to identify specific activities that must be put on hold or curtailed, and mere conjecture that resources devoted could have been spent on other activities did not demonstrate that diversion of resources concretely and "perceptibly impaired" plaintiffs' ability to carry out their purpose; thus, there was no injury in fact sufficient to support standing); *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) ("attending meetings and one member's efforts intervening as an interested party do not constitute 'significant resources,'" and establishing "a setback to the organization's abstract social interests" do not constitute an injury-in-fact) (citing *Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000); *City of Kyle*, 626 F.3d at 239; *Louisiana ACORN*, 211 F.3d at 305 (denying organization standing where plaintiff alleged that it held a meeting, sent out interorganizational emails, drafted a two-page speech, obtained minutes of a zoning commission meeting, and generally "spent significant time on the revised ordinances" and finding no organizational injury where plaintiff-organization failed to, *inter alia*, "mention[] any *specific* projects [it] had to put on hold").

Commissioners who are "sensitive to their and their members' interests" and that no Commissioner elected under the Enacted Plan could *possibly* "understand the needs of the Black and Latino residents and actively assist [the Organizational Plaintiffs] in their missions relating to voting, public health, disaster relief, education, racial discrimination, and more." Opp. at 11. This "injury" is nothing but a conjectural abstraction. Far from the concrete and particularization harm necessary to support an injury-in-fact, this allegation cannot support any Plaintiffs' standing because there is no guarantee that a different map would result in a Commissioner being elected that would "understand" or "actively assist" Plaintiffs, let alone be "sensitive" to their interests. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (requiring a plaintiff plead an injury in fact that is "not conjectural or hypothetical" and show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" (quotations omitted)); *See also Rucho v. Common Cause*, 139 S. Ct. 2484, 2503-2504 (2019) ("[A]sking judges to predict how a particular districting map will perform in future elections risks basing constitutional holdings on unstable ground outside judicial expertise.").

For these reasons, LULAC and the NAACP clearly lack Organizational standing to pursue their claims in the present case.

### B. <u>LULAC Lacks Associational Standing</u>

Despite its contentions, LULAC lacks associational standing to pursue its claims. LULAC incorrectly attempts to support its associational standing arguments by alleging that it has "Black and Latino members that live across Galveston County in all four commissioner precincts." Opp. at 5. But, these allegations are threadbare because they fail

4

to identify a plaintiff *in every precinct*. Merely alleging that LULAC has 100 members across Galveston and one individual plaintiff from one precinct is insufficient to support LULAC's associational standing to challenge the Enacted Plan as a whole. Despite claiming to have over one hundred members across Galveston and in each precinct, LULAC can only name one, who is already a party to this suit. LULAC "identifies none of those members with specificity, as it must do to show associational standing. If indeed Defendants' conduct has injured thousands of its members, [LULAC] should have no trouble identifying some of them . . ." *LULAC II,* 2022 U.S. Dist. LEXIS 91761*,* at \*22 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-99 (2009)).

The one member LULAC does name to support its standing is Joe A. Compian who resides in Precinct 1. FAC ¶ 17; Opp. At 6. Accordingly, LULAC *may* have some limited associational standing to challenge only Precinct 1. But, LULAC may challenge no other precinct because LULAC has not specifically identified any members in any other precinct. *See LULAC II,* 2022 U.S. Dist. LEXIS 91761*,* at \*21-\*22 (holding that plaintiff organizations pleaded associational standing, but only in the districts in which they identified specific members.). LULAC's claimed harm in any other precinct aside from Precinct 1 is a naked legal conclusion, which this Court cannot credit. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But in any case, those allegations cannot sustain associational standing; they do not "identify members who have suffered the requisite harm." *Summers*, 555 U.S. at 499. This is especially true here because LULAC bears the burden to prove standing. *S. Recycling, L.L.C. v. Aguilar (In re S. Recycling, L.L.C.)*, 982 F.3d 374, 378 (5th Cir. 2020).

