18      A.   Unless specified to.

19      Q.   So Ms. Van Horn says, "Nate, please see
20 attached," correct?

21      A.   Correct.

22      Q.   So she's specifying for you to look at the
23 attachments, correct?

24      A.   Correct.

25      Q.   So would you have looked at the
           UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED
                          ROUGH DRAFT                         121

1  attachments to Sigler Exhibit 10?

2       A.   Possibly.  I know for a Map 2, Map 1
3  precincts, the maps I looked at, but the Excel sheet
4  I'm still not positive on.  And I'm not quite sure
5  what Galveston Map 2 10_28 is.

6       Q.   Okay.  I -- we can look at -- if you'd
7  like to take a look at the attachments again, you
8  can.  They're all -- they're all in Sigler
9  Exhibit 10.  But just so I'm clear, your testimony
10 is that you did not do anything with the information
11 that you received in Sigler Exhibit 10?

12           MR. RUSSO:  Objection.  Asked and
13 answered.

14      Q.   You can still answer.

15      A.   Okay.  Could you repeat the question one

16  more time, please?

17      Q.   Absolutely.  So just so I'm clear, your

18  testimony is that you did not do anything with the

19  information that you received in Sigler Exhibit 10?

20          MR. RUSSO:  Same objection.

21      A.   Yes, not that I can recall.

22      Q.   All right.  Let's go back to Sigler

23  Exhibit 11, please.

24      A.   Right here?

25          MS. JAYARAMAN:  Counsel, if you're
    UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED
                  ROUGH DRAFT                               122

1  speaking with Mr. Sigler, if you wouldn't mind

2  speaking loud enough so we could all hear, please.

3          MR. RUSSO:  Yeah, I'm getting him to the

4  document, okay?  I mean, are you worried about us

5  secretly putting things on the record?  He's trying

6  to maneuver the documents.

7          MS. JAYARAMAN:  No, I'm not worried about

8  anything secretly going on the record.  I'd like to

9  just like to --

10          MR. RUSSO:  I'll tell you where the click

11  on the process that you guys have set up for today.

12  It's that simple.

13          MS. JAYARAMAN:  Okay.  I appreciate that.

```
14    Thank you for assisting him.
15        Q.   Mr. Sigler, do you have Sigler Exhibit 11
16    in front of you?
17        A.   Yes.
18        Q.   Great.  And this is the email we were
19    looking at before.  It's an email exchange between
20    yourself and Dale Oldham dated November 1st, 2021,
21    correct?
22        A.   Correct.
23        Q.   In the top email you send Mr. Oldham a
24    Zoom link.  Do you see that?
25        A.   Yes.
         UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED
                        ROUGH DRAFT                        123

 1        Q.   Did you meet with Mr. Oldham via Zoom on
 2    November 1st, 2021?
 3        A.   I believe so.
 4        Q.   Was anyone else in that meeting?
 5        A.   I do not recall.
 6        Q.   How long was that meeting?
 7        A.   I do not know.
 8        Q.   What did you discuss with Mr. Oldham
 9    during that meeting?
10             MR. RUSSO:  I'll instruct the witness not
11    to answer based on attorney-client privilege.
12             MS. JAYARAMAN:  Cathy, could we pull up
```

```
13    Tab 19, please.
14              MS. REYES:  I'm sorry.  If you don't mind,
15    I'd like to ask some questions about the basis for
16    that privilege.
17              MR. RUSSO:  Sorry.  Who's speaking?
18              MS. REYES:  My name is Bernadette Reyes
19    for Petteway plaintiffs.  I have some questions
20    about the basis for that privilege.
21              MR. RUSSO:  Okay.  There's counsel that
22    has the examination ongoing right now.
23              MS. JAYARAMAN:  Ms. Reyes can ask her
24    questions.  I don't mind.
25              MS. REYES:  Are you -- are you saying that
           UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED
                         ROUGH DRAFT                        124

 1    Mr. Oldham was retained as the county's attorney?
 2              MR. RUSSO:  He was a represent -- yes.  He
 3    was an attorney working for the county, retained to
 4    assist the county in the redistricting effort.
 5              MS. REYES:  Okay.  So can you tell us when
 6    he retired?
 7              MR. RUSSO:  I don't know the date.
 8              MS. REYES:  And this general subject
 9    matter of his work?
10              MR. RUSSO:  Can we go on with the
```

11    deposition and we can have this discussion off the

12    record when we're not wasting the witness's time

13    with this?

14              MS. REYES:  No, I want to make clear for

15    the record the basis of your objection.  You're

16    claiming attorney-client privilege --

17              MR. RUSSO:  The basis of my objection is

18    you are getting into an attorney-client privilege.

19    There's -- there's -- and that's it.  The guy --

20    Mr. Oldham was retained by the county to help with

21    the redistricting effort.

22              MS. REYES:  Okay.  That's the basis of --

23              MS. REYES:  I understand, Mr. Russo, but

24    the attorney-client privilege isn't just a blanket

25    coverage for anyone who is a lawyer that is -- that
      UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED
                   ROUGH DRAFT                                     125

1    is hired by the county.  There must be some basis

2    for the attorney-client privilege.  The privilege

3    covered is legal counsel, legal advice.  So if

4    Mr. Oldham was involved in mapping and giving data

5    regarding drawing the maps to Mr. Sigler, then

6    those -- those conversations, those communications

7    are not covered by the attorney-client privilege.

8    And I want to get this on the record.

9              MR. RUSSO:  I totally disagree with that.

10    Mr. Oldham was retained for the purpose of getting

11    redistricting done within the bounds of the law.

