# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| DICKINSON BAY AREA BRANCH NAACP, et al., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Action No. 3:22-cv-117- JVB |
| GALVESTON COUNTY, TEXAS, et al., | § § § | |
| *Defendants*. | § § | |
| TERRY PETTEWAY, et al., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Action No. 3:22-cv-57-JVB [Lead Consolidated Case] |
| GALVESTON COUNTY, TEXAS, et al. | § § | |
| *Defendants*. | § | |
| UNITED STATES OF AMERICA, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 3:22-cv-93-JVB |
| GALVESTON COUNTY, TEXAS, et al. | § § § | |
| *Defendants*. | § | |

## NAACP AND PETTEWAY PLAINTIFFS' JOINT MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM DEFENDANTS

## TABLE OF CONTENTS

I.   BACKGROUND ...................................................................................................... 2

II.   LEGAL STANDARD ........................................................................................... 5

III.   ARGUMENT ........................................................................................................ 6

  A. The Work Product Doctrine Does Not Apply. ............................................... 7

     1.    The documents were not created for the primary purpose of litigation. ........ 9

     2.    Defendants did not anticipate litigation during the 2021 redistricting process. ..................................................................................................... 12

  B. The attorney-client privilege does not apply to the challenged documents. ........... 13

     1.    Boilerplate objections cannot satisfy Defendants' burden. .......................... 14

     2.    Documents are not privileged if their primary purpose was to convey political, strategic, or policy advice. ........................................................... 15

     3.    Documents and communications that relay underlying facts are not privileged. .............................................................................................. 21

     4.    Defendants have waived the attorney-client privilege. ................................. 23

IV.  CONCLUSION ................................................................................................ 25

In this consolidated action, three plaintiff groups challenge under the Voting Rights Act and U.S. Constitution the Galveston County Commissioners Court redistricting plan enacted on November 12, 2021 (the "2021 Enacted Plan"). Plaintiffs allege, *inter alia*, that the Commissioners Court adopted the 2021 Enacted Plan with the intent to discriminate against Black and Latino voters, that race predominated in the drawing of the precinct lines, and that the totality of circumstances shows that the redistricting plan has the purpose and effect of denying Black and Latino voters equal opportunity to participate in the political process and to elect representatives of their choice.

In August 2022, NAACP Plaintiffs and Petteway Plaintiffs, together ("Plaintiffs") served on Defendants requests for production of documents relating to the redistricting process including the development of the 2021 Enacted Plan. However, based on sweeping assertions of the work product and attorney-client privileges, Defendants have withheld as attorney-client privileged virtually all documents that detail the development of the 2021 Enacted Plan in a plain effort to shield the legislative process from public view. In doing so, they seek to avoid scrutiny over a legislative act that resulted in the fragmentation of Galveston's longstanding and sole majority-minority district, Benchmark Precinct 3. Such broad application of privilege "stands squarely in conflict with the strong public interest in open and honest government." *Reed v. Baxter*, 134 F.3d 351, 356 (6th Cir. 1998).

Defendants cannot shield their unconstitutional legislative actions from public and judicial review by delegating their responsibilities to a redistricting consultant who also happens to be an attorney, and claiming the entire process concerned "legal advice" when the primary purpose of these communications was technical, procedural, political, policy,

1

or strategic advice. They cannot claim work product privilege while their own witnesses admit they did not anticipate litigation. And Defendants cannot claim attorney-client privilege over underlying facts, such as the map-drawers' knowledge of demographic and partisan statistics related to draft maps, where expert testimony has shown the fragmentation of Benchmark Precinct 3 was not required by any legal constraints. The Court should decline Defendants' attempt to grant the Commissioners Court an unprecedented and unwarranted expansion of these privileges in contravention of established law and public policy and should compel production as requested herein.

## I.   BACKGROUND

Defendants' overbroad assertions of privilege are the latest in a series of measures taken to ensure that almost every step of the 2021 redistricting process occurred outside the public eye. These measures are not only exceptional for their lack of transparency but also in how they deviate from standard practices established in prior redistricting cycles. Defendants did not disclose the identity of their proposed retaining counsel to the public before they met to approve the engagement agreement, as they had done in prior cycles. Ex. 1 (Henry Dep. 72:14–73:12; 135:3–137:18). The public therefore had no advance notice that the county would retain Dale Oldham, the man responsible for drawing maps in 2011 that failed the U.S. Department of Justice's pre-clearance process due to concerns they were racially discriminatory. Also unlike prior cycles, Defendants did not publicly announce the release of the 2020 Census data or provide a summary of that data to Galveston's residents. Ex. 1 (Henry Dep. 158:23–60:8). In fact, between retaining counsel on April 5, 2021, and releasing the first publicly available draft maps on October 29, 2021,

the Commissioners Court made no efforts to apprise the public of or solicit any public input for the 2021 redistricting process. In contrast to the six public hearings held in 2011, Galveston County held just a single hearing on November 12, 2021 to vote on the map proposals this cycle.

But behind the scenes, Defendants and their map-drawers met frequently to draft at least two proposals, and purposefully structured their redistricting communications with consultants to avoid having a physical quorum present at one time. *See, e.g.*, Ex. 1 (Henry Dep. 214:19–215:5). Defendants' production of purported "draft" maps (in the form of "shapefiles"—a series of electronic files that define the geographic shapes of district boundaries) is disingenuous: NAACP Plaintiff's expert confirmed that the earliest shapefiles produced by Defendants, from mid-October, are identical to the final versions posted online on October 29, 2021. Ex. 2 (Cooper Rep. ¶ 52 n.18; ¶ 70 n.25). And while Defendants have produced documents such as calendar invitations for meetings during the map-drawing process, they have consistently refused to testify as what was actually discussed, *see, e.g.*, Ex. 7 (Apffel Dep. 141:9–13; 142:6–10; 143:3–7); Ex. 9 (Giusti Dep. 52:14–18) or even what information they knew about draft maps if learned from counsel, even if unrelated to legal advice. *See, e.g.*, Ex. 1 (Henry Dep. 266:24–267:4). The public record is no better: in the only hearing in which draft maps were publicly discussed, County Judge Mark Henry asserted that there would be no time for revisions to the maps in response to public comment. Ex. 3 (Nov. 12 Hr'g Tr. 26:24-27:5). In sum, neither the public record nor Defendants' documentary disclosures reveal evidence detailing the process for drafting the 2021 Enacted Map.

