# EXHIBIT 1

*Excerpts of January 17, 2023, Deposition of*

*County Judge Mark Henry*

Page 1

1           IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                    GALVESTON DIVISION
3

    HONORABLE TERRY            )
4   PETTEWAY, et al.           )
                               )  Case No. 3:22-cv-00057
5   VS.                        )
                               )
6   GALVESTON COUNTY, et       )
    al.                        )
7

8       ORAL AND VIDEOTAPED DEPOSITION OF MARK A. HENRY
                      JANUARY 17, 2023
9

10          ORAL AND VIDEOTAPED DEPOSITION OF MARK A. HENRY,
11   produced as a witness at the instance of the Plaintiff and
12   duly sworn, was taken in the above styled and numbered
13   cause on Tuesday, January 17, 2023, from 9:08 a.m. to
14   6:07 p.m., before Janalyn Elkins, CSR, in and for the
15   State of Texas, reported by computerized stenotype
16   machine, via Zoom, pursuant to the Federal Rules of Civil
17   Procedure and any provisions stated on the record herein.
18
19
20
21
22
23
24
25

Page 71

1      Q.   But also to keep Galveston County red?

2      A.   I truly do what I can for all of the

3   candidates.  So -- so Republican candidates, of course.

4      Q.   And what about personally, is it a personal

5   goal of yours to keep Galveston County red?

6      A.   I believe that we have demonstrated good

7   governance and would like to keep it that way, yes.

8      Q.   Why in your mind -- well, let me ask you this.

9           Is Galveston at any risk of not staying

10   red?

11      A.   I don't know.  I wouldn't think so, but I don't

12   know.

13           MS. KLEIN:  All right.  This is where we

14   could take a break, but I'm happy to just keep on going

15   on.

16           THE WITNESS:  Keep going.

17           MS. KLEIN:  Okay.  Is that okay with the

18   other parties?

19      Q.   (BY MS. KLEIN)  All right.  We're going to

20   switch gears a little bit.  We're going to talk about --

21   I'm going to ask you about redistricting in 2011.

22      A.   Okay.

23      Q.   So you served as county judge during the

24   redrawing of Commissioner's Court precincts in 2011,

25   right?

1       A.   Correct.

2       Q.   So I'm going to talk about this and I'm going

3   to say the 2011 redistricting process to talk about

4   that --

5       A.   Okay.

6       Q.   -- and I will be talking about Commissioner's

7   Court unless I specify otherwise.

8       A.   Okay.

9       Q.   Does that make sense?

10      A.   So we're not -- unless you say otherwise, we're

11  not talking about JP precincts?

12      Q.   Correct.

13      A.   All right.  Got it.

14      Q.   Do you remember signing an engagement letter

15  with attorneys to help you with 2011 redistricting

16  process?

17      A.   Do I remember exactly doing it, no.  But I

18  remember it happening, yes.

19           MS. KLEIN:  Okay.  Can we please put up

20  Tab 116?  And this will be marked as Exhibit 7.

21           (Exhibit No. 7 was marked.)

22      Q.   (BY MS. KLEIN)  That first page says

23  Addendum -- Agenda Item 12.  Do you recognize what that

24  might mean?

25      A.   That's generally what would come before the

Page 73

```
 1     backup.  So the agenda item would have been No. 12 and
 2     this would have been probably the backup for that item
 3     for any commissioner to look at or any public member as
 4     well.
 5          Q.  When you say, "backup," do you mean the meeting
 6     package?
 7          A.  That would be a term for it, yes.
 8          Q.  Okay.  And is that publicly posted?
 9          A.  Yes.
10          Q.  Is it publicly posted at the same time as the
11     agenda?
12          A.  As far as I know, yes.
13          Q.  In general, not this specific time, but in
14     general it's posted?
15          A.  Yes.
16          Q.  Okay.  So if we scroll down to the second page,
17     this document is dated May 16, 2011.  It's addressed to
18     you, right?
19          A.  Uh-huh.  Yes.
20          Q.  And it says -- the subject is 2011
21     Redistricting of Galveston County Commissioner's
22     Precincts and it also says Justice of the Peace
23     Precincts, Constable Precincts, Election Precincts, and
24     Preclearance Submission Project Engagement Letter.  That
25     is a big title.
```

1      A.   Right.

2      Q.   What is meant by preclearance there?

3      A.   Not being a lawyer, I'm going to assume that

4   this is part of the Voting Rights Act preclearance that

5   would have been required in 2011.

