# EXHIBIT 7

*Excerpts of January 5, 2023, Deposition of Commissioner Darrell Apffel*

Exhibit to Plaintiffs' February 9, 2023 Motion to Compel

Page 1

```
       IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
                  GALVESTON DIVISION
HONORABLE TERRY PETTEWAY,*
ET AL.,                  *
                         *
PLAINTIFFS,              *
                         * CASE NO. 3:22-CV-00057
VS.                      *
                         *
GALVESTON COUNTY, ET AL.,*
                         *
DEFENDANTS.              *


       *******************************************
              ORAL AND VIDEOTAPED DEPOSITION OF
                       DARRELL APFFEL
                      JANUARY 5, 2023
       *******************************************


          ORAL AND VIDEOTAPED DEPOSITION OF DARRELL
   APFFEL, produced as a witness at the instance of
   the PLAINTIFF(S), and duly sworn, was taken in the
   above-styled and numbered cause on JANUARY 5, 2023,
   from 9:17 A.M. to 6:01 P.M., before AMY PRIGMORE,
   CSR, in and for the State of Texas, reported by
   stenographic means, at the offices of GREER HERZ &
   ADAMS, One Moody Plaza 18th Floor, Galveston,
   Texas, pursuant to the Federal Rules of Civil
   Procedure and the provisions stated on the record
   or attached hereto.
```

Page 103

1  commissioners court precincts.
2       Did I read that correctly?
3       Q.  Yes.  Did that definition -- did you
4  understand that definition?
5       A.  That all goes to the law.  And so, I
6  didn't -- I didn't -- I trusted the people that we
7  hired to -- to look at the population and draw the
8  maps in -- as equal as we could get them, and
9  follow the bounds of the law.
10      Q.  Do you understand what packed or stacked
11 mean in the context --
12      A.  I do not.
13      Q.  -- of redistricting?
14          Returning to page 5 of their proposal,
15 towards the top, there is a heading that says,
16 steps in redistricting.
17          Do you see that?
18      A.  I do.
19      Q.  This has a proposal -- you know, a proposed
20 timeline.
21          Did you review this at the time?
22      A.  Same answer.  I don't remember specifically.
23      Q.  Were --
24      A.  Again, this is -- this is two firms touting
25 their experience and ability to redistrict for us.

Page 104

1    And so I was looking at these for price and
2    experience and -- to make my decision.
3        Q.   All right.
4        A.   I assumed we would always follow the law.  I
5    didn't need to know the steps.  I knew that we
6    would.
7        Q.   Were you aware that the law firm Bickerstaff
8    submitted a proposal to Ken Clark to be hired as
9    redistricting counsel in January of 2020?
10       A.   Not if it was just submitted to him, no.
11       Q.   So you did not see a proposal from bur --
12   Bickerstaff?
13       A.   Not that I recall.
14              MS. VALL-LLOBERA:  I would like to
15   introduce Tab 8.
16              THE WITNESS:  9.
17              MR. RUSSO:  It's Tab 9 -- Tab 8, not
18   exhibit.
19              THE WITNESS:  Oh.
20              MS. VALL-LLOBERA:  Thank you for
21   keeping track.
22              I would like to introduce Apffel
23   Exhibit 9.
24              (Exhibit 9 is marked.)
25       Q.   (BY MS. VALL-LLOBERA)  This is January 29,

Page 105

1    2020, e-mail from David Mendez to Ken Clark,
2    regarding redistricting estimate for Galveston
3    County.
4            If you turn to the second page of this
5    exhibit, there is a proposal for redistricting.
6            Have you seen this before?
7        A.   Not that I recall.
8        Q.   If you turn to the third page, there is an
9    actual budget.
10           Do you see that?
11       A.   Hang on just a second.
12               (The witness peruses the document.)
13       A.   Okay.
14       Q.   (BY MS. VALL-LLOBERA)  Does seeing this
15   exhibit refresh your recollection about this
16   proposal?
17       A.   No.
18       Q.   On the last page, do you see what the total
19   is for their proposal?  It's towards the bottom.
20       A.   Yeah, I see that number.  50,370.
21       Q.   And do you see, as part of this proposal on
22   this page, there's a section, Section 5, towards
23   the middle of the page, that refers to public
24   hearings?
25       A.   Yeah, I do.

