# EXHIBIT 9

*Excerpts of January 6, 2023, Deposition of Commissioner Joseph Giusti*

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      GALVESTON DIVISION
 3   HONORABLE TERRY PETTEWAY,      *
     et al.,                        *
 4                                  *
            Plaintiffs,             *
 5                                  *
     VS.                            *
 6                                  *   Case No. 3:22-cv-00057
     GALVESTON COUNTY, et al.,      *
 7                                  *
            Defendants.             *
 8
 9
10       ******************************************
11            ORAL AND VIDEOTAPED DEPOSITION OF
12                     JOSEPH GIUSTI
13                    JANUARY 6, 2023
14                   (Reported Remotely)
15       ******************************************
16
17              ORAL AND VIDEOTAPED DEPOSITION OF JOSEPH
18   GIUSTI, produced as a witness at the instance of the
19   United States and duly sworn, was taken via
20   videoconference in the above-styled and numbered cause
21   on the 6th day of January, 2023, from 9:23 a.m. to
22   6:01 p.m., before Marsha Yarberry, Certified Shorthand
23   Reporter in and for the State of Texas, reported by
24   machine shorthand, in Galveston, Texas, pursuant to the
25   Federal Rules of Civil Procedure.
```

1      Q.   (By Mr. Gear)  So did you receive any written
2   materials related to criteria during the September
3   meeting?
4              MS. OLALDE:  Objection to any
5   attorney-client privileged communications or
6   attorney-client -- attorney work product that may have
7   been addressed or discussed during this meeting.
8              If you're looking only at facts, you may
9   answer only to the extent you have particular facts to
10  share but not communications.
11     Q.   (By Mr. Gear)  So the question is did you
12  receive any materials.
13     A.   I -- probably.  I don't recall what.
14     Q.   Do you recall what was discussed related to
15  redistricting criteria?
16             MS. OLALDE:  Objection, same instruction
17  to the witness not to reveal any attorney-client
18  privileged communications or work product.
19             MR. GEAR:  And, again, we reserve the --
20  our argument that attorney-client privilege is not --
21  does not apply to Dale Oldham.
22     Q.   (By Mr. Gear)  So following the September
23  meeting with yourself, Mr. Ready, and Mr. Oldham, did
24  you have any discussions with commissioners related to
25  redistricting criteria?

1     A.   I don't recall, sir.

2     Q.   Based on your understanding, was there a

3  decision made to establish redistricting criteria?

4     A.   I don't recall that either.

5     Q.   So, again, was there redistricting criteria

6  that was established, adopted, during the 2021

7  redistricting process?

8              MS. OLALDE:  Objection; asked and

9  answered.

10             THE WITNESS:  I don't recall.

11    Q.   (By Mr. Gear)  Is there any redistricting

12 criteria that you would have considered important

13 during the 2021 redistricting process?

14    A.   Yes, sir.  I think the important things would

15 have been leveling out the populations, also trying to

16 draw lines that the public understood as far as knowing

17 who their commissioners are.  The old lines were kind

18 of confusing at times as to where precincts started and

19 where they ended.

20    Q.   Anything else?

21    A.   That's the majority.  That's it.

22    Q.   And so you mentioned Mr. Oldham, the

23 redistricting consultant.  Did the county's post-2020

24 census redistricting processes begin at the April 5th,

25 2021, commissioners court?

1              MS. OLALDE:  Objection; speculation.

2              You can answer.  You can answer.

3              MR. GEAR:  Well, let me rephrase that.

4              MS. OLALDE:  Sure.

5       Q.    (By Mr. Gear)  When did the 2021 redistricting

6   process begin for the commissioners court?

7       A.    It would have been about the time frame you

8   mentioned.  The exact -- sounds about right.

9       Q.    And so what was the name of the redistricting

10  firm that you and the commissioners ultimately decided?

11      A.    I don't recall the name of the firm.  I just

12  remember Mr. Oldham.

13      Q.    And what was your understanding of the

14  services that Mr. Oldham would provide to the county

15  commissioners?

16      A.    That he would take the census that we were

17  getting in, and he would take that -- the numbers from

18  that and basically lay it out and give us a couple of

19  options to choose from on what he determined was the

20  best and legal maps that he could come up with.

21      Q.    And other than Mr. Oldham, was there any other

22  consultant that you personally dealt with during the

23  2021 redistricting process?

24      A.    He had a -- he had a demographer, I guess,

25  that did the map -- the actual map drawing, but I never

```
 1   really dealt with him.
 2       Q.   Did you meet with that demographer at all in
 3   any capacity?
 4       A.   Not that I recall, other than on the Zoom
 5   meeting, I believe.
 6       Q.   Is that the same September Zoom meeting that
 7   you referred to?
 8       A.   No.  That would have been later.
 9       Q.   Do you recall the time period in which he was
10   involved?
11       A.   October I want to say.
12       Q.   I'm sorry.  Did you say you don't recall his
13   name?
14       A.   I do not.
15       Q.   Did that demographer provide you with any
16   written information or maps of any kind?
17       A.   We did look at a couple of maps on Zoom.
18            MS. OLALDE:  And, again, I'm going to ask
19   that the witness not reveal any attorney-client
20   privileged communications or work product and instruct
21   him not to answer to that extent.
22            MR. GEAR:  And, again, we reserve our
23   rights that to -- against the claim that
24   attorney-client privilege applies to Dale Oldham.
25       Q.   (By Mr. Gear)  So did you have an opportunity
```

