IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF TEXAS GALVESTON
DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-CV-00057 |
| | § | |
| GALVESTON, TEXAS et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

**Table of Contents**

Nature and Stage of Proceeding ........................................................................ 1

Issues to be Ruled Upon .................................................................................... 8

Standard of Review ........................................................................................... 8

Argument ........................................................................................................... 8

COMES NOW, Defendants Galveston County, Texas, and the Honorable Mark Henry, et al. (collectively "Defendants"), and files this Response in Opposition to NAACP and Petteway Plaintiffs' ("Plaintiffs") Motion to Compel (ECF 102).

## NATURE AND STAGE OF PROCEEDING

Plaintiffs assert constitutional and Voting Rights Act claims against Defendants in connection with commissioners' precinct map adopted after the 2020 census, alleging the map discriminates against Black and Latino voters in Galveston County. Below left is the prior map of Precinct 3 (spanning from the intersection of Highway 3 and TX-96 to the Seawall in Galveston), below right is the current map, and beneath these is an enlarged image of the northernmost part of the prior precinct 3 boundaries:





Defendants' Motion to Dismiss is pending (ECF 46), discovery is ongoing, and trial is set for this summer. ECF 65.

### A.    Summary and Introduction

Plaintiffs paint an inaccurate picture of the parties' discovery dispute that withers under even the most cursory scrutiny. ECF 102 at 3 (claiming Defendants withheld "virtually *all* documents that detail the development of the 2021 Enacted Plan in a plain effort to shield the legislative process from public view") (emphasis added). Contrary to Plaintiffs' mischaracterization, Defendants have been more than cooperative—disclosing 4,149 documents containing 31,246 pages of information in a rolling production beginning in September, while only withholding 464 documents based on a narrow application of privilege. Defendants have produced many of the underlying documents Plaintiffs complain are withheld (including draft maps that were emailed between counsel and Defendants prior to adopting the final 2021 redistricting plan)—Plaintiffs simply want to pry into privileged communications about those documents. Defendants *have* produced the underlying facts to Plaintiffs, and only seek to protect privileged communications with counsel for legal services. *See, e.g.*, *U.S. v. Davis*, 636 F.2d 1028, 1041 (5th Cir. 1981) (clients may "transfer relevant documents to their attorneys without losing any evidentiary privileges the documents might possess in their own hands"). Defendants have also produced numerous communications with the very attorneys (including Mr. Oldham) that Plaintiffs now accuse Defendants of withholding. Plaintiffs' critiques amount to much ado about nothing.

Plaintiffs' legal arguments fare no better. Contrary to Plaintiffs' assertions, Defendants are entitled to legal counsel during the legislative process to provide legal advice during the process of drafting and analyzing legislation. Plaintiffs' sweeping argument that essentially *any* documents prepared by legislators while crafting legislation are not protected because they were prepared during the "ordinary course of business" must fail. If this categorical approach were adopted as law, it would directly contravene abundant caselaw holding that documents (including legislative documents) created for the primary purpose of preparation for litigation are subject to protection under the work product doctrine. *See, e.g.*, *LULAC v. Abbott*, 2022 U.S. Dist. LEXIS 131217, at *33-38 (W.D. Tex. July 25, 2022) ("*LULAC I*") (rejecting United States' argument that there is a categorical rule preventing legislators from asserting work-product protection).

This was no ordinary legislative process: a NAACP contractor repeatedly communicated directly with the Commissioners Court during the 2021 redistricting cycle, signaling Plaintiffs' preparation of legal challenges to continue Plaintiffs' prior and ongoing lawsuits over Defendants' maps from 2011. Defendants reasonably anticipated imminent litigation and wanted to ensure the 2021 redistricting plan complied with the law. If adopted as law, Plaintiffs' arguments regarding "outsourc[ing]" legislative duties to attorneys threaten to swallow the attorney-client privilege rule entirely, destroying the associated protections that legislators enjoy when communicating with attorneys privately about potential legislation under consideration. The sweeping rule Plaintiffs propose contradicts the law and common sense.

Additionally, because nearly all the documents withheld under the work-product

privilege were prepared during the course of separate, closely related litigation that was *ongoing* since 2013 with many of the same Petteway Plaintiffs, there is no question that litigation was anticipated because it was already happening. In fact, the prior litigation was so similar that Plaintiffs attempted to file a supplemental complaint in the 2013 matter, and they have questioned witnesses about the facts from those proceedings.

The Court should deny Plaintiffs' Motion to Compel.

## B. Background Facts

The redistricting process leading up to Galveston County's 2021 redistricting plan began with retention of redistricting counsel, Dale Oldham, which was first discussed in a phone call with Defendants on December 16, 2020. ECF 103-3 at 14. On April 5, 2021, Defendants retained the law firm of Holtzman Vogel "to provide legal representation and advice regarding redistricting in Galveston County, Texas, including provision of a technical expert to draw the map." *Id.* At 11. The agreement also indicated that Holtzman Vogel would be "associated with Dale Oldham, P.C. in representation on this matter." *Id.*

Between August 30, 2021, and September 23, 2021, Mr. Oldham had a series of fact-finding telephone conference calls with individual (or pairs of) Commissioners to develop a map that complied with the requirements of federal law and to provide legal advice to Defendants. *Id.* At 15. On October 15, 2021, Holtzman Vogel began working with map-drawer Thomas Bryan to serve as a technical expert to assist Mr. Oldham in providing legal advice to Defendants. *Id.* At 11. On October 17, 2021, Mr. Bryan created three initial baseline maps to assist Mr. Oldham in his legal analysis and in rendering legal advice to the Commissioners. *Id.* In response to legal analysis and feedback Mr. Oldham

provided regarding these maps, Mr. Bryan drew the first drafts of Map Proposals 1 and 2 on or about October 19, 2021. *Id.*; *see also* Oldham Aff., Ex. 1, ¶ 12. That same day, Mr. Oldham met in person with the Commissioners individually or in pairs of two to review the two map proposals and solicit feedback from each Commissioner. ECF 103-3 at 11. Mr. Oldham used this information to formulate his legal opinions about what was and was not feasible, and to then instruct Mr. Bryan in adjusting these two map proposals. *Id.* At 11-12.

