United States District Court
Southern District of Texas
**ENTERED**
March 30, 2023
Nathan Ochsner, Clerk

# In the United States District Court
# for the Southern District of Texas

## GALVESTON DIVISION

No. 3:22-cv-57

TERRY PETTEWAY, *ET AL.*, *PLAINTIFFS*,

v.

GALVESTON COUNTY, *ET AL.*, *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

Before the Court is the defendants' motion to dismiss the NAACP plaintiffs' first amended complaint under Fed. R. of Civ. P. 12(b)(1) and 12(b)(6). Dkt. 47. The court denies the motion.

## I.   BACKGROUND[1]

### A. Factual Background

This case arises out of the 2021 redistricting of the Galveston County Commissioners Court precincts. *Dickinson Bay Area Branch NAACP v.*

---

[1] When hearing a motion to dismiss under Rule 12(b)(6), factual allegations in the complaint must be taken as true and construed favorably to the plaintiff. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The "facts" in this section are taken from the plaintiffs' pleadings.

*Galveston County*, No. 3:22-cv-117, ECF 38 (S.D. Tex. May 25, 2022) ("FAC").

Galveston County is governed by a county commissioners court comprised of four commissioners representing precincts and one county judge elected countywide. FAC ¶ 23. The commissioners court is the governmental body responsible for drawing and enacting the boundaries of the four commissioners precincts and the precincts for constables and justices of the peace. *Id.* ¶ 24. Precinct 3 has long been the sole majority non-Anglo precinct that elected the candidate of choice for Black and Latino voters. *Id.* ¶ 28.

In the 2011 redistricting cycle, Precinct 3 was the subject of litigation under the preclearance regime of Section 5 of the Voting Rights Act ("VRA"). *Id.* ¶ 32. After the 2010 census, the commissioners court submitted commissioners-court maps to the Department of Justice ("DOJ") that would have reduced the populations of racial minorities in Precincts 1 and 3. *Id.* ¶ 35. The commissioners court also sought to cut the number of justices of the peace and constables from eight to four, making it more difficult for Black and Latino constables and justices of the peace to be reelected. *Id.* ¶ 36.

In a letter dated March 5, 2022, the DOJ objected to the changes to both the commissioners-court and constable/justice-of-the-peace map. *Id.*

¶ 38. The DOJ considered the following to be indicative of the commissioners court's discriminatory purpose in redistricting:

> (1) "the county's failure to adopt, as it had in previous redistricting cycles, a set of criteria by which the county would be guided in the redistricting process";

> (2) "deliberate exclusion from meaningful involvement in key deliberations of the only member of the commissioners court elected from a minority ability-to-elect precinct" (Precinct 3 Commissioner Stephen Holmes); and

> (3) the pretextual inclusion of the largely white Bolivar Peninsula in Precinct 3, which would "lead to a concomitant loss of the ability of minority voters to elect a candidate of choice" due to racially polarized voting and would constitute retrogression.

*Id.*

On March 22, 2012, the commissioners court formally adopted a 2012 redistricting plan for commissioners precincts that preserved Precinct 3 but not Precinct 1—the "benchmark plan." *Id.* ¶ 39. The DOJ did not object to that plan but maintained its objection to the constable/justice-of-the-peace map. *Id.* The proposed commissioner plan therefore went into effect, while the eight constables and justices of the peace would continue to be elected under the precleared 2002 map. *Id.* After the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), relieved the county of the need to undergo DOJ preclearance for voting changes, the commissioners court held a special redistricting meeting in August 2013. *Id.* ¶ 40. It voted 4-1 along racial lines, with Commissioner Holmes casting the lone dissenting

vote, to reduce the number of precincts for constables and justices of the peace from eight to four. *Id.* Commissioner Holmes was not included in the discussion leading up to the adoption of the constable/justice-of-the-peace map. *Id.*

The 2020 census data used in redistricting was released on August 16, 2021. *Id.* ¶ 41. The census data revealed the commissioners-court precincts were malapportioned, with a deviation as large as 17.9% between the largest and smallest precincts. *Id.* ¶ 44. After approval by the commissioners court, County Judge Mark Henry engaged the law firm of Holtzman Vogel Baran Torchinsky & Josefiak PLLC and attorney Dale Oldham to assist with the redistricting of the commissioner precincts. *Id.* ¶ 47.

As in 2012, the commissioners court did not publicly discuss or adopt any redistricting criteria or adopt any timeline by which to adopt proposed maps. *Id.* ¶ 48. The commissioners court had adopted redistricting criteria and timelines in the 1991 and 2001 redistricting cycles. *Id.* Like in 2012, the county did not include Commissioner Holmes in its redistricting plans. *Id.*49. The commissioners court did not provide him with complete data for the eventually proposed plans or inform him of its decision to post the proposed plans on the county's website. *Id.* Only in late September or early October 2021 did Oldham contact Commissioner Holmes about potential

redistricting maps. *Id.* ¶ 50.

On October 29, 2021, the county posted a redistricting webpage with interactive versions of two proposed maps that stated:

> The Galveston County Commissioners Court will be discussing and voting to redistrict county commissioner's precincts in the next few weeks. Below are the two proposed maps that will be considered. Public comment is now open for county residents via the form on this page.

*Id.* ¶ 52. Despite repeated requests by members of the plaintiffs' organizations, this was the first time they had access to any proposed precinct maps. *Id.* ¶ 53. The county did not make demographic or other information about the maps publicly available on its redistricting webpage. *Id.* ¶ 54.

Map 1 left the majority-minority Precinct 3 intact. Precinct 3 still covered parts of La Marque, Texas City, Dickinson, and Galveston but added the Bolivar Peninsula, which has a predominantly Anglo population. *Id.* ¶ 55.



