# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

No. 3:22-cv-57

TERRY PETTEWAY, *ET AL.*, *PLAINTIFFS*,

v.

GALVESTON COUNTY, *ET AL.*, *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

Before the court is the defendants' motion to dismiss the United States' first amended complaint under Fed. R. of Civ. P.12(b)(1) and 12(b)(6). Dkt. 48. The court denies the motion.

## I. BACKGROUND[1]

### A. Factual Background

This case arises out of the 2021 redistricting of the Galveston County Commissioners Court precincts. *United States v. Galveston County*, No. 3:22-cv-93, ECF 30 (S.D. Tex. May 31, 2022) ("FAC").

---

[1] When hearing a motion to dismiss under Rule 12(b)(6), factual allegations in the complaint must be taken as true and construed favorably to the plaintiff.

The United States alleges that during the 2021 redistricting cycle, the defendants dismantled the commissioners court's sole, longstanding minority opportunity-to-elect district, *i.e.*, a district in which the county's minority citizens have an equal opportunity to elect their preferred candidates of choice. FAC ¶ 2. To do so, the defendants failed to adopt any redistricting criteria, deliberately excluded the commissioner elected from the sole minority opportunity-to-elect district from being meaningfully involved in the drawing of the 2021 plan, and limited public participation in the 2021 redistricting process. *Id.* ¶¶ 3–4.

The United States further alleges that resolving the malapportionment revealed by the release of the 2020 census data did not require the county to redraw the commissioners-court map in its entirety, nor did it require the county to dismantle the commissioners court's sole, longstanding opportunity district. *Id.* ¶ 5. In fact, the defendants could have reapportioned the map by shifting as little as a single voting precinct from Precinct 2 to Precinct 3. *Id.* Nevertheless, the county made drastic changes to the district lines for the commissioners court, thereby eliminating the only majority-minority district. *Id.* ¶ 6.

---

*Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The "facts" in this section are taken from the plaintiffs' pleadings.

Over the course of the past three decades, the United States alleges, Galveston County has sought to eliminate electoral opportunities for the county's Black and Latino voters. *Id.* ¶ 7. The county has a long history, the United States continues, of adopting discriminatory redistricting plans. *Id.* While Texas and its political subdivisions were subject to the preclearance requirements of Section 5 of the Voting Rights Act ("VRA"), the United States Attorney General twice interposed objections under Section 5 to the county's proposed redistricting plans. *Id.* ¶ 8. In 1992, the Attorney General interposed an objection against the county's proposed plan for justice of the peace and constable districts. *Id.* In 2012, the Attorney General interposed an objection against the county's proposed plans for commissioners-court districts, as well as for justice of the peace and constable districts. *Id.* The Attorney General did so because the county did not meet its burden of showing that the proposed plans had either the purpose or effect of denying or abridging the right to vote for minority voters. *Id.*

**B. Procedural Background**

On March 24, 2022, the United States sued the defendants—Galveston County; the commissioners court; and the Honorable Mark Henry, in his official capacity as Galveston County Judge. *Galveston County*, No. 3:22-cv-93, ECF 1. On May 31, 2022, the United States amended its complaint.

On June 1, 2022, the court consolidated this case with Civil Action No. 3:22-cv-117, *Dickinson Bay Area Branch NAACP v. Galveston County*, and Civil Action No. 3:22-cv-57, *Honorable Terry Petteway v. Galveston County*, as the lead case under Fed. R. of Civ. P. 42(a). Dkt. 45. All three suits challenge the 2021 Galveston County redistricting process.

The United States' sole cause of action is vote dilution in violation of VRA Section 2. FAC ¶¶ 118–123. The defendants have moved to dismiss. Dkt. 48 at 2–3.

## II.   LEGAL STANDARD
### A. Rule 12(b)(1)

A court should grant a motion to dismiss for lack of subject-matter jurisdiction if the court "lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). The party asserting jurisdiction bears the burden of proof. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). Federal courts have jurisdiction over a claim between parties only if the plaintiff presents an actual case or controversy. U.S. Const. art. III, § 2, cl. 1; *Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001). "The many doctrines that have fleshed out that 'actual controversy' requirement— standing, mootness, ripeness, political question, and the like—are 'founded in concern about the proper—and properly limited—role of the courts in a

democratic society.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 541–42 (5th Cir. 2008) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

To test whether the party asserting jurisdiction has met its burden, a court may rely on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996). When standing is challenged in a motion to dismiss, the court must "accept as true all material allegations of the complaint and . . . construe the complaint in favor of the complaining party." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quotations omitted).

### B. Rule 12(b)(6)

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The claim is facially plausible when the well-pleaded facts allow the court to reasonably infer that the defendant is liable for the alleged conduct. *Id.* "The court does not 'strain to find inferences favorable to the plaintiffs' or 'accept conclusory allegations,

unwarranted deductions, or legal conclusions.'" *Vanskiver v. City of Seabrook*, No. H-17-3365, 2018 WL 560231, at *2 (S.D. Tex. Jan. 24, 2018) (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). Naked assertions and formulaic recitals of the elements of the cause of action will not suffice. *Iqbal*, 556 U.S. at 678. Even if the facts are well-pleaded, the court must still determine plausibility. *Id.* at 679.

## III. ANALYSIS

The defendants argue that the United States' claim fails for a variety of reasons: (1) the court lacks jurisdiction because this is actually a non-justiciable partisan-gerrymandering claim; (2) the case is now moot with the appointment of Dr. Robin Armstrong to the commissioners court; (3) the United States lacks standing because it has not adequately pleaded redressability; (4) the United States fails to plead sufficient facts to satisfy the second and third *Gingles* preconditions; and (5) the United States fails to plead sufficient facts to demonstrate that discriminatory intent was at least part of the decisionmaking process for enacting the 2021 commissioners-court precincts. Dkt. 48 at 1–2. The court addresses each argument in turn.

### A. Justiciability

Article III of the Constitution limits the jurisdiction of federal courts to deciding actual cases and controversies. *Rucho v. Common Cause*, 139 S. Ct.

2484, 2493 (2019). This, in part, means that courts are limited to deciding cases that are "historically viewed as capable of resolution through the judicial process." *Id.* at 2493–94. Cases that lack judicially manageable standards to resolve them are nonjusticiable political questions. *Id.* at 2494.

Only three types of redistricting claims are justiciable: (1) one-person-one-vote challenges; (2) racial-gerrymandering claims; and (3) vote-dilution claims under VRA Section 2. *Id.* at 2495–96. Judicially manageable standards to adjudicate partisan-gerrymandering claims are elusive. This is because partisanship is expected to happen in redistricting. *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973). Without clear judicially manageable standards, courts "risk assuming political, not legal, responsibility for a process that often produces ill will and distrust." *Rucho*, 139 S. Ct. at 2498.

The defendants argue that this court lacks jurisdiction because the United States' allegations, though "adorned in language sounding in the Voting Rights Act . . . amount to claims of partisan gerrymandering," which are non-justiciable political questions. Dkt. 48 at 2. The defendants contend this is simply a case about politics; the United States has dressed its partisan desires as racial problems to find judicial relief, but this court is not responsible for "vindicating generalized partisan preferences." *Id.* at 11 (quoting *Rucho*, 139 S. Ct. at 2501).

The United States responds that it has asserted a justiciable vote-dilution claim under VRA Section 2. Dkt. 56 at 7–8. Moreover, the United States' first amended complaint makes no claims regarding the partisan preferences of any voters. FAC ¶¶ 118–123. Rather, the United States claims the 2021 redistricting plan violates Section 2 because it results in denying Black and Latino voters, on account of their race, an equal opportunity to participate in the political process and to elect representatives of their choice by diluting their voting strength and was adopted, at least in part, for a discriminatory purpose. *Id.* ¶¶ 119–121.

The court agrees with the United States. Rather than mere partisan claims, it has alleged a justiciable controversy for which there are "judicially discoverable and manageable standards." *Baker v. Carr*, 369 U.S. 186, 217 (1962).

### B. Mootness

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies" and do not have "the power 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citation omitted). "To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the

complaint is filed.'" *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997) (quotation omitted). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

In other words, "[m]ootness applies when intervening circumstances render the court no longer capable of providing meaningful relief to the plaintiff." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013). A defendant claiming mootness "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

The defendants argue that the United States' case is moot because County Judge Henry appointed Dr. Armstrong, who is African American, to the commissioners court to serve as the commissioner for Precinct 4. Dkt. 48 at 13. The defendants contend that because the commissioners court is now 40% African American—slightly higher than the Black and Latino percentage of the total voting-age population (35.6%)— they now have proportional representation, mooting the United States' claims. *Id.*

The defendants misunderstand the United States' claim if they believe the appointment of Dr. Armstrong resolves the allegations of racial gerrymandering and violations of VRA Section 2. In a vote-dilution claim, "it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important." *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 503 (5th Cir. 1987) (citing *Thornburg v. Gingles*, 478 U.S. 30, 69 (1986)). The defendants have proffered no evidence that Dr. Armstrong is the candidate of choice of Black and Latino voters and simply tout the fact that he is Black. On the other hand, the United States has provided substantial factual allegations supporting Commissioner Stephen Holmes's status as the candidate of choice for Black and Latino voters since he was first elected as commissioner for Precinct 3 in 1999. FAC ¶¶ 20–21, 35–36, 46–48, 58, 80–82.

Equally misplaced is the defendants' contention that, with the appointment of Dr. Armstrong, "African American representation on the commissioners court is greater than the proportion of Black and Latino residents in Galveston County." Dkt. 48 at 13. While proportionality is a consideration as part of the totality-of-the-circumstances analysis under the VRA, it is the proportion of minority-opportunity districts that is relevant— *i.e.*, the number of districts in which minority voters can elect their candidate

of choice in relation to the number of minority voters jurisdiction-wide. *See LULAC v. Perry*, 548 U.S. 399, 426 (2006) ("Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area.").

The defendants neither contend nor offer any evidence to suggest that Dr. Armstrong is the candidate of choice for Black and Latino voters in Galveston County, nor that the new plan creates any district in which minority voters will be able to elect their preferred candidate. Accordingly, the court finds that this controversy is decidedly live.

## C. Standing

Standing is a constitutional prerequisite for this court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To demonstrate standing, a plaintiff must show (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) a likelihood that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (quotations omitted). Standing is assessed plaintiff by plaintiff and claim by claim. *See In re Gee*, 941 F.3d 153, 171 (5th Cir. 2019).

Redressability tests whether a favorable decision would "amount to a significant increase in the likelihood that the plaintiff would obtain relief that

directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002). Redressability also tests whether "the *effect of the court's judgment on the defendant*—not an absent third party"—redresses the plaintiff's injury. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (emphasis in original). Ultimately, in the context of injunctive relief, a plaintiff cannot satisfy the redressability prong of standing when the plaintiff sues a defendant who has no power to redress the alleged injury. *Okpalobi*, 244 F.3d at 426–27.

Therefore, a plaintiff must plead facts demonstrating that the defendant has "definite responsibilities relating to the application of" the challenged law. *Voting for Am., Inc. v. Andrade*, 888 F. Supp. 2d 816, 831 (S.D. Tex. 2012), *rev'd on other grounds*, *Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013). By contrast, redressability "will not exist where a governmental defendant has no 'duty or ability to do anything' about the enforcement of the challenged law." *Id.* at 830–31 (emphasis omitted).

To survive a motion to dismiss, "a complaint must present enough facts to state a plausible claim to relief." *Mandawala v. Northeast Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021); *see also Ghedi v. Mayorkas*, 16 F.4th 456, 464 (5th Cir. 2021) ("[T]he same plausibility standard that applies in the Rule 12(b)(6) context also applies to Rule 12(b)(1) [dismissals for want of

subject-matter jurisdiction].”). “[E]xhaustive detail” is not required, but “the pleaded facts must allow a reasonable inference that the plaintiff should prevail.” *Mandawala*, 16 F.4th at 1150. “[L]egal conclusions [and] ‘threadbare recitals of the elements of a cause of action” will not suffice. *Id.* (quoting *Iqbal*, 556 U.S. at 678) (alteration adopted).

The defendants argue the United States lacks standing because it has not pleaded sufficient facts demonstrating redressability, *i.e.*, that a favorable court decision will remedy the alleged injury. Dkt. 48 at 15. Specifically, the defendants point to the United States’ failure to plead that the defendants have the authority to administer, implement, or conduct elections in Galveston County. *Id.*

The United States responds that a favorable decision by this court will redress its injuries. Dkt. 56 at 13. Under the Texas Constitution, a county’s commissioners court is responsible for determining and approving the boundaries of the county’s four commissioners-court precincts, and elections for that county’s commissioners must be conducted under the map approved by the county’s commissioners court. Tex. Const. art. V, § 18(b) (“Each county shall . . . be divided into four commissioners precincts in each of which there shall be elected by the qualified voters thereof one County Commissioner”); *id.* § 18(a) (requiring the “division or designation” into

these precincts to be "made by the Commissioners Court"); *see also* FAC ¶ 22. Thus, the relief that the United States seeks depends entirely on the defendants' actions—and not on the actions of some unnamed, absent third party.

The court agrees with the United States. The defendants' case law is *readily* distinguishable from the instant case and therefore inapposite here, where the United States' injuries are clearly redressable by a favorable decision from this court. The United States has standing to pursue its claim.

### D. *Gingles* Claim

The United States brings a vote-dilution claim under VRA Section 2. FAC ¶¶ 118–123. Such claims are often called *Gingles* claims after *Thornburg v. Gingles*, 478 U.S. 30 (1986), because that case provides the "framework" for evaluating Section 2 vote-dilution claims. *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam).[2]

#### 1. Governing Law

VRA Section 2, 52 U.S.C. § 10301, imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby County v. Holder*, 570 U.S.

---

[2] *Gingles* itself involved Section 2 challenges to multimember districts, 478 U.S. at 46, but the Supreme Court later extended the analysis to apply to Section 2 challenges to single-member districts like the ones at issue here. *See Growe v. Emison*, 507 U.S. 25, 40–41 (1993).

529, 557 (2013). While Section 2 encompasses claims based on discriminatory intent, a violation can "be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 394 n.21, 404 (1991); *see also, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc). Section 2 prohibits vote dilution, such as the use of redistricting plans that "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Gingles*, 478 U.S. at 47 (internal citations and quotation marks omitted).

The language of Section 2 specifically prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). That occurs when "the totality of circumstances" shows that a state's "political processes . . . are not equally open to participation by" members of a minority group "in that [they] have less opportunity . . . to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

In *Gingles*, the Supreme Court "construed" Section 2 to prohibit the "dispersal of a [minority] group's members into districts in which they constitute an ineffective minority of voters." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (alteration adopted) (quoting *Gingles*, 478 U.S. at 46 n.11). When

"minority and majority voters consistently prefer different candidates" in such districts, "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters," thus depriving minorities of an equal opportunity to elect representatives of their choice. *Gingles*, 478 U.S. at 48.

A successful *Gingles* claim remedies that situation by undoing the dispersal of minorities. It does so by requiring their concentration into a new majority-minority district that will allow the group, usually, to be able to elect its preferred candidates. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion). These Section 2-required districts are often described as "opportunity districts." *See, e.g.*, *LULAC*, 548 U.S. at 428–29; Nicholas O. Stephanopoulos, *The South After* Shelby County, 2013 Sup. Ct. Rev. 55, 75 n.84 (2013).

*Gingles* claims are complicated and analytically intensive. To require its proposed district to be adopted, a *Gingles* plaintiff must make two showings. *First*, it must establish three preconditions. *Wis. Legislature*, 142 S. Ct. at 1248. Those preconditions are necessary to show that the *Gingles* theory describes the proposed district, *see Gingles*, 478 U.S. at 48–49, so each must be met for the claim to succeed, *Harris*, 581 U.S. at 305–06. *Second*, the plaintiff must show that, under the "totality of circumstances,"

the "political process is [not] equally open to minority voters" without the proposed district. *Wis. Legislature*, 142 S. Ct. at 1248 (quoting *Gingles*, 478 U.S. at 79). Because the defendants' motion focuses on the preconditions, the court discusses them in further detail below.

The first precondition is that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. That is "needed to establish that the minority has the potential to elect a representative of its own choice." *Growe*, 507 U.S. at 40. Accordingly, the minority group must be able to constitute a majority by CVAP.[3] *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852–53 (5th Cir. 1999); *see also LULAC*, 548 U.S. at 428–29 (analyzing CVAP and noting that "only eligible voters affect a group's opportunity to elect candidates"). And the population for which that majority must be shown is the population in the proposed district. *See Harris*, 581 U.S. at 302; *LULAC*, 548 U.S. at 427–28; *Growe*, 507 U.S. at 40.[4]

---

[3] Citizen Voting Age Population, or CVAP, is the segment of the population that is, by virtue of age and citizenship, eligible to vote.

[4] To satisfy the first *Gingles* precondition, a plaintiff must also allege that its proposed majority-minority district "is consistent with 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (quoting *LULAC*, 548 U.S. at 433). "[C]ombining 'discrete communities of interest'—with 'differences in socio-economic status, education, employment, health, and other characteristics'—is impermissible." *Id.* (quoting *LULAC*, 548 U.S. at 432); *see also*

The second and third preconditions are often discussed together. The second requires the minority group to be "politically cohesive." *Gingles*, 478 U.S. at 51. The third is that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (citation omitted). Unless both are met, "the challenged districting [does not] thwart[] a distinctive minority vote by submerging it in a larger white voting population." *Growe*, 507 U.S. at 40.

Plaintiffs normally demonstrate minority political cohesion by showing that "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56; *see also Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988). That is described as "bloc voting" (just like the third precondition)[5] and typically means that a large majority of the group favors the same candidates.[6] When both minorities and

---

*id.* at 219 (concluding that testimony indicating that proposed alternative district was "culturally compact" supported finding that proposed district "preserve[d] communities of interest").

[5] *E.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Fusilier v. Landry*, 963 F.3d 447, 458 (5th Cir. 2020).

[6] *Compare LULAC*, 548 U.S. at 427 (finding "especially severe" bloc voting when roughly 90% of each racial group votes for different candidates), *with Strickland*, 556 U.S. at 16 (plurality opinion) (noting "skeptic[ism]" about Anglo-bloc voting when 20% of Anglos would need to cross over to satisfy the first *Gingles* precondition); *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (noting that only 22-38% crossover by Anglos and 20-23% crossover by Black voters supported a

Anglos vote in blocs, courts conclude that voting is "racially polarized"[7] and typically hold that both the second and third preconditions have been met.[8]

Even so, the second and third preconditions are not mirror-image requirements for different racial groups. As relevant here, a *Gingles* plaintiff must show the second precondition for the minority population that would be included in its proposed district. *See Harris*, 581 U.S. at 301–02; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. In contrast, the third precondition must be established for the *challenged* districting. *See Harris*, 581 U.S. at 302; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. Importantly, Fifth Circuit precedent does not preclude a plaintiff from establishing the third precondition even if the challenged district is not majority Anglo by CVAP. *See Salas v. Southwest Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir.

---

finding that voting was not racially polarized). The necessary size of the majority, however, is a district-specific inquiry. *See Gingles*, 478 U.S. at 55–56.

[7] *See, e.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993); *Gingles*, 478 U.S. at 52 n.18; *Fusilier*, 963 F.3d at 458. The existence of racially polarized voting is also one of the factors that *Gingles* highlights as relevant to the totality-of-the-circumstances inquiry. *See* 478 U.S. at 44–45, 80.

[8] *See, e.g.*, *LULAC*, 548 U.S. at 427; *Gingles*, 478 U.S. at 56; *Fusilier*, 963 F.3d at 458–59; *Campos*, 840 F.2d at 1243. *But see LULAC v. Clements*, 999 F.2d 831, 849–51 (5th Cir. 1993) (en banc) (emphasizing that the plaintiff must still show that the bloc voting is "legally significant").

1992). Even so, such a plaintiff faces an "obvious, difficult burden" in establishing that situation. *Id.*

One last note. It bears emphasizing that each of these preconditions must be shown on a district-by-district basis. *See Wis. Legislature*, 142 S. Ct. at 1250; *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018); *LULAC*, 548 U.S. at 437; *Gingles*, 478 U.S. at 59 n.23. Because *Gingles* claims relate to the political experiences of a minority group in a particular location, a "generalized conclusion" cannot adequately answer "'the relevant local question' whether the preconditions would be satisfied as to each district." *Wis. Legislature*, 142 S. Ct. at 1250 (quoting *Harris*, 581 U.S. at 335 n.5 (Alito, J., concurring in part)). Ultimately, a plaintiff must prove that an "alternative to the districting decision at issue would . . . enhance the ability of minority voters to elect the candidates of their choice." *Perez*, 138 S. Ct. at 2332.

### 2. *Gingles* Preconditions

The defendants argue that the United States fails to plead sufficient facts to establish that the second and third *Gingles* preconditions—minority political cohesion and Anglo-bloc voting—are met. Dkt. 48 at 17–18. Specifically, the defendants contend that the United States has not plausibly shown that Black and Latino voters are sufficiently politically cohesive or

that Anglo-bloc voting usually defeats the minority coalition's preferred candidate. *Id.* at 17.

The United States alleges that Black and Latino voters are cohesive and have voted for the same candidates in recent elections. FAC ¶ 92. It further alleges that Black and Latino voters would have voted for the same candidate in a majority-minority district. *Id.* The defendants maintain, however, that these allegations of cohesion "[do not] say anything about how unified" Black and Latino voters are in supporting certain candidates. Dkt. 48 at 17–18 (quoting *LULAC v. Abbott*, 604 F. Supp. 3d 463, 499 (W.D. Tex. 2022)). The defendants also argue that the United States' allegation that "[n]on-[Latino] white voters in Galveston County vote sufficiently as a bloc to usually defeat preferred candidates of minority voters in the absence of a majority-minority district," FAC ¶ 93, is nothing more than a recitation of the elements of a cause of action and does nothing to move the needle from conceivable to plausible. Dkt. 48 at 18.

The United States responds that it has plausibly alleged all *Gingles* preconditions. Dkt. 56 at 15 (citing FAC ¶ 2, 5, 21, 90–93, 109). For the second *Gingles* precondition, the United States argues it has made a showing that a coalition of Black and Latino voters in Galveston County tend to vote the same way. *Id.* at 13 (quoting *LULAC v. Abbott*, No. EP-21-CV-00259-

DCG-JES-JVB, 2022 WL 174525, at *2 (W.D. Tex. Jan. 18, 2022)). To begin, the United States alleges that:

> statistical analyses of voting patterns in Galveston County demonstrate that in illustrative redistricting plans in which Black and [Latino] citizens combined to constitute a majority of the citizen voting age population in one single-member commissioner district, Black and [Latino] voters in such a district would have voted for the same candidates.

FAC ¶ 92. In an illustrative plan drawn by shifting just a single voting precinct from the 2012 plan, statistical analyses of several exogenous statewide elections between 2014 and 2020 indicate that Black and Latino voters in commissioners Precinct 3 would have supported the same candidate. Dkt. 56 at 16.

The United States also alleges that "the electorate in Galveston County's prior versions of commissioners[-]court Precinct 3, in which Black and [Latino] persons form a majority, has elected a minority county commissioner for over three decades." FAC ¶ 109; *see also id.* ¶¶ 2, 5, 21, 31. The United States also alleges that there is only one other electorate in the county in which Black or Latino residents are a majority, and that electorate is the only other one in which Black candidates have been successful—specifically, candidates for justice of the peace and constable. Dkt. 56 at 16 (citing FAC ¶ 109).

As to the third *Gingles* precondition, the United States argues that it has done far more than merely recite a cause of action. *Id.* Rather, it alleges that racially polarized voting—whereby Galveston County's non-Latino White voters vote sufficiently as a bloc to usually defeat the minority-preferred candidate—was confirmed by reconstituted election analyses for statewide elections between 2014 and 2020. *Id.* at 18 (citing FAC ¶ 93). These elections showed that under the 2021 adopted commissioners-court plan, the candidate of choice for Black and Latino voters was consistently defeated in all four adopted commissioners-court districts, including the newly drawn Precinct 3. *Id.* (citing FAC ¶ 93).

The United States has met its burden. Taking its well-pleaded factual allegations as true and viewing them in the light most favorable to the non-movant, it has alleged demographic facts that make it plausible that not only are Black and Latino voters a politically cohesive coalition but that Anglo-bloc voting usually results in the defeat of the minority coalition's preferred candidate. Because the United States has satisfied the *Gingles* preconditions, its claim survives.

### 3. Discriminatory Intent

A *Gingles* claim may be established by proof of discriminatory intent or results. *Chisom*, 501 U.S. at 394 n.21, 404. In a VRA Section 2 claim of

intentional discrimination, a plaintiff must plead that racial discrimination was one purpose of the challenged government action. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). Courts use the factors outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to determine intent in a Section 2 claim. *See id.*

To state an intentional-discrimination claim, "racial discrimination need only be one purpose, and not even a primary purpose" of the challenged plan. *Veasey*, 830 F.3d at 230 (quoting *Brown*, 561 F.3d at 433). "[I]ndirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions may be considered." *Brown*, 561 F.3d at 433 (quotation marks omitted).

Accordingly, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence on intent as may be available." *Arlington Heights*, 429 U.S. at 266. "The impact of the official action . . . provide[s] an important starting point." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). From there, courts consider "five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose": (1) "the historical background of the decision," (2) "the specific sequence of events leading up to the decision," (3) "departures from the

normal procedural sequence," (4) "substantive departures," and (5) "legislative history." *Veasey*, 830 F.3d at 231 (quotation marks omitted); *see also Arlington Heights*, 429 U.S. at 267–68. Evidence of "race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will towards minorities because of their race," is not required. *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017).

The defendants challenge the United States' allegations that support a theory of intentional racial discrimination, arguing that evidence of any illicit racial purpose in the complaint is "thin at best." Dkt. 48 at 18. In the defendants' view, the United States' intentional-discrimination claim arises from its allegations that the commissioners court failed to adopt redistricting criteria, deliberately excluded Commissioner Holmes from the process, held only one meeting to discuss the proposed redistricting plans, and did not make the proposed maps available to the public for review and comment. *Id.* (citing FAC ¶¶ 39, 59–60).

Moreover, the defendants argue that the United States' legal authority for the proposition that these allegations constitute illicit intent rests almost exclusively on a 2012 letter from the Department of Justice ("DOJ") concerning whether the commissioner court's map then presented to the DOJ for preclearance satisfied VRA Section 5. *Id.* at 19. Additionally, the

defendants contend that the DOJ's determination in 2012 that the commissioners-court map did not satisfy Section 5 does not bind this court for the 2021 map or Section 2 vote-dilution claim. *Id.* The defendants remind the court that a DOJ preclearance memorandum is not authoritative when conducting constitutional adjudication, as this court retains "an independent obligation in adjudicating consequent equal protection challenges." *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 922 (1995)). Finally, the defendants raise the specter of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), in telling the court that it, and not the DOJ, has the duty of saying what the law is. *Id.*

The United States responds that it has adequately pleaded that the 2021 redistricting plan violates Section 2 because its adoption was motivated at least in part by a racially discriminatory intent. Dkt. 56 at 19. In fact, the United States points to its substantial allegations in its first amended complaint, which it argues meets each category of evidence *Arlington Heights* identified as relevant to inferring that race was "a motivating factor" behind the enactment of the 2021 redistricting plan. *Id.* (citing *Arlington Heights*, 429 U.S. at 266).

*First*, the United States alleges that the 2021 commissioners court redistricting plan will dilute minority voting strength in Galveston County.

FAC ¶¶ 2, 6, 85, 88–93, 112. The adopted plan not only dramatically reshapes Precinct 3 to cut the Black and Latino citizen voting-age population by more than half (from nearly 58% in the previous plan to under 27% in the adopted plan) but also unnecessarily fragments the Black and Latino population among the three other precincts so that they constitute an ineffectual numerical minority in those districts. *Id.* ¶¶ 21, 85, 88. Quite notably, the adopted commissioners-court plan splits voting precinct 336, which had the largest Black voting-age population and highest percentage of Black voting-age population in the county and was wholly located within the previous Precinct 3 for over twenty years. *Id.* ¶¶ 50, 55. The adopted plan moved voting precinct 336 entirely out of commissioners Precinct 3 and split it between commissioners Precincts 1 and 4 in the adopted plan. *Id.* ¶ 55.

*Second*, the United States argues that the history of redistricting in Galveston County supports an inference of a racial motivation. Dkt. 56 at 20. That history includes successful litigation challenging the county's redistricting plan for the election of several constable/justice-of-the-peace districts and Section 5 objections by the Attorney General in two of the last three redistricting cycles. FAC ¶¶ 7–8, 24–28, 113–114. In 1992—and again in 2012—the Attorney General objected to the county's submission of its constable/justice-of-the-peace districts. *Id.* ¶¶ 8, 24, 26–28. Moreover, the

United States alleges that the 2021 commissioners-court plan resulted in the elimination of Precinct 3 as a district in which minority voters could elect candidates of choice—a reprise of the county's proposal in 2012, which was blocked by the Attorney General's objection. *Id.* ¶¶ 27, 50–51, 88.

*Third*, the United States contends that its allegations concerning the sequence of events and substantive and procedural departures from the norm that preceded the county's adoption of the 2021 commissioners-court plan also plausibly support an inference of discriminatory intent. Dkt. 56 at 21. Most notably, the United States' complaint includes allegations showing that the same procedural and substantive deviations that tainted Galveston County's 2012 redistricting process reappeared during the 2021 cycle: the failure to adopted redistricting criteria, the deliberate and ongoing exclusion of the only minority commissioner from the process, and the elimination of the only district in which minority voters had an equal opportunity to elect candidates of choice. FAC ¶¶ 3, 26–28, 39, 44–48, 58. The United States also details how the 2021 redistricting process departed from the normal procedural sequence of past redistricting cycles, including how the defendants engaged in a process that was so abridged and exclusionary that it significantly curtailed any opportunity for meaningful participation by the public. *Id.* ¶¶ 4, 41–45, 57, 59–66, 68–78.

*Fourth* (and finally), the United States argues that it alleges that the proffered rationale for eliminating Precinct 3, the only district in which Black and Latino voters had an opportunity to elect, was pretextual. Dkt. 56 at 22 (citing FAC ¶¶ 5, 52, 83–84, 86–87, 117).

On the past Section 5 determinations by the DOJ, the United States contends that it is not relying exclusively on those determinations to support its claim of discriminatory intent. *Id.* Rather, the allegations concerning the Attorney General's objections to the commissioners-court, justice-of-the-peace, and constable plans are support for each category of relevant evidence under *Arlington Heights*. The DOJ's Section 5 determination for the attempted revision to commissioners Precinct 3 in 2012 is particularly informative as to the county's motivation when it adopted a redistricting plan in 2021—to eliminate the only commissioners precinct in which Black and Latino voters constituted a majority of the electorate and enjoyed the opportunity to elect candidates of their choice. *Id.* (citing FAC ¶¶ 8, 26–28, 31–32, 113–114). Consequently, these determinations and the conduct giving rise to them are relevant evidence of discriminatory intent. *See Arlington Heights*, 429 U.S. at 267 ("The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.").

The United States also argues that courts considering intent claims under Section 2, including the Fifth Circuit, routinely take into account and afford due weight to Section 5 determinations by the DOJ as part of the *Arlington Heights* inquiry into the historical background of the decision. Dkt. 56 at 23 (citing *Veasey*, 830 F.3d at 230–31 (considering as relevant analysis of a photographic voter identification law and circumstantial evidence of discriminatory intent, including past DOJ determinations regarding redistricting plans)).

The defendants' counterarguments are solely factual and, at this stage, cannot "on their own render [the p]laintiffs' allegations implausible." *LULAC*, 2022 WL 174525, at *4 (citing *Arnold v. Williams*, 979 F.3d 262, 268 (5th Cir. 2020) (holding that at the 12(b)(6) stage "it is inappropriate for a district court to weigh the strength of the allegations")). In light of the United States' showing as to the *Arlington Heights* factors and accepting all well-pleaded factual allegations as true and viewing them in the light most favorable to the non-movant, the court finds the United States has pleaded a plausible intentional vote-dilution claim.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss the United States' claims is denied. Dkt. 48.

Signed on Galveston Island this 30th day of March, 2023.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE