# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

No. 3:22-cv-57

TERRY PETTEWAY, *ET AL.*, *PLAINTIFFS*,

v.

GALVESTON COUNTY, *ET AL.*, *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

Before the court is the defendants' motion to dismiss the Petteway plaintiffs' second amended complaint under Fed. R. of Civ. P. 12(b)(1) and 12(b)(6). Dkt. 46. The court grants in part and denies in part.

## I. BACKGROUND[1]

During the 2011 redistricting cycle, Galveston County adopted a redistricting plan that allegedly diminished the equal opportunity for Black and Latino voters to elect candidates for the commissioners court.

---

[1] When hearing a motion to dismiss under Rule 12(b)(6), factual allegations in the complaint must be taken as true and construed favorably to the plaintiff. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The "facts" in this section are taken from the plaintiffs' pleadings.

Dkt. 42 ¶ 2. At that time, the county was subject to federal preclearance under the Voting Rights Act ("VRA"). *Id.* The Department of Justice ("DOJ") objected to, and obtained an injunction against, the commissioners-court plan under VRA Section 5. *Id.* ¶ 3. The DOJ and the county eventually negotiated a plan, the "benchmark plan," for the commissioners court that maintained a majority-minority, or opportunity, district for Black and Latino voters in the county. *Id.* The district court subsequently issued a permanent injunction, which ordered the county to adopt the commissioners-court plan negotiated with the DOJ. *Id.* ¶ 4; *see also Petteway v. Galveston County*, No. 3:11-cv-511, ECF 69 at 1 (S.D. Tex. Mar. 23, 2012).

Despite the substantial growth of the county's minority voting-age population evident in the 2020 census, the county adopted the "enacted plan," which allegedly eliminates the sole minority-opportunity district for the commissioners court—virtually the same plan that failed to pass preclearance review in 2012. Dkt. 42 ¶¶ 5–6.

On June 1, 2022, the court consolidated Civil Action No. 3:22-cv-93, *United States v. Galveston County*, and Civil Action No. 3:22-cv-117, *Dickinson Bay Area Branch NAACP v. Galveston County*, with Civil Action No. 3:22-cv-57, *Honorable Terry Petteway v. Galveston County*, as the lead

case under Fed. R. of Civ. P. 42(a). Dkt. 45. All three suits challenge the 2021 Galveston County redistricting process.

In the lead case, the plaintiffs—Terry Petteway, the Honorable Derrick Rose, Michael Montez, Penny Pope, and Sonny James ("the Petteway plaintiffs" or "the plaintiffs")—bring this action under the Constitution, 42 U.S.C. § 1983, and 52 U.S.C. § 10301 against the defendants—Galveston County and the Honorable Mark Henry in his official capacity as Galveston County Judge. Dkt. 42. The Petteway plaintiffs allege that Galveston County has adopted a redistricting map that eliminates the sole minority-opportunity district for the commissioners court. *Id.* ¶ 6. They further contend that the 2021 commissioners-court plan reduces the ability of Black and Latino voters to elect their candidates of choice by intentionally dismantling a majority-minority precinct and cracking Black and Latino voters across four precincts. *Id.*

The plaintiffs bring five causes of action: (1) intentional racial discrimination in violation of the Fourteenth Amendment; (2) intentional racial discrimination in violation of the Fifteenth Amendment; (3) racial gerrymandering in violation of the Fourteenth Amendment; (4) discriminatory results in violation of VRA Section 2; and (5) intentional

racial discrimination in violation of VRA Section 2. *Id.* ¶¶ 170–184. The defendants have moved to dismiss all of them. Dkt. 46 at 2–3.

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

A court should grant a motion to dismiss for lack of subject-matter jurisdiction if the court "lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). The party asserting jurisdiction bears the burden of proof. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). Federal courts have jurisdiction over a claim between parties only if the plaintiff presents an actual case or controversy. U.S. Const. art. III, § 2, cl. 1; *Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001). "The many doctrines that have fleshed out that 'actual controversy' requirement—standing, mootness, ripeness, political question, and the like—are 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 541–42 (5th Cir. 2008) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

Courts rely on three factors to test whether the party asserting jurisdiction has met its burden: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of

disputed facts." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996). When a party challenges standing in a motion to dismiss, the court must "accept as true all material allegations of the complaint and . . . construe the complaint in favor of the complaining party." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quotations omitted).

## B. Rule 12(b)(6)

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The claim is facially plausible when the well-pleaded facts allow the court to reasonably infer that the defendant is liable for the alleged conduct. *Id.* "The court does not 'strain to find inferences favorable to the plaintiffs' or 'accept conclusory allegations, unwarranted deductions, or legal conclusions.'" *Vanskiver v. City of Seabrook*, No. H-17-3365, 2018 WL 560231, at *2 (S.D. Tex. Jan. 24, 2018) (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). Naked assertions and formulaic recitals of the elements of the cause of action will not suffice. *Iqbal*, 556 U.S. at 678. Even if the facts are well-pleaded, the court must still determine plausibility. *Id.* at 679.

## III.  ANALYSIS

The defendants argue that the Petteway plaintiffs' claims fail for a variety of reasons: (1) the court lacks jurisdiction because this is actually a non-justiciable partisan-gerrymandering claim; (2) the case is now moot with the appointment of Dr. Robin Armstrong to the commissioners court; (3) plaintiff Michael Montez lacks standing as to his Precinct 3 vote-dilution claim, and without Montez, the remaining plaintiffs cannot state a Section 2 challenge to Precinct 3; (4) the plaintiffs fail to identify which precinct constitutes a racial gerrymander or to allege that any precinct line subordinates traditional redistricting principles to race; and (5) the plaintiffs fail to allege sufficient facts showing that the defendants enacted the commissioners-court plan with illicit intent, therefore requiring the court to dismiss the intentional vote-dilution claim. Dkt. 46 at 2–3. The court addresses each argument in turn.

### A. Justiciability

Article III of the Constitution limits the jurisdiction of federal courts to deciding actual cases and controversies. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2493 (2019). This, in part, means that courts are limited to deciding cases that are "historically viewed as capable of resolution through the judicial process." *Id.* at 2493–94. Cases that lack judicially manageable standards to resolve them are nonjusticiable political questions. *Id.* at 2494.

Only three types of redistricting claims are justiciable: (1) one-person-one-vote challenges; (2) racial-gerrymandering claims; and (3) vote-dilution claims under VRA Section 2. *Id.* at 2495–96. Judicially manageable standards to adjudicate partisan-gerrymandering claims are elusive. This is because partisanship is expected to happen in redistricting. *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973). Without clear, judicially manageable standards, courts "risk assuming political, not legal, responsibility for a process that often produces ill will and distrust." *Rucho*, 139 S. Ct. at 2498.

The defendants argue this court lacks jurisdiction because the Petteway plaintiffs' allegations, though "adorned in language sounding in the VRA and the Fourteenth Amendment . . . amount to partisan[-]gerrymandering claims," which are non-justiciable political questions. Dkt. 46 at 2. The defendants contend this is simply a case about politics—that the plaintiffs have dressed their partisan desires as racial problems to find judicial relief—but this court is not responsible for "vindicating generalized partisan preferences." *Id.* at 12–14 (quoting *Rucho*, 139 S. Ct. at 2501).

The Petteway plaintiffs respond that they have asserted justiciable racial-gerrymandering and vote-dilution claims under the Fourteenth Amendment, Fifteenth Amendment, and VRA Section 2. Dkt. 53 at 7.

Moreover, the plaintiffs' claims do not "ask for a fair share of political power and influence" but rather for the "elimination of a racial classification." *Id.* at 8 (quoting *Rucho*, 139 S. Ct. at 2502).

The court agrees with the plaintiffs. Rather than mere partisan claims, the plaintiffs have alleged a justiciable controversy for which there are "judicially discoverable and manageable standards." *Baker v. Carr*, 369 U.S. 186, 217 (1962).

## B. Mootness

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies" and do not have "the power 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citation omitted). "To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997) (quotation omitted). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

In other words, "[m]ootness applies when intervening circumstances render the court no longer capable of providing meaningful relief to the plaintiff." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013). A defendant claiming mootness "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

The defendants argue that the Petteway plaintiffs' case is moot because County Judge Henry appointed Dr. Armstrong, who is African American, to the commissioners court to serve as the commissioner for Precinct 4. Dkt. 46 at 15. The defendants contend that because the commissioners court is now 40% African American—slightly higher than the Black and Latino percentage of the total voting-age population (35.6%)—the plaintiffs now have proportional representation, mooting their claims. *Id.*

The defendants misunderstand the plaintiffs' claims if they believe the appointment of Dr. Armstrong resolves the allegations of racial gerrymandering and violations of VRA Section 2. In a vote-dilution claim, "it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important." *Citizens for a*

*Better Gretna v. City of Gretna*, 834 F.2d 496, 503 (5th Cir. 1987) (citing *Thornburg v. Gingles*, 478 U.S. 30, 69 (1986)). The defendants have proffered no evidence that Dr. Armstrong is the candidate of choice of Black and Latino voters and simply tout the fact that he is Black. On the other hand, the plaintiffs have provided substantial factual allegations supporting Commissioner Stephen Holmes's status as the candidate of choice for Black and Latino voters since he was first elected as commissioner for Precinct 3 in 1999. Dkt. 53 at 10 (citing Dkt. 46 ¶¶ 61–62, 80, 97, 123, 167).

Equally misplaced is the defendants' contention that, with the appointment of Dr. Armstrong, "African American representation on the commissioners court is greater than the proportion of Black and Latino residents in Galveston County." Dkt. 46 at 15. While proportionality is a consideration as part of the totality-of-the-circumstances analysis under the VRA, it is the proportion of minority-opportunity districts that is relevant— *i.e.*, the number of districts in which minority voters can elect their candidate of choice in relation to the number of minority voters jurisdiction-wide. *See LULAC v. Perry*, 548 U.S. 399, 426 (2006) ("Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area.").

The defendants neither contend nor offer any evidence to suggest that Dr. Armstrong is the candidate of choice for Black and Latino voters in Galveston County, nor that the new plan creates any district in which minority voters can elect their preferred candidate. Accordingly, the court finds that this controversy is decidedly live.

### C. Standing

Standing is a constitutional prerequisite for this court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To demonstrate standing, a plaintiff must show (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) a likelihood that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (quotations omitted). Standing is assessed plaintiff by plaintiff and claim by claim. *See In re Gee*, 941 F.3d 153, 171 (5th Cir. 2019).

To survive a motion to dismiss, "a complaint must present enough facts to state a plausible claim to relief." *Mandawala v. Northeast Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021); *see also Ghedi v. Mayorkas*, 16 F.4th 456, 464 (5th Cir. 2021) ("[T]he same plausibility standard that applies in the Rule 12(b)(6) context also applies to Rule 12(b)(1) [dismissals for want of subject-matter jurisdiction]."). "[E]xhaustive detail" is not required, but "the pleaded facts must allow a reasonable inference that the plaintiff should

prevail." *Mandawala*, 16 F.4th at 1150. "[L]egal conclusions [and] 'threadbare recitals of the elements of a cause of action'" will not suffice. *Id.* (quoting *Iqbal*, 556 U.S. at 678) (alteration adopted).

### 1. Montez

The defendants challenge the standing of plaintiff Michael Montez, arguing he has failed to plead that the commissioners court's enacted plan has injured him in a particular and individualized way because he resides in Precinct 1, not Precinct 3—the minority-opportunity district under the 2012 benchmark plan. Dkt. 46 at 15–16 (citing Dkt. 42 ¶¶ 23–24, 46, 56). Because Montez lives in Precinct 1 under both the benchmark and enacted plans, his ability to vote for a candidate of his choice has not been negatively affected. *Id.* at 16. Further, the Petteway plaintiffs also do not allege that it is possible to draw Montez into the benchmark Precinct 3, or into another sufficiently large and geographically compact majority-minority district. *Id.*

The plaintiffs respond that Montez has standing because under the VRA, "an aggrieved person" may institute a proceeding to enforce their right to vote. Dkt. 53 at 15 (quoting 52 U.S.C. § 10302). Further, the plaintiffs argue that "[a]ny person who meets the requirements of constitutional standing is an 'aggrieved person' and also meets statutory standing requirements under the VRA." *Id.* (quoting *Vaughan v. Lewisville Indep. Sch. Dist.*, 475 F. Supp.

3d 589, 594 (E.D. Tex. 2020)). Montez alleges that the enacted map relies on the packing and cracking of Black and Latino voters across all four commissioner precincts, including where he presently resides in Precinct 1. *Id.* at 16.

The Petteway plaintiffs argue that Montez has standing because it is possible to create an additional opportunity district where he resides. *Id.* But without more, the court is left with the allegations that Montez continues to reside in the same precinct as before the enacted plan, with no change as to whether he can effectively vote for his candidate of choice. Because Montez has not met the constitutional minimum of a "concrete and particularized" injury, he lacks standing as to his Precinct 3 vote-dilution claim. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334 (2016).

### 2. Precinct 3

Next, the defendants argue that without Montez, the remaining Petteway plaintiffs—all African American—do not have standing to assert their VRA claim, as both Blacks and Latinos are needed to form a sufficiently large and geographically compact district in Precinct 3. Dkt. 46 at 17.

The defendants misunderstand the nature of coalition claims under VRA Section 2. A coalition of two or more politically cohesive minority groups may seek relief under Section 2. Applying Section 2 to protect

minority coalitions is "necessary and appropriate to ensure full protection of the Fourteenth and Fifteenth Amendments rights," because voting discrimination is just as problematic when it prejudices one minority group as when it harms several. *See Bush v. Vera*, 517 U.S. 952, 992 (1996) (O'Connor, J., concurring). Accordingly, the Fifth Circuit has long recognized that racial minority groups may form a coalition to seek relief under Section 2. *See Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988); *LULAC, Council No. 4386 v. Midland Indep. Sch. Dist.*, 812 F.2d 1494 (5th Cir. 1987).

Under the VRA, members of a group can sue as a class if the "members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). The text demonstrates that the shared disadvantage based on "race or color" defines the protected class, not the racial or ethnic commonality of the group. *See id.* § 10301(a). Therefore, the Black plaintiffs in this case are not, as the defendants claim, alleging "harm on the Latino community by proxy." Dkt. 46 at 18. Rather, the remaining Petteway plaintiffs—Petteway, Rose, James, and Pope—are alleging their *own* harm as members of the protected class and are seeking to vindicate their *own* rights. These plaintiffs have properly alleged that they have personally suffered the

concrete and particularized injury of race-based vote dilution. *See* Dkt. 42 ¶¶ 15–31.

Their VRA claim proceeds.

### D. Racial Gerrymander

To succeed on a racial-gerrymandering claim, a plaintiff must plead and prove that "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017). A plaintiff can attempt to show this by alleging that the district's shape deviates from traditional redistricting principles, such as compactness, or through more direct evidence going to legislative purpose. *See id.* at 188–89. As for evidence of legislative purpose, plaintiffs have successfully demonstrated in past cases that race predominated in the drawing of districts through pleading and proving that the legislature established population-percentage targets for the minority population. *See id.* at 190–91.[2]

---

[2] *Ala. Legis. Black Caucus v. Alabama,* 575 U.S. 254, 267 (2015) ("That Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person[-]one-vote) provides evidence that race motivated the drawing of particular lines in multiple districts in the State."); *LULAC v. Abbott* ("*Abbott* II"), 604 F. Supp. 3d 463, 510 (W.D. Tex. 2022) (observing that plaintiffs had pleaded sufficient facts to survive a motion to dismiss where the plaintiffs alleged that the "House committee chairman's statements stressing the number of majority-minority districts, the legislature's

The defendants argue that the Petteway plaintiffs have not met their burden by failing to identify the precinct that constitutes a racial gerrymander and allege that any commissioners-court precinct line subordinates traditional redistricting principles to race. Dkt. 46 at 22–23.

### 1. Identifying the Challenged Precinct

Racial-gerrymandering claims are district specific and therefore apply "to the boundaries of individual districts." *Ala. Legis. Black Caucus*, 575 U.S. at 262. By contrast, racial-gerrymandering claims do not apply to the map as an undifferentiated whole. *See id.* The harm in a racial-gerrymandering claim is personal and includes being "personally . . . subjected to [a] racial classification . . . as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group." *Id.* at 263 (alterations in original) (internal quotation marks and citations omitted). Thus, racial gerrymanders "directly threaten a voter who lives in the *district* attacked" and not those who live elsewhere. *See id.* (emphasis in original).

The Petteway plaintiffs' second amended complaint does not identify which district is the result of a racial gerrymander. *See generally* Dkt. 42.

---

apparent desire to keep various racial groups above 50% of certain districts, and the irregular shapes of CD 6 and 33").

Furthermore, though the plaintiffs reside in Precincts 1, 2, and 3, none lives in 4. The defendants argue that because the plaintiffs have not identified which district is the result of a racial gerrymander, this court cannot assure itself of jurisdiction and should dismiss the claim. Dkt. 46 at 22 (citing *United States v. Hays*, 515 U.S. 737, 739 (1995)).

The plaintiffs respond that they have sufficiently identified Precinct 3 and alleged that it is racially gerrymandered. Dkt. 53 at 25. The plaintiffs identify Precinct 3 multiple times as the opportunity district that was dismantled, eliminating the majority-minority precinct it had been under the benchmark plan. *Id*. at 26 (citing Dkt. 42 ¶¶ 63–68); *see also* Dkt. 42 ¶¶ 112–114.

The court agrees that the plaintiffs have adequately identified the district giving rise to their racial-gerrymander claim.

### 2. Precinct Lines

The defendants next argue that the Petteway plaintiffs fail to allege that any precinct line subordinates traditional redistricting principles to race. Dkt. 46 at 22. The defendants contend that there are no allegations that any precinct is not compact, divides communities of interest, is not contiguous, or does not respect political subdivision lines. *Id.*

The plaintiffs respond that the map mimics the plan the DOJ rejected as intentionally discriminatory just a decade ago, which the commissioners court knew would eliminate the county's only minority-opportunity district but nevertheless rushed through the redistricting process without input from either the public or its only minority commissioner. Dkt. 53 at 26. Moreover, the plaintiffs allege that intentional racial discrimination is the only explanation for the commissioners court's actions. *Id.* (citing Dkt. 42 ¶¶ 67–68, 112–114). The plaintiffs further allege that the commissioners court "did not provide any analysis on their map to explain their districting choices," which is especially notable given that shifting only one voting tabulation district would have corrected the prior plan's malapportionment and kept Precinct 3's majority–minority population intact. Dkt. 42 ¶¶ 63–68, 115. Instead of making a small change as just described, the commissioners court chose the enacted plan, which "radically alters the commissioner precincts, dismantling Precinct 3 and cracking its Black and Latino voters across all four precincts." *Id.* ¶¶ 63–68.

The second amended complaint also contains allegations of Precinct 3's "shape and demographics" on top of the allegations of "legislative purpose" already discussed. The complaint supplies comprehensive data

illustrating how the enacted plan eliminates the 61.7% CVAP[3] majority in Precinct 3 and replaces it with a plan in which minority CVAP is less than 40% in each precinct. *Id.* ¶¶ 120–121; *see also id.* ¶¶ 107–109. The complaint also depicts both the former and enacted maps, illustrating how the new plan unnecessarily and "radically alters the [c]ommissioner precincts" and including shading to highlight racial demographics in each district. *Id.* ¶¶ 59, 65. And to be clear, the plaintiffs also allege that intentional discrimination so thoroughly "controlled and dominated" the commissioners court's redistricting objectives that "[r]ace was the predominate consideration in the drawing of district lines" and "subordinate[d] traditional redistricting principles in the enacted . . . plan." *Id.* ¶¶ 111–112, 116.

As the Supreme Court has explained, a "plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). The Petteway plaintiffs have carried their burden in pleading a plausible racial gerrymander as to Precinct 3.

---

[3] Citizen Voting Age Population, or CVAP, is the segment of the population that is, by virtue of age and citizenship, eligible to vote.

### E. Intentional Vote Dilution

In an intentional vote-dilution claim under the Fourteenth and Fifteenth Amendments, a plaintiff must plead that the challenged redistricting plan was enacted with a discriminatory purpose and has discriminatory effects. *See Harding v. County of Dallas*, 948 F.3d 302, 312 (5th Cir. 2020). The gravamen of an intentional vote-dilution claim is that the commissioners court enacted "a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Perez v. Abbott*, 253 F. Supp. 3d 864, 932 (W.D. Tex. 2017) (internal quotation marks omitted). These claims are "infrequently" asserted. *Harding*, 948 F.3d at 313. This is because intentional vote-dilution claims "are more difficult to prove than are effects-only Section 2 claims." *LULAC v. Abbott* ("*Abbott* I"), 601 F. Supp. 3d 147, 160 (W.D. Tex. 2022) (citing *Harding*, 948 F.3d at 313 n.47).

For a Fourteenth and Fifteenth Amendment claim, a plaintiff must plead that a defendant "acted at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Courts use the factors outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to determine if the decisionmakers acted with

illicit intent. *Id.* at 160–61. Essentially, in intentional vote-dilution claims, a plaintiff must plead that race was "*part* of [the defendants'] redistricting calculus." *Id.* at 161. Similarly, in a VRA Section 2 claim of intentional discrimination, a plaintiff must plead that racial discrimination was one purpose of the challenged government action. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). The *Arlington Heights* factors are also used to determine intent in a Section 2 claim. *See id.*

To state an intentional-discrimination claim, "racial discrimination need only be one purpose, and not even a primary purpose" of the challenged plan. *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (quoting *Brown*, 561 F.3d at 433). "[I]ndirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions may be considered." *Brown*, 561 F.3d at 433 (quotation marks omitted).

Accordingly, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. "The impact of the official action . . . provide[s] an important starting point." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). From there, courts consider "five nonexhaustive factors to determine whether a particular decision was made with a discriminatory

purpose": (1) "the historical background of the decision," (2) "the specific sequence of events leading up to the decision," (3) "departures from the normal procedural sequence," (4) "substantive departures," and (5) "legislative history." *Veasey*, 830 F.3d at 231 (quotation marks omitted); *see also Arlington Heights*, 429 U.S. at 267–68. Evidence of "race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will towards minorities because of their race," is not required. *Perez*, 253 F. Supp. 3d at 948.

The defendants argue that the Petteway plaintiffs' allegations of an illicit racial purpose are thin at best, as the plaintiffs allege that (1) the commissioners court did not adopt redistricting criteria, (2) it held only one meeting to discuss the proposed redistricting plans, (3) Commissioner Holmes was allegedly "not allowed to be involved in the process for developing the proposed maps," and (4) the maps were allegedly drawn without his input. Dkt. 46 at 25 (quoting Dkt. 42 ¶¶ 69, 84, 95–96).

The defendants also counter that, as a matter of law, the commissioners court is not required to adopt redistricting criteria beyond what federal and state law already requires. *Id.* at 27. Further, the defendants note that the commissioners court scheduled the meeting within the public-notice requirements and posted the maps online two weeks in advance of

that meeting for public notice and comment. *Id.* at 27–28. The defendants also note that Commissioner Holmes was not prevented from participating in the redistricting process, nor was he prevented from providing input. *Id.* at 29. Instead of being prohibited from participating in the redistricting process, the defendants contend he "simply chose not to exercise his statutory authority as a duly elected [c]ommissioner to place redistricting on the agenda at any of the six regularly scheduled meetings between September and November." *Id.*

In response, the plaintiffs argue that their allegations easily satisfy the lenient pleading standard applicable on a motion to dismiss. Dkt. 53 at 18. *First*, the plaintiffs argue that the dismantling of Precinct 3 bears more heavily on minority voters than on Anglo voters. *Id.* Galveston County's minority population increased from 33.2% to 35.5% of the total population between 2010 and 2020. Dkt. 42 ¶ 52. Nevertheless, the enacted plan eliminates the county's only majority-minority precinct, cracking minority voters across all four precincts and ensuring that—despite their increased share of the total population—they are no longer a majority in any commissioners-court precinct. *Id.* ¶¶ 121–122.

There can be "little question that dismantling" a performing precinct has "a disparate impact on racial minority groups." *Texas v. United States*,

887 F. Supp. 2d 133, 163 (D.D.C. 2012), *vacated on other grounds*, 570 U.S. 928 (2013). And the commissioners court knew that the new plan would eliminate the county's only majority-minority district. *See, e.g.*, Dkt. 42 ¶¶ 78, 134. Although not dispositive, the "foreseeability" of this consequence supports "a strong inference" that the commissioners court intended the enacted plan to have "adverse effects" on minority voters. *Feeney*, 442 U.S. at 279 n.25.

*Second*, the plaintiffs argue that the historical background and legislative history corroborate "the normal inferences" that flow "from the foreseeability of defendant's actions." Dkt. 53 at 19 (quoting *Brown*, 561 F.3d at 433). In 2021, the defendants adopted "materially the same" map that they proposed in 2011. Dkt. 42 ¶¶ 72–77, 134. The county was subject to preclearance at the time, however, and the DOJ refused to preclear the map, because it would have caused unnecessary retrogression and was accompanied by several indicia of the commissioners court's "discriminatory purpose." *Id.* ¶¶ 34–43. The DOJ ultimately obtained a permanent injunction blocking the county from implementing the plan and requiring it to adopt an alternative map that preserved Precinct 3's majority-minority population. *Id.* ¶¶ 2–4, 44–46. The plaintiffs argue the current enacted plan

is a transparent attempt to revive the plan a three-judge panel on this court enjoined a decade ago. *See Petteway*, No. 3:11-cv-511, ECF 69.

*Third*, the plaintiffs argue the specific sequence of events preceding the dismantling of Precinct 3 suggest it was implemented with discriminatory intent. In the plaintiffs' view, the 2021 redistricting cycle picked up where the 2011 cycle left off. Dkt. 53 at 20. The commissioners court hired the same lawyers, drew the same discriminatory map, and eschewed formal redistricting guidelines just as it did a decade before. *Id.* at 20–21 (citing Dkt. 42 ¶¶ 69, 71, 134). The commissioners court "stalled" until November 9, 2021, to release map proposals, and it did not hold a public meeting to solicit input on its proposals until November 13—the day before the county's deadline to adopt a map. Dkt. 42 ¶¶ 70, 84–85.

The plaintiffs also allege that the lone Black commissioner and majority-minority precinct representative, Commissioner Holmes, was completely excluded throughout the process. *Id.* ¶¶ 95–99. The commissioners court did not permit him to provide input on the proposed maps, allow him to meet with the county's lawyer more than once, kept him in the dark about publicizing redistricting proposals, and refused to vote on his proposed maps. *Id.* ¶¶ 95–102.

The plaintiffs also highlight procedural irregularities from the sole public meeting. The commissioners court failed to provide microphones to the public. *Id.* ¶ 89. When members of the public and Commissioner Holmes presented evidence that the maps were racially discriminatory and that there was racially polarized voting in Galveston County, Judge Henry greeted this input by threatening to "clear . . . out" members of the public who attempted to participate and reminded the public, "I've got constables here!" *Id.* ¶¶ 90, 92–94, 100. This alleged sequence of events, including the evidence that "minority legislators" and their constituents "were treated unfavorably," is probative of the commissioners court's intent to discriminate against minority voters. *Abbott II*, 604 F. Supp. 3d at 508.

Accepting all well-pleaded factual allegations as true and viewing them in the light most favorable to the non-movant, as it must at this stage, the court finds the plaintiffs have pleaded a plausible intentional vote-dilution claim.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss the Petteway plaintiffs' claims is granted in part and denied in part. Dkt. 46. Plaintiff Michael Montez's claims are dismissed for lack of standing. In all other respects, the motion to dismiss is denied.

Signed on Galveston Island this 30th day of March, 2023.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE