UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY, et al.<br> Plaintiffs,<br>v.<br>GALVESTON COUNTY, TEXAS, et al.<br> Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-00057<br>(consolidated) |
| UNITED STATES OF AMERICA,<br> Plaintiffs,<br>v.<br>GALVESTON COUNTY, TEXAS, et al.<br> Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-00093 |
| DICKINSON BAY AREA BRANCH<br>NAACP, et al.<br> Plaintiffs,<br>v.<br>GALVESTON COUNTY, TEXAS, et al.<br> Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-00117 |

**DEFFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING ..........................................................1

SUMMARY OF THE ARGUMENT ..............................................................................2

STATEMENT OF FACTS ..............................................................................................5

    I.     Galveston County's population grew and shifted between 2010 and 2020, with most residents living in the northern one-third portion of the County ..................................................................................................................5

    II.    After the 2010 redistricting cycle, political gerrymandering claims were ruled nonjusticable and 2020 Census results were delayed ..............................9

    III.   Galveston County worked with counsel and an expert map drawer to provide two map proposals within two months ................................................10

ARGUMENT ...............................................................................................................16

    I.     VRA Section 2 does not permit minority coalitions .........................................17

    II.    Plaintiffs' discriminatory results VRA claims fail as a matter of law because Plaintiffs have not satisfied any of the *Gingles* preconditions ...........20

         A.   *Gingles* 1 Compactness: Plaintiffs' proposed minority coalition is not geographically compact ...........................................................................22

             1.    Plaintiffs fail to consider traditional redistricting principles, and propose unconstitutional racial gerrymanders. ................................23

             2.    Plaintiffs' illustrative plans join disparate and distinct minority communities...............................................................................24

             3.    Plaintiffs' experts fail to assess whether their maps serve a community of interest at the Precinct level ......................................36

         B.   *Gingles* 2: Plaintiffs' minority coalition is not cohesive .........................38

         C.   *Gingles* 3: Any purported White-bloc voting does not defeat minority-preferred candidates on account of their race ............................43

    III.   The NAACP and Petteway Plaintiffs' constitutional racial gerrymandering claims fail as a matter of law ................................................50

CONCLUSION ............................................................................................................54

## <u>TABLE OF AUTHORITIES</u>

**Case**                                                                      **Page No.**

*Abrams v. Johnson*, 521 U.S. 74 (1997)......................................................... 22, 23

*Ala. Legis. Black Caucus* v. *Ala.*, 575 U.S. 254 (2015) ................................. 20, 21, 51, 52

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................... 16

*Baird v. Consolidated City of Indianapolis*, 976 F.2d 357 (7th Cir. 1992)....................... 46

*Bartlett v. Strickland*, 556 U.S. 1 (2009)......................................................... 17

*Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178 (2017)............. 20, 22, 50, 51, 52

*Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989)......................................................... 17, 18, 39

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) ........................................... 2

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988),
   *rehearing denied*, 849 F.2d 943 (5th Cir. 1998).................................................... 18, 39

*Campos v. City of Hous.*, 113 F.3d 544 (5th Cir. 1997).................................. 20, 21, 36, 50

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).................................................... 16

*Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000) ..................................... 52

*Citizens for a Better Gretna v. Gretna*, 834 F. 2d 496 (5th Cir. 1987) ............................. 44

*Clark v. Calhoun Co.*, 88 F.3d 1393 (5th Cir. 1996).................................................... 44

*Cooper v. Harris*, 581 U.S. 285 (2017)........................................................ 21, 36

*Frank v. Forest County*, 336 F.3d 570 (7th Cir. 2003) ................................................ 18, 19

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) .......................................................... 10

*Growe v. Emison*, 507 U.S. 25 (1993)............................................................... 17

*Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004)......................................................... 18, 19

*Harding v. Cty. of Dall.*, 948 F.3d 302 (5th Cir. 2020) ................................................ 20, 50

*Jacksonville Branch of the NAACP*, No. 3:22-CV-493-MMH-LLL,
    2022 WL 7089087 (M.D. Fla. Oct. 12, 2022) ......................................................... 36, 51

*Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439 (E.D. Tex. 2020) ..................... 39

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
    999 F.2d 831 (5th Cir. 1993) .................................................................................. passim

*Lopez v. Abbott*, 339 F. Supp. 3d 589 (S.D. Tex. 2018) ................................................... 48

*LULAC # 4552 v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843 (5th Cir. 1997) ..................... 44

*LULAC Council No. 4386 v. Midland Independent School District*,
    812 F.2d 1494 (5th Cir. 1987) ................................................................................... 18

*LULAC v. Abbott*, 601 F. Supp. 3d 147 (W.D. Tex. 2022) ................................... 39, 40, 42

*LULAC v. Abbott*, 604 F. Supp. 3d 463 (W.D. Tex. 2022) ......................................... 39, 52

*LULAC v. Abbott*, No. 1:21-CV-1006, 2022 WL 12097120
    (W.D. Tex. Oct. 20, 2022) .......................................................................................... 21

*LULAC v. Perry*, 548 U.S. 399 (2006) ..................................................................... passim

*Merrill v. Milligan*, 142 S. Ct. 1358 (Mar. 21, 2022) ..................................................... 23

*Miller v. Johnson*, 515 U.S. 900 (1995) .......................................................... 20, 50, 51, 54

*Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) ................................................. 18, 19

*Ohio v. Raimondo*, 848 Fed. Appx. 187 (6th Cir. 2021) .................................................. 10

*Overton v. City of Austin*, 871 F.2d 529 (5th Cir. 1989) .................................................. 18

*Perry v. Perez*, 565 U.S. 388 (2012) ................................................................................ 17

*Petteway, et al. v. Galv. Cnty, et al* 12-40856, 2013 WL 6634558
    (5th Cir. Dec. 17, 2013) ............................................................................................... 6

*League of United Latin Am. Citizens v. Abbott*, 2022 WL 4545754
    (W.D. Tex. Sept. 28, 2022) .................................................................................. 44, 45

*Prejean v. Foster*, 227 F.3d 504 (5th Cir. 2000) ................................................ 52

*Rangel v. Morales*, 8 F.3d 242 (5th Cir. 1993) ................................................... 45

*Robinson v. Ardoin*, 37 F.4th 208 (5th Cir. 2022) (per curiam) ....................... 3, 23, 24, 52

*Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686 (S.D. Tex. 2013) ................... 20

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ............................................. 3, 10

*Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004) ..................................... passim

*Shaw v. Reno*, 509 U.S. 630 (1993) ..................................................... 33, 37, 53

*Shelby County v. Holder*, 570 U.S. 529 (2013) .................................................. 9

*Thomas v. Bryant*, 938 F.3d 134 (5th Cir. 2019) ............................................. 52

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ................................................ passim

*Walters v. Boston City Council*, No. CV 22-12048-PBS,
2023 WL 3300466 (D. Mass. May 8, 2023) ............................... 22, 50, 51, 52

*Whitcomb v. Chavis*, 403 U.S. 124 (1971) ....................................................... 22

*Wis. Legis. v. Wis. Elections Comm'n*, 142 S. Ct. 1245 (2022) ............ 3, 21, 22, 36, 38, 40

**Statutes**

Tex. Const. art. V, § 18 .......................................................................... 5

Tex. Elec. Code § 42.001 ....................................................................... 12

Tex. Elec. Code § 42.005 ....................................................................... 12

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................ 16

## NATURE AND STAGE OF PROCEEDING

This is a voting rights case originally filed in three separate actions, each challenging the 2021 Galveston County Commissioners Court Precincts Map (the "Enacted Plan"). The Petteway Plaintiffs[1] and the NAACP Plaintiffs[2] each allege intentional racial discrimination and racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments. The Petteway Plaintiffs, NAACP Plaintiffs, and the United States of America (the Department of Justice or "DOJ Plaintiff") (collectively, "Plaintiffs") allege discriminatory results and intentional racial discrimination under Section 2 of the Voting Rights Act ("Section 2" or "VRA").[3] The cases were consolidated, and discovery closed on April 21, 2023, though some discovery has yet to occur. *See* Dkts. 66, 134, 140. Trial is set for August 7, 2023.

In June 2022, Defendants moved to dismiss the Plaintiffs' complaints. Dkt. 45-47. On March 30, 2023, the Court dismissed Plaintiff Michael Montez, and otherwise denied the motions. Dkt. 123-125. On April 21, 2023, Defendants filed their Answers. Dkt. 142-144. Defendants now seek summary judgment for Plaintiffs' Section 2 claims and their constitutional racial gerrymandering claims. If granted, the DOJ Plaintiff would be

---

[1] Terry Petteway, Constable Derrick Rose, and the Hon. Penny Pope are the "Petteway Plaintiffs." Sonny James and Michael Montez have been dismissed. Dkt. 100, 125. The Petteway Plaintiffs sued Galveston County, Texas and the Hon. Mark Henry as Galveston County Judge.

[2] The "NAACP Plaintiffs" are Dickinson Bay Area Branch NAACP, Galveston Branch NAACP, Mainland Branch NAACP, Galveston League of United Latin American Citizens Council 151, Edna Courville, Joe A. Compian, and Leon Phillips. They sued Galveston County, Texas, the Hon, Mark Henry as Galveston County Judge, and Dwight D. Sullivan as Galveston County Clerk.

[3] The DOJ Plaintiff sued Galveston County, Texas, the Hon. Mark Henry as Galveston County Judge, and the Galveston County Commissioners Court. For ease of reference "Defendants" means any and all defendants in this consolidated action.

dismissed in its entirety, and only the Petteway and NAACP Plaintiffs' intentional racial discrimination claims under the Fourteenth and Fifteenth Amendments would remain.

## SUMMARY OF THE ARGUMENT

In 2021, Plaintiffs failed to obtain their preferred partisan outcome for the redistricting of Galveston County's Commissioners Court. The Supreme Court has warned against conflating discrimination on the basis of party affiliation with discrimination on the basis of race. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) ("[P]artisan motives are not the same as racial motives"). But Plaintiffs have brought a slew of tenuous race-based claims against Defendants to obtain from this Court what they could not obtain through the political process: a map designed to guarantee one Commissioners Court seat for the Democratic Party. Summary judgment is appropriate for several reasons.

*First*, Plaintiffs' VRA claims fail outright because the VRA does not permit coalition districts. Defendants acknowledge that, since 1988, the Fifth Circuit has permitted VRA coalition claims; however, since that time other circuits have disagreed with the Fifth Circuit's position, and the Supreme Court has not held that the VRA permits coalition claims. The danger in recognizing a "coalition district" VRA claim is that treating a coalition of separate minority groups as a single minority stretches *Gingles*[4] cohesiveness to include political alliances, which is not at all what Section 2 is meant to protect. And the

---

[4] *Thornburg v. Gingles*, 478 U.S. 30 (1986) ("*Gingles*").

Supreme Court has made clear that partisan vote dilution claims are not actionable. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2500 (2019). The issue should be reconsidered.

*Second*, Plaintiffs' claims under the VRA fail because they cannot meet the necessary preconditions under *Gingles*. Plaintiffs' experts do not address or conduct any analysis of the "communities of interest" factor at the *commissioner precinct* level. *See* Exhibit 1 at 25:15-26:2 (Fairfax Dep.); Exhibit 2 at ¶ 39 (Cooper Report). This is a fatal omission for their Section 2 claims. *See Wis. Legis. v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1250 (2022) (per curiam) (*Gingles* preconditions are analyzed "at the district [or precinct] level"); *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (per curiam). Plaintiffs' VRA claims are therefore insufficient as a matter of law.

The *Gingles* preconditions that Plaintiffs' experts do address fare no better: none of the minority-opportunity Commissioners Court precinct boundaries proposed in their experts' illustrative maps conform to traditional redistricting criteria. In the experts' various iterations of Precinct 3, communities of Black and Latino voters are not geographically compact, and are also insufficiently cohesive to form a cognizable minority voting coalition. This is evident when comparing voting behaviors in primaries (where there is no partisan cue) to general elections (where there is a partisan cue). Furthermore, the evidence shows as a matter of law that White voters do not vote as a bloc to prevent the minority candidate of choice from being elected *on account of race*. The only expert to discuss Galveston County-specific electoral data testified that, in general elections, voters in Galveston County vote on the basis of shared political orientation. *See* Exhibit 3 at 115:20-116:12 (Trounstine Dep.). As for Plaintiffs' other experts, they either conclude

3

(based on national rather than local analysis) that politics and race have become so intertwined that one factor cannot be distinguished from the other in explaining racial voting patterns. Exhibit 4 at ¶¶ 25, 31 (Barreto Decl.). Or, they admit that further research would be required to determine whether someone casts a ballot for racial or partisan reasons. Exhibit 5 at 180:17-181:21 (Oskooii Dep.). Voting-bloc differences on account of partisanship alone do not establish a Section 2 violation. Because Plaintiffs cannot meet the necessary *Gingles* preconditions, their Section 2 claims should be dismissed.

*Third*, the summary-judgment record establishes that race did not predominate in drawing the Enacted Plan; in fact, race was not considered at all when drawing the map proposals. The Enacted Plan adheres with great precision to race-neutral traditional redistricting criteria—and nothing else. The Petteway and NAACP Plaintiffs' racial gerrymandering claims under the Fourteenth Amendment thus fail.

Because (1) the VRA does not allow coalition claims, (2) Plaintiffs cannot satisfy any of the necessary preconditions for a VRA Section 2 claim; and (3) there is no evidence that race predominated the decision to adopt the Enacted Plan, Plaintiffs' VRA claims, and the NAACP and Petteway Plaintiffs' constitutional racial gerrymandering claims, fail as a matter of law.

## STATEMENT OF FACTS[5]

**I. Galveston County's population grew and shifted between 2010 and 2020, with most residents living in the northern one-third portion of the County.**

Galveston County is governed by a Commissioners Court comprised of elected County Judge Mark Henry and four elected Commissioners: Darrell Apffel, Joseph Giusti, Stephen Holmes, and Robin Armstrong. Commissioners Holmes and Armstrong are African American, and Commissioner Holmes is the only Democrat on the Commissioners Court. As Galveston County's policy-making body, the Commissioners Court is responsible for drawing and enacting redistricting plans after the decennial census. *See* Tex. Const. art. V, § 18. The County's unique shape creates redistricting challenges. The prior Commissioners precincts looked like the following (with Precinct 3 spanning from Highway 3 and TX-96 to the Seawall in Galveston, and including a "bubble" at the top to capture Commissioner Holmes' house):

---

[5] Defendants rely upon all pleadings and all evidence all documents on file at the time the Court considers this Motion, including the exhibits cited herein. A list of Defendants' exhibits is attached as **Appendix A**.



Exhibit 6 (Prior Commissioners Precincts Map); *see also* Exhibit 2 at n.24. That plan was the result of a negotiation and settlement between the County and the DOJ after the DOJ objected (in March 2012) to proposed County Commissioner precincts. Exhibit 7 (DOJ Letter Dated March 5, 2012).[6]

Further complicating matters is the fact that, between 2010 and 2020, there has been significant population growth, particularly in the northern portion of Galveston County. According to the 2020 Census, the County has a total *voting* age population ("VAP") of 267,382, 12.71% of which are Black, 22.5% are Latino, and 57.98% are White (noted in the 5th-6th columns below):

---

[6] The Fifth Circuit discusses events surrounding the prior Commissioners Court plan in *Petteway, et al. v. Galv. Cnty, et al.*, No. 12-40856, 2013 WL 6634558 (5th Cir. Dec. 17, 2013).

|  | 2000 VAP | 2000 VAP Percent | 2010 VAP | 2010 VAP Percent | 2020 VAP | 2020 VAP Percent | 2006-2010 CVAP Percent | 2016-2020 CVAP Percent |
|---|---|---|---|---|---|---|---|---|
| **Total 18+** | 183,289 | 100.00% | 217,142 | 100.00% | 267,382 | 100.00% | 100.00% | 100.00% |
| NH White 18+ | 121,028 | 66.03% | 136,259 | 62.75% | 155,020 | 57.98% | 67.40% | 63.29% |
| **Total Minority 18+** | 62,261 | 33.97% | 80,883 | 37.25% | 112,362 | 42.02% | 32.60% | 36.71% |
| Latino 18+ | 29,292 | 15.98% | 42,649 | 19.64% | 60,159 | 22.50% | 14.84% | 19.20% |
| NH Black 18+ | 26,549 | 14.48% | 28,423 | 13.09% | 32,289 | 12.08% | 14.31% | 12.75% |
| **NH Black + Latino 18+** | 55,841 | 30.46% | 71,072 | 32.73% | 88,582 | 33.13% | 29.15% | 31.95% |
| NH DOJ Black 18+ | 26,655 | 14.54% | 28,716 | 13.22% | 33,341 | 12.47% | 14.62% | 12.83% |
| NH AP Black 18+ |  |  |  |  | 33,972 | 12.71% |  |  |
| NH DOJ Black 18+Latino 18+ | 55,947 | 30.52% | 71,365 | 32.86% | 93,500 | 34.97% | 29.46% | 32.03% |
| **NH AP Black 18+ Latino 18+** |  |  |  |  | 94,131 | 35.21% |  |  |

Exhibit 2 at 10, Figure 2 (Cooper Report).[7] Between 2010 and 2020, Galveston County's total population increased by 59,373 to 350,682; Black residents increased by 3,891 individuals, and Latino residents increased by ***23,366*** individuals. Exhibit 2 at 8, Figure 1 (Cooper Report). Black residents actually account for a ***smaller*** percentage (12.3%) of County residents in 2020 than they did in 2010 (13.475%), while Latino residents increased their percentage of County residents, and now form almost a ***quarter*** of the County's population in 2020. *Id*.

League City, in the northern part of the County, is where most of the total Galveston County population increased—30,802 individuals of the total 59,323 population increase were in League City, or 51.88%. Exhibit 8 at 5-6 (Owens Report). Over half of the County's population currently lives in the six cities that form the northern one-third portion of Galveston County. Exhibit 2 at 13, Figure 4 (Cooper Report). As Plaintiff's expert Dr. William Cooper admits, significant intra-county population shifts between 2010 and 2020

---

[7] The parties do not dispute the data in this table, which summarizes Census results.

made population equalization necessary (including to accommodate dense northern County population growth) when redistricting the County's four commissioner precincts in 2021. *Id*. at 18, Figure 7. This contributed to redistricting complications in the last redistricting cycle, especially as African American and Latino communities are spread widely throughout Galveston County.

The areas with the highest Black Citizen Voting Age Population ("CVAP") are in the northern and southern portions of the County, roughly 21 miles apart. Exhibit 8 at 12 (Owens Report).[8] In the northernmost parts of the County, the median family income for African American families is $111,650 (League City); those median amounts fall to $46,234 in Dickinson, and $34,221 in the City of Galveston. Exhibit 2 at Ex. D, 19, 1, & 9, respectively (Cooper Report).[9] 4% of Black family households are below the poverty line in League City, whereas 18.2% are in Texas City, and 25.1% in the City of Galveston. Exhibit 2 at Ex. D, 18, 28 & 8, respectively (Cooper Report); *see also* Exhibit 10 at ¶ 12 (Cooper Rebuttal Report) (discussing northern portions of the County are "more affluent" with "marginally better" education, housing, and employment socio-economic indicators "across all racial groups" than in southern parts of the County). 46.1% of African Americans in League City rent their homes, in contrast with 70.7% who do in the City of Galveston. *Id*. With respect to education, 50.9% of Black residents have a bachelor's

---

[8] This information is based on Census data, which is released in census blocks. Census blocks provide the smallest level of basic demographic data such as population by race and ethnicity. Exhibit 17 at ¶ 6 (Bryan Decl.).

[9] Exhibit D to the expert report of Dr. Cooper references a link where additional records were available. Defendants downloaded and included the pages cited herein, in Exhibit 2 to this Motion, and added page numbers to the "Exhibit D" downloaded pages for ease of reference.

degree or higher in northern Galveston County, but in the southern parts of the County, rates drop to approximately 13%. Exhibit 2 at Ex. D, 5, 15, respectively (Cooper Report).

The densest Latino populations are in the northeast and southeast portions of the County, 24.8 miles apart. *Id*. at 8. The median family income of Latino families in League City is $97,224, but that median drops to the low $50,000s in Texas City and the City of Galveston. *Id.* at Ex. D 1-6.  8.7% of Latino family households are below the poverty line in League City, and that number doubles as you travel south into the City of Galveston, to 16.4%. *Id.* at Ex. D 8-15. The percentage Latino families renting their home in the City of Galveston is more than *three times* higher than those renting in League City. *See id*. at Ex. D 14, 24. With respect to education, 32.3% of Latino residents in the north part of the County have a bachelor's degree or higher, and that figure drops by more than half in Texas City and the City of Galveston. *Id.*

II.     **After the 2010 redistricting cycle, political gerrymandering claims were ruled nonjusticable and 2020 Census results were delayed.**

Apart from shifts in population, the legal landscape also changed between 2010 and 2020. In the prior redistricting cycle, Galveston County was required to obtain judicial or DOJ approval for its maps (known as preclearance). But this requirement ceased in 2013 when the United States Supreme Court ruled that the formula used to decide what jurisdictions were subject to VRA preclearance was unconstitutional and "based on decades-old data and eradicated procedures." *Shelby County v. Holder*, 570 U.S. 529, 551 (2013). Five years later, the United States Supreme Court ruled that partisan

gerrymandering claims are nonjusticiable. *Rucho*, 139 S. Ct. at 2500.[10] In Galveston County, primary and general election results confirm that Republicans outnumber and consistently outperform Democrats in the most populous areas of the County. *See, e.g.*, Exhibit 9.B (Duncan Decl.) (2022 primary election returns); Exhibit 9.J (Duncan Decl.) (2020 primary election returns); Exhibit 9.R (Duncan Decl.) (Cumulative 2020 general election results).

Finally, a near six-month delay in the release of 2020 Census data drastically compressed the amount of time the Commissioners Court had to complete redistricting. *See* Exhibit 20 at 102:22-103:19 (Drummond Dep.); *see also* Exhibit 11 at 62:23-63:3 (Giusti Dep.); *see also Ohio v. Raimondo*, 848 Fed. Appx. 187, 188 (6th Cir. 2021) (reversing district court dismissal for lack of standing and explaining "[t]he Census Bureau represents that it can deliver Ohio's data in a "legacy format" by August 16, 2021—well before the September 30, 2021, projection that the agency previously identified").

### III.   Galveston County worked with counsel and an expert map drawer to provide two map proposals within two months.

Even with the delays in the release of the 2020 Census data, the County retained counsel to help ensure that whatever redistricting map was proposed would comply with

---

[10] The United States Supreme Court, when it denied standing to plaintiffs alleging an unconstitutional partisan gerrymander in *Gill v Whitford*, made clear that the Court does not recognize partisan gerrymander claims. *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018) (explaining the proposed tests to measure partisan asymmetry "confirm[] the fundamental problem with the plaintiffs' case" as one "about group political interests, not individual legal rights. But this Court is not responsible for vindicating generalized partisan preferences"). *Gill* explained that for five decades, litigants have asked the Court to determine the judicial limits of enforcing or restricting partisan gerrymandering. *Id*. at 1926. In *Gill*, the plaintiffs' complained their votes were diluted, and that this sufficed to provide standing. *Id*. at 1930-31. That is essentially the same claim Plaintiffs allege here, but disguised as a race-based challenge.

the law. Exhibit 12 at 234:19-235:2 (Henry. Dep.). In September 2021, redistricting counsel for the County held a series of fact-finding telephone conferences with the County Judge and Commissioners about the changes that they wanted to make to the boundaries of the Commissioners Court precincts.[11] Exhibit 13 at ¶ 8 (Oldham Decl.). Counsel had two calls with Commissioner Holmes, who accessed the redistricting data before any other Commissioner. *See* Exhibit 9.L (Duncan Decl.) (Sept. 10, 2021 scheduling email); Exhibit 9.M (Duncan Decl.) (Sept. 20, 2021 conf. call); Exhibit 9.N (Sept. 23, 2021 conf. call). The Commissioners and County Judge provided their requests about redistricting during those meetings. One concern was simplifying boundaries so that the public could easily determine their precinct and their commissioners. *See, e.g.*, Exhibit 11 at 53:14-19 (Giusti Dep.) ("The old lines were kind of confusing at times as to where precincts started and where they ended"); and at 138:20-25 (stating he wanted "to level the populations amongst the precincts, to have . . . commissioner precinct lines that were easier for the public to know which precincts they were in"). Important to the County in adopting a new map were the following:

1. Compliance with federal law, particularly the equal-population requirement;

2. Creating a unified coastal precinct, comprising both Galveston Island and the Bolivar Peninsula;

3. Ensuring geographic compactness, to avoid the appearance of gerrymandering;

---

[11] *See* Exhibit 12 at 173:14-18 (Henry Dep.); Exhibit 11 at 82:22-83:19 (Giusti Dep.); Exhibit 9.D (Duncan Decl.) (Sept. 8, 2021 Conf. Call); Exhibit 16 at 130:10-25 (Apffel Dep.); *see also* Exhibit 9.C (Duncan Decl.) (Aug. 30, 2021 Scheduling E-Mail); Exhibit 9.K (Duncan Decl.) (Sept. 13, 2021 Conf. Call); Exhibit 9.L (Duncan Decl.) (Sept. 10, 2021 Scheduling E-mail); Exhibit 9.G, H (Duncan Decl.) (Sept. 16, 2021 Conf. Call Confirmations).

4.  Minimizing voting precinct splits;[12]

5.  Placing each Commissioner's residence in the precinct that they represent; and

6.  Reflecting the partisan composition of Galveston County.

*See* Exhibit 15 at 5-7, 8-9 (Response to Interrog. 1, Defs. 1st Supp. and Am. Responses to DOJ Interrogatories). Commissioners asked about the location of their homes and parents' homes, whether the population in each Commissioners Court precinct was equalized, whether the map adhered to federal requirements, and whether the map would favor them politically. *See id.*; *see also* Exhibit 16 at 103:3-9 (Apffel Dep.); Exhibit 11 at 138:6-25 (Giusti Dep.) (testifying he wanted his parents' house in his precinct, and that the prior map's boundaries made it difficult to determine who lived in which precinct); Exhibit 12 at 174:20-24 (Henry Dep.) (testifying he wanted a legally compliant map with population equalized and a single coastal precinct).[13]

In October 2021, County counsel began working with expert map-drawer Tom Bryan to prepare baseline maps to assist counsel in assessing whether client requests could

---

[12]The Texas Election Code establishes two kinds of precincts relevant to this action: county election precincts (hereinafter referred to as "voting precincts") and commissioner precincts. Each county in Texas is divided into four commissioner precincts, each of which is represented by one of the county's four commissioners. 2021 Guide to Texas Laws for County Officials, *available at* https://www.county.org/TAC/media/TACMedia/Legal/Legal%20Publications%20Documents/2021/2021-Guide-to-Laws-for-County-Officials.pdf (last visited May 4, 2023). Voting precincts, by contrast, are smaller divisions of the county that are drawn by the commissioners to set, among other things, voters' polling locations. *See* Tex. Elec. Code §§ 42.001, 42.005. "Precinct splitting" in the redistricting context refers to identifying voting precincts that are divided by new commissioner precinct lines, and creating new voting precincts in those areas to conform to the boundaries of the enacted plan. *See* Exhibit 14 at 69:13-70:17 (Sigler Dep.).

[13] Commissioner Ken Clark was ill during this process, and passed away in early 2022. Exhibit 12 at 312:13-21. Commissioner Holmes' deposition has not yet occurred. Defendants may seek leave to supplement the summary judgment record with his testimony after his deposition has been taken.

be legally incorporated; these baseline drawings were not shared beyond himself and County counsel Dale Oldham. *See* Exhibit 13 at ¶¶ 9-11 (Oldham Decl.). Between October 15th and 19th, Bryan prepared two draft maps of commissioners precincts. Exhibit 17 at ¶ 5 (Bryan Decl.). In doing so, he used widely available and standard mapping software, and loaded standard demographic data, including Census 2020 data, into that software. *Id.* at ¶ 6. In accordance with his standard process, he drew draft maps in his software program first, and when that was done he analyzed the total population demographics in Microsoft Excel. *Id*. While his standard template reports all demographic characteristics for a plan, he did not consider race when drawing or adjusting any map during this process, and was not instructed to consider race in drawing them. Exhibit 17 at ¶¶ 5-6 (Bryan Decl.). He did, however, consider political performance data. Exhibit 17 at ¶ 7 (Bryan Decl.).

The maps were shared in meetings with the County Judge and Commissioners in mid-October 2021. Exhibit 13 at ¶¶ 12-14 (Oldham Decl.); *see also* Exhibit 9.E (Duncan Decl.) (Oct. 16, 2021 Zoom conf.); Exhibit 9.F (Duncan Decl.) (Oct. 17, 2021 Zoom conf.); Exhibit 16 at 95:15-97:10 (Apffel Dep.). Bryan then adjusted the maps based on Oldham's legal analysis of client feedback. Exhibit 13 at ¶¶ 12-14 (Oldham Decl.); *see also* Exhibit 17 at ¶¶ 5, 8 (Bryan Decl.). The Commissioners and County Judge did not consider racial demographic data during this process. *See* Exhibit 16 at 160:7-161:3 (Apffel Dep.); Exhibit 11 at 127:13-19 (Giusti Dep.); Exhibit 12 at 228:12-229:21 (Henry Dep.).

On October 29, 2021, Defendants posted Maps 1 and 2 on the County's website with an online portal for public comment submissions:



Exhibit 31 (Online Portal Proposed Precinct Redistricting Maps).

Approximately 440 comments were received through the online portal between October 29, 2021 when the maps were posted, and approximately one hour before the November 12, 2021 hearing. Exhibit 18 at 61:14-62:10 (Nov. 12, 2021 Transcript). Of those comments, 208 (76.4%) preferred map 2, 64 (14.5%) preferred map 1, and 168 (38.1%) did not discuss either map. *Id*.; *see also* Exhibit 9.Q at (Duncan Decl.) Nov. 12, 2021 email) (providing updated summary of comment responses). Defendants worked

14

to get the proposed maps noticed ahead of the deadline to adopt a redistricting plan, and on November 9, 2023, noticed a special public meeting regarding the maps for November 12, 2021, in the Calder Road Annex in League City. Exhibit 19 at 84:16-24 (Martinez Dep.); Exhibit 20 at 157:25-158:5 (Drummond Dep.) (testifying County must provide 72 hours' notice for meetings).

During the meeting, over 30 members of the public provided comments, most in support of Commissioner Holmes. *See* Exhibit 18 (Nov. 12, 2021 Transcript). Exhibit 16 at 188:20-189:2 (Apffel Dep.); Exhibit 12 at 20:11-13 (Henry Dep.). Everyone who wanted to speak had the opportunity to do so. *See* Exhibit 11 at 147:8-19 (Giusti Dep.); Exhibit 9.P (Duncan Decl.) (Nov. 12, 2021 public comment roster). The Commissioners voted 3-1 to adopt Map 2. Exhibit 18 at 81:10-12 (Nov. 12, 2021 Transcript). Map 2 reduced the population deviation to 1.1%,[14] united Galveston Island and the Bolivar Peninsula into one coastal precinct,[15] minimized gerrymandered-appearing precinct boundaries (which had previously connected disparate pockets of voters in the northern part of the County with those on Galveston Island),[16] minimized voting precinct splits,[17] and reflected the County's partisan composition. Exhibit 12 at 92:10-93:6 and 69:4-6 (Henry Dep.). Even Plaintiffs' expert William Cooper does not dispute that the Enacted Plan meets compactness requirements. *See* Exhibit 21 at 77:14-19 (Cooper Dep.): "I

---

[14] *See* Exhibit 15 at 8, updated answer to Interrogatory 2 (Defs. 1st Supp. and Am. Responses to DOJ Interrogatories); Exhibit 8 at 5-6 (Owens Report).

[15] Exhibit 9.I (Duncan Decl.) (Map 2 with precincts); Exhibit 16 at 197:15-199:23 (Apffel Dep.).

[16] Exhibit 9.I (Duncan Decl.) (Map 2 with precincts).

[17] Exhibit 12 at 252:2-24 (Henry Dep.).

don't really have any problem with compactness scores in the enacted plan."); *id*. at 83:22-84:8 (agreeing that the Enacted Plan's compactness is "reasonable"). Cooper also does not critique the voting precinct split counts in the Enacted Plan. *Id*. at 84:9-21 (testifying he has no concerns with the Enacted Plan's voting precinct split count). Nor does he disagree with ensuring that incumbents are not drawn together into one precinct. *See id.* at 65:9-66:9 (Plaintiff's expert did not draw incumbents together into one precinct in his illustrative plans).

Between four and six months after Map 2 was enacted, the Plaintiffs filed what would become this consolidated action. They allege the Enacted Plan unconstitutionally dilutes a coalition of minorities' voting power, and was done intentionally for that purpose.

## **ARGUMENT**

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And not just warranted, but "mandate[d] . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

I.   **VRA Section 2 does not permit minority coalitions.**[18]

As a threshold matter, Plaintiffs' VRA claims rest entirely on the belief that that different minority groups (here Black and Latino voters) may form a coalition to create a majority-minority precinct. None of the Plaintiffs argue that Black or Latino voters alone are sufficiently numerous on their own to support a VRA violation in this case. However, Plaintiffs' Section 2 claims should fail because Section 2 does not afford protection to minority coalitions.

Congress made no reference to minority coalitions in the text of the VRA, and the Supreme Court has never decided whether these claims can be sustained under Section 2. *See, e.g.*, *Growe v. Emison*, 507 U.S. 25, 41 (1993) (declining to rule on the validity of coalition claims writ large); *Bartlett v. Strickland*, 556 U.S. 1, 13–14 (2009) (declining to address "coalition-district claims in which two minority groups form a coalition to elect the candidate of the coalition's choice"); *Perry v. Perez*, 565 U.S. 388, 398-99 (2012) (creating a coalition district is likely not necessary to comply with VRA Section 5). Circuit Courts of Appeal have split on the question, and have either: (1) explicitly accepted coalition claims, (2) assumed their validity, or (3) expressly rejected them.

Defendants acknowledge that Fifth Circuit precedent expressly permits VRA Section 2 coalition claims. *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc) ("*Clements*"); *Brewer v. Ham*, 876

---

[18] As explained below, Defendants are aware of Fifth Circuit case law applying the VRA to coalition groups; this argument is made to preserve Defendants' request to change this law to align with other circuits court decisions.

F.2d 448, 453 (5th Cir. 1989); *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989); *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988); *LULAC Council No. 4386 v. Midland Independent School District*, 812 F.2d 1494, 1499 (5th Cir. 1987). Yet, Defendants respectfully recognize Judge Higginbotham's dissents in *LULAC Council No. 4386* and *Campos*, Judge Jones' concurring opinion in *Clements*, 999 F.2d at 894, and analyses from sister circuits addressing a lack of congressional support or Supreme Court authority. These cases counsel in favor of reconsidering the validity of coalition claims. *See Hall v. Virginia*, 385 F.3d 421, 431-32 (4th Cir. 2004); *Nixon v. Kent County*, 76 F.3d 1381, 1392-93 (6th Cir. 1996); *Frank v. Forest County*, 336 F.3d 570, 575-76 (7th Cir. 2003).

For example, in Judge Higginbotham's dissent from the denial of rehearing in *Campos*, he explains the question to be answered is whether "Congress intended to *protect* [] coalitions" rather than whether the VRA prohibits them. *Campos v. City of Baytown, Tex.*, 849 F.2d 943, 945 (5th Cir. 1988) (per curiam) (Higginbotham, J. dissenting on denial of rehearing, joined by five other circuit judges). No such Congressional intent can be deduced. *Id.* Furthermore, the notion "that a group composed of [different minorities] is itself a protected minority" "stretch[es] the concept of cohesiveness" beyond its natural bounds to include political alliances, undermining Section 2's effectiveness. *See id*.

The Sixth Circuit has rejected the validity of coalition claims under Section 2. *Nixon*, 76 F.3d at 1387. The *Nixon* court relied on the "clear, unambiguous language" of Section 2 and the legislative record concluding that minority coalitions were not contemplated by Congress. *Id.* at 1386. If Congress had intended to extend protection to

coalition groups, it would have invoked protected "classes of citizens" instead of a (singular) protected "class of citizens" identified under the Act. *Id.* at 1386-87. Because Section 2 "reveals no word or phrase which reasonably supports combining separately protected minorities," the Sixth Circuit concluded that coalition claims are not cognizable. *Id.* at 1387. It expressly disagreed with *Campos* as an "incomplete [and] incorrect analysis." *Id.* at 1388, 1390-92 (noting the difficulties of drawing district lines for minority coalitions, and that permitting coalition claims would effectively eliminate the first *Gingles* precondition).

Other circuits have the better approach. Section 2 simply was not meant to—and cannot—provide protection to minority coalitions. Defendants re-urge this position here. *See Hall*, 385 F.3d at 431 (noting "multiracial coalitions would transform the [VRA]" from a source of minority protection to an advantage for political coalitions, and concluding that a redistricting plan preventing a minority group from forming "a political coalition with other racial or ethnic groups, does not result in vote dilution 'on account of race' in violation of Section 2"); *Frank*, 336 F.3d at 575 (acknowledging the circuit split, and observing the "problematic character" of coalition claims). All Plaintiffs rely on a coalition Black and Latino precinct in support of their arguments. *See, e.g.,* Dkts. 46 at ¶ 55 (Petteway Plaintiffs' Second Amended Complaint); 47 at ¶ 85 (NAACP Plaintiffs' First Amended Complaint); 48 at ¶ 92 (DOJ Plaintiff's First Amended Complaint). Because Plaintiffs' coalition claims are invalid under Section 2, Defendants are entitled to summary judgment.

II.     **Plaintiffs' discriminatory results VRA claims fail as a matter of law because Plaintiffs have not satisfied any of the *Gingles* preconditions.**

*Gingles* established a two-step test for a Section 2 vote dilution claim. *Harding v. Cty. of Dall.*, 948 F.3d 302, 308 (5th Cir. 2020). At step one, Plaintiffs must establish three threshold conditions: (1) a sufficiently large and geographically compact majority-minority district; (2) that is politically cohesive; that (3) White residents vote as a bloc to usually defeat that majority-minority's preferred candidate. *Id*. (citing *Gingles*, 478 at U.S. 50–51). "Failure to establish any one of these threshold requirements is fatal." *Campos v. City of Hous.*, 113 F.3d 544, 547 (5th Cir. 1997) ("*City of Hous.*"). That is because, without each of these three preconditions, a plaintiff cannot show that the challenged electoral practice or device impairs minority voters' ability to elect representatives of their choice." *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 699 (S.D. Tex. 2013).

At the outset, the Court should be aware of important legal guideposts underpinning the *Gingles* discussion. First, any existing or proposed redistricting plan and precincts within it, including those proposed by Plaintiffs' experts, must remain within the bounds of the Equal Protection Clause. More particularly, any existing or redrawn precinct may violate equal protection guarantees if race predominated the design. *See Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 188-89 (2017) (discussing *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Although compliance with the VRA might be a compelling interest, strict scrutiny and narrow tailoring require that there be a "strong basis in evidence"— meaning the drawing body must have "*good reasons* to believe"—that compliance cannot be achieved through use of race-neutral policies. *Id*. at 193-4 (citing *Ala. Legis. Black*

*Caucus* v. *Ala.*, 575 U.S. 254, 278 (2015)). The *Gingles* discussion reveals both that race is the primary driver of the Plaintiffs' illustrative maps, and that there is no "good reason" to believe using racial classifications in Galveston County redistricting was required to avoid a Section 2 violation.

Secondly, in this case, the *Gingles* preconditions must be analyzed at the precinct level to avoid being nothing more than a County-wide "generalized conclusion" about, for example, compactness, vote dilution, communities of interest or cohesiveness. *See Wis. Legis.*, 142 S. Ct. at 1250 (explaining the *Gingles* precondition standards require careful evaluation of "evidence at the district level," and it was improper to rely on "generalizations" to conclude the preconditions were satisfied). Plaintiffs improperly invite the Court to view the County map as a whole to support their claims without meaningfully addressing the relevant local question which, here, is whether the *Gingles* preconditions "would be satisfied as to each" Commissioner precinct. *Id.* (citing *Cooper v. Harris*, 581 U.S. 285, 304 n.5 (2017)); *see also LULAC v. Abbott*, No. 1:21-CV-1006, 2022 WL 12097120, at *8 (W.D. Tex. Oct. 20, 2022) (explaining it is improper to infer, even at the motion to dismiss stage, that a "minority coalition as a whole in the proposed district will be cohesive" without also showing "that the voters moving into the proposed district are cohesive"). Thus, insofar as Plaintiffs wish to use illustrative maps to bear their burden, their maps must satisfy *each* of the *Gingles* preconditions within the guidelines of the Constitution. *See City of Hous.*, 113 F.3d at 547.

Finally, *Gingles* preconditions 2 and 3 determine whether voting is "racially polarized." While Section 2 of the VRA protects against "defeats experienced by voters

21

'on account of race or color,'" there is "a clean divide between actionable vote dilution and 'political defeat at the polls.'" *Clements*, 999 F.2d at 850 (quoting *Whitcomb v. Chavis*, 403 U.S. 124 (1971)). The VRA is implicated only where, for example, "Democrats lose because they are [B]lack, not where [B]lacks lose because they are Democrats." *Id*. at 854. Accordingly, in looking at cohesiveness and bloc voting standards, the Court must consider "whether partisan affiliation, not race, best explains the voting patterns." *Id*. at 850.

A.   *Gingles* **1 Compactness: Plaintiffs' proposed minority coalition is not geographically compact.**

To carry their *Gingles* Step 1 burden, Plaintiffs must demonstrate that, after "tak[ing] into account traditional districting principles such as maintaining communities of interest and traditional boundaries,"[19] there is a sufficiently large and geographically compact community of interest for the area at issue (here, the precinct level) to create a majority-minority precinct. *See Wis. Legis.*, 142 S. Ct. at 1250. If race is considered when drawing a district (as Plaintiffs do in their illustrative plans), there must be a "strong basis in evidence" for doing so. *See Bethune-Hill*, 580 U.S. at 194. That does not exist here, when traditional redistricting principles such as compactness are considered. In fact, as discussed in more detail below, the County would risk violating the Fourteenth Amendment if it drew racially gerrymandered districts. *See Walters v. Boston City Council*, No. CV 22-12048-PBS, 2023 WL 3300466, at *8 (D. Mass. May 8, 2023) (mem. op. and order). Therefore, even assuming a coalition majority-minority precinct is appropriate

---

[19] *Sensley v. Albritton*, 385 F.3d 591, 596 (5th Cir. 2004) (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)).

under the VRA, Plaintiffs cannot pass *Gingles* Step 1.[20]

### 1. Plaintiffs fail to consider traditional redistricting principles, and propose unconstitutional racial gerrymanders.

At the outset, Plaintiffs' illustrative maps are blatant racial gerrymanders that look at no traditional redistricting principles for keeping communities together. Instead, they focus only on voters' race. This flouts the law: a Section 2 "compactness inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *Abrams,* 521 U.S. at 91; *see also Sensley*, 385 F.3d at 596. That is, it cannot be assumed merely "from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls." *LULAC v. Perry*, 548 U.S. 399, 434 (2006) ("*LULAC I*"). For that reason, illustrative plans that "lump[] together" minority populations "separated by considerable distance," *Sensley*, 385 F.3d at 597, or "combin[e] 'discrete communities of interest'" that differ "'in socio-economic status, education, employment, health, and other characteristics'" cannot satisfy the first *Gingles* precondition. *Robinson*, 37 F.4th at 218 (quoting *LULAC I*, 548 U.S. at 432).

DOJ Plaintiffs expert Dr. Fairfax testified that, in his view, "the communities of interest . . . considerations are unnecessary for the *Gingles* 1 analysis," **so he just "didn't**

---

[20] The Supreme Court heard argument in *Merrill v. Milligan* last October and is expected before the end of June 2023 to issue its opinion. *See Merrill v. Milligan*, Nos. 21-1086 & 21-1087, Oral Argument Transcript (Oct. 4, 2022) (available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/21-1086_6j36.pdf) (last visited May 9, 2023). *Merrill* considers largely the same issue here: whether a jurisdiction is required to prioritize majority-minority district creation over other race-neutral redistricting criteria, and focuses substantially on the first *Gingles* precondition. *See Merrill v. Milligan*, 142 S. Ct. 1358 (Mar. 21, 2022) (amending the question presented to whether Alabama's 2021 redistricting plan violates section 2 of the VRA).

**conduct any."** Exhibit 1 at 25:15-26:2 (Fairfax Dep.) (emphasis added). The Petteway Plaintiffs' expert, Rush, states that he took into account communities of interest, but does not specify how. *See* Exhibit 22 at ¶¶ 32, 54 (Rush Decl.). Because failure to consider communities of interest is fatal to Plaintiffs' VRA discriminatory impact claim as a matter of law, the Petteway Plaintiffs and DOJ Plaintiff cannot support their VRA vote dilution claims.

The NAACP's expert, Cooper, tried to provide sparse, de minimis analysis at the eleventh hour, *see* Exhibit 10 at ¶ 13 (Cooper Rebuttal Report); Exhibit 2 at ¶ 39 (Cooper Report). However, his own data shows starkly varying education and home ownership levels among minority populations, which contradicts any conclusion that these populations are communities of interest under traditional redistricting principles. His evidence therefore also fails to satisfy *Gingles* Step 1. *See Robinson*, 37 F.4th at 218 (quoting *LULAC I*, 548 U.S. at 432).

### 2. Plaintiffs' illustrative plans join disparate and distinct minority communities.

Plaintiffs present various illustrative maps that propose to create a long and winding Precinct 3s, that are not geographically compact as a matter of law. *See* Exhibit 24 at 14, Figure 1 (Fairfax Report); Exhibit 2 at 30, Figure 14 , 33, Figures 16 & 35, Figure 18 (Cooper Report); Exhibit 22 at 10, Figure 1, at 12, Figure 2 & at 14, Figure 3 (Rush Decl.); Exhibit 29 at Ex. B Figures 3–5 (Oskooi Report). African American and Latino communities are dispersed in several areas around Galveston County. Defense expert Dr. Owens depicts this in his report:



Exhibit 8 at 23, Figure 12 (Owens Report).



Exhibit 8 at 13, Figure 7 (Owens Report).

It is impossible to consider these distant communities geographically compact. *LULAC I*, 548 U.S. at 434 (2006). The largest CVAPs of Black voters in Galveston County are roughly 21 miles apart between Galveston Island and Dickinson, and the densest Latino census blocks are 24.8 miles apart. Exhibit 8 at 12, 8 (Owens Report).

Because of this undeniable geographic fact, each of Plaintiffs' illustrative maps include a majority-minority Precinct 3 that extends considerable distances, often splitting voting precincts in the process. *See, e.g.*, Exhibit 2 at 33, Figure 16, (Cooper Report) (drawing Precinct 3 nearly 25 miles long from the northeast corner to the southwest corner while splitting voting precinct 218 to include a small intersection); Exhibit 2 at 35, Figure 18 (Cooper Report) (dividing Dickinson Latino population and combining with population in Hitchcock separated by more than 13 miles); Exhibit 22 at Demonstrative Map 1 (Rush Declaration) (creating narrow 0.05-miles-wide corridor by splitting voting districts 439 and 144 from voting district 341 to achieve boundaries stretching more than 19 miles north of Galveston Island). Most of Plaintiffs' illustrative maps draw Precinct 3 boundaries that extend from the northern end of the County near the border of Dickinson and League City down to Galveston Island; each of these proposed Precinct 3 boundaries include some portion of League City. *See* Exhibit 2 at 30, Figure 14 and at 33, Figure 16 (Cooper Report) (Illustrative Maps 1 and 2 stretching from League City to Galveston Island beach); Exhibit 24 at 14, Figure 1 (Fairfax Report) (same); Exhibit 22 at Figures 1–3 (Rush Decl.) (same).

*Every one* of Plaintiffs' experts stated that they drew their illustrative plans with the express purpose of creating a majority Black and Latino (50+%-majority Black and Hispanic CVAP) Precinct 3. *See* Exhibit 25 at 6 (Fairfax Rebuttal Report); Exhibit 22 at 2

(Rush Decl.); Exhibit 2 at 3, ¶6 (Cooper Report). In prioritizing race, Plaintiffs' experts drew misshapen boundaries and plainly subordinated traditional race-neutral districting principles. Plaintiffs cannot achieve a majority-minority Precinct 3 without racial gerrymandering, and have not disguised their illustrative attempts as anything other than racial gerrymandering.

Indeed, Rush was "instructed" by counsel for the Petteway Plaintiffs to draw a map with a majority-minority precinct. Exhibit 23 at 192:6-22 (Rush Dep.). And to do so, Plaintiffs' experts uprooted, detached, and fused together distinct and far-apart communities and neighborhoods that, but-for a racially driven goal of Frankenstein-ing together a majority-minority precinct, would otherwise make no sense as a precinct.

For instance, the proposed Precinct 3 boundaries of Cooper Illustrative Map 1 include voting district 219 (CVAP of 2,689) while excluding the more populous voting district 225 and the concentrated Latino population to the west of Highway 6 that resides therein. Exhibit 8 at 21-22 (Owens Report). Cooper Illustrative Map 2 places 144 voting-age citizens (83% of whom are White) who live along the Gulf side of Galveston Island into Precinct 2 rather than Precinct 3, while leaving a narrow strip of beach to connect the portions of Precinct 2. Exhibit 8 at 22-23 (Owens Report). This strip of land is narrow enough that the dry land contiguity of Precinct 2 is dependent on the weather and the tide. *Id.* And in creating his illustrative map, Dr. Fairfax shifted a single more diverse voting district from Precinct 2 to Precinct 3 on the old map, even though shifting a more populous adjacent precinct would have reduced Precinct 3's population deviation further and improved population equality. *Id.* at 20.

In several illustrative plans, Plaintiffs' experts drew Precinct 3 with a narrow corridor connecting two geographically separate, unrelated populations in Texas City and Dickinson, resulting in a shape resembling a barbell. *See* Exhibit 2 at 31, Figure 15 (Cooper Report); Exhibit 24 at 14, Figure 1 (Fairfax Report); Exhibit 22 at Demonstrative Maps 1-3 (Rush Decl.). Rush Demonstrative Map 1 uses voting district 341 as a very narrow 0.05-mile-wide corridor connecting populations in the north and south of Galveston County to form Precinct 3. All three of the Rush Demonstrative Maps and two of the Cooper Illustrative Maps split Galveston Island into *three* separate precincts, even though Galveston Island only has a population of 54,774, which is "less than the ideal district population." Exhibit 8 at 24-25 (Owens Report); Exhibit 22 at 10, 12, 14 (Rush Decl.).

The Fifth Circuit addressed similar bizarrely shaped boundaries in *Sensley*, and found such boundaries indicated that traditional districting principles were subordinated to race. *See Sensley*, 385 F.3d at 597. In that case, the proposed plans included district boundaries with "extended and distorted shape[s]" that linked Farmerville and Marion Louisiana, excluded "non-blacks while simultaneously adding 'excess' blacks from other communities," and resulted in a "population dispersal" that resembled "an electoral barbell." *Id.* at 597 & n.4. At either end of the barbell were two heavily concentrated areas of African-American populations, connected by an 18-mile-long, narrow, rural strip sometimes less than a half-mile wide. *Id.* at n.4.



*Sensley v. Albritton*, No. 3:03-cv-722-RGJ-JDK, at 8 (W.D. La. Apr. 21, 2003) (Complaint)

(*available at* https://ecf.lawd.uscourts.gov/doc1/0891797484) (emphasis added). That

barbell shape is similar to the precinct 3 boundaries proposed by Plaintiffs' experts.

    For instance, Cooper drew maps with northern and southern extremities of Precinct

3 stretching about 28 miles, requiring well more than a half hour to drive from one end to

the other, s*ee* Exhibit 2 at 32 (Cooper Report). Notably, even in a best-case scenario for

Plaintiffs under Cooper Illustrative Maps 3 and 3A,[21] the 18-mile distance between

minority populations in Texas City and League City is the exact distance between the

minority communities in *Sensley* that the court determined were insufficiently compact to

---

[21] Exhibit 2 at 35, Figure 18 (Cooper Report); Exhibit 10 at Illustrative Map 3A (Cooper Rebuttal Report).

form a community of interest. *Sensley,* 385 F.3d at 598. And Cooper Maps 3 and 3A include

significantly more population from League City (4,378 or 3.91%) in Precinct 3 than the

other illustrative plans. *See* Exhibit 2 at Ex. K-3B (Cooper Report); Exhibit 10 at Ex. E-3B

(Cooper Rebuttal Report). In fact, *each* of the Plaintiffs' illustrative plans borrows some

portion of League City's population to form Precinct 3. *See, e.g.*, Exhibit 2 at Exs. I-3B, J-

3B, K-3B (Cooper Report); Exhibit 10 at Ex. E-3B (Cooper Rebuttal Report); Exhibit 22

at 10-14 (Rush Decl.); Exhibit 24 at 14 (Fairfax Report). But, as discussed above, minority

populations in League City are particularly distinct from those in the southern portions of

the County. *See Sensley*, 385 F.3d at 598 (noting that two distinct communities separated

by approximately 18 miles were insufficiently compact).

Similarly, Rush (Petteway Plaintiffs' expert) also draws boundaries extending for

lengthy geographic distances:



Exhibit 22 at 10, Figure 1. As with Cooper's maps, Rush's illustrative plans propose boundaries that stretch from League City in the north of the County to the Seawall on Galveston Island. *See id.* at 10, 12 & 14 (Rush Decl.). And Dr. Fairfax's (DOJ's expert) illustrative plan boundaries suffer similar issues: they extend a lengthy geographic distance of about 23 miles from League City to Galveston Island:



Exhibit 24 at 14 ¶ 34 (Fairfax Report). The same is true of Dr. Cooper's illustrative map:



Exhibit 2 at 30, Figure 14 (Cooper Report).

Similarly, the Rush Demonstrative Map 1 shrinks Precinct 3 down to a width of only 0.05 miles near Dickinson Bayou, with the evident aim of including 3,107 Black and Latino citizens of voting age who reside on the north side of that body of water, a population that is numerically important to achieving a comfortable majority-minority *coalition* Precinct 3 population:



Figure 13: Narrow Contiguity of Precinct 3 - Where Three Districts Meet

Exhibit 8 at 24, Figure 13 (Owens Report) (red circle added). The narrow point of contiguity at the center of the red circle above allows someone to be in one of three different Commissioner Precincts at Robinson's Auto Repair, depending on which side of the repair shop they are standing. *See id.* at 23-24. By taking this approach, Rush achieves a combined 56.56% Black and Latino majority CVAP for Precinct 3, with voting-age citizens residing north of Dickinson Bayou contributing 5.21% toward reaching that total. *See* Exhibit 22 at 11, Table 4 (Rush Decl.). This is textbook of racial gerrymandering. *See Shaw v. Reno*, 509 U.S. 630, 635-36 (1993) (describing North Carolina's Twelfth Congressional District as no wider than an interstate highway corridor and winding "in snakelike fashion through tobacco country, financial centers, and manufacturing areas 'until it gobbles in enough enclaves of black neighborhoods'").

Racial predominance is evident throughout Plaintiffs' illustrative plans. All of Plaintiffs' illustrative maps (except for Dr. Cooper's Illustrative Maps 3 and 3A) split Galveston Island into three separate precincts, even though Galveston Island only has a population of 54,774, which far below the "ideal" precinct population of 87,671. *See* Exhibit 8 at 2, 18 (Owens Report). Traditional districting principles disfavor breaking up geographically distinct areas like islands into multiple districts, and coastal regions have unique concerns that counsel in favor of uniting them under the auspices of a single Commissioner. These include "probably a dozen issues that only affect the coastline" that are "extremely difficult to even keep one commissioner really up to speed on" (including, among others, addressing problems with uncapped oil wells, coordinating responses to hurricanes, and complying with complex statues like the Coastal Erosion Planning and Response Act and Gulf of Mexico Energy Security Act). *See* Exhibit 12 at 236:1-240:19 (Henry Dep.); Exhibit 16 at 197:15-199:23 (Apffel Dep.); Exhibit 20 at 242:20-243:4, 261:5-16 (Drummond Dep.). To meet these concerns, the Enacted Plan's precinct boundaries maintain Galveston Island and Bolivar Peninsula as a unified coastal community.

The purpose for Plaintiffs' strange illustrative boundaries is clear: racial gerrymandering. Rush carved out portions of Galveston Island with large non-Hispanic Black populations to increase Precinct 3's minority population. Exhibit 8 at 24-25 (Owens Report); Exhibit 22 at 10, 12, 14 (Rush Decl.). Illustrative Map 2 from the NAACP Plaintiffs' expert Dr. Cooper prioritizes race by excluding 144 voting-age citizens (83% of

whom are white) from Precinct 3, and by using such a small strip of beach to connect his

Precinct 2 that the precinct's dry land contiguity depends on the weather and tide:



Figure 12: Cooper Map 2, Precinct 3

Exhibit 8 at 21-22, & at 23, Figure 12 (Owens Report) (marking up Cooper's illustrative

map and noting its jagged boundaries and that it makes the contiguity of a proposed

precinct 2 "dependent on the weather condition and high tide"). Cooper's Illustrative Map

2 uses this carveout to include a larger non-Hispanic Black population in Precinct 3, while

excluding areas with a higher non-Black population. *See id.*

Notably, Plaintiffs' illustrations attempt to preserve old Precinct 3. While Plaintiffs

may insist that preserving the historical boundaries of Precinct 3 is a traditional districting

principle in its own right, existing and proposed precincts must pass constitutional muster.

Indeed, the Middle District of Florida recently held that maintaining districts as they were

drawn in the previous redistricting cycle (i.e., to preserve minority-opportunity districts

that were initially drawn on the basis of race) does not eliminate the unconstitutionality of

35

such racial sorting now. *Jacksonville Branch of the NAACP*, No. 3:22-CV-493-MMH-LLL, 2022 WL 7089087, at *48 (M.D. Fla. Oct. 12, 2022), *appeal dismissed*, No. 22-13544-HH, 2023 WL 2966338 (11th Cir. Jan. 12, 2023) ("[R]acial sorting—even when done with good intention—violates the Constitutional mandate of the Equal Protection Clause if it cannot survive strict scrutiny").

Except for racial predominance, the distanced communities Plaintiffs' experts attempt to join have little in common. Exhibit 8 at 3 (Owens Report). Because "[l]egitimate yet differing communities of interest should not be disregarded in the interest of race," *LULAC I*, 548 U.S. at 434, Plaintiffs cannot satisfy their *Gingles* Step 1 burden, and their VRA discriminatory impact claims must be dismissed.

### 3. Plaintiffs' experts fail to assess whether their maps serve a community of interest at the precinct level.

The *Gingles* preconditions must be analyzed at the appropriate level, here, the precinct level. *See Wis. Legis.*, 142 S. Ct. at 1250. Courts may not view an entire state or County as a whole to make "generalized conclusion[s]" about what vote dilution might exist at the relevant local level. The relevant question here, which requires meaningful analysis, is whether the *Gingles* preconditions "would be satisfied as to each" precinct. *See id.* (citing *Cooper v. Harris*, 581 U.S. 285, 304 n.5 (2017)). And insofar as Plaintiffs wish to use illustrative maps to bear their burden, their maps must satisfy *each* of the *Gingles* preconditions. *See City of Hous.*, 113 F.3d at 547.

Dr. Cooper examined communities at the "county, municipal, and community levels"—but not, as required, at the precinct level. Exhibit 2 at ¶ 39 (Cooper Report). He

also did not "analyze the socioeconomic factors of the populations contained in [his] illustrative commissioner Precinct 3 maps." Exhibit 21 at 44:13-20 (Cooper Dep.). His analysis therefore fails to satisfy *Gingles* 1 at the outset. Cooper contends African American and Latino residents share socioeconomic disparities. Exhibit 10 at ¶ 13 (Cooper Rebuttal Report). However, he fails to support this conclusion with any geographic or other connection among these residents. Cooper also postulates that there is a community of interest between League City and the City of Galveston because African Americans and Latinos celebrate the Juneteenth holiday. Exhibit 21 at 92:17-24 (Cooper Dep.).[22] Failing any specific connections in Dr. Cooper's proposed precincts, his illustrative maps are the type of racial sorting that the Equal Protection Clause prohibits. *Shaw*, 509 U.S. at 647 ("A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid"); *see also Sensley*, 385 F.3d at 598; *LULAC I*, 548 U.S. at 432-35 (holding that a congressional district in Texas was not compact because, *inter alia*, significant socioeconomic differences between two Latino populations revealed different needs and interests between those communities).

Finally, Rush (the Petteway Plaintiffs' expert) insists his illustrative maps keep communities of interest intact. *See* Exhibit 22 at ¶¶ 32, 54 (Rush Decl.). He offers no support for that conclusion, and therefore also fails to satisfy *Gingles* 1.

---

[22]    Juneteenth    became    a    Texas    state    holiday    in    1980.    *See    e.g.* https://www.tsl.texas.gov/ref/abouttx/juneteenth (last visited May 6, 2023).

Perhaps Plaintiffs do not analyze traditional criteria for forming "communities of interest" at the Precinct level because doing so would reveal that the precincts they hypothesize clearly lack geographical and socioeconomic ties. For example, it is undisputed that Black residents in opposite ends of the County have substantially different family incomes. *See supra* at 7-8. The same is true for Latino residents living in different parts of the County. *Supra* at 8. Other socioeconomic measures also show stark differences that preclude forming a community of interest. As discussed above, northern County Black residents achieve bachelor's degrees approximately 50% more often than Black residents in the southern part of the County. *Supra* at 7-8. North County Latino residents obtain degrees approximately 20% more often than Latino residents in the southern part of the County. *Supra* at 8. Black residents in southern Galveston County rent instead of own their homes approximately 24% more often than Black residents in the northern part of the County, while southern County Latino households rent almost 43% more often than Latinos living in northern Galveston County. *Supra* at 7-8.

In addition to failing to show common socioeconomic, educational or other common interest of minorities within a particular precinct, *see Wis. Legis.*, 142 S. Ct. at 1250, it is also clear that people within the same minority group have different experiences across the numerous areas they seek to lump into precinct 3. In short, Plaintiffs fail *Gingles* I.

**B.** ***Gingles* 2: Plaintiffs' minority coalition is not cohesive.**

*Gingles* Step 2 exists because, without evidence of political cohesion, there is no argument that a plan "thwarts distinctive minority group interests." *Gingles*, 478 U.S. at 51. "[I]f the statistical evidence is that Blacks and Hispanics together vote for the Black or

Hispanic candidate, then cohesion is shown." *Campos*, 840 F.2d at 1245. While there is no clear threshold percentage for voter cohesion, **it is clear that 51% falls "far short of the large majority typically required to show political cohesion."** *LULAC v. Abbott*, 604 F. Supp. 3d 463, 499 (W.D. Tex. 2022) ("*LULAC II*") (emphasis added).

Despite this case law, Plaintiffs' expert Dr. Oskooii testified that cohesion occurs if 50.1% of the coalition votes for the same candidate. Exhibit 5 at 75:6-76:2, 82:16-83:2 (Oskooii Dep.). Another Plaintiffs' expert, Dr. Trounstine, surmised that a 60% threshold was necessary. Exhibit 27 at ¶ 31 (Trounstine Second Corrected Report); Exhibit 3 at 84:5-12 (Trounstine Dep.). A third, Dr. Barreto, refused to settle on any particular cohesion threshold. Exhibit 26 at 63:24-66:16 (Barreto Dep.). In short, Plaintiffs' experts disagree on the level needed for cohesion—but under *LULAC II*, that level is not 51%.

Because Plaintiffs have sought a majority-minority *coalition* precinct of Black and Latino voters, they must show that their proposed coalition votes cohesively with each other. "If one part of the [combined minority] group cannot be expected to vote with the other part the combination is not cohesive." *Brewer*, 876 F.2d at 453. Demonstrating cohesion is particularly difficult for minority coalitions. *See Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 504 (E.D. Tex. 2020) ("[C]ohesion, especially cohesion among various races, is not easy to prove"). Courts may find cohesion in a minority coalition when the various minority groups have electoral variances of less than 10%. *See, e.g., Clements*, 999 F.2d at 864-65 (Black-Latino cohesion existed where in 35 elections their vote percentages varied by less than 10%, and varied within 10% in 13 of 17 elections in another county). Ultimately, the question of whether African Americans and Latinos are politically

39

cohesive is a question of law. *LULAC v. Abbott*, 601 F. Supp. 3d 147, 169 (W.D. Tex. 2022) (three-judge court).

Plaintiffs cannot show cohesion. Dr. Trounstine (DOJ's expert) testified that she did not "analyze the extent to which Black and Latino voters as a single group voted in elections" or otherwise constitute a cohesive voting coalition. *See* Exhibit 3 at 115:20-116:12 (Trounstine Dep.). She also testified that she did not evaluate precinct-specific numbers in her analysis of racial cohesion in voting for county judge (including Commissioner Precinct 3 of the Enacted Plan), but instead used countywide election results analysis and extrapolated the county-level results to the commissioner precinct level, *id.* at 149:15-153:11. Her analysis is thus facially deficient under the *Wisconsin Legislature* opinion. *See Wis. Legis.*, 142 S. Ct. at 1250. Even if it were not, her election returns data actually reveals a lack of cohesion—Black and Latino voters cast ballots cohesively in only *6 of the 10* primary elections included in her report. Alford Rpt. at 14.

Dr. Oskooii's (NAACP expert) report fares no better. First, of the 25 general elections he analyzed, *all 25 elections* had a greater than 10% difference between the percentage of Black voters and the percentage of Latino voters who voted for the same candidate. Exhibit 29 at Ex. C, Figures 8-9 (Oskooii Report). Thus, cohesiveness between the groups is tenuous if only the general elections are considered.

An absolute lack of cohesiveness between Black and Latino voters is apparent in the 2014 County Judge general election results—a race in which Judge Mark Henry received 62.18% of the Latino vote against an Independent candidate, while receiving just 9.53% of the Black vote in that same election. Exhibit 27 at A-20 (Trounstine Second

Corrected Report) As Dr. Trounstine acknowledges, Latinos were thus "cohesive in favor of [Republican] Mark Henry" in the 2014 general election, while "African Americans voted cohesively for [Judge Henry's challenger]." Exhibit 3 at 160:15-161:12 (Trounstine Dep.).[23] In the 2018 Senate race between Latino Republican Ted Cruz and Anglo Democrat Beto O'Rourke, over 80% of Anglo voters supported Cruz, while greater than 80% of Latino and 90% of Black voters supported O'Rourke. Exhibit 28 at 21 (Alford Report); Exhibit 4 at App'x A Table 2 (Barreto Decl.).

And in non-partisan contests, which are important to consider to remove a candidate's partisanship as the cause of voting results rather than race, "[t]here is not a single contest out of ten in which both Latino and Black voters are cohesive". Exhibit 28 at 20, Table 5 & 21 (Alford Report). The voting percentages in Table 5 under the "Replication RxC Estimate" column contain Trounstines's estimated percentages of votes cast for a particular candidate for each racial group. *Id*. The percentages are miserably inadequate to show that Black and Latino voters were voting cohesively with each other.

As Dr. Alford explains, "[a]ll the conclusions based on the partisan general elections are in fact clearly 'dependent upon the presence of partisan labels.'" *Id*. This is an important point because where partisanship is a better explanation for the voting patterns than race, *Gingles* Step 2 is not met. *Clements*, 999 F.2d at 850.

---

[23] Additionally, in analyzing the 2020 nonpartisan election for Texas City Commission, Dr. Trounstine identifies two white candidates who received 48.13% and 48.08% support from Latino voters, as compared to her estimate of 82.23% Black support for a Black candidate in the same race. Exhibit 27 at A-30, A-32 (Trounstine Second Corrected Report).

In looking at primary elections, which typically eliminate party labels as a cause for voting patterns, cohesiveness between Black and Latino voters is unsustainable. As Dr. Oskooii acknowledges, "preferences are not as strong for any one candidate as they are in general elections." *Id*. at 24. And using Dr. Alford's cohesion rate of 75%, the data shows that Black voters were cohesive as a group in **five out of ten** primary elections, while Latino voters were cohesive as a group in just **one out of ten** elections. Exhibit 28 at 14 (Alford Report).

Dr. Barreto and Rios do not even analyze primary elections. Recently, a three-judge district court in Texas ruled that it gave Dr. Barreto's ultimate conclusions "little weight" because Dr. Barreto maintained there, as he does here, "that the only relevant factor in determining whether Black and Hispanic citizens vote as a cohesive group is how they vote in general elections." *See LULAC,* 601 F. Supp. 3d at 165. Dr. Barreto's same analytical deficiency should receive the same ruling from this Court.

Petteway Plaintiffs' experts Dr. Barreto and Rios also fail to show cohesiveness. They analyzed 29 elections using two different analytical methods. Of the 29 elections analyzed using Ecological Inference (EI),[24] **all 29 had a gap larger than 10% between Black and Latino voters** who voted for the Democratic Party candidate. Exhibit 4 at App'x A Table 1 (Barreto Decl.). In one analysis of those same 29 general election contests,

---

[24] The Ecological Inference (EI) methodology is the process of using aggregate data to make micro level inferences about individual behavior, and is an earlier iterative approach that has often been used for comparing cohesion of voters of two different races/ethnicities in an election where it isn't possible to use individual surveys. By contrast, the RxC method is a more recent EI technique that examines associations between rows and columns in a table and is more effective than the earlier EI approach for comparing voter cohesion when there are three different races/ethnicities being compared. *See* Exhibit 28 at 3-5 (Alford Report).

25 out of 29 elections had a larger than 10% gap in voting between Black and Latino voters voting for the Democratic candidate; the only election contests with a gap under 10% took place in 2014 and 2016. Exhibit 4 at App'x A Table 2 (Barreto Decl.). Additionally, the spread in 2022 elections was considerably wide between Black voters supporting a Democratic candidate in the low-to-mid 90% range, while Latino support for the candidate was in the low-to-mid 60% range. Exhibit 28 at 6 (Alford Report). Even without considering partisanship as a cause of the voting patterns, such a wide spread is a clear indication of important differences between Latino and Black voters.

Plaintiffs' expert reports fail to show the existence of a cohesive Black-Latino coalition of voters in any of their illustrative maps. DOJ, for its part, did not even attempt a cohesiveness analysis. Partisanship, rather than race, is a better explanation for voting patterns in Galveston County. Since the VRA does not protect political parties, *Gingles* 2 is not satisfied. *See Clements*, 999 F.2d at 850.

### C. *Gingles* 3: Any purported White-bloc voting does not defeat minority-preferred candidates on account of their race.

To prove the third *Gingles* precondition—establishing a legally significant white voting bloc—Plaintiffs must show that a majority of the white citizen voting age population votes sufficiently as a bloc to enable it—absent special circumstances—to usually defeat the minority coalition's preferred candidate; *i.e.*, evidence that the white bloc vote normally defeats the combined strength of minority support plus white "crossover" votes. *Rangel v. Morales*, 8 F.3d 242, 245 (5th Cir. 1993). And, unlike for the second precondition, this must be proved in regard to the *challenged* map, not Plaintiff's proposed map. *See League*

*of United Latin Am. Citizens v. Abbott*, 2022 WL 4545754, at *5 (W.D. Tex. Sept. 28, 2022) (explaining the second and third *Gingles* preconditions "are not mirror-image requirements for different racial groups" and a plaintiff "must show the second precondition for the minority population that would be included in its proposed district" while "the third precondition must be established for the challenged districting"). Minority electoral success and "racially polarized voting" are the two most probative factors in evaluating the merits of a Section 2 dilution allegation. *LULAC # 4552 v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 848 (5th Cir. 1997) (citing *Clark v. Calhoun Co.*, 88 F.3d 1393, 1397 (5th Cir. 1996)).

Failures of a minority group to elect representatives of its choice that are attributable to "partisan politics" provide no grounds for relief. Section 2 is "a balm for racial minorities, not political ones." *Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) (citation omitted). "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if Black voters are likely to favor that party's candidates." *Clements*, 999 F.2d at 854.

In other words, the elections that matter for purposes of racially polarized voting are those where minority *candidates* are defeated by White candidates *because of* their minority status. *Citizens for a Better Gretna v. Gretna*, 834 F. 2d 496, 503-04 (5th Cir. 1987).[25] Precedent makes this clear. "[I]mplicit in the *Gingles* holding is the notion that

---

[25] In her report's Gingles 3 analysis, Dr. Trounstine also uses an unusual definition of "racially polarized voting". Under her approach, when white voters and Black voters vote cohesively for the same candidate and Latino voters vote cohesively for a different candidate, she still categorizes this as a "racially polarized election". *See* Exhibit 3 at 31:5-17, 96:11-19 (Trounstine Dep.). As far as Defendants are aware, no Court

black preference is determined from elections which offer the choice of a black candidate." *Id*. Without examining races featuring a minority candidate, it is impossible to know "the extent that candidates preferred by Black voters are consistently defeated because of their substantive political positions," which makes them "casualties of interest group politics, not racial considerations." *Clements,* 999 F.2d at 879. Therefore, Plaintiffs have a negative causative requirement: they do not need to affirmatively show racial animus on behalf of the white voting bloc, but they must present evidence showing partisan affiliation was *not* the cause of any divergent voting patterns in the presented races. *See id.*

Plaintiffs cannot carry their burden. Dr. Trounstine (DOJ's expert) testified unambiguously that, that in general elections, Galveston voters usually support candidates "who share their political orientation," Exhibit 3 at 114:3-9 (Trounstine Dep.); *see also id.* at 186:17-187:3 (same)—*i.e.*, "voters will select the candidate who shares their priorities, preferences, and ideologies in an election in the general election, typically." *Id.* at 86:11-87:3. In other words, voters vote based on partisanship, which dooms Plaintiffs' Section 2 claim. *See Clements,* 999 F.2d at 854. That Dr. Trounstine is the *only* expert hired by any of the Plaintiffs' who looked at Galveston-specific electoral data makes this admission even more salient.

The data bears out Dr. Trounstine's concession. From the general election returns data Dr. Trounstine analyzed for county commissioner races, White voters in Commissioner Precinct 3 in the November 2004 election voted 72.79% for a Black

---

has characterized such elections as "racially polarized" for purposes of Section 2 of the VRA, further undermining the reliability of her analysis.

Republican candidate, Lewis Parker, Jr., and 26.65% for the Democrat candidate. Exhibit 27 at A-19 (Trounstine Second Corrected Report). Once again demonstrating that partisanship is a better explanation for voting trends than race, subsequent election results show that White voter support for Black Republican candidates was **roughly consistent with or higher than** White support for White Republican candidates. *Id.* Similarly, in the 2002, 2006, and 2010 elections, the Democrat candidate challenging Republican Judge Henry received more than 90% of the Latino vote. *Id.* at A-20. But, in the 2014 general election when an Independent candidate challenged Judge Henry, Judge Henry received 62.18% of the Latino vote, while the Independent challenger received 90.46% of the Black vote. *Id*; *see also* Exhibit 3 at 160:15-161:12 (Trounstine Dep.) (acknowledging that Latinos "were cohesive in favor of [Republican] Mark Henry" in the 2014 general election, while African American voters "voted cohesively for [the Independent candidate]"). Based on these facts, partisanship is a better explanation than race for Galveston County voting patterns. *Clements*, 999 F.2d at 850.

For his part, Dr. Oskooii (NAACP Plaintiffs' expert) admitted that he did not analyze whether voters (much less Galveston voters) cast ballots based on political orientation or race. *See* Exhibit 5 at 180:17-181:21 (Oskooii Dep.). When asked, he retorted "I would have to conduct a literature review to tell you more details." *Id.*[26] He did not look at "the reasons underlying the vote choice of different demographic groups"; instead, he only looked at whether "minority voters favor candidates . . . that are disfavored by the

---

[26] Notwithstanding this deficiency, Dr. Oskooii did indicate there is a "great deal of literature and research . . . saying that race and partisanship are interconnected." Exhibit 5 at 180:5-20 (Oskooii Dep.).

majority racial group voters" regardless of the reason for that divergence. Exhibit 30 at ¶ 4 (Oskooii Rebuttal Report). He also "did not analyze the Commissioners Court elections." Exhibit 5 at 61:7-10 (Oskooii Dep.). These failures render his expert report entirely meaningless, since he affirmatively disclaims any opinion as to whether minority "candidates lose because they are Democrats," or "Democrats lose because they are" minorities. *See Clements*, 999 F.2d at 879 (where partisanship is a better explanation for the voting patterns than race *Gingles* is not met).

In contrast with Dr. Oskooii, the Petteway Plaintiffs' experts (Dr. Barreto and Rios) considered the race-versus-partisanship question—but conducted their analysis entirely based on national- and state-level studies rather than studies of Galveston specifically. *See* Exhibit 26 at 109:11-18 (Barreto Dep.). Based on this analysis, they conclude that race and partisanship have become so closely intertwined that one factor often cannot be analyzed without the other in explaining racial voting patterns. *See* Exhibit 4 at ¶¶ 25, 31 (Barreto Decl.) ("[P]artisan general elections are often understood by voters through a racial/ethnic lens. Indeed, political science research has proven conclusively that attitudes about racial public policy issues, views on immigrants, and even racial animus influence partisanship among White voters"). Accordingly, "it is voters['] views on matters of race that often push White voters today into voting for Republican candidates in the first place, providing a clear link to racially polarized voting even when one considers partisanship." *Id.* Because this position runs headlong into *Clements*, 999 F.2d at 879, Dr. Barreto and Rios offer

nothing in support of Plaintiffs' *Gingles* Step 3 burden.[27]

Simply put, voting is not racially polarized in Galveston County. White voters cast ballots consistently for Republican candidates and in opposition to the Democrat candidates in general elections, while White opposition to the Democrat candidate varies by *less than a single percentage point* based on whether the Democrat candidate was White, Black, Latino, or Asian. Exhibit 28 at 5 (Alford Report). The same pattern holds true for Black and Latino voters; their support for Democrat candidates in general elections varies by less than a percentage point based on whether the Democrat candidate was White, Black, Latino, or Asian. *Id.* However, Latino support for Democrat candidates in general elections is less substantial, and the Plaintiffs experts do not agree on a definition of cohesion. The impact of the candidate's party label is clear, consistent, and stable, even as the race and ethnicity of the candidates vary across elections. *Id.* at 4. Indeed, the November 2, 2004 election where White voters in Precinct 3 voted 72.79% for a Black Republican candidate for county commissioner proves partisanship is the better explanation. Exhibit

---

[27] Even if Plaintiffs' evidence could meet all three *Gingles* preconditions, which it cannot, Plaintiffs' experts' testimony still dooms their case under the totality of the circumstances. This Court has held that Plaintiffs' burden under the totality of the circumstances is to show that "race rather than partisanship better explains [Plaintiffs'] preferred candidates' lack of success at the polls." *Lopez v. Abbott*, 339 F. Supp. 3d 589, 619 (S.D. Tex. 2018). Plaintiffs' expert testimony described *supra* directly undermines, if not precludes, any argument that race rather than partisanship better explains their proposed minority coalition's defeat at the polls in Galveston County. *E.g.*, Exhibit 3 at 114:3-9, 186:17-187:3 (Trounstine Dep.) (conceding that Galveston voters voting patterns are explained by selecting candidates who share their political orientation). Based on these concessions alone, no Plaintiff in this case can meet their burden of showing any electoral disadvantage due to race instead of politics.

27 at A-19 (Trounstine Second Corrected Report). White voter support in subsequent commissioner general election races further upholds that conclusion.[28]

Clements is on point here. There, the court held that the third Gingles prerequisite was not established because, in each challenged county, "a black Democratic voter and a white Democratic voter [stood] in the same position": "Both [were] unable to elect the Democratic judicial candidate they prefer." Clements, 999 F.2d at 879. In other words, "[t]he race of the candidate did not affect the pattern." Id. The unifying thread throughout plaintiffs' case for all counties challenged was "an insubstantiality of proof that the minority-preferred candidate lost 'on account of race.'" Id. at 877. Because plaintiffs lacked evidence of racial bloc voting, their vote dilution claims failed.[29]

---

[28] Exhibit 27 at A-19 (Trounstine Second Corrected Report) (In the 2006 general election, White support for the White Republican candidate in Precinct 2 was 57.16%; in the 2010 general election, White support for the White Republican candidate in Precinct 2 was 72.58%; in the 2012 general election, White support for the White Republican candidate in Precinct 1 was 75.73%).

[29] More specifically, in one challenged county, the Fifth Circuit relied on the fact that "White voters' support for black Republican candidates [in that county] was equal to or greater than their support for white Republicans." Clements, 999 F.2d at 879. "Likewise, black and white Democratic candidates received equal percentages of the white vote." Id. Critically, based on these facts the court determined that it could not "see how minority-preferred judicial candidates were defeated 'on account of race or color.' Rather, the minority-preferred candidates were consistently defeated because they ran as members of the weaker of two partisan organizations. We are not persuaded that this is racial bloc voting as required by Gingles." Id.

In another county challenged by the plaintiffs in Clements, the majority of minority voters always cast their votes for the Democratic candidate, while the majority of Anglo voters always cast their votes for the Republican "regardless of the race of the candidates." Id. at 892. Because Republican voters outnumbered Democratic voters, the minority-preferred Democratic candidate consistently lost. Id. The court noted that in one election the Latino Republican candidate for Attorney General won 76% of the Anglo vote when running against a white Democrat, which was the second highest vote received by any of the Republicans in the general elections analyzed there. Id. Accordingly, the undisputed facts indicated that "partisan affiliation, not race, caused the defeat of the minority-preferred candidate," meaning the third Gingles prerequisite was not established. Id. at 891-92. The court employed a similar analysis in rejecting plaintiffs' arguments for racial bloc voting in each of nine different challenged counties. See id. at 877-893.

Plaintiffs cannot show that race—not partisan politics—accounts for the sort of White-bloc voting that would usually defeat a minority coalition's candidate of choice. Fifth Circuit precedent requires a showing that minority *candidates* lose due to White-bloc voting, rather than candidates of a particular political party. Because Plaintiffs cannot satisfy *any* of the three *Gingles* threshold preconditions, their Section 2 claims necessarily fail. *City of Hous.*, 113 F.3d at 547 ("Failure to establish *any one* of these threshold requirements is fatal." (emphasis added)). Defendants are entitled to judgment as a matter of law on Plaintiffs' Section 2 vote dilution claims.

## III.   The NAACP and Petteway Plaintiffs' constitutional racial gerrymandering claims fail as a matter of law.

The NAACP and Petteway Plaintiffs' constitutional racial gerrymandering claims cannot survive summary judgment. The Equal Protection Clause of the Fourteenth Amendment's "central mandate is racial neutrality in governmental decisionmaking." *Miller*, 515 U.S. at 904. It "limits racial gerrymandering without 'sufficient justification' to separate voters on the basis of race." *Walters*, 2023 WL 3300466, at *8 (internal citations omitted).

To succeed, there must be evidence that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916; *see also Harding v. Cty. of Dall.*, 948 F.3d 302, 313 (5th Cir. 2020). The legislature must have "subordinated traditional race-neutral districting principles" like "compactness, contiguity, and respect for communities of interest" to racial considerations." *Walters*, 2023 WL 3300466, at *9; *see also Bethune-*

*Hill*, 137 S. Ct. at 797. Mere awareness of race is not enough; legislatures "will . . . almost always be aware of racial demographics." *Miller*, 515 U.S. at 916. Racial gerrymandering claims are district-specific and therefore apply "to the boundaries of individual districts" rather than the map as a whole. *Ala. Legis. Black Caucus*, 575 U.S. at 262.

Significantly, Plaintiffs' assertion that it violates the Constitution to ***not*** keep Precinct 3's boundaries as intact as possible in order to maintain a majority-minority precinct fails as a matter of law. In the 2012 settlement with the DOJ to reach Precinct 3's prior boundaries, race was absolutely a factor—a key point that Plaintiffs cannot refute. But maintaining prior district boundaries to preserve a minority-opportunity district that was drawn on the basis of race is, in itself, a form of unconstitutional racial sorting. *See Jacksonville Branch of the NAACP*, 2022 WL 7089087, at *48. In *Jacksonville*, the district court enjoined a redistricting plan that maintained the districts as they were drawn in the 2011 redistricting cycle. *Id*. at *36, *53. Although the court acknowledged a "very understandable desire" by city council "to assure continued minority representation," such intentions were not enough to withstand constitutional scrutiny. *Id.* at *48. As the court emphasized, "the Supreme Court has been unequivocal in its direction that racial sorting— even when done with good intention—violates the Constitutional mandate of the Equal Protection Clause if it cannot survive strict scrutiny." *Id.*

In *Walters v. Boston City Council*, voters sued the City of Boston over a redistricting map alleging it was enacted to achieve "racial balancing." *Walters*, 2023 WL 3300466, at *1. The court, after finding the legislation was in fact racially motivated to strengthen a minority opportunity district or to avoid packing, found there was no compelling interest

narrowly tailored to accomplish that goal under a Fourteenth Amendment analysis. *Id*. at *13. It reiterated that "[C]ompliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws." *Id*. (quotation omitted).

Unlike in *Walters*, the NAACP and Petteway Plaintiffs here cannot show (either through direct or circumstantial evidence) that the Commissioners prioritized race over compactness, contiguity, core preservation, and incumbency protection. *See Robinson*, 37 F.4th at 222. "Given the presumption of the legislature's good faith in redistricting, showing that a redistricting plan intentionally discriminates is not ordinarily an easy task." *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000). For example, there is no evidence that population percentage targets were established for a minority population. *See Bethune Hill*, 137 S. Ct. at 799; *Ala. Legis. Black Caucus,* 575 U.S. at 267. Nor is there indirect evidence such as "bizarre" or "irregular" shapes tracing racial demographics and densities (*Chen v. City of Houston*, 206 F.3d 502, 507 (5th Cir. 2000); *LULAC II*, 604 F. Supp. 3d at 510), "cracking" or "packing," *Thomas v. Bryant*, 938 F.3d 134, 158 n.119 (5th Cir. 2019), or disregarding traditional criteria like compactness, *Prejean*, 227 F.3d at 512–14.

As Tom Bryan (the County's map drawer and technical consultant during the 2021 redistricting cycle) declares, he did not consider race when creating the map proposals for a vote. Exhibit 17 at ¶5 (Bryan Decl.). He was not reviewing any racial data to create any map boundaries. *Id*. He was not instructed to consider racial data, and did not consider racial data in drawing the maps. *Id*. Bryan did, however, consider political performance data when drawing Map 2. Exhibit 17 at ¶ 7 (Bryan Decl.). For example, he compared the

2020 election performance of the Republican Presidential and Senatorial nominees in each of the four commissioner precincts with Map 1 and Map 2 boundaries. Exhibit 17 at ¶ 7 (Bryan Decl.). The data revealed that under Map 2, Republican candidates performed better in Precinct 3 than they did under Map 1. *Id.*

Most critically, the Commissioners and County Judge themselves considered no racial demographic data during this process, at any time before the Enacted Plan was adopted. *See* Exhibit 11 at 127:13-19 (Giusti Dep.); Exhibit 16 at 160:13-21 (Apffel Dep.). In other words, race was not a factor at all, let alone the *predominant* factor.

Lest the Court have any residual doubt, the record also demonstrates this is not the "exceptional case" where "a reapportionment plan [is] so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to segregate voters on the basis of race." *Shaw*, 509 U.S. at 646-47 (internal quotation marks omitted). Far from the kind of bizarre map boundary shapes in relation to racial demographics that courts have indicated provide evidence of racial gerrymandering, the Enacted Plan adheres closely to traditional districting principles like compactness, contiguity, minimization of voting precinct splits, core preservation, incumbency protection, and preserving communities of interest—just as Plaintiffs' expert William Cooper conceded at his deposition. *See, e.g.*, Exhibit 21 at 77:14-19 (Cooper Dep.) ("I don't really have any problem with compactness scores in the enacted plan."); *id.* at 83:22-84:8 (agreeing that the Enacted Plan's compactness is "reasonable"); *id.* at 84:9-21 (Cooper testified he has no problem with the Enacted Plan's split counts). It is, instead, Plaintiffs' illustrative plans that are drawn based on race.

Plaintiffs and their experts fail to identify any evidence capable of showing that race was a consideration during the 2021 redistricting cycle, much less a *predominant* consideration. Coupled with their burden of overcoming the presumption of the legislature's good faith in redistricting (*Miller*, 515 U.S. at 915), it becomes clear that Plaintiffs' hurdle to show racial gerrymandering is simply insurmountable. Because there is no triable issue of fact regarding whether race predominated in the drawing of the Enacted Plan, Defendants are entitled to summary judgment on Plaintiffs' racial gerrymandering claim.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant Defendants' Motion for Summary Judgment as to Plaintiffs' Section 2 and racial gerrymandering claims, and grant such other legal or equitable relief to which Defendants show themselves entitled.

Respectfully Submitted,

HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC

GREER, HERZ & ADAMS, L.L.P.

Dallin B. Holt
Texas Bar No. 24099466
S.D. of Texas Bar No. 3536519
Jason B. Torchinsky*
Shawn T. Sheehy*
dholt@holtzmanvogel.com
jtorchinsky@holtzmanvogel.com
ssheehy@holtzmanvogel.com
15405 John Marshall Hwy
Haymarket, VA 2019
P: (540) 341-8808
F: (540) 341-8809

*admitted pro hac vice

PUBLIC INTEREST LEGAL
FOUNDATION

Joseph M. Nixon
Federal Bar No. 1319
Tex. Bar No. 15244800
J. Christian Adams*
South Carolina Bar No. 7136
Virginia Bar No. 42543
Maureen Riordan*
New York Bar No. 2058840
107 S. West St., Ste. 700
Alexandria, VA 22314
jnixon@publicinterestlegal.org
jadams@publicinterestlegal.org
mriordan@publicinterestlegal.org
713-550-7535 (phone)
888-815-5641 (facsimile)

*pending pro hac vice application

By: /s/ *Joseph Russo*
    Joseph Russo (Lead Counsel)
    Fed. ID No. 22559
    State Bar No. 24002879
    jrusso@greerherz.com
    Jordan Raschke
    Fed. ID No.3712672
    State Bar No. 24108764
    jraschke@greerherz.com
    1 Moody Plaza, 18th Floor
    Galveston, TX 77550-7947
    (409) 797-3200 (Telephone)
    (866) 422-4406 (Facsimile)

    Angie Olalde
    Fed. ID No. 690133
    State Bar No. 24049015
    2525 S. Shore Blvd. Ste. 203
    League City, Texas 77573
    aolalde@greerherz.com
    (409) 797-3262 (Telephone)
    (866) 422-4406 (Facsimile)

    *Counsel for Defendants*

55

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was served to all counsel of record via the ECF e-filing system on May 12, 2023.

*/s/ Angie Olalde* _____

## APPENDIX A TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT

**Ex. No.**     **Description**

1       Excerpts from the April 12, 2023 Deposition of Anthony E. Fairfax (Plaintiff-designated expert) (Fairfax Dep.)

2       Excerpts from the Report of William S. Cooper (Plaintiff-designated expert) (Cooper Report)

3       Excerpts from the April 14, 2023 Deposition of Dr. Jessica Trounstine (Plaintiff-designated expert) (Trounstine Dep.)

4       Declaration of Matt Barreto (Plaintiff-designated expert) (Barreto Decl.)

5       Excerpts from the April 11, 2023 Deposition of Dr. Kassra A.R. Oskooii (Plaintiff-designated expert) (Oskooii Dep.)

6       Prior Commissioners Precincts Map

7       DOJ Letter Dated March 5, 2012 (US0002100-US0002104)

8       Amended Report of Dr. Mark Owens (Defense-designated expert) (Owens Report)

9       Declaration of SueAnn Duncan (Duncan Decl.)

        A. (Nov. 1, 2021 Apffel Email) Bates Labeled DEFS00003811

        B. (2022 primary election returns) Bates Labeled DEFS00009657

        C. (Aug. 30, 2021 Scheduling E-Mail)Bates Labeled DEFS00011029–DEFS00011030

        D. (Sept. 8, 2021 Conf. Call) Bates Labeled DEFS00011031

        E. (Oct. 16, 2021 Zoom Conf.) Bates Labeled DEFS00011238

        F. (Oct. 17, 2021 Zoom Conf.) Bates Labeled DEFS00011241

        G. (Sept. 16, 2021 Conf. Call Confirmations) Bates Labeled DEFS00011693

        H. (Sept. 16, 2021 Conf. Call Confirmations) Bates Labeled

DEFS00011694

I. (Map 2 with precincts) Bates Labeled DEFS00011888

J. (2020 primary election returns)Bates Labeled DEFS00013518

K. (Sept. 13, 2021 Conf. Call) Bates Labeled DEFS00015162

L. (Sept. 10, 2021 Scheduling E-mail) Bates Labeled DEFS00016258

M. (Sept. 20, 2021 Conf. Call) Bates Labeled DEFS00016260

N. (Sept. 23, 2021 Conf. Call) Bates Labeled DEFS00016262

O. (Sept. 10, 2021 Scheduling E-mail) Bates Labeled DEFS00017099–DEFS00017100

P. (Nov. 12, 2021 Public Comment Roster) Bates Labeled DEFS00031699-DEFS00031701

Q. (Nov. 12, 2021 email ) Bates Labeled DEFS00003893

R. Galveston County General Election Cumulative Results Report

10     Excerpts from the March 27, 2023 Expert Declaration and Rebuttal Report of William S. Cooper (Plaintiff-designated expert) (Cooper Rebuttal Report)

11     Excerpts from the January 6, 2023 Deposition of Commissioner Joseph Giusti (Giusti Dep.)

12     Excerpts from the January 17, 2023 Deposition of Galveston County Judge Mark Henry (Henry Dep.)

13     Declaration of Dalton Oldham (Oldham Dec.)

14     Excerpts from the December 19, 2022 Deposition of Nathan Sigler (Sigler Depo.)

15     Defs. 1st Supp. and Am. Responses to DOJ Interrogatories

16     Excerpts from the January 5, 2023 Deposition of Deposition of Commissioner Darrell Apffel (Apffel Dep.)

17      Declaration of Tom Bryan (Bryan Decl.)

18      Corrected Transcript of November 12, 2021 Commissioners Court Hearing (Nov. 12, 2021 Transcript)

19      Excerpts from the February 24, 2023 Deposition Dianna Martinez (Martinez Dep.)

20      Excerpts from the January 18, 2023 Deposition of Tyler Drummond (Drummond Dep.)

21      Excerpts from the April 21, 2023 Deposition of William S. Cooper (Plaintiff-designated expert) (Cooper Dep.)

22      Excerpts from the Report of Tye Rush (Plaintiff-designated expert) (Rush Decl.)

23      Excerpts from the April 21, 2023 Deposition of Tye Rush (Plaintiff-designated expert) (Rush Dep.)

24      Excerpts from the Report of Anthony E. Fairfax (Plaintiff-designated expert) (Fairfax Report)

25      Rebuttal Report of Anthony E. Fairfax (Plaintiff-designated expert)

26      Excerpts from the April 20, 2023 Deposition of Matt Barreto (Plaintiff-designated expert)

27      Excerpts from the Second Corrected Report of Dr. Jessica Trounstine (Plaintiff-designated expert) (Trounstine Second Corrected Report)

28      Experts from Report of Dr. John R. Alford (Defense-designated expert) (Alford Report)

29      Excerpts from the report of Dr. Kassra Oskooii (Plaintiff-designated expert)

30      Rebuttal Report of Dr. Kassra Oskooii (Plaintiff-designated expert)

31      Online Portal Proposed Precinct Redistricting Maps (Ex. 28 to Henry Dep.)

# Appendix B



EXHIBIT 6

Exhibit
0028
1/5/2023
Darrell Apffel

Previous Galveston
Commissioner Pre

# Appendix C



# Appendix D

*Expert Declaration and Report of William S. Cooper – January 2023*

in Section II, would also provide a reasonable basis to consider Precinct 3 as an established

community of interest.

82.    The map in **Figure 14** displays Illustrative Map 1 zoomed out to show the full extent

of Galveston County.

**Figure 14: Galveston County — Illustrative Map 1**



83.    Illustrative Map 1 makes no changes to Benchmark Plan precinct boundaries on

Galveston Island. On the mainland, the changes are made with minimal impact: two VTDs are

shifted from Precinct 2 to Precinct 3, bringing both precincts into compliance with one-person one

vote requirements. The addition of these two VTDs into Precinct 3 places all of La Marque in

Precinct 3, eliminating a split of the City that existed in the Benchmark Plan.

30

*Expert Declaration and Report of William S. Cooper – January 2023*

**Figure 16: Galveston County — Illustrative Map 2**



88.     Like the Benchmark Plan and Illustrative Map 1, the City of Galveston is split

between Precincts 2 and 3 in Illustrative Map 2. However, boundary lines between Precincts 2

and 3 change so that Precinct 3 has a clear continuous pathway along Seawall Boulevard and on

to its intersection with Highway 87 and the ferry to the Bolivar Peninsula.

89.     **Figure 17** reports summary population by precinct under Illustrative Map 2, Precinct

3 remains majority Black and Latino, with B+LCVAP at 56.51%. Precinct 3 in Illustrative Map 2

therefore also shows that Galveston County has a sufficiently large and geographically compact

Black and Latino population to constitute a majority in at least one Commissioners precinct.

### C.  Illustrative Map 3 – Coastal Precinct 1

92.    I prepared Illustrative Map 3 (shown in **Figure 18**) to demonstrate that all of the Bolivar Peninsula, Pelican Island, Galveston Island, and most of the Galveston Bay coast can be placed in a single precinct (Precinct 1) in a plan that both (*i*) adheres to race-neutral traditional redistricting criteria and (*ii*) still maintains an adjacent mainland Precinct 3 that is B+LCVAP majority.

**Figure 18: Galveston County — Illustrative Map 3**



93.    **Figure 19** reports summary population by district under Illustrative Map 3. Precinct 3 remains B+LCVAP majority (52.34%). Precinct 3 in Illustrative Map 1 therefore shows that Galveston County has a sufficiently large and geographically compact Black and Latino population to constitute a majority in at least one Commissioners precinct.

# Appendix E

## VIII.   The Illustrative Plan

A.   Introduction

34. The Illustrative Plan was developed using the "least change" approach (*See* Figure 1).

Therefore, minimal changes were made to the previous plan to bring the plan within

acceptable population deviation.



Figure 1 – Illustrative Plan for Galveston County Commissioner Precincts

# Appendix F

protection. I was also aware and mindful of the above six redistricting factors considered by Galveston County.

33. These demonstration maps were drawn using DRA 2020, an online redistricting platform that uses data from the Decennial Census and from the Census Bureau's American Community Survey (ACS).[4]

**DEMONSTRATIVE MAP 1**

34. Figure 1, below, shows DEMONSTRATIVE MAP 1, where the majority black and Hispanic district is Precinct 3.

**Figure 1: Demonstrative Map 1**



---

[4] DRA 2020. https://davesredistricting.org/maps#aboutus

**DEMONSTRATIVE MAP 2**

40. Figure 2, below, shows DEMONSTRATIVE MAP 2, where the majority black and

Hispanic district is Precinct 3.

**Figure 2: DEMONSTRATIVE MAP 2**



41. Table 5, below, provides a demographic breakdown of DEMONSTRATIVE MAP 2

from the total population tabulations in the 2020 Decennial Census and from the

Citizen Voting Age Population (CVAP) 5-year estimates in the 2020 American

Community Survey (ACS) data.

12

**Figure 3: DEMONSTRATIVE MAP 3**



47. Table 6, below, provides a demographic breakdown of DEMONSTRATIVE MAP 3 from the total population tabulations in the 2020 Decennial Census and from the Citizen Voting Age Population (CVAP) 5-year estimates in the 2020 American Community Survey (ACS) data.

14

# Appendix G

Oskooii Exhibit B

Figure 3. Plaintiff Map 1



Oskooii Exhibit B

Figure 4. Plaintiff Map 2



Oskooii Exhibit B

Figure 5. Plaintiff Map 3

