United States District Court
Southern District of Texas
**ENTERED**
May 15, 2023
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY, *et al.*, | § | |
| | § | |
| Plaintiffs. | § | |
| | § | |
| V. | § | |
| | § | CIVIL ACTION NO. 3:22-cv-00057 |
| GALVESTON COUNTY, *et. al.*, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Pending before me in this consolidated litigation are an array of privilege disputes. *See* Dkts. 102, 103, 141, 148, 156, 159, 162–164. United States District Judge Jeffrey V. Brown has already summarized the general factual background of this litigation in his rulings on Defendants' motions to dismiss. *See* Dkt. 123 at 1–10; Dkt. 124 at 1–3; Dkt. 125 at 1–4. In the interest of efficiency, I will add to that background only to the extent necessary to address the privilege issues that have been referred to me.

The United States, NAACP Plaintiffs, and Petteway Plaintiffs (collectively, "Plaintiffs") challenge the Galveston County Commissioners Court redistricting plan enacted on November 12, 2021 (the "2021 Redistricting Plan"). Plaintiffs bring constitutional and Voting Rights Act claims, arguing that "the Commissioners Court adopted the 2021 [Redistricting] Plan with the intent to discriminate against Black and Latino voters," and "that race predominated in the drawing of the precinct lines." Dkt. 102 at 3. Defendants answer that "[t]he County Commissioners precincts were drawn without consideration of race"; that Defendants "did not intend to discriminate with the adoption of the 2021 Redistricting Plan"; and Defendants deny that they attempted to "'crack' or 'pack' voters based on race in the County Commissioner redistricting plan." Dkt. 142 at 19; Dkt. 143 at 22; Dkt. 144 at 14.

As part of the redistricting process, Galveston County—through its General Counsel, Paul Ready ("Ready")—engaged the law firm of Holtzman Vogel Josefiak Torchinsky PLLC ("HVJT") "to provide legal representation and advice regarding redistricting in Galveston County, Texas, including provision of a technical expert to draw the map." Dkt. 103-4 at 2. That technical expert was Tom Bryan ("Bryan"). HVJT also associated with attorney Dale Oldham ("Oldham") in providing redistricting services to Galveston County. HVJT attorneys Phil Gordon ("Gordon") and Jason Torchinsky ("Torchinsky"), assisted by Oldham, were "primarily responsible for overseeing [HVJT's] representation" of Galveston County through its redistricting process. *Id.*

Plaintiffs have requested the "production of documents relating to the redistricting process including the development of the 2021 [Redistricting] Plan." Dkt. 102 at 3. Defendants refuse to produce these documents, asserting attorney–client privilege and/or the attorney work product doctrine protection. Many of the documents that Defendants are withholding are communications to, from, or between HVJT attorneys, Oldham, Bryan, Ready, Ready's Chief of Staff Tyler Drummond ("Drummond"), and Galveston County Geographic Information System ("GIS") Engineer Nathan Sigler ("Sigler"). Plaintiffs argue that "Defendants have withheld as attorney-client privileged virtually all documents that detail the development of the 2021 [Redistricting] Plan in a plain effort to shield the legislative process from public view." *Id.* Plaintiffs assert that "[m]any of the documents concern underlying facts and data that the attorney–client privilege does not cover," and "because these documents were not created in anticipation of litigation, the work product doctrine does not apply." Dkt. 103 at 4.

Defendants' assertions of attorney–client privilege and attorney work product are the "main event," but there are other substantive bouts on the card. NAACP Plaintiffs have withheld 24 documents "on the basis of First Amendment privilege" and one document on the basis of "First Amendment and attorney–client privileges." Dkt. 148 at 1. Separately, Commissioner Stephen O. Holmes

("Commissioner Holmes")—the Commissioner elected from the sole majority non-Anglo precinct and the lone vote against the 2021 Redistricting Plan—has refused to produce six responsive documents, asserting attorney–client privilege, the attorney work product doctrine, and legislative privilege.

The parties have thoroughly briefed the attorney–client privilege and attorney work product issues (*see* Dkts. 102, 103, 107–110, 141, 159, 164), and have provided joint dispute letters regarding the First Amendment privilege (*see* Dkt. 148) and the legislative privilege (*see* Dkt. 156). Defendants provided two privilege logs: a January 20, 2023 privilege log and an April 14, 2023 privilege log. NAACP Plaintiffs and Commissioner Holmes have also provided me with privilege logs describing the documents they are withholding from production. All of the underlying documents in dispute have been provided to me for *in camera* review, and I have reviewed them all. In addition to the documents on the various privilege logs, my *in camera* review included an Excel spreadsheet subject to claw-back notice by Defendants; four emails between Oldham and Bryan; and a text exchange between Bryan and Gordon.[3] *See* Dkt. 141 at 3.

On May 1, 2023, after undertaking my review of documents from Defendants' January 20, 2023 privilege log, I held a status conference and entered an Order regarding deficiencies with that privilege log. *See* Dkt. 157. Defendants have since revised their January 20, 2023 and April 14, 2023 privilege logs (*see* Dkts. 162-2 and 162-3) and have narrowed the universe of documents to be ruled upon; Plaintiffs have provided supplemental briefing (*see* Dkts. 159); and Defendants have responded (*see* Dkt. 164).

I am ready to rule on each of the challenged documents that have been provided to me for *in camera* review.

---

[3] Based on my review, I believe that both the Excel spreadsheet and the emails between Oldham and Bryan are duplicative (in substance, at least) of documents described on the privilege log.

A.    **ATTORNEY–CLIENT AND WORK PRODUCT PRIVILEGES**

    *1.*    ***Legal Principles***

        a.    **Attorney–Client Privilege**

The federal common law governs the analysis of any claim of privilege in federal court. *See* FED. R. EVID. 501. "The attorney–client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (citation omitted). "The objectives of the attorney-client privilege apply to governmental clients." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011). "Unless applicable law provides otherwise, the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys." *Id.* at 170 (citing Restatement (Third) of the Law Governing Lawyers § 74, cmt. b (1998)).

Despite the common law reverence for the attorney–client privilege, not every communication with an attorney is cloaked with the privilege. The Fifth Circuit has explained the standard for determining whether the privilege applies as follows:

> For a communication to be protected under the privilege, the proponent must prove: (1) that he made a confidential communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding. Determining the applicability of the privilege is a highly fact-specific inquiry, and ***the party asserting the privilege bears the burden of proof***. Once the privilege has been established, the burden shifts to the other party to prove any applicable exceptions. ***Ambiguities as to whether the elements of a privilege claim have been met are construed against the proponent.***
>
>     Because the attorney-client privilege has the effect of withholding relevant information from the fact-finder, it is

4

> *interpreted narrowly so as to apply only where necessary to achieve its purpose*.

*EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017) (emphasis added) (cleaned up).

### b. Attorney Work Product Doctrine

"The work product privilege applies to documents 'prepared in anticipation of litigation.'" *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000) (quoting FED. R. CIV. P. 26(b)(3)). "The law of our circuit is that the privilege can apply where litigation is not imminent, as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." *Id.* (quotation omitted). "The work product doctrine is not an umbrella that shades all materials prepared by a lawyer, however. . . . Excluded from work product materials . . . are '(m)aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation.'" *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982) (quoting FED. R. CIV. P. 26(b)(3) advisory comm. note to 1970 amendment). "This includes documents created in the ordinary course of government business." *League of United Latin Am. Citizens v. Abbott* ("*LULAC II*"), No. 21-cv-00259, 2022 WL 3233406, at *6 (W.D. Tex. Aug. 10, 2022). "Legislative counsel could not, for example, withhold documents pertaining to pending legislation on the basis of the work product doctrine because '[t]he [l]egislature could always have a reasonable belief that any of its enactments would result in litigation. That is the nature of the legislative process.'" *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 348 (E.D. Va. 2015) (quoting *Baldus v. Brennan*, No. 11-cv-562, 2011 WL 6385645, at *2 (E.D. Wis. Dec. 20, 2011)).

"[D]etermining whether a document is prepared in anticipation of litigation is a slippery task." *El Paso Co.*, 682 F.2d at 542. "It is admittedly difficult to reduce to a neat general formula the relationship between preparation of a document and possible litigation necessary to trigger the protection of the work product

doctrine." *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. Unit A Feb. 1981). Nevertheless, "[i]f the document would have been created without regard to whether litigation was expected to ensue, it was made in the ordinary course of business and not in anticipation of litigation." *Jolivet v. Compass Grp. USA, Inc.*, 340 F.R.D. 7, 18 (N.D. Tex. 2021). Considering this legal framework, I will now turn to address the privilege claims made by Defendants, Commissioner Holmes, and NAACP Plaintiffs.

### 2. *Application*

#### a.   **Defendants' Privilege Claims**

Certain documents are categorically *not* protected by the attorney–client privilege or the attorney work produce doctrine. As I have already explained, "pre-existing documents—whether prepared by a third-party or even by the client, so long as the client was not compelled to write it (aka, a testimonial communication)—are underlying facts that are not protected by the attorney-client privilege." Dkt. 157 at 1 (citing *Fisher v. United States*, 425 U.S. 391, 403–04 (1976); *United States v. Robinson*, 121 F.3d 971, 975 (5th Cir. 1997)). Pre-existing documents, however, are but a small subset of "underlying facts." Underlying facts may also include "documents created in the course of the attorney–client relationship," if the purpose of creating the documents was for the provision of something *other* than legal advice. *Davis*, 636 F.2d at 1043 (The "privilege extends only to legal advice given by a lawyer."). Indeed, this is the heart of the parties' privilege dispute. Although Gordon, Torchinsky, and Oldham are attorneys, Plaintiffs maintain that the work that HVTJ attorneys and Oldham were hired to do was "a quintessentially legislative and policy function" that was delegated to them by Galveston County. Dkt. 103 at 11. Defendants, on the other hand, assert that "Galveston County retained legal counsel to ensure compliance with the law's requirements, including the Voting Rights Act and the Constitution," and thus "their communications with clients and amongst themselves seeking and providing legal advice are protected by the attorney-client privilege." Dkt. 107 at 4.

We can find a useful comparator here by looking to one of life's unfortunate certainties: taxes. While "preparation of tax returns by itself may require some knowledge of the law, it is primarily an accounting service. Communications relating to that service should therefore not be privileged, even though performed by a lawyer." *Davis*, 636 F.2d at 1043. The same is true of redistricting. Defendants correctly note that "[t]he redistricting process is a constitutionally required legislative activity that the U.S. Supreme Court has described as a 'legal obstacle course.'" Dkt. 107 at 4 (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018)). But Defendants' myopic focus on **compliance** with redistricting laws overlooks their critical concession: that "[t]he redistricting process is a constitutionally required *legislative activity*." *Id.* (emphasis added). It is for this reason that the three-judge panel in *South Carolina State Conference of NAACP v. Alexander* ordered documents to, from, and by Patrick Dennis—the general counsel and chief of staff to the speaker of the South Carolina House of Representatives—produced despite claims of privilege. *See* No. 3:21-cv-3302, 2022 WL 2375798, at *5–6 (D.S.C. Apr. 27, 2022). The panel found emails containing "legal analysis and offer[ing] legal opinions" to be privileged, but it found that emails that did nothing more than forward correspondence, or documents that were merely drafts concerning "normal legislative business," were "political and not legal in nature." *Id.* at *5–6. The panel drew a sharp distinction between "correspondence concern[ing] legislative, not legal strategy." *Id.* at *6.

In our great state of Texas, it is the constitutional duty of County Commissioners Courts to divide their counties into precincts "according to the most recent federal census, from time to time, for the convenience of the people." TEX. CONST. art. V, § 18. Phrased differently, redistricting is part and parcel of the ordinary course of business of County Commissioners Courts. For this reason, I find that the vast majority of Defendants' attorney–client privilege and attorney work product assertions are lacking in merit.

Let me provide an example. Defendants wish to claw back a spreadsheet that Bryan prepared at Gordon and Torchinsky's request "in order for them to understand the lay of the land and conduct an initial analysis of the legal considerations at play in the 2021 redistricting process for the Galveston County Commissioners Court." Dkt. 141-3 at 2. This spreadsheet "is a breakdown of the population in Galveston County, based on the 2020 U.S. Census data and the 2016–2020 American Community Survey (ACS) estimates." *Id.* Defendants maintain that "this document—and the analysis and discussions that it facilitated between Mr. Bryan and redistricting counsel—were fashioned exclusively within the attorney-client relationship" and are "thus entitled to the attorney-client privilege." *Id.* at 3 (quotations omitted). But the spreadsheet contains only "specific factual information"—underlying facts that are classically outside the privilege's protection. *Alexander*, 2022 WL 2375798, at *5. Even if the discussions between Bryan and redistricting counsel are privileged—and I'm not saying they are—this spreadsheet merely reveals part of "legislative process without revealing the substantive communications [Bryan] exchanged with attorneys." *League of United Latin Am. Citizens v. Abbott* ("*LULAC V*"), 342 F.R.D. 227, 234 (W.D. Tex. 2022). Accordingly, documents like these are not protected by the privilege.

Defendants also claim this document is protected by the attorney work product doctrine. Defendants' assertion that "the primary motiving purpose of using redistricting counsel while preparing these documents was undoubtedly to aid in being prepared for such litigation" (Dkt. 108 at 26–27) misses the mark. Defendants had a constitutionally imposed legislative duty to redistrict when they prepared these documents, so the documents were unquestionably "made in the ordinary course of business and not in anticipation of litigation." *Jolivet*, 340 F.R.D. at 18. For this reason, I agree with Plaintiffs that "Bryan's description of the map he drew is not possibly privileged." Dkt. 141-4 at 3. Defendants could have easily created this spreadsheet themselves or hired Bryan directly to do it for them. That they chose to funnel this process through attorneys is their choice; but that

choice does not require this court to transform ordinary legislative activities into attorney work product. I cannot put it any better than the United States District Judge Stadtmueller from the Eastern District of Wisconsin:

> If [the Commissioners Court] did not retain [Bryan] in anticipation of litigation, then his work-product is not privileged. While [the Commissioners Court] may have reasonably believed that litigation would result from its redistricting efforts, the Court declines to hold that [Bryan]'s work-product is privileged. To do so would be a slap in the face to [Galveston County]'s citizens: essentially, the Court would be saying that the [Commissioners Court] could shield all of its actions from any discovery. [The Commissioners Court] could always have a reasonable belief that any of its enactments would result in litigation. That is the nature of the legislative process: it often involves contentious issues that the public may challenge as being unconstitutional. As such, if the [Commissioners Court] wished to obscure its legislative actions from the public eye then, conceivably, all it would need to do would be to retain counsel or other agent that it termed to be "in anticipation of litigation." The Court is unwilling to travel that road, for it would "be both unseemly and a misuse of public assets" to permit an individual hired with taxpayer money "to conceal from the taxpayers themselves otherwise admissible evidence" of allegedly unconstitutional motives affecting their voting rights.

*Baldus*, 2011 WL 6385645, at \*2 (citation omitted) (quoting *In re Witness Before the Special Grand Jury 2000-2*, 288 F.3d 289, 293 (7th Cir. 2002)).

For this reason, I am also ordering the redacted October 26, 2021 text message exchange between Bryan and Gordon (DEFS00031806) produced.[4] This text exchange is just a conversation between coworkers concerning client management and Galveston County's legislative strategy. Gordon asking Bryan to clarify his deliverables is also part and parcel of the ordinary legislative process of redistricting. Nothing in this text exchange represents the giving or receiving of legal advice. That Gordon is an attorney does not magically cloak this conversation with privilege or transform it into attorney work product.

---

[4] This text exchange is not captured on Defendants' privilege logs, so I am addressing it individually.

Keeping the above principles in mind, I am ordering Defendants to produce the vast majority of documents they are withholding as attorney–client privileged and/or attorney work product. My specific rulings are captured in the tables below:

| Defendants' Revised January 20, 2023 Privilege Log (Dkt. 162-2) | |
|---|---|
| **Doc ID** | **Ruling** |
| **3** | This email merely restates underlying facts. The restatement of these underlying facts was provided as part of the preclearance process, which is a legislative, not a legal activity. This information is neither privileged nor attorney work product. |
| **7** | This correspondence concerns whether Galveston County needed to submit tapes of public hearings to the DOJ, or only minutes for the public hearings. Preclearance is part of the normal legislative process. |
| **17, 19, 20** | This correspondence (two of these emails are merely forwards of the underlying correspondence) seeks pre-existing, non-privileged documents concerning Galveston County's "legislative, not legal strategy" and this correspondence "neither . . . seeks nor gives legal advice." *Alexander*, 2022 WL 2375798, at *6. That this email was crafted by an attorney in response to a request for information from the DOJ as part of the preclearance process does not transform it into attorney work product. Preclearance is part of the ordinary course of the legislative process, not litigation. |
| **22−26** | Lists of current or historical voting precincts and splits are underlying facts. A draft list is the provision of "legislative, not legal strategy" that "neither . . . seeks nor gives legal advice." *Id.* |
| **52** | The Texas Constitution is itself an underlying fact. Copying and pasting the law, without saying anything else at all, is not the giving or receiving of legal advice, nor is it attorney work product. |
| **55, 57** | Defendants have already produced much of this particular chain, which primarily concerns Ready repeating Oldham's *political speculation* regarding the timing for release of census data. Asking or confirming when Oldham thinks census data will be released is neither seeking nor giving legal advice—it is just continued speculation about an entirely political/bureaucratic decision. |
| **58** | ***PRIVILEGED.*** This email seeks a legal opinion. |
| **59−60** | This correspondence is Bryan seeking guidance from Gordon about the objective in crafting "the least change approach," and whether he could split precincts. This discussion is an underlying fact regarding Galveston County's "legislative, not legal strategy." *Id.* This correspondence "neither . . . seeks nor gives legal advice." |

| | |
|---|---|
| | *Id.* This is not attorney work product because it was prepared for the purpose of redistricting, not litigation. |
| **61–65** | This email and the consideration of the attachments to it are underlying facts about Galveston County's "legislative, not legal strategy." *Id.* This correspondence "neither . . . seeks nor gives legal advice." *Id.* This is not attorney work product. |
| **66–69** | This is an email titled "Galveston Deliverables." The email itself has no substance and only three attachments: two maps and an Excel spreadsheet. That Galveston County or its agents considered this data analysis and these maps are underlying facts about a "legislative, not legal strategy" and this correspondence "neither . . . seeks nor gives legal advice." *Id.* This is not attorney work product. |
| **70, 71** | That this email and the corresponding map were considered by Galveston County or its agents during the redistricting process are underlying facts about a "legislative, not legal strategy" and this correspondence "neither . . . seeks nor gives legal advice." *Id.* This is not attorney work product. |
| **72** | This is an email with the subject line "Updated table" and no substantive text. The attached Excel spreadsheet is titled "Galveston_Analysis 10_17_21." A document lacking substance cannot be privileged, nor can it be attorney work product. The fact that the attachment was considered during the redistricting process is an underlying fact regarding the legislative process. |
| **73, 77** | These Excel spreadsheets contain data that Galveston County and its agents considered during the redistricting process. That certain splits or analysis of data were considered is reflective of "legislative, not legal strategy" and this document "neither . . . seeks nor gives legal advice." *Id.* These documents constitute underlying facts and are neither privileged nor work product. |
| **74, 75** | This is an email with the subject line "Optimal Geo Map" and no substance. The attached map is titled "Galveston Texas Optimal Geo Plan." A document lacking substance cannot be privileged, nor can it be attorney work product. The fact that this map was considered by Galveston County or its agents during the redistricting process—and to the extent that the subject line means anything at all—these are underlying facts about a "legislative, not legal strategy" and this correspondence "neither . . . seeks nor gives legal advice." *Id.* |
| **76** | This document literally says nothing more than "For our call." This non-substantive communication "neither . . . seeks nor gives legal advice." *Id.* |

| 78, 80, 83, 84 | This correspondence concerns the timing and logistics of redistricting, and reflects a "legislative, not legal strategy." *Id.* The most current voter counts in precincts/districts and the fact that the law requires precincts over a certain number of active voters to be split is as much an underlying fact as the amount of one's income and the need to itemize deductions over the standard amount on your tax returns. *See Davis*, 636 F.2d at 1043. This correspondence "neither . . . seeks nor gives legal advice." *Alexander*, 2022 WL 2375798, at *6. |
|---|---|
| 82 | This correspondence concerns the timeline for deliverables pursuant to a legislative function. Copies of prior adoptions are underlying facts. This correspondence "neither . . . seeks nor gives legal advice." *Id.* |
| 85, 86, 88 | This correspondence is about how to represent precinct and block splits. This discussion is quintessentially "legislative, not legal strategy" and it "neither . . . seeks nor gives legal advice." *Id.* |
| 92, 94, 96 | This correspondence concerns "legislative, not legal strategy" and "neither . . . seeks nor gives legal advice." *Id.* |
| 98, 102, 104, 107, 111 | This chain is about timing/formatting/scheduling of a "legislative, not legal strategy"; it "neither . . . seeks nor gives legal advice." *Id.* |
| 115, 118, 123, 127, 131, 136 | Ready's displeasure with the quality of HVTJ's deliverables and issues with formatting are underlying facts regarding a legislative activity. This correspondence "neither . . . seeks nor gives legal advice." *Id.* Drummond's discussion of "strategy as per procedural aspects [and timing] of the special [session]" is not privileged. *Id.* |
| 121 | This is a pre-existing, public document from 2012. To the extent Defendants believe it is privileged because it was used as a "go-by," they overlook that drafting orders is a quintessentially "legislative, not legal strategy" and this document "neither . . . seeks nor gives legal advice." *Id.* |
| 140 | This correspondence concerns "legislative, not legal strategy" and "neither . . . seeks nor gives legal advice." *Id.* |
| 152 | This correspondence concerns the timing of a legislative activity and "neither . . . seeks nor gives legal advice." *Id.* |
| 154−155 | That Galveston County's GIS Engineer proposed descriptions of voting precincts is an underlying fact about a legislative activity. This document "neither . . . seeks nor gives legal advice." *Id.* |
| 156−157 | This email and the attached map are not clearly seeking or giving legal advice. That various iterations of maps were considered as part of the redistricting process is an underlying fact about a legislative activity. |

| | |
|---|---|
| **201, 213, 231, 233, 235, 278, 295−299, 308** | This correspondence concerns "legislative, not legal strategy" and "neither . . . seeks nor gives legal advice." *Id.* Ready's discussion of "strategy as per procedural aspects of the special [session]" is not privileged. *Id.* Ready telling HVTJ what is required to complete a legislative activity while *disclaiming* "expertise in the applicable legal requirements" is neither a request for nor the provision of legal advice. Ready describing how documents were assembled is an underlying fact regarding a legislative activity. Ready's satisfaction (or lack thereof) with the performance of outside redistricting counsel—paid for with taxpayer money—is no more privileged than an engagement letter. *See In re Grand Jury Subpoena*, 926 F.2d 1423, 1431 (5th Cir. 1991) ("As a general rule, client identity and fee arrangements are not protected as privileged."). Re-circulating an engagement letter is also not privileged. Communications regarding client satisfaction neither give nor seek legal advice. Changing agenda items and deciding what versions of documents to use are legislative/administrative tasks and underlying facts, not privileged discussions regarding the giving/receiving of legal advice. |
| **225** | This correspondence concerns "legislative, not legal strategy" and "neither . . . seeks nor gives legal advice." *Alexander*, 2022 WL 2375798, at *6. |
| **257, 259** | This correspondence "neither . . . seeks nor gives legal advice." *Id.* To the extent that saying shapefiles are "Good to go," such communication concerns "legislative, not legal strategy." *Id.* |
| **325** | ***ATTORNEY WORK PRODUCT.*** This email contains attorney thoughts and impressions regarding impending litigation. |
| **327** | ***ATTORNEY WORK PRODUCT.*** This email contains attorney thoughts and impressions regarding impending litigation. |
| **339−340** | Clark's request for and Ready's "draft responses to a journalist's inquiries are political and not legal in nature." *Id.* |
| **448, 453** | ***PRIVILEGED.*** These emails contain legal advice related to Galveston County's response to the DOJ. |

| **Defendants' Revised April 14, 2023 Privilege Log (Dkt. 162-3)** | |
|---|---|
| **Document** | **Ruling** |
| 2434381 | This communication describes in layman's terms what is required to conduct redistricting. It is a "how to" description of a legislative process. It is not legal advice. |
| 2865149, 2873023, 3094248, | This communication is about getting a Resolution or Order of the Commissioners Court adopting the precincts to the County Clerk. This is an entirely bureaucratic discussion and is not legal advice. |

| 3096786, 3098298 | |
|---|---|
| 2867350 | Saying that you are "still working on how to save" files is a technical discussion; it is not seeking or giving legal advice. |
| 2867865, 2867870, 2867876 | This data is an underlying fact; it is not legal advice. |
| 2872068, 2895905, 3132914, 3248345 | This correspondence concerns alternative map proposals. This is a purely legislative function. It does not matter that it was outsourced to a law firm; it concerns legislative, not legal strategy and is prepared in furtherance of that legislative function. |
| 3038819 | The Secretary of State Official Hispanic Report is a pre-existing document/underlying fact. Asking for it is not seeking legal advice. |
| 3115542, 3295671, 3297551, 3304871 | This correspondence seeks and/or transmits pre-existing, non-privileged documents concerning Galveston County's "legislative, not legal strategy" and this correspondence "neither . . . seeks nor gives legal advice." *Alexander*, 2022 WL 2375798, at *6. |
| 3130356 | A lawyer stating that he did not receive a file so he created one himself is not giving legal advice; it is a mundane bureaucratic task that is part of the legislative process. |
| 3131025 | Data regarding a map proposal is an underlying fact, not the seeking or giving of legal advice. |
| 3146188, 3148876 | The question itself—which we do not see in this correspondence—could potentially be privileged (or it could simply be part of the legislative process), but simply citing two legal authorities without anything else is not legal advice. |
| 3271781 | Draft redistricting documents are part of the legislative process; they are not legal advice. |
| 3290352, 3298513, 3300806, 3302104 | Asking someone to call you is neither seeking nor giving legal advice. |
| 3298210, 3305253 | This correspondence seeks pre-existing, non-privileged documents and underlying facts concerning a legislative process. It neither seeks nor gives legal advice. |

### b.    Commissioner Holmes's Privilege Claims

Commissioner Holmes asserts that three documents in his possession are covered by both the attorney–client privilege and the attorney work product

doctrine. For the reasons I have already stated above, the attorney work product doctrine does not apply simply because Galveston County outsourced its constitutionally required legislative duty to a law firm. As for the attorney–client privilege, I find that it does not apply either. With respect to Item 19— Commissioner Holmes's correspondence with his own outside redistricting counsel, Chad Dunn—Commissioner Holmes has stated that he will produce this document if Defendants produce "the Oldham and Bryan material." Dkt. 156 at 3.[5] Because I am ordering that material produced, Commissioner Holmes's claim of privilege with respect to Item 19 is moot.[6] With respect to Items 10 and 11— "Commissioner Holmes's handwritten notes from his conversations with outside counsel, Paul Ready and Dale Oldham" (Dkt. 156 at 3)—I need not decide whether the attorney–client privilege belongs to Galveston County or Commissioner Holmes, because these documents are also not privileged. The privilege applies only to communications made "for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding." *BDO USA, L.L.P.*, 876 F.3d at 695 (quotation omitted). Nothing in these documents suggests that Commissioner Holmes asked Ready or Oldham for legal advice or that they gave him legal advice.[7] Rather, these notes show the same thing as all of Defendants' non-privileged documents: discussions about the who, what, when, where, and

---

[5] In making this concession, Commissioner Holmes has presumably waived any assertion of legislative privilege over these documents, too.

[6] Even if it were not moot, I would find this correspondence not covered by the attorney–client privilege for the same reason that I have found the vast majority of Defendants' documents not privileged: this correspondence concerns "legislative, not legal strategy" and "neither . . . seeks nor gives legal advice." *Alexander*, 2022 WL 2375798, at *6.

[7] I am a tad confused as to which documents Commissioner Holmes is claiming are attorney–client privileged. The dispute letter says that 000181–000191 are "Holmes's handwritten notes from his conversations with outside counsel, Paul Ready and Dale Oldham." Dkt. 156 at 3. But it looks like only 000181 and 000184 reflect conversations with Ready and Oldham. Regardless, nothing in 000181–000191 reflects a communication made "for the primary purpose of security either a legal opinion or legal services, or assistance in some legal proceeding." *BDO USA, L.L.P.*, 876 F.3d at 695.

how of accomplishing the Commissioners Court's legislative responsibility to redistrict. These are not attorney–client privileged communications.

### c. NAACP Plaintiffs' Privilege Claims

NAACP Plaintiffs have withheld one document on the basis of attorney–client privilege. In their log, NAACP Plaintiffs state that this document "mentions [a] request for legal advice." Dkt. 148-1 at 2. That's true, but the mere *mention* of requesting legal services is not itself privileged, particularly when that mention is not even made to an attorney. In their dispute letter, NAACP Plaintiffs make no further attempt to explain why this document is attorney–client privileged, and I do not believe it is. Unless covered by some other privilege, which it is not, this document must be produced.

## B. LEGISLATIVE PRIVILEGE

### 1. *Legal Principles*

The legislative privilege "is an evidentiary privilege, 'governed by federal common law, as applied through Rule 501 of the Federal Rules of Evidence.'" *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't* ("*Jefferson*"), 849 F.3d 615, 624 (5th Cir. 2017) (quoting *Perez v. Perry*, No. 11-CV-360, 2014 WL 106927, at *1 (W.D. Tex. Jan. 8, 2014)). "The [legislative] privilege applies to any documents or information that contains or involves opinions, motives, recommendations or advice about legislative decisions between legislators or between legislators and their staff." *La Union del Pueblo Entero v. Abbott*, No. 21-cv-00844, 2022 WL 1667687, at *2 (W.D. Tex. May 25, 2022) (quotation omitted). "[A] primary purpose of the legislative privilege [is] shielding lawmakers from the distraction created by inquiries into the regular course of the legislative process." *In re Hubbard*, 803 F.3d 1298, 1311 (11th Cir. 2015).

To understand what, precisely, the legislative privilege covers, it may be helpful to understand what it should not cover:

> Factual matter collected for the information and use of legislators should not be privileged, even if collected and communicated by a personal staff member. Factual summaries in an

> advisory communication, if severable from confidential portions, should also not be privileged. Further, information which does not reveal the content of communications with a legislator should not be privileged.

*Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.* ("*Florida*"), 164 F.R.D. 257, 267–68 (N.D. Fla. 1995).

"Both [the Fifth Circuit] and the Supreme Court have confirmed that the state legislative privilege is not absolute." *League of United Latin Am. Citizens v. Abbott* ("*LULAC*"), No. 22-50407, 2022 WL 2713263, at \*1 (5th Cir. May 20, 2022). "[T]he legislative privilege for state lawmakers is, at best, one which is qualified." *Jefferson*, 849 F.3d at 624. The Fifth Circuit has instructed:

> The state legislative privilege must be protected when it arises; at the same time, the privilege must not be used as a cudgel to prevent the discovery of non-privileged information or to prevent the discovery of the truth in cases where the federal interests at stake outweigh the interests protected by the privilege.

*LULAC*, 2022 WL 2713263, at \*2. The legislative privilege "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Jefferson*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at \*1).

"[I]n deciding whether and to what extent the [legislative] privilege should be honored, the Court must balance the extent to which production of the information sought would chill the [legislature's] deliberations concerning such important matters as redistricting against any other factors favoring disclosure." *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 100 (S.D.N.Y. 2003), *aff'd*, 293 F. Supp. 2d 302 (S.D.N.Y. 2003). There are five factors a district court should weigh when determining whether the legislative privilege should be honored:

> (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*Id.* at 101 (quotation omitted) ("the *Rodriguez* factors"). In considering these factors, "the court's goal is to determine whether the need for disclosure and accurate fact finding outweighs the legislature's need to act free of worry about inquiry into its deliberations." *Veasey v. Perry*, No. 13–193, 2014 WL 1340077, at *2 (S.D. Tex. April 3, 2014) (cleaned up).

### 2.  Application

Commissioner Holmes asserts that five documents—items 1, 2, 11, 19, and 27—are covered by the legislative privilege. I will start with the easy ones:

***Holmes 000003 (part of Item 1)***. This page is Commissioner Holmes's handwritten notes reflecting a June 30, 2011 meeting between himself and Galveston County's outside redistricting counsel: Joe Nixon and Trey Trainor. Redistricting counsel are outsiders. Communications with them are not covered by the legislative privilege:

> While legislators are certainly free to seek information from outside sources, they may not assume that every such contact is forever shielded from view. A contrary ruling would allow a legislator to cloak any communication with legislative privilege by simply retaining an outsider in some capacity. Thus, to the extent that [Commissioner Holmes] relied on reports or recommendations generated by outside consultants . . . [he] waived their legislative privilege as to these documents.

*Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at *10 (N.D. Ill. Oct. 12, 2011) (cleaned up). This page must be produced.

***Holmes 000005–000034 (part of Item 2) and Holmes 000189–000191 (part of Item 11)***. These pages are Commissioner Holmes's handwritten notes of public redistricting meetings from 2011 and 2021, respectively. They do not reflect "opinions, motives, recommendations or advice about legislative decisions **between legislators** or **between legislators and their staff**." *La Union del Pueblo Entero*, 2022 WL 1667687, at *2 (emphasis added). These notes are not covered by the privilege and must be produced.

**Holmes 000181, 000184 (part of Item 11)**. These pages are Commissioner Holmes's handwritten notes reflecting meetings between himself, Oldham, and others. Oldham is an outsider and communications with him are not covered by the privilege. *See Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *10. These pages must be produced.

**Item 19**. This is Commissioner Holmes's correspondence with his redistricting counsel, Chad Dunn. Commissioner Holmes's communications with his own outside redistricting counsel are no more protected by the legislative privilege than his communications with Galveston County's outside redistricting counsel. *See id.* Additionally, Commissioner Holmes has waived any claim of privilege as to Item 19 by agreeing to produce it if I order Defendants to produce communications from Oldham and Bryan to Galveston County. *See* Dkt. 156 at 3. As stated above, I am ordering Defendants to produce Oldham and Bryan's communications with Galveston County, so I expect Commissioner Holmes to produce Item 19.

As an aside, I believe Commissioner Holmes may have also waived his legislative privilege as to some of the remaining portions of Item 1 and Item 11.[8] "Unlike a waiver of legislative immunity, the waiver of the [legislative] privilege need not be explicit and unequivocal, and may occur either in the course of the litigation when a party testifies as to otherwise privileged matters, or when purportedly privileged communications are shared with outsiders." *Favors v. Cuomo*, 285 F.R.D. 187, 211–12 (E.D.N.Y. 2012) (cleaned up); *see also Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *10 ("As with any privilege, the legislative privilege can be waived when the parties holding the privilege share their communications with an outsider."). According to Defendants, the United

---

[8] The remainder of Item 1 (Holmes 000001–000002, 000004) are Commissioner Holmes's handwritten notes from 2011 regarding his communications with other Commissioners and their staff. The remainder of Item 11 (Holmes 000182–000183, 000185–000188) are Commissioner Holmes's handwritten notes from 2021 phone calls and meetings with other Commissioners and/or their staff.

States has "produced a privilege log indicating two withheld documents described as 'Attorney notes and mental impressions of interview with Stephen Holmes conducted for litigation purposes.'" Dkt. 136 at 1. The United States' First Amended Complaint ("USA FAC")[9] contains several allegations that are specific to Commissioner Holmes and the extent of his participation in the 2021 Redistricting Plan. *See* USA FAC at 9 ("None of the other members of the commissioners court communicated with or otherwise involved Commissioner Holmes."); *id.* at 10 ("Commissioner Holmes . . . has stated that throughout [the redistricting] process, he was excluded from discussions with Defendant Henry and the other commissioners."). Because Defendants raised the issue of waiver in the joint dispute letter, I asked Commissioner Holmes to confirm whether he provided copies to, or had made any plaintiff or any plaintiff's counsel aware of the contents of Items 1, 2, and 11. To his credit, Commissioner Holmes admits that he "did not provide copies, but it is possible that he reviewed his notes ***and made the DOJ, through its counsel, aware of some of the contents of Items [1, 2, and 11]***." Dkt. 166 at 1 (emphasis added). I am particularly struck by the fact that one allegation in the USA FAC appears to parallel a page of notes—dated September 23, 2021—that Commissioner Holmes is withholding. *Compare* USA FAC at 11 ("During a September 23, 2021, meeting with the County's redistricting counsel, Commissioner Holmes provided the County's redistricting counsel with his views as to those changes to Precinct 3 that he believed to be necessary and appropriate."), *with* Holmes 000183 (appearing to capture these changes). Nevertheless, I need not waste time and resources on the question of waiver, because even if Commissioner Holmes has not waived the privilege, I still find that the majority of these notes should be produced because the interests at stake outweigh the interests protected by the legislative privilege.

---

[9] This pleading was filed before the underlying cases were consolidated. It can be located on the docket for *United States v. Galveston County*, No. 3:22-cv-93 (S.D. Tex. May 31, 2022), ECF No. 30.

As noted, the legislative privilege is not absolute. I must weigh the five *Rodriguez* factors to determine if documents covered by the legislative privilege must nevertheless be produced. The seriousness of the litigation (factor 3), the government's role in the litigation (factor 4), and the (low) possibility of future timidity by governmental employees (factor 5) all weigh in favor of disclosure. "Plaintiffs raise profound questions about the legitimacy of the redistricting process and the viability of the [2021 Redistricting Plan]. Moreover, the legislators' role in the allegedly unlawful conduct is direct. . . . These actions are under scrutiny." *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *8. "[T]his is not the usual [legislative privilege] case in which a private party . . . seeks documents . . . and the government tries to prevent its decisionmaking process from being swept up unnecessarily into public. Here, the decisionmaking process is not swept up into the case, it *is* the case." *United States v. Bd. of Educ. of Chi.*, 610 F. Supp. 695, 700 (N.D. Ill. 1985) (quotation marks omitted). Nor is this a case in which the redistricting process is being challenged solely on the basis of the enacted maps. Rather, Commissioner Holmes voluntarily engaged the United States to lament his exclusion from the process and, despite not being a party, he is undoubtedly a central piece of this litigation. *See* Dkt. 156 at 2 (collecting allegations regarding Commissioner Holmes from all three operative pleadings). I cannot, with a straight face, say that disclosure would "chill legislative debate" or "discourage earnest discussion within governmental walls," when the allegations here are that there was no legislative debate or earnest discussion. *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *9.

With three factors out of the way, I note that the factors of relevance (factor 1) and availability of other evidence (factor 2) vary from page to page. So, I will address each of the remaining pages in turn.

**Holmes 000001–000002, and 000004** are Commissioner Holmes's handwritten notes of communications he had with fellow legislators in 2011, primarily Commissioner Clark. These notes predate this litigation by more than a

decade. Nevertheless, "to evaluate claims of racial vote dilution under the Fourteenth Amendment, courts rely on the totality of the circumstances test." *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *3 (citing *Rogers v. Lodge*, 458 U.S. 613, 618 (1982)). Under the totality of the circumstances, "exclusion from the political process" and "historical background" matter. *See id.* Thus, it is no surprise that the USA FAC discusses not only Commissioner Holmes's exclusion in 2021, but also in the creation of the 2013 justice of the peace plan. *See* USA FAC at 9 ("None of the other members of the commissioners court communicated with or otherwise involved Commissioner Holmes . . . in the creation of this 2013 justice of the peace plan."). Accordingly, this information is relevant. The only question then is whether other evidence is available. Perhaps it is, but stacked up against four other factors weighing in favor of disclosure, the availability of other evidence is not, standing alone, enough to prevent disclosure here. These pages must be produced.

*Holmes 000182 (part of Item 11)*. This page is Commissioner Holmes's handwritten note reflecting a communication with "Engineering." I am not convinced that this page is even covered by the privilege because it does not reflect "opinions, motives, recommendations or advice about legislative decisions between legislators or between legislators and their staff." *La Union del Pueblo Entero*, 2022 WL 1667687, at *2. But even if this page were covered by the privilege, "communications with technical employees who provide information to legislators collectively, but who do not advise a particular legislator as his or her personal staff, at best deserve weak deference in the balancing of competing interests." *Favors*, 285 F.R.D. at 212 (quotation omitted). This page should be produced.

*Holmes 000183, Holmes 000185–000188 (part of Item 11)*. Holmes 000183 is Commissioner Holmes's handwritten notes from September 23, 2021, regarding various precincts. The remaining pages are Commissioner Holmes's handwritten notes from calls or meetings with Drummond and

Commissioner Apffel in the fall of 2021. Based on the USA FAC, it seems Commissioner Holmes has already discussed the content of his September 23, 2021 notes with the Department of Justice. *See* USA FAC at 11. Even if he has not, any document tending "to make a fact more or less probable than it would be without the evidence" is relevant. FED. R. EVID. 401(a). Relevance cuts both ways. Whether Commissioner Holmes's notes help or hurt one side or the other, they unquestionably tend to make the allegations and defenses in this litigation more or less probable. Yet, Commissioner Holmes argues that "Defendants have control of the witnesses whom they claim kept Commissioner Holmes involved and adequately responded to him. They can proffer those witness testimonies without rummaging through Commissioner Holmes' privileged materials." Dkt. 156 at 4. It is true that the testimony of other witnesses is available in addition to Commissioner Holmes's notes. But weighed against four other very compelling factors, I must order these pages produced.

*Item 27.* Item 27 is an emailed screenshot of a text message from Annye Watson ("Watson"), a member of Commissioner Holmes's staff. This text message is merely passing along factual information about Annye's contact with an outsider. Item 27 must be produced.

## C.   FIRST AMENDMENT PRIVILEGE

Defendants have asked that I review 24 documents that NAACP Plaintiffs have withheld on the basis of First Amendment privilege. NAACP Plaintiffs first respond that "Defendants' challenge is untimely" because they waited six weeks to raise this issue. Dkt. 148 at 2. Defendants point out that they began conferring with NAACP Plaintiffs before the close of discovery. I agree with NAACP Plaintiffs that Defendants' challenge came at the "eleventh-hour." *Id.* Nevertheless, once a dispute is before me, I like to resolve it on the merits.

### 1.   *Legal Principles*

The First Amendment "privilege protects against a forced '[d]isclosure[] of political affiliations and activities' that would have a deterrent effect on the exercise

of free speech or freedom of association rights." *La Union del Pueblo Entero*, 2022 WL 17574079, at *6 (quoting *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010)); *see also In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 479 (10th Cir. 2011) ("[T]he First Amendment privilege generally guarantees the right to maintain private associations when, without that privacy, there is a chance that there may be no association and, consequently, no expression of the ideas that association helps to foster.").

First Amendment privilege claims are generally evaluated under a two-part test. The party asserting the privilege must first make "a prima facie showing of arguable First Amendment infringement." *La Union del Pueblo Entero*, 2022 WL 17574079, at *6. "This prima facie showing requires the party to prove that enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." *Id.* Upon making a prima facie showing, the burden shifts to the requesting party to establish that the information sought "is sufficient to justify the deterrent effect on the free exercise of the constitutionally protected right of association." *Id.*

### 2.  *Application*

Defendants contend that NAACP Plaintiffs have not made a prima facie showing of First Amendment privilege. I agree. I allowed NAACP Plaintiffs to submit whatever affidavits they thought relevant to their First Amendment privilege claims, and they provided two declarations. *See* Dkts. 167-1, 167-2. These declarations are self-serving and conclusory. But before I turn to the substance of the declarations, I want to highlight how far afield Defendants' request, and the documents themselves, are from the cases on which NAACP Plaintiffs rely.

In *Young Conservatives of Texas Foundation v. University of North Texas*—a case that NAACP Plaintiffs cite for the proposition that their interest here is "self-evident"—the court was confronted with a discovery request for "**membership information**." No. 4:20-cv-973, 2022 WL 2901007, at *1, 3 (E.D.

Tex. Jan. 11, 2022) (emphasis added). Defendants here are expressly "**not requesting** any membership lists. To the extent [membership] information is included in the withheld documents, it can be redacted prior to production." Dkt. 148 at 1. Similarly, in *The Ohio Organizing Collaborative v. Husted*, the court was faced with "challenged requests [that] would require the disclosure of a wealth of financial, donor, membership, and strategic information – information that goes far beyond the issue of standing or even the merits of this action." No. 2:15-CV-01802, 2015 WL 7008530, at *3 (S.D. Ohio Nov. 12, 2015). Here, NAACP Plaintiffs argue that "[t]he challenged documents consist of internal, deliberative and strategic organizational communications." Dkt. 148 at 3. I have a hard time taking this statement seriously. At least one document is nothing more than the exchange of internet links. *See* KD0222WF00005335. There is no substantive communication whatsoever. Producing this document would not result in the "compelled disclosure" of people's "personal political and moral views." *Perry*, 591 F.3d at 1163. And when you consider Defendants' concession that member identities be redacted, it is hard to see how disclosure of this document could result in any consequence.

NAACP Plaintiffs seem to take the position that any disclosure of an association's internal communications is tantamount to the requests at issue in *Young Conservatives*, *Husted*, and *Perry*, without regard to what the requested documents actually say (or, in this case, don't say). But NAACP Plaintiffs must establish that disclosure ***of the documents on their privilege log*** would result in harassment, a chilling of associational rights, or other consequences. This they cannot do, particularly when Defendants have already conceded that membership information be redacted, *and* there is a protective order in place. *See* Dkt. 121. Against this backdrop, the declarations fall woefully short of a prima facie showing. For example, stating that "forcing the disclosure of confidential communications between NAACP members would violate our First Amendment rights to free speech and association because it would have a chilling effect on the

ability of individuals and groups to engage in candid, frank discussions about issues of importance to our communities" is a textbook example of a legal conclusion. Dkt. 167-2 at 3. Importantly, neither of the declarations' authors state that they personally would be less inclined to take a leadership position or to speak freely if these documents were disclosed.[11] In fact, one author appears to not even understand how little Defendants are asking to be disclosed, because "disclosure of documents that reveal NAACP leaders' names" is not even at issue. *Id.* This is simply insufficient to make a prima facie showing. Accordingly, I am ordering all of the documents on NAACP Plaintiffs' privilege log produced. Any membership-identifying information should be redacted and the documents can be produced as CONFIDENTIAL, in accordance with the Protective Order. *See* Dkt. 121 at 2.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motions to Compel (Dkts. 102, 103) are **DENIED** as to the following privileged documents on Defendants' January 20, 2023 privilege log: Doc IDs 58, 325, 327, 448, 453. In all other respects, Plaintiffs' Motions to Compel (Dkts. 102, 103) are **GRANTED**. Defendants are **ORDERED** to produce to Plaintiffs all documents that I have identified above as unprotected by the attorney–client privilege or attorney work product doctrine no later than Tuesday, May 16, 2023. Commissioner Holmes and NAACP should likewise

---

[11] To the extent the declarations discuss harassment, the harassment is about a third party who is an elected official. *See* Dkt. 167-1 at 3 ("I am aware that there is harassment of a member of the Dickinson Bay Area NAACP who is a La Marque city counsellor."); Dkt. 167-2 at 3 ("[A]n officer of my unit is a local elected official and spoke out about various issues and had to face racialized attacks and a recall campaign. Her family was threatened and called racial slurs, and her dog was poisoned."). Yet, the authors make no attempt to explain how this harassment is based on NAACP membership and not the third party's status as an elected official. Even if that third party had submitted a declaration, I would still want to know how disclosing redacted copies of listserv emails about training events or redacted emails showing nothing more than the exchange of internet links is likely to lead to harassment or the chilling of associational rights.

produce all documents on their respective privilege logs no later than Tuesday, May 16, 2023.

SIGNED this 15th day of May 2023.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE