**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| DICKINSON BAY AREA BRANCH NAACP, et al., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § | Civil Action No. 3:22-cv-117- JVB |
| GALVESTON COUNTY, TEXAS, et al., | § § § | |
| *Defendants*. | § § | |
| TERRY PETTEWAY, et al., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Action No. 3:22-cv-57-JVB [Lead Consolidated Case] |
| GALVESTON COUNTY, TEXAS, et al., | § § | |
| *Defendants*. | § | |
| UNITED STATES OF AMERICA, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 3:22-cv-93-JVB |
| GALVESTON COUNTY, TEXAS, et al., | § § § | |
| *Defendants*. | § | |

**NAACP PLAINTIFFS' RESPONSE IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................... 1

II.   SUMMARY OF THE ARGUMENT ....................................................... 1

III.  STATEMENT OF FACTS .......................................................................... 3

      A.    Galveston County's Black and Latino Residents Form a Community of Interest. ........................................................................... 3

      B.    The Commissioners Court Dismantles Benchmark Precinct 3 in the Enacted Plan. ............................................................................ 5

IV.  STANDARD OF REVIEW .................................................................... 9

V.   ARGUMENT ......................................................................................... 9

      A.    Defendants' Motion as to Plaintiffs' VRA Section 2 Claim Should Be Denied. .................................................................... 9

            i.     Section 2 of the VRA Protects Coalition Districts. .......................... 10

            ii.    Galveston County's Black and Latino Populations Satisfy Gingles I. ........................................................................ 10

            iii.   There Is Legally Significant Racially Polarized Voting in Galveston County. ............................................................. 16

            iv.   Galveston's White Bloc Voting Cannot Be Dismissed as Mere Partisanship. ................................................................. 23

      B.    The Court Should Deny Defendants' Motion for Summary Judgment on Plaintiffs' Claim of Racial Gerrymandering. ......................................... 28

VI.  CONCLUSION ................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) .................................................................................. 32

*Abrams v. Johnson,*
521 U.S. 74 (1997) .................................................................................. 11, 14

*Ala. Legislative Black Caucus v. Alabama,*
575 U.S. 254 (2015) ................................................................................ 30, 34

*Alabama State Conf. of NAACP v. Alabama,*
612 F. Supp. 3d 1232 (M.D. Ala. 2020) ................................................... 20, 30

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger,*
587 F. Supp. 3d 1222 (N.D. Ga. 2022) ......................................................... 24

*Bethune-Hill v. Va. State Bd. of Elections,*
580 U.S. 178 (2017) ............................................................................... *passim*

*Brewer v. Ham,*
876 F.2d 448 (5th Cir. 1989) ................................................................... 17, 19

*Campbell v. Sonat Offshore Drilling,*
979 F.2d 1115 (5th Cir. 1992) ...................................................................... 10

*Campos v. City of Baytown,*
840 F.2d 1240 (5th Cir. 1988) .................................................................. *passim*

*Cicalese v. Univ. of Texas Med. Branch,*
456 F. Supp. 3d 859 (S.D. Tex. 2020) ........................................................... 26

*Cooper v. Harris,*
581 U.S. 285 (2017) ................................................................................ 29, 34

*Growe v. Emison,*
507 U.S. 25 (1993) ...................................................................................... 11

*Hoskins v. Hannah,*
3:92-cv-12, ECF No. 61 (S.D. Tex. Aug. 19, 1992) ......................................... 4

*Jacksonville Branch of the NAACP v. City of Jacksonville*,
  No. 3:22-cv-493, 2022 WL 7089087 (M.D. Fla. Oct. 12, 2002)..................... 15, 32, 33

*Lopez v. Abbott*,
  339 F. Supp. 3d 589 (S.D. Tex. 2018) ................................................... 21, 23

*LULAC v. Abbott*,
  604 F. Supp. 3d 463 (W.D. Tex. 2022)........................................................ 16

*LULAC v. Abbott*,
  617 F. Supp. 3d 622 (W.D. Tex. 2022)........................................................ 34

*LULAC v. Abbott*,
  No. 3:21-CV-259-DCG-JES-JVB, 2022 WL 17683191 (W.D. Tex. Dec.
  14, 2022) .......................................................................................... 17

*LULAC v. Clements*,
  986 F.2d 728 (5th Cir. 1993) ................................................................. 22

*LULAC v. Clements*,
  999 F.2d 831 (5th Cir. 1993) ...........................................................*passim*

*Miller v. Johnson*,
  515 U.S. 900 (1995)........................................................................ 28, 35

*Patino v. City of Pasadena*,
  230 F. Supp. 3d 667 (S.D. Tex. 2017) ................................................. 20, 27

*Perez v. Abbott*,
  274 F. Supp. 3d 624 (W.D. Tex. 2017), *rev'd and remanded on other
  grounds*, 138 S. Ct. 2305 (2018)............................................................. 17

*Perez v. Pasadena Indep. Sch. Dist.*,
  958 F. Supp. 1196 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999) ................. 20

*Prejean v. Foster*,
  227 F.3d 504 (5th Cir. 2000) ................................................................ 35

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000)........................................................................... 12

*Robinson v. Ardoin*,
  37 F.4th 208 (5th Cir. 2022) ................................................................ 15

*Robinson v. Ardoin*,
605 F. Supp. 3d 759 (M.D. La.), *cert. granted before judgment*, 142 S.
Ct. 2892 (2022) ............................................................................. 24, 27

*Rodriguez v. Harris County*,
964 F. Supp. 2d 686 (S.D. Tex. 2013), *aff'd*, 601 F. App'x 255 (5th Cir.
2015) ............................................................................................... 23, 26

*S.C. State Conf. of NAACP v. Alexander*,
No. 21-CV-03302-MGL-TJH-RMG, 2023 WL 118775 (D.S.C. Jan. 6,
2023) .................................................................................................... 35

*Sensley v. Albritton*,
385 F.3d 591 (5th Cir. 2004) ....................................................... 13, 32

*Teague v. Attala County*,
92 F.3d 283 (5th Cir. 1996) ............................................................... 23

*Texas v. United States*,
887 F. Supp. 2d 133 (D.D.C. 2012), *vacated on other grounds and
remanded*, 570 U.S. 928 (2013) ........................................................ 19

*Thornburg v. Gingles*,
478 U.S. 30 (1986) ..................................................................... *passim*

*Turner v. Baylor Richardson Med. Ctr.*,
476 F.3d 337 (5th Cir. 2007) ............................................................... 9

*United States v. Galveston County*,
3:07-cv-00377, ECF No. 5 (S.D. Tex. July 2007) ............................... 4

*Walters v. Boston City Council*,
No. CV 22-12048-PBS, 2023 WL 3300466 (D. Mass. May 8, 2023) ... 33

*Wiley v. Bay City Indep. Sch. Dist.*,
No. 3:20-CV-119, 2022 WL 4368155 (S.D. Tex. Sept. 21, 2022) ......... 9

*Wisconsin Legislature v. Wisconsin Elections Commission*,
142 S. Ct. 1245 (2022) ........................................................................ 14

**Statutes**

Fed. R. Civ. P. 56(c) .................................................................................. 9

Texas Open Meetings Act ............................................................................ 7

U.S. Constitution Fourteenth Amendment .............................................. 1, 10

U.S. Constitution Fifteenth Amendment ...................................................... 10

Voting Rights Act of 1965 Section 2 ....................................... 1, 4, 9, 10, 21

## I.    NATURE AND STAGE OF PROCEEDINGS

Civil rights organizations and leaders Dickinson Bay Area Branch NAACP, Mainland Branch NAACP, Galveston Branch NAACP, Galveston LULAC Council 151, Edna Courville, Joe A. Compian, and Leon Phillips ("NAACP Plaintiffs" or "Plaintiffs") filed this action in April 2022 to challenge the new County Commissioners precincts adopted by the Galveston County Commissioners Court in November 2021 (the "Enacted Plan") as racially gerrymandered, adopted with discriminatory purpose, and unlawfully diluting the votes of Galveston's Black and Latino voters. Having failed to secure dismissal of any of NAACP Plaintiffs' claims under Rule 12, *see* Doc. 123, Defendants Galveston County, Galveston County Commissioners Court, and Dwight D. Sullivan now move for summary judgment ("the Motion" or "MSJ") on two of Plaintiffs' four claims: the results-based claim of vote dilution under Section 2 of the Voting Rights Act of 1965 ("VRA") and racial gerrymandering under the Fourteenth Amendment of the U.S. Constitution.

## II.    SUMMARY OF THE ARGUMENT

Presented with conclusive evidence supporting Plaintiffs' claims in discovery, Defendants seek to move the goalposts by asserting heightened and legally baseless hurdles for these claims in their Motion. But none of Defendants' arguments refutes the reality that the Enacted Plan, which systematically dismantles the sole and long-standing majority-minority Commissioner Precinct in Galveston County, represents a textbook case of vote dilution and racial gerrymandering.

The Court must deny summary judgment on Plaintiffs' Section 2 claim. Defendants' argument that Section 2 does not protect minority coalitions defies binding precedent. Their

1

contention that Plaintiffs cannot satisfy *Gingles* I is untenable, given that it is not only possible, but in fact *easy* to draw a reasonably compact majority Black/Latino precinct based solely on traditional race-neutral principles. Defendants also fail to lodge coherent criticism against several of Plaintiffs' illustrative maps. At most, they ask this Court to make credibility determinations and resolve evidentiary disputes that are plainly inappropriate on summary judgment.

As to *Gingles* II and III, the unchallenged statistical evidence shows that a supermajority of Black/Latino voters in Galveston vote for the same candidates, and a supermajority of Anglos bloc vote in opposition to defeat minority-preferred candidates in every single precinct of the Enacted Plan. This is bolstered by qualitative evidence of racial bloc voting. Unable to effectively rebut this evidence, Defendants instead engage in a parade of fruitless arguments: improperly attempting to shift their burden of showing race-neutral considerations instead explain Galveston's dramatic racial polarization onto Plaintiffs, then relying on unreliable statistical evidence, all while ignoring Plaintiffs' evidence that race plays an inextricable role in Galveston politics.

Summary judgment is also inappropriate on the racial gerrymandering claim. Defendants have enacted a textbook racial gerrymander by cracking Galveston's Black and Latino population nearly equally between all four Enacted Commissioners' Precincts. Their post hoc justifications in the form of inadmissible hearsay to point to race-neutral criteria cannot explain the contours of the Enacted Plan. Rather, the evidence shows that race unconstitutionally predominated. The Motion should be denied.

## III.   STATEMENT OF FACTS

A.  <u>Galveston County's Black and Latino Residents Form a Community of Interest.</u>

Galveston County's growing minority populations primarily reside in communities along I-45 from Dickinson to the City of Galveston and east to Galveston Bay, roughly coterminous with Commissioners Court Precinct 3 as it existed for decades. Doc. 176-2 ¶¶ 38, 81 (Cooper Report). Due to the enduring legacy of discrimination and systemic racism, Galveston County's Black and Latino residents lag behind Anglo residents in a variety of socioeconomic measures, including income, education, employment, health, and housing. *Id.* at ¶ 40; *see also* Ex. 1 at 22–30 (Burch Report); Ex. 2 at 262:18–263:5 (Mainland NAACP/Rice-Anders Dep.); Ex. 3 at 97:18–99:19 (Armstrong Dep.). For example, Black and Latino residents face unique challenges in getting medical care that Anglos do not, which is exacerbated by a distrust of healthcare systems due to historic mistreatment. Ex. 4 at 195:26–197:16 (LULAC/Compian Dep.); Ex. 5 at 47:4–49:8 (Galveston NAACP Dep.); Ex. 2 at 77:5–78:19 (Mainland NAACP/Rice-Anders Dep.); Ex. 6 at ¶¶ 4–5 (Compian Decl.). Natural disasters disproportionately impact the Black and Latino community, which often receives less government recovery funding. Ex. 4 at 216:11–217:24 (LULAC/Compian Dep.); Ex. 1 at 29 (Burch Report); Ex. 6 at ¶ 6 (Compian Decl.). Similarly, Black and Latino residents are treated unequally with regard to routine infrastructure maintenance. Ex. 5 at 203:5–205:21 (Galveston NAACP Dep.).

Black and Latino residents also face unique barriers to equal political representation. In the recent past, this Court directed the County in a 1992 consent order to create two majority-minority justice of the peace ("JP") and constable precincts, *see Hoskins v.*

*Hannah*, 3:92-cv-12, ECF No. 61 (S.D. Tex. Aug. 19, 1992), which were subsequently eliminated. Ex. 7 at ¶ 4 (Quintero Decl.). The County came under another consent decree in 2007 requiring it to comply with the VRA and other obligations to provide Spanish language assistance to voters, *United States v. Galveston County*, 3:07-cv-00377, ECF No. 5 (S.D. Tex. July 2007), yet there are continuing issues with insufficient Spanish language resources. Ex. 6 at ¶ 12 (Compian Decl.). Latino voters havefaced increasing intimidation and misinformation when voting in recent years, which has taken place in an environment of generally deteriorating race relations. *Id.* at ¶ 11; Ex. 8 at 197:1–198:5 (Courville Dep.); Ex. 7 at ¶¶ 6–11 (Quintero Decl.). And in 2011, the County failed to gain Department of Justice ("DOJ") preclearance for new Commissioners Court and JP/constable precinct maps (drawn using the same consultant, Dale Oldham, as in 2021) that would have diluted minority voting power. Doc. 176-7 (2012 DOJ Objection). Minority voters have also protested the proposed closure of polling places in predominantly Black and Latino neighborhoods. Ex. 8 at 165:11–169:14 (Courville Dep.); Ex. 9 (Exhibit 12 to Courville Dep.); Ex. 6 at ¶ 9 (Compian Decl.). Further, there is evidence of explicit racial discrimination against candidates and campaigners of color, racial appeals in campaigns, and less-explicit modes of exclusion such as campaign materials not translated into Spanish.[1]

---

[1] *See, e.g.*, Ex. 7 at ¶ 7 (Quintero Decl.); Ex. 22 at 29–35 (Stephens-Dougan Report); Ex. 4 at 176:8–179:16 (LULAC/Compian Dep.); Ex. 24 at 165:3–7 (Johnson Dep.); Ex. 16 at 32:11–16 (Giusti Dep.); Ex. 10 at 318:4–319:21 (Dickinson Bay Area NAACP/Lofton Dep.); Ex. 14 at 25:9–22 (Nov. 12 Hr'g Tr.).

To combat these challenges, Plaintiffs, long-standing community leaders and organizations, work collaboratively on shared issues critical to Galveston's Black and Latino community.[2] Community members rely on Commissioner Stephen Holmes, who had been the only minority representative on the Commissioners Court since 1999, to champion the issues important to them and do not expect the same level of support from Commissioners under the newly Enacted Plan.[3] Having a minority representative at Commissioners Court has also been critical to fostering Black and Latino leaders at other levels of county and municipal government within the Precinct 3 community. Ex. 4 at 91:4–25 (LULAC/Compian Dep.); Ex. 6 at ¶ 14 (Compian Decl.). Even Galveston County minority residents who do not live within Commissioner Holmes's former precinct, "Benchmark" Precinct 3, turn to him for advice and see him as a leader representing their interests. Ex. 10 at 332:19–21 (Dickinson Bay Area NAACP/Lofton Dep.); Ex. 5 at 90:9–22 (Galveston NAACP Dep.); Ex. 11 at 24:11–18 (Williamson Dep.).

B.  <u>The Commissioners Court Dismantles Benchmark Precinct 3 in the Enacted Plan.</u>

The Enacted Plan cracks Galveston's Black and Latino community, once largely included in Benchmark Precinct 3, among all four of its new Commissioners Precincts. *See*

---

[2] *See, e.g.*, Ex. 8 at 34:9–15, 35:14–36:4, 40:9–17, 194:8–15, 207:14–20 (Courville Dep.) (education, social services, working with LULAC); Ex. 25 at 25:12–25, 31:15–32:3 (Phillips Dep.) (policing and housing); Ex. 4 at 59:18–19, 172:11–174:7, 213:11–215:7 (LULAC/Compian Dep.) (shared membership in community organizations; infrastructure and healthcare access); Ex. 5 at 16:8–20, 61:20–62:5 (Galveston NAACP Dep.) (2012 redistricting and collaboration with LULAC); Ex. 10 at 69:7–70:18 (Dickinson Bay Area NAACP/Lofton Dep.) (business collaboration with LULAC); Ex. 6 at ¶¶ 4–10 (Compian Decl.) (COVID, disaster relief, school funding, electoral access).

[3] *See, e.g.*, Ex. 8 at 112:6–24, 199:16–200:9 (Courville Dep.); Ex. 4 at 92:1–17 (LULAC/Compian Dep.); Ex. 25 at 33:22–34:15 (Phillips Dep.); Ex. 11 at 21:22–25, 23:18–24:18, 64:6–20 (Williamson Dep.); Ex. 6 at ¶¶ 13–17 (Compian Decl.); Ex. 7 at ¶¶ 8–11 (Quintero Decl.).

App'x A-3 (2021 Enacted Plan with Benchmark Precinct 3 Overlay); Doc. 176-2 ¶ 17 (Cooper Report). The Commissioners Court adopted this plan in a redistricting cycle markedly different from past cycles, in a process plagued by Defendants' delay and lack of transparency. With no prior public disclosure, Defendants once again hired Oldham as a redistricting consultant as early as April 2021, Ex. 12 at 136:7–10 (Henry Dep.), but thereafter failed to take any action until shortly before the November 13, 2021 statutory deadline. In 2011, the Commissioners Court presented Census data results and two initial proposals, then held five public hearings throughout the County to solicit input, before a final meeting presenting new proposals that incorporated changes based upon public comment. Ex. 13 (2011 Preclearance Letter at 10). By contrast, in 2021 the Commissioners Court failed to announce any Census data results, and did not hold any public hearings, propose any maps, or provide timelines or even an opportunity for public comment until October 29, 2021, just two weeks before the November 13, 2021 statutory deadline. Ex. 12 at 159:19–22, 160:1–5, 163:21–164:25, 290:9–17 (Henry Dep.); Ex. 1 at 14–17 (Burch Report). On November 12, the Commissioners Court held just one meeting for public comment *and* a vote, meaning there was no opportunity for members to publicly consider or make changes to draft maps pursuant to public commentary. Ex. 14 at 26:13–27:5 (Nov. 12 Hr'g Tr.). In further contrast to prior standard practice, the Commissioners Court failed to publicly discuss or disclose redistricting criteria that might be used to draw or adopt new maps. Ex. 12 at 126:20–25, 128:1–4 (Henry Dep.); Ex. 15 at 112:6–114:15 (Apffel Dep.).

Instead, Defendants assiduously avoided any public discussion of their intentions toward redrawing precinct lines. They deliberately flouted the requirements of the Texas

Open Meetings Act, Tex. Gov. Code § 554.143, by meeting with Oldham and other redistricting consultants in groups of two or fewer Commissioners behind closed doors starting in September. Ex. 12 at 214:19–22, 215:1–4 (Henry Dep.); Ex. 15 at 129:4–18, 162:10–21 (Apffel Dep.). And they later tried to hide any evidence of their behind-the-scenes deliberations through wholesale and improper privilege assertions. *See, e.g.*, Doc. 177 (Ord. Granting Mot. to Compel). Though they disclaimed redistricting with partisan goals, *see, e.g.*, Ex. 12 at 257:3–7 (Henry Dep.); Ex. 15 at 193:6–8 (Apffel Dep.); Ex. 16 at 138:19–25 (Giusti Dep), the Commissioners Court and Oldham have not specifically disclaimed racial motivations, and they did receive racial breakdowns of Galveston County and each precinct in each map proposal. *See,* Doc. 176-32 (Oldham Decl.); Ex. 17 at 12 ("% BNH VAP" and "% HISP VAP" columns in "Pop Pivot" tab); Ex. 18 at 3 ("Hispanic" and "Black" columns).

On October 29, 2021, the County first posted images of two map proposals, devoid of demographic or other data analysis, along with an online comment portal. Ex. 12 at 227:24–229:1 (Henry Dep.). Map 1 closely resembled the map the DOJ objected to in 2011, *compare* App'x A-4 *with* Ex. 13 at 22 (2011 Preclearance Letter, Ex. C), and Map 2 (the Enacted Plan) made dramatic changes to the Benchmark Plan. *See* App'x A-3; Ex. 12 at 217:22–218:2 (Henry Dep.). The comment portal did not provide a meaningful way for constituents to voice concern—Commissioners Court members reviewed only a handful of the public comments, Ex. 15 at 190:16–191:1 (Apffel Dep.); Ex. 12 at 273:19–276:2 (Henry Dep.); Ex. 16 at 135:6–21 (Giusti Dep.), and many residents, especially Black and Latino senior citizens, have difficulty accessing the internet. Ex. 10 at 166:11–23

(Dickinson Bay Area NAACP/Lofton Dep.).

Then, with the minimum 72-hour notice (at most) and little fanfare, the Commissioners Court scheduled a special meeting on November 12, 2021 to hear public comment and vote on the maps. *See* Ex. 1 at 17–19 (Burch Report). Rather than the larger County seat used for regular meetings, this lone public redistricting hearing was held at the smaller League City Annex building, at the time under construction. *See id*. The room was so small, there was no room for Holmes at the dais, and he sat by himself at a small white table below.[4] Despite hearing from Commissioner Holmes and many Galveston County residents, including Plaintiffs and their members, about the discriminatory effects of both proposed maps, Judge Mark Henry, Commissioner Darrell Apffel, and Commissioner Joe Giusti voted in favor of the Enacted Plan (Map 2), without any significant discussion or rationale. Judge Henry mentioned only a tally of public comments received online supporting Map 2 over Map 1, a tally which failed to account for the hundreds of comments rejecting both maps, including those that criticized them as racially discriminatory. *See* Ex. 14 at 61:14–62:10 (Nov. 12 Hr'g Tr.); Ex. 1 at 20–21 (Burch Report). As discussed in the reports of Plaintiffs' expert William Cooper (Docs. 176-2, 176-29), Defendants' post hoc rationales cannot justify a whole-scale remapping of every precinct and the destruction of the only precinct that preserved minorities' ability to elect the candidate of their choice.

---

[4]   *See* Galveston County Commissioners Court Special Meeting, at 10:05 (Nov. 12, 2021), https://livestream.com/accounts/21068106/events/6315620/videos/227296657?origin=stre[…]c-404c0628-140000-155bc7a4b821a6&acc_id=30028131&medium=email.

## IV.   STANDARD OF REVIEW

Summary judgment is only appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "refrain from making credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Instead, "the court must consider all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in favor of the nonmoving party." *Wiley v. Bay City Indep. Sch. Dist.*, No. 3:20-CV-119, 2022 WL 4368155, at *2 (S.D. Tex. Sept. 21, 2022) (internal citations omitted).

## V.   ARGUMENT

### A.   Defendants' Motion as to Plaintiffs' VRA Section 2 Claim Should Be Denied.

Plaintiffs may prove unlawful vote-dilution under Section 2 of the VRA by satisfying three preconditions: (1) the minority population "is sufficiently large and geographically compact to constitute a majority in a single-member district" ("*Gingles* I"); (2) the minority group or coalition is "politically cohesive" ("*Gingles* II"); and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" ("*Gingles* III"). *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). If the preconditions are met, the Court must determine whether, under the "totality of the circumstances," "the political process is equally open to minority voters." *Id.* at 79.

Here, the analyses of Plaintiffs' experts conclusively show that Galveston's Black and Latino voters satisfy all three *Gingles* preconditions. Put simply, Galveston's Black and Latino voters have had both the opportunity and track record of electing their shared

candidate of choice to the Commissioners Court for decades, and it is undisputed that the Enacted Plan will "cancel out their ability to" do so in the future if it is not struck down by this Court. *Id.* at 48. Defendants ignore both the law and facts related to all three preconditions and fail even to address the "totality of the circumstances." *Id.* at 79. Their Motion should be denied as to this claim.

### i.   *Section 2 of the VRA Protects Coalition Districts.*

Defendants' argument that Section 2 does not protect minority coalitions (MSJ at 22–24)[5] should be summarily rejected. As Defendants acknowledge, the Fifth Circuit has long held that minority coalitions are protected under Section 2. *Id.* at 17; *see also, e.g.*, *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988). The Fifth Circuit's holdings remain binding on this Court. *See Campbell v. Sonat Offshore Drilling*, 979 F.2d 1115, 1121 n.8 (5th Cir. 1992). As this Court aptly noted, "[a]pplying Section 2 to protect minority coalitions is necessary and appropriate to ensure full protection of the Fourteenth and Fifteenth Amendments rights." Doc. 125 at 13–14 (internal quotations omitted).

### ii.   *Galveston County's Black and Latino Populations Satisfy Gingles I.*

Defendants' request for summary judgment on *Gingles* I is baseless. All expert evidence adduced to date demonstrates that Galveston County's Black and Latino populations are "sufficiently large and geographically compact to constitute a majority in a single-member district," *Gingles*, 478 U.S. at 50, specifically, here, a Citizen Voting Age Population ("CVAP") majority. This is true "tak[ing] into account 'traditional districting

---

[5] All page numbers of docketed briefs and orders cited refer to the numbers inserted by the CM/ECF system.

principles such as maintaining communities of interest and traditional boundaries.'" *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996)). Thus, it is indisputable that "the minority has the potential to elect a representative of its own choice" in a single-member district. *Growe v. Emison*, 507 U.S. 25, 40 (1993).

The illustrative maps drafted by Plaintiffs' expert William Cooper, who has over three decades of redistricting experience and has served as an expert in approximately 50 federal court voting rights cases, prove that a majority-Black/Latino precinct could "be *easily constructed* by adhering to only race-neutral traditional redistricting principles." Doc. 176-2 ¶¶ 2, 21 (emphasis added). The three examples he provides—out of many possible iterations—each follow race-neutral traditional redistricting criteria: Map 1, a "least-change" from the Benchmark Map to equalize populations, *id.* at ¶¶ 81–82; Map 2, a "least-change" that both equalizes populations and creates a coastal precinct, *id.* at ¶¶ 87–88; and Maps 3 and 3A, which prioritize placing all of Bolivar Peninsula, Pelican Island, and Galveston Island in a single precinct, among other traditional, race-neutral criteria. *Id.* at ¶¶ 92–93; Doc. 176-29 ¶ 35; App'x A (compilation of maps). Even under the most onerous proposed interpretations of *Gingles* I, Plaintiffs satisfy this precondition.

In seeking summary judgment on this issue, Defendants advance arguments that lack purchase in the record or misapply the relevant law:

*1.* Defendants' arguments that Cooper failed to consider traditional redistricting principles in his plans and instead drafted "racial gerrymanders" are directly contradicted by the sworn statements Cooper provided in his reports describing the race-neutral criteria he followed. *See* Doc. 176-2 ¶¶ 81, 86–87, 91–92, 95; Doc. 176-29 ¶¶ 7, 29–34. Cooper

categorically rejected having subordinated traditional redistricting criteria to draw a majority-minority district in any of his plans. *See* Ex. 19 at 100:10–25 (Cooper Dep.). Defendants ignore this testimony, and instead rely on vague, conclusory, and unsupported statements about varying education and home ownership levels (MSJ at 29) and precinct population statistics (*id.* at 32) unrelated to the criteria Cooper applied to draw his illustrative maps. Further, resolving Defendants' unfounded contentions would at least require the Court to assess Cooper's evidence and weigh his credibility, which is inappropriate on summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("[A court] may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.).

*2.* Defendants' argument that the illustrative plans join "disparate and distinct minority communities" is belied by the reasonable compactness of the illustrative maps. *See* Doc. 176-2 ¶¶ 86, 91, 95 (Cooper Report). For example, Defendants' own expert compiled tables of compactness scores that show Cooper's Map 3 creates an illustrative Precinct 3 that has a higher (and thus better) Reock compactness score than *each* of the Enacted Map's precincts. *See* Doc. 176-8 at 16 (Owens Report, Table 10, "Enacted Map" and "Cooper Illus 3" rows). Defendants cannot credibly argue that this *Gingles* I demonstrative district is not reasonably compact while defending their own gerrymander.

*3.* Given the reasonable compactness of the illustrative plans, Defendants' attempts to argue Galveston's Black and Latino populations are nonetheless "distant" and "disparate" fail. This is contradicted by the actual population distribution of the County, in which Black and Latino residents are "concentrated in communities along I-45 extending

from Dickinson to the City of Galveston and east to Galveston Bay," and thus "roughly coterminous with Benchmark Precinct 3" and one other precinct. Doc. 176-2 ¶ 38 (Cooper Report). Defendants' assertion that Plaintiffs' maps "extend[] considerable distances . . . often splitting voting precincts in the process" (MSJ at 31) rings hollow given that three of Cooper's maps split *fewer* populated voting precinct splits than the Enacted Plan, and all of Cooper's illustrative Precinct 3s span either comparable or smaller distances than precincts in the Enacted Plan.[6] As for their repeated reliance on *Sensley v. Albritton*, that case concerned a smaller county of 22,803 persons split among 9 districts, and in fact supports Plaintiffs' arguments. 385 F.3d 591, 593 (5th Cir. 2004). The challengers there were accused of improperly "disrupting the core of the preexisting electoral district (a black majority district)," as well as "separat[ing] distinct communities and disrupt[ing] relationships between incumbents and constituents, which had existed over the years and continued to exist under the [county's] new plan." *Id.* at 597–98. Here, *Plaintiffs* are the ones seeking to preserve the core of districts, maintain communities of interest, and continue relationships between incumbents and their long-standing constituents, which *Defendants* improperly disrupted via the Enacted Plan.

*4.* The in-depth, granular analysis Cooper performed shows definitively that Galveston's Black and Latino population shares common attributes across all socioeconomic markers. Cooper examined these factors both across the County and among

---

[6] The 2021 Enacted Plan has four populated VTD splits, Ex. 26 at 4 (Cooper Ex. F-3C), while Cooper Map 1 has just one, *id.* at 14 (Cooper Ex. I-3C), and Cooper Maps 3 and 3A have just 3, *id.* at 24 (Cooper Ex. K-3C) and 29 (Cooper Rebuttal Ex. E-3C).

its municipalities and Census Designated Places with populations greater than 2,500. Doc. 176-2 ¶¶ 39–43. Defendants do not dispute that Anglos "outpace African Americans and Latinos across a broad range of socioeconomic measures," including income, education, employment, and housing. *Id.* at ¶ 40. Instead, they harp on minor variances among populations in League City, an irrelevant fact given that disparities "persist even in League City" and, in any event, "none of [Cooper's] illustrative plans place substantial portions of League City in Precinct 3." Doc. 176-29 ¶ 13 (Cooper Rebuttal).[7]

   *5.* Next, Defendants wrongly assert that any plan based upon Benchmark Precinct 3 is automatically a racial gerrymander. The use of traditional boundaries as a starting point is a well-recognized race-neutral redistricting criterion. *See Abrams*, 521 U.S. at 92 (any *Gingles* I analysis "should take into account . . . communities of interest and traditional boundaries") (citation omitted). Precinct 3 has existed for decades in a substantially similar form. *See* Ex. 13 (2011 Preclearance Letter, Ex. D). This, paired with the common demographic and socioeconomic factors of residents in this area, indicates it is an "established community of interest." Doc. 176-2 ¶ 81 (Cooper Report). Unrebutted testimony confirms the shared interests of communities living on those portions of

---

[7] Defendants also attempt to fabricate a requirement that Cooper somehow analyze socioeconomic factors of populations by precinct—but fail to specify what this analysis might entail much less cite to precedent or authority requiring it. MSJ at 41–42. The *Wisconsin Legislature v. Wisconsin Elections Commission* decision they rely on merely held a party cannot rely upon "generalizations to reach the conclusion that the preconditions were satisfied." 142 S. Ct. 1245, 1250 (2022). It provides no support for rejecting Cooper's municipality analysis or requiring the unspecified "precinct" analysis Defendants imply is required. Defendants' own expert used even bigger units, Galveston's four Census County Divisions, in an unreliable analysis using boundaries that have no modern relevance to redistricting. *See* Doc. 176-29 ¶ 9 (Cooper Rebuttal). Cooper's more granular socio-economic analysis by municipality, Exhibit D to his report, can be downloaded online at http://www.fairdata2000.com/ACS_2015_19/Galveston/.

Galveston Island, the mainland, and in the unincorporated areas of Dickinson that comprise the Benchmark Precinct 3. *See supra* Section III.A; *Robinson v. Ardoin*, 37 F.4th 208, 219 (5th Cir. 2022). It is thus not only reasonable but *expected* that map-drawers would use a least-change approach. In fact, that appears to be how Defendants' alternative Map 1 was drawn. *See, e.g.*, Ex. 20 (Oct. 16, 2021 1:55am email discussing "minimum change scenario"); Ex. 12 at 352:13–16 (Henry Dep.) ("[a]bsolutely" considering Map 1 as a "viable option"); Doc. 176-32 at ¶ 15 (Oldham Decl.) (concluding that Map 1 "complied with the U.S. Constitution and the [VRA]").

But even if the original boundaries of Benchmark Precinct 3 were drawn conscious of race, that would not impact Cooper's least-change illustrative plans. Defendants misstate the appropriate legal standard, asserting that "[i]f race is *considered* when drawing a district (as Plaintiffs do in their illustrative plans), there must be a 'strong basis in evidence' for doing so." MSJ at 27 (citing *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 194 (2017)). But *Bethune-Hill* makes clear, it is racial *predominance*, not mere consideration, that requires this showing. 580 U.S. at 193–94. Cooper subordinated his use of Benchmark Precinct 3's boundaries to other race-neutral criteria in his least-change approaches to Illustrative Maps 1 and 2. Doc. 176-2 ¶¶ 81, 87. This approach renders irrelevant the case upon which Defendants primarily rely, *Jacksonville Branch of the NAACP v. City of Jacksonville*; there, legislative statements showed that "maintaining high BVAP percentages in the minority access districts was the criterion that could not be compromised." No. 3:22-cv-493, 2022 WL 7089087, at *46 (M.D. Fla. Oct. 12, 2002). Defendants ignore that "[r]acial consciousness in the drawing of illustrative maps does not

15

defeat a *Gingles* claim." *Robinson*, 37 F.4th at 222.

In any event, Defendants never assert that race was a predominating factor in Cooper's Illustrative Maps 3 and 3A, which are not least-change plans and thus not susceptible to Defendants' misplaced concerns regarding racial gerrymandering. Moreover, neither of these illustrative maps includes the components of the Benchmark Precinct 3 that Defendants criticize. *Compare* MSJ at 38–39 (criticizing Benchmark Precinct 3's "narrow point of contiguity" and 3-precinct split of Galveston Island) *with* App'x A-7 and A-8 (Cooper Maps 3 and 3A).

As Defendants have no legitimate complaints against Cooper's Illustrative Maps 3 and 3A, and these maps show that Galveston's Black and Latino populations are sufficiently numerous and geographically compact to form a majority CVAP in a single district, Plaintiffs have satisfied *Gingles* I. Defendants' arguments to the contrary ignore the record or are legally unsupportable. At best, Defendants have shown disputes as to material issues of fact that preclude summary judgment.

### iii.     *There Is Legally Significant Racially Polarized Voting in Galveston County.*

In requesting summary judgment on the second and third *Gingles* preconditions, Defendants completely elide the applicable legal standards for assessing racially polarized voting ("RPV"), and otherwise engage in a series of strawman arguments.

Plaintiffs satisfy the *Gingles* II precondition by showing that "a *significant number* of minority group members usually vote for the same candidates." *LULAC v. Abbott*, 604 F. Supp. 3d 463, 495 (W.D. Tex. 2022) (quoting *Gingles*, 478 U.S. at 56) (emphasis added). "The necessary size of the majority. . . . is a district-specific inquiry." *Id.* at 495 n.22. For

16

coalition districts, the Fifth Circuit assesses Black and Latino voters "as a whole"—*i.e.*, as one "minority group" under *Gingles*—to determine "whether the minority group together votes in a cohesive manner[.]" *Campos v. City of Baytown*, 840 F.2d 1240, 1245 (5th Cir. 1988). Statistical evidence is typically important, but it is "not a *sine qua non* to establishing cohesion," *Brewer v. Ham*, 876 F.2d 448, 454 (5th Cir. 1989), and "lay witness testimony concerning cooperation between the minority groups" is relevant. *Perez v. Abbott*, 274 F. Supp. 3d 624, 669 (W.D. Tex. 2017), *rev'd and remanded on other grounds*, 138 S. Ct. 2305 (2018). The third *Gingles* factor is present when the "white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 90. "When both minorities and Anglos vote in blocs, courts conclude that voting is 'racially polarized' and typically hold that both the second and third preconditions have been met." *LULAC v. Abbott*, No. 3:21-CV-259-DCG-JES-JVB, 2022 WL 17683191, at *3 (W.D. Tex. Dec. 14, 2022).

Defendants do not challenge the numerical accuracy of NAACP Plaintiff Expert Dr. Kassra Oskooii's ecological inference ("EI") or election performance analysis. Ex. 21 at 11:8–11, 45:25–46:10 (Alford Dep.). And this analysis shows legally significant RPV.

Dr. Oskooii's EI analysis plainly satisfies the *Campos* and *Gingles* standards for minority cohesion. His district-specific analysis of data from 25 recent elections shows that Galveston's Black/Latino voters overwhelmingly support a candidate of choice in every election in each of Cooper's illustrative plans at average rates above 87%. *See* Doc. 176-48 ¶¶ 61–62, Figures 13, 14. A "significant" majority of the Black/Latino population "as a whole" therefore usually votes for the same candidates and is cohesive. *Campos*, 840 F.2d

17

at 1243, 1245 (citing *Gingles*, 478 U.S. at 56). Similarly, the white bloc analysis shows that Anglos vote in opposition to minority-preferred candidates at average rates of about 87, 77, 88, and 85 percent in the four enacted precincts. Doc. 176-48 ¶ 56, Figures 11, 12 (Oskooii Report). Dr. Oskooii concludes there is "very clear and highly consistent Anglo bloc voting in each of the four Commissioner Precincts." *Id.* at ¶ 56. Defendants do not dispute that this severe white bloc vote defeats every minority-preferred candidate in every enacted Precinct. *See id.* at ¶ 71, Figure 17.

In addition to EI, Dr. Oskooii's reconstituted election results independently confirm the legal significance of RPV in Galveston. This analysis is important because it is based on actual election results, not estimated vote shares. The percentage of Anglo voters in an Enacted Precinct corresponds directly on a 1:1 basis with the severity of loss for minority-preferred candidates. For example, the newly-enacted Precinct 3 has the *highest* Anglo CVAP percentage (71.6%) in the Enacted Plan, and it performs the *worst* for minority-preferred candidates, with "clear and definitive" 35-point margin losses. *See supra* n.7; Doc. 176-48 ¶ 71 (Oskooii Report). The second most Anglo district performs second worst, and so on.[8] By contrast, under any demonstrative precinct with a majority Black/Latino CVAP, the minority-preferred candidates win. *Id.* at ¶ 75, Figure 18. Galveston's RPV therefore exemplifies the circumstances described in *Gingles*: that "minority and majority voters consistently prefer different candidates" such that "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters," thus denying

---

[8] *Compare* Doc. 176-2 at ¶ 58 (Cooper Report, Fig. 11 of Enacted Plan's CVAP levels) *with* Doc. 176-48 at ¶ 71 (Oskooii Report, Fig. 17 of Enacted Plan's performance analysis).

minorities an equal opportunity to elect representatives of their choice. 478 U.S. at 48. Since Defendants cannot dispute the clear evidence of RPV, they instead seek to move the goalposts, asking this Court to apply inflated standards that lack a basis in applicable law.

*1.* Defendants argue that cohesion breaks down when Black and Latino voters are analyzed separately, but this implies an inquiry that courts reject and is also unsupported by the facts. *See Campos*, 840 F.2d at 1245, n.6 (rejecting separate cohesion inquiries as statistically fraught and focusing on "the minority group as a whole"). Instead, the only important intra-group determination is that "black-supported candidates receive a majority of the Hispanic . . . vote [and] Hispanic-supported candidates receive a majority of the black . . . vote . . . in most instances[.]" *Brewer*, 876 F.2d at 453. So "[i]f the evidence were to show that the Blacks vote against a Hispanic candidate, or vice versa, then the minority group could not be said to be cohesive." *Campos*, 840 F.2d at 1245. But Defendants do not argue, and could not show, that Galveston's Black and Latino voters oppose each other. Indeed, Dr. Oskooii's analysis shows that Black and Latino voters consistently prefer the same candidates by decisive supermajorities. *See* Doc. 176-48 at ¶¶ 40–52. Accordingly, the Court must consider Black and Latino voters as a "whole," as Dr. Oskooii has.

*2.* Although primary election data has little utility in RPV analysis (a fact Defendants ignore), Dr. Oskooii's primary election analysis also supports cohesion. Primary analysis is less informative or reliable than general election analysis because of low turnout, the auxiliary role primaries play in the political process, and the closer ideological positions of primary candidates. *See* Doc. 176-48 ¶ 24; *accord Texas v. United States*, 887 F. Supp. 2d 133, 174–75 (D.D.C. 2012), *vacated on other grounds and*

*remanded*, 570 U.S. 928 (2013); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 694 (S.D. Tex. 2017); *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1225 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999). The value of primaries or other very low turnout elections can also be limited because, as data becomes sparser, it becomes less informative, which makes estimation more difficult and potentially less precise. In this context, ecological analysis relies on applying statistical models to aggregate demographic and election data for a unit, like a voting precinct. When only a tiny percentage of voters in a unit turn out, it is less certain that some minimum portion of the vote is attributable to a particular demographic group.[9] Indeed, Defendants' expert Dr. John Alford has recognized issues with ecological analysis of low turnout elections. *See Pasadena Indep. Sch. Dist.*, 958 F. Supp. at 1220.

Notwithstanding those caveats, Dr. Oskooii's analysis shows that Black and Latino voters prefer the same candidates an estimated 90% of the time in primaries. Doc. 176-48 ¶¶ 63–65. Further, even Dr. Alford's "replicated" analysis of Dr. Trounstine's recent primaries shows that Black and Latino voters in Democratic primaries shared the same first choice candidate in 7 out of 8 contests. Doc. 176-47 at 18. Accordingly, even primary analysis supports that Black and Latino voters are cohesive and should be treated as a single minority group protected by Section 2. *See Campos*, 840 F.2d at 1245 ("The key is the

---

[9] *Cf. Alabama State Conf. of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1276 (M.D. Ala. 2020) (describing as an example of the method of bounds in EI a hypothetical "where a precinct has 100 voters, of which 75 are black and 25 are white, and the black candidate receives 80 votes. In this hypothetical, at least 55 of the black voters (80 minus 25) voted for the black candidate and at most all 75 did."). However, if, in that *Alabama* example, only 10% of registered voters show up at the polls (10 total votes), there is no reason that Anglos could not make up 100% of that very small number of voters despite being only 25% of the voting population. Thus, the data is potentially far less informative.

minority group as a whole."). Furthermore, analysis of Democratic primaries in Galveston holds *no* probative value to evaluating white bloc voting because, as Dr. Alford acknowledges, it is "clear" most Anglos voting in primary elections do so in the Republican primaries. Ex. 21 at 93:23–94:3; *see also* Doc. 176-49 ¶ 8 (Oskooii Rebuttal).

*3.* Defendants' implication that cohesion exists only when the constituent minority groups have electoral variances of less than 10% has no basis in law or logic. *See* MSJ at 44. The case they rely on, *LULAC v. Clements*, 999 F.2d 831, 864–65 (5th Cir. 1993), stands for the opposite conclusion. The Fifth Circuit determined that Black-Latino cohesion *did exist* in counties where Black-Latino voting percentages differed by more than 10% because—as is the case here—"in those counties a significant number of blacks and Hispanics usually voted for the same candidates." *Clements*, 999 F.2d at 864–65. Defendants cite no precedent for declining to treat a minority coalition as a group because different-sized majorities of the constituent parts voted for the same candidate.

Besides lacking legal foundation, bright-line rules such as 10% variance or Dr. Alford's unsupported 75% cohesion suggestion[10] make little practical sense. Such rules would in part be premised on the notion that one can pinpoint in every election a precise voting percentage of every demographic group. But not every ecological estimate is equally informative given that various factors in the data can lead to different levels of precision.

---

[10] Of note, this is not the first time Dr. Alford has manufactured a threshold for a party seeking to prevent a Section 2 challenge. *See Lopez v. Abbott*, 339 F. Supp. 3d 589, 609 (S.D. Tex. 2018) (Dr. Alford "advocated a higher threshold for finding legally significant minority political cohesion. (recommending requiring 80 to 90%) . . . . [but] did not articulate any factual or methodological reason for his opinion and he agreed that Hispanics voted cohesively for their preferred candidate. His testimony that over 70% was required for compliance with *Gingles* is not corroborated in the briefing.") (internal citation omitted).

It was exactly this type of concern that led the *Campos* court to reject discrete cohesion inquiries for each constituent part of a minority group. 840 F.2d at 1245 n.6. Rather, courts do, and should, look at all relevant evidence to determine whether "a significant number of minority group members usually vote for the same candidates" and the white majority votes as a bloc "that normally will defeat the *combined* strength of minority support." *Gingles*, 478 U.S. at 56 (emphasis added). When all relevant evidence is considered, "Galveston County does not present a borderline case." Doc. 176-48 at ¶ 12 (Oskooii Report).

*4.* Finally, Defendants ignore the ample qualitative evidence of cohesion, which itself requires denying their Motion given that "*Gingles* allows minority voters to prove their political cohesiveness even in the absence of statistical evidence of racial polarization." *LULAC v. Clements*, 986 F.2d 728, 743 (5th Cir. 1993), *on reh'g*, 999 F.2d 831 (5th Cir. 1993). In Galveston, Black and Latino communities are tied together through a common history of discrimination which has led to facing shared socio-economic and political barriers. *See supra*, III.A; V.A.ii. In the face of this, Black and Latino communities have actively organized and advocated together through the political process to address the issues that are uniquely important to their minority communities and support candidates who are responsive to their needs. *Id.* But by drawing every single Black and Latino voter into majority Anglo districts, Defendants construct a map that allows them to "ignore [these] interests without fear of political consequences . . . leaving the minority effectively unrepresented." *Gingles*, 478 U.S. at 48 n.14 (internal citation omitted).

In sum, there is ample statistical and qualitative evidence that Black and Latino voters in Galveston are politically cohesive, defeating Defendants' Motion.

### iv.   *Galveston's White Bloc Voting Cannot Be Dismissed as Mere Partisanship.*

Defendants' contention that *Gingles* is not satisfied because "Plaintiffs cannot show that race—not partisan politics—accounts for . . . White-bloc voting," MSJ at 55, fails legally and factually. The Fifth Circuit has squarely rejected placing an evidentiary burden in the first instance on Plaintiffs to negate the role of partisanship, *Teague v. Attala County*, 92 F.3d 283, 290 (5th Cir. 1996), and this Court rightfully rejected Defendants' attempt to impose this burden at the pleading stage. Doc. 123 at 34–35. Defendants double-down on this legal fallacy by arguing that "Plaintiffs have a negative causative requirement" to disprove partisanship and "cannot carry their burden." MSJ at 50. But Plaintiffs have satisfied *Gingles* with evidence of significant RPV, and thus it is now Defendants' burden to show that these voting patterns are best explained by non-racial phenomena; the Court must then weigh all available evidence. *See, e.g.*, *Teague*, 92 F.3d at 290; *Lopez v. Abbott*, 339 F. Supp. 3d 589, 604 (S.D. Tex. 2018); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 760 (S.D. Tex. 2013), *aff'd*, 601 F. App'x 255 (5th Cir. 2015). Because partisanship and race can be correlated, the ultimate inquiry requires a "searching practical evaluation of the past and present reality . . . [and] courts *should not* summarily dismiss vote dilution claims in cases where racially divergent voting patterns correspond with partisan affiliation." *Clements*, 999 F.2d at 860–61 (cleaned up, emphasis added).

Defendants incorrectly believe they can simply invoke the "partisan" mantra to dismiss extreme racial bloc voting without explaining what they actually mean by "partisan politics." MSJ at 49. But Defendants have a burden to explain how partisanship in the County is not tinged by racial considerations. *See Clements*, 999 F.2d at 861 ("[W]e do not

23

indulge in the hopeful yet unrealistic assumption that decisions to support particular political parties among black and white voters in all cases rest on issues other than race."). "A longstanding finding in political science is that most Americans do not think of politics in coherent, ideological ways. Rather . . . , research indicates that people tend to think about parties in terms of [social] groups," including racial groups. Ex. 22 at 7 (Stephens-Dougan Report) (internal citations omitted). Defendants do not explain what race-neutral consideration they contend partisan labels represent, much less offer any affirmative evidence to counter the unambiguous evidence of racially divergent voting patterns. Their expert concedes that he did not conduct any analysis of voter motivations, nor did he analyze whether any variable, including voters' partisan identification or political ideology (which he concedes are distinct and not necessarily correlated concepts), is more correlated with voting patterns in Galveston than the race of the voters. Ex. 21 at 19:9–13, 20:9–12, 77:15–78:7, 83:24–84:20 (Alford Dep.). He engages only in speculatively re-characterizing Plaintiffs' evidence.[11] Defendants thus have failed to adduce evidence that would meet their burden, and certainly have not established as a matter of law that race is _*not*_ a significant explanation for voting patterns.

Factually, there is ample evidence in Galveston of racial polarization that cannot be rebutted or explained by mere partisanship. The case on which Defendants singularly rely,

---

[11] Several other courts have criticized, and declined to adopt, Dr. Alford's method of analysis. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759, 840–41 (M.D. La.), *cert. granted before judgment*, 142 S. Ct. 2892 (2022) (finding "Dr. Alford's opinions border on *ipse dixit*. . . . unsupported by meaningful substantive analysis and [] not the result of commonly accepted methodology in the field."); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1306–07 (N.D. Ga. 2022) (collecting cases criticizing Dr. Alford and his approach, including five Texas courts finding in favor of minority plaintiffs on *Gingles* II and III contrary to Dr. Alford's testimony).

*Clements*, primarily rested its partisanship finding on two factors not present here: (1) white voters constituted a majority of both political parties and "30-40% of white voters consistently support Democrats, making white Democrats more numerous than all of the minority Democratic voters combined," and (2) "both political parties, and especially the Republicans, aggressively recruited minority lawyers to run on their party's ticket" meaning voters were "not infrequently voting against candidates sharing their respective racial or ethnic backgrounds." 999 F.2d at 861. By contrast, in Galveston, there is minimal crossover voting by Anglo voters: Dr. Oskooii's analysis shows that Anglos in Galveston support Democratic candidates at percentages in the low teens—less than half the rate as in *Clements*. *See* Doc. 176-48 ¶¶ 40–43, 47–48, 61–62. And across 20 years, Defendants point to just two instances of white Republicans supporting minority candidates: the 2018 election between Ted Cruz and Beto O'Rourke and a 2004 race for County Commissioner. *See* MSJ at 46, 50–51.[12]

As Dr. Oskooii points out, there is not a single popularly elected Republican in Galveston County government that outwardly presents as a person of color, whereas every elected Democrat presents as a person of color. Doc. 176-49 ¶ 7. When minority success within a political party is practically nonexistent, this "is a strong indication that partisan choice does not explain the inability of white voters to support the Latino-preferred

---

[12] Besides being outdated, the 2004 race has little relevance here given that more Anglos in Galveston supported the Democratic party at that time. *See* Ex. 15 at 22:21–23:7, 23:17–20 (Apffel Dep.). Anglos shifting to the Republican party after 2010 corresponds with the increasing racialization of political parties after Barack Obama's 2008 election. *See* Ex. 22 at 22–24 (Stephens-Dougan Report) (describing research finding that "[s]ince 2008, . . . many racially resentful whites have outright fled the Democratic party").

candidate, but is more consistent with racial block voting." *Rodriguez*, 964 F. Supp. 2d at 776–77; *cf.* Ex. 3 at 57:3–7 (Armstrong Dep.) ("For the NAACP leadership and for the LULAC leadership, there are probably no opportunities to – to rise to leadership in the Republican party."); Ex. 7 at ¶ 5 (Quintero Decl.).

As for the 2014 County Judge race between Republican Mark Henry and Independent Bill Young, Defendants err when they contend this shows partisan considerations overtaking racially polarized voting. MSJ at 51. Rather, it is an example of the statistical peril of analyzing anomalous elections without proper context. Election results from 2014 show that roughly 16% fewer voters participated in the County Judge race (53,360) compared to other contested countywide elections (~62,000), and Judge Henry received fewer votes than other countywide Republican candidates. Ex. 23 (2014 General Election Returns).[13] Given that (1) Judge Henry received fewer total votes than other countywide Republicans and (2) Latinos were otherwise voting at rates over 70% for Democratic candidates in 2014, *see* Doc. 176–4 at 17 (Barreto Report, App'x A Table 1), the logical conclusion would not be that most Latinos suddenly switched to support Republican Henry, but rather that most did not vote in that race and some supported Young.

Additionally, Defendants ignore entirely the report of Dr. LaFleur Stephens-Dougan, a political scientist and expert in race, ethnicity, and politics who studies the role of race in partisanship. Noting that most Americans no longer espouse overtly racist

---

[13] These election results were produced by Defendants in a difficult-to-read technical format. They are also available at https://www.galvestonvotes.org/home/showpublisheddocument/7305/637595458881430000 in a more accessible format. For the Court's convenience, Plaintiffs request judicial notice of the Galveston County website's publication of those results. *See Cicalese v. Univ. of Texas Med. Branch*, 456 F. Supp. 3d 859, 871 (S.D. Tex. 2020) ("[G]overnmental websites are proper sources for judicial notice.").

26

opinions, she describes historical strategies, gold-standard surveys, and sociological experiments that show how political actors sometimes deploy seemingly racially-neutral language to activate engrained racial considerations and stereotypes in voters. Ex. 22 at 14–24 (Stephens-Dougan Report). And she offers local examples that illustrate the deep connection between race and partisan identification, opining that "Galveston County, Texas fits the well-accepted academic model of racial and partisan alignment," *id.* at 35, where Republican voters view the Democratic party as a "vehicle for advancing distinctively minority interests." *Clements*, 999 F.2d at 860–61. Her unrebutted report is precisely the kind of non-statistical, "analytical evidence of voter polarization" that courts use to inform racially polarized voting patterns, *see Robinson v. Ardoin*, 605 F. Supp. 3d 759, 845 (M.D. La.), *cert. granted before judgment*, 142 S. Ct. 2892 (2022), and blocks Defendants' attempts to undermine Plaintiffs' conclusive statistical evidence of RPV.

Finally, lay testimony illustrates the role of racial considerations in white bloc voting. Residents think of race and party as interchangeable proxies for each other in Galveston. Ex. 8 at 212:25–214:6 (Courville Dep.); Ex. 11 at 81:16–24 (Williamson Dep.); Ex. 3 at 49:22–50:11 (Armstrong Dep.); Ex. 16 at 30:7–24, 284:14–21 (Giusti Dep.); *cf. Patino*, 230 F. Supp. 3d at 703–04. Whether or not the Anglo-elected officials are responsive to minority communities "is intimately related" to the legal significance of bloc voting because if there is bloc voting, it "allows those elected to ignore [minority] interests without fear of political consequences." *Clements*, 999 F.2d at 857. Here there is evidence that Galveston's Anglo/Republican elected officials are unaware of issues facing or are unresponsive to the minority community. *See, e.g.*, *supra*, III.A; Ex. 8 at 214:7–215:13

(Courville Dep.); Ex. 16 at 285:16–287:5 (Giusti Dep.); Ex. 15 at 86:4–88:2, 300:3–6 (Apffel Dep.); Ex. 12 at 66:3–16 (Henry Dep.); Ex. 7 at ¶¶ 8–11 (Quintero Decl.) Evidence also shows explicit and implicit racial discrimination in campaigns and barriers to political participation for communities of color. *See supra*, III.A.

In sum, Defendants misstate the framework for assessing the legal significance of racial bloc voting when race and partisanship are highly correlated. But under the appropriate standards, Plaintiffs' evidence shows that the racially divergent voting patterns in Galveston are closely linked to race and satisfy the *Gingles* preconditions.

B.  <u>The Court Should Deny Defendants' Motion for Summary Judgment on Plaintiffs' Claim of Racial Gerrymandering.</u>

The Enacted Plan is a "textbook example of a racial/ethnic gerrymander," cracking Galveston's substantial Black and Latino population nearly equally between all four Enacted Precincts. Doc. 176-2 ¶¶ 17–18 (Cooper Report). Defendants do not (and cannot) dispute the demographic reality of their plan, which contravenes the very purpose of the Fourteenth Amendment's prohibition on a government "'separat[ing] its citizens into different voting districts on the basis of race'" without "sufficient justification." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). Importantly, a bizarre shape is not required to show a district is racially gerrymandered, because even a compact district can be gerrymandered when its lines are "considered in conjunction with [the district's] racial and population densities." *Miller*, 515 U.S. at 913, 916. And race may unconstitutionally "predominate even when a reapportionment plan respects traditional principles." *Bethune-Hill*, 580 U.S. at 189.

Evidence adduced in discovery makes clear there are material factual disputes as to whether "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller*, 515 U.S. at 916). Defendants' assertions about the map-drawing process reinforce that such disputes exist to preclude summary judgment.

Defendants would have this Court believe that they promulgated and followed a discrete set of redistricting criteria, not one of which had a racial aspect. But the record here establishes the opposite. In a deviation from established past practice, the Commissioners Court never adopted or disclosed redistricting criteria during the 2021 process. Ex. 12 at 94:20–22, 125:22 (Henry Dep.). As a result, the County electorate had no insight into what factors would be considered in drawing or adopting new precinct lines.

Defendants now argue they applied a defined set of criteria in drafting and adopting the Enacted Plan, citing their counsel's hearsay interrogatory responses that set forth a list of six purported criteria. *See* Doc. 176-34. But deposition testimony from County Judge Henry and Commissioners Apffel and Giusti reveal this interrogatory response to be no more than a *post hoc* fabrication. Each witness testified under oath they did not request, apply, or even fully understand these criteria. Ex. 12 at 249:16–20 (Henry Dep.); Ex. 15 at 136:5–137:21 (Apffel Dep.); Ex. 16 at 53:2–21 (Giusti Dep.). And Judge Henry, who certified those interrogatory responses, stated unequivocally he depended on counsel to draft them without consulting the Commissioners who voted for the Plan. Ex. 12 at 247:21–23 (Henry Dep.). These interrogatory responses are inadmissible hearsay that contradict sworn testimony and have no bearing on the criteria actually applied in drawing the

Enacted Plan. *See Bethune-Hill*, 580 U.S. at 189–90 ("The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not.").

Here is what that evidence at trial will show: The factors that were *actually* considered in drafting and adopting the Enacted Plan render its configuration inexplicable unless race predominated in its drafting. When the government seeks to achieve particular goals, "the 'predominance' question concerns *which* voters the legislature decides" to move to achieve those goals. *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 273 (2015). Here, "it was just plain as day obvious" it was not necessary to wholly dismantle benchmark Precinct 3 and crack Galveston's Black and Latino populations to achieve Defendants' goals. Ex. 19 at 85:2–4 (Cooper Dep.).

Equalizing populations was the predominant consideration, according to Judge Henry and Commissioners Apffel and Giusti. Ex. 12 at 249:16–20 (Henry Dep.); Ex. 15 at 208:25–209:4 (Apffel Dep.); Ex. 16 at 53:11–19 (Giusti Dep.). But the Enacted Plan "did not follow a simple redistricting solution to population imbalances resulting from the 2020 Census," *i.e.,* shifting two VTDs to balance populations, and instead was an unnecessary "full-scale remap," which eliminated the sole existing majority-minority district while "fundamentally altering the geographic population configurations of all four commissioner precincts." Doc. 176-2 ¶¶ 53, 81, 83 (Cooper Report). In any event, "legislative effort[] to create districts of approximately equal population" is "taken as a given" and not a factor that weighs against race predominating in a given plan. *Alabama*, 575 U.S. at 271–72.

Judge Henry also testified that the overriding preference driving his adoption of the Enacted Plan was a desire for a coastal precinct. Ex. 12 at 175:2–11 (Henry Dep.). But as Cooper Illustrative Maps 2, 3, and 3A all show, this consideration also did not require the cracking of Galveston's Black and Latino populations. *See* Doc. 176-2 ¶ 54; Doc. 176-29 at 12. Nor would the more minor considerations, such as residency addresses, mentioned by Commissioner Giusti. Ex. 16 at 138:19–25 (Giusti Dep.).

Even the *post hoc* criteria developed by counsel in interrogatory responses did not require the systematic cracking of the Black and Latino population in the Enacted Plan. As noted above, Cooper's illustrative plans prove that ensuring reasonable compactness, limiting VTD and municipal splits, and respecting incumbency were all possible without cracking Black and Latino communities. *See supra* Section V.A.ii. And as for the final criterion that any plan should "reflect[] the partisan composition of Galveston County," Doc. 176-34 at 9, Judge Henry, Commissioner Apffel, and Commissioner Giusti all disclaimed having any partisan aims in voting for the Enacted Plan. *See, e.g.*, Ex. 12 at 257:3–7 (Henry Dep.); Ex. 15 at 193:6–8 (Apffel Dep.); Ex. 16 at 138:19–25 (Giusti Dep.). And even if it were considered, "reflect[ing] the partisan composition" of the County would favor preserving at least one Democratic-leaning precinct, given Galveston tends to vote just above 60% Republican. *See, e.g.*, Doc. 176-28; Ex. 12 at 43:7–12 (Henry Dep.).

Additional evidence confirms that Defendants "subordinated traditional race-neutral districting principles . . . to racial considerations." *Bethune-Hill*, 580 U.S. at 187 (quoting *Miller*, 515 U.S. at 916). For example, the Enacted Plan completely disregarded the well-established traditional criteria of respecting traditional boundaries, preserving core

districts, and ensuring consistency in representation between constituents and incumbents. *See* App'x A-3 (2021 Enacted Plan with Benchmark Precinct 3 Overlay); *see also, e.g.*, *Sensley v. Albritton*, 385 F.3d 591, 598 (5th Cir. 2004) (rejecting plans that "ignor[ed] that traditional municipal boundary and disrupt[ed] the core of the preexisting electoral district"). Defendants also decided not to take any measures to assess, much less prevent, unconstitutional vote dilution. To the contrary, Judge Henry and Commissioner Apffel testified that they specifically disfavored Precinct 3 because they viewed it as a racial gerrymander. Ex. 12 at 241:8–19 (Henry Dep.); Ex. 15 at 263:21–265:15 (Apffel Dep.). But there is no evidence they took steps to confirm this fact or even to assess whether preservation of a majority-minority district was required. *See Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018) (rejecting state's explanation when it could "point[] to no actual 'legislative inquiry' that would establish the need for its manipulation of the racial makeup of the district").

Defendants misrepresent Plaintiffs' claims and applicable law in arguing that "maintaining prior district boundaries to preserve a minority-opportunity district that was drawn on the basis of race is, in itself, a form of unconstitutional racial sorting." MSJ at 56. First, this is not an accurate description of Plaintiffs' racial gerrymandering claim, which alleges that race predominated in the drawing of the Enacted Plan, not just that a failure to work from benchmark Precinct 3 was itself unconstitutional. NAACP First Am. Compl. at ¶ 150, No. 3:22-cv-117, Doc. 38. Second, neither case on which Defendants rely supports that a least-change approach here would be unconstitutional. As noted above, the court in *Jacksonville Branch of the NAACP* held that "maintaining high BVAP percentages

32

in the minority access districts was the criterion that could not be compromised," despite public commentary and reports from Black voters and leaders that packing Black voters was not necessary for their ability to vote for the candidate of their choice. 2022 WL 7089087, at *8–23, 46. *Walters v. Boston City Council* is even less on point, as there the "the concept of 'core retention' was not a focus of discussion" by the City Council, which instead focused on racial quotas such as "60% of non-white or ideally pushing it higher." No. CV 22-12048-PBS, 2023 WL 3300466, at *10, 12 (D. Mass. May 8, 2023). Here, by contrast, Defendants were aware that Black and Latino voters needed a district similar to Precinct 3 to have any chance of electing their candidate of choice based on their own political experience, the prior objections by the Department of Justice, and public comments. *See, e.g.*, Ex. 12 at 225:23–226:1 (Henry Dep.). And Defendants cite no direct evidence that the configuration of Benchmark Precinct 3 was due to a racial quota or race predominating in its drafting.

Instead, the evidence shows that Defendants intentionally crafted a map with the predominating feature of dismantling Precinct 3 and cracking Black and Latino voters among all four new precincts when such a result was otherwise unnecessary to achieve Defendants' stated goals. That Defendants sought to do this is all the more striking given that the County failed preclearance in the prior redistricting cycle due to potential discriminatory purpose in diluting minority voting power in Precinct 3. Doc. 176-7 (2012 DOJ Objection). Seen in context, the fact that each of the four Commissioners precincts in the Enacted Plan had roughly the same percentage of Black and Latino CVAP in them strongly suggests use of a racial target, one of the most direct forms of evidence of a racial

gerrymander. *See, e.g.*, *Cooper*, 581 U.S. at 300; *Alabama*, 575 U.S. at 267.

Even the specific boundaries of the Enacted Plan reveal that cracking minority voters at the voting precinct level predominated over other considerations. Despite a purported goal of minimizing voting precinct splits, the Enacted Plan split longtime voting precinct 336, which has the highest Black CVAP in the County and is considered a strong community of interest. *See* Ex. 17 (Galveston Blocks Data tab showing highest Black population in Precinct 336); Ex. 8 at 167:9–22 (Courville Dep.); Ex. 14 at 16:3–13 (Nov. 12 Hr'g Tr.). "Splitting precincts, especially when doing so is contrary to a legislature's stated redistricting criteria, can support a finding of discriminatory intent." *LULAC v. Abbott*, 617 F. Supp. 3d 622, 632 (W.D. Tex. 2022).

Thomas Bryan's declaration that he was never instructed to consider racial demographic data to draft the Enacted Plan does not help Defendants' case. Bryan's analyses contain detailed racial data and, in the analyses sent to the Commissioners Court, color-coded shading indicated where the highest percentages of minorities live in each map proposal. Ex. 17 at 12 ("Pop Pivot" tab). Courts have discredited testimony that a mapdrawer used only partisan data when drawing maps when the mapdrawer gave "self-contradictory testimony" that indicated actual use of race. *Cooper*, 581 U.S. at 315. Here, too, the Court should be suspicious of Bryan's stated process and objectives and, at the very least, must give the non-moving party the benefit of any doubt.

Moreover, Bryan did not work in isolation, but rather at the direction of Dale Oldham and others who have not disclaimed relying on race. *See generally*, Doc. 176-32 (Oldham Decl.). Furthermore, Oldham fed Bryan information based on conversations with

34

members of the Commissioners Court, as well as third parties, all of which determined what kind of draft maps would be offered as options. *Id.* at ¶¶ 8–14; Doc. 176–36 ¶ 8 (Bryan Decl.). And not only did Judge Henry and the Commissioners understand the racial geography of their County while giving this input, *see, e.g.*, Ex. 12 at 53:22–54:20 (Henry Dep.), Oldham also received detailed racial data, broken down to the block level as well as by draft Commissioners' precincts when he was advising on the map configurations. *See* Ex. 17; Ex. 18. Oldham cannot reasonably deny understanding the racial demographics of Galveston County, given his experience with the 2011 redistricting cycle. *See S.C. State Conf. of NAACP v. Alexander*, No. 21-CV-03302-MGL-TJH-RMG, 2023 WL 118775, at *2 (D.S.C. Jan. 6, 2023) ("[C]laims that an experienced map drawer did not consult racial data in drawing the plan ring 'hollow[.]'") (quoting *Cooper*, 581 U.S. at 314).

Given this direct and circumstantial evidence, Plaintiffs can make a "showing sufficient to support" an allegation of race-based decision-making that could overcome even the presumption of good faith in redistricting. *Miller*, 515 U.S. at 915. It is up to the trial court to "perform a 'sensitive inquiry into[']" whether race predominated in the Plan's development and adoption. *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) (quoting *Hunt v. Cromartie*, 526 U.S. 541 at 546 (1999)). Accordingly, this issue cannot be appropriately determined on summary judgment.

## VI.   CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment should be denied in full.

Respectfully submitted this 2nd day of June, 2023.

/s/   *Hilary Harris Klein*

**SOUTHERN COALITION FOR SOCIAL JUSTICE**

Hilary Harris Klein*
North Carolina Bar No. 53711
Adrianne M. Spoto*
DC Bar No. 1736462
1415 W. Hwy 54, Suite 101
Durham, NC 27707
919-323-3380 (Telephone)
919-323-3942 (Facsimile)
hilaryhklein@scsj.org
adrianne@scsj.org

**TEXAS CIVIL RIGHTS PROJECT**

Hani Mirza
Texas Bar No. 24083512
Joaquin Gonzalez*
Texas Bar No. 24109935
Sarah Xiyi Chen*
Attorney-in-Charge
California Bar No. 325327
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
hani@texascivilrightsproject.org
joaquin@texascivilrightsproject.org
schen@texascivilrightsproject.org

**WILLKIE FARR & GALLAGHER LLP**

Richard Mancino*
New York Bar No. 1852797
Michelle Anne Polizzano*
New York Bar No. 5650668
Andrew J. Silberstein*
New York Bar No. 5877998
Molly Linda Zhu*
New York Bar No. 5909353
Kathryn Carr Garrett*
New York Bar No. 5923909
787 Seventh Avenue

36

New York, New York 10019
212-728-8000 (Telephone)
212-728-8111 (Facsimile)
rmancino@willkie.com
mpolizzano@willkie.com
asilberstein@willkie.com
mzhu@willkie.com
kgarrett@willkie.com

Diana C. Vall-llobera*
DC Bar No. 1672102
1875 K Street, N.W.
Washington, DC 20006-1238
(202) 303-1000 (Telephone)
(202) 303-2000 (Facsimile)
dvall-llobera@willkie.com

**SPENCER & ASSOCIATES, PLLC**
Nickolas Spencer
Texas Bar No. 24102529
9100 Southwest Freeway, Suite 122
Houston, TX 77074
713-863-1409 (Telephone)
nas@naslegal.com

***COUNSEL FOR NAACP PLAINTIFFS***
*admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 2, 2023, the foregoing document, its appendix, and its exhibits were filed electronically (via CM/ECF), and that all counsel of record were served by CM/ECF.

/s/   *Hilary Harris Klein*

**APPENDIX A**

**TO NAACP PLAINTIFFS' RESPONSE IN OPPOSITION**

**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*Excerpt of Commissioners Precinct Configurations from January 13, 2023 Report of*

*William Cooper (Doc. 176-2) and March 27, 2023 Rebuttal Report (Doc. 176-29).*

Appendix A-1: Benchmark Plan[14]

**Figure 6: Galveston County Commissioners' Court — Benchmark Plan**



---

[14] Figure 6 from Cooper Report (Doc. 176-2 at 17).

2

Appendix A-2: 2021 Enacted Plan[15]

**Figure 8: Galveston County Commissioners Court — 2021 Enacted Plan**



---

[15] Figure 8 from Cooper Report (Doc. 176-2 at 20)§.

3

Appendix A-3: 2021 Enacted Plan with Benchmark Precinct 3 Overlay[16]

**Figure 9: 2021 Enacted Plan with Benchmark Precinct 3 Overlay**



---

Appendix A-4: 2021 Proposed Plan 1[17]



**Figure 12: Galveston County — 2021 Proposed Plan 1**



---

[17] Figure 12 from Cooper Report (Doc. 176-2 at 27).

Appendix A-5: Cooper Illustrative Map 1[18]

**Figure 14: Galveston County — Illustrative Map 1**



Appendix A-6: Cooper Illustrative Map 2[19]

**Figure 16: Galveston County — Illustrative Map 2**



---

[19] Figure 16 from Cooper Report (Doc. 176-2 at 33).

7

Appendix A-7: Cooper Illustrative Map 3[20]

**Figure 18: Galveston County — Illustrative Map 3**



---

Appendix A-8: Cooper Illustrative Map 3A[21]

**Figure 3: Galveston County — Illustrative Map 3A**



---

[21] Figure 3 from Cooper Rebuttal Report (Doc. 176-29 at 12).