# EXHIBIT  1

*Expert Declaration and Report of Traci Burch, dated January 27, 2023*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| DICKINSON BAY AREA BRANCH NAACP, et al., | § § § | |
| *Plaintiffs,* | § § § | |
| v. | § § | Civil Action No. 3:22-cv-117- JVB |
| GALVESTON COUNTY, TEXAS, et al., | § § § | |
| *Defendants.* | § § | |
| TERRY PETTEWAY, et al., | § § § | |
| *Plaintiffs,* | § § § | |
| v. | § § | Civil Action No. 3:22-cv-57-JVB [Lead Consolidated Case] |
| GALVESTON COUNTY, TEXAS, et al. | § § | |
| *Defendants.* | § § | |
| UNITED STATES OF AMERICA, | § § § | |
| *Plaintiff,* | § | |
| v. | § § § | Civil Action No. 3:22-cv-93-JVB |
| GALVESTON COUNTY, TEXAS, et al. | § § | |
| *Defendants.* | § § | |

**EXPERT DECLARATION AND REPORT OF TRACI BURCH**

JANUARY 27, 2023

## TABLE OF CONTENTS

QUALIFICATIONS AND BACKGROUND .............................................................................1

SCOPE OF THE REPORT ................................................................................................2

OPINIONS OFFERED .....................................................................................................3

  A.  Summary ...........................................................................................................3

  B.  *Arlington Heights* Analysis ...............................................................................4

     *Racially Disparate Impact* .............................................................................4

     *Historical Background* ...................................................................................8

     *Sequence of Events* .....................................................................................10

     *Departures from the Normal Procedural Sequence* ....................................14

     *Contemporaneous Statements* .....................................................................20

  B.  The "Senate Factors" ......................................................................................21

     *Senate Factor 5: Effects of discrimination* .................................................21

       1.  Education ...........................................................................................22

       2.  Income, Poverty, and Wealth ............................................................24

       3.  Housing and Racial Residential Segregation ....................................27

       4.  Health ................................................................................................29

       5.  Criminal Justice ................................................................................30

     *Senate Factor 6: Racial Appeals in Campaigns* .........................................31

     *Senate Factor 7: Minority Elected Officials* ...............................................32

     *Senate Factor 8: Lack of Responsiveness* ...................................................33

     *Senate Factor 9: Tenuousness* ....................................................................36

APPENDIX A: WORKS CITED

APPENDIX B: ALTERNATIVE MAPS

APPENDIX C: CURRICULUM VITAE

## QUALIFICATIONS AND BACKGROUND

My name is Traci Burch. I am an Associate Professor of Political Science at Northwestern University and Research Professor at the American Bar Foundation. I received my Ph.D. in Government and Social Policy from Harvard University in 2007.

Over the past 15 years, I have led several large, long-term quantitative and qualitative research projects on political participation in the United States. I have participated in and coauthored several book chapters and articles that examine race, political participation, and inequality, and am widely regarded as an expert on political behavior, barriers to voting, and political participation. My work has been widely cited and replicated and has won several awards. In particular, my dissertation on the effects of felony disenfranchisement on voting in North Carolina, Georgia, and other states, "Punishment and Participation: How Criminal Convictions Threaten American Democracy" won the Robert Noxon Toppan Prize for the Best Dissertation on a Subject of Political Science at Harvard in 2007. I also achieved national recognition for this work; the dissertation was also awarded the E.E. Schattschneider Award from the American Political Science Association for the best dissertation in American Government, and the William Anderson Award for the best dissertation in federalism, intergovernmental relations, and state and local politics.  Several articles from this dissertation, including work evaluating voting patterns among people with felony convictions in North Carolina, Georgia, Florida, Missouri, and Michigan, have been published in leading peer-reviewed journals.

My articles "Did Disfranchisement Laws Help Elect President Bush? New Evidence on the Turnout and Party Registration of Florida's Ex-Felons" and "Turnout and Party Registration among Criminal Offenders in the 2008 General Election," which appeared in the peer-reviewed journals Law and Society Review and Political Behavior, respectively, included my calculations of felony disenfranchisement. My academic book on the community-level effects of criminal convictions on political participation, *Trading Democracy for Justice*, was published by the University of Chicago Press and also won multiple national awards from the American Political Science Association and its sections, including the Ralph J. Bunche Award for the best scholarly work that explores the phenomenon of ethnic and cultural pluralism and best book awards from the law and politics and urban politics sections. *Trading Democracy for Justice*, as well as the articles "The Effects of Imprisonment and Community Supervision on Political Participation," "Did Disenfranchisement Laws Help Elect President Bush?" "Skin Color and the Criminal Justice System," "The Old Jim Crow," and "Turnout and Party Registration among Criminal Offenders in the 2008 General Election" rely on the analysis of large criminal justice and voter registration data files. In addition to my published work, I also have conducted analyses of legal financial obligations and barriers to voting as an expert witness.

I have worked with Professors Kay Schlozman, Sidney Verba, and Henry Brady on book chapters and articles related to the causes and consequences of inequality in political participation. I also collected data on congressional hearings and interest group activities for that book. For my coauthored article with Jennifer Hochschild and our book with Vesla Weaver, I analyzed the legislative history of several racial policies, including the 1965 Hart-Cellar Act. We explore political participation and attitudes in our book as well.

1

I have testified before the U.S. Commission on Civil Rights about the collateral consequences of felony convictions with respect to voting and other issues. I have received several grants for my work, including a grant from the Stanford University Center on Poverty and Inequality. I also serve as co-Principal Investigator on a National Science Foundation grant that supports graduate and postdoctoral fellowships at the American Bar Foundation. I have served on Editorial Boards of leading journals including Political Behavior and Law and Social Inquiry. Currently, I am on the Board of Overseers for the General Social Survey, a longstanding national public opinion survey run by the National Opinion Research Center at the University of Chicago. I routinely review the work of my peers for tenure, scholarly journals, university presses, and grants and have served as a reviewer for the American Political Science Review, The American Journal of Political Science, The Journal of Politics, Political Behavior, the National Science Foundation, Cambridge University Press, Princeton University Press, the University of Chicago Press, Oxford University Press, and many other entities. I also am a member of the Executive Council of the Elections, Public Opinion, and Voting Behavior Section of the American Political Science Association.

My curriculum vitae is appended to this declaration as Appendix C. I am being compensated $350 per hour for work in this case, plus expenses, and my payment is not contingent upon the outcome of this case. This is my tenth engagement as an expert witness. I previously testified at trial or in a deposition or both in the following matters: *Jones vs. DeSantis*, Consolidated Case No. 4:19-cv-300 (N.D. Fla.); *Community Success Initiative v. Moore*, Case No. 19-cv-15941 (N.C. Super. Ct.); *People First of Alabama v. Merrill*, Case No. 2:20-cv-00619-AKK (N.D. Ala.); *Florida State Conference of the NAACP v. Lee*, Case No. 4:21-cv-00187-MW-MAF (N.D. Fla.). I was also deposed in the matters *One Wisconsin Institute Inc. v. Jacobs*, Case No. 15-CV-324-JDP (W.D. Wis.), and *Luft v. Evers*, Case No. 20-CV-768-JDP (E.D. Wis.), and testified in a preliminary injunction hearing in *Robinson et al. v. Ardoin,* Case No. 22 CV-00211 (M.D. La.) In all cases where an opinion was issued, the courts accepted and relied on my expert testimony.

## **SCOPE OF THE REPORT**

I was asked by counsel for the Petteway Plaintiffs and NAACP Plaintiffs to conduct an analysis of the adoption of the 2021 enacted map in light of the guidelines set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), as well as under certain Senate Factors related to Section 2 of the Voting Rights Act. As I understand that other experts will focus on the historical background of the redistricting, racially disparate impact, and racially polarized voting in Galveston more broadly, I focus my report on the other *Arlington Heights* factors and a totality of the circumstances analysis under Section 2 of the VRA.

## OPINIONS OFFERED

A. <u>Summary</u>

Based upon my research and analysis, I conclude the following:

1. The historical record suggests that the Commissioners Court acted intentionally in 2021 to pass a map that would diminish the ability of Galveston's minority voters, and specifically Black and Latino voters, to elect a candidate of their choice because the Commissioners Court believed they could accomplish that goal in the wake of the 2013 Supreme Court decision in *Shelby County v. Holder.*

2. The redistricting process the Commissioners Court undertook in 2021 deviated from the county's past practice with respect to redistricting. Specifically:

    i. the Commissioners Court failed to adopt any redistricting criteria to guide the process as they did in 2001 and as other counties in Texas continue to do today;

    ii. unlike in past redistricting cycles, the Commissioners Court held only one public hearing to discuss the commissioners precinct map; that meeting was held the day before the candidate filing period opened for the next general election;

    iii. the Commissioners Court failed to publicly release any information or analysis regarding the 2020 Census results to Galveston residents at any point in the process;

    iv. the single redistricting hearing took place during business hours and at a location that was too small for the assembled crowd, in contrast to the multiple locations and evening times offered in the prior redistricting cycle;

    v. the sole minority member of the Commissioners Court and the representative of the majority-minority precinct was excluded from key deliberations of the court.

    Notably, the Commissioners Court was on notice of several of these deviations, and their significance, such as the failure to adopt redistricting criteria and exclusion of the only representative of the majority-minority precinct, because these procedural deviations were noted by the U.S. Department of Justice in its 2012 preclearance objection letter as probative of discriminatory intent in the prior redistricting cycle.

3. The conduct of County Judge Mark Henry in particular indicates a disregard for the input of minority voters in the redistricting process. This is apparent from his failure to take into account substantial written public comments rejecting both proposed maps as racially discriminatory, as well as his comments during the November 12, 2021 public hearing, among other factors.

4. Black and Hispanic residents of Galveston County face disadvantages with respect to education, income, employment, health, housing, and criminal justice. These factors can affect voter participation.

5. Race and implicit racial cues still appear in campaign materials and politicians' statements in Galveston County.

6. Historically, Galveston County only rarely has elected minority candidates for office; only three minority members have been elected to the Commissioners Court since 1990.

7. With the exception of the commissioner elected in the majority Black and Latino district, elected officials are not responsive to the needs of Black and Hispanic constituencies in Galveston.

8. The stated reasons for supporting the adopted plan—adhering to "one person one vote," equalizing districts within ten percentage points, establishing a coastal precinct based on community of interest, and majority support for the adopted plan—are either unsupported by the legislative record or can be accomplished without eliminating the majority Black and Latino precinct.

In formulating these opinions, I relied on my analysis of standard sources for political scientists such as my review of the relevant literature in political science and other disciplines. I also relied on documents provided to me by the attorneys for the plaintiffs such as deposition and trial transcripts. I also analyzed publicly available information, including websites, recordings of public meetings, newspaper articles, and data from the census and other surveys. All of the data and facts relied upon in forming these opinions, as well as assumptions I made in forming my opinions, are cited in this report and included in its Appendix.

B. *Arlington Heights* Analysis

The Supreme Court, in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), outlined the following factors as relevant to determining discriminatory intent: (1) "The impact of the official action" -- whether it "bears more heavily on one race than another," (2) "The historical background of the decision," (3) "The specific sequence of events leading up to the challenged decision," (4) "Departures from the normal procedural sequence," and (5) "The legislative or administrative history . . . especially where there are contemporary statements by members of the decision making body, minutes of its meetings, or reports." *Id.* at 266–68. I discuss evidence that the court may find useful for evaluating each of the Arlington Heights factors in the following sections.

*Racially Disparate Impact*

As a starting point, the Court in *Arlington Heights* looks to whether "the official action . . . bears more heavily on one race than another." The  redistricting plan enacted in 2021 fragments the only pre-existing majority-minority commissioners precinct in Galveston, Precinct 3, dividing its population among four new commissioners precincts.[1] As a result, this new plan establishes all four precincts as majority-White in terms of total population, voting-age population, and citizen

---

[1] *See generally*, Expert Report and Declaration of William S. Cooper, Section III.B (January 13, 2013).

voting age population.[2] For several reasons, the discriminatory impact of the maps was foreseeable, and indeed foreseen, by the Commissioners Court.

*First*, the evidence supports that drawers and supporters of the 2021 enacted plan knew about the racially disparate impact on Galveston's Black and Latino voters. Judge Henry and Commissioner Ken Clark were on the Commissioners Court when a map that diluted minority voting power was not precleared by the Department of Justice in 2011, and thus knew that Precinct 3 functioned as a majority-minority precinct.[3] They had retained the same counsel from the 2011 cycle, Dale Oldham, to draw their map in 2021.

The record also indicates that the Commissioners Court either reviewed racial data or were otherwise aware of the County's demographics such that they knew the 2021 enacted plan would fragment the only majority-minority precinct among all four new precincts. For example, Judge Henry acknowledged that he was aware that Precinct 3 was a majority-minority precinct,[4] as did Commissioner Giusti.[5] Judge Henry also acknowledged that he knew at the time that the enacted plan would split what was the majority-minority Precinct 3 among the four new precincts.[6] Commissioner Apffel admits that he saw racial data about the new precincts "but just for a second" (Ferguson 2021a).

*Second*, even if map-drawers and members of the Commissioners Court were not aware during the map-drawing process, the impact of the 2021 enacted map on the minority community was obvious by the time it was adopted. This is evidenced by the volume of public comment submitted by dozens of individuals expressing concern about the effects of the changes to Precinct 3 on minority voting power. In the November 12, 2021 special session, a majority of the speakers indicated that they were concerned that the maps diluted minority voting strength. For instance, Stephanie Swanson, with the Fair Vote Texas Coalition, said:

> The folks that live in Precinct 3 work together, play together, and worship together. They have worked to elect Commissioner Holmes to this seat for more than 20 years now. They can be considered a coalition district which is protected under the Voting Rights Act. In the benchmark plan, the African American community consists of 32.7% of citizen voting age population, and the Hispanic community consists of 21.9% of citizen voting age population which totals 54.6% thereby triggering section 2 Voting Rights Act. . . And here we are again, ten years later, in the exact same place. Geographic Strategies has been hired once again to draw the county's districts, the Commissioners Court did not adopt redistricting criteria, they did not include Commissioner Holmes in the deliberations of the map proposals that are being presented today, and they again have included the Bolivar Peninsula in the map proposal in Precinct 3. And in map proposal 2, the county is proposing

---

[2] Expert Report and Declaration of William S. Cooper, Section III.B (January 13, 2013).

[3] Henry Deposition, 225:23-25 – 226:1-4. Re Commissioner Clark's awareness, see (Aulds 2011a, b).

[4] Henry Deposition, 225:23-25 – 226:1-4.

[5] Giusti Deposition, 166:4-8.

[6] Henry Deposition 218:3-8.

to dismantle the coalition district that Commissioner Holmes represents, that courts have upheld the validity of coalition districts, and dismantling a coalition district is indicative of intentional discrimination. I also would like to point out that jurisdictions that have a history of repeatedly discriminating against voters of color can be placed back under the preclearance provision of the Voting Rights Act. We ask that you remove Bolivar Peninsula from Map 1, and that you preserve the coalition district in Precinct 3, and resoundingly reject Map 2.[7]

Commissioner Holmes also presented evidence to the rest of the commissioners that the new map would dismantle the coalition precinct:

> The importance of that is, for Precinct 3 in its current configuration, as an over 60% Black and Hispanic VAP population, the map that the commissioners just made a motion on, the largest population of Blacks and Hispanics together is 35%, and that won't have any way to pick the candidate of their choice. I have been the candidate of choice in Precinct 3, not because I'm Black, but because I think I've been the best candidate. But the point is, people have the ability in the precinct to pick the candidate of their choice. White, Black, Hispanic or whatever they should have that right. They should have that right. Some people don't think they should have protections under the Voting Rights Act.[8]

Commissioner Holmes also presented alternative maps that would achieve the required population targets without dismantling the coalition district. The commissioners did not discuss or consider these alternatives; instead, they immediately moved to vote in favor of Map 2 after Commissioner Holmes was finished speaking.

Even before the November 12 meeting, comments that came in through the online portal also expressed concerns about the racial impact of the redistricting plans. A comment submitted Friday, November 5, 2021 argued, "This is vastly uneven and will completely eliminate African American representation in Galveston County . . . to add Crystal beach and Bolivar gives the impression that The County Judge and the other commissioners have an additional agenda that doesn't include fairness and representation within Galveston County."[9] A comment submitted Tuesday, November 9 argues that Map 2 "completely dilutes the minority vote countywide."[10] These early comments would have provided some indication about racial concerns to the commissioners.

*Third*, as far as the process itself, the commissioners who supported the enacted plan do not appear to have made any effort to mitigate the negative effects of the plan on Galveston's Black and Latino voters. Commissioner Giusti said that he was unaware of any efforts to preserve the

---

[7] 55:30. "CC Special 11-12-21." Available online
https://livestream.com/accounts/21068106/events/6315620/videos/227296657. Accessed 17 Jan 2023.
[8] 1:23:57. "CC Special 11-12-21."
[9] Public Comment Submission #1283416.
[10] Public Comment Submission #1290630.

coalition district.[11] Commissioner Apffel stated he believed it would be "impossible" to preserve the coalition district, but later admitted that this opinion was based only on his "belief" and not on actual evidence.[12] Likewise, Judge Henry said that he never asked whether there was a way to preserve Precinct 3 as majority-minority.[13]

The lack of any attempt to preserve the majority-minority precinct is unsurprising given the fact that two of the commissioners who voted for the map, Judge Henry and Commissioner Apffel, have expressed antagonism toward the majority-minority district and a desire to modify it. For example, Commissioner Apffel described the previous map, with its coalition district, as gerrymandered, and equates gerrymandering with drawing majority-minority districts:

> Q. What -- when you mentioned gerrymandered like before, what do you -- what are you referring to?
>
> A. Like -- like I just said, drawing lines and making districts that just encompass and circle a certain type of people.
>
> Q. What do you mean, certain type of people?
>
> A. Well, you're the one referring to, for example, people of color, or minorities.
>
> Q. Oh, so that's -- that's what you meant?
>
> A. Yeah.
>
> Q. So when you said gerrymandered like before, were you not -- were you referring to any prior maps?
>
> A. Yeah. I think the map that Stephen Holmes was under, the previous map, was a gerrymandered map.[14]

Similarly, Judge Henry said that in the old plan, Precinct 3 looked gerrymandered to him and it had to be that way because they had to keep it as a majority-minority precinct.[15] Given the fact that these commissioners held such negative views of the coalition precinct, it is not surprising that they would favor a plan to eliminate it.

---

[11] Giusti Deposition, p. 162 line 23 – p. 163 line 3 ("Q.   Are you aware of any efforts to maintain by any of the commissioners or anyone responsible for drawing 2021 redistricting plans effort to maintain Precinct 3 as a majority-minority Black and Hispanic precinct? A.   Not that I'm aware of.")

[12] Apffel Deposition, 261:22-24; 262: 21.

[13] Henry Deposition, 224 l. 4-25, p. 225 l. 1.

[14] Apffel Deposition, 264:13 – 265:4.

[15] Henry Deposition, 241:11-19.

To summarize the discussion, the new redistricting plan adopted by the Galveston County Commissioners Court has a racially disparate impact on minority voters because it eliminates the coalition precinct, Precinct 3, and redraws all four precincts to have a White majority. The commissioners knew that their plan would negatively affect Black and Hispanic voters in Galveston County, and there is no evidence that the commissioners who voted for the plan took any steps to mitigate these negative effects. Moreover, the record shows that at least two commissioners viewed the coalition district negatively, describing it as "gerrymandered" based on race. Thus, the record supports that the process undertaken to adopt the 2021 enacted plan was designed to eliminate the majority-minority district.

*Historical Background*

The next consideration posed by the Court in the *Arlington Heights* opinion involves the examination of "the historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes." In Galveston County, there is evidence of such a series of official actions to taken to dismantle Precinct 3 as a coalition district and deny Black and Latino voters the equal opportunity to elect their candidate of choice.

*First*, the Galveston County commissioners have been found to have taken actions that disadvantage minority voters several times. In particular, the commissioners have drawn commissioner precincts and Constable/Justice of the Peace precincts in ways that diluted minority voting strength. The Department of Justice failed to grant preclearance to the County's redistricting plans for the Constable/Justice of the Peace districts in 1992[16] and 2012, and to the Commissioners Court redistricting plan in 2012.[17] The county had to enter into a consent decree for the 1992 Constable/Justice of the Peace maps as well as for failing to provide election materials in Spanish in 2007.[18]

The plan to redraw the commissioners precincts in 2011 serves as an important precursor to the 2021 redistricting. The main point is that the Department of Justice highlighted several procedural anomalies during that redistricting cycle that pointed to a discriminatory purpose:

> Based on our analysis of the evidence, we have concluded that the county has not met its burden of showing that the proposed plan was adopted with no discriminatory purpose. We start with the county's failure to adopt, as it had in previous redistricting cycles, a set of criteria by which the county would be guided in the redistricting process. The evidence establishes that this was a deliberate decision by the county to avoid being held to a procedural or substantive standard

---

[16] Letter from John R. Dunne to Judge Ray Holbrook, March 17, 1992.  Available online: https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/TX-2450.pdf.  Accessed 17 Jan 2023.

[17] Letter from Thomas E. Perez to James Trainor, March 5, 2012.  Available online: https://www.justice.gov/crt/voting-determination-letter-38.  Accessed 17 Jan 2023.

[18] Consent Decree, Judgment, and Order, United States v. Galveston County, CV No.: 3:07-cv-00377 (S.D. Tex. 2007), Dkt. 5.

of conduct with regard to the manner in which it complied with the constitutional and statutory requirements of redistricting.

The evidence also indicates that the process may have been characterized by the deliberate exclusion from meaningful involvement in key deliberations of the only member of the commissioners court elected from a minority ability-to-elect precinct.[19]

As I show below, these procedural steps that the Department of Justice raised as problematic—the failure to adopt redistricting criteria and the exclusion of Commissioner Holmes from key decisions—appear again during the 2021 redistricting of the Commissioner Precincts.

The Supreme Court struck down the preclearance provision that prevented Galveston County from enacting their original 2011 plan in *Shelby County v. Holder* 570 U.S. 529 (2013). In the wake of that decision, many states and localities began to enact election changes that detrimentally affected minority voters. For instance, hundreds of polling places in jurisdictions formerly subject to preclearance closed between 2012 and 2018.[20] States (including Texas) immediately passed strict Voter ID provisions after *Shelby* that had been blocked under Section 5 of the Voting Rights Act (Billings et al. 2022). Voter purging also increased in formerly covered jurisdictions after *Shelby* (Feder and Miller 2020). Recent studies suggest that eliminating preclearance had negative effects on minority voter turnout (De Rienzo Jr 2022, Billings et al. 2022).

The elimination of preclearance for Galveston County, as with other covered jurisdictions, allowed the county to pursue electoral changes that would have been blocked prior to 2013 because of their effects on minority voters. For instance, in August 2013, just months after the *Shelby* decision, the county moved to enact the Constable/JP precincts that the Department of Justice had objected to in 2012 once they no longer had to satisfy the obligations of Section 5. Galveston County was the first jurisdiction to redistrict after *Shelby* and did so without consulting the federal government (Swift 2013). Trial testimony in a previous case shows that the county intentionally waited until after *Shelby* was passed to enact the plan that had drawn the objections from the Justice Department.[21]

The evidence suggests that the commissioners also thought that the lack of a preclearance requirement was important to their ability to accomplish their longstanding goals during the 2021 redistricting cycle.

At the April 5, 2021 meeting of the Commissioners Court, Galveston General Counsel Paul Ready began by presenting an engagement letter to retain Dale Oldham and the firm Holtzman, Vogel, Josefiak, and Torchinsky for the approval of the commissioners.

When it came time for the Commissioners to vote, Mr. Ready made it clear that Mr. Oldham was involved in the 2011 round of redistricting as "the demographer 10 years ago" and describing the firm Holtzman, Vogel, Josefiak and Torchinsky as "a firm out of DC that was brought to us by

---

[19] Letter from Thomas E. Perez to James Trainor, March 5, 2012.
[20] *See (The Leadership Conference Education Fund 2019)*.
[21] Trial Transcript Vol. 3, at 139:9–140:2, *Petteway v. Galveston County*, Case No. 3:13-cv-00308 (S.D. Tex. 2014), Dkt. 76.

Dale Oldham, who was involved in the last redistricting, that was an activity that was part of the firm."[22] A commissioner asked off camera whether there was another firm perhaps from Houston who could do the work, and Ready replied that Oldham's involvement in the last round of redistricting was the reason for hiring him:

> Unknown: Is there anybody in Houston?
>
> Ready: There are. The reason this letter is the one in front of you is because Oldham has already got the familiarity with Galveston County having done it 10 years ago and so it should be a shorter more efficient path for him to adjust his prior work as opposed to somebody recreate it. [23]

A few minutes later, after an exchange about the release of the census data, Judge Henry brings up redistricting litigation:

> Judge Henry: We would not expect litigation on the JP constables like we got last time.
>
> Ready: It's hard to say. I will say among the changes is that there's no more preclearance so on that end it's a little bit cleaner. The other thing to sort of note is that although we don't expect final data until the fall . . .[24]

These two exchanges are important because they show that the commissioners are hiring the same person to work from the same maps as 2011 that eliminated Galveston's only majority-minority commissioners precinct, but they expect a different outcome due to the fact that preclearance of redistricting plans is no longer required under Section 5 of the Voting Rights Act.

Commissioner Holmes later said that he thinks the plan was to run "the same playbook that happened in 2012, only this year, you don't have to have approval from the justice department to approve the maps."[25]

To conclude, the evidence presented here shows that Galveston County's enactment of the 2021 redistricting plan is consistent with the county's past pattern of attempting to eliminate majority-minority districts. Importantly, the commissioners themselves discussed a connection between the past redistricting cycle and their goals for the current cycle.

### Sequence of Events

The Court in *Arlington Heights* found that analyzing the "specific sequence of events leading up to the challenged decision," in this case, the redistricting map enacted in Galveston County, may shed light on the reasons the decision was made. The sequence of events is important to show if the process was rushed and executed in a way that deviated from prior standard practices or that limited public transparency and input. Furthermore, the timing of certain statements made by Judge

---

[22] 16:15. "CC REG 04-05-21." Available online
https://livestream.com/accounts/21068106/events/6315620/videos/219596656.
[23] 17:59. "CC REG 04-05-21."
[24] 19:55. "CC REG 04-05-21."
[25] 1:22:16. "CC Special 11-12-21."

Henry and other actors relative to the passage of the map makes particular rationales advanced by the commissioners suspect.

My understanding of the timeline relevant for my discussion regarding the 2021 redistricting cycle, based on publicly available information, is as follows:

**Table 1: 2021 Redistricting Timeline**

| April 5 | 2021—Retain redistricting counsel[26] |
| --- | --- |
| August 12 | 2021—Census redistricting data released (U. S. Census Bureau 2021) |
| October 29 | 2021—Redistricting Maps 1 and 2 posted to Galveston County Website for public comment[27] |
| October 29 | 2021—Judge Henry posts that he supports Map 2 because of coastal precinct[28] |
| November 9 | 2021—First Public Notice of Nov 12, 2021 Special Meeting posted.[29] |
| November 10 | 2021—Community leaders in Galveston and Bolivar Peninsula say they have not provided feedback in support of coastal precinct (Ferguson 2021e) |
| November 12 | 2021—Public meeting at League City Annex; 2021 enacted map adopted[30] |

The Galveston County Commissioners Court had unusually little on the public agenda regarding redistricting in 2021. The commissioners and county judge also made very few public statements regarding the process or the reasoning behind their decisions.

The redistricting calendar was shifted this year because of the late arrival of the census data. However, the commissioners knew the approximate window between when the data would arrive and when they wanted to pass the maps; they could have planned their process to accommodate public hearings. For example, Judge Henry knew that the census data for redistricting would be released in August of 2021.[31] However, unlike in 2011, he did not attempt to schedule a public

---

[26] "Minutes."
http://agenda.galvestoncountytx.gov/sirepub/mtgviewer.aspx?meetid=2613&doctype=MINUTES.
[27] See County of Galveston, TX.  "Redistricting."  Available online
https://www.galvestoncountytx.gov/our-county/county-judge/redistricting.  Accessed 27 Jan 2023.
[28] "Exhibit 0031 - 61_Exhibit.pdf"
[29] Email from Linda Liechty, November 9, 2021.  "DEFS00031013"
[30] "Minutes."
http://agenda.galvestoncountytx.gov/sirepub/mtgviewer.aspx?meetid=2641&doctype=AGENDA.
[31] Henry Deposition, 156:4-17.

hearing or meeting to provide those data to the public.[32]   Judge Henry also expressed that he wanted to have the maps adopted by mid-November in time for the candidate filing process.[33]

At the April 5, 2021 regular session, the commissioners discussed their understanding that the census data for redistricting would arrive later than usual.  General Counsel Paul Ready raised the possibility that some work could be possible sooner:

> The other thing to sort of note is that while we're not expecting the final data until the fall, I'd say it's possible maybe even likely that we get preliminary data over the summer and we could begin planning conceptually though you may not finalize the lines until then.[34]

As noted above, the census data were released on August 12, 2021. The Commissioners expected as early as April 5, 2021 that the data would be released "sometime late summer, early fall"[35] and had every opportunity to structure the process to allow for greater transparency and public input. There was ample time to schedule in-person public meetings. For instance, Commissioner Apffel was able to  attend a meeting of the Bolivar Chamber of Commerce to discuss redistricting on Bolivar Peninsula on November 11, 2021 (2021a). Notably, this meeting occurred after the president of the Bolivar Chamber of Commerce was quoted in the newspaper saying that she thought the majority of people would prefer to keep Commissioner Apffel and not to have one coastal precinct (Ferguson, 2021e).

This sequence of events is also important for contextualizing one particular justification for adopting the map that was chosen: the coastal precinct justification. As noted above, the redistricting plans were posted to the county website on October 29, 2021. That same day, Judge Henry also posted a statement in support of the maps to his social media. He wrote on Facebook, "Having a coastal precinct will ensure that those residents directly along the coast have a dedicated advocate on commissioners court" according to the Galveston Daily News (Ferguson 2021d). This stated interest in establishing a coastal precinct came *before* any public comment on the new precinct maps had been solicited at all. There was in fact no concerted push from affected areas such as the Bolivar Peninsula or the City of Galveston (Ferguson 2021d). Judge Henry's post seems to create a public desire for a coastal community of interest united into one district out of thin air; these areas had not been lumped together in a precinct before, and there is no evidence of public advocacy for this single coastal precinct in 2021 before Judge Henry's October 29, 2021 social media post (Ferguson 2021e).

Moreover, a purported desire for a coastal precinct cannot explain the decision to crack apart the minority community outside the coastal precinct. The map[36] below, which is contained in the Appendix to Dr. Baretto's and Dr. Rios's report, shows the 2021 enacted plan boundaries over demographic shading by census voting tabulation district. This map shows that the minority community's splintering in the 2021 enacted plan was a map-wide feature:

---

[32] Henry Deposition, 159:14-25.

[33] Henry Deposition, 152:20 –153:5.

[34] 20:06. "CC REG 04-05-21."

[35] 18:56. "CC REG 04-05-21."

[36] Declaration of Dr. Matt A. Barreto and Michael Rios, page 170.



While it appears obvious from the map, the question of whether creating a coastal precinct can explain the elimination of a minority opportunity precinct can be tested by determining whether alternative maps are possible that satisfy the purported desire for a coastal precinct without such a striking effect on the minority population. To answer this question, I was provided a series of maps drawn by Petteway Plaintiffs' mapping expert that do just that.

### *Alternative Map 1*

Alternative Map 1 keeps the so-called "coastal precinct"—Precinct 2—unchanged. Thus, it directly tests whether the creation of a coastal precinct in the precise configuration adopted by the Commission explains the fragmentation of the minority population. As Alternative Map 1 shows, the creation of Precinct 2 as a "coastal precinct" does not explain the cracking of the minority population, because Precinct 3 in this alternative map remains a compact majority-minority precinct.



This and other alternative maps, which are included in Appendix B to my report, show a sampling of ways in which a coastal precinct can be created while retaining a compact, majority-minority precinct.

These alternative maps illustrate that the purported desire for a "coastal precinct" cannot explain the fragmentation of the minority population. Moreover, it is noteworthy that Judge Henry and Commissioner Apffel have both disclaimed in deposition testimony that partisanship—*i.e.*, a desire to create an additional Republican precinct—explained the fragmentation of the minority community as well.[37]

*Departures from the Normal Procedural Sequence*

Although examining the particular sequence of events helps shed light on the intentions of the Commissioners Court, the 2021 timeline is even more notable for the *absence* of certain events and procedures as compared to both Galveston County's prior practice, and the standard practice

---

[37] For instance, when asked was "partisanship a factor in your evaluation of these maps?" he responded, "Not at all." See Apffel Deposition 193:6-8.  Similarly, when Judge Henry was asked about the importance of passing the maps "to keep Galveston County red," he replied that he "already had that with three commissioners."  See Henry Deposition 258:15-259:9.

of jurisdictions at the local and state levels. In this case, the pattern of departures from prior and normal procedural sequences seems designed to stifle transparency and opposition for several reasons.

*First*, from the beginning, even the process of hiring the law firm was different from that followed in 2011. For instance, in 2011, the commissioners court agenda included notice of executive sessions (on April 19, 2011 and April 26, 2011) during which law firms were interviewed for redistricting, with a meeting to hire the firm on May 17, 2011.[38] In 2021, the court appeared to follow no such process. No interviews of firms for redistricting purposes appear on the public agenda, and Judge Henry has admitted that he specifically sought out the firm that he had worked with in 2011.[39] As noted before, there was no public disclosure of who the county intended to retain before the April 5, 2021 meeting to vote on the engagement. More telling, the other Commissioners did not seem familiar with the firm or the engagement letter in the April 5, 2021 meeting. Commissioner Clark said the engagement letter had not been posted online and Commissioner Holmes asked, "Who are we hiring?"[40] There was no indication that other bids were considered, although other bids were received.[41]

*Second*, no other public meetings, executive sessions, or workshops on redistricting were held between the April 5, 2021 meeting where the law firm was hired and the November 12, 2021 special session in which the 2021 enacted plan was adopted. This lack of public meetings is unusual for Galveston. In 2011, redistricting workshops were on the Commissioners Court public agenda on March 29, 2011 and June 21, 2011 (the census redistricting data were released beginning in February of that year),[42] and the Commissioners Court presented the results of the 2010 Census on August 2, 2011.[43] Thereafter, the Commissioners Court held five public hearings specifically to solicit comment on the maps, before a final meeting on August 30, 2021 to vote on maps that had been modified in response to public comment.[44]

In contrast, any consideration by the Galveston County Commissioners Court of proposed maps, other than the November 12, 2021 hearing in which they held a final vote, happened behind closed doors. There was no pre-Census working session, no presentation of the Census results, and no hearings held for public comment before final maps were proposed in October.

---

[38] See Agendas at

http://agenda.galvestoncountytx.gov/sirepub/mtgviewer.aspx?meetid=97&doctype=AGENDA;
http://agenda.galvestoncountytx.gov/sirepub/mtgviewer.aspx?meetid=99&doctype=AGENDA;
and

http://agenda.galvestoncountytx.gov/sirepub/mtgviewer.aspx?meetid=102&doctype=AGENDA;
[39] Henry Deposition, 120:3-18.

[40] 16:13. "CC REG 04-05-21."

[41] Letter from Allison, Bass, & Magee, L.L.P., February 6, 2020.

[42] *See* Agendas at

http://agenda.galvestoncountytx.gov/sirepub/mtgviewer.aspx?meetid=94&doctype=AGENDA
and

http://agenda.galvestoncountytx.gov/sirepub/mtgviewer.aspx?meetid=107&doctype=AGENDA.
[43] Letter from Thomas E. Perez to James Trainor, March 5, 2012.

[44] Letter from Thomas E. Perez to James Trainor, March 5, 2012.

Furthermore, the lack of public consideration of the proposed maps was designed specifically to avoid requiring a public meeting. Commissioner Giusti says that holding meetings with just two commissioners is a way to get around open meetings rules:

> Q.   So when you talk about the law related to quorums, during the process, for example, I believe the October 2021 meeting where you met with Dale Oldham and you were present and Tyler Drummond and Jed Web was also present, was that set up in a manner to avoid violating the law that applies to quorums?
>
>  MS. OLALDE:  Objection; form.
>
>  THE WITNESS:  Yes, I would assume it is . . .[45]

Commissioner Apffel explains the two-commissioner redistricting meetings similarly:
> Q. But only with Judge Henry and you, from the Commissioners Court?
>
> A. Yeah. Because as I told you, it's the judge's duty and responsibility to handle redistricting, in my opinion.  And more than two people would be a quorum.[46]

Judge Henry confirmed that  no more than two commissioners met at a time to discuss redistricting in order to avoid a quorum, which triggers the requirements for transparency under the Open Meetings Act.[47] Judge Henry described the requirements as follows:

> We are -- anytime there's a quorum, which is three or more, we're required to notice that publicly, notice the public about what we're going to be discussing, give at least 72 hours, and have it recorded.[48]

These comments suggest that the commissioners structured their meetings in pairs or directly with Mr. Oldham in succession in order to avoid the requirements of open meetings and minimize transparency in the process.

Commissioner Holmes also was excluded from full participation in the redistricting process. During the November 12, 2021 meeting, he said:

> And the other part of it was, essentially, meeting with the lawyer that one time, I didn't have any input in this process. I didn't have a vote on whether or not we would put these maps online, I didn't have a vote on which maps would get put online. I did not get an opportunity to submit a map.[49]

The exclusion of Commissioner Holmes was a suspicious exercise called out as such by the Department of Justice in 2012:

---

[45] Giusti Deposition, 104:14-105:7.
[46] Apffel Deposition, 129:10-15.
[47] Henry Deposition, 172:11-21; 353:16-22.
[48] Henry Deposition, 354:17-21.
[49] 1:21:25. "CC Special 11-12-21."

> "The evidence also indicates that the process may have been characterized by a deliberate exclusion from meaningful involvement in key deliberations of the only member of the Commissioners Court elected by the minority ability to elect their own county commissioner. Precinct 3 is the only precinct in the county where minority voters have the ability to elect candidate of choice, and it is the only precinct currently represented by a minority person."[50]

As was the case in 2012, at the time of the redistricting, Commissioner Holmes was still the sole minority member of the Commissioners Court and the representative of the only minority coalition precinct.

*Third*, redistricting criteria were not adopted to guide the process,  despite the fact that such criteria have been adopted in Galveston in the past and continue to be used in other counties in Texas today. Prior to the attempts to eliminate the majority-minority Precinct 3 that began in 2011, Galveston County, like others in Texas, adopted redistricting criteria to guide the redistricting process. In 2001, for instance, the redistricting criteria were adopted at a May 7, 2001 regular meeting of the Galveston County Commissioners Court. Many counties across Texas continued to use this format to adopt redistricting criteria during the 2021 cycle.[51]

*Fourth*, when the proposed maps were released by the county on October 29, 2021, the public was given no quantitative information about the maps. Again, there was a lack of transparency: the underlying population and demographic data were not released with the maps. Interested citizens could not see how the proposed maps changed precinct demographics by viewing information made publicly available by the county.

*Finally*, the lack of in-person public meetings denied the public the opportunity to provide meaningful feedback on the maps. This lack of in-person engagement was a departure from the normal procedural sequence.[52] Unlike in 2011, where the Commissioners Court held five public hearings on redistricting in the two weeks before the map was approved,[53] in 2021 during the two weeks between when the maps were released on October 29, 2021 and approved, only one in-person special session was called with the minimum of 72 hours notice. That meeting was held on November 12, 2021, the day before the candidate filing period for the 2022 general election. It was

---

[50] Letter from Thomas E. Perez to James Trainor, March 5, 2012.

[51] See orders from Glasscock County https://www.co.glasscock.tx.us/upload/page/0784/2021/Order%20Adpoting%20Criteria.pdf; Nacogdoches County https://www.co.nacogdoches.tx.us/downloads/Order%20Adopting%20Criteria%20For%20Use%20in%20the%202021%20Redistricting%20Process.pdf; and Harris County https://cao.harriscountytx.gov/Portals/20/Documents/Redistricting%20Order.pdf?ver=ebmKIX1ellRIVmYTTNE6Kg%3d%3d.

[52] This departure is not due to COVID-19 precautions; the Commissioners Court was still holding in-person meetings with public comments throughout 2021.

[53] Agenda, http://agenda.galvestoncountytx.gov/sirepub/mtgviewer.aspx?meetid=115&doctype=AGENDA.

held at 1:30pm in the Calder Road Annex in League City. By contrast, in 2011, those five meetings were all held in the evening, after work, in several cities across the county.[54]

The November 12, 2021 meeting is also notable for its inconvenience. The location was not designed to accommodate the crowd, over 100 people, who showed up to discuss the redistricting plan. The meeting room was standing-room only, with people overflowing into halls and other rooms.[55] Many people could not hear the meeting. The crowd was upset:

Rev. W. H. King:  "You called a meeting where you KNEW there would not be enough space for the people. You have elderly people standing up on the outside. You know better than that. [applause]. These are voters. They pay for the buildings that Galveston has. They should be able to come into the building comfortably without having to stand on walls and chairs and being able to stand on their legs or using their canes or their walkers."[56]

Lucretia Lofton:  "The fact that this meeting was called at a time that conflicts with most taxpaying citizens reinforces the notion that the community interest is not considered which is beyond reproachment because the same people that pay their taxes into this exact county lack inclusiveness and equality."[57]

Rev. Timmy Sikes:  "The same thing that was going on twenty-three years ago is the same thing that's going on today. And excuse me if I get emotional because its personal to me, not only personal but it's personal to everybody that's present. This county has facilities that are large enough to hold a crowd that's in here and outside, and on a Friday at 1:30, they want to have a meeting because they didn't think we were gonna show up."[58]

As audience members note, the meeting location was inconvenient, people did not have an opportunity to hear the discussion, and sufficient accommodations were not made for the elderly or other people with disabilities. The Commissioners Court should have been aware that there would be significant public interest in redistricting, given the hundreds of online public comments on the current maps and the hundreds of attendees at redistricting public hearings in 2011 (Aulds 2011c), yet still failed to hold even one fully accessible public meeting. The image of the overflowing room below illustrates the point:

---

[54] *Id*.
[55] See attached image of the meeting room.
[56] 40:32. "CC Special 11-12-21."
[57] 52:56. "CC Special 11-12-21."
[58] 1:10:30. "CC Special 11-12-21."



Some Commissioners might argue that the online comments were sufficient for public engagement with the maps. However, according to the 2021 American Community Survey, while 96.6% of non-Hispanic White people in Galveston have access to a computer with broadband internet at home, only 89.6% of Black Galveston residents do. One difference between the online portal and the in-person public comments lies in the commissioners' response to them. At public meetings, all the commissioners who are present hear every public comment. However, the commissioners may not have reviewed all the online comments to the map. This was the case in Galveston.  For instance, Commissioner Apffel admits that he only saw some of the comments:

> Q. Did you review the comments that -- excuse me. Did you review all the comments that were submitted through the website?
>
> A. Drop the word all, and maybe some. But not all.[59]

Likewise, Judge Henry admits that he read only a few of the online comments, less than a dozen, while Commissioner Giusti also says he reviewed about 15 of the online comments.[60]

To summarize the evidence presented, it is clear that the process that produced the redistricting plan enacted by Galveston County departed substantially from past practices. These departures had the intent and the effect of minimizing public input and transparency. Failing to adopt redistricting criteria, hold convenient public hearings, or release quantitative data made it much more difficult for the public to provide feedback on the maps. Online participation was not a replacement for the in-person meetings—the commissioners who supported the plan admit that they did not read more than a few of the online comments.

---

[59] Apffel Deposition, 187:7-12.
[60] Henry Deposition, 273–274; Giusti Deposition 124:2-5.

*Contemporaneous Statements*

The factors articulated in *Arlington Heights* acknowledge the importance of contemporaneous statements by decisionmakers for showing their intent. In particular, I would like to point to three statements that I would characterize as attempts by Judge Henry to diminish the input of minority voters. All took place during the November 12, 2021 special session.

First, at the beginning of the meeting, members of the public complained that they were not able to hear the proceedings. In response, Judge Henry threatened, "I will clear you out if you make a noise, I will clear you out of here. I've got constables here."[61]  Commissioner Giusti later said of these remarks:

> I did not think it was personally the thing to do. I didn't think it was the way to treat people. I mean, asking them to quiet down is one thing, but it to me was a little aggressive.[62]

Commissioner Giusti later said that he could recall the judge asking a deputy to remove a disruptive individual from a meeting in the past, but not making a comment toward an entire group.[63]

The second comment occurred in the middle of the meeting. Several members of the audience stood up to request that the commissioners go back to the drawing board and consider new maps that were more favorable to minority voters. In response, Judge Henry said:

> If I could address one recurring theme, we don't have time, we must adopt a map by tomorrow according to the secretary of state. That's not our requirement, that's the state of Texas requirement.[64]

The audience rightly noted that the fact that no changes could be made in response to their feedback rendered the meeting pointless. As Wendy Langham said:

> After hearing you say that, why do you even have us here? [audience agreement]. You had no intention of changing the map, of even getting our input. I hadn't thought that this was what I was going to say to you, but this seems so dishonest. It's like you're placating us.[65]

As Ms. Langham noted, Judge Henry's comment made it clear that the community's participation at the meeting would have no effect on the outcome.

The final comment occurred near the end of the meeting.  As he was calling for a vote on Map 2, Judge Henry said:

> We did online questions, some people responded, 440 total responses as of about 12:30 this afternoon . . . of the 440 that came in, 168 did not discuss a particular map they just called me names mostly, of the people who did choose a map preference, Map 1 received

---

[61] 10:40. "CC Special 11-12-21."
[62] Giusti Deposition, p. 250 lines 13-16.
[63] Giusti Deposition, p. 252 l 1-3.
[64] 34:50. "CC Special 11-12-21."
[65] 35:04. "CC Special 11-12-21."

64 responses Map 2 received 208 responses. Of those responding to a particular map, 76.4% Map 2, 23.5[%] Map 1.[66]

On its face, this statement does not seem hostile to the interests of minority voters. But Judge Henry has said he accounted for online public comment by asking for this breakdown from staff.[67] However, this breakdown only describes the number of comments that supported a particular map. It noticeably does not account for comments that rejected either or both maps, including those that rejected them on the grounds that they were both discriminatory against Galveston's voters of color. I reviewed and categorized the 446 submissions that came into the County prior to 1:30pm, when the November 12, 2021 meeting on the redistricting maps began. By my estimation, over half of the 168 comments Judge Henry says "did not discuss a particular map" expressed concerns about race and/or minority vote dilution.[68] In other words, Judge Henry dismissed as devoid of meaningful content nearly every comment that did not support the maps and that expressed concerns about racial discrimination and minority vote dilution.

In sum, these three comments by Judge Henry point to antipathy toward the views of the minority constituency. In the November 12, 2021 meeting, Judge Henry threatened a largely minority audience with forcible removal from the meeting, told them that their input would have no effect on the outcome, and characterized the online feedback in a way that discarded concerns about minority vote dilution and racial discrimination. These comments are especially important in light of the fact that the commissioners in support of Map 2 said very little else during the special session or otherwise during the redistricting process.

C. The "Senate Factors"

*Senate Factor 5: Effects of discrimination*

Currently, in Galveston County, 57.0% of the population is non-Hispanic White, 12.3% is non-Hispanic Black, and 25.0% is Hispanic.[69] I have been asked to provide information relevant for evaluating Senate Factor 5, or "the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process." In the following section, I will outline the historical and contemporary factors that have shaped racial disparities in socioeconomic status, housing, health, and criminal justice and the ways that these disparities can affect political participation. There are significant gaps between Black, White, and Latino people in Galveston County along each of these dimensions.

---

[66] 1:16:44. "CC Special 11-12-21."

[67] Henry Deposition 273:15-23.

[68] These figures are approximations because I do not have the particular coding assigned to each comment by Judge Henry's staff.

[69] U.S. Census Bureau. "Citizen Voting Age Population by Race and Ethnicity." Available online from https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html. Accessed 20 Jan 2023. For the citizen voting age population in Galveston County, 63.3% are non-Hispanic White, 12.7% are non-Hispanic Black, and 19.2% are Hispanic.

1. Education

People with higher educational attainment are more likely to vote (Almond and Verba 1963, Brady, Verba, and Schlozman 1995, Burden 2009, Campbell et al. 1980, Verba, Schlozman, and Brady 1995b). Verba, Schlozman, and Brady argue that the relationship between socioeconomic status and voting exists because people with greater education also tend to have more of the resources such as time, money, and civic skills that affect the calculus of participation (1995: 282). Education makes it easier for individuals to navigate the costs of voting such as acquiring information about the candidates and issues or learning how to register and vote (Verba, Schlozman, and Brady 1995b).

Black and Latino people historically have faced educational discrimination in Galveston County, which has hindered their ability to vote. Although the U. S. Supreme Court ruled segregation in public schools unconstitutional in *Brown v. Board of Education* in 1954, and Congress outlawed segregation in public accommodations in the Civil Rights Act of 1964, as I will discuss, districts in the county and across the state failed to desegregate for several years after those rulings. For instance, by 1961, the Southern Educational Reporting Service found that in Galveston County, only the Moody State Home had desegregated (Southern Educational Reporting Service 1961, 1961). The process of desegregation did begin later in the 1960s, partly as a result of court orders in the Texas City[70] and Galveston[71] Independent School Districts (ISD).  Eventually, as a result of *United States v. State of Texas*, the entire state was subject to a comprehensive desegregation plan (LBJ School of Public Policy 1982). Galveston ISD did not achieve unitary status until 2009 (Suayan 2009).

Today, there are eight school districts serving students in Galveston County. These districts range in diversity; High Island ISD and Santa Fe ISD are only 18 and 23% non-White, respectively (2022). Hitchcock ISD, Galveston ISD, Texas City ISD, and Dickinson ISD all are more than 70% non-White (2022). The largest district, Clear Creek ISD, as well as Galveston ISD, is still moderately segregated (ProPublica 2017).

Racial gaps in achievement scores persist in all eight districts that serve the students of Galveston County. According to **Figure 1**, which shows the percent of 8th graders who were not proficient in math and reading for each district, Black and Hispanic students were less likely than White students to be proficient in either subject in all eight school districts (Texas Education Agency 2022). Black and Hispanic students also are less likely to enroll in AP Math classes than their presence in the population would suggest. For instance, in Clear Creek, Black and Hispanic students are 8.2 and 30.9% of the district, but only 3 and 14% of the students enrolled in AP math courses, respectively (U. S. Department of Education 2018).

---

[70] *Evans v. Brooks*, Civil No. 2803 (Galveston Div., S.D. Tex.).
[71] *Smiley v. Vollert*, 453 F. Supp. 463 (S.D. Tex. 1978).

*Figure 1:* *Percent Not Meeting Grade Level, 8th Grade Reading (a) and Math (b).*
*Source: Texas Education Agency*





School suspensions have been shown to increase subsequent arrests and other anti-social behavior in youth (Mowen and Brent 2016, Hemphill et al. 2006). The evidence suggests that racial disparities in school suspensions exist in Galveston County school districts as well (U. S. Department of Education 2018). For instance, in Clear Creek ISD, Black students are absent three times as many days as White students due to suspensions on a per-capita basis (U. S. Department of Education 2018).

Historical and contemporary educational disparities such as these have led to disparities in educational attainment among the people of Galveston County. Although there have been gains in educational attainment over time, racial gaps persist. **Figure 2** shows estimates of the educational attainment of Galveston County residents over the age of 25 by race, calculated using the 2020 5-Year Public-Use Microdata from the American Community Survey. The data shows that White adults are far more likely than Black and Latino adults in the county to have earned a bachelor's or postgraduate degree, and that Black and Latino Galveston County residents have lower educational attainment overall. As a reminder, 28% of Galveston County residents are age 55 or older, which means that they were school age during the time when districts in Galveston County were still at least partially segregated (U. S. Census Bureau 2022).

***Figure 2:** Educational Attainment in Galveston County by Race, Age 25 and Up.*



2.   Income, Poverty, and Wealth

Income and wealth affect voting to the extent that greater income can make it easier to overcome the costs of voting, such as having the ability to afford time off work to go to the polls (Verba, Schlozman, and Brady 1995a). Educational discrimination such as that faced by Black Galveston residents can produce disparities in socioeconomic wellbeing (Long 2010). However, decades of persistent discrimination in employment and access to capital also contribute to economic disparities.

In Galveston County, Black and Hispanic residents are worse off economically than their White counterparts. For instance, as shown in **Figure 3**, the median income of Black Galveston County households, at $45,831, is more than $40,000 less than the median income of White households ($86,165) (County Health Rankings and Roadmaps 2022). White households in Galveston also have a higher median income than that of Latino households, which is $60,297 (County Health Rankings and Roadmaps 2022). There are racial disparities in child poverty in Galveston County, as well. As shown in **Figure 4**, the poverty rate for Black children in Galveston is 3 times higher than that of White children in the county, and the poverty rate for Latino children is more than 2

times higher than that of White children in Galveston County (County Health Rankings and Roadmaps 2022).

*Figure 3: Median Household Income in Galveston County by Race*



*Figure 4: Child Poverty in Galveston County by Race.*



Employment also can affect voter turnout. Rosenstone and Hansen argue that work is an important site for recruitment into politics, which also increases voter turnout (Rosenstone and Hansen 1993). The evidence depicted in **Figure 5** shows that the Black unemployment rate in Galveston County is more than twice that of White Galveston County workers; unemployment is higher for Latinos living in Galveston County as well.

*Figure 5: Unemployment Rate by Race in Galveston County, Age 18 and Older.*



Economic disparities can translate into political disparities some additional ways. One other mechanism is through access to transportation. As **Figure 6** shows, in Galveston County, access to vehicles varies by race, such that Black households are four times more likely to lack access to a vehicle than White households. Latino households are more likely to lack access to a vehicle as well. Studies have shown that polling place distance affects voter turnout, and those effects are related to transportation access (Brady and McNulty 2011, Bagwe, Margitic, and Stashko 2020). In states with no excuse absentee voting, people tend to offset issues accessing physical polling places with voting by mail; however, in states with limited absentee ballot options such as Texas (National Conference of State Legislatures 2022), the "substitution to mail-in voting" is smaller (Bagwe, Margitic, and Stashko 2020: 4).

*Figure 6: Households without Access to a Vehicle in Galveston County by Race.*



3.   Housing and Racial Residential Segregation

Neighborhood context matters for political mobilization and political outcomes (Burbank 1997, Burch 2013, Cohen and Dawson 1993, Huckfeldt, Plutzer, and Sprague 1993, Huckfeldt 1979, Tam Cho and Rudolph 2008). However, where people live also matters because racial residential segregation has been shown to decrease Black voter turnout. Researchers argue that segregated Black areas have less access to public goods, such as polling places or transportation, that might matter for voting (Zingher and Moore 2019). Racial residential segregation also affects politics indirectly because it is an important determinant of economic and health outcomes. Racial residential segregation increases Black poverty rates, lowers Black educational attainment, and increases income inequality between Black and White residents (Ananat 2011). Research attributes these effects to isolation from quality schools and jobs (Kruse 2013, Massey and Fischer 2006, Wilson 1996). Racial residential segregation also contributes to the test score gap between Black and White students (Reardon, Kalogrides, and Shores 2019), to inequalities in the provision of public goods, to lower public goods expenditures (Trounstine 2016), and to worse health outcomes and greater exposure to environmental toxins (Ard 2016, Kramer and Hogue 2009).

The historical evidence suggests that communities in Galveston County were segregated by race. In particular, Black-White racial residential segregation was high in communities in the county. In the period before World War II, racial residential segregation was the result of lending and insurance practices sanctioned by the Federal Housing Administration (FHA) and private actors. In order to prevent lending to places where Black people lived, the FHA relied on Residential Security Maps that were produced by the Home Owners Loan Corporation ("HOLC") (2021b). These maps "color-coded neighborhoods using racial composition as a primary indicator of their acceptability as candidates for mortgage investment" (Kimble 2007: 405). The maps assigned grades to neighborhoods based on racial composition, "with 'A' being most desirable and a 'D' grade ensuring rejection" (Kimble 2007: 405). The HOLC map for Galveston is shown in Figure 7 and follows this traditional grading system for lending based on neighborhood race (2021b). Galveston and Texas City continued to be marked by high racial residential segregation into the 1980s (Hwang and Murdock 1982).

*Figure 7:* HOLC Map of Galveston.  Source: (2021b)



Research shows that Galveston County still suffers from moderate racial residential segregation today. For instance, Black-White racial residential segregation in Galveston County is .48, indicating that Galveston County is moderately segregated (County Health Rankings and Roadmaps 2022, Othering and Belonging Institute 2022).

In addition to racial residential segregation, two additional aspects of residence and housing in Galveston County are worth discussing. The first, homeownership, is important because residency requirements have been shown to reduce voter registration and turnout, largely because residential mobility increases the administrative burden of maintaining registration (Highton 2000). Renters are more mobile than owners and are less likely to vote. In Galveston County, homeownership varies by race: according to the data shown in **Figure 8**, Black and Latino Galveston residents are less likely to live in owner-occupied housing units than White residents.

*Figure 8: Homeownership in Galveston County by Race.*



The second aspect of residence and housing relates to disaster recovery and displacement. In Galveston County, government policies have racialized patterns of resettlement after Hurricane Ike in 2008. Hurricane Ike destroyed 528 public housing units in Galveston City; overall, Galveston City's Black population decline was three times that of the White population decline in the aftermath of the hurricane (Hamideh and Rongerude 2018). The city resisted rebuilding those housing units for years, and still has not replaced them all despite a court order (Hamideh and Rongerude 2018, Dancy 2018). Displacement after Hurricane Ike has affected minority populations in Galveston County as a whole (Fucile-Sanchez and Davlasheridze 2020). Overall, in the county, the non-Hispanic Black population has declined from 15.0% of the population in 2000 to 12.3% in 2020.

4.   Health

Health status also may affect voting. Several studies have associated poor health with lower voter turnout (Blakely, Kennedy, and Kawachi 2001, Lyon 2021, Pacheco and Fletcher 2015). The effects of health on voting may take many pathways, such as reducing the availability of free time and money that could otherwise be devoted to politics (Pacheco and Fletcher 2015). Impaired cognitive functioning or physical disability also may make voting more difficult (Pacheco and Fletcher 2015). Poor health is likely the reason that voter turnout declines in old age (Pacheco and Fletcher 2015). People with disabilities also are less likely to vote; problems with polling place accessibility only partially explain this gap (Schur, Ameri, and Adya 2017, Schur et al. 2002).

Black residents of Galveston County, by many measures, suffer worse health outcomes than both White and Latino households in the county. For instance, premature mortality for Black Galveston County residents, at 572 per 100,000 residents, is higher than that for White (392 per 100,000 residents) and Latino residents (292 per 100,000 residents) (County Health Rankings and Roadmaps 2022). Infant mortality for Black babies in the county is twice as high as that for White and Latino babies (County Health Rankings and Roadmaps 2022). The Black homicide rate is four times higher than the White and Latino homicide rates (County Health Rankings and Roadmaps 2022). Moreover, despite similar incidence rates of invasive cancers, Black invasive cancer

mortality is higher than that of White and Latinos in Galveston County (2020). Overall, health disparities between racial groups in Galveston leads to disparities in life expectancy: as **Figure 9** shows, average life expectancy for Black Galveston County residents is just 72.6 years, compared with 77.4 years for White residents and 81.5 years for Latino residents of the county (County Health Rankings and Roadmaps 2022).

***Figure 9:*** *Life Expectancy by Race in Galveston County*



5.   Criminal Justice

A growing body of research shows that criminal justice interactions affect political behavior. Several studies have shown that, for individuals, contact with the criminal justice system, from police stops, to arrest, to incarceration, directly decreases voter turnout (Burch 2011, Lerman and Weaver 2014, Weaver and Lerman 2010). Primarily, criminal justice contact decreases turnout through "the combined forces of stigma, punishment and exclusion" which impose "barriers to most avenues of influence" and diminish "factors such as civic capacity, governmental trust, individual efficacy, and social connectedness that encourage activity" (Burch 2007: 12).

In Galveston County, criminal justice contact varies by race. Black people in Galveston County are disproportionately likely to be arrested. According to federal data, despite being only 12.3% of the county population, Black people were 21.5% of the people arrested in Galveston County across all reporting agencies in 2016 (Federal Bureau of Investigation 2018).[72] The disparities in incarceration are even higher: 30.2% of Galveston County Jail inmates are White, 30.0% are Latino, and 39.8% are Black (Bureau of Justice Statistics 2022). It is worth noting that the disparity in incarceration is not explained by the disparity in arrests: Black Galvestonians are a minority of those arrested in the county, but a majority of jail inmates.

Disparities in criminal justice can affect voting through a number of mechanisms, but felony disfranchisement is an important one. Although most people in Galveston County jail have not

---

[72] The data do not report on Hispanic ethnicity for the Galveston agencies.

been convicted of a felony and may vote while incarcerated, many people do not. In fact, jail incarceration can still decrease voting even when a person is not disenfranchised (White 2019).

Racial discrimination accounts for some of this disparity. Studies have shown that racial disparities in arrest are caused by factors that make it more likely that police will stop or search Black people, such as spatially differentiated policing, racial residential segregation, and discrimination (Beckett, Nyrop, and Pfingst 2006, Gelman, Fagan, and Kiss 2007, Ousey and Lee 2008, Pierson et al. 2020). Racial disparities in bail decisions (Arnold, Dobbie, and Yang 2018) and in sentencing also may contribute to incarceration disparities (Bushway and Piehl 2001, Mitchell 2005, Steffensmeier and Demuth 2000, Steffensmeier, Ulmer, and Kramer 1998).

There is evidence of racial discrimination by criminal justice authorities that operate in Galveston County. For instance, in a scene that "evoked images of slavery and the long history of racism and violence by whites against black people," two White police officers on horseback tied up a mentally ill Black man and paraded through the streets of Galveston (Zaveri 2019). Galveston's police chief said that the officers exercised "poor judgment" and could have waited for a vehicle to become available (Zaveri 2019). Other incidents raise allegations of racial profiling and police brutality against minority citizens (Heath 2021, Ferguson 2021c).

*Senate Factor 6: Racial Appeals in Campaigns*

Whether politics is marked by "the use of overt or subtle racial appeals in political campaigns" also is relevant to the consideration of section 2 of the Voting Rights Act. A deep and robust literature on racial appeals in politics exists in political science (Hutchings and Valentino 2004, Stephens-Dougan 2021). Writing in 2001, Mendelberg argued that a "norm of racial equality," which held that "southern segregation and the ideology of white supremacy were illegitimate" gained ascendance in the U. S. (Mendelberg 2001: 70). The norm of racial equality meant that using explicitly racist rhetoric or espousing explicitly racist policy positions would not help, and may even hurt, politicians (Mendelberg 2001). However, because "racial attitudes are still a potent force in American politics," candidates still have an incentive to appeal to White racial fears (Valentino, Hutchings, and White 2002: 76). These two phenomena, the need to appear racially egalitarian while activating racial attitudes, means that campaigns would work to activate White voters' negative racial attitudes through covert or implicit means such as images or coded language (Valentino, Hutchings, and White 2002, Mendelberg 2001).

Implicit racial appeals make racial attitudes and concerns more salient in the minds of voters, even without explicitly mentioning or referring to a particular race or group (Valentino, Hutchings, and White 2002, Mendelberg 2001). Implicit racial appeals may rely on certain code words or issues, use images of minority exemplars, or a combination of both, to make race more salient to voters (Valentino, Hutchings, and White 2002). In particular, Caliendo and McIlwain highlight racist appeals, which "prime antiminority racial fear, resentment, and bias . . . through a variety of audiovisual and textual cues that associate persons of color with long-standing, negative, racial stereotypes" (McIlwain and Caliendo 2014: 1159). These implicit racial appeals can rely on code words such as "inner-city" or "sanctuary city" or reference crime, welfare, and illegal immigration (Brader, Valentino, and Suhay 2008, Collingwood and O'Brien 2019, Hurwitz and Peffley 2005, Valentino, Hutchings, and White 2002). Referring to immigration as racial "invasion" is also a longstanding trope, one that is associated with violence (Lindsay 2018, Collins 2019). More broadly, McIlwain and Caliendo argue that racial appeals in television ads typically include

elements such as, "a salient stereotype, most often those of criminality, laziness, taking undeserved advantage, and the charge of liberalism (read, "extreme" liberal, "dangerously" liberal, "radical,"etc.); a minority opponent's image; all-White, noncandidate images; and an exposed audience that includes a high percentage of White potential voters" (McIlwain and Caliendo 2014: 1159).

In several instances, political officials in Galveston County have used racialized language privately and publicly against minorities. In 2019, Yolanda Waters, the chairwoman for Galveston County's Republican Party, refused to resign her post after referring to another Black Republican, J. T. Edwards, in private text messages as a "Typical Nig" (Svitek 2019). Ads targeting minorities are commonplace and often contain the "images of minority exemplars" and "certain code words or issues" that Valentino, Hutchings, and White argue increase the salience of ethnicity to voters (Valentino, Hutchings, and White 2002). For instance, campaign materials from Jackie Peden, a candidate for tax assessor in Galveston County, showed an MS-13 gang member and made claims about illegal immigrant voting (the man in the ad was not in Galveston County, nor was he registered as a voter there) (Ferguson 2020b). Ads and materials from several state and congressional legislators also use anti-immigrant language. For instance, Randy Weber has run anti-immigrant ads with minority exemplars, and Brandon Creighton uses invasion language to refer to immigrants.[73] Candidates in the Republican primary for State Senate District 11 also used invasion language in reference to immigrants (Natario 2022).

*Senate Factor 7: Minority Elected Officials*

Minorities are underrepresented relative to their share of the population with respect to Senate factor 7, or "the extent to which members of the minority group have been elected to public office in the jurisdiction." There have been two Black people and no Latinos elected County Commissioner in Galveston County: Stephen Holmes and his predecessor, Wayne Johnson III, both serving Precinct 3 (Heath 2022). No people of color have served as County Judge.

Dr. Robin Armstrong recently was appointed to serve as the County Commissioner for Precinct 4 after the death of Ken Clark (Heath 2022). The county argues that, because Dr. Armstrong is Black, he represents the needs of minority communities in Galveston (Ferguson 2022). For his part, Dr. Armstrong says he has ties to the Black community in Galveston County. For instance, he says:

> "I have very strong relationships in the Black community as my father served on the school board in La Marque ISD for many years and my mother taught school in Galveston for 34 years. I have relationships with Black and Hispanic evangelical pastors and leaders as well through many years of service. I will fight the Democrat narrative about conservative Republicans and educate all communities the value of working together to solve our problems" (Yanez 2022).

However, despite his claims, it is important to note that Dr. Armstrong holds several views that are outside the mainstream of Black Americans. For instance, despite the racial disparities in COVID-19 infections and deaths in Black communities, especially early in the pandemic, Dr. Armstrong advocated for unproven and potentially dangerous treatments over vaccines (Bethel

---

[73] See https://gopadtracker.com/node/3877 and https://gopadtracker.com/node/4769 for examples.

2021). He is famous for conducting unauthorized "observational" studies of hydroxychloroquine on elderly nursing home patients with COVID-19, in some cases without the knowledge or consent of them or their families (Romo 2020). Dr. Armstrong has made several statements minimizing the importance of racism against Black Americans, such as America is " 'not really as racist' as portrayed" and that "police officers are 'not racist by and large'" (Bethel 2021). Dr. Armstrong says that the protests in support of Black Lives Matter were more violent than the Capitol Riots (Bethel 2021). For comparison, in the 2021 Pew Survey of Black Americans,[74] 82% of Black Americans say that racism is an "extremely" or "very big" problem for Black people, and 80% say that police brutality is an "extremely" or "very big" problem. Eighty-three percent of Black Americans express support for the Black Lives Matter movement (DeAngelis 2022). Only 3% of Black Americans say that there is no discrimination against Black Americans. Lopez-Bunyasi and Philpot (2015) argue that Black people are unlikely to support even Black candidates who are racially conservative (Lopez Bunyasi and Wright Rigueur 2015), as Dr. Armstrong appears to be based on these comments.

Dr. Armstrong is aware that he is not aligned with most minorities in Galveston County and does not have their support. He did not receive any endorsements from the NAACP, LULAC, or other minority groups.[75] When asked, he said that he was not "the minority candidate of choice to represent Precinct 4."[76] Dr. Armstrong also disagrees that he "automatically represent[s] your African American constituents just because you yourself are African American."[77]

*Senate Factor 8: Lack of Responsiveness*

Under Section 2 of the Voting Rights Act, courts may consider additional factors, such as whether there is a lack of responsiveness on the part of elected officials to the particularized needs of minority group members. The longstanding and persistent gaps in socioeconomic status, incarceration, and health discussed throughout this report demonstrate the lack of responsiveness of public officials to the needs of Galveston's minority communities. Research has shown that public policies are important for creating and sustaining racial disparities.

It also is the case that Galveston County residents express the belief that certain Galveston public officials are not responsive to them and their needs. In the public meeting on the new redistricting plan, several Galvestonians stood up and expressed their frustration with the County Judge and Commissioners, saying that they felt ignored and disregarded:

Wendy Langham:     "After hearing you say that, why do you even have us here? [AUDIENCE AGREEMENT]. You had no intention of changing the map, or even getting our input. I hadn't thought that this was what I was going to say to you, but this seems so dishonest. It's like you're placating us. We don't matter to you. Juneteenth is something that's come up in the paper here recently. It

---

[74] Pew Research Center. 2022. Topline Questionnaire. https://www.pewresearch.org/race-ethnicity/2022/08/30/black-americans-have-a-clear-vision-for-reducing-racism-but-little-hope-it-will-happen/#h-black-americans-see-racism-in-our-laws-as-a-big-problem-and-discrimination-as-a-roadblock-to-progress. Accessed 8 Dec 2022.

[75] Armstrong Deposition, 55:12-14; 56:8-10; 57:21-23.

[76] Armstrong Deposition, 91:1-4.

[77] Armstrong Deposition, 97:10-13.

involves Galveston and Galveston County. That involves us. Us as Black people. You're telling me that I don't matter. I don't like that."[78]

Dr. Edna Courville:     "And they could care less! Not only do you portray selfishness, but you're arrogant with it. [CHEERS] You're arrogant. And this arrogance has got to stop. It's all over the nation. It has to stop. You need to stop it. You just disregard people; you act like we don't exist. We exist. Our tax dollars exist."[79]

Tierrisha Gibson:       "I have looked and watched your faces the whole time while people have been up here talking, and it's like you're thinking about something else."[80]

Leon Phillips:          "[I]t looks as though you're tired of hearing me talk, Mr. Hear me, just listen to what I'm saying."[81]

Throughout the evening, when speakers raised concerns such as these, the audience applauded and cheered, indicating their agreement.

Several residents also expressed the belief that they would not be well represented under the new maps by the current commissioners to whom they were being reassigned. For instance:

Wendy Langham:        "Now the three of you sitting up there, can you say that you know anything about my life and the way I live? You can't. This man [indicates Commissioner Holmes] does. He's lived it. He lives with us. He helps us. Y'all are doing this [HOLDS UP SIGN THAT READS "Politicians Picking Voters."] Y'all are picking who you want to vote for you so that you get into office. I want to pick who I want to vote for, and I'm telling you right now it's not you.[82]

Pastor Jerry Lee:       "Commissioner Holmes has been a help not only to this precinct, but all over. During storms, during anything, freezes, he's fed folk, everybody has come. He has a strong representation not only in this district. But you know what? You're not gonna treat me the way he treats me. You're not gonna look out for me the way he looks out for me. So I want you to know this, from a minister's point, one day we're all going to have to lay down and die, and we're going to have to answer to God for what we do." [APPLAUSE][83]

Dr. Annette Jenkins:    "So the maps that you have drawn are very discriminatory and it is going backwards . . . all the things that Commissioner Holmes has done for us . . . we could always go and call him, talk to him, we had a disaster he was

[78] 35:04. "CC Special 11-12-21."
[79] 31:20. "CC Special 11-12-21."
[80] 1:03:10. "CC Special 11-12-21."
[81] 1:05:16. "CC Special 11-12-21."
[82] 36:18. "CC Special 11-12-21."
[83] 33:10. "CC Special 11-12-21."

always there to help us and lend us a helping hand. I can't say that about some of you all that's in here today. . . ."[84]

Mayor Dedrick Johnson:      "This decision was made without including a majority side of the table that this vastly affects. Commissioner Stephen Holmes has not only been a good steward of his constituency, but he's been a superhero in his community. He's done things that none of us have ever seen either of you do for Black and brown people." [CHEERS].[85]

Again, the reactions to the comments of these citizens and community leaders suggest that these sentiments reflected those of the audience generally.

With respect to the online comments, over one hundred online comments expressed concerns about racial discrimination and minority voter suppression. For instance, the voter in Submission 1294673 writes:

"I would like a 3rd map option that protects minority voters and gives voice to the actual will of the citizens that line in this area or that you choose map 1 WITHOUT Bolivar. Map 2 should be stricken because it clearly discriminates against race, which is still forbidden. Hopefully we can get rid of political gerrymanderingin [sic] the future and the blatant power grabs by old White men."[86]

People who expressed such concerns about racism overwhelmingly voted against Map 2.

For their part, although the commissioners have paid lip service to representing their minority constituents in theory, in practice they have taken few actions to engage with them. Commissioner Apffel says he never did voter outreach or other events specifically to Black and Hispanic voters[87] and Commissioner Giusti says that his election materials were printed only in English.[88] Commissioner Apffel says he is not familiar with issues specific to minority communities:

Q. And based on your experience living in Texas City, and your interactions with the Black and Hispanic communities in Texas City, have you become -- or did you become familiar with the issues most pressing to those communities?

A. That's -- that's been asked. I don't -- I -- I never was able -- I didn't identify any -- any wants, needs, or desires, that those folks had. They would come to me. Then I would have handled them and addressed them. But I –

Q. Did you –

A. -- can't sit here and think of any.[89]

In the past, these commissioners have demonstrated a lack of support for policy stances important to the Black and Hispanic communities, failing to remove confederate statues and funneling $1.8

---

[84] 25:09. "CC Special 11-12-21."
[85] 46:25. "CC Special 11-12-21."
[86] DEFS00003646.
[87] Apffel Deposition, 292:1-3.
[88] Giusti Deposition, 32:14-16
[89] Apffel Deposition, 292: 14-25.

million of county dollars toward building a border wall (Ferguson 2021b, 2020a). Commissioner Holmes was the only commissioner to support removing the confederate statue or to reject spending county money on the border wall (Ferguson 2021b, 2020a).

*Senate Factor 9: Tenuousness*

With respect to Senate Factor 9, or "whether the policy underlying the challenged standard or practice is tenuous," there are few stated rationales for supporting the adopted plan on the public record. In fact, during the November 12, 2021 special session, again, the only public meeting where the Commissioners Court discussed the maps, the commissioners did not make an opening statement or other remarks to explain why Map 2 (the one that ultimately was adopted) was the best option for the county. As Norman Pappous, a Galveston Republican, said to the commissioners during that November 12, 2021 meeting, "Should these lines be interpreted as an attempt to disenfranchise people in our community, it's your job to go to them to make sure their voices are heard."[90] However, no such explanation was forthcoming. There is some evidence that at least some commissioners stated (1) putting coastal areas into one Commissioner Precinct, (2) public support for Map 2 and (3) the need to equalize population across precincts as a basis for supporting the adopted plan.  I consider these three rationales in turn below.

First, County Judge Mark Henry and some commissioners have expressed support for Map 2, the adopted plan, based on consolidating coastal areas into the same precinct. For instance, Judge Henry posted on Facebook that "Having a coastal precinct will ensure that those residents directly along the coast have a dedicated advocate on commissioners court" according to the Galveston Daily News (Ferguson 2021d). Commissioner Apffel agreed in his deposition that a coastal community was intriguing to everybody.[91] However, there is no basis for believing that coastal communities thought that their interests would be served by Map 2. There is little evidence of a push for a coastal precinct coming from the public or community leaders. For instance, several days *after* Judge Henry commented on the benefits of a coastal precinct, the President of the Bolivar Peninsula Chamber of Commerce said, "I think right now, two voices on commissioners court is better than one" (Ferguson 2021e). She reported hearing mixed feedback about the idea of a coastal precinct (Ferguson 2021e). At the time of the Facebook post, the Chamber of Commerce of Bolivar had not yet submitted any feedback regarding the redistricting plans, and no Bolivar meeting took place until the evening of November 11, 2021 (Ferguson 2021e). Likewise, the city of Galveston had not met to discuss a recommendation on the maps when Judge Henry made his social media post (Ferguson 2021e). The online comments also came after this post, and among the comments supporting Map 2, feedback about coastal communities appeared in only a minority. It is worth noting that the Department of Justice says that the county offered a similar justification that the public wanting Bolivar Peninsula and Galveston Island to be joined into coastal precinct to justify the 2011 redistricting; however, even back then "a review of all the audio and video recordings of the public meetings shows that only one person made such a comment."

It also is worth noting that the desire to draw new maps with a coastal precinct does not necessitate eliminating Precinct 3 as a majority-minority district. The plaintiffs have presented multiple plans

---

[90] 27:55. "CC Special 11-12-21."
[91] Apffel Deposition 184:4-18.  It is worth noting that Commissioner Apffel also expressed in his deposition that Bolivar Peninsula was a long drive for him. See Apffel Deposition, 126:18-127:5.

that manage to combine coastal areas into one precinct while maintaining Precinct 3 as a coalition district; several such maps are attached to this report in Appendix B.[92] Thus the stated goal of creating a new coastal precinct does not justify splitting up racial minorities across the four new precincts.

A second basis for supporting the adopted plan involves public feedback. Judge Henry claims that the public strongly supported Map 2 in the online comments; Commissioner Apffel says that this was an important rationale for voting for this map.[93]

I have described the implications of Judge Henry's breakdown of the online comments with respect to how he disregards comments that express concerns about minority voting dilution. Here, I want to note that my review of the public comments, contrary to the overwhelming supermajority of support for Map 2 asserted by Judge Henry in the November 12, 2021 meeting, instead shows that the online comments were divided pretty evenly between people who wrote to support Map 2 and those who supported a different option. I classified 218 responses as supportive of Map 2 (including 215 responses for Map 2 and 3 responses in favor of either map). However, I found that 197 people either supported Map 1 as is or opposed one or both maps as outlined in the plans. The remainder of the responses that came in before the 1:30pm meeting did not exert a clear preference. The characterization that "168 people did not discuss a particular map they just called me names" is inaccurate; often they discussed, and rejected, one or both maps.[94]

More importantly, if we consider the online commentary in conjunction with the public comments made at the special session, it is clear that a majority of the people who expressed an opinion through these public venues did not express support for Map 2. I observed that 29 people spoke against the redistricting plans in the November 12 special session, with only one person clearly supporting the plan.

Considering the public commentary reflected in these two venues is important, because the public was otherwise largely shut out of the deliberations as we have seen previously. For instance, there were no other public meetings, and as Commissioner Giusti admits, no surveys of Galveston residents, no consultation with the Black community, no consultation with the Hispanic community or others to see what they wanted.[95] The meeting on Bolivar took place the evening of November 11, 2021, the night before the special session and long after the redistricting plans had been submitted (Ferguson 2021e).

Finally, a few commissioners have indicated that they were motivated by traditional redistricting principles. For instance, at the April 5, 2021 general meeting of the commissioners court, Commissioner Clark mentioned having to "adhere to the one man one vote rule, the ten percent rule."[96] Likewise, in his deposition, Commissioner Apffel also said that equalizing the population

---

[92] Cooper Declaration pp. 32-37.
[93] Apffel Deposition, 192:18-23.
[94] When asked in his deposition about the meaning of this statement, he said "There are people who don't really care which map it is.  They just want to take shots."  See Henry Deposition 275:8-12.
[95] Giusti Deposition, pp. 98-100
[96] 19:42. "CC REG 04-05-21."

was one important reason for his vote for the adopted plan.[97] Commissioner Giusti also said that "leveling out the population" was important.[98] However, the need to balance population across precincts does not require the elimination of the coalition precinct: it is possible to achieve precinct population totals with deviation in the 10% range even in maps that retain a majority-minority precinct in Galveston County. Commissioner Holmes presented the other commissioners with examples of such maps publicly at the November 12, 2021 hearing.

In conclusion, Judge Henry and the Commissioners purported reasoning for adopting the 2021 enacted plan—the desire for a united coastal commissioners precinct and the public support of the adopted plan—are inconsistent with the factual evidence of the redistricting process. Not only is it possible to achieve population deviations in the accepted range even in plans that incorporate a coalition precinct, there is no evidence that coastal communities wanted this change. Nor is there evidence that a majority of the public supported the map the commissioners adopted, especially where a minority of the comments submitted via the online forum and in person during the November 12, 2021 hearing expressed support for the Map 2 that was eventually adopted as the 2021 enacted plan.

*       *       *       *       *

I reserve the right to continue to supplement this report upon receiving additional facts, testimony and/or materials that may come to light. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Dated: January 27, 2023

*Traci Burch*

Traci Burch

---

[97] Apffel Deposition, 192:18-19.
[98] Giusti Deposition, 45:24-25.

## APPENDIX A: WORKS CITED

1961. A statistical summary, State by State, of segregation-desegregation activity affecting Southern schools from 1954 to present, together with pertinent data on enrollment, teachers, colleges, litigation and legislation. Southern Education Reporting Service.

2020. "Texas Cancer Registry." accessed 4 Dec 2022. https://www.cancer-rates.info/tx/.

2021a. "COC Annual Meeting and Elections." *Crystal Beach Local News*. Accessed 27 Jan 2023. https://www.crystalbeachlocalnews.com/coc-annual-meeting-elections/.

2021b. "Mapping Inequality Redlining in New Deal America." University of Richmond Digital Scholarship Lab, accessed 5 Apr 2022. https://dsl.richmond.edu/panorama/redlining/#loc=5/39.1/-94.58.

Almond, Gabriel, and Sidney Verba. 1963. *The Civic Culture*. Princeton: Princeton University Press.

Ananat, Elizabeth Oltmans. 2011. "The wrong side (s) of the tracks: The causal effects of racial segregation on urban poverty and inequality." *American Economic Journal: Applied Economics* 3 (2):34-66.

Ard, Kerry. 2016. "By all measures: An examination of the relationship between segregation and health risk from air pollution." *Population and Environment* 38 (1):1-20.

Arnold, David, Will Dobbie, and Crystal S Yang. 2018. "Racial bias in bail decisions." *The Quarterly Journal of Economics* 133 (4):1885-1932.

Aulds, T.J. 2011a. "Commissioners to Talk About Redistricting." *The Galveston County Daily News*, 21 June 2011. Accessed 17 Jan 2023.

Aulds, T.J. 2011b. "Redistricting: How will Commissioners Vote?" *The Galveston County Daily News*, 29 Aug 2011. Accessed 17 Jan 2023.

Aulds, T.J. 2011c. "Vocal Opposition Grows to Redistricting Plans." *Galveston County Daily News*, 24 Aug 2011. Accessed 25 Jan 2023. https://www.galvnews.com/news/vocal-opposition-grows-to-redistricting-plans/article_683e962f-d9d5-59ec-a8ff-b5ab53cf6713.html.

Bagwe, Gaurav, Juan Margitic, and Allison Stashko. 2020. Polling Place Location and the Costs of Voting. Working Paper.

Beckett, Katherine, Kris Nyrop, and Lori Pfingst. 2006. "Race, drugs, and policing: Understanding disparities in drug delivery arrests." *Criminology* 44 (1):105-137.

Bethel, Brian. 2021. "Armstrong: Republican Party must Defy Democrats' Narrative." *Abilene Reporter News*, 28 May 2021. Accessed 8 Dec 2022. https://www.reporternews.com/story/news/2021/05/28/armstrong-republican-party-must-defy-democrats-narrative/7488084002/.

Billings, Stephen B, Noah Braun, Daniel Jones, and Ying Shi. 2022. "Disparate Racial Impacts of Shelby County v. Holder on Voter Turnout."

Blakely, Tony A, Bruce P Kennedy, and Ichiro Kawachi. 2001. "Socioeconomic inequality in voting participation and self-rated health." *American journal of public health* 91 (1):99.

Brader, Ted, Nicholas A Valentino, and Elizabeth Suhay. 2008. "What triggers public opposition to immigration? Anxiety, group cues, and immigration threat." *American Journal of Political Science* 52 (4):959-978.

Brady, Henry E., and John E. McNulty. 2011. "Turning Out to Vote: The Costs of Finding and Getting to the Polling Place." *The American Political Science Review* 105 (1):115-134. doi: https://doi.org/10.1017/S0003055410000596.

Brady, Henry E., Sidney  Verba, and Kay Lehman Schlozman. 1995. "Beyond SES: A Resource Model of Political Participation." *American Political Science Review* Vol. 89, No. 2 (Jun. 1995):271-294.

Burbank, Matthew J. 1997. "Explaining contextual effects on vote choice." *Political Behavior* 19 (2):113-132.

Burch, Traci. 2011. "Turnout and Party Registration among Criminal Offenders in the 2008 General Election." *Law and Society Review* 45 (3):699-730.

Burch, Traci. 2013. *Trading Democracy for Justice: Criminal Convictions and the Decline of Neighborhood Political Participation*. Chicago: University of Chicago Press.

Burden, Barry C. 2009. "The dynamic effects of education on voter turnout." *Electoral studies* 28 (4):540-549.

Bureau of Justice Statistics. 2022. Census of Jails, 2019. edited by United States Department of Justice. Office of Justice Programs. Bureau of Justice Statistics.: Inter-university Consortium for Political and Social Research [distributor].

Bushway, Shawn D, and Anne Morrison Piehl. 2001. "Judging judicial discretion: Legal factors and racial discrimination in sentencing." *Law and Society Review*:733-764.

Campbell, Angus, Philip E Converse, Warren E Miller, and Donald E Stokes. 1980. *The american voter*: University of Chicago Press.

Cohen, Cathy J., and Michael C. Dawson. 1993. "Neighborhood Poverty and African-American Politics." *American Political Science Review* 87 (2):286-302.

Collingwood, Loren, and Benjamin Gonzalez O'Brien. 2019. *Sanctuary cities: The politics of refuge*: Oxford University Press, USA.

Collins, Ben. 2019. "Investigators Reasonably Confident Texas Suspect Left Anti-Immigrant Screed, Tipped Off Before Attack." *NBC News*, 3 Aug 2019. Accessed 8 Dec 2022. https://www.nbcnews.com/news/us-news/investigators-reasonably-confident-texas-suspect-left-anti-immigrant-screed-tipped-n1039031.

County Health Rankings and Roadmaps. 2022. "Texas Data and Resources." accessed 5 Dec 2022. https://www.countyhealthrankings.org/explore-health-rankings/texas/data-and-resources.

Dancy, Kevin. 2018. Seizing the Opportunity for Equitable and Inclusive Redevelopment. Federal Reserve Bank of Dallas.

De Rienzo Jr, Salvatore M. 2022. "Shelby County v. Holder and Changes in Voting Behavior." *The American Economist*:05694345221101133.

DeAngelis, Tori. 2022. Support for Black Lives Matter Remains Stable.

EdBuild. 2022. "Data Dashboard." EdBuild, accessed 7 Sep 2022. https://shiny.edbuild.org/apps/edbuild-dashboard/.

Feder, Catalina, and Michael G Miller. 2020. "Voter purges after Shelby: Part of special symposium on election sciences." *American Politics Research* 48 (6):687-692.

Federal Bureau of Investigation. 2018. Uniform Crime Reporting Program Data: Arrests by Age, Sex, and Race, Summarized Yearly, United States, 2016. Inter-university Consortium for Political and Social Research [distributor].

Ferguson, John Wayne. 2020a. "Confederate Statue Stays Put After Galveston County Commissioners Fail to Vote." *The Galveston County Daily News*, 24 Aug 2020. Accessed 17 January 2023.

Ferguson, John Wayne. 2020b. "Johnson: Peden Ad Racist, Discriminatory, and a Lie." *The Galveston Daily News*, 22 Feb 2020. Accessed 8 Dec 2022. https://www.galvnews.com/news/article_1f26ee77-55ca-5723-a493-28fdd78f15c5.html.

Ferguson, John Wayne. 2021a. "Galveston County Commissioners OK Redistricting Map Despite Protest." *The Galveston County Daily News*, 12 Nov 2021. Accessed 17 Jan 2023.

Ferguson, John Wayne. 2021b. "Galveston County Commits $1.8M in COVID Relief to Texas Border Security." *The Galveston County Daily News*, 4 Oct 2021. Accessed 17 January 2023.

Ferguson, John Wayne. 2021c. "Grand Jury Issues Manslaughter Charge Against Galveston County Sheriff's Deputy." *The Galveston Daily News*, 24 Jun 2021. Accessed 8 Dec 2022. https://www.galvnews.com/news/police/free/article_317b2581-b3b0-519b-8e96-201768b5d240.html.

Ferguson, John Wayne. 2021d. "Political Buzz: County's redistricting might cut out lone Democrat." *Galveston County Daily News*, 3 Nov 2021. Accessed 28 Nov 2022.

Ferguson, John Wayne. 2021e. "Political Buzz: Does the Coast Want a Single Commissioner? ." *Galveston County Daily News*, 10 November 2021. Accessed 28 Nov 2022.

Ferguson, John Wayne. 2022. "Galveston County argues Armstrong's appointment makes map suits moot." *The Galveston Daily News*, 17 Jun 2022. Accessed 28 Nov 2022.

Fucile-Sanchez, Emily, and Meri Davlasheridze. 2020. "Adjustments of Socially Vulnerable Populations in Galveston County, Texas USA Following Hurricane Ike." *Sustainability* 12 (17):7097.

Gelman, Andrew, Jeffrey Fagan, and Alex Kiss. 2007. "An analysis of the New York City police department's "stop-and-frisk" policy in the context of claims of racial bias." *Journal of the American statistical association* 102 (479):813-823.

Hamideh, Sara, and Jane Rongerude. 2018. "Social vulnerability and participation in disaster recovery decisions: public housing in Galveston after Hurricane Ike." *Natural Hazards* 93 (3):1629-1648.

Heath, Keri. 2021. "Group Call Galveston's Slab Weekend Policing Racial Profiling." *The Galveston Daily News*, 4 May 2021. Accessed 8 Dec 2022. https://www.galvnews.com/news/article_e658263a-8187-50a1-a3f8-cf2060cec9ee.html.

Heath, Keri. 2022. "Armstrong Elected as GOP Pick for Precinct 4 Commissioner." *The Galveston Daily News*, 27 July 2022. Accessed 8 Dec 2022.

Hemphill, Sheryl A, John W Toumbourou, Todd I Herrenkohl, Barbara J McMorris, and Richard F Catalano. 2006. "The effect of school suspensions and arrests on subsequent adolescent antisocial behavior in Australia and the United States." *Journal of adolescent health* 39 (5):736-744.

Highton, Benjamin. 2000. "Residential mobility, community mobility, and electoral participation." *Political Behavior* 22 (2):109-120.

Huckfeldt, R. Robert. 1979. "Political Participation and the Neighborhood Social Context." *American Journal of Political Science* 23 (3):579-592.

Huckfeldt, Robert, Eric Plutzer, and John Sprague. 1993. "Alternative Contexts of Political Behavior: Churches, Neighborhoods, and Individuals." *Journal Of Politics* 55 (2):365-381.

Hurwitz, Jon, and Mark Peffley. 2005. "Playing the race card in the post–Willie Horton era: The impact of racialized code words on support for punitive crime policy." *Public Opinion Quarterly* 69 (1):99-112.

Hutchings, Vincent L, and Nicholas A Valentino. 2004. "The centrality of race in American politics." *Annu. Rev. Polit. Sci.* 7:383-408.

Hwang, Sean-Shong, and Steve H Murdock. 1982. "Residential segregation in Texas in 1980." *Social Science Quarterly* 63 (4):737.

Kimble, John. 2007. "Insuring inequality: The role of the Federal Housing Administration in the urban ghettoization of African Americans." *Law & Social Inquiry* 32 (2):399-434.

Kramer, Michael R, and Carol R Hogue. 2009. "Is segregation bad for your health?" *Epidemiologic reviews* 31 (1):178-194.

Kruse, Kevin M. 2013. *White flight*: Princeton University Press.

LBJ School of Public Policy. 1982. School Desegregation in Texas: The Implementation of United States v. State of Texas.

Lerman, Amy E, and Vesla M Weaver. 2014. *Arresting citizenship: The democratic consequences of American crime control*: University of Chicago Press.

Lindsay, Matthew J. 2018. "The Perpetual Invasion: Past as Prologue in Constitutional Immigration Law." *Roger Williams U. L. Rev.* 23:369.

Long, Mark C. 2010. "Changes in the returns to education and college quality." *Economics of Education Review* 29 (3):338-347. doi: https://doi.org/10.1016/j.econedurev.2009.10.005.

Lopez Bunyasi, Tehama, and Leah Wright Rigueur. 2015. ""Breaking bad" in black and white: What ideological deviance can tell us about the construction of "authentic" racial identities." *Polity* 47 (2):175-198.

Lyon, Gregory. 2021. "The Conditional Effects of Health on Voter Turnout." *Journal of Health Politics, Policy and Law* 46 (3):409-433.

Massey, Douglas S, and Mary J Fischer. 2006. "The effect of childhood segregation on minority academic performance at selective colleges." *Ethnic and Racial Studies* 29 (1):1-26.

McIlwain, Charlton D, and Stephen M Caliendo. 2014. "Mitt Romney's racist appeals: How race was played in the 2012 presidential election." *American Behavioral Scientist* 58 (9):1157-1168.

Mendelberg, Tali. 2001. *The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality*. Princeton: Princeton University Press.

Mitchell, Ojmarrh. 2005. "A Meta-Analysis of Race and Sentencing Research: Explaining the Inconsistencies." *Journal of Quantitative Criminology* 21:439-466.

Mowen, Thomas, and John Brent. 2016. "School discipline as a turning point: The cumulative effect of suspension on arrest." *Journal of research in crime and delinquency* 53 (5):628-653.

Natario, Nick. 2022. "Crowded State Senatee District 11 Seat in Galveston County Could Pull Austin  More to the Right." *ABC 13*, 9 Feb 2022. Accessed 8  Dec 2022. https://abc13.com/galveston-county-senate-elections-mayes-middleton-bianca-gracia/11549927/.

National Conference of State Legislatures. 2022. "Table 2: Excuses to Vote Absentee." accessed 5 Dec 2022. https://www.ncsl.org/research/elections-and-campaigns/vopp-table-2-excuses-to-vote-absentee.aspx.

Othering and Belonging Institute. 2022. "Technical Appendix." accessed 5 Dec 2022. https://belonging.berkeley.edu/technical-appendix.

42

Ousey, Graham C, and Matthew R Lee. 2008. "Racial disparity in formal social control: An investigation of alternative explanations of arrest rate inequality." *Journal of Research in Crime and Delinquency* 45 (3):322-355.

Pacheco, Julianna, and Jason Fletcher. 2015. "Incorporating health into studies of political behavior: Evidence for turnout and partisanship." *Political research quarterly* 68 (1):104-116.

Pierson, Emma, Camelia Simoiu, Jan Overgoor, Sam Corbett-Davies, Daniel Jenson, Amy Shoemaker, Vignesh Ramachandran, Phoebe Barghouty, Cheryl Phillips, and Ravi Shroff. 2020. "A large-scale analysis of racial disparities in police stops across the United States." *Nature human behaviour* 4 (7):736-745.

ProPublica. 2017. "Miseducation." accessed 29 Nov 2022. https://projects.propublica.org/miseducation/district/4814280.

Reardon, Sean F, Demetra Kalogrides, and Kenneth Shores. 2019. "The geography of racial/ethnic test score gaps." *American Journal of Sociology* 124 (4):1164-1221.

Romo, Vanessa. 2020. "COVID-19 Patients Given Unproven Drug in Texas Nursing Home in Disconcerting Move." *NPR*, 10 Apr 2020. Accessed 8 Dec 2022. https://www.npr.org/2020/04/10/830348837/covid-19-patients-given-unproven-drug-in-texas-nursing-home-garnering-criticism.

Rosenstone, Steven J., and John Mark Hansen. 1993. *Mobilization, Participation, and Democracy in America*. New York: MacMillan.

Schur, Lisa, Mason Ameri, and Meera Adya. 2017. "Disability, voter turnout, and polling place accessibility." *Social Science Quarterly* 98 (5):1374-1390.

Schur, Lisa, Todd Shields, Douglas Kruse, and Kay Schriner. 2002. "Enabling democracy: Disability and voter turnout." *Political Research Quarterly* 55 (1):167-190.

Southern Educational Reporting Service. 1961. A statistical summary, State by State, of segregation-desegregation activity affecting Southern schools from 1954 to present, together with pertinent data on enrollment, teachers, colleges, litigation and legislation. Southern Education Reporting Service.

Steffensmeier, Darrell, and Stephen Demuth. 2000. "Ethnicity and Sentencing Outcomes in U.S. Federal Courts: Who is Punished More Harshly?" *American Sociological Review* 65 (5):705-729.

Steffensmeier, Darrell, Jeffery Ulmer, and John Kramer. 1998. "The Interaction of Race, Gender, and Age in Criminal Sentencing: The Punishment Cost of Being Young, Black, and Male." *Criminology* 36 (4):763-798. doi: 10.1111/j.1745-9125.1998.tb01265.x.

Stephens-Dougan, LaFleur. 2021. "The Persistence of Racial Cues and Appeals in American Elections." *Annual Review of Political Science* 24:301-320.

Suayan, John. 2009. "Federal Judge Declares Galveston Schools Finally Desegregated." *Southeast Texas Record*, 5 May 2009. Accessed 29 Nov 2022. https://setexasrecord.com/stories/510610985-federal-judge-declares-galveston-schools-finally-desegregated.

Svitek, Patrick. 2019. "Top Texas Republicans Pressure a County Chair to Resign Over Racist Text." *Texas Tribune*, 7 Dec 2019. Accessed 8 Dec 2022. https://www.texastribune.org/2019/12/07/texas-republicans-racist-text-resign/.

Swift, Wes. 2013. "6 Sue County Over the New Maps for JPs." *The Galveston County Daily News*, 27 Aug 2013. Accessed 17 January 2023.

Tam Cho, Wendy K., and Thomas J. Rudolph. 2008. "Emanating Political Participation: Untangling the Spatial Structure Behind Participation." *British Journal of Political Science* 38:273-289.

Texas Education Agency. 2022. "STAAR Aggregate Data for 2021-2022." accessed 29 Nov 2022. https://tea.texas.gov/student-assessment/testing/staar/staar-aggregate-data-for-2021-2022.

The Leadership Conference Education Fund. 2019. Democracy Diverted: Polling Place Closures and the Right to Vote.

Trounstine, Jessica. 2016. "Segregation and inequality in public goods." *American Journal of Political Science* 60 (3):709-725.

U. S. Census Bureau. 2021. 2020 Census Statistics Highlight Local Population Changes and Nation's Racial and Ethnic Diversity.

U. S. Census Bureau. 2022. Table S0101: Age and Sex 2021 American Community Survey.

U. S. Department of Education. 2018. Civil Rights Data Collection. United States Department of Education.

Valentino, Nicholas A, Vincent L Hutchings, and Ismail K White. 2002. "Cues that matter: How political ads prime racial attitudes during campaigns." *American Political Science Review* 96 (1):75-90.

Verba, Sidney, Kay Lehman Schlozman, and Henry Brady. 1995a. *Voice and Equality: Civic Voluntarism in American Politics*. Cambridge: Harvard University Press.

Verba, Sidney, Kay Lehman Schlozman, and Henry E. Brady. 1995b. *Voice and Equality*. Cambridge: Harvard University.

Weaver, Vesla M, and Amy E Lerman. 2010. "Political consequences of the carceral state." *American Political Science Review* 104 (04):817-833.

White, Ariel. 2019. "Misdemeanor disenfranchisement? The demobilizing effects of brief jail spells on potential voters." *American Political Science Review* 113 (2):311-324.

Wilson, William Julius. 1996. *When Work Disappears*. New York: Knopf.

Yanez, Andy. 2022. "Q&A: Get to Know the Candidates for Texas Senate District 11 Ahead of Primary Election." *Community Impact*, 10 Feb 202. Accessed 8 Dec 2022. https://communityimpact.com/houston/pearland-friendswood/government/2022/02/10/qa-get-to-know-the-candidates-for-texas-senate-district-11-ahead-of-primary-election/.

Zaveri, Mihir. 2019. "White Officers Who Led Black Man on Rope Won't Face Criminal Charges." *The New York Times*, 19 Aug 2019. Accessed 8 Dec 2022. https://www.nytimes.com/2019/08/19/us/galveston-rope-donald-neely.html.

Zingher, Joshua N, and Eric M Moore. 2019. "The Power of Place? Testing the Geographic Determinants of African-American and White Voter Turnout." *Social Science Quarterly* 100 (4):1056-1071.

### APPENDIX B: ALTERNATIVE MAPS

*Alternative Map 1*



| Precinct | Total Population | Anglo CVAP | Non-Anglo CVAP | Hispanic CVAP | Black CVAP | Asian CVAP | Native CVAP |
|----------|------------------|------------|----------------|---------------|------------|------------|-------------|
| 1 | 88,586 | 69.9% | 30.1% | 19.0% | 7.3% | 3.1% | 1.0% |
| 2 | 87,697 | 62.4% | 37.6% | 20.6% | 14.5% | 1.7% | 1.0% |
| 3 | 86,450 | 45.9% | 54.1% | 23.1% | 26.4% | 3.2% | 0.4% |
| 4 | 87,949 | 74.5% | 25.5% | 14.0% | 5.2% | 4.9% | 1.1% |

1

*Alternative Map 2*



| Precinct | Total Population | Anglo CVAP | Non-Anglo CVAP | Hispanic CVAP | Black CVAP | Asian CVAP | Native CVAP |
|---|---|---|---|---|---|---|---|
| 1 | 88,586 | 69.9% | 30.1% | 19.0% | 7.3% | 3.1% | 1.0% |
| 2 | 87,173 | 63.5% | 36.5% | 20.5% | 13.1% | 2.0% | 1.0% |
| 3 | 86,974 | 45.1% | 54.9% | 23.2% | 27.5% | 2.9% | 0.4% |
| 4 | 87,949 | 74.5% | 25.5% | 14.0% | 5.2% | 4.9% | 1.1% |

2

*Alternative Map 3*



| Precinct | Total Population | Anglo CVAP | Non-Anglo CVAP | Hispanic CVAP | Black CVAP | Asian CVAP | Native CVAP |
|---|---|---|---|---|---|---|---|
| 1 | 88,586 | 69.9% | 30.1% | 19.0% | 7.3% | 3.1% | 1.0% |
| 2 | 87,222 | 66.1% | 33.9% | 20.2% | 10.9% | 1.7% | 1.1% |
| 3 | 87,738 | 44.0% | 56.0% | 23.6% | 28.3% | 2.7% | 0.5% |
| 4 | 87,136 | 73.5% | 26.5% | 13.4% | 6.4% | 5.7% | 0.9% |

*Alternative Map 4*



| Precinct | Total Population | Anglo CVAP | Non-Anglo CVAP | Hispanic CVAP | Black CVAP | Asian CVAP | Native CVAP |
|---|---|---|---|---|---|---|---|
| 1 | 89,244 | 69.7% | 30.3% | 18.0% | 6.4% | 4.7% | 1.1% |
| 2 | 87,514 | 64.1% | 35.9% | 21.0% | 11.9% | 2.0% | 1.0% |
| 3 | 87,826 | 44.9% | 55.2% | 25.0% | 27.7% | 1.3% | 0.5% |
| 4 | 86,098 | 75.7% | 24.3% | 12.0% | 6.3% | 5.0% | 1.0% |

*Alternative Map 5 (NAACP Plaintiffs' Illustrative Map 3)*



*Population and Demographic information available in expert report of William S. Cooper

**Traci Burch**

**Employment**

- Associate Professor, Northwestern University Department of Political Science (2014-Present)

- Research Professor, American Bar Foundation (2007- Present)

- Assistant Professor, Northwestern University Department of Political Science (2007-2014)

**Education**

- *Harvard University*

Ph.D. in Government and Social Policy

    Dissertation: *Punishment and Participation: How Criminal Convictions Threaten American Democracy*

Committee: Jennifer Hochschild (Chair); Sidney Verba, and Gary King

- *Princeton University*

A.B. in Politics, *magna cum laude*

**Publications**

- Burch, Traci. 2022. "Adding Insult to Injury: the Justification Frame in Official Narratives of Officer-Involved Killings." *Journal of Race, Ethnicity, and Politics.*

- Burch, Traci. 2022. "Officer-Involved Killings and the Repression of Protest." *Urban Affairs Review.*

- Burch, Traci. 2021. "Not All Black Lives Matter: Officer-Involved Deaths and the Role of Victim Characteristics in Shaping Political Interest and Voter Turnout." *Perspectives on Politics.*

- Kay Lehman Schlozman, Philip Edward Jones, Hye Young You, Traci Burch, Sidney Verba, Henry E. Brady. 2018. "Organizations and the Democratic Representation of Interests: What Happens When Those Organizations Have No Members?" *Perspectives on Politics.*

- Burch, Traci. 2016. "Political Equality and the Criminal Justice System." In Resources, Engagement, and Recruitment. Casey Klofstad, ed. Philadelphia: Temple University Press.

- Burch, Traci. 2016. "Review of The First Civil Right by Naomi Murakawa." *The Forum.*

- Kay Lehman Schlozman, Philip Edward Jones, Hye Young You, Traci Burch, Sidney Verba, Henry E. Brady. 2015. "Louder Chorus – Same Accent: The Representation of Interests in Pressure Politics, 1981-2011." In Darren Halpin, David Lowery, Virginia Gray, eds. The Organization Ecology of Interest Communities. New York: Palgrave Macmillan.

- Burch, Traci. 2015. "Skin Color and the Criminal Justice System: Beyond Black-White Disparities in Criminal Sentencing." *Journal of Empirical Legal Studies* 12(3): 395-420.

- Burch, Traci. 2014. "The Old Jim Crow: Racial Residential Segregation and Neighborhood Imprisonment." *Law & Policy* 36(3) 223-255.

- Burch, Traci. 2014. "The Effects of Imprisonment and Community Supervision on Political Participation." Detaining Democracy Special Issue. *The Annals of the American Academy of Political and Social Science* 651 (1) 184-201.

- Burch, Traci. 2013. Trading Democracy for Justice: Criminal Convictions and the Decline of Neighborhood Political Participation. Chicago: University of Chicago Press.

- Hochschild, Jennifer, Vesla Weaver, and Traci Burch. 2012. Transforming the American Racial Order. Princeton: Princeton University Press.

- Schlozman, Kay Lehman, Sidney Verba, Henry Brady, Traci Burch, and Phillip Jones. 2012. "Who Sings in the Heavenly Chorus? The Shape of the Organized Interest System." In Schlozman, Kay Lehman, Sidney Verba, and Henry Brady, The Unheavenly Chorus, Princeton: Princeton University Press.

- Schlozman, Kay Lehman, Sidney Verba, Henry Brady, Phillip Jones, and Traci Burch. 2012. "Political Voice through Organized Interest Activity." In Schlozman, Kay Lehman, Sidney Verba, and Henry Brady, The Unheavenly Chorus, Princeton: Princeton University Press.

- Burch, Traci. 2012. "Did Disfranchisement Laws Help Elect President Bush? New Evidence on the Turnout and Party Registration of Florida's Ex-Felons." *Political Behavior* 34 (1); 1-26.

- Burch, Traci. 2011. "Turnout and Party Registration among Criminal Offenders in the 2008 General Election." *Law and Society Review* 45(3): 699-730.

- Burch, Traci. 2011. "Fixing the Broken System of Financial Sanctions." *Criminology and Public Policy* 10(3).

- Hochschild, Jennifer; Vesla Weaver, and Traci Burch. 2011. "Destabilizing the American Racial Order." *Daedalus* 140; 151-165.

- Burch, Traci.  2009.  "Can the New Commander-In-Chief Sustain His All Volunteer Standing Army?"  *The Dubois Review on Race* 6(1).

- Burch, Traci. 2009. "Review of *Imprisoning Communities,* by Todd Clear."  *Law and Society Review* 43(3) 716-18.

- Burch, Traci.  2009.  "American Politics and the Not-So-Benign Neglect of Criminal Justice," in The Future of American Politics, ed. Gary King, Kay Schlozman, and Norman Nie.  (New York: Routledge).

- Schlozman, Kay Lehman and Traci Burch.  2009.  "Political Voice in an Age of Inequality," in America at Risk: Threats to Liberal Self-Government in an Age of Uncertainty, ed.  Robert Faulkner and Susan Shell (Ann Arbor: University of Michigan Press).

- Hochschild, Jennifer and Traci Burch. 2007.  "Contingent Public Policies and the Stability of Racial Hierarchy: Lessons from Immigration and Census Policy," in Political Contingency: Studying the Unexpected, the Accidental, and the Unforseen, ed. Ian Shapiro and Sonu Bedi (New York: NYU Press).

## Grants

- Co-Principal Investigator.  "Fellowship and Mentoring Program on Law and Inequality." September 1, 2020 to August 31, 2023.  $349, 313.  National Science Foundation.

## Honors and Fellowships
- American Political Science Association 2014 Ralph J. Bunche Award (for Trading Democracy for Justice).

- American Political Science Association Urban Section 2014 Best Book Award (for Trading Democracy for Justice).

- American Political Science Association Law and Courts Section 2014 C. Herman Pritchett Award (for Trading Democracy for Justice).

- Research grant, Stanford University Center for Poverty and Inequality (2012).

- American Political Science Association E. E. Schattschneider Award for the best doctoral dissertation in the field of American Government (2009)

- American Political Science Association William Anderson Award for the best doctoral dissertation in the field of state and local politics, federalism, or intergovernmental relations (2008)

- American Political Science Association Urban Section Best Dissertation in Urban Politics Award (2008)

- Harvard University Robert Noxon Toppan Prize for the best dissertation in political science (2007)

- Institute for Quantitative Social Sciences Research Fellowship (2006-07)

- *European Network on Inequality* Fellowship (2005)

- Research Fellowship, The Sentencing Project (2005)

- Doctoral Fellow, Malcolm Weiner Center for Inequality and Social Policy (2004-07)

**Professional Service**
- APSA Law and Courts Section Best Paper Award Committee (2020-2021)

- APSA Elections, Public Opinion, and Voting Behavior Executive Committee (2020-2023)

- General Social Survey Board of Overseers (2020-2025)

- APSA Kammerer Prize Committee (2017)

- Associate Editor, *Political Behavior* (2015-2019)

- APSA Law and Courts Section, Lifetime Achievement Award Prize Committee (2014-2015)

- Law and Society Association, Kalven Prize Committee (2013-2014)

- American Political Science Association, Urban Politics Section Dissertation Prize Committee (2012-13)

- American Political Science Association, Urban Politics Section Executive Committee (2012-13)

- Law and Society Association Diversity Committee, (2012-2013)

- American Political Science Association, Urban Politics Section Program Co-Chair (2011)

- Associate Editor, *Law and Social Inquiry*

- American Political Science Association, Urban Politics Section Book Prize Committee (2009)

4

- Reviewer for *The American Political Science Review, Public Opinion Quarterly, American Politics Research, and Time-Sharing Experiments in the Social Sciences.*

**Presentations and Invited Talks**

- American Political Science Association Annual Conference, Montreal, Canada. "Not All Black Lives Matter: Officer-Involved Deaths and the Role of Victim Characteristics in Shaping Political Interest and Voter Turnout." September 2022.

- University of Pennsylvania.  Virtual.  "Voice and Representation in American Politics." April 2021.

- University of Michigan.  Virtual.  "Which Lives Matter?  Factors Affecting Mobilization in Response to Officer-Involved Killings." February 2021.

- University of Pittsburgh.  Virtual.  "Policing and Participation."  November 2020.

- Hamilton College Constitution Day Seminar.  Virtual.  "Racial Protests and the Constitution."  September 2020.

- New York Fellows of the American Bar Foundation.  New York, NY.  "Police Shootings and Political Participation."  March 2020.

- Pennsylvania State University, State College, PA.  "Effect of Officer Involved Killings on Protest.  November 2019.

- Princeton University. Princeton NJ.  "Effects of Police Shootings on Protest among Young Blacks."  November 2019.

- Missouri Fellows of the American Bar Foundation.  Branson, MO.  Police Shootings and Political Participation in Chicago.  September 2019.

- Northwestern University.  "Police Shootings and Political Participation."  November, 2018.

- Princeton University.  Princeton, NJ.  "Police Shootings and Political Participation." September, 2018.

- University of California at Los Angeles.  Los Angeles, CA.  "Police Shootings and Political Participation."  August, 2018.

- American Bar Association Annual Meeting.  Chicago, IL.  "Police Shootings and Political Participation."  August 2018.

- American Bar Endowment Annual Meeting. Lexington, KY. "Effects of Police Shooting

in Chicago on Political Participation." June 2018.

- Vanderbilt University. "Effects of Police Shootings in Chicago on Political Participation." April 2018.

- Washington University in St. Louis. "Effects of Pedestrian and Auto Stops on Voter Turnout in St. Louis."  February 2018.

- Fellows of the American Bar Foundation, Los Angeles.  "Assaulting Democracy." January 2018.

- Northwestern University Reviving American Democracy Conference. Panel presentation. "Barriers to Voting." January 2018.

- University of Illinois at Chicago. "Effects of Police Shootings in Chicago on Political Participation."  October, 2017.

- Chico State University. "Constitution Day Address: Policing and Political Participation." September, 2017.

- Fellows of the American Bar Foundation, Atlanta, Georgia.  "Policing in Georgia."  May 2017.

- United States Commission on Civil Rights.  Testimony.  "Collateral Consequences of Mass Incarceration."  May 2017.

- Northwestern University Pritzker School of Law.  "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis."  April 2017.

- University of California at Los Angeles. Race and Ethnic Politics Workshop. "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis." March 2017.

- University of North Carolina at Chapel Hill. American Politics Workshop. "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis." February 2017.

- National Bar Association, St. Louis MO.  "Political Effects of Mass Incarceration." July 2016.

- Harvard University, Edmond J. Safra Center for Ethics. Inequalities/Equalities in Cities Workshop. April 2016.

- American Political Science Association Annual Meeting.  September 2015. "Responsibility for Racial Justice." Discussant.

- St. Olaf College. April 2015. "The Collateral Consequences of Mass Incarceration."

- Northwestern University. Institute for Policy Research. February 2015. "The Civic ~~Culture~~ Structure."

- Texas A&M University.  Race, Ethnicity, and Politics Workshop.  September 2014. "Trading Democracy for Justice."

- Columbia University Teachers College.  The Suburban Promise of Brown Conference. May 2014. "Can We All Get Along, Revisited: Racial Attitudes, the Tolerance for Diversity, and the Prospects for Integration in the 21st Century."

- University of Kentucky. Reversing Trajectories: Incarceration, Violence, and Political Consequences Conference. April 2014. "Trading Democracy for Justice."

- University of Chicago.  American Politics Workshop.  March 2014. "How Geographic Differences in Neighborhood Civic Capacity Affect Voter Turnout."

- Kennedy School of Government, Harvard University.  February 2014.  "Trading Democracy for Justice.

- University of Michigan.  American Politics Workshop.  December 2013.  "Trading Democracy for Justice."

- Yale University.  American Politics and Public Policy Workshop.  September 2013. "Trading Democracy for Justice."

- American Political Science Association Annual Meeting.  August 2013.  "The Heavenly Chorus Is Even Louder: The Growth and Changing Composition of the Washington Pressure System." With Kay Lehman Schlozman, Sidney Verba, Henry Brady, and Phillip Jones.

- National Bar Association, Miami Florida, July 2013.  "The Collateral Consequences of Mass Imprisonment."

- Loyola University.  American Politics Workshop.  December 2012.  "Mass Imprisonment and Neighborhood Voter Turnout."

- Marquette University School of Law.  November 2012.  "The Collateral Consequences of Mass Imprisonment."

- Yale University.  Detaining Democracy Conference.  November 2012.  "The Effects of Imprisonment and Community Supervision on Political Participation."

7

- Brown University.  American Politics Workshop.  October 2012.  "Mass Imprisonment and Neighborhood Voter Turnout."

- American Bar Association National Meeting, August 2012.  "Mass Imprisonment: Consequences for Society and Politics."

- University of Madison-Wisconsin.  American Politics Workshop. March 2012.  "The Spatial Concentration of Imprisonment and Racial Political Inequality."

- American Political Science Association Annual Meeting.  2011. "Theme Panel: How Can Political Science Help Us Understand the Politics of Decarceration?"

- University of Pennsylvania.  Democracy, Citizenship, and Constitutionalism Conference. April, 2011.  "Vicarious Imprisonment and Neighborhood Political Inequality."

- University of Chicago School of Law. Public Laws Colloquium. Chicago, IL. November, 2010. ""The Effects of Neighborhood Incarceration Rates on Individual Political Efficacy and Perceptions of Discrimination."

- Pomona College.  November, 2010.  "Incarceration Nation."

- University of Washington.  Surveying Social Marginality Workshop.  October 2010. "Using Government Data to Study Current and Former Felons."

- American Bar Foundation, Chicago, IL, September 2010.  "The Effects of Neighborhood Incarceration Rates on Individual Political Attitudes."

- Northwestern University.  Chicago Area Behavior Conference. May 2010. "Trading Democracy for Justice: The Spillover Effects of Incarceration on Voter Turnout in Charlotte and Atlanta."

- Annual Meeting of the Law and Society Association, Chicago, IL, May 2010. "Neighborhood Criminal Justice Involvement and Voter Turnout in the 2008 General Election."

- Annual Meeting of the Southern Political Science Association, Atlanta, GA, January 2010. "The Art and Science of Voter Mobilization: Grassroots Perspectives on Registration and GOTV from Charlotte, Atlanta, and Chicago."

- University of Illinois at Chicago.  Institute for Government and Public Affairs.  November 2009.  "Turnout and Party Registration among Convicted Offenders during the 2008 Presidential Election."

- Annual Meeting of the American Political Science Association, Toronto, Ontario, Canada, September 2009.  "'I Wanted to Vote for History:' Turnout and Party Registration among Convicted Offenders during the 2008 Presidential Election."

- Harris School of Public Policy, University of Chicago. American Politics Workshop. December 2008.  "Trading Democracy for Justice?  The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

- Northwestern University School of Law.   Law and Political Economy  Colloquium. November 2008.  "Did Disfranchisement Laws Help Elect President Bush?  New Evidence on the Turnout Rates and Candidate Preferences of Florida's Ex-Felons."

- University of California, Berkeley.   Center for the Study of Law and Society. October 2008.   "Trading Democracy for Justice?   The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

- Law  and  Society  Association  Annual  Meeting,  Montreal,  Canada,  May  2008. "Did Disfranchisement Laws Help Elect President Bush?  New Evidence on the Turnout Rates and Candidate Preferences of Florida's Ex-Felons."

- Law and Society Association Annual Meeting, Montreal, Canada, May 2008. "Trading Democracy for Justice? The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

-  Midwest Political Science Association Conference, Chicago, IL, April 2007.  Paper: "Concentrated  Incarceration:  How  Neighborhood  Incarceration  Decreases  Voter Registration."

**Working Papers Under Review**

- "Introduction" (with Jenn Jackson and Periloux Peay) in *Freedom Dreams: A Symposium on Abolition*.  Eds. Jenn Jackson, Periloux Peay, and Traci Burch. Social Science Quarterly.

- "The Effects of Community Police Performance on Protest in Chicago" (For Symposium Honoring John Hagan)

- Which Lives Matter?

**Additional Activities**
- Expert witness in *Kelvin Jones vs. Ron DeSantis, etc. et al.* (U.S. District Court for the Northern District of Florida Consolidated Case No. 4:19-cv-00).

- Expert witness in *Community Success Initiative, et al., Plaintiffs v. Timothy K. Moore* (Superior Court, Wake County, NC Case No. 19-cv-15941).

- Expert witness in *People First of Alabama v. Merrill* (U.S. District Court in Birmingham, Alabama, Case No. 2: 20-cv-00619-AKK)

- Expert witness in *Florida State Conference of the NAACP v. Lee* (U.S. District Court in the Northern District of Florida, Case No. 4:21-cv-00187-MW-MAF)

- Expert witness in *One Wisconsin Institute Inc. v. Jacobs* (U.S. District Court in the Western District of Wisconsin, Case No. 15-CV-324-JDP).

- Expert witness in *Alpha Phi Alpha Fraternity Inc., et al. v. Raffensperger* (U.S. District Court for the Northern District of Georgia, Case No. 1:21-cv-05337-SCJ)

- Expert witness in *Robinson, et al. v. Ardoin* (U.S. District Court for the Middle District of Louisiana, Civil Action No. 22-cv-00211).

- Expert witness in *Nairne, et al. v. Ardoin* (U.S. District Court for the Middle District of Louisiana, Civil Action No. 3:22-cv-00178 SDD-SDJ).

- Expert witness in *White, et al. v. State Board of Election Commissioners, et al.* (U. S. District Court for the Northern District of Mississippi, Civil Action No. 4:22-cv-00062-SA-JMV).

10