# EXHIBIT 12

*Excerpts of January 17, 2023 Deposition*

*of County Judge Mark Henry*

Page 1

1        IN THE UNITED STATES DISTRICT COURT

        FOR THE SOUTHERN DISTRICT OF TEXAS

2               GALVESTON DIVISION

3

HONORABLE TERRY              )

4   PETTEWAY, et al.             )

                             )   Case No. 3:22-cv-00057

5   VS.                          )

                             )

6   GALVESTON COUNTY, et         )

    al.                          )

7

8      ORAL AND VIDEOTAPED DEPOSITION OF MARK A. HENRY

               JANUARY 17, 2023

9

10        ORAL AND VIDEOTAPED DEPOSITION OF MARK A. HENRY,

11   produced as a witness at the instance of the Plaintiff and

12   duly sworn, was taken in the above styled and numbered

13   cause on Tuesday, January 17, 2023, from 9:08 a.m. to

14   6:07 p.m., before Janalyn Elkins, CSR, in and for the

15   State of Texas, reported by computerized stenotype

16   machine, via Zoom, pursuant to the Federal Rules of Civil

17   Procedure and any provisions stated on the record herein.

18

19

20

21

22

23

24

25

Page 2

```
 1                    A P P E A R A N C E S
 2
     FOR THE PLAINTIFFS:
 3        HILARY HARRIS KLEIN
          ADRIENNE SPOTO
 4        TALIA RAY
          SOUTHERN COALITION FOR SOCIAL JUSTICE
 5        1415 West NC Highway 54, Suite 101
          Durham, North Carolina  27707
 6        hilaryhklein@scsj.org
 7        SARAH CHEN
          BERNADETTE REYES
 8        JOAQUIN GONZALEZ
          TEXAS CIVIL RIGHTS PROJECT
 9        1405 Montopolis Drive
          Austin, Texas  78741
10        Schen@texascivilrightsproject.org
11        THARUNI JAYARAMAN
          CATHERINE MEZA
12        BRUCE GEAR
          K'SHAANI SMITH
13        DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION
          Voting Rights Section 150 M Street, N.E.
14        Washington, DC  20530
          Tharuni.Jayaraman@usdoj.gov
15
          VALENCIA RICHARDSON
16        MARK GABER
          ALEXANDRA COPPER
17        DaWUAN NORWOOD
          SIMONE LEEPER
18        CAMPAIGN LEGAL CENTER
          1101 14th Street NW, Suite 400
19        Washington, DC  20005
          Vrichardson@campaignlegalcenter.org
20
          KATHRYN GARRET
21        ANDREW SILBERSTEIN
          DIANA C. VALL-LLOBERA
22        WILLKIE FARR & GALLAGHER, LLP
          787 Seventh Avenue
23        New York, New York  10019
          Kgarrett@willkie.com
24
25
```

Page 3

1    FOR THE DEFENDANTS:
          JOSEPH R. RUSSO
2         GREER HERZ & ADAMS
          One Moody Plaza, 18th Floor
3         Galveston, Texas   77550
          jrusso@greerherz.com
4
          MATEO FORERO
5         HOLTZMAN VOGEL JOSEFIAK TORCHINSKY, PLLC
          2300 N. Street NW, Suite 643A
6         Washington, DC   20037
          mforero@holtzmanvogel.com
7
8    Also Present:
          DANIEL ALPIZAR (Videographer)
9         ALEXA PASTOR (Concierge)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                                      Page 42

1    think your answer here was wrong other than the fact

2    that right now you can't recall it?

3         A.  No, I can't recall it.  And this would have

4    been probably input from Commissioner Clark.

5         Q.  Okay.

6              MS. KLEIN:  You can take it down.

7         Q.  (BY MS. KLEIN)  So you won again in 2014, 2018,

8    and then, congratulations, this past 2022, right?

9         A.  Correct.

10        Q.  And it's correct, then, in all of these

11   campaigns you identified as a Republican when you ran?

12        A.  Right.

13        Q.  So fair to say that you have identified as a

14   Republican your entire political clear?

15        A.  Entire life, yes.

16        Q.  Entire life.  Okay.

17             Turning to your 2018 campaign, was

18   Commissioner's Court redistricting part of your 2018

19   campaign platform?

20        A.  No.

21        Q.  Do you recall if you mentioned it in any of

22   your campaign events?

23        A.  No.

24        Q.  What about one-on-one conversations with

25   constituents?

1          A.   Not that I recall.

2          Q.   Any -- in any campaign material sent to voters?

3          A.   No.

4          Q.   So by my count, you've run in four Galveston

5     county-wide elections, right?

6          A.   Yes, correct.

7          Q.   Do you remember your margins of victory in

8     these elections?

9          A.   2010 was 60/40.   Now, these are numbers that

10    may have been adjusted slightly after some mail-in

11    ballots, but for the most part 60/40 in 2010, 66/34 in

12    2022.

13         Q.   66, probably since COVID that kind of margin,

14    right?

15         A.   I agree.

16         Q.   Okay.   Do you think that 66 percent from the

17    2022 election aligns with the partisan makeup of the

18    county?

19         A.   Probably.

20         Q.   Why do you think probably?

21         A.   People had a choice.   So I mean, I had an

22    opponent that ran as a Democrat so they had a choice and

23    they selected me.

24         Q.   Who do you consider to be your core supporters

25    in the county when you run in county elections?

```
                                            Page 52
 1               MR. RUSSO:  Objection, vague and ambiguous.
 2               THE WITNESS:  People who don't want to pay
 3     city taxes but want city services.
 4         Q.  (BY MS. KLEIN)  Okay.  What about income levels
 5     on Bolivar Peninsula?
 6         A.  I would think they're -- I don't know.  I would
 7     think they're pretty respectable based on what it
 8     probably costs to live there.
 9         Q.  So respectable you would mean on the high end?
10         A.  On middle to upper, yes.
11         Q.  What about Freddiesville?
12               MR. RUSSO:  I'm sorry.  What did you say?
13               THE WITNESS:  Freddiesville, it's an
14     unincorporated part of Santa Fe.
15               I do not know much about the income level
16     of Freddiesville.
17         Q.  What about Santa Fe?
18         A.  Yes, very familiar with Santa Fe.
19         Q.  What's the income level of that area?
20               MR. RUSSO:  Objection, calls for
21     speculation.
22               THE WITNESS:  I have no way of knowing.
23     But, I mean, based on the size of the lots there, again,
24     I'm going to assume that it's middle to upper.
25         Q.  (BY MS. KLEIN)  La Marque?
```

                                                              Page 53

1           A.   Yes.

2           Q.   What's the income level of folks, to your

3    knowledge?

4           A.   No idea.

5           Q.   Texas City?

6           A.   Same as somewhere else -- same as Galveston.

7    Parts of Texas City are probably economically depressed.

8    Parts of Texas City are very affluent.

9           Q.   League City?

10          A.   League City is a bedroom community, it's going

11   to generally be on the middle to upper end.

12          Q.   And what about Dickinson?

13          A.   Dickinson, same as Texas City, parts are going

14   to be somewhat more modest and somewhat -- some other

15   parts are going to be better off.

16          Q.   What about the democratic -- demographic,

17   excuse me, makeup of these neighborhoods?  Are you

18   familiar with the race or ethnicity that's predominant

19   in these different neighborhoods?

20          A.   I mean, not specifically, no.

21          Q.   What about generally?

22          A.   Generally speaking, Santa Fe is probably going

23   to be mostly Caucasian, similar in League City.   There's

24   going to be a higher African American population in

25   Hitchcock, La Marque, parts of Galveston, parts of Texas

1    City.  Is that all you asked about?  Does that cover

2    every place you asked about?

3         Q.  Bolivar Peninsula?

4         A.  Bolivar is going to be mostly White.

5         Q.  Freddiesville?

6         A.  Freddiesville -- Freddiesville is a place I

7    don't get too very often, so I don't know much about

8    Freddiesville.

9         Q.  La Marque?

10        A.  La Marque is probably more African American.

11        Q.  And Dickinson?

12        A.  Dickinson -- Dickinson is probably somewhat

13   half and a half.  It's probably one of the more diverse

14   cities.

15        Q.  I mean, you see demographic data as part of

16   your role as county judge, the presiding officer of the

17   county, right?

18        A.  Honestly, I see it when we're doing

19   redistricting as it's presented to me and that's about

20   it.

21        Q.  Okay.  I would like to just pull up a document.

22   This is Tab 108.  We're going to mark this as Exhibit 2,

23   I guess?  3.  2 was the deposition transcript.

24             (Exhibit No. 3 was marked.)

25        Q.  (BY MS. KLEIN)  So Judge, do you recognize this

Page 66

1      that 1.8 million allocation?

2          A.  I don't remember.

3          Q.  Turning to another decision, in 2020 you

4      opposed the removal of a Confederate statue called the

5      Dignified Resignation that is in front of the Galveston

6      County Courthouse, correct?

7          A.  The removal of the statue, probably, yes.

8          Q.  Okay.  You actually had previously voted to

9      renovate and rededicate that statue, correct?

10         A.  Was that from 2011 or 2012?

11         Q.  It was before 2020.

12         A.  Okay.  Then that would -- most likely, yes.

13         Q.  And in 2020 Stephen Holmes, Commissioner

14     Holmes, proposed a vote to remove that Dignified

15     Resignation statue, correct?

16         A.  I believe that's correct.

17         Q.  Are you aware of whether any Galveston

18     residents were calling for its removal?

19         A.  I do not remember.

20         Q.  And do you remember whether that came up -- his

21     proposal for a vote was ever seconded?

22         A.  I don't -- I don't think it was, but I don't

23     remember for sure.

24         Q.  But there was never a vote on that issue,

25     right?

Page 67

1       A.  I don't remember.  If it didn't get seconded,

2    there was no vote.

3       Q.  Okay.  Did anyone from the African American

4    community come before you to oppose or to advocate for

5    its removal, to your knowledge?

6       A.  I don't remember.

7       Q.  Do you think it should be removed?

8       A.  The statute itself, no.

9       Q.  Why not?

10      A.  It's part of history.  I mean, the plaque was

11   removed and placed in a museum, as I recall.  But let me

12   go back to Commissioner Holmes for a minute.

13          Very unusual for this guy who's very smart

14   to not have a plan on what to do with the statue.  He

15   just wanted it removed.  No idea how to pay for it.  No

16   idea where it is going.  So that was kind of unusual for

17   Commissioner Holmes.

18      Q.  Do you know why he wanted it removed?

19      A.  No.  I mean, you have to ask him.

20      Q.  All right.  Turning to language access, fair to

21   say there are folks that speak Spanish as a primary

22   language in Galveston?

23      A.  Probably.

24      Q.  Have you made any efforts to expand Spanish

25   language access to county information?

Page 94

1    Calls for speculation.

2              THE WITNESS:  I don't think there was a

3    vote on the map.  Not that I remember.

4         Q.  (BY MS. KLEIN)  Would it surprise you if there

5    was a vote, you voted against it?

6         A.  I'd need more details as to -- was it run

7    through the demographer?  Do we know it was legally

8    compliant?  Did it meet all the criteria we had set

9    forth?  So I would want to know the answers to that

10   first.

11        Q.  I'm hoping you can provide some of that

12   information.

13        A.  Cannot.

14        Q.  But you don't remember?

15        A.  I do not.

16        Q.  Okay.  Let's talk a little bit about the

17   process.  You just mentioned criteria.  Did the

18   Commissioner's Court vote on criteria in the 2011 cycle?

19        A.  I can't -- I think we did.  I don't remember.

20        Q.  The Commissioner's Court had voted on criteria

21   in previous cycles, to your knowledge?

22        A.  I believe that to be correct, yes.

23        Q.  And -- but you don't remember whether you voted

24   for criteria in a public meeting in the 2011 process?

25        A.  I did everything that our legal counsel told us

```
                                                  Page 124
 1      them to her because then she's the voter registrar, she

 2      has to implement those addresses into the -- I can't

 3      remember the name of the system that then creates the

 4      voter card that tells you where -- what precincts you're

 5      in.

 6           Q.  Do you remember her asking -- all right.  We

 7      can take this one down.

 8                Do you remember her following up in January

 9      of the new year of 2021 about the same issue?

10      A.  I don't remember that, but she may well have.

11           Q.  Okay.  We'll pull that up.

12                MS. KLEIN:  This is Tab 26, Alexa, and it

13      will be Exhibit 15.

14                (Exhibit No. 15 was marked.)

15           Q.  (BY MS. KLEIN)  So this is an email dated

16      January 14, 2021 from Cheryl Johnson to you, correct?

17      A.  Correct.

18           Q.  And it also copies the other commissioners,

19      correct?

20      A.  Yes, it does.

21           Q.  Do you remember receiving this email?

22      A.  I don't remember it, but I don't doubt that I

23      got it.

24           Q.  And she says, (Reading:)  With redistricting

25      around the corner, I thought it may be helpful for each
```

Page 125

```
 1    of you to have the list of registered voters across the
 2    county (by precinct) which automatically provides county
 3    commissioner lists and the JP/Constable listings.
 4                  Do you know why she would have sent that to
 5    you?
 6         A.  Not really.
 7         Q.  Did you take any steps after receiving this
 8    email from her?
 9         A.  There's nothing -- again, there's nothing at
10    this point that can be done.  We don't have census data.
11    We don't have anything.
12         Q.  Could you have started making a timeline for
13    how the redistricting process should go?
14                  MR. RUSSO:  Objection, calls for
15    speculation.
16                  THE WITNESS:  It would strictly be an
17    exercise because we don't have census data.  So there's
18    nothing you can do until you get census data.
19         Q.  (BY MS. KLEIN)  Can you -- well, what about the
20    criteria that we just looked at a few exhibits ago?  Do
21    you need census data to pass a resolution of criteria?
22         A.  We didn't pass a resolution of criteria.
23         Q.  But hypothetically, would you need census data
24    to pass a resolution of criteria?
25                  MR. RUSSO:  Objection, calls for
```

Page 126

1       speculation and it's an incomplete hypothetical.

2                       THE WITNESS:  If our lawyers told us to

3       pass a resolution for criteria, we would have done that.

4           Q.   (BY MS. KLEIN)  Apart from what your lawyers

5       were telling you to do or not, your understanding, did

6       criteria require knowing anything about census data at

7       all?

8                       MR. RUSSO:  Calls for speculation and a

9       legal conclusion.

10                      THE WITNESS:  You lost me.  The -- the

11      census data -- if we are going to adopt criteria, I

12      don't guess we'd have to wait for census data.

13          Q.   (BY MS. KLEIN)  You don't guess.  You don't

14      think you would have had to wait?

15                      MR. RUSSO:  Objection, calls for

16      speculation.

17                      THE WITNESS:  I don't know that it would

18      have been passed by Commissioner's Court.  So I can only

19      speak for myself as one of five members.

20          Q.   (BY MS. KLEIN)  What I'm asking is did -- if

21      you were to pass redistricting criteria as they had in

22      the past, would you need to know census numbers in order

23      to draft those criteria, those standards for

24      redistricting and pass them?

25          A.   Probably not.

```
                                                  Page 127
 1                    MR. RUSSO:  Objection, calls for
 2      speculation.
 3                    MS. KLEIN:  If you could just let him --
 4      not speak over each other somehow.
 5                    MR. RUSSO:  She's telling you to wait for
 6      me.
 7                    THE WITNESS:  Okay.
 8          Q.  (BY MS. KLEIN)  So you say you sought out Dale.
 9      Do you remember receiving -- Dale Oldham, rather, do you
10      remember receiving communications from other perspective
11      counsel for redistricting?
12          A.  I do not remember getting anything else.
13          Q.  Okay.  Let's pull one of those documents up.
14      This is Doc 15 and it will be Exhibit 16.
15                    (Exhibit No. 16 was marked.)
16                    MS. KLEIN:  So Alexa, that's Tab 15.
17          Q.  (BY MS. KLEIN)  Just one more question on the
18      criteria issue.  I'm sorry to go back and poke around.
19          A.  That's okay.
20          Q.  You said, "probably."  I heard you say,
21      "probably."  Is there any reason you can think of that
22      you would need census numbers first before drafting up a
23      set of criteria to guide the redistricting process?
24                    MR. RUSSO:  Object.  Calls for speculation.
25      Misstates the record.  It's vague and ambiguous.
```

1              THE WITNESS:  No.  I think -- you're saying

2     do I need census data if we are going to adopt criteria,

3     do we need to wait for census data, the answer to that,

4     I guess, would be no.

5         Q.  (BY MS. KLEIN)  All right.  So we have this

6     document, Exhibit 16, pulled up.  And this is an email

7     from Dianna Martinez to you dated February 18, 2020,

8     correct?

9         A.  Correct.

10        Q.  And Dianna Garza-Martinez is your office

11    coordinator, correct?

12        A.  That is correct.

13        Q.  Let's scroll to the second page.  And this is a

14    letter attached, it says -- stamped with received

15    February 14, 2020.  The heading is Allison, Bass &

16    Magee, LLP.  The letter itself is dated February 6, 2020

17    and it is addressed to you, correct?

18        A.  It is.

19        Q.  Did I get any of that wrong?

20        A.  You got it correct.

21        Q.  And the subject line is, Commissioner's Court

22    Precinct Redistricting, right?

23        A.  Correct.

24        Q.  Do you remember getting this letter?

25        A.  I specifically don't remember, but I'm sure I

```
 1    saying who the attorneys that were proposed counsel
 2    would be?
 3         A.   No, I don't remember.
 4         Q.   So let's scroll to -- again, back to Agenda
 5    Item 11.  Does it say anywhere on this?
 6         A.   No.
 7         Q.   So would a member of the public from these
 8    public materials know who the proposed redistricting
 9    counsel would be?
10         A.   I wouldn't think so.
11         Q.   Is there any other way they might know who
12    redistricting counsel would be?
13              MR. RUSSO:  Objection, calls for
14    speculation.
15              THE WITNESS:  I don't know.
16         Q.  (BY MS. KLEIN)  I mean, you know what
17    information is posted about the commissioner court
18    meeting you preside over before?
19         A.   Right.  And we're required to publish the item
20    to be considered, not the details of every transaction.
21         Q.   But didn't you just say that you try to include
22    things whenever you can for the backup?
23         A.   Yes.
24         Q.   So do you know why you chose not to include the
25    draft?
```

Page 159

1    of the regular meetings.  Do you remember that?

2         A.   Not really, but, okay, I'm sure it happened.

3         Q.   You know, did you plan on having a similar

4    presentation about the census data, you know, maybe the

5    next September meeting, for example?  At this time did

6    you make any plans like that saying, okay, the data is

7    going to be released in August so the first regular

8    meeting in September we'll have our presentation like we

9    did last cycle of census demographics for the county?

10        A.   No, because we wouldn't have -- we wouldn't

11   have known for sure when to plan that.  And we don't --

12   we don't put things on the agenda six months for now.

13   We put things on the agenda for next Monday.

14        Q.   Okay.  Well, let me ask you this.  When the

15   data did come out in August, did you put that on the

16   agenda?

17        A.   For what purpose?  No.  But I don't know what

18   purpose we would put it on the agenda for.

19        Q.   To have a meeting to describe the census data

20   as you had, you know, last cycle in 2011, did you put

21   that on the agenda ever?

22        A.   No.

23        Q.   Do you remember why not?

24        A.   No one asked me -- no attorney told me we

25   should do this.

Page 160

1      Q.  Did you make any announcement publicly -- not

2   in just a meeting, but did you make any public

3   announcement to Galveston residents about what the

4   census data had to say about Galveston?

5      A.  I don't think so.

6      Q.  Did you see any analysis of that census data

7   yourself?

8      A.  When it first came out?  No.

9      Q.  What about later?

10      A.  I suspect I would only have seen any

11   information relating to a proposed map is my guess.

12      Q.  So other than counsel, did you see any summary

13   of the census data for Galveston?

14      A.  No.  Other than I did see the general

15   population, the total population.

16      Q.  When did you see that?

17      A.  Whenever that came out I saw it.  I'm assuming

18   August or September.

19      Q.  So turning back to Ms. Johnson, do you remember

20   her following up again with your office after the census

21   data was released?

22      A.  I remember that she was asking for at least a

23   part-time personnel for input data.  Other than that, I

24   don't recall anything else.

25      Q.  All right.  Let's pull up that document.  It's

Page 163

1      A.  I'm sorry.  Did I have any -- what was the

2   question?

3      Q.  Concerns about how -- informing the public

4   about how redistricting would proceed?

5      A.  We -- we informed the public.  I mean, that's

6   all we can do.

7      Q.  Well, did you inform them about what the census

8   had said about Galveston?

9      A.  I don't think so.

10      Q.  Did you inform them that maps were being

11   drafted by counsel?

12      A.  Sure, they would have known that.  I mean, you

13   have to understand that very few people show up to

14   Commissioner's Court.  So when you say the constituents,

15   I'm not really sure who you're talking about.  The

16   people who live here or the people who show up or all of

17   them?

18      Q.  I'm talking about the people in -- who live in

19   Galveston County when I say constituents.

20      A.  Okay.

21      Q.  So the people you represent in government.

22      A.  Right.

23      Q.  Did you -- how would they have known that maps

24   were being drafted?

25           MR. RUSSO:  Object.  Calls for speculation.

1           THE WITNESS:  Other than to access our

2    agendas and they can also get put on a list to always

3    get our agendas, that would have been it.

4           Q.  (BY MS. KLEIN)  Which agenda would that have

5    been on?

6           A.  Engagement letter back in whenever that was.

7           Q.  The engagement letter -- I mean, as we talked

8    about before, the engagement letter wasn't included in

9    the backup, right?

10          A.  It did not say who the firm was.  I did say

11   that we engaged -- that we engaged a firm, through, for

12   redistricting.

13          Q.  But did it have any information about when

14   draft maps would start being drafted?

15          A.  No.

16          Q.  Did it have any information about how many maps

17   would be drafted for proposal?

18          A.  I don't think so.

19          Q.  What about any information about a timeline for

20   drafting?

21          A.  We wouldn't have been able to provide a

22   timeline at that time.

23          Q.  Did it disclose to them that it would have to

24   be done by mid November?

25          A.  I don't think so.

Page 175

1    you didn't?

2         A.   After -- as long as -- to me, as long as we

3    joined Bolivar, Galveston, and that's really it, then

4    the rest of the lines are not that important.

5         Q.   And we'll get into this more later.  But that

6    concept of having a coastal precinct, did you share any

7    other -- strike that.

8              Did you have at the beginning of this

9    redistricting process in August any other conceptual

10   preferences other than this coastal precinct?

11        A.   Not really.

12             MS. KLEIN:  Okay.  This is a good time for

13   us to stop if folks want to get lunch.

14             MR. RUSSO:  No worries.

15             VIDEOGRAPHER:  The time is 12:35.  Off the

16   record.

17             (Brief recess.)

18             VIDEOGRAPHER:  The time is 1:36.  Back on

19   the record.

20        Q.   (BY MS. KLEIN)  Judge Henry, other than the

21   issue of the privilege with your -- with your counsel,

22   did you discuss your testimony here today with anybody

23   else?

24        A.   No.

25        Q.   Did you talk about issues unrelated to

1       Q.   (Reading:)   Please submit your support for

2   proposed map 2.   This map creates a much needed coastal

3   precinct.   Having a coastal precinct will ensure that

4   those residents directly along the coast have a

5   dedicated advocate on Commissioners Court.

6                 So is it fair to say that by October 29th

7   you had decided you're going to vote for Map 2?

8       A.   Having had -- having no reason not to,

9   probably.

10      Q.   What do you mean, "no reason not to"?

11      A.   In short of someone coming in and saying, hey,

12  it turns out that Map 2 is out of population deviation,

13  it's got a problem with something, some other problem,

14  then, yes.

15      Q.   Sorry.   I'm just trying to eliminate questions

16  we might have already covered.   If you'll give me a

17  moment.

18      A.   Okay.   That's fine.

19      Q.   So is it true that the first time a quorum of

20  commissioners met in the same room to discuss the draft

21  maps was the November 12, 2021 hearing?

22      A.   I believe that would be correct, yes.

23      Q.   Is there any other possibility you can think of

24  other than that hearing beforehand?

25      A.   No, I don't think so.

1        Q.   And you had taken great care to make sure that
2   that was the first time everybody met to discuss the
3   maps together, right?
4        A.   Correct.   We would not have been able to meet
5   short of a posted meeting.
6        Q.   Are you aware of whether any other commissioner
7   prepared a proposed map that was not posted on this
8   website?
9        A.   At the November 12th meeting Commissioner
10  Holmes introduced two maps that we saw -- all saw for
11  the first time there.
12       Q.   And when did you learn that Commissioner Holmes
13  would have his own proposal?
14       A.   When he stood up and introduced it.
15       Q.   Are you -- do you know why that wasn't one of
16  the drafts that Dale had put together in the beginning?
17       A.   I do not know.
18       Q.   Do you remember that Commissioner Holmes also
19  passed out an RPV study at that November 12th hearing?
20            MR. RUSSO:   Objection, calls for
21  speculation.   Vague and ambiguous.
22            MS. KLEIN:   I will --
23            MR. RUSSO:   At least ask him what that is.
24       Q.   (BY MS. KLEIN)   I'll clarify.   Are you aware of
25  what racially polaris voting study is?

1      A.  I don't remember that.  He may have, but I

2   don't remember that.

3      Q.  Scroll to the next page.  This is a document

4   titled November 8, 2021.  And the third paragraph says,

5   (Reading:)  Voting patterns in Galveston County are

6   definitely characterized by racially polarized voting.

7           So you don't -- your testimony is that you

8   don't know what that means?

9      A.  I do not recall having heard RVP -- or RPV

10  before today.

11     Q.  What about racially polarized voting?

12     A.  No, I don't think so.

13     Q.  And did you ever view a racially polarized

14  voting study?  Do you ever recall reviewing a study at

15  any point in the 2021 process?

16     A.  No.

17     Q.  Okay.  Let's go to the conclusions.  The third

18  sentence starts, (Reading:)  In recent elections which I

19  analyzed -- sorry, back up.  Do you know what, strike

20  that.

21           I'd like to talk a little bit more about

22  your decision to choose Map 2.  You were aware -- is it

23  fair to say you were aware when you decided on Map 2

24  that it would create a dramatic shift in the

25  commissioner precinct boundary that existed at the time?

Page 218

1     A.  Yes.  But that would be the nature of making
2  one precinct cover the coast.
3     Q.  And you were aware, right, when you chose Map 2
4  that it would take that then existing Precinct 3 and it
5  would split it into all of the four new precincts,
6  correct?
7     A.  I may have known that at the time.  I don't
8  know.
9     Q.  Didn't you -- wouldn't you have looked -- let
10 me ask you this.  Didn't you look at the existing
11 precinct lines during the process to see where -- where
12 you were starting from?
13    A.  Well, I would have known what the existing
14 precinct lines were.  I mean, I know that Dale ensured
15 that everybody lived in the new precincts regardless of
16 which map it was.  I think they all lived in the
17 precincts of either map.
18    Q.  So you can see that the existing Precinct 3 it
19 was in the middle of the county, right?
20    A.  Yes.
21    Q.  And then in the new Map 2 it got moved to the
22 north part of the county, right?
23    A.  Yes.
24    Q.  And all of the other precincts m1, 2, and 4 had
25 a chunk of that middle part of the county, right?

Page 225

1    these were shown to me.

2         Q.  What about a new -- did you ever ask -- so you

3    never asked for a map other than this one?

4         A.  The 2.

5         Q.  For Map Proposal 2, you liked this when you saw

6    it, right?

7         A.  I liked the fact that it got us one coastal

8    precinct.

9         Q.  But you liked -- you didn't -- you didn't ask

10   for the other lines to change.  You must have been --

11   you must have liked the other maps, right?  Sorry.  You

12   didn't ask for the other precinct lines to change.  You

13   must have liked -- been satisfied at least with where

14   the other precinct lines were, right?

15        A.  Again, the precinct lines are far more

16   important to the precinct commissioners than they are to

17   me.

18        Q.  But to answer my question, you must have at

19   least been satisfied with them if you --

20        A.  As long as they said that they complied with

21   the population -- population adjustment and all the

22   state and federal laws, that was fine.

23        Q.  You were aware from the 2011 litigation,

24   weren't you, that Precinct 3 was the only

25   majority/minority district in the whole county, right?

Page 226

1          A.   Yes.

2               MR. RUSSO:   Objection, speculation and

3     calls for a legal conclusion.

4               Go ahead.

5          Q.   (BY MS. KLEIN)   And your answer is yes?

6          A.   My answer is I was probably told that, yes.

7          Q.   And you had even seen -- we talked about that

8     preclearance letter, you know, with the preclearance

9     letter had those tables.   You had seen those, right?

10         A.   Back in 2011?

11         Q.   At some time before the 2021 process you had

12    seen that preclearance letter with those --

13         A.   Back in 2011, yeah.

14         Q.   Okay.   All right.   Did you ever use an

15    interactive version of this map?

16         A.   No.

17         Q.   Going onto this website, scroll again, I want

18    you to tell me if you see any kind of data about the

19    maps posted.

20         A.   The boundaries and the precinct number.

21         Q.   So the benchmark map, the preexisting map, that

22    wasn't on here, right?

23         A.   I don't know what a benchmark map is.

24         Q.   When I say benchmark I mean the map that was in

25    place in 2012 to 2021 until this map, the new one was

Page 227

1    passed.

2         A.  Oh, okay.

3         Q.  So that old map from 2012 to 2021, that's not

4    on this website, right?

5         A.  It appears so.

6         Q.  What would be somebody have to do if they

7    wanted to see that during the redistricting process?

8              MR. RUSSO:  Objection, calls for

9    speculation.

10              THE WITNESS:  The engineering website.

11        Q.  (BY MS. KLEIN)  What is the engineering

12   website?

13        A.  The county's main website.  They have all the

14   maps there.  They have everything.

15        Q.  Is there a link to that on this website?

16        A.  Can you show me the URL?

17        Q.  Then keep scrolling down maybe.

18        A.  Yeah.  You just remove the -- from the slash

19   County judge redistricting on, that will get you to -- I

20   think that gets you to the map section of engineering.

21        Q.  Were there any instructions on this website

22   about how to do that?

23        A.  I don't see any.

24        Q.  Okay.  So what about an explanation of US

25   Census data results for Galveston?  Is there any

Page 228

1   explanation of census data results on this web page?

2   　　　A.  I don't see any.

3   　　　Q.  So if somebody wanted to see, you know, what

4   had changed since the 2010 census or even just what the

5   numbers were, what would they have to do?

6   　　　　　　MR. RUSSO:  Objection, calls for

7   speculation.

8   　　　　　　THE WITNESS:  I assume go to the Census

9   Bureau's website.

10   　　　Q.  (BY MS. KLEIN)  They couldn't get that from the

11   county, right?

12   　　　A.  I do not know if ever we put that on our

13   website, but it was on the Census Bureau's website.

14   　　　Q.  And there's no breakdown for each of these

15   maps of -- can you scroll back up.  There's no breakdown

16   of the deviations or, you know, how many people are in

17   each of these precincts on these maps, right?

18   　　　A.  I don't see that.

19   　　　Q.  There's no racial demographic breakdown of

20   these maps?

21   　　　A.  I don't see it.

22   　　　Q.  And there's no partisan information?

23   　　　A.  I think there's some.

24   　　　Q.  Okay.  Any other analytics on this website

25   about these maps other than the pictures?

1        A.  Doesn't look like it.

2        Q.  So let's go back to the specific criteria that

3    you were actually -- if any that you were using when you

4    were deciding which map to -- which maps should be

5    drawn.

6             So you mentioned this coastal precinct

7    equalizing populations, I've understood, and then a

8    general, like, legally compliant, right?  Were there any

9    other specific criteria that you were thinking about

10   when you were giving input on what the proposed map

11   should look like?

12       A.  No.

13       Q.  What about the other commissioners, do you know

14   what criteria they might have had in mind when they were

15   providing feedback about what the proposed map should

16   look like?

17       A.  No.  Other than like I said, Commissioner Apfel

18   had asked that a street he moved over for a house that

19   either he owned or was buying or something like that.

20   Other than that, I would not have known any other

21   commissioners' requests, if they even had any.

22       Q.  All right.  I would like to go to another

23   exhibit.  But actually, if you would like to take a

24   break, this is an okay time to stop.

25       A.  I'm fine.

```
                                                Page 241
 1    to have been true for the other commissioners?
 2         A.  Do not know.
 3         Q.  And then the goal was to have -- the last
 4    sentence says, (Reading:)  There was a sense that the
 5    prior map looked gerrymandered.
 6              Do you agree with that statement?
 7         A.  I do.
 8         Q.  What does "gerrymandered" mean to you?
 9         A.  Moving lines in a -- in not necessarily in a
10    sensible manner in order to achieve a specific goal.
11         Q.  And which part of the prior map looked
12    gerrymandered?
13         A.  Precinct 3.  And I understand it had to be
14    so...
15         Q.  What do you mean it had to be?
16         A.  My understanding from the 2011 redistricting is
17    we had to make every effort to keep a majority/minority
18    precinct.  And the only way we could achieve that was to
19    have the precinct look like it did.
20         Q.  So you knew that by changing things the way you
21    did in Map Proposal 2 you were getting rid of that
22    majority/minority precinct, right?
23              MR. RUSSO:  Objection, calls for
24    speculation.
25              THE WITNESS:  And what I know would have
```

1    really affect me.

2         Q.   Was preserving the prior district lines

3    considered among potential criteria among this list at

4    any point?

5         A.   I didn't see it in there.

6         Q.   Do you know if it was ever considered?

7         A.   No, I do not.

8         Q.   Okay.  So we see your signature at the end of

9    this.  Do you know if the other commissioners reviewed

10   this before it was submitted?

11        A.   I do not know.

12        Q.   Did you talk to them about it to make sure this

13   was accurate to them before you signed it?

14        A.   Can't do that.

15        Q.   Even one on one?

16        A.   One on one but only one commissioner.  The next

17   time I talk to another commissioner, I'm in violation of

18   the state law.

19        Q.   Did you have your staff confirm with them?

20        A.   No.

21        Q.   Okay.  So just you signed this and you didn't

22   ever talk about it with another commissioner in any way?

23        A.   I did not.

24        Q.   So how do you know -- so going back up to the

25   top, the way -- if we could go back up to the top of

Page 248

```
 1     Interrogatory 1.  It says -- sorry, the Interrogatory

 2     No. -- the Supplemental Response.

 3               MS. KLEIN:  Sorry, Alexa, just a little bit

 4     further down.  Thank you.

 5        Q.  (BY MS. KLEIN)  (Reading:)  Defendants state

 6     that the Galveston County Commissioners Court considered

 7     the following factors in adopting the 2021 redistricting

 8     plan.

 9               If you never talked about this with the

10     other commissioners, how do you know that that statement

11     is true and accurate?

12        A.  That would be a question that I think that the

13     lawyers would have posed to other commissioners.

14        Q.  But you -- when you signed this document, you

15     didn't know whether that was true, right?

16        A.  Whether what is true, that if the lawyers

17     talked to them?

18        Q.  No.  That the Galveston County Commissioner's

19     Court considered these factors.

20               MR. RUSSO:  Counsel, are you taking issue

21     with the lawyers preparing the response on behalf of the

22     County?

23               MS. KLEIN:  No.  I'm --

24               MR. RUSSO:  -- because that's what

25     happened.
```

Page 249

1           MS. KLEIN:  I'm asking how he knew it was

2     true that the Commissioner's Court considered these

3     criteria if he never was able to confirm that.

4           MR. RUSSO:  You know that he's got to rely

5     on counsel's discussions with other folks.  There's

6     one -- he's one person that's verifying the responses.

7     This is a ridiculous line of questioning.

8         Q.  (BY MS. KLEIN)  I'm just -- I'm going to go

9     through and X out things that we've already covered if

10    you'll give me a little bit -- a moment.

11        A.  Yeah, sure.

12        Q.  So fair to say you never discussed these six

13    listed criteria with the other commissioners directly?

14        A.  I may have discussed them with one.  But

15    certainly not more than one.

16        Q.  Did you apply these criteria when you were

17    providing input on draft maps as they're stated here?

18        A.  The first one, absolutely, and then after that

19    the coastal precinct was the only other factor that I

20    would have said.

21        Q.  Let's -- I'm going to follow up on that voting

22    precinct issue and then we'll move on.

23           MS. KLEIN:  Alexa, could you -- can you

24    scroll down to Interrogatory No. 2, please?  Try to be

25    quick about this.

Page 257

```
 1       A.   Based on only the 2022 general election
 2   results, 34 percent.
 3       Q.   How many -- so did you view, you know, partisan
 4   breakdown by new Map 2 districts, commissioners'
 5   districts before you chose Map 2?
 6       A.   I'm sure the commissioners did, but I don't
 7   think I did.
 8       Q.   So you -- you didn't look at data related to
 9   this before you voted on the map?
10       A.   If I did, I don't remember it.  And again,
11   that's a commissioner -- far more important to the
12   commissioner than it is to me.
13       Q.   And when you say that Map 2 reflects the
14   partisan composition of Galveston County, you said that
15   makes sense to you, and why does that make sense to you?
16       A.   I don't think that I said Map -- well, I guess
17   it does say Map 2.  If you've got a 66 percent
18   Republican county, it's going to be very hard to draw a
19   map that doesn't have four Republican precinct
20   commissioners.
21       Q.   So you believe that Map Proposal 2 has all four
22   Republican commissioner precincts, right?
23       A.   Not at the moment but I suspect it will get
24   there eventually.
25       Q.   What do you mean by "eventually"?
```

Page 258

1         A.  Well, if it's -- if it -- if it stays the way

2     it is, it would appear that would elect four Republican

3     commissioners, yes.

4         Q.  So if Map -- just so I understand you

5     correctly.  If the enacted map from 2021 stays in place,

6     it will elect all four Republican commissioners, right?

7         A.  I believe so, yes.

8         Q.  And so that, you know, 30 percent of Democrats,

9     they're not going to have a Democratic commissioner on

10    the commission anymore, right?

11        A.  Well, they would be dispersed county-wide.

12    They would not be in any one location.

13        Q.  So no?

14        A.  No.

15        Q.  Going back to your -- just thinking, going back

16    to your slogan, you know, "Keep Galveston County Red," I

17    mean, is that one of the reasons that you like this map,

18    it would help keep Galveston County red?

19        A.  No.  I already had that with three

20    commissioners.

21        Q.  And you didn't think, you know, sealing the

22    deal would further that objective of keep Galveston

23    County red?

24                 MR. RUSSO:  Objection, vague and ambiguous.

25                 THE WITNESS:  It's not necessary.  It's

Page 273

1      A.  Do I remember doing that specifically, no.  But

2   my belief is I probably would have done that.  That's

3   something I would have done.

4      Q.  And where would you have done that?  You

5   mentioned Facebook and we saw that Facebook post

6   earlier.  Is there anywhere else?

7      A.  We have a Twitter feed that I have never even

8   seen before.  Facebook, Twitter is probably going to be

9   the primary possibilities.

10      Q.  To your knowledge, was there any instruction to

11   the public about when they had to post a public comment

12   by for it to be read by the Commissioner's Court?

13      A.  I don't remember.  If it's not on here, I don't

14   remember.

15      Q.  And any public comments that came in, what

16   happened to them after they were submitted?

17      A.  They were collected, compiled, and sorted by

18   probably Jed at that time.

19      Q.  Did you review the comments that were

20   submitted?

21      A.  I reviewed a few.  But they -- they were --

22   they were significant.  There were a lot of them.  And

23   then I got the final tally at the end.

24      Q.  When you say "a few," can you estimate about

25   how many?

Page 274

1          A.   Less than a dozen.

2          Q.   How did you choose which ones you were going to

3     review?

4          A.   Honestly, it's when I sat down at that time,

5     whatever the next ones to come flowing in, that's how.

6          Q.   And they were sent to your email directly or

7     somebody compiled them and sent them to you?

8          A.   They would have been forwarded on.

9          Q.   From -- by whom?

10         A.   It may have been automatic.  But if not, it

11    would have been either Jed or Zach.

12         Q.   Do you know how many comments your office had

13    received by the time you had issued notice of the

14    November 12, 2021 special meeting?

15         A.   I knew at the time.  It seems like it was 500

16    or 515, in that ballpark.

17         Q.   What about -- strike that.

18              You -- so you mentioned you received an

19    overall breakdown.  And do you recall that you shared

20    that breakdown during the November 12, 2021 hearing?

21         A.   I did.

22         Q.   Do you remember the breakdown?

23         A.   Exactly, no.  As I recall, it was about two to

24    one favoring Map 2.

25         Q.   And you -- do you remember saying in a hearing

1    that there were people that did not choose a map

2    preference; they just called you names?  Do you remember

3    that?

4          A.  Yes, that happens.

5          Q.  What were you referring to -- and I'm so sorry

6    about that.

7          A.  That's --

8          Q.  What were you referring to when you said that?

9          A.  There are people who don't really care which

10   map it is.  They just want to take shots.  And that's

11   what they do and that's fine.  That's -- that's part of

12   the job.

13         Q.  How did you -- were those within, like, the

14   dozen or so that you read?

15         A.  Yeah.

16         Q.  How did you know that they --

17         A.  My staff would have told me.  The ones that I

18   have read were actually somewhat relevant.

19         Q.  Well, tell me about the ones you read.

20         A.  I just remember them saying we like the coastal

21   county or we, you know, like Map 1 or you know -- but

22   they were generally, you know, related to the maps.

23         Q.  Did any of them -- the ones that you actually

24   read, did they change any of your opinions on how you

25   would vote on the map?

1          A.   No.   That's unlikely.   It's such a small sample

2     for such a large public policy issue.

3          Q.   So did it ever occur to you that you'd want to

4     review more than just a dozen?

5          A.   Which is why I got the composition or the total

6     at the end, yes.

7          Q.   What -- what directions did you give your

8     staff, if any, when you asked for the composition?

9          A.   I assume that I would have just said, you know,

10    I want to know the total because I think I read these

11    out at the Commissioner's Court meeting, how many people

12    responded, how many of them responded to a map

13    preference and then with a -- with a map on the ratio.

14         Q.   Okay.   I'd like to pull up one of these.   And

15    this is Tab 80.   And we are on Exhibit 34.

16              (Exhibit No. 34 was marked.)

17         Q.   (BY MS. KLEIN)   And this -- this is a public

18    comment and I see its submission date is November 12,

19    2021 at 9:24 in the morning.   And the comment is from

20    Richard Moore and it says, (Reading:)   Don't go out of

21    your way to break up the only majority minority precinct

22    in the country.   History dictates that you will get

23    taken to court and end up wasting taxpayer money

24    defending a totally unnecessary action.   You should

25    maintain this precinct as majority minority and make the

Page 289

1          Q.   (BY MS. KLEIN)   So the top email here is -- it

2     looks -- you know, the from is a little convoluted here,

3     but it says Liechty.

4          A.   Linda Liechty.

5          Q.   And then two, Dianna Martinez and Veronica Van

6     Horn.   This is your staff, right?

7          A.   Correct.

8          Q.   And it says, (Reading:)   JH and Tyler talked

9     this morning.   Need to schedule a special meeting on

10    Tuesday, November 9th.   It's the only day Commissioner

11    Clark is available.   Judge McCumber's courtroom is

12    available all day, but JH prefers we do it in the

13    morning.   It's about the meeting -- it's about meeting

14    that 11/13 deadline.

15               JH, is that Judge Henry?

16         A.   Yes, ma'am.

17         Q.   And can you tell me about the context of this

18    email being sent?

19         A.   Okay.   I was off by a few days.   So apparently,

20    it was on November 3rd they called and said you have to

21    have it to us by the 13th.   So on the 3rd we would have

22    jumped on trying to get this wrapped up.

23               So apparently, we made an attempt to get it

24    done on November 9th, and for reasons I'm guessing, you

25    know, but I can't remember, we had to switch it to the

Page 290

1    12th.

2         Q.   I actually don't know.  Do you remember why?

3         A.   No, I don't.  I don't know what day of the week

4    the 9th was.  Was that a -- if the 12th was a Friday.

5    It would have been a Tuesday.  It might be that we

6    couldn't get a forum.  There's nothing that tells me we

7    couldn't do it on the 9th.  We clearly wanted to and

8    tried to get the 9th.

9         Q.   What was the date you were planning on having

10   the vote before you were informed that it had to be done

11   by the 13th?

12        A.   I don't think we had a specific date in mind

13   yet.  We were -- I mean, we still had it out for input.

14        Q.   So in early November you didn't have a date for

15   legislative action that you wanted to get done before

16   mid to late November; is that correct?

17        A.   By mid to late November, yes,

18        Q.   You knew -- you know, going back to our

19   conversation at the beginning of the day, because that

20   regular session is usually the first Monday of the

21   month, you knew all the time that it would have to be a

22   special meeting, right, for this vote to happen?

23        A.   Not necessarily.  It could have happened during

24   a regular session.  But the regular session would have

25   likely been the 1st, 2nd, 3rd, 4th, 5th, in that

                                                            Page 305

 1                    THE WITNESS:  The notice from the state

 2      saying you must have your files to us by the 13th.

 3            Q.  (BY MS. KLEIN)  What was your understanding of

 4      the deadline before that?

 5            A.  I don't know if I had an understanding of a

 6      deadline before that other than my preference that it be

 7      before candidate filing period opening.

 8            Q.  And what was -- and your preference for

 9      candidate filing, what preference -- what preferred date

10      was that?

11                    MR. RUSSO:  Objection, asked and answered.

12                    THE WITNESS:  We -- whatever the date the

13      opening of the filing period was.  I don't recall what

14      it was.

15            Q.  (BY MS. KLEIN)  So had you planned ahead you

16      were going to have more than one meeting before that

17      preferred deadline?

18            A.  No way of knowing.  If we could have gotten it

19      done in one meeting, there's no reason to have

20      additional meetings necessarily.

21            Q.  So come November -- come October 29th, when you

22      posted on that website the proposed maps, you had no

23      plans for when you were going to hold the hearing or how

24      many hearings there would be.  Is that your testimony?

25            A.  Say it again.

1       Q.   When you posted the maps on October 29th on the

2   website, you had no understanding of when you would have

3   a hearing on it or whether there would be more than one

4   hearing.  Is that your testimony?

5       A.   We had no idea that the deadline would get

6   moved to the 13th.  That is correct.  So, therefore, we

7   did not feel like we were in a time-sensitive situation

8   at that time.

9       Q.   Even though the candidate deadline filing

10  starts mid to late -- your understanding was it started

11  mid to late November?

12      A.   Which is three weeks away.

13      Q.   So at that time you had no plans for how many

14  meetings you've had or when they -- those meetings would

15  occur?

16            MR. RUSSO:  Objection, asked and answered.

17            THE WITNESS:  And again, if we schedule a

18  meeting in three days, that's all it takes.

19      Q.   (BY MS. KLEIN)  Okay.  Do you remember how many

20  people commented during the November 12th hearing?

21      A.   I do not.

22      Q.   Do you remember the people who commented how

23  many opposed Map 2?

24      A.   I do not.

25      Q.   Did anything -- any of the comments you heard

1          THE WITNESS:  Yes, because as I've

2  mentioned, commissioners have specific peculiar lines

3  they want in certain places and I'm county-wide so I

4  don't have those same concerns.

5          Q.  (BY MS. RICHARDSON)  You testified earlier that

6  you already knew that you were voting for Map 2 before

7  the November 12th meeting.  Do I recall that testimony

8  correctly?

9          A.  I would have probably said something along the

10  lines of since that got my coastal precinct that I had

11  requested, all other things being equal and being

12  compliant, that would be my preference, yes.

13          Q.  Was there any consideration of Map 1 before

14  the -- did you personally consider Map 1 as a viable

15  option?

16          A.  Sure, I looked at it.  Absolutely.

17          Q.  When did you decide that --

18          MR. RUSSO:  Finish your question, counsel.

19          THE WITNESS:  Sorry, counsel.

20          MS. RICHARDSON:  That's fine.  I basically

21  finished.  He answered it.

22          Q.  (BY MS. RICHARDSON)  When did you decide that

23  you preferred Map 2 over Map 1?

24          A.  Again, because of the coastal precinct and if I

25  had seen that everything else was in balance and the