# EXHIBIT 22

*Expert Declaration and Report of Dr. LaFleur Stephens-Dougan, dated January 13, 2023*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| DICKINSON BAY AREA BRANCH NAACP, et al., | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. 3:22-cv-117- JVB |
| GALVESTON COUNTY, TEXAS, et al., | § § § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| TERRY PETTEWAY, et al., | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. 3:22-cv-57-JVB [Lead Consolidated Case] |
| GALVESTON COUNTY, TEXAS, et al. | § § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| *Plaintiff,* | § | |
| v. | § § | Civil Action No. 3:22-cv-93-JVB |
| GALVESTON COUNTY, TEXAS, et al. | § § | |
| *Defendants.* | § § | |

**EXPERT DECLARATION AND REPORT OF DR. LAFLEUR STEPHENS-DOUGAN**

January 13, 2023

1

## Executive Summary

1. I am an Associate Professor of Politics and the Associate Director of Graduate Studies in the Politics Department at Princeton University. Counsel for Plaintiffs, the Dickinson Bay Area Branch NAACP, Galveston Branch NAACP, Mainland Branch NAACP, Galveston LULAC Council 151, Edna Courville, Joe A. Compian, and Leon Phillips (collectively, "Plaintiffs") retained me in this matter to provide an overview of the academic research regarding the intersection of race, racial attitudes, and partisanship. I was also retained to opine on the interplay between racial attitudes and political behavior in America, with a particular look at the American South and Galveston County, Texas.

2. I begin by tracing the historical realignment of partisan voting behavior in the American South based on race, beginning with the civil rights movement of the 1960s and continuing into the Twenty-First Century. I also look at how the role of race in politics shifted as expressing explicit, biological racism became socially less acceptable in the latter part of the 20th Century.

3. Next, I review the contemporary research regarding a phenomenon referred to as "racial priming." Racial priming is when politicians highlight issues associated with racial and ethnic minorities, such as crime or welfare (Gilens 1999; Gilliam & Iyengar 2000; Mendelberg 2001, 2008; Valentino 1999; Hutchings and Jardina 2009), instead of employing direct references to racial and ethnic minorities. Subsequently, negative racial attitudes about those racial and ethnic minorities are activated or "primed" such that those attitudes become a salient factor in Americans' political evaluations. Partisan politicians are aware, and have been for many years, of the central role that race plays in social group formation, and hence in political behavior; thus, they have developed strategies to appeal to certain constituencies based on the underlying racial attitudes of those constituencies. These strategies not only play off of pre-existing racial attitudes in society, but they in turn further entrench those attitudes and polarize voters along a simultaneous racial and partisan divide.

4. Lastly, I consider sources of information on salient political and racial issues in Galveston County, Texas to determine whether the jurisdiction fits the well-accepted academic model of racial and partisan alignment described in the preceding sections.

5. Based on the analysis I conducted for this Report and the knowledge gained throughout my academic career focusing on these issues, I can conclude that race and politics are deeply intertwined in most of the American South and that Galveston County fits squarely within that paradigm. In a jurisdiction such as Galveston County, the political polarization between white voters and voters of color is not just an arbitrary statistical fluke, rather it is a reflection of the fact that partisanship and political behavior in such jurisdictions are themselves largely the outgrowth of a long history of racial division and racial attitudes.

6. I know of the facts set forth in this declaration of my own personal knowledge and research, and could and would competently testify to those facts if asked to do so.

7. All of the data and facts relied upon in forming my opinion, as well as assumptions I made in forming my opinions, are included in this Report and its Exhibits.

8.  I reserve the right to amend and to supplement the opinions expressed in this Report in light of additional facts, testimony, and or/materials brought to my attention concerning this matter.

## Background and Qualifications

9.  I am an Associate Professor of Politics and the Associate Director of Graduate Studies in the Politics Department at Princeton University, where I worked as a postdoctoral research associate for one year before becoming a faculty member in 2014. Prior to that, in 2013, I completed my predoctoral fellowship in the Department of Political Science at the Massachusetts Institute of Technology. From September 2017 to May 2018, I was a Sheila Biddle Ford Foundation Fellow at Harvard University's Hutchins Center for African and African American Research. My current Curriculum Vitae is appended to this declaration as Exhibit A.

10. My areas of expertise include racial attitudes; public opinion; Black politics; race, ethnicity, and politics; political communication; and experimental methods.

11. I have taught undergraduate courses on Race and Politics in the United States; Race and Politics in the Age of Obama; Black Politics in the Post-Civil Rights Era; and a Junior Paper Workshop on Race and Ethnic Politics. I have also taught a graduate course titled Introduction to American Politics: Political Behavior.

12. In 2013, I received my Ph.D. in Political Science and Public Policy from the University of Michigan in Ann Arbor, Michigan. In 2002, I received my Bachelor of Arts in Political Science with departmental honors at the University of Rochester in Rochester, NY.

13. In 2014, the Race and Ethnic Politics section of the American Political Science Association awarded me the Best Dissertation Award.

14. My research focuses on the role of race in electoral politics: racial attitudes, Black politics, and public opinion.

15. I have published, and plan to publish, several peer-reviewed articles in academic journals, including the *Journal of Politics*, the *American Political Science Review*, *Electoral Studies*, the *Annual Review of Political Science*, and the *Journal of Race, Ethnicity, and Politics*. These articles focus on race and electoral politics, Black politics, and inequality. A full list of my peer-reviewed publications is contained in my C.V., which is appended to this declaration as Exhibit A.

16. In 2019, I also published an analysis in the Washington Post titled "Joe Biden's 'civility' comment told biased whites that he won't upset the racial order."

17. In 2020, I authored a book of particular relevance to this Report titled *Race to the Bottom: How Racial Appeals Work in American Politics*. Relying on a series of survey experiments and cases of politicians, I argued that political candidates across the racial and political spectrum appeal to negative racial stereotypes for political advantage. My research shows

that this incentive to engage in racialized communications undermines racial progress and harms nonwhite communities.

18. I am being compensated at a rate of $300 per hour for work in this matter. My compensation is not in any way contingent on the content of my opinions or the outcome of this matter.

## A Note About Methodology

A number of survey items over the years have been used to measure racial attitudes, some of which I will discuss in this section.  It is worth taking the time to explain how racial attitudes are measured and what the different metrics capture, because these racial attitudes are referenced throughout the Report.

*Racial Resentment*

As explained in the body of this Report, overt biological racism – that is, openly opining about the biological superiority or inferiority of a race – became socially less acceptable in the last half of the Twentieth Century.  Racial attitudes became more values-aligned.  Kinder and Sanders (1996) effectively standardized the measurement of modern racism with their racial resentment scale.  The scale is routinely captured in political surveys, including the American National Election Studies (ANES), which has been asking the racial resentment battery for the last 30 years.

The questions are presented as assertions, and respondents are asked to indicate whether they agree or disagree with the statement, and how strongly they agree or disagree.  The assertions are as follows:

- Irish, Italian, Jewish and many other minorities overcame prejudice and worked their way up. Blacks should do the same without any special favors.

- Generations of slavery and discrimination have created conditions that make it difficult for Blacks to work their way out of the lower class.

- Over the past few years, Blacks have gotten less than they deserve.

- It's really a matter of some people not trying hard enough; if Blacks would only try harder, they could be just as well off as whites.

The racial resentment scale is constructed from these statements by coding the five potential responses to each assertion from 0 to 1 in intervals of .25, with 0 being the most racially liberal response and 1 being the most racially conservative.  Answers are then summed and divided by the number of items to provide an easily interpretable 0 to 1 scale.

The scale was designed to distinguish between racially sympathetic Americans who attribute racial inequity to structural causes and racially resentful Americans who attribute racial inequality to purported cultural deficiencies among African Americans.[1]

By this standard, a score of .50 marks the neutral point. Individuals scoring below .50 are classified as "racial liberals," whereas those individuals with scores above the midpoint are more racially resentful.  According to this standard, the United States is a racially conservative country.  The average racial-resentment score for whites is consistently around .65 on this 0 to 1 measure.  However, in 2020 (the last time the survey was fielded) the average racial-resentment score for whites was .48, which may have been an anomaly because of the widespread racial justice protests of 2020.  More relevant to this Report, however, are the mean and median racial resentment scores for whites living in the American South (whom I will refer to as Southern whites).  In 2020 the mean racial resentment score for Southern whites was .55, which means that on average Southern whites are racially resentful.  Moreover, the median racial resentment score for Southern whites was .56, which means that 50 percent of Southern whites had racial resentment scores higher than .56, squarely placing them on the racially resentful side of the spectrum.

*Negative Racial Stereotypes*

Because there has been considerable debate about how to measure racial prejudice in contemporary America, another metric that is commonly used measures racial stereotypes.  This measure asks respondents to rate how hardworking, intelligent, and non-violent racial and ethnic groups are on seven-point scales, ranging from 1 (lazy/unintelligent/violent) to 7 (hardworking/intelligent/non-violent).  Subsequently, the scores respondents give a racial or ethnic minority group are subtracted from the scores respondents give white people to calculate how a given respondent rates the racial or ethnic minority group *relative* to white people.  Endorsing the stereotype that people of color are lazier, less intelligent, or more violent than white people is an unambiguous measure of prejudice because respondents are expressing a preconceived notion about an entire group of people based on their racial or ethnic group.

A non-trivial faction of whites consistently rates their own group as more hardworking and intelligent than African Americans.  In the most recent American National Election Study (2020), 38 percent of white Southerners rated African Americans as less hardworking than whites.  In the same survey 25 percent of Southern whites rate Latinos as more violent than whites.  If anything, these statistics might underestimate the extent of prejudice because of social desirability bias, or the tendency to underreport socially undesirable attitudes.

*Survey Experiments*

---

[1] While the racial resentment scale was created with African Americans in mind, it is worth noting that evidence indicates the racial resentment scale is associated with generalized outgroup prejudice and correlated with anti-Latino attitudes (Kalkan et al. 2009; Kinder and Kam 2010).  Research also indicates that racial resentment is highly correlated with immigrant resentment, immigration policy attitudes, and sentiment towards immigrants and Latinos (Reny et al. 2020).

Much of the research cited throughout the Report relies on survey experiments. A survey experiment is an experiment conducted within a survey. These surveys are typically conducted online.  In an experiment, a researcher randomly assigns participants to at least two experimental conditions. The researcher then treats each condition differently. Due to random assignment, the researcher can assume that the only difference between conditions is the difference in treatment. For example, a survey experiment may learn about the effect of a campaign advertisement by creating two experimental conditions and exposing participants in only one condition to the campaign advertisement (the treatment). This is the gold standard of research because experiments can establish causality.

Random assignment ensures that the version of the "treatment" (message or cue) is not based on respondents' previous answers or any other personal characteristics. This way, we can generally be confident that any differences in answers across groups of respondents are not based on each group's particular attributes.  Since the only thing that differs between the two groups is the treatment, we can be confident that the "treatment" is responsible for the difference in opinion.

**Section 1: <u>The Relationship Between Race and Partisanship in the U.S. South</u>**

*Introduction*

Race has been a dominant element in Southern politics from the beginning of this nation's history, leading to significant sectional conflicts at several pivotal moments, including the writing of the Declaration of Independence and the Constitution, the events triggering the Civil War, and the abandonment of Jim Crow (Valentino and Sears 2005).  In each of these instances, the white South's formal system of racial inequality confronted substantial, though hardly unanimous, opposition elsewhere in the country.  Thus, from very early on, regional differences in the United States regarding race and racial attitudes were evident.  In fact, V.O. Key, in his seminal work *Southern Politics in State and Nation* (1949) went as far as to say, "In its grand outlines the politics of the South revolves around the position of the Negro" (5).  In other words, he contended that race had been and continued to be the fundamental structuring force of Southern politics.  Although decades old, Key's observations continue to be relevant today.

Today in the South, as well as nationally, the two major parties are split quite decisively along racial lines.  Republicans are almost all white and African Americans are the dominant core of the Southern Democratic party (Black and Black 2002; White and Laird 2020).  In the South, 9 of 10 Black people often vote Democratic, while most whites support Republicans.  And in the case of Latinos, although their support for the Democratic party is weaker than that of African Americans, Latinos in the South routinely support the Democratic party at or above twice the rate they support the Republican party.  The expert Report of Dr. Kassra Oskoii in this Matter, which uses accepted political science methods for assessing voting patterns and was provided to me by Plaintiffs' counsel, indicates that, in general, over 80 percent of African Americans and Latinos in Galveston County vote for Democratic candidates while over 80 percent of white voters support Republicans in the County. Race and party are deeply intertwined.

Take, for example, the 116th Congress.  In the 116th Congress, Republicans held 85 percent of the congressional seats in the South in districts that were 20 percent to 29 percent Black, compared

to 62.5 percent of congressional seats in Southern districts that were 30-39 percent Black (Bullock and Rozell 2021).  Democrats represent all of the districts in the South that are at least 40 percent Black (Bullock and Rozell 2021).  Furthermore, in the South, the districts with small concentrations of African Americans not held by Republicans were at least two-thirds Latino.[2] These statistics suggest that the lower the concentration of Blacks and Latinos in a district, the less likely it becomes that those districts will elect a Democratic politician.  In short, differences in partisanship and partisan voting behavior are deeply related to racial group membership in the South, thus giving each party advantages in distinctive types of constituencies.  A partisan advantage in the South is in effect a racial advantage, and, for reasons explained in this Report, the two concepts cannot simply be disentangled and considered as separate, independent phenomena when considering politics in a jurisdiction such as Galveston County, Texas.

### Why are Race and Partisanship in the South so Closely Intertwined?

A longstanding finding in political science is that most Americans do not think of politics in coherent, ideological ways (Converse, 1964; Kinder & Kalmoe, 2017).  Rather than a politics informed by ideology, research indicates that people tend to think about parties in terms of groups (Campbell et al., 1960; Converse, 2006; Green et al., 2002; Lazarsfeld et al., 1954).  As explained  by Green, Palmquist, and Schickler (2002), individuals first identify with primary social groups such as race, class, and religion.  Subsequently, these attachments lead individuals to associate with the party they see as closest to those groups, and which actively distances itself from outgroups they dislike. People's feelings toward the groups that constitute the parties drive their feelings toward the parties, and ultimately their partisanship (Green et al. 2002; Hetherington and Weiler 2009; Kane, Mason and Wronski 2021).

Green et al. (2002) describe the process by which people come to identify with a party as starting with the question: "What kinds of social groups come to mind as I think about Democrats, Republicans, and Independents?  Which assemblage of groups (if any) best describes me?" (p. 8), instead of: "Which party best represents my political positions?" In short, social identities are at the heart of party identification, more so than the parties' positions on the issues, their performance in office, or their ideology.  The prominent role of social identities in partisan identification means that party identification is both a political and, arguably, racial concept because race has historically been the most salient divide in American politics (Mangum 2013: Westwood and Peterson 2020; Zhirkov and Valentino 2022).  A reference to partisanship in the South is also a reference to race.

### Racial Realignment

Significant, long-term change in the voting behavior and party identification of the electorate is what scholars refer to as a "realignment." By their very nature, realignments are rare events.  The scholarly consensus is that the last realignment in the United States occurred in the American South during the latter half of the 20th century.

From the end of Reconstruction to the middle of the 20th century, Democratic candidates in the "Solid South" reliably won elections, with white Southerners overwhelmingly supporting the

---

[2] Except for Florida-7 and Virginia-10.

Democratic party. However, a major shift occurred during the latter half of the 20th century, among white Southerners from the Democratic party to the Republican party. This shift, or realignment, was driven by the battle over civil rights, which transformed the American South from the "Solid South," to a two-party system. As illustrated by Figure 1, Democratic party identification among whites in the South has dramatically declined since 1964.

Figure 1: Percent Party Identification as Democrat, Among Whites Who Live in the South, 1964 – 2020 (weighted) [Created from ANES]



*Source: American National Election Study Time Series Cumulative Data File (1948 – 2016) available at* https://electionstudies.org.

The Democratic hold on the South weakened considerably in the 1960s at the federal level and was nearly complete at the local level by the early 1990s (Bullock et al. 2005; Black and Black 1992; Black and Black 2002). In the 2000 presidential election, which was one of the most narrowly divided elections in history, the regional shift was complete, when Al Gore lost every Southern state including his own.

Many older whites who may have initially voted for the Democratic party, and who came from families where it was common to support Democrats, changed parties beginning in the 1960s (Beck 1977). This change to voting Republican was most pronounced in presidential elections, as many of these former Democrats continued to vote for Democrats at the local level, well into the 1980s. Conversely, most young, white, native-born Southerners in the post-civil rights era start out as Republicans because they have been politically socialized by parents and grandparents who despite being former Democrats, were solidly in the Republican camp by the

time the post-civil rights generation came of age.[3]  In short, the growth of the Republican party in the South during the latter half of the 20th century can largely be attributed to white Americans who changed from the Democratic party to the Republican party.

*What Caused Racial Realignment in the South?*

Realignments generally depend on two factors.  First is a change among party elites (i.e., elected officials and party leadership).  The second factor is the mass public's attitudes (Valentino and Sears 2005).[4]  The first factor—the change among party elites— can be traced to the end of Eisenhower's term.  In the congressional elections of 1958, liberal Democrats defeated several prominent liberal Republicans, and the reputation of both national parties began to change considerably (Carmines & Stimson, 1989) (Layman and Carsey 2002).  For example, by 1960, one-third of Mississippi voters cast their ballots for "unpledged electors" when the choice stood between a Republican and the pro-civil rights Kennedy (Maxwell and Shields 2019).  The implication of this is that these longstanding supporters of the Democratic party did not feel comfortable voting for the relatively pro-civil rights Kennedy, but they were not yet comfortable supporting the Republican party.  However, this reluctance to support the Republican party among white, Southern Democrats would soon change.  This change in support for the Republican party among the mass public is the second factor that contributed to racial realignment in the South.

Analyzing mass public opinion data from the American National Election Study, renowned political scientist Philip Converse wrote in 1963 that in the South, the race issue came closest to having "those characteristics necessary if a political issue is to form the springboard for a large-scale political realignment" (Davidson 1990, p. 226).  Up to that point, however, as Converse observed, "The Republicans have [not] come forth to champion the Southern white.  Instead, their gestures toward the Southern Negro have come close to matching those of the Northern Democrats.  If we doubt that partisan realignment is to occur, it is to say that we expect no dramatic change in this state of affairs" (Davidson 1990, p. 226). In other words, if partisan realignment was to occur, Converse said that it would occur because of Republican efforts to court the Southern white vote using the race issue. Converse's comments were extremely prescient.

By the 1964 presidential election, there was a dramatic change in the state of affairs, in which white Southerners no longer felt reluctant to support the Republican party. Many white Southerners felt comfortable supporting the GOP, with Barry Goldwater as the GOP nominee. Despite a moderately progressive record on Black equality, Goldwater largely based his presidential campaign on opposition to the Civil Rights Act of 1964, enacted in July 1964. Goldwater reportedly said, "We're not going to get the Negro vote as a bloc in 1964 or 1968, so

---

[3] Republican migration to the South has contributed to the shift toward the Republican party, but it is not a dominant factor (Black and Black 1992: Carmines and Stanley 1990; Miller and Shanks 1996; Petrocik 1987; Stanley 1988).

[4] For an exception, see Schickler 2016.  Schickler (2016) argues that top party leaders were actually among the last to move, and that their choices were dictated by changes that had already occurred among the mass public. Regardless of whether realignment was driven by party leadership or by the mass public, there is a near universal consensus that the realignment of the last half of the 20th century was driven by racial attitudes and racial issues.

Report of Dr. LaFleur Stephens-Dougan

we ought to go hunting where the ducks are" (Johnson 1968).[5]  In other words, Goldwater was suggesting that the Republican party should abandon efforts to court Black voters in the North, instead focus on white Southerners.  To do so, the Goldwater campaign appealed to racism against African Americans.  This strategy was referred to as "Operation Dixie" and it highlighted the party's opposition to civil rights as a means of courting the white Southern vote.  Operation Dixie was the first iteration of what later became known as the "Southern Strategy" (Maxwell and Shields 2019).

Ultimately, Goldwater only carried five deep Southern states in the 1964 election (and his home state of Arizona).  His victory in the few states that he won was largely driven by segregationists rallying to the Republican party, in what was otherwise an overwhelming defeat for Goldwater.  Most notably, Dixiecrat, Senator Strom Thurmond (SC) left the Democratic party to join the Republican party and campaign on behalf of Goldwater (Maxwell and Shields 2019).  Notably, Goldwater's greatest margins of victory came from the counties with the highest population of African American residents (Phillips 1969), which suggests that the whites who were most threatened by the potential of Black enfranchisement, were the most fervent supporters of the Republican party and less likely to support those candidates who sought to increase Black enfranchisement through civil rights legislation.  In short, Goldwater was most successful in the deep South, which was uniquely racially polarized, as the term, "Southern Strategy" aptly indicates.

Despite the fact that Goldwater was soundly defeated in the 1964 presidential election, the Goldwater/Thurmond moment was transformative in how white Southerners understood the two parties on civil rights.  Prior to 1964, the Democrats were largely seen as the party of economic liberalism, and the GOP, the party of economic conservatism.  As late as 1962, polls asking which political party was "more likely to see to it that Negroes get fair treatment in jobs and housing" showed that Americans saw virtually no difference between Democrats and Republicans (Edsall and Edsall 1992).  By 1964, when asked the same question, however, 60 percent of Americans said Democrats were more in favor of fair housing and jobs for African Americans, while just seven percent said Republicans.  In a similar vein, when asked which party was more likely to support integration in 1964, 56 percent of Americans said Democrats, whereas only seven percent said Republicans (Edsall and Edsall 1992).

The perception of the Democratic party as more in favor of integration and fair housing and jobs for African Americans can largely be attributed to Presidents Kennedy (1961-63) and Johnson (1963-69).  Kennedy and Johnson placed the Democratic Party firmly on the side of the civil rights movement and against segregation, resulting in the Civil Rights Act of 1964 and the Voting Rights Act of 1965, both of which President Johnson signed into law.  Thus, Kennedy and Johnson stood in sharp contrast to Goldwater, whose opposition to the 1964 Civil Rights Act was a cornerstone of his campaign.  This series of events led the two parties to become distinguishable on matters of race, which contributes to the racial polarization of the two major parties that we see today. In fact, since the passage of the Civil Rights Act, no Democratic presidential candidate has won the majority of the white vote nationally (Frey 2020).  Moreover,

---

[5] African Americans who were recently enfranchised started voting in large numbers for Democrats after the passage of the New Deal and also as a result of machine style politics in the North.  The national Democratic party's relatively pro-civil rights stance helped to solidify this allegiance.

since the Civil Rights Act became law, the only Democratic presidential candidate to have won the South (and Texas) is "son of the South," President Jimmy Carter (Montgomery 2020). Carter may have been a more palatable Democratic politician to many Southern whites because he was a Southerner, and thus, not as closely aligned with the racial liberalism of the national Democratic party.

As noted earlier, however, Republican gains in the South were initially limited to presidential elections. For much of the 1970s and 1980s, white Southerners voted heavily for Republican presidential candidates, but sent large numbers of Democrats to Congress and state legislatures. However, the Republican party was slowly able to make inroads with Southern whites at the local level, largely through the use of the Southern Strategy. In fact, liberal national Republicans, as early as 1961, warned that such a strategy, "built on the backs of the Negro" would lead to a "lily-white" GOP (Reinhard 1983). And that is precisely what happened.

### Southern Strategy in Texas and Beyond

In Texas, one issue that was successfully used to court the white vote as a part of the Southern Strategy was school desegregation. After the U.S. Supreme Court's 1954 decision in *Brown v. Board of Education*, opposition to school desegregation quickly became a cause within the state Republican party. For example, as early as 1958, the State Republican Party platform came out strongly against federal enforcement of desegregation laws. The 1958 platform indicated that 'the gradual solution for problems relating to desegregation in Texas be left to the people, the school boards, and the courts, within this state" (Davidson 1990, p. 224). This support of "states' rights" was tantamount to continuing segregation indefinitely, given the popular mood at the time.

By 1960, school desegregation, and the civil rights movement more broadly, had created a serious rift in the national Republican party. The liberal wing of the party, led by New York Governor Nelson Rockefeller, was instrumental in getting presidential candidate Richard Nixon to agree to a major revision of the civil rights plank of the platform, with stronger language in support of civil rights. For example, the revised language included a commitment to "aggressive action to remove remaining vestiges of segregation or discrimination in all areas of national life" (Davidson 1990, p. 225).

In response, Texans on the right threatened to bolt to Goldwater and lead a floor fight against the platform at the national convention. This threat to align with Goldwater resulted in the removal of any language from the platform indicating "aggressive action" in support of civil rights. In fact, John Tower, who would go on to represent Texas in the United State Senate, was credited with keeping the platform committee from writing all of Rockefeller's civil rights proposals into the platform. This behavior earned Tower a standing ovation from the Texas delegation to the convention (Davidson 1990). Tower was also able to use his opposition to desegregation to bolster his popularity within the state party in other ways. For example, Tower sponsored a proposed constitutional amendment barring "forced busing," successfully using the issue in his 1972 senatorial campaign to defeat his Democratic opponent (Davidson 1990).

Busing was successfully used to mobilize voters on the right in Texas. As late as 1976, the state Republican party added a referendum on "forced busing" to its primary, which was opposed by 90 percent of voters (Davidson 1990). Conversely, the state Democratic party refused to put the issue on their primary ballot, which only further contributed to the racial polarization of the two parties at the state level.

Thus, by the 1980s the state parties were largely sorted on race, with the Republican conventions being overwhelmingly white. For example, just one percent of the Texas delegates to the 1984 national Republican convention were Black and 9 percent were Latino, compared to 24 and 20 percent, respectively of Democratic delegates (Davidson 1990). A study of the Texas Republican gubernatorial primary electorate in 1978 revealed that African Americans and Mexican Americans made up less than one percent of the voters. Ten years later, African Americans constituted one percent of the Republican presidential primary electorate and slightly more than one half of one percent of the state Republican convention. Conversely, the minority proportion of the Democratic primary electorate in the 1980s may sometimes have exceeded 35 percent (Davidson 1990).

Similar racial patterns emerged among elected officials. By the mid-1980s, the overwhelming majority of Black and Latino officeholders at lower levels in Texas were Democrats. In state legislature, for example, none of the 58 Republicans in 1985 was Chicano, and only one was African American. Among the 123 Democrats, 22 were Chicano and 13 were Black, for a total of 28 percent of the party's legislative strength. In the Texas delegation to the U.S. House of Representatives elected in 1986, none of the 10 Republicans belonged to a minority group; of the 17 Democrats, four were Latino and one was Black, for a total of 29 percent (Davidson 1990).

The racial patterns that emerged in Texas among the two major parties were mirrored throughout the South, and nationally as well. By 1994, white support for Republican candidates throughout the South surged to record levels, enabling the GOP to achieve majority status in the region's U.S. Senate and House delegations and make substantial gains in Southern state legislatures as well (Black and Black 2002).

Republican dominance in the South continues today. Of the 11 states of the former Confederacy, only two are currently represented by Democratic governors (Louisiana and North Carolina), while in the U.S. Senate, Georgia and Virginia are the only Southern states to be represented by Democrats.[6] In Texas, a Democrat has not won a statewide election since 1994 (Montgomery 2020). The scholarly consensus is that the Democratic party's association with African American voters and racial liberalism (Carmines & Stimson, 1989) has cost them the support of white Southerners.

### Racial Backlash to the Voting Rights Act

To date, much of the scholarship about the effects of the Voting Rights Act (VRA) has focused on the positive outcomes of the VRA, specifically the expansion of the franchise for African Americans. The scholarship has also paid close attention to how the VRA enabled racial and ethnic minorities to elect political representatives of their choice. For example, when the Act

---

[6] Author's calculations

was passed in 1965, there were only five African Americans in the U.S. House and Senate combined. Today there are 60 African Americans.  In a similar vein, until 1980, Latinos seldom held more than five seats at the federal level. That figure has since increased more than tenfold. In the 118th Congress, there are 54 Latinos.[7]

Yet, despite the gains associated with the VRA, the response to the VRA has not been entirely positive. The evidence indicates for example, that there has been a racial backlash to the VRA, whereby jurisdictions that were covered by Section 5 incarcerated African Americans at a higher rate than those jurisdictions that were not covered by Section 5.  Specifically, Eubank and Fresh (2022) compiled archival statistical reports and prison intake data to create a new dataset on admissions to state prisons by race in the decades before and after the 1965 Voting Rights Act (~1940-1985).  Subsequently, they used those data in a series of difference-in-differences designs leveraging variation in state and local coverage by Section 5 of the VRA.[8]

The results of Eubank and Fresh (2022) indicate that Black prison admissions rates as well as the difference between Black and white admissions rates increased *more* after 1965 relative to those jurisdictions that remained uncovered.  Specifically, Black prison admissions rates in covered states increased by more than one-third of the average incarceration rate in non-covered states. Moreover, the difference between Black and white admissions rates in covered states increased by more than 50 percent of the average incarceration rate difference in uncovered states.  Also of note, is that the increase in Black prison admission rates, as well as the increase in the difference between Black and white prison admission rates, was not driven by a demand for more incarceration among the newly enfranchised Black population.  If anything, counties with more Black elected officials had less of an increase in racially differentiated incarceration rates relative to counties with fewer Black elected officials.[9]   Black incarceration rates were also lower in counties with Black elected officials relative to counties that did not have any Black elected officials (Eubank and Fresh 2022).

Thus, Eubank and Fresh (2022) provide important empirical evidence of a racialized response to the enfranchisement of people of color after the passage of the VRA.  These results indicate that racialized backlash to the VRA is not limited to the *electoral* context.  In other words, while a long line of research argues that electoral policies, such as racial gerrymandering, switching from district to multimember election systems, changing public offices from elective to appointive, or increasing the qualifications for candidacy were adopted as a racial backlash to the VRA (Parker

---

[7] Author's calculations
[8] Section 5 required "preclearance," whereby jurisdictions with a history of discrimination had to submit changes to their voting and election rules to federal officials for approval.  While the Voting Rights Act applied everywhere, only some jurisdictions were subject to preclearance, which means that they were effectively "treated" with greater scrutiny than jurisdictions not covered by Section 5 of the Voting Rights Act.  During the 1975 renewal of the VRA, Congress also expanded preclearance to jurisdictions with large language minority groups that had English-only voting materials and low registration or turnout.
[9] The analysis assessing the effect of Black elected officials at the county level relies on data from Alabama, Georgia, and Tennessee because county-level data by race and by year was not available for all states.  However, these states are "typical" cases (Seawright and Gerring 2008).

1990), Eubank and Fresh (2022) indicate that the racial backlash to the VRA went far beyond electoral policies to include issues such as the mass incarceration of Black people.

*Electoral Environment Post-Shelby County v. Holder*

In 2013, the Supreme Court in a 5-4 decision ruled that the VRA formula used to determine which states and localities were subject to preclearance was outdated and was therefore unconstitutional.  Thus, preclearance was made unenforceable.  The aftermath of the ruling has seen Republican lawmakers nationwide passing legislation that places more conditions on voting (e.g. strict voter ID requirements, limiting absentee voting, etc).

A 2022 study from the nonpartisan Brennan Center for Justice found that racially diverse states governed by Republicans are more likely to implement restrictive voting policies.  However, states with overwhelmingly white populations are unlikely to restrict voting policies, regardless of which party controls the legislature.  "The recent trend of restrictive voting laws lies at the intersection of race and partisanship," the report states.  "We are not seeing these bills introduced and passed everywhere that Republicans have control.  Rather, they are most prevalent in states where they have control and where there are significant non-white populations" (Morris 2022).

In order to assess the impact of race on voting laws, the researchers calculated the racial composition of both the districts represented by sponsors of voting restriction bills as well as their home states.  They also calculated the racial resentment scores of the respective legislative districts, using data from the 2020 Cooperative Election Study.  The results of the analysis indicate that lawmakers from the whitest districts in the most racially diverse states were the most likely to sponsor restrictive voting legislation.  It also found that districts with high levels of racial resentment were more likely to be represented by lawmakers who support measures to restrict voting.  Specifically, districts with the highest racial resentment scores were 50 percent more likely to have a lawmaker who sponsored restrictive voting legislation relative to districts with the lowest racial resentment scores.  These results held true even after controlling for other factors that might be related to the sponsorship of voting legislation, including the median age of the district, Trump vote share in the district (a measure of partisanship), and education levels in the district (Morris 2022).  According to the report, the results are "consistent with the theory that 'racial backlash'—a theory describing how white Americans respond to a perceived erosion of power and status by undermining the political opportunities of minorities— is driving this surge of restrictive legislation" (Morris 2022).

In short, in the post-*Shelby v. Holder* era, more restrictive voting legislation has been sponsored and passed.  The sponsorship of this legislation is strongly correlated with racial attitudes, even after accounting for partisanship.

## Section 2: The Relationship Between Racial Attitudes and Partisan Affiliation

*Racial "Dog Whistles"*

As far back as Reconstruction and the early Jim Crow era, white politicians have routinely engaged in race-baiting, or appealing to racial animus in the electorate, to generate political

support (Mendelberg, 2001; Williams, 2010).  Since the middle of the 20th century, however, surveys that measure the public's racial attitudes have documented a steep decline in overtly racist views (Schuman et al., 1997), such as biological racism as defined below.  For much of the post-civil rights era, this decline in overtly racist views has been accompanied by a similar decline in political appeals that are overtly racial in nature.

In the late 20th century, whites' racial attitudes underwent a transformation, which some scholars note as beginning in the 1970s.  This transformation was marked by a shift from biological racism to modern racism or racial resentment.  Biological racism is the belief that African Americans are genetically and/or socially inferior to whites, whereas racial resentment is "a moral feeling that blacks violate such traditional values as individualism and self-reliance, the work ethic, obedience, and discipline" (Kinder and Sears 1981, 416).  Similar claims have also been made about Latinos.  As such, racial appeals or racial messages have also experienced a similar transformation.  That is to say that racial appeals no longer explicitly make claims about Black or Latino genetic inferiority, but today, racial appeals include messaging that plays to negative stereotypes about African Americans' and Latinos' work ethic, discipline, self-reliance, and purported propensity for violence.

Research indicates that these stereotypes are deeply ingrained such that a non-trivial fraction of whites routinely rate African Americans and Latinos as less hardworking or more violent than whites.  For example, in the most recent American National Election Study (2020), 34 percent of whites rated Black people as less hardworking than whites.  The endorsement of this stereotype was slightly higher in the South, with 38 percent of Southern whites rating Black people as less hardworking than white people.  46 percent of Southern whites rate Black people as more violent than whites and 25 percent rate Latinos as more violent than whites. It is worth noting that when using less obtrusive measures of bias, such as the Implicit Association Test, bias against Blacks and Latinos appears to be even higher (Banaji and Greenwald 2013).  The association of people of color with negative stereotypes, while socially undesirable in some circles, is deeply ingrained and is more likely to manifest when these biases are measured less obtrusively (i.e., in ways that do not require respondents to consciously make explicit racial statements).

The conventional wisdom is that in the post-civil rights era, most Americans have a commitment to the "norm of racial equality" (Mendelberg 2001).  Mendelberg defines the norm of racial equality as "the prohibition against making racist statements in public" (2001, 17), personal repudiation of "the sentiments that have come to be most closely associated with the ideology of white supremacy—the immutable inferiority of Blacks, the desirability of segregation, and the just nature of segregation in favor of whites" (19), and commitment to "basic racial equality [and] in particular to equal opportunity" (18).

In other words, a social prohibition exists against espousing ideas that may indicate belief in the biological or inherent inferiority of Blacks, Latinos, or racial and ethnic minorities more broadly. This means that in the post-civil rights era, politicians may continue to appeal to negative predispositions about Blacks and Latinos, but rather than being critiqued for their inherent inferiority, people of color are criticized, sometimes implicitly, for their lack of work ethic and unwillingness to adhere to American values.  Thus, the conventional wisdom is that politicians who want to activate some white Americans' negative racial predispositions opt instead to use

racially coded language, often called "dog whistles," that could be plausibly perceived as unrelated to race but will nonetheless attract support for themselves or diminish support for their opponents among voters with racial attitudes.

If the message is explicit, with direct references to race or racial groups, the theory of racial priming, as developed by Mendelberg (2001), posits that voters will become aware of the racial content and reject the appeal.  According to the theory, once voters are aware of the racial content of an appeal, they will dismiss it because they will perceive it as violating shared norms of racial equality or the prohibition against racist speech—in other words, they do not want to think of themselves as a racist or to be outwardly perceived by others as being racist.

This prohibition against explicitly racist speech is best summed up by Republican campaign strategist, Lee Atwater, in what he thought was an anonymous interview, "You start out in 1954 by saying, 'Nigger, nigger, nigger.' By 1968 you can't say 'nigger'—that hurts you.  Backfires. So you stay stuff like forced busing, states' rights and all of that stuff" (Perlstein 2012). In other words, Atwater was suggesting that in the post-civil rights era, explicit racism was not socially acceptable, but that discussing "forced busing" and "states' rights" could replace explicit racial appeals.

### What Constitutes a Racial Dog Whistle?

There is a robust literature that demonstrates the power of racially coded language to activate or prime voters' racial predispositions.  Racially coded language includes terms that invoke racial themes without ever explicitly mentioning race.  In American society, well-researched examples include, "law and order," "tough on crime," "inner-city," and "illegal immigration." (Stephens-Dougan 2021). Research also indicates that, in addition to racially coded language, negative stereotypical imagery also has the power to prime voters' racial predispositions.  Negative stereotypical imagery that might activate voters' negative racial attitudes includes depictions of African Americans or Latinos as criminals or welfare recipients.

Research indicates that stereotypical images and racially coded language are connected to bundles of associations about race called racial schemas.  In the American context, racial schemas typically include beliefs about fairness and personal responsibility and a sense of zero-sum group competition[10], (Winter 2008).  According to the theory of racial priming, racial schemas become relevant to how people vote when racial schemas are activated by racially coded language or negative racial imagery depicting people of color.  Thus, racial codewords and stereotypical imagery are relevant in many public policy discussions.  Policies that have become racialized include welfare, crime, affordable housing, the death penalty, and Medicaid (Winter 2008; Hurwitz and Peffley 2007).  Race, therefore, still plays a significant role in politics, even when it is not explicitly discussed.[11]

*Welfare*

---

[10] The sense that a gain for an outgroup, is automatically a loss for one's own ingroup.

[11] In the section that follows, I will be discussing the use of racial appeals in various policy areas.  Much of this research relies on survey experiments and the use of various metrics of racial attitudes, namely the racial resentment scale and the negative stereotypes scale.  For a more detailed discussion of these metrics and methodology, please see the Appendix.

Many white Americans think African Americans are lacking in personal responsibility, work ethic, and willingness to "play by the rules" (Kinder and Sanders 1996). Therefore, appeals that tie racialized policies such as welfare to themes of fairness and personal responsibility have been shown to activate racial attitudes (Bobo and Kluegel 1993, Gilens 1999, Sears et al. 2000). For example, Gilens (1999) convincingly demonstrates that the reason that welfare has traditionally been an unpopular policy among white Americans is because media framings have made it such that many white Americans associate welfare with African Americans.

In his study, Gilens (1999) found that while African Americans made up about 30 percent of the poor, about 60 percent of the poor people shown on network television news and depicted in the major newsweeklies between 1988 and 1992 were Black. Similarly, the media portray low-income African Americans in a disproportionately negative light. Every single picture in newsweekly stories about the "underclass" between 1950 and 1992 showed African Americans. In sharp contrast, in more sympathetic stories about poverty, only one-fourth of the people pictured were African American. Admittedly, the Gilens study is now several decades old, but the point is that there is a long-term association of African Americans with welfare in the American psyche that is still relevant today. Therefore, when politicians invoke the issue of welfare, many whites' negative attitudes about African Americans are activated, and white voters subsequently become less supportive of the policy.

More recently, during the Obama era, there were numerous examples of how welfare was used in racialized attacks. For example, during the 2012 presidential campaign former House leader and Republican presidential candidate, Newt Gingrich routinely referred to President Obama as the "most successful food stamp president in American history," on the campaign trail. Gingrich also noted that if the NAACP invited him to their annual convention he would attend and "talk about why the African American community should demand paychecks and not be satisfied with food stamps."[12] Previous research demonstrates that the food stamp program has become identified as a "Black" social welfare program over time, such that the mere mention of "food stamps" or "welfare" activates many white Americans' negative attitudes about African Americans (Gilens 1999; Williams 2010; Winter 2008). By associating Obama with food stamps, Gingrich was likely making negative racial attitudes toward Black people more salient in the decision calculus of many white voters (Stephens-Dougan 2020).

Former Republican senator from Pennsylvania and presidential hopeful Rick Santorum also utilized racial dog whistles related to welfare against Obama during his presidential bid. During a campaign stop in Iowa, Santorum told a mostly white audience that he did not want to, "make Black people's lives better by giving them someone else's money; I want to go out and give

---

[12] Gingrich doubled down on his use of the term "food-stamp president" during a Republican primary debate in Myrtle Beach, South Carolina. One of the panelists was Juan Williams, an African American conservative commentator, who suggested that some people might find Gingrich's comments about the "food-stamp president" offensive. Gingrich's widely publicized response in which he derided "political correctness" was reported to have been met with the only standing ovation of the night. Gingrich also went on to use the exchange with Williams in a television ad that aired in South Carolina.

them the opportunity to earn the money."[13]  Santorum later denied that his comments were about Black people, and claimed that he said "blah people."  However, Santorum's comments could be interpreted as implying that Obama, who was president at the time, was trying to make Black people's lives better by giving them someone else's (white people's) money, rather than giving them the opportunity to go out and earn the money (Stephens-Dougan 2020).

In a similar vein, in September 2012, the Republican presidential nominee Mitt Romney told an audience of donors that "47 percent" of the country was comprised of "takers" who would inevitably vote for Obama and "his entitlement society" (Klein 2012; Corn 2012).  According to Romney, Obama's supporters were people who "are dependent on government, who believe that they are victims, who believe the government has a responsibility to care for them, who believe they are entitled to healthcare, to food, to housing, to you-name-it." The implication is that Obama supporters, and by extension, Obama, want to depend on government assistance rather than adhering to the American value of hard work.  And of course, given the widely known racial voting patterns present throughout the country, the "47 percent" of the country that would inevitably vote for Obama automatically calls to mind a group that is largely comprised of people of color.

Romney also used racial dog whistles related to welfare in his televised campaign advertisements against Obama, including "The Right Choice," which aired the summer before the 2012 presidential election.  The ad falsely accused Obama of doing away with the work requirements that accompany welfare benefits.  "Under Obama's plan you wouldn't have to work, and you wouldn't have to train for a job.  They just send you your welfare check."[14]  The language in the ad was juxtaposed with images of exclusively "hardworking" white Americans or at the very least white Americans engaged in what appears to be blue-collar factory work, wiping away sweat from their brows.  The message was clear—welfare recipients, whom many white Americans falsely perceive as predominantly Black, would just receive a check in the mail, at the expense of hardworking whites.

Of course, this is not an exhaustive list, but the aforementioned examples highlight how the issue of welfare can be used in a racialized manner.

*Crime*

Crime is another issue that research indicates has become tightly linked to attitudes about Black people (Hurwitz and Peffley 1997).  Evidence indicates that Black people are overrepresented as perpetrators of crime in the local news compared to whites and compared to real-crime statistics (Dixon and Linz 2000).  Therefore, such an information environment may prompt viewers to associate African Americans with criminal behavior.  In the short term, exposure to such stories has been shown to exacerbate negative racial attitudes and boost white support for punitive crime policies (Gilliam & Iyengar, 2000) and white support for those politicians who campaign on punitive crime policies (Valentino 1999).

---

[13] Rick Santorum, "Campaign Stop," Sioux City, IA, January 1, 2012, https://www.npr.org/sections/itsallpolitics/2012/01/03/144613385/santorum-explains-his-comments-about-black-people-and-entitlements.
[14] PolitiFact and FactChecker.org gave the ad their most dishonest rating.

Moreover, since crime has become so racialized, even exposure to crime-related news stories devoid of Black criminals can prime racial attitudes, enhancing their impact on political decision- making (Valentino 1999).  Therefore, strategic politicians can bring up the issue of crime, or air advertisements about crime, that ultimately activate negative attitudes about Black people without ever mentioning race.

Perhaps, the most infamous example of the use of crime to activate whites' negative racial predispositions is in the 1988 presidential election.  At that time, an ostensibly independent group aired a negative advertisement depicting the Democrat nominee, Michael Dukakis as weak on crime.  The ad, called, "Weekend Passes," featured a mugshot of an African American prisoner in Massachusetts named William Horton, who, while released on a furlough program, raped a white Maryland woman, and bound and stabbed her boyfriend.  Research indicates that pairing the photograph of the Black William Horton with the issue of crime in the 1988 presidential campaign powerfully primed racial considerations in candidate evaluations (Mendelberg 2001).  This research shows that racial considerations can be brought to bear on candidate evaluations even when both candidates are white.

Presidential candidates including Barry Goldwater, Richard Nixon, Ronald Reagan, and George H.W. Bush used crime in their campaigns with talk of being "tough on crime" and/or supporting a "war on drugs" in the "inner cities."  Critics have also argued that part of Bill Clinton's electoral success, especially among white Americans, can be attributed to his decision to be even tougher on crime than conservative Republicans (Lopez 2014; Murakawa 2014).

More recently, former President Trump emphasized a "law and order" theme in both his 2016 and 2020 presidential campaigns by portraying crime as out-of-control.  When he officially accepted the Republican nomination in 2016, he said, "An attack on law enforcement is an attack on all Americans.  I have a message to every person threatening the peace on our streets and the safety of our police: When I take the oath of office next year, I will restore law and order to our country" (quoted in Bacon, 2016, para.2).  Research indicates that Trump's support for police effectively functioned as a dog-whistle among whites with high racial resentment.  A 2020 study (Drakulich et al. 2020) found that support for the police was only associated with vote choice among those whites with high racial resentment.  In other words, regardless of whether some broader spectrum of voters might in theory support law enforcement as a general principle, political appeals to law-and-order only actually directly affected the electoral decision making of whites who indicated high levels of racial resentment.

*Immigration*

Research indicates that many Americans associate Latinos with immigration, even at a time when most of the Latino population growth in the United States comes from native-born Latinos. The growth and dispersion of Latino populations has been shown to trigger feelings of racial and cultural threat among whites (Craig et al. 2018; Enos 2014, Hopkins 2010; Ostfeld 2018), increase conservative sentiment and Republican party support (Craig and Richeson 2014; Newman et al. 2018; Reny et al. 2018), and expand support for punitive anti-immigrant policy (Abrajano & Hajnal 2015).  Pluralities or majorities of white Americans view Latino immigrants

as welfare recipients, less educated than other Americans, and as refusing to learn English, taking jobs from other Americans, and having too many children (Bobo, 2001; Masuoka and Junn, 2013; Reny and Manzano, 2016).

Abrajano and Hajnal (2015) for example, find that white Americans' concerns about Latinos and immigration have led to support for less generous and more punitive policies that conflict with the preferences of much of the immigrant population. Specifically, their results indicate that living in a state with a relatively high population of Latinos is associated with a 10% decline in white Americans' willingness to reduce income inequality. They also find that whites living in states with larger Latino populations are less willing to invest in public education and more eager to punish criminals. In short, their results show a consistent relationship between the size of the local Latino population, which arguably functions as a racial cue, and white support for state policies across a variety of areas, including, notably the already-racialized issue of crime.

In the case of Latino candidates, research indicates that, rather than solely engaging in explicit negative considerations about Latinos as an ethnicity, which can violate the norm of racial equality, white Americans are also influenced directly through anti-immigrant and partisan attitudes regardless of the actual political ideology of the candidate. Thus, Latino candidates are penalized through the activation of anti-immigrant attitudes and partisanship (McConnaughy et al. 2010). In a clever survey experiment, the researchers cue that a candidate is Latino by using the surname "Martinez." In one experimental condition, respondents are exposed to a website featuring a candidate named John Morgan running against a candidate name Frank Barry. In the second experimental condition, the website features the exact same photos and candidate information, but "John Morgan" was now named "Juan Martinez." That is, the only difference across the two conditions is the presence of Spanish surname to cue the Latino identity of one of the candidates.

The results of the survey experiment indicate that white Americans brought their sentiments on immigration directly to bear on their choice to vote for a Latino candidate. A Spanish surname on the ballot also cued partisanship, such that white Americans in the study assumed that the Latino candidate is a Democrat (McConnaughy et al. 2010).

The downstream effect of activating partisanship and anti-immigrant sentiments is that some white voters are less likely to support Latino candidates when partisanship and anti-immigrant sentiment are activated. For example, for Republicans in the study with the highest level of anti-immigrant sentiment, the predicted likelihood of supporting candidate Morgan was .82, but dropped to .19 in the Martinez condition. Recall, Morgan and Martinez were *identical* candidates, save for the fact that Martinez had a Spanish surname. In short, group-based considerations such as nativism may be the more socially acceptable conduit for some white Americans to discriminate against Latino candidates as opposed to explicitly anti-Latino sentiments.

*Racial Dog-Whistles During the Obama and Trump Eras*

As previously noted, race plays a significant role in American politics, even when a Black candidate is not on the ballot. Moreover, a long line of research indicates that when a Black

candidate is on the ballot, they frequently encounter difficulty winning elections outside of majority-minority districts.  Much of this research suggests that a large swath of racially resentful voters are unlikely to support a Black candidate (Highton 2004; Williams 1990; Sigelman et al. 1995). Thus, it was not surprising that racial attitudes would play a prominent role during the historic presidential campaign of the nation's first Black president, Barack Obama.  The historic nature of Obama's campaign made racial attitudes what Tesler and Sears (2010) refer to as "chronically accessible." Chronic accessibility means that a particular predisposition is almost inevitably and ubiquitously activated among voters because there is an especially strong connection between the attitude and the political evaluation in question. In other words, voters could not help but think about race when it came to the 2008 presidential election, since it was not lost on anyone that, if elected, Obama would be the nation's first Black president.  Obama's very presence on the ballot was in and of itself a racial cue.[15]  Similarly for other racial and ethnic minority candidates, their very presence on the ballot is likely to activate fellow Americans' racial attitudes, and for many white Americans, those racial attitudes are negative.

The chronic accessibility of race both hurt and helped Obama during his 2008 presidential campaign, a phenomenon referred to as "the two sides of racialization."  On the one hand, Obama generated tremendous support among racial liberals or those Americans who attribute racial inequality to structural factors.  On the other hand, Obama generated immense opposition among those Americans who have negative beliefs about African Americans.  The tremendous support among the least racially resentful voters, however, outweighed the opposition that his campaign generated among more racially resentful voters to allow him to win election (Sears and Tesler 2010).

Obama's victory, however, should not be taken as evidence that negative racial attitudes in the electorate did not hurt his campaign.  Research indicates that Obama underperformed relative to similarly situated Democratic candidates and that this underperformance was because of some voters' negative attitudes about African Americans.  In Galveston County in 2008, for example, Obama appears to have underperformed compared to the other Democrats running for statewide positions by between two to five percentage points.[16]  For example, Piston (2010) finds that negative stereotypes about African Americans eroded support for Obama in the 2008 presidential election.  Specifically, whites who thought that African Americans are on average less hardworking and less intelligent than whites were less likely to vote for Obama.

Furthermore, this was not a case of people who have negative stereotypes of African Americans, just being less likely to vote Democratic candidates in general.  The impact of these negative racial stereotypes was unique to Obama. Various statistical analyses demonstrate that belief in these negative racial stereotypes did not impact previous white Democratic presidential nominees in the same way they impacted Obama (Piston 2010).  Similarly, other studies find that Obama underperformed in certain electorates relative to previous Democratic presidential

---

[15] In a similar vein, when other Black and Latino candidates are on the ballot, it is likely that  their very presence is a racial cue, especially when there is the potential for them to be "historic firsts."  The vast majority of states have never had a Black or Latino politician hold statewide office, for example.
[16] Texas Secretary of State Election Data. https://elections.sos.state.tx.us/elchist141_county84.htm.

Report of Dr. LaFleur Stephens-Dougan

nominees because of negative racial attitudes (Tesler and Sears 2010; Kinder and Dale-Riddle 2012).

In addition to Obama's very presence helping to make race salient, Obama was subjected to "racial dog whistles" that also helped make race salient during his presidential campaigns and two terms as president.  For example, during the 2008 campaign, there were unsubstantiated claims that Obama was a Muslim, which was arguably an attempt to activate anti-Muslim attitudes.  Research indicates that white voters with anti-Muslim attitudes were far less likely to vote for Obama in 2008 and 2012 than white voters who did not hold those attitudes.  For example, Jardina and Stephens-Dougan 2021 find that a one-unit change on the anti-Muslim affect measure (how cold or warm they felt toward Muslims) resulted in a 22-point less favorable evaluation of Obama in both 2008 and 2012 (on a 100-point scale).[17]  There were also questions surrounding whether Obama was born in the United States, and thus, eligible to serve as president.  Arguably, these were attempts to activate nativism and anti-Black attitudes.  Previous research indicates that for many Americans, being American is implicitly synonymous with being white (Devos and Banaji 2005).  Thus, candidates of color, including Obama are more susceptible to these attacks of being un-American.

Another example of how American citizenship is conflated with whiteness is evidenced in comments from Senate Minority Leader, Mitch McConnell.  Prior to Republicans blocking a federal voting rights bill, at a conference on January 22, 2022, McConnell said, "The concern [about voter suppression] is misplaced because if you look at the statistics, African American voters are voting in just as high a percentage as Americans."[18]  The implications of these comments is that African Americans and Americans are two distinct groups.  Research also indicates that Latinos are similarly stereotyped as unAmerican (Devos and Banaji 2005).

*Racialization of Policy During the Obama Era*

For many white Americans, Obama's ascent to the presidency posed a threat to white dominance in American politics (Parker & Barreto 2013), which led to Obama presiding over one of the most racially polarized eras in American politics (Tesler 2016). Racial attitudes spilled over into just about everything.  Party identification, vote choices for Congress, public policy positions, and evaluations of prominent politicians, including Hillary Clinton, were all more divided by racial attitudes after Obama's eight years in the White House than they had been in the pre-Obama era.

Obama's position as the country's first African American president was associated with race permeating almost every political issue during his two terms in office, even prompting some racially resentful, non-college-educated whites to flee the Democratic party (Tesler 2016).

---

[17] The most consistently available measure on the ANES is one that captures affect toward Muslims via a "feeling thermometer"—a standard affective measure in public opinion research, in which survey respondents are asked to rate a target group on a scale ranging from 0 to 100 in which values below 50 represent "cold" or negative attitudes toward the target and values above 50 indicate "warm" or positive feelings.

[18] Bump, Phillip, "McConnell waves off voting concerns since Black people turn out as heavily as 'Americans,'" *Washington Post*, January 20, 2022. https://www.washingtonpost.com/politics/2022/01/20/mcconnell-waves-off-voting-concerns-since-black-people-turn-out-heavily-americans/

Some scholars also argue that Obama's ascent to the presidency helped to contribute to the further racialization of party identification whereby racially conservative Americans are increasingly aligned with the Republican party and racially liberal Americans are aligned with the Democratic party (Parker & Barreto 2013, Tesler 2016).

For example, Tesler (2016) finds that party identification was more polarized by race during the Obama era than it was shortly prior to his ascendancy.  During Obama's tenure, white racial liberals became increasingly Democratic, while racial conservatives became increasingly Republican.  The most racially liberal whites moved nine points more Democratic in the 2008-12 ANES study than they had in 2000-2004, whereas the most racially conservative whites became about three points more Republican.  Because partisanship is consistently one of the most influential predictors of political behavior, the growing racialization of partisanship is equivalent to the growing racialization of American politics more broadly, because race and partisanship are very intertwined in American politics.  Moreover, when a core dividing line in a nation (partisanship) becomes so closely aligned with race and ethnicity, it suggests that many of our political disagreements are no longer dispassionate arguments about policies and ideals.

Obama's association with various public policies meant that many Americans linked their opinion of those policies with their attitudes about African Americans (Tesler 2016).  Even public opinion on issues that were historically unrelated to race, such as healthcare, became closely linked to people's attitudes about race once Obama had taken a visible position on those issues (Tesler 2012).  Tesler (2012) shows that whites' healthcare policy preferences were associated with racial resentment when healthcare reform was framed as Obama's plan but not when it was framed as Bill Clinton's plan.  For example, when the plan was attributed to Clinton, the difference in support for healthcare between the least racially resentful respondents and most racially resentful respondents was 23 percent. However, when the identical health care plan was attributed to Obama, the difference in support between the least racially respondents and most racially resentful respondents almost doubled to 40 percent (Tesler 2016).  This difference is both substantively and statistically significant.

*Racial Dog Whistles During the Trump Era*

Racial and ethnocentric attitudes were deeply implicated in Donald Trump's ascent to the White House.  Racial resentment, attitudes toward Muslims, and white identity were all much stronger predictors of support for Trump in the 2016 primaries than they were for prior Republican nominees.  How could racial attitudes have become more influential in 2016 than they were in electing and reelecting the country's first African American president?  The heightened salience of race during Obama's presidency almost guaranteed a prominent role for racial attitudes in the 2016 election, even without Obama on the ballot.

As noted earlier, Obama presided over the most racially polarized electorate that we have witnessed in modern times.  Racially resentful whites are far more likely to identify as Republicans, and racially liberal whites are more likely to identify as Democrats (Tesler 2016; Engelhardt 2021).  However, prior to the Obama era, racial attitudes and partisanship were not so tightly intertwined.  For example, in the 1980s, there were "Reagan Democrats" who had high racial resentment, but still identified as Democrats.

Since 2008, however, many racially resentful whites have outright fled the Democratic party. Using survey data from the American National Election Studies, scholars contend that the eight years of Obama as the head of the Democratic party helped non-college educated whites "learn" about the racial liberalism of the Democratic party.  According to this line of reasoning, college-educated whites were already aware of the racial differences of the two major parties, and thus had already sorted accordingly.  But for non-college-educated whites, who had historically benefitted from the Democratic party's pro-labor and other policies targeted at the working class, Obama helped them associate the Democratic party with greater racial liberalism (Tesler 2016; Sides et al. 2016).

Second, racial attitudes were more influential in 2016 than they were in 2008 or 2012, precisely because of Donald Trump.  Obama polarized public opinion by racial attitudes because of who he was, and not because of what he said or did.  As noted later in this Report, Obama arguably went to great lengths to avoid discussions of race.  Conversely, Trump literally launched his campaign by injecting race:

> On June 16, 2015, Donald J. Trump announced his campaign for president. Almost immediately, the businessman-turned-politician began a tirade in which he stated, "When Mexico sends its people, they're not sending their best. They're not sending you.….They're sending people that have lots of problems, and they're bringing those problems with us [*sic*]. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people" (Stephens-Dougan 2021).

Trump discussed race more explicitly than perhaps any politician in the modern era.  His victory in 2016 is evidence that while racial codewords are in fact effective, a non-trivial fraction of the population is comfortable voting for a politician who uses messages that *openly* play to negative stereotypes of racial and ethnic minorities.  In fact, research suggests that Trump's 2016 presidential campaign had an emboldening effect, such that some voters felt more comfortable expressing prejudicial attitudes because of Trump's normalization of racist rhetoric (Crandall et al. 2018, Newman et al. 2020).

*How Candidates of Color Might Achieve Some Success Even Among Racially Resentful Whites*

A long line of research finds that whites who are racially resentful, or who believe that African Americans do not uphold traditional American values like work ethic, are less likely to vote for Black candidates (Terkildsen 1993; Reeves 1997; Tesler and Sears 2010).  Research also indicates that Black and Latino politicians are more likely to be stereotyped as liberal relative to identical white politicians (Sigelman et al. 1995; Jones 2014).  Thus, white opponents of candidates of color in electoral contests have effectively invoked negative stereotypes of candidates of color, as a means of undermining their electoral success. These attacks may include the depiction of Black and Latino candidates as "too liberal," especially on racialized policies such as welfare and crime.

Moreover, research also indicates that Black politicians have less latitude to call attention to the racial nature of attacks from their opponents.  In other words, when an opponent invokes race in

an electoral contest against a Black candidate, by raising racialized issues such as welfare or crime, Black candidates who "call out" the racial nature of the attack are largely penalized by white voters.  Similarly situated white candidates, however, are not penalized (Tokeshi and Mendelberg 2015).

Candidates of color are well aware that they are likely to face attacks that play to negative stereotypes of their group, and thus may try to overcome these attacks through various strategies.  One strategy that candidates of color might use is called "deracialization."  The originator of the term deracialization, political scientist Charles Hamilton (1977), initially intended the concept as a strategy by which the Democrats could regain some of the ground they had lost to the Republicans during the 1972 presidential election.  Central to the theory of deracialization is the idea that white voters will not support a candidate of color who does not deemphasize her racial identity.  The conventional wisdom is that if candidates of color can avoid associations with their racial identity, then they can minimize the salience of race in the campaign and assemble a broad, multiracial coalition.

Building upon the work of Hamilton (1977), McCormick and Jones (1993, 76) define deracialization as "conducting a campaign in a stylistic fashion that defuses the polarizing effect of race by avoiding explicit reference to race-specific issues, while at the same time emphasizing those issues that are perceived as racially transcendent, thus mobilizing a broad segment of the electorate for purposes of capturing or maintaining public office."  They also suggest that deracialization entails Black candidates presenting an image that is "reassuring to the white electorate" (76).  This strategy is not without controversy because, at its core, it suggests that Black politicians cannot be too closely aligned with their African American community if they want substantial electoral support from white voters. Qualitative evidence suggests that this strategy has been successful (Gillespie 2009), but it is difficult to estimate the counterfactual (i.e. would deracialized candidates have won if they did not run deracialized campaigns?).  To my knowledge, to date, no research employs an experiment to compare the effectiveness of a deracialization strategy relative to a racialized strategy.[19]  Furthermore, real-world candidates, who are risk-averse are unlikely to run a pro-minority campaign when running in a majority-white jurisdiction.

It is worth noting that although the vast majority of deracialization research has focused on Black candidates, research indicates that Latino candidates running for office in majority-white jurisdictions are also incentivized to run deracialized campaigns (Juenke and Sampaio 2010). Juenke and Sampaio (2010) conducted a study of Ken and John Salazar's successful campaigns in 2004 and find that conservative whites responded positively to Ken Salazar's deracialized campaign to represent Colorado in the U.S. Senate.[20] Relying on exit poll data from Ken Salzar's 2004 campaign for the U.S. Senate, Juenke and Sampaio (2010) find that racially polarized voting was virtually non-existent in the parts of Colorado, where the Salazar campaign emphasized a deracialized approach.  Instead, Salazar was able to attract both white and

---

[19] For an exception, see Stephens-Dougan 2020, discussed later in the Report.  However, this study compares to deracialization to a racialized strategy that invokes *negative* stereotypes of African Americans.  We do not know how a deracialized strategy compares to a racialized strategy that is pro-African American.

[20] John Salazar also ran successfully to represent Colorado's third congressional district in the U.S. House of Representatives.

Republican crossover votes at significantly higher levels than in the rest of the state (Juenke and Sampaio 2010).

Also, of note, both John and Ken Salazar packaged themselves and their policy platforms to appeal to Republicans and independents, highlighting the interests of rural Colorado without invoking unwarranted racial attention on issues such as immigration.  In fact, websites for both Ken and John Salazar's campaigns were available in English only.  They opted to not provide Spanish translations of their websites. This is of particular interest when one considers that both the Democratic and Republican national parties provided Spanish translations of their websites, as did Ken Salazar's Republican opponent, Pete Coors.  Moreover, both Salazar brothers were subjected to overt attempts by their Republican opponents to racialize their campaigns, with print and television ads emphasizing their support for policies such as driver's licenses for undocumented immigrants, comprehensive immigration reform, in-state tuition for undocumented immigrant students, and a new guest worker program. These ads used of dark lighting, grainy photographs of the brothers, and the racial trope of immigrants streaming over a fence.  The Salazar brothers never called out the racialized nature of these attacks (Juenke and Sampaio 2010).

In addition to deracialization, another strategy that politicians of color might employ as a means of obtaining significant electoral support from white voters is a strategy called "racial distancing." This strategy is characterized by politicians distancing themselves rhetorically, visually, and even substantively from racial and ethnic minorities, often through rhetoric that invokes negative stereotypes about people of color (Stephens-Dougan 2020).  Racial distancing is distinct from deracialization because it entails taking a stance on racial matters, albeit in a manner that indicates the politician will not be beholden to their constituents of color.  Again, this strategy suggests that candidates of color who are perceived as too closely aligned with other people of color are not palatable to white voters.

Racial distancing theory posits that when trying to win elections in majority-white jurisdictions, candidates who signal that they will maintain the racial status quo, which is characterized by white dominance in political, social, and economic institutions, will fare better than candidates who make no such indication.  Since politics is largely about which politician can deliver resources to a voter's group, even candidates of color can gain electoral support from white Americans who have animus toward racial and ethnic minorities, as long as they signal that they will maintain the racial status quo.

While deracialization and racial distancing are both approaches by which candidates can "enhance effectively the likelihood of white electoral support," Black and Latino candidates in particular might prefer to engage in racial distancing above and beyond a strategy of deracialization.  Black and Latino candidates are more likely to be perceived as liberal and preoccupied with minority rights (Jones 2014).  Therefore, racial distancing may be more effective in helping dispel some of the negative stereotypes that are associated with Black and Latino candidates relative to a strategy of deracialization, which simply avoids the topic of race altogether.

26

For example, in a 2016 study of a nationally representative sample of 500 whites, Republicans in the sample were on average 15 to 20 percentage points more likely to vote for a Black Democrat whose message emphasized negative stereotypes of "Black people needing to get off of the couch," relative to a deracialized message that emphasized, "working together" (Stephens-Dougan 2020). Similar results were found when looking at whites who score high on the racial resentment scale, or at whites who endorsed the negative stereotype of Blacks as less hardworking than whites.  Thus, messages that invoke negative stereotypes of people of color appear to be an effective means of garnering support from a non-trivial fraction of white voters.

When candidates of color discuss racial matters through a strategy of racial distancing, they are providing information that helps disrupt the stereotype of the candidate as racially liberal. Counter-stereotypical behavior provides individuating information and inhibits reliance on negative stereotypes (Hurwitz and Peffley 1998; Bobo and Kluegel 1993).  A racial distancing strategy provides white voters with more information, relative to deracialization, and consequently helps disrupt the stereotype of Black and Latino candidates as liberal on racial matters and preoccupied with matters of race.

Cues like Republican partisanship and individualist messages are counter-stereotypical (Fields 2016).  For precisely that reason, they fulfill the implicit expectations of racially resentful voters about the causes and remedies for racial disparities, thus prompting those voters to exceptionalize Black Republicans or Black politicians with individualist messages, and subsequently, change their voting behavior toward these particular minority candidates.

For example, Karpowitz et al. (2021) examine the effects of racial resentment in all 2010, 2012, and 2014 congressional races in which a Black candidate faced a white opponent.  In races in which the Black candidate ran as a Democrat, the effect of racial resentment is negative and steep. Moving from the 10th percentile to the 90th percentile of racial resentment reduces the predicted probability of voting for the Black candidate from 68 percent to a mere 25 percent.  In other words, racial resentment has a negative effect on support for Black Democratic candidates.

However, when the Black candidate is a Republican, Karpowitz et al. (2021) find that the effect runs in the opposite direction, increasing the predicted probability of voting for the Black candidate from about 9 percent to over 86 percent, moving from the 10th to the 90th percentile of racial resentment. The candidate's political party thus reverses the effect of racial resentment on vote choice.  The marginal effect of racial resentment is negative and strongly significant when the Black candidate is a Democrat but positive and strongly significant when the candidate is a Republican.  In short, the partisan cue of "Republican," helps make Black candidates attractive to racially resentful whites.  Black Republicans fare quite well with racially resentful whites.

Yet, another strategy that Black or Latino candidates might employ to overcome racism in the electorate is "whitewashing."  Whitewashing entails highlighting the candidate's commonality with and support from whites rather than merely avoiding issues associated with race (Hutchings et al. 2020).  Hutchings et al. (2020) demonstrate that the 2008 Obama campaign whitewashed Obama's image by drawing attention to his biracial ancestry and highlighting visual associations with white Americans to curry favor with some whites.

27

Using a survey experiment, Hutchings et al. (2020) test whether white voters were less likely to believe rumors about Obama's citizenship and religion when they were exposed to a whitewashed version of a televised campaign advertisement relative to a race-neutral baseline condition.  The results indicate that when an Obama campaign advertisement visually associated the candidate with whites and emphasized his biracial ancestry, Republicans in particular were less likely to believe rumors about Obama's citizenship and religion.  Specifically, among Republicans who viewed the race neutral version of the ad, the likelihood of believing that Obama was "definitely" or "probably" born outside of the United States was 52 percentage points.  However, the likelihood of believing that Obama was "definitely" or "probably" born outside of the United States was only 14 percentage points in the "whitewashed" version of the advertisement.  It is worth noting that the whitewashed version of the advertisement was the advertisement that the Obama campaign actually ran.  Moreover, these results suggest that race neutrality may not be sufficient for candidates of color to overcome racialized attacks.

Other scholarship has found that visual associations with racial and ethnic minorities can be detrimental to Democratic politicians.  Stephens-Dougan (2016) finds that racially resentful voters were less likely to vote for white Democrats who included African Americans in their campaign mailers.  Similarly, Ostfeld (2019) finds that as white Democratic voters learn about the Democratic party's outreach to Latino voters, they become less supportive of the Democratic party.  Finally, Berinsky et al. (2020) find a backlash effect of up to eight percentage points in reported vote intention among white voters for a candidate whose campaign mailer includes exclusively Black images.

Taken together, these results indicate that being perceived as too closely aligned with racial and ethnic minorities harms candidates, which might explain why in his first term, Obama spoke about race less than any of his Democratic predecessors (Gillion, 2016).

In an attempt to overcome the negative stereotypes, candidates may engage in various strategies—deracialization, racial distancing, and whitewashing.  These strategies all share a common thread— Black and Latino politicians do not necessarily have to cede the vote of racially resentful whites if they understand, and in some instances capitalize on, white racial resentment.

Racially resentful whites can actually be quite receptive to Black politicians—namely, when Black politicians behave in a manner that is counter-stereotypical to white voters' image of Black politicians as racially liberal (Hajnal 2007; Stephens-Dougan 2020; Karpowitz et al. 2021).

There are numerous examples of Black candidates, often Black Republicans who are able to win elections in majority-white, often racially conservative districts.  For example, Mia Love, the first Black person to represent Utah in Congress won several Congressional elections in a district that was less than five percent Black.  She publicly criticized the Congressional Black Caucus, saying, "They sit there and ignite emotions and ignite racism where there isn't" (Romboy 2012).  Also, featured prominently on Love's website was a video referencing one of her father's favorite statements to her: "Mia, your mother and I never took a handout.  You will not be a burden to society.  You will give back."  This statement from Love's father dispelled the

stereotype of an African American politician who would advocate for the expansion of the welfare state (Stephens-Dougan 2020).

Similar examples can be found from other prominent Black Republicans including Senator Tim Scott and former Secretary of Housing and Urban Development, Ben Carson.  Scott, who delivered the Republican rebuttal to President Biden's State of the Union address in 2021, vehemently stated that, "America is not a racist country," which is a view that is more closely aligned with that of racially resentful whites than it is with people of color.  Furthermore, both Scott and Carson have also made claims that they have experienced racism from the Left, but not from the Right, which may also be a means of distancing themselves from people of color and aligning themselves with racially resentful whites (Cobb 2015: Wootson and DeBonis 2021).

## Section 3: Racialized Politics in Galveston County, Texas

While the primary purpose of this Report is to provide an account of the academic consensus on the relationship between race and partisan politics in America, particularly in the American South, rather than a comprehensive study of Galveston County specifically, nevertheless there are readily available examples showing that the intertwined racial and political phenomena discussed in the preceding sections exist within Galveston County.

*Immigration and Crime*

Immigration has played an unusual role in Galveston County politics given the distance of the County from the border and the general lack of role for county-level government in immigration policy.  Despite the seeming lack of connection, Galveston County issued an emergency immigration disaster declaration in 2021 in order to send federal Covid-relief money to support immigration policing at the distant Texas border.[21]  This decision is notable because it took money intended for Covid-19 relief – an issue which research has been shown to have its own racialized dimensions (Stephens-Dougan 2022) – and redistributed that money to an issue that is of particular salience for racially resentful white voters (see Section 2 above).

Relying on a nationally representative sample of approximately 600 whites, Stephens-Dougan (2022) found that when whites who endorsed negative stereotypes of African Americans as less hardworking or less intelligent than whites were exposed to factual information about the disparate impact of Covid-19 on African Americans, those whites were less supportive of efforts to limit the spread of Covid-19.  This decrease in support included decreased willingness to wear a facemask, a key preventative measure in slowing the spread of Covid-19.[22]  Therefore, the

---

[21] Nick Natario, "Galveston County To Send COVID-19 Relief Money To fund the Border Wall and Security." June 30, 2021. https://abc13.com/texas-border-wall-counties-using-money-from-covid-relief-helping-fund-news/10844833.

[22] For example, Stephens-Dougan (2022) finds that the probability of indicating that it was "not at all important" or "not very important" to wear a face mask was 46% among whites who endorsed the stereotype, but who were exposed to race-neutral factual information about Covid-19. However, among white respondents who endorsed the negative stereotypes of Black people and were exposed to factual information about the disparate impact of Covid-19 on African Americans, the likelihood of indicating that mask-wearing was "not at all important" or "not very important," was 75% ($p < 0.05$ for a one-tailed test).   These results indicate that a critical preventative measure in

decision to use Covid-19 funds toward immigration policing – an issue that is highly racialized – was in effect a signal to the electorate that the politicians pushing this issue were prioritizing the policy preferences of whites who endorse negative stereotypes of immigrants and minorities over the health and well-being of Blacks and Latinos who have been disparately impacted by Covid-19.

Policing and crime have also been salient topics in Galveston County, along with of course the national spotlight on them in recent years. Galveston County became a center of national attention in 2019 when a Black man in handcuffs was led down the street by a rope held by white police officers on horseback.[23] This viral image elicited comparisons to the antebellum period in which slave patrols captured enslaved people who unsuccessfully attempted to escape and made an example of them by parading them through town for all to see. Police shootings involving Black residents have led to local activism.[24] And diversity in the police force has been a publicized issue for multiple localities within the county.[25] Research finds that diversity in law enforcement can lead to improvements in how police treat people of color. A 2021 study found that Black officers made far fewer stops and arrests and used force less often on Black civilians than white officers facing common circumstances: differences equal to 29%, 21% and 32% of average white officer behavior respectively. Hispanic & female officers showed reduced activity too, by smaller margins (Ba et al. 2021).

Against the local and national backdrops of immigration and policing, anti-immigrant and tough-on-crime messages with strongly suggestive racial appeals have surfaced in recent years in Galveston electoral contests. For example, a campaign advertisement from County Judge Mark Henry centers on denouncing, without defining, the concept of defunding the police by splicing together footage of post-George Floyd-shooting Black Lives Matter protesters, one of the most salient racial issues in recent years.[26] The advertisement also references a "crime surge in Democratic led cities," which is an overt attempt to tie Democratic politicians to the racially salient issue of crime. In reality, most cities, regardless of crime rates, have Democratic mayors because of the correlation between partisanship and urbanicity. For example, as of January 2022, 17 of the 20 largest cities in the United States have Democratic mayors.[27] The ad also prominently depicts a female Black organizer saying "we don't want no mo' police" as well as Representatives Alexandra Ocasio-Cortez and Cori Bush talking about the issue, both women of

---

fighting the coronavirus was perceived as less important when racially prejudiced whites were exposed to COVID-19 racial disparities information.

[23] Harmeet Kaur and Melissa Alonso, "A Black man who was led through Galveston, Texas, by police officers on horseback is suing the city for $1 million." CNN, October 12, 2020. https://www.cnn.com/2020/10/12/us/galveston-horseback-arrest-lawsuit-trnd/index.html

[24] James LaCombe, "Marchers call for action after police shooting in La Marque." Galveston County Daily News, December 12, 2020. https://www.galvnews.com/news/marchers-call-for-action-after-police-shooting-in-la-marque/article_7522734e-dbbb-5195-b2c6-54a2f0d6971e.html

[25] Matt Degrood, "Galveston County law enforcement works on diversity." Galveston County Daily News, July 17, 2020. https://www.galvnews.com/news/police/free/article_036c2431-b464-5eee-aad4-5164645122ae.html

[26] https://twitter.com/JudgeMarkHenry/status/1575916835811139584?cxt=HHwWgIClooeA5N4rAAAA

[27] Author's calculations. https://ballotpedia.org/Party_affiliation_of_the_mayors_of_the_100_largest_cities

color and representatives from the Democratic Party.  The message ends by saying "vote Republican all the way down the ballot and keep Galveston safe."

A copy of a political social media message, provided to me by Plaintiffs' counsel, from County Commissioner Darrell Apfel exemplifies the practice of juxtaposing political appeals with negative stereotypical imagery to elicit racial attitudes without explicitly using racial language. It calls to mind the famous Michael Dukakis incident referenced on Page 19 of this Report.



In 2020, the Republican primary race for Tax Assessor-Collector, in which Jackie Peden challenged the incumbent Cheryl Johnson, featured a classic case of racialized political imagery and racial codewords.  A campaign advertisement sponsored by the Peden campaign featured a photograph of an MS-13 gang member accompanied by language about illegal immigration: "Texans can thank Cheryl Johnson for having illegal immigrants vote in this November's election!"[28]  The man in the photograph is Latino, bare-chested, with tattoos on his torso, arms, and face.

It is also instructive to look at an advertisement from Commissioner Robin Armstrong when he was running for a Texas State Senate seat in 2022.  In an advertisement, "Stand Up," he pledges

---

[28] John Wayne Ferguson, "Johnson: Peden ad 'racist,' 'discriminatory,' and a 'lie.'" Galveston County Daily News, February 22, 2020. https://www.galvnews.com/news/free/article_1f26ee77-55ca-5723-a493-28fdd78f15c5.html

to "stand up" for voters by "fighting crime," "fighting critical race theory," and "securing our border."[29]  As noted earlier in the Report, crime and immigration are highly racialized, and can be used by strategic politicians to make racial resentment more consequential in white voters' decision calculus.  Research indicates that Armstrong, who is African American, might be especially advantaged with racially resentful white voters because as explained previously, some Black candidates, most notably Republicans, can benefit electorally from higher levels of racial resentment in the electorate  by presenting themselves counter-stereotypically (Karpowitz et a 2021l; Stephens-Dougan 2020).  Mentioning opposition to critical race theory as well is an example of the racial distancing phenomenon discussed in Section 2.

These advertisements are a prototypical example of how strategic campaigns can use negative, stereotypical imagery of racial and ethnic minorities and racialized issues to activate negative racial attitudes.  A long line of research (as discussed earlier in this document) indicates that stereotypical imagery, such as imagery that links racial and ethnic minorities with crime, activates stereotypical thinking.  Similarly, just mentioning racialized issues such as immigration and crime can also activate stereotypical thinking.  Once that stereotypical thinking is activated, it has been shown to reduce support, particularly from racially resentful white voters, for those candidates who are portrayed as being "soft on crime" (Reny et al 2020).  In a majority white district, such strategies would logically be employed to help win a greater share of the white vote.

*Public Housing*

Proposals to build public housing in Galveston have been met with opposition and appear to have been a central, animating issue for the community after Hurricane Ike destroyed an existing stock of public housing.[30]  Research finds that fear of crime is often tied to opposition to public housing, and as noted earlier, crime attitudes are closely bound up with race (Duke 2010).

Relatedly, Enos (2014) leverages the exogenous demolition of 12 large public housing developments in Chicago to test whether proximity to public housing has a conservatizing effect among whites.  Due to the notorious hypersegregation of Chicago, the demolition of these housing developments removed 25,000 African Americans from the area, many of whom had lived in relatively close proximity to whites.  He finds that voter turnout dropped by more than 10 percentage points for white voters living nearest to the public housing. This result can be considered evidence that whites living in close proximity to public housing experienced racial threat, but once their African American neighbors were removed, their sense of racial threat diminished considerably.

The change in turnout also varied by the size of the population that had been removed. The turnout of African Americans living nearby did not change. This result was maintained even when a number of alternative tests were considered.  Furthermore, the results indicate that whites

---

[29] Dr. Robin Armstrong, "Stand Up." https://www.youtube.com/watch?v=StikJDXxAkM.

[30] Edgar Walters, "It's our form of apartheid": How Galveston stalled public housing reconstruction in the 10 years after Ike." Texas Tribune, April 16, 2018. https://www.texastribune.org/2018/04/16/galveston-public-affordable-housing-hurricane-ike. Forrest Wilder, "Galveston's Nasty Public Housing Fight." Texas Observer. April 5, 2012. https://www.texasobserver.org/galvestons-nasty-public-housing-fight.

living near the public housing had voted more conservatively than whites living farther away and that this difference disappeared after the removal of their African American neighbors (Enos 2014).

Although Enos' 2014 study focused on Chicago, opposition to public housing can be bound up with race and racial threat in other locales, including, based on the explicit references to race in the media sources cited above, Galveston County .

*Confederate Statues*

In the aftermath of the "Unite the Right Rally" in Charlottesville in 2017, the removal of Confederate monuments has received great attention.  Galveston County has been on jurisdiction where this issue became prominent.  For example, Galveston County Judge Mark Henry said he would not support the removal of the Confederate soldiers monument in front of the Galveston County courthouse on 21st Street.  "I would not support removing it."  "Where does this end?  Today they're offended by these statues. Tomorrow they're offended by something else. Where's the end of this?"[31]  Ultimately Judge Henry and the three County Commissioners representing majority white districts voted against removing confederate statues while the lone commissioner representing a majority non-white district voted to remove the statues.[32]

For some, including Galveston County Judge Mark Henry, Confederate symbols could be described as innocuous tributes to Southern history and heritage.  However, research indicates that Confederate symbols are correlated with racial animus among whites (Strother et al. 2017).  In fact, Confederate symbols largely disappeared after the Civil War and were only reintroduced by white Southerners as a means of resisting the Civil Rights movement.

Strother et al. (2017) find in two separate surveys (one of white Georgians in 2004 and one of white South Carolinians in 2014), that racial resentment was strongly associated with support for the Confederate flag.  In the South Carolina study, at the low end of the racial resentment scale, the predicted probability of reporting the respondent strongly feels the flag should be flown is 0.23, but at the high end of the racial resentment scale, that probability more than doubled to 0.63.  This effect was statistically significant, even after controlling for partisanship, education, and other sociodemographic factors that could be potentially related to support for the Confederate flag.

Finally, also of note is that in the Georgia study, knowledge of Southern history was actually negatively related to support for the Confederate flag.[33]  In other words, the results suggest that

---

[31] Brooke A. Lewis, "Confederate statue in Galveston County will stay put — for now." Houston Chronicle. Aug. 24, 2020), https://www.houstonchronicle.com/news/houston-texas/houston/article/Confederate-statue-in-Galveston-County-will-stay-15511484.php

[32] John Wayne Ferguson," Political Buzz: Henry says 'no' to removing Galveston's Confederate statute." Galveston County Daily News. Aug. 16, 2017, https://www.galvnews.com/news/article_4dd6245b-6917-5b86-b756-5f3b38e8f2b7.html

[33] Questions about the knowledge of Southern history were only available on the 2004 Georgia survey.

Report of Dr. LaFleur Stephens-Dougan

support for the Confederate flag was more closely tied to animus rather than heritage (Strother et al. 2017). Similar results were found in a 2014 study by Hutchings et al. where they found in a representative sample of Georgians, white men became *more* supportive of the Confederate flag when they were told that it was endorsed by the Ku Klux Klan. These results suggest a political climate in which resistance to removing Confederate symbols is bound up with racial animus.

*Racist Remarks*

Thus far, much of the discussion about the racialized political climate in Galveston County has focused on policies, such as immigration, crime, and public housing, which are policies that have become racialized over time. These policies are by definition not about race but have become associated with race. The implicit role of race in politics was my primary focus for this Report. However, the Report's focus on implicit racial policies should not be interpreted as suggesting an absence of evidence of *explicit* racism in Galveston County.

There have been several publicized occurences in recent years in which politicians have been recorded making disparaging remarks about people of color in Galveston County. These remarks are indicative of a hostile racial environment. Many of the allegations of racist remarks surfaced when the Combined Law Enforcement Associations of Texas turned over sworn affidavits and audio recordings from former La Marque council candidate Deanna Bethea and her husband, James Bethea, to the U.S. Attorney.

The recordings include people making a joke about the Ku Klux Klan and discussing policy on zoning requests. LaMarque Councilwoman, Connie Trube is heard on a 2014 recording talking about La Marque school board member Annie Burton, saying: "I hate to say this, but she really turned Black." She also says that Burton helped "gang up" with others on the school board: She got on the school board with the rest of the Blacks and they all just ganged up and that's why the school system has gone to hell."[34] These statements imply that Councilwoman Trube equates Blackness with decline.

Trube acknowledged making the remarks. Responding to reporter Joel Eisenbaum, who asked whether she had made the statement, Trube responded, "Yes they [the words] are and all you have to do is see the condition the school district is in right now," Trube said. "Is that a black-white issue?" Eisenbaum said. "I think so," Trube said.[35]

In another instance, Trube is alleged to have suggested in 2012 to close the city library because "only Blacks use it."[36] Trube was eventually censured by the council.[37] At the council meeting

[34] Christopher Smith Gonzalez and T.J. Aulds. "LM police group calls for investigation after alleged racist remarks." Galveston County Daily News. May 30, 2014. https://www.galvnews.com/news/free/article_077059c8-e83e-11e3-8b66-001a4bcf6878.html

[35] Joel Eisenbaum. "Member of La Marque city council recorded making racist remarks." https://www.click2houston.com/news/2014/06/04/member-of-la-marque-city-council-recorded-making-racist-remarks/

[36] Harvey Rice. "La Marque councilwoman faces recall vote." Houston Chronicle. August 12, 2014. https://www.chron.com/neighborhood/bayarea/news/article/La-Marque-councilwoman-faces-recall-5684601.php

[37] Harvey Rice. "La Marque councilwoman faces recall vote." Houston Chronicle. August 12, 2014. https://www.chron.com/neighborhood/bayarea/news/article/La-Marque-councilwoman-faces-recall-5684601.php.

where Trube was censured, the council also voted to remove the Planning and Zoning Board Chairman, Chris Colombo, for using a racial slur about Councilman Chris Lane, who is African American.

Another incident in Galveston County that is indicative of a hostile racial environment involves a text from chairwoman for Galveston County's Republican party, Yolanda Waters.  The text was a part of a months-long text message exchange in which Waters complained to another person about her local State Republican Executive Committee member — J.T. Edwards, who is Black. In the texts, she referred to him as a "Typical Nig."  Waters claimed that she made an "unfortunate typo."[38]

In an era where it is generally not acceptable to make explicitly racist remarks, the fact that such incidents still occur in Galveston County is indicative of a political environment where race permeates the landscape.

## Conclusion

In this Report, I traced the historical realignment of partisan voting behavior in the American South based on race, beginning with the civil rights movement of the 1960s and continuing into the Twenty-First Century.  I also reviewed the robust literature on racial priming that explores how strategic politicians can inject race into politics by raising ostensibly non-racial issues.  The impact of racial priming is that voters often rely on negative racial stereotypes in their political decision calculus when they otherwise would not have done so.  Lastly, I considered publicly available information on salient political and racial issues in Galveston County, Texas to determine whether the jurisdiction fits the well-accepted academic model of racial and partisan alignment.

The Report has three key takeaways:  1) Race and partisanship are deeply intertwined in the American South, such that it is virtually impossible to disentangle the two.  2) The injection of ostensibly non-racial issues such as crime and immigration into campaign content is likely to activate negative racial attitudes among a non-trivial fraction of whites, such that they bring those attitudes to bear on their political decisions, thus further entangling racial attitudes and partisan voting behavior.  3) Galveston County, Texas fits the well-accepted academic model of racial and partisan alignment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information and belief.

Executed on: January 13, 2023

LAFLEUR STEPHENS-DOUGAN

---

[38] Patrick Svitek. "Top Texas Republicans pressure a county chair to resign over racist text."  Texas Tribune. December 7, 2019.  https://www.texastribune.org/2019/12/07/texas-republicans-racist-text-resign.

# References

Abrajano, M. and Hajnal, Z.L., 2015. *White Backlash*. Princeton: Princeton University Press.

American National Election Studies. 2022. *ANES Time Series Cumulative Data File* [dataset and documentation]. September 16, 2022 version. www.electionstudies.org

Ba, B.A., Knox, D., Mummolo, J. and Rivera, R., 2021. The role of officer race and gender in police-civilian interactions in Chicago. *Science*, *371*(6530), pp.696-702.

Bacon Jr, P., 2016. Trump and other conservatives embrace 'Blue Lives Matter'movement. *NBC News*.

Ballotpedia. "Party affiliation of the mayors of the 100 largest cities". https://ballotpedia.org/Party_affiliation_of_the_mayors_of_the_100_largest_cities

Banaji, M.R. and Greenwald, A.G., 2013. *Blindspot: Hidden biases of good people*. Bantam.

Beck, P.A., 1977. Partisan dealignment in the postwar South. *American Political Science Review*, *71*(2), pp.477-496.

Berinsky, A.J., de Benedictis-Kessner, J., Goldberg, M.E. and Margolis, M.F., 2020. The effect of associative racial cues in elections. *Political Communication*, *37*(4), pp.512-529.

Berelson, B.R., Lazarsfeld, P.F. and McPhee, W.N., 1986. *Voting: A study of opinion formation in a presidential campaign*. Chicago: University of Chicago Press.

Black, E. and Black, M., 1992. *The Vital South*. Cambridge: Harvard University Press.

Black, E., Black, M. and Black, E., 2002. *The Rise of Southern Republicans*. Cambridge: Harvard University Press.

Bobo, L. and Kluegel, J.R., 1993. Opposition to race-targeting: self-interest, stratification ideology, or racial attitudes?. *American Sociological Review*, pp.443-464.

Bobo, L., 2001. Racial attitudes and relations at the close of the twentieth century. *America becoming: Racial trends and their consequences*, *1*, pp.264-301.

Bullhorn Communications. 2022. *Dr. Robin Armstrong "Stand Up."* https://www.youtube.com/watch?v=StikJDXxAkM.

Bullock III, C.S., MacManus, S.A., Mayer, J.D. and Rozell, M.J., 2022. *African American Statewide Candidates in the New South*. Oxford: Oxford University Press.

Bullock III, C.S. and Rozell, M. eds., 2021. *The new politics of the old South: An introduction to Southern politics*. Rowman & Littlefield.

Bullock III, C.S., Hoffman, D.R. and Gaddie, R.K., 2005. The consolidation of the white southern congressional vote. *Political Research Quarterly*, *58*(2), pp.231-243.

Bump, Phillip, "McConnell waves off voting concerns since Black people turn out as heavily as 'Americans,'" *Washington Post*, January 20, 2022.

Campbell, Angus, Philip E. Converse, Warren E. Miller, and Donald Stokes. 1960. *The American Voter*. Chicago: University of Chicago Press.

Carmines, E.G. and Stimson, J.A., 1989. *Issue evolution: Race and the transformation of American politics*. Princeton: Princeton University Press.

Carmines, E.G. and Stanley, H.W., 1990. Ideological Realignment in the Contemporary South: Where Have All the Conservatives Gone?. *The Disappearing South? Studies in Regional Change and Continuity*, pp.21-33.

Cobb, Jelani. 2015. "Ben Carson's Exonerating Racism" The New Yorker. September 22, 2015

Converse, Philip E. 1964. "The Nature of Belief Systems in Mass Publics." *Critical Review* 18 (January): 1–74.

Corn, David. 2012. "Romney Tells Millionaire Donors What He REALLY Thinks of Obama Voters." Mother Jones. September 17, 2012.

Craig, M.A. and Richeson, J.A., 2014. On the precipice of a "majority-minority" America: Perceived status threat from the racial demographic shift affects White Americans' political ideology. *Psychological science*, *25*(6), pp.1189-1197.

Craig, M.A., Rucker, J.M. and Richeson, J.A., 2018. Racial and political dynamics of an approaching "majority-minority" United States. *The ANNALS of the American Academy of Political and Social Science*, *677*(1), pp.204-214.

Crandall, C.S., Miller, J.M. and White, M.H., 2018. Changing norms following the 2016 US presidential election: The Trump effect on prejudice. *Social Psychological and Personality Science*, *9*(2), pp.186-192.

Davidson, C., 1990. *Race and class in Texas politics*. Princeton: Princeton University Press.

Degrood, Matt. 2020.  "Galveston County law enforcement works on diversity." Galveston County Daily News, July 17, 2020. html

Devos, T. and Banaji, M.R., 2005. American= white?. *Journal of personality and social psychology*, *88*(3), p.447.

Dixon, T.L. and Linz, D., 2000. Overrepresentation and underrepresentation of African Americans and Latinos as lawbreakers on television news. *Journal of communication*, *50*(2), pp.131-154.

Drakulich, K., Wozniak, K.H., Hagan, J. and Johnson, D., 2020. Race and policing in the 2016 presidential election: Black lives matter, the police, and dog whistle politics. *Criminology*, *58*(2), pp.370-402.

Report of Dr. LaFleur Stephens-Dougan

Duke, J., 2010. Exploring homeowner opposition to public housing developments. *J. Soc. & Soc. Welfare*, *37*, p.49.

Edsall, T.B. and Edsall, M.D., 1992. *Chain reaction: The impact of race, rights, and taxes on American politics*. WW Norton & Company.

Eisenbaum, Joel. 2014. "Member of La Marque City Council Recorded Making Racist Remarks." KPRC. June 4, 2014.

Engelhardt, A.M., 2021. Racial attitudes through a partisan lens. *British Journal of Political Science*, *51*(3), pp.1062-1079.

Enos, R.D., 2014. Causal effect of intergroup contact on exclusionary attitudes. *Proceedings of the National Academy of Sciences*, *111*(10), pp.3699-3704.

Eubank, N. and Fresh, A., 2022. Enfranchisement and Incarceration after the 1965 Voting Rights Act. *American Political Science Review*, pp.1-16.

Fields, Corey D. 2016. *Black Elephants in the Room: The Unexpected Politics of African American Republicans*. Oakland: University of California Press.

Ferguson, John Wayne. "Johnson: Peden ad 'racist,' 'discriminatory,' and a 'lie.'" *Galveston County Daily News*, February 22, 2020.

Ferguson, John Wayne. 2017. "Political Buzz: Henry says 'no' to removing Galveston's Confederate statute." Galveston County Daily News. Aug. 16, 2017.

Frey, W.H., 2020. Exit polls show both familiar and new voting blocs sealed Biden's win. *Brookings Institution*, *11*, pp.12-20.

Gilens, M., 1999. *Why Americans Hate Welfare: Race, Media, and the Politics of Antipoverty policy*. Chicago: University of Chicago Press.

Gillespie, A. ed., 2009. *Whose Black Politics?* Taylor & Francis.

Gilliam Jr, F.D. and Iyengar, S., 2000. Prime suspects: The influence of local television news on the viewing public. *American Journal of Political Science*, pp.560-573.

Gillion, Daniel Q. 2016. Governing With Words. Cambridge, UK: Cambridge University Press.

Goldman, Seth K., and Diana C. Mutz. 2014. *The Obama Effect: How the 2008 Campaign Changed White Racial Attitudes*. New York: Russell Sage Foundation.

Gonzalez Smith, C. and T.J. Aulds 2023. "LM Police Group Calls for Investigation after Alleged Racist Remarks." *The Daily News*.

Green, D.P., Palmquist, B. and Schickler, E., 2002. *Partisan hearts and minds: Political parties and the social identities of voters*. Yale University Press.

Johnson, Thomas A. 1968. "Alienating the Negro Vote" .T*he New York Times*

Juenke, Gonzalez E. and Sampaio, A.C., 2010. Deracialization and latino politics: The case of the Salazar Brothers in Colorado. *Political Research Quarterly*, *63*(1), pp.43-54.

Hajnal, Z.L., 2007. *Changing white attitudes toward black political leadership*. New York: Cambridge University Press.

Hamilton, Charles. 1977. "Deracialization: Examination of a Political Strategy. *First World*, March/April 1977: 3–5

Hetherington, M.J. and Weiler, J.D., 2009. *Authoritarianism and Polarization in American politics*. New York: Cambridge University Press.

Highton, B., 2004. White voters and African American candidates for congress. *Political Behavior*, *26*(1), pp.1-25.

Hopkins, D.J., 2010. Politicized places: Explaining where and when immigrants provoke local opposition. *American Political Science Review*, *104*(1), pp.40-60

Hurwitz, Jon, and Mark Peffley. 1998. *Perception and Prejudice*. New Haven: Yale University Press.

Hutchings, V.L., Cruz Nichols, V., Gause, L. and Piston, S., 2021. Whitewashing: How Obama Used Implicit Racial Cues as a Defense Against Political Rumors. *Political Behavior*, *43*(3), pp.1337-1360.

Hutchings, V.L. and Jardina, A.E., 2009. Experiments on racial priming in political campaigns. *Annual Review of Political Science*, *12*, pp.397-402.

Hutchings, V.L., Walton Jr, H. and Benjamin, A., 2010. The impact of explicit racial cues on gender differences in support for confederate symbols and partisanship. *The Journal of Politics*, *72*(4), pp.1175-1188.

Jardina, A. and Stephens-Dougan, L., 2021. The electoral consequences of anti-Muslim prejudice. *Electoral Studies*, *72*, p.102364.

Jones, P.E., 2014. Revisiting stereotypes of non-white politicians' ideological and partisan orientations. *American Politics Research*, *42*(2), pp.283-310.

Kalkan, K.O., Layman, G.C. and Uslaner, E.M., 2009. "Bands of others"? Attitudes toward Muslims in contemporary American society. *The Journal of Politics*, *71*(3), pp.847-862.

Kane, J.V., Mason, L. and Wronski, J., 2021. Who's at the party? Group sentiments, knowledge, and partisan identity. *The Journal of Politics*, *83*(4), pp.1783-1799.

Karpowitz, C.F., King-Meadows, T., Monson, J.Q. and Pope, J.C., 2021. What leads racially resentful voters to choose black candidates?. *The Journal of Politics*, *83*(1), pp.103-121.

Kaur, Harmeet and Melissa Alonso, "A Black man who was led through Galveston, Texas, by police officers on horseback is suing the city for $1 million." CNN, October 12, 2020.

Report of Dr. LaFleur Stephens-Dougan

Key VO Jr. 1949. *Southern Politics in State and Nation*. New York: Knopf

Kinder, D.R., Sanders, L.M. and Sanders, L.M., 1996. *Divided by color: Racial Politics and Democratic ideals*. University of Chicago Press.

Kinder, D.R. and Kam, C.D., 2010. *Us Against Them: Ethnocentric foundations of American opinion*. Chicago: University of Chicago Press.

Kinder, D.R. and Sears, D.O., 1981. Prejudice and politics: Symbolic racism versus racial threats to the good life. *Journal of personality and social psychology*, *40*(3), p.414.

Kinder, D.R. and Dale-Riddle, A., 2012. *The End of Race?*. Yale University Press.

Kinder, D.R. and Kalmoe, N.P., 2017. *Neither Liberal nor Conservative*. University of Chicago Press.

Klein, E., 2012. Romney's theory of the 'taker class,'and why it matters. *Washington Post*, *17*.

LaCombe, James "Marchers call for action after police shooting in La Marque."  Galveston County Daily News, December 12, 2020.

Layman, G.C. and Carsey, T.M., 2002. Party polarization and" conflict extension" in the American electorate. *American Journal of Political Science*, pp.786-802.

Lopez, Ian Haney. 2014. *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class*. Oxford: Oxford University Press.

Lewis, Brooke A. 2020. "Confederate statue in Galveston County will stay put — for now." Houston Chronicle.

Mangum, M., 2013. The racial underpinnings of party identification and political ideology. *Social Science Quarterly*, *94*(5), pp.1222-1244.

Masuoka, N. and Junn, J., 2013. *The Politics of Belonging: Race, public opinion, and immigration*. University of Chicago Press.

Maxwell, A. and Shields, T., 2019. *The Long Southern Strategy: How Chasing White Voters in the South Changed American Politics*. Oxford University Press, USA.

McCormick, J. and Jones, C.E., 1993. The conceptualization of deracialization: Thinking through the dilemma. *Dilemmas of Black politics: Issues of leadership and strategy*.

McConnaughy, C.M., White, I.K., Leal, D.L. and Casellas, J.P., 2010. A Latino on the ballot: Explaining coethnic voting among Latinos and the response of White Americans. *The Journal of Politics*, *72*(4), pp.1199-1211.

Mendelberg, T., 2001. *The Race Card*. Princeton University Press.

Mendelberg, T., 2008. Racial priming revived. *Perspectives on Politics*, *6*(1), pp.109-123.

Miller, W.E., Shanks, J.M. and Shapiro, R.Y., 1996. *The New American Voter* (pp. 140-46). Cambridge, MA: Harvard University Press.

Montgomery, David. 2020. "The last Democratic presidential candidate to win Texas, Jimmy Carter, seeks to 'turn Texas blue." *New York Times*. October 30, 2020

Morris, K., 2022. "Patterns in the Introduction and Passage of Restrictive Voting Bills are Best Explained by Race." Brennan Center for Justice.

Murakawa, N., 2014. *The First Civil Right: How Liberals Built Prison America*. Oxford University Press.

Newman, B.J., Shah, S. and Collingwood, L., 2018. Race, place, and building a base: Latino population growth and the nascent Trump campaign for president. *Public Opinion Quarterly*, *82*(1), pp.122-134.

Newman, B., Merolla, J.L., Shah, S., Lemi, D.C., Collingwood, L. and Ramakrishnan, S.K., 2021. The Trump effect: An experimental investigation of the emboldening effect of racially inflammatory elite communication. *British Journal of Political Science*, *51*(3), pp.1138-1159.

Ostfeld, M.C., 2019. The new White flight?: The effects of political appeals to Latinos on White democrats. *Political Behavior*, *41*(3), pp.561-582.

Parker, F.R., 1990. *Black Votes Count: Political Empowerment in Mississippi after 1965*. Chapel Hill: Univ of North Carolina Press.

Parker, C.S. and Barreto, M.A., 2014. Change They Can't Believe In. In *Change They Can't Believe In*. Princeton: Princeton University Press.

Peffley, M. and Hurwitz, J., 2007. Persuasion and resistance: Race and the death penalty in America. *American Journal of Political Science*, *51*(4), pp.996-1012.

Perlstein, R., 2012. Exclusive: Lee Atwater's infamous 1981 interview on the southern strategy. *The Nation*, *13*.

Petrocik, J.R., 1987. Realignment: New party coalitions and the nationalization of the South. *The Journal of Politics*, *49*(2), pp.347-375.

Piston, S., 2010. How explicit racial prejudice hurt Obama in the 2008 election. *Political Behavior*, *32*(4), pp.431-451.

Phillips, K.P., 1969. *The Emerging Republican Majority*. Princeton: Princeton University Press.

Reeves, Keith. *Voting Hopes or Fears?: White voters, Black candidates and Racial politics in America*. Oxford University Press, 1997.

Reinhard, D.W., 1983. *The Republican Right since 1945*. Lexington: University Press of Kentucky.

Report of Dr. LaFleur Stephens-Dougan

Reny, T. and Manzano, S., 2016. The negative effects of mass media stereotypes of Latinos and immigrants. *Media and minorities*, *4*, pp.195-212.

Reny, T., Wilcox-Archuleta, B. and Nichols, V.C., 2018, December. Threat, mobilization, and Latino voting in the 2018 election. In *The Forum* (Vol. 16, No. 4, pp. 573-599).

Reny, T.T., Valenzuela, A.A. and Collingwood, L., 2020. "No, you're playing the race card": Testing the effects of anti-black, anti-Latino, and anti-immigrant appeals in the post-Obama era. *Political Psychology*, *41*(2), pp.283-302.

Rice, Harvey. 2014. "La Marque Councilwoman Faces Recall Vote." Chron. August 12, 2014.

Romboy, D., 2012. Love Would 'Take Apart 'Congressional Black Caucus If Elected in Utah's 4th Congressional District. *Deseret News*.

Schaffner, Brian; Ansolabehere, Stephen; Luks, Sam, 2021, "Cooperative Election Study Common Content, 2020", https://doi.org/10.7910/DVN/E9N6PH, Harvard Dataverse, V4.

Schickler, E., 2016. *Racial Realignment*. Princeton: Princeton University Press.

Schuman, H., Steeh, C., Bobo, L. and Krysan, M., 1997. *Racial Attitudes in America: Trends and interpretations*. Cambridge: Harvard University Press.

Sears, D.O., Hetts, J.J., Sidanius, J. and Bobo, L., 2000. Race in American politics: Framing the debates. *Racialized Politics: The debate about racism in America*, pp.1-43.

Seawright, J. and Gerring, J., 2008. Case selection techniques in case study research: A menu of qualitative and quantitative options. *Political research quarterly*, *61*(2), pp.294-308.

Sides, J., Tesler, M. and Vavreck, L., 2019. Identity crisis. In *Identity Crisis*. Princeton University Press.

Sigelman, C.K., Sigelman, L., Walkosz, B.J. and Nitz, M., 1995. Black candidates, white voters: Understanding racial bias in political perceptions. *American Journal of Political Science*, pp.243-265.

Stivek, Patrick. 2009. "Top Texas Republicans pressure a county chair to resign over racist text". The Texas Tribune. December 7, 2019.

Strother, L., Piston, S. and Ogorzalek, T., 2017. Pride or prejudice?: Racial prejudice, southern heritage, and white support for the confederate battle flag. *Du Bois Review: Social Science Research on Race*, *14*(1), pp.295-323.

Stanley, H.W., 1988. Southern partisan changes: Dealignment, realignment or both?. *The Journal of Politics*, *50*(1), pp.64-88.

Stephens-Dougan, L., 2016. Priming racial resentment without stereotypic cues. *The Journal of Politics*, *78*(3), pp.687-704

Stephens-Dougan, L., 2020. *Race to the bottom: How racial appeals work in American politics*. University of Chicago Press.

Stephens-Dougan, L., 2021. The persistence of racial cues and appeals in American elections. *Annual Review of Political Science*, *24*, pp.301-320.

Stephens-Dougan, L., 2022. White Americans' Reactions to Racial Disparities in COVID-19. *American Political Science Review*, pp.1-8.

Svitek, Patrick. 2019. "Top Texas Republicans Pressure a County Chair to Resign over Racist Text." The Texas Tribune. December 8, 2019.

Terkildsen, N., 1993. When white voters evaluate black candidates: The processing implications of candidate skin color, prejudice, and self-monitoring. *American Journal of Political Science*, pp.1032-1053.

Tesler, M. and Sears, D.O., 2010. *Obama's race: The 2008 election and the dream of a post-racial America*. University of Chicago Press.

Tesler, M., 2016. Post-racial or Most-racial?. In *Post-Racial or Most-Racial?*. University of Chicago Press.

Tesler, M., 2012. The spillover of racialization into health care: How President Obama polarized public opinion by racial attitudes and race. *American Journal of Political Science*, *56*(3), pp.690-704.

Tokeshi, M. and Mendelberg, T., 2015. Countering implicit appeals: Which strategies work?. *Political Communication*, *32*(4), pp.648-672.

Valentino, N.A., 1999. Crime news and the priming of racial attitudes during evaluations of the president. *Public opinion quarterly*, pp.293-320.

Valentino, N.A. and Sears, D.O., 2005. Old times there are not forgotten: Race and partisan realignment in the contemporary South. *American Journal of Political Science*, *49*(3), pp.672-688.

Westwood, S.J. and Peterson, E., 2020. The Inseparability of Race and Partisanship in the United States. *Political Behavior*, pp.1-23.

White, I.K. and Laird, C.N., 2020. *Steadfast Democrats*. Princeton University Press.

Williams, L.F., 2010. *Constraint of Race: Legacies of White Skin Privilege in America*. Penn State Press.

Williams, L.F., 2017. White/Black perceptions of the electability of Black political candidates. In *Black Electoral politics* (pp. 45-64). Routledge.

Winter, Nicholas J. G. 2008. *Dangerous Frames: How Ideas about Race and Gender Shape Public Opinion*. Chicago: University of Chicago Press

Wootson, Cleve R.  J. and Mike DeBonis Sen. Tim Scott's comments on race ignite a fiery debate" April 29, 2021.  The Washington Post.

Zhirkov, K. and Valentino, N.A., 2022. The Origins and Consequences of Racialized Schemas about US Parties. *Journal of Race, Ethnicity, and Politics*, pp.1-21.

Exhibit A

STEPHENS-DOUGAN EXHIBIT A

# LAFLEUR STEPHENS-DOUGAN

214 Fisher Hall •Princeton NJ 08544•
lafleurs@princeton.edu • 609-258-5376 (phone) • 609-258-1110 (fax)
lafleurstephensdougan.com

## ACADEMIC APPOINTMENTS

**Princeton University**
Associate Professor of Politics July 2022-present
Assistant Professor of Politics July 2014-June 2022
Postdoctoral Research Associate, July 2013 –July 2014

**Harvard University**
Sheila Biddle Ford Foundation Fellow, Hutchins Center for African and African American Research, September 2017-May 2018

**Massachusetts Institute of Technology**
Pre-Doctoral Fellowship, Department of Political Science, July 2012- June 2013

## EDUCATION

**University of Michigan, Ann Arbor, MI**
**Ph.D.** in Political Science and Public Policy, May 2013

**University of Rochester, Rochester, NY**
**B.A.**, Political Science (Departmental Honors), May 2002

## BOOKS

Stephens-Dougan, LaFleur. *The Color of Health:  How Racial Attitudes Shape Public Health* (manuscript in preparation)

Very few studies have explored the relationship between racial attitudes and public opinion on health policy.  Furthermore, the few studies in this area have primarily focused on public opinion on Obamacare.  Therefore, we still know very little about how racial attitudes influence opinion about health policy outside the context of the nation's first Black president.  *The Color of Health* argues that some diseases have become racialized, similar to other policy areas like welfare and crime. As a result, racial attitudes help drive public opinion on policies related to these diseases. I argue that we should expect to see racial attitudes matter for diseases such as Ebola, Zika, and of course, COVID-19 because of either the origin or the disparate impact of these diseases on people of color.  Alternatively, racial attitudes should matter far less for certain types of cancers and other conditions that are not racialized because the "face" of those diseases are White Americans (i.e., breast cancer, ALS, etc.).

I rely on a mix of survey experiments and cross-sectional survey data to test my theory.  For example, in a survey experiment funded by the National Science Foundation's Time-Sharing Experiments in the Social Sciences, I find that racially prejudiced White Americans are more resistant to COVID-19 restrictions when treated with information about the disease's disparate impact on African Americans.  In addition, analysis of cross-sectional survey data from the 2020 American National Election Study indicates that in many instances, racial attitudes such as racial resentment and the perception that Black people have too much influence in politics matter as much, if not more, than partisanship for White Americans' attitudes about COVID-19. Thus, while it has been widely documented that the pandemic has unfolded mainly along partisan lines, these results indicate that racial attitudes are also a driver of opinion on COVID-19.

Stephens-Dougan, LaFleur. 2020.  *Race to the Bottom: How Racial Appeals Work in American Politics.*  Chicago: University of Chicago Press.

● 2021 Winner of the American Political Science Association Ralph J. Bunche Award (given to "the best scholarly work in political science that explores the phenomenon of ethnic and cultural pluralism.")
● 2021 Winner of the International Society of Political Psychology David Sears Best Book Award (given to "the best book published in the field of the political psychology of mass politics.")
● Reviewed in *Perspectives on Politics*, *The Forum*, and *The National Review of Political Science.*

**ARTICLES**
Stephens-Dougan, LaFleur. (2022). White Americans' Reactions to Racial Disparities in COVID-19. *American Political Science Review*, 1-8.

Fenton, J., & Stephens-Dougan, LaFleur. (2021). Are Black state legislators more responsive to emails associated with the NAACP versus BLM? A field experiment on Black intragroup politics. *The Journal of Race, Ethnicity, and Politics, 7*(2), 203-218.

Jardina, Ashley, & Stephens-Dougan, LaFleur (2021). "The electoral consequences of anti-Muslim prejudice." *Electoral Studies* 72: 102364.

Stephens-Dougan, LaFleur (2021).  "The Persistence of Racial Cues and Appeals in American Elections."  *The Annual Review of Political Science.* 24: 301-320.

Stephens-Dougan, LaFleur (2016). "Priming Racial Resentment without Stereotypic Cues." *Journal of Politics* 78.3 (2016): 687-704. https://doi.org/10.1086/685087

**BOOK CHAPTERS**

Hutchings, Vincent and LaFleur Stephens. "The Role of Blacks in the Presidential Nomination Process" in William Mayer (ed), *In Pursuit of the White House 2008: How We Choose Our Presidents*. (2007). Chatham, NJ, Chatham House.

**NON-PEER REVIEWED ARTICLES**

Book Review of Davenport, Lauren. Politics Beyond Black and White: Biracial Identity and Attitudes in America (Cambridge University Press). (2019) *Perspectives on Politics.*

Book Review of Tesler, Michael. *Post Racial or Most-Racial?: Race and Politics in the Obama Era* (University of Chicago Press). *Political Research Quarterly* (2017) 132.2: 351-353.

**WORKING PAPERS**

"Moving Beyond Linked Fate: Toward a New Measure of Politicized Racial Identity" (with Kaiyla Banks, Jeron Fenton, Jasante Howard, Isaiah Johnson, Ismail White)

"Does Shared Disadvantage Foster Black and Latino Cooperation?" (with Davin Phoenix and Sonya Chen)

"The Influence of the Terms We Use on Racial Attitudes" (with Ashley Jardina)

"Racial Appeals and the Differential Role of Individualism Among Blacks and Whites" (with Ashley Jardina)

"I Get So Emotional: Race, Gender, and Candidate Evaluations" (with Andrea Benjamin and Davin Phoenix)

"The Role of Racial Attitudes and Identity in Affective Polarization (with Andrew Engelhardt)

**OTHER WRITING**

Joe Biden's 'Civility' Comment Told Biased Whites What We Won't Upset the Racial Order." *Washington Post/Monkey Cage.* July 2, 2019.

**FELLOWSHIPS, GRANTS, AND AWARDS**

2020 National Science Foundation's Time-Sharing Experiments for the Social Sciences Program Grant, "Racial Backlash Effect? White Americans' Reactions to Racial Disparities in COVID-19."

2020 National Science Foundation's Time-Sharing Experiments for the Social Sciences Program Grant, "The Influence of the Terms We Use on Racial Attitudes."  (with Ashley Jardina)

2020 Russell Sage Foundation Pipeline Grant: "Shared Disadvantage, Shared Identity: Explaining When and Why White Americans Support Affirmative Action," $30,000

STEPHENS-DOUGAN EXHIBIT A

2020 Princeton University Dean of Faculty Addressing Racism Grant $10,000

2020 Mamdouha S. Bobst Center Faculty Research Grant, $25,000

2019 University Committee on Research in the Humanities and Social Sciences, Princeton University, $6000

2019 Social Sciences Research Council Anxieties of Democracy Grant $4,737

2019 Woodrow Wilson Foundation Nancy Weiss Malkiel Award, finalist

2016 University Committee on Research in the Humanities and Social Sciences, Princeton University Anonymous Undergraduate Research Grant $2,016

2015 Princeton University Center for Human Values Faculty Grant $30,000 (with Ashley Jardina)

2014 University Committee on Research in the Humanities and Social Sciences, Princeton University Research Grant $10,000

2014 Princeton 250th Anniversary Fund for Innovation in Undergraduate Education Grant, $55,500 (with Ali Valenzuela and Omar Wasow)

2014 Best Dissertation in Race and Ethnic Politics, American Political Science Association

2013 Fund for Experimental Social Science, Princeton University $8000

2013-2015 Robert Wood Johnson Foundation Scholars in Health Policy Research Program, University of California at Berkeley (Declined)

**CONFERENCE PRESENTATIONS & POSTERS**

American Political Science Association Annual Meeting: 2022, 2018, 2013, 2012, 2011

Midwest Political Science Association Annual Meeting: 2019, 2014, 2013, 2012, 2009

National Conference of Black Political Scientists Annual Meeting:  2019, 2014, 2013, 2012, 2010

Social Science Research Council: Anxieties of Democracy Research Workshop, February 2019

**INVITED TALKS**

November 2022, More Than Every Four Years: When "Vote Harder" Won't Get Us Free, Yale University (panelist)

November 2022, Book Manuscript Conference for Assistant Professor Leah Christiani, University of Tennessee, at Knoxville (discussant)

September 2022, Moving Beyond Linked Fate: Moving Toward a New Measure of Politicized Racial Identity, Symposium on the Politics of Immigration, Race, and Ethnicity, Emory University

University of Wisconsin-Madison, April 2022

University of California at Santa Barbara, February 2022

University College of London, December 2021

University of Essex, November 2021

Minority Politics Online Seminar Series, June 2021

UC Berkeley Book Salon for *Race to the Bottom*, May 2021

UCLA, Race, Ethnicity, and Politics Workshop, April 2021

Rutgers University, American Politics Workshop, April 2021

Columbia University, Identity Politics Research Group (rescheduled due to COVID-19)

Yale University American Politics and Public Policy Workshop, December 2020

University of Maryland Department of Political Science American Politics Workshop, December 2020

Princeton University Office of the Dean of Undergraduate Students, November 2020

Harvard University Hutchins Center for African and African American Studies, November 2020

American Political Science Association Roundtable on Examining the Role of Emotions in Black Politics, September 2020

International Society of Political Psychology Presidential Symposium on the Intersection of Black Politics and Political Psychology, July 2020

Chicago Area Political Behavior Workshop, Northwestern University, July 2020

American Political Science Association, Political Psychology Pre-Conference

Northwestern University, Department of Political Science, March 2019

University of Pennsylvania, Department of Political Science, February 2019

Cornell University, Department of Political Science, May 2018

University of California at Berkeley, Department of Political Science, April 2017

Columbia University, Department of Political Science, February 2017

Black Power at 50 Conference, Columbia University, October 2016

Rutgers University, Emerging Trends in Political Science, March 2014

University of California at Berkeley, Institute for Governmental Studies' Race, Immigration, and Ethnicity Colloquium, March 2014

**TEACHING**

Princeton University

Race and Politics in the United States (undergraduate), Spring 2018, Spring 2019, Spring 2020, Fall 2021

Race and Politics in the Age of Obama (undergraduate), Spring 2016

Introduction to American Politics: Political Behavior (graduate), Fall 2018, Fall 2015

Black Politics in the Post-Civil Rights Era (undergraduate), Spring 2015

Junior Paper Workshop on Race and Ethnic Politics (undergraduate), Fall 2014, Fall 2018, Fall 2019

**ADVISING**

Dissertation Committees

Sonya Chen

Chaya Crowder, Co-Chair (Assistant Professor, Loyola Marymount University)

Kabir Khanna

Alexander Kustov

J. Baxter Oliphant

Derek Wakefield

## SERVICE TO THE DEPARTMENT AND PROFESSION

Reviewer for *American Political Science Review*, *American Journal of Political Science*, *DuBois Review, Journal of Politics*, *Journal of Race, Ethnicity, and Politics, Political Communication*, *Political Psychology, Political Behavior, Politics, Groups and Identities, Public Opinion Quarterly.*

International Society of Political Psychology Section Chair for Race, Gender, Ethnicity, and Religion (2021)

American Political Science Association Political Psychology Section Co-Chair (2021)

American Political Science Association Elections, Public Opinion, and Voting Behavior Section, Graduate Student Travel Award Committee (2019)

American Political Science Association REP Section Best Dissertation Award Committee (2019)

National Conference of Black Political Scientists, Section Chair on Identity Politics (2019)

Symposium on the Politics of Immigration, Race and Ethnicity, Co-Organizer (With Bernard Fraga, Daniel Gillion, Sophia Jordan Wallace) (2015-present)

Princeton University, Politics Department Undergraduate Advisor for the Track in Race and Identity (2021)

Princeton University, Co-Organizer of the Politics Research in Experimental Social Science (2013-present)

Princeton University, Senior Thesis Prize Committee (2015, 2016, 2019, 2020)

Princeton University, Aesthetics Committee (2019)

Princeton University, Faculty Advisor, Department of Politics Political Behavior Working Group (2015-2016)