## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY, et al., | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. 3:22-cv-57-JVB |
| | § | [Lead Consolidated Case] |
| GALVESTON COUNTY, TEXAS, et al. | § § | |
| *Defendants.* | § § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| *Plaintiff,* | § | |
| | § § | |
| | § | |
| v. | § § | Civil Action No. 3:22-cv-93-JVB |
| | § | |
| GALVESTON COUNTY, TEXAS, et al., | § | |
| *Defendants.* | § § | |
| | § | |
| | § | |
| DICKINSON   BAY   AREA   BRANCH NAACP, et al., | § § | |
| , | § § | |
| *Plaintiffs,* | § § | |
| | § | |
| v. | § | Civil Action No. 3:22-cv-117- JVB |
| | § | |
| GALVESTON COUNTY, TEXAS, et al. | § § | |
| *Defendants.* | § | |

## UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS...................................................................1

SUMMARY OF THE ARGUMENT ..............................................................................1

STATEMENT OF MATERIAL FACTS ........................................................................2

ARGUMENT...................................................................................................................7

I.    This Court is Bound by Fifth Circuit Precedent Recognizing the Voting Rights Act's Protection of Minority Coalition Districts....................................................8

II.    Summary Judgment Should Be Denied Because Disputed Issues of Material Fact Exist Regarding the United States' Section 2 Results Claim...............................12

    1.    The United States has presented sufficient evidence to satisfy the first *Gingles* precondition. ...........................................................................................................13

        a.The Illustrative Plan establishes the Black and Hispanic communities are sufficiently geographically compact to constitute a majority of the citizen voting age population in Illustrative Precinct 3. ..........................................13

        b.Race did not predominate the drawing of the Illustrative Plan. ....................................................................................................................17

    2.    The United States has presented sufficient evidence to satisfy the second precondition of *Gingles*. ........................................................................................19

        a.Expert racially polarized voting analysis demonstrates that Black and Hispanic voters in Galveston County are politically cohesive and would be so in Illustrative Precinct 3. ...............................................................................19

        b.Uncontested reconstituted election analysis further demonstrates that Black and Hispanic voters in Galveston County would vote for the same candidates in Illustrative Precinct 3. ..............................................................................21

        c.Anecdotal evidence from community leaders confirms political cohesion between the Black and Hispanic communities in Galveston County as a whole and in Precinct 3..................................................................................23

        d.Defendants' criticisms of Dr. Trounstine's analysis do not withstand scrutiny. ........................................................................................................24

    3.    The United States has presented sufficient evidence to satisfy the third precondition of *Gingles*. ........................................................................................26

        a.Evidence shows that White bloc voting in Adopted Precinct 3 will defeat the candidate of choice of Black and Hispanic Voters. .....................................27

        b.Defendants' "negative causative requirement" contravenes Fifth Circuit precedent. ....................................................................................................28

CONCLUSION ............................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ................................................................. 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................... 7

*Ashton v. Knight Transp., Inc.*, 3:09-CV-0759-B, 2010 WL 3703985 (N.D. Tex. Sept. 20, 2010) ...................................................................................................................... 8

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ................................................................. 13

*Benavidez v. City of Irving*, 638 F. Supp. 2d 709 (N.D. Tex. 2009) ..................... 16, 17

*Bethune-Hill v. Virginia State Board of Elections*, 580 U.S. 178 (2017) ...................... 18

*Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989) ........................................................... 19

*Bush v. Vera*, 517 U.S. 952 (1996) ........................................................................... 18

*Campos v. City of Baytown, Tex.*, 840 F.2d 1240 (5th Cir. 1988) ............................. 8, 9

*Campos v. City of Baytown, Tex.*, 849 F.2d 943 (5th Cir. 1988) ................................. 10

*Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393 (5th Cir. 1996) ..................................... 28

*Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498 (5th Cir. 2014) ........................................................................................................................ 7

*Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir. 1997) ............................. 7

*Elizondo v. Spring Branch Indep. Sch. Dist.*, No. 4:21CV1997, 2023 WL 2466401 (S.D. Tex. Feb. 13, 2023) ..................................................................................................... 14

*Frank v. Forest County*, 336 F.3d 570 (7th Cir. 2003) ......................................... 10, 11

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336 (11th Cir. 2015) ...................................................................................................................... 7

*Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) .................................................... 10, 11

*Johnson v. De Grandy*, 512 U.S. 997 (1994) ........................................................ 7, 17

*Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439 (E.D. Tex. 2020) ............. 14, 17

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993) ................................................................................................. 8, 9, 10, 28

*Lopez v. Abbott*, 339 F. Supp. 3d 589 (S.D. Tex. 2018) ......................................... 28, 29

*LULAC v. Abbott*, 604 F. Supp. 3d 463 (W.D. Tex. 2022) ......................................... 8, 9

*LULAC v. Midland Indep. Sch. Dist.*, 812 F.2d 1494 (5th Cir. 1987) ........................... 8, 9

*LULAC v. Perry*, 548 U.S. 399 (2006) ....................................................................... 13

*Mallory v. Eyrich*, 707 F. Supp. 947 (S.D. Ohio 1989) ................................................ 8

*Metts v. Murphy*, 363 F.3d 8 (1st Cir. 2004) ............................................................... 8

*Monroe v. City of Woodville, Miss.*, 897 F.2d 763 (5th Cir. 1990) ............................... 23

*N.A.A.C.P. v. Fordice*, 252 F.3d 361 (5th Cir. 2001) ................................................. 12

*Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) ................................................. 10

*Perez v. Abbott*, 250 F. Supp. 3d 123 (W.D. Tex. 2017) ....................................... 10, 11

*Robinson v. Ardoin*, 37 F.4th 208 (5th Cir. 2022) ............................................... passim

*Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004) ..................................................... 16

*Teague v. Attala Cnty., Miss.*, 92 F.3d 283 (5th Cir. 1996) .................................... 25, 28

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ......................................................... passim

*Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109 (5th Cir. 1991) 23

*Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245 (2022) .............17

**Statutes**

52 U.S.C. § 10301(a) .............................................................................................. 1

Tex. Election Code § 172.023(a)-(b) .................................................................... 3

## NATURE AND STAGE OF PROCEEDINGS

In November 2021, the Galveston County Commissioners Court adopted a redistricting plan that eliminated the only commissioner precinct that gave Black and Hispanic voters an equal opportunity to elect a candidate of their choice to the commissioners court.  The United States filed this action alleging that the adopted plan violates Section 2 of the Voting Rights Act (VRA) because it "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race," 52 U.S.C. § 10301(a), and because it was, at least in part, enacted for a racially discriminatory purpose.  U.S. First Am. Compl. ¶¶ 121-22, ECF No. 30.  The Court denied Defendants' motion to dismiss the United States' First Amended Complaint.  Mem. Op. & Order Den. Defs. Mot. to Dismiss, ECF No. 124.  Defendants now seek summary judgment on the United States' results claim, though disputed issues of material fact exist.[1]

## SUMMARY OF THE ARGUMENT

The Court should deny Defendants' Motion for Summary Judgment ("Mot.").  *First*, decades long precedent requires this Court to recognize that minority coalitions can collectively bring claims under Section 2.  *Second*, the record evidence shows that the

---

[1] Defendants fail to address the United States' Section 2 intentional discrimination claim, which is distinct from its results claim.  *United States v. Brown*, 561 F.3d 420, 432 (5th Cir. 2009) ("[T]o violate [Section 2], . . . these practices must be undertaken with an intent to discriminate or must produce discriminatory results").  Defendants fail to "show[] that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), on the "circumstantial and direct evidence of intent as may be available," *Arlington Heights v. Met. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Black and Hispanic coalition in the County meets each of the preconditions outlined in *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986): (1) Black and Hispanic populations are sufficiently large and geographically compact to constitute a majority in a commissioner precinct; (2) Black and Hispanic voters are politically cohesive; and (3) the County's non-Hispanic White voters vote sufficiently as a bloc to enable them, in the absence of special circumstances, usually to defeat the Black and Hispanic coalition's preferred candidate.  Defendants have failed to prove as a matter of law either that their evidence negates the existence of a material fact as to each precondition or that there is no evidence to support each precondition.  Summary judgment is therefore inappropriate.

## STATEMENT OF MATERIAL FACTS[2]

Galveston County initiated its 2021 redistricting process during its April 5, 2021, commissioners court meeting, when every commissioner except Stephen Holmes, voted in favor of retaining Holtzman Vogel as outside redistricting counsel.  Ex. 1 (Comm'rs Ct. April 5, 2021 Meeting Agenda & Minutes) at 2, 8-9.  The commissioners court took no other steps related to redistricting until after the 2020 Census P.L. 94-171 redistricting data were released on August 12, 2021.  Ex. 2 (Resp to U.S. First Set of Requests for Admissions), No. 35; Ex. 3 (2020 Census Timeline of Important Milestones) at 2; Ex. 4 (Apffel Dep.) at 91:4-17, 112:13-17; Ex. 5 (Giusti Dep.) at 44:10-45:6, 72:2-6.  Public hearings before the Census data release would have allowed more residents to participate in the redistricting process.  Ex. 5 at 72:17-73:2.

---

[2] In their Statement of Facts, Defendants fail to state whether the asserted facts are material, disputed, or undisputed.  In this response, the United States indicates those facts in dispute.

The 2020 redistricting data for Galveston County showed increases in both Black and Hispanic counts in total and voting age populations, a decrease in the proportion of the white population in both categories, and commissioner Precincts 2 and 3 over- and under-populated, respectively, by similar amounts.  Ex. 6 (Fairfax Rep.) ¶¶ 26-28.

Despite having the data necessary to redistrict its commissioner precincts since August 2021, the County did not begin redistricting work for several more weeks, when an outside redistricting consultant began holding telephone conferences with commissioners in September 2021.[3]  Ex. 7 (Resp. to Interrog. 4, Defs. 2nd Supp. & Am. Resps. To U.S. Interrog.) at 16.[4]  Between October 15 and 19, demographer Thomas Bryan began preparing two draft maps, Map 1 and Map 2.  Mot., Ex. 17 ¶ 5.  By this time, the commissioners were aware that the candidate-qualifying period for the March 2022 primary, when candidates had to know which precinct to run in, was set to begin in November 2021.  *See* Tex. Election Code § 172.023(a)-(b); Ex. 2, No. 83; Ex. 8 (Henry Dep.) at 74:23-75:6; Ex. 4 at 179:21-180:21; Ex. 5 at 67:2-68:3.

In the 2021 cycle, the Galveston County commissioners court held no public meetings, hearings, or workshops on redistricting except for one special session held on November 12, 2021, where the court adopted the maps.  Ex. 2, No. 43; Ex. 5 at 61:15-

---

[3] Given the months of inactivity by Galveston County on redistricting, even after the Census data's release, the United States disputes Defendants' characterization that the data's release "drastically compressed the amount of time the Commissioners Court had to complete redistricting."  Mot. at 10.

[4] The United States disputes Defendants' claim that Commissioner Holmes "accessed the redistricting data before any other Commissioner" because the cited sources do not support this statement. Mot. at 11. Commissioner Holmes was the last commissioner to meet with the outside redistricting consultant.  *See* Ex. 7 at 16-17.

17.[5]  The commissioners court did not adopt any criteria, guidelines, or timeline for
redistricting in this cycle.  Ex. 4 at 170:23-171:4, 175:1-14; Ex. 8 at 127:20-128:4; Ex. 5
at 59:24-60:13, 61:12-17.  In past redistricting cycles, the commissioners court held
multiple public hearings, adopted criteria, and adopted timelines.  *See* Ex. 2, No. 22
(admitting five public hearings on redistricting in 2011) began at or after 6:00 p.m.); Ex.
10 (Krochmal Rep.) App. B (noting public redistricting hearings in 1991, 2001, and 2011
cycles).  Before adopting the map, the only public rationale for any of the map proposals
was County Judge Mark Henry's Facebook post advocating for Map 2 because it
included a single coastal precinct, which the County had not had in this century, if ever.
Ex. 2, Nos. 75-76;  Ex. 11 (Cnty. J. Henry Facebook Post).  And the County neither
conducted any studies nor communicated any benefits or reasoning about a coastal
precinct before passing the map.  Ex. 4 at 184:14 (coastal precinct idea "just kind of
happened"), 302:12-303:10; Ex. 5 at 105:17-109:13; Ex. 12 (Sullivan Dep.) at 114:25-
115:8.[6]

On October 29, 2021, county officials posted Map 1 and Map 2 online.  Ex. 2, No.
45.  The website had an online form for the public to indicate support for one or neither
of the map proposals.  *Id.*, No. 43; Ex. 10 at 57.  Roughly 440 comments were received;

---

[5] In contrast, neighboring Harris County had nine redistricting hearings, one of which occurred the same month redistricting data was released. Ex. 9 (Harris Cnty. 2021 Comm'rs Ct. Redistricting Timeline) at 2.

[6] Based on these facts, among others in the evidentiary record, the United States disputes Defendants' characterization of its redistricting preferences, which only appeared post-litigation, as "[i]mportant to the County in adopting a new map." Mot. at 11-12.  When asked if he had preferences other than the coastal precinct during the early stages of redistricting, Judge Henry answered, "not really."  *See* Ex. 8 at 175:8-11.

no map proposal received a majority of the comments' support and many opposed both proposals. Ex. 10 at 57. Commissioners did not read most of the online comments. Ex. 8 at 273:15-274:5; Ex. 4 at 187:9-23; Ex. 5 at 135:3-17.

Judge Henry gave only the statutorily mandated minimum of three days' notice for a special session on November 12 to adopt a redistricting plan. Ex. 2, No. 64. The special session was held in a small annex building near the Harris County border, approximately 27 miles away from the county courthouse where the commissioners "meet typically." Ex. 2, No. 58; Ex. 13 (Johnson Dep.) at 202:4-11. Construction limited access to the annex building's parking lot. Defs. Answer to Petteway's Am. Compl. ¶ 88, ECF No. 142. The annex is not directly accessible by public transit. Ex. 10 at 53-54. The special session could have occurred "anywhere that we have adequate facilities and audio visual" equipment. Ex. 8 at 15:5-8. The county courthouse could seat more people than the annex. Ex. 13 at 204:7-15; Ex. 8 at 292:1-20, 296:23-297:7. In the 1991, 2001, and 2011 redistricting cycles, the County held public hearings at the larger county courthouse. Ex. 2, No. 22; Ex. 10 App B. The session occurred the day before final county-level redistricting plans were due to the Texas Secretary of State, which was also the first day of the candidate-filing period for the primary election. Ex. 14 (Tex. Sec'y of State Election Advisory, Nov. 1, 2021) at 2.

The special session began at 1:30 p.m., even though past redistricting hearings were held in the evening so "people could come after work if they wanted to come." Ex. 8 at 331:10-11; Ex. 10 at 52. Approximately 100 people attended. Ex. 10 at 56. The crowd's size necessitated an overflow room that livestreamed the proceedings with an

unreliable television connection.  Ex. 7, No. 8 at 26-27.  Of the 36 people who spoke at the special session, 35 opposed both map proposals.  Ex. 10 at 57.  Commissioner Holmes opposed both map proposals and presented his own.  *Id*.  The commissioners court passed Map 2 on a 3-1 vote, with Commissioner Holmes opposed.[7]  *Id*.  The enacted map eliminated the previous plan's sole commissioner precinct in which Black and Hispanic residents constituted a majority of the citizen voting age population and created four commissioner precincts with a non-Hispanic white population majority.  Ex. 2, No. 27; Ex. 15 (Brooks Decl.) App. B; Ex. 5, 165:20-166:8; Ex. 8, 225:23-226:6, 269:12-16.  This result was unnecessary; Defendants could have equalized the population by moving a single voting district ("VTD") from the previous plan's Precinct 2 to Precinct 3.  Ex. 6 ¶¶ 37-40.  Of the 26 voting precincts in the previous plan's Precinct 3, just five remain in the newly-enacted Precinct 3.  Ex. 2, No. 73.

Commissioner Holmes was the commissioners court's sole Black member from his appointment in 1999 until 2022.  Ex. 2, No. 11.  Before him, Commissioner Wayne Johnson, the County's first ever Black commissioner, also represented Precinct 3 from 1988 until 1999.  *Id*.  For decades, Precinct 3 was "a political home of historical significance to the county's Black and Latinx communities."  Ex. 10 at 60.  Eliminating Precinct 3 as a decades long opportunity-to-elect district for Black and Hispanic voters,

---

[7] The United States disputes Defendants' assertion that the enacted map "minimized gerrymandered-appearing precinct boundaries (which had previously connected disparate pockets of voters in the northern part of the County with those on Galveston Island)," which is a subjective assessment.  Mot. at 15.  The United States' expert drew an illustrative map with similar compactness scores to not only the 2012-21 map, but also the enacted map.  *See* Ex. 6 ¶¶ 51-58; *see also* Ex. 16 (Owens Rep.) Table 10 at 15, Table 11 at 16, Table 12 at 16.

coupled with evidence of racially polarized voting, results in Black and Hispanic voters'

inability to participate equally in the political process and elect candidates of choice to

the commissioners court under the 2021 adopted plan.  Ex. 17 (Trounstine Second

Corrected Rep.) at 9, 14; *id.* ¶¶ 3-7, 43, 55-56, 58; Ex. 10 at 1, 35, 45, 59.

## ARGUMENT

Summary judgment is only proper when "there is no genuine dispute as to any

material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(a).  In determining whether a genuine dispute of material fact exists, this Court must

view the evidence in a light most favorable to the nonmovant and accept the nonmoving

party's evidence as true.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);

*Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).  The moving party

has the initial burden of identifying the basis for the motion and pointing to materials in

the record that demonstrate the absence of a genuine dispute of material fact.  *Coastal*

*Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 505 (5th Cir. 2014)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In Section 2 cases, summary judgment "presents particular challenges due to the

fact-driven nature of the legal tests required by the Supreme Court."  *Ga. State Conf. of*

*NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015).  District

courts must conduct "a searching practical evaluation of the past and present reality" in a

jurisdiction, *Gingles*, 478 U.S. at 79, and a "comprehensive, not limited, canvassing of

relevant facts," *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994).  Thus, summary

adjudication is rarely possible in Section 2 cases.  *See Metts v. Murphy*, 363 F.3d 8, 12

7

(1st Cir. 2004).  When resolution turns on "disputed issues presented by the experts' analyses," full development of the record is often necessary.  *Mallory v. Eyrich*, 707 F. Supp. 947, 954 (S.D. Ohio 1989); *see also Ashton v. Knight Transp., Inc.*, 3:09-CV-0759-B, 2010 WL 3703985, at *3 (N.D. Tex. Sept. 20, 2010) (holding that summary judgment is improper where expert testimony conflicted).

## I.     This Court is Bound by Fifth Circuit Precedent Recognizing the Voting Rights Act's Protection of Minority Coalition Districts.

Because the Supreme Court has not ruled on minority coalition claims under Section 2 of the VRA, this Court must follow Fifth Circuit precedent, which "is governed by a strict rule of orderliness, such that later panels of that court, and much less district courts within the circuit, cannot overturn decisions of prior panels." *LULAC v. Abbott*, 604 F. Supp. 3d 463, 493 (W.D. Tex. 2022).  Fifth Circuit precedent expressly recognizes that minority coalition claims fall within the scope of Section 2.  *See, e.g.*, *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 863-64 (5th Cir. 1993) (en banc); *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1244 (5th Cir. 1988); *LULAC v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1499-1502 (5th Cir. 1987), *vacated on other grounds*, 829 F.2d 546 (5th Cir. 1987) (en banc).

Black and Hispanic voters in Texas have successfully challenged systems of elections as a coalition under Section 2.  *See, e.g.*, *Midland Indep. Sch. Dist.*, 812 F.2d 1494[8]; *Campos*, 840 F.2d 1240.  "There is nothing in the [VRA] that prevents the

---

[8] The *en banc* Fifth Circuit vacated the panel opinion only on the issue of legislative deference. 829 F.2d 546, 547 (5th Cir. 1987) (en banc).  It did not reconsider any arguments related to coalition districts.

plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics." *Campos*, 840 F.2d at 1244 (applying *Gingles* preconditions to a coalition district). Indeed, the Fifth Circuit has specifically rejected arguments that Black and Hispanic voters forming a coalition must be considered separately. *Midland Indep. Sch. Dist.*, 812 F.2d at 1499. The court explained that "[t]he records in too many cases show that Anglos do discriminate against both Blacks and Mexican-Americans for anyone to deny that these two groups may ever be aggregated in a voting dilution case," and relied on the trial court's recognition that the two groups "share[d] common experiences in past discriminatory practices," have "inseparable" political goals, and resided in the same areas of Midland. *Id.* at 1500. Relying on this binding precedent, the three-judge panel in the ongoing challenge to the 2021 Texas statewide redistricting plans similarly rejected arguments that coalition districts are not cognizable under Section 2. *LULAC v. Abbott*, 604 F. Supp. 3d at 500.

Defendants concede that "Fifth Circuit precedent expressly permits VRA Section 2 coalition claims," Mot. at 17, but hinge their contrary argument on nonbinding dissenting opinions and out-of-circuit case law. First, Defendants cite to a dissenting opinion in *Clements*, where the majority held that "if blacks and Hispanics vote cohesively, they are legally a single minority group" under Section 2.[9] 999 F.2d 831 at 864. The court further acknowledged that it has "treated the issue as a question of fact, allowing aggregation of different minority groups where the evidence suggests that they

---

[9] The *en banc* Fifth Circuit did not reverse any of the trial court's conclusions on political coalitions.

are politically cohesive . . . and we need not revisit this question here." *Id.* at 863-64 (citing *Midland Indep. Sch. Dist.*, 812 F.2d at 1500-02). Defendants point to no authority allowing this Court to ignore *Clements*' majority opinion.

Defendants also rely on *Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996), the only court of appeals case to expressly hold that Section 2 does not recognize minority coalition claims. Mot. at 18-19. There, a divided court relied on a dissent from the denial of rehearing in *Campos v. City of Baytown, Tex.*, 849 F.2d 943, 946 (5th Cir. 1988) (Higginbotham, J., dissenting), and concluded that the VRA's plain language did not authorize vote dilution claims by a coalition of two different minority groups. *Nixon*, 76 F.3d at 1388. In contrast, the court in *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017), followed Fifth Circuit precedent and turned to the legislative history of the VRA. The court concluded that the Fifth Circuit's determination as to coalition districts was consistent with Congress's intent when it amended the VRA in 1982 and "emphasized the need for courts to undertake a searching practical evaluation of the 'past and present reality.'" *Id.* at 139 (citing S. Rep. 97–417 at *30 and *White v. Regester*, 412 U.S. 755, 760-77 (1973)). Accordingly, because "[c]oalitions of minority voters are a present reality,[]affording them protection under § 2 is consistent with the Congressional goal of keeping political processes 'equally open to minority voters.'" *Id.*

Despite Defendants' characterization of *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) and *Frank v. Forest County*, 336 F.3d 570 (7th Cir. 2003) as reflective of circuits that have "the better approach," Mot. at 19, neither court issued an express opinion on whether Section 2 protects minority coalition districts. In *Hall v. Virginia*, the court

considered a crossover district, not a coalition district comprised of politically cohesive minority groups.  Reasoning whether Section 2 was not intended to protect "the ability to form a political coalition," the court addressed "multiracial coalitions" generally.  385 F.3d at 431.  *Frank v. Forest County* is even more attenuated from Defendants' plea to bypass binding Fifth Circuit authority.  There, Native American plaintiffs sought to remedy alleged violations of Section 2 by creating a Native American and Black coalition district.  336 F.3d at 574-75.  The court reviewed other circuits' endorsement of minority coalition claims under Section 2, as well as *Nixon* for the contrary view.  *Id.* at 575-76. The court simply noted that "the Supreme Court has reserved the issue" and affirmed the lower court's finding that the plaintiffs did not present sufficient evidence of political cohesion.  *Id.*

In contrast, the United States offers extensive evidence establishing the *Gingles* preconditions necessary to support its Section 2 claims.  The cases Defendants cite do not invalidate the United States' claims in this Court, much less support their claim for summary judgment.  *See Perez*, 250 F. Supp. 3d at 139 ("[I]f Plaintiffs can meet their burden of proof in all other respects, their § 2 claim will not fail simply because the minority group in question is composed of more than one race or ethnicity").  Accordingly, this Court is bound by the Fifth Circuit's longstanding recognition of coalition claims under Section 2, and despite Defendants' invitation, need not consider a lone circuit court opinion finding the contrary.

## II.     Summary Judgment Should Be Denied Because Disputed Issues of Material Fact Exist Regarding the United States' Section 2 Results Claim.

To prevail on a claim that a redistricting plan violates Section 2, a plaintiff must initially prove: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a district; (2) the minority group is politically cohesive; and (3) the Anglo majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate (the "*Gingles* preconditions"). *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 366 (5th Cir. 2001) (citing *Gingles*, 478 U.S. at 50–51).[10]   The United States has established the *Gingles* preconditions by offering reports from two experienced and credible experts showing that (1) the Black and Hispanic population in the County is sufficiently large and geographically compact to constitute a majority in a commissioner precinct; (2) the Black and Hispanic populations are politically cohesive; and (3) the non-Hispanic White majority votes sufficiently as a bloc to enable it to defeat the Black and Hispanic populations' preferred candidate.   Defendants fail to establish that no genuine issues of material fact exist with respect to all three *Gingles* preconditions.   Accordingly, Defendants' motion should be denied.[11]

---

[10] Once the *Gingles* preconditions are proven, the court must exam the "totality of circumstances" in the jurisdiction, all of which are fact based. *See Fordice*, 252 F. 3d at 366. Defendants do not address these factors, *see* Mot. at 48 n.27, and the United States has presented extensive record evidence that create genuine disputes on these questions of fact.

[11] Further showing that summary judgment is inappropriate, multiple experts in this consolidated action, whose reports accompany private plaintiffs' briefs, conclude that all three *Gingles* preconditions have been satisfied.

**1. The United States has presented sufficient evidence to satisfy the first *Gingles* precondition.**

The first *Gingles* precondition is that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50.  This precondition requires only that one can draw a "reasonably compact" election district, *LULAC v. Perry*, 548 U.S. 399, 430 (2006), where a minority group composes a majority of the eligible electorate, *see Bartlett v. Strickland*, 556 U.S. 1, 12-20 (2009) (plurality op.).  The United States satisfies this standard.  The Illustrative Plan, presented in Anthony Fairfax's expert report, shows that Black and Hispanic persons, who constitute nearly 32% of the County's total citizen voting age population (CVAP) and over 55% of Illustrative Precinct 3's CVAP, Ex. 6 ¶¶ 46-49, are sufficiently large and geographically compact to constitute a majority of the CVAP in a commissioner precinct.  *Id.* ¶¶ 1, 17, 44-63.  Defendants fail to present any facts to dispute that the United States has established the numerosity component of the first *Gingles* precondition.  They instead contend that Illustrative Precinct 3 does not meet an additional strict gloss on compactness that they have grafted on to the first precondition, one unsupported by law.

> **a. The Illustrative Plan establishes the Black and Hispanic communities are sufficiently geographically compact to constitute a majority of the citizen voting age population in Illustrative Precinct 3.**

Defendants argue that the Illustrative Plan fails to meet a novel and unsupportably narrow standard for compactness and, in doing so, misapprehend the purpose of the first *Gingles* precondition.  Defendants incorrectly revise the first precondition to require a

showing that "there is a sufficiently large and geographically compact community of interest"[12] and assert that because Mr. Fairfax did not analyze specific communities of interest when drawing the Illustrative Plan, the United States cannot meet the first precondition. Mot. at 22, 23-24.  No case law requires this showing.  In fact, courts have found that illustrative plans satisfy the first *Gingles* precondition even when the expert "did not consider specific communities of interest."  *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 489-99 (E.D. Tex. 2020).

Rather, the Illustrative Plan need only be geographically compact and consistent with traditional districting principles.  *See Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022).  Though the Fifth Circuit has not clearly defined "traditional districting principles," *Elizondo v. Spring Branch Indep. Sch. Dist.*, No. 4:21CV1997, 2023 WL 2466401, at *5 (S.D. Tex. Feb. 13, 2023), an illustrative plan is "likely consistent with traditional redistricting criteria" if the expert considered districting criteria such as "political subdivision lines, contiguity," the legislature's adopted redistricting criteria,[13] "group[ing] populations with similar economic demographics together, and attempt[ing]

---

[12] Throughout their motion, Defendants appear to either replace the compactness analysis with, or collapse all other traditional redistricting criteria into, an analysis of communities of interest. *See id*. at 22-24, 36-38.  The case that they cite to support this standard, *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245, 1250 (2022), Mot. at 22, does not mention communities of interest.

[13] Notably, Defendants now assert the Illustrative Plan must prioritize communities of interest over all other traditional districting principles, apparently including compliance with the VRA, one of the two criteria that they committed to following in 2021.  *See* Ex. 8, 225:18-22 (noting compliance with federal law); Mot. at 11 (same).  Generally, communities of interest are prioritized in redistricting if the governing body stipulated it as a criterion and only as less of a priority than compliance with the Constitution and federal law. *See* Ex. 18 (Fairfax Rebuttal Rep.) ¶ 10.  Defendants did not formally adopt any "traditional" districting criteria for enacting the 2021 map.  *See* Mot. at 11-12.

to keep census designated places together when possible," *Robinson*, 37 F.4th at 219.

Mr. Fairfax used the least change approach to develop the Illustrative Plan, starting with the County's previous 2012 plan as a foundation and moving a single voting district (VTD) from Precinct 2 to Precinct 3 to bring the population deviation among the precincts within an acceptable range of the ideal population size using the 2020 Census data. Ex. 6 ¶ 37, 39-41. This approach respected to the maximum extent possible the County's prior policy choices, including comprising Precinct 3 with the large concentration of Black and Hispanic residents densely populated in the center of the County, as reflected in the 2012 plan. *Id.* App. B at 44; Ex. 15 App. A at 1. Since 1991, Precinct 3 has been "a political home of historical significance" uniting these communities to reflect their shared interests. Ex. 10 at 29-30, 60.

Even when assessing mathematical measures of geographic compactness, the Illustrative Plan, and Precinct 3 specifically, is more or similarly compact to both the 2012 plan and the 2021 adopted plan. Ex. 18 ¶¶ 3-5. The Illustrative Plan meets the first *Gingles* precondition while considering traditional districting criteria, such as core retention, contiguity, and avoiding unnecessary splits of VTDs or census places. Ex. 6 ¶¶ 42-43, App. C. That Mr. Fairfax did not conduct an analysis of specific communities of interest in moving that single VTD is not "fatal" to the United States' claim. Mot. at 24.

Most Black and Hispanic residents live in a heavily populated corridor in the middle of the County, from Dickinson through West Texas City, La Marque, and Galveston Island. Ex. 15 App. A at 1. Contrary to Defendants' claim, Mot. at 28, Illustrative Precinct 3 is quite unlike the district in *Sensley v. Albritton*, 385 F.3d 591,

15

598, n.3, 4 (5th Cir. 2004), which combined two areas of heavy African-American concentration with a narrow corridor.  And although Illustrative Precinct 3 includes a portion of League City to capture Commissioner Holmes's residence, an action *Sensley* specifically sanctions, Defendants present no evidence that Illustrative Precinct 3 extends across a "sparsely-populated rural corridor" to avoid including intervening White communities.  *Sensley*, 385 F.3d at 597 n.4, 598.[14]

Defendants further assert that Illustrative Precinct 3 is not geographically compact because of its "long and winding" shape.  Mot. at 24.  This argument is similarly flawed. The first *Gingles* precondition "refers to the compactness of the minority population, not to the compactness of the contested district," and "[i]n evaluating the compactness of the minority population, considerations of the dispersion of the territory of the district and the regularity or length of the perimeters of the district become subsidiary to considerations of the minority group's compactness."  *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 721 (N.D. Tex. 2009) (citing *Perry*, 548 U.S. at 433); *see also Gingles*, 478 U.S. at 50. This makes sense, as "there is no unique measure to assess whether a plan definitely is or is not compact."  *Benavidez*, 638 F. Supp. 2d at 722.  Defendants fail to present undisputed facts to support any contention that the Black and Hispanic population within

---

[14] The court affirmed the district court's consideration of several additional factors beyond the mere shape of the proposed district, "including that both proposed additional majority-black districts separated distinct communities and disrupted relationships between incumbents and constituents, which had existed over the years and continued to exist under the Defendants' new plan."  *Sensley*, 385 F.3d at 597.  Illustrative Precinct 3 maintains Commissioner Holmes as the incumbent and his close-knit constituent relationships, which have existed since his election in 1999.  *See* Ex. 19 (McGaskey Decl.) ¶¶ 6-7, 9; Ex. 20 (Lewis Decl.) ¶¶ 9-10; NAACP Resp. in Opp. To Defs. Mot. for Summ. J. Ex. 6 ("Compian Decl.") ¶¶ 13-16.

the boundaries of Illustrative Precinct 3 is not reasonably compact.

Even if Defendants' critiques of the Illustrative Plan were compelling, a plaintiff need not present an "aesthetic ideal of compactness" in order to satisfy the first *Gingles* precondition. *Id.* at 730 (quoting *Hous. v. Lafayette Cnty., Miss.*, 56 F.3d 606, 611 (5th Cir. 1995)). Rather, a plaintiff must show that the minority population could be a majority in a "reasonably compact" district. *Abbott v. Perez*, 138 S. Ct. 2305, 2331 (2018) (citation omitted); *Kumar*, 476 F. Supp. 3d at 500 (finding plaintiff drew a "well-developed, legally adequate plan," and was "not concerned with any perceived flaws in said District"). The United States meets this standard.

### b. Race did not predominate the drawing of the Illustrative Plan.

Decades of Supreme Court precedent recognizes that Section 2 "demands consideration of race." *Abbott*, 138 S. Ct. at 2315; *see De Grandy*, 512 U.S. at 1020 (describing Section 2's "quintessentially race-conscious calculus"). To show that a minority group is "sufficiently large and compact to constitute a majority in a reasonably configured district," *Wis. Legis.*, 142 S. Ct. at 1248, plaintiffs regularly submit illustrative maps prepared by experts who have been asked whether it is possible to draw a majority-minority district and, as such, must inherently consider race, *see, e.g.*, *Robinson*, 37 F.4th at 223 (finding that experts weighing racial considerations alongside traditional factors is permissible under the first precondition). Defendants fail to cite any precedent that suggests, let alone requires, that plaintiffs ignore race when trying to meet the first precondition.

Defendants principally rely on *Bethune-Hill v. Virginia State Board of Elections*,

580 U.S. 178 (2017).  Mot. at 20.  But the case is inapposite, as it involved a racial gerrymandering claim under the Equal Protection Clause, wherein the Court analyzed a district enacted by the State, not an illustrative district, and the *Gingles* preconditions were never evaluated.  *Bethune-Hill*, 580 U.S. at 189.  State action is not implicated when a litigant offers an illustrative plan to satisfy the first *Gingles* precondition.  Equal protection racial gerrymandering cases apply only to plans adopted by jurisdictions, not to illustrative plans presented to prove the first *Gingles* precondition.  *Robinson*, 37 F.4th at 224 ("If the plaintiffs' *Gingles* showing is invalid because of racial gerrymandering, it is difficult to see how any *Gingles* showing could be successful.").  Thus, intentionally creating an illustrative district showing it is possible to have a majority of minority residents does not, by itself, establish racial predominance.  *Bush v. Vera*, 517 U.S. 952, 958-59 (1996).

Defendants also argue that the Illustrative Plan prioritizes race over race-neutral districting principles because it moved VTD 218 from Precinct 2 to Precinct 3 instead of VTD 223, which Defendants deem to be more populous and less "diverse."  Mot. at 27; Ex. 16 at 20.  But Mr. Fairfax clearly prioritized race-neutral districting principles by selecting VTD 218 because doing so made the Illustrative Plan more compact, and incidentally included a higher concentration of White voters, than had the plan instead shifted VTD 223.  Ex. 6 ¶ 40, n.30; Ex. 18 ¶¶ 7-9.  Further, the Illustrative Plan brought the overall population deviation within the constitutionally acceptable total deviation of

18

under 10%.[15]  Ex. 6 ¶ 40.  Thus, the facts establish that race did not predominate in the

drawing of the Illustrative Plan.[16]  But, even if Defendants prefer a plan that moves VTD

223 instead of VTD 218, Defendants need not adopt the Illustrative Plan; "[i]llustrative

maps are just that—illustrative."  *Robinson*, 37 F.4th at 223.

## 2. The United States has presented sufficient evidence to satisfy the second precondition of *Gingles*.

To fulfill the second *Gingles* precondition, the minority group must be "politically

cohesive."  *Gingles*, 478 U.S. at 56.  "Plaintiffs normally demonstrate minority political

cohesion by showing that 'a significant number of minority group members usually vote

for the same candidates.'"  ECF No. 124 at 18 (quoting *Gingles*, 478 U.S. at 56).  "[T]he

most persuasive evidence of inter-minority political cohesion for Section 2 purposes is to

be found in *voting patterns*."  *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989)

(describing *Campos,* 840 F.2d at 1244-45).  Here, the record contains both quantitative

and qualitative evidence sufficient to satisfy the second *Gingles* precondition.

### a. Expert racially polarized voting analysis demonstrates that Black and Hispanic voters in Galveston County are politically cohesive and would be so in Illustrative Precinct 3.

The United States' expert Dr. Jessica Trounstine analyzed 36 elections within

Galveston County encompassing "multiple levels of government, partisan and

---

[15] Mr. Fairfax notes that an illustrative plan that shifted VTD 223 instead of VTD 218 would have also been acceptable. *See* Ex. 6 ¶ 40, n.30; Ex. 18 ¶ 9, n.14.

[16] Even if the Supreme Court's racial gerrymandering jurisprudence were applicable to an illustrative plan under the first *Gingles* precondition, the question of whether race predominated is a disputed question of fact and thus inappropriate for summary judgment.  *Robinson*, 37 F.4th at 223 ("The inference of racial intent is an intensely factual process.") (citing *Arlington Heights*, 429 U.S. at 266).

nonpartisan elections, and primary and general elections." Ex. 17 at 15. This wide cross-section of elections shows a pattern of Black and Hispanic voters who "usually vote for the same candidates." *Gingles*, 478 U.S. at 56. They supported the same first choice candidate in 77% of general elections. Ex. 17 at 9, ¶ 43. General elections are more probative of inter-group cohesion than are primary elections. *Id.* ¶ 34. Further, across all 36 elections, Black and Latino voters supported the same first choice candidate 58% of the time. *Id.* at 9. The voting patterns in Illustrative Precinct 3 are consistent with these County-wide voting patterns. Ex. 21 (Trounstine Decl.) ¶ 2. Illustrative Precinct 3 contains about a quarter of the County's CVAP, nearly 60% of the County's Black CVAP, and just under a third of the County's Hispanic CVAP. *Id.* ¶ 3. Thus, the County-wide estimates are heavily influenced by the voters found in Illustrative Precinct 3.

Dr. Trounstine's analysis of local, non-partisan elections provides further evidence that Black and Latino voters would continue to vote for the same candidates in Illustrative Precinct 3. Specifically:

- <u>November 3, 2020, City of Galveston Mayoral Election</u>: 64.5% of the population of the City of Galveston is found in Illustrative Precinct 3. Ex. 6 App. at 72. In the November 3, 2020, mayoral election, Black voters cohesively supported the same candidate that Hispanic voters cohesively supported. Ex. 17 at A-30, A-32.

- <u>November 3, 2020, Galveston City Council District 4 Election</u>: Three of the five VTDs that comprise Galveston City Council District 4 are found in Illustrative Precinct 3. *Compare* Ex. 22 (Reconstituted_VTDs)[17] *with* Ex. 23 (DEFS00002605). In the November 3, 2020, election, Black and Hispanic voters shared the same first choice candidate. Ex. 17 at A-30, A-32.

---

[17] This spreadsheet was contained in the zip file produced to Defendants with Dr. Trounstine's Expert Report on Behalf of the United States of America on January 27, 2023.

- ▪ <u>November 3, 2020, Texas City Commission District 4 Election</u>: Three of the seven VTDs that comprise Texas City Commission District 4 are found in Illustrative Precinct 3. *Compare* Ex. 22 *with* Ex. 23. In the November 3, 2020, election, Black and Hispanic voters shared the same first choice candidate. Ex. 17 at A-30, A-32.

- ▪ <u>November 3, 2020, La Marque City Council District B Election</u>: Two of the six VTDs that comprise La Marque City Council District B are found in Illustrative Precinct 3. *Compare* Ex. 22 *with* Ex. 23. In the November 3, 2020, election, Black voters cohesively supported the same candidate that Hispanic voters cohesively supported. Ex. 17 at A-30, A-32.

- ▪ <u>November 3, 2020, Texas City Mayoral Election</u>: 54.1% of the population of Texas City is found in Illustrative Precinct 3. Ex. 6 at 73. In the November 3, 2020, mayoral election, Black voters cohesively supported the same candidate that Hispanic voters cohesively supported. Ex. 17 at A-30, A-32.

In sum, this racially polarized voting analysis demonstrates that Black and Hispanic voters are cohesive in the County as whole and in Illustrative Precinct 3.

### b. Uncontested reconstituted election analysis further demonstrates that Black and Hispanic voters in Galveston County would vote for the same candidates in Illustrative Precinct 3.

Dr. Trounstine's reconstituted election analysis, to which Defendants' expert John Alford offered no critique, Ex. 24 (Alford Dep.), 62:24-63:3, 64:1-5, also shows Black and Hispanic cohesion in Illustrative Precinct 3. "[A] reconstituted election analysis takes candidates who have run in prior elections and estimates how those candidates would have fared had they run for office under maps different from those under which they ran." Ex. 17 ¶ 38. Dr. Trounstine performed her analysis on Adopted Precinct 3 and Illustrative Precinct 3. *Id.* ¶ 39. Her analysis reveals a clear pattern: in each election, the candidate who wins in Illustrative Precinct 3 loses in Adopted Precinct 3. *Id.* ¶ 58. Another striking pattern emerges when comparing the vote share received by each of the

21

candidates with the precinct's minority composition: the vote shares that the candidates receive correlate with the combined Black and Hispanic share of the electorate in the precinct, indicating that Black and Hispanic voters in Illustrative Precinct 3 vote together. Specifically, according to 2016-2020 ACS estimates, the CVAP breakdown for Illustrative Precinct 3 and Adopted Precinct 3 is as follows:

**Table 1: CVAP in Illustrative Precinct 3 and Adopted Precinct 3**

| Precinct | White | Black | Hispanic | Black + Hispanic |
|---|---|---|---|---|
| **Illustrative Precinct 3**[18] | 42.6% | 30.8% | 24.4% | 55.2% |
| **Adopted Precinct 3**[19] | 63.8% | 8.0% | 19.4% | 27.5% |

The winning candidates in Illustrative Precinct 3 garner a share of the vote that is slightly higher than the combined Black and Hispanic share of CVAP in Illustrative Precinct 3. *Compare* Ex. 17 at 14, *with* Table 1. For example, Mark Salinas receives 64.9% of the vote in Illustrative Precinct 3 in the 2020 Galveston County sheriff general election, and Teresa Hudson receives 66.1% of the vote in Illustrative Precinct 3 in the 2020 405th District Court election. Ex. 17 at 14. Although these same candidates lose in Adopted Precinct 3, they still garner a share of the vote that is slightly higher than the combined Black and Hispanic share of CVAP in Adopted Precinct 3 of 27.5%. Mark Salinas receives 33.2% of the vote in Adopted Precinct 3, and Teresa Hudson receives 32.8% of the vote in Adopted Precinct 3. *Id.*

Dr. Trounstine's reconstituted election analysis thereby further demonstrates that Black and Hispanic voters in Illustrative Precinct 3 would vote together.

---

[18] Ex. 6 ¶ 47.
[19] U.S. First Amend. Compl. ¶ 85.

### c. Anecdotal evidence from community leaders confirms political cohesion between the Black and Hispanic communities in Galveston County as a whole and in Precinct 3.

"[S]tatistical evidence is not a *sine qua non* to establishing cohesion." *Brewer*, 876 F.2d at 454.  Political cohesion can be demonstrated with "other evidence" such as "lay testimony from members of the community." *Monroe v. City of Woodville, Miss.*, 897 F.2d 763, 764 (5th Cir. 1990) (per curiam); *see also Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1118 n.12 (5th Cir. 1991).

Black and Hispanic community leaders testified regarding political cohesion between Galveston County's Black and Hispanic communities, including in Precinct 3. *See, e.g.*, Ex. 25 (Compian Dep.) at 175:15-18 ("I point to other members that previously served here in the old Precinct 3 as constables or – both Latino and African Americans. There's support of members of each community by others from the opposite community.").  For example, Joe Compian, the Equal Rights Committee co-chair of the Galveston LULAC Council 151, *id.* at 26:16-19, and a board member of Gulf Coast Interfaith, an interfaith and interracial coalition of community organizations, Compian Decl. ¶ 3, testified that Black and Latino voters "share concerns and issues" that should be voiced to the commissioners court, Ex. 25 at 213:11-20; *see* Compian Decl. ¶¶ 4-6, and that he was "not aware of any" issues on which the two groups have different concerns,  Ex. 25 at 213:21-214:1; *see id.* at 39:12-40:3.  The president of the Dickinson Bay Area Branch of the NAACP echoed Mr. Compian's view, Ex. 26 (Lofton Dep.) at 44:13-16, 69:8-70:18, 71:5-9, as did the second vice president of the Galveston Branch of the NAACP, Ex. 27 (Toliver Dep.) at 37:12-13, 70:14, 148:6-149:6.  Community leaders

23

also testified that the Black and Hispanic communities, including the communities in

Precinct 3, vote together.  Ex. 28 (Rice Anders Dep.) at 262:7-263:6; Ex. 29 (Pope Dep.),

66:9-12; Ex. 30 (Courville Dep.) at 207:14-208:17; Ex. 19 ¶¶ 2-9; Ex. 20 ¶¶ 2-11;

Compian Decl. ¶¶ 4, 7, 13, 16.  Such testimony, provided by respected members of each

community, speaks as powerfully to the ground truth of electoral cohesion as does any

statistical analysis.

> **d.  Defendants' criticisms of Dr. Trounstine's analysis do not withstand scrutiny.**

Defendants critique Dr. Trounstine by erroneously attributing to her results that

she did not report.  In support of their contention that Dr. Trounstine's "election returns

data actually reveals a lack of cohesion," Defendants cite to page 14 of Dr. Alford's

report and point to "the 10 primary elections included in [Dr. Trounstine's] report."  Mot.

at 40 (emphasis omitted).  Page 14 of Dr. Alford's report does not, however, discuss Dr.

Trounstine's estimates.  Ex. 31 (Alford Rep.) at 14.[20]

Defendants also direct the Court to "[t]he voting percentages in Table 5 [of Dr.

Alford's report] under the 'Replication RxC [EI] Estimate' column" and identify these

"voting percentages" as "Trounstine's estimated percentages of votes cast."  Mot. at 41.

But the "voting percentages" in the "Replication RxC EI Estimate" column are not Dr.

Trounstine's estimates.  Ex. 31 at 17, 20.  They are a different set of estimates that were

produced by Dr. Alford's colleague, Dr. Randy Stevenson, Ex. 24, 7:7-23, and are only

---

[20] Further, Dr. Trounstine analyzed 14, not 10, primary elections.  *See* Ex. 17 at 9.

found in Dr. Alford's report.[21]  Dr. Trounstine's estimates, which are found in the column

labeled "Trounstine RxC EI Estimate," Ex. 31. at 20-21; *see* Ex. 32 (Trounstine Dep.) at

52:17-53:3, demonstrate cohesion between Black and Hispanic voters—in seven of the

10 local non-partisan elections that Dr. Trounstine analyzed, Black and Hispanic voters

shared the same first choice candidate, Ex. 17 ¶ 56, and in five of the 10 elections, Black

voters cohesively supported the same candidate that Hispanic voters cohesively

supported.[22]  *Id.* at A-30 to A-33.

There are only two estimates (2014 general election for county judge and 2020

general election for at-large Texas City commission) that Defendants properly attribute to

Dr. Trounstine.  Mot. at 40, 41 n.23.  These cherry-picked estimates on their own are not

probative because "[v]ote dilution is a determination that must be made over time and

over the course of many elections."  *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 288-89

(5th Cir. 1996).  Moreover, an examination of the full universe of elections reveals that

both estimates are outliers.  *First*, Black and Hispanic voters supported the same first

choice candidate in 17 of the 22 general elections that Dr. Trounstine analyzed—77% of

the time, Ex. 17 at 9, and Black voters cohesively supported the same candidate that

Hispanic voters cohesively supported in 15 out of the 22 general elections that Dr.

---

[21] Dr. Stevenson's involvement in this case was first disclosed during Dr. Alford's deposition. Ex. 24 at 7:7-23, 64:11-14.  That work done on behalf of Defendants resulted in different "RxC estimates" from Dr. Trounstine's RxC estimates creates yet another disputed issue of material fact.

[22] November 3, 2020, City of Galveston mayoral election; November 3, 2020, election for La Marque City Council District B; November 3, 2020, Texas City mayoral election; November 8, 2016, League City Council District 4; November 8, 2016, election for Galveston Navigation and Canal Commissioner.

Trounstine analyzed—68% of the time, *id.* at A-17 to A-35.[23]  *Second*, as discussed above, when all 10 local non-partisan elections that Dr. Trounstine analyzed are considered, a clear pattern of cohesion emerges.

In sum, the United States has presented strong quantitative and qualitative evidence of cohesion between Black and Latino voters in Galveston County as a whole, and in Precinct 3 in particular, and Dr. Trounstine's analysis is far from "facially deficient."[24]  *Cf.*  Mot. at 40.  This evidence precludes Defendants from establishing that there are undisputed material facts to support a finding that Black and Hispanic voters are not electorally cohesive, making summary judgment inappropriate.

**3.  The United States has presented sufficient evidence to satisfy the third precondition of *Gingles*.**

To fulfill the third *Gingles* precondition, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed— usually to defeat the minority's preferred candidate."  *Gingles*, 478 U.S. at 50 (citations omitted).  The United States has satisfied the third *Gingles* precondition.

---

[23] In all county judge general elections dating back to 2002, aside from the one to which Defendants point, Black voters cohesively supported the same candidate that Hispanic voters cohesively supported.  Ex. 17 at A-20.

[24] That "Plaintiffs' experts disagree on the level needed for cohesion," Mot. at 39, 48, is unremarkable.  Dr. Alford agreed with Dr. Trounstine that "'there is no universally accepted approach for determining cohesiveness.'"  Ex. 31 at 2 (quoting Ex. 17 ¶ 28 ).

### a.  Evidence shows that White bloc voting in Adopted Precinct 3 will defeat the candidate of choice of Black and Hispanic Voters.

Dr. Trounstine's reconstituted election analysis, to which Dr. Alford offered no critique, Ex. 24 at 62:24-63:3, 64:1-5, demonstrates that White bloc voting will prevent Black and Hispanic voters from being able to elect candidates of choice in Adopted Precinct 3.  *See* Ex. 17 ¶¶ 38-40, 58; *id.* at 14.  In "every election the candidate preferred by Black and Latino voters … would have lost the election had they run in Commissioner Precinct 3 under the Adopted Map." *Id.* ¶ 58.  Furthermore, her racially polarized voting analysis demonstrates that White voters in Galveston County vote as a bloc and lend the candidates preferred by Black and Hispanic voters little crossover support.  In 15 of the 17 general elections in which Black and Hispanic voters supported the same first choice candidate, White voters supported a different candidate, and in 17 of the 21 elections in which Black and Hispanic voters supported the same first choice candidate, White voters supported a different candidate.[25]  *Id.* at 9.  White voters also lend very little support to Black and Hispanic candidates.  White voters preferred Black candidates in just 14% of the general elections that included a Black candidate who ran against at least one non-Black candidate and in 18% of all elections that included a Black candidate who ran against at least one non-Black candidate; White voters preferred Hispanic candidates at an even lower rate—in 13% of general elections that included a Hispanic candidate and in just 6% of all elections that included a Hispanic candidate.  *Id.*

---

[25] Black and Hispanic voters supported the same first choice candidate in 17 of the 22 general elections and in 21 of 36 total elections that Dr. Trounstine analyzed.  Ex. 17 at 9.

### b.  Defendants' "negative causative requirement" contravenes Fifth Circuit precedent.

Defendants' attempt to impose a "negative causative requirement" on the United States, Mot. at 45, must be rejected because such a requirement violates Fifth Circuit precedent.  *See supra* Section I; *Teague*, 92 F.3d 283 at 290 ("[D]istrict court err[ed] by placing the burden on plaintiffs to disprove that factors other than race affect voting patterns"); *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1397 (5th Cir. 1996).  In the single case to which Defendants cite for this "requirement," Mot. at 45, the Fifth Circuit expressly stated that it was "not resolv[ing]" whether plaintiffs' burden "includes the burden to explain partisan influence," *Clements*, 999 F.2d at 860, 879, and held that the "district court erred in refusing to consider the nonracial causes of voting preferences" that *defendants* had offered at *trial*, *id.* at 850; *Lopez v. Abbott*, 339 F. Supp. 3d 589, 604 (S.D. Tex. 2018) (noting *Clements* "court refused to articulate a burden of proof").  By contrast, three years later, the court held that "plaintiffs do not bear the burden in the first instance to eliminate factors other than race as influencing voters."  *Lopez*, 339 F. Supp. 3d 589 at 604 (discussing *Teague*, 92 F.3d at 290).  "Plaintiffs are to present evidence of racial bias operating in the electoral system by proving up the *Gingles* factors. Defendants may then rebut the plaintiffs' evidence by showing that no such bias exists in the relevant voting community."  *Teague*, 92 F.3d at 290; *see Gingles*, 478 U.S. at 63.

Given the extensive record evidence of racially polarized voting in Galveston County as a whole and in Precinct 3 in particular, *see supra* Sections II n.10, II.2,

Defendants must present evidence of a non-racial explanation, such as partisan affiliation, as a defense. *Lopez*, 339 F. Supp. 3d at 604. Defendants have failed to do so.

*First*, Dr. Trounstine did not testify that voters vote based on partisanship. *Cf.* Mot. at 45. Rather, "the fact that Latino and Black voters tend to support candidates from one party is a reflection of their cohesion, not an alternative explanation for it." Ex. 17 ¶ 35. "[V]oters will select the candidate who comes closest to their preferences however the voter defines that preference," Ex. 32 at 110:4-6, *i.e.*, voters "generally speaking" will support candidates who share their "political orientation," a term that is not synonymous with partisanship. *Id.* at 109:7-13, 114:7-9. "Political orientation" is a "broad[]" term, *id.* at 106:6-12, that captures any number of "dimension[s] the voter deems to be important," *id.* at 108:7-10, including, "the relationship between [a] city council and the bureaucracy," *id.* at 108:17-20, the "procedural orientation of the candidate, [namely] the way in which they build coalitions," *id.* at 111:6-8, "the gender of the candidate," *id.* at 110:21-111:1, other "demographic characteristics of the candidate," *id.* at 111:1-2, a candidate's "approach to governing," *id.* at 108:11-12, "ideology," *id.* at 112:14-15, "effectiveness," *id.* at 111:19-112:3, and even a candidate's height, *id.* at 112:7-8.

*Second*, to the extent that Defendants' position is grounded in any of Dr. Trounstine's "data," Mot. at 45, it hinges on just two of the 36 elections that Dr. Trounstine analyzed, both of which are outliers and neither of which is among the local non-partisan elections that Dr. Trounstine analyzed for the exact purpose of "ensur[ing] that [her] conclusions were not dependent upon the presence of partisan labels." Ex. 17 ¶ 55; *see supra* Section II.2d. In particular, as with their second *Gingles* precondition

29

argument, Defendants direct the Court to the November 2014 county judge election, Mot. at 46, *i.e.*, the *only* county judge general election dating back to 2002 in which Black voters did not cohesively support the same candidate that Hispanic voters cohesively supported.  Ex. 17 at A-20.  Defendants likewise direct the Court to the November 2004 Precinct 3 election, Mot. at 45-46, 49, *i.e.*, the only commissioners court general election dating back to 2002 that included a Black Republican candidate.  Ex. 17 at A-19.[26]

*Finally*, Dr. Alford did not analyze the motivation underlying any patterns of voting.  Ex. 24 at 20:9-12, 19:11-13, 84:10-20.[27]

In sum, summary judgment based on the third *Gingles* precondition is inappropriate.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment should be denied.[28]

---

[26] For example, citing only page A-19 of Dr. Trounstine's Report for support, Defendants contend that "election results [subsequent to the November 2004 county commissioner precinct 3 election] show that White voter support for Black Republican candidates was roughly consistent with or higher than White support for White Republican candidates."  Mot. at 45-46 (emphasis omitted).  That contention, Defendants conclude, "demonstrate[es] that partisanship is a better explanation for voting trends than race."  *Id.* at 46.  But there is no other election on page A-19 of her Report with a Black Republican candidate.

[27] Defendants cannot question the "reliability" of Dr. Trounstine's methodology, Mot. at 44 n.25, given Dr. Alford's testimony that "the most obvious and complete thing to do is to provide a table in which all of those estimates are present that the judge would need" to determine cohesion, *see* Ex. 24 at 72:4-20.  Dr. Trounstine did exactly that.  *Id.* at 61:14-62:22; Ex. 17 at A-17 to -35.

[28] The United States reserves the right to supplement its opposition based on new information learned during the depositions of Thomas Bryan and Dale Oldham that have yet to occur.

Respectfully submitted this 2nd day of June 2023.

ALAMDAR S. HAMDANI
United States Attorney
Southern District of Texas

KRISTEN CLARKE
Assistant Attorney General
ELISE C. BODDIE
Principal Deputy Assistant Attorney General
Civil Rights Division

DANIEL D. HU
Civil Chief
United States Attorney's Office
Southern District of Texas
Texas Bar No. 10131415
SDTX ID: 7959
1000 Louisiana Ste. 2300
Houston, TX 77002
713-567-9000 (telephone)
713-718-3303 (fax)
daniel.hu@usdoj.gov

*/s/ Catherine Meza*
T. CHRISTIAN HERREN, JR.
ROBERT S. BERMAN*
CATHERINE MEZA*
Attorney-In-Charge
BRUCE I. GEAR*
THARUNI A. JAYARAMAN*
ZACHARY J. NEWKIRK*
K'SHAANI SMITH*
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-307-2767 (telephone)
202-307-3961 (fax)
catherine.meza@usdoj.gov

**COUNSEL FOR THE UNITED STATES**
*\* Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2023, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification to all counsel of record in this case.

 /s/ *Catherine Meza*

CATHERINE MEZA