UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY, et al.<br> Plaintiffs,<br>     v.<br>GALVESTON COUNTY, TEXAS, et al.<br> Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-00057<br>(consolidated) |
| UNITED STATES OF AMERICA,<br> Plaintiffs,<br>     v.<br>GALVESTON COUNTY, TEXAS, et al.<br> Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-00093 |
| DICKINSON BAY AREA BRANCH<br>NAACP, et al.<br> Plaintiffs,<br>     v.<br>GALVESTON COUNTY, TEXAS, et al.<br> Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-00117 |

**DEFFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................................ii

RECENT CASE LAW ....................................................................................3

OBJECTIONS AND SUPPLEMENTAL EVIDENCE ...................................5

BRIEF RESPONSE REGARDING FACTS.....................................................5

REPLY TO PLAINTIFFS' ARGUMENTS.....................................................8

    I.    Developing law shows coalition groups cannot bring VRA claims ..................8

    II.    *Gingles* I Compactness ....................................................................11

        A.    A minority group's race, alone does not mean they will ultimately prefer the same candidates .......................................................13

        B.    The illustrative maps were not created by subordinating race to other neutral criteria ..........................................................16

        C.    A precinct-level analysis avoids impermissible generalized conclusions, including about whether a community of interest exists in their proposed precincts ......................................................17

        D.    Disparate minority communities are not compact under *Gingles*.............20

    III.    *Gingles* II and III ........................................................................21

        A.    Plaintiffs cannot show that a significant number of Black and Latino voters in a proposed Precinct 3 would usually vote for the same candidate .............................................................................21

        B.    *Gingles* III is not satisfied when politics, not race, drive voting ..............27

    IV.    Racial Gerrymandering Reply..........................................................29

CONCLUSION AND PRAYER.......................................................................34

## TABLE OF AUTHORITIES

**Cases**

*Abrams v. Johnson*, 521 U.S. 74 (1997) ............................................................... 25

*Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015) ........................ 18

*Allen v. Milligan*, No. 21-1086, 2023 WL 3872517 (June 8, 2023) ........................... passim

*Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178 (2017) ........................... 16, 29, 30

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) ........................................ 34

*Bush v. Vera*, 517 U.S. 952 (1996) .......................................................... 4, 13, 21

*Cooper v. Harris*, 581 U.S. 285 (2017) ................................................... 17, 29, 30

*Easley v. Cromartie*, 532 U.S. 234 (2001) ........................................................ 30

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ...................................................... 17, 18

*Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439 (E.D. Tex. 2020) ...... 2, 14, 15, 20

*League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147
   (W.D. Tex. 2022) ....................................................................................... 23

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
   999 F.2d 831 (5th Cir. 1993) ............................................................... passim

*LULAC v. Abbott*, 604 F.Supp.3d 463 (W.D. Tex. 2022) ................................................ 22

*LULAC v. Perry*, 548 U.S. 399 (2006) ........................................................ 14, 15

*Miller v. Johnson*, 515 U.S. 900 (1995) ..................................................... 21, 29

*Patino v. City of Pasadena*, 230 F. Supp. 3d 667 (S.D. Tex. 2017) ................................ 22

*Robinson v. Ardoin*, 37 F.4th 208 (5th Cir. 2022) (per curiam) ..................................... 15

*Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686 (S.D. Tex. 2013) ............................... 1, 2

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ................................................ 9, 10, 11

*Shaw* v. *Reno*, 509 U.S. 630 (1993) ...................................................... 4, 20, 29

*Shaw v. Hunt*, 517 U.S. 899 (1996) .................................................................. 30

*Teague v. Attala County*, 92 F.3d 283 (5th Cir. 1996) ...................................................... 27

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ............................................................ 1, 11, 22

*Walters v. Boston City Council*, No. 22-12048-PBS, 2023 WL 3300466
   (D. Mass. May 8, 2023) ...................................................................... 31, 32

*Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245 (2022) ....... 15, 18

**Rules and Other Authorities**

Fed. R. Civ. P. 56(c)(2) .................................................................................. 7

Fed. R. Evid. 106 .......................................................................................... 5

S. Rep. No. 97-417 (1982), reprinted in 1982 U.S.C.C.A.N. 177 ...................................... 2

### DEFFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF THEIR
### MOTION FOR SUMMARY JUDGMENT

Defendants file this consolidated Reply to the Responses filed by the Petteway Plaintiffs (Dkt. 184), the DOJ Plaintiff (Dkt. 185), and the NAACP Plaintiffs (Dkt. 186) (collectively, "Plaintiffs").

Before addressing specific arguments raised in the Responses, Defendants restate the challenged elements of the Plaintiffs' Voting Rights Act ("VRA") and constitutional claims here, to clarify what is, and is not, at issue at this stage. Defendants have challenged the following elements of Plaintiffs' claims:

| Claim | Plaintiff(s) Alleging | Elements Challenged in MSJ |
|---|---|---|
| VRA § 2 – Discriminatory Results (Vote Dilution) | • DOJ Plaintiff<br>• Petteway Plaintiffs<br>• NAACP Plaintiffs | • All *Gingles*[1] preconditions<br>• Whether coalition claims are actionable under the VRA |
| VRA § 2 – Intentional Racial Discrimination | • DOJ Plaintiff<br>• Petteway Plaintiffs | • Whether a coalition claim is actionable under the VRA |
| 14th Amendment Equal Protection – Racial Gerrymandering | • Petteway Plaintiffs<br>• NAACP Plaintiffs | • Whether race was the predominant factor motivating for the redistricting plan (over traditional race-neutral principles[2]) |

There are two steps for establishing a VRA claim. First, Plaintiffs must meet the three

---

[1] *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986).

[2] *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 801 (S.D. Tex. 2013) (racial gerrymandering is difficult to prove because it involves "deliberate and arbitrary distortion" of boundaries for racial purposes and traditional race-neutral principles must be subordinated to racial considerations, such that race was the **predominant motivating factor**).

*Gingles* preconditions. *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 699 (S.D. Tex. 2013). "Failure to establish any of the three *Gingles* factors precludes a finding of vote dilution" because without them a plaintiff cannot show minority voters' ability to elect representatives of their choice is impaired. *Id*. Second, if all three *Gingles* preconditions are shown, a totality-of the circumstances analysis will be conducted. *See Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 454 (E.D. Tex. 2020). Only the first step (the *Gingles* preconditions) are challenged here. The second, "totality" step is not at issue in Defendants' Motion for Summary Judgment.[3]

With this in mind, Plaintiffs' responses color outside of the lines of the questions currently before the Court, which are:

1) whether the VRA permits coalition claims,

2) whether Plaintiffs fail to meet the three *Gingles* preconditions, and

3) whether the constitutional racial gerrymandering claims fail because race did not predominate when enacting the 2021 Plan.

The Petteway and NAACP Plaintiffs' Fourteenth and Fifteenth Amendment intentional racial discrimination claims are not challenged on summary judgment; therefore, references to intent are wholly misplaced in the Petteway Plaintiffs' Response. *See* Dkt. 184.

---

[3] Under a totality analysis, courts look to a nonexhaustive list of several "Senate" factors to determine whether the challenged plan impairs minority voters' ability to participate equally in the political process and to elect a representative of their choice. *See* S. Rep. No. 97-417 at 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206-07; *see also Rodriguez*, 964 F. Supp. 2d at 699. Those factors include the extent of any history of official discrimination touching the right to register, vote, or participate in the democratic process, the extent to which political campaigns have been characterized by racial appeals, the extent to which members of the minority group have been elected to public office. *See id*. at 699-700.

## RECENT CASE LAW

The United States Supreme Court recently issued its 5-4 Opinion in *Allen v. Milligan,* both reaffirming *Gingles* and making clear that traditional redistricting principles cannot be ignored in favor of proportionality. *Allen v. Milligan*, No. 21-1086, 2023 WL 3872517, at *13-14 (June 8, 2023).

In *Allen,* the Court explains that redistricting involves "myriad considerations—compactness, contiguity, political subdivisions, natural geographic boundaries, county lines, pairing of incumbents, communities of interest, and population equality." *Id*. at *18. And, as "residential segregation decreases," it becomes more difficult to satisfy the *Gingles* I compactness requirement. *Id*. at *14. In fact, for the past thirteen years, plaintiffs "have apparently succeeded in fewer than ten § 2 suits." *Id*. at *14. Section 2 challenges have been consistently rejected because minority populations' geographic diffusion does not permit a compact majority-minority district when traditional redistricting principles are considered. *Id*. That is because Section 2 will "never require adoption of districts that violate traditional redistricting principles." *Id*. at *15. The Court also instructs that, while it is permissible in redistricting to be **aware** of racial considerations, it is not permissible to be **motivated** by them. *Id*. at *15.[4]

*Allen* involved only one minority group. In that case, Mr. Cooper (who is also the expert for the NAACP Plaintiffs in this case) pointed to a grouping of mostly rural counties collectively referred to as the Black Belt, which formed an historical feature of the State

---

[4] Plaintiffs' arguments that Commissioners were aware of racial demographics therefore fall flat.

(not a demographic feature) and identified it as a community of interest. *Id*. at *16 n.5. That is very different from the coalition claims urged in this case, not only in terms of history and culture, but also in terms of geography:






|  |  |
|---|---|
| Alabama's Black Belt (in blue) | 2011 Precinct 3 (in yellow) |

*Allen* reiterates the line between legislatures and courts: reapportionment is the duty and responsibility of the state, and a *properly applied Gingles* analysis in court "help[s] ensure that remains the case." *Id*. at *15. Districts drawn to create proportional representation for minority voters, therefore, are often also unconstitutional racial gerrymanders. *Id*. at *14 (citing *Bush v. Vera*, 517 U.S. 952, 960 (1996)). As the Court explained:

> . . . proportional representation of minority voters is absent from nearly every corner of this country despite § 2 being in effect for over 40 years. And in case after case, we have rejected districting plans that would bring States closer to proportionality when those plans violate traditional districting criteria.

*Id*. at *14 n.4. The Court recognized the concern that "[r]acial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions" and "threatens to carry us further from the goal of a political system in which race no longer matters." *Id*. at 21 (quoting *Shaw* v. *Reno*, 509 U.S. 630, 657 (1993)). Ultimately, the Court held a faithful application of *Gingles* to the record in that case did not 'bear out' those concerns. *Id*.

## OBJECTIONS AND SUPPLEMENTAL EVIDENCE

Defendants object to the following:

1. The NAACP Plaintiffs' references beyond the record: (a) to data from their expert that may be downloaded online (Dkt. 183 at 20[5] n.7), and (b) to an online video (Dkt. 183 at 14 n.4). This information is not in the record; and the expert data is not pin cited to allow Defendants to respond.

2. The Petteway Plaintiffs' Exhibit 4, a rebuttal from their expert Dr. Barreto that contained new analysis. Defendants file concurrently with this Reply a Motion to Strike Dr. Barreto's Rebuttal Report, and incorporate the arguments in that Motion here.

Defendants also attach Exhibit 32 to this Reply, it is the email discussed during a deposition exchange filed by Petteway Plaintiffs (Dkt. 184-11). *See* Fed. R. Evid. 106.

## BRIEF RESPONSE REGARDING FACTS

Plaintiffs have made arguments citing incomplete facts, most of which are not necessary for resolving summary judgment. Defendants, however, briefly respond to ensure a clear record for the Court.

The DOJ Plaintiff contends there were "months" of inactivity prior to redistricting. Dkt. 185 at 7 n.3. However: (a) the County hired redistricting counsel in April 2021 (Dkt. 176-32 ¶ 5); (b) the 2020 Census data was not released until ***mid-August 2021*** (Dkt. 176-39 at 8[6]); (c) the County, through its Judge and Commissioners, met with redistricting counsel in September and October (Dkt. 176-32 ¶¶ 8-12); (d) the proposed maps were posted online on October 29, 2021 with a public comment portal (Dkt. 183-13 at 46:1-8);

---

[5] Citations in this Reply are to the file-stamped page number.

[6] Whether or not the format it was released in was usable is in question, but that is not pertinent at this stage.

and (e) the County wanted earlier public meetings on redistricting (*see* Dkt. 184-32 at 2).

On November 1, 2021, the Texas Secretary of State sent a notice to all election officials acknowledging the Census delays, advising that the redistricting timeline in Texas was modified, and stating that County Commissioner precincts must be adopted no later than November 13th. *See* Exhibit 32. With this incredibly compressed timeline, prior years' time frames and schedules are not comparable to that of the last redistricting cycle.

The NAACP and Petteway Plaintiffs argue the commissioners did not review all of the online public comments, which exceeded 400 by the time of the meeting. Dkt. 183 at 13; Dkt. 184 at 10 n.5. Those comments were summarized for the commissioners, as Judge Henry described at the November 12th hearing. Dkt. 176-37 at 61-62.[7] As for the hearing itself, NAACP Plaintiffs argue the courtroom was so small that Commissioner Holmes could not fit at the dais and had to sit by himself at a small white table. Dkt. 183 at 14. They withhold that Commissioner Holmes stated "they didn't make me sit down here" and that Commissioner Clark, had he been in attendance, would have sat opposite Commissioner Holmes. *See* Dkt. 176:37 at 17.[8]

With respect to the notice for the November 12, 2021 meeting, which was posted in accordance with Texas law, Plaintiffs carefully avoid arguing that any Commissioner objected to the location or timing of the meeting, to any lack of transparency before the meeting, or asked for additional meetings or public notices. Additionally, by pointing out

---

[7] The NAACP Plaintiffs argue the vote on November 12th did not take into account public comments asking to **reject** both Maps, despite the deadline to adopt new Commissioner precincts. Dkt. 183 at 14.

[8] Defendants object to referencing an online video by hyperlink; however, should the Court consider the video, Commissioner Holmes' statement is at 1:30:50 (available here).

that the crowd in attendance necessitated a County overflow room where proceedings were livestreamed, the DOJ Plaintiff demonstrates that the County took reasonable steps to ensure all present could observe and participate in the meeting. Dkt. 185 at 9-10.

The NAACP Plaintiffs cite the Carver Center poll closure (Dkt. 183-9 at 13:15-18), but that Center was open at the next voting cycle, and the cited deponent was able to vote when it was closed, and did not know of anyone who were unable to vote due to the closure. (Dkt. 183-9 at 14:18-15:2). The NAACP Plaintiffs also propose that "race plays an inextricable role in Galveston politics," but their cites do not support that broad argument. *See* Dkt. 183 at 2. There is no cited instance of inability to vote, or of noncompliance with Spanish language voting assistance. *See* Dkt. 183-7 at ¶¶9, 11-12.[9] It is nothing more than objectionable speculation that "County government **has tried**" to cut polling locations in minority neighborhoods. *Id* at ¶ 9 (Compian Decl.). Mr. Compian testified that some voters are overly worried about race, but he did not know if that was most people in Galveston County. Dkt. 183-5 at 12. He testified about an incident relayed to him by an unidentified friend, and that he was told more than once by a white person that they would never vote for a Mexican. *Id*. at 12-14.[10] Mr. Compian also stated that, when canvassing for city council, people stated they would not vote for a Black person, though he was "not saying it happened often . . . ." *Id*. at 14-15. Mr. Compian's testimony about Spanish language

---

[9] This is especially important because the DOJ, a plaintiff in this case, has not made these allegations or pursued any enforcement action based on the order referenced by Mr. Compian. Dkt. 183-7 at 6 ¶ 12.

[10] Apart from being a limited anecdotal statement, Mr. Compian's testimony is inadmissible hearsay from unidentified persons and Defendants object to its consideration here. *See* Fed. R. Civ. P. 56(c)(2).

assistance and immigration are also issues distinct to the Latino community in Galveston County that Plaintiffs do not allege Black voters share. *See* Dkt. 183-8 at ¶¶ 6-11.

Ms. Courville testified broadly that she believed race relations began to deteriorate in the 1990s, and when asked to provide examples, stated that in schools parents and children do not respect teachers, and that Galveston County voted to send money to the border (though she did not know whether any money actually left the County). Dkt. 183-9 at 197-200. The NAACP Plaintiffs also cite an advertisement used by a primary opponent of Cheryl Johnson—failing to explain that this opponent was voted down by Galveston County Republican primary voters after incumbent Cheryl Johnson publicly rejected the advertisement on Twitter. *See* Dkt. 183-25 at 164-65.

## REPLY TO PLAINTIFFS' ARGUMENTS

### I.  Developing law shows coalition groups cannot bring VRA claims.

Recent case law around the country shows that coalition claims are not actionable, and the U.S. Supreme Court has never permitted coalition claims under the VRA. This, combined with statutory language and recent congressional efforts, support dismissal.

At no time since enactment of the VRA in 1965 (including when it was amended in 1982) has the Supreme Court held that different minority groups may coalesce into one minority group for Section 2 protection to satisfy the first *Gingles* precondition.[11] And for good reason; the text of Section 2 is clear. A "protected class" is singular. If Congress

---

[11] Defendants acknowledge that the Fifth Circuit has allowed Section 2 coalition claims in the past. *See* Doc. 176 at 17 (citing *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc)).

meant to protect coalitions of groups, it would have chosen the words "protected classes." Moreover, as recently as 2022 Congress attempted to specifically require States involved in redistricting to comply with the Voting Rights Act of 1965, "including by creating any districts where . . . 2 or more politically cohesive groups protected by such Act are able to elect representatives of their choice in coalition . . . ." Freedom to Vote Act: S. 2747 § 5003(b)(2) (117th Cong. 2021-2022), available here. If the VRA covered coalitions, such language would have been unnecessary. The logical conclusion from the language in Section 2 and Congressional conduct is that different minority groups cannot coalesce into one "politically cohesive group." Such coalescence creates a political group, not a "protected class." Political groups are specifically not protected under Section 2. *See LULAC v. Clements*, 999 F.2d 831, 894 (5th Cir. 1993) (Jones, *concurring*) ("Congress did not authorize the pursuit of Section 2 vote dilution claims by coalitions of distinct ethnic and language minorities").

In *Rucho v. Common Cause,* the Court considered the partisan districting plans of North Carolina and Maryland. In North Carolina, the legislature passed a districting map creating ten Republican districts and three Democratic districts. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2491 (2019). In Maryland, the legislature redrew the lines to "change the overall composition of Maryland's congressional delegation to 7 Democrats and 1 Republican." *Id*. at 2493. The plans in both states were challenged , and the Supreme Court acknowledged that:

> [e]xcessive partisanship in districting leads to results that reasonably seem unjust. But the fact that such gerrymandering is 'incompatible with

democratic principles,'. . . does not mean that the solution lies with the federal judiciary.

*Id*. at 2506 (citations omitted).The *Rucho* Court said that "[p]artisan gerrymandering claims rest on an instinct that **groups** with a certain level of political support should enjoy a commensurate level of political power and influence . . ." and concluded that "[f]ederal courts are not equipped to apportion political power as a matter of fairness, nor is there any basis for concluding that they were authorized to do so," *id.* at 2499 (emphasis added). The Court held that "partisan gerrymandering claims present political questions beyond the reach of the federal courts." *Id*. at 2506-07.

Judge Jones, in her concurring opinion in *Clements*, explained that Section 2 "originally protected only black voters" but, when it was amended to include language minorities, it specifically "identified four new covered groups . . . ." *Clements*, 999 F.2d at 894 (Jones, concurring). Congress considered each group a homogenous minority unto itself and "by negative inference," did not intend these separate minority groups to overlap. *Id*. *Rucho* was even more explicit on this point: "Nor do our racial gerrymandering cases provide an appropriate standard for assessing partisan gerrymandering." *Rucho*, 139 S. Ct. at 2502.

It stands to reason, therefore, that if the single minority group in *Rucho* cannot sue for relief under Section 2 from a partisan gerrymander, neither can a coalition of minority groups. As *Rucho* states, "**determining that lines were drawn on the basis of partisanship does not indicate districting was improper**." *Rucho*, 139 S. Ct. at 2502-03. It is a "permissible intent" to secure partisan advantage, and that does not give rise to a

constitutional challenge. *Id*. The same rationale applies here. Plaintiffs admit that a coalition of two separate minority groups are needed in Galveston County to elect one candidate of that coalition's choice. Plaintiffs readily admit that the candidate of the coalition's choice is a Democrat.[12] The glue that coalesces the two separate minorities into one group is partisan politics. The Plaintiffs' Complaints, singularly and collectively, plead themselves out of a Section 2 claim because they admit the first *Gingles* precondition—-that "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district"[13]—is not met.

## II.    *Gingles* I Compactness

This is not compact:



---

[12] *See* Dkt. 31 ¶ 94; Dkt. 30 ¶ 92; Dkt. 38 ¶ 157.

[13] *Gingles*, 478 U.S. at 50-51. The Supreme Court reaffirmed this precondition in *Allen,* 2023 WL 3872517, at *9 ("[t]o succeed in proving a §2 violation under *Gingles*, plaintiffs must satisfy three 'preconditions.' *Id*., at 50. First, the 'minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district.")

Dkt 176-8 (prior Precinct 3 boundary highlighted in yellow). It spans over 20 miles from its northernmost to southernmost points, bubbles out at the top to catch Commissioner Holmes' house, divides Galveston Island into 3 Commissioners Court precincts, bisects **six cities** (League City, Dickinson, LaMarque, Texas City, Santa Fe, Hitchcock), meanders around Texas City, and reaches south of I-45 and past Highway 6 into parts of Santa Fe and Hitchcock—all to capture as many minority voters as possible:



Dkt. 176-6. Plaintiffs discount the bizarre shape of the prior precinct, and of their illustrative precincts, essentially arguing that aesthetics are not the test. They contend that since their experts drew illustrative maps that create precincts with a majority of Black and Latino voters, that is the end of the Court's *Gingles* I analysis. The Petteway Plaintiffs even point to the proposed Map 1 created for the County, arguing it contained a Precinct 3 that would have created a coalition majority precinct. This argument focuses only on external boundaries and the numbers of certain minority groups inside those boundaries. Dkt. 184 at 1-2. It ignores *why* those boundaries were drawn in the first place—to create a majority-

minority district. But under *Gingles* I, courts must assess traditional districting criteria, including whether a community of interest exists within the boundaries they propose.[14]

### A. A minority group's race, alone does not mean they will ultimately prefer the same candidates.

The NAACP Plaintiffs contend a community of interest exists for the vast majority of Black and Latino voters in Galveston County. But a community of interest is one not defined solely by race, as Plaintiffs attempt to do here. It is an area of people who have similar interests, including but not limited to ethnic, racial, economic, social, geographic or historical identities. *See Allen*, 2023 WL 2872517 at *10 (citing Alabama's districting guidelines). The Court rejected the argument that the entire Gulf Coast region in the southwest part of Alabama is a community of interest. *Id*.

In its *Gingles* I response, The DOJ cites the compactness scores of its expert's illustrative map, arguing they are similar to the Enacted Plan. Dkt. 185 at 10 n.7. Dr. Fairfax and the DOJ also discuss numerosity. *Id*. at 17. But the DOJ then argues that **the minority group need not be a "community of interest,"** and that an illustrative plan must "only be geographically compact and consistent with traditional redistricting principles." Dkt. 185 at 16, 18. This statement is both confusing and potentially misleading, since looking to

---

[14] Oddly, the DOJ appears to contend that geography plays *no role at all* in this analysis. Dkt. 185 at 20 & at n.14. They are wrong. *See Bush v. Vera*, 517 U.S. 952, 978 (1996) (noting *Gingles* I requires proof that the minority group be sufficiently large and **geographically** compact); *see also Allen*, 2023 WL 3872517, at *14 (explaining the dispersed minority population were concentrated into a single district by disregarding traditional districting principles, and the plan included people of the same race in a district but who were "*otherwise separated by geographical and political boundaries*" which raised serious constitutional concerns) (emphasis in original).

13

whether communities of interest exists *is* a traditional redistricting principle, as the U.S.

Supreme Court has explained:

> While no precise rule has emerged governing § 2 compactness, the "inquiry should take into account traditional districting principles such as **maintaining communities of interest** and traditional boundaries." The recognition of nonracial communities of interest reflects the principle that a State may not "assum[e] from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls." In the absence of this prohibited assumption, **there is no basis to believe a district that combines two farflung segments of a racial group with disparate interests** provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates.

*LULAC v. Perry*, 548 U.S. 399, 433-34 (2006) ("*Perry*") (cleaned up, emphasis added). A

district cannot "reach[] out to grab small and apparently isolated minority communities"

and still be compact. *Id*. at 434 (holding that a disservice is done to the important goals of

the VRA "by failing to account for the differences between people of the same race").[15]

    *Perry* explained why the district court was wrong in failing to perform a

compactness inquiry, or to account under Section 2 for just how significant the differences

were *within* the disparate Latino communities in that case. *Id*. That is, numbers alone are

not the beginning and end of a compactness inquiry. *Id*. ("[t]he mathematical possibility of

a racial bloc does not make a district compact"); *see also Kumar*, 476 F. Supp. 3d at 494

(a court that fails to consider traditional districting principles risks assuming that "from a

group of voters' races that they 'think alike, share the same political interests, and will

---

[15] The DOJ argues communities of interest are "[g]enerally" prioritized if the adopting body formally adopts maintaining them as redistricting criteria. Dkt. 185 at 14, n.13. It then states that no traditional districting criteria were adopted for the Enacted Plan. *Id*. Of course, *Gingles* I analyses are not limited to the formal criteria a jurisdiction adopts. Such an argument invites ridiculous results.

prefer the same candidates at the polls"). This is important, because glossing over whether the minority group (here, *two* different minority groups) forms a community of interest in a *Gingles* I analysis runs the same risk that *Kumar* and *Perry* counsel against: assuming that the race of a group of voters means that they will ultimately prefer the same candidates. That is why case law makes clear that a community-of-interest analysis must analyze non-racial factors. *See Perry*, 548 U.S. at 433-34; *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (per curiam) ("[t]hus, combining "discrete communities of interest"—with "differences in socio-economic status, education, employment, health, and other characteristics"—is impermissible" under Section 2).

Stating *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245, 1250 (2022) does not mention the term "communities of interest" (Dkt. 185 at 18 n.12), the DOJ concludes "[n]o case law requires this showing [a community of interest]." Dkt. 185 at 18. This is inaccurate and ignores clear precedent under *Perry*, and now *Allen*. *See Kumar*, 476 F. Supp. 3d at 498 (if the district is "initially compact enough," the "final, and most important" question is whether the minority community is "sufficiently compact while accounting for traditional districting principles"). Therefore, when Plaintiffs argue *Gingles* I is met because their experts drew maps with a Black and Latino voter majority (for example, Plaintiffs argue that simply pointing to Map 1 satisfies *Gingles* I), Plaintiffs do not provide the Court what it needs under *Allen* and *Perry*—a complete analysis.

**B.  The illustrative maps were not created by subordinating race to other neutral criteria.**

The NAACP Plaintiffs contend Mr. Cooper subordinated Precinct 3 boundaries to other race-neutral criteria. In his report, Mr. Cooper states he was asked "to determine whether, while accounting for traditional race-neutral redistricting principles, the combined Black and Latino population in Galveston County is 'sufficiently large and geographically compact' to allow for a majority-Black/Latino Commissioners Court precinct . . . ." Dkt. 176-2 ¶ 6. In doing so, he (and other Plaintiffs' experts in this case) used a "least-change" approach, explaining he understood "Precinct 3 has been operating as a majority-minority district since the 1990s and existed in a substantially similar form since at least 2002." Dkt. 176-2 at 29 ¶ 8. A least-change approach in this case, as Mr. Cooper admits, inherently considers race.

The DOJ argues Dr. Fairfax prioritized race-neutral principles because he chose a voting tabulation district with more white voters in it to move from Precinct 2 to Precinct 3. Dkt. 185 at 19. That argument merely shows that he did, in fact, consider race. Furthermore, in his April 7, 2023 rebuttal opinion, he states that the United States retained him to see if he could draw a Commissioner Court precinct map that contained a majority-African American and Latino Precinct. Dkt. 176-44 at ¶ 1 (Fairfax Rebuttal Report, April 7, 2023). Accordingly, race must necessarily take precedence, even if there other traditional redistricting factors are considered. *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017) ("'the constitutional violation' in racial gerrymandering cases stems from

the 'racial purpose of state action, not its stark manifestation . . . . The Equal Protection

Clause does not prohibit misshapen districts. It prohibits unjustified racial classifications").

### C. A precinct-level analysis avoids impermissible generalized conclusions, including about whether a community of interest exists in their proposed precincts.

Section 2 requires "an intensely local appraisal" of the electoral mechanism at issue.

*Allen*, 2023 WL 3872517, at *9; *see also, e.g., Gill v. Whitford*, 138 S. Ct. 1916, 1930

(2018) (explaining plaintiff's injury is district-specific in voting rights cases because it is

the district's boundaries and the composition of its voters that determines whether and to

what extent an injury exists).

In the *Wisconsin Legislature* case, the Court required the *Gingles* preconditions be

analyzed "at the district level." *Wis. Legis.*, 142 S. Ct. at 1250. Here, the applicable level

is the Commissioner precinct level. Plaintiffs' proposal that *Wisconsin Legislature* does

not require analysis at the precinct level ignores the Supreme Court's directive that each

*Gingles* precondition must be satisfied as "to each district." *Id.* (a "generalized conclusion

fails to meaningfully . . . address the relevant local question" whether the preconditions

would be satisfied as to each district). *Wisconsin Legislature* cited to *Cooper v. Harris*,

where the Court previously held that expert reports suggesting that statewide voting

patterns show "discernable, non-random relationships between race and voting" did not

"cast[] light on the relevant issue." *Cooper v. Harris*, 581 U.S. 285, 304 n.5 (2017). The

"generalized conclusion" failed "to meaningfully (or indeed, at all) address the relevant

local question: whether, in a new version of District 1 created without a focus on race,"

white block voting (*Gingles* III) would cancel out black voters' ability to elect candidates

of their choice. *Id*. (citations omitted). This district level analysis is consistent with requirements from other voting rights claims. *See, e.g., Gill*, 138 S. Ct. at 1930 ("[p]laintiffs who complain of racial gerrymandering in their State cannot sue to invalidate the whole State's legislative districting map; such complaints must proceed "district-by-district") (quoting *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015)).

Plaintiffs do not present an intensely local analysis of the demographics in their proposed precincts, including whether the majority Black and Hispanic voters form a community of interest.[16] Mr. Cooper's illustrative maps 1–3 (maps 3 and 3A are practically the same) are a good example of this. In his illustrative Maps 1 and 2, he captures a small part (750 people or 0.67%) of League City into a proposed Precinct 3. *See* Dkt. 176-2 at 30, 33, 74. In his illustrative Maps 3 and 3A (his coastal precinct maps) he includes 4,378 persons from League City. Dkt. 176-2 at 35, 78. Even using his municipal-level statistics, the socioeconomic factors from League City compared to Galveston City (for illustrative Maps 1 and 2) and Texas City (for illustrative Maps 3 and 3A) show that these communities are disparate. Importantly though, Mr. Cooper never analyzes socioeconomic factors at the *commissioner precinct* level—he cannot offer evidence because he did not consider the wealth, health, or any other of the socioeconomic factors of the 750 persons he included in his illustrative Maps 1 and 2 for Commissioner Precinct 3 or the 4,378 persons for his illustrative Maps 3 and 3a:

---

[16] The DOJ apparently concedes that Black and Hispanic voters form separate communities, as it argues that Precinct 3 has been "'a political home of historical significance' **uniting these communities** . . . ." Dkt. 185 at 19 (emphasis added).

Q. Did you analyze the socioeconomic factors of the populations contained in your Illustrative Commissioner Precinct 3 maps?

A. I did not. That would require aggregating the block group level data to arrive at an estimate and I did not do that, I just worked with the -- the chart you see here.

Dkt. 176-40 at 5-6. He did not show that Black and Latino groups in his proposed precincts form a community of interest. Therefore, Mr. Cooper's municipality analysis is **not** localized under *Gingles*—he did not know the statistics for his proposed precinct, and does not attempt to determine what portion of any municipality (or what demographic portion of that municipality) would be part of his illustrative precincts. Without a more directed view, there is no way to support a claim that residents of a proposed area—in this case, a precinct—share a common interest or hardship. In this case, a municipal-level analysis is a generalization that includes data on people both within and outside proposed precincts.

Petteway Plaintiffs' expert Tye Rush conducted no analysis on compactness. He created a least changes proposal based on a map drawn under Section 5 preclearance. And while Petteway Plaintiffs suggest he was not "instructed" to draw a majority-minority precinct, Rush was hired to "investigate the ability to draw a mapping plan" that meets *Gingles* I and "does not dilute the voting strength of Black and Latino communities," (Dkt. 176-41 at 2 ¶ 8), and testified he was instructed that the *Gingles* I threshold "he should do the analysis for" was a majority, or over 50%. Dkt. 176-42 at 191:9-192:22. Additionally, while Petteway Plaintiffs argue Dr. Owens "agreed" with Rush's alternative maps, that is incorrect—compactness Reock scores say nothing at all about whether alternative maps meet traditional redistricting criteria, or maintain communities of interest.

**D. Disparate minority communities are not compact under *Gingles*.**

The U.S. Supreme Court, in several cases, has refused to find communities exist under the Voting Rights Act when those communities are too dispersed. *See Allen*, 2023 WL 2872517 at *13 (citing *Shaw*, 509 U.S. at 635-36). *Kumar* recognizes that a compactness analysis analyzes the relevant minority group's dispersion, the shape of an illustrative district, what causes that shape, and "compliance with traditional districting principles including maintaining communities of interest and traditional boundaries." *Kumar*, 476 F. Supp. 3d at 494-96. In *Kumar*, the court found that a coalition district of Black, Hispanic and Asian minorities was not too dispersed because there was less than ten miles' distance between any two residences within the district. *Id.* at 498. In contrast, it is over 20 miles from the homes at the top of the prior Precinct 3 (or from the top of most illustrative maps' boundaries), to the point where the precincts end by homes near the Seawall on Galveston Island. Defendants point the Court to their Motion, Dkt. 176 at 30, illustrating the dispersion of Black and Hispanic minorities in Galveston County.

The DOJ argues the "long and winding shape" of Precinct 3 is not part of the analysis, the compactness of minority populations is. The NAACP Plaintiffs contend the Black and Hispanic populations in Precinct 3 are "roughly coterminous," not distant or disparate. Both arguments fail to look at the **reasons** why the proposed Precinct 3 had a long and winding shape to begin with. To the extent Plaintiffs assert their illustrations are least-change proposals, that is only one criteria of several, does not address dispersion or whether the minority groups are communities of interest, and ignores that prior Precinct 3

boundaries were drawn under Section 5 preclearance, with the express motivation of creating a majority-minority district. *See* Dkt. 184-4 at 30 ¶ 81.

Plaintiffs' illustrative plans are more like North Carolina's racially gerrymandered, and therefore rejected, boundaries in *Shaw*. *See id.* (discussing *Miller v. Johnson,* 515 U.S. 900, 906-08, 920-21 (1995) (finding one of Georgia's ten congressional districts was an impermissible racial gerrymander when it "centered around four discrete, widely spaced urban centers that ha[d] absolutely nothing to do with each other . . .") and discussing *Bush*, 517 U.S. at 957 (holding majority minority districts with narrow and bizarrely shaped tentacles or looked like a sacred Mayan bird lacked integrity in terms of traditional districting criteria and, although they brought Texas closer to proportional representation, they were impermissible racial gerrymanders)).

## III.   *Gingles* II and III

Plaintiffs' inability to satisfy *Gingles* I ends the inquiry. However, Plaintiffs do not meet *Gingles* II and III (which are often discussed together) because their generalized analyses are not sufficient under Supreme Court law. *See Allen*, 2023 WL 3872517, at *9 (requiring "an intensely local appraisal" before a Section 2 violation can be found, as well as a "searching practical evaluation of the 'past and present reality'").

### A. Plaintiffs cannot show that a significant number of Black and Latino voters in a proposed Precinct 3 would usually vote for the same candidate.

Plaintiffs must show the minority group is politically cohesive, and that a white majority votes sufficiently as a bloc to usually defeat the minority group's preferred candidate. To show cohesion, plaintiffs may show that "a significant number" of the

minority group (here, groups) "usually vote for the same candidates"—often referred to as bloc voting. *LULAC v. Abbott*, 604 F.Supp.3d 463, 495 (W.D. Tex. 2022) (quoting *Gingles*, 478 U.S. at 56). If both "minorities and Anglos vote in blocs, courts conclude that voting is 'racially polarized' and typically hold that both the second and third preconditions have been met." *Id*. But, *Gingles* II is judged by the minority population in a proposed district, and *Gingles* III is determined under the challenged districting. *Id*. at 496. Both preconditions "must be shown on a district-by-district basis." *Id*. Plaintiffs have not met either standard.

First, Plaintiffs have not shown that a **significant number** of Black and Hispanic voters in a proposed Precinct 3 would usually vote for the same candidates. 51% is not enough. *Id*. at 499.[17] They shy away from primary elections in their *Gingles* II evidence—even though primaries remove partisanship as a potential causative factor in selecting a candidate. Dr. Trounstine states it is better to look to general elections, because primaries are "the arena in which groups that have similar ideologies or political orientations vie to determine their nominee for the general election." Dkt. 185-18 at 10 ¶ 34. However, "[t]heir nominee" in this case would be a candidate of the voter's choice. The NAACP Plaintiffs argue primaries have "little utility" in this analysis. Dkt. 183 at 25 (citing *Patino v. City of Pasadena*, 230 F. Supp. 3d 667 (S.D. Tex. 2017) to support argument on the utility of primary data, even though that case involved an **at large** election, which is not at issue here). Since "defining voter cohesion is ultimately a legal question reserved to the Court,"

---

[17] The NAACP Plaintiffs argue Defendants cannot show that Black and Latino voters oppose each other. Dkt. 183 at 25. This is not the standard.

the decision to ignore the best source of nonpartisan voter data is not up to Plaintiffs' experts, but to the Court. *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 165 (W.D. Tex. 2022) (discussing Dr. Barreto's ultimate conclusions based entirely on general elections).

Only Drs. Oskooii and Trounstine analyze primary elections. Plaintiffs contend Defendants do not challenge the numerical accuracy of Dr. Oskooii's EI analysis—but he averages together Black and Latino numbers without separately showing Latino voting numbers and African American numbers. *See* Dkt. 176-46 at 14-16 (Figures 6 & 7), at 22 (Figure 13), and at 26 (Figure 16). This obscures a **twenty-point gap** between Black and Latino voters. As Dr. Alford demonstrated, when Latino voting numbers are separately reported, Black and Latino cohesion dissipates from what Oskooii's cohesion report in the mid 80s to Black cohesion in the mid 90s, and Latino cohesion in the low 70s. Dkt. 176-47 at 5, Figure 1.

Plaintiffs argue that defense expert Dr. Alford did not critique Dr. Trounstine's reconstituted election analysis or weigh her "estimates." But Dr. Trounstine did not analyze to what extent Black and Latino voters voted in elections, nor did she look to precinct-level data. Dkt. 176-3 at 115:20-116:12, 149:15-153:11. The DOJ argues her analysis shows cohesion (*see* Dkt. 185 at 24-25), citing broadly to Dkt. 185-18 at 52-55 in Dr. Trounstine's Second Corrected Report—without any explanation. She uses 60% as the threshold for cohesiveness—a mere 9% higher than a figure case law establishes (51%) is not cohesive, and despite the fact that (1) her threshold means 40% of voters prefer different candidates, and (2) in races with three or more candidates, her definition of cohesion **drops below**

**50%**. That is, if Latino and Black voters vote 30% for the same candidate in a three-candidate race, under Dr. Trounstine's analysis, that is cohesive. Under the law, it is not. The DOJ also omits that, in Dr. Trounstine's racially polarized voting analysis of 14 primary elections, she found no cohesion—only 29% of those races had Black and Latino voters selecting the same first-choice candidate. Dkt. 185-18 at 13. She also finds racially polarized voting exists if white and Latino voters vote for the same candidate, then Black voters vote for a different candidate. Dkt. 176-3 at 3:5-17; 9:11-18.

Out of 10 nonpartisan elections analyzed by Dr. Trounstine, Latinos and African Americans voted cohesively (under the definition of cohesive at 60%) in two candidate elections, and less than 50% in elections with three or more candidates (five out of ten times). Dkt. 176-46 at 8. But in two of those five elections, either African American or Latino support for the candidate was **below 50%**. Dkt. 176-46 at 29-30. Thus, when the partisan identifier of Democrat is removed, cohesion dissipates. This exemplifies why primary and nonpartisan elections are important: they remove the potential that partisanship is driving cohesiveness.

While the NAACP Plaintiffs argue there is "overwhelming cohesion" between Black and Latino voters, they cite to—and overstate—Dr. Oskooii's analysis. Dr. Oskooii analyzed ten Democratic primary elections from 2018 and 2020, and found cohesiveness in 9 out of 10 of those elections—but this does not equate to Black and Latino voters voting cohesively in primaries 90% of the time. *See* Doc. 176-48 ¶¶ 63-65. Dr. Oskooii downplays the less cohesive results in these races by arguing "preferences are not as strong for any one candidate as they are in general elections." Dkt. 176-48 at 24 ¶ 65. But clear gaps of

20% difference between Black and Latino voting, sometimes as large as 50%, shows a lack of cohesiveness. *See Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (noting only 22-38% crossover by Anglos and 20-23% crossover by Black voters supported a finding that voting was not racially polarized). And asserting cohesiveness in the face of huge confidence intervals for Latino voters is another issue that Oskooii avoids:



*See* Dkt. 176-48 at 24, Figure 15 (black bar showing large confidence interval for Latino voters in the 2020 Chief Justice and Supreme Court Justice 8 races). In fact, Drs. Oskooii, Trounstine, and Barreto each have high standard errors and confidence intervals for Latino voters. *See, e.g.*, Dkt. 185-18 at 52.[18] The confidence intervals in the lines above continue to demonstrate this trend that the confidence intervals for Latino votes are so wide that they straddle numbers both above and below the 50% level. Due to these broad confidence intervals, Plaintiffs have not shown conclusively that Latinos and African Americans are cohesive. Cohesion, therefore, is not supported by Plaintiffs' cites.

Dr. Barreto's Appendix A of racially polarized voting tables show that Black voters in Galveston County are very cohesive, often in the 98th or 99th percentile of cohesive

---

[18] Barreto's confidence intervals are discussed *infra*.

voting. Dkt. 184-5 at 18. But the same is not true for Hispanic voters—who are more split in terms of party and candidates of choice, and who more often vote for candidates with a Spanish surname. *See id*. Clearly, when viewing 33% of Hispanics voting for Trump in 2020, 84.3% of Hispanics voting for Valdez (over Governor Abbott) in 2018, and 36% of Hispanics voting for incumbent Jack Roady for District Attorney in 2022, Hispanic voters do not always share the same candidates of choice as Black voters in Galveston County. *Id*. at 18-201. But more telling are the "confidence intervals" for candidates of choice that he appends to his report. *See id*. at 24-41. For example, for the 2022 Attorney General race between Paxton and Garza, the lower and upper ecological inferences for Angle citizen voting age population (CVAP) voters had 3.3% and 3.4% differences in estimated outcomes, less than 2% differences for Black CVAP voters, and 24.2% and 30.1% *variation* in estimated outcomes for Hispanic voters. Dkt. 184-5 at 24. These variables run throughout Barreto's analysis, meaning the ecological inference (EI) tool he uses to infer individual behavior from group-level data finds there is extraordinarily high variance when attempting to estimate Hispanic voting.

Finally, Plaintiffs cite "qualitative" or "anecdotal" evidence of cohesion, such as comments about whether both Latino and Black candidates were supported by Latino or Black voters, or that witnesses were not aware of different concerns between Black and Latino voters, or that witnesses believe (without numerical support or concrete examples) that Black and Latino voters vote cohesively. The DOJ even argues that voters choose candidates based on individual preferences, including by looking at a candidate's political

orientation, gender, demographics, ideology, effectiveness and even their height. Dkt. 185 at 33. This evidence does not meet a *Gingles* II inquiry.

### B. *Gingles* III is not satisfied when politics, not race, drive voting.

Plaintiffs' briefing seems to indicate different tests, burdens or standards at different intervals that are incorrect. It is **Plaintiffs'** burden to establish the *Gingles* factors for their VRA claims, though Defendants may later rebut that evidence. *See Teague v. Attala County*, 92 F.3d 283, 290 (5th Cir. 1996). In parrying their burden under *Gingles* III, The DOJ contends it has no burden to eliminate factors other than race. Dkt. 185 at 32. They point to the Court's opinion on a prior motion to dismiss (Dkt 123 at 34-35), arguing their burden here is sufficiently met. But their allegations' force in a Rule 12(b) motion and the evidence at summary judgment are different, and are subject to different standards.

*Clements* makes clear that "[w]hether or not the burden of the plaintiffs to prove bloc voting includes the burden to explain partisan influence, **the result is the same**." *Clements*, 999 F.2d at 860 (emphasis added). *Clements* refused to hold that judicial elections in Texas were mere proxies for race or ethnicity, and rejected the plaintiffs' "suggestion that Republican voters are galvanized by a "white" or "anti-minority" agenda," because such suggestion "is plausible only to the extent that the Democratic Party can be viewed as a vehicle for advancing distinctively minority interests, which clearly is not the case." *Id*. at 861. Where white Democrats have "experienced the same electoral defeats as minority voters," those losses—"without more"—do not establish a racial vote dilution claim. *Id*. Plaintiffs contend White bloc voting is not *mere* partisanship. But voting in Galveston County is *undeniably* partisan. On this summary-judgment record, it is clear

Plaintiffs have not met their burden to establish *Gingles* III white bloc voting. Even if they had, the record provides clear evidence that voting in Galveston County is based on politics, not race.

Dr. Oskooii demonstrates that partisanship drives voting choices, not race. For example, under his estimates, white voters in Galveston County voted for George P. Bush, who is Latino, giving him 86.6% of the vote which is within the range of support white voters give to Republican candidates. Dkt. 176-48 at 16, Figure 7. The twenty-point gap between Latinos and African American voters indicates a lack of cohesion. *See Clements*, 999 F.2d at 864-65 (upholding a finding of cohesion between African Americans and Latinos where difference in voting preference was 10% or less).

The fact that white voters in Galveston County vote for the Republican candidate regardless of the candidate's race demonstrates that there is no racial bloc voting. *Id.* at 878-79. The Petteway Plaintiffs attempt to deflect from politics as a causative factor, arguing their claims should not be "summarily" dismissed. Dkt. 184 at 27. They cite Dr. Barreto's narrow look at County Judge or County Commissioner primary elections between 2014 and 2022, ignoring minority Republican candidates in other races such as for County Clerk, District Judge, as well as for constables and Justices of the Peace.

Importantly, as Dr. Trounstine's report shows, when white Republican voters in Commissioner Precinct 3 had an opportunity to vote for a Black Republican over the incumbent Black Democrat, they did so and at the same range as typical votes for white Republicans. Dkt. 176-46 at 27. The NAACP Plaintiffs argue Dr. Oskooii's analysis shows Anglos in Galveston County support Republicans more than they support Democrats. Dkt.

183 at 31. They incorrectly repeat Dr. Oskooii's statement that "there is not a single popularly elected Republican in Galveston County government that outwardly presents as a person of color," (*id*.), apparently forgetting several elected officials in Galveston County, including Dr. Robin Armstrong (a Republican), who was not only elected after he was appointed as Galveston County Commissioner for Precinct 4, he ran unopposed.

The NAACP Plaintiffs eschew 2004 results *not* because they are old, but because at that time there were more Anglos in Galveston who supported the Democratic party. *See* Dkt. 183 at 25 n.21. Essentially, they counter their own argument that County government was always properly under Section 5 preclearance (even when it was governed by Democrats, a party they also contend is supported by Black and Latino Galveston County residents). Arguing that Anglo voters shifted to the Republican party after 2010 because politics became more racialized after President Obama's 2008 election (*id*.), the NAACP Plaintiffs undercut their own arguments that race and partisanship are inextricably intertwined, or their implications that being a Republican means being racist. *See* Dkt. 183 at 33. In sum, Plaintiffs cannot meet their *Gingles* III burden.

## IV.    Racial Gerrymandering Reply

The Equal Protection Clause limits racial gerrymandering. *Cooper*, 581 U.S. 285, 291 (2017); *Bethune-Hill v. Virginia State Bd. Of elections,* 580 U.S. 178, 188-189 (2017); *Shaw*, 509 U.S at 643. It therefore prevents a state from separating citizens into voting districts based on race. *Cooper,* 581 U.S. at 291; *Miller,* 515 U.S. at 904. A state may not use race as the predominant factor motivating its map-drawing decision without subjecting itself to judicial strict scrutiny. *Cooper,* 581 U.S. at 291-292; *Miller* at 916. If racial

considerations **predominate** in the drawing of the districts, the state must prove that its race-based sorting of voters serves a compelling state interest, the only one of which the courts have thus far recognized is compliance with Section 2 of the VRA. *Cooper,* 581 U.S. at 292; *Bethune-Hill,* 580 U.S. 178, 194 (2017); *Shaw v. Hunt,* 517 U.S. 899, 915 (1996). Therefore, neither Galveston County nor Plaintiffs may draw a constitutionally compliant race-based map because, where racial considerations predominate the drawing of district lines, it is an unconstitutional act. *Easley v. Cromartie,* 532 U.S. 234, 242 (2001).

Nor is there evidence in the record that race **predominated** in the 2021 Plan's enactment. Race predominates when traditional redistricting criteria are subordinated to race. But Plaintiffs' own expert, Mr. Cooper, does not contest the number of splits in the 2021 Plan, its compactness, whether incumbency was taken into account (it was). He does not even analyze partisanship. Commissioner Holmes' notes also show that, from his earliest meeting with redistricting counsel, that Precinct 3 needed "to gain 8,000 people" and that counsel kept "asking [Commissioner Holmes] what areas [he] would like to have." Dkt. 184-40 at 1. With these admissions, Plaintiffs not only failed to provide evidence that race ***predominated*** the 2021 Plan's enactment, they have provided evidence showing it ***did not***.[19]

And where everyone agrees that the largest population growth was in the northern part of Galveston County, the NAACP Plaintiffs' comment that *only* race could explain the 2021 Enacted Plan's boundaries is unsustainable:

---

[19] The NAACP Plaintiffs note that Commissioners Giusti, Apffel, and Judge Henry testified that **equalizing populations** (not race) was their "predominant consideration" in redistricting. *See* Dkt. 184 at 36.



Dkt. 176-50. The "demographic reality" is that this plan fairly districts those living on the coast into one precinct, those living along the bay into another, and accurately reflects the large northern-County population growth. *See* Dkt. 176-8 at 6.

Commissioner Holmes' own notes also reflect that Commissioner Apffel wanted to support the adoption of Map 2 (the 2021 Enacted Plan) "for political purposes." Dkt. 184-40 at 9. Arguing Commissioner Apffel wanted to "balance" minorities among all precincts is a distortion of the record—and does not change the record to meet Plaintiffs' burden of establishing that race was the predominate factor. *See id*.; *see also* Dkt. 183-16 at 265:2-4 (Commissioner Apffel testifying the previous map seemed gerrymandered).

The *Walters* case cited by Plaintiffs does not apply here. *Walters v. Boston City Council*, No. 22-12048-PBS, 2023 WL 3300466, at *1 (D. Mass. May 8, 2023). In *Walters*, the plaintiffs argued that redistricting was motivated by a desire for "racial balancing" and the City agreed it considered race "to ensure VRA compliance, and that other, racially

neutral and competing considerations were the Council's primary motivators." *Id*. Here, race was not considered.

While Plaintiffs contend that redistricting counsel had "knowledge of" area racial demographics, being aware of racial demographics is entirely permissible, and is not enough to show racial predominance. *Allen*, 2023 WL 3872517, at *15 ("When it comes to considering race in the context of districting, we have made clear that there is a difference "between being aware of racial considerations and being motivated by them"). Since attorney Oldham worked on redistricting in 2011 for the County (at a time when Section 5 preclearance was required and therefore race **had to be considered**), it would not be unreasonable to think he had some amount of knowledge about general racial demographics in the area. *See id*. ("[redistricting legislatures will . . . almost always be aware of racial demographics") (internal quotation omitted).[20] Therefore, evidence of awareness does not meet the Petteway and NAACP Plaintiffs' constitutional racial gerrymandering burden.

The Petteway Plaintiffs also argue that the map drawer who worked with Mr. Oldham, Tom Bryan, had a spreadsheet with racial demographic data. Dkt. 184 at 12, 18. The Petteway Plaintiffs take this exhibit and essentially argue that it must mean Mr. Bryan's testimony in his declaration that he did not consider race in the preparation of or

---

[20] The Petteway Plaintiffs' citations to the record that the "same people that drew these maps did the same ones in 2011" are therefore inapposite. Dkt. 184 at 12 n.8 (citing testimony about using same redistricting counsel, as well as speculative conclusions that the reason to retain such counsel is to discriminate or dilute minority voting power).

drawing of the maps is untrue. *Compare* Dkt. 184 at 18 *with* Dkt. 176-36 at ¶ 5. They do not address his testimony that the computer program he uses has a template report that includes demographic characteristics. Dkt. 176-36 at ¶ 6.[21] But argument is not evidence. Plaintiffs' burden remains: provide a fact issue at this point that race ***predominated*** the enactment of the 2021 Plan. They have failed to do so.

For example, the NAACP Plaintiffs argue the commissioners testified they did not consider partisanship during redistricting, citing this testimony from Judge Henry:

Q. How many -- so did you view, you know, partisan breakdown by new Map 2 districts, commissioners' districts before you chose Map 2?

A. I'm sure the commissioners did, but I don't think I did.

*See* Dkt. 183 at 37 (citing Dkt. 183-13 at 37:3-7). They omit the next few lines, where Judge Henry also testified that partisan breakdown by precincts is "far more important to the commissioner[s] than it is to me" because his is a *County-wide* election, and also testified that "[i]f you've got a 66 percent Republican county, it's going to be very hard to draw a map that doesn't have four Republican precinct commissioners." Dkt. 183-13 at 37:8-12, 17-20. And Commissioner Giusti was not asked in his deposition whether he considered partisanship; the NAACP Plaintiffs cite a question about what his goals were,

---

[21] For example, Bryan did not "add" racial data to his software's spreadsheet or "construct[] a dedicated Tab within his analytics spreadsheet for the racial data" as Petteway Plaintiffs suggest. Dkt. 184 at 30. The Petteway Plaintiffs argue that the existence of this spreadsheet must mean Mr. Bryan "created 'Conditional Formatting' rules" in order to "visualize the racial distribution in each plan. . . ." *Id*. That argument is not only unsupported in the record, it is *contradicted* by it. Dkt. 176-36 ¶ 5.

not about everything he considered during redistricting. *See* Dkt. 183-17 at 11:12-25.[22] The DOJ notes that the County's redistricting preferences "only appeared post-litigation," even after citing a pre-adoption Facebook post from Judge Henry "advocating for Map 2 because it included a single coastal precinct . . . ." Dkt. 185 at 8 n.6.

The Supreme Court has clearly instructed that "partisan motives are not the same as racial motives." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021). Whether or not race and partisanship are intertwined, if the motivation for redistricting is political and not racial, there is no justiciable claim.

## CONCLUSION AND PRAYER

For the reasons discussed above, the Court should grant Defendants' Motion for Summary Judgment as to Plaintiffs' Section 2 and racial gerrymandering claims. Defendants ask for all other legal or equitable relief to which they are entitled.

---

[22] The NAACP Plaintiffs argue there was no formal adoption of the redistricting criteria they discussed with deponents, but fail to explain how this is evidence to support their conclusion that Commissioners must have had racial motivations during redistricting. *See* Dkt. 183 at 35.

Respectfully Submitted,

HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC

GREER, HERZ & ADAMS, L.L.P.

Dallin B. Holt
Texas Bar No. 24099466
S.D. of Texas Bar No. 3536519
Jason B. Torchinsky*
Shawn T. Sheehy*
dholt@holtzmanvogel.com
jtorchinsky@holtzmanvogel.com
ssheehy@holtzmanvogel.com
15405 John Marshall Hwy
Haymarket, VA 2019
P: (540) 341-8808
F: (540) 341-8809

*admitted pro hac vice

PUBLIC INTEREST LEGAL
FOUNDATION

Joseph M. Nixon
Federal Bar No. 1319
Tex. Bar No. 15244800
J. Christian Adams*
South Carolina Bar No. 7136
Virginia Bar No. 42543
Maureen Riordan*
New York Bar No. 2058840
107 S. West St., Ste. 700
Alexandria, VA 22314
jnixon@publicinterestlegal.org
jadams@publicinterestlegal.org
mriordan@publicinterestlegal.org
713-550-7535 (phone)
888-815-5641 (facsimile)

*pending pro hac vice application

By: /s/ *Joseph Russo*
    Joseph Russo (Lead Counsel)
    Fed. ID No. 22559
    State Bar No. 24002879
    jrusso@greerherz.com
    Jordan Raschke
    Fed. ID No.3712672
    State Bar No. 24108764
    jraschke@greerherz.com
    1 Moody Plaza, 18th Floor
    Galveston, TX 77550-7947
    (409) 797-3200 (Telephone)
    (866) 422-4406 (Facsimile)

    Angie Olalde
    Fed. ID No. 690133
    State Bar No. 24049015
    2525 S. Shore Blvd. Ste. 203
    League City, Texas 77573
    aolalde@greerherz.com
    (409) 797-3262 (Telephone)
    (866) 422-4406 (Facsimile)

    *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was served to all counsel of record via the ECF e-filing system on June 16, 2023.


*/s/ Angie Olalde*