UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY, et al.<br>Plaintiffs,<br>v.<br>GALVESTON COUNTY, TEXAS, et al.<br>Defendants. | § § § § § § § § | Civil Action No. 3:22-CV-00057<br>(consolidated) |
| UNITED STATES OF AMERICA,<br>Plaintiffs,<br>v.<br>GALVESTON COUNTY, TEXAS, et al.<br>Defendants. | § § § § § § § § | Civil Action No. 3:22-CV-00093 |
| DICKINSON BAY AREA BRANCH<br>NAACP, et al.<br>Plaintiffs,<br>v.<br>GALVESTON COUNTY, TEXAS, et al.<br>Defendants. | § § § § § § § § | Civil Action No. 3:22-CV-00117 |

**DEFFENDANTS' MOTION TO EXCLUDE PORTIONS OF
DR. MATTHEW BARRETO'S EXPERT AND REBUTTAL REPORTS**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................ii

INTRODUCTION ......................................................................................................... 1

NATURE OF THE PROCEEDINGS ............................................................................2

STANDARD OF REVIEW ...........................................................................................2

ARGUMENT................................................................................................................. 5

   I.   The Court should strike paragraphs 25, 28 and 30–42 of Dr. Barreto's January 13, 2023 Report as unhelpful. .............................................................................................. 5

     A.   Section 2 of the Voting Rights Act requires an intensely local analysis ...........5

     B.   Paragraphs 25, 28 and 30-43 fail to provide any local analysis .......................6

   II.   This Court should strike from Dr. Barreto's rebuttal report his BISG analysis because it is new analysis, and because he failed to disclose the underlying script. ....11

     A.   Factual Background .........................................................................................11

     B.   ..This Court should strike Dr. Barreto's BISG analysis because it contains new analysis. 13

     C.   The Court should strike Dr. Barreto's BISG analysis because Dr. Barreto failed to disclose his R script detailing his data inputs and commands. .............................15

CONCLUSION ...........................................................................................................20

CERTIFICATE OF SERVICE ....................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Albert Sidney Johnston Chapter v. Nirenberg,*
  2018 U.S. Dist. LEXIS 179561 (W.D. Tex. Oct. 18, 2018) ................................................. 4, 9

*Allen v. Milligan*, No. 21-1086, slip op.  (U.S. June 8, 2023)  ......................................... 4, 6, 8, 10

*Amin-Akbari v. City of Austin, Tex.,*
  52 F. Supp. 3d 830 (W.D. Tex. 2014) ..................................................................................... 4

*Busbee v. Smith,*
  549 F. Supp. 494 (D.D.C. 1982) ............................................................................................. 8

*Cadena v. El Paso County,*
  2017 U.S. Dist. LEXIS 234618 (W.D. Tex. Aug. 11, 2017) ........................................... 16, 17

*Cates v. Sears, Roebuck & Co.,*
  928 F.2d 679 (5th Cir. 1991) ........................................................................................... 13, 15

*Clark v. Calhoun Cty.,*
  88 F.3d 1393 (5th Cir. 1996) ....................................................................................... 5, 6, 7, 11

*Coane v. Ferrara Pan Candy Co.,*
  898 F.2d 1030 (5th Cir. 1990) ............................................................................................... 16

*Current v. Atochem N. Am., Inc.,*
  2001 U.S. Dist. LEXIS 26241 (W.D. Tex. Sep. 18, 2001) .................................................. 19

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1994) ................................................................................................................. 1

*Diggs v. Citigroup, Inc.,*
  551 Fed. Appx. 762 (5th Cir. 2014) ....................................................................................... 3

*Fairley v. Hattiesburg Miss.,*
  662 F. App'x 291 (5th Cir. 2016) ............................................................................................ 5

*Freeny v. Murphy Oil Corp., No. 2:13CV-791-RSP,*
  2015 U.S. Dist. LEXIS 118731 (E.D. Tex. June 3, 2015) .................................................. 16

*Geiserman v. MacDonald,*
  893 F.2d 787 (5th Cir. 1990) ................................................................................................ 20

*In re Toy Asbestos*,
    2021 U.S. Dist. LEXIS 52228 ................................................................. 14, 15

*Jacked Up, LLC v. Sara Lee Corp., No. 11-cv-3296*
    2018 U.S. Dist. LEXIS 29537 (N.D. Tex. Feb. 15, 2018) ...................................... 4

*Knight v. Kirby Inland Marine Inc.*,
    482 F.3d 347 (5th Cir. 2007) ................................................................. 4

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
    999 F.2d 831 (5th Cir. 1993) ........................................................ 6, 7, 10, 11

*Lopez v. Abbott*,
    339 F. Supp. 3d 589 (S.D. Tex. 2018) ......................................................... 7

*Majestic Oil, Inc. v. Certain Underwriters at Lloyd's*,
    2023 U.S. App. LEXIS 6593 (5th Cir. Mar. 17, 2023) ........................................ 16

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015) ................................................................. 5

*Musket Corp. v. Suncor Energy (U.S.A.) Mktg.*,
    2016 U.S. Dist. LEXIS 175601 (S.D. Tex. Dec. 20, 2016) ..................................... 5

*Morgan v. Commercial Union Assurance Cos.*,
    606 F.2d 554 (5th Cir. 1979) ................................................................ 14

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) ................................................................. 4

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
    382 F.3d 546 (5th Cir. 2004) .............................................................. 4, 16

*Roman v. Western Mfg.*,
    691 F.3d 686 (5th Cir. 2012) ......................................................... 4, 8, 10, 11

*Thornburg v. Gingles*,
    478 U.S. 30 (1982) ..................................................................... 2, 6, 7, 9

*United States v. Posado*,
    57 F.3d 428 (5th Cir. 1995) ................................................................. 5

*United States v. Valencia*,
    600 F.3d 389 (5th Cir. 2010) .......................................................... 3, 4, 17

*Wesdem, LLC v. Ill. Tool Works, Inc., No. SA-20-CV-00987-OLG,*
    2021 U.S. Dist. LEXIS 263726 (W.D. Tex. Aug. 12, 2021) .................................................. 16

**Rules and Statutes**

Fed. R. Civ. P. 26 ......................................................................................................... 3, 14

Fed. R. Civ. P. 37 ..................................................................................................... 5, 15, 16

Fed. R. Evid. 702 ............................................................................................................. 4, 5

**DEFFENDANTS' MOTION TO EXCLUDE PORTIONS OF**
**DR. MATTHEW BARRETO'S EXPERT AND REBUTTAL REPORTS**

Pursuant to Rule 37(c)(1) and *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579 (1994), and its progeny, Defendants Galveston County, Texas, the Galveston County Commissioners Court, County Judge Mark Henry, and County Clerk Dwight Sullivan (collectively "Defendants") move to exclude: (1) paragraphs 25, 28, and 30–43 of Dr. Matthew Barreto's January 13, 2023 expert report (attached hereto as Exhibit A), and (2) the Bayesian Improved Surname and Geocoding ("BISG") analysis contained in Dr. Barreto's April 14, 2023 rebuttal report (attached hereto as Exhibit B).

## INTRODUCTION

The Voting Rights Act requires an intensely local appraisal of voting districts. *Thornburg v. Gingles*, 478 U.S. 30, 79 (1982). However, Dr. Matthew Barreto, the *Gingles* 2 and 3 expert for the Petteway Plaintiffs, ignores this requirement. Arguing that Galveston County's white voters vote Republican for racist reasons as opposed to partisan or other reasons,  Dr. Barreto cites political science journals while also admitting that those studies have a national and, in some cases, regional focus (but none of which focus on Galveston County voters). The paragraphs from Dr. Barreto's report identified below are therefore based on generalized assessments that have no relevance to this case and are ultimately unhelpful. This Court should strike those paragraphs and preclude Dr. Barreto from testifying about them.

Next, Dr. Barreto's rebuttal report contains new analysis that, by his own admission, he intended to include in his January 2023 report, but did not. Even after receiving data he

1

claims he did not have, Dr. Barreto waited three months, until **April 14, 2023,** to submit this new analysis (28 days after Defense expert Dr. John Alford submitted his opposition report, and six days prior to his deposition). This Court should strike Dr. Barreto's new analysis as improper and untimely rebuttal evidence.

Compounding the problem is that, when Dr. Barreto transmitted his rebuttal report on April 14, 2023, he failed to produce an actual usable R script (the underlying data that contained his numerous data inputs and commands), and the probabilities that certain registered voters were white, African American, or Latino. Alternatively, Dr. Barreto chose not to create an R script (a notion that is both unlikely and irresponsible) or to save his R script, and therefore knowingly concealed the backbone of his analysis from Defendants when he produced his rebuttal report three months late. Defendants eventually did get an R script (7 pages of computer code); however, production was hardly voluntarily. It took an order from the Court, and even then all that could be produced was something he recreated at a later date. The Court should therefore strike this new analysis for the additional reason that Dr. Barreto failed to provide underlying data that Rule 26 requires. Fed. R. Civ. P. 26(a)(2)(B)(ii); Fed. R. Civ. P. 37(c)(1).

## <u>NATURE OF THE PROCEEDINGS</u>

Discovery closed on April 21, 2023. Trial is scheduled for August 7, 2023, with a pre-trial hearing scheduled for July 25, 2023. *See* Amended Doc. Control Order at 2 (ECF 155, April 28, 2023).

## <u>STANDARD OF REVIEW</u>

This Court's ruling on a motion to exclude expert testimony is reviewed for abuse of discretion. *United States v. Valencia*, 600 F.3d 389, 423 (5th Cir. 2010) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "The admission or exclusion of expert testimony is a matter left to the discretion of the trial court, and that decision will not be disturbed on appeal unless it is manifestly erroneous." *Primrose Operating Co. v. Nat'l Am. Ins. Co*., 382 F.3d 546, 563 (5th Cir. 2004).

Federal Rule of Evidence 702 permits a court to allow a qualified expert to testify so long as the "(1) testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Thus, district courts act as gatekeepers in determining the admissibility of expert testimony. *Valencia*, 600 F.3d at 424. As gatekeepers, courts may admit expert testimony only if the proponent of the testimony shows, by preponderance of the evidence, that: "(1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Jacked Up, LLC v. Sara Lee Corp*., No. 11-cv-3296 2018 U.S. Dist. LEXIS 29537, *7 (N.D. Tex. Feb. 15, 2018).

For an expert's opinion to be relevant under Fed. R. Evid. 702, the expert's opinion must "assist the trier of fact to understand the evidence or to determine a fact at issue." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002). The relevance of the expert's opinion depends upon whether the expert's "reasoning or methodology properly can be applied to the facts in issue." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). Thus, "an expert's opinion should not be admitted if it does not apply to the

specific facts of the case." *Diggs v. Citigroup, Inc.*, 551 Fed. Appx. 762, 765 (5th Cir. 2014) (citing *Kumho*, 526 U.S. at 154). Similarly, "expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful." *Roman v. Western Mfg.*, 691 F.3d 686, 694 (5th Cir. 2012). "The evidence must possess validity when applied to the pertinent factual inquiry." *United States v. Posado*, 57 F.3d 428, 433 (5th Cir. 1995).

Where the fact-finder is "just as competent as [the expert]" to interpret evidence or identify inconsistencies in the evidence, the expert's testimony is unhelpful and should be excluded. *See Amin-Akbari v. City of Austin, Tex.*, 52 F. Supp. 3d 830, 846 (W.D. Tex. 2014). Additionally, where an expert is making credibility determinations and weighing apparently inconsistent evidence, these subjects are improper for expert testimony and the Court should strike it. *See id.* at 846-47. An expert who merely restates facts "that any layperson would be able to easily comprehend without the assistance of an expert is unhelpful to the fact-finder and should be struck. *See Albert Sidney Johnston Chapter v. Nirenberg*, No. SA-17-CV-1072-DAE, 2018 U.S. Dist. LEXIS 179561 *8 (W.D. Tex. Oct. 18, 2018). Thus, as the Advisory Committee Notes for Rule 702 observe, a test for whether to permit expert testimony is whether "the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Id.* at *9. Thus, if a party can introduce evidence through a lay witness, an expert is not required to testify in their stead. *Id*; *Musket Corp. v. Suncor Energy (U.S.A.) Mktg*, No. H-15-100, 2016 U.S. Dist. LEXIS 175601 at *23-24 (S.D. Tex. Dec. 20, 2016) (holding that the proposed expert's testimony about communications disclosed in

4

discovery were unhelpful because the party proffering the expert may introduce those same communications through non-expert witnesses). The proponent of the expert bears the burden to show that by a preponderance of the evidence, the expert's testimony is relevant. *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015).

## **ARGUMENT**

### I.   **The Court should strike paragraphs 25, 28 and 30–42 of Dr. Barreto's January 13, 2023 Report as unhelpful.**

Section 2 of the Voting Rights Act requires an intensely local analysis of the social and political climate in the challenged jurisdiction. *Gingles*, 478 U.S. at 79. In conducting this intensely local analysis, evidence of the political climate nationwide is unhelpful. *Fairley v. Hattiesburg Miss.*, 662 F. App'x 291, 298 (5th Cir. 2016). This is especially true when there is an analytical gap between the nationwide data and the challenged jurisdiction. *See Clark v. Calhoun Cty.*, 88 F.3d 1393, 1399 (5th Cir. 1996). Without bridging the analytical gap between the nationwide data and the challenged jurisdiction, an expert's opinion is merely "generalized armchair speculation." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 867 (5th Cir. 1993) (en banc) ("*Clements*"). Paragraphs 25 and 30-42 of Dr. Barreto's January 13, 2023 expert report are precisely the generalized armchair speculation that this Court should reject and strike in this case.

### A.  **Section 2 of the Voting Rights Act requires an intensely local analysis.**

Section 2 of the Voting Rights Act requires courts to conduct "an intensely local appraisal" of the electoral mechanism at issue. *Allen v. Milligan*, No. 21-1086, slip op. at

11 (U.S. June 8, 2023). Whether the majority white population of a challenged district votes as a block to prevent the minority population from electing their candidate of choice "at least plausibly on account of race." *Id.*; *Clements*, 999 F.2d at 867 (rejecting expert opinion that relied on national data because "[a] district court's findings under § 2 must rest on an intensely local appraisal of the social and political climate of the cities and counties in which such suits are brought . . .") (internal quotation marks omitted); *see also Clark*, 88 F.3d at 1399 (upholding district court's decision to disregard expert opinion based upon political science literature and not "an 'intensely local appraisal' of the social and political climate"). Thus, under the third *Gingles* pre-condition, there must be evidence that white voters *in Galveston County* voted as a bloc to prevent the minority candidate of choice "at least plausibly on account of race." *Allen*, slip op. at 11; *LULAC*, 999 F.2d at 867.

### B.  Paragraphs 25, 28 and 30-43 fail to provide any local analysis.

Merely showing that white voters prefer different candidates from Latino or African American voters is insufficient to find liability under Section 2 of the Voting Rights Act. *See, e.g., Clements*, 999 F.2d at 878-79; *Lopez v. Abbott*, 339 F. Supp. 3d 589, 604 (S.D. Tex. 2018). Dr. Barreto attempts to fill this evidentiary gap with national studies about voting habits and partisan preferences. He draws from national studies and argues that racist attitudes and positions drive white voters in Galveston County to vote Republican.

This Court should strike Paragraphs 25, 28, and 30-43 from Dr. Barreto's report because these paragraphs contain no analysis of Galveston County voters. In fact, during his deposition, Dr. Barreto admitted that the studies were national in scope or focused on the Southern region of the United States. Barreto Dep. at 109:19-25, 110:1 (attached hereto

as Exhibit C). At best, because these studies are national, their random sampling of the population may include some people in Galveston County. *Id*. 109:13-18. Ultimately, however, these studies are not Texas- or Galveston-specific, and certainly are not specific to Galveston County. These paragraphs should therefore be stricken from the record as unhelpful and not relevant. *See Clark*, 88 F.3d at 1399; *Roman*, 691 F.3d at 694.

Specifically, this Court should strike paragraphs 28 and 43 from Dr. Barreto's report, as both discuss Texas generally and do not discuss Galveston. Nor does Dr. Barreto adduce statistical data from Galveston or Texas to support the assertions made in these paragraphs. The majority of paragraph 28 discusses discrimination against Latinos in Texas broadly and how this discrimination translates into lower rates of voter registration and voter turnout. But there is no citation to statistical information or any other evidence that Latino voters in Galveston register at lower rates than white voters, or vote at lower rates than white voters because of discriminatory institutional policies. In paragraph 43, Dr. Barreto contends that general elections are important to voters in Texas generally but provides no authority for this assertion, and says nothing about Galveston County. Nor does Dr. Barreto provide a citation to support his assertion that some jurisdictions in Texas—he doesn't identify which—"intentionally create districts in which no racial group is a majority, even though creating a majority-minority district is possible. This Court should strike that paragraph. *See Clark*, 88 F.3d at 1399.

This Court should also strike paragraphs 25, 30, 31, 32, 33, 34, and 40 because none of the studies cited by Dr. Barreto are from Galveston County; instead, they have a national or regional focus and do not concern Texas or Galveston County.

Dr. Barreto pieces together several academic studies and concludes without sufficient basis that "partisan general elections" in Galveston County "are often understood by voters through a racial/ethnic lens," and their attitudes about racial public policy issues immigrants and "racial animus" must "influence partisanship among White voters." Exhibit A at ¶ 25. His conclusions about voters' views on race are that "White voters today [are often pushed] into voting for Republican candidates" so that "a clear link to racially polarized voting" exists "even when one considers partisanship." *Id*. His conclusions are unsupported by any local analysis. His theory is one he repeats throughout the County— that racial attitudes drive partisan affiliation and bloc voting. *Id*. ¶ 30. For Dr. Barreto, "racial attitudes, partisanship and voting patterns" all demonstrate that racially polarized voting could not be explained as mere partisanship. *Id*. ¶ 31. This is because, according to Dr. Barreto, negative racial attitudes and attitudes about racial public policy and immigration "are the leading indicators of party affiliation among Whites" and "the underlying mechanism responsible for producing racial bloc voting among Whites." *Id*. ¶ 32-33. Dr. Barreto attempts to move the needle a little closer to home when he asserts that "discriminatory attitudes and racial prejudice play a central role in driving White party identification, and this is especially strong in states such as Texas." *Id*. ¶ 34. He still conducts no localized analysis, and provides no local data to support his beliefs—including his belief that it is not "ideological conservatism" that is driving white voters to the Republican party but "racial attitudes." *Id*. ¶ 40.

Dr. Barreto's sweeping assertions lack the intensely local analysis that *Gingles* requires, and should be stricken. *Allen*, No. 21-1086, slip op. at 11. *See* Exhibit A at ¶ 25

n. 12; ¶ 30 n. 14; ¶ 32-33 n.18; ¶ 34 n.21. Dr. Barreto's analysis of whether Galveston County white voters prevent African American and Latino voters from electing their candidate of choice on account of race is insufficient, and accordingly, should be stricken. *See Allen*, slip op. at 11; *Clements*, 999 F.2d at 867; *Clark*, 88 F.3d at 1399; *Roman*, 691 F.3d at 694.

Additionally, Dr. Barreto's citation of *Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982), demonstrates why this Court should preclude Dr. Barreto from testifying. Exhibit A at ¶ 30.  *Busbee* is a 1982 case from Georgia where there was evidence that members of the redistricting committee used profoundly offensive racial slurs. 549 F. Supp. at 500-501 (recounting that the chairman of the redistricting committee frequently used the N-word when describing majority-minority districts). This Court does not need political science journals or a professor from California to help the Court understand that using such a deeply hateful term is racist. *See Albert Sidney Johnston Chapter*, No. SA-17-CV-1072-DAE, 2018 U.S. Dist. LEXIS 179561 *8-9. And in citing *Busbee*, Dr. Barreto again lacks any localized analysis of Texas, Galveston County, or other facts pertinent to this case.

This Court should strike paragraphs 33, 35, 36, 37, 38, 39, 41, and 42 for the same reasons: Dr. Barreto supports his conclusions with studies that are national and regional in focus, and fails yet again to conduct an intensely local appraisal of Galveston County.

For example, Dr. Barreto asserts that President Obama's time in office "reshaped partisan affiliation in contemporary America almost entirely through the lens of racial attitudes." Exhibit A ¶ 33. To prove this point, Dr. Barreto discusses nationwide and southern regional studies demonstrating that President Obama received less support from

white voters in Southern states than did John Kerry and Al Gore. This, Dr. Barreto concludes, is a "direct result of racial prejudice and discriminatory attitudes." *Id.* at ¶ 35. He asserts (without support) that "White voters punished Obama for his race rather than his party affiliation" and, after the election of President Obama, "old fashioned racism" drove partisan preferences. *Id*. at ¶¶ 36-37. Dr. Barreto even states that there is a *causal link* between an individual's racial attitudes and their partisan preferences:

> Importantly, this paper disentangles antipathy toward Black people from other factors that may motivate White Americans to support the Republican party and not be willing to vote for a Black president, such as conservative principles, support for reduced government intervention, and other policy preferences (e.g., foreign policy)….The findings also demonstrate that Democratic commitments to general civil rights in 1963 *do not* produce defection towards the Republican party among Southern whites, if they are unwilling to support a Jewish, Catholic, or Woman president, all other groups that were associated with liberal beliefs at the time. Instead, it is only among those who have negative racial attitudes or who are unwilling to support a Black president who leave the Democratic Party for the Republican Party…[t]he unwillingness to support a Black president is the single most critical factor determining defection from the Democratic party into the Republican party.

*Id*. at ¶ 39. Despite reference to 'disentangling' other motivating factors, Dr. Barreto provides no such explanations. Rather, he concludes that an inseparable link exists between racial and partisan discrimination. *Id*. at ¶¶ 41-42.

Once again, Dr. Barreto relies upon studies that are national or regional in scope in support. Exhibit B at 109:19-25; Exhibit A at ¶ 25 n.12; ¶ 30 n.14; ¶ 32-33 n.18; ¶ 34 n.21. Dr. Barreto's analysis is insufficient and this Court should strike his opinon that white voters in Galveston County prevent African American and Latino voters from electing their candidate of choice on account of race. *Allen*, slip op. at 11; *Clements*, 999 F.2d at 867;

*Clark*, 88 F.3d at 1399; *Roman*, 691 F.3d at 694. The Court should strike these paragraphs from his report and preclude Dr. Barreto from testifying as to these topics.

> **II.** **This Court should strike from Dr. Barreto's rebuttal report his BISG analysis because it is new analysis, and because he failed to disclose the underlying script.**

The Court should strike Dr. Barreto's April 14, 2023 rebuttal report for two reasons. *First*, it is an improper rebuttal report containing additional new analysis that expands the analysis in the original January 13, 2023 report. *Second*, Dr. Barreto never disclosed the underlying data he used to prepare that report, including the script that contained his commands and inputs. In fact, he intentionally refused to create or failed to save that code. To date, Defendants have only received code Dr. Barreto generated after the fact (and did not provide until approximately 5 months after his initial report was due). For these reasons, this Court should strike the April 14, 2023 rebuttal report containing his BISG analysis.

### A. Factual Background

After serving their First Requests for Production in August 2022, the Petteway Plaintiffs waited until December 8, 2022 to ask whether Defendants would produce the Galveston County voter file by December 13th. *See* E-Mails Between All Counsel (attached hereto as Exhibit D). As counsel for Defendants noted in email correspondence, the Petteway Plaintiffs had not requested the file in any of their prior written requests. *Id.* Defendants provided the file on or about January 11, 2023 in response to a Second Request for Production of Documents. As per the scheduling order, Plaintiffs submitted their expert reports, including Dr. Barreto's report, on January 13, 2023. ECF 66. Defendants' experts

had two months, until March 17, 2023, to conduct a review of these reports and draft opposition reports. Over this time period, the Petteway Plaintiffs submitted no amendments or corrections to their reports. Approximately 28 days after Defendants' expert, Dr. John Alford, submitted his opposition report, Dr. Barreto submitted a purported rebuttal report containing entirely new analysis known as Bayesian Improved Surname and Geocoding ("BISG").

During his deposition on April 20, 2023, Dr. Barreto testified that to complete his BISG analysis he needed two weeks to one month. Exhibit C at 36:1-8; 40: 9-13. He also testified that he conducted the BISG analysis "earlier this year." *Id*. at 53:19-23. Although Dr. Barreto could have amended his original report and submitted it in February, allowing Dr. Alford the potential to review and respond and Defense counsel time to comprehend the analysis before Dr. Barreto's deposition, Dr. Barreto waited until a week before the close of discovery and six days before his deposition to submit his brand-new BISG analysis. Worse yet, Dr. Barreto consciously refused to create a script that would allow replication, which is highly unlikely, or deleted the corresponding R script (the script that shows every input and command he entered to generate the BISG analysis). Although the Court ordered Dr. Barreto to show Dr. Alford how he conducted the analysis over Zoom, questions still remain. *See* ECF Minute Entries of May 15, 2023 and May 18, 2023.

For example, during Dr. Barreto's deposition, he testified that his BISG analysis of each name on the voter file produced a probability regarding the person's race/ethnicity. Exhibit C at 44:6-17. Dr. Barreto noted that he used this information to arrive at his conclusions. *Id*. at 51:19-24. It is thus uncontroverted that the actual R script that Dr.

Barreto used to run the BISG analysis contains the data he relied on to create the rebuttal report, and that this data was used to study elections not previously considered in his initial expert report. Dr. Barreto has not, and apparently cannot, produce any of the inputs he used for the BISG analysis for Defendants' experts to examine. He only re-created something after the fact, and then only at the Court's order.  What's more, the 7-page length and detail of that document suggests that Dr. Barreto's claimed non-use of a script is either irresponsible or incorrect. *See* Exhibit F.

**B. This Court should strike Dr. Barreto's BISG analysis because it contains new analysis.**

A plaintiff may submit a rebuttal report that is "intended solely to contradict or rebut evidence on the same subject matter identified" by the defendants' expert. Fed. R. Civ. P. 26(a)(2)(D)(ii). Plaintiffs cannot use rebuttal reports to continue advancing their case-in-chief. *See Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991). More "detailed and comprehensive explanation[s] of earlier testimony" are improper rebuttal testimony. *Id*. This is because the term rebuttal "is a term of art denoting evidence introduced by a Plaintiff to meet new facts brought out in his opponent's case in chief." *Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554, 555 (5th Cir. 1979). "An expert report is not proper rebuttal if the report speaks directly to an issue on which [the offering party] bear the burden of proof." *In re Toy Asbestos*, 2021 U.S. Dist. LEXIS 52228, *18 (N.D. Cal. March 19, 2021).

Dr. Barreto's BISG analysis is a continuation of the Petteway Plaintiffs' case-in-chief on an issue which Plaintiffs bear the burden of proof. This conclusion does not require

the Court to analyze or parse the rebuttal report. Dr. Barreto himself testified that he intended to include the BISG analysis in his January 13, 2023 report. Exhibit C at 35:5-8. Indeed, Dr. Barreto states this intention explicitly in writing in his rebuttal report: "We also replicate our original analysis to provide racially polarized voting estimates based on the actual voter file for Galveston, which was not provided to us by Galveston County in time to include in the prior report." Exhibit B at 1, ¶ 5. Even the January 13, 2023 Report hints at this when Dr. Barreto states that he obtained from the Texas Legislative Council "Spanish Surname Registered Voters and Spanish Surname Turnout . . . ." Exhibit A at 2, ¶ 9. Dr. Barreto's BISG analysis is not rebuttal evidence; it is an expansion of his January 13, 2023 report using a new model. And, assuming he was held up by data availability, it is something he could have submitted in February 2023, since he had the voter file starting on January 11, 2023. Had he done so, Dr. Alford—Defendants' expert—would have had one month to review that analysis and include his response in his March 17, 2023 report. Dr. Barreto instead waited until April 14, 2023 to file a "rebuttal report," preventing Dr. Alford from having sufficient time to conduct his own review and analysis to include in his opposition report, and preventing Defendants' counsel from asking Dr. Barreto detailed questions about the analysis at Dr. Barreto's deposition. *In re Toy Asbestos*, 2021 U.S. Dist. LEXIS 52228, *19. The extended time (over two months) between when Dr. Barreto could have provided his BISG analysis and when it was disclosed indicates that the Petteway Plaintiffs were attempting to manufacture a tactical advantage "by waiting to disclose critical information about their case." *Id*. The late analysis should be stricken, as it "play[s] fast-and-loose with Rule 26's requirements." *Id*.; Fed. R. Civ. P. 37(c)(1).

### C. The Court should strike Dr. Barreto's BISG analysis because Dr. Barreto failed to disclose his R script detailing his data inputs and commands.

Further compounding this gamesmanship is Dr. Barreto's decision to withhold the R Script he used to conduct his BISG analysis. Rule 26(a)(2)(B)(ii) requires Dr. Barreto to provide all data they considered when forming their opinions and rebuttals. *See Freeny v. Murphy Oil Corp.*, No. 2:13CV-791-RSP, 2015 U.S. Dist. LEXIS 118731, at *6 (E.D. Tex. June 3, 2015*); Wesdem, LLC v. Ill. Tool Works, Inc.*, No. SA-20-CV-00987-OLG, 2021 U.S. Dist. LEXIS 263726, at *3 (W.D. Tex. Aug. 12, 2021). Should they fail to do so, Plaintiffs cannot use that information or those experts before the Court "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Fifth Circuit considers four factors in determining substantial justification: (1) the explanation for failing to identify the information; (2) the importance of the information; (3) potential prejudice to the other side; and (4) whether a continuance is available to cure any such prejudice. *Majestic Oil, Inc. v. Certain Underwriters at Lloyd's*, No. 21-20542, 2023 U.S. App. LEXIS 6593, at *3 (5th Cir. Mar. 17, 2023); *see also Primrose Operating Co.*, 382 F.3d at 563-64.

*First*, there is no explanation for Dr. Barreto's failure to provide his R script. Despite Dr. Barreto's initial deflection for requests for that script by pointing to 'publicly available data,' that data cannot be used to replicate Dr. Barreto's BISG analysis because it does not contain Dr. Barreto's assumptions and variables that he used in conducting the analysis. This analysis contains thousands of key-strokes and without an R script there is simply no way of reviewing each step of the analysis to see if mistakes were made. Dr. Alford cannot

replicate Dr. Barreto's work and test his results without Dr. Barreto having disclosed each step taken, each assumption made, and each variable applied. That information could have been easily saved and produced by saving the R script used. The Federal Rules of Civil Procedure simply do not "impose a duty on an opposing party" to guess how an opposing expert conducted an analysis, what that expert's assumptions were, what inputs were used, and what commands were given. *See Cadena v. El Paso County*, 2017 U.S. Dist. LEXIS 234618, *11 (W.D. Tex. Aug. 11, 2017). And importantly, the fact that Dr. Barreto failed to save his actual R script need not be a willful or malicious act to justify exclusion under Rule 37. *Coane v. Ferrara Pan Candy Co.*, 898 F.2d 1030, 1032 (5th Cir. 1990).

*Second*, as to the importance of the information, the BISG analysis is simply a different way of demonstrating racially polarized voting. Pages 19-52 of the Dr. Barreto's initial report contain his estimates of how African American, Latino, and White Voters voted in Galveston County across 29 elections. Exhibit A at 19-52. At his deposition, Dr. Barreto testified that he analyzed the same 29 elections using BISG analysis. Exhibit C at 41:4-7. To the extent the Court strikes Dr. Barreto's BISG analysis, the Petteway Plaintiffs still have his January 13, 2023 original analysis to support their claims of racially polarized voting. The BISG analysis was not critical enough for them to do the work for their case. To the extent the Petteway Plaintiffs contend the BISG analysis is of the utmost importance, their decision to stall in its production, and to withhold critical underlying data for that analysis, belies that argument, and is all the more detrimental to Defendants in building their defense. *Cadena*, 2017 U.S. Dist. LEXIS 234618 at *13.

*Third*, without the actual R script that Dr. Barreto used to run his BISG analysis, Defendants cannot evaluate whether "the reasoning and methodology underlying [Dr. Barreto's] testimony is valid and can be reliably applied to the facts of the case[]" and was indeed reliably applied." *Valencia*, 600 F.3d at 424. It is therefore critically important, and there is no valid reason for it being deleted and not produced with the rebuttal report. Without the actual R script that was used, this Court cannot adequately perform its gatekeeping role prior to Dr. Barreto explaining his inputs and commands for the first time on the witness stand. *Caden*, 2017 U.S. Dist. LEXIS 234618 at *15. Nor could counsel adequately prepare for cross-examination; guessing at what Dr. Barreto's inputs were and commands is not a viable cross-examination strategy. *Id*. at *15. For example, Dr. Barreto testified that his BISG analysis for each name on the voter file assigns each voter a probability that an individual was of either one of the "four main racial groups." Exhibit C at 44:6-17. Those probabilities were created and used by Dr. Barreto to reach the results and conclusions in the rebuttal report. *Id*. at 51:19-24. But these probability scores were not produced with the rebuttal report—not in tables as an appendix to the report, on a thumb drive, or on a webpage accessible by a link provided to opposing counsel.

Dr. Barreto did not provide or offer any of this information with his rebuttal report, and therefore to discover what each individual's probability score for the four main racial groups that Dr. Barreto generated, defense experts would need to replicate Dr. Barreto's analysis using a *generic* or publicly available R script. *Id.* at 71:20-24. In fact, this is exactly what Dr. Barreto contended defense experts in this case should do. But with only public data, the accuracy of Dr. Barreto's BISG analysis cannot be tested because it cannot be

recreated. For example, it is important to be able to test the accuracy of Dr. Barreto's model by checking the probability scores for elections involving Judge Henry, who is white, or Commissioner Holmes and Commissioner Armstrong, who are African American. This is not an idle concern. *See* Imai and Khanna, *Improving Ecological Inference by Predicting Individual Ethnicity from Voter Registration Records*, 24 Political Analysis 263, 268 (Spring 2016) (attached hereto as Exhibit E) (noting that BISG analysis with only name and block data available, the same data Dr. Barreto had, has a false negative rate of 32% for African Americans – i.e. 32% of the time BISG analysis falsely determines that someone who is not Black is Black). Without the actual names and probabilities that Dr. Barreto generated for those names, Defendants cannot adequately prepare to vigorously cross-examine Dr. Barreto at trial.

*Fourth*, this Court should not afford Dr. Barreto an opportunity to cure the defects in his rebuttal report; instead the appropriate sanction is exclusion of his BISG analysis. The opportunity to cure is only appropriate where it is not dilatory and would not be prejudicial to a party. *See Current v. Atochem N. Am., Inc.*, No. W-00-CA-332, 2001 U.S. Dist. LEXIS 26241, at *16 (W.D. Tex. Sep. 18, 2001) (holding that "permitting [an expert] to continue to refine and refresh his opinion as Plaintiffs discover new data for his review would substantially disrupt the progress of this case"); *Geiserman v. MacDonald*, 893 F.2d 787, 790-93 (5th Cir. 1990).

When Defendants received Dr. Barreto rebuttal report, they met and conferred with Plaintiffs to request the R script and underlying data he used. As explained above, however, this was a fruitless request since Dr. Barreto never actually saved his work. Instead of

18

explaining this, however, Plaintiffs stonewalled Defendants and forced them to file a Discovery Dispute Letter with the Court. See ECF 170. In the letter, Plaintiffs claimed that the underlying data Defendants sought was not needed while also readily admitting that a temporary file containing the data could be generated. Nevertheless, they claimed that they were not required to re-generate this data because Defendants' experts could re-create the same BISG process Dr. Barreto conducted.

The Court rejected these arguments and ordered Plaintiffs to produce Dr. Barreto's actual R script and underlying data. *See* ECF Minute Entry of May 15, 2023. The Court also required Dr. Barreto to meet with Defendants' expert Dr. Alford so the exchange of data could be facilitated. Regrettably, Plaintiffs again stonewalled Defendants during the experts' meeting: Dr. Barreto continued to insist that he had no obligation to recreate an R script he had not saved to begin with. After a status conference with the Court where the results of the meeting were communicated, the Court ordered Dr. Barreto to meet again with Dr. Alford and show him how to precisely re-create the BISG analysis that appeared in the rebuttal report. ECF No. 180. The meeting then occurred and the dispute over the data was not resolved until May 31, more than a month after the close of discovery and less than a month before exhibit lists for trial are due. It is telling that when the Court required a live demonstration, Barreto used an R-script because it is the most efficient and proper way to conduct this analysis. The fact that his R-script was not saved and disclosed warrants exclusion of the BISG analysis.

Plaintiffs have been given ample opportunity to provide the underlying data for Dr. Barreto's rebuttal report—both by Defendants and by this Court. They have rejected every

opportunity and instead acted in a dilatory and obstructive manner. The inescapable conclusion is that Plaintiffs cannot produce the actual data used in Dr. Barreto's report because Dr. Barreto never saved it or created any record to back up his analysis. All Plaintiffs have been able to do is walk Dr. Alford through how to re-create the data – but that does not give Defendants an opportunity to properly and fully review Dr. Barreto's report.

Because there is no real way to cure the defects in the rebuttal report, and because attempting to do so would create further delay in Defendants' ability to develop their strategy for trial, the only proper remedy is for the rebuttal expert report to be excluded in its entirety.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should grant Defendants' Motion and exclude Dr. Barreto's entire BISG analysis in his rebuttal report, and exclude paragraphs 25, 28, 30-43 from Dr. Barreto's January 13, 2023 report.

Respectfully Submitted,

GREER, HERZ & ADAMS, L.L.P.

By: */s/ Joseph Russo*
Joseph Russo (Lead Counsel)
Fed. ID No. 22559
State Bar No. 24002879
jrusso@greerherz.com
Jordan Raschke
Fed. ID No.3712672
State Bar No. 24108764
jraschke@greerherz.com
1 Moody Plaza, 18th Floor
Galveston, TX 77550-7947
(409) 797-3200 (Telephone)
(866) 422-4406 (Facsimile)
Angie Olalde
Fed. ID No. 690133
State Bar No. 24049015
aolalde@greerherz.com
2525 S. Shore Blvd. Ste. 203
League City, Texas 77573
(409) 797-3262 (Telephone)
(866) 422-4406 (Facsimile)
Counsel for Defendants

*Counsel for Defendants*

Date: June 16, 2023

HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC

Dallin B. Holt
Texas Bar No. 24099466
S.D. of Texas Bar No. 3536519
Jason B. Torchinsky*
Shawn T. Sheehy*
dholt@holtzmanvogel.com
jtorchinsky@holtzmanvogel.com
ssheehy@holtzmanvogel.com
15405 John Marshall Hwy
Haymarket, VA 2019
P: (540) 341-8808
F: (540) 341-8809

**admitted pro hac vice*

PUBLIC INTEREST LEGAL
FOUNDATION

Joseph M. Nixon
Federal Bar No. 1319
Tex. Bar No. 15244800
J. Christian Adams*
South Carolina Bar No. 7136
Virginia Bar No. 42543
Maureen Riordan*
New York Bar No. 2058840
107 S. West St., Ste. 700
Alexandria, VA 22314
jnixon@publicinterestlegal.org
jadams@publicinterestlegal.org
mriordan@publicinterestlegal.org
713-550-7535 (phone)
888-815-5641 (facsimile)

**pending pro hac vice application*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 16, 2023, I served the foregoing via email on all counsel of record in this case.

<u>/s/ Joseph Russo</u>
Joseph Russo