# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 3:22-cv-57 |
| GALVESTON, TEXAS, *et al.*, | § | |
| | § | |
| | § | |
| *Defendants.* | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 3:22-cv-93 |
| GALVESTON, TEXAS, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |
| Dickinson Bay Area Branch NAACP, *et al.*, | § | |
| | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-cv-117 |
| | § | |
| GALVESTON, TEXAS, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

## <u>PETTEWAY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PORTIONS OF DR. BARRETO'S EXPERT AND REBUTTAL REPORTS</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... i

TABLE OF AUTHORITIES ................................................................................ ii

SUMMARY OF ARGUMENT ............................................................................ 1

NATURE AND STAGE OF PROCEEDINGS ................................................... 2

COUNTER STATEMENT OF FACTS ............................................................... 2

STANDARD OF REVIEW ................................................................................. 7

LEGAL ARGUMENT ........................................................................................ 8

   I.     Plaintiffs' experts offer relevant testimony assessing the Gingles 2 and 3 preconditions. ................................................................................................... 8

   II.    Plaintiffs' expert testimony was properly disclosed. .......................................... 13

     A.  Defendants Deliberately Delayed Producing the Voter File ................................ 14

     B.  The inclusion of a BISG analysis in Dr. Barreto and Mr. Rios' Rebuttal Report was proper. .............................................................................................. 15

     C.  Dr. Barreto and Mr. Rios timely disclosed all relevant data in their underlying reports. .............................................................................................................. 17

     D.  Defendants Efforts to Strike Dr. Barreto and Mr. Rios BISG Analysis are simply bad faith attempts to exclude information harmful to their defense. ....................... 21

CONCLUSION .................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*Albert Sidney Johnston Chapter v. Nirenberg*
  2018 WL 5114150 (W.D. Tex. Oct. 18, 2018)……………………………10, 12-13

*Allen v. Milligan*
  599 U.S. ___ (2023)……………………….……………………………………10

*Amin-Akbari v. City of Austin, Tex.*
  52 F. Supp. 3d 830 (W.D. Tex. 2014)……….……………………………….....10

*Auto-Dril, Inc. v. Nat'l Oilwell Varco, L.P.*
  2017 WL 4270722 (S.D. Tex. Sept. 26, 2017)………………………………….7

*Busbee v. Smith*
  549 F. Supp. 494 (D.D.C. 1982)..……….……………………………………12

*Cadena v. El Paso County*
  2017 WL 11621471 (W.D. Tex. Aug. 11, 2017)…………………………..20

*Cates v. Sears, Roebuck & Co.*
  928 F.2d 679 (5th Cir. 1991)………………………………………………16

*Clerveaux v. East Ramapo Central School District*
  984 F.3d 213 (2nd Cir. 2021)………………………………2, 18, 19, 20, 21, 22, 23

*Current v. Atochem North America, Inc.*
  2001 WL 36101282 (W.D. Tex. 2001)……………………………………….21

*Daubert v. Merrell Dow Pharms., Inc.*
  509 U.S. 579 (1993)…………………………………………………………7

*Gibbs v. Gibbs*
  210 F.3d 491 (5th Cir. 2000)……………………………………...………8

*Gonzalez v. Harris Cnty., Tex.*
  601 F. App'x 255 (5th Cir. 2015)……………………………………...………9

*Huss v. Gayden*
  571 F.3d 442 (5th Cir. 2009)……………………………………...………8

*In re Toy Asbestos*
    2021 U.S. Dist.WL 1056552 (N.D. Cal. 2021)..……………………….……15, 16

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*
    999 F.2d 831, (5th Cir. 1993)………………………………………….……10, 11

*League of United Latin Am. Citizens v. Perry*
    548 U.S. 399 (2006)…………..…………………………………………….…10

*Lopez v. Abbott*
    339 F.Supp.3d 589 (S.D. September 12, 2018)………………………………11

*Morgan v. Commercial Union Assur. Companies*
    606 F.2d 554 (5th Cir. 1979)……………………………………………………16

*NAACP, Spring Valley Branch v. East Ramapo Central School District*
    462 F. Supp. 3d 368 (S.D.N.Y. 2020)………………………………………18,19, 21

*Puga v. RCX Sols., Inc.*
    922 F.3d 285 (5th Cir. 2019)……………………………………………...…7, 8

*Rodriguez v. Harris Cnty., Tex.*
    964 F. Supp. 2d 686 (S.D. Tex. 2013), *aff'd sub nom.* …….…..…………......………9

*Thornburg v. Gingles*
    478 U.S. 30 (1986) ..……………………………………………...…………9

*United States v. 14.38 Acres of Land, more or less Situated in Leflore Cnty.*
    80 F.3d 1074 (5th Cir. 1996)..………………………………………………8

*United States. v. Brock*
    833 F.2d 519 (5th Cir. 1987)..…………………………………………………16

*United States v. Michalik*
    5 F.4th 583 (5th Cir. 2021)………………………………………………………16

*Vazquez v. Aguilera*
    2022 WL 2292888 (S.D. Tex. 2022)..………..………..………..………..………....8

*Veasey v. Abbott*
    830 F.3d 216 (5th Cir. 2016)……………………………………………………10

*Westwego Citizens for Better Gov't v. City of Westwego*

946 F.2d 1109 (5th Cir. 1991)…………………………………….….…...…………9

**Rules and Statutes**

Fed. R. Civ. P. 26(a)(2)(B)(ii)……………………………………………..…………1, 20

Fed. R. Civ. P 34(b)(2)(a) ………...………………………………………………..15

Fed. R. Evid. 403……………………………………………………………………7

Fed. R. Evid. 702...…………………………………………………………………..7

Fed. R. Evid. 702 advisory committee's notes (2000)……………………………….8

# SUMMARY OF ARGUMENT

Defendants' Motion to Exclude portions of Dr. Barreto and Mr. Rios' expert report and rebuttal report should be denied. Defendants contend that portions of Dr. Barreto and Mr. Rios' initial expert report should be excluded as "unhelpful," and portions of their rebuttal report containing the Bayesian Improved Surname Geocoding (BISG) analysis should be excluded as "improper and untimely" and for failing to comply with Fed. R. Civ. P. 26. Fed. R. Civ. P. 26(a)(2)(B)(ii). These contentions are meritless.

First, Dr. Barreto and Mr. Rios' initial expert report contains relevant and helpful information necessary for Plaintiffs to establish Gingles preconditions 2 and 3. This report includes national, Southern, and Texas-specific studies that provide relevant information regarding the link between political party and race, and fully examines Galveston County voting patterns and data. Rather than being irrelevant, these analysis are key to fully understanding the racial voting patterns in Galveston County.

Second, Defendants' contentions that the experts' rebuttal report containing the BISG analysis was improper and untimely, and that they failed to provide the data required under Rule 26, are similarly incorrect. Defendants ignore their own fault in the delay of the BISG analysis, as they refused to provide Plaintiffs with the vote history file needed to conduct that analysis. Nevertheless, Dr. Barreto and Mr. Rios' rebuttal report was timely, having been submitted less than a month after Defendants' expert Dr. Alford filed his report, a week before the close of discovery, and two days after the Court allowed for submission of rebuttal reports. Moreover, Dr. Barreto and Mr. Rios' BISG analysis was necessary to properly rebut claims made by Dr. Alford regarding threshold cohesion levels.

Lastly, Defendants' claims that Dr. Barreto and Mr. Rios failed to produce the data necessary to replicate their BISG analysis are false. Indeed, two political scientists have submitted declarations attesting to the fact that Dr. Barreto and Mr. Rios' initial and rebuttal reports contain all the information necessary to replicate their BISG analysis. *See* Exhibits 1 and 2. Defendants' expert, Dr. Alford, has mounted the same argument in a prior case, to no avail. *Clerveaux v. East Ramapo Central School District,* 984 F.3d 213 (2nd Cir. 2021.) This Court should likewise decline Defendants' attempt to exclude relevant expert analysis simply because it harms their case.

## NATURE AND STAGE OF PROCEEDINGS

This case was filed by Plaintiffs to challenge the 2021 redistricting process for the Galveston County Commissioners Court. Petteway Plaintiffs allege that Defendants have violated Section 2 of the Voting Rights Act ("VRA"), as well as the Fourteenth and Fifteenth Amendments of the U.S. Constitution. On June 8, 2022, Defendants filed a Motion to Dismiss, Doc. 46, which this Court granted as to former Plaintiff Michael Montez, but denied as to all remaining Plaintiffs on March 30, 2023. Doc. 125. Discovery has closed, and trial is set for August 7, 2023. Defendants moved for summary judgement on May 12, 2023, with briefing completed on June 16, 2023. Defendants filed this Motion to Exclude on June 16, 2023, which Petteway Plaintiffs now oppose.

## COUNTER STATEMENT OF FACTS

In August of 2022, Petteway Plaintiffs, NAACP plaintiffs (NAACP) and United States of America Department of Justice (DOJ), plaintiffs respectively, served defendants

with their first discovery requests.[1] The NAACP and DOJ requests included language that clearly implicated production of the Galveston County voter file ("voter file"). Exhibit 3 and Exhibit 4.[2]

Following service of Plaintiffs' discovery requests, Defendants continuously requested extensions of time to respond. *See* Exhibit 5 at 1-4. In light of continued delay of Defendants' production, Petteway Plaintiffs emailed Defendants on November 18, 2022, noting that the voter file had not yet been provided and inquired whether it would be forthcoming. Defendants did not respond. Exhibit 6.

Nearly three weeks later, on December 7, 2023, Plaintiffs again attempted to confirm that the voter file would be produced in response to Plaintiffs' discovery requests. Exhibit 7 at 2. Defendants asked for clarification regarding which of Plaintiffs' requests warranted production of the voter file which Petteway Plaintiffs provided. To avoid further delay, Petteway Plaintiffs sent a second request for discovery explicitly requesting the voter file. Defendants responded that "It is Defendants position that Plaintiffs did not request the Voter History File, as demonstrated by a comparison between Request 1(d) and Plaintiffs Second Request for Production." Exhibit 7 at 5.

---

[1] Private Plaintiffs and DOJ collaborated, at Defendants' request, to ensure their Requests for Production were not duplicative of each other.
[2] Specifically, in their request served on August 12, 2022, NAACP Plaintiffs requested "all drafts in the development or revision of any of the redistricting proposals, including but not limited to shapefiles, files, or datasets used in mapping software, statistical reports, demographic data, election data, and files related to precinct names, precinct lines, split precincts, partisan indexes, population shifts, population deviations, voter registration, Spanish Surname Voter Registration, voter affiliation, Spanish Surname Voter Turnout, citizenship, changing census geography, or any other measure used to evaluate the redistricting proposal;" and DOJ on August 19, 2022 requested "all demographic or election data, regardless of source or format, used in the development of each total or partial revision of each such plan."

Finally, on January 11, 2023, two days before Dr. Barreto and Mr. Rios' initial expert report was due, Defendants produced the voter file. This left insufficient time for Dr. Barreto and Mr. Rios to conduct their BISG analysis by January 13, when their expert report was served to all counsel. Defendants submitted the report of their expert Dr. John Alford on March 17, 2023, in which Dr. Alford, among other things, claimed that political cohesion required a 75 percent threshold, and that polarization was caused by partisan politics alone. Exhibit 8 at 2-3, 6-7.

In response, Dr. Barreto and Mr. Rios served their rebuttal report on April 14, 2023, to all counsel. Prior to submitting this report, the Court conducted a hearing finding Plaintiffs' experts could submit rebuttal reports so long as they did not state any new theory of the case. The Court specifically allowed rebuttal reports for Dr. Barreto and Mr. Rios so long as they were submitted by noon on April 14, 2023. ECF Minute Entry April 12, 2023, Doc. 126. In their rebuttal, Dr. Barreto and Mr. Rios used the data from the voter file to conduct the same racially polarized voting analysis contained in their January 13 report, now using the newly available voter file for BISG analysis. Doc 193-2 ¶ 11. Dr. Barreto and Mr. Rios included the requisite code and explanation necessary to replicate the analysis with five specific footnotes to BISG references and two specific footnotes to websites where the software packages, help files, and sample code could be downloaded for free. Doc 193-2, ¶28-33. In the report, Dr. Barreto and Mr. Rios note, "Full replications instructions are publicly available at both the who are you (WRU) and *eiCompare* portals which explain the procedure in-depth with tutorials." Doc 193-2, ¶33.

The BISG section of the rebuttal report analyzed elections previously analyzed in the initial January 13th report in order to rebut to Dr. Alford's threshold for voter cohesion. Doc 193-2, ¶11. Specifically, the BISG data refutes Dr. Alford's claims that "voting in partisan elections in Galveston County is polarized according to the party affiliation of the candidates," and that "cohesion levels above 75% are closer to complete cohesion than they are to the complete absence of cohesion." Exhibit 8 at 2-4. The rebuttal report of Dr. Barreto and Mr. Rios takes specific aim at these claims by showing that "BISG estimates report even higher rates of political cohesion, almost always at the 80% cohesive rate for their candidates of choice," and demonstrate that "political party is essentially a proxy for race in Galveston County." Doc 193-2 at ¶ 13, 39.

Defendants deposed Dr. Barreto on April 20, 2023. During the deposition, Defendants asked several questions about BISG which Dr. Barreto answered in great detail including, *inter alia,* the process for using the voter file to conduct the analysis, Exhibit 9 at 36:19-39:8, the timing for conducting the analysis, *id.,* the importance of using the voter file to conduct the analysis, *id.* at 40:14-41:11, the data contained in the voter file that was used in the analysis, *id.* at 43:3-23, and the reasons for conducting a BISG analysis, *id.* at 43:23-44:22. After completing questioning, Defendants noted that they would keep Dr. Barreto's deposition open to allow Dr. Alford to run a replication analysis.

Following Dr. Barreto's deposition, Defendants reached out to Petteway Plaintiffs requesting "R code and output files" from Dr. Barreto and Mr. Rios' BISG analysis. Doc 193-4. Plaintiffs responded that the R code, or script, had already been provided in the April rebuttal report. Doc 193-4 at 5-6. Plaintiffs also noted that output files, or

intermediate results, were not saved by Dr. Barreto and Mr. Rios as it was not normal practice to save such files nor were these files necessary to replicate the analysis. Doc 193-4 at 3. Thereafter, the Parties filed a discovery dispute letter with the Court in which Defendants sought to exclude Plaintiffs' experts BISG analysis. Doc 170.

The Court heard this issue twice, once on May 15, 2023, and again on May 18, 2023. *See* ECF Minute Entries of May 15, 2023, and May 18, 2023. The Court first ordered Plaintiffs to "provide Defendants with the commands/instructions that would allow Defendants experts to replicate the BISG analysis." ECF Minute Entry of May 15, 2023. Plaintiffs' experts met with Defendants experts on May 15 and tried to explain and demonstrate what they did but defense counsel and Dr. Alford continuously interrupted apparently not wanting to understand but instead wanting to build arguments to exclude this important evidence. *See* Exhibit 10. At the conclusion of that meeting, it was then apparent that Dr. Stevenson preferred to input the code in a different way than Dr. Barreto and Mr. Rios do so. At Plaintiff counsels' request, Dr. Barreto and Mr. Rios wrote out a new version of their code that works utilizing Defendants' experts' preferred methods. *Id.* This was then shared with defense counsel. Exhibit 11 *and* Exhibit 12.

Thereafter, on May 18, the Court ordered Dr. Barreto and Mr. Rios to show Drs. Alford and Stevenson the "specific commands…used to conduct the analysis that underlies their rebuttal report" and ordered Drs. Alford and Stevenson to "ask all questions they have to understand how to replicate" the analysis. Doc 180. The experts met again on May 31, 2023, and the video recording of that meeting was circulated to all parties. Exhibit 13. After the meeting, Dr. Barreto sent Dr. Alford and Dr. Stevenson an email with a link to election

data from the TLC website for additional clarity. Exhibit 14. This had been previously provided in the expert report. Neither Defendants nor their experts raised any questions or concerns regarding the BISG analysis following this meeting. On June 16, 2023, Defendants filed the instant Motion.

## STANDARD OF REVIEW

A qualified expert may testify so long as "(1) testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. In deciding whether to admit expert testimony, the district court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). "The inquiry envisioned by Rule 702 is [] a flexible one." *Auto-Dril, Inc. v. Nat'l Oilwell Varco, L.P.*, No. CV H-16-280, 2017 WL 4270722, at *2 (S.D. Tex. Sept. 26, 2017) (citing *Daubert*, 509 U.S. at 594). "[T]he court's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the [] fact-finding role—the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the [fact-finder's] consideration." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019).

Additionally, a trial court may only exclude evidence if it is irrelevant, or would result in "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Auto-Dril, Inc.*, 2017 WL 4270722, at *1 (citing Fed. R. Evid. 403.) "[T]he rejection of expert testimony is the exception rather

than the rule." Fed. R. Evid. 702 advisory committee's notes (2000) (internal citations omitted).

## LEGAL ARGUMENT

Defendants seek to exclude relevant testimony that was properly disclosed. Because the rules strictly provide that such evidence should be admitted, Defendants' Motion should be denied.

I. **Plaintiffs' experts offer relevant testimony assessing the Gingles 2 and 3 preconditions.**

Concerns regarding the "bases and sources of an expert's opinion" are a question of the weight given to an expert opinion rather than its admissibility. *Puga*, 922 F.3d at 294. As such, where Defendants' arguments go to the weight of the evidence rather than its relevance, there is no basis for exclusion of the challenged testimony. *Id.* at 285; *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) ("Typically, 'differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility'"); *Vazquez v. Aguilera*, No. 5:19-cv-117, 2022 WL 2292888, at *2 (S.D. Tex. Mar. 25, 2022) (quoting *United States v. 14.38 Acres of Land*, *more or less Situated in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir. 1996)). This is especially true when, as here, the factfinder is a judge rather than a jury. *See Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury.").

Vote dilution claims under Section 2 of the Voting Rights Act are extremely complex and require extensive, in-depth factual analysis paired with expert opinion and

testimony. *Thornburg v. Gingles*, 478 U.S. 30, 49-51 (1986). Analysis of the *Gingles* preconditions, necessary to establish a vote dilution claim under Section 2, requires expert testimony and analysis, including racially polarized voting patterns within the jurisdiction. *See Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 754-55 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015); *see also Westwego Citizens for Better Gov't v. City of Westwego,* 946 F.2d 1109, 1118 (5th Cir. 1991)* ("Usually, plaintiffs in a vote dilution case will attempt to establish both the second and third Gingles factors with statistical evidence of racial polarization of the electorate"). Dr. Barreto and Mr. Rios' initial expert report contains detailed analysis based on their extensive political science expertise[3] that provides pertinent information about racial voting patterns in Galveston County. None of Defendants' claims regarding Dr. Barreto and Mr. Rios' initial report or rebuttal meaningfully challenge the methodology or conclusions of the studies cited, or Dr. Barreto and Mr. Rios' qualifications as experts. Rather, Defendants seek to exclude this information merely because they deem it "unhelpful." Br. at 5. Defendants are wrong.

---

[3] Dr. Barreto is currently a Professor of Political Science and Chicano/a & Central American Studies at the University of California Los Angeles. While at UCLA, Dr. Barreto has founded the research center Latino Policy & Politics Institute and the Voting Rights Project. Before taking a tenured position at UCLA, Dr. Barreto was a tenured political science professor at the University of Washington. He has been qualified as an expert witness in over four dozen federal and state voting and civil rights cases. Including this case, he has testified as an expert in deposition or at trial 49 times. He currently teaches a year-long course at UCLA on the Voting Rights Act that focuses on social science statistical analysis, demographics and voting patterns, and mapping analysis relevant to expert analysis in voting rights cases. Mr. Rios has extensive expertise with racially polarized voting analysis in the state of Texas, including authoring a report on racially polarized voting in Galveston County in 2021, and he recently performed a racially polarized voting analysis in *Portugal et al. v. Franklin County et al*. (October 2020), a lawsuit involving the Washington Voting Rights Act. *See* Doc 193-2 at ¶2-5.

First, Defendants wrongly assert that portions of Dr. Barreto and Mr. Rios' report restate facts that could be introduced by a fact witness. Br at 4. Their report includes PhD-level statistical analysis and literature review that could not be repeated by a layperson. For example, Dr. Barreto cites several peer-reviewed social science studies to provide context around his racially polarized voting analysis and denote important catalysts in voter behavior. Far from restating easily understandable facts already in evidence, their report assists the trier of fact in parsing through the complex social science data and voting trends implicated in this case. *See, e.g.,* Doc 193-1 at ¶ 25, 28, 30-43.

In support of their argument, Defendants cite cases where the expert merely restated facts already in evidence. *See* Br. at 4 (citing *Albert Sidney Johnston Chapter v. Nirenberg*, SA-17-cv-1072-DAE, 2018 WL 5114150, *3 (W.D. Tex. Oct. 18, 2018); *Amin-Akbari v. City of Austin*, Tex., 52 F. Supp. 3d 830, 846 (W.D. Tex. 2014)). But Dr. Barreto and Mr. Rios provide testimony that no lay witness could provide. Indeed, courts routinely recognize the provenance of expert testimony on the exact same topics which Defendants argue is "unhelpful." *See, e.g.*, *Allen v. Milligan,* 599 U.S. ___ (2023*); Veasey v. Abbott,* 830 F.3d 216, 227 (5th Cir. 2016); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 427 (2006).

Second, Defendants rely heavily on *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 867 (5th Cir. 1993) (en banc) to support their contention that portions of Dr. Barreto and Mr. Rios' January 13, 2023 report should be excluded. Br. at 5-6. But "The [*Clements*] opinion calls upon the court to look at all of the evidence regarding each of the factors to determine whether racial bias or partisan politics

better explains the voting patterns," *Lopez v. Abbott*, 339 F.Supp.3d 589, 604 (S.D. Tx. 2018), encouraging courts to look at "evidence, not musings," *Clements*, 999 F.2d at 867. In line with this standard, Dr. Barreto and Mr. Rios spend several paragraphs not "musing" but utilizing their expertise as political scientists, and their review of over 20 peer-reviewed studies to support their conclusion that racial attitudes are a strong factor explaining Anglo support for the Republican Party.[4] ECF 193-1.

Third, Defendants seek to discount this evidence by claiming it fails to provide a sufficiently local analysis, and to account for the "analytical gap" between national data and Galveston County. This argument too falls flat, as Defendants fail to show why the studies on voter behavior cited by Dr. Barreto and Mr. Rios *do not* apply to Galveston County voters. Many of the studies they cite look at the Southern region of the United States and Texas specifically. ECF 193-1 at ¶ 28, 34, 36, 38, 40. These studies are not, as Defendants claim, simply "generalized armchair speculation." Br. at 5. Rather these studies, as Dr. Barreto and Mr. Rios explain, represent a near "consensus in published, empirical political science studies" that "discriminatory attitudes and racial prejudice play a central role in driving White party identification," and that this correlation is "especially strong in states such as Texas." ECF 193-1 at ¶ 34.

Dr. Barreto and Mr. Rios likewise clearly bridge any "analytical gap" between the national studies and Galveston County in both their initial report and Section II of their rebuttal report. ECF 193-2 at 3-5. Specifically, Dr. Barreto and Mr. Rios' ecological

---

[4] By contrast, Dr. Alford's rebuttal, which claims racially polarized voting is better explained by partisanship, cites no peer-reviewed studies. Exhibit 8 at 6-7.

inference data in the initial report and the BISG analysis in their rebuttal—which relies on the Galveston County voter file, inherently local data—provide "significant qualitative support" for the claim that, in Galveston County, political party is a proxy for race. ECF 193-2 at ¶ 13. Indeed, the data show that Galveston County is even more polarized than Texas as a whole. *Id*. at ¶ 14. Dr. Barreto and Mr. Rios further buttress their discussion of nationwide voting trends by analyzing both the racial makeup of each political party and white Republican support for minority candidates in Galveston County specifically. *Id*. at ¶ 15-24. Dr. Barreto and Mr. Rios' breadth of scholarly research considered in conjunction with their inclusion of local and regional data are crucial aspects of the analysis required by *Clements*. This entire argument goes to the weight of the evidence; Defendants' conclusions regarding whether Dr. Barreto's testimony is "insufficient" are more appropriate for the fact finder to determine. *See* Br. at 8-11. Therefore, any arguments related to Defendants' opinions about Dr. Barreto and Mr. Rios's testimony are immaterial to the admissibility of their testimony.

Fourth, Defendants' contention that Dr. Barreto and Mr. Rios' citation to *Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982) precludes Dr. Barreto's testimony is nonsensical. Br. at 9. Experts are allowed to provide examples of cases that illustrate the point they are making. Far from opining on legal standards, Dr. Barreto and Mr. Rios briefly mention *Busbee*, in a footnote, simply to note that courts have considered evidence of racial attitudes and stereotypes in assessing whether racially polarized voting exists. *Cf. Albert Sidney Johnston Chapter, Chapter No. 2060, United Daughters of the Confederacy v. Nirenberg*, No. SA-17-cv-1072-DAE, 2018 WL 5114150, at *3 (W.D. Tex. Oct. 18, 2018). In a bench

trial, the Court is more than competent to assess the weight of this citation to the opinions in Dr. Baretto and Mr. Rios' report. *Compare with id.* (holding that an expert cannot testify to a jury about the law governing the case). Dr. Barreto and Mr. Rios' brief mention of *Busbee* hardly constitutes a basis for excluding Dr. Barreto's testimony.

Finally, Defendants' dig at Dr. Barreto's residency in California barely warrants a response. Br. at 9. Dr. Barreto has extensive experience analyzing local governments in Texas and has been certified as an expert in Section 2 cases in Texas several times. See 193-2 at 181-182.

*    *    *

Defendants' arguments related to the sufficiency of Dr. Barreto and Mr. Rios' expert report pertain to the weight of the evidence, which is not a basis for excluding their testimony. Defendants' attempts to conflate the relevance and weight of the evidence only underscore that this debate is best left for trial.

## II.    Plaintiffs' expert testimony was properly disclosed.

Dr. Barreto and Mr. Rios timely submitted and properly disclosed their reports regarding the BISG analysis of elections in Galveston County in rebuttal to Dr. Alford's expert declaration.  Defendants' complaint about timeliness is particularly disingenuous given that Defendants themselves sought to bar Plaintiffs' experts from submitting rebuttal reports at all, necessitating a hearing to decide the issue. After the Court ordered, on April 12, 2023, that Plaintiffs could submit rebuttal reports for their experts, Dr. Barreto and Mr. Rios did so within 48 hours, adhering to the Court-imposed deadline of noon on April 14, 2023. *See* ECF Minute Entry April 12, 2023.

Dr. Barreto and Mr. Rios' rebuttal report and its BISG analysis were directly responsive to Dr. Alford's arguments and included all data and instruction necessary to recreate the BISG analysis. Although Defendants now accuse Dr. Barreto of "gamesmanship," it is Defendants own strategic and intentional delay in producing the voter file that caused any delay. Br at 15. Indeed, Defendants crocodile tears are even more transparent as, after weeks of back and forth and receiving all the data and instructions they claimed to need, Defendants simply refuse to recreate Dr. Barreto and Mr. Rios' BISG analysis. This entire controversy is manufactured and part of a boilerplate argument that Dr. Alford tries to make in an attempt to avoid the highly probative BISG evidence. This Court should do as the others before have and reject Dr. Alford's scheme. The simple fact is (as attested to by other competent experts): Defendants' experts had everything they needed to replicate the BISG when they received the voter file from their client. There was not a spec in the glass when they received the rebuttal report and disclosures therewith. *See* Exhibits 1 and 2.

### A. Defendants Deliberately Delayed Producing the Voter File

Defendants claim that Dr. Barreto and Mr. Rios' BISG analysis should be stricken as Pettway Plaintiffs attempted to "manufacture a tactical advantage 'by waiting to disclose critical information about their case.'" Br. at 14. This claim is false. Rather, Defendants' deliberate refusal to produce the voter file is the primary reason Dr. Barreto and Mr. Rios could not incorporate a BISG analysis in their initial report.

In their motion, Defendants omit key facts illustrating their own bad faith intentions. NAACP and DOJ requested the voter file as part of the requests submitted on August 12

and 19th of 2022 respectively. Exhibits 3 and 4. Defendants ignored Petteway Plaintiffs follow up email regarding the voter file on November 18, 2022, forcing them to reach out again on December 7. *See* Exhibits 6 and 7. They then refused to provide the voter file.[5] This refusal forced Plaintiffs to serve a second request for production on December 9, 2022, and describe their request *in excruciating detail* to ensure Defendants could not again refuse to provide the requested file. Even after this, Defendants still produced the voter file on January 11, 2023, past the 30-day deadline of January 9, 2023, and only two days before Plaintiffs' experts' disclosures were due. Fed. R. Civ. P. 34(b)(2)(a).

Despite deliberately withholding the voter file from Petteway Plaintiffs, Defendants now cry foul for the timing issue they manufactured. This Court should not reward Defendants' conduct by granting their request to strike Dr. Barreto and Mr. Rios' BISG analysis. *See In re Toy Asbestos*, 2021 WL 1056552, *2 (N.D. Cal. 2021) ("To the extent Defendants suggest that the Court should hold only Plaintiffs accountable for missing the case deadline, the Court declines to credit such transparent gamesmanship.")

## B. The inclusion of a BISG analysis in Dr. Barreto and Mr. Rios' Rebuttal Report was proper.

Dr. Barreto and Mr. Rios' inclusion of BISG in their April 14, 2023, rebuttal report was proper. Their BISG analysis directly refutes statements made in Dr. Alford's report, specifically Dr. Alford's claim that a 75% threshold is required for determining true voter cohesion. Doc 193-2 at ¶11. Although Dr. Barreto indicated his original hope was to

---

[5] One could reasonably question, since BISG has become a routine method used by experts in vote dilution cases, whether Defendants intentionally delayed production of the voter file, a necessary data set to perform BISG that the county maintains, in order to setup this very motion to exclude.

perform a BISG analysis for his initial report, following its submission he was under no obligation to reanalyze election results. Only after reviewing Dr. Alford's report that called into question the level of Hispanic voter cohesion did Dr. Barreto and Mr. Rios decide to include a BISG analysis to rebut this claim. Since Dr. Alford's report discusses an untested and therefore "unforeseen theory" regarding the standard for cohesion, Dr. Barreto and Mr. Rios properly utilized BISG analysis in their rebuttal to refute this theory. *In re Toy Asbestos*, 2021 WL 1056552 at \*3 (noting that expert report is not a proper rebuttal as it does not "refute any unforeseen theories").

Even if a BISG analysis was more appropriate as part of Dr. Barreto and Mr. Rios' "case in chief," a court has "wide discretion and 'may admit in rebuttal evidence which could have been received as part of the case in chief." *U.S. v. Michalik*, 5 F.4th 583, 592 (5th Cir. 2021). Indeed, "prejudice only occurs if the Defendant is denied the opportunity to present evidence on any new issue raised. *U.S. v. Brock,* 833 F.2d 519, 522 (5th Cir. 1987). Here, Dr. Barreto and Mr. Rios' BISG analysis came almost *four months prior to the start of trial*, providing ample time for Defendants to present any new evidence regarding the BISG analysis. *Cates v. Sears, Roebuck & Co.,* 928 F.2d 679 (5th Cir. 1991) (finding no abuse of discretion in denying proffer of rebuttal evidence *at trial*), *Morgan v. Commercial Union Assur. Companies*, 606 F.2d 554 (5th Cir. 1979) (denying never before disclosed rebuttal testimony for the first time *at trial*). Indeed, Defendants have had no qualms in producing late discovery and to date continue to provide Plaintiffs with discovery responsive to requests sent in August 2022. *See* Exhibit 5.

Nor were Defendants prejudiced by being unable to thoroughly depose Dr. Barreto about his analysis. Br. at 14. Defendants asked over 50 questions relating to Dr. Barreto's BISG analysis. Defendants even stated they would keep the deposition open for any further questions following Dr. Alford completing his own BISG replication analysis, but they never asked to reconvene. Exhibit 9 at 135:23-25, 136:1-3. Nor did Defendants request to depose Mr. Rios, who Dr. Barreto confirmed helped him perform the BISG analysis, until June 9. Exhibit 18. Even then, Defendants only sought to depose Mr. Rios as a fact witness related to his interaction with Commissioner Stephen Holmes not as an expert witness who performed the BISG analysis. *Id.* Later, their own experts had the opportunity to directly interrogate Dr. Barreto and Mr. Rios, *twice*, including once on video. Dr. Barreto and Mr. Rios even re-wrote their code so that it would work with Dr. Stevenson's preferred methods.

Further, far from espousing a new theory of the case, Dr. Barreto and Mr. Rios' BISG analysis was limited. They only used previously unavailable data to provide a more precise level of cohesion to meet Dr. Alford's new and rigorous standard. They analyzed the same elections and utilized ecological inference as they had in their initial report. Given the complete absence of any prejudice in allowing the BISG analysis, the Court should use its discretion to allow this analysis into evidence.

## C. Dr. Barreto and Mr. Rios timely disclosed all relevant data in their underlying reports.

Defendants have everything they need to replicate Dr. Barreto and Mr. Rios' analysis. The claim that the data provided does not allow them to do so is simply false as

both political science experts and other federal courts have shown. Indeed, both Dr. Kassra Oskooii,[6] expert for NAACP plaintiffs, and University of Texas-Austin political scientist Dr. Hannah Walker note that the information provided by Dr. Barreto and Mr. Rios in their reports provided sufficient information to replicate their analysis. Exhibits 1 and 2.

Still, Defendants double down on Dr. Alford's previously tried and failed strategy of having a BISG analysis struck based on the claim that the proper script was not provided. *Clerveaux,* 984 F.3d at 226. Indeed, Defendants' complaint here is the *exact same* complaint raised by Dr. Alford and rejected by Southern District of New York and the Second Circuit. Br. 15-16, *compare* Exhibit 15 at 2360:9 - 2362:19. There, Dr. Barreto and another expert provided (as Dr. Barreto and Mr. Rios did here) publicly available scripts programmed according to the WRU program with no manipulation. Dr. Alford, repeatedly and without explanation, claimed that he could not replicate the BISG without the full script, despite statements from his colleague Dr. Stevenson to the contrary and his own admission that he could independently run BISG. Exhibit 15 at 2348:3-2350:10, *see also* Exhibit 16 at 146: 24-147:17 *and Clerveaux* at 226. Due to Dr. Stevenson's admission that he was able to run the BISG analysis with the scripts provided, the court found Dr. Alford's complaints unpersuasive. *NAACP, Spring Valley Branch v. East Ramapo Central School District*, 462 F. Supp. 3d 368, 391 (S.D.N.Y. 2020).

---

[6] Indeed, not only did Dr. Oskooii replicate Dr. Barreto and Mr. Rios' analysis successfully but was able to do so twice, using first only the information provided in their reports and then a second time using the extra information requested by Defendants. He achieved results similar to Dr. Barreto and Mr. Rios. *See* Exhibit 1.

Here, as he did in *Clerveaux*, Dr. Barreto, along with Mr. Rios, conducted their BISG analysis using the publicly available WRU package and the publicly[7] available *eiCompare* package. Doc 193-2 at ¶ 32-33. Dr. Alford knew which software Dr. Barreto and Mr. Rios used to perform BISG and had every opportunity to replicate their analysis. Additionally, Dr. Barreto and Mr. Rios subsequently produced code that they recreated and personally tested that code to ensure it could successfully replicate their BISG analysis utilizing Dr. Stevenson's preferred input method. Exhibits 10 and 12. Then, they provided a personal tutorial to aid Dr. Alford and Dr. Stevenson. Indeed, at the end of the video Dr. Stevenson noted that "everything was straightforward." Exhibit 13 at 1:09:03-1:09:05.

The information produced by Dr. Barreto and Mr. Rios made the BISG analysis easily replicable by any qualified expert. Exhibits 1 and 2. Thus, it is clear that Dr. Alford has everything necessary to replicate Plaintiffs' BISG analysis.

Defendants' additional complaint that they lack intermediate probability scores (Br. at 17-18) is another red herring.[8] Indeed, the same argument was made by Defendants and their expert, Dr. Alford, in *East Ramapo*. The Second Circuit rejected this argument noting, "[a]lthough the District on appeal claims that Dr. Barreto failed to preserve 'a spreadsheet whose rows identified voters by surname, address, and race probabilities' needed to replicate his analysis, the district court found that Dr. Barreto credibly testified that no such spreadsheet exists. Dr. Barreto explained that no 'interim printout of BISG race estimates'

---

[7] These packages also have publicly available tutorials showcasing their application. *Id.*

[8] At no point did the Court order Plaintiffs to produce the intermediate probability results regarding voter race or ethnicity. Br. at 12-13, *see also* ECF Minute Entries.

existed because '[t]hose are just generated in the background of the [WRU] program, and as those BISG estimates get generated, they then just get plugged into the precincts and then the precinct analysis is done.'" *Clerveaux,* 984 F.3d at 234.

Moreover, intermediate probability results are not necessary to replicate Plaintiffs' BISG analysis. They are not specifically created by Dr. Barreto nor is it normal practice to save this temporary file. *See* Doc 170 at 3 *and Clerveaux*, 984 F.3d at 234. Defendants are more than capable of producing those results when recreating the BISG analysis. The Court itself noted during the discovery dispute hearings in May that these intermediate outputs can and should be something the Defendants' experts create and save during their own replication. Indeed, Dr. Barreto and Mr. Rios, during their video tutorial for Drs. Alford and Stevenson, even explained and recreated the process in which the probability inputs are run. Exhibit 13 at 50:00 to 52:00.

This is not a scenario where Plaintiffs are asking Defendants to simply guess as to what Dr. Barreto or Mr. Rios will testify to at trial. *Compare Cadena v. El Paso County*, 2017 WL 11621471, at *4 (W.D. Tex. Aug. 11, 2017). Their conclusions and methods have been detailed as thoroughly as possible through their report, deposition testimony, dispute hearings, and meetings between experts. No critical underlying data (Br. at 16), indeed no data at all, is being withheld from Defendants. All of the data files came from the government. The information Defendants had in their possession since April 14, 2023, if not earlier, is all the data that Dr. Barreto and Mr. Rios considered in forming their opinion, thus satisfying what is required by Fed. R. Civ. P. 26(a)(2)(B)(ii). Dr. Barreto and

Mr. Rios have since then provided scores more than what is necessary to recreate their analysis.

Lastly, the "drastic and harsh" sanction of exclusion that Defendants seek was not even granted to parties with dilatory motives in the cases cited by Defendants. *See Current v. Atochem North America, Inc.,* 2001 WL 36101282, at *5 (W.D. Tex. 2001). Here, there were no dilatory motives from Dr. Barreto and Mr. Rios, and they have supplied all the data on which they relied. The *Clerveaux* case makes clear that the process Dr. Barreto utilized here is part of his normal practice, and the normal practice of political scientists conducting this analysis. Dr. Alford by now knows the same.

### D. Defendants Efforts to Strike Dr. Barreto and Mr. Rios' BISG Analysis are simply bad faith attempts to exclude information harmful to their defense.

BISG can be a superior methodology for determining the presence of racially polarized voting necessary to satisfy the second and third *Gingles* preconditions, as it utilizes the actual voter file instead of simply those eligible to vote. *E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d at 387; *see also Clerveaux,* 984 F.3d at 236. This superiority, rather than any untimely or incomplete production of data by Plaintiffs, is why Defendants now seek to exclude the BISG analysis.

Defendants' actions illustrate their bad faith intentions. As discussed, Defendants intentionally delayed providing Plaintiffs with the voter file, knowing that it is key in performing a BISG analysis. Further, although Defendants requested Court intervention in obtaining the script they claim was missing, their current actions show they only ever sought exclusion of the BISG analysis. Defendants continuously thwarted attempts by

Plaintiffs' experts to aid their replication of the BISG analysis. After the discovery dispute in front of the Court on May 15, 2023, Plaintiffs scheduled a meeting between the experts that same day. Exhibit 17 at 4-8. During the meeting, both counsel for Defendants and Dr. Alford repeatedly and purposefully interrupted any conversation geared toward resolution of the confusion regarding BISG between Dr. Barreto and Dr. Stevenson. *See* Exhibit 10 at ¶5. Defendants then rejected Dr. Barreto's offer to continue to walk Dr. Stevenson through the replication and never followed up on his offer for further meetings between the experts. *Id* at ¶5, 9.

At a follow up hearing with the Court on May 18, 2023, only when the Court proposed a video recording of a meeting between the experts alone did Defendants first mention having the BISG analysis excluded. Nonetheless, on May 31, Dr. Barreto and Mr. Rios spent time walking Dr. Stevenson and Dr. Alford through the BISG process and followed up, sending them all requested information. Exhibits 13 and 14 and Doc 193-6.

After spending weeks arguing this issue and expending judicial resources, Defendants now seek to have the BISG analysis struck—the plan all along. Defendants claim, "the Court should not afford Dr. Barreto an opportunity to cure the defects of his rebuttal report." Br. at 18. However, Defendants insisted on Dr. Barreto "curing" any alleged defects for the several weeks. Defendants change their tune without explanation, and it remains unclear why they are still unable to replicate the BISG analysis. Nor do they point to any specific information they are missing. Rather, they mimic the same complaints that prior courts have already found unpersuasive. *Clerveaux* 984 F.3d at 226.

Defendants had everything they needed to replicate Dr. Barreto and Mr. Rios' BISG analysis since at least April 14, 2023. Drs. Oskooii and Walker's declarations, as well as Dr. Alford's and Dr. Stevenson's prior testimony in *Clerveaux* confirms this. Since April, Plaintiffs have complied with every order by the court and Defendants have received multiple recreated scripts and a private step by step tutorial geared towards guiding Drs Alford and Stevenson in replicating the BISG analysis. Yet Defendants still refuse to do so. This illustrates Defendants true intentions. This Court should deny their motion to exclude.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion for Summary Judgment.

Respectfully submitted this 7th day of June, 2023.

*/s/ Bernadette Reyes*

Bernadette Reyes*
Sonni Waknin*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
bernadette@uclavrp.org
sonni@uclavrp.org

Neil G. Baron
Law Office of Neil G. Baron
1010 E Main Street, Ste. A
League City, TX 77573
(281) 534-2748
neil@ngbaronlaw.com

Chad W. Dunn (Tex. Bar No. 24036507)
Brazil & Dunn
1900 Pearl Street
Austin, TX 78705
(512) 717-9822
chad@brazilanddunn.com

Mark P. Gaber*
Simone Leeper*
Valencia Richardson*
Alexandra Copper*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
sleeper@campaignlegal.org
vrichardson@campaignlegal.org
acopper@campaignlegal.org

*admitted pro hac vice

Counsel for Petteway Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that on July 7, 2023, the foregoing document was filed electronically and served on all parties of record via CM/ECF.

/s/Bernadette Reyes
Bernadette Reyes
