# Exhibit 13

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      GALVESTON DIVISION

 3

    HONORABLE TERRY PETTEWAY,      §
 4  et al.,                        §
            Plaintiffs,            §
 5                                 §
                                   §   CIVIL ACTION
 6  VS.                            §   NO. 3:22-cv-00057
                                   §
 7  GALVESTON COUNTY, et al.       §
            Defendants.            §
 8

 9        -------------------------------------------

10             ORAL AND VIDEOTAPED DEPOSITION OF

11                      CHERYL JOHNSON

12                    FEBRUARY 28, 2023

13        -------------------------------------------

14

15        ORAL AND VIDEOTAPED DEPOSITION of CHERYL JOHNSON,

16  produced as a witness at the instance of the Plaintiff(s)

17  and duly sworn, was taken in the above-styled and

18  numbered cause on February 28, 2023, from 9:10 a.m. to

19  5:28 p.m., before Molly Carter, Certified Shorthand

20  Reporter in and for the State of Texas, reported by

21  machine shorthand, with all attendees appearing remotely,

22  pursuant to the Federal Rules of Civil Procedure.

23

24

25
```

2

1    A P P E A R A N C E S

2


3    FOR THE NAACP PLAINTIFF(S):
         Ms. Kathryn Carr Garrett
4        Ms. Molly Linda Zhu
         Mr. Andrew Silberstein
5        Mr. Richard Mancino
         WILLKIE FARR & GALLAGHER LLP
6        787 Seventh Avenue
         New York, New York 10019-6099
7        (212) 728-3924
         kgarrett@willkie.com
8        mzhu@willkie.com
         asilberstein@willkie.com
9        rmancino@willkie.com

10       Ms. Diana C. Vall-Llobera
         WILLKIE FARR & GALLAGHER LLP
11       1875 K Street, N.W.
         Washington, DC 20006-1238
12       (202) 303-1157
         dvall-llobera@willkie.com

13
         Ms. Sarah Xiyi Chen
14       TEXAS CIVIL RIGHTS PROJECT
         1405 Montopolis Drive
15       Austin, Texas 78741
         (512) 474-5073
16       schen@texascivilrightsproject.org


17
     FOR THE PETTEWAY PLAINTIFF(S):
18       Ms. Alexandra Copper
         Ms. Valencia Richardson
19       Mr. DaWuan Norwood
         CAMPAIGN LEGAL CENTER
20       1101 14th St. NW, Suite 400
         Washington, DC 20005
21       (619) 248-4903
         acopper@campaignlegalcenter.org
22       vrichardson@campaignlegalcenter.org

23

24

25

                                                                      3

 1          Ms. Bernadette Samson Reyes
            Ms. Sonni Waknin
 2          UCLA VOTING RIGHTS PROJECT
            3250 Public Affairs Building
 3          Los Angeles, California 90095
            (310) 400-6019
 4          bernadette@uclavrp.org
            sonni@uclavrp.org
 5

 6     FOR THE UNITED STATES OF AMERICA:
            Mr. Zachary Newkirk
 7          U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION
            DOJ-Crt
 8          150 M Street NE
            Washington, DC 20002
 9          (202) 307-2767
            zachary.newkirk@usdoj.gov
10
            Ms. Catherine Meza
11          DOJ-Crt
            U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION
12          950 Pennsylvania Avenue NW, Suite 4con
            Washington, DC 20530
13          (202) 307-2767
            catherine.meza@usdoj.gov
14

15     FOR THE DEFENDANT(S) GALVESTON COUNTY, TEXAS:
            Ms. Angela Olalde
16          GREER HERZ ADAMS LLP
            2525 South Shore Boulevard, Suite 203
17          League City, Texas 77573
            (409) 797-3262
18          aolalde@greerherz.com

19          Ms. Jordan Raschke Elton
            Mr. Joseph R. Russo, Jr.
20          GREER HERZ & ADAMS, LLP
            One Moody Plaza, 18th Floor
21          Galveston, Texas 77550
            (409) 797-3200
22          jraschke@greerherz.com
            jrusso@greerherz.com
23

24

25

4

1        Mr. Mateo Forero
         HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2        2300 North Street NW, Suite 643
         Washington, DC 20037
3        (202) 868-9709
         mforero@holtzmanvogel.com

4


5

    ALSO PRESENT:
6        Mr. Christopher Archie, Videographer
         Mr. Thomas Munk, Concierge Tech
7        Ms. Samantha Perlman, Legal Intern

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                          I N D E X

2

     Appearances ........................................   2
3

4    CHERYL JOHNSON
           Examination by Ms. Garrett ....................   9
5          Examination by Ms. Copper ..................... 134
           Examination by Mr. Newkirk .................... 179
6          Examination by Ms. Olalde ..................... 229

7

8

9

10

11

12

13                          EXHIBITS

14   NUMBER      DESCRIPTION                            PAGE

15   Exhibit 1   ........................................  40
                 Cheryl Johnson Campaign Website
16
     Exhibit 2   ........................................  62
17               1/14/21 Email Correspondence Re: County
                 Commissioner and JP/Constable Precinct
18               Lists with Current Number Registered
                 Voters
19
     Exhibit 3   ........................................  71
20               4/8/21 Email Correspondence Re: Old
                 Commissioner Precinct Maps
21
     Exhibit 4   ........................................  74
22               8/13/21 Email Correspondence with
                 Galveston County Commissioner Precinct
23               Voters Spreadsheet

24   Exhibit 5   ........................................  77
                 5/20/21 Email Correspondence Re: Asked
25               and Answered!

1     Exhibit 6    ..................................... 80
             5/20/21 Email Correspondence Re:
2            Redistricting Information

3     Exhibit 7    ..................................... 89
             8/24/21 Email Correspondence Re: Current
4            Voter Count by Precinct

5     Exhibit 8    ..................................... 90
             9/23/21 Email Correspondence Re:
6            Continuing Our Work

7     Exhibit 9    ..................................... 94
             10/22/21 Email Correspondence Re: Voters
8            in County by Precinct

9     Exhibit 10   ..................................... 95
             11/3/21 Email Correspondence Re:
10           Redistricting Scheduling

11    Exhibit 11   ..................................... 99
             8/27/21 Email Correspondence Re: Gearing
12           Up for Redistricting

13    Exhibit 12   .....................................108
             11/9/21 Email Correspondence Re:
14           Legislation Statuses & Redistricting

15    Exhibit 13   .....................................159
             2/21/20 Tweet
16
      Exhibit 14   .....................................161
17           2/23/20 Tweet

18    Exhibit 15   .....................................161
             2/22/20 Article from The Daily News,
19           "Johnson: Peden Ad 'Racist,'
             'Discriminatory' and 'a Lie'"
20
      Exhibit 16   .....................................169
21           1/8/18 Article from Big Jolly Politics,
             "Cheryl Johnson at Odds with Galveston
22           County Judge Mark Henry

23    Exhibit 17   .....................................200
             11/10/21 Email Correspondence Re:
24           Legislation Statuses & Redistricting

25

```
 1    Exhibit 18    .......................................205
                    11/12/21 Email Correspondence Re: Map 1
 2                  and 2 Breakdown

 3    Exhibit 19    .......................................210
                    11/15/21 Email Correspondence Re:
 4                  Precinct List with Lots of Info

 5    Exhibit 20    .......................................210
                    DEFS00016755 Spreadsheet
 6
      Exhibit 21    .......................................217
 7                  11/19/21 Email Correspondence Re:
                    Permission to Proceed with Included
 8                  Precinct Changes (Step One)

 9    Exhibit 22    .......................................222
                    11/15/21 Email Correspondence Re: Update
10                  Again!

11    Exhibit 23    .......................................226
                    10/26/21 Email Correspondence Re: Kudos
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

8

```
 1              THE VIDEOGRAPHER:  We are going on the record

 2     at 9:10 a.m., February 28, 2023.  This is Media Unit 1 of

 3     the video-recorded deposition of Cheryl Johnson, taken by

 4     counsel for Plaintiff in the matter of Honorable Terry

 5     Petteway, et al., versus Galveston County, Texas, et al.,

 6     filed in the United States District Court for the

 7     Southern District of Texas, Galveston Division, Case

 8     Number 3:22-CV-00057.

 9              My name is Christopher Archie, representing

10     Veritext, and I'm the videographer.  The court reporter

11     is Molly Carter for the firm Veritext.

12              Counsel and all present, including remotely,

13     will now state their appearances and affiliations for the

14     record, beginning with the noticing attorney.

15              MS. GARRETT:  This is Kathryn Garrett, here on

16     behalf of NAACP Plaintiffs.

17              MS. COPPER:  This is Alexandra Copper, here on

18     behalf of Petteway Plaintiffs.

19              MR. NEWKIRK:  Hi.  This is Zach Newkirk on

20     behalf of the United States.

21              MS. OLALDE:  Angie Olalde, Jordan Raschke Elton

22     and Mateo Forero on behalf of Defendants.

23              THE VIDEOGRAPHER:  Okay.  If that's everyone,

24     will the court reporter please swear in the witness, and

25     counsel may proceed.
```

9

1                        CHERYL JOHNSON,

2    having been first duly sworn, testified as follows:

3                    E X A M I N A T I O N

4    BY MS. GARRETT:

5         Q    Good morning, Ms. Johnson.  I appreciate your

6    time today.  My name is Kathryn Garrett and I'm one of

7    the lawyers representing the NAACP Plaintiffs in this

8    case.

9              Could you please state your name and full

10   name -- or please state and spell your full name for the

11   record?

12        A    Cheryl Johnson, C-H-E-R-Y-L, Johnson,

13   J-O-H-N-S-O-N.

14        Q    Have you ever given testimony in a deposition

15   before?

16        A    Not that I recall.

17        Q    Have you ever given testimony in court before?

18        A    Yes.

19        Q    So you have a bit of an understanding of what

20   we're doing here today.  You have been sworn in and are

21   under oath to give accurate and truthful testimony today

22   just as if you were in court.

23              Before we begin our conversation, I want to go

24   over a few ground rules for how this deposition will

25   proceed.  If you have any questions, please let me know.

```
 1                 Today we have Molly Carter as our court
 2      reporter.  She will be making a transcript of everything
 3      that occurs on the record today.  To help make her job
 4      easier and to help ensure an accurate record, I ask that
 5      you give oral responses to all of my questions as opposed
 6      to non-oral responses such as nodding or shaking your
 7      head.  Do you agree to do that?
 8          A    Yes.
 9          Q    First, if I ask you a question and you answer
10      it, I will assume that you have understood the question.
11      Fair enough?
12          A    Yes.
13          Q    If you aren't sure if you understand my
14      question, please feel free to ask me and I will clarify
15      or rephrase my question.
16                 It's also important that we not interrupt or
17      talk over each other.  I'll do my best not to interrupt
18      you when you are speaking, and in return, I ask that you
19      wait until I finish my question before answering.
20                 In addition, if your lawyer decides to object
21      to any of my questions, they will want to do so before
22      you answer.
23                 Do you agree to do that?
24          A    Yes.
25          Q    I'm going to ask you some questions that take
```

11

1    us back in time.  Other than the passage of time, is

2    there any reason you can think of why you would not be

3    able to accurately recall things that have happened in

4    the past?

5         A    No.

6         Q    You are not on any medication that may affect

7    your memory today; is that right?

8         A    That's right, I'm not.

9         Q    And you are not under the influence of anything

10   that may affect your memory today?

11        A    No, I am not.

12        Q    As mentioned, your lawyer may object to some of

13   my questions.  Unless they instruct you not to answer,

14   you still do have to answer the question.  Does that make

15   sense?

16        A    Yes.

17        Q    Other to -- other than to consult with your

18   attorney about issues of privilege, you cannot

19   communicate with anyone else about the questions I am

20   asking or about your testimony.  Do you understand that?

21        A    Yes.

22        Q    Is there anybody else in the room with you

23   today?

24        A    Yes.

25        Q    Who is in the room with you today?

12

1          A     Angie, Jordan and Zach.

2          Q     Also, please make sure that your cell phone is

3     turned off and that you're not able to see or view

4     notifications during the deposition.

5                You are not allowed to consult any written,

6     printed or electronic information unless that information

7     is provided to you by me or others -- or other attorneys

8     asking questions today during the deposition.

9                Do you agree to do that?

10         A     Yes.

11         Q     With that, do you have any documents in front

12    of you today?

13         A     No, I do not.

14         Q     If you need a break at any point during the

15    deposition, please let me know and we will accommodate

16    that.  Please note that if I have just asked you a

17    question, I will ask you to respond before we take that

18    break.

19               And as a final note, this case is consolidated

20    with cases brought by Terry Petteway and other

21    individuals, as well as the Department of Justice,

22    against Galveston County in the Southern District of

23    Texas.  Both the Department of Justice and counsel for

24    the Petteway Plaintiffs will have an opportunity to ask

25    you questions later today as well.

13

1          So our first question for you, how long have

2     you lived in Galveston County?

3          A    Since 1983.

4          Q    Where did you grow up?

5          A    Actually, I've been in Galveston County since

6     1999.

7          Q    Where did you grow up prior to moving to

8     Galveston County?

9          A    I grew -- I was born in New Jersey, and I grew

10    up there and in Pennsylvania.

11         Q    Are you affiliated with or a member of any

12    local Galveston County organizations?

13         A    Yes.

14         Q    Which ones?

15         A    The Santa Fe, Galveston, League City and

16    Hitchcock Chambers of Commerce, the Galveston Republican

17    Women and the Texas Gulf Coast Republican Women.  I'm

18    also associated with the Texas Assessor-Collectors

19    Association.

20         Q    For how long have you been a member of those

21    organizations?

22         A    Various amounts of time.

23         Q    Which one have you been a member of for the

24    longest period of time?

25         A    The Chambers of Commerce.

14

1          Q     Do you hold positions within these

2    organizations?

3          A     No, I do not.

4          Q     How much time do you devote to these

5    organizations generally?

6          A     Typically an -- an hour a month.

7          Q     For each or total?

8          A     For each, depending on their meeting schedules.

9          Q     Are you at all affiliated with the NAACP?

10         A     No, I am not.

11         Q     Are you affiliated with LULAC, the League of

12   United Latin American Citizens?

13         A     Would you repeat the question?

14         Q     Yes.  Are you affiliated with LULAC?

15         A     No, I am not.

16         Q     Can you describe your educational background?

17         A     I am a professional certified collector and a

18   certified tax office professional through the TACA, which

19   is the Texas Association -- or Assessor-Collectors

20   Association.  I formally had a license with TDLR as a

21   Texas assessor-collector.  I am a previous real estate --

22   licensed real estate agent in both Texas and

23   South Carolina.  I have an associate's degree from

24   San Jacinto College.

25         Q     What did you study or what was your associate's

1    degree in?

2         A    Business administration.

3         Q    Any education beyond the associate's degree,

4    and the other licenses and certifications you mentioned?

5         A    I've had over 300 hours in continuing education

6    as a licensed real estate agent at various institutions,

7    including University of North Carolina and Baylor

8    College.

9         Q    What was your first job after you earned your

10   associate's degree?

11        A    I was the director of information services at

12   the Galveston Central Appraisal District.

13        Q    What other jobs did you work after that?

14        A    Tax assessor-collector.

15        Q    And is that your current job in Galveston

16   County that you're referring to?

17        A    Yes, ma'am.

18        Q    So to confirm, did you have any other jobs

19   prior to your current job, other than the ones you've

20   already mentioned?

21        A    I've had prior jobs throughout my life.

22        Q    What were some of those jobs?

23        A    I was a real estate appraiser both in Texas and

24   in South Carolina.  I've had a small business doing

25   demographic work for a short time period.  And I've

16

```
1    worked in a variety of real estate-related fields,

2    including architectural firms, real estate offices and

3    real estate appraisal firms.

4         Q    Can you tell me about -- a little bit more

5    about the small business that you mentioned?

6         A    It was called Demographic Profile Associates.

7    It was strictly information that we would gather to

8    assist governments with writing grants.

9         Q    And for what years did you have that small

10   business?

11        A    I believe it was 2001 and '02.

12        Q    And where was that business located?

13        A    We worked from our homes.

14        Q    And which -- you mentioned that you provided

15   information to government entities; is that right?

16        A    Yes, ma'am.

17        Q    Which government entities did you provide that

18   information to?

19        A    The City of Bay City was our primary

20   governmental entity that we assisted with -- with

21   demographic work for grants.

22        Q    And what kind of demographic information did

23   you collect?

24        A    Typically census data.

25        Q    And then what would you do with that census
```

17

1    data when you -- how did you process it to give it to

2    different various government entities?

3         A    We would put it into charts and graphs, and

4    sometimes summarize in paragraph form, depending on what

5    their needs were.

6         Q    What were some of those needs that they had?

7         A    Obtaining grants from the federal government.

8         Q    So today you work for Galveston County; is that

9    right?

10        A    I work for the voters of Galveston County.

11        Q    Voters of Galveston County.  And how long have

12   you worked for the voters of Galveston County?

13        A    18 years.

14        Q    And what is your job title?

15        A    Galveston County tax assessor-collector.

16        Q    Do you have any other titles?

17        A    I'm also voter registrar.

18        Q    How do those two roles or job titles overlap?

19        A    By virtue of being the tax assessor-collector,

20   I am the voter registrar.

21        Q    And how did you get that job?  Did you apply

22   for it?

23        A    No.  I ran for public office.

24        Q    When were you first elected?

25        A    2004.

1          Q     And how many times have you been elected?

2          A     I -- I don't remember.   I guess eight times.

3    I've served 18 years, so six times.

4          Q     When were you last elected?

5          A     2020.

6          Q     Did you run opposed in that election?

7          A     In the primary, yes.

8          Q     In the primary.   And which primary was that?

9          A     The Republican primary.

10         Q     Have you always been a member of the Republican

11   party?

12         A     No.

13         Q     When did you become a member of the Republican

14   party?

15         A     You become a member of a party by virtue of

16   running for office in that primary or by voting in that

17   primary in Texas.

18         Q     Have you always run as a Republican in

19   elections?

20         A     No.   When I was on the school board, it was a

21   nonpartisan position.

22         Q     To what extent were you involved in politics

23   prior to your current job?

24         A     I was on the school board in Clear Creek ISD

25   for two terms -- three terms.

19

1          Q     Do you hold any titles or positions within the

2     Republican party?

3          A     No.

4          Q     How often do you attend GOP meetings as it

5     relates to your -- or do you -- how often do you attend

6     GOP meetings, if you attend?

7          A     I've never necessarily attended a GOP meeting.

8          Q     In general, can you describe your 2020 campaign

9     process?

10         A     The process?  You sign up the December before

11    to run in the primary, which I did, and you run in the

12    primary.  And I was unopposed in the November election.

13         Q     Did you hold or conduct any events as part of

14    that campaign?

15         A     Yes, ma'am.

16         Q     Which events did you hold?

17         A     Probably too many to recall all.  Campaign

18    fundraisers predominantly.  Town hall meetings.  I

19    attended candidate forums.

20         Q     Did you campaign in any majority or minority

21    neighborhoods?

22         A     I don't recall.

23         Q     Did you meet with any community groups?

24         A     Not that I recall specifically.  If a group had

25    a forum, I certainly attended.

1      Q     Did the 2011 redistricting cycle come up during

2   your 2020 campaign at all?

3      A     Not that I recall.

4      Q     So as the Galveston County tax

5   assessor-collector, what are your responsibilities

6   generally?

7      A     I assess, which is calculation, and collect

8   taxes on properties in both Galveston and Harris

9   counties.  For 36 jurisdictions, I am the voter

10  registrar.  We also work on behalf of the -- the

11  Secretary of State in that capacity.  The Texas

12  Department of Motor Vehicles performing registration and

13  titling services.  Texas Parks and Wildlife performing

14  licensing of water vessels.  Texas Alcoholic Beverage

15  Commission processing liquor licenses.  And that's

16  basically all that I recall off the top of my head.

17     Q     You mentioned that the voter registrar works

18  with the Secretary of State, is that right --

19     A     Yes.

20     Q     -- in your role as voter registrar?

21     A     Yes.

22     Q     And does that -- is it -- what is your role

23  with the redistricting process specifically for the

24  commissioners precinct lines, either as voter registrar

25  or tax assessor-collector?

21

1          A     Our primary function is to receive changes that

2     are made to various -- various election precincts and

3     implement those changes into the TEAM, Texas Election

4     Administration Management system, that we are associated

5     with through the Secretary of State.  So predominantly

6     and pretty much solely, it's updating boundaries as they

7     are provided -- updating the entitlements associated with

8     the boundaries that are adopted by the local governments.

9          Q     Have you used the TEAM system for the full

10    duration of your time with Galveston County?

11         A     The Secretary of State performed an update into

12    TEAM, I believe, in 2006 or '07.  The prior system was

13    TDRS.  And before that the county had a private software

14    company.  I believe it was Netdata.

15         Q     Do you have a say or an opinion in how any of

16    those boundaries are drawn?

17         A     No, ma'am.

18         Q     Does your office collect voter data with

19    respect to any racial demographics of voters in Galveston

20    County?

21         A     Only when required by the Secretary of State.

22         Q     Under what circumstances does the Secretary of

23    State require that data to be collected?

24         A     It's actually extracted from the TEAM system.

25    And I bel- --- I'm not certain how they identify what

22

1    is -- how -- how those are all specified.

2        Q    Does your office collect voter data with

3    respect to any socioeconomic demographics of voters in

4    Galveston County?

5        A    No.

6        Q    Does your office collect voter data with

7    respect to any political demographics of voters in

8    Galveston County?

9        A    The only process would be if we are requested

10    through open records request to provide voters in the

11    Democrat or Republican primary elections.

12        Q    So of this -- of any voter data that you

13    collect, who is this information shared with?

14        A    Whoever the requester is in the open records

15    request.

16        Q    Have any of the Galveston County commissioners

17    or county judge requested this voter data information

18    from you?

19            MS. OLALDE:  Objection, overbroad in regards to

20    what time you're talking about.

21            MS. GARRETT:  I can rephrase.

22        Q    (By Ms. Garrett) During the 2021 redistricting

23    cycle, did any of the commissioners or Judge Mark Henry

24    request any voter data from your office?

25        A    Not that I recall.

23

1          Q      How do you communicate with localities in

2    Galveston County on their redistricting?

3          A      Typically through emails and only as a planning

4    process, part of a planning process.

5          Q      Can you describe that planning process a little

6    bit more?

7          A      In anticipation of -- since receipt of census

8    data, we have multiple jurisdictions that have single

9    member districts, and I will reach out to them to have --

10   ask them to share their schedules, what their timelines

11   might be, so that I can properly staff my office and

12   obtain funding, if necessary, through commissioners to

13   perform whatever changes we're going to have to make to

14   the entitlements and the boundaries that they adopt.

15         Q      So you mentioned hiring, or bringing in staff.

16   Where do you pull in staff members from?  Do you hire

17   temporary staff?  Do you bring them in from other parts

18   of your office?  What do you mean by bringing in staff or

19   working on staff?

20         A      In some instances it's bringing in current

21   staff.  We've had the same problem as everybody else in

22   the country hiring temporary workers, but predominantly

23   we advertise for temporary workers 24/7 on the county

24   website.

25         Q      And that's 24/7 just during redistricting or --

24

```
 1          A    Year-round.

 2          Q    -- as a general rule?  Year-round?

 3          A    As a general rule.

 4          Q    And then you mentioned funding.  What

 5   funding -- the fund -- what are the funding sources that

 6   your office seeks for redistricting?

 7          A    That would be through county commissioners and

 8   the budget process.

 9          Q    Who typically sets that budget?

10          A    The county commissioners.

11          Q    Do you get to express an opinion about what

12   that budget should be?

13          A    I submit a requested proposed budget to them.

14          Q    And how often do you submit a requested budget

15   proposal?

16          A    Annually.  Sometimes it has to be revised and

17   we submit additional requests up until they actually

18   adopt the budget, if necessary.

19          Q    And is that around a similar time each year,

20   the same month every year you submit that?

21          A    Yeah.  Typically begins in April.

22          Q    And then what information do you typically need

23   to put that budget together?

24          A    95 percent of my budget is staffing, and so we

25   project -- we look at projections, look at history and
```

                                                                    25

1       projections on the work that we anticipate through the

2       next year and try to set that budget.  Sometimes it's --

3       at different times we have to hire vendors to assist us.

4       For example, this year is mass mailout, so we will seek a

5       vendor to help us fund the mass mailout of voter

6       registration certificates that will occur later this

7       year.

8            Q    Can you describe the people that are in your

9       office?

10               MS. OLALDE:  Objection, vague.

11           Q    (By Ms. Garrett) How many people work in your

12      office?

13           A    Counting myself, 53.

14           Q    Of those 53, how many people do you directly

15      supervise?

16           A    I have direct contact with two chief deputies

17      daily, but also a support services team.

18           Q    And are they all full-time staff?

19           A    Yes.

20           Q    How often do you meet with those that you

21      directly supervise?

22           A    Daily.

23           Q    Are those individuals involved in

24      redistricting?

25           A    I beg your pardon?  Would you repeat the

26

```
 1    question?

 2         Q    Sure.  Are those individuals that you supervise

 3    involved in redistricting?

 4              MS. OLALDE:  Objection, vague.

 5              You can answer.

 6              THE WITNESS:  I can answer?

 7              MS. OLALDE:  Uh-huh.  Any time I make an

 8    objection, unless I'm instructing you not to answer, you

 9    can answer --

10              THE WITNESS:  I can answer, okay.

11              MS. OLALDE:  -- to the extent you understand

12    her question.

13         A    The chief deputy of business services oversees

14    voter registration, and so her and I work together on

15    performing the entitlement changes.  The support services

16    staff assist in the auditing once changes are made in the

17    system, and that's three individuals.

18         Q    (By Ms. Garrett) Does anyone supervise you?

19         A    The voters of Galveston County.

20         Q    How do you typically communicate with the other

21    individuals in your office?

22         A    In person, frequently through email.  I have

23    four different locations -- three different locations

24    outside of Galveston and two satellite offices, so email

25    is the primary source of communication with office staff.
```

27

1       Q    How many emails do you have?  Do you use your

2    personal email for work at all?

3       A    I do my very best not to use my personal email

4    for work.

5       Q    Do you ever text with members of your staff?

6       A    Yes, we have county cell phones and we will

7    text each other occasionally, predominantly during

8    disasters when we cannot communicate effectively any

9    other way.

10      Q    And then you mentioned that you work with two

11   chief officers daily; is that right?

12      A    Would you repeat that?  I'm sorry.

13      Q    Is it -- am I accurate in saying that you work

14   with two chief officers on a daily basis in your office?

15      A    Chief deputies on a daily basis, if not in

16   person, then via telephone or email.

17      Q    And what are their names?

18      A    LaTonya Dominic is the chief deputy of property

19   tax and support services, and Kathleen Moreno is the

20   chief deputy of business services.

21      Q    So you mentioned that in your role as voter

22   registrar, you work with the Texas Secretary of State.

23   Could you describe a little bit more about that

24   relationship?

25      A    Predominantly, we receive directives from them.

28

```
 1    We attend annual conferences.  Some of us attend annual
 2    conferences, after -- typically at the end of summer
 3    after legislative session is when most of us attend
 4    those.  Predominantly, directives we receive via email,
 5    and then they provide work to my staff, my voter
 6    registration department staff and what's called the task
 7    summary screen system of TEAM.  We're an online county
 8    with the Secretary of State.
 9         Q    How often do you correspond with the Texas
10    Secretary of State?
11         A    As often as they correspond with me.
12         Q    How often is that, typically, on an average
13    basis?
14         A    It depends on what's going on.  During
15    elections, it's frequently.  Over the last several weeks,
16    they've been holding webinars and sending out -- out
17    schedules pretty regularly, a couple of times a week.
18         Q    In 2021, did you keep track of the state
19    legislature's actions in conducting statewide
20    redistricting?
21         A    Not really.  It became too delayed.  It was
22    very hard to keep up with.
23         Q    What were the reasons for that delay?
24         MS. OLALDE:  Objection, calls for speculation.
25         To the extent you know, you can answer.
```

29

1          A      The census data was late this year -- or in

2     2021.  2020 census data was not released until later than

3     typical.

4          Q      (By Ms. Garrett) Have you ever used your

5     personal email for work?

6          A      Occasionally to send files so that I can print

7     them on the home printer if I'm working from home.

8          Q      So you would use it to email yourself but not

9     others.  Is that accurate?

10         A      I would say that that's accurate.

11         Q      When did you first learn about this litigation?

12         A      Which litigation?  The 2011 redistricting?  I

13    think they all were rolled together.

14         Q      This current litigation that we are in this

15    deposition for.

16         A      Whenever the newspaper put it in the --

17    whenever it was published in the newspaper as a news

18    article, and I do not recall when that was.

19         Q      Did you read that news article pretty shortly

20    after it was published?

21         A      I do not recall.  I would have -- I receive the

22    paper daily.

23         Q      What news sources do you typically consult?

24         A      Do I consult?  The Galveston Daily News is a

25    local paper.  The Post is another local newspaper.  As

30

1    far as news sources that I consult, I watch the morning

2    news.  I watch sometimes the evening news.  I

3    occasionally receive smart news on my tablet.

4         Q    Other than from the news, did you hear about

5    this litigation from anyone else?

6              MS. OLALDE:  Objection, overbroad.

7              You can answer.

8              THE WITNESS:  I can answer?

9              MS. OLALDE:  Sure.

10        A    Not that I recall specifically.

11        Q    (By Ms. Garrett) Are you familiar with the

12   allegations in this litigation?

13        A    Not specifically.

14        Q    You mentioned that you've provided testimony in

15   court before; is that right?

16        A    Yes, ma'am.

17        Q    Under what circumstances did you provide that

18   testimony?

19        A    It was a lawsuit, I believe, in 2012 in federal

20   court in which I was named along with the Secretary of

21   State.  I believe the Plaintiff was Voting for America.

22        Q    And what was that case about?

23        A    The legislature had adopted rules and

24   regula- -- or laws for volunteer deputy registrars, and I

25   had worked with various legislators on passage of that

1    legislation.

2         Q    And which legislation was at issue in that

3    case?

4         A    I don't remember specifically the chapters of

5    the election code, but it would have been pertaining to

6    volunteer deputy registrars.

7         Q    Did you meet with anyone to prepare for this

8    deposition?

9         A    The attorneys that are present in this room,

10   Angie and Jordan.

11        Q    How many times did you meet with them?

12        A    Twice.

13        Q    And for how long did you meet with them?

14        A    I think a couple of hours on one day and maybe

15   four hours the next day.

16        Q    And how long ago was that?

17        A    Last week.

18        Q    And was anybody else in the room when you met

19   with your attorneys?

20        A    Angie was in the room.  Others attended via

21   Zoom.

22        Q    Who else was on Zoom when you met with Angie in

23   preparation for this deposition?

24        A    I'm not sure I know the names of everybody.

25   Jordan, Mytelka --

32

```
 1              MS. OLALDE:  Kathryn, I can represent to you

 2     that it was only attorneys speaking with Ms. Johnson, if

 3     that helps.  She may not remember all the names.

 4          A    I don't remember all the names.  I'm not

 5     sure who's -- I may have been introduced to everybody,

 6     but I don't recall.

 7          Q    (By Ms. Garrett) Are you aware that other

 8     individuals have been deposed in this matter?

 9          A    I have been told that, yes.

10          Q    Did you speak with any of those individuals

11     about their testimony?

12          A    I did not speak with them about their

13     testimony.

14          Q    Did you review any documents in preparation for

15     this deposition?

16          A    Only those that were presented as exhibits by

17     Angie.

18          Q    What types of documents did you review?

19          A    There were news articles.  I think that was the

20     predominant, I guess, column I had written.  Some emails.

21          Q    How did you review these documents?  Did you

22     see them on a screen?  Were they on paper?

23          A    They were on paper.

24          Q    Did these documents refresh your memory of

25     events and conversations?
```

33

1       A    Yes, they did.

2       Q    Which documents refreshed your recollection of

3   the events and conversations?

4       A    Each of the documents that was presented

5   refreshed my memory.

6       Q    So you mentioned news articles.  Which -- what

7   was -- or what were these news articles about that you

8   reviewed?

9       A    A couple of them pertained to the primary

10  election in 2020.  Another pertained to a decision -- or

11  actually, a vote taken by the Texas Department of Motor

12  Vehicles board, of which I was a member.  And another was

13  a guest column that I had written.

14      Q    And what was that article that you wrote about?

15      A    We were receiving many phone calls from voters

16  whose voter certificates had expired and they were

17  concerned they would not be able to vote in the upcoming

18  election.  So I wrote a new information piece to inform

19  them of what was underway, what was going on, and that

20  was during the 2011 redistricting process.

21      Q    And then the emails that you reviewed, what

22  were those emails related to?

23      A    Predominantly my communications with the

24  various governments that have single member districts in

25  Galveston County that I would be assisting with changing

34

1    their entitlements upon their decisions.

2        Q   And what time period were these emails from?

3        A   I believe the first one I wrote was in December

4    2019.

5        Q   Were the articles and emails that you reviewed

6    in this -- it's probably best answered by your

7    attorney -- were these produced to Plaintiffs?

8        MS. OLALDE:  Yes, Ms. Garrett, they were.  I'm

9    sorry, rephrase your question and I'll do my best to

10   answer for you.

11        MS. GARRETT:  Rephrase?  I can rephrase.

12        Q   (By Ms. Garrett) Of the documents that

13   Ms. Johnson reviewed, were these all produced to

14   Plaintiffs?

15        MS. OLALDE:  Everything she reviewed -- I don't

16   know about the news articles, you'd have to speak with

17   Sean.  I think that's all publicly available anyway.

18        Q   (By Ms. Garrett) How else did you prepare for

19   this deposition?

20        A   I tried to get a good night's sleep and not

21   drink espresso.

22        Q   What is your office's role in commissioners

23   precinct redistricting in Galveston County?

24        MS. OLALDE:  Objection, asked and answered.

25        But you can answer.

35

1    A    I have no role in the decision-making process.

2    My role is strictly in the implementation of making the

3    changes, implementing the changes in -- in TEAM to ensure

4    that the voting precincts were properly changed.

5    Q    (By Ms. Garrett) Is that similar to statewide

6    redistricting?  Is your role similar for statewide

7    redistricting?

8    A    I'm not -- I'm not sure I understand the

9    question.

10    Q    I guess --

11    A    Could you rephrase that?

12    Q    Yes.  Let me ask it this way.  What is your

13    office's role in statewide redistricting?

14    A    We receive notification or we read in the

15    newspaper sometimes that the legislature has acted to --

16    and through the Secretary of State's emails as well, that

17    the legislature has voted to approve congressional

18    districts, House and Senate districts, and State Board of

19    Education.  And upon that notification, we have to go out

20    and seek the maps.

21    Q    What do you mean by you "have to go out and

22    seek the maps"?

23    A    Nothing was specifically provided to us, that I

24    recall.  We had to go to State of Texas websites to

25    download the PDF files of changes.

36

1        Q    So looking to specifically commissioners

2   precinct redistricting, to your knowledge, who typically

3   draws the commissioner precinct maps?

4        A    The county commissioners and county judge.

5        Q    And then to your knowledge, who selects the

6   commissioners' precinct maps?

7        A    The county commissioners and county judge.

8        Q    You mentioned that you collect PDF files of the

9   maps from the Secretary of State website; is that right?

10       A    I'm not sure they were on the Secretary of

11  State website.  I do not recall where the link was taking

12  us.

13       Q    But you went out and you sought out the map and

14  you received a PDF file; is that right?

15       A    Yes.  We would download the PDF files from

16  links that would be provided.

17       Q    And then what would you do with that PDF file?

18       A    After saving it on my computer, trying to print

19  a big enough copy that I could determine what changes

20  would need to be made to our various voting precincts in

21  order to implement those changes.

22       Q    Was that something that you did -- you

23  mentioned that you printed the file.  So in evaluating

24  the changes that need to be made, is that something you

25  did by hand or did you use a computer software program?

37

1          A    I wish I had a computer software program.  So

2     we would take the 2011 maps and compare those manually to

3     the adopted maps, and it was my job to identify the

4     changes, the areas of change, so that we could begin

5     implementation.

6          Q    How long did that typically take to make note

7     of those changes?

8          A    This last time, not very much.  Maybe

9     overnight, a couple of days.

10         Q    What was your process for manually comparing

11    the maps?

12         A    I'd look at the prior, at the time, existing

13    maps and compared them to the approved maps, the adopted

14    maps, and try to identify specific areas.  We were

15    fortunate in that the legislature moved entire election

16    or voting precincts when they made changes, so it was a

17    fairly simple process for us to identify what voting

18    precincts needed to be changed for each one of the

19    various positions.

20         Q    And again, you did this for every map that you

21    helped implement?

22              MS. OLALDE:  Objection, vague.

23         A    And I may answer that.  I'm not certain I

24    understand the question.

25              MS. OLALDE:  So any time you don't understand a

38

```
 1       question, you can ask her to --

 2                THE WITNESS:  Yes.

 3                MS. OLALDE:  -- clarify the --

 4       A    If you could clarify that.

 5       Q    (By Ms. Garrett) For which maps would you

 6       manually compare?  Which maps did you manually compare?

 7       A    The -- the 2011 maps that had been adopted and

 8       that were in place at the time to the maps that were

 9       adopted for each one of the jurisdictions, for each one

10       of the positions for the state.

11       Q    How many jurisdictions did you have to compare

12       for the state?

13       A    For the state, we looked at U.S. congressional,

14       and there were no changes in Galveston County that

15       affected us.  Texas Senate, there were no changes that

16       affected -- well, I take that back.  There could have

17       been changes to Brandon Creighton's district, the Texas

18       Senate position.  But I looked at those only as they

19       affected Galveston County.  And Texas House, there were

20       several changes for the Texas House, and there were

21       multiple changes for the State Board of Education.

22       Q    So is it the case that it's easier to manually

23       compare these maps when the voting precincts are kept

24       whole in the adopted map?

25       A    Yes.  Using the Texas Secretary of State's
```

[2/28/2023 9:00 AM] Johnson, Cheryl 20230228

39

1    redistricting module, that was the easiest method of

2    making changes.

3         Q    So once you've manually compared the maps, what

4    is the next step?

5         A    For the state level, the next step would be to

6    provide a listing of changes to Ms. Moreno, and she would

7    provide that information to the voter registration

8    personnel at the time working on those changes.

9         Q    In 2021, when did you manually compare the maps

10   and share this information with Ms. Moreno?

11        A    To clarify, are you referring to the state and

12   federal changes?

13        Q    Yes.

14        A    It would have been in December 2021.

15        Q    Did you have a deadline, a strict deadline to

16   meet for getting those -- for finishing that manual

17   comparison and sharing that information with Ms. Moreno?

18   Was there a hard deadline?

19        A    There was a hard deadline established by the

20   Secretary of State for us to mail out voter registration

21   certificates.  Those changes needed to be made in advance

22   of generating the file to send to the print vendor.

23        Q    Do you recall when that deadline was?

24        A    Without referring to that election advisory,

25   no.  I believe it was mid-January.

40

1          Q      To what extent is redistricting performed

2     in-house?

3               THE REPORTER:  In what?  I'm sorry?

4          A      We don't perform redistricting in-house.  When

5     I refer to redistricting, it is the process of receiving

6     the changes, whether in the form of maps initially, maps

7     and shapefiles, and turning those into usable --

8     comparing those to our street range list to determine

9     where the changes are that need to be made.

10              And I'm not sure I fully answered your

11     question.  If you want to repeat it, I can validate that.

12              MS. GARRETT:  Real fast, are we all set up with

13     Exhibit Share at this point?  Do we all have access to

14     Exhibit Share?

15              MS. OLALDE:  Ms. Garrett, I do, thank you for

16     asking.

17         Q      (By Ms. Garrett) I would like to mark Tab 10 as

18     an exhibit.

19              MS. OLALDE:  I'll let you know when it pops up.

20              MS. GARRETT:  Thank you.

21              THE REPORTER:  May I ask who is speaking?

22              MS. OLALDE:  This is Angie Olalde.  I

23     apologize.  You won't see my box light up because I'm

24     using Ms. Johnson's speaker.

25              MR. MUNK:  Exhibit 1 has been introduced.

41

1          Q     (By Ms. Garrett) Ms. Johnson, can you see

2     Exhibit 1?

3               MS. OLALDE:  Just one moment.  Is there --

4     okay.  Let's see.

5          A     Yes, I can see it.

6          Q     (By Ms. Garrett) Do you recognize this

7     document?

8          A     It appears to be my campaign website.

9          Q     I'm looking at the top of Page 2.  There's a

10    bullet point that reads "Established" -- or it mentions

11    ways you reduce costs.  In the last bullet point in that

12    box, it reads "Established automated motor vehicle

13    registration & tax payment processing, performed

14    redistricting in-house."  Did I read that correctly?

15         A     Yes, ma'am.

16         Q     In that -- as part of your campaign page, what

17    does that mean to perform redistricting in-house?

18         A     What that means to me as voter registrar is

19    that we received maps and data, data files from the

20    various governmental entities and updated the boundaries

21    as appropriate to update the voter registration

22    entitlements.

23         Q     Why did you include this as part of your

24    campaign page?

25         A     Because it was an enormous task, and we saved

42

1    thousands of dollars, I believe, by virtue of not hiring

2    outside vendors to make those changes.

3         Q    Other than saving money, are there any other

4    advantages to conducting redistricting in-house in this

5    way that you were just discussing?

6         A    In what I'm referencing, the advantage was, we

7    were going to have to audit anything a vendor did anyway,

8    so we were able to establish timelines, perform the work,

9    and have teams put together to audit the work as the work

10   was being performed.  So it was a very efficient process.

11        Q    Was redistricting completed in-house in this

12   way both in 2011 and 2021?

13        A    Yes.  In 2011, it became necessary to hire a

14   vendor to assist with Galveston Island changes because

15   they were so complex.  We did not have any vendors in

16   this most recent update.

17        Q    And your office was fully equipped to handle

18   this redistricting process, especially with the budget

19   and temporary staff that you were able to bring on?

20        A    In 2011?

21        Q    Or in 2021.

22        A    We've made it work.

23        Q    What were your goals for the 2021 redistricting

24   process?

25        A    To implement the changes properly.

43

```
 1           Q    Did you have any other goals?
 2           A    I think that that's a pretty sizeable goal in
 3      itself.  It's a very short response, but it's a massive
 4      operation, massive task.
 5           Q    In 2021, how much of your time was spent on
 6      this redistricting process?
 7           A    From beginning to end?
 8           Q    Yes.
 9           A    Probably anywhere from 20 to 60 hours a week
10      for several months.  We only recently made changes for
11      the City of La Marque and Texas City and College of the
12      Mainland.
13           Q    And at what point in 2021 did that 20 to 60
14      hours a week begin?  Was it January 2021?  July 2021?
15      What month, roughly, did that process begin for your
16      office?
17           A    We may have started some work in November, but
18      predominantly, it was December.
19           Q    To what extent was your office involved in
20      redistricting prior to a map being adopted?
21           A    We were not involved in the decision-making
22      process.  My only -- our only involvement or my only
23      involvement was to determine a schedule so that I could
24      assign staff or know when I needed staff available in
25      order to make the changes.
```

44

1      Q    How did you go about creating a schedule for

2   redistricting?

3      A    Once we identified the entities that were going

4   to need changes, I tried to stay in touch with them --

5   not very successfully, I will say -- to know when those

6   changes would be expected and to plan my staffing

7   accordingly -- accordingly.  And I needed temporary

8   workers to perform the normal duties of voter

9   registration so that my full-time staff could make

10  changes as necessary.

11     Q    You mentioned reaching out to entities, did

12  that include the Galveston County Commissioners Court?

13     A    Yes, ma'am.

14     Q    And who on the Galveston County Commissioners

15  Court did you reach out to when you were putting together

16  these schedules?

17     A    All of the courts, the commissioners, county

18  judge and commissioners and their chiefs of staff.

19     Q    When -- do you recall when you first reached

20  out to them for the 2021 redistricting cycle?

21     A    I believe it was December 2019 when I first

22  reached out to everybody.  And then at various times as

23  we would get notification or I would read that the

24  government -- U.S. government was actually in the process

25  of providing census data, I would try and reach out to

```
 1    them again.

 2         Q    What information from these entities was most

 3    helpful for you as you were putting together schedules?

 4         A    Their timelines, what months.  I believe the

 5    very first entity that provided changes was the City of

 6    Galveston.

 7         Q    And by "timeline," do you mean timeline for

 8    selecting the adopted map?

 9         A    The timeline of implementing the maps that they

10    adopted.

11         Q    So did you want to know when they planned to

12    adopt the map?

13         A    Yes, ma'am.

14         Q    Did you want to know when they might be meeting

15    to discuss adoption of the map or selecting a map?

16         A    I asked for that information, and I can't say

17    that they were very responsive.

18         Q    Was the Galves- -- to what extent was the

19    Galveston County Commissioners Court responsive to your

20    requests in 2021?

21         A    I don't recall receiving any responses from

22    Galveston County Commissioners Court to my emails.

23              MS. OLALDE:  I'm sorry, we've been going about

24    an hour.  Just whenever we get to a breaking point, could

25    we take a short break?
```

46

```
1              MS. GARRETT:  We could take a break now, if

2    that works for you.

3              MS. OLALDE:  Sure.

4              MS. GARRETT:  Could we go off the record?

5              THE VIDEOGRAPHER:  Okay.  Current time is

6    10:16.  We are now off the record.

7         (Recess.)

8              THE VIDEOGRAPHER:  Current time is 10:41 a.m.,

9    and we're now back on the record.

10        Q    (By Ms. Garrett) Ms. Johnson, did you speak

11   with anyone during the break?

12        A    Yes.

13        Q    With whom did you speak?

14        A    To those present in the room, Jordan, Angie and

15   Zach.

16        Q    Is it still the case that only those

17   individuals are in the room with you now?

18        A    Yes, ma'am.

19        Q    And is it still the case that you have no

20   documents in front of you today?

21        A    Yes, ma'am.

22        Q    Do you know Nathan Sigler?

23        A    Yes.

24        Q    For how long have you known him?

25        A    I've known him well -- well, more -- during
```

47

1    redistricting, we developed a relationship as far as

2    working closer together when the redistricting for the

3    county began.

4         Q    And by "redistricting," you mean 2021

5    redistricting?

6         A    Yes.  The only time that I really interact with

7    Nathan is when I need maps from the engineering

8    department, and he is -- he is my point of contact.

9         Q    Is he a point of contact when you're doing

10   those manual comparisons of the maps that you were

11   testifying about earlier?

12        A    To some extent, yes.  He would provide lists of

13   precincts to me.

14        Q    How often during the 2021 redistricting did you

15   correspond with Nathan Sigler?

16        A    I would be guessing, but I would probably say

17   multiple times a day at times.

18        Q    And in general, how did you communicate with

19   him?  Via email?  Phone?  In person?

20        A    Email would oftentimes result in an in-person

21   meeting receiving the maps or he would come up to our

22   office to answer questions and to help us use his GIS

23   system.

24        Q    What kinds of questions would you ask him?

25        A    Just what maps were available, what he could

1      give me, how to use the technology effectively, getting

2      permissions for -- to use his maps.  He gave me his

3      administrative access.

4          Q    And then you mentioned technology.  What did

5      the technology enable you to do with the maps?

6          A    To zoom in, to oftentimes put in an address to

7      determine what -- an area where a -- a particular voter

8      may be located or to zoom in on a boundary.

9          Q    And were you able to use that technology when

10     you were doing the manual comparisons of the maps, or

11     were you -- only had your eyesight for those comparisons?

12         A    The comparisons were frequently performed

13     comparing spreadsheets and then validating on the maps.

14         Q    Are you aware of Nathan Sigler's communications

15     or correspondence with any of the entities that you were

16     looking to get in touch with during redistricting in

17     2021?

18         A    Would you repeat the beginning of that

19     statement?

20         Q    Yeah.  Were you aware of Nathan Sigler

21     corresponding with any of the entities that you were

22     reaching out to during the 2021 redistricting process,

23     such as the Galveston County Commissioners Court or any

24     other entity?

25         A    I'm not certain what his correspondence was

49

1    with the County Commissioners.  We -- I would loop him

2    into emails with the other entities when I was forwarding

3    shapefiles to him for printed -- to obtain printed maps.

4        Q    Do you know Michael Shannon?

5        A    Yes, I do.

6        Q    And for how long have you known Michael

7    Shannon?

8        A    For as long as he's been the county engineer.

9        Q    And do you work directly with Michael Shannon?

10       A    Rarely.

11       Q    Rarely?

12       A    Yes.

13       Q    Does Michael Shannon work with any members of

14   your staff?

15       A    No.

16       Q    Do you know Stephen Holmes?

17       A    Yes, I do.

18       Q    How long have you known Stephen Holmes for?

19       A    Since I took office January 1st, 2005.

20       Q    And how would you characterize your working

21   relationship with Stephen Holmes?

22       A    I'd say it's a good working relationship.

23       Q    How often do you communicate with Stephen

24   Holmes on a general basis?

25       A    Six times a year, perhaps.

50

1       Q     Did you communicate with him more during the

2   2021 redistricting process?

3       A     I do not recall talking with him at all during

4   the redistricting process.

5       Q     Do you know Darrell Apffel?

6       A     Yes, ma'am, I do.

7       Q     How long have you known Darrell Apffel for?

8       A     I'm not certain.  I probably met him about ten

9   years ago.

10      Q     How would you characterize -- or let me ask you

11  this:  How often do you communicate with Darrell Apffel

12  for your work?

13      A     For my work?  Probably same amount of time as I

14  do Stephen Holmes or any of the commissioners.  Maybe a

15  half a dozen times a year.

16      Q     Would you say that's consistent for all of the

17  county -- or Galveston County commissioners, about six

18  times a year?

19      A     As far as communicating with them directly,

20  talking to them, likely, yes.

21      Q     So there isn't one commissioner that you speak

22  to more than the others or -- you speak to them all

23  generally about the same amount?

24      A     Yes, Mr. Giusti, Commissioner Giusti and I

25  probably have the closest relationship.

51

1          Q     How long have you known Commissioner Giusti

2     for?

3          A     I'm not certain.  He began -- when he began

4     working for Constable Fullen was when I first met him.

5          Q     When around was that?  When did he begin

6     working for Constable Fullen?

7          A     I believe Constable Fullen was elected in 2006,

8     so it would have been probably 2007 or '08.

9          Q     What sorts of topics do you communicate with

10    Commissioner Giusti about?

11         A     Community events in his particular area.  He is

12    the commissioner in the Santa Fe and West Galveston

13    Island, and so we'd frequently bump into each other when

14    we were at different community events.

15         Q     Do you speak about community events with the

16    other commissioners as well?

17         A     If they happen to be attending an event, yes.

18         Q     So you mentioned you correspond with or meet

19    with or directly interact with the other commissioners or

20    all the commissioners each around six times a year.  What

21    do you typically -- can you describe those interactions a

22    little bit?

23         A     There isn't really much to describe.  I might

24    see them in commissioners court.  If I have an item on

25    the agenda, then I would go to their meetings and answer

1    any questions they may have or present information to

2    them so that they could make decisions on items that I

3    would bring to them, such as contracts and business.  Not

4    typically budget.  It was all typically in writing

5    through the county judge's office.

6        Q    So typically when you met with one commissioner

7    or -- did you typically meet with them as a group, or did

8    you meet with them one on one mostly?

9        A    Typically I saw them in a group in a public

10   setting like in commissioners court.  It was only

11   occasionally that I would see them outside of a

12   professional setting.

13       Q    Such as Commissioner Giusti at various social

14   events and --

15       A    Yes, ma'am.

16       Q    Okay.  And then -- so would you say that most

17   of your interactions with them were in person versus over

18   the phone or email or...

19       A    I may have corresponded with them via email

20   more than any other method of communication, but that was

21   only for informational purposes, to share information

22   with them.

23       Q    What information did the -- or what kind of

24   information would you share with the commissioners?

25       A    Valuation information I received from the

53

1    Central Appraisal District.  If there were legislative

2    changes that affected decisions that they were going to

3    make, I would try and just share whatever information I

4    had on those items.

5        Q    Did you typically expect a response when you

6    shared this information with the commissioners?

7        A    I came to never expect a response from county

8    commissioners.

9        Q    You mentioned that you would sometimes go to

10   commissioners court to answer questions, speak about

11   issues or topics.  How -- did you attend the

12   commissioners court meetings only when you were being

13   asked to attend for various reasons or would you go

14   sometimes on your own accord?

15       A    I typically only attended when I had an item on

16   the agenda.

17       Q    And how would they -- how would you be invited

18   to these meetings?  Was it over email?  Over the phone?

19   Would they contact your staff?  How did you know that you

20   were requested at the meeting?

21       A    I would receive an agenda and we would review

22   it, and when I saw my item on the agenda, I would attend

23   the meetings, if it was possible or necessary.

24       Q    And what sort of items did you have -- did you

25   see on the agenda that were for you?  What sorts of

54

```
1    topics would you --

2         A    Penalty and interest cases for property tax.

3    Budget amendments at times.

4         Q    Were you ever -- did you ever see an item on

5    the agenda related to you about redistricting?

6         A    I do not recall ever seeing an agenda item

7    specific to me or my office on the agenda.

8         Q    So never under the -- you didn't receive an

9    agenda that kind of triggered for you, I should go to

10   this meeting?  Or let me rephrase.

11        You didn't see any redistricting item on the

12   agenda that explicitly asked for you to attend the

13   commissioners court meeting?

14        A    Not that I recall.

15        Q    So you mentioned that you would share all this

16   helpful information with the commissioners, but you

17   eventually stopped expecting a response.  Did you stop

18   expecting a response for all of your attempts to reach

19   out to the commissioners or just some types of attempts

20   to reach out to commissioners?

21        A    I'm not sure I understand the question.  When

22   you're sharing information with people, if they had

23   questions, then they would follow up.  But I rarely

24   received questions.  I think that my emails were pretty

25   full and informative.
```

55

1          Q     Do you know Dwight Sullivan?

2          A     Yes, I do.

3          Q     How long have you known Dwight Sullivan for?

4          A     I'm not certain when he began working for the

5     county treasurer, but when he worked in the county

6     treasurer's office as the chief deputy is when I first

7     met him.

8          Q     Do you ever work with him?

9          A     Directly, no.  We work with his office, his

10    elections division, frequently during elections.

11         Q     And what do you work with his office on related

12    to those elections?

13         A     For directly Dwight on the election board, he

14    sets up those meetings to coordinate the elected

15    officials and party chairs to attend those in planning

16    for elections.  And then with his staff, as part of those

17    meetings, we establish schedules of when voter lists are

18    needed for the different elections, and then my staff --

19    I inform my staff of that information, and then it pretty

20    much turns over to them.  I'm only involved if a -- if an

21    issue arises, if they need intervention or assistance.

22         Q     During the 2021 redistricting process, how

23    often would your office work with Dwight Sullivan's

24    office?  On a daily basis?  Weekly basis?

25         A     I did -- I rarely worked with Dwight Sullivan's

56

```
 1    office directly.  I can't tell -- I can't tell you how
 2    much my staff worked with them.
 3         Q    Do you know Mark Henry, County Judge Mark
 4    Henry?
 5         A    Yes, I do.
 6         Q    How long have you known Mark Henry for?
 7         A    I first met him in 2008 at a GOP dinner, I
 8    believe.
 9         Q    Do you interact with him about the same number
10    of times a year that you interact with the county
11    commissioners, about six times a year?
12         A    I would say that would be a fairly accurate
13    statement, yes.
14         Q    And how would you characterize your working
15    relationship with Mark Henry?
16         A    Improved.
17         Q    Can you tell me more about that?
18         A    We didn't always like each other very much, and
19    we've been both working to improve our relationship.  And
20    I'd say things have definitely improved.
21         Q    And then do you know Tyler Drummond?
22         A    Yes, I do.
23         Q    And how long have you known Tyler Drummond for?
24         A    Since he first began working for Mark Henry.
25         Q    And do you ever work directly with Tyler
```

1   Drummond?

2        A    I don't work directly with him.  We will talk

3   occasionally.

4        Q    How often will you speak with him?

5        A    I'm not sure specifically.  Maybe once a month,

6   depending on what's going on.  During redistricting, it

7   may have been more frequent.  During budget, it may be

8   more frequent.  It just depends.  We'll sometimes go

9   weeks and weeks without talking to each other at all.

10        Q    What sort of things would you talk to Tyler

11   Drummond about?

12        A    Planning, what the schedules are, what it looks

13   like commissioners may be doing to determine what they

14   might need from me at any given time.

15        Q    Typically, were you initiating this

16   correspondence with Tyler Drummond or would he reach out

17   to you, or was it 50/50?

18        A    I'd say it was probably 50/50.

19        Q    And he -- was he generally responsive to your

20   requests for information or correspondence?

21        A    Yes.  Yes.  He was definitely a key point of

22   contact to understand what was underway at the

23   commissioners court.

24        Q    Would you -- was Tyler Drummond usually your

25   first point of contact for reaching out to the

1    commissioners court?

2         A    Frequently, yes.

3         Q    And how did you typically communicate with

4    Tyler Drummond?  Was it over the phone?  Over email?  In

5    person?

6         A    It was a combination of all.  Probably 30

7    percent each type, whether it was email, telephone calls,

8    sometimes text messages.

9         Q    And when you met in person or spoke over the

10   phone, how long were your interactions with Tyler

11   Drummond, on average?

12        A    I would have no idea.  Anywhere from 30 seconds

13   to 5 or 10 minutes.

14        Q    So you mentioned that he could be a good point

15   of contact for the commissioners court; is that right?

16        A    Yes.

17        Q    What sort of information would you request of

18   Tyler Drummond about the commissioners court?

19        A    Tyler was very helpful in communicating to me

20   what it looked like the timeline would be for the

21   commissioners to redraw their boundaries so that I could

22   make schedules, so I could schedule workers in my office.

23        Q    Do you recall what -- when he provided this

24   timeline to you?

25        A    Not specifically.

59

1      Q    And what was included in that timeline that he

2   provided to you?

3      A    Perhaps the expected dates when commissioners

4   may be making decisions or voting so that I would know

5   that shortly thereafter I'd be receiving information.

6      Q    Do you recall if he gave you an exact date

7   during the 2021 redistricting process?

8      A    I believe he let me -- he kept me informed

9   fairly well of meeting dates, of adoption dates, so that

10  we could plan.  I can't tell you specifically when that

11  was or what those dates were.

12     Q    Do you recall what types of meetings he would

13  provide updates on?  Were these meetings with the

14  commissioners?  Were these meetings with the public?  Can

15  you just describe the meetings that he would apprise you

16  of?

17     A    Commissioners court meetings that would be

18  agendaed.  So it would be posted meetings.

19     Q    And would these meetings be open to the public?

20     A    Every commissioners court meeting is open to

21  the public.

22     Q    Do you recall how many commissioners court

23  meetings there were related to the adoption of the maps

24  in 2021?

25            MS. OLALDE:  Objection, vague.

60

1          You can answer.

2     A    I have no idea.

3     Q    (By Ms. Garrett) So for the commissioners court

4    meetings, you mentioned you received every single agenda

5    for the commissioners court meeting; is that right?

6     A    As far as I know, yes.

7     Q    And then you would review every agenda that

8    came through to you or that you received?

9     A    No.  My staff would review them and highlight

10   those items that pertained to our office and provide them

11   to me.

12    Q    So the commissioners court did not -- other

13   than sending you an agenda and having your staff review,

14   did the commissioners court reach out to you about those

15   agenda items that related to you prior to the meeting?  I

16   know that was a long question.

17    A    The commissioners did not.  Occasionally Diana

18   Martinez might reach out to me if we had requested an

19   item on the agenda and it didn't make it in time or if it

20   needed to be rescheduled.

21    Q    So you mentioned that Tyler Drummond would also

22   update you on the timeline for redistricting and these

23   meetings.  How far in advance of the commissioners court

24   meetings related to redistricting did Tyler Drummond

25   provide you an updated timeline or updated information

[2/28/2023 9:00 AM] Johnson, Cheryl 20230228

```
1    about these meetings?
2         A    As I recall, he would tell me that they perhaps
3    were going to adopt a map at a certain meeting and a
4    certain month.  So in October, he may inform me of the
5    topic that was going to be coming up in November, or in
6    November he may inform me of a meeting that was coming up
7    in December.  So about a month in advance, probably.
8         Q    So you learned from Tyler Drummond about
9    redistricting being discussed at a commissioners court
10   meeting prior to your staff receiving the commissioners
11   court meeting agenda; is that accurate?
12        A    Would you repeat that, just to make sure I
13   understand exactly?
14        Q    Yes.  When your staff received the
15   commissioners court meeting agenda for November, had
16   Tyler Drummond already notified you that redistricting
17   would be discussed at that meeting?
18        A    He very likely provided a date in November that
19   he expected to be placed on the agenda, yes.
20        Q    And he provided that date sometime in October?
21        A    As I --
22             MS. OLALDE:  Object- --
23             THE WITNESS:  I'm sorry.
24             MS. OLALDE:  Objection, asked and answered,
25   calls for speculation.
```

62

```
 1              You can answer.

 2       Q    (By Ms. Garrett) You can answer.

 3       A    As far as I know, it was about -- he was fairly

 4   accurate in what he would inform me on those dates.

 5       Q    And he told you about that meeting over the

 6   phone or in person?  How did he inform you of that

 7   meeting?

 8       A    I seem to recall most of that information being

 9   provided in email.

10              MS. GARRETT:  I want to turn to an exhibit, now

11   that we're all set up with Exhibit Share.  Let me make

12   sure I've got the right one here.  Could we mark Tab 13

13   as an exhibit?

14              THE REPORTER:  I'm sorry, just for

15   clarification, are we marking it as Exhibit 13?

16              MS. GARRETT:  Oh, no.  We'll mark it as

17   Exhibit 2.  We'll mark Tab 13 as Exhibit 2.

18              MR. MUNK:  Exhibit 2 has been introduced.

19              MS. GARRETT:  Thank you.

20       Q    (By Ms. Garrett) Ms. Johnson, can you let me

21   know when you've reviewed the exhibit?

22       A    Yes, ma'am.  (Reviewing document.)  I sent this

23   email and this very long set of attachments --

24       Q    Yeah.

25       A    -- with questions, yes.
```

63

```
 1        Q    So you just said you sent this email.  What day
 2   did you send this email?
 3        A    According to the date on this, January 14th,
 4   2021.
 5        Q    I want to start just with the body of the email
 6   itself.  You start the email with "With redistricting
 7   around the corner."  What did you mean when you said
 8   redistricting was around the corner?
 9        A    Exactly that, that it would not be long before
10   they were going to be faced with making decisions about
11   their boundaries.
12        Q    And when did you anticipate that process would
13   start for the recipients in this email?
14        A    Shortly after the census data was received.
15        Q    I want to look at the third paragraph in the
16   body of this email.  You wrote, "Therefore, I reached out
17   to all of the officials, including Judge Henry, not for
18   the purpose of having any impact on your decisions,
19   except for JP and constable, but to be included from the
20   standpoint of providing input on whether certain proposed
21   plans would be better planned differently."
22             Did I read that correctly?
23        A    Yes, ma'am.
24        Q    What did you mean when you wrote that
25   paragraph?
```

64

1    A    Precisely what it says.  I wasn't trying to

2  influence the decisions that they were going to make in

3  the future except for their impact on the ease or

4  difficulty of us making the changes to our various voting

5  precincts and the entitlements.  And when I refer to

6  "entitlements," I'm talking about how each voter -- who

7  they can vote for as far as positions and which -- let's

8  say which -- which JP or constable, which school

9  district, single member district, what city and so forth.

10    Q    Can you say a bit more on how a proposed plan

11  could be better planned differently?

12             MS. OLALDE:  Objection, asked and answered.

13             You can answer.

14    A    My only concern was that they would implement

15  plans that were not so complicated that they would be

16  difficult to implement, and you can -- as you can see

17  from the next paragraph.

18    Q    (By Ms. Garrett) So the next paragraph reads,

19  "We currently have residential properties split between

20  two precincts.  You can stand on any given corner in

21  Galveston and add multiple same as well as multiple

22  different precincts for the city, ISD and county."  Did I

23  read that correctly?

24    A    Yes, ma'am.

25    Q    Would you say that this paragraph encompasses

65

1    possibly your main concern with having a difficult map to

2    implement once the map is selected?

3         A    It wasn't the map.  It was more the boundaries

4    that they were selecting.

5         Q    You mentioned -- back to that third paragraph

6    about providing input.  What sort of input could your

7    office provide to the recipients of this email and other

8    entities going through redistricting?

9         A    With regard to the county commissioners in this

10   paragraph, it would be much simpler if commissioner

11   Precinct 2 and JP Precinct 2 and constable were the same,

12   and they are not necessarily the same.

13        Q    So attached to this email -- actually, before I

14   get to that, are these three boundaries typically the

15   same?

16        A    Not necessarily the same.  If you're talking

17   about -- JP and constable are the same, but the JP and

18   constable numbers may or may not correspond to the county

19   commissioner numbers.

20        Q    But it's easiest for your office and your

21   implementation of the maps if the commissioner precinct

22   lines are the same as the JP and constable lines?

23        A    Absolutely.  And it's easier for the voters as

24   well.  If a voter called and was in County Commissioner

25   Precinct 2, they could be in JP or Constable Precinct 1,

1    2, 3 or 4, and that's very confusing for voters.  So from

2    the standpoint of ease for the voters as well.  And then

3    when they were different, I'd have to make a decision on

4    which entitlements we are putting on the voter

5    registration certificate, because I had to communicate

6    that information to the voters.

7        Q    Would this cause confusion for voters when

8    the -- the commissioner precinct lines were different

9    than the JP and constable lines?

10            MS. OLALDE:  Objection, asked and answered.

11        A    Yes, I believe it would cause confusion.

12        Q    (By Ms. Garrett) Do you know if counties often

13   had different commissioner lines -- or if counties in

14   Texas had JP and constable lines that were different than

15   commissioner precinct lines?  Do you know how common that

16   was --

17            MS. OLALDE:  Objection --

18        Q    (By Ms. Garrett) -- or is?

19            MS. OLALDE:  -- calls for speculation.

20        Q    (By Ms. Garrett) To your knowledge.

21        A    I have no knowledge of that at all.

22        Q    And then you mentioned entitlements on voter

23   registration certificates.  Can you elaborate on what you

24   mean by "entitlements" on those certificates?

25            MS. OLALDE:  Objection.  She's already answered

67

```
1        that.

2                You can answer again.

3        A    So I'm a registered voter in Friendswood,

4   Texas, and I have a certain school district entitlement,

5   which it's not a single member district, so it's FISD.

6   So that code is on my voters certificate.  The drainage

7   district code is on my certificate.  The county

8   commissioner precinct, the voting precinct number is on

9   that certificate.

10               So any -- the city precinct is on that

11  certificate.  So anybody that I'm entitled to cast any

12  position or race, I'm entitled to cast a vote for, should

13  be or we try and include all of those on the voter's

14  certificate.  There typically oftentimes are not enough

15  boxes on those certificates for us to include every

16  single position or jurisdiction that somebody can vote

17  for.

18       Q    (By Ms. Garrett) Turning to the last paragraph

19  of this email that you wrote on January 14th, 2021, in

20  the middle of that last paragraph you wrote, "I hope that

21  you find this letter was both thoughtful and efficient

22  and that working together is far better than being at

23  odds and possibly creating difficulties that can be

24  avoided."

25               My first question to you is, would you say that
```

68

1    being thoughtful and efficient was a goal of yours for

2    the redistricting cycle?

3         A    Absolutely, yes, ma'am.

4         Q    And then what sorts of difficulties were you

5    hoping to avoid by communicating early with these

6    individuals and reaching out early?

7         A    It was my preference that county commissioners

8    adopted their voting precincts early on so that then that

9    information could be provided to the other entities and

10   that they would, as much as they could, align their

11   various single member districts with those boundaries.

12   It was a simpler plan to implement.

13        Q    So is it the case that the earlier a map is

14   adopted, the better, for not only your office but

15   numerous entities?

16             MS. OLALDE:  Objection, calls for speculation

17   and compound.

18             You can answer to the extent you understand the

19   question.

20        A    If I understand your question correctly, it was

21   preferable that the county commissioner voting precincts

22   be identified early on so that other jurisdictions would

23   hopefully follow along with those.  As I stated earlier,

24   we just recently changed three of our jurisdictions

25   single member districts.  So this has been spaced out

69

1    <mark>over quite some time.</mark>

2         Q    (By Ms. Garrett) Looking to the attachment to

3    this email that should be on Page 2 of your exhibit, what

4    is this document?

5         A    This is the letter that I sent to all of the

6    jurisdictions, as I recall, informing them of what was

7    upcoming.  I really thought I'd sent this in 2019, but

8    apparently I sent it December 22nd, 2020.

9         Q    And then the third paragraph of this letter,

10   you mention, "To my knowledge, there has never been any

11   attempt to coordinate boundaries to align with any

12   standard such as county commissioner precinct lines or

13   even primary roadways or natural boundaries.  We have

14   many instances of properties being split between two or

15   more districts.  This makes it extraordinarily difficult

16   for us to accurately implement district changes."

17             Did I read that correctly?

18        A    Yes, ma'am.

19        Q    And what was your goal in including this

20   paragraph in this letter to the recipients?

21        A    Well, as voter registrar, my terminology is

22   somewhat different from others, but when I view a county

23   commissioner precinct line, that is an election -- a

24   voting precinct, for example, Precinct 102, 304, 485 or

25   whatever.  And so my purpose in -- in including this was

70

1    to try and encourage everybody to be consistent and not

2    split some of the properties.  We have some properties

3    that are split right down the middle of the property, and

4    it creates a difficult situation for us to determine

5    which precinct or entitlement we should be giving a

6    specific voter if it -- if there's a split.

7         Q    Did you -- so this email was sent to the

8    Galveston County Commissioners Court; is that right?

9         A    It was sent to, as I recall --

10              MS. OLALDE:  Hold on.  I just --

11        A    -- as I state --

12              MS. OLALDE:  I just want to make sure I'm

13   understanding your question.  The email, or are you

14   talking about the attachment?

15              MS. GARRETT:  The email.

16        Q    (By Ms. Garrett) So looking at the exhibit, the

17   email that was sent -- so the names in the "to" line on

18   the first page of the exhibit.

19        A    Yes, this particular email with that

20   copy-and-paste that I had sent to the other jurisdictions

21   was sent to county commissioners and their chiefs of

22   staff and a couple of people that work in my office or

23   did work in my office at the time.

24        Q    And then did you receive -- or what responses

25   did you receive to this email?

```
 1        A    I don't recall receiving any responses to this
 2   email.
 3        Q    At this time, did you expect or hope to receive
 4   a response?
 5        A    It wasn't necessary.  I was sharing
 6   information.  If they had additional questions, I
 7   expected them to reach out to me.
 8        Q    When -- when you shared information and the
 9   recipients had questions, how could they best contact you
10   to get those questions answered?
11             MS. OLALDE:  Objection, vague.
12        A    They could call, they could email, they could
13   stop by my office, so there was a variety of ways that
14   they could reach out to me.
15             MS. GARRETT:  I'd like to mark Tab 14 as an
16   exhibit.  This would be Exhibit 3.
17             MR. MUNK:  Exhibit 3 has been introduced.
18        Q    (By Ms. Garrett) Ms. Johnson, can you let me
19   know when you've had a chance to review the exhibit?
20        A    (Reviewing document.)  I've reviewed the email.
21        Q    Do you recognize this email?
22        A    Yes, I do.
23        Q    Can you describe what this email is?  What is
24   this email?
25        A    This is an exchange of information.  A reporter
```

1    with the Galveston Daily News was seeking copies of maps

2    or any information that I might have on who he could

3    obtain them from, and so I looped in people that might

4    have that information.

5         Q    Did you -- did you anticipate receiving

6    requests like this in 2021 around the time of

7    redistricting?

8              MS. OLALDE:   Objection, calls for speculation.

9              To the extent you know, you can answer.

10        A    People ask me for all sorts of information.

11   Most of it is not something that we even have anything to

12   do with.  It's just the most familiar with their tax

13   assessor-collector because I've touched them so often.

14        Q    (By Ms. Garrett) So your office fielded quite a

15   few questions, it sounds like?

16        A    On every topic.  I'm sorry.

17             MS. OLALDE:   Just give me a chance to object.

18        Q    (By Ms. Garrett) You mentioned in your response

19   to John Wayne Ferguson on April 8th, 2021, you say, "We

20   just cleaned out all of the 2000 maps in preparation for

21   2020 redistricting."  Did I read that correctly?

22        A    Yes, ma'am.

23        Q    And why did you clean out the maps at this

24   time?

25        A    We no longer had need for the 2000 maps, to the

73

1    decisions that were made then.  We compare the 10-year

2    maps for each effort that we do with regard to

3    redistricting.  So we looked at the 2000 maps in 2010,

4    the 2010 maps in 2020.  So there was no longer a need for

5    the older maps.

6         Q    And what format were these 2000 maps in?  Were

7    they electronic?  On paper?

8         A    As I recall, they were predominantly paper.

9         Q    And it looks like you included Nathan Sigler,

10   Michael Shannon on this email; is that right?

11        A    Yes, ma'am.

12        Q    Why did you include them on this email?

13        A    Because they were the most likely individuals

14   to have the information that Mr. Ferguson was seeking.

15        Q    Is it typically your practice to include

16   individuals with more information or additional

17   information on emails to help respond to requests for

18   your office?

19        A    It is very common for me to include the proper

20   people that perhaps -- when Mr. Ferguson was asking for

21   information and I -- I responded by sharing that

22   information with him.  This is very typical.

23        Q    We should have time for this line of

24   questioning before lunch.  As part of your work for

25   Galveston County -- actually, let me ask you this:  How

74

```
1    familiar are you with census data?

2         A    In 2000, I was more aware of census data than I

3    have been the most recent census data.  I've just not had

4    time to review the 2020 census data hardly at all.

5         Q    When you review census data, what sorts of

6    things do you look at when reviewing that data?  Just

7    generally, not any particular time frame.

8         A    Typically total populations.  I would want to

9    know, for instance, how many additional people we have in

10   Galveston County.  That sometimes triggers legislation

11   affecting us, and how those totals have changed from --

12   from one census to another.

13        Q    Do you know how the census data is used for

14   redistricting at the county level?

15        A    Not specifically.

16        Q    Do you recall when the 2020 census data was

17   released?

18        A    As I recall, it would have been August or

19   September.  Could have been as late as October in 2021.

20   Sometime late summer, early fall.

21             MS. GARRETT:  Okay.  I'd like to mark Tab 17 as

22   exhibit -- it should be Exhibit 4.

23             MR. MUNK:  Exhibit 4 has been introduced.

24        Q    (By Ms. Garrett) Ms. Johnson, once you've had a

25   chance to review, can you let me know if you recognize
```

75

1    this document?

2         A    Yes, ma'am, I'll let you know.  (Reviewing

3    document.)  I'm familiar with this email.

4         Q    Does this email refresh your recollection about

5    when the census data -- or the 2020 census data was

6    released?

7         A    It appears it was around or about August 13th.

8         Q    I'd like to ask you, at the very top of this

9    email you write, "With census data now being released,

10   please run voter totals by district for each entity with

11   single member districts."

12              First off, did I read that correctly?

13        A    Yes, ma'am.

14        Q    Okay.  And then why did you take this step to

15   send this email and have this task be completed?

16        A    To provide more current voter totals, number of

17   voters in each of the precincts and districts as

18   appropriate, depending on the jurisdiction.

19        Q    And once -- let me ask you this:  Who did you

20   ask to complete this task?  Was it the recipients listed

21   in the "to" line of this email?

22        A    Yes.  So Ms. Saludis was the senior voter

23   investigation specialist and Angela Bleyle was the

24   second -- the voter registration specialist.  Ms. Moreno

25   was the chief deputy that they each reported to directly.

76

1      Q    And once these voter totals were run, what

2  would you do with that information?

3      A    I would typically take multiple spreadsheets

4  and combine them into totals as you see on the second

5  page, so that others would not have to review multiple

6  spreadsheets, but to consolidate the information in a

7  concise manner so it'd be easy for people to understand.

8      Q    Did the county commissioners request this

9  information from your office?

10      A    Not that I recall.  Commissioner Clark was

11  typically the only commissioner who was ever, for lack of

12  a better term, down in the mud enough to want to see this

13  information.

14      Q    Did you receive a response from -- well, let me

15  just confirm.  Which information did you share with the

16  county commissioners?  The attachment to this email?

17      A    I don't know that I shared this attachment.  I

18  used the attachment as an example of what I was going to

19  do with the data I was asking my team to produce for me.

20      Q    Okay.  Do you recall, once you shared the voter

21  totals with the county commissioners, what response they

22  gave, if any?

23      A    I don't recall any responses from any of them

24  specifically.  I -- I don't even know exactly when I

25  provided this to them for a second or third time even.

1      Q     But if somebody were to respond, you would have

2   expected it to have been Ken Clark; is that right?

3           MS. OLALDE:  Objection, calls for speculation.

4      A    Typically, he was the one that was most

5   interested.  And who he shared that with, I -- I do not

6   know.

7           Q     Let's take a look at Tab 15.

8           MS. GARRETT:  If we could mark Tab 15 as an

9   exhibit.  So Tab 15, this will be Exhibit 5.

10          MR. MUNK:  Exhibit 5 has been introduced.

11     A    (Reviewing document.)

12     Q    (By Ms. Garrett) So Ms. Johnson, I'm looking at

13  the bottommost email, the earliest email.  Do you see

14  it's -- well, the "from," "to" -- "from," "sent" and "to"

15  lines are on the bottom of Page 1 and the substance of

16  the email is on Page 2.  Have you had a chance to review?

17     A    Yes.

18     Q    So this earliest -- or the email at the very

19  bottom you sent on May 20th, 2021.  Who did you send this

20  email to?

21     A    I sent it to the census bureau.

22     Q    And why did you reach out to the -- or let me

23  ask you this:  What was your purpose for reaching out to

24  the census bureau?

25     A    Very likely, Ms. Eldridge, Robin Eldridge in

78

1    the email, was the city secretary for the City of

2    La Marque, and she was likely asking me when they could

3    expect the data.

4         Q    Did Robin Eldridge give you more information

5    about why they were looking for this information?

6         A    Not specifically, but she could have been

7    responding to many of those emails that I had sent in

8    trying to develop a plan for her city of when they would

9    make their decisions.  That would be logical.

10        Q    So was it part of your job to share census data

11   with Texas counties and municipalities?

12        A    I did not share census data with Texas

13   municipalities and the counties.  I was sharing

14   projection of when the census bureau may have census data

15   available.

16        Q    And what was the census bureau's response to

17   your question?

18        A    They responded when the data products would be

19   available.

20        Q    Sounds like they estimated it'd be available in

21   August or September.  Is that accurate?

22        A    Yes, ma'am, that's what she wrote, or that's

23   what they wrote, the public information office.

24        Q    So looking at the very top email that you sent

25   at 1:50 p.m. Central Time, it looks like, you forwarded

79

1    this response to Tyler Drummond; is that right?

2           A    Yes, ma'am.

3           Q    Why did you forward this information to Tyler

4    Drummond?

5           A    The same reason that I had included Robin, to

6    let him know that it looks like we -- we have a date on

7    when we may receive the information.

8           Q    Did Tyler Drummond request this information

9    from you?

10          A    No.

11          Q    Did you at the time believe that this

12   information would be helpful to Tyler Drummond?

13          A    I assumed that this would be helpful for him to

14   inform the county commissioners when they could expect to

15   begin receiving information, so they could begin making

16   decisions.

17          Q    You also asked Tyler Drummond in this email,

18   "Do you have any timeline expectations yet?"  Is that

19   accurate?

20          A    Yes, ma'am.

21          Q    I know we discussed a little bit earlier today

22   about how Mr. Drummond provided you information about the

23   commissioners court meeting.  Do you recall what his

24   response was to your question here?

25          A    I'm not certain that he provided a direct

80

1    response to me.

2        Q    Did you forward this information to anyone else

3    at -- with the Galveston County Commissioners Court?

4        A    Not that I recall.  This specific email or the

5    date that census had responded?

6        Q    The information that the census bureau provided

7    about when additional data products will be available.

8    So in other words, when you learned that, from the census

9    bureau on May 20th that additional data products will be

10   available and that the August/September release is the

11   first sub-state data available, did you forward this

12   information to anyone at the Galveston County

13   Commissioners Court, other than Tyler Drummond?

14       A    Not that I recall.

15            MS. GARRETT:  Let's pull up Tab 9, and this

16   will be Exhibit 6.

17            MR. MUNK:  Exhibit 6 has been introduced.

18       Q    (By Ms. Garrett) And Ms. Johnson, let me know

19   when you've had a chance to fully review the document.

20       A    (Reviewing document.)  I've reviewed the email.

21       Q    Do you recognize this email --

22       A    Yes, I do.

23       Q    -- or this email thread?

24       A    Yes, I do.

25       Q    Can you describe what this email thread is

1    about?

2         A    So going from the beginning, it appears as

3    though Ms. Eldridge and I had a conversation, because I

4    state what we discussed, and I provided information to

5    her apparently as previously discussed, the breakout of

6    the number of voters in each of the La Marque's single

7    member districts, and looped her into the people who

8    would be able to assist her with other information.  She

9    thanked me for that.  And then she asked when the census

10   information was out, and I responded that I'd sent an

11   open records request to the census bureau, and that was

12   the previous exhibit that we -- that she was copied on.

13         At that point it was speculation because I had

14   not yet received a response.  I think there were news

15   articles about census.  It was very much in the news at

16   the time.  And that's pretty much it.

17         Also in this email thread --

18         MS. OLALDE:  Hold on.  Just wait for a

19   question.

20         THE WITNESS:  Okay.  I'm sorry.

21         MS. OLALDE:  That's okay.

22         Q    (By Ms. Garrett) So on the first page, I'm

23   looking at the second email listed.

24         A    Second email.  Let me get to the second email.

25         Q    On the first page of the exhibit.

82

```
1          A     The last -- the second email would be on the
2     last page of the exhibit.
3          Q     I'm looking at the email that you wrote on 2:21
4     p.m. on Thursday, May 20th, to Robin Eldridge, where it
5     reads, "No problem.  Tyler wrote to the attorney to
6     obtain a timeline for the county.  Once I have that, I
7     will send to you."  Do you see where I'm at?
8          A     Yes, I see that.
9          Q     So here in this email, Tyler, are you referring
10    to Tyler Drummond?
11         A     Yes, ma'am.
12         Q     And then you wrote -- you say, "Tyler wrote to
13    the attorney."  To your knowledge, who was the attorney
14    that Tyler was -- that Tyler wrote to to obtain a
15    timeline for the county?
16         A     I believe that was Paul Ready.
17         Q     Did you receive the timeline from Tyler
18    Drummond?
19         A     As I recall, I received a response from Paul
20    Ready.
21         Q     And what was Paul Ready's response?
22         A     I --
23               MS. OLALDE:  I'm going to ask you not to reveal
24    communications with counsel.
25         Q     (By Ms. Garrett) Did you have any further
```

follow-up with Tyler Drummond about this information or this timeline?

A Not that I recall.

Q When you received -- without disclosing the substance of any of your communications with Paul Ready, did you -- or what did you do with the information that you received? Did you create a timeline or a schedule? Did this inform the schedules that you were looking to create?

A I don't recall off the top of my head what the response was.

MS. OLALDE: Hold on. Hold on.

THE WITNESS: Yes.

MS. OLALDE: I need to be able to make my objections.

THE WITNESS: Yes, ma'am.

MS. OLALDE: And for that question, I was going to object as overbroad and vague.

So let's make sure we're giving me the time to do that, please.

MS. GARRETT: I think now -- I know we're a couple minutes earlier than we discussed, but now may be a good time to take a lunch break, if that works for you.

MS. OLALDE: Works for us, yeah.

MS. GARRETT: Okay. Could we go off the

84

```
 1    record?

 2             THE VIDEOGRAPHER:  Yes.  Current time is 11:50

 3    a.m. and we're now off the record.

 4         (Recess.)

 5             THE VIDEOGRAPHER:  Current time is 12:49.

 6    We're now back on the record.

 7         Q    (By Ms. Garrett) Ms. Johnson, you mentioned

 8    that in response to your request for a timeline from

 9    Mr. Drummond, that you received a response from Paul

10    Ready.  What did you understand Paul Ready's role to be?

11         A    He is the county's lawyer, attorney liaison,

12    essentially.  So with regard to redistricting, I don't

13    know.

14         Q    You also mentioned that Ken Clark was probably

15    the most commissioner involved with redistricting.  Is

16    that accurate?

17         A    From what I observed, yes.

18         Q    And what sorts of things did you observe to

19    lead you to draw that conclusion?

20         A    He was working with the county engineering

21    department, with specifically Nathan, on redrawing,

22    looking at the census data and actually drawing

23    boundaries, as I understand it.

24         Q    It was your understanding that Ken Clark was

25    drawing what kind of boundaries?
```

85

```
1          A     Voting --

2                THE WITNESS:  I'm sorry.

3                MS. OLALDE:  Objection as to speculation.

4                THE WITNESS:  Yes.

5                MS. OLALDE:  And you can answer if you know.

6          A     I know that he was involved with the actual

7     election precincts.  So after commissioners had adopted

8     their commissioner precincts, then he was working with

9     county engineering to actually define the specific voting

10    precincts, the individual voting precincts.

11         Q     (By Ms. Garrett) So post-redistricting, did you

12    work directly with Ken Clark, Commissioner Clark --

13                MS. OLALDE:  Objection --

14         Q     (By Ms. Garrett) -- or post-adoption of the

15    map, did you work directly with Ken Clark?

16         A     Not directly.  He would have phone calls -- he

17    would call occasionally, but that was -- it was -- was

18    rather rare.  I knew that he was working with county

19    engineering more than anybody else.

20         Q     Did Commissioner Clark reach out to you with

21    any questions in 2021 about the redistricting process?

22         A     Not about the process, no.

23         Q     Did he reach out with questions about anything

24    else related to redistricting?

25         A     I don't recall specifically.  The only thing he
```

1    knew that I would have would be the number of voters in

2    each voting precinct.

3         Q    You mentioned that you stopped expecting

4    responses to the information you were providing to

5    various entities throughout redistricting.  At what point

6    did you stop expecting a response?

7              MS. OLALDE:  Objection, misstates prior

8    testimony.

9         A    Okay.  I'm not -- I'm not sure I have an answer

10   to that.  Just sometime during the process, during that

11   year.

12        Q    (By Ms. Garrett) Did you have the opportunity

13   to provide -- or let me ask it this way:  Did you or your

14   office have the opportunity to provide input on any

15   proposed plan during the redistricting process?

16             MS. OLALDE:  Objection, asked and answered.

17        A    No.

18        Q    (By Ms. Garrett) To your knowledge, was anyone

19   other than...

20             Let me ask this:  So in August 2021, after the

21   census data was released, what steps did your office take

22   to prepare for redistricting?

23             MS. OLALDE:  Objection, misstates facts.

24             And you can answer to the extent you know.

25             THE WITNESS:  So I can answer that question or

87

```
 1    not?

 2              MS. OLALDE:  You can answer, to the extent you

 3    know.

 4              THE WITNESS:  If you would repeat the question,

 5    yes.

 6         Q    (By Ms. Garrett) So it's -- the census data was

 7    released in 2021, is that right, the 2020 census data?

 8         A    As I recall, yes.

 9         Q    Did your office -- did you or your office take

10    any actions to prepare for redistricting after that data

11    was released?

12         A    Not specifically actions.  We began

13    aggressively trying to hire temporary staff.

14         Q    And what did you hire those temporary staff to

15    do at your office?

16         A    Enter applications and scan documents.  The

17    day-to-day tasks that the full-time staff would not be

18    able to perform because they were changing street ranges.

19         Q    And changing street ranges, that process began

20    when?

21         A    Once we began to receive changes from the

22    different jurisdictions.  So once the Texas legislature

23    had adopted their boundaries, then -- and we were able to

24    access that information, that's when we specifically

25    began making changes in the -- in the system.
```

88

1      Q    When did you receive the first change in

2   boundaries to start making changes?  Do you recall when

3   that was?

4           MS. OLALDE:  Objection, vague as to

5   "boundaries."

6      Q    (By Ms. Garrett) Let me ask it this way:  When

7   did you receive -- so after the census data was released

8   in August 2021, when did your office receive its first

9   newly adopted map from any jurisdiction?

10          MS. OLALDE:  Objection, vague, overbroad.

11          You can answer to the extent you're able.

12     A    Once the legislature adopted their maps and we

13  were notified by the Secretary of State.  I don't

14  remember precisely when that was without looking at the

15  election advisory.

16     Q    (By Ms. Garrett) In August 2021, did you

17  receive any updates from the Galveston County

18  Commissioners Court about their actions to select a new

19  commissioners precinct map?

20          MS. OLALDE:  Objection, asked and answered.

21          You can answer.

22     A    I don't think they'd made any decisions in

23  August.

24     Q    (By Ms. Garrett) Did you receive any updates

25  about a decision-making process or any updates on the

```
 1    timeline?
 2              MS. OLALDE:  Objection, asked and answered.
 3         Q    (By Ms. Garrett) You can answer, if you --
 4         A    I don't know when I received a response.  I
 5    don't remember when they first approved their maps, so I
 6    can't really answer that question.
 7         Q    So you don't recall when the Galveston County
 8    Commissioners Court adopted their commissioner precinct
 9    map?
10         A    I don't remember specifically.  As I recall,
11    Tyler communicated around October that they would adopt
12    something around -- sometime during November or December.
13              MS. GARRETT:  I'd like to mark Tab 19 as an
14    exhibit.  I believe this would be Exhibit 7.
15              MR. MUNK:  Exhibit 7 has been introduced.
16         Q    (By Ms. Garrett) Ms. Johnson, when you've had a
17    chance to review, could you let me know if you recognize
18    this document.
19         A    (Reviewing document.)  Yes, I recognize this
20    document.
21         Q    What is this document?
22         A    This is an email which I'm sharing with the
23    county commissioners the current voter count by election
24    precinct as of August 13th, 2021.
25         Q    Do you recall which individuals were included
```

90

1    as recipients to this email?

2         A    I don't recall off the top of my head who the

3    commissioners' distribution list included.

4         Q    Did you expect any sort of response to this

5    email?

6         A    No.

7         Q    Why did you send this email?

8         A    To share information.

9         Q    Did you receive any responses to this email?

10        A    I do not recall receiving a response, no.

11        Q    Did you speak with anyone about the information

12   in this email after you sent it?

13        A    I don't recall.

14        Q    Do you recall if you shared the information in

15   this email with anyone else other than the commissioners

16   listed in the "to" line of this email?

17        A    I have -- I do not recall.

18        Q    After you sent this email, did you -- did you

19   have any further -- let me ask this.

20             MS. GARRETT:  I'd like to mark Tab 22 as an

21   exhibit.  I believe this would be Exhibit 8.

22             MR. MUNK:  Exhibit 8 has been introduced.

23        Q    (By Ms. Garrett) Ms. Johnson, when you've had a

24   chance to review, can you let me know if you recognize

25   this document?

1     A    Okay.  (Reviewing document.)  I've reviewed the

2     email.

3     Q    Do you recognize this document or this email

4     thread?

5     A    Yes, I'm familiar with it.

6     Q    Looking at Page 3 of this exhibit, this is an

7     email from you to Dwight Sullivan dated September 23rd,

8     2021; is that right?

9     A    I was trying to track the -- see when I was

10    added to this.  I can't tell when -- oh, it's Thursday,

11    September 20 -- are you talking about the Thursday,

12    September 23rd at 2:00 o'clock p.m. email?

13    Q    Yes.

14    A    Yes, I sent that to Dwight Sullivan.  Yes.

15    Q    And in the second paragraph there in that

16    email, you mention, "We will begin redistricting efforts

17    for Galveston County around October 9th."  Did I read

18    that correctly?  This is the first sentence in the second

19    paragraph.

20    A    Yes, you read that correctly.

21    Q    What did you mean by "redistricting efforts"?

22    A    As I've stated before, redistricting efforts

23    for my office involves us identifying and then making

24    changes to voter entitlements in the street range portion

25    of our system.

92

1          Q    What information did you need from Galveston

2    County in order to start that process?

3          A    We needed, number one, for them to adopt their

4    precincts, their commissioner precincts, and then

5    identify the election -- the voting precincts within

6    those.  That involved maps, shapefiles or access to the

7    information in either the county's or the Central

8    Appraisal District's GIS system.

9          Q    At the time you wrote this email, did you

10   anticipate that a commissioners' precinct map would be

11   selected by October 9th, 2021?

12         A    Based on this email string, I would have

13   assumed -- I can only assume that we -- that I was of the

14   impression that the county commissioners would adopt

15   their precincts around October 9th or before October 9th.

16         Q    Do you recall why you had that impression at

17   the time?

18         A    Not without looking at other documents.  There

19   could have been agenda items.  I -- I can't answer that

20   specifically.

21         Q    What kinds of agenda items might be

22   enlightening for refreshing your recollection about that?

23         A    I -- if there were posted agendas, if there

24   were news articles, if there would be something that

25   would have caused me to believe that they would begin

93

1    acting in October.

2         Q    If the commissioners court had adopted a

3    precinct map by October 9th, would this have made work at

4    your office easier in any way?

5              MS. OLALDE:  Objection, overbroad and vague as

6    to "precinct map."

7         A    If you're asking me if they adopted their

8    county commissioner precincts, we still could not have

9    begun our work.  The changes that we implemented from

10   their maps required the adoption and establishment of

11   actual voting precincts.  And that -- without that

12   occurring, we had nothing to do.  There was nothing for

13   us to do.

14        Q    (By Ms. Garrett) Could the process to draw the

15   voting precincts begin before the commissioners precinct

16   map was adopted?

17             MS. OLALDE:  Objection, calls for speculation,

18   also asked and answered.  She's already testified that

19   she doesn't have anything to do with drawing precincts.

20        A    I had nothing to do with that, so I wouldn't

21   know.

22        Q    (By Ms. Garrett) So you do not know whether

23   voting precinct lines could've been drawn sooner had the

24   commissioners court accepted -- or had the commissioners

25   court adopted a commissioner precinct map in October as

94

1    opposed to November?

2              MS. OLALDE:  Objection, calls for speculation,

3    asked and answered, also overbroad, also misstates prior

4    testimony.

5              You can answer to the extent you know.

6         A    Answer is no.

7              MS. GARRETT:  I'd like to mark Tab 23 as an

8    exhibit.  Looks like this will be Exhibit 9.

9              MR.MUNK:  Exhibit 9 has been introduced.

10        Q    (By Ms. Garrett) Ms. Johnson, when you've had a

11   chance to review, do you recognize this document?

12        A    (Reviewing document.)  I do.

13        Q    And what is this document?

14        A    This is an email that I sent to Tyler Drummond

15   providing, apparently per his request, the Galveston

16   County voters -- number of voters by precinct.

17        Q    And do you remember why you sent this email?

18        A    No.  The only -- the -- it says, "Per your

19   request," so that tells me that Tyler requested the

20   information.

21        Q    Do you recall whether he told you what he would

22   do with this information?

23        A    No.

24        Q    Do you recall if he asked you for any other

25   information related to this request?

95

1        A    No, not that I recall.

2        Q    Did you -- were you under the impression at the

3    time you sent this email that this information would be

4    shared with the commissioners court?

5             MS. OLALDE:  Objection, calls for speculation.

6        A    I truly don't know.

7             MS. GARRETT:  I'm going to mark Tab 27 as an

8    exhibit.  This will be Exhibit 10.

9             MR. MUNK:  Exhibit 10 has been introduced.

10       Q    (By Ms. Garrett) Ms. Johnson, when you've had a

11   chance to review, do you recognize this document?

12       A    (Reviewing document.)  I'm familiar with this

13   document.

14       Q    Looking to Page 3 of the exhibit, the earliest

15   email listed, I have a few questions for you about this

16   one.  This is an email from you dated October 28th, 2021;

17   is that right?  I guess it starts on Page 2 and goes into

18   Page 3.

19       A    Yes.

20       Q    So at this point, in the first part of the

21   second paragraph, you wrote, "Galveston County will vote

22   next week to change county election precinct boundaries."

23   Is that accurate?

24       A    That's what it states, yes.

25       Q    And then later on in that email, you write --

96

1    and this is at the very top of Page 3, you write, "We

2    will begin making changes upon receipt of county

3    commissioner maps through January 11.  On that date, we

4    must provide the midterm primary voting list to the

5    county clerk election division.  We cannot make any

6    changes to any boundaries until we send the final list to

7    them on February 11th, as it will adversely impact their

8    ballot styles."

9              Did I read that correctly?

10   A     Yes, ma'am.

11   Q     When you say "we cannot make any changes to the

12   boundaries," what kind of changes are you talking about

13   here?

14   A     To those particular governmental entities'

15   boundaries.

16   Q     And why did you have to -- or where did the

17   January 11th deadline come from?

18   A     From Dwight Sullivan, the county clerk.  They

19   needed us to produce the primary voting list by that

20   date, and we could not -- we had to finish the changes to

21   the voting precincts up to that point, and then we could

22   begin making changes to local jurisdictions.

23   Q     To your knowledge, do you -- or do you know how

24   this deadline was selected?

25   A     The January deadline?  The January 11th

```
1    deadline?

2         Q    Yes.  Do you know why -- or how the

3    January 11th deadline was selected?

4         A    As I recall, that was the date that Dwight

5    Sullivan identified he had to have the last list to

6    create his ballot styles for the primary elections.

7         Q    Do you recall if this January 11th deadline was

8    also a deadline back in 2011 during the prior

9    redistricting cycle?

10        A    I have no idea.  I believe the primary was

11   moved in 2011 to April.

12        Q    And then what -- what occurred between

13   January 11th and February 11th such that you couldn't

14   make changes during that time?

15             MS. OLALDE:  Objection, calls for speculation.

16             You can answer to the extent you know.

17        A    After January 11th, we could begin making

18   changes to any of those other jurisdictions that had

19   provided changes to us.  We could not make any changes

20   specifically to any other boundaries until February 12th

21   because there was a law, and that was during the time

22   that the county clerk would have been testing -- doing

23   their LMA testing and various testings that they do.  I'm

24   not that familiar with what they have to do.

25        Q    (By Ms. Garrett) I want to look at the first
```

```
 1     email in this exhibit now.  First off -- so this is on

 2     Page 1 of the exhibit.  Do you recognize the names listed

 3     in the "to" line?

 4          A    Are you talking about the November 3rd email?

 5          Q    Yes.

 6          A    The one at 9:20?

 7          Q    Yes.  This is the first email listed in the

 8     exhibit dated November 3rd, 2021, at 9:20 a.m. Central

 9     Time.

10          A    And what was your question again about this

11     email?

12          Q    Do you recognize the names of the recipients of

13     this email?

14          A    I recognize Paul McLarty and Nathan Sigler and

15     Kathleen Moreno, yes.

16          Q    And who was Paul McLarty?

17          A    He was a decision-maker, I think the

18     superintendent or assistant superintendent at CCISD,

19     Clear Creek Independent School District.

20          Q    Do you recognize this as an email that you

21     wrote?

22          A    I don't know that I wrote this.  It doesn't

23     have a "from."  I'd be speculating, but the language, "I

24     have included Nathan Sigler who is our mapping guru,"

25     sounds like something I may say, but I can't say that
```

99

1    with certainty.

2         Q    I will represent to you that you are listed as

3    a custodian for this document, though the "from" line is

4    empty.  To confirm, are you unsure whether you wrote this

5    email?

6              MS. OLALDE:  Objection, asked and answered.

7              You can answer.

8         A    It doesn't specifically say it's from me.  And

9    if I was the custodian of this record, I would think that

10   it would say who it's from.

11             MS. OLALDE:  She's just asking if you recall.

12        A    I don't specifically recall this email.

13             MS. GARRETT:  I'd like to mark Tab 21 as an

14   exhibit.

15             MR. MUNK:  Exhibit 11 has been introduced.

16        Q    (By Ms. Garrett) Ms. Johnson, do you recognize

17   this document?

18        A    I'm still reviewing it.  (Reviewing document.)

19   I'm familiar with this document.

20        Q    And what is this document?

21        A    This is a series of emails between members of

22   the elections division of the county clerk's office and

23   my voter registration department, my office, as well as

24   Ms. Hart with the Secretary of State's office.

25        Q    And how long have you known Ms. Hart,

100

1    Ms. Kristi Hart?

2        A    I don't know that I've ever actually met

3    Ms. Hart, but I believe that she's been with Secretary of

4    State's office at least a year and a half, maybe two

5    years.

6        Q    So in the March 5th, 2021, email from you sent

7    at 10:53 a.m., the actual text of which I'll quote is on

8    Page 3 of the exhibit, you wrote, "I did want you to know

9    that I contacted the law firm as I fully expected it to

10   have already completed entering the data."  Which law

11   firm are you referring to here?

12       A    I'm trying to find that email.  March 5th, so

13   the very first email is what you're asking about?

14       Q    The earliest email, yes.

15       A    The law firm would have been associated with

16   the emergency services district whose boundaries the

17   Secretary of State assisted us with creating -- well, the

18   entitlements that they assisted with us creating.

19       Q    And then at a later email on August 26th, 2021,

20   which starts on Page 1 of this exhibit and goes into

21   Page 2, you followed up with the Secretary of State on

22   this email.  What was the purpose of following up in

23   August 2021?

24       A    The Secretary of State had gone into the system

25   behind the scenes, so to speak, and added this ESD to

101

1    TEAM for us, which was a 24-hour action versus us

2    manually entering every single street.  And so the

3    purpose of this was me -- for me to determine whether the

4    Secretary of State could help us with redistricting

5    similarly.

6         Q    In the last paragraph you wrote, "Depending on

7    the schedule (per SB 13) we may have a very short time

8    frame if the Legislature completes its work by

9    mid-November."  Did I read that correctly?

10        A    Yes, ma'am.

11        Q    Can you confirm which schedule you were

12   referring to here?

13        A    Without reading SB 13, I'm not 100 percent sure

14   what the schedule was.  As I recall, the -- this was

15   where the legislature was defining when the primary would

16   be, when voter certificates could be mailed out and so

17   forth.  That's the best that I can recall.

18        Q    And then -- and I'll ask you this:  Which work

19   by the legislature were you referring to, if you could

20   confirm --

21        A    Their effort to redistrict the congressional

22   districts, the Texas Senate, Texas House, and State Board

23   of Education.

24        Q    And what concerns did you have, if any, about

25   this short time frame that you mentioned?

```
1        A    Predominantly workload related.  There's a --
2    there's a lot of work to do, particularly if we were
3    having to change voting entitlement street by street,
4    block by block, odd and even.  It's going to take us an
5    extraordinarily amount -- extraordinary amount of time to
6    both make those changes and audit those to make sure that
7    we had done everything correctly.
8        Q    How much time -- is it possible to estimate how
9    much time that takes?
10            MS. OLALDE:  Objection, vague.
11       A    I would -- you'd need to be more specific with
12   your question.
13       Q    (By Ms. Garrett) I can move on.
14            So when the Galveston County Commissioners
15   Court voted on a redistrict map, what were the next steps
16   for your office?
17            MS. OLALDE:  Can you be more specific?  I'm
18   sorry.  I don't want to just object.  I just wanted to
19   make sure that the record is clear as to what map you're
20   talking about.
21            MS. GARRETT:  The commissioners precinct map.
22            MS. OLALDE:  Thank you.
23       A    There was really nothing for us to do at that
24   point in time until we received additional information,
25   such as what voting precincts were to be located within
```

103

1    each commissioner precinct.  Once that list was provided,

2    then we needed to know -- the way that this -- the

3    election precincts are named, if -- if a precinct moved

4    from Commissioner Apffel to Commissioner Giusti, it would

5    go from a, say, 101 to a 201.  And once we could see the

6    list of voting precincts that were within the county

7    commissioners boundaries, my next question or concern

8    would be, Will these names be traditionally changed as

9    they have in the past and renamed?

10            We don't look at which Commissioner Precinct it

11   is.  We look at the number.  So Precinct 101 is County

12   Commissioner Precinct 1, 202 is Commissioner Precinct 2

13   and so forth.  And so we would possibly, once we had that

14   list, be able to begin making those name changes to the

15   voting precincts.

16            THE REPORTER:  Excuse me.  Who was the last

17   speaker that asked the question?

18            MS. OLALDE:  It was Angie Olalde.

19            THE REPORTER:  Thank you.

20       Q    (By Ms. Garrett) When did you have to complete

21   those name changes by?

22       A    In time to generate the list for the county

23   clerk, as well as to generate the list to mail out the

24   voter certificates.

25       Q    Was that the --

104

1          A      This was in January.

2          Q      The January 11th deadline?

3          A      Yes, ma'am.

4          Q      When you were making those name changes, did

5     you have any contact with the commissioners court during

6     that time period, the Galveston County Commissioners

7     Court?

8          A      I don't recall specifically.  I -- I don't

9     recall specifically.  I would've wanted them to vote to

10    change those names.  I was very uncomfortable proceeding

11    on the assumption that we would simply change the first

12    number.  I don't remember specifically contacting them.

13         Q      What information would you have wanted from the

14    commissioners court during that time?

15         A      The specific names of the precincts, to ensure

16    that 101 would become 201, that 105 would become 205, if

17    those were moved from one county commissioner's precinct

18    to another.  Without that -- although that was a logical

19    assumption and typical change, my preference was that

20    they took an official action.

21         Q      Did they ever provide that information to you

22    or your office?

23         A      I believe they finally took a vote on that in

24    December.

25         Q      So you used the phrase earlier that one of

105

```
 1    your -- is it accurate to say that your office's role was
 2    to implement the maps selected by the Galveston County
 3    Commissioners Court, or I guess the map selected by the
 4    Galveston County Commissioner Court?
 5         A    We did not implement their map.  We simply
 6    changed the voting precincts to correspond to the county
 7    commissioner numbers.
 8         Q    So when changing the names for the selected
 9    map, what changes -- your office needed to -- I guess,
10    let me ask you this:  How much time did it take to change
11    the names for the adopted Galveston County commissioners
12    precinct map?
13              MS. OLALDE:  Objection, misstates testimony.
14              THE WITNESS:  What was your objection?  I'm
15    sorry.
16              MS. OLALDE:  You don't need to know my
17    objection.  Just answer the question.
18              THE WITNESS:  Oh, yeah.
19         A    So repeat your question then, please.
20         Q    (By Ms. Garrett) You mentioned that your
21    office's role -- let me back up.
22              You mentioned your office's role was to change
23    the names --
24         A    Yes.
25         Q    -- of the precinct map; is that correct?
```

106

```
 1        A    Yes.

 2        Q    How much time did it take to implement the map

 3   that the Galveston County Commissioners Court adopted in

 4   2021, specifically the commissioner precinct map?

 5             MS. OLALDE:  Same objection.

 6        A    We did not specifically change the commissioner

 7   precincts.  We changed the names of the voting precincts

 8   and in some instances split precincts according to how

 9   they were finally adopted.  So we never looked at county

10   commissioner precincts.  We looked at individual voting

11   precincts and we changed those numbers.

12             If it was a simple 101 to 201, it would take 15

13   to 20 minutes, if the Secretary of State's redistricting

14   module was working, which it frequently did not.

15        Q    (By Ms. Garrett) How did the -- when did the

16   voters, after the -- these -- after these name changes

17   occurred, when did voters receive updated voter

18   registration certificates?

19        A    We mailed them out in different batches.  And

20   so we would produce the list, and if we -- we started

21   mailing them -- we weren't allowed to mail them until

22   January.  And so we would produce lists, and we worked

23   with our vendor to release certain batches of them.  So

24   if we were certain that an entire precinct was simply

25   renamed, we could mail those voter certificates.
```

1          In the instances where they were split to

2     combines, or tweaking for census data lines to be exactly

3     correct, those were set aside until that work could be

4     completed.  And we're still in some instances, due to

5     redistricting of other entities, sending out voter

6     certificates.

7          Q    Prior to the commissioners precinct map in

8     Galveston County being adopted, did you see the two

9     proposed maps?

10         A    I don't recall specifically.  If I saw them,

11    they were posted on a board outside the commissioners

12    courtroom.

13         Q    But you don't recall whether you saw them?

14         A    I very likely saw them.  I just don't

15    specifically remember when I would've seen them.  They

16    would've been released to the public, and I could have

17    seen them in the Galveston Daily News.  I may have seen

18    them on the county website.  I'm not sure how else I

19    would've seen them other than, like I said, posted

20    outside the courtroom.

21         Q    Were you shown the maps prior to when they were

22    shown to the public?

23         A    I do not believe so.  I think I saw them at the

24    same time.

25         Q    Would you have expected to have seen the maps

108

1    prior to them being shown to the public?

2         A    Not necessarily.  My opinion didn't -- and

3    did -- was not going to influence their decisions.

4         Q    And why do you say that?  Why do you say that

5    your opinion would not influence their decisions?

6         A    I'm not sure it was as important to them what

7    my opinion was as it was to the decisions that they were

8    making for whatever reason, or the public's input would

9    have had far more impact than my -- my own alone.  I'm

10   one voice.

11        Q    Were you present the day that the commissioners

12   court adopted the commissioners precinct map in 2021?

13        A    No, I was not.

14        Q    And why didn't you attend that meeting?

15        A    We had just sent out over 220,000 tax

16   statements, so we were kind of busy.

17        Q    And you were not requested at the meeting, I

18   take it?

19        A    No.

20             MS. GARRETT:  I'd like to mark Tab 29 as an

21   exhibit.

22             MR. MUNK:  Exhibit 12 has been introduced.

23        Q    (By Ms. Garrett) Ms. Johnson, do you recognize

24   this document?

25             MS. OLALDE:  Just one second.  It's blurry.  Is

109

```
 1      there -- can you read that?

 2             THE WITNESS:  Yes, it is a little blurry, but

 3      give me just a moment to look at this, please.

 4         A    (Reviewing document.)  I'm familiar with this

 5      email.  I wrote this email.

 6         Q    (By Ms. Garrett) What day did you send this

 7      email?

 8         A    November 9th.

 9         Q    I want to look at the last paragraph in this

10      email.  At the first part of that paragraph, you write,

11      "Commissioners were supposed to meet today, Tuesday, to

12      adopt county commissioner precincts and next week to

13      adopt the actual county precincts."  Did I read that

14      correctly?

15         A    Yes, ma'am.

16         Q    Why, when you wrote this email -- or I guess

17      prior to writing this email, why were you under the

18      impression that the commissioners were going to meet on

19      that Tuesday, November 9th?

20         A    Without looking at a calendar, I'm not certain,

21      but they -- they had a regularly scheduled meeting every

22      other week, would be my assumption.  But I don't know

23      specifically.  Apparently somebody or some communication

24      or some news report had predicted that they were going to

25      meet on Tuesday.
```

110

1        Q     Do you know why they didn't meet on Tuesday,

2   November 9th?

3        A     No, I don't.

4        Q     In that same paragraph, you wrote, "Nathan will

5   be providing a listing he created for each map being

6   considered so we will easily know which are full precinct

7   changes and where we will be making splits.  Also he will

8   be providing maps to us."

9             Did I read that correctly?

10       A     Yes, ma'am.

11       Q     Can you describe what was included in those

12  listings that Nathan provided?

13       A     Nathan would provide a list showing the county

14  commissioner precinct, the county commissioner as a

15  heading, in which voting precincts or election precincts

16  were included in each one, and this would be providing

17  the specific names that they were going to be given.

18       Q     And what format did you receive these listings

19  in?

20       A     He typically attached these as PDF files to

21  emails.

22       Q     Do you remember reviewing these listings for

23  each of the proposed maps?

24             MS. OLALDE:  Objection, misstates prior

25  testimony.

111

1      A     And I'm not a hundred percent certain that

2  there were lists provided for each of the maps.  It says

3  that he created a listing for each map.  I don't recall

4  seeing those lists specifically, or when I received those

5  from him.

6      Q     (By Ms. Garrett) So you have been the county

7  tax assessor-collector for Galveston County for quite

8  a -- quite a while; is that right?

9      A     Yes, ma'am.

10     Q     How many redistricts -- redistricting cycles

11  have you experienced during your time as county tax

12  assessor-collector?

13     A     This is my second.

14     Q     So you were the tax assessor-collector and

15  voter registrar in 2011 --

16     A     Yes, ma'am.

17     Q     -- is that right?

18     A     Yes, ma'am.

19     Q     Were your responsibilities and your office's

20  responsibilities during the 2011 redistricting cycle

21  similar to the responsibilities that you and your office

22  had in 2021?

23     A     Yes, they were very similar.

24     Q     Were they at all different?

25     A     The changes were different.  The JP and

112

1    constable precincts were combined in 2011, I believe,

2    from eight to four precincts.  And so that was a big

3    change for the county.

4         Q    Does your office -- did you or your office make

5    any changes in light of what you -- of what you may have

6    learned during the 2011 redistricting process?

7         A    Yes.  Technology had changed somewhat.  The

8    Secretary of State had come up with a redistricting

9    module which was supposed to simplify things, which it

10   did to some extent.  We had -- I had developed a

11   relationship with the CAD in which any time I received

12   shape or data files, I would send it to them, and they

13   could produce a street-by-street parcel list of all the

14   addresses within whichever data was in the shapefile, so

15   whether it was county voting precincts or -- call it,

16   or -- or City of Galveston precincts.

17             So we changed the process from strictly looking

18   at maps and physically identifying specific streets on

19   blown-up maps to relying more on the spreadsheets of

20   parcels from the CAD as compared to the street range

21   lists that we were pulling out of TEAM.  That's still a

22   manual process, but a little bit more exacting, just very

23   tedious and time-consuming.  Very, very time-consuming.

24        Q    In 2011, how much contact did you have with the

25   Galveston County Commissioners Court about the timeline

113

1    for redistricting?

2        A    I don't necessarily recall any communication

3    about a timeline.  That's an awful long time ago.

4        Q    Did you share information in 2011 similar to

5    how you shared information in 2021 with the commissioners

6    court in Galveston County?

7        A    I don't recall.  I would have given them

8    what -- any information that they requested that -- I was

9    probably more proactive this year in this redistricting

10   than then because I had no idea what to expect in 2011.

11       Q    So in 2021, with your experience, you felt you

12   could be more proactive about providing aid and services

13   to various entities across various localities and

14   municipalities?

15       A    I --

16            MS. OLALDE:  Objection.

17       A    Yes.

18            MS. OLALDE:  Compound and overbroad, but go

19   ahead and answer if you can.

20       A    I'm not sure how to answer your full question.

21            THE REPORTER:  I'm sorry, I didn't hear the

22   objection.

23            MS. OLALDE:  I said compound and overbroad.

24       A    So there were lessons learned from 2011, and so

25   I tried to take the pitfalls that we had encountered then

114

1    and avoid them in 2021.  And I believe that we were

2    successful in that.  I used the technology much more, and

3    that was very beneficial.

4          Q    (By Ms. Garrett) Can you clarify which pitfalls

5    you were looking to avoid in 2021 and successfully did

6    avoid in 2021?

7          A    We weren't strictly using visual maps,

8    comparing a 2000 map to a 2011 map.  We were also -- had

9    added the -- the additional benefit of the GIS system at

10   the Central Appraisal District to actually get parcel and

11   street addresses of every single property that was within

12   each precinct, whatever that precinct may be.  So that

13   definitely enabled us to be more precise than just simply

14   visually identifying a change.

15         Q    What information could the Commis -- could the

16   Galveston County Commissioners Court have provided you or

17   your office to make your job easier during the 2021

18   redistricting cycle?

19              MS. OLALDE:  Objection, asked and answered.

20         A    I think that they could have provided names of

21   election precincts sooner, but I'm not sure, other than

22   providing the budget so that I could hire staff.  It was

23   the -- the -- our part of the redistricting effort was

24   spread out over a long time period, and there's limited

25   funds available from the Secretary of State for me to be

115

1    reimbursed for temporary staff, so it would put a

2    budgetary strain on my office.  But they did provide the

3    funding that I requested.

4              MS. OLALDE:  Ms. Garrett, we've been going a

5    little over an hour.  When you get to a good stopping

6    point, may we take a break, please?

7              MS. GARRETT:  Yes.  Let me just finish this

8    line of questioning and then we can take a break.

9         Q    (By Ms. Garrett) Were you aware in 2011 that

10   the Department of Justice had to provide preclearance to

11   all redistrict maps prior to them being implemented?

12        A    I was aware of that, yes.

13        Q    Do you recall whether -- or let me ask you

14   this:  Did that preclearance requirement impact your work

15   at all in 2011?

16        A    It -- not specifically our work.  It would've

17   perhaps changed the timelines for commissioners.  They

18   would've had to submit the maps, adopted them, submitted

19   them, and we would've waited until that preclearance was

20   approved, until the maps were cleared before we began

21   anything, any work.

22        Q    So it sounds like it may have delayed your

23   process, but -- because you couldn't start your work

24   until they had been precleared?

25        A    Correct.

116

```
1              MS. GARRETT:  Okay.  We can -- now may be a
2    good time to take a brief break.
3              MS. OLALDE:  Thank you.
4              MS. GARRETT:  Can we go off the record?
5              THE VIDEOGRAPHER:  It's currently 1:59 p.m.
6    We're off the record.
7         (Recess.)
8              THE VIDEOGRAPHER:  Current time is 2:11 p.m.,
9    and we're back on the record.
10        Q    (By Ms. Garrett) Ms. Johnson, did you speak
11   with anyone during the break?
12        A    Yes.
13        Q    With whom did you speak?
14        A    The individuals in this room.
15        Q    Was it in relation to today's deposition?
16        A    No.
17        Q    Is it still the case that Zach, Angie and
18   Jordan are the only individuals in the room with you
19   today?
20        A    Yes.
21        Q    And is it still the case that you have no
22   documents in front of you for --
23        A    Yes.
24        Q    -- today's deposition?  I just have a few more
25   lines of questioning, and then as discussed, two other
```

117

1    groups will be asking questions as well.

2            So my first question for you in this line:  As

3    a voter registrar, is one of your duties to maintain

4    voter rolls?

5        A    Yes.

6        Q    Can you describe generally how you do that?

7        A    We -- we receive and I have teams of people who

8    enter voter applications.  Sometimes that means we have

9    to add street ranges.  We have a lot of development going

10   on in Galveston County.  We receive information from a

11   variety of sources, including the TEAM system has a

12   section called the "task summary," which a variety of

13   tasks are listed that must be performed daily by my staff

14   in the voter registrar department.  We receive

15   information from the district clerk, from the probate

16   judge, from Bureau of Vital Statistics, and the

17   appropriate work is done.  Sometimes voters themselves

18   will notify us if there's a deceased member of their

19   family.  And so it -- a variety of things are going on

20   constantly.

21       Q    How often do you process new voter

22   registrations?

23       A    We process applications every single day that

24   they are received.  And some of those do come across the

25   task summary as DPS applications.

118

1          Q    For what reasons may you remove a voter from

2     the voter roll?  I know you mentioned you might be

3     notified somebody is deceased.

4          A    Like if --

5          Q    What other reasons?

6          A    If another county or state notifies us that

7     somebody is registered in their county or their state, we

8     will remove them.  When we receive notifications from the

9     district clerk when people move out of county on -- as a

10    result of a jury summons, we will send notices of

11    confirmation to those voters to confirm they've actually

12    moved.  Sometimes those lists include people saying that

13    they -- they cannot serve because they are noncitizens.

14    That is very occasional, but when that -- that does

15    happen, and so we respond.  So they would be removed --

16    they wouldn't be removed until we send a notice of

17    examination to determine if the information we received

18    is correct.

19              So just about everything is checked

20    immediately, unless it's an immediate family member who

21    informs us a family member has died.

22         Q    So you mentioned a notice of examination.

23    That's something that's sent by your office?

24         A    Yes, ma'am.

25         Q    And who is that sent to?

119

1      A     Anybody who we've received information that

2   they've moved out of county or they're a noncitizen.  I'd

3   have to look at the actual form.  I know the notice of

4   examination is used for a potential noncitizen when we

5   receive that information.

6      Q     But it would be sent to the voter who may be

7   removed from the voter roll?

8      A     Yes, yes.  And it could be that they are a

9   felon, and so we try to confirm as much information as we

10  can.

11     Q     How often do you -- let me ask you this:  How

12  many notices of examination would you estimate your

13  office sends per day?

14     A     Per day?  Less than one per day.  I'd say there

15  may be -- without looking at the statistics, I couldn't

16  be certain, but I'd say no more than ten a month,

17  perhaps.

18     Q     And then how often does your office typically

19  remove voters from the voter roll?

20     A     Just when it's been confirmed or a voter fails

21  to respond timely to a notice of examination.  The only

22  other time a voter is removed, unless they moved out of

23  county or out of state, would be when the Secretary of

24  State actually removes voters as a result of the mass

25  purge being performed.  I think that's every other year

120

1    after -- two years after you've been on the suspense list

2    and have not voted in two federal election cycles.

3         Q    So you just mentioned voters being put on a

4    suspense list.  Did I hear that right?

5         A    Yes, ma'am.

6         Q    What does it mean for a voter to be put on the

7    suspense list?

8         A    It simply means that we've received information

9    that they have moved.  Mail's typically been returned to

10   our office, and so we take -- if the U.S. Postal Service

11   provides forwarding information, we then generate a

12   letter to confirm that they actually moved.  And that

13   places -- when you -- by virtue of mailing in that

14   letter, that -- that places an S on their record, placing

15   them in suspense status.  It does not affect their right

16   to vote.  It simply means they need to confirm their

17   address the next time they vote, or in response to the

18   correspondence we send them.

19        Q    So if a voter is placed in suspense, they have

20   two avenues to remedy being placed on suspense?

21        A    Yes, ma'am.

22        Q    Okay.  And so when a voter receives that

23   notice -- notice of examination, how much time do they

24   have to respond to that notification before being removed

25   from the voter roll?

```
 1       A    If it's in response to a change of address,

 2   they would stay in suspense up to four years before being

 3   removed by the secretary of State.  If it was they were a

 4   noncitizen, for example, we give them at least 30,

 5   typically 40 days.  They have 30 days to respond, but

 6   knowing that the U.S. Postal Service is a little bit

 7   delayed, we try and give the voter the benefit of the

 8   doubt and give them more time.

 9       Q    So I want to talk to you about an advisory from

10   the former Texas Secretary of State David Whitley back in

11   January 2019, an advisory from Friday, January 25th.  Do

12   you remember when David Whitley sent out that advisory

13   concerning the citizenship status of 95,000 registered

14   Texas voters?

15       A    I believe you just said January 25th.

16       Q    Yeah.  In January 2019, do you recall former

17   Texas Secretary of State David Whitley sending out an

18   advisory that questioned the citizenship status of

19   roughly 95,000 registered Texas voters?

20       A    I don't specifically remember his advisory.  I

21   remember it being in the press and on the news and those

22   names showing up on our task summary list.

23       Q    How soon did those names show up on your task

24   summary list?

25       A    They showed up the Monday after that somewhat
```

122

1    was out -- it was out in the news on a Saturday night,

2    and the lists were received that Monday morning.

3         Q    How did you respond to seeing those names on

4    that list, or how did your office respond to that?

5         A    I had already met with my staff after seeing

6    that news report.  I contacted my staff and we arranged a

7    meeting first thing Monday morning, and we sat down and

8    brainstormed, not knowing if we were going to receive one

9    name, a thousand names, or how many.  We put together a

10   strategy of what we would need to do, and everybody was

11   assigned specific tasks.  That included researching those

12   voters, confirming they were actually on our list of

13   registered voters, and determining if we had any

14   documents at all to validate whether they were or were

15   not U.S. citizens.

16        Q    How many Galveston County residents were

17   included on that list?

18        A    There were nearly 900 names on that list.

19        Q    Do you recall generally -- or did you notice

20   any patterns or similarities amongst the residents that

21   were identified in that list?

22             MS. OLALDE:  Objection, vague.

23        A    No, but I wasn't necessarily looking at that

24   list.  My staff was.  The task was to review the

25   information and obtain documents.  I'm not sure any of us

123

1    were looking at names.  We were looking at voter unique

2    identifiers.

3         Q    (By Ms. Garrett) And what sort of documents

4    were you -- were your staff looking into?

5         A    We were seeing if we had any voter

6    applications, if we had ever sent them any letters.

7    Every single letter we send a voter, with rare exception,

8    is scanned and maintained and held for a certain time

9    period.  And so we -- we searched each voter and do it a

10   variety of ways to determine if we had any documents

11   associated with that voter.  And all of that information

12   was gathered and clipped together and set aside for a

13   decision to be made whether it was appropriate to send a

14   notice of examination or not.

15        Q    Did you send any notices of examination?

16        A    Yes, I believe in total, we sent out 100 or 150

17   over a two-day period.  We had determined we could send

18   out and investigate approximately 100 a day, and we

19   pulled back the second set of the instruction.  There

20   was -- we were told to stop this middle of the second day

21   and we were able to retrieve about half of the letters

22   that we had prepared on the second day, from being

23   mailed.

24        Q    And who told you to stop sending letters?

25        A    I don't recall whether it was a temporary

124

1    restraining order or we received that instruction from

2    the Secretary of State.  I don't recall specifically

3    without going back and looking at those documents.

4        Q    Did you contact the Secretary of State at all

5    between receiving these names and sending out the

6    letters, or notices of examination?

7        A    I don't recall that I specifically did.  I

8    could have instructed my staff to, to validate was there

9    anything else we needed to be looking at, but I really

10   don't recall specifically.

11       Q    And the notices of examination that you sent

12   with -- are these just a standard form that you sent or

13   were they -- or were they at all edited in light of the

14   advisory that was provided by the Secretary of State?

15       A    They were -- they were system generated, so

16   they were form letters.

17       Q    Did you reach out to the Department of Public

18   Safety before sending out these letters?

19       A    I do not recall that we did.

20       Q    Would you have expected to speak to the

21   Department of Public Safety regarding these notices of

22   examination at any point in the process of sending them?

23       A    The Secretary of State had worked with DPS in

24   order to generate the list, so it would've been our

25   assumption they had communicated with one another.

125

1       Q     What was your reaction when you learned -- let

2    me ask you this:  What was your reaction when you were

3    told to stop sending the letters?

4       A     My reaction was to immediately contact my staff

5    and cease mailing those letters and retrieve any that had

6    not been put in the mail already.

7       Q     Were you aware of other county elections

8    officials sending letters in response to the Secretary of

9    State's advisory?

10      A     Not at that time.  The lawsuit involved, I

11   believe, a total of 17 counties, so there were other

12   county officials that were doing the same thing that we

13   were doing, apparently doing the research that we could,

14   and acting according to what the election code required

15   us to do in response to the information received.

16      Q     Were you aware of any other county elections

17   officials who did not send letters in response to the

18   Secretary of State advisory?

19      A     Not necessarily.  I guess the other 254 outside

20   of the 17 that I really -- I -- no, I was -- I had no

21   personal knowledge of any ones that were refusing to do

22   it, at that time.

23      Q     Did you speak to anyone outside of your office

24   prior to sending the notices of examination in response

25   to the Secretary of State advisory in January of 2019?

126

1      A    I believe I would have contacted -- it would

2    have been appropriate for me to possibly reach out to the

3    county judge or the commissioners and let them know what

4    we were doing or what was going on.  I would have

5    possibly contacted the county sheriff to determine if

6    they could assist us in any way with any information to

7    determine citizenship status of the individuals on the

8    list.  But I'm guessing, based on what would've been, in

9    my opinion today, an appropriate response at the time.

10   To try and find answers to that, I certainly reached out

11   to my U.S. congressman to find out if they could guide --

12   give us any guidance on how to make this determination.

13      Q    So did you say that you may have reached out to

14   the commissioners court in Galveston County, but you

15   don't recall?

16      A    I don't recall specifically doing so.  It would

17   have been appropriate for me to notify others in the

18   county that could be affected or receive phone calls,

19   that this is -- this is what we're doing based on the

20   information we have received.  There was a lot going on

21   then.  Whether I did that immediately or not, I just

22   don't remember.

23      Q    And when you say receiving phone calls, I -- do

24   you mean phone calls from residents of Galveston County

25   reaching out to their commissioners asking questions

127

```
 1       about this?
 2            A    The media predominantly.
 3            Q    Were you aware at the time -- were you aware in
 4       January 2019 that the Florida Secretary of State had
 5       inaccurately flagged 180,000 voters as noncitizens?
 6            A    I was not aware of that at the time that we
 7       received the information.  It was something I found
 8       out -- or I heard about subsequently, but I still really
 9       have no personal knowledge of what happened in Florida.
10            Q    When did you hear about what happened in
11       Florida?
12            A    I don't recall specifically.  Likely during the
13       next 30 to 45 days.
14            Q    I want to go back to any potential
15       communications you may have had with the commissioners
16       court at this time.  You mentioned that you anticipated
17       the commissioners court may have received phone calls
18       from the media; is that right?  Does your office provide
19       any guidance of what the commissioners court should say
20       to the media typically in cases like this or...
21            A    I would never presume to instruct another
22       elected official on what they should say to the media.  I
23       would simply -- had I sent that communication timely,
24       then it would've been to communicate so they were at
25       least aware and had knowledge.  No elected official or
```

128

1    department head in any organization wants a surprise call

2    and not to be aware of something of that magnitude that's

3    going on in their -- in their county or jurisdiction.

4    It's a courtesy.

5        Q     Were you aware that civil rights groups sent a

6    letter to the Secretary of State shortly after this

7    advisory was sent expressing alarm over this advisory?

8        A     I wasn't sure that they had contacted the

9    Secretary of State.  I know that some of those groups had

10   contacted my office and I think were trying to file

11   temporary restraining orders to stop the action from

12   proceeding.  There was an individual from one

13   organization, but I don't remember what that organization

14   was that actually called me.

15       Q     Do you remember when she called you, this

16   individual?

17       A     It was a gentleman, and it would have been

18   within 24 hours of having received that list to inquire

19   what -- what we were doing or -- everybody wanted a copy

20   of the list.  And I didn't think it was in those

21   individuals' best interest for that list to be provided.

22   And so basically, when everybody called me, I instructed

23   them to file an open records request, and I would work

24   with the -- the attorneys, the county attorneys, to

25   determine the appropriate response.

129

1       Q    So in 2019, in your capacity as Galveston

2   County tax assessor-collector, you were sued regarding

3   this advisory and response, along with the Texas

4   Secretary of State, Texas Attorney General, and the

5   governor of Texas; is that right?

6       A    I believe that there were also at least 16, if

7   not 17, other counties that were named in that suit.

8       Q    But you were included as a Defendant in that

9   case?

10      A    Yes, I was.

11      Q    And do you recall the complaints in that case?

12      A    Not specifically without going back and reading

13   that suit, but I believe the gist of it was that we had

14   violated the constitutional rights of the individuals

15   that we had sent those letters to.

16      Q    Do you recall in that case the Plaintiffs had

17   asserted that the actions taken by the Defendants in that

18   case had a discriminatory effect on Hispanic Americans?

19      A    I seem to recall that that was part of the

20   complaint, yes.

21      Q    What was your reaction when you saw that listed

22   in the complaint?

23      A    I went back and looked at the list, and they

24   were not all Hispanic surnames.

25      Q    And what ultimately happened with that lawsuit?

130

1       A    The counties -- the Defendants agreed to send

2    no more letters.  That would have been the voter

3    registrars and election administrators in the counties.

4    So we stood down without being given permission by the

5    court to proceed.  And I believe that there was an

6    agreement that was developed between the other parties.

7    We were removed from the suit.  And then at that point,

8    the -- the other parties, the remaining Defendants and --

9    worked out with the Plaintiffs an agreement on things

10    that would change, such as the notice of examination

11    letter was to be changed.  And subsequently, it was

12    changed later by the Secretary of State.  I can't tell

13    you specifically when.

14       Q    Did you discuss this lawsuit with anyone at the

15    commissioners court?

16       A    I would have.  If I did, it would have been in

17    executive session to discuss whether legal counsel was

18    needed.

19       Q    And in that case, would you have -- would your

20    staff have flagged for you that that was on the agenda or

21    would you have reached out to the commissioners court

22    about that?

23       A    It would've shown up on an agenda and they

24    likely would've notified me to appear in executive

25    session.  I would not have known they needed me in

131

1    executive session without being instructed that I needed

2    to come -- to come in the room.

3         Q    So you have been in your current role for about

4    18 years now; is that right?

5         A    Yes, ma'am.  I'm in my 18th year right now.

6         Q    Have you ever considered running for a

7    commissioner's seat?

8         A    No, ma'am.

9         Q    Have you ever considered running for a

10   different office?

11        A    I've been asked, but I have not considered it,

12   no.

13        Q    Are you aware of any African American or Latino

14   Republican county-wide elected officials?

15        A    Would you repeat that again, please?

16        Q    Are you aware of any African American or Latino

17   Republican county-wide election officials?

18        A    Yes, ma'am.

19        Q    Who are they?

20        A    Stephen Holmes is not county -- well,

21   county-wide, right now we have Robin Armstrong.  We have

22   different JP or constables.  And of course, Commissioner

23   Holmes, but he's not county-wide.  So the only -- I guess

24   we don't have any county-wide African American or

25   Hispanic -- well, we did have Michelle Slaughter.  She

132

1    was a state district judge.  And that's all to my

2      knowledge.

3              I don't typically ask people whether they're

4    Latino, Hispanic, or -- I -- I just really don't have

5    personal knowledge of that, unless they volunteer the

6    information.

7         Q    You mentioned that you've been asked to run for

8    other offices.

9         A    Uh-huh.

10        Q    Who's asked you to run for other offices?

11        A    A variety of individuals.  Many citizens.

12   Also, our current County Commissioner Robin Armstrong has

13   asked me to run for a congressional seat.  Different --

14   different people during different time periods have asked

15   me to run for -- a lot of people have asked me to run for

16   county judge, and I've been very happy to respond that

17   I'm content where I'm at.

18        Q    And why is it that you feel content where

19   you're at?

20        A    I believe I'm making a difference right now in

21   the seat that I'm in and there's -- as long as -- as the

22   work that I'm doing is making good changes and there's

23   benefit and there's people that I can help, that this is

24   really where I need to be.

25        Q    And just a couple more questions for you,

1    Ms. Johnson, as I wrap up my questioning.  Earlier today,

2    it's my recollection that you testified that you have

3    texted with Mr. Tyler Drummond; is that accurate?

4        A    Yes, ma'am.

5        Q    Did you use your personal cell phone when

6    writing those text messages?

7        A    Yes, ma'am.

8        Q    Have you shared those messages with your

9    attorney?

10       A    Yes, ma'am.

11       Q    Have you used your personal cell phone to text

12   with others that we have discussed today?

13       A    Different county commissioners, yes.  The

14   county judge occasionally, very rarely, but yes, I have.

15       Q    Have you also shared those messages with your

16   attorney?

17       A    Yes, as they applied to this case.  Yes, ma'am.

18            MS. GARRETT:  Those are all of my questions for

19   you today, Ms. Johnson.  I am now going to hand the mic

20   over to Alex Copper with the Petteway Plaintiffs, who

21   will now have a chance to ask you some follow-up

22   questions.

23            THE WITNESS:  Thank you.

24            We cannot hear you.

25            MS. COPPER:  How about now?  Can you hear me

134

1    now, Ms. Johnson?

2              THE WITNESS:  Yes.  It's a little garbled.

3              MS. COPPER:  Okay.  Let me try changing this

4    over -- (audio cutting out).

5              THE WITNESS:  Can't hear you at all now.

6              MS. RICHARDSON:  Hi.  This is Valencia

7    Richardson with the Petteway Plaintiffs.  Can we go off

8    the record while she fixes her sound so we're not burning

9    up time?

10             MS. COPPER:  Thank you, Valencia.

11         (Discussion off the record.)

12             THE VIDEOGRAPHER:  Okay.  Current time is 2:41.

13   We're on the record.

14                    E X A M I N A T I O N

15   BY MS. COPPER:

16        Q    Hi, Ms. Johnson.  My name is Alexandra Copper.

17   I am legal counsel for the Campaign Legal Center, and I'm

18   going to be asking you some questions today on behalf of

19   the Petteway Plaintiffs in this case.

20             I wanted to start by actually going back to the

21   very beginning of your deposition, a question that was

22   asked of you when going through your basic background

23   information, which was, when asked if you worked for

24   Galveston County, you said that you worked for the voters

25   of Galveston County.  Do you remember saying that?

135

1        A     Yes, ma'am.

2        Q     Can you explain to me what the distinction is

3   to you there?

4        A     I don't work for county commissioners court.  I

5   do not work for the county government, so to speak,

6   although my paychecks are actually provided through the

7   county system, the county treasurer's office.  I believe

8   as an elected official that my responsibility and that my

9   bosses are the 230,000 registered voters in Galveston

10  County.

11       Q     Thank you.

12             Can you tell me, have you, in your experience

13  as voting registrar, ever seen any situations or felt

14  like there have been times where the County itself is at

15  odds with its voters?

16             MS. OLALDE:  Objection, vague.

17       A     Yes.

18       Q     (By Ms. Copper) Can you tell me about those

19  circumstances where you felt that way?

20       A     Over 18 years, that's an awful big question.

21  From my personal perspective as tax assessor-collector,

22  they are most typically the -- the voters are very upset

23  about the amount of taxes, and so they frequently

24  complain about their taxes and their values that are

25  determined by the appraisal district.  And so any time

136

1    there's a vote on budget or tax rates, then there's

2    usually some disagreement within the community on whether

3    they're doing all that they can to save the money that

4    they claim to be spending, or saving.  That's probably

5    the biggest one.

6         I do know that there -- through redistricting

7    and obviously these lawsuits, there's been some

8    dissatisfaction with different voters, different elected

9    officials that were affected by decisions in 2011, and

10   obviously by -- you know, by, I believe,

11   Commissioner Holmes and others in this most recent

12   redistricting.

13       Q    You mentioned dissatisfaction among voters in

14   both 2011 and potentially during the most recent

15   redistricting cycle.  Can you tell me any specific

16   criticisms you have heard about either cycle and the maps

17   that were adopted as a result?

18       A    Not specifically with regard to the JP and

19   constables.  I'm not sure that the constables that -- I

20   don't recall, without going back and looking at some

21   notes, how the determination was made of who would run

22   for each one of those receipt -- seats, but you went from

23   eight JPs and constables to four, so obviously, there

24   were going to be some people who would not be reelected

25   or would any longer represent those voters.  And so there

137

```
 1    was general dissatisfaction with -- by those two elected

 2    official groups on those maps and -- but specifically,

 3    people did not typically complain to me about that, so it

 4    was only what you would hear in commissioners court and

 5    testimony you read about in the newspaper.

 6         Q    And you mentioned Commissioner Holmes in

 7    particular in respect to the most recent redistricting

 8    process.  Can you tell us any criticisms that you heard

 9    from him or about the redistricting with respect to him?

10         A    I did not specifically talk to Stephen Holmes,

11    but the general feeling and common knowledge in the

12    community is, I think that he is of the opinion that he

13    could not get elected in the current precinct as drawn.

14    I didn't nec- -- and he voted against the maps, so that

15    was an obvious position for him.

16              I didn't necessarily agree with his position.

17    I think that he could win reelection in that precinct.

18         Q    Why do you think that?

19         A    Because he served the county well in the time

20    that he's been in office.

21         Q    And you think performance alone should be

22    enough to get you reelected?

23         A    In this county, yes, ma'am, I do.

24         Q    Now, switching gears a little bit, if I

25    remember correctly, you said earlier that you don't
```

138

1    recall having seen the proposed maps for this

2    redistricting cycle before they were announced to the

3    public.  Is that accurate?

4         A    Yes.  I think we all somewhat saw them at the

5    same time.

6         Q    Okay.  Do you remember just approximately

7    might -- when that might have been?

8              MS. OLALDE:  Objection, asked and answered.

9         A    I believe that -- that it was stated that they

10   adopted those maps in October or November.

11        Q    (By Ms. Copper) Okay.  And you had said that

12   you were not present at the meeting at which they adopted

13   those maps?

14        A    No, ma'am, I was not.

15        Q    And is that -- I know there was a public

16   hearing regarding the redistricting process on

17   November 12th, and I -- if I remember correctly, that is

18   the meeting at which the commissioners adopted the maps.

19   Does that sound correct to you?

20        A    I -- without going back and looking at agenda,

21   I would believe that to be true, yes.

22        Q    And you were not at that November 12th meeting;

23   is that correct?

24             MS. OLALDE:  Objection, asked and answered.

25        A    No, I was not at that meeting.

1    Q    (By Ms. Copper) Okay.  Now, again, I would like

2    to revisit an exhibit that's already been introduced, if

3    that's okay.  If we could go ahead and pull up Exhibit

4    Number 2.  Luckily, I think you've read this all already

5    and had a chance to talk about it a bit, so I will try to

6    keep my questions much more tailored.  But this is the

7    January 14th email from yourself to -- looks like quite a

8    number of people.  The "to" line is to all of the county

9    commissioners at that time; is that correct?

10   A    Yes, and their chiefs of staff.

11   Q    Okay.  They -- the -- their chiefs of staff are

12   the folks in addition to yourself that are CC'd; is that

13   correct?

14   A    Yes.  And the blind CC would have been my chief

15   deputy and the senior voter registration specialists who

16   were going to be affected by this.

17   Q    Okay.  And now, in the first paragraph of your

18   email, you said that redistricting is around the corner;

19   is that correct?

20   A    Yes.  At that time, I assumed it would be

21   April, as it had typically been.

22   Q    And I -- from what we've discussed and you've

23   said already, the commissioners didn't adopt their maps

24   until October or November, as you remember; is that

25   accurate?

140

1              MS. OLALDE:  Objection, asked and answered.

2        A    Yes, ma'am.

3        Q    (By Ms. Copper) And the census data was

4   released in August, though; is that correct?

5              MS. OLALDE:  Objection, asked and answered.

6   Also vague as to "census data."

7              You can answer again.

8        A    I believe that data was released in August,

9   yes, ma'am.

10       Q    (By Ms. Copper) In your experience, or from

11  your side of things, what do you think would've taken so

12  long then between August and November to warrant the kind

13  of delay in coming out with the redistricting plan?

14             MS. OLALDE:  Objection, calls for a lot of

15  speculation.

16             You can answer if you can.

17       A    There was a lot of data to be looked at and

18  data that likely had to be entered into mapping, had to

19  be coded and put into maps so decisions could be made in

20  conformance with federal law, and I have no idea what

21  those restrictions and laws are.

22       Q    (By Ms. Copper) But it wasn't your office that

23  was responsible for combing through and documenting all

24  of that data.

25       A    Yes.

141

1        Q     Am I understanding that correctly?

2              Do you know who in particular was?

3        A     I believe the County engineering department was

4    predominantly responsible for entering the data into the

5    county's system, the county's mapping system.

6        Q     And would that be Mr. Sullivan and Mr. Sigler

7    primarily?

8        A     It would have been Mr. Shannon and Mr. Sigler

9    primarily.

10       Q     Apologies.  Okay, Mr. Shannon and Mr. Sigler.

11       A     Yes.

12       Q     And was Mr. Sigler your primary point of

13   contact in the engineering department?

14             MS. OLALDE:  Objection, asked and answered.

15       A     Yes, he was.

16       Q     (By Ms. Copper) In your experience, what is

17   Mr. Sigler's role with respect to redistricting,

18   probably?

19             MS. OLALDE:  Objection, calls for speculation.

20       A     I don't know specifically.  He has communicated

21   to me that he had to geocode the census data into his

22   system.  I do not know specifically what that means.

23       Q     (By Ms. Copper) Any data, though, that would

24   come with respect to the redistricting maps that your

25   office was then responsible for implementing, would those

142

1   maps and that data come from Mr. Sigler?

2          MS. OLALDE:  Objection, vague.

3      A   We didn't receive data.  We received decisions.

4      Q   (By Ms. Copper) Did you work with Mr. Sigler

5   directly to implement the decisions that were made by the

6   commissioners?

7      A   No, ma'am, I did not.  To imple- --

8      Q   So --

9      A   Well, repeat that question.

10     Q   Did you work with Mr. Sigler to implement the

11  changes that were made by the commissioners with respect

12  to redistricting?

13     A   To implement the changes that were made by

14  commissioners, yes.  But we -- neither one of us, to my

15  knowledge, had any role in the decision-making process.

16     Q   But the two of you together were then

17  responsible, once that decision was made, for making the

18  actual changes to the election precinct boundaries and

19  the implementation of how that would look in terms of

20  precinct splits, et cetera; is that correct?

21         MS. OLALDE:  Objection, overbroad, vague, long,

22  confusing.

23         You can answer if you can.

24     A   It was my office's responsibility to take the

25  changes that were provided and to enter them in the

143

1    system.  Nathan had nothing to do with that other than

2    providing maps and lists.

3         Q    (By Ms. Copper) Okay.  Now, looking at this

4    email again, in the third paragraph of your email, I know

5    we've discussed this language already, but you wrote that

6    you would like to be "included from the standpoint of

7    providing input on whether certain proposed plans would

8    be better planned differently."  Is that accurate?

9         A    Yes, ma'am.

10        Q    Now, you told me just a little while ago that

11   you didn't see any of the proposed plans until they were

12   made public; is that true?

13        A    Yes, ma'am.

14        Q    So even though you requested to have, as you

15   said, input on proposed plans, did you find that you were

16   allowed to have that kind of input during the 2021

17   process?

18             MS. OLALDE:  Objection, asked and answered

19   multiple times.

20        A    I was not con- --

21             MS. OLALDE:  You can answer again.

22        A    I was not consulted on any of the plans that

23   were presented.

24        Q    (By Ms. Copper) Even though, at least according

25   to this email, you asked to be directly; is that correct?

144

1          MS. OLALDE:  Counsel, listen, this line of

2    questioning has been repeated over and over again.  She's

3    given you her testimony.  Don't rephrase it five times

4    and ask her to repeat it again.  Move on.

5          MS. COPPER:  Counsel, if you could limit your

6    objections to the content of your objection.  And again,

7    Ms. Johnson is free to answer, even if they're

8    duplicative and you object.  So I'd like --

9          MS. OLALDE:  You know what, again --

10         MS. COPPER:  -- to continue with this course of

11   action.

12         MS. OLALDE:  No, no, no, no, no.  If they are

13   duplicative to the point of harassing and argumentative,

14   I will shut it down.

15         MS. COPPER:  We have not actually spoken about

16   whether she directly -- I have not asked yet and I don't

17   believe anyone has, whether she had specifically

18   requested opportunities for input and that she was then

19   denied.

20         MS. OLALDE:  You -- no, no, no.  You should

21   have been listening to the first part of the deposition,

22   because she was asked multiple times.

23     Q   (By Ms. Copper) Ms. Johnson, I'm going to go

24   ahead and ask my question one more time.  Your counsel

25   may go ahead and object, but unless she instructs you not

145

1    to answer, please go ahead and do so.  Okay?

2        A    My opinion was not considered --

3            MS. OLALDE:  Wait, wait, wait.  Wait for the

4    question, please.

5        Q    (By Ms. Copper) Ms. Johnson, even though in

6    your email on January 21st you specifically requested to

7    be allowed to provide input on those maps, you weren't

8    able to do so during the 2021 redistricting process; is

9    that correct?

10            MS. OLALDE:  Objection, asked and answered.  In

11    fact, you have asked this question before, and it has

12    been asked and answered.

13        Q    (By Ms. Copper) You can go ahead and answer,

14    Ms. Johnson.

15        A    I asked to provide input, and I was not given

16    an opportunity or did I provide input.

17        Q    Thank you.

18            Now, looking at the letter that was attached to

19    this email, which is -- if I remember correctly, you sent

20    to Judge Henry on -- in December of 2020; is that

21    accurate?

22        A    I believe that this had been sent to multiple

23    elected officials in December 2020.

24        Q    To any jurisdiction in the county that was

25    undergoing redistricting; is that right?

146

```
1        A    Yes, ma'am.

2        Q    Which obviously included the commissioners

3   court?

4        A    Yes, ma'am.

5        Q    Now, in that letter, on the second page of

6   it -- let's see here -- apologies.  So it is the fourth

7   paragraph down, second sentence.  You wrote,

8   "Communication will be key, thus I respectfully request

9   that you keep us apprised of redistricting meetings.  It

10  may make our job easier to have a clearer understanding

11  of your intentions as plans are developed."  Is that

12  accurate?

13       A    That's what this states, yes, ma'am.

14       Q    Do you feel, having completed the 2021

15  redistricting process, that you had a clear understanding

16  of the commissioners court's plans as they were

17  developed?

18            MS. OLALDE:  Objection, calls for speculation.

19       A    I was aware of meetings that would be held, and

20  that's what I asked to be apprised of.

21       Q    (By Ms. Copper) Were you aware of any of the

22  criteria that the commissioners were using to make their

23  decisions with respect to redistricting?

24       A    No, ma'am.

25       Q    Even though your office is responsible for
```

147

1    maintaining all up-to-date election information; is that

2    correct?

3              MS. OLALDE:  Objection.  I don't even know what

4    that question is.  She's already answered your question.

5         Q    (By Ms. Copper) I'll be happy to rephrase.

6    Ms. Johnson, even though your office is responsible for

7    maintaining information about voting precinct boundaries

8    as well as voter roll information; is that correct?

9              MS. OLALDE:  Wait.  Are you asking her to

10   restate her last answer?  You just asked her if she had

11   any role, and then you asked her again if she had any

12   role.  I'm going to instruct the witness not to answer.

13   Move on.

14             MS. COPPER:  I'm asking her whether her office,

15   irrespective of the redistricting process, was

16   responsible for maintaining information and data related

17   to election precinct splits and voter rolls, which is not

18   the question I asked previously.

19             MS. OLALDE:  If you're going to ask that

20   question, great.

21             Go ahead and answer.

22        A    We did not have access to the data that the

23   commissioners were using to make their decisions.  All I

24   had was the lists of registered voters in each precinct.

25        Q    (By Ms. Copper) Which, according to your

148

```
 1     January 14th email, you sent to the commissioners; is

 2     that correct?

 3          A    I'm not sure I understand that question.

 4          Q    Looking at your email, I see an attachment to

 5     it that says "Galveston County Precinct List" with number

 6     of voters, looks like an Excel spreadsheet.  And I

 7     believe in the first line of your email, you said, "I

 8     thought it may be helpful for each of you to have the

 9     list of registered voters across the county by precinct."

10     Do you see that?

11          A    Yes, ma'am.  And I see the --

12          Q    So your intention in sending this email was to

13     provide data to the commissioners that could potentially

14     be relevant for the redistricting process.  Is that --

15               MS. OLALDE:  Objection --

16          Q    (By Ms. Copper) -- accurate?

17               MS. OLALDE:  -- asked and answered.  This

18     question has been asked and answered.

19          Q    (By Ms. Copper) You can go ahead and answer,

20     Ms. Johnson.

21          A    In hindsight, it was useless for me to provide

22     this information because they were using geocoded census

23     data, not the number of voters in each precinct.  The

24     only benefit to this was to see that there was an

25     imbalance among the county commissioners of the total
```

149

```
1    number of voters in each voting precinct.

2         Q    And is the balance of the number of voters in

3    each precinct something that should be taken into

4    consideration when redistricting?

5              MS. OLALDE:  Objection, you're calling for a

6    legal conclusion, you're calling for speculation, you're

7    also asking a question that has already been answered.

8    She does not know about the criteria, as she has already

9    testified.

10        Q    (By Ms. Copper) In your opinion and experience,

11   Ms. Johnson, as the voter registrar responsible for

12   implementing redistricting plans once adopted, what was

13   the purpose in sending this information to them?

14             MS. OLALDE:  Okay, objection, misstates prior

15   testimony as to implement, and she's already answered

16   this question.

17             MS. COPPER:  Counsel, if you could --

18             MS. OLALDE:  You just asked her -- wait.  You

19   just asked her what the purpose was.  She answered your

20   question.

21             MS. COPPER:  Counsel, if you could please limit

22   your objections to the appropriate form that is required,

23   I would appreciate it moving forward.

24             MS. OLALDE:  Ms. Cooper, I would appreciate

25   it --
```

150

1            MS. COPPER:  My last name's Copper.

2            MS. OLALDE:  Okay.  I apologize, because I

3    don't have your face in front of me right now because the

4    witness is using my computer to look at the exhibit.  But

5    Ms. Copper, if you could please refrain from asking the

6    same questions that have already been answered, I would

7    appreciate it.

8        Q    (By Ms. Copper) Okay, Ms. Johnson, going back

9    to this email --

10            MS. OLALDE:  Her name is Ms. Johnson, not

11   Ms. Jackson.

12            MS. COPPER:  I said Ms. Johnson.

13       Q    (By Ms. Copper) I know, Ms. Johnson, that you

14   have already discussed the contents of the fourth

15   paragraph of your email with Ms. Garrett, which is about

16   the issue of residential property splits between voting

17   precincts.  Do you remember that?

18       A    Yes, ma'am.

19       Q    In your experience, did the plan the

20   commissioners adopted in 2021 address the issue of

21   residential precinct splits that you raised in this

22   email?

23            MS. OLALDE:  Objection, vague as to "plan."

24       A    They requested at a much later date if I could

25   identify any specific properties that had splits.  The

151

```
 1    issue became -- it was a moot point because these

 2    properties were not developed using census maps.  They

 3    were developed using plot plans developed -- created by

 4    developers, and there was no regard for census data.  And

 5    so there was really nothing that could be done about

 6    these issues, as I recall.

 7         Q    (By Ms. Copper) So despite raising them by

 8    virtue of being tied to the census data, it was something

 9    that you couldn't address more explicitly?  Am I

10    understanding that correctly?

11         A    That they could not address more explicitly.

12         Q    Okay.  I'd like to pull up another exhibit that

13    we've already discussed, which is Exhibit Number 10.

14    Now, this is a lengthy discussion, email thread between

15    you and Mr. Paul McLarty; is that correct?

16         A    It started with others.

17         Q    Okay.  Looking just at the top email from --

18    from -- I know the name is redacted, but we've

19    established that you were the custodian identified for

20    this email.

21         A    Uh-huh.

22         Q    So looking at that top email, it is addressed

23    to Paul McLarty and Nathan Sigler; is that correct?

24         A    Yes.

25         Q    And in your email, you said that Mr. Sigler
```

1    had -- was "currently loading geo information to perfect

2    the counts with regard to census data and voter rolls so

3    that the commissioners are able to make better decisions

4    on Friday, projected date to adopt."  Do you see that

5    language?

6         A    Yes, ma'am.

7         Q    Now, this email was sent on November 3rd, which

8    is a -- as the subject line identifies, a Wednesday.

9    When you say that you expected the commissioners to make

10   a decision on Friday, do you remember if you meant

11   November 5th or 12th?

12        A    I don't recall.  My projected date to adopt --

13   that's probably a good question.  Because that was

14   Wednesday, I would assume it would've been November 5th.

15        Q    In the same email, I think you also said, "I

16   believe commissioners will adopt their maps Friday."  Is

17   that correct?

18        A    Yes, ma'am.

19        Q    Now, to the best of your knowledge, when this

20   email was sent on November 3rd, there hadn't yet been a

21   public hearing about the proposed plans, had there?

22        A    I do not -- I could not tell you that.  I -- I

23   do not have -- I -- I did not know that.

24        Q    You had not seen any public postings of

25   meetings specifically seeking public input over

153

1     redistricting, though; is that correct?

2         A    Not that I recall.

3         Q    And to the best of your recollection, why did

4     you believe that the commissioners would adopt the

5     redistricting plans that Friday?

6         A    I can't tell you that, other than without

7     knowing what was being said in the community, what was

8     maybe in -- in the news -- and it could've been that they

9     were actually trying to move forward on that Friday.  But

10    everything was subject to people -- certain people

11    getting their work done, and in this case, as this email

12    states, it would have been Nathan completing his

13    geocoding.  They could not make decisions without that

14    occurring.

15        Q    I will represent to you that the public hearing

16    regarding redistricting which occurred on November 12th,

17    the following Friday, was not released publicly or

18    announced publicly until November 9th.  So if you didn't

19    see information about this hearing in the news, where

20    else might you have learned it?

21            MS. OLALDE:  Objection, calls for speculation.

22        A    It would be logical that Nathan or

23    Commissioner Clark would've told me that.

24        Q    (By Ms. Copper) And if you knew or had the

25    impression by the 3rd of November that the commissioners

154

1    were going to meet that Friday, do you think they likely

2    also knew that?

3           MS. OLALDE:  Objection, calls for speculation.

4       A    I have no idea.

5       Q    (By Ms. Copper) Do you know if the

6    commissioners or any of their staff knew at that time

7    that they were going to address the redistricting

8    proposal on that Friday?

9           MS. OLALDE:  Again, calls for speculation,

10   objection.

11      A    I have no idea.

12      Q    (By Ms. Copper) And did you know that the

13   commissioners didn't announce the hearing that was

14   eventually held on November 12th until November 9th, only

15   three days before it happened?

16      A    No, but that would be the 72 hours required in

17   advance of a public meeting.

18      Q    So there's a requirement to that effect?

19      A    In Texas law, as I understand it, yes, ma'am.

20      Q    Are there any circumstances, in your

21   experience, where if the commissioners or county staff

22   know that a meeting will be held more than 72 hours in

23   advance, they give public notice sooner anyway?

24      A    I don't -- everybody knows that they meet every

25   other week right now.  What's going to be an item on that

155

1    agenda's not known until that agenda's specifically

2    published.

3         Q    Now, looking at the very last sentence of your

4    email, you wrote, "One thing I have asked is that the

5    current lines remain the same as much as possible and

6    that major thoroughfares or natural boundaries (creeks,

7    drainage or utility easements, etc.) be used to split

8    precincts."  Did I read that accurately?

9         A    Yes, ma'am.

10        Q    Now, when you say that you asked that the

11   current lines remain the same, who would you have asked?

12        A    I believe it's in that other email or that

13   letter.  I asked all of the jurisdictions to consider

14   those -- to con- -- to make those -- take those items

15   into consideration.

16        Q    So you would have asked this in -- by virtue of

17   your December 2020 letter that was sent to all

18   jurisdictions undergoing redistricting?

19        A    Yes, ma'am.

20        Q    Did you ever ask anyone in the county

21   commissioners' staff or commissioners directly to have

22   the current lines of the redistricting plan remain as

23   close to the same as possible?

24        A    Would you repeat that question?  I did not have

25   conversations with any of them about that.

156

1   Q    Did you express -- other than your

2   December 2020 letter, did you express your desire that

3   the current lines remain the same as much as possible to

4   anyone in the county?

5   A    I would have to go back and look at that letter

6   specifically.  That's a very specific question.  We --

7   what I'm requesting there is that they didn't change the

8   individual lines for each of the voting precincts.  With

9   100 precincts, I did not want every single line redrawn.

10  And so that's what that means, that the current lines

11  remain the same as much as possible, and that, as I've

12  stated earlier, that entire precincts be moved, not that

13  they all be totally redrawn.  That would've been very

14  difficult to implement.  And they honored that request.

15  Q    So there were -- there were criteria with

16  respect to the implementation that the plan adopted that

17  were, in your opinion, useful for commissioners or others

18  doing redistricting to -- in the planning.  Is that

19  accurate?

20       MS. OLALDE:  Objection, calls for speculation.

21  Also calls for a legal conclusion.

22  A    And I didn't understand a lot of that.  It was

23  very garbled.

24  Q    (By Ms. Copper) I apologize.  How is my volume

25  now?

157

1          A    It's not a problem with the volume.  It's just

2     your -- the voice is very garbled.  It's not clear.

3          Q    Okay.  How -- any better?

4          A    Just -- if you speak slowly, then I should be

5     able to try and figure out what you're asking me.  Thank

6     you.

7          Q    Okay.  I'll do my best, and please do let me

8     know if I'm cutting out.

9               Now, my previous question was:  Did you

10    communicate your desire that the current lines remain the

11    same as much as possible to anyone in the county

12    commissioner -- either a county commissioner themselves

13    or to members of their staff with respect to the 2021

14    redistricting process?

15               MS. OLALDE:  Objection, asked and answered.

16          A    If that was contained in that email, in that

17    letter, then yes, I did.  I know that I asked them to

18    align by natural boundaries.  I don't recall

19    specifically, without going back and reading that

20    exhibit, whether I mentioned the current lines remain the

21    same as much as possible.

22          Q    (By Ms. Copper) But there were considerations

23    with respect to implementation of whatever map was

24    adopted that you felt were useful for the people

25    considering the (audio cutting out) redistricting to

158

```
1      think about during planning.  Is that accurate?
2              THE REPORTER:  I'm sorry, your audio is cutting
3      out.  It's a little garbled.  Could you repeat that,
4      please?
5              MS. COPPER:  Sure.  Could we actually -- is it
6      okay, Ms. Johnson, would you mind if we take a
7      five-minute break and I figure out my audio issues and we
8      reconvene after that?
9              MS. OLALDE:  We can take a break.
10             THE VIDEOGRAPHER:  Okay.  Current time is 3:13.
11     We're now off the record.
12         (Recess.)
13             THE VIDEOGRAPHER:  Current time is 3:21 p.m.
14     We're now back on the record.
15        Q    (By Ms. Copper) Okay, Ms. Johnson, I only have
16     one last question for you about this exhibit and our
17     conversation that we have been having about precinct --
18     residential precinct splits.  In your opinion, is the map
19     that the commissioners adopted in 2021, did it maintain
20     the current lines as much as possible?
21             MS. OLALDE:  Objection, vague as to "map."
22        A    As I recall, it did, if you're talking about
23     election voting precincts.
24        Q    (By Ms. Copper) Yes, ma'am.
25             Do you remember if the other proposed map also
```

159

```
 1    maintained election precincts as much as possible?

 2        A    As I recall, I -- you know, I'm not 100 percent

 3    certain, because I'm not sure I ever saw any details on

 4    anything but the final plan, so I'm not 100 percent sure.

 5    I -- I didn't see any detail in those maps.

 6        Q    Okay.  Well, I would like to switch gears a bit

 7    and show you a new exhibit.

 8             MS. COPPER:  Mr. Munk, in our folder, it will

 9    be marked as Docket Number DEFS00031247.  Do you see that

10    document?

11             MR. MUNK:  Yes, I do.

12             MS. COPPER:  Great.

13             MR. MUNK:  Exhibit 13 has been introduced.

14        Q    (By Ms. Copper) Do you have that exhibit in

15    front of you, Ms. Johnson?

16        A    Yes, I do.

17        Q    This is a document that your attorneys produced

18    to us yesterday, and if I'm looking at it correctly, it

19    is a picture of a Facebook post from February 21st, 2020,

20    from the user Cheryl E. Johnson at the handle

21    "@VoteforCheryl2020."  Is that all correct?

22        A    It's a tweet, not a Facebook post.

23        Q    Oh, apologies.  Yes, a tweet.  Other than that,

24    is that all correct?

25        A    Yes.
```

160

1    Q    Now, is this handle, "@VoteforCheryl2020," your

2    personal Twitter account or was this a campaign account?

3    A    They're one and the same.  It would have been a

4    personal campaign account, Twitter account.

5    Q    So you would've been the person writing this

6    tweet, not someone on your behalf.  Is that accurate?

7    A    Yes, ma'am, it is.

8    Q    And the tweet itself reads, "The Galveston

9    County Tax Assessor race has reached a new low with the

10   challenger mailing a racist flyer full of lies.  Stay

11   tuned for more!"  Is that accurate?

12   A    Yes, ma'am, that's what it states.

13   Q    And as I mentioned, your attorneys produced

14   this document to us yesterday.  When did you first search

15   your -- or remember that you had this document as

16   relevant to this case?

17   A    I never produced that document.  I only became

18   aware of it, was reminded of it myself, I believe,

19   yesterday.

20   Q    Okay.  And were you reminded of it by your

21   attorneys, I presume?

22   A    Yes, ma'am.

23   Q    I'd like to turn now to another new exhibit.

24        MS. COPPER:  Mr. Munk, this is Document Number

25   DEFS00031248.

161

```
 1              MR. MUNK:  Exhibit 14 has been introduced.

 2        Q    (By Ms. Copper) And Ms. Johnson, this is

 3   another document your attorneys produced yesterday to us,

 4   and it appears to be another tweet from your Twitter

 5   account from -- this time it's February 23rd, 2020, so

 6   two days after the first post.  Is that accurate?

 7        A    Yes, ma'am.

 8        Q    And the post itself reads, "We have some nasty

 9   campaigning going down in Galveston County, Texas."  Is

10   that accurate?

11        A    Yes, that's what it states.

12        Q    And the post appears to link to an article from

13   the Galveston County news titled, "Johnson: Peden ad

14   'racist,' 'discriminatory' and 'a lie.'"  Am I reading

15   that correctly?

16        A    Yes.

17        Q    Okay.  I'd like to turn now to another new

18   exhibit.

19              MS. COPPER:  Mr. Munk, this is in our folder

20   titled "Johnson: Peden ad 'racist,' 'discriminatory' and

21   'a lie'" -- or excuse me.  I apologize.  It's called

22   Galveston County News 222 Article.

23              MR. MUNK:  Exhibit 15 has been introduced.

24        Q    (By Ms. Copper) And I know this is a lengthier

25   article, Ms. Johnson, so please go ahead and take a
```

[2/28/2023 9:00 AM] Johnson, Cheryl 20230228

162

```
 1      moment to review.  Just let me know when you're ready.
 2           A    (Reviewing document.)  I'm familiar with this
 3      article.
 4           Q    Is this the article from the Galveston County
 5      News that was linked in your February 23rd tweet?
 6           A    Yes, ma'am.
 7           Q    Now, looking at the top of the second full
 8      page, there's a political ad pictured; is that correct?
 9           A    The campaign advertisement?
10           Q    Yes, ma'am.
11           A    That's not a PPA.  It looks like a title
12      underneath the picture.
13           Q    I'm sorry, I don't know what you mean by that.
14           A    Well, you said is it a PPA, and it says "A
15      campaign advertisement paid for by Republican tax
16      assessor-collector candidate Jackie Peden shows an MS-13
17      gang member among messages about illegal immigrants
18      voting in Galveston County."  So it's like a -- a
19      statement about what the picture is.
20           Q    Oh, I apologize.  I mean the picture itself is
21      of an ad of a campaign advertisement; is that correct?
22           A    Yes.  It was a flier that was mailed, yes,
23      ma'am.
24           Q    And this is a flier that was run against you by
25      your opponent in the 2020 Republican primary for tax
```

163

```
 1        assessor; is that correct?
 2             A    Yes, ma'am.
 3             Q    And looking at the ad itself, it states at the
 4        top, "Texans can thank Cheryl Johnson for having illegal
 5        immigrants vote in this November's election," with a
 6        picture of a heavily tattooed Hispanic man; is that
 7        correct?
 8             A    I would assume he's Hispanic, yes, or Latino,
 9        yes.
10             Q    Given that the focus of the ad is on illegal
11        immigrants, is the assumption that they are -- that it is
12        someone who is Hispanic?
13                  MS. OLALDE:  Objection, calls for speculation.
14             A    I can only imagine that she was suggesting that
15        illegal immigrants or noncitizens are -- are gang members
16        heavily tattooed and are voting in Galveston County.
17             Q    (By Ms. Copper) Which I assume, in your
18        experience, is not the case; is that correct?
19             A    Not -- not the case at all in my experience.
20             Q    Now, if you scroll down to the third page of
21        the article, the paragraph under the large gap, it states
22        that the photograph used in the advertisement was not
23        actually of a Galveston County resident at all, but
24        instead, is a 2012 picture of an MS-13 gang member
25        incarcerated in El Salvador; is that accurate?
```

164

1        A    That's what the ad -- that's what the article

2   states, yes.

3        Q    And the article also states in the paragraph

4   right below that this image is one of the first pictures

5   that shows up on a Google search for the gang MS-13.  Is

6   that accurate?

7        A    Yes.

8        Q    Now, looking at Page 4 of the article, the

9   second paragraph, you are quoted as saying that the ad

10  was "despicable, it is vile, and it's a lie," and that

11  you were "offended by it."  Is that accurate?

12       A    Yes, ma'am.

13       Q    Can you tell me, why were you offended by this

14  ad?

15       A    It suggests that noncitizens are heavily

16  tattooed gang members and it makes it appear that every

17  Hispanic male or somebody with tattoos is a noncitizen.

18  I think that that's very -- I think that is despicable

19  and vile and as well as being a lie.  I know a lot of

20  people with tattoos --

21       Q    And --

22       A    -- and they're not Hispanic males or gang

23  members or noncitizens.

24       Q    And in your -- and in your experience, not

25  every Hispanic person is an illegal immigrant either; is

165

```
1    that right?

2         A    That's right.

3         Q    And referring to your February 21st tweet, you

4    also described this ad as racist.  Is that accurate?

5         A    As I recall, yes.

6         Q    Do you believe today that this ad is racist?

7         A    Yes, I do.

8         Q    So I know we've discussed the facts that the

9    man identified -- the man pictured is not identified as

10   Hispanic, but that appears to be what is implied; is that

11   correct?

12        A    Yes --

13             MS. OLALDE:  Objection, calls for speculation,

14   also asked and answered.

15        A    Yes.  And according to the article -- actually,

16   he's from El Salvador.

17        Q    (By Ms. Copper) So not from Galveston County at

18   all?

19        A    Correct.

20        Q    Have you been the subject of other attacks

21   during any of your campaigns that have invoked fears of

22   illegal immigration or called on racial stereotypes?

23        A    I don't recall, although Ms. Peden could have

24   stated that I refused to remove noncitizens from the

25   voter roll.  I don't recall any other advertisement that
```

166

```
 1    was as -- as I would say, as despicable as this.
 2         Q    Was the critique that you had allowed
 3    noncitizens to remain on the voter roll a major part of
 4    the Republican primary in 2020?
 5         A    I don't believe it was a major part of -- of my
 6    specific campaign at all.
 7         Q    Were -- do you feel that you were the subject
 8    of attacks from either Ms. Peden or others during the
 9    Republican primary that focused particularly on your
10    experience with respect to illegal immigrants and their
11    place on the voter roll?
12         A    I think definitely Ms. Peden expressed this,
13    and I think that there were very many people who were
14    highly offended by this.
15         Q    Did you speak to others about being offended by
16    this ad?
17         A    Oh, yes, every voter that came to vote.
18         Q    What did they tell you?
19         A    That they didn't know they were going to vote
20    for me until they saw this.
21         Q    So the racism of this ad was something that
22    pushed them towards voting for you and supporting you.
23    Is that accurate?
24         A    Yes, because people agreed with my opinion of
25    this ad.
```

167

1    Q    And your opinion being that it was racist and a

2    lie?

3    A    Yes.

4    Q    Have you seen or heard about racial appeals in

5    any other political campaigns in Galveston County?

6         MS. OLALDE:  Objection, broad.  You can answer.

7    A    I don't recall specifically any other campaigns

8    that went down this trail, no.  Doesn't mean that they

9    didn't happen, but I have no recollection of them.

10   Q    (By Ms. Copper) And outside of political

11   campaigns, have you ever witnessed or heard of any kind

12   of instances of discrimination based on race or any --

13   even any type of racial stereotyping in Galveston County?

14        MS. OLALDE:  Objection, really broad.

15        You can answer to the extent you're able.

16   A    And I might have to ask you to repeat that

17   because it was a very broad, open-ended question, if you

18   would, please.

19   Q    (By Ms. Copper) Of course.  Happy to.

20        Outside of political campaigns, have you ever

21   witnessed or experienced or even heard about racial

22   discrimination or stereotyping in Galveston County?

23        MS. OLALDE:  Same question -- or same objection

24   to that question.

25   A    I have no personal knowledge of racial

168

1   stereotyping and being a major issue in Galveston County.

2      Q    (By Ms. Copper) When you say you have no

3   personal knowledge, does that mean you've never had

4   anyone raise complaints about discrimination to you?

5      A    There could've been people that have raised

6   that issue, including the NAACP, but after a meeting with

7   them, there was no belief on their part that that existed

8   at all.  So I -- as it pertained to me would've been my

9   only concern.  As it pertained to anybody in my office

10  would've been my concern.  I tried not to be -- play God

11  for the rest of Galveston County.

12      Q    Did you ever hear any criticisms about the 2021

13  redistricting process as it relates to race?

14      A    Not specifically.  The suggestion that a

15  minority district had been changed was all I heard, and

16  that was the extent of it.

17      Q    And what was the criticism made about the

18  district being changed?

19      A    That Commissioner Holmes' precinct had been

20  moved sufficiently that he may not be able to be

21  reelected.

22      Q    Did you ever hear concerns that a candidate of

23  color generally might not be able to be elected?

24      A    I -- I don't think that color comes into a

25  decision-making process for the people of Galveston

169

1      County, personally.

2          Q    And do you think that racism is a problem in

3      Galveston County?

4          A    Very broad question.  I do not believe it is a

5      problem in Galveston County.  It doesn't mean it doesn't

6      exist.  It doesn't mean it -- it isn't discussed or

7      hasn't come up as different topics.  But I don't believe

8      it's a major issue for the residents of Galveston County.

9          Q    Even if it's not a major problem, do you think

10     that racism exists in the county?

11         A    I think it would be unreasonable to assume it

12     does not.

13         Q    Okay.  Thank you.

14              I'm actually going to turn now to what would be

15     my last exhibit, which is another new exhibit.

16              MS. COPPER:  It is labeled in our folder as

17     "Big Jolly Politics - 1.8.2018 Post," Mr. Munk.

18              MR. MUNK:  Exhibit 16 has been introduced.

19         Q    (By Ms. Copper) Ms. Johnson, I know this is

20     another long one, so if you wouldn't mind just taking a

21     minute and reading this over and letting me know when

22     you're done.

23         A    (Reviewing document.)  I remember authoring

24     this.  Whether it was reproduced by this online paper

25     specifically as it was presented, I -- I can't affirm

1    without checking my files.  But yes, I remember.  I'm

2    very familiar -- I'm familiar with this.

3         Q    And can you tell me generally, are you familiar

4    with the website that this is on, Big Jolly Politics?

5         A    I'm vaguely familiar with it.  They -- they

6    sometimes carry articles that I write.  I think they go

7    out and they grab them and -- and publish them.

8         Q    Okay.  I will represent to you, just for

9    fullness of information, that according to the website's

10   "About" page, "Big Jolly Politics was started by David

11   Jennings in 2009 after moving on from LoneStarTimes.com,"

12   and "The goal was to create a website that covered local

13   and state politics with an eye on truth first."

14        Is that your experience with this website, that

15   it is focused on state and local politics with an eye on

16   truth first?

17        A    I don't see that printed here, but I -- from

18   what little I know, that would be a fair summation.

19        Q    And do you know David Jennings, the person

20   that's responsible for this web page?

21        A    Not personally.

22        Q    So only through his publications?

23        A    Yes.  I don't recall if I've ever met him.  I

24   don't remember meeting him.

25        Q    And am I right in understanding from this post,

171

1  again, with the caveat that whether your email is

2  reproduced accurately is something you can't attest to at

3  this moment, am I right in understanding that everything

4  in quotes, starting with "Lov ya Bon," is quoting an

5  email from you?

6        A    As I recall, this was a guest column that I had

7  written.  And assuming that he reproduced it in its

8  entirety, although it might have quotes, I think

9  that that quote was -- the "Lov ya Bon," I don't see the

10  end of that quote.

11       Q    Nor do I.  I assumed, based on -- that the

12  entire rest of the article was the email from you, or it

13  sounds like a guest column.  Looking at it, can you tell

14  me where you think your quoted language should end?  My

15  understanding was it was with the sentence "She laughed

16  from the bottom of her gut and sings (loudly) out of

17  tune."

18       A    Yes, that would be -- as I recall, that's the

19  way I wrapped up that article, that column, yes, ma'am.

20       Q    Well, what a lovely description.  She sounds

21  like a wonderful woman.

22       A    She really is.

23       Q    And very briefly, can you tell me just a little

24  bit about what is the subject of this post?

25       A    Bonnie Quiroga worked for the county for many,

172

```
 1   many years, including in the tax office, years before I

 2   was there.  So as this says, for 32 years, she was a

 3   devoted public servant and employee of Galveston County.

 4   And she was not loyal to people as much as -- this says,

 5   "She was loyal to the people and the purpose of county

 6   government."  She did not throw any punches, and I wanted

 7   people to know the person who was being assaulted in

 8   court, in -- and I don't mean physically assaulted, but

 9   was being attacked as a result of her termination by Mark

10   Henry.  It was, in my opinion, an unfair situation.  She

11   was a victim.  And she dared stand up to individuals she

12   didn't agree with, and she got fired for it.  And I was

13   trying to let people know that there was a human side to

14   Bonnie Quiroga.

15        Q    One who laughs loudly out of tune, it sounds

16   like.

17        A    Yes, ma'am.

18        Q    You said that she was loyal to the people

19   instead of the County.  That is much how you envision

20   yourself; is that accurate?

21        A    Yes, yes.  The people are part of the county,

22   so, you know, I'm not loyal to county government as much

23   as I am loyal to the people of the county.  The

24   purpose -- this is the purpose of county government.  We

25   all support the purpose of what we do.
```

173

1      Q    And in your experience, have other people like

2  Ms. Quiroga -- please tell me if I'm saying her name

3  incorrectly.  Are other people like Ms. Quiroga and

4  yourself who are loyal to the people over the government,

5  have they faced difficulties in county government as a

6  result of that?

7           MS. OLALDE:  Objection, calls for speculation.

8      A    I -- I really don't know.  There were many

9  county employees that left, some of which were fired,

10  after there were changes in commissioners court.

11     Q    (By Ms. Copper) Speaking only from your

12  personal experience, have you ever had difficulties,

13  given that your loyalty is to the people instead of to

14  the government structure of Galveston County?

15     A    Yes, ma'am.

16     Q    Can you tell me a little bit about that?

17     A    I do not support taxpayer-funded lobbying.  I

18  do not believe government funds should be used against

19  the people.  I am a public servant first, a politician

20  last, and that goes against the grain of most

21  politicians, ones I consider self-serving.  So I've just

22  simply tried to be a good public servant and -- and

23  fulfill the promises that I've made to the people from

24  day one.  That gets me into --

25     Q    And --

174

```
 1        A    -- trouble sometimes.

 2        Q    -- you mentioned County Judge Henry in

 3   particular.  Is he someone who in the past you felt like

 4   is maybe a politician more than a public servant?

 5             MS. OLALDE:  Objection, irrelevant,

 6   speculation.

 7        A    Judge Henry and I aren't currently at odds as

 8   we were at this time.  I'd rather reserve my opinion.

 9   We're working well together right now, and I think at one

10   point we didn't work well together at all and we were

11   definitely in different factions of the Republican party.

12        Q    (By Ms. Copper) And not to take you back to

13   2018, but I see looking at Page 2 of the article, the

14   third paragraph on the page, you wrote -- begin with,

15   "You see, the county judge has a problem.  He is a bully.

16   Bullies don't want advice because they are never wrong."

17   Is that accurate, what's written there?

18        A    Yes, ma'am.

19        Q    And when you refer to "the county judge,"

20   you're talking about Judge Henry?

21        A    Yes, ma'am.

22        Q    Now, I understand your relationship has

23   improved since then, but can you tell me, at the time,

24   why did you write that he was a bully?

25        A    Because he was.  Bullies intimidate.  They're
```

175

```
1    mean-spirited.  I may fire somebody for nonperformance,

2    but it's never personal, and everything with Judge Henry

3    is very personal.

4             MS. OLALDE:  I'm going to object --

5        Q    (By Ms. Copper) Does that include policy

6    work --

7             MS. OLALDE:  Hold on.

8        Q    (By Ms. Copper) -- or --

9             MS. OLALDE:  Hold on.  I'm going to place an

10   objection to the extent that that calls for speculation.

11            But go ahead.

12       A    Was there a question?

13       Q    (By Ms. Copper) Yes, ma'am.  Are you aware of

14   other instances besides the issues with Ms. Quiroga where

15   you believe Judge Henry has ever been a bully?

16            MS. OLALDE:  Again, I'm going to object to the

17   extent the answer -- the question calls for speculation.

18       A    There were a couple of IT employees and an IT

19   director who were fired.  I believe they might have

20   disagreed based on what they've told me.  Whether it was

21   factual or not, I don't know.  But they made decisions

22   that were not -- did not conform to what the judge wanted

23   them to do, and they no longer work for the county.

24       Q    (By Ms. Copper) And you said that you've now

25   gone through two redistricting cycles; is that correct?
```

176

1        A    Yes, ma'am.

2        Q    And both of those, you had to work with

3    Judge Henry to some extent.  Is that also correct?

4        A    Not really.  We did not -- there was no direct

5    contact other than me requesting funding from

6    commissioners court.  When he did receive his accurate

7    voter card, he took a picture of it and texted it to me

8    and said, Job well done.  That was very kind, but that's

9    about the extent of it.

10       Q    But you never had any direct contact with

11   Judge Henry, he never emailed you, set up a phone call,

12   came to meet with you about redistricting?

13       A    Not that I recall.

14       Q    Have you ever heard any comments from others

15   about Judge Henry being a bully with respect to the

16   redistricting process?

17       A    I'm not sure that I've heard from anybody that

18   he was a bully about redistricting.  And so no, I -- the

19   answer to that would be no.

20       Q    You've mentioned, though, that there have been

21   criticisms with respect to Stephen Holmes' continuing

22   role on the commission after the new plans were adopted;

23   is that correct?

24            MS. OLALDE:  Objection, misstates prior

25   testimony.

177

1     A    Yes, I'd have to ask you to repeat that

2   question.  I'm not sure I really understood the question.

3     Q    (By Ms. Copper) Of course.  You had mentioned

4   earlier that you had heard criticisms or complaints about

5   the redistricting process with respect to its effect on

6   Commissioner Holmes' district; is that correct?

7     A    I've not heard complaints about it.  That was a

8   concern I think was communicated in the media and -- to

9   the best of my recollection.

10     Q    But any reports over that are things that

11   you've heard from public reporting, not direct

12   conversations you've had with anyone?

13     A    Yeah, I've not had any direct conversations

14   with anybody about that.

15     Q    Okay.  Now, Ms. Johnson, my colleague,

16   Ms. Garrett, asked you about a couple emails, and I know

17   we've spoken about the January 14th email where you had

18   asked to have things like open dialogue, the ability to

19   look at plans before -- or proposed plans.  Is that

20   accurate?

21     A    Yes, I had asked for that in emails and in

22   correspondence.

23     Q    In your opinion only, if the county

24   commissioners had involved you in the planning process

25   with an eye towards implementation then, do you think

178

1    there's a chance we might not be sitting here in

2    litigation over the county's map?

3              MS. OLALDE:  Objection, calls for a lot of

4    speculation, also for legal conclusions.

5              You can answer to the extent it's possible.

6         A    I do not believe they could have done anything

7    differently to ease my implementation that regarded their

8    precincts.  The difficulty for me was -- that would've

9    made it easier was had they not split voting precincts

10   within the county commissioner precincts.  I understand

11   there was a need for them to do that due to population

12   totals, I would assume, but I don't believe that the

13   overall decision for county commissioner precincts in my

14   implementation would have been -- or Galveston County

15   commissioner precincts would've changed or my input

16   would've changed their overall big plan with regard to

17   the four precincts that they established.

18        Q    (By Ms. Copper) And how things shook out in

19   terms of precinct splits, do you think that if the

20   commissioners had adopted Map 1 in terms of Map 2, there

21   would have been any difference in the issue of precinct

22   splits?

23        A    As far as I know, no, because if I look at

24   those maps today, the areas where they split were

25   outside -- were in the center of the commissioner

179

1    precincts.  They weren't along the boundaries that maybe

2    had separated or changed Precinct 3.  They were

3    predominantly in the League City or South Shore Harbour,

4    densely populated, new areas of development.

5              MS. COPPER:  Okay.  I believe that those are

6    actually all of my questions for you, but if you don't

7    mind if we take a quick five-minute break, just so I can

8    confer.  And then otherwise, if that's it, I will be

9    happy to hand you over to my colleague, Mr. Newkirk.

10             THE WITNESS:  Thank you.

11             MS. OLALDE:  Thank you.  We can take a break.

12             THE VIDEOGRAPHER:  Time is 3:55.  We are now

13   off the record.

14        (Recess.)

15             THE VIDEOGRAPHER:  Current time is 4:03 p.m.

16   We're now back on the record.

17             MS. COPPER:  Ms. Johnson, I just wanted to

18   confirm that I have asked all of my questions of you and

19   to thank you very much for taking the time to talk to me

20   today.  I'm going to pass you off to my colleague, Zach

21   Newkirk for the government, who I believe is sitting in

22   the same room with you.

23             THE WITNESS:  Yes, he is.  Thank you very much.

24                  E X A M I N A T I O N

25   BY MR. NEWKIRK:

180

```
 1          Q    Hi.  Good afternoon, Ms. Johnson.  Zach Newkirk

 2     again --

 3          A    Good afternoon.

 4          Q    -- for the United -- on behalf of the United

 5     States -- also for the United States.  Thanks so much for

 6     your time this afternoon.  I don't anticipate --

 7               THE REPORTER:  Excuse me.

 8               MR. NEWKIRK:  Yes.

 9               THE REPORTER:  I am not hearing every word that

10     you're saying.  You're going to need to speak towards the

11     microphone.  I'm only hearing the loud words you're

12     saying.

13               MR. NEWKIRK:  Would it be okay to unmute

14     myself?

15               MS. OLALDE:  I have an external mic speaker.

16     We could try that.  Sometimes it works, sometimes it

17     doesn't.

18               MR. NEWKIRK:  I could try to enunciate really

19     loudly, if that's okay.  Is this all right, Ms. Carter?

20               THE REPORTER:  Yes, I'm hearing you now.  Thank

21     you.

22               MR. NEWKIRK:  All right.  Sorry about that.

23     Okay.  I don't know what you caught, Ms. Carter, but

24     essentially, I'm Zach Newkirk on behalf of the United

25     States.
```

181

1          Q     (By Mr. Newkirk) Ms. Johnson, thanks so much

2     for your time.  I know we've covered a lot of ground.

3     I'll do my very best to not repeat any questions that

4     have been asked already, so this might seem a little

5     disjointed more so than the others.  So I will just go

6     ahead and dive in.

7               So earlier this morning you were describing a

8     couple of the organizations that you're a part of.

9          A     Uh-huh.

10         Q     And just -- do you mind reminding me?  There

11    are two organizations, Republican Women -- do you mind

12    just reminding me what they are?

13         A     Galveston Republican Women and Texas Gulf Coast

14    Republican Women.

15         Q     Gotcha.  And how long have you been a member of

16    the Galveston Republican Women?

17         A     Off and on since I first ran for office in

18    2004.

19         Q     Okay.  And do you hold any positions in that

20    organization?

21         A     No, I do not.

22         Q     And in that role as a member of Galveston

23    Republican Women, do you ever interact with any member or

24    past or former -- past, former or present member of the

25    commissioners court?

182

```
1        A     There are frequently different ones that will

2   attend the meetings occasionally, yes.

3        Q     Okay.  And when you see them at these meetings,

4   do you ever talk to them?

5        A     Yes, but typically not county business.

6   There's too much activity going on and it just wouldn't

7   be appropriate for us to talk shop there.

8        Q     Okay.  So have you ever discussed redistricting

9   at all?

10       A     Not at any of those meetings that I recall.

11       Q     Okay.  How long have you been a member of the

12  Gulf Coast Republican Women?

13       A     Texas Gulf -- it was created about a year and a

14  half -- well, actually, it was created in late 2019, and

15  so I joined at that time.

16       Q     Do you hold any positions in that organization?

17       A     No, I do not.

18       Q     In that role as a member of that organization,

19  do you interact regularly or at all with any past, former

20  or present members of the commissioners court?

21       A     No, and I don't actually specifically

22  remember -- unless they were speakers, I don't ever

23  recall them even attending the meetings.

24       Q     All right, thank you.  I'll be shuffling a

25  lot --
```

183

1          THE REPORTER:  I'm sorry, I didn't hear that.

2          MR. NEWKIRK:  Sorry, Ms. Carter.  I just said

3     I'll be shuffling my papers a lot, so you might hear some

4     ambient noise, but apparently you didn't hear it.

5          Q    (By Mr. Newkirk) So Ms. Johnson, you were first

6     elected to county office in 2004, correct?

7          A    Yes, sir.

8          Q    And did you have a primary election that year?

9          A    Well, I had a primary election, but I had no

10    opponent.

11         Q    And did you have a general election opponent?

12         A    Yes, I did.

13         Q    What made you first decide to run in 2004?

14         A    I had been asked in 2002 to run by

15    Commissioner Clark when the seated tax assessor-collector

16    stepped down, and it was the different parties that were

17    appointing the person that was going to run in November

18    to fill an unexpired term.  And so he first -- was the

19    first person who ever asked me to run in the position,

20    and I was not selected to run in that November election,

21    but it stayed kind of in my mind.  I watched the elected

22    tax assessor-collector who did win that race, and made a

23    judgment decision in 2004 that I could do a better job.

24         Q    What was it like to run county-wide as a

25    Republican in 2004?

184

1          A     Very difficult.  At that point in time, there

2     were no county-wide elected Republicans, and so Judge Cox

3     and myself and a gentleman ran for sheriff, so there were

4     three of us that were basically running together during

5     that campaign.  We were received very well, but we -- we

6     just went to the people and ran very grass roots

7     campaigns.

8          Q     I'm sorry, who is Judge Cox?

9          A     Judge Lonnie Cox.  He's the judge of the 56th

10    District Court.  We were on the same ballot at the same

11    time.

12         Q     So the office he was running for was for that

13    office --

14         A     Yes.

15         Q     -- or for county judge?

16         A     For district judge, state district judge.

17         Q     When you were running in 2004, did you have a

18    campaign staff?

19         A     Myself and my husband and my two children.

20         Q     Did you hire any outside consultants?

21         A     No, I did not.

22         Q     Did you have interns, unpaid interns?

23         A     I wish.  No -- but no, I did not.

24         Q     Volunteers?

25         A     Yeah -- yes, many volunteers.

185

```
 1        Q    Roughly how many volunteers?

 2        A    Very active, probably about 25 in different

 3   parts of the county.

 4        Q    Was it a pretty wide geographic dispersal of

 5   your volunteer base?

 6        A    Yes.

 7        Q    Were there any areas you felt like they were

 8   not from or representing or bringing energy to your

 9   campaign?

10        A    Probably Bolivar Peninsula, because it was just

11   remote.

12        Q    Moving forward to your first reelection

13   campaign -- which would have been in 2008; is that

14   correct?

15        A    Yes.

16        Q    Did you have a primary opponent that year?

17        A    No, I did not.

18        Q    Did you have a general election opponent?

19        A    Yes, I did.

20        Q    What was your general election campaign

21   strategy in 2008?

22        A    To continue the progress that we had made.

23   I've always run on the exact same platform, even to this

24   day; increase service, reduce costs, fight for tax --

25   property tax relief.  And so I ran on having fulfilled
```

186

1      those promises with more to be done.

2          Q    And going back in time a little bit to 2004,

3      did you hold campaign events?

4          A    Oh, yes.

5          Q    What sort of events?

6          A    One of them that was a particular passion of

7      mine and I continued for several years was Tax Freedom

8      Day celebration.  So the day in April or May, depending

9      on when federal taxes were, you know, you finally reach

10     the point you were working for yourself instead of the

11     government, we always -- I used to do a soup and bread

12     celebration.  We were all broke.  It was kind of fun.

13         Q    Where -- where was that soup and bread

14     celebration located?

15         A    Wherever I could find inexpensive locations.

16     We held it once at the Gulf Greyhound Park in their large

17     banquet room.  I think I also held it at a -- in a

18     shopping center.  I don't remember specifically which one

19     of the stores that we were in, but the least expensive

20     places that I could find.

21         Q    And where geographically in the county?

22         A    Mid-county.  Those were very much mid-county,

23     so La Marque, Texas City area.

24         Q    Gotcha.  And how many folks were present

25     typically at these events, at the soup and bread

187

```
1    celebration?

2         A    Yeah, anywhere from 25 to a hundred.

3         Q    As part of your general election campaign, did

4    you attend community events?

5         A    Yes.

6         Q    What sort of community events?

7         A    Every single one that I could find.

8         Q    Can you give a few examples?

9         A    Every chamber luncheon, every chamber

10   networking event.  Those were typically in the morning.

11   Mixer in the evening.  I predominantly tried to attend

12   community events.  Kemah would have different events.  I

13   would go to Mardi Gras parades, 4th of July parades.  I

14   tried to spend as much time out and about in the

15   community where the people were, so fall festivals in --

16   like in Santa Fe.  La Marque, I would go to Octoberfest

17   on the island.  So really any place where there was

18   something going on.  The oyster cookoff in Crystal Beach

19   was always -- or Port Bolivar was always a favorite.  So

20   really, any place where there was something going on.

21        Q    You had said "Kemah."  What is Kemah?

22        A    Kemah is a community on the coast, on the

23   water, not too far from where we're at right now.

24        Q    Is that a...

25        A    It's a city.
```

188

```
 1          Q     Oh, okay.

 2                Did you engage with voters outside of these

 3     events through things like door-knocking or canvassing

 4     and passing out campaign literature, things like that?

 5          A     Yes, sir.

 6          Q     Did you target certain parts of Galveston

 7     County as areas where you could get the most votes?

 8          A     I went anywhere where there were people.

 9          Q     And any parts of the county where you didn't go

10     to not get any -- let me rephrase.

11                Were there parts of the county that you ignored

12     on the campaign trail for whatever reason?

13          A     I can't say so.  I -- there were 13 cities in

14     Galveston County, and so I tried to make a point of

15     attending events in each one of those cities, whatever

16     events they were holding.

17          Q     Since your first election in 2004 and your

18     subsequent reelections in 2008, 2012, 2016, 2020, have

19     you found your campaign strategy to remain consistent?

20          A     Yes.  During those time periods where I was not

21     opposed, I would attend community events but far less,

22     did not block walk or actually do any campaign

23     activities, although we would still put up signs.

24                In 2020, it was the first time I had a primary

25     opponent, so I targeted the Republican primary list of
```

189

1    voters.  That was different for me.  And really, I --

2    so -- so that was -- that was very different for me,

3    because I've never targeted Republican or Democrat.  I've

4    asked for everybody to support me.

5        Q    Any other reasons why that was different for

6    you?

7        A    Other than the fact that I had a -- somebody

8    that I had once considered a friend running against me,

9    no, that was -- it was unusual to me to have a Republican

10   running against a seated Republican incumbent who I felt

11   was doing the job.

12       Q    In 2012, did you have a general election

13   opponent?

14       A    No, I did not.

15       Q    In 2016?

16       A    I wasn't on the -- I think it was -- oh, wait a

17   minute.  So 2012, 2016, no, I had no opponent.  So I went

18   a couple of times without an opponent at all.

19       Q    And in 2020, did you have a general election

20   opponent?

21       A    No, I did not.

22       Q    What areas of Galveston County do you consider

23   to be your basic support?

24       A    Galveston Island for sure.  Friendswood, when I

25   look at the numbers, because that's where I live, about

190

1    82 percent of the voters there have always supported me.

2    League City, there's a large number of people, but it has

3    grown so much that I predominantly would stick to the

4    older parts of League City rather than the newer parts of

5    League City, because those people knew me because I'd

6    been in office for a while, rather than new residents who

7    did not.  Kemah, Clear Lake Shores, Texas City,

8    Dickinson.  So really, a little bit of everywhere.

9         Q    When you were talking about old versus new

10   League City, can you talk a little bit more -- are you

11   referring to length of residency or --

12        A    No, it's more the way the development occurred.

13   On the east side of I-45 is basically the older sections

14   of League City, and that's part of where we are right

15   now, although we're -- we're further out into the South

16   Shore Harbour area.  And then the west sections of League

17   City are where most of the new development has occurred.

18        Q    And you believe that your bases of support has

19   remained pretty consistent over time or --

20        A    I'd say it has, yes.

21        Q    Can you pull up -- I actually have a hard copy

22   if you prefer.

23        A    Oh, I prefer a hard copy.  Thank you.

24        Q    This was previously marked as Exhibit 2, I

25   believe, but I also have it here --

191

1        THE REPORTER:  Sorry, I'm not hearing you.  It

2    was marked as Exhibit what?

3        THE WITNESS:  2.

4        MR. NEWKIRK:  2.

5    Q    (By Mr. Newkirk) Ms. Johnson, I know we've

6    looked at this email for quite a bit of time.  I just

7    have a couple quick follow-up questions.

8        Looking down at the second paragraph, there is

9    a phrase in the second sentence -- I'll just go ahead and

10    read the second sentence.

11    A    Yes, please.

12    Q    "Implementing these plans is a challenge,

13    particularly since there is no coordinated effort."  Did

14    I read that correctly?

15    A    Yes, sir.

16    Q    What did you mean by "coordinated effort"?

17    A    There was no single person -- and I think that

18    I was hoping to be that person -- who was pooling all the

19    different pieces together.  So we had county

20    commissioners doing their own thing, and we had the

21    Dickinson ISD and Hitchcock ISD and the Texas City ISD

22    school boards doing their own thing.  And so we had --

23    what I was hoping to do was pool all those various pieces

24    together and there be a more organized effort and that

25    would simplify our implementation.

192

1    Q    And in your opinion, would this process of

2    centralizing -- simplifying take a large degree of

3    planning and time on your end?

4    A    If there was not a coordinated effort, yes,

5    there could be, and there -- there certainly was.  There

6    was not really any coordination that occurred.

7    Q    Was this recommendation -- suggestion about

8    coordinating efforts based on your experience in past

9    redistricting cycles?

10    A    Yes.

11    Q    Was -- can you explain a little bit more what

12    happened that caused you to make this suggestion?

13    A    In 2011, I did not even know what single member

14    districts we were going to have to implement.  I was not

15    that familiar with all the different governments and when

16    their decisions may or may not be made or -- so in 2021,

17    knowing everybody who was affected, all the different

18    governments, as I said, I tried to pool those together so

19    that we could have some common boundaries and so forth.

20    Q    As far as you know, did the commissioners take

21    this advice?

22    A    To my knowledge, they did not take my advice.

23    Q    Without speculating, do you know why not?

24    A    No, I really don't.

25    Q    In 2013, do you recall a redistricting process

193

1    that occurred at the JP and constable districts?

2        A    I recall in 2011 that there was a combination

3    that they were -- the eight were combined.  Is that what

4    you're referring to?

5        Q    I'm referring to the process in 2013.

6        A    There was a process in 2013?

7        Q    I'll represent to you that there was a

8    redistricting process for JP and constable districts in

9    2013.

10       A    Okay.  I had assumed that that occurred in 2011

11   when everything else was changed.

12       Q    Okay.  I was going to ask if you had any

13   difficulties with that redistricting process in 2013.

14       A    It would have been difficult because we were

15   taking eight and taking it down to four, which meant

16   combining, changing every single entitlement for all the

17   affected voters.  And we had no technology then that we

18   could take large areas and move them at one time.

19       Q    Is it fair to say that this particular

20   recommendation that you flagged about coordinating, that

21   is a separate issue that --

22            THE REPORTER:  I'm sorry, could you speak up,

23   please?

24            MR. NEWKIRK:  I am so sorry, Ms. Carter.

25       Q    (By Mr. Newkirk) So my question -- I'll just

194

1    rephrase it.  Ms. Johnson, is it fair to say that the

2    recommendation that I flagged here about not coordinating

3    is a separate issue that -- from the JP constables going

4    from eight to four?

5         A    Yes.

6         Q    Okay.  Ms. Johnson, do you see in the second

7    paragraph in -- in the second-to-last line, you reference

8    in quotation marks "dot" precincts?

9         A    Yes, sir.

10        Q    What is a dot precinct?

11        A    It would be an additional precinct that was

12   created because you were not -- the redistricting does

13   not allow, say, a state representative to -- or two state

14   representatives to represent the same precinct.  So dot

15   precincts were created to break out to create separation,

16   so that, for instance, House District 22 -- 23, we could

17   run a complete list of whole precincts, and the dot

18   precincts became an additional like subprecinct.

19        Q    I see.  So it would always be smaller than

20   the --

21        A    Much smaller, yes.

22        Q    Okay.  I understand.

23             Going down to the third paragraph here, we have

24   combed over this language a time today, but I just wanted

25   to ask a couple things.  I'll just read this.

195

1    "Therefore, I reached out to all of the officials,

2    including Judge Henry -- not for the purpose of having

3    any impact on your decisions (except for JP and

4    Constable) but to be included from the standpoint of

5    providing input on whether certain proposed plans would

6    be better planned differently."  Did I read that

7    correctly?

8         A    Yes, sir.

9         Q    When you say -- or when you say "provide

10   input," can you describe to me what you mean by "input"?

11        A    That they change entire precincts rather than

12   split or combine.  That if they're going to split, that

13   they use the natural boundaries so it clearly -- so we

14   could clearly identify different streets and entitlements

15   for the individual voters living in those areas.

16        Q    What are some other issues that arise when a

17   voting precinct or election precinct is split?

18        A    What we have to do is take the entire original

19   precinct and define which streets go into what -- which

20   new voting precinct.  So we might -- so there could be

21   anywhere from 200 to a thousand streets and entitlements

22   within that precinct that we're having to separate.  So

23   it's just a very tedious, cumbersome process, and just

24   takes a long time and leaves a lot of room for error.

25        Q    Going down to the sixth paragraph of this

1    email, you write at the end of the first line, "It is

2    relatively easy for me to know when you will meet to

3    discuss redistricting -- not so much the other entities."

4    Did I read that correctly?

5        A    Yes, sir, you did.

6        Q    What is the basis of your belief that it would

7    be relatively easy for you to know when the commissioners

8    court is discussing redistricting?

9        A    I'm on the distribution list for agendas, and

10   so I receive that and my staff receives it.

11       Q    Not so much of the other entities, though?

12       A    Right.

13       Q    Okay.  At the end of this paragraph, you write,

14   "I hope to avoid the use of costly contractors and

15   implement the redistricting plans in-house."  Did I read

16   that sentence correctly?

17       A    Yes, you did.

18       Q    Earlier this morning we were discussing what it

19   means to plan things in-house, and I think you had

20   referenced Galveston Island in 2011 --

21       A    Yes.

22       Q    -- you had to use outside vendors.  Is that

23   what you were talking about here?

24       A    Yes.

25       Q    So you're not talking about the demographers or

197

```
 1      the map drawers who actually draw --

 2           A    No.  No.

 3           Q    Okay.  Will you pull up -- this was already

 4      introduced as Exhibit 5, so there's a hard copy.  I

 5      wanted to find that --

 6                THE REPORTER:  I'm sorry, I'm not hearing you.

 7                MR. NEWKIRK:  Sorry, Ms. Carter.  I said we're

 8      going to pull up Exhibit 5, but I also have a hard copy

 9      that I'll distribute here.  One moment.

10           A    Thank you.

11           Q    (By Mr. Newkirk) Again, this is a document,

12      Ms. Johnson, that we've seen before.  I just have a

13      couple quick follow-up questions.

14                You see the email from May 20th, 2021, from you

15      to Tyler Drummond, subject line "Asked and answered"?

16           A    Yes, sir.

17           Q    Looking at the second paragraph in this email,

18      do you see where you note that the county -- I'm sorry,

19      that "the county would have to take the lead"?

20           A    Yes.

21           Q    What did you mean by "county would have to take

22      the lead"?

23           A    So what my hope was is that they would identify

24      their voting or election precincts so then that could be

25      shared with the other jurisdictions and that any changes
```

198

1    they would make, they would take entitle -- entire

2    precincts if they were going to make changes so that they

3    would consider those lines.

4         Q    At this point in May of 2021, did you believe

5    the county was going to take the lead or was that (audio

6    cutting out) at this point?

7         A    I was hoping -- of course, the legislature

8    needed to adopt the different federal and state

9    boundaries first, and then for them to follow that

10   after -- they would be the ones after that.  So on a

11   local level, it would be my -- would've -- it was my

12   preference that they make their decisions first.

13        Q    As best as you can recall, did that end up

14   being the sequence of events?

15        A    I believe that the City of Galveston actually

16   adopted theirs before the county commissioners did.

17        Q    Looking at the timestamps of the email, this

18   one you sent to Tyler Drummond at 1:50 p.m. --

19        A    Uh-huh.

20        Q    -- you were forwarding an email received at

21   1:48 p.m.  Any reason in particular that it was so quick

22   that you forwarded --

23        A    I was so excited that the census bureau

24   actually responded to me.

25        Q    Had you been anticipating a response?

199

1      A    I really didn't expect them to respond, so I

2  was very pleased.

3           MR. NEWKIRK:  That's all I have on that

4  document.

5           Could we pull up Exhibit 9 that has already

6  been introduced?  And again, I have a hard copy that I'll

7  distribute.  One moment.

8      A    Thank you.

9      Q    (By Mr. Newkirk) Ms. Johnson, again, this is a

10  document we've reviewed before.  This is an email you

11  sent Tyler Drummond on Friday, October 22nd, at -- 2021,

12  at 3:45 p.m., subject line, "Voters in County by

13  Precinct," with one attachment, "Galveston County Voters

14  by Precinct August 2021."  Is that accurate?

15      A    Yes, sir.

16      Q    Flipping to Page --

17           THE REPORTER:  I'm sorry, flipping to Page

18  what?

19           MR. NEWKIRK:  I'm sorry, Ms. Carter, I had a

20  piece of paper over my face.

21      Q    (By Mr. Newkirk) Flipping the page to the

22  attachment, do you see the date 8/13/21 at the top of

23  these tables?

24      A    Yes, I do.

25      Q    Do you agree that Mr. Drummond requested this

200

1    information in October of 2021?

2         A    Yes, based on my email.

3         Q    Was this the most up-to-date data that you had

4    that he was requesting from August?

5         A    We could've run another list, but he apparently

6    wanted the original list that I had sent to commissioners

7    previously in August.

8         Q    Do you recall if this was the first time

9    Mr. Drummond requested the breakdown of registers voters

10   from you or your office?

11        A    I believe it may have been the only time that

12   he requested it.

13        Q    Did the timing of his request in October 2021

14   surprise you, considering that you had previously thought

15   redistricting was around the corner earlier that year?

16        A    I didn't really consider that.

17             MR. NEWKIRK:  Those are all the questions I

18   have on that document.

19             Okay.  I'll introduce an exhibit.  Kathy, it's

20   going to be saved in Exhibit Share as U.S. Tab 11.  And I

21   have a hard copy here.

22             MR. MUNK:  Exhibit 17 has been introduced.

23        Q    (By Mr. Newkirk) Ms. Johnson, if you want to

24   just take a moment -- because we've not reviewed this

25   document yet, just take a moment and tell me if you're

1    familiar with this email chain.

2         A    Yes, I am.

3         Q    Okay.  Can you see the email -- well, actually,

4    I don't think we've talked about her yet, but who is

5    Kristi Saludis?

6         A    She was the senior voter registration

7    specialist in my voter registration department.

8         Q    When did she begin there?

9         A    Oh, goodness.  As I recall, six or seven years

10   ago.

11        Q    And is she there still?

12        A    No, she's not.

13        Q    Do you see down in the email that she sent to

14   you dated 11/10/21, 8:45 a.m., where she writes, "There

15   is a" -- "There is a special Agenda for Friday,

16   11-12-2021"?

17        A    Yes.

18        Q    Was this the first time you learned about the

19   November 12th special session?

20        A    I would say that that's very likely, although

21   the email that I sent on November 9th said, "I did not

22   see a posted meeting for today but they did post a

23   meeting for next week."  I'm not sure that I saw that

24   specifically, but she did clarify that.

25        Q    Do you see the most recent email in this chain

202

1    when you asked Kristi Saludis, "Is that meeting in League

2    City?"

3        A    Yes.

4        Q    Why did you ask whether the meeting was in

5    League City?

6        A    The county commissioners meet typically in the

7    county courthouse on the island.  They frequently hold

8    special called meetings in League City, the League City

9    Annex Building.  And so without having seen that agenda,

10   I would not known -- have known where the meeting was to

11   be held.

12       Q    Did you think it might be held in Galveston in

13   the courthouse?

14       A    On Fridays, they rarely drive to Galveston

15   Island.  They're frequently in League City if they have a

16   meeting outside of the regularly scheduled meetings.

17       Q    Are special meetings always held in League

18   City?

19       A    No, sir.

20       Q    Can they be held in other -- or can they be

21   held in Galveston, in the courthouse in Galveston?

22       A    Yes.

23       Q    In any other location that you're aware of?

24       A    I -- I don't know that they ever have, and I'm

25   not aware -- I don't know why they could not.  They have

203

1    other buildings in different areas of the county.

2         Q    How long have -- to the best of your memory,

3    how long have special meetings been held in League City?

4         A    Off and on, probably over the last four years,

5    four or five years.

6         Q    Do you know -- do you know, without

7    speculating, what prompted the development of special

8    meetings in League City?

9              MS. OLALDE:  I'm going to object and ask the

10    witness not to speculate.

11              Go ahead.

12              THE WITNESS:  Oh, I can answer that?

13              MS. OLALDE:  Uh-huh.

14         A    I don't know specifically.

15         Q    (By Mr. Newkirk) Have you ever attended a

16    commissioners court meeting in League City?

17         A    Yes, I have.

18         Q    Could you describe the meeting space?

19         A    It should -- the only one that I have -- well,

20    no, there's two locations.  They used to be in the old

21    League City Annex, which is now being renovated.  And the

22    most recent one that I attended, those would be held in

23    Judge McCumber's court, and there was seating for

24    probably 35 people.  And the space they're using now,

25    Judge McCumber's court is in a temporary building while

204

```
1     the renovation's underway, a far less comfortable space.

2         Q    In which of the locations that you just

3     described is the one on Calder Road?

4         A    They're both on Calder Road.

5         Q    Oh, okay.  Do you happen to know -- scratch

6     that.

7              Have you ever attended a commissioners court

8     meeting at the courthouse in Galveston?

9         A    Yes, I have.

10        Q    Can you describe that meeting space?

11        A    They actually have a formal courtroom-type

12    setting with a dais where they sit, speakers, seating.

13    Since COVID, half the amount of seating.  That they have

14    a lot of audiovisual equipment there that makes it really

15    comfortable for people, good sound equipment, so forth.

16        Q    And that audiovisual equipment is not available

17    in League City?

18             MS. OLALDE:  Objection, calls for speculation,

19    also overbroad.

20             Go ahead.

21        A    I believe that IT brings that -- that equipment

22    with them and sets it up.

23        Q    (By Mr. Newkirk) Did you ever learn about the

24    size of the attendance at the November 12th special

25    session when the commissioners court maps -- map was
```

205

1    adopted?

2        A    I saw minutes of that meeting last week that

3    had a list of people who had spoken at that meeting.

4    That was the first time I had seen that.

5        Q    Did the length of that list surprise you or

6    not?

7        A    Not necessarily.

8        Q    I believe that's all I have on this.

9             MR. NEWKIRK:  I'd like to introduce another

10   exhibit.  Kathy, it's saved as U.S. Tab 12.  And again, I

11   have hard copies for folks here.

12       A    Thank you.

13       Q    (By Mr. Newkirk) Ms. Johnson, you see that this

14   is an email exchange between Nathan Sigler and you dated

15   Friday, November 12th, 2021, at 12:32 p.m., and there are

16   two attachments?

17       A    Yes, sir.

18       Q    Do you recognize this document?

19       A    I -- I do.

20       Q    And do you see where he writes, "Here are the

21   breakdown lists as requested"?

22       A    Yes, I see that.  Yes.

23       Q    Do you recall when you requested those lists?

24       A    I'm not sure whether I requested them or if

25   Ms. Moreno requested them.  Obviously, we had not had

206

```
 1    them before this time.  I don't remember specifically
 2    requesting them myself.
 3         Q    Turning to the attachment -- or attachments,
 4    plural, can you go to the one with the number at the
 5    bottom right that says DEFS00020460?
 6         A    Yes.  Yes, sir.
 7              THE REPORTER:  Excuse me, while she's turning
 8    to that page, the page-flipping is right on the
 9    microphone and your voice is very far from the
10    microphone, so I'm having a hard time picking up your
11    voice, Mr. Newkirk.
12              MR. NEWKIRK:  All right.  I'll lean in some
13    more.
14         Q    (By Mr. Newkirk) Ms. Johnson, at the very top
15    of this page, do you see where it says 'Map 2'
16    Commissioner Precinct By Current Voting Precincts &
17    Splits"?
18         A    Yes, sir.
19         Q    Do you know what "Map 2" means?
20         A    It would've been one of the maps that they were
21    considering.
22         Q    For commissioners court?
23         A    For commissioners court, yes.  For commissioner
24    precincts.
25         Q    And do you see where it says "If the Voting
```

207

1    Precinct has 'A' at the end it is a split Precinct"?

2         A    Yes.

3         Q    Can you describe what this chart shows us?

4         A    From my perspective as the implementer of these

5    plans, that would tell me, based on these plans, the

6    difficulty of the task.  So under Commissioner

7    Precinct 1, it has 336, has two precincts with As,

8    meaning two precincts would have to be split, or all the

9    rest may require -- as in the 336, 343 and 347 would only

10   require a name change.  So from my perspective, it

11   communicates the complexity of the task.

12        Q    And stepping back a little bit, the numbers --

13   the three-digit number, that's simply the name of the

14   voting precinct?

15        A    Yes.

16        Q    Earlier today you talked about how the first

17   digit refers to the commissioner's precinct --

18        A    Yes.

19        Q    -- correct?  Do the other numbers, the other

20   two digits, have any meaning to them?

21        A    I do not believe they do.  I'm not certain.

22        Q    Okay.  So it doesn't mean, for example, that

23   they're close geographically together?

24        A    No.

25        Q    So 150 and 151 could be across, you know, the

208

1    street or --

2         A    Yes.

3         Q    -- (indiscernible).

4         A    As far as I know I'm not aware of any

5    particular -- it was just the order over time that

6    they've evolved.

7         Q    Looking, for example, at this first column,

8    Commissioner's Precinct 1, about halfway down, you see

9    165.1?

10        A    Yes, sir.

11        Q    What does that .1 mean?  Is that one of those

12   dot precincts?

13        A    That's one of those dot precincts, yes, sir.

14        Q    And can you describe, how is that different

15   from one that has an "A" after it?

16        A    It would be much smaller.  So a 165-A would've

17   originally been part of 165, but a portion, a sliver or

18   whatever, was changed to accommodate the -- whatever

19   elected official that that was set up for.  Typically

20   they're very small, where the other ones are entire

21   precincts of anywhere from 500, I guess, to 5 or 6,000

22   voters.

23        Q    Looking at the column Commissioner Precinct 2,

24   I see a couple of dot precincts.  One of them says 232.1,

25   and another says 232.3.  Does the number coming after the

209

1  decimal place have any meaning?

2       A    Not to my knowledge.  My -- without looking at

3  a map, it would probably mean they're on -- in different

4  parts of the precinct.  So the dot 1 might be on one side

5  of it and dot 3 would be on the other side of the whole

6  precinct, although I don't see a 232.  Yes, I do,

7  under 4.

8       Q    Do you mind flipping the page to -- to what

9  ends in 458?

10       A    Okay.

11       Q    And we see that this is titled "'Map 1'

12  Commissioner Precinct By Current Voting Precincts &

13  Splits," correct?

14       A    Yes, sir.

15       Q    Can you describe what this chart shows us and

16  if it differs in any significant way from the one we were

17  just looking at?

18       A    Without putting them side by side, it's --

19  there's -- I would guess that there's certain changes --

20  there's certain precincts that are included in some of

21  these lists that are in the other commissioner precincts

22  on the other list.  It looks like there's more in

23  Precinct 3, more individual precincts in Precinct 3 than

24  there were on the other map, and fewer for the other

25  commissioner precincts.

210

1          Q     Thank you.   That's all I have for this

2    document.

3                 MR. NEWKIRK:   I'd like to now introduce an

4    additional document.   I saved this on Exhibit Share as

5    U.S. Tab 13.

6                 THE WITNESS:   Thank you.

7                 THE REPORTER:   While he's getting that pulled

8    up, could we go off the record, please?

9                 MR. NEWKIRK:   Sure.

10                THE VIDEOGRAPHER:   Okay.   Current time is now

11   4:49 p.m.   We're now off the record.

12         (Recess.)

13                THE VIDEOGRAPHER:   Current time is 4:57 p.m.

14   We're now back on the record.

15         Q     (By Mr. Newkirk) Okay.   So we're looking at

16   what was marked as U.S. Tab 13 -- it's now an exhibit --

17   and you've had a chance, Ms. Johnson, to take a look at

18   it.   Do you recognize this document?

19         A     Yes, I do.

20         Q     And you agree that this is an email sent from

21   you sent to Nathan Sigler on Monday, November 15th, 2021,

22   with a subject line "Precinct List with Lots of Info"?

23         A     Yes, sir.

24         Q     We were also taking a look at the attachments.

25         A     Yes, sir.

211

```
1          Q    I also have a printed copy of the original.

2    It's not as easy to see, but I left that --

3          A    (Indiscernible.)

4          Q    Okay.  So first looking at the body of the

5    email, which is on the document titled -- or I'm sorry,

6    with Bates stamp Number DEFS00016754, do you see the

7    first sentence that you wrote, "Attempted to compile all

8    of the various pieces based on our discussions in your

9    previous Map 2 listing"?

10         A    Yes, sir.

11         Q    Do you mind taking me through the discussions

12   that you're referring to here with Mr. Sigler, how many

13   there were, when were they, to the best of your memory?

14         A    Looking at the time of this email, I -- I

15   really don't recall.  I would imagine that those

16   conversations took place throughout the day on that

17   Monday.

18         Q    Would any of them, to the best of your

19   recollection, have occurred before November 12th, 2021?

20         A    I -- I don't know.  Nathan and I spoke to each

21   other often, but based on the fact that the commissioner

22   precincts were adopted on that Friday, it is very likely

23   that this was the result of discussions to try and

24   implement that which was voted on.

25         Q    In the last paragraph where you write, "You had
```

212

1    mentioned 232.1 and 232.3 may merge into 225.  Doing that

2    would create a 5,400 voter precinct."

3         A    Yes, sir, I see that.

4         Q    By "5,400 voter precinct," do you mean a

5    precinct with 5400 voters?

6         A    Yes, sir.

7         Q    What are some consequences to you and your team

8    if a precinct has 5400 voters?

9         A    It's common knowledge or knowledge that we

10   just, I guess, acquired through the years that each

11   precinct was supposed to be about the same size and that

12   5,000 was the maximum number of voters that should be in

13   a voting precinct.  So that exceeded -- that if they

14   combined those, that would exceed that number.

15        Q    Do you know, is that 5,000 number custom or is

16   that set by state law or something?

17        A    I believe that's established in state law.

18        Q    Moving towards the attachment, we have the

19   sheet titled County Commissioner Precincts -- (audio cut

20   out).

21        A    Yes, sir.

22        Q    Do you agree that two tables appear on this

23   sheet?

24        A    Yes, sir.

25        Q    Looking at the table on the left, do you mind

213

1    going through each column and telling me what each column

2    means?

3        A    The former CC precinct would have been the

4    former county commissioner precinct.  The former precinct

5    number then was the number of that former county

6    commissioner precinct.  The change to county commissioner

7    precinct is specifying, based on those maps, which county

8    commissioner precinct it would be changed to, that former

9    precinct.  Changed to precinct number, the assumption is

10   made that we would change just the first digit, which

11   would be, in this instance of Line 1, 103 from Precinct 1

12   would move to Precinct 2 and become 203.  And then the

13   number of voters in Precinct 103 on November 15th was --

14   that's the number of voters on that date when the list

15   was generated.  And then the current total voters in

16   precinct to be split is just another information column

17   where if there was a precinct that they were anticipating

18   split, what the number of voters were in the original

19   precinct.

20          Do you want me to -- you were just interested

21   in the left-hand side?

22       Q    Yeah, for now.  Thank you.

23       A    Okay.

24       Q    That was incredibly helpful.

25          You anticipated my next question by running

214

1    through the first row --

2         A    Uh-huh.

3         Q    -- and identifying what each cell means.  Going

4    down a little bit, do you see that the number 205 and

5    205.1 are highlighted?

6         A    Yes, sir.

7         Q    Do you know why they're highlighted?

8         A    I don't recall why they're highlighted.  I was

9    looking to see if I can see that anywhere else.  Not

10   specifically, no.  I don't give a key here to explain it.

11        Q    Do you know why a full row, moving down a

12   little bit, is fully highlighted?

13        A    The next one that's highlighted is Precinct

14   1-152 that they were discussing splitting.  And so not

15   knowing what that new named precinct would be, I had two

16   lines there.  So if they were discussing splitting

17   Precinct 152, we would not know what the change in the

18   number would be, if there would be one at all, or if it

19   would be a new added precinct and to-be-decided name.

20        Q    And could you tell me why underneath that 152

21   there's a cell that's blank?  Why is that blank?

22        A    Because when they split, there was no former

23   county commissioner precinct.  It -- it would be assumed,

24   if they were splitting 152, that those were former

25   Precinct 152.  But since the precinct didn't actually

215

1    exist with a new number, would be unspecified.

2        Q    Going down a little bit further to the second

3    highlighted row.

4        A    Uh-huh.

5        Q    You see underneath the 155, that's blank.  But

6    also underneath a column saying "No Change," the cell

7    underneath that one is blank for that particular row.  Do

8    you see where I'm pointing?

9        A    Yes, sir.

10       Q    Do you know why that "No Change" -- the cell

11   underneath where it says "No Change" is left blank?

12       A    Probably because all of the second ones that --

13   there are -- they are changing -- well, like they weren't

14   necessarily changing.  It would be creating likely a new

15   number.  So probably all of those should have been blank.

16   So the one that says "No Change" above it should have

17   been blank and the one below it that says "No Change"

18   should've been blank, because we didn't -- we knew it was

19   going to be something, but we didn't know what it was

20   going to be.

21       Q    Going down one row, you see a number zero in --

22   it's no longer highlighted, but it's --

23       A    Yes.

24       Q    -- former Precinct Number 155.1 and then

25   there's a number zero --

216

```
1          A    Yes, sir.

2          Q    -- in a couple of columns.  Do you know why

3     that -- or do you know what that zero signifies?

4          A    That there were no registered voters in that --

5     in that dot precinct on that date.

6          Q    Gotcha.  So to summarize, is it fair to say

7     that the highlighted rows mean more or less that

8     the (audio cutting out) --

9          A    Split or combined.

10         Q    (Audio cutting out) or combined.

11              THE REPORTER:  I'm sorry.  I'm sorry, your

12    audio is cutting out and I -- could you please repeat the

13    last question?

14              MR. NEWKIRK:  I asked, is it fair to say that

15    the highlighted rows mean that a precinct is going to be

16    split.  Then Ms. Johnson responded split or combined.

17         Q    (By Mr. Newkirk) Ms. Johnson, if you could go

18    to that other table titled "Old Precincts Available in

19    TEAM."

20         A    Yes.

21         Q    Can you tell me what this table is all about?

22         A    So these are all the precinct numbers that at

23    some point in time in Galveston County's history have

24    been used.  And so this would present a list of possible

25    precinct numbers that the commissioners could use when
```

217

```
 1    they were splitting precincts and creating a new

 2    precinct.  They could have used others, but these have

 3    actually existed in the system.

 4         Q    Is there a benefit to using a number that's

 5    been in the system before?

 6         A    Not necessarily, no, because then that -- you

 7    run out of numbers.

 8         Q    And some values have decimals.  We've talked a

 9    bit about dot precincts, but some have values that end,

10    for example, in .02.  Does that have any significance?

11         A    No.  It was a naming convention, and I can't

12    tell you why they were -- some of them were .1 and some

13    of them were .01.  It was just the way they were named at

14    the time.

15              MR. NEWKIRK:  That's all the questions I have

16    on this document.  I am nearly done.

17              I'd like to introduce, Kathy, U.S. Tab 14.

18         Q    (By Mr. Newkirk) Ms. Johnson, do you recognize

19    this email?

20         A    Yes, I do.

21         Q    And you agree that this is from you to a

22    variety of people, Kristi Saludis, Stephanie Berry,

23    George Ott and Kathleen Moreno, dated Friday, November

24    19th, 2021, correct?

25         A    Yes, sir.
```

218

```
 1        Q    We already identified Kristi Saludis.  Who's
 2   Stephanie Berry?
 3        A    She was the -- one of the voter registration
 4   specialist.
 5        Q    George Ott?
 6        A    He was also a voter registration specialist.
 7        Q    Okay.  And looking at the bottom of the email,
 8   you write, "Per Commissioner Clark, we are good to
 9   proceed with the following county precinct changes."  Do
10   you agree?
11        A    Yes, sir.
12        Q    And by "county precinct," you're referring to a
13   voting precinct; is that --
14        A    Yes, sir.
15        Q    Were you in contact with Commissioner Clark
16   before you sent this email?
17        A    Yes.
18        Q    Do you recall how soon before you sent this
19   email you were in contact with him?
20        A    Earlier in the day would be my guess.  This is
21   sent in the afternoon, and so likely he and I had a
22   conversation sometime before that.  It would've taken me
23   a little bit of time to put this together.
24        Q    Was his approval necessary to make changes to
25   the voting precincts?
```

219

```
1              MS. OLALDE:  (Indiscernible) -ation.

2              You can answer.

3       A     Not specifically his approval, although he was

4   the lead commissioner on all of the changes that were

5   underway.  I was trying to get some confirmation that we

6   were good to proceed with the naming conventions that had

7   been discussed.  And I wanted that documented that he had

8   given us permission to proceed with these changes.

9       Q     (By Mr. Newkirk) If you were trying to look for

10  confirmation, is there anyone -- anyone better than

11  Commissioner Clark for that purpose?

12      A     There was nobody better for that purpose, no.

13      Q     You said he was the lead commissioner on these

14  issues.  Was that a official role that he had, or was it

15  sort of an unofficial role?

16      A     I believe it was a role that he happily

17  assumed.

18      Q     In this email, you also say, "I will send the

19  spreadsheet to print and use when making changes in

20  auditing.  It will be our audit trail."

21      A     Uh-huh.

22      Q     Do you see that?  Can you describe -- I guess

23  rather, was there an auditing process?

24      A     Yes, sir.

25      Q     And how often did that process happen?
```

220

1          A     Continuously throughout the changes.  Any time

2     a change was made, we had an auditor or somebody standing

3     by ready to confirm that everything changed properly.

4          Q     Besides voting precinct changes, what else, if

5     anything, did the audit cover?

6          A     To some extent, that entitlements were

7     appropriate and that they had all come over correctly.

8     It was a list very similar to this that had an additional

9     column that the -- two additional columns, likely, change

10    made by who, and then audited by who.

11         Q     Who performed that audit?

12         A     Various people in the office.  Sometimes it was

13    members of -- that are -- people that are listed on this.

14    Ms. Saludis was predominantly making the changes, with

15    Ms. Berry and Mr. Ott doing a lot of the auditing, along

16    with Ms. Moreno and other staff members.

17         Q     So it was an internal audit?

18         A     Yes, sir.

19         Q     Oh, okay.

20               Looking at the table that you attach to this

21    email, this looks similar to the exhibit that we are just

22    looking at.  Do you agree?

23         A     Yes, sir.

24         Q     Do they mean the same thing?

25         A     Yes, sir.

221

1          Q    We've run through all the columns, or you did,

2    rather.

3          A    Yes.

4          Q    Looking down on third page, DEFS0001708, column

5    marked Former Precinct Number, it looks like Precinct 336

6    is not in that column.  This would be about a little past

7    halfway down.

8          A    Yes, sir.

9          Q    Do you agree that you don't see Precinct 336

10   there?

11         A    I don't see Precinct 336 there.

12         Q    Do you agree that Precinct 336 was split in the

13   fashion of the commissioners court map?

14         A    I would have to refer to the other documents.

15         Q    Okay.  Do you happen to know why Precinct 336

16   does not appear on this list?

17         A    Either it didn't exist or these were simple --

18   these were county precinct changes that we could make

19   without further action, former action -- formal action by

20   anybody.

21         Q    Thank you.

22              MR. NEWKIRK:  That's all I have on this

23   document.  I have three more documents and then we'll be

24   done.

25              Can I introduce what's marked on Exhibit Share

222

1    as U.S. Tab 15, Kathy?

2         Q    (By Mr. Newkirk) Ms. Johnson, do you recognize

3    this email?

4         A    Yes, sir.

5         Q    Do you agree that it is between you and Paul

6    McLarty, among others, November 12th and November 15th,

7    2021?

8         A    Yes, sir.

9         Q    Beginning at the sentence of the -- I think we

10   identified him earlier, excuse me, but can you remind me

11   who Paul McLarty is?

12        A    He was an official and, I believe, an assistant

13   superintendent at (audio cutting out) ISD.

14        Q    Okay.

15             THE REPORTER:  I'm sorry.  I'm sorry.  The

16   paper movement is interfering with the audio, and if I

17   just miss a little piece of a sentence, I don't get what

18   you're saying.

19             THE WITNESS:  Do you need me to repeat what I

20   said?

21             THE REPORTER:  I got -- I missed a couple of

22   words at the beginning of the question too.  It's -- we

23   might need to go back to the other audio system.  This

24   one's not really working very good.

25             MR. NEWKIRK:  Do you mind reading back just

223

```
 1     what you have?  My question was basically who -- who is

 2     Paul McLarty.

 3               THE REPORTER:  I got that, and she said he is,

 4     and then there was a little paper noise and so I heard

 5     pieces of words, but I didn't hear the answer.

 6               THE WITNESS:  He is an official or assistant

 7     superintendent, had some decision-making role at Clear

 8     Creek ISD.

 9               MR. NEWKIRK:  All right, Ms. Carter, I'm not

10     going to touch this paper.

11          Q    (By Mr. Newkirk) Ms. Johnson, reading the first

12     sentence, you write, "You are likely sick of hearing from

13     me but I have new information (it seems to have been

14     changing hourly today but have something constant now)."

15     Do you see that?

16          A    Yes, sir.

17          Q    What do you mean by "changing hourly"?

18          A    Commissioner Clark -- I remember during that

19     time period where Commissioner Clark would make a

20     decision and then he would change that de- -- he'd get

21     with Nathan, and they'd come back with different

22     information.  And eventually, I think I stopped even

23     making notes of what they were doing until they finally

24     reached final decision.

25          Q    Final decisions about...
```

224

1        A    Precinct names and so forth.

2        Q    In your experience with redistricting, is it

3   common to receive frequent updates to precinct names and

4   conventions, or was this changing hourly unique to 2021?

5        A    I had always been included at the very end of

6   this, not in the middle.  Because we had so little time,

7   they were trying to give me as much information as they

8   could so we could proceed, because there was going to be

9   so much that we need to do in such a short time period.

10  So they were trying to accommodate my request to let me

11  change what I can so that then we can spend additional

12  time doing more complicated work later.  So I've never

13  been included in this -- at this stage before and in the

14  middle of -- of being provided information continuously.

15       Q    I understand.  And do you agree that this email

16  exchange that we're looking at, but not touching, is only

17  about CCISD?

18       A    This was communicating to CCISD the areas that

19  they needed to know what the precincts were going to be

20  so that they could make decisions, the board.

21       Q    But these are the voting precincts that are

22  common to all --

23       A    Yes, yes.

24       Q    -- other entities?

25       A    Well, they're -- as you recall, I was asking

225

1      these jurisdictions to try and change their boundaries in

2      conformance with the county commissioner voting

3      precincts, or the commiss- -- the voting precincts.  And

4      so Mr. McLarty was trying really hard to accommodate that

5      request.

6           Q     And down at your email, you write, second

7      paragraph, "Precinct 152 will be split down South Shore

8      Harbor Boulevard.  One portion will remain 152 and the

9      other will receive a new number by November 29th."  Do

10     you see that?

11          A     Yes, sir, I do.

12          Q     What's the significance of November 29th?

13          A     At that point in time, that was the projected

14     date that was being given to me where the final numbering

15     conventions would be decided.

16          Q     How -- when did you learn that November 29th

17     was going to be that -- the day that that happened?

18          A     At some point during the conversations with --

19     with Commissioner Clark.

20          Q     So would you agree that he sets the date --

21     that date?

22          A     Yes, that was the part --

23                MS. OLALDE:  Objection.

24                THE WITNESS:  Oh, I'm sorry.

25                MS. OLALDE:  Objection, that calls for (audio

226

1    cutting out).

2         A    It's -- and he could very well have been

3    speculating as well that that was the target date that

4    they were trying to make this change.

5         Q    (By Mr. Newkirk) Okay.

6              THE REPORTER:  Could we go off the record,

7    please?  I'm sorry, could we go off the record, please?

8              THE VIDEOGRAPHER:  Current time is 5:19 p.m.

9    We're off the record.

10        (Recess.)

11             THE VIDEOGRAPHER:  Current time is 5:21 p.m.

12   We are now back on the record.

13             MR. NEWKIRK:  Kathy, I think the last thing I

14   said is I wanted to introduce U.S. Tab 16, but we could

15   actually scratch that and just introduce U.S. Tab 17.

16   And this will be my last exhibit.

17             MS. GARRETT:  So I just did 16.

18             MR. NEWKIRK:  Oh, okay.  I think you can delete

19   it on Exhibit Share.

20             MS. GARRETT:  Okay.

21        A    Are you done with this one?

22        Q    (By Mr. Newkirk) Yes.

23             MS. GARRETT:  Sorry, I'm going to need

24   assistance from the concierge.  The option to delete is

25   shaded out, so I can't delete it.

227

```
1              MR. MUNK:  Certainly.  I'll go ahead and delete
2       that for you right now.
3              MS. GARRETT:  And can you just go ahead and add
4       17 as Exhibit 23?
5         Q    (By Mr. Newkirk) Ms. Johnson, have you had a
6       chance to review this email exchange?
7         A    Yes.
8         Q    And you recognize it?
9         A    Yes, I do.
10        Q    And you agree that this is an exchange you've
11      had with Nathan Sigler on October 26th and 25th of 2021?
12        A    Part of an exchange was between Kathleen Moreno
13      and -- and Nathan, and then I -- I was included, and I
14      did comment.
15        Q    Okay.  I'm looking at the first page.  You
16      write to Mr. Sigler that he is the best and that he's
17      very helpful and had a professional and timely response
18      which made him a keeper, correct?
19        A    Yes, sir.
20        Q    And can you describe why you were very
21      complimentary of Mr. Sigler?
22        A    Nathan was essential to this process.  When he
23      saw the few tools that we had, he went out of his way to
24      accommodate us to give us anything that he had at his
25      disposal in order to make our job easier.
```

228

1      Q     And based on your interactions with him, do you

2   consider him very knowledgeable about the specific steps

3   needed to implement a redistricting plan?

4           MS. OLALDE:  Objection, calls for speculation,

5   and also a legal conclusion.

6           But you can answer to the extent you're able.

7      A     I think Nathan was very knowledgeable on his

8   part of the process, which was creating the maps and

9   geocoding the data.  And then he became very aware of

10  what we needed in order to proceed with our part of it.

11          MR. NEWKIRK:  Thank you.  I just need a quick

12  second to make sure I got everything.

13          MS. OLALDE:  Do you want to go off the record?

14          MR. NEWKIRK:  I think I can do it in record

15  time on the record.

16      (Discussion off the record.)

17          MR. NEWKIRK:  Just one quick question.

18      Q     (By Mr. Newkirk) I -- earlier, you had said

19  that you ran into Commissioner Giusti at community

20  events.

21      A     Yes, sir.

22      Q     Do you remember saying that?  What sort of

23  community events?

24      A     Many of the elected officials get together

25  every December and have a big dinner we throw for anybody

229

```
1    who wants to come.  And so we all chip in a little bit

2    and feed typically 4 to 600 people.  And so we'd also see

3    each other at Chamber of Commerce events and -- and

4    that -- that was predominantly the local events that

5    would be held in -- in his particular precinct.

6              MR. NEWKIRK:  Those are all the questions I

7    have, Ms. Johnson.  Thanks --

8              THE WITNESS:  Okay.

9              MR. NEWKIRK:  -- so much for your time.

10             And apologies, Ms. Carter, for all the issues.

11             THE REPORTER:  Thank you for working with me.

12                   E X A M I N A T I O N

13   BY MS. OLALDE:

14        Q    This is Angie Olalde.  I just have one quick

15   question for you, Ms. Johnson.

16             Are you aware of the scope of Nathan Sigler's

17   work in the 2021 redistricting process?  Do you know

18   exactly what he was doing?

19        A    I truly do not know exactly what he was doing.

20   It was very technical, and I'm not a technical person.

21        Q    Do you know what his instructions were in order

22   to do work in the 2021 redistricting plan?

23        A    No, I do not know what his specific

24   instructions were.

25             MS. OLALDE:  Okay.  Defendants will reserve all
```

230

```
 1    further questions.

 2             THE VIDEOGRAPHER:  Molly, do you need to get

 3    anything for the record or anything?

 4             THE REPORTER:  No, that's fine.  Thank you.

 5             THE VIDEOGRAPHER:  Okay.  Current time is 5:27

 6    p.m., and we're off the record.

 7         (Discussion off the record.)

 8             THE VIDEOGRAPHER:  It's 5:28 p.m., and we're on

 9    the record.

10             MS. COPPER:  And apologies, Ms. Johnson, I

11    wanted to ask -- I know you had mentioned potential text

12    message communications with Mr. Drummond about the

13    timeline, and I wanted to ask your counsel -- we have not

14    received any text message communications between them as

15    part of your production, and so wanted to ask if you

16    could send anything that was -- that you find over.

17             MS. OLALDE:  Absolutely.  It's my understanding

18    that we've received any possible relevant text messages

19    and that they've been reviewed and produced as they are

20    requested in the lawsuit, so...

21             MS. COPPER:  Thank you.

22             THE VIDEOGRAPHER:  Time is 5:28 p.m., and we're

23    off the record.

24         (Deposition concluded at 5:28 p.m.)

25
```

231

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    GALVESTON DIVISION


 3
     HONORABLE TERRY PETTEWAY,      §
 4   et al.,                        §
              Plaintiffs,           §
 5                                  §
                                    §   CIVIL ACTION
 6   VS.                            §   NO. 3:22-cv-00057
                                    §
 7   GALVESTON COUNTY, et al.       §
              Defendants.           §
 8

 9                        - - - - - -

10                  REPORTER'S CERTIFICATION

11           ORAL DEPOSITION OF CHERYL JOHNSON

12                   FEBRUARY 28, 2023

13                        - - - - - -

14       I, MOLLY CARTER, Certified Shorthand Reporter in and

15   for The State of Texas, hereby certify to the following:

16       That the witness, CHERYL JOHNSON, was duly sworn by

17   the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by the

19   witness;

20       I further certify that pursuant to FRCP Rule

21   30(e)(1), that the signature of the deponent:

22       _XX_ was requested by the deponent or a party before

23   the completion of the deposition and returned within 30

24   days from date of receipt of the transcript.  If

25   returned, the attached Changes and Signature Page
```

232

1    contains any changes and the reasons therefor;

2         ____ was not requested by the deponent or a party

3    before the completion of the deposition.

4         I further certify that I am neither attorney nor

5    counsel for, related to, nor employed by any of the

6    parties to the action in which this testimony was taken.

7    Further, I am not a relative or employee of any attorney

8    of record in this cause, nor do I have a financial

9    interest in the action.

10        Certified to by me on this 1st day of March 2023.

11

12

13

14

     <%12752,Signature%>
15
        MOLLY CARTER, CSR, RPR, CRR
16      CSR NO. 2613, Expires 04/30/2024

17

18

19

20

21

22

23

24

25

233

1      Angela Olalde, Esq.

2      aolalde@greerherz.com

3                          March 1, 2023

4      Honorable Terry Petteway Et Al  v. Galveston County, Texas Et Al

5          2/28/2023, Cheryl Johnson (#5759026)

6          The above-referenced transcript is available for

7      review.

8          Within the applicable timeframe, the witness should

9      read the testimony to verify its accuracy. If there are

10     any changes, the witness should note those with the

11     reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13     Deponent and Errata and return to the deposing attorney.

14     Copies should be sent to all counsel, and to Veritext at

15     cs-ny@veritext.com.

16

17      Return completed errata within 30 days from

18     receipt of testimony.

19       If the witness fails to do so within the time

20     allotted, the transcript may be used as if signed.

21

22                      Yours,

23                      Veritext Legal Solutions

24

25

234

Honorable Terry Petteway Et Al  v. Galveston County, Texas Et Al

Cheryl Johnson (#5759026)

                    E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____

Cheryl Johnson                            Date

235

1    Honorable Terry Petteway Et Al  v. Galveston County, Texas Et Al

2    Cheryl Johnson (#5759026)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Cheryl Johnson, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Cheryl Johnson                        Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20____.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25