**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **HONORABLE TERRY** | § | **3:22-CV-00057** |
| **PETTEWAY, ET AL** | § | |
| | § | |
| **V.** | § | **9:01 A.M. TO 6:17 P.M.** |
| | § | |
| **GALVESTON COUNTY, TEXAS,** | § | |
| **ET AL** | § | **AUGUST 15, 2023** |

**BENCH TRIAL**
**BEFORE THE HONORABLE JEFFREY V. BROWN**
**Day 7 of 10 Days**

**APPEARANCES:**

**FOR THE PETTEWAY PLAINTIFFS:**
Mr. Mark P. Gaber
Campaign Legal Center
1101 14th Street NW
Suite 400
Washington, DC  20005
(202) 736-2200
     and
Mr. Neil G. Baron
Law Office of Neil G. Baron
1010 E. Main Street
Suite A
League City, Texas  77573
(281) 534-2748
     and
Mr. Chad W. Dunn
Brazil & Dunn
1900 Pearl Street
Austin, Texas  78705
(512) 717-9822
     and
Ms. Valencia Richardson
Campaign Legal Center
1101 14th Street NW
Suite 400
Washington, DC  20002
(318) 573-8984

**APPEARANCES: (continued)**

**FOR THE PETTEWAY PLAINTIFFS:**
Ms. Simone Leeper
Campaign Legal Center
1101 14th Street NW
Suite 400
Washington, DC  20005
(202) 736-2200
         and
Ms. Alexandra Copper
Campaign Legal Center
1101 14th Street NW
Suite 400
Washington, DC  20005
(202) 736-2200
         and
Ms. Bernadette Samson Reyes
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, California  90095
(310) 400-6019

**FOR THE NAACP PLAINTIFFS:**
Ms. Sarah Xiyi Chen
Texas Civil Rights Project
1405 Montopolis Drive
Austin, Texas  78741
(512) 474-5073
         and
Mr. Richard Mancino
Ms. Michelle A. Polizzano
Willkie Farr & Gallagher, LLP
787 Seventh Avenue
New York, New York  10019
(212) 728-8243
         and
Mr. Joaquin Gonzalez
Ms. Christina Beeler
Texas Civil Rights Project
1405 Montropolis Drive
Austin, Texas  78741-3438
(512) 474-5073
         and
Ms. Diana C. Vall-Llobera
Willkie Farr & Gallagher, LLP
1875 K. Street, NW
Washington, DC  20006
(202) 303-1157

*Laura Wells, RPR, RMR, CRR, RDR*

**APPEARANCES:   (continued)**

**FOR THE NAACP PLAINTIFFS:**
Ms. Hilary Harris Klein
Southern Coalition for Social Justice NC
1415 West Highway 54, Suite 101
Durham, North Carolina  27707
 (610) 574-5244
     and
Ms. Adrianne M. Spoto
Southern Coalition for Social Justice
1415 W. Highway 54
Suite 101
Durham, North Carolina  27707
 (407) 756-7873
     and
Mr. Andrew Silberstein
Ms. Molly Linda Zhu
Willkie Farr & Gallagher, LLP
787 Seventh Avenue
New York, New York  10019
 (212) 728-8243

**FOR THE UNITED STATES OF AMERICA:**
Ms. Catherine Meza
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue NW
Suite 4con
Washington, DC  20530
 (202) 307-2767
     and
Ms. K'Shaani Smith
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue NW
Suite 4con
Washington, DC  20530
 (202) 307-2767
     and
Ms. Tharuni A. Jayaraman
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue NW
Washington, DC  20530
 (202) 305-5194
     and
Mr. Zachary Newkirk
U.S. Department of Justice, Civil Rights Division
150 M Street NE
Washington, DC  20002
 (202) 307-2767

*Laura Wells, RPR, RMR, CRR, RDR*

**APPEARANCES:   (continued)**

**FOR THE UNITED STATES OF AMERICA:**
Mr. Bruce Gear
U.S. Department of Justice, Civil Rights Division
150 M Street NE
Washington, DC  20002
(202) 307-2767
     and
Mr. Robert Berman
U.S. Department of Justice, Civil Rights Division
150 M Street NE
Washington, DC  20002
(202) 307-2767

**FOR THE DEFENDANTS:**
Mr. Joseph R. Russo, Jr.
Ms. Jordan Raschke Elton
Greer Herz
One Moody Plaza
18th Floor
Galveston, Texas  77550-7998
(409) 797-3200
     and
Ms. Angela Olalde
Greer Herz Adams, LLP
2525 S. Shore Boulevard
Suite 203
League City, Texas  77573
(409) 797-3262
     and
Mr. Shawn T. Sheehy
Mr. Dallin Brockbank Holt
Holtzman Vogel Baran Torchinsky & Josefiak PLLC
15405 John Marshall Highway
Haymarket, Virginia  20169
(540) 341-8808
     and
Mr. Christian Adams
Mr. Joseph M. Nixon
Public Interest Foundation
107 West Street
Alexandria, Virginia  42543
(703) 963-8611
     and
Ms. Maureen S. Riordan
Ms. Kaylan L. Phillips
Public Interest Legal Foundation
107 S. West Street, Suite 700
Alexandria, Virginia  22314

*Laura Wells, RPR, RMR, CRR, RDR*

**APPEARANCES:   (continued)**

**ALSO IN ATTENDANCE:**
Attorney Randy Howry

Court Reporter:
Laura Wells, RPR, RMR, CRR, RDR
601 Rosenberg, Suite 615
Galveston, Texas 77550

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**DAY 7**
**(Bench Trial)**


**August 15, 2023**

Defendants Tender of Terry Petteway                    8
Deposition, Plaintiffs' Exhibit 607.............
Reporter's Certificate.........................    357

**ALPHABETICAL**

**WITNESSES**                                          **Page**

**PATRICK F. DOYLE**
    Direct Examination By Ms. Meza                    11
    Cross-Examination By Mr. Nixon                    22

**COUNTY JUDGE MARK HENRY**
    Direct Examination By Mr. Russo                  166
    Cross-Examination By Ms. Klein                   250
    Cross-Examination By Ms. Jayaraman               345
    Cross-Examination By Mr. Dunn                    346
    Redirect Examination By Mr. Russo                355

**COMMISSIONER STEPHEN HOLMES**
    Direct Examination By Mr. Dunn                    35
    Cross-Examination By Mr. Nixon                   114
    Redirect Examination By Mr. Dunn                 161

**EXHIBIT INDEX**

**PLAINTIFFS' EXHIBITS**

| EXHIBIT NUMBER | OFFERED | ADMITTED |
|---|---|---|
| Plaintiffs' Exhibit Number 607 | 7 | 9 |

**(Call to order of the Court.)**

THE COURT:  Good morning.  You may take your seats.

All right.  Are plaintiffs ready to call their next witness?

MS. KLEIN:  I believe so, Your Honor.  One matter of housekeeping, if I may?

THE COURT:  Yes.

MS. KLEIN:  Ms. Lucretia Lofton, who testified yesterday, we wanted to confirm that she could be excused.

MR. NIXON:  Of course.

THE COURT:  Okay.  Yes.

MS. KLEIN:  Thank you, Your Honor.

THE COURT:  All right.

MR. GABER:  One more housekeeping matter, Your Honor.  The plaintiffs would like to admit as an exhibit the declaration of Terry Petteway in order to save some time with -- it's about standing; and the defendants have agreed to that admission.

(Plaintiffs' Exhibit Number 607 offered into evidence.)

MR. RUSSO:  No objection.

THE COURT:  All right.

MR. GABER:  Plaintiffs' Exhibit 607.

THE COURT:  All right.

MR. NIXON:  At the appropriate time, we have

three questions to read from his deposition.  So if we could do that in response.  So whenever you want that.

THE COURT:  Okay.  If you are ready to do it right now, we can just knock it out right now.

MR. NIXON:  Sure.

THE COURT:  And then I want to hear from y'all on where we are on time, also.

MR. NIXON:  All right, Judge.  This is a tender from the deposition, from Terry Petteway, page 5, line 19.

"Good morning.  Would you please state your full name for the record.

"ANSWER:  Terry Darnell Petteway."

Going to page 45, beginning of line 11.

"QUESTION:  Okay.  Do you know whether Black and Hispanic or Latino voters in Galveston County usually vote for the same candidates?

"MS. REYES:  Objection.  Form.

"ANSWER:  I can't -- I can't answer that -- that question with any documented proof, and I would just assume that they do.

"QUESTION:  Okay.  And that's just an assumption?

"ANSWER:  That's my opinion.

"QUESTION:  Sure.  Okay.  But do you have any facts to support the opinion?

"ANSWER:  No."

Ending on Line 23.

And the final is page 65, line 22.

"QUESTION:  Okay.  Are you aware of any needs that members of the African American or Black community in Galveston County would have that would be different from the White or Latino communities in Galveston County?

"MS. REYES:  Objection.  Form.

"ANSWER:  I can't think of any at this time.

"QUESTION:  Sure.  Are you ever aware of -- have you -- let's just talk about your own experience.

"Have you ever approached a commissioner for help in Galveston County and that they were not responsive to your request?

"ANSWER:  I can't recall."

Concluding on page 66, line 8.

THE COURT:  All right.  Do you -- do y'all have a hard copy of the declaration that you can hand up?

MR. GABER:  I do, Your Honor.  And I don't -- may I approach?

THE COURT:  Yes.

MR. GABER:  I don't know that you admitted it.

THE COURT:  Oh, I don't think I did.  It's 607?

MR. GABER:  Right.

THE COURT:  Plaintiffs' Exhibit 607 is admitted.

(Plaintiffs' Exhibit Number 607 admitted into

evidence.)

MR. GABER:  Thank you, Your Honor.

And we were not aware that defendants would be reading in any portion of the deposition transcript.  I might just ask if we can reserve the ability to counter-designate something.  I don't know that we will have it but...

THE COURT:  If there is something you want to read in, let me know later on; and we'll take it up then.

MR. GABER:  Thank you.

THE COURT:  All right.  And then where are we on time expended?

MR. RUSSO:  So I think we were in agreement on these numbers.  For yesterday, the plaintiffs had 2 hours and 56 minutes; defendants had 2 hours and 7 minutes, which brings the total to 19 hours, 46 minutes for plaintiffs and 15 hours and 50 minutes for defendants.

THE COURT:  15 hours and 50?

MR. RUSSO:  50.

THE COURT:  Five zero?

MR. RUSSO:  Yes.

THE COURT:  All right.

Now the plaintiffs may call their next witness.

MS. MEZA:  Good morning, Your Honor.  Plaintiffs call Patrick Doyle to the stand.

THE COURT:  All right.

*Laura Wells, RPR, RMR, CRR, RDR*

Mr. Doyle, if you'll stop right there for just a second.

MR. DOYLE:  (Complying.)

THE COURT:  Do you solemnly swear the testimony that you are about to give in the case that's now on trial will be the truth, the whole truth, and nothing but the truth so help you God?

MR. DOYLE:  I do.

THE COURT:  All right.  You may take a seat at the witness stand.

MS. MEZA:  Ready.

**PATRICK F. DOYLE,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MS. MEZA:

**Q.**   Good morning, Mr. Doyle.

Can you please state your full name for the record?

**A.**   Yes.  Patrick F. Doyle.

**Q.**   And where do you live?

**A.**   Texas City, Texas.

**Q.**   And how long have you lived in Texas City?

**A.**   59-plus years.

**Q.**   So you are a life-long resident of Galveston County?

**A.**   I am.

**Q.**   Can you briefly describe your educational background.

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   A graduate of Texas City High School, 1982.

Texas Tech University, BBA finance in 1986.

A graduate of South Texas College of Law, December of 1990.

And then after which I joined a law firm in '91.  I have been there -- various different names over the years, but I have been there ever since.

And in '94, I started my own company, it's a real estate closing services company; and recently started my own underwriter.

**Q.**   Thank you.

Are you a member of any boards or membership organizations?

**A.**   Over the years, I was members of various non-profits, chambers, business development groups.  But more recently, I have devoted most of my time to a non-profit.  It's a fishing tournament that we raise money for various charities.  The main one is Crohn's and Colitis Foundation.

And then recently we donated a sum of money to have a statue erected in Santa Fe as a memorial for the children and adults that were either killed or injured during the mass shooting at the high school.

**Q.**   Thank you.

Mr. Doyle, have you served as an elected official in

*Laura Wells, RPR, RMR, CRR, RDR*

Galveston County?

**A.**    I have.

**Q.**    Okay.  Well, why don't we begin with your service as a Justice of the Peace.

How long did you serve as a Justice of the Peace?

**A.**    January -- it seems like a long time ago.  January 1 of 1995 to 2004.

**Q.**    Okay.  And what precinct did you serve during your time as a Justice of the Peace?

**A.**    Precinct 5.

**Q.**    And at that time, what areas of the county did precinct -- did Justice of the Peace Precinct 5 cover?

**A.**    Basically, all of Texas City and a little bit of Dickinson.

**Q.**    And let's move on to your service on the Galveston County Commissioners Court.

How long did you serve as a commissioner?

**A.**    From January of 2005 to December 31st, 2012.

**Q.**    So two terms?

**A.**    Yes.  So combined, it was a total of 18 years between the two.

**Q.**    18 years in public service.  Okay.

And what precinct did you serve during your tenure as a commissioner?

**A.**    Precinct 1.

**Q.** And what areas of the county did Precinct 1 cover at that time?

**A.** For the bulk of -- well, for my tenure, it was east of 61st Street on Galveston; all of Bolivar Peninsula; Texas City north of Palmer; Bacliff; Bayview; and San Leon.

**Q.** And are any of the individuals with whom you served on the Commissioners Court during your tenure from 2004 to 2012 still members of the Commissioners Court today?

**A.** Yes. Stephen Holmes and Judge Mark Henry.

**Q.** And how would you describe your relationship with Commissioner Stephen Holmes?

**A.** We have a great -- a good relationship. A very good relationship. I call him a good friend. We have done a lot together over the years. We started together. Well, when he started as county commissioner in -- 1998, '99 is when he was appointed, I was a JP. And we both were housed at the Texas City Annex building. So we saw a lot of each other, you know, crossed paths a lot, obviously, between my work as a JP and then as a county commissioner.

And then we have sat on various non-profit boards that -- we started one in particular related to that fishing tournament I was talking about; and on other boards as well.

**Q.** Okay. And how would you describe your relationship with County Judge Mark Henry?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   It's cordial.

**Q.**   So you testified that your tenure on the Commissioners Court concluded in 2012.

Did you run for re-election in 2012?

**A.**   I did not.

**Q.**   And why not?

**A.**   In 2011, when we went through redistricting, my precinct was redrawn pretty drastically, and I just chose at that time it was a good opportunity and time for me to no longer seek re-election.

**Q.**   So you just mentioned redistricting.  And I first want to get a sense of your overall redistricting experience.

So when you were a Justice of the Peace from 1994 to 2004, did you participate in the County's redistricting in 2001?

**A.**   If I did, it wasn't, you know, obviously actively. But if I did, I probably attended as an elected official. That would probably be -- yeah.

**Q.**   Okay.  And when you were on the Commissioners Court from 2004 to 2012, did you take part in the redistricting of the County's maps during the 2011-2012 redistricting cycle?

**A.**   Yes, I did.  I was actively involved with that.

**Q.**   Okay.  So I want to focus on your latter experience, the 2011-2012 redistricting of the Commissioners Court

map.

In advance of the 2011-2012 redistricting cycle, did the Commissioners Court adopt a timeline setting out key dates for the redistricting process?

**A.**   To my knowledge, yes, they did.

**Q.**   And do you recall whether certain factors or deadlines were driving when the map had to be completed?

**A.**   Yes.  My recollection was that we recreated a timeline -- well, first, we had to deal with preclearance. I do recall that.  And I don't remember all the elements to that.  But I do know that there was -- as part of that plan, you had to develop a -- public contacts or, you know, contacts to the public, as well as public hearings; and with that was a timeline or a calendar of sort, yes.

**Q.**   And in addition to accounting for the Section 5 submission and review process, did the map have to be completed and in place in time for the beginning of the candidate filing period for -- in time for the March 2012 primary election the next year?

**A.**   Yes, ma'am.

**Q.**   So you have run in multiple elections during the 18 years you served as an elected official.

Do you recall approximately when the candidate filing period started and ended, if one was running in the spring primaries the following year?

**A.** I just recall -- my recollection was that you had a time period, 30 days or so, to file. And it was usually in -- toward the latter part of the year, prior to the primary, November or December, somewhere in that timeframe. I can't tell you exactly the time period. I just remember when the thirtieth day came and I was on the ballot and no one had filed, I was happy. I remember that.

**Q.** Okay. And to your knowledge, did that period of time, the candidate filing period, change during the time you were an elected official?

**A.** No. Not to my knowledge. No.

**Q.** And to your knowledge, has that period changed since you concluded your service as an elected official?

**A.** No, ma'am.

**Q.** During the 2011-2012 redistricting cycle, was there a process through which members of the public could offer input on the proposed maps?

**A.** Yes. We had public hearings. I recall them being from one end of the county to the other. In particular, the precinct that I was in, I recall those the best. But I attended each of those. I believe the whole Court did. They were in Bolivar; Galveston County at the courthouse; Texas City at the Nessler Center; and in Santa Fe; as well as at Calder Road in League City. So one end to the

other.

Q.   So those were about five public hearings?

A.   Five.  Yes, ma'am.

Q.   And you said you attended those hearings.

Did you attend all five?

A.   Yes, ma'am.  To my -- to my knowledge, I did, yes.

Q.   And do you recall whether these were well attended -- the hearings were well attended by the public?

A.   Yes, ma'am.  You know, there was a lot going on back then between the consolidation of the JP and constables; you know, my precinct was being realigned; and Commissioner Holmes's precinct, what was going on there. There was heavy attendance.  I know in Bolivar it was as big as the place could hold at the County building there. Galveston, the same, you know, 50 to 100 people there. And then in Texas City I distinctly recall at Nessler Center -- I don't remember how it was set up, but there was probably 300, 400 people there, just to express their interest and given an opportunity to come to the mic and talk about their two cents on the maps and how they were being presented.

Q.   And there were opportunities to present comment at all of the five?

A.   All of them.  Yes.

And Santa Fe -- I'm sorry.  Not to leave out the other

*Laura Wells, RPR, RMR, CRR, RDR*

two.  But Santa Fe was fairly well attended.  I don't think quite as heavy.  And League City was pretty well attended as well.

Q.   Were other commissioners or the county judge present at the hearings?

A.   Yes.  To my knowledge, all of us were there.

Q.   At all?

A.   At all five, yes, ma'am.

Q.   And for the record, who was the county judge during the 2011-2012 redistricting session?

A.   Mark Henry.

Q.   So you testified previously that the County needed to submit its plan for federal review before it could be implemented.

     Did you have any specific concerns with the map that the Commissioners Court adopted and submitted for Section 5 review?

A.   Yes.  I felt that the -- in my opinion, that Stephen Holmes's precinct, which was the contingent at the time, it was being deprived of the minorities their opportunity to vote a candidate of their choice.  And I think Stephen was going to be severely diminished in his ability to get re-elected there.

Q.   And do you recall whether that map that you had concerns about when it was submitted for Section 5 review,

whether it was precleared by the Department of Justice?

**A.** It was not.

**Q.** And do you recall why the Department of Justice did not preclear that map?

**A.** My assumption is the same that I just said. And there was a group of us -- actually, I was one in the group -- that went to D.C. to talk to the Department of Justice as well. And, you know, I don't remember the specifics of that conversation, but I do recall it centered around Precinct 3 and what has happened there, and that there was concerns that minority voters would not be allowed to elect a candidate of their choice, and much less Stephen Holmes, who was well tenured, well liked, et cetera. So...

**Q.** And do you recall what occurred following the 2012 Section 5 objection of the Commissioners Court map?

**A.** Well, ultimately the map was revised, yes, ma'am, and approved. And my assumption there is that that map, just as I said, it's now allowed the minority voters the opportunity to elect a candidate of their choice, like Stephen, which they have and have continued to do so.

**Q.** So let's move on to 2021.

Were you involved in the most recent redistricting cycle in 2021 in any capacity?

**A.** No, ma'am. I wasn't elected at the time. I had gone

*Laura Wells, RPR, RMR, CRR, RDR*

back into private practice and kept myself busy. But I did keep up with it. I read the paper regularly and still stay in contact with, you know, what is going on in the community.

Q.   And were any of the commissioners that were involved in the 2011-2012 redistricting of the county's map also involved in the 2021 redistricting cycle?

A.   Yes. County Judge Mark Henry, Stephen Holmes, and Kenneth Clark.

Q.   And based on your knowledge of the 2021 redistricting cycle and your firsthand experience as a commissioner during the 2011-2012 cycle, I'm going to ask you to describe how the following components of the two cycles differed.

You testified that the Commissioners Court put in place a redistricting timeline or schedule during the 2011-2012 cycle.

To your knowledge, did the Commissioners Court put a timeline in place during the 2021 redistricting cycle?

A.   No, ma'am.

Q.   And you also testified that the Commissioners Court held five public hearings during the 2011-2012 cycle.

To your knowledge, did the Commissioners Court hold any public hearings during the most recent 2021 cycle?

A.   No, ma'am. They did not. What my understanding was

is, again, by reading the paper and, you know, knowing what is going on in the community, is that they had one hearing.  It was in the League City, Calder Road.  It was heavily attended; minimal input.  It was the maps were presented, voted on, and approved that day.

Q.   Did you communicate your thoughts or concerns about the 2021 redistricting process and map to anyone?

A.   I did.  I sent a message to Commissioner Apffel and to Commissioner Giusti -- who I felt I could.  I knew them well enough -- and told them of my displeasure with how they were handling the matter and especially with what I perceived to be cutting out Stephen Holmes and minority representation on the Court for Galveston County, which I felt was important.  And then, most importantly, what it was going to cost the taxpayers for doing what they were doing.

Q.   And did either Commissioners Apffel or Giusti respond to your messages?

A.   Never did.  And I still haven't heard from them to this day, no.

        MS. MEZA:  Thank you very much, Mr. Doyle.  I pass the witness.

                    **CROSS-EXAMINATION**

BY MR. NIXON:

Q.   Good to see you again.

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   You, too, Joe.

**Q.**   How are you doing?

**A.**   I'm good.  Thank you.

**Q.**   I'm really happy that you are here.

MR. NIXON:  Can I have Defendants' Exhibit 25, please.

BY MR. NIXON:

**Q.**   You were going to clear something up for us, and that's why I'm happy that you are here.

Let's take a look at this exhibit together.

Okay.  This is an article from the *Galveston Daily News*.

MR. NIXON:  I can't see either of those two monitors.  I'm just going to come over here.

BY MR. NIXON:

**Q.**   This is a story about the settlement that occurred. You just talked about it, right?

**A.**   Correct.

**Q.**   You were Commissioner in the Court while the Department of Justice lawyers were upstairs in a conference room and working out a resolution, right?

**A.**   I kind of recall that, yeah.

**Q.**   Right.

And your testimony a few minutes ago is that we were cutting up Holmes's district -- Commissioner Holmes's

*Laura Wells, RPR, RMR, CRR, RDR*

district.  Excuse me.  We all get familiar.  We were cutting up Commissioner Holmes's district really bad, right?

A.    That was the contention.  Yeah.  That was the issue.

Q.    Okay.  Let's go to this paragraph here.

"The only significant change the County's redistricting attorneys said was moving a portion of West Texas City out of Commissioner Precinct 1" -- which is yours -- "into Precinct 3.  Trey Trainor of the County's redistricting firm of Beirne Maynard and Parsons said only 52 residents were affected by the adjustment."

Do you see that?

A.    Yeah, I see that.

Q.    You don't have any evidence to contradict that statement, do you?

A.    No.  Just what I testified to.

Q.    So this whole thing about cutting up Commissioner Holmes's district was really about 52 people?

A.    I have no idea.

Q.    That's what it was.

Did you see a map of what was proposed by the County in 2011, prior to your testimony here today?

A.    No, I did not.

Q.    Neither have we.

A.    Okay.

**Q.**   We haven't seen how it was cut up.  You haven't seen how it was cut up either?

**A.**   No, sir.

**Q.**   Okay.  So the only other difference was moving Bolivar out of Precinct 3 into -- back into Precinct 1; is that about right?

**A.**   I recall that.  That was one thing I didn't understand at all.  But, yes, I recall that.  I think that there was an attempt to put Bolivar in Precinct 3.

**Q.**   Right.

**A.**   And I think that was revised and taken out.

        MR. NIXON:  Okay.  Let's pull up Plaintiffs' Exhibit 6 [sic].  I'm looking for the redistricting letter from the DOJ.  There we go.

     This is a letter to Mr. Trainor from the DOJ.

 BY MR. NIXON:

**Q.**   Now, you went up to -- you went up to Washington and lobbied the DOJ to get them to issue a rejection letter, right?

**A.**   Well, I don't know if it was "lobbied."  But I went to hear what they had to say and answer any questions they had of me, yeah.

**Q.**   And tell them -- did you tell them, "Please don't accept this map"?

**A.**   I don't recall that, no.

**Q.**   Okay.  Let's go to the second page.  Okay.  The last paragraph.  Let's read it together.

This is the letter that you wanted the DOJ to write; is that correct?

**A.**   I'm sorry?

**Q.**   Is this the letter you wanted the DOJ to write?

MS. MEZA:  Objection.  Mischaracterizes testimony.

THE COURT:  It's overruled.  He may answer the question.

**A.**   I don't recall asking them to write anything.  But -- I mean, no.  I mean, I went there to give my two cents, that was it, as to what was going on.  My assumption was they had us there for a reason.  They wanted to talk about the maps; and that was why I went.

BY MR. NIXON:

**Q.**   Okay.  And Commissioner Holmes went with you?

**A.**   That's correct.  Carlos Garza, myself -- I'm sorry.  I should have said that.  Carlos Garza, myself, Commissioner Holmes, and Dotti Jones.  There may have been other people go, but that's the only group that I was aware of.

**Q.**   Okay.  Let's look at this paragraph:  "Another factor that bears on the determination of the discriminatory purpose is the impact of the decision on minority groups.  In this regard, we note that during the current

*Laura Wells, RPR, RMR, CRR, RDR*

redistricting process, the County relocated the Bolivar Peninsula, a largely White area, from Precinct 1 into Precinct 3.  This reduced the overall minority share of electorate in Precinct 3 by reducing the African American population while increasing both the Hispanic and Anglo populations."

Do you see that?

**A.**  Yes, sir.

**Q.**  Okay.  So one of the complaints of the Department of Justice is that there were too many Hispanics being moved into Precinct 3.

Do you understand that from reading that sentence?

**A.**  Right.

**Q.**  Okay.  Okay.  Would you have liked -- one thing she didn't ask you, Commissioner.

You are a Democrat, right?

**A.**  I was elected as a Democrat, correct.

**Q.**  Yes.  A lot of Republicans moving into the north end of the county, right?

**A.**  I assume so.  Right.  There was a lot of population shift that went to the north county.

**Q.**  Right.

**A.**  Each census, the population grew in Galveston County, and the bulk of the population was moving to the north county.  I think that's an accurate statement.

**Q.**  Your district just got Republicanized, didn't it?

**A.**  It was redrawn such that, and the way I answered it was that -- my precinct you are talking about?

**Q.**  Yes.

**A.**  Precinct 1 was redrawn in 2011 such that I did not want to seek re-election.  Whether I was going to run as a Democrat or a Republican, I did not want to seek re-election.  My time was done.

**Q.**  Who won the district after you, Precinct 1?

**A.**  Mr. Dennard.

**Q.**  Ryan Dennard?

**A.**  Ryan Dennard.

**Q.**  A Republican, right?

**A.**  A Republican, correct.

**Q.**  All right.  The Department of Justice objection letter didn't refer to your district at all, in terms of having any objections as to the way your district was drawn?

**A.**  Correct.

**Q.**  The cavalry didn't come for you?

**A.**  I wasn't worried about the cavalry because I wasn't running.  I think I made that clear.

**Q.**  And when the cavalry came --

**A.**  And I never spoke about the cavalry coming for me. This wasn't about me.  This was about what was going on in Precinct 3.  I want to make that very clear.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** And all that happened in Precinct 3 was the removal of Bolivar Peninsula and the change of 52 people, right?

**A.** Removal because it was placed in there, correct.

**Q.** Okay. When you had your five hearings in the 2001 cycle, you had maps drawn prior to all of those hearings, right?

**A.** I believe so, yeah. That they presented at the hearings?

**Q.** Right.

**A.** Yes, sir.

**Q.** Right.

And when you were negotiating with the Department of Justice, you didn't have any hearings in between that? You didn't have a hearing with that map?

**A.** Not that I recall.

**Q.** You just voted on it, and they approved it, I think, within 15 minutes. You got your approval letter later that day.

**A.** Okay.

**Q.** That's what I -- that's what I think.

**A.** If you -- if you say so.

**Q.** Do you have any recollection like that?

**A.** I do not.

**Q.** I mean, the approval was that fast, right?

**A.** I don't recall.

**Q.** 52 people in Bolivar. That was it.

Now, just a couple of other things.

**A.** Sure.

**Q.** You talked about you and Mr. Holmes being good friends.

Mr. Holmes serves on one of your company's boards, does he not?

**A.** At Texas First Bank, yes, sir.

**Q.** So he is on the bank board of your bank?

**A.** Yes, sir.

**Q.** Okay. And how long has he been on your bank's board?

**A.** Oh, I don't -- I don't know for sure. It's been probably ten years.

**Q.** Okay. All right. Now, the Judge might would probably take notice of this; but you talked about primaries changing. You haven't been filing for office. So you haven't been paying attention to when the primaries changed?

**A.** No. Just what I recall.

**Q.** Yeah. If you were to file today, you would have to file by December 1st -- I think the filing deadline is December 1st or December 31st because the primary has been moved up to, like, March.

Did you know that?

**A.** Yeah. No. I don't know the filing deadlines. But,

*Laura Wells, RPR, RMR, CRR, RDR*

yeah -- I mean.

**Q.** You were asked a question -- and I think it was just a mistake. But, you know, have the primaries' filing periods changed since you were running.

And they certainly have, haven't they?

**A.** Well, I think my answer was that my recollection was they were in November or December, at some point, for a 30-day time period. You pick that time period. I don't know.

**Q.** Okay.

**A.** I don't recall the specifics, no.

**Q.** The statute would tell us when?

**A.** I would think so. Yeah.

**Q.** Okay. Very good.

One last item. You sued the County over the 2011 redistricting process, right?

**A.** Correct.

**Q.** You lost, right?

**A.** I think the map was revised such that the minorities could elect a candidate of their choice. So I don't think we lost.

**Q.** All right. So are you familiar with the Fifth Circuit opinion in *Petteway v. Henry*?

**A.** I don't recall it. I think I recall you maybe coming and boasting about it, but -- it sounds like you are about

to do it again.

I also want to know:  Is the back of your neck red yet?

Sorry, Joe.  I had to do it.

**Q.**  That's okay.  When you win, you win, right?

**A.**  If you say so.

**Q.**  All right.  The Fifth Circuit, did you read their opinion?

**A.**  No.  I don't recall it.  If I did, I don't recall it.

**Q.**  I mean, you were -- you went all the way to the Fifth Circuit.

Okay.  Just a quick sentence.  The Judge can --

MR. BARON:  Objection.  *Petteway* was a JP/Constable lawsuit.  He was a County Commissioner and was not a party in the *Petteway* lawsuit.  I have files in my office, *Petteway* 1, which was the County Commissioner and JP/Constable Section 5 preclearance case, which did go to the Fifth Circuit but only on the attorney fee issue.

The subsequent lawsuit was a Section 2 lawsuit, generally, after *Shelby County*; and that's the one that went to the Fifth Circuit.  And he was not a party to that lawsuit.

THE COURT:  Okay.  Mr. Nixon?

MR. NIXON:  I'm not talking about that case.

THE COURT:  Okay.

*Laura Wells, RPR, RMR, CRR, RDR*

BY MR. NIXON:

Q.   Just talking about the case in which Patrick Doyle is a citizen plaintiff, right?

Look, we don't need to get -- I will save the Court the time, and me the boast.

But you didn't win that case, did you?

MR. BARON:  Objection, again, to this case.

MR. NIXON:  One lawyer, one witness, Judge.

THE COURT:  Okay.  That's true.

MR. BARON:  I thought the Court said that we could -- but I'll sit down and be quiet.  Thank you, Judge.

THE COURT:  Let's get through this, Mr. Nixon.

BY MR. NIXON:

Q.   That's my last question.

The Court found that you were not prevailing parties and that there was nothing, because the injunctive relief the plaintiffs achieved was not material to the outcome of the case or the relief, right?

A.   If that's what you say.

Q.   That's what the Court said.  Fair enough?

A.   (No response.)

MR. NIXON:  That's all.  Thank you.

THE COURT:  Is there any redirect?

MS. MEZA:  No redirect, Your Honor.

*Laura Wells, RPR, RMR, CRR, RDR*

THE COURT:  Mr. Doyle, you may step down.

THE WITNESS:  Thank you.  I appreciate it.

MR. NIXON:  He may be excused.

THE COURT:  Great.

MR. BARON:  Apologies to the Court, Your Honor.
Sorry.

THE COURT:  That's okay.  There will be an
opportunity for me to educate myself on all of that.  So
appreciate you bringing it up.

MR. BARON:  Thank you.

THE COURT:  The plaintiffs may call their next
witness.

MR. DUNN:  Thank you, Your Honor.  The plaintiffs
call Commissioner Stephen Holmes.

THE COURT:  All right.

It's kind of treacherous through there, Commissioner.

If you'll raise your right hand, I'll swear you in
real quick.

COMMISSIONER HOLMES:  (Complying.)

THE COURT:  Do you solemnly swear the testimony
that you are about to give in the case that's now on trial
will be the truth, the whole truth, and nothing but the
truth so help you God?

COMMISSIONER HOLMES:  I do.

MR. HOWRY:  Judge Brown, my name is Randy Howry.

I'm counsel for Commissioner Holmes.  May I take a seat in the jury box?

THE COURT:  You certainly may.

MR. HOWRY:  Thank you.

MR. DUNN:  Your Honor, I would like to present the witness with what has been previously admitted as Joint Exhibit 23, which are some notes he is going to discuss; and I can hand a copy to Mr. Nixon.

All right.  May I approach?

THE COURT:  You may.

**COMMISSIONER STEPHEN HOLMES,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. DUNN:

**Q.**  All right.  How are you, sir?

**A.**  I'm doing good, Chad.  How are you doing?

**Q.**  Please tell us your name.

**A.**  My name is Stephen Holmes.

**Q.**  Where did you grow up, sir?

**A.**  I was born in La Grange, Texas, but I grew up in Dickinson, Texas.

**Q.**  And what got you this way?

**A.**  My dad got a job at Houston Lighting & Power.  We were living in La Grange and started working with Houston Lighting & Power in Bacliff/San Leon, the plant there.  So

*Laura Wells, RPR, RMR, CRR, RDR*

we moved to Dickinson.

**Q.** Was that pre-lightning bug days, or was the lightning bug around then?

**A.** There's still -- lightning bugs were still around. There were many lightning bugs in La Grange at that time.

**Q.** Well, what was it like growing up here in Galveston?

**A.** It was good. I had a good childhood. It was very good. I had five siblings: Three brothers, two sisters. So we had a good childhood.

**Q.** And give us the benefit of your educational background.

**A.** Educationally, I went to -- graduated from Dickinson High School in 1983.

Graduated from Rice University in 1988.

Graduated from Thurgood Marshall Law School in 1995 and became licensed that same year.

**Q.** Did you practice law some?

**A.** Yeah, I did. I practiced a little bit. After I got out of law school, I came back to Galveston County; and I was employed by the district attorney's office -- Galveston County District Attorney's Office until I became County Commissioner.

**Q.** So how did that come about?

**A.** The County -- how I became County Commissioner?

**Q.** Yes, sir.

**A.**   I was trying a sexual assault case.  The commissioner at that time was Wayne Johnson.  Wayne Johnson was going on a vacation.  He was in Hobby Airport.  He died of a heart attack, and that -- his seat became vacant.  And at that time, the county judge makes the appointment of the next county commissioner, at that time, because it was in between election cycles.  I was trying a sexual assault case.  Got a break in the case.  The county judge wanted to talk to me about being the next county commissioner.  So one week I was trying a sexual assault case; the next week I was county commissioner.

**Q.**   Now, who is Mr. Johnson in terms of politics here in Galveston?

**A.**   Wayne Johnson was a -- was certainly a mover and shaker in terms of politics in Galveston County.  He was a University of Texas graduate.  He grew up in Galveston County, grew up in La Marque, and well known by everybody on both sides of the aisle, both Republicans and Democrats at that time.  But he was very popular -- and not only in Galveston County, but he was very well known and very popular statewide within the Democratic Party.

THE COURT:  I'm sorry.  It could be that you are talking a little fast for our reporter.

**A.**   Okay.  I'm sorry.

THE COURT:  If you'll slow down just a little

bit.  We just want to get a clear record.

THE WITNESS:  Yes, sir.

BY MR. DUNN:

Q.   What is -- what was the precinct number that Commissioner Johnson served in?

A.   He served in Precinct 3.

Q.   About how long had that been the case?

A.   Commissioner Johnson served from 1989 till his death in January of 1999.

Q.   And is that the commissioners precinct that you ultimately began to serve in?

A.   Yes, it is.

Q.   And what year was that, again?

A.   I began to serve in -- I was appointed in February of 1999.

Q.   And you serve there now?

A.   Yes, I do.

Q.   What is the address you are registered to vote at?

A.   2216 Jernigan Ford, Dickinson, Texas.

Q.   And what is your race and ethnicity?

A.   I'm Black.

Q.   What was Mr. Johnson's?

A.   He was Black.

Q.   Let's talk about Precinct 3 for a minute.

Do you think Precinct 3, as it's currently constructed

under the map you serve under, connects together communities of interest?

**A.**   Yeah.  But let's make sure that the record is clear.  So you are talking about -- are you talking about the map they adopted in 2021 or the map I got elected to in 2020?

**Q.**   The map you got elected to, that you are serving in now.

**A.**   I'm sorry.  Ask your question again, please, Chad.

**Q.**   Do you view Precinct 3 as connecting together communities of interest?

**A.**   Yes, I do.

**Q.**   What are those communities?

**A.**   You have got a community -- you have got a community in Dickinson.  You have got West Texas City.  There is Hitchcock.  There is the east part of Texas City.  There is Galveston.  And there is La Marque.

**Q.**   And what is it that connects those communities?

**A.**   I think it's very cohesive because I think a lot of people they are like-minded.  A lot of the people within those communities -- a lot of those peoples in those communities are faith-based.  And a lot of the power structure in those communities are driven by the churches and the pastors.  They have a lot of respect in those communities.  So I think that that's what drives those communities.

**Q.**   How would you describe the racial makeup of those communities?

**A.**   I would say it's diverse.  It's very -- those communities are diverse, Black and Hispanic.  Some Whites in there, but there's a good large part of Black and Hispanic.

**Q.**   Are there part -- well, let me ask it this way.

What is -- what does the day in the life of a county commissioner look like, or at least a commissioner of Precinct 3 here in Galveston?

**A.**   Yeah.  I think it -- I think it looks different for the different precincts.  But in the life of County Commissioner Precinct 3, I think that the -- you know, the general statutory definition of what the county commissioner does is, you know, we approve the tax rate. We run the county jail.  We budget for the court system and things of that nature.  But the actual -- the actual life of a county commissioner, what you do on a day-to-day basis, is much different.

And certainly for Precinct 3, there's some things that happen there that I don't think necessarily happen in the other precincts.  Just by way of example, in the last week, I had a constituent that wanted to come and see me and talk about the fact that he -- she had a grandson who was charged with a crime and was in jail.  And the police

had come to her house, and they had taken some items from the house that had been seized as evidence that she didn't believe should have been evidence of that crime. And she wanted to see if I could help her get that stuff back: cell phones, jewelry, things like that.

Q. Is it fair to describe that a number of the political issues that are important to your constituents in Precinct 3 revolve around race issues?

A. Many times, yes.

Q. Is part of your service also to the Spanish-speaking citizens in your precinct?

A. Yes.

Q. What is it you do to communicate with them when you need to?

A. Well, I guess a couple of things. If we have a document or something we need to get out there, we get it translated into Spanish, if there is an assistance program, something of that nature.

And if we actually have walk-ins to the office that need something -- most of the time than not, they may just be looking for a direction of where they need to go. We have an office that's next to ours with Spanish speakers. They would help interpret us -- interpret for us. And I speak just enough Spanish to be dangerous. Just a little bit.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** Where is your office at?

**A.** My office is in what is called the Mid-County Annex, 9850 Emmett F. Lowry, in Texas City.

**Q.** Do you have access to interpreters there?

**A.** I wouldn't call them official interpreters. But, again, the office next door to us is a birth certificate office, vital statistics. There are several ladies in there that are Spanish speakers. And again, when we need their assistance, they assist us.

**Q.** And do you rely upon that regularly?

**A.** I would say not regularly. But when we need it, yes.

**Q.** So you have talked about different communities of interest between what I'll call the Mainland and also a part here of Galveston.

**A.** Yeah.

**Q.** But what connects those communities even though they might be disparate in geography?

**A.** What do you mean when you say "what connects them"? What do you --

**Q.** What connects the part of Galveston you consider to be a core of your district, part of the Island?

**A.** I would say north of Broadway, pretty much.

**Q.** And -- but what is it about that area that connects it, you think, with these other Mainland communities you represent?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Yeah.  I think -- again, I think it's -- I think it's more of the way of life of the people that are in those precincts and that are in the north-of-Broadway precinct. It's similar to the type of life and the type of living that the same people have on the Mainland.

**Q.**   Now, do you recall at some point Galveston County transitioned to what some of us refer to as vote centers or countywide voting?

**A.**   Yes.

**Q.**   Was one of the sort of give-and-takes of that arrangement is that there would be voting countywide at any polling location, but there would also be the closure of a number of polling locations?

**A.**   That is correct.

**Q.**   And a number of the polling locations that were closed then made it difficult for some voters to show up to vote?

**A.**   Yeah.  For some voters, it made it more difficult. For some, it was more convenient.

**Q.**   Are you aware of citizens in your district that don't have access to transportation, that were used to walking to their local polling location and now have to find some kind of transportation to get to one of these voting centers?

**A.**   Yeah.  There are people that at one time had a voting location that was close enough for them to walk; and now

*Laura Wells, RPR, RMR, CRR, RDR*

that we went to the vote centers, they are not as close for them to get to.  They may or may not have the transportation to get to that voting location.

Q.   Do you recall in 2020 the closure of the Carver Park and Dickinson Senior Center polling locations?

A.   Carver Park in Dickinson?

Q.   Yes, sir.

A.   There was a senior center in Dickinson.  That's not Carver Park.  Carver Park is in La Marque in West Texas City.

Q.   Do you recall the closure of polling locations in those general areas?

A.   Yeah.  At one time, yes.

Q.   And how did that affect your constituents?

A.   I think it made it more difficult for them to vote.

Q.   And what is the predominant race or ethnicity of the folks who voted in those areas?

A.   Black and Hispanic.

Q.   Now, as part of your job as commissioner, do you regularly speak with citizen groups?

A.   Actually, to be honest with you, since COVID it hasn't happened as often as it did before.  But before that, it was more often.  But since COVID it hasn't -- people are just really kind of starting to come out of it and starting to have more community meetings.  So I would say

*Laura Wells, RPR, RMR, CRR, RDR*

yes before COVID; after COVID, not so much.

**Q.** Before the virus intervened, would you accept invitations to speak at various events?

**A.** Yes. When asked, yes.

**Q.** How would you decide to do so?

**A.** It was pretty much never a "no." It was always if they wanted me to come and speak, I would come.

**Q.** Now, are you a Democrat?

**A.** Yes.

**Q.** Do you run as a Democrat?

**A.** Yes.

**Q.** Do you, as a result, speak to Democratic groups?

**A.** Yes.

**Q.** Do you go to Democratic Party events?

**A.** Occasionally, yes.

**Q.** Do you view the protection of Precinct 3 also as priority of the Democratic Party here in Galveston County?

**A.** Yes.

**Q.** And in terms of, to the extent a fight is needed to save the precinct, do you view that as important to Democrats in this county?

**A.** Absolutely.

**Q.** Is -- in the course of this case, I have heard this phrase, "Precinct 3 pride."

Have you heard that before?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.** Yes.

**Q.** What does that mean?

**A.** Well, I mean, I didn't -- when I got appointed in 1999 -- and I really didn't really get the whole -- the full magnitude of it until I actually got appointed and started going around and speaking to different groups of people and seeing the pride they have not only in the precinct itself and the cohesiveness in the precinct itself but even the pride they have in their elected official as the county commissioner. And they just think it's -- they think many of the roots of the community stem from Precinct 3. And so there is a cohesiveness in that thinking.

**Q.** I have got a daughter going off to college the next week.

**A.** Uh-huh.

**Q.** Probably the hardest thing I'm ever going to do is let her go. But she is also one of the joys of my life.

**A.** Uh-huh.

**Q.** What are the joys of yours, Commissioner?

**A.** Well, I've got -- people think it's kind of strange to have it, but six -- eight years ago, my parents lived -- moved right next door to me. It's probably been eight of the best years of my life because my relationship with them has -- my dad -- my father is going to be 89 next

month.  My mother is 85.  They are both here, sitting here.  My mom and my dad, they are both here.

And so our relationship and our friendship and our -- their mentorship has meant so much.  I get to see them every single day.  I don't have kids myself.  So I get to see my parents every single day.  My dad tries to beat me out to the park to run every single morning.  He is out trying -- I beat him this morning.  But he tries to beat me out there every single morning to run.

So, I mean, it's, you know, when you have a long day and you go home and you get a chance to chat with your parents and they tell you stories and things or whatever you might have, it is actually a lot of fun.  Yeah.

Q.    Where does your service to Precinct 3 fit into your hierarchies of joy in your life?

A.    That's -- I mean, it's very high.  It's a very high hierarchy -- very high in my life.  I think it's -- it has been much more than I thought it would be.  As I said before, when I first got into office, I hadn't been involved politically at all.

And so when I first got involved, I was like, "What have I got myself into?  What am I doing?  Who are these people?"

But as it's growing and it's growing on me, I have become certainly more attached to it and certainly more

*Laura Wells, RPR, RMR, CRR, RDR*

prideful and certainly take a huge responsibility in being the county commissioner for Precinct 3.

Q.   All right.  Let's talk about the Commissioners Court operation.  We have heard some evidence here about the agenda, that an agenda comes out for the Commissioners Court.  Is that fair to say?

A.   Yeah.

Q.   When the Commissioner Court meets, there is a public posting?

A.   Public posting of the agenda.  We normally meet every other week.  So we meet on Mondays at 9:30.

Q.   In your recent service on the Commissioners Court, what has been that process for the release of the agenda?

A.   The agenda goes through the county judge's office for items on the agenda.  They have a cutoff period of the Tuesday before at 5 o'clock for the agenda, for that Monday agenda.  The cutoff to submit items to the county judge's office is that Tuesday at 5 o'clock.  The statutory deadline is actually 72 hours, but the deadline to get it in through the county judge's office is a couple of days before that.

Q.   And do you have the opportunity to propose things for the agenda?

A.   Yes.

Q.   And does the agenda typically come out with some

advance notice, like in addition -- you know, some additional hours more than the 72 required by law, or is it usually issued right at the deadline?

**A.**    No.  When I see the -- when I see the actual agenda, it's right around the deadline time, if not after.

**Q.**    Is that also when you find out whether or not items you wanted on the agenda made it?

**A.**    Yeah.  You -- officially made it, yeah.  You can request it from the county judge's office and ask, "Hey, I want this item on there."  But the actual proof of it would not be until you see the posting of the agenda.

**Q.**    So functionally, once the agenda comes out, it's too late for you to go make an additional pitch or try to get something on the agenda.  The 72 hours is already running?

**A.**    Yeah.  But even more so than that, the policy of the county judge's office is 5 o'clock the Tuesday before is when you need to have your items in.

**Q.**    Has that process of creation of the agenda changed at all during your service on the Commissioners Court?

**A.**    I believe -- let's see here.  Under the prior administration, there was more time allotted, as I can recall, for -- to submit an item to be placed on the agenda.  What that exact day was, I can't recall.

**Q.**    Have there been circumstances where you have asked to put something on the agenda, and it hasn't occurred?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Yeah.  Yes.  It happened about a year ago.  Yes.

**Q.**   What is that example?

**A.**   I asked for an executive session on an item with Commissioners Court, and I was denied the executive session.

**Q.**   What was the issue?

**A.**   It was an issue in regards to this lawsuit.  And it was -- I asked to have an executive session because I didn't know what was going on.  I wanted to have an executive session to get an update on what was going on with the lawsuit.

**Q.**   So during the litigation here in this case, you weren't receiving updates from the County's attorneys?

**A.**   No.

**Q.**   Was there another opportunity for you to put something on the agenda that related to the voting centers, the closing of the voting centers?

**A.**   Yeah.

**Q.**   What was that?

**A.**   It wasn't necessarily closing of voting centers, but there was an opportunity where I got asked by the county judge do I -- were there any -- and I think he asked all the members of the Court, "Here is our voting locations. Are there any additional locations that you would like to have as a voting location?"

*Laura Wells, RPR, RMR, CRR, RDR*

I submitted two of them.  One was Old Central here in Galveston.  The other location was the Sanders Center in Texas City.

Q.   And what happened with that issue?

A.   With Old Central, the county clerk went out; and he said he took a look at it.  He said it was not compliant with the handicap accessibility rules and laws that's set by the government and that we could not use that location.

The second location is Sanders Center in Texas City. I was told by the county clerk that the judge's chief of staff just said, "No.  Don't give him that location."

I argued it when we went to Commissioners Court, for us to have that location.  It was denied.

Q.   Did the item officially make it on the agenda?

A.   It was on the agenda.

Q.   With regard to --

A.   Well, the voting locations were on the agenda.  I wanted to add that location at the vote -- at the date we voted.

Q.   And was that included?

A.   No.

Q.   In your opinion, what would have been the race and ethnicity of the voters who would have availed themselves of those two polling locations?

A.   They would have been mostly Black and Hispanic.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   All right.  I want to transition and talk about the Texas Open Meetings Act.

**A.**   Okay.

**Q.**   You are familiar with that generally, I assume?

**A.**   Generally, yes.

**Q.**   It governs your conduct as commissioner; is that correct?

**A.**   Yes.  That's correct.

**Q.**   Do you understand what its purpose is?

**A.**   Yes.

**Q.**   What is that?

**A.**   That is to comply and make sure that there is notice for people of meetings, things of that nature, and make sure that if there is a meeting of a quorum of members of Commissioners Court, the public is given notice and -- to be at that -- that they are having this meeting.

**Q.**   The idea is government decisions --

**A.**   Should be done in the light.

**Q.**   In the light of day, right?

**A.**   That's correct.

**Q.**   The best disinfectant?

**A.**   That's correct.

**Q.**   There are severe penalties for violation of the Open Meetings Act?

**A.**   There are penalties, yes.

**Q.**   Have you ever heard the phrase "silver bullet"?

**A.**   Yes.

**Q.**   What is that?

**A.**   That's a phrase that's -- it's almost like a magic bullet.  I don't know exactly what it is, but a magic-type bullet.

**Q.**   Well, how does it apply to phrase with regard to the Open Meetings Act?

**A.**   I am not familiar with how that would apply in that particular case.

**Q.**   Are you familiar with the rule that a commissioner can talk to only one other member of the Court about a given matter?

**A.**   Yes.

**Q.**   And that's to prevent something called a rolling quorum?

**A.**   Rolling quorum, yes.

**Q.**   And so when you -- or when a commissioner decides to talk to you substantively about a matter, what does that mean about your ability to talk to the other members of the Court?

**A.**   That would mean you would be prohibited from talking to any additional members of the Court.

**Q.**   The idea being for the debate to take place in a quorumed meeting where the public can watch?

*Laura Wells, RPR, RMR, CRR, RDR*

Case 3:22-cv-00057   Document 228   Filed 08/30/23 in TXSD   Page 54 of 412

Direct Examination of Commissioner Holmes    Day 7 - 54

**A.** That is correct.

**Q.** It's been stated here in this courtroom that Judge Henry rules with an iron fist.

Would you agree with that?

**A.** Yeah.  That would be a good description, yes.

**Q.** How often do you, you know, communicate directly with the judge, have a conversation with him, meet with him, lunch, that sort of thing?

**A.** We don't meet and have lunch or anything like that outside Commissioners Court.  And we rarely speak outside of Commissioners Court.  And our only contact generally is I sit by him in Commissioners Court and we talk about an item or something like that in Commissioners Court.  But that would be generally the totality of it.

**Q.** Why do you sit by him on the Commissioners Court meetings?

**A.** The commissioners, the way the seats are aligned, one, two, three, four.  And he sits in the middle.  So I'm three; so I sit next to him.

**Q.** At this moment, are you the most senior member of the Court?

**A.** Yes.

**Q.** In other words, you have been there the longest?

**A.** The longest, yes.

**Q.** By quite a bit?

**A.** Yeah.

**Q.** All right. Where does the Commissioners Court ordinarily meet?

**A.** We ordinarily meet at the old courthouse, 722 Moody, here in Galveston.

**Q.** It's been stated here that occasionally Commissioners Court will meet in other locations; is that fair?

**A.** Yes.

**Q.** Where are those locations?

**A.** The Calder Road Annex in League City.

**Q.** When is that location used, in your experience?

**A.** Well, we started in the last -- I would say in the last six to eight months, we started having every other Commissioners Court meeting at the Calder Road location. Before that, we would occasionally meet there and not for anything specific, occasionally to meet there. And there would be items -- seems as if there was a controversial item, it would be always be held at the Calder Road Annex.

**Q.** So is it fair to say that the November 12th meeting about redistricting held at Calder Road was an inflection point in the sense that after that a number of meetings have been called at Calder Road?

**A.** Yes.

**Q.** Prior to the November 12th redistricting meeting, what kind of meetings were held at Calder Road?

A.    It was -- normally we would have Calder Road -- again, a Calder Road meeting would be something that would -- could potentially be a controversial meeting or it would be maybe we forgot to put something on the agenda but we had to have it voted on and approved before the next agenda cycle.  So we had to get that before.  So it would be one or two items, something really short.

Q.    What was one of the topics that came up at an earlier Calder Road meeting?

A.    A couple of topics that ended up being pushed to the Calder Road, one was our vote on whether or not to remove a Confederate statue from the grounds of the old courthouse.

And the other had to do with sending police officers -- no.  It was initially calling an emergency in Galveston County for things that were happening at the border and allowing spending at the border from Galveston County.

Q.    Is it fair to describe that the topics brought up for meetings at Calder Road prior to November 12th touched on racial issues?

A.    I would say that would be a good example -- a good description.

Q.    What is the setup there at Calder Road?  Could you paint us a visual picture?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Yeah.  Well, now we have got a new building that has been constructed.  We just moved in there a couple of months ago.  So that building is somewhat spacious.

But the prior -- the prior building was really small. You can maybe seat, I don't know, maybe 40 people in the room.  And the bench where the commissioners would sit was really close and really cramped to the -- it was five of us that would sit there, and it was really close and really cramped.  You could hardly move there on the bench itself.

**Q.**   Was the facility conducive to a large crowd?

**A.**   No.

**Q.**   Did you have a large crowd at the Confederate statue debate?

**A.**   Well, what happened at the Confederate statue -- here is what happened at the Confederate statue debate is the County was observing COVID protocols at that time.  So at that time, everybody that wanted to speak on the statue, they weren't in the room.  They had to come into the room one by one in order to speak.  Whereas if we had had the meeting in Galveston, they could have been in the room but spaced out.

**Q.**   And generally what was the Confederate statue issue, and how did it come out?

**A.**   There was a group that developed some steam, a little

momentum here in Galveston County, that wanted the Confederate statue removed from the grounds of the old courthouse. And so they had come and spoken at a number of meetings -- a number of Commissioners Court meetings about that very issue. And it came -- at some point, it came to a vote as to whether or not to remove the statue.

Q.  How did the vote come out?

A.  The vote was -- I was the only vote to remove it, and everybody else opposed it. No. Actually, I think it died for lack of a second.

Q.  Does the statue stand today?

A.  It's still there.

Q.  What was the issue at the border -- at the border meeting?

A.  Well, it was two issues. One was to send cops down there. But the first issue was in order to have Galveston County spending their -- the county judge, by statute, is the emergency manager from Galveston. He is the only one that can declare an emergency. And he wanted to declare an emergency in Galveston County for what was happening at the border. And so that was the issue, as to whether or not what was happening at the border was actually an emergency here in Galveston County.

Q.  Did that have a fiscal impact, such a declaration?

A.  Yeah. I think at that time there was going to be

dedicated at least a million dollars.  I can't recall the exact amount.  Galveston County was going to dedicate a million dollars to that effort.

**Q.**   A million dollars of local Galveston County taxpayer dollars were going to do what?

**A.**   I don't really know.

**Q.**   How did the vote come out on that issue?

**A.**   I know I was -- I think I was the lone dissenter on that vote.

**Q.**   Why did you vote against that issue?

**A.**   I did not think -- first of all, based on the analysis of it, I did not think in -- the county judge has to prepare an order, this is why I'm calling the emergency, and one of which in the order talked about the flu -- influenza and different diseases that were happening here in Galveston County and attributing those to migrants who were coming from the border.

     But, in fact, those diseases that were listed in that order, the Galveston County Health District keeps stats on that stuff.  Those diseases were actually going down, not up, in Galveston County.  So there was no need for an emergency here in Galveston County based on the order that was prepared.  It didn't meet the statute.

**Q.**   All right.  I want to transition to talk about the redistricting process in 2011 and 2021.

*Laura Wells, RPR, RMR, CRR, RDR*

Q.   Were you present in the courtroom this morning with Commissioner Doyle's testimony?

A.   I was.

Q.   And he described a number of differences between the 2011 and 2021 process?

A.   Yeah.

Q.   Do you agree with that testimony?

A.   Yes.

Q.   Was there a substantial difference between 2001 -- excuse me, 2011 and 2021?

A.   Yes, I do believe so.

Q.   One of the ways that it was different was in the retention of counsel, legal counsel, to help with redistricting?

A.   Yes, sir.  Yes.

Q.   In 2011, there was a packet of information given for various attorneys.

     Do you recall that?

A.   Yes.

Q.   In 2021, there was no information given for the singular law firm put on the agenda?

A.   No.  It was just put on the agenda with the contract.

Q.   How did you vote on that retention?

A.   I voted "no."

Q.   And you were outvoted?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**    Yes.

**Q.**    Now, at some point in time, there began to be meetings about redistricting.

And were you invited to some of those?

**A.**    I was invited to a meeting with Dale Oldham, who was working on the redistricting, one of the lawyers contracted to work on the redistricting.

**Q.**    At the time you started meeting with Mr. Oldham and working on redistricting, did you understand or know him to be a lawyer?

**A.**    No.  I thought he was actually a demographer, is what I thought he was initially.

**Q.**    Did you ever meet with or be made aware of a person named Thomas Bryan?

**A.**    Thomas Bryan?  No, I don't recall that.

**Q.**    I think the record evidence is -- is that Mr. Bryan drew the map.

But you never have any access with Mr. Bryan?

**A.**    I don't recall.

**Q.**    All right.  You have there what I handed you when took the stand, Joint Exhibit 23.  And I'll pull it up on the screen for the rest of us.

All right.  I have here on the screen, you should have in front of you, the first page of Joint Exhibit 23?

**A.**    Yeah.

**Q.**    Tell us what these are.

**A.**    These are my notes that I took from a September 20th, 2021, conference call with Dale Oldham and Paul Ready, who is our local counsel.

**Q.**    Why is it you took notes?

**A.**    I actually have -- I take a lot of notes, write notes about a lot of stuff.  And I felt like it was important to memorialize this process that we're about to embark on.  I felt it important to start taking some notes.

**Q.**    Why?  Why this issue?  Why would it be important to memorialize this issue?

**A.**    Because I remember what happened in the 2011 redistricting cycle.

**Q.**    And what was that?

**A.**    Just that you needed to remember conversations and dates and times that things happened.

**Q.**    In 2011, generally, what was -- what is it that the map tried to do to your district and Commissioner Doyle's?

**A.**    It actually -- basically, Commissioner Doyle's precinct was moved further, what I would call, north, further north.  It became more Anglo.

      And my district, as I can recall, became less, less minority than it was before.

**Q.**    And what were the areas, if you recall, that were put into or attempted to put into your district?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Bolivar is an area I remember most specifically.

**Q.**   Were there other spots?

**A.**   Yeah.  But that's the one I remember most specifically.

**Q.**   Was it so insignificant it was just 52 votes?

**A.**   No.

**Q.**   What would have been the impact of those changes, in your opinion, if they had been implemented?

**A.**   Yeah.  If that had -- if that had happened, I'm not sure the voters in Precinct 3 would still have been able to elect the candidate of their choice.

**Q.**   And after the Department of Justice objected to the plan --

**A.**   Yes.

**Q.**   -- was it ultimately resolved in such a way to where your district would continue to perform for Black and Latino citizens?

**A.**   Yes.

**Q.**   But Commissioner Doyle's precinct was ultimately turned Republican in such a way where he would be unable to gain re-election.  Is that fair to say?

**A.**   As a Democrat, yes.

**Q.**   All right.  Now, turning back to your notes, and for the Court's record -- well, let me ask you this.

Did you take notes in the 2011 process, also?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**    I did.

**Q.**    For the Court's reference, that's Defendants' Exhibit 16.

Tell us what happened here in this first meeting, September 20th, '21?

**A.**    It was a -- it was a teleconference meeting that the -- Linda in the county judge's office had set up.  And the initial -- the initial conversation with Mr. Oldham was he laid out a couple of stats for me specifically about the ideal population and how many voters short my precinct was of being short of the ideal population.

And they -- and at some point during the conversation, he says, "Okay.  I want you to draw your map."

And I was a bit dumbfounded because I didn't -- I wasn't prepared to draw a map, and I didn't know exactly how to answer.

And then I think I told him I was not prepared to draw a map at that time.  And in my recollection, I still feel that I made a note here that I thought they had already spoken for every other -- spoken for every other -- well, no, he told me that they had already spoken with every other member of the Commissioners Court at this time.

And it was my belief at that time that, though I didn't get any data, I wrote this note that I believe every other member of the Court has seen the maps and the

*Laura Wells, RPR, RMR, CRR, RDR*

updated data, is what I wrote in my notes.  But he said they didn't have any data to give me.

**Q.**   And to be clear, on these notes, for each one of these that we'll talk about here today, did you take them down in your own hand?

**A.**   I did.

**Q.**   Did you take them at or near the time of the events recorded?

**A.**   I did.

**Q.**   Are they accurate?

**A.**   Yes.

**Q.**   Did you take down a note to set somebody up later?

**A.**   No.

**Q.**   Were you trying to engineer a lawsuit?

**A.**   No.

**Q.**   What is it that you hoped to accomplish out of the redistricting process?

**A.**   My hope was that we would avoid any type of litigation and the process would go as smoothly as possible, that it would be a fair process.

**Q.**   But you had reason for concern?

**A.**   Yes.

**Q.**   Was the 2011 process fair, in your view?

**A.**   No.

**Q.**   And this note here, it says:  "Fuzz in the census

numbers [as read]."

Can you recall what that was recording?

**A.**   I don't recall exactly what that was.  It was a statement that Dale Oldham made, but I don't recall exactly what he meant by that statement.

**Q.**   The last note taken here is:  "Did not even talk about redistricting principles."

Do you see that?

**A.**   Yeah.  I said, "Hey, what about the redistricting principles?"

He said, "We don't need to talk about that."

**Q.**   Was there anything mentioned in this conversation about a desire for a coastal district?

**A.**   Not to -- no.

**Q.**   Was there anything mentioned in this conversation about what other commissioners or members of the Court might want out of a map?

**A.**   No.

**Q.**   All right.  We'll go to page 2 of Joint Exhibit 23.

What is this note?

**A.**   Oh, this is a note that I -- that I -- I made a phone call to Michael Shannon, who was our county engineer, about asking him if he had the precinct data with the populations and the demographics of the precinct data.

**Q.**   On September 21st of 2020, you are asking for

precinct-level data?

**A.** Yes.

**Q.** And you understand today that almost a month or so before that, the United States Census Bureau had released that?

**A.** Yes.

**Q.** Did you get that information from the engineer's office?

**A.** I did not get that information. When I had this phone call, Mr. Shannon brought in, I call him, our GIS map guy, Nathan Sigler. I brought Nathan into the room. I talked to him about it, was that something that they could do? And they said yes, but I never received it.

**Q.** Was it your understanding when you hung up that that information would be forthcoming?

**A.** Yes.

**Q.** But it wasn't?

**A.** No, I never got it.

**Q.** Why did you want that information?

**A.** I wanted to see it because he asked me to -- Dale Oldham asked me to draw a map, what I wanted my precinct to look like. And I wanted to know where the shifts in population were, where the racial demographics of those different voting precincts, how they may have shifted over time; and I wanted to see that data before I agreed

to -- before I -- to draw a map.

**Q.** Did you believe that you and the County had a duty to determine the racial makeup of your precinct in particular?

**A.** I did.

**Q.** Why so?

**A.** Because I think that you want to -- you wanted to -- if at all possible, you didn't want -- you didn't want to delete the minority vote, and you wanted to keep it at just -- at the same level or at least at the same level that it was going into the redistricting process.

**Q.** Now, for 2011 to this point in time, the U.S. Supreme Court had issued a ruling that essentially lifted Section 5 preclearance for Galveston County.

You were aware of that?

**A.** Yes.

**Q.** Was it also, though, your understanding, as they said in *Shelby County*, that Section 2 remained nationwide and continued to apply?

**A.** Yes.

**Q.** Was racial data, in your opinion, necessary to understand whether or not the map complied with the remaining parts of the Voting Rights Act?

**A.** Yes, it was.

**Q.** On page 3 of the notes, what are these?

**A.**   This is a note that I made subsequently, that I had another teleconference with Dale Oldham; and these are the notes that I made about what changes I suggested to him for Precinct 3.

**Q.**   Let's walk through these one at a time.

What was the change you wanted there in number one that you've got circled there?

**A.**   Yeah, that's Precinct 192.  That's in Dickinson.  It was kind of jagged, and I just kind of smoothed it out from one block to another, where it kind of went down one street, as opposed to going one block up, one block down.

**Q.**   What was the change you have circled as number two?

**A.**   That was Precinct 144.  That's in Dickinson as well. There was a main thoroughfare called 517 that a few blocks went into another precinct around 517 and came back to my precinct.  And I just kind of smoothed it out where 517 was the divider between those two precincts.

**Q.**   What was the change in number three?

**A.**   That was down Palmer Highway in Texas City.  There was a Precinct 142.  Most of Palmer Highway to the north was in Precinct 1.  Most of it to the south was in Precinct 3. This just kind of cleaned it up where the part of Precinct 1 was coming south and the Precinct 3 just cut it off at Palmer Highway so Palmer Highway was the divider between the two county commissioner precincts.

**Q.**   And what was the change in four?

**A.**   Same -- much the same.  In four was Precinct 232, which is in La Marque.  It goes on both sides of I-45 in La Marque.  I think I said it either splits -- cuts the precinct off at I-45 so that one part of the precinct would be in Precinct 3, the other part would be in Precinct 4, where it was; or just move the whole precinct into Precinct 3.

**Q.**   Would these changes here have made any difference politically in the map for you or any other member of the Court?

**A.**   No.

**Q.**   What was your general purpose behind proposing them?

**A.**   Just to balance out the population, to get within that 10 percent deviation.

**Q.**   Was it also to straighten up edges in the map?

**A.**   Yeah.  To clean some edges up, to make some more realistic boundary lines for the different precincts.

**Q.**   What effect, if any, would adopting these precincts have to helping constituents understand the clear line between precincts?

**A.**   Yeah.  It would just be the main thoroughfares -- some main thoroughfares:  517, Palmer Highway, I-45.  That, hey, if you live on the north side of Palmer Highway, you are in this precinct; if you are on the south side, you

*Laura Wells, RPR, RMR, CRR, RDR*

are in that precinct.

Q.   And then what are the two alternatives you described with letters "A" and "B"?

A.   Yeah.  And so what my goal was, was to hopefully get what the population balance would be after I made these changes.  And if that was not enough to make the changes, then I could suggest these other changes there at the bottom.

Q.   And what were the purpose behind those?

A.   They were basically more cleanups, to move a little bit of population here and there; but they were more cleanups -- more cleanups.  I mean, one of them was actually my neighborhood where I live, half the precinct was in Precinct 4, half the precinct was in my precinct. This moved the whole neighborhood into one precinct.

Q.   Now, you communicated each of these options to whom, again, in this meeting?

A.   Dale Oldham was on the call in this meeting, and Paul Ready was on the call as well.

Q.   What, if anything, were you told in response?

A.   He said he would take them in and we would produce a map as a result of those suggestions.

Q.   When you left that meeting, did you have an understanding that you would be receiving a map --

A.   Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** -- based on this proposal?

**A.** Yeah.  What my expectation was, I would receive a map drawn with this proposal, as well as the data that went along with the map.

**Q.** Did that ever happen?

**A.** No.

**Q.** All right.  On the next page, what is reported in your first note at the top?

**A.** It's a meeting with Dale Oldham and Paul Ready in my office in Texas City, October 19th, 2021.

**Q.** And what have you recorded here?

**A.** I have reported that Oldham presented two maps on his laptop.  He had -- he was trying to initially project it, I think maybe, but it didn't work.  But he had two maps on his laptop.  The first map had Precinct 3 picking up all of the -- all of the currently -- what is in the Island that was Precinct 1, Pelican Island, and all of the Bolivar Peninsula.

And the second map had Precinct 3 going no further south in Dickinson, and a majority of the precinct was in League City and what looked like to be Friendswood.

**Q.** And what do you record in the final?

**A.** That he said he would send the copies of the maps and the data.

**Q.** So when these two maps were shown to you, did they

come with any data?  I mean, were you shared data on the individual districts?

**A.**   Not that day, no.

**Q.**   Were you shared election results or what we call "reconstituted elections" in the new map?

**A.**   No.

And I asked for -- that same day, I asked for the map that I had suggested to him a few weeks earlier, if he had that map.

**Q.**   And what did he say to that?

**A.**   "No."

**Q.**   So you got two proposals but not the one you asked for?

**A.**   That's correct.

**Q.**   And the two proposals you got, you got no data and no election results?

**A.**   That's correct.

**Q.**   You asked them to be sent to you with data and election results?

**A.**   That's correct.

**Q.**   Did that ever happen?

**A.**   I think sometime later.  Paul Ready may have sent them to me sometime later, but it was -- it was at around the same time that the maps were actually displayed on the County's website.

**Q.**    When they were displayed on the County's website, were you provided election or reconstituted election data then?

**A.**    No.

**Q.**    What was the sort of data that was made available to you?

**A.**    As I can recall, it was just the -- the precinct data; population data.  And I can't recall if it had the racial data along with it, but it had the population data.

**Q.**    So am I to understand your testimony that the point in time you got any kind of data on Maps 1 and 2 was the same time every other citizen in this county got that data?

**A.**    Right around that same time.  That's correct.

**Q.**    All right.  What is next shown here on your notes on October 22nd?

**A.**    Zoom meeting with Jed Webb.  And this -- I got a call that morning, on October 22nd, that, hey, they wanted to do a Zoom meeting with Dale Oldham and Paul, Zack -- Paul Ready, Zack Davidson, Dale Oldham.  And I do have a list here that it was a demographer that was on that particular call.  I don't know if it was -- who that was.

The other people were at Calder Road Annex and the judge's office.  That's where they phoned in from.

Yeah.  Oldham was in South Carolina at his house.

Paul Ready Zoomed in from -- I'm not sure where Paul was located.  He showed two maps.  And my notes here say

*Laura Wells, RPR, RMR, CRR, RDR*

it's the same that I saw on October 19th from my office. And it said he did show population and racial data. And I asked Paul Ready to get copies of the maps and the data.

Q.   Did you -- you have this note about being on the ferry?

A.   Yeah.  I was on the -- I was coming from Bolivar on the ferry, the Bolivar Ferry.  I was on my way back on the Bolivar Ferry.  I didn't -- I was hoping to make it back to the office by the time of the call, but I didn't.  So I -- I was actually, initially, on the ferry when I started; and then I drove off and parked at a gas station or something.

Q.   What were you over in Bolivar for that day?

A.   There was -- I had a -- I met this guy when I was a prosecutor back in 1996.  His name was Tsong Yang.  He was an immigrant from Taiwan.  And he had got assaulted.  He lived over in Bolivar.  And I prosecuted his case.  And ever since then, he -- for whatever reason, he took a liking to me.  He would bring me groceries.  He had a garden.  He would show up at Commissioners Court and bring me things from his garden from time to time.

     And Tsong had -- he had gotten pancreatic cancer.  And so, I hadn't heard from him.  I was calling him and calling him.  Me and Michelle -- my co-worker there, Michelle -- we said, man, we need to go check on Tsong.

So we went over there to check on him and beat and banged on the door and we finally got in.  And he was -- he was okay that particular day, but he had been in the hospital and he had gotten out.  And so I was on my way back from that visit.

Q.   All right.  If we can proceed to the next page in your notes.  We seem to have lost connection.

THE COURT:  George, can you tell what is wrong with the --

MR. DUNN:  Thank you, sir.

BY MR. DUNN:

Q.   All right.  What note is recorded here on this page at the top?

A.   This is a 10-29-2021.  This was a conversation with Tyler Drummond.  He called me, said he was on his way to Dallas, and informed me that the maps would be going up on the County website that day.  He said there would be two maps displayed, the two maps that Oldham had showed me before.

I asked about a timeline for this redistricting process, and he said that one would be set.  He said there would be a place for the public comment on the website.

I asked if this was a contest to see which map would get more votes, and he said no.

Q.   Who is Mr. Drummond?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Tyler Drummond is the county judge's assistant.

**Q.**   At this point, had a map that you had proposed with those changes you had suggested been given to you yet?

**A.**   No.  I had not seen that map.

**Q.**   Is it the maps that you are being shown here were the same ones you had been shown ten or so days before?

**A.**   Yes.

**Q.**   And --

**A.**   Well, he didn't actually show me any maps himself. But he said they were going up on the website, and those were the same maps.

**Q.**   And when they went up on the website, tell us what that looked like.  For example, could you download the map and zoom into it and see where the lines were?

**A.**   No.  You couldn't see, like, any main thoroughfares or anything of that nature.  You couldn't see that stuff. You just kind of had to kind of guess and just look at the -- it's almost like somebody drew it with a crayon and stuff, but you really couldn't zoom in to really see what it was that you were looking at.

**Q.**   Was it sort of like a thumbnail that some websites have?

**A.**   That is correct.

**Q.**   But there wasn't a file you could download and actually figure out where the lines went down various

*Laura Wells, RPR, RMR, CRR, RDR*

roads and natural monuments?

**A.**   No, it was not.

**Q.**   The data that you then saw on the website, was that what you had been provided in your prior meeting?

**A.**   Yes.

**Q.**   All right.  What is the next note you take down?

**A.**   The next note is November 2nd, 2021, a phone call with Tyler Drummond.  I spoke with him.  And he said that they were trying to set a special meeting for next Tuesday, 11-9, November 9th, 2021, to vote on the redistricting maps.  He said that Clark would be out the rest of the week.  Ken Clark was one of our county commissioners.  And Giusti, Joe Giusti, one of our county commissioners, would be out next Wednesday and Thursday.  He said maybe I could convince them at the next Tuesday meeting to not support Map 2 and maybe get it to a -- get the vote postponed until next Friday.  He said the Secretary of State had sent an e-mail stating maps must be sent by November 13th of 2021.

**Q.**   So what was the significance, if any, of these -- the unavailability of two other commissioners?

**A.**   I know one of our commissioners, who was battling cancer at that time, Commissioner Clark, I didn't know; but I assume it had something to do with his health.

       And I don't know why Commissioner Giusti wasn't there,

*Laura Wells, RPR, RMR, CRR, RDR*

but we still needed to have a quorum present to vote on the maps.

Q.    So was Mr. Drummond telling you that they had some difficulty getting a meeting because of the unavailability of these commissioners?

A.    That's what it appeared to me, yes.

Q.    Is this the first -- on November the 2nd, is this the first you heard that November 13th might be a deadline for the County to produce a map?

A.    It is.  Because I still thought that we were still going to lay out some type of timeline and thought we had more time in that timeline.

Q.    Now, there has been some discussion here about Harris County's redistricting process.

Did you follow that, at least generally?

A.    Generally, yes.

Q.    And Harris County managed to have nine or more public meetings; is that true?

A.    I know they had a bunch.  I don't know the exact number.

Q.    There were meetings in each commissioner's district and countywide quorum meetings, several of them?

A.    Yes.

Q.    There were over a dozen maps posted on the website with data and election results?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Yes.

**Q.**   All this is on the county attorney's website we looked at today, right?

**A.**   Yes.

**Q.**   And at the end of that process, the debate about which map was adopted took place in open meetings for everybody to watch?

**A.**   Yes.

**Q.**   All right.  What is the next note you take here, on November the 4th?

**A.**   This is November 4th.  Tyler Drummond called, said that they were still working on getting the meeting posted for next Tuesday.  He said that Nathan from our engineering department was finalizing the maps and was trying to get it ready.  He said he was going to send Dianna, who works in the county judge's office, home and have her come back Saturday morning to get it posted.

**Q.**   Were you in each of these meetings asking for where is my map that I want?

**A.**   I -- I don't know if either of these meetings I asked -- if I asked specifically for my map.

**Q.**   But you had been consistently asking for your map?

**A.**   That's correct.

**Q.**   All right.  And then there is a note on November the 5th.

What does it record?

**A.** Tyler called me Saturday morning. Said the meeting was probably going to be next Friday, 11-12-2021, because the maps were still not ready.

**Q.** The maps, the ones that you had been shown back in October and had been posted on the website for a number of days, weren't ready?

**A.** Yeah. Maps 1 and 2.

**Q.** Did he explain to you what the problem was in terms of the availability of those maps?

**A.** No, he did not. He didn't say if it was Maps 1 and 2. He just said "the maps."

**Q.** All right. Then on the next page, you have a note for October 21.

What is this note?

**A.** This is a phone call I got from Derreck Rose relaying a conversation that -- with Commissioner Apffel. "There are a couple of maps floating out there, and it is not looking good for Holmes," was what he said -- Darrell Apffel said.

**Q.** So as of October 21, Derreck Rose learns from Commissioner Apffel that it's, quote, "not looking good for Holmes"?

**A.** Yes.

**Q.** All right. Then you have this note on November the

9th.

What is recorded here?

**A.** This is a phone call I had on November 9th, 2021, at 12:58 p.m. Commissioner Apffel called me about the redistricting maps. He wanted to let me know that he would be voting to support Map 2. He said that Judge Henry would jump out and make a motion to approve Map 2. He said he was inclined to support that motion for political purposes. He didn't write it down, but he said -- I didn't write it down, but he said because he wants to be county judge one day, and this is something that he had to do.

I informed him that Map 2 was discriminatory for the minority voters currently in Precinct 3. He said that the minority population currently in Precinct 3 was divided fairly evenly amongst the precincts in Map 2 and that Dale Oldham told him that this was a legal map.

Also informed me that Mike Guarino, who is his brother-in-law and used to be the district attorney, called him and chastised him for supporting Map 2.

I told Commissioner Apffel that Map 2 clearly runs afoul of Section 2 of the Voting Rights Act, and I did not want members of the Commissioners Court to vote Friday and act as if they did not know Map 2 was discriminatory.

He talked about what Harris County was doing to

Republican members of their Commissioners Court by changing their precincts.  I told him that it was not about the Republican or Democrat but about the protections guaranteed to the minority groups in the Voting Rights Act.

He said he was going to call Dale Oldham and ask him if Map 2 was, in fact, discriminatory.

Commissioner Apffel also asked if I sicced the NAACP on him.

I told him I had had no conversations with the NAACP regarding him.

Q.   Now, you said a few things there I want to understand a little bit more about.

You're a lawyer, as you mentioned?

A.   Yeah.

Q.   Do you have any specialized training in the Voting Rights Act?

A.   I do not.

Q.   Do you consider yourself a voting rights or election lawyer?

A.   No.

Q.   Why is it that you expressed the opinion that you did there that this Map 2 violated the VRA?

A.   Yeah.  Because clearly in the -- the Department of Justice put out a guidance document, and it talked about

things in that guidance document that were a violation or could be violations of Section 2 of the Voting Rights Act. And, clearly, the things that were going on here were violations of that.

Q.   There is this discussion here about Harris County.

Were you aware or are you aware now that Harris County had several proposals to it that would have eliminated every Republican on its Commissioners Court?

A.   Yes.  I do know that.

Q.   And they were rejected, were they not?

A.   Yes.  They were rejected.

Q.   In fact, there is a district in Harris County that encompasses the most Anglo communities that's represented by a White Republican; is that true?

A.   Yes.

Q.   Harris County could have eliminated it and didn't?

A.   Yes.

Q.   Now, you also mention this phrase "sicced"?

A.   Yeah.  Those were his exact words.

Q.   Does that word have a special meaning to you?

A.   Yeah.  It's -- I mean, it's almost as if it's a dog whistle or some sort, as if there was a dog whistle put out there to go bother Commissioner Apffel.

Q.   Did Commissioner Apffel say something to you about him having some contact from NAACP, or was this a concern he

*Laura Wells, RPR, RMR, CRR, RDR*

was expressing for the future?

**A.**   I took it as somebody from the NAACP had contacted him or said something to him, and he wanted to know if I was the person that told them to say something to him.

**Q.**   And did you have anything to do with that?

**A.**   No.

MR. DUNN:  Your Honor, I've got some coffee that's caught up to me.  Would now be an appropriate morning break time?

THE COURT:  I think that would be just fine. Mine has caught up to me, too.

Okay.  Let's try and start back at 10:45.  All right?

CASE MANAGER:  All rise.

(Recess from 10:32 a.m. to 10:47 a.m.)

THE COURT:  Thank you.  Y'all can take your seats.

BY MR. DUNN:

**Q.**   All right.  Commissioner --

MR. DUNN:  May I proceed, Your Honor?

THE COURT:  Yes, you may.

BY MR. DUNN:

**Q.**   To wrap up on your notes here, in the last few pages of your notes -- I have the first page here on the screen -- dated November 12th; is that true?

**A.**   Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   What did you take down in these pages?

**A.**   These were the public comments at the meeting we had, the date we voted on the maps, November 12th, 2021.  And these were the public comment notes that I took of people that spoke that day.

**Q.**   Now, when you went into that meeting on November the 12th, did you know the cake was baked?

**A.**   Yes, I did.

**Q.**   How did you know that?

**A.**   Commissioner Apffel had told me a few days before that that the judge was going to make the motion, he was going to second it, and they were going to vote to approve Map 2.

**Q.**   Were you told by anyone that the map had actually been finalized and an agreement had been reached amongst the commissioners in late October?

**A.**   No.

**Q.**   Were you told that Judge Henry popped in to the meetings with the other commissioners and Mr. Oldham when they were talking about the maps and reviewing the maps?

**A.**   No.  I wasn't told that.

**Q.**   I want to show you this testimony in the case.

MR. DUNN:  It looks like we're having a volume issue, Your Honor.

CASE MANAGER:  If you could put the mic right on

*Laura Wells, RPR, RMR, CRR, RDR*

the speaker.

MR. DUNN:  Well, we'll do this instead.  That's why we always plan for the worst.  I'll just show you the transcript.  This is page 144 of Mr. Oldham's deposition, on Line 12.

"QUESTION:  And roughly what was the timeframe when Giusti and Clark got on board with Map 2?

"ANSWER:  I'm not exactly sure, but that's in late October, the late October period."

And at that point, Mr. Oldham had testified Mark Henry preferred Map 2.  There was the three votes in late October.

And on page 138 of the deposition, line 1.

"QUESTION:  So, Commissioner, it seems all the commissioners (Clark, Apffel, Holmes, Giusti) that their starting preference was Map 1; but then some changes were made to Map 2 to get them okay with that version?

"ANSWER:  That would appear to be correct.

"QUESTION:  And what was that all driven by, from your perspective?"

There was an objection, so I'll skip it.

Line 15.

"QUESTION" --

MR. ADAMS:  Your Honor, the objection is speculation, which is exactly where this --

BY MR. DUNN:

Q.   Line 15.

"But from your meetings, Judge Henry was the only one who saw Map 2 and said, 'Hey, that's what I want'?"

"ANSWER:  From the initial meetings."

So is it news to you today that this map had been decided on in October and that it was Judge Henry that convinced the other members to go with Map 2 instead of Map 1?

A.   Yes.  That would be news to me today.

Q.   All right.  Let's talk about the public meeting.

What was it like, November the 12th?

A.   It was -- it was a packed meeting, a lot of emotional people, a lot of emotion in the room for the meeting.  It was a very heightened atmosphere for the meeting.

Q.   Did the citizens who showed up, at least initially, have the sense that they had a chance to have an impact or influence on the map?

A.   Yeah.  I think they believed that their voices would be heard and that the Commissioners Court would listen to what they had to say.  At least I think that was what the hope was, at least.

Q.   And lots of people showed up?

A.   Oh, yes.

Q.   Skipped work and jobs, caretaking, whatever it is,

their other priorities, they skipped those to come to this meeting?

**A.**    Yes.  The meeting was at 1:30.  So yes.

**Q.**    In the lead-up to this meeting, you called me; is that true?

**A.**    Yes.

**Q.**    Why?

**A.**    Because I needed something to present at the meeting. I needed to get the maps that we had analyzed, and I needed to be ready when we took a vote on the meeting -- on the map.

**Q.**    Was anybody at the County that the County had hired for this purpose providing you that service?

**A.**    No.

**Q.**    So at your own expense, you had to go procure it?

**A.**    That is correct.

**Q.**    About when did you contact me?

**A.**    November 4th.

**Q.**    And up until November the 4th, had we had any contact since the 2013 trial here in this court?

**A.**    No.

**Q.**    Did I have anything to do with the notes that you took?

**A.**    No.

**Q.**    Did I have anything to do with what you said in the

meetings to Mr. Oldham and others?

**A.**  No.

**Q.**  You called me out of the blue about this; is that fair to say?

**A.**  That is correct.  That is correct.

**Q.**  And ultimately, what I did was connect you with Mr. Rios and Mr. Angle; is that true?

**A.**  That is true.

**Q.**  Mr. Rios created a racially polarized voting analysis for you?

**A.**  He did.

**Q.**  And Mr. Angle provided you some maps and some data and an analysis of the County's proposed maps; is that right?

**A.**  He did, yes.

**Q.**  Once you got those, we had a conference call; is that fair to say?

**A.**  We did have a conference call.

**Q.**  And without getting into the lawyer communications, did Mr. Rios and Mr. Angle describe to you the work that they did?

**A.**  They did.

**Q.**  And then what did you do with those items?

**A.**  Well, that was the day before -- that meeting was the day before.  That was November 11th.  And then the meeting was November 12th.  I took the maps.  I had the maps

enlarged for the meeting. I made copies of the other documents to be distributed to the Commissioners Court at the meeting.

**Q.** Now, was it your understanding that under the Voting Rights Act the government is supposed to consider RPV and maps that show whether or not minority population is geographically compact?

**A.** Yes. In my limited knowledge, yes.

**Q.** Was that your purpose in handing these items out?

**A.** That was.

**Q.** Did you hand them out to each member of the Commissioners Court?

**A.** I did.

**Q.** Did you also, during the meeting, provide blown-up versions of the maps?

**A.** Yes.

**Q.** Other than connect you with Mr. Rios and Mr. Angle, beyond that call the day before the hearing, did I do anything else for you?

**A.** No. No.

**Q.** Now, when you reviewed the racially polarized voting evidence that you were provided, did it show that Black and Latino voters voted together for candidates?

**A.** That is correct.

**Q.** And did it show that White voters voted for

alternative candidates?

**A.** That is correct.

**Q.** And that was handed out to each of the commissioners and the judge in advance of the debate?

**A.** At the meeting. That's correct.

**Q.** Now, there has been some discussion here about the e-mails -- the e-mail package between the two of us. And I have here on this screen Defendants' Exhibit 144 that we have seen.

Do you see this on your screen, sir?

**A.** Yes.

**Q.** I'll thumb through a few of these.

These aren't dated, are they?

**A.** No.

**Q.** Did you hide the dates on purpose?

**A.** No. And I subsequently sent the documents with the dates on it.

**Q.** When you found out there weren't dates, you turned them over?

**A.** Yes.

**Q.** And so is Defendants' Exhibit 132 the version with the dates on it?

**A.** Yes, it is.

**Q.** All right. Now -- and through here -- it begins at the beginning -- whoops. Excuse me.

*Laura Wells, RPR, RMR, CRR, RDR*

It shows that on November the 8th I forwarded to you Mr. Rios' and Mr. Angle's work product.

Do you see that?

A.   Yes, I do.

Q.   And then you responded that the meeting had been pushed until Friday.

You say that on November 8th at 4:59 p.m.?

A.   Yes.

Q.   And then you couldn't access the maps.

Do you see your e-mail on November 10th at 4:47 p.m.?

A.   I do see it.

Q.   So it had to be arranged to get you an additional Dropbox or Access so that you could get to the -- Mr. Angle's and Mr. Rios's materials?

A.   Yes.

MR. NIXON:  (Standing.)

THE COURT:  Yes, Mr. Nixon.

MR. NIXON:  We've slipped into a long line of leading questions.  And I have been patient, but I would like to have -- just go back to regular direct.

MR. DUNN:  Fair enough.

THE COURT:  All right.  Okay.

BY MR. DUNN:

Q.   Does this e-mail chain with the dates represent the, sort of, entire communications that we had in terms of the

dates and when you were delivered items?

A.   Yes, it does.

Q.   And now looking at Exhibit 144, which is the one that has the attachments, there is a series of maps here.

Do you understand these maps, generally, what they depict?

A.   Yes.

Q.   And what is that?

A.   It is -- it's a colored map that shows different races and the population -- the amount of population that's in those different categories.  The more heavily shaded it is, the more people there are from that particular race.

Q.   And do you understand that these maps -- what maps are overlaid on this racial data?  The County proposals?

A.   Yes.

Q.   And why did you want this information?

A.   Well, I think it's important to -- I think it would be important to show -- from the maps, show where the distribution was of the different races of population and people as it relates to the map that was adopted.

Q.   And were you asking for this information from the County officers?

A.   No.  I didn't necessarily ask for that information, but I needed the population information.

Q.   And as part of that, you wanted the racial data?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   The racial data, yes, correct.  So I couldn't necessarily overlay it like this, but I could look at it and apply it.

**Q.**   All right.  And then on what is Bates marked Holmes Exhibit 344, as part of Defendants' Exhibit 144, is this the memorandum from Mr. Rios?

**A.**   Yes.

**Q.**   And what does it show with regard to voters?

**A.**   It shows that --

MR. NIXON:  Excuse me.  Judge, we would object to this being offered in any way as any kind of expert testimony.  Mr. Rios was not designated as an expert.  I understand he gives information to Mr. Holmes.  But to the extent that the Court might rely on this at all as any kind of expert on racial demography in the county, I would object on that basis.

THE COURT:  Okay.  The exhibit is in evidence.

MR. DUNN:  And the defendants offered it.

THE COURT:  Okay.  All right.  Then it can certainly be used during this examination if the -- if Mr. Rios has not been designated and recognized as an expert, the Court will not give -- lend expert -- lend any expertise to anything in this exhibit.

BY MR. DUNN:

**Q.**   So what do you understand is shown here on Mr. Rios's

*Laura Wells, RPR, RMR, CRR, RDR*

report?

**A.**   Yeah.  I understand this to show that as a -- as a -- as an area gets more heavily Anglo, they tend to vote more heavily Republican; and as an area is more non-Anglo, they vote more Democratic.

**Q.**   So in terms of handing this out to the members of the Court, what is your view as to whether that would give them notice that there is -- is there a credible argument there is racially polarized voting, and it ought to be looked into?

**A.**   That is correct.

**Q.**   Now, prior to this trial commencing, when is the last time you talked to me?

**A.**   Prior to the trial?  Oh.  Maybe a couple of days after we took the vote on the maps, maybe in mid-November or so of 2021.

**Q.**   And have we met a few times in advance of your testimony today during the trial?

**A.**   Yes.

**Q.**   Was Mr. Howry present?

**A.**   Yes.

**Q.**   And have I encouraged you in any way to say something false or mislead this Court?

**A.**   No.

**Q.**   Now, there has been some questions asked here of why

you didn't just talk to the GIS department or why you didn't talk to the engineering department at the County and have them draw some maps.

**A.**   Yeah.

**Q.**   What is your answer to that question?

**A.**   I did talk to them.  I think there is a note here, November 21st -- November 21st, 2020, I asked the county engineer to run the precinct data for me.  And then subsequent to that, I was going to ask for -- to draw a map, if they could run that data for me.  Never received the data from them.

**Q.**   The -- focusing back, now, on the November 12th hearing, was there -- did everybody who showed up at that meeting get a chance to speak?

**A.**   I don't know if everybody got an opportunity to speak that wanted to speak because the room was so crowded and there were people in the hallways and some even outside. So I don't know if there were people out there who were interested in speaking that didn't get an opportunity to speak.

**Q.**   Was there any discussion at that meeting about redistricting criteria?

**A.**   At the meeting where we adopted the maps?

**Q.**   Right.

**A.**   I think that I -- I brought that subject up when I

talked about the ways that I thought that the County fell short of its responsibility in redistricting.

Q.   And why was criteria something that was important to you, if it was?

A.   Because it lays out -- a lot of things that happened in this redistricting cycle would have probably gone afoul of any criteria, if we had adopted criteria, and it would have given us a road map to things we had to do in relation to the redistricting process.

Q.   I want to show you Defendants' Exhibit 147, which is also admitted.

Do you see that on your screen, sir?

A.   Yes.

Q.   This is an e-mail from Annye Michelle Watson to Brandy Chapman; is that right?

A.   Yes.

Q.   What is the e-mail communicating?

A.   This is an e-mail that -- Annye Michelle Watson is my co-worker.  We work together in the Precinct 3 Commissioner's office.  And she sent those documents to Brandy Chapman, who is the clerk for the county clerk's office for Commissioners Court.  And she sent copies of those documents that I handed out at Commissioners Court to Brandy Chapman.

Q.   And as I thumb through these pages, are these the

*Laura Wells, RPR, RMR, CRR, RDR*

pages that you had handed out there on the dais?

**A.**  Yes.

**Q.**  All right.  Now, the room wasn't set up in such a way where the five members of the Court could have the same seating; is that fair to say?

**A.**  That is fair to say.

**Q.**  The Court has seen the video.

**A.**  Yeah.  At least not comfortably sit.  Yeah.  Yeah.

**Q.**  And you've had some experience having meetings there before?

**A.**  That is correct.

**Q.**  So how is it the meeting got set up the way it was?  Why were you seated where you were and others, that sort of thing?

**A.**  Yeah.  So at some point, we had some COVID protocols where there was tables down low, where some commissioners sat.  And that particular meeting, I sat down at one of the tables that were not on the bench.

**Q.**  And why did you do that?

**A.**  Because I had the -- I had the maps with me.  I had the racial profiling data.  I had the analysis.  And I wanted to spread it all out on the table.  And I wouldn't have had the room -- if I set up on the bench, I wouldn't have had room to do that.

**Q.**  Now, it's been argued here that if you had just moved

in a plan, that would have gotten adopted.

Is that your belief?

**A.**   No.

**Q.**   Did you, in fact, suggest during your comments that the Holmes Maps 1 and 2 that Matt Angle had drawn could be adopted?

**A.**   That is correct, yes.

**Q.**   Was there any second or response to those comments?

**A.**   No.

**Q.**   At the time you were allowed to speak, what were -- where were we at, like, procedurally in the meeting?  What were you permitted to do?  And had there been a motion made?  That sort of thing.

**A.**   The judge had made a motion to adopt Map 2. Commissioner Apffel had made a -- had seconded that motion.

**Q.**   And so at that point, could you have made, like, an alternative motion?

**A.**   Well, there was a motion on the floor at that point. So we would have had to deal with the motion that was on the floor at that point.

**Q.**   Is that the regular process at these commissioner meetings?

**A.**   That's correct.

**Q.**   And so at the point in time you were speaking, what

was the matter you were speaking on?

**A.**    I was speaking basically about -- I was laying out my evidence of the process in and of itself, and I was laying out on the maps -- the alternative maps to the maps that had been proposed.  And I was talking about the data and the analysis that was -- that supported those maps.

**Q.**    Now, you made some comments about Map 1, that you had concerns about Map 1.

Do you recall that generally?

**A.**    Yeah.

**Q.**    What was the concern you had about Map 1?

**A.**    The Bolivar Peninsula being incorporated into Precinct 3 in Map 1.

**Q.**    And why was Bolivar in particular something that brought you concern?

**A.**    It was pretty much the map looked similar to the map that was rejected by the Department of Justice in 2011.

**Q.**    And knowing what you know today, in terms of having the analysis that Mr. Angle did and others, would you have supported Map 1 if you thought there was a chance of getting votes for it?

**A.**    Yeah.  I mean, here is the bottom line, Chad, is if -- if the minority community can still elect a candidate of their choice in the precinct, that's what matters the most.  So if there is such an analysis that

*Laura Wells, RPR, RMR, CRR, RDR*

they can still elect the candidate of their choice, that's fine with me.

Q.   Do you recall whether or not the Galveston Chamber of Commerce at one point took a position of whether it made sense to have one commissioner for the Island as opposed to several?

A.   I don't recall that.

MR. NIXON:  Objection to the extent it calls for hearsay.

THE COURT:  It's overruled.  He can answer that question.

BY MR. DUNN:

Q.   I think you said you don't recall.

A.   Yeah, I don't recall.  Yeah.

Q.   Now, there has also been the argument made here that you should have just called a meeting and tried to adopt one of your maps or Map 1.

Why didn't you do that?

A.   It probably would have been available to, had we laid out our process and when the process -- and laid out a timeline when the process was going to happen.

I contacted you on November 4th.  We talked.  And I didn't get the maps from you -- actually, I don't think I -- I wasn't able to open the document until November 11th.  The meeting was November 12th.  You need

72 hours to posting having a meeting.  The maps had to be approved by the Court by November 13th.  There was not time.  I never got the map that I wanted from the -- from the law firm that the County had hired.  Had I got that map, I could have done that.

**Q.**   Anybody ever explain to you why the map -- why a meeting wasn't called back in October when Mr. Oldham said the map was finished?

**A.**   No.

**Q.**   Anybody ever explain to you why there weren't field meetings or other hearings to just take public testimony while the maps were in the process?

**A.**   No.  No.

**Q.**   Whose decision was it to set the meeting on the last day before the deadline?

**A.**   From my conversations with Tyler Drummond, it was the county judge.

**Q.**   And are you aware that Harris County, Fort Bend, Dallas, Tarrant, all these other populous counties in the state managed to have a number of field hearings; they managed to put out a number of maps and adopt them with a public debate in advance of November 13th?

**A.**   Yes.

**Q.**   So the map that was adopted, Map Number 2, what does it do to the communities of interest you described to us

this morning?

**A.**   It just splits them all up into different precincts.

**Q.**   And where does it put your house?

**A.**   My house is probably the southern -- almost at the southernmost tip of the precinct.  And everything else in the precinct goes north into League City and Friendswood.

**Q.**   In terms of the racial makeup of your new precinct under this map, is it the most diverse district?  The most White district?  Or do you know?

**A.**   It's the most White district.

**Q.**   Anybody ever explain to you why you were put in the district that was the most Anglo?

**A.**   No.

**Q.**   In your opinion, do you have a shot at re-election in your precinct under the new map?

**A.**   No.  No.

**Q.**   Do Latino and African American citizens of this county have the ability to elect in any one of the commissioner precincts under the new map?

**A.**   They do not.

**Q.**   The individual decisions on the lines and how your communities of interest were cut up under the new map, have they ever at any point been explained to you why, for example, one line has to be in one place as to another?

**A.**   No one explained that to me, no.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** In the lead up to the debate on the maps, did anybody tell you that it was important to have a coastal district?

**A.** No.

**Q.** And have you since learned that Judge Henry would like a coastal district?

**A.** Yes.  I do know that now, yes.

**Q.** Had you known that or had it been in some principles in advance, would you have tried to draw a district that had a coastal district?

**A.** Yes.

**Q.** Have you since seen some maps and proposals that create a coastal district but also still leave a district that Black and Latino citizens can elect a candidate from?

**A.** Yes.

**Q.** Did the County adopt those maps?

**A.** No.

**Q.** It split up your communities of interest, put you in the most Anglo commissioners precinct, no explanation, kept in the dark.

When you got to the meeting --

MR. NIXON:  Objection as to leading.

MR. DUNN:  I'll rephrase.

BY MR. DUNN:

**Q.** Why did you say "rage, rage, rage" at the meeting?

**A.** That was -- that was -- that's actually a -- actually

*Laura Wells, RPR, RMR, CRR, RDR*

a line from a poem I had to memorize in junior high, Ms. Caballa's English class.  And so the poem is -- *"Do Not Go Gentle Into That Good Night"* is what the poem is called.  And the poem is about death.  I mean, the writer wrote it because his father was dying.  But it's about death, and it's about not succumbing to death but fight, fight, fight.

So I was using it as metaphorically, not literally.  I wasn't using "rage, rage" to go tear down buildings or anything.  I was using it metaphorically to the community to say, hey, this is an injustice that is being done to us; and we have got to fight, fight, fight.  And the way we fight today is e-mails, phone calls, showing up, and letting your voice be heard, whether it be an article to the paper or whoever it might be, whether it be getting your church involved, getting your sororities involved, getting whomever in your community will be involved to fight this injustice.

Because every single generation, everyone is going to have to struggle.  This is a 1960s-style struggle for voting rights.  When they signed the Voting Rights Act in 1965, many thought this fight stuff was over.  But it's ongoing, and it's continuous.

So when I said "rage, rage," I'm just trying to fire up the community and the people that were there to say,

*Laura Wells, RPR, RMR, CRR, RDR*

"Hey, y'all.  This ain't over.  It's not going to end today.  We're going to fight, fight, fight until our last breath."

**Q.**   Now, after the map was adopted, you received some contact with the Department of Justice; is that true?

**A.**   That is correct.

**Q.**   And you had had contact with the Department of Justice in 2011?

**A.**   Yes.

**Q.**   I want to show you an exhibit we have here, Defendants' Exhibit 155.  This is -- this has been shown here in court.  I thought I'd give you the opportunity to explain what is going on here in this communication.

**A.**   Yeah.  This is an e-mail from German Bonilla, who worked at the Justice Department.  He had contacted me on November 17th, and we had spoken via phone on the 17th.  And he had asked me to get the maps and -- the adopted maps and any supporting data I could get for the adopted maps.

**Q.**   And I see that you are forwarding an e-mail from Mr. Ready; is that true?

**A.**   Yes.

**Q.**   And was the attachment to that October 29th e-mail from Mr. Ready the draft maps and the data?

**A.**   Yes.

**Q.**   You forwarded that to the Department of Justice?

**A.**   Yes, I did.

**Q.**   We have been shown here an interrogatory response from the Department of Justice that seems to indicate that maybe, if it wasn't a typo, that you had a conversation with him before the debate on November 12th; is that true?

**A.**   Before the debate?  No.  No.

**Q.**   Is it fair to say around November 22nd, 2021, is the first you communicated with the Department of Justice about this?

**A.**   Yes.

**Q.**   There has also been a question here about a lawyer involved in this case, Ms. Chen.

Are you familiar with her, generally?

**A.**   Generally, yes.

**Q.**   Also, a Ms. Klein.

Do you recognize that name?

**A.**   I don't recognize that name.

**Q.**   Did you have some contact with Ms. Chen leading up to the November 12th debate?

**A.**   I did.

**Q.**   Was she your lawyer or helping you to scheme to set up a lawsuit or anything else?

**A.**   No.  No.

**Q.**   How did you view her?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   She just asked -- she just asked me questions, "Hey, where are you?  Where are you guys at in the whole redistricting process?  Do you have time to chat for a minute about the redistricting process?"  Things of that nature.

**Q.**   Now, I'll show you what has been admitted as Defendants' Exhibit 156.

This is an e-mail from Tyler Drummond to himself.

Do you see that?

**A.**   Yeah.

**Q.**   Dated November the 30th?

**A.**   Yeah.

**Q.**   Take a minute to familiarize yourself with it.

**A.**   All right.  Okay.

**Q.**   You saw this was sent from Mr. Drummond to Mr. Drummond on November the 30th?

**A.**   Yes.

**Q.**   18 or so days --

**A.**   Yes.

**Q.**   -- after the debate?

**A.**   Yes.

**Q.**   Is this accurate?

**A.**   No, it's not.

**Q.**   I want to show you a few other exhibits that have been shown here in court.

*Laura Wells, RPR, RMR, CRR, RDR*

Defendants' Exhibit 49, which is on your screen, this is an e-mail that you sent to yourself on January 29th, 2021. Is that fair?

**A.** Yes. That's fair to say. Yes.

**Q.** What were you collecting here and why?

**A.** I don't even know, to be honest with you. I have no idea.

**Q.** And January 29th, 2021, was the census that -- the 2020 Decennial Census even available to you yet?

**A.** No, it was not.

**Q.** And then on Exhibit 50, it's a February 1, 2021, e-mail from a Mr. Shannon to you. Is that fair to say?

**A.** Yes.

**Q.** What is being discussed here?

**A.** Mr. Shannon is saying that: "Attached are two files showing the minority population by census block in the county. One map shows the African American/Black population. The other shows Hispanic population."

Signed, Michael.

**Q.** And why were you asking for this information?

**A.** This information we had -- in Commissioners Court, we had a workshop wherein we were talking about spending American Rescue Plan funds that we got from the federal government and how they could be spent. And one of the ways or areas it could be spent would be in minority --

majority-minority areas.  I was trying to see if Carbide Park in La Marque would be a majority-minority area such that we could spend some of those Rescue Plan funds on anything in Carbide Park.  So that's why I asked for this, the census block data with the race by race.

Q.   Fair to say this had nothing to do with redistricting?

A.   Nothing at all.

Q.   And again, it came months before the census data?

A.   That is correct.

Q.   I now want to show you what has been admitted as Defendants' Exhibit Number 85.  Take a minute to read that, if you would, please, sir.

A.   Yeah.

Q.   This is an e-mail from whom to whom?

A.   This is an e-mail from Nathan Sigler, who is our map guy, to his boss, Michael Shannon.

Q.   And even though you are not on this e-mail, do you have some idea what they are talking about here?

A.   Yeah.  I know exactly what they are talking about.  He is talking about the information that I had asked Michael Shannon for on September 21st.  But I had no idea that he had actually produced the information because I never got it.

Q.   So now you know today that Mr. Sigler collected together the information you had asked for and sent it to

*Laura Wells, RPR, RMR, CRR, RDR*

his boss?

**A.**   Yeah.  His boss.  They never sent it to me.

**Q.**   Now, let me show you Exhibit 86.  Take a moment to familiarize yourself with this.

**A.**   Yes.  Another -- it appears to be another e-mail from Nathan Sigler to his boss, Michael Shannon, again, regarding the "Commissioner Holmes Project."

**Q.**   And the "Commissioner Holmes Project" was collecting the information you had been asking for?

**A.**   That's correct.

**Q.**   But what does it say here with regard to you?

**A.**   "I forgot to mention Commissioner Holmes does not" -- and "does not" is in bold -- "have access to the map as of yet.  I wanted your approval of the lists and the map first in case you wanted to change anything [as read]."

So again, it appears that this was the information that I was asking for, but nobody ever sent it to me.

**Q.**   Is this the way that gentlepersons deal with one another?

**A.**   No.

**Q.**   You mentioned in your deposition you sensed fear?

**A.**   Yes.  From Michael Shannon.

**Q.**   What was that?

**A.**   Well, when I saw him after this and I still had not got the data -- keep in mind, I had no idea the data had

been produced.  I just thought it never was done.  And when I saw him at the next Commissioners Court meeting, which was October 6th or so, on a Monday, and I went up to him, and I could almost see, like, he knew I was going to confront him about this information.  But sensing his fear, I told him just, you know what, "Man, don't even worry about it.  You don't have to send it to me." Because my fear for him, to be quite honest with you -- and I mean this sincerely -- is if other members of the Court possibly had found out -- not all members -- that he sent this stuff to me, they probably would try to fire him, was my understanding -- my feeling of what I thought he was feeling.  So I told him, "Just stand down.  Don't even worry about it."  But again, I had no idea it had been produced two weeks before that.

MR. DUNN:  Thank you.  Thank you for your service, Commissioner.

THE WITNESS:  Yes, sir.  Thank you.

MR. DUNN:  I pass the witness.

THE COURT:  All right.  We're going to take an early lunch today.  I have a sentencing -- the lawyers know this already -- a sentencing scheduled at 11:30.

A couple of things on the sentencing -- and, Commissioner, you may step down.

THE WITNESS:  Thank you.  Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

THE COURT:  Again, from the lawyers, we will need a little room at the counsel tables.  The audience may be in here for the sentencing if they would like.  They don't -- if you are in the hallway, the defendant is in custody; and the deputy marshals are going to be bringing him down the hallway.  And they are going to want you to kind of part the Red Sea as they come through.  So if y'all would help them with that, just to get him into and out of the courtroom.

And we'll take a little bit of a -- we're going to do the sentencing over lunch.  We'll take a little bit longer break.  Let's start back at 12:45, and we will start with Mr. Nixon's cross of Commissioner Holmes.

CASE MANAGER:  All rise.

(Recess from 11:23 a.m. to 12:43 p.m.)

THE COURT:  Good afternoon.  You may take your seats.  Thank you all for your patience.  In hindsight, that was a longer break than we needed, but we should all be refreshed and ready for an afternoon of evidence.

So with that, Mr. Nixon, you may begin your cross-examination.

MR. NIXON:  Thank you.

**CROSS-EXAMINATION**

BY MR. NIXON:

Q.  Can you tell the Court why you didn't trust your

constituents with the knowledge that Map 1 would elect a candidate of their choice?

**A.**  I don't know what you are talking about.

**Q.**  Map 1.  That's the proposed Map 1.

**A.**  Is this the adopted map?  Is this the one we adopted? This is the map that was adopted?  It doesn't look like it.

**Q.**  Map 1.

**A.**  Is this the one we adopted?

**Q.**  No, sir.

**A.**  Okay.  Okay.

**Q.**  There were two maps --

**A.**  Yeah.

**Q.**  -- that were proposed.  This is Map 1, right?

**A.**  It says "Texas Map 1," yes.

**Q.**  And there was another map that was adopted, Map 2?

**A.**  Proposed by who?

**Q.**  The County.

**A.**  Who in the County?

**Q.**  Those were the two that were on the agenda.

**A.**  Who proposed them?

**Q.**  I'm going to be the one asking questions here.

**A.**  I'm trying to get clarity on your question.

**Q.**  No, sir.  You are playing a game with me.

**A.**  Okay.

*Laura Wells, RPR, RMR, CRR, RDR*

THE COURT:  Okay.  Question and answer.  The lawyer asks the questions.  The witness gives the answers.

THE WITNESS:  Yes, Your Honor.

**A.**   What is your question?

THE COURT:  And what should come from the lawyer should be questions and not argument.

MR. NIXON:  Thank you, Judge.

BY MR. NIXON:

**Q.**   There were two maps proposed at the hearing on November 12th, 2021?

**A.**   There were four.

**Q.**   Two of yours?

**A.**   Yes.

**Q.**   And two of the County's?

**A.**   That's four.

**Q.**   Okay.  This is the Map 1 of the County's that's on the screen?

**A.**   Okay.

**Q.**   Okay.  Map 1 would have elected a candidate of a majority-minority's interests of their choice, right?

**A.**   I'm not sure.

MR. NIXON:  If you could, let's pull up Exhibit 144.  Scroll down a little bit.  Okay.  Let's highlight that paragraph that says:  "Galveston County Map 1."

BY MR. NIXON:

Q. Okay. Do you recognize this memorandum from Matt Angle sent to you by Chad Dunn?

A. Can I see the whole document without this in front of it right quick?

Q. Sure. Sure. Do you want to scroll back to the first page.

A. Yes.

Q. Are you prepared to go forward now?

A. Yes.

MR. NIXON: Pull up that paragraph.

BY MR. NIXON:

Q. Were you advised that the "County-proposed Map 1 makes only minor changes in the benchmark map. The core neighborhoods within each precinct are maintained."

Did you see how you were advised that?

A. I see it in the memo, yes.

Q. Did you read it at the time you got --

A. I don't recall reading it, no.

Q. Do you have any reason to believe -- disbelieve the information that you were given by your lawyer, Chad Dunn?

A. What do you mean "disbelieve" it?

Q. Well, do you think it's not true?

A. I think that's an opinion, yes.

Q. Okay. The second sentence: "The population deviation

in majority-minority Precinct 3 is resolved by adding heavily Republican Bolivar Peninsula precincts to the west" -- actually, I think it's the east, but...

-- "to the west which reduces the Black CVAP in Precinct 3 to 32 percent and the Black plus Hispanic CVAP to 55 percent.  However, the district appears to continue to perform for Black and other minority voters."

Do you see that?

A.    Yes.

Q.    Do you believe that?

A.    Do I believe what?  That it appears to perform?

Q.    Yes.

A.    He says it does appear to perform.  I believe that he says it does appear to perform, yes.

Q.    All right.  The core information in that is that District 3 in proposed Map 1 would still perform for a candidate of choice, right?

A.    No.  That is not what it says.  It says -- this sentence does not say it does perform.  It says it appears to perform.

Q.    Okay.  Have you had a chance to look at any of the other maps, illustrative maps offered by your experts or plaintiffs' experts?

A.    Prior to this meeting?  Like, did I prep it?  What are you asking me?

**Q.**   Throughout the course of this lawsuit.

**A.**   Oh, yeah.  Through the course of the lawsuit, yeah, at some point, yes.

**Q.**   55 percent is better than any of those -- is as better or as good as any of those illustrative maps, right?

**A.**   The maps that this gentleman put forward?

**Q.**   Yes.

**A.**   No, it's not better.  I don't think so.  I don't recall that, no.

**Q.**   Okay.  Commissioner Holmes, you knew that Map 1 would perform for a candidate of choice, right?

**A.**   No.  I did not.  It says that it appears to perform. It does not say it does perform.

**Q.**   Okay.  Did you tell any of your constituents that Map 1 appears to perform for a candidate of their choice?

**A.**   At what point was I to tell them?

**Q.**   Any time before the vote.

**A.**   You know, I got this the day before the vote.

**Q.**   Okay.  Let's -- right.  But, nonetheless, did you tell any of your constituents that Map 1 would re-elect a candidate of their choice if adopted?

**A.**   I told them that the maps that I put forward on the day of the vote would do that.

**Q.**   I didn't ask that question.

**A.**   Okay.

**Q.**  I asked if -- we're just talking about Map 1.  Did you tell any of your constituents that Map 1 would elect a candidate of their choice?

**A.**  That's not what Map 1 says.  That's not what he says.  It says it appears.  It does not say it does.  It says "appears."  It doesn't say it does.

**Q.**  Listen, I don't have -- I don't have a problem with that position.  I understand that.

Did you tell anybody that Map 1 appears to be able to elect a candidate of their choice?

**A.**  No.

**Q.**  Okay.  Thank you, sir.

MR. NIXON:  Let's put up DX-120, please.

BY MR. NIXON:

**Q.**  Okay.  This is an e-mail from Roxy Hall to several people, including you.  Do you see that?

**A.**  I am actually looking for my name.

**Q.**  It's in the "to"?

**A.**  In the "to"?

**Q.**  To.  And then it's got -- yeah.  There you go.  There you go.  Do you see it?  It's highlighted?

**A.**  Yeah.  Okay.  Yeah.  Yes.

**Q.**  Okay.  It talks about you speaking at a redistricting event in Galveston County, it looks like, on November 3rd or 4th.

**A.**   I see where it says -- I see where it says I will be speaking.  I don't see the date when it says I'll be speaking.  I do see where it says:  "Stephen Holmes will be speaking."

**Q.**   Did you give a speech to a group of people on or about November 3rd or 4th?

**A.**   No, I don't recall.

**Q.**   The date of this e-mail is October 28th, right?

**A.**   It's Thursday, November 4th.

**Q.**   No.  It says:  "Galveston County redistricting workshop October 28th, 2021."

**A.**   No.  At the top there --

**Q.**   Oh, I see.

**A.**   -- it says Thursday, November 4th, 2021.

            MR. NIXON:  Let's scroll down to the second page.

 BY MR. NIXON:

**Q.**   These are talking points that Roxy Williamson is providing to the Galveston County Democratic Party, the people that you are going to be speaking to.

     The first talking point says:  "I support Map Proposal 1.  This map keeps Commissioner Holmes' district somewhat intact.  However, I do object to the Bolivar Peninsula being included in Precinct 3.  The Bolivar Peninsula is a drastically different community that is predominantly White.  This community has little in common

*Laura Wells, RPR, RMR, CRR, RDR*

with the residents that currently reside in Precinct 3, which has a large, diverse population of Latinx and African American residents."

Do you see that?

**A.** Yes.

**Q.** Did you read this?

**A.** On November 4th, 2021?

**Q.** When you got the e-mail.

**A.** I don't recall.

**Q.** Did you write back to Roxy Williamson and say that she was wrong, that Map 1 wouldn't elect a candidate of choice in Precinct 1?

**A.** I don't recall reading that, to begin with.  But, no, I did not write back.

**Q.** Okay.  Did you call her back and say, "You are wrong"?

**A.** I didn't read that.  I don't recall reading that.

**Q.** Okay.  That was her opinion?

**A.** She wrote it.

**Q.** Do you have any idea how she formulated that opinion?

**A.** That would be a question for her.

**Q.** Did you and she have a conversation?

**A.** About?

**Q.** About Map 1.

**A.** Not that I recall.  No.

**Q.** Okay.  We've talked about Bolivar Peninsula before.

You don't want Bolivar Peninsula in your district, do you?

**A.**   Here is what I want, Mr. Nixon.  I want the communities that I represent to be able to choose the candidate of their choice.  That's what I want.

**Q.**   You did not want Bolivar Peninsula in that district you just described, right?

**A.**   I would not have -- I would not have drawn it that way.  But, again, if the district performs where the people that I represent can elect the candidate of their choice, fine.  But would I have drawn it that way?  No.

**Q.**   I want to talk to you specifically about Bolivar Peninsula.  Do you agree with Ms. Williamson's description of why Bolivar Peninsula is objectionable?

**A.**   Put it back up for me.

MR. NIXON:  Yes, please.  120, I believe.

BY MR. NIXON:

**Q.**   Do you agree with Roxy Williamson's -- the second page.

Under the I support Map 1 -- Map Proposal 1.  "The Bolivar Peninsula is a drastically different community that is predominantly White."

Do you agree with that?

**A.**   That is factual.  Yes.

**Q.**   "This community has little in common with the residents that currently reside in Precinct 3."

*Laura Wells, RPR, RMR, CRR, RDR*

Do you agree with that?

**A.**   That is factual.

**Q.**   And that is why you didn't want Bolivar in your district?

**A.**   As I said before, I would not have drawn it that way. But, again, if Bolivar was in the district and it still performed to allow the community to elect the candidate of their choice, so be it.

**Q.**   So assume with me that Map 1 is a 55 percent Black and Hispanic district that would elect a candidate of their choice, would you have supported Map 1 had you understood that?

**A.**   I mean, I saw Map 1 and I think I had Map 1 analyzed, but there were better maps.

**Q.**   So you just wanted a better map?

**A.**   That was not the best map.  And, again, I would not have drawn it that way.

**Q.**   All right.  Well, as it relates to Map 1 --

MR. NIXON:  Let's put up Map 1.

BY MR. NIXON:

**Q.**   Imagine, if you will, with me that the Bolivar Peninsula is removed from Precinct 3 in Map 1.  Right? This Map 1 is identical to what you asked Mr. Oldham to draw?

**A.**   It is not.

**Q.**   You believe that to be the case?

**A.**   I'm sure that's the case.

**Q.**   So in all your metes and bounds that you went through, this is not exactly the same?

**A.**   It is not.

**Q.**   How is it different?

**A.**   Do you have a map that has the roads and the streets on it that has this map?

**Q.**   I do not.

**A.**   Okay.  Then how are we going to tell that it's exactly the same?

**Q.**   Okay.

**A.**   I'm telling you that it's different.

**Q.**   And how is it different that you can tell?

**A.**   Well, if you look at the northern part -- if Precinct 3 is in orange, if you look at the northern part, I describe some areas in Dickinson.  This appears to be Highway 3, but I don't know for sure.  That appears to be Highway 3.  I describe some areas that are east of Highway 3.  And if you look at this map here, there are no areas in Dickinson that are east of Highway 3.

**Q.**   Now, where is your house in this?

**A.**   Man, I don't -- you got streets on here?  Do you have some -- do you have some identifying information on this map?

Q.   All right.  We can get you that.  We'll have that.

But let me ask you this:  Is your house in that little section at the very northern part of Precinct 3?

A.   It would be in the northern part, but I can't tell you exactly what -- are you talking about this little piece right here that juts out?

Q.   Yes.

A.   No.  I don't think so.

Q.   Okay.

MR. NIXON:  Let's go on.  Let's get DX-123, please.

BY MR. NIXON:

Q.   This looks like the invitation for you to speak at the Galveston County monthly meeting of the Democratic Party.  Did you attend this meeting?

A.   Does it have a date?  Does it have a date on it?

Q.   It was the one that was referred to in the earlier e-mail of November 4th.

A.   Oh, yeah.  I'm sure I did.  I'm sure I did.

Q.   Okay.  Did you tell -- at this meeting, did you tell anybody to support Map 1?

A.   Not that I recall.

Q.   Did you tell them to vote against Map 1?

A.   I don't recall.

MR. NIXON:  Let's put up Defendants' Exhibit

*Laura Wells, RPR, RMR, CRR, RDR*

Number 140, please.

BY MR. NIXON:

**Q.**   So this is an e-mail from Roxy Williamson, and it got forwarded by -- it was forwarded from Stephanie Swanson to you and others.  And it says, you see:  "Looping in Noor here" -- in the middle -- "since Galveston is trying to get rid of a coalition district.  If they vote for Map 2, we could argue intentional discrimination as well as preclearance for the jurisdiction, since they would be a repeat offender."

Do you see that?

**A.**   Yes.  Yes.  I see the text.

**Q.**   So you were advised that if the County voted for Map 2, they could argue intentional discrimination and preclearance.

Do you know what they mean by "preclearance"?

**A.**   Wait a minute.  Am I on this e-mail?  Let me see.

**Q.**   I got it from you.

**A.**   Okay.  Let me see my name.

MS. KLEIN:  Your Honor, objection. Misrepresentation.  The document was produced by the NAACP plaintiffs as indicated in the bottom right corner.  I just want to make that clear for the record who it was produced by.

MR. NIXON:  I stand corrected.

THE COURT:  All right.

BY MR. NIXON:

**Q.**  All right.  Did you know on November 11th that there were discussions by lawyers in this room that if Map 2 passed, they had an argument for intentional discrimination and an argument about preclearance?

**A.**  I did not.

**Q.**  Do you know what they were referring to in terms of preclearance?

**A.**  I do not.

**Q.**  Okay.

MR. NIXON:  If you could put up Defendants' Exhibit Number 282.

BY MR. NIXON:

**Q.**  Is this an e-mail from Paul Ready to you?

**A.**  Yes.

**Q.**  Okay.  Did Mr. Ready inform you on September 20th that he spoke to Dale about obtaining census data so I could provide it to you.  Right?

**A.**  Yeah.  That's what he says, yes.

**Q.**  And you got the census data from Mr. Ready either later that day or the next day, right?

**A.**  No.

**Q.**  No?

He gave you the website that it is available at,

right?  Whatever data there is.

**A.**  Yeah.  But the data that -- the link that he sent that I could recall that this link went to was not -- it was just -- as I can recall, it was just a bunch of mumbo jumbo.  It wasn't anything that you could kind of make hay out of, that I can recall.

Now, Paul did send me -- at some point, Paul did send me a spreadsheet that I can recall that came from, I believe, Oldham that showed the total populations in each precinct and I think racial data as well, but not individual voting precincts.

**Q.**  Okay.  We're going to find that spreadsheet here in a sec.

**A.**  Okay.

**Q.**  All right.  Let's go back to the e-mail that attaches the spreadsheet.

This is from Mr. Ready.  DX Exhibit 80 is from Mr. Ready to you; is that correct?

**A.**  Yes, sir.

**Q.**  It says:  "I called and confirmed with County Judge's office that they do not have the 2020 census data.  Dale shared this top-level summary he put together.  No other commissioners have seen this yet."

**A.**  That's what he says, yes.

**Q.**  Yes.  And he attaches -- and that's dated

September 20th.  So it's later the same day?

**A.**   Yes.

**Q.**   And he attached a spreadsheet providing you the information?

**A.**   Oh, is this -- is this the spreadsheet from the link?  Is this what comes up when you click that link?

**Q.**   This is not the spreadsheet from the link.  This is a separate spreadsheet that was sent just to you.

**A.**   Okay.  Can you -- so this was not what came up when you sent the link, when we clicked the link that was on the e-mail?  I'm trying to -- can you go back to the e-mail?

**Q.**   We can go back to the next page.

**A.**   So does that spreadsheet you just showed come up when you click this link?

**Q.**   No.

**A.**   Okay.

**Q.**   This is a separate spreadsheet sent just to you.

**A.**   Okay.  Okay.  Yeah.  I -- the spreadsheet you showed, I did subsequently at some point get that from Mr. Ready; but it was not, as I can recall, attached to this e-mail.

**Q.**   All right.

         MR. NIXON:  Let's pull up Defendants' Exhibit Number 97.

BY MR. NIXON:

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   Here this is an e-mail from Roxy Williamson to you, right?

**A.**   Yes.

**Q.**   "Here's the original e-mail.  I'm hoping to get enough Galveston County citizen groups to step up and sign on.  I was hoping you could offer some suggestions.  I am planning to ask Mr. Elias Sanchez and the SD11 Tejanos to sign on.  I'm at a loss for who else to consider.  I would appreciate your time and consideration."

        Do you see that?

**A.**   Yes.

**Q.**   So Ms. Roxy Williamson was trying to develop some opposition or support for you and opposition to either one or both maps?

**A.**   That's a question you would have to ask her.

**Q.**   Okay.  You don't recall why she was sending you this e-mail?

**A.**   No.

**Q.**   Okay.  Did you respond?

**A.**   Not that I recall.

        MR. NIXON:  Let's look at Defendants' Exhibit Number 95.

 BY MR. NIXON:

**Q.**   Does this refresh your recollection?

**A.**   Yes.  That is my response.

Q.   Okay.  "Hey, Roxy!  I don't have anyone in particular or want the letter sent to.  Do you have a copy of the letter? [as read]"

     Did she ever send you a copy of the letter?

A.   Not that I recall.

Q.   Okay.

     MR. NIXON:  Let's look at Defendants' Exhibit Number 99.

BY MR. NIXON:

Q.   Okay.  This is a letter -- this is an e-mail from Roxy Williamson.

     MR. NIXON:  Just blow up the part -- it's redacted as to who it was sent to.  But let's blow up the wording of the e-mail itself.

BY MR. NIXON:

Q.   Do you see where she writes she is asking for people to help sign up and be part -- sign up in support to sign on to the letter?  That she is -- she is one of the redistricting fellows for Texas involved with the Southern Coalition for Social Justice.  She works in collaboration with the League of Women Voters and the Texas State NAACP.

     "...we are working with communities to ensure a fair, open, and transparent redistricting process.  You all are integral parts of various community-based organizations that work diligently to preserve the interest and protect

*Laura Wells, RPR, RMR, CRR, RDR*

the citizens of Galveston County.  We are asking that you review the letter, share with your networks, and sign on in advocacy."

Do you see that?

**A.**  Yes.

**Q.**  Did you ever receive a copy of this e-mail?

**A.**  Did I receive a copy of it?

**Q.**  Yeah.  To your knowledge.

**A.**  Not that I can recall.

**Q.**  Okay.  But Roxy Williamson is helping to drum up support either for or against certain maps, right?

**A.**  That's a question you would have to ask her.

**Q.**  All right.  We will.

MR. NIXON:  Let's -- let's pull up Defendants' Exhibit Number -- Plaintiffs' Exhibit Number 23.  I'm sorry.  It must be joint Exhibit 23.  Yeah.  That's the one.

Let's scroll forward.  I want to get to Tyler Dunn's [sic] notes or -- let's scroll forward.

THE COURT:  Tyler Drummond?

MR. NIXON:  Tyler Drummond, yes, sir.

BY MR. NIXON:

**Q.**  Okay.  On 10-29, October 29th of 2021, you write -- these are your notes with Tyler Drummond.

"I spoke with Tyler.  He called me as he was driving

to Dallas.  I informed me. [as read]"

Would that mean "he informed me"?

**A.**   It says "informed me."

**Q.**   Okay.

**A.**   It doesn't say "I informed me."  It says "informed me."

**Q.**   You are right.

"Informed me that maps would be up again on County website that day -- going up on the County website that day. [as read]"

Is that right?  Is that your recollection?

**A.**   Hold on a second.

Yes.  That says "going."  I know it looks bad; but it says "going," yes.

**Q.**   We did this during your deposition.

**A.**   Yeah.  Yeah.

**Q.**   All right.  "Said that there would be two maps displayed.  The two maps that Dale Oldham had shown me before. [as read]"

That would be Map 1 and Map 2, right?

**A.**   Yes.

**Q.**   Okay.  "I asked about a timeline for this redistricting process, and he said that one would be set. He said that there would be a place for public comment on the website.  I asked was this a contest to see which map

would get more votes, and he said no. [as read]"

Did he say anything else?

**A.**   There was more to the conversation.  Yeah.  I said some stuff; and he said some things, yes.

**Q.**   Okay.  Well, let's hear the rest of the conversation. What did you say?

**A.**   I talked about the ability for people who may not have access to the internet or a computer and their ability to get online to do this kind of stuff and to respond, if they wanted to respond, and having a mechanism for that to happen and for them to respond.

**Q.**   Yes.  Did you ask him -- did Tyler tell you this was a good time to go get your votes?

**A.**   On the 29th?

**Q.**   Yes.

**A.**   I don't think so.

**Q.**   Do you know that for sure?

**A.**   Fairly certain.  I would have put that down, yes.

**Q.**   At any time did Mr. Drummond tell you to go get your votes?

**A.**   No.  He said to get people to vote against something. He didn't tell me to go get my votes.  To go get votes to vote against something.  Not to vote in the affirmative, but to vote in the negative.

**Q.**   What did he suggest you vote -- to get people to vote

*Laura Wells, RPR, RMR, CRR, RDR*

against?

**A.**   Can I look at my notes?

**Q.**   Yes.

          MR. NIXON:  Just scroll down.

**A.**   Yeah.

BY MR. NIXON:

**Q.**   That's all there was on that day.

**A.**   Yeah.  It's another day.  It's another day.  I think I know what you were talking about, but it's another day.

          MR. NIXON:  Let's go to the next day, then.

**A.**   Yeah.  That's it right there.

BY MR. NIXON:

**Q.**   On November 21st -- November 2nd?

**A.**   Yeah.  That's November 2nd.

**Q.**   "Tyler Drummond.  Spoke with him and he said that there were -- they were trying to set the special meeting for next Tuesday, November 9th, to vote on the redistricting maps.  He said Clark would be out the rest of the week. [as noted]"

     Meaning Commissioner Clark was suffering from cancer?

**A.**   That's correct.  That's correct.

**Q.**   He really didn't participate any more from --

**A.**   He was in -- he was -- I think he passed -- he passed away in April of the next year.  So he was kind of in and out on some of the meetings.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**  Okay.  "And Giusti would be out next Wednesday and Thursday."

Which kind of meant it had to be Tuesday or Friday.

"He said maybe I could convince them at the next Tuesday meeting to not support Map 2 and maybe get the vote passed. [as read]"

**A.**  That says "postponed."

**Q.**  "...postponed to next Friday. [as read]"

**A.**  Till next Friday.

**Q.**  "...till next Friday."

Thank you.

"Said Secretary of State had sent e-mails stating maps must be sent by November 13th, '21. [as read]"

**A.**  Yes.

**Q.**  Okay.  So that's when Tyler said "go get your votes"?

**A.**  Those aren't the words he said.  "He said maybe I could convince them at the next Tuesday meeting to not support Map 2."  That is -- those are his exact words.

**Q.**  You are a commissioner a long time.  You know how to go get votes when you need some, right?

**A.**  You can't get votes from two commissioners.  You can't get --

**Q.**  You can get a vote for one?

**A.**  Yeah, you can.

**Q.**  And your staff can all talk to each other, right?

**A.** That's a walking -- no.  That's walking quorum stuff.

**Q.** No.  No.  No.

**A.** No.  You can't do that stuff.  No.  I don't do that stuff because you are trying to circumvent the law.  I don't do that.

**Q.** Your staff can communicate?

**A.** Yeah.  I don't do that.  You are trying to circumvent the law.

**Q.** Right.  As commissioners, you need three to constitute a quorum?

**A.** Yes.

**Q.** Okay.  So that's why you can't talk to more than one?

**A.** Yes.

**Q.** But your staff communicates regularly, right?

**A.** Not to circumvent the law.  No.  My staff does not. I've only got one person.  Michelle, she does not.

**Q.** Does Michelle speak Spanish?

**A.** Does she speak Spanish?

**Q.** Yes.

**A.** No, not to my knowledge.

**Q.** Okay.  Did you try to convince another commissioner to vote with you?

**A.** To vote with me on what?

**Q.** On whatever map you wanted or whatever map you didn't want.

*Laura Wells, RPR, RMR, CRR, RDR*

Cross-Examination of Commissioner Holmes    Day 7 - 139

**A.** On November 2nd, 2021, I didn't have --

**Q.** Just --

**A.** Can I finish?

**Q.** Yeah.

**A.** On November 2nd, 2021, I didn't have a map.

**Q.** You knew that -- but on November 2nd, 2021, there were two maps posted on the County's website?

**A.** Yes.

**Q.** On November 2nd, 2021, until the meeting, did you ever ask any commissioner to vote with you for a map or with you against a map?

**A.** I was told that Map 2 was going to be voted in, that the county judge was going to make the record -- make the motion to adopt Map 2, that Commissioner Apffel was going to second the motion, and that would be the map that would be passed.  That's what I was told.

**Q.** That's not what I asked.

**A.** What is the question?

**Q.** Did you go ask another commissioner to vote with you either for or against any map?

**A.** No.

**Q.** Did you ask Mark Henry to vote for or with you against any map?

**A.** No.

**Q.** Did you offer to put up any redistricting criteria on

*Laura Wells, RPR, RMR, CRR, RDR*

any agenda all throughout the year?  From January 1, 2021, until November 12th, 2021, did you offer any districting criteria?

**A.**   I was not retained by the County to lead us through the redistricting process.  That was Oldham's job and the law firm retained to do that.  That was their job; not my job.  But, no, I did not.

**Q.**   You did not see as your job as a commissioner to put districting criteria on the agenda?

**A.**   I felt it was the job of the lawyers who were retained to lead us through the redistricting process to put that on the agenda.

**Q.**   Okay.  You know you have the right to put anything on an agenda that is subject to 72 hours' notice?

**A.**   Actually, it's longer than that for Commissioners Court because our normal meetings are on Mondays at 9:30 every other Monday.  There is a deadline at county judge's office that I believe is the Tuesday before at 5:00 that you have to have your agenda items in.  So it's longer. It's longer than the 72 hours for the process.

**Q.**   I heard you -- I heard you talk about that.  But if you went to the county judge on Friday morning at 9:30 and said, "I want this on the agenda," he has to put it on as a matter of your constitutional right; isn't that correct?

**A.**   I don't know.  I don't think so.

**Q.**   Okay.  We have mentioned a little bit about your deposition earlier.  Do you remember being deposed?

**A.**   I remember being deposed, but I don't remember us talking about it here today.

**Q.**   I just asked you if you remember being deposed.

**A.**   Huh?

**Q.**   Do you remember being deposed?

**A.**   Oh, yes.

**Q.**   Do you remember that you were under oath?

**A.**   Yes.

**Q.**   You are a lawyer?

**A.**   Yes.

**Q.**   You know what taking an oath means, right?

**A.**   Yes.

**Q.**   Okay.

        MR. NIXON:  Let's put up Mr. Holmes's deposition and go to page 36.  All right.  Let's begin at line 11 -- or line 12.

BY MR. NIXON:

**Q.**   The question was:  "When was that?"

**A.**   Line 12?

**Q.**   Yes.  "When was that?"

**A.**   "...to Nathan Sigler.  Well, I went to his boss --"
        What day was that?  You are asking me what day it was?

**Q.**   Let's start:  "When was that?"

**A.**   Oh, you are reading.  Okay.  I'm sorry.

**Q.**   I'm reading.  I asked you about when Mr. Sigler was not responsive.  You told me one time.

And then I asked:  "When was that?"

**A.**   Wait.  Wait.  Line 12?

**Q.**   Well, let's start at line 3, then.

**A.**   Okay.  Line 3.  Okay.

**Q.**   Give you some context.  We can go back a little further if that helps, too.

**A.**   Okay.

**Q.**   "QUESTION:  So it's always been a response of whatever you ask?

"ANSWER:  A few times, yes.

"QUESTION:  Other than one?

"ANSWER:  But yes."

My question was:  "Other than one?

And your answer was:  "Yes."

"QUESTION:  The one time he was not responsive?

"ANSWER:  That is correct."

And I asked:  "When was that?"

And your answer was:  "At some point during this process, I had went to Nathan Sigler -- well, I went to his boss really, Michael Shannon, about census data that was probably in September or October, late September.  I think it was about census data, getting his -- getting

*Laura Wells, RPR, RMR, CRR, RDR*

census data for the precincts."

Did I read that right?

**A.**   Yes.

**Q.**   "QUESTION:  What happened?

"ANSWER:  I never got it.

"QUESTION:  Census data for your precinct?"

Your answer was:  "Yeah."

And somebody commented I wasn't speaking loudly enough.

So the question was:  "Census data for your precinct?

"ANSWER:  For the county.

"QUESTION:  For the entire county?

"ANSWER:  Yes.

"QUESTION:  And you never received any?

"ANSWER:  No.

"QUESTION:  Did you go back to him a second time to say I didn't get what I asked for?

"ANSWER:  No.  I went back to his -- I went back to his boss, Michael Shannon, and told Michael to stand down. Maybe a few days later and said, 'Hey, that's okay.'"

Do you remember that?

**A.**   Yes.

**Q.**   Do you think that would have been a good time to tell me it was two weeks later and the reason you didn't ask for it was because you didn't want to get him fired?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Yeah.  I didn't have the notes in front of me that I have here today in front of me that I can recall when you were asking me that question.  I went to him on September 21st, 2020.

And when I told him to stand down was at the first meeting in October of Commissioners Court, which would have been October 5th or the 6th.  I don't remember the exact date.

**Q.**   So let's go to page 194 in your deposition.

Now, you remember we had your notes that you produced, and we were marching through all your notes.

So now, on Line 14 of page 194, I asked a question.

"QUESTION:  Okay.  The next is, like, 921."

That was the number on the bottom of the page, 000921.

"You just flip the page.  You asked engineering if they could run the data?"

Your answer was:  "Yes.  That would have been a -- been a call that we spoke about earlier to Michael Shannon."

Right?

**A.**   Yes.

**Q.**   We're talking about the same thing?

**A.**   Yes.

**Q.**   Okay.  "Where Nathan Sigler ended up getting involved."

That would have been the call that we spoke about earlier.

"QUESTION:  So you asked them?

"ANSWER:  Uh-huh.

"They're -- yes.

"End of September.

"QUESTION:  They didn't get you --

"ANSWER:  I think the -- I think the other day after -- yeah, previously.

"QUESTION:  They didn't get you the information either?

"ANSWER:  That's correct.

"QUESTION:  Because you already got it from someplace else?

"ANSWER:  No.

"QUESTION:  Well, you told them never mind?

"ANSWER:  I said 'never mind;' but at that point, I still didn't have it.

"QUESTION:  Okay.  I just want to make sure.

"ANSWER:  Yeah.  Okay.

"QUESTION:  All right.  You're not faulting Shannon or Sigler because they didn't get you the information, because they told -- because you told them never mind."

Your answer was:  "Yeah.  I'm not trying to point fingers at anybody.  I'm trying to state the facts as to

*Laura Wells, RPR, RMR, CRR, RDR*

what happened."

"QUESTION:  That's right.  Just so you are not being critical of either of them for failing to get you information?

"ANSWER:  I'm stating the facts.

"Right.

"QUESTION:  Because you -- because you told them don't bother anymore?

"ANSWER:  No.  Well, I don't remember -- recall the length of time that had gone by; but once I didn't get it, I just said, 'Don't worry about it.'

"QUESTION:  Did you get it from any other source, the data that you were looking for?

"ANSWER:  Yes.

"QUESTION:  Where?

"ANSWER:  Census.gov."

All right.  You didn't tell us that it was a two-week delay.  You told us earlier that it was a couple-of-day delay, right?

A.  Yeah.

Q.  And you didn't tell us that you were worried about someone being fired or not fired, right?  You didn't tell us that?

A.  You didn't ask that.

Q.  Okay.  It would have been a good time to have told us

that, though, right, that's why I told them never mind.

You led us to believe the reason why you didn't -- why you said never mind is because you had already gotten the document from census.gov?

A.   I never told you that.  I said I got it from census.gov.

Q.   "Did you get it from any other source, the data you were looking for?

"ANSWER:  Yeah.

"QUESTION:  Where?

"ANSWER:  Census.gov."

A.   Yes.  I got it from census.gov.

Q.   "You weren't pointing fingers or blaming anybody, right?"

That was the question I asked you.

A.   Well, if my testimony today means that I'm blaming or pointing the finger at Michael Shannon or Nathan Sigler, both very good employees, do very good work for Galveston County, not pointing the finger at them then, I'm not pointing the finger at them now.  They do the best they can for Galveston County.

Q.   The question was:  Were you pointing the finger at anybody?

A.   No.  I wasn't pointing the finger at them.  Not those two, no.

**Q.**  Almost 25 years on the Commissioners Court?

**A.**  I came in February of 1999 until now.  Twenty.  Like I said, 24 years.

**Q.**  Twenty-four.

You are familiar with the process of the court?  Very familiar with the process of the court?

**A.**  Most processes, yes.

**Q.**  You know how to get something on the agenda?

**A.**  Yes.

**Q.**  You know how to make a motion?

**A.**  Yes.

**Q.**  You know how to make a substitute motion?

**A.**  A what?

**Q.**  A substitute motion.

**A.**  What do you mean "substitute motion"?

**Q.**  Well, someone moves to -- someone makes a motion, do you know how to say I -- before that motion is considered, "I move to amend the motion" or "I make a substitute motion"?

**A.**  Yeah.  I have never done that.

**Q.**  You haven't?

**A.**  No.

**Q.**  Has anybody -- in the whole time you have been on the Commissioners Court, you've never done that?

**A.**  I'm sure at some point, but not that I can recall.

**Q.** Okay. It's in order -- it is in the order of the court to consider an amended or substitute motion, right?

**A.** I don't know.

**Q.** So if someone says, "I move to adopt Map 2," even if it's seconded, you can say, "I move to amend the motion to say Map 1 instead of Map 2," right?

**A.** That's not something I know.

**Q.** Before someone says, "I move to adopt Map 2," you could say, "I move to adopt Map 1," right?

**A.** Yes.

**Q.** Okay. At what point, your motion would be up for consideration?

**A.** If you move -- if you are the initial mover?

**Q.** Yes.

**A.** Yeah. If you get a second to it.

MR. NIXON: Let us put up Defendants' Exhibit Number 64 -- 164.

BY MR. NIXON:

**Q.** Do you recognize Defendants' Exhibit Number 164? You and I are both doing the same thing.

**A.** I'm not going to say "recognize" it, but it is an e-mail between me and Sarah Chen.

**Q.** All right.

MR. NIXON: Let's scroll down to the bottom.

BY MR. NIXON:

*Laura Wells, RPR, RMR, CRR, RDR*

Q.   So your e-mail chain with Ms. Chen began September 28th of 2021?

A.   That's the date on this last e-mail you have got up here, yes.

Q.   She writes to inform you that she is "...an attorney with the Texas Civil Rights Project looking at what the county commissioners courts across the state are doing with respect to local redistricting.  Roxy Hall Williamson gave me your contact information, and I just left a voicemail on the phone number she gave me."

     Do you remember reading this e-mail?

A.   I do not remember it, no.

Q.   It says:  "Please call me any time at the cell number in my signature or we can set a time via phone or zoom. [as read]"

     Did you respond?

A.   No, I don't recall.

          MR. NIXON:  Let's look up one.

BY MR. NIXON:

Q.   She writes again on October 25th, 2021.

     "Hi, Commissioner Holmes.  Have you been well?  Have you heard any updates on your county redistricting plans? [as read]"

     Do you see that e-mail?

A.   Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**    Okay.  Did you respond?

**A.**    Yes.

**Q.**    Okay.  Your response said, "I had a teleconference with Redistricting Counsel Dale Oldham a couple of weeks ago.  Last week had an in-person Monday and Zoom meeting Friday with Oldham.  Two maps displayed.  One that essentially obliterated my current precinct, another that is close to current configuration, but one area that is unacceptable, and from what I know would be close to current racial percentages.  Requested but have not received maps or data. [as read]"

Okay.  So the one that has essentially obliterated your current precinct, that would be Map 2?

**A.**    Yes.

**Q.**    And the one that is close to your current configuration would be Map 1?

**A.**    Yes.

**Q.**    And the area that is unacceptable is Bolivar?

**A.**    Yes.  That would have been correct.

**Q.**    And, again, Bolivar is unacceptable because it is predominantly White?

**A.**    The community of interest has no community of interest to other parts of the precinct.

**Q.**    So what I hear is that your community of interest doesn't have anything to do with Bolivar's community of

interest?

**A.**  They don't match.  But as I said before, if the precinct would perform and allow the people of the precinct to continue to elect the candidate of their choice, I'm fine with it.

**Q.**  Do you know how many precincts, voting precincts, are on Bolivar?

**A.**  I don't.

**Q.**  Two.  Did you know that?

**A.**  No.  I did not know that.

MR. NIXON:  Let's scroll up a little bit.

BY MR. NIXON:

**Q.**  That was on October 28th.  That was 15 days before the maps were adopted.  She writes back:

"Thank you so much for the update.  Do you know if or when the Commissioners Court will put redistricting on the public agenda so members of the public may weigh in?  Please let me know if you get any copies of maps.  Even a screenshot or other image of a map can work.  I can recreate the map and get the data separately."

Do you see that?

**A.**  Yes.

**Q.**  At that point, the maps were on the County website, right?

**A.**  Not on the 28th.

**Q.**   Okay.

          MR. NIXON:  Well, let's scroll.

**A.**   I thought the e-mail was October 28th.  I think the maps went up October 29th.

**Q.**   Okay.

          MR. NIXON:  Let's scroll down.

**A.**   But at that time, I did not have notice they were going up October 29th of this e-mail.

 BY MR. NIXON:

**Q.**   Yeah.  Mr. Drummond's telephone call saying they are going up later that day.

**A.**   That's October 29th.

**Q.**   Yeah.

**A.**   This is October 28th.

**Q.**   On the 29th, did you send her the two maps?

**A.**   I don't recall.

**Q.**   Okay.

          MR. NIXON:  Let's scroll down -- or up.

 BY MR. NIXON:

**Q.**   She writes to you:  "Hi, Commissioner Holmes.  I saw that the maps are now posted on the County's website.  Do you have time to chat about these maps in the next couple of days?  Copying Stephanie Swanson of League of Women Voters who has been closely monitoring Galveston County redistricting and spearheaded the letter encouraging

*Laura Wells, RPR, RMR, CRR, RDR*

adoption of redistricting criteria and a transparent process that we sent you and other members of the Court last week."

Q.   Do you see that?

A.   Yes.

Q.   Did you get the letter that had the suggested redistricting criteria in it?

A.   From Sarah Chen?

Q.   Or Stephanie Swanson.

A.   Stephanie Swanson did send some communication.  I'm trying to remember if it was, in fact, redistricting criteria, to be honest with you.  She did -- she did send something, Stephanie Swanson.  I ended up getting several e-mails from her, Stephanie Swanson.

Q.   All right.  We have that letter.  We'll look at it in just a second when we're through with this.  Okay?

A.   Okay.

Q.   All right.  You write:  "Yes, I am available."  On November 2nd.  "Yes, I am available.  I can chat this afternoon if you have time."

Q.   Did you do that?

A.   I was going to say that's what I -- appears I wrote, yes.

Q.   Did you have a conversation with Ms. Chen on the afternoon of November 2nd, 2021?

**A.**   I honestly don't recall.

**Q.**   You don't know?

**A.**   I don't recall.

**Q.**   Okay.

MR. NIXON:  Let's scroll down.

BY MR. NIXON:

**Q.**   She writes.  It looks --

MR. NIXON:  Let's go back one.

BY MR. NIXON:

**Q.**   "I'm free from 4:00 to 5:00.  Feel free to call my cell any time after that period."

Did you ever call her cell?

**A.**   I don't recall.

**Q.**   Okay.  Did she ever call you?

**A.**   I don't recall.

**Q.**   You texted her back:  "Will do."

Do you know whether you did?

**A.**   I don't recall.

**Q.**   Okay. All right.  Let's see if we can't find that e-mail from Ms. Swanson.  I think it's DX-164.

MR. NIXON:  Let's scroll down.  Hopefully this isn't the same one we were looking at.  Yes, it is.

THE WITNESS:  Your Honor.  Judge, while they are looking for that, can I just stand up for a couple of seconds here?

*Laura Wells, RPR, RMR, CRR, RDR*

THE COURT: You sure can. Yes. It's an old chair. If you tell me it's not that comfortable, I would believe you.

BY MR. NIXON:

Q. Okay. Thanks. Okay. It looks like Plaintiffs' Exhibit Number 587 is an e-mail from Stephanie Swanson to everybody on the Commissioners Court that you had talked about, right?

MR. NIXON: Let's scroll down.

BY MR. NIXON:

Q. So here is this letter. And then at the bottom, she talks about recommended redistricting criteria, right? Do you see that?

A. Yes.

Q. And if you go to the next page, she sets out what she thinks are good redistricting criteria?

A. Yes.

Q. You have got this -- you received this e-mail?

A. I don't recall receiving it; but I see that I am on the list, the distribution list.

Q. You could have taken the e-mail and said, I propose these redistricting criteria, put it on the agenda, couldn't you?

A. No.

Q. Why not?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**    Can you get your -- can you scroll back to the actual e-mail?

**Q.**    Sure.

**A.**    That's Friday, October 29th, at 5:04 p.m.  The next agenda was that Monday.  This is within 72 hours of that. You couldn't have put it on the agenda because it's within 72 hours of putting it on the agenda.  It could not have gone on the agenda.

        The next meeting we had was November 12th, the day we voted on the map.

**Q.**    You could have put it on the November 12th agenda, couldn't you?

**A.**    Why would you adopt criteria after you approve the maps?

**Q.**    Well, did you make a motion to have it considered before?

**A.**    But you draw the maps based on the criteria.

**Q.**    Well, the point is that Stephanie Swanson drew criteria and gave them to you.  You could have drawn up your own criteria at any time throughout the year and put it on any agenda with 72 hours' notice, couldn't you?

**A.**    Yes, you could have.

**Q.**    Okay.  So I hope at some point you'll have an opportunity to read portions of this trial's transcript because there were so many people who said so many sincere

and wonderful things about how responsive and good you are, not just as a person but as a commissioner. They trusted you. They trust you today. Which leads me back to my original question.

Why didn't you trust them and tell them you could be elected under Map 1 and they could have a candidate of their choice?

**A.** Again, in all sincerity, nothing I had seen at that point, the date of the meeting, said that Map 1 would allow them to continue to elect the candidate of their choice.

Now, I did propose two maps that would have allowed them to elect the candidate of their choice; and that is what I proposed that day.

**Q.** Did you make a motion to have those maps considered at the meeting?

**A.** Commissioner Apffel already told me the judge was going to make the motion, he was going to second it, and they were going to approve Map 2.

**Q.** That's not what I asked. Did you make a motion?

**A.** The judge made a motion before I had the opportunity to make one.

**Q.** Did you make it? Did you offer to substitute a motion or make an amended motion?

**A.** No.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** Did you tell Judge Henry, "I want to go first"?

**A.** Do what?

**Q.** Did you tell him at the meeting, "I want to go first. I want to make my motion first"?

**A.** What do you mean? I mean, I don't understand what you mean.

**Q.** Did you say, before he calls the meeting to order, "Before you make any motions, I want to make my motion first"?

**A.** No. Did I say that? No.

**Q.** Commissioner, at the end of the meeting, the meeting will reflect the order but I have seen it and I recall that you made your speech after the maps had been adopted, already passed. That's when you made your speech.

**A.** Your recollection is incorrect.

**Q.** I'm sorry. It very well may be. But I'm very familiar with legislative process issues, and I'm very familiar how to fight to get things that matter to you accomplished.

And my question to you is: Instead of at the end of the meeting when you stood up and said "rage, rage, rage," when you meant really "fight, fight, fight"?

**A.** No. I said what I meant.

**Q.** You said "rage, rage, rage"?

**A.** I said figuratively.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** Right.

Now, your lawyer tried to have you say that you meant "fight, fight, fight" just a minute ago.

**A.** No.  My actual words were "rage, rage, rage."  Those were my words.  But I meant it figuratively "fight, fight fight."  I did not say "fight, fight, fight," but I meant it figuratively.

**Q.** My last question to you is:  Where was the fight, fight, fight before the vote?

**A.** What is your -- I mean, I don't know what you are -- from the community or from me?  What is your question?

**Q.** From you.

**A.** You are saying I didn't fight for my community?  Is that what you are saying?

**Q.** I didn't hear --

**A.** Is that what you are saying?

**Q.** -- any motions.  I didn't see any legislative efforts.

**A.** Yeah.  You --

**Q.** Where was the fight, fight, fight before?

**A.** Well, you already knew.  I already told you that Commissioner Apffel said how the vote was going to go down.  It wasn't like it was going to be any tricks or any -- the fix was already in.  You see it in my notes. It's in my notes.

You saw -- you heard the testimony this morning that the -- from Dale Oldham himself that said the county judge had met with other commissioners and convinced them which map to vote for.  You heard all that yourself.

Q.  So you just --

A.  The fix was already in.  It was already in.

Q.  So you just didn't fight?

A.  No.  I fought.  I fought, and I'm fighting now.  Yeah.

MR. NIXON:  Thank you.  Pass the witness.

**REDIRECT EXAMINATION**

BY MR. DUNN:

Q.  Did you do this to yourself?

A.  I did not.

Q.  Did you do this to these people back here?

A.  I did not.

Q.  Did you have anything to do with the map that was selected that day?

A.  I did not.

Q.  Can you go politic with other members of the Commissioners Court?

A.  No, not without violating the quorum.

Q.  Can you go around and count votes and get your votes in order?

A.  No, not without violating the quorum.

Q.  Let's say you were willing to commit that felony.

*Laura Wells, RPR, RMR, CRR, RDR*

Would it have worked here?

**A.** No.

**Q.** Was there anything you could have done at that meeting on November the 12th to change all of us being here today?

**A.** Nothing.

**Q.** You know Mr. Nixon asked you at your deposition -- he raised some concern here that you didn't tell him about Mr. Shannon and Mr. Sigler.

I want to show you those e-mails again real quick. You should have on the screen what I showed you earlier was Exhibit 85.

**A.** Yes.

**Q.** And 86.

**A.** Yes.

**Q.** Do you remember us talking about these during your direct examination?

**A.** Yes.

**Q.** Did Mr. Nixon show you those at your deposition?

**A.** No.  He did not.

**Q.** Now, would you have had any reason to have access to them?

**A.** No.  I did not.

**Q.** Did you see them for the first time during this trial?

**A.** I did.

**Q.** And did anybody tell you at your deposition that

**Q.**   Mr. Oldham had baked this cake in October?

**A.**   No, they did not.

**Q.**   Did anybody tell you at any point that Mr. Oldham and Mr. Bryan and their law firm were working with the National Republican Redistricting Trust?

**A.**   No.

**Q.**   Now, Mr. Nixon just showed you this exhibit, this Defendants' Exhibit Number 80 on the screen.  Do you see this?

**A.**   Yes.

**Q.**   And he asked you about this data that's attached to it.  Do you see that there?

**A.**   Yes.

**Q.**   This is the version you saw just moments ago?

**A.**   Yes.

**Q.**   This wasn't the data you were asking for though, was it?

**A.**   No, it was not.

**Q.**   Have you seen Plaintiffs' Exhibit Number 173?

**A.**   Is this it right here that you have up?

**Q.**   Yes, sir.

**A.**   Yes.  I have seen that, yes.

**Q.**   This one hasn't been scrubbed of its source, has it?

**A.**   No.  It has not.

**Q.**   And it shows there in the upper left-hand corner --

**A.**   Yes.

**Q.**   -- that Mr. Oldham was working with the National Republican Redistricting Trust, and that's who gave him this data.

**A.**   Yeah.  My copy had that on it.

**Q.**   Did you have any idea all along that you were up against the National Republican Redistricting Trust?

**A.**   I had no idea.

          MR. DUNN:  I pass the witness.

          MR. NIXON:  Nothing further.

          THE COURT:  Commissioner, you may step down.

          THE WITNESS:  Thank you.

          MR. NIXON:  Judge, we do not want this witness necessarily excused in the case.  We might want to call him in the case in chief.

          THE WITNESS:  Thank you, Your Honor.

          THE COURT:  Understood.

          MR. NIXON:  If he could hang around or be available by phone or something.

          THE COURT:  I don't think he is going to go far.

          MR. NIXON:  No.

          MR. HOWRY:  Thank you, Judge.

          THE COURT:  Good to see you, Mr. Howry.

          MR. HOWRY:  Thank you, Judge.

          MR. DUNN:  Your Honor, we don't rest at this

point.  We have an agreement with the defendants that they would be allowed to call the other members of the Commissioners Court and Mr. Oldham and Mr. Bryan and we cross.  We thought that would make the presentation easier for the Court rather than us do crosses at the front end.  But we have concluded calling witnesses at this point.

THE COURT:  All right.  Is the defense ready to call their first witness?

MR. NIXON:  The defense wants to make a motion to the Court.

THE COURT:  Okay.  It sounds like not all the plaintiffs' evidence is in yet if the cross of the commissioners is going to -- so I don't know if the timing -- if it's the right time for that motion.  I mean, I'll hear your argument on why it would be.

MS. OLALDE:  Your Honor, we could wait until the plaintiffs have stated that their evidence is in.

THE COURT:  Okay.  All right.  Yeah.  It just seems like if all the commissioners crosses are part of their case, then I need to hear that before I hear your motion.

MS. OLALDE:  Understood.

THE COURT:  Okay.  All right.  In that case, are you ready to begin your case in chief?

MR. NIXON:  Yes, Your Honor.

THE COURT:  All right.

MR. RUSSO:  Defendants call defendant Judge Mark Henry to the stand.

THE COURT:  If you'll pause right there and raise your hand, I'll swear you in.

COUNTY JUDGE HENRY:  (Complying.)

THE COURT:  Do you solemnly swear the testimony that you are about to give in the case that's now on trial will be the truth, the whole truth, and nothing but the truth so help you God?

COUNTY JUDGE HENRY:  Yes, Your Honor, I do.

MR. RUSSO:  May we proceed, Your Honor?

THE COURT:  Yes, you may.

**COUNTY JUDGE MARK HENRY,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. RUSSO:

**Q.**   Good afternoon, Judge Henry.  Where were you born?

**A.**   Houston, Texas.

**Q.**   And so how long did you live in the Houston, Texas, area?

**A.**   Short of the active duty time I spent in the Air Force, my entire life.

**Q.**   Let's talk a little bit about your career and time before some politics and going into county government, if

*Laura Wells, RPR, RMR, CRR, RDR*

we could.

You mentioned you were with the Air Force for a period?

**A.** Correct.

**Q.** Tell me a little bit about that, if you could.

**A.** I was commissioned second lieutenant in 1989, sent to flight school in California.  Upon that assignment, I was immediately sent to undergraduate space training in Denver, Colorado, and then sent on to crew combat training in Colorado Springs, where I controlled spy satellites for three years.

**Q.** What did you do after that?

**A.** I was transferred to officer training school, as we moved the program from San Antonio to Montgomery, Alabama.

**Q.** All right.  And then what about after that?

**A.** After that, I was -- I stayed on as reservist starting in 1985; ended my career in San Antonio as an assistant executive officer at the 560th Flying Training Squadron.

**Q.** After that, you retired from the Force?

**A.** I retired in 2010, the same year I got elected.

**Q.** What was your rank at the time?

**A.** Major.

**Q.** All right.  So I understand that you were a line officer with the Air Force; is that right?

**A.** Yeah.  Anybody who is not a doctor, lawyer, or nurse

is a line officer.

**Q.** Okay. What is that position?

**A.** That means you actually do something; whereas, the others would be considered support officers or non-line officers. So my job was in space operations. It would be the same as a pilot or navigator or something like that.

**Q.** And you spent, I think we discussed, significant time towards teaching and doing training in various areas?

**A.** Right. I was a flight commander at officer training school for both basic officer trainees, which will become line officers, and commissioned officer trainees, which will be the support officers.

**Q.** Okay. And were there any specific things or courses that you taught related to sort of diversity?

**A.** Sure. The Department of Defense has a zero tolerance policy for discrimination, and that was part of our job to not only train but to instill that anti-discriminatory attitude into our trainees. Either they got it and agreed to it or they were not going to stay with us very long.

**Q.** Okay. Did you take that training with you after you left the armed services?

**A.** Sure. Teaching it for 12 years, it becomes a part of you.

**Q.** Understood. You said 12 years doing that?

**A.** Correct. Three active duty and nine reserve.

**Q.**   Generally, what was sort of the purpose of the training that you were providing?

**A.**   Well, the entire scope of the training or just with respect to --

**Q.**   Well, we can discuss specifically, but for brevity purposes, the portion of training related to diversity within the Armed Forces.

**A.**   Again, you are explaining and instilling the Department of Defense's zero tolerance for discrimination policy.

**Q.**   Okay.  With that background in the military, I mean, would you say that you value organization and a healthy respect for authority?

**A.**   Certainly.

**Q.**   Yeah.  And that -- what about efficiency within government?  Do you have some training, or did you...

**A.**   Yes.

**Q.**   What kind of conduct or activity did you have?

**A.**   The last several years, I became what they called an ASO-21 implementator, if that's a word, where we would go and try to make government less difficult, more functional, more responsive.

**Q.**   Okay.  And specifically do you -- did you put that -- that service you provided to the Air Force, did you put that to use subsequent to your --

**A.** In my private businesses and in government, yes.

**Q.** So then after you left the service, what did you do next?

**A.** I -- when I transferred to the reserves, I began owning a series of aviation-related businesses, one of which I still have today. So I ran those businesses.

**Q.** And what are those? What type of businesses are those?

**A.** Currently, we have an aircraft parts business and an FAA certificated repair station where we do repairs and overhauls on certain pieces of equipment.

**Q.** And then eventually you got involved in politics, right?

**A.** I did.

**Q.** Tell me a little bit about that.

**A.** In 2003, I ran for a vacant congressional seat or a newly-created congressional seat. I was unsuccessful in that. But when I got back to my house in Galveston County, I became very involved in county politics.

**Q.** Okay. So what year did you move to Galveston County?

**A.** When I left active duty in '95.

**Q.** All right. And where did you move to?

**A.** League City.

**Q.** Are you still in the same location?

**A.** I'm still in League City. Not in the same location.

**Q.**   Okay.  All right.  So now I understand you became the party chair in the county, as well?

**A.**   I was a precinct chair.

**Q.**   Okay.  What year was that?

**A.**   That would have been probably 2008 to 2010.

**Q.**   Okay.  And then did you subsequently run for county judge?

**A.**   I did.

**Q.**   All right.  What year was that?

**A.**   They first asked me in 2006.  It was a logistical impossibility for me at that time.  I didn't.  They asked again in 2010, and I couldn't come up with a good reason.  So I said yes.

**Q.**   Okay.  And how did that election turn out?

**A.**   Well, I won 60/40.  So I guess it was pretty good.

**Q.**   At the time that you ran, how were you feeling about your chances?

**A.**   I had done an analysis on the numbers.  My first job was as a spacecraft analyst, and so I felt really comfortable analyzing numbers.  This nominee we had in 2006 was, honestly, not a great candidate, and he still did pretty well.  So I thought that in 2010, the numbers would be more favorable for the Republican nominee, and I was right.

**Q.**   Prior to the 2010 election, were you aware that the

Democrats had pretty heavily controlled Galveston County, for the judgeship anyway?

**A.**    At some point, I became aware of that.  I don't know exactly when that occurred.

**Q.**    So in the election of 2010, you were up against a healthy opponent?

**A.**    A well-financed opponent, long-time incumbent.  But we elected several countywide Republicans at that point.

**Q.**    And so you won?

**A.**    I did.

**Q.**    Congratulations.

**A.**    Thanks.  Most days.

**Q.**    Shortly after, I guess, taking office, you had to be involved in the redistricting effort.  Do you recall that?

**A.**    I do.

**Q.**    Okay.

**A.**    It was, unfortunately, one of the very first things I had to try to tackle.

**Q.**    And that would have been the redistricting effort in 2011?

**A.**    Correct.  Because I took office January 1st of 2011.

**Q.**    All right.  What was your understanding of redistricting at that time?

**A.**    Probably little more than what I was told.

**Q.**    Okay.

**A.**    I'm brand-new to the office, trying to figure out how the phone works and where the bathroom is.

**Q.**    So what did you do to sort of gain understanding of the redistricting process?

**A.**    We hired redistricting counsel.

**Q.**    Were there any guidelines or instructions sort of available to the county judges in connection with the redistricting effort that you could rely on?

**A.**    The Texas Association of Counties puts out some real general guidance, and then they really encourage you to hire redistricting lawyers beyond that.

**Q.**    Okay.  And so that's what you did?

**A.**    That's what we did.

**Q.**    At the time, what was the makeup of the Commissioners Court in terms of partisanship?

**A.**    That would have been three Republicans, two Democrats.

**Q.**    All right.  And so was the -- what was the first step you took towards redistricting?  Was it to obtain counsel?

**A.**    Yes.

**Q.**    Okay.  And who did you obtain or retain?

**A.**    I'm drawing a blank on Mr. Nixon's firm at that time but it was Mr. Nixon's firm, which I think is now gone, but I'm drawing a blank on the name of the firm.

**Q.**    I think it's Beirne --

**A.**    Beirne, Maynard & Parsons.  That sounds correct, yes.

**Q.** Okay. So 2011, the -- Galveston County retains counsel --

**A.** Correct.

**Q.** -- for the redistricting effort?

**A.** Right.

**Q.** Do you recall whether the county in 2011 sort of adopted any formal redistricting criteria?

**A.** We did not.

**Q.** Okay. And was there any particular reason why?

**A.** I am going to say that I did everything our lawyers told us to do. So they must have told us either don't do that or there is no reason to or something. So if they would have suggested it, I'm sure we would have done it.

**Q.** Okay. And I'm going to move through sort of the redistricting process by hitting the 2011 process without talking about it too much.

But there has been discussion about public meetings that were held in connection with the redistricting effort.

**A.** Right.

**Q.** And do you recall that there were, I think, five public meetings?

**A.** That sounds right.

**Q.** Let me ask you: Do you recall -- were those meetings held after you had maps in hand?

**A.**   Yes.   Certainly.

**Q.**   Okay.   And did the existence of the maps sort of help guide the meeting process, guide the public, give them something to see?

**A.**   Certainly.   Without maps, I'm not sure what we would have shown them to ask for their input on.   So, yes, we had maps and that was -- they were displayed at every meeting.

**Q.**   Okay.   Now, back in 2011, you may remember Texas was covered by Section 5; and we had to go through the preclearance process, right?

**A.**   Correct.

**Q.**   At which -- and do you remember how that was done in 2011?

**A.**   I was recently refreshed on that, and we sued the Department of Justice in order to accelerate the timeframe.   So that's -- it's been characterized they sued us.   That's not correct.   We sued the DOJ to get a faster turnaround from them.

**Q.**   And so -- and, also, I just need to sort of see if you remember that there were two different sets of redistricting efforts going on around the same time.   One of which related to the Galveston County Commissioners Court precinct map, right?

**A.**   Correct.

**Q.**   And the other related to JP's precincts within Galveston County?

**A.**   That's correct.

**Q.**   Do you recall that two separate preclearance letters were submitted to the Department of Justice, one for each of those maps?

**A.**   That sounds correct, yes.

**Q.**   Okay.  And then at the same time, the County filed a lawsuit in the District of Columbia to try to get judicial clearance on the County Commissioners map?

**A.**   The Commissioners map, correct.

**Q.**   All right.  So at the -- and, ultimately, do you remember the DOJ, the Department of Justice, you know, submitting a rejection letter denying preclearance?

**A.**   They did.

**Q.**   On both of the -- both of the maps, correct?

**A.**   Yes.  I'm, at this point, a little more familiar with the Commissioners because JPs were a little bit behind on that time schedule.

**Q.**   Okay.  The Department of Justice, at least on the Commissioners Court matter, did they fly down to Galveston County shortly after the letter was sent?

**A.**   They did.

**Q.**   Okay.  And what happened next?

**A.**   They asked for incredibly minor changes.  We agreed to

*Laura Wells, RPR, RMR, CRR, RDR*

them.  They gave us our clearance letter.

**Q.**  Do you remember how much time there was between sort of receiving the Department of Justice's denial letter and then coming down and actually getting the matter resolved?

**A.**  I don't recall the timeframe.

**Q.**  Do you feel like it was, remembering, a matter of days?

**A.**  It was very short.  It wasn't months, yes.

**Q.**  All right.  And then on -- in connection with the JP precincts, that matter actually ended up in a lawsuit.  Do you recall?

**A.**  Yeah.

**Q.**  And a full trial?

**A.**  Correct.

**Q.**  But, ultimately, what was the result on the JP?

**A.**  We were successful.

**Q.**  Successful in what way?

**A.**  Well, we won the lawsuit.  But, more importantly, we had nine Justices of the Peace, which is one more than the Constitution allows for.  So we were trying to reduce it down to a reasonable number, which we got and ended up with four.

**Q.**  All right.  So let's turn around and talk a little bit about the redistricting process in 2021.

Do you recall what was sort of the first step you

took, that the County took, to start the redistricting process?

**A.** It would have been the same as 2011, to hire an attorney or a firm to help us.

**Q.** Okay. And do you remember who it was that you went out to find or lawyers?

**A.** We ended up with Dale Oldham.

**Q.** Okay.

**A.** And the firm that he is associated with is a name that I'm not so sure I can pronounce.

**Q.** Holtzman and Vogel?

**A.** Holtzman and Vogel. There you go.

**Q.** Why was it you reached out to Mr. Oldham?

**A.** I had spent quite a bit of time with Mr. Oldham during the 2011. I was very impressed with his knowledge, his abilities, his knowledge of the Voting Rights Act, his knowledge of Galveston County.

When I called him and had our first phone call in 2020 probably, it's like he had instant recall and that we had just talked about Galveston County, you know, the day before.

**Q.** Do you remember exactly when it was that Mr. Oldham got involved in the 2011 process?

**A.** That was probably through Joe Nixon's firm. I don't -- I don't recall us contracting with him directly. I

think it was through Beirne Maynard.

Q.   Do you remember him helping assisting with preclearance?

A.   Oh, he did.  Very helpful.

Q.   And then helpful with the trial as well?

A.   Incredibly helpful.  He and the judge at that time got into this etherial discussion about the VRA.  I didn't even know what they were talking about.

Q.   None of us do.

MR. RUSSO:  Put up DX-43 quickly.

BY MR. RUSSO:

Q.   So this correspondence, DX-43, from Paul Ready to Mr. Oldham dated November 25th, 2020.

Do you see that?

A.   Yes.

Q.   So you had asked Mr. Ready to see if he could track down Dale in connection with the 2021 effort?

A.   Probably that is something I would have asked him to do.  Yes.

Q.   And do you recall giving specific instructions to find a particular lawyer, or was it find counsel because we need -- we're going to have redistricting?

A.   No.  I -- we interviewed a number of firms in 2011.  And some of them, honestly, didn't know what they were talking about.  So, no, we didn't want to just go find

anybody. I wanted to make sure we had somebody that knew what they were doing.

Q. So did you ask Paul to look to see if he could find Mr. Oldham?

A. Yes. Which I did not think would take too long.

Q. What about Mr. Nixon and Mr. Trainor?

A. They were both with the Federal Elections Commission and unavailable.

Q. All right.

A. But I may have talked to them and said, "Where is Dale Oldham these days?"

Q. You may have talked with them in 2021?

A. '20 or '21.

Q. Okay. Got it.

Okay. So this correspondence from November 2020 is consistent with your recollection of how the redistricting effort started?

A. It is.

Q. All right. Do you remember speaking to Mr. Oldham shortly thereafter in 2020?

A. I certainly spoke to him. Like I said, it was as if he had no loss of memory of Galveston County. I also remember him saying that he would do it for the same fee from the 2011; while that was far more involved, that he was very knowledgeable now about the county. So it would

be, you know, basically, the same fee for, he hoped, less work.

Q.   Okay.  At the time that you began the effort to retain counsel, did you have any idea sort of what the timeline was for release of census data that was upcoming and, you know, when the maps would need to be drawn?  What was your sense in terms of getting all this information?

A.   I would have assumed that we would have had to have maps adopted by the opening of the filing period in 2021.

Q.   Okay.  Well, what was that day?

A.   That's generally around the 20th of November.

Q.   All right.  So -- but you were looking to retain counsel back in 2021?

A.   Yes.

Q.   So why did you -- why did you look for counsel that early?

A.   I wouldn't say that that was that early.

Q.   Maybe that's the military inefficiency coming out in you.  But, yeah.

So you actually -- the County actually ended up retaining Mr. Oldham and the Holtzman Vogel firm in April of 2021.  Do you recall that?

A.   That sounds right.

Q.   Okay.  All right.  Now, did you consider at the time that you retained the Holtzman Vogel firm and Mr. Oldham

*Laura Wells, RPR, RMR, CRR, RDR*

to have public meetings at that point in April or shortly thereafter?

**A.** My assumption was that if the schedule mirrored the 2020 -- I'm sorry, the 2011 process, yes, we would have public hearings.

**Q.** And did Mr. Oldham provide you any sort of advice in connection with how those meetings might proceed?

**A.** I don't think we got to that point.

**Q.** All right. Well, why were meetings not held subsequent to April, June, July, and August? Do you know?

**A.** We wouldn't have anything to talk about. As we discussed in 2011, we had the proposed maps that people could look at and see. But here, we had nothing.

So to have a meeting and say we can't provide you any information, but let's have a meeting seems, again, not very helpful.

**Q.** And, in fact, what would happen is that, at least, COVID played a role in coming up with census data; is that correct?

**A.** Definitely. Everything far more difficult, yes.

**Q.** And so as it turns out, the census data release wouldn't -- the Census Bureau didn't release information until August of '21; is that right?

**A.** My understanding was they released information that wasn't terribly useful, and they cleaned it up in August

or September.

Q.   All right.  And so, again, going back to retaining counsel in April of '21 and then receiving data later in August or being released in August, why were no public meetings held between that period of time?

A.   As we have heard, we did not actually have any maps to show anyone until October 28th or 29th.  I can't remember exactly which date it was.

As I have recently looked at a calendar, I think that was a Friday.  And Monday would have been the 1st, and that's the day we got the notice from the Secretary of State that they had to have our maps to them by the 13th.

Q.   We'll get into all that.

My question was, really, looking at the period of time between April of when Mr. Oldham was retained and then late August when the data was released, why no meetings between that period of time?

A.   Oh, again, there is nothing to show.  We can't really -- all we could really say is the county has grown by this much in population.  That would be about it.

Q.   Now, eventually, the Census Bureau did release data, right?

A.   Correct.

Q.   And Mr. Oldham did obtain data, although it may not have been from the original census release.  It sounds

like you were aware of that, right?

**A.**   Yes.

**Q.**   Okay.  And then y'all had a meeting with Mr. Oldham after he had the data that he -- or was getting the data that he needed to start discussing what it was the County wanted in terms of map preparation, right?

**A.**   Right.

**Q.**   Do you remember when that meeting occurred, just on or about?

**A.**   Not specifically, no.

**Q.**   Okay.  Is September the 8th sort of consistent with your recollection of when that might have occurred?

**A.**   Of 2021?

**Q.**   2021.

**A.**   I would probably have talked to him before that, understanding he didn't have data to work with.

**Q.**   Okay.  Did the conversations -- prior to September 8th, what would the discussions have been?

**A.**   At some point -- and maybe it was in September.  I thought it was earlier than that -- I told him about my desire to have a coastal precinct.

**Q.**   Okay.  Well, let me put up -- put up JX-3.

        Okay.  So you mentioned the coastal precinct.  Was there -- the first time you thought of a coastal precinct idea in 2021?

**A.** It was from -- no. It was from feedback, actually, in 2011. And I think -- again, I'm brand-new, first year in office. I didn't quite appreciate how big a deal it would be.

But over the course of the years, it became far more obvious there are so many programs that only impact the coastline. And we deal with them so infrequently, it's hard to have two or three commissioners remain sharp on GOMESA and CPRA and these other programs that are very specific and just don't come up very often.

So I thought, from an efficiency standpoint, having one commissioner who could keep track of all that and then just tell us, you know, we have a GOMESA deposit. We can use it for a beach rake, and I recommend we do that.

**Q.** Do you remember seeing commentary in the --

**A.** Yes.

**Q.** -- *Galveston Daily News* --

**A.** Yes.

**Q.** -- dealing with that?

**A.** That article is exactly what it's saying --

**Q.** Okay.

**A.** -- to some degree.

MR. RUSSO: So, if you can, blow up the date on the article.

THE COURT: And y'all be careful about talking at

*Laura Wells, RPR, RMR, CRR, RDR*

the same time.

THE WITNESS:  Yes, sir.

**A.**  August 20-something, 2011.  29 maybe.

BY MR. RUSSO:

**Q.**  August 29th of 2011.  Do you remember seeing that?
I'm going to zoom in on a section of the article.

MR. RUSSO:  Actually, if you'll go to the next page and the third column down, that first paragraph on top.  Probably make it a little smaller maybe.  Let's take the -- get the whole paragraph that's up there.  There we go.  See if we can make it out.

BY MR. RUSSO:

**Q.**  The paragraph we're focusing on is under the title "Redistricting"?

**A.**  Right.

**Q.**  And it looks like the first sentence -- full sentence on that page, it says:  "For County Judge Mark Henry that was" --

**A.**  "Comments from" --

**Q.**  Yeah, "comments from Bolivar Peninsula residents..."

**A.**  I can't read that.

**Q.**  Hang on a second.

**A.**  "...that the four unincorporated communities on the peninsula have more in common with residents on Galveston Island and that any map should keep the island and Bolivar

in the same precinct."

**Q.**    Yeah.  Okay.  So we'll try it again.  So the sentence says:  "For County Judge Mark Henry, that was comments from Bolivar Peninsula residents who insist that the four unincorporated communities on the peninsula have more in common with residents on Galveston Island and that any map should keep the island and Bolivar in the same precinct."

Do you see that?

**A.**    Yes.

**Q.**    So did you see that was kind of -- sort of the expression that lead you to believe -- not led you to believe, but certainly consistent with your thought process on the coastal precinct idea?

**A.**    Certainly a starting point that just got reinforced over time.

**Q.**    All right.  Okay.  So you recall a meeting with Mr. Oldham, Commissioner Apffel, Paul Ready and -- regarding the initial sort of conversation about, you know, what was important to the county for 2021 redistricting?

**A.**    Yes.  I believe I said that.

**Q.**    And again, I think that meeting occurred on September the 8th of 2021.  Is that consistent with your recollection?

**A.**    Could have been.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** All right. Now, what -- what in that meeting did you tell Mr. Oldham was important to the county?

**A.** I essentially gave him criteria, not formally adopted criteria: Must be legally compliant; legally defensible; equalize the population; and then, all those things done, a coastal precinct.

**Q.** You talked a little bit about this. Again, what is the detail about the coastal precinct that you thought would make sense, or what are the similarities between what Bolivar experiences and what the City of Galveston experiences?

**A.** Seaweed; beach rakes; turtle-excluding devices; uncapped oil wells; GOMESA, which is a federal program; CPRA, which is a federal program; uncapped oil wells; beach access points; beach parking sticker program; and I'm probably forgetting a couple. But these are unique to the sand gulfward.

**Q.** And your thinking -- was it your thinking that having a single commissioner dealing with those similar issues along the coast made sense?

**A.** It -- it does. We would have an issue where we have money to do something, and the commissioner of Bolivar wants to spend it there and the commissioner of Galveston wants to spend it there. I thought if we have one commissioner, he can answer to his constituents; and he

will come to the Court with the request and the recommendation.

Q.   Okay.  And the County -- as I think I have been told, the County actually maintains the seawall in Galveston?

A.   The seawall structure is the County's, yes.

Q.   What about -- the County also manages several of the pocket beach parks, as well?

A.   We own them.  I believe they are managed by the Galveston Parks Board.

Q.   Understood.  Okay.  So do you recall any -- sort of Commissioner Apffel discussing with Mr. Oldham anything that he thought was important in the redistricting process during this meeting?

A.   I think he probably said he wanted to make sure he didn't have to move.  That seems like something he would have said.

Q.   Okay.  And then what about Mr. Oldham?  Did he -- did he express at that point here is sort of what my thinking is and here is how we're going to have to get from A to B?

A.   I don't recall that if he did.

Q.   Okay.  All right.  At the -- the initial meeting with Mr. Oldham, did you talk to him about use of demographic data or race data or consider changes made to the county based upon the racial makeup of the Galveston County?

A.   I would have expected, but that was his job to tell

me.  Not me to tell him.

Q.  Okay.  So did you provide him any specific instructions in terms of use of demographic data or not to use demographic data?

A.  Again, I would have expected that -- you know, my request for the single coastal precinct was really the only request I had other than be legally compliant.

Q.  All right.  Did anyone else, to your recollection, discuss with Mr. Oldham at that time or at that meeting the use of demographic or race data related to changing the maps or the redistricting process?

A.  I don't know anything about that.

Q.  All right.  At that meeting did you -- did y'all discuss what the next steps were in terms of what was he going to do next?

A.  I assumed -- and, in fact, I'm sure I told him make sure you get input from every commissioner.

Q.  Okay.  And that -- did you -- that included Commissioner Giusti?

A.  Yes.

Q.  And Commissioner Clark, who was alive at the time?

A.  Correct.

Q.  And Commissioner Holmes, as well?

A.  Correct.

Q.  Okay.  So your understanding was he was going to

collect information from each one of these commissioners?

**A.** Yeah. Commissioners often want a certain house or something, you know, park that's -- you know, they are fond of. I'm countywide. So I don't necessarily try to draw lines. It doesn't really matter. I represent the whole county. They kind of do. And so, I respect that and let them have that input.

**Q.** Were there any instructions provided by anyone during the first meeting that -- not to speak to certain commissioners?

**A.** No.

**Q.** Any instructions to, you know, put certain people's wishes over others?

**A.** No.

**Q.** Do you know whether Mr. Oldham actually did meet with these other commissioners --

**A.** I believe he did.

**Q.** -- in September?

**A.** I believe he did.

**Q.** Were all these -- to your knowledge, do you know were the meetings by phone call?

**A.** I do not know. I -- Linda would have scheduled them. So she probably would have known at that time, but I would not have known.

**Q.** Okay. I'm afraid I don't know if the record reflects

this.  The meeting on September 8th with you and Commissioner Apffel and Mr. Oldham, was that over the phone?

A.   I think it was, yes.

Q.   All right.  So were you -- do you recall being present at any of the other meetings that Mr. Oldham had with the commissioners?

A.   I believe that I was present for one with Commissioner Apffel.  I don't feel like I was there the entire time, because they would use my conference room regularly.  So being there, I would have probably stopped in and said hi to Commissioner Apffel and hi to Dale Oldham, and that would have been it.

Q.   Let's stick with the September timeframe.  And the record will reflect that -- the specific dates.

But was it -- is it your understanding, sitting here, that Mr. Oldham met with each of the commissioners by phone in September -- roughly, in the September period of time, shortly after you had the initial meeting with him?

A.   That sounds correct, yes.

Q.   Okay.  And is it your understanding that they -- I mean, it was the same kind of process that you went through, which is, you know, what would you like to see in your -- happening in the redistricting?

A.   Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** Did any of the commissioners tell you what they -- what they told Mr. Oldham early on in the process?

**A.** I don't believe so, no.

**Q.** Okay. Did Mr. Oldham tell you what the other commissioners said?

**A.** I don't think so. Again, it seems like maybe Commissioner Apffel wanted a street moved over to catch his house or something fairly minor like that, but that would be the extent of it.

**Q.** All right. So do you recall a period of time where Mr. Oldham returns or actually physically comes to Galveston County and, you know, presents maps?

**A.** I recall that happening. I don't recall exactly when it was.

**Q.** Okay. Let's see.

MR. RUSSO: May I get the timeline?

THE COURT: Yes.

BY MR. RUSSO:

**Q.** All right. I think the -- again, the Court record, when it's completed, will reflect that the meetings occurred on -- with you occurred on or about October the 18th?

**A.** Okay.

**Q.** Does that sound about right?

**A.** Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   And that meeting, was that the first time that Mr. Oldham actually sat down with you to review the maps?

**A.**   Probably, yes.

**Q.**   And was anyone else on the phone or was there a Zoom conference going on?

**A.**   I don't remember.

**Q.**   Do you remember an individual that was actually working with Mr. Oldham named Tom Bryan?

**A.**   I heard that name while we prepared for this.  I do not recall having heard that name before that.

**Q.**   Okay.  So you don't -- do you not remember having any meetings with Mr. Bryan being either on a Zoom call or --

**A.**   No.  To my knowledge, I had never met him or talked to him.

**Q.**   Okay.  So going back to the first meeting where you get a chance to see the maps that Mr. Oldham brought, what do those maps look like?

**A.**   They were pretty similar to the two that he ended up with, the Map 1 and the Map 2, if not exactly the same.  I don't know what changes he made.

         MR. RUSSO:  Your Honor, once more, I need to grab something from my bag.

         THE COURT:  Sure.  Go ahead.

      (Sotto voce discussion between counsel.)

         MR. RUSSO:  Okay.  Let me put up -- let's go to

*Laura Wells, RPR, RMR, CRR, RDR*

PX-197.  Scroll through that document.  Okay.

BY MR. RUSSO:

Q.  All right.  So this is one of the -- one of the maps that I believe Mr. Oldham may have brought with him that day, but I want to confirm with you.

This is the benchmark plan which -- that's titled "Benchmark Plan" which reflects what Galveston County's precincts looked like prior to the redistricting effort in 2021.

Does that look familiar to you?

A.  Yes.

Q.  Okay.

MR. RUSSO:  Next page.

BY MR. RUSSO:

Q.  And this is a map that is noted Draft Optimal D.  This map I believe Mr. Oldham may have brought with him and may have presented to you, but I'll ask you in a minute, with the coastal precinct on it.

Do you remember seeing this map?

A.  Is that similar to Map 1?

Q.  This would have been Map 2 eventually.

A.  Oh, Map 2.  I'm sorry.  Yes.

MR. RUSSO:  And then the next page.

BY MR. RUSSO:

Q.  Okay.  And this is the map which became -- actually

became Map 1 --

**A.**   Okay.

**Q.**   -- and it's titled "Draft Minimum Change Plan."

Do you remember seeing these maps in a meeting with Mr. Oldham?

**A.**   If these are the ones that he was working on, yes.

**Q.**   Okay.  And what was -- did Mr. Oldham explain to you sort of what the makeup of Map 1 and Map 2 were, how they were created, or anything like that?

**A.**   If he did, I don't remember it.

**Q.**   Do you remember him discussing with you that the map that became Map 2 -- Map 1 was a minimum change plan?

**A.**   I seem to recall him saying that, yes.

**Q.**   Did he tell you what he meant by that?

**A.**   No.  If he did, I don't remember it.  I just assumed that it's minimal changes from what we had.

**Q.**   Okay.  And did he tell you -- do you remember him telling you why he made some sort of minimal changes to your prior map?

**A.**   No.  I don't know.

**Q.**   Okay.  All right.  So what was your reaction to seeing these maps for the first time?

**A.**   One of the two showed a coastal precinct, which is what I was trying to lobby for.

**Q.**   Okay.  Did you have any thoughts about the draft

minimum change map?

**A.** Nothing in particular.

**Q.** Did you share any comments with him about it?

**A.** I don't recall.

**Q.** All right. Did you -- at the time that you met with Mr. Oldham and he presented the maps to you, did you have sort of a preference of a map that you preferred?

**A.** Sure. The one that had a single coastal precinct.

**Q.** Okay. And why was -- was Map 2 your preference? Was it just the coastal precinct area?

**A.** That's it.

**Q.** Do you recall you asked Mr. Oldham whether the maps complied with the law?

**A.** I'm sure I asked him that. I also asked him that to make sure that every commissioner stayed in their precinct, meaning they don't have to move, and are they legally defensible.

**Q.** All right. And what about sort of the politics end of it, the -- you know, the county makeup. Was that something that was concerning to you about the political result as a -- the map would achieve?

**A.** That was not a primary concern. I'm sure at some point he showed me what he expected the elections to produce, and that was fine as well. But that wasn't the initial -- that wasn't my primary driving force.

**Q.**    Okay.  Do you actually remember seeing the political results data, the expected data?

**A.**    He may have showed that to me toward the end.  So, yes, I may have -- I suspect I saw it, yes.

**Q.**    Okay.  Did that sort of develop any expectation one way or another as to how these maps would perform politically?

**A.**    Not necessarily for me.  I think it got some people interested in running as Republicans in the new Precinct 3.

**Q.**    All right.  And, you know, you are the Galveston County judge.  So are you -- are you aware of the sort of population in Galveston County in terms of politics?

**A.**    Based on 2022 numbers, it's approximately 66 percent Republican and 34 percent Democrat.

**Q.**    Did you ever discuss with Mr. Oldham the notion that, you know, drawing a sort of coastal map is going to change -- it changes the map that we had in place before significantly?

**A.**    Yes.  It would because it would make one precinct all on the coastline, yes.

**Q.**    And then the -- let me strike that.

        MR. RUSSO:  Okay.  Pull up PX-593.

BY MR. RUSSO:

**Q.**    And while he is doing that, let me -- in your

*Laura Wells, RPR, RMR, CRR, RDR*

consideration of what would ultimately become Map 2, if it ended up electing Republicans in all four precincts, it wouldn't hurt your feelings?

**A.**   That would not hurt my feelings.

MR. RUSSO:  The next page.  Keep going.  Next one.  Okay.  Right there.

BY MR. RUSSO:

**Q.**   Okay.  So this is an interrogatory response that I believe we have actually seen in the case before.  And it outlines some of the factors that defendants provided in response to considerations in developing the maps.

Have you seen this before today?

**A.**   Yes, I have.

**Q.**   I just want to ask you quickly.  Are these consistent with your understanding of what the County's thoughts were in terms of redistricting criteria were?

**A.**   Compliance with...(reading)

**Q.**   Factor 1 states, you know, "Compliance with requirements under the Fourteenth Amendment."

That is consistent with your understanding of we need to comply with the law, correct?

**A.**   Absolutely.

**Q.**   And number two, "Commissioners Court considered..." --

MR. RUSSO:  Next page.

BY MR. RUSSO:

**Q.**    -- "...the unified representation of Galveston Island and the Bolivar Peninsula."

    Is that -- what does that refer to?

**A.**    I think that refers to my hope that we could have a single commissioner representing the coastline.

**Q.**    And then this third factor was the compactness of the Commissioners Court precincts.

**A.**    Right.

**Q.**    Do you see that?

**A.**    Right.

**Q.**    It goes on to say the commissioners wanted sort of geographically compact precincts --

**A.**    Correct.

**Q.**    -- right?

**A.**    Yes.

**Q.**    Is that consistent with what you wanted to see happen to the -- in the development of the new maps?

**A.**    Yes.

**Q.**    Okay.  And then fourth is, you know, minimizing splits in voting precincts.

    Was that important?

**A.**    Yes.

**Q.**    Okay.  And then the fifth factor is the commissioners wanted a precinct that would include their residence, which makes some sense, right?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Right.

**Q.**   Okay.  And then the last factor is the commissioners wanted to consider the partisan composition of their districts.

Do you see that?

**A.**   Correct.

**Q.**   And so those six things, is that -- you know, the list there sort of consistent with what you understood the County was using sort of as criteria, so to speak --

**A.**   Yes.

**Q.**   -- in development of these plans?

**A.**   Yes.  I would call this criteria.  That's exactly what was sent -- or what was used.

**Q.**   Okay.  Now, in the development of -- in your meetings with Mr. Oldham, do you recall him sort of bringing up or mentioning that the idea or notion that old Precinct 3 may be a sort of a race -- have a problem with it because it's a racial gerrymandering?

Do you ever remember him mentioning that to you?

**A.**   In 2021, I don't recall.  I think I would have probably known that.  In 2011, I think he did talk about that.

**Q.**   Do you know why he thought that or believed that to be the case?

**A.**   No, I don't.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   Did you have any understanding of, you know, what that meant?

**A.**   Only what they -- what the lawyers would tell me.

**Q.**   Okay.  Well -- and was -- what did they tell you about it?

**A.**   Going back to 2011, they said we had to make our best effort to keep it a majority-minority precinct.

**Q.**   All right.  And did they ever discuss with you -- or Mr. Oldham discuss with you the idea that we may not be able to keep Precinct 3 as it is if it's a racial gerrymander?

**A.**   He -- right.  He was concerned about that in 2011, because I told him the growth in the county is overwhelmingly in the north, Friendswood and League City.  It's overwhelming Anglo, and it's overwhelmingly Republican.

**Q.**   Okay.  All right.  So Mr. Oldham and you have a meeting on the 18th of October, right?

**A.**   That sounds right.

**Q.**   What happened?  What happened next?  Do you know whether he met with all the other commissioners?

**A.**   He was instructed to, and I assume he did.

**Q.**   Okay.  Were you made aware that that actually happened?

**A.**   I believe so.  I certainly should have heard if it

*Laura Wells, RPR, RMR, CRR, RDR*

didn't happen.

Q.   Okay.  The expectation was that he was going to meet individually with each commissioner, right?

A.   Yes.

Q.   And show them the maps and, you know, go through the process of making changes as necessary --

A.   Yes.

Q.   -- right?

Did you subsequently hear about any sort of changes that were being made to the maps by the commissioners?

A.   Not that I recall, no.

Q.   All right.  What was your -- do you know when Mr. Oldham completed his effort of speaking with all the commissioners?

A.   No, I don't.

Q.   Okay.

MR. RUSSO:  Let me pull up JX-23.

BY MR. RUSSO:

Q.   Okay.  These are -- these are notes which we have seen here before, Commissioner Holmes' notes.

MR. RUSSO:  Let's see.  Can you make that smaller.  Okay.  Go to the next page.  Next.  And just let's go to the next page.  Okay.

BY MR. RUSSO:

Q.   So on the top of this document -- this is Bates number

Holmes 000184 for reference.

At the top of it, there is a date, October 19th, 2021. Do you see that?

**A.**   Yes.

**Q.**   And Commissioner Holmes writes:  "Meeting with Dale Oldham and Paul Ready.  My office.  9:00 a.m."

Do you see that?

**A.**   Yes.

**Q.**   Is that consistent with what you understood Mr. Oldham was going to be doing after meeting with you is meeting with other commissioners?

**A.**   Yes.  That's what he should have been doing.

**Q.**   And so it appears that Mr. -- Commissioner Holmes had a meeting with Dale -- Mr. Oldham on the 19th of October?

**A.**   Yes.

**Q.**   We'll be looking through the discussion; but they are discussing, it looks like, a couple of maps, the same maps you saw the day before?

**A.**   Yes.

**Q.**   All right.  Now, did you attend this meeting?

**A.**   No.

**Q.**   Okay.  Did you -- did you -- were you made aware of the results or conversation in the meeting?

**A.**   Not that I recall, no.

**Q.**   All right.  Okay.  And then right below that is

*Laura Wells, RPR, RMR, CRR, RDR*

another -- another set of notes.  This one is dated 10-22 of '21.  Do you see that?

**A.**  Yes.

**Q.**  And this meeting note reflects a Zoom meeting with Jed Webb, Joe Giusti, Paul Ready, Zack Davidson, Dale Oldham and demographer.

Do you see that?

**A.**  Yes.

**Q.**  And I think Commissioner Holmes stated earlier that he was attending this meeting on the ferry.

So this was a Zoom meeting conducted by Mr. Oldham as of October 22nd with, again, the parties represented.

Is that, again, sort of consistent with what you expected Mr. Oldham was going to be doing in connection with his redistricting efforts?

**A.**  Yes.

**Q.**  And what was that exactly?  Do you know?  What was Mr. Oldham tasked to do in this effort in talking to the commissioners?  What was he supposed to do?

**A.**  To get their input.  They are a member of this legislative body.  I mean, I would have liked to have had a 5:0 vote on the map.  So I would like all of them to have input into it.

THE COURT:  Is this a good time for an afternoon break, Mr. Russo?

MR. RUSSO:  As good as any.

THE COURT:  We have been going about two hours since lunch.  Let's start back at around 3:00.

CASE MANAGER:  All rise.

(Recess from 2:47 p.m. to 3:01 p.m.)

THE COURT:  Thank you.  You can resume your seats.

You may proceed, Mr. Russo.

MR. RUSSO:  Thank you, Your Honor.

BY MR. RUSSO:

Q.  So we looked a moment ago at a note on a Zoom conference from October 22nd, 2021.

Do you know when -- at what point Mr. Oldham completed his meetings with the commissioners?

A.  No.  Not exactly.

Q.  But, again, if the record shows it's around October 22nd he's back to doing his map work, is that consistent with your understanding of how things were going on the process?

A.  Yes.  That would be consistent.

Q.  Now, as of October 22nd, did you -- what was your expectation as to what was happening -- going to happen next in terms of your involvement with the process?

A.  My expectation was that he would produce us the maps either in their final version or their next-to final

version, if there is any changes that had to be made; but that we would have a final version within a week or so.

**Q.** So do you remember -- again, after the time that Mr. Oldham had met with all the commissioners and you -- sort of being made aware of what conversations were happening, what was occurring within these meetings with other commissioners?

**A.** No. I don't think -- I would not have known what was going on in those individual meetings, just that they are occurring.

**Q.** Do you recall occasionally walking in on a meeting here or there when a meeting is going on?

**A.** The only one I remember is the one where Commissioner Apffel was using our conference room.

**Q.** Okay. And in that meeting, did you hear anything really of substance related to the conversation?

**A.** No.

**Q.** Okay. So after -- is it fair to say, then, that the -- your involvement was minimal, at best, in terms of what Mr. Oldham was telling commissioners or what they were -- what the commissioners were telling Mr. Oldham in connection with gathering information?

**A.** Yes. I would have had --

MS. KLEIN: Objection, Your Honor. Leading.

THE COURT: I'll overrule it.

*Laura Wells, RPR, RMR, CRR, RDR*

**A.** Yes. I would have had no input or expected input or input back to me. Again, I'm countywide. I don't want to say I don't care where lines are. I do. But it's far more important to the commissioners.

BY MR. RUSSO:

**Q.** Just so we understand each other on that point, you are elected countywide, true?

**A.** Correct.

**Q.** And so, again, the general makeup of the county in 2021 and even today is fairly highly Republican, correct?

**A.** It is.

**Q.** And so the truth is in terms of your electability, you're really not at any sort of danger in terms of the Republican Party, correct?

**A.** Not in a general election. My vulnerability would be in a primary election.

**Q.** Okay. So, then, to a certain degree, the redistricting effort of the precincts, you don't -- you don't really have a huge role in terms of the partisanship as it relates to you maintaining your seat?

**A.** Not at all.

**Q.** So was there -- do you recall, after Mr. Oldham is done with his gathering information and then talking to the commissioners, showing them maps, do you recall any discussion at that point about having sort of public

meetings or setting up public meetings in connection with the maps?

**A.**   We had every intention of doing that, but we could not do that until we had the final maps that Mr. Oldham was going to draw.

**Q.**   Okay.  And so as of October 22nd when, again, we know that he has had a Zoom meeting with Commissioner Giusti and Commissioner Holmes, the maps weren't final at that point?

**A.**   That's my understanding, yes.

**Q.**   Okay.  But he was going to return and provide final maps to the county at some point in the future?

**A.**   Yes.

**Q.**   And did -- did that happen?

**A.**   It apparently happened around October 29th.

**Q.**   Okay.

        MR. RUSSO:  So let me -- let's pull up JX-29.

BY MR. RUSSO:

**Q.**   Okay.  And we'll talk about the exhibit in a second, but I want to go into the process of receiving the maps.

        Prior to receiving the maps in October of -- on October 29th, 2021, do you remember there being any concern that the maps weren't being provided or delivered quickly enough?

**A.**   Yes.  I thought it was taking longer than it should.

*Laura Wells, RPR, RMR, CRR, RDR*

And, again, I'm operating under the belief that we really have to have them adopted by about November 20th.  And so for us to have time to post -- make sure we have a quorum and post and have the public meetings, we needed them in our hands.

**Q.**   What effort did you undertake or your staff undertake to get the maps back to the county prior to October 29th?

**A.**   Well, I think there is an e-mail from Tyler Drummond to Mr. Oldham saying, "Where are our maps?  We need them."

**Q.**   Okay.  Let me see if I can find that.

        MR. RUSSO:  So let's pull up DX-98.

BY MR. RUSSO:

**Q.**   Okay.  And this may be the e-mail you are referring to.

**A.**   Yes.

**Q.**   It's dated October the 28th, 2021, from Tyler Drummond to Dale Oldham, Jay Torchinsky with the -- they're two lawyers from the Holtzman Vogel firm.

        Do you see that?

**A.**   Yes.

**Q.**   So is this the e-mail you were talking about?

**A.**   Yes.

**Q.**   So then as of --

        MR. RUSSO:  Pull up the top portion, if you could.

BY MR. RUSSO:

**Q.** All right. So on the 28th, Tyler sends an e-mail to Mr. Oldham basically saying, Hey, where are the final maps, right?

Is this consistent with your recollection as to, you know, what was going on behind the scenes in terms of getting the maps back to the County?

**A.** Yes.

**Q.** Was -- do you recall, was this done at your direction or was something else going on at the time?

**A.** I doubt that I told him to send an e-mail. He is really good about staying on top of projects. That's what he is referencing here.

I had given him an expected deadline, and he is following up saying we're past our deadline on this project.

**Q.** Right. And so -- and I wanted to point out. The second sentence in the blown-up e-mail states: "We're past our deadline on this project where we originally wanted to have a special meeting tomorrow to discuss and possibly adopt."

Do you -- are you aware of any sort of effort at this time or thought on behalf of the commissioners or, as the county judge, that as soon as the maps were coming back, they were going to be adopted?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.** No. I think what he is saying here is that in our timeline that we were hoping for, we would have had to have posted the meeting three days prior to this e-mail; and that's having final maps in our hand. So I think he's just making the point we're behind where we are supposed to be.

**Q.** Right. Okay. All right. And so -- and we discussed -- you mentioned that you think the maps were received on October 29th --

**A.** That's what I think, yes.

**Q.** -- the next day?

All right. And then did you provide your staff any direction as to what was supposed to happen once the maps were -- the final maps were received?

**A.** I would have told them as soon as you get them, put them up on a website where people can see them and make it easy to provide comment.

**Q.** Okay. And did the thought or notion, I guess, to put -- you know, collect information from the website, did that come from you or from your staff or from Mr. Oldham? What was -- how did that develop?

**A.** It was either my idea or I agreed to it. I don't recall.

**Q.** Okay. Specifically, what -- what was the instruction? How were we going to use the website in terms of getting

public information?

**A.**    That -- it's to make it easy for people to provide feedback on the maps that they see, to provide a link or something, some kind of system so they can give us feedback on the maps.

**Q.**    Okay.  And did your staff develop that?

**A.**    Yes.

**Q.**    And was there indeed a sort of website and comment place where people could comment on the maps?

**A.**    Yes.

**Q.**    Okay.  And do you know how long it took to turn the maps around from receipt to actual posting on the web?

**A.**    I think it was four hours.

**Q.**    So, to your recollection, they were posted the same day?

**A.**    Yes.

**Q.**    Okay.  And do you know whether the comment capability was opened at that point?

**A.**    I believe it was, yes.  We got more comments on those maps than anything else we have ever posted.

**Q.**    Did you also -- were the maps posted anywhere else?  Were they posted -- I think I have seen a Facebook post here or there.  Are you aware of that?

**A.**    No.

**Q.**    All right.  Okay.  So October 29, you got the maps

in-house, they're posted on the website?

**A.**    Yes.

**Q.**    What is the -- your thought process in terms of having a public meeting, multiple public meetings to get this thing moving up to adoption?  What is the plan at that point?

**A.**    I -- again, we have not received guidance from the Secretary of State yet moving up what I thought my timeline was.  I would have suggested we have at least one meeting where we show everybody and then see what kind of feedback we get and what kind of participation we get.  We never really seem to know.

**Q.**    Okay.

**A.**    So if we get participation and we have time, we could have another public meeting and still be well within the timeline that I thought we were working under.

**Q.**    All right.  And, generally speaking, your timeline was, you're thinking, hey, if we get this done by November 20th, we should be okay?

**A.**    Right.

**Q.**    All right.  And then did you subsequently receive the notice from the Secretary of State that November 20th is not going to work?

**A.**    On Monday the 1st.

**Q.**    Okay.  And let me show you JX-33.

*Laura Wells, RPR, RMR, CRR, RDR*

And so I want to focus on the bottom portion of this -- this document.

MR. RUSSO:  If you can pull out the "from" and the "to" and everything down at the bottom.

BY MR. RUSSO:

Q.   Okay.  What -- this document -- the date of this e-mail, the string anyway, is Tuesday, November 2nd, 2021. Do you see that?

A.   Yes.

Q.   Is this something that you remember receiving specifically?

A.   Yes, I did.

Q.   Okay.  And it's -- the subject line says:  "Mass E-Mail Advisory (County Judges - 326)."

A.   Right.

Q.   Okay.  So -- and it goes on:  "Dear County Judges. Our office has released the following advisory."  And the advisory subject is "Impact of Redistricting on Certain Election Deadlines and Procedures."

And I think that is actually -- there is a link attached to it.

A.   Right.

Q.   Is this the advisory that you were referring to?

A.   Yes.  I thought it came on the 1st.  Apparently, it came on the 2nd.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** Okay. And we'll look at the advisory. I think it was actually dated the 1st, but it looks like it was sent out to county judges on November 2nd.

**A.** Okay.

**Q.** Is that consistent with your recollection?

**A.** Yes.

**Q.** Okay. And, specifically, do you remember what the advisory was?

**A.** That they had to have the maps to them by the 13th.

MR. RUSSO: Let me see if I can find -- does that have an extra page -- a second page to it? No. Pull up JX-34. *Voila.*

BY MR. RUSSO:

**Q.** So this is, it looks like, an election advisory from the Secretary of State's office.

Is this the advisory that you recall being attached to that notice?

**A.** It looks correct, yes.

MR. RUSSO: And specifically, go to the next page, please.

BY MR. RUSSO:

**Q.** So the last -- the last sentence in the first paragraph is of particular importance to you. It states: "Therefore, each County Commissioners Court must order any necessary changes to the county commissioner precinct

lines in light of 2020 Census figures no later than November 13th, 2021, the first day of the candidate-filing period for the primary election."

Do you see that?

A.   Yes.

Q.   So, again, in your -- what -- what does that mean to you as a county judge receiving this on November 2nd?

A.   That means that we have to have adopted a map and have it to them by the 13th.

Q.   And, again, that's at least a week prior to what the date that you wanted to get it done?

A.   Correct.

Q.   And the November 20th date that you had in your mind, was that a hard set date, or was that a date that you thought if we get it done by then, we can live with it?

A.   No.  I just assumed that we would have to have it before the first day of filing for the primaries, which is generally the last week or so of November.  I don't recall it having been as early as November 13th before.

Q.   So, nevertheless, you received your maps on October 29th.  You think you had a little bit more time to have meetings, but then you get notice that you have got at least a week less than you thought?

A.   Correct.

Q.   All right.  Now, how does that change -- change your

*Laura Wells, RPR, RMR, CRR, RDR*

planning in terms of public meetings, notice to the public and actually and ultimately getting the map adopted?

**A.**   It accelerates it dramatically.  Now we don't have much time to work with.  We don't have enough time to post two meetings unless they were back-to-back, which is hard to do.

But, regardless, then our next challenge came in trying to get a quorum.  As you have heard, we had a hard time getting -- and I really wanted to have all the commissioners there, but I have to have at least three of them.

**Q.**   And the reason for that is what?

**A.**   I guess they were traveling.  I don't recall.

**Q.**   But in terms of needing a quorum?

**A.**   Well, we have to have a quorum to vote on a map. So -- or to hold a public meeting with three commissioners there.  We just couldn't get them together.  I think the 9th was the first possibility; and when that didn't work out, then it became the 12th.

**Q.**   And during this time, was the website open and able to receive comments from the public?

**A.**   To my knowledge, yes.

**Q.**   Did you talk to counsel at all about what might be needed or what you could do, given the situation you are in?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.** With regard to the shortened deadline?

**Q.** Yes.

**A.** I doubt that I did because I don't know what he could have done for us.  The Secretary of State was crystal clear in their direction.

**Q.** "Crystal clear" meaning?

**A.** You must have the maps to us by November 13th.

**Q.** Okay.  So did you feel like at that time -- what did you feel like your options were in terms of having a public meeting, looking at the collection of comments, you know --

**A.** Well, on the 2nd, which was an election day, we would not have had time to post a meeting for any day that week.  So we've already lost that week.  Now we're trying to get a quorum at least, and preferably all five members of the court, together the week after that.

**Q.** And so did you -- what did you -- what was the plan for use of the comments that you were receiving through the web?

**A.** To get the feedback.  And I assumed that we would present that at the meeting we can have or meetings that we have, if we are able to have more than one.

**Q.** All right.  And did you actually review any of the comments as they were coming in?

**A.** As they were coming in, no.  I would have a staff

member compile them and show them to me from time to time.

Q. Okay. And, you know, again, during this time period, in between receiving the notice on November the 2nd and the deadline of November 13th, did you talk to any of the commissioners about needing to -- having one meeting, two meetings? Was there any discussion in the background in relation to what the plan would be?

A. Not for me. Linda would have been trying to coordinate their schedules and trying to find a time when they were all available.

Q. As I recall, y'all set a meeting for some period of time, noticed a meeting for November 9th. Do you remember that?

A. I do.

Q. Okay. Do you know why that meeting date fell through?

A. I do not recall. I seem to think that it was a conflict with the -- with the building; but, no, I don't recall for sure.

Q. But, ultimately, y'all fell back on reviewing the comments from the public?

A. We did.

Q. What was it that made you feel like that was sort of an appropriate thing to do, given the circumstance?

A. It was about the only option we had. So it seemed to have gotten spread pretty widely. Again, we received more

comments and feedback than any other thing we had ever done.  So it seemed to be pretty well done.

Q.   Did you have a plan for how you might organize the comments and how you might deal with them, how you might review them?  What was your thought process?

A.   Not really.  I mean -- not really a plan for how to review them.  We were just taking input and seeing, you know, what the consensus seems to be.

Q.   Do you remember whether the Republican -- Galveston County Republican Party did they post the maps up on the -- Facebook or a website?

A.   I believe they put out some kind of effort.  I don't recall what it was, but I think they did something, yes.

Q.   Do you remember "Keep the County Red"?

A.   That sounds familiar, yes.

Q.   All right.  So, ultimately, the -- what was the -- do you remember the date of the meeting that y'all noticed and actually approved the plan?

A.   We finally got everyone there on November 12th.

Q.   All right.  And let me back up a little bit because there is the -- I wanted to cover an issue of a letter received by the County on October 29th, 2021, from, I think, the League of Women Voters.

Do you remember seeing that correspondence?

A.   It's been a while.  I don't recall what it said.

**Q.** Okay. Let me see if I can find a copy of that.

MR. RUSSO: Pull up JX-37.

BY MR. RUSSO:

**Q.** So the attached e-mail to this is dated November 4th, from Tyler Drummond to Commissioner Holmes; and I think he is forwarding the letter from the Texas League of Women Voters. There is --

MR. RUSSO: What is the next page?

BY MR. RUSSO:

**Q.** Yeah. That's the letter. Actually, we saw it earlier today.

**A.** All right.

**Q.** Do you remember receiving this letter?

**A.** I don't. I'm sure I did, but I don't remember receiving it.

**Q.** Do you remember reviewing it?

**A.** Not specifically, no.

**Q.** Did you know -- do you know what happened as a result of the letter, what was done with it?

**A.** Probably nothing.

**Q.** Did you forward it to counsel?

**A.** I suspect I would have had done that, yes, because -- yes. Not -- right. Yes, I would have.

**Q.** Do you recall any discussion between you and your counsel related to dealing with this correspondence?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**    I do not.

**Q.**    All right.  So, again, moving forward to the meeting on November 12th.

How did you set the location for that meeting?

**A.**    All special meetings for the last number of years, probably five or six, have been at the North County Annex.

**Q.**    And when did that start?  When did you start having meetings at the North County Annex?

**A.**    We started having them probably in 2012.  I was concerned about if a hurricane were to damage this building down here, what is our back-up plan for Commissioners Court.  So I started trying to have alternate locations around the county.

**Q.**    The building you are referring to is the one on 21st Street?

**A.**    The one on the Island is on 21st Street, yes.

**Q.**    Was that the only reason why you started using the county annex for meetings?

**A.**    That was my initial reason.  The commissioners all seemed to prefer it, from a distance standpoint, after that.  So it was fine that we had it there as long as we had the audiovisual we needed and we could record it as required by state law.

**Q.**    Distance meaning it's closer to where they are functioning every day in residence --

**A.**  Yes.

**Q.**  -- and business?

**A.**  Yes.

**Q.**  Is that something that the commissioners expressed to you?

**A.**  Yes, it is.

**Q.**  And so did you feel -- so the commissioners actually appreciated using the annex building?

**A.**  Oh, absolutely.  Commissioner -- I think it was -- Apffel even talked during public comment period one time about how, you know, it's much more convenient.  There's more things he is doing up there than on the Island.  So, he said that in public commentary.

**Q.**  How did the growth of the population of the county and the areas in which the growth was occurring impact the decision to continue using the League City Annex?

**A.**  Well, that's where the significant amount of growth is, like I said, League City and Friendswood; and that's right where it is, in League City.

**Q.**  The thought being that the more residents that are up there, it makes sense to have some meetings off the Island?

**A.**  Certainly.

**Q.**  And so is it -- is it -- how did you decide which meetings would be held at the League City Annex?

**A.**   This occurred over the course of many years, many years ago.  But the regular Commissioners Court must be held in the county seat.  So that's the first regular agenda of the month.  So that is still held in the county seat as required by the Constitution.  All others are held in League City.

**Q.**   How frequent are the regular meetings?

**A.**   Once a month.

**Q.**   But I understand that you also had -- you had meetings every other week, right?

**A.**   So anything that is not the first of the month would be a special session.

**Q.**   Okay.  So it is then -- is it -- was it the occurrence, generally speaking, that the meetings every other month were at the League City location?

**A.**   Every other week, yes.

**Q.**   Because those were special -- special sessions?

**A.**   Again, yes.  Anything that's not the first of the month is a special session.  But we have more than just that.  We'll have payroll-only special meetings.  We'll have -- if we have a contract that we desperately have to renew and we missed a deadline or something, we'll have a special session just to renew those.  So we'll have, I don't know, in addition to the 26, we'll have another 10 to 15 during the year.

**Q.** And the meeting that fell on the 12th was a special session, as well?

**A.** Yes.

**Q.** It fell on a Friday?

**A.** Yes.

**Q.** All right. And as it turns out, that was the last day that was available for the commissioners to meet and the last day prior to having the maps due to the State?

**A.** As I recall, that was the -- the date that we could get all the commissioners there.

**Q.** So the time that you set this special session in League City, what did -- what was your -- did you have any thought as to sort of the amount of people that you expected to show up in this meeting?

**A.** No. I would have no way of knowing.

**Q.** Did you think it would be heavily attended, lightly attended, moderately?

**A.** I wish I could know those things in advance. It would make life much easier; but, no, we have just no way of knowing.

**Q.** Did anyone suggest to you that maybe the League City Annex is not the right location because it's not big enough?

**A.** No.

**Q.** All right. How many people typically are at a

Commissioners Court meeting?

**A.**   Excluding staff, eight or ten.

**Q.**   So at the time, is it true that -- or did you believe that at the time that you set the meeting at the League City Annex you weren't really going to have an issue with the public participation?

**A.**   We had never before had an attendance problem in Calder, meaning we have never been able to not accommodate everybody in the courtroom.

**Q.**   And had -- let's just say when your commissioners suggested we may have a large turnout, why don't you move this meeting, what would you have done with that?

**A.**   If they had -- if someone had said, you know, it's an organized effort and we're going to have 100 people there, we could have had it at Walter Hall Park right down the road, a huge indoor, air-conditioned pavilion.

**Q.**   So at the time that the League City Annex was used, was it your intention to limit the participation of the public?

**A.**   No.  Of course not.

**Q.**   Did you use the League City Annex because you thought the parking was bad?

**A.**   No.  I'm sorry.  I didn't understand that one.

**Q.**   Did you purposely set the meeting in the League City Annex knowing that the parking was bad or an issue?

**A.**   No.

**Q.**   What about the microphones were or were not working?

**A.**   I did not know that.  We expect IT to have things set up for us.  So we did not know that until we got there.

**Q.**   Did you go into the meeting, the November 12th meeting, thinking this is our usual process and let's use that?

**A.**   Yes.

**Q.**   Have you ever had a situation where a commissioner suggested maybe we should use a different location and actually done it?

**A.**   I don't recall any commissioner ever asking this, other than the typical alternates that we use, to use anything else.

**Q.**   Is it possible, though, for that to happen?

**A.**   Oh, easily, yes.

**Q.**   The League City Annex, what is the setup there in terms of space?  How many seats are there in that location -- or were there in that location?

**A.**   At that time, I think we could seat 60 to 70.  We had -- we had meetings in there on a regular basis.  It was never full before that day.

**Q.**   Is there also an overflow room next to the main room?

**A.**   Yes.  The break room right next to it served as an overflow room.

**Q.**    And are you aware of whether or not that overflow room has access to stream the meeting?

**A.**    It has.  We used it extensively during the COVID nonsense, but, yes, it has.

**Q.**    Are you -- do you know whether or not this meeting -- November 12th meeting was actually streamed?

**A.**    No.  I do not know.

**Q.**    Are they -- do you know whether meetings are typically streamed?

**A.**    Yes.  They should all be streamed.

**Q.**    And is that something that's happened since you were county judge?

**A.**    I believe so, yes, only because the technology made it a lot easier.  We have been through at least two or three systems now, and they get better with each generation of being able to stream.

The very first generation, I think we were limited to 25 or 30 users being able to log in at one time; and now it's unlimited.

**Q.**    And use of streaming is one of the methods of being -- having sort of the open government and providing citizens access to the meeting without actually attending?

**A.**    Correct.

**Q.**    Okay.  So at the November 12th meeting, were you surprised at the attendance?

**A.**    Yes.

**Q.**    The amount of attendance?

**A.**    Yes.

**Q.**    Did it catch you off-guard?

**A.**    A little bit.

**Q.**    But you still had county government to conduct?

**A.**    We do.  That's correct.

**Q.**    There has been some talk during the trial about how you handled disruption in the courtroom during the meeting.

**A.**    Right.

**Q.**    So what is your feeling on, you know, conducting the meeting and, you know, talking to the public about how they -- the noise they make?

**A.**    We want them there, but they have to make it quiet enough that we can conduct our business.  It's actually a criminal statute that says you can't interrupt a public meeting.  We get trained on this every time I go to county judge training.

So we want them there, but they have to be at a tone and a level that everybody can be heard.  So if a lot of noise is being made, they are not going to be able to hear the person that wants to address the Court during public comment period.

**Q.**    You also refer to the constables being there?

**A.**   Yes.

**Q.**   Why were the constables there?

**A.**   They are always there.  Just like any other court, we have to have some kind of bailiff.  Hardly ever used, but they have to be there.

**Q.**   Not often used, but you have constables at every meeting, right?

**A.**   Yes.  Or a sheriff.  One of the two.

**Q.**   This meeting was no exception?

**A.**   That is correct.

**Q.**   And so one of the reasons -- one of the reasons that you need people to sort of be quiet, particularly in a meeting location that doesn't have microphones, is so that both the Commissioners Court can hear and the public can hear?

**A.**   Correct.

**Q.**   Do you recall anyone ever warning you to expect a large turnout at this event?

**A.**   No.

**Q.**   During the meeting are you -- citizens spoke to the Commissioners Court?

**A.**   Yes.

**Q.**   And there wasn't -- there was no comments, back-and-forth commentary between the Commissioners Court and the people speaking.  Do you recall that?

**A.**   There generally isn't.  We ask for public comment.  We receive the input.  But there is generally not a specific question that we can answer.  During the public comment portion, we are not allowed to.  During discussion of the map, we could have.

**Q.**   All right.  So it's not uncommon to not necessarily respond to the public comment by the commissioners?

**A.**   We are kind of trained that -- don't do that because it could be a violation of the Open Meetings Act.  So be very careful if you are corresponding -- or if you are having dialogue back and forth, that you are limiting it to a noticed topic on the agenda.

**Q.**   Are you aware of any person who wanted to speak at the meeting, that attended the meeting, that didn't have the opportunity to do that?

**A.**   No.

**Q.**   And at the meeting, there were people seated both in the room, correct, and people in the hallway --

**A.**   Yes.

**Q.**   -- right?

     People in the overflow room?

**A.**   Yes.

**Q.**   To your knowledge, was anyone prevented from putting their name on the list to speak?

**A.**   Just the opposite.  You didn't have to put your name

on the list. We prefer it because it goes in the permanent record of the County. You don't have to put your name on there. I will call anyone who didn't sign up who wants to speak.

And then I have my assistant, Linda, going through the hall saying, "Is there anyone here who wants to speak who hasn't spoken yet?"

**Q.** So -- and how much time -- was there a time limit for each speaker?

**A.** We generally limit it to three minutes per speaker.

**Q.** And was that done in the November 12th meeting, as well?

**A.** Yes. Although, we're fairly soft on the three-minute limit.

**Q.** Did you allow people to speak beyond the three minutes?

**A.** I'm sure I did. I usually do.

**Q.** Did you allow people to speak who weren't on the list?

**A.** Absolutely.

**Q.** Did you ask whether there was anyone left in the room who wanted to speak after the list was completed?

**A.** That's -- yes. That's the last thing I do. Anyone else who wants to speak who didn't sign up or who hasn't had a chance.

**Q.** And during the meeting, many of the people that were

in attendance spoke against both Map 1 and Map 2 --

**A.**   Yes.

**Q.**   -- do you recall that?

**A.**   Yes.

**Q.**   Would you say that's -- most of the comments were that, right?

**A.**   I don't recall the breakout now.  There were many people that said we should just start all over again.

**Q.**   Really, there was no advocacy for either one of the maps for most of the speakers.  Would you agree with that?

**A.**   That, I don't recall.  I would have to go back and watch the video again.

**Q.**   Prior to attending -- going -- attending the meeting, did you have an opportunity to review the comments that y'all had collected?

**A.**   Yes.

**Q.**   And what did you glean from those?

**A.**   I read it into the record at the end of the meeting. As I recall, it was 2:1, favoring Map 2 over Map 1.

**Q.**   Okay.  And Map 2 -- or Map 2 was the coastal precinct map?

**A.**   Correct.

**Q.**   And Map 1 was the minimum change?

**A.**   Right.

**Q.**   Now, do you recall at the end of the meeting

Commissioner Holmes spoke?

**A.**   Yes.

**Q.**   And prior to his talk, did he ever tell you that he had his own maps?

**A.**   No.

**Q.**   Do you know -- to your knowledge, did he ever tell any of the commissioners that he had his own maps?

**A.**   To my knowledge, no, he never did.

**Q.**   Did he ever suggest to you that I have some maps that might work for the county; let's consider those?

**A.**   No.

**Q.**   Do you know whether he did that with any of the other commissioners?

**A.**   I don't know.

**Q.**   But as far as you can testify, the first time you ever heard about or knew about Commissioner Holmes' maps was when he pulled them out at the hearing on November 12th?

**A.**   That is the first time I knew of the existence of those maps, yes.

**Q.**   And going back to the conversations with Dale Oldham, did you provide him any instructions as to whether he was to make himself accessible to the commissioners if they had changes during the process?

**A.**   He should have known that.  And I'm sure I made it very clear that, yes, this is a commissioner involvement,

yes.

**Q.** Did you issue any instructions that Mr. Oldham was not supposed to speak with any of your commissioners?

**A.** No.

**Q.** So as far as you are aware, Mr. Oldham was both accessible and willing to assist commissioners with changes to the maps?

**A.** Yes. And I expect I would have heard if there was a problem from any commissioner not being able to communicate with Mr. Oldham.

**Q.** Did Commissioner Holmes ever discuss with you whether you might have voted for Map 1?

**A.** No.

**Q.** Did he ever discuss with you whether you might vote for Map 2?

**A.** No.

**Q.** Are you aware of any advocacy at all?

**A.** None.

**Q.** When was it that you decided to vote for -- actually vote for Map 2?

**A.** I assume it was after I made the motion to approve Map 2.

**Q.** Well, do you assume or do you -- I mean, I get it that time has passed.

**A.** Well, I had my -- I wanted my coastal precinct. I

thought that was more efficient.  But I went in there willing to listen to everybody.

If I had had the public or commissioners say, "Look, you are missing this on Map 1; this is a much better plan," I was open to that.

**Q.**   Did you consider the comments made --

**A.**   Yes.

**Q.**   -- at the meeting?

**A.**   Sure.

**Q.**   And was it your understanding or your thought process that while we had to come out of the meeting with a map, it could have been either Map 1 or it could have been Map 2?

**A.**   We had either of those as an option, yes.

**Q.**   And no one moved to add additional maps to the consideration --

**A.**   No.

**Q.**   -- right?

Why, ultimately, did you vote for Map 2?

**A.**   I believe it will bring the efficiency that I hoped it would, having a coastal precinct.

**Q.**   Had you given any consideration to whether you believed you might have adopted Map 1 had the public pushed for it?

**A.**   Certainly.  If I had gotten the -- if the responses

had been the opposite, if it had been 2:1 for Map 1 over Map 2, that would have been very hard to move along.

Q.   Okay.  And what about the discussion that was actually ongoing during the meeting?  Do you think that could have changed your mind?

A.   Sure.  I mean, I wanted to hear a reason and argument as to why Map 1 would be a better map.  That's what I wanted to hear from folks.

Q.   Well, did you ever -- I mean, you thought about whether -- if Commissioner Holmes had asked you to consider Map 1, would you have?

A.   If Commissioner Holmes had asked me to consider Map 1?  I would have a hard time telling him no.  He has never asked me for a thing in 12 years.

Q.   But did he ask?

A.   He did not ask.

Q.   Did y'all get the maps submitted to the State of Texas timely?

A.   We did.

Q.   At the time that you voted for Map 2, was it your intention to discriminate against either Commissioner Holmes or the public in any way?

A.   No.

Q.   Up until the voting and after, had you given much consideration to the racial breakdown within any of the

precincts in either Map 1 or Map 2?

**A.**   That's -- going off of the information that Dale Oldham told us that we would comply with the Voting Rights Act and everything we were required to comply with, I would not have considered it beyond that.

**Q.**   In adopting Map 2, was it your belief that the County was complying with the law?

**A.**   Yes.  Absolutely.

**Q.**   Did you consider, in voting for Map 2 or considering voting for Map 1, the political performance of either of those maps?

**A.**   It was a secondary, at best, consideration.

**Q.**   Did you -- did you know whether -- at the time, do you recall knowing whether Map 1 potentially could have elected Commissioner Holmes?

**A.**   I do not remember that at that time, no.

**Q.**   All right.  What is your -- how long have you known Commissioner Holmes?

**A.**   For the 12 years I have been in office.

**Q.**   How would you describe y'all's relationship, your relationship?

**A.**   I think that both of us agree on putting employees first and taking care of the aging population.

**Q.**   Would you say that y'all are close outside of the working relationship that you have?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Not particularly.  But no reason for that.

**Q.**   Do you have a -- sort of a personal relationship with any of the commissioners on the Court?

**A.**   Not really.

**Q.**   Is there any particular reason for that?

**A.**   There is.

**Q.**   You like your personal space?

**A.**   That, and I have to occasionally be not friendly when I think they are making a bad policy decision.

**Q.**   Well, let me ask you this:  I mean, how would you -- would you say that you and Commissioner Holmes agree on most of the issues that are in front of Commissioners Court?

**A.**   Absolutely.

**Q.**   What percentage of the time, if you can provide an estimate, do you think the two of you vote together?

**A.**   I bet it's 90.  He is the second most fiscally conservative guy on the Commissioners Court.

**Q.**   Would you want to get rid of somebody with that view?

**A.**   No.

**Q.**   Who is the most conservative, fiscally conservative?

**A.**   Me.

**Q.**   And he is second?

**A.**   He absolutely is.

**Q.**   I want to talk to you about some of the things that

the County has done under you that may be community related.

First of all, are you -- there has been conversation about the County allowing the LULAC organization to use county facilities on an annual basis?

**A.** Yes.

**Q.** And are you -- is it your understanding, your personal understanding, that the LULAC organization actually uses that to attract people to the voting -- the polls on occasion?

**A.** As long as they are not doing something illegal, I don't really care what the use of it is. They are authorized to do it.

**Q.** And, also, the County, while you were running it, bumped the federal -- bumped the indigent level up to 100 percent of the federal poverty line, right?

**A.** The qualification for indigent healthcare, yes, we took it from 26 percent of FPL to 100 percent of FPL.

**Q.** And did you vote for that measure?

**A.** I think I made the motion, yes.

**Q.** Do you know who seconded it?

**A.** No. That's been five or six years ago now.

**Q.** As you recall, was it unanimous?

**A.** I'm pretty sure it was, yes.

**Q.** The County also assists, in its indigent care system,

the Coastal Health and Wellness Center.  Are you aware of that?

**A.**   Yes.

**Q.**   And that's one of the facilities that this indigent care issue sort of affects?

**A.**   They are the front-line providers, yes.

**Q.**   And the idea is the more people who fall under the poverty line, the more people that are considered indigent, the more people that can use the facilities, true?

**A.**   Correct.  Correct.  So raising it from 26 to 100 increases the number of people eligible for that service.

**Q.**   And does the County also, I think, spend money with the Rosenberg Library to open up libraries throughout the county to all of its citizens?

**A.**   We give $550,000 a year, I believe, to the entire library system in the county.  And, yes, we have an expectation that it's open to everyone.

**Q.**   I want to turn and take a look at sort of the criminal justice system for a minute.

     What has the County done over the past six years to improve its systems of magistration and bail setting?

**A.**   I would like to think we're a leader in the state.  We complied with what is now called Senate Bill 6 long before Bill 6 was even a draft.

*Laura Wells, RPR, RMR, CRR, RDR*

We have made -- we have tried to have a shift in the mentality of if you are a nonviolent offender, you are not coming in to jail, let's figure out how, either through your personal recognizance or a very affordable bond -- we actually ask them, "What can you afford for bond?"

So we do everything we can to get them either not in or in and out as quickly as possible for nonviolent offenders.

Q.   And did the County undertake that, you know, beginning to revamp the process of bail and magistration on its own?

A.   At least six years ago, yes.

Q.   How often are magistrations done within Galveston County?

A.   They are now done twice a day.  Once in the morning and once in the evening.

Q.   So, effectively, anyone who is arrested gets magistrated within 12 hours?

A.   That's correct.

Q.   Do you know what the magistration rate processes are for most locations?

A.   You mean other counties?

Q.   Other counties.

A.   No.  I don't know that.

Q.   Okay.  But the County is doing it twice every day?

A.   We are doing it twice a day, correct.

**Q.**   How does that affect actual arrestees in terms of being able to post bail or get out of jail earlier?

**A.**   Well, we know statistically that if you are incarcerated for two or three days, you are likely going to lose your job.  It's going to be a hardship on your family.  So that's exactly what we're trying to avoid.

Get you processed.  Give you a court date.  Get you out as quickly and as painlessly as possible.

**Q.**   What about the County's efforts on -- to the mental health court?  Tell me about that.

**A.**   We stood up our mental health court.  This is for people who are having mental health issues.  They are -- the jail is the worst place in the world for them to go.  They need to go to a provider and get mental health treatment.  So that court gets them out of the jail specifically and into a treatment program.

We just partnered with the State to -- we're going to open up our very first extended observation unit.  Again, I think we're kind of leading the state in mental health services.  And it's a national problem.  It's not just Galveston County.

**Q.**   And, I mean, the idea is to increase facilities at which people who need the mental -- need treatment can get it?

**A.**   They need treatment; not a jail cell.

**Q.**   And is that -- those efforts -- is that costing the County additional money?

**A.**   Yes, for sure.

**Q.**   But, nevertheless, the County is sort of being -- I wouldn't say an innovator.  But you consider yourself out front in terms of dealing with that issue?

**A.**   Dr. Bonnen, who is the House District Representative for 24, called us a thought leader.  So I'll use his words.

**Q.**   And there has been some discussion about Galveston County's decision to assist with -- assist peace officers down at the border?

**A.**   Yes.

**Q.**   You are aware of that, right?

**A.**   Yes.

**Q.**   And the measure in terms of providing assistance to those officers, did you vote for that?

**A.**   I did.

**Q.**   Why did you vote for it?

**A.**   The State asked us to help in a number of different ways.  We are an extension of the State.  So when the State asks, if it's something we can do, we're going to do it to the best of our ability.

**Q.**   As of today, is that program costing the County anything?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**    No.

**Q.**    How does it work?  What is happening?

**A.**    You mean from the finance end or --

**Q.**    Well, from the personnel.  Who is going down there?
Explain the process.

**A.**    We have a deputy constable, Jimmy Fullen, who does the
scheduling.  He gets people who are available to go down
there.  He coordinates housing.

We don't have to pay for housing anymore.  The rangers
beg us to stay in their houses.  So it costs us nothing
for that end.  Plus, the Lone Star grant pays for
everything else.

But we will have anywhere from six to eight deputies
at a time.  They are attached to Kinney County, who has a
full-time sheriff's office staff of six.  So when we go
down there, we double their sheriffs or their peace
officers.

**Q.**    Have those peace officers expressed some gratitude for
having the assistance?

**A.**    Yes.  The Kinney County commissioner -- sheriff and
county judge have both called me and seen me at
conferences and said thank you so much.

**Q.**    There was discussion -- some discussion about a vote
taken to actually send funds down to the border.  Did that
actually happen?

**A.**   No, it did not.

**Q.**   There was also an issue brought up about -- earlier in our case about the statue that's out in front of the courthouse on 21st Street.

You are aware that a group brought to Commissioners Court the issue of whether or not to remove that statue?

**A.**   I am.

**Q.**   And what actually happened with the vote, the conversation and the vote on that measure?

**A.**   The -- there was a request that they remove it, to which I responded, "Okay.  Where are we going to take it to?  We have no other place to put it."

And then the focus really became the plaque.  So we removed the plaque and put it in the museum.

**Q.**   And why move the -- why remove the plaque?

**A.**   From the feedback I got, that was the most offense part of it.  The statue is a nondescript, enlisted guy from the Confederacy.  I mean, so he is not even an actual real person.

So they said the plaque was the more offensive part.  So, at my direction, they just took it down and put it in the museum.

**Q.**   What is your thought on sort of not removing the statue itself?  Why not?

**A.**   Well, it's a part of history.  Again, we also have no

place to put it.

**Q.** What about voter access to polls? Is that something you take seriously?

**A.** Of course. Although, that is really the county clerk's responsibility, but we certainly want to make sure everyone can vote anywhere they want.

**Q.** Are you personally aware of any person who has lodged a complaint with the County about wanting to vote but not being able to?

**A.** No.

**Q.** Personally?

**A.** No.

**Q.** In the last ten years?

**A.** No.

**Q.** I understand that the polls have poll watchers at some of the polls. What do those people do? Do you know?

**A.** Poll watchers are authorized for candidates. That doesn't mean that the County doesn't provide them. The County -- it depends on what kind of an election it is -- either provides the judges; or if it's the primary election, it would be the parties providing them.

But as far as an actual poll watcher, that's something a candidate would probably have to pay for.

**Q.** Are you aware of -- any sort of any measure put in place by a governmental entity in Galveston County that's

*Laura Wells, RPR, RMR, CRR, RDR*

sort of made it more difficult to vote?

**A.** No. We made it easier to vote. You can now vote at any location in the county. You don't have to go to your precinct.

**Q.** Have you spoken to citizens who believe that's a great method of voting?

**A.** We got compliments when we implemented it early on. It's been in place for ten years now.

**Q.** What about the process of becoming a candidate in Galveston County? Is that -- the process hidden or restricted --

**A.** It's --

**Q.** -- in any way?

**A.** No. It's a party-driven process. You would apply it to whatever party you are going to want to get a nomination from, and they generally have a filing fee. You have to pay them.

**Q.** Is that an open process whether you are a minority, as well?

**A.** Yes. The parties would not have the ability to restrict someone who -- they shouldn't or they wouldn't.

**Q.** From your perspective, does sort of a candidate's party generally mean more to voters in Galveston County than the race of the candidate?

**A.** In many cases, yes.

**Q.** Are you -- do you consider the voting locations to be accessible, very accessible to Galveston County voters?

**A.** Yes. Again, considering you can vote anywhere in the county. You don't have to go anywhere near your house.

**Q.** And in voting for Map 2, was it your intention to remove Commissioner Holmes from the Commissioners Court?

**A.** No.

**Q.** Do you -- do you have any -- do you -- I was going to ask you: Do you believe that Commissioner Holmes could actually win in Precinct 3?

**A.** If he switched parties, yes.

**Q.** Why do you say that?

**A.** A number of candidates have done that. They have been elected one party and switched to the other party. So, I mean, it's not -- he wouldn't be the first.

He is the incumbent. Yeah. I assume he has campaign funds available. I mean, so, he would probably start off as a front-runner.

MR. RUSSO: I pass the witness, Your Honor.

THE COURT: Okay.

MS. KLEIN: Good afternoon, Your Honor. Hilary Klein for the NAACP and the LULAC plaintiffs.

**CROSS-EXAMINATION**

BY MS. KLEIN:

**Q.** Good afternoon, Judge Henry. We met in your

*Laura Wells, RPR, RMR, CRR, RDR*

deposition in January.  I think you might remember.

**A.**   I do.

**Q.**   Judge Henry, I would like to begin today by showing you a video.  This is a video.  It's the demonstrative -- part of the demonstrative that we showed at the beginning of the trial.  And that's -- it's from PX-129, but it's just a section.

We'll be playing about two and a half minutes.  I would like you to watch.

**A.**   Okay.

MR. RUSSO:  Your Honor, can I approach the podium and get that water?

THE COURT:  Yes.

(Excerpt of demonstrative video played of PX-129.)

BY MS. KLEIN:

**Q.**   So, Judge, we heard -- Judge Henry, we heard two comments there; and I'm going to ask you about them in turn.

The first speaker was asking you to form a committee and, quote, "redo the maps and make it inclusive."

Did you hear that?

**A.**   I did.

**Q.**   Sitting here today in this courtroom, about a year and a half after the events on that video, you have not since that moment publicly announced any such effort to go back

to the drawing board to even revise the maps or to make the process more inclusive, have you?

**A.**   No.

**Q.**   You know that doing that would be possible, right, because in 2013 you did go back and redraw JP/Constable districts, didn't you?

**A.**   We redistricted JPs and Constables in 2013, yes.

**Q.**   That was after the *Shelby* decision, correct?

**A.**   I do not recall the timing of the *Shelby* decision.

**Q.**   And you know now, because of the -- the plaintiffs' experts have shown in this case and produced documentation to your counsel, you know now that it is, in fact, possible to get your coastal precinct -- to actually get, I think you said, four criteria.  You said legally compliant, legally defensible, equal population, and coastal precinct.

We have, in fact, shown that it is possible to get all of those criteria and to preserve a majority-minority district; isn't that right?

**A.**   I wasn't here for that testimony.

**Q.**   But you are aware that plaintiffs have produced expert reports in this matter, aren't you?

**A.**   No, I don't think I am.

**Q.**   So you haven't asked your lawyers about keeping up with this matter and what the plaintiffs are saying they

think was wrong with the maps in the process?

MR. RUSSO:  Your Honor, I'm going to object to that line of questioning.  It's invading attorney-client privilege.

THE COURT:  Yes.  Watch the invasion of the privilege, Ms. Klein.

MS. KLEIN:  Sure.

BY MS. KLEIN:

**Q.**  Have you as a general matter -- strike it.  We'll move on.

The second comment asked how much taxpayer funds were going to be spent on the lawsuit.

Did you hear that part?

**A.**  I did.

**Q.**  So I heard you say -- I heard you say before with Mr. Russo that you are the most fiscally conservative member of the Commissioners Court, and Commissioner Holmes follows you as second, right?

**A.**  I would agree with that.

**Q.**  And if I remember correctly, and I was impressed by this in the deposition, you've actually cut taxes every year for the past 12 years in Galveston County, correct?

**A.**  Correct.

**Q.**  But going back to this lawsuit, if I saw correctly on the agenda for May of this year, the Commissioners Court,

you actually approved the transfer of about $1.5 million to cover the cost of this litigation. That's correct?

**A.** That seems correct.

**Q.** So fair to say you are prioritizing keeping the enacted plan that is in place, not exploring other options, and you are prioritizing that over other fiscal considerations related to that decision?

**A.** We adopted a map which has now been used in elections. I do not know of a process. I mean, I have -- we have not explored the idea of going in and doing another round of redistricting.

**Q.** Even though that's what you did in 2013 with the JPs?

**A.** My recollection is we did commissioners in 2011 and JPs in 2013.

**Q.** And you did JPs after there was a 2012 election, correct?

**A.** Yes. But as a separate issue from commissioners.

**Q.** I would like to talk a little bit about your background and your political career.

You have never received an endorsement from any leader from Galveston's Black and Latino community during any of your campaigns for County Judge, correct?

**A.** Not to my knowledge.

**Q.** You have sought endorsements from other groups, correct?

**A.**    A few.

**Q.**    That includes the League City and the Texas City Police Officers Associations, correct?

**A.**    Yes.

**Q.**    You hold a fall festival every year, I remember --

**A.**    Yes.

**Q.**    -- for constituents?

Where is that held?

**A.**    Walter Hall Park.

**Q.**    What part of the county is that in?

**A.**    North.

**Q.**    And that's in the League City area, right?

**A.**    Correct.

**Q.**    And that's a predominantly White area of the City, correct?

**A.**    The park doesn't have residents, but League City is probably predominantly White.

**Q.**    As far as interacting with your constituents, you use a Facebook account to post information for the public, right?

**A.**    Yes.

**Q.**    And on that, among other things, you post about public holidays, correct?

**A.**    Yes.

**Q.**    And we went over this in your deposition.  You post,

you know, Memorial Day, 4th of July, right?

**A.**   Correct.

**Q.**   Veterans Day?

**A.**   Correct.

**Q.**   Martin King Day?

**A.**   Correct.

**Q.**   But when we looked in your deposition, you had not posted about Juneteenth; is that correct?

**A.**   Correct.

**Q.**   And I -- that came up in your deposition.  So I actually went back and looked before we would be speaking together today to what you had done in 2023.

And would it surprise you -- well, I guess you'll know because it's your Facebook.  You, again, once again, did not post any kind of celebration or acknowledgment of the Juneteenth holiday in 2023?

**A.**   I don't actually personally make those posts.  That's staff.

**Q.**   It is your picture on that Facebook page, correct?

**A.**   Sure.

**Q.**   And it is your public facing Facebook page, correct?

**A.**   That someone else maintains.

**Q.**   And you did not direct the person who maintains that after we spoke in January?

**A.**   I absolutely did.  I asked him why; and he said, "It

was a new holiday.  We just missed it.  Everything else is on autopilot."

So, believe me, I'll have a discussion with him again.

Q.   And leading up to the holiday, it's a big holiday for Galveston, right?

A.   What's that?

Q.   It's a big holiday for Galveston?

A.   Yes.  Absolutely.

Q.   And leading up to it, you didn't make sure it got done, did you?

A.   I relied on my staff.  That's correct.

Q.   As county judge, you are the presiding officer of the Commissioners Court?

A.   Yes.

Q.   So as we just discussed, you supervise your staff to execute your duties as the county judge?

A.   Yes.

Q.   And just to go down the responsibilities of your office, your office is responsible and you are responsible for scheduling the Commissioners Court meetings, correct?

A.   Correct.

Q.   You prepare the agendas for those meetings?

A.   Dianna does.  My office does.  I don't personally.

Q.   And your office provides notice of those meetings, correct?

**A.** Yes.

**Q.** And you generally take responsibility for running those meetings, correct?

**A.** Yes.

**Q.** Every Commissioners Court meeting has a set of agenda items. You call it the backup; is that right?

**A.** No. An agenda item would have backup associated with it. Those are two separate things.

**Q.** Thank you.

So you have an agenda that's released, and with it there is this backup of materials associated with the agenda?

**A.** Yes.

**Q.** And as a general matter, I remember you saying every agenda item should have a backup if that's possible. Is that still your practice?

**A.** Should, if it's possible.

**Q.** As for when Commissioners Court meetings occur, you talked a little bit about that with your counsel. Just to refresh our memories a bit, Commissioners Court meets about every other week, right?

**A.** It meets at least every other week, yes.

**Q.** And that includes regular meetings. That's the first Monday of every month?

**A.** The first full agenda of the month. So it's possible

that the first meeting of the month is a payroll only that lasts less than one minute.  But the first full agenda of the month.

**Q.**   That's on Monday morning?

**A.**   Yes, ma'am.

**Q.**   And then you like to have your special meetings also on Monday morning every other week from that, correct?

**A.**   They are special meetings; but they are not the only special meetings, yes.

**Q.**   So you regularly do like to have some special meeting in the two weeks after your regular meeting with the full agenda, correct?

**A.**   Correct.  Because we have to approve payroll every two weeks.

**Q.**   And your -- you like to hold them on Monday meetings consistently -- Monday mornings consistently those special meetings so that members of the public can plan ahead and know that they can show up on that Monday morning meeting, correct?

**A.**   Yes.

**Q.**   Your office decides the time and location of those meetings?

**A.**   We got some direction from the County auditor saying that because of transferring payroll, that Monday was the best day.  So it wouldn't be my preference, but it

*Laura Wells, RPR, RMR, CRR, RDR*

complies with what the auditor wanted.  So we agreed to Monday mornings.

**Q.**   In recent years, you have been holding those meetings at the Calder -- those special meetings at the Calder Annex in League City, correct?

**A.**   Yes.

**Q.**   Technically, you could hold those meetings anywhere?

**A.**   That is correct.

**Q.**   It's only the regular meetings that are bound to one place?

**A.**   Not necessarily one place, but the county seat.

**Q.**   The county seat.

So you could hold the special meetings at the county seat, correct?

**A.**   Yes.

**Q.**   There is nothing stopping you from using that bigger space?

**A.**   No.

**Q.**   And as you talked about with your counsel, the Calder City Annex is significantly smaller than the county seat; isn't that right?

**A.**   It was then.  It's not now.

**Q.**   They built a new space?

**A.**   Yes.

**Q.**   Now I'm remembering.

So the space, for example, in November of 2021 was a smaller space than the county seat?

**A.**   Yes.

**Q.**   So going back to your role as county judge, at times, you have to ask your staff to get information on your behalf; isn't that right?

**A.**   Sure.

**Q.**   And that includes your chief of staff, Tyler Drummond?

**A.**   Yes.

**Q.**   Would that also include the general counsel, Paul Ready?

**A.**   Yes.

**Q.**   You agree, don't you, though, that you are not really supposed to give direction to Paul Ready without the entire Commissioners Court having voted, correct?

**A.**   That's not entirely correct.

**Q.**   Tell me how that's not entirely correct.

**A.**   It's been a while since I read our agreement with Mr. Ready, but I do have some autonomy with certain issues because there is a time sensitivity to it.  We wouldn't have time to notice a meeting and get it ready together and vote on something.

So I'm not clear on the specifics, but there are some things that I can direct without having a vote of the commissioners.

Q.   Let's look at what -- I asked you a similar question in your deposition.

MS. KLEIN:  I would like to pull that up to see, if we can.  This is page 30 of your deposition at lines 12 to 9.  Let's see if we can pull that up.

BY MS. KLEIN:

Q.   And I said:

"QUESTION:  Is there any broad category that the general counsel can do for you that any commissioner can ask but it doesn't require, you know, a vote, per se?"

And you answered:

"ANSWER:  Short of just getting some kind of information, not really.  Because if you're -- if you're going past getting information, it seems to me you are giving direction, and direction would have to come from a majority of the Court."

So I would like to talk about the 2011 redistricting process that you talked about with your counsel a bit.  We talked a little bit about engaging -- you talked a little bit about engaging redistricting counsel in 2011.

As far as you recall, the engagement agreement was included in the backup for the meeting when Commissioners Court voted to hire those counsel, correct?

A.   I don't remember.

Q.   I'm going to see if I can refresh your recollection

*Laura Wells, RPR, RMR, CRR, RDR*

with a document.

**A.** Okay.

MS. KLEIN: Let's pull up an e-mail from 2020 from your general counsel, Paul Ready.

BY MS. KLEIN:

**Q.** All right. So here you see an e-mail. Oh, it's not from Paul Ready. Excuse me. It's from Harvey Bazaman.

Can you make it clear for the Court who that person is?

**A.** At that time, he was the County's -- I guess it would be general counsel equivalent.

**Q.** And he is saying --

MS. KLEIN: I'm sorry. I don't think this is the correct document. Document 6. There we go.

BY MS. KLEIN:

**Q.** This an e-mail from Paul Ready dated November 25th, 2020, and it is to Dale Oldham and it has a couple of attachments to it.

And if you look at that second paragraph in the e-mail, "I have attached a slightly modified version of the County's standard outside counsel agreement. I have also attached the 2010 engagement between BMP and the County for reference."

Do you understand BMP to be Mr. Nixon's former firm?

**A.** Correct.

MS. KLEIN:  If we scroll down to the second attachment that he is referring to, it says -- let's stop there up at "Agenda Item Number 12."

BY MS. KLEIN:

Q.   Why would that have an "Agenda Item Number 12" before it on that attachment?

A.   I don't know.

Q.   I asked you about this in your deposition, and we can go look at that, as well.

But do you remember --

MS. KLEIN:  Maybe we could pull up your deposition at page 72 and line 22.

BY MS. KLEIN:

Q.   I said -- and I note to you, as I just did right now, the first page says:  "Addendum:  Agenda Item 12.  Do you recognize what that might mean?"

And you say:  "That's generally what would come before the backup.  So the agenda item would have been number 12 and this would have been probably the backup for that item for any commissioner to look at or any public member as well."

A.   Okay.

Q.   Does that still make sense to you today?

A.   Yes.

Q.   In 2011, you worked with Mr. Nixon and Mr. Oldham, I

heard.  Am I right?

**A.**    Yes.

**Q.**    So if I refer to those as your 2011 redistricting counsel, will you understand what I'm saying?

**A.**    Yes.

**Q.**    So your 2011 redistricting counsel submitted a letter to the Department of Justice asking for preclearance for the Commissioners Court plan; is that correct?

**A.**    That sounds right.

**Q.**    I'd like to pull up that letter and ask you a few questions about it.  JX-45.  And here, let's just confirm that this is the preclearance letter.  It's dated October 14th, 2011, and it is addressed to the Department of Justice.

        And if we go -- and the topic of the letter is: "Submission under Section 5, Voting Rights Act of 2011 redistricting of commissioner precincts for Galveston County, Texas, and request for expedited consideration."

        Do you recognize this as that preclearance letter?

**A.**    Yes.

**Q.**    And if we go to page 9 of the letter, we're going to see a heading "Publicity and Participation."  So let's start with the second paragraph.

        The second paragraph says:  "At a Commissioners Court meeting held on August 2, 2011, the County's redistricting

consultants presented a preliminary demographic report showing the results of the 2010 Census."

Q.   You attended this meeting, correct?

A.   I'm sure I did.

Q.   And then at the end, the last sentence of this says: "At this meeting, the Court was also presented with two preliminary redistricting proposals for commissioner precincts and accepted public comment."

You were there for this portion of that meeting, correct?

A.   I'm sure I was.

Q.   And "preliminary redistricting proposal," fair to say that's the maps, the draft maps?

A.   I would think so.

Q.   So before -- below that, we have a chart.  And there lists five separate meetings.

Fair to say these are five separate meetings in August in the evening time?

A.   Yes.

Q.   Fair to say that they are in various locations across the county?

A.   Yes.

Q.   And they were scheduled in the evening so that folks who were working during the day would be able to come and provide public comment on those draft maps, correct?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**    Possibly.

**Q.**    And you were also in all of these meetings?

**A.**    Yes.

**Q.**    And if we go back to the page under Bullet 2, it says: "A copy of the notice of public hearings and agendas of the Commissioners Court meetings at which the redistricting plans were discussed and/or adopted are attached as Exhibit H."

So the notices of the public hearings they attached as Exhibit H.  I would like to go to Exhibit H now.

And here is a public notice that it's referring to. And I see here that if this were posted as a public notice, we see there are hearings scheduled for both the August 15th but also over a week later on August 23rd.

Do you see that?

**A.**    Yes.

**Q.**    So if this notice were provided to the public, fair to say they would have at least more than one week notice for at least one of those meetings, correct?

**A.**    I don't know when the letter was -- when this was published.  Yes.  I mean, I guess.

**Q.**    So if this were published before August 15th, when that first meeting was going to happen, fair to say folks would have had over a week -- I mean, several days for several of these meetings before they would have an

opportunity to provide public comment, right?

A.    Yes.

            MS. KLEIN:   Let's go to page 67.   This is PDF page 67.

BY MS. KLEIN:

Q.    This is another attachment to the preclearance letter your lawyer submitted in 2011.

      Do you recognize these as the signatures of folks who signed up to speak at those meetings?

A.    It could be.   It looks right.

Q.    And it looks like we have them for all of the meetings.   I heard you say earlier that it is your practice in meetings to let people speak even if they haven't shown up, correct?

A.    Correct.

Q.    Or signed up.   Excuse me.

A.    Right.

Q.    So fair to say that even more folks might have spoken than we see on these sign-up sheets?

A.    It's possible.   I don't know if they did or not.

Q.    And, to your recollection, even more people came to the meeting than just the people who signed up, correct?

A.    Yes.

            MS. KLEIN:   Let's go back to the chart we were looking at in the letter.   So we'll get out of these

exhibits.

BY MS. KLEIN:

Q.   And that bottom paragraph below the chart, it says: "The Commissioners Court met again on August 30th, 2011, and received comment from the County's redistricting consultants and were presented with a new proposal that incorporated changes based upon public comment."

And you attended this meeting as well, Judge Henry?

A.   I'm sure I did.

Q.   So we have talked about a little bit the math that passed in 2011.  I think I would like to pull that up as well.

As you recall, that map that passed in 2011, it added the Bolivar Peninsula to the historic Precinct 3 that was then existing, correct?

A.   I don't remember.

MS. KLEIN:  Let's pull it up.  That's going to be Exhibit -- Exhibit C to this preclearance letter.  That's going to be on PDF page 22 or thereabouts.

BY MS. KLEIN:

Q.   So it's a little bit granular, a little bit hard to read; but if we try to zoom in on it, there are thick black lines that show the new precinct -- commissioner precinct boundaries proposed.  And we can see right there for Precinct 3 that it now juts out to include the Bolivar

Peninsula, correct?

**A.** Okay.

**Q.** Now, if we go to the map that existed before 2011, so the map that you were working off of in 2011, that's Exhibit D to this letter. And it's just two pages down.

Now, this is the 2001 map. And if we look there within -- this is a little bit easier to see. Within Precinct 3, Bolivar Peninsula is not included in that Precinct 3, correct?

**A.** That's correct.

**Q.** And we see that Precinct 3 is coming down in the central corridor of the county, correct?

**A.** Yes.

**Q.** And in that central corridor, we can see the towns -- and you are going to know the geography better than me -- but we see Dickinson; La Marque; Texas City is included there; and then parts of Galveston City, as well, below, correct?

**A.** Texas City is in Precinct 1. I'm not sure what you are asking at this point.

**Q.** Well, the title for Texas City, but as you understand the boundaries of Texas City.

**A.** There will be parts of Texas City in Precinct 3.

**Q.** Thank you.

And, likewise, parts of La Marque, correct?

**A.** Probably.

**Q.** And parts of Galveston, correct?

**A.** It looks like it, yes.

**Q.** And Dickinson, likewise?

**A.** Correct.

MS. KLEIN: Thank you. We can take this down.

BY MS. KLEIN:

**Q.** In 2011, you understood that the Voting Rights Act required maintaining that historic Precinct 3 as a majority-minority precinct, correct?

**A.** If that's what our counsel told us, yes.

**Q.** Is that -- you say -- I'm not asking what your counsel told you or not. I'm just asking what you understood. So I'll ask the question again. I want to be cognizant of the Court's direction about questions relating to counsel. So you can assume I'm not asking about what your counsel told you or not.

But you, you personally, had the understanding in 2011 that the Voting Rights Act would require maintaining historic Precinct 3 as a majority-minority precinct, correct?

**A.** I'm not a lawyer. I'm certainly not a Voting Rights Act lawyer. If it was not conveyed to me by a lawyer, I would not have known.

**Q.** Okay. Well, did you know that?

**A.**    I'm sure it was conveyed to me.

**Q.**    So you are sure you knew it, in other words?

**A.**    Yes.

**Q.**    And as far as who the -- who those majority-minority -- you know, who the folks in the majority-minority Precinct 3 were electing, you understood that to consistently be electing a minority candidate, correct?

**A.**    I thought the standard was to have the opportunity, not to necessarily do it, but...

**Q.**    But you understood that they had been electing at that time Commissioner Holmes and, before him, Commissioner Wayne Johnson, correct?

**A.**    I know that Precinct 3 elected Commissioner Holmes.

**Q.**    And what about Commissioner Wayne Johnson?

**A.**    I never met him.

**Q.**    You have become generally familiar with the demographic makeup of Galveston County as part of your work as county judge, right?

**A.**    Generally speaking.

**Q.**    And that includes where in the county minority populations predominantly live, correct?

**A.**    To some degree.

**Q.**    To what degree would you say?

**A.**    There is lots of places I don't know anything about

demographically.

Q.   But you have a general idea of where the minority populations are living, correct?

A.   Generally, because -- yes, generally speaking.

Q.   And so, for example, that historic Precinct 3 we just saw on the map, you do have an idea that parts of -- that La Marque, parts of Galveston Island, and parts of Texas City have higher African American populations specifically, correct?

A.   I believe that to be true.

Q.   And you are also aware that places like Santa Fe, League City, and the Bolivar Peninsula are mostly Anglo, correct?

A.   That's probably true.

Q.   So the plan the Commissioners Court enacted in 2011 did not end up becoming the map used in subsequent elections, correct?

A.   The majority of it did.

Q.   But that exact map did not become used?

A.   That exact map did not become the map we used.

Q.   And you were made aware then that the Department of Justice had rejected that map, and you were made aware of that fact, correct?

A.   I was made aware that if we made certain small changes, they would approve it.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** You were made aware that the Department of Justice had rejected that map in part because the County Commissioners failed to adopt redistricting criteria during that redistricting process; isn't that right?

**A.** And then they precleared us without adopting criteria.

**Q.** But to answer the question I asked you, you were aware that one of the reasons that they rejected the map was the failure to enact criteria, correct?

**A.** That was in their letter.

**Q.** And you were aware of the contents of their letter?

**A.** I am sure I was at the time.

MS. KLEIN: Let's go to that letter briefly. That's JX-6. So on page 2 -- so I'll just --

BY MS. KLEIN:

**Q.** For the record, this is JX-6. It's dated March 5th, 2012. It is -- it is addressed to James Trainor at Beirne Maynard & Parsons.

That was your counsel at the time, correct?

**A.** One of them, yes.

**Q.** And if we go to page 2 and the first full paragraph, here we see -- we turn first to the Commissioners Court redistricting plan. So they are talking about the Commissioners Court -- the Commissioners Court plan.

And then if we go to the second full paragraph, they write: "Based on our analysis of the evidence, we have

*Laura Wells, RPR, RMR, CRR, RDR*

concluded that the County has not met its burden of showing that the proposed plan was adopted with no discriminatory purpose. We start with the County's failure to adopt, as it had in previous redistricting cycles, a set of criteria by which the County would be guided in the redistricting process."

You were aware --

MS. KLEIN: We can take that down.

BY MS. KLEIN:

Q. You were aware before the 2011 process that the County had voted on redistricting criteria -- publicly adopted redistricting criteria in previous cycles, correct?

A. The previous administration did, yes.

Q. And if --

MS. KLEIN: I would like to pull up that prior criteria. This is PX-539.

BY MS. KLEIN:

Q. And I'll represent this was produced by your counsel in this matter. And the topic says: "Galveston County resolution adopting criteria for use in redistricting 2001 process."

We won't go over all criteria, but I do want to just go over two of them for you. The first --

MS. KLEIN: If we go to page 2, bullet point 4.

BY MS. KLEIN:

**Q.** This says: "Although it is recognized that existing districts will have to be altered to reflect new population distribution, any redistricting plan should, to the extent possible, be based on existing districts."

So this was one of the criteria that the County had used in prior cycles, correct?

**A.** That is their decision.

MS. KLEIN: And if we go to page 3.10.

BY MS. KLEIN:

**Q.** "The redistricting plan should not fragment a geographically compact minority community or pack minority voters in the presence of polarized voting so as to create liability under Section 2 of the Voting Rights Act."

This was also one of the criteria that the County had previously used in prior cycles, correct?

**A.** With a different Commissioners Court, yes.

**Q.** You, in fact, had considered adopting criteria in 2011; isn't that right?

**A.** I do not know that to be true or not.

**Q.** Let's see if we can refresh your memory.

MS. KLEIN: Let's pull up PX-19.

And, Your Honor, this was admitted on July 26th.

So let's go to page 3.

BY MS. KLEIN:

**Q.** And this is an e-mail from you to J. Nixon.

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**    Joe Nixon.

**Q.**    Is that Mr. Nixon here?

**A.**    It is.

MR. NIXON:  (Raised hand.)

MS. KLEIN:  There you are, Mr. Nixon.  Okay.  I thought you were behind me.  I can relax a little bit.

BY MS. KLEIN:

**Q.**    So this is an e-mail from you to Mr. Nixon.  And you say:  "Joe, in 2001, Galveston County Commissioners Court adopted a resolution establishing the Court's criteria for redistricting.  Attached is a copy of the proposed resolution for 2011.  Do you see any issues?  I would like to have it on the agenda for Tuesday."

Does this refresh your memory?

**A.**    It does.

**Q.**    And let's just take a peek at these criteria that you were thinking of proposing.

**A.**    That's a mischaracterization.  This is something that was given to me.  I did not come up with this.

MS. KLEIN:  All right.  Let's go back to the e-mail.

BY MS. KLEIN:

**Q.**    So can you -- can you provide a little bit more information about what you are saying?

**A.**    Sure.  We had a County attorney who was definitely not

philosophically aligned with me. He said, "This is what they did in the past. You should do it."

So, having no reason to question him, which I should have, I sent it to Joe Nixon and said, "Here is what I'm being told to do. What do you think?"

**Q.** Okay. All right. Fair enough.

So let's take a look at the criteria. I will not say it's something that you had endorsed.

**A.** Okay.

**Q.** I will be clear about that. I think the record is clear on that.

So, again, it looks a little bit like the 2001 that we just looked at. And let's just look at two of the criteria.

Point -- bullet point 4. And it says: "Although it is recognized" -- again, it's about these existing districts to the extent possible, correct?

**A.** I'm sure they just copied and pasted from 2001.

**Q.** Okay. So if we go to point 9 on this, we're going to see again the same language about adhering to the Voting Rights Act, correct?

**A.** Correct.

**Q.** So you didn't end up actually adopting these criteria as we discussed before in 2011?

**A.** We had criteria. We did not go through this exercise,

no.

Q.   You didn't publicly adopt in an open-meeting criteria that was disclosed at that time, correct?

A.   Did not.

Q.   Okay.  So when you say you used criteria, those were private criteria that you contend you used, but there is no public record of that, correct?

A.   Correct.

Q.   So I would like to dig into why you didn't adopt those criteria.

        MS. KLEIN:  Let's pull up PX-23.

BY MS. KLEIN:

Q.   And here I think -- let's see.  Yeah.  Let's start with that e-mail below.  So this is an e-mail from you to Patrick Doyle on June 24th, 2011.  You are answering a question that Mr. Doyle, then Commissioner Doyle, asked.

    And in the first paragraph you say:  "By 'requirements,' are you talking about the criteria the Court used in the past?  If so, Nixon is opposed on the idea.  It ties our hands in ways that will make redistricting impossible."

    Do you recall writing this e-mail?

A.   No.  But I believe I did.

Q.   Okay.  Let's fast forward to the 2021 redistricting process.  Fair to say you knew all along that the

County --

MS. KLEIN:  I'll note here.  Do you -- does anybody need to take a break?  This is a natural stopping point.

THE COURT:  No.  I think we're -- are you good, Laura?

THE REPORTER:  Yes, Your Honor.

MS. KLEIN:  Okay.  I'll keep going.

BY MS. KLEIN:

Q.   So fair to say you knew all along that Galveston County would have to redraw the commissioners districts following the 2020 Census?

A.   I would have been shocked if we didn't, yes.

Q.   And that's because you expected there to have been population changes reflecting --

A.   Dramatic population growth, yes.

Q.   Okay.  You were also aware that the redistricting needed to be completed before that candidate filing deadline for the 2022 general election, correct?

A.   For the primary election.  Not the general election.

Q.   But the candidate filing deadline, you know, applies for both elections.  You have to enter the primary; and then, if you do that, you go into the general, correct?

A.   Right.  But there is not a filing deadline for the general.

**Q.** So for the primary, you talked earlier about that filing deadline being in what you said was November?

**A.** Yes. I just thought it was later in November than it turned out to be.

**Q.** Okay. So you had this deadline in mind, and you were the person trying to make sure that the redistricting process got started and was actually finished, correct?

**A.** Yes.

**Q.** So you were the person responsible for making sure that deadline was met, as I understand it; is that right?

**A.** My office generally takes responsibility for all those kinds of things, yes.

**Q.** I would like to go to the statute setting forth that deadline, and I know you are not an attorney. I will not be asking you for any legal determination. But the statute is actually pretty clear on the issue. So I would like to pull that up. This is Texas Election Code 172.023, if we can get that up.

So here it says "regular filing period," and under (a), it says, "An application for a place on the general primary election ballot must be filed not later than 6:00 p.m. on the second Monday in December of an odd-numbered year." So the second Monday in December.

And if we go to part (b), it says, "An application, other than an application for the office precinct chair,

may not be filed earlier than the 30th day before the date of the regular filing deadline."

So part (b) is telling us that there is this 30-day window, correct?

A.   It looks like it, yes.

Q.   And the 30-day window starts -- it's 30 days before that second Monday in December, correct?

A.   At this point it is, yes.

Q.   Okay.  And you have run for office -- successfully for county judge now how many times?

A.   Four.

Q.   And you have had to meet this candidate filing deadline each time?

A.   Not this one.  They changed it in 2021.

Q.   Let's go down to the bottom and pull up the history, the legislative history; and here the last change listed is -- and again, I know you are not a lawyer.  But the last change listed, it says "effective September 1st, 2011."

A.   Okay.  But it doesn't -- up in there at the top, it's talking about the 2021 first-called session.  That's not a change?

Q.   It says this document is current through the 2021 regular session --

A.   Okay.

**Q.** -- of the 87th Legislature.

So I just want to establish that 30-day period starts 30 days before the second Monday --

**A.** Okay.

**Q.** -- in December. So it would be --

**A.** Okay. Then I was wrong about my guess of dates.

**Q.** Okay. But just to confirm, as you said before, you were the one responsible for making sure this deadline was met?

**A.** Yes.

**Q.** And you like to do things, I think you heard, with military efficiency?

**A.** I do.

**Q.** That resonated with me. My father fought in two wars. He liked the same thing.

So let's talk about how you sought to meet that deadline. Your first step in starting a 2021 redistricting process for commissioner districts was hiring counsel, correct?

**A.** Right.

**Q.** And I heard you say you had sought out Mr. Oldham specifically because of experience working in the county?

**A.** And his success rate.

**Q.** And you had wanted Mr. Nixon, but you understood he wouldn't be available this time around?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**    Correct.

**Q.**    So if I recall correctly, we saw in an exhibit pulled up by Mr. Russo, you asked your chief of staff, Tyler Drummond, to get ahold of Dale in about late 2020; is that right?

**A.**    That sounds right.

**Q.**    And Mr. Drummond was working at your direction when he did that, correct?

**A.**    Sure.

**Q.**    Is it fair to say that Mr. Drummond and, also, Mr. Ready were kind of your lead staff members that you were directing during the 2021 redistricting process?

**A.**    They would probably be the only staff members working on it, yes.

**Q.**    So you did receive other offers for counsel other than, you know, Mr. Oldham, correct?

**A.**    The only one I remember is that unsolicited letter saying I needed to send in my retainer, which is a law firm we had never even talked to.

**Q.**    All right.  Let's pull that up.  PX-100.  So here we see, at the top, it looks like you have e-mailed this to yourself, correct?

**A.**    I guess.  Although, I don't know why.

**Q.**    And below, Ms. Dianna Garza Martinez, your office coordinator, had forwarded it to you, correct?

**A.**   Yes.

**Q.**   We're not going to look at the entire letter.  It's pretty long.  But I would like to take a look at just a few things on this letter.  So we'll scroll to the attachment, and we'll actually look at the second letter right here.  For the record, this is DEFS00029435.  This is a letter dated February 6th, 2020.  It is addressed to you, Judge Henry; and it is from Allison Bass & Magee.

And if we go to the second page of this letter, in paragraph 2, they say, "In rebalancing that population, additional care must be given under the Voting Rights Act of 1965 so that where minority residents within the jurisdiction compose a sizable portion of overall population, the boundaries drawn to accomplish numerical balance cannot either fragment, dilute, or unfairly compact that minority population."

And then below it has definitions of cracking -- or "cracked," "packed," and "stacked."  Do you see that?

**A.**   I do.

**Q.**   When we spoke at your deposition, you said that you'd likely thrown this letter in the trash; is that right?

**A.**   I would never hire this lawyer for any case again. Yes.

**Q.**   Okay.  You didn't discuss getting this lawyer with any of the other commissioners, correct?

**A.**    They all got the letter, too.

**Q.**    And this was not even considered or put up for a vote when you were considering which counsel to hire for the 2021 redistricting process?

**A.**    Any commissioner could have put that on the agenda.

**Q.**    You say any commissioner could have put that on the agenda, but I just want to be clear --

          MS. KLEIN:  Pardon me, Your Honor.

BY MS. KLEIN:

**Q.**    You said any commissioner could have put them on the agenda; but you were the person specifically on the Court trying to make sure the redistricting process got started and was finished, correct?

**A.**    Only because I don't think anyone else would have done it.  That does not stop them from putting anything they want on the agenda.

**Q.**    But you are the presiding officer of the Commissioners Court, correct?

**A.**    Yes.

**Q.**    And so other than Mr. Oldham, no other law firms were considered during the process in a public meeting, correct?

**A.**    In a public meeting, no.  And by other commissioners, I would have no way of knowing.

**Q.**    Well, let's talk about the meeting when you did hire

Mr. Oldham. And do you recall that you -- the Commissioners Court did vote on whether to engage Mr. Oldham and Holtzman Vogel on April 5th, 2021?

A. That sounds about right.

Q. It's true that from the agenda and from the backup accompanying the agenda, there was no way for the public to know who the county was considering hiring for that process; is that right?

A. It was brought to my attention during this process. I did not know that at the time, I don't think.

Q. Well, let's look at the transcript of that meeting, PX-140. And we'll pull up page 2. And here, starting at Line 10, "Paul Ready, general counsel. Commissioner, this is an engagement letter that's substantially the same in its structure to what happened ten years ago for the last census where you engaged an attorney who will retain an expert, examine population shifts in the county, and draw you a new map for commissioner precincts and JPs."

And Commissioner Clark says, "There was no paperwork or backup on (indiscernible)."

Commissioner Clark then asked, "Do we have the engagement letter?"

So is it fair to say that you were made aware of the fact that the public had not been given prior notice of who you were engaging at this meeting on April 5th, 2021?

**A.**   The public was notified that we intended to engage an attorney for this process.

**Q.**   But they were not told who, correct?

**A.**   There was no -- there was no backup to indicate that, if that's the question.

**Q.**   It was not on the agenda either?

**A.**   What was not on the agenda?

**Q.**   The name of the counsel that you were proposing to hire, correct?

**A.**   I don't think so.

**Q.**   You went ahead and did vote to engage Mr. Oldham that day, correct?

**A.**   Yes.  We complied with state law, yes.

**Q.**   Do you remember whether that was a unanimous decision?

**A.**   I do not recall.  My guess is probably 4:1; but, no, I don't remember.

**Q.**   And by your guess, who would that one have been?

**A.**   I think you told me Commissioner Holmes voted against it.

**Q.**   Does that comport with your recollection?

**A.**   Yes.

**Q.**   All right.  We can take that down.  So you hired counsel.

     What step, if any, did you take after this with respect to redistricting?

**A.** I assumed that I had a phone call with him, but he would have, I'm sure, told me we don't have any census data yet. So there is not much we could do until then.

**Q.** You were still thinking about the redistricting process at this time, correct?

**A.** Daily? No.

**Q.** Was it on your mind at all?

**A.** To some degree, but so are 5,000 other things I've got to do around the county.

**Q.** I accept that. I know that you have 6,000 or something county employees. It is a big job, and I'm not ever going to imply otherwise, sir.

Let's look at an e-mail from April 20th, 2021. This is PX-144.

And here I'd like to hone in on the 9:19 p.m., April 20th, e-mail at the bottom. And this is from Paul Ready. I see you are cc'd on this e-mail. And then if we go to the second paragraph of that, Mr. Ready says, "I was under the impression that we had to draw a majority-minority district if we could. So we needed to wait on census data. The judge remembers hearing from another lawyer that my impression was not accurate."

Do you remember who the other lawyer Mr. Ready is referring to in this e-mail is?

**A.** No.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   Okay.  And he was reaching out to -- fair to say Mr. Ready was reaching out to Dale Oldham over a question that you had asked about the redistricting process?

**A.**   I don't know that to be true or not.  The subject says "JPs versus commissioners redistricting."  So I don't know which category he is talking about.

**Q.**   But as far as the reason that he was reaching out and cc'ing you, it was related to a conversation you were having with Mr. Ready about redistricting?

**A.**   I guess.

**Q.**   You just don't remember?

**A.**   I don't remember, no.

**Q.**   Okay.  You don't remember.  We can take that down.

You learned in the spring or summer -- so around that time or maybe a month or so after -- that the US Census Bureau anticipated releasing census data in August of 2021, correct?

**A.**   I'm sure someone told me that, yes.

**Q.**   And the census data eventually was released in August.  You are aware of that?

**A.**   My recollection was they released unusable data earlier than that.  It just did not do us any good.  So maybe August is when they cleaned it up or got it corrected.

**Q.**   They released a set of data in August?

**A.** Okay.

**Q.** You were made aware of that, correct?

**A.** Possibly, yeah. I'm sure I was.

**Q.** When that data was released, the Commissioners Court never arranged for a public presentation of the census data to the citizens of Galveston County, correct?

**A.** They could just go on the census website.

**Q.** The County -- did the County alert the public to that fact?

**A.** I do not know if we did or not.

**Q.** So to your knowledge, the county -- you never made any public announcement that the census had been released, that they could look it up somewhere, and that this would require redrawing the commissioner precincts, correct?

**A.** Those are two different questions. The Census Bureau I would think has a responsibility of letting people know that the numbers are out, not the County. And the people who are aware of redistricting are already aware of redistricting. I don't know what else we could have done.

**Q.** You could have issued a public announcement that the census data was out, this is what it shows about Galveston County, correct?

**A.** I don't know why we would have, but I guess we could have.

**Q.** And that's, in fact -- we just went over in the letter

that's, in fact, what the County had done on August 2nd of 2011, correct?

**A.** Announced that we had census data? No. That was a notification of public hearings about maps. We had maps at that time.

**Q.** And there was also, in addition to maps, there was a presentation of the census data. Would you like to go back to that exhibit? We can.

**A.** The maps would have shown the population of each precinct, yes. That's not quite the same as releasing all census data.

**Q.** What about a summary of what in the census would have required the commissioners precincts to change? Is that something you could have done?

**A.** We -- I don't think I follow that question.

**Q.** Could the County have -- I'll put it this way: In the first meeting you had with Dale Oldham that you talked about with Mr. Russo, I heard you say Mr. Oldham gave you an update on what the census showed had to change and rebalance in the map that you had for commissioners precincts, right?

**A.** No. If I said that in our first meeting, I think that's wrong. I don't think we would have had that information yet.

**Q.** In the September 8th meeting?

**A.**    September 8th of 2021?

**Q.**    Yes.

**A.**    Then, yes, he would have had information at that time.

**Q.**    So at some point -- we don't have to get stuck on the date, but at some point, your redistricting counsel, Mr. Oldham, said, "Judge Henry, you have asked me to handle redistricting for the County.  This is what the census says need to change.  We've got to change the lines because the population is out of balance," correct?

**A.**    Probably, yes.

**Q.**    That presentation that he made to you, you understand he made it to the other members of the Commissioners Court, correct?

**A.**    No.  I did not know that.

**Q.**    Well, he made it to you, at least, correct?

**A.**    Yes.

**Q.**    That presentation either in a public meeting, in writing, in any kind of Facebook post, that was never -- that information was never presented to the public, correct?

**A.**    If he had directed me to do that, I absolutely would have done that.

**Q.**    But you on your own initiative, even considering the 2011 process you were part of, you did not make any effort to update the public on that information you had received,

correct?

**A.** I am paying him to give us advice. I will follow any advice he gives us.

**Q.** So is the answer "no" to my question?

**A.** The answer -- I guess if you want a "yes" or "no" answer, the answer is no.

**Q.** Thank you.

At the time the census came out, there was also no public announcement about that candidate filing deadline and that redistricting the new precinct map would have to meet that deadline, correct?

**A.** That's a function that the party needs to deal with.

**Q.** I'm sorry?

**A.** Candidate filings are a party function. The party needs to -- first of all, I have reservations about a candidate filing for office who can't read a calendar. But second of all, the party would tell him your deadline for this is this. They file with the party. They don't file with the County.

**Q.** So, you know, putting aside that you said you hesitate to have a candidate up for office who can't read a calendar, and I think we have established that that November 20th date you thought was the candidate filing date was actually November 13th.

So putting that fact aside, you never updated the

public that we have to draw new maps and we have to draw them by November 13th? You never had your staff or anybody from the County make that update in any way to the public, correct?

**A.** So we had nothing to tell them, but we should tell them that we're doing something?

**Q.** Do you think telling them, "Hey, the maps are going to change and we have to do that before November 13th," do you think that is telling them nothing? Is that your testimony today?

**A.** No. I am saying -- you have lost me in this complex question. So if you would ask me again, please.

**Q.** At no point did you tell the public, your constituents, after the data was released, that the maps are going to change and that they would be changed by November 13th, correct?

**A.** We hired an attorney. So that was on the agenda. They would have known from that.

**Q.** Did anything -- if we go look at that agenda, did anything on that agenda say the November 13th deadline or that we're going to be looking at the census to see what changes are made?

**A.** Probably not.

**Q.** Okay. So those two facts were never publicly disclosed, correct?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   By me personally, no.

**Q.**   What about all of the -- any of 6,000 staff members that work for you?

**A.**   How about any of the four commissioners?  They could have put it on there.  They could have done it.

**Q.**   They didn't, correct?

**A.**   No, they did not.

**Q.**   And you did not?

**A.**   I did not.

**Q.**   In fact, if we looked at the agendas from April 5th until that November 12th, 2021, meeting, if -- between that period, if we went through and looked at those, which I sincerely do not want to do, we will not see redistricting once, mentioned once on those agendas; isn't that correct?

**A.**   I have no idea.

**Q.**   To the best of your recollection, can you point me to a date in any of those meeting times, which I am correct to assume you attended, any time redistricting was mentioned?

**A.**   Probably.  But again, no commissioner put it on the agenda either.

**Q.**   So probably not on those, correct?

**A.**   I would think not.

**Q.**   You also never set a schedule for your lawyers to meet

those specific markers of having a draft map, having the public comment on the draft map, and passing the map. There was no public timeline posted on the County's website for those milestones, correct?

**A.** If we had posted one, it would have been wrong because we didn't get the maps when I would have expected to have them.

**Q.** Can you point me to a time, even not publicly issued but privately issued, where you set forth your timeline for your lawyers to be doing each of those things?

**A.** I don't recall. I mean, I don't recall.

**Q.** I have to admit, for a man of military efficiency, that does surprise me. And you admit, don't you, that the adoption of a new commissioners precinct map in this case was done at the very last minute, correct?

**A.** Not by my doing, but yes.

**Q.** I would like to -- let's dig into the maps and the drafts that you saw themselves. From the start, you had hired Dale Oldham and you expected him to draw you a legally compliant map; is that right?

**A.** Right.

**Q.** Mr. Oldham, he was not limited to just two maps during that process, right?

**A.** I did not make that a requirement, no.

**Q.** You arranged for Mr. Oldham to speak with all the

commissioners about their ideas for map proposals; is that correct?

**A.**   My office did.  Linda did, yes.

**Q.**   And I think you talked about with your counsel that you had an early meeting in September with yourself and Commissioner Apffel to discuss both of your map preferences, correct?

**A.**   When?  What timeframe?

**Q.**   Around September 8th, you met with Mr. Oldham and Mr. Apffel to discuss what you had wanted to see in new maps?

**A.**   That sounds right.

**Q.**   Is that a "yes"?

**A.**   Yes.

**Q.**   And it's in that meeting that you learned Commissioner Apffel, I think you said earlier, wanted lines moved to accommodate a new residence or something?

**A.**   There was a meeting where that occurred, yes.

**Q.**   And during the process, you had also discussed, you know, the process more generally with Commissioner Apffel, correct?

**A.**   Yeah.  On September 8th?

**Q.**   Just -- just at any time during the process, you had discussed more generally about the process with Commissioner Apffel?

**A.**   I don't know.  I don't think he would need to have been told how the process works.  He has been here a while.  He should know.

**Q.**   Okay.  I would like -- I asked you a similar question, whether you had discussed criteria or other things with other commissioners and -- well, let's pull up the question.  This is your deposition, page 260.  And we'll start at line 12.

And I asked you, "First of all, you mentioned that you had discussed -- maybe discussed criteria with one of the commissioners but not more.  Which commissioner were you referring to?"

And you answered, "I don't know if I said criteria, but as far as the process -- and maybe it was criteria.  I don't recall -- Commissioner Apffel."

Is that still your recollection that you had discussed with Commissioner Apffel the process?

**A.**   No.  I mean, I don't -- I don't know why I would need to have talked to Commissioner Apffel about at the process.  He would know it.

And I did discuss the criteria with the attorney, but I don't know that I would have included Commissioner Apffel.

Maybe he was there when I talked to Dale Oldham about it.

**Q.** Are you changing your testimony today from what you told me in January, then?

**A.** I don't think so.

**Q.** "But as far as the process -- and maybe it was criteria. I don't recall -- Commissioner Apffel"?

**A.** That's pretty fuzzy recollection. So I don't know how I can change it.

**Q.** Your next meeting with Mr. Oldham in October, you reviewed draft maps, correct?

**A.** That sounds right.

**Q.** Okay. And do you -- this was on or about the afternoon of October 19th. Do you remember that?

**A.** That sounds right.

**Q.** You actually had a calendar invite setting aside the whole day for meetings between Oldham and the various commissioners. Do you remember that?

**A.** That would have been Linda.

**Q.** That would have been Linda?

**A.** Yes.

**Q.** And she put aside the whole day for you?

**A.** She would have not blocked off my entire day, no. Well, she shouldn't have. Maybe she made a mistake, but she shouldn't have.

**Q.** Okay. Let's pull up PX-202 to see if we can get clarity on that. So here it says, "Organizer: Mark

Henry. Attendees: Mark Henry." And it said, "Hold redistricting per Tyler."

"Tyler" is Tyler Drummond, correct?

A. Correct.

Q. And it's 8:00 a.m. to 5:00 p.m. on Tuesday, October 19th. That's right?

A. It is.

Q. When you met Mr. Oldham, do you remember who was on -- in that meeting -- excuse me -- either physically or on Zoom?

A. It would have only been Commissioner Apffel, if anyone, and probably Paul Ready.

Q. I don't think you recalled him when you were talking about with your counsel, Mr. Russo, but the map drawer, Tom Bryan, maybe had zoomed in. Do you remember that?

A. I do not.

Q. I would like to just pull up the maps. I think you went over some of these with your counsel. So we'll try to be brief here. But PX-197 and here -- we'll just go through them again. This is the e-mail that Mr. Bryan had sent Mr. Oldham on the 17th, and the first attachment to that is called "Texas benchmark" if we could go to the first attachment.

Do you understand that to have been the map in place at the time you were redistricting, correct?

**A.**   Yes.  This would have been in place in 2020.

**Q.**   And do you remember Mr. Oldham showing you this plan during that meeting on October 19th?

**A.**   No.

**Q.**   Aside from whether he showed it to you, you were aware of where the pre-existing commissioner precinct lines were, correct?

**A.**   Yes.

**Q.**   And you personally believed -- I think you talked about this earlier.  You personally believed that that pre-existing Precinct 3 right there in the middle was very gerrymandered, correct?

**A.**   Yes.

**Q.**   And you believed it had been gerrymandered in order to keep it as a majority-minority district?

**A.**   That's what I was told.

**Q.**   And that's what you believed?

**A.**   Yes.

**Q.**   And you knew that Precinct 3 was the only majority-minority district at that time in the county for precincts?

**A.**   Yes.

**Q.**   Let's look at this next attachment.  This is called "Galveston, Texas Draft Optimal D Plan."  This had the coastal precinct that you wanted.  And this map -- this

map is what you wanted, correct?

**A.**   It's a map that satisfies my coastal precinct.

**Q.**   And, otherwise, the district lines, you would have asked to have them changed if you had wanted them to look different, correct?

**A.**   Other than the coastal precinct, I don't really have a preference where lines run.

**Q.**   For example, you don't think that this one looks gerrymandered like the Precinct 3 we just looked at before, correct?

**A.**   No, I don't.

**Q.**   This map creates a dramatic shift from the precinct lines we saw before in the benchmark plan.  You would agree with that, correct?

**A.**   Yes.

**Q.**   Let's look at the next plan.  This is the draft minimum change plan.  Do you recall seeing this one as well?

**A.**   Or one similar to it, yes.

**Q.**   And this minimum change plan, fair to say that it makes changes that were based on the existing precincts we saw in the benchmark plan, correct?

**A.**   I don't know that I would know what he used.  I mean, to make the changes, I wouldn't know.

**Q.**   So minimum change, fair to say that's minimum change

from what was there before?

**A.**   Probably.

**Q.**   And you said this before, but you never asked Mr. Oldham to run a political analysis on the commissioner precincts?

**A.**   I did not ask him to run one, no.

**Q.**   Your lawyers did, though?  They did convey to you some partisan and some racial composition of the districts when they were showing you the maps, correct?

**A.**   I think so.

**Q.**   We can take this down.  There is another set of maps I'd like to show you.  This is PX-538.  And this is an e-mail from Mr. Bryan to Mr. Oldham.  And this is at 8:50 in the morning on October 19th.  I'd just like to see if we could narrow down if you saw these as well.

The first attachment is called "Galveston, Texas Optimal D Plan," and then the next one is called the "Optimal Geoplan."  So here we're looking at different options for the optimal plan, as it was termed that time.

Do you know why there were alternative plans for the optimal?

**A.**   No.

**Q.**   Do you recall if you were shown these or the earlier version?

**A.**   I only recall seeing two maps.  So, no, I don't know

which two I saw.  I didn't see four.

Q.  So you saw them, you liked what you saw, you've gotten what you wanted with this optimal idea?

A.  If optimal ends up being Map 2, then, yes, it's a coastal precinct.

Q.  You never requested a coastal precinct map that would also have worked off of the benchmark plan, correct?

A.  No.  I wouldn't have asked for that.

Q.  Why not?

A.  I wouldn't have thought to.

Q.  Because you weren't concerned about those dramatic changes in the map that we saw from your optimal plan to the benchmark, correct?

A.  I was looking for a coastal precinct.

Q.  So you -- fair to say you never requested a coastal precinct map that would have kept that core of historic Precinct 3 in the middle of the county, correct?

A.  I would not have asked for that.

Q.  You would not have asked for that.

So for the optimal plan, this new coastal precinct, you wanted to make sure that Commissioner Giusti was okay with his new coastal precinct because it was a dramatic change, correct?

A.  I wanted to make sure that he would be okay having a coastal precinct, yes.

**Q.** So you reached out to him sometime during the process and said, "I want to make sure you are okay with this because I do not want to force you on it if you don't want to do it," correct?

**A.** Something to that effect, yes.

**Q.** When you saw the dramatic change between where Precinct 3 in the middle of the county suddenly completely moved all the way up to the northern city, did you ever give Commissioner Holmes a call and ask him, hey, are you going to be okay with this? I don't want to force you on it if you don't want to do it?

**A.** No. That would have been a open meetings violation.

**Q.** So you chose to ask Commissioner Giusti about that and not Commissioner Holmes if you had to choose the two of them, correct?

**A.** I can only ask one person a question related to that map, and I wanted to make sure Commissioner Giusti would be okay having the coast.

**Q.** And to avoid an Open Meetings Act, fair to say you could just have a meeting where you show these proposed maps and there you could have asked both Commissioner Holmes and both Commissioner Giusti what they thought about the dramatic shift in the optimal plan?

**A.** Had we had the time.

**Q.** Well, let me ask you this: We just went through a

bunch of maps that were given to you in mid-October.  And as I understand it, about a week and a half later, they were posted online.

Am I correct that while these were shown privately to the commissioners, these in mid-October were not publicly posted and the meetings scheduled to do what I just said, ask the commissioners, hey, are you okay with this big shift?

**A.**    They weren't final work products.

**Q.**    Going back to the 2011 process.  We can go back to the letter.  It said "preliminary proposals"; isn't that right?

**A.**    I'm sure it does.

**Q.**    And fair to say these are preliminary proposals, correct?

**A.**    The preliminary proposals did not change in 2011.  The two that we had to work with were the ones that we voted on.

**Q.**    I read in the letter that some changes had been made pursuant to public comment for those draft maps.  Do you remember that?

**A.**    No.  I don't remember.

**Q.**    Okay.  We can -- it's in the letter.  So we'll -- we won't go back to it.  But no effort was made, as soon as you saw these preliminary or maybe instead of them being

shown privately, to have your lawyers present these in a public meeting where you could have asked both Commissioner Giusti and Commissioner Holmes, hey, are you both okay with your new dramatically different districts? That never happened, correct?

**A.** Or the commissioners could have asked for the same thing.

**Q.** When you saw Map Proposal 1, you told Mr. Oldham that it was a racial gerrymander, correct?

**A.** I don't think so.

**Q.** You also knew -- so you called Commissioner Giusti. You had already known from your September meeting with Apffel that as long as he got his residence, he would have no problem with this coastal precinct idea, correct?

**A.** Commissioner Apffel?

**Q.** Correct.

**A.** I don't think he had a problem with it regardless. He just didn't want to have to move.

**Q.** And I heard you say a 5:0 vote. You wanted a 5:0 vote. And I'm just confused now that you knew you could only talk privately with one commissioner, as you are saying you did, and you chose Commissioner Giusti, if you had won a 5:0 vote, you chose not to do that in a way where you could openly talk where all five of the Commissioners Court were in the same space at the same

time until November 12th, correct?

**A.**   We had no -- we had no way to do it before November 12th.

**Q.**   Well, let's talk about that a little bit.  Let's talk about that a little bit.  No way to do it.  I talked to -- we had talked earlier about how there were a series of meetings between -- between April 5th when you got counsel and the November 12th.  And I'm just -- can you tell me about how many regular and special meetings happened between April 5th and that November 12th?

**A.**   I would not know.  But from the time I got maps until November 12th, zero.

**Q.**   From the time you got maps until -- you are saying there were zero meetings between the time you got maps and the November 12th -- okay.  Well, let's look at --

**A.**   On August 20th or October 28th, I believe, or 29th.

**Q.**   All right.  Let's look at the schedule.  Let's pull up the meetings list, and just to refresh your memory about this --

        MS. KLEIN:  This should be Document 9, Michael.

    We're not admitting this as an exhibit, Your Honor.  But I'll represent that at the bottom right, you can see that the URL is from the County website.  I can represent that this was pulled from the County website in a search.

BY MS. KLEIN:

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   If we go to the top, the first page, it is starting back from about mid-November.  So we see the special meeting on November 12th, correct?  And then we see that there is, in fact, a regular meeting on November 1st, correct?

**A.**   Correct.

**Q.**   And there is also a regular meeting that had been on October 18th.

You had never planned to do anything related to redistricting in that November 1st meeting, correct?

**A.**   That would have been my preference, yes.  But we did not have maps in time to make the posting for this agenda.

**Q.**   Judge Henry, we just looked at a bunch of maps that were shown to you on October 19th.

**A.**   None of them were final product.

**Q.**   And so am I correct to understand that you did not want these maps to be made public until they were, what you are calling, final product, correct?

**A.**   We were paying for two -- well, I don't want to put a limit on it -- for maps that met all of our criteria, and I did not know at that time if those did or not.  They were proposals, I suppose.  But that's only, what, two weeks ahead.

**Q.**   And when you say your criteria -- and I'd like to talk about that next -- you also never made any kind of public

announcement about what those criteria you were using to build these maps were, correct?

**A.**   If our lawyers had told me to, I would have.

**Q.**   But you didn't, correct?

**A.**   They did not tell me to.

**Q.**   So if somebody, for example, wanted to draft their own map, they would not know the criteria that you, Commissioner Apffel, Commissioner Giusti, Commissioner Holmes, Commissioner Clark, they would not have known your preferences and been able to try to meet them in a map that they were proposing, correct?

**A.**   No.

**Q.**   Let's take a second to talk about criteria.

         MS. KLEIN:  I'd like to keep going, if we can, if that's okay with the Court.  I know we have been going for a while, if anybody needs a break.

BY MS. KLEIN:

**Q.**   But let's talk about that criteria here, and let's pull up PX-593.

         Okay.  These are your counsel's responses to DOJ interrogatories, the Department of Justice's interrogatories.  So these are from April 21st.  We looked at an earlier version from December.  So I am using the updated version pursuant to an objection from counsel where we agreed to use the updated version.  And if we

*Laura Wells, RPR, RMR, CRR, RDR*

scroll down just to look at the title, do you recognize this document?

**A.**   I am sure I saw it at the time.  It's the responses to interrogatories, yeah.

**Q.**   Let's go to the last page of this document.  And that's your signature, correct?

**A.**   It is.

**Q.**   And it says, "I declare under penalty of perjury, pursuant to the laws of the United States of America, that the foregoing is true and correct."  And you executed on April 21st, 2023.

You had signed this same declaration, this same certification for the earlier December version of this document, correct?

**A.**   If the attorneys told me to sign it, yes.

**Q.**   So fair to say you would have reviewed this document before signing and attesting it is true and correct under penalty of perjury?

**A.**   I would hope so.

**Q.**   Do you think you did?

**A.**   There is a chance I didn't.

**Q.**   So there is a chance -- you are saying that there is a chance that you signed this under penalty of perjury when you didn't review it?

**A.**   I would have reviewed it.  But there was one of these

documents that came at the last minute.  We were up against a deadline, and they asked me to sign it.

**Q.**   Do you remember which one that was?

**A.**   I do not.

**Q.**   All right.  Let's go to Interrogatory Number 1.  That is -- thank you.  That's on page 4 of the document.  And it says, "Identify all factors that the Galveston County Commissioners Court considered in adopting the 2021 redistricting plan."

And then there is objection, which we can skip over.  It's a bunch of lawyerly stuff.  And we'll go right to the first supplemental answer.  So I'll say -- I will note, if we could come out of that a little bit, in the first answer that your counsel provided when this was issued by the Department of Justice -- and I'll just tell you for the record there is a certain amount of time within which parties have to respond to these.  It's usually about 30 days, unless you got an extension.  And I think it's 30 days.  I'm realizing I'm not an expert in the Federal Rules of Civil Procedure.

But in the first answer, your counsel said is they don't have enough information to give an answer.  So -- and I think these were served around August.

So what we have is the first supplemental answer which actually provides that list.  And you remember we went

*Laura Wells, RPR, RMR, CRR, RDR*

over that in your deposition.  I would like to briefly revisit a few of these points.

It says, "Without waiving any of the objections stated above, defendants state that the Galveston County Commissioners Court considered the following facts in adopting the 2021 redistricting plan."

And there, it says, "The first factor considered was compliance with the requirements under the Fourteenth Amendment to the U.S. Constitution and the Voting Rights Act."

So regarding the Voting Rights Act, sitting here today, you have never seen a racially polarized voting study for Galveston County, correct?

A.   I do not know if I have or not.

Q.   And fair to say if you had been shown, you would have been told it was a racially polarized voting study?

A.   They probably would have had to have told me.  From ten years ago or from current?  I mean, I don't know.

Q.   Let's just talk about -- that's a good question. Let's just talk about this redistricting cycle for 2021.

Do you recall seeing anything that you were told is a racially polarized voting study?

A.   I just don't remember that.

Q.   And the second factor -- let's skip down to the second factor.  The second factor was unified representation on

Galveston Island and the Bolivar Peninsula.  This was your specific criteria that you wanted to add, correct?

**A.**  Correct.

**Q.**  So it shows up second after the U.S. and the other constitutional requirements and statutory requirements.

Regarding this factor, before, you know, putting it at such high priority, you never conducted any studies from redistricting counsel on the issue of whether a single coastline precinct would make sense, did you?

**A.**  I didn't need to.

**Q.**  And you also never conducted any surveys of the public regarding the creation of a coastal precinct, right?

**A.**  I didn't need to.

**Q.**  So you are not aware, sitting here, of anything the Commissioners Court did for the 2021 process to determine whether there was public support for the creation of a coastal precinct, right?

**A.**  Correct.

**Q.**  You knew from 2011, though, didn't you, that the Galveston Chamber of Commerce actually wanted three commissioners for the Island; isn't that right?

**A.**  It might be.

**Q.**  Will it help if I refresh your memory on that one?

**A.**  Not really.

**Q.**  All right.  Well, I would like to refresh your memory,

if I can, because I think it might.

Let's pull up Document 8.

This is a document produced, again, by your counsel in this matter. If we look at the e-mail chain with a big block, we can see here that it is from Marilyn Dinklage to the first one on the "to" line is Mark Henry. The title is "Resolution from the Galveston Chamber of Commerce board of directors." It is addressed to you as well as the other commissioners at the time. And the subject says "County redistricting plan." Correct?

**A.** Yes.

**Q.** Dated August 24th, 2011. And if we scroll to the next page, it says, "The Galveston Chamber of Commerce board of directors respectfully present the attached resolution as to its position on the County's redistricting plan. We would respectfully request that you consider this resolution."

And then if we go to the resolution itself, it said, "Therefore, be it resolved, endorsing a redistricting plan that leaves three commissioners on the Island."

So fair to say you didn't do research before adding that coastal precinct criteria on whether the community groups on Galveston actually wanted one unified precinct?

**A.** There are -- they are a business advocacy group. That's it.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**    Do you consider it important in your work to listen to advocates from the business community?

**A.**    Sure.  But they are going to advocate for things that they feel are in their best interest, not the public's best interest.

**Q.**    Well, let's talk about the public's best interest. Did you survey -- you didn't survey.  I think we just asked you.  You didn't survey the public on the coast to see if they, in fact, wanted to be limited to just one commissioner for the whole coast, did you?

**A.**    I didn't feel like I needed to.

**Q.**    And fair to say if you had done a little bit of research into your own e-mail, you might have pulled up things -- this is one example of something you had -- you had pulled up about a coastal precinct, but you didn't do that search through your e-mail to see what you might have gotten from constituents about this coastal precinct idea, correct?

**A.**    No.

**Q.**    So you are not aware of anything the Commissioners Court did to determine public support for the creation of a single coastal precinct?

**A.**    No.

**Q.**    Let's talk about Galveston Island itself and why, for example, the Galveston Chamber of Commerce might have

*Laura Wells, RPR, RMR, CRR, RDR*

wanted three different commissioners.

That Island has varying income levels across it, correct?

**A.**    Probably.

**Q.**    So the west has a high -- I think in our deposition we talked about this.  The west has a higher income, and the eastern side of the Island is more modest, correct?

**A.**    That's probably true.

**Q.**    And Bolivar is different still, with more middle to upper income on that part of the coast, correct?

**A.**    Yes.

**Q.**    And you didn't really take that into consideration either, the varying income and interests that fall from that when you decided to do this unified coastal precinct?

**A.**    It has nothing to do with income.  It's got to do with coastal issues from the sand gulfward.

**Q.**    Other than this coastal unification, the Commissioners Court, as far as you are aware, did not consider uniting any other communities as a factor in redistricting, to your knowledge?

**A.**    To my knowledge, no.

**Q.**    Let's go back to the Document 593 and make our way through the criteria here.  It says, "The third factor is going to be compactness of the Commissioners Court precincts."

You never saw compactness scores for the maps that were being proposed, correct?

A.   If I did, I don't remember them.

Q.   And then at the end there was -- there is a sentence, "There was a sense that the prior map looked gerrymandered."

You agree with that, correct?

A.   I do.

Q.   And specifically Precinct 3?

A.   Correct.

Q.   And you believed, in fact, that the only way to keep a majority-minority precinct in Precinct 3 would have the precinct look like it did, correct?

A.   That's probably -- I'm sure -- yes.

Q.   And you wanted to move away from that in the new map?

A.   I wanted a coastal precinct.

Q.   You would have been okay with something that you perceived to be a gerrymander and a racial gerrymander if you had gotten a coastal precinct?

A.   I would have done -- if the lawyer said it was legally compliant, that would have been a big factor.

Q.   The fourth factor says "minimizing the splitting of voting precincts," correct?

A.   Yes.

Q.   You didn't personally consider this factor either?

**A.**   Yes.  We had a couple of precincts that were over population.  They had to be split.  So we were just trying to minimize that.

**Q.**   When I asked you this in your deposition, you had a little bit of a different answer.  So I would like to go back to that.  Page 255 of your deposition, line 15.

     "QUESTION:  So your understanding of this criteria is not that a split precinct is" -- excuse me.

     Let's go to scrolling down a little bit on this.  And we're talking through it; and I asked, "So you actually don't quite know.  So how does this factor relate to commissioners precincts?"

     And you state on the next page, 256, "Yeah.  I don't know.  I mean, if that's what they are talking about.  I didn't write this.  So I'm kind of trying to answer as best I can."

     So you since understood that -- so since then, now what is your understanding of this factor?

**A.**   If you scroll up in this deposition, I say the exact same thing, that we're getting precincts above 5,000 people down below 5,000 people.

**Q.**   So your understanding for minimizing the splitting of voting precincts had to do with having to divide voting precincts that were above 5,000 people?

**A.**   That was certainly one of the issues, yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   It didn't relate -- your understanding, it didn't relate to whether commissioners precincts were bisecting those voting precincts or not?  That's not your understanding?

**A.**   No.

**Q.**   The fifth -- we'll go back to PX-593.  The fifth factor says that once factors one through four were achieved, the commissioners wanted a precinct that included their residence.  And you mentioned that you also wanted the precincts to include the commissioner's residence, correct?

**A.**   Yes.

**Q.**   Are you aware that Commissioner Apffel's new residence required splitting a voting precinct?

**A.**   No.

**Q.**   The sixth factor lists partisan composition of the districts.  I heard you say this was not a consideration that you personally had.

**A.**   I think I said it was not my most important issue.

**Q.**   Well, let's talk a little bit about that.

So your understanding of this is that -- this partisan composition, your understanding of this is that if a commissioner is in a Republican-leaning precinct, he would rather not get it changed to a Democratic-leaning one, correct?

**A.**   I'm sure that's correct.

**Q.**   You are aware, aren't you, though, that for all of the -- for yourself -- for Commissioner Giusti and for Commissioner Clark, who was then alive, and for Commissioner Apffel, all of them were in Republican districts and those districts maintained a Republican partisan composition, correct?

**A.**   I'm sure I was shown that at some point.

**Q.**   In fact, the only commissioner whose partisan composition changed was Commissioner Holmes, correct?

**A.**   I would think so.

**Q.**   And so he is the only one for whom this sixth factor appears to not have been considered in the enacted map, correct?

**A.**   Okay.

**Q.**   If we continue down to this, in the second supplemental answer -- so this supplement was provided -- this supplemental answer was not there when we spoke in January with the December version of this document, correct?

**A.**   If it came out in whenever you said it was, no, it wouldn't have been there.

**Q.**   So this is the second supplemental answer from April and it says, "In addition to the six factors referenced above, Judge Henry and the commissioners also wanted to

*Laura Wells, RPR, RMR, CRR, RDR*

adopt a map that would be clear and easy to understand by the public."

Q. You didn't know that this was a factor when you signed this document in December of 2022, right?

A. I signed this document in December of 2022?

Q. I'm saying in the prior version that didn't have this -- and maybe for the record I should be trying to readmit that into evidence, and we'll talk about that in a minute. But in the prior version of this document that didn't have this second supplemental answer, you signed it saying under penalty of perjury this is true and correct. It did not include this.

So is it fair to say you did not know in December of 2022 that this additional factor was something the Commissioners Court had considered?

A. The lawyers give it to me and they say, "Unless there is something you see is wrong, it's okay to sign." The lawyers put these together. I don't.

Q. So when you signed it in December, you didn't see anything wrong because you didn't see -- even though this was missing, you didn't see anything wrong because you didn't know this was a factor?

A. Correct.

Q. And then as we have discussed a little bit here, you personally did not consider the six factors that we went

through, correct?

**A.**    I personally did not consider them?

**Q.**    When you personally were considering which map to vote on between picking Map 1 and Map 2, you personally didn't consider, you know, VTD splits as something you cared about, correct?

**A.**    The lawyers should have given me maps that were all meeting the criteria for what we had established.

**Q.**    You didn't compare compactness scores between Map 1 and Map 2?

**A.**    I would not even know how to do that.

**Q.**    We can take this exhibit down.

So fair to say that as far as what factors were actually used in the 2021 redistricting process, even you, much less the public, did not know what those factors were until April of 2023, correct?

**A.**    No.  I gave direction that it had to be legally defensible, legally compliant.  Whether or not they added this compact -- or the clear and concise or compact, whatever it was, that's fine.  I don't object to that. But that wasn't one of the things I stated to him.

**Q.**    But as far as what the Commissioners Court as a whole considered, even plaintiffs in this action did not get a full answer on what was purportedly considered until April of this year, a year and a half later, correct?

**A.**  I guess.

**Q.**  You could have done it.  You could have disclosed criteria all the way back two years ago in 2021, right?

**A.**  And if our lawyers had told us to do it, we would have done it.

**Q.**  Okay.  You could have voted on criteria and adopted them -- you could have done that even before the census had been released, right?

**A.**  And if our lawyers had told us to do it, we would have done it.

**Q.**  I would like to talk -- just a few more questions, but I would like to talk about the November 12th hearing and the events leading up to it.

Let's go to JX-29.

This is the web page that your office made public on October 29th, 2021, correct?

**A.**  It looks correct, yes.

**Q.**  It was done at your direction?

**A.**  What?  The --

**Q.**  The posting.

**A.**  The posting, yes.

**Q.**  And your office decided what information would be included in this website, correct?

**A.**  Yes.

**Q.**  You do not remember directing anyone to specifically

notify the public about this website posting, correct?

**A.**   I didn't notify what?

**Q.**   You don't remember directing anyone in your office to specifically notify the public about this website posting, correct?

**A.**   I'm not sure how you would do that other than I think we did put Facebook ads out and some other things but...

**Q.**   There was no announcement, for example, in the November 1st regular meeting we just talked about?

**A.**   It would have already -- the agenda would have already been posted.  We would not have been able to amend the agenda that late in the game.

**Q.**   No announcement was made -- you weren't going to be considering or discussing anything, but you just didn't even mention it, you didn't even announce it in that meeting so it would be recorded in the minutes or anything?

**A.**   I don't believe you are allowed to do that.  If it's not on the agenda, you can't talk about it.

**Q.**   You didn't post on this any -- well, you didn't release a meeting agenda on October 29th when you posted this where people could come in person and discuss what they are seeing on the website, did you?

**A.**   On October 29th, no.

**Q.**   You personally did put it on your personal Facebook

page, correct?

A.   Whoever maintains my personal Facebook page did, yes. I do not do that.

Q.   Let's pull it up at PX-588.  And here it says, "Galveston County Commissioners Court will be voting on new commissioner precincts in the coming weeks.  The public comment period on the proposed maps is now open, and you can submit your comment by visiting the website. Please submit your support for proposed Map 2.  This map creates a much needed coastal precinct.  Having a coastal precinct will ensure that those residents directly along the coast have a dedicated advocate on Commissioners Court."

So to your knowledge, this is the only public announcement telling residents in Galveston County that there were map proposals posted online, correct?

A.   This is my campaign page, by the way.  This is not -- I mean, that's the closest thing I would have to an official page, but it's a campaign page.

Q.   So you were telling -- so instead of the County announcing it otherwise in a public forum online or through somewhere, your campaign website telling people to support Map Proposal 2 was the only place where you had directed people to that website, correct?

A.   No.  It's on the website.  This is a link to our

County website.

Q. And I'm saying for folks to understand that that website page had been filled with maps or even created, the only place that that was announced is on your campaign website, correct?

A. I don't know if that's true or not.

Q. You certainly didn't direct anyone to post it anywhere else or announce it anywhere else, correct?

A. I don't think I directed them to.

Q. Let's go back to the -- the website, JX-29.

So I see here there are pictures of the maps. There is no -- well, first of all, the benchmark map is not on here, correct?

A. I don't see it.

Q. So if somebody wanted to see what changes were actually being made from their current precincts, they would not be able to see it from this page, correct?

A. From this website, yes. Maybe not from this page, but the current precincts were still -- were on the County website.

Q. There is no link to that, though, on this page, correct?

A. I don't see a link to anything.

Q. So -- well, let's just go through this quickly. There is no summary of the U.S. Census results for Galveston

County on this page, correct?

**A.**   I don't see it.

**Q.**   There is no breakdown of the deviations of the benchmark map and why it had to change, correct?

**A.**   I don't see that.

**Q.**   There is no racial breakdown of the composition of these proposed maps, correct?

**A.**   No.

**Q.**   And there is no scores related to those criteria we just talked to.  So no compactness scores, no VTD splits, nothing like that, correct?

**A.**   No.

**Q.**   And, of course, there are no criteria for what the Commissioners Court was using to construct these maps anywhere on this website, correct?

**A.**   I don't see it.

**Q.**   You actually received at least one complaint about the lack of detail on this website.  Are you aware of that?

**A.**   No.

**Q.**   Let's take a look at it.  It's up.  JX-42.  This is the compilation of public comments that were received through the website, and we can see this one was -- we'll go to PDF page 72.

I promise at 5:45, I will not be going through many of these, Your Honor.

But let's look at one of them, page 72; and that is a November 5th, 2021, at 8:51 in the morning.

And here Judith Oppenheim said, "The interactive version does not provide any additional detail. I am wanting to evaluate the proposals and need information on approximate boundaries, street names, creeks, list of our census districts in order to obtain demographic data from the 2020 Census report."

So your office received this complaint on November 5th. Was anything done to address this lack of information?

**A.** I would not know.

**Q.** To your knowledge, nothing was done, correct?

**A.** I don't know.

**Q.** So at the bottom -- let's go back to the website. And that's JX-29. So at the bottom, there is a place for public comment. To your knowledge, was there any instruction to the public about when they had to submit a public comment for it to actually be read by a member of the Commissioners Court?

**A.** I don't see anything like that.

**Q.** And actually, you in fact yourself read less than a dozen of those comments yourself, correct?

**A.** Personally. But I had summaries given to me.

**Q.** Is that summary the tabulation that you read in open

court on November 12th?

**A.**   That would be part of it.  That would not be the whole thing, but that would be part of it.

**Q.**   But your staff provided a more detailed tabulation?  Is that what you are saying?

**A.**   Feedback.  I would say it's more feedback, yes.

**Q.**   Your review of the public comments in that feedback did not impact your decision to vote for Map 2, correct?

**A.**   The overwhelming support of Map 2.  But again, I was waiting to see if there was a compelling reason to consider Map 1.

**Q.**   I asked you this question in your deposition -- we'll just pull it up really briefly -- at page 276, starting on line 23.

Do you remember me asking you this question?

**A.**   No.

**Q.**   Well, let's look.  This might be the wrong page number.  There is -- let's try -- my apologies.  We'll skip that for now.

So your position is that you did take the public comments that you had read into account when you decided whether or not to vote for Map 2?

**A.**   Yes.

**Q.**   And tell me how you kept that -- how you took that into account.

**A.**   Because, like I said, some of the comments were saying start all over again.  You know, at this point, we know we couldn't have done that.  That wasn't an option.

The others were, like I said, I read the numbers in for the record, about 2:1 supporting Map 2.

**Q.**   Let's pull up the deposition at page 275.  I asked you this:  "Did any of them -- the ones that you actually read, did they change any of your opinions on how you would vote on the map?"

And you said back in January, "No.  That's unlikely. It's such a small sample for such a large public policy issue."

Fair to say January was closer to the events that we're talking about in this case than today?

**A.**   No.  It's consistent.  You are asking did any of the ones I read change my mind from Map 2.  I'm saying no. No, they didn't then; and, no, they don't now.

**Q.**   You understood at the time that those --

We can go back to JX-29.

You understood at the time that these two maps were posted as proposals that they were legally compliant, correct?

**A.**   They had better been, yes.

**Q.**   And that was your understanding that they were?

**A.**   Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** And as we had just discussed, your Facebook posting, you had decided back to October 29th that you were voting for Map 2, correct?

**A.** That was my preference because it was the coastal precinct, but that wasn't -- I mean, things change between first ideas and final vote in the court.

**Q.** So short of someone coming in and saying, you know, it turns out Map 2 is out of population deviation or got some other problem, but short of something like that happening, you were voting for Map 2, correct?

**A.** No. Well, yes. But if commissioner -- if commissioners had said, Judge, we think Map 1 is a better map and for these reasons, that's fine. I'm open to that.

**Q.** Okay. There was no time for the commissioners to do that because you had never had a meeting where all of you were in the same place discussing these maps until November 12th, correct?

**A.** Due to time constraints, that's correct.

**Q.** You had actually taken great care to make sure that you all weren't in the same room at the same time to discuss the maps until November 12th, correct?

**A.** No. We tried to do it earlier, but we could not make the 9th work.

**Q.** So either the 9th or the 12th, right?

**A.** Correct.

**Q.** All right. And you wanted to make sure that the other commissioners input on the draft maps would have been received before that meeting, right?

**A.** Commissioners input from -- to me? I'm not sure who you are asking about.

**Q.** That commissioners had already provided all of their input on the draft maps before that meeting, correct?

**A.** Yes. They were final versions, yes.

**Q.** So you are aware that other counties did actually hold public hearings throughout the fall for their county redistricting, right?

**A.** Okay.

**Q.** Well, Ms. Richardson, my colleague, asked you about this in your deposition in January. She asked you about Harris County. Do you remember that conversation?

**A.** Yes.

**Q.** So Harris County had -- I think we have talked about it earlier today, they had about, you know, nine meetings. They had a final meeting to vote October 28th on their maps. Does that sound familiar?

**A.** I think she said that, yes.

**Q.** And to this day, you do not have an explanation for why Galveston County did not follow the same process?

**A.** Sure, I do. We did not have enough time to do it.

**Q.** You had the same amount of time as Harris County,

correct?

**A.**   I have no idea what happens in Harris County.

**Q.**   But that November 13th deadline, which I think we have now understood never changed, that deadline applied to Harris County as much as it applied to Galveston County, right?

**A.**   Yes.

**Q.**   Okay.  You mentioned earlier for these public comments that you had gotten more public comments than anything that you have ever done as county judge for the 2020 map proposals, correct?

**A.**   Still a fairly small number, but yes.  It was fairly well commented on.

**Q.**   Those were rolling in.  We just saw a comment from November 5th.  Those were rolling in after that website got posted on October 29th, correct?

**A.**   Yes.

**Q.**   I think you also said you had no reason to expect the volume of people that came, and it's your testimony that even though you were experiencing the highest number of public comments on anything, your testimony is still that you had no reason to think that people were going to show up in numbers in that November 12th meeting to discuss the maps?

**A.**   No.  I said we never have any way of knowing how many

people are going to show up.

**Q.**   But here you had a public comment response that you have earlier said was the most response you have gotten for anything as a county judge, and is it your testimony today that you still had no indication of how many people were going to show up to this meeting?

**A.**   That's correct.

**Q.**   And we looked before at the signatures from the 2011 process when they had, you know, five public hearings just to solicit public comment and that I heard you testify that more people might have spoken than had signed up and that more people might have and did show up that didn't even speak, and it's your testimony today that, given that experience, you still had no indication of how many people were going to come for this redistricting cycle, the one hearing, correct?

**A.**   That's correct.

**Q.**   That November 12th special session, you mentioned trying to get it in a special session on November 9th.  I mean, it was always going to be a special session, correct?

**A.**   Yes.  We would not have had a regular session until after the deadline.

**Q.**   Well, there was that regular session on November 1st, correct?

**A.**  Which we could not have met the posting criteria.

**Q.**  There is no indication you had ever planned to meet that November 1st regular.  You'd never even tried or told your lawyers to meet, hey, we're going to do it on November 1st?

**A.**  Yes.  We were saying "Where's our maps?"  We were getting a little aggravated.

**Q.**  I understand that.  But you were never planning to do it in a November 1st regular session, correct?

**A.**  I don't know if I was planning.  I mean, I was planning on getting it going as soon as we had the final product.

**Q.**  Well, let's take a look.  Let's pull up JX-27.  You looked at this with Mr. Russo.

And I think this refers to the frustration that your office -- this is between Tyler Drummond.  Let's go to the top.  No.  Let's go to the Drummond e-mail from October 28th and it says -- yes.  The top, thank you.

It says, "We're past our deadline on this project where we originally wanted to have a special meeting tomorrow to discuss and possibly adopt."

So special meeting tomorrow -- this is written on a Thursday.  So that special meeting tomorrow would have been a Friday, October 29th, right?

**A.**  Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   So not one of your Monday morning meeting times?

**A.**   Correct.

**Q.**   And there was a November 1st regular meeting scheduled Monday morning 9:30 a.m., right?

**A.**   Correct.

**Q.**   And Tyler Drummond does not say here, 'We originally wanted to do this in the November 1st regular meeting,' does he?

**A.**   He is saying that we wanted to have this further along in the process than it is right now.  To post for the November 1st agenda, everything would have had to have been posted on this day, on October 28th, and he is saying, 'We don't have it.  Where are we?'

**Q.**   I understand that, but I also understand that he is saying we're going to have this on a Friday special meeting.  He is not anywhere referring to the next business day, Monday, 9:30 a.m. regular meeting time that would have happened at the county seat, correct?

**A.**   No.  But he doesn't -- he is showing his frustration. You are taking too long to get us what we need.  We need to get this moving.

**Q.**   He also, in addition to that, indicates it was planned in a special meeting?

**A.**   Well, he doesn't call meetings.  I do.  But that's what he said.

**Q.**    Okay.  And let's look at that meeting notice really quickly, if we can.  JX-38.  This is when the meeting notice actually went out.  And just for the record, that meeting happened at 1:30 p.m. on November 12th, correct?

**A.**    That sounds right.

**Q.**    If I look at the time of this e-mail, 1:39 p.m., correct?

**A.**    Yes.

          MS. KLEIN:  Okay.  Just one more minute and I'll collect myself and I think I should be done, Your Honor.

          THE COURT:  All right.

BY MS. KLEIN:

**Q.**    Judge Henry, I heard you say a lot, several times in this discussion we are having, you know, "If my lawyers told me to do it, I would have done it."  I just want to clarify that, you know, you are the presiding officer of Galveston County Commissioners Court, correct?

**A.**    Yes.

**Q.**    How many constituents do you have?

**A.**    360,000.

**Q.**    You are elected to represent those 360,000 people, correct?

**A.**    Yes.

**Q.**    You are hired -- you are elected to work for their benefit, correct?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**    Right.

**Q.**    You are expected to exercise your own judgment in doing that, correct?

**A.**    In some matters.

**Q.**    But as a general matter, you are -- you were elected to sit there in your position and exercise your judgment about what would be in the benefit of your constituents, correct?

**A.**    In some matters, yes.

**Q.**    What matters are you not?

**A.**    I do not think they would expect me to ignore legal advice.

**Q.**    Well, let's talk about that a little bit because there is the "my lawyer said I have to" and there is "my lawyer said I can't."  That's two different types of legal advice, correct?

**A.**    Yes.

**Q.**    At any point in this process, did your lawyers say you cannot adopt public redistricting criteria?

**A.**    I do not remember.

**Q.**    At any point in this redistricting cycle did your counsel say 'Legally, I cannot hold public hearings on the maps that were drafted for you in mid-October'?

**A.**    We did not have final product in mid-October.

**Q.**    But the drafts that you were shown in private, did

Q.   your counsel ever tell you it would be illegal --

A.   No.

Q.   -- for you to have a public hearing on that?

A.   No.

Q.   Did your counsel ever tell you it would be illegal for you to do a -- for them to do a presentation on the census release and what the census showed had to change in the maps?

A.   No.

Q.   Has your counsel ever told you it would be illegal to come back to the drawing board after the 2022 election and after hearing how many people are upset about what happened and to try to be more inclusive and put a committee together to try to figure something out?  Have you been told that's illegal?

A.   No.

Q.   If your lawyers said you could get away with doing something harmful to your constituents, even if it would be legal to do so, you would exercise your own judgment to decide not to take that harmful action, correct?

A.   That's a hypothetical, I guess.

Q.   Your lawyers work for you, Judge Henry, not the other way around, correct?

A.   They work for the Commissioners Court.

Q.   And you were the presiding officer of that, correct?

**A.**    I'm one member of five.

**Q.**    You are also expected to manage the County's agents generally in a way that will prevent harm to your constituents, correct?

**A.**    Yes.

**Q.**    And as we discussed before, ultimately it is your office that was responsible for scheduling the Commissioners Courts meetings, correct?

**A.**    Yes.

**Q.**    Your office is ultimately responsible for putting together those agendas, correct?

**A.**    Yes.

**Q.**    And your office and your staff were responsible for directing the redistricting process in 2021, correct?

**A.**    Directing the process or just keeping the process moving?  Yes.  I would say yes.

**Q.**    However you want to characterize it.

**A.**    Yes.

**Q.**    Even when you posted -- even when you posted those maps on October 29th, you didn't tell anybody that these maps had to be passed by the candidate filing deadline on November 13th, correct?

**A.**    Not on there, no.

**Q.**    And when you found out, you say you found out, we established the deadline never changed.  But you say you

found out from the Secretary of State on November 2nd that they would have to be passed by the 13th, no update to that website to tell people this is going to happen before November 13th, correct?

**A.**  That sounds correct.

MS. KLEIN:  I have no further questions, Your Honor.

At this time, I'm not going to pass the witness because, as discussed at the pretrial conference, I believe my colleagues from the other plaintiff groups have just a few questions they might want to ask the judge.  We have done what we could to coordinate, but there are three separate consolidated cases in this matter and we reserve the right to ask questions, if necessary.

THE COURT:  Okay.

MR. RUSSO:  Your Honor, we would absolutely object to having more than one examining attorney of any of these witnesses.  This is the first we have heard this is going to be an issue.  We are going to have all of a sudden three separate groups.  The case has been consolidated.  We have all been dealing with one examiner, one cross.  This is where we are six days into trial.

THE COURT:  Something like this came up.  That's what Mr. Baron was referring to earlier today or yesterday.  I can't remember.

MR. BARON:  It was earlier today, Your Honor.

THE COURT:  It was earlier today?

MR. BARON:  It seems like yesterday, but it was not.

THE COURT:  Yeah.  As far as -- well, I mean, having heard the examination, do the other two plaintiffs groups have questions?

MS. JAYARAMAN:  Very briefly, Your Honor.

THE COURT:  And --

MR. GABER:  (Nodding affirmatively.)

THE COURT:  All right.  How much redirect, based on what you have heard so far?  Based on what you know right now, how much redirect do you think you have?

MR. RUSSO:  None.

THE COURT:  Okay.  I think that the other two plaintiffs groups are -- the cases are consolidated for trial.  But within reason I would allow the other two plaintiffs' groups to cross-examine Judge Henry.

How much are we talking about?

MS. JAYARAMAN:  I have about ten minutes, Your Honor.

MR. DUNN:  About 15.

THE COURT:  Okay.  All right.  I want to be off the bench by 6:30.  If we could, let's make it quick.  Okay.  The objection is overruled.

**CROSS-EXAMINATION**

BY MS. JAYARAMAN:

Q.   Good evening, Judge Henry.  My name is Tharuni Jayaraman.  I'm one of the attorneys representing the United States.  I just have a few questions for you.

It is your belief that any member of the Commissioners Court has the right to place an item on the Commissioners Court agenda, correct?

A.   It's not my belief.  It's case law.

Q.   And that includes you, correct?

A.   Yes.

Q.   And since at least 2013, there have been at least 24 Commissioners Court meetings per year, correct?

A.   Yes.  I'm sure that's correct.

Q.   And likely, there have actually been more than 24 per year, correct?

A.   Yes.

Q.   And you testified earlier that you believed that the commissioners -- that Precinct 3 and the Commissioners Court map that was in effect between 2012 and 2021 was gerrymandered, correct?

A.   Yes.

Q.   And you still believe that today, correct?

A.   Yes.

Q.   But there was no item on any Commissioners Court

meeting agenda to replace that prior map until after the release of the 2020 Census data, correct?

**A.**   We wouldn't have -- correct.  We wouldn't have done that.

**Q.**   And you testified earlier that the changes between the Commissioners Court map that the Department of Justice did not preclear in 2012 and the map to which the Department of Justice did not object in 2012 and that went into effect were incredibly minor, correct?

**A.**   Yes.

**Q.**   And it was your understanding that only certain small changes needed to be made for that map to get approved, correct?

**A.**   Yes.

**Q.**   So in your mind, the removal of the Bolivar Peninsula from Precinct 3 was incredibly minor, correct?

**A.**   A very small population difference.  Plus the geography.

         MS. JAYARAMAN:  I'll pass the witness.  Thank you.

                    **CROSS-EXAMINATION**

BY MR. DUNN:

**Q.**   Nice to see you, Judge.

**A.**   Good to see you, sir.

**Q.**   It seems like this is the only environment we see one

another.

**A.**    Sadly.

**Q.**    Did you trip and fall into Map Number 2?  Is that what I understand from your testimony?

**A.**    No.

**Q.**    Map Number 2 was an accident?

**A.**    No, I don't think.

**Q.**    So at the time you adopted Map Number 2, you had no idea what impact it was going to have on Commissioner Holmes's electability?

**A.**    I'm sure I had an idea.

**Q.**    You had an intent?

**A.**    I did not.

**Q.**    You told us earlier that if Commissioner Holmes had asked you for something, you would have probably told him yes, right?

**A.**    That's a hard one.  But, yes, I would certainly have been persuaded or swayed by his request, yes.

**Q.**    Because he hadn't asked you for anything in 12 years; is that right?

**A.**    That's right.  Not that I can recall.

**Q.**    And you don't think his speech on November the 12th was an ask?

**A.**    No.

**Q.**    You didn't gather from his comments on November the

12th that Map Number 2 was disliked by Commissioner Holmes?

**A.** No.  He was advocating for these two maps I had never seen before.

**Q.** So you thought his backup plan would be Map Number 2?

**A.** If that was his backup plan, that's not how I understood it.

**Q.** Now, the -- you also told us that your one and only -- I wrote this down.  Your one and only priority was this coastal precinct.  In fact, coastal precinct was the only request that I had.

Do you recall saying that?

**A.** After legal compliance.

**Q.** You wanted a map that was legal?

**A.** Yes.

**Q.** And you wanted a coastal map, a coastal district?

**A.** Correct.

**Q.** And, of course, you had been through the 2011 process?

**A.** Yes.

**Q.** You had been through the trial here?

**A.** Yes.

**Q.** The three-judge court trial here and then a single-judge court trial here.  You had been through all those?

**A.** Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   You attended those?

**A.**   Yes.

**Q.**   You understood that the federal government and the U.S. Congress passed a law called the Voting Rights Act that ensured that certain voting rights are paid attention to by local governments?  You knew that?

**A.**   Yes.

**Q.**   When you adopted a map in 2011 that didn't pay enough respect to Commissioner Holmes's precinct, the Department of Justice stopped your county from implementing it.

Do you recall that?

**A.**   We did not get preclearance.  We did not adopt a map that did that.

**Q.**   So you had to make changes?

**A.**   Minor changes, yes.

**Q.**   And then you got permission from the federal government to invoke the map?

**A.**   Yes.

**Q.**   Ten years later it didn't occur to you that when you looked at these two options your lawyers gave you to give some consideration to how it might impact the minority voters in your county?

**A.**   They were given direction to make sure they were legally compliant.

**Q.**   And so you just went blindly into the night because

your lawyers told you to?

**A.**   No.

**Q.**   Did you get tricked by the National Republican Redistricting Trust?

**A.**   No.  Since I'm not really sure who that is, I don't think I did.

**Q.**   So was it the case that your lawyers decided to make a district where Black and Latino citizens couldn't elect a candidate of choice and you just had no knowledge of it?

**A.**   I'm not a map drawer.

**Q.**   Now, you drive around this county and do your job, I assume?

**A.**   Yes, I do.

**Q.**   Do you make it into Texas City?

**A.**   From time to time.

**Q.**   Do you make it into Dickinson?

**A.**   Yes.

**Q.**   Do you make it into the Island here on the other side of Broadway?

**A.**   I'm here now.

**Q.**   And you know that those are predominantly Black and Hispanic neighborhoods?

**A.**   Okay.

**Q.**   Do you?

**A.**   No.  Do I know that for a fact?  No.  I don't know

what the makeup is.

**Q.**  Can you name an area of the county that you do think is predominantly Black or Hispanic?

**A.**  Do you mean generally speaking?  I mean, or by neighborhood?  Or what exactly are you asking for?

**Q.**  Any area in the county, whether you want to call it a city, a school district, a block?

**A.**  Parts of Galveston, parts of Texas City, parts of La Marque.

**Q.**  And you understood that Map Number 2 was going to sever those into four different precincts, did you not?

**A.**  I do not know if I knew that or not.

**Q.**  Legally compliant map.  Coastal precinct.  You have seen such a map, have you not?

**A.**  Map Number 2.

**Q.**  You have seen a map that was proposed by the plaintiffs in this case, have you not?

**A.**  When?

**Q.**  In just the last month or so.

**A.**  I did not look at those maps.

**Q.**  You should have on your screen here --

        MR. RUSSO:  I have got to clarify something.  The document on the screen is related to, I think, an offer made to the parties to resolve the case.  If that's true, this is improper evidence to present in the case.

*Laura Wells, RPR, RMR, CRR, RDR*

THE COURT:  All right.  Mr. Dunn?

MR. DUNN:  It falls within an exception under the Federal Rules of Evidence 408 to show notice to the witness and it also shows what is possible here.  And so it is proper impeachment evidence under the exception and Rule 408.

MR. RUSSO:  Your Honor, if he wants to show -- there are plenty of illustrations in this case that could allow him to do it.  We have already seen from other experts related to what is possible to be drawn in this district.  He doesn't have to use the map in front of you to do that.

THE COURT:  I'm going to overrule the objection. Let's make it quick, Mr. Dunn.

MR. DUNN:  Yes, sir.

BY MR. DUNN:

Q.   This was in a letter from the plaintiffs' attorney in this case asking the County to resolve this lawsuit with this map.  You received the letter?

A.   I did.

Q.   It's your testimony here you didn't bother to look at the map?

A.   I did not look at the map.

Q.   I believe it was your testimony prior that you haven't been told by anyone that there have been a number of maps

offered in this litigation that would draw a coastal precinct and also still maintain the Black and Latino neighborhoods together in a Precinct 3, but you are learning this today on the witness stand; is that true?

**A.** Yes.

**Q.** Well, assume with me that His Honor has received at least five such maps into evidence in this case. If Mr. Holmes were to put that on the commissioners agenda, would you be a vote in favor?

**A.** I know nothing about this map.

**Q.** If those maps had a coastal precinct in it and they were otherwise legal, though, you would be in favor of them; is that true?

**A.** I would consider them, yes.

**Q.** And there is time for Commissioner Holmes to put the matter on the agenda between now and when the filing period opens in 2023. Would you agree?

**A.** Say that again.

**Q.** There is time here in 2023 for this matter to be taken up again by the Commissioners Court prior to the opening of the filing period?

**A.** He actually put something on the agenda and then pulled it off at the last minute.

**Q.** Well, actually, what happened was he asked to put it on the agenda, this very map, and at the last minute after

Mr. Ready had sent him an e-mail saying this would be on the agenda, at the last second it was taken off.  Isn't that what happened?

**A.**   At his request.  At his request.

**Q.**   As a result of that, it was only discussed in executive session and not in public?

**A.**   I don't think it was discussed in an executive session.

**Q.**   I showed some exhibits earlier, Defendants' Exhibits 85 and 86.  If you need to take a minute to familiarize yourself, please do so.  You were in the courtroom?

**A.**   I was.  I saw them on the screen.

**Q.**   The first exhibit, Exhibit 85, is where Mr. Sigler sends to Mr. Shannon some data that Commissioner Holmes -- in fact, they call it the Commissioner Holmes' project.  Would you agree?

**A.**   I knew nothing about it, but it's fine with me.

**Q.**   And on Defendants' Exhibit 86, in this same e-mail exchange or a different e-mail exchange between the same two people, they talk here about how Commissioner Holmes does not have access to the map.  Do you see that?

**A.**   I do.

**Q.**   Who told these career officers to hide things from Commissioner Holmes?

**A.**   Oh, I don't think anyone did.

**Q.** They just did it on their own?

**A.** They were not given direction from me or any other commissioner that I'm aware of.

**Q.** Just like the map, it just came together on its own?

**A.** I don't know how it happened.

MR. DUNN: Pass the witness.

THE COURT: All right. Any redirect, Mr. Russo?

MR. RUSSO: Yes, Your Honor.

### REDIRECT EXAMINATION

BY MR. RUSSO:

**Q.** So, Judge Henry, counsel just asked you a question about whether I guess Mr. Sigler or Mr. Shannon somehow hid information from Commissioner Holmes?

**A.** Yes.

**Q.** Do you know anything about it?

**A.** Not a thing.

**Q.** Anything?

**A.** Not a thing. If they had asked me, I would have said you give him what he wants. He is a sitting commissioner.

**Q.** And he can get access to information by asking, correct?

**A.** Yes. He should be able to ask anything, and he should be able to get it.

**Q.** Did you at any time instruct any commissioners, Mr. Oldham, the Holtzman Vogel firm, any of your staff to

*Laura Wells, RPR, RMR, CRR, RDR*

withhold any information from Commissioner Holmes?

**A.**   Just the opposite; make sure you include him as much as you can.

**Q.**   As far as you are aware, he was included in the process as much or more than any other commissioner in this redistricting effort?

**A.**   Yes.  Yes.

         MR. RUSSO:  Pass the witness.

         THE COURT:  All right.  Is there any re-cross?

         MS. KLEIN:  No, Your Honor.

         THE COURT:  Okay.  Judge, you may step down.

         THE WITNESS:  Thank you, Judge.

         THE COURT:  Just to clarify on the -- I obviously allowed a limited amount of cross by the other two plaintiffs groups after the primary advocate had finished her cross.  But I -- there is still going to be one lawyer, one witness on objections for each side.  That's also what I have done today, and we're going to continue to do that.  I don't need every lawyer at this table popping up and objecting since y'all -- since you represent three different groups.

         Okay.  Let's start at 8:30 tomorrow morning.  Is that all right?  And we'll take your next witness when we start at 8:30.

         MR. RUSSO:  Thank you, Your Honor.

        CASE MANAGER:  All rise.

     *(Proceedings adjourned at 6:17 p.m. and continued on Day 8.)*

 *Date:  August 30, 2023*

                    ***COURT REPORTER'S CERTIFICATE***

     *I, Laura Wells, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

                         _____/s/ Laura Wells_____

                         *Laura Wells, CRR, RMR*

*Laura Wells, RPR, RMR, CRR, RDR*

**$**

$550,000 [1] - 242:16

**'**

'20 [1] - 180:13
'21 [6] - 64:5, 137:13, 180:13, 182:23, 183:3, 205:2
'91 [1] - 12:5
'94 [1] - 12:8
'95 [1] - 170:21
'99 [1] - 14:15
'Hey [2] - 88:4, 143:20
'Legally [1] - 340:22
'never [1] - 145:17
'requirements [1] - 279:18
'We [2] - 338:6, 338:13

**/**

/s [1] - 357:9

**0**

000184 [1] - 204:1
000921 [1] - 144:14

**1**

1 [94] - 13:6, 13:25, 14:1, 24:8, 25:5, 27:2, 28:5, 28:9, 32:16, 69:21, 69:23, 72:17, 74:10, 81:8, 81:11, 87:13, 87:16, 88:9, 100:5, 101:7, 101:8, 101:11, 101:13, 101:20, 102:17, 110:11, 115:1, 115:4, 115:8, 115:14, 115:15, 116:16, 116:19, 116:25, 117:13, 118:16, 119:10, 119:15, 119:20, 120:1, 120:2, 120:4, 120:9, 121:21, 122:11, 122:12, 122:23, 123:19, 124:9, 124:11, 124:13, 124:18, 124:19, 124:22, 124:23, 126:21, 126:23, 134:20, 140:1, 149:6, 149:9, 151:16, 158:6, 158:9, 194:19, 195:20, 196:1, 196:8, 196:12, 199:18, 234:1, 234:19, 234:23, 236:12, 237:4, 237:12, 237:23, 238:1, 238:7, 238:11, 238:12, 239:1, 239:10, 239:14, 270:19, 308:8, 313:5, 324:4, 324:9, 331:11, 333:12
1.5 [1] - 254:1
10 [4] - 1:8, 70:15, 225:24, 287:13
10-22 [1] - 205:1
10-29 [1] - 133:23
10-29-2021 [1] - 76:14
100 [5] - 18:15, 227:14, 241:16, 241:18, 242:11
10019 [2] - 2:18, 3:11
101 [2] - 3:3, 3:7
1010 [1] - 1:16
107 [2] - 4:21, 4:25
10:32 [1] - 85:14
10:45 [1] - 85:12
10:47 [1] - 85:14
10th [1] - 93:10
11 [3] - 6:8, 8:13, 141:17
11-12-2021 [1] - 81:3
11-9 [1] - 78:10
1101 [4] - 1:12,
1:22, 2:3, 2:7
114 [1] - 6:14
11:23 [1] - 114:15
11:30 [1] - 113:22
11th [3] - 90:24, 102:25, 128:3
12 [17] - 87:5, 141:18, 141:21, 142:5, 168:22, 168:24, 238:14, 239:19, 243:17, 253:22, 262:4, 264:3, 264:5, 264:15, 264:18, 299:8, 347:19
120 [1] - 123:15
12:43 [1] - 114:15
12:45 [1] - 114:12
12:58 [1] - 82:4
12th [44] - 55:19, 55:24, 56:20, 85:24, 86:3, 86:7, 88:12, 90:25, 97:12, 102:25, 108:6, 108:20, 116:10, 140:2, 157:9, 157:11, 162:4, 218:19, 221:19, 223:3, 226:1, 228:5, 229:6, 229:24, 233:11, 235:17, 296:11, 309:1, 309:3, 309:8, 309:10, 309:12, 309:15, 310:3, 325:12, 331:1, 333:17, 333:21, 333:24, 335:23, 336:18, 339:4, 347:22, 348:1
132 [1] - 92:21
138 [1] - 87:13
13th [21] - 78:18, 79:8, 103:2, 103:22, 137:13, 183:12, 216:9, 217:2, 217:9, 217:19, 219:7, 220:4, 294:24, 295:2, 295:8, 295:16, 295:20, 335:3, 342:22, 343:2, 343:4
14 [1] - 144:12
140 [1] - 127:1
1405 [2] - 2:14, 2:21
1415 [2] - 3:3, 3:6
142 [1] - 69:20
144 [6] - 69:13, 87:4, 92:8, 94:3, 95:5, 116:23
147 [1] - 98:10
14th [5] - 1:12, 1:22, 2:3, 2:7, 265:13
15 [11] - 1:6, 6:3, 10:16, 10:17, 29:17, 87:22, 88:2, 152:13, 225:25, 320:6, 344:22
150 [3] - 3:24, 4:3, 4:6
15405 [1] - 4:18
155 [1] - 107:11
156 [1] - 109:7
15th [2] - 267:14, 267:22
16 [1] - 64:3
161 [1] - 6:15
164 [2] - 149:17, 149:19
166 [1] - 6:10
172.023 [1] - 281:18
173 [1] - 163:19
17th [3] - 107:16, 301:21
18 [4] - 13:20, 13:22, 16:22, 109:18
1875 [1] - 2:24
18th [4] - 4:11, 193:22, 202:18, 310:8
19 [2] - 8:9, 10:15
1900 [1] - 1:19
192 [1] - 69:8
194 [2] - 144:9, 144:12
1960s [1] - 106:20
1960s-style [1] - 106:20
1965 [2] - 106:22, 285:12
1982 [1] - 12:1
1983 [1] - 36:13
1985 [1] - 167:17
1986 [1] - 12:2
1988 [1] - 36:14
1989 [2] - 38:8, 167:6
1990 [1] - 12:4
1994 [1] - 15:13
1995 [2] - 13:7, 36:15
1996 [1] - 75:15
1998 [1] - 14:15
1999 [4] - 38:9, 38:15, 46:4, 148:2
19th [9] - 72:10, 75:1, 204:2, 204:14, 300:12, 301:6, 302:3, 304:14, 310:14
1:30 [2] - 89:3, 339:4
1:39 [1] - 339:6
1st [18] - 30:21, 30:22, 172:21, 183:10, 214:24, 215:24, 216:2, 282:18, 310:4, 310:10, 326:9, 336:24, 337:3, 337:5, 337:9, 338:3, 338:7, 338:11

**2**

2 [93] - 10:13, 10:14, 32:19, 66:19, 68:18, 74:10, 78:16, 81:8, 81:11, 82:6, 82:7, 82:13, 82:16, 82:20, 82:21, 82:22, 82:24, 83:7, 83:23, 84:2, 86:13, 87:7, 87:11, 87:17, 88:4,

88:8, 100:5, 100:14, 103:24, 115:16, 127:7, 127:14, 128:4, 134:20, 137:5, 137:18, 139:12, 139:14, 149:4, 149:6, 149:8, 151:13, 158:19, 194:19, 195:21, 195:22, 196:8, 196:12, 197:9, 199:1, 234:1, 234:19, 234:20, 236:15, 236:20, 236:22, 237:13, 237:19, 238:2, 238:20, 239:1, 239:6, 239:9, 250:5, 265:25, 267:4, 274:13, 274:20, 275:24, 276:13, 285:10, 287:12, 305:4, 324:4, 324:10, 327:9, 327:23, 331:8, 331:9, 331:22, 332:5, 332:16, 333:3, 333:8, 333:10, 347:3, 347:6, 347:8, 348:1, 348:5, 351:10, 351:15

20-something [1] - 186:3

20002 [4] - 1:23, 3:24, 4:4, 4:7

20005 [3] - 1:13, 2:4, 2:8

20006 [1] - 2:24

2001 [8] - 15:15, 29:4, 60:10, 270:6, 275:20, 277:9, 278:12, 278:18

2003 [1] - 170:16

2004 [4] - 13:7, 14:7, 15:14, 15:20

2005 [1] - 13:18

2006 [2] - 171:10, 171:21

2008 [1] - 171:5

2010 [8] - 167:20, 171:5, 171:12, 171:22, 171:25,

172:5, 263:22, 266:2

2011 [68] - 15:7, 24:22, 28:5, 31:15, 59:25, 60:5, 60:10, 60:16, 62:12, 62:17, 63:25, 65:23, 68:12, 101:17, 107:8, 172:20, 172:21, 174:1, 174:6, 174:15, 175:9, 175:14, 178:3, 178:15, 178:23, 179:23, 180:24, 182:4, 182:12, 185:2, 186:3, 186:5, 201:21, 202:6, 202:12, 254:13, 262:17, 262:20, 264:25, 265:3, 265:6, 265:13, 265:16, 265:25, 268:7, 269:4, 269:11, 269:13, 270:3, 270:4, 271:8, 271:18, 273:15, 275:10, 276:18, 277:12, 278:24, 279:15, 282:19, 292:2, 293:24, 307:10, 307:16, 315:19, 316:12, 336:8, 348:18, 349:8

2011-2012 [9] - 15:21, 15:25, 16:2, 17:16, 19:10, 21:6, 21:12, 21:17, 21:22

2012 [13] - 13:18, 14:8, 15:3, 15:4, 15:20, 16:18, 20:15, 223:9, 254:15, 274:16, 345:20, 346:7, 346:8

2013 [6] - 89:20, 252:5, 252:7, 254:12, 254:14, 345:12

20169 [1] - 4:18

202 [10] - 1:14, 2:5, 2:8, 2:25, 3:15, 3:19, 3:22,

3:25, 4:4, 4:7

2020 [22] - 39:5, 44:4, 66:25, 97:7, 110:9, 129:21, 144:4, 178:18, 179:13, 180:15, 180:20, 182:4, 217:1, 263:3, 263:17, 280:12, 284:4, 285:7, 302:1, 330:8, 335:10, 346:2

2021 [83] - 20:22, 20:24, 21:7, 21:10, 21:19, 21:24, 22:7, 39:5, 59:25, 60:5, 60:10, 60:20, 62:3, 72:10, 78:7, 78:10, 78:19, 82:3, 86:3, 96:16, 108:8, 110:3, 110:8, 110:11, 116:10, 121:11, 121:14, 122:7, 133:23, 139:1, 139:5, 139:6, 139:9, 140:1, 140:2, 150:2, 150:20, 154:25, 177:24, 179:17, 180:12, 181:9, 181:13, 181:22, 184:13, 184:14, 184:25, 187:19, 187:23, 195:9, 201:20, 204:2, 206:12, 208:10, 209:22, 210:16, 215:7, 217:2, 221:22, 261:1, 279:24, 282:14, 282:21, 282:23, 283:17, 284:12, 286:4, 287:3, 287:25, 289:13, 290:17, 293:1, 296:11, 313:8, 314:6, 314:20, 315:15, 324:14, 325:3, 325:16, 330:2, 342:14, 345:20

2022 [6] - 198:14, 280:19, 323:4, 323:5, 323:14, 341:11

2023 [9] - 1:6, 6:3, 256:12, 256:16, 312:11, 324:16, 353:17, 353:19, 357:4

203 [1] - 4:14

20530 [3] - 3:15, 3:18, 3:21

20th [13] - 62:2, 64:5, 128:17, 130:1, 181:11, 210:2, 214:19, 214:22, 217:13, 289:13, 289:16, 294:23, 309:16

21 [2] - 81:14, 81:21

212 [2] - 2:18, 3:11

21st [11] - 66:25, 97:7, 111:21, 136:13, 144:4, 223:14, 223:16, 247:4, 311:22, 312:11

22 [4] - 6:9, 9:2, 264:12, 269:19

2216 [1] - 38:19

22314 [1] - 4:25

22nd [8] - 74:14, 74:16, 108:8, 205:12, 206:12, 206:17, 206:21, 209:6

23 [8] - 9:1, 35:7, 61:21, 61:24, 66:19, 133:15, 133:16, 331:14

232 [1] - 70:2

23rd [1] - 267:14

24 [4] - 148:3, 245:8, 345:12, 345:15

24th [2] - 279:15, 316:12

25 [3] - 23:5, 148:1, 229:18

250 [1] - 6:11

2525 [1] - 4:14

255 [1] - 320:6

256 [1] - 320:13

25th [3] - 150:20, 179:13, 263:16

26 [3] - 225:24, 241:18, 242:11

260 [1] - 299:7

26th [1] - 276:22

275 [1] - 332:6

276 [1] - 331:13

27707 [2] - 3:4, 3:7

281 [1] - 1:17

282 [1] - 128:13

28th [14] - 121:8, 121:11, 150:2, 152:13, 152:25, 153:3, 153:14, 183:7, 210:16, 211:2, 309:16, 334:19, 337:18, 338:12

29 [2] - 186:3, 213:25

29th [26] - 107:23, 110:2, 110:8, 133:23, 135:14, 153:4, 153:8, 153:12, 153:15, 157:4, 183:7, 186:5, 209:15, 209:22, 210:7, 212:9, 217:21, 221:22, 309:16, 325:16, 326:21, 326:24, 333:2, 335:16, 337:24, 342:20

2:1 [3] - 234:19, 238:1, 332:5

2:47 [1] - 206:5

2nd [18] - 78:7, 79:7, 136:13, 136:14, 139:1, 139:5, 139:6, 139:9, 154:19, 154:25, 215:7, 215:25, 216:3, 217:7, 219:12, 220:3, 292:1, 343:1

**3**

3 [76] - 20:10, 24:9, 25:5, 25:9, 27:3, 27:4, 27:11, 28:25, 29:1, 38:6, 38:24,

38:25, 39:9, 40:10, 40:13, 40:20, 41:8, 45:16, 45:24, 46:12, 47:14, 48:2, 63:10, 68:25, 69:4, 69:21, 69:23, 70:6, 70:8, 72:15, 72:19, 82:14, 82:15, 98:19, 101:13, 118:1, 118:5, 118:16, 121:23, 122:1, 123:25, 124:22, 125:16, 125:18, 125:19, 125:20, 125:21, 126:3, 142:6, 142:7, 198:10, 201:16, 202:10, 250:10, 269:14, 269:25, 270:8, 270:9, 270:11, 270:23, 271:9, 271:20, 272:6, 272:14, 273:5, 276:23, 302:11, 302:19, 303:9, 305:17, 306:7, 319:9, 319:12, 345:19, 346:16, 353:3

3.10 [1] - 276:8

30 [8] - 17:2, 229:18, 262:4, 282:6, 283:3, 313:17, 313:18, 357:4

30-day [4] - 31:8, 282:3, 282:6, 283:2

300 [1] - 18:18

303-1157 [1] - 2:25

305-5194 [1] - 3:22

307-2767 [5] - 3:15, 3:19, 3:25, 4:4, 4:7

30th [4] - 109:11, 109:16, 269:4, 282:1

310 [1] - 2:11

318 [1] - 1:24

31st [2] - 13:18, 30:22

32 [1] - 118:5

3250 [1] - 2:10

326) [1] - 215:14

34 [1] - 198:15

341-8808 [1] - 4:19

344 [1] - 95:5

345 [1] - 6:11

346 [1] - 6:12

35 [1] - 6:14

355 [1] - 6:12

357 [1] - 6:5

36 [1] - 141:17

360,000 [2] - 339:20, 339:21

3:00 [1] - 206:3

3:01 [1] - 206:5

3:22-CV-00057 [1] - 1:3

3rd [2] - 120:24, 121:6

**4**

4 [5] - 70:7, 71:14, 275:24, 278:15, 313:6

40 [1] - 57:5

400 [5] - 1:13, 1:23, 2:4, 2:7, 18:18

400-6019 [1] - 2:11

407 [1] - 3:8

408 [2] - 352:3, 352:6

409 [2] - 4:12, 4:15

42543 [1] - 4:22

45 [1] - 8:13

46 [1] - 10:15

474-5073 [2] - 2:15, 2:22

49 [1] - 110:1

4:00 [1] - 155:10

4:1 [1] - 288:15

4:47 [1] - 93:10

4:59 [1] - 93:7

4con [2] - 3:14,

3:18

4th [13] - 80:10, 80:11, 89:18, 89:19, 102:22, 120:25, 121:6, 121:9, 121:14, 122:7, 126:18, 222:4, 256:1

**5**

5 [14] - 8:9, 13:10, 13:12, 16:15, 19:17, 19:25, 20:16, 32:17, 48:16, 48:18, 49:16, 68:14, 175:10, 265:16

5,000 [4] - 289:8, 320:20, 320:21, 320:24

50 [5] - 10:16, 10:17, 10:18, 18:15, 110:11

512 [3] - 1:20, 2:15, 2:22

517 [4] - 69:14, 69:15, 69:16, 70:23

52 [5] - 24:11, 24:18, 29:2, 30:1, 63:5

534-2748 [1] - 1:17

54 [2] - 3:3, 3:6

540 [1] - 4:19

55 [3] - 118:6, 119:4, 124:9

56 [1] - 10:14

560th [1] - 167:18

573-8984 [1] - 1:24

574-5244 [1] - 3:4

587 [1] - 156:6

59-plus [1] - 11:22

593 [1] - 318:22

5:0 [4] - 205:22, 308:19, 308:23

5:00 [3] - 140:18, 155:10, 301:5

5:04 [1] - 157:4

5:45 [1] - 329:24

5th [11] - 80:25, 144:7, 274:15, 287:3, 287:25, 296:10, 309:7, 309:10, 330:2, 330:10, 335:15

**6**

6 [4] - 25:13, 242:24, 242:25, 263:14

6,000 [2] - 289:10, 296:2

60 [1] - 228:20

60/40 [1] - 171:15

601 [1] - 5:4

607 [6] - 6:19, 7:20, 7:23, 9:22, 9:24, 9:25

607............ [1] - 6:4

610 [1] - 3:4

615 [1] - 5:4

61st [1] - 14:4

64 [1] - 149:17

65 [1] - 9:2

66 [2] - 9:15, 198:14

67 [2] - 268:3, 268:4

6:00 [1] - 281:21

6:17 [2] - 1:5, 357:2

6:30 [1] - 344:24

6th [3] - 113:3, 144:7, 285:7

**7**

7 [4] - 1:8, 6:1, 6:18, 10:14

70 [1] - 228:20

700 [1] - 4:25

703 [1] - 4:22

717-9822 [1] - 1:20

72 [12] - 48:19, 49:2, 49:14, 103:1, 140:14,

140:20, 157:5, 157:7, 157:21, 264:12, 329:23, 330:1

722 [1] - 55:4

728-8243 [2] - 2:18, 3:11

736-2200 [3] - 1:14, 2:5, 2:8

756-7873 [1] - 3:8

77550 [1] - 5:5

77550-7998 [1] - 4:11

77573 [2] - 1:17, 4:15

787 [2] - 2:17, 3:10

78705 [1] - 1:20

78741 [1] - 2:14

78741-3438 [1] - 2:21

797-3200 [1] - 4:12

797-3262 [1] - 4:15

**8**

8 [4] - 6:4, 9:15, 316:2, 357:3

80 [2] - 129:17, 163:8

85 [5] - 47:1, 111:11, 162:11, 354:10, 354:13

86 [4] - 112:3, 162:13, 354:10, 354:18

87th [1] - 283:1

89 [1] - 46:25

8:00 [1] - 301:5

8:30 [2] - 356:22, 356:24

8:50 [1] - 304:13

8:51 [1] - 330:2

8th [10] - 93:1, 93:7, 184:11, 184:18, 187:23, 192:1, 292:25, 293:1, 298:9, 298:22

## 9

9 [5] - 6:18, 262:5, 265:21, 278:19, 309:20
90 [1] - 240:17
90095 [1] - 2:11
921 [1] - 144:13
95 [1] - 131:22
950 [3] - 3:14, 3:17, 3:21
963-8611 [1] - 4:22
97 [1] - 130:24
9850 [1] - 42:3
99 [1] - 132:8
9:00 [1] - 204:6
9:01 [1] - 1:5
9:19 [1] - 289:15
9:30 [5] - 48:11, 140:16, 140:22, 338:4, 338:17
9th [9] - 78:10, 82:1, 82:3, 136:17, 218:18, 220:12, 333:23, 333:24, 336:19

## A

a.m [7] - 85:14, 114:15, 204:6, 301:5, 338:4, 338:17
A.M [1] - 1:5
abilities [1] - 178:16
ability [8] - 10:5, 19:22, 53:20, 104:18, 135:7, 135:8, 245:23, 249:20
able [20] - 63:10, 102:24, 120:9, 123:3, 202:10, 218:20, 219:22, 227:8, 229:16, 229:18, 230:22, 236:9, 244:2, 248:9, 266:24, 311:10, 326:11, 328:17, 355:22, 355:23

above-entitled [1] - 357:8
absolutely [11] - 45:22, 199:22, 224:9, 233:19, 239:8, 240:14, 240:24, 256:25, 257:8, 293:21, 343:16
accelerate [1] - 175:16
accelerates [1] - 218:3
accept [3] - 25:24, 45:2, 289:10
accepted [1] - 266:8
Access [1] - 93:13
access [13] - 42:4, 43:20, 61:18, 93:9, 112:13, 135:8, 162:20, 188:15, 229:2, 229:22, 248:2, 354:21, 355:20
accessibility [1] - 51:7
accessible [4] - 235:22, 236:6, 250:2
accident [1] - 347:6
accommodate [2] - 227:8, 298:17
accompanying [1] - 287:6
accomplish [2] - 65:16, 285:14
accomplished [1] - 159:19
account [3] - 255:19, 331:21, 331:25
accounting [1] - 16:15
accurate [4] - 27:25, 65:10, 109:22, 289:22
achieve [1] -

197:21
achieved [2] - 33:18, 321:8
acknowledgment [1] - 256:15
Act [24] - 52:2, 52:24, 53:8, 68:23, 82:22, 83:5, 83:17, 84:2, 91:5, 106:21, 178:16, 232:9, 239:4, 265:16, 271:8, 271:19, 271:23, 276:13, 278:21, 285:11, 306:19, 314:10, 314:11, 349:4
act [1] - 82:24
action [2] - 324:23, 341:20
active [3] - 166:22, 168:25, 170:21
actively [2] - 15:16, 15:23
activity [1] - 169:18
actual [10] - 40:17, 49:4, 49:10, 157:1, 160:4, 213:12, 244:1, 247:18, 248:22
Adams [2] - 4:13, 4:20
ADAMS [1] - 87:24
add [3] - 51:18, 237:15, 315:2
added [2] - 269:13, 324:18
addendum [1] - 264:15
adding [2] - 118:1, 316:21
addition [6] - 16:15, 49:1, 225:24, 292:6, 322:24, 338:22
additional [10] - 49:2, 49:13, 50:24, 53:23, 93:12, 237:15,

245:2, 285:11, 323:14, 330:4
address [3] - 38:18, 230:23, 330:10
addressed [4] - 265:13, 274:16, 285:7, 316:8
adhering [1] - 278:20
adjourned [1] - 357:2
adjustment [1] - 24:11
administration [2] - 49:21, 275:13
admission [1] - 7:19
admit [3] - 7:16, 297:12, 297:13
admitted [8] - 9:21, 9:24, 9:25, 35:6, 98:11, 109:6, 111:10, 276:22
ADMITTED [1] - 6:18
admitting [1] - 309:21
adopt [19] - 16:3, 100:14, 102:16, 103:21, 105:15, 139:14, 149:4, 149:8, 149:9, 157:13, 211:21, 274:3, 275:4, 279:2, 279:9, 323:1, 337:21, 340:19, 349:12
adopted [36] - 19:16, 39:5, 80:6, 94:20, 97:23, 98:7, 100:1, 100:6, 103:24, 107:4, 107:17, 107:18, 115:5, 115:6, 115:9, 115:16, 119:21, 152:14, 159:13, 174:7, 181:9, 188:3, 210:2, 211:25, 217:8, 218:2, 237:23, 254:8, 267:7, 275:2,

275:11, 277:10, 325:6, 347:8, 349:8
adopting [8] - 70:19, 239:6, 274:5, 275:20, 276:17, 278:23, 313:8, 314:6
adoption [3] - 154:1, 214:5, 297:14
Adrianne [1] - 3:5
ads [1] - 326:7
adults [1] - 12:22
advance [7] - 16:2, 49:1, 92:4, 96:17, 103:22, 105:8, 226:18
advice [5] - 182:6, 294:2, 294:3, 340:12, 340:16
advised [3] - 117:13, 117:16, 127:13
Advisory [1] - 215:14
advisory [7] - 215:17, 215:18, 215:23, 216:1, 216:8, 216:14, 216:16
advocacy [4] - 133:3, 234:9, 236:17, 316:24
advocate [3] - 317:3, 327:12, 356:15
advocates [1] - 317:2
advocating [1] - 348:3
Affairs [1] - 2:10
affect [2] - 44:14, 244:1
affected [1] - 24:11
affects [1] - 242:5
affirmatively [1] - 344:10
afford [1] - 243:5
affordable [1] - 243:4

afoul [2] - 82:22, 98:6
afraid [1] - 191:25
African [6] - 9:4, 27:4, 104:17, 110:17, 122:3, 273:8
afternoon [9] - 114:16, 114:19, 154:20, 154:25, 166:18, 205:24, 250:21, 250:25, 300:12
agenda [81] - 48:5, 48:10, 48:13, 48:14, 48:15, 48:16, 48:17, 48:23, 48:25, 49:4, 49:7, 49:11, 49:12, 49:14, 49:18, 49:23, 49:25, 50:16, 51:14, 51:15, 51:17, 56:4, 56:6, 60:21, 60:22, 115:20, 140:1, 140:9, 140:12, 140:14, 140:19, 140:23, 148:8, 152:17, 156:22, 157:5, 157:6, 157:7, 157:8, 157:11, 157:21, 225:4, 232:12, 253:25, 258:5, 258:7, 258:10, 258:12, 258:15, 258:25, 259:2, 259:12, 264:15, 264:18, 277:13, 286:5, 286:7, 286:11, 286:16, 287:5, 287:6, 288:6, 288:7, 295:17, 295:19, 295:20, 296:22, 310:12, 326:10, 326:12, 326:19, 326:21, 338:11, 345:8, 346:1, 353:8, 353:16, 353:22, 353:25, 354:2
Agenda [2] - 264:3, 264:5
agendas [5] - 257:22, 267:5,

296:10, 296:14, 342:11
agents [1] - 342:2
aggravated [1] - 337:7
aging [1] - 239:23
ago [15] - 13:6, 23:24, 46:22, 50:1, 57:3, 151:5, 160:3, 163:14, 206:11, 225:2, 241:22, 243:11, 287:15, 314:18, 325:3
agree [15] - 54:4, 60:7, 123:12, 123:17, 123:22, 124:1, 234:10, 239:22, 240:12, 253:19, 261:13, 303:14, 319:7, 353:17, 354:16
agreed [7] - 7:19, 67:25, 168:18, 176:25, 212:22, 260:1, 311:25
agreement [6] - 10:12, 86:15, 165:1, 261:18, 262:21, 263:21
ahead [4] - 194:23, 259:17, 288:11, 310:23
ahold [1] - 284:4
ain't [1] - 107:1
Air [4] - 166:22, 167:2, 167:24, 169:24
air [1] - 227:16
air-conditioned [1] - 227:16
aircraft [1] - 170:9
Airport [1] - 37:3
aisle [1] - 37:18
AL [2] - 1:4, 1:6
Alabama [1] - 167:14
alert [1] - 291:8
Alexandra [1] - 2:6
Alexandria [2] - 4:22, 4:25

aligned [2] - 54:17, 278:1
alive [2] - 190:21, 322:4
Allison [1] - 285:8
allotted [1] - 49:21
allow [7] - 124:7, 152:3, 158:10, 233:15, 233:18, 344:17, 352:9
allowed [8] - 20:11, 20:19, 100:10, 158:12, 165:2, 232:4, 326:18, 356:14
allowing [2] - 56:17, 241:4
allows [1] - 177:20
almost [7] - 53:4, 67:3, 77:18, 84:21, 104:4, 113:4, 148:1
ALPHABETICAL [1] - 6:6
ALSO [1] - 5:2
altered [1] - 276:2
alternate [1] - 223:13
alternates [1] - 228:13
alternative [4] - 92:1, 100:18, 101:4, 304:20
alternatives [1] - 71:2
amend [3] - 148:18, 149:5, 326:11
amended [2] - 149:2, 158:24
Amendment [2] - 199:19, 314:9
America [1] - 312:9
AMERICA [2] - 3:12, 4:2
American [6] - 9:4, 27:4, 104:17, 110:23, 122:3, 273:8

American/ Black [1] - 110:17
amount [8] - 59:2, 94:10, 224:17, 226:13, 230:2, 313:16, 334:25, 356:14
analysis [10] - 59:11, 90:9, 90:13, 99:21, 101:6, 101:19, 101:25, 171:18, 274:25, 304:4
analyst [1] - 171:19
analyzed [2] - 89:9, 124:13
analyzing [1] - 171:20
Andrew [1] - 3:9
Angela [1] - 4:13
Angeles [1] - 2:11
Angle [7] - 90:7, 90:12, 90:19, 91:17, 100:5, 101:19, 117:3
Angle's [2] - 93:2, 93:14
Anglo [9] - 27:5, 62:21, 84:13, 96:3, 96:4, 104:12, 105:18, 202:15, 273:12
annex [2] - 223:18, 224:8
Annex [17] - 14:17, 42:2, 55:10, 55:18, 74:21, 223:6, 223:8, 224:16, 224:25, 226:22, 227:5, 227:17, 227:21, 227:25, 228:17, 260:5, 260:20
announce [2] - 326:15, 328:8
announced [3] - 251:25, 292:3, 328:4
announcement [7] - 291:12,

291:20, 294:9, 311:1, 326:8, 326:13, 327:15
announcing [1] - 327:21
annual [1] - 241:5
Annye [2] - 98:14, 98:18
ANSWER [30] - 8:12, 8:18, 8:22, 8:25, 9:8, 9:14, 87:8, 87:18, 88:5, 142:13, 142:15, 142:19, 143:5, 143:11, 143:13, 143:15, 143:18, 145:4, 145:8, 145:12, 145:15, 145:17, 145:20, 146:5, 146:9, 146:14, 146:16, 147:9, 147:11, 262:12
answer [32] - 8:18, 25:21, 26:9, 31:6, 64:16, 97:5, 102:10, 116:1, 142:17, 142:21, 143:7, 144:17, 145:24, 188:25, 232:3, 274:6, 294:4, 294:5, 294:6, 313:12, 313:14, 313:21, 313:22, 313:24, 320:5, 320:15, 322:17, 322:18, 322:23, 323:10, 324:24
answered [3] - 28:2, 262:11, 299:13
answering [1] - 279:15
answers [1] - 116:2
anti [1] - 168:17
anti-discriminatory [1] - 168:17
anticipated [1] - 290:16
Antonio [2] - 167:14, 167:17

anyway [2] - 172:2, 215:7

Apffel [39] - 22:8, 22:17, 81:17, 81:20, 81:22, 82:4, 82:21, 83:8, 84:23, 84:24, 86:10, 87:15, 100:15, 139:14, 158:17, 160:22, 187:17, 189:11, 192:2, 192:9, 192:12, 193:7, 207:14, 224:10, 298:6, 298:10, 298:16, 298:20, 298:25, 299:15, 299:17, 299:19, 299:23, 300:5, 301:11, 308:13, 308:15, 311:8, 322:5

Apffel's [1] - 321:13

apologies [2] - 34:5, 331:18

appear [3] - 87:18, 118:13, 118:14

APPEARANCES [5] - 1:10, 2:1, 3:1, 4:1, 5:1

appeared [1] - 79:6

application [3] - 281:20, 281:24, 281:25

applied [2] - 335:4, 335:5

applies [1] - 280:21

apply [5] - 53:7, 53:9, 68:19, 95:3, 249:14

appointed [4] - 14:16, 38:14, 46:3, 46:5

appointment [1] - 37:5

appreciate [4] - 34:2, 34:9, 131:9, 185:3

appreciated [1] - 224:8

approach [3] - 9:19, 35:9, 251:11

approached [1] - 9:11

appropriate [3] - 7:25, 85:8, 220:23

approval [3] - 29:17, 29:24, 112:14

approve [8] - 40:15, 82:7, 86:12, 157:13, 158:19, 236:21, 259:13, 273:25

approved [8] - 20:18, 22:5, 29:16, 56:5, 103:2, 221:18, 254:1, 346:12

approximate [1] - 330:6

April [18] - 136:24, 181:21, 182:1, 182:10, 183:3, 183:15, 287:3, 287:25, 289:13, 289:15, 296:10, 309:7, 309:10, 311:22, 312:11, 322:23, 324:16, 324:24

area [14] - 27:2, 42:23, 63:1, 96:3, 96:4, 111:2, 151:8, 151:18, 166:21, 197:10, 255:12, 255:14, 351:2, 351:6

areas [12] - 13:11, 14:1, 44:12, 44:17, 62:24, 110:25, 111:1, 125:17, 125:19, 125:21, 168:8, 224:15

argue [2] - 127:8, 127:14

argued [2] - 51:12, 99:25

argument [7] - 96:8, 102:15, 116:6, 128:5, 128:6, 165:15, 238:6

armed [1] - 168:21

Armed [1] - 169:7

arranged [3] - 93:12, 291:5, 297:25

arrangement [1] - 43:11

arrested [1] - 243:16

arrestees [1] - 244:1

article [5] - 23:11, 106:14, 185:20, 185:24, 186:6

aside [5] - 294:20, 294:25, 300:14, 300:20, 302:5

ASO-21 [1] - 169:20

assault [3] - 37:1, 37:7, 37:10

assaulted [1] - 75:16

assignment [1] - 167:7

assist [4] - 42:9, 236:6, 245:11

assistance [4] - 41:17, 42:9, 245:16, 246:19

assistant [3] - 77:1, 167:17, 233:5

assisted [1] - 5:6

assisting [1] - 179:2

assists [1] - 241:25

associated [3] - 178:9, 258:7, 258:11

Association [1] - 173:9

Associations [1] - 255:3

assume [13] - 8:20, 27:20, 52:4, 78:24, 124:9, 202:22, 236:21, 236:23, 250:16, 271:16, 296:19, 350:12, 353:6

assumed [6] - 181:8, 190:16, 196:15, 217:16, 219:20, 289:1

assumption [5] - 8:21, 20:5, 20:18, 26:13, 182:3

atmosphere [1] - 88:15

attached [15] - 47:25, 110:15, 130:3, 130:21, 163:11, 215:21, 216:16, 222:4, 246:14, 263:20, 263:22, 267:8, 267:9, 277:11, 316:14

attaches [2] - 129:15, 129:25

attachment [9] - 107:23, 264:2, 264:6, 268:6, 285:5, 301:21, 301:23, 302:23, 304:16

attachments [2] - 94:4, 263:18

attack [1] - 37:4

attempt [1] - 25:9

attempted [1] - 62:25

attend [3] - 18:5, 126:15, 204:20

ATTENDANCE [1] - 5:2

attendance [5] - 18:13, 227:7, 229:25, 230:2, 234:1

attended [15] - 15:17, 17:22, 18:4, 18:7, 18:8, 19:1, 19:3, 22:4, 226:16, 226:17, 232:14, 266:3, 269:8, 296:19, 349:1

attendees [1] - 301:1

attending [4] - 205:10, 229:22, 234:13

attention [3] - 30:17, 287:9, 349:5

attesting [1] - 312:17

attitude [1] - 168:18

attorney [13] - 32:18, 82:19, 150:5, 178:4, 253:3, 277:25, 281:14, 287:16, 288:2, 295:17, 299:21, 343:17, 352:17

Attorney [1] - 5:2

attorney's [2] - 36:20, 80:2

Attorney's [1] - 36:21

attorney-client [1] - 253:3

attorneys [5] - 24:7, 50:13, 60:17, 312:15, 345:4

attract [1] - 241:9

attributing [1] - 59:16

audience [1] - 114:2

audiovisual [1] - 223:22

auditor [2] - 259:23, 260:1

AUGUST [1] - 1:6

August [24] - 6:3, 182:10, 182:23, 182:25, 183:4, 183:16, 186:3, 186:5, 265:25, 266:17, 267:14, 267:22, 269:4, 290:16, 290:19, 290:23, 290:25, 292:1, 309:16, 313:23, 316:12, 357:4

Austin [3] - 1:20, 2:14, 2:21

authority [1] -

**169:13**
authorized [2] - 241:13, 248:17
autonomy [1] - 261:19
autopilot [1] - 257:2
availability [1] - 81:10
available [13] - 74:4, 102:19, 110:9, 128:25, 154:18, 154:19, 164:19, 173:7, 220:10, 226:7, 246:7, 250:17, 283:25
availed [1] - 51:23
Avenue [5] - 2:17, 3:10, 3:14, 3:17, 3:21
aviation [1] - 170:5
aviation-related [1] - 170:5
avoid [3] - 65:18, 244:6, 306:19
aware [54] - 9:3, 9:9, 10:3, 26:21, 43:19, 61:13, 68:15, 84:6, 103:18, 171:25, 172:3, 184:1, 198:12, 202:23, 204:22, 207:5, 211:22, 213:23, 229:1, 232:13, 236:5, 236:17, 242:1, 245:14, 247:5, 248:7, 248:24, 252:21, 273:11, 273:21, 273:22, 273:24, 274:1, 274:6, 274:10, 275:7, 275:10, 280:17, 287:23, 290:20, 291:2, 291:18, 302:5, 315:14, 317:20, 318:18, 321:13, 322:2, 329:18, 334:9, 355:3, 356:4

**B**

back-and-forth [1] - 231:24
back-to-back [1] - 218:5
back-up [1] - 223:11
background [5] - 11:25, 36:11, 169:11, 220:6, 254:19
backup [12] - 258:6, 258:7, 258:11, 258:15, 262:22, 264:18, 264:19, 287:5, 287:20, 288:4, 348:5, 348:6
Bacliff [1] - 14:5
Bacliff/San [1] - 35:25
bad [5] - 24:2, 134:13, 227:22, 227:25, 240:9
bag [1] - 194:22
bail [3] - 242:22, 243:10, 244:2
bailiff [1] - 231:4
baked [2] - 86:7, 163:1
balance [4] - 70:14, 71:5, 285:15, 293:9
ballot [2] - 17:7, 281:21
banged [1] - 76:2
Bank [1] - 30:8
bank [2] - 30:9
bank's [1] - 30:11
Baran [1] - 4:17
Baron [3] - 1:15, 1:15, 343:24
BARON [7] - 32:13, 33:7, 33:10, 34:5, 34:10, 344:1, 344:3
based [15] - 21:10, 39:21, 59:11, 59:22,

72:1, 132:24, 157:17, 189:24, 198:14, 269:7, 274:25, 276:4, 303:21, 344:11, 344:12
basic [1] - 168:10
basis [4] - 40:19, 95:16, 228:21, 241:5
Bass [1] - 285:8
Bates [2] - 95:4, 203:25
bathroom [1] - 173:2
battling [1] - 78:22
Bayview [1] - 14:5
Bazaman [1] - 263:7
BBA [1] - 12:2
beach [5] - 185:14, 188:12, 188:15, 189:7
bears [1] - 26:23
beat [4] - 47:7, 47:8, 47:9, 76:1
became [16] - 36:16, 36:21, 36:24, 37:4, 62:21, 62:22, 169:19, 170:19, 171:1, 172:3, 185:5, 195:25, 196:1, 196:12, 218:19, 247:13
become [6] - 47:25, 168:10, 199:1, 272:17, 273:19, 273:20
becomes [1] - 168:22
becoming [2] - 249:9, 273:16
Beeler [1] - 2:20
BEFORE [1] - 1:8
beg [1] - 246:10
began [6] - 38:11, 38:14, 61:2, 150:1, 170:4, 181:3

begin [6] - 13:3, 114:20, 122:13, 141:17, 165:24, 251:3
beginning [5] - 8:13, 16:17, 92:25, 243:9, 251:5
begins [1] - 92:24
behalf [2] - 211:23, 261:6
behind [6] - 70:13, 71:9, 176:18, 211:6, 212:5, 277:6
Beirne [5] - 24:10, 173:24, 173:25, 179:1, 274:16
belief [6] - 64:23, 100:2, 210:1, 239:6, 345:6, 345:9
below [8] - 204:25, 266:15, 269:3, 270:17, 279:14, 284:24, 285:17, 320:21
BENCH [1] - 1:7
bench [5] - 57:6, 57:9, 99:18, 99:23, 344:24
Bench [1] - 6:1
Benchmark [1] - 195:7
benchmark [9] - 117:14, 195:6, 301:22, 303:13, 303:22, 305:7, 305:13, 328:12, 329:4
Bend [1] - 103:18
benefit [3] - 36:10, 339:25, 340:7
Berman [1] - 4:5
Bernadette [1] - 2:9
best [15] - 17:21, 46:24, 52:21, 124:16, 147:20, 202:6, 207:19, 239:12, 245:23, 259:25, 296:17, 317:4, 317:5,

317:6, 320:16
bet [1] - 240:17
better [11] - 119:4, 119:8, 124:14, 124:15, 229:15, 237:4, 238:7, 270:15, 332:23, 333:12
between [38] - 13:20, 14:19, 18:10, 29:13, 37:7, 42:13, 60:4, 60:9, 69:17, 69:25, 70:21, 92:7, 149:22, 177:2, 183:5, 183:15, 183:17, 188:9, 194:24, 220:3, 222:24, 231:24, 263:22, 296:11, 300:15, 306:6, 309:7, 309:10, 309:14, 324:4, 324:9, 333:5, 337:16, 345:20, 346:5, 353:16, 354:19
beyond [4] - 91:18, 173:11, 233:15, 239:5
big [9] - 18:14, 185:3, 226:22, 257:4, 257:7, 289:11, 307:7, 316:4, 319:21
bigger [1] - 260:16
Bill [2] - 242:24, 242:25
birth [1] - 42:6
bisecting [1] - 321:2
bit [45] - 13:13, 36:18, 38:1, 41:25, 54:25, 64:14, 71:11, 83:13, 114:10, 114:11, 116:23, 141:1, 152:11, 166:24, 167:5, 170:15, 176:18, 177:23, 178:14, 188:7, 217:21, 221:20, 230:5, 254:18, 258:19, 258:20, 262:18,

262:19, 262:20, 269:10, 269:21, 270:7, 277:6, 277:23, 278:12, 309:4, 309:5, 313:13, 317:12, 320:5, 320:9, 321:20, 323:24, 340:13

black [1] - 269:23

Black [20] - 8:14, 9:4, 38:21, 38:23, 40:4, 40:5, 44:18, 51:25, 63:16, 91:22, 105:13, 118:4, 118:5, 118:7, 124:9, 254:21, 350:8, 350:21, 351:3, 353:2

blaming [2] - 147:13, 147:16

blank [2] - 173:21, 173:23

blindly [1] - 349:25

block [7] - 69:10, 69:11, 110:16, 111:5, 316:5, 351:7

blocked [1] - 300:21

blocks [1] - 69:14

blow [3] - 132:12, 132:13, 185:23

blown [2] - 91:14, 211:18

blown-up [2] - 91:14, 211:18

blue [1] - 90:3

BMP [2] - 263:22, 263:24

board [7] - 30:9, 30:11, 87:7, 252:1, 316:8, 316:13, 341:11

Board [1] - 189:9

boards [4] - 12:12, 14:20, 14:23, 30:6

boast [1] - 33:5

boasting [1] - 31:25

body [1] - 205:21

bold [1] - 112:13

Bolivar [46] - 14:4, 17:23, 18:13, 25:4, 25:9, 27:1, 29:2, 30:1, 63:1, 72:18, 75:6, 75:7, 75:8, 75:13, 75:17, 101:12, 101:14, 118:2, 121:22, 121:23, 122:25, 123:1, 123:5, 123:11, 123:13, 123:20, 124:3, 124:6, 124:21, 151:18, 151:20, 152:7, 186:20, 186:25, 187:4, 187:7, 188:10, 188:22, 200:2, 269:14, 269:25, 270:8, 273:12, 315:1, 318:9, 346:15

Bolivar's [1] - 151:25

bond [2] - 243:4, 243:5

Bonilla [1] - 107:14

Bonnen [1] - 245:7

border [9] - 56:17, 58:13, 58:21, 58:22, 59:17, 245:12, 246:24

born [2] - 35:20, 166:18

boss [7] - 111:16, 112:1, 112:2, 112:6, 141:23, 142:23, 143:19

bother [3] - 84:23, 146:8, 352:21

bottom [14] - 71:8, 101:22, 127:22, 144:14, 149:24, 156:11, 215:1, 215:4, 269:3, 282:15, 289:16, 309:22, 330:15, 330:16

Boulevard [1] - 4:14

bound [1] - 260:9

boundaries [4] - 269:24, 270:22, 285:14, 330:6

boundary [1] - 70:18

bounds [1] - 125:3

box [1] - 35:2

brand [2] - 173:1, 185:2

brand-new [2] - 173:1, 185:2

Brandy [3] - 98:14, 98:21, 98:24

Brazil [1] - 1:19

break [8] - 37:8, 85:9, 114:12, 114:18, 205:25, 228:24, 280:3, 311:16

breakdown [3] - 238:25, 329:3, 329:6

breakout [1] - 234:7

breath [1] - 107:3

brevity [1] - 169:5

brief [1] - 301:19

briefly [5] - 11:25, 274:12, 314:1, 331:13, 344:8

bring [3] - 75:19, 75:20, 237:20

bringing [3] - 34:9, 114:5, 201:15

brings [1] - 10:15

broad [1] - 262:8

Broadway [3] - 42:22, 43:3, 350:19

Brockbank [1] - 4:17

brother [1] - 82:19

brother-in-law [1] - 82:19

brothers [1] - 36:8

brought [11] - 56:19, 67:10, 67:11, 97:25, 101:15, 194:16, 195:4, 195:16, 247:2, 247:5, 287:9

BROWN [1] - 1:8

Brown [1] - 34:25

Bruce [1] - 4:2

Bryan [11] - 61:14, 61:15, 61:16, 61:18, 163:4, 165:3, 194:8, 194:12, 301:15, 301:20, 304:13

budget [1] - 40:16

bug [2] - 36:2, 36:3

bugs [2] - 36:4, 36:5

build [1] - 311:2

Building [1] - 2:10

building [9] - 14:17, 18:14, 57:1, 57:3, 57:4, 220:17, 223:11, 223:14, 224:8

buildings [1] - 106:9

built [1] - 260:23

bulk [2] - 14:3, 27:24

bullet [5] - 53:1, 53:5, 53:6, 275:24, 278:15

Bullet [1] - 267:4

bumped [2] - 241:15

bunch [5] - 79:19, 129:4, 307:1, 310:13, 313:11

burden [1] - 275:1

Bureau [5] - 67:4, 182:22, 183:21, 290:16, 291:15

business [7] - 12:15, 170:9, 224:2, 230:16, 316:24, 317:2, 338:17

businesses [4] - 170:1, 170:5,

170:6, 170:7

busy [1] - 21:1

but.. [4] - 10:6, 118:3, 272:10, 326:7

BY [102] - 11:15, 22:24, 23:7, 23:15, 25:16, 26:16, 33:1, 33:14, 35:14, 38:3, 76:11, 85:17, 85:21, 88:1, 93:23, 95:24, 102:12, 105:23, 114:24, 116:8, 117:1, 117:12, 120:14, 121:16, 123:16, 124:20, 126:12, 127:2, 128:2, 128:14, 130:25, 131:23, 132:9, 132:15, 133:22, 136:6, 136:12, 141:19, 149:18, 149:25, 150:19, 152:12, 153:9, 153:19, 155:6, 155:9, 156:4, 156:10, 161:11, 166:17, 179:11, 186:4, 186:12, 193:18, 195:2, 195:14, 195:24, 198:24, 199:7, 199:25, 203:18, 203:24, 206:10, 208:5, 209:18, 210:12, 211:1, 215:5, 216:13, 216:21, 222:3, 222:9, 250:24, 251:15, 253:8, 262:6, 263:5, 263:15, 264:4, 264:13, 268:5, 269:2, 269:20, 271:7, 274:14, 275:9, 275:17, 275:25, 276:9, 276:24, 277:7, 277:22, 279:12, 280:9, 286:9, 309:25, 311:17, 339:12, 345:2, 346:22, 352:16, 355:10

| C |
|---|

caballa's [1] - 106:2
cake [2] - 86:7, 163:1
Calder [19] - 17:25, 22:3, 55:10, 55:14, 55:18, 55:20, 55:22, 55:25, 56:1, 56:2, 56:9, 56:11, 56:20, 56:24, 74:21, 227:8, 260:4, 260:19
calendar [5] - 16:14, 183:9, 294:16, 294:22, 300:14
California [2] - 2:11, 167:7
Campaign [4] - 1:12, 1:22, 2:3, 2:6
campaign [5] - 250:16, 327:17, 327:19, 327:22, 328:4
campaigns [1] - 254:22
cancer [3] - 75:22, 78:23, 136:20
candidate [44] - 16:18, 16:23, 17:10, 19:21, 20:12, 20:20, 31:20, 63:11, 101:24, 102:1, 105:13, 115:2, 116:19, 118:17, 119:11, 119:15, 119:21, 120:3, 120:10, 122:11, 123:4, 123:9, 124:7, 124:10, 152:4, 158:6, 158:10, 158:13, 171:21, 217:2, 248:23, 249:9, 249:24, 272:7, 280:18, 280:21, 282:12, 294:9, 294:14, 294:16, 294:21, 294:23, 342:21, 350:9

candidate's [1] - 249:22
candidate-filing [1] - 217:2
candidates [5] - 8:16, 91:23, 92:1, 248:17, 250:13
cannot [3] - 285:15, 340:19, 340:22
capability [1] - 213:17
capacity [1] - 20:24
Carbide [2] - 111:1, 111:4
care [7] - 208:3, 239:23, 241:12, 241:25, 242:5, 285:11, 333:19
cared [1] - 324:5
career [4] - 166:24, 167:17, 254:19, 354:23
careful [2] - 185:25, 232:10
caretaking [1] - 88:25
Carlos [2] - 26:18, 26:19
Carolina [3] - 3:4, 3:7, 74:23
Carver [4] - 44:4, 44:6, 44:9
case [44] - 11:5, 32:17, 32:24, 33:2, 33:6, 33:7, 33:19, 34:21, 37:1, 37:8, 37:10, 38:7, 45:23, 50:12, 53:10, 75:17, 86:22, 108:13, 112:15, 125:1, 125:2, 164:14, 164:15, 165:20, 165:23, 165:24, 166:8, 199:9, 201:24, 247:3, 252:11, 285:22, 297:14, 332:14, 343:20, 345:9, 350:7, 351:17,

351:24, 351:25, 352:8, 352:18, 353:7
CASE [5] - 85:13, 86:25, 114:14, 206:4, 357:1
cases [3] - 249:25, 343:13, 344:16
catch [2] - 193:7, 230:4
categories [1] - 94:11
category [2] - 262:8, 290:6
Catherine [1] - 3:13
caught [2] - 85:8, 85:11
cavalry [4] - 28:19, 28:20, 28:22, 28:23
cc'd [1] - 289:17
cc'ing [1] - 290:8
celebration [1] - 256:15
cell [5] - 41:5, 150:13, 155:11, 155:12, 244:25
Census [13] - 67:4, 110:9, 143:10, 182:22, 183:21, 217:1, 266:2, 280:12, 290:15, 291:15, 328:25, 330:8, 346:2
census [38] - 27:23, 65:25, 110:8, 110:16, 111:5, 111:8, 128:18, 128:21, 129:21, 142:23, 142:25, 143:1, 143:6, 181:5, 182:18, 182:21, 183:25, 287:16, 289:2, 289:20, 290:16, 290:19, 291:5, 291:7, 291:12, 291:21, 292:3, 292:7, 292:11, 292:12, 292:19, 293:8, 294:8, 295:21,

325:7, 330:7, 341:6, 341:7
census.gov [5] - 146:16, 147:4, 147:6, 147:11, 147:12
center [1] - 44:8
Center [10] - 1:12, 1:22, 2:3, 2:6, 17:24, 18:17, 44:5, 51:2, 51:9, 242:1
centered [1] - 20:9
centers [6] - 43:7, 43:23, 44:1, 50:16, 50:17, 50:20
central [2] - 270:12, 270:14
Central [2] - 51:1, 51:5
cents [2] - 18:20, 26:12
certain [13] - 16:6, 133:11, 135:18, 170:11, 191:2, 191:9, 191:12, 208:17, 261:19, 273:24, 313:16, 346:11, 349:5
Certain [1] - 215:18
certainly [22] - 31:5, 35:3, 37:14, 40:20, 47:25, 48:1, 95:20, 169:14, 175:1, 175:5, 180:21, 187:12, 187:14, 202:25, 224:23, 237:25, 248:5, 271:22, 320:25, 328:7, 347:17
certificate [1] - 42:6
CERTIFICATE [1] - 357:5
Certificate...... ................. [1] - 6:5
certificated [1] - 170:10

certification [1] - 312:13
certify [1] - 357:6
cetera [1] - 20:13
Chad [6] - 1:18, 35:16, 39:8, 101:22, 117:3, 117:21
chain [3] - 93:24, 150:1, 316:4
chair [4] - 156:2, 171:2, 171:3, 281:25
challenge [1] - 218:7
Chamber [5] - 102:3, 315:20, 316:7, 316:13, 317:25
chambers [1] - 12:15
chance [10] - 47:11, 88:17, 97:14, 101:20, 118:21, 194:16, 233:24, 312:21, 312:22, 312:23
chances [1] - 171:17
Change [1] - 196:3
change [37] - 17:10, 24:6, 29:2, 69:6, 69:12, 69:18, 70:1, 112:15, 162:4, 196:12, 197:1, 198:18, 217:25, 234:23, 282:16, 282:18, 282:22, 292:13, 292:19, 293:8, 295:8, 295:15, 300:7, 303:17, 303:20, 303:25, 305:23, 306:6, 307:16, 329:4, 332:8, 332:16, 333:5, 341:7
changed [12] - 17:13, 30:18, 31:4, 49:18, 238:5, 282:14, 295:15, 303:4, 321:24, 322:10,

335:4, 342:25

changes [34] - 63:7, 69:3, 70:9, 71:6, 71:7, 77:3, 87:16, 117:14, 176:25, 189:23, 194:20, 196:16, 196:18, 198:18, 203:6, 203:9, 207:1, 216:25, 235:23, 236:7, 269:7, 273:25, 280:15, 295:22, 303:21, 303:24, 305:12, 307:19, 328:15, 346:5, 346:12, 349:14, 349:15

changing [4] - 30:16, 83:2, 190:10, 300:1

Chapman [3] - 98:15, 98:21, 98:24

characterize [1] - 342:17

characterized [1] - 175:17

charged [1] - 40:25

charities [1] - 12:18

chart [3] - 266:15, 268:24, 269:3

chastised [1] - 82:20

chat [4] - 47:11, 109:3, 153:22, 154:19

check [2] - 75:25, 76:1

Chen [7] - 2:13, 108:13, 108:19, 149:22, 150:1, 154:8, 154:24

chief [5] - 51:10, 164:15, 165:24, 261:8, 284:3

childhood [2] - 36:7, 36:9

children [1] - 12:21

choice [25] - 19:21, 20:12, 20:20, 31:20,

63:11, 101:24, 102:1, 115:2, 116:20, 118:17, 119:11, 119:15, 119:21, 120:3, 120:10, 122:11, 123:4, 123:10, 124:8, 124:11, 152:5, 158:7, 158:11, 158:13, 350:9

choose [2] - 123:3, 306:14

chose [4] - 15:8, 306:13, 308:22, 308:23

Christian [1] - 4:20

Christina [1] - 2:20

church [1] - 106:16

churches [1] - 39:22

circled [2] - 69:7, 69:12

Circuit [5] - 31:22, 32:7, 32:11, 32:18, 32:21

circumstance [1] - 220:23

circumstances [1] - 49:24

circumvent [3] - 138:4, 138:7, 138:15

citizen [4] - 33:3, 44:20, 74:11, 131:5

citizens [13] - 41:11, 43:19, 63:17, 88:16, 104:17, 105:13, 133:1, 229:22, 231:20, 242:15, 249:5, 291:6, 350:8

city [2] - 306:8, 351:7

City [59] - 1:17, 4:15, 11:20, 11:21, 12:1, 13:13, 14:5, 14:17, 17:24, 17:25, 18:16,

19:2, 22:3, 24:8, 39:14, 39:15, 42:3, 44:10, 51:3, 51:9, 55:10, 69:19, 72:10, 72:21, 104:6, 170:23, 170:25, 188:10, 202:14, 224:16, 224:18, 224:19, 224:25, 225:6, 225:15, 226:12, 226:21, 227:5, 227:17, 227:21, 227:24, 228:17, 255:2, 255:12, 255:14, 255:16, 260:5, 260:20, 270:16, 270:17, 270:19, 270:21, 270:22, 270:23, 273:8, 273:12, 350:14, 351:8

Civil [10] - 2:13, 2:20, 3:13, 3:17, 3:20, 3:23, 4:3, 4:6, 150:6, 313:20

clarify [3] - 339:16, 351:22, 356:13

clarity [2] - 115:23, 300:25

Clark [13] - 21:9, 78:11, 78:12, 78:23, 87:7, 87:15, 136:18, 136:20, 190:21, 287:19, 287:21, 311:9, 322:4

class [1] - 106:2

clean [1] - 70:17

cleaned [3] - 69:22, 182:25, 290:23

cleanups [3] - 71:10, 71:12

clear [19] - 23:8, 28:21, 28:25, 38:1, 39:3, 65:3, 70:20, 127:23, 219:5, 219:6, 235:25, 261:23, 263:8, 278:10, 278:11, 281:16, 286:7, 323:1, 324:19

clearance [2] - 176:10, 177:1

clearly [3] - 82:21, 83:24, 84:3

clerk [3] - 51:5, 51:10, 98:21

clerk's [2] - 98:21, 248:5

click [2] - 130:6, 130:15

clicked [1] - 130:10

client [1] - 253:3

close [8] - 43:25, 44:1, 57:7, 57:8, 151:8, 151:9, 151:15, 239:24

closed [1] - 43:15

closely [1] - 153:24

closer [2] - 223:24, 332:13

closest [1] - 327:18

closing [3] - 12:9, 50:17, 50:20

closure [3] - 43:12, 44:4, 44:11

co [2] - 75:24, 98:19

co-worker [2] - 75:24, 98:19

Coalition [3] - 3:3, 3:6, 132:20

coalition [1] - 127:7

coast [6] - 188:20, 306:18, 317:8, 317:10, 318:10, 327:12

Coastal [1] - 242:1

coastal [54] - 66:13, 105:2, 105:5, 105:9, 105:12, 184:21, 184:23, 184:24, 187:13, 188:6, 188:8, 190:6, 195:18, 196:23, 197:8, 197:10, 198:17, 234:20,

236:25, 237:21, 252:13, 252:16, 302:25, 303:2, 303:6, 305:5, 305:6, 305:14, 305:15, 305:20, 305:22, 305:25, 308:14, 315:12, 315:17, 316:22, 317:15, 317:17, 317:22, 318:14, 318:16, 318:17, 319:16, 319:19, 327:10, 333:4, 348:10, 348:16, 351:13, 353:1, 353:11

coastline [4] - 185:7, 198:21, 200:5, 315:9

Code [1] - 281:17

coffee [1] - 85:7

cognizant [1] - 271:14

cohesive [1] - 39:18

cohesiveness [2] - 46:8, 46:12

Colitis [1] - 12:18

collaboration [1] - 132:20

colleague [1] - 334:13

colleagues [1] - 343:10

collect [3] - 191:1, 212:19, 339:10

collected [2] - 111:24, 234:15

collecting [2] - 110:5, 112:8

collection [1] - 219:10

college [1] - 46:14

College [1] - 12:3

Colorado [2] - 167:9, 167:10

colored [1] - 94:9

Columbia [1] - 176:9

column [1] - 186:8

combat [1] - 167:9

combined [1] - 13:20

comfortable [2] - 156:2, 171:20

comfortably [1] - 99:8

coming [15] - 28:23, 31:24, 59:17, 69:23, 75:6, 177:4, 181:18, 182:18, 211:24, 219:24, 219:25, 243:3, 270:11, 327:6, 333:7

commander [1] - 168:9

commencing [1] - 96:12

comment [28] - 18:22, 76:22, 86:4, 134:24, 212:17, 213:8, 213:9, 213:17, 224:10, 230:24, 232:1, 232:3, 232:7, 253:11, 266:8, 266:25, 268:1, 269:5, 269:7, 297:2, 307:20, 327:7, 327:8, 330:17, 330:19, 335:14, 336:2, 336:10

commentary [3] - 185:15, 224:13, 231:24

commented [2] - 143:8, 335:13

comments [30] - 86:2, 100:4, 100:8, 101:7, 186:19, 186:20, 187:3, 197:3, 213:19, 218:21, 219:10, 219:18, 219:24, 220:20, 221:1, 221:4, 231:23, 234:5, 234:14, 237:6, 251:17, 329:21, 330:23, 331:7, 331:21, 332:1, 335:8, 335:9, 335:21, 347:25

Commerce [5] - 102:4, 315:20, 316:7, 316:13, 317:25

Commission [1] - 180:7

commissioned [2] - 167:6, 168:11

commissioner [74] - 9:11, 13:17, 13:24, 14:15, 14:19, 21:11, 37:1, 37:6, 37:9, 37:11, 40:9, 40:15, 40:18, 44:19, 46:10, 48:2, 52:6, 53:11, 53:18, 69:25, 85:18, 100:22, 102:5, 104:18, 137:19, 138:21, 139:10, 139:19, 140:8, 158:2, 164:11, 185:12, 188:19, 188:22, 188:23, 188:25, 190:17, 197:15, 200:5, 203:3, 216:25, 224:9, 228:9, 228:12, 235:25, 236:9, 246:20, 262:9, 264:20, 265:17, 266:7, 269:23, 283:18, 286:5, 286:6, 286:10, 287:13, 287:18, 287:21, 291:14, 296:21, 299:11, 302:6, 304:4, 308:21, 317:10, 321:23, 322:9, 327:6, 333:11, 355:3, 355:19, 356:5

Commissioner [133] - 14:11, 18:12, 22:8, 22:9, 23:19, 23:25, 24:2, 24:8, 24:17, 26:17, 26:19, 27:15, 32:14, 32:16, 34:14, 34:16, 35:1, 36:22, 36:24,

38:5, 38:8, 40:13, 46:20, 48:8, 60:2, 62:18, 62:19, 63:19, 78:23, 78:25, 81:17, 81:22, 82:4, 82:21, 83:8, 84:23, 84:24, 86:10, 87:14, 100:15, 112:7, 112:8, 112:12, 113:17, 113:24, 114:13, 119:10, 121:21, 136:20, 139:14, 150:21, 153:20, 158:17, 159:11, 160:22, 187:17, 189:11, 190:19, 190:21, 190:23, 192:2, 192:8, 192:12, 193:7, 203:20, 204:5, 204:13, 205:9, 207:13, 209:7, 209:8, 222:5, 235:1, 235:16, 236:11, 238:10, 238:12, 238:21, 239:15, 239:18, 240:11, 250:6, 250:9, 253:17, 272:12, 272:14, 272:15, 279:16, 287:19, 288:18, 298:6, 298:15, 298:20, 298:25, 299:15, 299:17, 299:19, 299:22, 300:5, 301:11, 305:21, 306:9, 306:13, 306:14, 306:17, 306:21, 306:22, 308:3, 308:11, 308:15, 308:22, 311:8, 311:9, 321:13, 322:3, 322:4, 322:5, 322:10, 347:9, 347:14, 348:1, 349:9, 353:15, 354:14, 354:15, 354:20, 354:24, 355:13, 356:1

COMMISSIONER [4] - 6:13, 34:19, 34:24, 35:11

commissioner

's [2] - 79:21, 321:10

Commissioner's [1] - 98:20

Commissioners [116] - 13:16, 14:7, 14:8, 15:2, 15:19, 15:25, 16:3, 19:16, 20:16, 21:15, 21:18, 21:21, 21:23, 22:17, 48:3, 48:5, 48:12, 49:19, 50:4, 51:12, 52:15, 54:10, 54:11, 54:12, 54:13, 54:15, 55:2, 55:6, 55:14, 58:4, 64:22, 75:20, 82:23, 83:1, 84:8, 88:20, 91:2, 91:12, 98:22, 98:23, 110:21, 113:2, 140:15, 144:6, 148:1, 148:24, 152:16, 156:7, 161:20, 165:3, 173:14, 175:23, 176:10, 176:11, 176:18, 176:21, 199:23, 200:7, 216:24, 223:12, 225:2, 227:1, 231:14, 231:21, 231:24, 240:13, 240:18, 247:5, 250:6, 253:17, 253:25, 257:13, 257:20, 258:5, 258:18, 258:20, 261:15, 262:22, 265:8, 265:24, 267:6, 269:4, 273:15, 274:2, 274:21, 274:23, 276:16, 277:9, 286:17, 287:2, 291:4, 293:12, 308:25, 313:8, 314:5, 315:15, 317:20, 318:17, 318:24, 323:15, 324:22, 327:5, 327:12, 329:14, 330:20, 339:17, 341:24, 342:8,

345:6, 345:7, 345:13, 345:19, 345:25, 346:6, 353:20

commissioners [100] - 19:4, 21:5, 38:10, 54:17, 57:6, 66:16, 78:12, 78:13, 78:21, 78:22, 79:5, 86:16, 86:19, 87:15, 92:3, 99:16, 105:18, 129:23, 137:21, 138:9, 150:7, 161:3, 165:13, 165:19, 185:8, 191:1, 191:2, 191:10, 191:16, 192:7, 192:17, 193:1, 193:5, 200:11, 200:23, 201:2, 202:21, 203:10, 203:14, 204:11, 205:19, 206:14, 207:4, 207:7, 207:20, 207:21, 208:4, 208:24, 211:23, 218:10, 218:16, 220:5, 223:19, 224:4, 224:7, 226:7, 226:10, 227:10, 232:7, 235:7, 235:13, 235:22, 236:3, 236:6, 237:3, 240:3, 254:13, 254:17, 261:25, 280:11, 285:25, 286:23, 290:5, 292:13, 292:20, 296:4, 297:14, 298:1, 299:6, 299:11, 300:16, 307:5, 307:7, 308:6, 315:21, 316:9, 316:20, 318:1, 320:12, 321:2, 321:8, 322:25, 333:12, 333:14, 334:2, 334:4, 334:6, 345:19, 353:8, 355:24

commit [1] - 161:25

committee [2] -

251:19, 341:14

**common** [4] - 121:25, 123:24, 186:24, 187:6

**communicate** [5] - 22:6, 41:13, 54:6, 138:6, 236:10

**communicated** [2] - 71:16, 108:9

**communicates** [1] - 138:14

**communicating** [1] - 98:17

**communication** [2] - 107:13, 154:10

**communications** [2] - 90:18, 93:25

**communities** [24] - 9:6, 39:2, 39:10, 39:12, 39:17, 39:20, 39:21, 39:22, 39:24, 39:25, 40:2, 40:4, 42:12, 42:16, 42:24, 84:13, 103:25, 104:22, 105:17, 123:3, 132:22, 186:23, 187:5, 318:19

**community** [28] - 9:4, 21:4, 22:2, 39:13, 44:25, 46:11, 101:23, 106:10, 106:17, 106:25, 121:24, 121:25, 123:20, 123:24, 124:7, 132:24, 151:22, 151:24, 151:25, 160:11, 160:14, 241:1, 254:21, 276:11, 316:22, 317:2

**community-based** [1] - 132:24

**compact** [6] - 91:7, 200:12, 276:11, 285:16,

324:19

**compactness** [5] - 200:6, 318:24, 319:1, 324:9, 329:10

**company** [2] - 12:8, 12:9

**company's** [1] - 30:6

**compare** [1] - 324:9

**compelling** [1] - 331:10

**compilation** [1] - 329:21

**compile** [1] - 220:1

**complaint** [3] - 248:8, 329:17, 330:9

**complaints** [1] - 27:9

**completed** [7] - 16:7, 16:17, 193:20, 203:13, 206:13, 233:21, 280:18

**completely** [1] - 306:7

**complex** [1] - 295:11

**compliance** [3] - 199:17, 314:8, 348:13

**Compliance** [1] - 199:18

**compliant** [10] - 51:6, 188:4, 190:7, 252:15, 297:20, 319:21, 324:18, 332:21, 349:24, 351:13

**complied** [4] - 68:22, 197:13, 242:24, 288:13

**complies** [1] - 260:1

**compliments** [1] - 249:7

**comply** [4] - 52:12, 199:21, 239:3, 239:4

**complying** [1] -

239:7

**Complying** [3] - 11:3, 34:19, 166:6

**components** [1] - 21:13

**comport** [1] - 288:20

**compose** [1] - 285:13

**composition** [7] - 201:3, 304:8, 321:16, 321:22, 322:7, 322:10, 329:6

**computer** [2] - 5:6, 135:8

**computer-assisted** [1] - 5:6

**concern** [7] - 65:21, 84:25, 101:11, 101:15, 162:7, 197:22, 209:23

**concerned** [3] - 202:12, 223:10, 305:11

**concerning** [1] - 197:20

**concerns** [5] - 19:15, 19:25, 20:11, 22:6, 101:8

**concise** [1] - 324:19

**concluded** [4] - 15:3, 17:14, 165:6, 275:1

**concluding** [1] - 9:15

**conditioned** [1] - 227:16

**conducive** [1] - 57:11

**conduct** [4] - 52:6, 169:18, 230:6, 230:16

**conducted** [3] - 205:11, 315:7, 315:11

**conducting** [1] - 230:12

**Confederacy** [1] - 247:18

**Confederate** [6] - 56:12, 57:13, 57:15, 57:16, 57:23, 58:2

**conference** [9] - 23:21, 62:3, 90:15, 90:17, 192:10, 194:5, 206:12, 207:14, 343:9

**conferences** [1] - 246:22

**configuration** [2] - 151:8, 151:16

**confirm** [4] - 7:10, 195:5, 265:11, 283:7

**confirmed** [1] - 129:20

**conflict** [1] - 220:17

**confront** [1] - 113:5

**confused** [1] - 308:20

**congratulations** [1] - 172:11

**Congress** [1] - 349:4

**congressional** [2] - 170:16, 170:17

**connect** [2] - 90:6, 91:17

**connecting** [1] - 39:9

**connection** [9] - 76:7, 173:7, 174:18, 177:9, 179:17, 182:7, 205:14, 207:22, 209:1

**connects** [6] - 39:1, 39:17, 42:16, 42:18, 42:20, 42:23

**consensus** [1] - 221:8

**conservative** [4] - 240:18,

240:21, 253:16

**consider** [24] - 42:20, 83:19, 91:5, 131:8, 149:2, 181:24, 189:23, 201:3, 235:10, 237:6, 238:11, 238:12, 239:9, 245:5, 250:1, 316:16, 317:1, 318:18, 319:25, 323:25, 324:2, 324:5, 331:11, 353:14

**consideration** [11] - 131:9, 149:12, 199:1, 237:16, 237:22, 238:25, 239:12, 265:18, 318:12, 321:17, 349:21

**considerations** [2] - 199:11, 254:7

**considered** [16] - 148:17, 157:15, 158:15, 168:4, 239:5, 242:8, 276:17, 286:2, 286:21, 313:8, 314:5, 314:7, 322:13, 323:15, 324:23, 324:24

**considered..** [1] - 199:23

**considering** [7] - 239:9, 250:3, 286:3, 287:7, 293:23, 324:3, 326:14

**consistent** [15] - 180:16, 184:11, 187:12, 187:23, 199:14, 199:20, 200:16, 201:8, 204:9, 205:13, 206:17, 206:20, 211:5, 216:5, 332:15

**consistently** [4] - 80:22, 259:16, 272:7

**consolidated** [3] - 343:13, 343:21, 344:16

**consolidation**

[1] - 18:10
constable [1] - 246:6
Constables [1] - 252:7
constables [4] - 18:10, 230:25, 231:2, 231:6
constituent [1] - 40:23
constituents [16] - 41:7, 44:14, 70:20, 115:1, 119:14, 119:20, 120:2, 188:25, 255:7, 255:18, 295:14, 317:17, 339:19, 340:7, 341:18, 342:4
constitute [1] - 138:9
Constitution [3] - 177:20, 225:5, 314:9
constitutional [2] - 140:24, 315:5
constraints [1] - 333:18
construct [1] - 329:14
constructed [2] - 38:25, 57:2
consultants [2] - 266:1, 269:6
contact [9] - 21:3, 54:11, 84:25, 89:17, 89:19, 107:5, 107:7, 108:19, 150:9
contacted [3] - 85:2, 102:22, 107:15
contacts [2] - 16:12, 16:13
contend [1] - 279:6
contention [1] - 24:4
contents [1] - 274:10
contest [2] - 76:23, 134:25

context [1] - 142:8
contingent [1] - 19:19
continue [7] - 63:16, 118:6, 152:4, 158:10, 224:16, 322:16, 356:18
continued [7] - 2:1, 3:1, 4:1, 5:1, 20:21, 68:19, 357:2
continuous [1] - 106:23
contract [2] - 60:22, 225:21
contracted [1] - 61:7
contracting [1] - 178:25
contradict [1] - 24:14
controlled [2] - 167:10, 172:1
controversial [2] - 55:17, 56:3
convenient [2] - 43:18, 224:11
conversation [20] - 20:9, 54:7, 64:8, 64:12, 66:12, 66:15, 76:14, 81:17, 108:5, 122:21, 135:3, 135:5, 154:24, 187:18, 204:23, 207:16, 241:3, 247:9, 290:8, 334:15
conversations [6] - 62:15, 83:10, 103:16, 184:17, 207:5, 235:20
convey [1] - 304:7
conveyed [2] - 271:23, 272:1
convince [4] - 78:15, 137:4, 137:17, 138:21
convinced [2] - 88:8, 161:3

coordinate [2] - 220:9, 343:12
coordinates [1] - 246:8
coordinator [1] - 284:25
copied [1] - 278:18
copies [5] - 72:23, 75:3, 91:1, 98:22, 152:18
Copper [1] - 2:6
cops [1] - 58:15
copy [10] - 9:17, 35:8, 132:2, 132:4, 133:6, 133:7, 164:5, 222:1, 267:5, 277:11
copying [1] - 153:23
cordial [1] - 15:1
core [4] - 42:21, 117:14, 118:15, 305:16
corner [2] - 127:22, 163:25
correct [336] - 23:18, 26:4, 26:18, 27:17, 28:14, 28:18, 29:3, 31:17, 43:14, 52:7, 52:8, 52:20, 52:22, 54:1, 73:14, 73:17, 73:20, 74:12, 77:23, 80:23, 87:18, 89:16, 90:5, 91:24, 92:2, 92:5, 95:1, 96:11, 99:11, 100:7, 100:24, 107:6, 111:9, 112:10, 129:18, 136:21, 140:24, 142:19, 145:12, 151:19, 167:4, 168:25, 172:21, 173:25, 174:3, 175:12, 175:18, 175:25, 176:3, 176:7, 176:11, 176:16, 177:14, 182:19, 183:23, 190:22, 190:24,

192:20, 199:21, 200:13, 201:6, 208:8, 208:10, 208:14, 216:18, 217:12, 217:24, 229:23, 230:7, 231:10, 231:16, 232:18, 234:22, 242:11, 243:18, 243:25, 252:8, 253:22, 253:23, 254:2, 254:3, 254:16, 254:22, 254:25, 255:3, 255:13, 255:15, 255:23, 256:2, 256:4, 256:6, 256:8, 256:9, 256:19, 256:21, 257:11, 257:20, 257:21, 257:25, 258:3, 259:7, 259:12, 259:13, 259:19, 260:5, 260:8, 260:14, 261:15, 261:16, 261:17, 262:23, 263:14, 263:25, 265:8, 266:3, 266:10, 266:25, 267:19, 268:14, 268:15, 268:22, 269:15, 270:1, 270:9, 270:10, 270:12, 270:18, 270:25, 271:2, 271:5, 271:10, 271:21, 272:8, 272:13, 272:22, 273:3, 273:9, 273:13, 273:17, 273:23, 274:8, 274:18, 275:12, 276:6, 276:15, 278:17, 278:21, 278:22, 279:3, 279:7, 279:8, 280:19, 280:23, 281:7, 282:4, 282:7, 283:19, 284:1, 284:8, 284:16, 284:22, 284:25, 285:25, 286:13, 286:18, 286:22, 288:3, 288:9, 288:12, 289:5, 290:17, 291:2, 291:6, 291:14, 291:22, 292:2, 293:9, 293:13, 293:15,

293:20, 294:1, 294:11, 295:4, 295:16, 295:25, 296:6, 296:15, 296:18, 296:23, 297:4, 297:15, 298:2, 298:7, 298:21, 300:9, 301:3, 301:4, 301:25, 302:7, 302:12, 303:1, 303:5, 303:10, 303:14, 303:22, 304:9, 305:7, 305:13, 305:17, 305:23, 306:4, 306:15, 307:4, 307:15, 308:5, 308:9, 308:14, 308:16, 309:1, 310:3, 310:5, 310:6, 310:10, 310:16, 310:18, 311:2, 311:4, 311:11, 312:6, 312:10, 312:14, 312:17, 314:13, 315:2, 315:3, 315:18, 316:10, 317:18, 318:3, 318:7, 318:10, 319:2, 319:7, 319:10, 319:13, 319:23, 321:11, 321:25, 322:1, 322:7, 322:10, 322:14, 322:20, 323:11, 323:23, 324:1, 324:6, 324:16, 324:25, 325:16, 325:17, 325:23, 326:1, 326:5, 327:1, 327:16, 327:24, 328:5, 328:8, 328:13, 328:17, 328:22, 329:1, 329:4, 329:7, 329:11, 329:15, 330:13, 330:23, 331:8, 332:22, 333:3, 333:10, 333:17, 333:18, 333:21, 333:25, 334:7, 335:1, 335:11, 335:16, 336:7, 336:16, 336:17, 336:21, 336:25, 337:9, 338:2, 338:5, 338:18, 339:4,

339:7, 339:17, 339:22, 339:25, 340:3, 340:8, 340:16, 341:20, 341:23, 341:25, 342:4, 342:8, 342:11, 342:14, 342:22, 343:4, 343:5, 345:8, 345:10, 345:13, 345:14, 345:16, 345:21, 345:23, 346:2, 346:3, 346:9, 346:13, 346:16, 348:17, 355:21, 357:7

corrected [2] - 127:25, 290:24

correctly [3] - 253:20, 253:24, 284:2

correspondence [4] - 179:12, 180:15, 221:24, 222:25

corresponding [1] - 232:10

corridor [2] - 270:12, 270:14

cost [2] - 22:15, 254:2

costing [2] - 245:1, 245:24

costs [1] - 246:10

counsel [57] - 35:1, 60:13, 62:4, 114:2, 173:5, 173:18, 174:2, 179:21, 181:4, 181:13, 181:15, 183:3, 194:24, 218:23, 222:21, 222:25, 252:12, 258:19, 260:19, 261:10, 262:9, 262:18, 262:20, 262:23, 263:4, 263:11, 263:21, 265:4, 265:6, 271:11, 271:12, 271:15, 271:16, 274:18, 275:18, 283:19, 284:15, 286:3, 287:13, 288:8, 288:23, 293:5, 298:4, 301:14,

301:18, 309:8, 311:24, 313:14, 313:21, 315:8, 316:3, 340:22, 341:1, 341:5, 341:10, 355:11

Counsel [1] - 151:4

counsel's [1] - 311:20

count [1] - 161:22

counter [1] - 10:5

counter-designate [1] - 10:5

Counties [1] - 173:9

counties [4] - 103:19, 243:21, 243:22, 334:9

county [125] - 13:11, 14:1, 14:15, 14:19, 17:20, 19:4, 19:9, 27:19, 27:21, 27:25, 37:5, 37:6, 37:8, 37:9, 37:11, 40:8, 40:14, 40:16, 40:18, 45:21, 46:10, 48:2, 48:14, 48:17, 48:20, 49:9, 49:16, 50:21, 51:5, 51:10, 58:17, 59:12, 64:7, 66:22, 69:25, 74:11, 77:1, 78:12, 78:13, 80:2, 80:16, 82:11, 95:15, 97:7, 98:21, 103:17, 104:17, 110:17, 139:13, 140:17, 140:22, 143:11, 143:12, 150:7, 150:22, 161:2, 166:25, 170:19, 171:2, 171:6, 173:7, 174:6, 180:25, 183:19, 187:19, 188:2, 189:23, 191:6, 197:19, 202:13, 208:9, 209:12, 210:7,

211:24, 216:3, 216:25, 217:7, 223:13, 223:18, 224:14, 225:3, 225:4, 229:12, 230:6, 230:18, 235:10, 241:5, 242:15, 242:17, 246:21, 248:4, 249:3, 250:4, 255:10, 257:12, 257:16, 260:11, 260:12, 260:13, 260:20, 261:2, 261:4, 266:21, 270:12, 272:19, 272:21, 282:10, 283:22, 287:7, 287:17, 289:9, 289:11, 291:11, 302:20, 305:17, 306:7, 334:10, 335:10, 336:4, 338:18, 349:10, 349:22, 350:11, 351:2, 351:6

COUNTY [5] - 1:6, 6:10, 166:6, 166:11, 166:14

County [190] - 8:15, 9:5, 9:6, 9:12, 11:23, 13:1, 13:16, 14:25, 17:23, 18:14, 19:12, 21:8, 22:13, 24:21, 27:1, 27:23, 31:15, 32:14, 32:16, 32:20, 36:19, 36:21, 36:22, 36:24, 37:15, 37:17, 37:20, 40:12, 42:2, 43:6, 45:17, 56:16, 56:18, 57:17, 58:1, 58:17, 58:20, 58:23, 59:2, 59:4, 59:16, 59:19, 59:21, 59:22, 68:2, 68:14, 68:18, 76:17, 79:9, 79:17, 82:25, 84:5, 84:6, 84:12, 84:16, 89:12, 94:14, 94:22, 97:2, 98:1, 103:4,

103:18, 105:15, 115:18, 115:19, 116:24, 117:13, 120:24, 121:10, 121:18, 126:14, 127:13, 129:20, 131:5, 133:1, 134:8, 134:9, 140:4, 147:19, 147:21, 152:23, 153:24, 170:19, 170:20, 172:1, 174:1, 175:23, 176:2, 176:8, 176:10, 176:22, 178:1, 178:17, 178:20, 180:22, 181:20, 184:5, 186:17, 187:3, 189:3, 189:4, 189:6, 189:24, 193:12, 198:12, 198:13, 201:9, 211:7, 215:14, 215:16, 216:24, 221:10, 221:14, 221:22, 223:6, 223:8, 233:2, 239:6, 241:1, 241:4, 241:14, 241:25, 242:13, 242:21, 243:9, 243:13, 243:24, 244:21, 245:2, 245:4, 245:24, 246:14, 246:20, 248:8, 248:18, 248:19, 248:25, 249:10, 249:23, 250:2, 253:22, 254:22, 259:23, 263:23, 265:18, 272:18, 274:2, 275:1, 275:5, 275:10, 275:19, 276:5, 276:14, 277:9, 277:25, 280:1, 280:11, 291:6, 291:8, 291:17, 291:22, 292:1, 292:16, 293:7, 294:19, 295:3, 309:23, 309:24, 313:7, 314:4, 314:13, 316:10, 327:5, 327:15, 327:20, 328:1, 328:19, 329:1, 334:15, 334:17, 334:23, 334:25, 335:2,

335:5, 339:17, 352:18

County's [26] - 15:14, 15:21, 24:6, 24:9, 50:13, 73:25, 74:1, 79:14, 90:13, 116:14, 116:16, 139:7, 153:21, 189:5, 195:7, 199:15, 244:9, 245:11, 263:10, 263:21, 265:25, 269:5, 275:3, 297:3, 316:15, 342:2

county's [1] - 21:6

County-proposed [1] - 117:13

countywide [7] - 43:8, 43:11, 79:22, 172:8, 191:4, 208:2, 208:7

couple [17] - 30:2, 41:15, 48:20, 56:10, 57:2, 64:9, 81:18, 96:14, 113:23, 146:18, 151:4, 153:22, 155:24, 188:16, 204:17, 263:17, 320:1

couple-of-day [1] - 146:18

course [10] - 7:11, 45:23, 119:1, 119:2, 185:5, 225:1, 227:20, 248:4, 329:13, 348:18

courses [1] - 168:13

Court [152] - 5:3, 7:1, 13:16, 14:7, 14:8, 15:3, 15:19, 15:25, 16:3, 17:22, 19:16, 20:16, 21:15, 21:18, 21:21, 21:23, 22:13, 23:19, 33:4, 33:10, 33:16, 33:21, 34:5, 48:3, 48:6,

48:8, 48:12, 49:19, 50:4, 50:23, 51:12, 52:15, 53:12, 53:21, 53:23, 54:10, 54:11, 54:12, 54:13, 54:15, 54:21, 55:2, 55:7, 55:14, 58:4, 64:22, 64:25, 66:16, 68:13, 70:11, 75:20, 82:23, 83:1, 84:8, 88:20, 91:2, 91:12, 95:14, 95:22, 96:7, 96:23, 98:22, 98:23, 99:4, 99:7, 103:2, 110:21, 113:2, 113:10, 114:25, 140:16, 144:6, 148:1, 148:24, 152:16, 154:2, 156:7, 161:20, 165:3, 165:5, 165:10, 173:15, 175:24, 176:21, 189:1, 193:19, 199:23, 200:7, 216:24, 223:12, 225:2, 227:1, 230:23, 231:14, 231:21, 231:24, 240:3, 240:13, 240:18, 247:6, 250:6, 253:17, 253:25, 257:13, 257:20, 258:5, 258:18, 258:20, 261:15, 262:16, 262:23, 263:8, 265:8, 265:24, 266:6, 267:6, 269:4, 273:15, 274:21, 274:23, 276:16, 277:9, 279:19, 286:11, 286:18, 287:2, 291:4, 293:13, 308:25, 311:15, 313:8, 314:5, 315:15, 317:21, 318:18, 318:24, 323:15, 324:22, 327:5, 327:13, 329:14, 330:20, 339:17, 341:24, 345:7, 345:8, 345:13,

345:20, 345:25, 346:6, 353:20

**court** [17] - 40:16, 89:20, 107:12, 109:25, 148:5, 148:6, 149:2, 219:16, 231:3, 244:7, 244:10, 244:11, 244:15, 331:1, 333:6, 348:22, 348:23

**COURT** [93] - 1:1, 7:2, 7:8, 7:12, 7:14, 7:22, 7:24, 8:3, 8:6, 9:16, 9:20, 9:22, 9:24, 10:7, 10:10, 10:17, 10:19, 10:21, 10:25, 11:4, 11:9, 26:9, 32:23, 32:25, 33:9, 33:13, 33:24, 34:1, 34:4, 34:7, 34:11, 34:15, 34:20, 35:3, 35:10, 37:22, 37:25, 76:8, 85:10, 85:15, 85:20, 93:17, 93:22, 95:17, 95:19, 102:10, 113:20, 114:1, 114:16, 116:1, 116:5, 128:1, 133:20, 156:1, 164:11, 164:17, 164:20, 164:23, 165:7, 165:11, 165:18, 165:23, 166:1, 166:4, 166:7, 166:13, 185:25, 193:17, 194:23, 205:24, 206:2, 206:6, 207:25, 250:20, 251:13, 253:5, 280:5, 339:11, 343:15, 343:23, 344:2, 344:5, 344:9, 344:11, 344:15, 344:23, 352:1, 352:13, 355:7, 356:9, 356:11, 356:13, 357:5

**Court's** [4] - 63:24, 64:2, 271:15, 277:10

**courthouse** [5] - 17:23, 55:4, 56:13, 58:3, 247:4

**courtroom** [7] - 54:2, 60:1, 114:9, 227:9, 230:9, 251:23, 354:11

**courts** [1] - 150:7

**Courts** [1] - 342:8

**cover** [4] - 13:12, 14:1, 221:21, 254:2

**covered** [1] - 175:10

**COVID** [8] - 44:21, 44:23, 45:1, 57:17, 99:15, 182:18, 229:3

**CPRA** [2] - 185:9, 188:14

**cracked** [1] - 285:18

**cracking** [1] - 285:17

**cramped** [2] - 57:7, 57:9

**crayon** [1] - 77:18

**create** [2] - 105:12, 276:12

**created** [4] - 90:9, 170:17, 196:9, 328:3

**creates** [2] - 303:12, 327:10

**creation** [4] - 49:18, 315:12, 315:16, 317:21

**credible** [1] - 96:8

**creeks** [1] - 330:6

**crew** [1] - 167:9

**crime** [2] - 40:25, 41:3

**criminal** [2] - 230:17, 242:19

**criteria** [71] - 97:22, 98:3, 98:7, 139:25, 140:3, 140:9, 154:1, 154:7, 154:12, 156:12,

156:16, 156:22, 157:13, 157:17, 157:19, 157:20, 174:7, 188:3, 188:4, 199:16, 201:9, 201:12, 252:14, 252:18, 274:3, 274:5, 274:8, 275:5, 275:11, 275:12, 275:16, 275:20, 275:22, 276:5, 276:14, 276:17, 277:10, 277:16, 278:7, 278:14, 278:23, 278:25, 279:2, 279:5, 279:6, 279:10, 279:18, 299:5, 299:10, 299:13, 299:14, 299:21, 300:5, 310:20, 310:24, 311:1, 311:7, 311:13, 311:18, 315:2, 316:22, 318:23, 320:7, 324:8, 325:3, 325:6, 329:9, 329:13, 337:1, 340:19

**critical** [1] - 146:3

**Crohn's** [1] - 12:18

**Cross** [5] - 6:9, 6:11, 6:11, 6:12, 6:14

**CROSS** [5] - 22:23, 114:23, 250:23, 345:1, 346:21

**cross** [9] - 114:13, 114:21, 165:4, 165:12, 343:22, 344:18, 356:9, 356:14, 356:16

**Cross-Examination** [5] - 6:9, 6:11, 6:11, 6:12, 6:14

**CROSS-EXAMINATION** [5] - 22:23, 114:23, 250:23, 345:1, 346:21

**cross-examination** [1] - 114:21

**cross-examine** [1] - 344:18

**crossed** [1] - 14:18

**crosses** [2] - 165:5, 165:19

**crowd** [2] - 57:11, 57:13

**crowded** [1] - 97:16

**CRR** [2] - 5:4, 357:10

**crystal** [2] - 219:4, 219:6

**current** [10] - 26:25, 151:7, 151:8, 151:10, 151:13, 151:15, 282:23, 314:18, 328:16, 328:19

**custody** [1] - 114:5

**cut** [5] - 25:1, 25:2, 69:23, 104:22, 253:21

**cutoff** [2] - 48:15, 48:17

**cuts** [1] - 70:4

**cutting** [4] - 22:12, 23:25, 24:2, 24:17

**CVAP** [2] - 118:4, 118:5

**cycle** [18] - 15:22, 16:2, 17:16, 20:24, 21:7, 21:11, 21:12, 21:17, 21:19, 21:22, 21:24, 29:5, 56:6, 62:13, 98:6, 314:20, 336:15, 340:21

**cycles** [6] - 21:13, 37:7, 275:5, 275:12, 276:6, 276:15

**D**

**D.C** [1] - 20:7

**dad** [4] - 35:23, 46:25, 47:2,

47:6

Daily [2] - 23:11, 185:17

daily [1] - 289:6

dais [1] - 99:1

Dale [32] - 61:5, 62:3, 66:4, 67:20, 69:2, 71:18, 72:9, 74:17, 74:18, 82:16, 83:6, 128:18, 129:21, 134:18, 151:4, 161:2, 178:7, 179:17, 180:10, 192:12, 204:5, 204:14, 205:5, 210:17, 235:20, 239:2, 263:17, 284:4, 290:2, 292:17, 297:19, 299:24

Dallas [3] - 76:16, 103:19, 134:1

Dallin [1] - 4:17

damage [1] - 223:10

danger [1] - 208:13

dangerous [1] - 41:24

dark [1] - 105:19

Darnell [1] - 8:12

Darrell [1] - 81:19

data [93] - 64:24, 65:1, 65:2, 66:23, 66:24, 67:1, 67:25, 68:21, 72:3, 72:24, 73:1, 73:15, 73:18, 74:2, 74:4, 74:6, 74:7, 74:8, 74:10, 74:11, 75:2, 75:3, 78:3, 79:25, 90:12, 94:14, 94:25, 95:1, 97:8, 97:10, 97:11, 99:21, 101:5, 107:18, 107:24, 111:5, 111:8, 112:25, 128:18, 128:21, 129:1, 129:2, 129:10, 129:21, 142:23,

142:25, 143:1, 143:6, 143:10, 144:16, 146:13, 147:7, 151:11, 152:20, 163:11, 163:16, 164:4, 181:5, 182:18, 182:21, 183:3, 183:16, 183:21, 183:24, 184:4, 184:16, 189:23, 190:3, 190:4, 190:10, 198:2, 289:3, 289:21, 290:16, 290:19, 290:21, 290:25, 291:4, 291:6, 291:21, 292:3, 292:7, 292:11, 295:14, 330:7, 346:2, 354:14

date [26] - 51:18, 86:3, 121:2, 121:8, 126:16, 144:8, 150:3, 158:9, 183:8, 185:23, 204:2, 215:6, 217:11, 217:13, 217:14, 220:15, 221:17, 226:9, 244:7, 282:1, 293:5, 294:23, 294:24, 296:18

Date [1] - 357:4

dated [14] - 85:24, 92:13, 109:11, 129:25, 179:13, 205:1, 210:16, 216:2, 222:4, 263:16, 265:12, 274:15, 285:7, 316:12

dates [10] - 16:4, 62:16, 92:15, 92:17, 92:18, 92:22, 93:24, 94:1, 192:15, 283:6

daughter [1] - 46:14

Davidson [2] - 74:18, 205:5

DAY [1] - 6:1

day-to-day [1] - 40:18

days [22] - 17:2,

36:2, 48:21, 77:6, 81:7, 86:10, 96:14, 109:18, 143:20, 152:13, 153:23, 172:12, 177:7, 180:11, 212:3, 244:4, 267:24, 282:6, 283:3, 313:18, 313:19, 343:22

Days [1] - 1:8

DC [11] - 1:13, 1:23, 2:4, 2:8, 2:24, 3:15, 3:18, 3:21, 3:24, 4:4, 4:7

deadline [36] - 30:21, 48:19, 49:3, 49:5, 79:8, 103:15, 140:17, 211:14, 211:15, 211:19, 219:1, 220:4, 225:22, 280:19, 280:21, 280:24, 281:2, 281:5, 281:10, 281:14, 282:2, 282:13, 283:8, 283:17, 294:9, 294:11, 294:17, 295:20, 313:2, 335:3, 335:4, 336:23, 337:19, 342:21, 342:25

Deadlines [1] - 215:19

deadlines [2] - 16:6, 30:25

deal [7] - 16:9, 100:20, 112:18, 185:3, 185:7, 221:4, 294:12

dealing [5] - 185:19, 188:19, 222:25, 245:6, 343:21

Dear [1] - 215:16

death [4] - 38:8, 106:4, 106:6

debate [11] - 53:24, 57:14, 57:16, 80:5, 92:4, 103:22, 105:1, 108:6, 108:7, 108:20, 109:20

December [18] - 12:3, 13:18, 17:4, 30:21, 30:22, 31:7, 281:22, 281:23, 282:7, 283:5, 311:23, 312:13, 322:19, 323:4, 323:5, 323:13, 323:19

Decennial [1] - 110:9

decide [3] - 45:5, 224:24, 341:20

decided [7] - 88:7, 236:19, 318:14, 325:22, 331:21, 333:2, 350:7

decides [2] - 53:18, 259:21

decision [11] - 26:24, 103:14, 224:16, 240:9, 245:11, 252:8, 252:9, 254:7, 276:7, 288:14, 331:8

decisions [2] - 52:17, 104:21

declaration [4] - 7:17, 9:17, 58:24, 312:12

declare [3] - 58:19, 312:8

dedicate [1] - 59:2

dedicated [2] - 59:1, 327:12

defendant [2] - 114:4, 166:2

defendants [9] - 7:18, 10:3, 10:14, 10:16, 95:18, 165:1, 166:2, 199:10, 314:4

Defendants [1] - 6:4

DEFENDANTS [1] - 4:8

Defendants' [21] - 23:5, 64:2, 92:8, 92:21,

95:5, 98:10, 107:11, 109:7, 110:1, 111:11, 126:25, 128:12, 130:23, 131:21, 132:7, 133:14, 149:16, 149:19, 163:8, 354:9, 354:18

defense [2] - 165:7, 165:9

Defense [1] - 168:15

Defense's [1] - 169:9

defensible [4] - 188:4, 197:17, 252:15, 324:18

definitely [2] - 182:20, 277:25

definition [1] - 40:14

definitions [1] - 285:17

DEFS 00029435 [1] - 285:6

degree [5] - 185:22, 208:17, 272:23, 272:24, 289:8

delay [2] - 146:18, 146:19

delete [1] - 68:9

delivered [2] - 94:1, 209:23

Democrat [8] - 27:16, 27:17, 28:7, 45:8, 45:10, 63:22, 83:3, 198:15

Democratic [8] - 37:21, 45:12, 45:14, 45:17, 96:5, 121:18, 126:14, 321:24

Democratic-leaning [1] - 321:24

Democrats [4] - 37:18, 45:21, 172:1, 173:16

demographer [3] - 61:11,

74:19, 205:6
demographic [7] - 189:22, 190:3, 190:4, 190:10, 266:1, 272:18, 330:7
demographically [1] - 273:1
demographics [2] - 66:24, 67:23
demography [1] - 95:15
demonstrative [3] - 251:4, 251:5, 251:14
denial [1] - 177:3
denied [2] - 50:4, 51:13
Dennard [3] - 28:10, 28:11, 28:12
Denver [1] - 167:9
denying [1] - 176:14
Department [38] - 3:13, 3:17, 3:20, 3:23, 4:3, 4:6, 20:1, 20:3, 20:7, 23:20, 27:9, 28:15, 29:12, 63:12, 83:24, 101:17, 107:5, 107:7, 107:15, 108:1, 108:4, 108:9, 168:15, 169:9, 175:16, 176:5, 176:13, 176:20, 177:3, 265:7, 265:13, 273:21, 274:1, 311:21, 313:15, 346:6, 346:7, 349:9
department [3] - 80:14, 97:1, 97:2
depict [1] - 94:6
deposed [4] - 141:2, 141:3, 141:5, 141:7
deposit [1] - 185:13
Deposition [1] -

6:4
deposition [32] - 8:1, 8:9, 10:4, 87:4, 87:13, 112:21, 134:15, 141:2, 141:16, 144:9, 162:6, 162:18, 162:25, 251:1, 253:21, 255:25, 256:7, 256:10, 262:2, 262:4, 264:8, 264:12, 285:20, 299:7, 314:1, 318:5, 320:4, 320:6, 320:19, 331:12, 332:6, 334:14
deprived [1] - 19:20
deputies [1] - 246:13
deputy [2] - 114:5, 246:6
Derreck [2] - 81:16, 81:21
describe [11] - 11:25, 14:10, 14:24, 21:13, 40:1, 41:6, 56:19, 90:19, 125:17, 125:19, 239:20
described [4] - 60:4, 71:2, 103:25, 123:6
description [3] - 54:5, 56:23, 123:12
designate [1] - 10:5
designated [2] - 95:12, 95:21
desire [2] - 66:13, 184:21
desperately [1] - 225:21
detail [3] - 188:8, 329:18, 330:4
detailed [1] - 331:4
determination [2] - 26:23, 281:15
determine [3] -

68:3, 315:15, 317:21
develop [5] - 16:12, 131:12, 198:5, 212:21, 213:6
developed [1] - 57:25
developing [1] - 199:11
development [4] - 12:15, 200:17, 201:11, 201:14
deviation [3] - 70:15, 117:25, 333:8
deviations [1] - 329:3
devices [1] - 188:12
devoted [1] - 12:16
dialogue [1] - 232:11
Diana [1] - 2:23
Dianna [3] - 80:16, 257:23, 284:24
Dickinson [17] - 13:14, 35:21, 36:1, 36:12, 38:19, 39:14, 44:5, 44:6, 44:8, 69:8, 69:13, 72:20, 125:17, 125:21, 270:16, 271:4, 350:16
died [2] - 37:3, 58:9
differed [1] - 21:14
difference [4] - 25:4, 60:9, 70:9, 346:17
differences [1] - 60:4
different [35] - 9:5, 12:6, 40:11, 40:12, 40:19, 42:12, 46:6, 59:15, 60:12, 67:24, 70:18, 94:9, 94:11,

94:19, 104:2, 121:24, 123:20, 125:6, 125:13, 125:14, 175:21, 228:10, 245:20, 276:16, 291:15, 303:5, 304:18, 308:4, 318:1, 318:9, 320:5, 340:15, 351:11, 354:19, 356:21
difficult [6] - 43:16, 43:17, 44:15, 169:21, 182:20, 249:1
difficulty [1] - 79:4
dig [2] - 279:9, 297:17
diligently [1] - 132:25
dilute [1] - 285:15
diminished [1] - 19:22
Dinklage [1] - 316:5
direct [5] - 93:20, 162:16, 256:23, 261:24, 328:7
DIRECT [3] - 11:14, 35:13, 166:16
Direct [3] - 6:8, 6:10, 6:14
directed [3] - 293:21, 327:24, 328:9
directing [5] - 284:12, 325:25, 326:3, 342:14, 342:15
direction [15] - 41:21, 211:9, 212:13, 219:5, 247:21, 259:23, 261:14, 262:15, 271:15, 284:7, 324:17, 325:18, 349:23, 355:2
directly [3] - 54:6, 178:25, 327:11
directors [2] - 316:8, 316:14
disbelieve [2] - 117:20, 117:22

disclosed [3] - 279:3, 295:25, 325:2
discriminate [1] - 238:21
discrimination [5] - 127:8, 127:14, 128:6, 168:16, 169:9
discriminatory [6] - 26:23, 82:13, 82:24, 83:7, 168:17, 275:3
discuss [18] - 35:8, 169:5, 190:9, 190:14, 198:16, 202:8, 202:9, 211:20, 236:11, 236:14, 285:24, 298:6, 298:10, 299:21, 326:22, 333:21, 335:23, 337:21
discussed [19] - 110:14, 168:7, 182:12, 212:8, 257:15, 267:7, 278:24, 298:19, 298:24, 299:5, 299:10, 299:16, 323:24, 333:1, 342:6, 343:9, 354:5, 354:7
discussing [6] - 184:5, 189:11, 196:11, 204:17, 326:14, 333:16
discussion [18] - 79:13, 84:5, 92:6, 97:21, 174:17, 179:7, 194:24, 204:16, 208:25, 220:6, 222:24, 232:4, 238:3, 245:10, 246:23, 257:3, 339:14
discussions [2] - 128:4, 184:18
diseases [3] - 59:15, 59:18, 59:20
disinfectant [1] - 52:21
disliked [1] -

348:1

disparate [1] - 42:17

displayed [6] - 73:24, 74:1, 76:18, 134:18, 151:6, 175:7

displeasure [1] - 22:10

disruption [1] - 230:9

dissenter [1] - 59:8

distance [2] - 223:20, 223:24

distinctly [1] - 18:16

distributed [1] - 91:2

distribution [3] - 94:19, 156:20, 276:3

district [47] - 23:25, 24:1, 24:2, 24:18, 28:1, 28:9, 28:16, 28:17, 36:20, 42:21, 43:19, 62:18, 62:22, 62:25, 63:16, 66:13, 79:21, 82:19, 84:12, 104:8, 104:9, 104:10, 104:12, 105:2, 105:5, 105:8, 105:9, 105:12, 118:6, 121:21, 123:1, 123:5, 123:8, 124:4, 124:6, 124:10, 127:7, 252:19, 289:20, 302:15, 302:20, 303:3, 348:16, 350:8, 351:7, 352:11

District [5] - 36:21, 59:19, 118:16, 176:9, 245:7

DISTRICT [2] - 1:1, 1:1

districting [2] - 140:2, 140:9

districts [14] -

73:2, 201:4, 252:6, 276:2, 276:4, 278:17, 280:11, 283:18, 304:8, 308:4, 321:17, 322:6, 330:7

diverse [4] - 40:3, 40:4, 104:8, 122:2

diversity [2] - 168:14, 169:6

divide [1] - 320:23

divided [1] - 82:15

divider [2] - 69:17, 69:24

Division [6] - 3:13, 3:17, 3:20, 3:23, 4:3, 4:6

DIVISION [1] - 1:2

doctor [1] - 167:25

document [25] - 41:16, 83:25, 84:1, 102:24, 117:4, 127:21, 147:4, 195:1, 203:25, 215:2, 215:6, 263:1, 263:14, 282:23, 312:2, 312:5, 312:14, 312:16, 313:6, 316:3, 322:20, 323:4, 323:5, 323:9, 351:23

Document [4] - 263:14, 309:20, 316:2, 318:22

documentatio n [1] - 252:11

documented [1] - 8:19

documents [5] - 91:2, 92:16, 98:20, 98:23, 313:1

dog [2] - 84:21, 84:22

DOJ [8] - 25:14, 25:15, 25:18, 26:3, 26:6, 175:18, 176:13,

311:20

dollars [4] - 59:1, 59:3, 59:4, 59:5

donated [1] - 12:20

done [56] - 14:13, 28:8, 52:18, 103:5, 106:11, 113:1, 148:20, 148:24, 162:3, 171:18, 174:13, 175:13, 188:5, 208:23, 211:9, 214:18, 217:11, 217:15, 219:4, 221:2, 222:19, 222:22, 227:12, 228:11, 233:11, 241:1, 242:21, 243:12, 243:14, 250:13, 256:12, 257:10, 286:14, 291:19, 292:1, 292:14, 293:22, 296:5, 297:15, 317:12, 319:20, 325:2, 325:5, 325:7, 325:10, 325:18, 330:10, 330:13, 332:3, 335:10, 339:10, 339:15, 343:12, 346:3, 356:18

door [3] - 42:6, 46:23, 76:2

Dotti [1] - 26:20

double [1] - 246:16

doubt [2] - 211:11, 219:3

down [69] - 33:11, 34:1, 37:25, 58:15, 59:20, 65:4, 65:12, 69:10, 69:11, 69:19, 77:25, 78:6, 82:9, 82:10, 86:1, 99:16, 99:17, 106:9, 113:13, 113:24, 114:6, 116:23, 121:15, 135:18, 136:4, 143:19, 144:5, 149:24, 153:6, 153:18, 155:5, 155:21, 156:9, 160:23, 164:11,

176:21, 177:4, 177:21, 179:17, 186:8, 194:2, 215:4, 223:11, 227:15, 245:12, 246:4, 246:7, 246:16, 246:24, 247:21, 257:18, 264:1, 270:5, 270:11, 271:6, 275:8, 282:15, 288:22, 290:13, 304:11, 304:15, 312:1, 314:24, 320:9, 320:21, 322:16, 324:12, 348:9, 356:11

download [2] - 77:13, 77:24

DOYLE [4] - 6:8, 11:3, 11:8, 11:12

Doyle [11] - 10:24, 11:1, 11:16, 11:18, 12:25, 22:21, 33:2, 34:1, 279:15, 279:16

Doyle's [4] - 60:2, 62:18, 62:19, 63:19

dozen [2] - 79:24, 330:23

Dr [1] - 245:7

Draft [3] - 195:15, 196:3, 302:24

draft [13] - 107:24, 196:25, 242:25, 266:13, 266:25, 297:1, 297:2, 300:9, 303:16, 307:20, 311:6, 334:2, 334:7

drafted [1] - 340:23

drafts [2] - 297:18, 340:25

dramatic [6] - 280:16, 303:12, 305:11, 305:22, 306:6, 306:23

dramatically [2] - 218:3, 308:4

drastically [3] - 15:8, 121:24, 123:20

draw [18] - 64:13, 64:15, 64:17, 67:21, 68:1, 97:3, 97:9, 105:8, 124:24, 157:17, 191:5, 209:5, 287:17, 289:19, 295:1, 297:19, 353:1

drawer [2] - 301:14, 350:10

drawing [5] - 173:21, 173:23, 198:17, 252:1, 341:11

drawn [12] - 28:17, 29:5, 72:3, 100:5, 123:7, 123:10, 124:5, 124:17, 157:19, 181:6, 285:14, 352:10

drew [3] - 61:17, 77:18, 157:18

Drive [2] - 2:14, 2:21

drive [1] - 350:11

driven [3] - 39:22, 87:19, 249:14

drives [1] - 39:24

driving [3] - 16:7, 133:25, 197:25

Dropbox [1] - 93:13

drove [1] - 75:11

drum [1] - 133:10

Drummond [26] - 76:15, 76:25, 77:1, 78:8, 79:3, 80:11, 103:16, 109:8, 109:15, 109:16, 133:20, 133:21, 133:24, 135:19, 136:15, 210:8, 210:16, 222:5, 261:8, 284:4, 284:7, 284:10, 301:3, 337:16, 337:17, 338:6

Drummond's [1] - 153:10

due [2] - 226:8, 333:18

duly [3] - 11:13, 35:12, 166:15
dumbfounded [1] - 64:14
DUNN [31] - 34:13, 35:5, 35:14, 38:3, 76:10, 76:11, 85:7, 85:17, 85:19, 85:21, 86:23, 87:2, 88:1, 93:21, 93:23, 95:18, 95:24, 102:12, 105:22, 105:23, 113:16, 113:19, 161:11, 164:9, 164:25, 344:22, 346:22, 352:2, 352:15, 352:16, 355:6
Dunn [9] - 1:18, 1:19, 6:12, 6:14, 6:15, 117:3, 117:21, 352:1, 352:14
Dunn's [1] - 133:18
Durham [2] - 3:4, 3:7
during [54] - 12:22, 13:8, 13:23, 14:7, 15:21, 16:21, 17:10, 17:16, 19:9, 21:12, 21:16, 21:19, 21:22, 21:24, 26:25, 49:19, 50:12, 64:12, 91:14, 95:20, 96:18, 100:4, 134:15, 142:21, 162:15, 162:23, 178:14, 189:13, 191:8, 218:20, 220:2, 224:10, 225:25, 229:3, 230:8, 230:9, 230:23, 231:20, 232:3, 232:4, 233:25, 235:23, 238:4, 254:21, 266:24, 274:3, 284:12, 286:21, 287:9, 297:22, 298:19, 298:23, 302:3, 306:1

duties [1] - 257:16
duty [4] - 68:2, 166:22, 168:25, 170:21
DX [1] - 129:17
DX-120 [1] - 120:13
DX-123 [1] - 126:10
DX-164 [1] - 155:20
DX-43 [2] - 179:10, 179:12
DX-98 [1] - 210:11
dying [1] - 106:5

**E**

e-mail [79] - 78:18, 92:7, 93:10, 93:24, 98:14, 98:17, 98:18, 107:14, 107:20, 107:23, 109:8, 110:2, 110:12, 111:14, 111:15, 111:17, 112:5, 120:15, 121:8, 122:8, 126:18, 127:3, 127:17, 128:15, 129:15, 130:11, 130:12, 130:21, 131:1, 131:4, 131:17, 132:10, 132:14, 133:6, 149:22, 150:1, 150:3, 150:11, 150:24, 153:3, 153:8, 155:20, 156:6, 156:18, 156:21, 157:2, 210:8, 210:13, 210:21, 211:2, 211:11, 211:18, 212:3, 215:7, 222:4, 263:3, 263:6, 263:16, 263:20, 276:25, 277:8, 277:21, 279:14, 279:22, 289:13, 289:16, 289:17, 289:24, 301:20, 304:13, 316:4, 317:13, 317:16, 337:17,

339:6, 354:1, 354:18, 354:19
E-Mail [1] - 215:14
e-mailed [1] - 284:21
e-mails [5] - 92:7, 106:13, 137:12, 154:14, 162:9
early [7] - 113:21, 181:16, 181:17, 193:2, 217:19, 249:7, 298:5
easier [5] - 165:4, 226:19, 229:14, 249:2, 270:7
easily [1] - 228:16
east [5] - 14:3, 39:15, 118:3, 125:19, 125:21
eastern [1] - 318:7
easy [3] - 212:17, 213:2, 323:1
edges [2] - 70:16, 70:17
educate [1] - 34:8
educational [2] - 11:25, 36:10
educationally [1] - 36:12
effect [4] - 70:19, 306:5, 345:20, 346:9
effective [1] - 282:18
effectively [1] - 243:16
efficiency [5] - 169:15, 185:11, 237:20, 283:12, 297:12
efficient [1] - 237:1
effort [22] - 59:3, 172:14, 172:19, 173:8, 174:4, 174:19, 179:17, 180:17, 181:3, 195:8, 202:7, 203:13, 205:18, 208:18, 210:6, 211:22, 221:12,

227:14, 251:25, 293:24, 307:24, 356:6
efforts [5] - 160:18, 175:22, 205:15, 244:9, 245:1
eight [5] - 46:22, 46:23, 55:13, 227:2, 246:13
either [34] - 12:22, 22:17, 23:13, 25:2, 70:4, 80:20, 128:21, 131:13, 133:11, 139:20, 145:11, 146:3, 168:18, 174:11, 194:12, 206:25, 212:22, 234:9, 237:12, 237:14, 238:21, 239:1, 239:10, 243:3, 243:6, 248:20, 285:15, 288:6, 293:17, 296:22, 301:9, 318:13, 319:25, 333:24
elect [20] - 20:12, 20:20, 31:20, 63:11, 101:23, 102:1, 104:18, 105:13, 115:1, 119:20, 120:2, 120:10, 122:11, 123:9, 124:7, 124:10, 152:4, 158:10, 158:13, 350:8
electability [2] - 208:12, 347:10
elected [22] - 12:25, 15:17, 16:22, 17:11, 17:14, 19:23, 20:25, 27:17, 39:5, 39:6, 46:9, 116:19, 158:6, 167:20, 172:8, 208:7, 239:15, 250:14, 272:14, 339:21, 339:24, 340:5
electing [4] - 199:2, 272:6, 272:7, 272:11
election [31] - 15:4, 15:10,

16:19, 28:6, 28:8, 37:7, 63:21, 73:4, 73:16, 73:19, 74:2, 79:25, 83:19, 104:14, 171:14, 171:25, 172:5, 208:15, 208:16, 216:14, 217:3, 219:12, 248:19, 248:21, 254:15, 280:19, 280:20, 281:21, 341:11
Election [2] - 215:19, 281:17
Elections [1] - 180:7
elections [6] - 16:21, 73:5, 197:23, 254:8, 273:17, 280:22
electorate [1] - 27:4
elements [1] - 16:10
Elias [1] - 131:7
eligible [1] - 242:12
eliminated [2] - 84:7, 84:16
Elton [1] - 4:9
embark [1] - 62:8
emergency [7] - 56:15, 58:18, 58:19, 58:20, 58:23, 59:13, 59:22
Emmett [1] - 42:3
emotion [1] - 88:14
emotional [1] - 88:13
employed [1] - 36:20
employees [3] - 147:18, 239:22, 289:11
enact [1] - 274:8
enacted [3] - 254:5, 273:15, 322:13
encompasses [1] - 84:13

encourage [1] - 173:10

encouraged [1] - 96:22

encouraging [1] - 153:25

end [19] - 17:20, 17:25, 27:18, 80:5, 107:1, 145:6, 159:11, 159:20, 165:5, 197:18, 198:3, 234:18, 234:25, 246:3, 246:11, 266:5, 273:16, 278:23, 319:4

ended [11] - 16:24, 56:10, 144:24, 154:13, 167:17, 177:10, 177:21, 178:7, 181:20, 194:18, 199:2

ending [1] - 9:1

endorsed [1] - 278:8

endorsement [1] - 254:20

endorsements [1] - 254:24

endorsing [1] - 316:19

ends [1] - 305:4

engage [3] - 287:2, 288:1, 288:11

engaged [1] - 287:16

engagement [4] - 262:21, 263:22, 287:14, 287:22

engaging [3] - 262:19, 262:20, 287:25

engineer [3] - 65:14, 66:22, 97:8

engineer's [1] - 67:7

engineering [3] - 80:14, 97:2, 144:15

English [1] - 106:2

enlarged [1] - 91:1

enlisted [1] - 247:17

ensure [2] - 132:22, 327:11

ensured [1] - 349:5

enter [1] - 280:22

entire [9] - 93:25, 143:12, 166:23, 169:3, 192:9, 242:16, 261:15, 285:2, 300:21

entirely [2] - 261:16, 261:17

entitled [1] - 357:8

entity [1] - 248:25

environment [1] - 346:25

equal [1] - 252:15

equalize [1] - 188:5

equipment [1] - 170:11

equivalent [1] - 263:11

erected [1] - 12:21

especially [1] - 22:11

essentially [4] - 68:13, 151:7, 151:12, 188:3

establish [1] - 283:2

established [3] - 294:22, 324:8, 342:25

establishing [1] - 277:10

estate [1] - 12:9

estimate [1] - 240:16

ET [2] - 1:4, 1:6

et [1] - 20:13

etherial [1] - 179:7

ethnicity [3] - 38:20, 44:16, 51:23

evaluate [1] - 330:5

evening [4] - 243:15, 266:18, 266:23, 345:3

evenly [1] - 82:16

event [2] - 120:24, 231:18

events [6] - 45:3, 45:14, 65:7, 251:24, 325:13, 332:13

eventually [4] - 170:12, 183:21, 195:21, 290:19

Evidence [1] - 352:3

evidence [18] - 7:20, 10:1, 24:14, 41:2, 41:3, 48:4, 61:16, 91:22, 95:17, 101:3, 114:19, 165:12, 165:17, 274:25, 323:8, 351:25, 352:5, 353:7

exact [9] - 49:23, 59:2, 79:19, 84:19, 137:18, 144:8, 273:19, 273:20, 320:19

exactly [22] - 17:5, 53:5, 64:15, 66:3, 66:5, 87:8, 87:25, 111:19, 125:4, 125:10, 126:5, 172:4, 178:22, 183:8, 185:20, 193:13, 194:19, 201:12, 205:17, 206:15, 244:6, 351:5

examination [4] - 95:20, 114:21, 162:16, 344:6

Examination [10] - 6:8, 6:9, 6:10, 6:11, 6:11, 6:12, 6:12, 6:14, 6:14, 6:15

EXAMINATION [10] - 11:14, 22:23, 35:13, 114:23, 161:10, 166:16, 250:23, 345:1, 346:21, 355:9

examine [2] - 287:17, 344:18

examiner [1] - 343:21

examining [1] - 343:17

example [12] - 40:22, 50:2, 56:22, 77:13, 104:24, 261:1, 273:5, 303:8, 311:6, 317:14, 317:25, 326:8

exception [3] - 231:9, 352:2, 352:5

Excerpt [1] - 251:14

exchange [2] - 354:19

excluding [2] - 188:12, 227:2

excuse [8] - 24:1, 60:10, 92:25, 95:10, 263:7, 268:16, 301:9, 320:8

excused [3] - 7:10, 34:3, 164:14

execute [1] - 257:16

executed [1] - 312:10

executive [7] - 50:3, 50:4, 50:8, 50:10, 167:18, 354:6, 354:7

exercise [4] - 278:25, 340:2, 340:6, 341:19

EXHIBIT [2] - 6:16, 6:18

Exhibit [49] - 6:4, 6:18, 7:20, 7:23, 9:24, 9:25, 23:5, 25:13, 35:7,

61:21, 61:24, 64:2, 66:19, 92:8, 92:21, 94:3, 95:5, 98:10, 107:11, 109:7, 110:1, 110:11, 111:11, 112:3, 116:23, 126:25, 128:13, 129:17, 130:23, 131:21, 132:7, 133:15, 133:16, 149:16, 149:19, 156:6, 162:11, 163:8, 163:19, 267:8, 267:10, 269:18, 270:5, 354:13, 354:18

exhibit [12] - 7:16, 23:10, 95:17, 95:23, 107:10, 163:7, 209:19, 284:2, 292:8, 309:21, 324:12, 354:13

Exhibits [1] - 354:9

EXHIBITS [1] - 6:17

exhibits [3] - 109:24, 269:1, 354:9

existed [1] - 270:3

existence [2] - 175:2, 235:18

existing [7] - 269:15, 276:1, 276:4, 278:16, 302:6, 302:11, 303:21

expect [5] - 228:3, 231:17, 236:8, 335:18, 340:11

expectation [6] - 72:2, 198:5, 203:2, 206:22, 206:24, 242:18

expected [13] - 189:25, 190:5, 197:23, 198:2, 205:14, 208:1, 211:14, 226:14, 280:14, 297:6, 297:19, 340:2, 342:2

expedited [1] - 265:18

expended [1] - 10:11

expense [1] - 89:15

experience [8] - 9:10, 15:12, 15:24, 21:11, 55:11, 99:9, 283:22, 336:14

experiences [2] - 188:10, 188:11

experiencing [1] - 335:20

expert [8] - 95:11, 95:12, 95:15, 95:22, 252:21, 287:17, 313:19

expertise [1] - 95:23

experts [4] - 118:22, 118:23, 252:11, 352:10

explain [7] - 81:9, 103:6, 103:10, 104:11, 107:13, 196:7, 246:5

explained [2] - 104:23, 104:25

explaining [1] - 169:8

explanation [2] - 105:18, 334:22

explored [1] - 254:10

exploring [1] - 254:5

express [2] - 18:18, 189:18

expressed [3] - 83:22, 224:4, 246:18

expressing [1] - 85:1

expression [1] - 187:11

extended [1] - 244:18

extension [2] - 245:21, 313:18

extensively [1] - 229:3

extent [6] - 45:19, 95:14, 102:8, 193:9, 276:4, 278:17

extra [1] - 216:11

**F**

FAA [1] - 170:10

Facebook [11] - 213:22, 221:11, 255:19, 256:14, 256:19, 256:21, 293:18, 326:7, 326:25, 327:2, 333:1

facilities [4] - 241:5, 242:4, 242:9, 244:22

facility [1] - 57:11

facing [1] - 256:21

fact [26] - 40:24, 59:18, 83:7, 84:12, 100:4, 154:11, 182:17, 190:16, 252:12, 252:17, 273:23, 276:17, 287:24, 291:9, 291:25, 292:1, 294:25, 296:10, 310:4, 317:9, 319:11, 322:9, 330:22, 348:10, 350:25, 354:15

factor [23] - 26:22, 199:18, 200:6, 200:23, 201:2, 314:7, 314:24, 314:25, 315:6, 318:19, 318:23, 319:21, 319:22, 319:25, 320:11, 320:18, 321:7, 321:16, 322:12, 323:3, 323:14, 323:22

factors [8] - 16:6, 199:10, 313:7, 321:7, 322:24, 323:25, 324:13, 324:15

facts [5] - 8:23, 145:25, 146:5, 295:24, 314:5

factual [2] -

123:23, 124:2

failed [1] - 274:3

failing [1] - 146:3

failure [2] - 274:8, 275:4

fair [46] - 33:21, 41:6, 48:6, 55:7, 55:19, 56:19, 63:21, 65:20, 65:23, 90:3, 90:16, 93:21, 99:5, 99:6, 108:8, 110:3, 110:4, 110:12, 111:6, 132:22, 207:18, 254:4, 266:12, 266:17, 266:20, 267:17, 267:23, 268:18, 278:6, 279:25, 280:10, 284:10, 287:23, 290:1, 303:20, 303:25, 305:15, 306:19, 307:14, 312:16, 314:15, 316:21, 317:12, 323:13, 324:13, 332:13

fairly [8] - 19:1, 82:16, 135:18, 193:8, 208:10, 233:13, 335:12

faith [1] - 39:21

faith-based [1] - 39:21

fall [5] - 242:7, 255:5, 318:13, 334:10, 347:3

falls [1] - 352:2

false [1] - 96:23

familiar [15] - 24:1, 31:22, 52:4, 53:9, 53:11, 108:14, 148:5, 148:6, 159:17, 159:18, 176:17, 195:10, 221:15, 272:17, 334:20

familiarize [3] - 109:13, 112:4, 354:10

family [1] - 244:6

far [20] - 164:20, 180:24, 182:20,

185:5, 208:3, 235:15, 236:5, 248:22, 255:18, 262:21, 272:4, 290:7, 299:14, 300:4, 318:18, 324:13, 324:22, 344:5, 344:12, 356:4

Farr [3] - 2:17, 2:23, 3:10

fast [3] - 29:24, 37:23, 279:24

faster [1] - 175:18

father [3] - 46:25, 106:5, 283:14

faulting [1] - 145:21

favor [2] - 353:9, 353:12

favorable [1] - 171:23

favoring [1] - 234:19

Fe [5] - 12:21, 17:24, 18:25, 19:1, 273:11

fear [3] - 112:21, 113:6, 113:8

February [4] - 38:14, 110:11, 148:2, 285:7

federal [8] - 19:13, 110:23, 188:13, 188:14, 241:15, 241:16, 349:3, 349:16

Federal [3] - 180:7, 313:19, 352:3

fee [4] - 32:18, 180:23, 181:1, 249:16

feedback [10] - 185:1, 213:3, 213:5, 214:11, 219:20, 221:1, 247:16, 331:6, 331:7

feelings [2] - 199:3, 199:4

fell [5] - 98:1, 220:15, 220:19, 226:1, 226:4

fellows [1] - 132:19

felony [1] - 161:25

felt [7] - 19:18, 22:9, 22:14, 62:7, 62:9, 140:10, 171:19

ferry [4] - 75:5, 75:7, 75:10, 205:10

Ferry [2] - 75:7, 75:8

festival [1] - 255:5

few [18] - 23:24, 69:14, 73:8, 83:12, 85:22, 86:10, 92:12, 96:17, 109:24, 142:13, 143:20, 255:1, 265:10, 285:4, 314:2, 325:11, 343:11, 345:5

field [2] - 103:10, 103:20

Fifth [5] - 31:22, 32:7, 32:10, 32:18, 32:21

fifth [3] - 200:23, 321:6

fight [34] - 45:19, 106:6, 106:7, 106:12, 106:13, 106:18, 106:22, 107:2, 159:18, 159:22, 160:3, 160:5, 160:6, 160:8, 160:9, 160:14, 160:20, 161:7

fighting [1] - 161:8

figuratively [3] - 159:25, 160:5, 160:7

figure [4] - 77:25, 173:1, 243:3, 341:14

figures [1] - 217:1

file [6] - 17:2, 30:20, 30:21, 77:24, 294:18, 294:19

filed [4] - 17:7,

176:8, 281:21, 282:1

**files** [2] - 32:15, 110:15

**filing** [24] - 16:18, 16:23, 17:10, 30:16, 30:21, 30:25, 31:3, 181:9, 217:2, 217:17, 249:16, 280:18, 280:21, 280:24, 281:2, 281:19, 282:2, 282:12, 294:9, 294:16, 294:23, 342:21, 353:16, 353:21

**filings** [1] - 294:14

**filled** [1] - 328:3

**final** [19] - 9:2, 72:22, 206:25, 207:2, 209:4, 209:8, 209:11, 211:3, 212:4, 212:14, 307:9, 310:15, 310:18, 333:6, 334:8, 334:19, 337:11, 340:24

**finalized** [1] - 86:15

**finalizing** [1] - 80:14

**finally** [2] - 76:2, 221:19

**finance** [2] - 12:2, 246:3

**financed** [1] - 172:7

**fine** [9] - 85:10, 102:2, 123:10, 152:5, 197:24, 223:21, 324:20, 333:13, 354:17

**finger** [5] - 147:17, 147:19, 147:20, 147:22, 147:24

**fingers** [2] - 145:25, 147:13

**finish** [1] - 139:3

**finished** [4] - 103:8, 281:7, 286:13, 356:15

**fire** [2] - 106:24,

113:11

**fired** [3] - 143:25, 146:22

**firm** [18] - 12:5, 24:10, 60:21, 103:4, 140:6, 163:4, 173:21, 173:22, 173:23, 178:4, 178:9, 178:24, 181:21, 181:25, 210:18, 263:24, 284:19, 355:25

**firms** [2] - 179:23, 286:20

**First** [2] - 30:8, 299:9

**first** [85] - 11:13, 15:11, 16:9, 35:12, 47:19, 47:21, 58:16, 59:11, 61:24, 64:4, 72:8, 72:15, 79:7, 79:8, 85:23, 108:9, 112:15, 117:6, 121:20, 144:5, 159:1, 159:3, 159:4, 159:9, 162:23, 165:8, 166:15, 171:10, 171:18, 172:17, 173:17, 177:25, 178:18, 184:24, 185:2, 186:8, 186:16, 191:9, 194:1, 194:15, 196:22, 216:22, 217:2, 217:17, 218:18, 225:3, 225:11, 225:18, 229:17, 235:15, 235:18, 239:23, 241:3, 244:18, 250:15, 251:19, 258:23, 258:25, 259:1, 259:2, 264:15, 267:23, 274:20, 274:21, 275:23, 279:17, 282:21, 283:17, 292:17, 292:22, 294:15, 301:21, 301:23, 304:16, 310:1, 313:12, 313:13, 313:21, 313:24, 314:7, 316:6, 328:12, 333:6,

343:18, 354:13

**first-called** [1] - 282:21

**firsthand** [1] - 21:11

**fiscal** [2] - 58:24, 254:6

**fiscally** [3] - 240:17, 240:21, 253:16

**fishing** [2] - 12:17, 14:22

**fist** [1] - 54:3

**fit** [1] - 47:14

**five** [21] - 10:19, 18:2, 18:3, 18:5, 18:23, 19:8, 21:22, 29:4, 36:8, 57:7, 99:4, 174:21, 219:15, 223:6, 241:22, 266:16, 266:17, 308:24, 336:9, 342:1, 353:7

**fix** [2] - 160:24, 161:6

**flight** [2] - 167:7, 168:9

**flip** [1] - 144:15

**floating** [1] - 81:18

**Floor** [1] - 4:11

**floor** [2] - 100:19, 100:21

**flu** [1] - 59:14

**fly** [1] - 176:21

**Flying** [1] - 167:18

**focus** [3] - 15:24, 215:1, 247:13

**focusing** [2] - 97:12, 186:13

**folks** [8] - 44:17, 238:8, 266:23, 267:23, 268:8, 268:18, 272:5, 328:2

**follow** [4] - 79:15, 292:15, 294:2, 334:23

**following** [7] - 16:25, 20:15, 21:13, 211:15, 215:17, 280:12,

314:5

**follows** [4] - 11:13, 35:12, 166:15, 253:18

**fond** [1] - 191:4

**FOR** [7] - 1:11, 2:2, 2:12, 3:2, 3:12, 4:2, 4:8

**Force** [5] - 166:23, 167:2, 167:19, 167:24, 169:24

**force** [3] - 197:25, 306:3, 306:10

**Forces** [1] - 169:7

**Ford** [1] - 38:19

**foregoing** [2] - 312:10, 357:6

**forgetting** [1] - 188:16

**forgot** [2] - 56:4, 112:12

**form** [3] - 8:17, 9:7, 251:19

**formal** [1] - 174:7

**formally** [1] - 188:3

**former** [1] - 263:24

**formulated** [1] - 122:19

**Fort** [1] - 103:18

**forth** [4] - 231:24, 232:11, 281:13, 297:9

**forthcoming** [1] - 67:15

**forum** [1] - 327:21

**forward** [8] - 117:9, 119:6, 119:22, 133:18, 133:19, 222:21, 223:2, 279:24

**forwarded** [5] - 93:1, 108:1, 127:4, 284:25

**forwarding** [2] - 107:20, 222:6

**fought** [3] - 161:8, 283:14

**Foundation** [3] - 4:21, 4:24,

12:19

**four** [17] - 54:18, 70:1, 70:2, 116:11, 116:15, 148:4, 177:22, 186:23, 187:4, 199:2, 213:13, 252:14, 282:11, 296:4, 305:1, 321:7, 351:11

**Fourteenth** [2] - 199:19, 314:8

**fourth** [2] - 200:19, 319:22

**FPL** [2] - 241:18

**fragment** [2] - 276:10, 285:15

**free** [2] - 155:10

**frequent** [1] - 225:7

**Friday** [15] - 78:17, 81:3, 82:23, 93:6, 137:3, 137:8, 137:9, 137:10, 140:22, 151:6, 157:4, 183:10, 226:4, 337:24, 338:15

**friend** [1] - 14:13

**friendly** [1] - 240:8

**friends** [1] - 30:5

**friendship** [1] - 47:3

**Friendswood** [4] - 72:21, 104:6, 202:14, 224:18

**front** [11] - 61:24, 117:4, 144:1, 144:2, 165:5, 240:12, 242:6, 245:6, 247:3, 250:18, 352:11

**front-line** [1] - 242:6

**front-runner** [1] - 250:18

**frustration** [2] - 337:15, 338:19

**full** [13] - 8:10, 11:17, 46:5, 177:13, 186:16,

228:22, 246:15, 258:25, 259:2, 259:11, 274:20, 274:24, 324:24

full-time [1] - 246:15

Fullen [1] - 246:6

fun [1] - 47:13

function [2] - 294:12, 294:14

functional [1] - 169:22

functionally [1] - 49:12

functioning [1] - 223:25

funds [5] - 110:23, 111:3, 246:24, 250:17, 253:11

future [2] - 85:1, 209:12

fuzz [1] - 65:25

fuzzy [1] - 300:6

## G

GABER [8] - 7:15, 7:23, 9:18, 9:21, 9:23, 10:2, 10:9, 344:10

Gaber [1] - 1:11

gain [2] - 63:21, 173:3

Gallagher [3] - 2:17, 2:23, 3:10

GALVESTON [2] - 1:2, 1:6

Galveston [120] - 4:11, 5:5, 8:15, 9:5, 9:6, 9:12, 11:23, 13:1, 13:15, 14:4, 17:23, 18:15, 22:13, 23:11, 27:23, 36:6, 36:19, 36:21, 37:13, 37:15, 37:16, 37:20, 39:16, 40:10, 42:14, 42:20, 43:6, 45:17, 51:2, 55:5, 56:16, 56:17, 57:21, 58:1,

58:16, 58:18, 58:20, 58:23, 59:2, 59:4, 59:16, 59:19, 59:21, 59:22, 68:14, 102:3, 116:24, 120:24, 121:10, 121:18, 126:14, 127:6, 131:5, 133:1, 147:18, 147:21, 153:24, 170:18, 170:20, 172:1, 174:1, 175:23, 176:2, 176:21, 178:17, 178:20, 180:22, 185:17, 186:24, 187:6, 188:10, 188:23, 189:4, 189:9, 189:24, 193:12, 195:7, 198:11, 198:13, 200:1, 221:9, 243:12, 244:21, 245:10, 248:25, 249:10, 249:23, 250:2, 253:22, 257:5, 257:7, 265:17, 270:17, 271:2, 272:18, 273:7, 275:19, 277:9, 280:10, 291:6, 291:21, 302:24, 304:16, 313:7, 314:4, 314:13, 315:1, 315:20, 316:7, 316:13, 316:23, 317:24, 317:25, 327:5, 327:15, 328:25, 334:23, 335:5, 339:17, 351:8

Galveston's [1] - 254:21

game [2] - 115:24, 326:12

garden [2] - 75:20, 75:21

Garza [3] - 26:18, 26:19, 284:24

gas [1] - 75:11

gather [1] - 347:25

gathering [2] - 207:22, 208:23

Gear [1] - 4:2

general [20] - 40:14, 44:12, 70:13, 173:10, 208:9, 208:15, 253:9, 258:14, 261:10, 262:9, 263:4, 263:11, 273:2, 280:19, 280:20, 280:23, 280:25, 281:20, 287:13, 340:5

generally [34] - 32:20, 52:4, 52:5, 54:11, 54:14, 57:23, 62:17, 79:15, 79:16, 94:5, 101:9, 108:14, 108:15, 169:1, 181:11, 214:17, 217:18, 225:14, 232:1, 232:2, 233:10, 249:16, 249:23, 258:2, 264:17, 272:17, 272:20, 273:4, 281:11, 298:20, 298:24, 342:3, 351:4

generation [3] - 106:19, 229:15, 229:17

Gentle [1] - 106:3

gentleman [1] - 119:6

gentlepersons [1] - 112:18

geographicall y [3] - 91:7, 200:12, 276:11

geography [3] - 42:17, 270:15, 346:18

Geoplan [1] - 304:18

George [1] - 76:8

German [1] - 107:14

gerrymander [4] - 202:11, 308:9, 319:18

gerrymandere d [5] - 302:12, 302:14, 303:9, 319:6, 345:21

gerrymanderi ng [1] - 201:18

GIS [2] - 67:10, 97:1

Giusti [20] - 22:9, 22:17, 78:13, 78:25, 87:7, 87:15, 137:1, 190:19, 205:5, 209:7, 305:21, 306:13, 306:17, 306:22, 308:3, 308:11, 308:22, 311:8, 322:3

give-and- takes [1] - 43:10

given [22] - 18:19, 52:15, 53:12, 60:16, 60:20, 77:3, 98:8, 117:21, 211:14, 218:24, 220:23, 237:22, 238:24, 277:19, 285:11, 287:24, 307:1, 324:7, 330:24, 336:13, 349:23, 355:2

glean [1] - 234:17

goal [1] - 71:4

God [3] - 11:7, 34:23, 166:10

GOMESA [3] - 185:9, 185:13, 188:13

Gonzalez [1] - 2:19

government [12] - 51:8, 52:17, 91:5, 110:24, 166:25, 169:16, 169:21, 170:1, 229:21, 230:6, 349:3, 349:17

governmental [1] - 248:25

governments [1] - 349:6

governs [1] - 52:6

grab [1] - 194:21

graduate [3] -

12:1, 12:3, 37:16

graduated [3] - 36:12, 36:14, 36:15

grandson [1] - 40:24

Grange [3] - 35:20, 35:24, 36:5

grant [1] - 246:11

granular [1] - 269:21

gratitude [1] - 246:18

great [5] - 14:12, 34:4, 171:21, 249:5, 333:19

Greer [2] - 4:10, 4:13

grew [4] - 27:23, 35:20, 37:16, 37:17

groceries [1] - 75:19

grounds [2] - 56:12, 58:2

group [7] - 20:6, 26:21, 57:25, 121:5, 247:5, 316:24

groups [16] - 12:15, 26:24, 44:20, 45:12, 46:6, 83:4, 131:5, 254:24, 316:23, 343:10, 343:20, 344:7, 344:16, 344:18, 356:15, 356:21

grow [1] - 35:19

growing [3] - 36:6, 47:24

grown [1] - 183:19

growth [5] - 202:13, 224:14, 224:15, 224:17, 280:16

guaranteed [1] - 83:4

guard [1] - 230:4

Guarino [1] - 82:18

**guess** [19] - 41:15, 77:17, 171:15, 172:13, 212:18, 218:13, 256:13, 263:10, 267:21, 283:6, 284:23, 288:15, 288:17, 290:10, 291:23, 294:5, 325:1, 341:21, 355:12

**guidance** [4] - 83:25, 84:1, 173:10, 214:7

**guide** [2] - 175:3

**guided** [1] - 275:6

**guidelines** [1] - 173:6

**gulfward** [2] - 188:17, 318:16

**guy** [5] - 67:10, 75:14, 111:16, 240:18, 247:17

**guys** [1] - 109:2

## H

**half** [6] - 71:13, 71:14, 251:8, 251:24, 307:2, 324:25

**hall** [1] - 233:6

**Hall** [4] - 120:15, 150:8, 227:15, 255:9

**hallway** [3] - 114:4, 114:6, 232:18

**hallways** [1] - 97:17

**hand** [10] - 9:17, 34:17, 35:8, 65:5, 91:11, 163:25, 166:5, 174:25, 212:4, 277:4

**handed** [4] - 61:20, 92:3, 98:23, 99:1

**handicap** [1] - 51:7

**handing** [2] - 91:9, 96:6

**handle** [1] - 293:7

**handled** [1] - 230:9

**handling** [1] - 22:11

**hands** [2] - 210:5, 279:20

**hang** [2] - 164:18, 186:22

**happy** [3] - 17:7, 23:4, 23:9

**hard** [9] - 9:17, 185:8, 217:14, 218:5, 218:8, 238:2, 238:13, 269:21, 347:17

**hardest** [1] - 46:17

**hardly** [2] - 57:9, 231:4

**hardship** [1] - 244:5

**harm** [1] - 342:3

**harmful** [2] - 341:18, 341:20

**Harris** [14] - 3:2, 79:13, 79:17, 82:25, 84:5, 84:6, 84:12, 84:16, 103:18, 334:15, 334:17, 334:25, 335:2, 335:5

**Harvey** [1] - 263:7

**hay** [1] - 129:5

**Haymarket** [1] - 4:18

**heading** [1] - 265:22

**health** [6] - 78:24, 244:10, 244:11, 244:12, 244:15, 244:19

**Health** [2] - 59:19, 242:1

**healthcare** [1] - 241:17

**healthy** [2] - 169:12, 172:6

**hear** [17] - 8:6, 25:21, 135:5, 151:24, 160:16, 165:15, 165:20,

203:9, 207:15, 230:22, 231:14, 231:15, 238:6, 238:8, 251:21, 253:13

**heard** [38] - 22:19, 45:23, 45:25, 48:4, 53:1, 75:23, 79:8, 88:20, 106:14, 140:21, 150:22, 161:1, 161:4, 183:6, 194:9, 194:10, 202:25, 218:8, 230:21, 235:16, 236:8, 251:16, 253:15, 265:1, 268:12, 283:11, 283:21, 292:18, 308:19, 321:17, 336:10, 339:13, 343:18, 344:6, 344:12

**hearing** [11] - 22:3, 29:14, 91:18, 97:13, 116:9, 235:17, 289:21, 325:12, 336:16, 341:3, 341:12

**hearings** [22] - 16:13, 17:19, 18:2, 18:4, 18:8, 19:5, 21:22, 21:24, 29:4, 29:5, 29:8, 29:13, 103:11, 103:20, 182:5, 267:5, 267:9, 267:13, 292:4, 334:10, 336:9, 340:22

**hearsay** [1] - 102:9

**heart** [1] - 37:4

**heavily** [7] - 22:4, 94:11, 96:3, 96:4, 118:2, 172:1, 226:16

**heavy** [2] - 18:13, 19:2

**heightened** [1] - 88:15

**held** [14] - 21:22, 55:18, 55:20, 55:25, 174:18, 174:25, 182:9,

183:5, 224:25, 225:3, 225:4, 225:5, 255:8, 265:25

**help** [13] - 9:11, 11:7, 34:23, 41:4, 41:23, 60:13, 114:8, 132:17, 166:10, 175:2, 178:4, 245:20, 315:23

**helpful** [4] - 179:4, 179:5, 179:6, 182:16

**helping** [4] - 70:20, 108:22, 133:10, 179:2

**helps** [1] - 142:9

**Henry** [34] - 14:9, 14:25, 19:11, 21:8, 31:23, 54:3, 82:7, 86:18, 87:10, 88:3, 88:7, 105:4, 139:22, 159:1, 166:3, 166:18, 186:17, 187:3, 250:25, 251:3, 251:16, 269:8, 285:8, 293:6, 301:1, 310:13, 316:6, 322:25, 339:13, 341:22, 344:18, 345:3, 355:11

**HENRY** [4] - 6:10, 166:6, 166:11, 166:14

**Herz** [2] - 4:10, 4:13

**hesitate** [1] - 294:20

**hi** [4] - 150:21, 153:20, 192:11, 192:12

**hid** [1] - 355:13

**hidden** [1] - 249:10

**hide** [2] - 92:15, 354:23

**hierarchies** [1] - 47:15

**hierarchy** [1] - 47:17

**High** [2] - 12:1,

36:13

**high** [7] - 12:23, 47:16, 47:17, 106:1, 315:7, 318:5

**higher** [2] - 273:8, 318:6

**highest** [1] - 335:20

**highlight** [1] - 116:24

**highlighted** [1] - 120:21

**highly** [1] - 208:10

**Highway** [13] - 3:3, 3:6, 4:18, 69:19, 69:20, 69:24, 70:23, 70:24, 125:18, 125:19, 125:20, 125:21

**Hilary** [2] - 3:2, 250:21

**himself** [4] - 77:9, 109:8, 161:2, 235:22

**hindsight** [1] - 114:17

**hire** [7] - 173:11, 178:3, 262:23, 285:22, 286:3, 286:25, 288:9

**hired** [7] - 89:12, 103:4, 173:5, 288:22, 295:17, 297:19, 339:24

**hiring** [2] - 283:19, 287:7

**Hispanic** [11] - 8:15, 27:5, 40:4, 40:6, 44:18, 51:25, 110:18, 118:5, 124:10, 350:22, 351:3

**Hispanics** [1] - 27:10

**historic** [5] - 269:14, 271:9, 271:20, 273:5, 305:16

**history** [3] - 247:25, 282:15, 282:16

**Hitchcock** [1] -

39:15

hitting [1] - 174:15

Hobby [1] - 37:3

hold [10] - 18:14, 21:23, 134:12, 218:16, 255:5, 259:15, 260:7, 260:13, 334:9, 340:22

Hold [1] - 301:1

holding [1] - 260:3

holiday [5] - 256:16, 257:1, 257:4, 257:7

holidays [1] - 255:23

HOLMES [4] - 6:13, 34:19, 34:24, 35:11

Holmes [62] - 14:9, 14:11, 20:13, 21:8, 22:12, 26:17, 26:20, 30:4, 30:6, 34:14, 35:1, 35:18, 81:19, 81:23, 87:15, 95:4, 95:13, 100:5, 112:7, 112:8, 112:12, 114:13, 119:10, 121:3, 150:21, 153:20, 190:23, 204:1, 204:5, 204:13, 205:9, 209:8, 222:5, 235:1, 236:11, 238:10, 238:12, 238:22, 239:15, 239:18, 240:11, 250:6, 250:9, 253:17, 272:12, 272:14, 288:18, 306:9, 306:14, 306:22, 308:3, 311:9, 322:10, 347:14, 348:2, 353:8, 353:15, 354:14, 354:20, 354:24, 355:13, 356:1

Holmes' [4] - 121:21, 203:20, 235:16, 354:15

Holmes's [9] - 18:12, 19:19,

23:25, 24:2, 24:18, 141:16, 347:10, 349:9

Holt [1] - 4:17

Holtzman [8] - 4:17, 178:11, 178:12, 181:21, 181:25, 210:18, 287:3, 355:25

home [2] - 47:11, 80:16

hone [1] - 289:15

honest [4] - 44:21, 110:6, 113:8, 154:12

honestly [3] - 155:1, 171:21, 179:24

Honor [46] - 7:6, 7:13, 7:16, 9:18, 10:2, 10:23, 33:25, 34:5, 34:13, 35:5, 85:7, 85:19, 86:24, 87:24, 116:3, 127:20, 155:23, 164:16, 164:25, 165:16, 165:25, 166:11, 166:12, 194:21, 206:9, 207:24, 250:19, 250:21, 251:11, 253:2, 276:22, 280:7, 286:8, 309:21, 329:25, 339:10, 343:7, 343:16, 344:1, 344:8, 344:21, 352:7, 353:6, 355:8, 356:10, 356:25

HONORABLE [2] - 1:3, 1:8

hope [5] - 65:18, 88:22, 157:23, 200:4, 312:19

hoped [3] - 65:16, 181:1, 237:20

hopefully [2] - 71:4, 155:21

hoping [4] - 75:8, 131:4, 131:6, 212:2

hospital [1] - 76:4

hours [15] - 10:13,

10:14, 10:15, 10:16, 10:17, 48:19, 49:2, 49:14, 103:1, 140:20, 157:5, 157:7, 206:2, 213:13, 243:17

hours' [2] - 140:14, 157:21

house [12] - 41:1, 41:2, 74:23, 104:3, 104:4, 125:22, 126:2, 170:18, 191:2, 193:8, 214:1, 250:4

House [1] - 245:7

housed [1] - 14:17

housekeeping [2] - 7:7, 7:15

houses [1] - 246:10

housing [2] - 246:8, 246:9

Houston [4] - 35:23, 35:24, 166:19, 166:20

Howry [4] - 5:2, 34:25, 96:20, 164:23

HOWRY [4] - 34:25, 35:4, 164:22, 164:24

huge [3] - 48:1, 208:19, 227:16

hung [1] - 67:14

hurricane [1] - 223:10

hurt [2] - 199:3, 199:4

hypothetical [1] - 341:21

---

**I**

---

I-45 [3] - 70:3, 70:5, 70:23

idea [30] - 24:19, 52:17, 53:24, 110:7, 111:18, 111:21, 112:25, 113:14, 122:19, 164:6, 164:8,

181:4, 184:25, 187:13, 201:16, 202:9, 212:22, 242:7, 244:22, 254:10, 273:2, 273:6, 279:20, 296:16, 305:3, 308:14, 317:17, 335:2, 347:9, 347:11

ideal [2] - 64:10, 64:11

ideas [2] - 298:1, 333:6

identical [1] - 124:23

Identify [1] - 313:7

identifying [1] - 125:24

ignore [1] - 340:11

illegal [5] - 241:11, 341:1, 341:5, 341:10, 341:15

illustrations [1] - 352:8

illustrative [2] - 118:22, 119:5

image [1] - 152:19

imagine [1] - 124:21

immediately [1] - 167:8

immigrant [1] - 75:16

Impact [1] - 215:18

impact [9] - 26:24, 58:24, 63:7, 88:17, 185:6, 224:15, 331:8, 347:9, 349:21

impeachment [1] - 352:5

implementator [1] - 169:20

implemented [3] - 19:14, 63:8, 249:7

implementing [1] - 349:10

imply [1] - 289:12

importance [1] - 216:23

important [17] - 22:14, 41:7, 45:20, 62:7, 62:9, 62:10, 94:17, 94:18, 98:3, 105:2, 187:19, 188:2, 189:12, 200:21, 208:4, 317:1, 321:19

importantly [2] - 22:14, 177:18

impossibility [1] - 171:11

impossible [1] - 279:21

impressed [2] - 178:15, 253:20

impression [2] - 289:19, 289:22

improper [1] - 351:25

improve [1] - 242:22

IN [1] - 5:2

in-house [1] - 214:1

in-person [1] - 151:5

incarcerated [1] - 244:4

inclined [1] - 82:8

include [6] - 200:24, 261:10, 269:25, 321:10, 323:12, 356:2

included [10] - 51:20, 121:23, 190:18, 262:22, 270:8, 270:16, 299:22, 321:9, 325:23, 356:4

includes [5] - 255:2, 258:23, 261:8, 272:21, 345:10

including [1] - 120:16

inclusive [3] - 251:20, 252:2, 341:13
income [5] - 318:2, 318:6, 318:10, 318:13, 318:15
incorporated [2] - 101:12, 269:7
incorrect [1] - 159:15
increase [1] - 244:22
increases [1] - 242:12
increasing [1] - 27:5
incredibly [4] - 176:25, 179:6, 346:9, 346:16
incumbent [2] - 172:7, 250:16
indeed [1] - 213:8
INDEX [1] - 6:16
indicate [2] - 108:4, 288:4
indicated [1] - 127:22
indicates [1] - 338:22
indication [3] - 336:5, 336:14, 337:2
indigent [5] - 241:15, 241:17, 241:25, 242:4, 242:9
indiscernible) [1] - 287:20
individual [5] - 73:2, 104:21, 129:11, 194:7, 207:9
individually [1] - 203:3
individuals [1] - 14:6
indoor [1] - 227:16
inefficiency [1] - 181:18
inflection [1] -

55:20
influence [1] - 88:18
influenza [1] - 59:15
inform [2] - 128:17, 150:5
information [53] - 60:16, 60:20, 67:7, 67:9, 67:15, 67:19, 94:16, 94:21, 94:23, 94:24, 95:13, 110:20, 110:21, 111:20, 111:22, 111:25, 112:9, 112:16, 113:5, 117:21, 118:15, 125:24, 130:4, 145:10, 145:22, 146:4, 150:9, 181:7, 182:15, 182:22, 182:24, 191:1, 207:22, 208:23, 212:19, 213:1, 239:2, 255:19, 261:5, 262:13, 262:14, 277:24, 292:24, 293:3, 293:19, 293:25, 313:22, 325:22, 330:5, 330:11, 355:13, 355:20, 356:1
informed [9] - 76:16, 82:13, 82:18, 134:1, 134:2, 134:3, 134:5, 134:8
infrequently [1] - 185:7
initial [9] - 64:8, 88:5, 149:13, 187:18, 189:21, 192:19, 197:25, 223:19
initiative [1] - 293:23
injunctive [1] - 33:17
injured [1] - 12:22
injustice [2] - 106:11, 106:18
innovator [1] - 245:5

input [15] - 17:18, 22:4, 175:6, 190:17, 191:7, 205:20, 205:23, 208:1, 208:2, 221:7, 232:2, 334:2, 334:4, 334:7
insignificant [1] - 63:5
insist [1] - 187:4
instant [1] - 178:19
instead [6] - 87:2, 88:8, 149:6, 159:20, 307:25, 327:20
instill [1] - 168:17
instilling [1] - 169:8
instruct [1] - 355:24
instructed [1] - 202:22
instruction [2] - 212:24, 330:18
instructions [7] - 173:6, 179:20, 190:3, 191:8, 191:12, 235:21, 236:2
intact [1] - 121:22
integral [1] - 132:24
intended [1] - 288:1
intent [1] - 347:12
intention [4] - 209:3, 227:18, 238:21, 250:5
intentional [3] - 127:8, 127:14, 128:5
interacting [1] - 255:18
interactive [1] - 330:3
Interest [2] - 4:21, 4:24
interest [15] - 18:19, 39:2, 39:10, 42:13, 103:25, 104:22,

105:17, 132:25, 151:22, 151:24, 152:1, 317:4, 317:5, 317:6
interested [2] - 97:19, 198:9
interests [2] - 116:20, 318:13
internet [1] - 135:8
interpret [2] - 41:23
interpreters [2] - 42:4, 42:5
interrogatorie s [3] - 311:21, 311:22, 312:4
Interrogatory [1] - 313:5
interrogatory [2] - 108:3, 199:8
interrupt [1] - 230:17
intervened [1] - 45:2
interviewed [1] - 179:23
invading [1] - 253:3
invasion [1] - 253:5
invitation [1] - 126:13
invitations [1] - 45:3
invite [1] - 300:14
invited [2] - 61:4, 61:5
invoke [1] - 349:17
involved [17] - 15:23, 20:23, 21:5, 21:7, 47:20, 47:21, 106:16, 106:17, 108:13, 132:19, 144:25, 170:12, 170:19, 172:14, 178:23, 180:24
involvement [3] - 206:23, 207:19, 235:25
iron [1] - 54:3

island [2] - 186:25, 187:7
Island [18] - 42:21, 72:17, 102:5, 186:25, 187:6, 200:1, 223:16, 224:12, 224:22, 273:7, 315:1, 315:21, 316:20, 317:24, 318:2, 318:7, 350:18
issue [31] - 24:4, 25:18, 32:18, 50:6, 50:7, 51:4, 57:23, 58:5, 58:13, 58:16, 58:21, 59:7, 59:10, 62:10, 62:11, 86:24, 188:21, 221:21, 227:5, 227:25, 236:2, 242:5, 245:6, 247:2, 247:6, 254:17, 281:16, 315:8, 321:19, 332:12, 343:19
issued [6] - 49:3, 68:13, 291:20, 297:8, 297:9, 313:14
issues [12] - 41:7, 41:8, 56:21, 58:15, 159:17, 188:19, 240:12, 244:12, 261:19, 277:12, 318:16, 320:25
IT [1] - 228:3
Item [3] - 264:3, 264:5, 264:15
item [13] - 31:15, 49:10, 49:22, 50:3, 51:14, 54:13, 55:18, 258:7, 258:15, 264:18, 264:19, 345:7, 345:25
items [12] - 41:1, 48:15, 48:17, 49:6, 49:17, 55:17, 56:7, 90:22, 91:9, 94:1, 140:19, 258:6
itself [8] - 46:8,

46:9, 57:10, 101:3, 132:14, 247:24, 316:18, 317:24

## J

jagged [1] - 69:9
jail [7] - 40:16, 40:25, 243:3, 244:2, 244:13, 244:15, 244:25
James [1] - 274:16
January [15] - 13:6, 13:18, 38:9, 110:2, 110:8, 140:1, 172:21, 251:1, 256:24, 300:2, 322:19, 332:10, 332:13, 334:14
Jay [1] - 210:17
JAYARAMAN [4] - 344:8, 344:20, 345:2, 346:19
Jayaraman [3] - 3:20, 6:11, 345:4
Jed [2] - 74:15, 205:4
JEFFREY [1] - 1:8
Jernigan [1] - 38:19
jewelry [1] - 41:5
Jimmy [1] - 246:6
Joaquin [1] - 2:19
job [14] - 35:23, 44:19, 140:5, 140:6, 140:7, 140:8, 140:10, 168:5, 168:16, 171:18, 189:25, 244:5, 289:11, 350:11
jobs [1] - 88:25
Joe [8] - 23:1, 32:4, 78:13, 178:24, 205:5, 277:1, 277:9, 278:4
John [1] - 4:18

Johnson [8] - 37:2, 37:12, 37:14, 38:5, 38:8, 272:13, 272:15
Johnson's [1] - 38:22
joined [1] - 12:5
Joint [4] - 35:7, 61:21, 61:24, 66:19
joint [1] - 133:16
Jones [1] - 26:20
Jordan [1] - 4:9
Josefiak [1] - 4:17
Joseph [2] - 4:9, 4:20
joy [1] - 47:15
joys [2] - 46:18, 46:20
JP [5] - 14:16, 14:19, 18:10, 177:9, 177:15
JP's [1] - 176:1
JP/Constable [3] - 32:14, 32:17, 252:5
JPs [7] - 176:18, 252:7, 254:12, 254:14, 254:15, 287:18, 290:5
Jr [1] - 4:9
judge [40] - 19:4, 19:9, 37:5, 37:8, 50:22, 54:7, 58:17, 59:12, 82:11, 86:11, 92:4, 95:10, 100:14, 103:17, 139:13, 140:22, 158:17, 158:21, 161:2, 164:13, 171:7, 179:6, 198:12, 211:24, 217:7, 229:12, 230:19, 246:21, 257:12, 257:16, 261:4, 272:19, 282:10, 289:21, 335:10, 336:4, 343:11, 348:22, 348:23, 356:11
Judge [42] - 8:8,

14:9, 14:25, 21:8, 30:14, 32:12, 33:8, 33:12, 34:25, 54:2, 82:6, 86:18, 88:3, 88:7, 105:4, 116:7, 155:23, 159:1, 164:22, 164:24, 166:2, 166:18, 186:17, 187:3, 250:25, 251:3, 251:16, 254:22, 269:8, 285:8, 293:6, 310:13, 322:25, 333:12, 339:13, 341:22, 344:18, 345:3, 346:23, 355:11, 356:12
JUDGE [4] - 6:10, 166:6, 166:11, 166:14
Judge's [1] - 129:20
judge's [11] - 48:14, 48:18, 48:20, 49:9, 49:16, 51:10, 64:7, 74:22, 77:1, 80:16, 140:17
Judges [2] - 215:14, 215:16
judges [3] - 173:7, 216:3, 248:20
judgeship [1] - 172:2
judgment [3] - 340:2, 340:6, 341:19
judicial [1] - 176:9
Judith [1] - 330:3
July [3] - 182:10, 256:1, 276:22
jumbo [1] - 129:5
jump [1] - 82:7
June [2] - 182:10, 279:15
Juneteenth [2] - 256:8, 256:16
junior [1] - 106:1
jurisdiction [2] - 127:9, 285:13

jury [1] - 35:2
justice [1] - 242:20
Justice [42] - 3:3, 3:6, 3:13, 3:17, 3:20, 3:23, 4:3, 4:6, 13:4, 13:5, 13:9, 13:12, 15:13, 20:1, 20:3, 20:7, 23:20, 27:10, 28:15, 29:13, 63:12, 83:25, 101:17, 107:5, 107:7, 107:15, 108:1, 108:4, 108:9, 132:20, 175:16, 176:5, 176:13, 176:20, 265:7, 265:14, 273:22, 274:1, 313:15, 346:6, 346:8, 349:10
Justice's [2] - 177:3, 311:21
Justices [1] - 177:19
juts [2] - 126:6, 269:25
JX-23 [1] - 203:17
JX-27 [1] - 337:13
JX-29 [5] - 209:17, 325:14, 328:10, 330:16, 332:19
JX-3 [1] - 184:22
JX-33 [1] - 214:25
JX-34 [1] - 216:12
JX-37 [1] - 222:2
JX-38 [1] - 339:2
JX-42 [1] - 329:20
JX-45 [1] - 265:11
JX-6 [2] - 274:13, 274:15

## K

K'Shaani [1] - 3:16
Kaylan [1] - 4:24
keep [13] - 21:2, 68:9, 112:25, 185:12, 186:25,

187:7, 199:5, 202:7, 202:10, 280:8, 302:15, 311:14, 319:11
Keep [1] - 221:14
keeping [3] - 252:24, 254:4, 342:15
keeps [2] - 59:19, 121:21
Ken [1] - 78:12
Kenneth [1] - 21:9
kept [4] - 21:1, 105:19, 305:16, 331:24
key [1] - 16:3
kids [1] - 47:5
killed [1] - 12:22
kind [39] - 23:22, 34:16, 43:22, 44:24, 46:21, 55:25, 69:9, 69:10, 69:16, 69:22, 74:10, 77:17, 95:11, 95:15, 114:7, 129:5, 135:9, 136:24, 137:3, 169:18, 187:10, 191:6, 192:22, 213:4, 214:10, 214:11, 221:12, 231:4, 232:8, 244:19, 248:19, 256:15, 262:12, 284:11, 293:18, 310:25, 320:15
kinds [1] - 281:12
King [1] - 256:5
Kinney [2] - 246:14, 246:20
Klein [5] - 3:2, 6:11, 108:16, 250:22, 253:6
KLEIN [59] - 7:6, 7:9, 7:13, 127:20, 207:24, 250:21, 250:24, 251:15, 253:7, 253:8, 262:3, 262:6, 263:3, 263:5, 263:13, 263:15, 264:1, 264:4, 264:11,

264:13, 268:3,
268:5, 268:24,
269:2, 269:17,
269:20, 271:6,
271:7, 274:12,
274:14, 275:8,
275:9, 275:15,
275:17, 275:24,
275:25, 276:8,
276:9, 276:21,
276:24, 277:5,
277:7, 277:20,
277:22, 279:11,
279:12, 280:2,
280:8, 280:9,
286:8, 286:9,
309:20, 309:25,
311:14, 311:17,
339:9, 339:12,
343:6, 356:10

knock [1] - 8:4

knowing [8] -
22:1, 101:18,
226:15, 226:20,
227:25, 239:14,
286:24, 335:25

knowledge [30] -
16:5, 17:9,
17:12, 17:13,
18:6, 19:6,
21:10, 21:18,
21:23, 91:8,
115:1, 133:8,
138:20, 178:15,
178:16, 178:17,
191:20, 194:13,
218:22, 232:23,
235:6, 235:8,
254:23, 291:11,
318:20, 318:21,
327:14, 330:13,
330:17, 350:9

knowledgeabl
e [1] - 180:25

known [13] -
37:17, 37:20,
105:7, 191:23,
191:24, 201:21,
207:8, 235:24,
239:17, 271:24,
295:18, 308:12,
311:9

## L

lack [3] - 58:10,
329:18, 330:10

ladies [1] - 42:7

laid [3] - 64:9,
102:19, 102:20

language [1] -
278:20

laptop [2] - 72:13,
72:15

large [7] - 40:5,
57:11, 57:13,
122:2, 227:11,
231:18, 332:11

largely [1] - 27:2

last [36] - 26:1,
31:15, 33:15,
40:22, 55:12,
55:13, 66:6,
85:22, 96:12,
103:14, 107:2,
150:3, 151:5,
154:3, 160:8,
169:19, 201:2,
216:22, 217:18,
223:5, 226:6,
226:8, 233:22,
248:13, 266:5,
282:16, 282:18,
287:15, 297:15,
312:5, 313:1,
351:19, 353:23,
353:25, 354:2

lasts [1] - 259:2

late [9] - 49:13,
86:16, 87:8,
87:9, 87:11,
142:24, 183:16,
284:4, 326:12

Latino [9] - 8:15,
9:6, 63:17,
91:23, 104:17,
105:13, 254:21,
350:8, 353:2

Latinx [1] - 122:2

latter [2] - 15:24,
17:3

Laura [5] - 5:4,
280:6, 357:6,
357:9, 357:10

law [21] - 12:5,
36:17, 36:19,
49:2, 60:21,
82:19, 103:4,
138:4, 138:8,
138:15, 140:6,
163:4, 197:13,
199:21, 223:23,
239:7, 284:18,
286:20, 288:13,

345:9, 349:4

Law [3] - 1:15,
12:3, 36:15

laws [2] - 51:7,
312:9

lawsuit [17] -
32:14, 32:15,
32:19, 32:22,
50:7, 50:11,
65:14, 108:23,
119:1, 119:2,
176:9, 177:10,
177:18, 253:12,
253:24, 352:18

lawyer [28] - 33:8,
61:10, 83:14,
83:20, 90:18,
108:12, 108:22,
116:2, 116:5,
117:21, 141:11,
160:2, 167:25,
179:21, 268:7,
271:22, 271:23,
282:17, 285:22,
285:24, 289:21,
289:23, 319:20,
340:14, 356:17,
356:19

lawyerly [1] -
313:11

lawyers [30] -
23:20, 61:6,
113:21, 114:1,
128:4, 140:10,
173:11, 174:10,
178:6, 202:3,
210:18, 252:24,
296:25, 297:10,
304:7, 308:1,
311:3, 323:16,
323:18, 324:7,
325:4, 325:9,
337:4, 339:14,
340:18, 341:17,
341:22, 349:20,
350:1, 350:7

lay [1] - 79:11

laying [2] - 101:2,
101:3

lays [1] - 98:5

lead [6] - 89:4,
105:1, 140:4,
140:11, 187:11,
284:11

lead-up [1] - 89:4

leader [3] -

242:23, 245:8,
254:20

leading [8] -
93:19, 105:21,
108:19, 207:24,
244:19, 257:4,
257:9, 325:13

leads [1] - 158:3

League [33] -
1:17, 4:15,
17:25, 19:2,
22:3, 55:10,
72:21, 104:6,
132:21, 153:23,
170:23, 170:25,
202:14, 221:23,
222:6, 224:16,
224:18, 224:19,
224:25, 225:6,
225:15, 226:12,
226:21, 227:4,
227:17, 227:21,
227:24, 228:17,
255:2, 255:12,
255:16, 260:5,
273:12

leaning [2] -
321:23, 321:24

learned [3] -
105:4, 290:14,
298:15

learning [1] -
353:4

learns [1] - 81:21

least [25] - 40:9,
59:1, 68:10,
79:15, 88:16,
88:21, 88:22,
99:8, 176:20,
182:17, 214:9,
217:10, 217:23,
218:10, 219:15,
229:14, 243:11,
258:22, 267:18,
267:19, 293:15,
329:17, 345:12,
353:7

leave [2] - 18:25,
105:12

leaves [1] -
316:20

led [2] - 147:2,
187:11

Leeper [1] - 2:2

left [7] - 71:23,
150:9, 163:25,

168:21, 170:2,
170:21, 233:20

left-hand [1] -
163:25

legal [9] - 60:13,
82:17, 281:15,
340:11, 340:15,
341:19, 348:13,
348:14, 353:12

Legal [5] - 1:12,
1:22, 2:3, 2:6,
4:24

legally [13] -
188:4, 190:7,
197:17, 252:14,
252:15, 297:20,
319:20, 324:17,
324:18, 332:21,
349:24, 351:13

legislative [4] -
159:17, 160:18,
205:21, 282:16

Legislature [1] -
283:1

lend [2] - 95:22

length [1] -
146:10

Leon [2] - 14:5,
35:25

less [9] - 20:12,
62:22, 169:21,
181:1, 217:23,
259:2, 324:15,
330:22

letter [56] - 25:13,
25:15, 25:18,
26:3, 26:6,
28:15, 29:17,
132:2, 132:3,
132:4, 132:10,
132:18, 133:2,
153:25, 154:6,
154:15, 156:11,
176:14, 176:22,
177:1, 177:3,
221:21, 222:6,
222:10, 222:13,
222:19, 265:6,
265:10, 265:12,
265:15, 265:19,
265:21, 267:20,
268:6, 268:25,
269:18, 270:5,
274:9, 274:10,
274:12, 284:17,
285:2, 285:4,
285:5, 285:7,

285:9, 285:21, 286:1, 287:14, 287:22, 291:25, 307:11, 307:19, 307:23, 352:17, 352:19

letters [2] - 71:3, 176:4

letting [2] - 106:14, 291:16

level [6] - 67:1, 68:10, 68:11, 129:22, 230:21, 241:15

levels [1] - 318:2

liability [1] - 276:13

libraries [1] - 242:14

Library [1] - 242:14

library [1] - 242:17

licensed [1] - 36:16

lieutenant [1] - 167:6

life [12] - 11:23, 40:8, 40:12, 40:18, 43:2, 43:4, 46:18, 46:24, 47:15, 47:17, 166:23, 226:19

life-long [1] - 11:23

lifted [1] - 68:13

light [3] - 52:18, 52:19, 217:1

Lighting [2] - 35:23, 35:25

lightly [1] - 226:16

lightning [4] - 36:2, 36:4, 36:5

like-minded [1] - 39:19

likely [3] - 244:4, 285:21, 345:15

likewise [2] - 270:25, 271:4

limit [5] - 227:18, 233:8, 233:10, 233:14, 310:20

limited [5] - 91:8,

229:17, 297:22, 317:9, 356:14

limiting [1] - 232:11

Linda [8] - 3:9, 64:7, 191:22, 220:8, 233:5, 298:3, 300:17, 300:18

Line [5] - 9:1, 87:5, 88:2, 144:12, 287:13

line [31] - 8:9, 8:13, 9:2, 9:15, 70:20, 87:13, 87:22, 93:18, 101:22, 104:24, 106:1, 141:17, 141:18, 141:21, 142:5, 142:6, 142:7, 167:23, 168:1, 168:4, 168:11, 215:13, 241:16, 242:6, 242:8, 253:3, 264:12, 299:8, 316:6, 320:6, 331:14

lines [15] - 70:18, 77:14, 77:25, 104:21, 191:5, 208:3, 217:1, 262:4, 269:23, 293:8, 298:16, 302:6, 303:3, 303:7, 303:13

link [13] - 129:2, 129:3, 130:5, 130:6, 130:7, 130:10, 130:15, 213:3, 215:20, 327:25, 328:21, 328:23

list [11] - 74:18, 156:20, 201:7, 232:24, 233:1, 233:18, 233:21, 309:18, 313:25, 330:6

listed [3] - 59:18, 282:16, 282:18

listen [4] - 88:20, 120:7, 237:2, 317:1

lists [3] - 112:14, 266:16, 321:16

literally [1] - 106:8

litigation [4] - 50:12, 65:18, 254:2, 353:1

live [6] - 11:19, 70:24, 71:13, 166:20, 217:15, 272:22

lived [3] - 11:21, 46:22, 75:17

living [3] - 35:24, 43:4, 273:3

Llobera [1] - 2:23

LLP [4] - 2:17, 2:23, 3:10, 4:13

lobbied [2] - 25:18, 25:20

lobby [1] - 196:24

local [5] - 43:21, 59:4, 62:4, 150:8, 349:6

located [1] - 74:25

location [24] - 43:12, 43:21, 43:25, 44:3, 50:25, 51:2, 51:8, 51:9, 51:11, 51:13, 51:18, 55:11, 55:14, 170:24, 170:25, 223:4, 225:15, 226:22, 228:10, 228:19, 231:13, 249:3, 259:21

locations [14] - 43:13, 43:15, 44:5, 44:11, 50:23, 50:24, 51:17, 51:24, 55:7, 55:9, 223:13, 243:20, 250:1, 266:20

lodged [1] - 248:7

Lofton [1] - 7:9

log [1] - 229:18

logistical [1] - 171:10

Lone [1] - 246:11

lone [1] - 59:8

long-time [1] - 172:7

longest [2] -

54:23, 54:24

Look [1] - 237:3

look [56] - 23:10, 26:22, 33:4, 40:9, 51:6, 67:22, 77:17, 95:2, 115:6, 118:21, 125:15, 125:16, 125:20, 131:21, 132:7, 136:2, 150:18, 154:15, 180:3, 181:15, 182:13, 194:17, 195:10, 216:1, 242:19, 262:1, 263:19, 264:9, 264:20, 270:6, 278:7, 278:13, 285:2, 285:3, 285:5, 287:11, 289:13, 291:13, 295:19, 302:23, 303:4, 303:16, 309:15, 309:17, 312:1, 316:4, 319:13, 329:20, 330:1, 331:17, 337:13, 339:1, 339:6, 351:20, 352:21, 352:23

looked [20] - 72:21, 77:13, 80:2, 96:10, 101:16, 183:9, 195:8, 206:11, 256:7, 256:11, 278:13, 296:10, 296:12, 303:9, 310:13, 311:22, 319:5, 336:8, 337:14, 349:20

looking [20] - 25:13, 41:21, 77:20, 81:19, 81:22, 94:3, 120:17, 146:13, 147:8, 150:6, 155:22, 155:24, 181:12, 183:14, 204:16, 219:10, 268:25, 295:21, 304:18, 305:14

looks [20] - 40:11, 86:23, 120:24, 126:13, 134:13, 155:7, 156:5, 186:16, 204:17, 216:2, 216:14,

216:18, 268:10, 268:11, 271:3, 278:12, 282:5, 284:21, 303:8, 325:17

Looping [1] - 127:5

Los [1] - 2:11

lose [1] - 244:5

loss [2] - 131:8, 180:22

lost [5] - 31:18, 31:21, 76:7, 219:14, 295:11

loudly [1] - 143:8

low [1] - 99:16

Lowry [1] - 42:3

Lucretia [1] - 7:9

LULAC [3] - 241:4, 241:8, 250:22

lunch [5] - 54:8, 54:9, 113:21, 114:11, 206:3

**M**

ma'am [11] - 16:20, 17:15, 18:3, 18:6, 18:9, 19:8, 20:17, 20:25, 21:20, 21:25, 259:5

Magee [1] - 285:8

magic [2] - 53:4, 53:5

magic-type [1] - 53:5

magistrated [1] - 243:17

magistration [3] - 242:22, 243:10, 243:19

magistrations [1] - 243:12

magnitude [1] - 46:5

mail [79] - 78:18, 92:7, 93:10, 93:24, 98:14, 98:17, 98:18, 107:14, 107:20, 107:23, 109:8,

110:2, 110:12, 111:14, 111:15, 111:17, 112:5, 120:15, 121:8, 122:8, 126:18, 127:3, 127:17, 128:15, 129:15, 130:11, 130:12, 130:21, 131:1, 131:4, 131:17, 132:10, 132:14, 133:6, 149:22, 150:1, 150:3, 150:11, 150:24, 153:3, 153:8, 155:20, 156:6, 156:18, 156:21, 157:2, 210:8, 210:13, 210:21, 211:2, 211:11, 211:18, 212:3, 215:7, 222:4, 263:3, 263:6, 263:16, 263:20, 276:25, 277:8, 277:21, 279:14, 279:22, 289:13, 289:16, 289:17, 289:24, 301:20, 304:13, 316:4, 317:13, 317:16, 337:17, 339:6, 354:1, 354:18, 354:19

Mail [1] - 215:14

mailed [1] - 284:21

mails [5] - 92:7, 106:13, 137:12, 154:14, 162:9

Main [1] - 1:16

main [6] - 12:18, 69:14, 70:22, 70:23, 77:15, 228:23

Mainland [3] - 42:13, 42:24, 43:5

maintain [1] - 353:2

maintained [2] - 117:15, 322:6

maintaining [3] - 208:20, 271:9, 271:19

maintains [4] - 189:4, 256:22,

256:23, 327:2

major [1] - 167:22

majority [17] - 72:20, 111:1, 111:2, 116:20, 118:1, 202:7, 252:18, 262:16, 271:10, 271:20, 272:5, 272:6, 273:18, 289:19, 302:15, 302:20, 319:12

majority-minority [13] - 111:1, 111:2, 118:1, 202:7, 252:18, 271:10, 271:20, 272:5, 272:6, 289:19, 302:15, 302:20, 319:12

majority-minority's [1] - 116:20

makeup [10] - 40:1, 68:3, 104:7, 173:14, 189:24, 196:8, 197:19, 208:9, 272:18, 351:1

man [3] - 75:25, 125:23, 297:12

Man [1] - 113:6

manage [1] - 342:2

managed [4] - 79:17, 103:20, 103:21, 189:8

manager [1] - 58:18

MANAGER [5] - 85:13, 86:25, 114:14, 206:4, 357:1

manages [1] - 189:6

Mancino [1] - 2:16

Map [144] - 78:16, 82:6, 82:7, 82:13, 82:16, 82:20, 82:21, 82:24, 83:7, 83:23, 86:13, 87:7, 87:11,

87:16, 87:17, 88:4, 88:8, 88:9, 100:14, 101:7, 101:8, 101:11, 101:13, 101:20, 102:17, 103:24, 115:1, 115:4, 115:8, 115:14, 115:15, 115:16, 116:16, 116:19, 116:25, 117:13, 118:16, 119:10, 119:15, 119:20, 120:1, 120:2, 120:4, 120:9, 121:20, 122:11, 122:23, 123:19, 124:9, 124:11, 124:13, 124:18, 124:19, 124:22, 124:23, 126:21, 126:23, 127:7, 127:14, 128:4, 134:20, 137:5, 137:18, 139:12, 139:14, 149:4, 149:6, 149:8, 149:9, 151:13, 151:16, 158:6, 158:9, 158:19, 194:19, 195:20, 195:21, 195:22, 196:1, 196:8, 196:12, 197:9, 199:1, 234:1, 234:19, 234:20, 234:23, 236:12, 236:15, 236:20, 236:22, 237:4, 237:12, 237:13, 237:19, 237:23, 238:1, 238:2, 238:7, 238:11, 238:12, 238:20, 239:1, 239:6, 239:9, 239:10, 239:14, 250:5, 305:4, 308:8, 324:4, 324:9, 324:10, 327:9, 327:23, 331:8, 331:9, 331:11, 331:22, 332:5, 332:16, 333:3, 333:8, 333:10, 333:12, 347:3, 347:6, 347:8, 348:1, 348:5, 351:10

map [195] - 16:1,

16:7, 16:16, 19:15, 19:24, 20:4, 20:16, 20:17, 20:18, 21:6, 22:7, 24:21, 25:24, 29:14, 31:19, 39:1, 39:4, 39:5, 39:6, 61:17, 62:18, 64:13, 64:15, 64:18, 66:17, 67:10, 67:21, 68:1, 68:22, 70:10, 70:16, 71:22, 71:24, 72:2, 72:4, 72:15, 72:19, 73:5, 73:7, 73:9, 76:23, 77:2, 77:4, 77:13, 79:9, 80:6, 80:19, 80:21, 80:22, 82:17, 86:14, 88:6, 88:18, 89:11, 94:9, 94:20, 97:10, 98:8, 101:16, 103:3, 103:5, 103:6, 103:8, 103:24, 104:8, 104:15, 104:19, 104:22, 107:4, 110:17, 111:15, 112:13, 112:14, 115:5, 115:6, 115:16, 117:14, 121:21, 124:15, 124:16, 125:7, 125:8, 125:20, 125:25, 134:25, 138:24, 139:5, 139:10, 139:11, 139:15, 139:20, 139:23, 152:19, 152:20, 157:10, 161:4, 161:16, 175:24, 176:10, 176:11, 184:6, 186:25, 187:6, 195:15, 195:16, 195:19, 195:25, 196:11, 196:19, 197:1, 197:7, 197:21, 198:17, 198:18, 205:22, 206:17, 217:8, 218:2, 218:15, 232:5, 234:21, 237:11, 238:7, 254:8,

269:13, 270:3, 270:4, 270:6, 273:6, 273:16, 273:19, 273:20, 273:22, 274:2, 274:7, 287:18, 292:20, 294:10, 297:1, 297:2, 297:14, 297:20, 298:1, 298:6, 301:14, 301:24, 302:25, 303:1, 303:2, 303:12, 305:6, 305:12, 305:16, 306:17, 311:7, 311:10, 319:5, 319:15, 322:13, 323:1, 324:3, 327:9, 327:16, 328:12, 329:4, 332:9, 333:13, 335:10, 345:20, 346:1, 346:6, 346:7, 346:12, 348:14, 348:16, 349:8, 349:12, 349:17, 350:10, 351:13, 351:14, 351:15, 351:16, 352:11, 352:19, 352:22, 352:23, 353:10, 353:25, 354:21, 355:4

Maps [3] - 74:10, 81:11, 100:5

maps [223] - 15:21, 17:18, 18:20, 22:4, 26:15, 29:5, 64:25, 72:12, 72:14, 72:23, 72:25, 73:24, 74:25, 75:3, 76:16, 76:18, 77:5, 77:9, 77:11, 78:11, 78:18, 79:2, 79:24, 80:14, 81:4, 81:5, 81:8, 81:10, 81:12, 81:18, 82:5, 86:3, 86:20, 89:9, 90:12, 90:13, 90:25, 91:6, 91:15, 93:9, 94:4, 94:5, 94:13, 94:18, 96:15, 97:3, 97:23, 99:20,

101:4, 101:6, 102:17, 102:23, 103:1, 103:12, 103:21, 105:1, 105:11, 105:15, 107:17, 107:18, 107:19, 107:24, 115:12, 116:9, 118:22, 119:5, 119:6, 119:22, 124:14, 131:14, 133:11, 134:8, 134:17, 134:18, 136:18, 137:12, 139:7, 151:6, 151:11, 152:14, 152:18, 152:23, 153:4, 153:15, 153:21, 153:22, 157:14, 157:17, 158:12, 158:15, 159:13, 174:25, 175:2, 175:5, 175:7, 176:6, 176:16, 181:6, 181:9, 182:12, 183:6, 183:12, 190:11, 193:12, 194:2, 194:16, 194:17, 195:3, 196:4, 196:22, 197:6, 197:12, 198:6, 199:11, 200:17, 203:5, 203:10, 204:17, 206:24, 208:24, 209:2, 209:4, 209:8, 209:12, 209:20, 209:21, 209:23, 210:7, 210:9, 211:4, 211:7, 211:24, 212:4, 212:8, 212:13, 212:14, 213:3, 213:5, 213:9, 213:12, 213:20, 213:21, 213:25, 216:9, 217:20, 219:7, 221:10, 226:8, 234:10, 235:4, 235:7, 235:9, 235:16, 235:19, 236:7, 237:15, 238:17, 239:11, 251:20, 252:1, 253:1, 266:13, 266:25, 292:4, 292:6, 292:9, 295:1, 295:7, 295:14, 297:6,

297:17, 297:22, 298:11, 300:9, 301:17, 304:9, 304:11, 304:25, 306:21, 307:1, 307:20, 309:11, 309:13, 309:14, 310:12, 310:13, 310:17, 310:20, 311:2, 319:1, 324:7, 327:7, 328:3, 328:11, 329:7, 329:14, 332:20, 333:16, 333:21, 334:2, 334:7, 334:20, 335:24, 337:6, 340:23, 341:8, 342:20, 342:21, 348:3, 351:20, 352:25, 353:7, 353:11

March [3] - 16:18, 30:23, 274:15

marching [1] - 144:11

Marilyn [1] - 316:5

MARK [2] - 6:10, 166:14

Mark [13] - 1:11, 14:9, 14:25, 19:11, 21:8, 87:10, 139:22, 166:2, 186:17, 187:3, 300:25, 301:1, 316:6

marked [1] - 95:4

markers [1] - 297:1

Marque [10] - 37:17, 39:16, 44:9, 70:3, 70:4, 111:2, 270:16, 270:25, 273:7, 351:9

Marshall [2] - 4:18, 36:15

marshals [1] - 114:5

Martin [1] - 256:5

Martinez [1] - 284:24

mass [2] - 12:23, 215:13

match [1] - 152:2

material [1] - 33:18

materials [2] - 93:14, 258:11

math [1] - 269:10

Matt [2] - 100:5, 117:2

matter [24] - 7:6, 7:15, 22:11, 53:13, 53:19, 101:1, 140:24, 159:18, 176:21, 177:4, 177:6, 177:10, 191:5, 252:22, 252:25, 253:9, 258:14, 275:19, 316:4, 340:5, 343:13, 353:16, 353:19, 357:8

matters [4] - 101:25, 340:4, 340:9, 340:10

Maureen [1] - 4:23

Maynard [4] - 24:10, 173:25, 179:1, 274:17

mean [61] - 26:12, 29:24, 31:1, 32:10, 42:18, 46:2, 46:3, 47:10, 47:16, 53:20, 53:22, 71:12, 73:1, 84:21, 101:22, 106:4, 113:9, 117:22, 124:13, 127:16, 134:2, 148:15, 159:5, 159:6, 160:10, 165:14, 169:11, 192:22, 205:21, 217:6, 221:6, 236:23, 238:6, 238:9, 240:10, 243:21, 244:22, 246:3, 247:18, 248:18, 249:23, 250:15, 250:17, 254:9, 264:16, 267:21, 267:24, 297:11, 299:18, 303:23, 314:18, 320:14, 327:18, 333:5, 336:20,

337:10, 344:5, 351:4

meaning [6] - 84:20, 136:20, 197:16, 219:6, 223:24, 227:8

means [4] - 141:13, 147:16, 168:3, 217:8

meant [10] - 47:4, 66:5, 137:3, 159:22, 159:23, 160:2, 160:5, 160:6, 196:14, 202:2

measure [4] - 241:19, 245:16, 247:9, 248:24

mechanical [1] - 5:6

mechanism [1] - 135:10

meet [21] - 48:10, 48:11, 54:7, 54:9, 55:3, 55:4, 55:7, 55:15, 55:16, 59:23, 61:13, 191:15, 203:2, 226:7, 282:12, 283:16, 294:11, 296:25, 311:10, 337:2, 337:4

meeting [221] - 52:14, 52:16, 53:25, 55:14, 55:19, 55:24, 56:2, 56:3, 56:9, 57:21, 58:14, 61:5, 61:8, 64:4, 64:6, 71:17, 71:18, 71:23, 72:9, 74:15, 74:17, 78:4, 78:9, 78:15, 79:4, 80:12, 81:2, 86:2, 86:6, 88:11, 88:13, 88:14, 88:15, 89:2, 89:3, 89:4, 89:8, 89:11, 90:23, 90:24, 91:1, 91:3, 91:14, 92:5, 93:5, 97:14, 97:21, 97:23, 99:12, 99:17, 100:11, 102:16,

102:25, 103:1, 103:7, 103:14, 105:20, 105:24, 113:2, 118:24, 126:14, 126:15, 126:20, 136:16, 137:5, 137:17, 139:9, 144:6, 151:5, 157:9, 158:9, 158:16, 159:3, 159:7, 159:11, 159:21, 162:3, 175:3, 175:8, 182:14, 182:15, 184:3, 184:8, 187:16, 187:22, 188:1, 189:13, 189:21, 190:9, 190:13, 191:9, 192:1, 192:19, 194:1, 194:15, 196:4, 202:18, 204:5, 204:10, 204:14, 204:20, 204:23, 205:4, 205:10, 205:11, 207:11, 207:12, 207:15, 209:7, 211:20, 212:3, 214:4, 214:10, 214:15, 218:16, 219:10, 219:13, 219:21, 220:5, 220:11, 220:12, 220:15, 221:17, 223:2, 223:4, 226:1, 226:14, 227:1, 227:4, 227:12, 227:24, 228:5, 228:6, 229:2, 229:5, 229:6, 229:22, 229:24, 230:10, 230:13, 230:18, 231:7, 231:9, 231:13, 231:20, 232:14, 232:17, 233:11, 233:25, 234:13, 234:18, 234:25, 237:8, 237:11, 238:4, 258:5, 259:1, 259:10, 259:11, 259:18, 261:21, 262:22, 265:25, 266:3, 266:6, 266:9, 267:23, 268:22, 269:8, 279:2, 286:21, 286:23, 286:25, 287:11,

287:25, 292:17, 292:22, 292:25, 293:17, 296:11, 296:18, 298:5, 298:15, 298:18, 300:8, 301:9, 302:3, 306:20, 308:2, 308:12, 310:3, 310:4, 310:7, 310:10, 324:8, 326:9, 326:16, 326:21, 333:15, 334:3, 334:7, 334:19, 335:23, 336:6, 337:20, 337:22, 337:23, 338:1, 338:3, 338:7, 338:16, 338:17, 338:23, 339:1, 339:2, 339:4, 346:1

meetings [97] - 44:25, 52:13, 54:16, 55:21, 55:25, 56:20, 58:4, 61:2, 79:18, 79:21, 79:22, 80:6, 80:18, 80:20, 86:19, 88:3, 88:5, 90:1, 99:9, 100:23, 103:11, 136:25, 140:16, 174:17, 174:22, 174:24, 182:1, 182:7, 182:9, 183:5, 183:16, 191:21, 192:6, 193:20, 194:12, 201:14, 206:14, 207:6, 207:9, 209:1, 210:4, 214:4, 217:22, 218:1, 218:5, 219:21, 220:6, 223:5, 223:8, 223:18, 224:21, 224:25, 225:7, 225:9, 225:14, 225:20, 228:21, 229:8, 257:20, 257:22, 257:24, 258:3, 258:18, 258:23, 259:6, 259:8, 259:9, 259:15, 259:17, 259:22, 260:3, 260:4, 260:7, 260:9, 260:13,

266:16, 266:17, 267:2, 267:6, 267:19, 267:25, 268:9, 268:12, 268:13, 300:15, 306:12, 307:6, 309:7, 309:9, 309:14, 309:18, 334:18, 338:24, 342:8, 345:13

Meetings [5] - 52:2, 52:24, 53:8, 232:9, 306:19

meets [3] - 48:8, 258:20, 258:22

member [14] - 12:12, 53:12, 54:20, 64:22, 64:25, 70:10, 91:11, 205:20, 220:1, 253:17, 264:20, 330:19, 342:1, 345:6

members [26] - 9:4, 12:14, 14:8, 17:17, 50:23, 52:14, 53:20, 53:23, 66:16, 82:23, 83:1, 88:8, 96:6, 99:4, 113:9, 113:10, 152:17, 154:2, 161:19, 165:2, 219:15, 259:17, 284:11, 284:13, 293:12, 296:2

membership [1] - 12:12

memo [1] - 117:17

memorandum [2] - 95:6, 117:2

memorial [1] - 12:21

Memorial [1] - 256:1

memorialize [2] - 62:8, 62:11

memories [1] - 258:20

memorize [1] - 106:1

memory [6] - 180:22, 276:20, 277:14, 309:18,

315:23, 315:25

mental [6] - 244:9, 244:11, 244:12, 244:14, 244:19, 244:23

mentality [1] - 243:2

mention [3] - 84:18, 112:12, 326:15

mentioned [15] - 15:11, 66:12, 66:15, 83:14, 112:21, 141:1, 167:2, 184:23, 212:8, 296:14, 296:20, 299:9, 321:9, 335:8, 336:18

mentioning [2] - 201:16, 201:19

mentorship [1] - 47:4

message [1] - 22:8

messages [1] - 22:18

met [18] - 75:14, 96:17, 161:3, 192:17, 194:13, 197:5, 202:21, 207:4, 250:25, 269:4, 272:16, 275:1, 281:10, 283:9, 298:9, 301:8, 310:20, 337:1

metaphoricall y [2] - 106:8, 106:10

metes [1] - 125:3

method [1] - 249:6

methods [1] - 229:20

Meza [2] - 3:13, 6:8

MEZA [6] - 10:23, 11:11, 11:15, 22:21, 26:7, 33:25

mic [2] - 18:19, 86:25

Michael [12] -

66:22, 110:19, 111:16, 111:20, 112:6, 112:22, 142:23, 143:19, 144:18, 147:17, 309:20

Michelle [7] - 2:16, 75:24, 75:25, 98:14, 98:18, 138:16, 138:17

microphones [2] - 228:2, 231:13

mid [6] - 96:15, 307:1, 307:5, 310:2, 340:23, 340:24

Mid [1] - 42:2

Mid-County [1] - 42:2

mid-November [2] - 96:15, 310:2

mid-October [3] - 307:1, 307:5, 340:24

mid-October' [1] - 340:23

middle [6] - 54:18, 127:6, 302:11, 305:17, 306:7, 318:9

might [32] - 10:4, 30:14, 42:17, 47:13, 66:17, 79:8, 95:14, 106:15, 164:14, 182:7, 184:12, 218:23, 221:3, 221:4, 235:10, 236:12, 236:14, 237:23, 251:1, 264:16, 268:18, 315:22, 316:1, 317:13, 317:16, 317:25, 331:17, 336:11, 336:12, 343:11, 349:21

migrants [1] - 59:16

Mike [1] - 82:18

milestones [1] - 297:4

military [4] -

169:11, 181:18, 283:12, 297:12

million [4] - 59:1, 59:3, 59:4, 254:1

mind [12] - 112:25, 145:16, 145:17, 145:23, 147:1, 147:3, 217:13, 238:5, 281:5, 289:7, 332:16, 346:15

minded [1] - 39:19

mine [1] - 85:11

minimal [4] - 22:4, 196:16, 196:18, 207:19

minimize [1] - 320:3

minimizing [3] - 200:19, 319:22, 320:22

Minimum [1] - 196:3

minimum [7] - 196:12, 197:1, 234:23, 303:17, 303:20, 303:25

minor [6] - 117:14, 176:25, 193:8, 346:9, 346:16, 349:15

minorities [2] - 19:20, 31:19

minority [37] - 20:11, 20:19, 22:12, 26:24, 27:3, 62:23, 68:9, 82:14, 82:15, 83:4, 91:6, 101:23, 110:16, 110:25, 111:1, 111:2, 118:1, 118:7, 202:7, 249:18, 252:18, 271:10, 271:20, 272:5, 272:6, 272:7, 272:21, 273:2, 276:11, 285:12, 285:16, 289:19, 302:15, 302:20, 319:12, 349:21

minority's [1] - 116:20

concordance    Day 7 - 390

minute [17] - 38:24, 109:4, 109:13, 111:11, 127:17, 160:3, 195:17, 233:13, 242:20, 259:2, 297:15, 313:1, 323:9, 339:9, 353:23, 353:25, 354:10

minutes [11] - 10:14, 10:15, 10:16, 23:24, 29:17, 233:10, 233:16, 251:8, 326:16, 344:20

mirrored [1] - 182:3

mischaracterization [1] - 277:18

mischaracterizes [1] - 26:7

mislead [1] - 96:23

misrepresentation [1] - 127:21

missed [2] - 225:22, 257:1

missing [2] - 237:4, 323:21

mistake [2] - 31:3, 300:22

moderately [1] - 226:17

modest [1] - 318:7

modified [1] - 263:20

Molly [1] - 3:9

mom [1] - 47:2

moment [4] - 54:20, 112:3, 206:11, 251:25

moments [1] - 163:14

momentum [1] - 58:1

Monday [22] - 48:17, 113:3, 140:17, 151:5, 157:5, 183:10,

214:24, 258:24, 259:4, 259:7, 259:15, 259:16, 259:18, 259:24, 260:2, 281:22, 281:23, 282:7, 283:3, 338:1, 338:4, 338:17

Mondays [2] - 48:11, 140:16

money [5] - 12:17, 12:20, 188:22, 242:13, 245:2

monitoring [1] - 153:24

monitors [1] - 23:14

Montgomery [1] - 167:14

month [13] - 47:1, 67:3, 225:4, 225:8, 225:11, 225:15, 225:19, 258:24, 258:25, 259:1, 259:3, 290:15, 351:19

monthly [1] - 126:14

months [4] - 55:13, 57:3, 111:8, 177:8

Montopolis [1] - 2:14

Montropolis [1] - 2:21

monuments [1] - 78:1

Moody [2] - 4:10, 55:4

morning [24] - 7:2, 8:10, 10:23, 11:16, 47:7, 47:8, 47:9, 60:1, 74:16, 80:17, 81:2, 85:9, 104:1, 140:22, 161:1, 243:14, 259:4, 259:7, 259:18, 304:14, 330:2, 338:1, 338:4, 356:22

mornings [2] - 259:16, 260:2

most [29] - 12:16,

20:23, 21:24, 22:14, 41:20, 54:20, 63:1, 63:3, 69:20, 69:21, 84:13, 101:25, 104:8, 104:10, 104:12, 105:18, 148:7, 172:12, 234:5, 234:10, 240:12, 240:17, 240:21, 243:20, 247:16, 253:16, 321:19, 336:3

mostly [2] - 51:25, 273:12

mother [1] - 47:1

motion [36] - 82:7, 82:8, 86:11, 100:12, 100:14, 100:16, 100:18, 100:19, 100:20, 139:14, 139:15, 148:10, 148:12, 148:14, 148:15, 148:16, 148:17, 148:18, 148:19, 149:2, 149:5, 149:11, 157:15, 158:15, 158:18, 158:20, 158:21, 158:23, 158:24, 159:4, 159:8, 165:9, 165:14, 165:21, 236:21, 241:20

motions [2] - 159:8, 160:18

move [22] - 13:15, 20:22, 57:9, 70:7, 71:10, 148:18, 149:4, 149:5, 149:8, 149:9, 149:13, 170:20, 170:22, 174:14, 189:15, 197:16, 227:11, 238:2, 247:15, 253:9, 308:18, 319:15

moved [13] - 27:10, 30:23, 36:1, 46:23, 57:2, 62:20, 71:15, 99:25, 167:14, 193:7, 237:15, 298:16, 306:8

mover [2] - 37:14, 149:13

moves [1] - 148:16

moving [9] - 24:7, 25:4, 27:18, 27:24, 214:5, 214:8, 223:2, 338:21, 342:16

MR [209] - 7:11, 7:15, 7:21, 7:23, 7:25, 8:5, 8:8, 9:18, 9:21, 9:23, 10:2, 10:9, 10:12, 10:18, 10:20, 11:3, 11:8, 22:24, 23:5, 23:7, 23:13, 23:15, 25:12, 25:16, 26:16, 32:13, 32:24, 33:1, 33:7, 33:8, 33:10, 33:14, 33:23, 34:3, 34:5, 34:10, 34:13, 34:25, 35:4, 35:5, 35:14, 38:3, 76:10, 76:11, 85:7, 85:17, 85:19, 85:21, 86:23, 87:2, 87:24, 88:1, 93:16, 93:18, 93:21, 93:23, 95:10, 95:18, 95:24, 102:8, 102:12, 105:21, 105:22, 105:23, 113:16, 113:19, 114:22, 114:24, 116:7, 116:8, 116:22, 117:1, 117:11, 117:12, 120:13, 120:14, 121:15, 121:16, 123:15, 123:16, 124:19, 124:20, 126:10, 126:12, 126:25, 127:2, 127:25, 128:2, 128:12, 128:14, 130:23, 130:25, 131:21, 131:23, 132:7, 132:9, 132:12, 132:15, 133:14, 133:21, 133:22, 136:4,

136:6, 136:10, 136:12, 141:16, 141:19, 149:16, 149:18, 149:24, 149:25, 150:18, 150:19, 152:11, 152:12, 153:2, 153:6, 153:9, 153:18, 153:19, 155:5, 155:6, 155:8, 155:9, 155:21, 156:4, 156:9, 156:10, 161:9, 161:11, 164:9, 164:10, 164:13, 164:18, 164:21, 164:22, 164:24, 164:25, 165:9, 165:25, 166:2, 166:12, 166:17, 179:10, 179:11, 185:23, 186:4, 186:7, 186:12, 193:16, 193:18, 194:21, 194:25, 195:2, 195:13, 195:14, 195:23, 195:24, 198:23, 198:24, 199:5, 199:7, 199:24, 199:25, 203:17, 203:18, 203:21, 203:24, 206:1, 206:9, 206:10, 208:5, 209:17, 209:18, 210:11, 210:12, 210:24, 211:1, 215:3, 215:5, 216:10, 216:13, 216:19, 216:21, 222:2, 222:3, 222:8, 222:9, 250:19, 251:11, 253:2, 277:4, 343:16, 344:1, 344:3, 344:10, 344:14, 344:22, 346:22, 351:22, 352:2, 352:7, 352:15, 352:16, 355:6, 355:8, 355:10, 356:8, 356:25

MS [73] - 7:6, 7:9, 7:13, 8:17, 9:7, 10:23, 11:11, 11:15, 22:21, 26:7, 33:25, 127:20, 165:16,

concordance

165:22, 207:24, 250:21, 250:24, 251:15, 253:7, 253:8, 262:3, 262:6, 263:3, 263:5, 263:13, 263:15, 264:1, 264:4, 264:11, 264:13, 268:3, 268:5, 268:24, 269:2, 269:17, 269:20, 271:6, 271:7, 274:12, 274:14, 275:8, 275:9, 275:15, 275:17, 275:24, 275:25, 276:8, 276:9, 276:21, 276:24, 277:5, 277:7, 277:20, 277:22, 279:11, 279:12, 280:2, 280:8, 280:9, 286:8, 286:9, 309:20, 309:25, 311:14, 311:17, 339:9, 339:12, 343:6, 344:8, 344:20, 345:2, 346:19, 356:10

multiple [2] - 16:21, 214:4

mumbo [1] - 129:4

museum [2] - 247:14, 247:22

must [10] - 78:18, 133:16, 137:13, 174:11, 188:4, 216:24, 219:7, 225:2, 281:21, 285:11

## N

NAACP [9] - 2:12, 3:2, 83:8, 83:10, 84:25, 85:2, 127:21, 132:21, 250:22

name [20] - 8:10, 11:17, 34:25, 35:17, 35:18, 75:15, 108:17, 108:18, 120:17, 127:19, 173:23, 178:9, 194:9, 194:10, 232:24, 232:25, 233:3,

288:8, 345:3, 351:2

named [2] - 61:14, 194:8

names [2] - 12:6, 330:6

narrow [1] - 304:15

Nathan [9] - 67:11, 80:13, 111:15, 112:6, 141:23, 142:22, 144:24, 147:17

national [1] - 244:20

National [4] - 163:5, 164:2, 164:7, 350:3

nationwide [1] - 68:18

natural [2] - 78:1, 280:3

nature [5] - 40:17, 41:18, 52:13, 77:16, 109:5

navigator [1] - 168:6

NC [1] - 3:3

NE [3] - 3:24, 4:3, 4:6

near [2] - 65:7, 250:4

necessarily [10] - 40:21, 50:20, 94:23, 95:2, 164:14, 191:4, 198:8, 232:6, 260:11, 272:10

necessary [4] - 68:21, 203:6, 216:25, 343:14

neck [1] - 32:2

need [38] - 33:4, 41:14, 41:16, 41:20, 41:21, 42:8, 42:11, 49:17, 59:21, 66:11, 75:25, 102:25, 114:1, 137:20, 138:9, 165:20, 175:20, 179:22, 181:6, 194:21, 199:20, 210:9, 231:12,

244:14, 244:23, 244:25, 280:3, 293:8, 299:1, 299:18, 315:10, 315:13, 330:5, 338:20, 354:10, 356:19

needed [19] - 19:12, 45:19, 62:15, 79:1, 89:8, 89:9, 89:10, 94:24, 114:18, 184:5, 210:4, 218:24, 223:22, 280:18, 284:18, 289:20, 317:11, 327:10, 346:12

needing [2] - 218:14, 220:5

needs [4] - 9:3, 294:12, 294:15, 311:16

negative [1] - 135:24

negotiating [1] - 29:12

neighborhood [3] - 71:13, 71:15, 351:5

neighborhood s [3] - 117:15, 350:22, 353:3

Neil [2] - 1:15, 1:15

Nessler [2] - 17:24, 18:16

networks [1] - 133:2

never [56] - 22:19, 28:23, 45:6, 61:18, 67:13, 67:18, 97:10, 103:3, 111:22, 112:2, 113:1, 143:5, 143:14, 145:16, 145:23, 147:1, 147:3, 147:5, 148:20, 148:24, 194:13, 214:12, 227:7, 227:8, 228:22, 235:8, 238:13, 254:20, 272:16, 284:19, 285:22, 291:5, 291:11,

293:19, 294:25, 295:2, 295:24, 296:25, 304:3, 305:6, 305:15, 308:5, 310:9, 310:25, 314:12, 315:7, 315:11, 319:1, 333:15, 335:4, 335:25, 337:3, 337:8, 342:25, 348:3

nevertheless [2] - 217:20, 245:4

new [27] - 57:1, 73:5, 104:7, 104:15, 104:19, 104:22, 173:1, 185:2, 198:9, 200:17, 257:1, 260:23, 269:6, 269:23, 276:2, 287:18, 294:10, 295:1, 297:14, 298:10, 298:17, 305:20, 305:22, 308:4, 319:15, 321:13, 327:6

New [4] - 2:18, 3:11

Newkirk [1] - 3:23

newly [1] - 170:17

newly-created [1] - 170:17

news [2] - 88:6, 88:10

News [2] - 23:12, 185:17

next [75] - 7:4, 10:22, 16:19, 34:11, 37:6, 37:9, 37:10, 41:22, 42:6, 46:14, 46:23, 46:25, 54:19, 56:5, 72:7, 74:13, 76:6, 78:6, 78:7, 78:9, 78:14, 78:15, 78:17, 80:9, 80:13, 81:3, 81:13, 113:2, 128:22, 130:13, 136:10, 136:17, 136:24, 137:1, 137:4, 137:8,

137:9, 137:10, 137:17, 144:13, 153:22, 156:15, 157:4, 157:9, 170:3, 176:24, 186:7, 190:14, 190:15, 195:13, 195:23, 199:5, 199:24, 202:20, 203:22, 203:23, 206:23, 206:25, 212:11, 216:19, 218:7, 222:8, 228:23, 228:24, 300:8, 302:23, 303:16, 304:17, 310:25, 316:12, 320:13, 338:16, 356:23

next-to [1] - 206:25

nice [1] - 346:23

Night [1] - 106:3

night [1] - 349:25

nine [4] - 79:17, 168:25, 177:19, 334:18

Nixon [22] - 4:20, 6:9, 6:14, 32:23, 33:13, 35:8, 93:17, 114:20, 123:2, 162:6, 162:18, 163:7, 180:6, 264:25, 276:25, 277:1, 277:2, 277:5, 277:8, 278:4, 279:19, 283:24

NIXON [93] - 7:11, 7:25, 8:5, 8:8, 22:24, 23:5, 23:7, 23:13, 23:15, 25:12, 25:16, 26:16, 32:24, 33:1, 33:8, 33:14, 33:23, 34:3, 93:16, 93:18, 95:10, 102:8, 105:21, 114:22, 114:24, 116:7, 116:8, 116:22, 117:1, 117:11, 117:12, 120:13, 120:14, 121:15, 121:16, 123:15, 123:16, 124:19, 124:20, 126:10,

126:12, 126:25, 127:2, 127:25, 128:2, 128:12, 128:14, 130:23, 130:25, 131:21, 131:23, 132:7, 132:9, 132:12, 132:15, 133:14, 133:21, 133:22, 136:4, 136:6, 136:10, 136:12, 141:16, 141:19, 149:16, 149:18, 149:24, 149:25, 150:18, 150:19, 152:11, 152:12, 153:2, 153:6, 153:9, 153:18, 153:19, 155:5, 155:6, 155:8, 155:9, 155:21, 156:4, 156:9, 156:10, 161:9, 164:10, 164:13, 164:18, 164:21, 165:9, 165:25, 277:4

Nixon's [5] - 114:13, 173:21, 173:22, 178:24, 263:24

nobody [1] - 112:17

noise [2] - 230:14, 230:22

nomination [1] - 249:16

nominee [2] - 171:20, 171:23

non [5] - 12:14, 12:16, 14:20, 96:4, 168:4

non-Anglo [1] - 96:4

non-line [1] - 168:4

non-profit [2] - 12:16, 14:20

non-profits [1] - 12:14

nondescript [1] - 247:17

none [4] - 179:9, 236:18, 310:15, 344:14

nonetheless [1]

- 119:19

nonsense [1] - 229:4

nonviolent [2] - 243:2, 243:7

Noor [1] - 127:5

normal [1] - 140:16

normally [2] - 48:10, 56:1

North [4] - 3:4, 3:7, 223:6, 223:8

north [13] - 14:5, 27:18, 27:21, 27:24, 42:22, 43:3, 62:20, 62:21, 69:20, 70:24, 104:6, 202:14, 255:11

north-of-Broadway [1] - 43:3

northern [5] - 125:15, 125:16, 126:3, 126:4, 306:8

note [25] - 26:25, 64:19, 64:24, 65:12, 65:25, 66:6, 66:20, 66:21, 69:1, 72:8, 75:4, 76:12, 78:6, 78:7, 80:9, 80:24, 81:13, 81:15, 81:25, 97:6, 205:4, 206:11, 264:14, 280:2, 313:12

noted [2] - 136:19, 195:15

notes [30] - 35:7, 62:2, 62:5, 62:6, 62:9, 63:23, 63:25, 65:1, 65:3, 68:25, 69:3, 74:13, 74:25, 76:7, 85:22, 85:23, 86:4, 89:22, 133:19, 133:24, 136:2, 144:1, 144:10, 144:11, 160:24, 160:25, 203:19, 203:20,

205:1

nothing [22] - 11:6, 33:17, 34:22, 111:6, 111:7, 158:8, 162:5, 164:10, 166:9, 182:13, 183:18, 197:2, 222:20, 246:10, 260:16, 295:5, 295:9, 318:15, 329:11, 330:13, 353:10, 354:17

notice [25] - 30:15, 49:1, 52:12, 52:15, 96:8, 140:14, 153:7, 157:21, 183:11, 214:22, 216:17, 217:22, 218:1, 220:3, 257:24, 261:21, 267:5, 267:11, 267:13, 267:17, 267:18, 287:24, 339:1, 339:3, 352:3

noticed [3] - 220:12, 221:17, 232:12

notices [1] - 267:9

notification [1] - 292:4

notified [1] - 288:1

notify [3] - 326:1, 326:2, 326:4

notion [3] - 198:16, 201:16, 212:18

November [135] - 17:4, 31:7, 55:19, 55:24, 56:20, 78:7, 78:10, 78:18, 79:7, 79:8, 80:10, 80:11, 80:24, 81:25, 82:3, 85:24, 86:3, 86:6, 88:12, 89:18, 89:19, 90:24, 90:25, 93:1, 93:7, 93:10, 96:15, 97:7, 97:12, 102:22,

102:25, 103:2, 103:22, 107:16, 108:6, 108:8, 108:20, 109:11, 109:16, 116:10, 120:24, 121:6, 121:9, 121:14, 122:7, 126:18, 128:3, 136:13, 136:14, 136:17, 137:13, 139:1, 139:5, 139:6, 139:9, 140:2, 154:19, 154:25, 157:9, 157:11, 162:4, 179:13, 180:15, 181:11, 210:2, 214:19, 214:22, 215:7, 216:3, 217:2, 217:7, 217:13, 217:18, 217:19, 219:7, 220:3, 220:4, 220:12, 221:19, 222:4, 223:3, 228:5, 229:6, 229:24, 233:11, 235:17, 261:1, 263:16, 281:2, 281:3, 294:23, 294:24, 295:2, 295:8, 295:16, 295:20, 296:11, 309:1, 309:3, 309:8, 309:10, 309:12, 309:15, 310:2, 310:3, 310:4, 310:10, 325:12, 326:9, 330:2, 330:10, 331:1, 333:17, 333:21, 335:3, 335:15, 335:23, 336:18, 336:19, 336:24, 337:3, 337:5, 337:9, 338:3, 338:7, 338:11, 339:4, 342:22, 343:1, 343:4, 347:22, 347:25

NUMBER [1] - 6:18

number [31] - 38:4, 41:6, 43:13, 43:15, 55:21, 58:3, 58:4, 60:4, 69:6, 69:12, 69:18, 79:20, 81:6,

103:20, 103:21, 144:14, 150:10, 150:13, 177:21, 179:23, 199:23, 203:25, 223:5, 242:12, 245:20, 250:13, 264:18, 331:18, 335:12, 335:20, 352:25

Number [27] - 6:19, 7:20, 9:25, 103:24, 111:11, 127:1, 128:13, 130:24, 131:22, 132:8, 133:15, 149:17, 149:19, 156:6, 163:8, 163:19, 264:3, 264:5, 313:5, 347:3, 347:6, 347:8, 348:1, 348:5, 351:10, 351:15

numbered [1] - 281:22

numbers [9] - 10:13, 66:1, 171:18, 171:20, 171:22, 198:14, 291:17, 332:4, 335:23

numerical [1] - 285:14

nurse [1] - 167:25

NW [8] - 1:12, 1:22, 2:3, 2:7, 2:24, 3:14, 3:17, 3:21

**O**

o'clock [3] - 48:16, 48:18, 49:16

oath [2] - 141:9, 141:13

object [7] - 95:10, 95:16, 121:22, 253:2, 324:20, 343:17, 346:8

objected [1] - 63:12

objecting [1] - 356:20

objection [18] - 7:21, 8:17, 9:7,

20:16, 26:7, 28:15, 32:13, 33:7, 87:21, 87:24, 102:8, 105:21, 127:20, 207:24, 311:24, 313:10, 344:25, 352:13

**objectionable** [1] - 123:13

**objections** [3] - 28:17, 314:3, 356:17

**obliterated** [2] - 151:7, 151:12

**observation** [1] - 244:18

**observing** [1] - 57:17

**obtain** [4] - 173:18, 173:20, 183:24, 330:7

**obtaining** [1] - 128:18

**obvious** [1] - 185:6

**obviously** [3] - 14:18, 15:16, 356:13

**occasion** [1] - 241:10

**occasionally** [6] - 45:15, 55:6, 55:15, 55:16, 207:11, 240:8

**occur** [2] - 258:18, 349:19

**occurred** [11] - 20:15, 23:16, 49:25, 172:4, 184:8, 184:12, 187:22, 193:21, 225:1, 298:18

**occurrence** [1] - 225:14

**occurring** [3] - 207:6, 207:10, 224:15

**October** [71] - 72:10, 74:14, 74:16, 75:1, 81:6, 81:14, 81:21, 86:16, 87:9, 87:12, 88:7, 103:7,

107:23, 113:3, 121:8, 121:11, 133:23, 142:24, 144:6, 144:7, 150:20, 152:13, 153:3, 153:4, 153:8, 153:12, 153:14, 157:4, 163:1, 183:7, 193:21, 202:18, 204:2, 204:14, 205:12, 206:12, 206:16, 206:21, 209:6, 209:15, 209:21, 209:22, 210:7, 210:16, 212:9, 213:25, 217:21, 221:22, 265:13, 300:8, 300:12, 301:6, 302:3, 304:14, 307:1, 307:5, 309:16, 310:8, 310:14, 325:16, 326:21, 326:24, 333:2, 334:19, 335:16, 337:18, 337:24, 338:12, 340:24, 342:20

**October'** [1] - 340:23

**odd** [1] - 281:22

**odd-numbered** [1] - 281:22

**OF** [3] - 1:1, 3:12, 4:2

**off-guard** [1] - 230:4

**offender** [2] - 127:10, 243:2

**offenders** [1] - 243:8

**offense** [1] - 247:16

**offensive** [1] - 247:20

**offer** [6] - 17:17, 131:6, 139:25, 140:2, 158:23, 351:23

**OFFERED** [1] - 6:18

**offered** [5] - 7:20, 95:11, 95:18, 118:22, 353:1

**offers** [1] - 284:15

**office** [55] - 30:16, 32:16, 36:20, 41:19, 41:22, 42:1, 42:2, 42:6, 42:7, 47:19, 48:14, 48:18, 48:20, 49:9, 49:16, 64:7, 67:8, 72:10, 74:22, 75:1, 75:9, 80:16, 98:20, 98:22, 129:21, 140:18, 172:13, 172:21, 173:1, 185:3, 204:6, 215:17, 216:15, 239:19, 246:15, 257:19, 257:23, 257:24, 259:21, 281:11, 281:25, 282:9, 284:24, 294:16, 294:21, 298:3, 325:15, 325:22, 326:3, 330:9, 337:16, 342:7, 342:10, 342:13

**Office** [2] - 1:15, 36:21

**officer** [11] - 167:13, 167:18, 167:24, 168:1, 168:9, 168:10, 168:11, 257:12, 286:17, 339:16, 341:25

**Officers** [1] - 255:3

**officers** [11] - 56:15, 94:22, 168:4, 168:5, 168:11, 168:12, 245:11, 245:17, 246:17, 246:18, 354:23

**official** [8] - 12:25, 15:17, 16:22, 17:11, 17:14, 42:5, 46:10, 327:19

**officially** [2] - 49:8, 51:14

**often** [7] - 44:22, 44:23, 54:6, 185:10, 191:2, 231:6, 243:12

**oil** [2] - 188:13, 188:14

**OLALDE** [2] - 165:16, 165:22

**Olalde** [1] - 4:13

**Old** [2] - 51:1, 51:5

**old** [5] - 55:4, 56:12, 58:2, 156:1, 201:16

**Oldham** [119] - 61:5, 61:8, 62:3, 64:8, 66:4, 67:21, 69:2, 71:18, 72:9, 72:12, 74:17, 74:18, 74:23, 76:18, 82:17, 83:6, 86:19, 87:10, 90:1, 103:7, 124:23, 129:9, 134:18, 151:4, 151:6, 161:2, 163:1, 163:3, 165:3, 178:7, 178:13, 178:14, 178:22, 179:13, 180:4, 180:11, 180:19, 181:21, 181:25, 182:6, 183:15, 183:24, 184:3, 187:17, 188:2, 189:11, 189:17, 189:22, 190:9, 191:15, 192:2, 192:6, 192:12, 192:17, 193:2, 193:4, 193:11, 194:2, 194:8, 194:16, 195:4, 195:16, 196:5, 196:7, 197:6, 197:12, 198:16, 201:15, 202:9, 202:17, 203:13, 204:6, 204:9, 204:14, 205:5, 205:11, 205:14, 205:18, 206:13, 207:4, 207:20, 207:21, 208:22, 209:4, 210:9, 210:17, 211:3, 212:20, 235:20, 236:2, 236:5, 236:10, 239:3, 263:17, 264:25, 283:21, 284:16,

286:20, 287:1, 287:3, 288:11, 290:2, 292:17, 292:18, 293:6, 297:19, 297:22, 297:25, 298:9, 299:24, 300:8, 300:15, 301:8, 301:21, 302:2, 304:4, 304:13, 308:8, 355:25

**oldham** [1] - 164:2

**Oldham's** [2] - 87:4, 140:5

**once** [12] - 49:12, 90:15, 146:10, 194:21, 212:13, 225:8, 243:14, 243:15, 256:14, 296:14, 321:7

**One** [1] - 4:10

**one** [177] - 7:6, 7:15, 12:18, 14:21, 16:24, 17:7, 17:20, 17:25, 20:6, 22:2, 25:7, 27:9, 27:14, 30:6, 31:15, 32:20, 33:8, 37:10, 43:10, 43:22, 43:24, 44:13, 46:18, 51:1, 53:12, 54:17, 56:7, 56:8, 56:11, 57:20, 58:15, 58:18, 59:14, 60:12, 61:6, 63:3, 65:3, 69:5, 69:6, 69:10, 69:11, 70:5, 71:12, 71:15, 73:12, 76:21, 78:12, 78:13, 78:22, 82:11, 88:3, 94:3, 99:17, 102:4, 102:5, 102:17, 104:18, 104:24, 104:25, 110:17, 110:24, 112:18, 115:5, 115:9, 115:22, 126:17, 131:13, 132:18, 133:17, 134:23, 137:23, 138:12, 138:16, 142:3, 142:14,

142:16, 142:18, 150:18, 151:6, 151:8, 151:12, 151:15, 155:8, 155:22, 158:22, 163:23, 170:5, 172:17, 175:22, 176:5, 177:19, 185:12, 188:24, 191:1, 192:8, 195:3, 196:23, 197:8, 198:5, 198:20, 199:6, 205:1, 207:13, 214:9, 219:22, 220:5, 223:14, 223:16, 224:10, 227:23, 229:18, 229:20, 231:8, 231:11, 234:9, 237:15, 242:4, 250:14, 259:2, 260:9, 260:11, 267:18, 267:19, 274:7, 274:19, 276:5, 276:14, 282:14, 283:8, 284:17, 288:17, 297:5, 299:10, 303:8, 303:17, 303:19, 304:6, 304:17, 306:16, 308:21, 312:25, 313:3, 315:23, 316:6, 316:23, 317:9, 317:14, 320:25, 321:7, 321:24, 322:12, 324:21, 329:17, 329:22, 330:1, 336:15, 338:1, 339:9, 342:1, 343:17, 343:21, 343:22, 345:4, 346:25, 347:17, 348:8, 348:9, 356:16, 356:17

**ones** [6] - 77:6, 81:5, 196:6, 307:17, 332:7, 332:16

**ongoing** [2] - 106:23, 238:4

**online** [4] - 135:9, 307:3, 327:16, 327:21

**Open** [5] - 52:2, 52:23, 53:8, 232:9, 306:19

**open** [15] - 80:6, 102:24, 132:23, 218:20, 229:21, 237:5, 242:14, 242:18, 244:18, 249:18, 279:2, 306:12, 327:7, 330:25, 333:13

**open-meeting** [1] - 279:2

**opened** [1] - 213:18

**opening** [2] - 181:9, 353:20

**openly** [1] - 308:24

**opens** [1] - 353:17

**operating** [1] - 210:1

**operation** [1] - 48:4

**operations** [1] - 168:5

**opinion** [13] - 8:22, 8:24, 19:18, 31:23, 32:8, 51:22, 63:8, 68:21, 83:22, 104:14, 117:24, 122:17, 122:19

**opinions** [1] - 332:8

**Oppenheim** [1] - 330:3

**opponent** [2] - 172:6, 172:7

**opportunities** [1] - 18:22

**opportunity** [17] - 15:9, 18:19, 19:20, 20:20, 34:8, 48:22, 50:15, 50:21, 97:15, 97:19, 107:12, 157:24, 158:21, 232:15, 234:14, 268:1, 272:9

**opposed** [4] - 58:9, 69:11, 102:5, 279:19

**opposite** [3] -

232:25, 238:1, 356:2

**opposition** [2] - 131:13

**Optimal** [4] - 195:15, 302:24, 304:17, 304:18

**optimal** [7] - 304:19, 304:21, 305:3, 305:4, 305:12, 305:20, 306:23

**option** [3] - 220:24, 237:14, 332:3

**options** [5] - 71:16, 219:9, 254:6, 304:19, 349:20

**orange** [1] - 125:16

**order** [17] - 7:1, 7:17, 57:20, 58:16, 59:13, 59:14, 59:19, 59:22, 149:1, 159:7, 159:12, 161:23, 175:16, 216:24, 302:14, 330:7

**ordinarily** [2] - 55:3, 55:4

**organization** [3] - 169:12, 241:4, 241:8

**organizations** [2] - 12:13, 132:24

**organize** [1] - 221:3

**organized** [1] - 227:14

**Organizer** [1] - 300:25

**original** [3] - 131:4, 158:4, 183:25

**originally** [3] - 211:19, 337:20, 338:6

**otherwise** [4] - 289:12, 303:3, 327:21, 353:12

**ought** [1] - 96:9

**outcome** [1] - 33:18

**outlines** [1] - 199:10

**outside** [5] - 54:10, 97:17, 239:24, 263:21

**outvoted** [1] - 60:25

**overall** [3] - 15:12, 27:3, 285:13

**overflow** [4] - 228:23, 228:25, 229:1, 232:21

**overhauls** [1] - 170:11

**overlaid** [1] - 94:14

**overlay** [1] - 95:2

**overrule** [2] - 207:25, 352:13

**overruled** [3] - 26:9, 102:10, 344:25

**overwhelming** [2] - 202:15, 331:9

**overwhelmingly** [2] - 202:14, 202:15

**own** [17] - 9:10, 12:8, 12:10, 65:5, 89:15, 157:20, 189:8, 235:4, 235:7, 243:10, 293:23, 311:6, 317:13, 340:2, 341:19, 355:1, 355:4

**owning** [1] - 170:5

**P**

**P.M** [1] - 1:5

**p.m** [13] - 82:4, 93:7, 93:10, 114:15, 157:4, 206:5, 281:22, 289:15, 301:5, 339:4, 339:6, 357:2

**pack** [1] - 276:11

**package** [1] - 92:7

**packed** [2] - 88:13, 285:18

**packet** [1] - 60:16

**page** [77] - 8:9, 8:13, 9:2, 9:15, 26:1, 61:24, 66:19, 68:25, 72:7, 76:6, 76:12, 81:13, 85:23, 87:4, 87:13, 117:7, 121:15, 123:18, 130:13, 141:17, 144:9, 144:12, 144:14, 144:15, 156:15, 186:8, 186:17, 195:13, 195:23, 199:5, 199:24, 203:22, 203:23, 216:11, 216:20, 222:8, 256:19, 256:21, 262:4, 264:12, 264:15, 265:21, 267:4, 268:3, 268:4, 269:19, 274:13, 274:20, 275:24, 276:8, 276:23, 285:9, 287:12, 299:7, 310:1, 312:5, 313:6, 316:13, 320:6, 320:13, 325:15, 327:1, 327:2, 327:17, 327:19, 328:3, 328:17, 328:18, 328:21, 329:1, 329:23, 330:1, 331:13, 331:17, 332:6

**Page** [1] - 6:7

**pages** [5] - 85:22, 86:1, 98:25, 99:1, 270:5

**paid** [1] - 349:5

**painlessly** [1] - 244:8

**paint** [1] - 56:25

**Palmer** [7] - 14:5, 69:19, 69:20, 69:24, 70:23, 70:24

**pancreatic** [1] - 75:22

paper [3] - 21:2, 22:1, 106:15

paperwork [1] - 287:19

paragraph [18] - 24:5, 26:2, 26:22, 116:24, 117:11, 186:8, 186:10, 186:13, 216:23, 263:19, 265:23, 265:24, 269:3, 274:20, 274:24, 279:17, 285:10, 289:18

pardon [1] - 286:8

parents [3] - 46:22, 47:6, 47:12

Park [8] - 44:4, 44:6, 44:9, 111:2, 111:4, 227:15, 255:9

park [3] - 47:7, 191:3, 255:16

parked [1] - 75:11

parking [3] - 188:15, 227:22, 227:25

parks [1] - 189:7

Parks [1] - 189:9

Parsons [3] - 24:10, 173:25, 274:17

part [40] - 15:20, 16:11, 17:3, 39:15, 40:5, 40:7, 41:10, 42:14, 42:20, 42:21, 44:19, 69:22, 70:5, 70:6, 94:25, 95:5, 114:7, 125:15, 125:16, 126:3, 126:4, 132:12, 132:17, 165:19, 168:16, 168:22, 247:17, 247:20, 247:25, 251:5, 253:13, 255:10, 272:18, 274:2, 281:24, 282:3, 293:24, 318:10, 331:2, 331:3

participate [2] -

15:14, 136:22

participation [4] - 214:11, 214:14, 227:6, 227:18

Participation [1] - 265:22

particular [15] - 14:21, 17:20, 53:10, 68:4, 74:19, 76:3, 94:12, 99:17, 101:14, 132:1, 174:9, 179:21, 197:2, 216:23, 240:5

particularly [2] - 231:12, 240:1

parties [7] - 33:16, 205:12, 248:21, 249:20, 250:11, 313:17, 351:24

partisan [6] - 201:3, 304:8, 321:16, 321:21, 322:7, 322:9

partisanship [2] - 173:15, 208:19

partnered [1] - 244:17

parts [14] - 68:23, 132:24, 151:23, 170:9, 270:17, 270:23, 270:25, 271:2, 273:6, 273:7, 351:8

Party [7] - 37:21, 45:14, 45:17, 121:18, 126:14, 208:14, 221:10

party [13] - 32:15, 32:21, 171:2, 249:14, 249:15, 249:23, 250:14, 294:12, 294:14, 294:17, 294:18

party-driven [1] - 249:14

pass [9] - 22:22, 113:19, 161:9, 164:9, 250:19, 343:8, 346:19, 355:6, 356:8

passed [12] -

128:5, 136:23, 137:6, 139:16, 159:14, 236:24, 269:11, 269:13, 342:21, 343:2, 349:4

passing [1] - 297:2

past [8] - 211:15, 211:19, 242:21, 253:22, 262:14, 278:2, 279:19, 337:19

pasted [1] - 278:18

pastors [1] - 39:23

paths [1] - 14:18

patience [1] - 114:17

patient [1] - 93:19

PATRICK [2] - 6:8, 11:12

Patrick [4] - 10:24, 11:18, 33:2, 279:15

Paul [25] - 62:3, 71:18, 72:9, 73:22, 74:17, 74:24, 75:3, 128:15, 129:7, 179:12, 180:3, 187:17, 204:6, 205:5, 261:10, 261:14, 263:4, 263:7, 263:16, 287:13, 289:16, 301:12

pause [1] - 166:4

pavilion [1] - 227:16

pay [4] - 246:9, 248:23, 249:17, 349:8

paying [3] - 30:17, 294:2, 310:19

payroll [4] - 225:20, 259:1, 259:13, 259:24

payroll-only [1] - 225:20

pays [1] - 246:11

PDF [3] - 268:3,

269:19, 329:23

peace [3] - 245:11, 246:16, 246:18

Peace [6] - 13:4, 13:5, 13:9, 13:12, 15:13, 177:19

Pearl [1] - 1:19

peek [1] - 277:16

Pelican [1] - 72:17

penalties [2] - 52:23, 52:25

penalty [4] - 312:8, 312:18, 312:23, 323:11

Peninsula [24] - 14:4, 27:2, 29:2, 72:18, 101:12, 118:2, 121:23, 121:24, 122:25, 123:1, 123:5, 123:12, 123:13, 123:20, 124:22, 186:20, 187:4, 200:2, 269:14, 270:1, 270:8, 273:12, 315:1, 346:15

peninsula [2] - 186:24, 187:5

Pennsylvania [3] - 3:14, 3:17, 3:21

people [85] - 18:15, 18:18, 24:18, 26:20, 29:2, 30:1, 39:19, 43:2, 43:5, 43:24, 44:23, 46:7, 46:21, 47:23, 52:13, 57:5, 74:21, 86:4, 88:14, 88:23, 94:12, 94:20, 97:17, 97:18, 106:25, 120:16, 121:5, 121:19, 123:9, 132:16, 135:7, 135:21, 135:25, 152:3, 157:25, 161:14, 182:12, 198:8, 212:16, 213:2, 213:9, 226:13,

226:25, 227:14, 231:12, 231:25, 232:17, 232:18, 232:21, 233:15, 233:18, 233:25, 234:8, 241:9, 242:7, 242:8, 242:9, 242:12, 244:12, 244:23, 246:7, 248:16, 268:13, 268:21, 268:22, 291:16, 291:17, 320:21, 320:24, 326:22, 327:22, 327:24, 335:19, 335:22, 336:1, 336:5, 336:11, 336:12, 336:14, 339:21, 341:12, 343:3, 354:20

people's [1] - 191:12

peoples [1] - 39:20

per [5] - 233:10, 262:10, 301:2, 345:13, 345:15

perceived [2] - 22:12, 319:18

percent [10] - 70:15, 118:5, 118:6, 119:4, 124:9, 198:14, 198:15, 241:16, 241:18

percentage [1] - 240:15

percentages [1] - 151:10

perform [14] - 63:16, 118:7, 118:11, 118:13, 118:14, 118:16, 118:19, 118:20, 119:11, 119:12, 119:13, 119:15, 152:3, 198:6

performance [1] - 239:10

performed [1] - 124:7

performs [1] - 123:8

period [30] - 16:18, 16:24,

17:2, 17:5, 17:9, 17:10, 17:13, 31:8, 48:15, 87:9, 155:11, 167:3, 181:9, 183:5, 183:14, 183:17, 192:18, 193:10, 217:3, 220:2, 220:11, 224:10, 230:24, 281:19, 283:2, 296:12, 327:7, 353:17, 353:21

**periods** [1] - 31:4

**perjury** [4] - 312:8, 312:18, 312:23, 323:11

**permanent** [1] - 233:2

**permission** [1] - 349:16

**permitted** [1] - 100:12

**person** [16] - 61:13, 85:4, 138:16, 151:5, 158:2, 230:23, 232:13, 247:19, 248:7, 256:23, 263:8, 281:6, 281:9, 286:11, 306:16, 326:22

**personal** [6] - 240:2, 240:7, 241:7, 243:4, 326:25, 327:2

**personally** [16] - 248:7, 248:11, 256:17, 257:23, 271:18, 296:1, 302:9, 302:10, 319:25, 321:18, 323:25, 324:2, 324:3, 324:4, 326:25, 330:24

**personnel** [1] - 246:4

**perspective** [2] - 87:20, 249:22

**persuaded** [1] - 347:18

**PETTEWAY** [3] - 1:4, 1:11, 2:2

**Petteway** [8] - 6:4, 7:17, 8:9, 8:12, 31:23,

32:13, 32:15, 32:16

**Phillips** [1] - 4:24

**philosophicall y** [1] - 278:1

**phone** [17] - 66:21, 67:9, 78:7, 81:16, 82:3, 106:13, 107:16, 150:10, 150:14, 164:19, 173:2, 178:18, 191:21, 192:3, 192:18, 194:4, 289:1

**phoned** [1] - 74:22

**phones** [1] - 41:5

**phrase** [5] - 45:24, 53:1, 53:4, 53:7, 84:18

**physically** [2] - 193:11, 301:9

**pick** [1] - 31:8

**picking** [2] - 72:15, 324:4

**picture** [2] - 56:25, 256:19

**pictures** [1] - 328:11

**piece** [1] - 126:5

**pieces** [1] - 170:11

**pilot** [1] - 168:6

**pitch** [1] - 49:13

**place** [27] - 16:17, 18:14, 21:16, 21:19, 53:24, 76:22, 80:6, 104:24, 134:24, 198:18, 213:9, 244:13, 247:12, 248:1, 248:25, 249:8, 254:5, 260:10, 260:11, 281:20, 301:24, 302:1, 327:23, 328:4, 330:16, 333:16, 345:7

**placed** [2] - 29:3, 49:22

**places** [2] - 272:25, 273:11

**plaintiff** [2] - 33:3, 343:10

**plaintiffs** [19] - 7:4, 7:16, 10:13, 10:16, 10:22, 10:23, 33:18, 34:11, 34:13, 127:22, 165:17, 250:22, 252:21, 252:25, 324:23, 344:6, 344:16, 351:17, 356:15

**PLAINTIFFS** [4] - 1:11, 2:2, 2:12, 3:2

**plaintiffs'** [5] - 118:23, 165:12, 252:10, 344:18, 352:17

**Plaintiffs'** [10] - 6:4, 6:18, 7:20, 7:23, 9:24, 9:25, 25:12, 133:15, 156:5, 163:19

**PLAINTIFFS'** [1] - 6:17

**Plan** [6] - 110:23, 111:3, 195:7, 196:3, 302:24, 304:17

**plan** [42] - 16:12, 19:13, 63:13, 87:3, 100:1, 195:6, 196:12, 214:5, 219:17, 220:7, 221:3, 221:6, 221:18, 223:11, 237:5, 254:5, 259:17, 265:8, 273:15, 274:22, 274:23, 275:2, 276:3, 276:10, 302:2, 303:13, 303:16, 303:17, 303:20, 303:22, 304:19, 305:7, 305:12, 305:20, 306:23, 313:9, 314:6, 316:10, 316:15, 316:19, 348:5, 348:6

**planned** [3] - 310:9, 337:2, 338:22

**planning** [5] - 131:7, 218:1,

337:8, 337:10, 337:11

**plans** [4] - 150:22, 201:11, 267:7, 304:20

**plant** [1] - 35:25

**plaque** [4] - 247:13, 247:14, 247:15, 247:20

**played** [2] - 182:18, 251:14

**playing** [2] - 115:24, 251:8

**Plaza** [1] - 4:10

**plenty** [1] - 352:8

**PLLC** [1] - 4:17

**plus** [3] - 118:5, 246:11, 346:17

**pocket** [1] - 189:7

**podium** [1] - 251:11

**poem** [4] - 106:1, 106:2, 106:3, 106:4

**point** [68] - 31:7, 43:6, 55:21, 58:5, 61:2, 64:12, 68:12, 74:9, 77:2, 87:10, 99:15, 100:17, 100:19, 100:21, 100:25, 102:4, 104:23, 119:3, 119:16, 121:20, 129:7, 130:20, 142:21, 145:17, 145:24, 148:25, 149:11, 152:23, 157:18, 157:23, 158:9, 163:3, 165:1, 165:6, 172:3, 172:8, 176:17, 182:1, 182:8, 184:19, 187:14, 189:18, 197:23, 206:13, 208:6, 208:25, 209:9, 209:12, 211:17, 212:5, 213:18, 214:6, 270:20, 275:24, 278:15, 278:19, 280:4, 282:8, 293:4, 293:5, 295:13, 296:17, 297:8,

322:8, 332:2, 340:18, 340:21

**pointing** [6] - 147:13, 147:17, 147:19, 147:20, 147:22, 147:24

**points** [3] - 121:17, 188:15, 314:2

**polarized** [7] - 90:9, 91:21, 96:9, 276:12, 314:12, 314:16, 314:22

**Police** [1] - 255:3

**police** [2] - 40:25, 56:14

**policy** [5] - 49:15, 168:16, 169:10, 240:9, 332:11

**politic** [1] - 161:19

**political** [7] - 41:6, 82:9, 197:20, 198:1, 239:10, 254:19, 304:4

**politically** [3] - 47:20, 70:10, 198:7

**politics** [7] - 37:12, 37:15, 166:25, 170:12, 170:19, 197:18, 198:13

**Polizzano** [1] - 2:16

**poll** [3] - 248:15, 248:17, 248:22

**polling** [7] - 43:12, 43:13, 43:15, 43:21, 44:5, 44:11, 51:24

**polls** [4] - 241:9, 248:2, 248:15, 248:16

**popped** [1] - 86:18

**popping** [1] - 356:20

**popular** [2] - 37:19, 37:21

**population** [42] - 27:5, 27:20, 27:23, 27:24,

64:10, 64:11, 67:23, 70:14, 71:5, 71:11, 74:7, 74:8, 75:2, 82:15, 91:6, 94:10, 94:19, 94:24, 110:16, 110:18, 117:25, 122:2, 183:20, 188:5, 198:13, 224:14, 239:23, 252:15, 276:3, 280:15, 280:16, 285:10, 285:14, 285:16, 287:17, 292:9, 293:9, 320:2, 333:8, 346:17

populations [6] - 27:6, 66:24, 129:9, 272:22, 273:3, 273:8

populous [1] - 103:19

portion [8] - 10:4, 24:7, 169:6, 210:24, 215:1, 232:4, 266:9, 285:13

portions [1] - 157:24

position [6] - 102:4, 120:8, 168:2, 316:15, 331:20, 340:6

possibility [1] - 218:18

possible [16] - 65:19, 68:8, 228:15, 243:7, 244:8, 252:4, 252:13, 252:17, 258:15, 258:17, 258:25, 268:20, 276:4, 278:17, 352:4, 352:10

possibly [5] - 113:10, 211:21, 267:1, 291:3, 337:21

post [15] - 210:3, 210:4, 213:22, 218:4, 219:13, 221:10, 244:2, 255:19, 255:22, 255:25, 256:15, 293:18, 326:20,

328:7, 338:10

posted [26] - 79:24, 80:12, 80:17, 81:6, 139:7, 153:21, 212:3, 213:14, 213:20, 213:21, 213:22, 214:1, 256:8, 267:12, 297:3, 297:5, 307:3, 307:6, 326:11, 326:21, 327:16, 332:21, 335:16, 338:12, 342:19

posting [12] - 48:9, 48:10, 49:11, 103:1, 213:12, 310:12, 325:20, 325:21, 326:1, 326:4, 333:1, 337:1

postponed [3] - 78:16, 137:7, 137:8

posts [1] - 256:17

potentially [2] - 56:3, 239:14

poverty [2] - 241:16, 242:8

power [1] - 39:21

Power [2] - 35:23, 35:25

practice [4] - 21:1, 36:17, 258:16, 268:13

practiced [1] - 36:18

pre [3] - 36:2, 302:6, 302:11

pre-existing [2] - 302:6, 302:11

pre-lightning [1] - 36:2

precinct [126] - 13:8, 13:12, 13:23, 15:8, 17:21, 18:11, 18:12, 19:19, 28:3, 38:4, 38:10, 41:11, 43:3, 45:20, 46:8, 62:20, 63:19, 64:11, 66:23, 66:24,

67:1, 67:21, 68:3, 69:15, 69:16, 70:5, 70:7, 70:25, 71:1, 71:13, 71:14, 71:15, 72:20, 74:6, 97:8, 101:24, 104:5, 104:6, 104:7, 104:15, 105:18, 117:15, 129:10, 143:6, 143:10, 151:7, 151:13, 151:23, 152:3, 152:4, 171:3, 175:24, 184:21, 184:23, 184:24, 187:1, 187:7, 187:13, 188:6, 188:8, 190:6, 195:18, 196:23, 197:8, 197:10, 197:16, 198:20, 200:24, 202:7, 216:25, 234:20, 236:25, 237:21, 249:4, 252:13, 252:16, 269:23, 269:24, 271:10, 271:20, 281:25, 292:10, 294:10, 297:14, 302:6, 302:25, 303:2, 303:6, 303:12, 305:5, 305:6, 305:14, 305:16, 305:20, 305:22, 305:25, 308:14, 315:9, 315:12, 315:17, 316:22, 316:23, 317:15, 317:17, 317:22, 318:14, 319:12, 319:13, 319:16, 319:19, 320:8, 321:8, 321:14, 321:23, 327:10, 327:11, 333:5, 348:10, 349:9, 351:13, 353:2, 353:11

Precinct [87] - 13:10, 13:12, 13:25, 14:1, 20:10, 24:8, 24:9, 25:5, 25:9, 27:2, 27:3, 27:4, 27:11, 28:5, 28:9, 28:25, 29:1, 38:6,

38:24, 38:25, 39:9, 40:10, 40:13, 40:20, 41:8, 45:16, 45:24, 46:12, 47:14, 48:2, 63:10, 69:4, 69:8, 69:13, 69:20, 69:21, 69:23, 70:2, 70:6, 70:7, 70:8, 71:14, 72:15, 72:17, 72:19, 82:14, 82:15, 98:19, 101:13, 118:1, 118:5, 121:23, 122:1, 122:12, 123:25, 124:22, 125:16, 126:3, 198:10, 201:16, 202:10, 250:10, 269:14, 269:25, 270:8, 270:9, 270:11, 270:19, 270:23, 271:9, 271:20, 272:6, 272:14, 273:5, 302:11, 302:19, 303:9, 305:17, 306:7, 319:9, 319:12, 345:19, 346:16, 353:3

precinct-level [1] - 67:1

precincts [50] - 40:12, 40:22, 43:3, 67:24, 69:17, 69:25, 70:18, 70:19, 70:21, 82:16, 83:2, 104:2, 104:19, 118:2, 129:11, 143:1, 152:6, 176:1, 177:10, 195:8, 199:2, 200:7, 200:12, 200:20, 208:18, 239:1, 265:17, 266:8, 287:18, 291:14, 292:13, 292:21, 302:21, 303:21, 304:5, 318:25, 319:23, 320:1, 320:12, 320:20, 320:23, 320:24, 321:2, 321:3, 321:10, 327:6, 328:16, 328:19,

351:11

preclear [2] - 20:4, 346:7

preclearance [18] - 16:9, 32:17, 68:14, 127:9, 127:15, 127:16, 128:6, 128:9, 175:11, 176:4, 176:14, 179:3, 265:7, 265:12, 265:19, 268:6, 269:18, 349:12

precleared [2] - 20:1, 274:5

predominant [1] - 44:16

predominantly [8] - 121:25, 123:21, 151:21, 255:14, 255:17, 272:22, 350:21, 351:3

prefer [2] - 223:20, 233:1

preferably [1] - 219:15

preference [7] - 87:16, 197:7, 197:9, 259:25, 303:7, 310:11, 333:4

preferences [2] - 298:7, 311:10

preferred [2] - 87:11, 197:7

preliminary [7] - 266:1, 266:7, 266:12, 307:11, 307:14, 307:16, 307:25

prep [1] - 118:24

preparation [1] - 184:6

prepare [2] - 59:13, 257:22

prepared [5] - 59:23, 64:15, 64:17, 117:9, 194:9

presence [1] - 276:12

present [13] -

18:22, 19:4, 35:5, 60:1, 79:1, 89:8, 96:20, 192:5, 192:8, 219:21, 308:1, 316:14, 351:25

presentation [6] - 165:4, 291:5, 292:7, 293:11, 293:17, 341:6

presented [10] - 18:21, 22:5, 29:7, 72:12, 195:17, 197:6, 266:1, 266:6, 269:6, 293:19

presents [1] - 193:12

preserve [2] - 132:25, 252:18

presiding [4] - 257:12, 286:17, 339:16, 341:25

pretrial [1] - 343:9

pretty [15] - 15:8, 19:2, 42:22, 45:6, 101:16, 171:15, 171:22, 172:1, 194:18, 220:25, 221:2, 241:24, 281:16, 285:3, 300:6

prevailing [1] - 33:16

prevent [2] - 53:15, 342:3

prevented [1] - 232:23

previous [3] - 275:4, 275:12, 275:13

previously [4] - 19:12, 35:6, 145:9, 276:15

pride [3] - 45:24, 46:7, 46:9

prideful [1] - 48:1

primaries [4] - 16:25, 30:15, 30:17, 217:17

primaries' [1] - 31:3

primary [13] - 16:19, 17:4,

30:22, 197:22, 197:25, 208:16, 217:3, 248:20, 280:20, 280:22, 281:1, 281:21, 356:15

principles [3] - 66:7, 66:10, 105:7

priorities [1] - 89:1

prioritizing [2] - 254:4, 254:6

priority [3] - 45:17, 315:7, 348:9

private [4] - 21:1, 170:1, 279:6, 340:25

privately [4] - 297:9, 307:4, 308:1, 308:21

privilege [2] - 253:4, 253:6

problem [9] - 81:9, 120:7, 201:17, 227:7, 236:9, 244:20, 308:14, 308:17, 333:9

procedurally [1] - 100:11

Procedure [1] - 313:20

Procedures [1] - 215:19

proceed [5] - 76:6, 85:19, 166:12, 182:7, 206:8

proceedings [1] - 357:7

Proceedings [2] - 5:6, 357:2

process [112] - 16:4, 16:16, 17:17, 22:7, 27:1, 31:16, 48:13, 49:18, 59:25, 60:5, 62:8, 63:25, 65:17, 65:19, 65:20, 65:23, 68:11, 76:21, 79:14, 80:5,

98:9, 100:22, 101:3, 102:20, 102:21, 103:12, 109:3, 109:4, 132:23, 134:23, 140:5, 140:11, 140:20, 142:22, 148:5, 148:6, 154:2, 159:17, 173:4, 174:15, 175:3, 175:11, 177:24, 178:2, 178:23, 182:4, 187:13, 189:12, 190:11, 192:22, 193:2, 203:6, 206:19, 206:23, 209:20, 214:3, 221:5, 228:6, 235:23, 237:10, 243:10, 246:5, 249:9, 249:10, 249:14, 249:18, 252:2, 253:1, 254:9, 262:18, 274:4, 275:6, 275:10, 275:21, 279:25, 281:7, 283:18, 284:12, 286:4, 286:12, 286:21, 287:8, 287:9, 288:2, 289:5, 290:3, 293:24, 297:23, 298:19, 298:20, 298:23, 298:24, 299:2, 299:14, 299:17, 299:20, 300:4, 306:1, 307:10, 315:15, 324:14, 334:23, 336:9, 338:10, 340:18, 342:14, 342:15, 348:18, 356:5

processed [1] - 244:7

processes [2] - 148:7, 243:19

procure [1] - 89:15

produce [4] - 71:21, 79:9, 197:24, 206:24

produced [11] - 5:6, 111:22, 113:1, 113:15, 127:21, 127:24, 144:10, 252:11,

252:21, 275:18, 316:3

product [5] - 93:2, 310:15, 310:18, 337:12, 340:24

products [1] - 307:9

profiling [1] - 99:21

profit [2] - 12:16, 14:20

profits [1] - 12:14

program [7] - 41:18, 167:14, 188:13, 188:14, 188:15, 244:16, 245:24

programs [2] - 185:6, 185:9

prohibited [1] - 53:22

Project [6] - 2:10, 2:13, 2:20, 112:7, 112:8, 150:6

project [5] - 72:13, 211:16, 211:19, 337:19, 354:15

projects [1] - 211:12

promise [1] - 329:24

pronounce [1] - 178:10

proof [2] - 8:19, 49:10

proper [1] - 352:5

proposal [4] - 72:1, 72:3, 266:12, 269:6

Proposal [4] - 121:21, 123:19, 308:8, 327:23

proposals [15] - 73:12, 73:15, 84:7, 94:14, 105:11, 266:7, 298:1, 307:11, 307:14, 307:16, 310:22, 327:16, 330:5, 332:21, 335:11

propose [3] - 48:22, 156:21, 158:12

proposed [23] - 17:18, 24:21, 77:2, 90:13, 101:5, 115:4, 115:14, 115:17, 115:21, 116:9, 117:13, 118:16, 158:14, 182:12, 269:24, 275:2, 277:11, 306:20, 319:2, 327:7, 327:9, 329:7, 351:16

proposing [4] - 70:13, 277:17, 288:8, 311:11

prosecuted [1] - 75:17

prosecutor [1] - 75:15

protect [1] - 132:25

protection [1] - 45:16

protections [1] - 83:3

protocols [2] - 57:17, 99:15

provide [17] - 91:14, 128:19, 182:6, 182:14, 190:2, 209:11, 212:12, 212:17, 213:2, 213:3, 235:21, 240:15, 248:18, 266:25, 268:1, 277:23, 330:4

provided [13] - 74:2, 78:4, 90:12, 91:22, 169:24, 191:8, 199:10, 209:23, 267:17, 313:14, 322:18, 331:4, 334:6

provider [1] - 244:14

providers [1] - 242:6

provides [3] - 248:20, 257:24,

313:25

providing [7] - 89:13, 121:18, 130:3, 169:2, 229:21, 245:16, 248:21

Public [3] - 2:10, 4:21, 4:24

public [125] - 13:22, 16:12, 16:13, 17:17, 17:19, 18:2, 18:8, 21:22, 21:24, 48:8, 48:10, 52:15, 53:25, 76:22, 79:17, 86:2, 86:4, 88:11, 103:11, 103:22, 134:24, 152:17, 174:17, 174:22, 175:3, 182:1, 182:5, 183:4, 208:25, 209:1, 210:4, 213:1, 214:4, 214:15, 218:1, 218:16, 218:21, 219:10, 220:20, 224:10, 224:13, 227:6, 227:19, 230:13, 230:17, 230:23, 231:14, 232:1, 232:3, 232:7, 237:3, 237:23, 238:22, 255:19, 255:22, 256:21, 259:17, 264:20, 266:8, 266:25, 267:5, 267:9, 267:11, 267:12, 267:17, 268:1, 269:7, 279:7, 286:21, 286:23, 287:6, 287:24, 288:1, 291:5, 291:8, 291:12, 291:20, 292:4, 293:17, 293:20, 293:25, 294:9, 295:1, 295:4, 295:13, 297:2, 297:3, 307:20, 308:2, 310:17, 310:25, 315:11, 315:16, 317:8, 317:21, 323:2, 324:15, 325:15, 326:1, 326:4, 327:7, 327:14,

327:21, 329:21, 330:17, 330:18, 330:19, 331:7, 331:20, 332:11, 334:10, 335:8, 335:9, 335:21, 336:2, 336:9, 336:10, 340:19, 340:22, 341:3, 354:6

public's [2] - 317:4, 317:6

Publicity [1] - 265:22

publicly [6] - 251:25, 275:11, 279:2, 295:24, 297:8, 307:5

published [2] - 267:21, 267:22

pull [38] - 25:12, 61:21, 116:22, 117:11, 130:23, 133:14, 198:23, 203:17, 209:17, 210:11, 210:24, 215:3, 216:11, 222:2, 262:3, 262:5, 263:3, 264:11, 265:10, 269:11, 269:17, 275:15, 276:21, 279:11, 281:17, 282:15, 284:20, 287:12, 299:6, 300:24, 301:17, 309:17, 311:19, 316:2, 327:4, 331:13, 332:6, 337:13

pulled [6] - 235:17, 284:2, 309:24, 317:13, 317:15, 353:23

purportedly [1] - 324:24

purpose [9] - 26:24, 52:9, 70:13, 71:9, 89:13, 91:9, 92:15, 169:1, 275:3

purposely [1] - 227:24

purposes [2] - 82:9, 169:6

pursuant [3] -

307:20, 311:24, 312:9

pushed [3] - 56:10, 93:6, 237:24

put [72] - 21:15, 21:18, 25:9, 49:25, 50:15, 56:4, 60:21, 60:22, 62:24, 62:25, 83:25, 84:22, 86:25, 103:21, 104:3, 104:11, 105:17, 119:6, 119:22, 120:13, 123:14, 124:19, 126:25, 128:12, 129:22, 135:18, 139:25, 140:8, 140:11, 140:13, 140:23, 141:16, 149:16, 152:16, 156:22, 157:6, 157:11, 157:20, 169:23, 169:24, 179:10, 184:22, 191:12, 194:25, 212:15, 212:19, 221:12, 232:25, 233:2, 247:12, 247:14, 247:21, 248:1, 248:24, 286:2, 286:5, 286:6, 286:10, 292:16, 296:5, 296:21, 300:20, 310:19, 323:18, 326:7, 326:25, 341:13, 353:8, 353:15, 353:22, 353:24

puts [1] - 173:9

putting [8] - 157:7, 232:23, 239:22, 286:15, 294:20, 294:25, 315:6, 342:10

PX-100 [1] - 284:20

PX-129 [2] - 251:6, 251:14

PX-140 [1] - 287:12

PX-144 [1] - 289:14

PX-19 [1] - 276:21

PX-197 [2] - 195:1, 301:19

PX-202 [1] - 300:24

PX-23 [1] - 279:11

PX-538 [1] - 304:12

PX-539 [1] - 275:16

PX-588 [1] - 327:4

PX-593 [3] - 198:23, 311:19, 321:6

## Q

qualification [1] - 241:17

QUESTION [32] - 8:14, 8:21, 8:23, 9:3, 9:9, 87:6, 87:14, 87:19, 87:23, 142:11, 142:14, 142:18, 143:4, 143:6, 143:12, 143:14, 143:16, 144:13, 145:3, 145:7, 145:10, 145:13, 145:16, 145:19, 145:21, 146:2, 146:7, 146:12, 146:15, 147:10, 262:8, 320:7

questioning [1] - 253:3

questions [17] - 8:1, 25:21, 93:19, 96:25, 109:1, 115:22, 116:2, 116:6, 265:11, 271:15, 291:15, 325:11, 343:6, 343:11, 343:14, 344:7, 345:5

quick [6] - 32:12, 34:18, 117:5, 162:9, 344:24, 352:14

quickly [7] - 179:10, 199:14, 209:24, 243:7,

244:8, 328:24, 339:2

quiet [3] - 33:11, 230:15, 231:12

quite [7] - 19:2, 54:25, 113:8, 178:14, 185:3, 292:10, 320:11

quorum [14] - 52:14, 53:16, 53:17, 79:1, 79:22, 138:1, 138:10, 161:21, 161:24, 210:3, 218:8, 218:14, 218:15, 219:15

quorumed [1] - 53:25

quote [2] - 81:22, 251:20

## R

race [11] - 38:20, 41:8, 44:16, 51:22, 94:12, 111:5, 189:23, 190:10, 201:17, 249:24

races [2] - 94:9, 94:19

racial [23] - 40:1, 56:21, 67:23, 68:3, 68:21, 74:7, 75:2, 94:14, 94:25, 95:1, 95:15, 99:21, 104:7, 129:10, 151:10, 189:24, 201:18, 202:10, 238:25, 304:8, 308:9, 319:18, 329:6

racially [6] - 90:9, 91:21, 96:9, 314:12, 314:16, 314:22

rage [16] - 105:24, 106:9, 106:24, 159:21, 159:24, 160:4

raise [3] - 12:17, 34:17, 166:4

raised [2] - 162:7, 277:4

raising [1] -

242:11
rake [1] - 185:14
rakes [1] - 188:12
ran [3] - 170:6, 170:16, 171:16
Randy [2] - 5:2, 34:25
rangers [1] - 246:9
rank [1] - 167:21
rarely [1] - 54:10
Raschke [1] - 4:9
rate [3] - 40:15, 243:19, 283:23
rather [2] - 165:5, 321:24
RDR [1] - 5:4
re [9] - 15:4, 15:10, 19:23, 28:6, 28:8, 63:21, 104:14, 119:20, 356:9
re-cross [1] - 356:9
re-elect [1] - 119:20
re-elected [1] - 19:23
re-election [6] - 15:4, 15:10, 28:6, 28:8, 63:21, 104:14
reached [3] - 86:15, 178:13, 306:1
reaching [3] - 290:1, 290:2, 290:7
reaction [1] - 196:21
read [36] - 8:1, 10:8, 21:2, 26:2, 32:7, 111:11, 117:18, 122:6, 122:16, 132:3, 134:1, 134:10, 134:19, 135:1, 137:6, 137:8, 137:13, 143:2, 150:15, 150:23, 151:11, 157:24, 186:21, 234:18, 261:18, 269:22,

294:16, 294:21, 307:19, 330:19, 330:22, 330:25, 331:21, 332:4, 332:8, 332:16
read] [2] - 66:1, 112:15
reading [9] - 10:3, 22:1, 27:12, 117:19, 122:13, 122:16, 142:1, 142:2, 150:11
readmit [1] - 323:8
Ready [35] - 62:3, 71:19, 72:9, 73:22, 74:18, 74:24, 75:3, 107:21, 107:24, 128:15, 128:17, 128:21, 129:17, 129:18, 130:20, 179:12, 179:16, 187:17, 204:6, 205:5, 261:11, 261:14, 261:19, 263:4, 263:7, 263:16, 284:11, 287:13, 289:16, 289:18, 289:23, 290:2, 290:9, 301:12, 354:1
ready [11] - 7:4, 8:3, 11:11, 80:15, 81:4, 81:7, 89:10, 114:19, 165:7, 165:24, 261:21
real [5] - 12:8, 34:18, 162:9, 173:9, 247:19
realigned [1] - 18:11
realistic [1] - 70:18
realizing [1] - 313:19
really [48] - 23:4, 24:2, 24:18, 44:24, 46:4, 56:7, 57:4, 57:7, 57:8, 57:9, 59:6, 77:19, 136:22, 142:23, 159:22, 171:19, 173:10, 183:14, 183:19,

190:6, 191:5, 207:16, 208:13, 208:19, 210:1, 211:12, 214:12, 218:9, 221:6, 227:5, 234:9, 240:4, 241:12, 247:13, 248:4, 261:13, 262:13, 303:6, 315:24, 318:12, 331:13, 339:1, 350:5
reason [22] - 26:14, 65:21, 75:18, 117:20, 143:24, 147:2, 162:20, 171:12, 174:9, 174:12, 218:12, 223:17, 223:19, 238:6, 240:1, 240:5, 278:3, 290:7, 331:10, 335:18, 335:22, 344:17
reasonable [1] - 177:21
reasons [4] - 231:11, 274:7, 333:13
rebalance [1] - 292:20
rebalancing [1] - 285:10
recalled [1] - 301:13
receipt [1] - 213:12
receive [7] - 72:2, 133:6, 133:7, 214:21, 218:21, 232:2, 284:15
received [21] - 67:13, 97:10, 107:4, 143:14, 151:11, 156:18, 212:9, 212:14, 214:7, 217:20, 220:25, 221:22, 254:20, 269:5, 293:25, 329:17, 329:21, 330:9, 334:3, 352:19, 353:6
receiving [13] - 50:13, 71:24, 156:19, 177:3, 183:3, 209:20,

209:21, 215:10, 217:7, 219:18, 220:3, 222:13, 222:15
recent [4] - 20:23, 21:24, 48:12, 260:3
recently [5] - 12:9, 12:15, 12:20, 175:15, 183:9
Recess [3] - 85:14, 114:15, 206:5
recognizance [1] - 243:4
recognize [9] - 108:17, 108:18, 117:2, 149:19, 149:21, 264:16, 265:19, 268:8, 312:1
recognized [3] - 95:21, 276:1, 278:16
recollection [23] - 16:8, 17:1, 29:22, 31:6, 64:18, 131:24, 134:11, 159:15, 180:16, 184:12, 187:24, 190:8, 211:5, 213:14, 216:5, 254:13, 262:25, 268:21, 288:20, 290:21, 296:17, 299:16, 300:6
recommend [1] - 185:14
recommendation [1] - 189:2
recommended [1] - 156:12
reconstituted [2] - 73:5, 74:2
record [27] - 8:11, 11:17, 19:9, 38:1, 39:3, 61:16, 63:24, 72:22, 81:1, 127:23, 139:13, 191:25, 192:15, 193:19, 206:16, 223:22, 233:2,

234:18, 274:15, 278:10, 279:7, 285:6, 313:16, 323:7, 332:5, 339:3, 357:7
recorded [6] - 5:6, 65:8, 72:11, 76:12, 82:2, 326:16
recording [1] - 66:2
recreate [1] - 152:20
recreated [1] - 16:8
Red [2] - 114:7, 221:14
red [1] - 32:2
redacted [1] - 132:13
REDIRECT [2] - 161:10, 355:9
Redirect [2] - 6:12, 6:15
redirect [5] - 33:24, 33:25, 344:11, 344:13, 355:7
redistricted [1] - 252:7
Redistricting [7] - 151:4, 163:5, 164:3, 164:7, 186:14, 215:18, 350:4
redistricting [151] - 15:7, 15:11, 15:12, 15:14, 15:20, 15:21, 15:25, 16:2, 16:4, 17:16, 19:10, 20:23, 21:6, 21:7, 21:10, 21:16, 21:19, 22:7, 24:7, 24:10, 25:13, 27:1, 31:16, 55:20, 55:24, 59:25, 60:14, 61:3, 61:6, 61:7, 61:9, 62:13, 65:17, 66:7, 66:9, 68:11, 76:20, 78:10, 79:14, 82:5,

97:22, 98:2, 98:6, 98:9, 109:3, 109:4, 111:6, 120:23, 121:10, 132:19, 132:23, 134:23, 136:18, 139:25, 140:5, 140:11, 150:8, 150:22, 152:16, 153:25, 154:1, 154:7, 154:11, 156:12, 156:16, 156:22, 172:14, 172:19, 172:23, 173:4, 173:5, 173:8, 173:11, 173:18, 174:4, 174:7, 174:15, 174:18, 175:22, 177:24, 178:1, 179:22, 180:16, 187:20, 189:12, 190:11, 192:24, 195:8, 199:16, 205:15, 208:18, 254:11, 262:17, 262:20, 265:3, 265:6, 265:17, 265:25, 266:7, 266:12, 267:7, 269:5, 274:3, 274:4, 274:22, 275:4, 275:6, 275:11, 275:12, 275:20, 276:3, 276:10, 277:11, 279:21, 279:24, 280:17, 281:6, 283:18, 284:12, 286:4, 286:12, 288:25, 289:4, 290:3, 290:5, 290:9, 291:18, 291:19, 293:5, 293:7, 294:10, 296:14, 296:19, 301:2, 301:25, 310:10, 313:9, 314:6, 314:20, 315:8, 316:10, 316:15, 316:19, 318:19, 324:14, 334:11, 336:15, 340:19, 340:21, 342:14, 356:6

**redo** [1] - 251:20

**redraw** [2] - 252:5, 280:11

**redrawing** [1] - 291:14

**redrawn** [3] - 15:8, 28:2, 28:5

**reduce** [1] - 177:20

**reduced** [1] - 27:3

**reduces** [1] - 118:4

**reducing** [1] - 27:4

**refer** [5] - 28:16, 43:7, 200:3, 230:25, 265:3

**reference** [3] - 64:2, 204:1, 263:23

**referenced** [1] - 322:24

**referencing** [1] - 211:13

**referred** [1] - 126:17

**referring** [10] - 128:8, 210:13, 215:23, 223:14, 264:2, 267:11, 289:24, 299:12, 338:16, 343:24

**refers** [2] - 200:4, 337:15

**reflect** [4] - 159:12, 192:15, 193:20, 276:2

**reflecting** [1] - 280:15

**reflects** [3] - 191:25, 195:7, 205:4

**refresh** [8] - 131:24, 258:20, 262:25, 276:20, 277:14, 309:18, 315:23, 315:25

**refreshed** [2] - 114:19, 175:15

**regard** [6] - 26:25, 51:16, 53:7, 95:8, 112:11, 219:1

**regarding** [6] - 83:11, 112:7, 187:18, 314:11, 315:6, 315:12

**regardless** [2] - 218:7, 308:17

**regards** [1] - 50:7

**registered** [1] - 38:18

**regular** [23] - 93:20, 100:22, 225:2, 225:3, 225:7, 228:21, 258:23, 259:11, 260:9, 281:19, 282:2, 282:24, 309:9, 310:4, 310:7, 326:9, 336:22, 336:24, 337:3, 337:9, 338:3, 338:7, 338:17

**regularly** [7] - 21:2, 42:10, 42:11, 44:20, 138:14, 192:10, 259:10

**reinforced** [1] - 187:14

**rejected** [6] - 84:10, 84:11, 101:17, 273:22, 274:2, 274:7

**rejection** [2] - 25:18, 176:14

**relate** [3] - 320:11, 321:1, 321:2

**related** [18] - 14:21, 50:16, 168:14, 169:6, 170:5, 175:23, 176:1, 190:10, 207:16, 222:25, 241:2, 254:7, 290:8, 306:16, 310:9, 329:9, 351:23, 352:10

**relates** [3] - 94:20, 124:18, 208:20

**relating** [1] - 271:15

**relation** [2] - 98:9, 220:7

**relationship** [10] - 14:10, 14:12, 14:13, 14:24, 46:24, 47:3, 239:20, 239:21, 239:25, 240:2

**relax** [1] - 277:6

**relaying** [1] - 81:16

**release** [9] - 48:13, 181:5, 182:21, 182:22, 183:21, 183:25, 326:21, 341:7, 346:2

**released** [13] - 67:4, 182:24, 183:4, 183:16, 215:17, 258:10, 290:19, 290:21, 290:25, 291:4, 291:12, 295:14, 325:8

**releasing** [2] - 290:16, 292:10

**relied** [1] - 257:11

**relief** [2] - 33:17, 33:19

**relocated** [1] - 27:1

**rely** [3] - 42:10, 95:14, 173:8

**remain** [1] - 185:8

**remained** [1] - 68:18

**remaining** [1] - 68:23

**remember** [93] - 16:10, 17:6, 17:7, 18:17, 20:8, 62:12, 62:15, 63:1, 63:3, 141:2, 141:3, 141:5, 141:7, 141:9, 143:21, 144:7, 144:10, 146:9, 150:11, 150:12, 154:11, 162:15, 175:9, 175:13, 175:21, 176:13, 177:2, 178:5, 178:22, 179:2, 180:19, 180:23, 183:7, 184:8, 185:15, 186:5, 194:6, 194:7, 194:11, 195:19, 196:4, 196:10, 196:11, 196:15, 196:17, 198:1, 201:19, 207:3, 207:13, 209:22, 215:10, 216:7, 220:12, 221:9, 221:14, 221:17, 221:24, 222:13, 222:14, 222:16, 239:16, 251:1, 253:20, 255:5, 258:14, 262:24, 264:10, 269:16, 284:17, 288:14, 288:16, 289:23, 290:11, 290:12, 290:13, 300:12, 300:16, 301:8, 301:15, 302:2, 307:21, 307:22, 313:3, 313:25, 314:23, 319:3, 325:25, 326:3, 331:15, 334:15, 340:20, 343:25

**remembering** [2] - 177:6, 260:25

**remembers** [1] - 289:21

**removal** [3] - 29:1, 29:3, 346:15

**remove** [7] - 56:11, 58:6, 58:8, 247:6, 247:10, 247:15, 250:6

**removed** [3] - 58:2, 124:22, 247:14

**removing** [1] - 247:23

**renew** [2] - 225:22, 225:23

**repair** [1] - 170:10

**repairs** [1] - 170:10

**repeat** [1] - 127:10

**rephrase** [1] - 105:22

**replace** [1] - 346:1

**report** [3] - 96:1, 266:1, 330:8

**reported** [2] -

72:7, 72:12
Reporter [1] - 5:3
reporter [1] - 37:23
REPORTER [1] - 280:7
Reporter's [1] - 6:5
REPORTER' S [1] - 357:5
reports [1] - 252:22
represent [10] - 42:25, 93:24, 123:3, 123:9, 191:5, 275:18, 309:22, 309:23, 339:21, 356:21
representatio n [3] - 22:13, 200:1, 314:25
Representativ e [1] - 245:7
represented [2] - 84:13, 205:12
representing [2] - 200:5, 345:4
Republican [24] - 28:7, 28:13, 28:14, 63:20, 83:1, 83:3, 84:8, 84:14, 96:4, 118:2, 163:5, 164:3, 164:7, 171:23, 198:15, 202:16, 208:10, 208:14, 221:9, 221:10, 321:23, 322:5, 322:6, 350:3
Republican- leaning [1] - 321:23
Republicanize d [1] - 28:1
Republicans [6] - 27:18, 37:18, 172:8, 173:16, 198:9, 199:2
request [12] - 9:13, 49:9, 189:1, 190:6, 190:7, 247:10,

265:18, 316:16, 347:18, 348:11, 354:4
requested [3] - 151:10, 305:6, 305:15
require [3] - 262:10, 271:19, 291:14
required [7] - 49:2, 223:23, 225:5, 239:4, 271:9, 292:13, 321:14
requirement [1] - 297:24
requirements [4] - 199:19, 314:8, 315:5
Rescue [2] - 110:23, 111:3
research [2] - 316:21, 317:13
reservations [1] - 294:15
reserve [3] - 10:5, 168:25, 343:13
reserves [1] - 170:4
reservist [1] - 167:16
reside [2] - 122:1, 123:25
residence [7] - 200:24, 223:25, 298:17, 308:13, 321:9, 321:11, 321:13
resident [1] - 11:23
residents [12] - 24:11, 122:1, 122:3, 123:25, 186:24, 187:4, 187:6, 224:20, 255:16, 285:12, 327:11, 327:15
residents.. [1] - 186:20
Resolution [1] - 316:7
resolution [7] - 23:21, 275:20,

277:10, 277:12, 316:14, 316:17, 316:18
resolve [2] - 351:24, 352:18
resolved [4] - 63:15, 118:1, 177:4, 316:19
resonated [1] - 283:14
respect [7] - 39:23, 150:8, 169:4, 169:13, 191:6, 288:25, 349:9
respectfully [2] - 316:14, 316:16
respond [9] - 22:17, 131:19, 135:9, 135:10, 135:11, 150:16, 151:1, 232:7, 313:17
responded [2] - 93:5, 247:11
response [12] - 8:2, 33:22, 71:20, 100:8, 108:3, 131:25, 142:11, 151:3, 199:8, 199:11, 336:2, 336:3
responses [3] - 237:25, 311:20, 312:3
responsibilitie s [1] - 257:18
responsibility [6] - 48:1, 98:2, 248:5, 258:2, 281:11, 291:16
responsible [7] - 257:19, 281:9, 283:8, 342:7, 342:10, 342:13
responsive [5] - 9:12, 142:3, 142:18, 158:1, 169:22
rest [5] - 61:22, 78:11, 135:5, 136:18, 164:25
restrict [1] - 249:21

restricted [1] - 249:11
result [6] - 45:12, 71:22, 177:15, 197:21, 222:18, 354:5
results [8] - 73:4, 73:16, 73:19, 79:25, 198:2, 204:23, 266:2, 328:25
resume [1] - 206:6
retain [4] - 173:20, 181:3, 181:12, 287:16
retained [5] - 140:4, 140:6, 140:10, 181:25, 183:15
retainer [1] - 284:18
retaining [2] - 181:21, 183:2
retains [1] - 174:1
retention [2] - 60:13, 60:23
retired [2] - 167:19, 167:20
return [1] - 209:11
returns [1] - 193:11
revamp [1] - 243:10
review [12] - 16:16, 19:13, 19:17, 19:25, 133:2, 194:2, 219:23, 221:5, 221:7, 234:14, 312:24, 331:7
reviewed [4] - 91:21, 300:9, 312:16, 312:25
reviewing [3] - 86:20, 220:19, 222:16
revise [1] - 252:1
revised [3] - 20:17, 25:11, 31:19
revisit [1] - 314:2
revolve [1] - 41:8

Reyes [1] - 2:9
REYES [2] - 8:17, 9:7
Rice [1] - 36:14
Richard [1] - 2:16
Richardson [2] - 1:21, 334:13
rid [2] - 127:7, 240:19
rights [3] - 83:19, 106:21, 349:5
Rights [29] - 2:10, 2:13, 2:20, 3:13, 3:17, 3:20, 3:23, 4:3, 4:6, 68:23, 82:22, 83:4, 83:17, 84:2, 91:5, 106:21, 150:6, 178:16, 239:3, 265:16, 271:8, 271:19, 271:22, 276:13, 278:21, 285:11, 314:9, 314:11, 349:4
Riordan [1] - 4:23
Rios [7] - 90:7, 90:9, 90:19, 91:17, 95:6, 95:12, 95:21
Rios' [1] - 93:2
Rios's [2] - 93:14, 95:25
rise [4] - 85:13, 114:14, 206:4, 357:1
RMR [2] - 5:4, 357:10
road [2] - 98:8, 227:16
Road [15] - 17:25, 22:3, 55:10, 55:14, 55:18, 55:20, 55:22, 55:25, 56:1, 56:2, 56:9, 56:11, 56:20, 56:24, 74:21
roads [2] - 78:1, 125:7
Robert [1] - 4:5
role [3] - 182:18, 208:19, 261:4

rolling [4] - 53:15, 53:17, 335:14, 335:15

room [24] - 23:21, 57:6, 57:19, 57:21, 67:11, 88:14, 97:16, 99:3, 99:23, 99:24, 114:2, 128:4, 192:10, 207:14, 228:23, 228:24, 228:25, 229:1, 232:18, 232:21, 233:20, 333:20

roots [1] - 46:11

Rose [2] - 81:16, 81:21

Rosenberg [2] - 5:4, 242:14

roughly [2] - 87:6, 192:18

round [1] - 254:10

Roxy [11] - 120:15, 121:17, 122:10, 123:17, 127:3, 131:1, 131:12, 132:1, 132:10, 133:10, 150:8

RPR [1] - 5:4

RPV [1] - 91:5

Rule [1] - 352:6

rule [1] - 53:11

Rules [2] - 313:20, 352:3

rules [2] - 51:7, 54:3

ruling [1] - 68:13

run [15] - 15:4, 16:21, 28:6, 40:16, 45:10, 47:7, 47:9, 97:8, 97:10, 144:16, 171:6, 282:9, 303:7, 304:4, 304:6

runner [1] - 250:18

running [7] - 16:24, 28:21, 31:4, 49:14, 198:9, 241:14, 258:2

runs [1] - 82:21

Russo [11] - 4:9, 6:10, 6:12, 205:25, 206:8, 253:16, 284:3, 292:18, 301:14, 337:14, 355:7

RUSSO [63] - 7:21, 10:12, 10:18, 10:20, 166:2, 166:12, 166:17, 179:10, 179:11, 185:23, 186:4, 186:7, 186:12, 193:16, 193:18, 194:21, 194:25, 195:2, 195:13, 195:14, 195:23, 195:24, 198:23, 198:24, 199:5, 199:7, 199:24, 199:25, 203:17, 203:18, 203:21, 203:24, 206:1, 206:9, 206:10, 208:5, 209:17, 209:18, 210:11, 210:12, 210:24, 211:1, 215:3, 215:5, 216:10, 216:13, 216:19, 216:21, 222:2, 222:3, 222:8, 222:9, 250:19, 251:11, 253:2, 343:16, 344:14, 351:22, 352:7, 355:8, 355:10, 356:8, 356:25

Ryan [2] - 28:11, 28:12

## S

sadly [1] - 347:2

sample [1] - 332:11

Samson [1] - 2:9

San [3] - 14:5, 167:14, 167:17

Sanchez [1] - 131:7

sand [2] - 188:17, 318:16

Sanders [2] - 51:2, 51:9

Santa [5] - 12:21, 17:24, 18:25, 19:1, 273:11

Sarah [3] - 2:13, 149:22, 154:8

sat [4] - 14:20, 99:17, 194:2

satellites [1] - 167:10

satisfies [1] - 303:2

Saturday [2] - 80:17, 81:2

save [3] - 7:17, 33:4, 45:20

saw [32] - 14:17, 75:1, 78:3, 88:4, 109:15, 112:24, 113:2, 124:13, 153:20, 161:1, 163:14, 198:4, 204:18, 222:10, 253:24, 273:6, 284:2, 297:18, 303:13, 303:22, 304:15, 305:1, 305:2, 305:12, 306:6, 307:25, 308:8, 312:3, 319:1, 335:14, 354:12

scenes [1] - 211:6

schedule [5] - 21:16, 176:19, 182:3, 296:25, 309:17

scheduled [6] - 113:22, 191:22, 266:23, 267:13, 307:6, 338:3

schedules [1] - 220:9

scheduling [3] - 246:7, 257:20, 342:7

scheme [1] - 108:22

school [6] - 12:23, 36:19, 167:7, 167:13, 168:10, 351:7

School [3] - 12:1, 36:13, 36:15

scope [1] - 169:3

scores [4] - 319:1, 324:9, 329:9, 329:10

screen [13] - 61:22, 61:23, 85:24, 92:8, 92:10, 98:12, 110:1, 116:17, 162:10, 163:8, 351:21, 351:23, 354:12

screenshot [1] - 152:19

scroll [21] - 116:23, 117:6, 121:15, 133:18, 133:19, 136:4, 149:24, 152:11, 153:2, 153:6, 153:18, 155:5, 155:21, 156:9, 157:1, 195:1, 264:1, 285:4, 312:1, 316:12, 320:19

scrolling [1] - 320:9

scrubbed [1] - 163:23

SD11 [1] - 131:7

se [1] - 262:10

Sea [1] - 114:7

search [2] - 309:24, 317:16

seat [16] - 11:9, 35:1, 37:4, 57:5, 170:16, 170:17, 208:20, 225:3, 225:5, 228:20, 260:11, 260:12, 260:14, 260:20, 261:2, 338:18

seated [2] - 99:13, 232:17

seating [1] - 99:5

seats [6] - 7:3, 54:17, 85:16, 114:17, 206:7, 228:18

seawall [2] - 189:4, 189:5

seaweed [1] - 188:12

sec [1] - 129:13

second [47] - 11:2, 26:1, 51:9, 58:10, 72:19, 86:12, 100:8, 117:25, 121:15, 123:17, 134:12, 139:15, 143:16, 149:15, 154:16, 158:18, 167:6, 186:22, 209:19, 211:18, 216:11, 240:17, 240:23, 253:11, 253:18, 263:19, 264:1, 265:23, 265:24, 274:24, 281:22, 281:23, 282:7, 283:3, 285:5, 285:9, 289:18, 294:17, 311:13, 314:24, 314:25, 315:4, 322:16, 322:23, 323:10, 354:2

secondary [1] - 239:12

seconded [3] - 100:15, 149:5, 241:21

seconds [1] - 155:25

Secretary [8] - 78:17, 137:12, 183:11, 214:8, 214:22, 216:15, 219:4, 343:1

Section [13] - 16:15, 19:17, 19:25, 20:16, 32:17, 32:19, 68:14, 68:18, 82:22, 84:2, 175:10, 265:16, 276:13

section [3] - 126:3, 186:6, 251:7

see [147] - 22:25, 23:13, 24:12, 24:13, 24:21, 27:7, 40:23, 41:4, 47:4, 47:6, 49:4, 49:11, 49:20, 66:8, 67:20, 67:25, 76:23, 77:14,

77:15, 77:16, 77:19, 92:10, 93:3, 93:10, 93:11, 98:12, 107:20, 109:9, 111:1, 113:4, 117:4, 117:16, 117:17, 118:8, 120:16, 120:21, 121:1, 121:2, 121:3, 121:13, 122:4, 127:5, 127:11, 127:12, 127:17, 127:19, 131:10, 132:16, 133:4, 134:25, 140:8, 150:24, 152:21, 154:4, 155:19, 156:13, 156:19, 160:18, 160:24, 162:23, 163:8, 163:12, 164:23, 175:4, 175:20, 179:14, 179:16, 180:3, 182:13, 186:11, 187:8, 187:10, 192:23, 193:15, 194:16, 200:9, 200:16, 201:5, 203:21, 204:3, 204:7, 205:2, 205:7, 210:10, 210:19, 212:16, 213:3, 214:10, 215:8, 216:10, 217:4, 222:1, 262:3, 262:5, 262:25, 263:6, 265:22, 267:12, 267:13, 267:15, 268:19, 269:24, 270:7, 270:11, 270:14, 270:16, 274:21, 276:20, 277:12, 278:20, 279:13, 284:21, 285:18, 289:17, 295:21, 296:13, 298:10, 300:24, 304:14, 305:1, 309:22, 310:2, 310:3, 316:5, 317:9, 317:16, 323:17, 323:19, 323:20, 323:21, 328:11, 328:14, 328:15, 328:17, 328:23, 329:2, 329:5, 329:16, 329:22, 330:21,

331:10, 346:23, 346:24, 346:25, 354:21

**seeing** [13] - 46:7, 185:15, 186:5, 195:19, 196:4, 196:21, 198:1, 221:7, 221:24, 303:17, 304:25, 314:21, 326:23

**seek** [3] - 15:10, 28:6, 28:7

**seem** [4] - 76:7, 196:13, 214:12, 220:16

**seized** [1] - 41:2

**selected** [1] - 161:17

**Senate** [1] - 242:24

**send** [13] - 58:15, 72:23, 80:15, 113:7, 129:7, 132:4, 153:15, 154:10, 154:12, 211:11, 246:24, 284:18

**sending** [2] - 56:14, 131:16

**sends** [2] - 211:2, 354:14

**Senior** [1] - 44:5

**senior** [2] - 44:8, 54:20

**sense** [12] - 15:12, 55:21, 88:17, 102:5, 181:7, 188:9, 188:20, 200:25, 224:21, 264:23, 315:9, 319:5

**sensed** [1] - 112:21

**sensing** [1] - 113:5

**sensitivity** [1] - 261:20

**sent** [33] - 22:8, 73:18, 73:22, 78:18, 92:16, 98:20, 98:22, 109:15, 110:2, 111:25, 112:2, 112:17, 113:11, 117:3, 129:2,

130:8, 130:10, 130:18, 132:2, 132:13, 137:12, 137:13, 154:2, 167:6, 167:8, 167:9, 176:22, 201:13, 216:2, 278:4, 301:21, 354:1

**sentence** [11] - 27:12, 32:12, 117:25, 118:19, 186:16, 187:2, 211:18, 216:22, 266:5, 319:4

**sentencing** [5] - 113:21, 113:22, 113:23, 114:3, 114:11

**separate** [9] - 130:8, 130:18, 176:4, 254:17, 258:8, 266:16, 266:17, 343:13, 343:20

**separately** [1] - 152:20

**September** [28] - 62:2, 64:5, 66:25, 111:21, 128:17, 130:1, 142:24, 144:4, 145:6, 150:2, 183:1, 184:11, 184:18, 184:19, 187:23, 191:18, 192:1, 192:14, 192:18, 282:18, 292:25, 293:1, 298:5, 298:9, 298:22, 308:12

**series** [3] - 94:4, 170:5, 309:6

**seriously** [1] - 248:3

**serve** [8] - 13:5, 13:8, 13:17, 13:23, 38:11, 38:14, 38:16, 39:1

**served** [8] - 12:25, 14:6, 16:22, 38:5, 38:6, 38:8, 228:24, 313:23

**serves** [1] - 30:6

**service** [13] -

13:3, 13:15, 13:22, 17:14, 41:10, 47:14, 48:12, 49:19, 89:13, 113:17, 169:24, 170:2, 242:12

**services** [3] - 12:9, 168:21, 244:20

**serving** [1] - 39:6

**session** [20] - 19:10, 50:3, 50:5, 50:8, 50:10, 225:12, 225:19, 225:23, 226:2, 226:11, 282:21, 282:24, 336:18, 336:19, 336:20, 336:22, 336:24, 337:9, 354:6, 354:8

**sessions** [1] - 225:17

**set** [28] - 18:17, 51:7, 64:7, 65:12, 76:21, 78:9, 99:3, 99:12, 99:23, 103:14, 108:22, 134:23, 136:16, 150:14, 205:1, 217:14, 220:11, 223:4, 226:11, 227:4, 227:24, 228:3, 258:5, 275:5, 290:25, 296:25, 297:9, 304:11

**sets** [2] - 156:15, 175:21

**setting** [5] - 16:3, 209:1, 242:22, 281:13, 300:14

**settlement** [1] - 23:16

**setup** [2] - 56:24, 228:17

**Seventh** [2] - 2:17, 3:10

**sever** [1] - 351:11

**several** [12] - 42:7, 79:22, 84:7, 102:6, 120:15, 154:13, 169:19, 172:8,

189:6, 267:24, 267:25, 339:13

**severe** [1] - 52:23

**severely** [1] - 19:22

**sexual** [3] - 37:1, 37:7, 37:10

**shaded** [1] - 94:11

**shaker** [1] - 37:15

**Shannon** [16] - 66:22, 67:10, 110:12, 110:15, 111:16, 111:21, 112:6, 112:22, 142:23, 143:19, 144:19, 145:21, 147:17, 162:8, 354:14, 355:12

**share** [3] - 27:3, 133:2, 197:3

**shared** [3] - 73:1, 73:4, 129:22

**sharp** [1] - 185:8

**Shawn** [1] - 4:16

**Sheehy** [1] - 4:16

**sheets** [1] - 268:19

**Shelby** [4] - 32:20, 68:18, 252:8, 252:9

**sheriff** [2] - 231:8, 246:20

**sheriff's** [1] - 246:15

**sheriffs** [1] - 246:16

**shift** [5] - 27:21, 243:1, 303:12, 306:23, 307:8

**shifted** [1] - 67:24

**shifts** [2] - 67:22, 287:17

**shocked** [1] - 280:13

**shooting** [1] - 12:23

**Shore** [1] - 4:14

**short** [9] - 56:7, 64:10, 64:11, 98:2, 166:22, 177:8, 262:12,

333:7, 333:9

**shortened** [1] - 219:1

**shortly** [5] - 172:13, 176:22, 180:20, 182:1, 192:19

**shot** [1] - 104:14

**show** [38] - 43:16, 75:2, 75:20, 77:9, 86:22, 87:3, 91:6, 91:22, 91:25, 94:18, 95:8, 96:2, 98:10, 107:10, 109:6, 109:24, 111:10, 112:3, 162:9, 162:18, 183:7, 183:18, 203:5, 214:10, 214:25, 220:1, 226:14, 259:18, 269:23, 304:12, 306:20, 335:22, 336:1, 336:6, 336:12, 352:3, 352:7

**showed** [18] - 74:25, 76:18, 88:16, 88:23, 97:13, 129:9, 130:14, 130:19, 162:10, 163:7, 196:23, 197:23, 198:3, 251:5, 292:19, 302:5, 341:7, 354:9

**showing** [9] - 106:13, 110:16, 208:24, 251:3, 266:2, 275:2, 302:2, 304:9, 338:19

**shown** [22] - 72:25, 74:13, 77:5, 77:6, 81:5, 95:25, 107:11, 108:3, 109:25, 134:18, 175:6, 252:11, 252:17, 268:14, 292:9, 304:23, 307:4, 308:1, 310:14, 314:15, 322:8, 340:25

**shows** [10] - 93:1, 94:9, 95:9, 110:17, 110:18,

163:25, 206:16, 291:21, 315:4, 352:4

**siblings** [1] - 36:8

**sic** [1] - 133:19

**sic]** [1] - 25:13

**sicced** [2] - 83:8, 84:18

**side** [5] - 70:24, 70:25, 318:7, 350:18, 356:17

**sides** [2] - 37:18, 70:3

**Sigler** [13] - 67:11, 111:15, 111:24, 112:6, 141:23, 142:2, 142:22, 144:24, 145:22, 147:17, 162:8, 354:13, 355:12

**sign** [12] - 131:5, 131:8, 132:17, 133:2, 233:3, 233:23, 268:19, 312:15, 313:2, 323:17

**sign-up** [1] - 268:19

**signature** [2] - 150:14, 312:6

**signatures** [2] - 268:8, 336:8

**signed** [12] - 106:21, 110:19, 268:9, 268:16, 268:22, 312:12, 312:23, 323:3, 323:5, 323:10, 323:19, 336:11

**significance** [1] - 78:20

**significant** [3] - 24:6, 168:7, 224:17

**significantly** [2] - 198:19, 260:20

**signing** [1] - 312:17

**Silberstein** [1] - 3:9

**silver** [1] - 53:1

**similar** [8] - 43:4, 101:16, 188:19, 194:18, 195:20,

262:1, 299:4, 303:19

**similarities** [1] - 188:9

**Simone** [1] - 2:2

**sincere** [1] - 157:25

**sincerely** [2] - 113:9, 296:13

**sincerity** [1] - 158:8

**single** [12] - 47:5, 47:6, 47:7, 47:9, 106:19, 188:19, 190:6, 197:8, 200:5, 315:8, 317:22, 348:23

**single-judge** [1] - 348:23

**singular** [1] - 60:21

**sisters** [1] - 36:8

**sit** [8] - 33:11, 54:12, 54:15, 54:19, 57:6, 57:8, 99:8, 340:6

**sits** [1] - 54:18

**sitting** [6] - 47:1, 192:16, 251:23, 314:11, 315:14, 355:19

**situation** [2] - 218:24, 228:9

**six** [12] - 46:22, 55:13, 201:7, 223:6, 241:22, 242:21, 243:11, 246:13, 246:15, 322:24, 323:25, 343:22

**sixth** [2] - 321:16, 322:12

**sizable** [1] - 285:13

**skip** [4] - 87:21, 313:10, 314:24, 331:19

**skipped** [2] - 88:25, 89:1

**slightly** [1] - 263:20

**slipped** [1] -

93:18

**slow** [1] - 37:25

**small** [6] - 57:4, 273:24, 332:11, 335:12, 346:11, 346:17

**smaller** [4] - 186:9, 203:22, 260:20, 261:2

**Smith** [1] - 3:16

**smoothed** [2] - 69:9, 69:16

**smoothly** [1] - 65:19

**so..** [1] - 20:14

**Social** [3] - 3:3, 3:6, 132:20

**soft** [1] - 233:13

**solemnly** [3] - 11:4, 34:20, 166:7

**solicit** [1] - 336:10

**someone** [10] - 146:22, 148:16, 149:4, 149:8, 227:13, 249:21, 256:22, 290:18, 333:7

**someplace** [1] - 145:13

**sometime** [3] - 73:22, 73:23, 306:1

**somewhat** [2] - 57:3, 121:22

**somewhere** [3] - 17:4, 291:13, 327:22

**soon** [4] - 211:24, 212:15, 307:24, 337:11

**sororities** [1] - 106:16

**sorry** [16] - 18:25, 26:5, 26:18, 32:4, 34:6, 37:22, 37:24, 39:8, 133:16, 142:1, 159:16, 182:4, 195:22, 227:23, 263:13, 294:13

**sort** [57] - 16:14,

43:10, 54:8, 74:4, 77:21, 84:22, 93:25, 99:13, 100:13, 168:14, 169:1, 173:3, 173:6, 174:6, 174:14, 175:2, 175:20, 177:2, 177:25, 181:4, 182:6, 184:11, 187:10, 187:18, 189:10, 189:18, 196:8, 196:18, 197:7, 197:18, 198:5, 198:12, 198:17, 200:11, 201:8, 201:9, 201:15, 201:17, 203:9, 205:13, 207:5, 208:13, 208:25, 211:22, 213:8, 220:22, 226:13, 229:21, 231:12, 240:2, 242:5, 242:19, 245:4, 247:23, 248:24, 249:1, 249:22

**Sotto** [1] - 194:24

**sought** [3] - 254:24, 283:16, 283:21

**sound** [2] - 193:24, 334:20

**sounds** [18] - 31:25, 165:11, 173:25, 174:23, 176:7, 181:23, 183:25, 192:20, 202:19, 221:15, 265:9, 284:6, 287:4, 298:12, 300:10, 300:13, 339:5, 343:5

**source** [3] - 146:12, 147:7, 163:23

**South** [2] - 12:3, 74:23

**south** [4] - 69:21, 69:23, 70:25, 72:20

**SOUTHERN** [1] - 1:1

**Southern** [3] - 3:3, 3:6, 132:19

**southern** [1] -

104:4

southernmost [1] - 104:5

space [9] - 167:8, 168:5, 228:18, 240:7, 260:17, 260:23, 261:1, 261:2, 308:25

spacecraft [1] - 171:19

spaced [1] - 57:22

spacious [1] - 57:3

Spanish [7] - 41:10, 41:17, 41:22, 41:24, 42:8, 138:17, 138:18

Spanish-speaking [1] - 41:10

speaker [4] - 87:1, 233:9, 233:10, 251:19

speakers [3] - 41:22, 42:8, 234:10

speaking [21] - 41:10, 46:6, 97:19, 100:25, 101:1, 101:2, 120:23, 121:2, 121:3, 121:4, 121:19, 143:8, 180:19, 203:13, 214:17, 225:14, 231:25, 256:11, 272:20, 273:4, 351:4

spearheaded [1] - 153:25

special [30] - 78:9, 84:20, 136:16, 211:20, 223:5, 225:12, 225:17, 225:19, 225:20, 225:23, 226:1, 226:11, 259:6, 259:8, 259:9, 259:10, 259:16, 260:4, 260:13, 309:9, 310:2, 336:18, 336:19, 336:20, 337:20, 337:22,

337:23, 338:15, 338:23

specialized [1] - 83:16

specific [10] - 19:15, 55:16, 168:13, 179:20, 185:10, 190:2, 192:15, 232:2, 297:1, 315:2

specifically [20] - 63:1, 63:4, 64:9, 80:21, 123:11, 169:5, 169:23, 184:10, 212:24, 215:11, 216:7, 216:19, 222:17, 244:16, 273:9, 283:22, 286:11, 319:9, 325:25, 326:4

specifics [3] - 20:8, 31:11, 261:23

speculation [1] - 87:25

speech [4] - 121:5, 159:13, 159:14, 347:22

spend [4] - 111:3, 188:23, 188:24, 242:13

spending [3] - 56:17, 58:17, 110:22

spent [6] - 110:24, 110:25, 166:22, 168:7, 178:14, 253:12

split [3] - 105:17, 320:2, 320:8

splits [5] - 70:4, 104:2, 200:19, 324:5, 329:10

splitting [3] - 319:22, 320:22, 321:14

spoken [9] - 58:3, 64:20, 64:21, 107:16, 233:7, 249:5, 268:18, 336:11

Spoto [1] - 3:5

spots [1] - 63:2

spread [2] -

99:22, 220:25

spreadsheet [10] - 129:8, 129:12, 129:16, 130:3, 130:5, 130:7, 130:8, 130:14, 130:18, 130:19

spring [2] - 16:24, 290:14

Springs [1] - 167:10

spy [1] - 167:10

Squadron [1] - 167:18

stacked [1] - 285:18

staff [25] - 51:11, 137:25, 138:6, 138:14, 138:15, 210:6, 212:12, 212:20, 213:6, 219:25, 227:2, 246:15, 256:18, 257:11, 257:15, 261:5, 261:8, 284:3, 284:11, 284:13, 295:2, 296:2, 331:4, 342:13, 355:25

stand [11] - 10:24, 11:10, 58:11, 61:21, 113:13, 127:25, 143:19, 144:5, 155:24, 166:3, 353:4

standard [2] - 263:21, 272:9

standing [1] - 7:18

Standing [1] - 93:16

standpoint [2] - 185:11, 223:20

Star [1] - 246:11

start [21] - 62:9, 85:12, 114:12, 141:25, 142:6, 178:1, 184:5, 206:3, 223:7, 234:8, 250:17, 265:23, 275:3, 279:13, 297:18, 299:8, 332:2, 356:22, 356:23

started [18] - 12:8, 12:9, 14:14, 14:15, 14:21, 16:24, 35:24, 46:6, 55:12, 55:13, 61:8, 75:11, 180:17, 223:9, 223:12, 223:17, 281:7, 286:12

starting [9] - 44:24, 44:25, 87:16, 167:16, 187:14, 283:17, 287:12, 310:1, 331:13

starts [2] - 282:6, 283:2

State [14] - 78:17, 132:21, 137:12, 183:12, 214:8, 214:22, 219:4, 226:8, 238:17, 244:17, 245:20, 245:21, 245:22, 343:1

state [11] - 8:10, 11:17, 103:20, 145:25, 150:7, 223:23, 242:23, 244:19, 288:13, 314:4, 320:13

State's [1] - 216:15

statement [4] - 24:15, 27:25, 66:4, 66:5

states [3] - 199:18, 211:18, 216:23

STATES [3] - 1:1, 3:12, 4:2

States [3] - 67:4, 312:9, 345:5

statewide [1] - 37:21

stating [3] - 78:18, 137:12, 146:5

station [2] - 75:11, 170:10

statistically [1] - 244:3

statistics [1] - 42:7

stats [2] - 59:19, 64:9

statue [14] - 12:21, 56:12, 57:13, 57:15, 57:16, 57:18, 57:23, 58:2, 58:6, 58:11, 247:3, 247:6, 247:17, 247:24

statute [6] - 31:12, 58:17, 59:23, 230:17, 281:13, 281:16

statutory [3] - 40:14, 48:19, 315:5

stay [3] - 21:3, 168:19, 246:10

stayed [2] - 167:16, 197:15

staying [1] - 211:12

steam [1] - 57:25

stem [1] - 46:11

stenography [1] - 5:6

step [9] - 34:1, 113:24, 131:5, 164:11, 173:17, 177:25, 283:17, 288:24, 356:11

Stephanie [8] - 127:4, 153:23, 154:9, 154:10, 154:13, 154:14, 156:6, 157:18

Stephen [11] - 14:9, 14:11, 19:18, 19:21, 20:12, 20:21, 21:8, 22:12, 34:14, 35:18, 121:3

STEPHEN [2] - 6:13, 35:11

steps [1] - 190:14

stick [1] - 192:14

sticker [1] - 188:15

still [40] - 14:8, 21:2, 22:19, 36:4, 58:12, 63:10, 64:18,

79:1, 79:10, 80:12, 81:4, 101:23, 102:1, 105:12, 112:24, 118:16, 124:6, 145:18, 170:6, 170:24, 170:25, 171:21, 214:15, 225:4, 230:6, 258:16, 264:23, 289:4, 299:16, 318:9, 328:19, 335:12, 335:21, 336:5, 336:14, 345:23, 353:2, 356:16

stood [2] - 159:21, 244:11

stop [3] - 11:1, 264:2, 286:15

stopped [2] - 192:11, 349:10

stopping [2] - 260:16, 280:3

stories [1] - 47:12

story [1] - 23:16

straighten [1] - 70:16

strange [1] - 46:21

stream [2] - 229:2, 229:16

streamed [3] - 229:6, 229:9, 229:10

streaming [1] - 229:20

street [3] - 69:11, 193:7, 330:6

Street [16] - 1:12, 1:16, 1:19, 1:22, 2:3, 2:7, 2:24, 3:24, 4:3, 4:6, 4:21, 4:25, 14:4, 223:15, 223:16, 247:4

streets [2] - 125:7, 125:23

strike [2] - 198:22, 253:9

string [1] - 215:7

structure [3] - 39:22, 189:5, 287:15

struggle [2] - 106:20

stuck [1] - 293:4

studies [1] - 315:7

study [3] - 314:13, 314:16, 314:22

stuff [13] - 41:4, 59:20, 62:7, 77:16, 77:19, 106:22, 113:11, 135:4, 135:9, 138:1, 138:3, 138:4, 313:11

style [1] - 106:20

subject [6] - 97:25, 140:14, 215:13, 215:18, 290:4, 316:9

submission [2] - 16:16, 265:16

submit [6] - 19:13, 48:17, 49:22, 327:8, 327:9, 330:18

submitted [7] - 19:16, 19:25, 51:1, 176:5, 238:17, 265:6, 268:7

submitting [1] - 176:14

subsequent [5] - 32:19, 97:9, 169:25, 182:10, 273:16

subsequently [6] - 69:1, 92:16, 130:20, 171:6, 203:9, 214:21

substance [1] - 207:16

substantial [1] - 60:9

substantially [1] - 287:14

substantively [1] - 53:19

substitute [6] - 148:12, 148:14, 148:15, 148:18, 149:2, 158:23

success [1] - 283:23

successful [2] - 177:16, 177:17

successfully [1] - 282:9

succumbing [1] - 106:6

sudden [1] - 343:20

suddenly [1] - 306:7

sued [4] - 31:15, 175:15, 175:17, 175:18

suffering [1] - 136:20

suggest [5] - 71:7, 100:4, 135:25, 226:21, 235:9

suggested [8] - 69:3, 73:8, 77:3, 154:6, 174:13, 214:9, 227:11, 228:10

suggestions [2] - 71:22, 131:6

Suite [12] - 1:13, 1:16, 1:23, 2:4, 2:7, 3:3, 3:7, 3:14, 3:18, 4:14, 4:25, 5:4

sum [1] - 12:20

summaries [1] - 330:24

summary [4] - 129:22, 292:12, 328:25, 330:25

summer [1] - 290:14

supervise [1] - 257:15

supplement [1] - 322:17

supplemental [6] - 313:12, 313:24, 322:17, 322:18, 322:23, 323:10

support [19] - 8:24, 78:15, 82:6, 82:8, 121:20, 123:19, 126:21, 131:13, 132:17, 133:11, 137:5, 137:18, 168:4, 168:12, 315:16, 317:21, 327:9, 327:23, 331:9

supported [3] - 101:6, 101:20, 124:11

supporting [3] - 82:20, 107:18, 332:5

suppose [1] - 310:22

supposed [6] - 91:5, 205:19, 212:5, 212:13, 236:3, 261:14

Supreme [1] - 68:12

surprise [2] - 256:13, 297:13

surprised [1] - 229:25

survey [3] - 317:7, 317:8

surveys [1] - 315:11

suspect [2] - 198:4, 222:22

Swanson [9] - 127:4, 153:23, 154:9, 154:10, 154:13, 154:14, 155:20, 156:6, 157:18

swayed [1] - 347:18

swear [5] - 11:4, 34:17, 34:20, 166:5, 166:7

switched [2] - 250:11, 250:14

sworn [3] - 11:13, 35:12, 166:15

system [5] - 40:16, 213:4, 241:25, 242:17, 242:20

systems [2] - 229:15, 242:22

**T**

table [2] - 99:22, 356:19

tables [3] - 99:16, 99:18, 114:2

tabulation [2] - 330:25, 331:4

tackle [1] - 172:18

Taiwan [1] - 75:16

talks [2] - 120:23, 156:12

Tarrant [1] - 103:19

tasked [1] - 205:18

taught [1] - 168:14

tax [1] - 40:15

taxes [1] - 253:21

taxpayer [2] - 59:4, 253:11

taxpayers [1] - 22:15

teaching [2] - 168:8, 168:22

tear [1] - 106:9

Tech [1] - 12:2

technically [1] - 260:7

technology [1] - 229:13

Tejanos [1] - 131:7

teleconferenc e [3] - 64:6, 69:2, 151:3

telephone [1] - 153:10

ten [9] - 30:13, 77:6, 227:2, 248:13, 249:8, 287:15, 314:18, 344:20, 349:19

tend [1] - 96:3

tender [1] - 8:8

Tender [1] - 6:4

tenure [4] - 13:23, 14:3, 14:7, 15:2

tenured [1] - 20:13

termed [1] -

304:19

terms [33] - 13:19, 28:16, 37:12, 37:15, 45:19, 81:9, 93:25, 96:6, 101:18, 104:7, 128:8, 173:15, 181:7, 184:6, 190:3, 190:14, 198:13, 199:16, 206:23, 207:19, 208:12, 208:13, 208:19, 211:6, 212:25, 214:3, 218:1, 218:14, 219:9, 228:18, 244:1, 245:6, 245:16

terribly [1] - 182:25

Terry [4] - 6:4, 7:17, 8:9, 8:12

TERRY [1] - 1:3

testified [12] - 7:9, 11:13, 15:2, 19:12, 21:15, 21:21, 24:16, 35:12, 87:10, 166:15, 345:18, 346:5

testify [2] - 235:15, 336:10

testimony [25] - 11:4, 23:24, 24:22, 26:8, 34:20, 60:2, 60:7, 74:9, 86:22, 95:12, 96:18, 103:11, 147:16, 161:1, 166:7, 252:20, 295:10, 300:1, 335:19, 335:21, 336:4, 336:13, 347:4, 352:21, 352:24

TEXAS [2] - 1:1, 1:6

Texas [59] - 1:17, 1:20, 2:13, 2:14, 2:20, 2:21, 4:11, 4:15, 5:5, 11:20, 11:21, 12:1, 12:2, 12:3, 13:13, 14:4, 14:17, 17:24, 18:16, 24:8,

30:8, 35:20, 35:21, 37:16, 38:19, 39:14, 39:15, 42:3, 44:9, 51:3, 51:9, 52:2, 69:19, 72:10, 115:15, 132:19, 132:21, 150:6, 166:19, 166:20, 173:9, 175:9, 222:6, 238:17, 255:2, 265:18, 270:16, 270:19, 270:21, 270:22, 270:23, 273:7, 281:17, 301:22, 302:24, 304:16, 350:14, 351:8

text [1] - 127:12

texted [1] - 155:16

Tharuni [2] - 3:20, 345:3

THE [110] - 1:8, 1:11, 2:2, 2:12, 3:2, 3:12, 4:2, 4:8, 7:2, 7:8, 7:12, 7:14, 7:22, 7:24, 8:3, 8:6, 9:16, 9:20, 9:22, 9:24, 10:7, 10:10, 10:17, 10:19, 10:21, 10:25, 11:4, 11:9, 26:9, 32:23, 32:25, 33:9, 33:13, 33:24, 34:1, 34:2, 34:4, 34:7, 34:11, 34:15, 34:20, 35:3, 35:10, 37:22, 37:25, 38:2, 76:8, 85:10, 85:15, 85:20, 93:17, 93:22, 95:17, 95:19, 102:10, 113:18, 113:20, 113:25, 114:1, 114:16, 116:1, 116:3, 116:5, 128:1, 133:20, 155:23, 156:1, 164:11, 164:12, 164:16, 164:17, 164:20, 164:23, 165:7, 165:11, 165:18,

165:23, 166:1, 166:4, 166:7, 166:13, 185:25, 186:2, 193:17, 194:23, 205:24, 206:2, 206:6, 207:25, 250:20, 251:13, 253:5, 280:5, 280:7, 339:11, 343:15, 343:23, 344:2, 344:5, 344:9, 344:11, 344:15, 344:23, 352:1, 352:13, 355:7, 356:9, 356:11, 356:12, 356:13

themselves [2] - 51:23, 297:18

thereabouts [1] - 269:19

thereafter [2] - 180:20, 182:2

therefore [1] - 216:24

Therefore [1] - 316:19

thick [1] - 269:22

thinking [8] - 46:13, 188:18, 189:18, 214:18, 228:6, 277:17, 289:4

thinks [1] - 156:16

third [3] - 186:8, 200:6, 318:23

thirtieth [1] - 17:6

Thomas [2] - 61:14, 61:15

thoroughfare [1] - 69:14

thoroughfares [3] - 70:22, 70:23, 77:15

thoughts [3] - 22:6, 196:25, 199:15

three [26] - 8:1, 36:8, 54:18, 54:19, 69:18, 87:11, 138:9, 167:11, 168:25, 173:16, 185:8, 212:3, 218:10, 218:16, 229:14,

233:10, 233:13, 233:15, 244:4, 315:20, 316:20, 318:1, 343:12, 343:20, 348:22, 356:21

three-judge [1] - 348:22

three-minute [1] - 233:13

throughout [5] - 119:1, 140:1, 157:20, 242:14, 334:10

thrown [1] - 285:21

thumb [2] - 92:12, 98:25

thumbnail [1] - 77:21

Thurgood [1] - 36:15

Thursday [5] - 78:14, 121:9, 121:14, 137:2, 337:23

ties [1] - 279:20

timeframe [6] - 17:5, 87:6, 175:17, 177:5, 192:14, 298:8

timeline [18] - 16:3, 16:9, 16:14, 21:16, 21:19, 76:20, 79:11, 79:12, 102:21, 134:22, 181:4, 193:16, 212:2, 214:9, 214:16, 214:17, 297:3, 297:9

timely [1] - 238:18

timing [2] - 165:14, 252:9

tip [1] - 104:5

title [4] - 186:13, 270:21, 312:1, 316:6

titled [2] - 195:6, 196:3

TO [1] - 1:5

today [42] - 14:8, 24:22, 30:20, 58:11, 65:4,

67:3, 80:3, 88:6, 88:10, 96:18, 101:18, 106:13, 107:2, 111:24, 113:21, 141:4, 144:2, 147:16, 158:3, 162:4, 170:6, 199:12, 208:10, 222:11, 245:24, 251:3, 251:23, 256:12, 264:23, 295:10, 300:1, 314:12, 332:14, 334:18, 336:5, 336:13, 343:24, 344:1, 344:2, 345:23, 353:4, 356:18

together [20] - 14:14, 23:10, 26:2, 39:1, 39:9, 91:23, 98:19, 111:25, 129:22, 218:17, 219:16, 240:16, 256:12, 261:21, 323:18, 341:14, 342:11, 353:3, 355:4

tolerance [2] - 168:15, 169:9

Tom [2] - 194:8, 301:15

tomorrow [5] - 211:20, 337:21, 337:22, 337:23, 356:22

tone [1] - 230:20

took [21] - 51:6, 61:20, 62:2, 62:5, 75:18, 80:6, 85:2, 86:4, 89:10, 89:23, 90:25, 96:15, 102:4, 172:21, 173:18, 178:1, 213:11, 241:18, 247:21, 331:24

top [14] - 72:8, 76:13, 121:12, 129:22, 186:9, 203:25, 204:2, 210:24, 211:12, 282:20, 284:21, 310:1, 337:17, 337:18

top-level [1] - 129:22

topic [3] - 232:12, 265:15, 275:19
topics [3] - 56:8, 56:10, 56:19
Torchinsky [2] - 4:17, 210:17
total [3] - 10:15, 13:20, 129:9
totality [1] - 54:14
touched [1] - 56:20
tournament [2] - 12:17, 14:22
toward [2] - 17:3, 198:3
towards [2] - 168:8, 173:18
towns [1] - 270:14
track [2] - 179:16, 185:12
train [1] - 168:17
trained [2] - 230:18, 232:8
trainees [3] - 168:10, 168:11, 168:18
training [12] - 83:16, 167:8, 167:9, 167:13, 168:8, 168:9, 168:20, 169:2, 169:3, 169:6, 169:16, 230:19
Training [1] - 167:18
Trainor [4] - 24:9, 25:15, 180:6, 274:16
transcript [5] - 10:4, 87:4, 157:24, 287:11, 357:7
Transcript [1] - 5:6
transcription [1] - 5:6
transfer [1] - 254:1
transferred [2] - 167:13, 170:4
transferring [1] - 259:24

transition [2] - 52:1, 59:24
transitioned [1] - 43:7
translated [1] - 41:17
transparent [2] - 132:23, 154:1
transportation [3] - 43:20, 43:22, 44:3
trash [1] - 285:21
traveling [1] - 218:13
treacherous [1] - 34:16
treatment [4] - 244:15, 244:16, 244:23, 244:25
Trey [1] - 24:9
TRIAL [1] - 1:7
trial [17] - 11:5, 34:21, 89:20, 96:12, 96:14, 96:18, 162:23, 166:8, 177:13, 179:5, 230:8, 251:6, 343:22, 344:17, 348:20, 348:22, 348:23
Trial [1] - 6:1
trial's [1] - 157:24
tricked [1] - 350:3
tricks [1] - 160:23
tried [7] - 62:18, 102:16, 105:8, 160:2, 243:1, 333:22, 337:3
tries [2] - 47:6, 47:8
trip [1] - 347:3
true [27] - 33:9, 79:18, 84:14, 85:24, 89:5, 90:7, 90:8, 107:5, 107:21, 108:6, 117:23, 208:7, 227:3, 242:10, 273:10, 273:14, 276:19, 287:5, 290:4, 312:10, 312:17, 318:8, 323:11,

328:6, 351:24, 353:4, 353:13
Trust [4] - 163:5, 164:3, 164:7, 350:4
trust [3] - 114:25, 158:3, 158:5
trusted [1] - 158:3
truth [10] - 11:6, 11:7, 34:22, 34:23, 166:9, 166:10, 208:12
try [15] - 49:13, 85:12, 113:11, 138:21, 169:21, 172:18, 176:9, 187:2, 191:4, 269:22, 301:18, 311:10, 331:18, 341:13, 341:14
trying [35] - 37:1, 37:7, 37:10, 47:8, 65:14, 72:13, 78:9, 80:15, 106:24, 111:1, 115:23, 127:6, 130:11, 131:12, 136:16, 138:4, 138:7, 145:24, 145:25, 154:11, 173:1, 177:20, 196:24, 218:8, 219:14, 220:8, 220:9, 223:12, 244:6, 281:6, 286:12, 320:2, 320:15, 323:7, 336:19
Tsong [3] - 75:15, 75:22, 75:25
Tuesday [14] - 48:16, 48:18, 49:16, 78:9, 78:15, 80:13, 136:17, 137:3, 137:5, 137:17, 140:18, 215:7, 277:13, 301:5
turn [6] - 171:14, 177:23, 213:11, 242:19, 251:18, 274:21
turnaround [1] - 175:19
turned [3] - 63:20, 92:18, 281:4

turning [1] - 63:23
turnout [2] - 227:11, 231:18
turns [3] - 182:21, 226:6, 333:8
turtle [1] - 188:12
turtle-excluding [1] - 188:12
Twenty [2] - 148:2, 148:4
Twenty-four [1] - 148:4
twice [3] - 243:14, 243:24, 243:25
two [89] - 13:19, 13:21, 18:20, 19:1, 21:13, 23:13, 26:12, 36:8, 51:1, 51:24, 54:18, 56:7, 58:15, 69:12, 69:17, 69:25, 71:2, 72:12, 72:14, 72:25, 73:12, 73:15, 74:25, 76:17, 76:18, 78:21, 92:7, 110:15, 113:15, 115:12, 115:20, 116:9, 116:12, 116:14, 134:17, 134:18, 137:21, 139:7, 143:24, 146:17, 147:25, 151:6, 152:9, 153:15, 158:12, 173:16, 175:21, 176:4, 185:8, 194:18, 196:23, 199:23, 206:2, 210:17, 218:5, 220:5, 229:14, 231:8, 240:16, 244:4, 251:8, 251:16, 258:8, 259:11, 259:13, 266:6, 270:5, 275:23, 278:13, 283:14, 291:15, 295:24, 297:22, 304:25, 305:1, 306:14, 307:17, 310:19, 310:22, 325:3, 332:20, 340:15, 344:6,

344:15, 344:17, 348:3, 349:20, 354:20, 356:14
two-week [1] - 146:17
Tyler [26] - 76:15, 77:1, 78:8, 80:11, 81:2, 103:16, 109:8, 133:18, 133:20, 133:21, 133:24, 133:25, 135:12, 136:15, 137:15, 210:8, 210:16, 211:2, 222:5, 261:8, 284:3, 301:2, 301:3, 337:16, 338:6
type [6] - 43:4, 53:5, 65:18, 79:11, 170:7
types [1] - 340:15
typical [1] - 228:13
typically [3] - 48:25, 226:25, 229:8
typo [1] - 108:5

**U**

U.S [11] - 3:13, 3:17, 3:20, 3:23, 4:3, 4:6, 68:12, 314:9, 315:4, 328:25, 349:4
UCLA [1] - 2:10
ultimately [14] - 20:17, 38:11, 63:15, 63:19, 90:6, 176:12, 177:15, 199:1, 218:2, 220:19, 221:16, 237:19, 342:6, 342:10
unable [1] - 63:20
unacceptable [3] - 151:9, 151:18, 151:20
unanimous [2] - 241:23, 288:14
unavailability [2] - 78:21, 79:4
unavailable [1] - 180:8

uncapped [2] - 188:13, 188:14

uncommon [1] - 232:6

under [30] - 39:1, 49:20, 91:4, 104:8, 104:15, 104:19, 104:22, 123:19, 141:9, 158:6, 186:13, 199:19, 210:1, 214:16, 241:1, 242:7, 265:16, 267:4, 276:13, 281:19, 285:11, 289:18, 312:8, 312:17, 312:23, 314:8, 323:11, 352:2, 352:5

undergraduate [1] - 167:8

understood [19] - 124:11, 164:17, 165:22, 168:24, 189:10, 201:8, 204:9, 271:8, 271:13, 272:6, 272:11, 283:24, 320:17, 332:18, 332:20, 335:4, 348:7, 349:3, 351:10

undertake [3] - 210:6, 243:9

underwriter [1] - 12:10

unfairly [1] - 285:15

unfortunately [1] - 172:17

unification [1] - 318:17

unified [4] - 200:1, 314:25, 316:23, 318:14

unincorporated [2] - 186:23, 187:5

unique [1] - 188:16

unit [1] - 244:18

UNITED [3] - 1:1, 3:12, 4:2

United [3] - 67:4,

312:9, 345:5

uniting [1] - 318:18

University [3] - 12:2, 36:14, 37:16

Unless [1] - 323:16

unless [2] - 218:5, 313:18

unlikely [1] - 332:10

unlimited [1] - 229:19

unsolicited [1] - 284:17

unsuccessful [1] - 170:17

unusable [1] - 290:21

up [206] - 9:17, 10:8, 18:17, 21:2, 23:8, 23:25, 24:2, 24:17, 25:1, 25:2, 25:12, 25:17, 30:23, 34:9, 35:19, 35:20, 36:6, 37:16, 37:17, 43:16, 56:8, 56:10, 56:19, 59:21, 61:21, 64:7, 65:12, 67:14, 69:11, 69:22, 70:16, 70:17, 72:15, 75:20, 76:16, 77:10, 77:12, 85:8, 85:11, 85:22, 88:16, 88:23, 89:4, 89:19, 91:14, 97:13, 97:25, 99:3, 99:12, 99:23, 104:2, 104:22, 105:1, 105:17, 106:13, 106:25, 108:19, 108:22, 113:3, 116:22, 117:11, 120:13, 123:14, 124:19, 126:25, 128:12, 130:6, 130:9, 130:14, 130:23, 131:5, 132:12, 132:13,

132:17, 133:10, 133:14, 134:8, 134:9, 139:25, 141:16, 144:24, 149:11, 149:16, 150:3, 150:18, 152:11, 153:4, 153:8, 153:11, 153:18, 154:13, 155:24, 157:19, 159:21, 163:20, 164:6, 171:12, 172:5, 177:10, 177:21, 178:7, 179:10, 181:20, 182:18, 182:25, 184:22, 185:10, 185:23, 186:10, 194:18, 194:25, 198:23, 199:2, 201:15, 203:17, 209:1, 209:17, 210:11, 210:24, 211:15, 211:18, 212:16, 214:5, 214:8, 216:11, 221:10, 221:20, 222:2, 223:11, 224:12, 224:20, 226:14, 228:4, 233:3, 233:23, 238:24, 241:15, 242:14, 244:11, 244:18, 247:2, 252:24, 256:10, 257:4, 257:9, 259:18, 262:3, 262:5, 263:3, 264:3, 264:11, 265:10, 268:9, 268:14, 268:16, 268:19, 268:22, 269:11, 269:17, 273:16, 275:15, 276:21, 277:19, 278:23, 279:11, 281:17, 281:18, 282:15, 282:20, 284:3, 284:20, 286:2, 287:12, 290:23, 291:13, 294:21, 299:6, 300:24, 301:17, 305:4, 306:8, 309:17, 311:19, 313:1, 315:4, 316:2, 317:13, 317:15, 320:19, 325:13, 327:4, 329:20, 331:13, 332:6, 335:23,

336:1, 336:6, 336:11, 336:12, 337:13, 343:23, 353:20, 356:20

upcoming [1] - 181:5

update [6] - 50:10, 152:15, 292:19, 293:25, 295:3, 343:2

updated [4] - 65:1, 294:25, 311:24, 311:25

updates [2] - 50:13, 150:22

upper [2] - 163:25, 318:10

upset [1] - 341:12

upstairs [1] - 23:20

URL [1] - 309:23

US [1] - 290:15

useful [1] - 182:25

users [1] - 229:18

uses [1] - 241:8

usual [1] - 228:6

### V

vacant [2] - 37:4, 170:16

vacation [1] - 37:3

Valencia [1] - 1:21

Vall [1] - 2:23

Vall-Llobera [1] - 2:23

value [1] - 169:12

various [11] - 12:6, 12:14, 12:17, 14:20, 45:3, 60:17, 77:25, 132:24, 168:8, 266:20, 300:15

varying [2] - 318:2, 318:13

version [16] - 87:17, 92:21, 163:14, 206:25, 207:1, 207:2, 263:20, 304:24,

311:23, 311:24, 311:25, 312:13, 322:19, 323:6, 323:9, 330:4

versions [2] - 91:15, 334:8

versus [1] - 290:5

Veterans [1] - 256:3

via [2] - 107:16, 150:14

video [6] - 99:7, 234:12, 251:4, 251:14, 251:24

view [7] - 39:9, 45:16, 45:20, 65:23, 96:7, 108:25, 240:19

violated [1] - 83:23

violating [2] - 161:21, 161:24

violation [4] - 52:23, 84:1, 232:9, 306:12

violations [2] - 84:2, 84:4

Virginia [3] - 4:18, 4:22, 4:25

virus [1] - 45:2

visit [1] - 76:5

visiting [1] - 327:8

visual [1] - 56:25

vital [1] - 42:7

voce [1] - 194:24

Vogel [8] - 4:17, 178:11, 178:12, 181:21, 181:25, 210:18, 287:3, 355:25

voice [1] - 106:14

voicemail [1] - 150:10

voices [1] - 88:19

Voila [1] - 216:12

volume [2] - 86:23, 335:19

vote [84] - 8:15, 19:21, 38:18, 43:7, 43:16, 44:1, 44:15, 51:18, 56:11,

58:6, 58:7, 58:8, 59:7, 59:9, 59:10, 60:23, 68:9, 78:10, 78:16, 79:1, 82:23, 86:12, 89:10, 96:3, 96:5, 96:15, 119:17, 119:18, 119:23, 126:23, 127:7, 135:21, 135:23, 135:24, 135:25, 136:17, 137:6, 137:23, 138:22, 138:23, 139:10, 139:19, 139:22, 160:9, 160:22, 161:4, 205:22, 218:15, 236:14, 236:19, 236:20, 237:19, 240:16, 241:19, 245:17, 245:19, 246:23, 247:8, 247:9, 248:6, 248:8, 249:1, 249:2, 250:3, 261:22, 261:24, 262:10, 286:2, 287:2, 288:11, 308:19, 308:20, 308:23, 324:3, 331:8, 331:22, 332:9, 333:6, 334:19, 353:9

**voted** [20] - 22:5, 29:16, 44:17, 51:19, 56:5, 60:24, 86:3, 91:23, 91:25, 127:13, 139:12, 157:10, 236:12, 238:20, 261:15, 262:23, 275:11, 288:18, 307:17, 325:6

**voter** [1] - 248:2

**Voters** [4] - 132:21, 153:24, 221:23, 222:7

**voters** [17] - 8:15, 20:11, 20:19, 43:16, 43:17, 51:23, 63:10, 64:10, 82:14, 91:23, 91:25, 95:8, 118:7, 249:23, 250:2, 276:12, 349:22

**votes** [14] - 63:5, 76:24, 87:11, 101:21, 135:1, 135:13, 135:20, 135:22, 137:15, 137:20, 137:21, 161:22

**Voting** [20] - 2:10, 68:23, 82:22, 83:4, 83:16, 84:2, 91:4, 106:21, 178:16, 239:3, 265:16, 271:8, 271:19, 271:22, 276:13, 278:20, 285:11, 314:9, 314:11, 349:4

**voting** [41] - 43:8, 43:11, 43:22, 43:24, 44:3, 50:16, 50:17, 50:20, 50:23, 50:25, 51:17, 67:24, 82:6, 83:19, 90:9, 91:21, 96:9, 106:21, 129:11, 152:6, 200:20, 238:24, 239:9, 239:10, 241:9, 249:6, 250:1, 250:5, 276:12, 314:12, 314:16, 314:22, 319:23, 320:23, 321:3, 321:14, 327:5, 333:2, 333:10, 349:5

**VRA** [2] - 83:23, 179:7

**VTD** [2] - 324:5, 329:10

**vulnerability** [1] - 208:15

---

### W

**wait** [5] - 127:17, 142:5, 165:16, 289:20

**waiting** [1] - 331:10

**waiving** [1] - 314:3

**walk** [3] - 41:19, 43:25, 69:5

**walk-ins** [1] - 41:19

**walking** [4] - 43:20, 138:1, 207:11

**Walter** [2] - 227:15, 255:9

**want'** [1] - 88:4

**wants** [10] - 82:10, 165:9, 188:23, 188:24, 230:23, 233:4, 233:6, 233:23, 352:7, 355:19

**warning** [1] - 231:17

**wars** [1] - 283:14

**Washington** [12] - 1:13, 1:23, 2:4, 2:8, 2:24, 3:15, 3:18, 3:21, 3:24, 4:4, 4:7, 25:17

**watch** [5] - 53:25, 80:7, 234:12, 251:9, 253:5

**watcher** [1] - 248:22

**watchers** [2] - 248:15, 248:17

**water** [1] - 251:12

**Watson** [2] - 98:14, 98:18

**Wayne** [5] - 37:2, 37:14, 272:13, 272:15

**ways** [5] - 60:12, 98:1, 110:25, 245:21, 279:20

**web** [3] - 213:12, 219:19, 325:15

**Webb** [2] - 74:15, 205:5

**website** [48] - 73:25, 74:1, 76:17, 76:22, 77:10, 77:12, 78:3, 79:24, 80:2, 81:6, 128:25, 134:9, 134:25, 139:7, 152:23, 153:21, 212:16, 212:19, 212:25, 213:8,

214:1, 218:20, 221:11, 291:7, 297:4, 309:23, 309:24, 325:23, 326:1, 326:4, 326:23, 327:8, 327:22, 327:24, 327:25, 328:1, 328:3, 328:5, 328:10, 328:18, 328:20, 329:15, 329:18, 329:22, 330:15, 335:15, 343:3

**websites** [1] - 77:21

**Wednesday** [2] - 78:14, 137:1

**week** [26] - 37:10, 37:11, 40:23, 46:15, 48:11, 78:12, 136:19, 146:17, 151:5, 154:3, 207:2, 217:10, 217:18, 217:23, 219:13, 219:14, 219:16, 225:10, 225:16, 258:21, 258:22, 259:7, 267:14, 267:18, 267:24, 307:2

**weeks** [8] - 73:8, 113:15, 143:24, 151:4, 259:11, 259:14, 310:23, 327:6

**weigh** [1] - 152:17

**well-financed** [1] - 172:7

**Wellness** [1] - 242:1

**wells** [2] - 188:13, 188:14

**Wells** [4] - 5:4, 357:6, 357:9, 357:10

**west** [4] - 118:3, 118:4, 318:5, 318:6

**West** [6] - 3:3, 4:21, 4:25, 24:7, 39:14, 44:9

**whereas** [2] - 57:20, 168:3

**wherein** [1] -

110:22

**whistle** [2] - 84:22

**White** [11] - 9:6, 27:2, 84:14, 91:25, 104:9, 104:10, 121:25, 123:21, 151:21, 255:14, 255:17

**Whites** [1] - 40:4

**whole** [18] - 11:6, 17:22, 24:17, 34:22, 46:4, 70:7, 71:15, 109:2, 117:4, 148:23, 166:9, 186:10, 191:6, 300:15, 300:20, 317:10, 324:22, 331:2

**whoops** [1] - 92:25

**widely** [1] - 220:25

**Williamson** [8] - 121:17, 122:10, 127:3, 131:1, 131:12, 132:11, 133:10, 150:8

**Williamson's** [2] - 123:12, 123:17

**willing** [3] - 161:25, 236:6, 237:2

**Willkie** [3] - 2:17, 2:23, 3:10

**win** [4] - 32:5, 33:6, 250:10

**window** [2] - 282:4, 282:6

**wish** [1] - 226:18

**wishes** [1] - 191:13

**with...(reading** [1] - 199:17

**withhold** [1] - 356:1

**WITNESS** [10] - 34:2, 38:2, 113:18, 113:25, 116:3, 155:23, 164:12, 164:16, 186:2, 356:12

**witness** [22] - 7:5, 10:22, 11:10,

22:22, 33:8, 34:12, 35:6, 113:19, 116:2, 161:9, 164:9, 164:13, 165:8, 250:19, 343:8, 346:19, 352:4, 353:4, 355:6, 356:8, 356:17, 356:23

WITNESSES [1] - 6:7

witnesses [2] - 165:6, 343:18

Women [4] - 132:21, 153:23, 221:23, 222:6

won [5] - 28:9, 171:15, 172:9, 177:18, 308:23

wonderful [1] - 158:1

word [2] - 84:20, 169:20

wording [1] - 132:14

words [8] - 54:23, 84:19, 137:16, 137:18, 160:4, 160:5, 245:9, 272:2

worker [2] - 75:24, 98:19

works [4] - 80:16, 132:20, 173:2, 299:2

workshop [2] - 110:22, 121:11

world [1] - 244:13

worried [2] - 28:20, 146:21

worry [3] - 113:7, 113:14, 146:11

worst [2] - 87:3, 244:13

wrap [1] - 85:22

write [12] - 26:3, 26:6, 26:11, 62:6, 82:9, 82:10, 122:10, 122:14, 133:24, 154:18, 274:25, 320:15

writer [1] - 106:4

writes [7] - 132:16, 150:5, 150:20, 152:14, 153:20, 155:7, 204:5

writing [2] - 279:22, 293:18

written [1] - 337:22

wrote [6] - 64:24, 65:1, 106:5, 122:18, 154:22, 348:9

## X

Xiyi [1] - 2:13

## Y

y'all [14] - 8:6, 9:16, 107:1, 114:8, 184:3, 185:25, 190:13, 220:11, 220:19, 221:17, 234:15, 238:17, 239:24, 356:20

Y'all [1] - 85:15

y'all's [1] - 239:20

Yang [1] - 75:15

year [25] - 16:19, 16:25, 17:3, 36:16, 38:13, 50:1, 136:24, 140:1, 157:20, 167:20, 170:20, 171:4, 171:9, 185:2, 225:25, 242:16, 251:23, 253:22, 253:25, 255:5, 281:23, 324:25, 345:13, 345:16

years [34] - 11:22, 12:6, 12:14, 13:20, 13:22, 14:14, 16:22, 30:13, 46:22, 46:24, 148:1, 148:3, 167:11, 168:22, 168:24, 169:19, 185:5, 223:5, 225:1, 225:2, 238:14, 239:19, 241:22, 242:21, 243:11,

248:13, 249:8, 253:22, 260:3, 287:15, 314:18, 325:3, 347:19, 349:19

yesterday [4] - 7:10, 10:13, 343:25, 344:3

York [4] - 2:18, 3:11

you.. [1] - 169:16

yourself [13] - 83:19, 109:13, 110:2, 112:4, 161:4, 161:12, 245:5, 284:22, 298:5, 322:3, 330:22, 330:23, 354:11

## Z

Zachary [1] - 3:23

Zack [3] - 74:17, 74:18, 205:5

zero [5] - 10:19, 168:15, 169:9, 309:12, 309:14

Zhu [1] - 3:9

zoom [6] - 74:15, 77:14, 77:19, 150:14, 186:6, 269:22

Zoom [9] - 74:17, 151:5, 194:4, 194:12, 205:4, 205:11, 206:11, 209:7, 301:10

zoomed [1] - 301:15

Zoomed [1] - 74:24

## §

§ [7] - 1:3, 1:4, 1:4, 1:5, 1:5, 1:6, 1:6