**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **HONORABLE TERRY** | § | **3:22-CV-00057** |
| **PETTEWAY, ET AL** | § | |
| | § | |
| **V.** | § | **8:33 A.M. TO 5:24 P.M.** |
| | § | |
| **GALVESTON COUNTY, TEXAS,** | § | |
| **ET AL** | § | **AUGUST 16, 2023** |

**BENCH TRIAL**
**BEFORE THE HONORABLE JEFFREY V. BROWN**
**Day 8 of 10 Days**

**APPEARANCES:**

**FOR THE PETTEWAY PLAINTIFFS:**
Mr. Mark P. Gaber
Campaign Legal Center
1101 14th Street NW
Suite 400
Washington, DC  20005
(202) 736-2200
    and
Mr. Neil G. Baron
Law Office of Neil G. Baron
1010 E. Main Street
Suite A
League City, Texas  77573
(281) 534-2748
    and
Mr. Chad W. Dunn
Brazil & Dunn
1900 Pearl Street
Austin, Texas  78705
(512) 717-9822
    and
Ms. Valencia Richardson
Campaign Legal Center
1101 14th Street NW
Suite 400
Washington, DC  20002
(318) 573-8984

**APPEARANCES: (continued)**

**FOR THE PETTEWAY PLAINTIFFS:**
Ms. Simone Leeper
Campaign Legal Center
1101 14th Street NW
Suite 400
Washington, DC  20005
(202) 736-2200
        and
Ms. Alexandra Copper
Campaign Legal Center
1101 14th Street NW
Suite 400
Washington, DC  20005
(202) 736-2200
        and
Ms. Bernadette Samson Reyes
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, California  90095
(310) 400-6019

**FOR THE NAACP PLAINTIFFS:**
Ms. Sarah Xiyi Chen
Texas Civil Rights Project
1405 Montopolis Drive
Austin, Texas  78741
(512) 474-5073
        and
Mr. Richard Mancino
Ms. Michelle A. Polizzano
Willkie Farr & Gallagher, LLP
787 Seventh Avenue
New York, New York  10019
(212) 728-8243
        and
Mr. Joaquin Gonzalez
Ms. Christina Beeler
Texas Civil Rights Project
1405 Montropolis Drive
Austin, Texas  78741-3438
(512) 474-5073
        and
Ms. Diana C. Vall-Llobera
Willkie Farr & Gallagher, LLP
1875 K. Street, NW
Washington, DC  20006
(202) 303-1157

**APPEARANCES:   (continued)**

**FOR THE NAACP PLAINTIFFS:**
Ms. Hilary Harris Klein
Southern Coalition for Social Justice NC
1415 West Highway 54, Suite 101
Durham, North Carolina  27707
(610) 574-5244
     and
Ms. Adrianne M. Spoto
Southern Coalition for Social Justice
1415 W. Highway 54
Suite 101
Durham, North Carolina  27707
(407) 756-7873
     and
Mr. Andrew Silberstein
Ms. Molly Linda Zhu
Willkie Farr & Gallagher, LLP
787 Seventh Avenue
New York, New York  10019
(212) 728-8243

**FOR THE UNITED STATES OF AMERICA:**
Ms. Catherine Meza
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue NW
Suite 4con
Washington, DC  20530
(202) 307-2767
     and
Ms. K'Shaani Smith
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue NW
Suite 4con
Washington, DC  20530
(202) 307-2767
     and
Ms. Tharuni A. Jayaraman
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue NW
Washington, DC  20530
(202) 305-5194
     and
Mr. Zachary Newkirk
U.S. Department of Justice, Civil Rights Division
150 M Street NE
Washington, DC  20002
(202) 307-2767

*Laura Wells, RPR, RMR, CRR, RDR*

**APPEARANCES:   (continued)**

**FOR THE UNITED STATES OF AMERICA:**
Mr. Bruce Gear
U.S. Department of Justice, Civil Rights Division
150 M Street NE
Washington, DC  20002
(202) 307-2767
    and
Mr. Robert Berman
U.S. Department of Justice, Civil Rights Division
150 M Street NE
Washington, DC  20002
(202) 307-2767

**FOR THE DEFENDANTS:**
Mr. Joseph R. Russo, Jr.
Ms. Jordan Raschke Elton
Mr. Andrew J. Mytelka
Greer Herz
One Moody Plaza
18th Floor
Galveston, Texas  77550-7998
(409) 797-3200
    and
Ms. Angela Olalde
Greer Herz Adams, LLP
2525 S. Shore Boulevard, Suite 203
League City, Texas  77573
(409) 797-3262
    and
Mr. Shawn T. Sheehy
Mr. Dallin Brockbank Holt
Holtzman Vogel Baran Torchinsky & Josefiak PLLC
15405 John Marshall Highway
Haymarket, Virginia  20169
(540) 341-8808
    and
Mr. Christian Adams
Mr. Joseph M. Nixon
Public Interest Foundation
107 West Street
Alexandria, Virginia  42543
(703) 963-8611
    and
Ms. Maureen S. Riordan
Ms. Kaylan L. Phillips
Public Interest Legal Foundation
107 S. West Street, Suite 700
Alexandria, Virginia  22314

*Laura Wells, RPR, RMR, CRR, RDR*

**APPEARANCES:    (continued)**

Court Reporter:
Laura Wells, RPR, RMR, CRR, RDR
601 Rosenberg, Suite 615
Galveston, Texas 77550

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**DAY 8**
**(Bench Trial)**

**August 16, 2023**

Reporter's Certificate........................ 309

**ALPHABETICAL**

**WITNESSES**                                              **Page**

**THOMAS MARK BRYAN**
    Direct Examination By Mr. Sheehy            216
    Cross-Examination/Direct Examination By     288
     Mr. Gaber

**DALTON (DALE) OLDHAM**
    Direct Examination By Mr. Russo              8
    Cross-Examination By Mr. Gaber             129
    Cross-Examination By Ms. Chen              208
    Cross-Examination By Ms. Smith             210
    Redirect Examination By Mr. Russo          212

*Laura Wells, RPR, RMR, CRR, RDR*

**(Call to order of the Court.)**

THE COURT:  Good morning, everybody.  You may take your seats.

All right.  Where are we on time?

MR. RUSSO:  For yesterday, Your Honor -- let's see.  Plaintiffs had 4 hours and 0 minutes.  Defendants had 3 hours and 14 minutes.  Which brings the total to plaintiffs, 23 hours and 46 minutes; defendants at 19 hours and 4 minutes.

THE COURT:  All right.  Which puts us past the halfway point.  So, what, it's just the beginning of the third quarter?  Is that what you are saying to me?  That's all right.

The defendants may call their next witness.

MR. RUSSO:  Your Honor, defendants call Dale Oldham to the stand.

THE COURT:  All right.  Mr. Oldham, if you'll pause there for one second, I'll swear you in.

MR. OLDHAM:  (Complying.)

THE COURT:  Do you solemnly swear the testimony that you are about to give in the case that's now on trial will be the truth, the whole truth, and nothing but the truth so help you God?

MR. OLDHAM:  I do, Your Honor.

THE COURT:  And the witness stand is right over

here.

**DALTON (DALE) OLDHAM,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. RUSSO:

**Q.**   Good morning, Mr. Oldham.

**A.**   Mr. Russo, how are you doing, sir?

**Q.**   Very well.  Thank you for asking.

Will you introduce yourself to the Court.

**A.**   Yes.  I am Dalton Oldham, typically known as Dale.

**Q.**   Go on.

**A.**   And I was a counsel to Galveston County for the redistricting matter in 2021 and in 2011 and in 2013.

**Q.**   Okay.  And we'll talk about that in a little bit more detail.

How was it that you came to be engaged in the 2011 redistricting matter for Galveston County?

**A.**   I worked with a group of lawyers at Beirne Maynard & Parsons.  They associated me on a number of cases.  I had assisted them in becoming acquainted with the redistricting law.  And they had gone and had obtained cases in the state of Texas, and I assisted them in those cases.  This was one of those.

**Q.**   Okay.  Do you specifically recall at what stage of the redistricting process you became engaged for Galveston

County?  Where was the County in terms of dealing with the redistricting process?

**A.**  Well, they -- by the time they really consulted me heavily -- I mean, I knew they had the case from probably fairly soon after they acquired the clients.  But I didn't actually become intimately involved in the case until they got to the preclearance stage.

**Q.**  Okay.  And you are a lawyer by training?

**A.**  Yes, sir.

**Q.**  Okay.  And tell the Court, when did you graduate from law school?

**A.**  Do we have to tell you things like that?  1989.

**Q.**  Okay.  And then since that time, you have been practicing law?

**A.**  I have been practicing law since -- since that time.

**Q.**  Okay.  And is most of your work involved in the redistricting type of litigation?

**A.**  Much of it has.  Most of my -- I mean, I have done a few other things; but the bulk of my work has been in election law, either redistricting, campaign finance.

**Q.**  Okay.  So let me show you Exhibit JX-45.

**A.**  You're going to have to excuse me, but my eyes are not very good.  Looks like preclearance submission.

**Q.**  And the date on that submission is October 14th, 2011?

**A.**  Correct.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   And I think this is the preclearance submission for the Commissioners Court Precinct 3?

**A.**   That would be -- that would be correct for that timeframe.

**Q.**   Okay.

**A.**   So I'm assuming that's right.

**Q.**   Okay.  And then at the same time -- or roughly the same time, there was also a preclearance submission for the JP precincts as well?

**A.**   No.

**Q.**   No?

**A.**   No.  That's -- that comes later.

**Q.**   Okay.  So -- and at the time that this preclearance was -- letter was filed with the United States, what else was done at the County to achieve preclearance?

**A.**   Well, I think the important thing to remember is at the same time that this letter was filed with the DOJ, as was standard practice with people in which I was involved in the preclearance process, we also filed a declaratory judgment action in the DCDC so that the time limits on the response to the submission and the response to the complaint would be approximately the same.

**Q.**   Okay.  And so the lawsuit filed against the Department of Justice was pretty much contemporaneous with the --

**A.**   Pretty much contemporaneous with that, yes.  I won't

say we hit the date exactly, but it would have been close.

Q.   Okay.   And to your recollection, what was the result of the preclearance letters sent to the Department of Justice?

A.   Well, the first preclearance letter, prior to the date of having to file an answer on the DCDC case, the Department of Justice filed an objection to preclearance on the Galveston County Commission plan.

Q.   Okay.   And do you recall the -- that being around March of 2012?

A.   That would probably be about right.

Q.   All right.   And then what happened next?

A.   Well, at that time, we began to negotiate with DOJ to see what could be done in order to obtain a preclearance.

Q.   Okay.   And did the Department of Justice come down to Galveston to work on those details?

A.   They did.   As a matter of fact, we conducted the negotiations in a room in the county courthouse that was just over the lobby.   I remember it because it had this big window right out there, and I was staring at the DOJ people on the other side of the table, straight out that window.

Q.   And so were y'all able to resolve the matter with the Department of Justice?

A.   We were.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**  Okay.

**A.**  We obtained a -- an agreement.  When you -- you need to understand that when you negotiate with the Department of Justice, it is -- or at least its voting section, it is not the same sort of straightforward negotiation that you have when you are, say, settling a car wreck.  But the negotiation is much more like 20 questions.  And if I do X, Y, and Z, when can I expect a preclearance?  And eventually you find the solution that they find acceptable, and they assure you that you will receive a rapid response.  And both sides recognize that they have actually reached an agreement; and we did.

**Q.**  Can you scroll to page 22 of this exhibit.

So this is a copy, although sort of a poor copy --

**A.**  Well --

**Q.**  -- of the map submitted to -- proposed by the Galveston County -- by Galveston County Commissioners Court for adoption in 2011?

**A.**  I will assume that to be correct.  It appears to -- it appears to generally comport with my memory.  It's hard for me to read this, but I would -- I would suspect that's correct.

**Q.**  Okay.

MR. RUSSO:  Your Honor, we have a sort of demonstrative exhibit that I haven't shared with

plaintiffs yet, but I'm going to have them look at it. It's a colorized version of this map.  I'm going to give them an opportunity to look at it and potentially use it for demonstrative purposes.

THE COURT:  Okay.

A.   And I would emphasize, DOJ didn't have to look at this map.  They would have had a block assignment file sent to them so they could display it on their redistricting GIS system.

MR. RUSSO:  All good?

MR. GABER:  I don't know, but I'm not going to stop you.

BY MR. RUSSO:

Q.   So let me put up DX-304 for you.

A.   Yeah.  That's much easier to view.

Q.   A little easier to see.

And this is a demonstrative copy of the map that was submitted to the Department of Justice in 2011 for preclearance, colorized, so to speak.

Does it look relatively consistent to what your memory was?

A.   It looks relatively consistent to what my memory was, yes.

MR. RUSSO:  If you can, Brandon, can you put next to that DX-4.

*Laura Wells, RPR, RMR, CRR, RDR*

BY MR. RUSSO:

Q.   Okay.  And DX-4, which is on the right side of your screen, is the map that Galveston County was under between 2012 and 2021, which is -- it's labeled the "benchmark map."  You may have -- you may quibble with that --

A.   Yes.

Q.   -- but that's the way it's labeled.

A.   Well, that -- that -- yeah.  Yeah.  Well, obviously, the benchmark map in 2011 would have been something entirely different, but -- that would appear to comport with the deal we made with DOJ.

Q.   Okay.  And so -- yeah.  And comparing the difference between what was proposed, which is the exhibit on the left side, the Demonstrative 304 -- which, again, is a replica of what is attached to JX-45 at page 22.

A.   Right.

Q.   And then you compare that document to what is DX-4, which is the County's map that -- well, that existed from 2012 forward, you can kind of compare and see what the changes were in discussions with the Department of Justice.

     Do you agree?

A.   Correct.  I mean, pretty much every change that you see -- well, every change you see in that map, between what was submitted to the Department of Justice and what

is ultimately produced at the end of the process, were really demands of the Department of Justice.

Q.   And what were the Department of Justice's concerns in getting this case resolved?

A.   Well, their stated ones in the letter and clearly what they were doing after the -- after the -- during the negotiations was they were attempting to raise the African American percentage in District 3.

MR. GABER:  Your Honor, I'm going to object to speculation as to the DOJ's concerns.

THE COURT:  Why don't you lay a little bit of a foundation for that, Mr. Russo.

BY MR. RUSSO:

Q.   What was it about the negotiations that you had during settlement that provided you insight as to what the DOJ needed in order to have the map comply with their needs?

A.   Well, DOJ was insistent that the Bolivar Peninsula -- allow me to correct myself.  Bolivar Peninsula.  Or is it "Boliver" or Bolivar?

THE COURT:  We say Bolivar.

A.   Okay.  We say Bolivar.

Bolivar Peninsula and Pelican Island come out of the district.

They also had a number of cuts, which you can kind of see the result of, along the straight line there adjacent

to Texas City.  And all of those cuts are cuts that are increasing the African American percentage in District 3 and reducing the Hispanic White and the non-Hispanic White in District 3.

BY MR. RUSSO:

Q.   And do you recall that the fact that the proposed exhibit that was attached to the preclearance letter, actually, one of the complaints was it added White and Hispanic population to Precinct 3?

A.   Well, I would disagree with the concept of "added."  I understand that was how the DOJ phrased it, but I would -- I would strongly disagree with it.  In 2011, the demographic shifts within the county were far, far greater than they were in 2021.  And that would later be one of the issues that would kind of be important.  We were kind of waiting to see.

     But in 2011, 3 needed a lot of pop.  It was going to have to get population from outside of the district.  The question was going to be:  Was it going to try to consistently add African American population, or was it going to also add some non-Hispanic White and Hispanic White to get it up to a population center?  There were obviously geographic problems that were created when that -- when that district -- when you had to do that for that district.

*Laura Wells, RPR, RMR, CRR, RDR*

And that is part of why -- well, that's the real reason why Pelican and Bolivar are placed in the district is, essentially, they are cut off; and you are going to have to do something somewhat strange with them unless you put them in that district.

The map here using the water blocks kind of hides the compactness issue, the contiguity issue, that arises when you don't put Bolivar and Pelican in with whatever district holds the eastern end of Galveston Island.

Q.   And we'll chat more about some of that stuff in a bit.

A.   Right.

Q.   But getting back to the sort of resolution and the negotiations to achieve resolution with the Department of Justice in 2012, ultimately was the case -- how was the -- how was the -- how was it resolved?  What changes did you make that resolved the matter for the Department of Justice?

A.   Well, we made the changes that you see in the map right there, in what is listed as DX-4.  The differences between DX-304 and DX-4, those are the changes we ended up making.

Q.   Okay.  And looking at the map, one of those changes is removing Bolivar from the proposed map -- the map proposed by the Galveston County?

A.   Removing Bolivar was -- I would say, probably it

absolutely had to come out or they weren't going to preclear.

Q.   Okay.  And again, the purpose of that was to raise the -- or was the purpose of that -- or let me ask it this way:  Was the effect of that to increase the Black population in the remaining Precinct 3?

A.   Absolutely.

But here is what I'm going to tell you.  It did raise the Black population.  As I stated to DOJ at the time, I didn't think it changed the general election outcome one lick because Bolivar isn't that large.  But it did absolutely change the -- increase the African American population in the district.  And it meant that the African American population was going to be decidedly larger than the Hispanic White population in the district.  So it's going to dominate it in the Democratic primary.

Q.   Okay.  Did you leave this meeting sort of with a feeling or understanding that Precinct 3 was being racially gerrymandered?

A.   Well, that's a term of art.  The question becomes when using that term of art -- and I think it really kind of becomes very apparent as we get into what the 2021 problem is going to end up being -- if you don't have a Voting Rights Act excuse for that, the answer is absolutely yes.

Q.   Okay.

**A.**   And at least in 2011, the Voting Rights excuse would have been Section 5 and retrogression and the need for preclearance.

**Q.**   Okay.  Now, at the same time or around the same time, Galveston County also submitted for approval for preclearance the JP districts -- or JP precincts.

**A.**   JP precincts are an issue that come up after the *Shelby County* case.  You need to remember that the JP/constable districts do not have to be redistricted every ten years because they are not subject to the one-person, one-vote requirement in the same way that the commissioners districts are.

So you have time on those.  You can leave them in place.  There are lots of other reasons for coming back and redoing judicial districts, administrative districts such as those, but that wouldn't have been something that was redone at that time; and wasn't.

**Q.**   Okay.  So the County proposed -- let me just see if I can understand your response.

The County proposed JP districts in 2013?

**A.**   Correct.

**Q.**   And then the County was sued for that proposal, right?

**A.**   Right.  Well, what you mean by "proposal," the County passed new justice of the peace districts in 2013.

And just for a terminology point, Your Honor, I know

that in Texas the term "precinct" is often used for a voting district. That is confusing in the general parlance of this business. So I will attempt to avoid using "precinct" when I -- when I am referring to an election district. I'm going to call it a district, if that has the Court's approval.

THE COURT: It's understood.

THE WITNESS: Yes.

THE COURT: Yes.

BY MR. RUSSO:

Q. And so the allegations made in the lawsuit by the plaintiff groups related to the JP map that was adopted were what? How did they relate to the needs of the map in connection with the Hispanic and Black voters in the minority-majority district?

A. Sure. When the -- when the plaintiffs filed the original *Petteway* case, the -- you have to go back in time. There was a -- Texas law actually has the -- has it arranged so that there are supposed to be the same number of JP and constable districts as there are Commissioner Court districts, which would be four.

Q. Well, let me ask you this way.

At the time, there were nine JP districts in Galveston County, right?

A. Correct.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** And the County wanted to get down to five or four, correct?

**A.** Correct.

**Q.** Okay.

**A.** The -- there had been a consent decree agreed to long ago in the federal court that had allowed Galveston to have justices of the peace and constables in excess of the number. This was during a time in which the Voting Rights Act was being interpreted in certain places to allow expansions of the numbers of districts so that minority groups that didn't rise to a large enough proportion to have a district under the existing number of districts in that jurisdiction could rise to the level in which they would proportionally be entitled to a district.

**Q.** So let me ask you this: Is it correct that at the time Galveston County had two of those JP precincts that were considered to be majority-minority districts?

**A.** Correct. Two minority. Two Black -- excuse me, African American, yes.

**Q.** And was it the plaintiffs' contention that there should actually be three majority-minority districts -- JP districts?

**A.** Well, the plaintiffs -- there were at that time three minority JP/constables, if I remember correctly. There were two justices of the peace and two constables. I take

that back.  It adds up to five.  And -- in the two African American seats or jurisdictions.  And then there was a jurisdiction that had a non-Hispanic White justice of the peace and a Hispanic constable.

**Q.**  And so was it plaintiffs' allegation that this third -- they were entitled to a third minority-majority district based upon the cohesion between the Black voters and the Hispanic voters?

**A.**  Well, that's isolating one of their complaints.  Their complaints were, first off, they didn't want the number of JPs and constable districts reduced at all.

The second aspect of it was, which was one of the things that was a chief contention during the case, was whether you had a coalition seat where you had the Hispanic constable.

**Q.**  Okay.  And you were actually involved in the trial of that case, correct?

**A.**  I was.

**Q.**  As a lawyer participating in questioning rather than as a witness?

**A.**  Correct.

**Q.**  Which I'm sure you would prefer?

**A.**  I am extremely upset to be sitting here today, as you well know, Mr. Russo.

**Q.**  But as a result of that case, did the Court conclude

that there was a legitimate coalition and cohesion between the Black voters and the Hispanic voters?

**A.**   Absolutely not.  I did the deposition and the cross-examination of plaintiffs' expert in that case.  And that testimony, given the ruling of the Court -- and I will point out that the Court, on the Section 2 matter, ruled from the bench.

And the only thing that Judge Costa had us -- had us brief after that trial was a question of an influence district based on a Fourteenth Amendment intentional discrimination claim.  So we did a posttrial brief on *Arlington Heights*'s intent, *Mobile v. Bolden*, and *Rogers v. Lodge*.

**Q.**   And the expert in the prior case that you cross-examined and you referred to earlier, who was that?

**A.**   Dr. Barreto.

**Q.**   As a result of the case and holding dismissal of the Section 2 claim from the bench, was it -- is it true that the Court looked at this issue of cohesiveness between Black and Hispanic voters?

**A.**   They would have necessarily had to look at it.  It was -- it was the guts of Dr. Barreto's evidence.

**Q.**   And so tell me how -- you have used the term -- with me, at least -- crossover district?

**A.**   Correct.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   What is the difference between sort of a crossover district and a district that might be cohesive in a coalition situation?

**A.**   Well, "coalition" is -- again, "coalition" and "crossover" are terms of art.  They get misused, particularly in the press, particularly in the popular language, because -- and then some lawyers try to intentionally misuse them in a courtroom.  But they are both terms of art.  They are well described in the -- in the *Bartlett v. Strickland* decision.

**Q.**   A Supreme Court decision?

**A.**   That is a Supreme Court decision.

And the crossover district is what very often typically gets referred to as a coalition district.  A crossover district is very simple.  Let's imagine that -- and we'll make this easier in this hypothetical because we'll have -- we'll have a primary where we have a Hispanic candidate and -- a Hispanic White candidate and we have an African American candidate.

And then in this primary, the -- most of the African Americans in the primary vote for the African American. Most of the Hispanic Whites in the primary vote for the Hispanic.  The Hispanic loses.

Then we go to the general election.  And most of the Hispanics now come over and vote for the African American

candidate in the general election.

That's not a coalition.  That's crossover.

Q.   And the reason it's a crossover is that, if you are looking at the primary, you can determine and you can tell that -- who the Hispanics' candidate of choice is versus who the African Americans' candidate of choice is?

A.   Right.  Exactly.

Q.   And so in relation to the case that was tried here in 2013, what was the -- what was the conclusion in connection with this allegation that a third majority-minority JP precinct existed?

A.   Well, clearly the Hispanic seat couldn't have been considered one that fell into the coalition category because we wouldn't have been -- we wouldn't have been entitled to a verdict from the bench.

MR. GABER:  So, Your Honor, I just want to object to the extent this calls for a legal conclusion.  Obviously, the Court's record can speak for itself, and we don't -- Mr. Oldham's speculation as to what the Judge was basing his ruling on is not admissible.

THE COURT:  Okay.  All right.  I will sustain that objection.

BY MR. RUSSO:

Q.   So moving out of the 2011 to 2013 area or considering it, sort of wrapping it up, one thing that was -- you knew

*Laura Wells, RPR, RMR, CRR, RDR*

in discussions with the Department of Justice in settling the county commissioners precincts were that you had a potential issue with Precinct 3, going forward, being racially gerrymandered?

**A.**    Yes.

**Q.**    Okay.  And the other issue is a question on the cohesiveness between the Black voters and Hispanic voters and whether that cohesion existed?

**A.**    At this point, there is no evidence for that.

**Q.**    So let's move forward to 2021 redistricting.  Okay?

**A.**    All right.

**Q.**    Do you recall being contacted by the County to assist with that, the 2021 effort?

**A.**    I do.

**Q.**    Okay.  Do you remember who got in touch with you?  Was it Paul Ready?

**A.**    It was initially Paul Ready, yes.

**Q.**    Okay.  What did Mr. Ready ask of you?

**A.**    Well, he asked if I would be willing to do it.  I said yes, but I would have to have other assistance.

**Q.**    Okay.  Let me -- let me pull up DX-43 quickly.  All right.

     And this is an e-mail from Paul Ready dated November the 25th of 2020.

     Does this appear to be the first correspondence to

you -- or correspondence to you related to the engagement for the 2021 redistricting effort?

**A.**   Yes.  That looks -- that looks like something he sent me early on in the discussions.

**Q.**   Okay.  And you mentioned that you thought you would need assistance in order to --

**A.**   Yes.

**Q.**   -- in order to be engaged in the project?

**A.**   Correct.

**Q.**   And did you find this assistance?

**A.**   Well, I told him, I think at the time of this or probably even in the first conversation, that I was going to have to find another firm, and they were going to need to negotiate price with them.

**Q.**   Okay.

**A.**   And I -- and I found Holtzman Vogel.

**Q.**   And then pull up JX-9, if you would.  JX-9.

So JX-9 is an e-mail from Paul Ready to you, Mark Henry, and Tyler Drummond, inviting y'all to a meeting on Wednesday, December 16th, 2020?

**A.**   Yeah.

**Q.**   Is that -- did y'all have a phone call on that day, as far as you can recall?

**A.**   I can't necessarily recall a phone call for that day, but I think we probably had a phone call somewhere in and

*Laura Wells, RPR, RMR, CRR, RDR*

around that time, and that's liable to be it.

Q.   Okay.  So is that consistent with your memory as far as the timeline goes?

A.   Yeah.  It's in that area.

Q.   And let's move forward to April of 2021.

And is it your recollection that the County actually voted on and engaged you in and around April -- let me rephrase that.

Moving forward to April of 2021, is it your recollection that the County engaged the Holtzman Vogel firm and you collectively to assist in the 2021 redistricting effort?

A.   Yes.  That's -- again, that's around the timeline that I remember.  And I had put them in touch with Holtzman Vogel because I told them, you know, there wasn't much sense in negotiating with me on a deal.  You were going to have to -- they were going to have to reach a money agreement with them.  I was sure I would be okay with whatever that would end up being.

Q.   Okay.  Pull up JX-12.

And the first page of that, of JX-12, is an e-mail dated April 6th of 2021 from Ready -- Mr. Ready to you, it looks like, forwarding an engagement letter.

Do you see that?

A.   Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** And, actually, the e-mail says it attaches the executed engagement letter.

Do you see that?

**A.** Yes.

**Q.** Okay. Scroll to the next page. Zoom out, if you could. Any other -- scroll through this to the attachment. Okay.

Does this appear to be the engagement letter --

**A.** It does.

**Q.** -- engaging Holtzman Vogel and you, as well, for the redistricting effort in 2021?

**A.** Yes.

**Q.** Okay. What was it you were tasked to do? What did they ask you to do in 2021?

**A.** Well, essentially, the same thing I had been tasked in prior efforts. And that's to provide expertise on the Voting Rights Act and one-person, one-vote and the other aspects of redistricting -- of federal redistricting law. That's the limit of what I am doing and what I am engaged to do. So everything I'm doing is bluntly legal advice and opinion.

**Q.** Did they explain to you -- anyone at the County explain why they came to you to help redistricting?

**A.** Well, apparently they thought I had done a fairly stellar job in 2011 and 2013. So they wanted -- they were

Direct Examination of Dale Oldham                    Day 8 - 30

hoping they would get a repeat performance.

Q.   Did anyone tell you that they were also interested in the fact that you knew the county?

A.   I did know the county.  At this point -- while I didn't know the county when I first showed up in 2011, by 2021, I had a pretty decent -- except for my inability to pronounce "Bolivar," I had a pretty decent idea of the county.

Q.   Okay.  And 2021 -- it's no secret; we have talked about it -- the actual census data was delayed, right?

A.   The 2020 Census has been the worst census in over 100 years, yes.

Q.   And when was -- when would the census data have actually been due?

A.   Well, in a normal cycle, the Census Bureau releases on what is called a rolling basis.  So the four states that always come out first -- and they usually come out by the first or second week of February -- are New Jersey, Virginia, Mississippi, and Louisiana.  And the reason for this is very, very simple.  They all have one-year elections.  So the Bureau prioritizes those four states, and they get that data out usually by the first, no later than the second week of February.

      The next state out of the bag is usually Texas.  And that is a little bit artificial because Texas has a very

*Laura Wells, RPR, RMR, CRR, RDR*

early primary and an even earlier date for beginning filing for public offices, which I'm sure Your Honor is aware of. And as a result, they are, in the calendar of elections, the next state up; and, therefore, the Census Bureau usually has Texas data out by the end of February, if not earlier.

Q. Okay. And in this case, as of April, we are sort of in our -- when you were engaged, the census data had not been released?

A. And we didn't have a clear idea of when it was going to be released.

Q. So let me just have you reflect on the period between February of 2021 and August of 2021.

Is it true that the Census Bureau had sort of promised or gave indications of release dates and then would miss the release date and then would re-promise the date?

A. They had done that several times at that point. It had initially appeared that we really wouldn't have much of a delay at all prior to the administration change in January.

But then after the administration change, there was the announcement of more work needing to be done. A large portion of this was the result of the institution of the differential privacy program, which they were having a great deal of difficulty getting to work.

**Q.** So as you are sort of thinking about needing to deal with Galveston County, you have an expectation at times. We may get data, just as an example, in June, and it doesn't happen. You may get it in July, and it doesn't happen.

Is that sort of how this went?

**A.** That's pretty much how it went through the spring of 2021.

**Q.** Okay. So opposing counsel asked us -- asked and made an issue of public meetings in order to let the public know what the situation is with data or how the County is managing redistricting.

Did you discuss that issue with Galveston County at the time, in April, as to how to handle that situation?

**A.** I did. And I suggested that I thought that there was some real problems in having everybody talk blindly about this. Because there was a lot of discussion in Galveston -- and not just Galveston, but elsewhere -- about what people thought census numbers were going to do and what the result was going to be. Many people, I think, in Galveston thought they were going to require the same sort of dramatic shifts in the district that occurred in the 2010 cycle.

My thought was rather than have a bunch of people create a bunch of expectations that would then turn out to

be completely false and then everybody says, "Oh, you changed it" or "Ya, da, da, da, da, da, da."

And I'm sorry. I should not have put that on a court record.

But the -- rather than have that occur, you would be better off to hopefully soon get some numbers and have everyone who wants to comment on something do so intelligently and in an informed manner.

Q. Another issue that would -- that we've been dealing with in this case is the adoption of -- formal adoption of criteria.

What was your advice in connection with adopting criteria at this point?

A. Well, if you adopt criteria, you would kind of like to have your criteria somewhat informed by what your census data is going to be. And if you know you are going to have to make dramatic changes, have that reflected in your criteria. If you are not going to have to do that, then you probably want to view a different set of criteria. And that's not something you are going to really know until you know what your changes are going to actually look like.

Q. At the time -- or prior to the census data actually being released, how much does the County know about what changes or corrections are going to need to be made in

terms of certainty?

A.   Well, the answer is they don't.  But a lot of people think they do because they look at things like the ACS.  They look at things like their own building permits, which is the kind of information the County has available to itself.  They look at a whole bunch of things, and they think they have ideas of what the census data is going to look like.  But in reality, they don't.  And some of the guesstimations that I heard were not anywhere close to correct.

Q.   And was it your view that -- in terms of having public meetings or thinking about criteria, it is something -- it is better done when you have maps in your hand?

A.   Well, it can be better done when you have maps in your hand, but -- or at least better done when you have data.  And at that point, we didn't have data.

Q.   Okay.  And so in 2011, were you aware that the County actually did have meetings for that redistricting cycle prior to the actual adoption of the maps?

A.   Yes.  But we also had data in, like, the third week of February.

Q.   And do you recall at the time whether maps had actually been completed by the time that those meetings occurred?  Do you know?

A.   I don't know that maps had actually been completed;

but, again, it goes to my point.  You actually had data.  This was an incredibly compressed schedule this time.  It's not the way I would normally like to do it.  I wouldn't do it in any -- like this in any year except 2021.

Q.   And 2021 seems to be, hopefully, an anomaly, right?

A.   I would hope so.  I would hope the census is never done this way again.  I would hope that the releases are never like this again.

Q.   Okay.  All right.  So we move up to -- do you know when the Census Bureau first rolled out data for Texas?

A.   Well, again, this goes back to the unusualness of 2021.  Whereas it would normally have been done on a rolling basis and Texas would have had priority over all the states except for the four I mentioned earlier, in this cycle, all 50 states were released at the same time, which is very different from the situation most years.

     Texas, of course, had a slightly -- it's more troublesome in Texas than it is in other places because of the schedule, but they are all 50 released at the same time, that's never happened in modern era.

Q.   Okay.  And so the August 2021 time period sounds consistent with your memory?

A.   That's about when the first release in the legacy data format came out, yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   Were you able to use that data?

**A.**   Well, it's not a question of whether I can use that data.  It's a question of whether data guys and demographers I know can use that data, because I don't have a data program.  I don't do data.  And that's not what I do.  And so I am relying on someone else to be able to take that data and put it into a usable format.

**Q.**   Okay.  Do you know when it was that you were actually able to use data in connection with the Galveston County 2021 redistricting effort?

**A.**   That would have been -- I don't know the exact date, but that would have been when I got my first spreadsheet on the Galveston County data, which was a ways, because I was actually -- as soon as the legacy data came out, I was contacting various people I knew, trying to find someone that had figured out how to load the legacy data.

Now, once the user-friendly format came out, everybody had it.  But that was several weeks after the original legacy release in August.

**Q.**   Okay.  So do you recall around the September time period that you started setting up meetings with the Galveston County Commissioners Court to get criteria from them as to what they thought was important?

**A.**   Once we had some data available, we immediately started to -- started to contact and talk to the various

commissioners.

**Q.** Okay. Well, let me show you -- if you could pull up PX-173. I'm sorry. That's DX. I need PX-173.

Okay. This is an e-mail between you and someone named Adam Kincaid --

**A.** Correct.

**Q.** -- from September 14th, 2021?

**A.** Yes.

**Q.** So -- what is it that Mr. Kincaid is sending you in this e-mail?

**A.** That would be the spreadsheet.

**Q.** Okay. And let me go to page --

**A.** I would think.

**Q.** -- the third page.

**A.** Yeah. Yeah. That's it. I remember that.

**Q.** And so were you able to obtain this information to assist with getting at least initial numbers on Galveston County?

**A.** Yes. He was the only person I knew at that time that I could source the material from.

**Q.** Okay.

**A.** It was not -- it shortly became, after that, generally available.

**Q.** Okay. All right. So let's jump back to meetings with the County.

*Laura Wells, RPR, RMR, CRR, RDR*

You actually set up meetings with them prior to receiving this data.

Do you remember that?

**A.**    I did.

**Q.**    Okay.

**A.**    But that data was really critical for those meetings because I wanted -- I wanted them to be aware of that data when we had the meetings, because the purpose of the meetings, this is I am now going to find out what the commissioners want after they have some ability to be somewhat informed.

**Q.**    Okay.  So pull up JX-16, if you would.

So JX-16, I think, is a meeting invite for setting up a meeting of September 8th of 2021.

Do you see that?

**A.**    Yeah.

**Q.**    And the attendees mentioned there are Commissioner Apffel, Judge Mark Henry, Paul Ready, Seth Collins, and Veronica Van Horn.

Do you remember all those people attending that meeting?

**A.**    I do not.  But then I wasn't in a position to know necessarily that they were all on the call.  The only ones I was really interested in were Mr. Ready, Commissioner Apffel, and Judge Henry.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** All right. And so that was a phone call meeting?

**A.** Right.

**Q.** All right.

**A.** And all of these were phone call meetings.

**Q.** Okay.

**A.** And I had asked Paul to arrange meetings with each of the commissioners, and I wanted at least him and I on the call.

**Q.** Okay. So what was discussed at this meeting on September 8th in connection with redistricting?

**A.** Well, I believe that's probably -- I'm not absolutely certain, but I suspect that is my first call seeking what the commissioners want to do.

**Q.** Okay. And did Judge Henry provide input?

**A.** He did.

**Q.** And what was -- what was -- what were his comments?

**A.** Judge Henry wanted to go towards a map that was similar to something he actually had wanted back in 2010 but understood that legally that wasn't something we were really going to be able to do because it wasn't going to obtain preclearance; and that was to do a geographically-based redistricting map, in particular putting the Pelican Island, Galveston Island, and the Bolivar Peninsula together.

**Q.** I think, in other words, you are describing the coast

of the county?

A.   Describing the coast of the county.  There are a few other aspects to it, you know, keeping -- looking at various regions, the suburbs off of Harris County up in the north, the Galveston Bay area, and the added aspect of not pairing any commissioners.  But it's essentially a map he had discussed and there had been public support for in 2010.

Q.   The coastal precinct, you are talking about?

A.   Yeah.  In 2010-2011 there had been support for that publicly.

Q.   Did they discuss with you the need to have legally compliant maps, maps that comply with the law?

A.   Well, of course.  And I discussed with them the need to have legally compliant maps.  I mean, the -- the key to this is you are going to have to obey one-person, one-vote.  You are going to have to obey the Voting Rights Act.

     Go ahead.  I'm sorry.

Q.   Did Commissioner Apffel have any sort of comments or thoughts on what he might have needed or desired?

A.   Yes.  Commissioner Apffel -- and I'm somewhat -- I want to emphasize something here because I am somewhat uncomfortable talking about these, but I'm assuming this has already passed under the bridge.

With each one of the -- when you are representing a commission like this, there is a delicate ethical situation you have to deal with because you are not representing the individuals.  You are representing the commission.  And you are also, in that context, representing all of the commissioners.

So one of the things I thought was important in this process was to inform the commissioners that -- and I did want to require them to have to be in front of one another at one point -- at this point.  But all the commissioners could make requests of us that would be kept confidential from all the other commissioners, and we wouldn't reveal that unless they gave us permission to do so.

That having been said, Commissioner Apffel's requests at the time were fairly simple.  He wanted Pelican Island and Bolivar out of a district that went across Galveston Bay to hook into his, and he had -- he wanted to keep all his Texas City stuff.  He, frankly, wanted to keep everything; and he wanted to add two precincts in the north.

Q.   Okay.  Was there anything else discussed at the September 8th meeting?

A.   I think that's pretty much it.  That was the gist of it.

Q.   Okay.  And was the reason that you started the

*Laura Wells, RPR, RMR, CRR, RDR*

meetings around September 8th, we start running into potential deadlines for --

**A.**   We start running into potential deadlines.  We are starting to get -- we are getting data that's coming available to us.

**Q.**   Okay.  But at this time, in the September 8th meeting, you don't have usable data, even then, in your possession?

**A.**   We have some idea, but we don't have -- we don't have the kind of data I really want, which is in that spreadsheet.

**Q.**   Okay.  So did you leave this meeting with sort of instructions?  Or what was your expectations for what you were going to do next?

**A.**   Well, the expectations for what we were going to do next was keep calling commissioners and -- individually and getting their read on what they wanted.  This was not a time for us to suggest things to them or to -- and when I say "we," I mean myself and Mr. Ready.  This was not a time for us to suggest things to them.  This was to hear what they wanted.

**Q.**   All right.  Okay.  Then let me pull up JX-19.

And while he is doing that, I'm going to ask you:  Did you subsequently meet with Commissioner Giusti?

**A.**   I did.  And the same way.  Phone call with Mr. Ready on there.  Mr. Ready put it together.

**Q.**  Okay.  JX-19 is -- it's a sort of a call invite --

**A.**  Yeah.

**Q.**  -- with Commissioner Giusti and Mr. Ready and you.
Do you see that?

**A.**  Yes.

**Q.**  Dated September 13th?

**A.**  Yes, sir.

**Q.**  Okay.  Is that consistent with your recollection?

**A.**  Could easily be.  I don't know.  I'm not going to testify to exact dates, but it would be consistent generally with the timeline.

**Q.**  All right.  So then on September 13th, you are engaged in a phone call with Commissioner Giusti and Mr. Ready?

**A.**  Correct.

**Q.**  And what was the purpose of that phone call?

**A.**  Well, that was to find out what Commissioner Giusti wanted.

**Q.**  And what did he tell you?

**A.**  His were simple.  First and foremost, he wanted his parents' house in his district.

**Q.**  Did he say he wanted to keep his parents' house?

**A.**  He wanted to keep his parents' house in the district -- in his district.

**Q.**  Do you know where his parents live?

**A.**  I have no earthly idea at the time.  But I told

Mr. Ready to get that address; and the demographer would punch it in; and we would -- we would keep his parents' house in the district.

**Q.** Did you subsequently find out that his house -- the parents' house was on the Island -- on Galveston Island?

**A.** I did subsequently find out it was on the Island, and I did subsequently find out it was right up against the district line, which I did not know at the time that I said what I said to Commissioner Giusti. Sometimes, yeah.

**Q.** Pull up DX-4 again.

**A.** The other thing he wanted was to lose as little of his district as possible. He knew that wasn't really possible because he was one of the most overpopulated districts in the county. He was going to have to lose pop. There wasn't any way to avoid it. But he didn't want to lose his parents' house. Absolutely that was the most important thing, aside from his home.

**Q.** So if you are looking at DX-4, which is on the screen, Commissioner Giusti is in the red area?

**A.** Correct.

**Q.** And that's Precinct 2?

**A.** Correct.

**Q.** And as -- the map as it existed in -- prior to the vote in 2021, Commissioner Giusti, it appears that he has both his own residence and his parents' residence?

**A.** He does.  His parents are in that little knob that's in the top, on the far eastern side of -- on Galveston Island.

**Q.** Okay.  And so -- and during this process, I guess the next day, the 14th, is when you reach out to Mr. Kincaid and get -- you receive the data from him?

**A.** Yeah.  I --

**Q.** You receive data from him?

**A.** I'd actually reached out to him earlier.  That's when he got it to me.

**Q.** All right.  And did you subsequently also meet with Commissioner Clark?

**A.** I did.

**Q.** All right.  Let me pull up JX-20, quickly.

JX-20 is -- it looks like a -- let's see.  I think that's the wrong exhibit.  Go back to the map if you could, DX-4.

Is it consistent with your recollection that the meeting with Commissioner Clark occurred on or about September 16th?

**A.** It would be in the general timeframe, yes, sir.

**Q.** Okay.  And again, the purpose of that meeting or phone call with Commissioner Clark was what?

**A.** The purpose of the phone call meeting with Commissioner Clark was the exact same as it had been with

everyone else.  Tell us what you want and what you would like to see.

And Commissioner Clark's were in some ways more general than either Giusti's or Apffel's had been.  He was in the same position as Commissioner Giusti.  He was going to have to give up pop.  He was, again, saying give up as little as I possibly can.

And he was also saying, because he was a little bit concerned because the -- District 3 forms a little bit of a population dam through the county.  So moving population from the western side of the county, which was where most of the overpopulation in the map in 2021 was, to the eastern side of the county was a little tricky.  And Clark was savvy enough to know that that movement might very well go through his district, even though he was overpopulated.

So this is a common problem you hear with representatives in this exercise.  They go, "Well, I'm overpopulated.  I shouldn't have to pick up any new population."  Well, but if you have got to get the population from one place to another and you can't make a direct route there, it will end up going through somebody who is overpopulated or right at population.  He was savvy enough to know that he was in that -- potentially in that position, and he asked for as little of Giusti's seat as

he could possibly get.

**Q.** And just for clarification, Commissioner Clark is in which precinct?

**A.** He is in District 4.

**Q.** At the time?

**A.** So he wanted as little moved from 2 to 4 as could possibly be arranged.

**Q.** Okay. And you mentioned that Precinct 3, I think you said, forms a dam --

**A.** Right.

**Q.** -- through the county.

And that -- are you describing the fact that Precinct 3 runs, basically, the middle column right through the middle of the entire county?

**A.** There is only a small, little gap at the top, between the top of Dickinson and Harris County, through which you can flow population, unless you are going to flow it through 3. And if you are going to flow it through 3, you are going to make a massive disruption.

**Q.** Okay. So let's move forward to September 20th.

Well, let me ask you before I go there. Did Commissioner Clark have any other asks at that time with you?

**A.** That was it. Like I said, his were much more general, but he was also -- like I said, he was savvy enough to

know that that pop movement was a potential issue.

Q.   Okay.  Let's move forward to September 20th.

And I think you had a phone call, an initial phone call with Commissioner Holmes; is that correct?

A.   Correct.

Q.   Do you recall how that conversation went on the 20th?

A.   Yes.  I was asking Commissioner Holmes the exact same question I had asked the -- the questions I had asked the previous three district commissioners.  And I was seeking to get what changes he would like to have made to his district -- others as well, obviously, but principally to his district.

At this point, he knew he had to gain population.  He should have had the spreadsheet that I had gotten Ready.  And the -- I'm trying to at that point find out what changes he would like made to his district.

Q.   Okay.  Let me pull up, if I could, JX-23.

Before we go through the exhibit, I want to ask you: Did you express to the commissioners, each one by one, the idea or notion of confidentiality between you and them and not sharing information between other commissioners?

A.   Absolutely.  That was -- that was the first thing out of my mouth.

Q.   Okay.  And what specifically did you tell them in connection with the conversations you were having with

them?

**A.**   I was telling them that the conversations we're having right now are not going to be told to any other commissioner unless you release us and allow us to do so. That these are all strictly in confidence, and we're not going to -- we're not going to tell the other commissioners.  We're not going to tell the public.

And there are a lot of reasons for doing this.  For one thing, commissioners have a tendency to be more candid with you if they think that they are not speaking in front of their other commissioners.

Plus, this is a very delicate matter.  No elected politician that I have ever known likes it to be known that he doesn't want certain people in his district.  He loves them all equally, just like children.  And so you don't want to be in a position where you are putting an elected official, a commissioner in this case, and you are telling the world he doesn't want you.

So it's all in strict confidence.  And I was very clear about that with Commissioner Holmes, as well as all the other members of the Commissioners Court.

**Q.**   Okay.  All right.  And so looking at JX-23, they are notes.  These are Commissioner Holmes's handwritten notes.

The top is dated September 20th, 2021.

**A.**   I'm sorry.

**Q.**   So here is the question for you:  The notes state that -- there is an asterisk about five, six asterisks down.  It says:  "Keeps asking me what areas I would like to have."

Do you recall asking Commissioner Holmes that?

**A.**   Yes.

**Q.**   What was his response?

Well, let me back up.  First, what is the purpose of asking that question?

**A.**   Well, Commissioner Holmes, unlike other commissioners in the map, he is not going to be shedding locations.  If he is, he is going to have to make up for it with another location.  He has got to add about 8,000 people.  So the question becomes:  Where would you like those people to come from?

**Q.**   Okay.

**A.**   Where do you want us to go and bring those people into your district?  Because you have got to have some.  The law and the numbers are requiring that.  And this is your chance to tell us where you would like that to come from.

**Q.**   Okay.  And what was his response?

**A.**   He didn't give us one.  He put us off and told us he would get back to us later on that.

**Q.**   Okay.  And --

**A.**   Which was a little frustrating because we already had

everybody else's responses.  He is the last one I'm waiting on.

Q.   So did you have a subsequent meeting?

A.   We did.

Q.   Well, let me back up for a second.

There is -- you mentioned that you sent data to Mr. Ready?

A.   Yes.  The sheet that I had before.

Q.   Okay.  And do you remember why you sent him that?

A.   To be distributed to the commissioners.

Q.   Okay.  And let me pull up DX-80.

Okay.  So DX-80 is an e-mail between Mr. Ready and Commissioner Holmes dated September 20th, 2021.

A.   Okay.

Q.   And you can see from the e-mail that Mr. Ready is providing Mr. Holmes the data that you received from Mr. Kincaid?

A.   I assume that.

Q.   We'll go to that page next.

A.   Yeah.  I assume that's correct.

Q.   Okay.

A.   But it's an assumption.  That seems to be what is going on there, yes.

Q.   Well, let's take a look at the attachment.  Next page.

A.   Well, that would be it, yes.

**Q.** Okay. Now, counsel has remarked that the -- there is a difference between this document and the one that you actually received from Mr. Kincaid that we looked at earlier, and that it doesn't -- the sort of title material is blocked out of it.

**A.** I removed the header.

**Q.** And what was the -- what was the purpose of that?

**A.** There was no -- all I was acquiring was data. There was no reason to have the header on there. And it's -- all I had done is the only person I knew I could get the data from at that time.

Now, subsequently, we had data available from other sources. So I didn't need -- this is the only time I got a spreadsheet from Mr. Kincaid.

**Q.** Did Mr. Kincaid have any -- play any role at all in the Galveston County redistricting process?

**A.** No. None at all.

**Q.** All right. So back to the -- you are collecting information from the commissioners through phone calls.

Subsequent to the meeting, the first phone call you had with Commissioner Holmes, did you have a second phone call follow-up with Commissioner Holmes?

**A.** We did. I can't remember exactly when it was, but it was about a week later. And this time he had very detailed requests.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** All right.  And pull up JX-23, page 3.

And JX-23 is, again, Commissioner Holmes's handwritten notes of various meetings.

This one occurs on September 23rd.  Is that consistent with your memory as to how the process went?

**A.** That's about right.  I don't -- I'm not going to tell you that it's all right at this point.  These were given to Mr. Bryan to be put into the map.

**Q.** But when you say -- let's back up for a second.

So again, your phone call with Commissioner Holmes at this point, just like the rest of the commissioners, was to gain information from him as to what he would like to see in the map, right?

**A.** Right.  Right.

**Q.** And you had one call with him on the 20th, and I guess he didn't have the information that he needed.

Is that what he told you?

**A.** Yeah.  And he needed to think about it.

**Q.** Okay.  So he comes back, and you have a second meeting on September the 23rd with you?

**A.** Right.  And he has very detailed -- these are, in fact, the most detailed requests that we have gotten from any of the commissioners.

**Q.** Okay.  And what is it about those that makes them detailed, in your mind, to people who really don't know

much about how you draw precincts?

**A.**   Well, with the exception of Commissioner Apffel, who gave you two whole precincts and two whole pieces of geography, most of the rest of them are giving me more amorphous things like:  Don't give me any more of District 2 than I have to receive.  Don't give up as much -- you know, as little of my district as I possibly can.

     These, as you'll see, they run down streets. They -- while they are not identifying them by the FIPS codes for the census blocks, they are doing very specific cuts.

     And we -- that's fine.  In some ways, that's better. But we had -- he had very, very specific changes in mind.

**Q.**   In fact, you see the letters "PCT 192" on top.

     Does that refer to a specific voter precinct within the county?

**A.**   I believe that to be correct.

**Q.**   And then the instructions after each one of those precinct calls related to specific sort of streets or landmarks that he wanted?

**A.**   Correct.  Most of them he had running directly down streets.

**Q.**   And the specificity with which -- the information he gave you, what did it lead you to conclude in terms of

Commissioner Holmes's knowledge of Precinct 3 and 4 and 2?

**A.**   Well, I don't -- I'm not particularly surprised that a commissioner necessarily has knowledge of his own precincts; but it did kind of cause me to believe that he had help, not that there is anything wrong with that.

**Q.**   One way or another, nothing nefarious about it?

**A.**   Yeah.  That's what I'm trying to say.  There is nothing wrong with him having had help.

**Q.**   It's the details that were provided, the very specific areas that Commissioner Holmes wanted to see added to his precinct?

**A.**   Yeah.  Yeah.

**Q.**   Okay.  So did you and Commissioner Holmes discuss anything else in connection with the September 23rd meeting?

**A.**   Well, I think September 20- -- in this meeting, it was largely getting this piece of information, because this was the piece of information that was going to allow us to start constructing maps.

**Q.**   Okay.  And did you -- did you remind Commissioner Holmes or tell him that -- you know, the sort of confidentiality?

**A.**   I -- in every one of these meetings, I reminded them of the confidentiality.

**Q.**   And what about access to you if things change or

needed to get maps --

**A.**   I told him he was free to call me at any time; that I did want that call to be -- I did not want to talk to him without Mr. Ready there.  But he is free to contact me at any time to discuss any issue with the redistricting, and all those conversations would be held in confidence unless he released me of that.

**Q.**   Okay.

MR. RUSSO:  Your Honor, we have been going a while.  This is a good time to break in the examination if the Court is inclined.

THE COURT:  Okay.  We can do that.  Yeah.  Let's take about 15 minutes.

CASE MANAGER:  All rise.

(Recess from 9:52 a.m. to 10:08 a.m.)

THE COURT:  Thank you.  You may resume your seats.

MR. RUSSO:  May I approach, Your Honor?

THE COURT:  Yes.

MR. RUSSO:  May I proceed?

THE COURT:  Yes.  Yes, you may.

BY MR. RUSSO:

**Q.**   Would you pull up JX-23.

And before I move on, again, this is the handwritten notes by Commissioner Holmes, specifically related to the

meeting that occurred on September 20th, 2021.

There is a comment that is three asterisks from the bottom. It's the third one up. It begins: "I believe..."

It says: "I believe every other member of the Court has seen maps with updated data."

Is that an accurate statement?

A.   Well, that's absolutely wrong. There had been no maps drawn at that point.

Q.   Okay.

A.   So there are no maps to see updated data. The data is the data which I have already sent to Mr. Ready. The purpose of the conversation with Commissioner Holmes is the same as it is with all the other commissioners; that is, to get the requests and their idea of what criteria should be embodied in the map. That's the entire purpose of these conversations that are being held at this time. So, no.

Q.   So as of -- it's your recollection then, as of September 20, when you met with Commissioner Holmes the first time to get details for his requests, that no -- had any other commissioners been shown any data?

A.   Not any more data than he would have been shown at that point.

Q.   Had any of the commissioners been shown any other

maps?

**A.**   There are no maps.  They haven't been created yet.  So that would be impossible.

**Q.**   If we could go back to DX-4, which I think is the map.

Okay.  So we have got through, sort of, I guess, the first round of discussions with the Commissioners Court.

**A.**   Correct.

**Q.**   And as a result of those meetings, is it true that you, sort of, had your first-step request from the commissioners in terms -- and Judge Henry as to what they'd like to see?

**A.**   Right.  That is correct.

**Q.**   And what did you do next?

**A.**   Well, at this point we start taking the requests; and I start doing some analyses.  I have already started to some degree, but I start to do some analyses of what are going to be our legal problems here.  But I have also got all of that prepared to hand to the demographer -- the requests and everything to hand to the demographer so that he can try to put those into a map.

At this point, I'm not sure of whether the requests of the four commissioners with districts can be coordinated in such a fashion that most of the requests can be honored for each commissioner in a map.  But I am at least, after hearing all four of them, somewhat hopeful that that is

actually a possibility.

**Q.**   Okay.  Well, let's -- let's focus again on -- this is the map that was in effect prior to the changes made by the Commissioners Court in 2021.  Let's -- let's talk about Precinct 3 as it looked back then.

**A.**   Well, see --

**Q.**   And let me get a question in.

Did you -- did you have concerns at that time that Precinct 3 is a racial gerrymander and may need to be dealt with in terms of creating a legal map?

**A.**   Absolutely.  I mean, here is -- and what I was just saying actually dovetails into that problem because this is -- this is where you are starting to research the problem.

Galveston, Texas, is in a group of jurisdictions that has a significant issue with its minority districts post-*Shelby County* because since Section 5 of the Voting Rights Act is no longer applicable to Galveston County or the State of Texas at all, the standard under which this district had been drawn ten years earlier no longer applied.

**Q.**   And the standard you are talking about is -- relates to the fact that under Section 5 -- just tell me if I'm wrong -- is it -- is the -- is what you are describing the situation that Section 5 no longer applies and

preclearance isn't something that Galveston County is dealing with at this point?

**A.**   Correct.  You no longer have to get the map precleared.  But more importantly, the legal standard is different.  Section 5 had a retrogression legal standard to it.  And as a result, it did not matter whether the African Americans constituted a majority in the district or not.  It didn't really matter if it was a majority-minority.

There was some academic discussion about whether that was how it was supposed to be under Section 5 or not, but the Department of Justice was very clear about how they enforced it.

So for a practical matter, from a practitioner's standpoint, you did not have to have a majority-minority district under Section 5; and they could be concerned about one of the minorities.

The 3rd district had very clearly been drawn -- particularly after we originally submitted it, every change that had been done had been done under a racial basis under Section 5.  The problem with that is, as long as that's no longer an exception, that you could shield yourself from racial gerrymandering, well, you have just clicked off the predominance point because it's not -- it's not just predominant.  It's the only reason he

made the changes.

You have got -- you know, clearly it was -- they were race-driven.  And you either are going to have to find another basis for drawing that district in a similar fashion, or you are going to have to change it from a Section 5 seat to a Section 2 seat, which means you have to pick up additional requirements that you didn't have to do in 2010.

The most important of those is -- and this is where you get, again, to the *Bartlett* case, which has come down in 2009.  You get to the question, the only way to get to majority-minority, looking at the data that I was looking, at, at that time, is you have to claim a coalition.

Coalition --

**Q.**   You mean a coalition between two different minority groups?

**A.**   Correct.

**Q.**   And before you answer, could you move your microphone closer to you.

**A.**   I'm sorry.  I apologize.

**Q.**   It might be somebody that wants to hear all this.

**A.**   Well, I usually have a voice that somewhat carries; but we'll use the microphone.

**Q.**   Nevertheless, the change in, sort of, the elimination of the preclearance standard changed the games in terms of

being able to keep Precinct 3, in your view?

**A.** Right. Well, there is a little bit of difference between preclearance and retrogression. Part of the problem with preclearance and part of the problem with Section 5 is it also shifted the burden of proof.

So under Section 5, it was imperative that the jurisdiction seeking preclearance proved that it had not engaged any -- in any retrogression or in any intent to retrogress. Those are tough standards. It's hard to prove a negative. And that made it very difficult to deal with.

In Section 2, the burden flips back to the plaintiffs. Moreover, if you are a jurisdiction and you are going to draw a Section 2 district in a prophylactic fashion, then you have to at least have strong basis and evidence for what you are going to do.

**Q.** And let me stop you there.

The strong basis of evidence, I think it sort of dovetails into the strict scrutiny standard?

**A.** Well, it does. But the strict scrutiny standard is what is applying to the application of a racial gerrymander, a *Shaw*-type claim. There is a lot of misunderstanding on that in the public, too.

The *Shaw*-type claim, the racial gerrymandering, is not a racial vote dilution action, which is what this is.

**Q.**   So let me see if I can kind of sum up --

MR. GABER:  Objection, Your Honor.  To the extent that Mr. Oldham is giving legal conclusions and acting somewhat as a purported expert in the law here, I think that the Court can do that.

And, also, he has just mischaracterized the nature of the claims for one matter, the racial gerrymandering claim in this case.

THE COURT:  Okay.  All right.  The Court is aware of what the claims are in the case, and I'm going to overrule the objection.  I think it falls within his expertise as a redistricting expert.  Okay.

BY MR. RUSSO:

**Q.**   So what I was going to ask you is to try to sort of sum up most of this, because 99 percent of us have no idea what you are talking about.  But --

**A.**   I'm trying to explain.

**Q.**   In looking at the map that was in place and the requests that the commissioners had made of you, did you have a concern that you were going to have to make some changes to Precinct 3 in order to make it a legal map based upon the change in the preclearance standard in 2013?

**A.**   Yes.

But here is the -- and we had to make a change on the

basis of why it was done.  What I became convinced of in my examination of the law and my examination of the facts -- because I also went and looked at a few cases from Texas, in particular, *Perez v. Abbott* -- and I wasn't looking as much for the law in this case as I was looking for how the Court had actually handled ultimately deciding the coalition issue.

And the question in my mind was whether they were going to be -- if you go all the way back to the *Campos v. Baytown* and the *Brewer* case, these were all decided before *Bartlett*.  And there has been a debate in the academic field and in the legal field in these cases of whether you can prove coalition by merely looking at general election data or whether you have to have primary data or nonpartisan election data in order to do this.

That and in the Fifth Circuit, and one of the things I like about the case, is it has this long discussion that goes back and forth of whether you can or you can't; what is the state of law in the Fifth Circuit; da, da, da, da, da; never reaches a conclusion.  But at the end of the day, they decide the case based on the exogenous primary data.  And that -- what they did was, in a way, more important to me than the legal discussion.

And if I carry that same set of facts to Galveston County, we have got a real problem when it comes to

proving coalition if the County is going to bite off that case because that's -- that's the difficulty we are staring at when we redraw 3 is we have got a real difficulty at that point.  Because not only do we not have good primary data, but this case has already tried to be made only a few years previous, and the Court did not view it favorably.

MR. GABER:  Objection, Your Honor.  This is the same issue that you sustained the objection as to Judge Costa's ruling.  In fact, Judge Costa never ruled on the cohesion issue between Black and Latino voters.  It was about whether there was a second district over 50 percent, which is a completely different issue.

MR. RUSSO:  May I respond, Your Honor?

THE COURT:  Yes.

MR. RUSSO:  The witness is walking through an analysis that he is going through in order to reach a decision as to how the County is going to redistrict its maps.  The issue is not this is the law; but it's his impression of the law, which is, you know, sort of what we're trying to establish on the record.

THE COURT:  All right.  That's the way the Court will accept the testimony, and so the objection will be overruled.

MR. RUSSO:  Thank you, Your Honor.

BY MR. RUSSO:

Q.   You were saying.

A.   Well, so as we begin to -- it seems that the idea of being able to prove a coalition is going to be incredibly difficult.  Moreover, it means basically going after -- the County is going to have to reverse its position from the *Petteway* case, which is not that short a distance in time.

     So the --

Q.   You are referring to the prior *Petteway* case?

A.   The prior *Petteway* case, yes.  Sorry.  I should be more specific in that.

     So the question becomes if you are going to preserve District 3, you need to have another basis for doing so.  And I believed at that time that another potential basis for doing so was, in fact, developing before me.

     After having talked to the four commissioners of the districts, they had given us information which led you to believe that a map could be drawn that could be done on a least-changes criteria basis, that could be done on politics; and if we removed some of the more obvious racial gerrymander aspects from what had happened at the end of the 2011 redistricting process, we could produce a district that would elect -- re-elect Commissioner Holmes and we would not have to defend on the basis of Section 2

of the Voting Rights Act.

If we faced a racial gerrymandering claim, which I considered to be a very real possibility, then we would -- we would have an adequate nonracial defense.

Q.   Okay.  And so was it your concern, again, that Precinct 3 was a racial gerrymander by virtue of the prior negotiations, and you needed to make sort of a least-change type of change to the map in order to arguably remove the racial gerrymander arguments in the future?

A.   Correct.  And -- well, I'll let you take me to the next step.

Q.   So did -- at some point, we -- you engage -- or counsel engage, whether it's Holtzman Vogel or not -- y'all engaged a demographer to help with the actual -- well, I'm going to go into that.  I'll go into the demographer in a minute.

So is it true that one of the thoughts or ideas in developing the maps was this least-changes approach?

A.   Correct.

Q.   And that's, again, in connection with the gerrymandering issue and dealing with that?

A.   At this point, you have developing -- I can see it from what I have been told by the commissioners.  You can see two very different criteria that will result in two

very different maps --

**Q.**  Okay.

**A.**  -- both of which, after I have done my analysis, I think we can defend.

**Q.**  Okay.  And the other map was --

**A.**  If the demographer can actually make everything work.

**Q.**  And the other map or idea in your mind is dealing with this coastal precinct issue that was mentioned earlier in your conversations with --

**A.**  The geographic criteria map, yes.

**Q.**  All right.  So -- and let's move forward to when y'all get a demographer on board in this matter.

Do you remember his name?

**A.**  Yes.  Tom Bryan.

**Q.**  Okay.  And do you know when he was involved in the project?

**A.**  Not immediately, but it was sometime early October, I think.

**Q.**  Okay.  And --

**A.**  It was my first time working with him.

**Q.**  What is the first time you can recall speaking with Mr. Bryan about your plans or thoughts on Galveston County's redistricting?

**A.**  I don't know exactly, but it was sometime early in October.

**Q.** Okay. Well, let me pull up PX-193. If we could blow up the top portion of that.

So this is a -- it's a -- it looks like an invite for a meeting -- it's actually dated Saturday, October 16th -- from Tom Bryan to Jason Torchinsky and Jeff Ryer.

Do you know Jason Torchinsky?

**A.** I do. I have known Jason for a very long, long time.

**Q.** Is he with the Holtzman Vogel firm?

**A.** He is.

**Q.** And the actual date on the call suggested is -- in the subject line -- it's "Call on Galveston" is the subject. And that's 11:00 a.m. Eastern time, Sunday, October 17th.

Do you see that?

**A.** Yes, I do.

**Q.** And is that sort of consistent with your recollection of when you might have had a first phone call with Tom?

**A.** It could be. I won't dispute it.

**Q.** So what was the conversation? What was the purpose of this call?

**A.** Well, the first phone call, the purpose of the call was to make sure he was on board, and to start giving him the information that had been gathered from the commissioners, and getting him to work on the two plans.

**Q.** Did you sort of run the meeting and -- or how did it work? Tell me about it.

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Well, first of all, like I said, it's the first time I had ever worked with the guy.  So there is a little bit of getting acquainted.  But I am not sure if we had gotten directly to the question right then at that moment or whether we had a subsequent one.

But essentially, very quickly, I gave him the information that had been provided by the commissioners.

He also needed to get the houses of all the commissioners in his -- in his system, as well as Commissioner Giusti's parents' house, and have all that available so that we could look at it; but more importantly, he could start drawing.

**Q.**   So did you provide him the details that were supplied to you by the commissioners?

**A.**   Correct.

And the first map I wanted to do was the least-changes map because the first thing I wanted to see was could we actually put the requests of the four commissioners together into a single map.  I, being fully aware that probably no one is going to get absolutely everything they asked for, but can we put together a map where they get most of everything they have asked for; they're happy; and we then think we have, again, a nonracial basis for defending the map.  And I had some hopes at that time that that was possible.

*Laura Wells, RPR, RMR, CRR, RDR*

I will tell you, most of the time when you do electeds and you do a list of their wants, their wants are so on top of each other, you can't actually pull this off.  But I could see the flexibility in what was being asked for, and I kind of thought that this was a real possibility at this point.  But I wouldn't know it until after I saw what Tom was able to produce.

Q.   Okay.  And so you -- just to make sure, you conveyed the thoughts of Commissioner Apffel, and Judge Henry, Commissioner Giusti, Commissioner Clark, and those of Commissioner Holmes, as well, were all conveyed to Mr. Bryan?

A.   Yes.  But -- but let me just clarify something with Judge Henry.  With Judge Henry, that's Map 2, because that's a completely different concept than what we are working on, on Map 1.

Q.   Understood.

What instructions did you provide Mr. Bryan in connection with the use and development -- use of racial data and the development of these maps?

A.   My instruction was incredibly clear.  Do not put the race data up.  I don't want it as a thematic.  I don't want you using it in a -- in a rolling change box in the corner of the screen.  I want the race data absolutely not to be used at this stage of the map.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   And what you were referring to about -- were you referring to his use or reference to racial data in developing the maps?

**A.**   That's correct.  I didn't mean to be shaking my head, but that is absolutely correct.

**Q.**   Why was that important to you?

**A.**   Because if we are going to be defending against a racial gerrymandering claim, one of the first things that's going to be alleged against us is that we used race in the draw to -- even though we were, you know, claiming we are doing it on politics at their request, that we used race in the draw to actually draw the districts in a racial manner.  I wanted that absolutely not to be the case.

**Q.**   Okay.  And was that -- were the same instructions given on development of the coastal precinct matter?

**A.**   It was.

**Q.**   Okay.

**A.**   I told him in both cases not to use the race data at all in any shape, form, or fashion.

**Q.**   All right.  Was there -- did y'all discuss at this point with Mr. Bryan a need to get these maps done quickly?

**A.**   Yes.

**Q.**   Why was that?

**A.**   Because we weren't sure what our timeline was; and the whole census thing had put us in a terrible squeeze, worst squeeze I have ever been in and not be in a one-state. And it's probably -- as it turned out, it was even worse than being in a one-year election state.

And so we had a terrible timeframe problem.  No two ways about it.

**Q.**   Okay.  And then did you -- subsequent to this -- this phone call with Mr. Bryan, did he actually produce some maps for you?

**A.**   He worked very quickly, and I was very pleased with the end product.

**Q.**   Okay.  So let me put up PX-196.  No.  197.

So this is an e-mail from Tom Bryan to Mr. Torchinsky, Phil Gordon, and Dale Oldham, dated October 17th at 5:00 p.m. Central Daylight Time.

Will you zoom out.

And the top line there, it says:  "Galveston, Texas, for discussion [as read]."

Do you see that?

**A.**   Let me -- I would say I'm an old man, but the truth is I have never been able to see.

Yeah.  That appears to be right.

**Q.**   Okay.  Now, let's scroll to the first map.  Attached to this e-mail are some maps, presumably for discussion.

*Laura Wells, RPR, RMR, CRR, RDR*

Is that your recollection?

**A.**   Yeah.  I think that would be correct, yes.

**Q.**   Okay.  And so the first map that's attached is the Galveston benchmark plan, which we have seen earlier is also DX-4, right?

**A.**   Right.  Correct.

**Q.**   Scroll to the next map.

Now, this is what is titled "Galveston, Texas Draft Optimal D Plan."

And given the two maps that you had in mind when you talked to Tom Bryan earlier, which map would this -- how would you describe this?

**A.**   This would be Map 2.  This would be the map that's embodying the criteria suggested by Judge Henry.

**Q.**   That includes a coastal precinct, which you can see there in green, right?

**A.**   It does, yes.

**Q.**   All right.  Now -- and the numbers are a little bit off.  I think there is --

**A.**   Yeah.  He had to correct that.

**Q.**   -- what ultimately --

Well, let me ask you the question this way:  Do the numbers that are on the map reflect what actually ended up getting passed?

**A.**   No.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   Okay.  So go to the next screen.

Okay.  Now, describe this map for me.  Which of the maps was this?

**A.**   This would be the minimum change map here.  This would be the one that reflected the individual commissioners' wants.

**Q.**   The minimum change or least-changes map --

**A.**   Right.

**Q.**   -- that we talked about?

**A.**   Yeah.

**Q.**   And this map was designed, again, in your mind at least -- was it designed, in your mind, to, again, sort of alleviate the issues of potential racial gerrymandering that existed in Precinct 3?

**A.**   Correct.

**Q.**   Okay.

**A.**   And you'll note it puts the Bolivar Peninsula back in.  The last set of cuts that DOJ made us do are either reversed or they've been smoothed over partially, thanks to Holmes's own request, in a couple of places.

**Q.**   Okay.  Was there much discussion related to these two maps, between you and Mr. Bryan and, I guess, Mr. Torchinsky at the time, as to the adjustments that needed to be made?

**A.**   I don't think we had a whole lot of adjustments.  I

remember at some point there was -- a good part of what we were trying to do was do our one-person, one-vote rectifications in precincts that we already knew under Texas law were going to have to be subdivided.  And we were going to have to subdivide some internal to districts, but we were holding off on that at this point because we were just trying to get this done.

But there was -- the one that I'm remembering in particular is the one up there between, what is here, 2 and 4.  That precinct was particularly difficult to divide because there were some lines inside of it that weren't complying with census geography and didn't have a good identifier on the ground.  We had to -- we had to readjust that from what Tom had originally done.

Q.   And was it the intention of this map to incorporate specifically the request that Commissioner Holmes had in connection with --

A.   Absolutely.  My instruction to him was -- I'm sorry. I cut you off.

Q.   Let me finish my question.

In the development of this map was there -- was it intended particularly to pick up the areas that Commissioner Holmes had requested in your conversation with him?

A.   Absolutely.  In fact, I instructed Tom in this map to

draw Commissioner Holmes's seat first before he drew any of the others.  And we had to make sure we gave everybody some of what they wanted.  And we were trying to give everybody some of what they wanted.  And nobody got everything they wanted.  That's not how this usually works.

Q.  Well, and again, the addition of Bolivar Peninsula in this map was, again, used by you to try to remove the racial gerrymandering issue of Precinct 3?

A.  That was certainly one of the things.  But, I mean, also, keep in mind is one of the reasons it hangs out there like a sore thumb in a racial gerrymandering situation is it's also geographically sensible.  If you pop those water blocks -- the shading on the water blocks off -- and this is why you get a fake compactness score on the thing.  If you pop that off and you put the water blocks in, the lack of compactness, the lack of contiguity, if you put that in anything other than the district that has the eastern end of this island, it becomes very, very obvious.

Q.  And I think what you are describing -- maybe I can clarify a little bit.

     When you are talking about water blocks, it's the blocks -- the voter blocks that really have no people in it; is that right?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.** Yeah.  The only way --

**Q.** They cover the water?

**A.** The only thing that's out there are boats.

**Q.** And I think what you are suggesting is, is that sort of the straight line on this --

**A.** Right.

**Q.** -- map between Precinct 1 and Precinct 3 that runs right up Galveston Bay --

**A.** Right.

**Q.** -- that those are all water blocks?  And that line can be drawn straight, could be drawn crooked, and it's really not going to affect the population?

**A.** It doesn't affect population.  But moreover, when you do a Polsby-Popper or a Reock score on that, it's going to give you a little bit of a false read because of that.

**Q.** In other words, am I -- are you saying --

**A.** It will -- it will read more compact than it really is.

Sorry.  I cut you off again.

**Q.** No.  It's okay.

**A.** Yeah.  But it doesn't help the court reporter, and I'm trying to make her life easier.

**Q.** All right.  Okay.  So do you -- after you had the meeting with Mr. Bryan and obtained the maps, what did you do next?

**A.**   Well, after we had the meeting with -- after we got the maps put together, we wanted to show these to the commissioners and get their reactions.  So I had, at this point, two maps that I thought we could legally defend.  And so now I wanted to show them to the commissioners because this gets, again, to the delicate position of being counsel to the commission as an entity.

**Q.**   Okay.  That --

**A.**   I --

**Q.**   Let me -- let me see if we can put some context on this.

Can you pull up PX-199, quickly.

And this document just reflects on Judge Henry's calendar, setting a meeting on October 18th at 1:00 p.m. Central.

Is that sort of consistent with your thoughts on when you might have met with Judge Henry when you came back to town?

**A.**   That would be about right.

**Q.**   Or actually when you came to town.

**A.**   Yeah.  I flew down for this.

**Q.**   Okay.

**A.**   The -- and this gets to the -- like I said, to the delicate aspect.  We have produced two maps that embody two very different criteria, both of which at this point I

now consider to be legally viable.  The question now is a political one for the commission.  Which way are they going to go?  And we have a duty not to interfere with that or to become part of how that gets decided or be used as a weapon for one side or the other.

Q.   So did you go into these meetings with any view as to which meeting -- which map you were going to say was the best or which one you preferred using?

A.   I was prepared to tell them what I thought the issues were with both maps; but I was absolutely, positively not going to say, "You have to pass this one or you have to pass that one."

Q.   Okay.

A.   That -- for us, that would start to cross the line of representing a single commissioner or a group of commissioners or picking a side in what is about to be a political discussion.

Q.   But when you brought the two maps to Galveston, was it your belief that either one could be defended?

A.   It was my belief that I -- I stated very clearly to every commissioner that I believed that if we did these along the basis of what you saw here that I could defend either one and I thought I could win.

Q.   Were you satisfied in your conversations with Mr. Bryan that both maps had been drawn without reference

specifically to racial data?

**A.**   Correct.

**Q.**   What was it that made you believe that?

**A.**   Well, first off, I trusted him to some extent.  But my instructions had been very, very firm on this subject.  And I told him repeatedly that he was not to, during the drawing of the maps, use racial data.  That doesn't mean we didn't -- he couldn't produce it after we had drawn the maps; but during the construction of the maps, no.

**Q.**   Okay.  So we can go back to PX-197.  And -- all right.  So go ahead to, I guess, the optimal.

Okay.  So in your meeting with Judge Henry, did you -- did he review both of these maps?

**A.**   I did.

**Q.**   Do you recall whether Tom Bryan was actually on the Zoom session?

**A.**   I don't know.  He may have been.

**Q.**   But did you have these maps in hand?  Or were they on a computer?  How did you present them?

**A.**   Bryan had sent me screenshots.  I don't have the software for displaying these.

**Q.**   Okay.

**A.**   And I think we may have printed out some paper ones, but I don't -- I don't -- I haven't had redistricting software in a long, long time.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   Okay.  So did -- what was Judge Henry -- you met with Judge Henry on the 18th, right?

**A.**   Yes.

**Q.**   What were his thoughts -- well, let me ask it this way:  What's the purpose of going down to a meeting with Judge Henry with the maps in hand?

**A.**   Well, it's to explain each of the maps, to explain what we were doing when they were drawn, what the criteria are that are embodied in each of the two maps, how that affects our legal defenses for those two maps, how we would plan to defend either Map 1 or Map 2; and that's essentially the purpose of the explanation.

**Q.**   What were Judge Henry's thoughts on the two maps?

**A.**   Well, he very clearly preferred this one over the -- over the least-changes map.

**Q.**   And "this one," you are referring to the "Draft Optimal Plan D"?

**A.**   That is correct.

**Q.**   Is it also the coastal -- it has the coastal precinct in it?

**A.**   Correct.

**Q.**   Why did he prefer it?

**A.**   Well, it's essentially his criteria.  I mean, it's -- the instructions to Tom when drawing this map were to draw -- put the Bolivar Peninsula, Pelican Island,

Galveston Island together; come across the causeway; get to the closest commissioner, which it was obvious when you looked at where they all lived, they all live in the northern or far western part of the county.  And Giusti was the only guy who was remotely close.  He also didn't mind having the Island.  So he became the guy you were going to go to.

And I told him not to drive a secant to his house.  No corridors, no secants, no funny little lines.  Try to go up hard against the Fort Bend County border.  Because if you don't up hard against the Fort Bend County border, you are going to create a secant coming down by what you just haven't put in.  So he did that.  He almost ran out of population before he got to Giusti's house.

It's -- for the Court's information, there is a concept in this that's called "pop drag."  And it limits how far away from one point you can go to another point. And what it means is simply you are picking up population as you are going, and eventually you fill up your district.  And if you fill it up too fast before you get to the place you are trying to reach, you have got a problem.  And that's why people end up drawing secants and corridors and other things that look strange on the map.

And I told him not to do that in this case.  And he didn't.  I mean, that's a -- that's a pretty clean map

right there.

Q.   And the situation -- is the situation you are describing that Commissioner Giusti actually lives in the -- on the left side, sort of top portion of the green area --

A.   Yeah.  That last precinct up there that has the jagged little lines in it also has Giusti's house in it.

Q.   And he is actually, as far as residences go, he is the furthest south?

A.   Correct.

Q.   So it makes sense to put him in the coastal district?

A.   Correct.

Q.   And the rest of these --

A.   And his parents live on the Island.

Q.   And his parents live on the Island.  So you took care of that one, as well, right?

A.   That's right.

Q.   And the rest of the precincts, do they surround, sort of, residence areas where the rest of the commissioners live?

A.   Correct.  They are all also based on geographic-based criteria.  I mean, the -- the District 1 is essentially -- the instruction on that was begin with the shore of Galveston Bay and start working your way inland, trying not to cross the main transportation corridor in the

city -- in the center of the county.  But seeing how that would work out, it actually worked out very, very cleanly.  They had no idea that it would actually work out as cleanly as it would.

The other district at the top -- which I think is Number 4 here but didn't ultimately end up that way -- was to be a Houston suburbs -- Harris County suburbs district running along the Clear Creek and the area immediately across the Harris County line.

The other is a western central district and is somewhat dictated by the fact that once you have drawn the other three, that's what you've got left.

And they are all dictated by where the commissioners at that time lived, Clark living really very close to the Fort Bend County border on the far western end.

**Q.**  Okay.  And I probably should have done that earlier.  It sort of describes how Map 2 came to be.

**A.**  Right.

**Q.**  All right.  So scroll back -- or sorry.  Scroll to the next page, to the minimum change map.

So you showed this plan to Judge Henry, as well?

**A.**  I did.

**Q.**  Okay.  And, ultimately, you are going to show these two maps to all of the commissioners, one at a time, right?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Correct.

**Q.**   And out of the two, your belief was that Commissioner -- that Judge Henry had preferred Map 2?

**A.**   Yes.

**Q.**   Or preferred the Optimal D map --

**A.**   Yes.

**Q.**   -- as it was titled?

**A.**   Yeah.  Well, I -- I'm not quite sure where these names come from, but I was referring to them as Map 1 and Map 2.

**Q.**   All right.  So then do you recall meeting next with Commissioners Apffel and Clark?

**A.**   I think that's right.  Yes.

**Q.**   Okay.  Let me -- did those two actually meet together, in your recollection?

**A.**   May have been.  Or we may have met them separately.  I can't remember now.

**Q.**   Okay.

**A.**   But we did -- we met with both of them.  Clark would end up, over time, being in a lot of meetings.

**Q.**   Okay.  So pull up PX-201.

And so I believe that the meeting would have occurred on October 19th or -- I'm sorry -- on October 18th, later the same day that you met with --

**A.**   Yeah.  That's a later version of Map 2.

**Q.**   Right.

**Q.** But in terms of your meeting with Commissioner Apffel and Commissioner Clark, do you recall that happening subsequent to your meeting with Mark Henry on the 18th?

**A.** I believe that's correct. I think we met -- I met with Judge Henry to begin with. I think that was my first one.

**Q.** Okay. Now, this is a -- this is -- this map is still titled "Texas Optimal" -- the "D" is removed. It says "Optimal Geo Plan."

And there is actually a date down the far right-hand bottom column of the map that says 10-19-21?

**A.** Yeah.

**Q.** Do you see that?

**A.** You are asking me to read very small. There it is. Yes.

**Q.** Yeah. And so looking at this map, it looks like if you pay close attention, and just for an example, look at the area of Precinct 3 at the top -- well, it might be easier to see if you look at Precinct 4. On the far -- on the middle of the page on the right side -- I'm sorry, the left side -- dyslexia is killing me -- you could see there is sort of a, creep, the purple area --

**A.** Yeah.

**Q.** -- beyond the actual lines?

**A.** Yes.

**Q.**   What does that reflect?

**A.**   Well, I think -- I'm not exactly sure, given this one, but I'm thinking this is beginning to reflect the -- because I think that may be an overlay done by Tom, but I'm not absolutely sure if it's that.  You should probably ask him.  But after we produced these maps, bringing these maps down, there are a series of meetings that began to occur to modify Map 2.

**Q.**   Okay.  So is it your belief -- do you believe that sort of, again, when the areas of color creep beyond the actual lines of the precincts that maybe changes were being made to those areas?

**A.**   I think that's possible.  I'm not absolutely certain, but -- because I'm not completely certain what this map is.  But it would seem that that may be what it's reflecting.

**Q.**   Okay.  So let's talk about your meeting with Commissioners Apffel and Clark.

     What were Commissioner Apffel's thoughts on Map 1 and 2?

**A.**   Well, he was not particularly happy with Map 2.  Map 1 he was fine with.

**Q.**   Okay.  Let's talk about that.

     Scroll back to -- scroll to the next page.  That's the only page?  Okay.  There is a copy of it.

Go back to PX-197, the last page of that exhibit.

So in presenting this map to Commissioner Apffel, what were his thoughts on it?

**A.**   He was perfectly fine with that map.  He thought that worked.  He was -- he was happy with it.

**Q.**   Okay.  And then, as you recall, what comments did he have on Map 2?

**A.**   Well, he had mentioned that we didn't give him the same two precincts that he had asked for, that we did give him in Map 1.

**Q.**   Okay.  Did you later determine what it was about the two precincts that he wanted but y'all didn't give him?

**A.**   Yes.  He was later a little more candid with us; and he informed us that his wife had already bought a lot in the second of those precincts, the one we had left out in Map 2, for his new house.

**Q.**   So he was moving?

**A.**   He was moving.  And we had basically, in Map 2, taken him out of the seat.

**Q.**   And so he let you know that's one of the reasons I wanted to add two precincts to the north?

**A.**   Yes.

**Q.**   All right.

**A.**   Before he had just told us he wanted those two precincts.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   Okay.  So were there any other concerns from Commissioner Apffel?

**A.**   That was -- that was really it for Apffel.

**Q.**   What about Commissioner Clark?  Let's talk about him.

**A.**   Commissioner Clark was extremely upset when we showed him Map 2.  He was fine with Map 1.  He was extremely upset with Map 2.

**Q.**   All right.  And what were his concerns about Map 2 originally?

**A.**   He said that Map 2 would get him primaried and that he would lose.

**Q.**   Was that -- it was a political concern?

**A.**   It was a -- very much a political concern.

THE COURT:  Y'all need to work a little bit harder on not speaking at the same time.

THE WITNESS:  I'm sorry, Your Honor.  I'm used to being on that side.

THE COURT:  Understood.

BY MR. RUSSO:

**Q.**   So go back to PX-201.

Looking at some of the changes to Map 2, again, with the sort of purple areas bleeding through and the orange areas bleeding through, do any of those sort of -- are they consistent with your thought process in terms of what Commissioner Clark's concerns might have been?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Yes.  But not all of them.  Because I think I see one precinct that wasn't originally in his seat that's still within that border and is not a bleed-in.  But, yes, it is -- it is similar to what Clark's concerns were. Clark's concerns were extremely hard for anyone other than Clark to articulate because -- and I don't mean that that way.

**Q.**   Makes me feel a little better standing here at a microphone in trial.  But anyway, I'm sorry.

**A.**   Yeah.  The point was:  It was not something you were going to see in political data.  So looking at election results, whatever, wasn't going to tell you what his problem was.  His problem was very people-specific, very precinct-specific, people he knew, people he knew would be challengers to him.  So he had people he wanted out of his district.  He wanted people he wanted in his district. And they really didn't relate to the Republican or Democrat numbers.  In fact, most of the people he wanted out of his district were Republicans because those were the ones he thought were going to challenge him.

So there was nothing that someone who wasn't intimately tied to the area could possibly see in terms of reading it.  So we needed his specific input.

**Q.**   And so Commissioner Clark was worried about, you know, sort of drawing a political opponent in the future?

**A.**    Drawing a political opponent and having people that he -- that he knew were perhaps hostile to him even though they were Republicans.  This is part of what went behind his earlier comment regarding he didn't want that much of Giusti's seat.

**Q.**    As a result of sort of Commissioner Clark's concerns, were changes made to this map?

**A.**    Yeah.  Well, I think some of the changes are reflected in the version you have up there now.  But changes from the draft map that we -- that we brought down when I flew down, yes, there were significant changes that Commissioner Clark made.

**Q.**    Do you recall Mr. Bryan being on a Zoom session or joining your meeting?

**A.**    Yes.  Well, all of those are done because he is actually required to do the changes.  He has the map.  He has the software.  So what would happen would be a Zoom call would be arranged.  Bryan would be on the Zoom call. He would share a map on the screen, on the Zoom call.  We would all watch as Bryan made the shifts that the Commissioner wanted to make change.

And then the question would occur, you know, is that one, one that is going to create a legal problem?  Is that going to cause a one-person, one-vote problem?  And we had to deal with each one of those changes as he tried to make

it.

**Q.** At the time you were presenting these maps to the commissioners, did you -- did y'all have and present, sort of, proposed political performance data on these maps?

**A.** Tom had political performance data for the maps, yes.

**Q.** Okay. And do you recall the, you know, commissioners looking at those?

**A.** I do.

**Q.** Let me pull up -- let's see -- DX-262.

Is DX-262 similar to the data that you believe the commissioners would have had access to?

**A.** Yes. That looks similar to it, yes.

**Q.** Okay.

**A.** I think that was one of the races that Tom had done, yes.

**Q.** All right. And so explain to me how this -- how this is put together. What are we looking at here?

**A.** Well, what you are looking at is the summary of data for each one of the districts with the data for each district that race's results in it.

So if you read that in District 1 in this map Cornyn got -- the Republican -- the Republican candidates there got 67 percent of the vote, and that's -- that's -- he is doing an average across that.

The -- but the actual vote totals are right there in

each one of the columns.

Q.   Okay.  So did Mr. Bryan tell you that when he draws these maps that this kind of spreadsheet is done sort of as a matter of course or created by his program?

A.   It is certainly created by his program.  You have to have data loaded into the program for it to be able to do that.

Q.   All right.  And let me see if I understand how the -- what is reflected in the spreadsheet.

First of all, the tab at the bottom is -- I don't know if you can see it -- "VTD Pivot" is selected.  So we're looking at a VTD pivot table of this spreadsheet.

Do you see that?

A.   Right.  Yeah.

Q.   All right.  And so in the yellow -- the yellow -- the label in the yellow on this exhibit stating -- saying "Original," what is your understanding of what that means?  What does that refer to?

A.   I'm not absolutely certain, but I think it refers to the original map, the map -- the 2011 map.

Q.   Okay.  And then underneath "Row Labels," there is numbers 1, 2, 3, and 4?

A.   Correct.

Q.   What do those refer to?

A.   Those refer to the commissioner districts.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   In Galveston County?

**A.**   In Galveston County, yes.

**Q.**   Okay.  So the thought is that the original -- the numbers related to the original spreadsheet are related to the original map in Galveston County as it existed prior to 2021, right?

**A.**   Correct.

**Q.**   And then the second portion -- set of tables, where it's under minimum change, what does that refer to?

**A.**   Well, I believe that to be the minimum change map that we had constructed.

**Q.**   Okay.  And again, you have got numbers 1, 2, 3, and 4 under that.

Is that the precincts?

**A.**   Correct.

**Q.**   And then below that -- scroll down.

**A.**   Their political performance.

**Q.**   Well, below that is an "Optimal D" map, right?

**A.**   Correct.

**Q.**   1, 2, 3, 4, is that the political performance on the Optimal D plan?

**A.**   I would believe that to be correct.

**Q.**   Okay.  And then below that is "Optimal Geo."  And that would be the political performance for the Optimal Geo Plan?

**A.**   Again, I would believe that would be correct.

**Q.**   Okay.  And so -- and then running over -- looking over onto the right side of this exhibit, there is a percentage and an "R."

Do you see that?

**A.**   Yes.

**Q.**   And is that your understanding that those are percentage of expected votes received for -- from Republican voters --

**A.**   Yes.

**Q.**   -- for each precinct under the plans that --

**A.**   Well, by precinct, if you mean commissioner district, yes.

**Q.**   Yes.  Precincts 1, 2, 3, and 4 in Galveston County that I understand you refer to as "districts" --

**A.**   Yeah.

**Q.**   -- in your practice?

**A.**   Well, see, this is a place where it's particularly confusing because you are talking about vote totals from precincts.  So it's much better to talk about them from districts.

**Q.**   All right.  And I understand what you are saying, that we don't want to confuse the smaller voter tabulation precincts from the bigger Commissioner Court precincts --

**A.**   Correct.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** -- that covers those areas.  So I understand.  I think I understand what you are saying.

But so, again, just as an example, if we look under Optimal D plan and go to the number 1, scroll across underneath the percentage R, that number reflected is 64 percent.

Do you see that?

**A.** Correct.

**Q.** So what does that represent?

**A.** That is -- represents a number of a summation -- well, I'm going to assume this is how he is doing it.  It's how many people do it.

That it's a summation, an average of a number of Republican races, which I assume are the ones I'm seeing there.  I recognize a couple of those.

**Q.** Do you remember seeing this and sharing this information with the commissioners during these meetings?

**A.** At some point, I remember seeing these; and I think he has had that available, yes.

**Q.** All right.  And so under the Optimal D plan shown in this spreadsheet, Precincts 1, 2, 3, and 4 appear to, at least percentage-wise, pursuant to this spreadsheet, indicate that they all are going to perform for a Republican candidate?

**A.** Correct.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** And because, again, Precinct 1, the expectation is 64 percent of the vote is Republican; and then for Precinct 2, 56 percent; and so on, correct?

**A.** Yes, sir.

**Q.** All right.

**A.** That is correct.

**Q.** So let's scroll up and look at the minimum change plan.

All right. And just remind me, the minimum change plan is the, what, least change?

**A.** Yes. That's the least-change map, the Map 1.

**Q.** And that is the one that takes sort of the existing Precinct 3 and then adds Bolivar into it, as well?

**A.** Correct.

**Q.** Okay. Now, in the political performance on the minimum change plan, if we look at Precinct 3 and scroll across, what is the percentage of expected voters to vote Republican in Precinct 3 under your minimum change plan?

**A.** 37 percent.

**Q.** What does that indicate to you in terms of political performance of Precinct 3?

**A.** A very strong Democrat district.

**Q.** That's under the map as you drew and provided to the County?

**A.** Well, as Mr. Bryan drew according to the criteria.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** Thank you for that correction.

Okay. And if you look up at the original plan and look at Precinct 3, Precinct 3 at that time were performing at 32 percent Republican, right?

**A.** Correct.

**Q.** So there is a difference in the two plans; but you're talking about, what, 5 percentage points?

**A.** It doesn't affect the overall ability to elect a Democrat from the district.

I'm going to -- and I think it's important to point out that the 3 that's in that original map is not a 3 that can stay in place because it's got to gain people as a result of one-person, one-vote in the next redistricting.

It is hard, given what has been drawn around -- what is around and how it had been drawn in the past, to keep it at that same level of Democrat performance because clearly those additional people you were going to put into that district weren't going to be as Democrat as the people who were already there because you've already concentrated just about all of them in that district in the county now.

**Q.** Okay. So the -- was this information something that, again, the commissioners wanted to know about?

**A.** Yes.

**Q.** Okay. Is that Commissioner Apffel and Commissioner

*Laura Wells, RPR, RMR, CRR, RDR*

Clark?

**A.** Yes.

**Q.** What about Commissioner Holmes?

**A.** Yes.

**Q.** And what about Commissioner Giusti?

**A.** Yes.

**Q.** And what about Judge Henry?

**A.** Oh, absolutely. I haven't met an elected yet that doesn't want to know what the political performance numbers are.

**Q.** Okay. All right. So after the meeting with Commissioners Apffel and Clark, you then met with Commissioner Holmes?

**A.** Correct.

**Q.** And that was -- was that just with you, Commissioner Holmes; and was Tom Bryan on the Zoom, as well?

**A.** No. I believe it was myself and Paul Ready.

**Q.** Okay.

**A.** I think we had -- well, I'm not sure which meeting you are referring to. There was a subsequent meeting where we did have Tom Bryan. So I'm not sure which one you are referring to.

**Q.** All right. Well, so let's -- the first meeting that you had with Commissioner Holmes, if you recall, was on -- is about October the 19th at 9:00 a.m. in his office?

**A.**    Yeah.  That would be about right.  Is that the one you were referring to?

**Q.**    Yes.

**A.**    Okay.

**Q.**    And you showed Commissioner Holmes both maps?

**A.**    Correct.

**Q.**    What was his reaction to those?

**A.**    Well, obviously, he didn't like Map 2.  He also wasn't really happy that Bolivar was in Map 1.  But he specifically opened the conversation with us, looking at me and saying, "Well, there is only one of these maps I like."

**Q.**    And what did you -- what did you tell him, if anything, about Bolivar changing his election ability?

**A.**    I told him that I didn't believe it changed his ability to be re-elected at all.  As long as he was the Democratic candidate, he should be capable of being elected in that district --

**Q.**    Did you express --

**A.**    -- given Tom's numbers.

**Q.**    And that seems to be accurately reflected --

**A.**    That seems to be accurately a part of it.

**Q.**    That seems to be -- lets me ask the question.

That seems to be what is reflected in the spreadsheet that we're looking at?

**A.**   Correct.

**Q.**   Okay.  Was there any -- is there any question in your mind that when he -- Commissioner Holmes left the meeting with you that he wouldn't have understood that the least-changes map is extremely likely to elect a Democratic candidate?

**A.**   No.  There was no doubt in my mind that that was the case.

**Q.**   And that is true even with Bolivar in it?

**A.**   That's true with Bolivar in it.  Bolivar is not big enough to affect that.

**Q.**   Do you recall any conversation with Commissioner Holmes about whether his seat needed to be maintained or the precinct needed to be maintained under Section 2?

**A.**   We did.

**Q.**   What did he ask you?

**A.**   Well, he was insistent that Section 2 required that seat to be maintained.  I had a brief discussion about change from retrogression standard.

And he said, "But isn't it still a coalition district?"  And I had a brief discussion about the problems with coalition.

But I told him quite bluntly I thought we could defend this.  I made it very clear to him I was presenting this district to him because I thought it was a district that

we could defend, and we could defend it on a nonracial basis.  And I told him at that time that it was absolutely imperative if we were going to keep that defense that that be the case, that we defend it on a nonracial basis.

That we ran a very huge risk that if we try to do so as prophylactic Section 2 district, we would reignite all the things that had happened in the 2011 process.  We would bring ourselves back into the situation that we had racialized the district.

And the changes, particularly regarding the Bolivar Peninsula, but in several other cuts that had been made in response to the DOJ request, would leave us in a situation where the only reason those changes had been made was race.  And that would be difficult for us to defend.

But I had provided in this map and with this set of criteria a way to defend that map as the least-changes map, a politically-based map, a map that we wouldn't have to take that route of defense.  And what he needed to do at this point was find two other votes.

**Q.**   Was it -- was it your understanding that Commissioner Holmes, when looking at Map 1, did not want Bolivar included in it?

**A.**   He made that very, very clear.  He did not want Bolivar in the map.

**Q.**   Did you explain to him, again, in relatively simple

terms, why Bolivar needed to be included in your least-changes map?

**A.**   I did.  But I also pointed out to him that we can draw a version that doesn't have Bolivar in it.  And we were prepared to do so, understanding the problems that would occur if you did that.  But we were perfectly -- I told him it won't be that difficult to take it out.

**Q.**   You offered to actually draw Commissioner Holmes a map without Bolivar in it?

**A.**   We did.

**Q.**   Did he take you up on that?

**A.**   No.

**Q.**   Did he ever ask you to do that?

**A.**   No.  We made it clear we would draw additional maps if he wanted to.  And pursuant to what I told him earlier, nobody else on the commission needs to know.

**Q.**   And I was going to ask you that.

Did you make sure that Commissioner Holmes knew in the meetings with you without the other commissioners present that whatever he had to say about the maps' changes he wanted wouldn't be shared with the other commissioners?

**A.**   Correct.  I stressed that.  I constantly stressed that.  And I stressed that with the other commissioners, as well.

**Q.**   Let me pull up JX-23-4 -- page 4.

So this is a copy of Commissioner Holmes's handwritten notes.  And there is a note there from -- at the top, from October 19th, 2021.

Do you see that?

A.   Yes.

Q.   Okay.  And it states that:  "Mr. Oldham presented the two maps on his laptop [as read]."

Is that, again, consistent with your recollection as to how you were presenting the maps?

A.   I think that's probably so.  I would have -- I would not have had a -- the redistricting software.  So I would have had to have either given him a screenshot on paper or I would have had to have given him a PDF screenshot that I had on my computer.

Q.   Okay.  And then the bottom -- the bottom comments, they said:  "Oldham said he would send copies of maps and data [as read]."

Do you remember getting that request?

A.   We would have sent him copies of maps, hard copies of maps and data --

Q.   All right.  So --

A.   -- or either electronic.  I don't know which way we sent it.

Q.   After the meeting with Commissioner Holmes, then did you also meet with Commissioner Giusti separately?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Yes.  That's possible.

Are you talking about with Giusti separately or Giusti with --

**Q.**   Separately.

**A.**   Okay.  Separately.  That's possible, yes.

**Q.**   As you had done with the other commissioners?

**A.**   Yeah.  Yeah.

**Q.**   Again, the meeting being -- the purpose of the meeting being to show the maps?

**A.**   Right.  At some point, I did that.  That's for sure.

**Q.**   All right.  What were -- what were Commissioner Giusti's concerns on the maps?

**A.**   Well, Giusti's concern -- Giusti was fine with Map 1, as all the single-district commissioners had been.

He had problems with Map 2, as well.  A little less vociferous than Clark.  But his problems with Map 2 was he had essentially gone from the most Republican district to the least Republican district.

**Q.**   So let me put up map -- put PX-197 back up.  Scroll to the Optimal D.  Okay.

And so when you -- when Commissioner Giusti saw this map, his concern was that this coastal precinct was much less Republican than the precinct he had been in before?

**A.**   Correct.  He didn't mind the coastal precinct.  He just didn't quite realize what the numbers would be.

**Q.** Were there any other concerns that Commissioner Giusti shared with you?

**A.** That was really the extent of his concern.

**Q.** All right. So -- okay. Subsequent to your meetings in person with the commissioners, then did you subsequently have a meeting with several members of the Commissioners Court on October 22nd to again review maps?

**A.** Was this on a phone call?

**Q.** I believe it was a Zoom session.

**A.** Yeah. I think so. Yes.

**Q.** Okay. Let me pull up, again, JX-24, 4. And we'll get to the note in a minute.

But do you recall what the purpose of the meeting was on October 22nd?

**A.** Yeah. Okay. There he is.

Is this the one on the ferry?

**Q.** I think Commissioner Holmes is on the ferry in this meeting.

**A.** Yeah. I think this was to provide them with some more data. I do remember discussing the requests of the commissioners, because I specifically asked Commissioner Holmes during that meeting if I could actually reveal to Commissioner Giusti what he had asked for, and he said yes. And I told him the nature of Commissioner Holmes's asks and how they were embodied in the map.

**Q.** Okay.  So again, this is a -- this is a sort of a second session.  And it looks like it involved Commissioner Giusti, commissioner-wise, and Commissioner Holmes, right?

**A.** Correct.

**Q.** And then there are some other individuals from their staff.

And this -- the meeting notes from Commissioner Holmes also reflected you and the demographer, who is Tom Bryan?

**A.** Right.

**Q.** All right.  And the notes here reflect -- the second asterisk down from the bottom -- I'm sorry.  The second asterisk up from the bottom states:  "Showed population and racial data [as read]."

Do you see that?

**A.** Yes.

**Q.** Do you recall, again, the commissioners reviewing population and racial data?

**A.** I think after -- after we had produced the map, there was obviously some desire to see it; and Bryan had produced some tables that they could see.

**Q.** Okay.  And is that similar to the tables that we had looked at earlier with the spreadsheets?

**A.** Correct.  Yeah.

**Q.** So let me pull back up 262.

*Laura Wells, RPR, RMR, CRR, RDR*

So is it -- is it your belief that in --

A.   Well, that's political data.

Q.   Right.

Is it your belief that this kind of -- this spreadsheet format would have been reviewed by the commissioners and you --

A.   Yes.

Q.   -- in this meeting?

A.   Yes.  That's an Excel format, something similar to that, but with different data.

Q.   Okay.  Now I want to --

MR. RUSSO:  May I approach the exhibit, Your Honor?

THE COURT:  Yes, you may.

BY MR. RUSSO:

Q.   Down here at the bottom, again with our tabs, the first one says "Galveston Blocks Data," in the lower left-hand corner, and the second is "VTD Data"?

A.   Correct.

Q.   Do you see those?

And then the third one say "Pop Pivot"?

A.   Correct.

Q.   So underneath these tabs, there is population data on this spreadsheet, right?

A.   Right.  He can flip up to another tab that will

replace that one with the data described.

Q. Okay. So could you click on the "Pop Pivot" tab.

Okay. And this particular "Pop Pivot" tab, it's a different table than the one we looked at before.

A. Yeah. Everybody has different styles for how they do this.

Q. And the information reflected in here is a reflection of the population numbers within each of the precincts, agree?

A. Correct. That's what it appears to be, yes.

Q. Okay. So to the extent that you were looking at the population data -- or the commissioners were looking at population data, it would tell them, you know, what is the number of people living in particular precincts and so on?

A. Correct.

Q. Now, is it -- do you know whether -- it's true, is it not -- and you can tell me if I'm wrong -- but the spreadsheets that are created by Tom Bryan do include racial data information in them?

A. He does have some spreadsheets that have racial data in them, yes.

Q. Is it your recollection that the commissioners reviewed the racial data or were concerned with racial data when you showed them the maps?

A. Commissioner Holmes was.

**Q.** Do you remember any of the other commissioners sort of focusing on the race percentages?

**A.** No. They were focused on the politics.

**Q.** What about Judge Henry?

**A.** He was focused on the geography and the politics.

**Q.** Let me pull up -- let me just ask you first. Was the meeting on October 2nd -- October 22, 2021, was that the last meeting you recall having with the commissioners related to showing the maps to them?

**A.** No, I don't think so.

**Q.** Okay.

**A.** It may -- no. I don't think so.

**Q.** What other meetings were there?

**A.** Well, there were meetings -- obviously, we fixed Apffel's house in Map 2. Most of the meetings on Map 2 were on Map 2, and it was various commissioners seeking changes to Map 2 to rectify their concerns about Map 2.

**Q.** And so did you ever hear, at this point, from Commissioner Holmes again?

**A.** No.

**Q.** Was he -- had you told him -- let him know that he could get in touch with you, and you would make yourself available to him?

**A.** We had made that point earlier and -- you know, that we were available to him; that he could have maps drawn

through Tom; but that -- and it would be kept confidential.

**Q.** But you never heard from him again?

**A.** Never heard from him again. Nor did I hear from him in conjunction with another commissioner.

**Q.** Okay. At what point did you provide finished maps -- well, let me ask it this way. I'm getting into this further.

What happened after -- after you left your meetings with the commissioners, gathered whatever additional information you needed from them, input they were going to give you, what happened next?

**A.** Well, I'm not quite sure where you are leaving me off at; but we -- we had a series of meetings where commissioners adjusted Map 2 to meet their concerns on Map 2.

Apffel adjusted Map 2 to get his house in his district.

Commissioner Clark adjusted his district kind of in conjunction with Commissioner Giusti. Sometimes Clark alone, sometimes -- we had a couple of meetings with Clark. And eventually got -- Clark got to a position where he was okay with the way the district was configured, and he felt like he could survive a Republican primary, apparently.

And Commissioner Giusti was satisfied with Map 2, as well.

And at that point, there were no further changes to any of the maps.  So at that point, we went ahead -- Tom Bryan went ahead and produced the maps in finalized form so that they could put those up, and we could move towards the process of public comment and adoption.

Q.   Okay.  And do you remember sort of at what point you provided the final maps to the Commissioners Court?

A.   I don't remember the exact date.  And the maps actually would have come from Mr. Bryan and not from me; but it would have been somewhere in late October, I think.

Q.   All right.  What about, did the conversation about sort of the timing and needing to get the map done quickly ever come up at this point?

A.   Yes.  We were -- we were always conscious that we were working under a tight deadline.  We weren't exactly sure what the deadline really was because the State of Texas was having similar problems to us, and they actually controlled what the deadline would be.  So it wasn't clear whether we were going to have till some date in December, whether we were going to have some date in November.

That was -- at least the thinking was, when we were in late October, from my conversations with people in Galveston, was that we would probably have at least the

entire month of November, maybe even a few weeks into December.

Q.   And it's -- did that thought process -- did you ever talk about having meetings -- needing to have meetings immediately at this point in time?

A.   Yes.  If we had -- the first thing was -- and I emphasized this.  The first thing was get it up on the website.  This is the modern era.

Q.   Well, let me back up.  I'm talking about the time period when you were meeting with the commissioners and you had draft maps and things were being changed.

At that point, did you have discussions with the Commissioners Court about whether meetings are the appropriate step at that point, prior to the maps being finalized?

A.   Well, when we had something that we could show the public, yes, we needed to go ahead.  The first thing we needed to do is get it up on the website and begin to collect comment.

Q.   And at the time, were you thinking, again, that your timeline was more towards November-ish, end of November, and maybe even into December?

A.   Correct.  Correct.

Q.   Okay.

A.   But that was also one of the reasons why I was so

insistent on a website, because, you know, we had all learned website during COVID, and we had all learned Zoom meetings.  And this was an opportunity.  We needed to speed the process up; we needed to get comment in; and we needed to get it out there.  And putting it on the website was the easiest, simplest way to do this.

**Q.**  Okay.  Do you recall receiving an e-mail from Tyler Drummond?

**A.**  I probably did.  I don't know exactly when it is.  But it --

**Q.**  Pull up DX-98.

**A.**  Yeah.

**Q.**  DX-98.  Sorry.  I need to speak a little more clearly.

**A.**  Yes.  I remember this.

**Q.**  So DX-98 is an e-mail -- the top of the e-mail, it's Thursday -- dated Thursday, October 28th, 2021?

**A.**  Yeah.

**Q.**  From Tyler Drummond to Dale Oldham, Jay Torchinsky, Pete Gordon, and Paul Ready is copied on it as well --

**A.**  Correct.

**Q.**  -- right?

And subject is "Galveston Precinct Inventory"?

**A.**  Correct.

**Q.**  All right.  Go to the body.  Pull up -- yeah, there we go.

So do you recall receiving this e-mail from Mr. Drummond?

**A.** I do.

**Q.** And what was the -- what was he expressing to you?

**A.** The -- well, this is a little bit different aspect. We were -- we were splitting a number of precincts that were internal to districts in order to meet the Texas law on -- on splitting oversized precincts.

**Q.** Which is -- just to describe that, since you are there, the law as it exists -- and you have to tell me. What is the number at which you have to split a voter precinct?

**A.** I think it's 5,000.

**Q.** Okay. So -- and you are in the process of making sure that the precincts -- voter precincts that have more than 5,000 people in them --

**A.** Right.

**Q.** -- need to be split apart into two?

**A.** Correct.

But there is two types that are in there, and one of them is already done. There are the types that are on the border of a district. Those have to be done in order to have the district line finalized.

Then there are the ones that are not on the border of a district. They are internal to a district. That

doesn't change the line of the district. It's, obviously, something we have to do before everything is finished; but it doesn't change the line of a district. It's something that we do have to do for the board of voter registration --

**Q.** Okay.

**A.** -- so that they can actually get their work done.

**Q.** So at the time, there was some cleanup being done on the maps?

**A.** Yeah. Yeah.

**Q.** And this e-mail from Tyler Drummond is saying -- is basically -- is it expressing we need to get the maps in?

**A.** Right.

**Q.** All right. And --

**A.** But I don't think that should delay actually putting them up but, yeah.

**Q.** Yeah. So he has got -- and what he is asking for is: "We're past our deadline on the project where we originally wanted to have a special meeting tomorrow [as read]..."

And I'm just asking you: Do you recall Tyler telling you that there was supposed to be a special meeting on, I guess, the 29th?

**A.** Not that I really recall, but I'm not going to dispute it.

**Q.**   Okay.  All right.  Put up DX-31.  That is definitely not what I need.  What about JX-31?  I'll find it in a second.

Do you recall that y'all sent the County the maps on or about October 29th, 2021?

**A.**   It's somewhere in there.  I -- remember, the maps are not coming from me.  They are coming from Mr. Bryan.  So while I may be aware of when -- of their going down, I don't have custody of the maps, and I don't have software capable of transmitting it.

**Q.**   Okay.  Did you get the County sort of -- eventually, Galveston County received a notice from the State of Texas basically putting a November 13th deadline on the maps.

Do you remember that?

**A.**   Correct.  I do.

**Q.**   So before I get to that, though, prior to receiving the notice of the shortened timeline, what were your thoughts in terms of getting public comment and input on the maps?  How was that supposed to happen?

**A.**   Well, aside from the website, it was hoped that you would have at least one or two meetings prior to that at which comment could be -- could be received.  If not, then it would have to be some sort of website situation.

**Q.**   Was the website your idea?

**A.**   Well, I don't know if it was necessarily my idea, but

I certainly advocated it and pushed it, yes.

**Q.** Okay. When you are talking about the website, you are referring to this place -- the comment option --

**A.** Right.

**Q.** -- for the public to use?

**A.** Right. Right. To allow them to put in the full extent of their comments.

The emphasis I was making to the commission was simply don't cut anybody off. You can't let everybody talk forever and ever and ever, obviously. But make it very, very clear they can put in whatever written comments they want to put in. You can put it in through the website. You can send it in the old-fashioned way. But you can extend your comments to any shape, form, or fashion you want. And you want to be able to get -- make sure that everybody has that opportunity, as best as time will allow you.

**Q.** Okay. And pull up DX-277.

So does -- DX-277 is it consistent with your recollection as to the maps that Mr. Bryan designed for Galveston County?

**A.** It appears to be, yes.

**Q.** And this is the -- what started out as the least-changes map in an attempt to resolve the Precinct 3 gerrymandering issue that you created for the County?

**A.** Well, I don't think I created it. I think DOJ created it. But I solved it once and was hoping to solve it again.

**Q.** And pull up DX-276.

Does DX-276 appear to be Map 2, which reflected sort of the coastal precinct and other geographical changes that were part of the process -- the actual final of the process?

**A.** Yeah. That appears to be Map 2 after Commissioners Apffel, Clark, and Giusti have made their changes, yes.

**Q.** All right. The County received a letter on October 29th from the League of Women Voters.

Do you remember seeing that?

**A.** I remember it being referenced to me by Mr. Ready, I think. I believe.

**Q.** Okay. Do you remember -- did you look -- do you remember seeing it?

**A.** I think I looked at it, yes.

**Q.** So pull up JX-37.

And this is an e-mail dated November 4th. It's actually an e-mail from Tyler Drummond forwarding the letter to Commissioner Holmes on November 4th.

Go back to the -- let's look at the middle portion of the e-mail, the second e-mail in the string here. It's from Stephanie Swanson to Mark Henry and the

commissioners, and it attaches a letter from the League of Women Voters.

Do you remember seeing that?

**A.** I think -- I believe I did, yes.

**Q.** Let's go to the letter.

And this is a letter that was attached to the e-mail. It's dated, again, October 29th, 2021.

**A.** Yes. Okay.

**Q.** So do you remember looking through the contents of the correspondence?

**A.** Yes. I believe I did. I remember something from the League of Women Voters, yes.

**Q.** Was there anything in the letter that concerned you in terms of the content?

**A.** No. I did note their criteria, particularly the last one.

**Q.** What was notable about the last criteria?

**A.** Well, the last criteria referred to incumbencies and preserving them. And I noted that I didn't think Commissioner Holmes would particularly like it. But it was -- because it had the -- there it is. "Place of residence of any incumbent or political candidate may not be considered in the creation of the map [as read]."

That's going to cause a problem for a number of commissioners who live on the edge of their precinct --

*Laura Wells, RPR, RMR, CRR, RDR*

live on the edge of their districts.  And he wouldn't have been the only one.  But it certainly would have been an issue.  It's somewhat -- he lived on the edge of his district.  Apffel was moving to the edge of his district. And Clark lived on the edge of his district.  Giusti lived in the middle of his, but we were taking him to the edge of his district.

Q.   And you took it this criteria, it's basically -- you wouldn't have been able to employ this criteria in Galveston County?

A.   Well, there obviously would have been a political issue with it, but there also -- bluntly, we couldn't have done the least-changes map with it.

Q.   And despite receiving some review of the October 29th letter from the League of Women Voters, was it your belief that both Map 1 and Map 2 were legally defensible maps offered?

A.   Absolutely.  I had stated that from the beginning of the process.  I wouldn't have presented a map to the commission that I didn't think was a legally defensible map.  That's actually my job.

     And I felt we had -- it was my opinion that we had drawn two maps that could be legally defended on somewhat different bases but could be -- but they were also going to be attacked on two different bases.  So you were

preparing your defense for each line of attack that you might face.

Q.   Okay.  And subsequent to the letter, again, we talked about the State issuing an advisory mandate on November 2nd.

A.   Right.

Q.   And the mandate was, "We want your maps by November 13th, 2021," right?

A.   Correct.  Correct.

Q.   And how were you advised of that deadline?

A.   Someone from Galveston County called me about it.  I can't -- I want to say it was Paul Ready, but I'm not certain.

Q.   Okay.  What adjustments had to be made in terms of sort of public input at that point?

A.   It meant you had to dramatically compress your schedule.

Q.   And what was your advice at the time?

A.   Well, first off, compress your schedule.  We didn't have much choice.  The advice was, you know, at least allow the public to be able to address the commission.  Even if it is during a regular commission meeting, go ahead and have them be able to address the commission.  Again, control -- you know, you can't let it just turn into a filibuster.  But when you take that comment, make

*Laura Wells, RPR, RMR, CRR, RDR*

sure that everyone knows they have the ability to extend their comment and get their comment on the record.

**Q.**   And given the timeline, was it your view that that is the most reasonable approach?

**A.**   It's the most reasonable approach.  It was about the only thing that could be done at that point.  Of course, we still had the website.  It's still receiving comment. And we had the website open the entire time.  And, you know, definitely urge people to go to the website and use the website.

**Q.**   Did you keep any sort of tabs or monitor what was happening on the comments?

**A.**   Yes.  I wanted Paul, in particular, to examine what was coming in the website.  I think that's how I ended up getting the League of Women Voters thing.  If something significant came up there, he was to forward that on to me.

     If -- I also, you know, wanted him to basically give me running tabs on favorable/unfavorable on the two plans.

**Q.**   Did you have any -- what knowledge did you have of sort of the favorability of one map or the other before the hearing?

**A.**   From what I was told, Map 2 was doing substantially better.

**Q.**   Okay.  Is it consistent with your recollection of the

events that the next thing that happened was a meeting was held on November the 12th?

**A.**   Yes.   That would be correct.

**Q.**   Okay.   And the Commissioners Court adopted Map 2, correct?

**A.**   Correct.

**Q.**   Did you have any sort of feelings about either map being adopted?

**A.**   I was perfectly okay to defend either map.   That was a political -- it would have been very inappropriate if I had interjected myself into, "You have got to pick one over the other."

**Q.**   Did you ever provide that type of opinion as to which map you thought was better?

**A.**   No.   The closest I came to it was pointing out who would be suing under 1 versus who would be suing under 2.

**Q.**   I'm going to talk to you a little bit about some of the allegations made in the case.

Of course, you know the County did get sued, which is why we are here?

**A.**   Well, I kind of figured that, because we'd get sued by one group one way under 1, and we'd get sued by another group another way under 2.   So it was pick your poison.

**Q.**   Okay.   And one of the allegations made in the case is that Commissioner Holmes was excluded or shut out from the

process.

Have you heard that?

A.   I cannot agree with that.  I went out of my way to include Commissioner Holmes.  So I don't know.  It was very important to me that he be included in the process and know that we would keep his confidences.  That was crucial.

Q.   At any time in the process, top to bottom, in 2021, did you ever receive any instructions from Judge Henry or any of the other commissioners to ignore the input from Commissioner Holmes?

A.   No.  And let me be incredibly clear about this.  Had that ever been said to me, I would no longer have been a part of this.

Q.   Did you ever receive instructions from any of the commissioners or Judge Henry to put certain input over Commissioner Holmes's input?

A.   I am not quite sure what you mean by "input."  But, no, certainly not in terms of talking to me.  He was -- he was going to have access to myself and Mr. Bryan.

Q.   That was really my question.  Sitting here today, is it your belief that Commissioner Holmes had -- could access you just like any other commissioner needed to?

A.   Absolutely.

Q.   Was Commissioner Holmes ever excluded by you --

**A.**   No.

**Q.**   -- from the process?

**A.**   No.

**Q.**   Did you consistently let him know that he could get back to you with concern or needs over particular maps?

**A.**   At every meeting.

**Q.**   Did you recall specifically asking Commissioner Holmes for what he wanted to see happen in the maps?

**A.**   Yes.

**Q.**   And in the redrawing?

**A.**   Yes.

**Q.**   In the draw -- sort of creation of Map 1, was that designed to and would it have preserved Commissioner Holmes's seat in terms of political performance?

**A.**   Well, I don't do that sort of thing.  But according to Tom Bryan's numbers, he should have been able to retain his seat.  Certainly, if he is the Democratic nominee, he should be able to retain the seat.

**Q.**   Do you recall making Commissioner Holmes aware of that fact?

**A.**   Yes.  The only question that's not one that you could really answer from that data is kind of like the Clark problem, is, you know, can he continue to be the nominee?  But if he is the nominee, that data showed he should win the seat.

**Q.** And Commissioner Holmes never came back to you and asked for a different map?

**A.** He never did.

**Q.** Did he ever let you know that he was actually having maps drawn by someone else?

**A.** No. He did not. It's his right. He can certainly do that. But he did not.

**Q.** And he never provided you suggestions for how to redesign Map 1 other than, sort of, remove Bolivar?

**A.** That's the only thing he really said, but then he didn't follow up on drawing a map that put Bolivar out.

**Q.** And had he asked you to do that and present it to the Commissioners Court, would you have done that?

**A.** Yeah. Absolutely.

MR. RUSSO: Pass the witness.

THE COURT: All right. Good timing, Mr. Russo.

MR. RUSSO: Funny how that happens. Every now and then. It's rare.

THE COURT: Straight up noon.

Let's take our lunch break. And we will start back at 12:50.

Before you -- we have received word that our network is going to be down this evening. So we are going to have to stop before 6 o'clock tonight for sure, which probably no one will complain about. I see Mr. Nixon applauding

over there.  So just to let y'all know.

All right.  See y'all at 12:50.

CASE MANAGER:  All rise.

(Recess from 12:00 p.m. to 12:56 p.m.)

THE COURT:  Thank you.  Good afternoon.  You may take your seats.

MR. GABER:  Good afternoon, Your Honor.

**CROSS-EXAMINATION**

BY MR. GABER:

Q.  Mr. Oldham, my name is Mark Gaber.  We met previously at your deposition, right?

A.  Via Zoom.

Q.  Now, I heard you say earlier this morning that you are, quote, not a data guy; is that right?

A.  That is correct.

Q.  You are not trained in any sort of statistical analysis, correct?

A.  Well, I am not -- I am not what I would call a data guy.  I don't do that type of work.  I have worked -- I have been dealing with data evidence for a very long time.

Q.  So you can't run an ecological inference analysis?

A.  I understand how it works; but, no, I wouldn't try to run an ecological inference.

Q.  You can't open up R in the statistical package and run some data?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Again, I know basically how it works; but, no, I wouldn't do that.

**Q.**   And you are not an expert in this case in any sort of data-related issues?

**A.**   I am not attempting to be an expert on data-related issues.

**Q.**   In fact, you are not a disclosed expert on anything in this case?

**A.**   I don't think so.

**Q.**   You are a fact witness here, right?

**A.**   That is my understanding, yes.

THE COURT:  When I used the term "expert" this morning, I should have said specialist or something.  I recognize that --

MR. GABER:  That wasn't directed at you, Your Honor.

THE COURT:  All right.  I understand.

BY MR. GABER:

**Q.**   Now, Mr. Oldham --

MR. GABER:  And if we could pull up DX-4, please. Right after JX-27.  The middle of the list.  Yes.  Thank you.

BY MR. GABER:

**Q.**   And you recognize this as the benchmark plan for Galveston County Commissioners Court?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**  I wouldn't refer to it as the benchmark.  That is the 2011 plan, yes.

**Q.**  Okay.  The County referred to it as the benchmark plan.  Do you see the title of it?

**A.**  I understand that.  That's a term of art that really doesn't apply to it.

**Q.**  Now, you're very familiar with the population and demographic location of that population in Galveston County.  Is that fair?

**A.**  I don't know that I would say very familiar, but I'm pretty familiar, yes.

**Q.**  When Judge Henry talked to you about being engaged in this matter, he told us yesterday that he was very impressed with how much you knew about Galveston County.

Does that seem right to you?

**A.**  That would -- yes.  I can have that effect.  The -- I consider it malpractice for a lawyer who practices in this area to not study the facts of the place on the ground that they are actually going to work there.

**Q.**  And one of the things that you know about Galveston County is the location of its minority population?

**A.**  I have a rough idea where those are; but this, again, goes to getting data.  They change.

**Q.**  And I think we talked a bit about -- at your deposition a bit about this, that Galveston County in 2021

was actually one of the areas where there wasn't a lot of change, right?  That you looked at the data.  You looked at the racial data and saw that the precincts had kept their percentages right where they were at in 2011?

**A.**   Well, that's a little bit of a misnomer because it's one of those -- it's one of those things that you think about change.  Change can be defined in two ways.

Galveston had very significant growth from 2010 to 2020.  But this is what you have to -- why you have to tamp people down from time to time, because they think, oh, boy, there is a lot of growth.  That means there is going to be huge shifts in the district.  Maybe.  Maybe not.

Because the question becomes was that growth -- how equal was the growth throughout the districts?  If the growth is relatively equal throughout the districts, then even though you may have had a 10 or 20 percent growth in the jurisdiction, it won't be a significant distinction between the districts.

This was one of those cases when it's high, as I just said, but this is one of those cases where you had significant growth in the county but the relative differences between the individual districts was not that great.  And that's really something you weren't going to know until you actually looked at data.

**Q.**  Okay.  So you did that.  You looked at the data.  And your conclusion was that the minority populations had stayed in the same geographic location that they were back in 2011 because the data was the same this time?

**A.**  Well, it depends on which ones you are talking about.  I mean, there is some migration.  If you look at the African American, it's relatively stable where it is.  There has been some change on it.  Not -- not an enormous level of change.

Hispanic is extremely well-integrated throughout the county, and there has been some significant increases in Hispanic.  But it hasn't had the kind of concentration in specific locations the way African American is.

**Q.**  And what you knew is that the African American population was centered in the area of Dickinson and La Marque, and parts of Texas City, parts of Hitchcock, and on Galveston Island; is that right?

**A.**  Yes.  Although, you are seeing some of those shift a little bit, particularly Galveston Island.

**Q.**  And the map in front of you reflects your awareness of where the minority population was largely concentrated; and that's in Commissioner Holmes's Precinct 3, right?

**A.**  Well, it was certainly concentrated in Precinct 3.  I mean, the -- that district contained somewhere between probably three-fifths and two-thirds of the African

American population in the county.

Q.   So when you were called up to work on this again in 2021, it wasn't as if you were blind to what the population of Galveston County looked like.  You knew where those folks were located?

A.   I have rough ideas.  But, again, like I said, that's just not something you want to decide until you see what the new data is going to show you.

Q.   And you looked at that data?

A.   I did.

Q.   You also looked on the map to see where the concentrated Black populations were in the voting precincts?

A.   To some degree.  I didn't -- a lot of that analysis wasn't necessary in this case.  But, yes, it was -- I certainly always am trying to be conscious of are there concentrated areas or are there not concentrated areas.  I mean, in many ways the more interesting results in Galveston are the Hispanic White.

Q.   Focusing back in on the Black population, though, when you looked at the map showing the concentrated areas before the map drawing actually began, they had remained up the middle part of the county, correct?

A.   With some -- yeah.  I mean, there is some fanning out that's occurring.  There is also some decreasing of the

strength of African American communities on Galveston Island that you can see.

**Q.**   And this review happened before you ever talked to Thomas Bryan, right?

**A.**   No.  It's really a review on kind of doing a little bit later because I haven't got the level of data that I really need for that sort of thing at that point.

**Q.**   Well, now you talked to -- you talked to Thomas Bryan on, like, October 15th --

**A.**   Yeah.

**Q.**   -- right?

**A.**   Yeah.  You are staring -- as long as I have got the big data, the gross line data, it's telling me what the real shifts are within the county.

I mean, one of the things you wanted to immediately look at was how much is the African American increasing or decreasing in the county, how much the non-Hispanic White is increasing or decreasing, how much the Hispanic White is decreasing or increasing.  And those can be told to you by the big data.  It can be told to you by the data in the district.

Clearly, when you looked at the data in the districts, that initial spreadsheet that we were talking about before, you can see that the main African American voting strength was still contained within District 3.  There was

not an enormous influx of African American in the county. As a matter of fact, it's -- you know, it's not really moving in relation to the others.

And that still -- it still concentrates in that district. That's also part of the advantage. That's part of the problem.

Q. And this was back in September 2021 when Adam Kincaid gave you that spreadsheet with the racial data?

A. Right.

Q. That's right.

And it's about that time when you also checked in to see the sort of extreme case or concentrated precincts for Black voters, as well?

A. Yeah. We are starting to look for where those are and how many we have got. You are always looking for what that data may end up being.

Q. And because of the concentration of Black voters in the center part of Galveston County in the cities that we just discussed, adding those to the somewhat more distributed Hispanic population necessarily makes Precinct 3 the one that has the highest concentration of minority voters?

A. Correct. But the -- the way that district is designed, it's intentionally designed that way, I think, is that it -- the African American group dominates the

Democratic primary; therefore, dominates who the candidate is going to be.

Q.   Now, you said earlier that you first -- you didn't know Thomas Bryan until you talked with him in mid-October 2021?

A.   Yeah.  He is not a demographer I have worked with before in the past.  He was hired by Holtzman Vogel.

Q.   And you also talked a little bit about how you had difficulty finding someone who could access the redistricting data that was released in August -- mid-August --

A.   Right.

Q.   -- 2021; is that right?

A.   Correct.

Q.   How long have you been a redistricting attorney?

A.   Oh, about 30 years or better.

Q.   You have been involved in, I think you told me, most of the redistricting litigation --

A.   Right.

Q.   -- at least that's happened in the Supreme Court; is that right?

A.   Right.  That's correct.

Q.   How many -- without telling me who, how many maps -- how many redistricting plans have you worked on over your career, roughly?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   I have no idea at this point.  It's a lot.

**Q.**   A lot.  How many demographers have you worked with in the past?

**A.**   Oh, dozens.

**Q.**   Among those dozens, how many are currently still in the practice?

**A.**   Well, at my age, there are a lot of them that are no longer there and rapidly getting fewer.  Mr. Bryan is -- I shouldn't say this -- but by my standards, I guess, is extremely young.  And I haven't dealt with him before.

     But, I mean, I still know a few people, if that's what you are getting at, yes.

**Q.**   And I think you said you reached out to some folks --

**A.**   I did.

**Q.**   -- to see --

     Who were those people?

**A.**   Well, they were some other people who would be trying to put that data in a -- in a format where it could be used.

**Q.**   And none of those people?

**A.**   None of those people.

**Q.**   None of them could do it?

**A.**   That would be correct.  That I knew.  That didn't mean it couldn't be done.  The one person I knew that did it first was Mr. Kincaid.

**Q.**   I'm a little surprised by that.  I have to say that, you know, the State of Texas started its redistricting in the legislature two or three days after it came out in August.

Did you know that?

**A.**   I didn't know that, but I applaud their abilities.

**Q.**   You are familiar with Maptitude?

**A.**   I am roughly familiar with Maptitude.  I haven't dealt with Maptitude in a decade.

**Q.**   Were you aware that Maptitude had the data loaded in its system two or three days after it came out in August?

**A.**   I did not.  I don't have a Maptitude license anymore. I haven't had a Maptitude license in over a decade.

**Q.**   Now, when you were -- so you said you met with Mr. Bryan for the first time in mid-October; is that right?

**A.**   Correct.

**Q.**   Is it your recollection --

**A.**   Somewhere in there, yes.

**Q.**   Sorry.

Is it your recollection that he was off with his family on a vacation somewhere in the -- maybe the Pacific when you first talked to him?

**A.**   Yeah.  I've heard that.  I did not contact Mr. Bryan initially.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   Okay.

**A.**   That was -- Holtzman Vogel was supposed to acquire us a demographer.

**Q.**   You were -- you were retained by the County ultimately in April of 2021; is that right?

**A.**   I think that's about right.

**Q.**   You didn't take any steps between April and October to find a demographer who could actually draw the map?

**A.**   Well, no, because I had -- I was not in a position to -- the demographers I worked with were usually off doing something else or had been or were no longer in the business.  And I knew Holtzman Vogel had a number of people that they worked with, and I told them early on they were going to have to find me a demographer.  They knew the situation.

**Q.**   So early on, you told Holtzman Vogel they should find the demographer?

**A.**   Correct.

**Q.**   This is in the spring of 2021?

**A.**   Yes.

**Q.**   And, to your knowledge, Holtzman Vogel waited until mid-October to start looking for that demographer?

**A.**   I -- you know, that's speculation on my part.  You need to ask somebody else.

**Q.**   Ultimately, that's when they procured the

demographer --

**A.**  Yeah.  That's when they --

**Q.**  -- was in mid-October?

**A.**  That's when Mr. Bryan was provided to me, yes.

**Q.**  Now, as a result of that very late -- you would agree that that is sort of like doing your homework at the last minute?

**A.**  I don't know how critical that ended up being.  You know, would I -- you know, I just don't know how critical that ended up being.

**Q.**  But the consequence of that was that you had to give very specific instructions to Mr. Bryan for him to execute the creation of the map.  Is that fair?

**A.**  I wouldn't call them very specific.  Commissioner Holmes's were very specific.  The others were much broader.  The criteria given were broader.  So I don't know that I would characterize it in the same way you have.

MR. GABER:  Mr. Turnbull, could you please play --

BY MR. GABER:

**Q.**  I'm going to play a clip for you and ask you a couple of questions about it.

MR. GABER:  Would you play Bryan 115 to 120.

(Video played, as follows:)

"QUESTION:  And on that Zoom call, what were the ideas that they -- 'they' being Dale and possibly Mr. Gordon -- that they shared?

"ANSWER:  So at this point, with Dale's knowledge of the geography of Galveston, I would have received direction to move certain polygons representing VTDs or maybe not move some of the VTDs that I had chosen.

"So it was fairly precise direction, not just with the high-level direction I got for how to draw each plan; but rather, they had some ideas of some specific parts of Galveston that they thought were good for the moves that they wanted to make, and they would have shared that direction with me.

"QUESTION:  Do you recall any of the specifics of their instructions?

"ANSWER:  No.  I really don't.  But it would be reflected in the next versions of these maps that we see in the days following.

"QUESTION:  Did -- in providing the specific feedback about the polygons to move around the map, were there any thematic justifications or reasons given, or was it just like giving specific instructions about what to move without explaining why?

"MR. SHEEHY:  Objection, form.

"Go ahead.

*Laura Wells, RPR, RMR, CRR, RDR*

"ANSWER:  Yeah.  So it was very specific direction without justification.  We were trying to move extremely fast.  This was not one of those cases where we had taken a lot of time to talk about each neighborhood or each move or why we were doing things.  We were given three or four days to go from starting the project to having complete plans."

(Video concluded.)

BY MR. GABER:

Q.   Obviously, Mr. Bryan testified in his deposition that he got very specific instructions about polygons, which are shapes on the map, right?

A.   Yeah.  I'm aware of what a polygon is.

I'm not sure what he is referring to.  I think he may very well be referring to the changes for Commissioner Holmes, but I'm not sure what he is referring to.

Q.   So I can represent to you; and then Mr. Bryan will be here, as I am told.  What he is referring to is the instructions he got from you to create the two maps.

And so, does that comport with your recollection of giving him specific instructions for how to get from beginning to end on the map?

A.   Well, I didn't give him specific instructions on polygons.  I told him, at least for Map 2, start with Bolivar Peninsula, Pelican Island, Galveston Island, and then start moving up.  But I didn't specify polygons.  To

be quite honest with you, I don't even think I knew what the codes were for those polygons.

Q.   Now, you did give him instructions on how to construct Map 2 beyond just the -- putting the islands together, right?

A.   Well, yes.  It would go up -- Giusti was obviously our -- you know, he -- you were not to pair any two commissioners, Giusti becomes an obvious one for the islands, try not to draw secants, do the Bay district, do the Harris County suburb district, and see where we come out.

        MR. GABER:  Could we pull up DX-276, please.

BY MR. GABER:

Q.   And so we have Map 2 on the screen here.  Do you see that?

A.   Yeah.  That's the final -- that's the version after the commissioners made their changes, yes.

Q.   What you just described is reflected here on Map 2, right?

A.   Largely, yes.  The -- what I described initially was the first version of this.  But, yes.

Q.   And the changes weren't terribly large between the first version and this version.  Is that fair?

A.   Not terribly large, but there is -- yeah.  Most of the changes are a result of what was going on with 4.

**Q.** And so while you may dispute with Mr. Bryan whether you gave him specific polygons, you told him how to construct this map?

**A.** Well, I told him the criteria to be used, absolutely. I'm not even sure what timeframe you are talking about here.

I mean, when we get into the timeframe regarding individual commissioners, they are giving us very specific pieces of geography they want and don't want, put in, don't put in. So it's very hard for me, from that isolated clip you gave me, to figure out what in the world you are talking about.

MR. GABER: Let's -- Mr. Turnbull, please play Oldham 112 at Line 16.

(Video played, as follows:)

"QUESTION: What about Map 2? What were the -- you know, it wasn't originally called that, I know, but this sort of -- the first instructions to Mr. Bryan about the second map that wasn't the least-changes map, what were those instructions?

"ANSWER: Well, it's Map 2 because, literally, that's the second one he did. But, yeah. Map 2 the instructions were fairly simple following -- following Judge Henry's kind of -- kind of request to put all of the islands together. Okay. Basically, whereas before you are

working from the existing map and you're making changes to everybody's district per their request, this time you just take the map off and you leave the commissioners' houses on.  That's just -- lop it all off.  Then you put the islands together.

"Then, coming across at the transportation corridor at I-45, you come across the -- the causeway and you try to get to a commissioner's house without it looking too ragged, without trying -- creating a little corridor down the west side of the county, and try to get to a commissioners -- see if you can get to a commissioner's house without the pop drag preventing you from being able to get there.

"When you are looking at that, Giusti becomes almost the de facto guy that you've got to get to because he is the only one that -- he is the one that lives the farthest south.  The others -- I mean, one of the -- one of the problems is all of the commissioners tend to live in the northern part of the county, and Giusti is the closest to the Island.  And the question, obviously, became whether he could get there or not.

"But if you can get to Giusti, you get to Giusti and draw as good a looking district as you can get to Giusti. If you look at his first draft of Map 2, Giusti is in the last precinct.  He's in the one that's at the absolute top

of it, trying to go as much whole precincts as you can through there.

"And then you draw your Bay district, which is essentially taking the rest of Galveston Bay and start working your way inland from there and -- until you fill that up.

"And then you do your -- your Houston suburbs, Harris County suburbs district along the north.

"And then what is left is west and center and that goes in.  Those are your four districts.

"QUESTION:  And is this sort of, literally, the type of instruction that you gave to Mr. Bryan?

"ANSWER:  Yeah.  Pretty much what I told him."

(Video concluded.)

BY MR. GABER:

**Q.**  So this is -- what we just listened to and what you had, I think, testified is basically the same thing to me and then also on direct --

**A.**  Yeah.  You could have just played that and skipped the direct.

**Q.**  It certainly would have saved us three hours, right?

**A.**  Yeah.  I would have liked it.

**Q.**  But those are instructions that you gave to Mr. Bryan, right?

**A.**  Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** Okay. And so when he produced Map 2 for you, he was implementing your instructions to do that?

**A.** Well, he is implementing instructions I had basically received from Judge Henry. They are not my instructions, but, yes, those were the instructions on how to draw Map 2, yeah.

**Q.** And so the idea for the specific configuration of the plan that would have the coastal precinct, that's coming from Judge Henry to you to Mr. Bryan?

**A.** Correct. Now, understand when you do something like that, I don't think Judge Henry knew exactly how it would turn out. I didn't know exactly how it would turn out. We don't know exactly how it's going to turn out until Mr. Bryan is actually putting pen to paper and coming up with a map that has real numbers in it. Then we kind of know whether it will work, it won't work, or -- until then, it's an idea.

**Q.** And from Judge Henry, the idea was have the coastal precinct, have it go to the west side of the county and go up to Commissioner Giusti, right?

**A.** Yeah. It's kind of defined by what he says when he says he doesn't want the commissioners paired, because it's hard to figure out where you are going to pair -- how you are going to avoid a pair if you don't go for the nearest one.

**Q.**    Judge Henry had identified that Mr. Giusti was the closest, he thought, to the coast?

**A.**    Yeah.  I think we all could identify that once we saw their houses up on a map.  That one wasn't real hard to figure out.

**Q.**    Then the cascade from there -- I think the next one was the Bay district --

**A.**    The Bay district.

**Q.**    -- Precinct 1; is that right?

**A.**    Correct.

**Q.**    So Judge Henry said I want a Bay district on that side that comes over to 1-45?

**A.**    Well, trying not to cross 1-45.  I mean, it didn't necessarily have to come to 1-45.  The real question was when it was going to run out of pop.

**Q.**    Right.  But take it in --

**A.**    I should probably say "population," not "pop."

**Q.**    We're not talking about soda?

**A.**    Right.

**Q.**    Judge Henry then wanted that Bay district that moved central -- I guess it moved west, towards the center of the --

**A.**    It moves towards the center of the county.

**Q.**    Right.  The idea was that Precinct 2, which is the coastal precinct, would meet up with Precinct 1 up through

the center of the county?

**A.**   That's what you are thinking, yeah, or close to it or maybe not but it's -- it all kind of depends on where the population starts to lead you.

**Q.**   And then Judge Henry also had the idea to have the suburbs -- the northern suburbs of the precinct that's Precinct 3 in this map, right?

**A.**   In this map, yes.  I think in one version it got written as 4.  But, yeah.

**Q.**   And that precinct is a part of Friendswood and then loops up into League City and then --

**A.**   Right.

**Q.**   -- meets 1 and 2 at their northern borders?

**A.**   Right.  Basically runs along the Clear Creek county line.

**Q.**   And then there is -- whatever territory is left becomes Precinct 4?

**A.**   Pretty much.

**Q.**   And this concept was Judge Henry's concept?

**A.**   It's a concept that was provided to me by Judge Henry, yes.  And it's not -- it's not a new one.  This concept was floated around in 2010.

**Q.**   I think -- I heard you say that, that Judge Henry had wanted a map like this back in the 2011 process, right?

**A.**   Correct.

**Q.** And I heard you say on direct that the reason he couldn't have it was because it wouldn't get preclearance from the Department of Justice, right?

**A.** Yeah. And I may have been the person that said that. And it had some support publicly. I was aware of that. There had been public meeting support and press support for it.

**Q.** And the reason it wouldn't get preclearance, of course, is because that map would retrogress the minority voting strength in the county?

**A.** Correct.

**Q.** And that's something that you informed Judge Henry about when he first wanted it back in 2011, right?

**A.** I did. The question was, obviously, if it was -- if you did that map, you would not be able to obtain preclearance from the Justice Department. The only way you would be able to obtain preclearance on that map would be through a declaratory judgment at the District Court for the District of Columbia, which would have been counter productive, I think for the County, even if they won.

**Q.** And the factual reason for the inability to get preclearance is that the minority population is in the center of the county, and a map of this concept is going to cut that into four pieces, right?

**A.** Well, the African American is in the center of the county, which isn't the largest minority in this county. But, certainly, the African American was there. You had -- and that was what DOJ, at least at that moment, was concentrating on protecting.

An additional problem in 2010, they actually had to bring a lot of African Americans into that district because the dramatic changes that you had in the county had left it underpopulated; and if we didn't bring fresh African Americans into that district in that cycle, then it would have seriously retrogressed. It did slightly retrogress, even as it was; but it was -- DOJ agreed it was a necessary retrogression because of population shifts.

**Q.** But it was clear to everyone back in 2011 who was there that this concept would cause a decline in the voting strength of at least the Black population?

**A.** Yes. It would -- it would cause -- under the Section 5 standard, it would cause what DOJ would recognize as a retrogression.

**Q.** And the idea was that this concept could happen now because Section 4(b), the formula for the preclearance standard, wasn't in effect because of *Shelby County*?

**A.** Because of *Shelby County*, Section 5 no longer applies to Galveston. The only applicable part of the Voting

Rights Act in Galveston today is Section 2. That's what created the whole legal conundrum that I'm trying to deal with at that time because -- and this is not -- it's not limited to Galveston County.

There is a number of places where you have legacies from the Section 5 era that have -- that leave districts that are no longer within the scope of Section 2. And that's the problem with this district and why I was trying to devise the legal strategy that I was trying to devise.

Q.   Now, when you were talking with Mr. Bryan giving these instructions that we just walked through and that Judge Henry had related to you --

A.   Yeah.

Q.   -- the only justification that you told Mr. Bryan for why he was to draw it this way was for geographic reasons, correct?

A.   Yes. I was -- I was -- it was for geographic, whether that is in terms of geographic communities or geographic sense in terms of compactness and contiguity, but the basis of this is a geographically-oriented criteria map, yes.

Q.   You gave him no other justification for the purpose for Map 2?

A.   No. I was not looking at any other justification for the map.

**Q.** You certainly never told Mr. Bryan that Judge Henry's purpose for Map 2 was to create four Republican commissioner precincts?

**A.** No.

**Q.** Now, the configuration that Judge Henry gave you for Map 2 is certainly not the only way that you could draw a coastal precinct, right?

**A.** Well, it may not be. It seemed to be the one that made the most sense at the time. I'm not really sure how you could draw a coastal precinct that's going to look reasonable if it's not -- if Giusti is not the commissioner.

**Q.** But with respect to -- so, obviously, Precinct 3 in the benchmark plan --

            MR. GABER: And maybe we can pull that up again. That was, I think, DX-80, I want to say. I'm sorry. DX-4.

 BY MR. GABER:

**Q.** So you have got three precincts in the 2011 plan --

**A.** Correct.

**Q.** -- that are on the coastal region; is that right?

**A.** That's correct.

**Q.** Precincts 3, 2, and 1?

**A.** Yes.

**Q.** So --

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**  Or 1, 2, 3.

**Q.**  1, 2, 3.  If you don't think backwards, you can do that.

So in order to create the coastal precinct, you are going to have to take -- if you want to have Commissioner Giusti be the person who is going to be the commissioner for it, you have to take the parts of Precinct 3 that are on the Island off and the parts of Precinct 1 that are on the Island off, as well.  Is that fair?

**A.**  Correct.

**Q.**  And you can do that without changing anything about the parts of each precinct that's in the Mainland.  Other than that, you'll need to reduce the population in Precinct 2 and increase the population in Precincts 3 and 1.  Does that make sense?

**A.**  Well, you will.  And there will be some fairly traumatic rolling around because there is going to be a big chunk of 2 that's going to get cut loose at the top, but -- and how you roll that population around is going to make a lot of difference.

**Q.**  And I think you talked a little bit about how -- it was Commissioner Clark, I think, at the time, right?

**A.**  Yes.

**Q.**  You made him aware that just because you are overpopulated doesn't mean that you are going to lose

*Laura Wells, RPR, RMR, CRR, RDR*

population from your precise district, right?

**A.**   I didn't need to make him aware.  As I said, he was quite savvy about that point.  He understood it before I got there.

**Q.**   He had been the kind of point of contact or the most interested commissioner on redistricting on the commission, right?

**A.**   I don't know that I would quite call him the point of contact.  He was certainly a very -- a commissioner who was very interested in redistricting.  That was true in 2010.  It was true in this cycle.  Probably more so in 2010 than it was in this cycle, truthfully; and I suspect that was because of his health.

**Q.**   And I think the way you described it on direct was that because 2 was going to gain population from the coast, it might roll through 4 and over to --

**A.**   Well, no.  Actually, what I said before was this was actually on the least-changes map --

**Q.**   Okay.

**A.**   -- because 2 was overpopulated, and there was a population dam.  It was much less of a problem for doing the geographically-based plan because the population dam in the middle goes away.

      The problem is actually on this map or the least-changes map because 3 runs all the way from the top

of Dickinson almost to the very top of the county and runs all the way down to the Gulf of Mexico.

So when you get this large mass of population that has to come out of 2 and perhaps be rolled into 1 over there, it's going to have to march right through Clark's district.  Clark was aware of that problem.

But if you are doing a geographic-based map, it's not a problem because, well, you ain't got the pop dam there anymore.

MR. GABER:  Mr. Turnbull, if you could pull up the browser, please.

THE WITNESS:  And I apologize again to the court reporter.  I'll try to stop saying "pop" for "population."

MR. GABER:  We'll state for the record that "pop" means "population."

THE COURT:  Right.  The Court understands.

BY MR. GABER:

Q.  Now I'm going to -- maybe this will be helpful for the Court.  I don't know.  I'm going to use your expertise in your map drawing to walk through what this might look like.

You are familiar there is all sorts of public redistricting resources on the internet?

A.  Yes.

Q.  You are familiar with Dave's Redistricting app?

**A.**    I am familiar with Dave's Redistricting app, yes.

**Q.**    And this is a tool that allows the public to make redistricting plans?

**A.**    Yes.

**Q.**    Okay.

**A.**    I'm sorry.  I didn't know that was a question.

**Q.**    That may not have been a very good one.

            MR. RUSSO:  Can I seek clarification on this?  I think we're actually accessing a website from outside?

            MR. GABER:  This is a demonstrative.  I'm not going to make this an exhibit.

            MR. RUSSO:  I want to make sure.  The data in here is not in the record anywhere?

            MR. GABER:  No.

BY MR. GABER:

**Q.**    So if you want to have a coastal precinct and you want to have it in Precinct 2, what one would do is assign Precinct 2 the coast, as I'm doing here on the screen.

       Do you see that?

**A.**    Yeah.

**Q.**    And 2 is taking in all the territory?

**A.**    Well, you have got some more to go.

**Q.**    I know.  I have got to get this little dot in the middle here.  It's hard because there is a drag in the time with my mouse.

*Laura Wells, RPR, RMR, CRR, RDR*

Okay.  So 2 is now a coastal precinct.  Do you see that?

**A.**  Yeah.

**Q.**  But you see on the side here it now has 42,000-some-odd too many people?

**A.**  Correct.

**Q.**  And Precinct 3 has lost 37,000 people.  Do you see that?

**A.**  Yes.

**Q.**  Now, you have created the coastal precinct; but there is a big chunk of Precinct 3 that's still there on the Mainland; is that correct?

**A.**  Correct.  But this wasn't the way we were doing that map.

**Q.**  You were doing it by Judge Henry's instruction?

**A.**  Well, we were doing it as a blank.

**Q.**  Okay.

**A.**  But the instructions were to take all district lines off of your map.

**Q.**  Those were instructions you got from Judge Henry?

**A.**  Yeah.  This was -- this was to be a start-from-go map.  Interestingly enough, kind of like what the League of Women Voters was suggesting.  But, yes, it was a start-from-go map.

**Q.**  Well, accept my premise for the moment that we're

doing this exercise.

**A.**   All right.

**Q.**   So we have created the coastal precinct.  We need to drop Precinct 2's population down, and Precinct 3 needs to go up; is that right?

**A.**   Yes.

**Q.**   Okay.  So I am right that nothing about putting the islands into Precinct 2 requires that the portions of Precinct 3 that are on the Mainland have to go away?  They can stay in Precinct 3?

**A.**   You could -- you could start a map from Precinct 3 or try to do something in the middle of the county, yes. Just remember where Commissioner Giusti's house is.

**Q.**   Okay.  He is in -- in the current version on the screen, he is still in his house?

**A.**   He is still in his house.

**Q.**   His parents are still there, too, right?

**A.**   They are.

**Q.**   So we'd add population on the Mainland to Precinct 3, and that would increase the population as we add more territory, right?

**A.**   Right.

**Q.**   And you could keep doing this until you have balanced out the population on the Mainland?

**A.**   Yes.  You could keep expanding 3 out until you get

something that looks like -- I'm not sure what the numbers on that are going to ultimately end up being. But you could certainly start spanning 3 out. I mean, the logical thing would be to take over the leftover stuff from Giusti's seat.

**Q.** What I have done on the screen now, it looks like -- and I'm not taking this very purposefully. But we have got 17,000 under in Precinct 1 now, and we're still a little over in Precinct 2, and we can wrap around, and it will all be balanced?

**A.** Well -- but wrapping around is what you are trying to avoid in a map of this type. Trying to keep it clean. And, you know, the cleaner move would actually be to take the stuff at -- I'm going to say at the top because I can't point, but, yeah, the stuff up there and put it into Precinct 3.

**Q.** But, in any event, the -- this exercise, I think you agree, shows that Judge Henry's idea for the coastal precinct plan, it went beyond just the coastal district. It went to the whole map, right?

**A.** Well, to a certain degree, yes. But any time you start making that massive of a change, it's going to do that. That's one of the problems with doing a change like that. It's one of the reasons so many jurisdictions do least-changes maps.

*Laura Wells, RPR, RMR, CRR, RDR*

It's one of the reasons when I presented the least-changes map to the commissioners, it had a certain level of popularity to it.  You know, it hadn't engaged in that kind of radical change.  Any time you start doing this, you are going to have to start doing radical change.

Q.  And I guess I will push back a little bit on that.

A.  Yeah.

Q.  What we have just gone through on the screen, you understand, keeps in Precinct 3 the Mainland portions of Precinct 3 that are in the 2011 plan?

A.  Well, it kind of does.  But look at how you actually start to deviate from geographic criteria.  And I know why you are doing it.  But it's -- you know, if you are going to do that, you are going to clean this -- if you are going to really do geographic criteria, you have got to clean this off.  Certainly, you could take 3 and wrap it to the Fort Bend border, but I don't think you want to do that.

Q.  No one asked for that.

A.  Yeah.  Well -- but it makes it a lot cleaner if you are trying to do clean maps.  It makes it a lot cleaner.  I mean, it's -- I'll leave it at that.

Q.  But just so the record is clear, the configuration of Precincts 1, 3, and 4 in Map 2 were specific instructions from Judge Henry?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Well, you say "specific."  I'm not sure exactly how specific that is.  But it's --

**Q.**   They're not polygons?

**A.**   No.  They are not polygons.  They are -- it's a defined set of criteria, certainly.

**Q.**   You didn't get the impression from Judge Henry that he didn't care what Precincts 1, 3, and 4 looked like?

**A.**   I don't know.  I mean, it's -- it's not completely clear to me that he -- he was or wasn't.  I mean, I think this was something he definitely wanted to do.  It's something that had political -- it had certain public support, and he wanted to see what it looked like.

**Q.**   So I think we talked about given that you knew that Map 2 would not have gotten preclearance because it reduced the Black voting strength, right?

**A.**   Well, we're not dealing with that situation anymore.  This is a question of Section 2 at this point.

**Q.**   Right.  But what I'm saying is it reduced the Black voting strength by fragmenting the population across all four of the commissioner precincts?

**A.**   It ceased the concentration of the Black population that had been done under Section 5 that could very easily and probably correctly had been viewed as a racial gerrymander, yes.

**Q.**   Now, you are talking about the 2011 --

*Laura Wells, RPR, RMR, CRR, RDR*

Cross-Examination of Dale Oldham                    Day 8 - 164

**A.**   Right --

**Q.**   -- version?

**A.**   -- for the Court, yeah.

**Q.**   Now, with Map 2, you were aware that there would no longer be a majority-minority Commissioners Court precinct in Map 2?

**A.**   Probably.

**Q.**   What do you mean by "probably"?

**A.**   Well, I'm not so sure that would actually be the case. And it probably wouldn't be configured in the same way. It probably wouldn't be African American dominant, but I'm not sure that would actually be the case.

**Q.**   That's a fair point.  So -- and the point is that you create that coastal precinct, and you certainly still can have a majority-minority Commissioners Court precinct centered on the Mainland?

**A.**   Yes.

**Q.**   And that's kind of what we just went through, right?

**A.**   Well, it could be.

**Q.**   Or some version of it?

**A.**   It could be a different way.  And I'm not so sure -- you know, at this point, obviously, it's -- that's not the case with the coastal district, but I'm not sure how the coastal district is ultimately going to develop.

**Q.**   Ultimately going to what?

**A.**   Develop.

**Q.**   But the point is that there are a number of ways that you can continue to create that majority-minority Commissioners Court precinct wholly on the Mainland and have that coastal precinct?

**A.**   You might can, but it's -- like I said, it's not going to have the same character because it's not going to be African American dominant.

**Q.**   It will be a combination of African American and Hispanic population?

**A.**   Hispanics will probably be the majority in it.

          MR. GABER:  Let's pull up -- I'm going to find another exhibit.  Let's pull up, if we could, Mr. Turnbull, PX-384 at 171.

     This is a document that's -- exhibit that's been admitted into evidence in the case.

BY MR. GABER:

**Q.**   You didn't make this, but I'll tell you about it.

     This is a racial heat map of Galveston County.  The red shows the predominantly Anglo populations, and the green shows the non-Anglo populations.

     Do you see that?

**A.**   I see it.

**Q.**   And do you see that overlaid over it are the Map 2 Commissioners Court precinct lines?

**A.**   Yes.

**Q.**   And this is just a visual reflection of what we were just talking about, the fragmentation of the population?

**A.**   I would not use a map of this type.  And the reason is you have combined the African American and the Hispanic, and that's going to really hide a lot of the significance of this.  If I were going to do this, I would do it as two separate maps.

**Q.**   Okay.  Well, this is both of them.  And this comports with your understanding of where the Black population added into the Hispanic population would be?

**A.**   Yes.  But that hides both.  I don't -- the usefulness of this is not very much.

**Q.**   You agree, right, that this was the natural result of the particular configuration of the coastal precinct plan that Judge Henry had relayed to you?

**A.**   Yeah.  But it's -- it doesn't really tell you what the political results of this are.  I mean, it's probably more reflective of the African American than it is of the Hispanic.  I'm not real sure because I have never done a map like this, and I wouldn't.

          MR. GABER:  And if we could please pull up PX-485 and page 44.

          MR. DUNN:  The page again?

          MR. GABER:  Page 44, please.

BY MR. GABER:

Q.   And Judge Henry didn't ask you to explore other ways to draw the coastal precinct?  He just wanted that particular configuration that made its way into Map 2?

A.   Well, I'm not quite sure what you are -- what you are trying to say.  I mean --

Q.   I'm asking my question.  That's what I meant to say.

Judge Henry didn't give you -- didn't ask you to explore other potential maps that would have the coastal precinct?  He gave you that particular configuration that we walked through the instructions a couple of times?

A.   Well, the rough -- remember, the key part of the instruction that I think you are trying to slop over here is keep all the commissioners in their own seats.  He didn't specifically say go to Giusti.  We are the ones that kind of said go to Giusti because that was the only way we could figure out how to make it work.

Q.   So I'll just tell you in the map you are looking at on the screen, the commissioners are all in their seats.

A.   Yeah.

Q.   No one is paired.

This would be an example of another configuration that would have kept Commissioner Holmes in his -- something closer to his benchmark version of Precinct 3.

Do you agree with that?

**A.**    Probably, yes.

**Q.**    And Precincts 1 and 4 are pretty similar to --

**A.**    Well, it splits up the suburb configuration; but aside from that, it doesn't seem that far off.  What is the minority numbers in 3?

**Q.**    We can tell you that.  Let's go to perhaps the next page.  I don't know if it's the next page or the prior page.  Let me take a look.

So I'm farsighted.  I think most people are nearsighted.

**A.**    I'm extremely nearsighted.  I am having a monstrous time with this document.

**Q.**    So we are taking a look at the Hispanic separated from the non-Hispanic Black.  Do you see that?

**A.**    Yeah.

**Q.**    And 25.3 percent plus just the Black alone of 24.8 percent, that gets you over 50, right?

**A.**    25 plus Black alone?  Barely, yes.

**Q.**    And then if you add in the percent Black plus White --

**A.**    I notice that the Hispanic is greater than the African American in this.  I don't think that would have been agreeable to Commissioner Holmes at the time.

**Q.**    Well, not to quibble with you there; but 24.8 plus 1.3 is 26.1.  Am I right?

**A.**    Well, where are you putting in the --

**Q.** Percent Black plus White.

**A.** Oh, okay.  You are doing an AP.

**Q.** Well, not quite.

**A.** Are you picking up double count when you do that?

MR. GABER:  If you could scroll out a little bit, Mr. Dunn.

BY MR. GABER:

**Q.** We can see that we have the Hispanic CVAP plus the not Hispanic CVAP.  Up at the top.  This is from the Texas Legislative Council.

**A.** Well, we'll add the 1.3 in and assume it's not a double count.  That's still barely over.  But, yes.

**Q.** Of course, the County -- you understand that complying with VRA doesn't require drawing the district over 50 percent for the map drawer?  That's the government, right?

**A.** I don't quite understand what you are saying here.

**Q.** Well, there wasn't -- the County could have drawn a district without having a claim under section -- say the *Cooper* case, right, from North Carolina.  You are familiar with that?

**A.** I am very familiar with the *Cooper* case.

**Q.** And the gist there is that you don't necessarily have to have it precisely over 50 percent if you are the map drawer?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Well, but then you are not drawing it as a minority seat either.  Remember, the gist of the *Cooper* case is there is no legally significant racially polarized voting in North Carolina.

**Q.**   That's part of it.  But what I said is true is --

**A.**   Some of us may disagree with that, but the Court was pretty clear there is no legally significant racially polarized voting in North Carolina.

**Q.**   Well, in that district in North Carolina.  Not the rest.

**A.**   Yeah.  It's a little broader than that, I think; but we'll save that for another time.

**Q.**   All right.  Maybe we'll have a chance to debate that more.

MR. GABER:  So if we could turn to page 50 from PX-45, please, and maybe zoom back out.

BY MR. GABER:

**Q.**   Do you see on your screen here there is another way that you could draw the coastal precinct and retain -- start with the territory Commissioner Holmes had in Precinct 3 and add territory over to the Bay?

**A.**   Yes.  That's -- yes.  On the maps you have shown me, that one is a little better.  It still has the problem that it divides the suburban district up at the top of the map along Houston.

**Q.** Suburban districts are divided in the benchmark plan?

**A.** Yes. But not in the geo map.

**Q.** And, presumably, this could be changed to -- if that's some concern, that could be changed to accommodate that, too, couldn't it?

**A.** Well, it might; but you don't know until you have taken a look at exactly what the pops are in that one and how you have to pan it out.

**Q.** This is a version that -- with one exception there in the limits of La Marque -- follows the highway mostly?

**A.** Yeah. I see that.

MR. GABER: Thank you. We can take that down.

BY MR. GABER:

**Q.** So Map 2's configuration of the coastal precinct wasn't, like, written in the stars? That's not the only way it will be contiguous?

**A.** Well, I noticed on that map you actually did the coastal configuration -- I couldn't see it exactly, but it looked almost exactly like what was in Map 2.

**Q.** Right.

**A.** Yeah.

MR. GABER: Now, if we could pull up PX-528, please.

BY MR. GABER:

**Q.** And you talked a little earlier with counsel about

some spreadsheets that Mr. Bryan had prepared and showed you and that the commissioners were provided and shown.

**A.**    Right.

**Q.**    Do you recall that?

**A.**    Yes.

**Q.**    And you saw one version earlier.  This is -- this is the final version that was shared with you and the commissioners.  Does that look familiar to you?

**A.**    Vaguely, yes.  It's been a while.  And, again, I'm having a heck of a time trying to read this.  But, yes.

**Q.**    And maybe we can -- I don't know if we can make this bigger.  We'll make the --

THE WITNESS:  And I apologize for sticking my nose in the screen.

THE COURT:  That's all right.

BY MR. GABER:

**Q.**    So you were looking earlier at the political pivot table with Mr. Russo.  Do you recall that?

**A.**    Yes.

**Q.**    This is the pop pivot table.

**A.**    Okay.

**Q.**    And this is the table that presents the racial data.  Do you see that?

**A.**    Yes.

**Q.**    And so this is the racial data for the 2011 plan for

*Laura Wells, RPR, RMR, CRR, RDR*

Map 1 and for Map 2; is that right?

**A.**   I'll take your word for it.

**Q.**   You can see, on the left-hand side here, we have original Map 1 and Map 2.

**A.**   All right.

**Q.**   And so what Mr. Bryan did here for you was to present separately the voting age population for Black not Hispanic, the citizen voting age population for Hispanic, and then he combined those together in a separate column that's color coded --

**A.**   Right.

**Q.**   -- for the percent total minority VAP?

**A.**   That appears to be what is there, yes.

**Q.**   And then it has this what is called conditional formatting to show a heat map for whether there is a variation between the racial percentages between the precincts.  Do you see that?  The scale of red to green?

**A.**   When you say "precincts," you are referring to the districts?

**Q.**   Correct.

**A.**   Okay.  Yes.

**Q.**   And by "districts," we mean Commissioners Court precincts.

**A.**   We mean Commissioners Court precincts, yeah.

**Q.**   I just wanted to make sure.  I agree that Texas's

nomenclature is very confusing for this.

**A.**  That's why I say what I say at the beginning because it's -- I have seen it cause trouble.

**Q.**  So if we look at the -- and let's focus in on Precinct 3 in each of these maps.

**A.**  Sure.

**Q.**  In the original plan, the percentage minority VAP that Mr. Bryan purported to you was 61 percent.

Do you see that in the green and the top column?

**A.**  I do.

**Q.**  The top row, rather.

And then in the second one, which is Map 1, it drops slightly to 58 percent?

**A.**  Correct.

**Q.**  And in Map 2, it drops to 30 percent.  Do you see that?

**A.**  Correct.

**Q.**  And Precinct 3 in Map 2 actually has the smallest total minority voting age population; is that right?

**A.**  It does appear that way, yes.

**Q.**  And its Black population dropped from 30 percent in the original map to 7 percent in Map 2; is that right?

**A.**  Correct.

**Q.**  And its Hispanic population also decreased from 31 to 23 percent; is that right?

**A.**   That appears to be what is here, yes.

**Q.**   And Precinct 4 went from having the lowest minority population to having the highest minority population; is that right?

**A.**   No.  It appears to be Precinct 2.

**Q.**   I see 38 percent for Precinct 4 total.

**A.**   Oh, I'm sorry.  I'm looking at the wrong column.  My fault.

Yeah.  It's 2 percent higher than Precinct 2 -- pardon me -- or District 2.  Now you have got me doing it.

**Q.**   Hopefully, the Court will understand what we're talking about.

**A.**   Yes.

**Q.**   So the range here, it goes from 30 percent on the low end for the new Precinct 3, where Commissioner Holmes lives, to 38 percent on the high end, which is where Commissioner Clark lived at the time this map was drawn, right?

**A.**   That would have been correct, yes.

**Q.**   Did anyone tell you why Commissioner Holmes was being put into the precinct with the lowest minority population?

**A.**   Well, it was a function of where he lived.

**Q.**   Didn't you say earlier that all the commissioners sort of lived right by each other?

**A.**   Well, they live -- they don't live by each other, but

they live in a tier across the northern part of the county.  The problem is, though, of the next three after Giusti, the one that lived the furthest south was Clark.  He is also the furthest west.  He lived on the western edge of the county.  I had even thought of kind of a flop for those, but it ended up -- it looks like a yin and yang when you try it most of the time.

**Q.**   Do you recall we were just looking at some alternative coastal map configurations --

**A.**   Yeah.

**Q.**   -- in PX-485?

**A.**   Yeah.  But those -- like I said, those don't do the suburban district across the top.  You are trying to get Clark into that suburban district.  Then you have got to kind of come up and over and -- and Holmes comes down and over, and it literally kind of does a little yin and yang thing.

**Q.**   So it's not a function -- it's a function of, now you are saying, this suburban district idea --

**A.**   Yeah.  I mean, it's not --

**Q.**   -- that -- that puts Commissioner Holmes --

**A.**   -- it's not like I have said -- I have been talking about it for the last several minutes.  When you start -- it's -- you are cutting him in most of your configurations.  I understand that.  I understand that you

might want to say that's not that important of a thing. It certainly could have been something somebody could have raised. Somebody could have raised it as an issue. Somebody could have raised it to us. We would have done a different configuration.

But at least at the time, trying to do the district or the suburban Houston district along clear -- well, Clear Creek. I can't say Bolivar. Now I can't say Clear Creek. And -- but, you know, if you decide that's not that important of a criteria, obviously, you could draw that a little different.

Q.   It wasn't -- it's not surprising to you to see this spread of 30 percent to 38 percent in the way that Map 2 was constructed, is it?

A.   I don't know that it's that shocking to me. I mean, it's going to be interesting how this goes over the next decade, because I fully expect the Hispanic -- no -- the Hispanic White to increase in this county. I would be surprised if it doesn't.

So I'm not quite sure how they will end up by the time you get to the end of the decade.

Q.   You -- I think I heard you say on direct and in your deposition, too, that when you showed Commissioner Holmes Map 2 or, you know, the earlier iteration of it --

A.   Yeah.

**Q.** -- that you weren't -- you were expecting him to be dissatisfied with that map?

**A.** Yes. I mean, this is -- he has fought over having Bolivar Peninsula -- I'm getting it right now -- having the Bolivar Peninsula put in to his district. I mean, we had that incredible fight back in 2011, which put some really bad stuff on the record.

**Q.** I'm sorry to interrupt. Just to be clear, I'm asking about Map 2, not Map 1.

**A.** Well, I understand that. But this goes to the Map 2 comment. If he is that upset about Bolivar, he wasn't going to be happy about this.

**Q.** And you knew that was in large part because it dropped the Black population to 7 percent in his precinct and it dropped the Hispanic population down to 23 percent, right?

**A.** Right. I mean, this is a man who is clearly looking for an African American-dominant district. That's the key to it.

**Q.** Now, you think that, in the benchmark plan, Precinct 3 was an effective performing crossover district?

**A.** It was a performing crossover district, yes.

**Q.** And I think you agree with me that Map 2 dismantles that as an effective performing crossover district?

**A.** It's certainly not a crossover district in Map 2, no.

**Q.** And it's not going to perform for the candidate of

choice of minority voters?

**A.** I don't know that that's necessarily the case. That's a speculation. But it's -- it certainly was a performing crossover district at the time.

**Q.** You went through the election data on direct examination with Mr. Russo for Map 2.

**A.** Yes.

**Q.** And I think what you testified was that the Republican candidate was highly likely to win Precinct 3.

**A.** I agree with that.

**Q.** And you have been --

**A.** Your assumption there is that things don't change or that the Republican will never be the candidate of choice, and that's a bigger question.

**Q.** Do you agree with me that -- well, you agree that Black voters in Galveston County are racially polarized in their voting against White voters and support the Democratic candidate in general elections, generally?

**A.** They generally support the democratic candidate in general elections, yes, they do.

**Q.** Now -- oh, one thing before I move on to the meetings. I think you told me at the deposition, and you talked a little earlier about it, too, that one of the main things that you gave Mr. Bryan was the location of the homes of the incumbents. It's clear we did not want them paired.

**A.**   Actually, I didn't give him those.  Those came from the County.

**Q.**   And who gave them to Mr. Bryan?

**A.**   I'm not sure exactly how he got them.

**Q.**   Okay.  But it was your understanding that he had those?

**A.**   He had those.

**Q.**   And he needed to have them to follow these instructions?

**A.**   He needed to have those to follow all the instructions, yes.  He also had the additional home of Commissioner Giusti's parents.

**Q.**   And the new plot of land that --

**A.**   No.  He didn't have that.  That's what caused the problem.

**Q.**   Okay.  Ultimately, Commissioner Apffel gave you that plot of land?

**A.**   Ultimately, he gave us the plot of land.

**Q.**   You had to split a voting precinct to get that in?

**A.**   We did.

**Q.**   Now, you flew down to Galveston and met with each commissioner in person and met with Judge Henry and showed them the map?

**A.**   Correct.

**Q.**   Maps 1 and 2?

**A.**   Correct.

**Q.**   And I think you told me that you met with Judge Henry, and he was happy about Map 2?

**A.**   He was.

**Q.**   Not surprisingly, Map 2 is the visualization of the instructions he gave you?

**A.**   Correct.

**Q.**   For Precincts 1, 2, 3, and 4?

**A.**   Correct.

**Q.**   He disliked Map 1, right?

**A.**   He was not overly fond of it, no.

**Q.**   And tell me:  What was the reason he disliked Map 1?

**A.**   Well, it wasn't as much that he disliked Map 1, I think, as how much he liked Map 2.  Map 2 was something he had been visualizing for a decade and thought was a rational reasonable way to district Galveston County.

**Q.**   Now, I was a little surprised yesterday -- Judge Henry testified yesterday.

**A.**   Yeah.

**Q.**   And he testified that he never told you that he thought Map 1 was a racial gerrymander still.  Does that comport with your recollection?

**A.**   That Map 1 as I drew it was still a racial gerrymander?

**Q.**   Right.

**A.**   Well, my whole purpose in drawing Map 1 was to try and avoid the racial gerrymander, and I informed Judge Henry that I didn't think that would constitute a racial gerrymander.  I could defend it on nonracial grounds.

**Q.**   And you concluded and told all the commissioners that Map 1 was -- complied with the U.S. Constitution?

**A.**   Complied with the U.S. Constitution, and I had reached the conclusion that I could defend it from a racial gerrymandering claim.

MR. GABER:  Mr. Turnbull, if you could please play Oldham, page 120, line 6 -- or line 14 through 24, I think.

MR. RUSSO:  Your Honor, I can assume we're doing impeachment here; but, typically, the impeachment, it provides the witness an opportunity to see what we're impeaching him with.

MR. GABER:  That's what I was going to do here.

MR. RUSSO:  But usually you show it to the witness before and then ask him.

Object.  It's improper impeachment.

THE COURT:  I'm going to let him do it this way.  It's overruled.

(Video played, as follows:)

"QUESTION:  Did Judge Henry in his meeting say anything about Map 1?

"ANSWER:  Other than he much preferred Map 2 and he wanted that one to be the one that would go through.  He did suggest that Map 1 was still a racial gerrymander.  I, you know, said we're trying to get away from that.  But that was -- he did suggest that it was still a racial gerrymander."

        (Video concluded.)

BY MR. GABER:

**Q.**   Does that --

**A.**   Yes.

**Q.**   Does that comport with your memory?

**A.**   Well, let me -- let me clarify that a little bit.  Okay?

**Q.**   Okay.

**A.**   He was certainly concerned, because he still thought, you know, the 2011 map was a racial gerrymander without a doubt.

        We had a discussion, from me largely, that I believed that Map 1, as we had reconstructed it and if it had the proper backing from the commission, that we could defend it as not being a racial gerrymander.  We could defend it on the idea that it was a least-changes map.  We had taken the more difficult portions of that out, I would like to think; and I think maybe what that probably represented was I was successful in that discussion.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   Did you at any point in your discussion with Judge Henry have the impression that he was fine with Map 1 and would want that one just as much as Map 2?

**A.**   No.  I think he always wanted Map 2 better.  He has always --

**Q.**   Since 2011?

**A.**   What?

**Q.**   Since 2011?

**A.**   Yeah.  Since 2011.  I think he has always wanted a map that looked like that, yes, or a map that at least drew that coastal district.

**Q.**   Did he tell you he would be willing to vote for Map 1 if Commissioner Holmes asked him to?

**A.**   Not directly to me, no.

**Q.**   Did he give you any indication that that might be what he would do?

**A.**   It would be pure speculation.

**Q.**   Did you get any sense that Judge Henry was undecided as between Map 1 and Map 2 and was just going to wait until the day of the public meeting to figure it out?

**A.**   Again, that would be pure speculation on my part.

**Q.**   Well, you were with him and meeting with him, and he told you -- he told you that he liked Map 2 better?

**A.**   He did tell me he liked Map 2 better.  I don't know what other considerations might come into political play.

*Laura Wells, RPR, RMR, CRR, RDR*

And, quite frankly, that's not my place.

**Q.**   And one of the reasons that Judge Henry didn't particularly like Map 1 was that it kept the Black and Hispanic combination precinct in the center of the county?

**A.**   I'll have to disagree with that.  The reason Judge Henry didn't like Map 1 was -- he didn't like the original 2011 was it was splitting Galveston Island and it was separating out Republican Bolivar.

**Q.**   That's not speculation?

**A.**   Because he said that to me on numerous occasions, and you saw that at the hearings way back in 2010 -- or 2011, excuse me.

MR. GABER:  If we could pull up PX-144, please.

BY MR. GABER:

**Q.**   And this starts at the bottom.  This is an e-mail from Paul Ready to you and to Mark Henry dated April 20th, 2021.  Do you see that?

**A.**   Yes.

**Q.**   And Mr. Ready asks you:  "Dale, the judge called me to ask if there was any reason to wait to begin redrawing JP districts or if that could start sooner.  I was under the impression that we had to draw a majority-minority district if we could.  So we needed to wait on census data.  The judge remembers hearing from another lawyer that my impression was inaccurate.  Can we have a quick

call?"

Do you recall this?

**A.**   Yes.  I recall this.

**Q.**   So as of April 2021, the judge was asking -- Judge Henry was asking questions about whether majority-minority districts needed to be retained?

**A.**   Well -- and I actually said -- for one thing, I didn't think there was any reason.  I tamped that down by simply saying we didn't need to address JP and constable districts right now because they weren't triggered.  They were mistaken that they were triggered by the census and that they had to redraw them.  They did not, since they don't have to comply with one person, one vote.

And as a result it's, like, you've got plenty on your plate right now trying to get your commissioners map done.  You don't need to be taking on JP/constables at the moment.  Why don't you get your commissioners map done, and then we can deal with JPs and constables after that is complete.

**Q.**   But the crux of this is that there was a -- there was discussion about whether the County could get rid of the majority-minority JP district?

**A.**   Not much discussion.  I just put that the way I just described it, and that went away.

**Q.**   There is just -- there is four JP districts, right?

**A.**   Correct.

**Q.**   Same number as the commissioners precincts?

**A.**   Same number as the commissioners and the constables. But, again, not triggered by -- redraw is not triggered by the census.

**Q.**   Is it your sense that the redraw of the JP map is to come here after the commissioner court precincts?

**A.**   I have no idea.

**Q.**   Do you know there is a -- I gather you had discussions beyond this e-mail because what you read to me -- or you said to me is your discussion isn't what I see in this written response?

**A.**   Yeah.  Well, it's -- it comports with that.

**Q.**   Okay.  Did you have a phone call about this?

**A.**   Yes, I think I did.

**Q.**   And the other lawyer that --

**A.**   I have no idea who that was.

**Q.**   That didn't come up?

**A.**   No.  I don't know who that was.

**Q.**   Was it Lawyer Nixon?

**A.**   Mr. Nixon would not have been talking to Judge Henry about this topic at that time.  He was employed by the federal government at that time.

**Q.**   So after you --

        MR. GABER:  You can take this off the screen.

*Laura Wells, RPR, RMR, CRR, RDR*

BY MR. GABER:

Q.  After you flew back to South Carolina from meeting with the judge and the commissioners in person, Mr. Ready then set up a number of Zoom meetings with you to meet with Commissioners Clark, Giusti, Apffel; is that right?

A.  Correct.

Q.  And from your perspective, the purpose of these meetings was because Judge Henry was going and getting votes for Map 2?

A.  Well, I'm not going to speculate as to whether Judge Henry was getting votes.  What I will say is each one of these commissioners wanted to do an adjustment on Map 2 focused on their district.

Q.  You recall, though, we took a deposition in this case?

A.  Yes, I do.

MR. GABER:  Mr. Turnbull, if you could please play, starting at 131, line 11.

(Video played, as follows:)

"QUESTION:  Now, you had said that there -- we had gotten -- after the meetings where you showed the commissioners the draft maps, you got the feedback from that, and then you said there was phase 2 or phase 3.  What did you mean by that?

"ANSWER:  Well, the question was whether -- what -- but at least in terms of the map drawings itself, it's kind of

phase 2.  You know, you have had earlier phases prior to this.  But we've gotten down to the nitty-gritty of drawing maps at this point.

"And -- and we did still have some situations where we're trying to actually divide the precincts that we had to meet the 5,000 voter on that were internal to districts.  We -- we clicked the ones that were external to districts already, but we didn't click the ones that were internal to districts.  So we were still trying to work through some of that.

"But at this stage, what happens is now commissioners start to make changes to Map 2.  Essentially, Judge Henry is going and getting votes.  And -- and -- so the first one that comes is -- is Apffel.  And he wants to get his new house site in the map from -- into Map 2.

"And so Tom and I get together with him, and Tom starts to do some work.  The first thing we've got to do is find out exactly where the house is, or it's going to be, and then figure out how it can be done and -- and make sure that the line is actually a -- a usable line.  That was all found.  It was added in.  The changes were made that got his house into his district in Map 2.  And at that point, I think he was on board with Judge Henry at that point."

(Video concluded.)

BY MR. GABER:

Q.   Okay.  So does this refresh your recollection that your impression was that Judge Henry was going and getting votes?

A.   I probably over-testified when I did that.  Look, I'm not going to deny that they weren't -- that every commissioner was coming in there and they were trying to do something to Map 2 to make it more agreeable to them, but I don't have actual knowledge that the person was Judge Henry or that he was actually going back and forth to them.

     But, certainly, we were getting commissioners who were coming in at that point and were adjusting Map 2 so that they would not find themselves in opposition to it in the manner in which they had previously.

Q.   You landed on the point I wanted to raise again there, which is that I thought I heard you say that when you showed the maps originally to each of the commissioners, they -- everyone but Judge Henry wanted Map 1?

A.   Yes.

Q.   So it's not a lot of speculation for you to have said that the person who was going to get votes for Map 2 was the one person who wanted that?

A.   I'll leave that speculation and any inference to you. I don't think it's appropriate for me to say without more

knowledge than I have.

Q.   Now, Commissioner Apffel, Commissioner Clark, Commissioner Giusti, none of them reached out to you to set up these meetings, right?

A.   Well, they come through Paul Ready, but I'm assuming -- maybe incorrectly, but I'm assuming that each one of those commissioners has contacted Mr. Ready and has gotten Tom and myself set up for a Zoom call.

Q.   I think -- you are assuming perhaps incorrectly is what you said, right?

A.   Well, I said I may be assuming incorrectly.

Q.   All you know is that Paul Ready contacted you?

A.   Right.

Q.   But the commissioners didn't tell you, "Hey, we reached out to Paul Ready to have him reach out to you"?

A.   Right.

Q.   In fact, you had said, I think, at least with respect to Commissioner Holmes, you told him directly that you can reach out to me if you want?

A.   Well, I still would have needed him to call Ready, but, yes, because I had Ready in on any conversation I had with any commissioner because it was important in terms of making sure Texas law situations didn't screw up.

Q.   Now, what transpired was a series of Zoom meetings with the commissioners in their offices here in Galveston

and you and Mr. Ready and Mr. Bryan; is that right?

**A.** Yes.

**Q.** And that was with -- I think you said that sometimes Giusti and Clark were in the same room for that meeting?

**A.** I think there was a meeting with Giusti and Clark. There was certainly -- there were certainly meetings with Clark, and there was a meeting with Apffel.

**Q.** Okay. What about a meeting with Giusti on his own?

**A.** We may have had one with Giusti on his own. I don't know.

**Q.** And the idea here was that changes were being made to Map 2 to accommodate each of those three commissioners' wishes in order to get them on board with being okay with Map 2?

**A.** They were certainly -- we were certainly making changes to accommodate their wishes, yes.

**Q.** Did Paul Ready set up a meeting with Commissioner Holmes to do the same thing?

**A.** Not that I understand, no.

**Q.** Did you ever say to Mr. Ready, "Hey, when is the meeting with Commissioner Holmes going to be to accommodate his needs for Map 2, as well?"

**A.** I did not. But this was -- I didn't say it for any of the other commissioners either.

**Q.** Mr. Ready just brought them to you?

**A.**  Correct.

**Q.**  Did you tell Commissioner Holmes, "Hey, it looks like Map 1 is going to be DOA.  Time to start seeing if you can get what you want configured into Map 2"?

**A.**  That would have been me interjecting myself into the political process that was going on in Galveston County.  That is not something that would have been appropriate for me.

**Q.**  As far as you are aware, Commissioner Holmes was clueless that these meetings were happening between you, Mr. Bryan, Mr. Ready, and Commissioners Clark, Giusti, and Apffel?

**A.**  Well, that does get to the confidentiality issue; but, yes, I don't know whether he was or he was not.

**Q.**  And we saw earlier that Commissioner Holmes could have kept the core of his precinct and added on some additional territory and fit that into the idea of the coastal precinct?

**A.**  I don't know if that's something he would have been agreeable to.  He certainly didn't appear to be agreeable to that early on in the process.

**Q.**  But you don't know that because he wasn't asked?

**A.**  Well, I don't know that he wasn't asked, and I don't know how his attitudes may have changed.

**Q.**  Now, at your deposition, you told me that Judge Henry

had popped in to these Zoom meetings with the different commissioners. Do you recall that?

**A.** Only one. But, yeah, he had popped in, I think, on one.

**Q.** Which one do you now recall he popped in to?

**A.** Well, I think he probably popped in on the first one with Apffel.

**Q.** Okay. And today your recollection is that it's just one?

**A.** I think it's just one.

MR. GABER: Mr. Turnbull, could you please play Oldham deposition 152 starting on line 3.

(Video played, as follows:)

"QUESTION: Okay. So, we have had the meetings with Commissioners Giusti, Clark, and Apffel. Did you meet again with Judge Henry during this time period when the -- kind of the Apffel house fix was happening and the Clark primary opponent fix was happening? Were there other meetings with Commissioner -- I'm sorry -- with Judge Henry?

"ANSWER: We may have had a couple of discussions with Judge Henry, and -- and he might have popped his head in a couple of times on -- on some of the individual commissioner meetings that there were, too. But the -- you know, he was -- we were pretty much set at that point. He was prepared to bring the -- the new Map 2 up to the

commissioners and get a vote.

"QUESTION: So, Judge Henry, he knew that you were there and that you were having -- not there. He knew that you were having the Zoom calls with the commissioners at this point?

"MR. RUSSO: Calls for speculation.

"ANSWER: You know, I don't absolutely know that. I think he probably was.

"QUESTION: And you said he popped in to ask --

"ANSWER: He didn't actually pop.

"QUESTION: Yeah. You said he popped in. These were Zoom meetings at this point, right?

"ANSWER: Yeah.

"QUESTION: Did he come up on the Zoom screen, do you mean, or did he pop in to the room where one of the commissioners was?

"ANSWER: He usually popped in to the room.

"QUESTION: So he was, like, physically there with whatever commissioner it is that you are on the Zoom with?

"ANSWER: Yeah. And then he would pop out.

"QUESTION: Okay. Did he have any commentary when he popped in?

"ANSWER: Not a whole lot. No. Because it was mainly for the commissioners and getting them happy.

"QUESTION: But I think it's" --

*Laura Wells, RPR, RMR, CRR, RDR*

(Video concluded.)

MR. GABER:  So a couple of things --

MR. TURNBULL:  Can I finish?

MR. GABER:  You can keep playing.

(Video played, as follows:)

"QUESTION:  Aside from those pop-ins, there wasn't any other, like, dedicated Zoom meeting with a commissioner with Judge Henry?

"ANSWER:  Not that I recall.  I'm not going to say that there wasn't, but not that I recall.

"QUESTION:  Okay.  Now -- and we're still in October at this point?

"ANSWER:  Yeah.  I mean, most of this got decided before the end of the month.

"QUESTION:  Okay.  And I think you said you didn't..."

(Video concluded.)

THE COURT:  I think we're past whatever impeachment that was.

MR. GABER:  Yeah.  Thank you.

BY MR. GABER:

Q.  So what I heard was that he popped in a couple of times -- usually popped in to the room in reference to meetings with commissioners in which he was popping in. Has your memory changed?

A.  Yeah.  It's hard for you to tell in a Zoom meeting, I

mean, particularly when I'm in South Carolina and they are there.  Unless, you know, he appeared on the screen, which he didn't very often, or I heard his voice, you didn't really know.  And that doesn't seem terribly different from what I just testified to a minute ago.

Q.   I thought you had said in your testimony a few minutes ago that it was Commissioner Apffel meeting in the first meeting and only that one meeting; is that right?

A.   Well, I think -- I think he was in the Apffel meeting, but I said a couple of times I'm not sure exactly how many it was or not.  That's not exactly a statement of certainty.

Q.   So it might have been more than Commissioner Apffel's meeting?

A.   But I don't know if it -- you know, where it was or how many.  I mean, it's -- it's a Zoom call.  They're here.  I'm in South Carolina.  I can't see very much because Mr. Bryan has a screen share up which is occupying virtually everything that's on my screen.

Q.   Now, I gather you expected the commissioners and Judge Henry to monitor their compliance with the Texas Open Meetings Act themselves?

A.   Absolutely.  That was -- that's one of the principal reasons Mr. Ready is always present when I'm talking to a commissioner.

**Q.** And we just saw that by late October of 2021, Commissioners Clark, Giusti, and Apffel were satisfied; and it was your sense that Map 1 wasn't really in contention anymore?

**A.** At that point, again, that's speculation on my part. I mean, I don't know what the actual politics are going to be at the meeting or what is going to happen there or what other things might occur to cause people to change minds.

All I could see at that point was that there have been specific objections to Map 2 when the map was presented, and each one of those commissioners had done work to get themselves, if not in an agreement, at least copacetic with Map 2.

**Q.** And it was your sense in late October that Map 2 was going to be adopted?

**A.** It was my sense that the objections that I heard earlier were probably not there anymore.

**Q.** I think this varies from what you told me in your deposition. I hate to do this again.

**A.** That's fine.

MR. GABER: But, Mr. Turnbull, could we play --

**A.** I don't think it's inconsistent but go ahead.

MR. GABER: -- Oldham clip 145, line 2 through 15.

(Video played, as follows:)

*Laura Wells, RPR, RMR, CRR, RDR*

"QUESTION:  Was anyone -- were any of the commissioners asking for additional changes to Map 1 during these meetings?

"ANSWER:  Not at this point.

"QUESTION:  Was it your sense that, at this point, that Map 1 was not really in contention anymore?

"ANSWER:  I wouldn't say that was truly the case until Giusti and Clark were on board.  At that point, yes.  At that point, it was clear to me which way the commission would be going.

"QUESTION:  And, roughly, what was the timeframe when Giusti and Clark got on board with Map 2?

"ANSWER:  I'm not exactly sure, but it's in that -- that late October period."

(Video concluded.)

BY MR. GABER:

Q.   Does your testimony in your deposition comport with -- you stand by that?

A.   Well, it's a speculation on my part.  I probably shouldn't have said it, but it's a speculation on my part.

Q.   But that was how -- that was your read of what was going to happen?  You had been working with these folks for a couple of weeks at that point -- well, years, really -- decades?

A.   Yeah.  We had -- well, Giusti and Apffel I knew, but, yeah.  Clark and Henry I knew.  The -- you know, it's -- I

*Laura Wells, RPR, RMR, CRR, RDR*

don't know what's going to change; but, yeah, I'm not going to deny that they had fixed their concerns with Map 2 that they had expressed to me, and, you know, you then figure out what that's going to mean.

Q.   Earlier when Mr. Russo walked you through the spreadsheet with the election data --

A.   Yeah.

Q.   -- you said that all the commissioners were shown this?

A.   I believe so, yes.

Q.   So all the commissioners and Judge Henry knew that Map 2 was not going to have a precinct where Commissioner Holmes was going to get re-elected?

A.   I'm not sure at what time that would be the case; but at some point, that data would have been available to them.

Q.   They would have known that Map 2 no longer contained a performing crossover district?

A.   It would -- it would not have a crossover district that was performing in the same manner that the one that judge -- excuse me, Commissioner Holmes had, no.

Q.   Now, you talked a little bit about your advice to the County about holding the public meetings or meeting?

A.   Yes.

Q.   Do you recall that?

And your advice, if I recall from at least the deposition, was that they should have as many meetings as possible was sort of prong one, and prong two was that they should provide an opportunity for supplemental comments to be provided --

**A.** Correct.

**Q.** -- after the meeting?

**A.** Yes.

MR. GABER: If we could pull up JX-27, please, Mr. Turnbull. And I want to focus on the top e-mail from Tyler Drummond.

**A.** Yeah.

BY MR. GABER:

**Q.** And do you see that's to you, Mr. Torchinsky, Phil Gordon at Holtzman Vogel, and Paul Ready?

**A.** Right.

**Q.** And in this timeframe, do you recall that Mr. Drummond -- and Mr. Drummond is Judge Henry's chief of staff?

**A.** Right.

**Q.** Do you recall that he had some complaints about the work product that was coming in?

**A.** Well, there are two issues that start to develop in the work product. One is -- I'm not sure which he is referring to here, but they wanted a metes and bounds

done, and we had not done a metes and bounds in 2011. That had been done by the County. It was not within the scope of work. And it was not something that they were paying for. So that we expected them to do the metes and bounds, just as they had done it in 2011.

**Q.** So here in this e-mail, Mr. Drummond says: "We're past our" -- this is on October 28th. Do you see that?

**A.** Yeah.

**Q.** And he says: "We're past our deadline on this project, where we originally wanted to have a special meeting tomorrow to discuss and possibly adopt."

So it was at least a plan at that point -- or earlier than that, rather, to have adopted the map on the same day that it was discussed?

**A.** Well, I wouldn't have agreed with that.

**Q.** You would have told them this is a bad idea?

**A.** Yeah.

**Q.** And in October here, there is no pending --

**A.** No.

**Q.** -- deadline?

**A.** No. No.

**Q.** There would have been time, if they had the meeting on that day --

**A.** A meeting would have been fine. Adopting it wouldn't have been appropriate.

**Q.** And the reason is that you can't take in any of the feedback from the public and do anything with it if you adopt the plan the same day you have the meeting?

**A.** Well, you should -- you should take as much feedback as time will allow you to get.

**Q.** You can't even create the appearance that you are --

**A.** Yeah.

**Q.** -- considering the feedback if you adopt it on the same day?

**A.** Yeah. I would -- I would not have suggested that they have a meeting that quickly.

**Q.** And, in fact, your advice about having as many meetings as possible, they didn't really follow that advice?

**A.** Well, that depends on what you consider possible to be. I mean, they did -- they did do the website. They did get a lot of feedback through the website. They did ultimately do one.

We and everyone anticipated that there was going to be more time than they ended up having, which gave them time actually to have one or two meetings.

**Q.** They had one, though, right?

**A.** Yeah. Yeah.

**Q.** And they didn't follow the advice about allowing supplementation after the meeting either, did they?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   No.  I actually thought they did.

**Q.**   Well, they adopted the plan during the meeting.  So if they did allow folks to have supplemental comments, the comments were sort of like paper airplanes, right?

**A.**   Well, not completely.  You are still allowing people to make a record.

**Q.**   How many -- you have been working on maps, redistricting maps, for decades, right?

**A.**   Correct.

**Q.**   How many times have you worked on a map where a performing crossover district was dismantled?

**A.**   Well, that kind of depends on what you want to define a "crossover district" by.  I mean, I have seen plenty of times that a crossover district has been dismantled.  I hadn't -- what makes this one unusual is -- because they are not protected.  But what makes this one unusual is that it's going to become less unusual, I suspect.

     This one was a Section 5 district before; and because it was a Section 5 district, it had a level of protection for the African American percentage under the retrogression standard that doesn't exist for Section 2.

**Q.**   How many times have you worked on a redistricting plan in which you had dismantled the performing crossover district?

**A.**   I don't -- oh, I can't even think about that because

there have been plenty of times very often you would dismantle several of what people would call a crossover district.

What you are essentially describing here, because this also gets to what people consider to be candidate of choice and what people consider to be crossover, which is a really deep and complicated conversation.

But you are talking -- I can't give you the number on it, but that's something that happens very often with D districts when you are drawing majority-minority districts because the majority-minority district takes minority pop out of another district.

Q.   How many times have you dismantled a performing crossover district and left in its place no district in which minority voters could elect their preferred candidate?

A.   I would have to think about that.  I don't know.

Q.   More than one?

A.   Possibly.

Q.   This isn't the only time you have done that?

A.   I don't know that it's the only time I have done that, but it's -- what you are seeing is here something that is unique to the timeframe because this is -- you can see it as a problem.  Some people don't.

But this is a result of not having Section 5 in place

when you deal with these districts that now pop up under a different standard, and you are already seeing -- have seen problems like this occur in Arizona.  I didn't have anything to do with that.

But anyplace where you have districts where you drew to the Section 5 standard, particularly if you drew with a heavy racial criteria that exposes it to a racial gerrymandering charge and then you now have to protect it under Section 2 and you can't draw the majority-minority district, there is going to be a problem.

**Q.**   I want to -- one thing that you said in your direct examination was that you had to make sure that you gave everybody some of what they wanted in the map.

Do you recall saying that?

**A.**   I did.

**Q.**   Commissioner Apffel -- well, Judge Henry got the precise configuration of all the precincts?

**A.**   Well, that's not the map that I was discussing when I said that.  But okay.

**Q.**   So, in the ultimate map, Judge Henry got all the precincts in the way that he had envisioned them and told you to draw them?

**A.**   Well, he got the map after the other commissioners got through.

**Q.**   And Commissioner Clark got rid of his primary

opponents or his -- or what he thought were his primary opponents?

**A.** Well, he still wasn't particularly happy with that map; but he reached -- that's why I used the term "copacetic," not "agreed."

**Q.** Commissioner Apffel got his plot of land?

**A.** That's different.

He did.

**Q.** Commissioner Giusti got his parents?

**A.** Yes. But it still wasn't -- that's why I used "copacetic" with Giusti, too. It still wasn't exactly what he wanted.

**Q.** Commissioner Holmes went from being the only majority-minority precinct to being in the precinct with the lowest minority population in the county?

**A.** In Map 2, yes.

**Q.** Did he ask for that?

**A.** No.

**Q.** Thank you.

            MR. GABER: I pass the witness, Your Honor.

            MS. CHEN: Your Honor, just one question from the NAACP and LULAC plaintiffs.

            MR. GABER: I pass to my co-counsel.

            THE COURT: All right.

            MS. CHEN: Thank you.

**CROSS-EXAMINATION**

BY MS. CHEN:

Q.   Mr. Oldham, nice to see you again.  Sarah Chen --

A.   Nice to see you.

Q.   Sarah Chen for the NAACP and LULAC plaintiffs.

We have heard you speaking just now about Section 5 only protecting African Americans in Galveston County. And we have heard defense counsel talk a lot about the 2020 -- the 2012 DOJ objection letter for preclearance.

MS. CHEN:  Just to make sure we're talking about the same thing, could we please pull up JX-6.

BY MS. CHEN:

Q.   This is that March 2012 DOJ objection letter to Galveston County's Commissioners Court preclearance submission; is that right?

A.   Yes.

MS. CHEN:  And if we go down to --

A.   Or it looks like it, yes.

MS. CHEN:  If we go down to page 3.

BY MS. CHEN:

Q.   If we can scroll to the paragraph that says:  "In specific terms, the County decreased the Black voting age population percentage from 35.2 to 30.8 percent and increased the Hispanic voting age population 25.7 to 27.8 percent, resulting in an overall decrease of 2.3

*Laura Wells, RPR, RMR, CRR, RDR*

percentage points in the precinct's minority voting age population."

Did I read that correctly?

**A.** You did.

**Q.** And so you heard at the end of the sentence that the Department of Justice was concerned with the overall decrease of minority Black and Hispanic population, correct?

**A.** Well, I hear you say that but --

**Q.** And that is what the letter says?

**A.** Okay. That's not all the letter says. If you go back up to the, "As noted, the County's decision to relocate the Bolivar Peninsula into Precinct 1 into Precinct 3 had the effect of reducing the African American share of the electorate in Precinct 3, while increasing both the Hispanic and Anglo populations."

The question -- and it certainly is a question that you begin to see when the Department of Justice begins its negotiations. They're decreasing the Hispanic population when they seek to do the changes in District 3 while increasing the African American population. So there is a relative change they're engaged in.

Now, they are also increasing --

**Q.** That's okay.

**A.** Hold on for just a second.

*Laura Wells, RPR, RMR, CRR, RDR*

They are increasing the 38.8 percent, but we are never getting back to the 35.2 because that's from the old district, and the population shifts in Galveston County made it impossible to ever get back to that number. And DOJ was aware of that as much as we were.

So the question becomes: We went a little bit above this 30 percent. Did that, basically, by bumping the African American up above 30 -- up above 30 percent.

Q. And none of what you just said is reflected in this letter. Instead, what you see is a concern about the overall minority population --

A. Well, you can see by the way the district turned out. I'm sorry. I interrupted your question.

Q. That's all right. Thank you.

MS. CHEN: That's all.

MS. SMITH: I need to ask a few questions.

THE COURT: Okay.

**CROSS-EXAMINATION**

BY MS. SMITH:

Q. Good afternoon, Mr. Oldham. You stated that census data was available and shown to the commissioners and Judge Henry in early September of 2021, correct?

THE WITNESS: Excuse me, Your Honor.

A. Could you lower your microphone just a little bit. Thank you.

*Laura Wells, RPR, RMR, CRR, RDR*

BY MS. SMITH:

**Q.**   Can you hear me now?

**A.**   That's a little better.  Thank you.

**Q.**   You stated that census data was available and shown to the commissioners and Judge Henry in early September of 2021; is that correct?

**A.**   Yeah.  It would have been the sheet that we showed earlier.

**Q.**   Which sheet?

**A.**   The one that Mr. Russo presented in the exhibits.

**Q.**   From Mr. Kincaid?

**A.**   Yes.  That would have been the time.

**Q.**   Did you receive census data from the Census Bureau in September?

**A.**   Well, I wouldn't have been able to do anything with census data from the Census Bureau.  I would have had to have had somebody put it into a program so that they could produce data, like Mr. Bryan or Mr. Kincaid or a variety of other people.

MS. SMITH:  Okay.  That's all I have.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Any redirect, Mr. Russo?

MR. RUSSO:  Very briefly, Your Honor.

THE COURT:  Okay.

MR. RUSSO:  Mr. Guerrero, could you put up DX-98.

*Laura Wells, RPR, RMR, CRR, RDR*

**REDIRECT EXAMINATION**

BY MR. RUSSO:

**Q.**   This was the e-mail that counsel showed you a second ago dated October 28th of 2021 from Tyler Drummond?

**A.**   Yes.

**Q.**   Do you remember seeing it?

**A.**   Yeah.

**Q.**   You have seen it a couple of times today?

**A.**   Yeah.

**Q.**   So my question for you is:  Counsel asked you about the language referring to a special meeting tomorrow and then possibly adopting maps.

**A.**   Right.

**Q.**   Were you aware of any plan at the County to actually adopt the maps --

**A.**   No.

**Q.**   Well, let me finish the question.

         -- adopt the maps as soon as they were received?

**A.**   No.

**Q.**   Okay.  But you were aware that by virtue of reading Mr. Drummond's e-mail, that he was trying to express a great need to have the maps at the County as soon as possible?

**A.**   I get the idea that they were trying to get things done as quickly as possible; but, you know, even from this

*Laura Wells, RPR, RMR, CRR, RDR*

document, you can tell they are not having the meeting on the 28th. But, no, I wouldn't -- I didn't have any knowledge of the meeting on the 28th.

Q. There has been discussion about the -- sort of your meeting with Judge Henry in connection with development of Map 2.

Now, were -- most of those discussions with Judge Henry, did they focus more on the coastal precinct than the rest of the county?

A. Sure. That was one of the things that was driving it, but, of course, the idea was to have a geographic plan that was comprehensive for the County.

Q. I just want to make sure the record is clear. At no time when you left the meetings with Judge Henry did you sort of have the map drawn out by Judge Henry, handed to you, and then drawn by Tom Bryan later?

A. Nobody knew enough at that point to be able to do something like that. That was why Mr. Bryan was brought on board.

Q. I think you said that -- was it your belief that you didn't know what Map 2 would actually look like or even if it was possible at the time?

A. Correct. And I didn't know that about Map 1 either until after we got the draws from Mr. Bryan. I had suspicions, but not knowledge.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   And the primary concerns or at least thoughts for creating Map 2 related to this coastal precinct idea?

**A.**   Yes.

**Q.**   And, again, that was an idea that you recall discussions about back in 2011?

**A.**   Yes.  Absolutely.

MR. RUSSO:  Pass the witness.

THE COURT:  All right.  Is there any re-cross?

MR. GABER:  None from me, Your Honor.

THE COURT:  Mr. Oldham, you may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  And we have been going about two hours since lunch.  Let's take our afternoon break.

MR. RUSSO:  Your Honor, before we --

THE COURT:  Are we still on the record?

THE REPORTER:  Yes, Your Honor.

MR. RUSSO:  I just wanted to know if the witness is excused.

MR. GABER:  Yes, Your Honor.

THE COURT:  All right.

THE WITNESS:  Thank you, Mr. Russo, because I didn't want to make that motion myself, but I was about to.

THE COURT:  And I think I said we need to be done by 6:00 this evening.  We really need to be done by about

5:30, it turns out.

See you in a few minutes.

(Recess from 2:57 p.m. to 3:13 p.m.)

THE COURT:  Thank you all.  You can take your seats.

MR. SHEEHY:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. SHEEHY:  Shawn Sheehy on behalf of the defendants.

The defendants call Mr. Thomas Bryan.

THE COURT:  All right.  Mr. Bryan, right up here. If you'll pause there for just a second and raise your right hand.

MR. BRYAN:  (Complying.)

THE COURT:  Do you solemnly swear or affirm the testimony you are about to give in the case now on trial before the Court will be the truth, the whole truth, and nothing but the truth so help you God?

MR. BRYAN:  I do.  So help me God.

THE COURT:  The witness stand is right over here.

MR. BRYAN:  May I step?

THE COURT:  Yes.

MR. BRYAN:  Thank you.

Good afternoon.

**THOMAS MARK BRYAN,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. SHEEHY:

Q.   Good afternoon, sir.  Would you please state your name for the record.

A.   Yes.  My name is Thomas, T-h-o-m-a-s; Mark, M-a-r-k; Bryan, B-r-y-a-n.

Q.   Mr. Bryan, good afternoon.  Where do you reside, Mr. Bryan?

A.   I reside in Richmond, Virginia.

Q.   They gave me another Virginian.  Excellent.

A.   They did.

Q.   Mr. Bryan, what do you do for a living?

A.   I'm a professional demograher.

Q.   And do you -- are you employed with a company, or do you have your own company?

A.   I am.  I own a professional expert witness consulting company.  The name of the company is Bryan GeoDemo.  It stands for Bryan GeoDemographics.  Often called BGD for short.

Q.   And how long have you owned Bryan GeoDemo?

A.   More than 20 years.

Q.   I'd like to take a quick tour through your background in demography and data analytics, if I may.

Let's start in 1998.  Were you a statistician at the

US Census Bureau?

**A.** I was. That was my first year of employment at the US Census Bureau.

**Q.** Were you in the Population Estimates Branch at the US Census Bureau?

**A.** I was.

**Q.** And what did you do in the Population Estimates Branch at the US Census Bureau?

**A.** My responsibility was to work with a team of other experts and professionals on the development of the small area population estimates program for the entire United States.

**Q.** And did you develop any innovative demographic statistical methods while you were at the US Census Bureau's Population Estimates Branch?

**A.** It was part of my responsibility to not only execute the population estimates program that was in place but to develop enhancements, improvements, and refinements to the program.

One of those enhancements and improvements was the development of an error measurement system that was innovative and has been published and used worldwide now since its development.

**Q.** And was that statistical tool called the Mean Absolute Percent Errors?

**A.**   Yeah.   It was a variant of that named Mean R-R.

**Q.**   And while you were working in the Population Estimates Branch at the US Census Bureau, did you have occasion to work on the American Community Survey?

**A.**   I did.   The American Community Survey was just in the beginning stages of its development at the time that I was working at the Bureau.

**Q.**   What did you do as a member of the Population Estimates Branch in working on the American Community Survey?

**A.**   My responsibility was to work as a liaison and to collaborate with the team developing the American Community Survey.

The American Community Survey is a sample survey, and its purpose was to replace what is known as the census long form.   Since it was a sample survey, that sample of several million households in the United States needs to be weighted to represent everyone in the United States.

My goal was to work with that team to help them develop sophisticated weighting techniques to make sure that the American Community Survey was representative and as accurate as possible.

**Q.**   And in 2001, did you leave the Census Bureau to become a professional demographer at ESRI Business Information Solutions?

**A.**   Yes.   I was recruited away from the Census Bureau in 2001.

**Q.**   And what did you do at ESRI Business Solutions?

**A.**   There are other professional organizations in the United States responsible for developing demography and population estimates besides just the Census Bureau.

ESRI recruited me and retained me as a professional demographer to help them develop population estimates and error techniques as part of their software development program.

I'd like to note that ESRI is the company that is responsible for ArcMap or Arc, as it's called, the software that we use today for our redistricting work.

**Q.**   And is ArcMap a -- what is referred to as a geographic information system?

**A.**   It is.   Also known as a GIS, for short.

**Q.**   And during your time at ESRI Business Solutions, did you become familiar with geographic information systems?

**A.**   Yes, I had begun to develop expertise in GIS when I worked at the Bureau.   I developed more expert-level proficiency when I worked at ESRI.

**Q.**   So let me ask you this, Mr. Bryan:   Why did you start Bryan GeoDemo?

**A.**   So, at the time, approximately 20 years ago, I knew other professionals and experts in my circle of friends

who did work in redistricting and also using demography professionally in a way that we would call applied demography.  That is literally how to use demography to solve problems.

The work was very interesting to me, and I was very close to the people who practiced this kind of work themselves.  They brought me in to the business and helped teach me how to do it.  And that's what inspired me to start a company and start building infrastructure and a team around me to do this kind of work.

Q.   Now, in the past 20 years, have you had involvement in drawing state and local districts?

A.   I have.

Q.   And have you had involvement in drawing school redistricting plans?

A.   I have.

Q.   And approximately how many of those state, local, and school redistricting plans have you had involvement in?

A.   I have almost stopped counting; but my best estimate, both of those together, would be a couple of hundred.

Q.   Since the 2000 round of redistricting, have you built or supervised the building of demographic databases?

A.   I have many times.

Q.   And what data is placed into these databases?

A.   My company has developed a standard template.  It's

the same template that we use for every redistricting project that we do.  That template essentially includes three different pieces.

The first piece is using the American Community Survey, what is known as a special tabulation or a special tab that is requested from them by the U.S. Department of Justice.  That special tabulation is a set of data that includes citizen voting age population in small pieces of geography known as block groups.  That's the first piece of data that always goes into our standard template.

The second set of data that go into our template are the collection of what are known as the PL, or the Public Law, 94-171 dataset.  This is also known as the redistricting dataset which includes information on the total population as well as the voting age population or the VAP.  That information goes into our database both for the total in VAP as well as by race and ethnicity.

Lastly, very frequently, when we are involved in our redistricting cases, we are asked to integrate information on voting -- election data voting performance.  So the third leg of the school of our databases that we have built is any political data or voting data that may be relevant to the area that we're working on.

Q.  And this database that you put together, did you use it for redistricting in Galveston County?

**A.**    I used that exact template, the same as we used for every redistricting case here in Galveston, yes.

**Q.**    So a database that contained ACS citizenship data?

**A.**    That's correct.

**Q.**    A database that contained total population data?

**A.**    Yes.

**Q.**    A database that contained demographic data?

**A.**    Yes.

**Q.**    And a database that contained political performance data?

**A.**    That's correct.

**Q.**    Now, Mr. Bryan, have you participated on any panels regarding redistricting?

**A.**    I have.  Many times.

**Q.**    Have you chaired any panels regarding the census?

**A.**    I have had the privilege of being invited to chair and moderate professional panels at different professional conferences around the United States.

**Q.**    Can you explain what is the difference between participating on a panel and being invited to chair a panel?

**A.**    Sure.  So, typically, people will participate in these types of conferences in three ways.  They will attend; they present; or if the people who are running the conference, who are frequently the nation's leading

experts in the field, will recognize someone as being a particular expert in a field, they will invite them to help organize and moderate and chair a session of other experts and professionals to make an effective session.

That's a privilege I have enjoyed several times, being invited to chair and moderate and organize those types of sessions.

Q.   Did you chair a panel on the 2020 Census?

A.   I have chaired a session on the equality and performance of the 2020 Census.

Q.   Who else was on that panel with you?

A.   There were several people who I moderated, including members of the National Academy of Sciences as well as the director of the Census Bureau, Dr. Ron Jarmin.

Q.   Are you a member of any professional demographic or statistical associations?

A.   Yes, sir, I am.

Q.   And could you name a couple for me, please.

A.   I am a member in good-standing of the American Statistical Association.

I am a longtime member in good-standing of the Population Association of America, also known PAA.

I am also a longtime member in good-standing of the Southern Demographic Association, also known as the SDA.

Q.   And have any of these associations given you an award?

**A.**   Yes.   I had the privilege a couple of years ago to receive what is known as the E. Walter Terrie Award.   It's the annual award presented by the Southern Demographic Association for the best annual paper and presentation. And the subject of that paper and presentation was on redistricting.

**Q.**   So we have spoken for the past few minutes about your professional life.   Briefly, I want to cover your personal life.

Have you received any awards, noteworthy awards, in your personal life?

**A.**   Sure.   Going back in my history, when I was younger, I was fortunate to get my Eagle Scout award when I was 19 in 1988.

**Q.**   Congratulations.

Have you remained active in the Boy Scouts since receiving your Eagle Scout award?

**A.**   I have.

**Q.**   And how have you remained active in the Boy Scouts?

**A.**   I work in a leadership role in my son's Boy Scout troop, and I'm also on the board of directors for the Heart of Virginia Council in Central Virginia.

**Q.**   Is your son here with you in the courtroom today?

**A.**   He is.

**Q.**   And has he achieved Eagle Scout status?

**A.** Last week.

**Q.** Congratulations.

When is the ceremony?

**A.** Saturday.

**Q.** So we need to get you home.

**A.** I'm looking forward to it.

MR. GABER: He may be excused.

THE COURT: Nice try.

Congratulations.

THE WITNESS: Thank you.

THE COURT: To both of you.

BY MR. SHEEHY:

**Q.** Now that we have introduced you to the Court, Mr. Bryan, I'd like to transition to your work here in Galveston County.

You worked on the Commissioners Court precinct maps from approximately October 14th to the 28th. Does that sound about right?

**A.** That's about right, yes.

**Q.** And when were you first contacted about this case?

**A.** Late in the evening of October 14th.

MR. SHEEHY: And, Mr. Guerrero, could we put up PX-187, please. And if we could scroll to the second page, please.

BY MR. SHEEHY:

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** Mr. Bryan, do you see what has been placed in front of you, PX-187?

**A.** Yes, I do.

**Q.** What is PX-187, Mr. Bryan?

**A.** It's a series of e-mails between myself and an attorney I know who I have worked with named Phil Gordon.

**Q.** Do you know that Phil Gordon works at the law firm of Holtzman Vogel?

**A.** I do.

**Q.** Is this how Mr. Gordon asked you if you were available to draw districts in Galveston County?

**A.** It is.

**Q.** Do you see where -- do you see where Mr. Gordon says he needs it by Monday?

**A.** Yeah. I think the request was actually to have the project turned around in three days, by Sunday.

**Q.** That's correct. Yes.

**A.** Sunday night, yeah.

**Q.** And October 14th, do you recall that that was a Thursday?

**A.** It was.

**Q.** So you had Thursday, Friday, Saturday, Sunday to put together maps for Galveston County?

**A.** Not quite.

**Q.** And where were you when you received this text

message?

**A.**   Part of my family -- my father lives in Hawaii.

**Q.**   And you were on vacation with your family in Hawaii?

**A.**   Yes.  Before he died of COVID.

**Q.**   My apologies, Mr. Bryan.

Now, while you were visiting with your family in Hawaii, did that delay you starting work at all on drafting maps for Galveston County?

**A.**   It did not.

**Q.**   Now, Mr. Gordon is asking your availability in these text messages for a phone call; is that correct?

**A.**   That's correct.

**Q.**   And do you say that you will be -- that you are available for a phone call?

**A.**   I did.

**Q.**   And did that phone call happen?

**A.**   Yes.

**Q.**   Now, did that phone call happen the following day on October 15th?

**A.**   I believe so.

**Q.**   And who was on that call?

**A.**   To the best of my knowledge, it was just Phil Gordon and myself.

**Q.**   And how long did that phone call last?

**A.**   It was the very beginning of the project.  We usually

*Laura Wells, RPR, RMR, CRR, RDR*

need a lot of information to get going.  He tried to be respectful of my time, knowing that I was with my family.  My best estimate is an hour or so.

Q.   And during that approximately hour-long phone conversation with Mr. Gordon, what was your understanding of what you were instructed to do?

A.   So I was given instructions to draw two different maps as quickly as possible.  One of the maps we referred to as a least-change map just -- and this is a very common practice in redistricting, to make a version as -- you know, as we say, as much change as necessary and as little as possible.

The directions for that map were to include whole precincts, not to split any precincts, and to minimize deviation, the population deviation.

The other map that I was asked to draw had similar constraints, whole precincts, minimize deviation, but to also explore the possibility of balancing Republican performance across each of the four districts that I was asked to draw.

Q.   So you were asked to draw two maps?  The least-changes map --

A.   Yes.

Q.   -- and a map that balanced Republican performance?

A.   That's correct.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   Okay.  Let's take a look --

          MR. SHEEHY:  Mr. Guerrero, if you could put up, please, DX-284.  If we could go to page 2, please.

BY MR. SHEEHY:

**Q.**   Now, this first e-mail is from Mr. Gordon, Friday, October 15th, at 11:49 a.m.  At the end of the e-mail, he says:  "While I do not think the information is available as a shapefile, it should be very easy to recreate on the precinct level"?

**A.**   That's correct.

**Q.**   And then the next e-mail, Jason Torchinsky says:  "Takes about 15 minutes to draw in a GIS program"?

**A.**   That's correct.

**Q.**   Now, what was your understanding of what Mr. Gordon and Mr. Torchinsky were saying?

**A.**   Well, sure.  First, I really like it when attorneys tell me what is easy and not easy to do in my job.

          When we start a project like this, usually we try to begin with what is called a -- you know, an original map, or a benchmark plan sometimes it's called.  What is the landscape?  What is the world that we live in right now?  What has the plan been for the last several years?

          And so, frequently, those plans will be available to us in a format known as a shapefile, which is a collection of files that we can easily use in our geographic

information systems.

When we don't have that -- and apparently my client did not have that at the time -- we make due with what -- you know, a picture.  And my software has the ability to take that picture and, basically, recreate that plan and build our own shapefile.

So my understanding of their request is they wanted me to go build a shapefile for Galveston that represented the benchmark or the original plan.

Q.   So you took a picture of the benchmark plan and created -- using your software, created a shapefile of the benchmark plan?

A.   Yes, I did.  I was able to do that.

MR. SHEEHY:  Mr. Guerrero, if we could scroll up, please.

BY MR. SHEEHY:

Q.   Now, you respond at 1:25 p.m. on October 15th.

And you are still on vacation, correct?

A.   That is correct.  I'm getting ready to go to the airport to fly home.

Q.   So you say:  "I have taken a quick look at this.  A few questions and comments.  First, for the least-change approach, I assume you are just trying to balance total population, right?  Is it safe to assume I have plus or minus 5 percent to play with?"

Now, what are you referring to there, least-change approach and plus or minus 5 percent to play with?

**A.** Sure. So, you know, conventionally, unlike the U.S. House of Representative plans where we need to get, you know, balanced population down to the last person, with these types of districts, the convention is that the districts have to be within 5 percent of, in this case, an exact one-fourth share of the total population, which Galveston, I think, was about 370,000 people.

So sometimes I have the latitude to use all of that, plus or minus 5 percent. Frequently, my clients are demanding and they want it to be less than that. So, I'm just trying to find out what the rules are here.

**Q.** And then you continue. "Second, there are 93 precincts to play with."

What are you referring to there?

**A.** So there are two different layers of precincts for Texas and, in particular, for Galveston. The US Census Bureau has a layer of precincts that have demographic data associated with them. The State of Texas has a layer of state precincts that have voting data associated with them.

So since the directions that I had gotten right off the bat were, A, we need to look at the political performance of this second district, I automatically went

to we need to use the Texas plan because that's the one that has the political data.  So that is the precinct shapefile that I was referring to in this e-mail.

**Q.**   So in drawing the districts for Galveston County, you used the Texas precinct level data as opposed to the census data?

**A.**   I did.  Again, they are similar, but importantly different in the data they contain.

**Q.**   And that difference is that the Texas data has political performance data, correct?

**A.**   That's right.

**Q.**   And the census data does not contain that information?

**A.**   That's correct.

**Q.**   Any other differences that I missed?

**A.**   Just some very small differences in the boundaries of the precincts that they represent.

**Q.**   And then you continue.  "This is the lowest level of geography I have voting data for.  I never got disaggregated blocks from FairLines.  I am going to build the four R districts using these..."

     Referring to the voting --

**A.**   Yes.

**Q.**   -- data?

**A.**   Yes.

**Q.**   "...but I may run into some limitations.  Do I have

latitude to split a precinct or two if I need to?"

Now, what is the significance that you never received disaggregated blocks from FairLines?

**A.**   So if I was going to be designing a plan where I was going to be assessing the political performance of each one of the commissioner core precincts, it was important that I get data at the lowest level of geography as possible.  Because at the time, and frequently at these early stages of these kinds of projects, it's very common that you are going to end up splitting some precincts.  So I was trying to make an assessment of what data I had available or what my constraints were.

FairLines is an organization that produces block -- what you would call block-level disaggregated vote data, and this is an affirmation that I didn't have that list.

**Q.**   And so you were going to build the four R districts using the voting precinct data from Texas?

**A.**   That's correct.

**Q.**   And when you say "build the four R districts," are you referring to the four Republican districts?

**A.**   That's what the "R" in this message refers to.

**Q.**   Referring to making the four Commissioners Court precincts Republican?

**A.**   Per the direction of Phil Gordon at the first day of the project.

*Laura Wells, RPR, RMR, CRR, RDR*

MR. SHEEHY:  Let's put up DX-285, please.

BY MR. SHEEHY:

Q.   So this is an e-mail from you to Phil Gordon and Jason Torchinsky dated Saturday, October 16th, at 12:55 a.m. Central time.  And you say:  "Jason and Phil, I just got a draft plan ready with one minimum change scenario and one 4 R scenario.  Please let me know when you'd like to discuss [as read]"?

A.   Yes.

Q.   And so these are the two plans that Mr. Gordon had instructed you to draw?

A.   As to the best of my ability, as fast as I was able to put together a draft.

Q.   And with the minimum changes plan, what were the instructions on the population, the allowable population deviation?

A.   And so I had gotten direction that the expectation was to reduce the population deviation on plus or minus 5 percent.  It was not acceptable.  They wanted plus or minus 2-1/2 percent, less if at all possible.

Q.   And were there any instructions regarding the minimization of splits?

A.   Again, the goal for both plans was to avoid splits at all cost.

Q.   And when we say "splits," what are you referring to

when you say "splits"?

**A.**   This is avoiding the split of the precincts that we were using to build the plans.

**Q.**   And what is the significance of avoiding precinct splits?

**A.**   Precincts -- voting precincts are important pieces of administrative geography.  When precincts are split or they are changed, there are several problems.  The two most important to me are that, first, it runs the risk of creating voter confusion.  You know, you put a -- you know, someone who is used to voting in a certain place, they know they are in a precinct, and they know their polling place, and then you change that, it's disruptive and causes uncertainty.  It can cause uncertainty.

The second problem is that it makes the job of the officials responsible for the election very difficult.  It is time-consuming, expensive, and complex for election officials to try to implement changes to voter precincts.

So we always try as a practice, certainly with this -- the reinforcement of this direction, to minimize precinct splits wherever possible.

MR. SHEEHY:  And, Mr. Guerrero, if we could zoom out, please.

BY MR. SHEEHY:

**Q.**   And you were on vacation when you were first contacted

about redistricting in Galveston County. Where are you now on Saturday, October 16th, at 12:55 a.m. Central Time?

**A.** I'm 40,000 feet somewhere approaching the West Coast of the United States.

**Q.** So you were working on the plane drafting the least-changes plan and the four R plan?

**A.** The rest of that trip, including getting to the airport, getting to Honolulu, getting on the plane, making those plans was done in the process of trying to get that done before the next day.

**Q.** So the goals of the four R plan were to optimize political performance; is that right? Am I understanding that correctly?

**A.** Yes.

**Q.** And in addition to that, was it also maintaining equal population?

**A.** It was.

**Q.** And also minimizing splits?

**A.** That's correct.

**Q.** Split precincts?

**A.** Yes.

MR. SHEEHY: Mr. Guerrero, if we could put up JX-25, please. And if we could go to page 2, please.

BY MR. SHEEHY:

**Q.** So on October 16th, 2021, at 5:25 p.m., where are you?

*Laura Wells, RPR, RMR, CRR, RDR*

Have you landed in Richmond?

**A.**   Yeah.  By now I'm home, just home.

**Q.**   And you send an e-mail to Mr. Gordon and Mr. Torchinsky.  "Would you like a call on Galveston in the morning?  Maybe 10:00?  I assume [redacted] is in on this, too.  Please confirm I should be looping him in.  Teaser:  Sure looks like I could balance pop..."  --
Means "population"?

**A.**   That's correct.

**Q.**   -- "...with minimal disruptions (no precinct splits) and get four strong Rs..." --
Republicans?

**A.**   Yes.

**Q.**   -- "...with a bit more elbow grease (also no precinct splits)"?

**A.**   That's correct.

**Q.**   Now, what is the information that you are conveying to Mr. Gordon and Mr. Torchinsky?

**A.**   Sure.  So before I had had a chance to completely review the draft plans that I had developed at the time, I wanted to make sure who needed to be on the communications for the project, and I wanted to communicate that I had been able to work with the -- you know, what we called the original plan or the benchmark plan that I had created a GIS shapefile for, and I had explored some different ways

that I could adjust it, and it looked like I was going to be successful in being able to be pretty successful in meeting their objective for the two plans they have asked me for.

Q.   And by "balancing pop with minimal disruptions," your minimal disruptions means no precinct splits?

A.   That's correct.

Q.   Okay.  And was the purpose of the meeting that you were seeking to discuss both your four R plan and your least-changes plan?

A.   It was.

Q.   And, again, "four R" means four Republican?

A.   That's correct.

        MR. SHEEHY:  Now, if we could scroll up, please, Mr. Guerrero.

 BY MR. SHEEHY:

Q.   So you are inviting Jason Torchinsky, Dale Oldham, and Phil Gordon to a Zoom call on Sunday, October 17th at 11:00 a.m.; is that correct?

A.   That's correct.

        MR. SHEEHY:  And if we scroll down one, please, Mr. Guerrero.

 BY MR. SHEEHY:

Q.   Had you worked with Mr. Oldham previously?

A.   I didn't know who Mr. Oldham was at the time.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** Do you see Mr. Torchinsky's e-mail on Saturday, the 16th at 6:37 p.m.?

**A.** I do.

**Q.** Where he says: "I will be at church. Dale needs to join. He knows what the client wants"?

**A.** That's correct.

**Q.** Do you recall if this meeting happened?

**A.** It did.

**Q.** And the meeting was to discuss your four R plan and minimum-changes plan?

**A.** It was.

MR. SHEEHY: Mr. Guerrero, let's put up PX-190, the Excel spreadsheet, please.

BY MR. SHEEHY:

**Q.** Mr. Bryan, do you see the document in front of you that's marked PX-190?

**A.** I do.

**Q.** And what is PX-190?

**A.** This is one of several analytic spreadsheets that we developed through the course of this project. This spreadsheet represents the standard kind of template and formatting of data that we used to develop plans.

**Q.** And when you say "standard template," you are referring to this is a standard template of Bryan GeoDemo?

**A.** That's correct.

**Q.**   And this is a standard template that is generated by the database you built for Bryan GeoDemo?

**A.**   That's correct.

**Q.**   And this is a template that in every redistricting matter that you work on, your database generates this template?

**A.**   Exactly.

MR. SHEEHY:  So let's go to the Galveston blocks tab, please, Mr. Guerrero.

BY MR. SHEEHY:

**Q.**   Now, Mr. Bryan, I'd like to point down at the bottom left on the tab.  Do you see "10_15 blocks"?

**A.**   That's correct.

**Q.**   And that refers to the date October 15th?

**A.**   Yes, it does.

**Q.**   Now, we are on the tab Galveston blocks.

MR. SHEEHY:  If we could go all the way to the left, please, Mr. Guerrero.

BY MR. SHEEHY:

**Q.**   I'd like you to just walk us through what is on this page.  We have the first column Geo-DID20?

**A.**   That's right.

**Q.**   What is contained in that column?

**A.**   So this is a variable.  It's a collection of numbers that are what is called a FIPS code or Federal Information

Processing Standard code that are unique geographic identifiers or individual blocks within Galveston County. Geo-ID is a Census Bureau variable. That is not a BGD variable.

**Q.** What about the next column over, which I believe is CNT_20?

**A.** Sure. So this is a subset of the prior Geo-ID variable. The 48 represents the FIPS code for the state of Texas. 167 is the unique identifier of the FIPS code for Galveston County.

**Q.** And in the next column, Column D -- actually, Mr. Bryan, I'll ask you if you could explain what is in Columns D through H, please.

**A.** Sure. So this is a collection of the data that we started with from the DOJ special tabulation from the Census Bureau. These data are estimates built by my company, our software, to disaggregate those block group data to individual blocks.

The data represent the citizen voting age population, White non-Hispanic, Black non-Hispanic, all other non-Hispanic, and Hispanic citizen voting age population from the American Community Survey.

**Q.** And, again, this is a template that you have -- your system always produces when you are doing redistricting?

**A.** It is.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** And then what about Columns I through -- I through N?

**A.** Sure. So, as I discussed earlier, we produce in a standard format the total population. So I through N is the collection of the total population from the PO 94-171 file, and then it's followed by the total for White, Black, Asian, other, and Hispanic.

MR. SHEEHY: And if we can continue to scroll to the right, please, Mr. Guerrero.

BY MR. SHEEHY:

**Q.** So now I would like you to explain what is contained in Columns O through T, please.

**A.** Sure. So these are the -- it's essentially a subset of the data we just looked at. This is the voting age population for the same populations in total and by race and ethnicity.

**Q.** And if we keep going to right, we have your percent CVAP, percent BVAP, percent HVAP.

Can you explain what is in those columns, please?

**A.** Sure. Again, you know, this is something that we produce when we build these databases. We don't always know if we're going to use them or not. But we always have them there just because in order to main rigor and consistency, the quality control of our databases, they need, you know, to be the same from one to the next.

So these variables are information on the percent

Black CVAP, Hispanic CVAP, Black VAP, and Hispanic VAP derived from the data earlier in this spreadsheet.

Q.   And if we go further for AI, AJ, what is being reported in those two columns?

A.   Sure.  So what this is, is what is commonly known in the practice as a block assignment file.  So what these are, are numbers that say for each one of these plans what district that block is assigned to.

So, for example, the Galv Dist, Column AH, those are block assignments for the original or benchmark Galveston plan.  And then the least-change and four R, those are the block assignments for those two plans.  That's followed by some variables called least flag and four R flag.  There is no particular meaning for those.  Those are just variables that we use to help keep track of geography that changes as we're developing the plan.  So my guess -- I don't know for sure, but there is probably all zeros in those since we finished with the draft plan that day.

MR. SHEEHY:  Mr. Guerrero, if we could click on the pop pivot table, please.

BY MR. SHEEHY:

Q.   Now, Mr. Bryan, we see here we have your pop pivot table; and you have highlighted original, least-change, and four R?

A.   That's right.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** What are those referring to?

**A.** So, this is standard Excel functionality. It's something called a pivot table. It's one of the most powerful features that it contains.

And what this pivot table is doing is summing up all the different population groups I just shared with you all the way across from the CVAP data, the total population by race and ethnicity, and then the VAP by race and ethnicity for both the original benchmark plan, the draft least-change plan that I had created, and then the draft four R plan that I created.

**Q.** Now, is this page also a standard template that your database produces when you are doing redistricting?

**A.** Yeah. So, this is the template that we would always start with. You know, not knowing anything else at this point, we would just report -- you know, keep and maintain and report all the information that we have at this point. Nobody has asked me to do it or told me to do it this way. This is just how we always do it when we start a project.

**Q.** And if we scroll a little bit to the right, you have "Sum of PL Total" highlighted.

What is the column "Sum of PL Total"?

**A.** Sure. This variable is important because this is the one where we are using this to measure our performance and balancing the population and minimizing the deviation. So

when we talk about the plus or minus 2-1/2 percent direction that I had gotten from the client, you can see here that the total population is 350,000.  The average of the four districts is -- the target is 87,671.  And the math here tells me that my districts need to be -- or my commissioner precincts need to be within 85,500 to 89,500.

**Q.**  And is there a reason why you highlighted the total population?

**A.**  Because, you know, at this date, this is the only demographic variable that matters.  You know, just minimize deviation.  And so we highlighted that to make sure that, you know, we could draw our own eyes and our client's eyes to that variable, because that is the one that really mattered.

MR. SHEEHY:  If we could go to the VTD pivot tab, Mr. Guerrero.

BY MR. SHEEHY:

**Q.**  And what is being tracked here on the VTD pivot tab of PX-190?

**A.**  Sure.  So we have data on a variety of different races.  It's part of the art and the science of this is trying to find the right data to answer the question, right.

So in this case, the data that I had most readily available that was the most recent that I could use, the

most recent races in an election race that I had access to was the 2020 Senate race for the state of Texas.  So I had information on each one of the candidates that participated in that race.

So what I'm doing here is I am summarizing data that I have by VTD that I -- for which I had voting performance for that election.  I'm summing that up to say how many votes did each one of these candidates get in each one of these different, you know, planned scenarios.

Q.   So we have the original map.  Is that the benchmark plan?

A.   It is.

Q.   And we have least-changes plan, and we have the four R plan, correct?

A.   That's correct.

Q.   And if we look at the four Republican plan, can you explain the Column G for me, please, in the four R plan?

A.   Sure.  So that is the share of the votes cast for Republican candidate Cornyn in that commissioner precinct within that plan's scenario.

Q.   And so Commissioner Precinct 1 has a 53 percent Republican score.  Commissioner Precinct 2 has a 65 percent Republican score.  Commissioner Precinct 3, a 57 percent Republican score; and Commissioner Precinct 4, a 68 Republican score?

**A.** That's correct.

**Q.** And the spread on that is -- is it 15 points between the highest and the lowest?

**A.** Yeah. Thank you. I think it's important to note here that the total percent that Cornyn had of the entire county, just to give everyone a frame of reference, all up, not by district, but for the entire county is 61 percent.

**Q.** And between the four commissioner court precincts, the spread between the highest Republican-performing district Commissioners Court precinct and the lowest is about 15 points?

**A.** That's correct. Yeah, around that central 61 percent.

**Q.** So these two plans, your least-changes and four Republican plan, were the two plans you intended to discuss with Mr. Oldham on October 17th?

**A.** They are.

MR. SHEEHY: So let's put up JX-25, please, Mr. Guerrero. And if we could go to the top, please.

BY MR. SHEEHY:

**Q.** Do you recall that the meeting that is referenced here on the top of JX-25, do you recall that that meeting occurred?

**A.** I do.

**Q.** And what was discussed at that meeting?

**A.**   So this meeting on the 17th was really focused on assessing the draft plans that I had already created and then getting the input of Mr. Oldham on where those plans needed to go going forward.  Basically, what were the changes, the enhancements, the refinements of the work that I had already done myself just with extremely little direction.

**Q.**   Now, let's break it apart with -- we'll talk first about your least-changes plan.

**A.**   Okay.

**Q.**   Do you recall any instructions that Mr. Oldham gave you about the least-changes plan?

**A.**   You know, unfortunately, just because of the passage of time, I don't have specific memories of what they were. I knew there were some changes that were asked for, but they were along the lines of, you know, make these changes, please.

**Q.**   And do you recall any instructions that Mr. Oldham gave you about your four Republican plan?

**A.**   Yeah.  Similarly, I don't remember any specific moves or specific directions he gave me.  What I remember is that, you know, at that stage, since Mr. Oldham, you know, knew what the clients wanted, he started sharing more direction and more information about, you know, where the plans needed to go.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   Now, you have completed your creation of the October 15th least-changes plan, correct?

**A.**   Yes.

**Q.**   And completed the -- completed your draw of the October 15th four Republican plan?

**A.**   I did.

**Q.**   Now, with the least-changes plan, did race predominant the draw of any lines contained in that plan?

**A.**   No.

**Q.**   Did race at all affect any of the lines that you drew in that -- in the least-changes plan?

**A.**   No.

**Q.**   Was race in any way a factor in the drawing of any lines of the least-changes plan of October 15th, 2021?

**A.**   It was not at all.

**Q.**   And did you ever have racial demographic data present on your screen when you were drawing the least-changes plan of October 15th, 2021?

**A.**   I did not.

**Q.**   With the four R plan, did race predominate the drawing of any lines of your four Republican plan of October 15th, 2021?

**A.**   No.

**Q.**   Did it -- was race a factor into the drawing of any lines of your four Republican plan of October 15th, 2021?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   It was not.

**Q.**   Did you have racial demographic data on the screen when you were drawing the lines of your four Republican map of October 15th, 2021?

**A.**   I did not.

        MR. SHEEHY:  Mr. Guerrero, if we could put up PX-196, please.

BY MR. SHEEHY:

**Q.**   Now, this is still Sunday, October 17th.  And you are sending an invite to Mr. Oldham for a Zoom call at 4:15 p.m.; is that right?

**A.**   That's correct.

**Q.**   And do you recall if this Zoom call happened?

**A.**   It did.

**Q.**   And what was this later call about?

**A.**   So, at this stage, the cadence of the project became my clients giving me direction, feedback, you know, what they were looking for; and then I would go and do work on the plans and develop them, try to integrate the feedback and direction I had gotten, and then have a call such as this one to check back in with them and advise them on the progress of the plans.

        MR. SHEEHY:  Mr. Guerrero, if we could put up PX-197, please, the PDF.

BY MR. SHEEHY:

Q.   And here it is Sunday, October 17th, now at 5:00 p.m. Central time.  And you have sent this to Jason Torchinsky, Phil Gordon, and Dale Oldham.

And you are saying:  "Galveston, Texas, for discussion"?

A.   That's correct.

MR. SHEEHY:  If we could scroll down, please. And scroll down, please.  One more.  One more.

BY MR. SHEEHY:

Q.   And so this is the benchmark plan that you had attached in your e-mail to Mr. Oldham, Mr. Torchinsky, and Mr. Gordon; is that right?

A.   That's correct.

MR. SHEEHY:  And if we go to the next plan, the next page.

BY MR. SHEEHY:

Q.   And so this is the Galveston, Texas, draft Optimal D plan, correct?

A.   That's correct.

Q.   And did you draw this plan after receiving direction from Mr. Oldham?

A.   I drew this plan and a variety of plans at this time.

Q.   And this was the product of your two earlier calls with Mr. Oldham?

A.   It was.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   And, Mr. Bryan, did race predominate the drawing of any lines contained in draft Optimal D plan of October 17th, 2021?

**A.**   It did not.

**Q.**   Did race factor into the drawing of any lines of your draft Optimal D plan of October 17th, 2021?

**A.**   No, it did not.

**Q.**   Did you have racial demographic data on your screen while you were drawing draft Optimal D plan of October 17th, 2021?

**A.**   No, I did not.

          MR. SHEEHY:   If we could go to the next page, please.

 BY MR. SHEEHY:

**Q.**   And this is the Galveston, Texas, draft minimum change plan?

**A.**   Yeah.

**Q.**   Was this plan a product of your two earlier conversations with Mr. Oldham?

**A.**   It was.

**Q.**   And did race predominate the drawing of any lines of your October 17th, 2021, draft minimum change plan?

**A.**   It did not.

**Q.**   And was race at all a factor in the drawing of any lines contained in the draft minimum change plan of

October 17th, 2021?

**A.**    It was not.

**Q.**    Did you have racial demographic information on your screen while you were drawing the draft minimum change plan of October 17th, 2021?

**A.**    No, I did not.

        MR. SHEEHY:   Mr. Guerrero, could we put up PX-197, please, the Excel spreadsheet.

BY MR. SHEEHY:

**Q.**    So do you see PX-197 in front of you, Mr. Bryan?

**A.**    I do.

**Q.**    What is PX-197?

**A.**    So this is an updated version of the analytic spreadsheet enhancement of the earlier spreadsheet we have looked at.

**Q.**    Your October 15th, 2021, analytic spreadsheet?

**A.**    That's correct.

**Q.**    Before we discuss the VTD pivot --

        MR. SHEEHY:   Mr. Guerrero, if we go to the Galveston blocks data, please.  If we could scroll to the right, please.  Probably all the way to the right.

BY MR. SHEEHY:

**Q.**    And do you see that you have the Optimal D map listed on this spreadsheet?

**A.**    I do.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** Do you see you have the minimum change plan listed on this spreadsheet?

**A.** I do.

MR. SHEEHY: And, Mr. Guerrero, if we could go back to the VTD pivot, please.

BY MR. SHEEHY:

**Q.** And so on this page, you are recording the political performance numbers for the original plan, the minimum change plan, and the Optimal D plan?

**A.** That's correct.

**Q.** Let's take a look at the Optimal D plan. The Republican performance numbers in the Optimal D plan, now the lowest is Commissioner Precinct 3 at 56 percent with the highest at Commissioner Precinct 4 at 67 percent. Is that right?

**A.** That's correct.

**Q.** So is the Optimal D plan an improvement on Republican performance from your four R draft?

**A.** Precisely define the measure in terms of Republican performance. Did it improve that variable? Yes, it did.

**Q.** I think the lowest on the four R plan was at 53 percent; is that right?

**A.** Previously.

**Q.** And now the lowest is at 56 percent?

**A.** That's correct.

**Q.** And you have the plans highlighted as well as the percent R highlighted?

**A.** That's correct.

**Q.** Why did you do that?

**A.** Again, it's just helpful in a very fast-moving environment to help train our eyes and train the eyes of our clients into which numbers are important for decision-making and developing the rest of the plan.

**Q.** And during the development of the two maps in Galveston County, were you tracking the political performance of each Commissioners Court precinct?

**A.** Yes.  That was the original direction I had gotten when I started the plan.

**Q.** And did that continue throughout the redistricting process in Galveston County, the tracking of political performance?

**A.** It did.

MR. SHEEHY:  Mr. Guerrero, if we could go to the pop pivot table, please.  And if we could zoom in, please.

BY MR. SHEEHY:

**Q.** Now, Mr. Bryan, on this pop pivot table, you are reporting total CVAP population?

**A.** Mr. Sheehy, I'm reporting three different things.  I'm reporting a 2015 to 2019 citizen voting age population number, a PL or total population number, as well as a

Public Law 94-171 voting age population.  They are three different representations of total populations.

**Q.**    Thank you for that, Mr. Bryan.

And PL 191, what does that refer to?

**A.**    So the PL 94-171 refers to the Public Law that was written to inform the development and the parameters of the redistricting data that the Census Bureau had published for people like me.

**Q.**    And you have, once again, highlighted total population in this pop pivot table; is that right?

**A.**    I have.

**Q.**    And why did you highlight the total population number?

**A.**    The purpose of this evolution of the analytic spreadsheet was to show the range of deviations under different total population scenarios.  It's often insightful and helpful for the client to see and understand how different deviations of the total population look under different definitions.

The other definitions of CVAP and PLVAP are useful and interesting, but they are not the ones that are the rule.  They are not the ones that we have to draw to, to minimize deviation.  That is the PL total variable in the middle, and that is why that is highlighted.

**Q.**    Now, the minimum change plan looks like it has a 2-1/2 -- 2.5 percent total population deviation; is that

right?

**A.**   Yeah.  That's correct.  It's a reflection of District 2 on the low end and District 3 on the high end.

**Q.**   And I believe one of your criterion was to achieve a plus or minus 2-1/2 percent population deviation on the minimum change plan, right?

**A.**   Yeah.

**Q.**   So you have met that goal?

**A.**   We exceeded it.

**Q.**   In just two days?

**A.**   We did.

        MR. SHEEHY:  If we can scroll down, please, Mr. Guerrero.

 BY MR. SHEEHY:

**Q.**   Now, on your Optimal D plan, it looks like you are at, what, 4.3 percent total --

**A.**   Approximately.

**Q.**   -- population deviation?

**A.**   Yes.

**Q.**   So it's still within the plus or minus 5?

**A.**   It was.

**Q.**   And I assume you had more work to do to equalize that population deviation?

**A.**   It was a fluid situation.  There was work to do, you know, before Sunday night, you know, the deadline that I

had been given originally.  So, I didn't know what all was to come.  But definitely there was room to improve that number.

Q.   Now, Mr. Bryan, on this pop pivot table you are not reporting the racial demographic data that we saw on your October 15th spreadsheet?

A.   That's correct.

Q.   Did anyone ask you to remove the racial demographic information?

A.   No.

Q.   So why did you remove the racial demographic information?

A.   You know, at this point, it was clear that the only demographic variable that mattered in the development of these plans was this population deviation.  And so what I did as a service to my clients to help make this easy for them was to provide clearly the number that we were focused on and then, again, provide these two other numbers that are companion numbers that are useful and interesting to give context to that one number that matters.  All of the other race numbers that were in this spreadsheet previously were no longer needed.

Q.   So the focus was on the total population deviation?

A.   That's correct.

Q.   And that's why you have it highlighted?

**A.**   That's correct.

**Q.**   So we have now completed October 17th, 2021.  Let's move to October 19th, 2021.

         MR. SHEEHY:  Mr. Guerrero, could you please put up PX-538, please.

 BY MR. SHEEHY:

**Q.**   Now, this is sent on Tuesday, October 19th at 8:50 a.m. Central Time to Mr. Oldham with the subject "Galveston deliverables."

         What did you mean by that?

**A.**   At this point, what I was doing was delivering updated versions of the draft plans based on feedback and direction I had gotten.  We're now on Tuesday.

**Q.**   And you sent the Galveston Optimal D plan, the Optimal Geo Plan, and another one of your analytic spreadsheets?

**A.**   That's correct.

**Q.**   Why did you title it Optimal D in one of your plans, Galveston Optimal D?

**A.**   You know, at the time, you know, we were just calling the plans optimal plans; and so I was just thinking of, you know, different suffixes, I think, to distinguish one from the other.  There wasn't any special significance to it.

         When I think back, I probably was thinking optimal draft plan, something like that.  There was no particular

meaning to it besides that.

**Q.** And what about Galveston Optimal Geo?  What was the significance of that name, if anything?

**A.** Again, it was just a unique suffix that helped me differentiate it from some of the other plans.

MR. SHEEHY:  If we could zoom out, Mr. Guerrero. And are you able to scroll down on this.

BY MR. SHEEHY:

**Q.** So this is the Optimal D plan that was attached to your e-mail at 8:50 a.m. Central Time?

**A.** Yes.

MR. SHEEHY:  If we can scroll to the next.

BY MR. SHEEHY:

**Q.** This is the Galveston, Texas, Optimal Geo Plan attached to your e-mail at 8:50 a.m. on the 19th of October, 2021?

**A.** Yes.

**Q.** Did you draw the Galveston, Texas, Optimal Geo Plan?

**A.** I did.

**Q.** And did you draw the Optimal Geo Plan based on instructions from Mr. Oldham?

**A.** I did.

**Q.** And did race predominate the drawing of any lines of your Optimal Geo Plan?

**A.** It did not.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** Was race a factor in the drawing of any lines contained in the October 19th, 2021, Optimal Geo Plan?

**A.** No, it was not.

**Q.** Did you have racial demographic data on your screen while drawing the October 19th, 2021, Optimal Geo Plan?

**A.** I did not.

**Q.** So do you recall a meeting with the -- with Galveston County officials on October 19th, 2021?

**A.** Vaguely.

MR. SHEEHY: Let's go ahead and put up PX-200, please, Mr. Guerrero.

BY MR. SHEEHY:

**Q.** And do you see this e-mail here where Commissioner Apffel is saying: "Joe and I are in redistricting meetings today. Sent on October 19th, 2021."

Do you see that?

**A.** I do see that. I don't recognize this.

**Q.** Does that at all refresh your recollection to a meeting with Galveston County officials about redistricting on October 19th, 2021?

**A.** I just remember that we had a meeting that day. This seems to corroborate my memory.

**Q.** Okay. Now, what did you discuss in that meeting with Galveston County officials on October 19th, 2021?

**A.** Right. You know, again, with the passage of time,

*Laura Wells, RPR, RMR, CRR, RDR*

it's -- I have only vague memories of that meeting.

I know that there were several people in that meeting. I don't know who they were. I know that Dale was in that meeting, and I was there to basically, at his direction, share information about the draft plans that I had created so far.

Q.   And was Mr. Oldham physically present for that meeting?

A.   It was a remote meeting. Dale was appearing by remote. I don't know where Dale was during that meeting.

Q.   And you were appearing remotely on Zoom, as well?

A.   I was. From Richmond.

Q.   And Mr. Oldham was taking the lead in that meeting?

A.   He did.

Q.   And do you recall saying anything during that meeting?

A.   I only vaguely recall that I was asked some questions about the plans and their characteristics. I'm really sorry. I don't remember specific questions that I got in that conversation.

MR. SHEEHY:   If we could put up DX-262, please.

BY MR. SHEEHY:

Q.   We were just looking at your spreadsheet of October 17th, 2021?

A.   Uh-huh.

Q.   Would you have shown your analytic spreadsheet to

Galveston County officials during that meeting of October 17th -- October 19th, 2021?

**A.**    It's possible.  I -- speculating, you know, we were sharing screens and, you know, looking at some maps.  I either narrated these numbers or I showed them these numbers on the screen.

**Q.**    And, Mr. Bryan, when you say "these numbers," did you share total population numbers with those in attendance of that remote meeting on October 19th?

**A.**    Yes.

**Q.**    Did you share political performance numbers with those in attendance on October 19th, 2021?

**A.**    I would say that's extremely likely, but I cannot say with 100 percent certainty.

        MR. SHEEHY:  If we could click on the VTD pivot tab, Mr. Guerrero.

BY MR. SHEEHY:

**Q.**    Would these have been the numbers that you would have shown those in attendance on the remote meeting of October 19th, 2021?

**A.**    Yes.  Again, I don't have the memory if I showed them or if I told them.  But these would be the numbers that would have been in play that day.

**Q.**    And you reported the political performance numbers for the four commissioner precincts in your minimum change

*Laura Wells, RPR, RMR, CRR, RDR*

plan and your Optimal D plan; is that correct?

**A.** I did.

**Q.** And in the minimum change plan, Commissioner Precincts 1 and 2 are both 67 percent Republican performing; is that right?

**A.** That's correct.

**Q.** And Commissioner Precinct 3 is at the lowest with 37 percent Republican performing?

**A.** It is.

**Q.** And Commissioner Precinct 4 is at 69 percent Republican performing?

**A.** It is.

**Q.** Would those have been the numbers that you would have informed those in attendance at that meeting on October 19th, 2021?

**A.** Yes.

**Q.** Do you recall any questions that you received from those in attendance at the October 19th, 2021, meeting?

**A.** I apologize. I don't have memory of specific questions.

**Q.** No worries, Mr. Bryan.

What was some -- do you recall any feedback that was received regarding the draft plans of October 19th, 2021?

**A.** I don't remember feedback coming from the members of the call. The feedback and the direction that I take was

from Dale Oldham.  So if there was -- if there was some feedback or direction given on the call, it was minimal. Usually those conversations were just between myself and Dale Oldham and Phil.

Q.   Did you show -- during the October 19th, 2021, meeting with Galveston County officials, did you ever show racial demographic data during that meeting?

A.   No.  On this version of this spreadsheet, I don't think there was any racial data to be shown on it.

Q.   Let's move to October 21st, 2021.

        MR. SHEEHY:  Mr. Guerrero, if we could put up PX-203, please.

 BY MR. SHEEHY:

Q.   So it looks like you have a Zoom invite for you, Mr. Oldham, and Mr. Gordon on October 21st at 2:31 p.m.?

A.   Yes, that looks right.

Q.   And do you recall that meeting happening?

A.   I do.

Q.   Do you recall any discussions during that meeting?

A.   I don't remember any specific discussions.  As I mentioned, there is many, and it was a fast-moving target.

        MR. SHEEHY:  Mr. Guerrero, if we could put up PX-204, please.

 BY MR. SHEEHY:

Q.   This is a zoom invite between you and Mr. Oldham on

Direct Examination of Thomas Bryan    Day 8 - 266

October 21st at -- 5:30 p.m. is when you sent it --

**A.**    Right.

**Q.**    -- for a meeting at 6:30 p.m. Eastern Time.  You sent it at 5:30 p.m. Central.  So, roughly, the same time you sent them.  And the title of the e-mail is "Take Two"?

**A.**    That's right.

**Q.**    Do you know the significance, if any, of naming this meeting "Take Two"?

**A.**    I don't.  I believe that this was just the second meeting that we had had that day.  We are typically keeping a cadence of only one.  So this may have been slightly unusual that we had a double check-in on the same day.

            MR. SHEEHY:  Could we put up DX-263, please, Mr. Guerrero.  DX-263, the Excel spreadsheet, please.

BY MR. SHEEHY:

**Q.**    So, Mr. Bryan, what is DX-263?

**A.**    This is another update and enhancement to my analytic spreadsheet.  It looks like this was the version as of October 21st.

**Q.**    And what -- what is contained in this tab "VTD data"?  It looks like you are reporting by voting precinct the political performance numbers for both the 2020 presidential and Senate race; is that right?

**A.**    Yes.  This data were in this cap throughout the entire

series of these analytic spreadsheets.

Q.   And now we have the addition of Map 1 and Map 2?

A.   That's correct.

Q.   And was Map 1 your least-changes plan?

A.   It was.  Again, the naming of these, it kind of evolved quickly through the development of the project; and at this point, the direction I was -- received was to name Map 1 the least changed.

Q.   And Map 2 evolved from the optimal plans, Optimal D and Optimal Geo?

A.   Yes.  That's correct.  Yes.

Q.   And could we go to the pop pivot table, please.

     Now, here we are looking at your population deviation in the center panel?

A.   Yes.

Q.   Panel or Column C?

A.   Right.

Q.   In Map 1 you still have 2.5 percent population deviation?

A.   That's correct.

Q.   I believe that was the same population deviation contained in the October 17th spreadsheet?

A.   Correct.  Very little change had happened to that plan.

Q.   And if we go down to Map 2, a little bit lower --

**A.**   Yes.

**Q.**   -- population deviation is 0.8 percent?

**A.**   That's correct.

**Q.**   And I believe from October 17th, it was at over 4 percent, correct?

**A.**   That's correct.

**Q.**   So you had equalized the population in a couple of days?

**A.**   Yes.

**Q.**   The population became nearly pretty close to equal; is that right?

**A.**   That's correct.

**Q.**   Now, here on October 21st, unlike October 17th, you have the racial demographic information in your pop pivot table?

**A.**   That's correct.

**Q.**   Why was that information placed in your pop pivot table on October 21st?

**A.**   So throughout this process, we are taking direction from the client.  We're enhancing and refining the plan. But parallel packing with this is an effort to develop what I'll refer to as final spreadsheets, final statistics, a summary of the information that we would always deliver to our clients about the plans that we had delivered.

*Laura Wells, RPR, RMR, CRR, RDR*

No matter how we drew the plan or why we drew the plan a certain way, we always provide a package of information such as thematically shaded, color-coded information about the characteristics of the population in their plans.

Q.  And how did the thematic shading occur?

A.  So, again, this is a functionality, an advanced functionality within Excel.  And what it enables you to do is just select the data that you are interested in color coding.  And Excel is smart enough to figure out the high numbers, the low numbers, the middle numbers, and color code them for you.

It's possible to do it manually.  I don't.  Excel is much faster and better at it than I am.

Q.  And is it Bryan GeoDemo's standard practice to report this kind of information on a pop pivot tab?

A.  Mr. Sheehy, you would see this exact data layout, these exact colors, and this exact format in every single report that I have submitted to clients in courts for many years.

Q.  Now, as of October 21st, 2021, was it your impression that the draw of Map 1 and Map 2 had been largely completed?

A.  It was.

Q.  How would you describe kind of what was to occur with Map 1 and Map 2 between October 21st and October 28th?

**A.**   So at this point, you know, we were doing work on, you know, largely what we call quality control.  It's a term that we use often in our work, making sure that we have done all of our analytics correctly and our maps are accurate, that our numbers are accurate.

At this stage what we're doing is looking to see if, for example, you know, we may have drawn the lines in such a way to have cut off a couple of blocks out of precincts here or there.

You know, when you are drawing lines fast, that can happen.  So as part of our quality control and finalization process, we were using some of the tabs that you see here to identify places to focus on to -- I'll just use the term -- clean up loose ends.

**Q.**   So is it Bryan GeoDemo's standard practice to provide a comprehensive view of the demographics and the district that you are drawing for once you have completed your draw?

**A.**   Along with all the characteristics that we have in addition to the political performance statistics that we have.  Everything.

MR. SHEEHY:  And if we could go to the VTD pivot, please, Mr. Guerrero.

BY MR. SHEEHY:

**Q.**   And here we have your Cornyn-Trump numbers, your

*Laura Wells, RPR, RMR, CRR, RDR*

Republican performance numbers.  The -- for Map 2, the lowest precinct for Republican performance is now 56 percent; is that right?

A.   That's right.

Q.   And the highest is 65 percent?

A.   That's right.

Q.   So about a nine point difference?

A.   Yeah.  Again, this hadn't changed much.

Q.   But from your four R plan, it had decreased from 15 points to 9 points?

A.   That's correct.

Q.   And the four -- or the minimum change plan that became Map 1, are you reporting the percent Republican scores?

A.   I am.

Q.   Okay.  So let's move on then to October 22nd, 2021. You started drafting plans, creating plans on October 15th, 2021, correct?

A.   Yes.

Q.   And October 22nd would be the seventh day?

A.   That's correct.

Q.   Did you rest on the seventh day?

A.   I hadn't rested on any of those days.

        MR. SHEEHY:  Let's put up PX-527, please.

BY MR. SHEEHY:

Q.   Now, this is a Zoom link that you sent to Dale Oldham,

and you attached an updated analytic spreadsheet of October 21st, 2021, correct?

**A.**   That's correct.

**Q.**   That's the spreadsheet we just went through?

**A.**   Yes.

        MR. SHEEHY:  Now, if we could put up PX-208, please, the PDF.

BY MR. SHEEHY:

**Q.**   And this is at 9:15 a.m., and you are sending a revised 10-22 analytic spreadsheet, Galveston analysis 10-22?

**A.**   I am.

        MR. SHEEHY:  And if we could put up PX-208, the Excel, please.

BY MR. SHEEHY:

**Q.**   And this is your analytic spreadsheet for Map 1 and Map 2; is that correct?

**A.**   Again, yes.

**Q.**   Okay.

        MR. SHEEHY:  Let's put up DX-93, please.

BY MR. SHEEHY:

**Q.**   And so at this point, you are beginning to work on reducing the number of splits contained in Map 1 and Map 2?

**A.**   And identifying any loose pieces of geography that we

need to make sure are in one of the commissioner precincts or another.

Q.   Now --

A.   And I mean that as in individual blocks, just very, very small minutia details.

Q.   Now, do you recall a meeting with some Galveston County officials on Friday, October 22nd, in the afternoon?

A.   I do.

Q.   So we see here Friday, October 22nd, 2021, 1:27 p.m., redistricting Zoom call link to Commissioner Stephen Holmes at 3:30 p.m.?

A.   That's correct.

        MR. SHEEHY:  If we could scroll down, please, Mr. Guerrero.

BY MR. SHEEHY:

Q.   This is an e-mail from Paul to Mr. Oldham.  Actually, no.

        MR. SHEEHY:  It would be on DX-93.  There we go. If we could scroll down, please.  Oh, that's the only one.

    If we could put up JX-23, please.  If we could go to page 4, please.

BY MR. SHEEHY:

Q.   Do you see, Mr. Bryan, on October 22nd, 2021, these are Commissioner Holmes's notes saying a Zoom meeting with

*Laura Wells, RPR, RMR, CRR, RDR*

Jed Webb, Joe Giusti, Paul Ready, Zack Davidson, Dale Oldham, and demographer?

**A.**   I see that, yes.

**Q.**   Did you meet any of the commissioners during your drawing of the redistricting plans in Galveston County?

**A.**   No, I did not.

**Q.**   And do you see that Commissioner Holmes had dialed in from the ferry?  Do you see that?

**A.**   No.  I'm sorry.  I don't.  Okay.  I see -- I'm not clear on the handwriting, but it looks like something about a ferry on the top line.

**Q.**   Okay.  Does this refresh your recollection to the meeting that occurred on October 22nd, 2021?

**A.**   Yeah.  Again, since it was a remote meeting, I'm not sure who all was on the call or where they may have been calling in from for that call.

**Q.**   Okay.  Now, do you see where Commissioner Holmes said that during the meeting, that two maps were shown to him?

**A.**   I do.

**Q.**   And do you see that he writes population and racial data was shown?

**A.**   That's right.

         MR. SHEEHY:  So could we put up DX-264, the Excel spreadsheet, please.

BY MR. SHEEHY:

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   And, Mr. Bryan, what is this document DX-264?

**A.**   This is another update.  This looks like my daily update on the 22nd of October of that week.

**Q.**   The same day as the meeting?

**A.**   Yes.

**Q.**   Now, during that meeting, do you recall showing population data?

**A.**   I either showed it or I -- again, I narrated.  I don't remember which one, but I'm sure I did one or the other.

        MR. SHEEHY:  Can we go to the pop pivot tab, please.

BY MR. SHEEHY:

**Q.**   So on your pop pivot tab for Map 2, you are showing the 0.8 percent population deviation?

**A.**   That's right.

**Q.**   And for -- that's for Map 2?

**A.**   Yeah.

**Q.**   For Map 1 you are showing 2-1/2 percent population deviation?

**A.**   That's correct.

**Q.**   And so if you are showing population data to the commissioners, this is the page you would have shown them?

**A.**   It is.

**Q.**   What else is on this page?

**A.**   Again, going back to my earlier analysis, this shows

*Laura Wells, RPR, RMR, CRR, RDR*

the, you know, three different ways that, you know, an analyst or a client could look at the pop deviation.  You know, even though we have the PL, population total, data, again, you can see that I have taken away some of the highlighting because I'm trying to drive this into a final work product, something I can publish and, you know, put in a report, if need be.

In addition to that, again, you can see that I have now integrated the information on some of the racial characteristics.  So, again, I have got, you know, the total Black VAP and the Hispanic VAP along with the thematically-shaded statistics here.

**Q.**   And because the maps were largely done, you were trying to provide a comprehensive view of all the data for your plan?

**A.**   That's correct.

**Q.**   Do you recall discussing the population data, the population deviations of Map 1 and Map 2 during this meeting?

**A.**   I'm certain that I did.  That was the goal of the plan.

**Q.**   And did you discuss the racial demographic data of either Map 1 or Map 2?

**A.**   You know, Shawn, I don't recall that I did.  You know, it wasn't the purpose of the map or, you know, anything

that drove the drawing of these maps.  So it was, you know, probably on this screen while we were discussing the data, but there was no reason to go and talk about it or discuss, you know, those other statistics that were there. Those are just a formality for reporting as a demographer at that point.

Q.   You were just looking at Commissioner Holmes's notes. Did they say there was a discussion of racial data during that meeting?

A.   Again, I'm trying to use my short-term memory.  I think that his notes said that he saw population and racial data.  I'm not sure that he said that we had a discussion about it.

Q.   Now, did you -- do you recall discussing political performance data at the October 22nd, 2021, meeting?

A.   You know, again, since that was, you know, one of the two criteria that I had been given and the criteria for the second map, I'm certain that I showed or discussed the results of my political performance analysis.

MR. SHEEHY:  Mr. Guerrero, if we could go to the VTD political pivot tab, please.

BY MR. SHEEHY:

Q.   And so this is showing the same for Map 2, the 9 percent differential, 56 percent in Commissioner Precinct 2, and 65 percent at the high end; is that

correct?

**A.**   Yeah.  That's correct.  I want to emphasize that this tab at this point still has a highlighting.  It's not nicely formatted or color-coded because this was going to feed into another -- in a final summary analysis of political performance elsewhere on this spreadsheet.

**Q.**   And you provided the political performance numbers for Map 1 and Map 2 at this October 22nd, 2021, meeting?

**A.**   Yes.  I'm confident in that.

**Q.**   And you would have provided that on Map 1, Commissioner Precinct 3 had a 37 percent Republican performance?

**A.**   I'm confident.

MR. SHEEHY:  Can we go to the pop political pivot tab, please, Mr. Guerrero.

BY MR. SHEEHY:

**Q.**   Now on this tab, this is a new tab?

**A.**   It is.

**Q.**   What is this tab showing for Map 1 and Map 2 so far as political performance is concerned?

**A.**   Right.  So throughout the course of the analytic exercise, I had been using voting performance data for whole precincts.  As I mentioned at the beginning of our conversation, I had not gotten what you would call disaggregated or block-level voting performance data.

*Laura Wells, RPR, RMR, CRR, RDR*

At this stage, I had had some time, because the plans were largely finished, to go quickly run a disaggregation of my own.  And the reason that I did that is because since the goal of, you know, this Map 2 plan was to -- you know, I don't know what all the other goals of Map 2 were; but for me, as a demographer, the goal that I had was to, you know, balance this political performance number.  I wanted to just check and see any way that I could to make sure that those numbers were good.  And the reason I needed to do that was because by this stage of the analytic exercise, there had been -- as we have seen here for the last few days, there were a couple of precincts that had been split.

So I wanted to do my due diligence and make sure that none of those splits had ended up having a material difference or would change my expert opinion on the political performance that I had previously just based on precinct level data.

Q.   Now, how do you do disaggregation?

A.   So disaggregation is an art and a science.  It can be very complex.  This one is not particularly complex.  What I did is I took information on the number of the voting age population, just how much VAP there is in each block; and I took information on the Cornyn race about what the political performance in that -- in each voting precinct

was; and I merged those two pieces of information together to try to come up with an estimate of block-level Republican performance, again, the combination of VAP and the Cornyn race.

Q.   So your inputs for your disaggregation are voting age population data?

A.   Yes.

Q.   And the votes cast in the Cornyn 2020 Senate election?

A.   It is.

Q.   Was racial data in any way used as an input in getting your disaggregated numbers?

A.   No.

Q.   Have you provided the Court with all the ingredients for how you conducted your disaggregation?

A.   I have.

Q.   Are you -- is it for you a business advantage to maintain the precise formula for how you do your disaggregation to keep that secret?

A.   Yeah.  It's -- you know, we submit many years building proprietary techniques and developing intellectual property.  It is the value of my business.  And to the degree that we can, we do try to protect that.

Q.   And that allows -- that gives you an advantage over your competitors precisely how you do a disaggregation analysis?

**A.** If I spell out every way I do an iterative proportional fitting or I do a disaggregation, it would absolutely be a competitive advantage to people who might testify against me or work against me in the marketplace.

**Q.** Now, Mr. Bryan, we have on this page Map 1 has a disaggregated Republican performance that's 36 percent for Commissioner Precinct 3?

**A.** Yes.

**Q.** And a 37 percent precinct -- voting precinct Republican performance; is that right?

**A.** That's right.

**Q.** And would you have also shown these numbers during your October 22nd, 2021, meeting?

**A.** Yes. These -- you know, again, we were developing and cleaning and finalizing our analysis, you know, every day that was going by. And so these would have been the latest and best closest to final reportable numbers that we would have had. These would have been the numbers I shared with the conditional formatting included.

MR. SHEEHY: So let's put up -- excuse me. Let's put up DX-277, please.

BY MR. SHEEHY:

**Q.** Mr. Bryan, what is Galveston, Texas, Map 1 in DX-277?

**A.** This is what appears to be the final version of the least-change plan that I had started with a week earlier.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.** And did race predominate the drawing of any lines in Map 1?

**A.** No.

**Q.** Was race a factor in the drawing of any lines in Map 1?

**A.** No.

**Q.** Did you have racial demographic information on the screen while you were drawing Map 1?

**A.** I did not.

MR. SHEEHY: Mr. Guerrero, if we could put up DX-276, please.

BY MR. SHEEHY:

**Q.** What is DX-276, Mr. Bryan?

**A.** This is a final version of the -- what I originally started with for the Republican plan approximately a week earlier.

**Q.** And did race predominate the drawing of any lines in Map 2?

**A.** It did not.

**Q.** Was race a factor in any way in drawing any lines contained in Map 2?

**A.** No.

**Q.** And did you have racial demographic information on the screen while you were drawing any lines in Map 2?

**A.** No.

MR. SHEEHY: Mr. Guerrero, if we could put up DX-272, please. We have the DX-272 Excel spreadsheet. There we go. Perfect.

BY MR. SHEEHY:

Q. Mr. Bryan, what is DX-272?

A. This looks like the last version of the analytic spreadsheet that I produced on October 28th.

Q. And if we look at the --

MR. SHEEHY: If we could go to pop pivot table, please.

BY MR. SHEEHY:

Q. And if we look at Map 2's population deviation --

A. Yes.

Q. -- we were at .08 percent total population, correct?

A. Yes.

Q. And now we're at 1.1 percent?

A. That's correct.

Q. What occurred between October 22nd and October 28th that caused the population deviation to inch three-tenths of a percentage point?

A. Sure. So there was a little bit of movement between two of the districts because we had identified several individual populated blocks that had been cut off or cut out of a precinct that had just needed to be cleaned up.

So with the movement of a couple of blocks back and

forth between different precincts, that moved that deviation number around a couple of tenths.

**Q.** So in order to minimize splits and minimize the number of splits, the population deviation had to go up slightly?

**A.** Yes.

MR. SHEEHY: Mr. Guerrero, if we could go to JX-23, please, and go to page 3.

BY MR. SHEEHY:

**Q.** Do you see what has been marked as JX-23, Mr. Bryan?

**A.** I do.

**Q.** These are, again, Commissioner Holmes's notes?

**A.** I have seen these.

**Q.** Do you see Precinct 122 -- I'm sorry, 192?

**A.** Yes. That's the first item.

**Q.** Do you see "Boundary to south of precinct as 21st Street"?

**A.** I do.

**Q.** And it says, "Drew line from Dickinson Avenue to Texas Avenue"?

**A.** I do.

**Q.** "Make it part of 341 or 391 [as read]"?

**A.** That's correct.

**Q.** Do you know if that request of Commissioner Holmes was honored?

**A.** I believe it was.

MR. SHEEHY: Mr. Guerrero, could you put up Holmes's Precinct 192.

And, Your Honor, this is going to be a demonstrative exhibit. We have not provided this yet with plaintiffs. We just put this together. But this will be a demonstrative exhibit for the witness to testify -- to confirm the testimony that he just gave.

THE COURT: All right.

BY MR. SHEEHY:

Q. Mr. Bryan, what is this demonstrative exhibit Commissioner Holmes's Precinct 192?

A. In this exhibit what I sought to do was follow the handwriting of Commissioner Holmes. The note that you see on the lower left corner of the page is my rendering of his handwriting. So where he says "boundary to south part of 21st, draw a line from Dickinson to Texas Street," you can see that in the middle of the purple outline -- the purple outline is Precinct 192. And what you can see here is that I split Precinct 192 along 21st between Dickinson -- I'm sorry -- to Texas Street. That's in alignment with the handwritten notes that Commissioner Holmes had written.

Q. And this request of Commissioner Holmes was honored in Map 1, Commissioner Precinct 3?

A. It was. I want to be clear that I did not get this

direction from Commissioner Holmes.  This is part of a lot of direction and feedback that I had gotten from Dale Oldham, and I had no idea at the time I drew the map where that direction was coming from.

MR. SHEEHY:  So, Mr. Guerrero, you can go ahead and take that down.

BY MR. SHEEHY:

Q.   So, Mr. Bryan, to wrap up, during the timeline that we have discussed from October 14th to the 28th, were you at any point in time asked by Mr. Oldham or Mr. Gordon to factor race into the drawing of any of your maps that we have discussed?

A.   No, I was not.

Q.   Did anybody from the County ask you to factor race into the drawing of any maps that we have discussed here today?

A.   They did not.

Q.   Did you use any racial demographic data to modify any precinct lines contained in any of your maps that we have discussed today?

A.   I did not.

Q.   What about political performance data?  Did you use political performance data to modify any lines contained in the maps that we have looked at today?

A.   Extensively.

MR. SHEEHY:  Thank you, Mr. Bryan.  I have no further questions at this time.

THE WITNESS:  Thank you, Mr. Sheehy.

MR. GABER:  So, Your Honor, I heard the Court say that there was a 5:30 cutoff.  I don't think I'm going to finish by 5:30.  Would you like to start now or --

THE COURT:  If you don't mind starting your cross, I think I would like to go ahead and have you start.

MR. SHEEHY:  Your Honor, just to the extent that we can go a few minutes later, if possible, past 5:30 just to allow Mr. Bryan to make his way home tomorrow a little sooner.

THE COURT:  Well, I mean, I'm not going to cut off the plaintiffs' cross-examination, and I don't think Laura can do what she's doing once the network gets shut down; is that correct?

THE REPORTER:  That is correct, Your Honor.

MR. SHEEHY:  That's fine, Your Honor.  Thank you.

THE COURT:  He may end up spending an extra night in Galveston.

MR. SHEEHY:  Understood, Your Honor.  Thank you.

THE COURT:  I have restaurant recommendations.

THE WITNESS:  I appreciate that.

MR. GABER:  At this point, I do, too.

*Laura Wells, RPR, RMR, CRR, RDR*

THE WITNESS:  I have to get back tomorrow morning back home for his Eagle Scout ceremony.  That's what we're trying to aim for right now.  But if we could start early tomorrow, if we have to do that, we may be able to --

THE COURT:  What time is your flight tomorrow?

THE WITNESS:  I need to be at Hobby at noon.  So as much time as it takes to get here to there, plus whatever work we need to do in the morning.

THE COURT:  Okay.  All right.  I'll take that into account.  Thank you.

THE WITNESS:  Thank you, Your Honor.

     Good afternoon.

### CROSS-EXAMINATION/DIRECT EXAMINATION

BY MR. GABER:

Q.  Good afternoon.  How are you?

A.  It's good to see you.

Q.  Good to see you.

     Now, you testified on direct that you had a phone call with Mr. Phil Gordon from Holtzman Vogel.  That was your first call about Galveston; is that right?

A.  That's correct.

Q.  And that was on October 15th?

A.  It was the 14th.

Q.  14th?

A.  Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**   You began your work on two maps starting on October 15th, and you were off in Hawaii, right?

**A.**   Yeah.  So, roughly, I started looking at, you know, the work that was -- that we were going to get.  I knew where it was going to be.  So I tried to start familiarizing myself with it between the 14th and the 15th when I got my more precise direction for the plans.

MR. GABER:  Mr. Turnbull, can you pull up what has been marked as Plaintiffs' Exhibit 516.

BY MR. GABER:

**Q.**   Mr. Bryan, do you recognize this as the map, the four R map that you were discussing on direct examination?

**A.**   Yeah, I do.

**Q.**   And this is the -- this is rendered from the spreadsheet that lists the block assignments, right?

**A.**   It is, yes.

**Q.**   And this is the four R map?

**A.**   I believe so.  A draft.  A poor rough draft, I may add.

**Q.**   Now, I think I heard you say that Mr. Oldham wasn't on the phone call with Mr. Gordon when he gave you the instructions to draw the least-changed map and then a four Republican map; is that right?

**A.**   Yeah.  That's right.  I didn't even know Dale was involved with the project at the very beginning.  My only

communication on that early day was with Phil.

**Q.**   And after that initial communication with Mr. Gordon, it quickly became clear to you that Mr. Oldham was the lead person to whom you were to be taking instructions from; is that right?

**A.**   Yeah.  It was.  I think we shared an e-mail making that clear to me.

**Q.**   And you had an hour-long phone call with Mr. Gordon, you said?

**A.**   Approximately.  It's hard for me to remember exactly, but it was enough time to give me the basic information about the case and what I needed to do to get started.

**Q.**   And he went through with you what the criteria were for the two plans that he wanted you to start working on?

**A.**   Yeah.  Really, you know, I've got to admit really loosely.  It was, literally, go draw a least-change plan, knowing and trusting I knew what I was doing.  And he said, "Go -- you know, you have the Republican performance data, right?"

"Right."

"Go make a four R plan."

"Okay."

**Q.**   And looking at this map, I gather that you were not given an instruction to draw a coastal precinct by Mr. Gordon?

**A.**   There were no further instructions besides go do these two things.

**Q.**   This map doesn't have a coastal precinct, right?

**A.**   No.

**Q.**   And this map is quite different from Map 2.  That's a fair assessment?

**A.**   Yeah.

**Q.**   It doesn't really look anything like Map 2, right?

**A.**   It does not, no.

**Q.**   And this map wasn't really even the draft starting point for Map 2?

**A.**   Let me be clear.  I had one chance and a few hours to try and, to the best of my ability, throw together my two best efforts as fast as I possibly can.  So to the degree you want to say this is my first effort, yes, it was.

Was this a foundation for the evolution of Map 2?  No, it wasn't.  We pretty quickly changed gears away from my first two best ideas.

**Q.**   So what you see on the screen here map -- for the four R map essentially kind of went to the wastepaper basket?

**A.**   It did.

**Q.**   And that happened after the first sort of two days that you started working on it, the first day maybe?

**A.**   That's right.

**Q.**   And from that point forward, Mr. Oldham gave you very

specific instructions about how he wanted Map 2 to look, correct?

**A.** That is correct.

**Q.** Sometimes that was giving you specific neighborhoods or cities that he wanted, in particular commissioner precincts, right?

**A.** Yeah. Let me help clear that up. I think that, you know, we were building this using VTDs or the voting tabulation districts. And I had those, you know, unfortunately for the State of Texas already. So, you know, cities or neighborhoods may have been in some sense associated with the VTDs that we were trying to move; but the direction was move VTDs, avoid splitting VTDs per, you know, the earlier conversation we had.

**Q.** And Mr. Oldham was telling you the territory that you needed to put into the four different commissioner precincts based on his experience and knowledge about Galveston County?

**A.** I don't know what the direction he was giving me was based on. You know, I understand there is a lot of moving pieces in this case. I know I did get the direction to do what I was asked from him. I mean, who he was representing or where that came from, I don't know.

**Q.** And you don't know why he was asking you to put that particular territory in each of the commissioner precincts

in Map 2?

**A.**   No.  I had gotten an e-mail that said Dale knows what the client wants.  And to me, at that point, being the map drawer, why doesn't matter.  My art and craft as a demographer and a mapmaker is to go do what my client asked me to do.

**Q.**   At some certain points, he was telling you specific VTDs that he wanted you to move into the different commissioner precincts?

**A.**   Yes.  It was an evolutionary process, and we tested and moved them and examined the outcomes based on one or more VTD moves.

**Q.**   So the four R map we see here, that goes in the wastepaper basket; and starting on the map -- what ultimately became Map 2, you are not in the know as to what the basis or purpose or justification for those lines is, correct?

**A.**   I definitely am not.

**Q.**   Okay.

        MR. GABER:  We can take down this exhibit.

BY MR. GABER:

**Q.**   Now, you went through with Mr. Sheehy the spreadsheet that accompanied the four R map that we were just looking at?

**A.**   Yeah.  They basically work as companion pieces,

map/spreadsheet roughly together.  Because of the speed of the project, I don't think there is a perfect correspondence.  But, yes, there is a spreadsheet that aligns with that map.

Q.   And I don't want to belabor the point since I know you have some time here -- a time constriction.  But that spreadsheet contained sort of a host of racial data for each census block within Galveston County, correct?

A.   Yeah.  That's correct.  All of it.

Q.   And so it would include the percent voting age population for Black residents, for Hispanic residents, White residents, or other non-Hispanic?

A.   For all of them, yes.

Q.   And that was -- you could sort that within that spreadsheet?

A.   If possible, sure, or filter them in some cases.

Q.   And then in the pop pivot table on that spreadsheet, and that's Exhibit PX-190 for the Court's record, the -- you could also see the racial composition of each of the draft precincts, the commissioner precincts that you had drawn, as well, correct?

A.   Yeah.  In that very first draft, you may have seen a very lengthy pivot table that has every single one of the demographic variables in it.  That's our template.  That's the starting point for everything.  Right?  So that's why

we had that in that.  We didn't create that uniquely for Galveston.  That's just our starting point.  And given our need for speed, there was no need to change it at that time.

Q.   The first call that you had on October 14th with Mr. Gordon, that was the only time that it was just you and Holtzman Vogel, right?  After that point, Mr. Oldham was who you were talking to?

A.   Again, you know, I don't remember which specific calls happened the 14th or the 15th.  There may have been another call with just Phil on the 15th.  I don't want to get myself in trouble saying, well, I definitely didn't have a call with him; but it pretty quickly transitioned. We agree that it transitioned quickly to being me and Dale.

Q.   This was one of the fastest redistricting projects for a government that you have done before, right?

A.   We have done spur-of-the-moment redistricting cases before; but for sure, starting the project and being given between three and four days to finish it with 20 hours of travel in between was a lot.

Q.   And in projects where you have more time, as a demographer and as a map drawer that's where you generally are exercising more of your own discretion in crafting the maps.  Is that fair?

Direct/Cross Examination of Thomas Bryan   Day 8 - 296

**A.**   Let me be precise.  That is often the case, but there are situations where I have clients, such as Galveston County here, where because of their background and knowledge and experience with their area that I don't have -- I'm not from Galveston -- they will say what they want and ask me to be more the explorer and help them find a solution rather than me taking the liberty of drawing it on my own.

**Q.**   And so you -- in drawing this map, you weren't really -- in Map 2 and Map 1 you weren't really exercising your own discretion?

**A.**   I was not.

**Q.**   You didn't do any research on Galveston County before you started embarking on the map drawing?

**A.**   No.

**Q.**   But again, you didn't think that was particularly necessary here because it was Mr. Oldham who was literally directing where to put the lines?  You just happened to be the person who knew how to do it on the computer?

**A.**   Yeah.  I mean, as a professional, someone who enjoys my work, I like to know the areas and know things about them.  I like to visit them before I draw them.  I was in Hawaii with my family and my, you know, sick father just trying to get home.  So I was trying to weave this work in without infuriating my family too much.

*Laura Wells, RPR, RMR, CRR, RDR*

**Q.**  Now, I want to back up a little bit and talk about the redistricting data release in August --

**A.**  Yes.

**Q.**  -- of 2021.

**A.**  Yes.

**Q.**  Do you recall that it was the Census Bureau released the redistricting data on August 12th, 2021?

**A.**  Yeah.  They did.  It was about 3:00.  I was in it.  I remember it well.

**Q.**  So at 3:00 p.m. on August 12th, you were able to dive right into the redistricting data and start downloading it for your program?

**A.**  Because of the long history of my company and the software and the capabilities and the infrastructure we have, it is possible to do that.  It was possible to do that as soon as the Bureau made it available.

**Q.**  You did do that, right?

**A.**  In -- for some clients and in other cases and projects I was working on.  It was virtually a go from the minute that happened because people had been waiting for it.

**Q.**  And I think you told me in your deposition that one of the clients that you had worked for is the Texas State House map; is that right?

**A.**  It was, yes.

**Q.**  Was that one of the ones where you jumped right in, in

*Laura Wells, RPR, RMR, CRR, RDR*

August, in mid August when it came out?

**A.** Yes.

**Q.** Now, if someone in this case, an attorney in this case said the data in August was unusable for redistricting, that would not be correct?

**A.** There has been a lot of conversations around the usability of the census data for a variety of very technical reasons I'm happy to share with you sometime. But as far as I'm concerned, the data are what the data are. They are the official work product, and they were available to me.

**Q.** They were usable for redistricting?

**A.** Usable in the sense that I had access to them and would have been able to quickly connect them to my infrastructure and draw plans with them.

**Q.** Ultimately, you drew the plans at Mr. Oldham's direction over a period of three to four days for Galveston County, correct?

**A.** Much of them. You know, given the timeline, it went past that; but I got 90 percent in three days with the 20-hour flight in between.

**Q.** And if Holtzman Vogel had retained you to work on this matter in August, you could have had the -- surely you had some other clients and you were busy at the time --

**A.** Yes.

**Q.**    -- but assuming you couldn't do it in three or four days, but a week?  How long would it have taken you in mid-August to do it?

**A.**    Yeah.  You know, there is a lot of things that were at play with a variety of very anxious clients and other projects as well.  But, you know, let's say conservatively maybe a couple of weeks, again, depending on the feedback and direction I was getting from the client.  It depends, but more than three days.

**Q.**    And so at its latest, you could have had the draft plans done by the end of August.  Is that fair?

**A.**    It's possible if that had been, you know, my highest priority and that had been prioritized for me.

**Q.**    Now, you had some staff who assisted you on the Galveston County matter?

**A.**    I did.

**Q.**    Who were they?

**A.**    So I have a group of analysts and experts who work for me.  We had this conversation on my deposition.  I checked my payroll, actually, to make sure I was accurate in my response to you.  One of my two experts worked on the plan.  The other one that I thought had, did not.

One of my analysts is named Eric.  He spent 26 hours doing work called geocoding.  That work is taking the addresses of the 268,000 Galveston voters and creating a

latitude and longitude for them for the purpose of redrawing the precincts when we were done with the project.

Q.   And so it was just one staff member who worked on that?

A.   It was, yes.

Q.   That was Eric?

A.   I am certain because I looked at my payroll.

Q.   At your deposition, you weren't going to tell me what his last name was, were you?

A.   I'm trying not to.

Q.   But he worked 26 hours on the Galveston County's redistricting plan?

A.   He did.  And I had reported in my deposition I thought it may have been more like five to ten.  So I wanted to be honest and accurate with you.  I had gone back and looked at payroll, and I knew exactly how many hours he had spent on it.

    He didn't spend any time working on the maps or the plans.  It was geocoding, like expert geocoding work.

Q.   Now, I want to circle back to the discussion about the purpose behind the political purpose that you testified about.

A.   Of course.

Q.   That came from Mr. Gordon.  Am I right about that?

*Laura Wells, RPR, RMR, CRR, RDR*

**A.**   Originally, yes.

**Q.**   And were you here for Mr. Oldham's testimony today?

**A.**   Some of it.

**Q.**   Did you hear Mr. Oldham testify that he never told you, not once, that the purpose behind Map 2 was for Republican performance?

**A.**   I did hear that.

**Q.**   Was he not telling the truth?

**A.**   Here was the evolution of the direction that I got. Phil started telling me, as a very first step, you need to draw four Republican plans; and that was it.

When Dale got involved with the project, my understanding of the contribution he made to the drawing of the plans is that he complemented that with all of the information that he had from the commissioners.  He knew a lot more about Galveston, obviously, given his history here and with the commissioners' desire.

I had already gotten the direction to do the four Republican plans.  So the fact that I drew a four Republican plan and I kept track of that data throughout the entire process as a reflection of that original direction that I got.

I think Dale is probably right.  He didn't tell me you need to draw a four R plan because I had already been given that direction.  I knew that was a big part of what

I needed to do.  What he was giving me was direction based on the input and the needs and the expertise of the other commissioners.

**Q.**   Now, that's supposition on your part, right?

**A.**   It is, yes.

**Q.**   All of that?

**A.**   Yes.

**Q.**   You don't know what conversations Dale had with Holtzman Vogel?

**A.**   No idea.

**Q.**   You don't know what conversations that Dale had with the commissioners?

**A.**   I don't.  Dale was represented to me as the person who knew what the clients wanted.  I mean, that's literally what the string in the e-mail says.  So when that was represented to me, I don't know who that was or when or what those conversations were.  I just know what he was bringing to the table were holistically the needs of the clients.

**Q.**   And you don't know what conversations Dale had with Judge Mark Henry, right?

**A.**   No idea.

MR. GABER:  Mr. Turnbull, can we please play Henry deposition 258.

(Video played, as follows:)

*Laura Wells, RPR, RMR, CRR, RDR*

"QUESTION:  You know, going back to your -- just thinking, going back to your slogan, you know, 'Keep Galveston County Red,' I mean, is that one of the reasons that you liked this map, it would help keep Galveston County Red?

"ANSWER:  No.  I already had that with three commissioners."

(Video concluded.)

BY MR. GABER:

Q.   You have no reason to dispute Judge Henry and his purpose for why he wanted Map 2, do you?

A.   I just don't know.  You know, I didn't know him.  I don't know who he was.  You know, I -- honestly, when we were on a Zoom call with him, I couldn't have picked him out as being Judge Henry on the call.  I don't know.  I'm sorry.

Q.   But what you do know is the four R map that we were just looking at a little bit ago looks nothing like the Map 2 map that Dale Oldham directed you to draw?

A.   That's correct.

Q.   You were never asked to consider the compactness of any of the commissioner precincts that you drew, correct?

A.   I was not.

Q.   And you did not, correct?

A.   I did not, no.

**Q.**   You were never told to respect any communities of interest in Galveston County?

**A.**   No.  You know, for all these traditional redistricting principles, there was no time to even do what I was being told to do, let alone any of these other things.

**Q.**   You don't recall ever being told to keep all the Houston suburbs whole?

**A.**   I don't recall that.  No.  I'm sorry.

**Q.**   You were never provided by anyone with the addresses for the commissioners in Galveston County, were you?

**A.**   I have heard testimony that I was provided that.  I have looked.  I don't have a record of it.  I don't have a map of it.  So I am unsure.  I cannot say with certainty that I wasn't.  I just don't have any memory of it, and I don't have any records of it.

**Q.**   Let's take --

        MR. GABER:  Mr. Turnbull, if you could please play Mr. Bryan at 39, 11 through 43.

        (Video played, as follows:)

        "QUESTION:  Did you -- at what point did you become familiar with the identity of the commissioners?  Is it looking at the incumbent part of the process for you and where they live, for example?

            "MR. SHEEHY:  Objection.  Form.

            "ANSWER:  In this particular case, the issue of

*Laura Wells, RPR, RMR, CRR, RDR*

incumbency was not brought before me or prioritized. Honestly, we were working very fast and remotely.  My goal was just to try and draw two draft plans as quickly as I could.  The identity and the political background, any information about the incumbents I was not aware of; and it didn't have any influence on how I started drafting my preliminary plans."

(Video concluded.)

BY MR. GABER:

Q.   Thank you.  Does that comport with your recollection here today?

A.   It does, yes.

Q.   So you weren't -- on the map, you didn't have, like, dots for where the incumbents lived?

A.   No.  I don't have a record of an incumbency, what you would call a geocoded file, let alone a map where the incumbents are.

Q.   So you wouldn't have been drawing precincts -- you wouldn't have been drawing Precinct 2, for example, looking for Commissioner Giusti's home?

A.   No.

Q.   You weren't drawing Precinct 3 down from the Houston suburbs in order to reach Commissioner Holmes's home?

A.   No.

Q.   You weren't looking at Commissioner Apffel's home for

*Laura Wells, RPR, RMR, CRR, RDR*

where you should draw Precinct 1?

**A.**   I don't have any recollection of any of that.

**Q.**   And you weren't looking for where Commissioner Clark lived for where Precinct 4 should be drawn?

**A.**   No.  Again, I have no recollection or records of that.

**Q.**   You don't recall Mr. Oldham ever telling you that the commissioners' homes is the most important thing you should be looking at?

**A.**   Can you please restate.

**Q.**   I think I said you don't recall Mr. Oldham telling you that the commissioners' homes, not Commissioner Holmes, the commissioners' homes?

**A.**   I'm so sorry.  I misheard you.  I apologize.

**Q.**   Does that make sense?

**A.**   H-o-m-e-s.  Yes.  I don't recall that.

**Q.**   You don't recall that.

And the location of Commissioner Stephen Holmes's home was not something that explains how you drew Map 2?

**A.**   No.

MR. GABER:  Your Honor, it's 5:25.  This probably would be a good place for me to stop.

THE COURT:  Yeah.  How much do you think you have left, just to kind of gauge when we should start in the morning?

MR. GABER:  Maybe half an hour, maybe less.  Do

you want to start at 8:00?  Does that work?

THE COURT:  I don't even think we need to start --

I mean, you need to be at Hobby at noon?

THE WITNESS:  Yes.

THE COURT:  Okay.  Leaving at 11:00 would get you there with time to spare.

MR. GABER:  Okay.

THE COURT:  So let's say 8:30 just for...

MR. SHEEHY:  Your Honor, if I may, I know Mr. Gaber just has 30 minutes.  Do any of the other plaintiffs' counsel have questions?

THE COURT:  That's a good question.

MS. KLEIN:  Your Honor, if we do even need to ask questions, I think it would be five or ten minutes, max.

THE COURT:  Okay.

THE WITNESS:  I want to try and answer all of your questions.  I'm sorry for my own personal time constraints.  It's my problem.  But I wanted to do my best to faithfully serve you.

THE COURT:  It doesn't sound like it's going to be a problem.

MR. GABER:  Thank you, Your Honor.

MS. KLEIN:  My representation was just for the NAACP and LULAC plaintiffs.  I think the Department might

have a different estimate.

MS. MEZA:  If anything, it would be a couple of questions.

THE COURT:  Okay.  All right.  Sounds like we'll have plenty of time to do that.

THE WITNESS:  Thank you.

THE COURT:  You may step down.

MR. GABER:  Just to clarify, since he is on cross-examination, I would ask that he be sequestered from the attorneys.

THE COURT:  Right.  You need to not talk to the lawyers about your testimony.

THE WITNESS:  Can I talk to them at all or just not about my testimony?

THE COURT:  You may talk to them about travel arrangements, eating, anything like that, yes.  Just not anything about your testimony.

THE WITNESS:  I just want to be clear, Your Honor.

THE COURT:  All right.  8:30 tomorrow morning.

CASE MANAGER:  All rise.

  *(Proceedings adjourned at 5:24 p.m. and continued on Day 9.)*

*******************

*Laura Wells, RPR, RMR, CRR, RDR*

*Date:  September 2, 2023*

### COURT REPORTER'S CERTIFICATE

*I, Laura Wells, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

_____/s/ Laura Wells_____

*Laura Wells, CRR, RMR*

concordance                                                          Day 9_ 310

| ' | | | **2** | |
|---|---|---|---|---|
| **'Keep** [1] - 303:2 | 276:23, 278:8, 278:10, 278:19, 281:5, 281:23, 282:2, 282:5, 282:8, 285:24, 296:10, 306:1 | 43:12, 118:13, 123:8 | **18th** [5] - 4:11, 79:14, 82:2, 86:22, 87:3 | 124:23, 125:4, 125:16, 125:23, 143:23, 144:4, 144:14, 144:18, 145:16, 145:21, |
| **'they'** [1] - 142:2 | | **14** [2] - 7:7, 182:11 | **19** [2] - 7:9, 224:13 | 145:22, 146:24, |
| | **1-45** [3] - 149:12, 149:13, 149:14 | **1405** [2] - 2:14, 2:21 | **1900** [1] - 1:19 | 148:1, 148:6, 149:24, 150:13, |
| **/** | **1.1** [1] - 283:16 | **1415** [2] - 3:3, 3:6 | **191** [1] - 256:4 | 153:1, 153:7, |
| **/s** [1] - 309:6 | **1.3** [2] - 168:23, 169:11 | **145** [1] - 198:23 | **192** [6] - 54:15, 284:13, 285:2, | 153:23, 154:2, 154:6, 154:23, |
| | **10** [2] - 1:8, 132:17 | **14th** [16] - 1:12, 1:22, 2:3, 2:7, | 285:11, 285:18, 285:19 | 155:1, 155:2, 155:14, 155:18, |
| **0** | **10-19-21** [1] - 87:11 | 9:24, 37:7, 45:5, 225:17, 225:21, | **197** [1] - 73:13 | 156:15, 156:20, 157:4, 158:17, |
| **0** [1] - 7:6 | **10-22** [2] - 272:10, 272:11 | 226:19, 286:9, 288:23, 288:24, | **1988** [1] - 224:14 | 158:18, 158:21, 159:1, 160:8, |
| **0.8** [2] - 268:2, 275:14 | **100** [2] - 30:12, 263:14 | 289:6, 295:5, 295:10 | **1989** [1] - 9:12 | 161:9, 162:24, 163:14, 163:17, |
| **08** [1] - 283:14 | **10019** [2] - 2:18, 3:11 | **15** [6] - 56:13, 198:24, 229:12, | **1998** [1] - 216:25 | 164:4, 164:6, 165:24, 167:4, |
| | **101** [2] - 3:3, 3:7 | 247:2, 247:12, 271:10 | **19th** [20] - 86:22, 100:25, 105:3, | 171:19, 173:1, 173:4, 174:15, |
| **1** | **1010** [1] - 1:16 | **150** [3] - 3:24, 4:3, 4:6 | 259:3, 259:7, 260:15, 261:2, | 174:18, 174:22, 175:5, 175:9, |
| **1** [92] - 71:16, 78:7, 82:11, 84:22, | **107** [2] - 4:21, 4:25 | **152** [1] - 194:12 | 261:5, 261:8, 261:15, 261:20, | 175:10, 177:13, 177:24, 178:9, |
| 86:9, 88:19, 88:21, 89:10, | **10:00** [1] - 237:5 | **15405** [1] - 4:18 | 261:24, 263:2, 263:9, 263:12, | 178:10, 178:22, 178:24, 179:6, |
| 90:6, 93:21, 94:22, 95:12, | **10:08** [1] - 56:15 | **15th** [20] - 135:9, 227:19, 229:6, | 263:20, 264:15, 264:18, 264:23, | 180:25, 181:3, 181:5, 181:8, |
| 95:20, 96:14, 97:4, 97:21, | **10_15** [1] - 240:12 | 230:17, 240:14, 249:2, 249:5, | 265:5 | 181:14, 183:1, 184:3, 184:4, |
| 98:1, 98:11, 101:9, 103:21, | **11** [2] - 188:17, 304:18 | 249:14, 249:18, 249:21, 249:25, | **1:00** [1] - 79:14 | 184:19, 184:23, 184:24, 188:9, |
| 106:13, 122:16, 125:16, 125:22, | **1101** [4] - 1:12, 1:22, 2:3, 2:7 | 250:4, 253:16, 258:6, 271:17, | **1:25** [1] - 230:17 | 188:12, 188:22, 189:1, 189:12, |
| 127:12, 128:9, 149:9, 149:25, | **112** [1] - 145:14 | 288:22, 289:2, 289:6, 295:10, | **1:27** [1] - 273:10 | 189:15, 189:22, 190:8, 190:13, |
| 150:13, 154:23, 155:1, 155:2, | **115** [1] - 141:24 | 295:11 | | 190:22, 192:12, 192:14, 192:22, |
| 155:8, 155:15, 157:4, 161:8, | **11:00** [3] - 69:12, 238:19, 307:6 | **16** [3] - 1:6, 6:3, 145:14 | **2** | 193:4, 194:25, 198:10, 198:13, |
| 162:24, 163:7, 168:2, 173:1, | **11:49** [1] - 229:6 | **167** [1] - 241:9 | **2** [193] - 23:6, 23:18, 44:21, | 198:14, 198:23, 199:11, 200:3, |
| 173:4, 174:12, 178:9, 180:25, | **120** [2] - 141:24, 182:11 | **16th** [7] - 27:20, 45:20, 69:4, | 47:6, 54:6, 55:1, 61:6, 62:12, | 200:12, 200:17, 204:21, 206:9, |
| 181:8, 181:10, 181:12, 181:13, | **122** [1] - 284:13 | 234:4, 236:2, 236:25, 239:2 | 62:14, 66:25, 71:14, 74:13, | 207:16, 213:6, 213:21, 214:2, |
| 181:21, 181:23, 182:1, 182:6, | **129** [1] - 6:10 | **17,000** [1] - 161:8 | 76:9, 82:11, 85:17, 86:3, | 229:3, 236:23, 246:22, 257:3, |
| 182:25, 183:3, 183:19, 184:2, | **12:00** [1] - 129:4 | **171** [1] - 165:14 | 86:9, 86:24, 88:8, 88:20, | 264:4, 267:2, 267:9, 267:25, |
| 184:12, 184:19, 185:3, 185:6, | **12:50** [2] - 128:21, 129:2 | **17th** [19] - 69:12, 73:15, 238:18, | 88:21, 89:7, 89:16, 89:18, | 269:21, 269:25, 271:1, 272:17, |
| 190:19, 193:3, 198:3, 199:2, | **12:55** [2] - 234:4, 236:2 | 247:16, 248:1, 250:9, 251:1, | 90:6, 90:7, 90:8, 90:10, 90:21, | 272:24, 275:13, 275:16, 276:18, |
| 199:5, 209:13, 213:23, 246:21, | **12:56** [1] - 129:4 | 252:3, 252:6, 252:10, 252:22, | 94:22, 95:12, 95:20, 96:14, | 276:23, 277:23, 277:25, 278:8, |
| 264:4, 267:2, 267:4, 267:8, | **12th** [3] - 125:2, 297:7, 297:10 | 253:1, 253:5, 259:2, 262:23, | 97:21, 98:3, 101:8, 102:14, | 278:19, 279:4, 279:5, 282:18, |
| 267:18, 269:21, 269:25, 271:13, | **131** [1] - 188:17 | 263:2, 267:22, 268:4, 268:13 | 102:17, 103:6, 106:15, 106:16, | |
| 272:16, 272:23, 275:18, 276:18, | **13th** [4] - 43:6, | **1875** [1] - 2:24 | 111:15, 111:16, 111:17, 112:15, | |
| | | | 112:16, 112:17, 113:1, 120:5, | |
| | | | 120:9, 122:16, | |

282:21, 282:24, 291:5, 291:8, 291:11, 291:16, 292:1, 293:1, 293:15, 296:10, 301:5, 303:11, 303:19, 305:19, 306:18, 309:1

2's [3] - 160:4, 171:14, 283:12

2-1/2 [5] - 234:20, 245:1, 256:25, 257:5, 275:18

2.3 [1] - 208:25

2.5 [2] - 256:25, 267:18

20 [8] - 12:7, 55:16, 57:20, 132:17, 216:22, 219:24, 220:11, 295:20

20-hour [1] - 298:21

2000 [1] - 220:21

20002 [4] - 1:23, 3:24, 4:4, 4:7

20005 [3] - 1:13, 2:4, 2:8

20006 [1] - 2:24

2001 [2] - 218:23, 219:2

2009 [1] - 61:11

2010 [10] - 32:23, 39:18, 40:8, 61:8, 132:8, 150:22, 152:6, 156:11, 156:12, 185:11

2010-2011 [1] - 40:10

2011 [36] - 8:13, 8:16, 9:24, 12:18, 13:18, 14:9, 16:12, 16:17, 19:1, 25:24, 29:25, 30:5, 34:17, 66:23, 94:20, 103:7, 131:2, 132:4, 133:4, 150:24, 151:13, 152:15, 154:19, 162:10, 163:25, 172:25, 178:6, 183:16, 184:6,

184:8, 184:9, 185:7, 185:11, 202:1, 202:5, 214:5

2012 [6] - 11:10, 14:4, 14:19, 17:14, 208:9, 208:13

2013 [7] - 8:13, 19:20, 19:24, 25:9, 25:24, 29:25, 63:23

2015 [1] - 255:24

20169 [1] - 4:18

2019 [1] - 255:24

202 [10] - 1:14, 2:5, 2:8, 2:25, 3:15, 3:19, 3:22, 3:25, 4:4, 4:7

2020 [10] - 26:24, 27:20, 30:11, 132:9, 208:9, 223:8, 223:10, 246:2, 266:23, 280:8

2021 [95] - 8:13, 14:4, 16:14, 18:22, 26:10, 26:13, 27:2, 28:5, 28:9, 28:11, 28:22, 29:11, 29:14, 30:6, 30:9, 31:13, 32:8, 35:5, 35:6, 35:13, 35:22, 36:10, 37:7, 38:14, 44:24, 46:12, 49:24, 51:13, 57:1, 59:4, 95:6, 105:3, 111:7, 115:16, 118:5, 121:7, 123:8, 126:8, 131:25, 134:3, 136:7, 137:5, 137:13, 140:5, 140:19, 185:17, 186:4, 198:1, 210:22, 211:6, 212:4, 236:25, 249:14, 249:18, 249:22, 249:25, 250:4, 252:3, 252:6, 252:10, 252:22, 253:1, 253:5, 253:16, 259:2,

259:3, 260:16, 261:2, 261:5, 261:8, 261:15, 261:20, 261:24, 262:23, 263:2, 263:12, 263:20, 264:15, 264:18, 264:23, 265:5, 265:10, 269:20, 271:15, 271:17, 272:2, 273:10, 273:24, 274:13, 277:15, 278:8, 281:13, 297:4, 297:7

2023 [3] - 1:6, 6:3, 309:1

203 [1] - 4:14

20530 [3] - 3:15, 3:18, 3:21

208 [1] - 6:11

20th [8] - 47:20, 48:2, 48:6, 49:24, 51:13, 53:15, 57:1, 185:16

210 [1] - 6:11

212 [3] - 2:18, 3:11, 6:12

216 [1] - 6:7

21st [12] - 265:10, 265:15, 266:1, 266:20, 268:13, 268:18, 269:20, 269:25, 272:2, 284:15, 285:16, 285:19

22 [3] - 12:13, 14:15, 111:7

22314 [1] - 4:25

22nd [13] - 107:7, 107:14, 271:15, 271:19, 273:7, 273:10, 273:24, 274:13, 275:3, 277:15, 278:8, 281:13, 283:18

23 [3] - 7:8, 174:25, 178:15

23rd [3] - 53:4, 53:20, 55:14

24 [1] - 182:11

24.8 [2] - 168:17, 168:23

25 [1] - 168:18

25.3 [1] - 168:16

25.7 [1] - 208:24

2525 [1] - 4:14

258 [1] - 302:24

25th [1] - 26:24

26 [2] - 299:23, 300:12

26.1 [1] - 168:24

262 [1] - 108:25

268,000 [1] - 299:25

27.8 [1] - 208:25

27707 [2] - 3:4, 3:7

281 [1] - 1:17

288 [1] - 6:8

28th [10] - 115:16, 202:7, 212:4, 213:2, 213:3, 225:17, 269:25, 283:7, 283:18, 286:9

29th [5] - 117:23, 118:5, 120:12, 121:7, 122:14

2:31 [1] - 265:15

2:57 [1] - 215:3

2nd [2] - 111:7, 123:5

## 3

3 [93] - 7:7, 10:2, 15:8, 16:2, 16:4, 16:9, 16:17, 18:6, 18:18, 26:3, 46:9, 47:8, 47:13, 47:18, 53:1, 55:1, 59:5, 59:9, 62:1, 63:21, 65:3, 66:14, 67:6, 75:14, 77:9, 78:7, 87:18, 94:22, 95:12, 95:20, 96:14, 97:21, 98:13, 98:16, 98:18, 98:21, 99:3, 99:11, 119:24, 133:22, 133:23, 135:25, 136:21,

150:7, 154:13, 154:23, 155:1, 155:2, 155:7, 155:14, 156:25, 159:7, 159:11, 160:4, 160:9, 160:10, 160:11, 160:19, 160:25, 161:3, 161:16, 162:9, 162:10, 162:16, 162:24, 163:7, 167:24, 168:5, 170:21, 174:5, 174:18, 175:15, 178:19, 179:9, 181:8, 188:22, 194:12, 208:19, 209:13, 209:15, 209:20, 246:23, 254:13, 257:3, 264:7, 278:11, 281:7, 284:7, 285:24, 305:22

30 [9] - 137:16, 174:15, 174:21, 175:14, 177:13, 210:7, 210:8, 307:11

30.8 [1] - 208:23

303-1157 [1] - 2:25

304 [1] - 14:14

305-5194 [1] - 3:22

307-2767 [5] - 3:15, 3:19, 3:25, 4:4, 4:7

309 [1] - 6:4

31 [1] - 174:24

310 [1] - 2:11

318 [1] - 1:24

32 [1] - 99:4

3250 [1] - 2:10

341 [1] - 284:21

341-8808 [1] - 4:19

35.2 [2] - 208:23, 210:2

350,000 [1] - 245:3

36 [1] - 281:6

37 [4] - 98:19, 264:8, 278:11,

concordance

281:9

37,000 [1] - 159:7

370,000 [1] - 231:9

38 [3] - 175:6, 175:16, 177:13

38.8 [1] - 210:1

39 [1] - 304:18

391 [1] - 284:21

3:00 [2] - 297:8, 297:10

3:13 [1] - 215:3

3:22-CV-00057 [1] - 1:3

3:30 [1] - 273:12

3rd [1] - 60:18

## 4

4 [32] - 7:6, 7:9, 47:4, 47:6, 55:1, 76:10, 85:6, 87:19, 94:22, 95:12, 95:20, 96:14, 97:21, 104:25, 107:11, 144:25, 150:9, 150:17, 156:16, 162:24, 163:7, 168:2, 175:2, 175:6, 181:8, 234:7, 246:24, 254:14, 264:10, 268:5, 273:22, 306:4

4(b [1] - 152:22

4.3 [1] - 257:16

40,000 [1] - 236:3

400 [4] - 1:13, 1:23, 2:4, 2:7

400-6019 [1] - 2:11

407 [1] - 3:8

409 [2] - 4:12, 4:15

42,000-some-odd [1] - 159:5

42543 [1] - 4:22

43 [1] - 304:18

44 [2] - 166:23, 166:25

46 [1] - 7:8

474-5073 [2] - 2:15, 2:22

48 [1] - 241:8

4:15 [1] - 250:10

4con [2] - 3:14, 3:18

4th [2] - 120:20, 120:22

## 5

5 [27] - 19:2, 59:17, 59:23, 59:25, 60:5, 60:11, 60:16, 60:21, 61:6, 62:5, 62:6, 99:7, 152:19, 152:24, 153:6, 163:22, 204:18, 204:19, 205:25, 206:6, 208:6, 230:25, 231:2, 231:7, 231:11, 234:19, 257:20

5,000 [3] - 116:13, 116:16, 189:6

50 [7] - 35:16, 35:20, 65:12, 168:17, 169:15, 169:24, 170:15

512 [3] - 1:20, 2:15, 2:22

516 [1] - 289:9

53 [2] - 246:21, 254:22

534-2748 [1] - 1:17

54 [2] - 3:3, 3:6

540 [1] - 4:19

56 [5] - 98:3, 254:13, 254:24, 271:3, 277:24

57 [1] - 246:24

573-8984 [1] - 1:24

574-5244 [1] - 3:4

58 [1] - 174:13

5:00 [2] - 73:15, 251:1

5:24 [2] - 1:5, 308:22

5:25 [2] - 236:25,

306:20

5:30 [6] - 215:1, 266:1, 266:4, 287:5, 287:6, 287:11

## 6

6 [2] - 128:24, 182:11

601 [1] - 5:3

61 [3] - 174:8, 247:8, 247:13

610 [1] - 3:4

615 [1] - 5:3

64 [2] - 97:6, 98:2

65 [3] - 246:23, 271:5, 277:25

67 [3] - 93:23, 254:14, 264:4

68 [1] - 246:25

69 [1] - 264:10

6:00 [1] - 214:25

6:30 [1] - 266:3

6:37 [1] - 239:2

6th [1] - 28:22

## 7

7 [2] - 174:22, 178:14

700 [1] - 4:25

703 [1] - 4:22

717-9822 [1] - 1:20

728-8243 [2] - 2:18, 3:11

736-2200 [3] - 1:14, 2:5, 2:8

756-7873 [1] - 3:8

77550 [1] - 5:3

77550-7998 [1] - 4:12

77573 [2] - 1:17, 4:15

787 [2] - 2:17, 3:10

78705 [1] - 1:20

78741 [1] - 2:14

78741-3438 [1]

- 2:21

797-3200 [1] - 4:12

797-3262 [1] - 4:15

## 8

8 [3] - 1:8, 6:1, 6:10

8,000 [1] - 50:13

85,500 [1] - 245:6

87,671 [1] - 245:4

89,500 [1] - 245:6

8:00 [1] - 307:1

8:30 [2] - 307:9, 308:20

8:33 [1] - 1:5

8:50 [3] - 259:8, 260:10, 260:15

8th [5] - 38:14, 39:10, 41:22, 42:1, 42:6

## 9

9 [3] - 271:10, 277:24, 308:23

90 [1] - 298:20

90095 [1] - 2:11

93 [1] - 231:14

94-171 [4] - 221:13, 242:4, 256:1, 256:5

950 [3] - 3:14, 3:17, 3:21

963-8611 [1] - 4:22

99 [1] - 63:15

9:00 [1] - 100:25

9:15 [1] - 272:9

9:52 [1] - 56:15

## A

A.M [1] - 1:5

a.m [12] - 56:15, 69:12, 100:25, 229:6, 234:4, 236:2, 238:19, 259:8, 260:10, 260:15, 272:9

Abbott [1] - 64:4

abilities [1] - 139:6

ability [8] - 38:10, 99:8, 101:14, 101:16, 124:1, 230:4, 234:12, 291:13

able [30] - 11:23, 36:1, 36:6, 36:9, 37:16, 39:20, 62:1, 66:4, 71:7, 73:22, 94:6, 119:15, 122:9, 123:21, 123:23, 127:16, 127:18, 146:12, 151:15, 151:17, 211:15, 213:17, 230:13, 234:12, 237:23, 238:2, 260:7, 288:4, 297:10, 298:14

above-entitled [1] - 309:5

Absolute [1] - 217:24

absolute [1] - 146:25

absolutely [30] - 18:1, 18:7, 18:12, 18:24, 23:3, 39:11, 44:16, 48:22, 57:8, 59:11, 70:20, 71:24, 72:5, 72:13, 76:18, 76:25, 80:10, 88:5, 88:13, 94:19, 100:8, 103:2, 122:18, 126:24, 128:14, 145:4, 195:7, 197:23, 214:6, 281:3

academic [2] - 60:10, 64:11

Academy [1] - 223:13

accept [2] - 65:23, 159:25

acceptable [2] - 12:10, 234:19

access [7] - 55:25, 93:11, 126:20, 126:23,

137:9, 246:1, 298:13

**accessing** [1] - 158:9

**accommodate** [4] - 171:4, 192:12, 192:16, 192:22

**accompanied** [1] - 293:23

**according** [2] - 98:25, 127:15

**account** [1] - 288:10

**accurate** [6] - 57:7, 218:22, 270:5, 299:20, 300:16

**accurately** [2] - 101:21, 101:22

**achieve** [3] - 10:15, 17:13, 257:4

**achieved** [1] - 224:25

**acquainted** [2] - 8:20, 70:3

**acquire** [1] - 140:2

**acquired** [1] - 9:5

**acquiring** [1] - 52:8

**ACS** [2] - 34:3, 222:3

**Act** [8] - 18:24, 21:9, 29:17, 40:18, 59:18, 67:1, 153:1, 197:22

**acting** [1] - 63:3

**action** [2] - 10:20, 62:25

**active** [2] - 224:16, 224:19

**actual** [10] - 30:10, 34:19, 67:16, 69:10, 87:24, 88:11, 93:25, 120:7, 190:9, 198:6

**Adam** [2] - 37:5, 136:7

**Adams** [2] - 4:14,

4:20

**add** [11] - 16:20, 16:21, 41:19, 50:13, 89:21, 160:19, 160:20, 168:19, 169:11, 170:21, 289:19

**added** [7] - 16:8, 16:10, 40:5, 55:10, 166:11, 189:21, 193:16

**adding** [1] - 136:19

**addition** [5] - 77:7, 236:15, 267:2, 270:20, 276:8

**additional** [8] - 61:7, 99:17, 104:14, 112:10, 152:6, 180:11, 193:16, 199:2

**address** [4] - 44:1, 123:21, 123:23, 186:9

**addresses** [2] - 299:25, 304:9

**adds** [2] - 22:1, 98:13

**adequate** [1] - 67:4

**adjacent** [1] - 15:25

**adjourned** [1] - 308:22

**adjust** [1] - 238:1

**adjusted** [3] - 112:15, 112:17, 112:19

**adjusting** [1] - 190:13

**adjustment** [1] - 188:12

**adjustments** [3] - 75:23, 75:25, 123:14

**administration** [2] - 31:19, 31:21

**administrative** [2] - 19:15, 235:7

**admissible** [1] - 25:20

**admit** [1] - 290:15

**admitted** [1] - 165:16

**adopt** [6] - 33:14, 202:11, 203:3, 203:8, 212:15, 212:18

**adopted** [6] - 20:12, 125:4, 125:8, 198:15, 202:13, 204:2

**adopting** [3] - 33:12, 202:24, 212:12

**adoption** [5] - 12:18, 33:10, 34:19, 113:7

**Adrianne** [1] - 3:5

**advanced** [1] - 269:6

**advantage** [4] - 136:5, 280:16, 280:23, 281:3

**advice** [9] - 29:20, 33:12, 123:18, 123:20, 200:22, 201:1, 203:12, 203:14, 203:24

**advise** [1] - 250:21

**advised** [1] - 123:10

**advisory** [1] - 123:4

**advocated** [1] - 119:1

**Affairs** [1] - 2:10

**affect** [5] - 78:12, 78:13, 99:8, 102:11, 249:10

**affects** [1] - 82:10

**affirm** [1] - 215:15

**affirmation** [1] - 233:15

**African** [38] - 15:7, 16:2, 16:20, 18:12, 18:13, 21:19, 22:1, 24:19, 24:20, 24:21, 24:25, 25:6, 60:7, 133:7, 133:13, 133:14, 133:25, 135:1,

135:16, 135:24, 136:1, 136:25, 152:1, 152:3, 152:7, 152:10, 164:11, 165:8, 165:9, 166:5, 166:19, 168:20, 178:17, 204:20, 208:7, 209:14, 209:21, 210:8

**afternoon** [12] - 129:5, 129:7, 210:20, 214:13, 215:6, 215:7, 215:24, 216:4, 216:8, 273:8, 288:12, 288:15

**age** [17] - 138:7, 173:7, 173:8, 174:19, 208:22, 208:24, 209:1, 221:8, 221:15, 241:19, 241:21, 242:13, 255:24, 256:1, 279:23, 280:5, 294:10

**ago** [7] - 21:6, 197:5, 197:7, 212:4, 219:24, 224:1, 303:18

**agree** [13] - 14:22, 110:9, 126:3, 141:5, 161:18, 166:14, 167:25, 173:25, 178:22, 179:10, 179:15, 295:14

**agreeable** [4] - 168:22, 190:8, 193:20

**agreed** [4] - 21:5, 152:12, 202:15, 207:5

**agreement** [4] - 12:2, 12:12, 28:18, 198:12

**AH** [1] - 243:9

**ahead** [11] - 40:19, 81:11, 113:4, 113:5, 114:17, 123:23, 142:25, 198:22, 261:10, 286:5, 287:8

**AI** [1] - 243:3

**aim** [1] - 288:3

**ain't** [1] - 157:8

**airplanes** [1] - 204:4

**airport** [2] - 230:20, 236:8

**AJ** [1] - 243:3

**AL** [2] - 1:4, 1:6

**Alexandra** [1] - 2:6

**Alexandria** [2] - 4:22, 4:25

**alignment** [1] - 285:21

**aligns** [1] - 294:4

**allegation** [2] - 22:5, 25:10

**allegations** [3] - 20:11, 125:18, 125:24

**alleged** [1] - 72:9

**alleviate** [1] - 75:13

**allow** [10] - 15:18, 21:9, 49:4, 55:18, 119:6, 119:16, 123:21, 203:5, 204:3, 287:12

**allowable** [1] - 234:15

**allowed** [1] - 21:6

**allowing** [2] - 203:24, 204:5

**allows** [2] - 158:2, 280:23

**almost** [5] - 83:13, 146:14, 157:1, 171:19, 220:19

**alone** [5] - 112:21, 168:16, 168:18, 304:5, 305:16

**ALPHABETIC AL** [1] - 6:5

**alternative** [1] - 176:8

**Amendment** [1] - 23:10

**America** [1] - 223:22

**AMERICA** [2] -

3:12, 4:2

American [41] - 15:8, 16:2, 16:20, 18:12, 18:14, 21:19, 22:2, 24:19, 24:21, 24:25, 133:7, 133:13, 133:14, 134:1, 135:1, 135:16, 135:24, 136:1, 136:25, 152:1, 152:3, 164:11, 165:8, 165:9, 166:5, 166:19, 168:21, 178:17, 204:20, 209:14, 209:21, 210:8, 218:4, 218:5, 218:9, 218:12, 218:14, 218:21, 221:4, 223:19, 241:22

American-dominant [1] - 178:17

Americans [5] - 24:21, 60:7, 152:7, 152:10, 208:7

Americans' [1] - 25:6

amorphous [1] - 54:5

analyses [2] - 58:15, 58:16

analysis [11] - 65:17, 68:3, 129:17, 129:21, 134:14, 272:10, 275:25, 277:19, 278:5, 280:25, 281:15

analyst [1] - 276:2

analysts [2] - 299:18, 299:23

analytic [14] - 239:19, 253:13, 253:16, 256:13, 259:15, 262:25, 266:18, 267:1, 272:1, 272:10, 272:16, 278:21, 279:11, 283:6

analytics [2] -

216:24, 270:4

Andrew [2] - 3:9, 4:10

Angela [1] - 4:13

Angeles [1] - 2:11

Anglo [3] - 165:20, 165:21, 209:16

announcemen t [1] - 31:22

annual [2] - 224:3, 224:4

anomaly [1] - 35:6

ANSWER [20] - 142:4, 142:16, 143:1, 145:21, 147:13, 183:1, 188:24, 194:20, 195:7, 195:10, 195:13, 195:17, 195:20, 195:23, 196:9, 196:13, 199:3, 199:6, 303:6, 304:25

answer [8] - 11:6, 18:24, 34:2, 61:18, 127:22, 199:12, 245:22, 307:17

anticipated [1] - 203:19

anxious [1] - 299:5

anyplace [1] - 206:5

anyway [1] - 91:9

AP [1] - 169:2

apart [2] - 116:18, 248:8

Apffel [33] - 38:18, 38:25, 40:20, 40:22, 54:2, 71:9, 86:11, 87:1, 88:18, 89:2, 90:2, 90:3, 99:25, 100:12, 112:17, 120:10, 122:4, 180:16, 188:5, 189:14, 191:2, 192:7, 193:12, 194:7, 194:15, 194:17,

197:7, 197:9, 198:2, 199:24, 206:16, 207:6, 261:14

Apffel's [6] - 41:14, 46:4, 88:19, 111:15, 197:13, 305:25

apologies [1] - 227:5

apologize [5] - 61:20, 157:12, 172:13, 264:19, 306:13

app [2] - 157:25, 158:1

apparent [1] - 18:22

appear [7] - 14:10, 26:25, 29:8, 97:21, 120:5, 174:20, 193:20

appearance [1] - 203:6

APPEARANC ES [5] - 1:10, 2:1, 3:1, 4:1, 5:1

appeared [2] - 31:18, 197:2

appearing [2] - 262:9, 262:11

applaud [1] - 139:6

applauding [1] - 128:25

applicable [2] - 59:18, 152:25

application [1] - 62:21

applied [2] - 59:21, 220:2

applies [2] - 59:25, 152:24

apply [1] - 131:6

applying [1] - 62:21

appreciate [1] - 287:24

approach [7] - 56:18, 67:19, 109:12, 124:4, 124:5, 230:23,

231:2

approaching [1] - 236:3

appropriate [4] - 114:14, 190:25, 193:7, 202:25

approval [2] - 19:5, 20:6

April [10] - 28:5, 28:7, 28:9, 28:22, 31:7, 32:14, 140:5, 140:7, 185:16, 186:4

Arc [1] - 219:12

ArcMap [2] - 219:12, 219:14

area [14] - 25:24, 28:4, 40:5, 44:19, 84:5, 85:8, 87:18, 87:22, 91:22, 131:18, 133:15, 217:11, 221:23, 296:4

areas [14] - 50:3, 55:10, 76:22, 84:19, 88:10, 88:12, 90:22, 90:23, 97:1, 132:1, 134:17, 134:21, 296:21

arguably [1] - 67:9

arguments [1] - 67:9

arises [1] - 17:7

Arizona [1] - 206:3

Arlington [1] - 23:12

arrange [1] - 39:6

arranged [3] - 20:19, 47:7, 92:18

arrangements [1] - 308:16

art [8] - 18:20, 18:21, 24:5, 24:9, 131:5, 245:21, 279:20, 293:4

articulate [1] - 91:6

artificial [1] - 30:25

Asian [1] - 242:6

aside [4] - 44:17, 118:20, 168:3, 196:6

aspect [4] - 22:12, 40:5, 79:24, 116:5

aspects [3] - 29:18, 40:3, 66:22

assessing [2] - 233:5, 248:2

assessment [2] - 233:11, 291:6

assign [1] - 158:17

assigned [1] - 243:8

assignment [2] - 13:7, 243:6

assignments [3] - 243:10, 243:12, 289:15

assist [3] - 26:12, 28:11, 37:17

assistance [3] - 26:20, 27:6, 27:10

assisted [4] - 5:5, 8:20, 8:22, 299:14

associated [4] - 8:19, 231:20, 231:21, 292:12

Association [4] - 223:20, 223:22, 223:24, 224:4

associations [2] - 223:16, 223:25

assume [11] - 12:19, 51:18, 51:20, 97:11, 97:14, 169:11, 182:13, 230:23, 230:24, 237:5, 257:22

assuming [7] - 10:6, 40:24, 191:6, 191:9, 191:11, 299:1

assumption [2] -

51:22, 179:12

assure [1] - 12:10

asterisk [3] - 50:2, 108:12, 108:13

asterisks [2] - 50:2, 57:2

attached [9] - 14:15, 16:7, 73:24, 74:3, 121:6, 251:11, 260:9, 260:15, 272:1

attaches [2] - 29:1, 121:1

attachment [2] - 29:7, 51:24

attack [1] - 123:1

attacked [1] - 122:25

attempt [2] - 20:3, 119:24

attempting [2] - 15:7, 130:5

attend [1] - 222:23

attendance [5] - 263:8, 263:12, 263:19, 264:14, 264:18

attendees [1] - 38:17

attending [1] - 38:20

attention [1] - 87:17

attitudes [1] - 193:24

attorney [3] - 137:15, 226:6, 298:3

attorneys [2] - 229:16, 308:10

AUGUST [1] - 1:6

August [17] - 6:3, 31:13, 35:22, 36:19, 137:10, 137:11, 139:4, 139:11, 297:2, 297:7, 297:10, 298:1, 298:4, 298:23, 299:3,

299:11

Austin [3] - 1:20, 2:14, 2:21

automatically [1] - 231:25

availability [1] - 227:10

available [20] - 34:5, 36:24, 37:23, 42:5, 52:12, 70:11, 97:19, 111:23, 111:25, 200:15, 210:21, 211:4, 226:10, 227:14, 229:7, 229:23, 233:12, 245:25, 297:16, 298:11

Avenue [7] - 2:17, 3:10, 3:14, 3:17, 3:21, 284:18, 284:19

average [3] - 93:24, 97:13, 245:3

avoid [7] - 20:3, 44:15, 148:24, 161:12, 182:2, 234:23, 292:13

avoiding [2] - 235:2, 235:4

award [4] - 223:25, 224:3, 224:13, 224:17

Award [1] - 224:2

awards [2] - 224:10

aware [19] - 31:3, 34:17, 38:7, 63:9, 70:19, 118:8, 127:19, 139:10, 143:12, 151:5, 155:24, 156:2, 157:6, 164:4, 193:9, 210:5, 212:14, 212:20, 305:5

awareness [1] - 133:20

**B**

B-r-y-a-n [1] - 216:7

background [3]

- 216:23, 296:3, 305:4

backing [1] - 183:20

backwards [1] - 155:2

bad [2] - 178:7, 202:16

bag [1] - 30:24

balance [3] - 230:23, 237:7, 279:7

balanced [4] - 160:23, 161:10, 228:24, 231:5

balancing [3] - 228:18, 238:5, 244:25

Baran [1] - 4:17

barely [2] - 168:18, 169:12

Baron [2] - 1:15, 1:15

Barreto [1] - 23:16

Barreto's [1] - 23:22

Bartlett [3] - 24:10, 61:10, 64:11

based [17] - 22:7, 23:10, 39:22, 63:22, 64:21, 84:21, 103:17, 156:22, 157:7, 259:12, 260:20, 279:17, 292:17, 292:20, 293:11, 302:1

bases [2] - 122:24, 122:25

basic [1] - 290:11

basing [1] - 25:20

basis [17] - 30:16, 35:14, 60:21, 61:4, 62:15, 62:18, 64:1, 66:14, 66:15, 66:20, 66:25, 70:23, 80:22, 103:2, 103:4, 153:20, 293:16

basket [2] - 291:20, 293:14

bat [1] - 231:24

Bay [12] - 40:5, 41:17, 78:8, 84:24, 144:9, 147:3, 147:4, 149:7, 149:8, 149:11, 149:20, 170:21

Baytown [1] - 64:10

became [10] - 8:25, 37:22, 64:1, 83:6, 146:20, 250:16, 268:10, 271:12, 290:3, 293:15

become [6] - 9:6, 80:4, 204:17, 218:23, 219:18, 304:20

becomes [10] - 18:20, 18:22, 50:14, 66:13, 77:20, 132:14, 144:8, 146:14, 150:17, 210:6

becoming [1] - 8:20

Beeler [1] - 2:20

BEFORE [1] - 1:8

began [4] - 11:13, 88:8, 134:22, 289:1

begin [7] - 66:3, 84:23, 87:5, 114:18, 185:20, 209:18, 229:19

beginning [11] - 7:11, 31:1, 88:3, 122:18, 143:21, 174:2, 218:6, 227:25, 272:22, 278:23, 289:25

begins [2] - 57:3, 209:18

begun [1] - 219:19

behalf [1] - 215:8

behind [3] - 92:3, 300:22, 301:5

Beirne [1] - 8:18

belabor [1] - 294:5

belief [9] - 80:19, 80:20, 86:2, 88:9, 109:1, 109:4, 122:15, 126:22, 213:20

believe.. [1] - 57:4

below [3] - 95:16, 95:18, 95:23

bench [3] - 23:7, 23:18, 25:15

Bench [1] - 6:1

BENCH [1] - 1:7

benchmark [19] - 14:4, 14:9, 74:4, 130:24, 131:1, 131:3, 154:14, 167:24, 171:1, 178:19, 229:20, 230:9, 230:10, 230:12, 237:24, 243:10, 244:9, 246:10, 251:10

Bend [4] - 83:10, 83:11, 85:15, 162:17

Berman [1] - 4:5

Bernadette [1] - 2:9

best [12] - 80:8, 119:16, 220:19, 224:4, 227:22, 228:3, 234:12, 281:17, 291:13, 291:14, 291:18, 307:19

better [16] - 33:6, 34:13, 34:14, 34:15, 54:13, 91:8, 96:20, 124:24, 125:14, 137:16, 170:23, 184:4, 184:23, 184:24, 211:3, 269:13

between [47] - 14:3, 14:13, 14:24, 17:20, 22:7, 23:1, 23:19, 24:1, 26:7, 31:12, 37:4, 47:15, 48:20, 48:21, 51:12, 52:2, 61:15, 62:3,

65:11, 75:22, 76:9, 78:7, 132:19, 132:23, 133:24, 140:7, 144:22, 173:16, 184:19, 193:10, 222:19, 226:5, 247:2, 247:9, 247:10, 265:3, 265:25, 269:25, 283:18, 283:21, 284:1, 285:19, 289:6, 295:20, 295:21, 298:21

beyond [5] - 87:24, 88:10, 144:4, 161:19, 187:10

BGD [2] - 216:19, 241:3

big [7] - 11:20, 102:10, 135:13, 135:20, 155:18, 159:11, 301:25

bigger [3] - 96:24, 172:12, 179:14

bit [33] - 8:14, 15:11, 17:10, 30:25, 46:8, 46:9, 62:2, 70:2, 74:18, 77:22, 78:15, 90:14, 116:5, 125:17, 131:24, 131:25, 132:5, 133:19, 135:6, 137:8, 155:21, 162:6, 169:5, 183:12, 200:22, 210:6, 210:24, 237:14, 244:20, 267:25, 283:21, 297:1, 303:18

bite [1] - 65:1

Black [36] - 18:5, 18:9, 20:14, 21:18, 22:7, 23:2, 23:20, 26:7, 65:11, 134:12, 134:20, 136:13, 136:17, 152:17, 163:15, 163:18, 163:21, 166:10, 168:14, 168:16, 168:18, 168:19, 169:1, 173:7, 174:21, 178:14, 179:16,

185:3, 208:22, 209:7, 241:20, 242:6, 243:1, 276:11, 294:11

blank [1] - 159:16

bleed [1] - 91:3

bleed-in [1] - 91:3

bleeding [2] - 90:22, 90:23

blind [1] - 134:3

blindly [1] - 32:16

block [14] - 13:7, 221:9, 233:13, 233:14, 241:17, 243:6, 243:8, 243:10, 243:12, 278:25, 279:23, 280:2, 289:15, 294:8

block-level [3] - 233:14, 278:25, 280:2

blocked [1] - 52:5

Blocks [1] - 109:17

blocks [21] - 17:6, 54:11, 77:14, 77:17, 77:23, 77:24, 78:10, 232:19, 233:3, 240:8, 240:12, 240:16, 241:2, 241:18, 253:20, 270:8, 273:4, 283:23, 283:25

blow [1] - 69:1

bluntly [3] - 29:20, 102:23, 122:12

board [9] - 68:12, 69:21, 117:4, 189:23, 192:13, 199:7, 199:11, 213:19, 224:21

boats [1] - 78:3

body [1] - 115:24

bolden [1] - 23:12

Bolivar [38] - 15:17, 15:18, 15:19, 15:20, 15:21, 15:22, 17:2, 17:8, 17:23, 17:25, 18:11, 30:7,

39:24, 41:16, 75:17, 77:7, 82:25, 98:13, 101:9, 101:14, 102:9, 102:10, 103:10, 103:21, 103:24, 104:1, 104:4, 104:9, 128:9, 128:11, 143:24, 177:8, 178:4, 178:5, 178:11, 185:8, 209:13

Boliver [1] - 15:19

border [7] - 83:10, 83:11, 85:15, 91:3, 116:22, 116:24, 162:17

borders [1] - 150:13

bottom [11] - 57:3, 87:11, 94:10, 105:15, 108:12, 108:13, 109:16, 126:8, 185:15, 240:11

bought [1] - 89:14

Boulevard [1] - 4:14

boundaries [1] - 232:15

Boundary [1] - 284:15

boundary [1] - 285:15

bounds [3] - 201:25, 202:1, 202:5

box [1] - 71:23

boy [1] - 132:11

Boy [3] - 224:16, 224:19, 224:20

Branch [5] - 217:4, 217:7, 217:15, 218:3, 218:9

Brandon [1] - 13:24

Brazil [1] - 1:19

break [4] - 56:10, 128:20, 214:13, 248:8

Brewer [1] - 64:10

bridge [1] - 40:25

brief [4] - 23:9, 23:11, 102:18, 102:21

briefly [2] - 211:23, 224:8

bring [5] - 50:17, 103:8, 152:7, 152:9, 194:25

bringing [2] - 88:7, 302:18

brings [1] - 7:7

broader [3] - 141:16, 170:11

Brockbank [1] - 4:17

brought [6] - 80:18, 92:10, 192:25, 213:18, 220:7, 305:1

BROWN [1] - 1:8

browser [1] - 157:11

Bruce [1] - 4:2

Bryan [107] - 53:8, 68:14, 68:22, 69:5, 71:12, 71:18, 72:22, 73:9, 73:14, 74:11, 75:22, 78:24, 80:25, 81:15, 81:20, 92:13, 92:18, 92:20, 94:2, 98:25, 100:16, 100:21, 108:9, 108:20, 110:18, 113:5, 113:11, 118:7, 119:20, 126:20, 135:4, 135:8, 137:4, 138:8, 139:15, 139:24, 141:4, 141:12, 141:24, 143:9, 143:16, 145:1, 145:18, 147:12, 147:23, 148:9, 148:14, 153:10, 153:14, 154:1, 172:1, 173:6, 174:8, 179:24, 180:3, 192:1, 193:11, 197:18, 211:18, 213:16, 213:18, 213:24, 215:10,

215:11, 216:7, 216:8, 216:9, 216:13, 216:18, 216:19, 216:21, 219:22, 219:23, 222:12, 225:14, 226:1, 226:4, 227:5, 239:15, 239:24, 240:2, 240:11, 241:12, 243:22, 252:1, 253:10, 255:21, 256:3, 258:4, 263:7, 264:21, 266:17, 269:14, 270:15, 273:24, 275:1, 281:5, 281:23, 282:13, 283:5, 284:9, 285:10, 286:8, 287:1, 287:12, 289:11, 304:18

BRYAN [6] - 6:7, 215:14, 215:19, 215:21, 215:23, 215:25

Bryan's [1] - 127:16

build [7] - 230:6, 230:8, 232:19, 233:16, 233:19, 235:3, 242:20

building [5] - 34:4, 220:9, 220:22, 280:19, 292:8

Building [1] - 2:10

built [4] - 220:21, 221:22, 240:2, 241:16

bulk [1] - 9:19

bumping [1] - 210:7

bunch [3] - 32:24, 32:25, 34:6

burden [2] - 62:5, 62:12

Bureau [24] - 30:15, 30:21, 31:5, 31:14, 35:11, 211:13, 211:16, 217:1, 217:3, 217:5, 217:8, 218:3, 218:7, 218:23, 219:1, 219:6,

219:20, 223:14,
231:19, 241:3,
241:16, 256:7,
297:6, 297:16

**Bureau's** [1] -
217:15

**business** [5] -
20:3, 140:12,
220:7, 280:16,
280:21

**Business** [3] -
218:24, 219:3,
219:17

**busy** [1] - 298:24

**BVAP** [1] - 242:17

**BY** [101] - 8:5,
13:13, 14:1,
15:13, 16:5,
20:10, 25:23,
56:22, 63:13,
66:1, 90:19,
109:15, 129:9,
130:18, 130:23,
141:21, 143:8,
144:13, 147:15,
154:18, 157:17,
158:15, 165:17,
167:1, 169:7,
170:17, 171:13,
171:24, 172:16,
183:8, 185:14,
188:1, 190:1,
196:20, 199:15,
201:13, 208:2,
208:12, 208:20,
210:19, 211:1,
212:2, 216:3,
225:12, 225:25,
229:4, 230:16,
234:2, 235:24,
236:24, 238:16,
238:23, 239:14,
240:10, 240:19,
242:9, 243:21,
245:17, 247:20,
250:8, 250:25,
251:9, 251:16,
252:14, 253:9,
253:22, 254:6,
255:20, 257:14,
259:6, 260:8,
260:13, 261:12,
262:21, 263:17,
265:13, 265:24,
266:16, 270:24,
271:24, 272:8,
272:15, 272:21,
273:16, 273:23,

274:25, 275:12,
277:22, 278:16,
281:22, 282:12,
283:4, 283:11,
284:8, 285:9,
286:7, 288:14,
289:10, 293:21,
303:9, 305:9

---

## C

**cadence** [2] -
250:16, 266:11

**calendar** [2] -
31:3, 79:14

**California** [1] -
2:11

**Campaign** [4] -
1:12, 1:22, 2:3,
2:6

**campaign** [1] -
9:20

**Campos** [1] -
64:9

**candid** [2] - 49:9,
89:13

**candidate** [19] -
24:18, 24:19,
25:1, 25:5, 25:6,
97:24, 101:17,
102:6, 121:22,
137:1, 178:25,
179:9, 179:13,
179:18, 179:19,
205:5, 205:16,
246:19

**candidates** [3] -
93:22, 246:3,
246:8

**cannot** [3] -
126:3, 263:13,
304:13

**cap** [1] - 266:25

**capabilities** [1] -
297:14

**capable** [2] -
101:17, 118:10

**car** [1] - 12:6

**care** [2] - 84:15,
163:7

**career** [1] -
137:25

**Carolina** [9] -
3:4, 3:7, 169:20,

170:4, 170:8,
170:9, 188:2,
197:1, 197:17

**carries** [1] - 61:22

**carry** [1] - 64:24

**cascade** [1] -
149:6

**case** [62] - 7:21,
9:4, 9:6, 11:6,
15:4, 17:14,
19:8, 20:17,
22:13, 22:17,
22:25, 23:4,
23:14, 23:17,
25:8, 31:7,
33:10, 49:17,
61:10, 63:8,
63:10, 64:5,
64:10, 64:17,
64:21, 65:2,
65:5, 66:7,
66:10, 66:11,
72:14, 83:24,
102:8, 103:4,
125:18, 125:24,
130:3, 130:8,
134:15, 136:12,
164:9, 164:12,
164:23, 165:16,
169:20, 169:22,
170:2, 179:2,
188:14, 199:6,
200:14, 215:16,
222:2, 225:20,
231:7, 245:24,
290:12, 292:21,
296:1, 298:3,
304:25

**CASE** [3] - 56:14,
129:3, 308:21

**cases** [13] - 8:19,
8:22, 8:23, 64:3,
64:12, 72:19,
132:20, 132:21,
143:3, 221:19,
294:16, 295:18,
297:18

**cast** [2] - 246:18,
280:8

**category** [1] -
25:13

**Catherine** [1] -
3:13

**caused** [2] -
180:14, 283:19

**causes** [1] -
235:14

**causeway** [2] -
83:1, 146:7

**ceased** [1] -
163:21

**census** [25] -
30:10, 30:11,
30:13, 31:8,
32:19, 33:15,
33:23, 34:7,
35:7, 54:11,
73:2, 76:12,
185:23, 186:11,
187:5, 210:20,
211:4, 211:13,
211:16, 218:15,
222:15, 232:6,
232:12, 294:8,
298:7

**Census** [24] -
30:11, 30:15,
31:4, 31:14,
35:11, 211:13,
211:16, 217:1,
217:3, 217:5,
217:8, 217:14,
218:3, 218:23,
219:1, 219:6,
223:8, 223:10,
223:14, 231:18,
241:3, 241:16,
256:7, 297:6

**center** [11] -
16:22, 85:1,
136:18, 147:9,
149:21, 149:23,
150:1, 151:24,
152:1, 185:4,
267:14

**Center** [4] - 1:12,
1:22, 2:3, 2:6

**centered** [2] -
133:15, 164:16

**Central** [9] -
73:16, 79:15,
224:22, 234:5,
236:2, 251:2,
259:8, 260:10,
266:4

**central** [3] -
85:10, 149:21,
247:13

**ceremony** [2] -
225:3, 288:2

**certain** [18] - 21:9,
39:12, 49:14,
88:13, 88:14,
94:19, 123:13,

126:16, 142:6,
161:21, 162:2,
163:11, 235:11,
269:2, 276:20,
277:18, 293:7,
300:8

**certainly** [30] -
77:10, 94:5,
119:1, 122:2,
126:19, 127:17,
128:6, 133:23,
134:16, 147:21,
152:3, 154:1,
154:6, 156:9,
161:3, 162:16,
163:5, 164:14,
177:2, 178:24,
179:3, 183:15,
190:12, 192:6,
192:15, 193:20,
209:17, 235:19

**certainty** [4] -
34:1, 197:12,
263:14, 304:13

**CERTIFICAT
E** [1] - 309:2

**Certificate......
...................
** [1] - 6:4

**certify** [1] - 309:3

**Chad** [1] - 1:18

**chair** [5] - 222:16,
222:20, 223:3,
223:6, 223:8

**chaired** [2] -
222:15, 223:9

**challenge** [1] -
91:20

**challengers** [1] -
91:15

**chance** [4] -
50:20, 170:13,
237:19, 291:12

**change** [68] -
14:23, 14:24,
18:12, 31:19,
31:21, 55:25,
60:20, 61:5,
61:24, 63:22,
63:25, 67:8,
71:23, 75:4,
75:7, 85:20,
92:21, 95:9,
95:10, 98:7,
98:9, 98:10,

98:11, 98:16, 98:18, 102:19, 117:1, 117:3, 131:23, 132:2, 132:7, 133:8, 133:9, 161:22, 161:23, 162:4, 162:5, 179:12, 198:8, 200:1, 209:22, 228:9, 228:11, 230:22, 231:1, 234:6, 235:13, 243:11, 243:23, 244:10, 252:15, 252:22, 252:25, 253:4, 254:1, 254:9, 256:24, 257:6, 263:25, 264:3, 267:23, 271:12, 279:16, 281:25, 290:16, 295:3

changed [14] - 18:10, 33:2, 61:25, 101:15, 114:11, 171:3, 171:4, 193:24, 196:24, 235:8, 267:8, 271:8, 289:22, 291:17

changes [77] - 14:20, 17:15, 17:18, 17:20, 17:22, 33:17, 33:21, 33:25, 48:10, 48:16, 54:14, 59:3, 61:1, 63:21, 66:20, 67:19, 70:16, 75:7, 82:15, 88:11, 90:21, 92:7, 92:8, 92:9, 92:11, 92:16, 92:25, 102:5, 103:10, 103:13, 103:16, 104:2, 104:20, 111:17, 113:3, 119:24, 120:6, 120:10, 122:13, 143:14, 144:17, 144:22, 144:25, 145:19, 146:1, 152:8, 156:18, 156:25, 161:25, 162:2, 183:22, 189:12, 189:21, 192:11, 192:16, 199:2, 209:20, 228:21,

234:14, 235:18, 236:6, 238:10, 239:10, 243:16, 246:13, 247:14, 248:5, 248:9, 248:12, 248:15, 248:17, 249:2, 249:7, 249:11, 249:14, 249:17, 267:4

changing [2] - 101:14, 155:11

character [1] - 165:7

characteristic s [4] - 262:17, 269:4, 270:19, 276:10

characterize [1] - 141:17

charge [1] - 206:8

chat [1] - 17:10

check [3] - 250:21, 266:12, 279:8

check-in [1] - 266:12

checked [2] - 136:11, 299:19

CHEN [9] - 207:21, 207:25, 208:2, 208:10, 208:12, 208:17, 208:19, 208:20, 210:15

Chen [4] - 2:13, 6:11, 208:3, 208:5

chief [2] - 22:13, 201:18

children [1] - 49:15

choice [6] - 25:5, 25:6, 123:20, 179:1, 179:13, 205:6

chosen [1] - 142:7

Christian [1] - 4:20

Christina [1] - 2:20

chunk [2] - 155:18, 159:11

church [1] - 239:4

circle [2] - 219:25, 300:21

Circuit [2] - 64:16, 64:19

cities [3] - 136:18, 292:5, 292:11

citizen [5] - 173:8, 221:8, 241:19, 241:21, 255:24

citizenship [1] - 222:3

City [6] - 1:17, 4:15, 16:1, 41:18, 133:16, 150:11

city [1] - 85:1

Civil [8] - 2:13, 2:20, 3:13, 3:17, 3:20, 3:23, 4:3, 4:6

claim [10] - 23:11, 23:18, 61:13, 62:22, 62:24, 63:7, 67:2, 72:8, 169:19, 182:9

claiming [1] - 72:10

claims [2] - 63:7, 63:10

clarification [2] - 47:2, 158:8

clarify [4] - 71:13, 77:22, 183:12, 308:8

Clark [47] - 45:12, 45:19, 45:23, 45:25, 46:13, 47:2, 47:22, 71:10, 85:14, 86:11, 86:18, 87:2, 88:18, 90:4, 90:5, 91:6, 91:24, 92:12, 100:1, 100:12, 106:16, 112:19, 112:20, 112:22, 120:10, 122:5, 127:22, 155:22, 157:6, 175:17, 176:3, 176:14, 188:5, 191:2, 192:4, 192:5, 192:7, 193:11, 194:15, 194:17,

198:2, 199:7, 199:11, 199:25, 206:25, 306:3

Clark's [6] - 46:3, 90:25, 91:4, 91:5, 92:6, 157:5

clean [6] - 83:25, 161:12, 162:14, 162:16, 162:21, 270:14

cleaned [1] - 283:24

cleaner [3] - 161:13, 162:20, 162:21

cleaning [1] - 281:15

cleanly [2] - 85:2, 85:4

cleanup [1] - 117:8

clear [27] - 31:10, 49:20, 60:12, 71:21, 102:24, 103:23, 104:14, 113:20, 119:11, 126:12, 152:15, 162:23, 163:9, 170:7, 177:7, 178:8, 179:25, 199:8, 213:13, 258:13, 274:10, 285:25, 290:3, 290:7, 291:12, 292:7, 308:18

Clear [4] - 85:8, 150:14, 177:7, 177:8

clearly [11] - 15:5, 25:12, 60:18, 61:2, 80:20, 82:14, 99:17, 115:13, 135:22, 178:16, 258:17

click [4] - 110:2, 189:8, 243:19, 263:15

clicked [2] - 60:24, 189:7

client [9] - 230:2, 239:5, 245:2, 256:16, 268:20, 276:2, 293:3, 293:5, 299:8

client's [1] - 245:13

clients [15] - 9:5, 231:11, 248:23, 250:17, 255:7, 258:16, 268:24, 269:18, 296:2, 297:18, 297:22, 298:24, 299:5, 302:14, 302:19

clip [3] - 141:22, 145:11, 198:23

close [8] - 11:1, 34:9, 83:5, 85:14, 87:17, 150:2, 220:6, 268:10

closer [2] - 61:19, 167:24

closest [5] - 83:2, 125:15, 146:19, 149:2, 281:17

clueless [1] - 193:10

CNT_20 [1] - 241:6

co [1] - 207:23

co-counsel [1] - 207:23

coalition [16] - 22:14, 23:1, 24:3, 24:4, 24:14, 25:2, 25:13, 61:13, 61:15, 64:7, 64:13, 65:1, 66:4, 102:20, 102:22

Coalition [3] - 3:3, 3:6, 61:14

coast [5] - 39:25, 40:2, 149:2, 156:16, 158:18

Coast [1] - 236:3

coastal [40] - 40:9, 68:8, 72:16, 74:15, 82:19, 84:11, 106:22, 106:24, 120:6, 148:8, 148:18, 149:25, 154:7, 154:10, 154:21, 155:4, 158:16, 159:1, 159:10, 160:3,

161:18, 161:19, 164:14, 164:23, 164:24, 165:5, 166:15, 167:3, 167:9, 170:19, 171:14, 171:18, 176:9, 184:11, 193:17, 213:8, 214:2, 290:24, 291:3

code [5] - 240:25, 241:1, 241:8, 241:9, 269:11

coded [3] - 173:10, 269:3, 278:4

codes [2] - 54:11, 144:2

coding [1] - 269:9

cohesion [4] - 22:7, 23:1, 26:8, 65:11

cohesive [1] - 24:2

cohesiveness [2] - 23:19, 26:7

collaborate [1] - 218:12

collect [1] - 114:19

collecting [1] - 52:18

collection [5] - 221:12, 229:24, 240:24, 241:14, 242:4

collectively [1] - 28:11

Collins [1] - 38:18

color [6] - 88:10, 173:10, 269:3, 269:8, 269:10, 278:4

color-coded [2] - 269:3, 278:4

colorized [2] - 13:2, 13:19

colors [1] - 269:17

Columbia [1] - 151:19

Column [4] - 241:11, 243:9, 246:17, 267:16

column [10] - 47:13, 87:11, 173:9, 174:9, 175:7, 240:21, 240:23, 241:5, 241:11, 244:22

columns [3] - 94:1, 242:18, 243:4

Columns [3] - 241:13, 242:1, 242:11

combination [3] - 165:9, 185:4, 280:3

combined [2] - 166:5, 173:9

coming [14] - 19:14, 42:4, 83:12, 118:7, 124:14, 146:6, 148:8, 148:14, 190:7, 190:13, 201:22, 264:24, 286:4

comment [14] - 33:7, 57:2, 92:4, 113:7, 114:19, 115:4, 118:18, 118:22, 119:3, 123:25, 124:2, 124:7, 178:11

commentary [1] - 195:21

comments [12] - 39:16, 40:20, 89:6, 105:15, 119:7, 119:11, 119:14, 124:12, 201:5, 204:3, 204:4, 230:22

Commission [1] - 11:8

commission [13] - 41:2, 41:5, 79:7, 80:2, 104:16, 119:8, 122:20, 123:21, 123:22, 123:23, 156:7, 183:20, 199:8

Commissioner [176] - 20:20, 38:17, 38:24, 40:20, 40:22, 41:14, 42:23,

43:3, 43:13, 43:16, 44:9, 44:19, 44:24, 45:12, 45:19, 45:23, 45:25, 46:3, 46:5, 47:2, 47:22, 48:4, 48:7, 49:20, 49:23, 50:5, 50:10, 51:13, 52:21, 52:22, 53:2, 53:10, 54:2, 55:1, 55:10, 55:13, 55:20, 56:25, 57:13, 57:20, 66:24, 70:10, 71:9, 71:10, 71:11, 76:16, 76:23, 77:1, 84:3, 86:3, 87:1, 87:2, 88:19, 89:2, 90:2, 90:4, 90:5, 90:25, 91:24, 92:6, 92:12, 92:21, 96:24, 99:25, 100:3, 100:5, 100:13, 100:15, 100:24, 101:5, 102:3, 102:12, 103:20, 104:8, 104:18, 105:1, 105:24, 105:25, 106:11, 106:21, 107:1, 107:17, 107:21, 107:23, 107:24, 108:3, 108:8, 110:25, 111:19, 112:19, 112:20, 113:1, 120:22, 121:20, 125:25, 126:4, 126:11, 126:17, 126:22, 126:25, 127:7, 127:13, 127:19, 128:1, 133:22, 141:14, 143:14, 148:20, 155:5, 155:22, 160:13, 167:23, 168:22, 170:20, 175:15, 175:17, 175:20, 176:21, 177:23, 180:12, 180:16, 184:13, 191:2, 191:3, 191:18, 192:17, 192:21, 193:2, 193:9, 193:15, 194:19, 197:7,

197:13, 200:12, 200:21, 206:16, 206:25, 207:6, 207:9, 207:13, 246:21, 246:22, 246:23, 246:24, 254:13, 254:14, 261:13, 264:3, 264:7, 264:10, 273:11, 273:25, 274:7, 274:17, 277:7, 277:24, 278:11, 281:7, 284:11, 284:23, 285:11, 285:13, 285:21, 285:23, 285:24, 286:1, 305:20, 305:23, 305:25, 306:3, 306:11, 306:17

commissioner [38] - 49:4, 49:17, 55:3, 58:24, 80:15, 80:21, 83:2, 94:25, 96:12, 108:3, 112:5, 126:23, 154:3, 154:12, 155:6, 156:6, 156:9, 163:20, 180:22, 187:7, 190:7, 191:22, 194:22, 195:19, 196:7, 197:25, 233:6, 245:6, 246:19, 247:9, 263:25, 273:1, 292:5, 292:16, 292:25, 293:9, 294:20, 303:22

commissioner's [2] - 146:8, 146:11

commissioner -wise [1] - 108:3

Commissioners [31] - 10:2, 12:17, 36:22, 49:21, 58:6, 59:4, 86:11, 88:18, 100:12, 107:7, 113:9, 114:13, 120:9, 125:4, 128:13, 130:25, 164:5, 164:15, 165:4,

165:25, 173:22, 173:24, 188:5, 193:11, 194:15, 198:2, 208:14, 225:16, 233:22, 247:11, 255:11

commissioners [117] - 19:12, 26:2, 37:1, 38:10, 39:7, 39:13, 40:6, 41:6, 41:8, 41:10, 41:12, 42:15, 48:9, 48:19, 48:21, 49:7, 49:9, 49:11, 50:10, 51:10, 52:19, 53:11, 53:23, 57:14, 57:22, 57:25, 58:10, 58:22, 63:19, 66:17, 67:24, 69:23, 70:7, 70:9, 70:14, 70:18, 79:3, 79:5, 80:16, 84:19, 85:13, 85:24, 93:3, 93:6, 93:11, 97:17, 99:23, 104:19, 104:21, 104:23, 106:6, 106:14, 107:5, 107:21, 108:17, 109:6, 110:12, 110:22, 111:1, 111:8, 111:16, 112:10, 112:15, 114:10, 121:1, 121:25, 126:10, 126:16, 144:8, 144:17, 145:8, 146:11, 146:18, 148:22, 162:2, 167:14, 167:19, 172:2, 172:8, 175:23, 182:5, 186:15, 186:17, 187:2, 187:3, 188:3, 188:12, 188:21, 189:11, 190:12, 190:18, 191:7, 191:14, 191:25, 192:24, 194:2, 195:1, 195:4, 195:16, 195:24, 196:23, 197:20, 198:11, 199:1, 200:8,

200:11, 206:23, 210:21, 211:5, 274:4, 275:22, 301:15, 302:3, 302:12, 303:7, 304:10, 304:21

**commissioners'** [7] - 75:5, 146:3, 192:12, 301:17, 306:7, 306:11, 306:12

**common** [3] - 46:17, 228:9, 233:9

**commonly** [1] - 243:5

**communicate** [1] - 237:22

**communication** [2] - 290:1, 290:2

**communications** [1] - 237:21

**communities** [3] - 135:1, 153:18, 304:1

**Community** [8] - 218:4, 218:5, 218:9, 218:13, 218:14, 218:21, 221:4, 241:22

**compact** [1] - 78:17

**compactness** [5] - 17:7, 77:15, 77:17, 153:19, 303:21

**companion** [2] - 258:19, 293:25

**company** [9] - 216:15, 216:16, 216:18, 219:11, 220:9, 220:25, 241:17, 297:13

**compare** [2] - 14:17, 14:19

**comparing** [1] - 14:12

**competitive** [1] - 281:3

**competitors** [1] - 280:24

**complain** [1] -

128:25

**complaint** [1] - 10:22

**complaints** [4] - 16:8, 22:9, 22:10, 201:21

**complemented** [1] - 301:14

**complete** [2] - 143:6, 186:19

**completed** [8] - 34:23, 34:25, 249:1, 249:4, 259:2, 269:22, 270:17

**completely** [7] - 33:1, 65:13, 71:15, 88:14, 163:8, 204:5, 237:19

**complex** [3] - 235:17, 279:21

**compliance** [1] - 197:21

**compliant** [2] - 40:13, 40:15

**complicated** [1] - 205:7

**complied** [2] - 182:6, 182:7

**comply** [3] - 15:16, 40:13, 186:13

**Complying** [2] - 7:19, 215:14

**complying** [2] - 76:12, 169:13

**comport** [7] - 12:20, 14:10, 143:19, 181:22, 183:11, 199:16, 305:10

**comports** [2] - 166:9, 187:13

**composition** [1] - 294:19

**comprehensive** [3] - 213:12, 270:16, 276:14

**compress** [2] - 123:16, 123:19

**compressed** [1] - 35:2

**computer** [4] - 5:5, 81:19, 105:14, 296:19

**computer-assisted** [1] - 5:5

**concentrated** [8] - 99:20, 133:21, 133:23, 134:12, 134:17, 134:21, 136:12

**concentrates** [1] - 136:4

**concentrating** [1] - 152:5

**concentration** [4] - 133:12, 136:17, 136:21, 163:21

**concept** [10] - 16:10, 71:15, 83:16, 150:19, 150:20, 150:21, 151:24, 152:16, 152:21

**concern** [10] - 63:20, 67:5, 90:12, 90:13, 106:13, 106:22, 107:3, 127:5, 171:4, 210:10

**concerned** [8] - 46:9, 60:16, 110:23, 121:13, 183:15, 209:6, 278:20, 298:9

**concerns** [15] - 15:3, 15:10, 59:8, 90:1, 90:8, 90:25, 91:4, 91:5, 92:6, 106:12, 107:1, 111:17, 112:15, 200:2, 214:1

**conclude** [2] - 22:25, 54:25

**concluded** [10] - 143:7, 147:14, 182:5, 183:7, 189:25, 196:1, 196:16, 199:14, 303:8, 305:8

**conclusion** [5] - 25:9, 25:17, 64:20, 133:2,

182:8

**conclusions** [1] - 63:3

**conditional** [2] - 173:14, 281:19

**conducted** [2] - 11:17, 280:14

**conference** [1] - 222:25

**conferences** [2] - 222:18, 222:23

**confidence** [3] - 49:5, 49:19, 56:6

**confidences** [1] - 126:6

**confident** [2] - 278:9, 278:13

**confidential** [2] - 41:11, 112:2

**confidentiality** [4] - 48:20, 55:22, 55:24, 193:13

**configuration** [12] - 148:7, 154:5, 162:23, 166:15, 167:4, 167:10, 167:22, 168:3, 171:14, 171:18, 177:5, 206:17

**configurations** [2] - 176:9, 176:25

**configured** [3] - 112:24, 164:10, 193:4

**confirm** [2] - 237:6, 285:7

**confuse** [1] - 96:23

**confusing** [3] - 20:2, 96:19, 174:1

**confusion** [1] - 235:10

**congratulations** [3] - 224:15, 225:2, 225:9

**conjunction** [2] - 112:5, 112:20

**connect** [1] -

298:14

**connection** [11] - 20:14, 25:10, 33:12, 36:9, 39:10, 48:25, 55:14, 67:21, 71:19, 76:17, 213:5

**conscious** [2] - 113:16, 134:16

**consent** [1] - 21:5

**consequence** [1] - 141:11

**conservatively** [1] - 299:6

**consider** [6] - 80:1, 131:17, 203:15, 205:5, 205:6, 303:21

**considerations** [1] - 184:25

**considered** [4] - 21:17, 25:13, 67:3, 121:23

**considering** [2] - 25:24, 203:8

**consistency** [1] - 242:23

**consistent** [14] - 13:20, 13:22, 28:2, 35:23, 43:8, 43:10, 45:18, 53:4, 69:15, 79:16, 90:24, 105:8, 119:19, 124:25

**consistently** [2] - 16:20, 127:4

**constable** [5] - 20:20, 22:4, 22:11, 22:15, 186:9

**constables** [4] - 21:7, 21:25, 186:18, 187:3

**constantly** [1] - 104:22

**constitute** [1] - 182:3

**constituted** [1] - 60:7

**Constitution** [2] - 182:6, 182:7

constraints [3] - 228:17, 233:12, 307:19

constriction [1] - 294:6

construct [2] - 144:3, 145:3

constructed [2] - 95:11, 177:14

constructing [1] - 55:19

construction [1] - 81:9

consulted [1] - 9:3

consulting [1] - 216:17

consuming [1] - 235:17

contact [5] - 36:25, 56:4, 139:24, 156:5, 156:9

contacted [5] - 26:12, 191:7, 191:12, 225:20, 235:25

contacting [1] - 36:15

contain [2] - 232:8, 232:12

contained [20] - 133:24, 135:25, 200:17, 222:3, 222:5, 222:7, 222:9, 240:23, 242:10, 249:8, 252:2, 252:25, 261:2, 266:21, 267:22, 272:23, 282:21, 286:19, 286:23, 294:7

contains [1] - 244:4

contemporaneous [2] - 10:24, 10:25

content [1] - 121:14

contention [4] - 21:20, 22:13, 198:4, 199:5

contents [1] -

121:9

context [3] - 41:5, 79:10, 258:20

contiguity [3] - 17:7, 77:18, 153:19

contiguous [1] - 171:16

continue [6] - 127:23, 165:3, 231:14, 232:17, 242:7, 255:14

continued [5] - 2:1, 3:1, 4:1, 5:1, 308:22

contribution [1] - 301:13

control [4] - 123:24, 242:23, 270:2, 270:11

controlled [1] - 113:20

conundrum [1] - 153:2

convention [1] - 231:6

conventionally [1] - 231:3

conversation [15] - 27:12, 48:6, 57:13, 69:18, 76:23, 101:10, 102:12, 113:13, 191:21, 205:7, 228:5, 262:19, 278:24, 292:14, 299:19

conversations [14] - 48:25, 49:2, 56:6, 57:17, 68:9, 80:24, 113:24, 252:19, 265:3, 298:6, 302:8, 302:11, 302:17, 302:20

conveyed [2] - 71:8, 71:11

conveying [1] - 237:17

convinced [1] - 64:1

Cooper [3] - 169:20, 169:22,

170:2

coordinated [1] - 58:22

copacetic [3] - 198:12, 207:5, 207:11

copied [1] - 115:19

copies [3] - 105:16, 105:19

copy [5] - 12:14, 13:17, 88:25, 105:1

core [2] - 193:16, 233:6

corner [3] - 71:24, 109:18, 285:14

Cornyn [7] - 93:21, 246:19, 247:5, 270:25, 279:24, 280:4, 280:8

Cornyn-Trump [1] - 270:25

correct [204] - 9:25, 10:3, 12:19, 12:22, 14:23, 15:18, 19:21, 20:25, 21:2, 21:3, 21:15, 21:18, 22:17, 22:21, 23:25, 27:9, 34:10, 37:6, 43:14, 44:20, 44:22, 48:4, 48:5, 51:20, 54:18, 54:22, 58:7, 58:12, 60:3, 61:17, 67:11, 67:20, 70:15, 72:4, 72:5, 74:2, 74:6, 74:20, 75:15, 81:2, 82:18, 82:21, 84:10, 84:12, 84:21, 86:1, 87:4, 94:23, 95:7, 95:15, 95:19, 95:22, 96:1, 96:25, 97:8, 97:25, 98:3, 98:6, 98:14,

99:5, 100:14, 101:6, 102:1, 104:22, 106:24, 108:5, 108:24, 109:19, 109:22, 110:10, 110:15, 114:23, 115:20, 115:23, 116:19, 118:15, 123:9, 125:3, 125:5, 125:6, 129:15, 129:17, 134:23, 136:23, 137:14, 137:22, 138:23, 139:17, 140:18, 148:10, 149:10, 150:25, 151:11, 153:16, 154:20, 154:22, 155:10, 159:6, 159:12, 159:13, 173:20, 174:14, 174:17, 174:23, 175:19, 180:24, 181:1, 181:7, 181:9, 187:1, 188:6, 193:1, 201:6, 204:9, 209:8, 210:22, 211:6, 213:23, 222:4, 222:11, 226:17, 227:11, 227:12, 228:25, 229:10, 229:13, 230:18, 230:19, 232:10, 232:13, 233:18, 236:19, 237:9, 237:16, 238:7, 238:13, 238:19, 238:20, 239:6, 239:25, 240:3, 240:13, 246:14, 246:15, 247:1, 247:13, 249:2, 250:12, 251:6, 251:13, 251:18, 251:19, 253:17, 254:10, 254:16, 254:25, 255:3, 257:2, 258:7, 258:24, 259:1, 259:16, 264:1, 264:6, 267:3, 267:11, 267:20, 267:23, 268:3, 268:5, 268:6, 268:12, 268:16, 271:11, 271:17, 271:20, 272:2, 272:3, 272:17, 273:13, 275:20,

276:16, 278:1, 278:2, 283:14, 283:17, 284:22, 287:17, 287:18, 288:21, 292:2, 292:3, 293:17, 294:8, 294:9, 294:21, 298:5, 298:18, 303:20, 303:22, 303:24, 309:4

correction [1] - 99:1

corrections [1] - 33:25

correctly [5] - 21:24, 163:23, 209:3, 236:13, 270:4

correspondence [4] - 26:25, 27:1, 121:10, 294:3

corridor [3] - 84:25, 146:6, 146:9

corridors [2] - 83:9, 83:23

corroborate [1] - 261:22

cost [1] - 234:24

Costa [2] - 23:8, 65:10

Costa's [1] - 65:10

Council [2] - 169:10, 224:22

counsel [11] - 8:12, 32:9, 52:1, 67:14, 79:7, 171:25, 207:23, 208:8, 212:3, 212:10, 307:12

count [2] - 169:4, 169:12

counter [1] - 151:20

counting [1] - 220:19

county [47] - 11:18, 16:13, 26:2, 30:3, 30:4, 30:5, 30:8, 40:1, 40:2, 44:14,

46:10, 46:11, 46:13, 47:11, 47:14, 54:17, 83:4, 85:1, 99:21, 132:22, 133:11, 134:1, 134:23, 135:14, 135:17, 136:1, 146:10, 146:19, 148:19, 149:23, 150:1, 150:14, 151:10, 151:24, 152:2, 152:8, 157:1, 160:12, 176:2, 176:5, 177:18, 185:4, 207:15, 213:9, 247:6, 247:7

COUNTY [1] - 1:6

County [123] - 8:12, 8:17, 9:1, 10:15, 11:8, 12:17, 14:3, 17:24, 19:5, 19:8, 19:18, 19:20, 19:22, 19:23, 20:24, 21:1, 21:16, 26:12, 28:6, 28:10, 29:22, 32:2, 32:11, 32:13, 33:24, 34:5, 34:17, 36:9, 36:13, 36:22, 37:18, 37:25, 40:4, 47:16, 52:16, 59:17, 59:18, 60:1, 64:25, 65:1, 65:18, 66:6, 83:10, 83:11, 85:7, 85:9, 85:15, 95:1, 95:2, 95:5, 96:14, 98:24, 118:4, 118:11, 118:12, 119:21, 119:25, 120:11, 122:10, 123:11, 125:19, 130:25, 131:3, 131:9, 131:14, 131:21, 131:25, 134:4, 136:18, 140:4, 144:10, 147:8, 151:20, 152:23, 152:24, 153:4, 165:19, 169:13, 169:18, 179:16,

180:2, 181:16, 186:21, 193:6, 200:23, 202:2, 208:7, 208:22, 210:3, 212:14, 212:22, 213:12, 221:25, 225:15, 226:11, 226:23, 227:8, 232:4, 236:1, 241:2, 241:10, 255:10, 255:15, 261:8, 261:19, 261:24, 263:1, 265:6, 273:7, 274:5, 286:14, 292:18, 294:8, 296:3, 296:13, 298:18, 299:15, 303:3, 303:4, 304:2, 304:10

County's [5] - 14:18, 68:23, 208:14, 209:12, 300:12

couple [22] - 75:20, 97:15, 112:21, 141:22, 167:11, 194:20, 194:22, 196:2, 196:21, 197:10, 199:22, 212:8, 220:20, 223:18, 224:1, 268:7, 270:8, 279:12, 283:25, 284:2, 299:7, 308:2

course [11] - 35:18, 40:14, 94:4, 124:6, 125:19, 151:9, 169:13, 213:11, 239:20, 278:21, 300:24

Court [53] - 5:2, 7:1, 8:9, 9:10, 10:2, 12:18, 20:21, 22:25, 23:5, 23:6, 23:19, 24:11, 24:12, 36:22, 49:21, 56:11, 57:5, 58:6, 59:4, 63:5, 63:9, 64:6, 65:6, 65:22, 96:24, 107:7, 113:9, 114:13, 125:4, 128:13, 130:25, 137:20,

151:18, 157:16, 157:19, 164:3, 164:5, 164:15, 165:4, 165:25, 170:6, 173:22, 173:24, 175:11, 208:14, 215:17, 225:13, 225:16, 233:22, 247:11, 255:11, 280:13, 287:4

court [6] - 21:6, 33:3, 78:21, 157:12, 187:7, 247:9

COURT [69] - 1:1, 7:2, 7:10, 7:17, 7:20, 7:25, 13:5, 15:11, 15:20, 20:7, 20:9, 25:21, 56:12, 56:16, 56:19, 56:21, 63:9, 65:15, 65:22, 90:14, 90:18, 109:14, 128:16, 128:19, 129:5, 130:12, 130:17, 157:16, 172:15, 182:21, 196:17, 207:24, 210:17, 211:22, 211:24, 214:8, 214:10, 214:12, 214:15, 214:20, 214:24, 215:4, 215:7, 215:11, 215:15, 215:20, 215:22, 225:8, 225:11, 285:8, 287:7, 287:14, 287:20, 287:23, 288:5, 288:9, 306:22, 307:2, 307:6, 307:9, 307:13, 307:16, 307:21, 308:4, 308:7, 308:11, 308:15, 308:20, 309:2

Court's [4] - 20:6, 25:18, 83:15, 294:18

courthouse [1] - 11:18

courtroom [2] - 24:8, 224:23

courts [1] -

269:18

cover [2] - 78:2, 224:8

covers [1] - 97:1

COVID [2] - 115:2, 227:4

craft [1] - 293:4

crafting [1] - 295:24

create [10] - 32:25, 83:12, 92:23, 143:18, 154:2, 155:4, 164:14, 165:3, 203:6, 295:1

created [18] - 16:23, 58:2, 94:4, 94:5, 110:18, 119:25, 120:1, 153:2, 159:10, 160:3, 230:11, 237:24, 244:10, 244:11, 248:2, 262:5

creating [6] - 59:10, 146:9, 214:2, 235:10, 271:16, 299:25

creation [4] - 121:23, 127:12, 141:13, 249:1

Creek [4] - 85:8, 150:14, 177:8

creep [2] - 87:22, 88:10

criteria [35] - 33:11, 33:13, 33:14, 33:15, 33:18, 33:19, 34:12, 36:22, 57:15, 66:20, 67:25, 68:10, 74:14, 79:25, 82:8, 82:23, 84:22, 98:25, 103:16, 121:15, 121:17, 121:18, 122:8, 122:9, 141:16, 145:4, 153:20, 162:12, 162:15, 163:5, 177:10, 206:7, 277:17, 290:13

criterion [1] - 257:4

critical [3] - 38:6, 141:8, 141:9

crooked [1] - 78:11

Cross [4] - 6:8, 6:10, 6:11, 6:11

CROSS [4] - 129:8, 208:1, 210:18, 288:13

cross [9] - 23:4, 23:15, 80:14, 84:25, 149:13, 214:8, 287:8, 287:15, 308:9

Cross-Examination [3] - 6:10, 6:11, 6:11

CROSS-EXAMINATION [3] - 129:8, 208:1, 210:18

cross-examination [3] - 23:4, 287:15, 308:9

CROSS-EXAMINATION/DIRECT [1] - 288:13

Cross-Examination/Direct [1] - 6:8

cross-examined [1] - 23:15

crossover [21] - 23:24, 24:1, 24:5, 24:13, 24:15, 25:2, 25:3, 178:20, 178:21, 178:23, 178:24, 179:4, 200:18, 200:19, 204:11, 204:13, 204:14, 204:23, 205:2, 205:6, 205:14

CRR [2] - 5:2, 309:7

crucial [1] - 126:7

crux [1] - 186:20

current [1] - 160:14
custody [1] - 118:9
cut [10] - 17:3, 76:19, 78:19, 119:9, 151:25, 155:18, 270:8, 283:23, 287:14
cutoff [1] - 287:5
cuts [6] - 15:24, 16:1, 54:12, 75:18, 103:11
cutting [1] - 176:24
CVAP [8] - 169:8, 169:9, 242:17, 243:1, 244:7, 255:22, 256:19
cycle [7] - 30:15, 32:23, 34:18, 35:16, 152:10, 156:11, 156:12

**D**

daily [1] - 275:2
Dale [27] - 7:15, 8:10, 73:15, 115:18, 142:2, 185:19, 238:17, 239:4, 251:3, 262:3, 262:9, 262:10, 265:1, 265:4, 271:25, 274:1, 286:2, 289:24, 293:2, 295:15, 301:12, 301:23, 302:8, 302:11, 302:13, 302:20, 303:19
DALE [2] - 6:9, 8:2
Dale's [1] - 142:4
Dallin [1] - 4:17
DALTON [2] - 6:9, 8:2
Dalton [1] - 8:10
dam [5] - 46:10, 47:9, 156:21, 156:22, 157:8
data [202] - 30:10, 30:13, 30:22, 31:5, 31:8, 32:3,

32:11, 33:16, 33:23, 34:7, 34:15, 34:16, 34:20, 35:1, 35:11, 35:24, 36:1, 36:3, 36:4, 36:5, 36:7, 36:9, 36:13, 36:14, 36:16, 36:24, 38:2, 38:6, 38:7, 42:4, 42:7, 42:9, 45:6, 45:8, 51:6, 51:16, 52:8, 52:11, 52:12, 57:6, 57:11, 57:12, 57:22, 57:23, 61:12, 64:14, 64:15, 64:22, 65:5, 71:20, 71:22, 71:24, 72:2, 72:19, 81:1, 81:7, 91:11, 93:4, 93:5, 93:10, 93:18, 93:19, 94:6, 105:17, 105:20, 107:20, 108:14, 108:18, 109:2, 109:10, 109:23, 110:1, 110:12, 110:13, 110:19, 110:20, 110:23, 110:24, 127:22, 127:24, 129:14, 129:18, 129:20, 129:25, 130:4, 130:5, 131:23, 132:2, 132:3, 132:25, 133:1, 133:4, 134:8, 134:9, 135:6, 135:13, 135:20, 135:22, 136:8, 136:16, 137:10, 138:18, 139:10, 158:12, 172:22, 172:25, 179:5, 185:24, 200:6, 200:15, 210:21, 211:4, 211:13, 211:16, 211:18, 216:24, 220:24, 221:7, 221:10, 221:11, 221:20, 221:22, 222:3, 222:5, 222:7, 222:10, 231:19, 231:21, 232:2, 232:5, 232:6, 232:8, 232:9,

232:10, 232:12, 232:18, 232:23, 233:7, 233:11, 233:14, 233:17, 239:22, 241:14, 241:16, 241:18, 241:19, 242:13, 243:2, 244:7, 245:20, 245:22, 245:24, 246:5, 249:16, 250:2, 252:8, 253:20, 256:7, 258:5, 261:4, 265:7, 265:9, 266:21, 266:25, 269:8, 269:16, 274:21, 275:7, 275:21, 276:3, 276:14, 276:17, 276:22, 277:3, 277:8, 277:12, 277:15, 278:22, 278:25, 279:18, 280:6, 280:10, 286:18, 286:22, 286:23, 290:19, 294:7, 297:2, 297:7, 297:11, 298:4, 298:7, 298:9, 301:20
Data [2] - 109:17, 109:18
data-related [2] - 130:4, 130:5
database [9] - 221:16, 221:24, 222:3, 222:5, 222:7, 222:9, 240:2, 240:5, 244:13
databases [5] - 220:22, 220:24, 221:21, 242:20, 242:23
dataset [2] - 221:13, 221:14
date [14] - 9:24, 11:1, 11:5, 31:1, 31:16, 36:11, 69:10, 87:10, 113:10, 113:21, 113:22, 240:14, 245:9
Date [1] - 309:1
dated [13] - 26:23, 28:22, 43:6, 49:24, 51:13,

69:4, 73:15, 115:16, 120:20, 121:7, 185:16, 212:4, 234:4
dates [2] - 31:15, 43:10
Dave's [2] - 157:25, 158:1
Davidson [1] - 274:1
DAY [1] - 6:1
Daylight [1] - 73:16
days [15] - 139:3, 139:11, 142:18, 143:5, 226:16, 257:10, 268:8, 271:22, 279:12, 291:22, 295:20, 298:17, 298:20, 299:2, 299:9
Days [1] - 1:8
DC [11] - 1:13, 1:23, 2:4, 2:8, 2:24, 3:15, 3:18, 3:21, 3:24, 4:4, 4:7
DCDC [2] - 10:20, 11:6
de [1] - 146:15
deadline [9] - 113:17, 113:18, 113:20, 117:18, 118:13, 123:10, 202:9, 202:20, 257:25
deadlines [2] - 42:2, 42:3
deal [10] - 14:11, 28:16, 31:25, 32:1, 41:3, 62:10, 92:25, 153:2, 186:18, 206:1
dealing [7] - 9:1, 33:9, 60:2, 67:22, 68:7, 129:20, 163:16
dealt [3] - 59:10, 138:10, 139:8
debate [2] - 64:11, 170:13
decade [5] - 139:9, 139:13,

177:17, 177:21, 181:15
decades [2] - 199:23, 204:8
December [4] - 27:20, 113:21, 114:2, 114:22
decent [2] - 30:6, 30:7
decide [3] - 64:21, 134:7, 177:9
decided [3] - 64:10, 80:4, 196:13
decidedly [1] - 18:14
deciding [1] - 64:6
decision [6] - 24:10, 24:11, 24:12, 65:18, 209:12, 255:8
decision-making [1] - 255:8
declaratory [2] - 10:19, 151:18
decline [1] - 152:16
decrease [2] - 208:25, 209:7
decreased [3] - 174:24, 208:22, 271:9
decreasing [5] - 134:25, 135:17, 135:18, 135:19, 209:19
decree [1] - 21:5
dedicated [1] - 196:7
deep [1] - 205:7
defend [16] - 66:25, 68:4, 79:4, 80:22, 82:11, 102:23, 103:1, 103:4, 103:14, 103:16, 125:9, 182:4, 182:8, 183:20, 183:21
DEFENDANT

concordance                                                                              Day 9_324

S [1] - 4:8
defendants [6] -
7:6, 7:8, 7:14,
7:15, 215:9,
215:10
defended [2] -
80:19, 122:23
defending [2] -
70:24, 72:7
defense [5] -
67:4, 103:3,
103:18, 123:1,
208:8
defenses [1] -
82:10
defensible [2] -
122:16, 122:20
define [2] -
204:12, 254:19
defined [3] -
132:7, 148:21,
163:5
definitely [6] -
118:1, 124:9,
163:10, 258:2,
293:18, 295:12
definitions [2] -
256:18, 256:19
degree [5] -
58:16, 134:14,
161:21, 280:22,
291:14
delay [3] - 31:19,
117:15, 227:7
delayed [1] -
30:10
delicate [4] -
41:2, 49:12,
79:6, 79:24
deliver [1] -
268:24
deliverables [1]
- 259:9
delivered [1] -
268:25
delivering [1] -
259:11
demanding [1] -
231:12
demands [1] -
15:2
Democrat [5] -
91:18, 98:22,

99:9, 99:16,
99:18
democratic [1] -
179:19
Democratic [6] -
18:16, 101:17,
102:6, 127:17,
137:1, 179:18
demographer
[23] - 44:1,
58:18, 58:19,
67:15, 67:17,
68:6, 68:12,
108:9, 137:6,
140:3, 140:8,
140:14, 140:17,
140:22, 141:1,
216:14, 218:24,
219:8, 274:2,
277:5, 279:6,
293:5, 295:23
demographer
s [3] - 36:4,
138:2, 140:10
Demographic
[2] - 223:24,
224:3
demographic
[24] - 16:13,
131:8, 217:13,
220:22, 222:7,
223:15, 231:19,
245:10, 249:16,
250:2, 252:8,
253:3, 258:5,
258:8, 258:11,
258:14, 261:4,
265:7, 268:14,
276:22, 282:7,
282:23, 286:18,
294:24
demographics
[1] - 270:16
demography [5]
- 216:24, 219:5,
220:1, 220:3
demonstrative
[7] - 12:25, 13:4,
13:17, 158:10,
285:3, 285:6,
285:10
Demonstrativ
e [1] - 14:14
deny [2] - 190:6,
200:2

Department [27]
- 3:13, 3:17,
3:20, 3:23, 4:3,
4:6, 10:23, 11:3,
11:7, 11:15,
11:24, 12:3,
13:18, 14:20,
14:25, 15:2,
15:3, 17:13,
17:16, 26:1,
60:12, 151:3,
151:16, 209:6,
209:18, 221:6,
307:25
deposition [17] -
23:3, 129:11,
131:25, 143:9,
177:23, 179:22,
188:14, 193:25,
194:12, 198:19,
199:16, 201:2,
297:21, 299:19,
300:9, 300:14,
302:24
derived [1] -
243:2
describe [4] -
74:12, 75:2,
116:9, 269:24
described [6] -
24:9, 110:1,
144:18, 144:20,
156:14, 186:24
describes [1] -
85:17
describing [7] -
39:25, 40:2,
47:12, 59:24,
77:21, 84:3,
205:4
designed [6] -
75:11, 75:12,
119:20, 127:13,
136:24
designing [1] -
233:4
desire [2] -
108:20, 301:17
desired [1] -
40:21
despite [1] -
122:14
detail [1] - 8:15
detailed [4] -
52:25, 53:21,

53:22, 53:25
details [5] - 11:16,
55:9, 57:21,
70:13, 273:5
determine [2] -
25:4, 89:11
develop [11] -
164:24, 165:1,
201:23, 217:13,
217:18, 218:20,
219:8, 219:19,
239:22, 250:19,
268:21
developed [4] -
219:20, 220:25,
237:20, 239:20
developing [10] -
66:16, 67:19,
67:23, 72:3,
218:12, 219:5,
243:16, 255:8,
280:20, 281:14
development
[14] - 71:19,
71:20, 72:16,
76:21, 213:5,
217:10, 217:21,
217:23, 218:6,
219:9, 255:9,
256:6, 258:14,
267:6
deviate [1] -
162:12
deviation [25] -
228:15, 228:17,
234:16, 234:18,
244:25, 245:11,
256:22, 256:25,
257:5, 257:18,
257:23, 258:15,
258:23, 267:13,
267:19, 267:21,
268:2, 275:14,
275:19, 276:2,
283:12, 283:19,
284:2, 284:4
deviations [3] -
256:14, 256:17,
276:18
devise [2] - 153:9
dialed [1] - 274:7
Diana [1] - 2:23
Dickinson [6] -
47:16, 133:15,
157:1, 284:18,
285:16, 285:20

dictated [2] -
85:11, 85:13
DID20 [1] -
240:21
didn't.. [1] -
196:15
died [1] - 227:4
difference [10] -
14:12, 24:1,
52:2, 62:2, 99:6,
155:20, 222:19,
232:9, 271:7,
279:16
differences [4] -
17:19, 132:23,
232:14, 232:15
different [45] -
14:10, 33:19,
35:17, 60:5,
61:15, 65:13,
67:25, 68:1,
71:15, 79:25,
109:10, 110:4,
110:5, 116:5,
122:24, 122:25,
128:2, 164:21,
177:5, 177:11,
194:1, 197:4,
206:2, 207:7,
221:3, 222:17,
228:7, 231:17,
232:8, 237:25,
244:6, 245:20,
246:9, 255:23,
256:2, 256:15,
256:17, 256:18,
259:21, 276:1,
284:1, 291:5,
292:16, 293:8,
308:1
differential [2] -
31:24, 277:24
differentiate [1]
- 260:5
difficult [7] -
62:10, 66:5,
76:10, 103:14,
104:7, 183:23,
235:16
difficulty [4] -
31:25, 65:2,
65:4, 137:9
diligence [1] -
279:14
dilution [1] -
62:25

direct [10] - 46:22, 147:18, 147:20, 151:1, 156:14, 177:22, 179:5, 206:11, 288:18, 289:12

Direct [2] - 6:7, 6:10

DIRECT [2] - 8:4, 216:2

directed [2] - 130:15, 303:19

directing [1] - 296:18

direction [35] - 142:5, 142:8, 142:9, 142:13, 143:1, 233:24, 234:17, 235:20, 245:2, 248:7, 248:24, 250:17, 250:20, 251:20, 255:12, 259:13, 262:4, 264:25, 265:2, 267:7, 268:19, 286:1, 286:2, 286:4, 289:7, 292:13, 292:19, 292:21, 298:17, 299:8, 301:9, 301:18, 301:22, 301:25, 302:1

directions [3] - 228:13, 231:23, 248:21

directly [4] - 54:22, 70:4, 184:14, 191:18

director [1] - 223:14

directors [1] - 224:21

disaggregate [1] - 241:17

disaggregated [6] - 232:19, 233:3, 233:14, 278:25, 280:11, 281:6

disaggregatio n [8] - 279:2, 279:19, 279:20, 280:5, 280:14, 280:18, 280:24,

281:2

disagree [4] - 16:10, 16:12, 170:6, 185:5

disclosed [1] - 130:7

discretion [2] - 295:24, 296:11

discrimination [1] - 23:11

discuss [14] - 32:13, 40:12, 55:13, 56:5, 72:21, 202:11, 234:8, 238:9, 239:9, 247:16, 253:18, 261:23, 276:22, 277:4

discussed [13] - 39:9, 40:7, 40:14, 41:21, 136:19, 202:14, 242:2, 247:25, 277:18, 286:9, 286:12, 286:15, 286:20

discussing [6] - 107:20, 206:18, 276:17, 277:2, 277:14, 289:12

discussion [21] - 32:17, 60:10, 64:17, 64:23, 73:19, 73:25, 75:21, 80:17, 102:18, 102:21, 183:18, 183:25, 184:1, 186:21, 186:23, 187:11, 213:4, 251:5, 277:8, 277:13, 300:21

discussions [11] - 14:20, 26:1, 27:4, 58:6, 114:12, 187:9, 194:20, 213:7, 214:5, 265:19, 265:20

disliked [3] - 181:10, 181:12, 181:13

dismantle [1] - 205:2

dismantled [4] - 204:11, 204:14,

204:23, 205:13

dismantles [1] - 178:22

dismissal [1] - 23:17

display [1] - 13:8

displaying [1] - 81:21

dispute [4] - 69:17, 117:24, 145:1, 303:10

disruption [1] - 47:19

disruptions [3] - 237:10, 238:5, 238:6

disruptive [1] - 235:13

dissatisfied [1] - 178:2

Dist [1] - 243:9

distance [1] - 66:8

distinction [1] - 132:18

distinguish [1] - 259:21

distributed [2] - 51:10, 136:20

DISTRICT [2] - 1:1, 1:1

District [16] - 15:8, 16:2, 16:4, 46:9, 47:4, 54:6, 66:14, 84:22, 93:21, 135:25, 151:18, 151:19, 175:10, 209:20, 257:3

district [151] - 15:23, 16:18, 16:24, 16:25, 17:2, 17:5, 17:9, 18:13, 18:15, 20:2, 20:5, 20:15, 21:12, 21:14, 22:7, 23:10, 23:24, 24:2, 24:13, 24:14, 24:15, 32:22, 41:16, 43:20, 43:23, 44:3, 44:8, 44:12, 46:15,

48:9, 48:11, 48:12, 48:16, 49:14, 50:18, 54:7, 59:20, 60:7, 60:16, 60:18, 61:4, 62:14, 65:12, 66:24, 77:19, 83:20, 84:11, 85:5, 85:7, 85:10, 91:16, 91:19, 93:20, 96:12, 98:22, 99:9, 99:18, 99:20, 101:18, 102:21, 102:25, 103:6, 103:9, 106:14, 106:17, 106:18, 112:18, 112:19, 112:23, 116:22, 116:23, 116:25, 117:1, 117:3, 122:4, 122:5, 122:7, 132:12, 133:24, 135:21, 136:5, 136:23, 144:9, 144:10, 146:2, 146:23, 147:3, 147:8, 149:7, 149:8, 149:11, 149:20, 152:7, 152:10, 153:8, 156:1, 157:6, 159:18, 161:19, 164:23, 164:24, 169:14, 169:19, 170:9, 170:24, 176:13, 176:14, 176:19, 177:6, 177:7, 178:5, 178:17, 178:20, 178:21, 178:23, 178:24, 179:4, 181:16, 184:11, 185:23, 186:22, 188:13, 189:22, 200:18, 200:19, 204:11, 204:13, 204:14, 204:18, 204:19, 204:24, 205:3, 205:11, 205:12, 205:14, 206:10, 210:3, 210:12, 231:25, 243:8, 247:7, 247:10, 270:16

districts [63] - 19:6, 19:9, 19:12, 19:15,

19:20, 19:24, 20:20, 20:21, 20:23, 21:10, 21:12, 21:17, 21:21, 21:22, 22:11, 44:13, 58:22, 59:16, 66:18, 72:12, 76:6, 93:19, 94:25, 96:15, 96:21, 116:7, 122:1, 132:15, 132:16, 132:19, 132:23, 135:22, 147:10, 153:6, 171:1, 173:19, 173:22, 185:21, 186:6, 186:10, 186:25, 189:7, 189:8, 189:9, 205:10, 206:1, 206:5, 220:12, 226:11, 228:19, 231:6, 231:7, 232:4, 232:20, 233:16, 233:19, 233:20, 245:4, 245:5, 283:22, 292:9

dive [1] - 297:10

divide [2] - 76:10, 189:5

divided [1] - 171:1

divides [1] - 170:24

Division [6] - 3:13, 3:17, 3:20, 3:23, 4:3, 4:6

DIVISION [1] - 1:2

DOA [1] - 193:3

document [8] - 14:17, 52:2, 79:13, 165:15, 168:12, 213:1, 239:15, 275:1

DOJ [19] - 10:17, 11:13, 11:20, 13:6, 14:11, 15:15, 15:17, 16:11, 18:9, 75:18, 103:12, 120:1, 152:4, 152:12, 152:19, 208:9, 208:13, 210:5, 241:15

DOJ's [1] - 15:10
dominant [3] - 164:11, 165:8, 178:17
dominate [1] - 18:16
dominates [2] - 136:25, 137:1
done [62] - 9:18, 10:15, 11:14, 29:24, 31:17, 31:22, 34:13, 34:14, 34:15, 35:8, 35:13, 52:10, 60:20, 64:1, 66:19, 66:20, 68:3, 72:22, 76:7, 76:14, 85:16, 88:4, 92:15, 93:14, 94:3, 106:6, 113:14, 116:21, 116:22, 117:7, 117:8, 122:13, 124:6, 128:13, 138:24, 161:6, 163:22, 166:20, 177:4, 186:15, 186:17, 189:19, 198:11, 202:1, 202:2, 202:5, 205:20, 205:21, 212:25, 214:24, 214:25, 236:9, 236:10, 248:6, 270:4, 276:13, 295:17, 295:18, 299:11, 300:2
dot [1] - 158:23
dots [1] - 305:14
double [3] - 169:4, 169:12, 266:12
doubt [2] - 102:7, 183:17
dovetails [2] - 59:12, 62:19
down [46] - 11:15, 21:1, 50:3, 54:9, 54:22, 61:10, 79:21, 82:5, 83:12, 87:10, 88:7, 92:10, 92:11, 95:16, 108:12, 109:16, 118:8, 128:23,

132:10, 146:9, 157:2, 160:4, 171:12, 176:15, 178:15, 180:21, 186:8, 189:2, 208:17, 208:19, 214:10, 231:5, 238:21, 240:11, 251:7, 251:8, 257:12, 260:7, 267:25, 273:14, 273:20, 286:6, 287:17, 293:20, 305:22, 308:7
downloading [1] - 297:11
dozens [2] - 138:4, 138:5
Dr [3] - 23:16, 23:22, 223:14
draft [31] - 92:10, 114:11, 146:24, 188:21, 234:6, 234:13, 237:20, 243:18, 244:9, 244:10, 248:2, 251:17, 252:2, 252:6, 252:9, 252:15, 252:22, 252:25, 253:4, 254:18, 259:12, 259:25, 262:5, 264:23, 289:18, 291:10, 294:20, 294:22, 299:10, 305:3
Draft [2] - 74:8, 82:16
drafting [4] - 227:8, 236:5, 271:16, 305:6
drag [3] - 83:16, 146:12, 158:24
dramatic [3] - 32:22, 33:17, 152:8
dramatically [1] - 123:16
draw [53] - 54:1, 62:14, 72:10, 72:12, 77:1, 82:25, 104:3, 104:8, 104:14, 127:12, 140:8, 142:9, 144:9, 146:23, 147:3, 148:5, 153:15,

154:6, 154:10, 167:3, 170:19, 177:10, 185:22, 206:9, 206:22, 226:11, 228:7, 228:16, 228:20, 228:21, 229:12, 234:11, 245:12, 249:4, 249:8, 251:20, 256:21, 260:18, 260:20, 269:21, 270:18, 285:16, 289:22, 290:16, 290:24, 296:22, 298:15, 301:11, 301:24, 303:19, 305:3, 306:1
drawer [4] - 169:15, 169:25, 293:4, 295:23
drawing [51] - 61:4, 70:12, 81:7, 82:24, 83:22, 91:25, 92:1, 128:11, 134:22, 157:20, 169:14, 170:1, 182:1, 189:2, 205:10, 220:12, 220:14, 232:4, 249:13, 249:17, 249:20, 249:24, 250:3, 252:1, 252:5, 252:9, 252:21, 252:24, 253:4, 260:23, 261:1, 261:5, 270:10, 270:17, 274:5, 277:1, 282:1, 282:4, 282:8, 282:17, 282:20, 282:24, 286:11, 286:15, 296:7, 296:9, 296:14, 301:13, 305:18, 305:19, 305:22
drawings [1] - 188:25
drawn [22] - 57:9, 59:20, 60:18, 66:19, 78:11, 80:25, 81:8, 82:8, 85:11, 99:14, 99:15, 111:25, 122:23, 128:5, 169:18, 175:17, 213:15,

213:16, 270:7, 294:21, 306:4
draws [2] - 94:2, 213:24
drew [16] - 77:1, 98:23, 98:25, 181:23, 184:10, 206:5, 206:6, 249:10, 251:22, 269:1, 286:3, 298:16, 301:19, 303:22, 306:18
Drew [1] - 284:18
Drive [2] - 2:14, 2:21
drive [2] - 83:8, 276:5
driven [1] - 61:3
driving [1] - 213:10
drop [1] - 160:4
dropped [3] - 174:21, 178:13, 178:15
drops [2] - 174:12, 174:15
drove [1] - 277:1
Drummond [11] - 27:19, 115:8, 115:18, 116:2, 117:11, 120:21, 201:11, 201:18, 202:6, 212:4
Drummond's [1] - 212:21
due [3] - 30:14, 230:3, 279:14
duly [2] - 8:3, 216:1
DUNN [1] - 166:24
Dunn [3] - 1:18, 1:19, 169:6
Durham [2] - 3:4, 3:7
during [30] - 15:6, 15:14, 21:8, 22:13, 45:4, 81:6, 81:9, 97:17, 107:22, 115:2, 123:22, 194:16, 199:2, 204:2, 219:17, 228:4, 255:9,

262:10, 262:15, 263:1, 265:5, 265:7, 265:19, 274:4, 274:18, 275:6, 276:18, 277:8, 281:12, 286:8
duty [1] - 80:3
DX [1] - 37:3
DX-262 [3] - 93:9, 93:10, 262:20
DX-263 [3] - 266:14, 266:15, 266:17
DX-264 [2] - 274:23, 275:1
DX-272 [3] - 283:2, 283:5
DX-276 [5] - 120:4, 120:5, 144:12, 282:11, 282:13
DX-277 [4] - 119:18, 119:19, 281:21, 281:23
DX-284 [1] - 229:3
DX-285 [1] - 234:1
DX-304 [2] - 13:14, 17:20
DX-31 [1] - 118:1
DX-4 [12] - 13:25, 14:2, 14:17, 17:19, 17:20, 44:10, 44:18, 45:17, 58:4, 74:5, 130:20, 154:17
DX-43 [1] - 26:21
DX-80 [3] - 51:11, 51:12, 154:16
DX-93 [2] - 272:20, 273:19
DX-98 [4] - 115:11, 115:13, 115:15, 211:25
dyslexia [1] - 87:21

**E**

e-mail [42] -

26:23, 27:18, 28:21, 29:1, 37:4, 37:10, 51:12, 51:15, 73:14, 73:25, 115:7, 115:15, 116:1, 117:11, 120:20, 120:21, 120:24, 121:6, 185:15, 187:10, 201:10, 202:6, 212:3, 212:21, 229:5, 229:6, 229:11, 232:3, 234:3, 237:3, 239:1, 251:11, 260:10, 260:15, 261:13, 266:5, 273:17, 290:6, 293:2, 302:15

e-mails [1] - 226:5

Eagle [4] - 224:13, 224:17, 224:25, 288:2

early [12] - 27:4, 31:1, 68:17, 68:24, 140:13, 140:16, 193:21, 210:22, 211:5, 233:9, 288:3, 290:1

earthly [1] - 43:25

easier [5] - 13:15, 13:16, 24:16, 78:22, 87:19

easiest [1] - 115:6

easily [3] - 43:9, 163:22, 229:25

eastern [4] - 17:9, 45:2, 46:13, 77:19

Eastern [2] - 69:12, 266:3

easy [4] - 229:8, 229:17, 258:16

eating [1] - 308:16

ecological [2] - 129:21, 129:23

edge [7] - 121:25, 122:1, 122:3, 122:4, 122:5, 122:6, 176:5

effect [5] - 18:5, 59:3, 131:16, 152:23, 209:14

effective [3] - 178:20, 178:23, 223:4

effort [7] - 26:13, 27:2, 28:12, 29:11, 36:10, 268:21, 291:15

efforts [2] - 29:16, 291:14

either [18] - 9:20, 46:4, 61:3, 75:18, 80:19, 80:23, 82:11, 105:12, 105:22, 125:7, 125:9, 170:2, 192:24, 203:25, 213:23, 263:5, 275:8, 276:23

elbow [1] - 237:14

elect [5] - 66:24, 99:8, 102:5, 205:15

elected [6] - 49:12, 49:17, 100:8, 101:16, 101:18, 200:13

electeds [1] - 71:1

election [18] - 9:20, 18:10, 20:5, 24:24, 25:1, 64:13, 64:15, 73:5, 91:11, 101:14, 179:5, 200:6, 221:20, 235:16, 235:17, 246:1, 246:7, 280:8

elections [4] - 30:21, 31:4, 179:18, 179:20

electorate [1] - 209:15

electronic [1] - 105:22

elimination [1] - 61:24

elsewhere [2] - 32:18, 278:6

Elton [1] - 4:9

embarking [1] - 296:14

embodied [3] - 57:16, 82:9, 107:25

embody [1] - 79:24

embodying [1] - 74:14

emphasis [1] - 119:8

emphasize [3] - 13:6, 40:23, 278:2

emphasized [1] - 114:7

employ [1] - 122:9

employed [2] - 187:22, 216:15

employment [1] - 217:2

enables [1] - 269:7

end [31] - 15:1, 17:9, 18:23, 28:19, 31:5, 46:22, 64:20, 66:23, 73:12, 77:19, 83:22, 85:6, 85:15, 86:19, 114:21, 136:16, 143:21, 161:2, 175:15, 175:16, 177:20, 177:21, 196:14, 209:5, 229:6, 233:10, 257:3, 277:25, 287:20, 299:11

ended [8] - 17:20, 74:23, 124:14, 141:8, 141:10, 176:6, 203:20, 279:15

ends [1] - 270:14

enforced [1] - 60:13

engage [2] - 67:13, 67:14

engaged [13] - 8:16, 8:25, 27:8, 28:7, 28:10, 29:19, 31:8, 43:12, 62:8, 67:15, 131:12, 162:3, 209:22

engagement [4] - 27:1, 28:23, 29:2, 29:8

engaging [1] - 29:10

enhancement [2] - 253:14, 266:18

enhancements [3] - 217:18, 217:20, 248:5

enhancing [1] - 268:20

enjoyed [1] - 223:5

enjoys [1] - 296:20

enormous [2] - 133:8, 136:1

entire [9] - 47:14, 57:16, 114:1, 124:8, 217:11, 247:5, 247:7, 266:25, 301:21

entirely [1] - 14:10

entitled [4] - 21:14, 22:6, 25:15, 309:5

entity [1] - 79:7

environment [1] - 255:6

envisioned [1] - 206:21

equal [4] - 132:15, 132:16, 236:15, 268:10

equality [1] - 223:9

equalize [1] - 257:22

equalized [1] - 268:7

equally [1] - 49:15

era [3] - 35:21, 114:8, 153:6

Eric [2] - 299:23, 300:7

error [2] - 217:21, 219:9

Errors [1] - 217:25

ESRI [6] - 218:24, 219:3, 219:7, 219:11, 219:17, 219:21

essentially [14] - 17:3, 29:15, 40:6, 70:6, 82:12, 82:23, 84:22, 106:17, 147:4, 189:12, 205:4, 221:2, 242:12, 291:20

establish [1] - 65:21

estimate [4] - 220:19, 228:3, 280:2, 308:1

Estimates [5] - 217:4, 217:7, 217:15, 218:2, 218:9

estimates [5] - 217:11, 217:17, 219:6, 219:8, 241:16

ET [2] - 1:4, 1:6

ethical [1] - 41:2

ethnicity [4] - 221:17, 242:15, 244:8

evening [3] - 128:23, 214:25, 225:21

event [1] - 161:17

events [1] - 125:1

eventually [4] - 12:9, 83:19, 112:22, 118:11

evidence [6] - 23:22, 26:9, 62:15, 62:18, 129:20, 165:16

evolution [3] - 256:13, 291:16, 301:9

evolutionary [1] - 293:10

evolved [2] - 267:6, 267:9

exact [10] - 36:11, 43:10, 45:25, 48:7, 113:10, 222:1, 231:8, 269:16, 269:17

exactly [23] - 11:1, 25:7, 52:23, 68:24, 88:2, 113:17, 115:9, 148:11, 148:12, 148:13, 163:1, 171:7, 171:18, 171:19, 180:4, 189:18, 197:10, 197:11, 199:12, 207:11, 240:7, 290:10, 300:17

Examination [7] - 6:7, 6:8, 6:10, 6:10, 6:11, 6:11, 6:12

examination [9] - 23:4, 56:10, 64:2, 179:6, 206:12, 287:15, 289:12, 308:9

EXAMINATION [7] - 8:4, 129:8, 208:1, 210:18, 212:1, 216:2, 288:13

EXAMINATION/DIRECT [1] - 288:13

Examination/Direct [1] - 6:8

examine [1] - 124:13

examined [2] - 23:15, 293:11

example [8] - 32:3, 87:17, 97:3, 167:22, 243:9, 270:7, 304:23, 305:19

exceeded [1] - 257:9

Excel [10] - 109:9, 239:13, 244:2, 253:8, 266:15, 269:7, 269:9, 272:14, 274:23, 283:2

excel [1] - 269:12

excellent [1] - 216:11

except [3] - 30:6, 35:4, 35:15

exception [3] - 54:2, 60:22, 171:9

excess [1] - 21:7

excluded [2] - 125:25, 126:25

excuse [8] - 9:22, 18:24, 19:1, 21:18, 185:12, 200:21, 210:23, 281:20

excused [2] - 214:18, 225:7

execute [2] - 141:12, 217:16

executed [1] - 29:2

exercise [5] - 46:18, 160:1, 161:17, 278:22, 279:11

exercising [2] - 295:24, 296:10

Exhibit [3] - 9:21, 289:9, 294:18

exhibit [18] - 12:13, 12:25, 14:13, 16:7, 45:16, 48:18, 89:1, 94:16, 96:3, 109:12, 158:11, 165:13, 165:15, 285:4, 285:6, 285:10, 285:12, 293:20

exhibits [1] - 211:10

exist [1] - 204:21

existed [6] - 14:18, 25:11, 26:8, 44:23, 75:14, 95:5

existing [3] - 21:12, 98:12, 146:1

exists [1] - 116:10

exogenous [1] - 64:21

expanding [1] -

160:25

expansions [1] - 21:10

expect [2] - 12:8, 177:17

expectation [3] - 32:2, 98:1, 234:17

expectations [3] - 32:25, 42:12, 42:14

expected [4] - 96:8, 98:17, 197:20, 202:4

expecting [1] - 178:1

expensive [1] - 235:17

experience [2] - 292:17, 296:4

expert [13] - 23:4, 23:14, 63:4, 63:12, 130:3, 130:5, 130:7, 130:12, 216:17, 219:20, 223:2, 279:16, 300:20

expert-level [1] - 219:20

expertise [5] - 29:16, 63:12, 157:19, 219:19, 302:2

experts [6] - 217:10, 219:25, 223:1, 223:4, 299:18, 299:21

explain [12] - 29:22, 29:23, 63:17, 82:7, 93:16, 103:25, 222:19, 241:12, 242:10, 242:18, 246:17

explaining [1] - 142:23

explains [1] - 306:18

explanation [1] - 82:12

explore [3] - 167:2, 167:9, 228:18

explored [1] -

237:25

explorer [1] - 296:6

exposes [1] - 206:7

express [3] - 48:19, 101:19, 212:21

expressed [1] - 200:3

expressing [2] - 116:4, 117:12

extend [2] - 119:14, 124:1

extensively [1] - 286:25

extent [7] - 25:17, 63:2, 81:4, 107:3, 110:11, 119:7, 287:10

external [1] - 189:7

extra [1] - 287:20

extreme [1] - 136:12

extremely [11] - 22:23, 90:5, 90:6, 91:5, 102:5, 133:10, 138:10, 143:2, 168:11, 248:6, 263:13

eyes [5] - 9:22, 245:12, 245:13, 255:6

**F**

face [1] - 123:2

faced [1] - 67:2

fact [19] - 11:17, 16:6, 30:3, 47:12, 53:22, 54:15, 59:23, 65:10, 66:16, 76:25, 85:11, 91:18, 127:20, 130:7, 130:10, 136:2, 191:17, 203:12, 301:19

facto [1] - 146:15

factor [9] - 249:13, 249:24, 252:5, 252:24,

261:1, 282:4, 282:20, 286:11, 286:14

facts [3] - 64:3, 64:24, 131:18

factual [1] - 151:22

fair [8] - 131:9, 141:13, 144:23, 155:9, 164:13, 291:6, 295:25, 299:11

FairLines [3] - 232:19, 233:3, 233:13

fairly [6] - 9:5, 29:24, 41:15, 142:8, 145:23, 155:16

faithfully [1] - 307:20

fake [1] - 77:15

falls [1] - 63:11

false [2] - 33:1, 78:15

familiar [13] - 131:7, 131:10, 131:11, 139:7, 139:8, 157:22, 157:25, 158:1, 169:20, 169:22, 172:8, 219:18, 304:21

familiarizing [1] - 289:6

family [7] - 139:22, 227:2, 227:3, 227:6, 228:2, 296:23, 296:25

fanning [1] - 134:24

far [16] - 16:13, 27:23, 28:2, 45:2, 83:4, 83:17, 84:8, 85:15, 87:10, 87:19, 168:4, 193:9, 262:6, 278:19, 298:9

Farr [3] - 2:17, 2:23, 3:10

farsighted [1] - 168:9

farthest [1] - 146:16

fashion [5] - 58:23, 61:5, 62:14, 72:20, 119:14

fashioned [1] - 119:13

fast [8] - 83:20, 143:3, 234:12, 255:5, 265:21, 270:10, 291:14, 305:2

fast-moving [2] - 255:5, 265:21

faster [1] - 269:13

fastest [1] - 295:16

father [2] - 227:2, 296:23

fault [1] - 175:8

favorability [1] - 124:21

favorable/ unfavorable [1] - 124:19

favorably [1] - 65:7

features [1] - 244:4

February [5] - 30:18, 30:23, 31:5, 31:13, 34:21

federal [3] - 21:6, 29:18, 187:23

Federal [1] - 240:25

feed [1] - 278:5

feedback [15] - 142:19, 188:21, 203:2, 203:4, 203:8, 203:17, 250:17, 250:19, 259:12, 264:22, 264:24, 264:25, 265:2, 286:2, 299:7

feelings [1] - 125:7

feet [1] - 236:3

fell [1] - 25:13

felt [2] - 112:24, 122:22

ferry [4] - 107:16, 107:17, 274:8, 274:11

few [14] - 9:19, 40:2, 64:3, 65:6, 114:1, 138:11, 197:6, 210:16, 215:2, 224:7, 230:22, 279:12, 287:11, 291:12

fewer [1] - 138:8

field [4] - 64:12, 223:1, 223:2

Fifth [2] - 64:16, 64:19

fifths [1] - 133:25

fight [1] - 178:6

figure [8] - 145:11, 148:23, 149:5, 167:17, 184:20, 189:19, 200:4, 269:9

figured [2] - 36:16, 125:21

file [5] - 11:6, 13:7, 242:5, 243:6, 305:16

filed [6] - 10:14, 10:17, 10:19, 10:23, 11:7, 20:16

files [1] - 229:25

filibuster [1] - 123:25

filing [1] - 31:2

fill [3] - 83:19, 83:20, 147:5

filter [1] - 294:16

final [11] - 113:9, 120:7, 144:16, 172:7, 268:22, 276:5, 278:5, 281:17, 281:24, 282:14

finalization [1] - 270:12

finalized [3] - 113:5, 114:15, 116:23

finalizing [1] - 281:15

finance [1] - 9:20

fine [9] - 54:13, 88:22, 89:4, 90:6, 106:13, 184:2, 198:20, 202:24, 287:19

finish [5] - 76:20, 196:3, 212:17, 287:6, 295:20

finished [4] - 112:6, 117:2, 243:18, 279:2

FIPS [4] - 54:10, 240:25, 241:8, 241:9

firm [5] - 27:13, 28:11, 69:8, 81:5, 226:7

first [78] - 8:3, 11:5, 22:10, 26:25, 27:12, 28:21, 30:5, 30:17, 30:18, 30:22, 35:11, 35:24, 36:12, 39:12, 43:19, 48:22, 50:8, 52:20, 57:21, 58:6, 58:9, 68:20, 68:21, 69:16, 69:20, 70:1, 70:16, 70:17, 72:8, 73:24, 74:3, 77:1, 81:4, 87:5, 94:10, 100:23, 109:17, 111:6, 114:6, 114:7, 114:17, 123:19, 137:3, 138:25, 139:15, 139:23, 144:21, 144:23, 145:18, 146:24, 151:13, 189:13, 189:17, 194:6, 197:7, 216:1, 217:2, 221:4, 221:9, 225:20, 229:5, 229:16, 230:22, 233:24, 235:9, 235:25, 240:21, 248:8, 284:14, 288:20, 291:15, 291:18, 291:22, 291:23, 294:22, 295:5, 301:10

first-step [1] -

58:9

fit [1] - 193:17

fitting [1] - 281:2

five [5] - 21:1, 22:1, 50:2, 300:15, 307:15

fix [2] - 194:17, 194:18

fixed [2] - 111:14, 200:2

flag [2] - 243:13

flew [4] - 79:21, 92:10, 180:21, 188:2

flexibility [1] - 71:4

flight [2] - 288:5, 298:21

flip [1] - 109:25

flips [1] - 62:12

floated [1] - 150:22

Floor [1] - 4:11

flop [1] - 176:5

flow [3] - 47:17, 47:18

fluid [1] - 257:24

fly [1] - 230:20

focus [6] - 59:2, 174:4, 201:10, 213:8, 258:23, 270:13

focused [5] - 111:3, 111:5, 188:13, 248:1, 258:18

focusing [2] - 111:2, 134:20

folks [4] - 134:5, 138:13, 199:21, 204:3

follow [7] - 52:22, 128:11, 180:8, 180:10, 203:13, 203:24, 285:12

follow-up [1] - 52:22

followed [2] - 242:5, 243:12

following [4] - 142:18, 145:23,

227:18

follows [12] - 8:3, 141:25, 145:15, 171:10, 182:23, 188:18, 194:13, 196:5, 198:25, 216:1, 302:25, 304:19

fond [1] - 181:11

FOR [7] - 1:11, 2:2, 2:12, 3:2, 3:12, 4:2, 4:8

for.. [1] - 307:9

foregoing [1] - 309:3

foremost [1] - 43:19

forever [1] - 119:10

form [6] - 72:20, 113:5, 119:14, 142:24, 218:16, 304:24

formal [1] - 33:10

formality [1] - 277:5

format [9] - 35:25, 36:7, 36:17, 109:5, 109:9, 138:18, 229:24, 242:3, 269:17

formatted [1] - 278:4

formatting [3] - 173:15, 239:22, 281:19

forms [2] - 46:9, 47:9

formula [2] - 152:22, 280:17

Fort [4] - 83:10, 83:11, 85:15, 162:17

forth [3] - 64:18, 190:10, 284:1

fortunate [1] - 224:13

forward [12] - 14:19, 26:3, 26:10, 28:5, 28:9, 47:20, 48:2, 68:11, 124:16, 225:6, 248:4, 291:25

concordance                                                                          Day 9 _ 330

forwarding [2] - 28:23, 120:21
fought [1] - 178:3
Foundation [2] - 4:21, 4:24
foundation [2] - 15:12, 291:16
four [65] - 20:21, 21:1, 30:16, 30:21, 35:15, 58:22, 58:25, 66:17, 70:18, 143:5, 147:10, 151:25, 154:2, 163:20, 186:25, 228:19, 232:20, 233:16, 233:19, 233:20, 233:22, 236:6, 236:11, 237:11, 238:9, 238:12, 239:9, 243:11, 243:13, 243:24, 244:11, 245:4, 246:13, 246:16, 246:17, 247:9, 247:14, 248:19, 249:5, 249:20, 249:21, 249:25, 250:3, 254:18, 254:21, 263:25, 271:9, 271:12, 289:12, 289:17, 289:23, 290:21, 291:19, 292:16, 293:13, 293:23, 295:20, 298:17, 299:1, 301:11, 301:18, 301:19, 301:24, 303:17
Fourteenth [1] - 23:10
fourth [1] - 231:8
fragmentation [1] - 166:3
fragmenting [1] - 163:19
frame [1] - 247:6
frankly [2] - 41:18, 185:1
free [2] - 56:2, 56:4
frequently [5] - 221:18, 222:25, 229:23, 231:11, 233:8

fresh [1] - 152:9
Friday [4] - 226:22, 229:5, 273:7, 273:10
friendly [1] - 36:17
friends [1] - 219:25
Friendswood [1] - 150:10
front [6] - 41:9, 49:10, 133:20, 226:1, 239:15, 253:10
frustrating [1] - 50:25
full [1] - 119:6
fully [2] - 70:19, 177:17
function [3] - 175:22, 176:18
functionality [3] - 244:2, 269:6, 269:7
funny [2] - 83:9, 128:17
furthest [3] - 84:9, 176:3, 176:4
future [2] - 67:10, 91:25

**G**

Gaber [5] - 1:11, 6:8, 6:10, 129:10, 307:11
GABER [81] - 13:11, 15:9, 25:16, 63:2, 65:8, 129:7, 129:9, 130:15, 130:18, 130:20, 130:23, 141:19, 141:21, 141:24, 143:8, 144:12, 144:13, 145:13, 147:15, 154:15, 154:18, 157:10, 157:14, 157:17, 158:10, 158:14, 158:15, 165:12, 165:17, 166:22, 166:25, 167:1, 169:5, 169:7,

170:15, 170:17, 171:12, 171:13, 171:22, 171:24, 172:16, 182:10, 182:17, 183:8, 185:13, 185:14, 187:25, 188:1, 188:16, 190:1, 194:11, 196:2, 196:4, 196:19, 196:20, 198:21, 198:23, 199:15, 201:9, 201:13, 207:20, 207:23, 214:9, 214:19, 225:7, 287:4, 287:25, 288:14, 289:8, 289:10, 293:20, 293:21, 302:23, 303:9, 304:17, 305:9, 306:20, 306:25, 307:8, 307:23, 308:8
gain [4] - 48:13, 53:12, 99:12, 156:15
Gallagher [3] - 2:17, 2:23, 3:10
Galv [1] - 243:9
Galveston [139] - 4:12, 5:3, 8:12, 8:17, 8:25, 11:8, 11:16, 12:17, 14:3, 17:9, 17:24, 19:5, 20:23, 21:6, 21:16, 32:2, 32:13, 32:18, 32:21, 36:9, 36:13, 36:22, 37:17, 39:23, 40:5, 41:16, 44:5, 45:2, 52:16, 59:15, 59:18, 60:1, 64:24, 68:22, 69:11, 73:18, 74:4, 74:8, 78:8, 80:18, 83:1, 84:24, 95:1, 95:2, 95:5, 96:14, 109:17, 113:25, 115:22, 118:12, 119:21, 122:10, 123:11, 130:25, 131:8, 131:14, 131:20, 131:25, 132:8,

133:17, 133:19, 134:4, 134:19, 135:1, 136:18, 142:5, 142:11, 143:24, 147:4, 152:25, 153:1, 153:4, 165:19, 179:16, 180:21, 181:16, 185:7, 191:25, 193:6, 208:7, 208:14, 210:3, 221:25, 222:2, 225:15, 226:11, 226:23, 227:8, 230:8, 231:9, 231:18, 232:4, 236:1, 237:4, 240:8, 240:16, 241:2, 241:10, 243:10, 251:4, 251:17, 252:15, 253:20, 255:10, 255:15, 259:9, 259:14, 259:18, 260:2, 260:14, 260:18, 261:7, 261:19, 261:24, 263:1, 265:6, 272:10, 273:6, 274:5, 281:23, 287:21, 288:20, 292:18, 294:8, 295:2, 296:2, 296:5, 296:13, 298:18, 299:15, 299:25, 300:12, 301:16, 303:3, 303:4, 304:2, 304:10
GALVESTON [2] - 1:2, 1:6
games [1] - 61:25
gap [1] - 47:15
gather [3] - 187:9, 197:20, 290:23
gathered [2] - 69:22, 112:10
gauge [1] - 306:23
Gear [1] - 4:2
gears [1] - 291:17
general [10] - 18:10, 20:2, 24:24, 25:1, 45:21, 46:4, 47:24, 64:13, 179:18, 179:20

generally [6] - 12:20, 37:22, 43:11, 179:18, 179:19, 295:23
generated [1] - 240:1
generates [1] - 240:5
Geo [14] - 87:9, 95:23, 95:24, 240:21, 241:7, 259:15, 260:2, 260:14, 260:18, 260:20, 260:24, 261:2, 261:5, 267:10
geo [2] - 171:2, 241:3
Geo-DID20 [1] - 240:21
geo-ID [1] - 241:3
Geo-ID [1] - 241:7
geocoded [1] - 305:16
geocoding [3] - 299:24, 300:20
GeoDemo [5] - 216:18, 216:21, 219:23, 239:24, 240:2
GeoDemo's [2] - 269:14, 270:15
GeoDemographics [1] - 216:19
geographic [16] - 16:23, 68:10, 84:21, 133:3, 153:15, 153:17, 153:18, 157:7, 162:12, 162:15, 213:11, 219:14, 219:18, 229:25, 241:1
geographic-based [2] - 84:21, 157:7
geographical [1] - 120:6
geographically [4] - 39:22, 77:13, 153:20,

concordance

156:22

geographically-based [2] - 39:22, 156:22

geographically-oriented [1] - 153:20

geography [11] - 54:4, 76:12, 111:5, 142:5, 145:9, 221:9, 232:18, 233:7, 235:7, 243:15, 272:25

gerrymander [14] - 59:9, 62:22, 66:22, 67:6, 67:9, 163:24, 181:21, 181:24, 182:2, 182:4, 183:3, 183:6, 183:16, 183:21

gerrymandered [2] - 18:19, 26:4

gerrymandering [12] - 60:23, 62:24, 63:7, 67:2, 67:22, 72:8, 75:13, 77:9, 77:12, 119:25, 182:9, 206:8

GIS [5] - 13:8, 219:16, 219:19, 229:12, 237:25

gist [3] - 41:23, 169:23, 170:2

Giusti [54] - 42:23, 43:3, 43:13, 43:16, 44:9, 44:19, 44:24, 46:5, 71:10, 83:4, 84:3, 100:5, 105:25, 106:2, 106:13, 106:21, 107:1, 107:23, 108:3, 112:20, 113:1, 120:10, 122:5, 144:6, 144:8, 146:14, 146:19, 146:22, 146:23, 146:24, 148:20, 149:1, 154:11,

155:6, 167:15, 167:16, 176:3, 188:5, 191:3, 192:4, 192:5, 192:8, 192:9, 193:11, 194:15, 198:2, 199:7, 199:11, 199:24, 207:9, 207:11, 274:1

Giusti's [12] - 46:4, 46:25, 70:10, 83:14, 84:7, 92:5, 106:12, 106:13, 160:13, 161:5, 180:12, 305:20

given [26] - 23:5, 53:7, 66:18, 72:16, 74:10, 88:2, 99:14, 101:20, 105:12, 105:13, 124:3, 141:16, 142:21, 143:5, 163:13, 223:25, 228:7, 258:1, 265:2, 277:17, 290:24, 295:2, 295:19, 298:19, 301:16, 301:25

goal [7] - 218:19, 234:23, 257:8, 276:20, 279:4, 279:6, 305:2

goals [2] - 236:11, 279:5

God [3] - 7:23, 215:18, 215:19

Gonzalez [1] - 2:19

good-standing [3] - 223:19, 223:21, 223:23

Gordon [30] - 73:15, 115:19, 142:2, 201:15, 226:6, 226:7, 226:10, 226:13, 227:10, 227:22, 228:5, 229:5, 229:14, 233:24, 234:3, 234:10, 237:3, 237:18, 238:18, 251:3, 251:12, 265:15, 286:10, 288:19, 289:21, 290:2,

290:8, 290:25, 295:6, 300:25

government [3] - 169:15, 187:23, 295:17

graduate [1] - 9:10

grease [1] - 237:14

great [3] - 31:25, 132:24, 212:22

greater [2] - 16:13, 168:20

green [5] - 74:16, 84:4, 165:21, 173:17, 174:9

Greer [2] - 4:10, 4:14

gritty [1] - 189:2

gross [1] - 135:13

ground [2] - 76:13, 131:18

grounds [1] - 182:4

group [8] - 8:18, 59:15, 80:15, 125:22, 125:23, 136:25, 241:17, 299:18

groups [5] - 20:12, 21:11, 61:16, 221:9, 244:6

growth [7] - 132:8, 132:11, 132:14, 132:15, 132:16, 132:17, 132:22

Guerrero [38] - 211:25, 225:22, 229:2, 230:14, 235:22, 236:22, 238:15, 238:22, 239:12, 240:9, 240:18, 242:8, 243:19, 245:16, 247:19, 250:6, 250:23, 253:7, 253:19, 254:4, 255:18, 257:13, 259:4, 260:6, 261:11, 263:16, 265:11, 265:22, 266:15, 270:23, 273:15, 277:20,

278:15, 282:10, 283:1, 284:6, 285:1, 286:5

guess [10] - 45:4, 53:15, 58:5, 75:22, 81:11, 117:23, 138:9, 149:21, 162:6, 243:16

guesstimations [1] - 34:9

Gulf [1] - 157:2

guts [1] - 23:22

guy [6] - 70:2, 83:5, 83:6, 129:14, 129:19, 146:15

guys [1] - 36:3

**H**

H-o-m-e-s [1] - 306:15

half [1] - 306:25

halfway [1] - 7:11

hand [10] - 34:13, 34:15, 58:18, 58:19, 81:18, 82:6, 87:10, 109:18, 173:3, 215:13

handed [1] - 213:15

handle [1] - 32:14

handled [1] - 64:6

handwriting [3] - 274:10, 285:13, 285:15

handwritten [5] - 49:23, 53:2, 56:24, 105:1, 285:21

hangs [1] - 77:11

happy [9] - 70:22, 88:21, 89:5, 101:9, 178:12, 181:3, 195:24, 207:3, 298:8

hard [13] - 12:20, 62:9, 83:10, 83:11, 91:5, 99:14, 105:19, 145:10, 148:23,

149:4, 158:24, 196:25, 290:10

harder [1] - 90:15

Harris [7] - 3:2, 40:4, 47:16, 85:7, 85:9, 144:10, 147:7

hate [1] - 198:19

Hawaii [5] - 227:2, 227:3, 227:7, 289:2, 296:23

Haymarket [1] - 4:18

head [2] - 72:4, 194:21

header [2] - 52:6, 52:9

health [1] - 156:13

hear [9] - 42:19, 46:17, 61:21, 111:18, 112:4, 209:9, 211:2, 301:4, 301:7

heard [19] - 34:9, 112:3, 112:4, 126:2, 129:13, 139:24, 150:23, 151:1, 177:22, 190:17, 196:21, 197:3, 198:16, 208:6, 208:8, 209:5, 287:4, 289:20, 304:11

hearing [3] - 58:25, 124:22, 185:24

hearings [1] - 185:11

Heart [1] - 224:22

heat [2] - 165:19, 173:15

heavily [1] - 9:4

heavy [1] - 206:7

heck [1] - 172:10

Heights's [1] - 23:12

held [3] - 56:6, 57:17, 125:2

help [17] - 7:23, 29:23, 55:5, 55:8, 67:15,

78:21, 215:18, 215:19, 218:19, 219:8, 223:3, 243:15, 255:6, 258:16, 292:7, 296:6, 303:4

helped [2] - 220:7, 260:4

helpful [3] - 157:18, 255:5, 256:16

Henry [84] - 27:19, 38:18, 38:25, 39:14, 39:17, 58:10, 71:9, 71:14, 74:14, 79:17, 81:12, 82:1, 82:2, 82:6, 85:21, 86:3, 87:3, 87:5, 100:7, 111:4, 120:25, 126:9, 126:16, 131:12, 148:4, 148:9, 148:11, 148:18, 149:1, 149:11, 149:20, 150:5, 150:20, 150:23, 151:12, 153:12, 154:5, 159:20, 162:25, 163:6, 166:16, 167:2, 167:8, 180:22, 181:2, 181:17, 182:2, 182:24, 184:2, 184:18, 185:2, 185:6, 185:16, 186:5, 187:21, 188:8, 188:11, 189:12, 189:23, 190:3, 190:10, 190:19, 193:25, 194:16, 194:19, 194:21, 195:2, 196:8, 197:21, 199:25, 200:11, 206:16, 206:20, 210:22, 211:5, 213:5, 213:8, 213:14, 213:15, 302:21, 302:24, 303:10, 303:15

Henry's [8] - 79:13, 82:13, 145:23, 150:19, 154:1, 159:15, 161:18, 201:18

Herz [2] - 4:10, 4:14

hide [1] - 166:6

hides [2] - 17:6, 166:12

high [6] - 132:20, 142:9, 175:16, 257:3, 269:9, 277:25

high-level [1] - 142:9

higher [1] - 175:9

highest [7] - 136:21, 175:3, 247:3, 247:10, 254:14, 271:5, 299:12

highlight [1] - 256:12

highlighted [9] - 243:23, 244:21, 245:7, 245:11, 255:1, 255:2, 256:9, 256:23, 258:25

highlighting [2] - 276:5, 278:3

highly [1] - 179:9

highway [1] - 171:10

Highway [3] - 3:3, 3:6, 4:18

Hilary [1] - 3:2

hired [1] - 137:7

Hispanic [56] - 16:3, 16:9, 16:21, 18:15, 20:14, 22:3, 22:4, 22:8, 22:15, 23:2, 23:20, 24:18, 24:22, 24:23, 25:12, 26:7, 133:10, 133:12, 134:19, 135:17, 135:18, 136:20, 165:10, 166:5, 166:11, 166:20, 168:13, 168:14, 168:20, 169:8, 169:9, 173:8, 174:24, 177:17, 177:18, 178:15, 185:4, 208:24, 209:7, 209:16,

209:19, 241:20, 241:21, 242:6, 243:1, 276:11, 294:11, 294:12

Hispanics [2] - 24:25, 165:11

Hispanics' [1] - 25:5

history [3] - 224:12, 297:13, 301:16

hit [1] - 11:1

Hitchcock [1] - 133:16

Hobby [2] - 288:6, 307:4

hold [1] - 209:25

holding [3] - 23:17, 76:6, 200:23

holds [1] - 17:9

holistically [1] - 302:18

Holmes [75] - 48:4, 48:7, 49:20, 50:5, 50:10, 51:13, 51:16, 52:21, 52:22, 53:10, 55:10, 55:13, 55:21, 56:25, 57:13, 57:20, 66:24, 71:11, 76:16, 76:23, 100:3, 100:13, 100:16, 100:24, 101:5, 102:3, 102:13, 103:21, 104:8, 104:18, 105:24, 107:17, 107:22, 108:4, 108:8, 110:25, 111:19, 120:22, 121:20, 125:25, 126:4, 126:11, 126:22, 126:25, 127:7, 127:19, 128:1, 143:15, 167:23, 168:22, 170:20, 175:15, 175:20, 176:15, 176:21, 177:23, 184:13, 191:18, 192:18, 192:21, 193:2, 193:9, 193:15, 200:13, 200:21, 207:13,

273:12, 274:7, 274:17, 284:23, 285:13, 285:22, 285:23, 286:1, 306:11

Holmes's [18] - 49:23, 53:2, 55:1, 75:20, 77:1, 105:1, 107:24, 126:17, 127:14, 133:22, 141:15, 273:25, 277:7, 284:11, 285:2, 285:11, 305:23, 306:17

Holt [1] - 4:17

Holtzman [18] - 4:17, 27:16, 28:10, 28:14, 29:10, 67:14, 69:8, 137:7, 140:2, 140:12, 140:16, 140:21, 201:15, 226:8, 288:19, 295:7, 298:22, 302:9

home [13] - 44:17, 180:11, 225:5, 230:20, 237:2, 287:12, 288:2, 296:24, 305:20, 305:23, 305:25, 306:17

homes [4] - 179:24, 306:7, 306:11, 306:12

homework [1] - 141:6

honest [2] - 144:1, 300:16

honestly [2] - 303:13, 305:2

Honolulu [1] - 236:8

Honor [41] - 7:5, 7:15, 7:24, 12:24, 15:9, 19:25, 25:16, 31:2, 56:9, 56:18, 63:2, 65:8, 65:14, 65:25, 90:16, 109:13, 129:7, 130:16, 182:13, 207:20, 207:21, 210:23, 211:23, 214:9, 214:11,

214:14, 214:16, 214:19, 215:6, 285:3, 287:4, 287:10, 287:18, 287:19, 287:22, 288:11, 306:20, 307:10, 307:14, 307:23, 308:19

HONORABLE [2] - 1:3, 1:8

honored [3] - 58:23, 284:24, 285:23

hook [1] - 41:17

hope [3] - 35:7, 35:8

hoped [1] - 118:20

hopeful [1] - 58:25

hopefully [3] - 33:6, 35:6, 175:11

hopes [1] - 70:24

hoping [2] - 30:1, 120:2

Horn [1] - 38:19

host [1] - 294:7

hostile [1] - 92:2

hour [4] - 228:3, 228:4, 290:8, 306:25

hour-long [2] - 228:4, 290:8

hours [11] - 7:6, 7:7, 7:8, 7:9, 147:21, 214:13, 291:12, 295:20, 299:23, 300:12, 300:17

house [23] - 43:20, 43:21, 43:22, 44:3, 44:4, 44:5, 44:16, 70:10, 83:8, 83:14, 84:7, 89:16, 111:15, 112:17, 146:8, 146:12, 160:13, 160:15, 160:16, 189:15, 189:18, 189:22, 194:17

House [2] - 231:4,

297:23
households [1] -
218:17
houses [3] - 70:8,
146:3, 149:4
Houston [6] -
85:7, 147:7,
170:25, 177:7,
304:7, 305:22
huge [2] - 103:5,
132:12
hundred [1] -
220:20
HVAP [1] -
242:17
hypothetical [1]
- 24:16

**I**

I-45 [1] - 146:7
ID [2] - 241:3,
241:7
idea [35] - 30:7,
31:10, 42:8,
43:25, 48:20,
57:15, 63:15,
66:3, 68:7, 85:3,
118:24, 118:25,
131:22, 138:1,
148:7, 148:17,
148:18, 149:24,
150:5, 152:21,
161:18, 176:19,
183:22, 187:8,
187:17, 192:11,
193:17, 202:16,
212:24, 213:11,
214:2, 214:4,
286:3, 302:10,
302:22
ideas [6] - 34:7,
67:18, 134:6,
142:1, 142:10,
291:18
identified [2] -
149:1, 283:22
identifier [2] -
76:13, 241:9
identifiers [1] -
241:2
identify [2] -
149:3, 270:13
identifying [2] -
54:10, 272:25

identity [2] -
304:21, 305:4
ignore [1] -
126:10
imagine [1] -
24:15
immediately [5]
- 36:24, 68:17,
85:8, 114:5,
135:15
impeaching [1] -
182:16
impeachment
[4] - 182:14,
182:20, 196:18
imperative [2] -
62:6, 103:3
implement [1] -
235:18
implementing
[2] - 148:2, 148:3
important [20] -
10:16, 16:15,
36:23, 41:7,
44:17, 61:9,
64:23, 72:6,
99:10, 126:5,
177:1, 177:10,
191:22, 233:6,
235:6, 235:9,
244:23, 247:4,
255:7, 306:7
importantly [3] -
60:4, 70:12,
232:7
impossible [2] -
58:3, 210:4
impressed [1] -
131:14
impression [7] -
65:20, 163:6,
184:2, 185:22,
185:25, 190:3,
269:20
improper [1] -
182:20
improve [2] -
254:20, 258:2
improvement
[1] - 254:17
improvements
[2] - 217:18,
217:20
inability [2] -

30:6, 151:22
inaccurate [1] -
185:25
inappropriate
[1] - 125:10
inch [1] - 283:19
inclined [1] -
56:11
include [4] -
110:18, 126:4,
228:13, 294:10
included [4] -
103:22, 104:1,
126:5, 281:19
includes [4] -
74:15, 221:2,
221:8, 221:14
including [2] -
223:12, 236:7
inconsistent [1]
- 198:22
incorporate [1] -
76:15
incorrectly [3] -
191:6, 191:9,
191:11
increase [5] -
18:5, 18:12,
155:14, 160:20,
177:18
increased [1] -
208:24
increases [1] -
133:11
increasing [8] -
16:2, 135:16,
135:18, 135:19,
209:15, 209:21,
209:23, 210:1
incredible [1] -
178:6
incredibly [4] -
35:2, 66:4,
71:21, 126:12
incumbencies
[1] - 121:18
incumbency [2]
- 305:1, 305:15
incumbent [2] -
121:22, 304:22
incumbents [4] -
179:25, 305:5,
305:14, 305:17

indicate [2] -
97:23, 98:20
indication [1] -
184:15
indications [1] -
31:15
individual [8] -
75:5, 132:23,
145:8, 194:22,
241:2, 241:18,
273:4, 283:23
individually [1] -
42:15
individuals [2] -
41:4, 108:6
inference [3] -
129:21, 129:23,
190:24
influence [2] -
23:9, 305:6
influx [1] - 136:1
inform [2] - 41:8,
256:6
Information [2] -
218:24, 240:25
information [51]
- 34:5, 37:16,
48:21, 52:19,
53:12, 53:16,
54:24, 55:17,
55:18, 66:18,
69:22, 70:7,
83:15, 97:17,
99:22, 110:7,
110:19, 112:11,
219:15, 219:18,
221:14, 221:16,
221:19, 228:1,
229:7, 230:1,
232:12, 237:17,
242:25, 244:17,
246:3, 248:24,
253:3, 258:9,
258:12, 262:5,
268:14, 268:17,
268:23, 269:2,
269:3, 269:15,
276:9, 279:22,
279:24, 280:1,
282:7, 282:23,
290:11, 301:15,
305:5
informed [7] -
33:8, 33:15,
38:11, 89:14,
151:12, 182:2,

264:14
infrastructure
[3] - 220:9,
297:14, 298:15
infuriating [1] -
296:25
ingredients [1] -
280:13
initial [4] - 37:17,
48:3, 135:23,
290:2
inland [2] - 84:24,
147:5
innovative [2] -
217:13, 217:22
input [12] - 39:14,
91:23, 112:11,
118:18, 123:15,
126:10, 126:16,
126:17, 126:18,
248:3, 280:10,
302:2
inputs [1] - 280:5
inside [1] - 76:11
insight [1] - 15:15
insightful [1] -
256:16
insistent [3] -
15:17, 102:17,
115:1
inspired [1] -
220:8
instead [1] -
210:10
institution [1] -
31:23
instructed [3] -
76:25, 228:6,
234:11
instruction [7] -
71:21, 76:18,
84:23, 147:12,
159:15, 167:13,
290:24
instructions [42]
- 42:12, 54:19,
71:18, 72:15,
81:5, 82:24,
126:9, 126:15,
141:12, 142:15,
142:22, 143:10,
143:18, 143:20,
143:22, 144:3,
145:18, 145:20,

145:22, 147:23, 148:2, 148:3, 148:4, 148:5, 153:11, 159:18, 159:20, 162:24, 167:11, 180:9, 180:11, 181:6, 228:7, 234:15, 234:21, 248:11, 248:18, 260:21, 289:22, 290:4, 291:1, 292:1

**integrate** [2] - 221:19, 250:19

**integrated** [2] - 133:10, 276:9

**intellectual** [1] - 280:20

**intelligently** [1] - 33:8

**intended** [2] - 76:22, 247:15

**intent** [2] - 23:12, 62:8

**intention** [1] - 76:15

**intentional** [1] - 23:10

**intentionally** [2] - 24:8, 136:24

**Interest** [2] - 4:21, 4:24

**interest** [1] - 304:2

**interested** [5] - 30:2, 38:24, 156:6, 156:10, 269:8

**interesting** [5] - 134:18, 177:16, 220:5, 256:20, 258:20

**interestingly** [1] - 159:22

**interfere** [1] - 80:3

**interjected** [1] - 125:11

**interjecting** [1] - 193:5

**internal** [5] - 76:5, 116:7, 116:25, 189:6, 189:9

**internet** [1] -

157:23

**interpreted** [1] - 21:9

**interrupt** [1] - 178:8

**interrupted** [1] - 210:13

**intimately** [2] - 9:6, 91:22

**introduce** [1] - 8:9

**introduced** [1] - 225:13

**Inventory** [1] - 115:22

**invite** [7] - 38:13, 43:1, 69:3, 223:2, 250:10, 265:14, 265:25

**invited** [3] - 222:16, 222:20, 223:6

**inviting** [2] - 27:19, 238:17

**involved** [10] - 9:6, 9:16, 10:18, 22:16, 68:15, 108:2, 137:17, 221:18, 289:25, 301:12

**involvement** [3] - 220:11, 220:14, 220:18

**ish** [1] - 114:21

**island** [1] - 77:19

**Island** [23] - 15:22, 17:9, 39:23, 41:15, 44:5, 44:6, 45:3, 82:25, 83:1, 83:6, 84:14, 84:15, 133:17, 133:19, 135:2, 143:24, 146:20, 155:8, 155:9, 185:7

**islands** [5] - 144:4, 144:9, 145:24, 146:5, 160:8

**isolated** [1] - 145:11

**isolating** [1] - 22:9

**issue** [26] - 17:7, 19:7, 23:19, 26:3, 26:6, 32:10, 32:13, 33:9, 48:1, 56:5, 59:16, 64:7, 65:9, 65:11, 65:13, 65:19, 67:22, 68:8, 77:9, 119:25, 122:3, 122:12, 177:3, 193:13, 304:25

**issues** [6] - 16:15, 75:13, 80:9, 130:4, 130:6, 201:23

**issuing** [1] - 123:4

**item** [1] - 284:14

**iteration** [1] - 177:24

**iterative** [1] - 281:1

**itself** [3] - 25:18, 34:6, 188:25

## J

**jagged** [1] - 84:6

**January** [1] - 31:20

**Jarmin** [1] - 223:14

**Jason** [8] - 69:5, 69:6, 69:7, 229:11, 234:3, 234:5, 238:17, 251:2

**Jay** [1] - 115:18

**Jayaraman** [1] - 3:20

**Jed** [1] - 274:1

**Jeff** [1] - 69:5

**JEFFREY** [1] - 1:8

**Jersey** [1] - 30:18

**Joaquin** [1] - 2:19

**job** [4] - 29:25, 122:21, 229:17, 235:15

**Joe** [2] - 261:14, 274:1

**John** [1] - 4:18

**join** [1] - 239:5

**joining** [1] - 92:14

**Jordan** [1] - 4:9

**Josefiak** [1] - 4:17

**Joseph** [2] - 4:9, 4:20

**JP** [16] - 10:9, 19:6, 19:7, 19:20, 20:12, 20:20, 20:23, 21:16, 21:21, 25:11, 185:20, 186:9, 186:22, 186:25, 187:6

**JP/constable** [1] - 19:9

**JP/constables** [2] - 21:24, 186:16

**JPs** [2] - 22:11, 186:18

**Jr** [1] - 4:9

**judge** [6] - 167:8, 185:19, 185:24, 186:4, 188:3, 200:21

**Judge** [89] - 23:8, 25:19, 38:18, 38:25, 39:14, 39:17, 58:10, 65:9, 65:10, 71:9, 71:14, 74:14, 79:13, 79:17, 81:12, 82:1, 82:2, 82:6, 82:13, 85:21, 86:3, 87:5, 100:7, 111:4, 126:9, 126:16, 131:12, 145:23, 148:4, 148:9, 148:11, 148:18, 149:1, 149:11, 149:20, 150:5, 150:19, 150:20, 150:23, 151:12, 153:11, 154:1, 154:5, 159:15, 159:20, 161:18, 162:25, 163:6, 166:16, 167:2, 180:22, 181:2, 181:17, 182:2, 182:24, 184:1, 184:18, 185:2,

185:5, 186:4, 187:21, 188:8, 188:10, 189:12, 189:23, 190:3, 190:10, 190:19, 193:25, 194:16, 194:19, 194:21, 195:2, 196:8, 197:20, 200:11, 201:18, 206:16, 206:20, 210:22, 211:5, 213:5, 213:7, 213:14, 213:15, 302:21, 303:10, 303:15

**judgment** [2] - 10:20, 151:18

**judicial** [1] - 19:15

**July** [1] - 32:4

**jump** [1] - 37:24

**jumped** [1] - 297:25

**June** [1] - 32:3

**jurisdiction** [5] - 21:13, 22:3, 62:7, 62:13, 132:18

**jurisdictions** [3] - 22:2, 59:15, 161:24

**Justice** [27] - 3:3, 3:6, 3:13, 3:17, 3:20, 3:23, 4:3, 4:6, 10:24, 11:4, 11:7, 11:15, 11:24, 12:4, 13:18, 14:21, 14:25, 15:2, 17:14, 17:17, 26:1, 60:12, 151:3, 151:16, 209:6, 209:18, 221:7

**justice** [2] - 19:24, 22:3

**Justice's** [1] - 15:3

**justices** [2] - 21:7, 21:25

**justification** [5] - 143:2, 153:14, 153:22, 153:24, 293:16

**justifications** [1] - 142:21

| | |
|---|---|

**L**

JX-12 [2] - 28:20, 28:21
JX-16 [2] - 38:12, 38:13
JX-19 [2] - 42:21, 43:1
JX-20 [2] - 45:14, 45:15
JX-23 [8] - 48:17, 49:22, 53:1, 53:2, 56:23, 273:21, 284:7, 284:9
JX-23-4 [1] - 104:25
JX-24 [1] - 107:11
JX-25 [3] - 236:23, 247:18, 247:22
JX-27 [2] - 130:21, 201:9
JX-31 [1] - 118:2
JX-37 [1] - 120:19
JX-45 [2] - 9:21, 14:15
JX-6 [1] - 208:11
JX-9 [3] - 27:17, 27:18

**K**

K'Shaani [1] - 3:16
Kaylan [1] - 4:24
keep [23] - 41:17, 41:18, 42:15, 43:21, 43:22, 44:2, 62:1, 77:11, 99:15, 103:3, 124:11, 126:6, 160:23, 160:25, 161:12, 167:14, 196:4, 242:16, 243:15, 244:16, 280:18, 303:4, 304:6
keeping [2] - 40:3, 266:11
keeps [2] - 50:3, 162:9
kept [7] - 41:11, 112:1, 132:3, 167:23, 185:3,

193:16, 301:20
key [3] - 40:15, 167:12, 178:17
killing [1] - 87:21
Kincaid [11] - 37:5, 37:9, 45:5, 51:17, 52:3, 52:14, 52:15, 136:7, 138:25, 211:11, 211:18
kind [44] - 14:19, 15:24, 16:15, 17:6, 18:21, 33:14, 34:5, 42:9, 55:4, 63:1, 71:5, 94:3, 109:4, 112:19, 125:21, 127:22, 133:12, 135:5, 145:24, 148:15, 148:21, 150:3, 156:5, 159:22, 162:4, 162:11, 164:18, 167:16, 176:5, 176:15, 176:16, 188:25, 194:16, 204:12, 220:6, 220:10, 239:21, 267:5, 269:15, 269:24, 291:20, 306:23
kinds [1] - 233:9
KLEIN [2] - 307:14, 307:24
Klein [1] - 3:2
knob [1] - 45:1
knowing [3] - 228:2, 244:15, 290:17
knowledge [12] - 55:1, 55:3, 124:20, 140:21, 142:4, 190:9, 191:1, 213:3, 213:25, 227:22, 292:17, 296:4
known [16] - 8:10, 49:13, 69:7, 200:17, 218:15, 219:16, 221:5, 221:9, 221:12, 221:13, 223:22, 223:24, 224:2, 229:24, 243:5
knows [3] - 124:1, 239:5, 293:2

label [1] - 94:16
labeled [2] - 14:4, 14:7
Labels [1] - 94:21
lack [2] - 77:17
land [4] - 180:13, 180:17, 180:18, 207:6
landed [2] - 190:16, 237:1
landmarks [1] - 54:21
landscape [1] - 229:21
language [2] - 24:7, 212:11
laptop [1] - 105:7
large [7] - 18:11, 21:11, 31:22, 144:22, 144:24, 157:3, 178:13
largely [8] - 55:17, 133:21, 144:20, 183:18, 269:21, 270:2, 276:13, 279:2
larger [1] - 18:14
largest [1] - 152:2
last [18] - 51:1, 75:18, 84:6, 89:1, 111:8, 121:15, 121:17, 121:18, 141:6, 146:25, 176:23, 225:1, 227:24, 229:22, 231:5, 279:12, 283:6, 300:10
lastly [1] - 221:18
late [7] - 113:12, 113:24, 141:5, 198:1, 198:14, 199:13, 225:21
latest [2] - 281:17, 299:10
Latino [1] - 65:11
latitude [3] - 231:10, 233:1, 300:1
Laura [5] - 5:2, 287:16, 309:3,

309:6, 309:7
Law [4] - 1:15, 221:13, 256:1, 256:5
law [20] - 8:21, 9:11, 9:14, 9:15, 9:20, 20:18, 29:18, 40:13, 50:19, 63:4, 64:2, 64:5, 64:19, 65:19, 65:20, 76:4, 116:7, 116:10, 191:23, 226:7
lawsuit [2] - 10:23, 20:11
lawyer [5] - 9:8, 22:19, 131:17, 185:24, 187:16
Lawyer [1] - 187:20
lawyers [3] - 8:18, 24:7, 308:12
lay [1] - 15:11
layer [2] - 231:19, 231:20
layers [1] - 231:17
layout [1] - 269:16
lead [4] - 54:25, 150:4, 262:13, 290:4
leadership [1] - 224:20
leading [1] - 222:25
League [9] - 1:17, 4:15, 120:12, 121:1, 121:12, 122:15, 124:15, 150:11, 159:22
learned [2] - 115:2
least [70] - 12:4, 19:1, 23:24, 34:15, 37:17, 39:7, 58:24, 62:15, 66:20, 67:8, 67:19, 70:16, 75:7, 75:12, 82:15, 97:22, 98:10, 98:11, 102:5, 103:16, 104:2,

106:18, 113:23, 113:25, 118:21, 119:24, 122:13, 123:20, 137:20, 143:23, 145:19, 152:4, 152:17, 156:18, 156:25, 161:25, 162:2, 177:6, 183:22, 184:10, 188:25, 191:17, 198:12, 201:1, 202:12, 214:1, 228:9, 228:21, 230:22, 231:1, 236:6, 238:10, 243:11, 243:13, 243:23, 244:10, 246:13, 247:14, 248:9, 248:12, 249:2, 249:7, 249:11, 249:14, 249:17, 267:4, 267:8, 281:25, 289:22, 290:16
least-change [10] - 67:8, 98:11, 228:9, 230:22, 231:1, 243:11, 243:23, 244:10, 281:25, 290:16
least-changed [1] - 289:22
least-changes [29] - 66:20, 67:19, 70:16, 75:7, 82:15, 102:5, 103:16, 104:2, 119:24, 122:13, 145:19, 156:18, 156:25, 161:25, 162:2, 183:22, 228:21, 236:6, 238:10, 246:13, 247:14, 248:9, 248:12, 249:2, 249:7, 249:11, 249:14, 249:17, 267:4
leave [9] - 18:17, 19:13, 42:11, 103:12, 146:3, 153:6, 162:22, 190:24, 218:23
leaving [2] - 112:13, 307:6
led [1] - 66:18

Leeper [1] - 2:2

left [18] - 14:14, 84:4, 85:12, 87:21, 89:15, 102:3, 109:18, 112:9, 147:9, 150:16, 152:9, 173:3, 205:14, 213:14, 240:12, 240:18, 285:14, 306:23

left-hand [2] - 109:18, 173:3

leftover [1] - 161:4

leg [1] - 221:21

legacies [1] - 153:5

legacy [4] - 35:24, 36:14, 36:16, 36:19

legal [14] - 25:17, 29:20, 58:17, 59:10, 60:4, 60:5, 63:3, 63:21, 64:12, 64:23, 82:10, 92:23, 153:2, 153:9

Legal [5] - 1:12, 1:22, 2:3, 2:6, 4:24

legally [10] - 39:19, 40:12, 40:15, 79:4, 80:1, 122:16, 122:20, 122:23, 170:3, 170:7

Legislative [1] - 169:10

legislature [1] - 139:3

legitimate [1] - 23:1

lengthy [1] - 294:23

less [7] - 106:15, 106:23, 156:21, 204:17, 231:12, 234:20, 306:25

letter [21] - 10:14, 10:17, 11:5, 15:5, 16:7, 28:23, 29:2, 29:8, 120:11,

120:22, 121:1, 121:5, 121:6, 121:13, 122:15, 123:3, 208:9, 208:13, 209:10, 209:11, 210:10

letters [2] - 11:3, 54:15

level [16] - 21:13, 99:16, 133:9, 135:6, 142:9, 162:3, 204:19, 219:20, 229:9, 232:5, 232:17, 233:7, 233:14, 278:25, 279:18, 280:2

liable [1] - 28:1

liaison [1] - 218:11

liberty [1] - 296:7

license [2] - 139:12, 139:13

lick [1] - 18:11

life [4] - 78:22, 224:8, 224:9, 224:11

likely [3] - 102:5, 179:9, 263:13

limit [1] - 29:19

limitations [1] - 232:25

limited [1] - 153:4

limits [3] - 10:20, 83:16, 171:10

Linda [1] - 3:9

Line [1] - 145:14

line [24] - 15:25, 44:8, 69:11, 73:18, 78:5, 78:10, 80:14, 85:9, 116:23, 117:1, 117:3, 123:1, 135:13, 150:15, 182:11, 188:17, 189:20, 194:12, 198:23, 274:11, 284:18, 285:16

lines [31] - 76:11, 83:9, 84:7, 87:24, 88:11, 159:18, 165:25, 248:16, 249:8,

249:10, 249:14, 249:21, 249:25, 250:3, 252:2, 252:5, 252:21, 252:25, 260:23, 261:1, 270:7, 270:10, 282:1, 282:4, 282:17, 282:20, 282:24, 286:19, 286:23, 293:16, 296:18

link [2] - 271:25, 273:11

list [3] - 71:2, 130:21, 233:15

listed [3] - 17:19, 253:23, 254:1

listened [1] - 147:16

lists [1] - 289:15

literally [7] - 145:21, 147:11, 176:16, 220:3, 290:16, 296:17, 302:14

litigation [2] - 9:17, 137:18

live [13] - 43:24, 83:3, 84:14, 84:15, 84:20, 121:25, 122:1, 146:18, 175:25, 176:1, 229:21, 304:23

lived [12] - 83:3, 85:14, 122:3, 122:5, 175:17, 175:22, 175:24, 176:3, 176:4, 305:14, 306:4

lives [4] - 84:3, 146:16, 175:16, 227:2

living [3] - 85:14, 110:14, 216:13

Llobera [1] - 2:23

LLP [4] - 2:17, 2:23, 3:10, 4:14

load [1] - 36:16

loaded [2] - 94:6, 139:10

lobby [1] - 11:19

local [2] - 220:12, 220:17

located [1] - 134:5

location [6] - 50:13, 131:8, 131:21, 133:3, 179:24, 306:17

locations [2] - 50:11, 133:13

Lodge [1] - 23:13

logical [1] - 161:3

longitude [1] - 300:1

longtime [2] - 223:21, 223:23

look [47] - 13:1, 13:3, 13:6, 13:20, 23:21, 33:22, 34:3, 34:4, 34:6, 34:8, 51:24, 70:11, 83:23, 87:17, 87:19, 97:3, 98:7, 98:16, 99:2, 99:3, 120:16, 120:23, 133:6, 135:16, 136:14, 146:24, 154:10, 157:20, 162:11, 168:8, 168:13, 171:7, 172:8, 174:4, 190:5, 213:21, 229:1, 230:21, 231:24, 246:16, 254:11, 256:18, 276:2, 283:8, 283:12, 291:8, 292:1

looked [28] - 23:19, 52:3, 59:5, 64:3, 83:3, 108:23, 110:4, 120:18, 132:2, 132:25, 133:1, 134:4, 134:9, 134:11, 134:21, 135:22, 163:7, 163:12, 171:19, 184:10, 238:1, 242:13, 253:15, 286:24, 300:8, 300:16, 304:12

looking [52] - 17:22, 25:4, 40:3, 44:18, 49:22, 61:12, 63:18, 64:5,

64:13, 87:16, 90:21, 91:11, 93:7, 93:17, 93:18, 94:12, 96:2, 101:10, 101:25, 103:21, 110:11, 110:12, 121:9, 136:15, 140:22, 146:8, 146:14, 146:23, 153:24, 167:18, 172:17, 175:7, 176:8, 178:16, 225:6, 250:18, 262:22, 263:4, 267:13, 270:6, 277:7, 289:3, 290:23, 293:23, 303:18, 304:22, 305:20, 305:25, 306:3, 306:8

looks [26] - 9:23, 13:22, 27:3, 28:23, 45:15, 69:3, 87:16, 93:12, 108:2, 161:1, 161:6, 176:6, 193:2, 208:18, 237:7, 256:24, 257:15, 265:14, 265:16, 266:19, 266:22, 274:10, 275:2, 283:6, 303:18

looping [1] - 237:6

loops [1] - 150:11

loose [3] - 155:18, 270:14, 272:25

loosely [1] - 290:16

lop [1] - 146:4

Los [1] - 2:11

lose [5] - 44:11, 44:14, 44:15, 90:11, 155:25

loses [1] - 24:23

lost [1] - 159:7

Louisiana [1] - 30:19

loves [1] - 49:15

low [3] - 175:14, 257:3, 269:10

lower [4] - 109:17, 210:24, 267:25,

285:14

lowest [12] -
175:2, 175:21,
207:15, 232:17,
233:7, 247:3,
247:11, 254:13,
254:21, 254:24,
264:7, 271:2

LULAC [3] -
207:22, 208:5,
307:25

lunch [2] - 128:20,
214:13

## M

mail [42] - 26:23,
27:18, 28:21,
29:1, 37:4,
37:10, 51:12,
51:15, 73:14,
73:25, 115:7,
115:15, 116:1,
117:11, 120:20,
120:21, 120:24,
121:6, 185:15,
187:10, 201:10,
202:6, 212:3,
212:21, 229:5,
229:6, 229:11,
232:3, 234:3,
237:3, 239:1,
251:11, 260:10,
260:15, 261:13,
266:5, 273:17,
290:6, 293:2,
302:15

mails [1] - 226:5

main [4] - 84:25,
135:24, 179:23,
242:22

Main [1] - 1:16

Mainland [8] -
155:12, 159:12,
160:9, 160:19,
160:24, 162:9,
164:16, 165:4

maintain [2] -
244:16, 280:17

maintained [3] -
102:13, 102:14,
102:18

maintaining [1] -
236:15

majority [20] -
20:15, 21:17,

21:21, 22:6,
25:11, 60:7,
60:9, 60:15,
61:12, 164:5,
164:15, 165:3,
165:11, 185:22,
186:5, 186:22,
205:10, 205:11,
206:9, 207:14

majority-
minority [16] -
21:17, 21:21,
25:11, 60:9,
60:15, 61:12,
164:5, 164:15,
165:3, 185:22,
186:5, 186:22,
205:10, 205:11,
206:9, 207:14

malpractice [1] -
131:17

man [2] - 73:21,
178:16

MANAGER [3] -
56:14, 129:3,
308:21

managing [1] -
32:12

Mancino [1] -
2:16

mandate [2] -
123:4, 123:7

manner [4] -
33:8, 72:13,
190:15, 200:20

manually [1] -
269:12

Map [195] - 71:14,
71:16, 74:13,
82:11, 85:17,
86:3, 86:9,
86:24, 88:8,
88:19, 88:21,
89:7, 89:10,
89:16, 89:18,
90:6, 90:7, 90:8,
90:10, 90:21,
98:11, 101:8,
101:9, 103:21,
106:13, 106:15,
106:16, 111:15,
111:16, 111:17,
112:15, 112:16,
112:17, 113:1,
120:5, 120:9,
122:16, 124:23,
125:4, 127:12,

128:9, 143:23,
144:4, 144:14,
144:18, 145:16,
145:21, 145:22,
146:24, 148:1,
148:6, 153:23,
154:2, 154:6,
162:24, 163:14,
164:4, 164:6,
165:24, 167:4,
171:14, 171:19,
173:1, 173:4,
174:12, 174:15,
174:18, 174:22,
177:13, 177:24,
178:9, 178:10,
178:22, 178:24,
179:6, 181:3,
181:5, 181:10,
181:12, 181:13,
181:14, 181:21,
181:23, 182:1,
182:6, 182:25,
183:1, 183:3,
183:19, 184:2,
184:3, 184:4,
184:12, 184:19,
184:23, 184:24,
185:3, 185:6,
188:9, 188:12,
189:12, 189:15,
189:22, 190:8,
190:13, 190:19,
190:22, 192:12,
192:14, 192:22,
193:3, 193:4,
194:25, 198:3,
198:10, 198:13,
198:14, 199:2,
199:5, 199:11,
200:3, 200:12,
200:17, 207:16,
213:6, 213:21,
213:23, 214:2,
267:2, 267:4,
267:8, 267:9,
267:18, 267:25,
269:21, 269:25,
271:1, 271:13,
272:16, 272:17,
272:23, 272:24,
275:13, 275:16,
275:18, 276:18,
276:23, 277:23,
278:8, 278:10,
278:19, 279:4,
279:5, 281:5,
281:23, 282:2,
282:5, 282:8,
282:18, 282:21,
282:24, 283:12,

285:24, 291:5,
291:8, 291:11,
291:16, 292:1,
293:1, 293:15,
296:10, 301:5,
303:11, 303:19,
306:18

map [222] - 12:16,
13:2, 13:7,
13:17, 14:3,
14:5, 14:9,
14:18, 14:24,
15:16, 17:6,
17:18, 17:22,
17:23, 20:12,
20:13, 39:17,
39:22, 40:6,
44:23, 45:16,
46:12, 50:11,
53:8, 53:13,
57:16, 58:4,
58:20, 58:24,
59:3, 59:10,
60:3, 63:18,
63:21, 66:19,
67:8, 68:5, 68:7,
68:10, 70:16,
70:17, 70:19,
70:21, 70:24,
71:25, 73:24,
74:3, 74:7,
74:11, 74:13,
74:23, 75:2,
75:4, 75:7,
75:11, 76:15,
76:21, 76:25,
77:8, 78:7, 80:7,
82:15, 82:24,
83:23, 83:25,
85:20, 86:5,
87:7, 87:11,
87:16, 88:14,
89:2, 89:4, 92:7,
92:10, 92:16,
92:19, 93:21,
94:20, 95:5,
95:10, 95:18,
98:11, 98:23,
99:11, 102:5,
103:15, 103:16,
103:17, 103:24,
104:2, 104:8,
106:19, 106:22,
107:25, 108:19,
113:14, 119:24,
121:23, 122:13,
122:19, 122:21,
124:21, 125:7,
125:9, 125:14,
128:2, 128:11,

133:20, 134:11,
134:21, 134:22,
140:8, 141:13,
142:20, 143:11,
143:21, 145:3,
145:19, 146:1,
146:3, 148:15,
149:4, 150:7,
150:8, 150:24,
151:9, 151:15,
151:17, 151:24,
153:20, 153:25,
156:18, 156:24,
156:25, 157:7,
157:20, 159:14,
159:19, 159:21,
159:24, 160:11,
161:12, 161:20,
162:2, 165:19,
166:4, 166:21,
167:18, 169:15,
169:24, 170:25,
171:2, 171:17,
173:15, 174:22,
175:17, 176:9,
178:2, 180:23,
183:16, 183:22,
184:9, 184:10,
186:15, 186:17,
187:6, 188:25,
189:15, 198:10,
202:13, 204:10,
206:13, 206:18,
206:20, 206:23,
207:4, 213:15,
228:9, 228:13,
228:16, 228:22,
228:24, 229:19,
246:10, 250:4,
253:23, 276:25,
277:18, 286:3,
289:11, 289:12,
289:17, 289:22,
289:23, 290:23,
291:3, 291:5,
291:10, 291:19,
291:20, 293:3,
293:13, 293:14,
293:23, 294:4,
295:23, 296:9,
296:14, 297:23,
303:4, 303:17,
303:19, 304:13,
305:13, 305:16

map/
spreadsheet
[1] - 294:1

mapmaker [1] -
293:5

Maps [1] - 180:25
maps [122] -
34:13, 34:14, 34:19, 34:22, 34:25, 40:13, 40:15, 55:19, 56:1, 57:6, 57:8, 57:11, 58:1, 58:2, 65:19, 67:19, 68:1, 71:20, 72:3, 72:22, 73:10, 73:25, 74:10, 75:3, 75:22, 78:24, 79:2, 79:4, 79:24, 80:10, 80:18, 80:25, 81:7, 81:9, 81:13, 81:18, 82:6, 82:7, 82:9, 82:10, 82:13, 85:24, 88:6, 88:7, 93:2, 93:4, 93:5, 94:3, 101:5, 101:11, 104:14, 105:7, 105:9, 105:16, 105:19, 105:20, 106:9, 106:12, 107:7, 110:24, 111:9, 111:25, 112:7, 113:4, 113:5, 113:9, 113:10, 114:11, 114:14, 117:9, 117:12, 118:4, 118:6, 118:9, 118:13, 118:19, 119:20, 122:16, 122:23, 123:7, 127:5, 127:8, 128:5, 137:23, 142:17, 143:18, 161:25, 162:21, 166:8, 167:9, 170:22, 174:5, 188:21, 189:3, 190:18, 204:7, 204:8, 212:12, 212:15, 212:18, 212:22, 225:16, 226:23, 227:8, 228:7, 228:8, 228:21, 255:9, 263:4, 270:4, 274:18, 276:13, 277:1, 286:11, 286:15, 286:19, 286:24, 289:1,

295:25, 300:19
maps' [1] - 104:20
Maptitude [6] -
139:7, 139:8, 139:9, 139:10, 139:12, 139:13
march [1] - 157:5
March [2] - 11:10, 208:13
Mark [9] - 1:11, 27:18, 38:18, 87:3, 120:25, 129:10, 185:16, 216:6, 302:21
MARK [3] - 6:7, 215:25, 216:6
marked [3] - 239:16, 284:9, 289:9
marketplace [1] - 281:4
Marque [2] - 133:16, 171:10
Marshall [1] - 4:18
mass [1] - 157:3
massive [2] - 47:19, 161:22
material [3] - 37:20, 52:4, 279:15
math [1] - 245:5
matter [22] - 8:13, 8:17, 11:17, 11:23, 17:16, 23:6, 49:12, 60:6, 60:8, 60:14, 63:7, 68:12, 72:16, 94:4, 131:13, 136:2, 240:5, 269:1, 293:4, 298:23, 299:15, 309:5
mattered [2] - 245:14, 258:14
matters [2] - 245:10, 258:21
Maureen [1] - 4:23
max [1] - 307:15
Maynard [1] - 8:18

mean [59] - 9:4, 9:18, 14:23, 19:23, 40:15, 42:18, 59:11, 61:15, 72:4, 77:10, 81:7, 82:23, 83:25, 84:22, 91:6, 96:12, 126:18, 133:6, 133:24, 134:18, 134:24, 135:15, 138:11, 138:23, 145:7, 146:17, 149:13, 155:25, 161:3, 162:22, 163:8, 163:9, 164:8, 166:18, 167:6, 173:22, 173:24, 176:20, 177:15, 178:3, 178:5, 178:16, 188:23, 195:15, 196:13, 197:1, 197:16, 198:6, 200:4, 203:16, 204:13, 259:10, 273:4, 287:14, 292:22, 296:20, 302:14, 303:3, 307:4
Mean [2] - 217:24, 218:1
meaning [2] - 243:14, 260:1
means [9] - 61:6, 66:5, 83:18, 94:17, 132:11, 157:15, 237:8, 238:6, 238:12
meant [3] - 18:13, 123:16, 167:7
measure [2] - 244:24, 254:19
measurement [1] - 217:21
mechanical [1] - 5:4
meet [11] - 42:23, 45:11, 86:13, 105:25, 112:15, 116:7, 149:25, 188:4, 189:6, 194:15, 274:4
meeting [131] - 18:17, 27:19, 38:13, 38:14, 38:21, 39:1,

39:9, 41:22, 42:6, 42:11, 45:19, 45:22, 45:24, 51:3, 52:20, 53:19, 55:15, 55:16, 57:1, 69:4, 69:24, 78:24, 79:1, 79:14, 80:7, 81:12, 82:5, 86:10, 86:21, 87:1, 87:3, 88:17, 92:14, 100:11, 100:19, 100:20, 100:23, 102:3, 105:24, 106:8, 107:6, 107:13, 107:18, 107:22, 108:8, 109:8, 111:7, 111:8, 114:10, 117:19, 117:22, 123:22, 125:1, 127:6, 151:6, 182:24, 184:20, 184:22, 188:2, 192:4, 192:5, 192:7, 192:8, 192:17, 192:21, 196:7, 196:25, 197:7, 197:8, 197:9, 197:14, 198:7, 200:23, 201:7, 202:11, 202:22, 202:24, 203:3, 203:11, 203:25, 204:2, 212:11, 213:1, 213:3, 213:5, 238:3, 238:8, 239:7, 239:9, 247:21, 247:22, 247:25, 248:1, 261:7, 261:19, 261:21, 261:23, 262:1, 262:2, 262:4, 262:8, 262:9, 262:10, 262:13, 262:15, 263:1, 263:9, 263:19, 264:14, 264:18, 265:5, 265:7, 265:17, 265:19, 266:3, 266:8, 266:10, 273:6, 273:25, 274:13, 274:14, 274:18, 275:4, 275:6, 276:19, 277:9, 277:15, 278:8,

281:13
Meetings [1] - 197:22
meetings [54] - 32:10, 34:12, 34:18, 34:23, 36:21, 37:24, 38:1, 38:6, 38:8, 38:9, 39:4, 39:6, 42:1, 53:3, 55:23, 58:8, 80:6, 86:19, 88:7, 97:17, 104:19, 107:4, 111:13, 111:14, 111:15, 112:9, 112:14, 112:21, 114:4, 114:13, 115:3, 118:21, 179:21, 188:4, 188:8, 188:20, 191:4, 191:24, 192:6, 193:10, 194:1, 194:14, 194:18, 194:23, 195:12, 196:23, 199:2, 200:23, 201:2, 203:13, 203:21, 213:14, 261:15
meets [1] - 150:13
member [7] - 57:5, 218:8, 223:15, 223:19, 223:21, 223:23, 300:4
members [4] - 49:21, 107:6, 223:13, 264:24
memories [2] - 248:14, 262:1
memory [13] - 12:20, 13:20, 13:22, 28:2, 35:23, 53:5, 183:11, 196:24, 261:22, 263:21, 264:19, 277:10, 304:14
mentioned [9] - 27:5, 35:15, 38:17, 47:8, 51:6, 68:8, 89:8, 265:21, 278:23
merely [1] - 64:13
merged [1] -

concordance    Day 9_339

280:1

message [2] - 227:1, 233:21

messages [1] - 227:11

met [16] - 57:20, 79:17, 82:1, 86:15, 86:18, 86:23, 87:4, 100:8, 100:12, 129:10, 139:14, 180:21, 180:22, 181:2, 257:8

metes [3] - 201:25, 202:1, 202:4

methods [1] - 217:14

Mexico [1] - 157:2

Meza [1] - 3:13

MEZA [1] - 308:2

Michelle [1] - 2:16

microphone [4] - 61:18, 61:23, 91:9, 210:24

mid [7] - 137:4, 137:11, 139:15, 140:22, 141:3, 298:1, 299:3

mid-August [2] - 137:11, 299:3

mid-October [4] - 137:4, 139:15, 140:22, 141:3

middle [13] - 47:13, 47:14, 87:20, 120:23, 122:6, 130:21, 134:23, 156:23, 158:24, 160:12, 256:22, 269:10, 285:17

might [21] - 24:2, 40:21, 46:14, 61:21, 69:16, 79:17, 87:18, 90:25, 123:2, 156:16, 157:20, 165:6, 171:6, 177:1, 184:15, 184:25, 194:21, 197:13, 198:8, 281:3, 307:25

migration [1] - 133:6

million [1] - 218:17

mind [13] - 53:25, 54:14, 64:8, 68:7, 74:10, 75:11, 75:12, 77:11, 83:6, 102:3, 102:7, 106:24, 287:7

minds [1] - 198:8

minimal [4] - 237:10, 238:5, 238:6, 265:2

minimization [1] - 234:22

minimize [7] - 228:14, 228:17, 235:20, 245:11, 256:21, 284:3

minimizing [2] - 236:18, 244:25

minimum [23] - 75:4, 75:7, 85:20, 95:9, 95:10, 98:7, 98:9, 98:16, 98:18, 234:6, 234:14, 239:10, 252:15, 252:22, 252:25, 253:4, 254:1, 254:8, 256:24, 257:6, 263:25, 264:3, 271:12

minimum-changes [1] - 239:10

minorities [1] - 60:17

minority [45] - 20:15, 21:10, 21:17, 21:18, 21:21, 21:24, 22:6, 25:11, 59:16, 60:9, 60:15, 61:12, 61:15, 131:21, 133:2, 133:21, 136:22, 151:9, 151:23, 152:2, 164:5, 164:15, 165:3, 168:5, 170:1, 173:12, 174:7, 174:19,

175:2, 175:3, 175:21, 179:1, 185:22, 186:5, 186:22, 205:10, 205:11, 205:15, 206:9, 207:14, 207:15, 209:1, 209:7, 210:11

minority-majority [2] - 20:15, 22:6

minus [8] - 230:25, 231:2, 231:11, 234:18, 234:20, 245:1, 257:5, 257:20

minute [5] - 67:17, 107:12, 141:7, 197:5, 297:19

minutes [13] - 7:6, 7:7, 7:8, 7:9, 56:13, 176:23, 197:6, 215:2, 224:7, 229:12, 287:11, 307:11, 307:15

minutia [1] - 273:5

mischaracterized [1] - 63:6

misheard [1] - 306:13

misnomer [1] - 132:5

miss [1] - 31:15

missed [1] - 232:14

Mississippi [1] - 30:19

mistaken [1] - 186:11

misunderstanding [1] - 62:23

misuse [1] - 24:8

misused [1] - 24:5

Mobile [1] - 23:12

moderate [3] - 222:17, 223:3, 223:6

moderated [1] - 223:12

modern [2] - 35:21, 114:8

modify [3] - 88:8, 286:18, 286:23

Molly [1] - 3:9

moment [5] - 70:4, 152:4, 159:25, 186:17, 295:18

Monday [1] - 226:14

money [1] - 28:17

monitor [2] - 124:11, 197:21

monstrous [1] - 168:11

month [2] - 114:1, 196:14

Montopolis [1] - 2:14

Montropolis [1] - 2:21

Moody [1] - 4:11

moreover [3] - 62:13, 66:5, 78:13

morning [9] - 7:2, 8:6, 129:13, 130:13, 237:5, 288:1, 288:8, 306:24, 308:20

most [37] - 9:16, 9:18, 24:20, 24:22, 24:24, 35:17, 44:13, 44:16, 46:11, 53:22, 54:4, 54:22, 58:23, 61:9, 63:15, 70:22, 71:1, 91:18, 106:17, 111:15, 124:4, 124:5, 137:17, 144:24, 154:9, 156:5, 168:9, 176:7, 176:24, 196:13, 213:7, 235:9, 244:3, 245:24, 245:25, 246:1, 306:7

mostly [1] - 171:10

motion [1] - 214:22

mouse [1] - 158:25

mouth [1] - 48:23

move [23] - 26:10, 28:5, 35:10, 47:20, 48:2, 56:24, 61:18, 68:11, 113:6, 142:6, 142:20, 142:22, 143:2, 143:4, 161:13, 179:21, 259:3, 265:10, 271:15, 292:12, 292:13, 293:8

moved [5] - 47:6, 149:20, 149:21, 284:1, 293:11

movement [4] - 46:14, 48:1, 283:21, 283:25

moves [4] - 142:11, 149:23, 248:20, 293:12

moving [11] - 25:24, 28:9, 46:10, 89:17, 89:18, 122:4, 136:3, 143:25, 255:5, 265:21, 292:20

MR [241] - 7:5, 7:15, 7:19, 7:24, 8:5, 12:24, 13:10, 13:11, 13:13, 13:24, 14:1, 15:9, 15:13, 16:5, 20:10, 25:16, 25:23, 56:9, 56:18, 56:20, 56:22, 63:2, 63:13, 65:8, 65:14, 65:16, 65:25, 66:1, 90:19, 109:12, 109:15, 128:15, 128:17, 129:7, 129:9, 130:15, 130:18, 130:20, 130:23, 141:19, 141:21, 141:24, 142:24, 143:8, 144:12, 144:13, 145:13, 147:15, 154:15, 154:18, 157:10, 157:14, 157:17, 158:8,

158:10, 158:12, 158:14, 158:15, 165:12, 165:17, 166:22, 166:24, 166:25, 167:1, 169:5, 169:7, 170:15, 170:17, 171:12, 171:13, 171:22, 171:24, 172:16, 182:10, 182:13, 182:17, 182:18, 183:8, 185:13, 185:14, 187:25, 188:1, 188:16, 190:1, 194:11, 195:6, 196:2, 196:3, 196:4, 196:19, 196:20, 198:21, 198:23, 199:15, 201:9, 201:13, 207:20, 207:23, 211:23, 211:25, 212:2, 214:7, 214:9, 214:14, 214:17, 214:19, 215:6, 215:8, 215:14, 215:19, 215:21, 215:23, 216:3, 225:7, 225:12, 225:22, 225:25, 229:2, 229:4, 230:14, 230:16, 234:1, 234:2, 235:22, 235:24, 236:22, 236:24, 238:14, 238:16, 238:21, 238:23, 239:12, 239:14, 240:8, 240:10, 240:17, 240:19, 242:7, 242:9, 243:19, 243:21, 245:15, 245:17, 247:18, 247:20, 250:6, 250:8, 250:23, 250:25, 251:7, 251:9, 251:14, 251:16, 252:12, 252:14, 253:7, 253:9, 253:19, 253:22, 254:4, 254:6, 255:18, 255:20, 257:12, 257:14, 259:4, 259:6, 260:6, 260:8, 260:12, 260:13, 261:10, 261:12, 262:20, 262:21, 263:15,

263:17, 265:11, 265:13, 265:22, 265:24, 266:14, 266:16, 270:22, 270:24, 271:23, 271:24, 272:6, 272:8, 272:13, 272:15, 272:20, 272:21, 273:14, 273:16, 273:19, 273:23, 274:23, 274:25, 275:10, 275:12, 277:20, 277:22, 278:14, 278:16, 281:20, 281:22, 282:10, 282:12, 283:1, 283:4, 283:9, 283:11, 284:6, 284:8, 285:1, 285:9, 286:5, 286:7, 287:1, 287:4, 287:10, 287:19, 287:22, 287:25, 288:14, 289:8, 289:10, 293:20, 293:21, 302:23, 303:9, 304:17, 304:24, 305:9, 306:20, 306:25, 307:8, 307:10, 307:23, 308:8

MS [16] - 207:21, 207:25, 208:2, 208:10, 208:12, 208:17, 208:19, 208:20, 210:15, 210:16, 210:19, 211:1, 211:20, 307:14, 307:24, 308:2

Mytelka [1] - 4:10

## N

NAACP [5] - 2:12, 3:2, 207:22, 208:5, 307:25

name [9] - 68:13, 129:10, 216:4, 216:6, 216:18, 223:18, 260:3, 267:8, 300:10

named [4] - 37:4, 218:1, 226:6, 299:23

names [1] - 86:8

naming [2] - 266:7, 267:5

narrated [2] - 263:5, 275:8

nation's [1] - 222:25

National [1] - 223:13

natural [1] - 166:14

nature [2] - 63:6, 107:24

NC [1] - 3:3

NE [3] - 3:24, 4:3, 4:6

nearest [1] - 148:25

nearly [1] - 268:10

nearsighted [2] - 168:10, 168:11

necessarily [9] - 23:21, 27:24, 38:23, 55:3, 118:25, 136:20, 149:14, 169:23, 179:2

necessary [4] - 134:15, 152:13, 228:11, 296:17

need [50] - 12:2, 19:2, 19:8, 27:6, 27:13, 33:25, 37:3, 40:12, 40:14, 52:13, 59:9, 66:14, 72:22, 90:14, 115:13, 116:18, 117:12, 118:2, 135:7, 140:24, 155:13, 156:2, 160:3, 186:9, 186:16, 210:16, 212:22, 214:24, 214:25, 225:5, 228:1, 231:4, 231:24, 232:1, 233:1, 242:24, 245:5, 245:6, 273:1, 276:7, 288:6, 288:8, 295:3, 301:10, 301:24, 307:2, 307:4, 307:14, 308:11

needed [35] -

15:16, 16:17, 40:21, 53:16, 53:18, 56:1, 67:7, 70:8, 75:24, 91:23, 102:13, 102:14, 103:18, 104:1, 112:11, 114:17, 114:18, 115:3, 115:4, 115:5, 126:23, 180:8, 180:10, 185:23, 186:6, 191:20, 237:21, 248:4, 248:25, 258:22, 279:10, 283:24, 290:12, 292:16, 302:1

needing [4] - 31:22, 32:1, 113:14, 114:4

needs [11] - 15:16, 20:13, 104:16, 127:5, 160:4, 192:22, 218:17, 226:14, 239:4, 302:2, 302:18

nefarious [1] - 55:6

negative [1] - 62:10

negotiate [3] - 11:13, 12:3, 27:14

negotiating [1] - 28:16

negotiation [2] - 12:5, 12:7

negotiations [6] - 11:18, 15:7, 15:14, 17:13, 67:7, 209:19

neighborhood [1] - 143:4

neighborhood s [2] - 292:4, 292:11

Neil [2] - 1:15, 1:15

network [2] - 128:22, 287:16

never [22] - 35:7, 35:9, 35:21, 64:20, 65:10,

73:22, 112:3, 112:4, 128:1, 128:3, 128:8, 154:1, 166:20, 179:13, 181:20, 210:1, 232:18, 233:2, 301:4, 303:21, 304:1, 304:9

nevertheless [1] - 61:24

New [5] - 2:18, 3:11, 30:18

new [10] - 19:24, 46:19, 89:16, 134:8, 150:21, 175:15, 180:13, 189:15, 194:25, 278:17

Newkirk [1] - 3:23

next [37] - 7:14, 11:12, 13:24, 29:5, 30:24, 31:4, 42:13, 42:15, 45:5, 51:19, 51:24, 58:13, 67:12, 74:7, 75:1, 78:25, 85:20, 86:10, 88:24, 99:13, 112:12, 125:1, 142:17, 149:6, 168:6, 168:7, 176:2, 177:16, 229:11, 236:10, 241:5, 241:11, 242:24, 251:14, 251:15, 252:12, 260:12

nice [3] - 208:3, 208:4, 225:8

nicely [1] - 278:4

night [3] - 226:18, 257:25, 287:20

nine [2] - 20:23, 271:7

nitty [1] - 189:2

nitty-gritty [1] - 189:2

Nixon [4] - 4:20, 128:25, 187:20, 187:21

nobody [4] - 77:4, 104:16, 213:17, 244:18

**nomenclature** [1] - 174:1

**nominee** [3] - 127:17, 127:23, 127:24

**non** [10] - 16:3, 16:21, 22:3, 135:17, 165:21, 168:14, 241:20, 241:21, 294:12

**non-Anglo** [1] - 165:21

**non-Hispanic** [9] - 16:3, 16:21, 22:3, 135:17, 168:14, 241:20, 241:21, 294:12

**none** [8] - 52:17, 138:20, 138:21, 138:22, 191:3, 210:9, 214:9, 279:15

**nonpartisan** [1] - 64:15

**nonracial** [5] - 67:4, 70:23, 103:1, 103:4, 182:4

**noon** [3] - 128:19, 288:6, 307:4

**normal** [1] - 30:15

**normally** [2] - 35:3, 35:13

**North** [6] - 3:4, 3:7, 169:20, 170:4, 170:8, 170:9

**north** [4] - 40:5, 41:20, 89:21, 147:8

**northern** [5] - 83:4, 146:19, 150:6, 150:13, 176:1

**nose** [1] - 172:14

**notable** [1] - 121:17

**note** [7] - 75:17, 105:2, 107:12, 121:15, 219:11, 247:4, 285:13

**noted** [2] - 121:19, 209:12

**notes** [13] - 49:23,

50:1, 53:3, 56:25, 105:2, 108:8, 108:11, 273:25, 277:7, 277:11, 284:11, 285:21

**noteworthy** [1] - 224:10

**nothing** [7] - 7:22, 55:6, 55:8, 91:21, 160:7, 215:18, 303:18

**notice** [3] - 118:12, 118:17, 168:20

**noticed** [1] - 171:17

**notion** [1] - 48:20

**November** [11] - 26:23, 113:22, 114:1, 114:21, 118:13, 120:20, 120:22, 123:5, 123:8, 125:2

**November-ish** [1] - 114:21

**number** [33] - 8:19, 15:24, 20:19, 21:8, 21:12, 22:10, 97:4, 97:5, 97:10, 97:13, 110:14, 116:6, 116:11, 121:24, 140:12, 153:5, 165:2, 187:2, 187:3, 188:4, 205:8, 210:4, 255:25, 256:12, 258:3, 258:17, 258:20, 272:23, 279:7, 279:22, 284:2, 284:3

**Number** [1] - 85:6

**numbers** [49] - 21:10, 32:19, 33:6, 37:17, 50:19, 74:18, 74:23, 91:18, 94:22, 95:4, 95:12, 100:10, 101:20, 106:25, 110:8, 127:16, 148:15, 161:1, 168:5, 240:24, 243:7, 254:8,

254:12, 255:7, 258:19, 258:21, 263:5, 263:6, 263:7, 263:8, 263:11, 263:18, 263:22, 263:24, 264:13, 266:23, 269:10, 270:5, 270:25, 271:1, 278:7, 279:9, 280:11, 281:12, 281:17, 281:18

**numerous** [1] - 185:10

**NW** [8] - 1:12, 1:22, 2:3, 2:7, 2:24, 3:14, 3:17, 3:21

## O

**o'clock** [1] - 128:24

**obey** [2] - 40:16, 40:17

**object** [3] - 15:9, 25:16, 182:20

**objection** [11] - 11:7, 25:22, 63:2, 63:11, 65:8, 65:9, 65:23, 142:24, 208:9, 208:13, 304:24

**objections** [2] - 198:10, 198:16

**objective** [1] - 238:3

**obtain** [5] - 11:14, 37:16, 39:21, 151:15, 151:17

**obtained** [3] - 8:21, 12:2, 78:24

**obvious** [4] - 66:21, 77:20, 83:2, 144:8

**obviously** [18] - 14:8, 16:23, 25:18, 48:11, 101:8, 108:20, 111:14, 117:1, 119:10, 122:11, 143:9, 144:6, 146:20, 151:14, 154:13, 164:22,

177:10, 301:16

**occasion** [1] - 218:3

**occasions** [1] - 185:10

**occupying** [1] - 197:18

**occur** [8] - 33:5, 88:8, 92:22, 104:6, 198:8, 206:3, 269:5, 269:24

**occurred** [8] - 32:22, 34:24, 45:19, 57:1, 86:21, 247:23, 274:13, 283:18

**occurring** [1] - 134:25

**occurs** [1] - 53:4

**October** [115] - 9:24, 68:17, 68:25, 69:4, 69:12, 73:15, 79:14, 86:22, 100:25, 105:3, 107:7, 107:14, 111:7, 113:12, 113:24, 115:16, 118:5, 120:12, 121:7, 122:14, 135:9, 137:4, 139:15, 140:7, 140:22, 141:3, 196:11, 198:1, 198:14, 199:13, 202:7, 202:18, 212:4, 225:17, 225:21, 226:19, 227:19, 229:6, 230:17, 234:4, 236:2, 236:25, 238:18, 240:14, 247:16, 249:2, 249:5, 249:14, 249:18, 249:21, 249:25, 250:4, 250:9, 251:1, 252:3, 252:6, 252:10, 252:22, 253:1, 253:5, 253:16, 258:6, 259:2, 259:3, 259:7, 260:16, 261:2, 261:5, 261:8, 261:15, 261:20, 261:24, 262:23, 263:2,

263:9, 263:12, 263:20, 264:15, 264:18, 264:23, 265:5, 265:10, 265:15, 266:1, 266:20, 267:22, 268:4, 268:13, 268:18, 269:20, 269:25, 271:15, 271:17, 271:19, 272:2, 273:7, 273:10, 273:24, 274:13, 275:3, 277:15, 278:8, 281:13, 283:7, 283:18, 286:9, 288:22, 289:2, 295:5

**OF** [3] - 1:1, 3:12, 4:2

**offered** [2] - 104:8, 122:17

**office** [1] - 100:25

**Office** [1] - 1:15

**offices** [2] - 31:2, 191:25

**official** [2] - 49:17, 298:10

**officials** [8] - 235:16, 235:18, 261:8, 261:19, 261:24, 263:1, 265:6, 273:7

**often** [9] - 20:1, 24:13, 197:3, 205:1, 205:9, 216:19, 256:15, 270:3, 296:1

**Olalde** [1] - 4:13

**old** [3] - 73:21, 119:13, 210:2

**old-fashioned** [1] - 119:13

**oldham** [1] - 208:3

**OLDHAM** [4] - 6:9, 7:19, 7:24, 8:2

**Oldham** [54] - 7:16, 7:17, 8:6, 8:10, 63:3, 73:15, 105:6, 105:16, 115:18, 129:10, 130:19, 145:14, 182:11,

194:12, 198:23, 210:20, 214:10, 238:17, 238:24, 238:25, 247:16, 248:3, 248:11, 248:18, 248:22, 250:10, 251:3, 251:11, 251:21, 251:24, 252:19, 259:8, 260:21, 262:7, 262:13, 265:1, 265:4, 265:15, 265:25, 271:25, 273:17, 274:2, 286:3, 286:10, 289:20, 290:3, 291:25, 292:15, 295:7, 296:17, 301:4, 303:19, 306:6, 306:10

Oldham's [3] - 25:19, 298:16, 301:2

once [9] - 36:17, 36:24, 85:11, 120:2, 149:3, 256:9, 270:17, 287:16, 301:5

one [216] - 7:18, 8:23, 16:8, 16:14, 17:22, 18:10, 19:11, 22:9, 22:12, 25:13, 25:25, 29:17, 30:20, 40:16, 40:17, 41:1, 41:7, 41:9, 41:10, 44:13, 46:21, 48:19, 49:9, 50:22, 51:1, 52:2, 53:4, 53:15, 54:19, 55:6, 55:23, 57:3, 60:17, 63:7, 64:16, 67:18, 70:5, 70:20, 72:8, 73:3, 73:5, 75:5, 76:2, 76:8, 76:9, 77:10, 77:11, 80:2, 80:5, 80:8, 80:11, 80:12, 80:19, 80:23, 82:14, 82:16, 83:17, 84:16, 85:24, 87:6, 88:2, 89:15, 89:20, 91:1, 92:23, 92:24,

92:25, 93:14, 93:19, 94:1, 98:12, 99:13, 100:21, 101:1, 101:11, 107:16, 109:17, 109:21, 110:1, 110:4, 114:25, 116:20, 118:21, 121:16, 122:2, 124:21, 125:11, 125:22, 125:24, 127:21, 128:25, 131:20, 132:1, 132:6, 132:20, 132:21, 135:15, 136:21, 138:24, 143:3, 144:8, 145:22, 146:16, 146:17, 146:25, 148:25, 149:4, 149:6, 150:8, 150:21, 154:8, 158:7, 158:17, 161:23, 161:24, 162:1, 162:19, 167:21, 170:23, 171:7, 171:9, 172:6, 174:12, 176:3, 179:21, 179:23, 183:2, 184:3, 185:2, 186:7, 186:13, 188:11, 189:14, 190:23, 191:7, 192:9, 194:3, 194:4, 194:5, 194:6, 194:9, 194:10, 195:15, 197:8, 197:23, 198:11, 200:20, 201:3, 201:24, 203:18, 203:21, 203:22, 204:15, 204:16, 204:18, 205:18, 206:11, 207:21, 211:10, 213:10, 217:20, 228:8, 231:8, 232:1, 233:6, 234:6, 238:21, 239:19, 242:24, 243:7, 244:3, 244:24, 245:13, 246:3, 246:8, 250:21, 251:8, 257:4, 258:20, 259:15, 259:17, 259:21, 266:11, 273:1, 273:20, 275:9, 277:16, 279:21,

291:12, 293:11, 294:23, 295:16, 297:21, 297:25, 299:21, 299:22, 299:23, 300:4, 303:3

One [1] - 4:11

one-fourth [1] - 231:8

one-person [6] - 19:11, 29:17, 40:16, 76:2, 92:24, 99:13

one-state [1] - 73:3

one-vote [6] - 19:11, 29:17, 40:17, 76:2, 92:24, 99:13

one-year [2] - 30:20, 73:5

ones [13] - 15:5, 38:23, 81:23, 91:20, 97:14, 116:24, 133:5, 167:15, 189:7, 189:8, 256:20, 256:21, 297:25

Open [1] - 197:21

open [2] - 124:8, 129:24

opened [1] - 101:10

opinion [4] - 29:21, 122:22, 125:13, 279:16

opponent [3] - 91:25, 92:1, 194:18

opponents [2] - 207:1, 207:2

opportunity [5] - 13:3, 115:3, 119:16, 182:15, 201:4

opposed [1] - 232:5

opposing [1] - 32:9

opposition [1] - 190:14

optimal [4] - 81:11, 259:20, 259:24, 267:9

Optimal [37] - 74:9, 82:17, 86:5, 87:8, 87:9, 95:18, 95:21, 95:23, 95:24, 97:4, 97:20, 106:20, 251:17, 252:2, 252:6, 252:9, 253:23, 254:9, 254:11, 254:12, 254:17, 257:15, 259:14, 259:17, 259:18, 260:2, 260:9, 260:14, 260:18, 260:20, 260:24, 261:2, 261:5, 264:1, 267:9, 267:10

optimize [1] - 236:11

option [1] - 119:3

orange [1] - 90:22

order [17] - 7:1, 11:14, 15:16, 27:6, 27:8, 32:10, 63:21, 64:15, 65:17, 67:8, 116:7, 116:22, 155:4, 192:13, 242:22, 284:3, 305:23

organization [1] - 233:13

organizations [1] - 219:4

organize [2] - 223:3, 223:6

oriented [1] - 153:20

Original [1] - 94:17

original [22] - 20:17, 36:18, 94:20, 95:3, 95:4, 95:5, 99:2, 99:11, 173:4, 174:7, 174:22, 185:6, 229:19, 230:9, 237:24, 243:10, 243:23, 244:9, 246:10, 254:8, 255:12, 301:21

originally [11] - 60:19, 76:14,

90:9, 91:2, 117:19, 145:17, 190:18, 202:10, 258:1, 282:14, 301:1

ourselves [1] - 103:8

outcome [1] - 18:10

outcomes [1] - 293:11

outline [2] - 285:17, 285:18

outside [2] - 16:18, 158:9

over-testified [1] - 190:5

overall [4] - 99:8, 208:25, 209:6, 210:11

overlaid [1] - 165:24

overlay [1] - 88:4

overly [1] - 181:11

overpopulated [6] - 44:13, 46:16, 46:19, 46:23, 155:25, 156:20

overpopulatio n [1] - 46:12

overrule [1] - 63:11

overruled [2] - 65:24, 182:22

oversized [1] - 116:8

own [16] - 34:4, 44:25, 55:3, 75:20, 167:14, 192:8, 192:9, 216:16, 216:17, 230:6, 245:12, 279:3, 295:24, 296:8, 296:11, 307:18

owned [1] - 216:21

**P**

P.M [1] - 1:5

p.m [19] - 73:16,

79:14, 129:4, 215:3, 230:17, 236:25, 239:2, 250:11, 251:1, 265:15, 266:1, 266:3, 266:4, 273:10, 273:12, 297:10, 308:22

PAA [1] - 223:22

Pacific [1] - 139:22

package [2] - 129:24, 269:2

packing [1] - 268:21

Page [1] - 6:6

page [38] - 12:13, 14:15, 28:21, 29:5, 37:12, 37:14, 51:19, 51:24, 53:1, 85:20, 87:20, 88:24, 88:25, 89:1, 104:25, 166:23, 166:24, 166:25, 168:7, 168:8, 170:15, 182:11, 208:19, 225:24, 229:3, 236:23, 240:21, 244:12, 251:15, 252:12, 254:7, 273:22, 275:22, 275:24, 281:5, 284:7, 285:14

pair [3] - 144:7, 148:23, 148:24

paired [3] - 148:22, 167:21, 179:25

pairing [1] - 40:6

pan [1] - 171:8

panel [6] - 222:20, 222:21, 223:8, 223:11, 267:14, 267:16

panels [3] - 222:12, 222:15, 222:17

paper [6] - 81:23, 105:12, 148:14, 204:4, 224:4, 224:5

paragraph [1] - 208:21

parallel [1] - 268:21

parameters [1] - 256:6

pardon [1] - 175:9

parents [7] - 43:24, 45:1, 84:14, 84:15, 160:17, 180:12, 207:9

parents' [8] - 43:20, 43:21, 43:22, 44:2, 44:5, 44:16, 44:25, 70:10

parlance [1] - 20:3

Parsons [1] - 8:19

part [37] - 17:1, 62:3, 62:4, 76:1, 80:4, 83:4, 92:3, 101:22, 120:7, 126:14, 134:23, 136:5, 136:18, 140:23, 146:19, 150:10, 152:25, 167:12, 170:5, 176:1, 178:13, 184:21, 198:5, 199:18, 199:19, 217:16, 219:9, 227:2, 245:21, 270:11, 284:21, 285:15, 286:1, 301:25, 302:4, 304:22

partially [1] - 75:19

participate [1] - 222:22

participated [2] - 222:12, 246:4

participating [2] - 22:19, 222:20

particular [17] - 39:22, 64:4, 76:9, 110:3, 110:14, 124:13, 127:5, 166:15, 167:4, 167:10, 223:2, 231:18, 243:14, 259:25, 292:5, 292:25, 304:25

particularly [18] - 24:6, 55:2, 60:19, 76:10, 76:22, 88:21, 96:18, 103:10, 121:15, 121:20, 133:19, 185:3, 197:1, 206:6, 207:3, 279:21, 296:16

parts [6] - 133:16, 142:10, 155:7, 155:8, 155:12

pass [6] - 80:11, 80:12, 128:15, 207:20, 207:23, 214:7

passage [2] - 248:13, 261:25

passed [3] - 19:24, 40:25, 74:24

past [12] - 7:10, 99:15, 117:18, 137:7, 138:3, 196:17, 202:7, 202:9, 220:11, 224:7, 287:11, 298:20

Paul [18] - 26:16, 26:17, 26:23, 27:18, 38:18, 39:6, 100:17, 115:19, 123:12, 124:13, 185:16, 191:5, 191:12, 191:15, 192:17, 201:15, 273:17, 274:1

pause [2] - 7:18, 215:12

pay [1] - 87:17

paying [1] - 202:4

payroll [3] - 299:20, 300:8, 300:17

PCT [1] - 54:15

PDF [3] - 105:13, 250:24, 272:7

peace [4] - 19:24, 21:7, 21:25, 22:4

Pearl [1] - 1:19

Pelican [7] - 15:22, 17:2,

17:8, 39:23, 41:15, 82:25, 143:24

pen [1] - 148:14

pending [1] - 202:18

Peninsula [12] - 15:18, 15:19, 15:22, 39:24, 75:17, 77:7, 82:25, 103:11, 143:24, 178:4, 178:5, 209:13

Pennsylvania [3] - 3:14, 3:17, 3:21

people [56] - 10:18, 11:21, 32:19, 32:20, 32:24, 34:2, 36:15, 38:20, 49:14, 50:13, 50:14, 50:17, 53:25, 77:24, 83:22, 91:13, 91:14, 91:15, 91:16, 91:18, 92:1, 97:12, 99:12, 99:17, 99:19, 110:14, 113:24, 116:16, 124:9, 132:10, 138:11, 138:16, 138:17, 138:20, 138:21, 140:13, 159:5, 159:7, 168:9, 198:8, 204:5, 205:2, 205:5, 205:6, 205:24, 211:19, 220:6, 222:22, 222:24, 223:12, 231:9, 256:8, 262:2, 281:3, 297:20

people- specific [1] - 91:13

per [3] - 146:2, 233:24, 292:13

percent [82] - 63:15, 65:12, 93:23, 97:6, 98:2, 98:3, 98:19, 99:4, 132:17, 168:16, 168:17, 168:19,

169:1, 169:15, 169:24, 173:12, 174:8, 174:13, 174:15, 174:21, 174:22, 174:25, 175:6, 175:9, 175:14, 175:16, 177:13, 178:14, 178:15, 208:23, 208:25, 210:1, 210:7, 210:8, 230:25, 231:2, 231:7, 231:11, 234:19, 234:20, 242:16, 242:17, 242:25, 245:1, 246:21, 246:23, 246:24, 247:5, 247:8, 247:13, 254:13, 254:14, 254:22, 254:24, 255:2, 256:25, 257:5, 257:16, 263:14, 264:4, 264:8, 264:10, 267:18, 268:2, 268:5, 271:3, 271:5, 271:13, 275:14, 275:18, 277:24, 277:25, 278:11, 281:6, 281:9, 283:14, 283:16, 294:10, 298:20

Percent [1] - 217:25

percentage [13] - 15:8, 16:2, 96:3, 96:8, 97:5, 97:22, 98:17, 99:7, 174:7, 204:20, 208:23, 209:1, 283:20

percentage- wise [1] - 97:22

percentages [3] - 111:2, 132:4, 173:16

Perez [1] - 64:4

perfect [2] - 283:3, 294:2

perfectly [3] - 89:4, 104:6, 125:9

perform [2] - 97:23, 178:25

performance

[52] - 30:1, 93:4, 93:5, 95:17, 95:20, 95:24, 98:15, 98:21, 99:16, 100:9, 127:14, 221:20, 222:9, 223:10, 228:19, 228:24, 231:25, 232:10, 233:5, 236:12, 244:24, 246:6, 254:8, 254:12, 254:18, 254:20, 255:11, 255:16, 263:11, 263:24, 266:23, 270:20, 271:1, 271:2, 277:15, 277:19, 278:6, 278:7, 278:12, 278:20, 278:22, 278:25, 279:7, 279:17, 279:25, 280:3, 281:6, 281:10, 286:22, 286:23, 290:18, 301:6

**performing** [14] - 99:4, 178:20, 178:21, 178:23, 179:3, 200:18, 200:20, 204:11, 204:23, 205:13, 247:10, 264:5, 264:8, 264:11

**perhaps** [4] - 92:2, 157:4, 168:6, 191:9

**period** [7] - 31:12, 35:22, 36:21, 114:10, 194:16, 199:13, 298:17

**permission** [1] - 41:13

**permits** [1] - 34:4

**person** [22] - 19:11, 29:17, 37:19, 40:16, 52:10, 76:2, 92:24, 99:13, 107:5, 138:24, 151:4, 155:6, 180:22, 186:13, 188:3, 190:9, 190:22, 190:23, 231:5, 290:4, 296:19, 302:13

**personal** [3] - 224:8, 224:11,

307:18

**perspective** [1] - 188:7

**Pete** [1] - 115:19

**Petteway** [4] - 20:17, 66:7, 66:10, 66:11

**PETTEWAY** [3] - 1:4, 1:11, 2:2

**phase** [3] - 188:22, 189:1

**phases** [1] - 189:1

**Phil** [15] - 73:15, 201:14, 226:6, 226:7, 227:22, 233:24, 234:3, 234:5, 238:18, 251:3, 265:4, 288:19, 290:1, 295:11, 301:10

**Phillips** [1] - 4:24

**phone** [30] - 27:22, 27:24, 27:25, 39:1, 39:4, 42:24, 43:13, 43:15, 45:22, 45:24, 48:3, 52:19, 52:20, 52:21, 53:10, 69:16, 69:20, 73:9, 107:8, 187:14, 227:11, 227:14, 227:16, 227:18, 227:24, 228:4, 288:18, 289:21, 290:8

**phrased** [1] - 16:11

**physically** [2] - 195:18, 262:7

**pick** [5] - 46:19, 61:7, 76:22, 125:11, 125:23

**picked** [1] - 303:14

**picking** [3] - 80:16, 83:18, 169:4

**picture** [3] - 230:4, 230:5, 230:10

**piece** [4] - 55:17, 55:18, 221:4,

221:9

**pieces** [10] - 54:3, 145:9, 151:25, 221:3, 221:8, 235:6, 272:25, 280:1, 292:21, 293:25

**Pivot** [4] - 94:11, 109:21, 110:2, 110:3

**pivot** [28] - 94:12, 172:17, 172:20, 243:20, 243:22, 244:3, 244:5, 245:15, 245:18, 253:18, 254:5, 255:19, 255:21, 256:10, 258:4, 263:15, 267:12, 268:14, 268:17, 269:15, 270:22, 275:10, 275:13, 277:21, 278:14, 283:9, 294:17, 294:23

**PL** [8] - 221:12, 244:21, 244:22, 255:25, 256:4, 256:5, 256:22, 276:3

**place** [16] - 19:14, 46:21, 63:18, 83:21, 96:18, 99:12, 119:3, 121:21, 131:18, 185:1, 205:14, 205:25, 217:17, 235:11, 235:13, 306:21

**placed** [4] - 17:2, 220:24, 226:1, 268:17

**places** [5] - 21:9, 35:19, 75:20, 153:5, 270:13

**plaintiff** [1] - 20:12

**PLAINTIFFS** [4] - 1:11, 2:2, 2:12, 3:2

**plaintiffs** [10] - 7:6, 7:8, 13:1, 20:16, 21:23, 62:12, 207:22, 208:5, 285:4, 307:25

**Plaintiffs'** [1] -

289:9

**plaintiffs'** [5] - 21:20, 22:5, 23:4, 287:15, 307:12

**plan** [127] - 11:8, 74:4, 82:11, 85:21, 95:21, 97:4, 97:20, 98:8, 98:10, 98:16, 98:18, 99:2, 130:24, 131:2, 131:4, 142:9, 148:8, 154:14, 154:19, 156:22, 161:19, 162:10, 166:15, 171:1, 172:25, 174:7, 178:19, 202:12, 203:3, 204:2, 204:22, 212:14, 213:11, 229:20, 229:22, 230:5, 230:9, 230:10, 230:12, 232:1, 233:4, 234:6, 234:14, 236:6, 236:11, 237:24, 238:9, 238:10, 239:9, 239:10, 243:11, 243:16, 243:18, 244:9, 244:10, 244:11, 246:11, 246:13, 246:14, 246:16, 246:17, 247:15, 248:9, 248:12, 248:19, 249:2, 249:5, 249:7, 249:8, 249:11, 249:14, 249:18, 249:20, 249:21, 249:25, 251:10, 251:14, 251:18, 251:20, 251:22, 252:2, 252:6, 252:9, 252:16, 252:18, 252:22, 252:25, 253:5, 254:1, 254:8, 254:9, 254:11, 254:12, 254:17, 254:21, 255:8, 255:13, 256:24, 257:6, 257:15, 259:14, 259:25, 260:9, 264:1, 264:3, 267:4, 267:24, 268:20, 269:1,

271:9, 271:12, 276:15, 276:21, 279:4, 281:25, 282:15, 290:16, 290:21, 299:22, 300:13, 301:20, 301:24

**Plan** [11] - 74:9, 82:17, 87:9, 95:25, 259:15, 260:14, 260:18, 260:20, 260:24, 261:2, 261:5

**plan's** [1] - 246:20

**plane** [2] - 236:5, 236:8

**planned** [1] - 246:9

**plans** [57] - 68:22, 69:23, 96:11, 99:6, 124:19, 137:24, 143:6, 158:3, 220:15, 220:18, 229:23, 231:4, 234:10, 234:23, 235:3, 236:9, 237:20, 238:3, 239:22, 243:7, 243:12, 247:14, 247:15, 248:2, 248:3, 248:25, 250:19, 250:22, 251:22, 255:1, 258:15, 259:12, 259:17, 259:20, 260:5, 262:5, 262:17, 264:23, 267:9, 268:24, 269:4, 271:16, 274:5, 279:1, 289:7, 290:14, 298:15, 298:16, 299:11, 300:20, 301:11, 301:14, 301:19, 305:3, 305:7

**plate** [1] - 186:15

**play** [17] - 52:15, 141:20, 141:22, 141:24, 145:13, 182:11, 184:25, 188:17, 194:11, 198:21, 230:25, 231:2, 231:15, 263:23, 299:5, 302:23, 304:18

**played** [10] - 141:25, 145:15,

147:19, 182:23, 188:18, 194:13, 196:5, 198:25, 302:25, 304:19

playing [1] - 196:4

Plaza [1] - 4:11

pleased [1] - 73:11

plenty [4] - 186:14, 204:13, 205:1, 308:5

PLLC [1] - 4:17

plot [4] - 180:13, 180:17, 180:18, 207:6

plus [16] - 49:12, 168:16, 168:18, 168:19, 168:23, 169:1, 169:8, 230:24, 231:2, 231:11, 234:18, 234:19, 245:1, 257:5, 257:20, 288:7

PLVAP [1] - 256:19

PO [1] - 242:4

point [103] - 7:11, 19:25, 23:6, 26:9, 30:4, 31:17, 33:13, 34:16, 35:1, 41:10, 48:13, 48:15, 53:7, 53:11, 57:9, 57:24, 58:14, 58:21, 60:2, 60:24, 65:4, 67:13, 67:23, 71:6, 72:22, 76:1, 76:6, 79:4, 79:25, 83:17, 91:10, 97:18, 99:10, 103:19, 106:10, 111:18, 111:24, 112:6, 113:3, 113:4, 113:8, 113:15, 114:5, 114:12, 114:14, 123:15, 124:6, 135:7, 138:1, 142:4, 156:3, 156:5, 156:8, 161:15, 163:17, 164:13, 164:22, 165:2,

184:1, 189:3, 189:23, 189:24, 190:13, 190:16, 194:24, 195:5, 195:12, 196:12, 198:5, 198:9, 199:3, 199:4, 199:7, 199:8, 199:22, 200:15, 202:12, 213:17, 240:11, 244:16, 244:17, 258:13, 259:11, 267:7, 270:1, 271:7, 272:22, 277:6, 278:3, 283:20, 286:10, 287:25, 291:11, 291:25, 293:3, 294:5, 294:25, 295:2, 295:7, 304:20

pointed [1] - 104:3

pointing [1] - 125:15

points [7] - 99:7, 209:1, 247:2, 247:12, 271:10, 293:7

poison [1] - 125:23

polarized [3] - 170:3, 170:8, 179:16

political [53] - 80:2, 80:17, 90:12, 90:13, 91:11, 91:25, 92:1, 93:4, 93:5, 95:17, 95:20, 95:24, 98:15, 98:20, 100:9, 109:2, 121:22, 122:11, 125:10, 127:14, 163:11, 166:18, 172:17, 184:25, 193:6, 221:22, 222:9, 231:24, 232:2, 232:10, 233:5, 236:12, 254:7, 255:10, 255:15, 263:11, 263:24, 266:23, 270:20, 277:14, 277:19, 277:21, 278:6, 278:7, 278:14, 278:20, 279:7,

279:17, 279:25, 286:22, 286:23, 300:22, 305:4

politically [1] - 103:17

politically-based [1] - 103:17

politician [1] - 49:13

politics [5] - 66:21, 72:11, 111:3, 111:5, 198:6

Polizzano [1] - 2:16

polling [1] - 235:13

Polsby [1] - 78:14

Polsby-Popper [1] - 78:14

polygon [1] - 143:12

polygons [9] - 142:6, 142:20, 143:10, 143:23, 143:25, 144:2, 145:2, 163:3, 163:4

poor [2] - 12:14, 289:18

pop [37] - 16:17, 44:14, 46:6, 48:1, 77:14, 77:16, 83:16, 146:12, 149:15, 149:17, 157:8, 157:13, 157:14, 172:20, 195:10, 195:15, 195:20, 196:6, 205:11, 206:1, 238:5, 243:20, 243:22, 255:19, 255:21, 256:10, 258:4, 267:12, 268:14, 268:17, 269:15, 275:10, 275:13, 276:2, 278:14, 283:9, 294:17

Pop [3] - 109:21, 110:2, 110:3

pop-ins [1] - 196:6

pop.. [1] - 237:7

popped [11] - 194:1, 194:3, 194:5, 194:6, 194:21, 195:9, 195:11, 195:17, 195:22, 196:21, 196:22

Popper [1] - 78:14

popping [1] - 196:23

pops [1] - 171:7

popular [1] - 24:6

popularity [1] - 162:3

populated [1] - 283:23

population [144] - 16:9, 16:18, 16:20, 16:22, 18:6, 18:9, 18:13, 18:14, 18:15, 46:10, 46:20, 46:21, 46:23, 47:17, 48:13, 78:12, 78:13, 83:14, 83:18, 108:13, 108:18, 109:23, 110:8, 110:12, 110:13, 131:7, 131:8, 131:21, 133:15, 133:21, 134:1, 134:4, 134:20, 136:20, 149:17, 150:4, 151:23, 152:13, 152:17, 155:13, 155:14, 155:19, 156:1, 156:15, 156:21, 156:22, 157:3, 157:13, 157:15, 160:4, 160:19, 160:20, 160:24, 163:19, 163:21, 165:10, 166:3, 166:10, 166:11, 173:7, 173:8, 174:19, 174:21, 174:24, 175:3, 175:21, 178:14, 178:15, 207:15, 208:23, 208:24, 209:2, 209:7, 209:19, 209:21, 210:3,

210:11, 217:11, 217:17, 219:6, 219:8, 221:8, 221:15, 222:5, 228:15, 230:24, 231:5, 231:8, 234:15, 234:18, 236:16, 237:8, 241:19, 241:21, 242:3, 242:4, 242:14, 244:6, 244:7, 244:25, 245:3, 245:8, 255:22, 255:24, 255:25, 256:1, 256:9, 256:12, 256:15, 256:18, 256:25, 257:5, 257:18, 257:23, 258:15, 258:23, 263:8, 267:13, 267:18, 267:21, 268:2, 268:7, 268:10, 269:4, 274:20, 275:7, 275:14, 275:18, 275:21, 276:3, 276:17, 276:18, 277:11, 279:23, 280:6, 283:12, 283:14, 283:19, 284:4, 294:11

Population [6] - 217:4, 217:7, 217:15, 218:2, 218:8, 223:22

populations [7] - 133:2, 134:12, 165:20, 165:21, 209:16, 242:14, 256:2

portion [5] - 31:23, 69:2, 84:4, 95:8, 120:23

portions [3] - 160:8, 162:9, 183:23

position [8] - 38:22, 46:5, 46:25, 49:16, 66:7, 79:6, 112:22, 140:9

positively [1] - 80:10

possession [1] - 42:7

possibility [4] -

59:1, 67:3, 71:5, 228:18

**possible** [25] - 44:12, 70:25, 88:13, 106:1, 106:5, 201:3, 203:13, 203:15, 212:23, 212:25, 213:22, 218:22, 228:8, 228:12, 233:8, 234:20, 235:21, 263:3, 269:12, 287:11, 294:16, 297:15, 299:12

**possibly** [10] - 46:7, 47:1, 47:7, 54:7, 91:22, 142:2, 202:11, 205:19, 212:12, 291:14

**post** [1] - 59:17

**post-Shelby** [1] - 59:17

**posttrial** [1] - 23:11

**potential** [7] - 26:3, 42:2, 42:3, 48:1, 66:15, 75:13, 167:9

**potentially** [2] - 13:3, 46:24

**powerful** [1] - 244:4

**practical** [1] - 60:14

**practice** [8] - 10:18, 96:17, 138:6, 228:10, 235:19, 243:6, 269:14, 270:15

**practiced** [1] - 220:6

**practices** [1] - 131:17

**practicing** [2] - 9:14, 9:15

**practitioner's** [1] - 60:14

**precinct** [88] - 20:1, 20:4, 25:11, 40:9, 47:3, 54:16, 54:20, 55:11, 68:8, 72:16,

74:15, 76:10, 82:19, 84:6, 91:2, 91:14, 96:11, 96:12, 102:14, 106:22, 106:23, 106:24, 116:12, 120:6, 121:25, 146:25, 148:8, 148:19, 149:25, 150:6, 150:10, 154:7, 154:10, 155:4, 155:12, 158:16, 159:1, 159:10, 160:3, 161:19, 164:5, 164:14, 164:15, 165:4, 165:5, 165:25, 166:15, 167:3, 167:10, 170:19, 171:14, 175:21, 178:14, 180:19, 185:4, 193:16, 193:18, 200:12, 207:14, 213:8, 214:2, 225:16, 229:9, 232:2, 232:5, 233:1, 233:17, 235:4, 235:12, 235:20, 237:10, 237:14, 238:6, 246:19, 247:11, 255:11, 266:22, 271:2, 279:18, 279:25, 281:9, 283:24, 284:15, 286:19, 290:24, 291:3

**Precinct** [93] - 10:2, 16:9, 18:6, 18:18, 26:3, 44:21, 47:8, 47:13, 55:1, 59:5, 59:9, 62:1, 63:21, 67:6, 75:14, 77:9, 78:7, 87:18, 87:19, 98:1, 98:3, 98:13, 98:16, 98:18, 98:21, 99:3, 115:22, 119:24, 133:22, 133:23, 136:21, 149:9, 149:24, 149:25, 150:7, 150:17, 154:13, 155:7, 155:8, 155:14, 158:17, 158:18, 159:7, 159:11,

160:4, 160:8, 160:9, 160:10, 160:11, 160:19, 161:8, 161:9, 161:16, 162:9, 162:10, 167:24, 170:21, 174:5, 174:18, 175:2, 175:5, 175:6, 175:9, 175:15, 178:19, 179:9, 209:13, 209:15, 246:21, 246:22, 246:23, 246:24, 254:13, 254:14, 264:7, 264:10, 277:25, 278:11, 281:7, 284:13, 285:2, 285:11, 285:18, 285:19, 285:24, 305:19, 305:22, 306:1, 306:4

**precinct's** [1] - 209:1

**precinct-specific** [1] - 91:14

**Precincts** [7] - 97:21, 155:14, 162:24, 163:7, 168:2, 181:8, 264:4

**precincts** [79] - 10:9, 19:6, 19:7, 21:16, 26:2, 41:19, 54:1, 54:3, 55:4, 76:3, 84:18, 88:11, 89:9, 89:12, 89:15, 89:21, 89:25, 95:14, 96:14, 96:20, 96:24, 110:8, 110:14, 116:6, 116:8, 116:15, 132:3, 134:13, 136:12, 147:1, 154:3, 154:19, 154:23, 163:20, 173:17, 173:18, 173:23, 173:24, 187:2, 187:7, 189:5, 206:17, 206:21, 228:14, 228:17, 231:15, 231:17, 231:19, 231:21, 232:16, 233:6, 233:10,

233:23, 235:2, 235:6, 235:7, 235:18, 236:20, 245:6, 247:9, 263:25, 270:8, 273:1, 278:23, 279:12, 284:1, 292:6, 292:17, 292:25, 293:9, 294:20, 300:2, 303:22, 305:18

**precise** [6] - 142:8, 156:1, 206:17, 280:17, 289:7, 296:1

**precisely** [3] - 169:24, 254:19, 280:24

**preclear** [1] - 18:2

**preclearance** [32] - 9:7, 9:23, 10:1, 10:8, 10:13, 10:15, 10:19, 11:3, 11:5, 11:7, 11:14, 12:8, 13:19, 16:7, 19:3, 19:6, 39:21, 60:1, 61:25, 62:3, 62:4, 62:7, 63:22, 151:2, 151:8, 151:16, 151:17, 151:23, 152:22, 163:14, 208:9, 208:14

**precleared** [1] - 60:4

**predominance** [1] - 60:24

**predominant** [2] - 60:25, 249:7

**predominantly** [1] - 165:20

**predominate** [6] - 249:20, 252:1, 252:21, 260:23, 282:1, 282:17

**prefer** [2] - 22:22, 82:22

**preferred** [6] - 80:8, 82:14, 86:3, 86:5, 183:1, 205:15

**preliminary** [1] -

305:7

**premise** [1] - 159:25

**prepared** [5] - 58:18, 80:9, 104:5, 172:1, 194:25

**preparing** [1] - 123:1

**present** [9] - 81:19, 93:3, 104:19, 128:12, 173:6, 197:24, 222:24, 249:16, 262:7

**presentation** [2] - 224:4, 224:5

**presented** [6] - 105:6, 122:19, 162:1, 198:10, 211:10, 224:3

**presenting** [4] - 89:2, 93:2, 102:24, 105:9

**presents** [1] - 172:22

**preserve** [1] - 66:13

**preserved** [1] - 127:13

**preserving** [1] - 121:19

**presidential** [1] - 266:24

**press** [2] - 24:6, 151:6

**presumably** [2] - 73:25, 171:3

**pretty** [18] - 10:24, 10:25, 14:23, 30:6, 30:7, 32:7, 41:23, 83:25, 131:11, 147:13, 150:18, 168:2, 170:7, 194:24, 238:2, 268:10, 291:17, 295:13

**preventing** [1] - 146:12

**previous** [2] - 48:9, 65:6

**previously** [6] - 129:10, 190:15, 238:24, 254:23,

258:22, 279:17

price [1] - 27:14

primaried [1] - 90:10

primary [16] - 18:16, 24:17, 24:20, 24:21, 24:22, 25:4, 31:1, 64:14, 64:21, 65:5, 112:25, 137:1, 194:17, 206:25, 207:1, 214:1

principal [1] - 197:23

principally [1] - 48:11

principles [1] - 304:4

printed [1] - 81:23

prioritized [2] - 299:13, 305:1

prioritizes [1] - 30:21

priority [2] - 35:14, 299:13

privacy [1] - 31:24

privilege [3] - 222:16, 223:5, 224:1

problem [31] - 18:22, 46:17, 59:12, 59:14, 60:21, 62:4, 64:25, 73:6, 83:22, 91:13, 92:23, 92:24, 121:24, 127:23, 136:6, 152:6, 153:8, 156:21, 156:24, 157:6, 157:8, 170:23, 176:2, 180:15, 205:24, 206:10, 235:15, 307:19, 307:22

problems [13] - 16:23, 32:16, 58:17, 102:22, 104:5, 106:15, 106:16, 113:19, 146:18, 161:23, 206:3, 220:4, 235:8

proceed [1] - 56:20

Proceedings [2] - 5:4, 308:22

proceedings [1] - 309:4

process [32] - 8:25, 9:2, 10:19, 15:1, 41:8, 45:4, 52:16, 53:5, 66:23, 90:24, 103:7, 113:7, 114:3, 115:4, 116:14, 120:7, 120:8, 122:19, 126:1, 126:5, 126:8, 127:2, 150:24, 193:6, 193:21, 236:9, 255:15, 268:19, 270:12, 293:10, 301:21, 304:22

Processing [1] - 241:1

procured [1] - 140:25

produce [7] - 66:23, 71:7, 73:9, 81:8, 211:18, 242:2, 242:20

produced [9] - 5:5, 15:1, 79:24, 88:6, 108:19, 108:21, 113:5, 148:1, 283:7

produces [3] - 233:13, 241:24, 244:13

product [7] - 73:12, 201:22, 201:24, 251:23, 252:18, 276:6, 298:10

productive [1] - 151:20

professional [10] - 216:14, 216:17, 218:24, 219:4, 219:7, 222:17, 223:15, 224:8, 296:20

professionally [1] - 220:2

professionals

[3] - 217:10, 219:25, 223:4

proficiency [1] - 219:21

program [12] - 31:24, 36:5, 94:4, 94:5, 94:6, 211:17, 217:11, 217:17, 217:19, 219:10, 229:12, 297:12

progress [1] - 250:22

Project [3] - 2:10, 2:13, 2:20

project [20] - 27:8, 68:16, 117:18, 143:6, 202:10, 221:2, 226:16, 227:25, 229:18, 233:25, 237:22, 239:20, 244:19, 250:16, 267:6, 289:25, 294:2, 295:19, 300:3, 301:12

projects [5] - 233:9, 295:16, 295:22, 297:18, 299:6

promise [1] - 31:16

promised [1] - 31:14

prong [2] - 201:3

pronounce [1] - 30:7

proof [1] - 62:5

proper [1] - 183:20

property [1] - 280:21

prophylactic [2] - 62:14, 103:6

proportion [1] - 21:11

proportional [1] - 281:2

proportionally [1] - 21:14

proposal [2] - 19:22, 19:23

proposed [8] - 12:16, 14:13,

16:6, 17:23, 19:18, 19:20, 93:4

proprietary [1] - 280:20

protect [2] - 206:8, 280:22

protected [1] - 204:16

protecting [2] - 152:5, 208:7

protection [1] - 204:19

prove [3] - 62:10, 64:13, 66:4

proved [1] - 62:7

provide [13] - 29:16, 39:14, 70:13, 71:18, 107:19, 112:6, 125:13, 201:4, 258:17, 258:18, 269:2, 270:15, 276:14

provided [17] - 15:15, 55:9, 70:7, 98:23, 103:15, 113:9, 128:8, 141:4, 150:20, 172:2, 201:5, 278:7, 278:10, 280:13, 285:4, 304:9, 304:11

provides [1] - 182:15

providing [2] - 51:16, 142:19

proving [1] - 65:1

Public [6] - 2:10, 4:21, 4:24, 221:12, 256:1, 256:5

public [20] - 31:2, 32:10, 34:11, 40:7, 49:7, 62:23, 113:7, 114:17, 118:18, 119:5, 123:15, 123:21, 151:6, 157:22, 158:2, 163:11, 184:20, 200:23, 203:2

publicly [2] - 40:11, 151:5

publish [1] - 276:6

published [2] - 217:22, 256:8

pull [38] - 26:21, 27:17, 28:20, 37:2, 38:12, 42:21, 44:10, 45:14, 48:17, 51:11, 53:1, 56:23, 69:1, 71:3, 79:12, 86:20, 93:9, 104:25, 107:11, 108:25, 111:6, 115:11, 115:24, 119:18, 120:4, 120:19, 130:20, 144:12, 154:15, 157:10, 165:12, 165:13, 166:22, 171:22, 185:13, 201:9, 208:11, 289:8

punch [1] - 44:2

pure [2] - 184:17, 184:21

purple [4] - 87:22, 90:22, 285:17, 285:18

purported [2] - 63:4, 174:8

purpose [30] - 18:3, 18:4, 38:8, 43:15, 45:22, 45:24, 50:8, 52:7, 57:13, 57:16, 69:18, 69:20, 82:5, 82:12, 106:8, 107:13, 153:22, 154:2, 182:1, 188:7, 218:15, 238:8, 256:13, 276:25, 293:16, 300:1, 300:22, 301:5, 303:11

purposefully [1] - 161:7

purposes [1] - 13:4

pursuant [2] - 97:22, 104:15

push [1] - 162:6

pushed [1] - 119:1

put [82] - 13:14, 13:24, 17:5, 17:8, 28:14, 33:3, 36:7, 42:25, 50:22, 53:8, 58:20, 70:18, 70:21, 71:21, 73:2, 73:13, 77:16, 77:18, 79:2, 79:10, 82:25, 83:13, 84:11, 93:17, 99:17, 106:19, 113:6, 118:1, 119:6, 119:11, 119:12, 126:16, 128:11, 138:18, 145:9, 145:10, 145:24, 146:4, 161:15, 175:21, 178:5, 178:6, 186:23, 211:17, 211:25, 221:24, 225:22, 226:22, 229:2, 234:1, 234:13, 235:10, 236:22, 239:12, 247:18, 250:6, 250:23, 253:7, 259:4, 261:10, 262:20, 265:11, 265:22, 266:14, 271:23, 272:6, 272:13, 272:20, 273:21, 274:23, 276:6, 281:20, 281:21, 282:10, 283:1, 285:1, 285:5, 292:16, 292:24, 296:18

puts [3] - 7:10, 75:17, 176:21

putting [9] - 39:23, 49:16, 115:5, 117:15, 118:13, 144:4, 148:14, 160:7, 168:25

PX-144 [1] - 185:13

PX-173 [2] - 37:3

PX-187 [3] - 225:23, 226:2, 226:4

PX-190 [5] - 239:12, 239:16, 239:18, 245:19,

294:18

PX-193 [1] - 69:1

PX-196 [2] - 73:13, 250:7

PX-197 [7] - 81:10, 89:1, 106:19, 250:24, 253:8, 253:10, 253:12

PX-199 [1] - 79:12

PX-200 [1] - 261:10

PX-201 [2] - 86:20, 90:20

PX-203 [1] - 265:12

PX-204 [1] - 265:23

PX-208 [2] - 272:6, 272:13

PX-384 [1] - 165:14

PX-45 [1] - 170:16

PX-485 [2] - 166:22, 176:11

PX-527 [1] - 271:23

PX-528 [1] - 171:22

PX-538 [1] - 259:5

## Q

quality [3] - 242:23, 270:2, 270:11

quarter [1] - 7:12

QUESTION [23] - 142:1, 142:14, 142:19, 145:16, 147:11, 182:24, 188:19, 194:14, 195:2, 195:9, 195:11, 195:14, 195:18, 195:21, 195:25, 196:6, 196:11, 196:15, 199:1, 199:4, 199:10, 303:1, 304:20

questioning [1] -

22:19

questions [15] - 12:7, 48:8, 141:23, 186:5, 210:16, 230:22, 262:16, 262:18, 264:17, 264:20, 287:2, 307:12, 307:15, 307:18, 308:3

quibble [2] - 14:5, 168:23

quick [3] - 185:25, 216:23, 230:21

quickly [18] - 26:21, 45:14, 70:6, 72:23, 73:11, 79:12, 113:14, 203:11, 212:25, 228:8, 267:6, 279:2, 290:3, 291:17, 295:13, 295:14, 298:14, 305:3

quite [15] - 86:8, 102:23, 106:25, 112:13, 126:18, 144:1, 156:3, 156:8, 167:5, 169:3, 169:17, 177:20, 185:1, 226:24, 291:5

quote [1] - 129:14

## R

R-R [1] - 218:1

race [36] - 61:3, 71:22, 71:24, 72:9, 72:12, 72:19, 103:14, 111:2, 221:17, 242:14, 244:8, 246:1, 246:2, 246:4, 249:7, 249:10, 249:13, 249:20, 249:24, 252:1, 252:5, 252:21, 252:24, 258:21, 260:23, 261:1, 266:24, 279:24, 280:4, 282:1, 282:4, 282:17, 282:20, 286:11, 286:14

race's [1] - 93:20

race-driven [1] -

61:3

races [4] - 93:14, 97:14, 245:21, 246:1

racial [66] - 59:9, 60:20, 60:23, 62:21, 62:24, 62:25, 63:7, 66:22, 67:2, 67:6, 67:9, 71:19, 72:2, 72:8, 72:13, 75:13, 77:9, 77:12, 81:1, 81:7, 108:14, 108:18, 110:19, 110:20, 110:23, 132:3, 136:8, 163:23, 165:19, 172:22, 172:25, 173:16, 181:21, 181:23, 182:2, 182:3, 182:8, 183:3, 183:5, 183:16, 183:21, 206:7, 249:16, 250:2, 252:8, 253:3, 258:5, 258:8, 258:11, 261:4, 265:6, 265:9, 268:14, 274:20, 276:9, 276:22, 277:8, 277:12, 280:10, 282:7, 282:23, 286:18, 294:7, 294:19

racialized [1] - 103:9

racially [5] - 18:19, 26:4, 170:3, 170:7, 179:16

radical [2] - 162:4, 162:5

ragged [1] - 146:9

raise [5] - 15:7, 18:3, 18:8, 190:16, 215:12

raised [3] - 177:3, 177:4

ran [2] - 83:13, 103:5

range [2] - 175:14, 256:14

rapid [1] - 12:11

rapidly [1] - 138:8

rare [1] - 128:18

Raschke [1] - 4:9

rather [7] - 22:19, 32:24, 33:5, 142:10, 174:11, 202:13, 296:7

rational [1] - 181:16

RDR [1] - 5:2

re [5] - 31:16, 66:24, 101:16, 200:13, 214:8

re-cross [1] - 214:8

re-elect [1] - 66:24

re-elected [2] - 101:16, 200:13

re-promise [1] - 31:16

reach [7] - 28:17, 45:5, 65:17, 83:21, 191:15, 191:19, 305:23

reached [7] - 12:12, 45:9, 138:13, 182:7, 191:3, 191:15, 207:4

reaches [1] - 64:20

reaction [1] - 101:7

reactions [1] - 79:3

read [12] - 12:21, 42:16, 78:15, 78:17, 87:14, 93:21, 172:10, 187:10, 199:20, 209:3, 234:8, 284:21

read] [5] - 73:19, 105:7, 105:17, 108:14, 121:23

read].. [1] - 117:20

readily [1] - 245:24

reading [2] - 91:23, 212:20

readjust [1] -

76:13

ready [2] - 230:19, 234:6

Ready [42] - 26:16, 26:17, 26:18, 26:23, 27:18, 28:22, 38:18, 38:24, 42:18, 42:24, 42:25, 43:3, 43:13, 44:1, 48:14, 51:7, 51:12, 51:15, 56:4, 57:12, 100:17, 115:19, 120:14, 123:12, 185:16, 185:19, 188:3, 191:5, 191:7, 191:12, 191:15, 191:20, 191:21, 192:1, 192:17, 192:20, 192:25, 193:11, 197:24, 201:15, 274:1

real [11] - 17:1, 32:16, 64:25, 65:3, 67:3, 71:5, 135:14, 148:15, 149:4, 149:14, 166:20

reality [1] - 34:8

realize [1] - 106:25

really [53] - 9:3, 15:2, 18:21, 31:18, 33:20, 38:6, 38:24, 39:20, 42:9, 44:12, 53:25, 60:8, 77:24, 78:11, 78:17, 85:14, 90:3, 91:17, 101:9, 107:3, 113:18, 117:24, 126:21, 127:22, 128:10, 131:5, 132:24, 135:5, 135:7, 136:2, 142:16, 154:9, 162:15, 166:6, 166:17, 178:7, 197:4, 198:3, 199:5, 199:23, 203:13, 205:7, 214:25, 229:16, 245:14, 248:1, 262:17,

290:15, 291:8, 291:10, 296:10

reason [21] - 17:2, 25:3, 30:19, 41:25, 52:9, 60:25, 103:13, 151:1, 151:8, 151:22, 166:4, 181:12, 185:5, 185:20, 186:8, 203:1, 245:7, 277:3, 279:3, 279:9, 303:10

reasonable [4] - 124:4, 124:5, 154:11, 181:16

reasons [13] - 19:14, 49:8, 77:11, 89:20, 114:25, 142:21, 153:15, 161:24, 162:1, 185:2, 197:24, 298:8, 303:3

receive [8] - 12:10, 45:6, 45:8, 54:6, 126:9, 126:15, 211:13, 224:2

received [16] - 51:16, 52:3, 96:8, 118:12, 118:22, 120:11, 128:22, 142:5, 148:4, 212:18, 224:10, 226:25, 233:2, 264:17, 264:23, 267:7

receiving [8] - 38:2, 115:7, 116:1, 118:16, 122:14, 124:7, 224:17, 251:20

recent [2] - 245:25, 246:1

Recess [3] - 56:15, 129:4, 215:3

recognize [8] - 12:11, 97:15, 130:14, 130:24, 152:20, 223:1, 261:17, 289:11

recollection [24] - 11:2, 28:6, 28:10, 43:8,

45:18, 57:19, 69:15, 74:1, 86:14, 105:8, 110:22, 119:20, 124:25, 139:18, 139:21, 143:19, 181:22, 190:2, 194:8, 261:18, 274:12, 305:10, 306:2, 306:5

recommendations [1] - 287:23

reconstructed [1] - 183:19

record [16] - 25:18, 33:4, 65:21, 124:2, 157:14, 158:13, 162:23, 178:7, 204:6, 213:13, 214:15, 216:5, 294:18, 304:12, 305:15, 309:4

recorded [1] - 5:4

recording [1] - 254:7

records [2] - 304:15, 306:5

recreate [2] - 229:8, 230:5

recruited [2] - 219:1, 219:7

rectifications [1] - 76:3

rectify [1] - 111:17

red [3] - 44:19, 165:20, 173:17

Red [2] - 303:3, 303:5

redacted [1] - 237:5

redesign [1] - 128:9

Redirect [1] - 6:12

redirect [1] - 211:22

REDIRECT [1] - 212:1

redistrict [1] - 65:18

redistricted [1] - 19:9

redistricting [71] - 8:13, 8:17, 8:21, 8:25, 9:2, 9:17, 9:20, 13:8, 26:10, 27:2, 28:12, 29:11, 29:18, 29:23, 32:12, 34:18, 36:10, 39:10, 39:22, 52:16, 56:5, 63:12, 66:23, 68:23, 81:24, 99:13, 105:11, 137:10, 137:15, 137:18, 137:24, 139:2, 156:6, 156:10, 157:23, 158:3, 204:8, 204:22, 219:13, 220:1, 220:15, 220:18, 220:21, 221:1, 221:14, 221:19, 221:25, 222:2, 222:13, 224:6, 228:10, 236:1, 240:4, 241:24, 244:13, 255:14, 256:7, 261:14, 261:20, 273:11, 274:5, 295:16, 295:18, 297:2, 297:7, 297:11, 298:4, 298:12, 300:13, 304:3

Redistricting [2] - 157:25, 158:1

redoing [1] - 19:15

redone [1] - 19:17

redraw [4] - 65:3, 186:12, 187:4, 187:6

redrawing [3] - 127:10, 185:20, 300:2

reduce [2] - 155:13, 234:18

reduced [3] - 22:11, 163:15, 163:18

reducing [3] - 16:3, 209:14, 272:23

refer [9] - 54:16,

94:18, 94:24, 94:25, 95:9, 96:15, 131:1, 256:4, 268:22

reference [4] - 72:2, 80:25, 196:22, 247:6

referenced [2] - 120:14, 247:21

referred [6] - 23:15, 24:14, 121:18, 131:3, 219:14, 228:8

referring [26] - 20:4, 66:10, 72:1, 72:2, 82:16, 86:9, 100:20, 100:22, 101:2, 119:3, 143:13, 143:14, 143:15, 143:17, 173:18, 201:25, 212:11, 231:1, 231:16, 232:3, 232:21, 233:20, 233:22, 234:25, 239:24, 244:1

refers [4] - 94:19, 233:21, 240:14, 256:5

refinements [2] - 217:18, 248:5

refining [1] - 268:20

reflect [5] - 31:12, 74:23, 88:1, 88:3, 108:11

reflected [13] - 33:17, 75:5, 92:8, 94:9, 97:5, 101:21, 101:24, 108:9, 110:7, 120:5, 142:17, 144:18, 210:9

reflecting [1] - 88:16

reflection [4] - 110:7, 166:2, 257:2, 301:21

reflective [1] - 166:19

reflects [2] - 79:13, 133:20

refresh [3] - 190:2, 261:18,

274:12

regarding [7] - 92:4, 103:10, 145:7, 222:13, 222:15, 234:21, 264:23

region [1] - 154:21

regions [1] - 40:4

registration [1] - 117:5

regular [1] - 123:22

reignite [1] - 103:6

reinforcement [1] - 235:20

relate [2] - 20:13, 91:17

related [12] - 20:12, 27:1, 54:20, 56:25, 75:21, 95:4, 111:9, 130:4, 130:5, 153:12, 214:2

relates [1] - 59:22

relation [2] - 25:8, 136:3

relative [2] - 132:22, 209:22

relatively [5] - 13:20, 13:22, 103:25, 132:16, 133:7

relayed [1] - 166:16

release [6] - 31:15, 31:16, 35:24, 36:19, 49:4, 297:2

released [8] - 31:9, 31:11, 33:24, 35:16, 35:20, 56:7, 137:10, 297:6

releases [2] - 30:15, 35:8

relevant [1] - 221:23

relocate [1] - 209:12

relying [1] - 36:6

remained [3] - 134:22, 224:16, 224:19

remaining [1] - 18:6

remarked [1] - 52:1

remember [45] - 10:16, 11:19, 19:8, 21:24, 26:15, 28:14, 37:15, 38:3, 38:20, 51:9, 52:23, 68:13, 76:1, 86:16, 97:16, 97:18, 105:18, 107:20, 111:1, 113:8, 113:10, 115:14, 118:6, 118:14, 120:13, 120:14, 120:16, 120:17, 121:3, 121:9, 121:11, 160:13, 167:12, 170:2, 212:6, 248:20, 248:21, 261:21, 262:18, 264:24, 265:20, 275:9, 290:10, 295:9, 297:9

remembering [1] - 76:8

remembers [1] - 185:24

remind [2] - 55:20, 98:9

reminded [1] - 55:23

remote [5] - 262:9, 262:10, 263:9, 263:19, 274:14

remotely [3] - 83:5, 262:11, 305:2

remove [5] - 67:9, 77:8, 128:9, 258:8, 258:11

removed [3] - 52:6, 66:21, 87:8

removing [2] - 17:23, 17:25

rendered [1] - 289:14

rendering [1] - 285:14

Reock [1] - 78:14

repeat [1] - 30:1

repeatedly [1] - 81:6

rephrase [1] - 28:8

replace [2] - 110:1, 218:15

replica [1] - 14:15

report [5] - 244:16, 244:17, 269:14, 269:18, 276:7

reportable [1] - 281:17

reported [3] - 243:4, 263:24, 300:14

REPORTER [2] - 214:16, 287:18

Reporter [1] - 5:2

reporter [2] - 78:21, 157:13

REPORTER'S [1] - 309:2

Reporter's [1] - 6:4

reporting [7] - 255:22, 255:23, 255:24, 258:5, 266:22, 271:13, 277:5

represent [5] - 97:9, 143:16, 218:18, 232:16, 241:19

representation [1] - 307:24

representations [1] - 256:2

representative [1] - 218:21

Representative [1] - 231:4

representatives [1] - 46:18

represented [4] - 183:24, 230:8, 302:13, 302:16

representing [7] - 41:1, 41:4, 41:6, 80:15, 142:6, 292:23

represents [3] - 97:10, 239:21, 241:8

Republican [55] - 91:17, 93:22, 96:9, 97:14, 97:24, 98:2, 98:18, 99:4, 106:17, 106:18, 106:23, 112:24, 154:2, 179:8, 179:13, 185:8, 228:18, 228:24, 233:20, 233:23, 238:12, 246:16, 246:19, 246:22, 246:23, 246:24, 246:25, 247:10, 247:15, 248:19, 249:5, 249:21, 249:25, 250:3, 254:12, 254:17, 254:19, 264:4, 264:8, 264:11, 271:1, 271:2, 271:13, 278:11, 280:3, 281:6, 281:10, 282:15, 289:23, 290:18, 301:6, 301:11, 301:19, 301:20

Republican-performing [1] - 247:10

Republicans [3] - 91:19, 92:3, 237:12

request [12] - 58:9, 72:11, 75:20, 76:16, 103:12, 105:18, 145:24, 146:2, 226:15, 230:7, 284:23, 285:23

requested [2] - 76:23, 221:6

requests [13] - 41:11, 41:14, 52:25, 53:22, 57:15, 57:21,

58:14, 58:19, 58:21, 58:23, 63:19, 70:18, 107:20

require [3] - 32:21, 41:9, 169:14

required [2] - 92:16, 102:17

requirement [1] - 19:11

requirements [1] - 61:7

requires [1] - 160:8

requiring [1] - 50:19

research [2] - 59:13, 296:13

reside [2] - 216:8, 216:10

residence [4] - 44:25, 84:19, 121:22

residences [1] - 84:8

residents [3] - 294:11, 294:12

resolution [2] - 17:12, 17:13

resolve [2] - 11:23, 119:24

resolved [3] - 15:4, 17:15, 17:16

resources [1] - 157:23

respect [3] - 154:13, 191:17, 304:1

respectful [1] - 228:2

respond [2] - 65:14, 230:17

response [9] - 10:21, 12:11, 19:19, 50:7, 50:21, 103:12, 187:12, 299:21

responses [1] - 51:1

responsibility [3] - 217:9,

217:16, 218:11
**responsible** [3] - 219:5, 219:12, 235:16
**rest** [11] - 53:11, 54:4, 84:13, 84:18, 84:19, 147:4, 170:10, 213:9, 236:7, 255:8, 271:21
**restate** [1] - 306:9
**restaurant** [1] - 287:23
**rested** [1] - 271:22
**result** [17] - 11:2, 15:25, 22:25, 23:17, 31:3, 31:23, 32:20, 58:8, 60:6, 67:25, 92:6, 99:13, 141:5, 144:25, 166:14, 186:14, 205:25
**resulting** [1] - 208:25
**results** [5] - 91:12, 93:20, 134:18, 166:18, 277:19
**resume** [1] - 56:16
**retain** [3] - 127:16, 127:18, 170:20
**retained** [4] - 140:4, 186:6, 219:7, 298:22
**retrogress** [3] - 62:9, 151:9, 152:12
**retrogressed** [1] - 152:11
**retrogression** [8] - 19:2, 60:5, 62:3, 62:8, 102:19, 152:13, 152:20, 204:21
**reveal** [2] - 41:12, 107:22
**reverse** [1] - 66:6
**reversed** [1] - 75:19
**review** [6] - 81:13, 107:7, 122:14,

135:3, 135:5, 237:20
**reviewed** [2] - 109:5, 110:23
**reviewing** [1] - 108:17
**revised** [1] - 272:10
**Reyes** [1] - 2:9
**Richard** [1] - 2:16
**Richardson** [1] - 1:21
**Richmond** [3] - 216:10, 237:1, 262:12
**rid** [2] - 186:21, 206:25
**right-hand** [1] - 87:10
**Rights** [17] - 2:10, 2:13, 2:20, 3:13, 3:17, 3:20, 3:23, 4:3, 4:6, 18:24, 19:1, 21:8, 29:17, 40:17, 59:18, 67:1, 153:1
**rigor** [1] - 242:22
**Riordan** [1] - 4:23
**rise** [5] - 21:11, 21:13, 56:14, 129:3, 308:21
**risk** [2] - 103:5, 235:9
**RMR** [2] - 5:2, 309:7
**Robert** [1] - 4:5
**Rogers** [1] - 23:12
**role** [2] - 52:15, 224:20
**roll** [2] - 155:19, 156:16
**rolled** [2] - 35:11, 157:4
**rolling** [4] - 30:16, 35:14, 71:23, 155:17
**Ron** [1] - 223:14
**room** [6] - 11:18, 192:4, 195:15, 195:17, 196:22,

258:2
**Rosenberg** [1] - 5:3
**rough** [4] - 131:22, 134:6, 167:12, 289:18
**roughly** [7] - 10:7, 137:25, 139:8, 199:10, 266:4, 289:3, 294:1
**round** [2] - 58:6, 220:21
**route** [2] - 46:22, 103:18
**row** [1] - 174:11
**Row** [1] - 94:21
**RPR** [1] - 5:2
**Rs..** [1] - 237:11
**rule** [1] - 256:20
**ruled** [2] - 23:7, 65:10
**rules** [1] - 231:13
**ruling** [3] - 23:5, 25:20, 65:10
**run** [8] - 54:9, 69:24, 129:21, 129:23, 129:24, 149:15, 232:25, 279:2
**running** [7] - 42:1, 42:3, 54:22, 85:8, 96:2, 124:19, 222:24
**runs** [6] - 47:13, 78:7, 150:14, 156:25, 157:1, 235:9
**RUSSO** [37] - 7:5, 7:15, 8:5, 12:24, 13:10, 13:13, 13:24, 14:1, 15:13, 16:5, 20:10, 25:23, 56:9, 56:18, 56:20, 56:22, 63:13, 65:14, 65:16, 65:25, 66:1, 90:19, 109:12, 109:15, 128:15, 128:17, 158:8, 158:12, 182:13, 182:18, 195:6,

211:23, 211:25, 212:2, 214:7, 214:14, 214:17
**Russo** [13] - 4:9, 6:10, 6:12, 8:7, 15:12, 22:24, 128:16, 172:18, 179:6, 200:5, 211:10, 211:22, 214:21
**Ryer** [1] - 69:5

## S

**safe** [1] - 230:24
**sample** [3] - 218:14, 218:16
**Samson** [1] - 2:9
**Sarah** [3] - 2:13, 208:3, 208:5
**satisfied** [3] - 80:24, 113:1, 198:2
**Saturday** [6] - 69:4, 225:4, 226:22, 234:4, 236:2, 239:1
**save** [1] - 170:12
**saved** [1] - 147:21
**savvy** [4] - 46:14, 46:23, 47:25, 156:3
**saw** [11] - 71:6, 80:22, 106:21, 132:3, 149:3, 172:6, 185:11, 193:15, 198:1, 258:5, 277:11
**scale** [1] - 173:17
**scenario** [3] - 234:6, 234:7, 246:20
**scenarios** [2] - 246:9, 256:15
**schedule** [4] - 35:2, 35:20, 123:17, 123:19
**school** [4] - 9:11, 220:14, 220:18, 221:21
**science** [2] - 245:21, 279:20
**Sciences** [1] - 223:13

**scope** [2] - 153:7, 202:3
**score** [6] - 77:15, 78:14, 246:22, 246:23, 246:24, 246:25
**scores** [1] - 271:13
**Scout** [5] - 224:13, 224:17, 224:20, 224:25, 288:2
**Scouts** [2] - 224:16, 224:19
**screen** [28] - 14:3, 44:18, 71:24, 75:1, 92:19, 144:14, 158:18, 160:15, 161:6, 162:8, 167:19, 170:18, 172:14, 187:25, 195:14, 197:2, 197:18, 197:19, 249:17, 250:2, 252:8, 253:4, 261:4, 263:6, 277:2, 282:8, 282:24, 291:19
**screens** [1] - 263:4
**screenshot** [2] - 105:12, 105:13
**screenshots** [1] - 81:20
**screw** [1] - 191:23
**scroll** [30] - 12:13, 29:5, 29:6, 73:24, 74:7, 85:19, 88:24, 95:16, 97:4, 98:7, 98:16, 106:19, 169:5, 208:21, 225:23, 230:14, 238:14, 238:21, 242:7, 244:20, 251:7, 251:8, 253:20, 257:12, 260:7, 260:12, 273:14, 273:20
**scrutiny** [2] - 62:19, 62:20
**SDA** [1] - 223:24
**seat** [17] - 22:14,

25:12, 46:25, 61:6, 77:1, 89:19, 91:2, 92:5, 102:13, 102:18, 127:14, 127:17, 127:18, 127:25, 161:5, 170:2

**seats** [7] - 7:3, 22:2, 56:17, 129:6, 167:14, 167:19, 215:5

**secant** [2] - 83:8, 83:12

**secants** [3] - 83:9, 83:22, 144:9

**second** [30] - 7:18, 22:12, 30:18, 30:23, 51:5, 52:21, 53:9, 53:19, 65:12, 89:15, 95:8, 108:2, 108:11, 108:12, 109:18, 118:3, 120:24, 145:18, 145:22, 174:12, 209:25, 212:3, 215:12, 221:11, 225:23, 231:14, 231:25, 235:15, 266:9, 277:18

**secret** [2] - 30:9, 280:18

**Section** [35] - 19:2, 23:6, 23:18, 59:17, 59:23, 59:25, 60:5, 60:11, 60:16, 60:21, 61:6, 62:5, 62:6, 62:12, 62:14, 66:25, 102:14, 102:17, 103:6, 152:19, 152:22, 152:24, 153:1, 153:6, 153:7, 163:17, 163:22, 204:18, 204:19, 204:21, 205:25, 206:6, 206:9, 208:6

**section** [2] - 12:4, 169:19

**see** [140] - 7:6, 11:14, 13:16, 14:19, 14:24,

15:25, 16:16, 17:18, 19:18, 28:24, 29:3, 38:15, 43:4, 45:15, 46:2, 51:15, 53:13, 54:9, 54:15, 55:10, 57:11, 58:11, 59:6, 63:1, 67:23, 67:25, 69:13, 70:17, 71:4, 73:20, 73:22, 74:15, 79:10, 87:13, 87:19, 87:21, 91:1, 91:11, 91:22, 93:9, 94:8, 94:11, 94:13, 96:5, 96:18, 97:7, 105:4, 108:15, 108:20, 108:21, 109:20, 127:8, 128:25, 129:2, 131:4, 134:7, 134:11, 135:2, 135:24, 136:12, 138:15, 142:17, 144:10, 144:14, 146:11, 158:19, 159:1, 159:4, 159:7, 163:12, 165:22, 165:23, 165:24, 168:14, 169:8, 170:18, 171:11, 171:18, 172:23, 173:3, 173:17, 174:9, 174:15, 175:6, 177:12, 182:15, 185:17, 187:11, 197:17, 198:9, 201:14, 202:7, 205:23, 208:3, 208:4, 209:18, 210:10, 210:12, 215:2, 226:1, 226:13, 239:1, 239:15, 240:12, 243:22, 245:2, 253:10, 253:23, 254:1, 256:16, 261:13, 261:16, 261:17, 269:16, 270:6, 270:13, 273:10, 273:24, 274:3, 274:7, 274:8, 274:9, 274:17, 274:20, 276:4, 276:8, 279:8,

284:9, 284:13, 284:15, 285:13, 285:17, 285:18, 288:16, 288:17, 291:19, 293:13, 294:19

**seeing** [12] - 85:1, 97:14, 97:16, 97:18, 120:13, 120:17, 121:3, 133:18, 193:3, 205:22, 206:2, 212:6

**seek** [2] - 158:8, 209:20

**seeking** [5] - 39:12, 48:9, 62:7, 111:16, 238:9

**seem** [4] - 88:15, 131:15, 168:4, 197:4

**select** [1] - 269:8

**selected** [1] - 94:11

**Senate** [3] - 246:2, 266:24, 280:8

**send** [3] - 105:16, 119:13, 237:3

**sending** [3] - 37:9, 250:10, 272:9

**sense** [14] - 28:16, 84:11, 153:19, 154:9, 155:15, 184:18, 187:6, 198:3, 198:14, 198:16, 199:4, 292:11, 298:13, 306:14

**sensible** [1] - 77:13

**sent** [18] - 11:3, 13:7, 27:3, 51:6, 51:9, 57:12, 81:20, 105:19, 105:23, 118:4, 251:2, 259:7, 259:14, 261:15, 266:1, 266:3, 266:5, 271:25

**sentence** [1] - 209:5

**separate** [2] -

166:8, 173:9

**separated** [1] - 168:13

**separately** [6] - 86:15, 105:25, 106:2, 106:4, 106:5, 173:7

**separating** [1] - 185:8

**September** [25] - 36:20, 37:7, 38:14, 39:10, 41:22, 42:1, 42:6, 43:6, 43:12, 45:20, 47:20, 48:2, 49:24, 51:13, 53:4, 53:20, 55:14, 55:16, 57:1, 57:20, 136:7, 210:22, 211:5, 211:14, 309:1

**sequestered** [1] - 308:9

**series** [5] - 88:7, 112:14, 191:24, 226:5, 267:1

**seriously** [1] - 152:11

**serve** [1] - 307:20

**service** [1] - 258:16

**session** [7] - 81:16, 92:13, 107:9, 108:2, 223:3, 223:4, 223:9

**sessions** [1] - 223:7

**set** [14] - 33:19, 38:1, 64:24, 75:18, 95:8, 103:15, 163:5, 188:4, 191:4, 191:8, 192:17, 194:24, 221:7, 221:11

**Seth** [1] - 38:18

**setting** [3] - 36:21, 38:13, 79:14

**settlement** [1] - 15:15

**settling** [2] - 12:6,

26:1

**seventh** [2] - 271:19, 271:21

**Seventh** [2] - 2:17, 3:10

**several** [14] - 31:17, 36:18, 103:11, 107:6, 176:23, 205:2, 218:17, 223:5, 223:12, 229:22, 235:8, 239:19, 262:2, 283:22

**shaded** [2] - 269:3, 276:12

**shading** [2] - 77:14, 269:5

**shaking** [1] - 72:4

**shape** [2] - 72:20, 119:14

**shapefile** [7] - 229:8, 229:24, 230:6, 230:8, 230:11, 232:3, 237:25

**shapes** [1] - 143:11

**share** [9] - 92:19, 197:18, 209:14, 231:8, 246:18, 262:5, 263:8, 263:11, 298:8

**shared** [9] - 12:25, 104:21, 107:2, 142:3, 142:12, 172:7, 244:6, 281:19, 290:6

**sharing** [4] - 48:21, 97:16, 248:23, 263:4

**Shaw** [2] - 62:22, 62:24

**Shaw-type** [2] - 62:22, 62:24

**Shawn** [3] - 4:16, 215:8, 276:24

**shedding** [1] - 50:11

**SHEEHY** [115] - 142:24, 215:6, 215:8, 216:3, 225:12, 225:22, 225:25, 229:2,

229:4, 230:14, 230:16, 234:1, 234:2, 235:22, 235:24, 236:22, 236:24, 238:14, 238:16, 238:21, 238:23, 239:12, 239:14, 240:8, 240:10, 240:17, 240:19, 242:7, 242:9, 243:19, 243:21, 245:15, 245:17, 247:18, 247:20, 250:6, 250:8, 250:23, 250:25, 251:7, 251:9, 251:14, 251:16, 252:12, 252:14, 253:7, 253:9, 253:19, 253:22, 254:4, 254:6, 255:18, 255:20, 257:12, 257:14, 259:4, 259:6, 260:6, 260:8, 260:12, 260:13, 261:10, 261:12, 262:20, 262:21, 263:15, 263:17, 265:11, 265:13, 265:22, 265:24, 266:14, 266:16, 270:22, 270:24, 271:23, 271:24, 272:6, 272:8, 272:13, 272:15, 272:20, 272:21, 273:14, 273:16, 273:19, 273:23, 274:23, 274:25, 275:10, 275:12, 277:20, 277:22, 278:14, 278:16, 281:20, 281:22, 282:10, 282:12, 283:1, 283:4, 283:9, 283:11, 284:6, 284:8, 285:1, 285:9, 286:5, 286:7, 287:1, 287:10, 287:19, 287:22, 304:24, 307:10

**Sheehy** [7] - 4:16, 6:7, 215:8, 255:23, 269:16, 287:3, 293:22

**sheet** [3] - 51:8, 211:7, 211:9

**Shelby** [4] - 19:8, 59:17, 152:23, 152:24

**shield** [1] - 60:22

**shift** [1] - 133:18

**shifted** [1] - 62:5

**shifts** [7] - 16:13, 32:22, 92:20, 132:12, 135:14, 152:14, 210:3

**shocking** [1] - 177:15

**Shore** [1] - 4:14

**shore** [1] - 84:23

**short** [4] - 66:7, 216:20, 219:16, 277:10

**short-term** [1] - 277:10

**shortened** [1] - 118:17

**shortly** [1] - 37:22

**show** [13] - 9:21, 37:2, 79:2, 79:5, 85:23, 106:9, 114:16, 134:8, 173:15, 182:18, 256:14, 265:5, 265:6

**showed** [18] - 30:5, 85:21, 90:5, 101:5, 108:13, 110:24, 127:24, 172:1, 177:23, 180:22, 188:20, 190:18, 211:7, 212:3, 263:5, 263:21, 275:8, 277:18

**showing** [8] - 111:9, 134:21, 275:6, 275:13, 275:18, 275:21, 277:23, 278:19

**shown** [16] - 57:22, 57:23, 57:25, 97:20, 170:22, 172:2, 200:8, 210:21, 211:4, 262:25, 263:19, 265:9, 274:18, 274:21, 275:22, 281:12

**shows** [4] -

161:18, 165:20, 165:21, 275:25

**shut** [2] - 125:25, 287:16

**sick** [1] - 296:23

**side** [18] - 11:21, 14:2, 14:14, 45:2, 46:11, 46:13, 80:5, 80:16, 84:4, 87:20, 87:21, 90:17, 96:3, 146:10, 148:19, 149:11, 159:4, 173:3

**sides** [1] - 12:11

**significance** [6] - 166:6, 233:2, 235:4, 259:22, 260:3, 266:7

**significant** [9] - 59:16, 92:11, 124:16, 132:8, 132:18, 132:22, 133:11, 170:3, 170:7

**Silberstein** [1] - 3:9

**similar** [11] - 39:18, 61:4, 91:4, 93:10, 93:12, 108:22, 109:9, 113:19, 168:2, 228:16, 232:7

**similarly** [1] - 248:20

**Simone** [1] - 2:2

**simple** [6] - 24:15, 30:20, 41:15, 43:19, 103:25, 145:23

**simplest** [1] - 115:6

**simply** [3] - 83:18, 119:8, 186:8

**single** [5] - 70:19, 80:15, 106:14, 269:17, 294:23

**single-district** [1] - 106:14

**site** [1] - 189:15

**sitting** [2] - 22:23, 126:21

**situation** [15] - 24:3, 32:11, 32:14, 35:17, 41:3, 59:25, 77:13, 84:2, 103:8, 103:12, 118:23, 140:15, 163:16, 257:24

**situations** [3] - 189:4, 191:23, 296:2

**six** [1] - 50:2

**skipped** [1] - 147:19

**slightly** [5] - 35:18, 152:11, 174:13, 266:12, 284:4

**slogan** [1] - 303:2

**slop** [1] - 167:13

**small** [6] - 47:15, 87:14, 217:10, 221:8, 232:15, 273:5

**smaller** [1] - 96:23

**smallest** [1] - 174:18

**smart** [1] - 269:9

**Smith** [2] - 3:16, 6:11

**SMITH** [4] - 210:16, 210:19, 211:1, 211:20

**smoothed** [1] - 75:19

**Social** [2] - 3:3, 3:6

**soda** [1] - 149:18

**software** [11] - 81:21, 81:25, 92:17, 105:11, 118:9, 219:9, 219:13, 230:4, 230:11, 241:17, 297:14

**solemnly** [2] - 7:20, 215:15

**solution** [2] - 12:9, 296:7

**Solutions** [3] - 218:25, 219:3, 219:17

**solve** [2] - 120:2, 220:4

**solved** [1] - 120:2

**someone** [11] - 36:6, 36:15, 37:4, 91:21, 123:11, 128:5, 137:9, 223:1, 235:11, 296:20, 298:3

**sometime** [3] - 68:17, 68:24, 298:8

**sometimes** [7] - 44:9, 112:20, 112:21, 192:3, 229:20, 231:10, 292:4

**somewhat** [12] - 17:4, 33:15, 38:11, 40:22, 40:23, 58:25, 61:22, 63:4, 85:11, 122:3, 122:23, 136:19

**somewhere** [7] - 27:25, 113:12, 118:6, 133:24, 139:19, 139:22, 236:3

**son** [1] - 224:23

**son's** [1] - 224:20

**soon** [6] - 9:5, 33:6, 36:14, 212:18, 212:22, 297:16

**sooner** [2] - 185:21, 287:13

**sophisticated** [1] - 218:20

**sore** [1] - 77:12

**sorry** [30] - 33:3, 37:3, 40:19, 49:25, 61:20, 66:11, 76:18, 78:19, 85:19, 86:22, 87:20, 90:16, 91:9, 108:12, 115:13, 139:20, 154:16, 158:6, 175:7, 178:8, 194:19, 210:13, 262:18, 274:9, 284:13, 285:20, 303:16,

304:8, 306:13, 307:18

sort [71] - 12:5, 12:14, 12:24, 17:12, 18:17, 24:1, 25:25, 31:7, 31:14, 32:1, 32:6, 32:22, 40:20, 42:11, 43:1, 52:4, 54:20, 55:21, 58:5, 58:9, 61:24, 62:18, 63:14, 65:20, 67:7, 69:15, 69:24, 75:12, 78:4, 79:16, 84:4, 84:18, 85:17, 87:22, 88:10, 90:22, 90:23, 91:25, 92:6, 93:3, 94:3, 98:12, 108:1, 111:1, 113:8, 113:14, 118:11, 118:23, 120:5, 123:15, 124:11, 124:21, 125:7, 127:12, 127:15, 128:9, 129:16, 130:3, 135:7, 136:12, 141:6, 145:17, 147:11, 175:23, 201:3, 204:4, 213:4, 213:15, 291:22, 294:7, 294:14

sorts [1] - 157:22

sought [1] - 285:12

sound [2] - 225:18, 307:21

sounds [2] - 35:22, 308:4

source [1] - 37:20

sources [1] - 52:13

South [3] - 188:2, 197:1, 197:17

south [5] - 84:9, 146:17, 176:3, 284:15, 285:15

Southern [4] - 3:3, 3:6, 223:24, 224:3

SOUTHERN

[1] - 1:1

spanning [1] - 161:3

spare [1] - 307:7

speaking [4] - 49:10, 68:21, 90:15, 208:6

special [9] - 117:19, 117:22, 202:10, 212:11, 221:5, 221:7, 241:15, 259:22

specialist [1] - 130:13

specific [38] - 54:11, 54:14, 54:16, 54:20, 55:9, 66:12, 91:13, 91:14, 91:23, 133:13, 141:12, 141:14, 141:15, 142:10, 142:19, 142:22, 143:1, 143:10, 143:20, 143:22, 145:2, 145:8, 148:7, 162:24, 163:1, 163:2, 198:10, 208:22, 248:14, 248:20, 248:21, 262:18, 264:19, 265:20, 292:1, 292:4, 293:7, 295:9

specifically [9] - 8:24, 48:24, 56:25, 76:16, 81:1, 101:10, 107:21, 127:7, 167:15

specificity [1] - 54:24

specifics [1] - 142:14

specify [1] - 143:25

speculate [1] - 188:10

speculating [1] - 263:3

speculation [13] - 15:10, 25:19, 140:23, 179:3, 184:17, 184:21, 185:9, 190:21, 190:24, 195:6,

198:5, 199:18, 199:19

speed [3] - 115:4, 294:1, 295:3

spell [1] - 281:1

spend [1] - 300:19

spending [1] - 287:20

spent [2] - 299:23, 300:17

split [10] - 116:11, 116:18, 180:19, 228:14, 233:1, 235:2, 235:7, 236:20, 279:13, 285:19

splits [15] - 168:3, 234:22, 234:23, 234:25, 235:1, 235:5, 235:21, 236:18, 237:10, 237:15, 238:6, 272:23, 279:15, 284:3, 284:4

splitting [5] - 116:6, 116:8, 185:7, 233:10, 292:13

spoken [1] - 224:7

Spoto [1] - 3:5

spread [3] - 177:13, 247:2, 247:10

spreadsheet [49] - 36:12, 37:11, 42:10, 48:14, 52:14, 94:3, 94:9, 94:12, 95:4, 97:21, 97:22, 101:24, 109:5, 109:24, 135:23, 136:8, 200:6, 239:13, 239:21, 243:2, 253:8, 253:14, 253:16, 253:24, 254:2, 256:14, 258:6, 258:22, 262:22, 262:25, 265:8, 266:15, 266:19, 267:22, 272:1, 272:4, 272:10, 272:16, 274:24,

278:6, 283:2, 283:7, 289:15, 293:22, 294:3, 294:7, 294:15, 294:17

spreadsheets [8] - 108:23, 110:18, 110:20, 172:1, 239:19, 259:15, 267:1, 268:22

spring [2] - 32:7, 140:19

spur [1] - 295:18

spur-of-the-moment [1] - 295:18

squeeze [2] - 73:2, 73:3

stable [1] - 133:7

staff [4] - 108:7, 201:19, 299:14, 300:4

stage [9] - 8:24, 9:7, 71:25, 189:11, 248:22, 250:16, 270:6, 279:1, 279:10

stages [2] - 218:6, 233:9

stand [4] - 7:16, 7:25, 199:17, 215:20

standard [26] - 10:18, 59:19, 59:22, 60:4, 60:5, 61:25, 62:19, 62:20, 63:22, 102:19, 152:19, 152:23, 204:21, 206:2, 206:6, 220:25, 221:10, 239:21, 239:23, 239:24, 240:1, 242:3, 244:2, 244:12, 269:14, 270:15

Standard [1] - 241:1

standards [2] - 62:9, 138:9

standing [4] - 91:8, 223:19, 223:21, 223:23

standpoint [1] -

60:15

stands [1] - 216:19

staring [3] - 11:20, 65:3, 135:12

stars [1] - 171:15

start [45] - 42:1, 42:3, 55:19, 58:14, 58:15, 58:16, 69:21, 70:12, 80:14, 84:24, 128:20, 140:22, 143:23, 143:25, 147:4, 159:21, 159:24, 160:11, 161:3, 161:22, 162:4, 162:5, 162:12, 170:20, 176:24, 185:21, 189:12, 193:3, 201:23, 216:25, 219:22, 220:9, 229:18, 244:15, 244:19, 287:6, 287:9, 288:3, 289:5, 290:14, 297:11, 306:23, 307:1, 307:3

start-from-go [2] - 159:21, 159:24

started [19] - 36:21, 36:25, 41:25, 58:15, 119:23, 139:2, 241:15, 248:23, 255:13, 271:16, 281:25, 282:15, 289:3, 290:12, 291:23, 296:14, 301:10, 305:6

starting [14] - 42:4, 59:13, 136:14, 143:6, 188:17, 194:12, 227:7, 287:7, 289:1, 291:10, 293:14, 294:25, 295:2, 295:19

starts [3] - 150:4, 185:15, 189:17

state [14] - 8:22, 30:24, 31:4, 50:1, 64:19, 73:3, 73:5,

157:14, 216:4, 220:12, 220:17, 231:21, 241:8, 246:2

**State** [8] - 59:19, 113:18, 118:12, 123:4, 139:2, 231:20, 292:10, 297:22

**statement** [2] - 57:7, 197:11

**states** [6] - 30:16, 30:21, 35:15, 35:16, 105:6, 108:13

**STATES** [3] - 1:1, 3:12, 4:2

**States** [7] - 10:14, 217:12, 218:17, 218:18, 219:5, 222:18, 236:4

**stating** [1] - 94:16

**statistical** [5] - 129:16, 129:24, 217:14, 217:24, 223:16

**Statistical** [1] - 223:20

**statistician** [1] - 216:25

**statistics** [4] - 268:23, 270:20, 276:12, 277:4

**status** [1] - 224:25

**stay** [2] - 99:12, 160:10

**stayed** [1] - 133:3

**stellar** [1] - 29:25

**stenography** [1] - 5:4

**step** [7] - 58:9, 67:12, 114:14, 214:10, 215:21, 301:10, 308:7

**Stephanie** [1] - 120:25

**Stephen** [2] - 273:11, 306:17

**steps** [1] - 140:7

**sticking** [1] - 172:13

**still** [37] - 87:7, 91:2, 102:20,

124:7, 135:25, 136:4, 138:5, 138:11, 159:11, 160:15, 160:16, 160:17, 161:8, 164:14, 169:12, 170:23, 181:21, 181:23, 183:3, 183:5, 183:15, 189:4, 189:9, 191:20, 196:11, 204:5, 207:3, 207:10, 207:11, 214:15, 230:18, 250:9, 257:20, 267:18, 278:3

**stop** [5] - 13:12, 62:17, 128:24, 157:13, 306:21

**stopped** [1] - 220:19

**straight** [5] - 11:21, 15:25, 78:5, 78:11, 128:19

**straightforward** [1] - 12:5

**strange** [2] - 17:4, 83:23

**strategy** [1] - 153:9

**Street** [15] - 1:12, 1:16, 1:19, 1:22, 2:3, 2:7, 2:24, 3:24, 4:3, 4:6, 4:21, 4:25, 284:16, 285:16, 285:20

**streets** [3] - 54:9, 54:20, 54:23

**strength** [6] - 135:1, 135:25, 151:10, 152:17, 163:15, 163:19

**stressed** [3] - 104:22, 104:23

**Strickland** [1] - 24:10

**strict** [3] - 49:19, 62:19, 62:20

**strictly** [1] - 49:5

**string** [2] - 120:24, 302:15

**strong** [4] - 62:15, 62:18, 98:22,

237:11

**strongly** [1] - 16:12

**study** [1] - 131:18

**stuff** [6] - 17:10, 41:18, 161:4, 161:14, 161:15, 178:7

**styles** [1] - 110:5

**subdivide** [1] - 76:5

**subdivided** [1] - 76:4

**subject** [7] - 19:10, 69:11, 81:5, 115:22, 224:5, 259:8

**submission** [6] - 9:23, 9:24, 10:1, 10:8, 10:21, 208:15

**submit** [1] - 280:19

**submitted** [6] - 12:16, 13:18, 14:25, 19:5, 60:19, 269:18

**subsequent** [8] - 51:3, 52:20, 70:5, 73:8, 87:3, 100:20, 107:4, 123:3

**subsequently** [7] - 42:23, 44:4, 44:6, 44:7, 45:11, 52:12, 107:6

**subset** [2] - 241:7, 242:12

**substantially** [1] - 124:23

**suburb** [2] - 144:10, 168:3

**suburban** [6] - 170:24, 171:1, 176:13, 176:14, 176:19, 177:7

**suburbs** [9] - 40:4, 85:7, 147:7, 147:8, 150:6, 304:7, 305:23

**successful** [3] - 183:25, 238:2

**sued** [4] - 19:22, 125:19, 125:21, 125:22

**suffix** [1] - 260:4

**suffixes** [1] - 259:21

**suggest** [4] - 42:17, 42:19, 183:3, 183:5

**suggested** [4] - 32:15, 69:10, 74:14, 203:10

**suggesting** [2] - 78:4, 159:23

**suggestions** [1] - 128:8

**suing** [2] - 125:16

**Suite** [12] - 1:13, 1:16, 1:23, 2:4, 2:7, 3:3, 3:7, 3:14, 3:18, 4:14, 4:25, 5:3

**sum** [2] - 63:1, 63:15

**Sum** [2] - 244:21, 244:22

**summarizing** [1] - 246:5

**summary** [3] - 93:18, 268:23, 278:5

**summation** [2] - 97:10, 97:13

**summing** [2] - 244:5, 246:7

**Sunday** [8] - 69:12, 226:16, 226:18, 226:22, 238:18, 250:9, 251:1, 257:25

**supervised** [1] - 220:22

**supplemental** [2] - 201:4, 204:3

**supplementation** [1] - 203:25

**supplied** [1] - 70:13

**support** [8] - 40:7, 40:10, 151:5, 151:6, 163:12, 179:17, 179:19

**supposed** [5] - 20:19, 60:11, 117:22, 118:19, 140:2

**supposition** [1] - 302:4

**Supreme** [3] - 24:11, 24:12, 137:20

**surely** [1] - 298:23

**surprised** [4] - 55:2, 139:1, 177:19, 181:17

**surprising** [1] - 177:12

**surprisingly** [1] - 181:5

**surround** [1] - 84:18

**survey** [2] - 218:14, 218:16

**Survey** [8] - 218:4, 218:5, 218:10, 218:13, 218:14, 218:21, 221:5, 241:22

**survive** [1] - 112:24

**suspect** [4] - 12:21, 39:12, 156:12, 204:17

**suspicions** [1] - 213:25

**sustain** [1] - 25:21

**sustained** [1] - 65:9

**Swanson** [1] - 120:25

**swear** [3] - 7:18, 7:20, 215:15

**sworn** [2] - 8:3, 216:1

**system** [6] - 13:9, 70:9, 139:11, 217:21, 219:15, 241:24

**systems** [2] - 219:18, 230:1

---

**T**

**tab** [21] - 94:10,

109:25, 110:2, 110:3, 221:6, 240:9, 240:12, 240:16, 245:15, 245:18, 263:16, 266:21, 269:15, 275:10, 275:13, 277:21, 278:3, 278:15, 278:17, 278:19

**table** [21] - 11:21, 94:12, 110:4, 172:18, 172:20, 172:22, 243:20, 243:23, 244:3, 244:5, 255:19, 255:21, 256:10, 258:4, 267:12, 268:15, 268:18, 283:9, 294:17, 294:23, 302:18

**tables** [3] - 95:8, 108:21, 108:22

**tabs** [5] - 109:16, 109:23, 124:11, 124:19, 270:12

**tabulation** [5] - 96:23, 221:5, 221:7, 241:15, 292:9

**tamp** [1] - 132:10

**tamped** [1] - 186:8

**target** [2] - 245:4, 265:21

**tasked** [2] - 29:13, 29:15

**teach** [1] - 220:8

**team** [4] - 217:9, 218:12, 218:19, 220:10

**teaser** [1] - 237:7

**technical** [1] - 298:8

**techniques** [3] - 218:20, 219:9, 280:20

**template** [16] - 220:25, 221:1, 221:2, 221:10, 221:11, 222:1, 239:21, 239:23, 239:24, 240:1, 240:4, 240:6, 241:23, 244:12,

244:14, 294:24

**ten** [4] - 19:10, 59:20, 300:15, 307:15

**tend** [1] - 146:18

**tendency** [1] - 49:9

**tenths** [2] - 283:19, 284:2

**term** [10] - 18:20, 18:21, 20:1, 23:23, 130:12, 131:5, 207:4, 270:2, 270:14, 277:10

**terminology** [1] - 19:25

**terms** [25] - 9:1, 24:5, 24:9, 34:1, 34:11, 54:25, 58:10, 59:10, 61:25, 87:1, 90:24, 91:22, 98:20, 104:1, 118:18, 121:14, 123:14, 126:19, 127:14, 153:18, 153:19, 188:25, 191:22, 208:22, 254:19

**terrible** [2] - 73:2, 73:6

**terribly** [3] - 144:22, 144:24, 197:4

**Terrie** [1] - 224:2

**territory** [8] - 150:16, 158:21, 160:21, 170:20, 170:21, 193:17, 292:15, 292:25

**TERRY** [1] - 1:3

**tested** [1] - 293:10

**testified** [11] - 8:3, 143:9, 147:17, 179:8, 181:18, 181:20, 190:5, 197:5, 216:1, 288:18, 300:22

**testify** [4] - 43:10, 281:4, 285:6, 301:4

**testimony** [12] -

7:20, 23:5, 65:23, 197:6, 199:16, 215:16, 285:7, 301:2, 304:11, 308:12, 308:14, 308:17

**TEXAS** [2] - 1:1, 1:6

**Texas** [55] - 1:17, 1:20, 2:13, 2:14, 2:20, 2:21, 4:12, 4:15, 5:3, 8:22, 16:1, 20:1, 20:18, 30:24, 30:25, 31:5, 35:11, 35:14, 35:18, 35:19, 41:18, 59:15, 59:19, 64:4, 73:18, 74:8, 76:4, 87:8, 113:18, 116:7, 118:12, 133:16, 139:2, 169:9, 191:23, 197:21, 231:18, 231:20, 232:1, 232:5, 232:9, 233:17, 241:9, 246:2, 251:4, 251:17, 252:15, 260:14, 260:18, 281:23, 284:18, 285:16, 285:20, 292:10, 297:22

**Texas's** [1] - 173:25

**text** [2] - 226:25, 227:11

**Tharuni** [1] - 3:20

**THE** [96] - 1:8, 1:11, 2:2, 2:12, 3:2, 3:12, 4:2, 4:8, 7:2, 7:10, 7:17, 7:20, 7:25, 13:5, 15:11, 15:20, 20:7, 20:8, 20:9, 25:21, 56:12, 56:16, 56:19, 56:21, 63:9, 65:15, 65:22, 90:14, 90:16, 90:18, 109:14, 128:16, 128:19, 129:5, 130:12, 130:17, 157:12, 157:16, 172:13,

172:15, 182:21, 196:17, 207:24, 210:17, 210:23, 211:21, 211:22, 211:24, 214:8, 214:10, 214:11, 214:12, 214:15, 214:16, 214:20, 214:21, 214:24, 215:4, 215:7, 215:11, 215:15, 215:20, 215:22, 225:8, 225:10, 225:11, 285:8, 287:3, 287:7, 287:14, 287:18, 287:20, 287:23, 287:24, 288:1, 288:5, 288:6, 288:9, 288:11, 306:22, 307:2, 307:5, 307:6, 307:9, 307:13, 307:16, 307:17, 307:21, 308:4, 308:6, 308:7, 308:11, 308:13, 308:15, 308:18, 308:20

**thematic** [3] - 71:22, 142:21, 269:5

**thematically** [2] - 269:3, 276:12

**thematically-shaded** [1] - 276:12

**themselves** [4] - 190:14, 197:22, 198:12, 220:7

**therefore** [2] - 31:4, 137:1

**these..** [1] - 232:20

**they've** [1] - 75:19

**thinking** [9] - 32:1, 34:12, 88:3, 113:23, 114:20, 150:2, 259:20, 259:24, 303:2

**third** [9] - 7:12, 22:6, 25:10, 34:20, 37:14, 57:3, 109:21, 221:21

**thirds** [1] - 133:25

**THOMAS** [3] - 6:7, 215:25, 216:6

**Thomas** [5] - 135:4, 135:8, 137:4, 215:10, 216:6

**thoughts** [11] - 40:21, 67:18, 68:22, 71:9, 79:16, 82:4, 82:13, 88:19, 89:3, 118:18, 214:1

**three** [26] - 21:21, 21:23, 48:9, 57:2, 85:12, 133:25, 139:3, 139:11, 143:5, 147:21, 154:19, 176:2, 192:12, 221:3, 222:23, 226:16, 255:23, 256:1, 276:1, 283:19, 295:20, 298:17, 298:20, 299:1, 299:9, 303:6

**three-fifths** [1] - 133:25

**three-tenths** [1] - 283:19

**throughout** [8] - 132:15, 132:16, 133:10, 255:14, 266:25, 268:19, 278:21, 301:20

**throw** [1] - 291:13

**thumb** [1] - 77:12

**Thursday** [4] - 115:16, 226:20, 226:22

**tied** [1] - 91:22

**tier** [1] - 176:1

**tight** [1] - 113:17

**time-consuming** [1] - 235:17

**timeframe** [8] - 10:4, 45:21, 73:6, 145:5, 145:7, 199:10, 201:17, 205:23

**timeline** [9] -

28:3, 28:13, 43:11, 73:1, 114:21, 118:17, 124:3, 286:8, 298:19

**timing** [2] - 113:14, 128:16

**title** [4] - 52:4, 131:4, 259:17, 266:5

**titled** [3] - 74:8, 86:7, 87:8

**TO** [1] - 1:5

**today** [13] - 22:23, 126:21, 153:1, 194:8, 212:8, 219:13, 224:23, 261:15, 286:16, 286:20, 286:24, 301:2, 305:11

**together** [21] - 39:24, 42:25, 70:19, 70:21, 79:2, 83:1, 86:13, 93:17, 144:4, 145:25, 146:5, 173:9, 189:16, 220:20, 221:24, 226:23, 234:13, 280:1, 285:5, 291:13, 294:1

**Tom** [24] - 68:14, 69:5, 69:16, 71:7, 73:14, 74:11, 76:14, 76:25, 81:15, 82:24, 88:4, 93:5, 93:14, 100:16, 100:21, 108:9, 110:18, 112:1, 113:4, 127:16, 189:16, 191:8, 213:16

**Tom's** [1] - 101:20

**tomorrow** [8] - 117:19, 202:11, 212:11, 287:12, 288:1, 288:4, 288:5, 308:20

**tonight** [1] - 128:24

**took** [6] - 84:15, 122:8, 188:14, 230:10, 279:22, 279:24

**tool** [2] - 158:2, 217:24

**top** [28] - 45:2, 47:15, 47:16, 49:24, 54:15, 69:2, 71:3, 73:18, 84:4, 85:5, 87:18, 105:2, 115:15, 126:8, 146:25, 155:18, 156:25, 157:1, 161:14, 169:9, 170:24, 174:9, 174:11, 176:13, 201:10, 247:19, 247:22, 274:11

**topic** [1] - 187:22

**Torchinsky** [15] - 4:17, 69:5, 69:6, 73:14, 75:23, 115:18, 201:14, 229:11, 229:15, 234:4, 237:4, 237:18, 238:17, 251:2, 251:11

**Torchinsky's** [1] - 239:1

**Total** [2] - 244:21, 244:22

**total** [32] - 7:7, 173:12, 174:19, 175:6, 221:15, 221:17, 222:5, 230:23, 231:8, 242:3, 242:4, 242:5, 242:14, 244:7, 245:3, 245:7, 247:5, 255:22, 255:25, 256:2, 256:9, 256:12, 256:15, 256:17, 256:22, 256:25, 257:16, 258:23, 263:8, 276:3, 276:11, 283:14

**totals** [2] - 93:25, 96:19

**touch** [3] - 26:15, 28:14, 111:22

**tough** [1] - 62:9

**tour** [1] - 216:23

**towards** [5] - 39:17, 113:6, 114:21, 149:21,

149:23

**town** [2] - 79:18, 79:20

**track** [2] - 243:15, 301:20

**tracked** [1] - 245:18

**tracking** [2] - 255:10, 255:15

**traditional** [1] - 304:3

**train** [2] - 255:6

**trained** [1] - 129:16

**training** [1] - 9:8

**Transcript** [1] - 5:5

**transcript** [1] - 309:4

**transcription** [1] - 5:5

**transition** [1] - 225:14

**transitioned** [2] - 295:13, 295:14

**transmitting** [1] - 118:10

**transpired** [1] - 191:24

**transportation** [2] - 84:25, 146:6

**traumatic** [1] - 155:17

**travel** [2] - 295:21, 308:15

**trial** [5] - 7:21, 22:16, 23:9, 91:9, 215:16

**TRIAL** [1] - 1:7

**Trial** [1] - 6:1

**tricky** [1] - 46:13

**tried** [5] - 25:8, 65:5, 92:25, 228:1, 289:5

**triggered** [4] - 186:10, 186:11, 187:4

**trip** [1] - 236:7

**troop** [1] - 224:21

**trouble** [2] - 174:3, 295:12

**troublesome** [1] - 35:19

**true** [10] - 23:18, 31:14, 58:8, 67:18, 102:9, 102:10, 110:16, 156:10, 156:11, 170:5

**truly** [1] - 199:6

**Trump** [1] - 270:25

**trusted** [1] - 81:4

**trusting** [1] - 290:17

**truth** [8] - 7:22, 7:23, 73:21, 215:17, 215:18, 301:8

**truthfully** [1] - 156:12

**try** [25] - 16:19, 24:7, 58:20, 63:14, 77:8, 83:9, 103:5, 129:22, 144:9, 146:7, 146:10, 157:13, 160:12, 176:7, 182:1, 225:8, 229:18, 235:18, 235:19, 250:19, 280:2, 280:22, 291:13, 305:3, 307:17

**trying** [48] - 36:15, 48:15, 55:7, 63:17, 65:21, 76:2, 76:7, 77:3, 78:22, 83:21, 84:24, 134:16, 138:17, 143:2, 146:9, 147:1, 149:13, 153:2, 153:8, 153:9, 161:11, 161:12, 162:21, 167:6, 167:13, 172:10, 176:13, 177:6, 183:4, 186:15, 189:5, 189:9, 190:7, 212:21, 212:24, 230:23, 231:13, 233:11, 236:9, 245:22, 276:5, 276:14, 277:10, 288:3, 292:12, 296:24, 300:11

**Tuesday** [2] - 259:7, 259:13

**turn** [6] - 32:25, 123:24, 148:12, 148:13, 170:15

**TURNBULL** [1] - 196:3

**Turnbull** [12] - 141:19, 145:13, 157:10, 165:14, 182:10, 188:16, 194:11, 198:21, 201:10, 289:8, 302:23, 304:17

**turned** [3] - 73:4, 210:12, 226:16

**turns** [1] - 215:1

**two** [78] - 21:16, 21:18, 21:25, 22:1, 41:19, 54:3, 61:15, 67:25, 69:23, 73:6, 74:10, 75:21, 79:4, 79:24, 79:25, 80:18, 82:9, 82:10, 82:13, 85:24, 86:2, 86:13, 89:9, 89:12, 89:21, 89:24, 99:6, 103:19, 105:7, 116:18, 116:20, 118:21, 122:23, 122:25, 124:19, 132:7, 133:25, 139:3, 139:11, 143:18, 144:7, 166:7, 201:3, 201:23, 203:21, 214:12, 228:7, 228:21, 231:17, 233:1, 234:10, 235:8, 238:3, 243:4, 243:12, 247:14, 247:15, 251:23, 252:18, 255:9, 257:10, 258:18, 274:18, 277:17, 280:1, 283:22, 289:1, 290:14, 291:2, 291:13, 291:18, 291:22, 299:21, 305:3

**Two** [2] - 266:5, 266:8

two-thirds [1] - 133:25
Tyler [8] - 27:19, 115:7, 115:18, 117:11, 117:21, 120:21, 201:11, 212:4
type [9] - 9:17, 62:22, 62:24, 67:8, 125:13, 129:19, 147:11, 161:12, 166:4
types [5] - 116:20, 116:21, 222:23, 223:6, 231:6
typically [5] - 8:10, 24:14, 182:14, 222:22, 266:10

## U

U.S [10] - 3:13, 3:17, 3:20, 3:23, 4:3, 4:6, 182:6, 182:7, 221:6, 231:3
UCLA [1] - 2:10
ultimate [1] - 206:20
ultimately [16] - 15:1, 17:14, 64:6, 74:21, 85:6, 85:23, 140:4, 140:25, 161:2, 164:24, 164:25, 180:16, 180:18, 203:18, 293:15, 298:16
uncertainty [2] - 235:14
uncomfortable [1] - 40:24
undecided [1] - 184:18
under [34] - 14:3, 21:12, 40:25, 59:19, 59:23, 60:11, 60:16, 60:20, 60:21, 62:6, 76:3, 95:9, 95:13, 96:11, 97:3, 97:20, 98:18, 98:23, 102:14, 113:17, 125:16, 125:22,

125:23, 152:18, 161:8, 163:22, 169:19, 185:21, 204:20, 206:1, 206:9, 256:14, 256:18
underneath [3] - 94:21, 97:5, 109:23
underpopulated [1] - 152:9
understood [7] - 20:7, 39:19, 71:17, 90:18, 102:4, 156:3, 287:22
unfortunately [2] - 248:13, 292:10
unique [4] - 205:23, 241:1, 241:9, 260:4
uniquely [1] - 295:1
UNITED [3] - 1:1, 3:12, 4:2
United [7] - 10:14, 217:11, 218:17, 218:18, 219:5, 222:18, 236:4
unless [6] - 17:4, 41:13, 47:17, 49:4, 56:6, 197:2
unlike [3] - 50:10, 231:3, 268:13
unsure [1] - 304:13
unusable [1] - 298:4
unusual [4] - 204:15, 204:16, 204:17, 266:12
unusualness [1] - 35:12
up [185] - 13:14, 16:22, 17:20, 18:23, 19:7, 22:1, 25:25, 26:21, 27:17, 28:19, 28:20, 30:5, 31:4, 35:10, 36:21, 37:2, 38:1, 38:12, 38:13,

40:4, 42:21, 44:7, 44:10, 45:14, 46:6, 46:19, 46:22, 48:17, 50:8, 50:12, 51:5, 51:11, 52:22, 53:1, 53:9, 54:6, 56:23, 57:3, 61:7, 63:1, 63:15, 69:1, 69:2, 71:22, 73:13, 74:23, 76:9, 76:22, 78:8, 79:12, 83:10, 83:11, 83:18, 83:19, 83:20, 83:22, 84:6, 85:6, 86:19, 86:20, 92:9, 93:9, 98:7, 99:2, 104:11, 104:25, 106:19, 107:11, 108:13, 108:25, 109:25, 111:6, 113:6, 113:15, 114:7, 114:9, 114:18, 115:4, 115:11, 115:24, 117:16, 118:1, 119:18, 120:4, 120:19, 124:14, 124:16, 128:11, 128:19, 129:24, 130:20, 134:2, 134:23, 136:16, 141:8, 141:10, 143:25, 144:6, 144:12, 147:6, 148:14, 148:20, 149:4, 149:25, 150:11, 154:15, 157:10, 160:5, 161:2, 161:15, 165:12, 165:13, 166:22, 168:3, 169:4, 169:9, 170:24, 171:22, 176:6, 176:15, 177:20, 185:13, 187:18, 188:4, 191:4, 191:8, 191:23, 192:17, 194:25, 195:14, 197:18, 201:9, 203:20, 206:1, 208:11, 209:12, 210:8, 211:25, 215:11, 225:22, 229:2, 230:14, 233:10,

234:1, 236:22, 238:14, 239:12, 244:5, 246:7, 247:7, 247:18, 250:6, 250:23, 253:7, 259:5, 261:10, 262:20, 265:11, 265:22, 266:14, 270:14, 271:23, 272:6, 272:13, 272:20, 273:21, 274:23, 279:15, 280:2, 281:20, 281:21, 282:10, 283:1, 283:24, 284:4, 285:1, 286:8, 287:20, 289:8, 292:7, 297:1
update [3] - 266:18, 275:2, 275:3
updated [5] - 57:6, 57:11, 253:13, 259:11, 272:1
upset [4] - 22:23, 90:5, 90:7, 178:11
urge [1] - 124:9
US [7] - 217:1, 217:2, 217:4, 217:8, 217:14, 218:3, 231:18
usability [1] - 298:7
usable [5] - 36:7, 42:7, 189:20, 298:12, 298:13
useful [2] - 256:19, 258:19
usefulness [1] - 166:12
user [1] - 36:17
user-friendly [1] - 36:17

## V

vacation [4] - 139:22, 227:3, 230:18, 235:25
vague [1] - 262:1
vaguely [3] - 172:9, 261:9, 262:16

234:1, 236:22 ... Valencia [1] - 1:21
Vall [1] - 2:23
Vall-Llobera [1] - 2:23
value [1] - 280:21
Van [1] - 38:19
VAP [11] - 173:12, 174:7, 221:16, 221:17, 243:1, 244:8, 276:11, 279:23, 280:3
variable [10] - 240:24, 241:3, 241:4, 241:8, 244:23, 245:10, 245:13, 254:20, 256:22, 258:14
variables [4] - 242:25, 243:13, 243:15, 294:24
variant [1] - 218:1
variation [1] - 173:16
varies [1] - 198:18
variety [5] - 211:18, 245:20, 251:22, 298:7, 299:5
various [5] - 36:15, 36:25, 40:4, 53:3, 111:16
verdict [1] - 25:15
Veronica [1] - 38:19
version [23] - 13:2, 86:24, 92:9, 104:4, 144:16, 144:21, 144:23, 150:8, 160:14, 164:2, 164:20, 167:24, 171:9, 172:6, 172:7, 228:10, 253:13, 265:8, 266:19, 281:24, 282:14, 283:6
versions [2] - 142:17, 259:12
versus [2] - 25:5, 125:16
via [1] - 129:12

viable [1] - 80:1
Video [18] - 141:25, 143:7, 145:15, 147:14, 182:23, 183:7, 188:18, 189:25, 194:13, 196:1, 196:5, 196:16, 198:25, 199:14, 302:25, 303:8, 304:19, 305:8
view [9] - 13:15, 33:19, 34:11, 62:1, 65:6, 80:6, 124:3, 270:16, 276:14
viewed [1] - 163:23
Virginia [7] - 4:18, 4:22, 4:25, 30:19, 216:10, 224:22
Virginian [1] - 216:11
virtually [2] - 197:19, 297:19
virtue [2] - 67:6, 212:20
visit [1] - 296:22
visiting [1] - 227:6
visual [1] - 166:2
visualization [1] - 181:5
visualizing [1] - 181:15
vociferous [1] - 106:16
Vogel [18] - 4:17, 27:16, 28:10, 28:15, 29:10, 67:14, 69:8, 137:7, 140:2, 140:12, 140:16, 140:21, 201:15, 226:8, 288:19, 295:7, 298:22, 302:9
voice [2] - 61:22, 197:3
vote [20] - 19:11, 24:21, 24:22, 24:25, 29:17, 40:17, 44:24, 62:25, 76:2,

92:24, 93:23, 93:25, 96:19, 98:2, 98:17, 99:13, 184:12, 186:13, 195:1, 233:14
voted [1] - 28:7
voter [9] - 54:16, 77:24, 96:23, 116:11, 116:15, 117:4, 189:6, 235:10, 235:18
Voters [6] - 120:12, 121:2, 121:12, 122:15, 124:15, 159:23
voters [19] - 20:14, 22:7, 22:8, 23:2, 23:20, 26:7, 65:11, 96:9, 98:17, 136:13, 136:17, 136:22, 179:1, 179:16, 179:17, 205:15, 299:25
votes [10] - 96:8, 103:19, 188:9, 188:11, 189:13, 190:4, 190:22, 246:8, 246:18, 280:8
Voting [9] - 2:10, 18:23, 19:1, 21:8, 29:17, 40:17, 59:17, 67:1, 152:25
voting [44] - 12:4, 20:2, 134:12, 135:24, 151:10, 152:17, 163:15, 163:19, 170:3, 170:8, 173:7, 173:8, 174:19, 179:17, 180:19, 208:22, 208:24, 209:1, 221:8, 221:15, 221:20, 221:22, 231:21, 232:18, 232:21, 233:17, 235:6, 235:11, 241:19, 241:21, 242:13, 246:6, 255:24, 256:1, 266:22, 278:22, 278:25, 279:22, 279:25, 280:5, 281:9,

292:8, 294:10
VRA [1] - 169:14
VTD [13] - 94:11, 94:12, 109:18, 245:15, 245:18, 246:6, 253:18, 254:5, 263:15, 266:21, 270:22, 277:21, 293:12
VTDs [7] - 142:6, 142:7, 292:8, 292:12, 292:13, 293:8

## W

wait [3] - 184:19, 185:20, 185:23
waited [1] - 140:21
waiting [3] - 16:16, 51:2, 297:20
walk [2] - 157:20, 240:20
walked [3] - 153:11, 167:11, 200:5
walking [1] - 65:16
Walter [1] - 224:2
wants [8] - 33:7, 61:21, 71:2, 75:6, 189:14, 239:5, 293:3
Washington [11] - 1:13, 1:23, 2:4, 2:8, 2:24, 3:15, 3:18, 3:21, 3:24, 4:4, 4:7
wastepaper [2] - 291:20, 293:14
watch [1] - 92:20
water [7] - 17:6, 77:14, 77:16, 77:23, 78:2, 78:10
ways [11] - 36:13, 46:3, 54:13, 73:7, 132:7, 134:18, 165:2, 167:2, 222:23, 237:25, 276:1
weapon [1] - 80:5

weave [1] - 296:24
Webb [1] - 274:1
website [18] - 114:8, 114:18, 115:1, 115:2, 115:5, 118:20, 118:23, 118:24, 119:2, 119:12, 124:7, 124:8, 124:9, 124:10, 124:14, 158:9, 203:16, 203:17
Wednesday [1] - 27:20
week [9] - 30:18, 30:23, 34:20, 52:24, 225:1, 275:3, 281:25, 282:15, 299:2
weeks [4] - 36:18, 114:1, 199:22, 299:7
weighted [1] - 218:18
weighting [1] - 218:20
well-integrated [1] - 133:10
Wells [4] - 5:2, 309:3, 309:6, 309:7
West [4] - 3:3, 4:21, 4:25, 236:3
west [5] - 146:10, 147:9, 148:19, 149:21, 176:4
western [5] - 46:11, 83:4, 85:10, 85:15, 176:4
whereas [2] - 35:13, 145:25
White [18] - 16:3, 16:8, 16:21, 16:22, 18:15, 22:3, 24:18, 134:19, 135:17, 135:18, 168:19, 169:1, 177:18, 179:17, 241:20, 242:5, 294:12

Whites [1] - 24:22
whole [16] - 7:22, 34:6, 54:3, 73:2, 75:25, 147:1, 153:2, 161:20, 182:1, 195:23, 215:17, 228:13, 228:17, 278:23, 304:7
wholly [1] - 165:4
wife [1] - 89:14
willing [2] - 26:19, 184:12
Willkie [3] - 2:17, 2:23, 3:10
win [3] - 80:23, 127:24, 179:9
window [2] - 11:20, 11:22
wise [2] - 97:22, 108:3
wishes [2] - 192:13, 192:16
witness [14] - 7:14, 7:25, 22:20, 65:16, 128:15, 130:10, 182:15, 182:19, 207:20, 214:7, 214:17, 215:20, 216:17, 285:6
WITNESS [19] - 20:8, 90:16, 157:12, 172:13, 210:23, 211:21, 214:11, 214:21, 225:10, 287:3, 287:24, 288:1, 288:6, 288:11, 307:5, 307:17, 308:6, 308:13, 308:18
WITNESSES [1] - 6:6
Women [6] - 120:12, 121:2, 121:12, 122:15, 124:15, 159:23
won [1] - 151:21
word [2] - 128:22, 173:2
words [2] - 39:25, 78:16
works [4] - 77:6,

129:22, 130:1, 226:7

world [3] - 49:18, 145:11, 229:21

worldwide [1] - 217:22

worried [1] - 91:24

worries [1] - 264:21

worse [1] - 73:4

worst [2] - 30:11, 73:2

wrap [3] - 161:9, 162:16, 286:8

wrapping [2] - 25:25, 161:11

wreck [1] - 12:6

writes [1] - 274:20

written [6] - 119:11, 150:9, 171:15, 187:12, 256:6, 285:22

## X

Xiyi [1] - 2:13

## Y

y'all [12] - 11:23, 27:19, 27:22, 67:15, 68:11, 72:21, 89:12, 90:14, 93:3, 118:4, 129:1, 129:2

yang [2] - 176:6, 176:16

year [4] - 30:20, 35:4, 73:5, 217:2

years [14] - 19:10, 30:12, 35:17, 59:20, 65:6, 137:16, 199:22, 216:22, 219:24, 220:11, 224:1, 229:22, 269:19, 280:19

yellow [3] - 94:15, 94:16

yesterday [4] - 7:5, 131:13,

181:17, 181:18

yin [2] - 176:6, 176:16

York [4] - 2:18, 3:11

young [1] - 138:10

younger [1] - 224:12

yourself [3] - 8:9, 60:23, 111:22

## Z

Zachary [1] - 3:23

Zack [1] - 274:1

zeros [1] - 243:17

Zhu [1] - 3:9

Zoom [30] - 81:16, 92:13, 92:17, 92:18, 92:19, 100:16, 107:9, 115:2, 129:12, 142:1, 188:4, 191:8, 191:24, 194:1, 195:4, 195:12, 195:14, 195:19, 196:7, 196:25, 197:16, 238:18, 250:10, 250:13, 262:11, 265:14, 271:25, 273:11, 273:25, 303:14

zoom [7] - 29:5, 73:17, 170:16, 235:22, 255:19, 260:6, 265:25

## §

§ [7] - 1:3, 1:4, 1:4, 1:5, 1:5, 1:6, 1:6

Laura Wells, RPR, RMR, CRR, RDR