UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 3:22-cv-57 |
| GALVESTON, TEXAS, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 3:22-cv-93 |
| GALVESTON, TEXAS, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |
| Dickinson Bay Area Branch NAACP, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-cv-117 |
| | § | |
| GALVESTON, TEXAS, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

**CONSOLIDATED PLAINTIFFS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................ **Error! Bookmark not defined.**

INTRODUCTION ....................................................................................................... 1

FINDINGS OF FACT .................................................................................................. 3

I. Procedural History .................................................................................. 3

II.   Parties .................................................................................................... 7

A.   Plaintiffs .................................................................................................. 7

B.   Defendants ............................................................................................ 11

III.   Expert Witnesses ................................................................................. 12

IV.   Galveston County Demographics and Voting Patterns .................... 24

A.   The Black and Latino population is sufficiently large and geographically compact to constitute a majority in a commissioners precinct. .................................. 26

B.   Black and Latino voters are politically cohesive. ................................. 41

C.   Anglo bloc voting will almost certainly defeat the candidates of choice of Black and Latino voters in allthe Enacted Plan's commissioners precincts. ......................... 51

D.   The strong racially divergent voting patterns in Galveston County cannot be dismissed as "mere partisanship" completely unconnected to race. ......................... 56

V.   Discriminatory impact of the Enacted Plan ...................................... 60

VI.   Galveston County History Relating to Voting and Redistricting ................... 63

A.   Galveston County has a history of discrimination in voting practices. .............. 63

B.   The Attorney General has objected to Galveston's voting practices in several instances. ................................................................................................. 64

C.   Galveston County had a historical practice of seeking public input and providing more transparency in commissioners court redistricting before 2021 ...................... 69

VII.   The 2021 Redistricting Process ......................................................... 74

A.   Sequence of Events Leading to the Adoption of the Enacted Plan ................... 74

B.   Procedural Deviations from Prior Redistricting Cycles ....................... 92

C.   Purported and Actual Redistricting Criteria ...................................... 121

VIII.   Ongoing Discrimination Touching on Participation in Voting ..................... 132

A.   Contemporary Voting Barriers ......................................................... 134

B.   Lack of Electoral Success and Responsiveness ................................. 139

i

C.   Education ........................................................................................ 147

D.   Employment and Poverty................................................................. 150

E.   Housing ........................................................................................... 153

F.   Public Health................................................................................... 156

G.   Other Discrimination ...................................................................... 157

IX.   Summary of Findings of Fact as they relate to the Senate Factors and the Arlington Heights factors. ........................................................................ 159

CONCLUSIONS OF LAW ........................................................................... 160

I. Jurisdiction and Venue ......................................................................... 160

II.   Section 2 of the Voting Rights Act................................................... 163

A.   *Gingles* I: Black and Latino voters are sufficiently large and geographically compact. .............................................................................................. 165

B.   *Gingles* II: Latino and Black voters are politically cohesive............................ 172

C.   *Gingles* III: Anglo voters vote as a bloc to defeat the candidate of choice of minority voters. .......................................................................................... 176

D.   The racially divergent voting patterns in Galveston County cannot be dismissed as "mere partisanship." .............................................................................. 177

E.   The totality of the circumstances supports a finding of vote dilution. .............. 179

III.   Intentional Discrimination under Section 2 of the VRA and the U.S. Constitution ................................................................................................ 189

A.   The discriminatory impact of the Enacted Plan on Galveston's Black and Latino voters provides strong circumstantial and direct evidence of discriminatory intent. 194

B.   The historical background supports a finding of discriminatory intent............. 200

C.   Significant procedural and substantive departures in the sequence of events all support a finding of discriminatory intent. .......................................................... 203

D.   The legislative history and the exclusion of Commissioner Holmes support a finding of discriminatory intent. .............................................................................. 211

IV.   Racial Gerrymandering in Violation of the Fourteenth Amendment............. 213

A.   The Enacted Plan's dispersion of Galveston's Black and Latino population among all four commissioners precincts indicates racial gerrymandering.............. 214

B.   Defendants' asserted redistricting criteria are *post hoc* justifications that do not explain the textbook cracking of Galveston's Black and Latino population............ 216

C.   Plaintiffs' alternative maps are key evidence that race, and not other purported race-neutral objectives, predominated in the design of the Enacted Plan. ...............219

D.   Evidence of the map-drawing process indicates the predominant consideration for the Enacted Plan's geographic configuration was a racial one: the dismantling of the sole majority-minority commissioners precinct. ................................................225

E.   The Enacted Plan does not withstand strict scrutiny. .........................................230

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                    **Page(s)**

*Abbott v. Perez*,
138 S. Ct. 2305 (2018) ................................................................................. 193, 218

*Ala. Legis. Black Caucus v. Alabama*,
575 U.S. 254 (2015) ...........................................................................................*passim*

*Allen v. Milligan*,
599 U.S. ___, 143 S. Ct. 1487 (2023) ................................................................*passim*

*Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977) ...........................................................................................*passim*

*Bartlett v. Strickland*,
556 U.S. 1 (2009) ...............................................................................................*passim*

*Bethune-Hill v. Va. State Bd. of Elections*,
580 U.S. 178 (2017) ...................................................................................214, 218, 225

*Brewer v. Ham*,
876 F.2d 448 (5th Cir. 1989) .....................................................................172, 173, 175

*Briscoe v. Bell*,
432 U.S. 404 (1977) .................................................................................................. 184

*Bush v. Vera*,
517 U.S. 952 (1996) ..........................................................................................217, 230

*Campos v. City of Baytown*,
840 F.2d 1240 (5th Cir. 1988) ...........................................................................167, 173

*Chen v. City of Houston*,
206 F.3d 502 (5th Cir. 2000) .................................................................................... 171

*Chisom v. Roemer*,
501 U.S. 380 (1991) ..........................................................................................163, 181

*Citizens for a Better Gretna v. City of Gretna*,
834 F.2d 496 (5th Cir. 1987) .................................................................................... 188

*Clark v. Calhoun Cnty. (Clark I)*,
21 F.3d 92 (5th Cir. 1994).........................................................................................180

*Clark v. Calhoun Cnty.* (*Clark II*),
88 F.3d 1393  (5th Cir. 1996)..................................................... 177, 185, 186

*Comm. for a Fair & Balanced Map v. Ill. Bd. of Elections*,
No. 1:11-CV-5065, 2011 WL 5185567 (N.D. Ill. Nov. 1, 2011) ............................. 199

*Cooper v. Harris*,
581 U.S. 285 (2017)...............................................................*passim*

*Evenwel v. Abbott*,
578 U.S. 54 (2016)................................................................. 160, 170

*Finlan v. City of Dallas*,
888 F. Supp. 779 (N.D. Tex. 1995) .......................................................... 208

*Garza v. County of Los Angeles*,
918 F.2d 763 (9th Cir. 1990) ............................................................... 199

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960)............................................................ 189, 192

*Growe v. Emison*,
507 U.S. 25 (1993)................................................................ 164

*Harding v. Cnty. of Dallas*,
948 F.3d 302 (5th Cir. 2020) ....................................................... 161, 189

*Houston v. Lafayette Cnty.*,
56 F.3d 606 (5th Cir. 1995) .................................................... 169

*Jamison v. Tupelo*,
471 F. Supp. 2d 706 (N.D. Miss. 2007)................................................. 185

*Johnson v. De Grandy*,
512 U.S. 997 (1994)................................................................ 188

*Johnson v. Waller Cnty.*,
593 F. Supp. 3d 540 (S.D. Tex. 2022) .................................................. 186

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
999 F.2d 831 (5th Cir. 1993) ....................................... 167, 178, 179, 185

*League of United Latin Am. Citizens v. Abbott*,
604 F. Supp. 3d 463 (W.D. Tex. 2022)...............................................*passim*

*League of United Latin Am. Citizens v. Abbott*,
  617 F. Supp. 3d 622 (W.D. Tex. 2022)..................................................... 217

*Lopez v. Abbott*,
  339 F. Supp. 3d 589 (S.D. Tex. 2018) ..................................................... 177

*LULAC v. Abbott*,
  3:21-cv-259, ECF No. 144 (W.D. Tex. Jan. 8, 2022).............................. 167

*LULAC v. Abbott (LULAC II)*,
  601 F. Supp. 3d 147 (W.D. Tex. 2022)............................................*passim*

*LULAC v. Midland Indep. Sch. Dist.*,
  812 F.2d 1494 (5th Cir. 1987), *vacated on other grounds*, 829 F.2d 546
  (5th Cir. 1987) (en banc)......................................................................... 167

*LULAC v. Perry*,
  548 U.S. 399 (2006) .............................................................................*passim*

*Miller v. Johnson*,
  515 U.S. 900 (1995) .............................................................................*passim*

*Mobile v. Bolden*,
  446 U.S. 55 (1980) ................................................................................... 181

*Monroe v. City of Woodville*,
  897 F.2d 763 (5th Cir. 1990) ................................................................... 173

*N.C. State Conf. of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ..............................................................*passim*

*Patino v. City of Pasadena*,
  230 F. Supp. 3d 667 (S.D. Tex. 2017) ................................................*passim*

*Perez v. Abbott*,
  250 F. Supp. 3d 123 (W.D. Tex. 2017)............................................ 167, 193

*Perez v. Abbott*,
  253 F. Supp. 3d 864 (W.D. Tex. 2017)..............................................*passim*

*Perez v. Abbott*,
  274 F. Supp. 3d 624 (W.D. Tex. 2017)............................................ 173, 189

*Perez v. Pasadena Indep. Sch. Dist.*,
  958 F. Supp. 1196 (S.D. Tex. 1997), *aff'd* 165 F.3d 368 (5th Cir. 1999) ................ 176

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) ......................................................................... 190, 196

*Reynolds v. Sims*,
  377 U.S. 533 (1964) ................................................................................ 160

*Robinson v. Ardoin*,
  605 F. Supp. 3d 759 (M.D. La. 2022) ..................................................... 183

*Rodriguez v. Harris Cnty., Tex.*
  964 F. Supp. 2d 686 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v.
  Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015) ...................... 176, 177, 181, 184

*Rogers v. Lodge*,
  458 U.S. 613 (1982) ......................................................................... 184, 190

*S.C. State Conf. of NAACP v. Alexander*,
  No. 21-CV-03302-MGL-TJH-RMG, 2023 WL 118775 (D.S.C. Jan. 6,
  2023) ....................................................................................................... 229

*Save Our Springs All., Inc. v. Lowry*,
  934 S.W.2d 161 (Tex. App. Aus. 1996) .................................................. 207

*Shaw v. Reno*,
  509 U.S. 630 (1993) ......................................................................... 166, 227

*Shelby County v. Holder*,
  570 U.S. 529 (2013) ........................................................................ *passim*

*Singleton v. Merrill*,
  582 F. Supp. 3d 924 (M.D. Ala. 2022), *aff'd sub nom. Milligan*, 143 S.
  Ct. ........................................................................................................... 183

*Teague v. Attala Cnty.*,
  92 F.3d 283 (5th Cir. 1996) ..................................................................... 177

*Texas v. United States*,
  887 F. Supp. 2d 133 (D.D.C. 2012), *vacated on other grounds and
  remanded*, 133 S. Ct. 2885 (2013) .................................................. 174, 194

*Thomas v. Bryant*,
  938 F.3d 134 (5th Cir. 2019) ................................................................... 214

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ........................................................................... *passim*

*United States v. Brown*,
 561 F.3d 420 (5th Cir. 2009) ................................................................ 189, 190, 191

*Valdespino v. Alamo Heights Indep. Sch. Dist.*,
 168 F.3d 848 (5th Cir. 1999) ............................................................................ 166

*Veasey v. Abbott*,
 830 F.3d 216 (5th Cir. 2016) (en banc) ........................................................*passim*

*Westwego Citizens for Better Gov't v. City of Westwego*,
 946 F.2d 1109 (5th Cir. 1991) .......................................................................... 173

*Willmann v. City of San Antonio*,
 123 S.W.3d 469 (Tex. App. 2003) .................................................................... 207

*Wis. Legislature v. Wisc. Elections Comm'n*,
 142 S. Ct. 1245 (2022) ...................................................................................... 165

## Statutes

52 U.S.C. § 10301 .................................................................................................. 163

52 U.S.C. § 10308(d) ............................................................................................... 11

Tex. Elec. Code § 172.003 ..................................................................................... 137

Tex. Gov. Code § 551.001(2) ................................................................................ 207

Tex. Gov. Code § 551.001(6) ................................................................................ 106

Tex. Gov. Code § 551.071 ...................................................................................... 208

Tex. Gov. Code § 551.101 ...................................................................................... 208

Tex. Gov. Code § 551.143 ...................................................................................... 206

Tex. Loc. Gov. Code § 81.001 ............................................................................... 106

Tex. Loc. Gov. Code § 81.005(b) .......................................................................... 209

Tex. Loc. Gov. Code § 81.021 ............................................................................... 106

## Other Authorities

S. Rep. 97-417 ........................................................................................................ 185

Tex. Const. art. V, § 15 ............................................................................................ 24

Tex. Const. art. V, § 16................................................................................ 24

Tex. Const. art. V, § 18................................................................................ 106

Tex. Const. art. V, § 18(a)........................................................................... 24

Tex. Const. art. V, § 18(b)........................................................................... 24

## INTRODUCTION

These consolidated cases challenge the commissioners precinct plan adopted by the Galveston County Commissioners Court in a November 12, 2021, special meeting (the "Enacted Plan"). All Plaintiffs challenge the Enacted Plan as violating in both purpose and effect Section 2 of the Voting Rights Act and the Private Plaintiffs (all, but the United States) challenge the Enacted Plan as intentionally discriminatory against Galveston's Black and Latino[1] voters in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and as racially gerrymandered in violation of the Fourteenth Amendment.

After a thorough review of the substantial record in this case, which includes 19 lay and 11 expert witnesses heard in 10 days of trial as well as several hundred exhibits admitted into evidence, the Court finds that the Enacted Plan illegally dilutes the voting power of Galveston's Black and Latino voters, including the individual Plaintiffs, by dismantling Precinct 3, the historic and sole majority-minority commissioners precinct in the county. The Enacted Plan distributes Galveston's Black and Latino voters, who comprise 38% of the County's eligible voter population, with near-surgical precision among all four new commissioners precincts. As a result, every one of Galveston's Black and Latino voters is subsumed in a majority-Anglo district in a county with legally significant, racially polarized voting. All evidence supports that Galveston's Black and

---

[1] Plaintiffs use the term Latino and Hispanic interchangeably.

Latino voters will have zero chance of electing a candidate of their choice under the Enacted Plan and participating in their county government on an equal basis.

The Court also finds the Enacted Plan was adopted with discriminatory intent as a motivating factor. The commissioners court adopted the Enacted Plan following a redistricting process that deviated from prior practice at nearly every juncture, with the effect of suppressing public transparency and input and preventing the then-sole minority commissioner representing the sole majority-minority precinct from meaningfully participating. There is substantial evidence that members of the commissioners court viewed the benchmark commissioners precinct plan as conferring a racial benefit on Black and Latino voters by bolstering the minority population in Precinct 3, and that an early motivation in the configuration of new commissioners precincts was to actively undo this perceived racial benefit. The evidence thus supports the commissioners court purposefully reduced the minority population in Precinct 3, effectively dismantling the benchmark configuration, by disregarding traditional redistricting principles that would otherwise support maintaining a configuration preserving the historic core of Precinct 3 in place for decades.

Defendants offered several purportedly benign reasons for the Enacted Plan's design and the substantial deviations in the process by which the Enacted Plan was adopted. But the record evidence contradicts the proffered justifications—including contradictory testimony of Defendants' own witnesses. The evidence shows that the 2021 redistricting process was designed to minimize public opposition to the obvious discriminatory impact of the Enacted Plan and to render it impossible for the many alternative viable

configurations, later produced by Plaintiffs' experts and all maintaining a majority-minority Precinct 3, from coming to light in time to meet the statutory candidate filing deadline. There is also substantial evidence that race, and specifically the goal of undoing a perceived racial gerrymander by dismantling Precinct 3, predominated in the initial configuration of commissioners precincts on the mainland in the Enacted Plan.

Accordingly, and for the reasons below, the Court finds in favor of Plaintiffs and enjoins the Enacted Plan as violating Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

## FINDINGS OF FACT

### I.   Procedural History

1.      On February 15, 2022, Honorable Terry Petteway, Honorable Penny Pope, and Honorable Derreck Rose ("Petteway Plaintiffs") filed suit challenging Galveston County's 2021 commissioners court redistricting plan (the "Enacted Plan") as intentionally discriminatory and in violation of Section 2 of the Voting Rights Act, as well as the Fourteenth and Fifteenth Amendments. *Petteway v. Galveston Cnty.*, No. 3:22-cv-57 (S.D. Tex. Feb. 15, 2022), Dkt. 1.[2] Petteway Plaintiffs filed their First Amended Complaint on April 19, 2022, and their Second Amended Complaint on May 25, 2022. Dkts. 31, 42.

2.      On March 24, 2022, the United States filed suit challenging the Enacted Plan as intentionally discriminatory and in violation of Section 2 of the Voting Rights Act. *See United States of America v. Galveston Cnty.*, No. 3:22-cv-93 (S.D. Tex. Mar. 24, 2022),

---

[2] The Court dismissed additional Plaintiffs Sonny James and Michael Montez. Dkts. 100, 125.

Dkt. 1. The United States filed its First Amended Complaint on May 31, 2022. *See id.*, Dkt. 30.

3.      On April 14, 2022, civil rights organizations and leaders Dickinson Bay Area Branch NAACP, Mainland Branch NAACP, Galveston Branch NAACP, and Galveston LULAC Council 151 filed suit challenging the Enacted Plan redistricting plan under the Fourteenth and Fifteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act. *Dickinson Bay Area Branch NAACP v. Galveston Cnty.*, No. 3:22-cv-117 (S.D. Tex. Apr. 14, 2022), Dkt. 1. They amended their complaint to add Edna Courville, Joe A. Compian, and Leon Phillips as individual plaintiffs on May 25, 2022. *Id.*, Dkt. 38. Collectively, these Plaintiffs ("NAACP/LULAC Plaintiffs") alleged that the Enacted Plan was racially gerrymandered, adopted with discriminatory purpose, and unlawfully dilutes the votes of Galveston's Black and Latino voters. *Id.*

4.      On May 18, 2022, NAACP/LULAC Plaintiffs moved to consolidate these three cases. *Petteway v. Galveston Cnty*, No. 3:22-cv-57 (S.D. Tex. May 18, 2022), Dkt. 37. This Court granted that motion and ordered the cases consolidated on June 1, 2022. Dkt. 45.

5.      In June 2022, Defendants filed separate motions to dismiss the three consolidated complaints on the grounds that the Court lacked jurisdiction and that Plaintiffs had failed to state a claim for relief. Dkts. 46, 47, 48. On March 30, 2023, this Court granted Defendants' motion as to former Petteway Plaintiff Michael Montez but denied the motions as to all remaining claims and parties. Dkts. 123, 124, 125.

6.      On May 12, 2023, Defendants subsequently moved for summary judgment as to the three *Gingles* preconditions as well as Petteway and NAACP/LULAC Plaintiffs' racial gerrymandering claims. Dkt. 176. The Court denied the motion on July 11, 2023. Dkt. 200.

7.      The Court held a ten-day bench trial beginning on August 7, 2023. *See* Dkt. 195; *see also* Minute Entries, Aug. 8, 2023–Aug. 18, 2023.

8.      At trial, the Court heard live testimony from Plaintiffs Honorable Derreck Rose, Honorable Penny Pope, Edna Courville, Joe Compian (in his individual capacity and on behalf of Plaintiff LULAC Council 151), and Lucretia Henderson-Lofton (on behalf of Plaintiff Dickinson Bay Area NAACP). Trial Tr. vol. 1, 55–104 (Rose); Trial Tr. vol. 2, 8–61 (Pope); Trial Tr. vol. 2, 211–79 (Courville); Trial Tr. vol. 6, 62–111 (Compian); Trial Tr. vol. 6, 188–215 (Henderson-Lofton). Plaintiffs also presented live testimony from current and former elected officials and other County residents Lucille McGaskey, Robert Quintero, Sharon Lewis, Joe Jaworski, Pastor William Randall, Patrick Doyle, and Commissioner Stephen Holmes. Trial Tr. vol. 1, 105–79 (McGaskey); Trial Tr. vol. 6, 8–61 (Quintero); Trial Tr. vol. 6, 112–53 (Lewis); Trial Tr. vol. 6, 154–87 (Jaworski); Trial Tr. vol. 6, 216–30 (Randall); Trial Tr. vol. 7, 11–34 (Doyle); Trial Tr. vol. 7, 35–164 (Holmes).

9.      The Court also heard expert testimony offered by Plaintiffs. William S. Cooper, Dr. Tye Rush, and Anthony E. Fairfax provided expert testimony on the first *Gingles* precondition, illustrative map configurations, and redistricting principles. Trial Tr. vol. 3, 9–193 (Cooper); Trial Tr. vol. 4, 9–73 (Rush); Trial Tr. vol. 4, 74–162 (Fairfax).

Dr. Matthew A. Barreto, Dr. Jessica Trounstine, and Dr. Kassra A.R. Oskooii provided expert testimony on the second and third *Gingles* preconditions. Trial Tr. vol. 3, 194–329 (Barreto); Trial Tr. vol. 4, 163–272 (Trounstine); Trial Tr. vol. 4, 273–349 (Oskooii). And Dr. Traci Burch, Dr. Rene R. Rocha, and Dr. Max Krochmal provided expert testimony on the totality of the circumstances and/or indicia of discriminatory intent. Trial Tr. vol. 2, 62–210 (Burch); Trial Tr. vol. 5, 192–283 (Rocha); Trial Tr. vol. 5, 10–191 (Krochmal).

10.     Plaintiffs and Defendants presented live testimony from Judge Mark Henry, Commissioner Joe Giusti, Commissioner Darrell Apffel, the County's redistricting consultant, Dale Oldham, and mapping consultant Thomas Bryan. Trial Tr. vol. 7, 166–356 (Henry); Trial Tr. vol. 9, 63–163 (Giusti); Trial Tr. vol. 9, 289–379 (Apffel); Trial Tr. vol. 8, 8–214 (Oldham); Trial Tr. vol. 8, 215–308, vol. 9, 8–62 (Bryan).

11.     Defendants also called Commissioner Robin Armstrong, and County Clerk Dwight Sullivan. Trial Tr. vol. 10, 191–219 (Armstrong); Trial Tr. vol. 10, 231–268 (Sullivan). Defendants' experts were Dr. Mark Owens, who addressed the first *Gingles* precondition and responded to Dr. Krochmal's report, and Dr. John Alford, who addressed racially polarized voting. Trial Tr. vol. 9, 164–288 (Owens); Trial Tr. vol. 10, 10–190 (Alford).

12.     Defendants moved for a directed verdict on all claims on the last day of trial, which the Court denied. Trial Tr. vol. 10, 272:3–285:16.

## II.     Parties

### A.     Plaintiffs

13.     Plaintiff Honorable Terry Petteway is an African American resident of Galveston County. Pls.' Ex. 607 at ¶¶ 2–3 (Petteway Declaration). He currently resides on Avenue N ½ in Galveston, Texas. Pls.' Ex. 607 at ¶ 3. Under the prior commissioners court plan, Mr. Petteway's home sat in Precinct 3 and was represented by Commissioner Stephen Holmes, but under the Enacted Plan, Mr. Petteway now resides in Commissioner Precinct 2 with Commissioner Giusti as his Commissioner. Pls.' Ex. 607 at ¶¶ 6–8. Mr. Petteway is a registered voter who votes religiously and intends to vote in the future. Pls.' Ex. 607 at ¶¶ 4–5.

14.     Plaintiff Honorable Penny Pope is an African American resident of Galveston County. Trial Tr. vol. 3, 8:18–9:4 (Pope). She is a former Justice of the Peace who represented Galveston Constable/Justice of the Peace Precinct 3 for 26 years. Trial Tr. vol. 2, 9:21–23, 12:13–19 (Pope). She currently resides on Avenue O in Galveston, Texas. Trial Tr. vol. 3, 8:14–15 (Pope). Under the prior commissioners court plan, Judge Pope's home sat in Precinct 3 and was represented by Commissioner Stephen Holmes, but under the Enacted Plan, Judge Pope now resides in Commissioner Precinct 2 with Commissioner Giusti as her commissioner. Trial Tr. vol. 3, 21:6–12 (Pope). Judge Pope is a registered voter and actively votes in Galveston County elections, and plans to vote in the future. Trial Tr. vol. 3, 10:12–20 (Pope).

15.     Plaintiff Honorable Derreck Rose is an African American resident of Galveston County. Trial Tr. vol. 1, 55:8–19 (Rose). He currently serves as Constable for

Galveston Constable/Justice of the Peace Precinct 3, for which he has served since 2005. Trial Tr. vol. 1, 57:4–7, 19–24 (Rose). He currently resides at Royal Oak Drive in Texas City, Texas. Trial Tr. vol. 1, 55:8–9 (Rose). Under the prior commissioners court plan, Constable Rose's home sat in Precinct 3 and was represented by Commissioner Stephen Holmes, but under the Enacted Plan, Constable Rose now resides in Commissioner Precinct 1 with Commissioner Apffel as his commissioner. Trial Tr. vol. 1, 56:5–15, 60:8–15 (Rose). Constable Rose is a registered voter and actively voters in Galveston County elections, and plans to vote in the future. Trial Tr. vol. 1, 55:14–56:4 (Rose).

16.    Plaintiff Joe Compian is a Latino resident of Galveston County. Trial Tr. vol. 6, 62:10–24 (Compian). He currently resides at DuRoux Road in La Marque, Texas. Trial Tr. vol. 6, 62:11–12 (Compian). Under the prior commissioners court plan, Mr. Compian's home sat in Precinct 3 and was represented by Commissioner Stephen Holmes, but under the Enacted Plan, Mr. Compian now resides in commissioner Precinct 4 with Dr. Armstrong as his commissioner. Trial Tr. vol. 6, 62:14–21 (Compian). Mr. Compian is a member of LULAC Council 151 and he is a registered voter who votes religiously and intends to vote in the future. Trial Tr. vol. 6, 63:23–64:4, 64:14–66:1 (Compian).

17.    Plaintiff Edna Courville is an African American resident of Galveston County, residing on Oriole Circle in Texas City, Texas. Trial Tr. vol. 2, 211:18–20 (Courville). This location used to sit in Commissioner Holmes's precinct under the prior commissioners court plan, but, under the Enacted Plan, she now resides in Commissioner Armstrong's precinct. Trial Tr. vol. 2, 218:11–15 (Courville). Ms. Courville is registered to vote, votes regularly in all elections, and intends to vote in the future. Trial Tr. vol. 2,

219:16–23 (Courville). Ms. Courville is a member of the Mainland Branch NAACP. Trial Tr. vol. 2, 215:25–216:13 (Courville).

18.     Plaintiff Leon Phillips is an African American resident of Galveston County. He is a member of the Galveston Branch NAACP. Defs.' Ex. 310 at 21:2–7 (Leon Phillips Depo. Transcript). He is a registered voter and resides on 38th Street in Galveston, Texas, which sat in commissioner Precinct 3 under the commissioners precinct plan in place from 2012 to 2021 (the "Benchmark Plan"). *Id.* at 7:8–9; Defs.' Ex. 115 at Row 160041 (Nov. 2, 2021 Registered Voters in Galv. County). Under the Enacted Plan, he now resides in commissioner Precinct 2. Defs.' Ex. 34 at Row 31383 (2022 Nov. General Election File).

19.     Plaintiff Dickinson Bay Area Branch of the NAACP ("Dickinson Branch") is a nonprofit, nonpartisan membership organization and is an affiliate branch of the Texas State Conference of the NAACP. Stipulated Facts ¶ 27. The Dickinson Branch serves the northern part of the County (Dickinson and League City) and has at least 50 members. Trial Tr. vol. 6, 200:5–7, 201:19–22 (Henderson-Lofton). It has members who live in historical Precinct 3. Trial Tr. vol. 6, 201:23–25 (Henderson-Lofton). These members include Lucille McGaskey, who lived in historical Precinct 3 and now lives in Precinct 4. Trial Tr. vol. 1, 106:4–11, 123:3–15 (McGaskey); Defs.' Ex. 115 at Row 133363 (Nov. 2, 2021 Registered Voters in Galv. County); Defs.' Ex. 34 at Row 95740 (2022 Nov. General Election File). Its mission, consistent with the national NAACP and all other local NAACP units, includes educating people on discrimination and voting, as well as helping people register to vote. Trial Tr. vol. 6, 199:13–200:4 (Henderson-Lofton).

20.     Plaintiff Galveston Branch of the NAACP ("Galveston Branch") is a nonprofit, nonpartisan membership organization and is an affiliate branch of the Texas State Conference of the NAACP. Stipulated Facts ¶ 27. The Galveston Branch has roughly 60 members, all of whom live in or work in Galveston County. Pls.' Ex. 605 ¶ 4–5 (Toliver Declaration). As a result of the 2021 redistricting cycle, at least one Galveston Branch NAACP member who was a resident of the former Precinct 3 now lives in a different commissioners precinct. Pls.' Ex. 605 ¶ 6; *see also supra*, FOF ¶ 18. As a unit of the national NAACP, the Galveston Branch's mission includes educating people on discrimination and voting, as well as helping people register to vote. *See* Trial Tr. vol. 6, 199:13–200:4 (Henderson-Lofton).

21.     Plaintiff Galveston LULAC Council 151 ("LULAC") is a civic organization based out of Galveston County and an independent unit of the national organization League of United Latin American Citizens. Trial Tr. vol. 6, 65:24–66:14 (Compian); Stipulated Facts ¶ 28. LULAC's goals include supporting and advocating for civil rights and improving Latinos' participation in the political system. Trial Tr. vol. 6, 66:3–12 (Compian). As a result of the 2021 redistricting cycle, at least one LULAC member who was a resident of historical Precinct 3 now lives in a different commissioners precinct. *See supra*, FOF ¶ 16.

22.     Plaintiff Mainland Branch of the NAACP ("Mainland Branch") is nonprofit, nonpartisan membership organization and is an affiliate branch of the Texas State Conference of the NAACP. Stipulated Facts ¶ 27. The Mainland Branch has over 50 members who live or work in Texas City, La Marque, and Hitchcock, Texas. Pls.' Ex. 606

¶¶ 7–8 (Rice-Anders Declaration). As a unit of the national NAACP, the Galveston Branch's mission includes educating people on discrimination and voting, as well as helping people register to vote. *See* Trial Tr. vol. 6, 199:13–200:4 (Henderson-Lofton); *see also* Trial Tr. vol. 2, 216:16–22 (Courville) (describing the Mainland Branch's activities, including its voter education efforts). At least one member of Mainland Branch in Galveston County was a resident of the former Precinct 3 and now lives in a different commissioners' precinct. Pls.' Ex. 606 ¶ 9; *see also supra*, FOF ¶ 17.

23.    Congress has vested the U.S. Attorney General with authority to enforce Section 2 on behalf of the United States. See 52 U.S.C. § 10308(d).

## B.    Defendants

24.    Defendant Galveston County, Texas is a political and geographical subdivision of the State of Texas, located in southeast Texas on the Gulf of Mexico. Stipulated Facts ¶ 1.

25.    Defendant Judge Mark Henry is the county judge for the commissioners court in Galveston County. Defendant Henry is sued in his official capacity as the chief officer of Galveston County. *See, e.g.*, Dkt. 143 at 6 ¶ 21 (Defendants Answer to NAACP/LULAC Plaintiffs' First Amended Complaint).

26.    Defendant Galveston County commissioners court is the governing body of Galveston County. The court consists of a county judge elected at-large, who serves as the presiding officer, and four county commissioners elected from single-member districts, called "precincts," to serve four-year, staggered terms. Stipulated Facts ¶ 2. The commissioners court that adopted the Enacted Plan consisted of Judge Mark Henry,

Commissioner Darrel Apffel (Precinct 1), Commissioner Joe Giusti (Precinct 2), Commissioner Stephen Holmes (Precinct 3), and Commissioner Ken Clark (Precinct 4).

27.     Defendant Dwight D. Sullivan is the incumbent county clerk for Galveston County. Trial Tr. vol. 10, 233:3–4 (Sullivan). Sullivan's office is in charge of conducting all county elections including supervision of poll workers, polling sites, creation of ballots and ballot tabulation. Trial Tr. vol. 10, 233:25–234:22 (Sullivan).

### III.   Expert Witnesses

28.     Plaintiffs' experts William Cooper, Anthony Fairfax, and Tye Rush, Ph.D., testified as to the first *Gingles* precondition. Trial Tr. vol. 3, 9–190 (Cooper); Trial Tr. vol. 4, 74–162 (Fairfax); Trial Tr. vol. 4, 9–71 (Rush).

29.     Each of Plaintiffs' experts testified to forming their opinions using publicly available data from the U.S. Census Bureau and applying standard and reliable methods in the field of redistricting in conducting their analyses and forming their opinions. Trial Tr. vol. 3, 15:5–16:5, 17:16–21 (Cooper); Pls.' Ex. 342 ("Exhibit B: Methodology and Sources," Cooper Expert Report); Trial Tr. vol. 4, 85:17–86:20; 92:15–93:23, 97:16–21 (Fairfax); Pls.' Ex. 337 at 7–10; Trial Tr. vol. 4, 22:13–19, 23:24–24:12, 26:3–9 (Rush).

30.     William Cooper has nearly four decades of experience drawing voting plans for approximately 750 jurisdictions across the United States, including plans used in elections. Trial Tr. vol. 3, 9:16–10:6 (Cooper). He has testified on redistricting and demographic analysis in federal court approximately 55 times. Trial Tr. vol. 3, 10:13–14 (Cooper); *see also* Pls.' Ex. 341 (Exhibit A, Cooper Expert Report). Mr. Cooper submitted, and the Court received into evidence, principal and rebuttal reports addressing the first

*Gingles* precondition among other issues. Pls.' Ex. 386 (Cooper Expert Report); Pls.' Ex. 438 (Cooper Rebuttal).

31.     The Court recognized Mr. Cooper as an expert on redistricting, demographic analysis, and *Gingles* I. Trial Tr. vol. 3, 11:22–12:4 (Cooper). Having observed Mr. Cooper and reviewed his reports, the Court credits his analyses, opinion, and testimony, and grants them substantial weight.

32.     Anthony Fairfax has over 30 years of map-drawing, demography, and redistricting experience. Trial Tr. vol. 4, 74:25–75:4 (Fairfax). He testified that he has developed and helped develop hundreds of redistricting plans, including plans for local jurisdictions. Trial Tr. vol. 4, 75:5–77:16 (Fairfax). Mr. Fairfax has testified as an expert in redistricting matters approximately nine times. Trial Tr. vol. 4, 80:11–15 (Fairfax); see also Pls.' Ex. 338 (Appx. 1, Fairfax Expert Report). Mr. Fairfax submitted, and the Court admitted into evidence, an initial and rebuttal report addressing the first *Gingles* precondition among other issues. Pls.' Ex. 337 (Fairfax Expert Report); Pls.' Ex 454 (Fairfax Rebuttal).

33.     The Court recognized Mr. Fairfax as an expert on map drawing, demography, redistricting, and the use of Census data as it applies to *Gingles* I. Trial Tr. vol. 4, 81:9–16 (Fairfax). Having observed Mr. Fairfax and reviewed his reports, the Court credits his analyses, opinion, and testimony, and grants them substantial weight.

34.     Dr. Tye Rush is the President's Postdoctoral Fellow at the University of California, San Diego with an area of expertise in mapping and political geography. Trial Tr. vol. 4, 12:8–11, 13:24–14:3 (Rush). He holds a B.A. in Political Science from the

University of California, Riverside, and a Master of Arts and Ph.D. in Political Science from the University of California, Los Angeles. Trial Tr. vol. 4, 11:23–12:13 (Rush); Pls.' Ex. 486, Appx. A (Resume of Tye Rush). Dr. Rush previously held the position of Senior Policy Fellow of the UCLA Voting Rights Project, where he led research projects, conducted mapping analyses, and taught mapping. He also held the role of Redistricting and Voting Fellow at Common Cause where he taught mapping to lawyers and assisted with Census research. Trial Tr. vol. 4, 13:7–20 (Rush); Pls.' Ex. 486, Appx. A (Rush Resume). Dr. Rush testified that he has taught mapping and political geography at the university level and has been hired by clients to perform political mapping. Trial Tr. vol. 4, 13:24–14:6 (Rush). Dr. Rush submitted, and the Court admitted into evidence, an initial and rebuttal report as well as a supplemental declaration addressing the first *Gingles* precondition among other issues. Pls.' Ex. 487 (Rush Expert Report); Pls.' Ex. 486 (Rush Rebuttal Report); Pls.' Ex. 485 (Rush May 15, 2023, Declaration).

35.     The Court recognized Dr. Rush as an expert on political geography and mapping as well as electoral behavior. Trial Tr. vol. 4, 14:23–15:7. Having observed Dr. Rush and reviewed his reports, the Court credits his analyses, opinion, and testimony, and grants them substantial weight.

36.     Defendants' expert Dr. Mark Owens lacks the qualifications to opine on Plaintiffs' illustrative plans. Dr. Owens does not describe himself as an expert or having a focus on redistricting or *Gingles* I. Trial Tr. vol. 9, 190:5–8 (Owens). Instead, the focus of his work is the federal legislative process. Trial Tr. vol. 9, 190:13–16 (Owens). None of his prior educational course work included training on the technical aspects of drawing a

14

voting plan, Trial Tr. vol. 9, 193:4–11 (Owens), and Dr. Owens has published no peer-reviewed work focusing on any of the issues he opined on in his *Gingles* I report. Trial Tr. vol. 9, 193:14–194:7 (Owens). Dr. Owens has never taught a course related to geographic information systems ("GIS") or the technical aspects of drawing a voting plan. Trial Tr. vol. 9, 196:19–25 (Owens). Other than part of a single class of his course on southern politics, he does not teach any specialized courses to graduate students on the *Gingles* standard. Trial Tr. vol. 9, 197:1–12 (Owens).

37.     Before forming his opinions in this matter, Dr. Owens had reviewed less than 10 voting plans for compactness and just two of those professionally, and his only experience in redistricting was to assist a nonprofit drawing statewide maps in Oklahoma that were never considered by a court of law or used in an election. Trial Tr. vol. 9, 195:21–196:18 (Owens). And in his report, Dr. Owens demonstrated a misunderstanding of the most basic traditional redistricting principles. *See, e.g.*, Defs.' Ex. 290 at 16 (Table 9 of Owens Amended Report) (table providing an "average" population deviation instead of the maximum deviation most relevant to whether a plan complies with one person, one vote); Trial Tr. vol. 9, 255:2–18 (Owens) (discussion re: same); Trial Tr. vol. 9, 252:14–254:9 (Owens) (Dr. Owens admitting that he had incorrectly calculated the averages for plans by looking at absolute value).

38.     Accordingly, the Court assigns no weight to Dr. Owens' opinions as they relate to traditional redistricting principles, the geographic dispersion of minority populations, and *Gingles* I.

39.     Plaintiffs' experts Matthew Barreto, Ph.D., Jessica Trounstine, Ph.D., and Kassra Oskooii, Ph.D., testified as to the second and third *Gingles* preconditions. *See generally* Trial Tr. vol. 3, 194−265 (Barreto); Trial Tr. vol. 4, 163−268 (Trounstine), 273−349 (Oskooii).

40.     Drs. Barreto, Trounstine, and Oskooii's opinions are based on quantitative analyses of demographic data and election results. Pls.' Ex. 356 at ¶¶ 20−37 (Oskooii Expert Report); Pls.' Ex. 384 at 5−7 (Barreto/Rios Expert Report); Pls.' Ex. 476 at 4−14 (Trounstine Expert Report); Pls.' Ex. 501 (Trounstine Declaration) at 1−6.

41.     Dr. Matt Barreto is a Professor of Political Science and Chicano Studies at the University of California at Los Angles. Trial Tr. vol. 3, 196:25−197:6 (Barreto); Pls.' Ex. 384 at 1, 173 (Barreto/Rios Expert Report). He is also the Co-Founder and Faculty Director of the Latino Policy and Politics Initiative at UCLA, and the Co-Founder and Faculty Director of the UCLA Voting Rights Project. Trial Tr. vol. 3, 196:25−197:10 (Barreto); Pls.' Ex. 384 at 1, 173 (Barreto/Rios Expert Report). Dr. Barreto has testified dozens of times in federal court on the topics of racially polarized voting, demographic change, mapmaking, and public polling. Pls.' Ex. 384 at 1 (Barreto/Rios Expert Report); Trial Tr. vol. 3, 206:24−207:17 (Barreto). The Court recognized Plaintiffs' expert Dr. Barreto as an expert in mapping, racially polarized voting, demographic change, racial and ethnic politics, and *Gingles* preconditions II and III. Trial Tr. vol. 3, 209:8−11 (Barreto). Having observed Dr. Barreto and reviewed his reports and declaration, the Court credits his analyses, opinion, and testimony, and grants them substantial weight.

42.     Dr. Jessica Trounstine is a Professor of Political Science at Vanderbilt University. Pls.' Ex. 604 (Trounstine Updated CV) at 1. Before her employment at Vanderbilt University, she served as the Foundation Board of Trustees Presidential Chair of Political Science at the University of California, Merced. *Id.* Before her employment at the University of California, Merced, she served as an Assistant Professor of Politics and Public Affairs at Princeton University. *Id.* Dr. Trounstine holds a Ph.D. and an M.A. in political science, both from the University of California, San Diego, and a B.A., High Honors, in Political Science from the University of California, Berkeley. *Id.* Dr. Trounstine has published a number of peer-reviewed publications, *id.* at 1–3, including two award-wining books published by university presses, entitled *Segregation by Design: Local Politics and Inequality in American Cities* and *Political Monopolies in American Cities: The Rise and Fall of Bosses and Reformers* ("*Political Monopolies*"), respectively. *Id.* at 1. *Political Monopolies* "is about how local political coalitions get built," "how those coalitions end up electing officials to office," "how those officials keep themselves in power for multiple decades," and "the consequences those political monopolies [] have for [] representation." Trial Tr., vol 4., 167:1–7 (Trounstine). For *Political Monopolies*, Dr. Trounstine was awarded the Best Book in Urban Politics from the American Political Science Association. Pls.' Ex. 604 (Trounstine Updated CV) at 1.

43.     As part of her academic work, Dr. Trounstine has analyzed "the building of political coalitions," "racial group representation," and "the political voting patterns of various racial/ethnic and class groups as well as other groups along gender lines." Trial Tr. vol 4, 168:18–169:1 (Trounstine). As part of her academic work, Dr. Trounstine has also

"looked at the various ways that coalitions are built over time." Tr. vol. 4, 168:25−169:1 (Trounstine).

44.     Dr. Trounstine is currently an Andrew Carnegie Fellow. Pls.' Ex. 604 (Trounstine Updated CV) at 3. She was awarded the fellowship to "write a book on local political polarization in the United States." Trial Tr. vol. 4, 168:6−11 (Trounstine).

45.     The Court recognized Dr. Trounstine as an expert in political science, particularly statistical analysis of group voting patterns and the ability of voters to elect their candidates of choice. Trial Tr. vol. 4, 170:20−171:2. Having observed Dr. Trounstine and reviewed her reports and declaration, the Court credits her analyses, opinion, and testimony, and grants them substantial weight.

46.     Dr. Kassra Oskooii is a tenured Associate Professor of Political Science at the University of Delaware and is a faculty member of the University of Delaware's Data Science Institute. Trial Tr. vol. 4, 273:21–276:10 (Oskooii). He has published peer reviewed works on racially polarized voting analysis and served as an expert in Voting Rights Act cases in jurisdictions across the country. Trial Tr. vol. 4, 273:21–276:10 (Oskooii). The Court recognized Dr. Oskooii as an expert on racially polarized voting analysis. Trial Tr. vol. 4, 278:9–18 (Oskooii). Defendants' *Gingles* II and III expert, Dr. Alford, testified that he has great respect for Dr. Oskooii as a methodologist. Trial Tr. vol. 10, 151:9–13 (Alford). Having observed Dr. Oskooii and reviewed his reports and declaration, the Court credits his analyses, opinion, and testimony, and grants them substantial weight.

47.     Defense expert Dr. Alford, Trial Tr. vol. 10, 12:23–13:3, did not dispute the numerical accuracy of Dr. Barreto's or of Dr. Oskooii's ecological inference results and adopted their results for purposes of his own analysis. Trial Tr. vol. 10, 99:24–100:6 (Alford).

48.     Dr. Alford's rebuttal report contained "replication estimates" for some, but not all, of Dr. Trounstine's Rows by Columns (RxC EI) estimates. *Compare* Defs.' Ex. 305 (Alford Rebuttal Expert Report) at 13 & Table 1 (no "replication estimates"), *with id.* at 18 & Table 3 (lists "Replication RxC EI Estimates"), 19 & Table 4 (lists "Replication RxC EI Estimates"), 20 & Table 5 (lists "Replication RxC EI Estimates"). At trial, Dr. Alford testified that his criticism of Dr. Trounstine's methodology in his rebuttal report "was harsh[]" because he had "assume[d]" that Dr. Trounstine had made a mistake that he now understood she did not make. Trial Tr. vol. 10, 171:9–18 (Alford). Dr. Alford also testified that he did not know if the "replication estimates" contained in his rebuttal report were produced using inputs identical to those that Dr. Trounstine used in producing her RxC EI estimates. *Id.* at Trial Tr. vol. 10, 178:7–179:14 (Alford). Thus, Dr. Alford's testimony is of limited probative value.

49.     Expert for Petteway and NAACP/LULAC Plaintiffs Dr. Traci Burch testified as to the racially discriminatory intent of the 2021 redistricting plan. Pls.' Ex. 414 (Burch Expert Report); Trial Tr. vol. 2, 72:9–110:3 (Burch). Dr. Burch also testified as to the Senate Factors. Pls.' Ex. 414 (Burch Expert Report); Trial Tr. vol. 2, 72:9–110:3 (Burch).

50.     Dr. Traci Burch is an Associate Professor of Political Science at Northwestern University and a Research Professor at the American Bar Foundation. Trial

Tr. vol. 2, 64:16–19 (Burch); Pls.' Ex. 414 at 1, 52 (Burch Expert Report). Her areas of expertise include political behavior, political participation and barriers to participating in politics, barriers to voting, race and ethnic politics, and criminal justice. Trial Tr. vol. 2, 64:25–65:5 (Burch); Pls.' Ex. 414 at 1, 52 (Burch Expert Report). She has been credited as an expert in federal and state court on the topics of barriers to voting and felony disenfranchisement, as well as the Senate Factors and Arlington Heights factors. Trial Tr. vol. 2, 66:17–67:7 (Burch); Pls.' Ex. 414 at 1, 52 (Burch Expert Report).

51.     Reflecting a reliable application of Senate Factors 5, 6, 7, 8, and 9 to the facts of this case, Dr. Burch's opinions, as set forth in her 38-page report, are based on a review of sources and methods that are standard for political scientists and social scientists, including the relevant literature in political science and documents provided by the Plaintiffs such as depositions of the Defendants and other decision makers. Trial Tr. vol. 2, 68:24–69:10 (Burch). Dr. Burch also collected relevant data and analyzed publicly available information including websites, meeting records, newspaper articles, Census data, and other surveys. Trial Tr. vol. 2, 69:11–18 (Burch).

52.     Reflecting a reliable application of the *Arlington Heights* factors, Dr. Burch's relevant opinions set forth in page 4 of her report are based on her analysis of relevant demographic data and county-specific primary sources, including statements by the County Judge and commissioners and public comments, as well as peer-reviewed political science and sociological studies, which is standard for political scientists and social scientists. *See generally* Pls.' Ex. 414 (Burch Expert Report). Dr. Burch "cast a fairly wide net,"

20

undertaking an extensive survey of public records and public statements made by decision makers and residents in Galveston County. Trial Tr. vol. 2, 69:21–71:1 (Burch).

53.     The Court qualified Dr. Burch as an expert in this case. Trial Tr. vol. 2, 67:12– 25 (Burch). After having heard and observed Dr. Burch's testimony and reviewed her report, the Court credits her analyses, opinions, and testimony, and grants them substantial weight.

54.     Expert for the United States, Dr. Rene Rocha, testified as to the Senate Factors. Pls.' Ex. 335 (Rocha Expert Report); Trial Tr. vol. 5, 192–279 (Rocha).

55.     Dr. Rene Rocha is the Herman J. and Eileen S. Schmidt Chair and Professor of Political Science and Latino Studies at the University of Iowa. Trial. Tr. vol. 5, 193:8– 18 (Rocha); Pls.' Ex. 336 (Curriculum Vita of Dr. Rene Rocha). Dr. Rocha conducts research and teaches courses on the subject of race and ethnic politics, immigration policy, and voting rights. Trial Tr. vol. 5, 193:19–24 (Rocha). He has previously served as an expert in a Section 2 case in federal court. Trial Tr. vol. 5, 196:13–20 (Rocha).

56.     Dr. Rocha's relevant opinion is set forth in his 38-page report is based on his analysis of relevant demographic data and county-specific primary sources, as well as peer-reviewed political science and sociological studies, which is standard for political scientists and social scientists. His analysis included reviewing Census and ACS data, federal and state government documents, court decisions, peer-reviewed academic work, websites, and newspaper articles centered on his charge of gathering evidence of incidents and events in Galveston County that fall with the ambit of Senate Factors 1, 2, 3, 5, and 6, and presenting

21

that information to the Court. Pls.' Ex. 335 (Rocha Expert Report); Trial Tr. vol. 5, 192:5–283:3 (Rocha).

57.     The Court qualified Dr. Rocha as an expert in this case. Trial Tr. vol. 5, 199:7–14 (Rocha). After having heard and observed Dr. Rocha's testimony and reviewed his report, the Court credits his analyses, opinions, and testimony, and grants them substantial weight.

58.     Expert for the United States Dr. Max Krochmal testified as to the racially discriminatory intent of the 2021 redistricting plan. Pls.' Ex. 412 (Krochmal Expert Report); Trial Tr. vol. 5, 36:6–19, 74:23–95:22 (Krochmal).

59.     Dr. Max Krochmal is a Professor of U.S. History and the Czech Republic Endowed Professor and Director of Justice Studies at the University of New Orleans. Trial Tr. vol. 5, 11:2-10 (Krochmal); Pls.' Ex. 317 (Curriculum Vita of Dr. Max Krochmal). Dr. Krochmal researches and teaches courses in the history of the American South, African American history, Latino/Latina history, and multiracial coalitions, with a particular focus on Texas history during the twentieth century. Trial Tr. vol. 5, 11:11-18 (Krochmal).

60.     Dr. Krochmal's testimony cataloged discriminatory events undertaken by local and state entities against Latino and Black residents in Galveston County that affected the right to vote. Trial Tr. vol. 5, 52:2–67:6 (Krochmal). Based on his research Dr. Krochmal concluded there was sufficient evidence to find there is a history of official voting-related discrimination in Galveston County. Trial Tr. vol. 5, 34:10–35:13 (Krochmal). The Court agrees with Dr. Krochmal's conclusion in this regard.

61.     Reflecting a reliable application of the procedural departures factor of the *Arlington Heights* analysis, as well as the specific sequence of events leading up to the decision, Dr. Krochmal's relevant opinion set forth in his report is based on his training on the historical method. Pls.' Ex. 412 at 4–5 (Krochmal Expert Report); Trial Tr. vol. 5, 36:20–45:2, 41:19–52:1 (Krochmal). In short, historical methodology involves locating primary and secondary sources, evaluating "as much written evidence as possible," interpreting these sources, and then placing them within a larger historical context. Pls.' Ex. 412 at 4 (Krochmal Expert Report). In reaching his conclusions here, Dr. Krochmal analyzed more than 300 newspaper articles, years of minutes and agendas from the Galveston County Commissioners Court, video streams, primary sources in archives, oral history interviews, and engaged in multiple days of fieldwork. *Id.*; *see also* Trial Tr. vol. 5, 36:20–45:3, 41:19–52:1 (Krochmal). Dr. Krochmal's training and practice conform to professional standards and practices, including removing any personal biases from his work. Trial Tr. vol. 5, 43:16–45:3 (Krochmal); Pls.' Ex. 412 at 4 (Krochmal Expert Report). Dr. Krochmal examined Galveston County's past redistricting cycles and the specific sequence of events leading up to the 2021 redistricting plan, as well as the history of discrimination against the county's Black and Latino population. *See generally* Pls.' Ex. 412 (Krochmal Expert Report).

62.     The Court qualified Dr. Krochmal as an expert in this case. Trial Tr. vol. 5, 32:23–33:1 (Krochmal). After having heard and observed Dr. Krochmal's testimony and reviewed his report, the Court credits his analyses, opinions, and testimony, and grants them substantial weight.

## IV.    Galveston County Demographics and Voting Patterns

63.    According to the 2020 Census, Galveston County has a total population of 350,682 — of whom 54.57% are non-Hispanic White ("NH White"), 25.28% are Latino, and 13.30% are non-Hispanic Any Part Black "NH AP Black" or "Black". The combined Black and Latino population represents approximately 38% of the countywide population. Stipulated Facts ¶ 6; Pls.' Ex. 386 at ¶ 26 (Cooper Expert Report).[3]

64.    The County is governed by a commissioners court comprised of one County Judge elected countywide and four commissioners elected from precincts of roughly equal population. Tex. Const. art. V, §§ 15, 16, 18(a)−(b).

65.    Commissioner Precinct 3, which covers portions of Dickinson east of the I-45 highway, La Marque, Texas City, and the city of Galveston, was the only majority-minority precinct in Galveston County from 1991 to 2021. Pls.' Ex. 386 at ¶ 38 (Cooper Expert Report); Pls.' Ex. 412 at 29–30 (Krochmal Expert Report).

66.    The historic core of a majority-minority Precinct 3, which existed in the Benchmark Plan in place from 2012 to 2021, was the product of advocacy by Black and Latino activists for the creation of a majority-minority precinct in which they could elect a candidate of choice in the 1991 redistricting cycle. Pls.' Ex. 412 at 28–30 (Krochmal Expert Report); Trial Tr. vol. 2, 19:20-20:6 (Pope) (describing how the election of minority

---

[3] Mr. Cooper explained that it is possible to consider a variety of different definitions for the Black population—such as non-Latino any-part Black, non-Latino DOJ Black, or single-race Black—in a demographic analysis; for Galveston's population, the differences are "fairly insignificant" for overall population, and "de minimis" for CVAP calculations, and thus do not impact the *Gingles* I analysis. Trial Tr. vol. 3, 20:9–21:9; 22:12–23:7 (Cooper).

candidates to public office makes Black and Latino residents of Galveston County "feel pride and want to be involved in what goes on in the community"). This advocacy took place shortly after the 1988 election of the first Black member of the commissioners court, Wayne Johnson, in a close campaign marked by racially polarized voting and strong Latino support for Johnson. Pls.' Ex. 412 at 23–25 (Krochmal Expert Report); Trial. Tr. vol. 5, 62:4–65:10 (Krochmal).

67.     Over time, Black and Latino residents in Precinct 3 "felt like that - Commissioner Precinct was theirs, it was a home for them. It was responsive. It was reflective of their priorities. And people took great pride and ownership in it." Trial Tr. vol. 5, 71:10–20 (Krochmal); *see also* Trial Tr. vol. 7, 46:3–13 (Holmes) (discussing how "different groups of people" take pride "not only in the precinct itself and the cohesiveness in the precinct itself but even the pride they have in their elected official as the county commissioner"); Trial Tr. vol. 6, 190:1–191:12 (Henderson-Lofton) (describing her family history in historic Precinct 3).

68.     By 2020, Benchmark Precinct 3 was 58.31% Black and Latino citizen voting age population ("CVAP"), compared to Black and Latino CVAP ranges of 22–28% in the other three commissioners precincts. Pls.' Ex. 386 at ¶ 46 (Fig. 7, Cooper Expert Report). By contrast, the Enacted Plan has no commissioners precinct with a Latino and Black CVAP higher than 35%, and Precinct 3 in the Enacted Plan has the lowest such population at 28% Latino and Black CVAP. Pls.' Ex. 386 at ¶ 58 (Fig. 11, Cooper Expert Report).

A. **The Black and Latino population is sufficiently large and geographically compact to constitute a majority in a commissioners precinct.**

69.     The commissioners court considered a proposed map during the 2021 redistricting process with a majority Latino and Black population by CVAP in a reasonably compact commissioners precinct. "Map 1"—one of the two proposed maps drawn by the County, *see* Joint Ex. 29 (Galveston County redistricting website)—contained a Precinct 3 with 30.86% Black CVAP and 24.28% Latino CVAP. Pls.' Ex. 487 at 19–20 (Rush Expert Report); *see also* Pls.' Ex. 341 at 27–29 (Exhibit A, Cooper Expert Report)

70.     The commissioners' own legal consultant for the redistricting process, Dale Oldham, testified that Map 1 was legally defensible and was not racially gerrymandered. Trial Tr. vol. 8, 122:14–123:2 (Oldham). Plaintiffs' experts likewise testified that Map 1 met the *Gingles* I standard. *See* Trial Tr. vol. 4, 73:2–5 (Rush); *cf.* Pls.' Ex. 386 at 26–29 (Cooper Expert Report) (Map 1 has characteristics of majority Black and Latino CVAP precinct and is reasonably compact); Trial Tr. vol. 3, 51:2–55:11 (Cooper).

71.     Plaintiffs' illustrative plans further demonstrate that Galveston County's Latino and Black population is sufficiently large to constitute a majority by CVAP in a single commissioners precinct.

72.     Mr. Cooper drafted four illustrative plans that all include a majority Black and Latino commissioners precinct by CVAP. *See generally* Pls.' Ex. 386 at 29–37 (Cooper Expert Report). According to the 5-Year 2017-2021 ACS Special Tabulation CVAP, Cooper Plans 1, 2, 3, and 3A each include an illustrative commissioners precinct with

57.65%, 57.72%, 55.27%, and 54.52% Black + Latino CVAP respectively. Pls.' Ex. 439 (Exhibit A to Cooper Rebuttal).

73.     Mr. Fairfax's illustrative plan likewise includes a majority Black and Latino commissioners precinct. According to the 2020 Census redistricting dataset and the 2016-2020 ACS 5-Year ACS Data, Mr. Fairfax's illustrative plan includes a commissioners' precinct with 55.15% Black + Latino CVAP. Trial Tr. vol. 4, 109:7–111:17 (Fairfax); Pls.' Ex. 337 at 20; Pls.' Ex. 551 (Fairfax Expert Report Table 6).

74.     For his initial report, Dr. Rush created three illustrative plans (Demonstrative Maps 1, 2, and 3) containing alternative Precinct 3 configurations wherein the Black and Latino community formed a majority by CVAP. Pls.' Ex. 487 (Rush Report). According to the 2020 Census redistricting dataset and the 2016–2020 5-year ACS Data, each plan includes an illustrative commissioners precinct with a Black + Latino CVAP of 56.56%, 61.22%, and 57.47% respectively. *Id*. Dr. Rush also presented a fourth plan, Demonstrative Map 2b, with a Black + Latino CVAP of 57.92%. Pls.' Ex. 486, Appx. B (Rush Rebuttal Report).

75.     Dr. Rush subsequently created four additional plans containing coastal precincts, each unifying the entire Galveston County coastline into one commissioners precinct without fragmenting the mainland minority population in the manner of the Enacted Plan. Pls.' Ex. 486 at 6–9 (Rush Rebuttal Report); *see also* Pls.' Exs. 415 (Rush Alternative Map 1), 416 (Rush Alternative Map 2), 417 (Rush Alternative Map 3), 418 (Rush Alternative Map 4). Texas Legislative Council-generated reports confirm that three of those coastal precinct plans contain a commissioners precinct (Precinct 3) in which the

27

combined Black and Latino CVAP is over 50%. Pls.' Ex. 485 (Rush May 15, 2023 Declaration).

       1.    *Plaintiffs' illustrative plans comport with traditional redistricting criteria and are reasonably configured.*

    76.    Each of the Plaintiffs' *Gingles* I experts credibly testified to applying traditional redistricting criteria in developing each of Plaintiffs' illustrative maps.

    77.    Dr. Owens' criticisms of Plaintiffs' illustrative plans do not overcome Plaintiffs' experts' testimony demonstrating that each of those plans comport with traditional redistricting criteria.

    78.    <u>NAACP/LULAC Plaintiffs illustrative plans (Cooper)</u>. Mr. Cooper developed Cooper Map 1 by shifting two voting precincts from the Benchmark Plan, a least-change approach he deemed acceptable for Galveston County based upon the characteristics of its population changes over the past decade. Trial Tr. vol. 3, 56:12–57:13 (Cooper); Pls.' Ex. 386 at 29–32 (Cooper Expert Report). This "least-change" plan sought to make the minimal number of changes necessary to eliminate malapportionment and brought the commissioners precincts within an "almost perfect deviation, within plus or minus 1 percent." Trial Tr. vol. 3, 58:14–21 (Cooper); Pls.' Ex. 386 at 31 (Fig. 15, Cooper Expert Report). In Cooper Map 1, all commissioners precincts are contiguous, and Precinct 3 is reasonably compact given the complex geography of Galveston County. Trial Tr. vol. 3, 58:8–11 (Cooper). This plan keeps 11 municipalities whole[4] with 15 populated splits,

---

[4] Mr. Cooper explained that in considering municipal splits he included Galveston County's 13 municipalities and its three unincorporated "census designated places" or "CDPs". When considering municipal splits, Mr. Cooper testified he almost always uses "populated" splits, or those that separate

and just one populated voting district (VTD) split.[5] Pls.' Ex. 349 at 5–6 (Ex. I, Cooper Expert Report). It therefore respects municipal and political subdivision boundaries better than the Enacted Plan, which keeps nine municipalities whole and has 16 populated municipal splits as well as four populated VTD splits. Pls.' Ex. 346 at 5–6 (Ex. F, Cooper Expert Report). Racial considerations did not predominate in drawing Cooper Map 1, Trial Tr. vol. 3, 58:3–7 (Cooper), and, using this approach, Mr. Cooper testified "it wasn't hard because [he] wasn't even trying" to achieve a majority Black and Latino precinct. Trial Tr. vol. 3, 59:3–11 (Cooper). Given these points of analysis, Cooper Map 1 adheres to traditional redistricting principles and is reasonably configured. Trial Tr. vol. 3, 62:7–11 (Cooper); Pls.' Ex. 386 at 31–32 (Cooper Expert Report).

79.     Mr. Cooper developed Cooper Map 2 also using a least-change strategy for equalizing populations while also creating an entirely coastal precinct 2. Trial Tr. vol. 3, 62:8–63:4 (Cooper); Pls.' Ex. 386 at 32–34 (Cooper Expert Report). The total top to bottom population deviation is "even closer" to zero than the Enacted Plan at 0.57%. Trial Tr. vol. 3, 64:11–25 (Cooper); Pls.' Ex. 350 at 3 (Ex. J, Cooper Expert Report). All commissioners precincts are contiguous, and Cooper Map 2 keeps ten municipalities whole with 15 populated splits, an improvement on the Enacted Plan. Trial Tr. vol. 3, 66:4–15 (Cooper);

---

populations, and deemed it appropriate to do so in Galveston. Trial Tr. vol. 3, 46:14–47:21 (Cooper); *see also* Pls.' Ex. 386 at 12–13, 25 n.23 (Cooper Expert Report).

[5] The Census Bureau defines a variety of areas, such as election districts, precincts, legislative districts, or wards, established by states and local governments for voting purposes as a voting district or VTD. In Galveston County, the VTDs generally aligned with the 92 "voting precincts" in place during the 2021 redistricting. *See* Pls.' Ex. 386 at 25 (Cooper Expert Report).

Pls.' Ex. 350 at 4–5 (Ex. J, Cooper Expert Report). Cooper Map 2 has nine populated VTD splits, which Mr. Cooper explained were done to prioritize creating a coastal commissioners precinct that would be contiguous by driving. Trial Tr. vol. 3, 66:16–25 (Cooper); Pls.' Ex. 350 at 6 (Ex. J, Cooper Expert Report). Mr. Cooper testified that Precinct 3 in Cooper Map 2 is reasonably compact, while also questioning whether the single coastal commissioners precinct 2 was a "good idea" due to the volume of territory it covered. Trial Tr. vol. 3, 67:1–68:11. Racial considerations did not predominate in drawing Cooper Map 2. Trial Tr. vol. 3, 63:5–8. Given these points of analysis, Cooper Map 2 adheres to traditional redistricting principles and is reasonably configured. Pls.' Ex. 386 at 34 (Cooper Expert Report).

80.     Mr. Cooper developed Cooper Maps 3 and 3A by prioritizing the goal of keeping all offshore islands in a single precinct. Trial Tr. vol. 3, 68:13–24; Pls.' Ex. 386 at 35–37 (Cooper Expert Report); Pls.' Ex. 438 at 11–13 (Cooper Rebuttal). The population deviations for both plans are within +/- 5%. Pls.' Ex. 351 at 3 (Ex. K, Cooper Expert Report); Pls.' Ex. 443 at 3 (Ex. E, Cooper Rebuttal). Mr. Cooper included Cooper Map 3A as a slightly modified version of Cooper Map 3 to allow Precinct 1 to be contiguous by driving without the need for authorized entry across the Moses Lake Floodgate. Trial Tr. vol. 3, 70:16–71:1, 671:19–72:2; Pls.' Ex. 438 at 11 (Cooper Rebuttal). Cooper Map 3 keeps nine municipalities whole and includes 16 populated splits, the same as the Enacted Plan, while Cooper Map 3A keeps nine municipalities whole with 15 populated splits, one less split than the Enacted Plan. Pls.' Ex. 351 at 5 (Ex. K, Cooper Expert Report); Pls.' Ex. 443 at 5 (Ex. E, Cooper Rebuttal). Both Cooper Maps 3 and 3A have three VTD splits, one

less than the Enacted Plan. Ex. 351 at 6 (Ex. K, Cooper Expert Report); Pls.' Ex. 443 at 6 (Ex. E to Cooper Rebuttal). Both Map 3 and 3A are reasonably compact, and in fact Mr. Cooper characterized Cooper Map 3 as "clearly compact" and Cooper Map 3A as "very compact." Trial Tr. vol. 3, 68:13–69:4, 75:10–19 (Cooper). Race did not predominate in the development of either map. Trial Tr. vol. 3, 70:10–11, 75:20–76:7 (Cooper). Given these points of analysis, Cooper Maps 3 and 3A adhere to traditional redistricting principles and are reasonably configured. Trial Tr. vol. 3, 76:8–10; Pls.' Ex. 386 at 36 (Cooper Expert Report); Ex. 438 at 13 (Cooper Rebuttal).

81.    In sum, all the Cooper Illustrative Plans adhere to traditional redistricting criteria, performing comparably or better overall than the Enacted Plan on measures of municipal and VTD splits as well as compactness, without the need to pair any incumbents or predominate the consideration of race in drafting them. *See generally* Trial Tr. vol. 3, 76:11–77:17. Indeed, Cooper Maps 2, 3, and 3A prove it is possible to achieve these metrics, and maintain a majority-Black and Latino precinct, even with a unified coastal precinct.

82.    United States' illustrative Plan (Fairfax). Mr. Fairfax developed an illustrative plan using the least-change approach to equalize the population among the commissioner precincts due to population changes in the County. This required that he shift only one VTD from Precinct 2 to Precinct 3 to bring the commissioner precincts population deviations within the accepted guideline +/- 5% and the overall plan deviation under 10%. Trial Tr. vol. 4, 97:16–102:20 (Fairfax); Pls.' Ex. 337 at 16–19 (Fairfax Expert Report). All commissioner precincts are contiguous. Trial Tr. vol. 4, 106:2–107:8

(Fairfax); Pls.' Ex 337 at 19; Pls.' Ex. 340 at 60 (Appx. C, Fairfax Expert Report). Mr. Fairfax testified that his illustrative plan is reasonably compact and more compact than the Benchmark Plan. Trial Tr. vol. 4, 115:4–117:3 (Fairfax); Pls.' Ex. 552 (Table 7, Fairfax Expert Report). The illustrative plan is also similarly compact as compared to the Enacted Plan. Pls.' Ex. 454 at 2 (Fairfax Rebuttal); Pls.' Ex. 557 (Tables 1–3, Fairfax Rebuttal).

83.     Mr. Fairfax testified that his illustrative plan adhered to traditional redistricting criteria, including equal population, contiguity, and compactness. Trial Tr. vol. 4, 104:16–22, 107:20–23 (Fairfax). Mr. Fairfax's illustrative plan also maintained the same municipality and voting district splits that existed in the prior plan. *Compare* Pls.' Ex. 340 at 63–64 *with* 87–88 (Appx. C, Fairfax Expert Report). Racial considerations did not predominate in drawing Mr. Fairfax's illustrative plan. Trial Tr. vol. 4, 103:13–18 (Fairfax). Given this evidence, Mr. Fairfax's illustrative plan adheres to traditional redistricting principles and is reasonably configured.

84.     Petteway Plaintiffs' illustrative plans (Rush). Each precinct in each of Dr. Rush's eight total illustrative plans created for the Petteway Plaintiffs (Demonstrative Maps 1, 2, 2b & 3 and Alternative Maps 1, 2, 3 & 4) are made up of contiguous land base. Pls.' Exs. 487 (Rush Expert Report), 486 (Rush Rebuttal Report), 485 (Rush May 15, 2023, Declaration), 415–18 (Alternative Maps 1–4).

85.     All of Petteway Plaintiffs' illustrative plans have an overall plan deviation under 10%, and seven of the eight plans are within the +/- 5% guideline (with Demonstrative Map 2b having moved just one VTD from Demonstrative Map 2 to bring

32

that plan within the +/- 5% guideline). Pls.' Exs. 487 (Rush Expert Report), 486 (Rush Rebuttal Report), 485 (Rush May 15, 2023 Declaration), 415–18 (Alternative Maps 1–4).

86. Precinct 3 in each of Dr. Rush's illustrative plans is reasonably compact as are the remaining three commissioners' court precincts in each of those plans. Trial Tr. vol. 4, 22:17–23:1 (Rush); Pls.' Exs. 487 (Rush Expert Report), 486 (Rush Rebuttal Report). Each of the districts in Dr. Rush's illustrative plans are also comparatively compact when measured against the districts in the Enacted Plan and, on average, are *more* compact than the Benchmark Plan. Pls.' Exs. 487 (Rush Expert Report), 486 (Rush Rebuttal Report). In particular, each of Dr. Rush's four plans containing a coastal precinct *outperform* the Enacted Plan in compactness. Pls.' Ex. 486 at 6–8 (Rush Rebuttal Report).

87. Petteway Plaintiffs' illustrative plans respect political and precinct boundaries. For example, Dr. Rush's Demonstrative Plans 1, 2, and 2b do not split *any* VTDs. Pls.' Ex. 487 at 11, 13 (Rush Expert Report). In addition to respecting political boundaries, Petteway Plaintiffs' illustrative plans keep together pivotal communities of interest. *See, e.g.,* Trial Tr. vol. 4, 21:13–22:1 (Rush) ("I went and did some historical research, read as much as I could about the county, communities of interest, to help identify those."); Ex. 486 at 5–6 (Rush Rebuttal).

88. Finally, racial considerations did not predominate in the drawing of any of the Petteway Plaintiffs' illustrative plans, as Dr. Rush did not even consider race or ethnicity while he was creating his maps, only exporting demographics for the illustrative plans *after* completing them. Trial Tr. vol. 4, 22:2–16, 27:14–18.

89.     <u>Defendants' assessment of Plaintiffs' illustrative plans (Owens).</u> Even if the Court assigned any weight to defense expert Dr. Owens' analysis, which it does not, *see* FOF ¶¶ 36−38, it would only confirm that, under traditional measures of compactness (Reock, Polsby-Pepper, and Convex-Hull) "[t]he Enacted map has an average score that is consistent with the other [plaintiff illustrative] plans." Defs.' Ex. 290 at 16 (Owens Amended Report); Trial Tr. vol. 9, 229:1–20 (Owens) (agreeing that "all of Plaintiffs' illustrative plans were about as reasonably compact as the enacted plan"), 276:16–19 (agreeing compactness scores are "generally the same" for the Enacted Plan and Plaintiffs' illustrative plans) (Owens).

90.     At trial, Dr. Owens abandoned his contention that the lower standard deviation between the Polsby-Pepper and Reock (but not the Convex-Hull) compactness scores in the Enacted Plan, compared to some of Plaintiffs' illustrative plans, was a measure of the plans' compactness. Trial Tr. vol. 9, 281:10–282:5 (Owens) ("I don't think in this case that a lower standard of deviation is always better.").

91.     Dr. Owens also failed to articulate why he thought Plaintiffs' illustrative plans used race as a predominating factor other than his work "comparing the outcomes" of the maps, nor did he dispute that Plaintiffs' experts did in fact use the non-racial traditional redistricting criteria they testified to using. Trial Tr. vol. 9, 256:6–258:25 (Owens). He did not dispute the appropriateness of Plaintiffs' experts using a least-change approach, and agreed it is a common approach when rebalancing populations following a census. Trial Tr. vol. 9, 259:12–260:13. (Owens).

92.     Dr. Owens' other criticisms of Plaintiffs' illustrative plans lack any probative value to the Court's findings that the plans were reasonably configured and compact. For example, Dr. Owens did not dispute that Cooper Map 3A resolved his criticisms of contiguity in Precinct 1 over the Moses Lake Floodgate in Cooper Map 3. Trial Tr. vol. 9, 265:6–12 (Owens). He also admitted that his criticism that Dickinson should be joined with League City "where populations are more similar" could apply equally to the Enacted Plan. Trial Tr. vol. 9, 265:13–266:7 (Owens). Similarly, for Cooper Map 1, Dr. Owens criticized Mr. Cooper for prioritizing compactness in his choice of which VTD to bring into Precinct 3, instead of an alternative configuration that Dr. Owens admitted at trial he never actually analyzed. *See* Trial Tr. vol. 9, Trial Tr. vol. 9, 262:2–6 (Owens). And Dr. Owens admitted it is not standard practice to assess contiguity under conditions of extreme weather as he had done in criticizing Cooper Map 2. Trial Tr. vol. 9, 263:12–264:12 (Owens).

93.     Dr. Owens' criticism of Mr. Fairfax's illustrative plan, and its shift of a VTD from Precinct 2 to Precinct 3, resulted from him mistakenly identifying the VTD at issue. As a result of this error, both his assertions that the shifted VTD had a higher minority population and lower Anglo population to increase Precinct 3's minority population, Trial Tr. vol. 9, 261:3–263:6 (Owens), and that the VTD made Precinct 2 less contiguous, Trial Tr. vol. 9, 263:19–264:6 (Owens), are erroneous. The VTD Mr. Fairfax shifted had a lower minority population and higher Anglo population, increased the illustrative plan's compactness, and did not make Precinct 2 less contiguous than the alternative configuration Owens suggested, which he admitted to not analyzing before forming his opinion. Trial Tr. vol. 9, 269:22–273:21 (Owens).

35

94.     Dr. Owens claimed that six of Plaintiffs' seven proposed plans "perpetuate[d] significant political divisions of Galveston Island," Defs.' Ex. 290 at 26 (Owens Amended Report), but this criticism is only possible because Dr. Owens neglected to analyze the *four* coastal precinct plans created by Dr. Rush and included in both his Rebuttal Report, Pls.' Ex. 486, and the Expert Report of Dr. Traci Burch, Pls.' Ex. 414. *See also* Trial Tr. vol. 9, 288:1–5 (Owens) (answering "I did not" to the question of whether he had disclosed any opinions related to Dr. Rush's coastal precinct maps).

95.     Accordingly, Dr. Owens' opinions, even if afforded any weight, would not change the Court's findings that Plaintiffs' illustrative plans demonstrate several methods of showing a majority Black and Latino CVAP within reasonably compact commissioners precincts that comport with traditional redistricting principles without race predominating.

96.     Conclusions Regarding Traditional Redistricting Principles.  Overall, Plaintiffs' illustrative plans from Mr. Cooper, Mr. Fairfax, and Dr. Rush confirm the Black and Latino population is sufficiently numerous and geographically compact to constitute the majority by CVAP in a single commissioners' precinct that is both reasonably configured and adheres to traditional redistricting principles.

97.     As found above, several of Plaintiffs' illustrative plans preserve Precinct 3 as a majority-minority precinct even while performing the same or better on traditional redistricting criteria. Indeed, there are a "multitude of potential plans adhering to traditional redistricting principles that would result in maps that maintain a majority B+L CVAP Commissioners Precinct." Pls.' Ex. 386 at 37 (Cooper Expert Report); *see also* Trial Tr. vol. 3, 52:12–15 (Cooper) ("There are many, many different ways to draw a majority Black

plus Latino precinct. You can make few changes. You can make lots of changes. It can look a lot of different ways."); Pls.' Ex. 337 at 25 (Fairfax Expert Report); Trial Tr. vol. 4, 117:15–118:4 (Fairfax).

98.     Plaintiffs' illustrative plans further show that a majority-minority commissioners precinct is achievable even if a unified coastal precinct is a predominant consideration second only to complying with federal law, and, as Dr. Rush's illustrative plans show, even where a plan includes the exact same coastal commissioners Precinct 2 as in the Enacted Plan. *See, e.g.,* Pls.' Exs. 415 (Rush Alternative Map 1), 416 (Rush Map 2), 417 (Rush Alternative Map 3), 418 (Rush Alternative Map 4).

### 2.  *Galveston's Black and Latino population is geographically compact.*

99.     Defendants' arguments that Galveston's Latino residents are too "distant and disparate" to be appropriately joined in a single commissioners precinct are unavailing. They have presented no credible support for that factual conclusion. Rather, Defendants have offered only the expert report of Dr. Owens, in which he opines that the "Hispanic population in Galveston County is not compact" and that "Galveston County's HCVAP is both distant and disparate." Defs.' Ex. 290 at 7–11 (Owens Amended Report). On the stand, however, Dr. Owens appeared to back away from these opinions, instead opining that the Latino population in Galveston is "evenly dispersed throughout the county." Trial Tr. vol. 9, 213:16–23 (Owens).[6]

---

[6] In his Amended Report, Dr. Owens opined that Galveston's Black population is "geographically dispersed" in the county and that a "compact community of interest does not exist among the current Black population in Galveston County." Defs.' Ex. 290 at 12–15 (Owens Amended Report). But on the stand at

100.    The Court assigns no weight to Dr. Owens' opinions on the geographic compactness of Galveston's minority population for several reasons. First, as set forth above, Dr. Owens lacks significant education, experience, knowledge, or skill in this area. *See* FOF ¶¶ 36−38. But even if Dr. Owens were qualified to offer these opinions, he did not use reliable and standard methods in forming them.

101.    For example, Dr. Owens based his assessment that the Latino population is "dispersed" on a figure in his report highlighting concentrations by whether they are above or below a 46% Latino BVAP threshold. *See* Defs.' Ex. 290 at 7 (Fig. 2, Owens Amended Report). But Dr. Owens could cite no academic or other authority for using a 46% threshold, and asserted it was instead based upon measures of electoral competitiveness, despite his analysis not concerning electoral competitiveness at all. Trial Tr. vol. 9, 233:19–235:20 (Owens). Instead, he chose 46% to "show the difference [he] wanted to show." Trial Tr. vol. 9, 236:6–8 (Owens).

102.    Dr. Owens also based his conclusion that Galveston's Latino population is "distant and disparate" on the distances between concentrations of Latino residents ranging from 305 to 7,637, but again he provided no authority or reference for the significance of those distances to his conclusions or even a definition for what would be considered "distant and disparate" in Galveston County at all. *See* Defs.' Ex. 290 at 8 (Owens Amended Report); Trial Tr. vol. 9, 237:19–238:3, 241:24–17 (Owens).

---

trial, Dr. Owens appeared to retract this, agreeing that Galveston's Black community is located "towards the center of Galveston County" and is "geographically compact." Trial Tr. vol. 9, 212:23–213:9 (Owens).

103.    Dr. Owens formed his opinions in this matter on Galveston's Latino and Black residents by relying on a breakdown of socioeconomic factors by Census County Division ("CCD"). Defs.' Ex. 290 at 9 (Owens Amended Report); Trial Tr. vol. 9, 244:5–11 (Owens). But Dr. Owens admitted that it is not a standard practice in a *Gingles* I analysis to compare socioeconomic conditions across CCDs and that he was not aware of any academic authority or court of law using CCDs in this way. Trial Tr. vol. 9, 244:12–245:1 (Owens). And as part of that analysis, Dr. Owens analyzed just a few of the dozens of potential socioeconomic factors available, Trial Tr. vol. 9, 245:2–246:7 (Owens), and he admitted to inconsistently choosing which factors to examine for Black and Latino residents and failing to perform any analysis for how these groups compared to their Anglo counterparts. Trial Tr. vol. 9, 247:16–23 (Owens).

104.    Overall, Dr. Owens had no basis for disputing Plaintiffs' evidence that, throughout Galveston County, Latino and Black residents perform worse than their Anglo counterparts across all socioeconomic categories. Trial Tr. vol. 9, 247:20–249:2 (Owens). This evidence is based on a "wide range" of factors measuring "income levels, education, housing, communications" and "internet access" broken out by race and ethnicity and using standard factors relevant in a Section 2 analysis. Trial Tr. vol. 3, 26:3–18 (Cooper); Pls.' Ex. 386 at 13–16 (Cooper Expert Report). And this fulsome analysis confirms that, in Galveston County, "Anglos outpace the Black and Latino population almost across the board in every single data point" analyzed. Trial Tr. vol. 3, 28:13–19, 29:17–22 (Cooper); Pls.' Ex. 386 at 14 (Cooper Expert Report); Pls.' Exs. 343, 344 (Exs. C and D, Cooper Expert Report).

105.     The Court does not credit Defendants' assertions that Plaintiffs' illustrative plans are not reasonably compact or reasonably configured because they include portions of League City. While League City is more affluent than other parts of the county, "disparities between Black and Latino residents as compared to their Anglo counterparts persist even in League City, which indicates that they share the common socio-economic challenges of Black and Latino residents in Galveston." Pls.' Ex. 438 at 5 (Cooper Rebuttal); *see also* Trial Tr. vol. 3, 184:9–16 (Cooper).

106.     This quantitative socioeconomic data is further supported by witness testimony adduced at trial, including the testimony of Ms. Lucretia Henderson-Lofton, a former President of the Dickinson Bay Area NAACP and resident of League City who identifies as Black. Trial Tr. vol. 6, 188:21–25, 198:23–199:12 (Henderson-Lofton). Born on Galveston Island and raised in Texas City, Ms. Henderson-Lofton moved to League City in or about 2016. Trial Tr. vol. 6, 189:1–15 (Henderson-Lofton). She testified to the continued challenges of racial discrimination her family and others experience in League City as well as to the significant contacts that she maintains in Texas City. Trial Tr. vol. 6, 189:1–3, 190:18–2, 193:25–198:18, 204:23–207:6 (Henderson-Lofton). She also testified to knowing of several other Black and Latino families who also maintained similar connections with work and family in Texas City and so are "still deeply connected to Texas City as well." Trial Tr. vol. 6, 191:3–12 (Henderson-Lofton).

107.     Given this substantial quantitative and qualitative evidence, the Court does not find the Black and Latino population of League City to be "distant" or "disparate" from the rest of the County and, instead, finds that Galveston's Black and Latino population to

be sufficiently numerous and geographically compact to constitute a majority in a single commissioners precinct that is reasonably configured and comports with traditional redistricting principles.[7]

### B.   Black and Latino voters are politically cohesive.

108.   Utilizing ecological inference methods, Plaintiffs' quantitative experts show that Latino and Black voters in Galveston County are cohesive in that a large majority of them consistently favor the same candidates across a series of elections. Pls.' Ex. 384 (Barreto/Rios Expert Report) at 17−49; Trial Tr. vol. 3, 226:2−24 (Barreto); Pls.' Ex. 356 at ¶¶ 6(b), 58−62, Figs. 6, 7, 13−14; Trial Tr. vol. 4, 279:11−16, 280:25−282:25 (Oskooii); Trial Tr. vol. 4, 199:14−16 (Trounstine) (Black and Latino voters cohesive in 77% of elections); Trial Tr. vol. 4, 184:20−24 (Trounstine); Trial Tr. vol. 4, 188:11−189:7; Pls.' Ex. 476 (Trounstine Expert Report) ¶¶ 6, 25, 34; *id.* at 9 & Table 1; *id.* at A-13−A-15, A-17−A-21, A-25−A-26, A-30−A-35. These results were consistent across several different data sources and over hundreds of statistical models. Pls.' Ex. 384 (Barreto/Rios Report) at 6, Pls.' Ex. 465 (Barreto/Rios Rebuttal) at 8-19, Trial Tr. vol. 3, 223:11−18, 221:20−232:6 (Barreto), Pls.' Ex. 356 (Oskooii Expert Report) at 3; Trial Tr. vol. 4, 175:15−22 (Trounstine); Pls.' Ex. 476 (Trounstine Expert Report) at 15.

---

[7] It is worth noting that, even if the Court did find League City to be a "distant" or "disparate" minority population, it would not impact the Court's factual findings that Galveston's Latino and Black populations are sufficiently numerous and geographically compact to constitute a majority in a reasonably-configured commissioners precinct. Defendants have failed to show that an exclusion of League City from Plaintiffs' illustrative plans would impact this finding. Mr. Cooper testified that League City's inclusion in the illustrative plans was likely due to accounting for incumbent residencies, Trial Tr. vol. 3, 191:14–22 (Cooper), and that League City was a "very small portion" of each plan that could be removed without impacting his opinion that Galveston County satisfies *Gingles* I. Trial Tr. vol. 3, 185:16–24 (Cooper); *see also* Pls.' Ex. 438 at 5 (Cooper Rebuttal).

109.    Ecological inference is a reliable and standard method of measuring racially polarized voting. Pls.' Ex. 384 (Barreto/Rios Report) at 5−6, Trial Tr. vol. 3, 216:13−217:14, 219:8−24 (Barreto); Pls.' Ex. 476 (Trounstine Expert Report) ¶ 25; *id.* at A-13−A-15. Two forms of ecological inference, King's Ecological inference (King's EI) and RxC EI, use aggregate data to identify voting patterns through statistical analysis of candidate choice and racial demographics within a precinct. Pls.' Ex. 384 (Barreto/Rios Report) at 5−6, Trial Tr. vol. 3, 216:13−217:14, 219:8−24 (Barreto).

110.    RxC EI is appropriate for analyzing elections with more than two candidates and/or more than two racial/ethnic groups. Pls.' Ex. 476 (Trounstine Expert Report) ¶ 25; *id.* at A-13−A-15; Trial Tr. vol. 4, 188:13−20 (Trounstine); Pls.' Ex. 384 (Barreto/Rios Report) at 5. Plaintiffs' quantitative experts produced estimates using both King's EI and RxC EI. Pls.' Ex. 384 (Barreto/Rios Expert Report) at 17−40; Trial Tr. vol. 3, 217:15−219:24 (Barreto); Pls.' Ex. 356 at Figs. 6,7 (Oskooii Expert Report); Trial Tr. vol. 4, 285:1−14 (Oskooii); Pls.' Ex. 476 ¶ 25 (Trounstine Expert Report); *id.* at A-13−A-15; Trial Tr. vol. 4, 188:11−189:7 (Trounstine); Trial Tr. vol. 10, 170:12−172:9 (Alford) (Dr. Trounstine's "RxC estimates" were produced using the RxC EI methodology).

111.    In addition to CVAP and Spanish Surname Turnout data used in King's EI and RxC EI, Dr. Barreto and Mr. Rios conducted a Bayesian Improved Surname Geocoding ("BISG") analysis of Galveston County elections to more precisely assess voting patterns by race and ethnicity. Pls.' Ex. 465 at 8−24 (Barreto/Rios Rebuttal Report).

112.    BISG analysis creates a probability that a given voter who participated in a given election is of a particular racial/ethnic group based upon their surname and the racial

composition of their Census block. Pls.' Ex. 465 at 9−10 (Barreto/Rios Expert Rebuttal Report). Latinos turnout at lower rates than Anglo and Black voters, so BISG is particularly useful at narrowing in on the vote choices of the Latino voters who actually participated in elections. Trial Tr. vol. 3, 242:6−244:11 (Barreto).

113.    BISG provides a more accurate racial composition of the voting precinct—particularly for Latino voters—that is included in the EI regression analysis to account for the racial composition of actual voters as opposed to the racial composition of the eligible voters in a voting precinct, *i.e.*, the CVAP of the voting precinct. Trial Tr. vol. 3, 242:6−243:4 (Barreto).

114.    Studies have validated the reliability of using BISG for conducting racially polarizing voting analysis. Trial Tr. vol. 3, 236:13−25 (Barreto).

115.    Dr. Oskooii both replicated and reproduced Dr. Barreto's BISG results and achieved highly consistent results. Pls.' Ex. 505 (Dr. Oskooii Supplemental Report). Dr. Oskooii testified that BISG is a reliable method and is widely employed across a variety of industries and applications. Trial Tr. vol. 4, 305:5−206 (Oskooii). Dr. Alford agreed that BISG is reliable for estimating Latino voting patterns in Texas. Trial Tr. vol. 10, at 160:12−25 (Alford). The Court finds that BISG is a reliable methodology for assessing racially polarized voting patterns.

116.    All experts agreed that cohesion is a continuous variable, *i.e.*, there is no universal on/off switch for determining cohesion, but rather must be determined by analyses of elections that show a particular pattern within the relevant jurisdiction. Pls.' Ex. 465 (Barreto/Rios Rebuttal) at 1−2; Trial Tr. vol. 4, 301:5−20 (Oskooii); Pls.' Ex. 476

(Trounstine Expert Report) ¶¶ 27−28, 30; Defs.' Ex. 305 (Alford Rebuttal Report) at 2; Trial Tr. vol. 10, 100:25–101:19 (Alford).

117.   The undisputed RxC EI analyses from the reports of Drs. Oskooii and Barreto, show that, on average, over 85% of Black and Latino voters vote for the same candidate both countywide and within the illustrative Precinct 3 plans contained in those reports. Pls.' Ex. 356 at Figs. 6, 13 (Oskooii Expert Report); Pls.' Ex. 465 (Barreto/Rios Rebuttal) at Table 4. *See* Trial Tr. vol. 4, 199:14−16 (Trounstine) (Black and Latino voters cohesive in 77% of elections); Trial Tr. vol. 4, 184:20−24, 188:11−189:7 (Trounstine).

118.   The undisputed RxC EI analyses from the original reports of Drs. Barreto and Oskooii show that large majorities of both Latinos and Blacks separately vote for the same candidate in every single general election contest. Pls.' Ex. 372 at Figs. 8, 10 (Oskooii Expert Report Ex. C); Pls.' Ex. 384 at Table 2 (Barreto/Rios Expert Report). After using the voter file (the list of actual individuals who voted in a particular election) to refine the projected demographic data for voters, Dr. Barreto's and Mr. Rios's BISG-based analysis shows even stronger cohesion among Latino voters, with over 75% of Latino voters favoring the same candidates in the bulk of the 29 elections they assessed (with most elections featuring over 80% Latino support for a given candidate). Pls.' Ex. 465 (Barreto/Rios Rebuttal) at 17−19. Dr. Oskooii's BISG analysis confirmed these results. Pls.' Ex. 505 at Figs 4, 8 (Oskooii Supplemental Report). These analyses definitively establish that Latino voters consistently support the Black-preferred candidate and Black voters consistently support the Latino-preferred candidate. Pls.' Ex. 465 (Barreto/Rios

Rebuttal) at 17−19. Dr. Alford did not dispute Dr. Barreto's and Mr. Rios's BISG results. Trial Tr. vol. 10, 161:15−25 (Alford).

119.    Dr. Alford considered the voting patterns of Anglos, Blacks, and Latinos separately and testified that it would be hard to find "a more classic pattern of what polarization looks like in an election." Trial Tr. vol. 10, 17:11–183 (Alford).

120.    Not all elections are created equal. Certain elections are more probative than others in determining cohesion. *Infra*, FOF ¶¶ 122−131, 136–140.

121.    Here, the most probative elections demonstrate clear cohesion between Latino and Black voters in Galveston County. *Infra*, FOF ¶¶ 125, 132−134, 141.

122.    All experts agreed that recent elections are more probative and can more reliably confirm the presence of cohesion and polarization than can more distant elections. Trial Tr. vol. 3, 247:14−248:8 (Barreto); Pls.' Ex. 356 (Oskooii Expert Report) ¶ 22; Trial Tr. vol. 4, 176:5−176:8 (Trounstine); Trial Tr. vol. 10, 139:9–12 (Alford).

123.    The pattern of cohesion found in the past decade is consistent with prior racially polarized voting analyses conducted for elections between 2002 and 2012. Trial Tr. vol. 3, 261:17−262:8 (Barreto).

124.     Due to the limited number of contested endogenous elections, it was necessary to analyze exogenous elections. Pls.' Ex. 384 at 17−40 (Barreto/Rios Expert Report) (analyzing 28 exogenous elections across 5 election cycles); Trial Tr. vol. 4, 281:3–10 (Oskooii); Pls.' Ex. 476 at A-12 (Trounstine Expert Report).

125.    Exogenous elections that encompass the entirety of Galveston County, such as those for Attorney General and Governor, are more probative than are elections that

cover only portions of the County. Trial Tr. vol. 4, 280:9−20 (Oskooii); Trial Tr. vol. 4, 181:16−182:4 (Trounstine); Trial Tr. vol. 10, 144:3–145:5 (Alford). The exogenous elections that cover the entire County show high and consistent levels of cohesion. Pls.' Ex. 384 at 17−40 (Barreto/Rios Expert Report); Pls.' Ex. 356 at Fig. 6 (Oskooii Expert Report); Pls.' Ex. 476 at A-25−A-26 (Trounstine Expert Report).

126.    All experts agreed that general elections are more probative than are primary elections in this case; this includes for purposes of determining inter-group cohesion, *i.e.*, cohesion between Black and Latino voters in Galveston County. Trial Tr. vol. 3, 246:4−247:13 (Barreto); Pls.' Ex. 465 at 6−8 (Barreto/Rios Expert Rebuttal Report); Trial Tr. vol. 4, 283:22−276:6 (Oskooii); Trial Tr. vol. 4, 181:21−187:14 (Trounstine); Trial Tr. vol. 4, 262:2−263:6 (Trounstine); Pls.' Ex. 476 at ¶ 34 (Trounstine Expert Report); Trial Tr. vol. 10, 145:24−146:16 (Alford) ("I think the general elections are – to me are the elections that provide the clearest picture. And it's—my conclusion depends to a large degree on the pattern in the general elections."); Trial Tr. vol. 10, 149:5-8 (Alford).

127.    Primary elections have limited probative value in determining inter-group cohesion for several reasons. *Infra*, FOF ¶¶ 128–131.

128.    First, in the context of "racial and ethnic coalition building . . . coalitions get built in the general election," not the primary election, Trial Tr. vol. 4, 181:21−187:14 (Trounstine).

129.    Second, because primary elections are generally low turnout elections, the resulting estimates are less robust and the estimates that are produced results may not

present a good picture of the majority of voters for any demographic group. Pls.' Ex. 356 at ¶ 24 (Oskooii Expert Report); Trial Tr. vol. 4, 292:19–293:18 (Oskooii).

130.    Third, candidate preferences are not as likely to be as strong for any one candidate given that the ideological positions of candidates in the same party is likely closer than the positions of candidates in different parties in a general election. Trial Tr. vol. 4, 292:19–293:18 (Oskooii); Pls.' Ex. 356 at ¶ 24 (Oskooii Expert Report).

131.    Primary elections for the commissioners court are rarely contested, with lower levels of voter participation among all racial and ethnic groups, and relatively few Latino and Black voters participate in these elections. Pls.' Ex. 356 at 8 (Oskooii Expert Report); Pls.' Ex. 465 at 6−8 (Barreto/Rios Rebuttal); Trial Tr. vol. 4, 292:19–293:18 (Oskooii); Trial Tr. vol. 10, 139:5−11 (Alford).

132.    Keeping in mind their qualified probative value, the primary elections that Dr. Oskooii analyzed show a steady presence of inter-group cohesion between Black and Latino voters. In nine out of the ten primary elections that he analyzed, Black and Latino voters vote cohesively. Pls.' Ex. 356 at 24, Fig. 15 (Oskooii Expert Report). Even Dr. Alford's analysis of Democratic primaries, which provided less data than did Dr. Oskooii's, established that in 13 out of 14 primary elections, Latino and Black voters preferred the same top-choice candidate. Defs.' Ex. 305 at Tables 3, 4 (Alford Expert Report).

133.    Between Drs. Oskooii and Alford, the results that were analyzed show Blacks and Latinos supporting the same top-choice candidate in 22 out of 24 (92%) primary contests. Pls.' Ex. 356 at 24, Fig. 15 (Oskooii Report); Defs.' Ex. 305 at Tables 3, 4 (Alford Expert Report); Trial Tr. vol. 4, 302:20–303:21 (Oskooii).

134.    The 2012 primary election for Precinct 3 is the single most probative primary election because it is the most recent endogenous contest for Precinct 3. Trial Tr. vol. 10, 140:3−20, 141:24−142:23 (Alford). That election featured a "highly cohesive" Black and Latino electorate. Trial Tr. vol. 10, 140:9−20 (Alford).

135.    Dr. Alford observed that a number of Democratic primary elections did not feature "racially polarized" voting because Anglo voters in those primaries chose the same candidates as Black and Latino voters. Trial Tr. vol. 10, 30:18−31:6; 37:7−10, 38:13−39:5, 47:9−48:7, 70:1−7 (Alford). But on cross-examination, Dr. Alford admitted that this observation is irrelevant to the issue of *Gingles* II cohesion among Black and Latino voters. Trial Tr. vol. 10, 125:9−128:21, 130:5−11, 130:20−131:2 (Alford). And Dr. Alford acknowledged that for purposes of *Gingles* III in this case (where the opportunity for Black and Latino voters to elect—rather than nominate—a candidate of choice is at issue), it is Anglo voter behavior in the general election, not the Democratic primary, that is relevant. Trial Tr. vol. 10, 131:22−132:10 (Alford). The Court thus does not credit Dr. Alford's observation about Anglo voter behavior in Democratic primaries for purposes of the *Gingles* preconditions.

136.    Two data limitations limit the probative value of the local nonpartisan elections that were analyzed in this case. Trial Tr. vol. 4 182:9−18 (Trounstine) ("[I]n analyzing my nonpartisan elections, I was analyzing some City council races, very tiny units of analysis. You know, a single district in a city council or a mayor of a smaller city. I placed less emphasis on those elections because they don't represent the entirety of Galveston County"); *see* Pls.' Ex. 476 at A-30−A-35 (Trounstine Expert Report).

48

137.    First, the local nonpartisan elections cover smaller geographic areas than any individual county commissioners precinct (*i.e.*, the smaller geographic areas that are the subject of these elections do not perfectly align with the boundaries of commissioner precincts), Trial Tr. vol. 4, 182:9−18 (Trounstine), and therefore often encompass very few election precincts, *see, e.g.*, Defs.' Ex. 287 (Galveston County 2020 Canvas Summary), thereby limiting the amount of demographic information available to produce estimates, Trial Tr. vol. 4, 283:22−284:7 (Oskooii); Trial Tr. vol. 10, 67:22−68:8 (Alford).

138.    Second, many of the local nonpartisan elections were low turnout, multi-candidate contests—two features that contribute to "instability" in estimates. Trial Tr. vol. 4, 294:11−14, 325:12−326:11 (Oskooii).

139.    The local nonpartisan races also have less probative value than do the partisan general elections that were analyzed because commissioners court races are partisan contests. Pls.' Ex. 465 at 6 (Barreto/Rios Rebuttal).

140.    The Court therefore assigns little weight to the available local nonpartisan election analyses.

141.    To the extent that the analyses of local nonpartisan elections are considered, there is evidence that they show the steady presence of cohesion between Black and Latino voters in Galveston County. Pls.' Ex. 476 at ¶ 56 (Trounstine Report) (Black and Latino voters cohesive in seven out of ten nonpartisan elections). Further, non-statistical evidence indicates that minority candidates in nonpartisan elections are primarily elected only from majority-minority districts within the county, *see, e.g.*, Trial Tr. vol. 10, 265:6−21

49

(Sullivan), a fact that could be consistent with racially polarized voting patterns, Trial Tr. vol. 10, 165:10−25 (Alford).

142.    Based on their analyses, Plaintiffs' quantitative experts concluded that Latino and Black voters in Galveston are cohesive, *i.e.*, they vote together. Pls.' Ex. 356 at ¶ 6 (Oskooii Expert Report); Pls.' Ex. 384 at 7 (Barreto/Rios Expert Report); Trial Tr. vol. 4, 184:20−24 (Trounstine); Pls.' Ex. 476 at ¶¶ 6, 34 (Trounstine Expert Report).

143.    Lay testimony confirms political cohesion between Blacks and Latinos in Galveston County.

144.    Community leaders testified that Black and Latino voters in Galveston County vote cohesively. Trial Tr. vol. 6, 130:6−25 (Lewis) (Black and Latino voters "typically . . . vote together," including in nonpartisan elections); Trial Tr. vol. 1, 133:16−134:3 (McGaskey) (shared concerns regarding "healthcare, education, housing, and employment" lead Black and Latino voters in Galveston County to come together at the ballot box); Trial Tr. vol. 6, 15:13−18 (Quintero).

145.    Community leaders testified that the Latino and Black communities in Galveston County share interests across a number of issues, including education, housing, healthcare, and employment. Trial Tr. vol. 2, 214:1−215:25, 240:9−20 (Courville); Trial Tr.  vol. 6, 67:19−68:4  (Compian);  Trial  Tr.  vol.  6,  197:7−198:18,  204:20−22, 207:22−208:16 (Henderson-Lofton); Trial Tr. vol. 1, 65:12−16 (Rose); Trial Tr. vol. 2, 32:10−36:15 (Pope); Trial Tr. vol. 6, 128:19−130:9 (Lewis); Trial Tr. vol. 6, 156:18−157:4 (Jaworski);  Trial  Tr.  vol.  6,  14:2−16  (Quintero);  Trial  Tr.  vol.  1,  133:16−134:25, 109:19−110:2 (McGaskey).

146.   The local LULAC and NAACP branches in Galveston frequently collaborate with each other, sharing services and resources. Trial Tr. vol. 6, 204:8−19 (Henderson-Lofton) ("So I work with LULAC. And that consists of all of the NAACP units and LULAC as well . . . we're all working together doing things to make sure that our communities has something that represents them and can, you know, truly move forward, because a lot of times we are not -- we get left out of things."), Trial Tr. vol. 2, 217:1−10 (Courville); Trial Tr. vol. 6, 86:7−19 (Compian); Trial Tr. vol. 6, 117:4−8, 120:18−121:2 (Lewis) (NAACP and LULAC work together on issues related to education). Many individuals are members of both organizations. Trial Tr. vol. 6, 201:19−202:2, 204:8−19 (Henderson-Lofton); Trial Tr. vol. 2, 217:1−10 (Courville); Trial Tr. vol. 6, 14:8−9 (Quintero); Trial Tr. vol. 6, 65:8−10 (Compian).

147.   The Court finds Latino and Black voting cohesion in Galveston County.

**C.     Anglo bloc voting will almost certainly defeat the candidates of choice of Black and Latino voters in all the Enacted Plan's commissioners precincts.**

148.   Anglo voters in Galveston County engage in bloc voting such that a large majority of Galveston's Anglo voters favor their own set of candidates both countywide and in each of the enacted 2021 commissioners precincts, and these candidates are different than, and run in opposition to, those favored by Latino and Black voters. Pls.' Ex. 356 at ¶ 6, Figs. 6, 11 (Oskooii Expert Report); Trial Tr. vol. 4, 278:21−279:625 (Oskooii); Pls.' Ex. 384 ¶¶ 23−24 (Barreto/Rios Expert Report); Pls.' Ex. 476 ¶ 58, p. 14 & Table 2 (Trounstine Expert Report). The high level of Anglo bloc voting is sufficient to usually

defeat the ability of Black and Latino voters in Galveston County to elect their candidates of choice.

149.    An electoral performance analysis/reconstituted election analysis is a technique used to examine how candidates would fare under different maps or different precinct boundaries. Pls.' Ex. 356 at ¶ 68 (Oskooii Expert Report); Pls.' Ex. 476 at ¶¶ 38−40 (Trounstine Expert Report); *see* Pls.' Ex. 384 at ¶ 46 (Barreto/Rios Expert Report).

150.    Plaintiffs'         quantitative      experts        conducted        electoral performance/reconstituted election analyses on elections that encompassed the entirety of Galveston County. Pls.' Ex. 384 (Barreto/Rios Expert Report) at 13−16, 41−49; Pls.' Ex. 356 (Oskooii Expert Report) at ¶¶ 67−75; Pls.' Ex. 476 ¶¶ 38−40, 58, p. 14 & Table 2(Trounstine Expert Report).

151.    Dr. Barreto and Mr. Rios conducted electoral performance/reconstituted election analyses on 25 elections under both the Enacted Plan and the three illustrative maps prepared by the Petteway Plaintiffs' expert Tye Rush ("Rush illustratives"). Pls.' Ex. 384 at ¶¶ 44−46, at 14 & Table 2−16 Tables 1−3 (Appendix B) (Barreto/Rios Expert Report).

152.    Dr. Oskooii conducted electoral performance/reconstituted election analyses on 25 elections under the Enacted Plan and the three illustrative maps prepared by the NAACP/LULAC Plaintiffs' expert William Cooper ("Cooper illustratives"). Pls.' Ex. 356 at ¶¶ 67−75, Figs. 16 and 18 (Oskooii Expert Report).

153.    Dr. Trounstine conducted electoral performance/reconstituted election analyses on five elections under both the Enacted Plan and the Fairfax illustrative. Pls.' Ex. 476 at ¶¶ 38−40, 58, p. 14 & Table 2 (Trounstine Expert Report).

154.    Under the Enacted Plan, Anglo bloc voting defeated the candidate of choice of Black and Latino voters in every election in every commissioners precinct that Plaintiffs' experts analyzed. Pls.' Ex. 384 at ¶¶ 44−46, at 14 & Table 2 (Barreto/Rios Expert Report); Pls.' Ex. 356 at ¶¶ 71−72 (Oskooii Expert Report), Fig. 17; Trial Tr. vol. 4, 205:1−17 (Trounstine), 288:14−289: 2 (Oskooii); Pls.' Ex. 476 ¶ 58, 14 & Table 2 (Trounstine Expert Report).

155.    Dr. Barreto and Mr. Rios' electoral performance/reconstituted election analyses establish that under each of the three Rush illustratives, the candidate of choice of Latino and Black voters won in Precinct 3 in every election. Pls.' Ex. 384 at ¶¶ 44−46, Tables 1−3 (Appendix B) (Barreto/Rios Expert Report).

156.    Dr. Oskooii's electoral performance/reconstituted election analyses establish that under each of the three Cooper illustratives, the candidate of choice of Black and Latino voters won in Precinct 3 in every election. Pls.' Ex. 356 at ¶¶ 72−75, Fig. 8 (Oskooii Expert Report).

157.    Dr. Trounstine's electoral performance/reconstituted election analyses establish that under the Fairfax illustrative, the candidate of choice of Black and Latino voters won in Precinct 3 in every election. Pls.' Ex. 476 ¶ 58,  14 & Table 2 (Trounstine Expert Report); Trial Tr. vol. 4, 205:1−17 (Trounstine).

158.    Dr. Alford did not conduct any analysis as to whether Anglo bloc voting is sufficient to defeat minority-preferred candidates in the Enacted Plan, Trial Tr. vol. 10, 123:4−17 (Alford), and did not dispute Plaintiffs' quantitative experts' electoral performance/reconstituted election analyses. Trial Tr. vol. 10, 123:10−17 (Alford); *see generally* Defs.' Ex. 305 (Alford Expert Report).

159.    The relationship between the demographic composition of a district and the success of certain candidates as demonstrated by the electoral performance/reconstituted election result analysis goes beyond a mere general correlation. Rather, as the minority percentage moves up or down, the performance of minority-preferred candidates moves in direct proportion. Trial Tr. vol. 4, 289:12−290:7 (Oskooii). This tight relationship independently supports a finding of racially polarized voting based on actual election returns and complements the ecological inference estimates performed by the quantitative experts in this case. *Id.*; Pls.' Ex. 356 at ¶¶ 74−75 (Oskooii Expert Report).

160.    In recent general elections, undisputed evidence shows that on average, over 85% of Anglos across Galveston County vote for candidates running in opposition to the minority-preferred candidates. Pls.' Ex. 356 at Fig. 6 (Oskooii Expert Report); Pls.' Ex. 384 ¶¶ 22−24 (Barreto/Rios Expert Report). Similarly high levels of bloc voting are present at the individual district level in the enacted commissioner precincts. Pls.' Ex. 356 at Fig. 11 (Oskooii Expert Report).

161.    Plaintiffs' quantitative experts concluded that the patterns of voting found at the County level hold true at the commissioner precinct level. Dr. Oskooii found that there is Anglo bloc voting in each of the enacted precincts and that there is cohesive minority

54

voting in each of William Cooper's illustrative Precinct 3 maps. Pls.' Ex. 356 at ¶¶ 56−62, Figs. 11, 13 (Oskooii Expert Report). Dr. Barreto found that in each of the four enacted Precincts, Anglo and non-Anglo voters are sharply polarized in their voting patterns. Pls.' Ex. 465 at ¶¶ 44−46, at 14 & Table 2 (Barreto/Rios Rebuttal). Dr. Trounstine likewise found the same polarized voting pattern at the level of Precinct 3 in an illustrative map prepared by the United States' expert Anthony Fairfax ("Fairfax illustrative"). Pls.' Ex. 501 ¶ 2 (Trounstine Declaration); *see* Trial Tr. vol. 4 198:13−199:4 (Trounstine). The Court credits Plaintiffs' quantitative expert testimony and agrees with their conclusion.

162.    All experts agree that Anglo bloc voting usually defeats the Latino and Black candidate of choice in Galveston County elections in every precinct analyzed in the Enacted Plan. Pls.' Ex. 356 at ¶¶ 71−72 (Fig. 17, Oskooii Expert Report); Trial Tr. vol. 4, 287:18−289:2 (Oskooii); Pls.' Ex. 384 ¶¶ 22−24, at 17− 24, Appx. A Tables 1−3 (Barreto/Rios Expert Report); Trial Tr. vol. 3, 225:14−226:1; *see* Pls.' Ex. 476 at ¶ 58, 14 & Table 2 (Trounstine Expert Report); *see* Trial Tr. vol. 4, 205:1−17 (Trounstine); Trial Tr. vol. 10, 123:10−17 (Alford); *see generally* Defs.' Ex. 305 (Alford Expert Report).

163.    The Court finds that voting in Galveston County is racially polarized such that Anglo voters usually vote as a bloc to defeat the candidate of choice of Latino and Black voters.

**D.** **The strong racially divergent voting patterns in Galveston County cannot be dismissed as "mere partisanship" completely unconnected to race.**

164.   Defendants contend that partisanship devoid of any connection to race explains the racially divergent voting patterns in Galveston County, but the evidence adduced at trial does not support this finding.

165.   Defense expert Dr. Alford did not conduct any reliable form of analysis to determine if any factor other than race explains the divergent racial voting patterns in partisan elections in Galveston County. Trial Tr. vol. 10, 107:21–108:5 (Alford).

166.   Dr. Alford characterized his methodology for assessing what he terms "partisan polarization" as being outside of accepted practice and stated he agreed with a previous court's comment that "[h]is conclusions were not reached through methodologically sound means and were therefore speculative and unreliable." Trial Tr. vol. 10, 87:18–88:5 (Alford) (discussing *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1305 (N.D. Ga. 2022)).

167.   Dr. Alford did not conduct any analysis to determine whether there are any variables about voters, including political issue attitudes, that are more correlated with partisan voting behavior in Galveston County than is the race of the voter. Trial Tr. vol. 10, 111:10–112:3 (Alford).

168.   Dr. Alford testified that political issue attitudes are distinct from party identification, and that party identification, unlike issue attitudes, are primarily the result of socialization. Trial Tr. vol. 10, 77:25–79:1 (Alford).

169.   Dr. Alford did not conduct any analysis as to the prevalence of successful minority candidates, including whether, for example, such candidates are ever elected by non-majority-minority areas in Galveston County. Trial Tr. vol. 10, 165:10–25 (Alford).

170.   Dr. Alford testified that he based his conclusions regarding the role of partisanship versus race primarily on a single partisan general election: Senator Ted Cruz versus Beto O'Rourke in 2018. Trial Tr. vol. 10, 53:1–16, 166:1–8 (Alford).

171.   Even if one were to focus on the race of candidates, the evidence would still support a finding of racially polarized voting. Dr. Oskooii testified that in 13 out of 14 racially contested elections (93%), Latino and Black voters were cohesive behind the minority candidate (based on physical presentation or surname), while Anglo voters were cohesive behind the Anglo candidate. Trial Tr. vol. 4, 298:17–300:10 (Oskooii); Pls.' Ex. 452 ¶ 7 (Oskooii Rebuttal Expert Report).

172.   The racial composition of political parties in Galveston County, measured through participation in each party's primaries, confirms the racial polarization of the County's electorate.

173.   All experts agree that few Anglo voters in Galveston County participate in Democratic Party primaries. Pls.' Ex. 465 at ¶¶ 13−17 (Barreto/Rios Rebuttal); Trial Tr. vol. 4, 293:5−7; 300::13−25 (Oskooii) ("Anglo voters by and large do not participate in Democrat primary process."); *see* Pls.' Ex. 476 at A-12 (Trounstine Expert Report); Trial Tr. vol. 10, 109:20−110:3 (Alford) (Anglo voters in Galveston "are more likely by a large margin to participate in the Republican primary than in the Democratic primary").

174.    All experts also agree that Latino and Black voters in Galveston County largely do not participate in Republican primaries. Pls.' Ex. 465 at ¶¶ 17−19 (Barreto/Rios Rebuttal); Trial Tr. vol. 4. 300:13−25 (Oskooii); Trial Tr. vol. 4 183:10−18 (Trounstine); Pls.' Ex. 476 at ¶ 21 & n.4, A-12 (Trounstine Report).

175.    A Black or Latino Republican has never won a primary election to be the Republican party's nominee for county judge or county commissioner. Pls.' Ex. 465 at ¶ 17 (Barreto/Rios Expert Rebuttal Report).

176.    Commissioner Robin Armstrong, who is a racial minority, was appointed and did not participate in a Republican primary election. Trial Tr. vol. 10, 197:10−21 (Armstrong). Commissioner Armstrong was also uncontested in the general election. Trial Tr. vol. 4, 298:17−299:19 (Oskooii).

177.    Defendants did not put on any evidence showing that a local Black candidate or a local candidate with a Spanish surname has ever emerged victorious from a Republican primary election in Galveston County. *Cf.* Pls.' Ex. 452 (Oskooii Rebuttal Expert Report) at ¶ 7. The only successful local Latino Republican candidates that Defendants identified have first and last names that voters understood to be Anglo. Trial Tr. vol. 6, 57:18−58:5 (Quintero) (example name: Dwight Sullivan).

178.    There is evidence that Latinos who have run with Spanish surnames in Republican Primaries lost to Anglo opponents in the primary. Trial Tr. vol. 6, 15:25−17:3, 54:7−15 (Quintero).

179.    This split in primary voting behavior between Anglo voters, on the one hand, and Black and Latino voters, on the other hand, described *supra*, FOF ¶¶ 173–174, is far

beyond the even (50/50) split of participation that would be present if partisanship and race were not connected. Trial Tr. vol. 4, 300:13−25 (Oskooii).

180.    National scholarship on political trends also supports finding the existence of a link between race and partisanship in Galveston County. Pls.' Ex. 384 at ¶¶ 30−43 (Barreto/Rios Expert Report); Trial Tr. vol. 3, 249:13−251:4 (Barreto). "[T]hat Latino and Black voters tend to support candidates from one party is a reflection of their cohesion, not an alternative explanation for it [because] [i]n most cases in the United States, racial/ethnic cohesiveness [] find[s] its expression through the two-party system." Pls.' Ex. 476 ¶ 35 (Trounstine Expert Report).

181.    The political shift among Anglo voters and candidates that took place in 2010 in Galveston County coincided with a national trend of a shift in more active Republican party participation by Anglos, fueled by higher-than-average rates of negative racial stereotypes and attitudes. Trial Tr. vol. 3 254:23−257:8 (Barreto).

182.    Racial appeals in campaigning, described *infra*, make it likelier that the political decisions of Anglos will result in racially polarized voting. Pls.' Ex. 335 ¶ 75 (Rocha Expert Report); Pls.' Ex. 414 at 31 (Burch Expert Report); *see infra*, FOF ¶¶ 415–420.

183.    The history of discrimination resulting in ongoing socioeconomic disparities and barriers to voting along racial lines also contributes to a finding that race, not partisanship alone, drives the voting patterns seen in Galveston County. *See infra*, FOF ¶¶ 196–210, 396–500.

184.    Moreover, Galveston County voters provided testimony of racially polarized voting based on their lengthy residences in the County, their elections to public office, or both. *See* Trial Tr. vol. 1, 128:24–129:21, 133:24–134:3 (McGaskey); Trial Tr. vol. 6 130:6–25 (Lewis); Trial Tr. vol. 6, 15:13–21 (Quintero).

185.    For example, Ms. McGaskey, who served as the campaign manager for a Black Democratic district judge candidate who lost to an Anglo Republican, analyzed election return data and found that predominantly Anglo voting precincts that had voted for an Anglo Democrat for the County Clerk position had "crossed over and voted for the Republican candidate" when their other option was a Black Democrat. Trial Tr. vol. 1, 129:22–132:2 (McGaskey). Similarly, Judge Pope testified that "minority candidates often depend on support from minority voters." Trial Tr. vol. 2, 17:23–25 (Pope).

186.    The Court therefore finds that partisanship cannot explain the racially polarized voting patterns established in Galveston County.

## V.    Discriminatory impact of the Enacted Plan

187.    The Enacted Plan converted the existing majority-minority commissioners' Precinct 3 from the precinct with the highest percentage of Latino and Black residents to one with the lowest. Trial Tr. vol. 3, 42:20–3743:9 (Cooper). According to 2016–2020 ACS Special Tabulation data from the U.S. Census, Precinct 3 in the Benchmark Plan contained about 58% Black and Latino by CVAP with the remaining precincts containing about 22% to 28% Black and Latino CVAP. Pls.' Ex. 386 at 18 (Fig. 7, Cooper Expert Report). But after the lines were redrawn in 2021, Precinct 3 now contains the lowest Black and Latino CVAP proportion of any precinct (about 28%), and the remaining precincts

evenly distribute the Black and Latino population, ranging from 32% to 35% Black and Latino CVAP. *Id*. at 22 (Fig. 11, Cooper Expert Report); *see also* Pls.' Ex. 384 at 15 (Barreto/Rios Expert Report).

188.   Accordingly, Latino and Black residents fail to comprise a majority in any new commissioners precinct despite comprising about 38% of the overall population, and about 32% of the CVAP. Pls.' Ex. 386 at 10 (Table 1, Cooper Expert Report).

189.   Plaintiffs' quantitative experts conducted performance/reconstituted election analysis that confirms Latino and Black voters will have zero chance of electing a candidate of their choice in any commissioners precinct within the Enacted Plan. Pls.' Ex. 356 at ¶¶ 70–74 (Fig. 17, Oskooii Expert Report); Trial Tr. vol. 4, 288:14–289:2 (Oskooii); Pls.' Ex. 384 at ¶¶ 44–46 (Table 2, Barreto/Rios Expert Report).

190.   Anglo voters comprise 64.1% of the County's voting age population but now control 100% of the electoral outcomes for Galveston County commissioners court. *See* Pls.' Ex. 487 at 4 (Table 1, Rush Corrected Expert Report).

191.   The County's redistricting counsel, Dale Oldham, likewise testified that the Benchmark Plan included a performing precinct for minority voters while the Enacted Plan does not. Trial Tr. vol. 8, 178:19–24 (Oldham).

192.   Dr. Burch similarly found evidence that there was a racially disparate impact from the Enacted Plan, based on her findings that "the county went from having one precinct in which racial and ethnic minorities formed a majority to no precincts in which racial and ethnic minorities formed a majority. And that impact of the maps was foreseeable and foreseen by the people who voted for the map on the Commissioners' Court." Trial Tr.

vol. 2, 110:7–105:16 (Burch). As Dr. Burch notes, on its face, the Enacted Map creates a disparate impact on racial minorities in Galveston County by eliminating entirely the sole minority opportunity district. *See* Trial Tr. vol. 2, 110:17–25 (Burch).[8]

193.   Judge Mark Henry, the county commissioners, and their redistricting counsel Mr. Oldham knew about the racially disparate impact of the Enacted Plan on Galveston's Black and Latino residents. Trial. Tr. vol. 2, 111:6–23 (Burch); Pls.' Ex. 414 at 5 (Burch Expert Report); Trial Tr. vol. 9, 329:24–330:14 (Apffel) (admitting that he spoke with Commissioner Holmes about the proposed maps violating the Voting Rights Act, but averring that "[t]here was never a solution offered"); Trial Tr. vol. 9, 131:3–8 (Giusti) (admitting that he understood that Precinct 2 was picking up minority voters from Precinct 3); *see also infra*, FOF ¶¶ 222–274.

194.   Galveston County's Black and Latino population together comprise 38.29% of the population. Pls.' Ex. 337 at 7 (Fairfax Expert Report). The Benchmark Plan accomplished proportional representation for Black and Latino voters with one out of four Commissioners (one out of five members of the Commissioners Court) being elected from a majority-minority precinct, while the Enacted Plan does not. *See supra*, FOF ¶¶ 64, 68, 187–188.

195.   The Court finds that the Enacted Plan disproportionately impacts Galveston's minority voters by depriving them of the only commissioners precinct where minority

---

[8] Several witnesses testified that it was obvious on the face of the map that the Enacted Plan would fracture minority communities. Trial Tr. vol. 6, 21:20–22:1 (Quintero); Trial Tr. vol. 6, 69:3–12, 77:13–21 (Compian) (describing the three-way split of his city of La Marque and saying "it devastated us"); Trial Tr. vol. 2, 248:20–249:1 (Courville) ("Precinct 3 was just all chopped up all over the place"); Trial Tr. vol. 1, 62:12-63:10 (Rose) (describing how the Enacted Map "splits a whole section of voters up" in Precinct 3).

voters could elect a candidate of their choice. The Court likewise finds that the commissioners court was aware of that fact when they adopted the Enacted Plan.

## VI. Galveston County History Relating to Voting and Redistricting

### A. Galveston County has a history of discrimination in voting practices.

196.    There is a "very long history of official discrimination" against Black and Latino voters in Galveston County. Trial Tr. vol. 5, 75:4–5, 94:8–95:22 (Krochmal); Pls.' Ex. 335 ¶¶ 9, 19–26 (Rocha Expert Report); Pls.' Ex. 412 at 9–17 (Krochmal Expert Report).

197.    Galveston County was a center for buying and selling enslaved Black people during the antebellum era. Trial Tr. vol. 5, 52:20–53:17 (Krochmal). After the Civil War, race relations in the county reflected those seen across much of the South, including segregation and Jim Crow laws. *Id.* 53:17–54:16; Pls.' Ex. 412 at 9–10 (Krochmal Expert Report). At the same time, "state-supported practices and laws in a variety of different areas of life" came together to segregate Latinos in Galveston County, a system termed Juan Crow. Trial Tr. vol. 5, 57:24–58:8 (Krochmal); Pls.' Ex. 412 at 6–8 (Krochmal Expert Report).

198.    The segregation of Black and Latino residents in "different areas of life" in Galveston County extended to voting. Trial Tr. vol. 5, 58:3-8 (Krochmal). For instance, the Texas state legislature passed a poll tax in 1903, which required payment each January. Pls.' Ex. 412 at 9 (Krochmal Expert Report); Trial Tr. vol. 5, 54:17–55:5 (Krochmal). This affected many Black and Latino voters because many were agricultural laborers, and few had cash on hand in January because of the timing of the agricultural cycles. *See* Trial Tr.

vol. 5, 54:23–55:5 (Krochmal). The all-white Democratic primary was also in effect during much of the twentieth century, prohibiting Black and Latino voters from participating in the "elections and caucuses that really mattered" during a period when Democratic dominance meant Texas "was still a one-party state." Pls.' Ex. 412 at 9–11 (Krochmal Expert Report); Trial Tr. vol. 5, 55:6–20 (Krochmal).

199.    Restrictions on voting for minorities remained present in Texas even after the passage of the Voting Rights Act in 1965 and its 1975 extension that added Texas and its subdivisions, including Galveston County, to the Act's Section 4(b) coverage formula. Pls.' Ex. 412 at 11 (Krochmal Expert Report); Trial Tr. vol. 5, 58:15–25, 75:23–25 (Krochmal); *see also infra*, FOF ¶¶ 402–420 (describing contemporary barriers to voting including polling place closures, language access issues, and racial appeals in campaigns).

200.    Even after the extension of the Act to Texas and its subdivisions in 1975, Galveston County and jurisdictions within it were subjected to multiple Section 5 objection letters from the U.S. Attorney General. Pls.' Ex. 335 ¶¶ 19–23 (Rocha Expert Report).

**B.    The Attorney General has objected to Galveston's voting practices in several instances.**

201.    Since 1976, Galveston County and the political subdivisions within it have been the subject of a total of six objection letters from the U.S. Attorney General. Pls.' Ex. 335 ¶ 19 (Rocha Expert Report). The U.S. Attorney General has objected to the use of at-large seats, the use of numbered posts for at-large seats (requiring candidates to run for a specific seat on an at-large body), and majority-vote requirements for municipal offices. *Id*. at ¶¶ 19-23.

202.   In 1976, the Attorney General interposed an objection to Texas City's proposal to adopt a numbered post system to its city council elections. Pls.' Ex. 1 (Mar. 10, 1976, Section 5 objection letter from J. S. Pottinger to H. Lillenstern); Pls.' Ex. 335 ¶ 20 (Rocha Expert Report); Trial Tr. vol. 5, 202:23–203:4 (Rocha). Looking at the history of governmental discrimination, racial bloc voting, and the city's responsiveness to minorities, among other factors, the Attorney General was unable to conclude that the city's proposal would not have a racially discriminatory effect. *Id*.

203.   In 1992, the Attorney General interposed an objection to Galveston County's redistricting plans for justice of the peace and constable districts. Pls.' Ex. 2 (Mar. 17, 1992, Section 5 objection letter from J. Dunne to J. Holbrook); Pls.' Ex. 335 ¶ 26 (Rocha Expert Report); Trial Tr. vol. 5, 203:7–16 (Rocha). The Attorney General's letter noted that Black and Latino residents were not a majority in any of the eight districts, despite comprising 31.4% of the County's population, and that County officials "rebuffed" multiple requests from minorities to create a district in which they would have an equal opportunity to elect candidates of their choice. Pls.' Ex. 2 at 1. Ultimately, the county entered a consent decree for the 1992 justice of the peace and constable redistricting plan. Pls.' Ex. 563 (*Hoskins v. Hannah* order on consent decree). This resulted in the election of more minority candidates, including Penny Pope as the first Black woman to be elected as justice of the peace in 1992. Trial Tr. vol. 2, 16:8–25, 18:1–4 (Pope). Judge Pope did not think that more minority candidates would have been elected to county government without that lawsuit and consent decree. *Id*.

204.    Also in 1992, the Attorney General interposed an objection to the City of Galveston's proposal to modify how city council members are elected—from six at-large districts to four single-member districts, with two members elected at large to numbered posts. Pls.' Ex. 3 (Dec. 14, 1992, Section 5 objection letter from J. Dunne to G. Smith); Pls.' Ex. 335 ¶ 21 (Rocha Expert Report); Trial Tr. vol. 5, 203:19–204:10 (Rocha). Noting how several minority candidates had unsuccessfully run for city council because of racially polarized voting, the city was denied preclearance. Pls.' Ex. 3. Ultimately, the city entered into a consent decree to elect city councilmembers from single-member districts. Pls.' Ex. 335 ¶ 21 (Rocha Expert Report). As a result of Galveston's single-member districts, minority residents have been able to elect multiple candidates of choice, which at least one current county commissioner has agreed is important to those communities. Trial Tr. vol. 9, 151:6–21 (Giusti).

205.    In 1998, the City of Galveston again sought to change the method of electing its city council from six single-member districts to four single-member districts and two elected at-large to numbered posts, the same scheme to which the Attorney General interposed an objection in 1992. Pls.' Ex. 4 (Dec. 14, 1998, Section 5 objection letter from B. Lee to B. Roberts); Pls.' Ex. 335 ¶ 22 (Rocha Expert Report); Trial Tr. vol. 5, 204:13–23 (Rocha). Noting that two of the six single-member districts had elected minority officials, the Attorney General concluded that reverting to two at-large districts would result in a retrogression of minority voting strength. *Id*.

206.    Additionally, in 2001, the City of Galveston asked the Attorney General to reconsider the objection to four single-member districts, with two members elected at large

66

to numbered posts, and he declined to withdraw the objection in 2002. Pls.' Ex. 335 ¶ 22 (Rocha Expert Report).

207.    In 2011, the City of Galveston again sought to change the method of electing its city council from six single-member districts to four single-member districts, with two members elected at large to numbered posts. Pls.' Ex. 47 (Oct. 3, 2011, Section 5 objection letter from T. Perez to C. Heath); Pls.' Ex. 335 ¶ 23 (Rocha Expert Report); Trial Tr. vol. 5, 205:1–13 (Rocha). The Attorney General interposed an objection to this change, noting racial bloc voting continued to play a significant role in city elections and that minority candidates could elect candidates of choice from three of the six single-member districts. Therefore, reverting to four single-member districts, with two members elected at large with numbered posts, would have resulted in minorities having the ability to elect candidates of choice in only two of the four single-member districts and neither of the at-large posts. *Id*.

208.    In 2012, the Attorney General interposed an objection to Galveston County's 2011 redistricting plans for the commissioners precincts and the justice of the peace/constable precincts. Joint Ex. 6 (Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor); Pls.' Ex. 335 ¶ 26 (Rocha Expert Report); Trial Tr. vol. 5, 205:14–206:1 (Rocha). The justice of the peace/constable precinct plan proposed the reduction in the number of justices of the peace from nine to five and the number of constables from eight to five. Joint Ex. 6 at 1–2 (Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor). The Attorney General's letter noted that minority voters possessed the ability to elect candidates of choice in Precincts 2, 3, and 5, and that, with respect to Precincts 2

and 3, this ability was the result of the court's order in *Hoskins v. Hannah*, Civil Action

No. G-92-12 (S.D. Tex. Aug. 19, 1992), which created these two precincts. *Id.* at 4. Under

the proposed plan, minority voters' ability to elect a candidate of choice would be reduced

to one. *Id.*[9]

209.    In 2012, the Attorney General also concluded that the County had not met its

burden of showing that the proposed commissioners court plan was not adopted with a

discriminatory purpose, and that the County had failed to adopt, as it had in previous

redistricting cycles, a set of criteria by which it would be guided in the redistricting process.

Joint Ex. 6 at 2 (Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor). The

letter noted that (1) this procedural deviation was a deliberate decision by the County to

avoid being held to a procedural or substantive standard of conduct with regard to the way

it complied with the constitutional and statutory requirements for redistricting; (2) the

process may have been characterized by the deliberate exclusion from meaningful

involvement in key deliberations of the only member of the commissioners court elected

from a minority ability-to-elect precinct; and (3) the proposed changes would reduce the

overall minority electorate in Precinct 3 and lead to the loss of the ability of minority voters

to elect a candidate of choice. *Id.*

210.    These efforts to reduce majority-minority districts are significant because

research has shown that Blacks and Latinos are more likely to vote if they live in majority-

---

[9] In 2013, just six weeks after *Shelby County v. Holder*, 570 U.S. 529 (2013) relieved Galveston County of the requirement to submit changes affecting voting for review under Section 5, the County enacted a reduction in the number of justice of the peace/constable precincts. *See, e.g.*, Trial Tr. vol. 5, 81:14–82:16 (Krochmal).

minority districts. Pls.' Ex. 335 ¶ 25 (Rocha Expert Report). Former Justice of the Peace
Penny Pope also observed that the results of the 2011, 2013, and 2021 redistricting
processes created additional voting barriers for minority residents who felt less motivation
to vote and participate. Trial Tr. vol. 2, 27:8–28:9 (Pope).

### C. Galveston County had a historical practice of seeking public input and providing more transparency in commissioners court redistricting before 2021.

211.    Only after the County became subject to preclearance did Galveston's
minority residents see substantive representation within County government. During the
1981 redistricting cycle, County Judge Ray Holbrook appointed a committee of
approximately 30 citizens who studied and made recommendations to the County's voting
precincts, which would then be used as a "basis for remapping the commissioners court
precincts." Pls.' Ex. 412 at 20-21 (Krochmal Expert Report). The commissioners court
ratified this public committee's work by adopting revised boundaries for its 62 voting
precincts, and then adopting new commissioners court precincts a week later. Pls.' Ex. 412
at 21. The 1981 commissioners precinct map reflected "minimal" change that only
"[s]lightly increas[ed] the combined voting strength of the county's Black and Latin[o]
residents," "stopping short of creating a precinct with in [sic] which the 'total minority'
vote would constitute a majority." Pls.' Ex. 412 at 22 (Krochmal Expert Report); *see also*
Trial Tr. vol. 5, 76:6-14 (Krochmal) (noting the 1981 map "hadn't changed a whole lot"
and there "was no retrogression"). The U.S. Attorney General did not interpose any
objection to Galveston County's 1981 redistricting plan for commissioners court. Trial Tr.
vol. 5, 76:12–14; 187:2–5 (Krochmal).

212. During the 1991 redistricting cycle for commissioners court, the commissioners court adopted a set of criteria, adopted a timeline, and held three public hearings where numerous members of the public, including minorities, participated in the process. Pls.' Ex. 412 at 28–30, 33, 63 (Krochmal Expert Report); Trial Tr. vol. 5, 76:15–77:22 (Krochmal). The redistricting plan reflected input from local chapters of the NAACP and LULAC, and it created a majority-Black and Latino Precinct 3. Pls.' Ex. 412 at 30; Trial Tr. vol. 5, 78:1–14 (Krochmal). The U.S. Attorney General did not interpose any objection to Galveston County's 1991 redistricting plan for commissioners court. Trial Tr. vol. 5, 187:6–11 (Krochmal).

213. During the 2001 redistricting cycle, the commissioners court adopted redistricting criteria, created a schedule of public hearings, and held four public meetings across Galveston County. Pls.' Ex. 412 at 34–35, 63 (Krochmal Expert Report); Trial Tr. vol. 5, 78:17–20 (Krochmal). Among the redistricting criteria the commissioners court adopted was that "[c]ommunities of interest should be maintained in a single district" and that the plan "should not fragment a geographically compact minority community or pack minority voters in the presence of polarized voting so as to create liability under section 2 of the Voting Rights Act." Pls.' Ex. 539 (adopted 2001 redistricting criteria). The U.S. Attorney General did not interpose any objection to Galveston County's 2001 redistricting plan for commissioners court. Stipulated Facts ¶ 17.

214. During the 2011 redistricting cycle, after consideration of several proposals for redistricting counsel, Defendants hired James E. "Trey" Trainor, III, Dale Oldham, and Joe Nixon of the law firm Beirne, Maynard & Parsons, L.L.P. to serve as redistricting

consultants. Joint Ex. 45 (Oct. 14, 2011 Galveston County preclearance submission); *see also infra*, FOF ¶ 291.

215.    During the 2011 redistricting cycle, the commissioners court had proposed criteria that again stated "[c]ommunities of interest should be maintained in a single district" and that the plan "should not fragment a geographically compact minority community or pack minority voters in the presence of polarized voting so as to create liability under section 2 of the Voting Rights Act." Pls.' Ex. 19 (June 2, 2011 email corr. from M. Henry to J. Nixon et al. on 2011 redistricting criteria), Pls.' Ex. 20 (June 2, 2011 email from R. Lewis to M. Henry on 2011 redistricting criteria).

216.    The commissioners court did not adopt these criteria because Judge Mark Henry believed criteria would "tie our hands in ways that will make redistricting impossible." Pls.' Ex. 23 (June 24, 2011 email corr. Between M. Henry, P. Doyle & S. Holmes); Pls.' Ex. 412 at 39 (Krochmal Expert Report). Judge Henry later became aware that the Attorney General had objected to the 2011 commissioners map in part because the commissioners court failed to adopt criteria. Trial Tr. vol. 7, 274:1–11 (Henry).

217.    During the 2011 redistricting cycle, the commissioners court adopted a redistricting timeline that accounted for the Section 5 review process and the candidate filing period. Trial Tr. vol. 7, 16:21–20, 21:15-20 (Doyle); *see also* Pls.' Ex. 412 at 39–42 (Krochmal Expert Report). This timeline included an initial hearing to present draft maps and explain the Census results in Galveston County, followed by five public hearings on redistricting located throughout the county and in the evening before a final meeting to consider maps revised pursuant to public comment that were then adopted. *See* Pls.' Ex.

45 at 9 ("Public Participation", Galveston County 2011 Preclearance Submission); Pls.'
Exs. 531–35 (minutes of redistricting public hearings held on August 15, 16, 17, 22, and
23, 2011); Trial Tr. vol. 1, 141:5–142:3 (McGaskey) (recalling attendance, county-wide
locations, and evening timing of 2011 redistricting public hearings); Trial Tr. vol. 6, 225:4-
7 (Randall) (In 2011, the County was "going to each precinct educating the community,
that precinct on the map."); *see also* Trial Tr. vol. 7, 17:16–18:6, 21:21–22:5 (Doyle).

218.   The Galveston County Commissioners Court adopted a redistricting plan for
commissioners court in 2011 and submitted it to the U.S. Attorney General for preclearance
under Section 5 of the Voting Rights Act on October 14, 2011. Joint Ex. 45 (Oct. 14, 2011,
Galveston County preclearance submission). Under Section 5, covered jurisdictions were
required to submit proposed voting changes to the U.S. Attorney General or the federal
district court in Washington D.C. and meet their burden of showing that the proposed
changes have neither the purpose nor the effect of denying or abridging the right to vote on
account of race, color, or membership in a language minority group. *See* Joint Ex. 6 at 1, 6
(Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor) (describing Section 5
requirements and retrogression standard).

219.   On March 5, 2012, the United States Attorney General interposed an
objection under Section 5 to Galveston County's commissioners court redistricting plan
and method of election for justices of the peace and constables. The Attorney General's
objection letter noted: (a) the County's deliberate decision not to adopt a set of criteria (to
guide the redistricting process) in order "to avoid being held to a procedural or substantive
standard of conduct"; (b) "the deliberate exclusion from meaningful involvement in key

deliberations of the only member of the commissioners court elected from a minority ability-to-elect precinct"; and (c) the retrogressive impact that the relocation of a largely White area (the Bolivar Peninsula) from Precinct 1 into Precinct 3—which was the minority ability-to-elect district—would have on minority residents. Joint Ex. 6 (Mar. 5, 2012, Section 5 objection letter from T. Perez to T. Trainor).

220.   Following negotiations with the counsel for the United States, the Galveston County commissioners court on March 22, 2012, adopted and submitted a revised redistricting plan to the U.S. Attorney General for review under Section 5 of the Voting Rights Act in which Precinct 3 remained a district in which Black and Latino residents constituted a majority of the citizen voting-age population. Pls.' Ex. 579 (Mar. 22, 2012, letter from T. Trainor to C. Herren). The next day, the U.S. Attorney General informed Galveston County officials that it was not interposing an objection under Section 5 of the Voting Rights Act to the revised commissioners court plan that the Galveston County commissioners court adopted and submitted for review on March 22, 2012. Pls.' Ex. 595 at 13 (Jun. 12, 2023 Defs' 1st Supp. Resp. to the United States RFAs).

221.   The plan adopted on March 22, 2012, contained a Precinct 3 in which Black and Latino residents constituted a majority of the voting age population. *Id*. at 12–13 (Jun. 12, 2023 Defs' 1st Supp. Resp. to the United States RFAs). This Precinct 3 was a continuation of a district that the commissioners court created in the 1991 redistricting cycle that allowed Black and Latino voters to elect a candidate of choice and which was maintained in the 2001 redistricting cycle; over its decades of existence, it has become "a

political home of historical significance" to Galveston County's Black and Latino communities. Pls.' Ex. 412 at 60 (Krochmal Expert Report).

## VII.   The 2021 Redistricting Process

### A.   Sequence of Events Leading to the Adoption of the Enacted Plan

*1.   The county commissioners engage redistricting counsel in April 2021 and Judge Henry asks whether they will have to draw majority-minority districts.*

222.   Judge Henry understood that Galveston County was likely to have to revise its county commissioners precincts following the release of the 2020 Census and had the County's general counsel contact Mr. Oldham in November 2020 to retain him as redistricting counsel. Joint Ex. 11 at 2 (Nov. 25, 2020 email from P. Ready to D. Oldham). Henry specifically wanted Mr. Oldham because of his prior redistricting experience in the County, and so he did not consider contacting Mr. Oldham a year in advance as too "early" for a task he understood the commissioners court would have to complete by November of 2021. Trial Tr. vol. 7, 181:15–23, 280:10–20, 281:1–12, 283:21–284:1 (Henry). A solo practitioner, Mr. Oldham required a law firm to assist him in his work and in April 2021 the commissioners court retained Holtzman Vogel Baran Torchinsky & Josefiak PLLC for that purpose. Trial Tr. vol. 8, 28:5–19 (Oldham); Pls.' Ex. 138 (April 1, 2021 Email from P. Ready to D. Martinez, attaching Jan. 20, 2021 Letter from Holtzman Vogel Josefiak Torchinsky PLLC).

223.   The commissioners court voted 4-1, with Commissioner Holmes the lone dissenting opinion, to hire Mr. Oldham and Holtzman Vogel as redistricting counsel on April 5, 2021. *See generally* Pls.' Ex. 140 (Apr. 5, 2021, meeting transcript); Pls.' Ex. 585

at 8 (Apr. 5, 2021, meeting agenda and minutes). The commissioners court did not publicly

consider any other counsel, despite receiving other bids from alternative counsel. *See* Pls.'

Ex. 100. The commissioners court did not provide any information on the April 5, 2021,

meeting agenda or accompanying backup materials about whom the County was

considering hiring, and thus the public had no advance notice of prospective redistricting

counsel until the meeting. *See* Trial Tr. vol. 7, 286:25–288:10 (Henry); Pls.' Ex. 140, 2:10–

3:18 (Apr. 5, 2021, meeting transcript); Pls.' Ex. 585 (April 5, 2021, meeting agenda and

minutes); Pls.' Ex. 570 (Apr. 5, 2021, meeting backup).

224.    Shortly after engaging his preferred counsel, Judge Henry and the County's

General Counsel Paul Ready reached out to Mr. Oldham to ask whether the county "had to

draw a majority minority district if we could." Pls.' Ex. 144 at 1 (Apr. 20, 2021, email from

P. Ready to D. Oldham, CCing M. Henry).[10] Mr. Oldham was able to resolve the question

by explaining the Census delays, and that the commissioners court could take care of

commissioners precincts, which were dependent upon the Census, first before considering

changes to justice of the peace/constable precincts. Pls.' Ex. 144 at 1 (Apr. 21, 2021, email

from P. Ready to D. Oldham); Trial Tr. vol. 8, 179:3–180:85175 (Oldham).

2.    *The U.S. Census Data is released in August 2021; redistricting counsel start meeting with commissioners in September 2021 for input on new precinct lines.*

225.    The 2020 Census data necessary for redistricting was delayed due to the

COVID-19 pandemic and was ultimately released in the legacy format on August 12, 2021,

---

[10] Judge Henry testified at trial that he could not recall the purpose of the email. Trial Tr. vol. 7, 290:7–13 (Henry).

and in a more user-friendly format in September 2021. Trial Tr. vol. 8, 36:8–19 (Oldham); 297:6–16 (Bryan); Defs.' Ex. 175 at 2–3 (2020 Census Timeline).

226.    Judge Henry became aware in the spring or summer of the Census data's expected release date and was aware when it was released in August. Trial Tr. vol. 7, 290:14–291:3 (Henry); *see also* Pls.' Ex. 586 (Aug. 13, 2021, email from T. Drummond to T. Drummond); Pls.' Ex. 568 (Feb. 12, 2021, U.S. Census Bureau Statement on Redistricting Data Timeline); Pls.' Ex. 569 (Mar. 15, 2021, U.S. Census Bureau Statement on Release of Legacy Format Summary Redistricting Data).

227.    Mr. Oldham lacked the technical ability to parse the Census data released in August and Defendants had not yet obtained a demographer for the project, so Mr. Oldham reached out to Adam Kincaid of the National Republican Redistricting Trust to obtain Census data about Galveston County. Trial Tr. vol. 8, 36:1–37:20, 68:11–18 (Oldham); Pls.' Ex. 173 at 1 (Sept. 14, 2021, email from A. Kincaid to D. Oldham).

228.    On September 14, 2021, Mr. Kincaid emailed Mr. Oldham a chart showing the racial demographic changes from 2010 to 2020 for each commissioners precinct. Pls.' Ex. 173 at 1, 3 (Sept. 14, 2021, email from A. Kincaid to D. Oldham). Mr. Oldham then removed the logo of the National Republican Redistricting Trust from the document and sent it to Paul Ready to distribute to the commissioners. Trial Tr. vol. 8, 51:5–10, 52:1–14 (Oldham).

229.    Mr. Oldham reviewed the racial data Mr. Kincaid had sent and concluded that Galveston County's Black population had remained concentrated in Precinct 3 and the

Latino population had grown throughout the County. Trial Tr. vol. 8, 131:24–134:10 (Oldham).

230.     Mr. Oldham was "pretty familiar" with "the population and demographic location of that population in Galveston County." Trial Tr. vol. 8, 131:7–11 (Oldham). He knew that the Black population was centered in the areas of Dickinson and La Marque, and parts of Texas City, parts of Hitchcock, and on Galveston Island, and concentrated in Precinct 3 in the 2011 plan. Trial Tr. vol. 8, 133:14–134:1 (Oldham). Mr. Oldham reviewed racial shading maps of Galveston County after the Census data were released to see where Black populations were concentrated in the voting precincts. Trial Tr. vol. 8, 134:11–135:2, 136:7–16 (Oldham). Mr. Oldham's understanding was generally consistent with Judge Henry and Commissioners Apffel and Giusti's understanding that Galveston's Black and Latino population were centered around the sole majority-minority commissioners precinct, Precinct 3, which had consistently elected Commissioners Holmes. *See, e.g.*, Trial Tr. vol. 7, 271:18–273:10 (Henry); Trial Tr. vol. 2, 111:19–23 (Burch); Pls.' Ex. 414 at 5 (Burch Expert Report) (citing deposition testimony); Trial Tr. vol. 9, 356:7-14 370:1-3 (Apffel); *cf.* Trial Tr. vol. 9, 148:11–14, 149:15–24 (Giusti).

231.     Mr. Oldham held a series of meetings in mid-September 2021 with members of the commissioners court to determine their priorities for the redistricting process. The first meeting on September 8 included both Judge Henry and Commissioner Apffel, followed by individual meetings with Commissioners Giusti and Clark, and ending with a meeting with Commissioner Holmes on September 20. Trial Tr. vol. 8, 38:12–25, 42:21–43:7, 45:11–21, 48:2–5 (Oldham).

232.    In his meeting with Mr. Oldham and Commissioner Apffel, Judge Henry told Oldham that he wanted a map similar to the one he conceived in 2011—the configuration that ultimately became Map 2—but could not have had in 2011 because it would retrogress minority voting strength and thus not get preclearance under Section 5 of the Voting Rights Act. Trial Tr. vol. 8, 39:9–40:8, 150:23–151:11, 152:15–20 (Oldham).[11]

233.    Commissioner Apffel expressed an expectation he would have to give up Bolivar due to the overpopulation of his district, and stated he wanted to remain in his current precinct; in this or a later October meeting, he requested that a specific area in the west side of his precinct be brought in because his wife had found a new home. Trial Tr. vol. 9, 307:20–308:2 (Apffel); Trial Tr. vol. 7, 189:10–16 (Henry).

234.    Precinct 2 Commissioner Giusti asked Mr. Oldham to "level out" the commissioner precincts in population, "clean up" the lines, and keep his parents' home in his precinct. Giusti did not dispute Mr. Oldham's recollection that he requested his precinct lines not change more than they would have to. Trial Tr. vol. 9, 124:15–126:14 (Giusti).

235.    When Mr. Oldham first met with Commissioner Holmes on September 20, he was apparently "frustrat[ed]" that Commissioner Holmes—the last commissioner with whom he met—was unable to list his mapping priorities and that a follow up call for that purpose would be necessary on September 23. Trial Tr. vol. 8, 49:22–51:4, 53:1–23

---

[11] Mr. Oldham had a much more detailed recollection of Judge Henry's requests in his meetings throughout the redistricting process, and thus the Court credits his detailed recollections of these meetings. County Judge Henry was only able to testify as to what was "probably said" and what he "would have expected" his requests at the time to be, *see* Trial Tr. vol. 7, 189:14, 190:5–7 (Henry), and could not recall definitively what portions of these meetings he was present for. Trial Tr. vol. 7, 192:8–10 (Henry) ("I believe that I was present for one with Commissioner Apffel. I don't feel like I was there the entire time, . . . .").

(Oldham). In the follow-up call on September 23, Commissioner Holmes provided detailed instructions on which areas he wanted to add to Precinct 3 to resolve population imbalances and increase the compactness of the district. *See* Trial Tr. vol. 7, 68:25–72:6 (Holmes); Joint Ex. 23 at Holmes000183 (Commissioner Holmes' notes).

### 3. *The County waits until mid-October 2021 to engage a demographer to begin drafting maps.*

236. Despite Mr. Oldham having completed the meetings with commissioners and Judge Henry by September 23, and despite Mr. Oldham claiming he was "frustrated" that Commissioner Holmes required until September 23 to provide feedback, no one contacted a demographer to begin implementing the input provided by commissioners until weeks later, on October 14, when Holtzman Vogel asked Thomas Bryan to start drafting maps. Trial Tr. vol. 8, 225:20–21 (Bryan); Pls.' Ex. 187 at DEFS00031807 (Oct. 14, 2021 through Oct. 26, 2021 Text Messages between T. Bryan and P. Gordon); Pls.' Ex. 189 (Oct. 15, 2021 Email from P. Gordon to J. Torchinsky).

237. Mr. Bryan owns Bryan GeoDemo, a company that provides, among other things, redistricting mapdrawing services. Trial Tr. vol. 8, 216:15–20, 219:22–220:10 (Bryan).

238. On an October 15, 2021, call between Phil Gordon of Holtzman Vogel and Mr. Bryan, Mr. Gordon instructed Mr. Bryan to create a least change plan and one that created four Republican precincts, later titled a "Four R Plan." Trial Tr. vol. 8, 227:16–228:25, 233:19–25, 289:8–290:1 (Bryan); *see also* Pls.' Ex. 188 (Oct. 15, 2021 Email from T. Bryan to J. Torchinksy et al.).

239.    The purported driving motivation of Judge Henry—creation of a "coastal precinct"—never arose during the hour-long phone call between Mr. Gordon and Mr. Bryan, and Mr. Bryan's initial draft plans created no coastal precinct. Trial Tr. vol. 8, 290:23–291:4 (Bryan); Pls.' Ex. 516 (Four R Map).

240.    After that initial call, it quickly became clear to Mr. Bryan that Mr. Oldham, not Mr. Gordon, was the lead person from whom he should take instructions about configuring plans. Trial Tr. vol. 8, 290:2–7 (Bryan). Mr. Bryan and Mr. Oldham spoke by phone for the first time on October 17, 2021. Trial Tr. vol. 8, 68:21–69:17 (Oldham); Pls.' Ex. 196 (Oct. 17, 2021 Email from T. Bryan to D. Oldham).

241.    As a result, the "Four R" map was short-lived—Mr. Bryan agreed that it "went to the wastepaper basket," is "quite different from," and "doesn't really look anything like" the map proposal he eventually drafted, Map 2; the "Four R" plan was not the foundation upon which Map 2 was built. Trial Tr. vol. 8, 291:5–21 (Bryan). Mr. Oldham never told Mr. Bryan that Judge Henry ever sought to create four Republican districts, and Mr. Oldham denied there was any such partisan justification when he conveyed instructions on a draft plan. Trial Tr. vol. 8, 153:14–154:4 (Oldham).

   4.   *The county's demographer delivers initial draft plans by October 17, including an "optimal" draft plan that divides Benchmark Precinct 3 among all four new commissioners precincts.*

242.    After speaking with Mr. Oldham, Mr. Bryan drafted two map proposals that he shared via email with Mr. Oldham on October 17: a "Minimum Change" plan that became Map Proposal 1, and a so-called "Optimal" plan based upon Judge Henry's preferred geographic configuration for new commissioners precincts, including an entirely

coastal precinct and three mainland precincts, all of which dipped into the core of Benchmark Precinct 3. *See* Pls.' Ex. 197 (Oct. 17, 2021, email from T. Bryan to D. Oldham); Trial Tr. vol. 8, 145:13–150:22 (Oldham). Map 2 was "the visualization of the instructions" Judge Henry had provided Mr. Oldham for each of Precincts 1, 2, 3, and 4. Trial Tr. vol. 8, 181:5–9 (Oldham).

243.    Mr. Bryan did not exercise any of his own discretion in drawing Maps 1 or 2; Mr. Oldham told him where to place the lines. Trial Tr. vol. 8, 296:9–25 (Bryan). Mr. Oldham gave Mr. Bryan "very specific instructions about how he wanted Map 2 to look," and Mr. Bryan did not know "why [Mr. Oldham] was asking [him] to put [any] particular territory in each of the commissioner precincts in Map 2." Trial Tr. vol. 8, 291:25–293:6 (Bryan). Mr. Bryan emphasized that he "definitely" was "not in the know as to what the basis or purpose or justification for" Map 2 was. Trial Tr. vol. 8, 293:13–18 (Bryan). Mr. Bryan testified he could not speak to what motivated the drawing of Map 2. Trial Tr. vol. 9, 29:13–20 (Bryan).

244.    Mr. Bryan was never asked to consider the compactness of draft precincts, to respect communities of interest within Galveston County, nor to keep the Houston suburbs unified in a precinct. Trial Tr. vol. 8, 303:21–304:8 (Bryan).

245.    Mr. Bryan testified credibly that he did not himself display or consult racial data while working on the Galveston maps. Trial Tr. vol. 9, 33:3–8 (Bryan). But he also credibly testified that he was "given no instruction one way or the other on racial and ethnic information." Trial Tr. vol. 9, 19:12–19, 21:4–10 (Bryan). This contradicts Mr. Oldham's testimony that he gave Mr. Bryan clear and repeated instructions not to display or consult

81

any racial data while drawing the map. Trial Tr. vol. 8, 71:18–25 (Oldham). Mr. Bryan testified he was confident he remembered the instructions he was provided by Mr. Oldham and that he would have remembered such an instruction not to display or use racial data had it been provided, especially if this instruction had been "incredibly clear" as Mr. Oldham asserted. Trial Tr. vol. 9, 56:25–57:20 (Bryan). The Court credits Mr. Bryan and not Mr. Oldham in this regard. Indeed, Mr. Oldham acknowledged having "over-testified" as to certain matters, Trial Tr. vol. 8, 190:2–15 (Oldham), and his purported instructions would have been inconsistent with the analytical spreadsheets Mr. Bryan created with detailed racial data, as described below. The Court finds that Mr. Oldham's emphatic testimony about the fact that racial data was not used is contrived to benefit Defendants' litigation positions and does not reflect the actual sequence of events during the map-drawing process.

246.   The first draft of Map 2 represents a dramatic change in the commissioners precinct lines, both on the coast but also on the mainland, in a way that distributes the population of Benchmark Precinct 3 among all four new precincts and shifts Commissioner Holmes's precinct to the northern part of the county closest to Houston:



Pls.' Ex. 197 (attachments to Oct. 17, 2021, email from T. Bryan to D. Oldham).

247.    The configuration of this initial "optimal" plan is not explained by the creation of a coastal precinct. Mr. Oldham testified that it was possible to retain a majority-minority precinct while also creating a coastal precinct, and also agreed that nothing about putting the Galveston, Pelican, and Bolivar Islands in Precinct 2 requires that the portions of (former) Precinct 3 that are on the mainland be dismantled. Trial Tr. vol. 8, 160:7–13, 164:13–17 (Oldham). When shown alternative maps from Plaintiffs' expert Dr. Rush at trial, Mr. Oldham agreed that these illustrative maps in fact created coastal precincts that were "almost exactly like what was in Map 2" without cracking apart the minority populations on the mainland. Trial Tr. vol. 8, 167:21–168:1, 171:14–21 (Oldham).

248.    The Court finds that a purported desire to create a coastal precinct cannot and does not explain the configuration of commissioners precincts on the mainland in the initial draft of Map 2.

     5.   *Mr. Oldham shows the commissioners draft maps with racial demographic data.*

249.    After Maps 1 and 2 were drawn, Mr. Oldham traveled to Galveston to meet with Judge Henry and the commissioners to show them the maps. Trial Tr. vol. 8, 79:12–80:12 (Oldham). Mr. Oldham met with Judge Henry on October 18 and Judge Henry told Mr. Oldham he preferred Map 2 because "it's essentially his criteria." Trial Tr. vol. 8, 82:1–84:1 (Oldham); Pls.' Ex. 199 (Oct. 19, 2021 calendar item).

250.    Commissioners Apffel, Giusti, and Clark told Mr. Oldham that they preferred Map 1. Trial Tr. vol. 8, 190:16–20 (Oldham).

251.   Mr. Oldham knew Commissioner Holmes was going to be dissatisfied with Map 2 because it dramatically reduced the minority population in Precinct 3, resulting in having the lowest minority population percentage of all four precincts. Trial Tr. vol. 8, 177:22–178:18 (Oldham).

252.   Mr. Oldham unpersuasively testified that Commissioner Holmes's placement in the precinct with the lowest minority population in Map 2 was a function of where he lived, Trial Tr. vol. 8, 175:20–22 (Oldham), but Mr. Bryan disputed this testimony, saying that he did not know where Commissioner Holmes lived and his residence had no bearing on his placement in Precinct 3, Trial Tr. vol. 8, 306:16–19 (Bryan). The Court credits Mr. Bryan and not Mr. Oldham in this regard.

253.   Mr. Bryan produced an analytic spreadsheet for Maps 1 and 2 that was shown to the members of the commissioners court with the draft maps. Trial Tr. vol. 8, 171:25–173:5, 200:5–21 (Oldham); Trial Tr. vol. 8, 268:13–269:4 (Bryan). The spreadsheet included a substantial amount of both granular and summary racial data about the plans. The first tab included CVAP and voting age population data by racial group for each Census block within Galveston County, along with the precinct to which each block was assigned in Maps 1 and 2. Trial Tr. vol. 9, 10:8–11:21 (Bryan); Pls.' Ex. 528 (Maps 1 and 2 Analytics Spreadsheet). That information could be filtered and sorted. Trial Tr. vol. 9, 12:7–13 (Bryan).

254.   The second tab of Mr. Bryan's spreadsheet, titled "Pop Pivot," provided the Black and Latino voting age population percentages for each commissioners precinct in the 2011 plan, Map 1, and Map 2, as well as the two categories combined to identify the

total majority-minority percentage share for each precinct. Trial Tr. vol. 9, 12:14–13:11, 14:2–21 (Bryan); *see also* Pls.' Ex. 528 (Maps 1 and 2 Analytics Spreadsheet). The combined Black and Latino voting age population data is not provided by the Census Bureau; Mr. Bryan added formulas to Excel to calculate that information. Trial Tr. vol. 9, 14:22–15:4 (Bryan). Mr. Bryan also added color-coded conditional formatting to shade the racial data on a scale of red to green to highlight variation among the racial compositions of each precinct. Trial Tr. vol. 9, 15:5–16:16, 17:10–13 (Bryan). This section of the Pop Pivot tab is shown below:

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | 1519 | 2020 | 2020 | 2020 | 2020 | | | |
| 2 | Original | CVAP Total | PL Total | PL VAP Total | PL VAP BNH | PL VAP HISP | | | |
| 3 | Row Labe | Sum of acs_cv_ | Sum of PL_Totl | Sum of PL_Tt18 | Sum of PL_T18_B | Sum of PL_T18_H | % BNH VAP | % HISP VAP | % Min VAP |
| 4 | 1 | 60,982 | 85,433 | 65,769 | 4,324 | 14,944 | 7% | 23% | 29% |
| 5 | 2 | 62,872 | 95,596 | 73,739 | 5,748 | 14,634 | 8% | 20% | 28% |
| 6 | 3 | 53,445 | 79,906 | 61,257 | 18,556 | 18,731 | 30% | 31% | 61% |
| 7 | 4 | 57,047 | 89,747 | 66,617 | 3,661 | 11,850 | 5% | 18% | 23% |
| 8 | Grand Total | 234,346 | 350,682 | 267,382 | 32,289 | 60,159 | 12% | 22% | 35% |
| 9 | | | | | | | | | |
| 10 | Low | -8.8% | -8.9% | -8.4% | | | | | |
| 11 | Average | 58,586 | 87,671 | 66,846 | | | | | |
| 12 | High | 7.3% | 9.0% | 10.3% | | | | | |
| 13 | | | | | | | | | |
| 14 | | 1519 | 2020 | 2020 | 2020 | 2020 | | | |
| 15 | Map 1 | CVAP Total | PL Total | PL VAP Total | PL VAP BNH | PL VAP HISP | | | |
| 16 | Row Labe | Sum of acs_cv_ | Sum of PL_Totl | Sum of PL_Tt18 | Sum of PL_T18_B | Sum of PL_T18_H | % BNH VAP | % HISP VAP | % Min VAP |
| 17 | 1 | 61,630 | 87,659 | 66,625 | 4,589 | 15,017 | 7% | 23% | 29% |
| 18 | 2 | 57,445 | 86,431 | 67,003 | 5,018 | 13,159 | 7% | 20% | 27% |
| 19 | 3 | 59,945 | 88,633 | 68,547 | 19,275 | 20,371 | 28% | 30% | 58% |
| 20 | 4 | 55,345 | 87,959 | 65,207 | 3,447 | 11,612 | 5% | 18% | 23% |
| 21 | Grand Total | 234,346 | 350,682 | 267,382 | 32,289 | 60,159 | 12% | 22% | 35% |
| 22 | | | | | | | | | |
| 23 | Low | -5.5% | -1.4% | -2.5% | | | | | |
| 24 | Average | 58,586 | 87,671 | 66,846 | | | | | |
| 25 | High | 5.2% | 1.1% | 2.5% | | | | | |
| 26 | | | | | | | | | |
| 27 | | 1519 | 2020 | 2020 | 2020 | 2020 | | | |
| 28 | Map2 | CVAP Total | PL Total | PL VAP Total | PL VAP BNH | PL VAP HISP | | | |
| 29 | Row Labe | Sum of acs_cv_ | Sum of PL_Totl | Sum of PL_Tt18 | Sum of PL_T18_B | Sum of PL_T18_H | % BNH VAP | % HISP VAP | % Min VAP |
| 30 | 1 | 61,215 | 87,689 | 66,641 | 6,332 | 16,404 | 10% | 25% | 34% |
| 31 | 2 | 63,746 | 87,368 | 71,169 | 9,104 | 16,395 | 13% | 23% | 36% |
| 32 | 3 | 55,319 | 88,111 | 64,704 | 4,716 | 14,908 | 7% | 23% | 30% |
| 33 | 4 | 54,067 | 87,514 | 64,868 | 12,137 | 12,452 | 19% | 19% | 38% |
| 34 | Grand Total | 234,346 | 350,682 | 267,382 | 32,289 | 60,159 | 12% | 22% | 35% |
| 35 | | | | | | | | | |
| 36 | | -7.7% | -0.3% | -3.2% | | | | | |
| 37 | | 58,586 | 87,671 | 66,846 | | | | | |
| 38 | | 8.8% | 0.5% | 6.5% | | | | | |

Tabs: Galveston_Blocks Data | **Pop Pivot** | Pop Political Pivot | VTD Data | Map 1 VTD Sp

Pls.' Ex. 528 (Maps 1 and 2 Analytics Spreadsheet).

255.   Mr. Oldham never instructed Mr. Bryan to remove the racial data from the analytics spreadsheet to prevent the commissioners from making decisions based upon the data. Trial Tr. vol. 9, 18:7–10 (Bryan).

256.    Commissioner Apffel is quoted in a news article and admitted during his deposition and at trial that he reviewed racial data during the 2021 redistricting process, prior to approval of the Enacted Plan. Trial Tr. vol. 9, 358:10–359:15 (Apffel).

257.    The commissioners were all provided with data and analysis that showed that Map 2 would not maintain the district that had elected Commissioner Holmes. Trial. Tr. vol. 8, 200:11–21 (Oldham).

6.    *Map 2 is revised to accommodate Commissioners Apffel, Giusti, and Clark.*

258.    At his deposition, Mr. Oldham testified that Judge Henry at this point began pursuing votes in favor of Map 2. Although Mr. Oldham testified at trial that he had "over-testified" when he said this, he agreed (and the evidence otherwise supports) that Judge Henry was the only member of the commissioners court in favor of Map 2 before it was changed to accommodate Commissioners Giusti, Apffel, and Clark. Trial Tr. vol. 8, 188:14–190:20 (Oldham). Judge Henry's testimony tends to support this narrative. According to him, he instructed Oldham to meet with the commissioners and "go through the process of making changes." Trial Tr. vol. 7, 202:20–203:7 (Henry). He was present with Commissioner Apffel when he was reviewing the map proposals, Trial Tr. vol. 7, 301:5–12 (Henry); Trial Tr. vol. 8, 194:5–7 (Oldham), and he later reached out to Commissioner Giusti to make sure he was comfortable with his new coastal precinct because it was a dramatic change from his current precinct. Trial Tr. vol. 7, 305:20–306:5 (Henry). Henry chose not to call Holmes to do the same. Trial Tr. vol. 7, 306:6–18 (Henry).

259.   Paul Ready set up a series of Zoom meetings between Mr. Oldham, Mr. Bryan, and Commissioners Giusti, Clark, and Apffel to endeavor to accommodate their wishes into Map 2 to gain their support for it. Trial Tr. vol. 8, 191:2–192:16 (Oldham).

260.   Mr. Oldham met with Commissioners Giusti and Clark simultaneously to make modifications they wanted to see in Map 2. Trial Tr. vol. 8, 191:24–192:16 (Oldham). Judge Henry's calendar reflects that the entire day was blocked out for redistricting meetings, Pls.' Ex. 202 (Oct. 19, 2021, calendar item), and he recalled meeting with Commissioner Apffel that day too. Trial Tr. vol. 7, 301:8–12 (Henry); *see also* Trial Tr. vol. 8, 194:5–197:5 (Oldham).

261.   Paul Ready never set up a meeting with Commissioner Holmes to seek to accommodate his desires in Map 2, nor did Mr. Oldham inform him that he should convey changes favorable to him in Map 2. Trial. Tr. vol. 8, 192:17–193:8 (Oldham). When Commissioner Apffel called Commissioner Holmes shortly before the November 12, 2021, special meeting to share that he felt Map 2 was likely to be adopted, and this would present issues for Commissioner Holmes, Commissioner Holmes told him "[y]ou are the only one that's called to speak with me about this." Trial Tr. vol. 9, 327:2–12 (Apffel); Trial Tr. vol. 7, 86:9–13 (Holmes).

   7.   *The November 12, 2021, special meeting is only scheduled once Map 2 is "final."*

262.   The basic configurations of Map 1 and Map 2 were completed no later than October 22. Trial Tr. vol. 9, 43:22–44:1 (Bryan); *see also* Pls.' Ex. 386 at 19 n.18, 26 n.25 (Cooper Expert Report) (confirming receipt of shapefiles for drafts of Map 1 and Map 2

dated October 17 and October 21, respectively, that are identical to the final versions). But Judge Henry did not want to post the draft maps, or hold a public meeting, until the maps could be considered "final" versions. Trial Tr. vol. 7, 208:22–209:5, 310:13–23 (Henry).

263.   Mr. Oldham testified at deposition that it was "clear to him" that the commissioners court would vote for Map 2 by late October 2021, though he testified at trial that he thought it was possible things could change. Trial Tr. vol. 8, 198:21–200:4 (Oldham).

264.   The County publicly posted the two proposals, Map 1 and Map 2 on the County's website, on October 29, 2021. *See* Joint Ex. 29 (Galveston County redistricting website); Trial Tr. vol. 7, 325:14–17 (Henry). Judge Henry's office was responsible for deciding what would be posted on the web page, and he never directed anyone to include the Benchmark Plan (and thus what changes were being proposed), population or demographic data about the plans, or any other analytics such as compactness scores, voting precinct splits, or the criteria that went into drafting them. *See* Joint Ex. 29 (Galveston County redistricting website); Trial Tr. vol. 7, 325:11–329:16 (Henry).

265.   The web page provided an opportunity for public comment, but there were no instructions on when public comment had to be submitted to be read. Joint Ex. 29 (Galveston County redistricting website); Trial Tr. vol. 7, 330:15–21 (Henry).

266.   The only evidence of the County announcing the creation of the redistricting web page or the release of proposed maps is a post on Judge Henry's campaign Facebook page encouraging the public to support Map 2. Pls.' Ex. 588 (Oct. 29, 2021 Mark Henry Facebook Post), which was then reposted by Commissioner Giusti. Pls.' Ex. 247 (Oct. 29,

2021, Giusti Facebook Post); *see also* Trial Tr. vol. 7, 328:7–9 (Henry) (noting that Judge Henry does not think he directed anyone to announce the posting of the maps anywhere else). Other than these postings, and a later article by the Galveston Daily News, there is no other evidence of a public announcement for the release of proposed maps or the public comment portal.

267.    The commissioners court was apparently frustrated with the time it was taking for their consultants to finalize the maps in a form acceptable for adoption. On October 28, 2021, Judge Henry's chief of staff Tyler Drummond emailed redistricting counsel asking about the status of the "final maps" and stating the County "originally wanted to have a special meeting tomorrow to discuss and possibly adopt"; the commissioners court was "awaiting the final maps with split precincts so we can finalize everything and get a special meeting together for next week." Joint Ex. 27 at 1 (Oct. 28, 2021, email from T. Drummond to D. Oldham et al.). This email indicates that the commissioners court was considering proposing and adopting the draft maps on the same day and was always intending to do it in a special meeting as opposed to the regularly scheduled meetings occurring around the same time.

268.    When asked why he never planned to use the regularly scheduled November 1, 2021, public meeting, for example, Henry testified that he was never planning on "getting" any public meeting on redistricting "going" until "we had the final product." Trial Tr. vol. 7, 337:8–12 (Henry).

269.    On November 1, 2021, the Texas Secretary of State issued an election advisory confirming that county commissioners courts had to revise their commissioners

precincts by the November 13, 2021, candidate filing period start. Joint Ex. 34 at 2 (Nov. 1, 2021, Election Advisory No. 2021–14). The advisory also informed counties that the deadline for revising voting precinct revisions, normally due by October 1, was extended to December 30, 2021. *Id.* at 4. Judge Henry testified to mistakenly believing the candidate filing period date was about a week later than it actually was. Trial Tr. vol. 7, 281:1–4, 283:6 (Henry). But he provided no credible explanation for this mistake, and later agreed in his testimony that he would "have reservations about a candidate filing for office who can't read a calendar." Trial Tr. vol. 7, 294:15–16 (Henry).

270.    Judge Henry's failure to identify and plan for the proper date, or to consult his counsel on the appropriate date and plan accordingly, tends to support a finding that he and others involved in redistricting intended to wait as late as possible before publicly disclosing and voting to adopt new commissioners precincts. It shows an intentional disregard for public input or transparency and stands in contrast to Judge Henry's early motivation to secure his preferred redistricting counsel nearly a year before the deadline he understood at the time. *See* Trial Tr. vol. 7, 181:15–23 (Henry).

271.    The evidence also supports that the adoption of the finalized Map 2 was a forgone conclusion by the time of the November 12, 2021, special meeting. *See* Trial Tr. vol. 2, 145:8–24 (Burch); Pls.' Ex. 414 at 20–21 (Burch Expert Report); Trial Tr. vol. 7, 86:6–8 (Holmes). Commissioner Apffel called Commissioner Holmes a few days before the November 12 special meeting with the understanding that Map 2 would be adopted. Trial. Tr. vol. 7, 86:6–13 (Holmes); Joint Ex. 23 at Holmes000188 (Commissioner Holmes'

Notes).[12] In the words of Commissioner Stephen Holmes, "the fix was already in." Trial Tr. vol. 160:20–161:8 (Holmes).

272.    The commissioners court members' conduct at the November 12, 2021, special meeting tends to support this view. The transcript for this special meeting shows that, other than Judge Henry's summary of the online public comment, no member of the commissioners court who voted in favor of Map 2 shared their reasons for doing so. *See generally* Pls.' Ex. 591 (Nov. 12, 2021, special meeting transcript).

273.    During this meeting, the commissioners court heard from dozens of Galveston residents, all but one of whom expressed their concerns about the process and map proposals. Pls.' Ex. 129 (video of November 12, 2021, special meeting); Pls.' Ex. 414 at 18 (Burch Expert Report); Trial Tr. vol. 6, 135:5–11 (Lewis) (speaking at special session because "[w]hat I saw [there] was another disparity . . . within our voting system. And . . . it just was not right."); *see also* Pls.' Ex. 412 at 56–57 (Krochmal Expert Report). And as set forth below, this special meeting was held in a time, place, and manner that deviated significantly from the County's standard practices and fell short of its legal obligations. *See infra*, FOF ¶¶ 333–344.

274.    Commissioner Holmes testified that he handed out a polarized voting analysis, providing the commissioners with notice that there is credible evidence that there is racially polarized voting in Galveston County. Defs.' Ex. 144 at Holmes000344–000346

---

[12] Commissioner Apffel had a different recollection of that call, but similarly testified that he understood at the time Judge Henry would be supporting Map 2 and that Commissioner Apffel was inclined to support Map 2 as well. Trial Tr. vol. 9, 328:5–19 (Apffel).

(M. Rios memorandum on voting patterns in Galveston County); Trial Tr. vol. 7, 95:4–96:11 (Holmes).

**B.    Procedural Deviations from Prior Redistricting Cycles**

275.    Dr. Burch and Dr. Krochmal surveyed the 2021 redistricting cycle and found several procedural anomalies that also marked the 2021 redistricting process. Trial Tr. vol. 2, 133:24–135:19 (Burch); Pls.' Ex. 414 at 3 (Burch Expert Report); Pls.' Ex. 412 at 49–57 (Krochmal Expert Report). These procedural departures included: 1) the failure to adopt a timeline, 2) the failure to adopt any publicly available redistricting criteria to guide the process, 3) the lack of transparency in engaging redistricting counsel, 4) the lack of public notice and availability for comment 5) the circumstances surrounding the November 12, 2021, special meeting, 6) the disregard for minority input in the process, and 7) the exclusion of Commissioner Stephen Holmes from the process. *See* Trial Tr. vol. 2, 133:24–135:19 (Burch); Pls.' Ex. 414 at 3, 14–19 (Burch Expert Report); Pls.' Ex. 412 at 50 (Krochmal Expert Report). The Court credits these findings as evidence of departures from the normal procedural sequence. The record evidence and lay testimony adduced at trial further substantiate these procedural deviations.

276.    The U.S. Attorney General's 2012 objection letter noted several procedural deficiencies in the 2011 redistricting process that raised concerns of intentional discrimination. Pls.' Ex. 414 at 8–9 (Burch Expert Report); Joint Ex. 6 at 2 (Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor). These deficiencies included the failure to adopt redistricting criteria and the deliberate exclusion of Stephen Holmes, the only minority member of the commissioners court. Pls.' Ex. 414 at 8–9 (Burch Expert

Report); Joint Ex. 6 at 2 (Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor).

277.    The 2012 objection letter put Defendants on notice of what procedural deficiencies would give rise to concerns about the exclusion of minority stakeholders and lack of transparency, lapses that could be viewed as evidence of intentional discrimination. Both Judge Henry and Commissioner Ken Clark were on the commissioners' court in 2011, and Judge Henry was aware of the basis for the objection. Pls.' Ex. 414 at 5 (Burch Expert Report); Trial Tr. vol. 7, 273:21–274:11 (Henry); Joint Ex. 6 at 2 (Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor).

278.    Nonetheless, in the 2021 redistricting process directed by Judge Henry, Trial Tr. vol. 7, 342:13–18 (Henry), the County repeated these same procedural lapses (i.e., the exclusion of Commissioner Holmes from meaningfully participating in the process and failing to adopt redistricting criteria), in a process that deviated from procedural norms for redistricting the County had historically followed. *See generally* Trial Tr. vol. 2, 122:20–123:18, 123:19–124:18 (Burch); Pls.' Ex. 414 at 9, 16–17 (Burch Expert Report). Judge Henry even sought out the same redistricting counsel in 2021 as in 2011, hoping for a "repeat performance" from the last cycle. Trial Tr. vol. 8, 8:10–13, 29:22–30:1 (Oldham); *see also* Trial Tr. vol. 7, 179:20–180:5, 283:21–284:1 (Henry); Trial Tr. vol. 7, 60:12–22 (Holmes); Pls.' Ex. 414 at 9–10 (Burch Expert Report). The only alternative plan offered by Mr. Oldham during the 2021 redistricting cycle, Map 1, closely resembled the 2011 map, to which the U.S. Attorney General interposed an objection, that added the predominantly Anglo Bolivar Peninsula into Precinct 3. *Compare* Joint Ex. 45 at 22 (2011

commissioners precincts), *with* Joint Ex. 29 (Galveston County redistricting website); Trial Tr. vol. 7, 101:11–17 (Holmes); *see also* Pls.' Ex. 386 at 13 (Fig. 4, Cooper Expert Report).

279.    The 2013 *Shelby County v. Holder* decision eliminating preclearance also significantly impacted the 2021 redistricting process. *See* Trial Tr. vol. 2, 124:19–125:20 (Burch); Pls.' Ex. 414 at 9 (Burch Expert Report).[13] Indeed, Mr. Oldham testified that the elimination of preclearance facilitated the dismantling of the majority-minority precinct. Trial Tr. vol. 2, 124:19–126:15 (Burch); Pls.' Ex. 414 at 9–10 (Burch Expert Report); Trial Tr. vol. 8, 59:22–60:17 (Oldham).

### C. *Failure to set forth a redistricting timeline*

280.    In contrast to prior redistricting cycles, there is no evidence of any redistricting timeline in 2021. *See, e.g.*, Trial Tr. vol. 7, 21:10–20 (Doyle).

281.    Defendants have failed to provide any credible explanation for the lack of a redistricting timeline. Judge Henry, who was principally responsible for the redistricting process, testified that he was always aware Galveston County would need to redraw its commissioners precincts due to anticipated population growth, and that he was aware this would need to be completed by the November candidate filing date. Trial Tr. vol. 7, 280:10–20, 281:1–12 (Henry). But Henry had no explanation for the commissioners court's

---

[13] Dr. Burch described a phenomenon by which many jurisdictions passed election changes which had a discriminatory impact on minority voters in the wake of *Shelby County v. Holder. See* Trial Tr. vol. 2, 124:19–125:20 (Burch); Pls.' Ex. 414 at 9 (Burch Expert Report). Tracking that phenomenon, Dr. Burch similarly found that Galveston County took steps "with respect to the expectation that they no longer have to worry about justifying this [discriminatory] effect on minority voters." Trial Tr. vol. 2, 125:21–126:15 (Burch); Pls.' Ex. 414 at 9–10 (Burch Expert Report).

failure to publicly announce this known deadline, or to set forth a public or even private timeline for redistricting. *See* Trial Tr. vol. 7, 295:19–296:24, 297:8–11 (Henry).

282.    Commissioner Stephen Holmes had no knowledge of the redistricting timeline. He was not even aware that proposed Maps 1 and 2 were finalized until he was told about the November 12 special meeting. *See* Trial Tr. vol. 7, 86:6–17; 87:2–88:10 (Holmes).

283.    Because Commissioner Holmes had no awareness of the timeline, he was unable to put forth alternative map proposals or consider whether a coastal precinct map could preserve the majority-minority Precinct 3. Trial Tr. vol. 7, 102:15–103:5, 105:1–10 (Holmes).

284.    The timeline the 2021 redistricting process did follow was rushed and failed to include any meaningful participation for the public or the only minority Commissioner at the time. *See supra*, FOF ¶¶ 262–273; *see also infra*, FOF ¶¶ 301–319; Trial Tr. vol. 2, 126:21–127:3 (Burch); Trial Tr. vol. 5, 92:22–94:6 (Krochmal).

### 2. *Failure to adopt redistricting criteria*

285.    Unlike in prior years, the commissioners court failed to adopt any public redistricting criteria in 2021. As Dr. Burch testified, the absence of public redistricting criteria is notable because "redistricting criteria tend to guide the process and give people a sense of what the priorities are, and the County saw fit to adopt them in previous years. Other counties still found it possible." Trial Tr. vol. 2, 192:20–193:2 (Burch). Commissioner Holmes similarly testified that criteria would have provided a "road map"

for the redistricting process that was otherwise lacking. Trial Tr. vol. 7, 97:21–98:9 (Holmes).

286.   Judge Henry admitted to knowing that the County had historically adopted redistricting criteria, including criteria that new districts be "based on existing districts" and "should not fragment a geographically compact minority community . . . in the presence of polarized voting." Trial Tr. vol. 7, 275:10–276:16 (Henry) (discussing Pls.' Ex. 539 (2001 Redistricting Criteria)); Pls.' Ex. 18 (May 24, 2011 Email from R. Lewis to M. Henry). Henry also knew that the county's failure to adopt criteria in 2011 provided a basis for the Attorney General's interposing an objection to the 2011 map due to concerns over intentional discrimination. Trial Tr. vol. 7, 274:1–11 (Henry) (discussing Joint Ex. 6 (March 5, 2012, Section 5 objection letter from T. Perez to J. Trainor). Even Mr. Oldham testified that standard practice would be to adopt redistricting criteria once the Census data were released. Trial Tr. vol. 8, 34:11–16 (Oldham).

287.   The reason for Henry's decision in 2011 is telling: a belief that it would "tie[] [their] hands" during the process. Pls.' Ex. 23; Pls.' Ex. 412 at 39 (Krochmal Expert Report).

288.   It is reasonable to conclude that the commissioners court once again decided not to adopt redistricting criteria in 2021, as it had in years past, to avoid the same constraint. Henry admitted that, without publicly adopted criteria, there would be no way for anyone to know the commissioners court's map preferences and propose alternative maps that would meet them. Trial Tr. vol. 7, 310:24–311:12 (Henry).

289.    Defendants have failed to provide any other explanation for deciding not to publicly adopt redistricting criteria in 2021.

290.    Overall, the commissioners court's failure to adopt redistricting criteria in 2021 is "unusual" and a significant procedural deviation because the County had adopted criteria in prior years and because other counties across the state routinely adopt redistricting criteria as well. Trial Tr. vol. 2, 137:15–138:6 (Burch); Pls.' Ex. 414 at 17 (Burch Expert Report).

### 3. *Lack of transparency in engaging redistricting counsel.*

291.    The County deviated from past practice in how they engaged redistricting counsel in 2021. In prior cycles, the County publicly entertained offers from several prospective counsel. Trial Tr. vol. 7, 60:16–22 (Holmes); Pls.' Ex. 412 at 39 (Krochmal Expert Report); Trial Tr. vol. 2, 135:20–136:20 (Burch); Pls.' Ex. 414 at 15 (Burch Expert Report); Pls.' Ex. 17 (May 16, 2011 Letter to M. Henry from Beirne Maynard & Parsons L.L.P. re: 2011 Redistricting of Galveston County Commissioners Precincts).

292.    In 2021, the County did not even consider any other proposals. Instead, Judge Henry directed his staff to rehire Mr. Oldham as early as late 2020 and sought out Mr. Oldham due to his "success" in the county the prior cycle. Trial Tr. vol. 7, 283:21–284:1 (Henry).

293.    Judge Henry admitted he likely threw a competing bid—one that specifically noted the importance of drawing boundaries that would not "fragment, dilute, or unfairly compact the minority population"—in the trash without discussing the proposal with the commissioners. Trial Tr. vol. 7, 284:15–286:5 (Henry) (discussing Pls.' Ex. 100 (Feb. 18,

2020, email from M. Henry to M. Henry)). No other law firms than Mr. Oldham's personal choice, Holtzman Vogel, were publicly considered during the process. Trial Tr. vol. 7, 286:20–24 (Henry).

294.   In the April 5, 2021, commissioners court meeting in which they voted to hire Mr. Oldham and the law firm he brought in, Holtzman Vogel, the commissioners court failed to provide any advance notice in the meeting agenda or backup that Mr. Oldham was the counsel they intended to hire. Trial Tr. vol. 7, 286:25–288:10 (Henry); Pls.' Ex. 140 at 2:10–3:18 (Apr. 5, 2021, meeting transcript); Pls.' Ex. 585 at 2 (April 5, 2021, meeting agenda and minutes); Pls.' Ex. 570 at 239–241 (Apr. 5, 2021, meeting backup) (featuring no documents related to agenda item #11). Defendants have failed to provide any explanation for this lack of transparency, which is further remarkable given Judge Henry's admission that, as a general matter, all agenda items should have a backup "if it's possible." Trial Tr. vol. 7, 258:14–17 (Henry).

4. _Lack of public notice and opportunity for comment._

295.   Failure to disclose the data underlying the commissioners court's decision-making. At no point in the process did the commissioners court publicly disclose any quantitative data about the Benchmark Plan or proposed commissioners court maps, in stark contrast to the information provided in prior redistricting cycles.

296.   In 2011, the Galveston County commissioners court held public meetings prior to adoption and before maps were completed but after Census data came out, consistent with the standard practice identified by Mr. Oldham. Trial Tr. vol. 8, 34:11–35:5 (Oldham); Pls.' Ex. 414 at 15 (Burch Expert Report).

297.   Judge Henry acknowledged that the County could have made a public announcement of the U.S. Census results for Galveston County, Trial Tr. vol. 7, 291:20–24 (Henry), similar to the August 2, 2011, meeting in which "the County's redistricting consultants presented a preliminary demographic report showing the results of the 2010 Census as they related to the existing commissioner precincts." Joint Ex. 45 at 9 (Oct. 14, 2011, Galveston County preclearance submission). Indeed, Judge Henry admitted to receiving this very presentation from Dale Oldham in September, including detailed information of why the commissioners court lines needed to change, but he had no explanation as to why this information was never made public as it was in the past. Trial Tr. vol. 7, 293:4–294:6 (Henry).

298.   When proposed Maps 1 and 2 were made public on October 29, 2021, the County provided no quantitative data by which the public could assess the maps. *See generally* Joint Ex. 29 (Galveston County redistricting website); Trial Tr. vol. 2, 138:7–19 (Burch); Pls.' Ex. 414 at 17 (Burch Expert Report).

299.   Judge Henry directed the web posting on October 29, and admitted that his office decided what information would be included. Trial Tr. vol. 7, 325:11–24 (Henry). This web page fails to provide any information about the configuration of the Benchmark Plan (and therefore what the proposed maps would in fact change), and lacks any population or demographic data about the county or the proposed new districts. Joint Ex. 29 (Galveston County redistricting website). It contains none of the analytics that Defendants contend now were considered in drafting and adopting the Enacted Plan,

including no information on compactness scores, VTD splits, incumbent residency, or partisan composition. Joint Ex. 29 (Galveston County redistricting website).

300.   The failure to make qualitative data available "speaks to the lack of transparency," as "the public wasn't able to see underlying population and demographic data to fully understand exactly how these maps were changing." Trial Tr. vol. 2, 138:7–19 (Burch); *see* Pls.' Ex. 414 at 17 (Burch Expert Report).

301.   <u>Rushed redistricting process that prevented meaningful public comment.</u> The process of redistricting the commissioners court in 2021 was rushed and failed to include any meaningful participation for the public nor the only minority commissioner at the time. Trial Tr. vol. 2, 126:21–127:3 (Burch); Pls.' Ex. 414 at 15–19 (Burch Expert Report): Trial Tr. vol. 5, 92:22–94:6 (Krochmal).

302.   The Court finds that the COVID-19 pandemic caused delays in the provision of the data required to redistrict, but this delay does not account for the failure to include meaningful participation for the public or for the rushed process. Trial Tr. vol. 2, 127:15–128:5 (Burch); Pls.' Ex. 414 at 11–12 (Burch Expert Report); Defs.' Ex. 175 at 2– 3 (2020 Census Timeline).

303.   Demographers for Plaintiffs and Defendants agree that it was feasible to create timely redistricting plans despite the COVID-19 delay. William Cooper, an expert demographer with experience in over 750 jurisdictions across the United States, Trial Tr. vol. 3, 9:12–25 (Cooper), testified he had the 2020 Census data available "within a couple of days" of its release, and thus had a "nationwide dataset breaking out the block-level Census data for the whole country" around August 15, 2021. Trial Tr. vol. 3, 16:8–25

(Cooper). According to Mr. Cooper, this timing would be typical for anyone using standard demographic software such as Maptitude. Trial Tr. vol. 3, 17:1–13 (Cooper). Plaintiffs' expert Anthony Fairfax likewise testified that "anybody with GIS skills" could access and use the 2020 Census data in the format provided by the Census Bureau on August 12, 2021. Trial Tr. vol. 4, 78:20–79:21 (Fairfax). Mr. Fairfax also testified that the U.S. Census Bureau also provided a database that could have been used to review the 2020 Census data released in August 2021. Trial Tr. vol. 4, 79:7–14 (Fairfax).

304.   The demographer hired by Defendants, Thomas Bryan, also was able to download the Census Bureau's redistricting data immediately once it was released on August 12, 2021, and begin working with it for his other clients. Trial Tr. vol. 8, 297:6–299:13 (Bryan). Had Defendants retained him earlier, he could have had draft maps prepared for Galveston County by the end of August. Trial Tr. vol. 8, 298:16–299:13 (Bryan).

305.   The Court finds that Defendants offer no credible explanation as to why the County did not begin drawing proposed maps for the commissioners court until mid-October 2021. Judge Henry admitted he was notified in the spring or summer of 2021 that Census data would be released in August, and that he was likewise made aware of the August data release. Trial Tr. vol. 7, 290:14–284:3 (Henry). This timing stands in further contrast to the County's timeline for hiring Judge Henry's preferred redistricting counsel, Mr. Oldham. When asked why he started looking for redistricting counsel in late 2020, Henry testified he "wouldn't say that that was early." Trial Tr. vol. 7, 181:15–23 (Henry).

306.     Defendants' map drawer, Thomas Bryan, testified to a rushed process, in which he was made to draw maps on a flight back from a vacation in Hawaii, and given only a few days turnaround to complete the project. Trial Tr. vol. 8, 236:5–10, 298:16–21 (Bryan); Trial Tr. vol. 9, 36:1–6 (Bryan). It is Mr. Bryan's normal practice to visit a jurisdiction and study it before drawing a map for it. Trial Tr. vol. 9, 35:6–23 (Bryan). Mr. Bryan testified that his inability to research or visit Galveston and the tight timeline he was given was unusual for his work. Trial Tr. vol. 9, 35:17–36:6 (Bryan).

307.     The County was aware that redistricting likely needed to occur no later than November 2021, due to candidate filing period. Judge Henry testified that he fully expected Galveston to need to redraw commissioners precincts even before the redistricting data came out, and that this redistricting would have to be completed before the November candidate filing period. Trial Tr. vol. 7, 280:10–281:12 (Henry). He provided no explanation for his apparent belief that the candidate filing period opened one week later than the November 13, 2021, date. Trial Tr. vol. 7, 281:1–4 (Henry).

308.     This oversight is further inexplicable given that Henry himself agreed he would "have reservations about a candidate filing for office who can't read a calendar." Trial Tr. vol. 7, 294:15–16 (Henry). Commissioner Giusti also testified that he "was pretty sure" the candidate filing period would be from November to mid-December in 2021 because there "was a lot of resistance to [the state] moving the election dates." Trial Tr. vol. 9, 106:8–9 (Giusti). As such, the November 1, 2021, notice by the Secretary of State provided no justification for the delay in redistricting the commissioners court.

309.    The Court finds that the commissioners court was fully aware of the delays and chose not to hold any public hearings during that time. There were no public meetings discussing redistricting in the dozens between the April 5, 2021, retention of redistricting counsel and the November 12, 2021, special meeting adopting the Enacted Map. Pls.' Ex. 414, 11–12 (Burch Expert Report); Pls.' Ex. 129 (Jan. 5, 2021 through Nov. 12, 2021 meeting minutes and agendas). Commissioner Giusti agreed that "allowing public hearings prior to the release of the Census would have allowed for greater transparency during the 2021 redistricting process." Trial Tr. vol. 9, 123:8–13 (Giusti). That the county failed to do so constitutes a significant procedural deviation.

310.    <u>Decision to hold a single redistricting special meeting on November 12, 2021.</u> The single redistricting meeting on map proposals was also an "unusual" occurrence in Galveston County. Trial Tr. vol. 2, 126:21–127:14, 195:10–19 (Burch). Pls.' Ex. 414 at 15 (Burch Expert Report). There is substantial evidence that the County failed to hold additional public hearings to prevent meaningful input on draft maps before adoption.

311.    As set forth above, it was standard for the county to hold several hearings at various locations across the county to solicit public input on map proposals, including a total of seven public hearings during the 2011 redistricting cycle. *See supra*, FOF ¶ 217. In 2021, Mr. Oldham advised the commissioners court that they should hold as many public meetings as possible and allow for supplementation of feedback after the meetings. Trial. Tr. vol. 8, 201:1–8 (Oldham).

312.    The record supports that such public hearings on draft maps would have been feasible despite the County's delay in engaging a demographer until mid-October.

According to Mr. Bryan, the map configurations were set in place by October 22, 2021. Trial Tr. vol. 9, 43:22–44:1 (Bryan).

313.    An email exchange between Mr. Oldham and Judge Henry's chief of staff, Tyler Drummond, among others, reveals that adopting the plan the same night as the sole public meeting was always being considered, even if that meeting had occurred weeks before the November 13, 2021, state-imposed deadline for enacting maps. Joint Ex. 27 (Oct. 28, 2021, email from T. Drummond to D. Oldham). Mr. Oldham testified that this "wouldn't have been appropriate." Trial Tr. vol. 8, 202:6–25 (Oldham).

314.    Judge Henry agreed the county had initial map "proposals" by October 19, when he was shown them, but testified he did not want anything publicly disclosed until they were a "final product." Trial Tr. vol. 7, 310:12–23 (Henry). Henry also testified that he took great care to ensure commissioners had provided all input on draft maps so that only "final versions" were considered in the first public meeting to consider maps, and that he was only planning on getting [the meeting] going as soon as we had the final product." Trial Tr. vol. 7, 334:1–8, 337:8–12 (Henry). This tends to show that Judge Henry deviated from prior practice to have a single special meeting on the draft proposal instead of several public hearings and at a time when the maps were already "final" and could thus not be impacted by public comment. And, as the November 12, 2021, special meeting transcript shows, this is exactly what happened. *See* Pls.' Ex. 591 at 26:24–27:4 (Nov. 12, 2021, special meeting transcript) ("If I could address one recurring theme. We don't have time [to change the map proposals]. We must adopt a map by tomorrow according to Secretary of State.").

104

315.    Even factoring in the COVID-19 pandemic, Dr. Burch found that the lack of more public meetings was unusual. Trial Tr. vol. 2, 191:2–23, 196:10–22 (Burch). In both 2011 and 2021, there were two weeks between when the maps were enacted and when the commissioners could have held public meetings. Trial Tr. vol. 2, 191:2–234 (Burch). In the same two weeks prior to the adoption of the map in 2011, the commissioners court held five meetings across the County. Trial Tr. vol. 2, 191:2–23 (Burch). In the two weeks before the adoption of the map in 2021, only one meeting was held. Trial Tr. vol. 2, 191:2–23 (Burch).

316.    The only opportunity for public input was an online public comment portal and the November 12, 2021, special meeting. Joint Ex. 42 (Compilation of Public Comments). But the County's web page failed to inform the public of when they would have to submit public comment for it to be considered. Joint Ex. 29 (Galveston County redistricting website). The County even failed to provide this information after receiving the Texas Secretary of State's notice confirming the November 13, 2021, redistricting deadline. *See* Joint Ex. 29 (Galveston County redistricting website); Trial Tr. vol. 7, 342:24–343:5 (Henry).

317.    Commissioner Holmes testified that he expressed concerns to Tyler Drummond, Judge Henry's chief of staff, that the online comment portal was not adequate to provide residents the opportunity to be heard because of lack of access to internet or a computer. Trial Tr. vol. 7, 135:7–10 (Holmes); Joint Ex. 23 at Holmes000185 (Commissioner Holmes' notes); *see also* Trial Tr. vol. 2, 194:18–23 (Burch) (noting the racial disparities in internet access).

318.    The Court finds that the public comment portal was never intended to provide a meaningful opportunity for the public to provide input on draft maps. Putting aside the lack of information about draft maps that would facilitate meaningful input, the commissioners court members did not actually review them. Judge Henry admitted reading less than a dozen comments, Trial Tr. vol. 7, 330:22–24 (Henry), and Commissioner Giusti similarly testified to reading about fifteen of the submitted online public comments, which he could not accurately recall. Trial Tr. vol. 9, 106:25–107:14, 140:20–141:4 (Giusti). Commissioner Apffel initially testified to reviewing "all" comments, but later admitted it was likely just "some comments" as he had earlier testified in his deposition. Trial Tr. vol. 9, 360:23–362:6 (Apffel).

319.    Similarly, the evidence does not support that the public comment portal was necessitated by the COVID-19 pandemic. Commissioner Giusti confirmed that the county continued to hold biweekly public meetings in-person from May through December 2021 notwithstanding the pandemic, and that the maps were not posted online due to COVID-19 concerns. Trial Tr. vol. 9, 120:7–121:4 (Giusti).

*5. Conduct inconsistent with the requirements of the Texas Open Meetings Act*

320.    The redistricting of county commissioner precinct lines is an issue within the jurisdiction of the Galveston County commissioners court. Tex. Loc. Gov. Code § 81.021.

321.    Three out of five members of the Galveston County commissioners court constitutes a quorum. Tex. Const. Art. 5 § 18; Tex. Loc. Gov. Code § 81.001; Tex. Gov. Code § 551.001(6).

322.   On September 8, 2021, Judge Henry and Commissioner Apffel met with others to discuss the redistricting of county commissioner precincts. Trial Tr. vol. 7, 187:16–188:6, 298:9–22 (Henry); Trial Tr. vol. 9, 304:8–305:5 (Apffel); Trial Tr. vol. 8, 38:17–25 (Oldham); Joint Ex. 17 (Email Showing Calendar Event). At this meeting, Commissioner Apffel and Judge Henry discussed the details they wanted in a new map, including Judge Henry's plan for a "coastal precinct." Trial Tr. vol. 7, 187:16-188:6 (Henry). This meeting constituted a verbal or written exchange concerning the redistricting of county commissioner precinct lines.

323.   After the September 8, 2021, meeting with Commissioner Apffel and Dale Oldham, Judge Mark Henry contacted Commissioner Giusti to discuss his desire for a coastal precinct and to ask Commissioner Giusti if he was willing to represent that coastal precinct. Trial Tr. vol. 7, 305:19–306:5 (Henry). Judge Henry testified that he knew this communication with Commissioner Giusti constituted a verbal or written exchange concerning an issue within the jurisdiction of the governmental body that implicated the Texas Open Meetings Act. Trial Tr. vol. 7, 306:6–18 (Henry).

324.   After having initially met with Commissioner Apffel and then talking to Commissioner Giusti, Judge Henry was present for at least part of a second meeting between Commissioner Apffel and Mr. Oldham. Trial Tr. vol. 7, 301:5–12 (Henry); Trial Tr. vol. 8, 193:25–194:10 (Oldham).

325.   After the September 8 meeting where he discussed redistricting with Judge Henry and Mr. Oldham, Commissioner Apffel also participated in at least one in-person meeting with Commissioner Clark and Mr. Oldham to discuss the redistricting of County

107

commissioners precincts. Trial Tr. vol. 9, 305:17–23, 308:16–309:7, 353:12–21, 373:22–374:10 (Apffel); Trial Tr. vol. 8, 88:17–90:13, 100:11–14 (Oldham).

326.    Commissioner Clark participated in "a lot of meetings," including, in addition to the meeting(s) with Commissioner Apffel, a meeting with Commissioner Giusti. Trial Tr. vol. 8, 86:10–19, 112:6–113:7, 192:3–7 (Oldham); *supra*, FOF ¶ 325.

327.    Judge Henry had a calendar hold on his calendar for redistricting meetings for the entire day of October 19, 2021, when Mr. Oldham met with other commissioners. Pls.' Ex. 202 (Judge Henry Calendar Event). At his deposition, Mr. Oldham testified that Judge Henry popped into these commissioner meetings while they were happening. At trial he testified that Judge Henry only did so with Commissioner Apffel, but then equivocated that he could not be certain which meeting or how many times Judge Henry appeared. Trial Tr. vol. 8, 193:25–197:19 (Oldham).

328.    Knowing that he had already communicated with a quorum consisting of Judge Henry and Commissioner Clark regarding redistricting, Commissioner Apffel further contacted Commissioner Holmes on November 9, 2021, shortly before the court was set to vote on the proposed maps. Trial Tr. vol. 9, 326:20–327:23, 373:22–374:10 (Apffel); Joint Ex. 23 (Commissioner Holmes' notes). Commissioner Apffel knew at the time that he contacted Commissioner Holmes that Commissioner Holmes would have met with Commissioner Giusti and Dale Oldham to discuss redistricting. Trial Tr. vol. 9, 315:4–14 (Apffel); *cf.* Trial Tr. vol. 9, 94:16–24 (Giusti) (confirming meeting with Holmes), Pls.' Ex. 593 at 12 (Defs. Second Supp. Response to United States Interrogatories). On this call with Commissioner Holmes, Commissioner Apffel discussed the upcoming redistricting

108

vote and specifically the fact that Judge Henry was supporting Map 2. Trial Tr. vol. 9, 326:20–327:23 (Apffel); Trial Tr. vol. 7, 81:25–83:11, 158:15–19 (Holmes); Joint Ex. 23 (Commissioner Holmes' notes).

329.    The purpose of the meetings between Judge Henry, the commissioners, and Mr. Oldham was for the commissioners to provide their input on how to redistrict the county commissioner precinct maps, to review proposed maps, and to render those maps "final". *See supra*, FOF ¶¶ 258–262. Although some or all of the individuals involved may have contemplated that their ultimate actions would at some point result in litigation, there is no evidence that the purpose of the meetings themselves was to seek advice regarding: (i) pending or contemplated litigation; or (ii) a settlement offer; or (iii) on a matter in which the duty of the attorney to the governmental body under the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas clearly conflicts with the Texas Open Meetings Act.

330.    Judge Henry instructed Mr. Oldham to meet with each member of the commissioners court to discuss the redistricting of county commissioner precincts. Trial Tr. vol. 7, 202:17−203:1 (Henry). Commissioner Apffel also knew that Mr. Oldham was meeting with the other commissioners in a "series of meetings." Trial Tr. vol. 9, 315:4–14, 360:10–13 (Apffel). There was specifically a series of meetings at which Commissioners Apffel, Giusti, and Clark adjusted Map 2 to make it acceptable to them. Trial Tr. vol. 8, 112:6–113:7, 120:4–10, 188:2–191:1 (Oldham).

331.    The communications that occurred between the members of the commissioners court could have occurred in open meetings. There is nothing preventing

county commissioners from holding open meetings to discuss redistricting prior to having final map proposals, and the court held public meetings to discuss preliminary map proposals in 2011. Trial Tr. vol. 7, 306:19–308:7, 334:9–12, 340:21–341:9 (Henry).

332.   At a minimum, Judge Henry and Commissioner Apffel directly engaged in a series of communications with a quorum of the court (Henry-Apffel; Henry-Giusti; Apffel-Clark; Apffel-Holmes) knowing that this series of communications would constitute a verbal or written exchange between a quorum of the members of the court regarding the issue of redistricting county commissioners precincts.

> 6.   *The time, place, and manner of the November 12, 2021, special meeting, which failed to accommodate the number of persons reasonable expected to attend.*

333.   The November 12, 2021, special meeting was not only unusual for its singularity during the redistricting cycle, but also its lack of accessibility for many of Galveston's Black and Latino residents. Trial Tr. vol. 7, 57:1–12 (Holmes); Trial Tr. vol. 6, 213:17–214:13 (Henderson-Lofton) (describing individuals who were unable to attend due to the inconvenient, inaccessible, and overcrowded location); Trial Tr. vol. 6 132:5–18 (Lewis) (explaining how she drove others to the special meeting, including one individual who lacked a car).

334.   In prior years, residents could choose between multiple locations so that they could attend the most geographically accessible location. Pls.' Ex. 412 at 56 (Krochmal Expert Report); Trial Tr. vol. 5, 75:1–82:16 (Krochmal); Trial Tr. vol. 2, 138:24–139:12 (Burch); Pls.' Ex. 414 at 17 (Burch Expert Report). Compounded with last-minute notice for the only meeting held about the maps, this factor "denied the public the opportunity to

provide meaningful feedback on the maps." Pls.' Ex. 414 at 17 (Burch Expert Report);
Trial Tr. vol. 2, 138:24–139:23 (Burch); *see also* Trial Tr. vol. 6, 211:22–212:2
(Henderson-Lofton) (describing her expectation that there "would be five or so meetings
so that the community could actually have questions, give feedback, maybe the maps could
be explained to them, maybe someone have questions about numbers").

335.   The location of the November 12, 2021, special meeting was another
departure from past redistricting cycles. Pls.' Ex. 412 at 51–56 (Krochmal Expert Report).
The League City location, 27 miles from the City of Galveston, is not directly accessible
via public transportation; in fact, Google Maps cannot calculate directions to the annex if
one selects public transportation as the travel mode. Pls.' Ex. 412 at 53–54 (Krochmal
Expert Report); Trial Tr. vol. 5, 87:24–89:3 (Krochmal).

336.   The first meeting of the commissioners court at the League City Annex on
Calder Road occurred in 2013. Trial Tr. vol. 5, 89:4–90:2 (Krochmal). Meeting locations
besides the county courthouse, termed auxiliary courts, initially served a limited purpose—
"in the event the County of Galveston becomes precluded from conducting business or
judicial functions within the county seat due to meteorological or catastrophic events." Pls.'
Ex. 412 at 52 (Krochmal Expert Report). Meetings at the League City Annex generally
pertained to non-controversial routine business, such as payroll approvals. *Id*. at 52–54;
Trial Tr. vol. 5, 89:4–90:2. Deviations from this trend involved controversial issues. Trial
Tr. vol. 7, 55:11–18 (Holmes) ("[I]f there was a controversial item, it would always be held
at the Calder Road Annex.").

337.    But in recent years, topics involving race were typically held at the League City Annex: an August 24, 2020, meeting on the removal of a Confederate statue, a July 2, 2021, meeting when the commissioners court extended an immigration–related disaster declaration, and the November 12, 2021, meeting on redistricting. Pls.' Ex. 412 at 55 –56 (Krochmal Expert Report); Trial Tr. vol. 5, 90:3 –16; Trial Tr. vol. 6, 20:17 –21:4 (Quintero); Trial Tr. vol. 7, 58:13 –23 (Holmes); *see also* Trial Tr. vol. 7, 56:19 –23 (Holmes).

338.    Judge Henry agreed that the County's redistricting special meeting had always been planned as a special meeting at an unusual time. Trial Tr. vol. 7, 337:19–338:2 (Henry) (discussing Joint Ex. 27 (Oct. 28, 2021, email from T. Drummond to D. Oldham)). At the time, the County held regular meetings in the larger Galveston County Courthouse, the County seat, every other week on Monday mornings. Trial Tr. vol. 9, 325:1–15 (Apffel). Despite the commissioners court meeting regularly on Monday mornings every other week, and despite a regular meeting scheduled for Monday, November 1, 2021, at the County seat, Judge Henry admitted that the redistricting meeting was never intended to occur during one of these regular meeting times: instead, evidence shows it was always planned as a special meeting (and thus away from the County seat), on October 29 (a Friday), November 9 (a Tuesday) or November 12 (a Friday). Trial Tr. vol. 7, 337:19– 338:2 (Henry); Joint Ex. 27 (Oct. 28, 2021, email from T. Drummond to D. Oldham).

339.    Lay testimony and video evidence of the November 12, 2021, special meeting indicate the commissioners court failed to provide the adequate space needed to

accommodate the number of persons who attended the County's sole redistricting public meeting in 2021.

340.    The small size of the League City Annex and the foreseeably large crowd caused congestion and overcrowding on November 12, 2021. Constable Rose testified that the League City Annex "was under construction . . . [t]he parking was terrible. It's just not the place that you want to hold a meeting of that magnitude." Trial Tr. vol. 1, 75:2–10 (Rose). Additionally, Constable Rose observed that "people were standing all along the walls in the hallways . . . You have got people [in] wheelchairs, walkers, everything there, and the accommodation was very poor." Trial Tr. vol. 1, 75:11–22 (Rose); *see also* Trial Tr. vol. 6, 226:19-227:5 (Randall) (same; "it was very, very discouraging that particular day"); Trial Tr. vol. 1, 134:7–141:4 (McGaskey) (describing issues with parking, accessing meeting room, and crowded space on November 12, 2021); Trial Tr. vol. 6, 132:5–135:11 (Lewis) (describing crowd, parking, and commissioners' demeanor at special session); Trial Tr. vol. 2 243:22–248:6 (Courville) (same). One Vietnam War veteran who had hoped to speak at the meeting had to leave because the overcrowding triggered his post-traumatic stress disorder. Trial Tr. vol. 6, 214:7–16 (Jaworski).

341.    Commissioners were aware that a larger number than usual of attendees would be at this special session. Commissioner Giusti testified that he "had a really good feeling that there would be quite a few people in attendance because of the subject matter." Trial Tr. vol. 9, 110:5–7 (Giusti). Commissioner Apffel said he "knew there would be folks come [sic]." Trial Tr. vol. 9, 333:13–14 (Apffel).

342.    Defendants have not provided any credible explanation for their failure to hold the November 12, 2021, special meeting in a space that would accommodate the number of persons expected. Judge Henry was responsible for scheduling the time and place of the November 12 meeting. Trial Tr. vol. 7, 257:12–21(Henry). He was present for all five redistricting public hearings and two meetings in 2011, and admitted that even more individuals spoke, and certainly more individuals attended, than the hundreds who appear on the sign-up sheets for those meetings. Trial Tr. vol. 7, 262:25–267:3, 268:18–269:9 (Henry); Joint Ex. 45 (2011 redistricting hearing sign-up sheets, Oct. 14, 2011, Galveston County preclearance submission). Former County Commissioner Patrick Doyle also testified that every member of the commissioners court who participated in the 2011 redistricting cycle, including Judge Mark Henry, took part in the five well-attended public hearings held in 2011. Trial Tr. vol. 7, 18:7–19:11 (Doyle).

343.    There was every indication that public interest would be just as high in 2021. Henry testified that, in 2021, the commissioners court got "more comments on those maps than anything else we have ever posted" and "received more comments and feedback than any other thing we had done" after posting the draft maps on October 29. Trial Tr. vol. 7, 213:19–20, 220:25–221:2 (Henry).

344.    Based on the levels of interest in and attendance at the 2011 public hearings and the unusually high volume of interest and comments on the draft maps in 2021, it was highly foreseeable that any in-person meeting concerning the draft commissioners precinct maps would be of high public interest and trigger high attendance. The County's failure to provide an adequate space, despite the awareness, availability and indeed regular use of

that space (including the County Seat), *see* Trial Tr. vol. 7, 260:3–261:3 (Henry), indicates

a failure to abide by the requirements of the Texas Local Government Code and yet another

deviation in the process.

7. *Disregard for public input from minority residents.*

345.    Conduct by Judge Henry and the county commissioners indicate a disregard

for public input from the minority community and those critical of the Enacted Plan's

discriminatory effect.

346.    One primary example of this is the treatment of online public commentary

received after the map proposals were posted online on October 29, 2021. In addition to

the lack of information that would allow for meaningful input online, *see supra*, FOF

¶¶ 264–265, 298–300, Judge Henry admitted there was "not really a plan for how to

review" the online comments, Trial Tr. vol. 7, 221:6–8 (Henry), and that he personally

reviewed less than a dozen. Trial Tr. vol. 7, 330:22–24 (Henry).

347.    Instead, Judge Henry had his staff provide a breakdown of comments in

support of a particular map, which he then provided during the November 12, 2021, special

meeting before making the motion to adopt Map 2:

> Of the 440 that came in, 168 did not discuss a particular map, they just
> called me names mostly. Of the people who did choose a map
> preference, Map 1 – received 64 responses. Map 2 received 208
> responses. So of those responding to a particular map, 76.4, Map 2.
> 23.5, Map 1. With that, I'm going to make the motion to approve Map
> 2.

Pls.' Ex. 591 at 62 (Nov. 12, 2021, special meeting transcript).

348.    A detailed look at the public comments, Joint Ex. 42, indicates that County Judge's Henry's summary during the November 12, 2021, meeting specifically disregards the significant public commentary expressing concern over the discriminatory impact of redistricting on Galveston's minority community.

349.    Plaintiffs' expert Dr. Burch analyzed all 446 public comments that were submitted prior to the meeting on November 12, 2021. Trial Tr. vol. 2, 145:25–146:23 (Burch); Pls.' Ex. 414 at 21 (Burch Expert Report). Dr. Burch found that Judge Henry's characterization of 168 comments as not discussing a particular map in fact "dismissed as devoid of meaningful content nearly every comment that did not support the maps and that expressed concerns about racial discrimination and minority vote dilution." Pls.' Ex. 414 at 21 (Burch Expert Report); *see also* Trial Tr. vol. 2, 145:25–146:23 (Burch).

350.    Judge Henry displayed a similar disregard for the in-person public comments provided on November 12, 2021, where commentators overwhelmingly expressed concern for the discriminatory impact of the proposed map and the lack of a fair process. One speaker, Leon Phillips, said, "it looks as though you're tired of hearing me talk." Pls.' Ex. 591 at 52:10–11 (Nov. 12, 2021, special meeting transcript). Judge Henry simply responded, "you have three minutes," to which Mr. Phillips said, "just pay attention to what I'm saying." *Id*. at 52:12–15.   The County residents who appeared at this meeting were predominantly Black and Latino, including many older residents. Pls.' Ex. 412 at 56 (Krochmal Expert Report); Trial Tr. vol. 1, 136:20–137:11 (McGaskey); Pls.' Ex. 129 (video of November 12, 2021, special meeting).

351.    When attendees informed the commissioners court that they could not hear the proceedings, Judge Henry reacted by threatening to have the constables present remove attendees by force:

> I'm going to speak at this tone. That's all I can do. I'm not going to scream. I don't have a microphone. Consideration where we're establishing new information. I will clear you out. If you make a noise, I will clear you out of here. I've got constables here.

Pls.' Ex. 591 at 3:7–14 (Nov. 12, 2021, special meeting transcript).

352.    Witnesses testified that Judge Henry was "real ugly about clearing the room. You have that many people piled in a small room, you are going to have noise. And so, you know, I guess people were trying to be as quiet as they could. But everybody was packed in there." Trial Tr. vol. 1, 138:20–24 (McGaskey); *see also* Trial Tr. vol. 1, 139:14–140:2 (McGaskey); Trial Tr. vol. 1, 77:6–77:25 (Rose). Even Commissioner Giusti believed that this conduct was "aggressive." Trial Tr. vol. 9, 150:17–25 (Giusti); *see also* Trial Tr. vol. 2, 143:4–145:7 (Burch); Pls.' Ex. 414 at 20 (Burch Expert Report).

353.    The in-person public commentary overwhelmingly opposed then-Map 2, which was adopted as the Enacted Plan. Of 36 members of the public who spoke at that meeting, just one spoke in support of Map 2. *See generally* Pls.' Ex. 591 at 4–57 (Nov. 12, 2021, special meeting transcript). The remaining comments noted the inconvenience of the meeting and the lack of public transparency in the process. *See* Pls.' 414 at 18 (Burch Expert Report); *see also* Pls.' Ex. 591 at 4–57 (Nov. 12, 2021, special meeting transcript).

354.    Commissioner Giusti acknowledged that only Commissioner Holmes attempted to respond to concerns of the audience that the Enacted Map would eliminate

the majority-minority precinct, and that neither he nor any of the other members of the Court responded to Commissioner Holmes's proposed maps. Trial Tr. vol. 9, 148:24–149:8 (Giusti).

355.    The commissioners court adopted the Enacted Plan on the same day, without addressing any of the public comment received at the meeting; there was no public deliberation of the map proposals other than Judge Henry's discussion of the online public commentary and Commissioner Holmes' comments. *See generally* Pls.' Ex. 591 at 61:13–81:12 (Nov. 12, 2021, special meeting transcript); Joint Ex. 44 (Nov. 12, 2021, order adopting the Enacted Plan).

356.    Judge Henry acknowledged that the commissioners court has made no efforts since the 2022 election to revise the maps or undertake a more inclusive process, despite having undertaken a redraw of justice of the peace and constable precincts in 2013, after the 2012 election. Trial Tr. vol. 7, 251:23–252:7 (Henry).

    8.    *The exclusion of Commissioner Stephen Holmes from the redistricting process*

357.    The Court finds that the 2021 redistricting process was marked by the exclusion of Commissioner Holmes. This was unusual because he was the only minority commissioner at the time, his district was directly affected, and there was otherwise a lack of opportunity for minority voters to participate. Commissioner Holmes testified to this exclusion: he was not notified when the maps were finalized, he was not told why additional public meetings were not held, and he was never sent the data underlying the map proposals as he requested. Trial Tr. vol. 7, 103:6–13, 111:17–112:2 (Holmes).

358.    Commissioner Holmes even requested an executive session to discuss this litigation and was denied. Trial Tr. vol. 7, 49:24–50:11 (Holmes). He did not receive updates about this litigation. Trial Tr. vol. 7, 50:12–14 (Holmes).

359.    Commissioner Holmes took contemporaneous notes because of his experience in 2011 when he was excluded from the process. Trial Tr. vol. 7, 61:23–62:16 (Holmes); Joint Ex. 23 (Commissioner Holmes' notes). Those notes describe how Commissioner Holmes was the last commissioner with whom Mr. Oldham spoke, Trial Tr. vol. 7, 64:4–65:2 (Holmes); Joint Ex. 23 at Holmes000184 (Commissioner Holmes' notes), and that he never received any demographic data related to the proposed maps despite repeated requests. Trial Tr. vol. 7, 66:19–67:13 (Holmes), Joint Exhibit 23 at Holmes000184 (Commissioner Holmes' notes).

360.    Commissioner Holmes also requested specific changes to balance out the population of Precinct 3 and make the precinct lines more understandable to voters. Trial Tr. vol. 7, 68;25–72:6 (Holmes); Joint Ex. 23 at Holmes000183 (Commissioner Holmes' notes). Those changes were not reflected in any map proposal, including Map 1, which was purportedly prepared to accommodate Commissioner Holmes, yet failed to add one of his requested voting precincts, 142, and added Bolivar Peninsula despite Commissioner Holmes' specific instructions to the contrary. *Compare* Trial Tr. vol. 8, 75:4–77:10 (Oldham) (testifying the "minimum change" map proposal was drafted to accommodate Commissioner Holmes but also include predominantly-white Bolivar Peninsula), *with* Joint Ex. 23 at 3 (Commissioner Holmes' notes) (list of changes requested by Commissioner Holmes, including voting precinct 142 addition to Precinct 3), *and* Trial Tr. vol. 3, 52:10–

53:6 (Cooper) (confirming no portion of voting precinct 142 was added to Precinct 3 in Map 1 even though it would have been possible according to one person, one vote standards and roughly equal in population to the Bolivar Peninsula voting precincts that were added).

361.    Commissioner Holmes' testimony that he was generally excluded from providing meaningful input in the process is corroborated by additional witness testimony.

362.    Judge Henry testified that both Commissioner Apffel and Commissioner Giusti would have been aware, through discussions with Judge Henry, of his desire for a coastal precinct. Trial Tr. vol. 7, 187:16–188:6 (Henry) (discussing September 8, 2021, meeting with Oldham, Apffel, and Ready in which Henry shared his desire for a coastal precinct), 305:20–306:5 (Henry) (discussing his call to Commissioner Giusti because he "wanted to make sure that [Giusti] would be okay having a coastal precinct."). But when asked why he had never similarly reached out to Commissioner Holmes during the process to see if he would be okay with the dramatic change in his precinct in Map 2, Judge Henry asserted that such outreach "would have been a[n] open meetings violation" and that, instead of calling a public meeting to confer with both commissioners about his preferences and the dramatic changes in both commissioners precincts, he had opted to call just Commissioner Giusti before voting to adopt the Enacted Map. Trial Tr. vol. 7, 306:6–18 (Henry).

363.    As stated above, Commissioner Holmes was the only member of the commissioners court offered no opportunity to provide specific input about Map 2. *See supra*, FOF ¶¶ 259–261.

### C.       Purported and Actual Redistricting Criteria

364.    The stated rationales by Defendants regarding the 2021 redistricting process do not explain the adoption of the Enacted Plan. *See generally infra*, FOF ¶¶ 365–395; Trial Tr. vol. 2, 104:5–10 (Burch); Pls.' Ex. 414 at 36 (Burch Expert Report).

365.    Defendants have attempted to disclaim any consideration of race by asserting that seven factors were used in drafting and adopting the Enacted Plan, as set forth in their interrogatory responses as part of this litigation. Pls.' Ex. 593 (Defs.' Apr. 21, 2021, Second Supp. Answer to United States Interrogatories). As an initial matter, the rationales stated by members of the commissioners court in public and in deposition and trial testimony are inconsistent with these purported criteria. *Compare* Pls.' Ex. 414 at 36 (Burch Expert Report, listing the coastal precinct, population balancing, and public support for Map 2 as stated rationales by members of the commissioners court in depositions and on Facebook) *with* Pls.' Ex. 593 at 5–6 (Burch Expert Report, listing several other rationales in response to Plaintiffs' interrogatories).

366.    Not a single witness testified at trial to applying the criteria as described in Defendants' interrogatory responses in either drawing or adopting the Enacted Plan. *See generally* Trial Tr. vol. 7, 312:16–325:1 (Henry); Trial Tr. vol. 9, 88:4–18 (Giusti) (testifying he considered the inclusion of his and his parents' residence in his precinct, population equalization, and that lines were "drawn in a way the people understood" during the 2021 redistricting process); Trial Tr. vol. 9, 304:21–305:5, 307:16–308:2 (Apffel) (testifying that he had no requests other than "equalized population" and keeping his new home in his precinct); *see also supra*, FOF ¶¶ 239, 241, 244, 245. Judge Henry, who signed

121

the interrogatory responses setting forth these criteria, admitted that the complete list of criteria the County claims to have applied in the redistricting process was not fully disclosed, or even known to him, until a year-and-a-half after adopting the Enacted Plan. Trial Tr. vol. 7, 323:19–324:25 (Henry).

367.    Based on this lack of consistency, the Court finds it unlikely that the set of race-neutral redistricting considerations in Defendants' interrogatory responses represents the considerations actually used at the time of redistricting.

368.    The unlikelihood that the factors set forth in Defendants' interrogatory responses were actually used to draw the Enacted Plan is further supported by the fact that none of these factors explain the destruction of Galveston County's sole majority-minority commissioners precinct affording Latino and Black residents an opportunity to elect candidates of their choice.

369.    The seven factors Defendants now claim were applied in adopting the Enacted Plan include: 1) compliance with federal law, 2) the creation of a coastal precinct, 3) geographic compactness, 4) minimizing voting precinct splits, 5) incumbency protection, and 6) partisanship, as well as 7) "adopt[ing] a map that would be clear and easy to understand by the public." Pls.' Ex. 593 at 5–7 (Defs.' Apr. 21, 2021, Second Supp. Answer to United States Interrogatories). Notably, these criteria do not include the historic criteria about maintaining communities of interest, preventing the unnecessary fragmentation of minority populations, or adhering to historic boundaries that were applied by the County in past cycles. *See* Pls.' Ex. 539 (2001 adopted redistricting criteria). This practice had led to the consistent presence of a historic majority-minority Precinct 3 over

decades. *See* Joint Ex. 45 at 22 (2001 commissioners precincts map). From 1981 until 2021, the commissioners court had at least one precinct which performed to elect the candidate of choice for Galveston's Black and Latino voters.

370.    Plaintiffs have provided several illustrative map configurations that perform on par with or better than the Enacted Plan in the criteria disclosed by Defendants. FOF ¶¶ 76−98.

371.    Plaintiffs' redistricting expert William Cooper reviewed the criteria set forth in Defendants' interrogatory responses and evaluated whether the Enacted Plan in fact adhered to them. In his opinion, Defendants "didn't follow their own guidelines." Trial. Tr. vol. 3, 72:5–12 (Cooper); *see generally* Pls.' Ex. 386 at 23–26 (Expert Declaration of William Cooper).

372.    As to the first factor—compliance with the U.S. Constitution and the Voting Rights Act—Mr. Oldham disclaimed any considerations required by the Voting Rights Act, asserting instead that the elimination of preclearance cleared the way for the County to dismantle Precinct 3 as a majority-minority district. *See supra*, FOF ¶ 279. Commissioner Apffel testified that he was aware of Commissioner Holmes' concerns about the potential Voting Rights Act violation, but that he still voted for the map because "[t]here was never a solution offered." Trial Tr. vol. 9, 329:24–330:14 (Apffel).

373.    Additionally, Plaintiffs' expert and mapmaker Dr. Rush testified, alternative maps that comply with federal law could be drawn which maintain Precinct 3 as a majority-minority district without consideration of race. Trial Tr. vol. 4, 28:6–17, 27:7–16 (Rush); Pls.' Ex. 487 at 8–16 (Corrected Rush Expert Report).

374.    Plaintiffs' expert Mr. Cooper explained that there "are many, many different ways to draw a majority Black plus Latino precinct. You can make few changes. You can make lots of changes. It can look a lot of different ways." Trial Tr. vol. 3, 47:2–10 (Cooper). Nothing required cracking and dividing the Latino and Black population into four different precincts, and in Mr. Cooper's view this is an unexplained result when "there are other ways to preserve the minority majority district and still adhere to traditional redistricting principles." Trial Tr. vol. 3, 78:18–79:16 (Cooper). In fact, Mr. Cooper could draw illustrative maps that were "across the board on par or superior to the Enacted Plan" except for Cooper Map 2, which has greater VTD splits to create a coastal precinct. Trial Tr. vol. 3, 88:24–89:7 (Cooper).

375.    Plaintiffs' expert Mr. Fairfax testified that "there are possibilities of different configurations [of illustrative maps] and still continue to create a majority Black and Latino district that satisfied the first precondition of *Gingles* and followed traditional redistricting criteria." Trial Tr. vol. 4., 117:15–24 (Fairfax). Mr. Fairfax maintained that his illustrative plan is just one of several plans that could have been created to maintain a majority-Black and Latino commissioner precinct. Trial Tr. vol. 4, 117:25–118:4 (Fairfax).

376.    As to the second and third factors, Plaintiffs have provided multiple illustrative maps that would create a coastal precinct while maintaining a majority-minority Precinct 3 that provides Latino and Black residents the opportunity to elect a candidate of choice, and which are all more geographically compact than the Enacted Plan. As Dr. Burch testified, the existence of alternative map proposals demonstrates that, at best, the creation of a coastal precinct was not mutually exclusive with the preservation of Precinct

3 as a majority-minority district that provided Latino and Black voters with the opportunity to elect a candidate of choice. Trial Tr. vol. 2, 131:5–13 (Burch); Pls.' Ex. 414 at 13–14, Appendix B (Burch Expert Report).

377.   For example, Burch Alternative Map 1 combines Galveston Island and Bolivar Peninsula. Precinct 3 is 59.7% non-Anglo:



Pls.' Ex. 414 at 47 (Burch Expert Report); Pls.' Ex. 485 at 33–34 (Supplemental Rush Expert Report).

378.   Likewise, Burch Alternative Maps 2, 3, and 4 creates a coastal precinct, and all versions of Precinct 3 are more than 60% non-Anglo:







Pls.' Ex. 414 at 48–50 (Burch Expert Report); Pls.' Ex. 485 at 39–53 (Supplemental Rush Expert Report)

379.   All of the illustrative coastal precinct maps "show[] a significant outperformance" in their compactness scores compared to the Enacted Map. Pls.' Ex. 486 at 6–7 (Corrected Rush Rebuttal).

380.   Nor does the evidence support the need for a single coastal precinct. Before the map's passage, "there weren't a bunch of people clamoring for a coastal precinct." Trial Tr. vol. 5, 85:8–9 (Krochmal); Trial Tr. vol. 2, 105:11–106:6 (Burch). The documentary record that Dr. Krochmal examined had very few instances even mentioning a coastal precinct—just one mention in a news article from the early 2010s. Trial Tr. vol. 5, 84:21–85:16 (Krochmal).

381.   What the historical record does show, on the other hand, is a desire from residents on Bolivar Peninsula to have separate political representation. Trial Tr. vol. 5,

85:17–86:12; Pls.' Ex. 412 at 31–32 (describing past efforts for Bolivar to maintain separate justice of the peace/constable precinct).

382.    Residents testified how the coastal interests of people who live in the West End of Galveston Island, the East End of Galveston Island, and the Bolivar Peninsula are "very, very different." Trial Tr. vol. 6, 71:25–72:9 (Compian); Trial Tr. vol. 6, 126:18–127:24 (Lewis).

383.    County commissioners did not engage the public on the need for a coastal precinct. *See, e.g.*, Trial Tr. vol. 7, 315:14–18, 317:6–19 (Henry); Trial Tr. vol. 9, 142:18–143:21 (Giusti).

384.    Even elected officials on Galveston Island were unaware of any engagement or advocacy in favor of a single coastal precinct. Trial Tr. vol. 6, 127:25–128:18 (Lewis). Galveston City Councilwoman Lewis noted she did not experience any collaboration with the County on issues involving coastal erosion, which mostly involved direct work with the state's General Land Office. Trial Tr. vol. 6, 127:19–24 (Lewis).

385.    Some constituent groups even advocated against a single coastal precinct. Trial Tr. vol. 9, 350:11–352:9 (Apffel) (discussing Bolivar Chamber of Commerce opposition to single coastal precinct in 2021); Trial Tr. vol. 7, 315:19–317:5 (Henry) (discussing Galveston Island Chamber of Commerce opposition to single coastal precinct in 2011).

386.    As to the fourth and fifth factors—to minimize the splitting of voting precincts before including incumbent residence—Mr. Cooper also observed that the Enacted Plan deviates from these purported factors because the Enacted Plan split a

precinct to accommodate an incumbent residence. Trial Tr. vol. 3, 83:25–85:4 (Cooper); Pls.' Ex. 593 at 7 (Defs.' Apr. 21, 2021, Second Supp. Answer to United States Interrogatories). Moreover, the alternative maps created by Dr. Rush protect the incumbency of the current commissioners. *See, e.g.*, Trial Tr. vol. 9, 157:25–158:9 (Giusti).

387.    The sixth criteria did not require the Enacted Plan's configuration, as all members of the commissioners court who voted for the Enacted Plan and recalled providing input disclaimed partisanship as a predominating consideration in the geographic configuration of districts. *See* Trial Tr. vol. 7, 197:18–25, 304:3–6 (Henry), Trial Tr. vol. 9, 355:25–356:6 (Apffel).[14] Consistent with this, Mr. Oldham testified that he never told Mr. Bryan that Judge Henry's purpose for Map 2 was to create four Republican districts, and Mr. Oldham denied there was any such partisan motivation. Trial Tr. vol. 8, 153:14–154:4. As for the final criteria that the map be "clear and easy to understand by the public," Mr. Cooper observed that the dramatic changes in the Enacted Plan from the Benchmark would do essentially the opposite, causing voter confusion "because entire [voting] precincts are going to be shifted around into different districts," especially in the municipality of La Marque, which has a significant Black population percentage. Trial Tr. vol. 3, 85:18–88:2 (Cooper). And Commissioner Giusti, whose deposition testimony prompted the late addition of this criterion to Defendants' interrogatory responses, acknowledged that preserving the historical Precinct 3 would have resulted in fewer

---

[14] Commissioner Giusti did not recall sharing what he wanted in redistricting or hearing terms like "traditional redistricting criteria." Trial Tr. vol. 9, 88:21–82:2 (Giusti), and testified he was not familiar with the "legal criteria." Trial Tr. vol. 9, 104:10–12 (Giusti). However, he testified that he was not concerned about his ability to get re-elected when he saw proposed maps. Trial Tr. vol. 9, 98:9–11 (Giusti).

divisions of the municipalities of La Marque and Hitchcock. Trial Tr. vol. 9, 154:7–155:1 (Giusti).

388.    Any contention that Defendants adopted the Enacted Plan because they sought to achieve near-equal population deviation is unsupported by the criteria set forth in their discovery responses, which does not refer at any point to achieving zero deviation, *see* Pls.' Ex. 593 at 5, or in the record. *See, e.g.*, Pls.' Ex. 191 (Oct. 15, 2021, email from P. Gordon to T. Bryan) ("For least changes, aim for ~+/-2.5% or so").

389.    But even if zero population deviation was in fact Defendants' objective in adopting the Enacted Plan, Mr. Cooper testified that he has "never encountered a case at the local level where it was necessary to have perfect deviation," and generally there is "no need to" achieve a zero deviation. Trial Tr. vol. 3, 140:24–141:1, 186:6–20 (Cooper).

390.    Finally, there is significant evidence that Defendants opted not to disclose criteria publicly during the process to limit transparency into the actual considerations used in drafting Map 2 and prevent the submission of viable alternatives that would preserve a majority-minority commissioners precinct while meeting Defendants purported race-neutral criteria.

391.    As set forth above, the Enacted Plan fails to adhere to the criteria set forth in Defendants' interrogatory responses, and there are viable alternative maps performing on par or better than these criteria that it is reasonable to assume could have been proposed during the process if the criteria had been made public. Furthermore, evidence supports that Judge Henry chose not to have the commissioners court publicly consider and adopt

redistricting criteria because doing so would "tie [their] hands" during the process. Pls.' Ex. 23; Trial Tr. vol. 7, 279:11–23 (Henry).

392.   Instead, evidence of the map-drawing process supports that a primary motivation for the geographic configuration of Map 2 was instead to dismantle Precinct 3 based on a belief that any majority-minority commissioners precinct would be a "gerrymander." Trial Tr. vol. 2, 109:13–111:6 (Burch); Pls.' Ex. 414 at 6–7 (Burch Expert Report). In contrast to the paucity of evidence the other race-neutral considerations Defendants claim were applied, there is significant evidence this was a factor at the time of redistricting.

393.   Judge Henry admitted he viewed Benchmark Precinct 3 as a racial gerrymander and that any majority-minority Precinct 3 would have to look that way. Trial Tr. vol. 7, 319:4–14 (Henry). Commissioner Apffel similarly testified that he believed and "ha[d] been told" that Precinct 3 had been "racially gerrymandered in favor of minorities." Trial Tr. vol. 9, 356:7–14 (Apffel).

394.   Judge Henry further admitted he "would not have asked for" a coastal precinct map that kept the core of historic Precinct 3. Trial Tr. vol. 7, 305:6–18 (Henry). This is consistent with the testimony of Mr. Oldham, who testified in detail about Judge Henry's instructions as to the geographic configuration of Map 2. *See supra*, FOF ¶ 242.

395.   It is thus reasonable to conclude, and this Court so finds, that the primary motivation for the configuration of Map 2 was to dismantle the existing majority-minority Precinct 3 and undo what Judge Henry and at least one other commissioner perceived as a

racial benefit conferred as a result of the 2012 settlement with the United States. Trial Tr. vol. 2, 109:13–111:6 (Burch); Pls.' Ex. 414 at 6–7 (Burch Expert Report).

## VIII. Ongoing Discrimination Touching on Participation in Voting

396.    The 2021 redistricting process for commissioners precincts occurred within a climate of historic and ongoing discrimination impacting Latino and Black voting participation. This has led to limited Black and Latino electoral success in Galveston County. Notably, the limited success by Latino and Black candidates for office is largely attributable to majority-minority districts like the one dismantled by the Enacted Plan.

397.    Dr. Traci Burch's and Dr. Rene Rocha's qualitative and quantitative analyses show that Black and Latino residents of Galveston County bear the effects of discrimination in income, poverty, education, and health, all of which combine to increase the costs of voting and decrease political participation. Trial Tr. vol. 2, 72:14−79:13 (Burch); Pls.' Ex. 414 at 21–30 (Burch Expert Report); Pls.' Ex. 335 ¶¶ 66–71 (Rocha Expert Report). Defendants do not dispute these analyses, nor did Defendants call any fact witnesses to rebut any claims of socioeconomic disparities between the minority and Anglo populations in Galveston County.

398.    Historical disparities contribute to the contemporary disparities that persist, not least because there are Galveston County voters who are alive today who lived through the Jim Crow era. Trial Tr. vol. 2, 74:8–20 (Burch). Ms. Pope testified to living through desegregation in education and public accommodations, and the difficulties the County faced during that time. Trial Tr. vol. 2, 28:15−29:21, 30:5–10, 30:22–31:8 (Pope). Similarly, Reverend Randall described "racial fights" that occurred "in the junior high and

high school and spilled over into the community" during the school desegregation process as he was growing up. Trial Tr. vol. 6, 218:14–23 (Randall). Leon Phillips testified to leaving the integrated Ball High School for the predominantly Black Central High School because "this was the beginning of integration, so walking down the hall and having somebody go in the opposite direction and hearing, nigger, go home became more than I can handle." Defs.' Ex. 310 at 13:20–14:8 (Phillips Deposition). Robert Quintero described his father explaining to him at age 8, "Son, there are going to be a lot of people who dislike you because you are Mexican. Just learn to live with it and make peace." Trial Tr. vol. 6, 10:18–11:9 (Quintero). Edna Courville attested to public signs in Santa Fe in the 1960s and 70s such that "Blacks and others, Latinos, did not go to Santa Fe because of the racial hatred that was there. You just didn't go. Because if you went, you may not get home." Trial Tr. vol. 2, 234:19–235:2; 268:3–11 (Courville) (testifying also that she still "tr[ies] not to go to Santa Fe").

399.   Testimony from Black and Latino residents of Galveston County confirm that Black and Latino voters still share similar issues regarding discrimination in income, poverty, education, and health as compared to Anglo residents. *See* Trial Tr. vol. 1, 65:12–16 (Rose); Trial Tr. vol. 6, 14:13−16 (Quintero); Trial Tr. vol. 1, 133:16–23 (McGaskey). Edna Courville described the hurdles to racial minorities' full access to resources: "[W]hen a group of people get a cold, Blacks and Latinos get pneumonia." Trial Tr. vol. 2, 231:14–232:10 (Courville).

400.   Discrimination against minorities in Galveston County has a negative effect on their ability to participate equally in the electoral process. Pls.' Ex. 335 ¶¶ 9, 18, 27

(Rocha Expert Report). Racial and ethnic disparities in education, income, housing, and public health are in part the result of past and present discrimination. Peer-reviewed academic research confirms that these disparities, which exist in Galveston County, hinder Latinos and Blacks from participating in the political process. Pls.' Ex. 335 ¶¶ 18, 27, 66–67 (Rocha Expert Report); Pls.' Ex. 414 at 29 (Burch Expert Report).

401.    Black and Latino voters, as measured by their consistently lower turnout rate than Anglo voters in Galveston County elections, have a depressed level of political participation. Trial Tr. vol. 3, 242:6−244:11 (Barreto); Trial Tr. vol. 4, 174:18−175:9 (Trounstine); Trial Tr. vol. 10, 157:18−21 (Alford).

### A.    Contemporary Voting Barriers

402.    In addition, language-based voting discrimination in Galveston County persists. For example, in 2007, in *United States* v. *Galveston County*, Civil Action No. 3:07-CV-377, the County entered into a Consent Decree pursuant to 52 U.S.C. § 10303(f)(2), for failing to provide an adequate number of bilingual poll officials trained to assist Spanish-speaking voters on election day, and failing to provide in an effective manner the way certain election-related information is distributed to Spanish-speaking voters. Pls.' Ex. 564 (*United States v. Galveston County* consent decree); Trial Tr. vol. 2, 122:20–123:10 (Burch). Still, while Spanish-language election materials exist, in the last ten years, they have not always been posted at the voting sites where they are most needed. Trial Tr. vol. 6, 82:7–83:7 (Compian).

403.    Additionally, the Galveston County tax assessor-collector's purge of Spanish-surnamed voters from the voter rolls in 2019 disproportionately affected Latino

voters and resulted in a lawsuit by LULAC. Trial Tr. vol. 6, 18:7−22 (Quintero); Trial Tr. vol. 6, 105:3−11 (Compian).

404.   Residents also testified how voter identification requirements weigh more heavily on Latino and Black voters and constitute barriers to voting. Trial Tr. vol. 2, 226:25–227:6, 227:15–228:1 (Courville); Trial Tr. vol. 6, 18:1-6 (Quintero); *see also* Pls.' Ex. 414 at 11 (Burch Expert Report) (describing Texas passing stricter voter ID laws after *Shelby County v. Holder*, 570 U.S. 529 (2013)).

405.   Closure of polling places has also made it more difficult for Black and Latino Galveston residents to vote. The number of polling places in predominantly minority neighborhoods decreased in recent decades. Trial Tr. vol. 1, 86:5–87:9 (Rose).

406.   The decline in the number of polling places is partially attributable to adoption of vote centers, but Galveston County still does not have the mandatory minimum number of vote centers open under Texas law. Before the November 2022 general election, civil rights organizations sent a letter to the Galveston County clerk and commissioners court informing them that the County was violating the Texas Elections Code by opening only 28 vote centers rather than the minimum required 41. Pls.' Ex. 315 (Nov. 1, 2021, Letter to D. Sullivan et al. from ACLU of Texas w/Attachments). The letter described the disproportionate impact reduced polling places would have on minority residents with less access to transportation. *Id.* The County had previously been warned in 2019 that this existed as an issue in 2018, in which it conducted elections using overly large election precincts. Pls.' Ex. 315 (Nov. 1, 2021, Letter to D. Sullivan et al. from ACLU of Texas w/Attachments) at Ex. 1.

407.    Latino and Black residents have reported greater difficulty accessing polling places without reliable access to transportation. Trial Tr. vol. 6, 58:6−16 (Quintero); Trial Tr. vol. 6, 209:4−24 (Henderson-Lofton); Trial Tr. vol. 7, 43:19−44:3 (Holmes).

408.    The County has also refused Commissioner Holmes's requests for additional voting locations that make access to those locations easier for Black and Latino voters because of their lack of access to transportation. Trial Tr. vol. 7, 50:15−51:25 (Holmes) (noting that, for one location he requested, Commissioner Holmes was informed "that the judge's chief of staff just said, 'No. Don't give him that location.'").

409.    Studies have shown that polling place distance affects voter turnout, and those effects are related to transportation access. Pls.' Ex. 414 at 26 (Burch Expert Report).

410.    Latino and Black voters also have concerns regarding the presence of police officers at vote centers generally. Trial Tr. vol. 6, 87:9-21, 88:20−89:6 (Compian).

411.    The County has recently closed or attempted to close specific polling places in predominantly Black and Latino neighborhoods. The historic Carver Park polling place is the "hub" of the Benchmark Precinct 3, Trial Tr. vol. 1, 61:23−62:11 (Rose), and was closed during at least one election cycle in 2020, causing some people to be unable to vote due to inability to get transportation to another voting location. Trial Tr. vol. 2, 278:3–15 (Courville). This location and another polling place closed during the 2020 election (the Dickinson Senior Center) were predominantly used by Black and Latino voters. Trial Tr. vol. 7, 44:4−18 (Holmes). The County also attempted to eliminate the Alamo Elementary polling location in a heavily Latino neighborhood. Trial Tr. vol. 6, 69:3−12 (Compian).

412.     Though the elected County Clerk, who administers elections in Galveston County, says that he would treat a minority coming to his office the same as a non-minority, he acknowledged that it "[w]asn't always that way around here." Trial Tr. vol. 10, 241:11−16 (Sullivan).

413.     As previously discussed, officials in Galveston County and in municipalities within the County have taken actions that would tend to reduce the ability of Latino and Black residents to participate effectively in the political process and elect candidates of choice. *See, e.g.*, *supra*, FOF ¶¶ 199–210, 402–411; Pls.' Ex. 335 ¶ 82 (Rocha Expert Report).

414.     Primary elections for commissioners court seats have a majority vote requirement. Tex. Elec. Code § 172.003.

415.     In recent years, candidates running for office in Galveston County have made implicit racial appeals in their campaigns. Pls.' Ex. 335 ¶¶ 72–75 (Rocha Expert Report); Trial Tr. vol. 2, 89:9–22 (Burch). Racial appeals can "make racial attitudes and concerns more salient in the minds of voters, even without explicitly mentioning or referring to a particular race or group." Pls.' Ex. 414 at 31 (Burch Expert Report).

416.     Implicit racial appeals are commonly understood to contain certain structural elements. However, for an implicit racial appeal to be effective, it need not contain each element. The structural elements include: (1) avoiding explicit appeals that violate contemporary norms of racial equality, such as using slurs; (2) containing images of individuals that will be perceived as belonging to a minority group or making textual or spoken references about a minority group; (3) containing stereotype-confirming messaging

or linking a racial/ethnic minority group with negative traits or activities; (4) making textual or spoken references to associate the opposition candidate(s) with a "problematic" minority or out-group; and (5) drawing an in-group or out-group distinction without specifically invoking racial language. Pls.' Ex. 335 ¶¶ 76–77 (Rocha Expert Report) ; Trial Tr. Vol. 5, 237 :17–238 :15 (Rocha).

417.   For example, in the 2020 Republican primary for Galveston County tax assessor-collector, candidate Jackie Peden sent out a mailer of a "Latino man covered in tattoos that indicates association with a violent gang (in this case, MS-13)." Pls.' Ex. 335 ¶ 78; Pls.' Ex. 561 (Fig. 2 of Rocha Report); Trial Tr. vol. 5, 240:15–241:6 (Rocha); Trial Tr. vol. 6, 17:4−16 (Quintero); Trial Tr. vol. 2, 90:6–91:25 (Burch). Referring to her incumbent opponent, Peden's mailer stated, "Texans can thank Cheryl Johnson for having illegal immigrants vote in this November's Election!" Pls.' Ex. 561 (Fig. 2 of Rocha Report). In so stating, the mailer "uses text to associate her opposing candidate . . . with 'illegal immigrants' and appeals to race-based biases and fears regarding Latinos." Pls.' Ex. 335 ¶ 78 (Rocha Expert Report). The image of the tattooed man featured not a Galveston County resident but an El Salvadorean man whose image has been featured in other political campaigns. *Id.* ¶ 79; Pls.' Ex. 562 (Fig. 3 of Rocha Report); Trial Tr. vol. 5, 241:12–242:25 (Rocha). Latino residents found this ad derogatory. Trial Tr. vol. 6, 17:4−16 (Quintero). Other candidates running in Galveston County have used anti-immigrant imagery and "invasion" language as an anti-minority appeal. Pls.' Ex. 414 at 32 (Burch Expert Report).

418.    In 2022, Julie Pickren, a candidate for District 7 of the Texas State Board of Education, which includes Galveston County, shared a video showing Black students at a local high school vandalizing the school cafeteria. Pls.' Ex. 335 ¶ 80 (Rocha Expert Report). The video was accompanied by text stating, "Discipline in schools must be restored." *Id.* As an implicit racial appeal, the video contains images of Black youth engaged in a stereotype-confirming behavior: violent destruction of property. *Id.*

419.    Also, during her 2022 campaign, Julie Pickren shared a post on social media featuring an image of a young Black girl with text advocating for decreased alcohol and drug consumption and violence at schools. In so doing, she paired "an image of a Black youth with stereotype-confirming behaviors: drug use and violence." Pls.' Ex. 335 ¶ 81 (Rocha Expert Report).

420.    Other racial incidents surrounding campaigns have occurred in recent years. In 2019, the Chairwoman of the Galveston County Republican Party referred to another Black Republican as a "Typical Nig." Trial Tr. vol. 2, 89:23–90:5 (Burch); Pls.' Ex. 414 at 32 (Burch Expert Report). Residents heard racially derogatory language used toward Barack Obama during his presidential campaigns, including the n-word. Trial Tr. vol. 6, 17:17–25 (Quintero). Campaign signs of Black candidates have been ripped up by Anglo residents. Trial Tr. vol. 2, 220:22–221:18 (Courville).

### B.    Lack of Electoral Success and Responsiveness

421.    Minorities have always been underrepresented relative to their share of Galveston County's population. Pls.' Ex. 414 at 32 (Burch Expert Report). Until the 1992 consent decree which increased minority representation in the justice of the

peace/constable precincts, few minorities were elected to County office. Trial Tr. vol. 2, 15:10−16:7 (Pope). Former Justice of the Peace Pope—the first Black woman elected to that position—testified to the difficulties of running countywide as a minority in Galveston County. Trial Tr. vol. 2, 16:8−25, 17:1−22 (Pope) ("Because of the entire population of the county, and Blacks and minorities only make up 30 to 40 percent, then it is hard for them to be elected countywide in most times — in most instances. But if it's a smaller group where minorities are in the majority, then they have a better opportunity to elect candidates of their choice."); *see also* Trial Tr. vol. 1, 129:22–132:3 (McGaskey) (describing being a campaign manager for a different countywide Black candidate).

422.    There have been three Black members of the commissioners court: Wayne Johnson, Stephen Holmes, and Robin Armstrong. Stipulated Facts ¶¶ 14–16.

423.    Wayne Johnson was the first Black member of the commissioners court and was elected in 1988. *Id*. ¶ 15.

424.    Stephen Holmes was appointed in 1999 after Wayne Johnson's passing and has served continuously since then. *Id*. ¶ 16.

425.    Robin Armstrong was initially appointed in 2022, after the Republican primary had already occurred, and ran unopposed in a majority-Anglo precinct in the November 2022 general election. Trial Tr. vol. 10, 195:22−24, 198:10−12, 211:9−13 (Armstrong).

426.    Commissioner Armstrong holds "several views that are outside the mainstream of Black Americans." Pls.' Ex. 414 at 32 (Burch Expert Report); Pls.' Ex. 412 at 57–59 (Krochmal Expert Report); Trial Tr. vol. 2, 97:4–98:5 (Burch).

427.    Edna Courville testified that Commissioner Armstrong has not had a strong presence in her historic community in La Marque and Texas City and did not believe he would be responsive to her community's needs. Trial Tr. vol. 2, 231:7−9, 240:25−241:7 (Courville).

428.    Commissioner Armstrong acknowledged he does not have a basis to believe he is a candidate of choice for Black or Latino voters. Trial Tr. vol. 10, 210:4−7 (Armstrong); *cf.* Trial Tr. vol. 2, 242:13−22 (Courville).

429.    There has been just one Latino member of the commissioners court, Frank Carmona, who served from 1971 to 1990. Pls.' Ex. 335 ¶ 7 (Rocha Expert Report).

430.    Several witnesses, including Republican commissioners, could not identify any minority candidates who successfully ran in a Republican primary. Trial Tr. vol. 9, 153:6−10 (Giusti); Trial Tr. vol. 9, 367:11−14 (Apffel). Latino candidates with Spanish surnames have had minimal to no success in Republican primaries, and the only Latino Republicans who have had electoral success, like Dwight Sullivan and Michelle Slaughter, have first and last names that would be seen as Anglo names and do not participate in Latino-serving organizations like LULAC. Trial Tr. vol. 6, 15:25−17:3, 54:8−15, 57:14−58:5 (Quintero).

431.    The limited number of successful Latino and Black elected officials within the County have tended to be members of city councils elected from majority-minority districts in cities with larger minority populations, such as Texas City and La Marque, or— in the case of the City of Galveston—elected from single-member districts created by court order to be majority-minority. *See, e.g.*, Trial Tr. vol. 2, 278:16–22 (Courville); Trial Tr.

vol. 9, 151:6–21 (Giusti); Trial Tr. vol. 10, 255:19–256:10 (Sullivan); Trial Tr. vol. 2, 16:14–25 (Pope).

432.    Those minorities who are elected still experience racism in office. Former Justice of the Peace Pope testified that when she would substitute for an Anglo justice of the peace on Bolivar Peninsula, "I could see the disgust on their faces when I went on the bench as opposed to when Judge Vondra went on the bench," and when she later become the judge of that court, "participation or appearances by the defendants just plummeted" because "it was me on the bench and not Judge Vondra or any other White justice of the peace that was holding court." Trial Tr. vol. 2, 31:11–32:9 (Pope).

433.    Lack of responsiveness "refers to whether there is a lack of responsiveness on the part of elected officials to the particularized needs of the minority group." Trial Tr. vol. 2, 98:6–13 (Burch). Lack of responsiveness to public policies is related to the maintenance and creation of racial disparities. Pls.' Ex. 414 at 33 (Burch Expert Report).

434.    Anglo members of the commissioners court are not interested in or actively engaged in specific outreach to Galveston's minority residents. Trial Tr. vol. 2, 98:20–99:13 (Burch); Pls.' Ex. 414 at 35–36 (Burch Expert Report); Trial Tr. vol. 2, 26:18–19 (Pope) ("I do not believe that minority interest is ever on the forefront with the County."). Commissioner Apffel testified that he thought that Black and Latino residents had some issues distinct from Anglo residents but tellingly could not name any. Trial Tr. vol. 9, 368:2–369:8 (Apffel). Judge Henry testified that he has never received endorsements from any leader of the County's Black or Latino communities, holds his fall festival in the predominantly Anglo League City area, and does not publicly celebrate Juneteenth, a

holiday of special significance to Galveston's Black residents, on his Facebook. Trial Tr. vol. 7, 254:20−257:11 (Henry). Commissioner Giusti has attended one Dia de los Muertos event "years and years ago" and hired a Spanish–speaking assistant in part because there was no one else working in the County's West County facility that was bilingual, but otherwise did not describe specific responsiveness to minority residents. Trial Tr. vol. 9, 72:16−22, 80:17−81:17 (Giusti).

435.    Minority residents have indicated that the County has become increasingly nonresponsive to the needs of minority constituents. Trial Tr. vol. 6, 87:25–88:24 (Compian); *see also* Defs.' Ex. 310 at 110:1–4 (Leon Phillips Depo.); Trial Tr. vol. 6, 216:4–217:8 (Randall).

436.    La Marque City Councilman Joe Compian noted that since the 2021 redistricting process divided La Marque into three different precincts, it has been "challenging" to get support or attention from those precincts' commissioners. Trial Tr. vol. 6, 76:1−24 (Compian).

437.    The lack of responsiveness makes the minority community "not want to participate" in the political process. Trial Tr. vol. 2, 28:4–9 (Pope).

438.    Recent votes by the commissioners court have been seen as unresponsive to the Latino and Black communities. Numerous witnesses cited Judge Henry's proclamation of a border emergency and the commissioners court's vote to send American Rescue Plan Act funding to pay to send County law enforcement officers to the U.S.-Mexico border as racially discriminatory and diverting much-needed resources from local Black and Latino

residents. Trial Tr. vol. 2, 240:7–20 (Courville); Trial Tr. vol. 6, 19:16−20:23 (Quintero); Trial Tr. vol. 2, 103:11–21 (Burch).

439. Additionally, the late Commissioner Ken Clark opposed federal Housing and Urban Development funding going to the City of Galveston after Hurricane Ike to rebuild public housing that predominantly affected Black and Latino residents displaced after the disaster. Trial Tr. vol. 6, 165:4–166:1 (Jaworski).

440. A majority of commissioners, all of whom were Anglo, opposed removing the Confederate statue in front of the County courthouse, with Commissioner Apffel going so far as to say the statute "certainly didn't affect [his] children," and he did not really know the argument against the statue. Trial Tr. vol. 9, 345:8−18 (Apffel); *see also* Pls.' Ex. 412 at 46 (Krochmal Expert Report).

441. The handling of the November 12, 2021, special meeting itself indicates a lack of responsiveness. Trial Tr. vol. 2, 99:24–100:5 (Burch); Pls.' Ex. 414 at 33–35 (Burch Expert Report); *see also* Pls.' Ex. 129 (video of Nov. 12, 2021, special meeting).

442. Judge Henry's comments that he would have a constable clear out attendees who made noise indicated to some community members his lack of attentiveness and responsiveness. Trial Tr. vol. 1, 77:6−25 (Rose); Trial Tr. vol. 6, 137:1–14 (Lewis). His disinterested demeanor to public comments also indicated lack of responsiveness. Trial Tr. vol. 2, 246:5–12; 246:21–247:19; 249:5–10 (Courville); *see also* Trial Tr. vol. 6, 133:21−134:25 (Lewis) (describing commissioners' demeanor as "not interested" and "lackadaisical"). Galveston City Councilwoman Lewis described it as "almost like a back-in-the-'60s environment." Trial Tr. vol. 6, 134:2−134:25 (Lewis).

443.   Also causing community members not to feel heard, the two commissioners who voted for Map 2 neither acknowledged public comments stressing the impact of the map on minority communities nor objected to Judge Henry's treatment of the predominantly Black attendees of that meeting. Trial Tr. vol. 1, 78:19–80:5 (Rose); Trial Tr. vol. 2, 247:11−19 (Courville); *see also* Trial Tr. vol. 9, 148:24−149:4 (Giusti) (acknowledging that only Commissioner Holmes attempted to respond to concerns of the audience that the Enacted Map would eliminate the majority-minority precinct); Trial Tr. vol. 9 365:24−366:5 (Apffel) (asserting that he entered the meeting with an open mind yet resolved to vote for Map 2 after hearing overwhelming public comments against).

444.   In contrast to Galveston's needlessly rushed process, neighboring Fort Bend County extended its own deadline to enable community members to give more input on redistricting. Trial Tr. vol. 6, 212:7–213:7 (Henderson-Lofton); *see also* Trial Tr. vol. 7, 103:18−23 (Holmes).

445.   Many residents reported that only Commissioner Holmes was responsive to Black and Latino residents' needs. *See, e.g.*, Trial Tr. vol. 2, 26:20−27:7 (Pope); Trial Tr. vol. 2, 235:14–236:9 (Courville); Trial Tr. vol. 6, 73:6−74:8 (Compian); Trial Tr. vol. 6, 192:14-22 (Henderson-Lofton); Trial Tr. vol. 6, 221:9-19 (Randall) ("I don't know any important event that Stephen wasn't there and giving us what we needed."); Trial Tr. vol. 1, 93:14−21 (Rose).

446.   Commissioner Holmes was "instrumental" in getting the Wayne Johnson Senior Center reopened after Hurricane Ike. Trial Tr. vol. 2, 236:10–22 (Courville); Trial

Tr. vol. 6, 221:15−18 (Randall) ("Even as far as Ike, Harvey, even Katrina. He led most of those efforts with housing and getting us back on our feet during tough times . . .").

447.    During the COVID-19 pandemic, Commissioner Holmes participated in weekly calls with the community; he "would get doctors, the health district, epidemiologists" and help with organizing and testing. Trial Tr. vol. 6, 221:20–222:20 (Randall). He assisted with setting up a phone line for people without internet access to sign up for COVID vaccines. Trial Tr. vol. 1, 118:24–119:20 (McGaskey).

448.    Commissioner Holmes also helped arrange transportation for senior citizens and students around the County. Trial Tr. vol. 2, 237:5–238:1 (Courville).

449.    Residents testified about similar experiences with former Commissioner Wayne Johnson, the only other Black commissioner elected from the majority-minority historical Precinct 3. *See, e.g.*, Trial Tr. vol. 6, 220:6−221:4 (Randall).

450.    Residents of historical Precinct 3 who now live in Commissioner Armstrong's precinct did not believe that he would be responsive to his constituents from their neighborhoods due to his lack of responsiveness to community organizations and his absence from the Black and Latino community. Trial Tr. vol. 2, 240:25–242:9 (Courville); Trial Tr. vol. 6, 228:2−13 (Randall) ("I have been all over this county and every Black church I know of and every major event. I have never seen him there. I know of him, but I really have not seen him in our community other than at Mainland Center High School.").

451.    Commissioner Armstrong admitted he was unfamiliar with complaints from Latino and Black residents about voter registration or voting and acknowledged he has no

basis to believe he is the candidate of choice among minority voters. Trial Tr. vol. 10, 202:14–19, 210:4–7 (Armstrong).

## C.   Education

452.   Educational level is an important predictor of political participation: the higher the education level, the more likely one is involved in political activities; the lower the education level, the less likely one is to participate in political activities. Pls.' Ex. 335 ¶ 68 (Rocha Expert Report); Trial Tr. vol. 5, 233:16–234:23 (Rocha); Pls.' Ex. 414 at 22 (Burch Expert Report).

453.   Minorities in Galveston County continue to bear the effects of discrimination in education. Trial Tr. vol. 5, 220:9–14 (Rocha); Trial Tr. vol. 2, 73:6–14 (Burch). Specifically, Dr. Burch found that there are "significant . . . racial gaps in terms of educational attainment, as well as in – for current students, in achievement in Galveston County." Trial Tr. vol. 2, 73:6–14 (Burch).

454.   Black and Latino residents are much less likely have a high school diploma than white residents in the County. Pls.' Ex. 414 at 23–24; Trial Tr. vol. 2, 76:11–77:1 (Burch). A total of 87.7% of Blacks and 75.9% of Latinos over 25 years old have completed high school. The high school completion rate among whites, 94.8%, is higher than both of these groups. A total of 22.1% of Blacks and 17.5% of Latinos over 25 years old have earned a bachelor's degree or higher. The college graduation rate among whites is 37.5%. Pls.' Ex. 335 ¶ 14 (Rocha Expert Report).

455.   Schools in Galveston County were under a court desegregation order from 1961 to 2009, and in the years during which it was subject to the order, the Galveston

Independent School District struggled to achieve racially balanced enrollments in its elementary schools. Pls.' Ex. 335 ¶ 28 (Rocha Expert Report); Trial Tr. vol. 5, 209:4–210:18 (Rocha); *see also* Trial Tr. vol. 6, 67:24−68:4 (Compian) (describing how LULAC and NAACP worked together against a GISD campus closure plan that would have larger impacts on minority students). Even today, the eight school districts serving the County vary in diversity. Pls.' Ex. 414 at 22 (Burch Expert Report) (describing racial makeup of ISDs in Galveston County).

456.    Racial inequality in K-12 education persists in Galveston County. Pls.' Ex. 335 ¶¶ 28–39 (Rocha Expert Report). There is a disproportionate number of Latino and Black students who are not proficient in reading and math across all school districts in Galveston County. Pls.' Ex. 414 at 22 (Burch Expert Report); Trial Tr. vol. 2, 75:10–76:7 (Burch).

457.    In her role as a justice of the peace, Judge Pope dealt with issues of truancy, and her truancy docket was primarily made up of children of color. Trial Tr. vol. 2, 33:12–14 (Pope). She observed that children were not going to school because of how far behind they were and noted that it did not seem "that any efforts were made to try to bring them up to where they needed to be." Trial Tr. vol. 2, 32:10–25 (Pope).

458.    Schools in La Marque, which is a predominantly minority city, have older or damaged facilities, including issues with water quality from lead pipes. Trial Tr. vol. 1, 65:23–66:12 (Rose); Trial Tr. vol. 2, 228:11–20, 229:4–10 (Courville). One County resident, Lucretia Lofton, testified to moving from majority-minority Texas City to

majority-Anglo League City "to put [her] children in a better school district." Trial Tr. vol. 6, 189:16−20 (Henderson-Lofton); Pls.' Ex. 386 at 13 (Cooper Expert Report).

459.    There is clear evidence of second-generation discrimination in public schools within Galveston County, which refers to "practices that limit the integration of schools and deny minority students access to education." Pls.' Ex. 335 ¶ 29 (Rocha Expert Report). This practice results in the disproportionate exclusion of minorities from positive programs, such as Advanced Placement classes or gifted and talented programs, and their disproportionate clustering in negative programs, such as in-school and out of school suspensions. *Id*. ¶¶ 29–39; Trial Tr. vol. 5, 211:20–212:11 (Rocha).

460.    Further, the use of academic grouping denies a disproportionate number of Black and Latino students' access to high-quality educational programs, including Advanced Placement courses. Pls.' Ex. 335 ¶¶ 30–34, 39 (Rocha Expert Report); Trial Tr. vol. 5, 213:5–216:11 (Rocha); Pls.' Ex. 559 (Table 1 from Rocha Report); Trial Tr. vol. 6, 118:20−119:13 (Lewis); Trial Tr. vol. 6, 207:15–208:16 (Henderson-Lofton).

461.    Black and Latino students are also disciplined at higher rates compared to Anglo students, such as in-school and out-of-school suspensions. Pls.' Ex. 335 ¶¶ 35–38 (Rocha Expert Report); Pls.' Ex. 559 (Table 2–3 of Rocha Report); Trial Tr. vol. 5, 216:12–219:24 (Rocha); Trial Tr. vol. 6, 117:9−118:19 (Lewis); Trial Tr. vol. 2, 32:14–33:14 (Pope). They are subjected to increased scrutiny by school officials. Trial Tr. vol. 6, 197:4–198:18 (Henderson-Lofton) (describing incident where Black child was searched for pistol in school on tenuous grounds). School suspensions have been shown to increase subsequent arrests and other anti-social behavior in youth. Pls.' Ex. 414 at 23 (Burch Expert Report).

462.   Black and Latino children also experience racial harassment and bullying in schools, particularly when they attend school outside of majority-minority communities. Trial Tr. vol. 6, 195:13−197:3, 198:13–18, 204:23−207:6 (Henderson-Lofton) (describing repeated incidents at multiple schools, including one where a parent ultimately decided to homeschool her child after the n-word was used with her child at multiple schools "[a]nd no one stood up for them"). These experiences teach children that their "voice does not matter" and that their "vote doesn't matter." Trial Tr. vol. 6, 207:7−14 (Henderson-Lofton).

463.   Finally, Latino and Black students also have fewer resources related to mental health counseling despite increased need. Trial Tr. vol. 6, 119:14−120:2, 135:21–24 (Lewis); *see also* Trial Tr. vol. 6, 196:15−197:3 (Henderson-Lofton) (describing needing to put her son in counseling after the incident when he was baselessly searched for a gun at school).

464.   These disparities in education have collectively hindered minorities' abilities to participate in the political process in Galveston County. Pls.' Ex. 335 ¶ 18, 27 (Rocha Expert Report); Pls.' Ex. 414 at 22 (Burch Expert Report).

### D.    Employment and Poverty

465.   Employment disparities are important to understanding the cost of voting; that is, voters with lower wage jobs are much more likely to be hindered from accessing the ballot box. Pls.' Ex. 414 at 24 (Burch Expert Report); Trial Tr. vol. 2, 77:24–78:10 (Burch).

466.    Research shows that work is an important site for recruitment into politics, which also increases voter turnout. Pls.' Ex. 414 at 25 (Burch Expert Report); *see also* Pls.' Ex. 335 ¶ 67 (Rocha Expert Report).

467.    Racial disparities in earnings are present in several sectors of employment within Galveston County. Trial Tr. vol. 2, 79:6–13 (Burch); Pls.' Ex. 414 at 24–25 (Burch Expert Report); Pls.' Ex. 335 ¶¶ 40–45 (Rocha Expert Report); Trial Tr. vol. 2, 35:12–36:2; 60:4–9 (Pope).

468.    In Galveston County, earnings from employment for Blacks and Latinos are lower than earnings for Anglo employees, in part because they are clustered in jobs that earn less than Anglos. Trial Tr. vol. 2, 79:6–13 (Burch); Pls.' Ex. 414 at 24–25 (Burch Expert Report); Pls.' Ex. 335 ¶¶ 40–45 (Rocha Expert Report); Trial Tr. vol. 5, 222:22–223:8 (Rocha); Pls.' Ex. 559 (Table 4–5 of Rocha Expert Report); Trial Tr. vol. 2, 35:12–36:2 (Pope).

469.    Black Galveston County households have a median household income of $45,831, and Latino households have a median income of $60,297–both markedly lower than the median income of White households ($86,165). Pls.' Ex. 414 at 24 (Burch Expert Report); *see also* Pls.' Ex. 386 at 14 (Cooper Expert Report) (using different dataset). Even when they hold the same types of jobs, Blacks and Latinos earn less than white employees, though Blacks and Latinos are also less likely to hold high-paying occupations. Pls.' Ex. 335 ¶¶ 40–45 (Rocha Expert Report), Pls.' Ex. 559 (Table 4–5 of Rocha Expert Report).

470.    Residents testified to the shared need for job training for Latino and Black communities in particular. Trial Tr. vol. 6, 14:13−16 (Quintero); Trial Tr. vol. 6, 72:1−8 (Compian); Trial Tr. vol. 6, 124:14−17, 128:19−129:6 (Lewis).

471.    Likewise, the unemployment rate in Galveston County is disproportionately higher for Black and Latino residents than white residents. The unemployment rate for Blacks and Latinos is 9.1% and 7.0%, respectively, and the unemployment rate for Anglos is lower, at 4.8%. Pls.' Ex. 335 ¶ 15 (Rocha Expert Report); Pls.' Ex. 414 at 25–26 (Burch Expert Report); Trial Tr. vol. 2, 79:3–13 (Burch); *see also* Pls.' Ex. 386 at 14 (Cooper Expert Report).

472.    Approximately 29.2% of Black households and 15.1% of Latino households rely on the Supplemental Nutrition Assistance Program, whereas only 6.7% of Anglos do. Pls.' Ex. 386 at 14 (Cooper Expert Report).

473.    Additionally, the child poverty rate is disproportionately higher for Black children (nearly 25%) and Latino children (over 20%) than Anglo children in Galveston County (under 10%). Pls.' Ex. 414 at 25 (Burch Expert Report); Trial Tr. vol. 2, 78:22–79:2 (Burch); *see also* Pls.' Ex. 386 at 14 (Cooper Expert Report).

474.    Black and Latino residents have lower rates of car ownership in Galveston County. Pls.' Ex. 414 at 26 (Burch Expert Report); Trial Tr. vol. 2, 79:14–24 (Burch). Black households are four times more likely to lack access to a vehicle than Anglo households, and Latino households are more likely to lack access to a vehicle as well. Pls.' Ex. 414 at 26 (Burch Expert Report). In states like Texas with limited absentee ballot options, fewer people are able to offset socioeconomic-related transportation issues

accessing physical polling places by voting absentee. Pls.' Ex. 414 at 26 (Burch Expert Report).

475.   Finally, economic disparities are also reflected in funding for political campaigns of Black and Latino candidates in comparison to Anglo candidates. Trial Tr. vol. 6, 131:21−132:4 (Lewis) ("[U]sually there is more money on the Caucasian end, and there is always the . . . I guess you would say, the edge, the opportunity to buy more materials for campaign, to offer bigger events, charge more for those events.").

476.   Together, these economic disparities hinder the ability of Galveston County's Latino and Black communities to participate effectively in the political process. Pls.' Ex. 335 ¶ 18, 27 (Rocha Expert Report); Pls.' Ex. 414 at 24–26 (Burch Expert Report).

### E.   Housing

477.   Renters are more mobile than homeowners and so are less likely to vote, as mobility increases the administrative burden of maintaining voter registration. Pls.' Ex. 414 at 28 (Burch Expert Report). Homeowners are also more likely to be mobilized by campaigns, increasing their likelihood of turning out to vote. Pls.' Ex. 335 ¶ 69 (Rocha Expert Report). The documented effect of homeownership on turnout is as large as the effect of education—specifically, owning a home has been shown to have the same impact on the decision to turn out as graduating from college. *Id.* (citations omitted).

478.   There is a long history of government support for residential segregation in Galveston County, including "redlining" by the Homeowners' Loan Corporation (HOLC). Pls.' Ex. 335 ¶ 46 (Rocha Expert Report); Trial Tr. vol. 2, 80:24–82:6 (Burch). Today, these same areas, redlined decades ago, continue to have disproportionately high minority

populations. *Id.* Redlining created a pattern of housing discrimination that is still present today. Pls.' Ex. 335 ¶ 47 (Rocha Expert Report); Trial Tr. vol. 5, 228:25–230:7 (Rocha); Trial Tr. vol. 2, 82:7–13 (Burch); Pls.' Ex. 414 at 27 (Burch Expert Report); Trial Tr. vol. 6, 193:25–195:12 (Henderson-Lofton) (describing being pulled over and questioned on the first day she moved into a predominantly Anglo neighborhood).

479.    In 1997, the U.S. Department of Housing and Urban Development (HUD) found that the Galveston Housing Authority (GHA), the agency in charge of public housing assistance and the management of Section 8 vouchers had used public housing to reinforce patterns of segregation, in violation of Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, or national origin in all HUD–assisted programs. Pls.' Ex. 335 ¶ 48 (Rocha Expert Report).

480.    Disparities in homeownership for Blacks and Latinos as compared to Anglos persist in Galveston County today and have not meaningfully improved in recent years. Pls.' Ex. 335 ¶ 49 (Rocha Expert Report); Pls.' Ex. 559; Trial Tr. vol. 5, 230:8–231:19 (Rocha); Pls.' Ex. 414 at 28–29 (Burch Expert Report).

481.    Black and Latino residents are less likely to live in owner-occupied housing than white residents. Trial Tr. vol. 2, 82:14–24 (Burch); Pls.' Ex. 414 at 28–29 (Burch Expert Report). A minority of Blacks, 47.5%, reside in an owner-occupied housing unit. Slightly more Latinos, 60.6%, reside in an owner-occupied housing unit. The percentage of whites who do the same, however, is much larger, at 73.3%. Pls.' Ex. 335 ¶ 16 (Rocha Expert Report).

482.    In the northern part of the County, home values are lower in areas with more Black and Latino residents such as the unincorporated east side of Dickinson, and higher in areas with more Anglo residents such as western League City. Trial Tr. vol. 6, 200:8−17 (Henderson-Lofton).

483.    In the aftermath of 2008's Hurricane Ike, disparities in housing have worsened. Pls.' Ex. 335 ¶¶ 50–59 (Rocha Expert Report); Trial Tr. vol. 2, 33:15–34:17 (Pope); Trial Tr. vol. 1, 111:20–113:19 (McGaskey); Pls.' Ex. 414 at 29 (Burch Expert Report); Pls.' Ex. 412 at 36–38 (Krochmal Expert Report).

484.    The City of Galveston lost 16.5% of its overall population between 2000 and 2010, including an 11.4% loss in the white population compared to a 36.7% loss in the Black population. Pls.' Ex. 335 ¶ 51 (Rocha Expert Report). Many of the predominantly minority Galveston Island residents displaced by Hurricane Ike moved to the mainland, such as to La Marque and Dickinson, and have been unable to return due to the lack of affordable housing. Trial Tr. vol. 2, 232:14–233:5 (Courville).

485.    Rebuilding public housing after Ike has also had a racialized component, where predominantly Anglo residents and politicians opposed efforts to rebuild. Trial Tr. vol. 6, 166:19−167:22 (Jaworski); Pls.' Ex. 412 at 36–38 (Krochmal Expert Report); Trial Tr. vol. 2, 34:18−35:11 (Pope).

486.    Difficulty accessing affordable housing is another high priority issue for Black and Latino communities. Trial Tr. vol. 6, 72:1−8 (Compian); Trial Tr. vol. 6, 124:14−17, 128:19−129:6 (Lewis).

487.    These disparities related to housing hinder the ability of Galveston County's Black and Latino communities to participate effectively in the political process. Pls.' Ex. 335 ¶ 18, 27 (Rocha Expert Report); Pls.' Ex. 414 at 27–29 (Burch Expert Report).

### F.    Public Health

488.    Healthy individuals are more likely to be civically engaged. Poor health can reduce the odds of voting by 12%. Pls.' Ex. 335 ¶ 70 (Rocha Expert Report); Pls.' Ex. 414 at 29 (Burch Expert Report).

489.    Black and Latino residents in Galveston County disproportionately suffer from public health issues compared to white residents and continue to bear the effects of discrimination in public health. Pls.' Ex. 335 ¶ 58 (Rocha Expert Report); Trial Tr. vol. 5, 232:17–24 (Rocha); Trial Tr. vol. 2, 83:2−7 (Burch).

490.    Discrimination increases incidents of psychological distress, major depression, generalized anxiety disorder, early initiation of substance abuse, and psychosis. These general patterns have been documented among minority residents in Galveston County. Pls.' Ex. 335 ¶ 59 (Rocha Expert Report). A study of 1,238 Latinos living in Texas City, published in the *Journal of Social Science & Medicine* in 2013, found a significant relationship between experiences with discrimination and poor mental health outcomes. *Id.*

491.    Significant disparities in infant health and life expectancy exist between Blacks and whites in Galveston County. *Id.* ¶¶ 60–61; Trial Tr. vol. 5, 232:25–233:15 (Rocha). Black infants are more than twice as likely to have a low birthweight and have nearly double the infant mortality rate as Anglo infants. Pls.' Ex. 335 ¶ 60 (Rocha Expert Report).

492.    In Galveston County, Blacks and Latinos suffer disparities in insurance coverage which also affect access to preventative health care. Pls.' Ex. 335 ¶ 61 (Rocha Expert Report). Latinos between the ages of 19 and 64 are more than twice as likely as whites to be uninsured. (The uninsured rate among Latinos is 18.5% compared to 7.3% among whites). A total of 12.5% of Blacks between the ages of 19 and 64 do not have health insurance. Pls.' Ex. 335 ¶ 17 (Rocha Expert Report).

493.    Disparities in health outcomes are associated with disparate housing opportunities, which, as explained above, can affect political participation. For example, a 2019 analysis of Census tracts across 10 counties, including Galveston, found that neighborhoods with larger shares of Black and Latino residents were likely to have elevated levels of industrial pollution. Pls.' Ex. 335 ¶ 64 (Rocha Expert Report).

### G.    Other Discrimination

494.    Black and Latino residents face disparities in the criminal justice system in Galveston County compared to white residents. Trial Tr. vol. 2, 84:25–85:22 (Burch); Pls.' Ex. 414 at 30–31 (Burch Expert Report).

495.    Criminal justice interactions affect political behavior such that increased contact with arrests and incarceration can hinder one's ability to vote. Trial Tr. vol. 2, 85:24–86:14 (Burch); Pls.' Ex. 414 at 30 (Burch Expert Report).

496.    Black residents in Galveston County are more likely to be arrested, and Black and Latino residents comprise a disproportionate percentage of inmates compared to their share of the population. Trial Tr. vol. 2, 85:2–22 (Burch); Pls.' Ex. 414 at 31 (Burch Expert

Report); Trial Tr. vol. 2, 36:3−15 (Pope) (testifying that "minorities were treated more harshly than nonminorities" with respect to criminal sentencing practices).

497.    Black and Latino residents testified to over-policing and disparities in treatment by the criminal justice system. *See, e.g.*, Trial Tr. vol. 1 67:20−70:23 (Rose) (describing instances of being pulled over and treated aggressively); Trial Tr. vol. 6 13:25–14:11 (Quintero) (describing a complaint LULAC received of a Latino family's house being torn up by police); Trial Tr. vol. 6, 194:14−195:12 (Henderson-Lofton) (describing being pulled over by police in her new neighborhood in League City); Defs.' Ex. 310 at 65:22–66:12 (Leon Phillips Depo.) (describing Galveston Police Department's focus on making traffic stops in a predominantly Black and Latino neighborhood).

498.    An incident in which a Black man, Donald Neely, was led by a rope by police on horseback made national news in 2019 and "was one of the most racist things I have seen in my life," according to Constable Rose. Trial Tr. vol. 1 73:1–21 (Rose); *see also* Trial Tr. vol. 2, 86:15–87:7 (Burch) (describing the incident as evidence of the presence of Senate Factor 5).

499.    Residents' testimony also confirms other examples of open racial discrimination. Robert Quintero described an incident in Santa Fe in which someone harassed their neighbor, a Latina resident who had lost her son in the Santa Fe school shooting, by repeatedly waving a Confederate flag over their shared property line into her yard, then calling the police on her when she removed the flag. Trial Tr. vol. 6, 12:5−19 (Quintero); *see generally, supra*, FOF ¶¶ 415–420.

500.   La Marque Mayor Pro Tem Joe Compian reported discrimination when trying to exercise his right to vote when he was asked whether he was born in the United States at the polling place. Trial Tr. vol. 6, 91:17−92:1 (Compian).

## IX.   Summary of Findings of Fact as they relate to the Senate Factors and the Arlington Heights factors.

501.   Based on the foregoing findings of fact, the Court finds that each of the Senate Factors relevant to a finding of vote dilution in violation of Section 2 of the Voting Rights is present here, consistent with the findings of Professor Rocha and Dr. Burch. *See* Pls.' Ex. 335 ¶¶ 9–12 (Rocha Expert Report); Trial Tr. vol. 5, 200:7–19 (Rocha). Trial Tr. vol. 2, 147:14–23 (Burch); Pls.' Ex. 414 (Burch Expert Report).

502.   Similarly, the Court finds that the factors relevant to a finding of discriminatory intent, as set forth in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977), support a finding of discriminatory intent here, consistent with the opinions of Dr. Burch and Dr. Krochmal. *See* Trial Tr. vol. 2, 141:5–19 (Burch) ("the Commissioners know that there was a racially disparate impact . . . and the process [] by which they adopted this map is consistent with some historical attempts to eliminate coalition precincts. Their sequence of events by which these maps were adopted is different and differs from past practice in ways that reduces the transparency and the ability of minority voters to participate fully in the process."); Trial Tr. vol. 5, 30:2–15, 68:3–17 (Krochmal).

159

## CONCLUSIONS OF LAW

### I.     Jurisdiction and Venue

1.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343,

1345, and 1357, 42 U.S.C. § 1983, and 52 U.S.C. §§ 10101(d) and 10301, *et seq*. Plaintiffs'

action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202,

as well as Fed. R. Civ. P. 57 and 65. Jurisdiction for Plaintiffs' claim for costs and

attorneys' fees is based upon Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310I.

2.      Venue is proper in this Court under 28 U.S.C. §§ 124(b) and 1391 because

some of the parties, including at least one of the Defendants, reside in this District.

Stipulated Facts ¶ 1; Trial Tr. vol. 7, 170:20–25 (Henry); Trial Tr. vol. 10, 232:13–25

(Sullivan). Further, a substantial part of the events giving rise to the claims in this case

occurred in this District. *See, e.g.*, Stipulated Facts ¶¶ 1, 24–25.

3.      Plaintiffs have standing to bring this action.

4.      In redistricting cases, plaintiffs typically meet the injury-in-fact requirement

by establishing that an action by the state has reduced the power of their votes relative to

the votes of others. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (decrying the

"debasement or dilution of the weight of a citizen's' vote"); *Evenwel v. Abbott*, 578 U.S.

54, 62 (2016) (discussing plaintiffs' contention that "basing apportionment on total

population dilutes their votes").

5.      A person has standing to bring racial-discrimination, racial-gerrymandering,

malapportionment, or Section 2 vote-dilution claims where she resides, votes, and

personally suffers such injuries. *League of United Latin Am. Citizens v. Abbott*, 604 F.

Supp. 3d 463, 485–86 (W.D. Tex. 2022).

6.      In vote dilution cases, the "harm arises from the particular composition of

the voter's' own district, which causes his vote—having been packed or cracked—to carry

less weight than it would carry in another, hypothetical district." *Harding v. Cnty. of

Dallas*, 948 F.3d 302, 307 (5th Cir. 2020) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1931

(2018)).

7.      Individual NAACP/LULAC Plaintiffs Courville, Compian, and Phillips are

registered voters who reside in Benchmark Precinct 3 and have been drawn into Precincts

4, 1, and 2 respectively under the 2021 Enacted Map. *See supra*, FOF ¶¶ 16–18. Individual

Petteway Plaintiffs Petteway, Pope, and Rose are registered voters who reside in

Benchmark Precinct 3 and have been drawn into Precincts 1 and 2 under the Enacted Map.

*See supra*, FOF ¶¶ 13−15. They each have standing to assert that their district has been

"cracked" so that their votes carry less weight and that their former precinct, Benchmark

Precinct 3, was gerrymandered on the basis of race.

8.      "[A]n association has standing to bring suit on behalf of its members when

its members would have standing to sue in their own right, the interests at stake are germane

to the organization's purpose, and neither the claim asserted nor the relief requested

requires individuals members' participation in the lawsuit." *Ala. Legis. Black Caucus v.

Alabama*, 575 U.S. 254, 269 (2015) (citation omitted).

9.      Organizations must "identify members who have suffered the requisite harm" with specificity. *LULAC v. Abbott*, 604 F. Supp. 3d at 485 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488 499 (2009)).

10.     Organizational Plaintiffs Galveston NAACP, Mainland NAACP, Dickinson Bay Area NAACP, and LULAC Council 151 each have identified members who have standing to sue in their own right. Plaintiff Phillips is a member of Galveston NAACP, Plaintiff Courville is a member of Mainland NAACP, and Plaintiff Compian is a member of LULAC Council 151. *See supra*, FOF ¶¶ 16−18. Plaintiffs have also identified Lucille McGaskey as a member of Dickinson Bay Area NAACP who is a registered voter and lives in the Benchmark Precinct 3 and Enacted Precinct 4, FOF ¶ 19, thereby suffering the harms of alleged vote dilution and racial gerrymandering. Thus, each Organizational Plaintiff has a member who has standing to sue in their own right on each of their claims in this case.

11.     The missions of the NAACP and LULAC as stated above relate to advancing political equality, promoting voting rights and voter education, and combating discrimination. *See supra*, FOF ¶¶ 19−22. Because the claims relate to disenfranchisement and racial discrimination, the interests at stake are germane to the organizations' purposes.

12.     Neither the claims asserted nor the relief requested requires individual members' participation in the lawsuit.

13.     The Organizational Plaintiffs thus have associational standing to sue.

## II.     Section 2 of the Voting Rights Act

14.     Section 2 of the Voting Rights Act provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group] as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice. The extent to which members of a protected class have been elected to office is but one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

15.     Section 2 prohibits, *inter alia,* the use of redistricting plans that "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (internal citations and quotation marks omitted).

16.     Section 2 imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 557 (2013).

17.     A violation of Section 2 can be established either by proving the challenged voting standard, practice or procedure was adopted, at least in part, by a discriminatory intent or "by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991); *see also id.* at 394 n.21; *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc).

18.     Section 2 vote dilution claims that allege a discriminatory result are evaluated "using the three-part framework developed in" *Gingles*.[15] *Allen v. Milligan,* 599 U.S. ___, 143 S. Ct. 1487, 1502–03 (2023).

19.     In *Gingles*, the Supreme Court "construed" Section 2 to prohibit the "dispersal of a [minority] group's members into districts in which they constitute an ineffective minority of voters." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (alteration adopted) (quoting *Gingles*, 478 U.S. at 46 n.11). When "minority and majority voters consistently prefer different candidates" in such districts, "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters," thus depriving minorities of an equal opportunity to elect representatives of their choice. *Gingles*, 478 U.S. at 48.

20.     A successful Section 2 claim remedies that situation by requiring the creation of a majority-minority election district, in this case a commissioners court precinct, in which minority voters have an equal opportunity to be able to elect their preferred candidates. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality op.). Such districts are often described as "opportunity districts." *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 428–29 (2006).

21.     "To succeed in proving a § 2 violation under *Gingles,* plaintiffs must first satisfy three 'preconditions.'" *Milligan,* 143 S. Ct. at 1503 (quoting *Gingles*, 478 U.S. at

---

[15] *Gingles* itself involved Section 2 challenges to multimember districts, 478 U.S. at 46, but the Supreme Court later extended the analysis to apply to Section 2 challenges to single-member districts like the ones at issue here. *See Growe v. Emison*, 507 U.S. 25, 40–41 (1993).

50); *Wis. Legislature v. Wisc. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022). Each must be met for the claim to succeed. *Cooper*, 581 U.S. at 306. Having met these three preconditions, the plaintiff must show that, under the "totality of circumstances," the "political process is [not] equally open to minority voters" without the proposed district. *Wis. Legislature*, 142 S. Ct. at 1248 (quoting *Gingles*, 478 U.S. at 79).[16]

> **A.**   ***Gingles* I: Black and Latino voters are sufficiently large and geographically compact.**

22.    The first *Gingles* precondition ("*Gingles* I") requires that the minority group be "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50; *see also Milligan*, 143 S. Ct. at 1503; *LULAC*, 548 U.S. at 425 (citation omitted).

23.    Plaintiffs typically satisfy *Gingles* I by drawing illustrative majority-minority districts "to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Milligan*, 143 S. Ct. at 1503 (quoting *Growe*, 507 U.S. at 40); *see also id.* at 1504 (applying *Gingles* I to the "illustrative maps" adduced by plaintiffs). The sole purpose of these maps is to establish that the potential for a legally-compliant plan exists. They are not presented as a proposed plan that the jurisdiction must adopt as a remedy.

---

[16] Throughout this litigation Defendants have signaled their intent to challenge the Fifth Circuit's precedent finding coalition claims viable for purposes of Section 2, noting the contrary precedent from the Sixth Circuit. Because Plaintiffs have proved both discriminatory intent and discriminatory results under Section 2, Defendants' objection to the viability of coalition claims is inapposite. And because discriminatory intent violates Section 2 and not only the Constitution, the Court would find the presence of discriminatory intent under Section 2 even if it were to avoid reaching Plaintiffs' constitutional claims. *See infra*, COL ¶ 116.

24.     For jurisdictions in the Fifth Circuit, the minority group must be able to constitute a majority of the citizen voting age population ("CVAP") in an illustrative district. *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852–53 (5th Cir. 1999); *see also LULAC*, 548 U.S. at 427–29 (analyzing CVAP and noting that "only eligible voters affect a group's opportunity to elect candidates"). The burden of proof is "a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Bartlett*, 556 U.S. at 19–20.

25.     The Supreme Court has explained that a "district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." *Milligan*, 143 S. Ct. at 1503; *see also Miller v. Johnson*, 515 U.S. 900, 916 (1995) (identifying traditional districting criteria such as "compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests"). Courts may also consider other traditional redistricting criteria, including equal population, respect for political boundaries, and keeping together communities of interest. *See, e.g.*, *Milligan*, 143 S. Ct. at 1504; *Ala. Legis. Black Caucus*, 575 U.S. at 259; *Shaw v. Reno*, 509 U.S. 630, 651–52 (1993).

26.     Defendants do not dispute that Galveston's Black and Latino communities together are sufficiently large to satisfy the first *Gingles* precondition. Instead, Defendants contend that the Black and Latino population in Galveston County cannot form a coalition district for purposes of satisfying *Gingles* I and that Plaintiffs' illustrative plans are not reasonably configured. For the reasons below, the Court rejects each of Defendants' arguments.

27.     Fifth Circuit precedent expressly recognizes that Section 2 of the Voting Rights Act protects such minority coalition districts and thus forecloses Defendants' arguments to the contrary. *See, e.g.*, *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 863–64 (5th Cir. 1993) (en banc); *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1244 (5th Cir. 1988); *LULAC v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1499–1502 (5th Cir. 1987), *vacated on other grounds*, 829 F.2d 546 (5th Cir. 1987) (en banc).

28.     This Court "is governed by a strict rule of orderliness, such that later panels of [the Fifth Circuit], and much less district courts within the circuit, cannot overturn decisions of prior panels." *LULAC v. Abbott*, 604 F. Supp. 3d at 493.

29.     This Court will follow well-established Fifth Circuit precedent and recognize the Black and Latino population as a coalition for purposes of *Gingles* I. *See Perez v. Abbott*, 250 F. Supp. 3d 123, 138–39 (W.D. Tex. 2017) (three-judge court); *see also LULAC v. Abbott*, 3:21-cv-259, ECF No. 144, at 3 (W.D. Tex. Jan. 8, 2022) (noting that in *Bartlett*, the Supreme Court "specifically declined to address districts in which 'two minority groups form a coalition to elect a candidate of the coalition's choice,'" and concluding that *Bartlett* did not conflict with the Fifth Circuit's recognition of coalition districts in *Campos v. City of Baytown*).

30.     As to Defendants' second argument, Plaintiffs' illustrative plans, as well as the commissioners court's own Map 1, demonstrate that Galveston County's Black and Latino population is geographically compact enough to form a majority of eligible voters within a reasonably configured commissioners precinct. FOF ¶¶ 69−70. Plaintiffs' experts,

Mr. Cooper, Mr. Fairfax, and Dr. Rush have provided several illustrative plans that each contain one majority-Black and Latino commissioners court precinct while adhering to traditional redistricting criteria, including equal population, contiguity, and compactness. *See supra*, FOF ¶¶ 76−98. These illustrative maps are but a few examples of a multitude of potential districts that are reasonably configured and that contain a majority Black and Latino population by CVAP. *See supra*, FOF ¶ 97.

31.     Contrary to Defendants' contentions, "cultural compactness" is not a standalone element of Section 2 liability nor a standalone component of the *Gingles* I precondition. In *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006), the Supreme Court held that one of six Latino opportunity districts, CD25, was not "reasonably compact." *Id.* at 430. CD25 contained "a 300-mile gap between the Latino communities . . . and a similarly large gap between the needs and interests of the two groups." *Id.* at 432; *see also id.* at 434 (noting that "the different characteristics, needs, and interests of the Latino community near the Mexican border and the one in and around Austin are well supported and uncontested"). In so holding, the Court noted that "in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." *Id.* at 435. It concluded its discussion of CD25 with this critical caveat: "We emphasize it is the enormous geographical distance separating the Austin and Mexican-border communities, coupled with the disparate needs and interests of these populations—not either factor alone—that renders District 25 noncompact for § 2 purposes." *Id.*

32.     The Latino and Black areas joined in Plaintiffs' illustrative Precinct 3s are marked by neither the "enormous geographical distance" nor the "disparate needs and interests" which would lead to the configurations failing to be reasonably compact. *Id*.; *See supra*, FOF ¶¶ 99−107. To the contrary, there is substantial quantitative evidence, supported by lay witness testimony, that the needs and interests of communities included in Plaintiffs' illustrative plans are similar, including issues of ongoing discrimination. *See supra*, FOF ¶¶ 99−107, 396−500. Galveston's Latino and Black community, therefore, is reasonably compact.

33.     Plaintiffs' illustrative plans satisfy the traditional redistricting criterion of geographic compactness. Mr. Cooper, Mr. Fairfax, Dr. Rush, and Defendants' expert Dr. Owens each testified that all the illustrative maps are geographically compact. *See supra*, FOF ¶¶ 76−107. Indeed, their illustrative plans have compactness scores comparable to— and, in some cases, better than—the Enacted Plan. *See supra*, FOF ¶ 81. Even Defendants' expert Dr. Owens agreed that the illustrative plans are similarly compact as the Enacted Plan. Defs.' Ex. 290 at 16 (Owens Amended Report); Trial Tr. vol. 9, 229:1–20 (agreeing that "all of Plaintiffs' illustrative plans were about as reasonably compact as the enacted plan"), 276:11–19 (agreeing compactness scores are "generally the same" for the Enacted Map and Plaintiffs' illustrative plans) (Owens).

34.     While district shape is relevant to determining whether a district satisfies the compactness inquiry, *Gingles* I "does not require some aesthetic ideal of compactness, but simply that the [minority] population be sufficiently compact to constitute a majority in a single-member district." *Houston v. Lafayette Cnty.*, 56 F.3d 606, 611 (5th Cir. 1995)

(quoting *Clark v. Calhoun Cnty., Miss.* (*Clark I*), 21 F.3d 92, 95 (5th Cir. 1994). Here, Plaintiffs' illustrative plans are reasonably compact and thus it is not necessary for the Court to weigh them against the Enacted Plan in a "beauty contest." *Milligan*, 143 S. Ct. at 1505 (internal quotation marks omitted).

35.     All other traditional redistricting principles are satisfied in Plaintiffs' illustrative plans. They are contiguous and all satisfy the equal population criterion. *See supra*, FOF ¶¶ 76−98. The Supreme Court has recognized that a redistricting plan for local jurisdictions with a maximum overall population deviation under 10% is consistent with the principle of one-person, one-vote. *See Evenwel v. Abbott*, 578 U.S. 54, 60 (2016). Mr. Cooper, Mr. Fairfax, and Dr. Rush appropriately applied a +/- 5% deviation measure of approximate population equality when assessing their illustrative plans under *Gingles* I, and the population deviation in Plaintiffs' illustrative plans are in many instances better than or similar to that of the Enacted Plan.

36.     Plaintiffs' illustrative plans also maintain "traditional boundaries" by minimizing municipal and VTD splits. *LULAC*, 548 U.S. at 433 (internal quotation marks omitted). While Plaintiffs need not prioritize maintaining municipality and VTD lines to satisfy *Gingles* I, the illustrative plans performed better than or similar to the Enacted Plan in maintaining traditional boundaries. *See supra*, FOF ¶¶ 81, 83, 87.

37.     To the extent the Enacted Plan had some higher compactness scores or lower population deviation than some of Plaintiffs' illustrative plans, such evidence is not enough to defeat a Section 2 claim. *See Milligan*, 143 S. Ct. at 1504–05 (finding that plaintiffs' illustrative plans were reasonably configured, even where the challenged plan arguably

performed better on certain traditional redistricting criteria than the illustrative plans); *Chen v. City of Houston*, 206 F.3d 502, 519 (5th Cir. 2000). It is sufficient that Mr. Cooper, Mr. Fairfax, and Dr. Rush reliably testified that the illustrative plans comport with traditional redistricting principles such that they are reasonably configured. *See Milligan*, 143 S. Ct. at 1503 (describing *Gingles* I as requiring the minority group be "sufficiently large and geographically compact to constitute a majority in a reasonably configured district" and that a "district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact.").

38.     Finally, Plaintiffs have demonstrated that race did not predominate in the drawing of the illustrative maps. Mr. Cooper, Mr. Fairfax, and Dr. Rush credibly testified that neither race nor any single criterion predominated when they drew their illustrative plans. *See supra*, FOF ¶¶ 76−98. The illustrative plans' compliance with neutral redistricting criteria confirms this, and Defendants have failed to provide any reliable evidence to the contrary.

39.     Moreover, the Supreme Court has recently made clear that:

> [T]here is a difference 'between being aware of racial considerations and being motivated by them.' . . . The former is permissible; the latter is usually not. That is because '[r]edistricting legislatures will . . . almost always be aware of racial demographics,' . . . but such 'race consciousness does not lead inevitably to impermissible race discrimination.

*Milligan*, 143 S. Ct. at 1510 (quoting *Miller*, 515 U.S. at 916 and *Shaw*, 509 U.S. at 646). Indeed, Section 2 itself "'demands consideration of race'" because "[t]he question whether additional majority-*minority* districts can be drawn, after all, involves a 'quintessentially

race-conscious calculus.'" *Id.* (quoting *Abbott*, 581 U.S. ___ 138 S. Ct. 2305, 2315 (2018), and *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)). Consideration is not the same as predominance, and none of Defendants' arguments or expert analyses provide any compelling evidence that race predominated in Plaintiffs' illustrative plans.

40.     Applying controlling Section 2 caselaw, the Court concludes that the Black and Latino population in Galveston County is sufficiently large and geographically compact to constitute a majority in a commissioners court precinct, thereby satisfying the first *Gingles* precondition

### B.     *Gingles* II: Latino and Black voters are politically cohesive.

41.     In order to prevail on a Section 2 vote dilution claim, a minority group must "show that it is politically cohesive." *Gingles*, 478 U.S. at 51.

42.     Plaintiffs satisfy the *Gingles* II precondition by showing that "'a significant number of minority group members usually vote for the same candidates.'" *LULAC v. Abbott*, 604 F. Supp. 3d at 495 (quoting *Gingles*, 478 U.S. at 56). "The necessary size of the majority . . . is a district-specific inquiry." *Id.* at 495 n.22.

43.     "[T]here is no simple doctrinal test for the existence of legally significant racial bloc voting," *Gingles*, 478 U.S. at 58, and Plaintiffs' and Defendants' experts agreed that it is inappropriate to establish bright-line thresholds for assessing a continuous variable such as cohesion. *See supra*, FOF ¶ 116.

44.     "[T]he most persuasive evidence of inter-minority political cohesion for Section 2 purposes is to be found in *voting patterns*." *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989) (discussing *Campos*, 840 F.2d at 1244–45) (emphasis in original). For

coalition districts, unless the evidence indicates that two groups vote in opposition to each other, the court assesses the cohesion of Black and Latino voters "as a whole"—*i.e.*, as one "minority group" under *Gingles*—to determine "whether the minority group *together* votes in a cohesive manner." *Campos*, 840 F.2d at 1245 (emphasis added).

45.     This standard is rooted in the practical consideration that as one breaks up the available aggregate demographic and electoral data into subcategories, it becomes more difficult to precisely estimate the voting behavior of particular groups. *Id.* at 1245 n.6 (noting the difficulty of arriving at specific estimates for separate minority groups if there are substantial numbers of both minorities in the election precinct(s) analyzed).

46.     Statistical evidence is typically important, but it is not the "*sine qua non*" for proving cohesion, *Brewer*, 876 F.2d at 454, and "lay witness testimony concerning cooperation between the minority groups" is relevant. *Perez v. Abbott*, 274 F. Supp. 3d 624, 669 (W.D. Tex. 2017), *rev'd and remanded on other grounds*, 138 S. Ct. 2305 (2018); *Monroe v. City of Woodville*, 897 F.2d 763, 764 (5th Cir. 1990) (per curiam); *see also Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1118 n.12 (5th Cir. 1991).

47.     A court must undertake "a diligent inquiry into the political dynamics of the particular community" before treating multiple minority groups as a coalition, but "the determinative question is whether black-supported candidates receive a majority of the [Hispanic] vote [and] whether Hispanic-supported candidates receive a majority of the [Black] vote." *Brewer*, 876 F.2d at 453.

48.     All experts agreed that general elections are the most probative elections to consider for the purposes of this case. *See supra*, FOF ¶ 126.

49.     All experts agreed that the RxC ecological inference is an appropriate method to use for analyzing the voting patterns of different demographic groups in Galveston County. *See supra*, FOF ¶ 110. Using RxC ecological inference analysis, the undisputed results show that a large majority of Latino and Black voters prefer the same set of candidates. *See supra*, FOF ¶¶ 117−118. When the voter file is used to further refine analysis using the BISG method, the results show that an even higher estimated percentage of the two groups vote together. *See supra*, FOF ¶ 118.

50.     The general election results strongly support a conclusion that Black voters vote for Latino-preferred candidates and Latino voters vote for Black-preferred candidates. *See supra*, FOF ¶¶ 117−118.

51.     Analysis of primary elections in this case is less informative and reliable than general election analysis because of low turnout, the auxiliary role primaries play in the political process, and the closer ideological positions of primary candidates. *See supra*, FOF ¶¶ 127−131; *accord Texas v. United States,* 887 F. Supp. 2d 133, 174–75 (D.D.C. 2012), *vacated on other grounds and remanded*, 133 S. Ct. 2885 (2013).

52.     Though the Court puts significantly less weight on the statistical analysis of primary elections in this case, the combined results of Drs. Oskooii and Alford's Democratic primary analyses all point in the same direction and show that in 22 out of 24 (92%) of Democratic primaries, Latino and Black voters shared a top-choice candidate. *See supra*, FOF ¶¶ 132−135.

53.     Plaintiffs produced ample evidence of non-statistical cohesion between the Latino and Black communities in Galveston County. *See supra*, FOF 143−146. This leads the Court to conclude that there are distinctive minority interests that tie the two communities together. *Cf. Gingles*, 478 U.S. at 51 (discussing whether an "electoral structure thwarts distinctive minority group interests.").

54.     Taken together, the statistical analysis of general elections, the statistical analysis of primary elections, and the non-statistical evidence of cohesion, all support the conclusion that it is appropriate to consider Black and Latino voters as a coalition for purposes of *Gingles II* because "black-supported candidates receive a majority of the [Hispanic] vote [and] Hispanic-supported candidates receive a majority of the [Black] vote." *Brewer*, 876 F.2d at 453.

55.     When considering the combined Latino and Black coalition, the undisputed evidence shows that the group is highly cohesive. The undisputed RxC ecological inference analysis shows that over 85% of Latino and Black voters vote for the same candidates across a series of elections. *See supra*, FOF ¶¶ 108−141. This satisfies the *Gingles* standard that "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56.

56.     A reconstituted election/electoral performance analysis is an appropriate methodology for determining presence of racial bloc voting. *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 693 (S.D. Tex. 2017).

57.     The reconstituted/electoral performance analyses conducted by Plaintiffs' experts shows that if this cohesive group constitutes a majority of eligible voters in a county

commissioner precinct, they will be able to elect a candidate of their choice. FOF ¶¶ 155−157. *Cf. Milligan*, 143 S. Ct. at 1503 (citing *Growe*, 507 U.S. at 40 ("The second [*Gingles* precondition], concerning the political cohesiveness of the minority group, shows that a representative of its choice would in fact be elected."

      **C.**    ***Gingles* III: Anglo voters vote as a bloc to defeat the candidate of choice of minority voters.**

58.    Generally, "a white bloc vote that normally will defeat the combined strength of minority support plus white crossover votes rises to the level of legally significant white bloc voting." *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 757 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015) (quoting *Gingles*, 478 U.S. at 56).

59.    Defendants do not dispute the statistical evidence of Drs. Barreto and Oskooii which shows that upwards of 85% of Anglos vote cohesively in opposition to 85+% of Black/Latino voters. *See supra*, FOF ¶¶ 117, 160.

60.    Defendants do not dispute the reconstituted/electoral performance analyses of Plaintiffs' experts, which show that the degree of Anglo bloc voting is sufficient to defeat a minority-preferred candidate in each commissioner precinct in the Enacted Plan. *See supra*, FOF ¶ 154.

61.    Democratic primaries do not provide an appropriate data set to consider the patterns of Anglo voters in Galveston County for a *Gingles* III analysis. *See supra*, FOF ¶¶ 127−131, 135; *cf. Patino*, 230 F. Supp. 3d at 694; *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1225 (S.D. Tex. 1997), *aff'd* 165 F.3d 368 (5th Cir. 1999) (finding that

primaries are less probative for detecting racially polarized voting because they do not present the same candidate pool to all voters).

62.     The undisputed evidence shows that Anglo voters in Galveston vote cohesively and in opposition to Latino and Black voters and that they do so at a sufficient rate to defeat the minority-preferred candidate consistently in each of the enacted commissioners court precincts. FOF ¶¶ 148−163.

**D.     The racially divergent voting patterns in Galveston County cannot be dismissed as "mere partisanship."**

63.     After Plaintiffs present statistical evidence showing a racially divergent voting pattern, the burden shifts to Defendants to show that there is a race-neutral explanation for the racially divergent voting pattern. *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 290 (5th Cir. 1996); *see Gingles*, 478 U.S. at 63; *Rodriguez*, 964 F. Supp. 2d at 760, *aff'd* 601 F. App'x 255; *Lopez v. Abbott*, 339 F. Supp. 3d 589, 604 (S.D. Tex. 2018); *Clark v. Calhoun Cnty.* (*Clark II*)*,* 88 F.3d 1393, 1397 (5th Cir. 1996).

64.     In "proving up the *Gingles* factors," the burden is not on Plaintiffs to prove racial animus in the electorate. *Teague*, 92 F.3d at 290.

65.     Instead, Plaintiffs must show "'that the challenged districting thwarts a distinctive minority vote at least plausibly on account of race.'" *Milligan*, 143 S. Ct. at 1503 (quoting *Growe*, 507 U.S. at 40).

66.     Whether or not the Anglo-preferred elected officials are responsive to minority communities "is intimately related" to the legal significance of bloc voting because if there is bloc voting, it "'allows those elected to ignore [minority] interests

without fear of political consequences.'" *Clements*, 999 F.2d at 857 (quoting *Gingles*, 478 U.S. at 48 n.14).

67.     By establishing the second and third *Gingles* preconditions through both acceptable statistical evidence and testimony from voters, Plaintiffs have shown that racially polarized voting patterns exist in Galveston County elections. *See supra*, FOF ¶¶ 108−163.

68.     Defendants have failed to present any reliable or methodologically sound evidence sufficient to dispute that Anglo bloc voting "thwarts" the cohesive Black and Latino voters in Galveston County for reasons wholly unconnected to race. *See supra,* FOF ¶¶ 164−186.

69.     Even if the court credits to some extent the sparse and unreliable evidence Defendants did introduce that the highly racially divergent voting patterns in this jurisdiction are explained by wholly race-neutral considerations, the preponderance of the evidence supports the conclusion that the challenged plan "'thwarts a distinctive minority vote' at least plausibly on account of race." *Milligan*, 143 S. Ct. at 1503 (quoting *Growe*, 507 U.S. at 40).

70.     In reaching this conclusion, the Court gives considerable weight to the facts that: (i) Plaintiffs' quantitative experts concluded that partisanship does not account for Galveston County's patterns of racially polarized voting, *supra*, FOF ¶¶ 164−186; (ii) the lack of successful minority candidates emerging from Republican primaries, *supra*, FOF ¶¶ 175−178, 421−451; (iii) the extremity of the Anglo bloc voting in opposition to minority-preferred candidates, *supra*, FOF ¶¶ 148−163; (iii) even in nonpartisan contexts,

minority candidates tend to only be elected from majority-minority areas, *supra*, FOF ¶¶ 141; (iv) racial appeals continue to be used in political contexts in Galveston County, *supra*, FOF ¶¶ 415−420; (v) individuals testified as to continued overt discrimination in Galveston County, *supra*, FOF ¶¶ 396−500; (vi) Black and Latino residents of Galveston County continue to face disparities across a wide range of issues in Galveston County, *supra*, *id.*, FOF ¶¶ 104; and (vii) Anglo voters in Galveston County generally participate in the Republican primary, while Black and Latino voters in Galveston County generally participate in the Democratic primaries, FOF ¶¶ 173–174. *See Clements*, 999 F.2d at 860-61 (holding that "partisan affiliation may serve as a proxy for illegitimate racial considerations" but concluding that was not so because white voters were majority of both Republican and Democratic parties in relevant jurisdictions and because both parties recruited and nominated minority candidates in relevant elections). The factors that caused the Fifth Circuit in *Clements* to doubt that partisan affiliation served as proxy for racial considerations point in the opposite direction here.

71.    In sum, and based on the foregoing analysis, the Court concludes that all three *Gingles* preconditions are met here.

### E.    The totality of the circumstances supports a finding of vote dilution.

72.    After examining the *Gingles* preconditions, courts "adhere to the Supreme Court's instruction to examine challenged laws and practices in an intensely fact-based and local totality-of-the-circumstances analysis." *Veasey*, 830 F.3d at 261 (citing *Gingles*, 478 U.S. at 36–38). "'[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2

under the totality of the circumstances.'" *Clark I*, 21 F.3d at 97 (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). The Senate Report that accompanied the 1982 amendments to Section 2 guides that totality of the circumstances inquiry. *See Gingles*, 478 U.S. at 36–37.

73.    The Senate Report factors include, but are not limited to:

1.  the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2.  the extent to which voting in the elections of the state or political subdivision is racially polarized;
3.  the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4.  if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5.  the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6.  whether political campaigns have been characterized by overt or subtle racial appeals;
7.  the extent to which members of the minority group have been elected to public office in the jurisdiction;

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[;]

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37 (quoting S. Rep. 97-417 at 28–29).

74.    "[T]his list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered. Furthermore, . . . there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (internal quotations and citations omitted).

75.    There is no requirement that plaintiffs prove intentional discrimination to establish a Section 2 results violation. *Gingles*, 478 U.S. at 35 ("Congress substantially revised § 2 [in 1982] to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test'"); at 43–44 ("First and foremost, the [Senate] Report [for the 1982 amendment to Section 2] dispositively rejects the position of the plurality in *Mobile v. Bolden*, 446 U.S. 55 (1980), which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters.") (footnote omitted); *accord Chisom*, 501 U.S. at 404.

76.    State-level policies and practices are relevant considerations even though they are not themselves adopted by the county or localities within the county, as is private, non-governmental discrimination. *See, e.g.*, *Rodriguez*, 964 F. Supp. 2d at 783–85, *aff'd sub nom. Gonzalez*, 601 F. App'x 255 (considering Texas state policies, including the state's voter ID law, and private acts of voter intimidation in assessing Senate Factor 3).

77.     A Section 2 "totality of the circumstances" analysis "depends upon a searching practical evaluation of the 'past and present reality,' [citation omitted] and on a 'functional' view of the political process." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417 30 (1982)). This is accomplished by a court "assess[ing] the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors'" identified in a non-exhaustive list in the Senate Report. *Id*. at 44 (quoting S. Rep. No. 97-417 at 27).

78.     Here, nearly all the Senate Factors have characterized the circumstances of the Black and Latino communities in Galveston County. *See generally* Pls.' Ex. 335 (Rocha Expert Report); Pls.' Ex. 414 (Burch Expert Report). There is a lengthy history of official and *de facto* discrimination related to voting, a long history of racially polarized voting, presence of dilutive voting practices, substantial socio-economic differences between Black and Latino residents and Anglo residents in Galveston County that create barriers to voting, a presence of racial appeals in recent local political campaigns, a relative lack of Black and Latino electoral success, and a lack of responsiveness on the part of Galveston County's officials to the needs of the Black and Latino communities. *See generally supra*, FOF ¶¶ 196−210, 396−500. Further, the 2021 redistricting plan's justifications are tenuous, FOF ¶¶ 364−395, and will prevent Galveston County's Black and Latino communities to elect a candidate of their choice. FOF ¶ 154.

79.     Senate Factor 1: History of Official Discrimination. Plaintiffs have shown that the 2021 redistricting plan "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their

preferred representatives." *Gingles*, 478 U.S. at 47. As the Fifth Circuit recognizes, although "contemporary examples of discrimination are more probative than historical examples," "even long-ago acts of official discrimination give context" to the analysis for Senate Factor 1. *Veasey*, 830 F.3d at 257 (also characterizing evidence from "every redistricting cycle since 1970" as "contemporary"); *Patino*, 230 F. Supp. 3d at 682–84 (discussing history of discriminatory election laws in Texas and how this "past discrimination for Latinos in Texas also hinders their current ability to participate effectively in the political process"). As such, even long-ago official voting-related discrimination in Galveston County remains relevant. Furthermore, much of the history relied on by Plaintiffs occurred during the lifetimes of current Galveston voters, which cautions against discounting that history as long-past or unhelpful. *See Singleton v. Merrill*, 582 F. Supp. 3d 924, 1020 (M.D. Ala. 2022) ("If Alabama's history . . . is sufficiently recent for a plaintiff to recall firsthand how that history impacted his childhood, then it seems insufficiently distant for us to completely disregard it in a step of our analysis that commands us to consider history."), *aff'd sub nom. Milligan*, 143 S. Ct. at 1506 (explicitly acknowledging the district court's findings as to "Alabama's extensive history of repugnant racial and voting-related discrimination); *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 847 (M.D. La. 2022), *cert. before judgment dismissed as improvidently granted*, 143 S. Ct. 2654 (2023) ("In this context, taking a broader look is well justified. A Black Louisianan born in 1965, the year the Voting Rights Act was passed, is only 57 years old today. This is not ancient history.").

80.     Galveston County's history of official voting-related discrimination did not end with the enactment of the Voting Rights Act in 1965, the enactment of the 1975 amendments resulting in Texas becoming subject to the Section 5 preclearance requirement, *see Briscoe v. Bell*, 432 U.S. 404 (1977), or with the enactment of 1982 amendments prohibiting practices having a discriminatory result. Instead, Texas and its subdivisions, including Galveston County, have been subject to multiple Section 5 objection letters and lawsuits challenging discriminatory voting changes. *See supra*, FOF ¶¶ 201−210.

81.     Senate Factor 2: Racially Polarized Voting. Plaintiffs have shown extensive evidence of racially polarized voting in Galveston County. Racial bloc voting "allows those elected to ignore [minority] interests without fear of political consequences," *Rogers v. Lodge*, 458 U.S. 613, 623 (1982), and racial bloc voting continues to be a reality in Galveston County elections. *See supra*, FOF ¶¶ 108−163.

82.     Senate Factor 3: Voting Practices Enhancing the Opportunity for Discrimination. Plaintiffs have also shown that voting practices exist that may "enhance the possibility that the County's map has a dilutive effect." *Rodriguez*, 964 F. Supp. 2d at 785, *aff'd sub nom. Gonzalez*, 601 F. App'x 255. Practices that have been deemed to satisfy this factor and exist in Galveston County include discriminatory voter purges, failure to ensure voters in fact have access to multi-lingual voter information (deemed relevant even in a county that had improved access to such materials over the past 15 to 20 years), questions by poll workers to voters about their citizenship status, disparate access to polling places, and photo identification requirements. *Id.* at 780–84; *see also supra*, FOF

¶¶ 402−420. The majority-vote requirement for primaries, *see supra*, FOF ¶ 414, provides further support. *See Jamison v. Tupelo*, 471 F. Supp. 2d 706, 714 (N.D. Miss. 2007) ("Majority vote primaries reduce the chance that a minority candidate will advance to a general election.").

83.    Senate Factor 5: Effects of Discrimination Hindering Political Participation. Plaintiffs have demonstrated deep socioeconomic disparities between Galveston County's Black and Latino communities, on the one hand, and the Anglo population on the other. Defendants do not contest this evidence. *See* Trial Tr. vol. 10, 280:13-19 (Defs.' Mot.).

84.    In addition, Black and Latino voters participate in Galveston County elections at a lower rate than do Anglo voters. *See supra*, FOF ¶¶ 400–401. Because "courts have recognized that disproportionate educational, employment, income levels and living conditions arising from past discrimination tend to depress minority political participation, . . . plaintiffs need not prove any further causal nexus between their disparate socioeconomic status and the depressed level of political participation." S. Rep. 97-417 at 29 n.114 (citing *White v. Regester*, 412 U.S. 755, 768 (1973) *and Kirksey v. Bd. of Supervisors*, 528 F.2d 139, 145 (5th Cir. 1977)); *see also Clark II*, 88 F.3d at 1399; *Clements*, 999 F.2d at 867 (Senate Report does not "insist[] upon a causal nexus between socioeconomic status and depressed participation"); *Patino*, 230 F. Supp. 3d at 695–97 (analyzing socioeconomic disparities and concluding they "dampen" minority turnout "and contribute to making it more difficult for Latinos to elect their candidates of choice, even though when Latinos vote, they vote cohesively.").

85.     Further, Plaintiffs' experts have shown the effect of the education, economic, housing, health, and other racially linked disparities present in Galveston County negatively affect voter behavior. *See supra*, FOF ¶¶ 396−420, 452–500.

86.     *Senate Factor 6: Racial Appeals.* Evidence of racial appeals in political campaigns, even while "neither frequent nor routine," can "contribute" to a finding that minority voters lack equal opportunities to participate politically. *Patino*, 230 F. Supp. 3d at 715 (finding as relevant under this Senate Factor even infrequent racial appeals as contributing to unequal opportunities of political participation of city's Latino population). Here, Plaintiffs have demonstrated this factor by showing unrebutted evidence of racial appeals in recent political campaigns. *See supra*, FOF ¶¶ 415−420.

87.     Senate Factor 7: Minority Election to Public Office. Black and Latino candidates' success in elections "has been slow, slight, and disproportionately lower than" their population share in Galveston County. *Patino*, 230 F. Supp. 3d at 715. In analyzing whether "minority voices are heard in a meaningful way during pertinent political decisions, versus being shut out of the process altogether," the Court concludes that the 2021 redistricting plan and its elimination of the long-standing equal opportunity of Black and Latino voters to elect a candidate of choice in Precinct 3 falls squarely within the latter category. *Johnson v. Waller Cnty.*, 593 F. Supp. 3d 540, 608 (S.D. Tex. 2022); *see also Clark II*, 88 F.3d at 1397 (holding that lack of minority electoral success in relevant district has significant impact on the evaluation of vote-dilution claims).

88.     Additional Senate Factor: Lack of Responsiveness. Along with the enumerated Senate Factors, the totality of the circumstances inquiry "requires a court to

ask whether there is a significant lack of responsiveness by elected officials to the minority group members' particularized needs." *Patino*, 230 F. Supp. 3d at 715–16. Here, this factor weighs heavily in favor of the Plaintiffs. Numerous witnesses testified to the lack of responsiveness by the commissioners court in public housing, particularly after Hurricane Ike, education, and criminal justice. *See supra*, FOF ¶¶ 421–451. Additionally, the process by which the 2021 redistricting plan was adopted itself demonstrates the County's pattern of "[i]gnoring clear and supported objections about the racially disparate impact of a proposed law is probative of a lack of responsiveness to minority concerns." *Patino*, 230 F. Supp. 3d at 717 (citing *Veasey*, 830 F.3d at 262).

89.    <u>Additional Senate Factor: Tenuousness of Policy.</u> Moreover, "[a]long with elected officials' lack of responsiveness to minority needs, a tenuous fit between the expressed policy and the provisions of the law bolsters the conclusion that minorities are not able to equally participate in the political process." *Veasey*, 830 F.3d at 262–63. While a jurisdiction "is entitled to make policy choices about when and how it will address various priorities," a policy's rationales are tenuous when the enacted law "fail[s] to correspond in any meaningful way to the legitimate interests the State claims to have been advancing." *Id.* at 263. Here, the stated reason for a single coastal precinct is a *post hoc* rationalization for which very few members of the public advocated. *See supra*, FOF ¶¶ 376–385. The rationale is further undermined by the existence of several maps that both create a single coastal precinct and maintain a majority-minority precinct. *Id*. The other criteria similarly do not require the Enacted Plan's cracking of the majority-minority population in Galveston. FOF ¶¶ 364–395.

90.   <u>Additional Relevant Factor: Proportionality.</u> Finally, "proportionality is 'a relevant fact in the totality of circumstances.'" *LULAC*, 548 U.S. at 436 (quoting *De Grandy*, 512 U.S. at 1000); *see also De Grandy*, 512 U.S. at 1025 (O'Connor, J., concurring) ("Lack of proportionality is probative evidence of vote dilution."). Although not dispositive, it is a relevant consideration. *LULAC*, 548 U.S. at 436. In a vote dilution claim, "'it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important.'" *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 503 (5th Cir. 1987) (quoting *Gingles*, 478 U.S. at 69) (emphases omitted).

91.    For that reason, it is irrelevant that Commissioner Armstrong is Black, where his precinct is comprised of predominantly Anglo voters, he has never won a competitive election, and witnesses emphatically deny that he is the candidate of choice of Black and Latino voters. *See supra*, FOF ¶¶ 425−428. The Enacted Plan would not provide an opportunity for the minority community to elect that is proportional to the County's minority population.

92.    The County's plan precludes Black and Latino voters from electing a candidate of choice in any commissioners precinct and does so in a county where these two groups comprise 38% of its total population. Moreover, it eliminated an existing commissioners precinct where such an opportunity existed for decades. Taken together, it is clear that under the totality of the circumstances, the political process is not equally open to minority voters under the Enacted Plan.

93.     Plaintiffs have demonstrated that the totality of the circumstances show Latino and Black voters in Galveston County have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Gingles*, 478 U.S. at 63; *see also Patino*, 230 F. Supp. 3d at 729 ("Curing the § 2 violation requires that the map provide Latino voters an equal opportunity to elect their candidates of choice.").

## III.   Intentional Discrimination under Section 2 of the VRA and the U.S. Constitution

94.     A challenged redistricting plan violates the Fourteenth and Fifteenth Amendments if it is enacted with a discriminatory purpose and has discriminatory effects. *See Harding v. County of Dallas*, 948 F.3d 302, 312 (5th Cir. 2020). Similarly, a redistricting plan also violates Section 2 of the Voting Rights Act if racial discrimination was one purpose of the challenged government action. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009).[17]

95.     As an initial matter, where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face," the "evidentiary inquiry is then relatively easy." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 266 (1977). That is, an action clearly designed with the "essential inevitable effect" of discriminating on the basis of race is unconstitutional on its face. *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960).

---

[17] Of course, "the legislative history of section 2 and case law also make clear that voters may bring a claim based on discriminatory voting practices using either the results test *or* an intentional discrimination test." *Perez v. Abbott*, 274 F. Supp. 3d 624, 637 (W.D. Tex. 2017). Accordingly, the Court incorporates by reference only the totality of the circumstances conclusions above. *See supra*, COL ¶¶ 72–93.

96.     But importantly, to prove an intentional-discrimination claim, "racial discrimination need only be one purpose, and not even a primary purpose" of the challenged plan. *Veasey*, 830 F.3d at 230 (en banc) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). Furthermore, "discriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Rather, "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of [the legislature's] actions may be considered." *Brown*, 561 F.3d at 433. As the *en banc* Fifth Circuit has explained,

> [i]n this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence. To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.

*Veasey*, 830 F.3d at 235-6.

97.     Although discriminatory purpose "implies more than intent as volition or intent as awareness of consequences," there is a "strong inference" that adverse effects were desired when they were an inevitable result of a government's chosen action, but otherwise avoidable. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 & n.25 (1979)).

98.     In redistricting, intentionally fragmenting minority populations violates Section 2 of the Voting Rights Act as well as the Fourteenth and Fifteenth Amendments. The gravamen of an intentional vote-dilution claim is that the commissioners court enacted "a particular voting scheme as a purposeful device to minimize or cancel out the voting

potential of racial or ethnic minorities." *Perez v. Abbott*, 253 F. Supp. 3d 864, 932 (W.D. Tex. 2017) (internal quotation marks omitted). This remains true regardless of whether the challenged plan concerns the destruction of a minority coalition district or a functioning crossover district. *See Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (Kennedy, J., Roberts, C.J., Alito, J., lead op.) ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments.").

99.     Courts use the factors outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to determine if the decision-makers acted with illicit intent. *LULAC v. Abbott*, 601 F. Supp. 3d 147, 160–61 (W.D. Tex. 2022) ("*LULAC II*"); *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (applying *Arlington Heights* factors in Section 2 intent claims). In intentional-vote dilution claims, plaintiffs may show a violation by showing race was "*part* of [the defendants'] redistricting calculus." *LULAC II*, 601 F. Supp. 3d at 161. Similarly, plaintiffs may prove a VRA Section 2 claim of intentional discrimination by showing that racial discrimination was one purpose of the challenged government action. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009).

100.     Under *Arlington Heights*, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. "The impact of the official action . . . provide[s] an important starting point." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). From there, courts consider "five

191

nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose": (1) "the historical background of the decision," (2) "the specific sequence of events leading up to the decision," (3) "departures from the normal procedural sequence," (4) "substantive departures," and (5) "legislative history." *Veasey*, 830 F.3d at 231 (quotation marks omitted); *see also Arlington Heights*, 429 U.S. at 267–68. Evidence of "race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will toward minorities because of their race," is *not* required. *Perez*, 253 F. Supp. 3d at 948.

101.   As discussed below, this Court need not reach the *Arlington Heights* factors because the manner in which the County devised and adopted the Enacted Plan and the obvious discriminatory effect it had on Black and Latino residents of Galveston County permits no other conclusion. Under prior commissioners precincts plans, Black and Latino voters had the opportunity to elect at least one candidate of their choice. Under the Enacted Plan, Defendants knowingly split apart Black and Latino communities across four precincts and have placed the known minority candidate of choice in a precinct that is less than 30 percent Black and Latino. Having disclaimed all partisan motivation, the effects of the Enacted Plan were so "inevitable" that a finding of racial discrimination is "tantamount for all practical purposes to a mathematical demonstration." *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960). As such, the adoption of the Enacted Plan is intentionally discriminatory on its face.

102.   Indeed, Defendants began with a map option that would preserve a majority minority Precinct (Precinct 3 in Map 1) and then carved that Precinct into four pieces in

Map 2. The creation and subsequent elimination of the majority minority precinct in the drafting process is evidence of discriminatory intent. For example, in *Perez v. Abbott*, Texas's 2011 map for the Dallas Fort Worth area congressional districts was enjoined as intentionally discriminatory where "the map looked as though mapdrawers started out with the district they wanted to avoid"—a "minority coalition district"—"and then carved it up into pieces." 253 F. Supp. 3d 864, 954 (W.D. Tex. 2017).[18] That is precisely what happened here. A precinct all knew would perform to elect the minority preferred candidate was drawn and them systematically dismantled in the final map.

103.    However, even an assessment of the *Arlington Heights* factors here requires the conclusion that discriminatory racial intent motivated, at least in part, the design and adoption of the Enacted Plan. The Galveston County commissioners court adopted an Enacted Plan with an undeniably discriminatory impact on Galveston's Black and Latino voters, a result that is neither justified nor the natural consequence of their purported redistricting goals. Instead, there is significant direct and circumstantial evidence that the Enacted Plan was designed to actively undo what was perceived by some to be a racially-constructed majority-minority district, and that the Enacted Plan was configured at least in part to execute a countervailing racial deconstruction of the district by distributing the minority residents of the former district among all four new commissioners precincts.

---

[18] The *Perez* court's adjudication of the 2011 congressional plan was never appealed. Although the Supreme Court later reversed aspects of its decision regarding the 2013 plan, the intentional discrimination finding with respect to the 2011 plan was undisturbed. *See Abbott v. Perez*, 138 S. Ct. 2305, 2317 n.8 (2018).

104.    This action occurred within the historical context of repeated efforts by Galveston County to retrogress minority voting rights. The commissioners court deviated in nearly every manner from prior redistricting cycles, running askew of procedural laws along the way that would otherwise have permitted the transparent process guaranteed under law but denied to Galveston's residents in the 2021 redistricting cycle. The conclusion that Galveston's commissioners court engaged in unlawful intentional discrimination does not equate to nor even suggest that any member of that body harbors racial hatred or animosity toward any minority group. But they intentionally discriminated against those voters nonetheless and violated Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments in doing so.

A.    **The discriminatory impact of the Enacted Plan on Galveston's Black and Latino voters provides strong circumstantial and direct evidence of discriminatory intent.**

105.    There can be "little question that dismantling" a performing precinct has "a disparate impact on racial minority groups." *Texas v. United States*, 887 F. Supp. 2d 133, 163 (D.D.C. 2012), *vacated on other grounds*, 570 U.S. 928 (2013).

106.    The Enacted Plan is a textbook cracking of Galveston's Black and Latino population between all four new commissioners precincts, dismantling a long-standing and performing majority-minority district. *See supra*, FOF ¶¶ 187−195; *see also* Trial Tr. vol. 3, 42:17–43:9 (Cooper) (describing the Enacted Plan as "textbook example of a racial gerrymander"). The members of the commissioners court who designed and voted to adopt the Enacted Plan knew Precinct 3 was the county's sole majority-minority district at the start of the redistricting cycle, and knew the Enacted Plan would (and, as detailed below,

designed it to) dismantle this district, placing the sole minority Commissioner in the lowest minority-population district as a result. *See supra*, FOF ¶¶ 187−195, 230. As one commissioner put it, all one had to do was "look at the picture and tell" the other option was much better for Commissioner Holmes. Trial Tr. vol. 9, 372:15–25 (Apffel). In other words, what Plaintiffs' experts have shown now was obvious then: the Enacted Plan on its face targets Galveston's Latino and Black voters "with almost surgical precision." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016). The foreseeable effect that they would be diluting minority voting power is "objective evidence that, combined with other evidence, provide[s] ample support for finding discriminatory intent." *Patino*, 230 F. Supp. 3d at 728.

107.   Plaintiffs' illustrative plans demonstrate that the discriminatory impact of the Enacted Plan was neither required nor the natural consequence of the purported goals of the county commissioners when they sought to redistrict. *See supra*, FOF ¶¶ 76−98, 364−395. The existence of alternative maps that satisfy the purported objective of the challenged plan without its discriminatory effect is also "key evidence" and a "highly persuasive way" to disprove purported race-neutral justifications. *Cooper,* 581 U.S. at 317.

108.   As the Supreme Court explained in *Cooper*: "If you were *really* sorting by [the purported justification] instead of skin color (so the argument goes) you would have done—or, at least, could just as well have done—*this*. Such would-have, could-have, and (to round out the set) should-have arguments are a familiar means of undermining a claim that an action was based on a permissible, rather than a prohibited, ground." *Id.* (emphasis in original).

109.    In *Cooper*, the claim was racial gerrymandering and a partisan motivation was alleged. *Id.* But evidentiary value of alternative maps "extends just as easily to intentional vote dilution," *LULAC II*, 601 F. Supp. 3d at 177, and is not limited to claims of partisan motivation, but extends to any purported justification behind a map's lines.

110.    In Galveston, none of the commissioners court's "asserted justifications" of equalizing population, creating a new coastal precinct, adopting an "easy to understand" map, or the myriad of other purported redistricting considerations necessitated dismantling the sole and longstanding majority-minority precinct in a county with 45% minority population. *See supra*, FOF ¶¶ 364−395. Defendants thus "cannot and do not conceal" their "true motivation" in adopting the Enacted Plan of achieving its discriminatory impact. *McCrory,* 831 F.3d at 214. Accordingly, the Court appropriately draws a "strong inference" from Plaintiffs' alternative maps that the adverse impact of the Enacted Plan was desired. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 & n.25 (1979)).

111.    There is further direct evidence that reducing the percentage minority population in Precinct 3 was at least *a* motivating factor in the commissioners court's design and adoption of the Enacted Plan.

112.    It is important to emphasize that Defendants need not have been motivated by any sort of "subjective personal racism" so long as they had an "an intent or purpose to discriminate by taking a course of action that [would] cause a racially disparate adverse impact, at least in part in order to achieve that impact." *Patino*, 230 F. Supp. 3d at 725–26(citing *Veasey*, 830 F.3d at 241). Here, it appears at least one motivating factor for the Enacted Plan's design and adoption was the purported belief that maintaining Precinct 3

would be an unconstitutional racial gerrymander. The commissioners who voted for Map 2 knew that it would reduce the minority population of Precinct 3. Trial Tr. vol. 7, 303:8–15, 347:7–11 (Henry); Trial Tr. vol. 9, 141:25–142:8, 148:5–19; 149:9–24 (Giusti); Trial Tr. vol. 9, 372:15–25 (Apffel). And at least two of them thought some reduction in the minority population was actively needed because they viewed the Benchmark Precinct 3 as a racial gerrymander. Trial Tr. vol. 7, 302:9–22, 305:6–19 (Henry); Trial Tr. vol. 9, 356:7–14 (Apffel); Trial Tr. vol. 8, 178:19–21 (Oldham). But the evidence shows that they were told by their redistricting counsel, Mr. Oldham, that retaining the basic configuration of Precinct 3 (as Map 1 did) would *not* be an unlawful racial gerrymander. Trial Tr. vol. 8, 181:20-182:9 (Oldham).

113. Thus, a desire on their behalf to fragment Precinct 3's minority population into all four precincts cannot be excused as a good faith attempt to correct a perceived unconstitutional racial gerrymander. Rather, in light of their knowledge of Mr. Oldham's assessment that Precinct 3 in Map 1 was lawful, the discussion of the racial composition of Precinct 3 instead reveals knowledge and intent to withdraw from Galveston County's minority voters the opportunity to continue electing their preferred candidate to the commissioners court.

114. Setting aside that the county failed to conduct a good faith analysis of what Section 2 of the Voting Rights Act might require, which goes to the substantive departure prong of *Arlington Heights* discussed below, the issue is not whether the commissioners court subjectively genuinely believed that the prior Precinct 3 was a racial gerrymander, the issue is that purposefully eliminating the precinct to deliberately countervail a previous

decision is direct evidence that the commissioners court reduced the minority percentage in Precinct 3 at least partially for the sake of reducing that percentage.

115.    This discriminatory intent exists regardless of whether it was executed by purposefully moving additional "principally Anglo voters" from Bolivar into Precinct 3 in Map 1 "to deal with the racial gerrymandered map in Precinct 3," as their counsel argued in opening, Trial Tr. vol. 1, 44:10–20 (Defendants' Opening Statement), or by intentionally designing and adopting a map that dismantled the core of Galveston's sole majority-minority commissioners precinct to "resolve[] any issues of Precinct 3 then being a gerrymandered map," *id.* at 45:5-6, as the map drawing-related evidence tends to support. *See supra*, FOF ¶¶ 222−274. In either or both scenarios, the commissioners court and their counsel had the pre-existing knowledge of where racial groups lived in the County, and viewed the racial data during the map-drawing itself, to execute on their desires. *See supra*, FOF ¶¶ 230, 249−257. And both of these explanations for the dismantling of Benchmark Precinct 3, which are not mutually exclusive, constitute "taking a course of action that will cause a racially disparate adverse impact, at least in part in order to achieve that impact." *Patino*, 230 F. Supp. 3d at 725–26.

116.    Defendants' contention that Benchmark Precinct 3 was no more than a Black cross-over district is legally inapposite to concluding their actions were unlawful. Defendants' actions would run afoul of the law regardless of whether their discriminatory action targets Black and Latino voters alike, or individually. *See Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (Kennedy, J., Roberts, C.J., Alito, J., lead op.) ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover

districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments."); s*ee also, id.* ("[E]vidence of intentional discrimination tends to suggest that the jurisdiction is not providing an equal opportunity to minority voters to elect the representative of their choice, and it is therefore unnecessary to consider the majority-minority requirement before proceeding to the ultimate totality of circumstances analysis" (internal quotation marks omitted)); *Garza v. County of Los Angeles*, 918 F.2d 763, 769 (9th Cir. 1990) (holding that *Gingles* I precondition only requires showing of majority-minority district in absence of showing of intentional discrimination); *Perez v. Abbott*, 253 F. Supp. 3d 864, 944 (W.D. Tex. 2017) (rejecting argument that statutory Section 2 intentional discrimination claims require satisfying first *Gingles* prong); *Comm. for a Fair & Balanced Map v. Ill. Bd. of Elections*, No. 1:11-CV-5065, 2011 WL 5185567, at *4 (N.D. Ill. Nov. 1, 2011) ("[T]he first *Gingles* factor is appropriately relaxed when intentional discrimination is shown . . . ."). In other words, the first *Gingles* precondition is irrelevant to this analysis and Plaintiffs likewise need not show that Black and Latino voters vote cohesively to prove unlawful intentional discrimination.

117.   Defendants' unsupported assertions that Commissioner Holmes might be re-elected if he changed party affiliation, and that the Enacted Plan diminishes voting power on party lines, is similarly irrelevant even if true. The Fourteenth and Fifteenth Amendments and the Voting Rights Act prohibit intentionally causing a racially disparate adverse impact regardless of the electability of specific candidates. Partisan politics is also especially irrelevant here, given the lack of any evidence substantiating a partisan intent in the design and adoption of the Enacted Plan. *See supra*, FOF ¶¶ 241, 387.

118.    The record is otherwise clear that, under the Enacted Plan, every single Latino and Black resident of Galveston County resides in a majority-Anglo commissioners precinct, in a county where 80-90% of Anglo voters consistently vote against the candidates preferred by Latino and Black voters. The foreseeability of this disparate impact, coupled with direct evidence it was intended, provides a strong inference of discriminatory intent.

### B.    The historical background supports a finding of discriminatory intent.

119.    *Arlington Heights* also requires the Court to consider "[t]he historical background of the decision" challenged as racially discriminatory. 429 U.S. at 267. The historical background of the commissioners court's decision to adopt the Enacted Plan further supports a finding of discriminatory intent here.

120.    Texas, and specifically Galveston County, has a long history of race discrimination that includes race-based vote suppression. *See supra*, FOF ¶¶ 196−200.Gains in minority representation were only achieved after the County became subject to preclearance, *see supra*, FOF ¶ 211, and it is particularly relevant here that the 2021 redistricting cycle was the first instance of redrawing the commissioners precinct lines following the Supreme Court's decision to end preclearance in the 2013 decision *Shelby County v. Holder,* 570 U.S. 529 (2013). In recent decades, there are several examples of the commissioners court taking official steps to disadvantage minority voters. *See supra*, FOF ¶¶ 402−420. This includes the 2011 attempt by the commissioners court to retrogress minority voting rights in redrawing the commissioners precinct lines, to which

the U.S. Attorney General objected. *See generally* Joint Ex. 6 (Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor).

121.   The grounds for the Attorney General's objections are particularly relevant here because they spoke to discriminatory intent, including aspects of the 2011 redistricting cycle that were, as explained further below, selectively and intentionally repeated in 2021. The 2011 map "reduced the overall minority share of the electorate in Precinct 3," and was drafted in a process "characterized by the deliberate exclusion" of Commissioner Holmes without the adoption of public redistricting criteria. Joint Ex. 6 at 2 (Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor). Based upon these findings, the Attorney General concluded the county had "not met its burden of showing that the proposed plan was adopted with no discriminatory purpose." Joint Ex. 6 at 2 (Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor). Importantly, the Attorney General's objections can be probative of a historical background of racial discrimination. *See, e.g.*, *Veasey*, 830 F.3d at 240 (finding previous Section 5 objections to Texas's prior decades' statewide redistricting plans constituted circumstantial evidence of discriminatory intent); *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 224 (4th Cir. 2016) (similarly considering past Section 5 objection letters as relevant to discriminatory intent in redistricting).

122.   The "proximity and comparability" of a map to which a Section 5 objection had been interposed for failure to meet the statutory standard that it was not intentionally discriminatory, "weighs in favor of an inference of discriminatory intent." *LULAC II*, 601 F. Supp 3d at 171. That Galveston's commissioners court was on notice as early as 2012 that eliminating the minority population majority in Precinct 3 was problematic, and then

pursued a "repeat performance" from the same counsel, Trial Tr. vol. 8, 29:22–30:1 (Oldham), with essentially the same result, is highly probative of discriminatory intent.

123.    The historical context of redistricting in Galveston, and specifically the experience of current commissioners court members who participated in 2011, further informs the decisions made during the 2021 redistricting cycle. Judge Henry, who provided the instructions for the "optimal" configuration of commissioners precincts in the Enacted Plan, inquired whether the county would have to draw majority-minority districts as one of his first steps after obtaining counsel. Pls.' Ex. 144 (Apr. 20, 2021, email from P. Ready to D. Oldham). In one of his first meetings with counsel following the Census data release, he expressed a desire to draw a map design first conceived in 2010 but unachievable because of its retrogressive impact during a time of preclearance. Trial Tr. vol. 8, 150:19–151:21 (Oldham). He made this request while fully aware of the reasons for the Attorney General's objection to the 2011 map. Trial Tr. vol. 7, 273:21–274:11 (Henry). It is a reasonable inference that Judge Henry's desire in 2021 was to obtain the map design he sought, but failed to obtain, in 2011.

124.    In sum, the Enacted Plan's purpose is only properly understood within the historical background of the 2011 redistricting cycle and other recent history. This context shows that Galveston has a "historical pattern" of discriminatory action specific to the commissioners precincts. *See, e.g., Veasey,* 830 F.3d at 240–41 (finding, *inter alia*, Section 5 objection letters as relevant to intentional discrimination analysis); *McCrory*, 831 F. 3d at 223–24 (same). This historical pattern further supports that the commissioners court

intended in adopting the Enacted Plan to continue retrogressing minority voting power as it had in prior cycles, and thus supports a finding of discriminatory intent here.

### C.   Significant procedural and substantive departures in the sequence of events all support a finding of discriminatory intent.

125.   *Arlington Heights* requires the Court to consider the "specific sequence of events leading up to the challenged decision" including "[d]epartures from the normal procedural sequence" that may demonstrate "that improper purposes are playing a role." 429 U.S. at 267.

126.   The significant and at times unlawful procedural deviations in 2021, which effectively prevented the sole minority commissioner from meaningfully engaging in the process, coupled with the redistricting process's truncated timing, all evidence intentional conduct designed to ensure the adoption of a map with obvious and avoidable discriminatory impact.

127.   <u>Last-minute timing of the redistricting process.</u> The timing of Galveston's process is especially probative of intentional conduct. Judge Henry, who directed the process, did not deem it too "early" to engage his preferred redistricting counsel in December of 2020, months before the Census data's release. *See* Trial Tr. vol. 7, 181:15–23 (Henry). But after taking this first step, the record is devoid of any planning by Henry or his staff to quickly engage a demographer or inform or solicit input from the public after the Census Data's release. This is especially remarkable given Judge Henry's participation in no less than seven public meetings during the 2011 redistricting process, including a

hearing to provide draft maps and an overview of Census data for public comment well in advance of the statutory deadline. *See supra*, FOF ¶¶ 214−217, 342.

128.    By Judge Henry's own admission, the Enacted Plan was finalized and adopted at "the last minute" on November 12, 2021. Trial Tr. vol. 7, 297:12–16 (Henry). Defendants claim this special meeting occurred the day before the deadline by happenstance alone, but the record instead supports that a last-minute single meeting was the plan all along: meeting agendas from the day counsel was engaged on April 5, 2021, to the Enacted Plan's adoption on November 12, 2021, are devoid of any mention of redistricting at all, *see generally* Pls.' Ex. 129 (video of November 12, 2021, special meeting), and even the exasperated email from Henry's Chief of Staff rushing draft maps indicates a plan to hold a single meeting to consider and adopt a map. Joint Ex. 27. Even Henry admitted several times he did not want the commissioners court to publicly disclose, deliberate, or consider the draft plans until they were, in his words, "final." Trial Tr. vol. 7, 310:13–23, 334:1–8, 337:8–12 (Henry). And as for the last-minute rush to finalize these maps, Defendants have offered no credible explanations for failing to engage a demographer before mid-October, nor for failing to hear comment on draft maps that were in place as early as October 22 before they were made "final". Trial Tr. vol. 9, 43:22–44:1 (Bryan); *see also supra*, FOF ¶ 305,

129.    Defendants have laid blame for this truncated timeline on Census delays related to the COVID-19 pandemic, and the Secretary of State's advisory on November 1, 2021, that the start of the candidate filing period indeed November 13, 2021. But these arguments are unavailing for several reasons. First, the Census delays do not account for

the failure to include meaningful participation of the public or for the rushed process. *See supra*, FOF ¶ 302. Commissioner Giusti testified that, between May 28, 2021, and December 31, 2021, the commissioners court did not cancel any of its biweekly public meetings due to COVID-19 concerns, and while the maps were posted online, their posting was not because of COVID-19 concerns about having an in-person meeting. Trial Tr. vol. 9, 120:7–121:4 (Giusti). And he admitted that the more public input on an issue the better as a general matter. Trial Tr. vol. 9, 122:22–23 (Giusti). Defendants have provided no credible explanations for why they did not provide more public input for redistricting, as they had done in past cycles, for 2021.

130.    As for the redistricting deadline, there is no evidence that the statutory candidate filing period set under Texas Election Code § 172-23 ever changed. The Secretary of State's advisory tends to show, instead, that it was the October deadline for revising voting precincts that was altered. *See generally* Joint Ex. 34 (Election Advisory No. 2021-14). Other jurisdictions were able to meet the same November 13, 2021 deadline while holding several rounds of public comment and adopt criteria in public meetings. *See, e.g.,* Trial Tr. vol. 6, 212:23–213:7 (Henderson-Lofton) (neighboring counties); Pls.' Ex. 414 at 17 & n.51 (Burch Expert Report).

131.    Overall, there is no evidence that the commissioners court ever intended to hold any hearings to collect public comment on *draft* maps during any of the regular meetings occurring in October or November. Instead, the "hurried pace" of drawing and adopting the Enacted Plan "strongly suggests an attempt to avoid in-depth scrutiny," and the Court would err in accepting these "efforts to cast this suspicious narrative in an

innocuous light" which fail to "acknowledge[] the whole picture." *See N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 228 (4th Cir. 2016).

132.    Even if the last-minute timing of Galveston's redistricting process were attributable to happenstance, there would be sufficient evidence in the other procedural deviations to support a finding of discriminatory intent. "[O]f course, a legislature need not break its own rules to engage in unusual procedures." *McCrory*, 831 F.3d at 228. But here, they likely broke several.

133.    <u>Violation of the Texas Open Meetings Act.</u> Evidence of the map-drawing process supports a conclusion that the commissioners who voted to adopt the Enacted Plan intentionally violated the Texas Open Meetings Act with the effect of excluding meaningful public input as well as meaningful participation by Commissioner Holmes, the sole minority commissioner elected from the sole majority-minority district.

134.    Section 551.143 of the Texas Government Code provides that:

> A member of a governmental body commits an offense if the member:
>
> (1)  knowingly engages in at least one communication among a series of communications that each occur outside of a meeting authorized by this chapter and that concern an issue within the jurisdiction of the governmental body in which the members engaging in the individual communications constitute fewer than a quorum of members but the members engaging in the series of communications constitute a quorum of members; and
>
> (2)  knew at the time the member engaged in the communication that the series of communications:
>
> > (A)  involved or would involve a quorum; and
> >
> > (B) would constitute a deliberation once a quorum of members engaged in the series of communications.

206

135.   In this context, a "deliberation" is "a verbal or written exchange between a quorum of a governmental body, or between a quorum of a governmental body and another person, concerning an issue within the jurisdiction of the governmental body." Tex. Gov. Code § 551.001(2).

136.   Courts have a "mandate to liberally construe TOMA's provisions in order to safeguard the public's interest in open government." *Willmann v. City of San Antonio*, 123 S.W.3d 469, 479 (Tex. App. 2003) (citing *Acker*, 790 S.W.2d at 300). The evidence here shows that at least three members of the commissioners court knowingly engaged in a series of communications concerning the new commissioners precincts both with each other (Henry with Apffel and Henry with Giusti), as well as via a third person (Dale Oldham), that prima facie runs afoul of the plain language and the spirit of TOMA to secure open government. *See supra*, FOF ¶¶ 320−332.

137.   At least three members of Galveston's commissioners court engaged in private conversations discussing what factors they felt were important in new commissioners maps, both before they were drafted, but also again after non-public drafts had been produced; the utter failure of the commissioners court to disclose any redistricting criteria or draft maps that could meaningfully change before enactment, and the lack of any genuine debate at the November 12, 2021, special meeting, indicates an intent to circumvent one of the most fundamental procedural laws regulating the conduct of local governmental bodies in Texas. *Cf. Save Our Springs All., Inc. v. Lowry*, 934 S.W.2d 161, 162 (Tex. App. Aus. 1996) ("The Open Meetings Act was promulgated to encourage good government by ending, to the extent possible, closed-door sessions in which deals are cut

207

without public scrutiny.") (citing *Cox Enters., Inc. v. Bd. of Trs. of the Austin Indep. Sch. Dist.*, 706 S.W.2d 956, 960 (Tex. 1986)).

138.    The purpose of the meetings between Judge Henry, the commissioners, and Mr. Oldham was for the commissioners to provide their input on how to redistrict the county commissioner precinct maps, to review proposed maps, and to render those maps "final". *See supra*, FOF ¶¶ 225−274.

139.    That some of these meetings occurred with the county's redistricting counsel, Dale Oldham, does not immunize the commissioners court from the prohibition on walking quorums. As was previously held in this matter, "[r]edistricting is part and parcel of the ordinary course of business of County commissioners courts" so privilege "largely doesn't apply" to the communications at issue. Dkt. 177 (Order on Motion to Compel) (Mag., J.). And there is no evidence the commissioners or their counsel intended the series of communications they engaged in to constitute a properly-held closed meeting, which would have required them to first convene a quorum of the body in an open meeting, upon proper notice. Tex. Gov. Code § 551.101 ("Requirement To First Convene in Open Meeting"). Accordingly, the three permitted exceptions allow for limited consultations with an attorney in a closed meeting, *see* Tex. Gov. Code § 551.071, do not apply since "[g]eneral discussion of policy, unrelated to legal matters, is not permitted under this attorney consultation exception merely because an attorney is present." *Finlan v. City of Dallas*, 888 F. Supp. 779, 782 n.9 (N.D. Tex. 1995).

140.    In sum, the conduct exhibited by members of the court exhibits a flagrant disregard for the Texas Open Meetings Act and thus an extreme departure from normal

procedure for a local governmental body in Texas. Along with other choices made by the commissioners court, this departure had the effect of preventing public participation in the 2021 redistricting process and, as described below, effectively preventing the sole minority commissioner from meaningfully engaging the process. This departure is consistent with other objective evidence that demonstrates the commissioners court took a course of action that it at least in part intended to have a disparate adverse impact on Galveston County's minority residents. Because this course of action would foreseeably cause substantial public controversy, the evidence indicates that the court acted in a manner that limited opportunities for public testimony and served to conceal its intentions and actions until the last possible moment. Accordingly, this serious departure from the normal conduct of the commissioners court, as required by law, provides compelling evidence that "improper purposes . . . play[ed] a role" in the adoption of the Enacted Plan. *Arlington Heights*, 429 U.S. at 267.

141.  <u>Other procedural departures that likely constitute legal violations.</u> The commissioners court's failure to comply with the Texas Open Meetings Act's prohibition on walking quorums was not the only procedural departure that ran afoul of the law. Section 81.005(b) of the Texas Local Government Code requirement them to a hold special term in a location, if not the county seat, that could "accommodate the number of persons expected to attend the meeting." By all accounts, the commissioners court failed to do so, despite the availability of larger spaces (including the county seat), and despite a reasonable expectation based upon the 2011 cycle and the tremendous public commentary online that the sole public hearing on Galveston's new commissioners precinct maps would be well

attended. *See supra*, FOF ¶¶ 333−344. There is ample evidence that this redistricting hearing was planned as a "special meeting" at the Calder Annex all along, *see* Joint Ex. 27, and was part of a pattern of practice by Judge Henry to hold racially controversial votes at this location instead of the County seat. *See supra*, FOF ¶ 336. This procedural departure further underscores the intent of the commissioners court to limit and obstruct public commentary and transparency in the 2021 redistricting process.

142.    Finally, it is not substantiated that the commissioners court in fact met its 72-hour deadline for providing notice for the 1:30 pm November 12, 2021, special meeting. The record shows that at least the digital notice of this meeting was sent after this deadline. *See* Joint Ex. 38 (Nov. 9, 2021, 1:39 pm email from L. Liechty re "Commissioners Court Special Meeting Agenda – November 12th."). While a relatively minor infraction, this last-minute notice further underscores the intentional actions taken to narrow the window for public transparency and opportunity to comment as much as possible.

143.    <u>Substantive departures.</u> Substantive departures are "relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267. Here, Plaintiffs have shown that the Enacted Plan deviates from the criteria Defendants asserted were used in the 2021 redistricting process. *See supra*, FOF ¶¶ 364−395. Plaintiffs' illustrative plans further show that these purported criteria could be met while maintaining Precinct 3 as a majority-minority district. *See id*. It is thus reasonable to conclude the commissioners court would have favored a map meeting their criteria while avoiding the public scrutiny and expected legal challenges that accompany an obviously retrogressive plan, if in fact that

had been their motive. Accordingly, the adoption of the Enacted Plan constitutes a substantive departure not just from these purported criteria, but from past practice in maintaining at least one majority-minority district.

144.    Additionally, there is evidence that, in past cycles, redistricting criteria were adopted that specifically required the commissioners court to try to retain the same cores of existing districts as in prior years, and that this practice had led to the historic core of Precinct 3 remaining largely unchanged for decades. *See supra*, FOF ¶¶ 211−213; Joint Ex. 45 at 24 (2001 commissioners precincts). Accordingly, the adoption of a new plan in 2021 that dramatically dismantled the historic core of Precinct 3, the sole majority-minority district, itself represents a significant substantive procedural deviation that would show a contrary decision by the commissioners court had they consider factors they "usually considered important." *Arlington Heights,* 429 U.S. at 267.

> **D.    The legislative history and the exclusion of Commissioner Holmes support a finding of discriminatory intent.**

145.    *Arlington Heights* also requires the court to consider the legislative history leading to a challenged provision, including contemporaneous statements or reports. 429 U.S. at 268. The exclusion of the sole non-Anglo commissioner from the decision-making process and refusal to seriously consider his concerns, is probative. *See, e.g., Perez v. Abbott*, 253 F. Supp. 3d 864, 961 (W.D. Tex. 2017) (listing the "exclusion of minority member and public input despite the minority population growth" as probative of intentional discrimination); *see also LULAC v. Abbott,* 604 F. Supp. 3d at 508(holding allegations that "minority legislators were treated unfavorably" supported the plausibility

of plaintiffs discriminatory intent claims, citing *Texas v. United States*, 887 F. Supp. 2d 133, 164 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 570 U.S. 928 (2013) (mem.)).

146.    The 2021 redistricting process was marked by the exclusion of Commissioner Holmes, the sole minority member of the commissioners court at the time, and only member elected from the county's sole majority-minority commissioners district, as well as the exclusion of the public. *See supra*, FOF ¶¶ 357−363. The redistricting process began with a single meeting to hire redistricting counsel, devoid of public input. *See supra*, FOF ¶¶ 291−294. No public hearing was held about redistricting between the April 5, 2021, decision to retain counsel and the November 12, 2021, adoption of the Enacted Plan. FOF ¶¶ 309. While other commissioners were engaged in an illegal walking quorum to ensure the so-called "optimal" map configuration became final in a form acceptable to at least three commissioners, *see supra*, FOF ¶¶ 320−332, Commissioner Holmes was left in the dark as to the criteria his fellow commissioners felt necessary to draft an acceptable map. *See supra*, FOF ¶¶ 357−363. As a result, neither he, nor the public, had a meaningful opportunity to show then what Plaintiffs' experts have proven now: that the cracking of Galveston's Black and Latino population, and the dismantling of its sole majority-minority commissioners precinct, was neither a required nor natural result of the purported criteria important to the commissioners court. Indeed, it appears that the process was intentionally designed to prevent exactly that occurrence and thereby allow the commissioners court to "avoid in-depth scrutiny" until it was too late. *See N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 228 (4th Cir. 2016).

147.    The transcript of the November 12, 2021, special meeting is devoid of any deliberation or discussion by any other member of the commissioners court about what they felt was important in new commissioners precincts, or the reasons for their vote in favor of the Enacted Plan instead of Map 1 or the plans proposed by Commissioner Holmes. *See generally* Pls.' Ex. 591 (Transcript of Nov. 12, 2021, special meeting). The reason for this is clear: the November 12, 2021, special meeting was no more than formalization of what had already been decided when the so-called "optimal" plan was finalized to the liking of every other commissioner other than Stephen Holmes.

148.    In sum, the legislative history demonstrates a closed, rushed process that excluded the only minority commissioner from participating, and a lack of community input in the process. These actions underscore that Defendants "subordinated other factors…to racial considerations." *Cooper v. Harris*, 581 U.S. at 291.

## IV.    Racial Gerrymandering in Violation of the Fourteenth Amendment[19]

149.    The Equal Protection Clause of the Fourteenth Amendment prohibits a governing body, without sufficient justification, from "separat[ing] its citizens into different voting districts on the basis of race." *Miller,* 515 U.S. at 911. Plaintiffs may prove racial gerrymandering by showing, "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number

---

[19] The following conclusions relate to the claims brought by the Petteway and NAACP/LULAC plaintiffs alleging a violation of the 14th Amendment. The United States has only alleged violations of Section 2.

of voters within or without a particular district." *Miller*, 515 U.S. at 916; *see also Cooper*, 581 U.S. at 291; *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017).

150.   Importantly, a bizarre shape is not required to show a district is racially gerrymandered, because even a compact district can be gerrymandered when its lines are "considered in conjunction with [the district's] racial and population densities." *Miller*, 515 U.S. at 913, 916. Indeed, "race may predominate even when a reapportionment plan respects traditional principles." *Bethune-Hill*, 580 U.S. at 189.

151.   Defendants have disclaimed any contention that the map was configured to advantage Republicans. So too has Mr. Oldham. Any contrary argument is an unsupported *post hoc* litigation position that the Court does not credit. Instead, the preponderance of the evidence supports that the configuration of commissioners precincts in the "optimal" Map 2 was predominantly designed to crack Galveston's minority population and dismantle its sole majority-minority commissioners precinct.

152.   All other non-racial considerations appear to have followed only after this basic racially motivated configuration was set.

**A.   The Enacted Plan's dispersion of Galveston's Black and Latino population among all four commissioners precincts indicates racial gerrymandering.**

153.   The Enacted Plan's textbook cracking of Galveston's Black and Latino population among all four commissioners precincts is highly probative of racial gerrymandering because it indicates Defendants moved large numbers of Black and Latino voters out of Benchmark Precinct 3. *See Thomas v. Bryant*, 938 F.3d 134, 158 n.119 (5th Cir. 2019) ("Allegations of 'cracking' or 'packing' can figure prominently in racial

gerrymandering cases, in which evidence that a legislature moved large numbers of one race in or out of a district may be strong circumstantial evidence that 'racial considerations predominated' in the legislature's decisions." (citing *Cooper*, 137 S. Ct. at 1472–78 (2017))).

154.    By adopting the Enacted Plan, the commissioners court moved and distributed the Latino and Black residents formerly in Precinct 3 into each of the four new commissioners precincts, thereby transforming every new commissioners precinct to majority Anglo. This result is particularly unusual for a jurisdiction with existing majority-minority districts and is all the more remarkable given minority populations comprise 45% of Galveston's total population and have accounted for the majority of its growth since 1990. Pls.' Ex. 386 at 6 (Cooper Expert Report); Trial Tr. vol. 3, 42:20–43:23 (Cooper).

155.    The Enacted Plan achieves this result despite evidence the historic core of a majority-minority Precinct 3 was in place for decades before, *see* Joint Ex. 45 at 22 (2001 commissioners precincts), and that the County had historically applied redistricting criteria that sought to preserve existing districts. Pls.' Ex. 539 (adopted 2001 Redistricting Criteria). Plaintiffs' experts each provided least-change configurations following these historical criteria that met acceptable population deviations by shifting one or two voting precincts. *See* Pls.' Ex. 386 at (Cooper Map 1, Cooper Expert Report); Pls.' Ex. 337 at 14–19 (Fairfax Expert Report); Pls.' Ex. 486 (Rush Expert Report) at 10–16 (Rush Maps 1–3); Pls.' Ex. 487 (Rush Rebuttal Expert Report) at App. B (Rush Map 2b). Even the county's own demographer, Thomas Bryan, testified that it would be fairly easy to make a

small number of adjustments in Galveston to fix the small population deviation. Trial Tr. vol. 9, 43:14–19 (Bryan).

156.    The reasonable compactness of the Enacted Plan's Precinct 3 does not lessen the probative value of its perfect cracking effect; even a compact district can be racially gerrymandered when its lines are "considered in conjunction with [the district's] racial population densities." *Miller*, 515 U.S. at 916. Here, Galveston's Black and Latino communities are concentrated in the central and southern parts of the County, and the Enacted Plan evenly distributes these populations among all four new districts by dramatically dismantling the existing district in that area of the county. Trial Tr. vol. 3, 24:2–14 (Cooper); Pls.' Ex. 386 at 18 (Fig. 3, Cooper Expert Report). Seen in context, the fact that each of the four commissioners precincts in the Enacted Plan had roughly the same percentage of Black and Latino CVAP strongly suggests use of a racial target, one of the most direct forms of evidence of a racial gerrymander. *See, e.g.*, *Cooper*, 581 U.S. at 300; *Alabama*, 575 U.S. at 267.

**B.    Defendants' asserted redistricting criteria are *post hoc* justifications that do not explain the textbook cracking of Galveston's Black and Latino population.**

157.    Defendants have offered purported criteria used in drafting and adopting the Enacted Plan, in the form of interrogatory responses disclosed as part of this matter. Pls.' Ex. 593. There is strong evidence this set of purported criteria is no more than a *post-hoc* justification for the Enacted Plan's design. FOF ¶¶ 364−395. None of the officials who voted to adopt the Enacted Plan testified to applying this set of criteria. *See generally* Trial Tr. vol. 7, 312:16−325:1 (Henry); Trial Tr. vol. 9, 88:4−18, 124:15−126:14 (Giusti); Trial

216

Tr. vol. 9, 354:22–365:23 (Apffel). Judge Henry, who signed the interrogatory responses, admitted he may have done so without reading them first. Trial Tr. vol. 7, 312:16–313:4 (Henry). Mr. Oldham did not mention these criteria when describing the instructions he received from Judge Henry and provided to demographer Thomas Bryan in configuring Map 2, *see* Trial Tr. vol. 8, 145:21–147:13 (Oldham), and Bryan also confirmed he was not told to consider several of the criteria, including compactness or incumbent residence, during the map-drawing process. Trial Tr. vol. 9, 45:6–46:4 (Bryan).

158.    Furthermore, the Enacted Plan deviates from these purported criteria by splitting a voting precinct in order to accommodate an incumbent residence, *see* Trial Tr. vol. 3, 83:25–84:4 (Cooper), despite the criteria specifying that incumbent residences only be considered after the minimizing of splitting voting precincts. Pls.' Ex. 593 at 6 (Defs.' Apr. 21, 2023 Second Supp. Resp. to United States Interrogatories). Indeed, the "utter disregard" of "voter tabulation district lines" is probative of a racial gerrymander. *Bush v. Vera*, 517 U.S. 952, 974 (1996); *see also League of United Latin Am. Citizens v. Abbott*, 617 F. Supp. 3d 622, 632 (W.D. Tex. 2022) ("Splitting precincts, especially when doing so is contrary to a legislature's stated redistricting criteria, can support a finding of discriminatory intent.").

159.    This casts serious doubt that this set of criteria—which Defendants failed to identify or publicly disclose until a year and a half after adopting the Enacted Plan, *see* Trial Tr. vol. 7, 323:19–325:1 (Henry)—commanded the Enacted Plan's design. As a result, these purported criteria cannot mitigate the evidence of racial predominance, since "[t]he racial predominance inquiry concerns the *actual* considerations that provided the

essential basis for the lines drawn, not post hoc justifications the legislature in theory could have used but in reality did not." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189–90 (2017) (emphasis added).

160.    Other than equalizing population, the foremost individual criteria Defendants assert commanded the Enacted Plan's design was Judge Henry's desire for a unified coastal precinct. But it is not at all clear that the creation of a coastal precinct was in fact a genuine interest prior to the redistricting process. *See supra*, FOF ¶¶ 380−385; *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018) (rejecting state's explanation when it could "point[] to no actual 'legislative inquiry' that would establish the need for its manipulation of the racial makeup of the district").

161.    The fact that Mr. Bryan's first draft maps—drawn after an hour-long phone call with Mr. Gordon—contained no coastal precinct belies the contention that the creation of such a precinct was a predominant factor motivating the mapdrawing. Trial Tr. vol. 8, 290:23–291:4 (Bryan). Indeed, Mr. Bryan was not instructed to create a coastal precinct. Trial. Tr. vol. 8, 290:23–291:4 (Bryan).

162.    Those who voted in favor of the Enacted Plan purportedly because of its coastal precinct admitted they knew of no studies of public opinion calling for a coastal district. *See* Trial Tr. vol. 7, 315:6–22 (Henry); Trial Tr. vol. 9, 142:19–143:18 (Giusti); Trial Tr. vol. 9, 346:24–347:9 (Apffel). Commissioner Apffel testified he was aware the Bolivar Chamber of Commerce actually wanted him to remain their commissioner. Trial Tr. vol. 9, 349:14–16 (Apffel). Finally, Plaintiffs' offer of alternative plans creating a coastal precinct while maintaining Precinct 3 as a majority-minority district, *supra*, FOF

¶¶ 376−379, reinforce that the coastal precinct justification for the Enacted Plan's cracking of Galveston's Black and Latino population as a pretextual post hoc explanation.

**C.   Plaintiffs' alternative maps are key evidence that race, and not other purported race-neutral objectives, predominated in the design of the Enacted Plan.**

163.    Plaintiffs may show that race, and not some other objective, predominated in a challenged plan by producing an alternative plan that achieves the purported goals without moving so many members of a minority group. *Cooper*, 581 U.S. at 285, 317–18; *see also LULAC II*, 601 F. Supp. 3d at 176–77 (noting that "all nine Justices agree[] that [alternative] maps are helpful evidence of legislative intent"). While evidence of an alternative districting plan is not *required* to demonstrate that race rather than some other objective explain line drawing decisions, such a plan is powerful evidence. As the Supreme Court explained in *Cooper v. Harris*, when considering whether partisanship instead of race explained district lines:

> [A]n alternative districting plan . . . can serve as *key evidence* in a race-versus-politics dispute. One, often *highly persuasive* way to disprove a State's contention that [a purported justification] drove a district's lines is to show that the legislature had the capacity to accomplish all its . . . goals without moving so many members of a minority group into the district. If you were *really* sorting by [the purported justification] instead of skin color (so the argument goes) you would have done—or, at least, could just as well have done—*this*. Such would-have, could-have, and (to round out the set) should-have arguments are a familiar means of undermining a claim than an action was based on a permissible, rather than a prohibited, ground.

*Cooper*, 581 U.S. at 317 (first and second emphasis added); *id.* at 322 (noting that such an alternative map "could carry the day" even where other evidence of racial motivations was "meager").

164.    In their *Cooper* dissent, Justice Alito, Chief Justice Roberts, and Justice Kennedy agreed that the proffer of an alternative map was a "sound" approach for plaintiffs to overcome their "burdens of production and persuasion," and the "presumption that the plan was drawn for constitutionally permissible reasons." *Id.* at 336. The Supreme Court is thus unanimous about the powerful probative value of an alternative map in disentangling race from other purported justifications as the motivation for the drawing of lines.

165.    Here, Plaintiffs have offered several alternative maps that meet the purported non-racial criteria asserted by Defendants, including the exact same coastal precinct in the Enacted Plan, all while maintaining a majority-minority Precinct 3. *See* Trial Tr. vol. 2, 129:25–132:9 (Burch); Pls.' Ex. 414 at 12–14 (Burch Expert Report); Pls.' Ex. 386 at 32–37 (Cooper Maps 2 and 3, Expert Declaration of William Cooper); Pls.' Ex. 438 at 11–13 (Cooper Map 3A, Rebuttal Declaration of William Cooper). Indeed, the Burch/Rush maps maintain a majority-minority Precinct 3 while including a coastal Precinct 2 identical or nearly identical to the Enacted Plan's. *See* Pls.' Ex. 485 (Rush Supplemental Declaration) at 30–53 (Alternative Coastal Precinct Maps 1–4); Pls.' Ex. 486 (Rush Rebuttal Expert Report) at 6–9 (compactness and demographic data for Alternative Coastal Precinct Maps 1–4). These alternative maps achieve coastal precincts while also equalizing population imbalances, accounting for incumbent residencies, and performing on par or better on traditional redistricting criteria overall. Trial Tr. vol. 4, 26:16-33:4 (Rush); Trial Tr. vol. 3, 88:24–89:7 (Cooper).

166. With these maps, Plaintiffs have overcome any presumption that the Enacted Plan was drawn for constitutionally permissible reasons. When the government seeks to achieve particular goals, "the 'predominance' question concerns *which* voters the legislature decides" to move to achieve those goals. *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 273 (2015). Here, it is clear that Defendants chose to evenly distribute Galveston's Latino and Black residents among all four new commissioners precincts when doing so was neither required nor a natural consequence of creating a coastal precinct.

167. Defendants offer no response to Plaintiffs' alternative map evidence—no evidence as to a non-racial reason the alternative maps would not have been adopted. Mr. Oldham observed that the alternative maps did not create a single suburban Houston precinct, but this purported criterion was not among those identified in Defendants' interrogatories, and Mr. Bryan denied ever being instructed to create a suburban Houston precinct or that a desire to have a suburban precinct explained the map. Trial Tr. vol. 8, 168:3–5 (Oldham), Trial Tr. vol. 8, 304:6-9 (Bryan). To the extent creation of a suburban map was a real priority, Mr. Oldham agreed it might nevertheless be possible to do so in the alternative maps. Trial Tr. vol. 8, 171:1–8 (Oldham). No evidence or testimony in the record rebuts Plaintiffs' compelling alternative maps evidence.

168. Similarly, Defendants' argument now that there was a desire to achieve near-zero percent deviation in their plan is unsupported by the record evidence from the redistricting process itself: Demographer Thomas Bryan testified that, while he is sometimes asked to minimize deviations in other jurisdictions, for Galveston he was told

via email to aim for deviations around +/- 2.5%. Trial Tr. vol. 9, 42:16–43:7 (Bryan) (discussing Pls.' Ex. 191, Oct. 15, 2021, email from P. Gordon to T. Bryan). Plaintiffs' expert Cooper also testified that, in his considerable experience, zero percent deviation is also not a logical goal for a county experiencing significant growth like Galveston. Trial Tr. vol. 3, 140:24–141:16, 186:6–20 (Cooper). And there is no evidence that, if a zero-deviation goal were substantiated, it would not have required cracking the Black and Latino population. Plaintiffs have shown illustrative maps with both coastal precincts and smaller population deviations than the Enacted Plan. *See, e.g.,* Pls.' Ex. 386 at 32 (Cooper Map 2, Cooper Expert Report).

169.   In any event, "legislative efforts to create districts of approximately equal population" is not one of the factors to be weighed in the balance. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 271–72 (2015) (The one-person one-vote standard is "part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination.").

170.   Finally, it is also clear that partisanship did not predominate in the Enacted Plan's geographic configuration of commissioners precincts. While disentangling racial and partisan gerrymandering can often be a "formidable" task for a court, it is not necessary to tackle here. *Cooper*, 581 U.S. at 308. All members of the commissioners court who voted for the Enacted Plan recalled providing input disclaiming partisanship as a predominating consideration in the geographic configuration of districts. *See* Trial Tr. vol.

7, 197:18–25, 304:3–6 (Henry), Trial Tr. vol. 9, 355:25–356:6 (Apffel).[20] Consistent with

this, Mr. Oldham testified that he never told Mr. Bryan that Judge Henry's purpose for Map

2 was to create four Republican districts, and Mr. Oldham denied there was any such

partisan motivation. Trial Tr. vol. 8, 153:14–154:4.[21]

171.   The presumption of good faith normally applied to the government cannot

withstand the overwhelming evidence disputing Defendants' purported rationales and

contradictory testimony about their redistricting priorities. *See Miller*, 515 U.S. at 915.

172.   This is particularly so because the evidence shows a lack of good faith

specifically related to considerations of race in the map creation and selection process. *See*

*LULAC II*, 601 F. Supp. 3d at 179–181 (concluding that evidence of a witness being "less

than forthright" must relate to racial considerations to overcome presumption of good

faith). In *LULAC II*, the court concluded that the Texas senate redistricting committee chair

was not forthright in justifying the configuration of senate district 10 but that she was

concealing a partisan motivation. *Id.* at 180. Here, Mr. Oldham adamantly testified that he

repeatedly and sternly instructed Mr. Bryan not to consult or consider racial data while

map-drawing—testimony that Mr. Bryan just as adamantly denied was true. Trial Tr. vol.

---

[20] Commissioner Guisti did not recall sharing what he wanted in redistricting or hearing terms like "traditional redistricting criteria," Trial Tr. vol. 9, 88:21–89:2 (Guisti), and testified he was not familiar with the "legal criteria." Trial Tr. vol. 9, 104:10–12 (Giusti). However, he testified that he was not concerned about his ability to get re-elected when he saw proposed maps. Trial Tr. vol. 9, 98:9–11 (Giusti).

[21] Mr. Bryan did testify to drafting an initial "4R" plan that prioritized creating four Republican districts. Trial Tr. vol. 8, 289:8–290:1 (Bryan); Pls.' Ex. 516. But Bryan also explained that this early version lacked the coastal precinct that County Judge Henry had requested and was therefore disregarded in favor of the "optimal" configuration that ultimately became the Enacted Plan. Trial Tr. vol. 8, 291:5–21 (Bryan).

8, 71:18–25, 72:15–20, 80:24–81:9 (Oldham); Trial Tr. vol. 9, 19:12–19, 21:4–10, 56:25–57:20 (Bryan).

173.     Mr. Oldham's version of the events is belied by the fact that Mr. Bryan repeatedly generated spreadsheets, which were provided to the commissioners, with both granular and summary racial data about the draft maps. FOF ¶ 254. Those maps contained special conditional formatting to highlight how they spread the minority population equally across all four commissioner precincts, and Commissioner Holmes contemporaneously recorded notes of a conversation with Commissioner Apffel in which Commissioner Apffel specifically noted that Map 2 spread the minority population across all four precincts. Joint Ex. 23 at Holmes000183 (Commissioner Holmes' notes). Likewise, the Court finds that the placement of Commissioner Holmes's residence—at the time the only Black commissioner and the preferred candidate of former Precinct 3's majority minority voting population—in the commissioner precinct with the *lowest* minority population share is evidence of predominant consideration of race.

174.     Moreover, Mr. Oldham's testimony on this topic was directly contradicted by Mr. Bryan. Mr. Oldham testified that it was simply a function of where Commissioner Holmes lived that he ended up assigned to the most Anglo precinct in Map 2. Trial Tr. vol. 8, 175:20–22 (Oldham). Mr. Bryan denied this—he testified he never even had the commissioners' home addresses and that the location of Commissioner Holmes's residence played no role in the mapdrawing. Trial Tr. vol. 8, 306:16–19 (Bryan). Having observed the testimony of both Mr. Oldham and Mr. Bryan, the Court declines to credit Mr. Oldham's testimony claiming to have provided instructions to Mr. Bryan not to consider

224

race in the mapdrawing process and that Commissioner Holmes's residence explains his assignment to the most Anglo precinct. Rather, the Court concludes that Mr. Oldham's testimony in this regard was contrived *post hoc* to aid Defendants' litigation position. Plaintiffs have overcome the presumption of good faith directly on the issue of the role of race in creating and selecting maps.

> **D.   Evidence of the map-drawing process indicates the predominant consideration for the Enacted Plan's geographic configuration was a racial one: the dismantling of the sole majority-minority commissioners precinct.**

175.   There is substantial evidence that members of the commissioners court sought to dismantle Benchmark Precinct 3 as the sole majority-minority precinct because they perceived this district to be a racial gerrymander that was artificially bolstering minority voting power in the county.

176.   Specifically, the evidence supports that "race-neutral considerations [came] into play only after the race-based decision had been made." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U. S. 178, 189 (2017). Here, the race-based decision was the "optimal" geographic configuration of districts that cracked the core of historic Precinct 3 to evenly distribute Galveston's Latino and Black residents among all four new commissioners precincts.[22]

---

[22] Defendants have asserted that Benchmark Precinct 3 was not a majority-minority coalition district but rather a Black cross-over district. *See, e.g.*, Trial Tr. vol. 8, 178:19–21 (Oldham). But whether Defendants designed Map 2 to crack the majority-minority community overall, or just Black voters individually, is a distinction without a difference for the purposes of finding racial gerrymandering because, in both scenarios, "race for its own sake is the overriding reason for choosing one map over others." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 189 (2017).

177.   Judge Henry admitted to believing the Benchmark Precinct 3 was gerrymandered to maintain it as the sole majority-minority commissioners precinct in the County. Trial Tr. vol. 7, 302:9–22 (Henry). In an April 20, 2021, email, Paul Ready contacted Dale Oldham with a question from County Judge Mark Henry: whether the County could get rid of its majority-minority districts. Pls.' Ex. 144 (Apr. 20, 2021, email from P. Ready to D. Oldham). In other words, Judge Henry's first step in the 2021 redistricting cycle after securing counsel was to ascertain whether he could eliminate majority-minority districts following the release of the 2020 Census.

178.   In September, when Judge Henry met with Mr. Oldham and Commissioner Apffel to discuss his preferences for a new map, Henry expressed his desire for a map that he had originally conceived in 2010, but which he was told would fail preclearance because of its clearly retrogressive effects on minority voters. Trial Tr. vol. 8, 150:19–151:21 (Oldham). The instructions Henry provided Oldham included the creation of a coastal precinct as well as detailed directions as to the remaining non-coastal precincts that cut into the center of the county. Trial Tr. vol. 8, 149:11–150:22 (Oldham).

179.   While Judge Henry did not specifically recall what direction he provided Oldham in that first meeting, *see* Trial Tr. vol. 7, 190:2–7 (Henry), Henry admitted that he would not have requested a map with a coastal precinct that maintained the historic core of majority-minority Precinct 3. Trial Tr. vol. 7, 305:6–19 (Henry). And he also admitted to believing that Benchmark Precinct 3, in the middle of the County, was gerrymandered in

order to maintain it as the sole majority-minority commissioners district in the County. Trial Tr. vol. 7, 302:5–22 (Henry).[23]

180.   After Judge Henry shared his map preferences with Mr. Oldham, Mr. Oldham gave Mr. Bryan specific instructions that became the "optimal" design in Map 2. Trial Tr. vol. 8, 145:13–150:22 (Bryan); Trial Tr. vol. 8, 181:5–9 (Oldham). The instructions for Map 2 were "instructions [Oldham] had basically received from Judge Henry." Trial Tr. vol. 8, 148:1–6 (Oldham). They were "fairly simple" and included specific direction as to how to configure the non-coastal precincts, shifting Precinct 3 northwards, and distributing the mainland portions of Benchmark Precinct 3 among all four precincts. *see* Trial Tr. vol. 8, 145:16–147:20 (Oldham).

181.   Mr. Bryan was not asked to consider public commentary, incumbent residences, compactness, or a map configuration that would have preserved the core of existing districts while creating a coastal precinct, an analysis Mr. Bryan testified would have been "definitely possible" to do. Trial Tr. vol. 9, 45:6–47:20 (Bryan). Mr. Oldham conceded at trial that the changes Judge Henry requested to precincts on the mainland, dismantling Benchmark Precinct 3, were not required by the creation of a coastal precinct. Trial Tr. vol. 8, 160:7–13 (Oldham).

182.   It was only after this "optimal" configuration in Map 2 was developed that the other considerations came into play. These include modifications made to Map 2 to

---

[23] Commissioner Apffel held a similar belief. Trial Tr. vol. 9, 356:7–14 (Apffel). But the Supreme Court has been clear that "when members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes." *Shaw*, 509 U.S. at 646.

include Commissioner Apffel's new residence, and Commissioner Giusti's desire to have his parents' residence in his district. *See* Trial Tr. vol. 8, 190:12–15 (Oldham) ("But certainly we were getting commissioners who were coming in at that point and were adjusting Map 2 so that they would not find themselves in opposition to it in the manner in which they had previously."); Trial Tr. vol. 9, 373:12–12 (Apffel).

183.    Testimony from the County's demographer, Thomas Bryan, that he did not use racial data in drafting Map 2 is irrelevant. Mr. Bryan testified to merely implementing Mr. Oldham's specific instructions without being told the purpose behind those instructions. Trial Tr. vol. 9, 29:7–20 (Bryan). Indeed, it appears these instructions, coupled with the unusually limited time and information Mr. Bryan was given to work on Galveston's maps, succeeded in preventing Mr. Bryan from understanding that Mr. Oldham's instructions were in effect to execute a near-perfect cracking of Galveston's Black and Latino population. *See* Trial Tr. vol. 9, 35:13–36:6, 45:20–25 (Bryan) ("I assume the direction I got reflected all of the desires and priorities of my clients. I did not know what they were, and frankly I did not have time to digest that or contemplate the impact of that on my maps.").

184.    It further appears that Mr. Bryan was reporting back, via analytical spreadsheets, racial breakdowns that confirmed to Mr. Oldham and the commissioners court that they had succeeded in evenly distributing Galveston's minority populations among all four precincts. *See* Trial Tr. vol. 9, 15:5–16:16, 17:10–13, 18:7–10 (Bryan); Pls.' Ex. 528 (Pop Pivot spreadsheet); Trial Tr. vol. 7, 304:7–10 (Henry). And regardless of whether specific commissioners recall reviewing racial data, it was obvious that Map 2

would be problematic for those in Benchmark Precinct 3 to re-elect Commissioner Holmes. Trial Tr. vol. 9, 372:4–25 (Apffel, testifying that he could "look at the picture and tell" Map 2 would be problematic for Commissioner Holmes).

185.   Mr. Oldham's disclaimer of consideration of race also "ring[s] 'hollow'" given there is considerable circumstantial evidence that a district "sort[ed] voters on the basis of race" and racial data is "fixed" in the head of an experienced map drawer," and in light of his experience and familiarity with demographics in the county. *S.C. State Conf. of NAACP v. Alexander*, No. 21-CV-03302-MGL-TJH-RMG, 2023 WL 118775, at *2 (D.S.C. Jan. 6, 2023) (quoting *Cooper*, 137 S. Ct. at 1477); Trial Tr. vol. 8, 131:7–134:1 (Oldham) (describing his familiarity with minority populations in Galveston and that the minority population was "certainly concentrated in Precinct 3."). In fact, Mr. Oldham testified to a belief that he was retained due to this familiarity and the expectation the commissioners court would get a "repeat performance" of his work in 2011. Trial Tr. vol. 8, 29:22–30:1 (Oldham).

186.   These facts, together with the ultimate configuration of the Enacted Plan, provide strong and persuasive direct and circumstantial evidence that race "for its own sake," and specifically the dismantling of a perceived racially-beneficial district, was the "dominant and controlling rationale" for the geographic design of the commissioners precincts in the Enacted Plan. *See Miller*, 515 U.S. at 913.

E.     **The Enacted Plan does not withstand strict scrutiny.**

187.   The use of racial classifications triggers the application of strict scrutiny, which requires that any use of race be narrowly tailored to further a compelling state interest. *Bush v. Vera*, 517 U.S. 952, 976 (1996).

188.   Courts have assumed that compliance with the Voting Rights Act is a compelling state interest, *Bush*, 517 U.S. at 977, but here the record is devoid of any attention paid to the Voting Rights Act by Defendants during the redistricting process.

189.   As the Supreme Court made clear nearly four decades ago, Section 2 prohibits vote dilution brought about by the "dispersal of [a group's members] into districts in which they constitute an ineffective minority of voters." *Thornburg v. Gingles*, 478 U.S. 30, 46, n.11 (1986). Every member of the commissioners court who voted in favor of the Enacted Plan admitted to understanding that Stephen Holmes' district, Precinct 3, was Galveston's sole majority-minority commissioners precinct. Trial Tr. vol. 7, 271:18–272:3 (Henry); Trial Tr. vol. 9, 116:8–18, 149:15–24 (Giusti); Trial Tr. vol. 9, 346:24–350:1 (Apffel). Each of them also understood, heard public comment and/or were provided data indicating that the proposed Map 2 would diminish the ability of Galveston's minority community from re-electing their candidate of choice, Commissioner Holmes. Trial Tr. vol. 8, 200:11–21 (Oldham); Trial Tr. vol. 7, 303:8–15, 347:8–11 (Henry); Trial Tr. vol. 9, 148:5–19 (Giusti)[24]; Trial Tr. vol. 9, 372:15–25 (Apffel).

---

[24] Commissioner Giusti admitted that his belief Commissioner Holmes could be re-elected in his new precinct if switched political parties was speculation. Trial Tr. vol. 9, 152:24–153:5 (Giusti).

190.    And yet the record is devoid of any consideration of a Section 2 analysis or racially polarized voting study by those who favored that plan, and the Section 2 concerns raised in public comment, as well as the racially polarized voting study Commissioner Holmes distributed during the November 12, 2021, were ignored. *See generally* Pls.' Ex. 591 at 36–37, 42–43, 68–74 (Nov. 12, 2021, special meeting transcript); Pls.' Ex. 282 (Nov. 12, 2021, email from A. Watson to Br. Chapman attaching information Commissioner Holmes distributed in Nov. 12, 2021 meeting). This disregard for the requirements of the Voting Rights Act is remarkable given the county's failure in 2011 to achieve preclearance based upon a finding the prior map "reduced the overall minority share of the electorate in Precinct 3." Joint Ex. 6 at 2 (Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor), and further supports that dismantling the sole majority-minority commissioners precinct was intentional and predominated in the Enacted Plan's design.

191.    Defendants have emphasized concerns that using Benchmark Precinct 3 would itself violate the Fourteenth Amendment. But this concern is unsupported by the evidence: the County's own legal counsel advised that proposed Map 1, a "minimum change" from the Benchmark Plan, was legally defensible, Trial Tr. vol. 8, 122:18–123:2, 183:18–25 (Oldham); and members of the commissioners court testified to relying on their counsel's advice as to the legality of any proposed plans. Trial Tr. vol. 9, 336:18–24 (Apffel); Trial Tr. vol. 7, 332:18–25 (Henry); Trial Tr. vol. 9, 89:3–11 (Giusti). Any argument that Defendants believed a least-change map would violate the Fourteenth Amendment is belied by their willingness to publicly propose Map 1.

192.   As shown above, Plaintiffs' illustrative plans prove that none of the other (non-legal) purported justifications Defendants have offered necessitated the dismantling of the County's sole majority-minority commissioners precinct in the Enacted Plan. Accordingly, the Enacted Plan is not narrowly tailored to meet any of these justifications, regardless of whether they constitute a compelling state interest or not.

193.   Overall, direct and circumstantial evidence from the map-drawing process supports that the Enacted Plan's basic configuration was executed pursuant to instructions from the originator of this map design, Judge Henry, to configure Galveston's commissioners precincts in a way that would dramatically reconfigure districts in a manner that dismantled the sole majority-minority precinct, and that other considerations were only adopted into the map after the basic configuration of the so-called "optimal" plan was in place. Plaintiffs' illustrative plans demonstrate the Enacted Plan's configuration in cracking the heart of Galveston's Black and Latino between all four new commissioners precincts, and dramatically shifting Precinct 3 to predominantly Anglo parts of the county, are inexplicable but for the predominating objective of dismantling the sole majority-minority district in the county.

194.   In other words, the intentional dismantling of the majority-minority district is the only feasible explanation for drawing lines that dispersed the Black and Latino residents in the historic core of Benchmark Precinct 3 throughout all four new commissioners precincts. This is a fundamentally racial goal. Race thus predominated in the drawing of the Enacted Plan and it constitutes a racial gerrymander in violation of the Fourteenth Amendment.

\*          \*          \*

For the reasons stated above, the Court finds in favor of Plaintiffs and enjoins the Enacted Plan as violating Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

*[Proposed Orders filed Separately]*

Respectfully submitted, this the 11th day of September, 2023.

<table>
<tr><td>

*/s/ Valencia Richardson*
Mark P. Gaber\*
Simone Leeper\*
Valencia Richardson\*
Alexandra Copper\*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
sleeper@campaignlegal.org
vrichardson@campaignlegal.org
acopper@campaignlegal.org

Chad W. Dunn (Tex. Bar No. 24036507)
Brazil & Dunn
1900 Pearl Street
Austin, TX 78705
(512) 717-9822
chad@brazilanddunn.com

Bernadette Reyes\*
Sonni Waknin\*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
bernadette@uclavrp.org
sonni@uclavrp.org

</td><td>

*/s/ Sarah Xiyi Chen*
Hani Mirza
Joaquin Gonzalez\*
Sarah Xiyi Chen\*
Attorney-in-Charge
Christina Beeler
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
hani@texascivilrightsproject.org
joaquin@texascivilrightsproject.org
schen@texascivilrightsproject.org
christinab@texascivilrightsproject.org

Hilary Harris Klein\*
Adrianne M. Spoto\*
Southern Coalition for Social Justice
1415 W. Hwy 54, Suite 101
Durham, NC 27707
919-323-3380 (Telephone)
hilaryhklein@scsj.org
adrianne@scsj.org

Nickolas Spencer
Spencer & Associates
9100 Southwest Freeway, Suite 122
Houston, TX 77074
713-863-1409 (Telephone)

</td></tr>
</table>

nas@naslegal.com

Neil G. Baron
Law Office of Neil G. Baron
1010 E Main Street, Ste. A
League City, TX 77573
(281) 534-2748
neil@ngbaronlaw.com

**Counsel for Petteway Plaintiffs**

Richard Mancino*
Michelle Anne Polizzano*
Andrew J. Silberstein*
Molly Linda Zhu*
Kathryn Carr Garrett*
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
212-728-8000 (Telephone)
rmancino@willkie.com
mpolizzano@willkie.com
asilberstein@willkie.com
mzhu@willkie.com
kgarrett@willkie.com

Diana C. Vall-llobera*
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
(202) 303-1000 (Telephone)
dvall-llobera@willkie.com

**Counsel for NAACP/LULAC Plaintiffs**

ALAMDAR S. HAMDANI
United States Attorney
Southern District of Texas


DANIEL D. HU
Civil Chief
United States Attorney's Office
Southern District of Texas
Texas Bar No. 10131415
SDTX ID: 7959
1000 Louisiana Ste. 2300
Houston, TX 77002
713-567-9000 (telephone)
713-718-3303 (fax)
daniel.hu@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division


*/s/ Catherine Meza*
T. CHRISTIAN HERREN, JR.
ROBERT S. BERMAN*
CATHERINE MEZA*
Attorney-In-Charge
BRUCE I. GEAR*
K'SHAANI SMITH*
THARUNI A. JAYARAMAN*
ZACHARY J. NEWKIRK*
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-307-2767 (telephone)
202-307-3961 (fax)
catherine.meza@usdoj.gov

**COUNSEL FOR THE UNITED STATES**
*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 11, 2023, the foregoing document was filed electronically (via CM/ECF), and that all counsel of record were served by CM/ECF.

/s/ *Valencia Richardson*