United States Courts
Southern District of Texas
FILED

*09/26/2024*

Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| TERRY PETTEWAY, THE HONORABLE DERRECK ROSE, MICHAEL MONTEZ, SONNY JAMES and PENNY POPE, | § § § § § | |
| *Plaintiffs*, | § § | Civil Action No. 3:22-cv-57 [Lead Consolidated Case] |
| v. | § § | |
| GALVESTON, TEXAS, and HONORABLE MARK HENRY, in his official capacity as Galveston County Judge, | § § § § § | |
| *Defendants*. | § § § | |

**PETTEWAY AND NAACP/LULAC PLAINTIFFS' MOTION FOR ENTRY OF
JUDGMENT ON THEIR INTENTIONAL DISCRIMINATION AND RACIAL
GERRYMANDERING CLAIMS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

PROCEDURAL BACKGROUND .................................................................................... 4

FACTUAL BACKGROUND .............................................................................................. 5

    I. The Early Redistricting Process....................................................................... 5

    II. The Development of Maps ............................................................................... 8

    III. Limited Opportunity for Public Input ...................................................... 12

    IV. The Enacted Plan's Impact and Lack of Justification ............................. 16

ARGUMENT ...................................................................................................................... 20

    I. Plaintiffs are entitled to judgment on their intentional discrimination claims. ........ 20

        A. The standard for Plaintiffs to establish discriminatory intent is clear. ............. 20

        B. Plaintiffs' discriminatory intent claims are not foreclosed by the unavailability of relief for their discriminatory results claims. ...................... 26

        C. Defendants designed and adopted the challenged plan to dismantle Galveston's sole majority-minority precinct. ................................................................. 28

        D. Defendants' actions in creating and adopting the Enacted Map overwhelmingly demonstrate satisfaction of the *Arlington Heights* factors................................. 33

            *Factor 1: Discriminatory Effect* ................................................................. 33

            *Factor 2: Historical Background* ............................................................. 34

            *Factor 3: The Sequence of Events Leading to the Enacted Map* ............... 35

            *Factor 4: Procedural and Substantive Departures from the Norm*............ 38

            *Factor 5: Legislative History* ................................................................. 39

    II. Plaintiffs are entitled to judgment on their racial gerrymandering claim. .............. 41

    III. This Court should order a remedial process that concludes before the end of the year and a remedy that provides for election in the remedial district in 2026. ...... 44

CONCLUSION .................................................................................................................. 45

CERTIFICATE OF SERVICE ........................................................................................ 48

# TABLE OF AUTHORITIES

**Cases**                                                   **Page**

*Alexander v. South Carolina State Conference of the NAACP*,
144 S. Ct. 1221 (2024) ............................................................. 2, 24, 32, 42, 43, 44

*Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) .............................................. 20, 26

*Bethune-Hill v. Virginia State Board of Elections*, 580 U.S. 178 (2017) ......................... 42

*Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020) ............................................. 21

*Committee for a Fair & Balanced Map v. Illinois Board of Elections*,
No. 1:11-CV-5065, 2011 WL 5185567 (N.D. Ill. Nov. 1, 2011) ................................. 27

*Cooper v. Harris*, 581 U.S. 285 (2017) ........................................ 2, 23, 24, 32, 42

*Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020) ............................................................. 21

*Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) ................................... 25, 27

*Hunter v. Underwood*, 471 U.S. 222 (1985) ............................................................. 21, 24

*League of United Latin American Citizens v. Abbott*,
601 F. Supp. 3d 147 (W.D. Tex. 2022) ..................................... 21, 24, 25, 32, 33, 34, 42

*League of United Latin American Citizens v. Abbott*,
604 F. Supp. 3d 463 (W.D. Tex. 2022) ......................................................... 40

*Miller v. Johnson*, 515 U.S. 900 (1995) ......................................................... 41, 42

*Patino v. City of Pasadena*, 230 F. Supp. 3d 667 (S.D. Tex. 2017) ............................ 28, 32

*Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017) ........................................... 27, 40

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ............. 22, 28

*Petteway v. Galveston County*, No. 23-40582,
2024 WL 3617145 (5th Cir. Aug. 1, 2024) ............................................. 1, 4, 24, 25, 27

*Prejean v. Foster*, 227 F.3d 504 (5th Cir. 2000) ................................................ 21

*Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997) ("*Reno I*") .......................... 21

*Reno v. Bossier Parish School Board*, 528 U.S. 320 (2000) ("*Reno II*") ......................... 21

*Rogers v. Lodge*, 458 U.S. 613 (1982) ........................................................... 22

*Texas v. Holder*, 570 U.S. 928 (2013) (Mem.) ................................................... 40

*Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court).............. 40

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) ....................................... 22

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (*en banc*) ............................. 21, 22, 23, 35

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977) ....................................................... 23, 24, 34, 39

**Codes and Constitutional Provisions**                                              **Page**

52 U.S.C. § 10301(a) ....................................................................... 21

U.S. Const. amend. XV ..................................................................... 21

## INTRODUCTION

Plaintiffs Terry Petteway, Derreck Rose, and Penny Pope ("Petteway Plaintiffs") and Dickinson Bay Area Branch NAACP, Galveston Branch NAACP, Mainland Branch NAACP, Galveston LULAC Council 151, Edna Courville, and Joe A. Compian ("NAACP/LULAC Plaintiffs") respectfully request that this Court enter judgment in their favor on their intentional discrimination (Petteway Counts 1, 2, and 5; NAACP/LULAC Counts 1 and 3) and racial gerrymandering (Petteway Count 3; NAACP/LULAC Count 3) claims. Plaintiffs file this motion to seek timely judgment on those claims as well as to address the issues the Fifth Circuit noted should be considered on remand in this case. *See Petteway v. Galveston County*, No. 23-40582, 2024 WL 3617145, at *13 n.13 (5th Cir. Aug. 1, 2024) (en banc).

The 2021 redistricting process was infected with racial discrimination and resulted in a "stark" and "jarring" district plan—enacted through a "mean-spirited" process. Findings of Fact and Conclusions of Law, ECF No. 250 ¶ 420. The resulting map intentionally diluted the strength of Galveston's Black and Latino voters and had race as the predominant factor in its configuration, making it "a textbook example of a racial gerrymander." *Id.* at 6. This Court has rejected as pretext every non-racial justification Defendants advanced at trial to explain the map's fracturing of Black and Latino voters across all four precincts and its conversion of Commissioner Holmes's majority-minority precinct into that with the lowest minority percentage. *Id.* ¶¶ 214, 280–92. It has credited alternative maps showing that the County's non-racial justifications are false—the precise type of maps the Supreme Court has now repeatedly held to be "highly persuasive"

evidence of a racial motivation behind a map's configuration that can alone carry plaintiffs' burden of proof. *Id.* ¶¶ 285, 288; *Cooper v. Harris*, 581 U.S. 285, 318 (2017); *see also Alexander v. S. Carolina State Conf. of the NAACP*, 144 S. Ct. 1221, 1249 (2024).

The nontransparent and deficient 2021 redistricting process in Galveston County, orchestrated by County Judge Mark Henry, was marked by a lack of community involvement in the process, *id.* ¶ 269, the exclusion of the only Commissioner who represented the interests of Galveston's minority voters, *id.* ¶ 277, and the dismantling of the only Commissioners Precinct where Black and Latino voters had the opportunity to elect that Commissioner, *id.* ¶ 153. At trial, it became readily apparent that the presumption of good faith governments otherwise enjoy is overcome. This was perhaps best illustrated by the back-to-back testimony of Dale Oldham, the County's redistricting consultant, and Thomas Bryan, the cartographer who was not allowed to exercise discretion and instead implemented Mr. Oldham's (and through him, Judge Henry's) instructions. With Mr. Bryan present in the courtroom, Mr. Oldham repeatedly and adamantly testified that he had provided Mr. Bryan with "incredibly clear" instructions not to view racial data, that he had been "very firm on this subject," and had told Mr. Bryan "repeatedly that he was not to, during the drawing of the maps, use racial data." ECF No. 231 at 66:9–16, 67:6–11, 71:21–25, 75:14–24, 81:4–9 (Oldham). After Mr. Oldham left the witness stand, Mr. Bryan testified that Mr. Oldham's testimony was *false*. Mr. Bryan testified that he was "given no instruction one way or the other on racial and ethnic information," ECF No. 232 at 13:11–18, 19:12–19 (Bryan), that what Mr. Oldham said about racial instructions "never happened," and he "would have remembered" if it had, ECF No. 232 at 15:3–9, 21:4–9,

50:9–51:3 (Bryan). *See also* ECF No. 250 ¶ 211. Having observed this testimony, this Court has already "credit[ed] Bryan—an eminently believable witness—and not Oldham in this regard." ECF No. 250 ¶ 211. The County's invention of testimony after the fact— *on the topic of race*—in an effort to advance its legal defense suffices to eliminate any application of the presumption of good faith in this case.

As analyzed below, the record reflects—and the Court has already found, *see generally* ECF No. 250—sufficient facts to show that Plaintiffs have met their burden to prove that they are entitled to judgment on their intentional discrimination and racial gerrymandering claims. The Court should therefore enter judgment in Plaintiffs' favor on their remaining claims.

Plaintiffs also respectfully request that the Court resolve this motion expeditiously. Commissioner Holmes—the elected representative of the minority community in Galveston County—remains in office until his term ends in December 2024. The delay caused by the Fifth Circuit proceedings have already resulted in an unconstitutional map for the November 2024 elections. If the Court acts expeditiously, there will be time for the Court to issue its judgment and provide the County a reasonable deadline *this calendar year* to file with the Court a proposed remedial map.[1] Having been forced to suffer the 2024 election cycle under a discriminatory map, Plaintiffs should at the very least have the

---

[1] That remedial map must number the precincts such that the precinct drawn to remedy Plaintiffs' claims stands for election in 2026 so as not to require Plaintiffs to wait a full four years before their constitutional rights are vindicated.

benefit of their elected representative having a voice in the development of the County's proposed remedial map before his term ends.

## PROCEDURAL BACKGROUND

On October 13, 2023, this Court granted judgment in Plaintiffs' favor on Count 4 of Petteway Plaintiffs' Second Amended Complaint and Count 3 of NAACP/LULAC Plaintiffs' First Amended Complaint, which alleged discriminatory results in violation of Section 2 of the Voting Rights Act. *See generally* ECF No. 250. In its Findings of Fact and Conclusions of Law, this Court explicitly declined to make legal conclusions with respect to Plaintiffs' intentional discrimination and racial gerrymandering claims because "the relief the plaintiffs seek is not broader than that which they are entitled to under § 2." *Id.* ¶ 428. This Court, however, did find that "the enacted plan disproportionately affects Galveston County's minority voters by depriving them of the only Commissioners Court precinct where minority voters could elect a candidate of their choice," and "that the commissioners court was aware of that fact when it adopted the enacted plan." *Id.* ¶ 158. The County appealed, and when a three-judge panel affirmed this Court's judgment, the County sought reconsideration by the en banc Fifth Circuit.

On August 1, 2024, the en banc Fifth Circuit majority reversed this Court's judgment, holding that Black and Latino voters could not be counted together for purposes of satisfying the majority-minority district requirement of the first *Gingles* precondition. *Petteway*, 2024 WL 3617145, at *13. In reversing this Court's judgment, the Fifth Circuit remanded this case for this Court to resolve Plaintiffs' intentional discrimination and racial gerrymandering claims. *Id.* at *13.

## FACTUAL BACKGROUND

In the 2020 redistricting cycle, Defendants eliminated the only opportunity for Black and Latino voters to have representation on the Galveston County Commissioners Court, an opportunity that had been enjoyed for the more than three decades. ECF No. 250 ¶ 417. While the Court did not reach the legal questions whether the Enacted Plan was motivated by discriminatory intent or whether race predominated in rendering Judgment for Plaintiffs, its October 13, 2023, Findings of Fact lay a strong basis for striking down the Enacted Plan on those bases. *See generally*, ECF No. 250. The Findings of Fact set forth in detail the unjustifiable lack of transparency, exclusion of minority voices, and procedural and substantive deviations of Galveston's 2021 redistricting process, as well as the undeniable harm of the challenged map. *Id*. Below, Plaintiffs summarize this Court's October 13 Findings and identify additional evidence adduced at trial that further supports findings of discriminatory intent and racial gerrymandering.

## I. The Early Redistricting Process

In April 2021, Galveston County Judge Mark Henry engaged redistricting counsel to begin the redistricting process for the Galveston County Commissioners Court. ECF No. 250 ¶ 190. Judge Henry understood that Galveston County was likely to have to revise its County Commissioners precincts following the release of the 2020 Census and had the County's general counsel contact Dale Oldham in November 2020 to retain him as a redistricting consultant. Joint Ex. 11 at 2 (Nov. 25, 2020 email from P. Ready to D. Oldham); *see also* ECF No. 250 ¶ 190. Dale Oldham had previously drawn the County's Commissioners Court precincts; Judge Henry specifically chose him because of Mr.

Oldham's prior experience in the County. ECF No. 228 at 181:15–23, 280:10–20, 281:1–12, 283:21–284:1 (Henry); ECF No. 250 ¶¶ 198, 241. That experience had resulted in a map that failed to obtain Section 5 preclearance after the Attorney General concluded that the County had not met its burden of showing that the proposed Commissioners Court plan was not adopted with a discriminatory purpose. Joint Ex. 6 at 2 (Mar. 5, 2012, Section 5 objection letter from T. Perez to J. Trainor); ECF No. 250 ¶ 187. With no opportunity for public input, the Commissioners Court voted 4–1, with Commissioner Holmes the lone dissenter, to hire Mr. Oldham and Holtzman Vogel as redistricting counsel on April 5, 2021. *See generally* Pls.' Ex. 140 (Apr. 5, 2021, meeting transcript); *see also* Pls.' Ex. 585 at 8 (Apr. 5, 2021, meeting agenda and minutes); ECF No. 250 ¶ 191.

Race was at the forefront of Judge Henry's mind from the beginning of the redistricting process. ECF No. 250 ¶ 192. Before the Census data had even been released, Judge Henry and the County's general counsel, Paul Ready, emailed Mr. Oldham to ask "whether the county 'had to draw a majority[-]minority district.'" ECF No. 250 ¶ 192 (quoting Pls.' Ex. 144 at 1 (Apr. 20, 2021, email from P. Ready to D. Oldham)); ECF No. 231 at 185:15–186:24 (Oldham).

Mr. Oldham lacked the technical ability to parse the Census data released in August and Defendants had not yet obtained a demographer for the project, so Mr. Oldham reached out to Adam Kincaid of the National Republican Redistricting Trust to obtain Census data about Galveston County. ECF No. 231 at 36:1–37:20, 68:11–18 (Oldham); Pls.' Ex. 173 at 1 (Sept. 14, 2021, email from A. Kincaid to D. Oldham); ECF No. 250 ¶¶ 195–96. Mr. Kincaid sent Mr. Oldham data showing the racial demographic changes from 2010 to 2020

for each commissioners precinct. Pls.' Ex. 173 at 1, 3 (Sept. 14, 2021, email from A. Kincaid to D. Oldham); ECF No. 250 ¶ 195. Mr. Oldham then removed the logo of the National Republican Redistricting Trust from the document and sent it to Paul Ready to distribute to the commissioners. ECF No. 231 at 51:5–10, 52:1–14 (Oldham); ECF No. 250 ¶ 196. Mr. Oldham—who was "pretty familiar" with "the population and demographic location of that population in Galveston County," ECF No. 231 at 131:7–11 (Oldham)— reviewed the racial data Mr. Kincaid had sent and concluded that Galveston County's Black population had remained concentrated in Precinct 3 and the Latino population had grown throughout the County. ECF No. 231 at 131:24–134:10 (Oldham); ECF No. 250 ¶ 198. Nevertheless, Oldham subsequently took it a step further and obtained and "reviewed racial-shading maps of Galveston County after the census-data release to identify where Black populations were concentrated." ECF No. 250 ¶ 198. This confirmed his preexisting understanding of the concentrated location of the Black community in Precinct 3. *Id.*

Oldham held a series of meetings in mid-September 2021 with members of the Commissioners Court to determine their priorities for the redistricting process. The first meeting on September 8 included both Judge Henry and Commissioner Apffel, followed by individual meetings with Commissioners Giusti and Clark, and ending with a meeting with Commissioner Holmes on September 20. ECF No. 231 at 38:12–25, 42:21–43:7, 45:11–21, 48:2–5 (Oldham); ECF No. 250 ¶ 199. In his meeting with Oldham and Commissioner Apffel, Judge Henry told Oldham that he wanted a map like the one he conceived in 2011—the configuration that ultimately became Map 2. *Id.* ¶ 200 (citing ECF

No. 231 at 39–40, 150–52 (Oldham)). In 2011, the County had been subject to Section 5 of the Voting Rights Act and Mr. Oldham had advised Judge Henry that such a configuration "wouldn't get preclearance . . . because th[e] map would retrogress the minority voting strength in the county." ECF No. 231 at 150:19–151:11 (Oldham). A decade later, in 2021, Judge Henry once again desired a map that he knew would lead to "a decline in the voting strength of at least the Black population." ECF No. 231 at 152:15–20 (Oldham); ECF No. 250 ¶ 158.

## II. The Development of Maps

Despite Oldham completing the meetings with the commissioners and Judge Henry by September 23, no one contacted a demographer until October 14, when Holtzman Vogel asked Thomas Bryan to start drafting maps. ECF No. 250 ¶ 204; *see also* ECF No. 231 at 225:20–21 (Bryan); Pls.' Ex. 187 at DEFS00031807 (Oct. 14, 2021 through Oct. 26, 2021 Text Messages between T. Bryan and P. Gordon); Pls.' Ex. 189 (Oct. 15, 2021 Email from P. Gordon to J. Torchinsky). On an October 15 call between Bryan and Phil Gordon of Holtzman Vogel, Gordon instructed Bryan to create two plans: (1) a least change plan and (2) a plan that created four Republican precincts, later titled a "Four R plan." ECF No. 250 ¶ 205; *see also* ECF No. 231 at 227:16–228:25, 233:19–25, 289:8–290:1 (Bryan); Pls.' Ex. 188 (Oct. 15, 2021 Email from T. Bryan to J. Torchinksy et al.). The purported motivation of Judge Henry—creating a "coastal precinct" which connected all the smaller islands off the coast of Galveston City—never arose during the hour-long phone call between Gordon and Bryan, and Bryan's initial draft plans included no coastal precinct. ECF No. 250 ¶ 206; *see also* ECF No. 231 at 290:23–91:4 (Bryan); Pls.' Ex. 516 (Four R map). After that initial

call, Bryan immediately understood that Oldham, not Gordon, was the lead person from whom he should take instructions about configuring plans. ECF No. 250 ¶ 207; *see also* ECF No. 231 at 290:2–7 (Bryan). Bryan and Oldham spoke by phone for the first time on October 17. ECF No. 250 ¶ 207; *see also* ECF No. 231 at 68:21–69:17 (Oldham); Pls.' Ex. 196 (Oct. 17, 2021 Email from T. Bryan to D. Oldham). The Four R plan was not the foundation upon which Bryan built Map 2. ECF No. 250 ¶ 208; *see also* ECF No. 231 at 291:5–21 (Bryan). Oldham never told Bryan that Judge Henry wanted to create four Republican precincts, and Oldham denied any such partisan objective. ECF No. 250 ¶ 208; *see also* ECF No. 231 at 153:14–154:4 (Oldham).

Bryan testified that he could not speak to what motivated the drawing of Map 2. ECF No. 232 at 29:7–20 (Bryan); ECF No. 250 ¶ 210. Bryan did not exercise discretion in drawing Maps 1 or 2. ECF No. 250 ¶ 210. Oldham told him where to place the lines. ECF No. 231 at 296:9–25 (Bryan); ECF No. 250 ¶ 210. Oldham gave Bryan "very specific instructions about how he wanted Map 2 to look," and Bryan did not know for what reason Oldham "was asking [him] to put [any] particular territory in each of the commissioner[s] precincts in Map 2." ECF No. 231 at 291:25–293:6 (Bryan); ECF No. 250 ¶ 210. On the witness stand, Mr. Oldham adamantly testified that he gave Mr. Bryan clear and repeated instructions not to display or consult any racial data while drawing the map. ECF No. 231 at 66:9–16, 67:5–11, 75:11–24 (Oldham). Immediately after, Mr. Bryan—who was present for Mr. Oldham's trial testimony—testified that this *never happened*. ECF No. 232 at 19:4–23, 21:3–9, 50:9–51:3 (Bryan); *see also* ECF No. 250 ¶ 211. While Mr. Bryan testified credibly that he did not display or consult racial data while working on the Galveston

9

County maps, ECF No. 232 at 33:3–8 (Bryan); ECF No. 250 ¶ 211, he also credibly testified that he was "given no instruction one way or the other on racial and ethnic information," ECF No. 232 at 19:12–19, 21:4–10 (Bryan), revealing Mr. Oldham's testimony to be a *post hoc* invention seeking to bolster the County's case. *See* ECF No. 250 ¶ 211. Furthermore, Mr. Oldham unpersuasively testified that Commissioner Holmes's placement in the precinct with the lowest minority population in Map 2 was a function of where he lived, ECF No. 231 at 175:20–22 (Oldham), but Mr. Bryan disputed this testimony, saying that he did not know where Commissioner Holmes lived and his residence had no bearing on his placement in Precinct 3, ECF No. 231 at 306:16–19 (Bryan). Again, Oldham testified that Bryan had the incumbent addresses and needed them to follow his instructions, ECF No. 231 at 179:21–180:11 (Oldham), but Bryan testified this was not true, *id.* at 304:17–306:19 (Bryan).

After Bryan drew these maps, Oldham traveled to Galveston County to meet with Judge Henry and the commissioners. ECF No. 250 ¶ 215; *see also* ECF No. 231 at 79:12–80:12 (Oldham). Oldham met with Judge Henry on October 18, and Judge Henry told Oldham he preferred Map 2 because it was "essentially his criteria." ECF No. 250 ¶ 215; *see also* ECF No. 231 at 82:1–84:1 (Oldham); Pls.' Ex. 199 (Oct. 18, 2021 calendar item). Commissioners Apffel, Giusti, and Clark initially told Oldham that they preferred Map 1. ECF No. 250 ¶ 216; *see also* ECF No. 231 at 190:16–20 (Oldham). At his deposition, Mr. Oldham testified that Judge Henry at this point began pursuing votes in favor of Map 2. *See* ECF No. 250 ¶ 220. Although Mr. Oldham testified at trial that he had "overtestified" when he said this, he agreed that Judge Henry was the only member of the Commissioners

Court in favor of Map 2 before it was changed to accommodate Commissioners Giusti, Apffel, and Clark. ECF No. 231 at 182:4–184:8 (Oldham). Oldham knew Commissioner Holmes would be dissatisfied with Map 2 because it dramatically reduced the minority population in Precinct 3, resulting in Precinct 3 having the lowest minority population percentage of all four precincts. ECF No. 250 ¶ 217; *see also* ECF No. 231 at 177:22–178:18 (Oldham). Commissioner Holmes opposed Map 2 and insisted that Oldham inform the Commissioners Court that Section 2 of the Voting Rights Act required a majority-minority precinct. ECF No. 250 ¶ 217; *see also* ECF No. 231 at 102:12–22 (Oldham).

Paul Ready set up a series of zoom meetings between Mr. Oldham, Mr. Bryan, and Commissioners Giusti, Clark, and Apffel to endeavor to accommodate their wishes into Map 2 to gain their support for it. ECF No. 231 at 184:15–186:4 (Oldham); ECF No. 250 ¶ 221. Mr. Oldham met with Commissioners Giusti and Clark simultaneously to make modifications they wanted to see in Map 2. ECF No. 231 at 191:24–192:16 (Oldham); ECF No. 250 ¶ 221. At his deposition, Mr. Oldham testified that Judge Henry popped into these commissioner meetings while they were happening, but at trial he testified that he only did so with Commissioner Apffel, but then equivocated that he could not be certain which meeting or how many times Judge Henry appeared. ECF No. 231 at 193:25–197:19 (Oldham). Paul Ready never set up a meeting with Commissioner Holmes to seek to accommodate his desires in Map 2, nor did Mr. Oldham inform him that he should suggest changes favorable to him in Map 2. ECF No. 231 at 192:17–193:8 (Oldham); *see also* ECF No. 250 ¶ 221. The basic configurations of Map 1 and Map 2 were completed no later than October 22. ECF No. 232 at 43:22–44:1 (Bryan); *see also* Pls.' Ex. 386 at 19 n.18, 26 n.25

(Cooper Expert Report) (confirming receipt of shapefiles for drafts of Map 1 and Map 2 dated October 17 and October 21, respectively, that are identical to the final versions); ECF 250 ¶ 257. Mr. Oldham testified at his deposition that it was "clear to [him]" that the Commission would vote for Map 2 by late October 2021, though he testified at trial that he shouldn't have said that because it was possible things could change. ECF No. 231 at 198:21–200:4 (Oldham). The commissioners were all provided with data and analysis that showed that Map 2 would not maintain the effective majority-minority district that had elected Commissioner Holmes. ECF No. 231 at 200:11–21 (Oldham).

## III. Limited Opportunity for Public Input

The County publicly posted the two proposals, Map 1 and Map 2 on the County's website, on October 29, 2021. *See* Joint Ex. 29 (Galveston County redistricting website); ECF No. 228 at 325:14–17 (Henry); ECF No. 250 ¶ 224. Judge Henry's office was responsible for deciding what would be posted on the web page, and he never directed anyone to include the Benchmark Plan (and thus what changes were being proposed), population or demographic data about the plans, or any other analytics such as compactness scores, voting precinct splits, or the criteria that went into drafting them. *See* Joint Ex. 29 (Galveston County redistricting website); ECF No. 228 at 325:11–329:16 (Henry). Judge Henry did not schedule a public meeting until November 12, 2021, despite having the maps in late October, knowing that there would be a November 1, 2021, regular session, and understanding that the candidate filing period would occur in early November. *See* ECF No. 250 ¶¶ 253, 257, 268.

Mr. Oldham testified that standard practice would be to adopt redistricting criteria once the Census data were released. ECF No. 231 at 33:9–22(Oldham). In 2011, the Galveston County Commissioners Court held public meetings prior to adoption and prior to maps being completed but after Census data came out, consistent with the standard practice identified by Mr. Oldham. ECF No. 231 at 34:17–25 (Oldham); ECF No. 250 ¶ 244. Mr. Oldham advised the commission that they should hold as many public meetings as possible and allow for supplementation of feedback after the meetings. ECF No. 231 at 201:1–6 (Oldham); ECF No. 250 ¶ 256.

In spite of this advice, the only opportunity for public input was an online public comment portal and the November 12, 2021, special meeting. Joint Ex. 42 (Compilation of Public Comments); ECF No. 250 ¶ 259. But the County's web page failed to inform the public of when they would have to submit public comment for it to be considered. Joint Ex. 29 (Galveston County redistricting website); ECF No. 250 ¶ 225. The County even failed to provide this information after receiving the Texas Secretary of State's notice confirming the November 13, 2021, redistricting deadline. *See* Joint Ex. 29 (Galveston County redistricting website); ECF No. 228 at 342:24–343:5 (Henry). In addition to the lack of information that would allow for meaningful input online, Judge Henry admitted there was "not really a plan for how to review" the online comments, ECF No. 228 at 221:6–8 (Henry), and that he personally reviewed less than a dozen. ECF No. 228 at 330:22–24 (Henry); ECF No. 250 ¶ 270.

Indeed, in reviewing the online public comments, Judge Henry had his staff provide a breakdown of comments in support of a particular map, which he then provided during the November 12, 2021, special meeting before making the motion to adopt Map 2:

> Of the 440 that came in, 168 did not discuss a particular map, they just called me names mostly. Of the people who did choose a map preference, Map 1 – received 64 responses. Map 2 received 208 responses. So of those responding to a particular map, 76.4[%], Map 2. 23.5[%], Map 1. With that, I'm going to make the motion to approve Map 2.

Pls.' Ex. 591 at 61–62 (Nov. 12, 2021, special meeting transcript); ECF No. 250 ¶ 270. But Plaintiffs' expert Dr. Burch analyzed all 446 public comments that were submitted prior to the meeting on November 12, 2021. ECF No. 222 at 145:25–146:23 (Burch); Pls.' Ex. 414 at 21 (Burch Expert Report); ECF No. 250 ¶ 271. Dr. Burch found that Judge Henry's characterization of 168 comments as not discussing a particular map in fact "dismissed as devoid of meaningful content nearly every comment that did not support the maps and that expressed concerns about racial discrimination and minority vote dilution." Pls.' Ex. 414 at 21 (Burch Expert Report); *see also* ECF No. 222 at 145:25–146:23 (Burch); ECF No. 250 ¶ 271. This Court found that Dr. Burch's detailed look at the public comments "indicates that Henry's summary during the November 12 meeting disregards public commentary expressing concern over the discriminatory impact of redistricting on Galveston County's minority community." ECF No. 250 ¶ 271.

Judge Henry displayed a similar disregard for the in-person public comments provided on November 12, 2021, where commentators overwhelmingly expressed concern for the discriminatory impact of the proposed map and the lack of a fair process. ECF No. 250 ¶¶ 273–274. The Commissioners' conduct at the November 12, 2021, special meeting

revealed that the County had no intention to involve the public in the redistricting process. During this meeting, the Commissioners Court heard from dozens of Galveston residents, all but one of whom expressed their concerns about the process and map proposals. Pls.' Ex. 129 (video of November 12, 2021, special meeting); Pls.' Ex. 414 at 18 (Burch Expert Report); ECF No. 226 at 135:5–11 (Lewis) (speaking at special session because "[w]hat I saw [there] was another disparity . . . within our voting system. And . . . it just was not right."); *see also* Pls.' Ex. 412 at 56–57 (Krochmal Expert Report); ECF No. 250 ¶ 275. One speaker, the late former NAACP/LULAC Plaintiff Leon Phillips, said, "it looks as though you're tired of hearing me talk." Pls.' Ex. 591 at 52:10–11 (Nov. 12, 2021, special meeting transcript). Judge Henry simply responded, "you have three minutes," to which Mr. Phillips said, "just pay attention to what I'm saying." *Id.* at 52:12–15. The transcript for this special meeting shows that, other than Judge Henry's summary of the online public comment, no member of the Commissioners Court who voted in favor of Map 2 shared their reasons for doing so. *See generally* Pls.' Ex. 591 (Nov. 12, 2021, special meeting transcript); ECF No. 250 ¶ 276. The County residents who appeared at this meeting were predominantly Black and Latino, including many older residents. Pls.' Ex. 412 at 56 (Krochmal Expert Report); ECF No. 221 at 136:20−137:11 (McGaskey); Pls.' Ex. 129 (video of November 12, 2021, special meeting); ECF No. 250 ¶ 272.

The adoption of the finalized Map 2 was a forgone conclusion by the time of the November 12, 2021, special meeting. See ECF No. 222 at 145:8–24 (Burch); Pls.' Ex. 414 at 20–21 (Burch Expert Report); ECF No. 228 at 86:6–8 (Holmes). Commissioner Apffel called Commissioner Holmes a few days before the November 12 special meeting with the

understanding that Map 2 would be adopted. ECF No. 228 at 86:6–13 (Holmes); Joint Ex. 23 at Holmes000188 (Commissioner Holmes' Notes); ECF No. 250 ¶ 230. An email exchange between Mr. Oldham and Judge Henry's chief of staff Tyler Drummond, among others, reveals that adopting the plan the same night as the sole public meeting was always the plan, even if that meeting had occurred weeks before the November 13, 2021, state-imposed deadline for enacting maps. Joint Ex. 27 (Oct. 28, 2021, email from T. Drummond to D. Oldham et al.); ECF No. 250 ¶ 223. Mr. Oldham testified that this "wouldn't have been appropriate." ECF No. 231 at 202:12–203:11 (Oldham). In the words of Commissioner Stephen Holmes, "the fix was already in." ECF No. 228 at 160:20–161:8 (Holmes). The Commissioners Court voted 3–1 to adopt Map 2 at the November 12, 2021, hearing. ECF No. 250 ¶ 231.

## IV. The Enacted Plan's Impact and Lack of Justification

As this Court has found, "Judge Henry [] was principally responsible for the redistricting process," ECF No. 250 ¶ 236, and the testimony at trial revealed that his motivations, which he executed through his instructions and work with Oldham, were prevailing "but for" causes for how the map was configured. As Mr. Oldham testified, Map 2—the Enacted Plan—was "the visualization" of Judge Henry's instructions. ECF No. 231 at 181:12–16 (Oldham) ("Map 2 was something [Judge Henry] had been visualizing for a decade"); *see also* ECF No. 231 at 82:1–84:1 (Oldham) (testifying that Judge Henry preferred Map 2 because "it's essentially his criteria," the embodiment of "the instructions to [Mr. Bryan] when drawing this map"); ECF No. 250 ¶ 209.

The Enacted Plan "converted the benchmark Precinct 3 from the precinct with the highest percentage of Black and Latino residents to the one with the lowest." ECF No. 250 ¶ 153 (citing ECF No. 223 at 42–43 (Cooper)). Specifically, the Enacted Plan "represents a dramatic change in the commissioners-precinct lines, both on the coast and the mainland, in a way that distributes the population of benchmark Precinct 3 among all four new precincts and shifts Commissioner Holmes's precinct north." ECF No. 250 ¶ 212. Plaintiffs' experts William Cooper, Anthony Fairfax, and Tye Rush, Ph.D. also found that the Enacted Map carved out Galveston County's Black and Latino populations across the four Commissioners Court precinct, despite the availability of alternatives that would have maintained Precinct 3 as a majority-minority district. ECF No. 250 ¶ 285. As a result, Black and Latino residents in Galveston County will "usually fail" to elect a candidate of their choice for Galveston County Commissioner. ECF No. 250 ¶ 155.



Joint Ex. 7 (Benchmark Plan); Defs.' Ex. 151 (Enacted Plan).

During the litigation, Defendants proffered several criteria which they alleged guided the redistricting process, including "1) compliance with federal law, 2) the creation of a coastal precinct, 3) geographic compactness, 4) minimizing precinct splits, 5) incumbency protection, 6) partisanship, and 7) adopting a map that would be clear and easy

to understand by the public." ECF No. 250 ¶ 280. The Court has rejected all these proffered justifications and concluded that none were what motivated the configuration of Map 2. ECF No. 250 ¶¶ 280–92.

Plaintiffs' experts all concluded that it was possible to comply with these criteria while maintaining Precinct 3 as a majority-minority district. ECF No. 250 ¶ 283. Plaintiffs' expert Mr. Cooper explained that there "are many, many different ways to draw a majority Black plus Latino precinct. You can make few changes. You can make lots of changes. It can look a lot of different ways." ECF No. 223 at 52:2–15 (Cooper); ECF No. 250 ¶ 285. Nothing required cracking and dividing the Latino and Black population into four different precincts, and in Mr. Cooper's view this is an unexplained result when "there are other ways to preserve the minority majority district and still adhere to traditional redistricting principles." ECF No. 223 at 78:18–79:16 (Cooper). Plaintiffs' expert Mr. Fairfax testified that "there are possibilities of different configurations [of illustrative maps that] still continue to create a majority Black and Latino district that satisfied the first precondition of Gingles and followed traditional redistricting criteria." ECF No. 224 at 117:15–24 (Fairfax); ECF No. 250 ¶ 285.

To that effect, Plaintiffs offered several alternative maps that "perform as well or better than the enacted plan under the disclosed criteria." *See* ECF No. 250 ¶ 283. For example, Burch Alternative Map 1 (created by Dr. Rush) combines Galveston Island and the Bolivar Peninsula. Precinct 3 is 59.7% non-Anglo:



Pls.' Ex. 415 (Burch Alternative Map 1). Likewise, Burch Alternative Maps 2, 3, and 4

create a coastal precinct, and all versions of Precinct 3 are more than 60% non-Anglo. Pls.'

Ex. 414 at 48–50 (Burch Expert Report); Pls.' Ex. 485 at 39–53 (Supplemental Rush Expert

Report). The Rush maps also minimize precinct splits while preserving a majority-minority

district. ECF No. 250 ¶ 288. Likewise, Drs. Fairfax and Cooper provided multiple

alternative maps which complied with federal law, minimized precinct splits, protected

incumbents, and maintained Precinct 3 as a majority-minority district. ECF No. 250

¶¶ 284–88.

   As to partisanship, this Court found that this criterion "did not require the enacted

plan's configuration, as all members of the Commissioners Court who voted for the enacted

plan disclaimed partisanship as a predominating consideration." *Id.* ¶ 289. Finally, most of

the alternative maps are easier for the public to understand than the Enacted Plan, because

the alternative maps tend to reduce dramatic changes to voting precincts. *Cf. id.* ¶ 290

(noting that "that dramatic changes in the enacted plan do the opposite").

## ARGUMENT

### I.   Plaintiffs are entitled to judgment on their intentional discrimination claims.

Plaintiffs have demonstrated by a preponderance of the evidence that the 2021 Commissioners Court map was passed with a racially discriminatory intent.[2] Defendants were aware—and indeed intended—that their actions would lead to the destruction of the County's only majority-minority precinct, which alone would merit a finding of intentional discrimination. Additionally, Plaintiffs demonstrated evidence of the presence of all five *Arlington Heights* factors during the 2021 redistricting process. Finally, Plaintiffs have demonstrated that the Enacted Map intentionally dilutes Black and Latino voters in Galveston County. As a result, Plaintiffs are entitled to judgment in their favor on their intentional discrimination claims.

### A.   The standard for Plaintiffs to establish discriminatory intent is clear.

Intentionally fragmenting minority populations in redistricting violates Section 2 of the Voting Rights Act as well as the Fourteenth and Fifteenth Amendments. "[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (Kennedy, J., Roberts, C.J., Alito, J., lead op.). In assessing those serious questions, "'racial

---

[2] Plaintiffs incorporate by reference their detailed Proposed Findings of Facts and Conclusions of Law, ECF No. 239, as well as the legal arguments in their closing briefing related to these claims. *See* Petteway Post-trial Br., ECF No. 240; NAACP/LULAC Post-trial Br., ECF No. 242; NAACP/LULAC Response Br., ECF No. 246; Petteway Response Br., ECF No. 247.

discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (*en banc*) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). In identifying whether racial discrimination was *a* purpose, plaintiffs must only show that the map would not have been adopted *but for* the acts of those involved who harbored discriminatory intent. *See, e.g.*, U.S. Const. amend. XV (prohibiting discrimination "on account of" race, color, or previous condition of servitude); 52 U.S.C. § 10301(a) (prohibition discrimination in voting "on account of" race); *accord Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) ("As this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.' . . . That form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause.") (internal citations omitted); *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (holding that Alabama's felony disenfranchisement law was intentionally discriminatory in violation of the Fourteenth Amendment's Equal Protection Clause because discrimination against Blacks was a "'but for' motivation for the enactment").[3]

---

[3] As the *LULAC v. Abbott* court explained, there is some dispute in the case law about the role of the Fifteenth Amendment in intentional vote dilution claims. 601 F. Supp. 3d 147, 160 & n.4 (W.D. Tex. 2022). The Supreme Court has addressed such claims as deriving under either the "Fourteenth or Fifteenth Amendments." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997) ("*Reno I*"). The Court later observed that it had never *held* the Fifteenth Amendment to so apply, *see Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000) ("*Reno II*"), which a subsequent Fifth Circuit panel mistook (in dicta that was unnecessary to the result in that case) as an affirmative holding, *see Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000). Subsequently, the Fifth Circuit has explained, in a vote dilution case, that "[a]n election practice violates Section 2 and the Fourteenth and Fifteenth Amendments if it is undertaken and maintained for a discriminatory purpose."

"[D]iscriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Rather, "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of [the legislature's] actions may be considered." *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (citations omitted). As the *en banc* Fifth Circuit has explained,

> [i]n this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence. To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.

*Veasey*, 830 F.3d at 235–36.

Although discriminatory purpose "implies more than intent as volition or intent as awareness of consequences," *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979), the Supreme Court has explained that "the inevitability or foreseeability of consequences . . . bear[s] upon the existence of discriminatory intent," *id.* at 379 n.25. Where "the adverse consequences of a law upon an identifiable group" are clear, "a strong inference that the adverse effects were desired can reasonably be drawn." *Id.*; *see also Brown*, 561 F.3d at 433 ("the normal inferences to be drawn from the foreseeability of [the legislature's] actions may be considered").

---

*Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020). In any event, the analytical framework presented herein applies regardless of the source of law. *See LULAC*, 601 F. Supp. 3d at 160.

As the Supreme Court explained, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). "The impact of the official action[,] whether it 'bears more heavily on one race than another,' may provide an important starting point." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). From there, the Court "set out five non-exhaustive factors to determine whether a particular decision was made with a discriminatory purpose: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Veasey*, 830 F.3d at 231 (quotation marks omitted); *Arlington Heights*, 429 U.S. at 267–68.

One means the Supreme Court has endorsed for establishing the purpose or intent behind maps is to proffer alternative maps that satisfy the purported objective of the maps without the racially discriminatory effects. In *Cooper*, the Supreme Court characterized alternative maps of this sort as "key evidence" and a "highly persuasive" way to disprove a purported justification for a map. 581 U.S. at 289, 318.  "If you were *really* sorting by [the purported justification] instead of skin color (so the argument goes) you would have done—or, at least, could just as well have done—*this*. Such would-have, could-have, and (to round out the set) should-have arguments are a familiar means of undermining a claim that an action was based on a permissible, rather than a prohibited, ground." *Id.* at 317

23

(emphasis in original). In *Cooper*, the claim was racial gerrymandering and a partisan motivation was alleged. *Id.* But evidentiary value of alternative maps "extends just as easily to intentional vote dilution," *LULAC*, 601 F. Supp. 3d at 177, and is not limited to claims of partisan motivation, but extends to any purported justification behind a map's lines. The Supreme Court recently punctuated the importance of alternative map evidence, noting that it alone can "carry the day" for Plaintiffs and, if produced, will "undermine[] the [government's] defense that the districting lines were 'based on a permissible, rather than a prohibited, ground.'" *Alexander*, 144 S. Ct. at 1249–50.[4]

While a discriminatory *intent* claim also requires a showing that there was an attendant discriminatory *effect*, *cf. Hunter*, 471 U.S. at 232, it does *not* require satisfying the test for a Section 2 discriminatory effects claim. As this Court (together with Circuit Judge Smith and District Judge Guaderrama), explained in assessing whether Texas senate district 10 was intentionally discriminatory, "[t]he intentional-vote-dilution analysis [] is derived from the Constitution, and the *Arlington Heights* framework deployed in that analysis states merely that effects are discriminatory when they 'bear[ ] more heavily on race than another.'" *LULAC*, 601 F. Supp. 3d at 163 (quoting *Arlington Heights*, 429 U.S. at 266). "Incorporating the *Gingles* framework into the intentional-vote-dilution analysis, thereby constitutionalizing the *Gingles* factors, would thus be an unnatural result, and is

---

[4] The en banc Fifth Circuit noted, 2024 WL 3617145, at *13 n.13, that the *Alexander* decision should be considered on remand. In this case, it is most relevant to show the key and compelling nature of Plaintiffs' unrebutted alternative map evidence in refuting the County's non-racial justifications for the Enacted Map. This is especially so because, unlike in *Alexander*, here the County has not advanced any partisan justification for the map's configuration. *See infra.*

not one that this Court accepts." *Id.* The *LULAC* court reasoned that this conclusion was supported by the Supreme Court's decision in *Bartlett*, where a plurality of the Court's analysis showed that "it must be possible for a state to violate the Constitution by dismantling a district that does not meet all three *Gingles* requirements." *Id.* at 163. The *LULAC* court likewise relied upon the Ninth Circuit's consistent holding in *Garza v. County of Los Angeles*, 918 F.2d 763, 769–71 (9th Cir. 1990). *Id.* at 164.

For that reason, it is irrelevant whether Plaintiffs' Section 2 discriminatory *results* claims were premised upon a coalition theory in order to satisfy the first *Gingles* precondition. Where intentional discrimination is established, under *Arlington Heights* it suffices to establish liability if the Enacted Map bears more heavily on Black voters. Or Latino voters. Or any other group. The Constitution does not demand that Plaintiffs be members of a class so numerous as to constitute the majority of a potential alternative precinct in order to show that they have suffered a discriminatory effect as a result of the County's discriminatory intent. As the *LULAC* court explained, "though Plaintiffs must show discriminatory effect to prevail on their intentional-vote-dilution theory . . . this Court concludes that that discriminatory effect does not the benchmark district to meet all, or any, of the *Gingles* requirements for a Section 2 district.[5]

---

[5] This addresses the Fifth Circuit's direction that the Court consider the analytical framework for Plaintiffs' constitutional claims, including "whether Plaintiffs can prove that they have been injured, or are entitled to relief, when their claims are premised on a coalition theory." 2024 WL 3617145, at *13 n.13. Plaintiffs' intentional discrimination claims are *not* premised on a coalition theory. They are premised on the theory that *Plaintiffs* have suffered a discriminatory effect as a result of the County's redistricting action. With race as at least one motivating purpose, they have been fragmented from other

**B.     Plaintiffs' discriminatory intent claims are not foreclosed by the unavailability of relief for their discriminatory results claims.**

Following the Fifth Circuit's en banc decision, the United States sought clarification that its Section 2 *intent* claim remained to be decided on remand. In response to the County's motion to avoid this remand altogether, Petteway and NAACP/LULAC Plaintiffs noted their pending Section 2 *intent* claims as well. The Fifth Circuit issued an order and three separate opinions denying both motions to amend the judgment, but in doing so brought no clarity to the question posed by the United States. The majority merely refused to clarify the Court's judgment one way or another. Only Judge Ho directly stated his view that the unavailability of relief for a Section 2 discriminatory *results* claim means relief is unavailable for a Section 2 discriminatory *intent* claim. Judge Ho's position is contrary to Supreme Court precedent as well as precedent of the Ninth Circuit and three-judge district courts adjudicating Texas redistricting in prior cases. *Supra* I.A.

Intentional discrimination violates Section 2 of the Voting Rights Act regardless of whether a particular minority group or coalition of minority groups can comprise a majority of eligible voters in a single member district. In *Bartlett v. Strickland*, the Court held that plaintiffs bringing a discriminatory results claim under Section 2 must show the possibility of an alternative majority minority district, but the Court specified that its "holding does not apply to cases in which there is intentional discrimination against a racial minority."

---

voters of their same race. The intended effect of that action has occurred—they will no longer be represented on the Commissioners' Court by their preferred representative, Commissioner Holmes, a Black man. That result suffices to show there was a discriminatory effect of the discriminatory intent.

556 U.S. 1, 20 (2009) (plurality op.); *see also id.* ("[E]vidence of discriminatory intent tends to suggest that the jurisdiction is not providing an equal opportunity to minority voters to elect the representative of their choice, and it is therefore unnecessary to consider the majority-minority requirement before proceeding to the ultimate totality of circumstances analysis" (internal quotation marks omitted)); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 769 (9th Cir. 1990) (holding that *Gingles* 1 precondition only requires showing of majority-minority district in absence of showing of intentional discrimination); *Perez v. Abbott*, 253 F. Supp. 3d 864, 944 (W.D. Tex. 2017) (rejecting argument that statutory Section 2 intentional discrimination claims require satisfying first *Gingles* prong); *Comm. for a Fair & Balanced Map v. Ill. Bd. of Elections*, No. 1:11-CV-5065, 2011 WL 5185567, at *4 (N.D. Ill. Nov. 1, 2011) ("[T]he first *Gingles* factor is appropriately relaxed when intentional discrimination is shown . . . ."). If the Court finds intentional discrimination, the first *Gingles* precondition is irrelevant to a Section 2 *intent* claim and Plaintiffs likewise need not show that Black and Latino voters vote cohesively.[6]

Plaintiffs' position is thus that their Section 2 *intent* claims remain live on remand and do not depend upon aggregating different minority groups because the *Gingles* 1

---

[6] In its en banc decision, the Fifth Circuit noted, 2024 WL 3617145, at *13 n.13, that on remand a pertinent consideration would be the "appropriate analytical framework to apply to Plaintiffs' constitutional claims," citing the 2017 *Perez v. Abbott* three-judge court decision cited above. It is unclear what relevance *Perez* could have to Plaintiffs' *constitutional* claims, as the cited discussion from *Perez* is about what showing is required for a *statutory* Section 2 intent claim. But Plaintiffs agree that *Perez* properly sets forth the standard for a Section 2 intent claim, where *Gingles* 1—and thus the topic of coalitions— is irrelevant.

requirement is inapplicable when discriminatory intent is shown.[7] Given the uncertainty caused by the Fifth Circuit's orders, the Court must, however, decide the constitutional claims as well.

### C.       Defendants designed and adopted the challenged plan to dismantle Galveston's sole majority-minority precinct.

Defendants' express purpose during the 2021 redistricting cycle was to eliminate the sole performing majority-minority Commissioners Court precinct. And as this Court already found, "[t]he enacted plan creates an evident and foreseeable impact on racial minorities in Galveston County by eliminating the sole majority-minority precinct." ECF No. 250 ¶ 157. "Likewise, [] the commissioners court was aware of that fact when it adopted the enacted plan." *Id.* ¶ 158. There is a "strong inference" that adverse effects were desired when they were an inevitable, but otherwise avoidable result of a government's chosen action. *Pers. Adm'r of Mass.*, 442 U.S. at 279 n.25. "[T]he disparate and discriminatory dilutive impact" of a proposed plan, "and the knowledge that it would occur . . . provide objective evidence that, combined with other evidence, provide ample support for finding discriminatory intent." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 728 (S.D. Tex. 2017).

Beginning with a process intentionally devoid of transparency, *see* ECF No. 250 ¶¶ 240–247; Pls.' Ex. 414 at 15 (Burch Expert Report), Defendants, led by Judge Henry, began by hiring Dale Oldham, who just a decade prior had crafted a plan retrogressing

---

[7] Petteway and NAACP/LULAC Plaintiffs note that they preserve their Section 2 *intent* claim both for this remand, and if necessary, for any subsequent appeal.

minority voting strength in Commissioners Court Precinct 3. *See* ECF No. 250 ¶¶ 232–34; Pls.' Ex. 414 at 5, 8–9 (Burch Expert Report). Judge Henry and Paul Ready explicitly asked Mr. Oldham whether the County "had to draw a majority minority district if we could," demonstrating the centrality of race to Judge Henry's redistricting priorities. Pls.' Ex. 144 (Apr. 21, 2021 Email from P. Ready to D. Oldham, CCing M. Henry). Thus, it was clear from the outset that the dismantling of the Benchmark Precinct 3 was the primary goal in the formation of the Enacted Plan. ECF No. 250 ¶ 158.[8]

The Enacted Plan was created based on specific instructions from Judge Henry to Mr. Oldham. ECF No. 250 ¶¶ 209–10; ECF No. 231 at 290:2–293:18 (Bryan) (explaining that Oldham gave him "very specific instructions about how he wanted Map 2 to look" because "Dale knows what the client wants"); ECF No. 231 at 145:13–150:22 (Oldham) (describing Bryan as "implementing instructions I had basically received from Judge Henry . . . on how to draw Map 2"). Indeed, as Mr. Oldham testified, Map 2—the Enacted Plan— was "the visualization" of Judge Henry's instructions. ECF No. 231 at 18112–16 (Oldham) ("Map 2 was something [Judge Henry] had been visualizing for a decade"), *see also* ECF No. 231 at 82:1–84:1 (Oldham) (that Judge Henry preferred Map 2 because "it's essentially

---

[8] Judge Henry's attempt to defend the dismantling of Precinct 3 by claiming he believed it to be a racial gerrymander is belied by his own testimony, that of Mr. Oldham, and of the other Commissioners. *See* ECF No. 231 at 122:14–123:2 (Oldham) ("I wouldn't have presented a map to the commission that I didn't think was a legally defensible map."); ECF No. 228 at 332:18–25 (Henry) (testifying that he understood that both proposed maps were legally compliant: "[t]hey had better been, yes"); ECF No. 232 at 336:18–337:1 (Apffel) ("I had to trust the process because we hired Dale Oldham to provide us legally defensible maps. . . . And so, yes, I believe they were both legally defensible maps."); ECF No. 232 at 89:3–11 (Giusti) (noting his reliance on Mr. Oldham to "give us a legal map that fit everything that it needed to fit").

his criteria," the embodiment of "the instructions to [Mr. Bryan] when drawing this map"). Judge Henry knew that his "visualization," brought to life by Oldham, had been thwarted a decade earlier *because* it reduced Black voting strength. ECF No. 231 at 152:15–25 (Oldham).

Defendants understood that the Enacted Map would eliminate minority voters' ability to elect a candidate of their choice to the Commissioners Court. *See* ECF No. 250 ¶ 158; ECF No. 228 at 302:5–303:15, 347:8–11 (Henry) (testifying that the Enacted Plan involved "a dramatic shift" in historic Precinct 3 and that he was "sure [he] had an idea" what impact the Enacted Plan would have on Commissioner Holmes' electability); ECF No. 232 at 131:3–8, 141:25–142:8, 148:5–149:24 (Giusti) (admitting that he knew prior to voting for the Enacted Plan that "if adopted, it would eliminate the majority-minority Black and Hispanic voting age population in precinct 3"); ECF No. 232 at 329:24–330:14, 358:10–359:15, 372:15–25 (Apffel) (testifying to (1) speaking with Commissioner Holmes about the proposed maps violating the Voting Rights Act, but averring that "[t]here was never a solution offered"; (2) reviewing racial data prior to approval of the Enacted Plan; and (3) the fact that "you can look at the picture [of Map 2] and tell" that it disadvantages Commissioner Holmes); Joint Ex. 23 at Holmes000183 (Commissioner Holmes' notes) (recording conversation wherein Commissioner Apffel specifically noted that Map 2 spread the minority population across all four precincts); *see also* Pls.' Ex. 414 at 5 (Burch Expert Report).

Moreover, Defendants provided no credible, non-racial justification for the passage of their 2021 Commissioners Court map. *See* ECF No. 250 ¶¶ 279–92; *supra* Factual

Background, IV. Despite Defendants' assertion that their goal during the redistricting process was to create a "coastal precinct," *see* ECF No. 221 at 38:5–23, 42:6–17 (Defs.' Opening Statement), evidence and Defendants' own testimony completely undermine that purported goal. The idea of a "coastal precinct" was pre-textual: the mapping process was already underway, with Galveston County Judge Henry considering multiple mapping options before the concept of a "coastal precinct" was ever raised. ECF No. 250 ¶ 206. Map drawer Thomas Bryan did not consider drawing an entirely coastal precinct until Oldham requested such, and even then, the lines of the map were entirely dictated by Oldham, who himself had studied the racial shading of the County and in particular that of Black voters. *Id.* ¶¶ 206–10; *see also* ECF No. 231 at 134:11–135:2, 136:7–16 (Oldham). The resulting map completely dismantled the existing Precinct 3. ECF No. 250 ¶ 212.

Such dismantling was unnecessary and avoidable to achieve any purported goal. This Court found, *id.* ¶¶ 213–14, 286–87, 414, and Oldham testified that the creation of a coastal precinct could not explain the fragmentation of the Black and Latino population on the mainland of Galveston County, ECF No. 231 at 160:7–13, 164:13–17 (Oldham) (testifying that it was possible to retain a majority-minority precinct while also creating a coastal precinct and agreeing that putting Galveston, Pelican Island, and Bolivar in Precinct 2 does not require that the portions of historic Precinct 3 on the mainland be dismantled). The justification is further undermined by the alternative maps provided by Plaintiffs experts including a coastal precinct while preserving a majority-minority population in

Precinct 3. ECF No. 250 ¶¶ 80, 85, 88, 100, 214 n.11.[9] This alternative map evidence—unrebutted by Defendants—is "key evidence" in showing that a proffered justification is pretext and that racial discrimination was actually afoot. *See Cooper*, 581 U.S. at 317–18; *Alexander*, 144 S. Ct. at 1235; *LULAC*, 601 F. Supp. 3d at 176–77 (noting that alternative map evidence is just as relevant in intentional discrimination claims as in racial gerrymandering claims). Indeed, the Supreme Court has held that alternative maps like those proffered by Plaintiffs can *alone* "carry the day"—even where other evidence of racial motivation is "meager" (which is certainly not the case here). *Alexander*, 144 S. Ct. at 1249 (quoting *Cooper*, 581 U.S. at 322). And other considerations such as partisanship cannot explain the formation of the Enacted Plan. *Id.* ¶ 289; *supra* Factual Background, I, IV.

In sum, Defendants' knowledge of the discriminatory effect of the map, Judge Henry's actions in ensuring the discriminatory configuration of the Enacted Plan, and the alternative maps and other evidence showing the County's purported non-racial justifications to be pretext all constitute direct evidence that Defendants had "the intent to disproportionately and discriminatorily dilute Latino [and Black] minority voting strength and acting in order to achieve that goal" and thus compel a finding of intentional discrimination. *Patino*, 230 F. Supp. 3d at 728.

---

[9] The record contains other evidence discrediting the coastal precinct justification including the lack of popular support for a coastal precinct (and in some cases actual opposition to the idea) and the failure of commissioners to consult the public on the issue of a coastal precinct. *Id.* ¶ 287.

### D.   Defendants' actions in creating and adopting the Enacted Map overwhelmingly demonstrate satisfaction of the *Arlington Heights* factors.

In addition to the direct evidence of discriminatory intent outlined above, evidence adduced at trial also demonstrates the presence of all five *Arlington Heights* factors, further supporting a finding that the Enacted Map was passed with discriminatory intent.

The five *Arlington Heights* factors that courts consider in assessing whether a governmental action—here the enactment of Map 2—is intentionally discriminatory are (1) "discriminatory effect," (2) "historical background," (3) "the sequence of events leading up to a challenged decision," (4) "departures from normal procedure," and (5) "legislative history." *LULAC*, 601 F. Supp. 3d at 160.[10]

### *Factor 1: Discriminatory Effect*

In *LULAC*, the court observed with respect to the redrawing of Texas senate district 10 that "the redrawing of SD 10 disperses the district's minority voters—irrespective of whether one conceives of them as a coalition—such that the candidates they support are far less likely to win election. Although a *Gingles* theory would require more, the Court concludes that Plaintiffs will likely demonstrate that the action they challenge produced a discriminatory effect." *Id.* at 164. This Court has already concluded, based upon extensive expert evidence, that Black and Latino voters in former Precinct 3—whether considered alone or in combination—cohesively supported Commissioner Holmes as their candidate

---

[10] As the *LULAC* court noted, the factors are sometimes enumerated differently with substantive departures distinct from procedural departures. Plaintiffs use the *LULAC* court's articulation, which also match that of the Fifth Circuit in *Fusilier* for organizational purposes. 601 F. Supp. 3d at 160 n.5.

of choice. ECF No. 250 ¶¶ 107–32, 382–91. Likewise, the Court has already concluded that under the Enacted Map, neither Black nor Latino voters—whether considered in isolation or in combination—will be able to elect their preferred candidates to the Commissioners Court. *Id.* ¶¶ 133–42, 392–400. At the same time, white voters in the County will see the Enacted Map provide a windfall of representation—increasing from three to four the number of precincts in which the white-preferred candidate is likely to prevail. This illustrates that the Enacted Map "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266. That is a sufficient showing of discriminatory effects to accompany a discriminatory intent claim. *See LULAC*, 601 F. Supp. 3d at 170.

### Factor 2: Historical Background

The historical background, on balance, weighs in favor of a finding of intentional discrimination. In its October 13 decision, this Court explained the long history of official discrimination in Galveston County, starting with its place as a center for buying and selling enslaved Black people during the Antebellum era, the Civil War, Jim Crow, Juan Crow, efforts by the Texas Democratic Party to exclude Black and Latino voters, and a long history of Section 5 preclearance objection letters to redistricting maps from the United States Attorney General from 1975 through 2013, ECF No. 250 ¶¶ 160–63, including six objection letters. *Id.* ¶¶ 169–77. The 1991 and 2001 redistricting cycles saw advancements for minorities on the Commissioners Court and did not result in Attorney General objections, but that changed in 2011. *Id.* ¶¶ 182–85.

The 2012 objection letter from the Attorney General to that decade's redistricting map noted the failure of the County to adopt redistricting criteria to guide the process, the

"deliberate exclusion from meaningful involvement of Commissioner Holmes," and a drop in the minority composition of Precinct 3. *Id.* ¶ 177. Testimony showed that the conduct resulting in these objection letters led to "additional voting barriers for minority residents who felt less motivated to vote and participate politically." *Id.* ¶ 178; *see also Veasey*, 830 F.3d at 240 (citing Attorney General objections as evidence relevant to a finding of intentional discrimination under the historical background *Arlington Heights* factor); *id.* at 257 n.54 (explaining that preclearance decisions remain relevant as factual evidence related to the *Arlington Heights* analysis notwithstanding the Supreme Court's invalidation of Section 4(b)'s coverage formula and the different burden of proof under Section 5). At the same time, the Court has acknowledged that *casting a ballot* has become easier in Galveston County. ECF No. 250 ¶¶ 164–68. But that does not lessen the extensive history of efforts to *dilute* the strength of minorities' votes, both in past and recent history, in Galveston County. On balance, the historical background of Galveston County redistricting points in favor of a finding of intentional discrimination.

### *Factor 3: The Sequence of Events Leading to the Enacted Map*

The sequence of events leading up to the adoption of the enacted map likewise points in favor of a finding of intentional discrimination. The Commissioners Court voted 4–1 to hire Oldham and Holtzman Vogel as redistricting counsel and consultants without providing any public information or supporting materials at a public meeting. *Id.* ¶ 191. The first question Judge Henry asked Oldham was whether the County "had to draw a majority[-]minority district"—illustrating the centrality of race to his early thinking about redistricting. *Id.* ¶ 192. After the Census data was released, Oldham obtained summary

racial data from the National Republican Redistricting Trust, removed that organization's logo from the material, and sent it to the commissioners. *Id.* ¶ 196. That data confirmed Oldham's pre-existing understanding of where the minority population was located in Galveston County. *Id.* ¶ 198. Nevertheless, Oldham took further steps to understand exactly where, in particular, the Black population of Galveston County was concentrated—he "reviewed racial-shading maps . . . to identify where Black populations were after the census-data release to identity where Black populations were concentrated." *Id.* ¶ 198.

Notably, Oldham's studying of racial shading maps to identify the specific locations of Black voters in Galveston County could not have been for any perceived Voting Rights Act *compliance* purpose—because he testified that he was of the adamant view from his prior work that Black and Latino voters in the county were not cohesive and thus could not satisfy the second *Gingles* precondition. ECF No. 231 at 23:3–25:7; 25:24–26:9 (Oldham). From his own subjective standpoint, then, Oldham had no legal basis to be studying racial shading maps "to identify where Black populations were concentrated." ECF No. 250 ¶ 198.

Oldham's September 2021 meeting with Judge Henry and Commissioner Apffel resulted in Henry requesting "a map like the one he conceived in 2011—the configuration that ultimately became Map 2." *Id.* ¶ 200. At the same time, the other commissioners gave suggestions favorable to minimal changes. *Id.* ¶¶ 201–03. Inexplicably, the County then waited three weeks to retain a demographer capable of doing the technical mapdrawing—Thomas Bryan. *Id.* ¶¶ 204–05. Map drawing did not begin until mid-October 2021. *Id.* ¶¶ 248–52. Defendants offered no explanation for this late start. *Id.* ¶ 251. Mr. Bryan

testified that the tight timeline he was given was unusual for his work. *Id.* ¶ 252; *see also* ECF No. 232 at 35:3–36:6 (Bryan).

During initial phone calls with Mr. Bryan, "[t]he purported motivation of Judge Henry—creating a 'coastal precinct'—never arose." ECF No. 250 ¶ 206. An expressed goal of one of the outside lawyers from Holtzman Vogel to create a map with four Republican districts went nowhere; that map "was not the foundation upon which Bryan built Map 2." *Id.* ¶¶ 205–08. Bryan exercised no discretion in drawing the map. *Id.* ¶ 210. Oldham adamantly testified that he repeatedly instructed Bryan not to view racial data; *see supra*, but this Court credited Bryan's contrary testimony denying ever being told any such thing. *Id.* ¶ 211. Although Bryan in fact did not display racial data, it did not matter, because Bryan exercised no discretion in choosing where to place the lines. He placed the lines exactly where Oldham told him to, which was "the visualization of the instructions" Henry had provided Oldham—that is, the map that Henry and Oldham knew divided the minority population and in particular the Black population in central Galveston County. *Id.* ¶¶ 209–10.

When the County eventually posted their proposed maps, they provided no quantitative data by which the public could assess them. *See generally* Joint Ex. 29 (Galveston County redistricting website). This failure to make quantitative data available highlighted the lack of transparency by the County as "the public wasn't able to see underlying population and demographic data to fully understand exactly how these maps were changing." ECF No. 222 at 138:7–19 (Burch). The failure to host robust public

meetings was contrary to the advice that Oldham gave the County. ECF No. 231 at 194:7–14 (Oldham).

This Court has rejected as pretext all nonracial justifications that have been offered to explain the map. *See supra*. The sequence of events points strongly in favor of a finding of intentional discrimination.

### Factor 4: Procedural and Substantive Departures from the Norm

This Court has already credited expert testimony demonstrating substantial procedural departures from the normal redistricting process and concluded that "[t]he record evidence and lay testimony adduced at trial substantiate these procedural departures." ECF No. 250 ¶ 232. These include "(1) failure to adopt a timeline, (2) failure to adopt any publicly available redistricting criteria to guide the process, (3) lack of transparency in engaging redistricting counsel, (4) lack of public notice and availability for comment, (5) conduct surrounding the November 12 special meeting, (6) disregard for minority input, and (7) exclusion of Commissioner Holmes from the process." *Id.* The Court has also cited the 2011 Attorney General objection letter, which "put Judge Henry on notice of procedural defects that could raise concerns about the exclusion of minority stakeholders and lack of transparency—lapses that could be viewed as evidence of intentional discrimination." *Id.* ¶ 233. Yet, "during the 2021 redistricting process directed by Judge Henry, the county repeated these same procedural lapses." *Id.* ¶ 234; *see also id.* ¶¶ 232–78 (recounting the trial evidence demonstrating procedural and substantive

departures from the normal process).[11] Additionally, evidence of the map-drawing process supports a conclusion that the commissioners who voted to adopt the Enacted Plan intentionally violated the Texas Open Meetings Act, worsening the exclusion of meaningful public input and thwarting meaningful participation by Commissioner Holmes, a significant procedural deviation. *See* ECF No. 239 ¶¶ 133, 140, 320–32.

### *Factor 5: Legislative History*

Courts also consider administrative or legislative history to reveal discriminatory intent. *Arlington Heights*, 429 U.S. at 267. Here, there is overlap with the discussion above regarding the sequence of events leading to the enactment. Several parts of the legislative history stand out. First, the process began with Judge Henry asking Oldham whether the county still needed to draw a majority-minority precinct, showing that race was top of mind for Henry from the beginning. *See* ECF No. 250 ¶ 217; *see also* ECF No. 231 at 102:12–22 (Oldham). Corroborating that fact is Henry's awareness from the 2011 process that his desired map would reduce minority voting strength, the objections lodged by the Attorney General regarding the 2011 process, and his repeat—both substantively, in terms of the map, and procedurally—of those 2011 steps and processes. ECF No. 250 ¶ 158; *see also* ECF No. 231 at 152:15–20 (Oldham). The legislative history reflects Oldham—believing he had no legal basis to do so—reviewing racial shading maps to identify the locations of concentrations of Black voters, who were then carefully fragmented apart in the Enacted Map. ECF No. 250 ¶ 198; *see also* ECF No. 231 at 23:3–25:7; 25:24–26:9 (Oldham). It

---

[11] The Court has laid out in detail its factual findings as to the procedural and substantive departures from the norm; Plaintiffs do not repeat them here.

likewise reflects the fact that Henry (via Oldham) directed the entire process—and but for his motivations and preferences, the Enacted Map would not have occurred as it did. *See* ECF No. 250 ¶¶ 209, 236.

The legislative history also reveals the exclusion of the sole non-Anglo commissioner from the decision-making process and refusal to seriously consider his concerns. *Id.* ¶ 277; *see, e.g.*, *Perez*, 253 F. Supp. 3d at 961 (listing the "exclusion of minority member and public input despite the minority population growth" as probative of intentional discrimination); *see also LULAC v. Abbott*, 604 F. Supp. 3d 463, 508 (W.D. Tex. 2022) (holding allegations that "minority legislators were treated unfavorably" supported the plausibility of plaintiffs discriminatory intent claims, *citing Texas v. United States*, 887 F. Supp. 2d 133, 164 (D.D.C. 2012) (three-judge court), vacated on other grounds, 570 U.S. 928 (2013) (Mem.). Here, Commissioner Holmes testified, and this Court found, that he was excluded during the 2021 redistricting process. *See* ECF No. 250 ¶¶ 277–78. Commissioner Holmes did not receive notification of when the maps were finalized, did not receive an explanation for the lack of meeting, and was never sent map data he requested. *Id*. Despite being warned previously by the 2012 objection letter from the Attorney General about exclusion of Commissioner Holmes being viewed as indicative of intentional discrimination, the County once again deliberately kept him out of the redistricting process. *Id*. ¶¶ 233–34.

The legislative history culminated in the November 12 meeting, at which Henry was "ugly" and "aggressive" toward the mostly minority members of the public in attendance,

threatening to have them removed by constables for asking him to speak more loudly so they could hear him. ECF No. 250 ¶¶ 272–74.

\* \* \*

As explained above—and in even greater detail in this Court's factual findings regarding the *Arlington Heights*/totality of circumstances factors—the direct and circumstantial evidence compel a finding that intentional discrimination, and specifically the dismantling of the county's sole majority-minority commissioners precinct, was a motivating purpose of the Enacted Map's design and adoption, and a but for cause of its impact on Galveston's Black and Latino voters.

## II.    Plaintiffs are entitled to judgment on their racial gerrymandering claim.

The evidence adduced at trial demonstrated not just that the 2021 Commissioners Court map was adopted with racially discriminatory intent, but also that race was the *predominant* motivating factor such that the map is "a textbook example of a racial gerrymander" in violation of the Fourteenth Amendment. *Id.* at 6 (quoting ECF No. 223 at 42:17–43:9 (Cooper)).

The Equal Protection Clause of the Fourteenth Amendment prohibits a governing body from "separat[ing] its citizens into different voting districts on the basis of race" without sufficient justification. *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Plaintiffs may prove racial gerrymandering in violation of the Fourteenth Amendment by showing "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular

district." *Miller*, 515 U.S. at 916; *see also Cooper*, 581 U.S. at 291; *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017). "Race may predominate even when a reapportionment plan respects traditional principles." *Bethune-Hill*, 580 U.S. at 189; *see also Miller*, 515 U.S. at 913, 916. Heightened requirements for plaintiffs to demonstrate that race, not partisanship, was the predominant motivating factor apply only "when the State raises a partisan-gerrymandering defense." *Alexander*, 144 S. Ct. at 1235; *see also Cooper*, 581 U.S. at 308 (explaining how courts assess evidence differently "where no one has raised a partisanship defense").

While legislatures enjoy a presumption of good faith in redistricting their legislative maps, that presumption is overcome "when there is a showing that a legislature acted with an ulterior racial motive." *LULAC*, 601 F. Supp. 3d at 181. Plaintiffs have demonstrated that the Enacted Map was passed with discriminatory intent. *See supra* I.A–D. The evidence further demonstrates that no predominating factor *other than race* can explain the Enacted Map's configuration, such that Plaintiffs overcome any presumption of good faith on the part of the County.

Here, as the Court has already found, a partisan gerrymandering defense was expressly *disclaimed* by the commissioners. *See* ECF No. 250 ¶ 289 ("[P]artisanship . . . did not require the enacted plan's configuration, as all members of the commissioners court who voted for the enacted plan disclaimed partisanship as a predominating consideration. . . . Consistent with this, Oldham testified that he never told Bryan that Judge Henry's purpose for Map 2 was to create four Republican districts, and Oldham denied there was any such partisan motivation."). Plaintiffs therefore do not carry the burden of producing

42

"an alternative map showing that a rational [commission] sincerely driven by its professed partisan goals would have drawn a different map with greater racial balance"—because the commissioners made no such profession of partisan intent. *Alexander*, 144 S. Ct. at 1235.

Nonetheless, Plaintiffs have produced multiple alternative maps showing that the Enacted Plan's configuration was not required to accomplish the redistricting goals that *have* been proffered by the commissioners. *See id.* at 1249 ("By showing that a rational legislature, driven only by its professed mapmaking criteria, could have produced a different map with 'greater racial balance,' . . . an alternative map can perform the critical task" of rejecting Defendants' proffered justifications). Specifically, all of Plaintiffs experts offered alternative maps that complied with federal law and show that the County could have achieved all its purported justification without fragmenting the minority population across all four precincts. *See* ECF No. 250 ¶ 285; *see also* Pls.' Exs. 415–18; *supra* Factual Background, IV. This includes the creation of a coastal precinct; as this Court already found, "a desire to create a coastal precinct cannot and does not explain or justify why Map 2, the 'optimal' plan, was drawn the way it was—and especially does not explain its obliteration of benchmark Precinct 3." ECF No. 250 ¶ 214.

Moreover, none of Defendants' supposed criteria—contrived during the litigation— are served by the Enacted Plan. Indeed, NAACP expert Dr. Bill Cooper "reviewed the criteria provided by the defendants" and concluded that the Enacted Plan did not adhere to any of them. ECF No. 250 ¶ 284. This Court found that Enacted Plan is notable not for adhering to that criteria, but for the "stark and jarring" way that the Enacted Plan "transformed Precinct 3 from the precinct with the highest percentage of Black and Latino

residents to that with the lowest percentage." *Id.* ¶ 420. As, "[s]everal witnesses testified that it was obvious on the face of the map that the enacted plan would fracture minority communities." *Id.* ¶ 157, n.10.[12]

The testimony at trial, Plaintiffs' alternative maps, and the additional record evidence thus demonstrate "that race drove the mapping of district lines" and "the burden shifts to the [Defendants] to prove that the map can overcome the daunting requirements of strict scrutiny." *Alexander*, 144 S. Ct. at 1236. Defendants cannot and indeed have not even attempted to make such a showing. With all the foregoing evidence demonstrating that the Enacted Plan was motivated by discriminatory intent and with no colorable justification *apart* from racial intent, Plaintiffs have demonstrated that race predominated in the selection of the enacted plan, making that plan a racial gerrymander in violation of the Fourteenth Amendment.

III.    **This Court should order a remedial process that concludes before the end of the year and a remedy that provides for election in the remedial district in 2026.**

Plaintiffs are already set to suffer under a discriminatory map for the upcoming 2024 election and are likely to lose their hard-won Commissioners Court representation in Precinct 3. This Court identified that Precinct 3, dismantled with racially discriminatory intent in violation of the U.S. Constitution and the Voting Rights Act, has been "an

---

[12] For these reasons, the Court's finding that the commissioners "never *expressly* considered" spreadsheet information with racial data, ECF No. 250 ¶ 218, does not undermine finding that race predominated in the Enacted Map's design and adoption. The demographic location of Galveston's Black and Latino population, centered in Precinct 3, was well known to the commissioners and their consultants, *id.* ¶ 198, such that it was wholly unnecessary for commissioners to review specific statistical data to confirm they had achieved the intended discriminatory impact of the Enacted Plan, *id.* ¶ 158.

important political homebase for Black and Latino residents" for over thirty years. ECF No. 250 ¶ 71. Plaintiffs respectfully request that the Court expedite its consideration of this motion so that Commissioner Holmes, the elected representative of the discriminated-against minority community in Precinct 3, can participate in the remedial process and vote on a remedial map before his term ends this year.

Plaintiffs request that this Court provide 14–30 days for the Commissioners Court to adopt a remedial plan and, if they fail to do so, request that this Court impose Map 1 as a remedy. Plaintiffs further request that Map 1's remedial district, wherein the discriminated-against minority group forms a majority, be numbered either Precinct 2 or 4 so that it will be up for election in 2026. This will ensure that Plaintiffs' constitutional rights are not violated by the discriminatory, racially gerrymandered plan any longer than necessary.

## CONCLUSION

Plaintiffs respectfully request that this Court enter judgment in their favor on Counts 1, 2, 3, and 5 of Petteway Plaintiffs' Second Amended Complaint and Counts 1, 2, and 3 of NAACP/LULAC Plaintiffs' First Amended Complaint.


Respectfully submitted this 26th day of September, 2024.

<table>
<tr><td></td><td>/s/ Valencia Richardson</td></tr>
<tr><td>Chad W. Dunn (Tex. Bar No. 24036507)</td><td>Valencia Richardson*</td></tr>
<tr><td>Brazil & Dunn</td><td>Mark P. Gaber*</td></tr>
<tr><td>1900 Pearl Street</td><td>Simone Leeper*</td></tr>
<tr><td>Austin, TX 78705</td><td>Alexandra Copper*</td></tr>
<tr><td>(512) 717-9822</td><td>Campaign Legal Center</td></tr>
<tr><td>chad@brazilanddunn.com</td><td>1101 14th St. NW, Ste. 400</td></tr>
</table>

Bernadette Reyes*
Sonni Waknin*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
bernadette@uclavrp.org
sonni@uclavrp.org

Neil G. Baron
Law Office of Neil G. Baron
1010 E Main Street, Ste. A
League City, TX 77573
(281) 534-2748
neil@ngbaronlaw.com

Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
sleeper@campaignlegal.org
vrichardson@campaignlegal.org
acopper@campaignlegal.org

*Admitted *pro hac vice*

*COUNSEL FOR PETTEWAY PLAINTIFFS*

/s/   *Hilary Harris Klein*

**SOUTHERN COALITION FOR SOCIAL JUSTICE**
Hilary Harris Klein*
North Carolina Bar No. 53711
Adrianne M. Spoto*
DC Bar No. 1736462
1415 W. Hwy 54, Suite 101
Durham, NC 27707
919-323-3380 (Telephone)
919-323-3942 (Facsimile)
hilaryhklein@scsj.org
adrianne@scsj.org

**SPENCER & ASSOCIATES, PLLC**
Nickolas Spencer
Texas Bar No. 24102529
9100 Southwest Freeway, Suite 122
Houston, TX 77074
713-863-1409 (Telephone)
nas@naslegal.com

Joaquin Gonzalez*
Texas Bar No. 24109935

**TEXAS CIVIL RIGHTS PROJECT**
Attorney-in-Charge
Sarah Xiyi Chen*
California Bar No. 325327
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
schen@texascivilrightsproject.org

**WILLKIE FARR & GALLAGHER LLP**

Richard Mancino*
New York Bar No. 1852797
Michelle Anne Polizzano*
New York Bar No. 5650668
Andrew J. Silberstein*
New York Bar No. 5877998
Kathryn Carr Garrett*
New York Bar No. 5923909
787 Seventh Avenue
New York, New York 10019
212-728-8000 (Telephone)

1533 Austin Hwy.
Ste. 102-402
San Antonio, TX 78218
joaquinrobertgonzalez@gmail.com

212-728-8111 (Facsimile)
rmancino@willkie.com
mpolizzano@willkie.com
asilberstein@willkie.com
kgarrett@willkie.com

*Admitted *pro hac vice*

*COUNSEL FOR NAACP PLAINTIFFS*

47

## CERTIFICATE OF SERVICE

I certify that on September 26, 2024, the foregoing document was filed electronically and served on all parties of record via CM/ECF, and that the document complies with the page limitations set out by the Court.

/s/*Valencia Richardson*
Valencia Richardson