# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **TERRY PETTEWAY, et al.** | § | |
|  Plaintiffs, | § | |
| v. | § | **Civil Action No. 3:22-CV-00057** |
| | § | **(consolidated)** |
| **GALVESTON COUNTY, TEXAS, et al.** | § | |
|  Defendants. | § | |
| | § | |
| | § | |
| **DICKINSON BAY AREA BRANCH** | § | |
| **NAACP, et al.** | § | |
|  Plaintiffs, | § | **Civil Action No. 3:22-CV-00117** |
| v. | § | |
| **GALVESTON COUNTY, TEXAS, et al.** | § | |
|  Defendants. | § | |

## DEFFENDANTS' RESPONSE TO
## <u>PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT</u>

# INDEX OF AUTHORITIES

## Cases

*Abbott v. Perez*, 138 S.Ct. 2305 (2018)...........................................................11, 12, 13, 14

*Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221 (2024).......................passim

*Bartlett v. Strickland*, 556 U.S. 1 (2009).................................................................................9

*Bethune-Hill v. Va. State Bd. Of Elections*, 580 U.S. 178 (2017)..............................12, 14

*Bush v. Vera*, 517 U.S. 952 (1996).........................................................................................26

*Cooper v. Harris*, 581 U.S. 285, 137 S.Ct. 1455, (2017)..................................................14

*Easley v. Cromartie*, 532 U.S. 234 (2001)...................................................................14, 25

*Elkins v. United States*, 364 U. S. 206 (1960)....................................................................13

*Hunter v. Underwood*, 471 U.S. 222, 105 S. Ct. 1916 (1985)..........................4, 5, 24, 25

*Miller v. Johnson*, 515 U.S. 900 (1995)..........................................................9, 12, 13, 14

*Perez v. Abbott*, 250 F. Supp. 3d 123 (W.D. Tex. 2017)....................................................23

*Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017)..............................................4, 34

*Petteway v. Galveston Cnty.*, 111 F.4th 596 (5th Cir. 2024).....................................passim

*Prejean v. Foster*, 227 F.3d 504 (5th Cir. 2000)................................................................11

*Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 866  (2000).....................................................11

*Reno v. Bossier Parish School Bd.*, 520 U.S. 471 (1997)..........................................11, 13

*Rice v. Cayetano*, 528 U.S. 495 (2000)...............................................................................11

*Rucho v. Common Cause*, 588 U.S. 684 (2019)...................................................................8

*Shaw v. Hunt*, 514 U.S. 899 (1996)......................................................................................12

*Shaw v. Hunt*, 517 U.S. 899 (1996)......................................................................................14

*Shaw v. Reno*, 509 U.S. 630 (1993)................................................................9, 11, 12, 27

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ....................................................... 29

*Simpson v. Hutchinson*, 636 F. Supp. 3d 951 (E.D. Ark. 2022) ........................................ 11

*Students for Fair Admissions, Inc. v. Pre. and Fellows of Harvard College*, 600 U.S. 181 (2023) ........................................................................................ 9

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) ......................................................... 24, 29

**Statutes**

U.S. Const. amend. XV, § 2 .............................................................................. 11

## DEFFENDANTS' RESPONSE TO
## PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT

Defendants Galveston County, Texas, the Hon. Mark Henry as Galveston County Judge, and Dwight D. Sullivan as Galveston County Clerk (collectively, "Defendants" or "County") submit this response to the Motion for Entry of Judgment ("Motion") filed by Plaintiffs Dickinson Bay Area Branch NAACP, Galveston Branch NAACP, Mainland Branch NAACP, Galveston League of United Latin American Citizens Council 151, Edna Courville, and Joe A. Compian ("NAACP Plaintiffs"),[1] and Plaintiffs Terry Petteway, Constable Derrick Rose, and the Hon. Penny Pope (the "Petteway Plaintiffs") (collectively, "Plaintiffs").[2]

## SUMMARY

The Fifth Circuit has held that Section 2 of the Voting Rights Act ("Section 2" or "VRA") does not require that districts be drawn "for the electoral benefit of distinct minority groups that share political preferences but lack the cementing force of race or ethnicity." *Petteway v. Galveston Cnty.*, 111 F.4th 596, 614 (5th Cir. 2024) (en banc). On remand, this Court is asked to consider the following:

1. the appropriate analytical framework to apply to Plaintiffs' constitutional claims (*cf. Perez v. Abbott*, 253 F. Supp. 3d 864, 942-43 (W.D. Tex. 2017)), and, in particular,

2. whether Plaintiffs can prove that they have been injured, or are entitled to relief, when their claims are premised on a coalition theory (*cf. Hunter v. Underwood*, 471 U.S. 222, 232, 105 S. Ct. 1916, 1922 (1985) (requiring proof of both discriminatory

---

[1] Mr. Phillips passed away while this case was on appeal.

[2] The United States' claims were dismissed by the en banc Fifth Circuit. The United States was the only party that had sued "the Galveston County Commissioners Court," so there are no more claims against that entity in this case.

impact and discriminatory effect)).

*Id*. at 614 n.13.

Taking these out of order, Plaintiffs and their experts discussed the coalition in this case as a political coalition—one "built" in general elections. *See* Dkt. 224 at 185-86. As the Fifth Circuit noted, Plaintiffs' claims are premised entirely upon a political coalition. But courts do not adjudicate political complaints. Plaintiffs therefore lack an injury and standing, and their remaining claims must be dismissed.

With respect to the proper analytical framework, the Fifth Circuit cited *Alexander* as presenting "a helpful discussion on the relationship and distinctions between" racial gerrymandering and intentional vote dilution Constitutional claims. *Id*. (citing *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1251-52 (2024)). Briefly, *Alexander* rejected the racial gerrymandering and vote dilution claims in that case, and cautioned that, when race and partisan preference are highly correlated, plaintiffs must disentangle the two in order to establish that race was the predominant factor motivating the legislature's decision. *Alexander*, 144 S.Ct. at 1234. That is, **it is Plaintiffs' burden to disentangle race and partisan preference whenever, as here, there is a high correlation between race and partisan preference.** This is not Defendants' burden, just as it is not Defendants' burden to prove that politics was the predominant factor guiding redistricting efforts.

Plaintiffs fail to articulate and apply the proper analytical framework, and have not overcome the presumption of legislative good faith that *Alexander* mandates. In fact, looking only to Plaintiffs' arguments and evidence, they are wholly unable to prove racial predominance because they insist that race and politics **cannot be** separated in Galveston

County. The proper framework and analysis, applied here, makes clear that Plaintiffs' intentional discrimination and gerrymandering claims must be dismissed.

Finally, there are no remaining Section 2 claims in this case. The Fifth Circuit made this abundantly clear when it (i) based its opinion on the same statutory text that would give rise to either an effects or intent claim under Section 2, and (ii) refused to remand any Section 2 intent claim from the United States.

**ARGUMENT**

**I.    Plaintiffs have no injury, and therefore no standing, because they only seek to reinstate a political coalition.**

**A.  Plaintiffs only sought relief for a political coalition.**

In remanding, the Fifth Circuit outlined aspects of the remaining claims needing careful scrutiny. A specific primary issue is whether Plaintiffs have any injury or are entitled to relief on their Constitutional claims when those claims "are premised on a coalition theory." *Petteway*, 111 F.4th at 614 n.13. In other words, given their own allegations, Plaintiffs' standing is in question.

Plaintiffs' only alleged Constitutional violation is that Defendants "intentionally dismantled" a political coalition district. *See* Dkt. 42 at 29-30, ¶¶ 171, 173 (Petteway Plaintiffs' Second Amended Complaint) (Counts 1 and 2 alleging Fourteenth and Fifteenth Amendment violations due to "the intentional dismantling of Precinct 3 as a performing majority-minority precinct through the cracking of Black and Latino voters across four precincts in which they will have <u>no opportunity to elect</u> their preferred candidate because of racially polarized voting") (emphasis added); *see* Dkt. 42 at 9-20 ¶¶ 55-118 (factual allegations concerning the change of Precinct 3 from a performing majority-minority precinct);[3] *see also* Dkt. 38 at 36 ¶¶ 148, 150 (NAACP Plaintiffs' First Amended Complaint) (Count 1 claiming intentional racial discrimination and racial gerrymandering "by the intentional dismantling of Precinct 3 as a performing majority-minority precinct

---

[3] Plaintiffs also raise a Fourteenth Amendment gerrymandering claim that is also based entirely upon the drawing of a coalition district. *See* Dkt. 42 at 30 ¶ 175; Dkt. 38 at 36 ¶ 150 (each alleging that "Race predominated in the drawing of Commissioners Court precinct lines . . .").

through the cracking of Black and Latino voters across four precincts in which they will have <u>no opportunity to elect</u> their preferred candidate because of racially polarized voting") (emphasis added).

In a footnote, Plaintiffs attempt to shift away from their pleadings to allege something completely different—that their "intentional discrimination claims are *not* premised on a coalition theory." Dkt. 288 at 29 (emphasis in original). This late attempt to recast their allegations on remand cannot stand. The discriminatory effect and injury they alleged—made clear throughout the case, its trial, and appeal—revolves around Plaintiffs' claim that a performing coalition district was dismantled so that Black and Latino voters have "no opportunity to elect their preferred candidate." *See* Dkt. 42 at 30. That is, their claims turn entirely on the viability of a political coalition's claimed injury.

### B.  Political injuries do not support Constitutional claims.

As Plaintiffs and their experts argued (discussed in more detail below), Plaintiffs' coalition is a political construct. *Rucho* explains that courts have "no business entertaining" claims on questions "entrusted to one of the political branches" or involve "no judicially enforceable rights." *Rucho v. Common Cause*, 588 U.S. 684, 695-96 (2019) (quotation omitted). Political questions thus are nonjusticiable, "outside the courts' competence and therefore beyond the courts' jurisdiction." *Id*. Nonjusticiable political questions include those "that lack 'judicially discoverable and manageable standards for resolving [them].'" *Id*. (quotation omitted).

Ultimately, Plaintiffs seek to protect a coalition of distinct groups that share political preferences and "lack the cementing force of race or ethnicity" to advance partisan goals.

*Petteway*, 111 F.4th at 614. But race cannot be used as a proxy for politics.

"[I]n the context of a Fourteenth Amendment challenge, courts must bear in mind the difference between what the law permits and what it requires." *Shaw v Reno*, 509 U.S. 630, 654 (1993). There is no statutory requirement to draw a crossover or coalition district. *Petteway*, 111 F.4th at 604; *Bartlett v. Strickland*, 556 U.S. 1, 23-24 (2009) ("[o]ur holding also should not be interpreted to entrench majority-minority districts by statutory command, for that, too, could pose constitutional concerns") (citing *Miller v. Johnson*, 515 U.S. 900, 915-916 (1995) and *Shaw*, 509 U.S. 630). If a state draws a coalition district, it must be able to survive a strict scrutiny analysis, but a state cannot be required to draw a coalition district—not under the VRA, or the Constitution.

To be clear, should the Court rule that Plaintiffs can prove racial predominance or intent **just by the dismantling of a political coalition precinct**, Defendants would be equally open to challenges in Court from Plaintiffs' political opponents if they enacted a precinct that had been drawn and maintained on the basis of race under Section 5. This would provide the very political battlefield warned against in *Alexander*.[4] Because Plaintiffs have only alleged injury from the dismantling of a political precinct, they cannot

---

[4] As the Supreme Court explained in *Miller*,

> Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire. It is for these reasons that race-based districting by our state legislatures demands close judicial scrutiny.

*Miller*, 515 U.S. at 912 (citing *Shaw*, 509 U.S. at 657. Those concerns continue with the Court today, almost twenty years later. *See Students for Fair Admissions, Inc. v. Pre. and Fellows of Harvard College*, 600 U.S. 181, 206 (2023).

show a Constitutional injury. Lacking an injury, they also lack standing.

**II.     The appropriate analytical framework places the burden on Plaintiffs to disentangle race from other permissible considerations, which Plaintiffs have failed to do.**

Plaintiffs ask the Court to enter judgment on their remaining Fourteenth and Fifteenth Amendment claims—intentional discrimination and racial gerrymandering.

The burden of proof for these claims lies with Plaintiffs, and starts with a presumption that the legislative body acted in good faith. The good-faith presumption is extremely important. It exists to require that Plaintiffs show "**race for its own sake, and no other districting principles, was the legislature's dominant and controlling rationale**." *Alexander*, 144 S. Ct. at 1236 (quotation omitted, emphasis added). This presumption ensures the judiciary's due respect for legislative judgment, ensures that the legislature is not lightly accused by federal courts of offensive and demeaning conduct, and ensures that federal courts are not misused by plaintiffs as weapons of political warfare to win victories lost "in the political arena." *Id.* (quotations omitted).

A plaintiff traversing their requisite burden will find all the more problems when, as here, race and political preference are closely aligned. In those circumstances, courts must be careful not to infer bad faith based on the effects of a districting plan. *See Alexander*, 144 S.Ct. at 1241-42.

Plaintiffs' Fourteenth and Fifteenth Amendment claims are much more difficult to establish than a VRA effects claim. And Plaintiffs' burden does not evaporate under the Fifteenth Amendment, which provides that

[t]he right of citizens of the United States to vote shall not be denied or
abridged by the United States or by any State on account of race, color, or
previous condition of servitude.

U.S. Const. amend. XV, § 2.[5] Establishing a Fifteenth Amendment claim therefore requires

proof of denial or abridgment "on account of race," not on account of politics. Plaintiffs

have not met their burden to prove that race was the predominant factor motivating the

districting decision.

### A. Plaintiffs' Constitutional claims require proof that race predominated districting to overcome the presumption of legislative good faith, before any burden of proof ever shifts to a defendant.

There is no "effects only" Constitutional challenge. Racial gerrymandering under

the Equal Protection Clause is "intentionally assigning citizens to a district on the basis of

race without sufficient justification." *Abbott v. Perez*, 138 S.Ct. 2305, 2314 (2018) (quoting

*Shaw v. Reno*, 509 U.S. 630, 641 (1993)). These claims ask **whether race predominated**

in the drawing of precinct boundaries, "regardless of the motivations" for using race—

because it is the "racial classification itself" that is the "relevant harm." *Id*. at 1252

---

[5] The Supreme Court has discussed the differences between Fourteenth and Fifteenth Amendment claims. *See Rice v. Cayetano*, 528 U.S. 495, 522 (2000). Under the Fifteenth Amendment, the question is not whether there is a violation of the equal protection afforded under the one-person, one-vote requirement. *Id*. Instead, the Fifteenth Amendment 'commands' "race neutrality." *Id*. The Fifteenth Amendment's meaning, therefore, is to prohibit states from "deny[ing] or abridg[ing] the right to vote on account of race." *Id*. Courts have applied the same elements for both Fourteenth and Fifteenth Amendment vote dilution claims, despite the apparent debate over whether vote dilution is actionable under the Fifteenth Amendment. *See Simpson v. Hutchinson*, 636 F. Supp. 3d 951, 958 (E.D. Ark. 2022) (recognizing the question of whether a vote dilution claim is cognizable under the Fifteenth Amendment and stating that, even so, "[g]iven the overlap between the Fourteenth and Fifteenth Amendment vote-dilution claims, the latter "may not move the needle much'") (quotation omitted); *see also Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000) (citing *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 866 875 n.3 (2000) as rejecting application of the Fifteenth Amendment to vote dilution claims). Notably, the recent *Alexander* case also involved Fifteenth Amendment claims. *See Alexander,* 144 S. Ct. at 1216 (Thomas, J., concurring) (discussing Fifteenth Amendment claims).

(quotation omitted). Vote dilution is "invidiously . . . minimiz[ing] or cancel[ing] out the voting potential of racial or ethnic minorities." *Id*. at 2314. Here, however, the Court found that "the commissioners never expressly considered" racial data. Dkt. 250 at 79 ¶ 219 (discussing spreadsheet data that provided Black and Latino VAP percentages).

Intentional vote dilution is "analytically distinct" from a racial gerrymandering claim. *Id*. at 1252. It requires proof of both discriminatory purpose and discriminatory effect. *Id*. Showing that race played a predominant role in the districting process is not enough. *Id*. Plaintiffs must also show that the plan was adopted "as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Id*. (quoting *Miller*, 515 U.S. at 911).

> The distinction between being aware of racial considerations and being motivated by them may be difficult to make. This evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race.

*Miller*, 515 U.S. at 916.

To prove race predominated in a jurisdiction where race and politics are connected, Plaintiffs must do the following *just to switch the burden of proof* to Defendants:

1. disentangle race and partisan preference;

2. show that race-neutral districting criteria was subordinated to racial considerations, through proof that—

   a. "[r]ace was the criterion that, in the State's view, **could not be compromised** in the drawing of district lines" or,

   b. that the plan "**conflicts with** traditional redistricting criteria." *Alexander*, 144 S.Ct. at 1233-34 (quoting *Shaw v. Hunt*, 514 U.S. 899, 907 (1996) and *Bethune-Hill v. Va. State Bd. Of Elections*, 580 U.S. 178, 190 (2017));

and

3. produce an alternative map to show partisan goals could have been met with greater racial balance. *Id*. at 1233-36.

To meet their burden, Plaintiffs must pay more than mere lip service to the analysis—since race and partisan preference are "highly correlated." *See Alexander*, 144 S. Ct. at 1233. *Alexander* recounted that the district court in that case did not carefully apply this analysis—a "misguided approach" that "infected" the court's findings with error. *Id*. A close analysis of these points is therefore critical. *Id*. at 1233.

### i.   Plaintiffs have not overcome the presumption of legislative good faith.

The most significant consideration Plaintiffs skirt is their burden to overcome the presumption of legislative good faith. *See Abbott v. Perez*, 138 S.Ct. 2305, 2324 (2018) ("[w]henever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State") (citing *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 481 (1997)).[6] Good faith "takes on special significance in districting cases." *Id.* That is because not only does the state (here, the County) bear the duty of districting, but also because federal court intervention in districting matters "represents a serious intrusion on the most vital of local functions." *Id*. (quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995)).

---

[6] *Reno* discussed Section 5 of the VRA and its "difficult burden of proving the absence of discriminatory purpose and effect." *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 480 (1997) (citing *Elkins v. United States*, 364 U. S. 206, 219 (1960) ("[A]s a practical matter it is never easy to prove a negative")). Section 5 preclearance is, of course, not the standard here.

There are good reasons for these rules. Officials who engage in districting enter a complicated "legal obstacle course." *Abbott*, 138 S.Ct. at 2315. They must consider legal requirements, such as compliance with the VRA, which involves the consideration of race that would otherwise conflict with a Fourteenth Amendment analysis. *Id*. at 2315 ("we have assumed that complying with the VRA is a compelling state interest") (citing *Bethune–Hill*, 580 U.S. at 178 and *Shaw v. Hunt*, 517 U.S. 899, 915 (1996)). Therefore, consideration of race satisfies strict scrutiny when there are "good reasons" to believe districting must comply with the VRA. *Id*.; *see also Alexander*, 144 S. Ct. at 1233 ("redistricting is an inescapably political enterprise" and "[l]egislators are almost always aware of the political ramifications of the maps they adopt"). It is beyond contest here to think that Galveston County would not have this good reason. Nor does past discrimination shift a plaintiff's burden, or overcome the presumption of legislative good faith. *Id*. at 2324.

Therefore, in reviewing a claim of intentional discrimination or racial gerrymandering, courts "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Id*. (quoting *Miller*, 515 U.S. at 915-16). This includes whether "a voter's race correlates closely with political party preference," as is the undisputed case here. *Id*. at 2314 (citing *Cooper v. Harris*, 581 U.S. 285, 137 S.Ct. 1455, 1473-1474, (2017) and *Easley v. Cromartie*, 532 U.S. 234, 243 (2001)).

Plaintiffs essentially ask the Court to take their burden and place it in the first instance upon Defendants to prove disentanglement, or that **politics** was a predominating factor, not race. This is an erroneous application of the law.

### i. Plaintiffs must disentangle race from politics.

If Plaintiffs do not completely rule out partisan preference by proving that "race *drove* a district's lines," and if either race or politics could explain the plan, Plaintiffs have "not cleared [their] bar." *Alexander*, 144 S. Ct. at 1235 (quotation omitted).

Plaintiffs completely misstate the record and the Supreme Court's mandated analysis when they say they have no "[h]eightened requirement[]" to prove that race, rather than partisanship, was the predominant motivating factor if there is no partisan-gerrymandering defense. Dkt. 288 at 46.[7] Defendants **did** plead a partisan gerrymandering defense. *See* Dkt. 142 at 19; Dkt. 143 at 22; Dkt. 144 at 13. And *Alexander* **does not hold** that a defendant must allege partisanship was the only motivating factor before a plaintiff's burden to disentangle race from politics arises. As Justice Alito instructs,

> The Constitution entrusts state legislatures with the primary responsibility for drawing congressional districts, and redistricting is an inescapably political enterprise. Legislators are almost always aware of the political ramifications of the maps they adopt, and claims that a map is unconstitutional because it was drawn to achieve a partisan end are not justiciable in federal court. . . . **The[] doctrinal lines [between race and politics as motivating factors] collide when race and partisan preference are highly correlated**.[8] We have navigated this tension by endorsing two related propositions. First, **a party challenging a map's constitutionality must disentangle race and politics if it wishes to prove that the legislature was motivated by race as opposed to partisanship**. Second, in assessing a legislature's work, we start with a presumption that the legislature acted in good faith.

*Alexander*, 144 S.Ct. at 1233 (emphasis added). Awareness of political ramifications,

---

[7] Citations here are to blue docketed pagination, not to Plaintiffs' printed page numbering.

[8] It is important to note that the Court uses several terms when discussing appropriate legislative motives that derive from politics—including political preferences, partisan ends, political ramifications, politics, and even "other permissible considerations." *See Alexander*, 144 S. Ct. at 1233, 1234, 1235, 1242, 1243.

creation of and voting for a map that has a minimum precinct-level Republican performance at 56%, and a desire to keep the County red are undisputed facts in the record. *Alexander* therefore does not hold that a Plaintiffs' initial burden depends only on how strenuously a defendant argues politics as a basis for districting.

Where, as here, it is undisputed that there is a 'high correlation' between race and politics (and therefore Plaintiffs argue that districting results or effects indicate racial motives), to avoid the equal inference that politics is just as likely a factor, Plaintiffs must disentangle the two to meet their burden to show that race was the **predominant** factor. *See Alexander*, 144 S. Ct. at 1236 (quotation omitted) (where the evidence "could plausibly support multiple conclusions" the good-faith presumption to show that "race for its own sake, and no other districting principles, was the legislature's dominant and controlling rationale" is not overcome).

By failing to carefully identify and analyze the proper framework for their Constitutional claims, Plaintiffs run into the very trap that *Alexander* and the Fifth Circuit warned against. For example, they argue they can prove a Fourteenth Amendment racial gerrymandering claim here by submitting circumstantial evidence of a district's shape and demographics. Dkt. 288 at 45. But where there is a high correlation between race and politics, a district's shape and demographics are not only weak circumstantial evidence, they are no evidence of racial intent. Their conclusion that the evidence "demonstrates that no predominating factor *other than race* can explain the Enacted Map's configuration" is not only completely wrong, it is unsupported by any citation. *Id*. at 46. Plaintiffs have failed to overcome the presumption of legislative good faith here.

Plaintiffs' misapplication of *Alexander* hides the weakness of their current position: they have already **disproven** their Constitutional claims because the claims are based entirely on the argument "that race and politics are 'inextricably intertwined.'" Dkt. 250 at 55 ¶ 144. Plaintiffs' arguments, evidence, and their own witnesses' testimony all point to not only a high correlation between race and politics, but Plaintiffs' claimed **inability** to disentangle the two. Thus, they are unable to prove their claims.

### B. The Plaintiffs have admitted, and this Court has recounted, that race and politics in Galveston County are inseparable.

#### i. Plaintiffs' own witnesses testified about a high correlation between race and politics.

Plaintiffs' own arguments and evidence are that race and politics are inseparable here. *See* Dkt. 250 at 55 ¶ 144 (citing Dkt. 247 at 6 n.3).

Dr. Trounstine testified about how "local political coalitions get built" to elect officials (Dkt. 250 at ¶¶48-49), defining political coalitions based upon the coalition members' first choice for a political candidate. Dkt. 224 at 185-86.

Dr. Krochmal testified,

My conclusion, based on the research, the historical evidence, is that there is ample evidence of ongoing collaboration between Mexican Americans and African Americans in Galveston County; **an enduring political coalition** that emerged in response to experiences of discrimination and **sort of shared political aspirations and interests**; and that that coalition has become more intimate, more tight, over the last several decades.

Dkt. 225 at 35:14-36:2. He testified "there was extensive record" of a "history of Black and Hispanic political collaboration in Galveston County." *Id*. 67:8-17. Tellingly, he defined coalition as—

. . . actually two groups who are different and sometimes may even strongly disagree, but they nonetheless find ways to work together and they value that working together and they prioritize it and act accordingly.

*Id*. 67:23-68:4. He openly discussed the coalition in this case as a "political coalition" comprised of different groups with different needs at times, but who work together to reach shared political ends. *Id*. 68:5-11, 70:24-71:4.[9]

Plaintiffs themselves, and their lay witnesses, testified about the interconnected nature of race and politics. On the first day of trial, Plaintiff Constable Rose testified on two very important points. First, when asked whether he thought the 2021 redistricting cycle was politically motivated, he testified "**I think it was some of both, politically and racially**." Dkt. 221 at 98:7-15.[10] Plaintiffs never attempted to separate these two factors identified by Plaintiff Rose. Second, when asked why he did not believe Commissioner Holmes can be elected in Precinct 4, Constable Rose testified:

---

[9] The bases for Plaintiffs' expert opinions on Anglo Republican voting in Galveston County are highly questionable. Plaintiffs brought experts in to generally testify that White Galveston County Republicans are (largely) racists. Dr. Barreto went so far as to say it is "conclusively" proven that "even racial animus influence[s] partisanship among White voters" and, therefore, "it is voters' views on matters of race that often push White voters today into voting for Republican candidates in the first place." Dkt. 223 at 276:10-21 (emphasis added). The link between his "conclusive" proof and his conclusion that White voters vote Republican based on their views on race is not only leaps an analytical gap wide enough to park a car in, it is preposterous. In pursuit of Section 2 proof, he further opined that "the literature suggests that today" "White Anglo Republicans in the United States" are "more likely" to "harbor negative racial views of Latinos and African Americans. Dkt. 223 at 278:15-19. According to him, "it is only among those who have negative racial attitudes or who are unwilling to support a Black president who leave the Democratic Party for the Republican Party." DX-305 at 9, 8.

Dr. Krochmal's testimony, which revealed his public statement that, "Who can now say the Republican Party isn't a vehicle of White power?" was a glaring indication of both his bias in this case and his willingness to stretch logic for the sake of public argument. Dkt. 225 at 121:12-19.

[10] At deposition, he testified only that he believed the 2021 redistricting cycle was politically motivated.

A.      **Because it's the north end of the county, and they normally vote Republican**.

Q.      And he is a Democrat?

A.      **And he is a Democrat**.

Dkt 221 at 92:2-15. The Court credited Constable Rose's testimony by citing some of it in its Findings. Similarly, Plaintiffs' Black and Latino Galveston County witnesses consistently testified that they have never voted for a Republican. Dkt. 222 at 39, 41, 59 (Judge Pope); Dkt. 221 at 83, 84 (Constable Rose); Dkt. 222 at 220 (Edna Courville).

### ii. The Commissioners, County Judge, and map drawers testified about the importance of political performance.

The Commissioners and map-drawing team also testified about politics. Commissioner Holmes' detailed notes reflect that Commissioner Apffel's motivations were political. JX-28 at 8.[11] Thomas Bryan, the map drawer, was instructed from day one to draw a "Four R" plan. Dkt. 250 at 75 ¶ 205; Dkt. 231 at 233:16-25. The Court discounted this instruction in its Findings. Dkt. 250 at 75 ¶ 208. But Mr. Bryan also, as instructed, continuously tracked political performance data for each commissioner precinct during redistricting, as "[t]hat was the original direction I had gotten when I started the plan." Dkt. 231 at 255. He informed the Commissioners about that political performance data, including that Precinct 3 in Map 1 had 37% Republican performance, with the remaining precincts at or above 67% Republican performance. Dkt. 231 at 264:3-16. Mr. Bryan testified that, between October 14th and 28th, he used "political performance data to

---

[11] It cannot be overstated that Commissioner Holmes was the only Democrat on the Commissioners Court, but at the time of trial he was not the only Black elected Galveston County Commissioner. Republicans nominated Commissioner Armstrong to fill Ken Clark's seat, and then elected him to that position.

modify" Map 1 and 2 lines—"[e]xtensively." Dkt. 231 at 286:8-25; Dkt. 232 at 52:4-53:1.

He even disaggregated political performance data down to the block level. Dkt. 232 at

52:19-22. By October 21st when the map drawing was "largely completed" (Dkt. 231 at

269:20-23), Mr. Bryan's political analytics, stated again, had improved—with 56% being

the minimum percentage for expected Republican performance in any precinct. *Id.* at 266-

67, 270-71, 281 (reviewing DX-263), at 277:23-78:13 (same for October 22nd meeting).

**In fact, political data purposely tracked by Bryan allowed him to see that the changes**

**being made over time increased the expected Republican performance of Map 2 to**

**exceed even what Mr. Bryan had originally generated in his "Four R" map.** *See* Dkt.

231 at 249:4-6, 253:10-254:10 (reviewing PX-197, where Mr. Bryan recorded the political

performance numbers for the original plan, the minimum change plan, and the Optimal D

plan), 254:11-25 (agreeing Optimal D plan has higher Republican performance than initial

Four R draft). Bryan confirmed that in working toward Map 2, ". . . [w]e had the additional,

you know, expectation that we would create four plans with comparable political

performance in them." *See* Dkt. 232 at 53:2-11. Despite attempts to discount political

objectives on cross, Bryan stated that he knew that political performance was a "big part"

of what he needed to do[12] and that political performance was at least a part of the reason

Map 2 was drawn. Dkt. 232, at 25:21-26:9.

Judge Henry is elected County-wide, in a County that is approximately 66%

Republican; his testimony was that politics were not his "primary concern", but were "a

---

[12] Dkt. 231, at 301:4-302:3.

secondary, at best, consideration." Dkt. 228 at 197-98, 239. If Map 2 ended up electing four Republican commissioners, it would not "hurt his feelings." *Id*. at 199. Judge Henry testified the criteria that "was used" were six factors, one of which was that the Commissioners wanted to consider the partisan composition of their districts. *Id*. at 201. As discussed above, Tom Bryan's testimony and conduct corroborates this with his analytics and continuous tracking of partisan performance for each precinct.

Even Ms. Courville testified that she recalled Judge Henry saying he wanted to keep Galveston County red, which she understood to mean that he wanted a Republican County—and "that was going on because that is what our governor, who is now in charge of a red state, wanted to happen. That's what I thought at that time." Dkt. 222 at 250:17-251:4 (Ms. Courville testimony). When asked whether Commissioner Holmes could be re-elected today, under Map 2, Ms. Courville testified: "No. No. **There are too many Republicans** where they have him now." *Id*. at 251. Similarly, as Dale Oldham testified,

> Q. Is it your recollection that the commissioners reviewed the racial data or were concerned with racial data when you showed them the maps?
>
> A. Commissioner Holmes was.
>
> Q. Do you remember any of the other commissioners sort of focusing on the race percentages?
>
> A. No. They were focused on the politics.
>
> Q. What about Judge Henry?
>
> A. He was focused on the geography and the politics.

Dkt. 231 at 110-111. Mr. Oldham's testimony that he "was not looking at any other justification for" Map 2 than geography does not change this evidence. Dkt. 231 at 153.

And, his testimony that Map 2 was the "visualization of the instructions" Judge Henry provided (Dkt. 231 at 181), Mr. Oldham also testified about changes made to that map based on other Commissioners' comments. For example, Commissioner Clark's motivations were "very much" political.' Dkt. 231 at 90 (Dale Oldham testimony). Commissioner Giusti, though "less vociferous" to Mr. Oldham than Commissioner Clark, had "problems with Map 2" because "he had essentially gone from the most Republican district to the least Republican district." Dkt. 231 at 106.

### iii. The Court discussed a high correlation between race and politics.

The Court's *Gingles* Findings also discuss the interconnected relationship between race and politics. The Court found Black and Latino voters were cohesive, and looked at general elections as "more probative" evidence in support. Dkt. 250 at 47-48 ¶¶ 119-121.[13] The Court accepted the Plaintiffs' explanations that "coalitions get built in the general election" where candidates' positions are not as close as they are in primary elections. Dkt. 250 at 48 ¶ 122. The Court examined testimony from Plaintiffs that White and non-White voters "are sharply polarized in their voting patterns in each of the four enacted precincts." Dkt. 250 at 54 ¶ 140 (citing PX-465 at 44-46) (Barreto report).[14]

Significantly, the Court never discounted the clear role that partisanship has in racially divergent voting patterns in the County. Dkt. 250 at 54-55 ¶ 143 ("To the extent

---

[13] Defendants have consistently argued that primary elections are more probative of cohesion, because that is where political parties are removed from consideration when testing cohesion.

[14] Defendants have consistently argued that politics, not race, drives voting in Galveston County. Dkt. 250 at 55 ¶ 144.

that partisanship explains the voting patterns in the county, it still does not change the fact that the data unerringly points to racially polarized voting"). The Court also acknowledged that, in the County, Anglos comprise a supermajority and "are mostly Republicans" while Black and Latino voters "are mostly Democrats." Dkt. 250 at 55 ¶ 144, 57 ¶ 149 (stating in general elections "Anglos overwhelmingly vote for Republican candidates," "Blacks overwhelmingly vote for Democrat candidates, and Latinos very often support the same candidates") (citing PX-452 at 8, PX-476 at 33).

Significantly, the Court recounts that the Plaintiffs have admitted and argued "that **race and politics are 'inextricably intertwined.'"** *See* Dkt. 250 at 55 ¶ 144. The Court even discussed "anecdotal and isolated" evidence that "race provides a plausible explanation for voting patterns in Galveston County" before ultimately finding that "a partisan explanation for voting patterns in Galveston County does not overcome the weighty evidence of racially polarized voting on account of race." Dkt. 250 at 57-58 ¶¶ 151-52.

This, however, is precisely the kind of finding the Supreme Court in *Alexander* warns against in the context of Constitutional claims—one that simply concludes race drove a decision without any evidence that separates political from racial factors on the grounds that the two are hopelessly intertwined.  This, and other analyses that Plaintiffs contend would allow intent findings based on inextricably interlinked race-and-politics evidence, clearly cannot withstand *Alexander*. *See, e.g., Perez v. Abbott*, 250 F. Supp. 3d 123, 179 (W.D. Tex. 2017) (holding "mapdrawers were motivated in part by an intent to dilute minority voting strength" where "[d]iscussions among mapdrawers demonstrated a

hostility to creating any new minority districts, as those were seen to be **a loss of Republican seats**, despite the massive minority population growth statewide").

### C. Plaintiffs have not proven that race-neutral considerations were subordinated to racial considerations.

There is no evidence of predominance here—that race-neutral considerations were subordinated to racial considerations, or that Defendants subordinated traditional principles to race.[15] Evidence may be direct, or circumstantial. This case was built on circumstantial evidence, alone. Without direct evidence, it is "much more difficult" to prove racial predominance. *Alexander*, 144 S. Ct. at 1234. That task is "especially difficult" when there is "a partisan-gerrymandering defense" (*id*. at 1235), as there was here. *See* Dkt. 142 at 19; Dkt. 143 at 22; Dkt. 144 at 13 (Defendants' Answers); Dkt. 245 at 3-5 (Defendants' proposed findings); Dkt. 244 at 11-12. Plaintiffs say that the defense was disclaimed. It was not.

Plaintiffs appear to contend that the elimination of a multi-racial political coalition district can somehow show racial intent. It cannot. Racially disproportionate impact alone will not establish an Equal Protection challenge. *Hunter*, 471 U.S. at 227-28. Nor, as *Hunter* explained, is it easy to establish intent. "Proving the motivation behind official action is often a problematic undertaking." *Id*. at 228. The Fifth Circuit has described it as "a difficult enterprise," especially when different peoples' motives are involved. *Veasey v.*

---

[15] As discussed in Defendants' Closing Brief, William Cooper testified he had no problems with the municipal splits in the enacted plan, or its compactness scores. Dkt. 223 at 106:1-15; 111:16-24. He did not conduct any political performance analysis, so he could not opine on whether the traditional redistricting criterion of political affiliation was satisfied. *Id*. at 112:15-22. He testified the enacted plan did not pair any of the incumbents. *Id*. at 112:9-14. Lastly, he testified the 2021 Map is contiguous. *Id*. at 45:8-10, 46: 6-13.

*Abbott*, 830 F.3d 216, 230-31 (5th Cir. 2016).

Plaintiffs also argue the Commissioners and Dale Oldham knew the demographics of Galveston County, and knew the effect on Precinct 3 that Map 2 would have. But awareness "that there is a disparate impact on a protected group" is not enough. *Hunter*, 471 U.S. at 228. Nor is it suspect that the Commissioners know the general racial demographics of the County in which they have served for decades (and some grew up in); that is no evidence to support an intent claim. *See Alexander*, 144 S. Ct. at 1251 (stating "there is nothing nefarious" about the demographer's awareness of racial demographics after he had spent 20 years drawing maps for various state and local initiatives). Nor can knowledge about the correlation between race and party preference prove a Constitutional intent claim. *Id.* at 2314. ("[o]ur prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact").

As discussed herein, the weak, circumstantial evidence Plaintiffs rely on now is similar to the weak evidence rejected in *Cromartie*, which involved circumstantial evidence of a racial gerrymander that included expert testimony and a discrepancy between the adopted plan and traditional districting criteria. *Cromartie*, 532 U.S. at 240-41. The Supreme Court had reversed the district court's summary judgment and remanded, holding that there was insufficient evidence that race, rather than politics, predominated districting. *Id*. at 243. The trial court had relied on the shape of the district, its splitting towns and counties, and its high Black voting population. *Id*. The evidence there, as here, was that

race and political affiliation was "highly correlated." *Id*. (discussing prior holding that these facts alone cannot, as a matter of law, support the judgment) (citing *Bush v. Vera*, 517 U.S. 952, 968 (1996) ("If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify"). There, as here, the evidence was insufficient.

### D. An *Arlington Heights* analysis does not support Plaintiffs' claims.

The Court need not reach an *Arlington Heights* analysis because Plaintiffs cannot overcome the initial presumption of legislative good faith, because they cannot disentangle race from politics.

Even so, *Arlington Heights* does not support Plaintiffs' Constitutional claims. Plaintiffs have no evidence, much less direct evidence, of any intent to discriminate or racial predominance as a consideration by the members of the Commissioners Court, or the team that drew the two map options.

In its Findings, the Court credited Dr. Burch's testimony about racially discriminatory intent. Dkt. 250 at 27 ¶ 59.[16] Her opinions and testimony on this topic amount to no evidence, especially when viewed after *Alexander* issued. She testified that there was racial intent because there was a racially disparate impact with the enacted plan, that was foreseeable. *See* Dkt. 222 at 110:10-113:3, 121 ("So I found here that the map has the effect of eliminating the only coalition majority-minority precinct . . . The county commissioners who voted for that map and the county judge knew that that would be the

---

[16] Dr. Burch discusses Senate Factors at pages 72-110 of her testimony. Dkt. 222 at 72-110.

impact of the map and made no effort to mitigate that impact as well").

Regardless, the Court's pre-appeal Findings cannot be relied upon to support a Constitutional analysis, because they place the burden on Defendants to **disprove** racial intent. Dkt. 250 at 56 ¶ 147 ("[a]lthough partisanship undoubtedly motivates voting behaviors in Galveston County, the **defendants failed to show that a race-neutral explanation explains the racially divergent voting patterns**"). *Alexander* makes abundantly clear that this is not a defendant's burden to prove a plaintiff's Constitutional claim.

Defendants have argued that Plaintiffs cannot succeed on a Constitutional claim because Precinct 3 was drawn and maintained as a racial draw under Section 5. In 2020, after *Shelby*, Precinct 3 was no longer subject to Section 5 non-retrogression, and legislators no longer have Section 5 as a compelling interest which could justify a decision to **keep** a district drawn on the basis of race. *See Shaw*, 509 U.S. at 654 (finding the creation of a majority-minority district unconstitutional despite a Section 5 justification and stating "the Voting Rights Act and our case law make clear that a reapportionment plan that satisfies § 5 still may be enjoined as unconstitutional"). Plaintiffs cannot now conflate their Constitutional claims with Section 5 non-retrogression requirements.

*Petteway* holds that Section 2, enacted to implement the Fifteenth Amendment, does not protect (and therefore provides no justification for) coalition districts. Here, there is no dispute that Precinct 3 was originally created using race to satisfy preclearance demands. When a jurisdiction like Galveston County, a majority Republican and Anglo County, contains a politically fused precinct that is not protected under Section 2, there is no longer

any justification under the VRA for the legislature to consider race. More succinctly stated, without the potential for a VRA claim, there is no constitutional reason to consider race. Plaintiffs have no statutory or constitutional right to insist on the maintenance or creation of a racial coalition district. Plaintiffs have not met their burden to establish that race was the predominant factor in redistricting.

Plaintiffs have provided no strong or direct evidence under the *Arlington Heights* factors—historical background, sequence of events, departures from the normal course, and legislative history. For example, antebellum history aside, "several witnesses" testified "it is easier to vote now than it has ever been in Galveston County." Dkt. 250 at para 164-68 (the Hispanic, Republican District Clerk testified the clerk's office pays postage for mail-in ballots that fail to affix it because he wants every vote to count). Prior Attorney General objections under Section 5 non-retrogression do not move the needle with respect to the predominance of race in districting. *See, e.g.,* Dkt. 250 at 65 ¶ 177 (citing AG statement that he "could not conclude that [Texas City's] proposal would not have a racially discriminatory effect" and the County did not meet **its** burden to show challenged plan was **not** adopted with a discriminatory purpose). While the Court mentioned this Court's prior **dismissal of intent claims against the County** in connection with JP and constable precinct districting challenges raised in 2013 (Dkt. 250 at 67 ¶ 180), this fact is far more probative than any AG objection letter under Section 5 review.

Additionally, any differences with four prior, decennial, districting cycles is also wholly explainable by the fact that **every prior districting year required compliance with Section 5**. Plaintiffs, post-*Shelby* and post-*Petteway*, improperly attempt to apply

anti-retrogression standards to a political coalition district via Constitutional claims. *See Shelby Cnty. v. Holder*, 570 U.S. 529 (2013); *Petteway*, 111 F.4th at 604. By arguing that Defendants' failure to follow Section 5 requirements in 2021 when Section 5 does not apply, Plaintiffs' attempt to retrogress a Constitutional intent analysis into a stale statutory process.

It is also critical to note the impact of COVID-19—forcing the late release of Census data, and affecting timelines and processes from the start. The County map consultant did not receive any data until September 14th, and on November 1st, the County was informed that the last day to adopt a plan was on November 13th. Left with two months to complete this process from inception to adoption, the County's process does not amount to a number of "virtually unprecedented" or "radical procedural departures" to "lend [any] credence to an inference of discriminatory intent." *Veasey*, 830 F.3d at 237-38. In *Veasey*, departures from the normal sequence in the Texas legislature included special permission to file the legislation under a low number to prioritize it, the fact it was deemed an emergency to speed up its consideration, suspending the 2/3 rule on how many votes are needed to make the bill a "special order," bypassing normal committee processes, passing the bill "with an "unverified $2 million fiscal note" despite a prohibition on doing so, cutting debate time, and allowing the conference committee to add provisions to the bill, despite legislative rules and practices. *Id*. The facts here in no way reach those in *Veasey*, where even with those facts, the Fifth Circuit instructed the district court to "take the requisite time to reevaluate the evidence and determine anew whether the Legislature acted with a discriminatory intent." *Id*. at 243.

Just like the *Alexander* plaintiffs, Plaintiffs have provided no direct evidence in support of their intent claims, "and their circumstantial evidence is very weak." *Alexander*, 144 S. Ct. at 1240. The record does not support the judgment Plaintiffs ask this Court to enter.

### E. Plaintiffs provided no alternative map that would have created a Republican coalition district.

When race and politics are intertwined, Plaintiffs must present an alternative map or else suffer an adverse inference, making it likely that they will not be able to "defeat our starting presumption that the legislature acted in good faith." *Alexander*, 144 S. Ct. at 1235-36. The purpose of an alternative map is to show that racial considerations can be separated from political considerations.

*Alexander*'s alternative map factor begins and ends with Plaintiffs' arguments and evidence. Their contention that race and politics cannot be disentangled parallels the fact that they presented no alternative map that both preserved Precinct 3 and disentangled race from politics. Their arguments and evidence establish not only that they cannot overcome a good-faith presumption, but also that they should bear an adverse inference from their inability to present such an alternative map.

Not just any alternative map will do. The Supreme Court explained the expert reports in *Alexander* were "deeply flawed," even after the district court credited those experts' testimony. *Alexander*, 144 S. Ct. at 1240. Significantly, despite the "tens of thousands of maps" the *Alexander* plaintiffs produced, none created a Republican district while also increasing the Black voting age population in that district. *Id*. The Court reversed

the racial gerrymandering claim on this record. *Id*. Here, Plaintiffs presented alternative maps using ACS data that was not available at the time Map 2 was drawn, and none of those maps maintained a minority-majority coalition precinct *and* created a Republican-majority precinct. Had Plaintiffs been able to separate race from politics, such a map could have been presented.

III.   **There has been a significant change in the law that alters the framework within which the parties presented, and the Court analyzed, the evidence—and the Court's Findings cannot support judgment against Defendants.**

The record is saturated with Section 2 evidence that is, at this stage, either wholly irrelevant or cannot support a Fourteenth or Fifteenth Amendment claim. In urging the Court to enter a judgment, Plaintiffs rely on findings this Court issued on a Section 2 effects claim. Not only does this request forget the Court's express statement in its Findings that it was not making an intent finding (Dkt. 250 at 152 ¶ 427), they are based on what we now know is an incorrect legal principle—that Section 2 protects coalitions. Dkt. 250 at 127-28 ¶¶ 367-69.

A court's findings are generally reviewed for clear error, but if they are based on a mistaken application of legal principles, reviewing courts are not bound by a clear-error standard. *Alexander*, 144 S.Ct. at 1240 ("in a case like this, there is a special danger that a misunderstanding of what the law requires may infect what is labeled a finding of fact. If a trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard") (cleaned up).

31

The Findings and record are subsumed by irrelevant, coalition-based VRA evidence and argument that was never submitted to prove intent. For example, the Findings recount Commissioner Holmes' testimony that he told Commissioner Apffel Map 2 "ran afoul of § 2." Dkt. 250 at 82 ¶ 230, at 99 ¶ 284. Hundreds of exhibits and days of expert testimony were based entirely upon the premise that a coalition must be protected under the VRA.[17] Even the NAACP and Petteway Plaintiffs confuse evidence proffered solely under Section 2 for evidence to support their Constitutional claims when they cite Mr. Cooper's testimony about "stark" or "mean-spirited" districting. Mr. Cooper was the NAACP Plaintiffs' "*Gingles* I expert in redistricting and demographic analysis." Dkt. 223 at 11. He testified about whether the "minority community in Galveston County was sufficiently numerous and geographically compact in order to draw a majority-minority district." *Id*. at 12. He also reviewed the enacted plan, Map 2. *Id*. He was not proffered on the issue of intent, or on *Arlington Heights* factors. *Id*. at 43. In fact, he explained that **when he said "mean-spirited," he does not "know what the thinking was."** *Id*. His adjectives cannot, and do not, support any intent finding.

---

[17]*See, e.g.,* Dkt. 250 at 19-20, 23, 25, 28; Dkt. 223 at 209 (testimony of Matthew Barreto as an expert in mapping, racially polarized voting, demographic change, racial and ethnic politics, offered to testify on *Gingles* II and III); *see also* PX-384 and PX-465 (Barreto reports); Dkt. 223 at 11-12 (testimony of William Cooper, as an expert on redistricting, demographic analysis offered to testify on *Gingles*, with no discussion of intent or *Arlington Heights*); PX-386 (William Cooper expert report); *see also* Dkt. 224 at 81 (testimony of Dr. Anthony Fairfax, an expert on map-drawing, demography, redistricting, and census data as it applies to the first *Gingles* precondition); Dkt. 224 at 278 (testimony of Dr. Oskooii, an expert on racially polarized voting analysis offered to testify on *Gingles* II and III); Dkt. 224 at 14-15 (testimony of Dr. Rush, an expert on political geography, mapping, and electoral behavior, offered to testify on *Gingles* I); PX-385 (Rush report); Dkt. 224 at 170-71 (testimony of Dr. Trounstine, an expert in political science, particularly statistical analysis of group voting patterns and the ability of groups to elect their candidates of choice, offered to testify on *Gingles* II and III); Dkt. 225 at 199 (Dr. Rocha testimony on Senate Factors).

Additionally, the record evidence and argument presented by Plaintiffs and considered by the Court was based on the incorrect legal theory that Galveston County had a duty to preserve a coalition district, and that knowingly dismantling a performing political coalition district violated Section 2. Should the Court believe that the significant legal and factual impediments discussed above can be overcome, Defendants ask that the Court carefully review its Findings, disregard irrelevant evidence, apply the appropriate analytical framework without reliance on irrelevant VRA evidence, and ultimately find and hold that Plaintiffs have not met their burden to establish their racial gerrymandering and intentional vote dilution claims against Defendants. Applying the proper legal analysis, this Court should render a judgment dismissing Plaintiffs' remaining claims in their entirety.

## IV.    The Fifth Circuit dismissed all Section 2 claims in this case.

The Plaintiffs contend that, somehow, their Section 2 intent claims can survive here when the United States' Section 2 claims do not. That argument contradicts logic, the Fifth Circuit's judgment and mandate, and the rationale underlying the Fifth Circuit's en banc Opinion.

First, it is incongruous to argue that Plaintiffs can pursue Section 2 claims, while the United States cannot.

Second, the Fifth Circuit has, by denying any request to clarify its Judgment, held that its Judgment is clear and in need of no clarification. The Court ordered that:

> the judgment of the District Court is REVERSED as to the Section 2 claim and we REMAND for the district court to consider the intentional discrimination and racial gerrymandering claims brought by the Petteway Plaintiffs and the NAACP Plaintiffs.

*See* Aug. 1, 2024 Judgment. The United States' Section 2 intent claim was not remanded.

Finally, the Judgment comports with the Court's rationale in its Opinion. The Court based its holdings on statutory text, the same text from which an intent claim would arise under Section 2: "[t]he text of Section 2 does not authorize coalition claims, either expressly or by implication." *Petteway*, 111 F.4th at 603. Plaintiffs cite *Perez*, 253 F. Supp. at 944, arguing that *Gingles* I does not apply to a Section 2 intent claim. Again, because the Fifth Circuit's Opinion is based on statutory text, Plaintiffs' citation to *Perez* does not save a Section 2 intent claim. Regardless, even if the Fifth Circuit had remanded a Section 2 intent claim (it did not), that claim too would fail for the reasons discussed herein.

## CONCLUSION AND PRAYER

The Fifth Circuit has instructed this Court to carefully consider the appropriate analytical framework and whether Plaintiffs have any injury or entitlement to the relief sought. A careful application of the law, the burden of proof and accompanying presumptions, and Plaintiffs' own position that race and politics are so intermingled in Galveston County that they are inseparable, all point to dismissal of Plaintiffs' Constitutional claims. Plaintiffs also have no Section 2 intent claim following remand. Defendants ask that the Court consider, find and ultimately rule that Plaintiffs' remaining claims must be dismissed, with prejudice. Defendants pray for all other relief to which they may be entitled, at equity or law.

Respectfully Submitted,

PUBLIC INTEREST LEGAL
FOUNDATION

Joseph M. Nixon
Federal Bar No. 1319
Tex. Bar No. 15244800
J. Christian Adams
South Carolina Bar No. 7136
Virginia Bar No. 42543
Maureen Riordan
New York Bar No. 2058840
107 S. West St., Ste. 700
Alexandria, VA 22314
jnixon@publicinterestlegal.org
jadams@publicinterestlegal.org
mriordan@publicinterestlegal.org
713-550-7535 (phone)
888-815-5641 (facsimile)

GREER, HERZ & ADAMS, L.L.P.

By: /s/ *Angie Olalde*
    Joseph R. Russo, Jr. (Lead Counsel)
    Fed. ID No. 22559
    State Bar No. 24002879
    jrusso@greerherz.com
    Angie Olalde
    Fed. ID No. 690133
    State Bar No. 24049015
    aolalde@greerherz.com
    Jordan Raschke Elton
    Fed. ID No.3712672
    State Bar No. 24108764
    jraschke@greerherz.com
    1 Moody Plaza, 18th Floor
    Galveston, TX 77550-7947
    (409) 797-3200 (Telephone)
    (866) 422-4406 (Facsimile)
    *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2024, I served the foregoing via email on

all counsel of record in this case.

/s/ *Joseph R. Russo, Jr.*