**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| THE HONORABLE TERRY PETTEWAY, DERRECK ROSE, and PENNY POPE, | § § § § | |
| | § | |
| *Plaintiffs*, | § § | |
| | § | Civil Action No. 3:22-cv-57 |
| v. | § | [Lead Consolidated Case] |
| | § | |
| GALVESTON, TEXAS, and THE HONORABLE MARK HENRY, in his official capacity as Galveston County Judge, | § § § § § | |
| | § | |
| *Defendants*. | § § | |
| | § | |

**PETTEWAY PLAINTIFFS' SUPPLEMENTAL BRIEF ON THEIR**
**INTENTIONAL DISCRIMINATION AND RACIAL GERRYMANDERING**
**CLAIMS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

LEGAL ARGUMENT .................................................................................................... 2

    A.    *Callais* does not impact Plaintiffs' intentional discrimination claim. ................. 2

        i.    *Callais* did not address constitutional intentional discrimination claims. ..................................................................................................... 3

        ii.    The *Gingles* framework does not apply to intentional discrimination claims under Section 2 or the Constitution. ............................................. 5

        iii.    This Court should find that Galveston engaged in intentional discrimination during the 2021 redistricting of the Galveston County Commission. ........................................................................................ 9

    B.    Plaintiffs still prevail on their racial gerrymandering claim under the *Callais* framework. ....................................................................................................... 13

        i.    *Callais* affirmed that racial gerrymandering occurs when race overrides political considerations, as occurred in Galveston. ............................... 13

        ii.    Under *Callais* and *Alexander*, this Court should enter final judgment in favor of Plaintiffs on their racial gerrymandering claims. ..................... 15

    C.    The current case law supports a judgment in favor of Plaintiffs. ..................... 20

        i.    *Alexander v. South Carolina State Conference of the NAACP* and its progeny. ........................................................................................... 20

        ii.    *Singleton v. Allen* and *Allen v. Milligan*. ............................................... 21

CONCLUSION ........................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Pages**

*Abbott v. League of United Latin American Citizens*, 146 S. Ct. 418 (2025).....................21

*Alexander v. South Carolina State Conference of the NAACP*,
　　602 U.S. 1 (2024)...............................................................................15, 16, 19, 20, 21

*Allen v. Caster*, 146 S. Ct. 1196 (2026) ........................................................................5, 22

*Allen v. Milligan*, No. 25A1314, 2026 WL 1552756 (U.S. June 2, 2026) ....4, 5, 16, 23, 24

*Allen v. Milligan*, 599 U.S. 1 (2023)...................................................................15, 22, 23

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ........................................................................4, 7

*City of Mobile v. Bolden*, 446 U.S. 55 (1980) ......................................................................4

*Cubanos Pa'Lante v. Florida House of Representatives*, 810 F. Supp. 3d 1292 (S.D. Fla.
　　2025) .............................................................................................................................21

*Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020)..................................................................4

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ....................................................................4, 6

*Hunter v. Underwood*, 471 U.S. 222 (1985).........................................................................7

*Jackson v. Tarrant County*, 158 F.4th 571 (5th Cir. 2025) ................................................20

*League of United Latin American Citizens v. Abbott*, 601 F. Supp. 3d 147 (W.D. Tex.
　　2022) ("*LULAC I*") ..............................................................................................5, 7, 8, 11

*Louisiana v. Callais*, 146 S. Ct. 1131 (2026)...................3, 8, 12, 13, 14, 15, 16, 17, 19, 23

*Merrill v. Milligan*, 142 S. Ct. 879 (2022)..........................................................................23

*Patino v. City of Pasadena*, 230 F. Supp. 3d 667 (S.D. Tex. 2017) ..............................9, 10

*Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017) ("*Perez I*") ...............................6, 7

*Perez v. Abbott*, 390 F. Supp. 3d 803 (W.D. Tex. 2019) ("*Perez II*") ................................4

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979) .................6, 9

*Petteway v. Galveston County*, 86 F.4th 214 (5th Cir. 2023) ...........................................2

*Rice v. Cayetano*, 528 U.S. 495 (2000) ..............................................................................4

*Singleton v. Allen*, No. 2:21-cv-1291-AMM, 2026 WL 1469518 (N.D. Ala. May 26, 2026) ....................................................................................................... 21, 22, 23

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ........................................................................ 5

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) ...................................................... 6

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016)............................................................. 4, 6

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977) ................................................................................................. 6, 10

**Other Authorities**

Galveston County 2024 November 5th General Election, Cumulative Results Report
(Nov. 14, 2024), https://galvestonvotes.org/wp-content/uploads/2025/02/2024-
November-5th-Election-Cumulative-Report-5NOV24.pdf ........................................... 2

## INTRODUCTION

In the 2020 redistricting cycle, Defendants eliminated the only opportunity for Black and Latino voters to have representation on the Galveston County Commissioners Court, an opportunity that had been enjoyed for the more than three decades. ECF No. 250 ¶ 417. The Enacted Plan "converted the benchmark Precinct 3 from the precinct with the highest percentage of Black and Latino residents to the one with the lowest." ECF No. 250 ¶ 153 (citing ECF No. 223 at 42–43 (Cooper)). Specifically, the Enacted Plan "represents a dramatic change in the commissioners-precinct lines, both on the coast and the mainland, in a way that distributes the population of benchmark Precinct 3 among all four new precincts and shifts Commissioner Holmes's precinct north." ECF No. 250 ¶ 212.

The Court's October 13, 2023 Findings of Fact lay a strong basis for striking down the Enacted Plan for being motivated by discriminatory intent and for racial predominance. *See generally* ECF No. 250. The Findings of Fact set forth in detail the unjustifiable lack of transparency, exclusion of minority voices, and procedural and substantive deviations of Galveston's 2021 redistricting process, as well as the undeniable harm of the challenged map. *Id.* In Petteway and NAACP/LULAC Plaintiffs' September 26, 2024 Motion for Entry of Judgment on their Intentional Discrimination and Racial Gerrymandering Claims, Plaintiffs summarized this Court's October 13 findings and identified additional evidence adduced at trial that further supports findings of discriminatory intent and racial gerrymandering. ECF No. 288 at 9–19.

On November 5, 2024, the first election for County Commissioner Precinct 3 was held under the Enacted Plan. As anticipated, Commissioner Stephen Holmes, the

1

longstanding elected representative of the minority community in Galveston County, was defeated.[1] Commissioner Holmes received 31.17% of the votes, while the new Precinct 3 Commissioner Hank Dugie received 68.83% of the votes.[2] The remainder of the Commissioners Court maintains the same composition.

Recent legal developments support a final judgment in favor of Plaintiffs. The Enacted Plan is a "textbook example of a racial gerrymander." ECF No. 250 at 5–6. This Court's findings of fact—expressly left undisturbed by the Fifth Circuit, *Petteway v. Galveston Cnty.*, 86 F.4th 214, 218 (5th Cir. 2023)—including that "the enacted plan disproportionately affects Galveston County's minority voters by depriving them of the only commissioners precinct where minority voters could elect a candidate of their choice" and "that the commissioners court was aware of that fact when it adopted the enacted plan," ECF No. 250 ¶ 158, support a finding of intentional racial discrimination and racial gerrymandering under the standards set forth in *Alexander* and affirmed in *Callais*.

## LEGAL ARGUMENT

**A.    *Callais* does not impact Plaintiffs' intentional discrimination claim.**

Plaintiffs are entitled to final judgment in their favor because *Callais* did not disturb this Court's factual findings suggesting intentional discrimination, nor did *Callais* alter the legal standard for Plaintiffs' intentional discrimination claims.

---

[1] Galveston County 2024 November 5th General Election, Cumulative Results Report (Nov. 14, 2024), https://galvestonvotes.org/wp-content/uploads/2025/02/2024-November-5th-Election-Cumulative-Report-5NOV24.pdf.
[2] *Id.*

### i. *Callais* did not address constitutional intentional discrimination claims.

The Supreme Court's decision in *Callais* is clear in its focus on race-based redistricting under Section 2 of the Voting Rights Act. *See generally Louisiana v. Callais*, 146 S. Ct. 1131 (2026). The Court did not address, let alone call into question, the validity of intentional discrimination claims under the Fourteenth and Fifteenth Amendments.

Indeed, quite the opposite. The Court's reasoning, while focused exclusively on Section 2, implicitly acknowledges the axiomatic nature of constitutional intentional discrimination claims. The Court reaffirmed that the Fifteenth Amendment bars "state action 'motivated by a discriminatory purpose'" such that "the focus of [Section] 2 must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination." *Id.* at 1155 (quoting *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997)). The Court reasoned—and repeatedly stressed—that focusing on intentional discrimination ensures that Section 2 is "sufficiently congruent with and proportional to the Amendment's prohibition." *Id.*; *see also id.* at 1156 ("Only when understood this way does [Section] 2 of the Voting Rights Act properly fit within Congress's Fifteenth Amendment enforcement power."). Accordingly, the Court held that "[Section] 2 imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race"—an interpretation that "is consistent with the limited authority that the Fifteenth Amendment confers." *Id.* at 1157. In a subsequent stay decision in *Allen v. Milligan*, the Court reiterated that the purpose of *Callais* was to "to resolve the tension between vote-dilution claims under [Section] 2 of the Voting Rights Act of 1965 and our colorblind Constitution . . . to

3

avoid requiring congressional maps under [Section] 2 that would be unconstitutional racial gerrymanders." No. 25A1314, 2026 WL 1552756, at *1 (U.S. June 2, 2026). In so holding, the Court's analysis of Section 2 took as a given not only the continuing viability but also the foundational nature of constitutional intent-based claims like those still at issue here.

The Court's treatment in *Callais* of constitutional intentional discrimination claims is entirely consistent with existing precedent affirming that the Fifteenth Amendment prohibits state action which intentionally denies voters of color the equal opportunity to elect their candidates of choice. That is why the Supreme Court and Fifth Circuit—and this Court, *see* ECF No. 125 at 20–21—have long recognized that an "election practice violates . . . the Fourteenth and Fifteenth Amendments if it is undertaken and maintained for a discriminatory purpose," *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020); *see also, e.g.*, *Rice v. Cayetano*, 528 U.S. 495 (2000); *City of Mobile v. Bolden*, 446 U.S. 55 (1980) (plurality opinion); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Veasey v. Abbott*, 830 F.3d 216, 229 (5th Cir. 2016) (en banc); *Perez v. Abbott*, 390 F. Supp. 3d 803, 814 (W.D. Tex. 2019) ("*Perez II*") (three-judge court). Indeed, the Supreme Court has specified that, if "a State intentionally drew district lines in order to destroy otherwise [performing] districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality opinion). *Callais* does nothing to change this.

In sum, *Callais*, given its limited focus on Section 2 of the Voting Rights Act, has no bearing on Plaintiff's intentional discrimination claims under the Fourteenth and Fifteenth Amendments, except to the extent the Court's reasoning reinforces the primacy

of constitutional intent-based claims. *See Allen*, 2026 WL 1552756, at *3 (Sotomayor, J., dissenting) (affirming explicitly that *Callais* did not "alter the analysis for intentional-discrimination claims"); *see also Allen v. Caster*, 146 S. Ct. 1196, 1198 (2026) (mem.) (Sotomayor, J., dissenting) (*Callais* "said not a word about the standard for Fourteenth Amendment intentional-discrimination claims.").

> ## ii.    The *Gingles* framework does not apply to intentional discrimination claims under Section 2 or the Constitution.

The framework established in *Thornburg v. Gingles*, 478 U.S. 30 (1986), applies only to Section 2 effects claims. Accordingly, the Court's modification of the *Gingles* standard in *Callais* is irrelevant to Plaintiffs' outstanding intentional discrimination claims and does nothing to disturb or undermine in any way the principle that intentionally fragmenting minority populations in redistricting violates both Section 2 and the Fourteenth and Fifteenth Amendments.

As Plaintiffs have previously explained, *see* ECF No. 239 ¶¶ 94–97, 99–100 (Conclusions of Law); ECF No. 240 at 7–10; ECF No. 288 at 20–25, to prove intentional discrimination under the Fourteenth and Fifteenth Amendments, plaintiffs must show that race was "*part* of [the defendants'] redistricting calculus," *LULAC v. Abbott*, 601 F. Supp. 3d 147, 161 (W.D. Tex. 2022) ("*LULAC I*") (emphasis in original); *see also Veasey*, 830 F.3d at 230 ("[R]acial discrimination need only be one purpose, and not even a primary purpose" of the challenged plan.) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)) (citation modified). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct

evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Courts consider "five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose": (1) "the historical background of the decision," (2) "the specific sequence of events leading up to the decision," (3) "departures from the normal procedural sequence," (4) "substantive departures," and (5) "legislative history." *Veasey*, 830 F.3d at 230–31 (citation and internal quotation marks omitted); *see also Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017) ("*Perez I*") (Evidence of "race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will towards minorities because of their race" is not required.).

While discriminatory purpose "implies more than intent as volition or intent as awareness of consequences," there is a "strong inference" that adverse effects were desired when they were an inevitable, but otherwise avoidable result of a government's chosen action. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 & n.25 (1979); *see also Brown*, 561 F.3d at 433 ("[T]he normal inferences to be drawn from the foreseeability of [the legislature's] actions may be considered.") (internal quotation marks omitted). Indeed, where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face," the "evidentiary inquiry is then relatively easy." *Arlington Heights*, 429 U.S. at 266. An action designed with the "essential inevitable effect" of discriminating on the basis of race is unconstitutional on its face. *Gomillion*, 364 U.S. at 341. And in redistricting, intentionally fragmenting minority populations when such a result is not otherwise required violates the

6

Fourteenth and Fifteenth Amendments. *See Perez I*, 253 F. Supp. 3d at 932 (finding intentional discrimination where the legislature enacted "a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities") (internal quotation marks omitted); *Bartlett*, 556 U.S. at 24 (Kennedy, J., lead op.).

Crucially, while a discriminatory *intent* claim also requires a showing that there was an attendant discriminatory *effect*, *cf. Hunter v. Underwood*, 471 U.S. 222, 232 (1985), it does *not* require satisfying the test for a Section 2 discriminatory effects claim. As the court assessing whether Texas senate district 10 was the product of intentional discrimination explained, "[t]he intentional-vote-dilution analysis [] is derived from the Constitution, and the *Arlington Heights* framework deployed in that analysis states merely that effects are discriminatory when they 'bear[] more heavily on one race than another.'" *LULAC I*, 601 F. Supp. 3d at 163 (quoting *Arlington Heights*, 429 U.S. at 266). "Incorporating the *Gingles* framework into the intentional-vote-dilution analysis, thereby constitutionalizing the *Gingles* factors, would thus be an unnatural result, and it is not one that this Court accepts." *Id.* The *LULAC I* court reasoned that this conclusion was supported by the Supreme Court's decision in *Bartlett*, where a plurality of the Court's analysis showed that "it must be possible for a state to violate the Constitution by dismantling a district that does not meet all three *Gingles* requirements." *Id.* The *LULAC I* court likewise relied upon the Ninth Circuit's consistent holding in *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 769–71 (9th Cir. 1990). *Id.* at 164.

In line with this reasoning, where intentional discrimination is established, it suffices under *Arlington Heights* to establish liability if the Enacted Plan bears more heavily on Black voters. Or Latino voters. Or any other group. The Constitution does not demand that Plaintiffs be members of a class so numerous as to constitute the majority of a potential alternative precinct in order to show that they have suffered a discriminatory effect as a result of the County's discriminatory intent. As the *LULAC I* court explained, "though Plaintiffs must show discriminatory effect to prevail on their intentional-vote-dilution theory . . . this Court concludes that that discriminatory effect does not require the benchmark district to meet all, or any, of the *Gingles* requirements for a Section 2 district." *Id.* at 164.

Nothing in *Callais* affects this conclusion or in any way suggests that the *Gingles* framework is applicable to intentional discrimination claims like those still at issue. Instead, the Court's analysis makes abundantly clear that the *Gingles* framework and *Callais*'s modifications of it are applicable only to effects claims under Section 2 of the Voting Rights Act. *See, e.g.*, *Callais*, 146 S. Ct. at 1146 ("To succeed in proving a [Section] 2 violation, *Gingles* taught, a plaintiff must make four showings."); *id.* at 1157 ("interpretation of [Section] 2 does not require abandonment of the *Gingles* framework"); *id.* at 1161 ("[W]e now update the *Gingles* test to ensure a constitutional reading and application of [Section] 2."). Consequently, here too, *Callais* has no bearing on Plaintiff's intentional vote dilution claims under either Section 2 or the Fourteenth and Fifteenth Amendments, the analytical framework for which remains untouched.

     **iii.**    **This Court should find that Galveston engaged in intentional discrimination during the 2021 redistricting of the Galveston County Commission.**

As Plaintiffs have already demonstrated, *see* ECF No. 239 ¶¶ 94–148 (Conclusions of Law); ECF No. 240 at 8–25; ECF No. 247 at 6–15; ECF No. 288 at 28–41; ECF No. 290 at 6–8, there can be no question that Defendants' purpose during the 2021 redistricting cycle was to eliminate the sole performing majority-minority Commissioners Court precinct. This conclusion is established through both direct evidence of discriminatory intent as well as evidence regarding Defendants' actions in creating and adopting the Enacted Plan that overwhelmingly satisfies the *Arlington Heights* factors. *See* ECF No. 288 at 28–41.

As this Court has already found, "[t]he enacted plan creates an evident and foreseeable impact on racial minorities in Galveston County by eliminating the sole majority-minority precinct." ECF No. 250 ¶ 157. "Likewise, [] the commissioners court was aware of that fact when it adopted the enacted plan." *Id.* ¶ 158. Under these circumstances, there is a "strong inference" that adverse effects were desired when they were an inevitable, but otherwise avoidable result of a government's chosen action. *Pers. Adm'r of Mass.*, 442 U.S. at 279 n.25. "[T]he disparate and discriminatory dilutive impact" of a proposed plan, "and the knowledge that it would occur . . . provide objective evidence that, combined with other evidence, provide ample support for finding discriminatory intent." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 728 (S.D. Tex. 2017).

Direct evidence clearly establishes that, from the outset, dismantling Benchmark Precinct 3 was the primary goal in the formation of the Enacted Plan. *See* ECF No. 288 at

28–29; ECF No. 250 ¶¶ 158, 232–34, 240–47. Indeed, the Enacted Plan was created based on specific instructions from Judge Henry to Mr. Oldham, even though Judge Henry knew that his "visualization," brought to life by Oldham, had been thwarted a decade earlier *because* it reduced Black voting strength. *See* ECF No. 288 at 29–30; ECF No. 250 ¶¶ 209–10. Defendants further understood that the Enacted Plan would eliminate minority voters' ability to elect a candidate of their choice to the Commissioners Court. *See* ECF No. 288 at 30–31; ECF No. 250 ¶ 158. Defendants, meanwhile, provided no credible, non-racial justification for the passage of their 2021 Commissioners Court map, which completely dismantled the existing Precinct 3. *See* ECF No. 288 at 30–31; ECF No. 250 ¶¶ 212, 279–92. And such dismantling was unnecessary and avoidable to achieve any purported goal. *See* ECF No. 288 at 31–32; ECF No. 250 ¶¶ 80, 85, 88, 100, 213–14, 286–87, 414. Of particular note in light of *Callais*, this Court has already recognized that partisanship "did not require the enacted plan's configuration, as all members of the Commissioners Court who voted for the enacted plan disclaimed partisanship as a predominating consideration." ECF No. 250 ¶ 289. In sum, ample direct evidence establishes that Defendants had "the intent to disproportionately and discriminatorily dilute Latino [and Black] minority voting strength and act[ed] in order to achieve that goal," thus compelling a finding of intentional discrimination. *Patino*, 230 F. Supp. 3d at 728.

In addition to direct evidence of discriminatory intent, evidence adduced at trial also demonstrates the presence of all five *Arlington Heights* factors, further supporting a finding that the Enacted Plan was passed with discriminatory intent. *See* ECF No. 288 at 33–41. *First*, the Enacted Plan "bears more heavily on one race than another," *Arlington*

*Heights*, 429 U.S. at 266, which shows discriminatory effects sufficient to accompany a discriminatory intent claim, *see LULAC I*, 601 F. Supp. 3d at 170; *see also* ECF No. 288 at 33–34. This Court has already concluded that Black and Latino voters in former Precinct 3 supported Commissioner Holmes as their candidate of choice, but under the Enacted Plan, neither Black nor Latino voters will be able to elect their preferred candidates to the Commissioners Court. *See* ECF No. 250 ¶¶ 107–42, 382–400. In contrast, Anglo voters in the County will see the Enacted Plan provide a windfall of representation—increasing from three to four the number of precincts in which the Anglo-preferred candidate is likely to prevail.

*Second*, the historical background, on balance, weighs in favor of a finding of intentional discrimination, as this Court itself explained the long history of both official discrimination in Galveston County and Section 5 preclearance objection letters to redistricting maps from the United States Attorney General from 1975 through 2013. *See* ECF No. 288 at 34–35; ECF No. 250 ¶¶ 160–63, 169–78, 182–85.

*Third*, the sequence of events leading up to the adoption of the Enacted Plan further points to a finding of intentional discrimination. *See* ECF No. 288 at 35–38; ECF No. 250 ¶¶ 191–92, 196, 198, 200–11, 248–52. The process leading to the Enacted Plan included review by the Commissioners Court's mapmaker, Oldham, of "racial-shading maps . . . after the census-data release to identify where Black populations were concentrated." ECF No. 250 ¶ 198. And as explained *supra*, this Court has already rejected as pretext all nonracial justifications that have been offered to explain the map—including partisanship. If a Section 2 plaintiff "cannot use race as a districting criterion" in producing *Gingles*

11

demonstrative maps because doing so "would be unconstitutional if a State engaged in such mapmaking," *Callais*, 146 S. Ct. at 1159, then Oldham's confession on cross examination that he consulted racial shading maps "to identify where Black populations were concentrated," ECF No. 250 ¶ 198, should start and end the analysis.

*Fourth*, the Court has likewise already credited expert testimony demonstrating substantial procedural departures from the normal redistricting process and concluded that "[t]he record evidence and lay testimony adduced at trial substantiate these procedural departures," including but not limited to "(1) failure to adopt a timeline, (2) failure to adopt any publicly available redistricting criteria to guide the process, (3) lack of transparency in engaging redistricting counsel, (4) lack of public notice and availability for comment, (5) conduct surrounding the November 12 special meeting, (6) disregard for minority input, and (7) exclusion of Commissioner Holmes from the process." ECF No. 250 ¶ 232; *see also id.* ¶¶ 233–78; ECF No. 288 at 38–39.

*Finally*, legislative history reveals Defendants' discriminatory intent, including a process marked from the outset by a focus on race and tight control by Judge Henry, the exclusion of the sole non-Anglo commissioner from the decision-making process and refusal to seriously consider his concerns, and the culminative November 12 meeting, at which Henry was "ugly" and "aggressive" toward the mostly minority members of the public in attendance, threatening to have them removed by constables for asking him to speak more loudly so they could hear him. *See* ECF No. 288 at 39–41; ECF No. 250 ¶¶ 158, 198, 209, 217, 233–34, 236, 272–74, 277–78.

In sum, given that *Callais* did not address and thus did not change the legal framework for analyzing Plaintiffs' intentional discrimination claims, the direct and circumstantial evidence compel a finding that intentional discrimination, and specifically the dismantling of the county's sole majority-minority commissioners precinct, was a motivating purpose of the Enacted Plan's design and adoption, and a but for cause of its impact on Galveston's Black and Latino voters.

**B.    Plaintiffs still prevail on their racial gerrymandering claim under the Callais framework.**

    **i.   Callais affirmed that racial gerrymandering occurs when race overrides political considerations, as occurred in Galveston.**

*Callais* supports a finding of racial gerrymandering in the drawing of the 2021 map. *Callais* addressed whether and to what extent a state may raise compliance with Section 2 of the Voting Rights Act as a defense against a claim of racial gerrymandering. [3] *Louisiana v. Callais*, 146 S. Ct. 1131, 1153 (2026). Specifically, Louisiana defended their map by claiming that they were required to draw it to comply with Section 2 of the Voting Rights Act. *Id.* at 1149–51. The Supreme Court held that because Section 2 compliance did not justify the creation of the new map, the map was an unconstitutional racial gerrymander. *Id.* at 1161–62. In determining whether Section 2 justified the creation of the new map, the

---

[3] The Court also reinterpreted the *Gingles* preconditions for a Section 2 effects claim to consider whether "the competing explanation that political considerations dominated the legislature's redistricting efforts." *Callais*, 146 S. Ct. at 1157. Specifically, under the first *Gingles* precondition, "in drawing illustrative maps, plaintiffs cannot use race as a districting criterion." *Id.* at 1159. Additionally, "illustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals." *Id.* To satisfy the second and third *Gingles* preconditions, Plaintiffs "must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation." *Id.*

Court specifically noted that Louisiana had offered partisanship as the primary justification for the creation of the initial map which was later held to violate Section 2's prohibition against racial vote dilution. *Id.* at 1161.

In so doing, the Supreme Court affirmed its previous holding in *Alexander v. South Carolina State Conference of the NAACP* that "when a State defends a districting scheme on the ground that it was drawn for partisan purposes," in defense to a claim of racial gerrymandering, "plaintiffs have a 'special' burden to overcome." *Callais*, 146 S. Ct. at 1156 (citing *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 9–10 (2024)).

Galveston, however, has disclaimed *both* partisanship and Voting Rights Act compliance in the drawing of the Enacted Plan. *Callais*, therefore, does not directly address Plaintiffs' claims here, and this Court need not assess whether Section 2 compliance serves as a compelling governmental interest to justify Galveston's express consideration of race. Indeed, Galveston "disclaimed any requirement to draw a precinct that conformed with Section 2 of the Voting Rights Act." ECF No. 250 ¶ 284; ECF No. 231 at 61–62 (Oldham). At least one commissioner, Commissioner Apffel, "knew of Commissioner Holmes's concerns about the potential Voting Rights Act violation," but ignored it. ECF No. 250 ¶ 284. Fatally, Galveston's mapmaker "Oldham testified that the elimination of preclearance facilitated the dismantling of the majority-minority precinct." ECF No. 250 ¶ 234 (citing ECF No. 231 at 59–60). In the absence of all doubt, Galveston expressly considered race in eliminating benchmark Precinct 3, admitting that it targeted Precinct 3 because the precinct favored minority voters. *E.g.*, ECF No. 250 ¶ 157 ("Oldham . . . acknowledged that the benchmark plan included a performing precinct for minority voters while the

14

enacted plan no longer does."); *id.* ¶ 292 (finding that Judge Henry and Commissioner Apffel believed that Precinct 3 had been "racially gerrymandered in favor of minorities"). And as this Court found, "all members of the commissioners court who voted for the enacted plan disclaimed partisanship as a predominating consideration." ECF No. 250 ¶ 289 (citing ECF Nos. 228 at 197, 304; 232 at 98, 355–56); *cf. Callais*, 146 S. Ct. at 1162 (affirming the Court's prior vote dilution determination in *Allen v. Milligan*, 599 U.S. 1 (2023), because "the State did not defend its map on the ground that it was drawn to achieve a political objective"). This express consideration of race and waiver of politics would alone demonstrate that, under *Callais*, Plaintiffs have met their "special burden" of "disentangl[ing] race from politics by proving that the former *drove* a district's lines." *Callais*, 146 S. Ct. at 1156–57 (citation modified). A plaintiff need not disprove a justification that the government disclaims.

### ii. Under Callais and Alexander, this Court should enter final judgment in favor of Plaintiffs on their racial gerrymandering claims.

Even if Galveston had not waived the defenses of partisanship or VRA compliance, Plaintiffs have still shown that the Enacted Plan was a racial gerrymander under the burden-shifting framework in *Callais* and *Alexander*. "To prevail, a plaintiff must disentangle race from politics by proving that the former *drove* a district's lines." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 9–10 (2024) (citation modified); *Callais*, 146 S. Ct. at 1156–57. "That means, among other things, ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts." *Id.* Additionally, "in assessing a legislature's work, we start with a presumption that the legislature acted in

15

good faith." *Alexander*, 602 U.S. at 6. The Enacted Plan is a racial gerrymander because it eliminated the only majority-minority district with the intent to disfavor minority voters. *See, e.g.*, ECF No. 250 ¶ 292. This Court detailed specific factual findings demonstrating that Galveston's purported nonracial criteria were wholly unsupported by the Defendants' own admissions, such that Plaintiffs have met their burden that racial concerns drove the drawing of the Enacted Plan.

Any presumption of legislative good faith is overcome by the Court's previous finding that "[t]he plaintiffs have provided several illustrative map configurations that perform as well or better than the enacted plan under the disclosed criteria." ECF No. 250 ¶ 283; *Alexander*, 602 U.S. at 10; *Callais*, 146 S. Ct. at 1156; *accord Allen v. Milligan*, No. 25A1314, 2026 WL 1552756, at *1 (U.S. June 2, 2026). As this Court previously found, of Galveston's purported redistricting criteria—(1) compliance with federal law, (2) the creation of a coastal precinct, (3) geographic compactness, (4) minimizing voting precinct splits, (5) incumbency protection, (6) partisanship, and (7) "adopt[ing] a map that would be clear and easy to understand by the public"—"[t]he rationales stated by members of the commissioners court in public, in deposition testimony, and at trial are inconsistent with these purported criteria." ECF No. 250 ¶ 280.

Plaintiffs' several alternative maps "achieve[] all the State's objectives—including partisan advantage and any of the State's other political goals—at least as well as [Galveston's] map" to "rul[e] out the competing explanation that political considerations dominated the legislature's redistricting efforts." *Callais*, 146 S. Ct. at 1157 (citation omitted). Specifically, Plaintiffs provided alternative maps that comported with all seven

16

of Galveston's purported nonracial criteria—including partisanship and the creation of a coastal precinct—while maintaining Precinct 3 as a majority-minority district. Plaintiffs' expert Dr. Rush presented seven illustrative plans which maintained Precinct 3 as a majority-minority district while maintaining the 3-1 Republican majority of the precinct. ECF No. 250 ¶ 79; PX 487 ¶¶ 34–54, 415–18. Four of those maps contained coastal precincts. ECF No. 250 ¶ 80; PX 415–18. And, Dr. Rush "did not consider race or ethnicity while creating his maps." ECF No. 250 ¶ 95; *accord Callais*, 146 S. Ct. at 1159 (holding that in a results-based Section 2 claim, "in drawing illustrative maps, plaintiffs cannot use race as a districting criterion"). Galveston's mapmaker "admitted that it was possible to retain a majority-minority precinct while also creating a coastal precinct without dismantling benchmark Precinct 3." ECF No. 250 ¶ 213 (citing ECF No. 231 at 164, 167–68, 171. All seven maps were more compact or equally compact as the 2021 map. ECF No. 250 ¶ 286. Additionally, Dr. Rush's maps minimize precinct splits and "protect the incumbency of the current commissioners while also preserving a majority-minority precinct." ECF No. 250 ¶ 288 (citing ECF No. 232 at 157–58), while the Enacted Plan deviates from these purported factors because the Enacted Plan split a precinct to accommodate an incumbent residence. ECF No. 223 at 83–85 (Cooper). Even though the claimed goal of low population deviation was belied by the record, as well as deemed unnecessary in testimony by the experts,[4] Plaintiffs' alternative maps still achieved this goal. *See* PX 191. At least three of Dr. Rush's coastal precincts had a population deviation

---

[4] *See* ECF No. 223 at 140–41, 186.

of under 2.5%, another goal outlined to map drawer Thomas Bryan. PX 191, PX 485. Dr. Cooper developed a map that had a single coastal precinct with a population deviation *lower* than that of the Enacted Plan while maintaining a majority-minority district. ECF No. 250 at 35-36 *citing* ECF No. 223 at 62–63; PX 386 ¶¶ 87–90.

"As for the final criterion, that the map be 'clear and easy to understand by the public,'" this Court found that the 2021 map *increased* public confusion by shifting entire voting districts into new precincts, ECF No. 250 ¶ 290, while Plaintiffs' alternative maps hewed closer to the previous map with which the public has been familiar for the last three decades, *while creating a coastal precinct*:



18



*Burch Alternative Map 2*



*Burch Alternative Map 3*

Put together, Plaintiffs have produced multiple "alternative map[s] showing that a rational legislature sincerely driven by its professed partisan goals would have drawn a different map with greater racial balance." *Alexander*, 602 U.S. at 10. And, given Galveston's knowledge that a coastal precinct and partisan majority was possible without dismantling Precinct 3, Galveston "cannot provide a legitimate reason for rejecting all those maps and eliminating all majority-minority districts." *Callais*, 146 S. Ct. at 1156.

Thus, this Court should enter judgment in favor of Plaintiffs on their racial gerrymandering claims.

## C.    The current case law supports a judgment in favor of Plaintiffs.

Recent caselaw supports finding that Galveston intentionally discriminated against Black and Latino voters in Galveston County and drew a racially gerrymandered map for the County Commission.

### i.    *Alexander v. South Carolina State Conference of the NAACP* and its progeny.

Following this Court's findings in October 2023, the Supreme Court provided further guidance on how to evaluate racial gerrymandering and intentional vote dilution claims in *Alexander*. 602 U.S. 1 (2024). Under *Alexander*, plaintiffs alleging racial gerrymandering claims must "show that race was the 'predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* at 7 (internal citations omitted). As discussed *infra*, Defendants vehemently disclaimed partisanship as motivation for their Enacted Plan, and Plaintiffs drafted several alternative maps that achieved the Defendants' actual stated goals. *See* ECF No. 250 at 101 (citing ECF Nos. 228 at 197, 304; 231 at 153–54; 232 at 98, 355–56); *compare Alexander*, 602 U.S. at 25 (where South Carolina raised partisan-gerrymandering defense at trial). Recent cases have applied *Alexander* to determine whether partisanship can explain the racial composition and dilutive racial effects of redistricting plans. *See Jackson v. Tarrant Cnty.*, 158 F.4th 571, 590 (5th Cir. 2025) ("[A] jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were conscious of that fact.") (internal citations

20

omitted); *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025) (finding an alternative map necessary where the State claimed partisan goals in mapdrawing); *Cubanos Pa'Lante v. Fla. House of Representatives*, 810 F. Supp. 3d 1292, 1301 (S.D. Fla. 2025) (citing *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189–90 (2017)) ("Even where a map respects traditional, race-neutral districting criteria, 'if race for its own sake is the overriding reason for choosing one map over others' or if 'race-neutral considerations came into play only after the race-based decision had been made,' then 'race still may predominate.'").

In addition to these alternative maps, *Alexander* affirmed that direct evidence may point to race playing a predominant role in the development and adoption of the Enacted Plan. *See Alexander*, 602 U.S. at 8 ("Direct evidence often comes in the form of a relevant state actor's express acknowledgement that race played a role in the drawing of district lines."). Judge Mark Henry made clear his belief that he would not have accepted any map iteration that kept Precinct 3 as a majority minority. ECF No. 228 at 305. This description of the non-negotiable criteria by Judge Henry illustrates that "racial considerations" predominated the drawing of the Enacted Plan. *Alexander*, 602 U.S. at 7–8. Judge Henry's insistence that Precinct 3's minority population must be dismantled "could not be compromised" by the Defendants. *Id.* Under *Alexander*, Plaintiffs demonstrate by a preponderance of the evidence that the Enacted Plan was an unlawful racial gerrymander.

### ii.  *Singleton v. Allen* and *Allen v. Milligan*.

*Singleton v. Allen*, No. 2:21-cv-1291-AMM, 2026 WL 1469518 (N.D. Ala. May 26, 2026), was the first chance for a district court to address Section 2 and intentional vote

dilution claims after *Callais*. In 2025, a three-judge panel found that Alabama's 2023 redistricting plan violated Section 2 and constitutional vote dilution, after the Supreme Court affirmed the lower court's preliminary injunction finding a Section 2 violation in *Allen v. Milligan*, 599 U.S. 1 (2023). The Supreme Court vacated and remanded the 2025 trial decision in light of *Callais*. *Allen v. Caster*, 146 S. Ct. 1196, 1196 (2026). After *Callais*, Alabama sought to reinstate the 2023 plan, and the challengers filed a preliminary injunction seeking to prevent the implementation of that plan. The three-judge panel issued a preliminary injunction, ruling that their previous findings of unlawful vote dilution and intentional discrimination were "undisturbed by *Callais*." *Singleton*, 2026 WL 1469518, at *12. Specifically, the three-judge panel concluded that "[t]he Supreme Court had no occasion to consider in *Callais* the standard for intentional discrimination under the Fourteenth Amendment" and applied *Arlington Heights* to Plaintiffs' constitutional vote dilution claims. *Id.* at *12. The three-judge panel ruled that "the Legislature intended to discriminate against Black voters based on race when it passed the 2023 Plan." *Id.* at *18. The panel rejected the State's posttrial partisanship defense, noting that the defense belied "the evidence of its own contemporaneous statements and reasons. The State cannot avoid liability by way of revisionist history." *Id.* at *20. The court also found a results-based vote dilution violation under Section 2. *Id.* at *21–22 Applying the updated *Gingles* factors under *Callais,* the court found that "from all the evidence that race is the core driver of voting behavior and election results in Alabama." *Id.* at *26. Therefore, "Black Alabamians in the districts at issue in these cases have less opportunity than their

22

majority counterparts because of race, not just because of partisan affiliation." *Id.* (internal quotation marks omitted) (quoting *Callais*, 146 S. Ct. at 1159).

The Supreme Court stayed the lower court's preliminarily injunction. *Allen v. Milligan*, No. 25A1314, 2026 WL 1552756, at *1 (U.S. June 2, 2026). However, the Court's nondispositve[5] stay order only reaffirms that Plaintiffs here are entitled to final judgment in their favor. In *Allen*, the Court determined that the State was likely to succeed on the merits because "the District Court found a violation even though the plaintiffs' alternative map would not perform just as well as to the State's constitutionally permissible criteria of keeping together the Gulf Coast community of interest and avoiding the pairing of incumbents." *Allen*, 2026 WL 1552756, at *1. Here, as explained *supra* Part B, Plaintiffs achieved all of Galveston's purported criteria, including incumbent protection and maintaining a coastal precinct, while maintaining a majority-minority Precinct 3.

And here, unlike in *Allen*, this Court did not credit the "mere fact that voters of different races vote for different parties." *Id.* Instead, the Court made specific findings that "race provides a plausible explanation for voting patterns in Galveston County," ECF No. 250 ¶ 151, including evidence of "intra-party disparities show[ing] that black voters had less opportunity to elect their preferred candidate because of their race, not because of their partisan affiliation." *Callais*, 146 S. Ct. at 1158; *compare with* ECF No. 250 ¶¶ 143–51.

---

[5] The Supreme Court itself has stated that these interim decisions do not themselves create "make or signal any change to voting rights law." *Merrill v. Milligan*, 142 S. Ct. 879 (2022) ("The stay order is not a ruling on the merits, but instead simply stays the District Court's injunction pending a ruling on the merits.") (later ruling in favor of the plaintiffs, *Allen v. Milligan*, 599 U.S. 1 (2023)).

Racial appeals continue to be used by candidates running campaigns in Galveston County, leading to "racial attitudes and concerns more salient in the minds of voters." ECF No. 250 at 106–07 *citing* PX 335 ¶¶ 76–77; PX 414 at 33; ECF No. 225 at 237–38. Local nonpartisan elections showed cohesion from Black and Latino voters and that minority candidates elected in such elections were elected in minority-majority districts. ECF No. 250 at 50–51 *citing* PX 476 ¶ 56. Results showed severe extremity in Anglo voting in opposition to minority preferred candidates and as mentioned *supra*, Anglo Democrats crossed party lines to avoid voting for a minority candidate. All of these factors, taken together, show that race rather than partisanship account for the racially polarized voting in Galveston County.

Finally, this Court's factual findings appropriately consider, then reject, the presumption of legislative good faith by concluding that Plaintiffs' alternative maps meet or beat all of the County's purported criteria. *Cf. Allen*, 2026 WL 1552756, at *1. Therefore, even under *Allen*, Plaintiffs still succeed on all their constitutional claims.

*    *    *

Nothing about the Supreme Court's recent decisions disturbs this Court's previous findings that "the enacted plan illegally dilutes the voting power of Galveston County's Black and Latino voters by dismantling Precinct 3, the county's historic and sole majority-minority commissioners precinct," ECF No. 250 at 7; that Galveston held "a disregard for public input from the minority communities and those critical of the enacted plan's discriminatory effect," *id.* ¶ 269; and that "the commissioners court was aware of" the discriminatory impact "when it adopted the enacted plan," *id.* ¶ 158. Therefore, this Court

24

should find that the Enacted Plan, and Galveston's process for implementing it, violates Section 2 and the Fourteenth and Fifteenth Amendments.

## CONCLUSION

For the foregoing reasons, Petteway Plaintiffs respectfully request that this Court enter final judgment in their favor.

Respectfully submitted this 16th day of June, 2026.

Chad W. Dunn (Tex. Bar No. 24036507)
Brazil & Dunn
1900 Pearl Street
Austin, TX 78705
(512) 717-9822
chad@brazilanddunn.com

Bernadette Reyes*
Sonni Waknin*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
bernadette@uclavrp.org
sonni@uclavrp.org

Neil G. Baron
Law Office of Neil G. Baron
1010 E Main Street, Ste. A
League City, TX 77573
(281) 534-2748
neil@ngbaronlaw.com

/s/ Valencia Richardson
Valencia Richardson*
Mark P. Gaber*
Simone Leeper*
Alexandra Copper*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
sleeper@campaignlegal.org
vrichardson@campaignlegal.org
acopper@campaignlegal.org

*Admitted *pro hac vice*

*COUNSEL FOR PETTEWAY PLAINTIFFS*

25

## CERTIFICATE OF SERVICE

I certify that on June 16, 2026, the foregoing document was filed electronically and served on all parties of record via CM/ECF, and that the document complies with the page limitations set out by the Court.

/s/*Valencia Richardson*
Valencia Richardson

26