**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| TERRY PETTEWAY, THE HONORABLE DERRECK ROSE, and PENNY POPE, | § § § § | |
| *Plaintiffs*, | § § | |
| | § | Civil Action No. 3:22-cv-57 |
| v. | § | [Lead Consolidated Case] |
| | § | |
| GALVESTON, TEXAS, and HONORABLE MARK HENRY, in his official capacity as Galveston County Judge, | § § § § § | |
| *Defendants*. | § § | |
| | § | |

**NAACP/LULAC PLAINTIFFS' SUPPLEMENTAL BRIEF ON RACIAL
GERRYMANDERING AND INTENTIONAL DISCRIMINATION CLAIMS**

**TABLE OF CONTENTS**

I.   Introduction ...................................................................................................... 1

II.  The *Callais* holding, applied here, requires a finding of racial gerrymandering. ........ 5

    A.   The commissioners court had an underlying, explicitly racial goal in designing and adopting the enacted plan: to dismantle the existing majority-minority district ....... 5

    B.   The enacted plan harms Galveston's Black and Latino communities distinctly and regardless of whether they form a coalition voting bloc. ....................................... 12

    C.   The enacted plan fails strict scrutiny. .................................................................. 14

III. Discriminatory intent was at least a motivating factor in the adoption of the enacted plan causing discriminatory injury. ................................................................................. 15

    A.   The facts here overcome the presumption of legislative good faith. ..................... 17

    B.   Plaintiffs' alternative plans account for all other criteria, including the creation of a coastal precinct. ................................................................................................... 24

    C.   Plaintiffs can still prove discriminatory harm against Black and Latino voters separate and apart from their collective coalition. .................................................. 26

IV.  Conclusion ........................................................................................................ 29

ii

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418 (2025) ........................ 3, 13

*Abbott v. Perez*, 585 U.S. 579 (2018) ........................................................................ 18, 20

*Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1 (2024) ... passim

*Allen v. Milligan*, 608 U.S. __, No. 25A1314, 2026 WL 1552756 (June 2, 2026) .... passim

*Bartlett v. Strickland*, 556 U.S. 1 (2009) .................................................................... 19, 26

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) .................................................................. 26

*Callais v. Landry*, 732 F. Supp. 3d 574, 590 (W.D. La. 2024), *aff'd Louisiana v. Callais*, 608 U.S. __, 146 S. Ct. 1131 (2026) .............................................................................. 16

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) ............................................... 5

*Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161 (2d Cir. 2024) ......... 29

*Christian Ministerial All. v. Jester,* 786 F. Supp. 3d 1134 (E.D. Ark. 2025) ................... 12

*Dowdell v. City of Apopka*, 698 F.2d 1181 (11th Cir. 1983) ............................................. 29

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) .................................................................... 29

*Hunter v. Underwood*, 471 U.S. 222 (1985) ............................................................... 28, 31

*Jackson v. Tarrant County*, 158 F.4th 571 (5th Cir. 2025) .................................. 27, 28, 29

*Johnson v. Waller Cnty.*, 593 F. Supp. 3d 540 (S.D. Tex. 2022) ...................................... 31

*League of United Latin Am. Citizens v. Abbott*, 809 F. Supp. 3d 502 (W.D. Tex. 2025), *rev'd sub nom.*, *Abbott v. LULAC*, No. 25-845, 2026 WL 1127246 (U.S. Apr. 27, 2026) ........................................................................................................................ 3, 12, 13

*Louisiana v. Callais*, 608 U.S. __, 146 S. Ct. 1131 (2026) ........................................ passim

*Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025) .............................................. 20

*Miller v. Johnson*, 515 U.S. 900 (1995) ..................................................................... 14, 30

*Miss. State Conf. of Nat'l Ass'n for Advancement of Colored People v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383 (S.D. Miss. 2024) ........................................... 12

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) ............................ 29

*Olibas v. Native Oilfield Servs., LLC*, 104 F. Supp. 3d 791 (N.D. Tex. 2015) ................. 10

*Petteway v. Galveston Cnty.*, 86 F.4th 214 (5th Cir. 2023) ................................................. 5

*Shaw v. Reno*, 509 U.S. 630 (1993) .................................................................................... 14

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) .................................................................... 22

*Singleton v. Allen*, __ F. Supp. 3d __, No. 2:21-cv-1291-AMM, 2026 WL 1469518 (N.D. Al. May 26, 2026) ........................................................................................................ 2, 19

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ..................................................................................................................... 14

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)). ............................................................................................................. 19, 28, 30

iv

## I.　　Introduction

Plaintiffs Dickinson/Bay Area NAACP, Galveston NAACP, Mainland NAACP, LULAC Council 151, Edna Courville, and Joe Compian ("Plaintiffs") respectfully submit this Supplemental Briefing pursuant to the Court's May 19, 2026, Order.

The Supreme Court's decision in *Louisiana v. Callais*, 608 U.S. __, 146 S. Ct. 1131 (2026), "update[d] the *Gingles* framework" applicable to effects-based claims under § 2 of the Voting Rights Act and clarified and applied the standards for racial gerrymandering set forth in *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1, 10 (2024). Since issuing *Callais*, the Supreme Court has also indicated that certain principles in *Callais* may possibly be relevant to claims of intentional discrimination when (unlike here) those claims rest on legislators' failure to draw new majority-minority districts as remedial relief following § 2 litigation decided under the pre-*Callais* standard. *See Allen v. Milligan*, 608 U.S. __, No. 25A1314, 2026 WL 1552756 (June 2, 2026) (granting applications for a stay of the district court opinion in *Singleton v. Allen*, __ F. Supp. 3d __, No. 2:21-cv-1291-AMM, 2026 WL 1469518 (N.D. Al. May 26, 2026)).

A reexamination of the evidence here, and in light of these recent decisions, confirms what Plaintiffs proved at trial: the Galveston County Commissioners Court unlawfully and intentionally dismantled the longstanding, sole majority-minority commissioners district in violation of the Fourteenth and Fifteenth Amendments. This is true based on several undeniable circumstances that make Galveston's redistricting unique from other redistricting cases and especially egregious:

*First*, this case is about the intentional dismantling of an *existing* majority-minority district (Precinct 3) in which Black and Latino voters already had an opportunity to elect a candidate of their choice, in order to create an additional majority-Anglo district. "The circumstances and effect of the enacted plan were 'mean-spirited' and 'egregious' given that 'there was absolutely no reason to make major changes to Precinct 3.'" Findings of Fact and Conclusions of Law, Dkt. 250 ¶ 420 (quoting Bench Trial Transcript, Dkt. 223 at 42–43). As this Court observed, "it is stunning how completely the county extinguished the Black and Latino communities' voice on its commissioners court during 2021's redistricting." *Id.* ¶ 418. The intentional destruction of an *existing* district distinguishes the claims in this case from the minority voters' claims in Alabama[1] and Louisiana[2], and the "mean-spirited," "egregious" and "stunning" circumstances here make this case the rare instance in which even a strong presumption of good faith of legislators is overcome.

*Second*, partisan considerations "did not require the enacted plan's configuration, as all members of the commissioners court who voted for the enacted plan disclaimed partisanship as a predominating consideration" and the lead mapping consultant, Dale Oldham, "denied there was any such partisan motivation." Dkt. 250 ¶ 289. These facts further distinguish this case from other recent decisions, including out of Texas, where partisanship was not expressly disclaimed by lawmakers, and "partisanship was

---

[1] *See Milligan*, 2026 WL 1552756, at *1 ("The District Court had held that the State's map violated § 2 because it had only one in which black voters were a majority and did not include an additional black-opportunity district." (internal quotation and alteration omitted)).

[2] *See Callais*, 146 S. Ct. at 1142 ("In 2022, a federal judge in the Middle District of Louisiana held that the map adopted by the state legislature likely violated § 2 because it did not include an additional majority-black district.").

undoubtedly a motivating factor in the 2025 redistricting process." *League of United Latin Am. Citizens v. Abbott*, 809 F. Supp. 3d 502, 559 (W.D. Tex. 2025), *rev'd sub nom.*, *Abbott v. LULAC*, No. 25-845, 2026 WL 1127246 (U.S. Apr. 27, 2026); *see also Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 422 (2025) (Kagan, J., dissenting) (noting plaintiffs "did not contest that . . . politics made Republican state legislators glad to vote for the map eventually developed"). Here, there is no burden on Plaintiffs to disentangle race from partisan intent when Defendants have already disclaimed it.

*Third*, Plaintiffs provided "several illustrative map configurations that perform as well or better than the enacted plan under the disclosed criteria." Dkt. 250 ¶ 283. Plaintiffs (and the Court) took Defendants at their *own* words regarding the criteria they considered and have clearly disproved that any of those criteria—particularly the establishment of a coastal precinct—can justify dismantling Precinct 3. This fact also distinguishes this matter from the recent Alabama emergency order. *Compare id.* ¶ 286 (noting Plaintiffs' alternative plans include "multiple illustrative maps that would create a compact coastal precinct while maintaining a majority-minority Precinct 3") *with Milligan*, 2026 WL 1552756, at *1 (faulting the district court for finding a violation "even though the plaintiffs' alternative map would not perform just as well as to the State's constitutionally permissible criteria of keeping together the Gulf Coast community of interest").

*Finally*, there can be no plausible argument here that Galveston's Commissioners believed in good faith that dismantling Precinct 3 was somehow *required* by the Equal Protection Clause, even after applying a strong presumption of legislative good faith to the facts here. The enacted plan was an intentional design to dismantle an existing district that

3

was otherwise likely to naturally occur. *See* Dkt. 250 ¶ 370 (noting expert illustrative maps "are but a few examples of a multitude of potential districts that are reasonably configured and that contain a majority Black and Latino population by CVAP"). And this was done despite legal advice that adopting a least-change map maintaining the majority-minority precinct was legally permissible. As this Court concluded, the other alternative proposed by the commissioners court, Map 1, was a "minimum change" map that included a majority-minority district, *id.* ¶ 209, and "[b]ased on Oldham's assessment, Judge Henry believed that Maps 1 and 2 were both legally compliant," *id.* ¶ 227. Until Judge Henry convinced them to support Map 2, the other commissioners supported Map 1, *id.* ¶ 216, indicating they also did not think the intentional destruction of Precinct 3 was legally required.

Importantly, the Court's factual findings to date have withstood appeal before both a panel of three Fifth Circuit judges and *en banc* review by the Fifth Circuit. *See Petteway v. Galveston Cnty.*, 86 F.4th 214, 218 (5th Cir. 2023) (holding that, in its factual findings, "[t]he district court . . . did not clearly err"), *vacated en banc on other grounds*, 111 F.4th 596, 599 (5th Cir. 2024) ("We overrule this court's decision in *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988), and its progeny, which allowed such [coalition] claims to be maintained."). Nothing about the updated precedent issued by the Supreme Court needs to disturb the core credibility and factual findings of this Court.

The fundamental holding of *Callais*—that Louisiana's "underlying goal" of creating a majority-minority district in its congressional plan constitutes racial gerrymandering, 146 S. Ct. at 1161—requires a finding of racial gerrymandering here: The underlying intent to

4

create a majority-minority district (in *Callais*) and to dismantle one in favor of a majority-Anglo district (in this case) are two sides of the same coin. And the "egregious" circumstances in which this underlying goal was achieved overcomes even a strong presumption of good faith and further supports that a racially discriminatory intent was at least a motivating factor in the adoption of the enacted plan, constituting intentional discrimination in violation of the Fourteenth and Fifteenth Amendments.

Below, Plaintiffs address in more detail the three specific issues requested in the Order as relevant to each remaining claim, and why the Court should enter final judgment for Plaintiffs on remand. In the interest of judicial efficiency, and given the request for supplemental briefing, Plaintiffs will refer to and rely on prior post-trial briefing, including the recitation of facts and background with which the Court is well acquainted. *See* Plaintiffs' Mot. J., Dkt. 288 at 4–19 (procedural and factual background).

**II.     The *Callais* holding, applied here, requires a finding of racial gerrymandering.**

> *A. The commissioners court had an underlying, explicitly racial goal in designing and adopting the enacted plan: to dismantle the existing majority-minority district.*

In *Callais*, the Supreme Court applied and clarified the analytical framework applicable to Plaintiffs' constitutional claim of racial gerrymandering by holding that Louisiana's "underlying goal" of creating a majority-minority district in its congressional plan triggered strict scrutiny and, ultimately, constituted racial gerrymandering. 146 S. Ct. at 1161. By the same logic, the underlying goal in this matter of *dismantling* a majority-minority district *because* it is majority-minority, and replacing it with an additional

5

majority-Anglo district, likewise triggers strict scrutiny and compels a finding of racial gerrymandering. *See generally*, Dkt. 288 at 5–8, 16–17, 41–44.

The record strongly supports that the underlying goal of the commissioners court in its 2021 redistricting process was to dismantle Precinct 3 as a majority-minority district and to replace it with entirely majority-Anglo districts, resulting in a map representing a "textbook example of a racial gerrymander" with all majority-Anglo districts. Dkt. 250 at 6–7 (quoting Dkt. 223 at 42–43):

1. Race, and specifically the ability to dismantle a long-standing majority-minority district, was at the forefront of County Judge Mark Henry's mind at the start of the redistricting process. *See generally* Dkt. 288 at 6. After the commissioners court voted to retain redistricting counsel, Judge Henry began that engagement by asking Oldham whether the county "had to draw a majority[-]minority district." Dkt. 250 ¶ 192 (quoting PX-144 at 1). It was clear Judge Henry wanted to achieve an overall configuration that dismantled Precinct 3, a configuration he was previously unable to achieve in 2011 because of preclearance requirements under Section 5 of the Voting Rights Act and the clear retrogressive impact doing so would have had on minority, particularly Black, voting strength. *See* Dkt. 231 at 39:9–40:8, 152:15–20 (Oldham); *see also* Dkt. 250 ¶ 200. Whether or not Judge Henry sought to dismantle Precinct 3 because he believed it to be a racial gerrymander, Dkt. 250 ¶ 292, is inapposite since "[a] racial-gerrymandering claim asks whether race predominated in the drawing of a district *regardless* of the motivations

for the use of race." *Alexander*, 602 U.S. at 38 (emphasis added, internal quotations omitted).[3]

In developing the enacted plan (Map 2), Oldham instructed the county's mapdrawer, Thomas Bryan, on its configuration, such that Map 2 represented "'the visualization of the instructions' Judge Henry had provided Oldham." Dkt. 250 ¶¶ 209–210 (quoting Dkt. 231 at 181). Other commissioners initially preferred the "minimum change" alternative Map 1 that included a majority-minority Precinct 3, but Judge Henry convinced them instead to support his design in Map 2. *See* Dkt. 288 at 10–11 (citing Dkt. 250 ¶¶ 216, 220). The evidence thus establishes the "underlying goal" in the commissioners court's 2021 redistricting was to dismantle Precinct 3 as a majority-minority district, as this goal predominated in the map's design and adoption during the redistricting process.

2. The demographic location of Galveston's Black and Latino populations in Precinct 3 was well known to the commissioners court and its consultants. *See* Dkt. 288 at 44 n.12. Any argument that targeting Precinct 3 was non-racial therefore lacks credibility. The commissioners court's redistricting counsel Oldham, as well as Judge Henry and Commissioners Apffel and Giusti, all had a "generally consistent . . . understanding that Galveston County's Black and Latino population was centered around Precinct 3[.]" Dkt. 250 ¶ 198. Since "Bryan did not exercise discretion in drawing Maps 1 or 2; Oldham told

---

[3] The Supreme Court's discussion of the presumption of good faith—or rather lack thereof—in *Callais* is also instructional. Where the "underlying goal was racial" as it was here, *Callais*, 146 S. Ct. at 1161, *Callais* instructs that the Court's analysis proceeds to considering whether it survives strict scrutiny. *See generally id.* (including no discussion of the presumption of good faith).

him where to place the lines[,]" *Id.* ¶ 210, it is irrelevant that Bryan himself may not have displayed or consulted racial data. *Id.* ¶ 211.

3. No other criteria purportedly used in the redistricting process can explain the wholesale dismantling of this district. *See* Dkt. 288 at 43–44 (citing Dkt. 250 ¶¶ 214, 284–285). Specifically, "a desire to create a coastal precinct . . . does not explain [Map 2's] obliteration of benchmark Precinct 3." Dkt. 250 ¶ 214. And, as explained below, Defendants cannot rely on a partisanship defense even under the clarifications provided by the Supreme Court in *Callais*. In fact, Plaintiffs' alternative maps definitively prove that non-racial criteria cannot explain the textbook racial gerrymander present in the enacted map. Plaintiffs provided "several illustrative map configurations that perform as well or better than the enacted plan under the disclosed criteria," *id.* ¶ 283, including "at least five illustrative plans that included both a coastal precinct and a majority-minority Precinct 3." *Id.* ¶ 214 n.11 (citing PX-386 ¶¶ 87–90, PXs-415–418); *cf. Milligan*, 2026 WL 1552756, at *1 (requiring the plaintiffs' alternative map to "perform just as well as to the State's constitutionally permissible criteria of keeping together the Gulf Coast community of interest and avoiding the pairing of incumbents"). And the Court has already found that race did not predominate in the drawing of Plaintiffs' alternative plans. Dkt. 250 ¶ 379. Likewise, Plaintiffs' experts explained race-neutral strategies for developing alternative plans, including those that provide entirely coastal precincts while also maintaining a majority-minority district. *See, e.g.*, *id.* ¶ 85 (describing Cooper Map 2 as "using a least-change strategy for equalizing populations while also including an entirely coastal Precinct 2."); *id.* ¶ 95 ("[R]acial considerations did not predominate in drawing Dr. Rush's

8

illustrative plans, as he did not consider race or ethnicity while creating his maps."); Dkt. 223 at 62:12–63:16 (describing race-neutral factors in the drawing of Cooper Map 2).[4]

Overall, the direct evidence that Judge Henry had an underlying racial goal, and the lack of any other credible explanation for the resulting textbook racial gerrymander in the enacted plan, provide definitive evidence that race predominated in the enacted plan's design and adoption.

### B. Partisanship is not a viable defense for the enacted plan under the racial gerrymandering standard clarified in Callais.

The Court in *Callais* clarified the need to disentangle race from partisanship to prove racial gerrymandering, as first set forth in *Alexander*. Specifically, "in considering the constitutionality of a districting scheme, courts must treat partisan advantage like any other race-neutral aim: a constitutionally permissible criterion that States may rely on as desired." *Callais*, 146 S. Ct. at 1156. "That means, among other things, ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts. If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." *Id.* at 1157 (quoting *Alexander*, 602 U.S. at 9–10). Importantly,

---

[4] Under *Callais*, a plaintiff "cannot use race as a districting criterion" in preparing its *illustrative* maps for proving the first *Gingles* precondition, 146 S. Ct. at 1159, but this requirement has not been placed on *alternative* maps designed to disentangle race from other objectives in racial gerrymandering claims. *See, e.g.*, *Alexander*, 602 U.S. at 10 (requiring "showing that a rational legislature sincerely driven by its professed partisan goals would have drawn a different map with greater racial balance"). Indeed, in the section of *Callais* discussing strict scrutiny for a racial gerrymandering claim, the Court instead focused on what maps "achieve" and not how they are drawn. *See Callais*, 146 S. Ct. at 1161. If, notwithstanding these findings, the Court finds Plaintiffs' alternative maps must meet a different standard following *Callais*, the appropriate step would be to reopen the record regarding alternative map configurations to allow Plaintiffs to provide evidence that accounts for updated Supreme Court guidance. *Cf. Olibas v. Native Oilfield Servs., LLC*, 104 F. Supp. 3d 791, 807 (N.D. Tex. 2015) (noting "[l]ower courts are afforded discretion to reopen the record" (internal quotations omitted)).

9

however, plaintiffs only have this "'special' burden to overcome" "when a State defends a districting scheme on the ground that it was drawn for partisan purposes[.]" *Id.* at 1156 (quoting *Alexander*, 602 U.S. at 9).

Here, no burden exists for Plaintiffs to disentangle race and politics in any alternative map because the districts in the challenged plan were, by Defendants' own admissions, *not* drawn for partisan purposes. *See generally* Dkt. 288 at 8–9, 42–44. While Defendants did later assert (through counsel via interrogatory responses) that partisanship was one of their criteria, their own public statements and testimony were inconsistent with this later assertion. Dkt. 250 ¶¶ 280–81. Judge Henry testified that partisanship "was not a primary concern" and "wasn't my primary driving force," and that he may have only been shown political data "toward the end" of the redistricting process. Dkt. 228 at 197:18–198:10. He never asked his redistricting counsel to run a political analysis of the commissioner precincts. *Id.* at 304:3–6. Commissioner Giusti testified that he considered the inclusion of his and his parents' residence in his precinct, population equalization, and that lines were "drawn in a way that people understood" during the 2021 redistricting process. Dkt. 232 at 88:3–12, 98:1–15. Commissioner Apffel testified that he had no other requests beyond "equalize[d] population" and keeping his new home in his precinct. *Id.* at 304:8–305:5, 307:16–308:7. In sum, "all members of the commissioners court who voted for the enacted plan disclaimed partisanship as a predominating consideration." Dkt. 250 ¶ 289.

There is also no evidence that partisanship guided specific lines: "Oldham testified that he never told Bryan that Judge Henry's purpose for Map 2 was to create four

10

Republican districts, and Oldham denied there was any such partisan motivation." Dkt. 250 ¶ 289 (citing Dkt. 231 at 153–54). The statements by the commissioners who adopted the enacted plan, and the consultants who assisted in its development, definitively "rul[e] out the competing explanation that political considerations dominated the legislature's redistricting efforts." *Callais*, 146 S. Ct. at 1157 (quoting *Alexander*, 602 U.S. at 9–10).

Importantly, this distinguishes this matter from *League of United Latin Am. Citizens v. Abbott*, 809 F. Supp. 3d at 559, *rev'd sub nom.*, *Abbott v. LULAC*, No. 25-845, 2026 WL 1127246 (U.S. Apr. 27, 2026), and other recent cases advancing racial gerrymandering claims where courts relied on evidence of partisan motivation. *See, e.g.*, *Alexander*, 602 U.S. at 18; *Miss. State Conf. of Nat'l Ass'n for Advancement of Colored People v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 409 (S.D. Miss. 2024); *Christian Ministerial All. v. Jester*, 786 F. Supp. 3d 1134, 1148 (E.D. Ark. 2025). In *Abbott*, after detailed factfinding, a three-judge panel enjoined use of Texas's 2025 Congressional Map, finding that racial motivations predominated, while acknowledging that "partisanship was undoubtedly a motivating factor in the 2025 redistricting process[.]" 809 F. Supp. 3d at 559. In contrast to the disavowal of partisanship during Galveston's 2021 redistricting process and at trial in this case, the *Abbott* order acknowledged numerous examples of stated partisan intent, including: (1) "the Trump Administration pressed the State to redistrict for exclusively partisan reasons[,]" (2) the redistricting bill's author spoke of his non-racial partisan intent during the legislative process, and (3) other legislators testified about their partisan objectives. *Id.* at 550, 560–62.

11

In the Supreme Court's order staying the preliminary injunction, it found in its "preliminary evaluation" legal errors relating to the lower court's consideration of "the State's *avowedly* partisan goals." *Abbott*, 146 S. Ct. at 419 (emphasis added). Specifically, the Supreme Court required applying the presumption of legislative good faith even more favorably when construing ambiguous evidence, and (for the first time) drawing a "dispositive or near-dispositive adverse inference" against plaintiffs who failed to produce an alternative map that met the defendant's stated *partisan* goal. *Id.* Here, where the County Judge and commissioners explicitly disclaimed partisan intent, there is no ambiguous evidence to interpret that could restore the presumption of legislative good faith in favor of a partisan goal, and no requirement for Plaintiffs to produce a map to meet any goal but the stated goal of creating a coastal precinct—a requirement which Plaintiffs more than met with Cooper's Maps 2, 3 and 3A. *See* Dkt. 250 ¶ 88.

> B.  *The enacted plan harms Galveston's Black and Latino communities distinctly*
>      *and regardless of whether they form a coalition voting bloc.*

Because the underlying goal of the enacted plan's design was to dismantle a majority-minority district, it constitutes a racial gerrymander harming the Black and Latino voters who were moved from their district to achieve this impermissible racial goal. As made clear by the Supreme Court decades ago:

> [T]he essence of the equal protection claim recognized in *Shaw* [*v. Reno*, 509 U.S. 630 (1993)]*,* is that the State has used race as a basis for separating voters into districts. Just as the State may not, absent extraordinary justification, segregate citizens on the basis of race in its public parks . . . so did we recognize in *Shaw* that it may not separate its citizens into different voting districts on the basis of race. The idea is a simple one: At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.

12

*Miller v. Johnson*, 515 U.S. 900, 911 (1995) (internal quotations omitted). "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Callais*, 146 S. Ct. at 1153 (quoting *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 208 (2023)).

The harm of racial gerrymandering is thus the moving of individuals between districts based on their ancestry. This is the exact harm inflicted by Map 2—a map designed to dismantle a long-standing majority-minority commissioners precinct—when it was ultimately adopted. The Black voters in Precinct 3 were cracked between three remaining districts, *because* they were Black voters, and not part of the Anglo majority. *Compare* PX-345 at 3 (showing Black CVAP distribution in benchmark plan) *with* PX-346 at 3 (showing Black CVAP distribution in enacted plan); *see also* PX-386 ¶¶ 17, 59. The Latino voters in Precinct 3 were cracked between three remaining districts, *because* they were Latino voters, and not part of the Anglo majority. *Compare* PX-345 at 3 (showing Latino CVAP distribution in benchmark plan) *with* PX-346 at 3 (showing Latino CVAP distribution in enacted plan); *see also* PX-386 ¶¶ 17, 59. If they had all been Anglo voters, they would not have comprised the majority-minority district that the commissioners court set out to dismantle. And because these individuals were moved out of their district on this basis, the "enacted plan converted the benchmark Precinct 3 from the precinct with the highest percentage of Black and Latino residents to the one with the lowest." Dkt. 250 ¶ 153.

In this way, the harm of racial gerrymandering is distinct from claims of vote dilution, where the harm stems from the voting populations' polarization and the resulting

minimization or cancelling out of the minority group's voting power on account of race. *See Alexander*, 602 U.S. at 38 ("A vote-dilution claim is analytically distinct from a racial-gerrymandering claim and follows a different analysis." (internal quotations omitted)). But here, it was Plaintiffs' (and other minority voters in Precinct 3's) ancestry as non-Anglo voters that caused them to be cracked into three new districts. *Cf. Callais v. Landry*, 732 F. Supp. 3d 574, 590 (W.D. La. 2024) (finding in favor of racial-gerrymandering plaintiffs self-described as "non-Black voter[s]."), *aff'd Callais*, 146 S. Ct. 1131.

### C. The enacted plan fails strict scrutiny.

The commissioners court's use of race is subject to strict scrutiny and can only be justified by meeting an "'extraordinarily onerous' standard of proving that [the] use of race was narrowly tailored to further a compelling governmental interest." *Callais*, 146 S. Ct. at 1161 (quoting *Alexander*, 602 U.S. at 11). As *Callais* emphasized, the Supreme Court has recognized only three compelling interests that justify the use of race in any context: "avoiding imminent and serious risks to human safety in prisons"; "remediating specific, identified instances of past discrimination that violated the Constitution or a statute"; and a requirement to "create a new majority-minority district" to comply with the VRA. *Id.* at 1152–53, 1161 (internal quotations omitted).

No such government interest is present here. Nor have Defendants claimed that they had such an interest. *See generally* Dkt. 289 at 27–28 (arguing that a compelling interest would be required for the commissioners court to use race to "**keep** a district drawn on the basis of race" but not attempting to justify with a compelling interest the actual use of race to proactively dismantle Precinct 3) (emphasis in original). In other words, Defendants

14

have argued that they *lacked* a compelling reason to pursue a counterfactual path (maintaining Precinct 3 on the basis of race), instead of providing a justification for the race-based redistricting that occurred to dismantle Precinct 3. This defense quickly falls apart in light of the evidence that Defendants were aware of race-neutral redistricting approaches that would not require the creation of an additional majority-Anglo district. For example, their own legal counsel advised that the "minimum change" Map 1 that resulted in a majority-minority in Precinct 3 was legally compliant. Dkt. 250 ¶¶ 209, 227.

At base, the enacted plan remains a "textbook example of a racial gerrymander;" an "egregious" example of the obliteration of a majority non-Anglo district where there was "absolutely no reason" to make changes to it. *Id.* at 5–6 (quoting Dkt. 223 at 42–43). Since the underlying goal of the enacted plan's design and adoption was to crack non-Anglo (Black and Latino) voters among all precincts in favor of creating a fourth majority-Anglo district, which the enacted plan accomplishes with chilling efficiency, a principled application of *Callais* requires a finding of racial gerrymandering in violation of the Fourteenth Amendment.

## III. Discriminatory intent was at least a motivating factor in the adoption of the enacted plan causing discriminatory injury.

The Supreme Court in *Callais* emphasized that the "Fifteenth Amendment bars only state action motivated by a discriminatory purpose." 146 S. Ct. at 1155 (internal quotations omitted). The remaining portions of the opinion address claims of racial gerrymandering under the Fourteenth Amendment (discussed above) and set forth the "updated" standard for claims under § 2 of the Voting Rights Act, but do not otherwise address the standard

15

for claims of intentional discrimination in violation of the Fourteenth and Fifteenth Amendments.

In a subsequent order concerning Alabama's congressional map, the Supreme Court indicated that certain principles from *Callais* may possibly apply to claims of discrimination under the Fourteenth Amendment, granting a stay of the lower court's preliminary injunction on plaintiffs' § 2 and Fourteenth Amendment vote dilution claims. *See generally Milligan*, 2026 WL 1552756. Importantly, the Court applied these principles where the theory of liability was a refusal to draw an *additional* Black-opportunity district as part of a § 2 remedy, *id.* at *1, not the intentional dismantling of an *existing* district, and did not clearly articulate that these principles would apply to intentional discrimination claims unmoored from this procedural posture (as they are here). The Supreme Court signaled that the lower court departed from *Callais* when deciding plaintiffs' intentional vote dilution claims in two ways:

(i)     "[T]he District Court did not heed the presumption of legislative good faith . . . because it interpreted the State's legal disagreement with the court's earlier remedial order as proof of discriminatory animus"; and

(ii)    "the District Court found a violation even though the plaintiffs' alternative map would not perform just as well as to the State's constitutionally permissible criteria of keeping together the Gulf Coast community of interest and avoiding the pairing of incumbents".

*Milligan*, 2026 WL 1552756, at *1 (citing *Alexander*, 602 U.S. 1, 10, *Abbott v. Perez*, 585 U.S. 579, 608-09 (2018), and *Callais*, 146 S. Ct. at 1156.[5]

---

[5] The Court's third assigned error regarding racially polarized voting clearly applies to its analysis of the second *Gingles* precondition applicable under § 2, and not intentional discrimination under the Fourteenth Amendment. *See Milligan*, 2026 WL 1552756, at *1 ("The District Court also failed to follow our instruction in *Callais* that the mere fact that voters of different races vote for different

16

Overall, these recent holdings from the Supreme Court do not alter its prior warning that if a State "intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality). As set forth below, and taking the two relevant assigned errors in *Milligan* in turn, the unusually egregious circumstances here strongly merit finding a violation of the Fourteenth and Fifteenth Amendments due to the intentional destruction of an effective minority opportunity district that performed for both Black and Latino voters. *See also* Dkt. 288 at 20–44 (Plaintiffs' Motion for Judgment on Remanded Claims addressing intentional discrimination claims and the standard under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977)).

> ### A.  *The facts here overcome the presumption of legislative good faith.*

In *Callais,* the Supreme Court did not discuss the presumption of legislative good faith where the "underlying goal was racial" as it was here, 146 S. Ct. at 1161, and where partisan considerations did not drive the challenged plan. *See generally*, *id.* (including no discussion of the presumption of good faith). Accordingly, it would be appropriate here for the Court to similarly find that the underlying racial goal in drafting and adopting the enacted plan, and the lack of partisan justification, overcomes any presumption of legislative good faith.

---

parties is not relevant to proving racially polarized voting patterns."); *Singleton*, 2026 WL 1469518, at *24-26 (citing *Callais* in its assessment of racially polarized voting under the second *Gingles* precondition, and not in relation to the constitutional claim of intentional discrimination).

Likewise, the facts here are easily distinguishable from the Court's stay order in *Milligan,* in which it noted that the Alabama legislature's refusal to comply with a remedial court order was not itself evidence of racial discrimination in violation of the Fourteenth Amendment. 2026 WL 1552756, at *1 (faulting the lower court "because it interpreted the State's legal disagreement with the court's earlier remedial order as proof of discriminatory animus"). In so holding, the Supreme Court cited *Abbott v. Perez*, 585 U.S. at 608–09, which held uncontroversially that evidence of prior mapdrawers' intent must also be "weighed together with any other direct and circumstantial evidence of that Legislature's intent." 585 U.S. at 607. Here, the totality of direct and circumstantial evidence overwhelmingly supports that the commissioners court had no mere legal disagreement; instead, mountains of evidence point to intentional racial discrimination overcoming even a strong presumption of legislative good faith.[6]

Following a two-week bench trial with dozens of witnesses, hundreds of exhibits, and thousands of pages of pre- and post-trial briefing, this Court looked to the totality of the circumstances of Galveston County's redistricting process and concluded:

> This is not a typical redistricting case. What happened here was stark and jarring. The commissioners court transformed Precinct 3 from the precinct with the highest percentage of Black and Latino residents to that with the lowest percentage. The circumstances and effect of the enacted plan were mean-spirited and egregious given that there was absolutely no reason to make major changes to Precinct 3.

---

[6] *See also* Dkt. 291 at 1-2 (citing *Mi Familia Vota v. Fontes*, 129 F.4th 691, 729 (9th Cir. 2025) (holding that *Arlington Heights* requires that "[f]actfinders considering whether a law was passed with discriminatory intent must analyze the totality of the circumstances" in context with all evidence presented, rather than in isolation)).

18

Dkt. 250 ¶ 420 (internal quotations omitted). The Court found it was "stunning how completely the county extinguished the Black and Latino communities' voice on its commissioners court during 2021's redistricting." *Id.* ¶ 418.

These conclusions were well founded given the political context and process by which the commissioners court achieved the dismantling of Precinct 3, meeting each *Arlington Heights* factor. *See* Dkt. 288 at 33–41. The Court found expert and lay testimony as well as record evidence that substantiated several procedural deviations in the process that specifically harmed the ability of minority voters to participate. Dkt. 250 ¶ 232. There was no redistricting timeline like in past cycles, *id.* ¶ 235, and no public adoption of public redistricting criteria. *Id.* ¶ 237. The commissioners court failed to provide any advance notice that they would be hiring redistricting counsel, *id.* ¶¶ 240–42, and did so over the objection of the sole minority commissioner. *Id.* ¶ 191. There were no credible explanations for any of these failures. *Id.* ¶¶ 236, 238, 242.

The commissioners failed to provide any quantitative data about the benchmark or proposed plans, and then rushed a redistricting process that "failed to include any meaningful participation from the public and Commissioners Holmes." *Id.* ¶¶ 243–248. They held several public meetings after retaining redistricting counsel and before adopting the enacted plan, but failed to discuss redistricting publicly in any of them. *Id.* ¶ 255. They chose this course of action despite advice from their redistricting counsel to hold as many public meetings as possible and allow for supplementation of feedback after the meetings. *Id.* ¶ 256. The only meeting on redistricting, on the same day the enacted plan was adopted, was held at a separate, smaller, meeting annex 27 miles away from the regular meeting

19

location—a location inaccessible for many of Galveston County's Black and Latino residents and unable to accommodate the foreseeably high number of persons who sought to attend. *Id.* ¶¶ 261–68. Again, no credible explanation was provided for these failures. *Id.* ¶ 268.

The commissioners court also disregarded public input from Black and Latino residents, who overwhelmingly opposed the enacted plan, and Judge Henry threatened the removal of attendees during the sole public hearing in a move even a fellow commissioner admitted was "aggressive." *Id.* ¶¶ 269–76. And finally, the sole Black commissioner at the time, Commissioner Holmes, was systematically excluded from the redistricting process. *Id.* ¶¶ 277–78.

The commissioners court's actions must also be viewed within the context of *current* discriminatory practices and non-responsiveness in the county. *See Callais*, 146 S. Ct. at 1160 (recognizing that the "Fifteenth Amendment prohibits[] present-day intentional racial discrimination regarding voting," directing courts to look at "'current data' and 'current political conditions' that shed light on current intentional discrimination." (citing *Shelby Cnty. v. Holder*, 570 U.S. 529, 552–53 (2013)). The Court heard and considered ample evidence of current discriminatory practices adduced at trial, including:

1. Discriminatory voting practices in the county. The Court found Galveston was subject to "voter purges and racially disparate access to polling places." Dkt. 250 ¶ 406. Specifically, in 2020, LULAC filed a lawsuit against the Texas Secretary of State after it sent over 90 letters to "mostly Hispanic-surname people" in Galveston County as part of a larger purge, and told them they would be "purged

20

from the voter list" because of unsupported citizenship concerns. Dkt. 226 at 18. This Court also found that Galveston County "has recently closed or attempted to close specific polling places in predominantly Black and Latino neighborhoods." Dkt. 250 ¶ 304. Plaintiff Edna Courville testified that when Carver Park was closed during a recent election cycle, "there were some people who could not find a ride 12 or 15 miles away to go to Texas City to vote." Dkt. 222 at 277–78.

2.  "[U]nrebutted evidence of racial appeals in recent political campaigns." Dkt. 250 ¶ 410. For example, "in the 2020 Republican primary for Galveston County tax assessor-collector, candidate Jackie Peden sent a mailer of a 'Latino man covered in tattoos that indicates association with a violent gang (in this case, MS-13)'" that said "Texans can thank Cheryl Johnson for having illegal immigrants vote in this November's Election!" *Id.* ¶ 307. This Court found that the mailer "use[d] text to associate her opposing candidate . . . with 'illegal immigrants' and appeals to race-based biases and fears regarding Latinos." *Id.* In 2022, "Julie Pickren, a candidate for District 7 of the Texas State Board of Education, shared a video showing Black students at a local high school vandalizing the school cafeteria" with the caption, "Discipline in schools must be restored." *Id.* ¶ 308. This Court found that the video was an "implicit racial appeal," because it "contain[ed] images of Black youth engaged in a stereotype-confirming behavior: violent destruction of property." *Id.*

21

3. <u>Slow, slight, and disproportionately lower success of Black and Latino candidates' in elections compared to their population share in Galveston County.</u> *Id.* ¶ 411. A Latino member of the commissioners court has not been elected since Frank Carmona, who served from 1971 to 1990. *Id.* ¶ 311. To date, there have been only three Black commissioners on the court: Wayne Johnson, Stephen Holmes, and Robin Armstrong. *Id.* Commissioners Johnson and Holmes were elected in the majority-minority Precinct 3. *Id.* ¶ 419. Robin Armstrong, who ran unopposed in a majority-Anglo precinct in November 2022, testified that he "does not have a basis to believe he is a candidate of choice for Black or Latino voters." *Id.* ¶ 312.

4. <u>Lack of responsiveness to minority concerns in public housing, education, and criminal justice in addition to the redistricting process.</u> *Id.* ¶ 412. This Court found that "[r]ecent votes by the commissioners court have been seen as unresponsive to the Black and Latino communities." *Id.* ¶ 318. For example, in 2021, each member of the commissioners court other than Stephen Holmes voted to "allow $1.8 million to help pay for a U.S.–Mexico border wall and to send constables to the border." *Id.* ¶ 318; PX-414 at 35–36. In 2019, police officers on horseback "tied up" Donald Neely, a mentally disabled Black man, and "paraded him through the streets of Galveston." Dkt. 250 ¶ 353; PX-414 at 31. This Court also found that "[t]he commissioners court's handling of the November 12 special meeting also portrayed a lack of responsiveness." Dkt. 250 ¶ 319.

22

The totality of these circumstances—an egregious redistricting process, current discriminatory practices, and non-responsiveness, all harming Black and Latino voters in the county—belie any argument here that the enacted plan resulted from a mere disagreement with the law or purely non-discriminatory intent in adopting Map 2. Instead, it was an intentional design to dismantle an existing district that was otherwise likely to naturally occur. *See* Dkt. 250 ¶ 370 (noting expert illustrative maps "are but a few examples of a multitude of potential districts that are reasonably configured and that contain a majority Black and Latino population by CVAP").

Although Judge Henry testified that he viewed benchmark Precinct 3 as a racial gerrymander, Dkt. 250 ¶ 292 (citing Dkt. 228 at 319), he also confirmed that he knew a redrawn map that included a majority-minority district would still be legal, including the alternative "Map 1" proposed during the redistricting process. *See* Dkt. 250 ¶¶ 75–76, 227 ("Based on Oldham's assessment, Judge Henry believed that Maps 1 and 2 were both legally compliant."). And but for Henry's intent to dismantle it, and his efforts to convince a majority of the other commissioners to do the same, any map that fulfilled the commissioners court's purported race-neutral criteria would likely have included a majority-minority district, given "there was absolutely no reason to make major changes to Precinct 3." Dkt. 250 at 5 (quoting Dkt. 223 at 42–43); *accord Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) ("As this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.' . . . That form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause."). The other commissioners were initially in favor of adopting Map 1, until Judge Henry

23

convinced them to likewise support a map that would to dismantle Precinct 3. *See* Dkt. 288 at 10–11 (citing Dkt. 250 ¶¶ 216, 220). If the government had generated as options "numerous maps with districts in which the members of a minority group constitute a majority, and . . . the State cannot provide a legitimate reason for rejecting all those maps and eliminating all majority-minority districts. . . . , the inference of racial motivation is strong." *Callais*, 146 S. Ct. at 1156. And in the context of multiple racial groups voting together for one candidate in "crossover" districts, the Supreme Court has warned that if a State "intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett*, 556 U.S. at 24 (plurality).

Thus, even applying a strong presumption of good faith, the commissioners court's targeting of a majority-minority district, exclusion of Black and Latino voices, rushed and inaccessible redistricting process, and ongoing discriminatory context support the unique, and unfortunate, circumstance in which that presumption is overcome. Unlike in *Jackson v. Tarrant County*, where the courts concluded that plaintiffs did not sufficiently allege current discrimination or point to racial motivation rather than partisan motivation that would satisfy the *Arlington Heights* factors, 158 F.4th 571, 591 (5th Cir. 2025), this Court has already made factual findings off a voluminous trial record of Defendants' disclaimer of partisan intent, ongoing discrimination, and deviations from typical procedure.

### B. Plaintiffs' alternative plans account for all other criteria, including the creation of a coastal precinct.

To the extent that *Milligan* signals an alternative plan may be required for a Fourteenth Amendment intentional discrimination claim (something the Supreme Court

has not definitively held in a merits opinion), Plaintiffs produced alternative plans that performed better on Defendants' purported criteria. This includes "multiple illustrative maps that would create a compact coastal precinct while maintaining a majority-minority Precinct 3." Dkt. 250 ¶ 286.[7] Notably, in *Milligan*, the *per curiam* court did not even discuss or credit purported partisan reasons for the map's configuration in considering the merits of plaintiffs' intent claims, and as the dissent observed "there is minimal evidence that partisanship entered the calculus" where "[n]either of the legislators who led the redistricting process testified that they drew the 2023 redistricting plan for partisan reasons." 2026 WL 1552756, at *5. Likewise, here, the Court need not consider unsubstantiated arguments regarding partisan intent where those have been disclaimed by Defendants. The express disclaimer of partisan intent also distinguishes this case from *Jackson v. Tarrant County*, in which the Fifth Circuit affirmed a district court's dismissal of Black and Latino redistricting plaintiffs' intentional discrimination claim in large part because the county judge's discriminatory statements could be attributed to partisan rather than racial intent. 158 F.4th 571 at 589.

The Court has therefore appropriately accounted for all of the commissioners court's purported, non-discriminatory criteria.

---

[7] These maps fulfill any application of *Callais*'s call to "disentangle race from the State's race-neutral considerations" in order to ensure that Plaintiffs' claim "does not intrude on States' prerogative to draw districts based on nonracial factors," 146 S. Ct. at 1156–57, although that mandate has not to date been applied to intentional discrimination claims under the Fourteenth and Fifteenth Amendments.

### C. Plaintiffs can still prove discriminatory harm against Black and Latino voters separate and apart from their collective coalition.

To succeed on an intentional racial discrimination claim, a plaintiff must "show that the State's districting plan has the purpose *and* effect of diluting the minority vote." *Jackson*, 158 F.4th at 586 (internal quotation marks and citations omitted); *see also Hunter v. Underwood*, 471 U.S. 222, 224 (1985) (holding that the challenged practice was "intentionally adopted to disenfranchise blacks on account of their race and that [it] has had the intended effect."). This showing requires that the challenged practice produces "disproportionate effects along racial lines" in terms of "likel[ihood]" of the harm on different racial groups. *Hunter*, 471 U.S. at 227 (affirming the law had discriminatory effect where Black voters were "at least 1.7 times as likely as whites to suffer disfranchisement."). In other words, it requires that "[t]he impact of the [challenged action] bear[s] more heavily on racial minorities." *Arlington Heights*, 429 U.S. at 269 (noting that although "[m]inorities constitute 18% of the Chicago area population," they were "40% of the income groups eligible" for the proposed project).

This standard for discriminatory harm has consistent, longstanding application,[8] and nothing in *Callais* nor any subsequent emergency orders from the Supreme Court has

---

[8] *See also, e.g.*, *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (holding that the "effect of this redefinition of Tuskegee's boundaries is to remove from the city all save four or five of its 400 Negro voters while not removing a single white voter or resident."); *Jackson*, 158 F.4th at 580, 590 (holding there was discriminatory effect in Tarrant County Commissioner redistricting where "[a]lthough black and Latino Americans comprise 17.9% and 26.3% of Tarrant County's voting-age population, they represent 31.2% and 31.9%, respectively, of those transferred to precincts not holding a County Commissioner election until 2028," though finding the effect provided "only marginal support" for a finding of intent); *Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 177 (2d Cir. 2024) (holding that discriminatory effect prong was met when "11 of 24 majority-Asian-American middle schools were rendered ineligible for" a facially neutral income-

26

altered it. Here, the evidence definitely shows that the enacted plan bears more heavily on Galveston's Black and Latino voters than its Anglo voters.

The 2021 enacted plan "extinguished the Black and Latino communities' voice on its commissioners court," resulting in Black and Latino voters "being shut out of the process altogether." Dkt. 250 ¶¶ 418–19 (internal quotations omitted). This discriminatory harm impacts Black and Latino voters regardless of whether they are considered as a common minority group in coalition or as separate and distinct racial classes, since both groups were excluded and both groups lost the opportunity to elect candidates of their choice.

Simply put, before the 2021 redistricting, Black voters were consistently able to elect a candidate of their choice to the commissioners court. Dkt. 250 ¶ 419; *see also id.* ¶¶ 133–41. Because of the commissioners court's discriminatory design and adoption of Map 2, they now cannot. *Id.* at ¶¶ 135, 141. Likewise, Latino voters were consistently able to elect a candidate of their choice to the commissioners court. *Id.* at ¶ 419; *see also id.* at ¶¶ 133–41. Now, they also cannot, *id.* ¶¶ 135, 141, and Anglo voters instead benefit with an additional electoral opportunity overall. *Id.* ¶¶ 141, 156 ("Anglo voters comprise 64.1%

---

based admission program); *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 230–31 (4th Cir. 2016) (holding discriminatory effect where "African Americans disproportionately used the removed voting mechanisms and disproportionately lacked DMV-issued photo ID." (internal quotations and alterations omitted)); *Dowdell v. City of Apopka*, 698 F.2d 1181, 1185 (11th Cir. 1983) (affirming "intentional discrimination in the provision of street paving, the water distribution system, and storm drainage facilities" where impact was established because "42% of the street footage in the black community was unpaved as compared to 9% in the white community and that 33% of the black community residences fronted on such unpaved streets while only 7% of the residences in the white community did [and] while 60% of the residential streets in the white community had curbs and gutters, no streets in the black community had curbs and gutters.").

of the county's voting age population but now control 100% of the electoral outcomes for Galveston County commissioners court.").[9] In this way, the enacted map undeniably "bears more heavily on one race than another," *Arlington Heights*, 429 U.S. at 266, representing a "voting scheme [used] as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Miller*, 515 U.S. at 911 (internal quotation marks omitted).

Black and Latino voting power has been minimized to the maximum—there is no greater dilution than to zero—and utterly cancelled. *See* Dkt. 250 ¶ 411 ("In analyzing whether 'minority voices are heard in a meaningful way during pertinent political decisions, versus being shut out of the process altogether,' the court concludes that the enacted plan's elimination of Precinct 3 falls squarely within the latter category." (citing *Johnson v. Waller Cnty.*, 593 F. Supp. 3d 540, 608 (S.D. Tex. 2022))).

In sum, the evidence shows that the commissioners court intended the new map to shut Black and Latino voters out of the county political process when they Precinct 3 was "summarily carved up and wiped off the map," Dkt. 250 ¶ 419, and that the enacted plan challenged here "had the intended effect." *Hunter*, 471 U.S. at 227. Accordingly, Plaintiffs should prevail on their claim of intentional discrimination in violation of the Fourteenth and Fifteenth Amendments.

---

[9] The loss of opportunity found at trial came to fruition in the November 2024 General Election, when the sole Black commissioner elected as a candidate of choice for minority voters (Stephen Holmes) was defeated. *See* "2024 November 5th General Election," Galveston County, TX, https://results.enr.clarityelections.com/TX/Galveston/122842/web.345435/#/summary (last visited June 16, 2026).

## IV.    Conclusion

For the reasons set forth above, a re-examination of the facts adduced at trial under the updated standard provided by the Supreme Court in *Callais* warrant a finding and final judgment in favor of Plaintiffs on Counts 1 and 2 of NAACP/LULAC Plaintiffs' First Amended Complaint.

Respectfully submitted this 16th day of June, 2026.


/s/  *Sarah Xiyi Chen*

**TEXAS CIVIL RIGHTS PROJECT**
Attorney-in-Charge
Sarah Xiyi Chen*
California Bar No. 325327
Texas Bar No. 24144784
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
schen@texascivilrightsproject.org

**SOUTHERN COALITION FOR SOCIAL JUSTICE**
Hilary Harris Klein*
North Carolina Bar No. 53711
Adrianne M. Spoto*
DC Bar No. 1736462
P.O. Box 51280
Durham, NC 27717
919-323-3380 (Telephone)
919-323-3942 (Facsimile)
hilaryhklein@scsj.org
adrianne@scsj.org

**WILLKIE  FARR  &  GALLAGHER LLP**
Richard Mancino*
New York Bar No. 1852797
Kathryn Carr Garrett*
New York Bar No. 5923909
787 Seventh Avenue
New York, New York 10019
212-728-8000 (Telephone)
212-728-8111 (Facsimile)
rmancino@willkie.com
kgarrett@willkie.com

Joaquin Gonzalez*
Texas Bar No. 24109935
1533 Austin Hwy.
Ste. 102-402
San Antonio, TX 78218
joaquinrobertgonzalez@gmail.com


*Admitted *pro hac vice*


**Counsel for NAACP/LULAC Plaintiffs**

## CERTIFICATE OF SERVICE

I certify that on June 16, 2026, the foregoing document was filed electronically and served on all parties of record via CM/ECF.


/s/ *Sarah Xiyi Chen*