IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY, THE HONORABLE DERRECK ROSE, and PENNY POPE,<br><br>*Plaintiffs*,<br><br>v.<br><br>GALVESTON, TEXAS, and HONORABLE MARK HENRY, in his official capacity as Galveston County Judge,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-cv-57<br>[Lead Consolidated Case] |

**NAACP/LULAC PLAINTIFFS' RESPONSE TO DEFENDANTS' SUGGESTION OF MOOTNESS**

Plaintiffs Dickinson/Bay Area NAACP, Galveston NAACP, Mainland NAACP, LULAC Council 151, Edna Courville, and Joe Compian ("Plaintiffs") respectfully submit this Response to Defendants' June 30, 2026, Suggestion of Mootness.

Defendants incorrectly assert that their unprecedented action in adopting new commissioners court precincts—post-primary election, in an even more egregious process than in 2021, on the cusp of judgment in this case, and perpetuating the same discriminatory harm as the prior plan—automatically moots Plaintiffs' claims. As set forth below, Plaintiffs' constitutional claims fall under at least two exceptions to the mootness doctrine: Defendants' voluntary actions do not cease any racial gerrymandering or discrimination

and instead perpetuate the same harm as originally alleged, and Plaintiffs' claims are demonstrably capable of repetition yet evading review. The limited shifts to the precincts' contours do not resolve the racial sorting and discrimination Plaintiffs have experienced since 2021. Furthermore, Plaintiffs should be given the opportunity to supplement their pleadings to pursue claims against the 2026 map. Doing so would further weigh against dismissing claims against the 2021 enacted map because the legality of that map remains relevant if claims against the 2026 enacted map succeed. Given the background and events leading up to the enactment of the 2026 map, a finding of discriminatory intent or racial gerrymandering in the 2021 map would itself bear on the intent underlying the 2026 map as well.

Defendants should not be rewarded for actions that circumvent and obstruct federal court review of their actions. Plaintiffs have diligently litigated this matter since 2022, exercising their First Amendment right to "petition the Government for a redress of grievances." U.S. Const. amend. I; *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (noting the right to petition includes "[t]he right of access to the courts," such as by filing a lawsuit). The upshot of Defendants' arguments—that they can easily evade final judicial review and obtain summary dismissal of live challenges through actions that perpetuate alleged harm—is that they can violate the federal constitution with impunity. Governments cannot be allowed to "put redistricting litigation in an infinity loop," preventing voters from ever vindicating their constitutional rights. *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1292–93 (N.D. Ala. 2023) (cleaned up). Plaintiffs respectfully request judgment on their remaining constitutional claims.

## I.      Background

In late June 2026, nearly five years after U.S. Census redistricting data was released and three months after the 2026 primary elections, Defendants posted on the Galveston County website a proposal to redistrict the County's commissioners court, constable, and justice of the peace ("JP") precincts and an agenda for a special meeting on June 29, 2026 for "[c]onsideration of an order establishing new commissioners, constables, and justices of the peace precinct boundaries." Ex. I at 1; *see also* Ex. B, Declaration of Adrianne M. Spoto ("Spoto Dec.") ¶ 8. Upon information and belief, this announcement appeared with no fanfare and no other notice was given to the public—just one week after Plaintiffs filed supplemental briefing on their intentional discrimination claims on the Court-ordered deadline of June 16, 2026. Dkts. 307, 308; Ex. A, Declaration of Edna Courville ("Courville Dec.") ¶ 6. Defendants also did not hold public redistricting hearings before their final vote, as they had done in the past. *Id.* ¶ 14. Many Galveston County residents, including many members of the Black community, remained unaware for days that Defendants planned to redistrict on June 29 or had posted a new map. *Id.* ¶¶ 6–7.

Despite candidate filing deadlines for commissioners, constables, and JPs passing in November 2025 and primaries held in March 2026,[1] Defendants' proposed map altered commissioners precincts and entirely redrew JP and constable precincts. For commissioners precincts, the new map maintains the pretextual "coastal precinct" adopted in 2021 and continues to crack the Black and Latino populations across all four precincts.

---

[1] Important Election Dates, Texas Sec'y of State, https://www.sos.state.tx.us/elections/voter/important-election-dates.shtml (last visited July 16, 2026).

3

*See* Dkt. 310 at 3 (featuring images of the 2021 and 2026 map). The map was posted with no demographic data, redistricting criteria, or other explanation, and provided no option for submission of public maps. *See* Ex. A, Courville Dec. ¶¶ 13, 15; Ex. I.

**Table 1: Comparison of Black and Latino Populations Across Maps[2]**

| Precinct | 2021 Map BVAP | 2026 Map BVAP | 2021 Map HCVAP | 2026 Map HCVAP |
|---|---|---|---|---|
| **Precinct 1** | 10.68% | 11.44% | 21.60% | 23.48% |
| **Precinct 2** | 14.29% | 12.62% | 20.58% | 20.13% |
| **Precinct 3** | 9.38% | 11.95% | 19.00% | 20.38% |
| **Precinct 4** | 18.18% | 16.73% | 15.32% | 17.91% |

The new map's biggest change was to adopt the same boundaries for JPs and constables, as for commissioners. The pre-existing JP/constable map had been in use since 2014 and more closely resembled the commissioners Benchmark Map in place prior to the 2021 redistricting; the new 2026 map has therefore dismantled the County's sole majority-minority JP/constable precinct, Precinct 3. *Compare* Ex. C, *with* Ex. D; *see also* Ex. B, Spoto Dec. ¶¶ 2–3. Ms. Courville's understanding from her community is that the only two candidates affected by the redistricting are long-serving Black officials, Justice of the Peace Billy Williams and Constable Derreck Rose, both of whom she voted for in the past. Ex. A, Courville Dec. ¶ 10. Those minority candidates representing Precinct 3 will likely face more difficulty getting elected in the newly drawn Precinct 3 with its significantly reduced minority population. *See* Dkt. 250 ¶ 138.

---

[2] *Compare* Ex. F at 3 (PX-346 showing Black and Hispanic CVAP distributions across 2021 commissioners precincts), *with* Ex. C (showing Black and Hispanic CVAP distributions across 2026 commissioners/JP/constable precincts); *see also* Ex. B, Spoto Dec. ¶ 2 (authenticating Exhibit C, explaining how it was generated, and describing the underlying data sources).

Despite limited notice, dozens of Galveston County residents attended the June 29 meeting to speak out against the new map. Ex. A, Courville Dec. ¶¶ 16–17. The meeting room of the North County Annex building in League City appeared to fill with at least sixty people and reached capacity, forcing members of the public to sit in an overflow room or stand in the hallway. *Id.* ¶ 16. Nearly fifty people testified, overwhelmingly against redistricting and criticizing its racial impact, with only two people speaking in favor of redistricting at all. *Id.* ¶¶ 17–18.[3]

After hearing more than two hours of public testimony, within approximately one minute and without any discussion, Defendants voted 5-0 to immediately enact the proposed map. Ex. A, Courville Dec. ¶¶ 20–22. Defendants did not provide an explanation of how the map had been developed or why. *Id.* ¶ 22. They also did not discuss any of the lengthy public comment from the past two hours before taking a vote. *Id.* There was no opportunity for the public to propose alternative maps. *Id.* ¶ 15. In fact, the Commissioners Court did not publicly provide a single rationale for adopting the map either before or during the meeting. *Id.* ¶¶ 16, 21–22. The vote happened with such speed that many Galveston County residents in attendance were frustrated, confused, and convinced that the Commissioners Court had predetermined their vote. *Id.* ¶¶ 23–24.

---

[3] *See also* Nick Natario, *Galveston Co. Commissioners Unanimously Vote for New Redistricting Map*, ABC 13 (June 29, 2026) https://abc13.com/post/texas-voting-commissioners-galveston-county-approve-new-redistricting-map/19415193.

## II.    NAACP/LULAC Plaintiffs' claims are not moot.

*A. Plaintiffs' claims are not moot because the 2026 map continues to harm Plaintiffs in the same fundamental way.*

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party. . . . As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307–08 (2012) (cleaned up). Defendants bear the burden to prove that this case has become moot. *West Virginia v. EPA*, 597 U.S. 697, 719 (2022).

That burden is especially "heavy," "formidable," and "stringent" when the asserted mootness stems from the defendant's voluntary conduct. *Id.*; *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)); *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 n.10 (1982). "[I]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Aladdin's Castle*, 455 U.S. at 289. Were it otherwise, in a case like this one challenging a government act, "a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993); *see also Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("[A] defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends."). Therefore, unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected

6

to recur," the case is not moot. *Parents Involved In Cmty. Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 719 (2007) (quoting *Friends of the Earth*, 528 U.S. at 189).[4] The exception holds true "for governmental defendants no less than for private ones." *Fikre*, 601 U.S. at 241. And it has been repeatedly applied in situations where a governmental defendant repealed or amended a challenged law. *See, e.g.*, *Aladdin's Castle*, 455 U.S. at 288–89; *City of Jacksonville*, 508 at 661–63; *see also McCorvey v. Hill*, 385 F.3d 846, 849 & n.3 (5th Cir. 2004) (explaining that a suit regarding the constitutionality of a statute will not become moot upon that statute's repeal "where there is evidence, or a legitimate reason to believe, that the state will reenact the statute or one that is substantially similar.").

Here, Plaintiffs' claims of racial gerrymandering and intentional discrimination are not moot because the 2026 precincts constitute "continuations" of the 2021 precincts. *North Carolina v. Covington*, 585 U.S. 969, 976 (2018). As the Supreme Court observed in finding redistricting claims not moot despite the repeal of gerrymandered maps and enactment of new plans, "it is the segregation of the plaintiffs—not the legislature's line-

---

[4] In cases involving governmental defendants, Fifth Circuit cases have applied a "lighter burden to make 'absolutely clear' that the [allegedly wrongful behavior] cannot 'reasonably be expected to recur'" due to the presumption of good faith. *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011) ("We will not require some physical or logical impossibility that the challenged policy will be reenacted absent evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct."). This holding was arguably invalidated by the Supreme Court's recent decision in *FBI v. Fikre*, where the Court held that the "formidable" standard for mootness based on voluntary cessation "holds for governmental defendants no less than for private ones," applied that burden to the defendant there, and made no mention of a lesser burden for governmental defendants. 601 U.S. at 241; *see also Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 142 F.4th 819, 826 & n.10 (5th Cir. 2025) (noting that *Fikre* "makes no mention" of a presumption of good faith in voluntary cessation and finding for governmental defendants who met the higher "formidable burden"). But even under a lesser burden, NAACP/LULAC Plaintiffs' claims are not moot given that Defendants' wrongful behavior has *already* occurred. *See Perez v. Perry*, 26 F. Supp. 3d 612, 621 (W.D. Tex. 2014).

drawing as such—that gives rise to their claims." [5] *Id.* Although the new lines make some alterations to the commissioners precinct boundaries, the commissioners precincts continue to cover similar core areas as they did in 2021, such as the "coastal" Precinct 2 uniting Galveston Island and Bolivar Peninsula and unnecessarily separating a historic Black and Latino community on Galveston Island from the rest of the historic core of Benchmark Precinct 3. *See* Dkt. 310 at 3 (featuring images of the 2021 and 2026 maps); Dkt. 250 ¶ 100. And, as detailed above, the new map continues to crack Black and Latino populations across all four precincts into nearly equal proportions, similar to the 2021 map. *Compare* Ex. C, *with* Ex. D. Because Plaintiffs "assert[] that they remained segregated on the basis of race" under intentionally discriminatory and racially gerrymandered precincts, "their claims remained the subject of a live dispute." *Covington*, 585 U.S. at 976.

The voluntary cessation exception likewise prevents a finding of mootness here. "There is no mere risk" that the County "will repeat its allegedly wrongful conduct; it already has done so." *City of Jacksonville*, 508 U.S. at 662; *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 286 (5th Cir. 2012) (rejecting mootness where city had "already repeated its allegedly wrongful conduct" by removing an ordinance's challenged language and replacing it with other, still-discriminatory restrictions). Defendants passed a map that cracks the County's Black and Latino population in a "substantially similar" manner to the 2021 map. *Perez v. Perry*, 26 F. Supp. 3d 612, 621 (W.D. Tex. 2014). While the dividing lines between commissioners precincts have shifted somewhat in the new map,

---

[5] Note that at this jurisdictional stage, the district court and Supreme Court credited the *Covington* plaintiffs' argument that the remedial map perpetuated the same racial gerrymandering and discrimination as the old one, despite North Carolina's assertion that its new map remedied past discrimination. *Id.*

they still cover the same general areas and impose the same constitutional harms on Plaintiffs here. *Associated Gen. Contractors*, 508 U.S. at 662 ("Nor does it matter that the new ordinance differs in certain respects from the old one. . . . [I]f that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect.").

Moreover, Defendants' process for adopting the new map featured many of the same procedural deviations as did the 2021 process—and then some. In 2026, the Commissioners Court repeated the egregious procedures from its 2021 redistricting: Failing to give adequate public notice, disregarding public input, especially from Black residents who displayed large-scale public opposition, and apparently coming to an agreement before the public meeting was held, as indicated by the lack of any public debate or justification provided for the new map before its enactment. *See* Ex. A, Courville Dec. ¶¶ 6, 12–24; Dkt. 250 at 83–96 ("Deviations from Prior Redistricting Cycles"). Defendants cannot escape review by passing a similar racially gerrymandered and intentionally discriminatory map, in a similarly egregious fashion, that harms Plaintiffs "in the same fundamental way." *Associated Gen. Contractors*, 508 U.S. at 662.

Consider the litigation over Texas's 2011 congressional and state house maps: There, the legislature had passed allegedly discriminatory districts. Without making a finding of discrimination, the three-judge court imposed interim maps for the 2012 elections, which were based on compromise maps submitted by some of the parties. *Perez v. Perry*, 26 F. Supp. 3d at 614. In 2013, Texas enacted new maps based on the court-ordered interim ones and argued that the "passage of the new plans [in 2013] repealed the

9

2011 plans . . . and that the vacated 2011 plans can never be used to conduct any election and therefore pose no threat of injury to Plaintiffs," rendering the plaintiffs' claims moot. *Id.* at 615. But the plaintiffs argued that the 2013 maps still contained districts that were the same as or similar to districts from the 2011 plans which they challenged. *Id.* at 621.[6] The court held that the 2011 claims were not moot, applying the voluntary cessation doctrine. *Id.* The court went on to issue judgment on the claims against the 2011 maps, only treating as moot claims that had been *remedied* by the 2013 maps (notably, none of the discriminatory intent claims). *Perez v. Abbott*, 250 F. Supp. 3d 123 (W.D. Tex. 2017); *Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017).[7]

The same reasoning applies here: There, as here, the new maps were "not sufficiently altered so as to present a substantially different controversy," the plaintiffs alleged "the same fundamental harms [were] continuing," and the plaintiffs were "still suffering injury from the 2011 plans in the 2013 plans." *Perez v. Perry*, 26 F. Supp. 3d at 618. Likewise, in *Covington*, although the state legislature had repealed the redistricting plans the plaintiffs had challenged and enacted remedial plans in their place, the Supreme

---

[6] For this reason, Defendants' citation to *Davis v. Abbott*, 781 F.3d 207 (5th Cir. 2015), which dealt with the challenge to the 2011 Texas *Senate* map, is unavailing. The plaintiffs there had agreed that the 2013 Texas Senate map did not violate the Voting Rights Act or Constitution and so did not argue that the 2013 map continued any of the harms of the 2011 map. *Id.* at 212–13; *see also Perez v. Abbott*, 253 F. Supp. 3d 864, 874–75 (W.D. Tex. 2017) (distinguishing *Davis* because, "[u]nlike in the Senate plan, many asserted VRA and constitutional infirmities were *not* remedied in the interim plans, and thus the injuries were alleged to persist in the 2013 plans").

[7] While the Supreme Court later held that there was no evidence of discriminatory intent in passing the *2013 plans*, it relied heavily on the legislature having largely kept the court-ordered interim maps—which were meant to remedy constitutional ills and "no one would claim that the court acted with invidious intent" in adopting. *Abbott v. Perez*, 585 U.S. 579, 609–10 (2018). It did not reject the trial court's mootness holding. *Id.* at 591 n.8; *Chafin v. Chafin*, 568 U.S. 165, 177 (2013) (cautioning against "confus[ing] mootness with the merits"). Defendants' assertion that the Supreme Court's decision in *Abbott v. Perez* would require a finding of mootness here is therefore incorrect. *See* Dkt. 310 at 5.

Court held that the plaintiffs' claims "did not become moot simply because the General Assembly drew new district lines around them." *Covington*, 585 U.S. at 976. Instead, because the plaintiffs argued that some of the new districts "were mere continuations of the old, gerrymandered districts" and that they "remained segregated on the basis of race," their claims were not moot. *Id.*

Defendants' reliance on *Holloway v. City of Virginia Beach*, 42 F.4th 266 (4th Cir. 2022), is misplaced. There, plaintiffs had challenged a city's exclusive use of at-large elections for city council under Section 2 of the Voting Rights Act, but a subsequent state law change "fundamentally alter[ed]" that system and changed many of the council seats to single-member districts. *Id.* at 274. There, unlike here, the change in law addressed the very harm plaintiffs had sued over. *Id.* The change was also made by the state legislature, meaning the city did not *voluntarily* change its own system, and the city would not have the authority to re-adopt its at-large system on its own. *Id.* at 276–77. Here, by contrast, the 2026 map has not fundamentally altered the discrimination asserted by Plaintiffs; instead, it perpetuates that discrimination, making shifts to the contours of the precincts that do not impact the racial sorting and discrimination Plaintiffs have experienced since 2021. *See id.* at 273 (explaining that "'minor and insignificant' changes that do not address the essence of a plaintiff's claims will not forestall legal challenges to the original statute") (quoting *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir. 2000)). Notably, Defendants make no assertions in their Suggestion of Mootness that the passage of the 2026 map was meant to *remedy* any alleged discriminatory effects of the 2021 redistricting.

Nor does Defendants' invocation of the presumption of good faith require mootness here. Dkt. 310 at 5–7. The primary case they rely on, *Miller v. Johnson*, 515 U.S. 900, 915 (1995), made no holdings relevant to mootness, and counsel is not aware of any Supreme Court application of this principle to circumvent the appropriate analysis of whether a mootness exception applies under circumstances such as these. *See also supra*, n. 4. While this presumption may be invoked in dispositive motions practice and trial, it cannot be used to avoid (perhaps perpetually) the ability of plaintiffs to achieve court review at all.

B.  *Plaintiffs' claims are not moot because they are capable of repetition yet evade review.*

Additionally, there is another exception to mootness for "the class of controversies capable of repetition, yet evading review." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (quoting *First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978)). This exception applies where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.* (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)) (cleaned up). "Controversy surrounding election laws . . . is one of the paradigmatic circumstances in which the Supreme Court has found that full litigation can never be completed before the precise controversy (a particular election) has run its course." *Id.* at 661.

The circumstances under which Defendants passed the 2026 map make clear that Plaintiffs' claims here are capable of repetition yet would evade review. Under the first prong of the test, the Supreme Court has rejected that a "2–year window . . . provides ample time for parties to litigate their rights," where the plaintiffs "had no way of knowing well

12

in advance" they could be further harmed by the defendants' actions, and full relief could not be obtained otherwise. *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007). Moreover, "[c]laims need to be judged on how quickly relief can be achieved in relation to the specific claim," *Empower Texans, Inc. v. Geren*, 977 F.3d 367, 370 (5th Cir. 2020), and redistricting actions generally require longer timelines. Here, Plaintiffs fully pursued their claims in advance of the 2024 election and could not have expected Defendants to enact a new map mid-decade, unprompted by a new decennial census or any court order invalidating the prior map. Even more unusually, it made these new precincts effective immediately, just after briefing had resumed in this litigation and despite the 2026 primary elections having already occurred over three months ago under the prior precinct lines. As discussed above, Defendants have *already* demonstrated with the 2026 redistricting a "repetition" of much of their 2021 discriminatory process—Plaintiffs therefore easily meet their burden to demonstrate "either a 'demonstrated probability' or a 'reasonable expectation'" of being subjected to unlawful redistricting. *Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010) (citing *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002)). If these actions are permitted to moot Plaintiffs' claims, thereby obstructing federal court review, Defendants could simply pass a new map that slightly adjusts precinct boundaries every couple of years and on the eve of judgment, forever thwarting any final resolution of constitutional claims, and all while continuing to intentionally crack the County's Black and Latino population and silence their electoral power.

13

The Supreme Court has rejected similar efforts to frustrate judicial review in redistricting cases. *E.g.*, *Covington*, 585 U.S. at 969. Were it otherwise, legislatures could "put[] redistricting litigation in an infinity loop[,]" enacting different plans ad nauseum whenever an election was impending and thereby extending the litigation and preventing Plaintiffs from ever obtaining a remedy. *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1292–93 (N.D. Ala. 2023). That tactic "is inconsistent with the Article III judicial power because it allows the State to constrain (indeed, to manipulate) the Court's authority to grant equitable relief." *Id.* at 1292. It would create "an endless paradox that only [the State] can break, thereby depriving Plaintiffs of the ability to effectively challenge and the courts of the ability to remedy." *Id.*

Since Plaintiffs' remaining constitutional claims fall within these mootness exceptions, a final judgment as to the 2021 enacted plan is warranted, followed by remedial proceedings.

**III.    Plaintiffs' claims as to the 2021 enacted map would also remain a live dispute if Plaintiffs are permitted to supplement their complaint to challenge the 2026 enacted map.**

In light of the renewed redistricting, Plaintiffs should also be provided an opportunity to file a supplemental complaint within a reasonable time[8] addressing the 2026 enacted plan.[9] Proceeding under a supplemental complaint, Plaintiffs' claims against the 2021 map would remain justiciable for two additional reasons.

---

[8] Plaintiffs are amenable to working with the other parties on a scheduling order for supplementation.

[9] Defendants baselessly assert that Plaintiffs "have no standing to challenge the new precinct boundaries," apparently incorporating their arguments from their 2024 brief that all of Plaintiffs' claims rely on a "political coalition." Dkt. 310 at 8 & n.4. Plaintiffs' response to the 2024 brief, Dkt. 290, and recent post-*Callais* supplemental brief, Dkt. 308, make clear that Plaintiffs suffer ongoing racial harm establishing

14

*First,* a final judgment of discriminatory redistricting in 2021 would have legal relevance to ongoing claims of racial discrimination. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (calling for consideration of the "historical background of the decision" as "one evidentiary source"); *Abbott v. Perez*, 585 U.S. at 607 (explaining that the intent in adopting a past map is relevant to the extent it gives rise to inferences about the intent behind adopting a new one and "must be weighed together with any other direct and circumstantial evidence"). Likewise, a ruling on Plaintiffs' claims against the 2021 map would also be necessary in providing likely requested relief in any supplemental claims via a record for potential bail-in preclearance under 52 U.S.C. § 10302. *Cf. Perez v. Perry*, 26 F. Supp. 3d at 619, 622 ("The Court further held that Plaintiffs could amend their pleadings to assert claims under § 3(c) with regard to the 2011 plans and that the possibility of § 3(c) relief also precluded Plaintiffs' 2011 plan claims from being moot."); *Perez v. Abbott*, 390 F. Supp. 3d 803, 811–12 (W.D. Tex. 2019) (proceeding to consider whether to grant bail-in preclearance based on findings of discriminatory intent in 2011 maps, despite the Supreme Court having held that the 2013 maps lacked such discriminatory intent).

*Second*, although Defendants assert that the order adopting the 2026 map repealed the 2021 map, the order does not say that on its face. Dkt. 310-1 at 1. Regardless, a possible outcome if Plaintiffs prevail on their supplemental claims is that Defendants may argue the unconstitutional 2021 map should be used as a remedial plan and/or reinstated. While

---

standing for their racial gerrymandering and intentional discrimination claims. Those harms are continued by the 2026 redistricting.

Plaintiffs contend that remedial redistricting would instead be required under those circumstances, *see North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam), the illegality of the 2021 plan as a remedial option will likely be relevant to those proceedings. As such, Plaintiffs will need an injunction against the 2021 map as well to ensure full relief, and it is far from "impossible" for the Court to provide any relief. *Knox*, 567 U.S. at 307–08.

## IV.    Conclusion

For the reasons set forth above, NAACP/LULAC Plaintiffs' claims are not moot. Plaintiffs respectfully request judgment on their constitutional claims.

Respectfully submitted this 16th day of July, 2026.

*/s/ Adrianne M. Spoto*

**TEXAS CIVIL RIGHTS PROJECT**
Attorney-in-Charge
Sarah Xiyi Chen*
California Bar No. 325327
Texas Bar No. 24144784
Miranda van Dijk
Texas Bar No. 24149460
P.O. Box 17757
Austin, Texas 78760
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
schen@texascivilrightsproject.org
mvandijk@texascivilrightsproject.org

Nina Lea Oishi
Texas Bar No. 24142250
P.O Box 1108
Houston TX 77251
noishi@texascivilrightsproject.org

**WILLKIE FARR & GALLAGHER LLP**
Richard Mancino*
New York Bar No. 1852797
Kathryn Carr Garrett*
New York Bar No. 5923909
787 Seventh Avenue
New York, New York 10019
212-728-8000 (Telephone)
212-728-8111 (Facsimile)
rmancino@willkie.com
kgarrett@willkie.com

Joaquin Gonzalez*
Texas Bar No. 24109935
1533 Austin Hwy.
Ste. 102-402
San Antonio, TX 78218
joaquinrobertgonzalez@gmail.com

**Counsel for NAACP/LULAC Plaintiffs**

16

**SOUTHERN COALITION FOR**
**SOCIAL JUSTICE**
Hilary Harris Klein*
North Carolina Bar No. 53711
Adrianne M. Spoto*
DC Bar No. 1736462
P.O. Box 51280
Durham, NC 27717
919-323-3380 (Telephone)
919-323-3942 (Facsimile)
hilaryhklein@scsj.org
adrianne@scsj.org

\*Admitted *pro hac vice*

17

## CERTIFICATE OF SERVICE

I certify that on July 16, 2026, the foregoing document and its exhibit was filed electronically and served on all parties of record via CM/ECF.

*/s/ Adrianne M. Spoto*