**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| TERRY PETTEWAY, THE HONORABLE DERRECK ROSE, and PENNY POPE,<br><br>        *Plaintiffs*,<br><br>v.<br><br>GALVESTON, TEXAS, and HONORABLE MARK HENRY, in his official capacity as Galveston County Judge,<br><br>        *Defendants.* | § § § § § § § § § § § § § § § § § | Civil Action No. 3:22-cv-57<br>[Lead Consolidated Case] |

**NAACP/LULAC PLAINTIFFS' REPLY BRIEF ON RACIAL**
**GERRYMANDERING AND INTENTIONAL DISCRIMINATION CLAIMS**

**TABLE OF CONTENTS**

I.   Introduction.................................................................................................................1

II.  Argument....................................................................................................................2

A.  Defendants contort the presumption of good faith..................................................2
   1.   Plaintiffs have overcome the presumption of legislative good faith in racial gerrymandering claims. ............................................................................................3
   2.   Plaintiffs have shown discriminatory legislative intent. .......................................7
B.  Defendants mischaracterize Plaintiffs' claims and remedy sought.........................12

III. Conclusion ...............................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418 (2025). -------------------- 12

*Abbott v. Perez*, 585 U.S. 579 (2018) -------------------------------------------------------- 3, 7, 8

*Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1 (2024) ---------------------- passim

*Allen v. Milligan*, 146 S. Ct. 1377 (2026) -------------------------------------------------- 3, 6

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ------------------------------------------------------ 14

*Cooper v. Aaron*, 358 U.S. 1 (1958) ------------------------------------------------------------- 2

*Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020) ----------------------------------------------- 7

*Jackson v. Tarrant County*, 158 F.4th 571  (5th Cir. 2025) ----------------------------- passim

*Louisiana v. Callais*, 608 U.S. __,146 S. Ct. 1131 (2026) ------------------------------ passim

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ----------------------------------------- 14

*Petteway v. Galveston Cnty.*, 86 F.4th 214 (5th Cir. 2023) ------------------------------------- 4

*Singleton v. Allen*, 782 F. Supp. 3d 1092 (N.D. Ala. 2025) ------------------------------------ 4

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023) -------------------------------------------------------------------------------------- 13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ---------- 2, 10

## I.    Introduction

Defendants' brief mischaracterizes NAACP/LULAC Plaintiffs' claims, the pre- and post-*Callais* legal precedent, and the thorough record in this case. Among other issues, Defendants wrongly characterize Plaintiffs' case as wanting to "create" a minority-majority precinct. Defs.' Br., Dkt. 316 at 5. This contradicts the evidence that such a precinct has existed for decades and would naturally occur and represent a historic community of interest—even with a coastal precinct. *See* Pls.' Supp Br., Dkt. 308 at 12 (citing Dkt. 250 ¶ 214); *see also* Dkt. 250 ¶¶ 70–71, 188 (noting Precinct 3's "decades of existence"). Defendants also misapply the presumption of good faith to both the racial gerrymandering and intentional discrimination claims. As for the facts, they fail to engage with the Court's detailed findings or the voluminous record of direct and circumstantial evidence of racial intent, opting instead to argue within an alternative set of factual findings that do not reflect the record in this case.

Under well-established precedent and a proper reading of the recent Supreme Court decisions in *Callais* and *Milligan*, the Fifth Circuit decision in *Jackson*, and the Fourteenth and Fifteenth Amendments, Plaintiffs have met their burden to prove that in Defendants' 2021 redistricting, race predominated over other factors and racial discrimination was a motivating factor. It is Defendants who have failed to satisfy strict scrutiny for their racial targeting or to prove racial intent was not the but-for cause for creating and voting for the Enacted Map, as Plaintiffs have successfully shown. Thus, Plaintiffs are entitled to judgment on their racial gerrymandering and intentional discrimination claims.

1

## II.    Argument

### A.  Defendants contort the presumption of good faith.

Defendants argue for an expanded view of the presumption of legislative good faith that exaggerates the caselaw. *See* Dkt. 316 at 9. If the presumption were applied as broadly as Defendants suggest, government actors would be entirely shielded from legal challenges in federal courts, an impermissible workaround that contravenes the Supremacy Clause as applied to local and state governments. *See Cooper v. Aaron*, 358 U.S. 1, 19 (1958) (noting that state responsibilities "must be exercised consistently with federal constitutional requirements as they apply to state action. The Constitution created a government dedicated to equal justice under law.").

Current precedent recognizes that the presumption of legislative good faith has a defined scope, which Defendants urge this Court to ignore. For racial gerrymandering cases, *Alexander* set forth a roadmap by which plaintiffs can meet their high bar of proving racial predominance through "rul[ing] out" politics and providing alternative maps that "replicate the 'myriad considerations' that a legislature must balance as part of its redistricting efforts." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 24, 34 (2024). The burden then shifts to the legislators to satisfy strict scrutiny. *Id.* That is the roadmap followed in *Callais*. *See Louisiana v. Callais*, 608 U.S. __, 146 S. Ct. 1131, 1156–57 (2026) (citing *Alexander*, 602 U.S. at 9–10). In the intentional discrimination context, "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Neither *Callais* nor the recent stay order

in *Milligan* have disturbed—much less overturned—this standard for intentional discrimination. *See Allen v. Milligan*, 146 S. Ct. 1377, 1381 (2026) (citing *Abbott v. Perez*, 585 U.S. 579, 608–609 (2018), which applied *Arlington Heights*); *Callais*, 146 S. Ct. at 1146–47 (distinguishing racial gerrymandering and intentional discrimination claims). And as explained in detail below, the Fifth Circuit's analysis weighing evidence of discriminatory purpose in *Jackson* highlights the way in which evidence can overcome the judicial deference afforded under the presumption of good faith, as properly applied. *See Jackson v. Tarrant County*, 158 F.4th 571, 587–592 (5th Cir. 2025).

>    1. *Plaintiffs have overcome the presumption of legislative good faith in racial gerrymandering claims.*

In a racial gerrymandering analysis where (as here) partisanship is disclaimed as the primary motivation, Plaintiffs have no heightened burden to disentangle race and party. Instead, the presumption of legislative good faith is overcome here by abundant evidence of racial predominance without justification, as well as of intentional racial discrimination.

Contrary to Defendants' assertion that "*Callais* relied on the legislative good faith presumption," Dkt. 316 at 9, *Callais* makes no mention of it. Instead, it refers to legislative intent in one specific way: "when a State defends a districting scheme on the ground that it was drawn for partisan purposes, plaintiffs have a 'special' burden to overcome." 146 S. Ct. at 1156–57 (quoting *Alexander*, 602 U.S. at 9) (cleaned up). "That means, among other things, ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts. If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." *Id.* at 1157 (quoting *Alexander*, 602 U.S. at 9–10). Plaintiffs can overcome that burden to disentangle race and politics by providing an

alternative map that achieves the defendants' actual objectives as well as the challenged map. *Id.* at 1157. But if the "underlying goal was racial" with no competing partisan explanation—as it was here and in *Callais*—*Callais* instructs that the Court's analysis immediately proceeds to considering whether the map survives strict scrutiny. *Id.* at 1161.[1]

That is why Defendants' explicit disclaimer of partisanship and this Court's factual findings about Defendants' purported criteria are so critical to distinguishing this case from others, where partisanship was a true justification. *See* Dkt. 250 ¶¶ 280–92; *see also* Dkt. 316 at 18 (conceding that politics was "not the predominating factor for redistricting"). There is no need to disentangle race and partisanship when this Court has already found that "all members of the commissioners court who voted for the enacted plan disclaimed partisanship as a predominating consideration," and the lead mapping consultant, Dale Oldham, "denied there was any such partisan motivation." Dkt. 250 ¶ 289. The Fifth Circuit found no clear error in these factual findings. *See Petteway v. Galveston Cnty.*, 86 F.4th 214, 218 (5th Cir. 2023), *vacated en banc on other grounds*, 111 F.4th 596, 599 (5th Cir. 2024). Tellingly, Defendants do not and cannot provide a record citation for partisanship causing the textbook racial gerrymander in the 2021 enacted plan, rather than a mere *post hoc* rationale for its configuration. *See* Dkt. 316 at 11. This case is therefore easily distinguishable from others where the district court "cited no evidence that could not also

---

[1] Note that the Supreme Court in *Milligan* did not consider any holding on racial gerrymandering, and addressed only claims of intentional discrimination under the Fourteenth and Fifteenth Amendments. *See Singleton v. Allen*, 782 F. Supp. 3d 1092, 1337 (N.D. Ala. 2025), *vacated and remanded sub nom.*, *Allen v. Caster*, 146 S. Ct. 1196 (2026) (avoiding deciding the Singleton plaintiffs' racial gerrymandering claim). The application of the presumption of good faith in intentional discrimination claim is discussed in more detail, *infra* Part II.A.2.

4

support the inference that politics *drove* the mapmaking process." *Alexander*, 602 U.S. at 22 (emphasis added). Plaintiffs have more than met their burden to show racial predominance given the lack of credibility of any factors besides dismantling the sole majority-minority precinct. *See* Dkt. 250 ¶¶ 280–92.

Defendants imply that race did not predominate because Judge Henry's goal of dismantling Galveston's sole majority-minority commissioners precinct stemmed from a desire to avoid violating the law. Dkt. 316 at 15 (arguing that the NAACP/LULAC Plaintiffs "equate[] a goal of not violating constitutional law with having race as a predominant purpose in drawing a new map"). Even if true, it would be insufficient under *Callais*, where the legislature's underlying goal to create a majority-minority district stemmed from a desire to comply with a district court order. 146 S. Ct. at 1150. Defendants here did not have the benefit of such a ruling to support an underlying racial goal of dismantling majority-minority Precinct 3.

More importantly, the evidence reveals that this assertion is yet another *post hoc* justification that is unsupported by the record. Oldham believed that a least-change map naturally preserving Precinct 3 would also be legal, and Judge Henry and other Defendants agreed; Judge Henry allowed Map 1 to be proposed alongside his Map 2 design and, in fact, three Commissioners initially supported that least-change map until Judge Henry convinced them otherwise. Dkt. 250 ¶ 227 ("Based on Oldham's assessment, Judge Henry believed that Maps 1 and 2 were both legally compliant"); *id.* ¶¶ 75–76, 209, 216.[2]

---

[2] Even Defendants' own 2024 post-trial brief characterized the 2012 configuration of Precinct 3 as creating no more than "legal exposure" for which they "hired legal counsel [Oldham] who had decades of experience on redistricting matters," and who advised that "[a] least-changes plan

Therefore, avoiding a constitutional violation is not a sufficient justification (factually or legally) for Defendants' intentionally cracking of Black and Latino voters in the benchmark Precinct 3. Given the lack of evidence of past racial gerrymandering and legal consensus that naturally maintaining benchmark Precinct 3 in a least-change map would be constitutional, Defendants' argument requires a finding of liability under *Callais*.

In any event, Plaintiffs have met the burden that Defendants assert applies under *Alexander*, because Plaintiffs have provided alternative maps that achieve Defendants' stated objectives—(1) compliance with federal law, (2) the creation of a coastal precinct, (3) geographic compactness, (4) minimizing voting precinct splits, (5) incumbency protection, (6) partisanship, and (7) "adopt[ing] a map that would be clear and easy to understand by the public" (although the Court found these stated objectives at odds with Defendants' statements and testimony). *See* Dkt. 250 ¶ 280; *Alexander*, 602 U.S. at 35; *see also Milligan*, 146 S. Ct. at 1381. Plaintiffs' maps often performed *better* on those purported criteria. *See* Dkt. 308 at 12–13; *Petteway* Pls.' Supp. Br., Dkt. 307 at 20–22. The only *possible* objective on which Plaintiffs' maps may not perform better is the unsupported partisan rationale. *See* Dkt. 316 at 18, 20 (criticizing Plaintiffs' alternative maps for not electing a Republican in Precinct 3).[3] Defendants' mapping consultant Oldham, who disclaimed partisanship, also "admitted that it was possible to retain a

---

seemed an acceptable way to resolve the problem with the prior design of Precinct 3." Dkt. 244 at 11–12. Their new argument—that Map 2 was necessary to avoid perpetuating a racial gerrymander—cannot be squared with this undisputed evidentiary landscape.

[3] Defendants also argue that "no plan discussed at trial will preserve a majority-minority district in Galveston County that is not a coalition." Dkt. 316 at 18. This appears to be another concession that Defendants' purpose was to destroy Precinct 3 because it contained Black and Latino voters, and to sort Black and Latino voters on the basis of race.

6

majority-minority precinct while also creating a coastal precinct without dismantling benchmark Precinct 3." Dkt. 250 ¶ 213. This Court even "f[ound] that a desire to create a coastal precinct cannot and does not explain or justify why Map 2, the 'optimal' plan, was drawn the way it was—and especially does not explain its obliteration of benchmark Precinct 3." Dkt. 250 ¶ 214.

The testimony at trial, record evidence, and Plaintiffs' alternative maps thus demonstrate "that race drove the mapping of district lines," and "the burden shifts to the [Defendants] to prove that the map can overcome the daunting requirements of strict scrutiny." *Alexander*, 602 U.S. at 11. Defendants cannot and indeed have not even attempted to meet strict scrutiny.

### 2. Plaintiffs have shown discriminatory legislative intent.

The presumption of legislative good faith applies somewhat differently to Plaintiffs' intentional discrimination claim under the Fourteenth and Fifteenth Amendments.[4]

It is "the plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Defendants] acted with invidious intent." *Abbott v. Perez*, 585 U.S. at 605. But there is no heightened burden for plaintiffs to isolate racial goals from partisan ones to prove a discriminatory intent claim, for which "'racial discrimination need only be one purpose, and not even a primary purpose, of an official act in order for a violation of the Fourteenth and the Fifteenth Amendments to occur.'" *Jackson*, 158 F.4th at 586 (quoting *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020) (cleaned up)) (distinguishing

---

[4] As discussed in Plaintiffs' Supplemental Brief, to the extent an alternative map is help for an intentional discrimination claim under *Milligan*, post-*Callais*, Plaintiffs have met that alternative map requirement. *See* supra, Part II.A.1; Dkt. 308 at 12.

intentional discrimination from racial gerrymandering claims). If plaintiffs can prove racially discriminatory purpose, "the burden shifts to the County to prove that race was *not* the but-for cause of the decision." *Jackson*, 158 F.4th at 586–87 (emphasis added).

Importantly, the Supreme Court and Fifth Circuit have emphasized that "all the relevant evidence in the record is taken into account," *Abbott v. Perez*, 585 U.S. at 607, and "[t]aken as a whole," *Jackson*, 158 F.4th at 591. A faithful adherence to the analytical steps outlined in *Jackson*, applied to the evidence here, overcomes the presumption of legislative good faith as applied to intentional discrimination claims.

In *Jackson*, the Fifth Circuit found that the plaintiffs, Black and Latino voters, had not established that race was a motivating factor in Tarrant County's redistricting under the *Arlington Heights* factors, and so never reached the county's burden. 158 F.4th at 591. Critically, the court grounded its findings in Tarrant County officials' contemporaneous statements of and conduct supporting partisan intent, which are not present in this case's record or the Court's existing findings. *Id.* at 588–91.

As an initial matter, *Jackson* presented only one piece of direct evidence of intentional discrimination, a quote from the county judge calling out Black voters for continually voting for Democratic policies. *Id.* at 588. The court observed that without further context, such as whether this comment came in response to a question about race, "we cannot simply assume the worst." *Id.* at 589. However, if the judge "made his remark in response to a question that did not mention race and simply asked why he intended to vote for Map 7—as the Challengers imply—then his remark might be probative of a discriminatory purpose." *Id.* at 588.

In contrast, Plaintiffs here provide ample direct evidence of discriminatory intent in redistricting, including: *(i)* Evidence of Defendants' express purpose from the outset of redistricting to eliminate the county's sole majority-minority commissioners precinct, *see* Dkt. 250 ¶¶ 192, 209–10; *(ii)* Defendants' "disregard for public input from the minority communities and those critical of the enacted plan's discriminatory effect," including threats and aggressive behavior towards predominantly Black and Latino community members during the process, *id.* ¶¶ 269–79; *(iii)* Defendants' actions to exclude the sole non-Anglo member of the commissioners court during the redistricting process, including failing to have his proposals reflected in the alternative Map 1 proposal while the preferences of the Anglo commissioners were incorporated into the Map 2 proposal, *id.* ¶¶ 277–78, 220–21; *(iv)* Defendants' understanding during the redistricting process that Black and Latino voters would no longer have an opportunity to elect the candidate of their choice, *see id.* ¶ 158; and *(v)* the lack of any other credible *contemporaneous* motive, including the *post hoc* rationales of creating a coastal precinct, *see id.* ¶¶ 279–92. *See also* Pls.' Mot. For Entry of Judgment, Dkt. 288 at 32–36. Despite the hours of testimony and reams of briefing in this case evincing the opposite, Defendants still cling to their *post hoc* rationales of a coastal precinct and partisan considerations. *See* Dkt. 316 at 11–12. Crediting these unsupported excuses would transform the presumption of legislative good faith into an impenetrable shield for unconstitutional action for all redistricting decisionmakers at any stage.

The analysis in *Jackson* for each *Arlington Heights* factor is similarly distinguishable. *First*, the "impact of the official action" and "whether it 'bears more

9

heavily on one race than another'" is relevant, but the court found its probative value limited only because "districting decisions driven by partisanship will often have disparate racial effects." *Jackson*, 158 F.4th at 589–90 (quoting *Arlington Heights*, 429 U.S. at 266). Similarly, *Jackson* also found that partisan motivations could easily explain "[d]epartures from the normal procedural sequence," *Id.* at 590 (quoting *Arlington Heights*, 429 U.S. at 267). Neither of those findings can be made here, where partisanship has been disclaimed as driving the line-drawing, and Judge Henry expressly sought advice on whether the County could eliminate a majority-minority precinct. Nor can creating a "coastal precinct" explain racial effect or procedural deviations, since Judge Henry admitted he "would not have asked for" a coastal precinct map that kept the core of benchmark Precinct 3," Dkt. 250 ¶ 292, despite such a map being possible, *id.* ¶¶ 213, 286, and the coastal precinct rationale never arose in Judge Henry's initial discussions with mapdrawers, *id.* ¶¶ 206, 281.

Moreover, the record before this Court, after a two-week bench trial with dozens of witnesses and thousands of pages of exhibits, is on entirely different evidentiary footing than the record in *Jackson*. This Court has already found that (1) Defendants' asserted criteria are "inconsistent" with their contemporaneous statements, *id.* ¶ 280; (2) the redistricting process departed sharply from typical procedure in at least seven distinct respects, *id.* ¶ 232; and (3) the sole Black commissioner at the time was excluded from the process entirely, despite his precinct being the one dramatically reshaped by the enacted plan, *id.* ¶ 277–78. *See also* Dkt. 308 at 22–24. Dkt. 288 at 38–39. That is why, evaluating the totality of the record, the Court could conclude:

> This is not a typical redistricting case. What happened here was stark and jarring. The commissioners court transformed Precinct 3 from the precinct with the highest percentage of Black and Latino residents to that with the lowest percentage. Dkt. 223 at 42. The circumstances and effect of the enacted plan were "mean-spirited" and "egregious" given that "there was absolutely no reason to make major changes to Precinct 3." *Id.* at 42–43.

Dkt. 240 ¶ 420.

*Second*, the *Jackson* plaintiffs provided more attenuated historical background relating to state-level redistricting, 158 F.4th at 590, whereas this Court has made findings of recent examples of Defendants' and other local racial discrimination touching on voting. *See* Dkt. 308 at 24–26. In addition, Defendants are incorrect about preclearance denials being irrelevant post-*Shelby County*, since the historical background of continued efforts of discrimination are a well-established part of the *Arlington Heights* inquiry. *See* Dkt. 288 at 38–39; Dkt. 250 ¶¶ 160–63, 169–78, 182–85. A similar record of specific DOJ objections to county redistricting was not present in *Jackson*.

*Third*, the *Jackson* analysis properly does not require or discuss any alternative map in an *Arlington Heights* analysis. But this case is further distinguishable from *Jackson* in the thorough alternative maps presented that further rebut the presumption of legislative good faith. *See supra*, Part II.A.1.

Applying the legal standards properly deflates Defendants' argument that "Judge Henry's inquiry at the outset of redistricting about whether the County was required to maintain a majority-minority district reflects appropriate legal diligence, not discriminatory intent." Dkt. 316 at 11. Viewed in the context of voluminous evidence of Judge Henry's specific desire to dismantle the majority-minority precinct because of its

racial makeup, the evidence does not "plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10. Judge Henry had already once tried to dismantle Precinct 3 and knew his efforts failed due to its retrogressive effect on Black and Latino voters. Dkt. 250 ¶¶ 187, 200. This Court held, "[t]he 2012 objection letter put Judge Henry on notice of procedural defects that could raise concerns about the exclusion of minority stakeholders and lack of transparency—*lapses that could be viewed as evidence of intentional discrimination*." *Id.* ¶ 233 (emphasis added). Yet the 2021 process itself repeated the same procedural defects that had drawn a federal preclearance objection a decade earlier, *id.* ¶ 234, and was rushed in a way that "prevented meaningful public comment," including from Commissioner Holmes himself. *Id.* ¶ 248. Even behind the scenes, Commissioner Holmes was shut out— Judge Henry reached out to Commissioner Giusti to make sure he was comfortable with his new, dramatically altered coastal precinct, but not to Commissioner Holmes, the one commissioner whose precinct was being dismantled. *Id.* ¶ 220.

Given the various admissions by Oldham, Defendants, and Defendants' counsel, this Court is not addressing the type of "ambiguous direct and circumstantial evidence" that should be construed in the legislator's favor. *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025).

### B.  Defendants mischaracterize Plaintiffs' claims and remedy sought.

Finally, Plaintiffs must clarify several mischaracterizations of their claims.

Defendants argue that "it would be unconstitutional for the County or this Court to draw [Precinct 3] as a race-based district." Dkt. 316 at 13. That is a straw man. Plaintiffs do not and have not ever argued that Defendants had to use race to create a new district in

2021. Rather, as this Court found, the benchmark Precinct 3 had a long history over more than 30 years as "a political home of historical significance to Galveston County's Black and Latino communities." Dkt. 250 ¶ 188 (cleaned up); *see also id.* ¶ 71. That is why a least-change map in 2021 was legally sound, as Oldham and Defendants affirmed, and why intentionally dismantling that significant majority-minority precinct, with its historic communities of interest, would not have occurred but-for racially discriminatory intent. Again, even a coastal precinct could have been drawn while maintaining the historic core of the benchmark Precinct 3.

To the extent Defendants mean to suggest that no remedy would be available even if Plaintiffs prevail on their constitutional claims, *Callais* confirms that this Court can order a race-conscious district as remedy when "'remediating specific, identified instances of past discrimination that violated the Constitution or a statute.'" *Callais*, 146 S. Ct. at 1152 (quoting *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 207 (2023)). This section of *Callais* plainly belies Defendants' assertion that "[u]nder *Callais*, the *only* Constitutionally-acceptable use of race in redistricting is the creation of a VRA district under Section 2." Dkt. 316 at 12.

Plaintiffs also do not argue for a simple retrogression, proportionality, or effects test, as Defendants assert. *See id.* at 13. Unlike Defendants, who seek to invent categorical rules and standards, Plaintiffs hinge their arguments on *this* dismantling in a specific redistricting cycle resulting from *intentional* race-based decisions, that this Court already found unsupported by Defendants' purported criteria. Dkt. 250 ¶¶ 212–14, 279–92. Disproportionate impact and awareness of such are relevant as one part of an intentional

13

discrimination inquiry. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 278–79 & n.25 (1979) (holding there is a "strong inference" that adverse effects were desired when they were an inevitable, but otherwise avoidable result of a government's chosen action).

Finally, Defendants rehash their arguments from 2024 briefing that Plaintiffs cannot assert intent-based claims against Black and Latino voters in the same jurisdiction. This argument essentially grants governments the ability to racially discriminate against minorities in redistricting so long as they are discriminating against more than one minority group. *See* Dkt. 289 at 27–28. This cannot be so and is entirely at odds with expansive precedent on both racial gerrymandering and discriminatory intent claims. It particularly flies in the face of the warning in *Bartlett v. Strickland* (discussing "crossover" districts, *i.e.*, districts that do not have a majority-minority composition) that if "a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality op.). Benchmark Precinct 3 was an effective crossover district for both Black and Latino voters independently and was intentionally dismantled by Defendants.

In other words, unlike in VRA Section 2 effects claims, there is no requirement for groups to be a numerical majority to assert a statutory right. Instead, the Constitution protects individuals' rights, and the Fifteenth Amendment protects the right of individual citizens to vote: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Here, Plaintiffs are individual voters and organizations

14

representing their members who identify as Black, Latino, or both, and who were redistricted on the basis of their race (*i.e.*, not being Anglo and so not making up an Anglo majority in Precinct 3), and with discriminatory motivation. *See* Dkt. 308 at 17–18. Each individual Plaintiff was moved into a precinct where an Anglo majority controls the outcome. Dkt. 250 ¶¶ 141, 156, 418–19. That is an individual, race-based injury to each Plaintiff violating the Fourteenth and Fifteenth Amendments regardless of how Defendants characterize Plaintiffs' voting behaviors, and the appropriate inquiry is focused solely on Defendants' intent to discriminate against individuals on account of their race.

## III.    Conclusion

For the foregoing reasons, and the reasons set forth in both Plaintiffs' Supplemental Briefs, Dkt. 307 and 308, NAACP/LULAC Plaintiffs respectfully request that this Court enter final judgment in their favor on their racial gerrymandering and intentional discrimination claims.

Respectfully submitted this 21st day of July, 2026.

/s/  *Sarah Xiyi Chen*

**TEXAS CIVIL RIGHTS PROJECT**
Attorney-in-Charge
Sarah Xiyi Chen*
California Bar No. 325327
Texas Bar No. 24144784
Miranda van Dijk
Texas Bar No. 24149460
P.O. Box 17757
Austin, Texas
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
schen@texascivilrightsproject.org
mvandijk@texascivilrightsproject.org

**WILLKIE  FARR  &  GALLAGHER LLP**
Richard Mancino*
New York Bar No. 1852797
Kathryn Carr Garrett*
New York Bar No. 5923909
787 Seventh Avenue
New York, New York 10019
212-728-8000 (Telephone)
212-728-8111 (Facsimile)
rmancino@willkie.com
kgarrett@willkie.com

15

Nina Lea Oishi
Texas Bar No. 24142250
P.O Box. 1108
Houston TX 77251
noishi@texascivilrightsproject.org

Joaquin Gonzalez*
Texas Bar No. 24109935
1533 Austin Hwy.
Ste. 102-402
San Antonio, TX 78218
joaquinrobertgonzalez@gmail.com

**SOUTHERN COALITION FOR
SOCIAL JUSTICE**
Hilary Harris Klein*
North Carolina Bar No. 53711
Adrianne M. Spoto*
DC Bar No. 1736462
P.O. Box 51280
Durham, NC 27717
919-323-3380 (Telephone)
919-323-3942 (Facsimile)
hilaryhklein@scsj.org
adrianne@scsj.org

*Admitted *pro hac vice*

**Counsel for NAACP/LULAC Plaintiffs**

16

## CERTIFICATE OF SERVICE

I certify that on July 21, 2026, the foregoing document was filed electronically and served on all parties of record via CM/ECF.


/s/ *Sarah Xiyi Chen*