No. ___

# In the Supreme Court of Texas

—————

In re the Honorable Dereck Rose, Wilma Green, and Diane Merchant,

*Relators.*

—————

## ORIGINAL EMERGENCY PETITION FOR
## WRIT OF MANDAMUS

—————

Chad W. Dunn
(Tex. Bar No. 24036507)
K. Scott Brazil
BRAZIL & DUNN
1900 Pearl Street
Austin, TX 78705
(512) 717-9822
chad@brazilanddunn.com

Bernadette Reyes*
Sonni Waknin*
UCLA VOTING RIGHTS PROJECT
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
bernadette@uclavrp.org

Neil G. Baron
LAW OFFICE OF NEIL G. BARON
4903 27th Street
Dickinson, TX 77539
(281) 534-2748
neil@ngbaronlaw.com

Mark P. Gaber*
Valencia Richardson*
Simone Leeper*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
vrichardson@campaignlegal.org
sleeper@campaignlegal.org

*Motion for admission *pro hac vice* forthcoming

i

ii

# IDENTITY OF PARTIES AND COUNSEL

**Relators:**

Honorable Dereck Rose
Wilma Green
Diane Merchant

**Counsel for Relators:**

Chad W. Dunn
(Tex. Bar No. 24036507)
K. Scott Brazil
Brazil & Dunn
1900 Pearl Street
Austin, TX 78705
(512) 717-9822
chad@brazilanddunn.com

Bernadette Reyes*
Sonni Waknin*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
bernadette@uclavrp.org

Neil G. Baron
Law Office of Neil G. Baron
4903 27th Street
Dickinson, TX 77539
(281) 534-2748
neil@ngbaronlaw.com

Mark P. Gaber*
Valencia Richardson*
Simone Leeper*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
vrichardson@campaignlegal.org
sleeper@campaignlegal.org

**Respondent:**

Galveston County, Texas
Galveston County Commissioners Court
Galveston County Judge Mark Henry, in his official capacity
Galveston County Commissioner Darrell Apfell, in his official capacity
Galveston County Commissioner Joe Giusti, in his official capacity
Galveston County Commissioner Hank Dugie, in his official capacity
Galveston County Commissioner Robin Armstrong, in his official capacity
Galveston County Clerk Dwight D. Sullivan

**Counsel for Respondents:**

Joseph R. Russo, Jr.
Angie Olalde
Greer Herz & Adams, L.L.P.
123 Rosenberg St, Ste. 3000
Galveston, TX 77550-7947
(406) 797-3200
jrusso@greerherz.com
aolalde@greerherz.com

Joseph M. Nixon
J. Christian Adams
Jewel Lightfoot
Public Interest Legal Foundation
107 S. West St., Ste. 700
Alexandria, VA 22314
(713) 550-7535
jnixon@publicinterestlegal.org
jadams@publicinterestlegal.org
jlightfoot@publicinterestlegal.org

**Real Parties in Interest**

Voters of Galveston County, Texas

## TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL .................................................ii

INDEX OF AUTHORITIES .................................................................. v

STATEMENT OF THE CASE ..............................................................vii

STATEMENT OF JURISDICTION.......................................................viii

ISSUES PRESENTED ........................................................................viii

STATEMENT OF FACTS ...................................................................... 3

   I.  Relators and Respondents ............................................................. 3

   II.  Galveston County's Commissioners Court and Justices of the
      Peace/Constables' Precincts................................................... 6

   III.Galveston County's adoption of a new 2026 map ........................... 7

ARGUMENT...................................................................................... 14

   I.  The 2026 Map violates equal protection by denying voters the
      opportunity to have voted in—or declared candidacy for—the
      primary election for their new precinct........................................ 14

   II.  Galveston County's redistricting violates the Election Code's
      requirement that a primary election be held for each
      corresponding general election county officer election.................. 16

   III.The 2026 Map delays Relators' right to vote for two years
      without any justification in violation of equal protection. ............. 24

   IV.Relators are entitled to mandamus relief. ..................................... 26

   V.  Relators' petition is timely, requests precise relief, and should be
      addressed promptly.................................................................. 28

PRAYER............................................................................................ 31

CERTIFICATE OF COMPLIANCE ...................................................... 33

APPELLATE RULES 52.3(J), 52.3(K)(1)(A), .......................................... 33

CERTIFICATE OF SERVICE................................................................ 34

# INDEX OF AUTHORITIES

## Constitutional Provisions

Tex. Const. art. I, § 2 ..................................................................................3

Tex. Const. art. I, § 3 ................................................................................13

Tex. Const. art. V, § 18 .............................................................................18

Tex. Const. art. V § 18(b)..........................................................................22

Tex. Const. art. XVI, § 65 (1999)..............................................................21

## Statutes

Tex. Elec. Code Ann. § 1.0015.................................................... 17, 22, 23

Tex. Elec. Code Ann. § 1.002.....................................................................22

Tex. Elec. Code. Ann. § 41.007.................................................................18

Tex. Elec. Code Ann. § 42.002...................................................................19

Tex. Elec. Code Ann §§ 42.031-033................................................... 20, 26

Tex. Elec. Code Ann. § 42.033(c)...............................................................20

Tex. Elec. Code Ann. § 42.033(c)(1) ................................................... 20, 21

Tex. Elec. Code Ann. § 172.001........................................... 18, 22, 27

Tex. Elec. Code Ann. § 273.061(a) ...........................................................26

Tex. Local Gov't Code § 81.021 ................................................................21

## Cases

*Anderson v. City of Seven Points,*
806 S.W.2d 791 (Tex. 1991) ................................................................27

*Barshop v. Medina Cnty. Underground Water Conservation Dist.,*
925 S.W.2d 618 (Tex. 1996) ................................................................23

*Bullock v. Carter,*
405 U.S. 134 (1972) ............................................................................15

*Dick v. Kazen,*
292 S.W.2d 913 (Tex. 1956) ................................................................27

*Gray v. Sanders,*
372 U.S. 368 (1963) ............................................................................15

*In re Khanoyan,*
637 S.W.3d 762 (Tex. 2022) ..........................................viii, 24, 29, 30

*In re Rogers,*
690 S.W.3d 296 (Tex. 2024) ......................................................... viii, 26

*Jones v. Robison,*
133 S.W. 879 (Tex. 1911) ..............................................................27-28

*Love v. Wilcox,*
28 S.W.2d 515 (Tex. 1930) ...................................................................29

*Petteway v. Galveston Cnty.,*
111 F.4th 596 (5th Cir. 2024) (en banc) .................................................7

*Pub. Utility Comm'n of Tex. v. Luminant Energy Co. LLC,*
691 S.W.3d 448 (Tex. 2024) ..........................................................17, 21

*Smith v. Allwright,*
321 U.S. 649 (1944) ........................................................................1, 15

*Williams v. Castleman,*
247 S.W. 263 (1922)........................................................................16, 22

**Other Authorities**

H.R. J. Res. 62, 76th Reg. Sess. (1999)....................................................21

## STATEMENT OF THE CASE

*Nature of Proceeding:*

Direct original mandamus proceeding under Texas Election Code section 273.061.

*Respondents:*

Galveston County, Texas; the Galveston County Commissioners Court; the Honorable Mark Henry, in his capacity as Galveston County Judge; and the Honorable Darrell Apfell, Joe Giusti, Hank Dugie, and Robin Armstrong, in their official capacity as Galveston County Commissioners; Dwight D. Sullivan, in his official capacity as Galveston County Clerk.

*Challenged Action and Relief Sought:*

Under Texas law, Galveston has unlawfully enacted a general election map for commissioners' court, justice of the peace, and constable after the primary elections have already occurred, in violation of Art. V, § 18 and the Texas Election Code. With impending deadlines for the 2026 general election, mandamus relief is necessary.

Relators seek a writ of mandamus from this Court (1) declaring that Respondents' attempt to pass new maps in between the primary and general elections was done in violation of the United States and Texas Constitutions and Texas Election Code, and (2) directing Respondents not to implement the

vii

2026 map and instead conduct the 2026 general election for Galveston County's Justices of the Peace and Commissioners Court using the same precinct boundaries that were used for the 2026 primary election.

## STATEMENT OF JURISDICTION

The Court has jurisdiction to "issue a writ of mandamus to compel the performance of any duty imposed by law in connection with the holding of an election" under Texas Election Code section 273.061(a). *See, e.g., In re Rogers*, 690 S.W.3d 296, 302 (Tex. 2024) ("The Election Code unquestionably authorizes appellate courts to grant mandamus relief to compel the performance of an election-related duty."). No genuine issues of material fact exist to divest this Court of mandamus jurisdiction. Mandamus relief is necessary to remedy the violation of law ahead of the November 2026 elections. *See In re Khanoyan,* 637 S.W.3d 762, 764 (Tex. 2022).

## ISSUES PRESENTED

(1)    Whether it violates equal protection rights guaranteed by the Texas and United States Constitutions for Galveston County to change precinct boundaries between the primary and general election and thus

viii

deny certain voters and potential candidates the opportunity to have participated in the primary election.

(2)    Whether it violates the Texas Election Code for Galveston County to redraw precinct boundaries between the primary and general election and thereby conduct the November general election for new Commissioner and Justice of the Peace precincts for which no primary election was held.

(3)    Whether it violates equal protection rights guaranteed by the Texas and United States Constitutions to cause voters to experience delayed voting for staggered term offices when the County admits that its purported justification—partisan gain—cannot be realized until the next election cycle in two years and thus it has no rationale whatsoever to support delaying voting rights in the upcoming election.

**TO THE HONORABLE SUPREME COURT OF TEXAS:**

Texas law requires that general election candidates for county office be nominated in a March primary election. The Texas and United States Constitutions' equal protection guarantees confer upon voters the right to participate in primary elections on an equal basis with other voters. *See Smith v. Allwright*, 321 U.S. 649, 661-62 (1944).

Last week, in a court hearing before United States District Judge Jeffrey Vincent Brown, Galveston County clarified that it intends to hold the November 2026 general election for two County Commissioner precincts and three Justice of the Peace precincts under new boundaries that differ from the boundaries under which the March primary election was conducted. That is, it intends to hold a general election despite holding no corresponding primary election for five different precincts.

This is unlawful. It denies equal protection by precluding certain voters and potential candidates from participating in the primary election on an equal basis as others. It violates the Texas Election Code, which requires there to be a primary election for county offices to be elected at the November general election. And it violates equal protection by delaying for two years many voters' right to cast a ballot by abruptly

1

shifting them into a new precinct that will next vote in 2028—especially as here where the government concedes that its proffered rationale cannot be advanced until the next election cycle.

Galveston County must be precluded from implementing its new map. Unlike other cases in which courts are asked to intervene close to an election, granting relief here will ease, rather than cause, disruption in the electoral process. The maps used for the March primary are ready to be used for the November election. Those are the maps with which the County's election staff, the voters, and the candidates are familiar because those were the maps that were used to nominate candidates for the general election.

If this is not stopped, the precedent set will be horribly damaging to democracy. It will make Texas's primary elections an empty exercise. The voters' choices just cast aside on the whim of the government—the very governmental officials *on the ballot* in the ongoing election. If polling against their general election opponent is looking bad, they can just change the map—up to the very eve of the election—to evade the voters' judgment. It won't just be Galveston County. Other counties and political subdivisions will act if the Court does not block this. In fact, that could

happen yet in advance of the November election. If the majority of a county's commissioners court has a disfavored colleague or challenger standing for election this November, inaction from this Court in response to this Petition will greenlight them to redraw their maps prior to November, thwarting the voices of voters—perhaps in a perpetual "post-primary" redistricting scheme.

Texans, who "stand[] pledged to the preservation of a republican form of government" and in whom "[a]ll political power is inherent[,]" Tex. Const. art. I, § 2, will see those fundamental guarantees eviscerated if this Court does not act.

The law forbids Galveston County from changing the electoral system mid-election. The Court must act.

## APPENDIX

The appendix to this petition will be cited as "App. [tab]."

## STATEMENT OF FACTS

### I.    Relators and Respondents

Relator Derek Rose is a resident of Galveston County and a registered voter. He was elected as the Galveston County Constable for Precinct 3 in 2024. Under the maps in place for the March 2026 primary

3

election, Constable Rose was a resident of Justice of the Peace and Constable Precincts 3 and Commissioners Court Precinct 1. Following the June redistricting, he now resides in Precinct 4 for all three maps. Consequently, he was denied the right to cast a ballot (or consider candidacy) for Commissioners Court Precinct 4, which is on the ballot in the November general election. Moreover, if the County conducts the Justice of the Peace general election in the same precinct numbers that were on the ballot in the March primary election (Nos. 1, 2, and 3), he will have no opportunity to cast a general election ballot in the precinct in which the primary election was held and will likewise be subjected to a two-year delay in voting for Justice of the Peace—waiting six rather than four years to cast his ballot—on account of the mid-election redistricting.

Relators Wilma Green and Diane Merchant are each residents of Galveston County and registered voters. At the time of the March 2026 primary election, they were residents of Justice of the Peace and Constable Precincts 3. As a consequence of the mid-election redistricting, they now reside in Precinct 4. If the County conducts the Justice of the Peace general election in the same precinct numbers that were on the

4

ballot in the March primary election (Nos. 1, 2, and 3), they will have no opportunity to cast a general election ballot in the precinct in which the primary election was held and they will likewise be subjected to a two-year delay in voting for Justice of the Peace—waiting six rather than four years to cast her ballot—on account of the mid-election redistricting.

Respondent Galveston County, Texas is a political subdivision of the State of Texas.

Respondent Galveston County Commissioners Court is comprised of a County Judge and four County Commissioners. This body is a constitutional court, created by the Texas Constitution with judicial, administrative, and legislative powers. The Galveston County Commissioners Court is the body directly responsible for passage of redistricting plans for both Commissioners' precincts and for Justice of the Peace/Constables' precincts. As outlined below, on June 29, 2026, the Commissioners Court passed new, identical redistricting plans for Commissioners' precincts and for Justice of the Peace/Constables' precincts (the "2026 Map").

Respondent Mark Henry is the current and duly elected County Judge for Galveston County. He is named herein in his official capacity

5

only. He voted in favor of the 2026 Map. Respondents Darrell Apffel, Joe Giusti, Hank Dugie, and Robin Armstrong are the current and duly elected Commissioners for Precincts 1, 2, 3, and 4 respectively. They are named herein in their official capacity only. Each of them voted in favor of the 2026 Map.

Respondent Dwight D. Sullivan is the Galveston County Clerk and is responsible for administering elections in Galveston County. He is named in his official capacity only.

## II.    Galveston County's Commissioners Court and Justices of the Peace/Constables' Precincts

On August 19, 2013, the Galveston County Commissioners Court voted to adopt a redistricting plan for Justices of the Peace/Constables ("2013 Map"). App. L. The Commissioners Court did not adopt a new redistricting plan for Justices of the Peace/Constables following the 2020 census, so every election for Justices of the Peace and Constables since August 19, 2013 has been conducted under the 2013 Map.

On November 12, 2021, the Commissioners Court adopted a new redistricting plan for its own precincts following the 2020 census ("2021 Map"). App. K. The 2021 Map was challenged in federal court pursuant to Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth

6

Amendments of the U.S. Constitution. Second Am. Compl., *Petteway v. Galveston Cnty.*, 3:22-cv-00057, (S.D. Tex. May 25, 2022), ECF No. 42. That case went to trial in August 2023. The federal district court found in favor of the plaintiffs on their Section 2 vote dilution claim but was ultimately reversed by the Fifth Circuit sitting en banc and remanded for the consideration of plaintiffs' outstanding intentional discrimination and racial gerrymandering claims. *Petteway v. Galveston Cnty.*, 111 F.4th 596, 614 (5th Cir. 2024) (en banc). The federal district court has yet to rule on plaintiffs' outstanding claims (though has indicated a ruling is imminent), and every election for Commissioners Court since November 12, 2021 has been conducted under the 2021 Map.

## III.   Galveston County's adoption of a new 2026 map

The 2026 primary election for Galveston County took place on March 3, 2026, using the 2013 Map for the Justices of the Peace contests and the 2021 Map for the Commissioners Court contests. App. J. The 2026 primary for Justices of the Peace included Republican candidates for Precincts 1 and 2 and a Democratic candidate for Precinct 3. *Id.* The Justice of the Peace for Precinct 4 is up for election this year. The 2026 primary for Commissioners Court included Republican candidates for

7

Precincts 2 and 4. *Id.* Commissioners for Precincts 1 and 3 are not up for election this year.

On April 29, 2026, the United States Supreme Court issued its decision in *Louisiana v. Callais*, a case regarding the federal Voting Rights Act, and, on May 19, 2026, the federal district court hearing the challenge to the 2021 Map issued an Order for Supplemental Briefing on what impact the *Callais* case could have on the pending claims. App. H. The Court ordered that it would hear oral argument on the supplemental briefing on July 28.

On June 8, 2026, the Galveston County Commissioners Court passed a resolution to reexamine the precinct boundaries for Justices of the Peace, Constables, and County Commissioners. App. G. The resolution contained several "whereas" clauses and a numbered list of the bases for the reexamination, including the *Callais* decision and the improvement of partisan performance for Republican candidates. *Id.* The County Judge and two Commissioners voted in favor of this resolution, with the remaining two commissioners absent. *Id.*

On June 29, 2026, the Galveston County Commissioners Court adopted the 2026 Map, which contained new precinct lines for Justices of

8

the Peace, Constables, and County Commissioners. App. B. The Order contained just two "whereas" clauses providing the bases for the new precincts, but neither mentioned the *Callais* decision or partisan performance. *Id.* Instead, the justification was simply that the Commissioners Court "desire[d]" to divide the boundaries and "determined that the interests of the people of the county are best served by changing the existing Commissioners, Constables, and Justices of the Peace Precinct Boundaries." *Id.* The entire Commissioners Court, including the County Judge and all four Commissioners, voted in favor of this Order. *Id.* On June 30, 2026, Galveston County filed a Suggestion of Mootness in the federal case challenging the 2021 Map, citing the newly passed 2026 Map. App. I.

At the July 28, 2026 hearing, both the plaintiffs and Judge Brown expressed the need for clarity on which map Galveston County was intending to implement for the November 2026 election, given that the primary elections resulting in the nominees for Justices of the Peace and Commissioners had been conducted using the 2013 and 2021 Maps respectively. App. A at 6:25-7:3 (Plaintiffs' counsel: "I think we need some clarity from the County about whether [the 2026 Map] is actually

9

governing the November election and they are actually holding an election in which there has not been a primary election?"); *id.* at 7:4-16 (Judge Brown: "Okay. Let's stop there because that's a question I had, too. What is the County's position on that?" . . . Judge Brown: "Okay. So even though the 2026 primary, the candidates – the nominees chosen by the two parties were working under a different map, the primary was held under the 2021 map and the general election is going to be held under the 2026 map? That's the County's position?" Defendants' Counsel: "Yes.").

Galveston County's counsel further said "Now, two candidates. Basically the JP in 3 is now the JP in 4. And the JP in 4 is now the JP in 3 on the November elections . . . and both are running unopposed." *Id.* at 7:17-19. But only one of those precincts was on the March primary ballot—Justice of the Peace Precinct 3, which resulted in the nomination of Democrat Billy Williams—and the other officeholder who had been the Justice of the Peace for Precinct 4 (Republican Kathleen McCumber) has two years left in her term, having been last elected in 2024. From the County's representation to the federal court, it is unclear how they plan to conduct the election. Is the County planning to hold the general

10

election within the boundaries of Precinct 4 under the 2026 Map, to which they have now designated Mr. Williams as the Justice of the Peace? Or is it planning to hold the general election in Precinct 3's new boundaries, which was the number-designated precinct on the March primary ballot but which now has a Justice of the Peace whose term continues for two more years? Or, as the County's counsel's comments seem to reflect, is it planning to hold a general election in both? Either way, no primary election was held within the full territory of *any* precinct slated for the November general election.

When asked by Judge Brown "[a]re y'all aware of an instance when this has happened before when a map has been changed between the primary and the general," Defendants' counsel responded "[n]o." *Id.* at 8:3-6.

Despite offering partisanship as a reason for the mid-election cycle redistricting at the oral argument, Galveston County agreed that, if the 2026 general election were to move forward under the 2026 Map, the "status quo" would be maintained with respect to the breakdown of Democratic and Republican Justices of the Peace. *Id.* at 38. This is because the primary for Justice of the Peace Precinct 3—which has

11

improved Republican performance in the 2026 Map as opposed to a Democratic lean under the 2013 Map—has already been completed with the Democratic candidate running unopposed. *Id.* at 36-37. So, Precinct 3 (perhaps now on the ballot as Precinct 4) will necessarily deliver a Democratic Justice of the Peace absent a successful write-in campaign in opposition. *Id.*

The 2021 Map[1] and the 2026 Map[2] are shown below. There was a primary election in March 2026 held within the boundaries of Commissioners Court Precincts 2 and 4 under the 2021 Map. The County intends to hold a general election within the boundaries of Precincts 2 and 4 under the 2026 Map. As a consequence, many voters (such as Relator Rose with respect to the Commissioners Court map) who will now participate in the November general election were precluded from participating in the March 2026 primary elections—either as voters or candidates—for the two commissioners court precincts and the three

---

[1]*Galveston Cnty. Comm'r Precincts* (last viewed Aug. 4, 2026), https://www.arcgis.com/apps/webappviewer/index.html?id=ffb008277ace4c6b9d9f82 c1838ee8a0&extent=-10631799.478%2C3386023.1822%2C-10485040.3837%2C3453211.33%2C102100.

[2] *Galveston Cnty. JP Precincts* (last viewed Aug. 4, 2026), https://experience.arcgis.com/experience/9efefdcb9ba647f9841d2f530fdcc622?org=ga lvcountymaps.

justice of the peace precincts up for election this year. Many voters participated in a primary election for a different precinct than that in which the general election will occur, many others participated in the March 2026 primary election but have been moved to precincts in which there will be no November general election, and people who may have wished to run as a candidate in the March primary were precluded from doing so because they were only moved into the new general election precincts after the primary was held. Voters who were in the precincts up for election at the time of the primary election but no longer are (as is the case for all Relators) will see their right to vote for Justice of the Peace delayed two years, resulting in a six-year period between elections. Other Galveston County voters will be able to vote for these offices after either four or even just two years as a result of the latest redistricting.

13

| 2021 Map | 2026 Map |
|---|---|



## ARGUMENT

**I.    The 2026 Map violates equal protection by denying voters the opportunity to have voted in—or declared candidacy for—the primary election for their new precinct.**

The 2026 Map violates equal protection by denying voters the opportunity to vote in, or declare their candidacy for, the primary election for the offices up for election in November. The Texas Constitution mandates that "[a]ll freemen, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." Art I, § 3. The Fourteenth Amendment to the United States Constitution guarantees equal protection of law. And the United States Supreme Court has long recognized that voters have an equal protection interest

14

in participating in primary elections. *See, e.g., Bullock v. Carter*, 405 U.S. 134, 140–41 (1972) (recognizing that primary elections are "the creature of state legislative choice . . . [that] must be exercised in a manner consistent with" equal protection); *Gray v. Sanders*, 372 U.S. 368, 380 (1963); *see also Smith v. Allwright,* 321 U.S. 649, 661–62 (1944) ("[I]t may now be taken as a postulate that the right to vote in such a primary for the nomination of candidates . . . like the right to vote in a general election, is a right secured by the Constitution."). Likewise, in *Gray*, the Supreme Court recognized that "the right to have one's vote counted has the same dignity as the right to put a ballot in a box." 372 U.S. at 380 (citation modified).

Here, by adopting a new map between the primary election and the general election, Galveston County has (1) denied some voters who will vote in the general election for Commissioners Court and Justice of the Peace the right to participate in the corresponding primary election (or, for some, *any* primary at all), (2) denied anyone newly added to the precincts on the ballot in November the chance to declare their candidacy for the March primaries for those offices, (3) denied some voters who cast ballots in the primary the ability to support their preferred candidate in

15

the general election, and (4) effectively nullified the votes cast in the March primary for all the precincts up for election this year.

By denying some (but not other) voters and potential candidates the right to participate in the primary election, Galveston County has violated the equal protection guarantees of the Texas and United States Constitutions.[3]

## II.　Galveston County's redistricting violates the Election Code's requirement that a primary election be held for each corresponding general election county officer election.

Galveston's decision to replace the maps governing the 2026 countywide general election after the primary election was already held violates the Texas Constitution and the Texas Election Code. While article V, section 18(a) of the Constitution grants commissioners courts the power to redistrict "from time to time, for the convenience of the people," like all its powers, they may only be exercised in a manner "as is conferred by this Constitution and the laws of the State, or as may be hereafter prescribed." *Id.* § 18(b); *accord Williams v. Castleman,* 247 S.W.

---

[3] Relators' claims are not mooted by the fact that the primary election already occurred. Their injury is being subjected in November to a general election for precinct offices for which they were excluded from participating in the primary and precluded from declaring their candidacy.

16

263, 266-67 (1922) (recognizing that the Legislature may restrain commissioners' courts' power under article V, section 18); *see also* Tex. Elec. Code Ann. § 1.0015.

> When the Court interprets statutes, it
>
> discern[s] [its] objectives from its plain text. That text must always be read in context—not isolation. [The Court] give[s] meaning to every word in a statute, harmonizing each provision, while consider[ing] the context and framework of the entire statute, in order to meld its words into a cohesive reflection of legislative intent.

*Pub. Util. Comm'n of Tex. v. Luminant Energy Co.*, 691 S.W.3d 448, 460-61 (Tex. 2024) (quotation marks and citations omitted).

Applying these principles, it is apparent that the Legislature has restricted the power of Commissioners Courts to redistrict precinct boundaries to prevent exactly what Galveston County has done here: holding a general election for a precinct-based county office for which there has been no primary election.

Throughout various provisions of the Election Code, the Legislature exercised its power to require that county officers be elected during a primary election and a general election, within precinct boundaries drawn ahead of the primary. As a threshold matter, the Election Code expressly requires that "a political party's nominees in the general

17

election for offices of state and county government . . . must be nominated by primary election." Tex. Elec. Code Ann. § 172.001. The primary must be held on the first Tuesday in March in each even-numbered year. Tex. Elec. Code. Ann. § 41.007.

Accordingly, the boundaries of the precincts from which county officers are elected necessarily cannot change between the March primary election and the November general election. The offices of County Commissioner, Justice of the Peace, and Constable are defined by their boundaries. *See* Tex. Const. art. V, § 18. If a boundary changes between the March primary election and the November general election, the precinct in which the general election is held will not be the same as the precinct in which the primary was held. That is, contrary to section 172.001's requirement, there will have been *no* primary election for the precinct-based county office on the ballot in November, as that precinct did not exist at the time the primary was held.

Such is the case for the 2026 Map, where the boundaries of Justice of the Peace Precincts 1, 2, and 3 and Commissioners Court Precincts 2 and 4—which are all up for election in November—have had no primary election held within their boundaries. Only some, but not all, of the voters

18

in these newly configured precincts were eligible to vote in the March primary election. Moreover, people who should have been eligible to run as candidates in those primaries were precluded from doing so because the County waited until after the March primary to adjust the boundaries. It does not matter that the primaries for each of the precincts under the 2021 Map featured unopposed candidates. In 2023, the Legislature amended the Election Code to repeal section 2.056, which had allowed unopposed candidates to be declared elected. Tex. Sec'y of State, Election Advisory No. 2023-27 (Dec. 23, 2023), https://www.sos.state.tx.us/elections/laws/advisory2023-27.shtml.   And the County's actions thwarted the chance for contested elections in both the primary and general election.

By requiring that county officers be nominated in a primary, the Legislature necessarily precluded any post-primary change to precinct boundaries for those precincts that are up for election in November.

This conclusion is supported by other statutory provisions. The Legislature has specified that county election precincts "are the election precincts" for both the primary *and* general countywide elections. Tex. Elec. Code Ann. § 42.002. The Election Code further specifies that

19

commissioners courts must reevaluate election precincts for compliance with the Election Code every odd-numbered year—*i.e.*, in between election cycles—no later than April or May, Tex. Elec. Code Ann. § 42.031, and "each commissioners court shall order the changes" to election precincts "before October 1 of the year in which the redistricting is done" for state legislative seats—*i.e.*, the calendar year prior to an election year, Tex. Elec. Code Ann. § 42.033.

The Election Code expressly contemplates the need to redraw the maps ahead of the primary, by providing that "[a] change in a county election precinct boundary may not take effect on a date occurring between the date of the general primary election and the date of the general election for state and county officers[.]" Tex. Elec. Code Ann. § 42.033(c). Although it creates an exception for "a boundary change made under Article V, Section 18, of the Texas Constitution," *id.* § 42.033(c)(1), that exception must be interpreted in context and harmony with the rest of the Code. The Constitution was amended to require staggered elections for County Commissioners beginning with the November 1956 election, with County Commissioners for Precincts 1 and 3 elected during presidential election cycles and Precincts 2 and 4

20

elected in midterm election cycles. *See* Tex. Const. art. XVI, § 65 (1999).[4]

Because two of the four Commissioner precincts are *not* up for election each election cycle, boundary changes affecting only those two *off-cycle* Commissioner precincts can occur in the time between a primary and general election for the *on-cycle* precincts without causing any conflict with section 172.001's requirement that a primary election be held for county office on the general election ballot. Properly construed, section 42.033(c)(1) thus provides an exception allowing alterations to election precinct boundaries in that circumstance. But it cannot be read to greenlight election precinct changes between the primary and general election occasioned by reconfiguring boundaries for Commissioner, Justice of the Peace, or Constable precincts that are being elected that year. Such a reading would conflict directly with section 172.001 by allowing general elections to occur for county offices for which no primary election has been held—exactly the type of interpretation that must be avoided if possible. *See Luminant Energy Co.*, 691 S.W.3d at 460-61.[5]

---

[4] Because the staggering was achieved by the earlier amendment, it was later removed from the Constitution. H.R. J. Res. 62, 76th Reg. Sess. (1999).

[5] Similarly, Local Government Code section 81.021's timing provision for changes in precinct boundaries is not to the contrary. It provides that when redistricting occurs, the map must take effect by January 1 following a general election, which aligns with the beginning of the elected commissioners' terms. It merely regulates when terms

21

By setting forth specific deadlines by which boundary changes must occur, all ahead of the primary election, and by requiring that each county office undergo a primary election in March, the Legislature has necessarily prohibited boundary changes to precinct-based county offices in the time period between a primary election and a general election for that office. *See* Tex. Const. art. V, § 18(b) (requiring Commissioners Courts to exercise their power "as is conferred by this Constitution *and the laws of the State, or as may be hereafter prescribed*") (emphasis added); *Williams v. Castleman,* 247 S.W. at 266-67 (explaining that Commissioners Courts' power to redistrict "from time to time, for the convenience of the people" under Art. V, § 18 is subject to "reasonable legislative action" restricting it).

This interpretation of the Election Code, which harmoniously gives meaning to all its provisions, is likewise compelled by section 1.0015, which provides that "[i]t is the intent of the legislature that the

---

begin following a lawfully conducted redistricting. It cannot be interpreted to permit redistricting to occur between the primary and general election, as that would directly conflict with the Election Code, which mandates primary elections to occur in the boundaries of precincts being elected at the general election. *See* Tex. Elec. Code Ann. § 172.001; *see also* Tex. Elec. Code Ann. § 1.002 ("This code supersedes a conflicting statute outside this code unless this code or the outside statute expressly provides otherwise.").

22

application of this code and the conduct of elections be uniform and consistent throughout this state to," *inter alia*, "promote voter access." Tex. Elec. Code Ann. § 1.0015. The Election Code cannot be interpreted to exempt County Commissioner and Justice of the Peace positions from the requirement that they undergo a primary election in March. It cannot be interpreted to permit Galveston County to hide the ball on its proposed precinct boundary changes until after the primary election, thereby precluding would-be candidates from running in the primary election.

Moreover, this interpretation is compelled by the constitutional avoidance principle to avoid the equal protection violations that result from interpreting the Election Code to permit a boundary change between the primary and general election. *See supra* Part I; *see also Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 629 (Tex. 1996) ("When possible, we are to interpret legislative enactments in a manner to avoid constitutional infirmities.").

Because Galveston County has failed to hold a primary election for the Commissioners Court and Justice of the Peace precincts set forth in the 2026 Map that are up for election in November 2026, its imposition is prohibited by Texas law and a writ of mandamus should issue to block

23

its implementation and require implementation of the maps that correspond with the March primary election.

### III. The 2026 Map delays Relators' right to vote for two years without any justification in violation of equal protection.

The 2026 Map also violates the equal protection guarantees of the Texas and United States Constitutions because it, without advancing any governmental objective whatsoever, delays Relators' right to vote for certain offices for two years—a right that would otherwise have arisen in November 2026. Other Galveston County voters will have just voted for Commissioner two years ago yet will vote again this fall if the 2026 Map is permitted to stand. This denies equal protection under the circumstances of this case.

In *In re Khanoyan,* Harris County voters faced a "redistricting combined with staggered elections" which made it "inevitable that some voters who would have voted in 2022 under an old map will end up voting in 2024 under a new map." 637 S.W.3d 762, 764 (Tex. 2022). This Court observed that mandamus could be an appropriate vehicle to address the question, but for reasons particular to the posture of that case denied relief. In doing so, the Court noted that the issue raised "a serious question." *Id.* at 769.

24

In *Khanoyan*, Harris County explained that the shifting of voters and resulting delayed voting was done in part to unify communities of interest. *Id*. at 764. Here, Galveston County has suggested that partisan improvement for Republicans was its interest, but when pressed by Judge Brown at the recent federal court hearing about how that could be so, the County acknowledged that it could not actually realize that goal until the November 2028 election. App. A at 36:12-37:24[6] So the County is left with *nothing* to justify causing Relators and those similarly situated to see their right to vote needlessly delayed two years. Regardless of whether partisan advantage could justify this conduct under different circumstances, when the government admits that its actions will not even achieve that result in the upcoming election it cannot possibly be a sufficient justification to cause voters to suffer delayed voting. Nor can merely seeking to evade a federal court judgment regarding the 2021 Map justify denying voters the right to vote on schedule in the November 2026 election.

---

[6] The County's counsel observed that the 2026 Map would increase the Republican performance of Commissioners precincts up for election this year, but those candidates are unopposed. *Id*.

25

As Relators explain below, this case does not feature any of the complexities of *Khanoyan*. A writ of mandamus compelling Respondents not to implement the 2026 Map will automatically revive the maps that were used for the 2026 primary election (or their use can in any event be compelled). There is no population equality problem with those maps as there was with the benchmark map in *Khanoyan*. The Court need not take any remedial steps that caused it concern in *Khanoyan*.

## IV.    Relators are entitled to mandamus relief.

This Court has jurisdiction to issue mandamus relief to order Galveston to use the same maps for the 2026 general elections that were used in the primary elections.[7] "The supreme court [] may issue a writ of mandamus to compel the performance of any duty imposed by law in connection with the holding of an election[.]" Tex. Elec. Code Ann. § 273.061(a); *In re Rogers*, 690 S.W.3d 296, 302 (Tex. 2024) ("The Election

---

[7] To be clear, Relators also challenge the validity of the 2021 map under federal law, for separate violations of the United States Constitution. *See* Compl., *Petteway v. Galveston Cnty.*, 3:13-cv-00308, (S.D. Tex. Aug. 26, 2013), ECF No. 1. However, Relators aver that one violation should not beget another; while the legality of the 2021 map is adjudicated in federal court, Galveston should not be allowed to implement a map under which no primary election has been held in clear violation of United States and Texas law.

Code unquestionably authorizes appellate courts to grant mandamus relief to compel the performance of an election-related duty.").

"A writ of mandamus will issue to compel a public official to perform a ministerial act." *Anderson v. City of Seven* Points, 806 S.W.2d 791, 793 (Tex. 1991). "An act is ministerial when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion." *Anderson,* 806 S.W.2d at 793. Respondents have a clear duty not to violate Relators' equal protection constitutional rights. Moreover, the Legislature expressed a clear duty to hold a primary election for countywide offices, Tex. Elec. Code Ann. § 172.001, under boundary lines which were established before the primary election, Tex. Elec. Code Ann §§ 42.031-033. The relevant provisions of the Election Code "spell[] out the act to be performed by the mayor with sufficient certainty so that nothing is left to the exercise of discretion." *Anderson,* 806 S.W.2d at 793.

Further, this Court has jurisdiction to issue a writ of mandamus where the facts are undisputed, *Dick v. Kazen,* 292 S.W.2d 913, 915 (Tex. 1956), or where any questions of fact that exist are "wholly irrelevant to any issue before this court." *Jones v. Robison,* 133 S.W. 879, 881 (Tex.

27

1911). Here, the relevant facts—that the 2026 primary election was conducted under one set of maps and that Galveston County now seeks to conduct the 2026 general election under a different set of maps—are undisputed. There are no relevant fact questions in dispute. Therefore, Relators are entitled to mandamus relief to prevent Galveston from using the 2026 Map in the upcoming general elections.

## V.    Relators' petition is timely, requests precise relief, and should be addressed promptly.

Relators have appropriately brought this petition before this Court, seeking relief that is precise and administrable. While it is possible for Relators to receive their requested relief without causing any disruption or delay to the election calendar, rapid adjudication is necessary to ensure that Galveston County's general election is conducted in the same districts as the primary election as guaranteed by the United States and Texas Constitutions and the election code.

Relators filed this mandamus petition as soon as possible following the July 28, 2026 representation of Galveston County in federal court that it intended to carry out the 2026 general election using different districts than it used for the corresponding 2026 primary election. App. A at 6-7. Given the impending electoral deadlines for the 2026 general

28

election, Relators have filed this mandamus petition invoking this Court's original jurisdiction. This is necessary, because "urgency makes proceeding in a district court impracticable." *In re Khanoyan*, 637 S.W.3d 762, 766 (Tex. 2022); *see Love v. Wilcox*, 28 S.W.2d 515, 521 (Tex. 1930) ("[T]he remedy of mandamus must be pursued in the lower courts unless it is made plain that urgent necessity calls for the exercise of the original jurisdiction of the Supreme Court.").

Granting Relators' requested relief, however, need not cause any disruption or delay to the election calendar in Galveston County. The first relevant deadline related to the 2026 general election, the last day for candidates for county office to file as a write-in candidate for the November general election, is not until August 17, 2026.[8] This is also the date by which the Texas Secretary of State recommends that "[t]he political subdivision should confirm that the most recent maps or boundary changes have been provided to the voter registrar."[9] Accordingly, granting relief by this date would ensure there is no

---

[8] Tex. Sec'y of State, *November 3, 2026 Election Law Calendar* (last visited Aug 4, 2026), https://www.sos.state.tx.us/elections/laws/advisory2026-21-november-3-election-law-calendar.shtml.

[9] *Id.*

disruption whatsoever to the election calendar. And, even if relief from this Court were to come after that date, the deadline for a declaration of write-in candidacy could be extended with relatively little burden. The next relevant deadlines are not until August 28 (deadline for the county judge to certify names of independent and declared write-in candidates to county election officer for placement on the general election ballot) and September 19 (deadline to mail ballots to military or overseas voters who already submitted ballot requests).[10] There is, therefore, sufficient time for this Court to act without providing any significant disruption and with no delay whatsoever for the 2026 general election.

The timing of Relators' petition and nature of the relief requested make it possible for this Court "to order relief that would not disrupt the larger election." *In re Khanoyan*, 637 S.W.3d at 764. Unlike in the recent case considered by this Court, *In re Khanoyan*, here there is "precision about the requested relief." *Id.* at 769. Relators do not seek the imposition of any novel map nor is there a question as to the process by which relief could be afforded. Relators merely request that this Court order that Galveston County use for the 2026 general election *the very maps* that

---

[10] *Id.*

30

were used in the 2026 primary. This relief would alleviate, rather than impose, burdens on Galveston's election officials who are now being asked to conduct a general election under novel maps for Galveston's Justices of the Peace and Commissioners Court, setting aside the plans that have been utilized in every election since they first passed in 2013 and 2021 respectively. Likewise, the relief sought by Relators would alleviate, rather than impose, the burden of electoral confusion on Galveston's voters, many of whom are currently set to arrive at the polls for the general election to discover candidates and positions entirely different than the ones they expected to see based on the votes they cast in the primary mere months prior. *Cf. id.* at 765.

## PRAYER

Relators request that the Court grant the petition and issue a writ of mandamus ordering Respondents not to implement the 2026 Map.

August 4, 2026                          Respectfully submitted,

                                        */s/ Chad W. Dunn*
                                        Chad W. Dunn
                                        State Bar No. 24036507
                                        K. Scott Brazil
                                        BRAZIL & DUNN, LLP
                                        1900 Pearl Street
                                        Austin, Texas 78705
                                        Telephone: (512) 717-9822
                                        Facsimile: (512) 515-9355

31

chad@brazilanddunn.com

Mark P. Gaber*
Valencia Richardson*
Simone Leeper*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
sleeper@campaignlegal.org
vrichardson@campaignlegal.org

Bernadette Reyes*
Sonni Waknin*
UCLA VOTING RIGHTS PROJECT
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
bernadette@uclavrp.org

Neil G. Baron
LAW OFFICE OF NEIL G. BARON
4903 27th Street
Dickinson, TX 77539
(281) 534-2748
neil@ngbaronlaw.com

*Motion for admission *pro hac vice*
forthcoming

32

## CERTIFICATE OF COMPLIANCE

In compliance with Tex. R. App. P. 9.4(i)(3), I certify that this brief was prepared with Century Schoolbook typefaces, in 14-point height for body text and 12-point text for footnotes. I further certify that this document contain 6,277 words, excluding the portions of the document exempted by Rule 9.4(i)(1).

/s/ Chad W. Dunn
Chad W. Dunn

## APPELLATE RULES 52.3(J), 52.3(K)(1)(A), and 52.7(A) CERTIFICATION

My name is Chad Dunn.  I am over the age of 18, and I am fully competent to execute this Certification. I am counsel for Relators in this case. I am the person filing the Petition.

I have reviewed the foregoing Petition and concluded that every factual statement in the Petition is supported by competent evidence included in the Appendix or Record.

The Record contains a true and correct copy of every document that is material to the Relators' claim for relief.

/s/ Chad W. Dunn
Chad W. Dunn

## CERTIFICATE OF SERVICE

I certify that on August 4, 2026, a true and correct copy of the foregoing document has been served via the Court's e-filing system on the below parties:

Joseph R. Russo, Jr.
Angie Olalde
Greer Herz & Adams, L.L.P.
123 Rosenberg St, Ste. 3000
Galveston, TX 77550-7947
(406) 797-3200
jrusso@greerherz.com
aolalde@greerherz.com

Joseph M. Nixon
J. Christian Adams
Jewel Lightfoot
Public Interest Legal Foundation
107 S. West St., Ste. 700
Alexandria, VA 22314
(713) 550-7535
jnixon@publicinterestlegal.org
jadams@publicinterestlegal.org
jlightfoot@publicinterestlegal.org

/s/ Chad W. Dunn
Chad W. Dunn

34

No. ___

# In the Supreme Court of Texas

_____

In re Rose et al,

*Relators.*

_____

## APPENDIX TO PETITION FOR REVIEW

_____

Chad W. Dunn
(Tex. Bar No. 24036507)
K. Scott Brazil
BRAZIL & DUNN
1900 Pearl Street
Austin, TX 78705
(512) 717-9822
chad@brazilanddunn.com

Bernadette Reyes*
Sonni Waknin*
UCLA VOTING RIGHTS PROJECT
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
bernadette@uclavrp.org

Neil G. Baron
LAW OFFICE OF NEIL G. BARON
1010 E Main Street, Ste. A
League City, TX 77573
(281) 534-2748
neil@ngbaronlaw.com

Mark P. Gaber*
Valencia Richardson*
Simone Leeper*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
sleeper@campaignlegal.org
vrichardson@campaignlegal.org

*Motion for admission *pro hac vice* forthcoming

1

## INDEX OF APPENDIX

July 28, 2026 Petteway Hearing Transcript  ................................ Tab A

June 29 Order Establishing New Precincts ................................... Tab B

June 29 Commissioners Court Meeting Agenda ........................... Tab C

June 29 Commissioners Court Meeting Minutes .......................... Tab D

June 8 Commissioners Court Meeting Agenda  ........................... Tab E

June 8 Commissioners Court Meeting Minutes ........................... Tab F

June 8 Resolution to Reexamine Precinct Boundaries ................. Tab G

May 19 Order for Supplemental Briefing ...................................... Tab H

June 30 Suggestion of Mootness Filing ........................................ Tab I

March 2026 Galveston Election Results ........................................ Tab J

November 12, 2021 Commissioners Court Order Establishing New
Commissioner Precinct Boundaries .............................................. Tab K

August 19, 2013 Commissioners Court Redistricting Order Establishing
Justice of the Peace Precinct Boundaries ...................................... Tab L

# Tab A:

# July 28, 2026 Petteway Hearing Transcript

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| HONORABLE TERRY | § | 3:22-CV-00057 |
| PETTEWAY, ET AL | § | |
| | § | |
| V. | § | 10:01 A.M. TO 11:59 A.M. |
| | § | |
| GALVESTON COUNTY, TEXAS, | § | |
| ET AL | § | JULY 28, 2026 |

FINAL HEARING
BEFORE THE HONORABLE JEFFREY V. BROWN
Day 1  of 1 Day

APPEARANCES:

**FOR THE PETTEWAY PLAINTIFFS:**
Mr. Mark P. Gaber
Ms. Valencia Richardson
Ms. Simone Leeper
Campaign Legal Center
1101 14th Street NW
Suite 400
Washington, DC  20005
(202) 736-2200
mgaber@campaignlegal.org
vrichardson@campaignlegalcenter.org
sleeper@campaignlegal.org
   and
Mr. Neil G. Baron
Law Office of Neil G. Baron
1010 E. Main Street
Suite A
League City, Texas  77573
(281) 534-2748
neil@ngbaronlaw.com
   and
Mr. Chad W. Dunn
Brazil & Dunn
1900 Pearl Street
Austin, Texas  78705
(512) 717-9822
chad@brazilanddunn.com

**FOR THE PETTEWAY PLAINTIFFS (continued):**
Ms. Bernadette Samson Reyes
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, California  90095
(310) 400-6019
bernadette@uclavrp.org

**FOR THE NAACP PLAINTIFFS:**
Ms. Sarah Xiyi Chen
Ms. Miranda van Dijk
Ms. Nina Oishi
Mr. Joaquin Gonzalez
Texas Civil Rights Project
P.O. Box 17757
Austin, Texas  78741
(512) 474-5073
schen@texascivilrightsproject.org
mvandijk@texascivilrightsproject.org
noishi@texascivilrightsproject.org
joaquinrobertgonzalez@gmail.com
        and
Ms. Hilary Harris Klein
Ms. Adrianne M. Spoto
Southern Coalition for Social Justice NC
1415 West Highway 54
Suite 101
Durham, North Carolina  27707
(610) 574-5244
hilaryhklein@scsj.org
adrianne@scsj.org
        and
Ms. Kathryn Carr Garrett
Willkie Farr & Gallagher
787 Seventh Avenue
New York, New York  10019
(212) 728-8000
kgarrett@willkie.com

**FOR THE UNITED STATES OF AMERICA:**
Mr. Joseph W. Voiland
U.S. Department of Justice, Civil Rights Division
4 Constitution Square
150 M Street NE
Washington, DC  20002
(202 353-5318
joseph.voiland@usdoj.gov

**FOR THE DEFENDANTS GALVESTON COUNTY, HONORABLE MARK HENRY, GALVESTON COUNTY COMMISSIONERS COURT:**

Mr. Joseph M. Nixon
Mr. Christian Adams
Public Interest Foundation
107 West Street
Alexandria, Virginia  42543
(703) 963-8611
jnixon@publicinterestlegal.org
adams@publicinterestlegal.org
      and
Kaylan Lytle Phillips
Public Interest Legal Foundation
32 East Washington Street
Suite 1675
Indianapolis, Indiana 46204
kphillips@publicinterestlegal.org
         and
Mr. Joseph R. Russo, Jr.
Ms. Angela Olalde
Greer Herz & Adams, LLP
123 Rosenberg Street, Suite 3000
Galveston, Texas 77550
(409) 797-3200
jrusso@greerherz.com
aolalde@greerherz.com
         and
Mr. Jewel Morris Lightfoot, IV
Department of Justice - Civil Division
1100 L Street NW, Suite 3405
Washington, DC  20530
(202) 305-2644
jlightfoot@publicinterestlegal.org
         and
Mr. Paul Ready
Ready Law Firm, PLLC
1770 Saint James Place, Suite 640
Houston, Texas  77056
(713) 814-3980

Court Reporter:
Laura Wells, RPR, RMR, CRR, RDR
601 Rosenberg, Suite 615
Galveston, Texas 77550

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**(Call to order of the Court.)**

THE COURT:  Good morning.  You may all take your seats.

All right.  There is one case on the Court's docket.  Just one case on the Court's docket this morning; and that is in Cause Number 3:22-CV-57, the Honorable Terry Petteway and others v. Galveston County and others.

Would the attorneys make their appearances, please.

MR. GABER:  Good morning, Your Honor.  Mark Gaber for the Petteway plaintiffs; and I have with me Ms. Richardson, Mr. Dunn, Ms. Leeper, Mr. Baron, and Ms. Reyes.

THE COURT:  All right.  Great.  Good to see y'all again.

Yes.

MS. CHEN:  Good morning.  Sarah Chen for the NAACP/LULAC plaintiffs; and I'm joined by Hilary Klein, Joaquin Gonzales, Miranda Catlin van Dijk, Kathryn Garrett, Andrianne Spoto, and Nina Oishi.

THE COURT:  Great.  Good to have you, too.

All right, Mr. Nixon.

MR. NIXON:  Good morning, Judge.  Joe Nixon for the defendants, Joe Russo, Angela Olalde, Paul Ready for the County, Christian Adams, Jewel Lightfoot, and Kaylan Phillips.

THE COURT: All right. Great. Good to have y'all here this morning, too.

MR. VOILAND: Judge, may I? Joe Voiland for the United States.

THE COURT: Oh, great. Okay. Good. Welcome. So what I was originally thinking was I wanted to -- so that you -- I asked for this hearing, to begin with, to cover, you know, how the Supreme Court's decision in *Callais* and maybe some other decisions, too, might have affected the remaining -- the claims that are leftover in this case.

And then a new issue got introduced when the County passed a new map earlier this summer.

And so -- and the defense made a suggestion of mootness. So we have mootness as an issue, as well.

And the plaintiffs have asked to amend their pleadings to assert a claim under Section 3(c). So we need to cover that as well.

What I originally was going to do is have the defense get us started on mootness since that's their -- they're pushing for that and then let the -- get that covered and then let the plaintiffs get us started on the original purpose of the hearing, what the Supreme Court -- what the Supreme Court rulings may have done to the constitutional claims in this case.

And we're going to do that; but before we do that, I think I want to hear from the plaintiffs first on kind of what you see as the lay of the land, what you -- what relief are you seeking at this point in the case, especially in light of the new map the County has passed.

So I'll hear from whoever wants to -- whoever wants to address that.

MR. GABER:  Thank you, Your Honor.  I'll start. Mark Gaber for the Petteway plaintiffs; and Ms. Chen can speak, as well, for the NAACP plaintiffs.

I think we need a little bit of clarity from the County as to whether or not the new map that was enacted in June is actually governing the November election. There were primary elections that were held under the map that existed, under the 2021 map in March.  Candidates could have ran for office, been involved in that primary; and Texas law requires that there be primaries for these offices.

And now, purportedly, there is a map that's been passed that is to take effect immediately.  It's not clear -- I don't think it's entirely clear whether or not that map will actually govern the 2026 election because it is being held under lines for which there was no primary election.

And so I think we need some clarity from the County

about whether that map is actually governing the November election and they are actually holding an election in which there has not been a primary election.

THE COURT:  Okay.  Let's stop there because that's a question I had, too.

What is the County's position on that?

MR. NIXON:  The map is -- the 2026 map is the legal map that's now in effect and the elections in November are being held under the 2026 map lines.

THE COURT:  Okay.  So even though the 2026 primary, the candidates -- the nominees chosen by the two parties were working under a different map, the primary was held under the 2021 map and the general election is going to be held under the 2026 map?  That's the County's position?

MR. NIXON:  Yes.

Now, two candidates.  Basically, the JP in 3 is now the JP in 4.  And the JP in 4 is now the JP in 3 on the November elections.

THE COURT:  Okay.

MR. NIXON:  And both are running unopposed.

THE COURT:  Okay.  That cleans it up a little, doesn't it?

MR. NIXON:  Yes.  I believe all the JPs are running unopposed.  Those that are running are running

unopposed. And the constables are not up for election this cycle.

THE COURT: Okay. All right. Are y'all aware of an instance when this has happened before when a map has been changed between the primary and the general?

MR. NIXON: No.

THE COURT: Okay.

MR. NIXON: Well, I think we researched that. We researched the law. The law is that the two candidates just they flip numbers. They remain in their current -- they remain JPs in their current offices until the end of the year, in which case the election takes place. And then they basically flip numbers. One is a 3, and the other is a 4.

THE COURT: Okay. The Constable for Precinct 3 becomes the Constable for 4 and vice versa?

MR. NIXON: JP.

THE COURT: JP. Yes. The constables aren't up. You said that. Yeah, the JPs. Okay. All right.

Mr. Gaber, that's the County's position.

MR. GABER: Okay. I think Texas Election Law might have something to say about that, whether there can be a general election for which there has been no primary in the district at question.

So the plaintiffs' position, obviously, is that the

*Laura Wells, RPR, RMR, CRR, RDR*

case is not moot.  And so, therefore, our position is that the Court should issue its judgment with respect to the trial that we have had on the 2021 map, issue declaratory judgment, issue injunctive relief with respect to the 2021 map and the practice of racial gerrymandering and intentional discrimination with respect to redistricting.

There is some discussion, you know, about the 2021 map being the only thing at issue.  At issue is the fact that the plaintiffs have alleged that they were subject to racial gerrymandering and intentional discrimination; and that is the conduct that the Court can enjoin, as well as the implementation of the map that was at issue at trial.

So we think we are entitled to that judgment and entitled to that injunction.  And as we said in our pleadings or in the papers that we filed, that is also relevant to any claims against the 2026 map because it's part of the *Arlington Heights* analysis.  So, therefore, you know, it would also be part of the Court's consideration of that map.

And then there is also the issue of amending the 3(c) relief, as Your Honor mentioned.

THE COURT:  Okay.  All right.  So the -- if I were to decide that the -- if I were to decide that the plaintiffs are entitled to relief, I guess y'all's position is that regardless of what the County

said -- tell me if I'm right about this.

It sounds like your position is regardless of what the County says, you think the 2026 general election needs to be held under the 2021 map, which means that I can still do something about that between now and then.

MR. GABER:  I think that that is right.  I do not think that the County can hold a general election for which they have not held a primary for the office that is at issue, which is the office defined by the boundaries of its precinct.

Regardless of that, the Court can issue a declaratory judgment and an injunction with respect to the 2021 map and the practice of racial gerrymandering and intentional discrimination because they don't satisfy their burden to prove that the case is moot.  And the case law on that is clear that the voluntary cessation, even if you believe that they have ceased, the case is not moot.  And, therefore, the Court can issue its injunction and issue its declaratory relief.

That's precisely what happened in the 2011 and the 2013 state-wide case in *Perez v. Perry*.  At the end of that case, you know, in 2017 the Court issued a final judgment -- or 2018, after it came back down from the Supreme Court, the Court issued a final judgment that enjoined the operation of the 2011 lines in addition to

the narrow relief that was left with respect to the 2013 lines coming out of the House District 90 in Tarrant County.

And so at the end of that case there was a final judgment, a declaratory judgment, and an injunction against the operation of the 2011 map that the Court had found to be intentionally discriminatory.  And that's just following the case law that it is the general rule that voluntary cessation does not moot the case even in cases where injunctive relief is requested.

And so, yes, I believe that the County cannot conduct its election under a map for which there has not been a primary election; but also, even if they can, this Court still can issue the relief that we've requested because they haven't met their burden under the mootness exception.

THE COURT:  Okay.  And so what would the --

Go ahead, Ms. Chen.

MS. CHEN:  I would just like to add for the NAACP and LULAC plaintiffs that our understanding is that the JP Precinct 4 isn't even on the ballot this year.  And so I have some issue with their characterization of what can occur.

But we also think that the 2026 lines, our claims are not about those lines.  We do not need to get into exactly

what to do about those lines in order to justify immediate declaratory and injunctive relief against, as Mr. Gaber said, the use of the 2021 lines at any point in the future because there is nothing the defendants have said to indicate they could never just return to those discriminatory 2021 lines, as well as enjoining any lines that perpetuate that same racial gerrymandering and intentional discrimination, depending specifically on Your Honor's fact finding on that judgment.

So, again, I just want to reiterate we do not need to litigate exactly what is going on in 2026, exactly what those claims are, exactly what is in place in November, except to say our plaintiffs, our clients, have suffered racial harms and intentional discrimination for over five years.  They have had to vote under at least two election cycles under this discriminatory map.

They deserve a declaration that the County has discriminated against them.  That declaration can be used in future proceedings and is also essential just to vindicating their constitutional right and defendants actions have not mooted those claims.

And injunctive relief against the 2021 map is still proper because it is -- it is the defendants burden to show it is impossible for this Court to provide any relief.  But while enjoining the 2021 map will still have

some effect and some teeth for the fact that defendants can never return to that map, we believe that injunction will still validate that.

THE COURT:  All right.  I think I understand now.

MS. CHEN:  And then do you mind if I add one more thing to that --

THE COURT:  Yeah.

MS. CHEN:  -- which is if the Court does have any questions about mootness and does think that litigating about the 2026 map is relevant or having more fact finding on the '26 map is relevant, we do not think it is relevant; but that's why we are seeking, as sort of a second priority, supplementation to add claims on the 2026 map.

We think that we do not need to go there in order to get final judgment, which is our top priority; but if needed, we are not seeking amendment.  We think our complaint should stand, the claim should stand, it should not be amended in any way, but would seek to supplement to add new claims against the 2026 map that we will get into more of these details that the defendants are trying to raise.

THE COURT:  Okay.  And so I guess that's what makes this situation different from LULAC last year when the legislature passed a new congressional map is that the

plaintiffs did amend their claims in that case and that's when we went forward with the injunction on the congressional map.  And that's not happening here.

MR. GABER:  We -- all of the plaintiffs supplemented their complaints to be about the new event that had occurred.

THE COURT:  Okay.

MR. GABER:  I don't think there was an amendment because nothing had changed in the past about, you know.

THE COURT:  Okay.  It was a supplement.  I'm sorry.

MR. GABER:  Right.  Yeah.  And so I think that is what would happen here, as well, is there would be a supplement -- a supplemental claim and, as we say in the papers, supplemental relief with respect to 3(c) based upon the 2011 finding, if the Court issues it in our favor, justified in part by the repeated conduct that has now occurred in 2026 as we allege.

And so that together -- and that shows why there can be additional teeth to the Court's injunction and its declaration because there is still relief that can accord based upon that finding.

THE COURT:  Okay.  And as far as -- let's say the County intends to run the 2028 elections based on the 2026 map, that's new litigation to deal with that, if y'all

decide to challenge that?

MR. GABER: Yes. I believe that is correct.

THE COURT: Okay. All right. Before we get neck deep into mootness, do the defendants have any response to everything you just heard from them just now?

MR. NIXON: Yes, of course. The Texas Election Code actually speaks to this situation as to what happens when lines change. And so that's why I told you that the JP from 3 becomes 4 and 4 becomes 3 in the November election.

The Court knows that primaries are run not by the County but by the parties. The County -- the State runs the November general election. So the County has the authority to change lines as it relates to the November general election, which it has exercised proper authority under Texas Election Code to do so and in compliance with the Texas Constitution.

So the candidate -- the parties choose the candidates who are on the ballot. Everybody remains the same except the JP for 2 -- or for 3 and 4 flip on the November election. So just to clarify that for the Court.

And then I think the other comments I can address in substance as the Court chooses.

THE COURT: All right. Well then y'all have already heard and you have seen in the briefing, too, that

the plaintiffs do not think that their claims against the 2021 -- their constitutional claims against the 2021 map are moot.  Y'all have filed a suggestion of mootness. Let's hear your argument.

MR. NIXON:  Okay.  Thank you, Judge.  If I may.

THE COURT:  Sure.

MR. NIXON:  The case is moot.  The 2021 map doesn't exist.  It's not something that can be adjudicated, and the relief sought as it relates to the plaintiffs regarding the 2021 map is no longer before the Court.

When the case becomes moot, the Court only has jurisdiction to determine what its jurisdiction is.  It does not have jurisdiction to allow for amendments of pleadings on other claims or even if they relate back.  If the case is now moot, the case is moot.  This map, the 2021 map no longer exists.

What exists is the 2026 map, and it became effective immediately.  Now, I will tell you that despite their earlier protestations the Court heard the plaintiffs actually agree the case is moot in their response because they asked the Court to consider an exception to mootness. Well, exception to mootness would only apply if there is moot.  The exception they ask the Court to apply is capable of repetition but escaping review.  That's what

they wrote.  To which I have the rhetorical question: What is capable of repetition?

We have a coalition district that was drawn as a racial coalition district in 1991, again in 2001, and again in 2011, which the Fifth Circuit in the en banc decision in *Petteway*, in this case, said is not protected under Section 2.

And I don't want to get too far ahead and talk about *Callais*, but I have to in regard to the mootness because *Callais* is an intervening superseding event.  *Callais* said jurisdictions may not use race to draw districts.  So even if the County wanted to draw a district that coalesced Black and Latino voters and said that's what it intended to do in order to protect the voice and the historical district that was created in 1991, it could not do so.  It could not constitutionally do so.

So what is it that's capable of repetition?  Nothing. There is nothing that the County can repeat.  And escaping review, plaintiffs have had five years with this case. This case was litigated.  This case went to two -- heard on the Fifth Circuit twice, and they applied for stays for the Fifth Circuit's issuance orders to the Supreme Court. This case has had plenty of review, and there has been plenty of time.

But what has happened is that the en banc decision

that reversed *Campos;* the *Tarrant County v. Jackson* case, which basically eliminated the evidence that they claim has -- the circumstantial evidence of the claim as has relevance to intent; and then, of course, the *Callais* decision that said jurisdictions may not use race and to separate people on the basis of their ancestry is odious to a free people.  It cannot do it.

And the *Callais* court went even further and said there has to be present-day voting problems, which this Court has not found any, and there was no evidence submitted by the plaintiffs with regard to present-day voting problems. And, in fact, the Court found that it was easier to register and easier to vote for everybody in Galveston County than it ever has been.

So what is it that is incapable of repetition?  There is no legally protected interest that is being violated that could be -- for which a violation could be repeated. With that -- and it's -- that's all very clear that if it's -- if there is nothing that can be repeated, there is nothing escaping review.  So the exception to mootness doesn't apply.

The other reason why the plaintiffs admitted the case is moot is because they have asked to amend their pleadings to seek relief that they did not originally seek and to assert that somehow their rights are being violated

*Laura Wells, RPR, RMR, CRR, RDR*

again in the application of the 2026 map.

The two maps are different things.  They are different legislative enactments by different Commissioners Courts. The Commissioners Court today is different than the one that existed in 2021.  And the basis of this Commissioners Court was very clear that it adopted the map, as it said in its October 8th, because of compliance with applicable law.  It had read *Callais*.  It said we have read *Callais*. So we're making changes based upon applicable law, the 2020 Census, and improving partisan performance in favor of Republican candidates.

THE COURT:  You said October 8th, but I think you meant July 8th.

MR. NIXON:  Yeah, I did.  I meant June 8th is what I meant.

THE COURT:  June 8th.  Okay.

MR. NIXON:  Yes, you are right.  June 8th.

So it's not complicated.  The case is moot.  The only jurisdiction you have is to determine whether you have jurisdiction.  Once you make the decision that the case is moot, that ends it.

As the Court implied, if there is a different cause of action they want or complaint they want to bring against the 2026 map, that's for a different time and place; but it is not in this case.

THE COURT:  Okay.  All right.  Thank you, Mr. Nixon.

MR. NIXON:  Thank you.

THE COURT:  All right.  Response from the plaintiffs.  You can argue from there or from here, wherever you want to.

MR. GABER:  I will avoid spit coming toward the Court's staff, Your Honor.

I guess I'm a little surprised because, as I understand the case law, the case is not moot when there is voluntary cessation unless the government carries its heavy burden to show that there is absolutely no way in which the challenged conduct, here racial gerrymandering and intentional discrimination, can recur.

We raised the capable of repetition yet evading review exception as a secondary argument in the event that the Court disagreed with us that the government has not carried its burden with respect to voluntary cessation.  And the Supreme Court said in the *City of Mesquite* case that this isn't a question of the Court's power.  It is the general rule that a case does not become moot when there has been a voluntary cessation by the government or by the defendant.

And the question of whether or not the Court decides to issue its judgment or declaration or injunction is a

question of the Court's discretion and not a question of the Court's power because that is the general rule. The case does not become moot based upon the mere voluntary cessation.

And the Fifth Circuit in the first -- in the *Speech First* case set out three factors the Court is to consider in whether or not the government has carried that burden. And, specifically, the Court in that case acknowledged that government defendants have some solicitude in the voluntary cessation space; and then it defined what the government would have to do to satisfy its burden.

And in the reply brief, Galveston County says, no, no, that is just about public universities. But the Fifth Circuit has subsequently applied that to government officials. And I'll give the Court one cite. In *Netflix Incorporated v. Babin*, and this is 88 F.4th 1080 at 1089 through -90, the Fifth Circuit said the following, "We have said before that the voluntary cessation by a governmental official like Babin," who was the District Attorney in the case, "is given some solicitude, but the presumption of good faith cessation is defeated when, as here, there is no controlling statement of future intention, the change in conduct is suspiciously timed, and the defendant continues to defend the challenged behavior."

Now -- and then, if you will just click on the citing references for *Speech First*, you'll see that district courts in the Fifth Circuit have continued to apply this doctrine to show when the presumption of good faith is overcome.

In case after case against government officials, against jurisdictions, against the federal government, against the EPA, against President Biden in the *Trump v. Biden* case, the Fifth Circuit again said this is the three test -- the three-part test that we're going to apply.

The County doesn't even mention that test in its suggestion of mootness and doesn't in its reply attempt to meet it, and that's because it can't.

With respect to the first factor, there has been no controlling statement that the County will not return not only to the 2021 map but the conduct that was at challenge, racial gerrymandering and intentional discrimination. In the *Speech First* case the Fifth Circuit noted that there hadn't been a declaration from the relevant government decision-maker and that a mere statement in the brief by the lawyers is insufficient to show that.

With respect to the suspicious timing, I think that, first, the answer to Your Honor's question at the beginning of this hearing from the County that they are

unaware of a single instance in which a Texas jurisdiction has changed the map between the primary election and the general election is, you know, evidence number one of the suspicious timing.  I'm unaware of an example in the country of a jurisdiction having a primary election and then jettisoning that map and purporting to then hold a general election with candidates who ran in that primary with people who might have chosen to run in the primary had they known they resided in the new district for which the general election would be held.  I'm unaware of a single example of that happening anywhere.

There are some cases right now, in light of *Callais,* where primaries were underway in Alabama -- I think in Alabama --

MS. RICHARDSON:  And Louisiana.

MR. GABER:  -- and Louisiana.  Alabama responded to that by canceling the ongoing primary and rescheduling it for the specific districts that were affected by the map change so that every voter who was in the map in the boundaries of that district for the general election would, one, have the opportunity to run in that primary if they chose to do so and, two, participate in the election in that primary.

And so I'm still a little unclear because -- and this is getting aside from mootness for a moment -- because I

heard that there were two candidates that are just flipping their precinct numbers, apparently, and that both were unopposed. Only one precinct, as I understand it, is up for election in 2026. That's Precinct 3. And so I don't understand how candidate McCumber could be unopposed if that office -- if her term is not even up.

And I think the County needs to state its position with respect to the ability of candidates to serve regardless of where they have placed them in the map.

But with respect to suspicious timing in addition to the fact that this has never happened before, that they would make this change, it occurred three weeks before the Court's hearing on the issue of intentional discrimination and racial gerrymandering. And if you just look at the papers that were filed, the mootness suggestion attaches the order adopting the new maps. And the rationale that we're given in the papers is something like the County Commissioners have determined that this is in the best interest and so, therefore, it's moot.

And then the reply brief comes along and they find, apparently they forgot, that they had adopted an order earlier in June when three -- two members -- two commissioners and the county judge were present and the two other commissioners were absent, suggesting that partisan reasons might be something they are interested

*Laura Wells, RPR, RMR, CRR, RDR*

in.

Didn't include that in their suggestion of mootness, only apparently remembered it when the reply brief came around to attach it, and those justifications apparently were rejected by the majority that voted because they were not adopted in the order adopting the map.

And the contention that this would be for partisan reasons that they would wait until the primary was done, there is only one office up for election for the JP and constables, which is Precinct 3, which had been the Democratic majority precinct, the idea that it was to benefit Republicans to wait until the primary was over and there was only one candidate, a Democrat, on the ballot and then change the map just belies common sense. How would that benefit the Republicans who were precluded from running in the district that they say they have drawn to benefit Republicans?

So I think the Court, while there is presumptions of good faith when there are inferences that go in either direction, I think the Court -- no doctrine says the Court needs to suspend disbelief of the justifications that have been offered.

And so I think I have not seen a case where the timing was more suspicious as to the reason for the change, which quite evidently here is to try to evade having this Court

issue a judgment with respect to the trial that it had.

And then finally, with respect to the continued defense prong, obviously the County continues to file pleadings.  After they filed the suggestion of mootness, they filed a response to the *Callais* briefing saying all the reasons why they think the 2021 map is lawful.

So not one of the three factors that the Fifth Circuit has set out for when the presumption of faith applies and when it can be overcome have been established by the County.  They don't even mention it in their briefing or engage with it in any way.  And for that reason they have not come close to satisfying their heavy burden to show that their purported cessation has caused the case to become moot.

And as a consequence of that, the Court doesn't even need to reach the capable of repetition yet evading review doctrine because that only applies when the Court finds that the case would otherwise be moot; and they have not even attempted to satisfy their burden to show that that's the case.

And I think with that I will let Ms. Chen speak.

THE COURT:  All right.

MS. CHEN:  Thank you.

We completely agree with that argument about voluntary cessation, the defendants not meeting their burden.  We

would also just add defendants have not engaged Supreme Court precedent in redistricting cases, right, in *Covington v. North Carolina* finding that a map adopted in 2011 was not moot even after the adoption of a later -- of a later map, despite the North Carolina legislature arguing that their adoption of a superseding map did moot original claims.  That is because the Supreme Court was very clear to say it is not the specific line drawing.  It is the racial intent and the racial harm that created standing and created the issue, and that could not be mooted simply by additional line drawing around that same core of racial harm.  So defendants have not engaged that Supreme Court precedent at all.

They also have not engaged significantly the Texas 2011 redistricting cycle where the three-judge panel there also found that an earlier map was not mooted by the adoption of a later map, even adopting some of this reasoning from the more recent *Speech First* cases about voluntary cessation saying that, you know, the defendants had never conceded the illegality of any of their conduct and had steadfastly maintained that the 2011 plans contained no legal deficiencies.  That was part of the reasoning that the Court used in *Perez v. Perry* about the Texas statewide maps.

And so again here, defendants are similarly doubling

down, refusing to admit any illegality.  And if a voluntary cessation doctrine can't apply here, when can it apply?  It will always -- if defendants are allowed to succeed here on this mootness argument, it will result in governmental defendants, maybe any defendants, being able to continually evade any responsibility for constitutional violations simply by taking these voluntary actions.

In this case, our clients and the community have suffered these racial harms for the last five years.  There will absolutely be another round of redistricting after the 2030 Census.  There may be more redistricting next year, since defendants have shown themselves interested in and capable of redistricting at any time, including in this unprecedented post-primary period.  And we also are not aware of any other examples in history in the country of this timing for redistricting.

And so we do fear that any agreement on their expansive mootness argument would do incredible damage to the ability to seek -- to hold anyone accountable for constitutional violations.

THE COURT:  Real quick, before we turn back to the defendants.  Just to be clear, none of the plaintiffs in this case are seeking any relief against the use of the 2026 map as of right now?

MR. GABER:  In this case, that is correct --

THE COURT:  Okay.

MR. GABER:  -- as of right now.  That is a true statement.

THE COURT:  Okay.  All right.  And what y'all are seeking is declaratory relief and injunctive relief on the 2021 map?

MR. GABER:  Yes.

MS. CHEN:  That is correct.

THE COURT:  All right.  And is there any difference between the relief that the Petteway plaintiffs are seeking and the LULAC and NAACP plaintiffs are seeking?  Are y'all completely lined up?

MR. GABER:  I believe so.

MS. CHEN:  We are aligned.

I did just want to present one option for the Court that I completely recognize may not be the option that you wish to take, right, which is that an injunction against the 2021 map and the racial gerrymandering or intentional discrimination that created the 2021 map could result in a remedial phase where defendants have the first opportunity to present what a remedial map would look like.  And they could then have the opportunity to argue why the 2026 lines actually remedy the harms that the Court finds in its judgment.

At that stage, the Court has the duty to assess those

*Laura Wells, RPR, RMR, CRR, RDR*

lines to say whether or not they actually constitute a sufficient remedy.  And so at that point that is an opportunity for the Court to evaluate the 2026 lines and their constitutionality.

However, we recognize it is challenging to argue for an immediate remedial process, to argue for a new map before the November election.  We are arguing that defendants should not have been able to change their -- to change the lines post-primary and, if so, are not currently specifically asking the Court to enter that immediate remedial phase.

But we believe it is absolutely within the Court's duty to ensure that defendants do act constitutionally in any redistricting that they undertake and that a finding relating to the 2021 maps does have bearing on the 2026 maps because everything before the Court right now does show the 2026 maps continue the harm from 2021.

So, again, it's not necessary.  And so we are totally aligned in that we can -- declaratory injunctive relief on 2021 is all that we are presently seeking.  I just wanted to present that option for the Court, but that is well within the Court's authority and duty.

MR. GABER:  I guess I would just add that, you know, under Rule 65, which sets out what the Court has to do in an injunction, it talks about stating the conduct

that is being enjoined.  Here it's not just the particular map.  It is the conduct of racially gerrymandering and intentionally discriminating, if the Court finds in that manner.

And in that sense, you know, it would be our position that the 2026 map would be violating that injunction, you know, on a prospective basis.  And so there is that to consider, as well.

THE COURT:  Okay.  Well, that sounds like you are seeking relief against the 2026 map.

MR. GABER:  I think that that -- I think the cleanest way that that is addressed is through whatever future proceedings happen with respect to it, and there would be evidence and whatnot.  But I think it just sort of dovetails on the suggestion that that could be part of the remedial process, that it actually would be an enforcement proceeding, in some respect, with respect to the Court's injunction for the conduct that we have already adjudicated.

THE COURT:  Okay.  And any remedial effort that the Court might undertake with regard to the 2026 general election we are -- we are real short on time.

MR. GABER:  I think that that is correct.  And I think, you know, perhaps we will find out soon whether or not this can even be the map that the County purports to

put forward for this election; and that could affect the analysis, as well.

THE COURT:  Okay.  Are you saying there may be some other litigation against the use of the 2026 map because of the whole 2021 map in the primary and the 2026 in the term?

MR. GABER:  Right.  Right.  Yeah.

THE COURT:  Okay.

MR. GABER:  I think that's certainly possible.

THE COURT:  Mr. Nixon.

MR. NIXON:  Thank you, Judge.  Yeah.  There are a couple of things that I would like to clear up.

First of all, the government is afforded the presumption of good faith even with regard to voluntary cessation.  It's not a private corporation.  So when the government alters something with regard to voluntary cessation, it's presumed good faith.  Okay.  So doubt, fear that they have articulated, no place in this courtroom.

But more importantly, what is being cessated is -- is it cessated?  What?

THE COURT:  Ceased.

MR. NIXON:  I went to A&M.

What is being ceased?  We have a map that was of racial draw, that race was used to draw in '91, 2001,

2011.  Now the -- which would be proscribed today.  It's a very interesting situation.  If the County had drawn Precinct 3 and kept Precinct 3 in place, today a litigant could come in and say you County used race and it must be ended.  It has to be redrawn.

And they would be right under *Callais*.  That's exactly what happened in *Callais*.  The Louisiana legislature drew, used race to draw a second majority-minority district.  Even that was the least defendable because it was a single minority.  Here it's a coalition district, which is not protected as a matter of law.

The County -- so what is being ceased?  The County -- if the County drew a map, the 2026 map, and reconstituted Precinct 3, you could argue voluntary cessation because they put 3 back together.  And they could say, well, you could undo it the next time.

But the County didn't put the old historic Precinct 3 back together.  It didn't cease.  Voluntary cessation doesn't apply because the County didn't redo a map that would have violated *Callais* and, two, the County is presumed to be good faith -- to have good faith.

And with regard to the situation of you can't change lines after the primary, well, there is no law where they decided it.  The Constitution of Texas allows for it.  The election code allows for it.  And, quite frankly, these

plaintiffs have no standing as candidates to challenge the new map on that basis by saying, well, candidates could have run in this. They don't have standing to make that argument.

So this case is moot. And everything else based upon -- all of their other arguments are based upon they want something more that they have not yet pled. So that's where we are.

THE COURT: Okay. All right. I understand.

MR. VOILAND: Judge, may I briefly?

THE COURT: Yes.

MR. VOILAND: So I -- Joe Voiland for the United States.

And in terms of matters of Texas state law or Texas constitution primary elections and so forth, the United States intended to have nothing to say on this. The United States' claim was resolved against it in -- by the Fifth Circuit. The United States has not been dismissed as a party yet, but it won't have a Section 2 claim going forward.

I would be remiss if I didn't point out in terms of the discussion here about whether or not there is going to be some type of relief at this time against the 2026 map.

And the question about whether this has come up anywhere else, I think, as the two plaintiffs

*Laura Wells, RPR, RMR, CRR, RDR*

acknowledged, it has come up in Louisiana.  It's come up in Tennessee.  It's come up in Alabama.  And the consideration that is for the Court I think is *Purcell*, *Purcell v. Gonzalez.*

And I didn't want to sit here and not say hold on a second.  The election it sounds like it's in November.  Again, not my issue about when there is a primary or general.  But I do think that action at this point in time -- I haven't seen what it's going to be.  I don't know what it's going to look like.  But *Purcell* is absolutely the only thing the United States would have a concern on that issue.

THE COURT:  Okay.  And I didn't say *Purcell*, but I did -- I was talking about *Purcell* when I said that we're short on -- when I said we're short on time when it comes to any kind of relief like that, *Purcell* was the word in my mind, of course.  But I appreciate that.

Okay.  Let me quickly consult my prehearing notes on -- okay.  I'll tell you what.  Have we really been going for an hour and 45 minutes already?  Let's take a quick break and start back at -- start back at 11:00.  And I may have some questions about mootness and Section 3(c) to start off at 11:00.  But then we'll try to get into the *Callais* stuff pretty quickly after that.  Okay.  So if you need to run down the hall or anything, feel free.

(Recess from 10:47 a.m. to 11:03 a.m.)

THE COURT:  All right.  Thank you very much.  You may take your seats.

I do have a couple of questions before we get on to *Callais* stuff.  First of all, let me say when I was so amazed that it was already a quarter to 11:00, I was imagining that we had started at 9:00 and I was, like, wow, that hour and 45 minutes sure went by fast.  We started at 10:00.  So it had only been 45 minutes, which means y'all are being very efficient in your arguments, which the Court appreciates.

Okay.  My first question is for Mr. Nixon and the defendants.  The 2026 Commissioners Court has said that one of the reasons for the 2026 map was to enhance Republican performance, and I guess I don't understand how it's going -- maybe it would enhance Republican -- maybe there is an argument it would enhance Republican performance in 2028.  But in 2026 it sounds like it -- I mean it -- the JP who is running unopposed in 2026 is a Democrat and it sounds like is going to become the JP of a precinct that should elect a Republican in future elections.

MR. NIXON:  Yes.

THE COURT:  Okay.  How does that enhance Republican performance in 2026?  It sounds like it gives a

Republican precinct to a Democrat officeholder.

MR. NIXON:  Well, the way -- so they aligned commissioners, JPs, and constables all together.

THE COURT:  Yes.

MR. NIXON:  So they are all one now, where they were mixed before.

The JP in 3, Williams, was running unopposed.  So when they drew the lines, I mean, he was going to win.

THE COURT:  Right.

MR. NIXON:  Okay.  So the constables are not up this time.  So they will be up in two years.  So when they redrew it, he was in Precinct 4 running unopposed.  So it did not change that in order -- so there wouldn't be a problem as it related to a specific candidate.

But it does enhance partisan performance in each of the Commissioners Court precincts, the four.  And I think if the Court were to examine the nature of those precincts, that the partisan improvement in each of those precincts is better.

So understanding that the one JP did not alter -- he did not alter his ability to be re-elected.  We didn't take it away from him in the middle of an election year.  But that JPs 4 and 3 are going to -- are improved in partisan performance.

Does that answer the Court's question?  And so the

constables will --

THE COURT:  It was an answer to the Court's question, yes.

MR. NIXON:  It was an answer.  Did --

THE COURT:  Yes.

MR. NIXON:  Was -- well, did I answer the question?  Did I give the Court enough facts and answer the question?  I don't want to leave it -- I don't want to have it to be an answer.  I want the Court to be satisfied with what the answer is.  So it --

THE COURT:  It still sounds -- it sounds like the net effect, at least after the 2026 election, is everything is the status quo as far as how many Democrat JPs there are and how many Republican JPs there are.

MR. NIXON:  That's -- yes, that's the status quo; but the constable I believe in Precinct 3, the next election, will most likely become a Republican.

THE COURT:  Yeah.  Yeah.  I understand that.

MR. NIXON:  And so -- and the Republican performance in each of the commissioners precincts is enhanced in the meantime.

THE COURT:  All right.  So in the 2026 general election the commissioners precincts are a little more strongly Republican; and in the 2028 constable elections it sounds like, the way things are, there probably won't

be any Democrat.

MR. NIXON:  That was the intent.

THE COURT:  And so it will certainly enhance Republican performance in 2028 in the constable races.

MR. NIXON:  That's the intent of the County, and I think that's what the partisan information on the map will indicate.

THE COURT:  Yeah.  Okay.  All right.  Do you all have anything on that before we move on?

MS. CHEN:  First, I would urge the Court to take judicial notice of the Galveston County website which indicates that the last Precinct 4 JP election took place in 2024.  And so that term for four years will go until 2028.  And we do not understand what provision the election code would allow the Galveston County commissioners to simply swap in somebody for a term that has not yet expired in Precinct 4.

And so I just think the factual inconsistencies and the legal inconsistencies indicate how partisanship is just a pretext here even in the 2026 lines.

We would also note that there is no evidence before you about any partisan performance for commissioners precincts; and again, there was no -- the past elections, as we have cited in our brief, have been electing five members of the Commissioners Court who are Republican in

the last couple of elections after the 2021 map was enacted.  It is absolutely unclear what it means to have a better partisan performance than 5:0 Republican.  And the way that *Callais* even talks about partisan targets, it does require specific partisan targets and -- or demographics.  And again, there is just no record of what Mr. Nixon is discussing here.

THE COURT:  Okay.  All right.

MR. GABER:  Just to add, Your Honor, I think that the question identified that what the County has done by waiting until the primary was done to create a Republican seat that only a Democrat ran for does the opposite of helping Republicans.  It handed a JP seat to a Democrat that they otherwise could have had an election, could have had primary candidates, could have had a Republican.  And I think that again shows the pretext and shows why the timing is so suspicious.

But I also would emphasize again that this reference to partisan Republican performance appears only once. It's in an early June order, which itself is a bit confusing because the top of it says that all members of the commission are present.  And then the bottom says that two of them are absent.  And then when the court -- when the Commissioners Court actually adopted the new map with all members of the commission voting, they jettisoned the

partisan performance rationale and had the same "whereas" clauses, got rid of the partisan performance one, and simply said they deemed it in the best interest of the County.

So normally when we interpret things, legal documents, and something is there and it's removed, that is intentional. And that is not the justification that, particularly the two absent members who did not sign on to the first order but did the second, there is no indication that that would be their view.

And so I would just add that I think it's pretext, it doesn't help Republicans, it actually harms them, and it goes to show why the case is not moot.

THE COURT: Okay. I'm ready to move on from that particular question unless Mr. Nixon has anything he wants to say.

MR. NIXON: No, Your Honor. Thank you.

THE COURT: Appreciate that.

Okay. I think the rest of what I wanted to ask y'all about is kind of Section 3(c) related. First of all, are y'all seeking to amend or supplement your pleadings to assert anything other than your request for Section 3(c) relief?

MR. GABER: This question is with respect to the existing pleadings about the 2021 map and the alleged

conduct.

I think the way that we had envisioned it would be that the -- whatever supplemental complaint happens with respect to the new claims about the 2026 map would include requested 3(c) relief based upon this kind of series of conduct. They did what we alleged to have been discriminatory and racial gerrymandering in violation of the Fourteenth Amendment for the 2021 map. We have alleged they have now done it again. We will include in that the request for 3(c) relief.

And the possibility of that relief, based upon the Fourteenth Amendment violation with respect to the 2021 map, was part of our argument for why the case would not be moot; but at least I have not -- and I haven't had a chance to confer about this, but I had not conceived of it as a change to the complaint with respect to -- that currently exists with respect to the relief and injunction and declaration about the 2021 map. It's simply that there has been a -- there will have been, we hope, a finding of a Fourteenth Amendment violation that would justify the 3(c) relief at the end of the next proceeding.

Does that make sense?

THE COURT: Okay. All right. Yeah.

So you -- it doesn't sound like you -- it doesn't sound like you need to amend your pleadings to assert a

claim for Section 3(c) relief before the general election this year.  Is that right?  Did I say that correctly?

MS. CHEN:  That is correct.

MR. GABER:  I think so, yes.

MS. CHEN:  We are not seeking to amend our 2022 pleadings in any way at any time and only in a supplement asserting new claims would we then add a new request for 3(c) relief and that would be at, you know, whatever timing that we can -- that, you know, counsel can confer on, a timeline for supplementation or the Court can order a timeline if it deems it necessary.

Again, our first ask, though, is we do not even think it's necessary to supplement our complaint at this stage in order to just rule on the pending claims; and those claims will not be disturbed or we do not intend to disturb them by amendment to add any additional relief.

THE COURT: Okay. All right. Okay. I think I understand now much better.

So it's not like this is -- you are not asking for 3(c) relief as an alternative to a finding of no mootness, and it sounds like that's all a little bit down the road kind of stuff.

MS. CHEN:  That is correct.

THE COURT:  All right.  To be technical about it, "down the road kind of stuff."

*Laura Wells, RPR, RMR, CRR, RDR*

Okay.  Well, in light of that, I'll hear from the plaintiffs on how they believe *Callais* may or may not have altered the legal standard for their constitutional intentional discrimination claims and anything else they think that *Callais* or any other thing that the Supreme Court did since the last time we spoke has any effect on the claims here.  And then I'll hear from the defense in response.

MR. GABER:  Thank you, Your Honor.

So as we say in our papers, *Callais* is a case about the statutory Section 2 claim that was the basis of the redraw in Louisiana.  The Supreme Court interpreted the text of Section 2, updated the *Gingles* preconditions, and updated the emphasis that a Court should have in the totality of circumstances analysis for a Section 2 case, for a Section 2 discriminatory effects case.

We don't see that decision as altering the intentional discrimination analysis or the racial gerrymandering analysis that would be before the Court on our claims. The *Callais* decision itself cites to the *Village of Arlington Heights* standard when it discusses the intentional discrimination standard.  It does not alter the *Arlington Heights* framework in any way.

And to the extent it talks about intentional discrimination, everything that the *Callais* Court found

lacking with respect to Louisiana and then in the subsequent *Milligan* stay decision that the Court issued that it found lacking with respect to the plaintiffs' claim in Alabama, which did have an intent claim, are all the things that are present in this case, which is alternative maps that show that adhering to the criteria, the redistricting criteria that the government sets forth, would not result in the racially imbalanced result of the challenged map.

And so -- and the Court emphasizes repeatedly that with respect to the disentangling of partisanship and race, that obligation occurs when the government actually openly asserts that it has engaged in partisan gerrymandering.

Here, every witness who testified about it disclaimed that. This Court has made a finding that they had disclaimed partisanship as the predominant purpose; and thus, we don't even face the obligation to disentangle race and partisanship. Their testimony did that. There is no -- you know, when someone testifies that they have not engaged in partisan gerrymandering, the plaintiffs don't have an obligation to go prove that they were right about that. In fact, that would be applying a presumption of bad faith to the testimony they gave that we don't believe them. They said what they said under oath; and

that can't be changed simply because the Supreme Court, in counsel's view, has subsequently made it easier in court if the partisanship happened to have been the primary aim. That is not what the testimony is in this case.

And the Supreme Court in *Callais* is clear in distinguishing between Louisiana's goals and aims and the goals and aims that Alabama had set forth in the *Milligan* case and explained that that was not something Alabama had said they were doing. That was something Louisiana has said from the beginning was its goal, and that was actually disclaimed in this case to the extent to which Judge Henry suggested that he wanted Commissioner Holmes to remain on the Court because he agreed with him more than he agreed with the other commissioners. So you can't have that testimony and then say that the predominant aim was partisanship.

And so -- and there has been no claim that there is anything with respect to the alternative maps that didn't satisfy their objectives. The testimony was to the contrary.

And so whatever *Callais* did with respect to intent, which I don't think was much, it was a -- it was a statutory claim before it, it just bolsters the evidence that's already in this case.

And the same is true with respect to the *Allen v.*

*Milligan* stay decision that came from the Supreme Court shortly after *Callais*. And there again, Alabama had not put forward a partisanship defense. But what they did say is we had this goal of ironically creating a coastal district in the congressional map of Alabama keeping the southeastern counties of Alabama together. And what the Supreme Court said that the plaintiffs had failed to do there was put forward alternative maps that did that, that had that southeastern Gulf Coast congressional district.

Well, that's precisely what the alternative maps in this case do with respect to Galveston's assertion of having its primary objective be to have a coastal precinct. All of those alternative maps have that coastal precinct. I believe some of them have the precise coastal precinct that Galveston enacted.

And so to the extent the *Milligan* case, *Callais*, or *Alexander*, which also happened, you know, I believe in between the Court's first judgment in this case and today, all just bolster the evidence that plaintiffs adduced in this case with respect to those alternative maps.

I want to talk a little bit about -- and we covered this extensively in the briefing. But this argument that because *Petteway* at the Fifth Circuit found that coalition districts are not required under Section 2 that that means that there can't be a discriminatory effect in this case

on these constitutional claims.

And there is just no support in the case law, certainly, for that proposition but it just doesn't make any doctrinal sense to suggest that a statute -- a statutory standard that was adopted in 1982 for Section 2 discriminatory effects claims somehow dictates the contours of relief that's available for violations of the Fourteenth and Fifteenth Amendment.

That was Congress's negotiation and determination for the burden a plaintiff would have to show discriminatory effects under that statute; and it's based upon, as the Supreme Court said in *Bartlett* and I think again talked about in *Callais*, that phrase "to elect" that's in the statutory text.  In order to elect a candidate, the Court has concluded that Congress meant that you have to be able to with your own votes of that class, your own votes alone, elect that candidate.

And so this whole argument derives from the 50 percent plus one requirement that the Supreme Court has found in the text of Section 2 and there is -- the phrase "to elect" doesn't appear in the Fourteenth or Fifteenth Amendment.

There is no requirement under the Fourteenth or Fifteenth Amendment that in order to show that you have been injured as a result of intentional discrimination

that you otherwise could have had a majority district of members of your same racial group. That is not what defines an injury in the constitutional context.

And we say in our papers that the requirement that you have a discriminatory effect that corresponds with the discriminatory intent that's found is simply to show that you have suffered an injury, that you have that Article III injury in fact that you can get into the courthouse door. Otherwise, you can imagine a situation where a government might intend to discriminate and then do a really bad job and not actually get rid of the district or, you know, draw the map wrong or whatever. But you have to have some harm.

And *Arlington Heights* has addressed that through its standard by saying it has to bear more heavily on one race rather than another. And the evidence in this case shows that it bears more heavily against both Black voters, Latino voters, independently, alone, together, however you want to consider them. It bears more heavily against the plaintiffs in this case because of the way the map was redrawn. And so that's the -- that's the standard. It's not showing that Section 2 would be violated in addition to the Constitution. That would make no sense.

THE COURT: Okay. And everything you just said is in response to Footnote 13 in the *Petteway* en banc

opinion?

MR. GABER:  I think so, yes.

THE COURT:  Yeah.

MR. GABER:  And as you said, I'm unsure why that decision cited to the *Perez* case.  That footnote cites to the *Perez* case about what the right standard is.  That discussion in *Perez* is about the statutory intent claims under Section 2.  So that's my best guess as to what the Fifth Circuit was trying to say there.

Obviously, there has been some disagreement about whether those claims continue.  We believe they do.  The Supreme Court said that it was remanding for determination of our intent claims.  That's one of the intent claims.

But given the opaqueness of what the Fifth Circuit said and then its subsequent rejection of the United States' request, though without any real binding rationale for why it was rejecting that, we think the Court has to decide the constitutional claims here.

It can't, you know, apply constitutional avoidance and decide the Section 2 intent claim and then -- that's not what we're asking the Court to do, and I don't think that's what the Court can do.  It has to decide the Fourteenth and Fifteenth Amendment claims and, in the process, our Section 2 intent claim, as well.

THE COURT:  Okay.  And that answers another

*Laura Wells, RPR, RMR, CRR, RDR*

question I was going to ask.  So y'all are not asking me to look differently at your Section 2 at whether there -- if there is a Section 2 intentional discrimination claim left in the case, you think it's going to line right up with the constitutional claim?

MR. GABER:  I think there is nothing different about it.  It uses -- the Section 2 uses the "on account of race" language, which we believe is a but-for causation standard based on the Supreme Court's precedent in *Bostock.*

And the Fifteenth Amendment uses that same "on account of" language.  And this gets to, like, who has to have held the discriminatory intent.  The text of the Fifteenth Amendment makes it a but-for causation standard.

And the Supreme Court in -- I am blanking on the name of the case.  It is the Alabama felony disenfranchisement case from 1985.  Someone might -- *Hunter*, *Hunter v. Underwood* sets a but-for causation standard for the Fourteenth Amendment, as well.

And so all of those sources of law use that standard.

THE COURT:  So you either win on both or you lose on both?

MR. GABER:  Yes.

THE COURT:  Okay.  And you mentioned alternative maps.  Let me ask you this real quick.  Of course,

Ms. Chen is going to get to chime in on all of this, as well as all of the defendants.

While I've got you standing up and talking, would any of your alternative maps have elected four Republican commissioners?

MR. GABER:  I am not certain.

THE COURT:  And I'm not even saying they have to. I'm just asking the question.

MR. GABER:  Right.  Right.  I don't have that off the top of my head what the answer to that is.  I'm not sure whether that's in the record or not because partisanship wasn't at issue.

THE COURT:  Right.  I understand your position.

MR. GABER:  And I'm not sure that we have -- I would have to look to see if there is election results in the exhibit that corresponds with the maps.  And so I really can't.  But it could be that there is -- it could be that that is one of the reports.  I just -- I don't know.

MR. DUNN:  It's in the TLC report.

MR. GABER:  Is it in the TLC report?

So the reconstituted election results may be in that Texas Legislative Council exhibit that's, I think, attached to Dr. Burch's report.

THE COURT:  Okay.  All right.  Thank you.

Ms. Chen, on this issue, on this broad issue, please.

MS. CHEN:  I agree with Mr. Gaber and would just add, based off of defendants' briefing and Mr. Nixon's discussion just now about trying to address what they perceived as race-based redistricting in the past with their 2021 redistricting and also their 2026 redistricting that there is no finding of any past constitutional violation.  There is nothing in *Callais* that would require any finding that Precinct 3 -- the benchmark Precinct 3 that the Court found represented an historic core of communities of interest was drawn on the basis of race and thus constituted any sort of legal violation that needed to be redressed, and that cannot be the rationale that satisfies strict scrutiny for why race predominated in their 2021 redistricting.

Their experts, Judge Henry, the other commissioners all also testified that they believed a least-changed Map 1 that maintained the core of Precinct 3 would still be legal.  They had no issues with its legality.

And so what does that leave for what caused them to dismantle this historic Black and Latino community?  They disclaimed partisanship.  It can't be a coastal precinct because alternative maps could create that coastal precinct.  It wasn't avoiding confusion or maintaining incumbent addresses or equalizing population.

That really leaves that overriding goal of moving Black and Latino voters on the basis of race essentially to create a majority Anglo district, and that's what makes this case actually a mere image of *Callais* and why *Callais*' holding -- why *Callais*' discussion of the Fifteenth Amendment and a racial gerrymandering supports a finding for us in this case because none of the record can support any of this partisan intent and instead just shows that overriding rationale of dismantling an existing Black and Latino district rather than what is at issue -- what was factually ultimately at issue in *Callais*, the creation of an additional district based off of new racial demographics.

So I would just also add that to the point on coalition districts and what is needed to -- whether that affects our Fourteenth or Fifteenth Amendment claims at all, the Fourteenth and Fifteenth Amendments do protect individual rights and protect against those individual harms for similar reasons as discussed in our mootness argument, the reasons that the *Covington v. North Carolina* Supreme Court decision recognized that it is the racial gerrymandering harm of being sorted on the basis of race as an individual harm, and that our Black clients or Latino clients have all faced that individual harm regardless of whether they could meet some, you know,

statutory case law created actually a numerical majority requirement for a Voting Rights Act Section 2 claim.

So for those reasons we also agree that the *Callais* decision and any subsequent case law only support entering judgment on our remaining constitutional claims.

As for the Voting Rights Act Section 2 intent claim, we have not dismissed that claim.  We also have not been pressing it because of that uncertain status after the Fifth Circuit remand and discussion in this case.  And so we're not -- we can't say right now that we would agree that resolution of the Fourteenth Amendment or Fifteenth Amendment claims would also resolve our VAR Section 2 intent claim, but I just wanted to note that for the Court.

THE COURT:  All right.  Appreciate that.

Mr. Nixon.

MR. NIXON:  Thankfully for the Court, *Callais* answers your legal questions and precludes the remedies sought by the plaintiffs.

The Court in *Callais* said we start with the general rule that the Constitution almost never permits the State to discriminate on the basis of race.  So what would be the basis for the plaintiffs to have a district drawn for their benefit on the basis of race?  It is legally precluded.

The one case that I have not heard the plaintiffs talk about, and it's very helpful for the Court, is *Jackson v. Tarrant County*. When these same claims were made against Tarrant County, the Fifth Circuit dismissed them as being not evidence of racial intent. So let's start basically that there is no direct evidence of racial intent. Nobody said -- nobody -- there is no evidence that said it is our intent to dismantle a performing district that elects a minority. Nobody said that. There is no direct evidence of that. So they are trying to cobble together an intent claim based upon circumstantial evidence.

And, of course, the Supreme Court in *Alexander* said, well, we're not going to say it can't be done but it's never been done. And the things that we look at have altered -- have been altered in *Callais* but most importantly in *Jackson v. Tarrant County*. The fact that the County did things differently than they did in other years is of no evidence. Other departures are just as easily explained by partisan efforts.

And so while -- they took all that same kind of things, and the Fifth Circuit said none of those matter. They are not evidence. They don't fit in *Arlington Heights*. They don't fit the factors, and we're not going to legally, as a matter of law, all those complaints.

So what I heard is, well, I don't understand why they

did it.  Well, that's not evidence.  Why did they dismantle Precinct 3?  They could have kept it together and still had a coastal district.  That's not evidence.

In fact, the Court in *Callais* was very clear to say alternative maps alone are not enough to prove intent.  They prove only that a State could create an additional majority-minority district -- in this case they can't because it's a coalition district -- not that the State's failure to do so violated Section 2 of the Voting Rights Act.

So you asked the question did any of the maps produce a four R and the answer to that question is no because the purpose of the alternative maps was to elect a Democrat.

You remember Penny Pope, Justice Pope's testimony.  I asked her:  "Is your candidate of choice a Black person?"

And she said, "Yes."

"Is your candidate of choice a Latino person?"

She thought and she said, "Could."

"Is a candidate of choice ever an Anglo person?"

And she said, "Yes."

And then I asked her, "Under any circumstance could your candidate of choice be a Republican?"

And she said, "Don't make me answer that question."

THE COURT:  I remember.

MR. NIXON:  Yeah.  And then I said, "Please."

*Laura Wells, RPR, RMR, CRR, RDR*

And she said, "No."

Now what did the Court in *Callais* say about that?  You can't re-engineer using race to create a partisan result.  And that's when they said the alternative maps -- and let's be clear.  "Alternative" and "illustrative" are synonyms.  The Court in *Callais* said, "Drawing illustrative maps, plaintiffs cannot use race as a districting criterion."

And in *Allen II*, just a few weeks later, they said a plaintiff also cannot use race as a districting criterion in preparing an alternative map.

So the Supreme Court used "alternative" and "illustrative" as synonyms.

So where are we here?  We have people who say, well, I just disagree with the outcome.  You could have voted for Map 1 or you could have voted for Map 2.  The County is given the presumption of good faith.  The burden to overcome that presumption is not met with the statement of I don't understand why you did it.  You actually have to have evidence.

And all of the evidence that this Court found that we've all been over about 100 million times, you know, in the last several weeks, does not have any evidence of intent.  In fact, the Court made specific findings that I think preclude the Court -- not I think.  Do in fact

preclude the Court from finding intent.

You found, first of all, that the Black and Hispanic can't make a single race district.  We all agree to that.

You also found that plaintiffs admitted that race and politics are inextricably intertwined.

So it's interesting that while the County didn't rely on a political defense, the plaintiffs interjected politics into their own case and said that race and politics are inextricably intertwined.  That's your paragraph 144, and you agreed with that.

You found that the commission -- that Bryan, the County's mapmaker, didn't use race in drawing maps.  After he drew the map, he then put together spreadsheets that included racial demographics.  And then you found that -- you found -- the Court finds that the commissioners never expressly considered the spreadsheet information.

You also found that Judge Henry, based upon Oldham's advice, believed both maps were legally compliant.  And then you also found that Commissioner Apffel said he never witnessed anyone instruct Oldham or Bryan to consider racial data or race.  And Apffel testified he did not recall seeing, reviewing, evaluating, or using racial demographics when considering race.

Those are your fact findings.  So that's where we come

today in light of *Callais*, which says that the County, the State can't use race except very rarely in order to resolve a current ongoing problem, and then it has to be narrowly tailored to address that problem.

But in this case you found that it was easier to register and to vote in Galveston County that it ever has been.  And nobody was complaining about the ease of voting.  That's in your paragraph 164.

So let us talk about *Callais*.  Very specifically, a law that seeks to enforce the Fifteenth Amendment by prohibiting mere disparate impact would fail to enforce a right that the amendment secures.  That Precinct 3 was altered so that it no longer elected a Democrat or a candidate of choice doesn't -- is not a violation of the Fifteenth Amendment because the Fifteenth Amendment doesn't secure that right.

So -- but it goes beyond Footnote 13 in the *Petteway* decision.  Plaintiffs have said there has to be intent and effect.  They have admitted that in their pleadings.  I can show you that.  The *Petteway* en banc decision says there has to be intent and effect.  And they cite to *Underwood*.

But more importantly, the Fifth Circuit admonished all of the courts in its districts that "This Court will not remain in the forefront of authorizing litigation, not

compelled by law or Supreme Court, whose principal effects are to supplant legislative redistricting by elected representatives with judicial fiat," which is what the plaintiffs are asking, "encourage divisively counting citizens by race or ethnicity," which is what the plaintiffs are asking, and "displace the fundamental principal of democratic rule by the majority with balkanized interest," which is what the plaintiffs are asking.

So the Court found exactly what the plaintiffs were pleading for, a declaratory judgment that the enacted plan violates the law.  Well, what law does it violate?  It doesn't violate Section 2.  The Fifth Circuit already held that.  It doesn't violate the Fifteenth and -- Fourteenth and Fifteenth Amendments.  *Callais*, *Jackson,* and *Allen II* have decided that.

A preliminary and permanent injunction preventing the defendants from calling, holding, supervising, or certifying elections.  They are not entitled to that, assuming that the case is not moot.  Now, our position, of course, is that that map doesn't exist anymore.  So the Court can't order any of the relief.

That's it.  So the other two things that they ask for, procedures on how to adopt a new map to remedy the '21 map and attorneys' fees are not before the Court anymore.

*Laura Wells, RPR, RMR, CRR, RDR*

So the -- *Callais* altered the landscape.  And we understand that this Court was following *Campos v. Bay City,* but that law got changed.  And then the Supreme Court altered the *Gingles* analysis in *Callais* and made very specific pronouncements about what must be proved, a current ongoing.  So all of the historical information that they wanted and put into evidence doesn't matter.  *Jackson v. Tarrant County* took care of that and said that stuff doesn't matter.

So the only other thing I want to address in response is that there is no legal or factual framework that the Court can provide remedy and that the presumption of good faith is not overcome.  That -- but the last thing I want to say is that plaintiffs make a res ipsa argument.  You have eliminated a performing district, therefore, there must be a violation is not legally sufficient for this Court to grant the relief the plaintiffs have requested.

And *Callais* was very clear [as read:]  Section 2 does not intrude on a State's prerogative to draw districts based upon nonracial factors.  States are free to draw districts as they please.  We have held that they may use traditional districting factors such as compactness, contiguity, maintaining integrity of political subdivisions, preserving the core of existing districts, and protecting incumbents.  Nothing in the Constitution

requires States to heed these criteria, of course, and the desirability of some of these criteria might be disputed. But because they are not forbidden by the Constitution, it is up to each State to decide what weight, if any, they warrant.

The Supreme Court has mandated that courts give great deference to whatever decisions State makes. There is a reason for that. It's called federalism. You have to show a specific violation of the Constitution, not that they would draw a district better that they liked, not that the Court could draw a district better that it might like, not that we have to -- the County has to draw a district that they understand or agree with or makes sense to anybody but them.

The commissioners are elected to exercise their judgment. They take the same oath to defend the Constitution as does any other public official. That is why that they are given great deference. And if the Court is not sure why they picked the particular district they did, that's not enough evidence for the Court to impose an injunction or finding that it violated the Constitution.

The burden is on the plaintiffs to prove their case. They have to prove intent and effect, and they have not done so. This Court's hands are tied.

This case is moot. There is no evidence. There is no

legal basis for any injunction against the defendants.

Thank you.

THE COURT:  All right.  Thank you, Mr. Nixon.

All right.  Mr. Nixon is correct that the burden is on the plaintiffs.  And since the burden is on the plaintiffs, they get the last words.

MR. VOILAND:  Judge, may the United States be heard in between?

THE COURT:  Yes.

MR. VOILAND:  Because I think it would be fair to the plaintiffs because we may have something to say that the plaintiffs may want to respond to.

THE COURT:  Sure.  Go right ahead.

MR. VOILAND:  So I have to say it surprised me somewhat to hear the plaintiffs unable to identify who the elected under the map whether it would be -- how many Republicans or Democrats it would be.

In addition, I'm surprised somewhat at the plaintiffs' disagreement with what motivations or what criteria -- I shouldn't say motivations.  I should say what criteria the County used in creating its map.

The legal reason that I say that is because *Callais* says plaintiffs must present a map, an alternative map or an illustrative map, and that map must satisfy all of the criteria that the government used to the same level that

the government used it.  It must satisfy all of those same criteria and then add in race as a factor.

Now, to satisfy all of the government's criteria and then add in an additional criteria of race, it's a heavy lift; and it's such a heavy lift that the dissent in *Callais* says three times -- three times the dissent in *Callais* says that's impossible.

So I do think the plaintiffs are left with the impossible in what they would ask the Court for, particularly admitting that they are not exactly aligned with what districting criteria the County would use.  And that's really all I'll have to say.

THE COURT:  All right.  Appreciate that.

MR. VOILAND:  Thank you, Judge.

THE COURT:  Mr. Gaber.

MR. GABER:  Thank you, Your Honor.

I'll start there.  And I don't have the paragraph from the Court's decision, but my recollection is that the Court found that the alternative maps that the plaintiffs put into evidence satisfied all of the criteria that the Court found were the legitimate criteria that the County -- or the purported criteria that the County had set forth.  They maintained that coastal precinct.  They adhered to precinct -- voting precinct boundaries.  They were compact.  They were contiguous.  They protected

incumbents or all of the six or seven criteria that the Court went through, found that the alternative maps satisfied those criteria.

And so this is not the *Callais* case. One, it's not a Section 2 case anymore. But that comment that counsel from the United States mentioned in *Callais* just doesn't apply here because these maps satisfy all those criteria and there has not been a partisan defense. And counsel just said it again that there was no political defense raised for the reason the map was -- or why the map was drawn the way it was.

And so whatever commentary there is in *Callais* between the majority and the dissent about the difficulty of the burden, that the new update to the *Gingles* prongs, how hard or not hard that is for a plaintiff to meet, is just simply irrelevant to this case because we are talking about the Fourteenth and Fifteenth Amendments.

Now, there were a couple of discussions from Mr. Nixon about *Callais* that I just wanted to address specifically. It seemed to me like there may have been the suggestion that a Court cannot remedy a finding of intentional discrimination because that might entail looking at race.

One, those alternative maps I just discussed all were drawn without using any racial information, and the Court has made an express finding in that regard. So to the

extent those might be remedial, that is just simply not relevant.

But in *Callais* -- and this is page 1152 to 1153 of the *Callais* decision -- the Court talks about instances in which it would find consideration of race to be a compelling justification to satisfy strict scrutiny.  And it says, quote, [as read:] To rise to the level of compelling State interest, an effort to remediate past discrimination must satisfy two conditions.  First, the discrimination must be identified discrimination.  In other words, the State or Federal government must identify the specific instances of past discrimination that it aims to remediate and, in light of that specification, must determine the precise scope of the injury it seeks to remedy.

And then it goes on to say [as read:]  Second, that it has to have a strong basis in evidence to conclude the remedial action is necessary.

So I think it just is contrary to *Callais* itself to suggest that if there is a finding of intentional discrimination that the prohibition on Section 2 plaintiffs from using race in an illustrative map would somehow prevent remedying a finding of intentional discrimination because the Court will, of course, have made that intent finding specifically.

The next thing, Mr. Nixon discussed how the fact that we have satisfied *Alexander*'s, *Callais*', and *Milligan*'s discussion -- the last *Milligan*'s discussion of alternative maps is somehow insufficient.  I don't know how to read Justice Alito's discussion of alternative maps to suggest that they are not in evidence, you know, not key evidence.  *Cooper* called it key evidence even when it wasn't required.  *Alexander* said that a weak case could be won on the basis of these alternative maps.  They doubled down on it in the discussion in *Callais* and again in the subsequent *Milligan* case.

And I just wanted to read from *Callais* again.  This is at page 1156 in the majority opinion, and it is in the section where they are talking about how the statutory test is being modified or updated to account for enforcement of intent requirements.

And the Court says, quote, [as read:] Suppose, for example, that the application of a State's districting algorithm yields numerous maps with districts in which members of a minority group constitute a majority and suppose that the State cannot provide a legitimate reason for rejecting all those maps and eliminating all majority-minority districts.  In such a situation, the inference of racial motivation is strong.

And so the Supreme Court disagrees with Galveston's

characterization of the strength of alternative map evidence and finds that it could support a strong inference and in the *Alexander* case and in the *Cooper* case that it could be the key evidence that wins the day for a plaintiff who has no direct evidence.

And I disagree strongly with the County's suggestion that there was not evidence -- direct evidence in this case. I'm not going to characterize the Court's findings. The Court is familiar with its own findings and what they mean or what the Court has or has not found. But my own view of it is that the Court's opinion laid out in paragraph after paragraph the evidence that would support a finding of intentional discrimination and racial gerrymandering.

And then one last point -- or maybe two last points -- there was the discussion of, well, we had said that politics and race are intertwined. That was in the context of testimony discussing the *Gingles II* and *III* condition prongs. And under the existing case law at the time, that was not in the context of the intent claim. But in any event, it is irrelevant to the standard that the Supreme Court has set forth with respect to when you have to disentangle what otherwise might be entangled. And that standard is simply not relevant here because they disclaimed the partisan defense.

*Laura Wells, RPR, RMR, CRR, RDR*

And then there was a statement, I think in the reply brief that the County filed on the *Callais* issue, that suggested that the Court had found that race was not used in this case; and they cited to the paragraph where the Court discussed -- discusses Mr. Bryan's spreadsheets. That, of course, is one piece of evidence in the case. The Court made no finding that race was not used by the County in its map drawing.  I just wanted to make sure the record was clear on that.

And with that, I will pass it to Ms. Chen.

MS. CHEN:  Thank you.

And we agree and believe that the various mischaracterizations by the defendants in their oral presentation are all addressed in our papers with citations to the cases, with citations to the record showing contemporaneous discrimination and voting showing that direct evidence of racial predominance.

And just to directly respond to this characterization of our claims as saying -- as some sort of res ipsa theory that a government could never dismantle an existing Black and Latino majority district, that is not what we're arguing.

As you see in our papers, we are arguing to look at the totality of all of the evidence and the specific case to see that based on the Court's already voluminous

*Laura Wells, RPR, RMR, CRR, RDR*

findings, based off of the testimony of the defendants, we do have evidence of racial predominance here, and that is well-established law.  That is not disturbed in any way by *Callais* or *Milligan.*  And I think it's emphasized by the *Jackson v. Tarrant County* case which we describe and distinguish at length in our papers.

So we would just direct the Court to those specific citations that can belie the various mischaracterizations you have heard today.

THE COURT:  All right.  Thank you, Ms. Chen.

All right.  If y'all can believe it, the impression I'm taking -- one of the impressions I'm taking away from the arguments today, which were very helpful to the Court, in addition to your very good briefing on both sides, is that this is actually a little bit simpler than I thought it was.  I thought it was more complicated.  So the hearing was very valuable to me, and you have really clarified some things for me.

And so we're going to get to work on getting a ruling out on this.  It's been sitting for a while since *Petteway.*  We were waiting for what the Supreme Court had to say and they have said it now and we're ready to move on and resolve what is still pending in this litigation. We'll get to that as quickly as we can.

We appreciate your arguments.  I am glad that we had a

pretty day in Galveston for y'all to come down for.  Go and get some gumbo or some fried shrimp, and we'll get a ruling out to you as quick as we can.  Okay.

CASE MANAGER:  All rise.

(Proceedings concluded at 11:59 a.m.)

*Date:  July 29, 2026*

### *COURT REPORTER'S CERTIFICATE*

*I, Laura Wells, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

_____/s/ Laura Wells_____

*Laura Wells, CRR, RMR*

# Tab B:

# June 29 Order Establishing New Precincts



**EXHIBIT A**

## GALVESTON COUNTY COMMISSIONERS COURT
## ORDER ESTABLISHING NEW COMMISSIONER, CONSTABLES, AND JUSTICES OF THE PEACE PRECINCT BOUNDARIES

On this, the 29th day of June 2026, the Commissioners Court of Galveston County, Texas, convened a specially scheduled meeting with the following members thereof present

        Mark A. Henry, County Judge
        Darrell Apffel, County Commissioner, Precinct No. 1
        Joe Giusti, County Commissioner, Precinct No. 2
        Hank Dugie, County Commissioner, Precinct No. 3
        Robin Armstrong, MD, County Commissioner, Precinct No. 4

    When the following proceedings were had, to wit:

> An Order approving a redistricting plan for Galveston County Commissioners' Court Precincts (Districts)

**WHEREAS,** pursuant to the Constitution and Laws of the State of Texas, and other laws, the Galveston County Commissioners' Court desires to divide the Commissioners, Constables, and Justices of the Peace Precinct Boundaries; and,

**WHEREAS,** the Galveston County Commissioners' Court has determined that the interests of the people of the county are best served by changing the existing Commissioners, Constables, and Justices of the Peace Precinct Boundaries; and,

**NOW, THEREFORE, BE IT ORDERED BY THE COMMISSIONERS' COURT OF GALVESTON COUNTY, TEXAS,** that Commissioners, Constables, and Justices of the Peace Precincts are hereby composed as depicted on the attached map, affixed hereto as "Exhibit A," and fully adopted and incorporated in this Order. It is further ordered by the Court that this Redistricting Order shall take effect immediately.

Upon the Motion of __County Judge Henry__ and **Seconded by** __Commissioner Dugie__ the above Redistricting Plan, passed with _____5_____ votes in favor thereof and ___0___ votes against.

**Passed** and **approved** this ___29th___ day of June, 2026

Galveston County

Mark Henry, County Judge

Attest:

Dwight D. Sullivan, County Clerk

By: _____ **Deputy**
        Melissa Childs



Galveston_Final2 (Proposed Commissioner & JP Precincts)

**EXHIBIT A**









Galveston_Final2 (Proposed Commissioner & JP Precincts)



Galveston_Final2 (Proposed Commissioner & JP Precincts)



Galveston_Final2 (Proposed Commissioner & JP Precincts)

# Tab C:

# June 29 Commissioners Court Meeting Agenda



# GALVESTON COUNTY, TEXAS
# COMMISSIONERS COURT
# SPECIAL MEETING
# AGENDA

722 Moody
County Courthouse
Galveston, TX 77550
(409) 766-2244

| | | | | |
|---|---|---|---|---|
| Mark Henry | Darrell Apffel | Joe Giusti | Hank Dugie | Robin Armstrong, MD |
| County Judge | Commissioner, Precinct 1 | Commissioner, Precinct 2 | Commissioner, Precinct 3 | Commissioner, Precinct 4 |

**Monday, June 29, 2026**          **9:30 AM**          **CALDER MEETING LOCATION**

### 174 Calder Rd., Room 100
### League City, Texas 77573
### SPECIAL MEETING

CONSENT AGENDA: ALL ITEMS MARKED WITH A SINGLE ASTERISK (*) ARE PART OF THE CONSENT AGENDA AND REQUIRE NO DELIBERATION BY THE COMMISSIONERS COURT. ANY COMMISSIONERS COURT MEMBER MAY REMOVE AN ITEM FROM THIS AGENDA TO BE CONSIDERED SEPARATELY.

In accordance with the provisions of the Americans with Disabilities Act (ADA), persons in need of a special accommodation to participate in this proceeding shall, within three (3) days prior to any proceeding contact the County Judge's office at 722 Moody, Galveston, Texas 77550 (409) 766-2244.

**Call to Order**

**Public Comment**

**Action Agenda**

**County Judge**

1.      Consideration of an order establishing new commissioners, constables, and justices of the peace precinct boundaries

**Adjourn**

### Appearances before Commissioners Court

A speaker whose subject matter as submitted relates to an identifiable item of business on this agenda will be requested by the County Judge or other presiding court members to come to the podium where they will be limited to three minutes (3). A speaker whose subject matter as submitted does not relate to an identifiable item of business on this agenda will be limited to three minutes (3) and will be allowed to speak before the meeting is adjourned. Please arrive prior to the meeting and sign in with the County Clerk.

**Commissioners Court Special Meeting**  AGENDA  **June 29, 2026**

### Executive Sessions

The Galveston County Commissioners Court may recess into closed meeting (Executive Session) on any item listed on this agenda if the Executive Session is authorized under the Open Meetings Act pursuant to one or more the following exceptions:  Tex. Gov't Code §§ 551.071 (consultation with attorney), 551.072 (deliberation regarding real property), 551.073 (deliberation regarding a prospective gift or donation), 551.074 (personnel matters), 551.0745 (personnel matters affecting County advisory body),  551.076 (deliberation regarding security devices or security audits),  and/or 551.087 (deliberations regarding economic development negotiations).  The Presiding Officer of the Commissioners Court shall announce the basis for the Executive Session prior to recessing into Executive Session.  However, the Commissioners Court may only enter into the Executive Session on any agenda item for which a separate Executive Session has not been separately posted if, prior to conducting the Executive Session, a majority of the Commissioners Court votes to go into Executive Session.  This motion requirement does not apply to any agenda item that has been previously noticed to constitute or include an Executive Session.

\*\*\*

# Tab D:

# June 29 Commissioners Court Meeting Minutes

**MINUTES**

BE IT REMEMBERED, That on June 29, 2026, Commissioners Court of Galveston County, Texas, met at a special meeting with the following present:

Mark Henry, County Judge

Darrell A. Apffel, Commissioner Precinct 1

Joe Giusti, Commissioner Precinct 2

Hank Dugie, Commissioner Precinct 3

Robin Armstrong, MD, Commissioner Precinct 4

Dwight D. Sullivan, County Clerk by Melissa Childs, Deputy

## CALL TO ORDER
Call to Order by Judge Henry at 9:30 A.M. at the Calder Annex.

## PUBLIC COMMENT
Mae Francis, Maleia Brooks, Rev. William Randall, Jr., Diane Merchant, Minister Kathy Bell, Deborah Warren, Robert R. A. Maddox, Sr., Judy Brown, Gretchen L. Mason, Linda Cobbs, Lisa Brown, Tierrishia Bell, William Sowell, Pastor Bradley Hale, Sr., Dr. W. H. King III, Winifred Gilmore, Frances King, Brittany Payne, Imran Kasam, Maria Tripovich (departed prior to the conclusion of public comment), Barbara Rice Anders, Lucille McGaskey, Rev. Timothy Allen, Jeanne Reed, Rev. Mark Davis, Dr. Edna Courville, Elizabeth Lewis, Gerald Wilson, Linda Alexander, Elizabeth Protas, Shannon Dicley, Sharon B. Lewis, Callie Liles, Sarah Ditgen, Kathleen Buckley, Tamy Gary, Roderick Cunningham, Barbara Meeks, Phil Mercado, Maryanne Delgado, Lucretia Henderson-Lofton, Ursula Burns, W. Brad Boney, Sade Williams, Leah Fanuiel, Chad Rankin, Samuel Collins III, Robert Quintero, Tracie Steans, Nakisha Paul, and Billy A. Williams, Jr. addressed the Court.

Additionally, written public comments were submitted via email by Bridget Duran, Dede Griffin, and Marica.

## ACTION AGENDA

### County Judge

1.   Consideration of an order establishing new commissioners, constables, and justices of the peace precinct boundaries

**Attachments:** 1

Motion to approve by County Judge Henry, seconded by Commissioner Dugie that the above action be taken by the Court.

Passed: 5-0

**Aye:**    County Judge Henry, Commissioner Apffel, Commissioner Giusti, Commissioner Dugie, Commissioner Armstrong

**Nay:**    None

## **ADJOURN**

Commissioners Court adjourned at 11:36 A.M. on Monday, June 29, 2026.

# Tab E:

# June 8 Commissioners Court Meeting Agenda



# GALVESTON COUNTY, TEXAS
# COMMISSIONERS COURT
# AGENDA

722 Moody
County Courthouse
Galveston, TX 77550
(409) 766-2244

| Mark Henry | Darrell Apffel | Joe Giusti | Hank Dugie | Robin Armstrong, MD |
|---|---|---|---|---|
| County Judge | Commissioner, Precinct 1 | Commissioner, Precinct 2 | Commissioner, Precinct 3 | Commissioner, Precinct 4 |

**Monday, June 8, 2026**          **9:30 AM**          **Galveston County Courthouse**

## REGULAR MEETING

CONSENT AGENDA: ALL ITEMS MARKED WITH A SINGLE ASTERISK (*) ARE PART OF THE CONSENT AGENDA AND REQUIRE NO DELIBERATION BY THE COMMISSIONERS COURT. ANY COMMISSIONERS COURT MEMBER MAY REMOVE AN ITEM FROM THIS AGENDA TO BE CONSIDERED SEPARATELY.

In accordance with the provisions of the Americans with Disabilities Act (ADA), persons in need of a special accommodation to participate in this proceeding shall, within three (3) days prior to any proceeding contact the County Judge's office at 722 Moody, Galveston, Texas 77550 (409) 766-2244 .

**Call to Order**

**Invocation and Pledge of Allegiance**

**Public Comment**

**Consent Agenda**

Submitted by the Auditor's Office:

**\*1.**   Approval of the accounts payable checks dated 6/8/2026

**\*2.**   Order for payroll ending 6/3/2026 bi-weekly #12

**\*3.**   Order for supplemental payroll period ending 6/3/2026 bi-weekly #12

**\*4.**   Internal audit report of the District Attorney's Office Petty Cash Funds with response letter from Honorable Kenneth Cusick, dated 5/19/2026

**\*5.**   Internal audit report of the Sheriff's Office Commissary and Inmate Property accounts for period of 4/1/2025 - 3/31/2026 with response letter from Sheriff Jimmy Fullen

**\*6.**   Internal audit report of the agreement between Galveston County and Friends for Life Guardianship Services for period of 3/1/2025 - 2/28/2026 with response letter from Diana Huallpa, Chief Financial Officer, dated 5/19/2026

**\*7.**   Consideration of approval of Change Order to authorize additional funding of Workday support, for a Foundation Data Model (FDM) review, with Guidehouse submitted by County Auditor

**Commissioners Court**               **AGENDA**                    **June 8, 2026**

**\*8.**   Approval of the Certification of Revenue for Constable Precinct 2 in the amount of $122,500 for the DHS ICE 287 (g) Task Force and appropriation of funds

**\*9.**   Receive and file refund check list from Odyssey submitted by the District Clerk

**\*10.**  Receive and file restitution checklist from Odyssey submitted by Personal Bond/Collections

**\*11.**  Receive and file Galveston County Emergency Services District No. 2 Annual Financial Report for Fiscal Year Ended September 30, 2025 submitted by the County Judge

**\*12.**  Receive and file Galveston County Emergency Communication (911) District Annual Audit for Year Ended December 31, 2024 submitted by the County Judge

**\*13.**  Receive and file Galveston County Community Supervision and Corrections Department financial statements and supplementary information with independent financial audit report for year ending August 31, 2025, submitted by Adult Probation

**\*14.**  Consideration for approval to partner with Sarah Glaser with Lloyd Gosselink, Rochelle & Townsend, P.C. ("Lloyd Gosselink") to conduct two half-day training sessions on employment law topics submitted by Human Resources

**\*15.**  Consideration of approval of renewal of a memorandum of understanding (MOU) between Gulf Coast Monitoring Specialists (GCMS) and Galveston County to provide various alcohol and drug monitoring services for participants in the Galveston County Veterans Treatment Court (GCVTC) program submitted by County Judge

**\*16.**  Consideration of approval of granting a reduction of a permit fee (Facility Permitting Policy, Section 5.1.2 and 5.1.3) to Loving the Mama Postpartum Services & Black Chamber Foundation Brazoria County for use of the banquet hall, South Ground and North Grounds at Walter Hall Park for their Fed with Love 5K and resource fair on Saturday, August 15th, 2026, presented by the Parks & Cultural Services Department

**\*17.**  Consideration of approval of Interlocal Cooperative Agreement for Galveston County Public Safety Consortium On-Premise and Cloud-Based Motorola PremierOne CAD/RMS System with Tiki Island submitted by Information Technology

**\*18.**  Consideration of approval of Interlocal Cooperative Agreement for Galveston County Public Safety Consortium On-Premise and Cloud-Based Motorola PremierOne CAD/RMS system with Port of Galveston submitted by Information Technology

**\*19.**  Consideration of a Resolution as required by the grant application, affirming that Galveston County has not and will not reduce the amount of County funds provided to the Galveston County Sheriff's Office because of grant funds provided under Senate Bill 8 (SB 8) submitted by Sheriff's Office

**\*20.**  Consideration of approval of an order granting various residence homestead exemptions from the 2026 Tax Levy pursuant to V.T.C.A., Tax Code §11.13 and §11.131 submitted by Legal Services Manager

**Commissioners Court**                    **AGENDA**                         **June 8, 2026**

**\*21.**   Consideration of approval of an order authorizing the split payment of 2026 ad valorem taxes pursuant to V.T.C.A, tax code §31.03 submitted by Legal Services Manager

**\*22.**   Consideration of a Resolution in support of re-examining precinct lines for Justices of the Peace, Constables, and County Commissioners submitted by Legal Services Manager

**\*23.**   Consideration of the release and settlement agreement with Alicia Monroe arising from an incident that occurred on or about May 10, 2024, in the matter of 25-CV-1967 Alicia Monroe v William T. Lambert and Galveston County Sheriff's Office, submitted by Legal Services Manager

**\*24.**   Consideration of renewal Agreement for lodging/sleep accommodations between Galveston County and Hampton Inn and Suites during emergency disaster operations submitted by Legal Services Manager

**\*25.**   Consideration of full and final waiver, release, and settlement agreement with Juan Alberto Alamo Gomez arising from an incident that occurred on or about February 13, 2026, submitted by Legal Services Manager

**\*26.**   Consideration of approval to authorize the County Judge to sign the Authorization to Act as an Agent form from the U.S. Army Corps of Engineers (USACE) to allow Balcones Field Services to act on the County's behalf for the Frenchtown Road Expansion Project in Port Bolivar, submitted by Road & Bridge

**\*27.**   Consideration of approval to authorize the County Judge to sign the Nationwide Permit Pre-Construction Notification (PCN) form and Request for Jurisdictional Determination form from the U.S. Corps of Engineers for the Frenchtown Road Expansion Project in Port Bolivar, submitted by Road & Bridge

**\*28.**   Consideration of authorizing the abatement of a public nuisance located at 15325 Cedar St., Santa Fe, TX 77510, submitted by Nuisance Abatement

**\*29.**   Consideration of authorizing the abatement of a public nuisance located at 918 20th St., San Leon, TX 77539, submitted by Nuisance Abatement

**\*30.**   Consideration of authorizing the abatement of a public nuisance located at 6714 Ave. O, Santa Fe, TX 77510, submitted by Nuisance Abatement

**\*31.**   Consideration of authorizing the abatement of a public nuisance located at 13529 Montgomery Rd., Santa Fe, TX 77510, submitted by Nuisance Abatement

**\*32.**   Consideration for authorization to extend the contracts for ITB 25-042, Inmate Clothing and Supplies submitted by the Purchasing Agent

**\*33.**   Consideration for authorization to dispose of salvage or surplus property submitted by the Purchasing Agent

**Commissioners Court**         **AGENDA**         **June 8, 2026**

**\*34.** Consideration of acknowledging receipt of a sand pit permit application from Brad Ballard at 687 State Highway No 87 on Bolivar Peninsula and authorizing the County Engineer to run the required newspaper notice submitted by the County Engineer

**\*35.** Consideration of approval of permit number HB 26-43 to install one 20" liquid natural gas pipeline under the Highland Bayou Diversion Channel submitted by the County Engineer

**\*36.** Consideration of approval of a Texas City Hurricane Levee permit number TCSW-26-386 to install one 24" pipeline to transport liquid petroleum gas, submitted by the County Engineer

**\*37.** Consideration of approval of a Texas City Hurricane Levee permit number TCSW-26-385 to install one 12" natural gas pipeline over the Texas City Hurricane Levee near Dike Rd submitted by the County Engineer

**\*38.** Consideration of approval of a Texas City Hurricane Levee permit number TCSW-26-3857 to proceed with Marathon MPLX project consisting of the installation of pipelines in the vicinity of the Texas City Hurricane Levee submitted by the County Engineer

**\*39.** Consideration of approval of application from Ramjit Patel and Nita Patel for a partial replat of Moore's Addition subdivision submitted by Platting & Right-of-Way

**\*40.** Consideration of authorizing the County Judge to execute a pipeline easement agreement to BANGL, LLC submitted by Platting & Right-of-Way

**\*41.** Consideration of authorizing the County Judge to execute a pipeline easement agreement under Highland Bayou Diversion Channel to BANGL, LLC submitted by Platting & Right-of-Way

**\*42.** Consideration of authorizing the County Judge to execute an easement to TxDOT for the SH 146 project submitted by Platting & Right-of-Way

**\*43.** Consideration of approval of a road opening request from Clint Hardy for Nichols Ave., Dickinson and acceptance of the approx. 310 LF into the county road maintenance system submitted by Platting & Right-of-Way

**\*44.** Consideration of approval of application from Kevin and Kelli Roberts for a partial replat of Alta Loma Outlots subdivision submitted by Platting & Right-of-Way

**\*45.** Consideration of authorization for County Judge to accept additional funding for FY2026 Houston-Galveston Area Council (H-GAC) Congregate Senior Meals & Transportation Grant-Amendment #1, on behalf of Galveston Countys Parks & Cultural Services Department submitted by Grants Administration

**\*46.** Consideration of authorization to submit the FY2027 Texas General Land Office (GLO) Beach Maintenance Reimbursement (BMR) Program grant application on behalf of Galveston County's Road and Bridge Department submitted by Grants Administration

**\*47.** Receive and file AFFH Certification form for the Texas General Land Office Community Development Block Grant, Regional Mitigation Program - Method of Distribution as approved on May 11, 2026, Item #45 submitted by Grants Administration

**Commissioners Court**                    **AGENDA**                    **June 8, 2026**

\*        Consideration of approval of the following budget amendments submitted by Professional Services:

**\*48.**    26-123-0608-A
Information Technology- Request transfer within IT - Other Contract Services to Radio Expenditures to fund N70 Radio subscription renewal

**\*49.**    26-124-0608-B
Sheriff's Office - Request transfer within Sheriff Administration - Training Services to Training Supplies to fund the purchase of ammunition

**\*50.**    26-125-0608-C
Sheriff's Office - Request Transfer from General Fund - Budgeted Reserves to Identification Division - Extraordinary Supplies to fund purchase of storage containers

**\*51.**    26-126-0608-D
Adult Probation- Request transfer from General Fund - Budgeted Reserves to Mental Health Court Program - Software Maintenance to fund CSS annual invoice

**\*52.**    26-127-0608-E
Auditor- Request transfer from General Fund - Budgeted Reserves to IT - Other Contract Services to fund Guidehouse review of the Foundation Data Model

**\*53.**    26-128-0608-F
District Attorney- Request transfer from General Fund - Budgeted Reserves to District Attorney's - Various Spend Categories to fund personnel adjustments

**\*54.**    26-129-0608-G
General Government- Request to transfer funds from Capital Project Funds to General Fund and to transfer from the General Fund - Transfers and Reserves and Self Insurance Reserve Fund - General Self Insurance - Liability Premiums to the Self Insurance Reserve Fund - General Self Insurance - Claims Paid Liability to fund settlement payment, and request rescission of BA 26-109-0511A

**\*55.**    26-130-0608-H
Sheriff's Office - Request transfer within Criminal Investigation - Furniture and Fixtures to Extraordinary Supplies to fund the purchase of office furniture

**Action Agenda**

**<u>Purchasing</u>**

**56.**    Consideration to award RFQ 25-082, Galveston County Flood Mitigation Assistance (FMA) Elevation Engineering Services

**57.**    Consideration to award RFP 26-086, Local Trucking Services

**58.**    Consideration of resultant contract from RFP #26-086, Local Trucking Service with J R Contreras Trucking submitted by the Road & Bridge Department

**Adjourn**

### Appearances before Commissioners Court

A speaker whose subject matter as submitted relates to an identifiable item of business on this agenda will be requested by the County Judge or other presiding court members to come to the podium where they will be limited to three minutes (3). A speaker whose subject matter as submitted does not relate to an identifiable item of business on this agenda will be limited to three minutes (3) and will be allowed to speak before the meeting is adjourned. Please arrive prior to the meeting and sign in with the County Clerk.

### Executive Sessions

The Galveston County Commissioners Court may recess into closed meeting (Executive Session) on any item listed on this agenda if the Executive Session is authorized under the Open Meetings Act pursuant to one or more the following exceptions:  Tex. Gov't Code §§ 551.071 (consultation with attorney), 551.072 (deliberation regarding real property), 551.073 (deliberation regarding a prospective gift or donation), 551.074 (personnel matters), 551.0745 (personnel matters affecting County advisory body),  551.076 (deliberation regarding security devices or security audits),  and/or 551.087 (deliberations regarding economic development negotiations).  The Presiding Officer of the Commissioners Court shall announce the basis for the Executive Session prior to recessing into Executive Session.  However, the Commissioners Court may only enter into the Executive Session on any agenda item for which a separate Executive Session has not been separately posted if, prior to conducting the Executive Session, a majority of the Commissioners Court votes to go into Executive Session.  This motion requirement does not apply to any agenda item that has been previously noticed to constitute or include an Executive Session.

**\*\*\***

# Tab F:

# June 8 Commissioners Court Meeting Minutes

## MINUTES

BE IT REMEMBERED, That on June 8, 2026, Commissioners Court of Galveston County, Texas, met at a regular meeting with the following present:

Mark Henry, County Judge

Darrell A. Apffel, Commissioner Precinct 1

Joe Giusti, Commissioner Precinct 2

Hank Dugie, Commissioner Precinct 3

Robin Armstrong, MD, Commissioner Precinct 4

Dwight D. Sullivan, County Clerk

## CALL TO ORDER

Call to Order by Judge Henry at 9:31 A.M. at the Galveston County Courthouse.

## INVOCATION AND PLEDGE OF ALLEGIANCE

Commissioner Hank Dugie led the Court in the Pledge of Allegiance.

The Invocation was given by Commissioner Darrell Apffel.

## PUBLIC COMMENT

No public comment.

## CONSENT AGENDA

Submitted by the Auditor's Office:

**\*1.**    Approval of the accounts payable checks dated 6/8/2026

  **Attachments:** 1

**\*2.**    Order for payroll ending 6/3/2026 bi-weekly #12

  **Attachments:** 2

**\*3.**    Order for supplemental payroll period ending 6/3/2026 bi-weekly #12

**\*4.**    Internal audit report of the District Attorney's Office Petty Cash Funds with response letter from Honorable Kenneth Cusick, dated 5/19/2026

  **Attachments:** DA Petty Cash Funds CC Audit Packet for 6.8.26

**\*5.**    Internal audit report of the Sheriff's Office Commissary and Inmate Property accounts for period

of 4/1/2025 - 3/31/2026 with response letter from Sheriff Jimmy Fullen

**Attachments:** SO Commissary & Inmate Property Audit  for CC date 6.8.26

**\*6.** Internal audit report of the agreement between Galveston County and Friends for Life Guardianship Services for period of 3/1/2025 - 2/28/2026 with response letter from Diana Huallpa, Chief Financial Officer, dated 5/19/2026

**Attachments:** Guardianship F4L Audit Agenda Packet for 6.8.26

**\*7.** Consideration of approval of Change Order to authorize additional funding of Workday support, for a Foundation Data Model (FDM) review, with Guidehouse submitted by County Auditor

**Attachments:** 7

**\*8.** Approval of the Certification of Revenue for Constable Precinct 2 in the amount of $122,500 for the DHS ICE 287 (g) Task Force and appropriation of funds

**Attachments:** Certification of Revenue-06.08.26 DHS ICE 287(g) Task Force Constable Pct 2 & Related BA

**\*9.** Receive and file refund check list from Odyssey submitted by the District Clerk

**Attachments:** SR-387 DC.pdf
SR-394 DC.pdf

**\*10.** Receive and file restitution checklist from Odyssey submitted by Personal Bond/Collections

**Attachments:** SR-387 Collections
SR-394 Collections

**\*11.** Receive and file Galveston County Emergency Services District No. 2 Annual Financial Report for Fiscal Year Ended September 30, 2025 submitted by the County Judge

**Attachments:** GCESD No. 2--2025.05.28--Letter to Galveston Co. Commissioners Court fwding FY 2024-25 Audit Report
GCESD No. 2--2026.05.19--FY 2024-25 Audit Report

**\*12.** Receive and file Galveston County Emergency Communication (911) District Annual Audit for Year Ended December 31, 2024 submitted by the County Judge

**Attachments:** GCECD

**\*13.** Receive and file Galveston County Community Supervision and Corrections Department financial statements and supplementary information with independent financial audit report for year ending August 31, 2025, submitted by Adult Probation

**Attachments:** Annual Financial Report 2025 - CSCD

**\*14.** Consideration for approval to partner with Sarah Glaser with Lloyd Gosselink, Rochelle & Townsend, P.C. ("Lloyd Gosselink") to conduct two half-day training sessions on employment law topics submitted by Human Resources

**Attachments:** 14

**\*15.** Consideration of approval of renewal of a memorandum of understanding (MOU) between Gulf Coast Monitoring Specialists (GCMS) and Galveston County to provide various alcohol and

drug monitoring services for participants in the Galveston County Veterans Treatment Court (GCVTC) program submitted by County Judge

**Attachments:** 15

**\*16.**  Consideration of approval of granting a reduction of a permit fee (Facility Permitting Policy, Section 5.1.2 and 5.1.3) to Loving the Mama Postpartum Services & Black Chamber Foundation Brazoria County for use of the banquet hall, South Ground and North Grounds  at Walter Hall Park for their Fed with Love 5K and resource fair on Saturday, August 15th, 2026, presented by the Parks & Cultural Services Department

**Attachments:** Solomon Fee Reduction 2026

**\*17.**  Consideration of approval of Interlocal Cooperative Agreement for Galveston County Public Safety Consortium On-Premise and Cloud-Based Motorola PremierOne CAD/RMS System with Tiki Island submitted by Information Technology

**Attachments:** 17

**\*18.**  Consideration of approval of Interlocal Cooperative Agreement for Galveston County Public Safety Consortium On-Premise and Cloud-Based Motorola PremierOne CAD/RMS system with Port of Galveston submitted by Information Technology

**Attachments:** 18

**\*19.**  Consideration of a Resolution as required by the grant application, affirming that Galveston County has not and will not reduce the amount of County funds provided to the Galveston County Sheriff's Office because of grant funds provided under Senate Bill 8 (SB 8) submitted by Sheriff's Office

**Attachments:** 19

**\*20.**  Consideration of approval of an order granting various residence homestead exemptions from the 2026 Tax Levy pursuant to V.T.C.A., Tax Code §11.13 and §11.131 submitted by Legal Services Manager

**Attachments:** 20

**\*21.**  Consideration of approval of an order authorizing the split payment of 2026 ad valorem taxes pursuant to V.T.C.A, tax code §31.03 submitted by Legal Services Manager

**Attachments:** 21

**\*22.**  Consideration of a Resolution in support of re-examining precinct lines for Justices of the Peace, Constables, and County Commissioners submitted by Legal Services Manager

**Attachments:** 22

**\*23.**  Consideration of the release and settlement agreement with Alicia Monroe arising from an incident that occurred on or about May 10, 2024, in the matter of 25-CV-1967 Alicia Monroe v William T. Lambert and Galveston County Sheriff's Office, submitted by Legal Services Manager

**Attachments:** Monroe Release and Settlement Agreement

**\*24.**   Consideration of renewal Agreement for lodging/sleep accommodations between Galveston County and Hampton Inn and Suites during emergency disaster operations submitted by Legal Services Manager

**Attachments:** 24

**\*25.**   Consideration of full and final waiver, release, and settlement agreement with Juan Alberto Alamo Gomez arising from an incident that occurred on or about February 13, 2026, submitted by Legal Services Manager

**Attachments:** Alamo Gomez Property Release

**\*26.**   Consideration of approval to authorize the County Judge to sign the Authorization to Act as an Agent form from the U.S. Army Corps of Engineers (USACE) to allow Balcones Field Services to act on the County's behalf for the Frenchtown Road Expansion Project in Port Bolivar, submitted by Road & Bridge

**Attachments:** 26

**\*27.**   Consideration of approval to authorize the County Judge to sign the Nationwide Permit Pre-Construction Notification (PCN) form and Request for Jurisdictional Determination form from the U.S. Corps of Engineers for the Frenchtown Road Expansion Project in Port Bolivar, submitted by Road & Bridge

**Attachments:** 27

**\*28.**   Consideration of authorizing the abatement of a public nuisance located at 15325 Cedar St., Santa Fe, TX 77510, submitted by Nuisance Abatement

**Attachments:** 15325 Cedar_Redacted

**\*29.**   Consideration of authorizing the abatement of a public nuisance located at 918 20th St., San Leon, TX 77539, submitted by Nuisance Abatement

**Attachments:** 918 20th St - Louise

**\*30.**   Consideration of authorizing the abatement of a public nuisance located at 6714 Ave. O, Santa Fe, TX 77510, submitted by Nuisance Abatement

**Attachments:** 6714 Ave O_Redacted

**\*31.**   Consideration of authorizing the abatement of a public nuisance located at 13529 Montgomery Rd., Santa Fe, TX 77510, submitted by Nuisance Abatement

**Attachments:** 13529 Montgomery Rd - Perroncel

**\*32.**   Consideration for authorization to extend the contracts for ITB 25-042, Inmate Clothing and Supplies submitted by the Purchasing Agent

**Attachments:** inmate clothing

**\*33.**   Consideration for authorization to dispose of salvage or surplus property submitted by the Purchasing Agent

**Attachments:** surplus

**\*34.** Consideration of acknowledging receipt of a sand pit permit application from Brad Ballard at 687 State Highway No 87 on Bolivar Peninsula and authorizing the County Engineer to run the required newspaper notice submitted by the County Engineer

**Attachments:** Sand-24-2_Bradb(2026)

**\*35.** Consideration of approval of permit number HB 26-43 to install one 20" liquid natural gas pipeline under the Highland Bayou Diversion Channel submitted by the County Engineer

**Attachments:** 35

**\*36.** Consideration of approval of a Texas City Hurricane Levee permit number TCSW-26-386 to install one 24" pipeline to transport liquid petroleum gas, submitted by the County Engineer

**Attachments:** 36

**\*37.** Consideration of approval of a Texas City Hurricane Levee permit number TCSW-26-385 to install one 12" natural gas pipeline over the Texas City Hurricane Levee near Dike Rd submitted by the County Engineer

**Attachments:** 37

**\*38.** Consideration of approval of a Texas City Hurricane Levee permit number TCSW-26-3857 to proceed with Marathon MPLX project consisting of the installation of pipelines in the vicinity of the Texas City Hurricane Levee submitted by the County Engineer

**Attachments:** 38

Motion to approve an amendment to the Texas City Hurricane Levee Permit to TSCW-26-387, allowing the Marathon MPLX project to proceed with the installation of pipelines in the vicinity of the Texas City Hurricane Levee. Motion made by County Judge Henry and seconded by Commissioner Apffel that the above action be approved by the Court.

Passed: 3-0

**Aye:**      County Judge Henry, Commissioner Apffel, Commissioner Dugie

**Nay:**      None

**Absent:**  Commissioner Giusti, Commissioner Armstrong

**\*39.** Consideration of approval of application from Ramjit Patel and Nita Patel for a partial replat of Moore's Addition subdivision submitted by Platting & Right-of-Way

**Attachments:** 39

**\*40.** Consideration of authorizing the County Judge to execute a pipeline easement agreement to BANGL, LLC submitted by Platting & Right-of-Way

**Attachments:** 40

**\*41.** Consideration of authorizing the County Judge to execute a pipeline easement agreement under Highland Bayou Diversion Channel to BANGL, LLC submitted by Platting & Right-of-Way

**Attachments:** 41

---

**\*42.** Consideration of authorizing the County Judge to execute an easement to TxDOT for the SH 146 project submitted by Platting & Right-of-Way

**Attachments:** RCSJ 0389-06-092, Parcel P00071640 Easement- To be Signed
RCSJ 0389-06-092, Parcel P00071640 MOA - To be Signed
RCSJ 0389-06-092, Parcel P00071640 Property Description Final

(NO ACTION TAKEN)

**\*43.** Consideration of approval of a road opening request from Clint Hardy for Nichols Ave., Dickinson and acceptance of the approx. 310 LF into the county road maintenance system submitted by Platting & Right-of-Way

**Attachments:** CC Letter_Nichols Ave

**\*44.** Consideration of approval of application from Kevin and Kelli Roberts for a partial replat of Alta Loma Outlots subdivision submitted by Platting & Right-of-Way

**Attachments:** 44

**\*45.** Consideration of authorization for County Judge to accept additional funding for FY2026 Houston-Galveston Area Council (H-GAC) Congregate Senior Meals & Transportation Grant- Amendment #1, on behalf of Galveston Countys Parks & Cultural Services Department submitted by Grants Administration

**Attachments:** 2026-05-27_FY26 HGAC A1 SR Program_LegistarMemo_MM_revised

**\*46.** Consideration of authorization to submit the FY2027 Texas General Land Office (GLO) Beach Maintenance Reimbursement (BMR) Program grant application on behalf of Galveston County's Road and Bridge Department submitted by Grants Administration

**Attachments:** 46

**\*47.** Receive and file AFFH Certification form for the Texas General Land Office Community Development Block Grant, Regional Mitigation Program - Method of Distribution as approved on May 11, 2026, Item #45 submitted by Grants Administration

**Attachments:** GLO CDBG RMP AFFH CERTIFICATION

**\*** Consideration of approval of the following budget amendments submitted by Professional Services:

**\*48.** 26-123-0608-A
Information Technology- Request transfer within IT - Other Contract Services to Radio Expenditures to fund N70 Radio subscription renewal

**Attachments:** BA 26-123-0608-A

**\*49.** 26-124-0608-B
Sheriff's Office - Request transfer within Sheriff Administration - Training Services to Training Supplies to fund the purchase of ammunition

**Attachments:** BA 26-124-0608-B

**\*50.**  26-125-0608-C

Sheriff's Office - Request Transfer from General Fund - Budgeted Reserves to Identification Division - Extraordinary Supplies to fund purchase of storage containers

**Attachments:** BA 26-125-0608-C

**\*51.**  26-126-0608-D

Adult Probation- Request transfer from General Fund - Budgeted Reserves to Mental Health Court Program - Software Maintenance to fund CSS annual invoice

**Attachments:** BA 26-126-0608-D

**\*52.**  26-127-0608-E

Auditor- Request transfer from General Fund - Budgeted Reserves to IT - Other Contract Services to fund Guidehouse review of the Foundation Data Model

**Attachments:** BA 26-127-0608-E

**\*53.**  26-128-0608-F

District Attorney- Request transfer from General Fund - Budgeted Reserves to District Attorney's - Various Spend Categories to fund personnel adjustments

**Attachments:** BA 26-128-0608-F

**\*54.**  26-129-0608-G

General Government- Request to transfer funds from Capital Project Funds to General Fund and to transfer from the General Fund - Transfers and Reserves and Self Insurance Reserve Fund - General Self Insurance - Liability Premiums to the Self Insurance Reserve Fund - General Self Insurance - Claims Paid Liability to fund settlement payment, and request rescission of BA 26-109-0511A

**Attachments:** BA 26-129-0608-G
                 Project BA 26-129-0608-G

**\*55.**  26-130-0608-H

Sheriff's Office - Request transfer within Criminal Investigation - Furniture and Fixtures to Extraordinary Supplies to fund the purchase of office furniture

**Attachments:** BA 26-130-0608-H

Motion to approve consent agenda items 1-55 with the exception of item(s): #38 and #42. (Agenda Item #38 was amended, and Agenda Item #42 was deferred. Item #38 was voted on separately.)

Passed: 3-0

**Aye:**      County Judge Henry, Commissioner Apffel, Commissioner Dugie

**Nay:**      None

**Absent:**   Commissioner Giusti, Commissioner Armstrong

## ACTION AGENDA

## Purchasing

56.    Consideration to award RFQ 25-082, Galveston County Flood Mitigation Assistance (FMA) Elevation Engineering Services

**Attachments:** Flood Mitigation

Motion to approve by County Judge Henry, seconded by Commissioner Apffel that contract be awarded to Comal Design Group, as recommended.

Passed: 3-0

**Aye:**        County Judge Henry, Commissioner Apffel, Commissioner Dugie
**Nay:**        None
**Absent:**    Commissioner Giusti, Commissioner Armstrong

57.    Consideration to award RFP 26-086, Local Trucking Services

**Attachments:** LOCAL TRUCKING (002)

Motion to approve by County Judge Henry, seconded by Commissioner Apffel that contract be awarded to J R Contreras Trucking, LLC, as recommended.

Passed: 3-0

**Aye:**        County Judge Henry, Commissioner Apffel, Commissioner Dugie
**Nay:**        None
**Absent:**    Commissioner Giusti, Commissioner Armstrong

58.    Consideration of resultant contract from RFP #26-086, Local Trucking Service with J R Contreras Trucking submitted by the Road & Bridge Department

**Attachments:** 58

Motion to approve by County Judge Henry, seconded by Commissioner Dugie that the above action be taken by the Court.

Passed: 3-0

**Aye:**        County Judge Henry, Commissioner Apffel, Commissioner Dugie
**Nay:**        None
**Absent:**    Commissioner Giusti, Commissioner Armstrong

**ADJOURN**

Commissioners Court adjourned at 9:36 A.M. on Monday, June 8, 2026.

# Tab G:

# June 8 Resolution to Reexamine Precinct Boundaries



# COUNTY OF GALVESTON

On this the 8th day of June, 2026, the **Commissioners' Court of Galveston County, Texas** convened in a regularly scheduled meeting with the following members thereof present:

> **Mark Henry, County Judge**
> **Darrell A. Apffel, Commissioner, Precinct No. 1**
> **Joe Giusti, Commissioner, Precinct No. 2**
> **Hank Dugie, Commissioner, Precinct No. 3**
> **Robin Armstrong, MD, Commissioner, Precinct No. 4; and**
> **Dwight D. Sullivan, County Clerk**

when the following proceedings, among others, were had, to-wit:

**Whereas,** the Commissioners Court has the lawful responsibility under Tex. Const. Art. V, § 18 to draw precinct boundaries for each Justice of the Peace, Constable, and County Commissioner; and

**Whereas,** after the publication of the 2020 census, on November 12, 2021, Galveston County redrew County Commissioner precincts; and

**Whereas,** Galveston County never revised its Justice of the Peace and Constable precinct boundaries based on the 2020 census; and

**Whereas,** redistricting litigation has been pervasive in Galveston County and nationwide following the 2020 census; and

**Whereas,** in *Louisiana v. Callais*, No. 24-109, 608 U.S. _____ (2026), the Supreme Court of the United States recently clarified applicable federal redistricting law, and

**Whereas,** partisan election results across Galveston County have continued to evolve since 2021.

**Now, Therefore, Be It Resolved,** that the **Commissioners' Court of Galveston County, Texas** intends to reexamine precinct boundaries for Justices of the Peace, Constables, and County Commissioners on the basis of:

1. Compliance with applicable law; and
2. The 2020 census results; and
3. Improving partisan performance in favor of Republican candidates.

**Upon Motion Duly Made and Seconded**

Attest:

County of Galveston, Texas

By:

_____
Dwight D. Sullivan, County Clerk

Mark A. Henry, County Judge

_____
Darrell A. Apffel, Comm., Pct. #1

Hank Dugie, Comm., Pct. #3

**Absent**
Joe Giusti, Comm., Pct. #2

**Absent**
Robin Armstrong, MD, Comm., Pct. #4

# Tab H:

# May 19 Order for Supplemental Briefing

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | 3:22-CV-57 |
| | § | |
| GALVESTON COUNTY, TEXAS, *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## ORDER FOR SUPPLEMENTAL BRIEFING

Before the court is the Petteway and NAACP/LULAC plaintiffs' motion for entry of judgment on their intentional-discrimination and racial-gerrymandering claims. Dkt. 288. The plaintiffs' intentional-discrimination and racial-gerrymandering claims are ripe for the court to consider on remand from the Fifth Circuit. *Id.* at 5; *see Petteway v. Galveston Cnty.*, 111 F.4th 596, 614, n.13 (5th Cir. 2024) (en banc).

On April 29, 2026, the United States Supreme Court issued its opinion in *Louisiana v. Callais*, in which the Court "update[d] the *Gingles* framework" under § 2 of the Voting Rights Act and held that Louisiana's congressional map was an unconstitutional racial gerrymander. 608 U.S. ---, --- S.Ct. ---, --- L.Ed.2d ---, 2026 WL 1153054, at *4, 15 (2026). A few days later, the NAACP/LULAC plaintiffs notified the court of ways in which they believe *Callais* "is relevant to [their]

pending claim of racial gerrymandering." Dkt. 304 at 1.

Because issues related to those in *Callais* are before the court in *Petteway*, it is hereby ordered that the parties submit supplemental briefing on the following issues:

(1)     How *Callais* applies to the issues in *Petteway* pending before the court;

(2)     Whether *Callais* changes the "appropriate analytical framework to apply to Plaintiffs' constitutional claims," *Petteway*, 111 F.4th at 614, n.13, and if so, what the new analytical framework is; and

(3)     Any other updates to the parties' previously-filed briefing on the plaintiffs' intentional-discrimination and racial-gerrymandering claims, including other new case law, that the parties believe would assist the court in its decision-making.

The court hereby orders the following briefing and hearing schedule:

The plaintiffs' supplemental briefing is due **Tuesday, June 16, 2026**. The defendants' supplemental briefing is due **Tuesday, July 14, 2026**. The plaintiffs' reply supplemental briefing is due **Tuesday, July 21, 2026**.

The court will hear oral argument on the supplemental briefing on **Tuesday, July 28, 2026, at 10:00 a.m.** in the 6th floor courtroom at 601 Rosenberg Ave. in Galveston, TX.

Signed on Galveston Island this 19th day of May, 2026.

_____

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE

# Tab I:

# June 30 Suggestion of Mootness Filing

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| TERRY PETTEWAY, et al. | § | |
|   Plaintiffs, | § | |
|         v. | § | **Civil Action No. 3:22-CV-00057** |
| | § | **(consolidated)** |
| GALVESTON COUNTY, TEXAS, et al. | § | |
|   Defendants. | § | |
| | § | |
| | § | |
| DICKINSON BAY AREA BRANCH | § | |
| NAACP, et al. | § | |
|   Plaintiffs, | § | **Civil Action No. 3:22-CV-00117** |
|         v. | § | |
| GALVESTON COUNTY, TEXAS, et al. | § | |
|   Defendants. | § | |

## DEFENDANTS' SUGGESTION OF MOOTNESS

TO THE HONORABLE JUDGE OF THIS COURT:

Defendants Galveston County, Texas, the Hon. Mark Henry as Galveston County Judge, and Dwight D. Sullivan as Galveston County Clerk (collectively, "Defendants" or "County") file this suggestion of mootness to inform the Court of the County's recent adoption of new County Commissioners, Constables, and Justices of the Peace (JP) precinct boundaries. *See* Exhibit A (June 29, 2026 Order establishing new precinct boundaries). The adoption of new precinct boundaries renders Plaintiffs' remaining claims moot.[1]

---

[1] Plaintiffs are Dickinson Bay Area Branch NAACP, Galveston Branch NAACP, Mainland Branch NAACP, Galveston League of United Latin American Citizens Council 151, Edna Courville, and Joe A. Compian, and Plaintiffs Terry Petteway, Constable Derrick Rose, and the Hon. Penny Pope (collectively, "Plaintiffs").

## BACKGROUND

Plaintiffs challenged the County's 2021 County Court Commissioner's precinct map (2021 Map), asking the Court to enjoin the County from using the 2021 Map. Their requested declaratory and injunctive relief relates solely to the 2021 Map. *See* ECF 42 at 32-34 (Petteway Plaintiffs' Second Amended Complaint); ECF 38 at 38-39 (NAACP Plaintiffs' First Amended Complaint). The Petteway Plaintiffs asked that the Court retain jurisdiction until the Defendants "have complied with all orders and mandates of this Court" and other relief the Court deems proper. *Id*.

Following the Court's preliminary injunction in October 2023 and the Fifth Circuit's stay orders and September 2024 judgment, elections under the 2021 Map were held in November 2024. The County has now enacted a new plan which replaces the 2021 Map and aligns the County's Commissioner, Constable, and JP precinct boundaries; the change was made by the Galveston County Commissioners' Court because it "determined that the interests of the people of the county are best served by changing the existing Commissioners, Constables, and Justices of the Peace Precinct Boundaries." Exhibit A. The vote was unanimous. *Id*. The changed boundaries are not minor—they constitute a significant change to the Commissioners' Court precincts drawn in the 2021 Map:

2



2021 Map & Exhibit A, new precinct boundaries.

**ARGUMENT**

## I. The Plaintiffs' challenges to the 2021 Map are moot.

The Article III case-or-controversy requirement is a fundamental principle of "the judiciary's proper role in our system of government." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quotation omitted). To invoke federal court jurisdiction, plaintiffs "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Continental Bank Corp*., 494 U.S. 472, 477 (1990). Cases become moot when the issues they present are no longer live, or when plaintiffs lack a legally cognizable interest in the outcome. *Cnty of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). Without a case or controversy, federal courts have nothing to decide, rendering any decision they issue an impermissible advisory opinion. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

This Article III requirement persists throughout a case's life, not only when it is first filed. *Thomas v. Bryant*, 938 F.3d 134, 143-44 (5th Cir. 2019). New legislation that alters a challenged law can moot a case, "because courts can no longer enjoin the enforcement of a repealed law that has no effect." *Id*. Cases become moot when there is no "reasonable expectation" the violation will recur, and interim events "completely and irrevocably eradicated the effects of the alleged violation." *Id*. If at any point a case becomes moot, it must be dismissed. *Lewis*, 494 U.S. at 477-78.[2]

---

[2] Cases may become moot at any time, even on appeal. *See Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc) (new bail legislation enacted while case was on appeal so that plaintiffs' as-applied challenge was based on evidence predating new law, and any attack on procedures in place at the time of trial was no longer a present, live controversy); *see also U.S. Dep't of Justice v. Provenzano*, 469 U.S. 14, 15-16 (1984) (per curiam) (case became moot when Freedom of Information Act was amended); *United*

4

Here, the challenged 2021 Map has been replaced, there is no remaining controversy over its application, and no declaratory relief or injunction regarding its impact or enforcement can provide any relief. In these circumstances, a ruling on the repealed 2021 Map would be an impermissible advisory opinion. *See McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004) ("Suits regarding the constitutionality of statutes become moot once the statute is repealed"). Plaintiffs lack grounds to litigate a request for declaratory or injunctive relief for enactment of repealed and replaced boundaries. *See Abbott v. Perez*, 585 U.S. 579, 590-91 (2018) (district court allowed plaintiffs to litigate challenges to replaced districting plan, and erred in holding the amended plans were not shown to be cured of the "taint" of the old plans); *see also Holloway v. City of Va. Beach*, 42 F.4th 266, 270 (4th Cir. 2022) (holding case mooted after challenged at-large districts were repealed and reversing district court's holding that old at-large system violated Section 2 and granting injunctive relief to remedy that violation going forward).

Though Plaintiffs will undoubtedly cast aspersions in response to this suggestion of mootness, they cannot overcome the fact that courts "presume that public officials act in good faith and without invidious bias in formulating policy." *Abbott v. Anti-Defamation League*, 610 S.W.3d 911, 923 (Tex. 2020) (citing *Miller v. Johnson*, 515 U.S. 900, 915 (1995)); *see also Abbott*, 585 U.S. at 603 (2018) (discussing presumption of legislative good faith in redistricting matter); *see also, Jackson v. Tarrant Cnty.*, 158 F.4th 571, 590

---

*Bldg. & Constr. Trades Council v. Mayor and Council of Camden*, 465 U.S. 208, 213-14 (1984) (repeal of municipal residency requirement "moot[ed] appellant's equal protection challenge" to that requirement); *Diffenderfer v. Cent. Baptist Church*, 404 U.S. 412, 414 (1972) (per curiam) (claim for injunctive relief moot when new legislation enacted because relief sought is based on the "law as it now stands").

(5th Cir. 2025). While private parties may easily switch courses, governmental action is of a different character. Where a new law is enacted or ordinance adopted, courts presume that action was made in good faith, that government officials have "properly discharged their official duties," and unless there is a clear intent to revert to prior law, courts presume there is no such intent. *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties").

In *Miller*, the Supreme Court made clear that the "good faith of a state legislature must be presumed" and courts "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Miller*, 515 U.S. at 915. This presumption extends to local government officials. *See Jackson*, 158 F.4th at 589-90; *Kimbrough v. Walling*, 371 S.W.2d 691, 692 (Tex. 1963) ("[t]he law presumes that officers of municipal corporations act within the limits of their authority; that they act in good faith; and that they act in the best interests of the municipality they represent"); *Melton v. Wichita Falls*, 799 S.W.2d 778, 780 (Tex. App.—Fort Worth 1990, no writ) ("[t]he law presumes that city officials act within the limits of their authority, in good faith, and in the best interest of the city they serve"). Therefore, "Texas courts afford state statutes a strong presumption of constitutionality under the Texas Constitution." *Miller v. Raytheon Co.*, 716 F.3d 138, 148 (5th Cir. 2013). This is because courts must presume "the Legislature 'understands and correctly appreciates the needs of its own people'" and therefore directs its laws "to problems made manifest by experience, and that its discriminations are based upon

6

adequate grounds." *Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W.2d 931, 934 (Tex. 1996).

No injury can flow from the repealed 2021 Map, and the Court cannot provide Plaintiffs with the relief they have requested with respect to that map. The case is now moot, and the Court lacks subject matter jurisdiction and must dismiss.[3] Because the new plan has been adopted, this Court no longer has jurisdiction to consider declaratory or injunctive relief relating to implementation of the 2021 Map. *See Davis v. Abbott*, 781 F.3d 207, 215 (5th Cir. 2015).

There is no threat that the 2021 map will be reinstated, such as might exist if the County had implemented an interim plan. Nor is there any theoretical possibility of a future reversion to the 2021 Map. Federal courts do not maintain jurisdiction over cases on the off chance of a potential future action. They certainly do not in the face of government conduct. Rather, courts presume that government enactments are not made with the intent to revert to prior laws. *Fed'n of Adver. Indus. Representatives, Inc. v. City of Chi.*, 326 F.3d 924, 930 (7th Cir. 2003). It is only when legislatures make clear that they intend to revert to prior plans in certain circumstances, such as a court win, that a case or controversy remains. *See Hunt v. Cromartie*, 526 U.S. 541, 545 n.1 (1999) ("[b]ecause the State's 1998 law provides that the State will revert to the 1997 districting plan upon a favorable decision of this Court…this case is not moot"). When it is clear that a change in law is temporary or contingent, a concern over evading review might arise. *See City News & Novelty v. City*

---

[3] a request for fees and costs is "insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990)

7

*of Waukesha*, 531 U.S. 278, 284 n.1 (2001). For example, in *Thomas v. Bryant*, the case was *not* moot where the legislature adopted new district boundaries but explicitly stated that "it will restore the challenged boundaries if it 'prevails'" on appeal. *Thomas*, 938 F.3d at 144. That is not the case here, where the County Commissioners' Court has expressly found that the best interests of the people of Galveston County are served by the new boundaries. *See* Exhibit A. Therefore, under the new map, there is no "capable of repetition, yet evading review" concern. *See Preiser v. Newkirk*, 422 U.S. 395, 403 (1975) (after inmate was transferred to minimum security facility, there was "no reasonable expectation that the wrong will be repeated").

## II.     Standing

Plaintiffs have no standing to challenge the new precinct boundaries.[4]

Article III standing requires the plaintiff to identify a concrete and imminent intrusion upon a legally protected interest, one that is not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In *Daves v. Dallas County*, the Fifth Circuit held that Texas' new bail-reform legislation mooted the plaintiffs' case, which was brought to challenge old Texas procedures. *Daves v. Dallas Cty.*, 64 F.4th 616, 625 (5th Cir. 2023) (en banc). The Court held that ruling on the new law based on evidence generated from pre-amendment procedures "would constitute no more than an advisory opinion." *Id*. The plaintiffs in *Daves* had not been subject to those new procedures, so that "their ability to pursue th[e] litigation for ongoing injunctive relief as injured parties, much

---

[4] Defendants previously briefed that the Plaintiffs lack standing because they only sought relief for a political coalition. ECF 289 at 7-9.

less class representatives" was called into question. *Id*. The case was moot, because there was no longer a live issue to resolve, "or the parties lack a legally cognizable interest in the outcome." *Id*. (quotation omitted).

Because Plaintiffs' challenge is to a now-replaced 2021 Map, the matter is moot, and should be dismissed.

Respectfully Submitted,

PUBLIC INTEREST LEGAL FOUNDATION

Joseph M. Nixon
Federal Bar No. 1319
Tex. Bar No. 15244800
J. Christian Adams
South Carolina Bar No. 7136
Virginia Bar No. 42543
Jewel Lightfoot
Bar No. 24138965
107 S. West St., Ste. 700
Alexandria, VA 22314
jnixon@publicinterestlegal.org
jadams@publicinterestlegal.org
jlightfoot@publicinterestlegal.org
713-550-7535 (phone)
888-815-5641 (facsimile)

GREER, HERZ & ADAMS, L.L.P.

By: /s/ *Angie Olalde*
  Joseph R. Russo, Jr. (Lead Counsel)
  Fed. ID No. 22559
  State Bar No. 24002879
  jrusso@greerherz.com

  Angie Olalde
  Fed. ID No. 690133
  State Bar No. 24049015
  aolalde@greerherz.com

  123 Rosenberg St., Ste. 3000
  Galveston, TX 77550-7947
  (409) 797-3200 (Telephone)
  (866) 422-4406 (Facsimile)

  *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2026, I served the foregoing via email on all counsel of record in this case.

/s/ *Angie Olalde*

9

# Tab J:

# March 2026 Galveston Election Results

| Cumulative Results Report | | | Galveston County | | | Official Results | |
|---|---|---|---|---|---|---|---|

**Galveston County**

**2026 Primary Election**

3/3/2026

Page 1

| Election Night Results | | |
|---|---|---|

**Official Results**

**Registered Voters**
58399 of 0 = 0.00%

**Precincts Reporting**
91 of 91 = 100.00%

Run Time    1:58 PM
Run Date    03/12/2026

## United States Senator - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Anna Bender | | 9 | 1.10% | 318 | 1.41% | 156 | 1.60% | 483 | 1.46% |
| Gulrez "Gus" Khan | | 5 | 0.61% | 114 | 0.50% | 42 | 0.43% | 161 | 0.49% |
| Ken Paxton | | 230 | 28.12% | 9,894 | 43.77% | 4,357 | 44.72% | 14,481 | 43.66% |
| John O. Adefope | | 1 | 0.12% | 52 | 0.23% | 35 | 0.36% | 88 | 0.27% |
| Virgil John Bierschwale | | 1 | 0.12% | 65 | 0.29% | 23 | 0.24% | 89 | 0.27% |
| John Cornyn | | 476 | 58.19% | 8,626 | 38.16% | 3,457 | 35.48% | 12,559 | 37.87% |
| Sara Canady | | 14 | 1.71% | 229 | 1.01% | 126 | 1.29% | 369 | 1.11% |
| Wesley Hunt | | 82 | 10.02% | 3,305 | 14.62% | 1,547 | 15.88% | 4,934 | 14.88% |
| Cast Votes: | | 818 | 100.00% | 22,603 | 100.00% | 9,743 | 100.00% | 33,164 | 100.00% |
| Overvotes: | | 3 | | 0 | | 0 | | 3 | |

## United States Representative, District 14 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Jessica Forgy | | 82 | 10.21% | 2,458 | 11.07% | 1,392 | 14.77% | 3,932 | 12.13% |
| Randy Weber | | 721 | 89.79% | 19,743 | 88.93% | 8,032 | 85.23% | 28,496 | 87.87% |
| Cast Votes: | | 803 | 100.00% | 22,201 | 100.00% | 9,424 | 100.00% | 32,428 | 100.00% |
| Overvotes: | | 1 | | 0 | | 0 | | 1 | |

## Governor - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Stephen Samuelson | | 2 | 0.24% | 229 | 1.02% | 128 | 1.32% | 359 | 1.09% |
| Arturo Espinosa | | 2 | 0.24% | 212 | 0.94% | 103 | 1.06% | 317 | 0.96% |
| Kenneth Hyde | | 5 | 0.60% | 180 | 0.80% | 83 | 0.86% | 268 | 0.81% |
| Greg Abbott | | 749 | 89.49% | 18,642 | 82.76% | 7,886 | 81.34% | 27,277 | 82.51% |
| Nathaniel Welch | | 3 | 0.36% | 179 | 0.79% | 82 | 0.85% | 264 | 0.80% |
| R.F. "Bob" Achgill | | 5 | 0.60% | 111 | 0.49% | 52 | 0.54% | 168 | 0.51% |
| Ronnie Tullos | | 2 | 0.24% | 98 | 0.44% | 56 | 0.58% | 156 | 0.47% |
| Charles Andrew Crouch | | 3 | 0.36% | 169 | 0.75% | 87 | 0.90% | 259 | 0.78% |
| Pete "Doc" Chambers | | 31 | 3.70% | 2,352 | 10.44% | 1,060 | 10.93% | 3,443 | 10.42% |
| Mark V. Goloby | | 5 | 0.60% | 33 | 0.15% | 15 | 0.15% | 53 | 0.16% |
| Evelyn Brooks | | 30 | 3.58% | 321 | 1.43% | 143 | 1.47% | 494 | 1.49% |
| Cast Votes: | | 837 | 100.00% | 22,526 | 100.00% | 9,695 | 100.00% | 33,058 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 2

| | |
|---|---|
| **Cumulative Results Report** | **Official Results** |
| Election Night Results | **Registered Voters** |
| | 58399 of 0 = 0.00% |
| | **Precincts Reporting** |
| | 91 of 91 = 100.00% |
| Run Time          1:58 PM | |
| Run Date          03/12/2026 | |

## Lieutenant Governor - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Perla Muñoz Hopkins | | 30 | 3.60% | 1,038 | 4.67% | 531 | 5.58% | 1,599 | 4.91% |
| Esala Wueschner | | 10 | 1.20% | 198 | 0.89% | 105 | 1.10% | 313 | 0.96% |
| Timothy Mabry | | 65 | 7.80% | 1,919 | 8.63% | 952 | 10.00% | 2,936 | 9.01% |
| Dan Patrick | | 728 | 87.39% | 19,087 | 85.82% | 7,930 | 83.32% | 27,745 | 85.13% |
| | Cast Votes: | 833 | 100.00% | 22,242 | 100.00% | 9,518 | 100.00% | 32,593 | 100.00% |
| | Overvotes: | 1 | | 0 | | 0 | | 1 | |

## Attorney General - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Mayes Middleton | | 547 | 65.82% | 14,144 | 63.11% | 5,337 | 56.00% | 20,028 | 61.11% |
| Chip Roy | | 155 | 18.65% | 3,554 | 15.86% | 2,103 | 22.06% | 5,812 | 17.73% |
| Aaron Reitz | | 60 | 7.22% | 2,860 | 12.76% | 1,026 | 10.76% | 3,946 | 12.04% |
| Joan Huffman | | 69 | 8.30% | 1,854 | 8.27% | 1,065 | 11.17% | 2,988 | 9.12% |
| | Cast Votes: | 831 | 100.00% | 22,412 | 100.00% | 9,531 | 100.00% | 32,774 | 100.00% |
| | Overvotes: | 3 | | 0 | | 0 | | 3 | |

## Comptroller of Public Accounts - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Christi Craddick | | 170 | 20.83% | 2,965 | 13.54% | 1,310 | 14.16% | 4,445 | 13.91% |
| Michael Berlanga | | 21 | 2.57% | 557 | 2.54% | 391 | 4.23% | 969 | 3.03% |
| Don Huffines | | 449 | 55.02% | 14,602 | 66.71% | 5,514 | 59.59% | 20,565 | 64.35% |
| Kelly Hancock | | 176 | 21.57% | 3,766 | 17.20% | 2,038 | 22.03% | 5,980 | 18.71% |
| | Cast Votes: | 816 | 100.00% | 21,890 | 100.00% | 9,253 | 100.00% | 31,959 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Commissioner of the General Land Office - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Dawn Buckingham | | 668 | 100.00% | 19,489 | 100.00% | 8,409 | 100.00% | 28,566 | 100.00% |
| | Cast Votes: | 668 | 100.00% | 19,489 | 100.00% | 8,409 | 100.00% | 28,566 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Commissioner of Agriculture - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Nate Sheets | | 421 | 54.04% | 12,398 | 59.23% | 4,861 | 55.62% | 17,680 | 58.06% |
| Sid Miller | | 358 | 45.96% | 8,534 | 40.77% | 3,879 | 44.38% | 12,771 | 41.94% |
| | Cast Votes: | 779 | 100.00% | 20,932 | 100.00% | 8,740 | 100.00% | 30,451 | 100.00% |
| | Overvotes: | 1 | | 0 | | 0 | | 1 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 3

## Railroad Commissioner - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Katherine Culbert | | 60 | 7.66% | 2,303 | 11.15% | 1,315 | 15.33% | 3,678 | 12.26% |
| Jim Wright | | 260 | 33.21% | 4,947 | 23.96% | 2,349 | 27.39% | 7,556 | 25.18% |
| Hawk Dunlap | | 40 | 5.11% | 1,067 | 5.17% | 575 | 6.70% | 1,682 | 5.60% |
| Bo French | | 331 | 42.27% | 8,844 | 42.83% | 2,482 | 28.94% | 11,657 | 38.84% |
| James (Jim) Matlock | | 92 | 11.75% | 3,489 | 16.90% | 1,856 | 21.64% | 5,437 | 18.12% |
| Cast Votes: | | 783 | 100.00% | 20,650 | 100.00% | 8,577 | 100.00% | 30,010 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Chief Justice, Supreme Court - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Jimmy Blacklock | | 659 | 100.00% | 19,108 | 100.00% | 8,233 | 100.00% | 28,000 | 100.00% |
| Cast Votes: | | 659 | 100.00% | 19,108 | 100.00% | 8,233 | 100.00% | 28,000 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Justice, Supreme Court, Place 2, Unexpired Term - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| James P. Sullivan | | 656 | 100.00% | 19,075 | 100.00% | 8,207 | 100.00% | 27,938 | 100.00% |
| Cast Votes: | | 656 | 100.00% | 19,075 | 100.00% | 8,207 | 100.00% | 27,938 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Justice, Supreme Court, Place 7 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Kyle Hawkins | | 652 | 100.00% | 18,931 | 100.00% | 8,156 | 100.00% | 27,739 | 100.00% |
| Cast Votes: | | 652 | 100.00% | 18,931 | 100.00% | 8,156 | 100.00% | 27,739 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Justice, Supreme Court, Place 8 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Brett Busby | | 652 | 100.00% | 18,894 | 100.00% | 8,126 | 100.00% | 27,672 | 100.00% |
| Cast Votes: | | 652 | 100.00% | 18,894 | 100.00% | 8,126 | 100.00% | 27,672 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

| Cumulative Results Report | Galveston County | Official Results |
|---|---|---|
| | 2026 Primary Election | **Registered Voters** |
| Election Night Results | | 58399 of 0 = 0.00% |
| | | **Precincts Reporting** |
| | | 91 of 91 = 100.00% |
| Run Time 1:58 PM | 3/3/2026 | |
| Run Date 03/12/2026 | Page 4 | |

## Judge, Court of Criminal Appeals, Place 3 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Brent Coffee | | 98 | 13.10% | 2,824 | 14.34% | 1,533 | 18.86% | 4,455 | 15.59% |
| Thomas Smith | | 225 | 30.08% | 5,324 | 27.04% | 2,172 | 26.72% | 7,721 | 27.03% |
| Lesli Fitzpatrick | | 97 | 12.97% | 2,851 | 14.48% | 1,636 | 20.12% | 4,584 | 16.05% |
| Alison Fox | | 328 | 43.85% | 8,691 | 44.14% | 2,789 | 34.31% | 11,808 | 41.33% |
| Cast Votes: | | 748 | 100.00% | 19,690 | 100.00% | 8,130 | 100.00% | 28,568 | 100.00% |
| Overvotes: | | 2 | | 0 | | 0 | | 2 | |

## Judge, Court of Criminal Appeals, Place 4 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Kevin Patrick Yeary | | 648 | 100.00% | 18,566 | 100.00% | 7,900 | 100.00% | 27,114 | 100.00% |
| Cast Votes: | | 648 | 100.00% | 18,566 | 100.00% | 7,900 | 100.00% | 27,114 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Judge, Court of Criminal Appeals, Place 9 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Jennifer Balido | | 246 | 33.38% | 5,861 | 29.65% | 2,560 | 31.35% | 8,667 | 30.23% |
| John Messinger | | 491 | 66.62% | 13,905 | 70.35% | 5,607 | 68.65% | 20,003 | 69.77% |
| Cast Votes: | | 737 | 100.00% | 19,766 | 100.00% | 8,167 | 100.00% | 28,670 | 100.00% |
| Overvotes: | | 13 | | 0 | | 0 | | 13 | |

## Member, State Board of Education, District 7 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Julie Pickren | | 568 | 100.00% | 16,952 | 100.00% | 7,210 | 100.00% | 24,730 | 100.00% |
| Cast Votes: | | 568 | 100.00% | 16,952 | 100.00% | 7,210 | 100.00% | 24,730 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Member, State Board of Education, District 8 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| George Brian Vachris | | 2 | 5.71% | 141 | 23.42% | 78 | 30.59% | 221 | 24.78% |
| Audrey G. Young | | 33 | 94.29% | 461 | 76.58% | 177 | 69.41% | 671 | 75.22% |
| Cast Votes: | | 35 | 100.00% | 602 | 100.00% | 255 | 100.00% | 892 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

2026 Primary Election

3/3/2026
Page 5

## State Senator, District 4 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Charlie Miller | | 0 | 0.00% | 191 | 45.05% | 86 | 47.51% | 277 | 45.56% |
| Brett W. Ligon | | 3 | 100.00% | 233 | 54.95% | 95 | 52.49% | 331 | 54.44% |
| Cast Votes: | | 3 | 100.00% | 424 | 100.00% | 181 | 100.00% | 608 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## State Senator, District 11 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Dennis Paul | | 634 | 100.00% | 18,523 | 100.00% | 7,901 | 100.00% | 27,058 | 100.00% |
| Cast Votes: | | 634 | 100.00% | 18,523 | 100.00% | 7,901 | 100.00% | 27,058 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## State Representative, District 23 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Terri Leo Wilson | | 185 | 78.39% | 5,200 | 69.52% | 2,033 | 64.66% | 7,418 | 68.31% |
| Nathan Watkins | | 51 | 21.61% | 2,280 | 30.48% | 1,111 | 35.34% | 3,442 | 31.69% |
| Cast Votes: | | 236 | 100.00% | 7,480 | 100.00% | 3,144 | 100.00% | 10,860 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## State Representative, District 24 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Greg Bonnen | | 447 | 100.00% | 12,630 | 100.00% | 5,362 | 100.00% | 18,439 | 100.00% |
| Cast Votes: | | 447 | 100.00% | 12,630 | 100.00% | 5,362 | 100.00% | 18,439 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Chief Justice, 15th Court of Appeals District - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Scott Brister | | 625 | 100.00% | 18,509 | 100.00% | 7,886 | 100.00% | 27,020 | 100.00% |
| Cast Votes: | | 625 | 100.00% | 18,509 | 100.00% | 7,886 | 100.00% | 27,020 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Justice, 15th Court of Appeals District, Place 2 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Scott K. Field | | 620 | 100.00% | 18,402 | 100.00% | 7,848 | 100.00% | 26,870 | 100.00% |
| Cast Votes: | | 620 | 100.00% | 18,402 | 100.00% | 7,848 | 100.00% | 26,870 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 6

## Justice, 15th Court of Appeals District, Place 3 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| April Farris | | 622 | 100.00% | 18,308 | 100.00% | 7,799 | 100.00% | 26,729 | 100.00% |
| Cast Votes: | | 622 | 100.00% | 18,308 | 100.00% | 7,799 | 100.00% | 26,729 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Justice, 1st Court of Appeals District, Place 3 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Malcolm E. Whittaker | | 139 | 18.89% | 4,294 | 22.41% | 2,194 | 27.76% | 6,627 | 23.84% |
| Todd Frankfort | | 412 | 55.98% | 8,996 | 46.96% | 2,804 | 35.48% | 12,212 | 43.93% |
| Elizabeth Ling Urrego | | 58 | 7.88% | 1,865 | 9.74% | 929 | 11.75% | 2,852 | 10.26% |
| Zach Gibson | | 127 | 17.26% | 4,002 | 20.89% | 1,977 | 25.01% | 6,106 | 21.97% |
| Cast Votes: | | 736 | 100.00% | 19,157 | 100.00% | 7,904 | 100.00% | 27,797 | 100.00% |
| Overvotes: | | 1 | | 0 | | 0 | | 1 | |

## Justice, 1st Court of Appeals District, Place 4 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| David Gunn | | 621 | 100.00% | 18,246 | 100.00% | 7,770 | 100.00% | 26,637 | 100.00% |
| Cast Votes: | | 621 | 100.00% | 18,246 | 100.00% | 7,770 | 100.00% | 26,637 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Justice, 1st Court of Appeals District, Place 5 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Jessica Caird | | 614 | 100.00% | 18,116 | 100.00% | 7,706 | 100.00% | 26,436 | 100.00% |
| Cast Votes: | | 614 | 100.00% | 18,116 | 100.00% | 7,706 | 100.00% | 26,436 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Chief Justice, 14th Court of Appeals District - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Kevin Jewell | | 612 | 100.00% | 18,103 | 100.00% | 7,713 | 100.00% | 26,428 | 100.00% |
| Cast Votes: | | 612 | 100.00% | 18,103 | 100.00% | 7,713 | 100.00% | 26,428 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Justice, 14th Court of Appeals District, Place 7 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Ken Wise | | 611 | 100.00% | 18,227 | 100.00% | 7,764 | 100.00% | 26,602 | 100.00% |
| Cast Votes: | | 611 | 100.00% | 18,227 | 100.00% | 7,764 | 100.00% | 26,602 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 7

## District Judge, 122nd Judicial District - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Jeth Jones | | 595 | 100.00% | 18,408 | 100.00% | 7,813 | 100.00% | 26,816 | 100.00% |
| Cast Votes: | | 595 | 100.00% | 18,408 | 100.00% | 7,813 | 100.00% | 26,816 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## District Judge, 212th Judicial District - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Patricia Grady | | 602 | 100.00% | 18,415 | 100.00% | 7,763 | 100.00% | 26,780 | 100.00% |
| Cast Votes: | | 602 | 100.00% | 18,415 | 100.00% | 7,763 | 100.00% | 26,780 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## District Judge, 306th Judicial District - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Emily A. Fisher | | 601 | 100.00% | 18,297 | 100.00% | 7,713 | 100.00% | 26,611 | 100.00% |
| Cast Votes: | | 601 | 100.00% | 18,297 | 100.00% | 7,713 | 100.00% | 26,611 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Criminal District Attorney Galveston County - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Jennifer Ott | | 270 | 35.29% | 8,619 | 39.57% | 4,265 | 46.95% | 13,154 | 41.58% |
| Kenneth Cusick | | 495 | 64.71% | 13,165 | 60.43% | 4,820 | 53.05% | 18,480 | 58.42% |
| Cast Votes: | | 765 | 100.00% | 21,784 | 100.00% | 9,085 | 100.00% | 31,634 | 100.00% |
| Overvotes: | | 2 | | 0 | | 0 | | 2 | |

## County Judge - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Chris Kinard | | 166 | 21.81% | 7,067 | 32.57% | 3,658 | 40.63% | 10,891 | 34.62% |
| Mark Henry | | 595 | 78.19% | 14,628 | 67.43% | 5,345 | 59.37% | 20,568 | 65.38% |
| Cast Votes: | | 761 | 100.00% | 21,695 | 100.00% | 9,003 | 100.00% | 31,459 | 100.00% |
| Overvotes: | | 2 | | 0 | | 0 | | 2 | |

## Judge, County Court at Law No. 1 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| John Grady | | 596 | 100.00% | 18,546 | 100.00% | 7,860 | 100.00% | 27,002 | 100.00% |
| Cast Votes: | | 596 | 100.00% | 18,546 | 100.00% | 7,860 | 100.00% | 27,002 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

Election Night Results

2026 Primary Election

| | | |
|---|---|---|
| Run Time | 1:58 PM | |
| Run Date | 03/12/2026 | |

3/3/2026

Page 8

## Judge, County Court at Law No. 2 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Kerri Foley | | 597 | 100.00% | 18,353 | 100.00% | 7,770 | 100.00% | 26,720 | 100.00% |
| | Cast Votes: | 597 | 100.00% | 18,353 | 100.00% | 7,770 | 100.00% | 26,720 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Judge, County Court at Law No. 3 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Jack Ewing | | 598 | 100.00% | 18,418 | 100.00% | 7,773 | 100.00% | 26,789 | 100.00% |
| | Cast Votes: | 598 | 100.00% | 18,418 | 100.00% | 7,773 | 100.00% | 26,789 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Judge, County Probate Court - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Kim Sullivan | | 602 | 100.00% | 18,410 | 100.00% | 7,793 | 100.00% | 26,805 | 100.00% |
| | Cast Votes: | 602 | 100.00% | 18,410 | 100.00% | 7,793 | 100.00% | 26,805 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## District Clerk - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Samantha Morris | | 466 | 62.30% | 11,728 | 55.18% | 4,221 | 47.84% | 16,415 | 53.25% |
| John D. Kinard | | 282 | 37.70% | 9,527 | 44.82% | 4,602 | 52.16% | 14,411 | 46.75% |
| | Cast Votes: | 748 | 100.00% | 21,255 | 100.00% | 8,823 | 100.00% | 30,826 | 100.00% |
| | Overvotes: | 2 | | 0 | | 0 | | 2 | |

## County Clerk - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Dwight Sullivan | | 623 | 100.00% | 18,588 | 100.00% | 7,875 | 100.00% | 27,086 | 100.00% |
| | Cast Votes: | 623 | 100.00% | 18,588 | 100.00% | 7,875 | 100.00% | 27,086 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## County Commissioner, Precinct No. 2 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Joe Giusti | | 144 | 100.00% | 4,960 | 100.00% | 1,901 | 100.00% | 7,005 | 100.00% |
| | Cast Votes: | 144 | 100.00% | 4,960 | 100.00% | 1,901 | 100.00% | 7,005 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 9

Election Night Results

Run Time 1:58 PM
Run Date 03/12/2026

**Registered Voters**
58399 of 0 = 0.00%

**Precincts Reporting**
91 of 91 = 100.00%

## County Commissioner, Precinct No. 4 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Robin Armstrong | | 124 | 100.00% | 4,838 | 100.00% | 2,152 | 100.00% | 7,114 | 100.00% |
| Cast Votes: | | 124 | 100.00% | 4,838 | 100.00% | 2,152 | 100.00% | 7,114 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Justice of the Peace, Precinct No. 1 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Greg Rikard | | 177 | 100.00% | 4,732 | 100.00% | 2,089 | 100.00% | 6,998 | 100.00% |
| Cast Votes: | | 177 | 100.00% | 4,732 | 100.00% | 2,089 | 100.00% | 6,998 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Justice of the Peace, Precinct No. 2 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| D. Blake Apffel | | 212 | 100.00% | 7,166 | 100.00% | 2,842 | 100.00% | 10,220 | 100.00% |
| Cast Votes: | | 212 | 100.00% | 7,166 | 100.00% | 2,842 | 100.00% | 10,220 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## County Chair - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| W. Brad Boney | | 603 | 100.00% | 18,257 | 100.00% | 7,741 | 100.00% | 26,601 | 100.00% |
| Cast Votes: | | 603 | 100.00% | 18,257 | 100.00% | 7,741 | 100.00% | 26,601 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Precinct Chair, Precinct 166 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Kurt Otten | | 5 | 38.46% | 167 | 49.85% | 78 | 50.32% | 250 | 49.70% |
| Alison L. Putman | | 8 | 61.54% | 168 | 50.15% | 77 | 49.68% | 253 | 50.30% |
| Cast Votes: | | 13 | 100.00% | 335 | 100.00% | 155 | 100.00% | 503 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Precinct Chair, Precinct 204 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Danny Kitchens | | 3 | 100.00% | 143 | 80.34% | 65 | 81.25% | 211 | 80.84% |
| Donald G. Floyd | | 0 | 0.00% | 35 | 19.66% | 15 | 18.75% | 50 | 19.16% |
| Cast Votes: | | 3 | 100.00% | 178 | 100.00% | 80 | 100.00% | 261 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 10

## Precinct Chair, Precinct 276 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Sandra Jones Tetley | | 4 | 33.33% | 109 | 40.67% | 36 | 40.45% | 149 | 40.38% |
| Keven Healy | | 8 | 66.67% | 159 | 59.33% | 53 | 59.55% | 220 | 59.62% |
| Cast Votes: | | 12 | 100.00% | 268 | 100.00% | 89 | 100.00% | 369 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Precinct Chair, Precinct 356 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Kathy Rogers | | 14 | 73.68% | 281 | 65.81% | 97 | 58.79% | 392 | 64.16% |
| Santos Venegas | | 5 | 26.32% | 146 | 34.19% | 68 | 41.21% | 219 | 35.84% |
| Cast Votes: | | 19 | 100.00% | 427 | 100.00% | 165 | 100.00% | 611 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Precinct Chair, Precinct 363 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Lanette Lashway | | 9 | 47.37% | 101 | 33.89% | 31 | 27.93% | 141 | 32.94% |
| Jason Long | | 10 | 52.63% | 197 | 66.11% | 80 | 72.07% | 287 | 67.06% |
| Cast Votes: | | 19 | 100.00% | 298 | 100.00% | 111 | 100.00% | 428 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Precinct Chair, Precinct 419 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Jeff Summers | | 0 | 0.00% | 134 | 72.83% | 63 | 57.27% | 197 | 66.55% |
| Nicholas Roque | | 2 | 100.00% | 50 | 27.17% | 47 | 42.73% | 99 | 33.45% |
| Cast Votes: | | 2 | 100.00% | 184 | 100.00% | 110 | 100.00% | 296 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Precinct Chair, Precinct 428 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Brad Bricker | | 10 | 71.43% | 405 | 77.88% | 136 | 80.00% | 551 | 78.27% |
| Melencio Villarreal | | 4 | 28.57% | 115 | 22.12% | 34 | 20.00% | 153 | 21.73% |
| Cast Votes: | | 14 | 100.00% | 520 | 100.00% | 170 | 100.00% | 704 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 11

## Precinct Chair, Precinct 483 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Carol K. Dean | | 3 | 37.50% | 109 | 41.44% | 39 | 30.23% | 151 | 37.75% |
| Bruce Henderson | | 5 | 62.50% | 154 | 58.56% | 90 | 69.77% | 249 | 62.25% |
| Cast Votes: | | 8 | 100.00% | 263 | 100.00% | 129 | 100.00% | 400 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Precinct Chair, Precinct 495 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Dave Smith | | 6 | 46.15% | 76 | 33.63% | 46 | 38.98% | 128 | 35.85% |
| Michael P. Ross | | 7 | 53.85% | 150 | 66.37% | 72 | 61.02% | 229 | 64.15% |
| Cast Votes: | | 13 | 100.00% | 226 | 100.00% | 118 | 100.00% | 357 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Proposition 1 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| YES | | 647 | 80.47% | 19,785 | 88.83% | 8,665 | 90.28% | 29,097 | 89.05% |
| NO | | 157 | 19.53% | 2,489 | 11.17% | 933 | 9.72% | 3,579 | 10.95% |
| Cast Votes: | | 804 | 100.00% | 22,274 | 100.00% | 9,598 | 100.00% | 32,676 | 100.00% |
| Overvotes: | | 2 | | 0 | | 0 | | 2 | |

## Proposition 2 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| YES | | 756 | 91.30% | 21,320 | 94.40% | 9,237 | 94.84% | 31,313 | 94.45% |
| NO | | 72 | 8.70% | 1,264 | 5.60% | 503 | 5.16% | 1,839 | 5.55% |
| Cast Votes: | | 828 | 100.00% | 22,584 | 100.00% | 9,740 | 100.00% | 33,152 | 100.00% |
| Overvotes: | | 2 | | 0 | | 0 | | 2 | |

## Proposition 3 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| YES | | 540 | 65.93% | 16,755 | 74.60% | 6,965 | 71.76% | 24,260 | 73.55% |
| NO | | 279 | 34.07% | 5,705 | 25.40% | 2,741 | 28.24% | 8,725 | 26.45% |
| Cast Votes: | | 819 | 100.00% | 22,460 | 100.00% | 9,706 | 100.00% | 32,985 | 100.00% |
| Overvotes: | | 7 | | 0 | | 0 | | 7 | |

**Galveston County**

Election Night Results

2026 Primary Election

**Registered Voters**

58399 of 0 = 0.00%

**Precincts Reporting**

91 of 91 = 100.00%

| | |
|---|---|
| Run Time | 1:58 PM |
| Run Date | 03/12/2026 |

3/3/2026

Page 12

### Proposition 4 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| YES | | 652 | 79.51% | 18,528 | 83.11% | 8,076 | 83.87% | 27,256 | 83.24% |
| NO | | 168 | 20.49% | 3,765 | 16.89% | 1,553 | 16.13% | 5,486 | 16.76% |
| | Cast Votes: | 820 | 100.00% | 22,293 | 100.00% | 9,629 | 100.00% | 32,742 | 100.00% |
| | Overvotes: | 1 | | 0 | | 0 | | 1 | |

### Proposition 5 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| YES | | 737 | 88.90% | 20,208 | 89.80% | 8,679 | 89.31% | 29,624 | 89.63% |
| NO | | 92 | 11.10% | 2,295 | 10.20% | 1,039 | 10.69% | 3,426 | 10.37% |
| | Cast Votes: | 829 | 100.00% | 22,503 | 100.00% | 9,718 | 100.00% | 33,050 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

### Proposition 6 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| YES | | 699 | 84.42% | 20,440 | 90.81% | 8,927 | 92.04% | 30,066 | 91.01% |
| NO | | 129 | 15.58% | 2,069 | 9.19% | 772 | 7.96% | 2,970 | 8.99% |
| | Cast Votes: | 828 | 100.00% | 22,509 | 100.00% | 9,699 | 100.00% | 33,036 | 100.00% |
| | Overvotes: | 1 | | 0 | | 0 | | 1 | |

### Proposition 7 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| YES | | 742 | 90.71% | 20,415 | 92.54% | 8,726 | 92.81% | 29,883 | 92.57% |
| NO | | 76 | 9.29% | 1,646 | 7.46% | 676 | 7.19% | 2,398 | 7.43% |
| | Cast Votes: | 818 | 100.00% | 22,061 | 100.00% | 9,402 | 100.00% | 32,281 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

### Proposition 8 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| YES | | 748 | 90.45% | 20,996 | 93.48% | 9,030 | 93.06% | 30,774 | 93.28% |
| NO | | 79 | 9.55% | 1,465 | 6.52% | 673 | 6.94% | 2,217 | 6.72% |
| | Cast Votes: | 827 | 100.00% | 22,461 | 100.00% | 9,703 | 100.00% | 32,991 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 13

## Proposition 9 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| YES | | 605 | 73.51% | 17,979 | 81.07% | 7,645 | 80.10% | 26,229 | 80.60% |
| NO | | 218 | 26.49% | 4,197 | 18.93% | 1,899 | 19.90% | 6,314 | 19.40% |
| | Cast Votes: | 823 | 100.00% | 22,176 | 100.00% | 9,544 | 100.00% | 32,543 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Proposition 10 - Republican Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| YES | | 771 | 93.45% | 20,935 | 95.04% | 8,936 | 94.84% | 30,642 | 94.94% |
| NO | | 54 | 6.55% | 1,093 | 4.96% | 486 | 5.16% | 1,633 | 5.06% |
| | Cast Votes: | 825 | 100.00% | 22,028 | 100.00% | 9,422 | 100.00% | 32,275 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## United States Senator - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Ahmad R. Hassan | | 14 | 1.45% | 185 | 1.17% | 123 | 1.61% | 322 | 1.31% |
| Jasmine Crockett | | 510 | 52.85% | 7,705 | 48.53% | 3,672 | 47.97% | 11,887 | 48.53% |
| James Talarico | | 441 | 45.70% | 7,986 | 50.30% | 3,859 | 50.42% | 12,286 | 50.16% |
| | Cast Votes: | 965 | 100.00% | 15,876 | 100.00% | 7,654 | 100.00% | 24,495 | 100.00% |
| | Overvotes: | 2 | | 0 | | 0 | | 2 | |

## United States Representative, District 14 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Thurman Bill Bartie | | 214 | 24.51% | 3,303 | 22.84% | 1,552 | 22.84% | 5,069 | 22.91% |
| Richard H. Davis | | 387 | 44.33% | 6,630 | 45.84% | 3,344 | 49.22% | 10,361 | 46.82% |
| Konstantinos Vogiatzis | | 272 | 31.16% | 4,529 | 31.32% | 1,898 | 27.94% | 6,699 | 30.27% |
| | Cast Votes: | 873 | 100.00% | 14,462 | 100.00% | 6,794 | 100.00% | 22,129 | 100.00% |
| | Overvotes: | 1 | | 0 | | 0 | | 1 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 14

## Governor - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Gina Hinojosa | | 533 | 56.11% | 9,152 | 60.07% | 3,884 | 54.03% | 13,569 | 58.05% |
| Angela "TíaAngie" Villescaz | | 26 | 2.74% | 758 | 4.98% | 546 | 7.59% | 1,330 | 5.69% |
| Carlton W. Hart | | 19 | 2.00% | 346 | 2.27% | 213 | 2.96% | 578 | 2.47% |
| Patricia Abrego | | 33 | 3.47% | 707 | 4.64% | 433 | 6.02% | 1,173 | 5.02% |
| Andrew White | | 66 | 6.95% | 616 | 4.04% | 308 | 4.28% | 990 | 4.24% |
| Jose Navarro Balbuena | | 12 | 1.26% | 242 | 1.59% | 196 | 2.73% | 450 | 1.93% |
| Chris Bell | | 220 | 23.16% | 2,671 | 17.53% | 1,234 | 17.17% | 4,125 | 17.65% |
| Bobby Cole | | 32 | 3.37% | 674 | 4.42% | 323 | 4.49% | 1,029 | 4.40% |
| Zach Vance | | 9 | 0.95% | 69 | 0.45% | 52 | 0.72% | 130 | 0.56% |
| Cast Votes: | | 950 | 100.00% | 15,235 | 100.00% | 7,189 | 100.00% | 23,374 | 100.00% |
| Overvotes: | | 3 | | 0 | | 0 | | 3 | |

## Lieutenant Governor - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Courtney Head | | 182 | 19.61% | 3,435 | 23.33% | 1,942 | 28.17% | 5,559 | 24.66% |
| Vikki Goodwin | | 544 | 58.62% | 8,023 | 54.49% | 3,295 | 47.80% | 11,862 | 52.62% |
| Marcos Isaias Velez | | 202 | 21.77% | 3,265 | 22.18% | 1,656 | 24.02% | 5,123 | 22.72% |
| Cast Votes: | | 928 | 100.00% | 14,723 | 100.00% | 6,893 | 100.00% | 22,544 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Attorney General - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Anthony "Tony" Box | | 144 | 15.05% | 2,665 | 17.82% | 1,649 | 23.77% | 4,458 | 19.51% |
| Nathan Johnson | | 281 | 29.36% | 4,730 | 31.62% | 2,470 | 35.61% | 7,481 | 32.74% |
| Joe Jaworski | | 532 | 55.59% | 7,562 | 50.56% | 2,817 | 40.61% | 10,911 | 47.75% |
| Cast Votes: | | 957 | 100.00% | 14,957 | 100.00% | 6,936 | 100.00% | 22,850 | 100.00% |
| Overvotes: | | 3 | | 0 | | 0 | | 3 | |

## Comptroller of Public Accounts - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Savant Moore | | 201 | 21.99% | 3,372 | 23.49% | 1,542 | 23.18% | 5,115 | 23.33% |
| Sarah Eckhardt | | 582 | 63.68% | 8,605 | 59.94% | 4,031 | 60.59% | 13,218 | 60.29% |
| Michael Lange | | 131 | 14.33% | 2,379 | 16.57% | 1,080 | 16.23% | 3,590 | 16.38% |
| Cast Votes: | | 914 | 100.00% | 14,356 | 100.00% | 6,653 | 100.00% | 21,923 | 100.00% |
| Overvotes: | | 1 | | 0 | | 0 | | 1 | |

**Cumulative Results Report**

Election Night Results

Run Time                1:58 PM
Run Date           03/12/2026

**Galveston County**

2026 Primary Election

3/3/2026

Page 15

**Official Results**

**Registered Voters**
58399 of 0 = 0.00%

**Precincts Reporting**
91 of 91 = 100.00%

### Commissioner of General Land Office - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Jose Loya | | 435 | 48.55% | 6,501 | 45.68% | 3,141 | 47.65% | 10,077 | 46.40% |
| Benjamin Flores | | 461 | 51.45% | 7,730 | 54.32% | 3,451 | 52.35% | 11,642 | 53.60% |
| | Cast Votes: | 896 | 100.00% | 14,231 | 100.00% | 6,592 | 100.00% | 21,719 | 100.00% |
| | Overvotes: | 1 | | 0 | | 0 | | 1 | |

### Commissioner of Agriculture - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Clayton Tucker | | 850 | 100.00% | 13,847 | 100.00% | 6,480 | 100.00% | 21,177 | 100.00% |
| | Cast Votes: | 850 | 100.00% | 13,847 | 100.00% | 6,480 | 100.00% | 21,177 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

### Railroad Commissioner - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Jon Rosenthal | | 844 | 100.00% | 13,650 | 100.00% | 6,387 | 100.00% | 20,881 | 100.00% |
| | Cast Votes: | 844 | 100.00% | 13,650 | 100.00% | 6,387 | 100.00% | 20,881 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

### Chief Justice, Supreme Court - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Cory L. Carlyle | | 208 | 22.83% | 3,081 | 21.24% | 1,496 | 22.16% | 4,785 | 21.58% |
| Maggie Ellis | | 703 | 77.17% | 11,427 | 78.76% | 5,256 | 77.84% | 17,386 | 78.42% |
| | Cast Votes: | 911 | 100.00% | 14,508 | 100.00% | 6,752 | 100.00% | 22,171 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

### Justice, Supreme Court, Place 2, Unexpired Term - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Chari Kelly | | 845 | 100.00% | 13,770 | 100.00% | 6,426 | 100.00% | 21,041 | 100.00% |
| | Cast Votes: | 845 | 100.00% | 13,770 | 100.00% | 6,426 | 100.00% | 21,041 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

### Justice, Supreme Court, Place 7 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Gordon Goodman | | 197 | 21.74% | 3,200 | 22.29% | 1,592 | 23.92% | 4,989 | 22.77% |
| Kristen Hawkins | | 709 | 78.26% | 11,153 | 77.71% | 5,063 | 76.08% | 16,925 | 77.23% |
| | Cast Votes: | 906 | 100.00% | 14,353 | 100.00% | 6,655 | 100.00% | 21,914 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 16

## Justice, Supreme Court, Place 8 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Gisela D. Triana | | 833 | 100.00% | 13,766 | 100.00% | 6,382 | 100.00% | 20,981 | 100.00% |
| Cast Votes: | | 833 | 100.00% | 13,766 | 100.00% | 6,382 | 100.00% | 20,981 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Judge, Court of Criminal Appeals, Place 3 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Okey Anyiam | | 833 | 100.00% | 13,622 | 100.00% | 6,318 | 100.00% | 20,773 | 100.00% |
| Cast Votes: | | 833 | 100.00% | 13,622 | 100.00% | 6,318 | 100.00% | 20,773 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Judge, Court of Criminal Appeals, Place 4 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Audra Riley | | 838 | 100.00% | 13,658 | 100.00% | 6,353 | 100.00% | 20,849 | 100.00% |
| Cast Votes: | | 838 | 100.00% | 13,658 | 100.00% | 6,353 | 100.00% | 20,849 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Judge, Court of Criminal Appeals, Place 9 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Holly Taylor | | 839 | 100.00% | 13,675 | 100.00% | 6,353 | 100.00% | 20,867 | 100.00% |
| Cast Votes: | | 839 | 100.00% | 13,675 | 100.00% | 6,353 | 100.00% | 20,867 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Member, State Board of Education, District 7 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Ben Estrada | | 164 | 20.22% | 2,798 | 20.73% | 1,444 | 23.16% | 4,406 | 21.45% |
| Debra Drake Ambroise | | 161 | 19.85% | 3,531 | 26.17% | 1,515 | 24.29% | 5,207 | 25.35% |
| Janell Burse | | 102 | 12.58% | 1,593 | 11.80% | 857 | 13.74% | 2,552 | 12.42% |
| Tiffany Perkinz | | 297 | 36.62% | 4,493 | 33.29% | 1,887 | 30.26% | 6,677 | 32.50% |
| Adam Khan | | 87 | 10.73% | 1,080 | 8.00% | 533 | 8.55% | 1,700 | 8.28% |
| Cast Votes: | | 811 | 100.00% | 13,495 | 100.00% | 6,236 | 100.00% | 20,542 | 100.00% |
| Overvotes: | | 2 | | 0 | | 0 | | 2 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 17

## Member, State Board of Education, District 8 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Shahzeb Meghani | | 2 | 20.00% | 66 | 24.81% | 33 | 24.63% | 101 | 24.63% |
| Dana Van De Walker | | 8 | 80.00% | 200 | 75.19% | 101 | 75.37% | 309 | 75.37% |
| | Cast Votes: | 10 | 100.00% | 266 | 100.00% | 134 | 100.00% | 410 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## State Senator, District 4 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Ron C. Angeletti | | 3 | 100.00% | 81 | 100.00% | 20 | 100.00% | 104 | 100.00% |
| | Cast Votes: | 3 | 100.00% | 81 | 100.00% | 20 | 100.00% | 104 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## State Senator, District 11 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Cameron A. Rollwitz | | 239 | 27.50% | 3,793 | 27.05% | 2,003 | 30.89% | 6,035 | 28.23% |
| Shannon Dicely | | 630 | 72.50% | 10,231 | 72.95% | 4,482 | 69.11% | 15,343 | 71.77% |
| | Cast Votes: | 869 | 100.00% | 14,024 | 100.00% | 6,485 | 100.00% | 21,378 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## State Representative, District 23 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Cheryl Lynn Clark | | 223 | 59.15% | 4,124 | 65.49% | 2,124 | 71.39% | 6,471 | 67.06% |
| Sean Foley | | 154 | 40.85% | 2,173 | 34.51% | 851 | 28.61% | 3,178 | 32.94% |
| | Cast Votes: | 377 | 100.00% | 6,297 | 100.00% | 2,975 | 100.00% | 9,649 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## State Representative, District 24 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Frank N Carr | | 456 | 100.00% | 7,511 | 100.00% | 3,395 | 100.00% | 11,362 | 100.00% |
| | Cast Votes: | 456 | 100.00% | 7,511 | 100.00% | 3,395 | 100.00% | 11,362 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Chief Justice, 15th Court of Appeals District - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Jerry Zimmerer | | 819 | 100.00% | 13,358 | 100.00% | 6,169 | 100.00% | 20,346 | 100.00% |
| | Cast Votes: | 819 | 100.00% | 13,358 | 100.00% | 6,169 | 100.00% | 20,346 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 18

## Justice, 15th Court of Appeals District, Place 2 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|--------|-------|-----------------|--|--------------|--|---------------------|--|-------|--|
| Tom Baker | | 818 | 100.00% | 13,345 | 100.00% | 6,159 | 100.00% | 20,322 | 100.00% |
| | Cast Votes: | 818 | 100.00% | 13,345 | 100.00% | 6,159 | 100.00% | 20,322 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Justice, 15th Court of Appeals District, Place 3 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|--------|-------|-----------------|--|--------------|--|---------------------|--|-------|--|
| Marc M. Meyer | | 812 | 100.00% | 13,318 | 100.00% | 6,130 | 100.00% | 20,260 | 100.00% |
| | Cast Votes: | 812 | 100.00% | 13,318 | 100.00% | 6,130 | 100.00% | 20,260 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Justice, 1st Court of Appeals District, Place 3 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|--------|-------|-----------------|--|--------------|--|---------------------|--|-------|--|
| Veronica Rivas-Molloy | | 813 | 100.00% | 13,479 | 100.00% | 6,231 | 100.00% | 20,523 | 100.00% |
| | Cast Votes: | 813 | 100.00% | 13,479 | 100.00% | 6,231 | 100.00% | 20,523 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Justice, 1st Court of Appeals District, Place 4 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|--------|-------|-----------------|--|--------------|--|---------------------|--|-------|--|
| Julie Countiss | | 811 | 100.00% | 13,364 | 100.00% | 6,173 | 100.00% | 20,348 | 100.00% |
| | Cast Votes: | 811 | 100.00% | 13,364 | 100.00% | 6,173 | 100.00% | 20,348 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Justice, 1st Court of Appeals District, Place 5 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|--------|-------|-----------------|--|--------------|--|---------------------|--|-------|--|
| Amy Guerra | | 813 | 100.00% | 13,455 | 100.00% | 6,225 | 100.00% | 20,493 | 100.00% |
| | Cast Votes: | 813 | 100.00% | 13,455 | 100.00% | 6,225 | 100.00% | 20,493 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Chief Justice, 14th Court of Appeals District - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|--------|-------|-----------------|--|--------------|--|---------------------|--|-------|--|
| Connie Gonzales | | 345 | 39.70% | 7,077 | 50.65% | 3,504 | 54.41% | 10,926 | 51.34% |
| Sarah Beth Landau | | 524 | 60.30% | 6,895 | 49.35% | 2,936 | 45.59% | 10,355 | 48.66% |
| | Cast Votes: | 869 | 100.00% | 13,972 | 100.00% | 6,440 | 100.00% | 21,281 | 100.00% |
| | Overvotes: | 2 | | 0 | | 0 | | 2 | |

## Galveston County

### 2026 Primary Election

### 3/3/2026

Page 19

**Election Night Results**

| Run Time | 1:58 PM |
|---|---|
| Run Date | 03/12/2026 |

**Registered Voters**
58399 of 0 = 0.00%

**Precincts Reporting**
91 of 91 = 100.00%

## Justice, 14th Court of Appeals District, Place 7 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| William Demond | | 460 | 54.12% | 6,003 | 44.36% | 2,598 | 41.90% | 9,061 | 44.02% |
| Michael Adams-Hurta | | 251 | 29.53% | 4,827 | 35.67% | 2,290 | 36.94% | 7,368 | 35.80% |
| Derek Obialo | | 139 | 16.35% | 2,702 | 19.97% | 1,312 | 21.16% | 4,153 | 20.18% |
| Cast Votes: | | 850 | 100.00% | 13,532 | 100.00% | 6,200 | 100.00% | 20,582 | 100.00% |
| Overvotes: | | 3 | | 0 | | 0 | | 3 | |

## County Judge - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Albert Al Smith | | 788 | 100.00% | 13,394 | 100.00% | 6,209 | 100.00% | 20,391 | 100.00% |
| Cast Votes: | | 788 | 100.00% | 13,394 | 100.00% | 6,209 | 100.00% | 20,391 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Justice of the Peace, Precinct No. 3 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Billy A. Williams, Jr | | 215 | 100.00% | 2,462 | 100.00% | 1,118 | 100.00% | 3,795 | 100.00% |
| Cast Votes: | | 215 | 100.00% | 2,462 | 100.00% | 1,118 | 100.00% | 3,795 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## County Chair - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| CJ Beard | | 374 | 45.01% | 5,099 | 36.49% | 2,212 | 34.11% | 7,685 | 36.10% |
| Tierr'ishia W. Bell | | 457 | 54.99% | 8,874 | 63.51% | 4,272 | 65.89% | 13,603 | 63.90% |
| Cast Votes: | | 831 | 100.00% | 13,973 | 100.00% | 6,484 | 100.00% | 21,288 | 100.00% |
| Overvotes: | | 1 | | 0 | | 0 | | 1 | |

## Proposition 1 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 965 | 97.97% | 15,387 | 98.24% | 7,370 | 97.75% | 23,722 | 98.07% |
| No | | 20 | 2.03% | 276 | 1.76% | 170 | 2.25% | 466 | 1.93% |
| Cast Votes: | | 985 | 100.00% | 15,663 | 100.00% | 7,540 | 100.00% | 24,188 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

2026 Primary Election

3/3/2026

Page 20

## Proposition 2 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 955 | 97.25% | 15,346 | 97.93% | 7,348 | 97.62% | 23,649 | 97.81% |
| No | | 27 | 2.75% | 324 | 2.07% | 179 | 2.38% | 530 | 2.19% |
| | Cast Votes: | 982 | 100.00% | 15,670 | 100.00% | 7,527 | 100.00% | 24,179 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Proposition 3 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 958 | 97.46% | 15,317 | 97.60% | 7,362 | 97.45% | 23,637 | 97.54% |
| No | | 25 | 2.54% | 377 | 2.40% | 193 | 2.55% | 595 | 2.46% |
| | Cast Votes: | 983 | 100.00% | 15,694 | 100.00% | 7,555 | 100.00% | 24,232 | 100.00% |
| | Overvotes: | 2 | | 0 | | 0 | | 2 | |

## Proposition 4 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 954 | 97.85% | 15,278 | 97.86% | 7,315 | 97.51% | 23,547 | 97.75% |
| No | | 21 | 2.15% | 334 | 2.14% | 187 | 2.49% | 542 | 2.25% |
| | Cast Votes: | 975 | 100.00% | 15,612 | 100.00% | 7,502 | 100.00% | 24,089 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

## Proposition 5 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 948 | 97.33% | 14,997 | 96.46% | 7,144 | 95.83% | 23,089 | 96.30% |
| No | | 26 | 2.67% | 551 | 3.54% | 311 | 4.17% | 888 | 3.70% |
| | Cast Votes: | 974 | 100.00% | 15,548 | 100.00% | 7,455 | 100.00% | 23,977 | 100.00% |
| | Overvotes: | 2 | | 0 | | 0 | | 2 | |

## Proposition 6 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 918 | 93.77% | 15,054 | 96.48% | 7,155 | 95.36% | 23,127 | 96.02% |
| No | | 61 | 6.23% | 550 | 3.52% | 348 | 4.64% | 959 | 3.98% |
| | Cast Votes: | 979 | 100.00% | 15,604 | 100.00% | 7,503 | 100.00% | 24,086 | 100.00% |
| | Overvotes: | 0 | | 0 | | 0 | | 0 | |

**Galveston County**

Election Night Results

2026 Primary Election

| Run Time | 1:58 PM |
| Run Date | 03/12/2026 |

3/3/2026

Page 21

## Proposition 7 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 979 | 99.80% | 15,637 | 99.67% | 7,520 | 99.59% | 24,136 | 99.65% |
| No | | 2 | 0.20% | 51 | 0.33% | 31 | 0.41% | 84 | 0.35% |
| Cast Votes: | | 981 | 100.00% | 15,688 | 100.00% | 7,551 | 100.00% | 24,220 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Proposition 8 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 685 | 72.03% | 12,862 | 83.57% | 6,093 | 82.23% | 19,640 | 82.69% |
| No | | 266 | 27.97% | 2,529 | 16.43% | 1,317 | 17.77% | 4,112 | 17.31% |
| Cast Votes: | | 951 | 100.00% | 15,391 | 100.00% | 7,410 | 100.00% | 23,752 | 100.00% |
| Overvotes: | | 1 | | 0 | | 0 | | 1 | |

## Proposition 9 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 950 | 97.34% | 15,071 | 96.73% | 7,217 | 96.29% | 23,238 | 96.62% |
| No | | 26 | 2.66% | 509 | 3.27% | 278 | 3.71% | 813 | 3.38% |
| Cast Votes: | | 976 | 100.00% | 15,580 | 100.00% | 7,495 | 100.00% | 24,051 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Proposition 10 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 929 | 96.07% | 15,070 | 97.18% | 7,166 | 96.86% | 23,165 | 97.03% |
| No | | 38 | 3.93% | 438 | 2.82% | 232 | 3.14% | 708 | 2.97% |
| Cast Votes: | | 967 | 100.00% | 15,508 | 100.00% | 7,398 | 100.00% | 23,873 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

## Proposition 11 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 920 | 94.85% | 14,913 | 96.21% | 7,089 | 95.28% | 22,922 | 95.86% |
| No | | 50 | 5.15% | 588 | 3.79% | 351 | 4.72% | 989 | 4.14% |
| Cast Votes: | | 970 | 100.00% | 15,501 | 100.00% | 7,440 | 100.00% | 23,911 | 100.00% |
| Overvotes: | | 1 | | 0 | | 0 | | 1 | |

**Galveston County**

Election Night Results

**Registered Voters**
58399 of 0 = 0.00%

2026 Primary Election

**Precincts Reporting**
91 of 91 = 100.00%

| | |
|---|---|
| Run Time | 1:58 PM |
| Run Date | 03/12/2026 |

3/3/2026

Page 22

## Proposition 12 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 948 | 97.13% | 15,105 | 97.09% | 7,212 | 96.75% | 23,265 | 96.99% |
| No | | 28 | 2.87% | 453 | 2.91% | 242 | 3.25% | 723 | 3.01% |
| Cast Votes: | | 976 | 100.00% | 15,558 | 100.00% | 7,454 | 100.00% | 23,988 | 100.00% |
| Overvotes: | | 1 | | 0 | | 0 | | 1 | |

## Proposition 13 - Democratic Party

| Choice | Party | Absentee Voting | | Early Voting | | Election Day Voting | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Yes | | 953 | 98.25% | 15,234 | 97.46% | 7,240 | 96.73% | 23,427 | 97.26% |
| No | | 17 | 1.75% | 397 | 2.54% | 245 | 3.27% | 659 | 2.74% |
| Cast Votes: | | 970 | 100.00% | 15,631 | 100.00% | 7,485 | 100.00% | 24,086 | 100.00% |
| Overvotes: | | 0 | | 0 | | 0 | | 0 | |

*** End of report ***

# Tab K:

# November 12, 2021 Commissioners Court Order Establishing New Commissioner Precinct Boundaries

# MINUTES

BE IT REMEMBERED, That on November 12, 2021, Commissioners Court of Galveston County, Texas, met at a special meeting with the following present:

Mark Henry, County Judge

Darrell A. Apffel, Commissioner Precinct 1

Joe Giusti, Commissioner Precinct 2

Stephen D. Holmes, Commissioner Precinct 3

Kenneth Clark, Commissioner Precinct 4 (Absent)

Dwight D. Sullivan, County Clerk by Brandy Chapman, Chief Deputy

## CALL TO ORDER

Call to Order by Judge Henry at 1:30 P.M. at the Calder Annex.

## PUBLIC COMMENT

No public comment.

## CONSENT AGENDA

*1.    Consideration of *approval of cloud-based budget book and capital budgeting services with ClearGov* submitted by the County's Office

*2.    Consideration of *approval of the following budget amendment* submitted by the Auditor's Office:

a.    22-038-1109-A
       **Professional Services -** Request increase to Professional Services Cloud Subscription Services for ClearGov subscription funded by General Fund interest revenue received through the American Rescue Plan Stimulus funding. The interest earned on the ARP funds can be used at the County's discretion.

Motion to approve consent agenda items 1-2a by County Judge Henry, seconded by Commissioner Apffel.

Passed: 4-0

Aye: County Judge Henry, Commissioner Apffel, Commissioner Giusti, Commissioner Holmes

Nay: (None)
Absent: Commissioner Clark

## ACTION AGENDA

3.      County Judge

      a.      Consideration of an order establishing new commissioners precinct boundaries

Public Comments: (See Video for comments)

Tom Watkins addressed the Court.

Corlie Jackson addressed the Court.

Rev. Elias D. Bohnse addressed he Court.

Evelyn McDaniel addressed the Court.

Winifred Gilmore addressed the Court.

Deborah Jones addressed the Court.

Amber Ratisseau addressed the Court.

Lillian McGrew addressed the Court.

Barbara Anders addressed the Court.

Dr. Annette Jenkins addressed the Court.

Norman Pappous addressed the Court.

Hannah Melcer addressed the Court.

Edna Courville addressed the Court.

Pastor Jerry Lee addressed the Court.

Henry Gomez addressed the Court.

Wendy Langham addressed the Court.

Nakisha Paul addressed the Court.

Pastor W.H. King, III addressed the Court.

Judith P. Oppenheim addressed the Court.

Mayor Dedrick Johnson addressed the Court.

Heidi Gordon addressed the Court.

Brandon Wyt addressed the Court.

Lucretia Lofton addressed the Court.

Roxy D. Hall Williamson addressed the Court.

Stephanie Swanson addressed the Court.

Rev. D. H. Buford addressed the Court.

Deborah H. Warren addressed the Court.

Mary Stidham addressed the Court.

Tierrishia B. Gibson addressed the Court.

Leon Phillips addressed the Court.

Keith Henry addressed the Court.

Rev. William Randall addressed the Court.

Rev. Timmy L. Sykes addressed the Court.

Linda Alcorn-Arceneaux addressed the Court.

Sharron Lewis addressed the Court.

Ann Willis addressed the Court.

Motion to approve by County Judge Henry, seconded by Commissioner Apffel Order for Map No. 2.

Passed: 3-1

Aye: County Judge Henry, Commissioner Apffel, Commissioner Giusti
Nay: Commissioner Holmes
Absent: Commissioner Clark

**ADJOURN**

Commissioners Court adjourned at 2:29 P.M. on Friday, November 12, 2021.

# AGENDA ITEM #1.



# GALVESTON COUNTY, TEXAS
# COMMISSIONERS COURT
## Contract Approval Request

| To Be Completed By Department | | |
|---|---|---|
| **1. Date of Request:** 10/27/2021 | **2. Contract Type:** Expense | **3. Renewal Contract:** Yes ✓  No ☐ |
| **4. Department Name:** County Auditor's Office | **5. Department Contact:** Madeline Walker, First Assistant | |
| **6. Description:** ClearGov offers cloud based Budget Book and Capital Budgeting services. | | |
| **7. IFAS PEID No:** | **8. IFAS Req No:** | **9. Orgkey:** 1101151400  **10. Object Code:** 5414300 |
| **11. Vendor:** ClearGov | **12. Vendor Contract No:** CM21338 | |
| **13. Requested Legal Review:** Yes ✓  No ☐   (Explain if No) | | |

### Expenditure Budget / Revenue Projections

| 14. Fund Name | 15. Fund # | 16. Current Year Budgeted | 17. Current Year Projected | 18. Year 2 Projected | 19. Year 3 Projected | 20. Year 4 Projected | 21. Year 5 Projected |
|---|---|---|---|---|---|---|---|
| Cloud Based Subscription Services | 1101-151400-5414300 | | 21,266.67 | | | | |
| | | | | | | | |
| | | | | | | | |
| **22. Totals:** | | | 21,266.67 | | | | |

| To Be Completed By Purchasing Department | | |
|---|---|---|
| **Contract Start Date:** 12/1/2021 | **Auto Renewal Contract:** Yes ☐  No ✓ | **Bid No:** |
| **Contract End Date:** 09/30/2022 | **Contract # Issued By Purchasing:** CM21338 | |

## NOTES

Budget Amendment will be on 11/9 agenda.

| Approved By: | Digital Signature | |
|---|---|---|
| Department Head: | Madeline Walker | Digitally signed by Madeline Walker DN: cn=Madeline Walker, o=Galveston County Auditor's Office, ou, email=Madeline.Walker@co.galveston.tx.us, c=US. Date: 2021.06.21 08:31:44 -05'00' |
| Purchasing Agent: | Rufus Crowder | Digitally signed by Rufus Crowder Date: 2021.10.27 17:06:35 -05'00' |
| Legal: | Veronica Van Horn | Digitally signed by Veronica Van Horn Date: 2021.11.04 14:51:29 -05'00' |
| | | Contract listed in Budget Documentation:   YES ☐  NO ☐ |
| County Budget Office: | Madeline Walker | Digitally signed by Madeline Walker DN: cn=Madeline Walker, o=Galveston County Auditor's Office, ou, email=Madeline.Walker@co.galveston.tx.us, c=US Date: 2021.11.04 14:57:35 -05'00' |
| | | Budget Available and Funds are/will be Available:   YES ✓  NO ☐ |
| County Auditor: | Madeline Walker | Digitally signed by Madeline Walker DN: cn=Madeline Walker, o=Galveston County Auditor's Office, ou, email=Madeline.Walker@co.galveston.tx.us, c=US Date: 2021.11.04 14:57:55 -05'00' |



**CLEARGOV**

2 Mill & Main; Suite 630; Maynard, MA 01754

# Service Order

| | | | | |
|---|---|---|---|---|
| **Created by** | Kristin Fine | | **Order Date** | Oct 27, 2021 |
| **Contact Phone** | 972-948-2999 | | **Order valid if signed by** | **Nov 16, 2021** |
| **Contact Email** | kfine@cleargov.com | | | |

## Customer Information

| | | | | | |
|---|---|---|---|---|---|
| **Customer** | Galveston County, TX | **Contact** | Mark Henry | **Billing Contact** | |
| **Address** | 722 Moody, 4th Floor | **Title** | Galveston County Judge | **Title** | |
| **City, St, Zip** | Galveston, Texas, 77550 | **Email** | Mark.Henry@galvestoncountytx.gov | **Email** | |
| **Phone** | 409-770-5300 | | | **PO # (If any)** | |

## To be clear, you will be billed as follows...

| Billing Date(s) | Amount(s) | Notes |
|---|---|---|
| Dec 1, 2021 | $    21,266.67 | 10 Month Pro-Rata Subscription Fee + Setup Fee |
| Oct 1, 2022 | $    20,960.00 | Annual Subscription Fee |

Additional subscription years and/or renewals will be billed annually in accordance with pricing and terms set forth herein.

## ClearGov will provide your Services according to this schedule...

| Period | Start Date | End Date | Description |
|---|---|---|---|
| Setup | Dec 1, 2021 | Dec 1, 2021 | ClearGov Setup Services |
| Pro-Rata | Dec 1, 2021 | Sep 30, 2022 | ClearGov Subscription Services |
| Initial | Oct 1, 2022 | Sep 30, 2025 | ClearGov Subscription Services |

## The Services you will receive and the Fees for those Services are...

| Set up Services | Tier/Rate | Service Fees |
|---|---|---|
| ClearGov Setup: Includes activation, onboarding and training for ClearGov solutions. | Tier 4 | $    6,000.00 |
| ClearGov Onboarding Discount: Valid only if signed by 11/16/21 | Tier 4 | $    (2,200.00) |
| **Total ClearGov Setup Service Fee - Billed ONE-TIME** | | **$    3,800.00** |

| Subscription Services | Tier | Service Fees |
|---|---|---|
| ClearGov Capital Budgeting - Civic Edition | Tier 4 | $    13,100.00 |
| ClearGov Digital Budget Book - Civic Edition | Tier 4 | $    13,100.00 |
| ClearGov Budget Cycle Management Bundle Discount: Discount for bundled solutions. | Tier 4 | $    (5,240.00) |
| **Total ClearGov Subscription Service Fee - Billed ANNUALLY IN ADVANCE** | | **$    20,960.00** |

| **Billing Terms and Conditions** | | |
|---|---|---|
| **Valid Until** | **Nov 16, 2021** | Pricing set forth herein is valid only if ClearGov Service Order is executed on or before this date. |
| **Payment** | **Net 30** | All invoices are due Net 30 days from the date of invoice. |
| **Rate Increase** | 3% per annum | After the Initial Service Period, the Annual Subscription Service Fee shall automatically increase by this amount. |

## General Terms & Conditions

| **Customer Satisfaction Guarantee** | During the first thirty (30) days of the Service, Customer shall have the option to terminate the Service, by providing written notice. In the event that Customer exercises this customer satisfaction guarantee option, such termination shall become effective immediately and Customer shall be eligible for a full refund of the applicable Service Fees. |
|---|---|
| **Statement of Work** | ClearGov and Customer mutually agree to the ClearGov Service activation and onboarding process set forth in the attached Statement of Work. |
| **Taxes** | The Service Fees and Billing amounts set forth above in this ClearGov Service Order **DO NOT** include applicable taxes. In accordance with the laws of the applicable state, in the event that sales, use or other taxes apply to this transaction, ClearGov shall include such taxes on applicable invoices and Customer is solely responsible for such taxes, unless documentation is provided to ClearGov demonstrating Customer's exemption from such taxes. |

| | |
|---|---|
| **Term & Termination** | Subject to the termination rights and obligations set forth in the ClearGov Service Agreement, this ClearGov Service Order commences upon the Order Date set forth herein and shall continue until the completion of the Service Period(s) for the Service(s) set forth herein. Each Service shall commence upon the Start Date set forth herein and shall continue until the completion of the applicable Service Period. |
| **Auto-Renewal** | After the Initial Period, the Service Period for any ClearGov Annual Subscription Services shall automatically renew for successive annual periods (each an *"Annual Term"*), unless either Party provides written notice of its desire not to renew at least sixty (60) days prior to the end of the then current Annual Term. |
| **Agreement** | This ClearGov Service Order shall become binding upon execution by both Parties. The signature herein affirms your commitment to pay for the Service(s) ordered in accordance with the terms set forth in this ClearGov Service Order and also acknowledges that you have read and agree to the terms and conditions set forth in the ClearGov Service Agreement found at the following URL: http://www. ClearGov.com/terms-and-conditions. This Service Order incorporates by reference the terms of such ClearGov Service Agreement. |

| Customer | | | ClearGov, Inc. | |
|---|---|---|---|---|
| **Signature** | | | **Signature** | |
| **Name** | Mark Henry | | **Name** | Bryan A. Burdick |
| | Galveston County Judge | | **Title** | President |

**Please e-mail signed Service Order to Orders@ClearGov.com or Fax to (774) 759-3045**

# Statement of Work

This Statement of Work outlines the roles and responsibilities by both ClearGov and Customer required for the activation and onboarding of the ClearGov Service. ClearGov will begin this onboarding process upon execution of this Service Order. All onboarding services and communications will be provided through remote methods - email, phone and web conferencing.

### ClearGov Responsibilities

- ClearGov will activate ClearGov Service subscription(s) as of the applicable Start Date(s). ClearGov will create the initial Admin User account, and the Customer Admin User will be responsible for creating additional User accounts.

- ClearGov will assign a Client Success Manager (CSM) responsible for managing the activation and onboarding process. ClearGov CSM will coordinate with other ClearGov resources, as necessary.

- ClearGov CSM will provide a Kickoff Call schedule to Customer's Primary Contact - to be scheduled within two weeks after the Service Order has been executed.

- ClearGov will provide Customer with financial data requirements and instructions, based on the ClearGov Service subscription(s). If necessary, ClearGov will set up a Data Discovery call to assist with such requirements/instructions.

- ClearGov will review financial data files and confirm that data is complete, or request additional information, if necessary. Once complete financial data files have been received, ClearGov will format the data, upload it to the ClearGov platform and complete an initial mapping of the data.

- After initial mapping, ClearGov will schedule a Data Review call with a ClearGov Data Onboarding Consultant (DOC), who will present how the data was mapped, ask for feedback and get answers to open questions. Depending upon Customer feedback and the complexity of data mapping requests, there may be additional follow up calls or emails required to complete the data onboarding process.

- ClearGov will make Customer aware of all training, learning and support options. ClearGov recommends all Users attend training sessions and/or read Support Center articles before using the ClearGov Service to ensure a quick ramp and success. As needed, ClearGov will design and deliver one customized remote training session for Admins and one for End Users - via video conference - and these sessions will be recorded for future reference.

- ClearGov will make commercially reasonable efforts to complete the onboarding process in a timely fashion, provided Customer submits financial data files and responds to review and approval requests by ClearGov in a similarly timely fashion. Any delay by Customer in meeting these deliverable requirements may result in a delayed data onboarding process. Any such delay shall not affect or change the Service Period(s) as set forth in the applicable Service Order.

### Customer Responsibilities

- Customer's Primary Contact will coordinate the necessary personnel to attend Kickoff Call within two weeks after the Service Order has been executed. If Customer needs to change the date/time of the Kickoff Call, the Primary Contact will notify the ClearGov CSM at least one business day in advance.

- Customer will provide requested financial data files (revenue, expense, chart of accounts, etc.) to ClearGov in accordance with the requirements provided by ClearGov.

- Customer's Primary Contact will coordinate the necessary personnel to attend the Data Review call. It is recommended that all stakeholders with input on how data should be mapped should attend. Based on the Data Review call and any subsequent internal review, Customer shall provide a detailed list of requested changes in a timely manner, and Customer will approve the final data mapping, once completed to Customer's satisfaction.

- Customer shall be solely responsible for inputting applicable text narrative, custom graphics, performance metrics, capital requests and personnel data and other such information for budget books, projects, dashboards, etc.

# AGENDA ITEM #2.a.

## COUNTY OF GALVESTON
## REQUEST FOR BUDGET AMENDMENT/TRANSFER

| Department: | Professional Services | 22-038-1109-A |
|---|---|---|
| Date Submitted: | November 4, 2021 | (Assigned by County Auditor's Office) |

**COMMISSIONER'S COURT ACTION:**

Please complete the following form in its entirety and submit to the Budget Office at least eleven (11) days prior to the first regularly scheduled Tuesday Commissioners Court meeting date each month. Emergency amendments will be processed at the earliest available Court meeting date. If information on this form is incomplete, the amendment will be returned to your office for completion. It is suggested that the department requesting the amendment be present on the date of its submittal to the Court for action.

**GENERAL EXPLANATION:**

Request increase to Professional Services Cloud Subscription Services for ClearGov subscription funded by General Fund interest revenue received through the American Rescue Plan Stimulus funding. The interest earned on the ARP funds can be used at the County's discretion.

This budget amendment does not increase the budget for FY 2022

| TRANSFER FROM | | | | *Auditor Use Only* *Account Balance* *Sufficient* *(Y/N)* |
|---|---|---|---|---|
| Fund | Department | Line Item: | Amount | |
| 1101-General Fund | 151400-Professional Services | 4811010-Interest Revenue | 21,266.67 | |
| TOTAL - Transfer From | | | 21,266.67 | |

| TRANSFER TO | | | | *Auditor Use Only* *Account Balance* *Sufficient* *(Y/N)* |
|---|---|---|---|---|
| Fund | Department | Line Item: | Amount | |
| 1101-General Fund | 151400-Professional Services | 5414300-Cloud Subscription Services | 21,266.67 | |
| TOTAL - Transfer To | | | 21,266.67 | |

**ADDITIONAL COMMENTS:**

11/4/2021

| | |
|---|---|
| Budget Office Authorization | Date |

**AUDITOR'S REVIEW**

This budget amendment has been reviewed for validity of accounts and sufficiency of account balances used for budget transfer.

Reviewed by: _____    Date: _____

Auditor's Remarks:

**COMMISSIONERS COURT APPROVAL**

Date Submitted: _____    Date Approved: 11/12/2021

# AGENDA ITEM #3.a.

## GALVESTON COUNTY COMMISSIONERS COURT ORDER ESTABLISHING NEW COMMISSIONER PRECINCT BOUNDARIES

On this the 12th day of November 2021, the Commissioners Court of Galveston County, Texas convened a regularly scheduled meeting with the following members thereof present

    Mark A. Henry, County Judge
    Darrell Apffel, County Commissioner, Precinct No. 1
    Joe Giusti, County Commissioner, Precinct No. 2
    Stephen D. Holmes, County Commissioner, Precinct No. 3
    Ken Clark, County Commissioner, Precinct No. 4

When the following proceedings were had, to wit:

> An Order approving a redistricting plan for Galveston County Commissioners Court Precincts (Districts)

**WHEREAS,** pursuant to the Constitution and Laws of the State of Texas, and other laws, the Galveston County Commissioners Court desires to divide the Commissioner Precinct Boundaries; and,

**WHEREAS,** the Galveston County Commissioners Court has determined that the interests of the people of the county are best served by changing the existing Commissioner Precinct Boundaries, and,

**NOW, THEREFORE, BE IT ORDERED BY THE COMMISSIONERS COURT OF GALVESTON COUNTY, TEXAS,** that Commissioners Precincts are hereby composed as depicted on the attached map, affixed hereto as "Exhibit A," labeled "Map 2" and fully adopted and incorporated in this Order. It is further ordered by the Court that this Redistricting Order shall take effect immediately.

Upon the Motion of __HENRY__ and **Seconded by** __APFFEL__ the above Redistricting Plan passed with __3__ votes in favor thereof and __1__ votes against.

Passed and approved this __12__ day of November, 2021

**County of Galveston**

Mark Henry, County Judge

Dwight Sullivan
County Clerk

By: _Brandy Chapman_ Deputy
Brandy Chapman

# Galveston Texas Map 2

**Map 2**

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |

0    3.75    7.5    15    22.5    30
Miles

Sources: Esri, HERE, Garmin, USGS, Intermap, INCREMENT P, NRCan, Esri Japan, METI, Esri China (Hong Kong), Esri Korea, Esri (Thailand), NGCC, (c) OpenStreetMap contributors, and the GIS User Community

# Tab L:

# August 19, 2013 Commissioners Court Redistricting Order Establishing Justice of the Peace Precinct Boundaries

## MINUTES

BE IT REMEMBERED, That on August 19, 2013, Commissioners Court of Galveston County, Texas, met at a special meeting with the following present:

Mark Henry, County Judge

Ryan Dennard, Commissioner Precinct 1

Kevin D. O'Brien, Commissioner Precinct 2

Stephen D. Holmes, Commissioner Precinct 3

Kenneth D. Clark, Commissioner Precinct 4

Dwight D. Sullivan, County Clerk by Brandy Chapman, Chief Deputy

## CALL TO ORDER

Call to order by Judge Henry at 10:30 A.M. at the Galveston County Courthouse.

## MOTION TO TESTIFY UNDER OATH

Motion by Commissioner Dennard, seconded by Commissioner Clark that those addressing the court shall testify under oath.

Passed: 5-0

Aye: County Judge Henry, Commissioner Dennard, Commissioner O'Brien, Commissioner Holmes, Commissioner Clark
Nay: (None)

## ACTION AGENDA

1.      County Judge

a.    Consideration of adopting new Justice of the Peace Precinct Maps.

Robert Morgan addressed the Court.

Richard Batie addressed the Court.

Mac McDonald addressed the Court.

Anne Willis addressed the Court.

Lloyd Criss addressed the Court.

Judge Penny Pope addressed the Court.

Constable William Comeaux addressed the Court.

Henry Gomez addressed the Court.

Motion to approve by County Judge Henry, seconded by Commissioner Dennard that the above action be taken by the Court.

Passed: 4-1

Aye: County Judge Henry, Commissioner Dennard, Commissioner O'Brien, Commissioner Clark
Nay: Commissioner Holmes

**ADJOURN**

Commissioners Court adjourned at 12:36 P.M. on Monday, August 19, 2013.

# AGENDA ITEM #1.a.

# Proposed Justice of the Peace Precincts



# Proposed Justice of the Peace Precinct 1



# Proposed Justice of the Peace Precinct 2 - Island



# Proposed Justice of the Peace Precinct 2 - Mainland



# Proposed Justice of the Peace Precinct 3 - Island



# Proposed Justice of the Peace Precinct 3 - Mainland



# Proposed Justice of the Peace Precinct 4



# GALVESTON COUNTY COMMISSIONERS COURT
## REDISTRICTING ORDER
## ESTABLISHING JUSTICE OF THE PEACE PRECINCT BOUNDARIES

**WHEREAS**, pursuant to the Constitution and Laws of the State of Texas. and other laws. the Galveston County Commissioners Court desires to reduce and divide the Justice of the Peace Precinct Boundaries; and.

**WHEREAS**. Galveston County currently has eight Justice of the Peace Precincts. served by nine Justices of the Peace. and eight Constables; and.

**WHEREAS**, Galveston County Commissioners Court has conducted a thorough review and analysis of its Justice of the Peace court system. including as follows:

In 2011, Galveston County held five public hearings about Justice of the Peace redistricting in different parts of the County. and multiple hearings at Commissioners Court. and every current member of Commissioners Court attended a majority of those hearings;

In 2011, Galveston County collected and reviewed case load and other operational data regarding its Justice of the Peace courts from the Texas Office of Court Administration;

In 2013, Galveston County again collected and reviewed case load and other operational data about its Justice of the Peace courts from the Texas Office of Court Administration;

In 2013, Galveston County held two workshop hearings on Justice of the Peace courts' structure, staff, and budgeting;

In 2013, one or more members of Commissioners Court met individually with every Galveston County Justice of the Peace, and met with some Justices of the Peace multiple times, and discussed structure, staffing and general operations of each individual Justice of the Peace court; and

Members of Commissioners Court met with the County's Justice Administration Department, which coordinates various administrative functions for the county's Justice of the Peace courts, including reports to the Office of Court Administration, and discussed the operation of the Justice Courts; and,

**WHEREAS**, the Galveston County Commissioners has determined based upon a review of the Annual

Statistical Report for the Texas Judiciary for Fiscal Year 2012 published by the Texas Office of Court Administration and the Galveston County budget proposals for fiscal year 2014 that the caseload of the current Justice of the Peace Precincts is as follows:

Justice of the Peace Precinct 1 constitutes 8.13% of the average total caseload of Justice of the Peace Courts for Galveston County;

Justice of the Peace Precinct 2 constitutes 2.10% of the average total caseload of Justice of the Peace Courts for Galveston County;

Justice of the Peace Precinct 3 constitutes 7.60% of the average total caseload of Justice of the Peace Courts for Galveston County;

Justice of the Peace Precinct 4 constitutes 17.71% of the average of the total caseload of Justice of the Peace Courts for Galveston County;

Justice of the Peace Precinct 5 constitutes 16.15% of the average total caseload of Justice of the Peace Courts for Galveston County;

Justice of the Peace Precinct 6 constitutes 7.18% of the average total caseload of Justice of the Peace Courts for Galveston County;

Justice of the Peace Precinct 7 constitutes 19.31% of the average total caseload of Justice of the Peace Courts for Galveston County; and

Justice of the Peace Precinct 8, Place 1 constitutes 20.04% of the average total caseload of Justice of the Peace Courts for Galveston County; and

Justice of the Peace Precinct 8, Place 2 constitutes 1.73% of the average total caseload of Justice of the Peace Courts for Galveston County; and,

**WHEREAS**, the Galveston County Commissioners Court has determined that the interests of the people of the county are best served by administering the county's justice court system through fewer Justice of the Peace Precincts, which will significantly reduce the cost of operating that court system and free up resources for use on other pressing matters such as law enforcement and infrastructure, and will also enable Galveston County to more easily establish consistent processes among its justice courts and thereby improve the quality of service to the public; and,

**WHEREAS**, the Galveston County Commissioners Court has determined that the interests of the people of the county are best served by balancing the caseload of Justices of the Peace by reducing the number

of Justice of the Peace Precincts to four and establishing new Justice of the Peace Precinct boundaries: and.

**NOW, THEREFORE, BE IT ORDERED BY THE COMMISSIONERS COURT OF GALVESTON COUNTY, TEXAS**. that the following offices are hereby abolished:

Justice of the Peace Precinct 4.

Justice of the Peace Precinct 5.

Justice of the Peace Precinct 6.

Justice of the Peace Precinct 7,

Justice of the Peace Precinct 8. Place 2.

Precinct 4 Constable.

Precinct 5 Constable.

Precinct 6 Constable.

Precinct 7 Constable; and

pursuant to article V, section 18(c) of the Texas Constitution, a justice of the peace or constable elected to a four-year term in one the above abolished offices is entitled to serve out his or her term of office in the newly created precinct in which he or she resides when this Redistricting Order takes effect; and

**IT IS FURTHER ORDERED BY THIS COURT** that Justice of the Peace Precinct 8, Place 1 is hereby designated as Justice of the Peace Precinct 4 and Constable Precinct 8 is designated Constable Precinct 4; and

**IT IS FURTHER ORDERED BY THIS COURT** that the remaining Justice of the Peace Precincts are hereby composed as follows:

**Justice of the Peace Precinct 1** shall contain all of Voting Precincts 142,144, 146, 148, 150, 151, 152, 159, 165, 166, 167, 170, 172, 193, 197, 343, 347, 394 and 490, as well as portions of the following Voting Precincts:

Voting Precinct 168: That portion of the Voting Precinct contained in Moses Lake as well as that portion of Galveston Bay west of a line running from the east side of the Moses Lake Tide Gate to April Fool Point in the City of San Leon;

**Justice of the Peace Precinct 2** shall contain all of Voting Precincts 218, 220, 221, 224, 226,

227, 228, 258, 274, 275, 276, 277, 278, 279, 281, 283, 315, and 482 as well as the portions of the following Voting Precincts:

Voting Precinct 105. That portion east of 4th Street and 4th Street extended to the center of the Galveston Channel, and also east of the center of the Galveston Channel.

Voting Precinct 306: That portion not contained in Justice of the Peace Precinct 3

Voting Precinct 223: That portion not contained in Justice of the Peace Precinct 3

Voting Precinct 225: That portion not contained in Justice of the Peace Precinct 3

Voting Precinct 232: That portion not contained in Justice of the Peace Precinct 3

Voting Precinct 231: That portion not contained in Justice of the Peace Precinct 3

Voting Precinct 280: That portion not contained in Justice of the Peace Precinct 3

Voting Precinct 308: That portion not contained in Justice of the Peace Precinct 3

Voting Precinct 338: That portion not contained in Justice of the Peace Precinct 3

Voting Precinct 301: That portion not contained in Justice of the Peace Precinct 3;

**Justice of the Peace Precinct 3** shall contain all of Voting Precincts 103, 104, 169, 219, 309, 311, 312, 314, 316, 329, 330, 334, 336, and 345 as well as portions of the following Voting Precincts:

Voting Precinct 306: That portion north of Harborside Drive (Water Street) and west of 4th street, excluding the block bounded by Harborside Drive (Water Street), 21st Street, Wharf Road and 20th Street

Voting Precinct 308: That portion both north of Avenue O and west of 14th Street

Voting Precinct 223: That portion north of the frontage road on the south side of Interstate 45 and including all portions of Interstate 45

Voting Precinct 225: That portion north of the frontage road on the south side of Interstate 45 and including all portions on Interstate 45

Voting Precinct 232: That portion north of the frontage road on the south side of Interstate 45 and including all portions of Interstate 45; as well as that area bounded as follows: beginning at the intersection of Interstate 45 and Bayou Rd running south for 1130 yard along Bayou Rd, thence west for approximately 532 yards to Highland Bayou, thence generally eastward along the south boundary of the Precinct until its intersection with the railroad spur of the AT&SF railroad running generally northeastern into Texas City, thence north easterly along the AT&SF railroad spur to the point at which it crosses Interstate 45, thence generally northwesterly along Interstate 45 to the point of beginning.

Also that portion between the northern and southern frontage roads running parallel to Interstate 45 between Lake Road and the western boundary of the Voting Precinct near Vauthier Road

Voting Precinct 331: That portion of the Precinct north of the southern frontage road running parallel to Interstate 45

Voting Precinct 338: That portion of the Precinct south of the northern frontage road running parallel to Interstate 45, and also that portion of the Precinct both east of N Amburn Road and south of Monticello Drive

Voting Precinct 280: That portion of the Voting Precinct north of the south frontage road running parallel to Interstate 45 between the eastern boundary of the Voting Precinct and the intersection of Interstate 45 with the Galveston County Water Canal

Voting Precinct 301: That portion of the Voting Precinct south of the northern frontage road running parallel to Interstate 45 between the eastern boundary of the precinct near Mall of Mainland Parkway and the intersection of Interstate 45 and the Galveston County Water Canal

Precinct 146: That portion east and northeast of the seawall running along Galveston Bay from just south of the Texas City Dike north to the Moses Lake Tide Gate, and also including the Texas City Dike extending into Galveston Bay

Voting Precinct 168: That portion not contained in Justice of the Peace Precinct 1

Voting Precinct 105: That portion not contained in Justice of the Peace Precinct 2;

**Justice of the Peace Precinct 4** shall contain all of Voting Precincts 192, 220, 263, 281, 283, 301, 338, 340, 389, 391, 398, 399, 401, 439, 453, 487, 454, 455, 456, 457, 460, 461, 462, 464, 471, 482 and 488;

as depicted in the attached map, affixed hereto as "Exhibit A" and fully adopted and incorporated in this Order. Additionally, if there is any difference between the forgoing Voting Precincts included in each of the listed Justice of the Peace Precincts and the legal description of those Voting Precincts, the legal description is hereby altered only to the extent necessary to ensure that the statistics, populations and persons included in the Justice of the Peace Precincts are the same as reported in the attached map "Exhibit A."

**IT IS FURTHER ORDERED BY THIS COURT** that this Justice of the Peace Redistricting Order

shall take effect the 8th day of November 2013.

DULY ADOPTED BY VOTE OF THE COMMISSIONERS COURT OF GALVESTON COUNTY, TEXAS, THIS 19TH DAY OF AUGUST A.D. 2013 **COMMISSIONER HOLMES "OPPOSED."**
**MOTION PASSED FOUR TO ONE.**

Attest:

_____
Dwight D. Sullivan, County Clerk
By: _____ Deputy
    Brandy Chapman

_____
Ryan L. Dennard, Comm., Pct. #1

_____
Kevin D. O'Brien, Comm., Pct. #2

County of Galveston

By:

_____
Mark A. Henry, County Judge

_____OPPOSED_____
Stephen D. Holmes. Comm., Pct. #3

_____
Kenneth Clark, Comm., Pct. #4

# EXHIBIT A

# Proposed Justice of the Peace Precincts



# Proposed Justice of the Peace Precinct 1



# Proposed Justice of the Peace Precinct 3 - Mainland



# Proposed Justice of the Peace Precinct 3 - Island



# Proposed Justice of the Peace Precinct 2 - Mainland



# Proposed Justice of the Peace Precinct 2 - Island



# Proposed Justice of the Peace Precinct 4