5

Accordingly, this Court should dismiss LULAC Council 151 for lack of associational standing.

## II.   PLAINTIFFS FAIL TO PLEAD SUFFICIENT FACTS TO ESTABLISH A RACIAL GERRYMANDERING CLAIM.

Plaintiffs fail to state a claim of racial gerrymandering because their claims are not district specific and there is not a plaintiff from each Commissioners Court Precinct in this lawsuit.

The Supreme Court has soundly rejected the interpretation that racial gerrymanders involved claims "that race improperly motivated the drawing of boundary lines of the State *considered as a whole*." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015) (emphasis added). Instead, the Supreme Court has required racial gerrymandering claims to be pursued against the specific boundaries of individual districts, and it applies district-by-district. *Id*. The Supreme Court has consistently described racial gerrymandering claims "as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*." *Id*. at 262-63 (emphasis in the original). This district-specific language is necessary in light of the harm that racial gerrymanders cause, namely, being "personally . . . subjected to [a] racial classification," *Bush v. Vera*, 517 U.S. 952, 957 (1996) (principal opinion), as well as being represented by a legislator who believes his "primary obligation is to represent only the members" of a particular racial group. *Shaw v. Reno*, 509 U.S. 630, 648 (1993) (*Shaw I*). Simply put, racial gerrymandering "directly threatens a voter who lives in the district attacked. But [does] not so keenly threaten a voter

who lives elsewhere in the State. Indeed, the latter voter normally lacks standing to pursue a racial gerrymandering claim." *Ala. Legis. Black Caucus*, 575 U.S. at 263.

Plaintiffs also pursue their challenge against all four Commissioners Court precincts as unconstitutional racial gerrymanders without a Plaintiff from each of the four precincts participating in this lawsuit. FAC at ¶¶ 17-19. And, the present Plaintiffs do not make any allegations as to how the boundaries specific to Precincts 1, 2, or 4 constitute a racial gerrymander. While Plaintiffs ostensibly pursue their challenge to the Enacted Plan as a whole, there are no statewide (or in this case countywide) claims of racial gerrymandering, only district-specific claims. Jurisdiction-wide evidence is permitted to prove violations in individual districts, but nothing more. Importantly, for their jurisdiction-wide complaint, Plaintiffs lack a plaintiff in each Commissioners Court precinct. So Plaintiffs cannot bring a racial gerrymandering claim that challenges all four precincts.

Imprecision in pleading as to which district is allegedly the unlawful racial gerrymander "is a problem." *LULAC II,* 2022 U.S. Dist. LEXIS 91761, at *81. "A racial gerrymandering claim . . . applies to the boundaries of individual districts." *Id*. Here, Plaintiffs have presented no allegations as to Precincts 1, 2 or 4.

As for Commissioners Precinct 3, even though Precinct 3 is cited several times throughout the FAC, it lacks any allegations that Precinct 3 exhibits an irregular shape or that the Commissioners established a target percentage of minority population to create the district. *Id.* at *82. Moreover, Plaintiffs have not identified a Plaintiff in every district and Organizational Plaintiffs fail to identify or name any specific members in Precinct 3. This is insufficient to state a claim. But ultimately, Plaintiffs also do not identify which Precinct

is a racial gerrymander. The two allegations of splitting precincts were located in Benchmark Precinct 3. But since there is no plaintiff in Precinct 3, there is no plaintiff to challenge that Precinct 3 is an unconstitutional racial gerrymander.

Accordingly, Plaintiffs fail to state a claim of racial gerrymandering because their claims are not district specific and there is not a plaintiff from each Commissioners Court Precinct in this suit. Their claims must therefore be dismissed.

### III.   <u>PLAINTIFFS CLAIMS ARE EITHER MOOT OR UNRIPE.</u>

Plaintiffs allege that Commissioner Holmes, who is Black, is the *only* commissioner that represents the interests of the Black and Latino communities. FAC ¶ 135; Opp. at 11, 14. But, Plaintiffs never sufficiently explain why Commissioner Holmes represents those interests beyond merely asserting that he represented a majority-minority precinct. Without substantively explaining why they believe that Commissioner Holmes is the candidate of choice for Black and Latino communities, and instead only repeatedly asserting the undisputed fact of Commissioner Holmes's race and the district he represented, it seems, relying only upon the facts pleaded in the First Amended Complaint, that Plaintiffs must believe that either Commissioner Holmes's race or his partisan affiliation is what makes him the candidate of choice of minority voters.

Plaintiffs' scant pleading on this point explains why the recent appointment of Dr. Robin Armstrong, who is also Black, to the Commissioner' Court Precinct 4 moots Plaintiffs' claims. Black and Latino residents combined account for 35.6% of the total voting-age population in Galveston County, and two of the five Commissioners Court Commissioners (or 40%) are also Black. Minority representation on the Commission now

8

clearly exceeds the proportion of Black and Latino residents in Galveston County. If, as seemingly alleged, a candidate's race alone makes him the candidate of choice for minority voters, then Plaintiffs' claim has been mooted; if, however, it is a candidate's partisan affiliation that matters, then Plaintiffs instead seek "a 'fair' apportionment of political power" that is not this Court's to give. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1260 (11th Cir. 2020). Either way, Plaintiffs' vote dilution claim is non-cognizable when minority voters have greater than proportional representation on the Commission.

## IV.   PLAINTIFFS FAIL TO PLEAD SUFFICIENT FACTS TO ESTABLISH AN INTENTIONAL DISCRIMINATION CLAIM.

Plaintiffs continue to offer no real facts evidencing discrimination in the County Commission's enactment of the Enacted Plan, instead preferring that this Court impermissibly draw tenuous "inferences" of discrimination. What factual allegations they have made are directly contradicted by publicly available documents that are judicially noticeable. To be clear, Plaintiffs did not object to Defendants' request that this Court take judicial notice of "all 2021 public meeting notices for the Galveston County Commissioners Court," Mot. to Dismiss at 9. Therefore, the Court can see that "all the public meetings that the Commissioners' Court held in 2021 were during normal business hours" and that the date and time of the November 12th meeting at which the map was ultimately adopted "was announced with the requisite 72-hour notice required for such meetings." *Id.* at 26-27. The 2021 redistricting process was conducted in accordance with past practice; to the extent that the redistricting timeline was in any way abbreviated, that is attributable to the delayed release of 2020 Census data and not any impermissible intent

on the part of the Commissioners. *Id.* at 27-28. Indeed, there is absolutely no evidence (or even factual allegation) that can tie any abbreviation in, or delay of, the redistricting process to any kind of racial discrimination on the part of the County Commission.

Plaintiffs rely heavily on the argument that the DOJ's 2012 refusal to preclear an earlier Commissioners Court redistricting map should also doom this version, Opp. at 23-24; but, this Court should not give deference to DOJ's opinion that the 2012 map contained indicia of intentional discrimination. "[T]he judiciary retains an independent obligation in adjudicating [] equal protection challenges to ensure that the State's actions are narrowly tailored to achieve a compelling interest." *Miller v. Johnson*, 515 U.S. 900, 922 (1995). Plaintiffs insist that *Arlington Heights* requires courts to review the historical background of a decision as an "evidentiary source" for discriminatory intent. Opp. at 16, 22, 25. In fact, the relevant evidence is judicial determinations of invalidity (which do not appear in the record), not *prima facie* Section 5 letters issued before fact-finding and litigation commenced. *See LULAC v. Abbott*, No. 3:21-CV-259-DCG-JES-JVB, 2022 U.S. Dist. LEXIS 80659, at *51-52 (W.D. Tex. May 4, 2022) (hereinafter "*LULAC I*"). A DOJ letter advising the state that it has detected indicia of discrimination does not relieve the state of its independent obligation to assure itself with a strong basis in evidence that a remedy is required. *Miller*, 515 U.S. at 922.

Plaintiffs' argument that Commissioner Holmes was somehow treated unfairly or irregularly in the 2021 redistricting process is also unavailing. Opp. at 15, 24, 27. Like every other Commissioner, Commissioner Holmes had the ability and legal authority to call a meeting at any time and place redistricting on the agenda. *See* Tex. Att'y. Gen. Op.

No. DM-228 at 3. At no point was Commissioner Holmes deprived of any legal authority—he simply chose not to exercise it. Moreover, the Commission could not, as a matter of law discuss Commissioner Holmes' proposed maps at the November 12th meeting. Opp. at 24. Because he failed to timely produce his maps to make the agenda notice deadline and for the public to have time to review, Texas law prohibits the Commissioners Court from discussing, much less vote on, items not listed on the agenda. Tex. Gov't Code § 551.041 (requiring notice of meeting including notice of the subject of the meeting); *see id*. § 551.042 (a-b) (prohibiting discussion of items not listed on the agenda with the exception of discussion of placing the issue on the agenda for the next meeting); *see also* Ex. A (agenda for November 12, 2022 only mentions discussion of the two map proposals, and no other proposals). This is not a factual contradiction of Plaintiffs' allegations. Rather, this shows that Plaintiffs' factual allegations of illicit intent behind not responding to Commissioner Holmes's proposals fail as a matter of law.

It is remarkable that Plaintiffs bemoan an alleged lack of public access and participation in the Enacted Plan at the same time that they advance a claim of inferred illicit intent due to late introduced plans. *Id.* at 25. Additionally, no inference can be drawn from Plaintiffs' allegation that the County attorney only met with Commissioner Holmes once, FAC ¶ 50, because they fail to allege that the County attorney met with any other Commissioners Court member more than once.

Finally, the Court should note that it is not clear whether a vote dilution cause of action like Plaintiffs bring in the present case can be used to enforce the Fifteenth Amendment. The Supreme Court "has not decided whether the Fifteenth Amendment

applies to vote-dilution claims; in fact, [it] ha[s] never held any legislative apportionment inconsistent with the Fifteenth Amendment." *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993). In the absence of any guidance as to what a Fifteenth Amendment vote dilution claim would look like or even if such claims exist, this Court should dismiss Plaintiffs' Fifteenth Amendment claim.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request this Court grant their Motion to Dismiss.

Date: July 6, 2022                                    Respectfully submitted,

*/s/ Dallin B. Holt*
Dallin B. Holt
Attorney in Charge
Texas Bar No. 24099466
S.D. of Texas Bar No. 3536519
Jason B. Torchinsky*
Shawn T. Sheehy*
dholt@holtzmanvogel.com
jtorchinsky@holtzmanvogel.com
ssheehy@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Hwy
Haymarket, VA 2019
P: (540) 341-8808
F: (540) 341-8809
*Pro hac vice pending*

Joseph R. Russo, Jr.
Greer, Herz & Adams, L.L.P.
State Bar No. 24002879
Federal I.D. No. 22559
Jordan S. Raschke
State Bar No 24108764

jrusso@greerherz.com
jraschke@greerherz.com
One Moody Plaza, 18th Floor
Galveston, Texas 77550
(409) 797-3200 (telephone)
(866) 456-0170 (facsimile)

Angie Olalde
Greer, Herz & Adams, L.L.P.
State Bar No. 24049015
Fed. ID No. 11084
aolalde@greerherz.com
2525 South Shore Blvd., Ste. 203
League City, Texas 77573
(409) 797-3200 (telephone)
(866) 422-4406 (facsimile)
*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 6, 2022, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Dallin B. Holt*
Counsel for Defendants