12    That was his duty.

13            MS. REYES:  I just want to be clear though

14    that based on what I've just said and based on the

15    earlier ruling containing the decision involving

16    judge brown, it is your position that the

17    communications from Dale Oldham are covered by

18    attorney-client privilege?

19            MR. RUSSO:  That's correct.  And again,

20    the case that you sent to us dealt with the

21    attorney-client privilege of a blanket privilege

22    that was asked for documents, not for specific

23    conversations between the attorney and the county.

24            MS. REYES:  It is -- it is our position

25    that those are similar and that the testimony is
         UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED
                     ROUGH DRAFT                          126

1    akin to the documents.

2            MR. RUSSO:  This is all --

3            MS. REYES:  I am just -- I'm making my --

4    I'm just saying it for the record, Mr. Russo.

5            MR. RUSSO:  Okay.

6            MS. REYES:  I will pass it back to the

7    Department of Justice.

```
 8                MR. RUSSO:  This is argument for the
 9   court.  This is not argument for this deposition.
10   Do you want to continue examining the witness or
11   not.
12                MS. REYES:  Yes, we can continue.  I just
13   want to make sure I'm understanding the basis of
14   your objection.
15                MR. RUSSO:  Great.
16                (Exhibit 13 marked)
17   BY MS. JAYARAMAN:
18       Q.   Okay.  So we're going to take a look at
19   Sigler Exhibit 13.  And please let me know when you
20   have it in front of you, Mr. Sigler.  And if you'd
21   take a look at the second page of Sigler Exhibit 13,
22   it's labeled defendant's first supplemental and
23   amended response to the United States first set of
24   interrogatories.  Do you see that?
25       A.   I do.
        UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED
                       ROUGH DRAFT                    127

 1       Q.   Okay.  And let's turn to the very last
 2   page of Sigler Exhibit 13.  I believe it's page 39
 3   of 39 in the PDF.  And on the last page of Sigler
 4   Exhibit 13, you will see a certification from judge
 5   Henry that says that he declares under penalty of
 6   perjury that the foregoing is true and correct.  Do
```

7    you see that?

8         A.    I don't recognize -- okay.  Let me see.

9         Q.    The very last page of Sigler Exhibit 13.

10   So you can scroll all the way to the end of the

11   document.

12        A.    Okay.

13        Q.    Do you see that there's a certification

14   from judge Henry that says he declares under penalty

15   of perjury that the foregoing is true and correct?

16        A.    I do.

17        Q.    Okay.  So now using the printed page

18   numbers on the bottom of Sigler Exhibit 13, let's

19   turn to page 18 of Sigler Exhibit 13.

20        A.    You said number 18?  I'm sorry.

21        Q.    Yes, 18 using the printed page numbers and

22   that's page -- yeah, 18.  Please let me know when

23   you're there?

24              MR. RUSSO:  The page numbers are on the

25   bottom.

    UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED
                    ROUGH DRAFT                          128

1         A.    Okay.  Oh, okay, okay.

2               MR. RUSSO:  Okay.  He's ready.

3         Q.    Okay.  At the very top of the page, it

4    says on November 1st, 2021, Nathan Sigler and Dale

5   Oldham scheduled a Zoom call.  Upon information and

6   belief, this call concerned the verification of what

7   was posted to the website.  Do you see that?

8       A.   Yes.

9       Q.   Would you agree with defendants' assertion

10  that your Zoom call on November 1st, 2021, with

11  Mr. Oldham concerned the verification of what was

12  posted to the Galveston website?

13      A.   Could you repeat that question, please?

14      Q.   Sure.  Do you agree with defendants'

15  assertion that your Zoom call on November 1st, 2021,

16  with Mr. Oldham concerned the verification of what

17  was posted to the Galveston website?

18      A.   I believe so.

19      Q.   What do you mean by "I believe so"?

20           MR. RUSSO:  Let me just caution the

21  witness that we're not disclosing conversations

22  other than what is stated in the interrogatories.

23  So if there are other conversations with Mr. Oldham,

24  we're not disclosing that on the basis of privilege.

25  To the extent you can answer her question, you can.

         UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED
                        ROUGH DRAFT                       129

1       A.   And is this regarding commissioner -- the

2   redistricting for commissioner precincts or

3   redistricting for voting precincts?

```
 4        Q.   I do not know.  I wanted to know if you
 5   agreed with defendants' assertion that your Zoom
 6   call on November 1st, 2021, with Mr. Oldham
 7   concerned the verification of what was posted to the
 8   Galveston County website.
 9             MR. RUSSO:  Objection, asked and answered.
10        A.   I don't remember the specifics of what was
11   talked about in that conversation.
12        Q.   When I asked the question a moment ago,
13   you said I believe so.  And then I asked what do you
14   mean by believe so, and then I don't believe you
15   answered that.  So what did you mean by I believe
16   so?
17             MR. RUSSO:  Again, the witness is being
18   admonished in connection with disclosing
19   conversations that are between the county and an
20   attorney hired to represent them on the basis of
21   attorney-client privilege.  To the extent you can
22   answer the question without revealing such other
23   communications, you can answer.
24        Q.   So Mr. Sigler, do you disagree that your
25   November 1st, 2021, Zoom call with Mr. Oldham
          UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED
                        ROUGH DRAFT                          130

 1   concerned what was posted to the Galveston County
```

2  website?

3      A.  Can you repeat that question, please?

4      Q.  Absolutely.  Do you disagree that your

5  November 1st, 2021, Zoom call with Mr. Oldham

6  concerned what was posted to the Galveston County

7  website?

8      A.  I do not.  I don't recall what the

9  specifics of the conversation were.