3

In August 2022, NAACP Plaintiffs and Petteway Plaintiffs (together, "Plaintiffs") served on Defendants requests for production of documents relating to the redistricting process including the development of the 2021 Enacted Plan. Ex. 15. Plaintiffs agreed to several extensions on Defendants' responses in a good faith effort to complete discovery, and Defendants committed to completing production by mid-December. By agreement of the parties, Defendants served the first privilege log on December 31, 2022, Doc. 97-3 at 9, which they updated on January 2, 2023, after Plaintiffs identified data missing in the initial draft. Doc. 97-3 at 4–6; Doc. 97-1. On January 6, 2023, Plaintiffs emailed Defendants a native Excel version of Defendants' January 2 privilege log with new columns reflecting Plaintiffs' line-by-line challenges to the privileges asserted by category (Column O, "Privilege Objection Tags") and with individualized explanation (Column P "Privilege Objection Notes"). Doc. 97-2. In their cover email, Plaintiffs provided the legal basis for each challenge category with legal citations. Doc. 97-3.

During the parties' January 12, 2023, meet and confer, Defendants represented they intended to produce 25–30 additional documents in response to Plaintiffs' privilege challenges and to provide an updated privilege log noting any changes from the January 2 version around January 16, 2023. On January 20, 2023, Defendants served an updated privilege log in PDF format. Doc. 97-6 at 5. As this updated log did not indicate what changes had been made from the prior version, Plaintiffs inquired about what was updated, to which Defendants responded by listing 19 entries that had "substantive edits," and stated that any new entries were duplicates of existing entries. Doc. 97-6 at 2. In their review, Plaintiffs have identified significantly more changes than Defendants had listed in their

4

January 24 email,[1] and that just 11 of the 22 documents produced after December 31, 2022, are unique and not duplicates.

A current Excel version of the privilege log that includes Defendants' most recent privilege notes and entries, as well as Plaintiffs' updated privilege challenges by category and with individualized explanation, is appended to this Motion as Exhibit 4. As discussed with the Court on January 30, 2023, Plaintiffs have served a native version of this document to the Court and to Defendants to facilitate the Court's *in camera* review.[2]

## II.   LEGAL STANDARD

"A party seeking discovery may move for an order compelling an answer, designation, production, or inspection" if the other party "fails to produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iv). Rule 34 permits parties to serve upon each other "a request within the scope of Rule 26(b)" to produce certain items "in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1).

Rule 26 requires a party asserting a privilege to "describe the nature of the documents, communications, or tangible things not produced or disclosed—and to do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii). "It is well settled that the party asserting the privilege has the burden of establishing its applicability." *Perez v. Perry*,

---

[1] *Compare, e.g.*, Doc. 97-1 (1/2 privilege log) at Doc IDs 68, 226, 235 *with* Doc. 97-7 (1/20 privilege log) at Doc IDs 54, 208, 211. The January 20 log also included 23 new entries, only one of which Defendants had identified in their list of edits. *See* Doc. 97-7 (1/20 privilege log) at Doc IDs 149, 279-294, 300-307.

[2] Plaintiffs understand that the Court requested in the January 30 hearing that Defendants produce all challenged documents withheld by Defendants for *in camera* review on or before February 10, 2023.

No. SA-11-CV-360-OLG-JES-XR, 2014 WL 3495414, at *2 (W.D. Tex. July 11, 2014) (citation omitted); *see also LULAC v. Abbott* ("*LULAC II*"), No. EP-21-CV-00259, 2022 WL 3233406, at *4 (W.D. Tex. Aug. 10, 2022). Conclusory assertions are "insufficient to carry out the proponent's burden of establishing" privilege. *E.E.O.C. v. BDO USA, L.L.P.*, 876 F.3d 690, 696 (5th Cir. 2017). When a motion to compel "is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A).

## III. ARGUMENT

Courts caution restraint when governmental entities seek broad application of privilege, which "stands squarely in conflict with the strong public interest in open and honest government." *Reed v. Baxter*, 134 F.3d 351, 356 (6th Cir. 1998). In redistricting matters specifically, the truth is "extremely important to the public, whose political rights stand significantly affected by the efforts of" government officials. *Baldus v. Members of Wis. Gov't Accountability Bd.*, 843 F. Supp. 2d 955, 959 (E.D. Wis. 2012). Accordingly, the attorney-client privilege should be interpreted "narrowly" to "appl[y] only where necessary to achieve its purpose." *BDO USA, L.L.P.*, 876 F.3d at 695 (quoting *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)).

Here, Defendants seek to exploit the protections of the attorney-client privilege and work product doctrine to shield the 2021 redistricting process from public view. They

outsourced their constitutional duty to redistrict entirely to a redistricting consultant, Dale Oldham, and Oldham's hand-picked outside law firm and demographer. Now they assert that this entire map-drawing process constitutes legal advice as a result in an attempt to "cloak the record of that action behind a charade masking as privilege." *Baldus v. Brennan* ("*Baldus II*"), 843 F. Supp. 2d 955, 958–61 (E.D. Wis. 2012) (criticizing legislature's "concerted efforts to mask the process behind the closed doors of a private law firm").

Defendants' overbroad assertions of privilege should be rejected. First, the work product doctrine does not apply to the challenged documents. Draft maps, non-legal policy and factual analysis, and other communications relating to the redistricting in 2011 and 2021 were created in the ordinary course of the legislative process and not in anticipation of litigation. As for the attorney-client privilege, Defendants defy case law establishing that communications containing technical, procedural, political, policy, and strategic advice—even when provided by attorneys—are not privileged. Defendants have otherwise failed to substantiate that the provision of legal advice was the primary purpose of the withheld communications. To the extent any privilege may apply, Defendants have waived that privilege by misusing privilege assertions as a sword and shield in this matter. The challenged documents must be produced.

### A. The Work Product Doctrine Does Not Apply.

Defendants inappropriately asserted 336 documents are protected work product.[3] To qualify for protection under the work product doctrine, "'the primary motivating purpose'

---

[3] These documents can be identified in Exhibit 4, Column "O" with the Privilege Objection Tag "WP – Legislation Exception". They are also listed for the Court's reference in Exhibit 11.

behind the creation of the document must be to aid in possible future litigation." *SEC v. Microtune, Inc.*, 258 F.R.D. 310, 318 (N.D. Tex. 2009) (quoting *In re Kaiser Aluminum & Chem Co.*, 214 F.3d 586, 593 (5th Cir. 2000)). "If the document would have been created without regard to whether litigation was expected to ensue, it was made in the ordinary course of business and not in anticipation of litigation." *Id.* at *318. This is true even if the work "involve[d] weighing legal arguments . . . and forecasting the ultimate likelihood of sustaining [the client's] position in court." *United States v. El Paso Co.*, 682 F.2d 530, 543 (5th Cir. 1982); *see also Mims v. Dallas County*, 230 F.R.D. 479, 484 (N.D. Tex. 2005) ("[T]hat the report would not have been prepared 'but for' this litigation does not, in itself, make it work product. The County still must establish that the 'primary motivating purpose' behind the creation of the report was to aid in the lawsuit.").

It follows that "the mere possibility of a legal challenge," even in the redistricting context, is insufficient to trigger work product protections. *LULAC v. Abbott* ("*LULAC I*"), No. EP-21-CV-00259-DCG-JES-JVB, 2022 WL 2921793, at *2 (W.D. Tex. July 25, 2022) (addressing work product protection in the litigation over Texas's 2021 statewide redistricting maps). In redistricting, this is true even if a body "may have reasonably believed that litigation would result from its redistricting efforts." *LULAC v. Abbott* ("*LULAC III*"), No. EP-21-CV-00259, 2022 WL 3353409, at *5 (W.D. Tex. Aug. 12, 2022) (cleaned up); *see also Baldus v. Brennan* ("*Baldus I*"), No. 11-CV-1011 JPS-DPW, 2011 WL 6385645, at *2 (E.D. Wis. Dec. 20, 2011). "Like all privileges," the work product doctrine is "strictly construed," and the party asserting the doctrine has the burden to establish that it applies. *Mims*, 230 F.R.D. at 484.

8

As set forth below, Defendants cannot establish that the work product doctrine applies to the challenged documents because (*i*) redistricting-related communications concern quintessentially legislative business and were not created in anticipation of litigation, and (*ii*) Defendants have not shown that they anticipated litigation in any event.

   1.  *The documents were not created for the primary purpose of litigation.*

It is undisputed that the Galveston County Commissioners Court has a constitutional responsibility to divide itself into four precincts, *see* Tex. Const. art. V, § 18, and is obligated under the Fourteenth Amendment to ensure that those precincts have roughly equal populations. *Avery v. Midland County*, 390 U.S. 474, 479 (1968).[4] Accordingly, documents generated while executing these duties were prepared as a result of the legislature's ordinary duty to redistrict, and not in anticipation of litigation. *See Ohio A. Philip Randolph Inst. v. Smith*, No. 1:18-cv-357, 2018 WL 6591622, at *3 (S.D. Ohio Dec. 15, 2018) (finding no reason to believe that "data and maps" from a consultant on Ohio's statewide redistricting "were prepared 'because of' anticipated litigation" or that they "would have been prepared differently but for the anticipated litigation").

It is immaterial that a legislature "could always have a reasonable belief that any of its enactments would result in litigation," because "[t]hat is the nature of the legislative process"—counsel assisting the government still cannot "withhold documents pertaining to pending legislation on the basis of the work product doctrine." *Bethune-Hill v. Va. State*

---

[4] *See also* "Court Functions," Galveston County, https://www.galvestoncountytx.gov/our-county/county-judge/court-functions (listing "establishing commissioners and justice of the peace precinct boundaries" among Commissioners Court's additional "responsibilities").

9

*Bd. of Elections*, 114 F. Supp. 3d 323, 348 (E.D. Va. 2015) (cleaned up). Legislation, particularly redistricting legislation, "often involves contentious issues that the public may challenge as being unconstitutional." *Baldus I*, 2011 WL 6385645, at *2. If work product doctrine were applied to all legislative actions, a government body that "wished to obscure its legislative actions from the public eye" would do so by simply "retain[ing] counsel or other agent that it termed to be 'in anticipation of litigation.'" *Id.* This level of concealment, one court concluded, would be not only "unseemly and a misuse of public assets" but in fact serve as "a slap in the face" to the public. *Id.*

Indeed, the three-judge panel in the ongoing suit over Texas's 2021 statewide redistricting maps recently considered whether the work product doctrine applied to documents created by map-drawer Thomas Bryan for the law firm advising the Texas legislature—the same Thomas Bryan retained by the law firm advising Defendants here. *See LULAC III*, 2022 WL 3353409, at *1–2, 5. The panel held the work product doctrine inapplicable because "[r]espondents created the documents the United States seeks while assisting the Texas Legislature with redistricting legislation," and Bryan's engagement letter with the law firm's assertion that he was "'retain[ed] [ ] in anticipation of litigation' does not automatically render all documents subject to the work product doctrine." *Id.* at *5 (cleaned up, internal citations omitted).

The same considerations exist here. While (upon information and belief) Defendants have not produced Bryan's engagement letter, Holtzman Vogel's engagement letter shows that both they and Bryan were primarily retained to perform a legislative function: Holtzman Vogel's representation included providing "a technical expert to draw the map"

(*i.e.*, Bryan) and payment of the $80,000 fee was conditioned on work performed after release of Census data leading up to adoption of a final map, not on work relating to litigation. Ex. 5 at DEFS00011722. Indeed, the engagement letter contemplates *separate* charges and fee arrangements for "any litigation over the maps." *Id.* at DEFS00011724.

For this reason, Defendants cannot properly invoke work product protection over the draft maps, communications or analyses regarding draft maps, or "metes and bounds" descriptions generated before they adopted the 2021 Enacted Plan. *See, e.g.*, Ex. 4 at Doc IDs 59–77, 158–194. This information was all generated as part of the ordinary business of the Commissioners Court in fulfilling its constitutional duty to redistrict and were thus primarily motivated by that redistricting responsibility and not the specter of any speculative future litigation. As for the discussions and analyses of the maps specifically, Defendants have not established that these analyses were primarily legal in nature, as opposed to policy-oriented. *See infra* Section III.B.2. But even if these documents contemplate whether the draft redistricting plans comply with legal requirements, such an assessment is still *primarily* motivated by legislative concerns, not litigation concerns. *Cf. El Paso Co.*, 682 F.2d at 543–44 (documents created to comply with federal law and regulations not protected work product). Work product doctrine thus does not apply under any scenario.

For similar reasons, Defendants' communications with Oldham, Bryan, and Holtzman Vogel attorneys concerning draft orders adopting the redistricting plans—including the draft orders themselves and exemplars of previously adopted redistricting orders—are also part of the ordinary course of legislative business and not covered by the

work product doctrine. *See, e.g.*, Ex. 4 at Doc IDs 107–121, 131–136, 201–212); *Cf. S.C. State Conf. of NAACP v. Alexander*, No. 21-CV-3302, 2022 WL 2375798, at *6 (D.S.C. Apr. 27, 2022) (rejecting application of attorney-client privilege and work product doctrine to emails discussing "strategy as per procedural aspects of the special order" on redistricting). These orders were prepared primarily for the purpose of adopting a new Commissioners Court precinct map, and, as such, they would have been prepared regardless of any hypothetical litigation. Communications around coordinating the special session to adopt the redistricting plans are likewise unprotected. *See, e.g.*, Ex. 4 at Doc IDs 295–307; *Cf. S.C. State Conf. of NAACP*, 2022 WL 2375798, at *6 (rejecting application of attorney-client privilege or work product doctrine to emails discussing the timing when a House session would be called for redistricting because the emails concerned "legislative strategy").

To hold that documents created in the ordinary course of redistricting are covered by the work product doctrine would risk enabling governments to "shield all of [their] actions from any discovery." *Baldus I*, 2011 WL 6385645, at *2.[5] The work product doctrine does not, and cannot, require such a result.

### 2. *Defendants did not anticipate litigation during the 2021 redistricting process.*

Even if the documents at issue here could theoretically have been primarily motivated by anticipated litigation rather than ordinary legislative responsibilities, the work product doctrine still would not apply because Defendants have not met their burden

---

[5] Additional examples of documents to which the work product doctrine does not apply are compiled in Table 1 of Exhibit 6.

to show that they did in fact anticipate litigation. On the contrary, Commissioner Darrell Apffel testified that Defendants "[a]bsolutely [did] not" expect litigation. Ex. 7 (Apffel Dep. 107:8–9). None of the other commissioners or Judge Henry testified to having expected litigation before the public hearing on the map during which it was enacted.

Even Defendants' own privilege log entries fail to demonstrate any expectation of litigation until well after the Commissioners Court voted on the 2021 Enacted Plan on November 12, 2021. Defendants first began discussing demands from the U.S. Department of Justice on November 27, 2021, *see* Ex. 4 at Doc ID 329, and a document preservation letter from the Texas Civil Rights Project on December 7, 2021, *See id.* at Doc ID 341–42. Plaintiffs have not challenged the work product assertions over documents discussing these items,[6] and there is no indication *prior* to these entries of any anticipation of litigation. Accordingly, the work product doctrine still cannot apply to the challenged documents generated during the redistricting process.

### B. The Attorney-Client Privilege Does Not Apply to the Challenged Documents.

Defendants' assertion of attorney-client privilege over three-quarters of the privilege log entries also fails due to their unreasonable, overbroad, and inconsistent interpretation of the privilege.

To assert attorney-client privilege, one "must prove: (1) that he made a confidential communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing

---

[6] Plaintiffs have challenged the *attachments* to some of these communications, *see, e.g.*, Ex. 4 at Doc IDs 384–402, 404–22, 424–42, as these attachments appear to be pre-existing maps initially created as part of the redistricting process, and not in anticipation of litigation.

either a legal opinion or legal services, or assistance in some legal proceeding." *BDO USA, L.L.P.*, 876 F.3d at 695 (quoting *Robinson*, 121 F.3d at 974). The proponent "has the burden of 'demonstrat[ing] how *each* document satisfies all three elements of the privilege.'" *LULAC III*, 2022 WL 3353409, at *4, (alterations in original) (quoting *Microtune, Inc.*, 258 F.R.D. at 315). Any "[a]mbiguities as to whether the elements of a privilege claim have been met are construed against the proponent." *BDO USA, L.L.P.*, 876 F.3d at 695.

Defendants have failed to meet their burden of establishing the attorney-client privilege applies to challenged documents by (*i*) making no more than boilerplate assertions, (*ii*) failing to establish that the primary purpose of communications was the provision of legal advice, (*iii*) improperly claiming privilege over underlying facts, and (*iv*) waiving privilege by using it as a sword and shield in this matter.

### 1. *Boilerplate objections cannot satisfy Defendants' burden.*

Defendants' privilege notes for over 165 entries still contain only conclusory assertions that communications sought or provided "legal" advice, even after Plaintiffs identified each boilerplate objection and afforded Defendants several weeks to update their privilege log to cure deficiencies.[7] Defendants have thus failed to meet their burden to show that the privilege applies.

"[S]imply describing a lawyer's advice as 'legal,' without more, is conclusory and insufficient to carry out the proponent's burden of establishing attorney-client privilege," and documents are not privileged "merely because a copy is also sent to counsel." *BDO*

---

[7] These are identified in Ex. 4, Column "O" with the Privilege Objection Tag "A/C – Boilerplate/Conclusory." They are also listed for the Court's reference in Exhibit 12.

*USA, L.L.P.*, 876 F.3d at 696. Here, Defendants have asserted privilege over emails and attachments between the redistricting consultants and the demographer Bryan by contending only that Bryan presented initial drafts of maps and map revisions "to assist in providing legal advice and forming opinions." Ex. 4 at Doc IDs 86–88*; see also* Ex. 6 at Table 2. But courts have held that a redistricting consultant cannot meet his burden to show documents are privileged "by stating in conclusory fashion that he sent and received the documents at issue in order to help him render legal advice." *Ohio A. Philip Randolph Inst.*, 2018 WL 6591622, at *4; *see also LULAC III*, 2022 WL 3353409, at *4 ("[A] claim that attorneys worked on or reviewed documents does not alone establish attorney-client privilege."). Accordingly, by declining to update their conclusory descriptions of privilege for these entries, Defendants have failed to meet their burden in substantiating the privilege should apply.

2. *Documents are not privileged if their primary purpose was to convey political, strategic, or policy advice.*

Plaintiffs have challenged the privilege asserted over 206 documents where the primary purpose of the communication was not the provision of legal advice, including draft maps, logistical and scheduling documents, and review of policy priorities.[8]

It is well-established that "a statement is privileged only if it was for the 'primary purpose' of legal advice or services." *LULAC v. Abbott* ("*LULAC IV*"), 342 F.R.D. 227, 232 (W.D. Tex. 2022) (quoting *Robinson*, 121 F.3d at 974). Redistricting is a policy

---

[8] These are identified in Ex. 4, Column "O" with the Privilege Objection Tag "A/C – Legal Advice Not Primary Purpose." They are also listed for the Court's reference in Exhibit 13.

endeavor with political and strategic dimensions, which includes, *inter alia*: setting a timeline, adopting redistricting criteria, analyzing Census and other demographic data, drafting and editing maps, creating a process for public comment, considering and adopting maps, and adjusting voter precinct lines after map adoption.

Surely at certain discrete points in the process, lawyers are consulted to address specific legal determinations. But courts considering the issue of attorney-client privilege in redistricting have consistently concluded that individuals are not de facto providing legal advice just because they are lawyers retained to aid in the redistricting legislative process. *See, e.g.*, *LULAC III*, 2022 WL 3353409, at *4 (documents "concerning 'advice on political, strategic or policy issues are not shielded from disclosure by the attorney-client privilege'") (quoting *Evans v. City of Chicago*, 231 F.R.D. 302, 312 (N.D. Ill. 2005)) (cleaned up) (emphasis in original); *Baldus I*, 2011 WL 6385645, at *3 (communications between redistricting consultant and outside counsel likely "concerned advice on political, strategic, or policy issues" and thus were not privileged); *S.C. State Conf. of NAACP*, 2022 WL 2375798, at *6 (rejecting assertions of attorney-client privilege over redistricting communications concerning "legislative strategy"); *cf. Perez v. Perry*, No. SA-11-CV-360-OLG-JES-XR, 2014 WL 3359324, at *1 (W.D. Tex. July 9, 2014) (noting that attorney-client privilege does not protect communications between legislator and outside counsel where "the topics of these communications are political in nature").

Here, as discussed above, Oldham and Holtzman Vogel were retained for the primary purpose of fulfilling a legislative function, *i.e.*, drafting maps, and not the limited role of assessing legal issues. Judge Henry testified that he specifically sought Oldham to

"draft the map" for the Commissioners Court and had no expectation of Holtzman Vogel's services except that "Holtzman Vogel comes with [Oldham]." Ex. 1 (Henry Dep. 140:2–141:4). The County's engagement letter to Oldham and Holtzman Vogel emphasized the map-drawing work by creating a payment schedule tethered to the Census data release date and the adoption of a final map, and not covering litigation. Ex. 5. Oldham, in turn, hired an expert demographer, Bryan, to perform "redistricting and geocoding services" that are technical—not legal—in nature. Ex. 8 at DEFS00031122.

This point is substantiated by invoices for Bryan's work that have been produced. Between October 16 and 22, 2021, Bryan executed quintessentially legislative (not legal) adjacent tasks, as he: 1) "[d]igitized original plan," 2) "drafted new maps," 3) made client calls, 4) "drafted new maps," 5) "modified Map 1 and Map 2," 6) "finalized plans" and "created split precinct outputs and analysis," 7) performed "[q]uality control," "modified political performance estimates," "added disaggregated data," as well as additional mapping, client, and voter precinct line adjustment services after October 22, 2021. Ex. 8 at DEFS00031123. Bryan's technical work exemplifies policy or strategy work that is not shielded by attorney-client privilege, and it cannot be rendered privileged merely because he worked with the County's redistricting consultants instead of the Commissioners Court directly.[9]

Defendants thus impermissibly assert attorney-client privilege over documents that are clearly technical, such as map drafts and population data, or related to procedural

---

[9] Documents with Thomas Bryan are identified in Ex. 4, Column "O" with the Privilege Objection Tag "Thomas Bryan."

aspects of redistricting, merely because they were sent to an attorney. For example, Defendants improperly assert privilege over the "first drafts of redistricting plan" merely because they were "sent to redistricting counsel for legal review." *See* Ex. 4 at Doc ID 61. But while "technical work may well [be] necessary in reviewing the legality of the proposed [redistricting] legislation and compliance with the Voting Rights Act . . . just because attorneys are involved in the process does not automatically shield the work of such technical experts, nor does it necessarily protect all communications between the parties." *LULAC I*, 2022 WL 2921793, at *11 ("That these data—admittedly created, received, and/or gathered for the purpose of working on redistricting legislation—were also used by counsel, does not render them privileged.") (cleaned up); *Ohio A. Philip Randolph Inst.*, 2018 WL 6591622, at *3 (finding documents containing "only facts, data, and maps" are not protected by attorney-client privilege). Additional such examples can be found in the compilations of "boilerplate" and "technical" examples in Tables 2 and 3, respectively, of Ex. 6.

Defendants also wrongly assert privilege over purely procedural or strategic matters. For example, Defendants withheld communications asking about the "progress of work on drawing proposed Commissioners Court precinct maps." Ex. 4 at Doc ID 82. Other documents withheld from the 2011 redistricting cycle concern the timing and procedure for obtaining preclearance from the Department of Justice, another routine procedure at the time. *See* Ex. 4 at Doc IDs 3–6. Similar examples of these procedural or strategic communications are compiled in Table 4 of Exhibit. 6. These items mirror those ordered to be produced in a recent South Carolina redistricting case, in which the court held that

18

(1) communications relating to outside counsel reviewing the state legislature's "draft map room procedures" were "normal legislative business"; (2) attorney approval of a draft text regarding the timing of when session would be called for redistricting was "legislative strategy"; and (3) attorney advice to put up a "special order" to adopt a house resolution regarding the maps was "strategy as per procedural aspects of the special order." *S.C. State Conf. of NAACP*, 2022 WL 2375798, at *4–7. Likewise, those documents concerning purely procedural or strategic matters should be produced here.

Finally, Defendants have failed to show that, even where routine redistricting advice and legal advice may be intermingled, legal advice is the "primary purpose" of such "dual purpose" communications. *See LULAC I*, 2022 WL 2921793, at *2, 7–9, 12; *see also BDO USA, L.L.P.*, 876 F.3d at 696 (courts should "seek[] to glean the 'manifest purpose' of the communication"). Here, it was Defendants' decision to intermingle strategic and policy advice with any legal advice regarding the drafting of new commissioners precincts. It is now their burden to establish the *primary* purpose of any document withheld for attorney-client privilege was the provision of legal advice, not policy or strategic advice. Where "the staff attorneys and retained counsel serve both legal and policy roles, it is incumbent upon the party seeking the privilege to prove it was for the primary purpose of securing either a legal opinion, legal services, or assistance in some legal proceeding." *BDO USA, L.L.P.*, 876 F.3d at 695. And to the extent any documents do contain legal advice, "redaction is the appropriate solution." *LULAC I*, 2022 WL 2921793, at *8–9, 13.

Such intermingling of policy and legal advice is apparent in communications mentioning, for example, redistricting criteria. *See* Ex. 6 at Table 5. But traditional

redistricting criteria such as compactness, communities of interest, and contiguity implicate policy decisions, rather than legal ones. And Plaintiff's expert Dr. Cooper has confirmed that the fragmentation of Benchmark Precinct 3, a fact central to Plaintiffs' claims, was not even necessitated by adherence to legal requirements. *See* Ex. 2 (Cooper Rep. ¶ 21). In other words, the decision to fragment Benchmark Precinct 3 in the 2021 Enacted Plan was one of policy. Even if that were not the case, compliance with the U.S. Constitution and Voting Rights Act does not automatically involve legal advice, as those are traditional redistricting criteria and "questions about the rationale behind legislative choices do not necessarily transgress privilege, even if the answers have legal consequences or expose the legislature to legal liability." *LULAC IV*, 342 F.R.D. at 235.

Defendants' other privilege log descriptions also indicate that legal advice was not the primary purpose of communications relating to the process of drawing maps. For example, Defendants' privilege log indicates that on October 15, 2021, Bryan and the redistricting counsel communicated about "preparation of first draft map for legal review and posing questions re: redistricting constitutional requirements and traditional redistricting criteria." *See* Ex. 4 at Doc IDs 59–60. But as explained above, "preparation of [a] first draft map" is a technical and not legal service, and involves the legislative process, and thus it is not clear at all that these communications have a primary purpose of providing specific legal advice. And constitutional and traditional redistricting criteria are quintessential "rationale[s] behind legislative choice" in the redistricting context and therefore not automatically privileged, even if there are legal consequences to those criteria. *LULAC IV*, 342 F.R.D. at 235. To the extent the Court does determine in its *in*

20

*camera* review that these mixed purpose documents contain select legal advice, redaction is the most appropriate form of production. *See LULAC II*, 2022 WL 3233406, at *5 (where "[b]y Defendant's own admission in his privilege log, the disputed documents and communications have a mixed purpose: legal and strategy advice," the court may review and compel production with redactions of the legal advice only).

 3. *Documents and communications that relay underlying facts are not privileged.*

The updated privilege log improperly contains 292 documents describing underlying facts about documents known to County officials and redistricting plan features.[10] These communications relay "facts, not legal advice," and are thus not privileged "'even if the client learned those facts through communications with counsel.'" *La Union Del Pueblo Entero (LUPE) v. Abbott*, No. SA-21-CV-00844-XR, 2022 WL 1667687, at *7, (W.D. Tex. May 25, 2022) (quoting *Thurmond v. Compaq Comput. Corp.*, 198 F.R.D. 475, 483 (E.D. Tex. 2000)). Likewise, documents containing "facts, data, and maps" sent during the redistricting process "do not become privileged simply because they are attached to an email on which [an attorney] is a recipient." *Ohio A. Philip Randolph Inst.*, 2018 WL 6591622, at *3.

In *LULAC*, the Texas statewide redistricting case, the Court determined that no privilege applied to answers to questions "inquir[ing] exclusively about [the legislator's] personal knowledge, his actions (or inaction), and empirical features of the redistricting plans." *LULAC IV*, 342 F.R.D. at 233. For example, the plaintiffs could inquire about

---

[10] These are identified in Ex. 4, Column "O" with the Privilege Objection Tag "A/C – Underlying Facts." They are also listed for the Court's reference in Exhibit 14.

whether a proposed plan "created two new majority Hispanic [voting age population] districts as compared to the prior plan," whether he "review[ed] any analysis of racial block voting, otherwise known as racially polarize[d] voting in drawing up" the plan, and whether the initial plan "decrease[d] Latino population share" in a specific district. *Id.* This same principle applies equally to communications describing the personal knowledge of Commissioners, County staff and others involved in drafting the 2021 Enacted Plan.

A large swath of entries sent by Galveston County GIS specialist Nathan Sigler appear to contain only maps and descriptions of Commissioners precinct map proposals and voting precincts, also known as a voter tabulation districts. *See, e.g.*, Ex. 6 at Table 6. It is immaterial if the maps originated from Oldham or another attorney because facts "within the client's knowledge" are not protected by the attorney-client privilege, "even if the client learned those facts through communications with counsel." *LULAC III*, 2022 WL 3353409, at *4 (cleaned up). Likewise, "[d]ocuments do not become cloaked with the lawyer-client privilege merely by the fact of their being passed from client to lawyer." *LULAC I*, 2022 WL 2921793, at *7 (quoting *Robinson*, 121 F.3d at 975). These descriptions, analyses, and updates of voting precinct changes and splits constitute underlying facts known to Sigler, and by extension, Galveston County, and do not appear to contain any legal advice.

Finally, Defendants have withheld four documents regarding the "scope of redistricting representation," Ex. 4 at Doc IDs 231–34, which is similarly not privileged. *See, e.g.*, *Realtime Data, LLC v. Packeteer, Inc.*, No. 08-CV-144, 2009 WL 10742275,  at *4 (E.D. Tex. May 8, 2009) (holding "sections and paragraphs contain[ing] information

regarding the scope and extent of representation . . . [are] not privileged"); *United States v. Moazzeni*, 906 F. Supp. 2d 505, 514 (E.D. Va. 2012) ("communications regarding the scope of representation" are documents that "do not appear to be privileged under any colorable theory.").

All communications containing such underlying facts must be produced.

### 4. *Defendants have waived the attorney-client privilege.*

Even if the Court determines privilege apples to some documents here, Defendants have waived that privilege by implementing it as both a sword and shield in this matter.[11]

Under the doctrine of implied waiver, "a party may not use privileged information both offensively and defensively at the same time." *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 497 (5th Cir. 2005); *see also Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999) (parties may not "at once, employ the privilege as both a sword and a shield. . . . Attempts at such improper dual usage of the privilege result in waiver by implication."). Attorney-client privilege thus may be waived on a subject-matter basis "when [a] defendant asserts a claim that in fairness requires examination of protected communications." *Favors v. Cuomo*, 285 F.R.D. 187, 199 (E.D.N.Y. 2012) (internal quotation omitted).

Defendants have repeatedly asserted privilege over matters in which they have in other contexts made assertions central to their defenses in this matter. For example:

>    (i)    Defendants have asserted in interrogatory responses that the 2021 Enacted Plan was drafted and adopted pursuant to six redistricting criteria, *see* Ex. 10 (excerpt of DOJ interrogatory responses), but are withholding all documents that would confirm whether that is in fact the case, *see, e.g.*, Ex. 4 at Doc IDs

---

[11] Plaintiffs contend implied waiver covers all challenged documents concerning the 2021 redistricting process, *i.e.,* all challenged documents from Doc IDs 52 (1/25/2021) to 457 (12/10/2021) in Exhibit 4.

59–60, 128–130, 139, 146, even though all three Commissioners who voted in favor of the plan in effect testified they considered *different* criteria in adopting the map. *See* Ex. 1 (Henry Dep. 249:16–20); Ex. 7 (Apffel Dep. 136:5–137:21); Ex. 9 (Giusti Dep. 53:2–21).

(ii)     Judge Henry and Commissioners Apffel and Giusti have asserted that they relied on Oldham to draw their map and were therefore assured it would be "legal," *see* Ex. 1 (Henry Dep. 140:3–20); Ex. 7 (Apffel Dep. 103:5–9); Ex. 9 (Giusti Dep. 54:13–55:5), but are withholding (and refusing to testify) about the specific instructions provided to Oldham or Bryan or parameters given, all under the guise of privilege. *See* Ex. 4 at Doc IDs 59–61.

(iii)    Defendants have produced shapefiles for draft maps from mid-October, which NAACP Plaintiff's expert has determined are identical to the final map proposals, *see* Ex. 2 (Cooper Rep. ¶¶ 52 n.18, 70 n.25), but have withheld the "first drafts" of these maps under the guise of privilege. *See* Ex. 4 at Doc IDs 61–65.

It is fundamentally "unfair for a party asserting contentions [of good faith] to then rely on its privileges to deprive its adversary of access to material that might disprove or undermine the party's contentions." *Nguyen*, 197 F.3d at 207 n.18; *see also Favors*, 285 F.R.D. at 199 (party may not "use[] an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion" (internal quotation omitted)); *Charalambopoulos v. Grammer*, No. 14-CV-2424-D, 2017 WL 1094394, at *4 (N.D. Tex. Mar. 8, 2017) ("[P]arties . . . may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials.") (citation omitted).

The application of implied waiver here is especially strong because the Commissioners Court's actions and members' testimony indicate a conscious effort to avoid deliberating about redistricting in public in contravention to public disclosure requirements. Judge Henry, Commissioner Apffel, and Commissioner Giusti all admit to

consciously avoiding meeting with Oldham or one another in a quorum—which would trigger Texas Open Meetings Act ("TOMA") requirements to hold a public meeting with advance notice to the public. *See, e.g.*, Ex. 1 (Henry Dep. 214:19–25); Ex. 7 (Apffel Dep. 129:2–130:5); Ex. 9 (Giusti Dep. 104:14–21). This directly contravenes TOMA's express prohibition on officials engaging in a "series of communications" while knowing that, if those communications occurred at the same time and place, they would "constitute a deliberation" between a quorum of members. *See* Tex. Gov. Code § 554.143. "[F]airness is the critical consideration when evaluating whether a party has waived the attorney-client privilege," and for government actors to avoid deliberating in public about such a vital topic—with such dire consequences for Black and Latino constituents—constitutes obvious unfairness. *Doe 1 v. Baylor Univ.*, 320 F.R.D. 430, 440; *see also Reed v. Baxter*, 134 F.3d 351, 356 (6th Cir. 1998) ("The government privilege stands squarely in conflict with the strong public interest in open and honest government").

Accordingly, the doctrine of implied waiver independently requires disclosure of withheld communications; to hold otherwise would be to deprive Plaintiffs' access to materials that might disprove or undermine Defendants' own assertions.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion to compel and order production of documents identified in Exhibit 16. Plaintiffs further request that the Court award reasonable expenses and attorney's fees incurred in making the Motion pursuant to Rule 37(a)(5)(A) of the Federal Rules of Civil Procedure. Respectfully submitted this 9th day of February, 2023.

/s/ Valencia Richardson
Mark P. Gaber*
Simone Leeper*
Valencia Richardson*
Alexandra Copper*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
sleeper@campaignlegal.org
vrichardson@campaignlegal.org
acopper@campaignlegal.org

Sonni Waknin*
Bernadette Reyes*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
sonni@uclavrp.org
bernadette@uclavrp.org

Chad W. Dunn (Tex. Bar No. 24036507)
Brazil & Dunn
4407 Bee Cave Road
Building 1, Ste. 111
Austin, TX 78746
(512) 717-9822
chad@brazilanddunn.com

Neil G. Baron
Law Office of Neil G. Baron
1010 E Main Street, Ste. A
League City, TX 77573
(281) 534-2748
neil@ngbaronlaw.com

**COUNSEL FOR
PETTEWAY PLAINTIFFS**
*admitted *pro hac vice*

/s/   Sarah Xiyi Chen
**TEXAS CIVIL RIGHTS PROJECT**
Attorney-in-Charge
Hani Mirza
Texas Bar No. 24083512
Joaquin Gonzalez*
Texas Bar No. 24109935
Sarah Xiyi Chen*
California Bar No. 325327
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
hani@texascivilrightsproject.org
joaquin@texascivilrightsproject.org
schen@texascivilrightsproject.org

**SOUTHERN   COALITION   FOR
SOCIAL JUSTICE**
Hilary Harris Klein*
North Carolina Bar No. 53711
Adrianne M. Spoto*
DC Bar No. 1736462
1415 W. Hwy 54, Suite 101
Durham, NC 27707
919-323-3380 (Telephone)
919-323-3942 (Facsimile)
hilaryhklein@scsj.org
adrianne@scsj.org

**WILLKIE   FARR   &   GALLAGHER
LLP**
Richard Mancino*
New York Bar No. 1852797
Michelle Anne Polizzano*
New York Bar No. 5650668
Andrew J. Silberstein*
New York Bar No. 5877998
Molly Linda Zhu*
New York Bar No. 5909353
Kathryn Carr Garrett*
New York Bar No. 5923909
787 Seventh Avenue

26

New York, New York 10019
212-728-8000 (Telephone)
212-728-8111 (Facsimile)
rmancino@willkie.com
mpolizzano@willkie.com
asilberstein@willkie.com
mzhu@willkie.com
kgarrett@willkie.com

JoAnna Suriani*
DC Bar No. 1645212
Diana C. Vall-llobera*
DC Bar No. 1672102
1875 K Street, N.W.
Washington, DC 20006-1238
(202) 303-1000 (Telephone)
(202) 303-2000 (Facsimile)
jsuriani@willkie.com
dvall-llobera@willkie.com

**SPENCER & ASSOCIATES, PLLC**
Nickolas Spencer
Texas Bar No. 24102529
9100 Southwest Freeway, Suite 122
Houston, TX 77074
713-863-1409 (Telephone)
nas@naslegal.com

***COUNSEL FOR NAACP PLAINTIFFS***
*admitted *pro hac vice*

**CERTIFICATE OF CONFERENCE**

I HEREBY CERTIFY that I conferred with counsel for Defendants regarding the filing of this Motion in a conference before the Court on January 30, 2023, and as previously certified in the joint letter filed with the Court, Doc. 97, and that Defendants oppose the relief requested herein.

/s  *Sarah Xiyi Chen*

**CERTICATE OF SERVICE**

I HEREBY CERTIFY that on February 9, 2023, the foregoing document was filed electronically (via CM/ECF), and that all counsel of record were served by CM/ECF.

/s   *Sarah Xiyi Chen*