6           MS. KLEIN:  Okay.  So let's scroll through

7   slowly all the way to the end, Alexa.

8      Q.   (BY MS. KLEIN)  And this isn't a signed

9   version.  But is there any reason you would think that

10  this is not the version that was ultimately executed?

11     A.   No, that's probably it.

12     Q.   Okay.  Going back to the first page, and

13  there -- that one, two, three, third paragraph says, Joe

14  Nixon, Trey Trainor, and Dale Oldham, attorneys at law,

15  365 per hour.

16          Do you see that?

17     A.   Yes.  It's just bouncing around.  I see it now.

18     Q.   Those were the lawyers that worked on the

19  Galveston County commissioner's precincts for

20  redistricting in 2011?

21     A.   That is correct.

22     Q.   Okay.  We can take that down.

23          Do you remember what timeline restricting

24  of commissioner's precincts had to be completed by in

25  the 2011 redistricting process?

Page 132

1    on the Commissioner's Court meeting agenda in

2    January 2021?

3         A.   I don't remember that, but it sounds right.

4         Q.   Okay.  I can -- I can pull it up if you -- if

5    you need -- if you want me to.  I can pull it up.  I'm

6    willing to represent it --

7         A.   Okay.

8         Q.   -- for the record.  Do you remember that that

9    item was deferred at that time?

10        A.   I don't remember that.

11        Q.   Okay.  Do you remember why it might have been

12   deferred?

13        A.   Since I don't remember it being deferred, I

14   don't remember why.

15        Q.   All right.  They were eventually -- Holtzman

16   Vogel, redistricting counsel, and Dale Oldham were

17   eventually approved and retained by the Commissioner's

18   Court in April of 2021.  Does that timing sound right to

19   you?

20        A.   Sounds about right.

21             MS. KLEIN:  Let's go to Tab 31, please,

22   Alexa.  This will be Exhibit 17.

23             (Exhibit No. 17 was marked.)

24        Q.   (BY MS. KLEIN)  Do you recognize this document?

25        A.   It appears to be one of our agendas for

1    April 5th in this case.

2         Q.  And scroll down -- if we could scroll down to

3    Item 11, please.  And can you read Item 11?

4         A.  (Reading:)  Consideration of approval of an

5    engagement of counsel based on 2020 census submitted by

6    county judge.

7         Q.  Do you recall if there's a meeting package for

8    this meeting?

9         A.  What do you mean a meeting package?

10        Q.  What we talked about before, the materials

11   associated --

12        A.  Oh, the backup.

13        Q.  The backup, you call it the backup.  I'll call

14   it the backup now, too.

15             Do you recall if there's a backup for this

16   meeting?

17        A.  There's a backup for every meeting, not every

18   single item has got a backup document to go with it.

19        Q.  Do you remember if this item had a backup

20   document?

21        A.  No, I don't remember.

22        Q.  Okay.  I'm going to actually take the time to

23   take you to that.

24        A.  Okay.

25             MS. KLEIN:  Or you know, I can save the

Page 134

1    time if counsel is willing to represent that we don't

2    need to authenticate the backup that we got from the

3    county website.

4             MR. RUSSO:  In terms of, like, authenticate

5    it and ask him if it's a county --

6             MS. KLEIN:  If it's accurate, the version

7    that was posted on the county website is accurate.

8             MR. RUSSO:  I can't tell you that I've seen

9    it, frankly.  So it's hard for me to make the

10    representation.

11      Q.  (BY MS. KLEIN)  All right.  That's fair.  We'll

12    do it -- Doc 32.  Just trying to save --

13             MR. RUSSO:  I understand.

14      Q.  (BY MS. KLEIN)  Let's pull up Doc 32, so it

15    will be Exhibit 18.

16             (Exhibit No. 18 was marked.)

17      Q.  (BY MS. KLEIN)  And this -- this is a large

18    document so it is going to take a little bit of time.

19    But while we're waiting for it -- for to load, who

20    decides what will be in the backup?

21      A.  Dianna, although we -- you know, to the extent

22    possible, we like everything to have backup if we can.

23    Just that all things -- we don't get some things in on

24    time.  Some things you can't really put a backup to,

25    appointments, for example.  So some things just don't

1    have a backup or can't -- doesn't get there quick

2    enough.

3         Q.  So we saw that it was Item Agenda 11.  Do you

4    remember that?

5         A.  Yes.

6         Q.  So when this loads, it's a big file, but when

7    it loads, I'm going to take you to PDF pages 239, if you

8    could scroll to that.  And it says Agenda Item 10.  Do

9    you see that?

10        A.  Yes.

11        Q.  And if we keep scrolling please and keep

12   scrolling to the next page, please.  And then it says

13   Agenda Item 12, right?

14        A.  Yes.

15        Q.  So it appears there's no backup materials for

16   Agenda Item 11, correct?

17        A.  Correct.

18        Q.  Do you remember why no backup materials?

19        A.  No, I have no idea.

20        Q.  So the -- for example, the -- you know, the

21   proposed retainer agreement was not included in this

22   agenda packet, correct?

23        A.  It doesn't appear that way, correct.

24        Q.  And if we go back to Exhibit 17, the agenda

25   itself, and you just read that.  Do you remember it

```
                                                Page 136
 1   saying who the attorneys that were proposed counsel
 2   would be?
 3         A.  No, I don't remember.
 4         Q.  So let's scroll to -- again, back to Agenda
 5   Item 11.  Does it say anywhere on this?
 6         A.  No.
 7         Q.  So would a member of the public from these
 8   public materials know who the proposed redistricting
 9   counsel would be?
10         A.  I wouldn't think so.
11         Q.  Is there any other way they might know who
12   redistricting counsel would be?
13               MR. RUSSO:  Objection, calls for
14   speculation.
15               THE WITNESS:  I don't know.
16         Q.  (BY MS. KLEIN)  I mean, you know what
17   information is posted about the commissioner court
18   meeting you preside over before?
19         A.  Right.  And we're required to publish the item
20   to be considered, not the details of every transaction.
21         Q.  But didn't you just say that you try to include
22   things whenever you can for the backup?
23         A.  Yes.
24         Q.  So do you know why you chose not to include the
25   draft?
```

Page 137

1              MR. RUSSO:  Objection, asked and answered.

2              THE WITNESS:  It becomes a public document.

3     We're not trying to hide anything.

4         Q.  (BY MS. KLEIN)  But you agree you didn't --

5     it's not included in the notice material?

6         A.  I agree it did not get into the backup at the

7     time of the posting.

8         Q.  So someone would have to actually go to the

9     meeting to understand who the proposed counsel were

10    going to be, right?

11        A.  Or what's online.

12        Q.  So if somebody, say, objected to using the same

13    counsel as last redistricting cycle, they wouldn't have

14    known that unless they had chosen to show up to the

15    meeting to find out, correct?

16             MR. RUSSO:  Objection, calls for

17    speculation.

18             THE WITNESS:  I assume so.

19        Q.  (BY MS. KLEIN)  Do you think -- strike that.

20             Does it surprise you that the January 25th

21    meeting where we talked about how the item was deferred

22    that it was not in that meeting packet either?

23             MR. RUSSO:  Objection, calls for

24    speculation.

25             THE WITNESS:  No.

Page 138

1      Q.  (BY MS. KLEIN)  Other than Dale Oldham, do you
2  know of any other counsel who worked -- who represented
3  you in the 2021 process that also specifically had
4  worked with you in 2011 on the redistricting process?
5      A.  No, I -- no.
6      Q.  Do you remember what discussion, if any, there
7  was in the April 2021 meeting where you decided to
8  retain counsel what discussion there was at that meeting
9  about retaining counsel?
10      A.  There was no discussion.  It's on consent.
11      Q.  Which means it just goes to a vote?
12      A.  Right.
13      Q.  Do you remember the vote on this item?
14      A.  I do not.  Unless someone pulled it off, it was
15  everyone present, but I don't know who was present at
16  that meeting.
17      Q.  Let's go to the meeting minutes for this.
18  That's Tab 33.  And this will be Exhibit 19.
19              (Exhibit No. 19 was marked.)
20      Q.  (BY MS. KLEIN)  Do you want to guess who voted
21  for and who voted against?
22      A.  Was it --
23              MR. RUSSO:  Objection, calls for
24  speculation.
25              THE WITNESS:  Was it removed from consent

Page 139

1    agenda?

2         Q.   (BY MS. KLEIN)  Let's scroll to -- let's scroll

3    to 11, Item 11 here, it says, (Reading:)  Consideration

4    of approval of an engagement of counsel based on 2020

5    census submitted by county judge.  Motion to approve

6    consent agenda Item 11 only by County Judge Henry,

7    seconded by Commissioner Giusti and it says passed 4-1.

8         A.   Okay.  So it was pulled off consent agenda and

9    Commissioner Holmes voted against it.

10        Q.   Do you know why he voted against it?

11        A.   Do not.

12        Q.   Was there -- if it was pulled off consent

13   agenda, was there discussion about it?

14        A.   There could have been.  If it's pulled off

15   consensual, you're allowed to discuss it now.  That

16   doesn't mean there has to be.  And I'll just tell you

17   many, many times Commissioner Holmes will say just pull

18   it off because I'm going to vote against it.

19        Q.   Okay.  Do you remember if there was discussion

20   about it in this meeting?

21        A.   No, I don't remember.

22        Q.   All right.  So you eventually retained the

23   counsel.  I'd like to show you that engagement letter.

24        A.   Okay.

25        Q.   That's -- and we can pull this down.  And let's

Page 140

```
1    pull up Document 34.  This is going to be Exhibit 20.
2              (Exhibit No. 20 was marked.)
3         Q.  (BY MS. KLEIN)  While we're waiting for it to
4    load, let me ask you, what was your expectation for the
5    scope of work your redistricting counsel would provide
6    for you in the 2021 redistricting process?
7         A.  What was my expectation about the scope of his
8    work?
9         Q.  What did you think Holtzman Vogel was going to
10   do for you with respect to the 2021 redistricting
11   process?
12        A.  I -- well, I want to be clear that my belief
13   was that Dale was really the person that I was hiring.
14   Holtzman Vogel comes with him.  I understand that.  But
15   that Dale would get us a legally compliant map that gets
16   us in balance for the -- with the census data we have
17   available.
18        Q.  So your understanding was that Dale would draft
19   the map for you?
20        A.  Yes.
21        Q.  Did you have the understanding he would draft
22   several maps for you?
23        A.  I don't know that I gave him an upper and lower
24   limit.  The more maps he drafts, the more he charges us.
25   But, you know, it could be more than one.
```

Page 141

1          Q.  Did you give him any concept maps or

2     description before he started drafting?

3          A.  Concept maps, no, I don't know how to do that.

4     Drafts -- I'm sorry.  Direction --

5                    MR. RUSSO:  Before you complete, facts

6     related to the representation, legal -- the legal

7     services are okay, but don't provide or disclose

8     communications between you and Mr. Oldham specifically

9     related for legal services.

10                    THE WITNESS:  Well, I think that's what I

11    would be answering.

12                    MR. RUSSO:  Well, the difference being the

13    facts as to -- again, you talked about what he was

14    supposed to do for you.

15                    THE WITNESS:  Okay.

16                    MR. RUSSO:  That's fine.  But how he's

17    going to do it is a different question.  Do you

18    understand?

19                    THE WITNESS:  Yes, I think.

20         Q.  (BY MS. KLEIN)  Let me separate this out.  I'm

21    not going to ask you about what Dale thought about the

22    legal requirements.  I'm not going to ask you what

23    Mr. Oldham thought, you know, about what was legally

24    required or advice he gave you specifically.

25                    But I do want to know about, you know, the

1    drafting process, just the maps and the ideas you had,

2    not about whether they were legal or not or anything,

3    but just if you had an idea geographically -- putting

4    all the legal stuff aside if you had an idea

5    geographically that you shared with Mr. Oldham when you

6    retained him about what the maps or proposed maps should

7    look like?

8                    THE WITNESS:  Is that okay?

9                    MR. RUSSO:  There's no question pending.

10   She's just making a statement so...

11       Q.  (BY MS. KLEIN)  So I'll ask the question.  Did

12   you share with him any geographic concept ideas about

13   what one or more proposed maps should look like?

14                   MR. RUSSO:  Again, you can answer in hiring

15   and what the general retainage was about and for.  But

16   specifics as to him providing legal services or

17   financial matters or what the facts could be related to

18   specific advice he was providing are off the table.

19                   THE WITNESS:  Well, then I guess I can't

20   answer that.

21                   MS. KLEIN:  Okay.  I'm going to interpose,

22   just for the record preserve the right -- because I

23   understand this is related to an issue that's pending

24   before the Court.  So -- so I'm going to just preserve

25   the right to ask that question again if we get a

Page 143

1    different determination from the Court in the future on

2    this issue.  But I'm going to keep asking this line of

3    questions and just to preserve our rights.

4                    MR. RUSSO:  I understand.

5                    MS. JAYARAMAN:  Hi, this is Tharuni

6    Jayaraman for the United States.  The United States also

7    joins in preserving.

8                    MS. RICHARDSON:  Petteway plaintiff joins

9    in the reservation as well.

10       Q.  (BY MS. KLEIN)  Apart from wanting a legal map,

11   did you have any other goals or objectives for how the

12   county commissioners' new precincts should look?

13                   MR. RUSSO:  Same reservation in terms of

14   the attorney-client privilege.  To the extent that you

15   can describe the general retainage, that's okay.  I

16   would waive --

17                   THE WITNESS:  Can I step out and ask him a

18   question?  Because I don't know -- I just don't know if

19   this is privileged or not.

20                   MS. KLEIN:  We can go off the record if you

21   want.

22                   THE WITNESS:  Yes.

23                   MS. KLEIN:  But before that, let me just

24   clarify.  That question, I didn't ask anything about an

25   attorney anywhere.  I'm just asking about Judge Henry's

```
                                          Page 158
 1    would -- the data was going to come out in August?

 2                 MR. RUSSO:  Objection, calls for -- I'm

 3    sorry.  Improper hypothetical or incomplete

 4    hypothetical.

 5                 THE WITNESS:  Yeah.  I don't know how you

 6    can set a timeline when you don't know for sure when

 7    you're going to have information to work with.

 8         Q.  (BY MS. KLEIN)  But they had announced August,

 9    correct?

10         A.  And they often get things wrong.

11         Q.  But you could have, for example, planned to put

12    redistricting on, you know, regular meeting agendas, for

13    example, at that time, right?

14         A.  For what purpose?  No.  I don't know what you

15    would do.  Once we have accurate precinct data, then

16    it -- you know, we're not his only client,

17    unfortunately.  He's going to have to work us in with

18    everyone else and we'll get drafts back at some point.

19                 But putting it on the agenda just because

20    the Census Bureau provides the corrected information,

21    what would the agenda item even be?  There's nothing

22    there to do.

23         Q.  You remember earlier we talked about what had

24    happened in the 2011 process and there was that

25    August 2, 2011 presentation about the census data in one
```

Page 159

1     of the regular meetings.  Do you remember that?

2          A.  Not really, but, okay, I'm sure it happened.

3          Q.  You know, did you plan on having a similar

4     presentation about the census data, you know, maybe the

5     next September meeting, for example?  At this time did

6     you make any plans like that saying, okay, the data is

7     going to be released in August so the first regular

8     meeting in September we'll have our presentation like we

9     did last cycle of census demographics for the county?

10         A.  No, because we wouldn't have -- we wouldn't

11    have known for sure when to plan that.  And we don't --

12    we don't put things on the agenda six months for now.

13    We put things on the agenda for next Monday.

14         Q.  Okay.  Well, let me ask you this.  When the

15    data did come out in August, did you put that on the

16    agenda?

17         A.  For what purpose?  No.  But I don't know what

18    purpose we would put it on the agenda for.

19         Q.  To have a meeting to describe the census data

20    as you had, you know, last cycle in 2011, did you put

21    that on the agenda ever?

22         A.  No.

23         Q.  Do you remember why not?

24         A.  No one asked me -- no attorney told me we

25    should do this.

1        Q.  Did you make any announcement publicly -- not

2    in just a meeting, but did you make any public

3    announcement to Galveston residents about what the

4    census data had to say about Galveston?

5        A.  I don't think so.

6        Q.  Did you see any analysis of that census data

7    yourself?

8        A.  When it first came out?  No.

9        Q.  What about later?

10       A.  I suspect I would only have seen any

11   information relating to a proposed map is my guess.

12       Q.  So other than counsel, did you see any summary

13   of the census data for Galveston?

14       A.  No.  Other than I did see the general

15   population, the total population.

16       Q.  When did you see that?

17       A.  Whenever that came out I saw it.  I'm assuming

18   August or September.

19       Q.  So turning back to Ms. Johnson, do you remember

20   her following up again with your office after the census

21   data was released?

22       A.  I remember that she was asking for at least a

23   part-time personnel for input data.  Other than that, I

24   don't recall anything else.

25       Q.  All right.  Let's pull up that document.  It's

Page 214

```
 1         Q.   (Reading:)  Please submit your support for
 2    proposed map 2.  This map creates a much needed coastal
 3    precinct.  Having a coastal precinct will ensure that
 4    those residents directly along the coast have a
 5    dedicated advocate on Commissioners Court.
 6                   So is it fair to say that by October 29th
 7    you had decided you're going to vote for Map 2?
 8         A.   Having had -- having no reason not to,
 9    probably.
10         Q.   What do you mean, "no reason not to"?
11         A.   In short of someone coming in and saying, hey,
12    it turns out that Map 2 is out of population deviation,
13    it's got a problem with something, some other problem,
14    then, yes.
15         Q.   Sorry.  I'm just trying to eliminate questions
16    we might have already covered.  If you'll give me a
17    moment.
18         A.   Okay.  That's fine.
19         Q.   So is it true that the first time a quorum of
20    commissioners met in the same room to discuss the draft
21    maps was the November 12, 2021 hearing?
22         A.   I believe that would be correct, yes.
23         Q.   Is there any other possibility you can think of
24    other than that hearing beforehand?
25         A.   No, I don't think so.
```

```
 1        Q.  And you had taken great care to make sure that
 2   that was the first time everybody met to discuss the
 3   maps together, right?
 4        A.  Correct.  We would not have been able to meet
 5   short of a posted meeting.
 6        Q.  Are you aware of whether any other commissioner
 7   prepared a proposed map that was not posted on this
 8   website?
 9        A.  At the November 12th meeting Commissioner
10   Holmes introduced two maps that we saw -- all saw for
11   the first time there.
12        Q.  And when did you learn that Commissioner Holmes
13   would have his own proposal?
14        A.  When he stood up and introduced it.
15        Q.  Are you -- do you know why that wasn't one of
16   the drafts that Dale had put together in the beginning?
17        A.  I do not know.
18        Q.  Do you remember that Commissioner Holmes also
19   passed out an RPV study at that November 12th hearing?
20                MR. RUSSO:  Objection, calls for
21   speculation.  Vague and ambiguous.
22                MS. KLEIN:  I will --
23                MR. RUSSO:  At least ask him what that is.
24        Q.  (BY MS. KLEIN)  I'll clarify.  Are you aware of
25   what racially polaris voting study is?
```

Page 248

1    Interrogatory 1.  It says -- sorry, the Interrogatory

2    No. -- the Supplemental Response.

3                    MS. KLEIN:  Sorry, Alexa, just a little bit

4    further down.  Thank you.

5        Q.  (BY MS. KLEIN)  (Reading:)  Defendants state

6    that the Galveston County Commissioners Court considered

7    the following factors in adopting the 2021 redistricting

8    plan.

9                    If you never talked about this with the

10   other commissioners, how do you know that that statement

11   is true and accurate?

12       A.  That would be a question that I think that the

13   lawyers would have posed to other commissioners.

14       Q.  But you -- when you signed this document, you

15   didn't know whether that was true, right?

16       A.  Whether what is true, that if the lawyers

17   talked to them?

18       Q.  No.  That the Galveston County Commissioner's

19   Court considered these factors.

20                   MR. RUSSO:  Counsel, are you taking issue

21   with the lawyers preparing the response on behalf of the

22   County?

23                   MS. KLEIN:  No.  I'm --

24                   MR. RUSSO:  -- because that's what

25   happened.

Page 249

1           MS. KLEIN:  I'm asking how he knew it was
2      true that the Commissioner's Court considered these
3      criteria if he never was able to confirm that.
4                MR. RUSSO:  You know that he's got to rely
5      on counsel's discussions with other folks.  There's
6      one -- he's one person that's verifying the responses.
7      This is a ridiculous line of questioning.
8           Q.  (BY MS. KLEIN)  I'm just -- I'm going to go
9      through and X out things that we've already covered if
10     you'll give me a little bit -- a moment.
11          A.  Yeah, sure.
12          Q.  So fair to say you never discussed these six
13     listed criteria with the other commissioners directly?
14          A.  I may have discussed them with one.  But
15     certainly not more than one.
16          Q.  Did you apply these criteria when you were
17     providing input on draft maps as they're stated here?
18          A.  The first one, absolutely, and then after that
19     the coastal precinct was the only other factor that I
20     would have said.
21          Q.  Let's -- I'm going to follow up on that voting
22     precinct issue and then we'll move on.
23                MS. KLEIN:  Alexa, could you -- can you
24     scroll down to Interrogatory No. 2, please?  Try to be
25     quick about this.

1              MR. RUSSO:  Yeah.  I'm sorry.  I'm just --

2     which conversation are you speaking about?

3         Q.  (BY MS. KLEIN)  Right before the break I was

4     asking, you know, with respect to your awareness of, you

5     know, racial breakdown by Map Proposal 2 district and

6     your awareness of that.

7              And you said that you couldn't answer -- if

8     I remember correctly, you said you couldn't answer

9     because it was told to you, whatever you knew was told

10    to you by your attorneys.  Do you remember that?

11        A.  Yes.

12        Q.  So which is who, which attorneys is what I'm

13    asking?

14             MR. RUSSO:  You can answer that.

15             THE WITNESS:  Dale Oldham primarily.  To a

16    lesser extent Joe Nixon in 2011-2012.

17        Q.  (BY MS. KLEIN)  Okay.  And Just to clarify the

18    privilege objection and whether or not you're going to

19    answer, so you -- your position is you are not willing

20    to confirm whether you were aware of any of these, you

21    know, racial data or partisan data facts at a later date

22    after learning them from an attorney, correct?

23             MR. RUSSO:  Well, let me just tell you what

24    my objection is.  It's not to reveal conversations that

25    he or information he got from the attorney.  If he got

Page 262

1   it later from someplace else, that's -- that's not what

2   we're objecting to.  It's not a point in time, in other

3   words.  It's who the conversation was with.

4       Q.  (BY MS. KLEIN)  So you are not willing --

5   pursuant to your counsel's instruction, you are not

6   willing to tell me whether you were aware of a

7   particular fact if that fact was told to you by your

8   attorney?

9              MR. RUSSO:  That's like it's an

10  oversimplification of our objection but...

11             THE WITNESS:  And I will also say that

12  that's the only place I got the information from.  So

13  there was not a point where someone else gave me

14  information that would not be privileged information.

15      Q.  (BY MS. KLEIN)  So you are not willing to say

16  whether or not you were aware of a fact later if that

17  fact was told to you by counsel and only counsel?

18      A.  I guess, yes.

19             MS. KLEIN:  So is that attorney-client

20  privilege?

21             MR. RUSSO:  That's -- I think that's an

22  oversimplification.  What we would need to get into this

23  is particular questions on the record or -- we've had

24  this conversation.  You've asked questions and we've

25  objected.  To be able to just sort of incapsulate the

Page 263

1   argument here, I mean, you can look at the letter brief

2   and go into the witness with it is probably improper.

3   But the point is it's going to -- it dependent upon the

4   question that you're asking the way you're asking him.

5              MS. KLEIN:  I am going to be fully

6   forthright that I do not understand your privilege

7   objection and the basis for it.  So I am trying to

8   understand that you are instructing your -- and you're

9   not the witness in this and that's why I'm talking to

10  him because he's following your advice.

11             But -- and I want to make sure he

12  understands what he is not willing to provide.  I want

13  to make sure the witness understands what testimony he

14  is not willing to provide in this deposition.  So that's

15  why I'm going through him.  I'm not trying to get

16  between you two.

17             MR. RUSSO:  Sure.

18             MS. KLEIN:  And I'm -- I'm just confirming

19  that if he was shown -- if he was shown partisan data

20  from his attorney, he is not willing to testify about

21  his awareness of that partisan data at a later date

22  because he says he only got it from his attorney.  Am I

23  understanding it correctly?

24             MR. RUSSO:  No, again.  That's over --

25  overly simplified.  The point of the objection and the

Page 264

1    privilege is to prevent disclosure of communications

2    related to the provision of legal services.  So to the

3    extent that the facts are provided with a specific

4    regard and primarily for the purpose of providing legal

5    services, those communications are not going to be

6    disclosed.

7              MS. KLEIN:  So if I don't -- I don't care

8    about the context of this.  I don't care if he was --

9    why he was reviewing them.  I don't care what questions

10   about legal advice he was -- I don't care about any of

11   that.

12             All I want to know is if at a later date

13   and specifically when he was choosing Map Proposal 2, I

14   want to know what data he was aware of at the point he

15   was choosing Map Proposal 2, which I believe was, based

16   on our testimony, around October 29th when he made that

17   Facebook post.

18             MR. RUSSO:  Right.  And here's the answer

19   to my response and this is what I've instructed the

20   witness.  To the extent that provision of data or facts

21   is balled up with Mr. Oldham providing legal services,

22   he can't answer that question.  If it's just here's some

23   facts, that's it.  That's a different story.  If it's

24   just here, look at the -- look at the data.

25             MS. KLEIN:  But I'm not asking for the

Page 265

1    context of them at all.  I'm not going to follow up --

2                   MR. RUSSO:  I get it.  And the problem is

3    is that we've got to rely on the witness to say the

4    communication basically was part of providing legal

5    services, and I think he's established that.

6                   But -- so the idea or notion that, well,

7    you know, there are objections just based upon one thing

8    or another is -- again, it's oversimplifying.

9                   MS. KLEIN:  All right.  Maybe I'll just

10   probe a little bit.

11       Q.  (BY MS. KLEIN)  How was the discussion of

12   partisan data part of the provision of legal advice?  I

13   mean, was -- let me ask this first.

14                  Was any discussion you had with your

15   lawyers about partisan data part of the provision of

16   legal advice?

17       A.  What was that?

18       Q.  Was the -- was any -- you said that you

19   couldn't answer what -- you couldn't answer me what

20   exact partisan data you had seen when you voted for Map

21   Proposal 2 or before you had voted for Map Proposal 2

22   what you were aware of because you had learned that from

23   your attorney.  So let me ask you this.

24                  When you learned that from your attorney,

25   was that part of you seeking or them providing specific

1    legal advice?

2         A.   I'd say yes.  It wasn't strictly -- that's it.

3              MR. RUSSO:  But that's where the privilege

4    applies.

5         Q.   (BY MS. KLEIN)  You know -- so is your

6    understanding that compliance with state and federal law

7    relates to the partisan composition of the precincts

8    you'd be voting on?

9              MR. RUSSO:  Object as speculative and calls

10   for a legal conclusion.

11             THE WITNESS:  So I would ask again.  Am

12   I --

13        Q.   (BY MS. KLEIN)  Was -- is your understanding

14   based on that answer that the partisan composition of

15   the enacted precincts for commissioners you'd be voting

16   on was related to their legal compliance to whether they

17   were legally compliant?

18        A.   I can't say --

19             MR. RUSSO:  You responded that the

20   discussion that you're asking about factually relates to

21   the provision of legal services.  That's all we can

22   provide you.  I mean, that's where the privilege

23   applies.  So I think we've established that.

24        Q.   (BY MS. KLEIN)  So what would you say -- so if

25   you learned certain facts from an attorney, are you

1    saying that you can never discuss that again with

2    anybody?

3         A.   I think that I'd be saying that I am allowed to

4    not discuss that with anybody.

5         Q.   So have you talked with anybody besides your

6    attorneys about the partisan composition of the enacted

7    2021 commissioner's precinct map?

8         A.   I don't know who it would be.  Honestly, most

9    people don't care.

10        Q.   If a constituent asked you, hey, when you voted

11   for Map Proposal 2, did you know that, you know, each

12   commissioner's precinct was going to be a Republican

13   precinct, how would you answer that question?

14        A.   My belief would be yes.

15        Q.   And why would your belief be yes to that

16   question?

17        A.   Because I simply don't think it's possible to

18   draw a precinct that would elect a Democrat without

19   making it look like a handprint as I described it.

20        Q.   And why do you believe that?

21        A.   Just based on the numbers that I see in the

22   general election.  If 34 percent tend to vote Democrat

23   in a gubernatorial year and they're all spread all

24   across the county, you don't have 25 percent in any one

25   location.

Page 374

REPORTER'S CERTIFICATION

DEPOSITION OF MARK A. HENRY

TAKEN JANUARY 17, 2023

1          I, Janalyn Elkins, Certified Shorthand

2     Reporter in and for the State of Texas, hereby certify

3     to the following:

4          That the witness, MARK A. HENRY, was duly

5     sworn by the officer and that the transcript of the oral

6     deposition is a true record of the testimony given by

7     the witness;

8          That the original deposition was delivered to

9     HILARY HARRIS KLEIN;

10         That a copy of this certificate was served on

11    all parties and/or the witness shown herein on

12    _____.

13         I further certify that pursuant to FRCP No.

14    30(f)(i) that the signature of the deponent was

15    requested by the deponent or a party before the

16    completion of the deposition and that the signature is

17    to be returned within 30 days from date of receipt of

18    the transcript.  If returned, the attached Changes and

19    Signature Page contains any changes and the reasons

20    therefor.

21         I further certify that I am neither counsel

22    for, related to, nor employed by any of the parties in

23    the action in which this proceeding was taken, and

                                                          **Page 375**

1      further that I am not financially or otherwise

2      interested in the outcome of the action.

3                  Certified to by me this 20th day of January

4       2023.

5

6

7        JANALYN ELKINS

         Texas CSR 3631

8        Expiration Date 1/31/2023

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25