Page 106

1  Q. Would it be unusual for only one
2  commissioner to get a proposal?
3  A. No.
4  Q. Did you receive any proposals?
5  A. No.
6  Q. Going back to the approval of the contract
7  with Vogel and Oldham, when was -- when was
8  Mr. Oldham's contract approved?
9  A. I believe -- I believe in April.
10 Q. April 2021?
11 A. Yes, ma'am.
12 Q. What kind of services does Mr. Oldham
13 provide?
14 A. Again, it was all about determining --
15 looking at the population and having his
16 demographer draw the maps, to equalize the
17 population.
18 Q. Okay. What did you know about the
19 redistricting process?
20 A. Nothing.
21 Q. Did you see a proposal from him?
22 A. That we approved? That -- that we
23 ultimately approved? Yes, I saw that.
24 Q. Do you recall how much that proposal was
25 for?

Page 107

1  A. 80 or $90,000, but only 25,000 for mapping.
2  And what I liked about that one was it -- it -- if
3  there -- those people -- these two that you've
4  shown me were just about mapping.
5      That one said not only will we draw the maps
6  for you, we will handle your litigation as part of
7  it.
8  Q. Did you expect litigation?
9  A. Absolutely not.
10 Q. So why was that a factor in hiring Oldham?
11 A. Because it -- it would make good business
12 sense to me that not only did -- these people were
13 putting their money where their mouth is to say,
14 our maps were going to be within the bounds of the
15 law, so much that we will -- we will handle any
16 litigation as part of our fees.
17 Q. Did it strike you as odd, that they would
18 include litigation -- expected litigation --
19 A. No. It struck --
20 Q. -- as part of their proposal?
21 A. -- it struck me as good, that, hey, look,
22 it's a guarantee, a warranty of the work.
23 Q. What did you know about Mr. Oldham's
24 background, at this time?
25 A. Nothing.

Page 129

1     A.   I guess.
2     Q.   Who -- who is the recipient of this e-mail?
3     A.   Yeah, Dale Oldham.
4     Q.   Why was this -- why was meeting with you the
5  first step?
6     A.   Because they had received the census data,
7  and it would -- we had approved the contract with
8  the -- him and his firms, much earlier.  And it was
9  time to begin discussing redistricting.
10    Q.   But only with Judge Henry and you, from the
11 Commissioners Court?
12    A.   Yeah.  Because as I told you, it's the
13 judge's duty and responsibility to handle
14 redistricting, in my opinion.
15         And more than two people would be a quorum.
16 And so, on many occasions, the judge will invite a
17 commissioner to a meeting for informational
18 purposes.
19         And -- and -- and he had done that, I knew,
20 with Ken Clark, in redistricting before.  And I
21 asked that I be that one.
22    Q.   Did you know that Mr. Ready and Mr. Oldham
23 were setting up similar online meetings or
24 conference calls with the other commissioners, to
25 discuss redistricting?

Page 130

1     A.  After this, or at some point -- yeah, I knew
2  that they were going -- everyone was going to be
3  talked to.  That's how we do.
4     Q.  And did all the commissioners meet with
5  Mr. Oldham?
6     A.  As far as I know, yes.
7          MS. VALL-LLOBERA:  I would like to
8  introduce Tab 14.  I'm introducing Apffel
9  Exhibit 13.
10         (Exhibit 13 is marked.)
11    Q.  (BY MS. VALL-LLOBERA)  This is an Outlook
12  invitation, dated September 8, 2021.  The attendees
13  are listed as you, Mr. Ready, Seth Collins, and
14  Veronica Van Horn.
15         Do you see that?
16    A.  I do.
17    Q.  And the subject line -- in the subject line,
18  it states, conference call re: Redistricting;
19  attendees, colon, Judge Henry, Commissioner Apffel,
20  Paul Ready, and Dale Oldham.
21         Do you see that?
22    A.  Yes.
23    Q.  Did this meeting take place?
24    A.  That's the telephone conference call that I
25  previously described, yes.

Page 136

1    our position, but I don't -- you know, it's
2    deposition procedure.  I just need to make sure I
3    maintain my -- and preserve the objections for the
4    record.
5         Q.   (BY MS. VALL-LLOBERA)  Did -- without
6    revealing the substance of any conversations with
7    counsel, as we sit here today, what is your
8    understanding of traditional redistricting
9    criteria?
10        A.   The county grows by people.  The precincts
11   become imbalanced by people.  And we are required
12   to continually balance the representation of the
13   people.
14        Q.   Specifically, how do you have to rebalance
15   the populations?
16        A.   In my simple little way --
17              MR. RUSSO:  Let me object -- just
18   let me interpose -- interpose the objection on
19   attorney-client privilege grounds.  And you've
20   heard the basis before.
21              So don't reveal conversations or
22   information you've learned from Dale, related to
23   the redistricting effort.
24        A.   Well, my simple understanding is to -- to
25   redraw the lines to balance the population, to be

Page 137

1  within compliance with the law.
2       Q.  (BY MS. VALL-LLOBERA)  Is the only criteria
3  for redistricting that the numbers line up?
4       A.  I don't know.
5       Q.  You've stated that the imbalances needed to
6  be corrected, based on population shifts.
7           What -- do you need to consider anything
8  other than population numbers, in redrawing maps?
9       A.  I don't --
10              MR. RUSSO:  Same objection on
11  attorney-client privilege grounds.
12              To the extent you can answer without
13  revealing conversations between the county, you,
14  and any of your counsel, you can answer.
15              MS. VALL-LLOBERA:  And we
16  preserve --
17      A.  I trust that the people we hired to do the
18  job, do it in compliance with the law.
19      Q.  (BY MS. VALL-LLOBERA)  Are there any other
20  factors considered in drawing the maps?
21      A.  I don't know.
22      Q.  Earlier, you stated that you were looking
23  to -- to cut Bolivar.
24          Was that a factor that you were considering
25  in redrawing the maps?

```
                                              Page 138
```

1    A.   No, I wasn't looking to cut Bolivar.  I
2    wasn't looking to cut anyone.  I was understanding
3    that in order to balance the -- the four precincts,
4    that I would have to give up something and give it
5    to someone else, to -- to make that -- to
6    accomplish that.
7         And so, that's -- that's what I understood.
8    Q.   When looking at what areas you could peel
9    off of your district, what factors did you
10   consider?
11   A.   I've told you, that made sense to me.  And
12   part of that analysis, in -- the -- the Excel
13   spreadsheet, I was trying to see how many -- I was
14   trying to see the numbers by the voting precincts
15   to say, okay, we can give up this -- 103 and 104,
16   because I have to -- for a 20-minute meeting in
17   by -- in High Island, I have to drive four hours,
18   because of the ferry, the geographical split
19   between the -- the island and the peninsula.
20        But -- so, it was -- I was thinking, okay,
21   this -- this is what makes sense.  If I've got to
22   give something up, I'll give up this.
23   Q.   Did you consider any other factors?
24   A.   I wasn't --
25            MR. RUSSO:  Object as vague.

Page 139

1    A.   -- considering factors.  I was just looking
2    at numbers.
3    Q.   (BY MS. VALL-LLOBERA)  Did Mr. Oldham
4    discuss any factors?
5              MR. RUSSO:  Objection.
6              I'll instruct the witness not to
7    answer, based upon attorney-client privilege.
8    Q.   (BY MS. VALL-LLOBERA)  If a constituent
9    asked you about the redistricting process and asked
10   what kind of things you were thinking about in
11   redrawing the maps, what would you have said --
12   what would you say?
13   A.   I would say our county grew by whatever
14   number, 80,000 people, whatever the number was.  I
15   don't remember the number.
16             And the law requires us to balance the
17   precincts, based on that population, and we've
18   hired a law firm and a demographer to -- to do that
19   for us the best way possible to be within the
20   bounds of the law.
21   Q.   Did you discuss the Voting Rights Act?
22   A.   Never.
23             MR. RUSSO:  Objection.
24             What -- what are you talking about?
25   Are you talking about a meeting with -- who are --

Page 140

1    with who?
2        Q.   (BY MS. VALL-LLOBERA)  Referring still to
3    the September 8, 2021, meeting, and your other
4    meeting with Mr. Oldham, the in-person conference,
5    did you discuss the Voting Rights Act?
6                MR. RUSSO:  I'm going to object to
7    that and instruct the witness not to answer based
8    upon attorney-client privilege.
9                MS. VALL-LLOBERA:  We'll preserve
10   our arguments that these are not protected
11   communications.
12       A.   And for clarification, when I said never, it
13   was because I thought you were talking about
14   constituents still.  I didn't have those
15   conversations.
16       Q.   (BY MS. VALL-LLOBERA)  Did you discuss the
17   U.S. Constitution?
18                MR. RUSSO:  Objection.  Instruct the
19   witness not to answer, based on attorney-client
20   privilege.
21                MS. VALL-LLOBERA:  And we preserve
22   our arguments.
23       Q.   (BY MS. VALL-LLOBERA)  Without revealing the
24   substance -- without -- without revealing the
25   substance of any conversations with counsel, as we

```
 1     sit here today, what is your understanding of the
 2     Voting Rights Act?
 3         A.  I've answered that twice.
 4         Q.  Without revealing the substance of any
 5     conversations with counsel, as we sit here today,
 6     what is your understanding of the requirements of
 7     the U.S. Constitution with regard to redistricting?
 8         A.  I don't know.
 9         Q.  Did you discuss policy objectives with
10     Mr. Oldham?
11              MR. RUSSO:  Same objection,
12     attorney-client privilege, instruct the witness not
13     to answer.
14              MS. VALL-LLOBERA:  And we preserve
15     our arguments that these are not privileged
16     communications.
17         Q.  (BY MS. VALL-LLOBERA)  Did you discuss
18     policy objectives with the other commissioners?
19         A.  No.
20              MR. RUSSO:  Wait.  Let me clarify
21     it.  When?  Anytime?
22         Q.  (BY MS. VALL-LLOBERA)  Okay.  I'll rephrase.
23              Did you discuss policy objectives with other
24     commissioners during -- between the two meetings
25     you had with Mr. Oldham?
```

Page 142

1      A.   No.
2      Q.   During your two meetings with Mr. Oldham
3  that we previously referred to, did you discuss
4  political objectives?
5      A.   No.
6      Q.   During those two meetings, did you discuss
7  the need or desire for a coastal precinct?
8           MR. RUSSO:  Let me object, and
9  instruct the witness not to answer that question,
10 based on attorney-client privilege.
11          MS. VALL-LLOBERA:  And we preserve
12 our arguments that these are not privileged.
13     Q.   (BY MS. VALL-LLOBERA)  Did you run an RPV
14 analysis -- excuse me.
15          Separate from these two meetings, did you
16 run an RPV analysis?
17          MR. RUSSO:  Objection; vague and
18 ambiguous.
19     A.   I don't know what -- I don't understand the
20 question.
21     Q.   (BY MS. VALL-LLOBERA)  RPV stands for
22 racial -- racially polarized voting.
23          Are you familiar with the term, racially
24 polarized voting?
25     A.   I am not.

Page 143

1    Q.   Have you heard this term before?
2    A.   I have not.
3    Q.   So Mr. Oldham and you did not discuss an RPV
4    analysis in either of these meetings?
5              MR. RUSSO:  Let me object based upon
6    the attorney-client privilege, and instruct the
7    witness not to answer.
8              MS. VALL-LLOBERA:  And we preserve
9    our arguments that these are not privileged
10   communications.
11   Q.   (BY MS. VALL-LLOBERA)  Have you ever seen an
12   RPV analysis?
13   A.   No.
14   Q.   Generally --
15   A.   Maybe, but I didn't know what I was looking
16   at.
17   Q.   When might you have seen an RPV analysis?
18             MR. RUSSO:  Object as ambiguous.
19   A.   During the process --
20             MR. RUSSO:  And again, are you
21   talking about in the conversation with his
22   attorneys --
23             MS. VALL-LLOBERA:  Generally.
24             MR. RUSSO:  -- or any time?
25   Q.   (BY MS. VALL-LLOBERA)  Generally, when might

Page 314

1  COUNTY OF HARRIS
2  STATE OF TEXAS
3
4              REPORTER'S CERTIFICATE
5
6         I, AMY PRIGMORE, Certified Shorthand
7  Reporter in and for the State of Texas, hereby
8  certify that this transcript is a true record of
9  the testimony given by the witness named herein,
10 after said witness was duly sworn by me.
11 I further certify that the deposition transcript
12 was submitted on _____, _____ to
13 the witness or to the attorney for the witness for
14 examination, signature, and return to me by
15 _____, _____.
16         I further certify the amount of time used
17 by each party at the deposition is as follows:
18         Diana C. Vall-llobera - (05h37m)
           Bernadette Reyes - (00h32m)
19         Zachary Newkirk - (00h46m)
           Joseph R. Russo - (00h00m)
20
21         I further certify that I am neither
22 attorney nor counsel for, related to, nor employed
23 by any of the parties to the action in which this
24 testimony was taken.  Further, I am not a relative
25 or employee of any attorney of record in this

Page 317

1  cause, nor do I have a financial interest in the
2  action.
3           SUBSCRIBED AND SWORN TO by the undersigned
4  on this the 6th day of January, 2023.
5
6
7           AMY PRIGMORE, Texas, CSR, RPR
            Expiration Date:  4/30/2023
8           Firm Registration: 571