```
 1      A.   There again, I'm not -- don't know.  I didn't
 2   really see any support for Map 1 or Map 2.
 3      Q.   Based on your personal knowledge, what was
 4   your understanding of black community support for
 5   Map 2?
 6      A.   Not -- didn't support it, didn't want change.
 7      Q.   Based on your personal knowledge, what was
 8   your understanding of Hispanic community support for
 9   Map 2?
10      A.   Same.
11      Q.   They didn't support it, didn't want change?
12      A.   From -- from what little Hispanic response I
13   got.  It didn't seem like as many Hispanics responding
14   as African-Americans.
15      Q.   And so when you indicated that you received
16   email responses, was that in relation to the posting of
17   Map 1 and 2 to the county website, or did you receive
18   them on some other personal or work emails?
19      A.   No.  It was on county website.
20      Q.   Do you know generally how many comments you
21   received in total?
22      A.   I want to say in the neighborhood of 40.
23      Q.   So based on those 40 responses that you are
24   aware of, how many of those actually supported Map 1?
25      A.   I don't recall.
```

1    Q.   Based on your awareness of the 40 emails that
2    were received, how many of those actually supported
3    Map 2?
4    A.   I don't recall.
5    Q.   Did you have any communications with any of
6    the other commissioners related to the comments that
7    were received on the county website?
8    A.   No, sir.
9    Q.   Did anyone from the public submit proposed
10   plans to the commissioners court during the 2021
11   redistricting process?
12   A.   I don't recall.
13   Q.   Who would that have been submitted to if -- if
14   that were to occur?
15   A.   It could have been submitted to any one of us
16   just sent in with an email.
17   Q.   Would it have been the procedure if a
18   commissioner received -- well, strike that.
19         So if a community member submits a
20   redistricting plan, what is the procedure if it goes to
21   an individual commissioner?
22   A.   There is really no written procedure, but I
23   think what would normally happen is that would be
24   distributed to the judge's office.
25   Q.   And would the judge then be responsible to

```
 1   distribute it to the rest of the commissioners?
 2        A.    I would assume.
 3        Q.    And based on your -- go ahead.
 4        A.    But at some point, you know, the question
 5   would come in are we discussing this and now do we have
 6   more than three people involved in the discussion where
 7   we're violating the law.
 8        Q.    And you're talking about the quorum?
 9        A.    Yes, sir.  As it not being in an open meeting.
10        Q.    So was there an effort to avoid creating a
11   quorum during -- at any time during the 2021
12   redistricting process?
13        A.    No, sir.
14        Q.    So when you talk about the law related to
15   quorums, during the process, for example, I believe the
16   October 2021 meeting where you met with Dale Oldham and
17   you were present and Tyler Drummond and Jed Webb was
18   also present, was that set up in a manner to avoid
19   violating the -- the law that applies to quorums?
20              MS. OLALDE:  Objection; form.
21              THE WITNESS:  Yes, I would assume it is.
22   That's the reason that on lots of different occasions
23   we'll only have two commissioners together for
24   different things.  So if we're hiring -- for instance,
25   if we're hiring our engineer, when we hired him, when
```

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       GALVESTON DIVISION
 3   HONORABLE TERRY PETTEWAY,    *
     et al.,                      *
 4                                *
           Plaintiffs,            *
 5                                *
     VS.                          *
 6                                *   Case No. 3:22-cv-00057
     GALVESTON COUNTY, et al.,    *
 7                                *
           Defendants.            *
 8
 9
            *****************************************
10                    REPORTER'S CERTIFICATION
                    DEPOSITION OF JOSEPH GIUSTI
11                       JANUARY 6, 2023
            *****************************************
12
13           I, Marsha Yarberry, Certified Shorthand
14   Reporter in and for the State of Texas, hereby certify
15   to the following:
16           That the witness, JOSEPH GIUSTI, was duly
17   sworn by the officer and that the transcript of the
18   oral deposition is a true record of the testimony given
19   by the witness.
20           I further certify that pursuant to FRCP
21   Rule 30(f)(1) that the signature of the deponent:
22           _____ was requested by the deponent or a
23   party before the completion of the deposition and is to
24   be returned within 30 days from date of receipt of the
25   transcript.  If returned, the attached Changes and
```

```
 1   Signature pages contain any changes and the reasons
 2   therefor;
 3           __xx__ was not requested by the deponent or a
 4   party before the completion of the deposition.
 5           I further certify that the amount of time used
 6   by each party at the deposition is as follows:
 7              Mr. Bruce Gear - 4 hours, 44 minutes
 8              Ms. Valencia Richardson - 39 minutes
 9              Mr. Andrew Silberstein - 1 hour, 35 minutes.
10           I further certify that I am neither counsel
11   for, related to, nor employed by any of the parties or
12   attorneys in the action in which this proceeding was
13   taken.  Further, I am not a relative or employee of any
14   attorney of record, nor am I financially or otherwise
15   interested in the outcome of the action.
16           Subscribed and sworn to on this the 26th day
17   of January, 2023.
18
19
20                     [signature: Marsha Yarberry]
                       MARSHA YARBERRY, TEXAS CSR
21                     Expiration Date:  07/31/24
                       Veritext Legal Solutions
22                     Firm Registration No. 571
                       300 Throckmorton, Suite 1600
23                     Fort Worth, Texas  76102
                       800-336-4000
24
25
```