On October 21, 2021, Mr. Oldham, Mr. Bryan, and counsel from Holtzman Vogel conferred about the legality of proposed maps 1 and 2. *Id.* At 12. Afterward, the maps were considered ready for review by the Commissioners Court as a whole and by the public. Oldham Aff., Ex. 1, ¶ 15. Between October 21 and October 28, 2021, Mr. Bryan made some refinements and updates to the underlying data and shared these updates with redistricting counsel and Galveston County's General Counsel, Paul Ready, *see* ECF 103-3 at 12; *see also* Oldham Aff., Ex. 1, ¶ 16. He did not change the map shapefiles. *Id.*

On October 28, 2021, Mr. Oldham met with Mr. Bryan and Holtzman Vogel counsel and again conferred about the proposed maps to ensure that both maps complied with state and federal law. ECF 103-3 at 12. That same day, redistricting counsel submitted both Map Proposals 1 and 2 to Galveston County's General Counsel, Paul Ready. *Id.*

On October 29, 2021, Defendants posted Map Proposals 1 and 2 on the County's website (in interactive formats) for public review, consideration, and comments, *id.* At 28-29, approximately 2 weeks before the November 12, 2021, Commissioners Court meeting when the 2021 redistricting plan was adopted, *id.* At 29. Approximately 440 public

comments were submitted and considered by Defendants before the November 12th meeting. *Id.*; Ex. 2 at 61:14-62:10. Defendants timely noticed the November 12th meeting, and, at that meeting, Defendants listened and considered comments on the proposed maps. ECF 103-3 at 29. The Commissioners Court ultimately adopted Map Proposal 2. *Id.*

Adoption of Map Proposal 2 was not a foregone conclusion. Commissioner Giusti testified that he initially did not favor Map Proposal 2 over Map Proposal 1 but was eventually persuaded to vote for Map Proposal 2 based on the benefits of having one commissioner responsible for the coastline. *See* Giusti Dep., Ex. 3 at 136:24-137:2. Map Proposal 1 was supported by Southern Coalition for Social Justice fellow and NAACP contractor Roxy D. Hall Williamson, who worked closely with her trusted advisor, League of Women Voters of Texas Issue Chair of Redistricting Stephanie Swanson. ECF 97-11 at 64 ("I support Map Proposal 1."); *see also* Ex. 4 at 94:3-19, 142:1-6 (Williamson confirming she relied on Swanson's direction throughout the 2021 redistricting process).

On February 15, 2022, the Court refused Plaintiffs' attempt to continue this case in their 2013 litigation (*Petteway v. Galveston*, No. 3:13-cv-308, ECF 65 at 1), and this case was opened that same day. ECF 1. On August 12, 2022, Plaintiffs served three discovery requests on Defendants seeking a vast array of documents, from over three decades. *See, e.g.*, Ex. 5 at 6, DOJ RFP No. 2 (requesting agendas, meeting minutes and transcripts relating to commissioners court redistricting back to 1991). Using search terms Plaintiffs proposed, there were 2.1 million potentially responsive documents. Defendants worked with Plaintiffs to narrow the search terms and scope, and set a rolling production schedule. Ex. 6. Defendants worked diligently to respond to three sets of discovery requests and

complied with all mutually agreed-upon deadlines and search terms.

Even with this narrowed scope, Defendants engaged in thousands of attorney hours reviewing hundreds of thousands of documents to comply with Plaintiffs' (still) far-reaching requests. Defendants have produced dozens of shapefiles containing both draft and final adopted maps for both the 2021 and 2011 redistricting cycles. *See* Ex. 7. Defendants have also produced Excel spreadsheets containing analyses of the draft maps, demographic data, and meeting schedules.

Far from withholding information about the process by which the 2021 map was adopted, Defendants have offered many hours of deposition testimony by the Commissioners regarding policy considerations for the 2021 map, as well as detailed answers responding to interrogatories regarding those same considerations. *See, e.g.*, Henry Dep., Ex. 8 at 174:1-175:10, 200:1-203:10, 213:2-214:25, 224:2-225:22, 249:12-253:17; Apffel Dep., Ex. 9 at 184:2-23,195:16-197:10, 303:1-20; Giusti Dep., Ex. 3 at 136:17–139:10; *see also* ECF 103-3 at 5-7, 31-32 (detailing and ranking in order of importance the factors Defendants considered in adopting the 2021 redistricting plan).

Defendants have produced **4,149** documents responsive to Plaintiffs' requests—31,246 pages of information. Only 464 documents are privileged. *See* ECF 102-5.[1] 97 emails that included Dale Oldham were produced, as well as 78 redacted emails that included Dale Oldham. Twenty-four of these documents include both Mr. Oldham and a Galveston County domain name. Defendants also produced 62 emails where map-drawer

---

[1] Plaintiffs criticize the January 2, 2023, privilege log, which contains no substantive changes. It only fixes a printing error from converting an Excel file to PDF format. ECF 102 at 6; Ex. 10. Plaintiffs also argue about the December 31 and January 20 logs (ECF 102 at 6-7), the differences between which resulted from Defendants' (1) cooperation in producing additional documents to Plaintiffs, (2) removing duplicate or already-produced items, and (3) updating two versions of the same email to show unique "parent" emails.

Tom Bryan's name is included, as well as 39 redacted emails that included Mr. Bryan.

## ISSUES TO BE RULED UPON (RESTATED) & STANDARD OF REVIEW

Whether the Court should deny Plaintiffs' request to compel production of documents identified in Exhibit 16 (ECF 102-17) and deny Plaintiffs' request for attorneys' fees and expenses under Rule 37(a)(5)(A).

The Court has discretion in determining these issues, subject to a "clearly erroneous" standard of review by the district court. *See Castillo v. Frank*, 70 F.3d 382, 385 (5th Cir. 1995) (citing 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a)).

## ARGUMENT

I.   **Galveston County's Commissioners Court is entitled to legal counsel to ensure redistricting complies with the law.**

A.   **The attorney-client privilege protects Defendants' communications with counsel to prepare a legally compliant plan.**

The attorney-client privilege "is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981). Its aim is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* The privilege protects "any communication from an attorney to his client when made in the course of giving legal advice." *In re LTV Sec. Litig.*, 89 F.R.D. 595, 602 (N.D. Tex. 1981) (citing *Garner v. Wolfinbarger*, 430 F.2d 1093, 1096 n.7 (5th Cir. 1970) in support a "broad[]" attorney-client privilege in the Fifth Circuit).

As the Supreme Court has affirmed, "[t]he objectives of the attorney-client privilege apply to governmental clients. The privilege aids government entities and employees in obtaining legal advice founded on a complete and accurate factual picture." *U.S. v. Jicarilla Apache Nation*, 564 U.S. 162, 169-170 (2011) (quoting 1 Restatement (Third) of the Law Governing Lawyers § 74, Comment b, pp. 573-574 (1998)). "[G]overnmental agencies and employees enjoy the same privilege as nongovernmental counterparts." *Id.* "Unless applicable law provides otherwise, the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys." *Id.*

Defendants are entitled to legal counsel (and the associated privilege protections) during the legislative process to draft and analyze legislation, and to provide legal analysis of proposed legislation. *LULAC v. Abbott*, 342 F.R.D. 227, 236 (W.D. Tex. 2022) ("*LULAC IV*"); *Bethune-Hill v. Va. State Bd. Of Elections*, 114 F. Supp.3d 323, 346 (E.D. Va. 2015); *see also* Tex. Gov't Code § 323.017(b).

Plaintiffs ask this Court to adopt a sweeping rule that threatens to eliminate the attorney-client privilege for legislators' and other policymaking officials' communications with counsel as soon as drafting of legislation begins. Under Plaintiffs' theory, so long as there are "technical," "procedural," or "strategic" aspects intermingled with legal advice, even during the early non-public stages of the legislative process, no communication with counsel is safe. *See* ECF 102 at 19-22. Taken to its logical conclusion, Plaintiffs' argument encompasses quintessentially privileged communications, such as communications where legislators expressly seek or obtain legal advice from counsel during the drafting process,

merely because the clients are legislators who happen to be considering technical, procedural, or strategic issues while also seeking the advice of counsel. *Cf. Exxon Mobil Corp. v. Hill*, 751 F.3d 379, 382 (5th Cir. 2014) (holding memorandum could not be "mistaken for anything other than legal advice" where nothing showed the author, an in-house lawyer, was providing "business advice divorced from its legal implications"). Plaintiffs' arguments threaten to undermine the critical protection legislators enjoy when seeking candid, confidential legal advice during the legislative drafting process.

It is undeniable that the law protects legislators' communications with their attorneys that seek or obtain legal advice—it is a well-established principle of both state and federal law, and extends across numerous contexts and jurisdictions.[2] Galveston County retained counsel "to provide legal representation and advice regarding redistricting . . . including provision of a technical expert to draw the map." ECF 97-8 at 2. The law firm Holtzman Vogel would "be associated with Dale Oldham, P.C." in this representation. *Id*. Holtzman Vogel attorney Phillip Gordon was "primarily responsible," assisted by Mr. Oldham and Holtzman Vogel attorney Jason Torchinsky. *Id.*; *see also* ECF 97-9 at 6-8

---

[2] *See, e.g.*, House Office of the Legislative Counsel, *Confidentiality and Impartiality*, available at https://legcounsel.house.gov/about/confidentiality-and-impartiality (last visited February 8, 2023) ("All communications with our Office are confidential and are subject to the attorney-client relationship. Unless otherwise indicated by the Member or staff, no information concerning a request for assistance . . . will be disclosed to any person outside our Office."); Tex. Gov't Code § 323.017(b) (A communication between the Texas Legislative Council and a member of the legislature is covered by attorney-client privilege if the communication is (1) with, or under the direction of, a council attorney; (2) given privately; and (3) for the purpose of providing "legal advice or other legal services."); Cal. Govt Code § 10207(a) ("The Legislative Counsel shall maintain the attorney-client relationship with each Member of the Legislature with respect to communications between the member and the Legislative Counsel."); *Chaimov v. State*, 370 Ore. 382, 392-98 (2022) (holding that attorney-client privilege under Oregon law protects forms from Governor's office requesting Oregon OLC's services because those services were "primarily legal" provided to the requestor by attorneys in the office, including interpreting the client's goals, contacting the client for clarification, providing legal research for the client, and making legal recommendations to the client).

(103:10-128:17), 97-10 at 16 (221:12-21); 97-10 at 22 (261:7-16) (Commissioner Apffel and Judge Henry repeatedly testifying that Mr. Oldham worked as redistricting counsel for Galveston County to ensure the maps were legally compliant).

Accordingly, it was clear from the outset that Mr. Oldham functioned as redistricting counsel, not as a political consultant for the redistricting process. The same was true in 2011, when attorney Joe Nixon and Mr. Oldham were retained as redistricting counsel for that redistricting cycle. Confidential communications between Mr. Oldham (or Mr. Nixon) and the Commissioners during that process sought legal opinions, advice, services, or assistance, and were withheld as protected attorney-client communications. The fact that these legal opinions were rendered regarding legislation or drafts of proposed legislation does not remove their protection or privileged status. *See LULAC IV*, 342 F.R.D. at 236 (noting that "the United States went a bridge too far by directly asking about the advice that Butler Snow gave Chairman Hunter regarding proposed House Bill 1."); *S.C. State Conf. of the NAACP v. Alexander*, 2022 U.S. Dist. LEXIS 120295, at *19 (D.S.C. Apr. 27, 2022).

Case law affirms that communications between legislators and their counsel are privileged. In *Alexander*, an email from the General Counsel to the Speaker of the House in a state legislature was sent to a representative in the House, containing documents with legal research relating to Sine Die Adjournment. The Court held that all these documents were "protected from disclosure by the attorney-client privilege because they contain legal analysis and offer legal opinions." *Alexander*, 2022 U.S. Dist. LEXIS 120295, at *19. Accordingly, the "House Defendants [were] not required to produce said documents." *Id.*

11

The same is true here. Communications with Mr. Oldham seeking or obtaining legal advice on redistricting are quintessentially privileged. The Court should reject Plaintiffs' unsupported arguments to the contrary.

**B.       The privilege log amply supports privilege.**

When a document is withheld as privileged, the party asserting the privilege must "describe the nature of the document[] . . . not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5). Defendants provided all parties to withheld communications, the dates, document names, and the purpose of the communications. Plaintiffs are wrong in contending that 165 of these entries are insufficient, and their reliance on *Ohio A. Philip Randolph Inst. v. Smith*, 2018 U.S. Dist. LEXIS 211420, at *10 (S.D. Ohio Dec. 15, 2018) is misplaced because that case plainly relied on a Northern District of Alabama case that involved "mere conclusory statements" in an *affidavit*, not a privilege log. *Id*. Plaintiffs thus untether the asserted principle from its affidavit (rather than privilege log) moorings.

Defendants incorporate the arguments from their opposition to the United States' Motion to Compel here. *See* Defs.' Opp. to DOJ's Mot. to Compel at Section I.B. The Court should reject Plaintiff's challenge to these descriptions. *See Carhartt, Inc. v. Innovative Textiles, Inc*., 333 F.R.D. 118, 120 (E.D. Mich. 2019) (privilege log containing the date, parties to the communication, privilege asserted, and a description such as "[d]ocument(s) providing, containing, reflecting, or discussing confidential advice from counsel concerning anticipated litigation" is sufficient).

### C.  No underlying facts exception applies here.

The purpose of the attorney-client privilege "is to encourage clients to make full disclosure to their attorney." *Fisher v. U.S.*, 425 U.S. 391, 403 (1976). If a client knows "that damaging information could more readily be obtained from the attorney . . . the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice." *Id*. The privilege, therefore, "recognizes that sound legal advice or advocacy . . . depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389. Because the U.S. Supreme Court describes the process of redistricting as a "legal obstacle course," *Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018), the attorney-client privilege is essential for the Commissioners to candidly communicate with Mr. Oldham and the lawyers at Holtzman Vogel, to successfully navigate the complex legal thicket of redistricting law. *See United States v. Chen*, 99 F.3d 1495, 1499 (9th Cir. 1996) (citing *United States v. Zolin*, 491 U.S. 554, 562 (1989)).

It is "hornbook law that the privilege protects communications, not facts." *Thurmond v. Compaq Comput. Corp.*, 198 F.R.D. 475, 479 (E.D. Tex. 2000). That is, the attorney-client privilege does not protect underlying facts within the personal knowledge of a client (*Upjohn*, 449 U.S. at 395), but it does protect communications with counsel that involve those facts. *Id*. For example, a document outside the attorney-client relationship is not privileged, even if sent to an attorney for legal review. *See United States v. Davis*, 636 F.2d 1028, 1040-41 (5th Cir. 1981). On the other hand, "while it is not proper to ask, 'What did you tell your lawyer about the accident,' it is quite proper to ask, 'What do you know about the accident?'" *Thurmond*, 198 F.R.D. at 479.

13

But written communications from a client to counsel *are* protected under the attorney-client privilege. *Davis*, 636 F.2d at 1041. This is so because clients need to "*transfer relevant documents* to their attorneys" to "obtain fully informed legal advice." *Id*. (emphasis added). Therefore, documents created as communications from the client to counsel are privileged, such as letters seeking legal advice, and all documents created by the attorney "that are within the normal ambit of the common-law attorney-client privilege[.]" *Id*.

Defendants have adhered closely to this distinction. Defendants have disclosed 126 underlying documents as not privileged, which appear on the log only because they are attached to communications with counsel. *See* Ex. 11. But documents such as the initial draft maps created, analyzed, and revised between October 15 and October 21, 2021 are withheld because they were fashioned exclusively within the attorney-client relationship, for Mr. Oldham to conduct a legal analysis of what was legally possible for Galveston County under both the Constitution and federal law.[3] Ex. 1, ¶¶ 9-14.

Defendants have complied with the law's distinction between underlying facts and privileged communications. Because the underlying facts exception to privilege does not apply to the withheld documents challenged by Plaintiffs, they were properly withheld.

**D.   The privilege log lists documents where the client sought legal advice.**

Plaintiffs contend that because preparation of map drafts and population data is

---

[3] Contrary to Plaintiffs' assertion, producing draft maps that were circulated, updated, or reviewed *after* October 21, 2021 does not waive the attorney-client privilege with respect to the maps that were created *prior to* October 21, 2021, as described *infra* at Section I.E.

"clearly technical," such communications are not protected at all by the attorney-client privilege, even when sent to Mr. Oldham for legal review. *See* ECF 102 at 19-20. Alternatively, they argue that Mr. Oldham's work with Mr. Bryan in preparing a first draft map for legal review involved primarily a "technical" rather than a "legal service" during the legislative process, making them "mixed purpose" documents subject to redaction. *Id.* at 22-23. These points are wrong on the law. Plaintiffs' allegation that Mr. Oldham and Mr. Bryan were consultants who "assisted on 'technical' matters does not categorically move their work beyond the scope of the attorney-client privilege." *See LULAC I*, 2022 U.S. Dist. LEXIS 131217, at *32. In any event, Plaintiffs fail to substantiate their assertion that certain documents are "mixed purpose documents." ECF 102 at 22-23. Instead they provide a bare list of documents that Plaintiffs argue lacked the primary purpose of seeking legal advice (ECF 102-14), and speculate about whether communications had "a primary purpose of providing specific legal advice" (ECF 102 at 22)—even though the privilege log clearly indicates "that legal advice was sought or provided." *Cf. LULAC I*, 2022 U.S. Dist. LEXIS 131217, at *41. The Court should reject Plaintiffs' arguments about whether legal advice was the primary purpose of communications related to the map-drawing process.[4]

---

[4] Plaintiffs' reliance on *S.C. State Conf. of NAACP v. Alexander* is misplaced. ECF 102 at 20-21. The Court did hold that an email containing legal analysis relating to *sine die* adjournment was protected under the attorney-client privilege. 2022 U.S. Dist. LEXIS 120295 at *19. Unprotected were responses to press inquiries where the responses were political, not legal in nature, or involved legislative strategy. *Id.* at *20-21. Importantly, the speaker served as both chief counsel and chief of staff. *Id.* at *19. Mr. Oldham did not serve in a dual capacity. And, ultimately, Mr. Oldham's advice was always tethered to the legal implications of his advice. *Exxon Mobil Corp*, 751 F.3d at 381-82 (holding that the attorney-client privilege protected a memo from in-house counsel because there was no indication that attorney's business advice was divorced from its legal implications).

### E.      Defendants have not waived the attorney-client privilege.

It is common practice for legislators to communicate with staff attorneys or outside counsel about drafting legislation. Typically, this process involves legislative counsel preparing initial, confidential drafts of bills and sending them to a legislator for review; legislators then return the drafts to counsel with proposed revisions and often include questions to counsel seeking legal advice regarding the revisions. Many of these communications preceding a bill's introduction on the floor of the legislature and final enactment into law are private (non-public) privileged communications. *See, e.g.*, *LULAC I*, 2022 U.S. Dist. LEXIS 131217, at *31 (legislators' communications with outside counsel that included draft maps "may well be privileged as containing legal advice").

In accordance with this traditional approach, Defendants withheld confidential shapefiles from Plaintiffs that were created before the Commissioners Court "introduced" their proposed legislation (*i.e.*, Map Proposals 1 and 2) and produced shapefiles that were created after introduction of the maps for consideration by the full body of the Commissioners Court and the public. This accords with the law governing attorney-client privilege. *See supra* at Section 1(C). Specifically, Defendants withheld initial draft maps created between October 15 and October 21, 2021 because they were fashioned exclusively within the attorney-client relationship. By contrast, after October 21, 2021, the draft maps were ready for consideration by the Commissioners Court as a whole and by the public. Oldham Aff., Ex. 1, ¶ 15. These shapefiles were identical (apart from minor changes discussed above) to those made available for public comment on October 29, 2021 (ECF 103-3 at 12), as Plaintiffs emphasize in their Motion to Compel, ECF 102 at 5, 26.

Contrary to Plaintiffs' assertions, withholding maps produced prior to October 21 based on privilege hides nothing from the people of Galveston County. Instead, consistent with legislatures' traditional approach in numerous jurisdictions of obtaining counsel's assistance with drafting legislation, *see supra* at Section I(A), Defendants have produced all draft maps that were attached to communications after the introduction of the redistricting plan for the Commissioners' and public's review. Because these maps were shared during the "public phase" of the legislative/redistricting process (*i.e.*, after October 21 when the maps were ready for consideration by the full body of Commissioners and the public), they are not protected. *See* Oldham Aff., Ex. 1, ¶ 15. Producing shapefiles of later drafts after the legislation had already been introduced does not waive attorney-client privilege for the first drafts created within the attorney-client relationship, and not considered by the Commissioners.

### F. The work product privilege extends to redistricting documents prepared for the Commissioners Court.

The federal work product privilege protects documents prepared in anticipation of litigation or for trial. *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000) (quoting Fed. R. Civ. P. 26(b)(3)). A document need not be generated in the course of an ongoing lawsuit to qualify for work product protection. *Id.* Work product prepared during ongoing litigation is likewise entitled to protection. *See In re Fluidmaster, Inc.*, No. 1:14-cv-05696, 2016 U.S. Dist. LEXIS 154618, at *24 (N.D. Ill. Nov. 8, 2016) (documents prepared "during the course of litigation . . . . are protected by the work product doctrine.").

While there is no blanket protection for documents created when drafting

legislation, there is also no categorical *exclusion* of legislative documents from the work product doctrine. *See LULAC I*, 2022 U.S. Dist. LEXIS 131217 at *33-38 (rejecting categorical rule to prevent legislators from asserting work-product protection).

While Defendants agree with Plaintiffs about the basic principle that documents created in the ordinary course of legislative business are not work-product (ECF 102 at 10-14), there was nothing "ordinary" about the documents prepared for Defendants in the legally contentious context of late 2021. Although determining whether a document was prepared based on the prospect of future litigation can be a "slippery task," *that* is not the case here. *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982).

Specifically, at the time the work product at issue in this case was prepared, redistricting litigation between many of the same Petteway Plaintiffs and Galveston County regarding redistricting was not only imminent, but was *ongoing*. *See Petteway v. Galveston*, No. 3:13-cv-308 (S.D. Tex. 2013). In fact, Plaintiffs' own acts in that matter leading up to this litigation confirm that even they viewed this action as closely connected to the 2013 redistricting litigation between the parties—and even a continuation of the same.

For instance, Plaintiffs filed a motion for leave to file the instant matter as a "supplemental complaint" in the 2013 case, arguing that the evidence and the Court's adjudication of Plaintiffs' intentional discrimination claim in that case "bear heavily on the resolution of Plaintiffs' intentional discrimination claim" here. ECF 2 at 5. Although the Court denied Plaintiffs' motion because this action was not "sufficiently related" to warrant filing a new matter in the original case, Plaintiffs clearly believed that it was. *See*

*Petteway v. Galveston*, No. 3:13-cv-308 (S.D. Tex. Feb. 15, 2013), ECF 65 at 1.

For Plaintiffs to now argue that redistricting litigation was not anticipated here is simply belied by these facts.[5] Under these circumstances, where there was a separate (but closely-related) active intentional discrimination lawsuit Plaintiffs brought under the Fourteenth Amendment (which Plaintiffs attempted to supplement with the instant complaint also alleging intentional discrimination), it is self-evident that draft maps and other documents prepared were not only created in anticipation of litigation, but in the context of ongoing litigation that remained open against Galveston County at the time the 2021 plan was adopted. Such work product is protected.

## G.   The work-product privilege protects documents prepared for Defendants with the primary purpose of aiding in anticipated litigation.

Beyond its application to legislative documents prepared in anticipation of imminent litigation, the Fifth Circuit has also extended the work product privilege to instances where litigation is not imminent. *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d at 593. Specifically, "[l]itigation need not necessarily be imminent . . . as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." *Davis*, 636 F.2d at 1040 (holding that workpapers were not protected by work product privilege because there was "no evidence that [defendant] had reason to expect future trouble with the IRS" and because those materials "were to aid in preparing tax returns, not primarily to help litigate over those returns"). In support of this "primary

---

[5] Plaintiffs also argue that redistricting counsel's work was not in anticipation of litigation because the engagement letter "contemplates *separate* charges and fee arrangements for 'any litigation over the maps.'" ECF 102 at 13. That language only highlights that litigation was anticipated—so much that the parties felt the need to specify that active litigation would be separately billed.

purpose" test, the Fifth Circuit in *Davis* cited a treatise, *see id.*, which explains that the test is whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the *prospect* of litigation." 8 C. Wright and A. Miller, Federal Practice and Procedure § 2024 at 198 (1970) (emphasis added).

Furthermore, while the "[i]nvolvement of counsel is not a guarantee that work-product protection will apply," it may still "show that the pertinent documents were prompted by the prospect of litigation." *LULAC I*, 2022 U.S. Dist. LEXIS 131217, at *35 (quoting 8 Wright & Miller, Federal Practice & Procedure § 2024 (3d ed. 2010)).

Accordingly, if the Court determines that the maps were not prepared in the context of ongoing litigation or in anticipation of *imminent* litigation, which they were, the "primary motivating purpose" of these documents was still certainly to "aid in *possible* future litigation," *Davis*, 636 F.2d at 1040 (emphasis added), meaning the documents are entitled to protection under the work product privilege. First, counsel was involved at every step of the preparation of the documents Plaintiffs challenge as improperly withheld under work product privilege. This strongly supports that these documents were "prompted by the prospect of litigation." *See LULAC I*, 2022 U.S. Dist. LEXIS 131217, at *35. And because litigation had been previously brought challenging Galveston County's maps in the most recent redistricting cycle which included the very same issue raised in the instant litigation, that expectation was more than reasonable—it was plainly evident. Defendants were on notice that any map adopted would be subject to immediate constitutional scrutiny and likely additional litigation from Plaintiffs, as with the previous cycle's maps.

Accordingly, in contrast with the facts of *Davis*, the 2021 redistricting plan was not created merely in the ordinary course of business[6] (*i.e.*, during the ordinary legislative process of drawing district boundaries). Rather, there is ample evidence that Defendants "had reason to expect future trouble" from Plaintiffs and the Department of Justice no matter which redistricting plan was ultimately adopted by the Commissioners Court, based on recent (and ongoing) legal disputes between them. *Cf. Davis*, 636 F.2d at 1040.

Record evidence also demonstrates that Galveston County reasonably anticipated litigation during the period of time that draft maps were being prepared and considered for the 2021 redistricting cycle, and thus that the maps were prepared primarily to aid in future litigation.[7] *See* Oldham Aff., Ex. 1 ¶ 4 ("[B]ecause of my experience in the 2011 litigation, I was aware that litigation over redistricting in Galveston County was both ongoing and anticipated….I anticipated [some of the same counsel that I was opposed to in 2011 would]

---

[6] Insurance defense is "another context [like redistricting] in which litigation could reasonably be anticipated at nearly any point." *Baldus v. Members of the Wis. Gov't Accountability Bd.*, 2011 U.S. Dist. LEXIS 146869, at *7–8 (E.D. Wis. Dec. 20, 2011). Insurers investigate claims and draft investigative reports in the ordinary course of business as they reach coverage decisions. Those reports are not automatically entitled to work product protection, but some are, if they were created with the primary purpose of aiding in future litigation, since "denial of an insurance claim . . . frequently leads to a lawsuit." *See Arnold v. State Farm Lloyds*, 2006 U.S. Dist. LEXIS 107146, at *5 (S.D. Tex. Sep. 18, 2006). The same principle applies to documents prepared during the legislative drafting process, particularly redistricting legislation where Defendants were recently sued based on maps created during the previous redistricting cycle.

[7] Plaintiffs rely heavily on Commissioner Apffel's testimony that Defendants "[a]bsolutely [did] not" expect litigation in April 2021. ECF 102-8 at 7, 107:8-9. They cite no caselaw for the proposition that an individual commissioner can determine whether the entire Commissioners Court anticipated litigation. Regardless, this statement is clearly limited to the time that Defendants were retaining Mr. Oldham and Holtzman Vogel as redistricting counsel in April 2021; he may not have anticipated litigation at that point, but the situation changed dramatically by the fall of 2021. *See infra*. Regardless, Commissioner Apffel was clearly aware that Galveston County was already in the midst of *ongoing* redistricting litigation initiated by the Petteway Plaintiffs. *See* Apffel Dep., Ex. 9 at 280:19-281:6.

file a lawsuit" challenging the 2021 map.). In particular, NAACP contractor[8] Roxy D. Hall Williamson's testimony demonstrates how the Commissioners Court was plainly on notice of activist groups' preparations to bring a legal challenge to the 2021 redistricting plan during the redistricting process.

For instance, Ms. Williamson testified that, in furtherance of her advocacy work on redistricting issues in Galveston County, she hosted town halls about Galveston redistricting that League of Women Voters' Stephanie Swanson assisted with. *See* Ex. 4 at 20:13-21:3, 24:19-25:3, 27:8-12; 28:20-23, 144:21-145:3. Ms. Williamson testified that Ms. Swanson directed Ms. Williamson regarding what "important information [was] needed for litigation" to build a case and what she was to be "work[ing] on" during the redistricting cycle. *See id.* at 142:3-6. As part of these preparations, Ms. Williamson organized a September 2021 meeting where lawyers from the Texas Civil Rights Project were present at her request to answer legal questions about redistricting. *See id.* at 113:6-114:18.

After being hired by NAACP Plaintiffs, Ms. Williamson testified that she was communicating with Galveston County Commissioner Stephen Holmes, himself an attorney, *see* Ex. 13, as early as September 11, 2021 (more than two months before the 2021 redistricting plan was adopted), to communicate and gather information about redistricting, Ex. 4 at 141:20-142:12; 144:21-22, 151:24-25-152:1-5; 155:4-10; 168:4-13.

---

[8] Plaintiffs did not reveal Ms. Williamson's status as an NAACP contractor until NAACP counsel stated it to support the assertion of attorney-client privilege and work-product during Ms. Williamson's deposition, *see* Ex. 4 at 144:21-145:3. The NAACP's initial disclosures provided no reference to this fact, nor was the contract included with its initial disclosures. *See* NAACP Pls.' Initial Disclosures, Ex. 12.

She also testified that she had been communicating with him through email since as early as "maybe" July or "probably [] August." *Id.* at 155:19-23. These redistricting communications continued throughout the redistricting cycle and included updates to Commissioner Holmes about her efforts "to galvanize the community" with regard to the ongoing redistricting of the Commissioners Court. *See id.* at 151:24-152:5, 168:7-13.

In fact, Ms. Williamson was sure to copy Commissioner Holmes on "all of [her] communications as [she] was working through the community." *Id.* at 152:2-5. She testified that her reason for copying him on each of these communications was so "he would be aware of what I was doing" in the community regarding redistricting. *Id.* Although most of her communications were technically with Commissioner Holmes' official secretary, her purpose for this was clear: "I did most of my communications with her as far as trying to get any information; or *if I needed to contact him or pass him a message from the coalition*, I would go through his secretary." *Id.* at 154:24-155:3 (emphasis added). The "coalition" from which she was passing messages along to Commissioner Holmes, and with whom she was working on redistricting advocacy, included counsel for plaintiffs in this case, Sara Chen and Hillary Klein. *See id.* at 142:7-12. In fact, Ms. Williamson was in regular communication with Plaintiffs' counsel regarding her redistricting work. *Id*. at 130:2-10. Ms. Williamson invited Commissioner Holmes to participate in redistricting meetings on October 11, 2021. *See* ECF 97-12 at 1-4. Commissioner Holmes also spoke for approximately 30 minutes about Map Proposals 1 and 2 at a local Democratic Party event on November 4, 2021. *Id*. at 1-2.

Furthermore, the record demonstrates that many (if not all) of Ms. Williamson's

23

communications to Commissioner Holmes were sent to official government email accounts. *See* Ex. 14. This pattern of communicating with Commissioner Holmes is consistent with the pattern engaged in by other advocacy groups like the UCLA Voting Rights Center which emailed draft proposed maps to Commissioner Holmes during the redistricting cycle. *See* Barreto Decl., Ex. 15, ¶ 21.

The law is clear: when governing bodies like counties are sued under Section 1983, the proper defendants are the individual state actors themselves—here the individual Commissioners for the Galveston County Commissioners Court. *See Adams v. Lumpkin*, 2021 U.S. Dist. LEXIS 251402, at *9 (E.D. Tex. Nov. 30, 2021). That means that, in a Section 1983 action like this, communications with Commissioner Holmes and with official Galveston County email accounts are treated as communications directly with the Defendants in this case. Here the Commissioners, and by extension Galveston County, were plainly on notice as early as September 2021 (and certainly by October 2021) that prospective plaintiff groups were preparing to build a case for litigation against the redistricting plan that was under consideration.[9]

Accordingly, because Defendants were at a minimum aware of the prospect of "*possible* future litigation," *Davis*, 636 F.2d at 1040 (emphasis added), the "primary motivating purpose" of using redistricting counsel while preparing these documents was

---

[9] In their joint discovery dispute letter, Defendants argued Ms. Williamson's communications with Commissioner Holmes put the County on notice that litigation was anticipated, which Plaintiffs disputed. ECF 97 at 2-3. That Plaintiffs knew about and chose not to address this argument is enough to reject their anticipation of litigation argument. *Murthy v. Abbott Labs.*, 847 F. Supp. 2d 958, 977 n.9 (S.D. Tex. 2012) (arguments raised for the first time in a reply brief were waived and would not be considered).

undoubtedly to aid in being prepared for such litigation. Litigation was both ongoing and anticipated. The documents are thus entitled to protection under the work product privilege.

## II.    Defendants' Privilege Assertions Are Proper and Fully Supported.

Defendants' privilege assertions are entirely proper and supported under the governing law. In support of this, Defendants incorporate by reference the responses contained in Section II of Defendants' Opposition to the United States' Motion to Compel, which addresses Plaintiffs' objections by grouping the documents into like categories. *See* Defs.' Opp. To DOJ's Mot. to Compel at Section II.

## III.    Plaintiffs' demand for expenses and fees is inappropriate.

Plaintiffs overreach when demanding expenses and attorney's fees under Rule 37(a)(5)(A). Defendants' position is "substantially justified" and Plaintiffs' request is inappropriate. Defendants timely disclosed over 4,000 documents, made their clients available for several depositions, and asserted privilege over 464 documents. Defendants' good-faith assertions of privilege are nothing like the cases where imposition of fees, expenses, or other sanctions were justified. *Cf. Baldus*, 843 F. Supp. 2d at 960 (imposing sanctions for, *inter alia*, "disinformation, foot-dragging, and obfuscation"). It is also ironic that Plaintiffs demand attorneys' fees when they themselves have not produced a privilege log nearly two months after asserting privilege. Ex. 16 at 2-4; Ex. 17 at 4-5. Even now, Plaintiffs have not indicated when they will produce one. Tellingly, the United States opted to not request expenses and fees in its Motion. *See* ECF 103.

## CONCLUSION

For the above-mentioned reasons, Plaintiffs' Motion to Compel should be denied.

Dated: February 16, 2023                    Respectfully submitted,

                                            */s/ Dallin B. Holt*
                                            Dallin B. Holt
                                            Attorney in Charge
                                            Texas Bar No. 24099466
                                            S.D. of Texas Bar No. 3536519
                                            Jason B. Torchinsky*
                                            Shawn T. Sheehy*
                                            dholt@holtzmanvogel.com
                                            jtorchinsky@holtzmanvogel.com
                                            ssheehy@holtzmanvogel.com
                                            HOLTZMAN VOGEL BARAN
                                            TORCHINSKY & JOSEFIAK PLLC
                                            15405 John Marshall Hwy
                                            Haymarket, VA 2019
                                            P: (540) 341-8808
                                            F: (540) 341-8809

                                            *Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was served on all counsel of record on February 16, 2023, through email and on February 21, 2023, through the CM/ECF system.

*/s/ Dallin B. Holt*
Dallin B. Holt

**IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF TEXAS GALVESTON
DIVISION**

| | | |
|---|---|---|
| **TERRY PETTEWAY et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:22-CV-00057** |
| | § | |
| **GALVESTON, TEXAS et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**ORDER DENYING PLAINTIFFS' MOTION TO COMPEL (Doc. 102)**

On this day, the Court considered the Motion to Compel filed by the individual Petteway

and NAACP Plaintiffs (ECF 102). After considering the record and arguments of counsel the

Court DENIES the Motion in its entirety.


Dated: _____, 2023



_____ _____
United States Magistrate Judge Andrew M. Edison