Map 1 resembles the county's 2012 proposal to which the DOJ objected because the Bolivar Peninsula's predominantly Anglo population dilutes the voting power of racial minorities in Precinct 3. *Id.* ¶ 58. Nevertheless, Map 1 would still have maintained Precinct 3 as a majority-minority precinct. *Id.* ¶ 58.

In contrast to Map 1, Map 2 completely altered the benchmark plan, moving proposed Precinct 3 to a concentrated population in the northwest of the county to cover predominantly Anglo parts of League City and Friendswood, maintaining only a small area of Dickinson. *Id.* ¶ 59. Map 2 also divided most of Precinct 3's Black and Latino residents among proposed Precincts 1, 2, and 4. *Id.* ¶ 60. La Marque and Texas City were divided among

Precincts 1, 2, and 4. *Id.* Portions of League City and Dickinson were moved to Precinct 1. *Id.* Map 2 also split voting precinct 336, which has the highest Black population and CVAP[2] in the county, among Precincts 1, 2, and 4. *Id.* ¶ 61. Voting precinct 336 has been part of Precinct 3 for over 20 years. *Id.* Map 2 rendered all four precincts predominantly Anglo. *Id.* ¶ 63.



These changes were unnecessary to resolve malapportionment under the previous plan, as the populations could have been rebalanced by shifting a single voting precinct from Precinct 2 to Precinct 3. *Id.* ¶ 65. Further, the

---

[2] Citizen Voting Age Population, or CVAP, is the segment of the population that is, by virtue of age and citizenship, eligible to vote.

Latino and Black CVAP would remain a majority in such a revised Precinct 3 even after shifting this single-voting precinct from Precinct 2 to Precinct 3 to balance total populations among precincts. *Id.*

Moreover, the county's redistricting webpage did not specify the time and date of the public hearing on the maps. *Id.* ¶ 66. On November 9, 2021, the commissioners court provided only the statutorily required 72 hours of notice and published an agenda for a special meeting on November 12, 2021, that included the item, "[c]onsideration of an order establishing new commissioners precinct boundaries." *Id.* ¶ 67. In previous redistricting years, the commissioners court held multiple public meetings that began at 6:00 p.m. or later. *Id.* ¶ 68.

On Friday, November 12, 2021, the commissioners court held a public meeting at 1:30 p.m. in the small county annex building in League City. *Id.* ¶ 69. All the commissioners-court members attended, except Precinct 4 Commissioner Ken Clark. *Id.* ¶ 73. About 150 to 200 people attended the meeting, crowding into the annex building's meeting room that could only seat 70 people. *Id.* ¶ 74. More than 40 community members—including members of the county NAACP branches like the plaintiffs Edna Courville and Leon Phillips—spoke at the meeting, criticizing the redistricting process and the racially discriminatory effect of the two map proposals. *Id.* ¶ 75.

Many members of the public heard about the hearing only through word of mouth or social media due to the efforts of community members and organizations, including the county NAACP branches. *Id.* ¶ 76. Many other members of the plaintiff organizations and civically minded members of the Black and Latino communities—including plaintiff Joe A. Compian—were unable to attend due to the time, location, and inadequate notice of the meeting. *Id.* ¶ 77. Members of the public also reported having difficulty accessing or parking at the annex building because of construction in the building's parking lot. *Id.* ¶ 78.

The county judge and commissioners did not use microphones when speaking or provide microphones for the public, making it difficult for attendees to hear. *Id.* ¶ 80. Members of the public and Commissioner Holmes spoke in opposition to (1) eliminating Precinct 3 as a minority-opportunity precinct and (2) using an opaque, rushed process for proposing maps and soliciting public comments. *Id.* ¶¶ 81–82. Commissioner Holmes offered two alternative maps that would have complied with federal one-person-one-vote standards while preserving Precinct 3 as an opportunity precinct. *Id.* ¶ 84. The other commissioners refused to consider or vote on Commissioner Holmes's proposals. *Id.*

On a 3-1 vote, with only Commissioner Holmes voting against, the commissioners court adopted Proposal 2, the "enacted plan," which completely rearranged the prior precincts and eliminated the only precinct that would perform for a coalition of minority voters. *Id.* ¶ 85.

### B. Procedural Background

On April 14, 2022, the NAACP plaintiffs—Dickinson Bay Area Branch NAACP, Galveston Branch NAACP, Mainland Branch NAACP, and Galveston LULAC Council 151 ("LULAC")—sued the defendants—Galveston County; the Honorable Mark Henry, in his official capacity as Galveston County Judge; and Dwight D. Sullivan, in his official capacity as Galveston County Clerk. *Dickinson Bay Area Branch NAACP*, No. 3:22-cv-117, ECF 1. On May 25, 2022, the plaintiffs amended their complaint, adding Courville, Compian, and Phillips as plaintiffs. *Id.* ECF 38.

On June 1, 2022, the court consolidated this case with Civil Action No. 3:22-cv-93, *United States v. Galveston County*, and Civil Action No. 3:22-cv-117, *Dickinson Bay Area Branch NAACP v. Galveston County*, with Civil Action No. 3:22-cv-57, *Honorable Terry Petteway v. Galveston County*, as the lead case under Fed. R. of Civ. P. 42(a). Dkt. 45. All three suits challenge the 2021 Galveston County redistricting process.

The NAACP plaintiffs bring three causes of action: (1) intentional racial

discrimination in violation of the Fourteenth and the Fifteenth Amendments; (2) racial gerrymandering in violation of the Fourteenth Amendment; and (3) vote dilution in violation of VRA Section 2. FAC ¶¶ 147–159. The defendants have moved to dismiss all of them. Dkt. 47 at 1–2.

## II.   LEGAL STANDARD

### A. Rule 12(b)(1)

A court should grant a motion to dismiss for lack of subject-matter jurisdiction if the court "lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). The party asserting jurisdiction bears the burden of proof. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). Federal courts have jurisdiction over a claim between parties only if the plaintiff presents an actual case or controversy. U.S. Const. art. III, § 2, cl. 1; *Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001). "The many doctrines that have fleshed out that 'actual controversy' requirement—standing, mootness, ripeness, political question, and the like—are 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 541–42 (5th Cir. 2008) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

To test whether the party asserting jurisdiction has met its burden, a court may rely on: "(1) the complaint alone; (2) the complaint supplemented

by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996). When standing is challenged in a motion to dismiss, the court must "accept as true all material allegations of the complaint and . . . construe the complaint in favor of the complaining party." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quotations omitted).

### B. Rule 12(b)(6)

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The claim is facially plausible when the well-pleaded facts allow the court to reasonably infer that the defendant is liable for the alleged conduct. *Id.* "The court does not 'strain to find inferences favorable to the plaintiffs' or 'accept conclusory allegations, unwarranted deductions, or legal conclusions.'" *Vanskiver v. City of Seabrook*, No. H-17-3365, 2018 WL 560231, at *2 (S.D. Tex. Jan. 24, 2018) (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). Naked assertions and formulaic recitals of the elements of

the cause of action will not suffice. *Iqbal*, 556 U.S. at 678. Even if the facts are well-pleaded, the court must still determine plausibility. *Id.* at 679.

## III.   ANALYSIS

The defendants argue that the NAACP plaintiffs' claims fail for a variety of reasons: (1) the entity[3] plaintiffs lack organizational standing; (2) LULAC lacks associational standing; (3) the case is now moot with the appointment of Dr. Robin Armstrong to the commissioners court; (4) the plaintiffs fail to identify the precinct which constitutes a racial gerrymander or to allege that any precinct line subordinates traditional redistricting principles to race; (5) the plaintiffs fail to allege sufficient facts showing that the defendants enacted the commissioners-court plan with illicit intent, therefore requiring the court to dismiss the plaintiffs' intentional vote-dilution claim; and (6) the plaintiffs fail to allege sufficient facts to state a claim under VRA Section 2. Dkt. 47 at 1–2. The court addresses each argument in turn.

### A. Standing

Standing is a constitutional prerequisite for this court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To demonstrate

---

[3] Dickinson Bay Area Branch NAACP, Galveston Branch NAACP, Mainland Branch NAACP, and LULAC.

standing, a plaintiff must show (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) a likelihood that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (quotations omitted). Standing is assessed plaintiff by plaintiff and claim by claim. *See In re Gee*, 941 F.3d 153, 171 (5th Cir. 2019).

To survive a motion to dismiss, "a complaint must present enough facts to state a plausible claim to relief." *Mandawala v. Northeast Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021); *see also Ghedi v. Mayorkas*, 16 F.4th 456, 464 (5th Cir. 2021) ("[T]he same plausibility standard that applies in the Rule 12(b)(6) context also applies to Rule 12(b)(1) [dismissals for want of subject-matter jurisdiction]."). "[E]xhaustive detail" is not required, but "the pleaded facts must allow a reasonable inference that the plaintiff should prevail." *Mandawala*, 16 F.4th at 1150. "[L]egal conclusions [and] 'threadbare recitals of the elements of a cause of action" will not suffice. *Id.* (quoting *Iqbal*, 556 U.S. at 678) (alteration adopted).

The defendants first argue that the entity plaintiffs lack organizational standing. Dkt. 47 at 2. The defendants also contend LULAC lacks associational standing. *Id.*

### 1. Third-Party Standing

An organization may show injury-in-fact in two ways. *First*, the organization may show that the defendants' acts injured the organization itself. *See NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). That is "organizational standing." *Id.* To establish it, the organization must show that "the defendant's conduct significantly and perceptibly impaired" the organization's activities. *Id.* (quotation omitted). The injury must be "far more than simply a setback to the organization's abstract social interests" or costs related to the instant litigation. *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also ACORN v. Fowler*, 178 F.3d 350, 361 n.7 (5th Cir. 1999) ("[S]howing that an organization's mission is in direct conflict with a defendant's conduct is insufficient . . . ."). "[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Put another way, even if an organization incurs some expense because of a defendant's conduct, that expense is not a cognizable Article III injury unless it "detract[s] or differ[s] from its routine activities." *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) (alteration and quotation omitted).

*Second*, an organization may assert the standing of its members so long as their interests in the suit are "germane" to the organization's "purpose." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). That is "associational standing." *Id.* An organization must identify "a specific member" to assert standing on his behalf.[4]

### a. Organizational Standing

The defendants argue the entity plaintiffs have not met their burden to show how the enacted plan "significantly and perceptibly impaired" their actual activities, "not just their abstract interests in civic participation, voting rights[,] and the like." Dkt. 47 at 13 (quoting *LULAC v. Abbott* ("*LULAC III*"), 604 F. Supp. 3d 463, 483 (W.D. Tex. 2022)). Rather, the defendants contend the entity plaintiffs' assertions that the enacted plan "frustrates" the organizations' abilities to "promote civil participation" and "educate on voting rights issues" are simply too abstract to state a concrete and particularized injury. *Id.*

The NAACP plaintiffs respond that they have a broad mission that relates to civic engagement and advocating for their members' interests. Dkt.

---

[4] *City of Kyle*, 626 F.3d at 237; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm . . . .").

54 at 9–10 (citing FAC ¶¶ 4–7). This mission includes "ensur[ing] the political, educational, social, and economic equality of rights of all persons and to eliminate racial hatred and racial discrimination," including "that the interests of communities of color are represented on local, state, and national legislative bodies." *Id.* at 9. To further these goals, the NAACP branches regularly engage in efforts to register, educate, and engage people of color in the political process through "voter[-]registration drives, voter[-]education events, poll[-]watcher programs, and get-out-the-vote campaigns," which predominantly serve the minority populations in Galveston County. *Id.* at 10 (quoting FAC ¶¶ 5, 9).

LULAC similarly aims to "advance[] the economic condition, educational attainment, political influence, housing, health and civil rights of Latino Americans through community-based programs." *Id.* (quoting FAC ¶ 11). LULAC "regularly organizes voter[-]registration events," hosts "cultural events and fundraisers for educational scholarships, participates in community-wide charity events with other organizations such as the county NAACP branches, and receives and addresses calls and complaints of racial discrimination." *Id.* (quoting FAC ¶ 13).

As a consequence of the defendants' actions, the entity plaintiffs argue they have been and will be forced to "devote[] resources to counteract [the

defendants'] allegedly unlawful practices." *Id.* (quoting *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014)). Moreover, they contend the defendants' actions in creating the 2021 commissioners-court precinct map dilute the votes of Galveston's Black and Latino residents such that it renders the commissioners court nonresponsive to these communities. *Id.* (citing FAC ¶¶ 10, 16). Further, the entity plaintiffs argue that because the defendants' actions have intentionally targeted their members' voting rights and ability to elect candidates of their choice by dividing them among several precincts, the defendants have perceptibly impaired the entity plaintiffs' ability to pursue their missions. *Id.* at 10–11.

The court agrees with the defendants that no entity plaintiff has adequately pleaded organizational standing. All assert the same boilerplate injury: that Galveston County's redistricting plans frustrate and impede their core missions and that they will have to expend new and additional resources to meet this challenge. But "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing." *Nat'l Treas. Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (cleaned up). Rather, there must be "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitut[ing] far more than simply a setback to the

organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379.

No matter how laudable an organization's goal is, it cannot establish "standing simply on the basis of that goal." *Simon*, 426 U.S. at 40 (rejecting standing of an organization "dedicated to promoting access of the poor to health services" based on allegations that the challenged law made it harder for the poor to access such services). Even a "showing that an organization's mission is in direct conflict with a defendant's conduct is insufficient, in and of itself, to confer standing on the organization to sue on its own behalf." *ACORN*, 178 F.3d at 361 n.7.

Moreover, even if the entity plaintiffs had pleaded facts showing they had diverted resources to addressing the defendants' conduct, that could not alone meet their burden. "Mere redirection of resources in response to another party's actions does not supply standing; after all, there is 'no legally protected interest in not expending . . . resources on behalf of individuals for whom the [entity plaintiffs] . . . advocate." *LULAC III*, 604 F. Supp. 3d at 484 (quoting *Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994)). Having to expend more resources to register and turn out discouraged Black and Latino voters is simply not comparable to the offending conduct in *OCA-*

*Greater Houston*. 867 F.3d at 612 (holding voter organization focused on assisting voters at the ballot box who were unable to read or write English had standing to challenge a state statute that impermissibly narrowed VRA protections during the act of voting).

### b. Associational Standing

Next, the defendants argue that LULAC lacks associational standing because it has only alleged a threadbare recital of the elements of associational standing. Dkt. 47 at 12–13 (citing FAC ¶ 14).

The court disagrees. LULAC has identified a member who resided in benchmark Precinct 3, presently resides in enacted Precinct 1, and has standing in his own right—Joe A. Compian. FAC ¶ 17. Compian has joined the suit as an individual plaintiff, but that does not preclude LULAC from asserting his injury (and that of his fellow LULAC members) as its own.

### B. Mootness

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies" and do not have "the power 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citation omitted). "To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67

(1997) (quotation omitted). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

In other words, "[m]ootness applies when intervening circumstances render the court no longer capable of providing meaningful relief to the plaintiff." *Ctr. For Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013). A defendant claiming mootness "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

The defendants argue that the NAACP plaintiffs' case is moot because County Judge Henry appointed Dr. Armstrong, who is African American, to the commissioners court to serve as the commissioner for Precinct 4. Dkt. 47 at 16–17. The defendants contend that because the commissioners court is now 40% African American—slightly higher than the Black and Latino percentage of the total voting-age population (35.6%)—the plaintiffs now have proportional representation, mooting their claims. *Id.*

The defendants misunderstand the plaintiffs' claims if they believe the appointment of Dr. Armstrong resolves the allegations of racial gerrymandering and violations of VRA Section 2. In a vote-dilution claim, "it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important." *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 503 (5th Cir. 1987) (citing *Thornburg v. Gingles*, 478 U.S. 30, 69 (1986)). The defendants have proffered no evidence that Dr. Armstrong is the candidate of choice of Black and Latino voters and simply tout the fact that he is Black. On the other hand, the NAACP plaintiffs have provided substantial factual allegations supporting Commissioner Holmes's status as the candidate of choice for Black and Latino voters since he was first elected as commissioner for Precinct 3 in 1999. FAC ¶¶ 26–27, 92, 127–135.

Equally misplaced is the defendants' contention that, with the appointment of Dr. Armstrong, "African American representation on the commissioners court is greater than the proportion of Black and Latino residents in Galveston County." Dkt. 47 at 118. While proportionality is a consideration as part of the totality-of-the-circumstances analysis under the VRA, it is the proportion of minority-opportunity districts that is relevant—*i.e.*, the number of districts in which minority voters can elect their candidate

of choice in relation to the number of minority voters jurisdiction-wide. *See LULAC v. Perry*, 548 U.S. 399, 426 (2006) ("Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area.").

The defendants neither contend nor offer any evidence to suggest that Dr. Armstrong is the candidate of choice for Black and Latino voters in Galveston County, nor that the new plan creates any district in which minority voters will be able to elect their preferred candidate. Accordingly, the court finds that this controversy is decidedly live.

### C. Racial Gerrymander

To succeed on a racial-gerrymandering claim, a plaintiff must plead and prove that "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Bethune-Hill v. Va. State Bd. Of Elections*, 580 U.S. 178, 187 (2017). A plaintiff can attempt to show this by alleging that the district's shape deviates from traditional redistricting principles such as compactness, or more direct evidence going to legislative purpose. *See id.* at 188–89. As for evidence of legislative purpose, plaintiffs have successfully proven in past cases that race predominated in the drawing of districts through pleading and proving that the legislature established

population percentage targets for the minority population. *See id.* at 190–91.[5]

The defendants argue that the NAACP plaintiffs have not met their burden by failing to identify the precinct that constitutes a racial gerrymander and allege that any commissioners-court precinct line subordinates traditional redistricting principles to race. Dkt. 47 at 21–22.

## 1. Identifying the Challenged Precinct

Racial-gerrymandering claims are district specific and therefore apply "to the boundaries of individual districts." *Ala. Legis. Black Caucus*, 575 U.S. at 262. By contrast, racial-gerrymandering claims do not apply to the map as an undifferentiated whole. *See id.* The harm in a racial-gerrymandering claim is personal and includes being "personally . . . subjected to [a] racial classification . . . as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group." *Id.* at 263 (alterations in original) (internal quotation marks and

---

[5] *Ala. Legis. Black Caucus v. Alabama,* 575 U.S. 254, 267 (2015) ("That Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person[-]one-vote) provides evidence that race motivated the drawing of particular lines in multiple districts in the State."); *LULAC III*, 604 F. Supp. 3d at 510 (observing that plaintiffs had pleaded sufficient facts to survive a motion to dismiss where the plaintiffs alleged that the "House committee chairman's statements stressing the number of majority-minority districts, the legislature's apparent desire to keep various racial groups above 50% of certain districts, and the irregular shapes of CD 6 and 33").

citations omitted). Thus, racial gerrymanders "directly threaten a voter who lives in the *district* attacked" and not those who live elsewhere. *See id.* (emphasis in original).

The defendants argue that the NAACP plaintiffs' first amended complaint does not identify which district is the result of a racial gerrymander. *See generally* FAC. The defendants also contend that there is a plaintiff in Precincts 1, 2, and 3, but not in 4. The defendants argue that because the plaintiffs have not identified which district is the result of a racial gerrymander, this court cannot assure itself of jurisdiction and should dismiss the claim. Dkt. 47 at 20 (citing *United States v. Hays*, 515 U.S. 737, 739 (1995)).

The plaintiffs respond that they have sufficiently identified Precinct 3 and alleged that it is racially gerrymandered. Dkt. 54 at 27–30. The plaintiffs identify Precinct 3 multiple times as the opportunity district that was dismantled, eliminating the majority-minority precinct it had been under the benchmark plan. *Id.* (citing FAC ¶¶ 60–61, 63, 65, 84).

The court agrees that the plaintiffs have adequately identified the district giving rise to their racial-gerrymander claim.

### 2. Precinct Lines

The defendants next argue that the NCAAP plaintiffs fail to allege that any precinct line subordinates traditional redistricting principles to race. Dkt. 47 at 20–22. The defendants contend that there are no allegations that any precinct is not compact, divides communities of interest, is not contiguous, or does not respect political subdivision lines. *Id.*

The plaintiffs respond that the map can be explained only by a desire to draw four majority-Anglo precincts. Dkt. 54 at 28. The plaintiffs allege that race predominated over traditional redistricting criteria because:

> (1) none of the dramatic changes to the commissioners-court precincts were necessary to address malapportionment, which could have been solved by shifting a single voting precinct, FAC ¶ 65, 84;
>
> (2) Map 2 split existing political subdivisions of the cities of La Marque, Texas City, and Dickinson, and longtime voting precincts, FAC ¶¶ 60–61; and
>
> (3) Map 2 failed to respect existing communities of interest of Black and Latino voters, instead cracking them such that all four precincts became majority Anglo, FAC ¶ 63.

*Id.* at 28–29.

The plaintiffs also argue that a racial gerrymander need not resemble a bug or a bird (or a salamander) for race to predominate over other traditional redistricting principles. *Id.* at 29 (citing *Miller v. Johnson*, 515 U.S. 900, 913 (1995) ("Shape is relevant not because bizarreness is a

necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake . . . was a legislature's dominant and controlling rationale . . . .")). Even a more compactly shaped district can be obviously racially gerrymandered when its lines are "considered in conjunction with [the district's] racial and population densities." *Miller*, 515 U.S. at 917. Ultimately, the plaintiffs argue that the fundamental alteration of Precinct 3's borders and targeted division of Precinct 3's Black and Latino populations among Precincts 1, 2, and 4—splitting city borders and communities of interest—supports a racial-gerrymandering claim. Dkt. 54 at 29.

As the Supreme Court has explained, a "plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision." *Miller*, 515 U.S. at 916. The plaintiffs have carried their burden in pleading a plausible racial gerrymander as to Precinct 3.

### D. *Gingles* Claim

The NAACP plaintiffs bring a vote-dilution claim under VRA Section 2. FAC ¶¶ 151–159. Such claims are often called *Gingles* claims after *Thornburg v. Gingles*, 478 U.S. 30 (1986), because that case provides the "framework"

for evaluating Section 2 vote-dilution claims. *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam).[6]

### 1. Governing Law

VRA Section 2, 52 U.S.C. § 10301, imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby County v. Holder*, 570 U.S. 529, 557 (2013). While Section 2 encompasses claims based on discriminatory intent, a violation can "be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 394 n.21, 404 (1991); *see also, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc). Section 2 prohibits vote dilution, such as the use of redistricting plans that "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Gingles*, 478 U.S. at 47 (internal citations and quotation marks omitted).

The language of Section 2 specifically prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). That

---

[6] *Gingles* itself involved Section 2 challenges to multimember districts, 478 U.S. at 46, but the Supreme Court later extended the analysis to apply to Section 2 challenges to single-member districts like the ones at issue here. *See Growe v. Emison*, 507 U.S. 25, 40–41 (1993).

occurs when "the totality of circumstances" shows that a state's "political processes . . . are not equally open to participation by" members of a minority group "in that [they] have less opportunity . . . to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

In *Gingles*, the Supreme Court "construed" Section 2 to prohibit the "dispersal of a [minority] group's members into districts in which they constitute an ineffective minority of voters." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (alteration adopted) (quoting *Gingles*, 478 U.S. at 46 n.11). When "minority and majority voters consistently prefer different candidates" in such districts, "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters," thus depriving minorities of an equal opportunity to elect representatives of their choice. *Gingles*, 478 U.S. at 48.

A successful *Gingles* claim remedies that situation by undoing the dispersal of minorities. It does so by requiring their concentration into a new majority-minority district that will allow the group, usually, to be able to elect its preferred candidates. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion). These Section 2-required districts are often described as "opportunity districts." *See, e.g.*, *LULAC*, 548 U.S. at 428–29; Nicholas O.

Stephanopoulos, *The South After* Shelby County, 2013 Sup. Ct. Rev. 55, 75 n.84 (2013).

*Gingles* claims are complicated and analytically intensive. To require its proposed district to be adopted, a *Gingles* plaintiff must make two showings. *First*, it must establish three preconditions. *Wis. Legislature*, 142 S. Ct. at 1248. Those preconditions are necessary to show that the *Gingles* theory describes the proposed district, *see Gingles*, 478 U.S. at 48–49, so each must be met for the claim to succeed, *Harris*, 81 U.S. at 305–06. *Second*, the plaintiff must show that, under the "totality of circumstances," the "political process is [not] equally open to minority voters" without the proposed district. *Wis. Legislature*, 142 S. Ct. at 1248 (quoting *Gingles*, 478 U.S. at 79). Because the defendants' motion focuses on the preconditions, the court discusses them in further detail below.

The first precondition is that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. That is "needed to establish that the minority has the potential to elect a representative of its own choice." *Growe*, 507 U.S. at 40. Accordingly, the minority group must be able to constitute a majority by CVAP. *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852–53 (5th Cir. 1999); *see also LULAC*, 548 U.S. at 428–29 (analyzing

CVAP and noting that "only eligible voters affect a group's opportunity to elect candidates"). And the population for which that majority must be shown is the population in the proposed district. *See Harris*, 581 U.S. at 302; *LULAC*, 548 U.S. at 427–28; *Growe*, 507 U.S. at 40.[7]

The second and third preconditions are often discussed together. The second requires the minority group to be "politically cohesive." *Gingles*, 478 U.S. at 51. The third is that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (citation omitted). Unless both are met, "the challenged districting [does not] thwart[] a distinctive minority vote by submerging it in a larger white voting population." *Growe*, 507 U.S. at 40.

Plaintiffs normally demonstrate minority political cohesion by showing that "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56; *see also Campos v. City of*

---

[7] To satisfy the first *Gingles* precondition, a plaintiff must also allege that its proposed majority-minority district "is consistent with 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (quoting *LULAC*, 548 U.S. at 433). "[C]ombining 'discrete communities of interest'—with 'differences in socio-economic status, education, employment, health, and other characteristics'—is impermissible." *Id.* (quoting *LULAC*, 548 U.S. at 432); *see also id.* at 219 (concluding that testimony indicating that proposed alternative district was "culturally compact" supported finding that proposed district "preserve[d] communities of interest").

*Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988). That is described as "bloc voting" (just like the third precondition)[8] and typically means that a large majority of the group favors the same candidates.[9] When both minorities and Anglos vote in blocs, courts conclude that voting is "racially polarized"[10] and typically hold that both the second and third preconditions have been met.[11]

Even so, the second and third preconditions are not mirror-image requirements for different racial groups. As relevant here, a *Gingles* plaintiff must show the second precondition for the minority population that would be included in its proposed district. *See Harris*, 581 U.S. at 301–02; *LULAC*,

---

[8] *E.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Fusilier v. Landry*, 963 F.3d 447, 458 (5th Cir. 2020).

[9] *Compare LULAC*, 548 U.S. at 427 (finding "especially severe" bloc voting when roughly 90% of each racial group votes for different candidates), *with Strickland*, 556 U.S. at 16 (plurality opinion) (noting "skeptic[ism]" about Anglo bloc voting when 20% of Anglos would need to cross over to satisfy the first *Gingles* precondition); *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (noting that only 22-38% crossover by Anglos and 20-23% crossover by Black voters supported a finding that voting was not racially polarized). The necessary size of the majority, however, is a district-specific inquiry. *See Gingles*, 478 U.S. at 55–56.

[10] *See, e.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993); *Gingles*, 478 U.S. at 52 n.18; *Fusilier*, 963 F.3d at 458. The existence of racially polarized voting is also one of the factors that *Gingles* highlights as relevant to the totality-of-the-circumstances inquiry. *See* 478 U.S. at 44–45, 80.

[11] *See, e.g.*, *LULAC*, 548 U.S. at 427; *Gingles*, 478 U.S. at 56; *Fusilier*, 963 F.3d at 458–59; *Campos*, 840 F.2d at 1243. *But see LULAC v. Clements*, 999 F.2d 831, 849–51 (5th Cir. 1993) (en banc) (emphasizing that the plaintiff must still show that the bloc voting is "legally significant").

548 U.S. at 427; *Growe*, 507 U.S. at 40. In contrast, the third precondition must be established for the *challenged* districting. *See Harris*, 581 U.S. at 302; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. Importantly, Fifth Circuit precedent does not preclude a plaintiff from establishing the third precondition even if the challenged district is not majority Anglo by CVAP. *See Salas v. Southwest Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). Even so, such a plaintiff faces an "obvious, difficult burden" in establishing that situation. *Id.*

One last note. It bears emphasizing that each of these preconditions must be shown on a district-by-district basis. *See Wis. Legislature*, 142 S. Ct. at 1250; *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018); *LULAC*, 548 U.S. at 437; *Gingles*, 478 U.S. at 59 n.23. Because *Gingles* claims relate to the political experiences of a minority group in a particular location, a "generalized conclusion" cannot adequately answer "'the relevant local question' whether the preconditions would be satisfied as to each district." *Wis. Legislature*, 142 S. Ct. at 1250 (quoting *Harris*, 581 U.S. at 335 n.5 (Alito, J., concurring in part)). Ultimately, a plaintiff must prove that an "alternative to the districting decision at issue would . . . enhance the ability of minority voters to elect the candidates of their choice." *Perez*, 138 S. Ct. at 2332.

### 2. Challenged Claim

The defendants argue that the NAACP plaintiffs have not pleaded sufficient facts to make it plausible that race, and not politics, explains the racial divergence in voting patterns. Dkt. 47 at 23. Indeed, the defendants contend that if partisanship explains the bloc voting, then a "vote[-]dilution claim is a mere euphemism for political defeat at the polls." *Id.* (quoting *Lopez v. Abbott*, 339 F. Supp. 3d 589, 603 (S.D. Tex. 2018)).

The plaintiffs respond that the defendants have attempted to improperly shift the pleading burden back to them to rebut the defendants' assertion that partisanship, rather than race, better explains the bloc voting behavior. Dkt. 54 at 17. In so doing, the plaintiffs argue, the defendants attempt to circumvent circuit case law by improperly imposing a pleading burden on the plaintiffs that the Fifth Circuit and lower courts have squarely rejected. *Id.* The defendants in the contemporaneous statewide redistricting case attempted the same argument to no avail. *LULAC III*, 604 F. Supp. 3d at 500 ("[The defendants] say that even if minorities vote cohesively in general elections, [the plaintiff] hasn't explained why that behavior is best explained by race, not partisanship, in each of its proposed districts. . . . [A]t least at the pleading stage—it is enough for a *Gingles* plaintiff to allege that minorities vote cohesively in general elections in the proposed district.

Accordingly, the Court rejects [the defendants'] position here, too.") (internal citations omitted). Nevertheless, even if so required, the plaintiffs argue their allegations are sufficient to disprove that partisanship better explains voting behavior than race. Dkt. 54 at 20; *see generally* FAC ¶¶ 103, 109, 111–116, 118, 122–123, 126, 136–146.

The plaintiffs have the better reading of the case law. They are not required, at this stage, to rebut the defendants' evidence that partisanship better explains voting behavior in Galveston County's commissioner-court precincts than race. The plaintiffs were required to plead demographic facts that satisfy the *Gingles* preconditions, which they have done. *See generally* FAC ¶¶ 45, 90–95, 151–159. Accordingly, their *Gingles* claim survives.

### E. Intentional Vote Dilution

In an intentional vote-dilution claim under the Fourteenth and Fifteenth Amendments, a plaintiff must plead that the challenged redistricting plan was enacted with a discriminatory purpose and has discriminatory effects. *See Harding v. County of Dallas*, 948 F.3d 302, 312 (5th Cir. 2020). The gravamen of an intentional vote-dilution claim is that the commissioners court enacted "a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Perez v. Abbott*, 253 F. Supp. 3d 864, 932 (W.D. Tex. 2017)

(internal quotation marks omitted). These claims are "infrequently" asserted. *Harding*, 948 F.3d at 313. This is so because intentional vote-dilution claims "are more difficult to prove than are effects-only Section 2 claims." *LULAC v. Abbott* ("*LULAC II*"), 601 F. Supp. 3d 147, 160 (W.D. Tex. 2022) (citing *Harding*, 948 F.3d at 313 n.47).

For a Fourteenth and Fifteenth Amendment claim, a plaintiff must plead that a defendant "acted at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Courts use the factors outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to determine if the decision-makers acted with illicit intent. *Id.* at 160–61. Essentially, in intentional-vote dilution claims, a plaintiff must plead that race was "*part* of [the defendants'] redistricting calculus." *Id.* at 161. Similarly, in a VRA Section 2 claim of intentional discrimination, a plaintiff must plead that racial discrimination was one purpose of the challenged government action. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). The *Arlington Heights* factors are also used to determine intent in a Section 2 claim. *See id.*

To state an intentional-discrimination claim, "racial discrimination need only be one purpose, and not even a primary purpose" of the challenged

plan. *Veasey*, 830 F.3d at 230 (quoting *Brown*, 561 F.3d at 433). "[I]ndirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions may be considered." *Brown*, 561 F.3d at 433 (quotation marks omitted).

Accordingly, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence on intent as may be available." *Arlington Heights*, 429 U.S. at 266. "The impact of the official action . . . provide[s] an important starting point." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). From there, courts consider "five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose": (1) "the historical background of the decision," (2) "the specific sequence of events leading up to the decision," (3) "departures from the normal procedural sequence," (4) "substantive departures," and (5) "legislative history." *Veasey*, 830 F.3d at 231 (quotation marks omitted); *see also Arlington Heights*, 429 U.S. at 267–68. Evidence of "race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will toward minorities because of their race," is not required. *Perez*, 253 F. Supp. 3d at 948.

The defendants argue that the NAACP plaintiffs' allegations of an illicit racial purpose are thin at best, as the plaintiffs allege that (1) the commissioners court did not adopt redistricting criteria, (2) it held only one meeting to discuss the proposed redistricting plans, (3) Commissioner Holmes was allegedly not allowed to be involved in the process for developing the proposed maps, and (4) the maps were allegedly drawn without his input. Dkt. 47 at 25–26 (citing FAC ¶¶ 48–49, 69).

The defendants also counter that, as a matter of law, the commissioners court is not required to adopt redistricting criteria in addition to what federal and state law already requires. *Id.* at 27. Further, the defendants note that the commissioners court scheduled the meeting within the public-notice requirements and posted the maps online two weeks in advance of that meeting for public notice and comment. *Id.* at 27–28. The defendants also note that Commissioner Holmes was not prevented from participating in the redistricting process, nor was he prevented from providing input. *Id.* at 29. Instead of being prohibited from participating in the redistricting process, the defendants contend he "simply chose not to exercise his statutory authority as a duly elected [c]ommissioner to place redistricting on the agenda at any of the six regularly scheduled meetings between September and November." *Id.*

In response, the plaintiffs argue that they have pleaded specific facts relevant to each *Arlington Heights* factor and therefore satisfied their burden to show that racial discrimination was a substantial factor behind the adoption of the current commissioners-court map. Dkt. 54 at 22.

As to the first *Arlington Heights* factor—the historical background of the decision—the plaintiffs allege numerous allegations of discriminatory actions by the county itself. *See, e.g.*, FAC ¶¶ 97–102, 104–110, 126, 133, 136–138, 142–146. Furthermore, although the defendants argue that the DOJ's 2012 findings of discriminatory intent are not legally binding on this court, the plaintiffs argue those conclusions need not be legally binding to be probative of a historical background of racial discrimination. Dkt. 54 at 23 (citing *Veasey*, 830 F.3d at 240, and *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 224 (4th Cir. 2016).

The plaintiffs argue that the second *Arlington Heights* factor—the specific sequence of events leading up to the adoption of the maps in 2021—mirrored the sequence of events that led to the initial failure of preclearance in 2012:

> (1) "the county's failure to adopt, as it had in previous redistricting cycles, a set of criteria by which the county would be guided in the redistricting process";
>
> (2) "deliberate exclusion from meaningful involvement in key deliberations of the only member of the commissioners court

elected from a minority ability-to-elect precinct" (Precinct 3 Commissioner Holmes); and

(3) the pretextual inclusion of the largely white Bolivar Peninsula in Precinct 3.

*Id.* (quoting FAC ¶ 38). Judge Henry and the late Commissioner Clark, who were on the commissioners court during the 2011-12 redistricting cycle, were clearly aware that those specific actions had resulted in a finding of discriminatory intent, and in 2012, the commissioners court obtained preclearance of and adopted a different map that maintained the benchmark Precinct 3. *Id.* at 23–24. The plaintiffs contend Judge Henry and Commissioner Clark nevertheless forged ahead with similar actions and map proposals. *Id.* at 24. As the panel in the statewide redistricting case held, the "proximity and comparability" of a map previously rejected as intentionally discriminatory "weighs in favor of an inference of discriminatory intent." *LULAC II*, 601 F. Supp. 3d at 171.

Further, the plaintiffs maintain that the defendants were also aware of the disparate and discriminatorily dilutive effect of adopting either Map 1 or 2—but particularly Map 2—on Black and Latino voters. Dkt. 54 at 24. The DOJ's 2012 letter clearly describes the dilutive effect of adding the Bolivar Peninsula to Precinct 3, as the commissioners court proposed to do in Map 1, and the public outcry—including Commissioner Holmes's own map proposals and public statements—emphasized how destructive Map 2 would

be to Black and Latino voting power. FAC ¶¶ 58–60, 81–84. The foreseeable effect of an action to dilute minority voting strength is "objective evidence that, combined with other evidence, provide[s] ample support for finding discriminatory intent." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 728 (S.D. Tex. 2017).

For the third *Arlington Heights* factor—departures from the normal procedural sequence—the plaintiffs note their detailed allegations regarding the hearing on November 12, 2021, including the numerous barriers to public access. Dkt. 54 at 25 (citing FAC ¶¶ 70–83); *see also* FAC ¶¶ 66–69, 84–89. The plaintiffs argue that this is similar to the statewide redistricting case, where allegations that "minority legislators were treated unfavorably" and the adoption of "procedures that made it difficult for non-English speaking members of the public to participate" were sufficient to render the plaintiffs' theory of discriminatory intent plausible. Dkt. 54 at 25 (quoting *LULAC III*, 604 F. Supp. 3d at 508).

For the fourth *Arlington Heights* factor—substantive departures from usual decision-making factors—the plaintiffs allege that the commissioners court failed to adhere to traditional redistricting principles, such as preserving the cores of existing districts, communities of interest, and non-discriminatory incumbent protection—although all the Anglo incumbents

remained in their own winnable precincts, Commissioner Holmes's precinct became practically unwinnable for him. FAC ¶¶ 59–61, 65, 94.

Finally, regarding the last *Arlington Heights* factor—legislative history—the plaintiffs allege that the exclusion of the sole non-Anglo commissioner from the decisionmaking process and the refusal to seriously consider his concerns is probative. Dkt. 54 at 25; *see, e.g.*, *Perez*, 253 F. Supp. 3d at 961 (listing the "exclusion of minority member[s] and public input despite the minority population growth" as probative of intentional discrimination).

The defendants' counterarguments are solely factual and, at this stage, cannot "on their own render [the p]laintiffs' allegations implausible." *LULAC I*, No. EP-21-CV-00259-DCG-JES-JVB, 2022 WL 174525, at *4 (W.D. Tex. Jan. 18, 2022) (citing *Arnold v. Williams*, 979 F.3d 262, 268 (5th Cir. 2020) (holding that at the 12(b)(6) stage "it is inappropriate for a district court to weigh the strength of the allegations")). In light of the plaintiffs' showing as to the *Arlington Heights* factors and accepting all well-pleaded factual allegations as true and viewing them in the light most favorable to the non-movant, the court finds the NAACP plaintiffs have pleaded a plausible intentional vote-dilution claim.

## IV.  CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss the NAACP plaintiffs' claims is denied. Dkt. 47.

Signed on Galveston Island this 30th day of March, 2023.

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE